# Exhibit K

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| **KAREN L. STRAUSS, et al.,** | | |
| | Petitioners, | S168047 |
| v. | | |
| **MARK D. HORTON, State Registrar of Vital Statistics, etc., et al.,** | | |
| | Respondents, | |
| **DENNIS HOLLINGSWORTH, et al.,** | | |
| | Intervenors. | |

## ANSWER BRIEF IN RESPONSE TO PETITION
## FOR EXTRAORDINARY RELIEF

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Deputy Attorney General

MANUEL M. MEDERIOS
State Solicitor General

DAVID S. CHANEY
Chief Assistant Attorney General

CHRISTOPHER E. KRUEGER
Senior Assistant Attorney General

KIMBERLY J. GRAHAM
Deputy Attorney General

MARK R. BECKINGTON
Deputy Attorney General
State Bar No. 126009
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (213) 897-1096
  Fax:  (213) 897-1071
  Mark.Beckington@doj.ca.gov
Attorneys for Respondent
Edmund G. Brown Jr., in his official
capacity

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

KAREN L. STRAUSS, et al.,

                                  Petitioners,              S168047

        v.

MARK D. HORTON, State Registrar of Vital
Statistics, etc., et al.,

                                Respondents,

DENNIS HOLLINGSWORTH, et al.,

                                Intervenors.

## ANSWER BRIEF IN RESPONSE TO PETITION
## FOR EXTRAORDINARY RELIEF

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Deputy Attorney General

MANUEL M. MEDERIOS
State Solicitor General

DAVID S. CHANEY
Chief Assistant Attorney General

CHRISTOPHER E. KRUEGER
Senior Assistant Attorney General

KIMBERLY J. GRAHAM
Deputy Attorney General

MARK R. BECKINGTON
Deputy Attorney General
State Bar No. 126009
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (213) 897-1096
  Fax: (213) 897-1071
  Mark.Beckington@doj.ca.gov
Attorneys for Respondent
Edmund G. Brown Jr., in his official
capacity

# IN THE SUPREME COURT OF CALIFORNIA

Case Name: *KAREN L, STRAUSS et al., Petitioners, v.*   Supreme Court   S168047
*MARK B. HORTON, as State Registrar of*   Case No.:
*Vital Statistics, etc., et al., Respondents;*
*DENNIS HOLLINGSWORTH et al.,*
*Intervenors.*

## CERTIFICATE OF INTERESTED PARTIES OR ENTITIES OR PERSONS
(Cal. Rules of Court, Rule 8.208)

*(Check One)*   **INITIAL CERTIFICATE**   [x]   **SUPPLEMENTAL CERTIFICATE**   [ ]

Please check the applicable box:

[x]   There are no interested entities or persons to list in this Certificate per California Rules of Court, rule 8.208(d).

[ ]   Interested entities or persons are listed below:

| Full Name of Interested Entity or Party | Party | Non-Party (Check One) | Nature of Interest (Explain) |
|---|---|---|---|
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |
| | [ ] | [ ] | |

The undersigned certifies that the above listed persons or entities (corporations, partnerships, firms or any other association, but not including government entities or their agencies), have either (i) an ownership interest of 10 percent or more in the party if an entity; or (ii) a financial or other interest in the outcome of the proceeding that the justices should consider in determining whether to disqualify themselves, as defined in rule 8.208(d)(2).

Attorney Submitting Form                                         Party Represented

Kimberly Graham                                         Attorneys for Respondents
Deputy Attorney General
State Bar No. 204210
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 322-6114
Fax: (916) 324-8835
E-mail: Kimberly.Graham@doj.ca.gov

_____                    December 19, 2008
(Signature of Attorney Submitting Form)                    (Date)

Tyler Interested Parties.wpd

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION                                                        1

II.  STATEMENT                                                          6

    A.   Procedural History                                            6

    B.   Summary Of The Process For Amending And
        Revision The California Constitution.                          9

    C.   The California Constitution As A Guarantee Of
        Individual Rights                                             16

III. ARGUMENT                                                          22

    A.   Question One: Is Proposition 8 Invalid Because It
        Constitutes A Revision Of, Rather Than An
        Amendment To, The California Constitution?                    22

        1.   The Scope Of Proposition 8 Should Be
            Interpreted Consistently With Its Stated Purpose
            Of Eliminating State-licensed Marriages For
            Same-Sex Couples.                                        22

        2.   Under This Court's Prior Precedents, Whether
            Proposition 8 Constitutes A Qualitative Revision
            Depends On Whether The Denial Of Marriage
            To Same-Sex Couples Can Be Characterized As
            A Change In The Fundamental Structure Or
            Foundational Powers Of California Government,
            Including The Powers Of This Court To
            Construe The California Constitution.                    28

        3.   Whether Petitioners' Theory, If Accepted,
            Would Expand The Definition Of A
            Constitutional Revision Beyond This Court's
            Existing Jurisprudence And The Possible Effect

i

**TABLE OF CONTENTS** (continued)

Page

On Existing Constitutional Provisions Enacted
By Initiative Amendments.                                          38

    a.   Whether Proposition 8 Should Be
        Considered A Revision Because It Takes
        Away Fundamental Constitutional Rights
        From A Minority Defined By A Suspect
        Classification.                                           39

    b.   Whether Proposition 8 Should Be
        Considered A Revision Because It Prevents
        The Judiciary From Protecting
        Constitutional Rights.                                    46

   4.   The Effect Of Petitioners' Proposed Test For
       Revision On The Initiative Process And On
       Existing Constitutional Provisions Enacted By
       Initiative.                                               50

B.  Issue Two: Does Proposition 8 Violate The
    Separation Of Powers Doctrine Under The California
    Constitution?                                                 53

   1.   The Separation Of Powers Doctrine Would Not
       Appear To Present An Independent Basis On
       Which To Declare Proposition 8 A Revision Of
       The State Constitution                                    53

C.  Issue Three: If Proposition 8 Is Not Unconstitutional,
    What Is The Effect, If Any, On The Marriages Of
    Same-sex Couples Performed Before The Adoption
    Of Proposition 8?                                             60

**TABLE OF CONTENTS** (continued)

Page

1. Legislation Is Presumed To Operate
   Prospectively Absent Express Language Or A
   Clear And Unequivocal Implication That It
   Applies Retroactively.                                      61

2. The Measure's Plain Language And Ballot
   Materials Demonstrate That Proposition 8
   Operates Prospectively And May Not Be
   Applied Retroactively.                                      65

3. Added Factors Establish That Proposition 8
   Should Be Declared To Have No Retroactive
   Effect On Marriages Entered Into Before The
   November Election.                                          71

D. Proposition 8 Should Be Invalidated Even If It Is
   Deemed To Amend The Constitution Because It
   Abrogates Fundamental Rights Protected By Article I
   Without A Compelling Interest.                              75

   1. Article I, Section 1, Enjoys A Privileged Status
      In The Plan Of The Constitutional Conventions
      As The Essential Safeguard Of Individual
      Freedom.                                                 78

   2. The Framers Did Not Give The Legislature The
      Power To Put A Group's Right To Enjoy Liberty
      To A Popular Vote.                                       84

   3. The Court Can Harmonize The Constitutional
      Guarantees Under Article I With The Initiative-
      Amendment Power By Evaluating Whether A
      Proposed Amendment Abrogating Fundamental
      Rights Serves A Compelling Interest;
      Proposition 8 Does Not Satisfy This Test.                87

**TABLE OF CONTENTS**  (continued)

Page

IV.    CONCLUSION                                                91

# TABLE OF AUTHORITIES

Page

**Cases**

*Aetna Casualty & Surety Co. v. Industrial Accident Com.*
    (1947) 30 Cal.2d 388      61

*Aktar v. Anderson*
    (1997) 58 Cal.App.4th 1166      62

*Alford v. Pierno*
    (1972) 27 Cal.App.3d 682      69

*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*
    (1978) 22 Cal.3d 208      *passim*

*Barron v. Baltimore*
    (1833) 32 U.S. (7 Pet.) 243      17, 82

*Bautista v. Jones*
    (1944) 25 Cal.2d 746      84

*Billings v. Hall*
    (1857) 7 Cal. 1      89

*Bixby v.* Pierno
    (1971) 4 Cal.3d 130      53

*Bowen v. Georgetown University Hospital*
    (1988) 488 U.S. 204      62

*Bowens v. Superior Court*
    (1991) 1 Cal.4th 36      42, 56

*Brosnahan v. Brown*
    (1982) 32 Cal.3d 236      31, 32, 33, 40, 49

*Brown v. Merlo*
(1973) 8 Cal.3d 855 ................................................... 23

*Budd v. People*
(1892) 143 U.S. 517 ................................................... 81

*Californians for Disability Rights v. Mervyn's LLC*
(2006) 39 Cal.4th 223 ................................................... 66

*Carmel Valley Fire Protection Dist. v. State of California*
(2001) 25 Cal.4th 287 ................................................... 54, 58

*Carter v. California Dept. of Veterans Affairs*
(2006) 38 Cal.4th 914 ................................................... 65

*Chicago, Burlington & Quincy Railroad v. Chicago*
(1897) 166 U.S. 226 ................................................... 17

*Citizens' Savings & Loan Assn. v. City of Topeka*
(1874) 87 U.S. 655 ................................................... 86, 89

*City and County of San Francisco v. County of San Mateo*
(1995) 10 Cal.4th 554 ................................................... 87

*City of Cleburne, Tex. v. Cleburne Living Center*
(1985) 473 U.S. 432 ................................................... 83

*District of Columbia v. Heller*
(2008) 128 S.Ct. 2783 ................................................... 17

*Evangelatos v. Superior Court*
(1988) 44 Cal.3d 1188 ................................................... 61,63,, 64, 69, 70

*Ex parte Beck*
(1912) 162 Cal. 701 ................................................... 85

*Ex parte Drexel*
(1905) 147 Cal. 763 ................................................... 84

*Ex parte Newman*
    (1858) 9 Cal. 502 .......................................................... 80, 88

*Ex parte Quarg*
    (1906) 149 Cal. 79 ........................................................ 80, 84

*Ex parte Wall*
    (1874) 48 Cal. 279 ............................................................. 85

*Ex parte Whitwell*
    (1893) 98 Cal. 73 .............................................................. 88

*Flournoy v. State of California*
    (1964) 230 Cal.App.2d 520 ............................................... 72

*Glavinich v. Commonwealth Land Title Ins. Co.*
    (1984) 163 Cal.App.3d 263 ............................................... 61

*Goodridge v. Department of Public Health*
    (Mass. 2003) 798 N.E.2d 941 ................................ 44, 45, 60

*Griswold v. Connecticut*
    (1965) 381 U.S. 749 ......................................................... 83

*Hawkins v. Superior Court*
    (1978) 22 Cal.3d 584 ........................................ 41, 42, 43, 56

*Hill v. National Collegiate Athletic Assn.*
    (1994) 7 Cal.4th 1, 28-29 ................................................. 77

*Hodges v. Superior Court*
    (1999) 21 Cal.4th 109 ...................................................... 23

*Hustedt v. Workers' Comp. Appeals Bd.*
    (1981) 30 Cal.3d 329 ................................................... 57, 58

*In re Adoption of Doe*
    (Fla. Circ. Ct. Nov. 25, 2008) 2008 WL 5006172 .......... 76

*In re Lance W.*
    (1985) 37 Cal.3d 873                      21, 33, 40, 41

*In re Marriage Cases*
    (2008) 43 Cal.4th 757                      *passim*

*In re Marriage of Bouquet*
    (1976) 16 Cal.3d 583                      69, 72

*In re Marriage of Buol*
    (1985) 39 Cal.3d 751                      72

*In re Marriage of Fabian*
    (1986) 40 Cal.3d 440                      72, 73

*In re Rosenkrantz*
    (2002) 29 Cal.4th 616                      57

*Independent Energy Producers Assn. v. McPherson*
    (2006) 38 Cal.4th 1020                    44

*Ingram v. Colgan*
    (1894) 106 Cal. 113                       87

*Landgraf v. USI Film Products*
    (1994) 511 U.S. 244                       62

*Legislature v. Eu*
    (1991) 54 Cal.3d 492                      *passim*

*Lockyer v. City and County of San Francisco*
    (2004) 33 Cal.4th 1055                    74

*Lozano v. City of Hazleton*
    (M.D. Pa. 2007) 496 F.Supp.2d 477          77

*Mandel v. Myers*
    (1981) 29 Cal.3d 531                      57, 60

*McCann v. Jordan*
    (1933) 218 Cal. 577                                              74

*McClung v. Employment Development Dept.*
    (2004) 34 Cal.4th 467                                          65

*McFadden v. Jordan*
    (1948) 32 Cal.2d 330                                  29, 33, 50

*Meachum v. Fano*
    (1976) 427 U.S. 215                                          81

*Meyer v. Nebraska*
    (1923) 262 U.S. 390                                          83

*Miranda v. Arizona*
    (1966) 384 U.S. 436                                          33

*Mulkey v. Reitman*
    (1966) 64 Cal.2d 529                                      18, 49

*Myers v. Philip Morris Companies, Inc.*
    (2002) 28 Cal.4th 828                                    63, 66, 71

*Naim v. Naim*
    (Va. 1955) 87 S.E.2d 749, 753                            76

*People v. Anderson*
    (1972) 6 Cal.3d 628                                      *passim*

*People v. Brisendine*
    (1975) 13 Cal.3d 528                                      20, 21

*People v. Bunn*
    (2002) 27 Cal.4th 1                                        54, 57

*People v. Disbrow*
    (1976) 16 Cal.3d 101                                      33

*People v. Frierson*
 (1979) 25 Cal.3d 142           *passim*

*People v. May*
 (1988) 44 Cal.3d 309           33

*Perez v. Sharp*
 (1948) 32 Cal.2d 711, 731-732      18, 76, 83,

*Professional Engineers in California Government v. Kempton*
 (2007) 40 Cal.4th 1016          37

*Raven and Revision*
 (1991) 25 U.C. Davis L. Rev. 1)        21

*Raven v. Deukmejian*
 (1990) 52 Cal.3d 336           *passim*

*Reitman v. Mulkey*
 (1967) 387 U.S. 369           18, 49

*Richmond F. & P. R. Co. v. City of Richmond*
 (Va. 1926) 133 S.E. 800          81

*Rippon v. Bowen*
 (2008) 160 Cal.App.4th 1308        37

*Rosasco v. Commission on Judicial Performance*
 (2000) 82 Cal.App.4th 315         63

*Schulman v. Attorney General*
 (Mass. 2006) 850 N.E.2d 505        60

*Sei Fujii v. State*
 (1952) 38 Cal.2d 718, 720          18

*Serrano v. Priest*
 (1976) 18 Cal.3d 728           52

*Silicon Valley Taxpayers Assn. v. Santa Clara County Open Space Auth.*
    (2008) 44 Cal.4th 431                  22

*Strong v. State Bd. of Equalization*
    (2007) 155 Cal.App.4th 1182          23

*Superior Court v. County of Mendocino*
    (1996) 13 Cal.4th 45                 56

*Tinsley v. Superior Court*
    (1983) 150 Cal.App.3d 90            52

*United States v. Security Industrial Bank*
    (1982) 459 U.S. 70                   63

*West Virginia State Bd. of Educ. v. Barnette*
    (1943) 319 U.S. 624                 79

## Constitutional Provisions

Cal. Const. of 1849, art. X, § 1                11
Cal. Const. of 1849, art. X, § 2                11
Cal. Const., art. I, § 1              17, 20, 76, 78
Cal. Const., art. I, § 13                  41
Cal. Const., art. I, § 24                20, 87
Cal. Const., art. I, § 27                21,40
Cal. Const., art. I, § 28, subd. (c)          77
Cal. Const., art. I, § 31                53
Cal. Const., art. II, § 1                 88
Cal. Const., art. II, § 8, subd. (b)         30
Cal. Const., art. II, § 8, subd. (d)         30
Cal. Const., art. III, § 3                54
Cal. Const., art. IV, § 1              14, 86
Cal. Const., art. V, § 13               75
Cal. Const., art. XVI, § 8(b)            52
Cal. Const., art. XVIII, § 1     9, 10, 11, 12, 84
Cal. Const., art. XVIII, § 2               9
Cal. Const., art. XVIII, § 3              10
Cal. Const., art. XVIII, § 4           9, 10
Cal. Const., art. XI, § 1, subd. (a)        23

Cal. Const., former art. IV, § 1                                                        14
Cal. Const., former art. XVIII, §.1                                                     11
Former Cal. Const., art I, § 17                                                         19

**Statutes**

Family Code
    § 297                                                          27
    § 300                                                          7, 74
    § 350                                                          23
    § 308.5                                                        90

Government Code
    §68108                                                         58

Health & Safety. Code
    § 102175                                                       23
    § 102100                                                       23
    § 102180                                                       23
    § 102200                                                       23
    § 102285                                                       23

**Other Authorities**

7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 623, pp. 1017-
1018                                                                                    74


8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, p. 582, § 1002
                                                                                        52


Falk, *The Supreme Court of California 1971-1972, Forward, The State Constitution: A
More Than "Adequate" Nonfederal Ground* (1973) 61 Cal L. Rev. 273, 273-274
                                                                                        17

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**KAREN L. STRAUSS, et al.,**

Petitioners,                    S168047

v.

**MARK D. HORTON, State Registrar of Vital Statistics, etc., et al.,**

Respondents,

**DENNIS HOLLINGSWORTH, et al.,**

Intervenors.

# I.

## INTRODUCTION

The writ petitions present an issue of critical significance: whether the voters may, by initiative, amend the California Constitution when doing so takes away a fundamental right from a class of people who are members of a group defined by a suspect classification.[1]  Although this

---

1.  The Attorney General is filing identical briefs in response to the petitions in *Strauss v. Horton*, No. S168047 ("Strauss"), *Tyler v. State of California*, No. S168066 ("Tyler"), and *City and County of San Francisco v. Horton*, No. S168078 ("CCSF").  In the Tyler action, his response is also filed on behalf of the State of California as a named respondent.

issue is presented in the context of the right to marry, it could have arisen in

the context of other rights and minority groups.

Petitioners allege that Proposition 8, which declares that

"only marriage between a man and a woman is valid or recognized in

California," constitutes an illegal revision of the Constitution rather than an

amendment. The Constitution provides two alternative processes for

proposing an amendment: either proposal by petition through the initiative

process, or proposal by the Legislature. By contrast, a revision of the

Constitution may not be proposed through the initiative process. A

revision must be proposed either by the Legislature followed by approval

by the electorate or by a constitutional convention. An amendment or

revision may be adopted by a majority vote of the electors. Petitioners

contend that Proposition 8 proposes the kind of change in the Constitution

that cannot be effected through the initiative process.

This litigation presents a conflict between the constitutional

power of the voters to amend the Constitution, on the one hand, and the

Constitution's Declaration of Rights, on the other. Our Constitution

provides that all political power is inherent in the people, who have the

right to amend the Constitution through the initiative process. At the same

time, the Constitution guarantees that enjoyment of certain fundamental

rights will not be denied without a compelling governmental justification. This Court has a long and honorable record of safeguarding both the legal rights of minorities and the people's right to direct democracy.

The text of our Constitution does not define "revision" or "amendment." Past judicial decisions attempting to distinguish the two kinds of changes have drawn a line that is not always clear in its application. This Court has held that a change constitutes an amendment unless the text of the challenged provision indicates that it alters the basic governmental framework of the state. These holdings suggest that a focus on the allocation of governmental powers is key to determining if a change constitutes a revision. This Court has also stated that, since constitutions are intended to be statements of lasting legal principles, changes should be considered amendments only if they are improvements or elaborations upon existing principles.

Petitioners argue that Proposition 8 must be deemed a revision because, as this Court held in *In re Marriage Cases* (2008) 43 Cal.4th 757, same-sex couples possess the same fundamental right to marry as do opposite-sex couples and restricting gay men and lesbians from marrying violates the equal protection rights of a group defined by a suspect classification. Petitioners argue that enjoyment of fundamental

3

rights and equal protection of the law are core constitutional principles and that this Court has a unique constitutional responsibility to protect the rights of politically vulnerable minorities against action by the majority. By depriving a suspect class of a fundamental right recognized by this Court, Proposition 8, in petitioners' view, revises the state Constitution by altering its underlying principles and changing the state's basic governmental plan.

The counter-majoritarian function of our Constitution cannot be denied, but neither can the fact that, with this Court's approval, the voters have previously employed the initiative process effectively to reverse the effect of constitutional decisions by this Court. The rulings that have been undone by the voter-approved amendments include decisions rendered in the criminal law context addressing fundamental constitutional issues, such as equal protection, due process, the ban on cruel or unusual punishment and the protection against unlawful searches and seizures. Other, significant civil-law changes to the Constitution, such as the property tax limitations of Proposition 13 and term limits for state officials, have also been deemed amendments rather than revisions, despite their significant effects on state government.

4

Petitioners' precise claim, that a constitutional change that affects the exercise of a fundamental right by a group defined by a suspect classification is a revision, constitutes a matter of first impression under California law. Although this argument pushes past the boundaries of this Court's existing precedents on what constitutes an amendment, petitioners have nevertheless identified significant concerns about the use of the initiative in these circumstances.

Respondent Attorney General believes that petitioners have failed to demonstrate that Proposition 8 is a revision. But the Attorney General also believes that the initiative-amendment process does not encompass a power to abrogate fundamental constitutional rights without a compelling justification. He believes that Proposition 8, lacks such a justification as determined by the Supreme Court in the *In re Marriage Cases* and therefore deprives persons of basic liberty guaranteed by section 1, article I of the California Constitution.

Respondent further believes that, even if the Court concludes that Proposition 8 is a permissible amendment to the Constitution, the measure should nevertheless apply prospectively only. Respondent believes that the marriages of the same-sex couples entered into after the effective date of *In re Marriage Cases* and before Proposition 8 became

5

effective on November 5, 2008 remain valid. To conclude otherwise would violate the normal presumption against retroactivity and harm the vested rights of the couples.

## II.

## STATEMENT

### A.  Procedural History

On May 15, 2008, this Court rendered its decision in *In re Marriage Cases, supra,* 43 Cal.4th 757. The majority opinion included the following holdings:

- The California Constitution guarantees the basic civil right to marry to all individuals and couples, regardless of their sexual orientation. (*Id.* at pp. 810-820.)

- Sexual orientation is a suspect classification for the purposes of analysis under the Constitution's equal protection clause, and statutes that treat persons differently based on their sexual orientation are thus subject to a strict scrutiny analysis. (*Id.* at pp. 840-844.)

- Strict scrutiny review is required because the marriage statutes necessarily impinged on a same-sex couple's

6

fundamental, constitutionally-protected privacy

interest, thereby creating unequal and detrimental

consequences for same-sex couples and their children.

(*Id.* at pp. 844-848.)

- The marriage statutes limiting marriage to only

    opposite-sex couples did not serve a compelling state

    interest, and thus violated the equal protection clause.

    (*Id.* at pp. 848-856.)

Consistent with these holdings, the Court ordered that the

definition of marriage contained in Family Code section 300, limiting

marriage to only a union "between a man and woman," be stricken as

unconstitutional, and that Family Code section 308.5, which provided that

"[o]nly marriage between a man and a woman is valid or recognized in

California," be invalidated in its entirety. (*Id.* at p. 857.)

*In re Marriage Cases* became final on June 16, 2008. In the

five months following the decision, many thousands of same-sex couples

were married in this state.

On June 2, 2008, the Secretary of State certified that the

supporters of a measure, later numbered as Proposition 8, had gathered

sufficient signatures to qualify their measure for the November 4, 2008

7

General Election ballot. (Secretary of State Debra Bowen, Press Release, June 2, 2008, Respondent's Request for Judicial Notice ("RJN") Exh. 1, at p. 1.)

Based on the semi-official results of the November 4, 2008 General Election, it appeared that Proposition 8 had received a majority of the votes cast and, therefore, would take effect the day after the election. (Cal. Const., art. XVIII, § 4.) On December 13, 2008, the Secretary of State certified that Proposition 8 passed by a vote of 7,001,084 (52.3 percent) in favor to 6,401,482 (47.7 percent) against. (Secretary of State Debra Bowen, Press Release, Dec. 13, 2008, RJN Exh. 2 at p. 1; Statement of Vote, Nov. 4, 2008 General Election, RJN Exh. 3 at p. 7.)

Immediately following the passage of Proposition 8, three petitions seeking this Court's original jurisdiction were filed challenging the legality of the measure. Two of the petitions also sought a stay of the effects of the proposition on the issuance of marriage licenses to same-sex couples.

On November 19, 2008, after receiving preliminary responses to the petitions, this Court issued an order to show cause why the relief sought by the petitions should not be granted and sought briefing by the parties on the following three issues:

8

1.    Is Proposition 8 invalid because it constitutes a

revision of, rather than an amendment to, the

California Constitution?

2.    Does Proposition 8 violate the separation of powers

doctrine under the California Constitution?

3.    If Proposition 8 is not unconstitutional, what is its

effect, if any, on the marriages of same-sex couples

performed before the adoption of Proposition 8?

In addition, this Court denied the request of the petitioners in

the Strauss and Tyler actions to stay the effects of Proposition 8.

**B.    Summary Of The Process For Amending
And Revision The California Constitution.**

There are two procedures for revising the Constitution and

two for amending it.

<u>Revision:</u>  The Legislature may, by a vote of two-thirds

majority of both houses, propose a revision of the Constitution to the

voters.  (Cal. Const., art. XVIII, § 1.)  The voters may then approve the

revision by a majority vote.  (Cal. Const., art. XVIII, § 4.)  Alternatively,

the Legislature may, by a vote of two-thirds majority of both houses,

submit to the voters the question whether to call a constitutional

convention.  (Cal. Const., art. XVIII, § 2.)  If the convention is called and

the delegates adopt a proposed revision, it is then submitted to the voters

for approval by majority vote.  (Cal. Const., art. XVIII, § 4.)

Amendment.  The amendment process may be initiated either

by signature-gathering on a private petition for an initiative or by a

legislative proposal.  The voters may amend the Constitution by initiative.

(Cal. Const., art. XVIII, § 3.)  To qualify a constitutional amendment

through signature-gathering, a proponent must gather signatures equivalent

to eight percent of the voters who voted in the last election for governor.

(Cal. Const., art.II, § 8, subd. (b).)  The Legislature may also propose

constitutional amendments for adoption by a two-thirds vote of both

houses—the same vote requirement needed for revisions.  (Cal. Const., art.

XVIII, § 1.)  In either situation, the amendment will require approval of a

majority of voters in order to take effect.  (Cal. Const., art. XVIII, § 4.)

The current procedures for revising and amending the

Constitution have remained unchanged since 1970, but they changed

extensively before that time.

California's first Constitution, adopted in 1849, provided for

amendments and revisions in narrow circumstances, but it contained no

process for citizen-sponsored amendments.  Article X, section 1 of the

1849 Constitution allowed the Legislature to propose a constitutional

10

amendment only upon a majority vote of both houses in two successive

legislative sessions. (Cal. Const. of 1849, art. X, § 1.) If such votes were

obtained, it was the "duty of the Legislature . . . to submit such proposed

amendment or amendments to the people, in such manner, and at such time

as the Legislature shall prescribe." (*Ibid.*)

The 1849 Constitution also permitted revisions. Article X,

section 2 provided that if two-thirds of both houses of the Legislature

believed it was "necessary to revise and change [the] entire Constitution,"

the Legislature was required to present to the voters at the next election the

opportunity to "vote for or against [a] convention." (Cal. Const. of 1849,

art. X, § 2.) If a majority of the voters favored the calling of a

constitutional convention, then the Legislature was required to assemble

the convention within six months. (*Ibid.*)

The Legislature passed a bill in February 1878 calling for

delegates to attend a constitutional convention. (Grodin, The California

State Constitution: A Reference Guide (1993) p. 10.) After several months

of debate, a revised constitution was approved in May 1879. (*Id.* at p. 16.)

The section of the 1849 Constitution that addressed amendment and

revision was moved from article X to article XVIII of the new Constitution,

and added the following provision: If one or more amendments were to be

11

submitted in the same election, the Legislature was required to prepare and distinguish, "by numbers or otherwise," so that each could be voted upon separately. (Cal. Const., former art. XVIII, § 1.) Further, the revised Constitution provided for a single two-thirds approval of an amendment by both houses of the Legislature, eliminating the requirement for approval in a subsequent legislative session. (*Ibid.*) As with the 1849 Constitution, if a majority of the voters approved and ratified the amendment, then such amendment or amendments would become part of the Constitution. (*Ibid.*)

While the California Constitution was revised in 1879, many believed that the revisions failed to address the problems that were facing the state. (Grodin, *supra*, at p. 16.) Resentment against the power of the railroads continued to grow, which caused the public to call for more reforms to the governmental structure. (Grodin, *supra*, at p. 17; see also The Cal. Constitution Revision Commission, *Constitution Revision: History and Perspective* (1996) at p. 5.) A new political force developed in the state (as well as the nation) and became known as the Progressive Movement. (*Ibid.*) The goal of the Progressive Movement was to return all political power to the people. (Grodin, *supra*, at p. 17.) The Progressives advocated for the passage of legislation that would permit

12

"direct democracy" – the powers of initiative, referendum and recall. (*Ibid*; see also Cal. Constitution Revision Commission, *supra*, at pp. 5-6.)

In 1910, California elected Hiram Johnson as Governor; Johnson was one of the leaders of the Progressive Movement in California. (*Constitution Revision, supra*, at p. 5.) In his inaugural address, Governor Johnson promised Californians he would give "people the means by which they may accomplish such other reforms as they desire," and stated his belief that the powers of initiative, referendum, and recall would "give to the electorate the power of action when desired, and they do place in the hands of the people the means by which they may protect themselves." (See Inaugural Address of Hiram Johnson, presented January 3, 1911, RJN Exh. 4 at p. 3.)

By February 1911, the Legislature drafted an amendment to article IV, section 1 of the California Constitution, adding the powers of initiative, referendum and recall and submitted it to the voters for approval. (Cal. Constitution Revision Commission, *supra*, at pp. 5-6; Ballot Pamp., Gen. Elec. (Oct. 11, 19911) analysis of SCA 22, RJN Exh. 5.) Seventy-six percent of voters approved Senate Amendment 22 at a special election held on October 10, 1911. (*Id.* at p. 6.)

13

As originally approved in 1911, the initiative power had two aspects, referred to as the powers of "direct initiative" and "indirect initiative." To qualify a "direct initiative" for the ballot "proposing a law or amendment to the Constitution," the proponents would need to submit a petition for the Secretary of State bearing signatures equal in number to eight percent of all votes cast for all candidates for governor at the last preceding general election. (Cal. Const., former art. IV, § 1.) The Secretary of State was required to place a qualifying initiative on the ballot at the next election. (*Ibid.*)

An "indirect initiative" required the signatures of only five percent of the voters. (*Ibid.*) This vehicle could be used to propose a statutory change, but the initiative initially would be presented to the Legislature rather than to the voters. (*Ibid.*) The law proposed by the initiative could be "either enacted or rejected without change by the legislature" within 40 days. (*Ibid.*) If the Legislature failed to act within this period, the initiative would be submitted to the voters. (*Ibid.*) An additional provision allowed the Legislature to reject the citizen-sponsored initiative and propose its own initiative to the voters, which would appear on the ballot beside the citizen-sponsored initiative. (*Ibid.*)

14

The Legislature's power to revise the Constitution was expanded in 1962. Proposition 7 amended section 1 of article XVIII of the Constitution to authorize the Legislature to propose revisions directly to the people by a two-thirds vote of both houses – the same vote requirement already in place for amendments proposed by the Legislature. The Legislative Counsel's ballot analysis summarized the initiative's impact:

> Under existing provisions the Legislature can only propose "amendments," that is measures which propose changes specific and limited in nature. "Revisions," i.e., proposals which involve broad changes in all or a substantial part of the Constitution, can presently be proposed only by convening a constitutional convention.

(Ballot Pamp., Gen. Elec. (Nov. 6, 1962), analysis of Proposition 7 by Legislative Counsel, RJN Exh. 6, at p. 13.)

In 1966, Proposition 1-A reduced the number of signatures needed to qualify an initiative statute from eight percent to five percent of the votes cast at the last election for Governor. (Ballot Pamp., Gen. Elec. (Nov. 8, 1966, analysis of Proposition 1-a by Legislative Counsel, RJN Exh. 7, at p. 1.) The proposition, which was part of a wide-ranging revision of the Constitution prompted by the California Constitution Revision Commission, also eliminated the process for submission of "indirect initiatives" to the Legislature. (*Ibid.*)

15

The final change in the procedures for enacting revisions and amendments was enacted by Proposition 16 in 1970. This initiative added new provisions allowing the Legislature to amend or withdraw a constitutional amendment or revision prior to a vote of the electorate, changing the requirements for calling a constitutional convention and selecting convention delegates, and adding a provision that, if two competing measures were adopted by voters at the same election, the measure receiving the highest number of "yes" votes would prevail. (Ballot Pamp., Gen. Elec. (Nov. 3, 1970, analysis of Proposition 16 by Legislative Counsel, RJN Exh. 8 at pp. 27-28.)

### C.    The California Constitution As A Guarantee Of Individual Rights

California's original Constitution contained a Declaration of Rights which provided, in relevant part: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property; and pursuing and obtaining safety and happiness." (Cal. Const. 1849, art. I, § 1.)

Our current Constitution, ratified in 1879, contains essentially the same set of inalienable rights in Article I, section 1. It presently states: "All people are by nature free and independent and have inalienable rights.

16

Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I, § 1.) This provision has been amended only once, in 1972, to add privacy to the list of inalienable rights, to delete the adjective "certain" before the phrase "inalienable rights," and to clarify that these rights are guaranteed to all people rather than just to men. (Ballot Pamp., Gen. Elec. (Nov. 7, 1972) RJN. Exh. 9 at part II, p. 11.)

When California was founded in 1849, the protections of the Bill of Rights had been held not to apply to the States. (*Barron v. Baltimore* (1833) 32 U.S. (7 Pet.) 243.) Ratification of the Fourteenth Amendment in 1868 did not initially change this situation; use of the Fourteenth Amendment to apply select provisions of the Bill of Rights against the States was mainly a twentieth century phenomenon. (Falk, *The Supreme Court of California 1971-1972, Forward, The State Constitution: A More Than "Adequate" Nonfederal Ground* (1973) 61 Cal L. Rev. 273, 273-274.)[2]

---

2. The first decision incorporating a provision of the Bill of Rights, the Fifth Amendment's Takings Clause, was rendered by the United States Supreme Court in 1897. (Van Cleave, *A Constitution in Conflict: The Doctrine of Independent State Grounds and the Voter Initiative in California* (1993) 21 Hastings Const. L.Q. 95, 104, citing *Chicago, Burlington & Quincy Railroad v. Chicago* (1897) 166 U.S. 226.) Even today, not all provisions of the Bill of

Despite the presence of a Declaration of Rights in the California Constitution, state courts in general tended to look toward the federal Bill of Rights rather than to their own constitutions as a source of constitutional protections throughout the first part of the twentieth century. (Van Cleave, *supra*, 21 Hastings Const. L.Q. at p. 106; Grodin, The California State Constitution, *supra*, at p. 21 ["For a considerable period of time, the federally guaranteed rights seemed far more expansive and protective than their state analogues. Accordingly, the independent status of state constitutional rights became a largely forgotten concept."].)  This Court was no exception.  When the Court struck down the statutory ban on interracial marriage in 1948, it did so solely under the Fourteenth Amendment.  (*Perez v. Sharp* (1948) 32 Cal.2d 711, 731-732 (plur. opn.).[3/])

---

Rights have been found to apply to the states. (See *District of Columbia v. Heller* (2008) __ U.S. __, 128 S.Ct. 2783, 2813, fn. 22 [leaving undecided the question whether the Second Amendment has been incorporated against the States].)

3.  See also *Sei Fujii v. State* (1952) 38 Cal.2d 718, 720 fn. 1, 738 [striking down the Alien Land Law, which denied the right to own land to aliens who were ineligible for citizenship unless their home nations had treaties with the United States, as a Fourteenth Amendment violation]; *Mulkey v. Reitman* (1966) 64 Cal.2d 529, 532, 533, aff'd *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [holding that, although plaintiffs brought suit under both federal and state constitutional provisions, "we do not find it necessary" to consider claims under the California Constitution].)

18

A notable early decision rendering a judgment solely under the California Constitution was *People v. Anderson* (1972) 6 Cal.3d 628, in which this Court struck down the death penalty as a violation of the California Constitution's proscription against cruel or unusual punishment. (Former Cal. Const., art I, § 17.) Two years later, the electorate endorsed a revision to the Constitution that, among other provisions, added a declaration that the Constitution stands as an independent charter of rights. This provision declared that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."[4]

_____

4. This clause regarding constitutional independence was added as part of a major revision that added a specific equal protection guarantee as well as new provisions relating to due process, establishment of religion, and the rights of persons accused of crimes, revised eminent domain and grand jury procedures, and deleted material more suited to statutory enactment. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974), Prop. 7, analysis by Legislative Analyst, RJN Exh. 10, at p. 26.) The CCSF petition characterizes the addition of the equal protection guarantee as an "amendment" to the Constitution. (CCSF Second Amend. Pet. at p. 25.) This statement appears to be incorrect. While the legislation that put Proposition 7 on the ballot was termed an "Assembly Constitutional *Amendment*," the label that the Legislature used does not, by itself, render the measure an amendment rather than a revision because the same two-thirds vote requirement by the Legislature (followed by a majority vote of the electorate) is required for either an amendment or a revision. (Cal. Const., art. XVIII, § 1.) The ballot pamphlet for Proposition 7 indicates that it incorporated proposals made by the California Constitution Revision Commission. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974), argument in favor of Prop. 7, RJN Exh. 10, at p. 28.) Thus, Proposition 7 was a revision because of the quantity of the changes that it made. Perhaps for this reason, the Legislative Analyst's ballot analysis described the initiative as a revision. (*Ibid.*)

(Ballot Pamp., Gen. Elec. 1974, Prop. 7, RJN Exh. 10, at p. 72 [adding Cal. Const., art. I, § 24].)

This Court later articulated its own vision of the California Constitution as an independent charter of rights. In *People v. Brisendine* (1975) 13 Cal.3d 528, the Court applied the California Constitution to invalidate a search by police that would have been legal under the Supreme Court's Fourth Amendment precedents. (*Id.* at p. 552.) In rejecting the argument that federal precedent should be followed, this Court stated:

> This court has always assumed the independent vitality of our state Constitution. In the search and seizure area our decisions have often comported with federal law, yet there never has been any question that this similarity was a matter of choice and not compulsion. [¶] . . . [¶] [T]he California Constitution is, and always has been, a document of independent force. Any other result would contradict not only the most fundamental principles of federalism but also the historic bases of state charters. It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse.

(*Id.* at pp. 548, 549-550.)

The Court's interpretations of the California Constitution have sometimes prompted initiatives amending the Constitution to trump

20

the effect of judicial decisions.  The result in *Anderson* was undone by a

1972 initiative that added section 27 to article I of the California

Constitution.  It provided, in part, that the death penalty "shall not be

deemed to be, or to constitute, the infliction of cruel or unusual

punishments within the meaning of Article I, Section 6 nor shall such

punishment for such offenses be deemed to contravene any other provision

of this constitution."  (Cal. Const., art I, § 27; see *People v. Frierson*

(1979) 25 Cal.3d 142, 185 ["The clear intent of the electorate in adopting

section 27 was to circumvent *Anderson* by restoring the death penalty to the

extent permitted by the federal constitution."[5]].)  Similarly, *Brisendine's*

interpretation of the state constitutional protection against unlawful

searches was effectively reversed by Proposition 8 in 1982.  (*In re Lance*

---

5.  The lead opinion in *Frierson* addressing whether the 1972 initiative
adding section 27 to article I was a revision or an amendment was joined by three
justices.  Justice Mosk, joined by Justice Newman, filed a concurrence in the
judgment stating that, despite his personal dismay at the voters' decision to
reinstate the death penalty, he was "compelled to conclude that the 1977 death
penalty legislation does not violate the California Constitution."  (*Id.* at p. 189
(conc. opn. of Mosk, J.).)  Although Justice Mosk later characterized this holding
as dicta by a plurality of the Court (*Legislature v. Eu* (1991) 54 Cal.3d 492, 541
(conc. & dis. opn. of Mosk, J.) [stating that in *Frierson* "a plurality of the court
considered in dictum whether a 1972 initiative measure was amendatory or
revisory"]; see also Mosk, *Raven and Revision* (1991) 25 U.C. Davis L. Rev. 1,
7), this Court has cited and discussed *Frierson* as a majority holding.  (*Raven v.
Deukmejian* (1990) 52 Cal.3d 336, 355 [concluding that "we upheld a
provision which in essence required California courts in capital cases to apply the
state cruel or unusual punishment clause consistently with the federal
Constitution."].)  Thus, the conclusion that the death penalty initiative was an
amendment is properly viewed as a majority holding.

*W.* (1985) 37 Cal.3d 873, 879 [holding that the initiative abrogated both the "vicarious exclusionary rule" and "a defendant's right to object to and suppress evidence seized in violation of the California, but not the federal, Constitution."].)

## III.

## ARGUMENT

A.   **Question One: Is Proposition 8 Invalid Because It Constitutes A Revision Of, Rather Than An Amendment To, The California Constitution?**

1.   **The Scope Of Proposition 8 Should Be Interpreted Consistently With Its Stated Purpose Of Eliminating State-licensed Marriages For Same-Sex Couples.**

The scope of Proposition 8 should neither be overstated nor understated.  There can be no minimizing the fact that the initiative is intended to take a legal right away from same-sex couples.  And there can be no discounting the depth of emotion on all sides of the issue.  As a matter of legal interpretation, however, "the aim . . . is to 'determine and effectuate the intent of those who enacted the constitutional provision at issue.'"  (*Silicon Valley Taxpayers Assn. v. Santa Clara County Open Space Auth.* (2008) 44 Cal.4th 431, 444 (citation omitted).)  "If the

22

language is clear and unambiguous, the plain meaning governs. . . . But if the language is ambiguous, [the Court] consider[s] extrinsic evidence in determining voter intent, including the Legislative Analyst's analysis and ballot arguments for and against the initiative." (*Id.* at pp. 444-445 (citations omitted).)  When interpreting the meaning of an initiative, a step that must logically precede determining whether or not it is constitutional, the goal is that "'the voters should get what they enacted, not more and not less.'" (*Strong v. State Bd. of Equalization* (2007) 155 Cal.App.4th 1182, 1195, quoting *Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114.)

Here, the plain language of Proposition 8 is relatively straightforward.  Indeed, the exact words were used in former Family Code section 308.5, which was previously struck down as unconstitutional.  Nevertheless, assessment of the legal effect of Proposition 8 requires considering its impact on the holding of *In re Marriage Cases*.  (*Brown v. Merlo* (1973) 8 Cal.3d 855, 862 [determining constitutionality of a law requires consideration of the entire legal context].)

While the decision in *In re Marriage Cases* compelled the state, acting through its 58 counties,[6] to take the historic step of providing

_____

6.  Counties are legal subdivisions of the state.  (Cal. Const., art. XI, § 1, subd. (a).)  County clerks and county recorders are the local officials who have been granted authority with regard to marriage licenses and certificates.  (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1080; see also Fam.

marriage for same-sex couples, the legal holding was both precise and

narrow. This Court was confronted by a situation not present in most other

states: the existence of a statutory arrangement in which same-sex couples

were barred from marrying but were allowed to enter into "an officially

recognized family relationship that affords all of the significant legal rights

and obligations traditionally associated with marriage" by registering as

domestic partners.[7] (*In re Marriage Cases, supra,* 43 Cal.4th at pp. 779-

780.)

In response to the Attorney General's argument that the

difference in terminology between the two institutions did not rise to the

level of constitutional significance, the Court stated that it "ha[d] no

occasion in this case to determine whether the state constitutional right to

marry necessarily affords all couples the constitutional right to designate

_____

Code, § 350, Health & Saf. Code, § 102285.) The Director of the California
Department of Public Health, who is designated as the State Registrar of Vital
Statistics, is required to prescribe and furnish forms for use in registering
marriages and to supervise local registrars in the use of those forms. (Health &
Saf. Code, §§ 102175, 102100, 102180, 102200.) Thus, while Dr. Horton and Dr.
Scott have been named as respondents in this action, petitioners do not allege that
either of them took any step to enforce Proposition 8. Indeed, since marriage
licensing occurs on the county level, no such allegation could be logically made.

7. This Court observed that domestic partnerships provided same-sex
couples with the opportunity to have "virtually all of the same substantive legal
benefits and privileges" that opposite-sex married couples had. (*In re Marriage
Cases, supra,* 43 Cal.4th at p. 779.) The legal differences between the two
institutions were described as "relatively minor." (*Id.* at p. 779 fn. 2.)

their official family relationship a 'marriage,' or whether . . . the Legislature would not violate a couple's right to marry if . . . it were to assign a name other than marriage as the official designation of the family relationship for *all* couples." (*Id.* at p. 830.) Since same-sex-couples were being treated differently than opposite-sex couples, the Court did "not decide . . . whether the name 'marriage' is *invariably* a core element of the state constitutional right to marry. . . ." (*Id.* at p. 783.) For the purpose of deciding the *Marriage Cases,* it was sufficient to conclude that "assigning a different designation for the family relationship of same-sex couples while reserving the historic designation of 'marriage' exclusively for opposite-sex couples poses at least a serious risk of denying the family relationship of same-sex couples . . . equal dignity and respect." (*Ibid.*)

By way of contrast to the constitutional right to marry, Proposition 8 addresses marriage as a government licensing scheme. It addresses the issue of which kinds of relationships will be defined as "marriages" and authorized by law. It leaves unaddressed the central part of this Court's holding: that same-sex couples possess a constitutional right to form a family that is recognized by the state and given dignity and respect equal to that given to the relationships of opposite-sex

couples–without reference to the terminology employed by the state to describe those relationships.

Because this interpretation of Proposition 8 is supported by the plain words of the initiative, there is no need to consult its legislative history for interpretative guidance. Ballot materials, however, also support a limited view of the scope of Proposition 8. The proponents of Proposition 8 argued that their purpose was to "restore the definition of marriage" in response to this Court's decision and to "protect[] our children from being taught in public schools that 'same-sex marriage' is the same as traditional marriage."[8] (Ballot Pamp., Gen. Elec. (Nov. 4, 2008), Argument in Favor of Proposition 8, RJN Exh. 14, p. 56.) The proponents further argued that "[s]ome will try to tell you that Proposition 8 takes away legal rights of gay domestic partnerships. That is false. Proposition 8 DOES NOT take away any of those rights and does not interfere with gays living the lifestyle they choose." (*Ibid.*) Thus, the proponents cannot reasonably contend that their initiative was intended to do anything more

---

8.  The ballot pamphlet states that the initiative "*overturns the outrageous court decision of four activist Supreme Court judges* [sic] who ignored the will of the people." (Ballot Pamp., Gen. Elec. (Nov. 4, 2008), Argument in Favor of Proposition 8, Exh. 14, at p. 56 (emphasis original).) While Proposition 8 by its plain terms changes the Constitution to counteract the prospective legal effect of *In re Marriage Cases*, it does not literally overturn or reverse the decision. Nor does the initiative address what can or cannot be taught about marriage in the public school system.

than to restore a statutory definition, although as part of the Constitution. There can be little question that the holdings of this Court regarding the rights of same-sex couples to have officially-recognized family relationships–that are due the same stature and respect as marriages–remain in effect after Proposition 8.  Nor does Proposition 8 change this Court's holding "that statutes imposing differential treatment on the basis of sexual orientation should be viewed as constitutionally suspect under the California Constitution's equal protection clause." (*In re Marriage Cases, supra,* 43 Cal.4th at p. 843.)

Petitioners assert that Proposition 8 has undermined the authority of this Court either to interpret the Constitution or to protect the rights of minorities. (Strauss Amend. Pet., ¶ 21, p. 8, p. 17.) Such effects appear to exceed the legal effect of the initiative when considered in light of *In re Marriage Cases*. That decision has not literally been "vetoed" by the electorate.[9]  (CCSF Second Amend. Pet. at p. 22.)  Nor does Proposition 8 "strip the Petitioners and thousands like them of fundamental legal rights and attributes traditionally associated with marriage that are integral to personal liberty and personal autonomy." (Tyler Amend. Pet.,

---

9.  Petitioners appear to assert that the electorate enacted Proposition 8 with intent to harm gay men and lesbians.  This Court, however, concluded that Proposition 22, was not enacted with "an invidious intent or purpose." (*In re Marriage Cases, supra,* 43 Cal.4th at p. 856, fn. 73.)

27

¶ 11, p. 5) To the contrary, the Domestic Partnership Act (Fam. Code, §§ 297, et seq.) continues to exist, as does the State's "obligat[ion] to take affirmative action to grant official, public recognition to [a same-sex] couple's relationship as a family . . . ." (*In re Marriage Cases, supra*, 43 Cal.4th at pp. 819-820.)

>     **2.     Under This Court's Prior Precedents,
>             Whether Proposition 8 Constitutes A
>             Qualitative Revision Depends On
>             Whether The Denial Of Marriage To
>             Same-Sex Couples Can Be
>             Characterized As A Change In The
>             Fundamental Structure Or
>             Foundational Powers Of California
>             Government, Including The Powers
>             Of This Court To Construe The
>             California Constitution.**

"Although the California Constitution does not define the terms 'amendment' or 'revision,' the courts have developed some guidelines helpful in resolving the . . . issue." (*Raven v. Deukmejian, supra*, 52 Cal.3d at p. 350.) "[R]evision/amendment analysis has a dual aspect, requiring [a court] to examine both the quantitative and qualitative effects of the measure on our constitutional scheme." (*Ibid.*; see also *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 223 (*Amador Valley*) [". . . our analysis in determining whether a particular constitutional enactment is a revision or

an amendment must be both quantitative and qualitative in nature."])
"Substantial changes in either respect could amount to a revision." (*Ibid.*)

   "For example, an enactment which is so extensive in its
provisions as to change directly the 'substantial entirety' of the Constitution
by the deletion or alteration of numerous existing provisions may well
constitute a revision thereof. However, even a relatively simple enactment
may accomplish such far reaching changes in the nature of our basic
governmental plan as to amount to a revision also." (*Amador Valley,
supra*, 22 Cal.3d at p. 223.) "Thus, a constitutional 'revision' need not
involve widespread deletions, additions and amendments affecting a host
of constitutional provisions and resulting in a quantitative revision."
(*Legislature v. Eu, supra,* 54 Cal.3d at p. 506.)

   Petitioners do not argue that Proposition 8, which addresses
only one issue, is quantitatively a revision. The only case that ever struck
down an initiative on a quantitative as well as a qualitative basis,
*McFadden v. Jordan* (1948) 32 Cal.2d 330, involved an initiative that
would have repealed or altered 15 of the 25 articles of the Constitution and
substantially curtailed the functions of both the legislative and the judicial

branches. (*Id.* at p. 345)[10] It therefore sheds little light on the issues raised by the petitions.

More relevant to the question presented here are a series of decisions, beginning with *Amador Valley* and *People v. Frierson,* and culminating in *Raven v. Deukmejian* and *Legislature v. Eu,* that have considered whether initiatives making significant changes in our Constitution were qualitative revisions.

In *Amador Valley*, this Court upheld Proposition 13, the Jarvis-Gann property tax initiative, as a valid constitutional amendment. In addition to declining to find that Proposition 13 was a revision by reason of its quantitative effect, this Court held that the measure's qualitative effect on the state's basic governmental plan was not as "fundamentally disruptive" as its opponents suggested. (*Amador Valley, supra*, 22 Cal.3d at p. 224.) Proposition 13 did not effect such changes either by causing loss of home rule on the part of local governments or by changing from a "republican" to a "democratic" form of government. (*Id.* at pp. 224-228.)

---

10. If an initiative like the one at issue in *McFadden* were proposed today, it would probably be held to violate the single-subject rule for initiatives. (Cal. Const., art. II, § 8, subd. (d).) That rule was adopted in 1948, "possibly in response to the multifaceted initiative measure" struck down in *McFadden*. (*Amador Valley, supra*, 22 Cal.3d at p. 229.)

30

Therefore, this Court concluded that Proposition 13 "may fairly may be deemed a constitutional amendment, not a revision." (*Id.* at p. 229.)

One year later, in *People v. Frierson,* this Court rejected constitutional challenges to a California constitutional amendment restoring the death penalty. *(People v. Frierson, supra,* 25 Cal.3d 142.) The *Frierson* defendant, who had been convicted of first degree murder and sentenced to death, challenged his sentence in part on the ground that the 1972 initiative adding article I, section 27 to the California Constitution in response to *People v. Anderson, supra,* 6 Cal.3d 628, was an improper constitutional revision. (*Id.* at p. 186.) Noting *Amador Valley*'s admonition concerning "far reaching changes in the nature of our basic governmental plan," *Frierson* held that section 27 "accomplishes no such sweeping result":

> As we have explained, we retain broad powers of judicial review of death sentences to assure that each sentence has been properly and legally imposed and to safeguard against arbitrary or disproportionate treatment. In addition, we possess unrestricted authority to measure and appraise the constitutionality of the death penalty under the federal Constitution, in accordance with the guidelines established by the United States Supreme Court. We are thus led to the conclusion that the constitutional change worked by section 27 is not so broad as to constitute a fundamental constitutional revision.

(*Id.* at pp. 186-187.)

31

After *Frierson* came a trio of cases challenging initiatives that were enacted in response to holdings by this Court. In *Brosnahan v. Brown* (1982) 32 Cal.3d 236, this Court upheld in its entirety another crime measure, Proposition 8, known as "The Victim's Bill of Rights," against a challenge that it effected an invalid constitutional revision. Among other things, that initiative added section 28 to article I of the state Constitution. (*Id.* at p. 242.) In new section 28, the voters adopted provisions governing restitution for crime victims, safe schools, truth-in-evidence (requiring that relevant evidence shall not be excluded in any criminal proceeding), and use of prior felony convictions for impeachment and sentence enhancement. (*Id.* at pp. 242-243.)

After holding that these provisions did not amount to a quantitative revision, this Court also found that they did not sufficiently change the state's basic governmental plan to amount to a qualitative revision: "From a qualitative point of view, while Proposition 8 does accomplish substantial changes in our criminal justice system, even in combination these changes fall considerably short of constituting 'such far reaching changes in the nature of our *basic governmental plan* as to amount to a revision . . . .'" (*Brosnahan v. Brown, supra*, 32 Cal.3d at p. 260, quoting *Amador Valley, supra*, 22 Cal.3d at p. 223.) Finding that

32

"nothing contained in Proposition 8 necessarily or inevitably will alter the basic governmental framework set forth in our Constitution[,]" this Court held that the measure "did not accomplish a 'revision' of the Constitution within the meaning of article XVIII." (*Id.* at p. 261.)

Subsequently, section 28(d), the truth-in-evidence provision, was upheld against a further attack that it amounted to an improper revision of the state Constitution. (*In re Lance W., supra,* 37 Cal.3d at p. 891.) In *Lance W.,* this Court saw no reason to depart from its *Brosnahan* decision upholding Proposition 8 in its entirety. (*Ibid.*) "The adoption of section 28(d) . . . cannot be considered such a sweeping change either in the distribution of powers made in the organic document or in the powers which it vests in the judicial branch as to constitute a revision of the Constitution within the contemplation of article XVIII." (*Id.* at p. 892; see also *People v. May* (1988) 44 Cal.3d 309, 311 [holding that the "truth in evidence" provision had abrogated the prior holding of *People v. Disbrow* (1976) 16 Cal.3d 101, that statements made in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, were inadmissible for impeachment purposes].)

*Brosnahan* and *Lance W.* were followed by *Raven v. Deukmejian, supra,* 52 Cal.3d 336, which, other than *McFadden*, is the

33

only case ever to strike down a portion of an initiative on the ground that it

was a qualitative revision. The petitioners in *Raven* challenged Proposition

115, the "Crime Victim's Justice Reform Act," as an invalid revision.

Proposition 115, as it was addressed by this Court, could be divided into

two parts. First, the initiative amended the declaration in section 24 of

Article I that the California Constitution would be interpreted

independently from the United States Constitution. Proposition 115 added

language to this provision, which stated:

> In criminal cases the rights of a defendant to equal
> protection of the laws, to due process of law, to the
> assistance of counsel, to be personally present with
> counsel, to a speedy public trial, to compel the
> attendance of witnesses, to confront the witnesses
> against him or her, to be free from unreasonable
> searches and seizures, to privacy, to not be compelled
> to be a witness against himself or herself, to not be
> placed twice in jeopardy for the same offense, and not
> to suffer the imposition of cruel or unusual
> punishment, shall be construed by the courts of this
> state in a manner consistent with the Constitution of
> the United States. This Constitution shall not be
> construed by the courts to afford greater rights to
> criminal defendants than those afforded by the
> Constitution of the United States, nor shall it be
> construed to afford greater rights to minors in juvenile
> proceedings on criminal causes than those afforded by
> the Constitution of the United States.

(*Id.* at p. 350.)

34

Separate from this omnibus provision, Proposition 115 also added constitutional provisions denying preliminary hearings to defendants charged by indictment, providing that the people have a rights to due process and a speedy and public trial, setting forth rules governing joinder and severance of criminal cases, declaring hearsay testimony admissible at preliminary hearings, and calling for reciprocal discovery in criminal cases, as well as making various changes to the Penal Code. (*Id.* at pp. 342-346.)

The *Raven* Court held that the omnibus provision of Proposition 115 was a revision. As amended by Proposition 115, section 24 added language that "[i]n essence and practical effect . . . would vest all judicial interpretive power, as to fundamental criminal defense rights, in the United States Supreme Court." (*Id.* at p. 352.) "California courts in criminal cases would no longer have authority to interpret the state Constitution in a manner more protective of defendants' rights than extended by the federal Constitution, as construed by the United States Supreme Court." (*Id.* at p. 352.) This change "would substantially alter the substance and integrity of the state Constitution as a document of independent force and effect." (*Ibid.*) "It substantially alters the preexisting constitutional scheme or framework heretofore extensively and repeatedly used by courts in interpreting and enforcing state constitutional

35

protections." (*Id.* at p. 354.) Based on these effects, "new article I, section

24, represents an invalid revision of the California Constitution." (*Id.* at p.

355.)

Significantly, the *Raven* Court distinguished this provision

from the other constitutional and statutory changes wrought by Proposition

115. It stated that "[t]he additional constitutional changes cannot be

deemed matters which standing alone, or in the aggregate, substantially

change our preexisting governmental framework." (*Ibid.*) For this reason,

the Court severed the omnibus provision of Proposition 115, which it

invalidated as a revision, while upholding the remainder of the initiative.

(*Id.* at pp. 355-356.)

One year after *Raven* came *Legislature v. Eu,* which

concerned Proposition 140, known as the "Political Reform Act of 1990."

Among other things, Proposition 140 imposed term limitations on state

legislators and constitutional officers, placed budgetary limitations on the

Legislature and restricted legislators' pension rights. (*Legislature v. Eu,*

*supra,* 54 Cal.3d at pp. 501-503.) In rejecting arguments that these

changes amounted to a constitutional revision, this Court said that "a

qualitative revision includes one that involves a change in the basic plan of

California government, i.e., a change in its fundamental structure or the

36

foundational powers of its branches." (*Id.* at p. 509.)  No such change had

been made because "the basic and fundamental structure of the Legislature

as a representative branch of government is left substantially unchanged by

Proposition 140." (*Id.* at p. 508.)

　　　　　　　　Further, *Eu* held that a revision must appear on the face of the

measure: "Our prior decisions have made it clear that to find such a

revision, it must *necessarily or inevitably appear from the face* of the

challenged provision that the measure will substantially alter the basic

governmental framework set forth in our Constitution." (*Legislature v. Eu,*

*supra,* 54 Cal.3d. at p. 510.)  Proposition 140 failed this facial test because

"the assertedly momentous consequences to our governmental scheme are

largely speculative ones, dependent on a number of as yet unproved

premises." (*Id.* at p. 508.)  Therefore, "[r]esolving, as we must, all doubts

in favor of the initiative process," this Court concluded "that nothing on the

face of Proposition 140 effects a constitutional revision." (*Id.* at p. 512; see

also *Rippon v. Bowen* (2008) 160 Cal.App.4th 1308, 1315-1321 [following

*Eu* to hold that term limits initiative was not a constitutional revision].)

　　　　　　　More recently, in *Professional Engineers in California*

*Government v. Kempton* (2007) 40 Cal.4th 1016 (*Professional Engineers*),

this Court followed *Amador Valley* in upholding Proposition 35, which

removed a constitutional restriction on the ability of governmental entities to contract with private firms for architectural and engineering services on public works projects. (*Id.* at p. 1023.) Proposition 35 was not a qualitative revision in that it did not "usurp the Legislature's plenary authority to regulate private contracting by public agencies in a global sense" and the Legislature retained some authority to amend the initiative by statute. (*Id.* at p. 1047.) This Court could not agree "that Proposition 35 creates such 'far reaching changes to our basic governmental plan as to amount to a revision.'" (*Ibid.*, quoting *Amador Valley*, *supra*, 22 Cal.3d at p. 223.)

> 3.  **Whether Petitioners' Theory, If Accepted, Would Expand The Definition Of A Constitutional Revision Beyond This Court's Existing Jurisprudence And The Possible Effect On Existing Constitutional Provisions Enacted By Initiative Amendments.**

In urging this Court to find that Proposition 8 impermissibly revises the state Constitution, petitioners make two arguments. First, they contend that Proposition 8 alters the underlying principles on which the Constitution is based by severely compromising the core constitutional principle of equal protection and by depriving a vulnerable minority of a fundamental right. Second, they assert that the measure effects a far-

reaching change to the nature of California's governmental plan by

preventing California courts from exercising their traditional function of

protecting the equal protection rights of a minority defined by a suspect

classification. (Strauss Amended Pet., p. 8, ¶ 21; see CCSF Second

Amended Pet., pp.24-35; see Tyler Amended Pet., pp. 7-8, ¶¶ 17-19.) Each

of these assertions, and the questions they raise about the impact on

existing initiatives, can be discussed in turn.

> **a.**  **Whether Proposition 8 Should Be Considered A Revision Because It Takes Away Fundamental Constitutional Rights From A Minority Defined By A Suspect Classification.**

With respect to equal protection and fundamental rights, the

Strauss petitioners state that Proposition 8, "would work a dramatic,

substantive change to our Constitution's 'underlying principles' of

individual equality, on a scale and scope never previously condoned by this

Court." (Strauss Amended Pet., p. 12.) If permitted to stand, they warn

that Proposition 8 "would strike directly at the foundational constitutional

principle of equal protection . ... by establishing that an unpopular group

may be selectively stripped of fundamental rights by a simple majority of

voters." (*Id.* at p. 16.) Thus, the Strauss petitioners frame the issue as

"whether the initiative process may be used to enshrine in our Constitution discrimination against a disfavored minority with regard to a fundamental right." (*Id.* at p. 18.)   Similarly, the CCSF petitioners assert that Proposition 8 is invalid on grounds that "the initiative power does not permit voters to divest a politically unpopular group of rights conferred by the equal protection clause." (CCSF Second Amended Pet., p. 15, ¶ 34.)

Petitioners' contention that Proposition 8 is entirely without precedent, either because it takes away constitutional rights generally or equal protection rights specifically, must be assessed in light of this Court's decisions upholding initiatives challenged as invalid revisions.  This Court has upheld as valid amendments measures that deleted or added provisions of the Declaration of Rights or that limited its provisions.  (*Raven v. Deukmejian, supra,* 52 Cal.3d at pp. 342-343, 350 [upholding addition of article I, §§ 14.1, 29, and 30]; *In re Lance W., supra,* 37 Cal.3d at p. 891 [upholding addition of article I, § 28(d)]; *Brosnahan v. Brown, supra,* 32 Cal.3d at pp. 260-261 [upholding repeal of article I, § 12 and addition of article I, § 28]; *People v. Frierson, supra,* 25 Cal.3d at pp. 186-187 [upholding addition of article I, § 27, limiting article I, § 6].)  This Court has also allowed the initiative process to be used to change specific fundamental rights.  As the decisions upholding amendments to the

40

Declaration of Rights demonstrate, such decisions have implicated rights considered as fundamental in our system of justice. (*In re Lance W., supra,* 37 Cal.3d at p. 891 [amendment effecting enforcement of right to be secure against unreasonable search and seizure]; *Brosnahan v. Brown,* 32 Cal.3d at pp. 260-261 [same]; *People v. Frierson, supra,* 25 Cal.3d at pp. 186-187 [right to be free from cruel or unusual punishment].)

This Court has suggested that the voters might use the initiative process to delete an entire section of the Declaration of Rights. Commenting on the adoption of article I, section 28(d), which limited the use of the exclusionary rule, this Court observed, "The people could by amendment of the Constitution repeal section 13 of Article I in its entirety." (*In re Lance W., supra,* 37 Cal.3d at p. 891.) Section 13 protects the right of the people to be secure from unreasonable search and seizure. (Cal. Const., art. I, § 13.) Under this reasoning, section 28(d) could not be a revision: "The adoption of section 28(d) which affects only one incident of that guarantee of freedom from unlawful search and seizure, a judicially created remedy for violation of the guarantee, cannot be considered such a sweeping change either in the distribution of powers made in the organic document or in the powers which it vests in the judicial branch as to

41

constitute a revision of the Constitution within the contemplation of Article

XVIII." (*In re Lance W.*, *supra*, 37 Cal.3d at p. 891.)

Petitioners' argument also must be reconciled with the

subsequent history of *Hawkins v. Superior Court* (1978) 22 Cal.3d 584,

which concerned the constitutionality of procedures for prosecution by

grand jury indictment. In *Hawkins*, this Court held that "an accused is

denied the equal protection of the laws guaranteed by article I, section 7, of

the California Constitution when prosecution is by indictment and he is

deprived of a preliminary hearing and the concomitant rights which attach

when prosecution is by information." (*Id.* at pp. 586-587.) This Court

concluded that "the denial of a postindictment preliminary hearing deprives

the defendant of 'such fundamental rights as counsel, confrontation, the

right to personally appear, the right to a hearing before a judicial officer,

and the right to be free from unwarranted prosecution. These guarantees

are expressly or impliedly grounded in both the state and federal

Constitutions and must by any test be deemed "fundamental."'" (*Id.* at pp.

592-593 (citation omitted).) Yet, new section 14.1 to the Declaration of

Rights, added by Proposition 115, abrogated the equal protection holding

in *Hawkins*, and, "as such, a defendant indicted in California is no longer

entitled to, and indeed may not be afforded, a postindictment preliminary

42

hearing or any other similar procedure." (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 39.) This Court recognized that "[t]he only reasonable interpretation of Proposition 115 is that article I, section 14.1, was purposefully intended to abrogate the equal protection analysis underlying the substantive holding in *Hawkins*." (*Id.* at p. 44.) Thus, "the voters' adoption of article I, section 14.1, must be seen as . . . limiting the scope of the state constitutional right to equal protection . . . as it relates to the constitutionally mandated indictment process." (*Id.* at p. 45.) And yet *Raven* characterized this change in the Constitution, denying a right protected by equal protection, as relating only to an "isolated matter[]" that could not be deemed to "substantially change our preexisting governmental framework." (*Raven v. Deukmejian, supra,* 52 Cal.3d at p. 350.) Taken together, *Raven* and *Bowens* appear to recognize that the voters may deny fundamental rights protected by the equal protection clause.

However, this case raises a further issue not considered in the earlier cases. Specifically, this Court has held that limiting marriage to opposite-sex unions discriminates on sexual orientation and further held that "statutes imposing differential treatment on the basis of sexual orientation should be viewed as constitutionally suspect under the California Constitution's equal protection clause." (*In re Marriage Cases,*

43

*supra*, 43 Cal.4th at pp. 840, 843.)  And this Court has held that the history
of invidious discrimination against gay men and lesbians supports strict
judicial scrutiny of classifications that discriminate against them.  (*Ibid.*)

In invoking suspect classification doctrine, petitioners appear
to contend that the analysis of whether a constitutional change is an
amendment or a revision should include matters beyond the face of the
initiative.  This would be an apparent change in the legal test.  Previously,
this Court has held that a revision "must *necessarily or inevitably appear*
*from the face* of the challenged provision." (*Legislature v. Eu, supra*, 54
Cal.3d at p. 510.)  Legal challenges to initiatives as improper revisions
have historically been considered more like single-subject rule challenges,
which can be heard pre-election, and unlike substantive constitutional
challenges, which are usually disfavored in a pre-election context because
of their potential to disrupt elections. (*Independent Energy Producers*
*Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1029.)

Petitioners' apparent legal theory might prove problematic if
applied outside the specific context of *In re Marriage Cases* and
Proposition 8.  If a court is confronted with an initiative addressing a right
not yet deemed fundamental or a classification not yet deemed suspect, that

court would find it extremely difficult to prevent the electorate from voting on the initiative or to invalidate the initiative post-election.

For example, consider the decision by the Massachusetts Supreme Judicial Court in *Goodridge v. Department of Public Health* (Mass. 2003) 798 N.E.2d 941, 961, which held that the Massachusetts' exclusion of same-sex couples failed even rational basis review. Because it reached this conclusion, that court declined to consider whether the marriage exclusion denied a fundamental right or implicated a suspect classification. (*Ibid.*) If this Court had adopted *Goodridge's* exact holding in *In re Marriage Cases*, would a subsequent initiative attempting to bar same-sex marriage be an amendment or a revision? In other words, should the distinction between an amendment and a revision turn on the precise legal reasoning used by the Court in reaching its conclusion? Such a rule raises the possibility that the judiciary might appear to insulate its rulings from the initiative process by deeming certain rights as fundamental or certain classifications as suspect rather than deciding constitutional questions on narrower grounds.

Respondent respectfully submits that, while petitioners present important concerns about the use of the initiative process to limit the rights of minorities, any potential expansion of the test for finding a

revision also raises important questions. In answering these questions, this

Court must also consider well-settled principles that guide judicial review

of the initiatives:

> Although the legislative power under our state
> Constitution is vested in the Legislature, 'the people
> reserve to themselves the powers of initiative and
> referendum.' [Citation omitted.] Accordingly, the
> initiative power must be *liberally construed* to
> promote the democratic process. [Citation omitted.]
> Indeed, it is our solemn duty to jealously guard the
> precious initiative power, and to resolve any
> reasonable doubts in favor of its exercise. [Citation
> omitted.] As with statutes adopted by the Legislature,
> all presumptions favor the validity of initiative
> measures and mere doubts as to validity are
> insufficient; such measures must be upheld unless their
> unconstitutionality clearly, positively, and
> unmistakably appears. [Citation omitted.]

(*Legislature v. Eu, supra*, 54 Cal.3d at pp. 501-502.)

>           **b.     Whether Proposition 8 Should
>                    Be Considered A Revision
>                    Because It Prevents The
>                    Judiciary From Protecting
>                    Constitutional Rights.**

With respect to the impact of Proposition 8 on the

foundational powers of the judiciary, the petitioners view the measure as

effecting a far-reaching change in the nature of the state's basic

governmental plan by preventing California courts from exercising their

core, traditional constitutional role of protecting established equality rights

of a minority defined by a suspect classification. (Strauss Amended Pet.,
pp. 12, 35-44; CCSF Second Amended Pet., pp.28-35; see also Tyler
Amended Pet., Mem., pp. 7-8.) For example, the Strauss petitioners argue
that Proposition 8 "would substantially alter the system of checks and
balances that is fundamental to the structure of our constitutional system."
(Strauss Amended Pet., p. 36.) Just as equal protection is an underlying
constitutional principle, "the court's authority to interpret and apply the
guarantee of equal protection is a core judicial function that plays a central
role in the system of checks and balances mandated by the separation of
powers." (*Id.* at p. 36.) In petitioners' view, Proposition 8 "would entirely
strip the courts of authority to enforce the guarantee of equal protection . . .
where judicial authority is ordinarily at its height" and "would strike
directly at the heart of the allocation of legislative and judicial competence
in a way that fundamentally alters the separation of powers contemplated
by our existing constitutional scheme." (*Ibid.*) This would render
California courts "powerless to enforce the guarantee of equal protection
for a historically stigmatized and disadvantaged minority with regard to the
exercise of a fundamental right. (*Id.* at p. 42.) Therefore, the petitioners
conclude that Proposition 8 would significantly alter the system of checks

47

and balances mandated by the state Constitution and is invalid because it was not adopted through the revision process. (*Id.* at pp. 42-43.)

Petitioners' contentions are based on an expansive view of the impact on the judiciary of Proposition 8. But Proposition 8 does not expressly expand or diminish the powers of the judicial system. After passage of Proposition 8, this Court retains the same authority to interpret and apply the state Constitution, including the equal protection clause, that it possessed before the measure's approval by the voters.

As noted above, this Court has upheld initiatives adopting constitutional amendments aimed at setting aside judicial decisions. (*Raven v. Deukmejian, supra,* 52 Cal.3d at p. 348; *People v. Frierson,* 25 Cal.3d at pp. 186-187.) These decisions amount to a recognition that an initiative proposing to reverse a judicial decision by changing the Constitution does not invariably constitute a revision rather than an amendment.

Further, Proposition 8 does not alter the independent force and effect of the California Constitution. Unlike the proposed amendment struck down in *Raven,* Proposition 8 does not created a forced linkage between the Court's interpretation of the California Constitution and rulings of the United States Supreme Court on analogous portions of the

48

federal Constitution. The state equal protection clause remains an independent source of rights that this court may interpret independently of the federal Constitution.

In addition, California courts retain authority to interpret and apply Proposition 8 itself. For example, this Court is not precluded from ruling on whether Proposition 8 applies retroactively to marriages occurring before the November 4, 2008 election. Nothing precludes state courts from considering whether Proposition 8 is consistent with the federal Constitution just as this Court did in striking down the initiative at issue in *Mulkey v. Reitman, supra,* 64 Cal.2d 529, 545, affd. *sub nom. Reitman v. Mulkey* (1967) 387 U.S. 369 [holding that Proposition 14, which had added a provision to the California Constitution giving property owners "absolute discretion" in deciding to whom to sell, lease or rent their property, constituted racial discrimination in violation of the Fourteenth Amendment].)

This Court has upheld initiatives that have made significant changes in California's governmental structure. Among other things, this Court has upheld initiatives that changed the state property tax system (*Amador Valley, supra,* 22 Cal.3d 208), altered the makeup and operation of the Legislature (*Legislature v. Eu, supra,* 54 Cal.3d 492), and made

49

major changes to the criminal justice system (*Brosnahan v. Brown, supra,*
32 Cal.3d 236). In order to find that Proposition 8 is a revision, this Court
would have to find that its effect on the judiciary is closer to the provision
struck down in *Raven* than to the types of changes that this court has
previously upheld.

> ### 4. The Effect Of Petitioners' Proposed Test For Revision On The Initiative Process And On Existing Constitutional Provisions Enacted By Initiative.

Petitioners' proposals for determining whether an initiative
would effect a revision or amendment of the Constitution, based on a
measure's effect on fundamental rights or suspect classifications, raise
additional issues concerning the scope of the initiative process and the
impact on that process if any of the proposed tests were adopted by this
Court.

For example, one factor bearing on this question is the
underlying purpose served by establishing different procedures for
changing the Constitution and for making the revision process more
cumbersome than the process for an amendment. The differentiation
between "revise" and "amend" "is not merely between two words; more
accurately it is between two procedures and between their respective fields
of application." (*McFadden v. Jordan, supra,* 32 Cal.2d at p. 347.) This

Court has suggested "that the revision provision is based on the principle that 'comprehensive changes' to the Constitution require more formality, discussion and deliberation than is available through the initiative process." (*Legislature v. Eu, supra,* 54 Cal.3d at p. 506.) As one commentator has written, "Prevention of logrolling and voter confusion are implicit policies of the nonrevision requirement." (Note, *Preelection Judicial Review: Taking the Initiative in Voter Protection* (1983) 71 Cal.L.Rev. 1216, 1224, n. 55.)

These principles suggest that Proposition 8 should be treated as a revision if this Court concludes that it is the type of measure that requires greater deliberation than ordinarily would be offered by the initiative process for a proposed amendment or if the voters could not reasonably be expected to inform themselves of the measure's ramifications through the electoral process. Petitioners, however, have not suggested that Proposition 8 involved improper logrolling or voter confusion. Nor have they suggested that the consequences of Proposition 8 were not capable of wide discussion and consideration prior to the election.

Moreover, one may legitimately ask how the rule advocated by petitioners would be applied to future proposed initiative measures. At the very least, it could create uncertainty as to when voters may use the

initiative process to adopt constitutional amendments affecting competing interests.  (Cf. *Tinsley v. Superior Court* (1983) 150 Cal.App.3d 90, 99 [recognizing that Proposition 1, approved by voters in 1978, which amended state Constitution's equal protection clause, significantly altered California equal protection law as it applied to school desegregation].)

The potential impact on measures that have been adopted by the voters and are now considered part of the settled law of California should also be considered.  For example, Proposition 98, approved by the voters in 1988, amended the state Constitution by "setting a minimum level for 'monies to be applied by the state for the support of school districts and community college districts.'"  (8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, p. 582, § 1002; Cal. Const., Art. XVI, § 8(b).)  Under the California Constitution, education is a "fundamental interest." (*Serrano v. Priest* (1976) 18 Cal.3d 728, 768.)  Under petitioners' formulation of revision/amendment analysis, would Proposition 98 itself be unconstitutional as an improper revision or, even if not, would the voters have the right to change or abolish the provision through the initiative process?

Similarly, Proposition 209, adopted in 1996, amended the Declaration of Rights in the state Constitution to prohibit affirmative action

by public entities. (Cal. Const., art. I, § 31.) Among other things, this proposition added language providing that "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (*Ibid.*) As with Proposition 98, would petitioners' argument invalidate Proposition 209 as a revision or, alternatively, remove it from further amendment?

Respondent submits that these factors should be considered along with the contentions made by petitioners and the other issues discussed herein in determining whether Proposition 8 should be deemed an invalid revision or a validly enacted amendment.

**B.    Issue Two: Does Proposition 8 Violate The Separation Of Powers Doctrine Under The California Constitution?**

**1.    The Separation Of Powers Doctrine Would Not Appear To Present An Independent Basis On Which To Declare Proposition 8 A Revision Of The State Constitution**

The California Constitution provides for the separation of governmental powers among the three branches of state government. (*Bixby v.* Pierno (1971) 4 Cal.3d 130, 141.) "The powers of state

53

government are legislative, executive, and judicial. Persons charged with

the exercise of one power may not exercise either of the others except as

permitted by this Constitution." (Cal. Const., Art. III, § 3.)

The separation of powers doctrine "limits the authority of one

of the three branches of government to arrogate to itself the core functions

of another branch." (*Carmel Valley Fire Protection Dist. v. State of*

*California* (2001) 25 Cal.4th 287, 297 (*Carmel Valley*).) "The courts have

long recognized that the primary purpose of the separation of powers

doctrine is to prevent the combination in the hands of a single person or

group of the basic or fundamental powers of government." (*Ibid.*, internal

brackets and quotation marks omitted.)

Notwithstanding these principles, however, "it is well

understood that the branches share common boundaries . . . and no sharp

line between their operations exists." (*People v. Bunn* (2002) 27 Cal.4th 1,

14.) "Indeed, the 'sensitive balance' underlying the tripartite system of

government assumes a certain degree of mutual oversight and influence."

(*Ibid.*)

In their petitions, the Strauss and CCSF petitioners raise the

separation of powers doctrine in support of their contention that

Proposition 8 revises the Constitution by altering the fundamental functions

54

and powers of the judiciary.  (See Strauss Amend. Pet., pp. 40-43; CCSF

Second Amend. Pet., pp. 30-32.)  For example, in Strauss, the petitioners

discuss separation of powers in the context of their argument that

Proposition 8 would revise the Constitution by preventing the courts from

exercising their unique constitutional responsibility to protect the equal

protection rights of minorities.  (Strauss Amend. Pet., pp. 35-43.)  And the

CCSF petitioners suggest that Proposition 8 alters the separation of powers

by "transfer[ring] final authority over the equal protection rights of

unpopular groups from the judiciary to a bare political majority."  (CCSF

Second Amend. Pet., p. 30.)

Addressing this assertion in more depth than is done in the

CCSF Petition, the Strauss petitioners argue that Proposition 8 would strip

the courts of the authority to enforce the guarantee of equal protection and

thereby "strike directly at the heart of the allocation of legislative and

judicial competence in a way that fundamentally alters the separation of

powers contemplated by our existing constitutional scheme."  (Strauss

Amend. Pet., p. 41.)  They add, "By restricting the courts' traditional

authority to invalidate such overtly discriminatory measures, Proposition 8

would significantly alter the system of checks and balances mandated by

our Constitution."  (*Id.* at pp. 42-43.)

55

The Strauss and CCSF separation of powers arguments might
be better assessed under the rubric of revision-versus-amendment analysis.
To the extent that these petitioners are raising concerns about diminishment
of judicial power as a revision of the Constitution, those concerns are
addressed above.

On the other hand, the Tyler petitioners raise separation of
powers as an independent basis on which to find that Proposition 8 could
not be validly enacted by the electorate.  (Tyler Pet., pp. 9-11.)  The Tyler
petitioners assert that "[u]nder the separation of powers doctrine, 'the
Legislature may not undertake to readjudicate controversies that have been
litigated in the courts and resolved by a final judgment.'"  (Tyler Pet., p.
10, quoting *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45,
53 (*Mendocino*).)  Relying on this settled rule, the Tyler petitioners contend
that "the separation of powers doctrine is violated [if] an initiative
effectively readjudicates controversies that were litigated and settled by the
courts."  (*Ibid.*)

To the extent the Tyler petitioners suggest that the initiative
process may never be used to abrogate legal holdings announced by this
Court, their argument seems contrary to existing authority.  (See e.g.
*People v. Frierson, supra,* 25 Cal.3d at p. 186-187 [upholding initiative

56

abrogating *People v. Anderson, supra,* 6 Cal.3d 628]; *Bowens v. Superior Court, supra,* 1 Cal.4th at p. 39 [recognizing that Proposition 115 abrogated equal protection holding in *Hawkins v. Superior Court, supra,* 22 Cal.3d 584].).) As this Court has said, "[s]eparation of powers principles do not preclude the Legislature from amending a statute and applying the change to both pending and future cases." (*People v. Bunn, supra,* 27 Cal.4th at p. 17.)

Indeed, "with regard to functions over which one branch of government possesses primary and inherent power, the other branches do not necessarily violate the separation of powers doctrine simply because they undertake actions that affect those core functions." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 662.) "[T]he separation of powers doctrine is violated only when the actions of a branch of government defeat or materially impair the inherent functions of another branch." (*Ibid.*)

This Court has previously applied these principles to legislative encroachments on judicial functions. "In the context of asserted legislative encroachment on the judicial power . . ., although we have invalidated legislative measures that would defeat or materially impair this court's inherent power . . ., we have rejected separation of powers claims

57

when no material impairment appeared." (*Carmel Valley, supra,* 25 Cal.4th at p. 298.)

For example, in *Carmel Valley,* the Supreme Court cited *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, as a case in which the Legislature had defeated or materially impaired the Court's inherent power. *Hustedt* held that the Legislature violated the separation of powers doctrine by bestowing the power to discipline attorneys on the Workers' Compensation Appeals Board. (*Id.* at pp. 339-341.) "In purporting to bestow the power to discipline attorneys upon the Board, the Legislature overreached its traditionally recognized authority, under the police power, to regulate the practice of law." (*Id.* at p. 341.)

On the other hand, *Carmel Valley* cited *Mendocino* as a case in which a legislative act did not materially infringe upon the separate powers of the judiciary. In *Mendocino,* this Court construed the facial constitutionality of Government Code section 68108, which authorized counties to declare unpaid furlough days that would require closure of the courts along with other county offices. (*Mendocino, supra,* 13 Cal.4th at pp. 60-61.) No separation of powers violation was present: "[I]t cannot reasonably be suggested that, under any and all circumstances, a county's designation of one or more unpaid furlough days pursuant to section 68108

58

*necessarily* will 'defeat' or 'materially impair' a court's fulfillment of its constitutional duties." (*Id.* at p. 60.)  Nor did the Legislature's action "inevitably threaten the integrity or independence of the judicial process" or intrude upon "the judge's decisionmaking process or the independence of the judicial role." (*Id.* at p. 65.)

Here, on its face, Proposition 8 does not purport to "defeat or materially impair" the Court's ability to fulfill its constitutional duties.  Nor, unlike the provision struck down in *Raven*, does it change constitutional provisions in a way that threatens the ability of the judiciary to interpret the California Constitution as an independent document.  On the other hand, to the extent the Tyler petitioners, like the Strauss and CCSF petitioners, direct their contentions to the showing that would establish a constitutional revision, this issue has been addressed above.

Of course, "there are some functions performed by the judicial branch that the separation of power doctrine prohibits the Legislature from exercising under any circumstances." (*Mendocino, supra,* 13 Cal.4th at p. 61.)  "[W]hile the Legislature enjoys very broad governmental power under our constitutional framework, it does not possess the authority to review or to readjudicate final court judgments on a case by case basis." (*Mandel v. Myers* (1981) 29 Cal.3d 531, 549.)  For

59

example, in *Mandel*, the Court held that while the Legislature could enact "generally applicable statutory measures" to limit state expenditures, it could not reject a particular attorney fee award because of its disagreement with the merits of a final court judgment rendered in the case. (*Id.* at p. 551.)

Arguably, an initiative measure that purported to set aside a court judgment in the manner disallowed by *Mandel* might be deemed a constitutional revision. But the Tyler petitioners misplace their reliance on this rule. (See Tyler Pet., p. 9.) Regardless of other concerns that may be expressed regarding Proposition 8, it cannot be reasonably construed -- and should not be construed -- as seeking to readjudicate specific court judgments. (Cf. *Schulman v. Attorney General* (Mass. 2006) 850 N.E.2d 505, 506-507 [holding that a proposed initiative that would have banned same-sex marriage in response to the Massachusetts Supreme Judicial Court's decision in *Goodridge v. Department of Public Health*, *supra*, 798 N.E.2d 941, was not invalid under provision of Massachusetts Constitution prohibiting initiatives that reverse a judicial decision].)

This approach is consistent with this Court's holding in *Professional Engineers*, *supra*, which, in addition to finding that the constitutional amendment implemented by Proposition 35 was not a

revision, held that it did not violate the separation of powers by diverting a

legislative function to the executive branch. (*Professional Engineers*,

*supra*, 40 Cal.4th at pp. 1044-1045.) "[T]he setting of policy with respect

to private contracting is a legislative matter and, therefore, a proper subject

for the electorate to exercise its legislative authority through initiative,

which is what the electorate has done." (*Id.* at p. 1045.) Similarly, it is not

impermissible for the voters, when done through a valid amendment, to

exercise their authority through the initiative process to alter legal

pronouncements issued by the courts.

<blockquote>

**C.     Issue Three: If Proposition 8 Is Not Unconstitutional, What Is The Effect, If Any, On The Marriages Of Same-sex Couples Performed Before The Adoption Of Proposition 8?**

</blockquote>

<blockquote>

**1.     Legislation Is Presumed To Operate Prospectively Absent Express Language Or A Clear And Unequivocal Implication That It Applies Retroactively.**

</blockquote>

"It is an established canon of interpretation that statutes are

not to be given a retrospective operation unless it is clearly made to appear

that such was the legislative intent." (*Aetna Casualty & Surety Co. v.*

*Industrial Accident Com.* (1947) 30 Cal.2d 388, 393.) This principle

"reflects the common understanding that legislative provisions are

presumed to operate prospectively, and that they should be so interpreted

'unless express language or clear and unavoidable implication negatives

the presumption.'" (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188,

1208, quoting *Glavinich v. Commonwealth Land Title Ins. Co.* (1984) 163

Cal.App.3d 263, 272.) "'Retroactivity is not favored in the law. Thus,

[legislative] enactments and administrative rules will not be construed to

have retroactive effect unless their language requires this result.'" (*Aktar v.*

*Anderson* (1997) 58 Cal.App.4th 1166, 1179, quoting *Bowen v.*

*Georgetown University Hospital* (1988) 488 U.S. 204, 208.)

      "[T]he presumption against retroactive legislation is deeply

rooted in our jurisprudence, and embodies a legal doctrine centuries older

than our Republic. Elementary considerations of fairness dictate that

individuals should have an opportunity to know what the law is and to

conform their conduct accordingly; settled expectations should not be

lightly disrupted." (*Landgraf v. USI Film Products* (1994) 511 U.S. 244,

265, footnotes omitted.) This Court has emphasized this presumption in

other citations to the United States Supreme Court:

> Justice (now Chief Justice) Rehnquist succinctly
> captured the well-established legal precepts governing
> the interpretation of a statute to determine whether it
> applies retroactively or prospectively, explaining: "The
> principle that statutes operate only prospectively, while
> judicial decisions operate retrospectively, is familiar to

> every law student. . . . . This court has often pointed
> out: '[T]he first rule of construction is that legislation
> must be considered as addressed to the future, not to
> the past. . . . The rule has been expressed in varying
> degrees of strength but always of one import, that a
> retrospective operation will not be given to a statute
> which interferes with antecedent rights . . . unless such
> be "the unequivocal and inflexible import of the terms,
> and the manifest intention of the legislature."'"

(*Evangelatos v. Superior Court, supra*, at p. 1206-1207, quoting *United*

*States v. Security Industrial Bank* (1982) 459 U.S. 70, 79-80, italics

omitted.)

Thus, "California continues to adhere to the time-honored

principle . . . that in the absence of an express retroactivity provision, a

statute will not be applied retroactively unless it is very clear from extrinsic

sources that the Legislature or the voters must have intended a retroactive

application." (*Evangelatos v. Superior Court, supra*, 44 Cal.3d at 1209;

accord, *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 844

["[A] statute may be applied retroactively only if it contains express

language of retroactivity *or* if other sources provide a clear and

unavoidable implication that the Legislature intended retroactive

application."]. This principle applies equally to initiative measures

approved by the voters. (*Id.* at p.1209 [applying presumption against

retroactivity to Proposition 51]; *Rosasco v. Commission on Judicial*

*Performance* (2000) 82 Cal.App.4th 315, 323 [following *Evangelatos* and holding Proposition 190, which amended state Constitution, not retroactive].) "Initiative measures are subject to the same rules and canons of statutory construction as ordinary legislative enactments." (*Rosasco v. Commission on Judicial Performance, supra,* 82 Cal.App.4th at p. 323.)

For example, in *Evangelatos,* this Court held that Proposition 51 (the Fair Responsibility Act of 1986) was limited to prospective application because, in part, "we find nothing in the language of Proposition 51 which expressly indicates that the statute is to apply retroactively." (*Id.* at p. 1209.) "[A] fair reading of the proposition as a whole makes it clear that the subject of retroactivity or prospectivity was simply not addressed." (*Ibid.*) Further, *Evangelatos* found that a retroactive application could not be inferred from the ballot materials. (*Id.* at pp. 1209-1221.) "Defendants can point to nothing in the election brochure materials which provide any comparable confirmation of an actual intention on the part of the drafters or electorate to apply the statute retroactively." (*Id.* at p. 1211.)

/ / /

/ / /

/ / /

64

2.    **The Measure's Plain Language And Ballot Materials Demonstrate That Proposition 8 Operates Prospectively And May Not Be Applied Retroactively.**

Applying these fundamental principles of statutory construction leads inevitably to the conclusion that Proposition 8, even if found constitutional, has only prospective application and may not be applied retroactively. Nothing in the measure's plain language "expressly" provides for retroactive application. Nor do the measure or the ballot materials "clearly and unavoidably" imply that retroactivity was intended by the drafters or the electorate.

At the outset, it must be recognized that Proposition 8 may not be construed as declaring *existing* law prior to the November 2008 election to be contrary to this Court's decision in *Marriage Cases*. "When this court 'finally and definitively' interprets a statute, the Legislature does not have the power to then state that a later amendment merely declared existing law." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922; see *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 470 ["After the judiciary definitively and finally interprets a statute, . . . the Legislature may amend the statute to say something different. But if it does so, it *changes* the law; it does not merely state what

65

the law always was."].)  Thus, notwithstanding Proposition 8, *Marriage Cases* remains the declaration of the constitutionality of state law before the election.  Instead, the issue is whether Proposition 8 may be retroactively applied to existing marriages that were lawfully recognized and solemnized before the measure's approval by the electorate.

Proposition 8's text, which states that "[o]nly marriage between a man and a woman is valid or recognized in California," plainly does not include an *express* retroactivity clause.  Nor may retroactivity be inferred from such language.  (See *Myers v. Philip Morris Companies, Inc.*, *supra*, 28 Cal.4th at p. 843 [ambiguity required statute to be read as unambiguously prospective].)  As this Court has said, "the time-honored presumption against retroactive application of a statute . . . would be meaningless if [such] vague phrases . . . were considered sufficient to satisfy the test of a 'clear manifestation' . . . or an 'unequivocal and inflexible' assertion of the . . . [s]tatute's retroactivity."  (*Ibid*, citations and original brackets omitted; accord, *Californians for Disability Rights v. Mervyn's LLC* (2006) 39 Cal.4th 223, 229-230 ["[I]n modern times, we have been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from 'vague

66

phrases' . . . and 'broad, general language' . . . in statutes, initiative

measures and ballot pamphlets."].)

       Further, nothing in the extrinsic ballot materials supports

such an inference under the exacting standards that have been applied by

this Court. For example, in the voter guide distributed to registered voters,

the Official Title and Summary advised voters that the measure would

change the California Constitution to eliminate the right of same-sex

couples to marry in California and summarized the specific terms of the

measure. (Ballot Pamp., Gen. Elec. (Nov. 4, 2008), Official Title and

Summary for Proposition 8, RJN Exh. 14, p. 54.) But the title and

summary did not suggest that the measure would impact existing marriages.

(*Ibid.*) Further, the Analysis by the Legislative Analyst noted that, as a

result of this Court's decision overruling Proposition 22, "marriage

between individuals of the same sex is currently valid or recognized in the

state." (*Id.* at p. 55.) But, as with the title and summary, the Legislative

Analyst did not inform voters that the import of the measure would be to

retroactively void thousands of existing and legal marriages. (*Ibid.*)

       Moreover, the ballot arguments for and against the measure

never claimed that Proposition 8 would have such a far-reaching retroactive

effect. In the official voter guide distributed to registered voters, the

proponents argued that a vote of "YES on Proposition 8 does three simple

things: *It restores the definition of marriage* to what the vast majority of

California voters already approved and human history understood marriage

to be. *It overturns the outrageous decision of four activist Supreme Court

judges* who ignored the will of the people. *It protects our children* from

being taught in public schools that 'same-sex marriage' is the same as

traditional marriage." (*Id.* at p. 56.) Their argument in rebuttal states

"Your YES vote on Proposition 8 means that only marriage between a man

and a woman will be valid or recognized in California, regardless of when

or where performed." (*Id.* at p. 57.) Nor did the opponents of Proposition

8 address the possible retroactive effect of the initiative in either the

argument against Proposition 8 or the rebuttal to argument in favor of

Proposition 8. (*Id.* at pp. 56-57.) Nothing in these materials would have

alerted an informed voter that Proposition 8 could be construed as

retroactive.

It is worth noting that the proponents of the measure began

their argument with the assertion that Proposition 8 is "simple and

straightforward." (*Id.* at p. 56.) Surely, if Proposition 8 were so "simple

and straightforward" as to encompass existing marriages as well as future

marriages that impact would be clear from the measure itself or from the

extrinsic materials. The proponents' own characterization of the measure
belies an intent to make it retroactive.

Thus, while the arguments in favor of Proposition 8 state the
measure is intended to "do three simple things," none would
unambiguously suggest retroactive effect on existing same-sex marriages.
The rebuttal to the opponents of Proposition 8 vaguely states that
California law will recognize a marriage only between a man and a woman
"regardless of when or where performed." But this isolated and ambiguous
statement contained in a rebuttal to an argument is insufficient to cast aside
the bedrock principle of non-retroactivity. As this Court has noted, "if the
retroactive application had been brought to the attention of the electorate, it
might well have detracted from the popularity of the measure."
(*Evangelatos v. Superior Court, supra*, 44 Cal.3d at p. 1219.) The subject
of retroactivity was not put to the voters, and this Court should not lightly
infer that voters contemplated that this would be the outcome from voting
in favor of the measure.

When a court seeks to divine the legislative purpose, "[a]
wide variety of factors may illuminate the legislative design, 'such as
context, the object in view, the evils to be remedied, the history of the times
and of legislation upon the same subject, public policy, and

contemporaneous construction.'" (*In re Marriage of Bouquet* (1976) 16
Cal.3d 583, 587, quoting *Alford v. Pierno* (1972) 27 Cal.App.3d 682, 688.)
As shown by the plain language of the measure and the ballot materials
provided to voters, such factors as context, purpose and construction
militate against retroactive application.

Nor does consideration of "the history of the times and of
legislation upon the same subject" support an inference of retroactivity.
(*See Evangelatos v. Superior Court, supra,* 44 Cal.3d at p. 1211 [assessing
these factors in construing intent of initiative proponents].) Far from
supporting retroactivity, these factors strongly indicate that a
knowledgeable voter reading Proposition 8 and the ballot materials would
have concluded that the measure, if enacted, would apply prospectively to
persons contemplating marriage but not retroactively to existing marriages.
At the time the proposed initiative measure was being drafted, the
proponents, interveners in this action, were well aware that the issue of
same-sex marriage was pending in this Court. It required little imagination
to recognize that same-sex marriages would occur legally before the
November 2008 election if this Court, as it in fact did, found that statutes
prohibiting such marriages were unconstitutional. If the proponents had
intended not only to ban same-sex marriages prospectively but to also void

70

existing same-sex marriages, they could have easily phrased the measure to
expressly address this contingency. (See *ibid.* ["[I]t appears rather clear
that the drafters of Proposition 51, in omitting any provision with regard to
retroactivity, must have recognized that the statute would not be applied
retroactively."]) The proponents failure to do so underscores that the
presumption against retroactivity is not overcome by Proposition 8.

### 3. Added Factors Establish That Proposition 8 Should Be Declared To Have No Retroactive Effect On Marriages Entered Into Before The November Election.

In addition to the presumption against retroactivity, several
additional factors demonstrate that Proposition 8 should be limited to so
that it operates only prospectively and has no retroactive effect on
marriages lawfully entered into prior to the November 2008 election.

For example, "[a]n established rule of statutory construction
requires [a court] to construe statutes to avoid 'constitutional
infirmities.'" (*Myers v. Phillip Morris Companies, Inc.*, *supra*, 28 Cal.4th at p. 846.)
Plainly, even if Proposition 8 is upheld as a valid constitutional
amendment, its retroactive application to existing marriages would, at the
very least, raise significant issues under the United States Constitution. In
the absence of clear direction from the voters that the measure was

71

intended to be retroactive, it should be interpreted to avoid these questions.
This can be accomplished by limiting its scope to future marriage
applicants.

Moreover, "[r]etrospective legislation . . . may not be applied
where such application impairs a vested property right without due process
of law." (*In re Marriage of Fabian* (1986) 40 Cal.3d 440, 447.) Of
course, "[v]ested rights are not immutable; the state, exercising its police
power, may impair such rights when considered reasonably necessary to
protect the health, safety, morals and general welfare of the people." (*In re
Marriage of Buol* (1985) 39 Cal.3d 751, 760-761.) In determining whether
a retroactive law contravenes the due process clause, a court considers
"such factors as the significance of the state interest served by the law, the
importance of the retroactive application of the law to the effectuation of
that interest, the extent of reliance upon the former law, the legitimacy of
that reliance, the extent of actions taken on the basis of that reliance, and
the extent to which the retroactive application of the new law would disrupt
those actions." (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592.) It
has been suggested that "it is upon the sole question of whether or not there
has been reliance upon, or the reasonable expectation of the continuance of,

preexisting law that constitutionality of retroactive legislation depends."
(*Flournoy v. State of California* (1964) 230 Cal.App.2d 520, 533.)

Here, retroactive application of Proposition 8 to existing same-sex marriages would overturn the settled expectations of couples who entered into these marriages in reliance on the holding in *Marriage Cases*. Given the strong presumption against retroactive statutory application, the vested interest that these couples have in the continued existence of their marriages should not be overturned in the absence of clear direction from the voters. This is particularly true given that many life-altering decisions have undoubtedly been made by newly married persons in the wake of *Marriage Cases*. These decisions may involve such matters as estate-planning, child-rearing, and property ownership. Nowhere in the ballot materials do the proponents advance a reason why the public interest would be served by interfering with such interests by voiding the marriages.

As this Court has recognized, "[i]n the interest of finality, uniformity and predictability, retroactivity of marital property statutes should be reserved for those rare instances when such disruption is necessary to promote a significantly important state interest." (*In re Fabian, supra,* 40 Cal.3d at p. 450.) Without question, existing marriages

73

are no less deserving of protection from being declared void by retroactive

application of a newly enacted amendment.

Moreover, it has long been recognized that objection to

retroactivity may be made "where . . . the obligation of a contract . . . is

impaired." (*McCann v. Jordan* (1933) 218 Cal. 577, 579 [upholding

retroactivity of statute where "we have no contract and no vested right."];

see (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, §

623, pp. 1017-1018 ["A retrospective law is invalid . . . if it conflicts with

certain constitutional protections, e.g., if it . . . impairs the obligation of a

contract."].) California law recognizes that "[m]arriage is a personal

relation arising out of a civil contract . . . to which the consent of the parties

capable of making that contract is necessary." (Fam. Code, § 300

[excluding language "between a man and a woman" stricken as

unconstitutional in *In re Marriage Cases, supra*, 43 Cal.4th at p. 857].)

These factors help distinguish this case from the situation

faced by this Court in *Lockyer*. There, this Court ruled that the

approximately 4,000 same-sex marriages sanctioned by the City and

County of San Francisco "must be considered void and of no legal effect

from their inception" because they did not comply with state law when they

were entered into. (*Lockyer v. City and County of San Francisco* (2004) 33

Cal.4th 1055, 1113.) Unlike *Lockyer*, the crucial distinction here is that persons have entered into marriages that were *legal at the time of formation.*

It has been widely reported that thousands of same-sex couples have been married between June 16, when such marriages could be lawfully recognized in California for the first time, and the passage of Proposition 8 on November 4. The licenses issued for these couples did not contravene any law of the state of California and, as a result of *Marriage Cases*, these marriages were not unlawful on that basis. Those same-sex couples who relied on California law to enter into legally recognized marriages, like any married couple, as well as their other family members and their community, have settled expectations regarding these marriages that deserve protection. The Court should declare that these marriages remain valid and recognized in California notwithstanding the passage of Proposition 8.

> ### D. Proposition 8 Should Be Invalidated Even If It Is Deemed To Amend The Constitution Because It Abrogates Fundamental Rights Protected By Article I Without A Compelling Interest.

Respondent Attorney General is the chief law officer of the state. (Cal. Const., art. V, § 13.) In that capacity, he is duty bound to

uphold the *whole* of the Constitution, not only the People's reservation of

the initiative power, but also the People's expression of their will in the

Constitution's Declaration of Rights. (Cal. Const., art. I, § 1.)  In

reconciling these separate constitutional protections, Respondent concludes

that the initiative power could never have been intended to give the voters

an unfettered prerogative to amend the Constitution for the purpose of

depriving a disfavored group of rights determined by the Supreme Court to

be part of fundamental human liberty.

This case concerns the right of same-sex couples to marry,

which this Court has determined to be part of fundamental liberty.  But the

issues raised here go far beyond the issue of same-sex marriage.

Petitioners' arguments could as well be raised by a proposed amendment

resurrecting a ban on interracial marriage;[11] a proposed amendment

prohibiting a class of persons from adopting children;[12] a measure denying

---

11.   In this regard, the Court noted that, "In *Perez v. Sharp* . . . the court did not characterize the constitutional right that the plaintiffs in that case sought to obtain as 'a right to interracial marriage' and did not dismiss the plaintiffs' constitutional challenge on the ground that such marriages never had been permitted in California." (*In re Marriage Cases, supra,* 43 Cal.4th at p. 811; cf., *Naim v. Naim* (Va. 1955) 87 S.E.2d 749, 753 [refusing to follow *Perez* because the ruling "is contrary to the otherwise uninterrupted course of judicial decision, both State and Federal, as pointed out in the dissenting opinion, with which we agree"].)

12.   See, e.g., *In re Adoption of Doe* (Fla. Circ. Ct. Nov. 25, 2008) 2008 WL 5006172 [invalidating initiative statute barring homosexuals from adopting children]

76

employment to a class of persons;[13] a measure prohibiting unwed couples

generally from serving as foster parents;[14] a measure quarantining persons

with a disease, or forbidding them from holding employment;[15] or a

measure forbidding landowners to lease or rent to a class of persons, and

denying that class of persons the right to enter into contracts.[16]

    At bottom, the question is whether rights secured under the

state Constitution's safeguard of liberty as an "*inalienable*" right may

intentionally be withdrawn from a class of persons by an initiative

amendment.[17]   Although petitioners have couched their complaint in terms

---

    13.  See 1978 California General Election, Proposition 6 [forbidding homosexuals from working in public schools] RJN Exh. 11.

    14.  See Arkansas 2008 General Election, Initiative No. 1, RJN Exh. 16.

    15.  See 1986 California General Election, Proposition 64 [AIDS], RJN Exh. 12; 1988 Primary Election, Proposition 69 [same], RJN Exh. 13.

    16.  See *Lozano v. City of Hazleton* (M.D. Pa. 2007) 496 F.Supp.2d 477, 555 ["Hazleton, in its zeal to control the presence of a group deemed undesirable [undocumented residents], violated the rights of such people, as well as others within the community"].

    17.  Rights protected by sections other than section 1 in article I may or may not be encompassed by those expressly identified as "inalienable" by the Framers in section 1.  Similarly, after the 1849 and 1879 Conventions, the right to safe schools has been expressly identified as "inalienable." (Const., art. I, § 28, subd. (c).)  Although "privacy" was expressly added to Article I, section 1, in 1972, nevertheless at least insofar as the right includes the principle of personal autonomy, the right to privacy was reasonably encompassed by the right to liberty. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 28-29.) Respondent's suggestion here is intended to encompass only initiative amendments that diminish or abrogate the right to liberty, which has been expressly guaranteed by the Framers in the 1849 and 1879 Conventions in article

of the amendment-revision dichotomy, this litigation, perhaps for the first time, poses a more fundamental question: Is the initiative-amendment power wholly unfettered by the California Constitution's protection of the People's fundamental right to life, liberty, and privacy?

This Court must consider this question, not only because it is part of instant dispute, but also because its resolution will serve as precedent to guide the analysis of future proposed amendments that purport to impair fundamental rights. Accordingly, respondent proposes a means of preserving a clear distinction between amendment and revision, while at the same time giving appropriate weight to rights that the Supreme Court has deemed to be a fundamental.

1.  **Article I, Section 1, Enjoys A Privileged Status In The Plan Of The Constitutional Conventions As The Essential Safeguard Of Individual Freedom.**

Both the 1849 and 1879 Constitutional Conventions declared liberty to be one of the "inalienable" rights that are secured by section 1 of the Declaration of Rights in article I of the California Constitution. Others included "acquiring, possessing, and protecting property, and pursuing and obtaining safety, and happiness." (Cal. Const., art. I, § 1.) The Framers'

---

I, section 1.

78

purpose in declaring certain rights to be "inalienable" was to place those fundamental rights of citizens beyond the power of the Legislature or the Executive to abrogate. As both this Court and the United States Supreme Court have recognized in the context of the Bill of Rights, the federal analogue to California's Declaration of Rights:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.

(*West Virginia State Bd. of Educ. v. Barnette* (1943) 319 U.S. 624, 638, quoted in *In re Marriage Cases, supra*, 43 Cal.4th at p. 852.)[18]

The rights recognized as "inalienable" by the Framers in 1849 and 1879 were so designated because it was generally believed as a matter

---

18. In this regard, one delegate to the 1849 Convention expressed his understanding of the compact:
> What says your bill of rights? It says in the first place that the people are sovereigns. It then goes on to specify certain inalienable rights, and to provide that those rights shall not be infringed upon. The people agree, by adopting the Constitution, that so long as they are members of the community, they will not infringe on those special rights; but they reserve control over all others not restricted by the Constitution.

(Browne, Rep. of Debates in Convention of Cal. on Formation of St. Constitution (1850) p. 53 (remarks of Mr. Semple), RJN Exh. 15.)

political philosophy that a constitution is not the source of these rights.
The rights "antedate" the constitution as inherent in human nature, and the
constitution is the covenant by which Society secures those inherent
freedoms to itself. These rights were not surrendered in the "social
compact." (See *Ex parte Newman* (1858) 9 Cal. 502, 507 (opn. of Terry,
J.) ["When societies are formed, each individual surrenders certain rights,
and as an equivalent for that surrender has secured to him the enjoyment of
certain others appertaining to his person and property, without the
protection of which society cannot exist."]; see also *id*. at p. 511 (opn. of
Burnett, J.) ["[T]here must be certain inherent and inalienable rights of
human nature that no government can rightfully take away. These rights
are retained by the individual because their surrender is not required by the
good of the whole. The just and legitimate ends of civil government can be
practically and efficiently accomplished whilst these rights are retained by
the individual. Every person, upon entering into a state of society, only
surrenders so much of his individual rights as may be necessary to secure
the substantial happiness of the community. Whatever is not necessary to
attain this end is reserved to himself."]; *Ex parte Quarg* (1906) 149 Cal.
79, 80 ["Under our form of government by Constitutions the individual, in
becoming a member of organized society, unless the Constitution states

80

otherwise, surrenders only so much of these personal rights as may be considered essential to the just and reasonable exercise of the police power in furtherance of the objects for which it exists. [Citations]"];[19] cf. *Meachum v. Fano* (1976) 427 U.S. 215, 230 (dis. opn. of Stevens, J.) ["[N]either the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen . . . . Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source"]; *Richmond F. & P. R. Co. v. City of Richmond* (Va. 1926) 133 S.E. 800, 803 [inherent rights of life, liberty, and pursuit of happiness "existed before society was organized and are not surrendered by entering into the organization"].)

The protection of these rights, then, was one of the very purposes of the Constitution. (See Cal. Const., Preamble ["We the People of the State of California, grateful to Almighty God for our freedom, *in order to secure and perpetuate its blessings*, do establish this Constitution." (emphasis added)]; see, e.g., *Budd v. People* (1892) 143 U.S.

_____

19. Professor Grodin describes this principle as the corollary to the basic Lockean premise as to the justification for government that is presently articulated in Article II, Section 1 of the Constitution. (See Grodin, The California State Constitution, *supra*, p. 65.)

81

517, 550 ["Men are endowed by their Creator with certain unalienable

rights,--'life, liberty, and the pursuit of happiness;' and to 'secure,' not grant

or create, these rights, governments are instituted."].)

        Whereas these inalienable rights were not expressly declared

in the original United States Constitution (they were, of course, set out in

the Declaration of Independence), the Framers of the California

Constitution purposefully made them part of the state charter because they

understood that no similar safeguard against state government was

available under the Bill of Rights.  More than a decade before the 1849

Constitution, Chief Justice Marshall had made clear that citizens must look

to their own constitutions for limitations on state governmental invasion of

property rights.  (*Barron v. Baltimore, supra,* 32 U.S. (7 Pet.) 243; see

Grodin, *The California Supreme Court and State Constitutional Rights:*

*The Early Years* (2004) 31 Hastings Const. L.Q. 141, 141-143; see also,

Van Cleave, *supra,* 21 Hastings Const. L. Q. at pp. 103-104.)

        While Respondent does not suggest that the Framers

contemplated that liberty interests included a right to marry that extended to

same-sex couples, the scope of liberty interests evolves over time as

determined by the Supreme Court.  As Justice Thurgood Marshall

observed, ""[H]istory makes clear that constitutional principles of equality,

like constitutional principles of liberty, property, and due process, evolve

over time; what once was a ''natural'' and ''self-evident'' ordering later

comes to be seen as an artificial and invidious constraint on human

potential and freedom."" (*City of Cleburne, Tex. v. Cleburne Living Center*

(1985) 473 U.S. 432, 467 (conc. & dis. opn. of Marshall, J.) (citations

omitted); see also *Perez v. Sharp* (1948) 32 Cal.2d 711, 714 [""The due

process clause of the Fourteenth Amendment protects an area of personal

liberty not yet wholly delimited.""].) Certainly in 1849 or 1879, the

Framers would not have considered contraception to be an aspect of

fundamental liberty. But the United States Supreme Court came to that

conclusion in 1965. (*Griswold v. Connecticut* (1965) 381 U.S. 749.)

The United States Supreme Court recognized that the right to

marry is an aspect of fundamental liberty (See *Meyer v. Nebraska* (1923)

262 U.S. 390, 349.) But as is evident from the dissent in *Perez*, supra, and

from the rejection of the Court's decision in that case by other state courts,

there was no universal agreement that the fundamental right to marry

extended to interracial marriages. (See *Perez v. Sharp, supra,* 32 Cal.2d at

p. 742 et seq. (dis. opn. of Shenk, J.) As this Court had done in *Perez*, the

Court in *In re Marriage Cases* held that the civil right to marry is not a

right limited by Nineteenth Century notions about the nature of that

83

institution, and the Court extended the right -- as a liberty interest -- to include same-sex couples. (See *In re Marriage Cases, supra,* 43 Cal.4th at pp. 781-782.) This holding now delineates the scope of the right to marry protected by article I of the California Constitution.

### 2. The Framers Did Not Give The Legislature The Power To Put A Group's Right To Enjoy Liberty To A Popular Vote.

The Framers (and the People in adopting the Constitution) intended article I, section 1 to act as a check on legislative excesses. (See Van Cleave, *supra,* 21 Hastings Const. L. Q. at pp. 99-101.) Given that protective purpose, the Framers (and the People) would not have endowed [20] the Legislature with the power to eliminate a judicially recognized fundamental liberty interest through a constitutional amendment passed by popular vote -- at least not without a compelling reason for doing so.[21]

---

20. For example, the right of a citizen to work at a lawful occupation (*Bautista v. Jones* (1944) 25 Cal.2d 746, 749) or the right to contract (*Ex parte Drexel* (1905) 147 Cal. 763), or the right to dispose of one's property in a lawful manner (*Ex parte Quarg, supra,* 149 Cal. at p. 80).

21. The Legislature did not obtain the power to propose *revisions* to the Constitution until 1962. Not presented by this case is the question whether the Legislature could propose a *revision* to the Constitution without regard to the limitations of article I, section 1. As noted, in 1962, by amendment to the Constitution, the Legislature acquired a share in what was previously the constitutional convention's exclusive power to propose constitutional revisions. (See now, Cal. Const., art. XVIII, §§ 1, 2.)

And if the Framers did not contemplate such broad legislative powers, then they never would have intended to subject the rights of individuals or groups under article I to abrogation by popular vote–raising the specter of Mills's "tyranny of the majority."  (John Stuart Mill, *On Liberty* (1869) 6.)[22]  This Court stated in 1874: "Our government is a representative republic, not a simple democracy. Whenever it shall be transformed into the latter–as we are taught by the examples of history–the tyranny of a changeable majority will soon drive honest men to seek refuge beneath the despotism of a single ruler." (*Ex parte Wall* (1874) 48 Cal. 279, 314, overruled on other grounds in *Ex parte Beck* (1912) 162 Cal. 701, 705 [re delegation of legislative power].)  And, in the same year, the United States Supreme Court made this observation:

> It must be conceded that there are such rights in every free government beyond the control of the State.  A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less a despotism. It may well be doubted if a man is to hold

---

22.  Not only would such a proposition arguably have been inconsistent with the idea of "inalienable" rights altogether, but it would seemingly have been inconsistent with the belief that California's citizens should not have to look to federal judges and the United States Constitution for protection of their fundamental rights – and, of course, in 1849 such protection did not exist.

> all that he is accustomed to call his own, all in which
> he has placed his happiness, and the security of which
> is essential to that happiness, under the unlimited
> dominion of others, whether it is not wiser that this
> power should be exercised by one man than by many.

(*Citizens' Savings & Loan Assn. v. City of Topeka* (1874) 87 U.S. 655, 662.)

If the Legislature's power to propose amendments did not include the unlimited power–i.e. without sufficient justification in furtherance of the public health, safety, or welfare–to propose an amendment for the purpose of putting fundamental rights to a popular vote, then the power of initiative-amendment, *reserved* to the People in 1911 (see Cal. Const., art. IV, § 1), could likewise not have encompassed any such power. The point of the initiative power was to enable the People to *circumvent* the Legislature (see *Amador Valley, supra,* 22 Cal.3d at pp. 228-229), not to invest the voters with a power that the Legislature itself did not possess.

One could maintain that the initiative-amendment power does not extend to proposals abrogating fundamental rights. Alternatively, one could maintain that article I does not apply to initiative-amendment measures, suggesting that the 1911 amendment of article IV, section 1 (and as partially reformulated as present article XVIII, section 3) impliedly

86

repealed article I, section 1.  The Court need not adopt either of these

alternatives:  if the Court concludes that a material conflict exists between

the guarantees of article I, section 1, and article XVIII, section 3, the Court

should harmonize the two constitutional provisions.  (See *City and County*

*of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 ["In

choosing between alternative interpretations of constitutional provisions we

are further constrained by our duty to harmonize various constitutional

provisions . . . in order to avoid the implied repeal of one provision by

another.  Implied repeals are disfavored."].)[23]

3.     **The Court Can Harmonize The Constitutional Guarantees Under Article I With The Initiative-Amendment Power By Evaluating Whether A Proposed Amendment Abrogating Fundamental Rights Serves A Compelling Interest; Proposition 8 Does Not Satisfy This Test.**

Even "inalienable" rights were understood by many from the

early days of statehood to be subject to restriction or abrogation when the

public good requires (See, e.g., *Ingram v. Colgan* (1894) 106 Cal. 113,

---

23.  Such harmonization would also give effect to the Framers' intent, discussed above, that the Declaration of Rights serve as a source of citizen protection that is *independent* of the Bill of Rights. (See also, Cal. Const., art. I, § 24 ["Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."].)

25

122-123 ["'Any law which goes beyond that principle, which undertakes to abolish rights, the exercise of which does not involve an infringement of the rights of others, or to limit the exercise of rights beyond what is necessary to provide for the public welfare and the general security, cannot be included in the police power of the government. It is a government usurpation, and violates the principles of abstract justice, as they have been developed under our republican institutions.'" (citations omitted)]; *Ex parte Whitwell* (1893) 98 Cal. 73, 79 ["If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution." (Citation omitted)]; *Ex parte Newman* (1858) 9 Cal. 502, 527 (dis. opn. of Field, J.) ["Men have an inalienable right of pursuing and obtaining safety and happiness, but subject to such restrictions as the public good may require."]; see also Cal. Const. Art. 2, § 1 ["All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it *when the public good may require*" (emphasis added)].)

If the initiative process were to encompass the unlimited power to abrogate fundamental rights, article I, section 1, would be stripped of all meaning. (Cf., *Billings v. Hall* (1857) 7 Cal. 1, 17 (conc. opn. of Burnett, J.) ["[F]or the Constitution to declare a right inalienable, and at the same time leave the Legislature unlimited power over it, would be a contradiction in terms, an idle provision, proving that a Constitution was a mere parchment barrier, insufficient to protect the citizen, delusive and visionary, and the practical result of which would be to destroy, not conserve, the rights it vainly presumed to protect."].)

The Court should give expression to the guarantees secured by article I, section 1 by evaluating whether the proposed initiative-amendment sufficiently furthers the public health, safety, or welfare. Mere majority support alone for the measure does not suffice. (See *Citizens' Savings & Loan Assn. v. City of Topeka, supra,* 87 U.S. at p. 662, quoted above; see also Tribe, American Constitutional Law (2d ed.) 1311 ["[A]ttempts to ground constitutional rights of privacy or personhood in conventional morality . . . are helpful but have inherently limited power. For we are talking, necessarily, about rights of individuals or groups *against* the larger community, and against the majority – even an overwhelming majority – of the society as a whole. Subject to the perils of

89

antimajoritarian judgment, courts – and all who take.seriously their

constitutional oaths – must ultimately define and defend rights against

government in terms independent of consensus or majority will."(Italics in

original).])

       Where fundamental rights and suspect classes are involved,

"strict scrutiny" analysis is appropriate in order that the power of the

initiative may be harmonized with the *"inalienable"* guarantees of article I,

section 1.   In this case, the Court has already concluded that the

justifications advanced to support Family Code 308.5 were insufficient to

justify denial of the right to marry to same-sex couples. (*In re Marriage*

*Cases, supra,* 43 Cal.4th at pp. 848-856.)  Given that the proponents chose

simply to elevate the language of Family Code section 308.5 into the

Constitution, and given that the proponents of Proposition 8 advanced no

compelling need in furtherance of public health, safety, or welfare for

abrogating the fundamental rights of same sex couples, the outcome should

be no different here.  For the reasons articulated in *In re Marriage Cases,*

Proposition 8 should be stricken as inconsistent with the guarantees of

individual liberty safeguarded by article I, section 1 of the Constitution.

/ / /

/ / /

Alternatively, if this Court finds the initiative constitutional,

it should be narrowly construed to uphold the marriages that took place

prior to the enactment of the initiative.

Dated:  December 19, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of
California
JAMES M. HUMES
Chief Deputy Attorney General
MANUEL M. MEDERIOS
State Solicitor General
DAVID S. CHANEY
Chief Assistant Attorney General
CHRISTOPHER E. KRUEGER
Senior Assistant Attorney General
KIMBERLY J. GRAHAM
Deputy Attorney General


MARK R. BECKINGTON
Deputy Attorney General
Attorneys for Respondent
Edmund G. Brown Jr., in his official
capacity

92

# IV.

## CONCLUSION

The use of the initiative power to take away a legal right deemed by this Court to be fundamental and from a group defined by a suspect classification is a matter of grave concern. Existing precedents of this Court do not support the invalidation of Proposition 8 either as a revision or as a violation of the separation of powers. However, Proposition 8 should be invalidated as violating the inalienable right of liberty found in article I, section 1 of our Constitution.

///

///

///

///

///

///

///

///

///

///

///

91

## CERTIFICATE OF COMPLIANCE

**CALIFORNIA RULES OF COURT, RULE 8.504 SUBDIVISION (d) (1)**

I hereby certify that:

Pursuant to California Rules of Court, Rule 8.504 subdivision (d) (1), in reliance upon the word count feature of the software used, I certify that **ANSWER BRIEF IN RESPONSE TO PETITION FOR EXTRAORDINARY RELIEF** filed on December 19, 2008 used a 13 point Times New Roman font and contains 20,190 words, including footnotes.

Dated:  December 19, 2008

MARK R. BECKINGTON

## DECLARATION OF SERVICE BY FACSIMILE AND MAIL

Case Name:   **_Karen L. Strauss, et al. v. Mark D. Horton, et al._**

Case No.:     .**S168047**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the
California State Bar at which member's direction this service is made.  I am 18 years of age or
older and not a party to this matter; my business address is 1300 I Street, Suite 125, P.O. Box
944255, Sacramento, CA 94244-2550.  I am familiar with the business practice at the Office of
the Attorney General for collection and processing of correspondence for mailing with the United
States Postal Service.  In accordance with that practice, correspondence placed in the internal
mail collection system at the Office of the Attorney General is deposited with the United States
Postal Service that same day in the ordinary course of business.  My facsimile machine telephone
number is (916) 324-8835.

On December 19, 2008,  I served the attached **ANSWER BRIEF IN RESPONSE TO
PETITION FOR EXTRAORDINARY RELIEF** by transmitting a true copy by facsimile
machine, pursuant to California Rules of Court, rule 2.306.  The facsimile machine I used
complied with Rule 2.306, and no error was reported by the machine.  Pursuant to rule
2.306(g)(4), I caused the machine to print a record of the transmission, a copy of which is
attached to this declaration.  In addition, I placed a true copy thereof enclosed in a sealed
envelope with postage thereof fully prepaid, in the internal mail system of the Office of the
Attorney General, addressed as follows:

**PLEASE SEE THE ATTACHED SERVICE LIST**

I declare under penalty of perjury under the laws of the State of California the foregoing is true
and correct and that this declaration was executed on December 19, 2008, at Sacramento,
California.

| Rowena A.R. Aquino | | |
| --- | --- | --- |
| Declarant | | Signature |

10462768.wpd

## SERVICE LIST FOR STRAUSS V. HORTON

## CALIFORNIA SUPREME COURT CASE NO. S168047

| | |
|---|---|
| **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:** | **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:** |
| Shannon Minter<br>Catherine Pualani Sakimura<br>Melanie Speck Rowen<br>Shin-Ming Wong<br>Christopher Francis Stoll<br>Ilona M. Turner<br>**National Center For Lesbian Rights**<br>870 Market Street, Suite 370<br>San Francisco, CA 94102 | Gregory D. Phillips<br>Jay Masa Fujitani<br>David Carter Dinielli<br>Michelle Taryn Friedland<br>Lika Cynthia Miyake<br>Mark R. Conrad<br>**Munger, Tolles & Olson, LLP**<br>355 S. Grand Ave., 35th Floor<br>Los Angeles, CA 90071 |
| Telephone:    (415) 392-6257<br>Facsimile:    (415) 392-8442 | Telephone:    (213) 683-9100<br>Facsimile:    (213) 687-3702 |
| **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:** | **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:** |
| Jon W. Davidson<br>Jennifer C. Pizer<br>F. Brian Chase<br>Tara Borelli<br>**Lambda Legal Defense and Education Fund, Inc.**<br>3325 Wilshire Blvd., Suite 1300<br>Los Angeles, CA 90010 | Alan L. Schlosser<br>Elizabeth O. Gill<br>**ACLU Foundation of Northern California**<br>39 Drumm Street<br>San Francisco, CA 94111<br><br>Telephone:    (415) 621-2493<br>Facsimile:    (415) 255-8437 |
| Telephone:    (213) 382-7600<br>Facsimile:    (213) 351-6050 | |

| | |
|---|---|
| **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:**<br><br>Mark Rosenbaum<br>Clare Pastore<br>Lori Rifkin<br>**ACLU Foundation of Southern California**<br>1313 W. 8th Street<br>Los Angeles, CA 90017<br><br>Telephone: (213) 977-9500<br>Facsimile: (213) 250-3919 | **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:**<br><br>John David Blair-Loy<br>**ACLU Foundation of San Diego and Imperial Counties**<br>450 B Street, Suite 1420<br>San Diego, CA 92101<br><br>Telephone: (619) 232-2121<br>Facsimile: (619) 232-0036 |
| **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:**<br><br>David C. Codell<br>**Law Office of David C. Codell**<br>9200 Sunset Blvd., Penthouse Two<br>Los Angeles, CA 90069<br><br>Telephone: (310) 273-0306<br>Facsimile: (310) 273-0307 | **Representing Petitioner Karen L. Strauss, Ruth Borentein, Brad Jacklin, Dustin Hergert, Eileen Ma, Suyapa Portillo, Gerardo Marin, Jay Thomas, Sierra North, Celia Carter, Desmund Wu, James Tolen, and Equality California:**<br><br>Stephen V. Bomse<br>**Orrick, Herrington & Sutcliffe LLP**<br>405 Howard Street<br>San Francisco, CA 94105<br><br>Telephone: (415) 773-5700<br>Facsimile: (415) 773-5759 |
| **Representing Intervenors Dennis Hollingsworth, Gail J. Knight, Martin F. Gutierrez, Hak-Shing William Tam, Mark A. Jansson, & Protectmarriage.com:**<br><br>Andrew P. Pugno<br>**Law Offices of Andrew P. Pugno**<br>101 Parkshore Dr., Ste 100<br>Folsom, CA 95630<br><br>Telephone: (916) 608-3065<br>Facsimile: (916) 608-3066 | |