# Exhibit M

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

**Coordination Proceeding, Special Title [Rule 1550(b)] In re MARRIAGE CASES.**

Case No. S147999

(JCCP No. 4365)

First Appellate District, Case Nos. A110449, A110450, A110451, A110463, A110651, A110652
San Francisco County Superior Court Nos. CGC-04-429539, CGC-04-504038, CGC-04-429548, CPF-04-503943, CGC-04-428794
Los Angeles County Superior Court Case No. BS-088506
Hon. Richard A. Kramer, Judge

## ANSWER BRIEF OF STATE OF CALIFORNIA AND THE ATTORNEY GENERAL TO OPENING BRIEFS ON THE MERITS

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Deputy Attorney General

MANUEL M. MEDEIROS
State Solicitor General

DAVID S. CHANEY
Chief Assistant Attorney General

STACY BOULWARE EURIE
Senior Assistant Attorney General

CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General
State Bar No. 173288

1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 445-7385
Fax: (916) 324-8835
Email: Christopher.Krueger@doj.ca.gov

Attorneys for the State of California and Attorney General Edmund G. Brown Jr.

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................... 1

STATEMENT OF FACTS ................................................. 3

    A.  The History of California's Laws Regulating Marriage as Between a Man and a Woman. .......... 3

    B.  The History of the Recognition of Lawful Conjugal and Family Relationships Outside of the Marriage Context. .......... 7

    C.  The History of California's Statutory Recognition of Committed Same-sex Partnerships. .......... 10

    D.  The History of the Instant Litigation. .......... 12

ARGUMENT ............................................................... 16

  I.  CALIFORNIA'S MARRIAGE LAWS SATISFY EQUAL PROTECTION UNDER A RATIONAL BASIS TEST BECAUSE THE STATE MAY PRESERVE THE TRADITIONAL DEFINITION OF MARRIAGE WHILE AFFORDING THE SAME RIGHTS, BENEFITS AND PROTECTIONS TO DOMESTIC PARTNERS. .......... 16

    A.  The Marriage Laws Do Not Discriminate Based on Gender Because They Do Not Favor One Gender Over Another. .......... 17

    B.  The Marriage Statutes Do Not Discriminate Based on Sexual Orientation Because They Do Not Favor One Sexual Orientation Over Another. .......... 22

    C.  Sexual Orientation Is Not a Suspect Classification. .......... 24

    D.  The Equal Protection Clause of the California Constitution Does Not Establish a Fundamental Right to Same-sex Marriage. .......... 38

**TABLE OF CONTENTS (continued)**

Page

E. If the Court Declines to Apply a Rational Basis Test, the Marriage Laws Should Nevertheless Be Sustained Because They Satisfy an Intermediate Level of Scrutiny.  39

F. The State's Maintenance of Traditional Marriage and Domestic Partnerships Promotes Important State Interests.  43

    1. The State Has an Important Interest in Maintaining the Traditional Definition of Marriage While Providing Same-sex Couples With the Same Rights and Benefits.  45

    2. The State Has an Important Interest in Carrying Out the Will of Its Citizens as Represented Through the Legislative Process.  48

II.   CALIFORNIA'S CHOICE TO EQUALIZE RIGHTS FOR SAME-SEX COUPLES WHILE PRESERVING THE INSTITUTION OF MARRIAGE COMPORTS WITH THE FUNDAMENTAL RIGHT TO MARRY.  55

A. The Personal Dignity Interests That Inform the Historically Recognized "Right to Marry" Have Been Given to Same-sex Partners by the Domestic Partnership Act.  55

B. There Is No Fundamental Liberty Interest in Using the Title "Marriage" to Describe a Same-sex Relationship.  63

III.  THE MARRIAGE LAWS COMPORT WITH THE RIGHTS OF PRIVACY, ASSOCIATION AND EXPRESSION.  63

A. There Is No Constitutionally Recognized Privacy Interest that Guarantees Same-sex Couples a Right to Marry.  64

B. The Marriage Laws Do Not Infringe Upon Rights of Association or Expression.  66

CONCLUSION  68

# TABLE OF AUTHORITIES

Page

**Cases**

*Alaska Civil Liberties Union v. State of Alaska*
(Alaska 2005) 122 P.3d 781 ............... 43

*Amador Valley Joint Union High School District v. State Board of Equalization*
(1978) 22 Cal.3d 208 ............... 11, 32

*American Academy of Pediatrics v. Lungren*
(1997) 16 Cal.4th 307 ............... 65

*Andersen v. King County*
(Wash. 2006) 138 P.3d 963 ............... 19, 24, 54

*Armijo v. Miles*
(2005) 127 Cal.App.4th 1405 ............... 6

*Arp. v. Workers' Comp. Appeals Bd.*
(1977) 19 Cal.3d 395 ............... 18

*Baehr v. Lewin*
(Hawaii 1993) 852 P.2d 44 ............... 19

*Baker v. Carr*
(1962) 369 U.S. 186 ............... 49

*Baker v. Nelson*
(Minn. 1971) 191 N.W.2d 185 ............... 19

*Baker v. State of Vermont*
(Vt. 1999) 744 A.2d 864 ............... 18, 41, 45, 53

*Bakke v. Regents of the Univ. of Calif.*
(1976) 18 Cal.3d 34 ............... 36

*Baluyut v. Superior Court*
(1996) 12 Cal.4th 826 ............... 23

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Board of Supervisors v. Local Agency Formation Comm.*
(1992) 3 Cal.4th 903 .......................................................... 8

*Bowens v. Superior Court*
(1991) 1 Cal.4th 36 ............................................................ 32

*Bowers v. Hardwick*
(1986) 478 U.S. 186 ........................................................ 37, 56

*Brown v. Board of Education*
(1954) 347 U.S. 483 ........................................................ 46, 47

*Brown v. Merlo*
(1973) 8 Cal.3d 855 .......................................................... 46

*Butt v. State of California*
(1992) 4 Cal.4th 668 .......................................................... 38

*Califano v. Jobst*
(1977) 434 U.S. 47 ............................................................ 59

*City of Cleburne v. Cleburne Living Center*
(1985) 473 U.S. 432 .............................................. 30, 31, 35, 41

*Coshow v. City of Escondido*
(2005) 132 Cal.App.4th 687 ................................................ 56

*Craig v. Boren*
(1976) 429 U.S. 190 ........................................................ 28, 40

*Dandridge v. Williams*
(1970) 397 U.S. 471 .......................................................... 43

*Dawn D. v. Superior Court*
(1998) 17 Cal.4th 932 ...................................................... 56, 57

*DeBurgh v. DeBurgh*
(1952) 39 Cal.2d 858 ......................................................... 21

## TABLE OF AUTHORITIES  (continued)

**Page**

*D'Amico v. Board of Medical Examiners*
    (1974) 11 Cal.3d 1                         16, 38-40

*Eisenstadt v. Baird*
    (1972) 405 U.S. 438                        58

*Elden v. Sheldon*
    (1988) 46 Cal.3d 267                      4

*Elisa B. v. Superior Court*
    (2005) 37 Cal.4th 108                    9

*Fair Political Practices Commission v. Superior Court*
    (1979) 25 Cal.3d 33                        59

*Flores v. Morgan Hill Unified Sch. Dst.*
    (9th Cir. 2003) 32 F.3d 1130             37

*Frontiero v. Richardson*
    (1973) 411 U.S. 677                   28, 30, 31

*Gay Law Students Assn. v. Pac. Telephone & Telegraph Co.*
    (1979) 24 Cal.3d 458                    18

*Goodridge v. Department of Public Health*
    (Mass. 2003) 798 N.E.2d 941             60

*Graham v. Richardson*
    (1971) 403 U.S. 365                      29

*Griswold v. Connecticut*
    (1965) 381 U.S. 479                      58

*Hansen v. City of San Buenaventura*
    (1986) 42 Cal.3d 1172                  32

*Hardy v. Stumpf*
    (1978) 21 Cal.3d 1                       19

TABLE OF AUTHORITIES  (continued)

Page

*Harris v. Capital Growth Investors XIV*
    (1991) 52 Cal.3d 1142                                   23

*Hawkins v. Superior Court*
    (1978) 22 Cal.3d 584                             42, 52, 59

*Hays v. Wood*
    (1979) 25 Cal.3d 772                                   40

*Hernandez v. City of Hanford*
    (June 7, 2007, S143287) __ Cal.4th __ [2007 WL 1629830]   40

*Hernandez v. Robles*
    (N.Y. 2006) 855 N.E.2d 1                         19, 45, 52

*Hernandez v. State of Texas*
    (1954) 347 U.S. 475                                   34

*Hernandez-Montiel v. Immigration & Naturalization Serv.*
    (9th Cir. 2000) 225 F.3d 1084                       37

*Hill v. National Collegiate Athletic Assn.*
    (1994) 7 Cal.4th 1                                   63

*Holguin v. Flores*
    (2004) 122 Cal.App.4th 428                          37

*Holmes v. California Army National Guard*
    (9th Cir. 1997) 124 F.3d 1126                       37

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*
    (1995) 515 U.S. 557                                   67

*In re Anderson*
    (1968) 69 Cal.2d 613                                 51

*In re Kandu*
    (Bankr. W.D. Wash. 2004) 315 B.R. 123              19

TABLE OF AUTHORITIES  (continued)

                                                              **Page**

*In re Lane*
    (1962) 58 Cal.2d 99                                            8

*Johnson v. California*
    (2005) 543 U.S. 449                                           31

*Johnson v. Calvert*
    (1993) 5 Cal.4th 84                                            8

*K.M. v. E.G.*
    (2005) 37 Cal.4th 130                                          9

*Kasler v. Lockyer, supra,*
    (2000) 23 Cal.4th 472                                      31, 38

*Kenneally v. Med. Bd. of Calif.*
    (1994) 27 Cal.App.4th 489                                     32

*Kilburn v. Kilburn*
    (1891) 89 Cal. 46                                              4

*Kim v. Workers' Comp. Appeals Bd.*
    (1999) 73 Cal.App.4th 1357                                    23

*Knight v. Superior Court*
    (2005) 128 Cal.App.4th 14                                      6

*Koebke v. Bernardo Heights Country Club*
    (2005) 36 Cal.4th 824                               10, 22, 41, 48

*Koire v. Metro Car Wash*
    (1985) 40 Cal.3d 24                                           18

*Kristine H. v. Lisa R.*
    (2005) 37 Cal.4th 156,                                         9

*Lawrence v. Texas*
    (2003) 539 U.S. 558                                    8, 36, 56

## TABLE OF AUTHORITIES  (continued)

                                                                    **Page**

*Lewis v. Harris*
   (N.J. 2006) 908 A.2d 196                              43, 45, 52

*Lochner v. New York*
   (1905) 198 U.S., 45                                       57

*Lockyer v. City and County of San Francisco*
   (2004) 33 Cal.4th 1055                                  7, 12, 60

*Loving v. Virginia*
   (1967) 388 U.S. 1                                    8, 20, 29, 58

*Massachusetts Board of Retirement v. Murgia*
   (1976) 427 U.S. 307                                       30

*Maynard v. Hill*
   (1888) 125 U.S. 190                                        7

*Meyer v. State of Nebraska*
   (1923) 262 U.S. 390                                       57

*Michelle W. v. Ronald W.*
   (1985) 39 Cal.3d 354                                      18

*Mississippi Univ. for Women v. Hogan*
   (1982) 458 U.S. 718                                       18

*Morrison v. Sadler*
(Ind. Ct. App. 2005) 821 N.E.2d 15                                    52

*Mott v. Mott*
   (1890) 82 Cal. 413                                      4, 61

*Nahrstedt v. Lakeside Village Condominium Assn.*
   (1994) 8 Cal.4th 361                                      64

*Nguyen v. Immigration & Naturalization Serv.*
   (2001) 533 U.S. 53                                        29

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Ortiz v. Los Angeles Police Relief Ass'n, Inc.*
   (2002) 98 Cal.App.4th 1288                                      65

*People v. Anderson*
   (1972) 6 Cal.3d 628                                            51

*People v. Hill*
(1992) 3 Cal.4th 959                                             51

*People v. Mobley*
   (1999) 72 Cal.App.4th 761                                       8

*People v. Santos*
   (2007) 147 Cal.App.4th 965                                     56

*Perez v. Sharp*
   (1948) 32 Cal.2d 711                               7, 8, 20, 21, 58

*Personnel Administrator of Mass. v. Feeney*
   (1979) 442 U.S. 256                                            22

*Plessy v. Ferguson*
   (1896) 163 U.S. 537                                            47

*Plyler v. Doe*
   (1982) 457 U.S. 202                                            30

*Purdy & Fitzpatrick v. State of California*
   (1969) 71 Cal.2d 566                                           32

*Raffaelli v. Committee on Bar Examiners*
   (1972) 7 Cal.3d 288                                            32

*Raich v. Gonzales*
   (9th Cir. Mar. 27, 2007) __ F.3d __, 2007 WL 754759            56

*Reed v. Reed*
   (1971) 404 U.S. 71                                             28

## TABLE OF AUTHORITIES  (continued)

Page

*Regents of the Univ. of Calif. v. Bakke*
    (1978) 438 U.S. 265                                              36

*Reyna v. City & County of San Francisco*
    (1977) 69 Cal.App.3d 876                                         32

*Roe v. Wade*
    (1973) 410 U.S. 113                                              50

*Romer v. Evans*
    (1996) 517 U.S. 620                                              16

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*
    (2006) 547 U.S. 47, 126 S.Ct. 1297                               67

*Sail'er Inn, Inc. v. Kirby*
    (1971) 5 Cal.3d 1                                    25, 27-29, 40

*San Antonio Independent School Dist. v. Rodriguez*
    (1973) 411 U.S. 1                                                29

*Schmidt v. Superior Court*
    (1989) 48 Cal.3d 370                                             32

*Self v. Self*
    (1962) 58 Cal.2d 683                                             21

*Serrano v. Priest*
    (1977) 18 Cal.3d 728                                             33

*Sharon S. v. Superior Court*
    (2003) 31 Cal.4th 417                                            9

*Skinner v. Oklahoma*
    (1942) 316 U.S. 535                                            7, 57

*Smelt v. County of Orange*
    (C.D. Cal. 2005) 374 F.Supp.2d 861                              19

**TABLE OF AUTHORITIES  (continued)**

Page

*Standhardt v. Superior Court*
   (Ariz. Ct. App. 2003) 77 P.3d 451      52

*Tain v. State Bd. of Chiropractic Examiners*
   (2005) 130 Cal. App.4th 609      32

*Turner v. Safley*
   (1987) 482 U.S. 78      59, 60

*U.S. Department of Agriculture v. Moreno*
   (1973) 413 U.S. 528      40

*United States v. Carolene Products Co.*
   (1938) 304 U.S. 144      *passim*

*United States v. Virginia*
   (1996) 518 U.S. 515      18, 29

*Vacco v. Quill*
   (1997) 521 U.S. 793      39

*Warden v. State Bar of California*
   (1999) 21 Cal.4th 628      40

*Warfield v. Peninsula Golf & Country Club*
   (1995) 10 Cal.4th 594      66

*Washington v. Glucksberg*
   (1997) 521 U.S. 702      39, 49, 56, 57

*Watkins v. United States Army*
   (9th Cir. 1989) 875 F.2d 699      37

*Werner v. Southern California Associated Newspapers*
   (1950) 35 Cal.2d 121      49

*Zablocki v. Redhail*
   (1978) 434 U.S. 374      8, 58-60

TABLE OF AUTHORITIES  (continued)

**Page**

**Constitutional Provisions**

Calif. Const. 1849, art. XI
   § 12                                         3, 45

Calif. Const., art. I
   § 1                                            63
   § 6 (former)                           51
   § 8                                          27
   § 17                                      51

Calif. Const., art. II
   § 1                                        51
   § 8                                        51

Calif. Const., former art. XX
   § 7                                        3
   § 18                                     27

Hawaii Const., art. I
   § 26                                      20

United States Const.
   First Amendment                       7
   Fourteenth Amendment           *passim*
   Twenty-Sixth Amendment         4

**Statutes and Regulations**

1 U.S.C.
   § 7                                 11, 12, 46

28 U.S.C.
   § 1738C                            11, 12

TABLE OF AUTHORITIES  (continued)

**Page**

Calif. Civ. Code (former)
§ 55 — 3, 4
§ 56 — 3, 4
§ 4100 — 4-6
§ 4101 — 4-6
§ 4101(a) — 5
§ 4357 — 5
§ 4400 — 5
§ 4401 — 5
§ 4425(b) — 5
§ 4213(a) — 5

Calif. Code Civ. Proc.
§ 1094 — 13

Calif. Code Regs., tit. 18,
§ 462.240, subd. (k) — 11

Calif. Fam. Code
§ 297 — 62
§ 297.5 — *passim*
§ 299.2 — 12
§ 300 — *passim*
§ 301 — *passim*
§ 302 — *passim*
§ 304 — 6
§ 308 — 6
§ 308.5 — *passim*
§ 420 — 3
§ 7602 — 8
§ 9000 — 9

Calif. Rev. & Tax. Code
§ 61 — 11
§ 18521 — 11

Calif. Stats. 1850, ch. 140
§§ 1-11 — 3

TABLE OF AUTHORITIES  (continued)

Page

Calif. Stats. 1969, ch. 1608 — 4

Calif. Stats. 1971, ch. 1748
  § 26 — 5

Calif. Stats. 1977, ch. 339
  § 1 — 5

Calif. Stats. 1999, ch. 588 — 10

Calif. Stats. 2002, ch. 447 — 10

Calif. Stats. 2003, ch. 421 — 9

Calif. Stats. 2003, ch. 421
  § 1 — 48

Calif. Stats. 2006, ch. 802 — 10

Calif. Welf. & Inst. Code
  § 16013 — 9

Conn. Gen. Stat. Ann.
  §§ 46b-38aa – 46b-38oo — 54

D.C. Official Code
  § 32-702 — 54

Haw. Rev. Stat. § 572C-2 — 53

Maine Rev. Stats. Ann., tit. 22
  § 2710 — 53

N.H. Stats. 2007, ch. 58 — 53

N.J. Stat. Ann.
  §§ 37:1-29 - 37:1-36 — 53

Ore. Stats. 2007, ch. 99 — 53

xiv

**TABLE OF AUTHORITIES  (continued)**

**Page**

Vt. Stat. Ann.
§§ 1201 - 1207                                                     54

Wash. Stats. 2007, ch. 156                                         54

**Other Authorities**

2B Sutherland, Statutes and Statutory Construction
(6th ed. 2000) Reenactment of a Statute After Contemporaneous and
Practical Interpretation, § 49-09, p. 103                          24

3 Rotunda & Nowak, *Treatise on Constitutional Law*
(3rd ed. 1999) § 18.28, p. 580                                     59

Breyer, Active Liberty
(2005)                                                            50

Buchanan, *Gays and Lesbians Gain New Rights As 8 Laws Take Effect Monday*
S.F. Chronicle, Dec. 29, 2006, p. B7                              34

Burke, A Vindication of Natural Society
(1757), reprinted in The Portable Edmund Burke (1999)            44

Burke, Reflections on the Revolution in France, para. 36 (1790), reprinted in
The Portable Edmund Burke (1999)                                 44

Chauncey, Why Marriage: The History Shaping Today's Debate Over Gay
Equality (2004)                                                  47

Ely, Democracy and Distrust
(1980)                                                        26, 36

Eskridge, Equality Practice: Civil Unions and the Future of Gay Rights
(2002)                                                          47

Frankfurter, *The Supreme Court in the Mirror of the Justices*
(1957) 105 U.Pa.L.Rev. 781                                       51

xv

## TABLE OF AUTHORITIES  (continued)

Page

Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade*
  (1985) 63 N. Carolina L.Rev. 375                                    50

Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*
  (1972) 86 Harv. L. Rev. 1                                      26, 40

Lusky, *Footnote Redux: A Carolene Products Reminiscence*
  (1982) 82 Colum. L. Rev. 1093                                    25

Note, *The Glucksberg Renaissance: Substantive Due Process Since Lawrence v. Texas*
  (2006) 105 Mich. L. Rev. 409                                     56

Pull, *Questioning the Fundamental Right to Marry*
  (2006) 90 Marq. L. Rev. 21                                    57, 61

Sunstein, *Foreward: Leaving Things Undecided*
  (1996) 110 Harv. L. Rev. 1                                    41, 50

Sunstein, *The Right to Marry*
  (2005) 26 Cardozo L. Rev. 2081                                 60, 61

Traynor, *Law and Social Change in a Democratic Society*, 1956 U. Ill. L. F. 230, reprinted in The Traynor Reader
  (Hastings L. J. 1987)                                           49

Traynor, *Statutes Revolving in Common-Law Orbits,*  17 Cath. U.L. Rev. 401 (1968), reprinted in The Traynor Reader (Hastings L. J. 1987)    21

Traynor, *The Limits of Judicial Creativity*
  (1978) 29 Hastings L. J. 1025                                    50

Webster's Ninth New Collegiate Dictionary
  (1989)                                                          21

**TABLE OF AUTHORITIES (continued)**

**Page**

Zelinsky, *Deregulating Marriage: The Pro-Marriage Case for Abolishing Civil Marriage*
(2006) 27 Cardozo L. Rev. 1161                                    61

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| **Coordination Proceeding, Special Title [Rule 1550(b)] In re MARRIAGE CASES.** | Case No. S147999 |
| | (JCCP No. 4365) |

## INTRODUCTION

Across the nation, a historic debate about marriage and equality continues. While many states have responded to the push for legalization of same-sex marriage by amending their constitutions to outlaw it, California in recent years has been moving steadily in the opposite direction. Although same-sex marriage remains unrecognized by statute, the Legislature created a domestic partnership system for same-sex partners in 1999 and then amended it in 2003 to provide these partners with substantially all of the same rights and benefits that are given to married couples. While these consolidated cases were under submission to the Court of Appeal, California further amended its laws to provide domestic partners with all of the same rights and benefits given by the state to married couples.

Several states have followed California's lead in providing rights and benefits to same-sex couples without judicial compulsion. In just the last few

months, Washington and Oregon have approved domestic partnership laws while New Hampshire has adopted a system of civil unions. A total of 10 states now provide same-sex couples with some or all of the rights and benefits typically associated with marriage.

Petitioners[1] ask this Court to strike down laws preserving marriage as traditionally defined. The Court should, regardless of the doctrinal test involved, refrain from invalidating California's marriage scheme for three separate yet related reasons. First, California's political process has demonstrated itself to being open to gay men and lesbians, who have and who will continue to be fully respected by the laws that emerge. Second, the current status quo whereby same-sex couples receive all of the material and tangible benefits California confers on married couples does not remotely treat gays and lesbians with any animus or invidiously relegate them to second-class citizenship of any kind. And third, the state should have the power to stick with a definition and conception of marriage that has proven durable and functional over many generations in order to avoid the social risks inherent in overly rapid change that rends the fabric of society in ways that cannot be readily assimilated and that may prompt backlash reactions. Under such circumstances, prudence and respect for the coordinate branches of government counsel that the judiciary should not short-circuit the legislative process by stepping in and imposing its own view of a perfect solution.

---

1. For the sake of clarity, this brief will refer to the four groups of parties challenging the marriage laws as "petitioners." (This answer brief does not address the arguments regarding standing made in the opening briefs filed by Campaign for California Families and the Proposition 22 Legal Defense and Education Fund.) The State of California and Attorney General Edmund G. Brown Jr. will be referred to collectively as the "state."

A day may come when the people decide to legalize same-sex marriage. But such a social change should appropriately come from the people rather than the judiciary so long as constitutional rights are protected. All applicable constitutional rights have been so protected in California through enactment of the domestic partnership laws, which confer on domestic partners the same rights and benefits that are given to married couples. Because California's marriage laws are constitutional, the state respectfully requests the judgment of the Court of Appeal be affirmed.

## STATEMENT OF FACTS

### A. The History of California's Laws Regulating Marriage as Between a Man and a Woman.

The Legislature began exercising its authority over civil marriage immediately upon statehood.[2] (Stats. 1850, ch. 140, §§ 1-11.) The state's current marriage statutes find their origin in the 1872 Civil Code, a modified version of Field's New York Draft Civil Code. Former Civil Code section 55 provided that marriage was "a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary." (Appellants' Appendix on Appeal ("AA") at p. 6.) Section 56 of that Code provided: "Any unmarried male of the age of eighteen years or upwards, and any unmarried female of the age of fifteen years or upwards, and not otherwise disqualified, are capable of consenting to and consummating

---

2. Marriage has an undeniable spiritual or religious significance for many people, but civil marriage in California has never been subject to a religious requirement. California's first Constitution provided: "No contract of marriage, if otherwise duly made, shall be invalidated for want of conformity to the requirements of any religious sect." (Cal. Const. 1849, art. XI, § 12.) This provision was retained in the 1879 Constitution before being codified in 1970. (Cal. Const., former art. XX, § 7; Fam. Code, § 420, subd. (c).) Thus, civil marriage has never been a religious institution under California law.

marriage." (*Ibid.*) The 1872 Civil Code further provided, in section 69, subdivision (4), that the county clerk must obtain the "the consent of the father, mother, or guardian," before solemnizing any marriage in which "the male be under the age of twenty-one, or the female under the age of eighteen years . . . ." (AA at p. 7.)

Former Civil Code section 55 did not expressly state that marriage was between a man and a woman, but this Court held in 1890 that the legal relationship defined in section 55 "is one 'by which a man and woman reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife.'" (*Mott v. Mott* (1890) 82 Cal. 413, 416, quoting Bouvier's Law Dist., tit. Marriage; see also *Kilburn v. Kilburn* (1891) 89 Cal. 46, 50, quoting Shelf. Mar. & Div. 1 [describing marriage as a contract "by which a man and woman, capable of entering into such a contract, mutually engage with each other to live their whole lives together in the state of union which ought to exist between a husband and his wife"].)

Although California statutes governing marriage and family relations have undergone extensive changes since the nineteenth century,[3] the understanding of marriage as a union between a man and a woman has endured. In 1969, the Legislature enacted "The Family Law Act." (Stats. 1969, ch. 1608.) While reforming the laws governing divorce, the bill left many of the statutes governing marriage unchanged though recodified. Former Civil Code sections 55 and 56 were recodified as Civil Code sections 4100 and 4101. (AA at p. 21.)

Following the passage in 1971 of the Twenty-Sixth Amendment to the United States Constitution lowering the minimum voting age to 18 years,

---

3. California abolished common law marriage in 1895. (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 275.)

4

the Legislature passed Assembly Bill 2887 (1971 Reg. Sess.), an omnibus bill lowering most statutory minimum ages to 18. (AA at pp. 41-57; Stats. 1971, ch. 1748.) AB 2887 amended subdivision (a) of former Civil Code section 4101, setting the uniform age requirement for marriage at 18 years of age, instead of 21 for men and 18 for women. (Stats. 1971, ch. 1748, § 26.) Although, by setting a uniform age, the amended statute was able to eliminate the reference to the gender of the marrying partners, the legislative history of AB 2887 confirms that there was no intent to authorize same-sex marriage.[4] In fact, the enactment of AB 2887 left unchanged many statutes that continued to treat marriage as the union of one man and one woman, including Civil Code section 4100.[5]

In 1977, the County Clerks Association of California sponsored Assembly Bill 607 (Stats. 1977, ch. 339, § 1). The legislation amended former Civil Code sections 4100 and 4101 to reaffirm that marriage was a contract between a man and a woman. The legislative history of AB 607 indicates concern that the 1971 elimination of the gender references in section 4101 made the issue of whether same-sex couples could marry

---

4. AA at p. 59 (Gov. Reagan Statement on AB 2887, Dec. 14, 1971); see also AA at pp. 60-61(Assem. Comm. on Jud. Analysis of AB 2887, July 12, 1971).

5. See AA at pp. 23, 25 (former Civil Code § 4213(a) ["[w]hen unmarried persons, not minors, have been living together as man and wife, they may, without a license, be married by any clergyman"], § 4357 ["the superior court may order the husband or wife, or father or mother, as the case may be, to pay any amount that is necessary" to support the husband, wife or children], § 4400 [prohibiting marriages between "brothers and sisters of the half as well as the whole blood, and between uncles and nieces and aunts and nephews"], § 4401 [prohibiting marriage by a person "during the life of a former husband or wife of such person"], § 4425(b) [marriage voidable if "husband or wife" is living, marriage is in force, and husband or wife has not been absent for five years or more]).

5

"vague and subject to controversy."[6] (AA at p. 63.) Today, section 4100 is recodified, without substantial change, as Family Code section 300, and the provisions of former section 4101 are found in Family Code sections 301, 302 and 304.

Proposition 22 was subsequently enacted by the People of California in the year 2000. That initiative added Family Code section 308.5, which provides that "[o]nly marriage between a man and a woman is valid or recognized in California." (Fam. Code, § 308.5.)[7]

This statutory history demonstrates that California's definition of marriage has always been commonly and judicially understood as a union

6. The City contends that a campaign by singer Anita Bryant to repeal a Dade County, Florida ordinance prohibiting discrimination against gay men and lesbians "was also influential in the movement in California to amend the marriage statutes to explicitly exclude same-sex couples." (City Brief at p. 17.) But the evidence that Bryant influenced the 1977 amendment is nonexistent. The City cites two letters from constituents supporting AB 607 that also praised Bryant's activities. (*Id.* citing S.F. Respondent's Appendix at pp. 1121-1122).) But these letters give no indication that Bryant was involved in any way in AB 607.

7. The Court of Appeal noted that the Second and Third Appellate Districts have rendered conflicting decisions in this area. (Opn. at pp. 13-15, citing *Armijo v. Miles* (2005) 127 Cal.App.4th 1405; *Knight v. Superior Court* (2005) 128 Cal.App.4th 14.) In *Armijo*, the Second Appellate District stated that Proposition 22 "was designed to prevent same-sex couples who could marry validly in other countries or who in the future could marry validly in other states from coming to California and claiming, in reliance on Family Code section 308, that their marriages must be recognized as valid marriages." (127 Cal.App.4th at p. 1424.) In *Knight*, the Third Appellate District stated that Proposition 22 "ensures that California will not legitimize or recognize same-sex marriages from other jurisdictions, as it otherwise would be required to do pursuant to section 308, and that California will not permit same-sex partners to validly marry within the state." (128 Cal.App.4th at pp. 14, 23-24.) The state agrees with the Court of Appeal that there is no need to decide this issue regarding the scope of Proposition 22 in order to render a decision in this case. (Opn. at p. 15.)

between a man and a woman.  (See also *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1128 (conc. & dis. opn. of Kennard, J.) ["Since the earliest days of statehood, California has recognized only opposite-sex marriages"].)

## B. The History of the Recognition of Lawful Conjugal and Family Relationships Outside of the Marriage Context.

The assumption that marriage serves as the gateway to lawful sexual relations, the parentage and raising of children, and the formation of family units appears as a common theme in cases discussing marriage.  A nineteenth century United States Supreme Court case described marriage as "the foundation of the family and of society, without which there would be neither civilization or progress." (*Maynard v. Hill* (1888) 125 U.S. 190, 211.)  In *Skinner v. Oklahoma* (1942) 316 U.S. 535, a sterilization case, the high court stated that "[m]arriage and procreation are fundamental to the very existence and survival of the race." (*Id.* at p. 541.)  This Court and the United States Supreme Court both cited this observation from *Skinner* in their decisions striking down anti-miscegenation laws.  (*Perez v. Sharp* (1948) 32 Cal.2d 711, 715 (plur. opn.),[8] quoting *Skinner v. Oklahoma*,

---

8. Justice Traynor's opinion was joined by only two justices. (*Perez v. Sharp, supra*, 32 Cal.2d at p. 732 (plur. opn. of Traynor, J.).)  Justice Edmonds filed a separate concurrence, but did not join the lead opinion. (*Id.* at p. 741 (conc. opn. of Edmonds, J.).)  Although Justice Edmonds briefly stated that he agreed with the plurality opinion's observation that marriage is a "fundamental right of free men," he based his concurrence on his belief that marriage was "grounded in the fundamental principles of Christianity" and that the anti-miscegenation law therefore violated petitioners' First Amendment freedom to practice their Catholic faith. (*Id.* at pp. 741-742 (conc. opn. of Edmonds, J.).)  Justice Traynor's plurality opinion rejected this reasoning on the ground that regulation of marriage was a proper state function that could indirectly affect religious activity without violating the First Amendment. (*Id.* at p. 713 (plur. opn. of Traynor, J.).)  Justice Edmonds' concurrence did not address the main conclusions of Justice

*supra,* 316 U.S. at p. 541); *Loving v. Virginia* (1967) 388 U.S. 1, 12.)
Finally, in *Zablocki v. Redhail* (1978) 434 U.S. 374, the high court made
explicit the connection between marriage, lawful sexual relations and child-
rearing implied in the earlier cases. (*Id.* at p. 386 ["[I]f appellee's right to
procreate means anything at all, it must imply some right to enter the only
relationship in which the State of Wisconsin allows sexual relations legally
to take place"].)

But civil marriage no longer constitutes a prerequisite for lawful
sexual relations. (See *In re Lane* (1962) 58 Cal.2d 99, 105 [invalidating "a
city ordinance attempting to make sexual intercourse between persons not
married to each other criminal" as void under state law]; *People v. Mobley*
(1999) 72 Cal.App.4th 761, 785 [noting 1975 repeal of California law
criminalizing sodomy]; see also *Lawrence v. Texas* (2003) 539 U.S. 558
[invaliding Texas statute criminalizing homosexual sodomy].) Nor is
marriage a prerequisite for child-rearing. California law recognizes and
supports the right of unmarried couples to raise children. (*Johnson v. Calvert*
(1993) 5 Cal.4th 84, 88 [holding the purpose of the Uniform Parentage Act
"was to eliminate the legal distinction between legitimate and illegitimate
children"]; Fam. Code, § 7602 [providing that the relationship of parent and
child exists "regardless of the marital status of the parents"].) Moreover,
"California's adoption statutes have always permitted adoption without

---

Traynor's plurality opinion: that the anti-miscegenation statutes violated
equal protection by discriminating based on race and were void for
vagueness. (*Id.* at pp. 731-732 (plur. opn. of Traynor, J.).)
     Since Justice Traynor's opinion was not signed by four justices,
propositions and principles contained in it lack precedential authority.
(*Board of Supervisors v. Local Agency Formation Comm.* (1992) 3 Cal.4th
903, 918.) Suggestions by some of the petitioners that the Court of Appeal
failed to follow the "holdings" contained in the *Perez* plurality are therefore
imprecise. (See, e.g., Clinton Brief at p. 14.)

regard to the marital status of the prospective adoptive parents." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 433.)

Recent judicial decisions and statutory changes have confirmed that same-sex couples enjoy the same rights to bear and rear children as traditional couples. Gay men and lesbians are legally entitled to become foster or adoptive parents. (Welf. & Inst. Code, § 16013.) In 2003, this Court held that second-parent adoption, a method of adoption often used by same-sex couples in which a child born to or legally adopted by one partner is adopted by a non-legal or non-biological second parent, constitutes a valid independent adoption under our adoption laws. (*Sharon S. v. Superior Court, supra,* 31 Cal.4th at p. 422, fn. 2.) Subsequently, the Legislature enacted Assembly Bill 205, the Domestic Partner Rights and Responsibilities Act of 2003 (Stats. 2003, ch. 421) ("AB 205" or the "DPA"), which declares that "[t]he rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses." (Fam. Code, § 297.5, subd. (d); see also Fam. Code, § 9000, subd. (b) [providing for stepparent adoption by registered domestic partner].) This Court has also issued several decisions confirming that same-sex partners should have the same rights and bear the same responsibilities as traditional couples with regard to the children of their relationships.[9]

---

9. See *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 113 [holding that a woman who agreed to raise children with her female partner, supported her partner's artificial insemination, and held the children out as her own was considered a legal parent]; *K.M. v. E.G.* (2005) 37 Cal.4th 130, 134 [holding that a woman who donated her ova to her lesbian partner so that the partner could bear children is a parent to the children]; *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, 166 [holding that a biological mother who stipulated to a judgment declaring that she and her lesbian partner were the parents of her child was estopped from attacking that judgment].

Marriage is also not the sole way to form a family.  This Court has held that same-sex couples who form registered domestic partnerships engage in "the creation of a new family unit" as surely as married couples do.  (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 843.)

## C. The History of California's Statutory Recognition of Committed Same-sex Partnerships.

The Legislature created the first statewide domestic partnership registry in 1999, and has steadily expanded those rights.  (Stats. 1999, ch. 588; Stats. 2002, ch. 447.)  In 2003, the Legislature abandoned its piecemeal approach to providing rights and benefits in passing the DPA. The DPA, which became effective on January 1, 2005, broadly declared that registered domestic partners "shall have the same rights, protections and benefits" as spouses, "and shall be subject to the same responsibilities, obligations, and duties under the law . . . ." (Fam. Code, § 297.5, subd. (a).)  The DPA gave registered domestic partners rights and obligations regarding financial support of partners and children, community property, child custody and visitation, and ownership and transfer of property.  (Fam. Code, § 297.5, subds. (b)-(d).)

As originally enacted, the DPA provided registered domestic partners with *substantially all* of the rights and benefits that the state gives to married couples.  This is how the state briefed this issue in the lower courts.  But as of this year, registered domestic partners are provided with *all* of the rights and benefits given by the state to married couples.  While this matter was under submission in the Court of Appeal, the Legislature enacted and the Governor signed Senate Bill 1827 (Stats. 2006, ch. 802), which amended the DPA to provide that the earned income of registered domestic partners would be treated as community property for purposes of state income

taxation and gave them the option to file joint tax returns as married spouses do. (Rev. & Tax. Code, § 18521, subd. (d).) This was the last material benefit given by the state to married couples that had been denied to same-sex domestic partners.[10]

Of course, the DPA does not modify federal law, which does not recognize domestic partnerships and defines marriage as the union of a man and a woman. (1 U.S.C. § 7; 28 U.S.C. §1738C.) Thus, many federal benefits cannot be enjoyed by registered domestic partners. These rights and benefits pertain to social security, medicare, federal housing, food stamps, federal income taxation, veterans' benefits, federal civilian and military benefits, the Family and Medical Leave Act, and other federal employment

---

10. The Court of Appeal's decision stated in reliance on a 2003 legislative analysis that "the property tax reassessment benefit granted to surviving spouses under Proposition 13 is not available to a surviving domestic partner." (Opn. at p. 18, citing Assem. Com. on Judiciary, Analysis of AB 205 as amended Mar. 25, 2003, p. 4).) This conclusion was erroneous for three reasons. First, the Court of Appeal should not have relied upon evidence of the legislative intent of AB 205 unless it first found the law to be ambiguous, which it did not. Second, the legislative history cited by the Court of Appeal was inherently contradictory. The bill analysis stated that the author of AB 205 intended to grant domestic partners equal rights with regard to "[t]axes, including, but not limited to, . . . non-reassessment of real property upon a spouse's death . . . ." (S.F Respondents' Unopposed Motion to Augment the Record on Appeal in *Fund*, p. CT 1510, citing Assem. Com. on Judiciary, Analysis of AB 205 as amended Mar. 25, 2003, p. 3.) Third, the Court of Appeal ignored the fact that, subsequent to that legislative analysis, the Board of Equalization and the Legislature acted to address this issue by respectively promulgating a regulation and enacting a statute specifying that a transfer to a surviving domestic partner is not a change in ownership for purposes of Proposition 13. (Cal. Code Regs., tit. 18, § 462.240, subd. (k), effective Nov. 13, 2003; Rev. & Tax. Code, § 61, subd. (p), effective Sept. 29, 2005.) This Court has previously held that the Legislature and the Board of Equalization are empowered to resolve such ambiguities appearing in Proposition 13. (*Amador Valley Joint Union High School District v. State Board of Equalization* (1978) 22 Cal.3d 208, 246.)

benefits. These rights and benefits would be denied to same-sex couples even if California chose to extend the title of marriage to same-sex couples, because federal law prohibits recognition of same-sex marriages for the purposes of providing federal benefits. (1 U.S.C. § 7.)[11]

It is also true that other states are not required to recognize registered domestic partnerships from California even though California law recognizes legal statuses comparable to domestic partnerships entered into in other states.[12] California lacks authority to dictate the laws of other states. Moreover, because of the federal Defense of Marriage Act, other states would not be required to recognize same-sex marriages from California even if such marriages were legalized. (28 U.S.C. § 1738C.)

**D. The History of the Instant Litigation.**

On February 10, 2004, San Francisco Mayor Gavin Newsom directed the San Francisco County Clerk to begin altering official marriage forms so that same-sex couples could be married. (See *Lockyer v. City and County of San Francisco, supra,* 33 Cal.4th at p. 1070.) The County Clerk altered the forms and began marrying same-sex couples. (*Id.* at pp. 1070-1071.)

On March 11, 2004, in response to a petition for writ of mandate filed by the Attorney General, this Court ordered San Francisco officials to show cause why a writ of mandate should not issue requiring them "to apply and

---

11. Nevertheless, to the extent that California law relies upon federal law in conferring any right or benefit to spouses, the DPA provides that domestic partners shall be treated under state law as if federal law recognized such partnerships. (Fam. Code, § 297.5, subd. (e).)

12. See Fam. Code, § 299.2 ["A legal union of two persons of the same sex, other than a marriage, that was validly formed in another jurisdiction, and that is substantially equivalent to a domestic partnership as defined in this part, shall be recognized as a valid domestic partnership in this state regardless of whether it bears the name domestic partnership"].

abide by the current California marriage statutes in the absence of a judicial determination that the statutory provisions are unconstitutional." (*Id.* at p. 1073.) Pending a determination on that question, this Court directed San Francisco officials to comply with the marriage laws, an order that halted further same-sex marriages. (*Ibid.*)

In response to the order, the City and County of San Francisco initiated *City and County of San Francisco v. State of California, et al.*, San Francisco County No. CGC-04-429539. Two additional lawsuits were filed soon after, entitled *Woo, et al. v. Lockyer, et al.*, San Francisco County No. CGC-04-504038,[13] and *Tyler, et al. v. County of Los Angeles, et al.*, Los Angeles County No. BS 088 506. Each action challenged the constitutionality of California's marriage laws.

The Judicial Council ordered the *CCSF*, *Woo*, and *Tyler* actions coordinated with two other actions brought by private groups seeking to defend the marriage statutes: *Thomasson v. Newsom*, San Francisco County No. CGC-04-428794, and *Proposition 22 Legal Defense & Education Fund v. City and County of San Francisco,* San Francisco County No. CGC-04-503943, and assigned the Honorable Richard A. Kramer to preside over the cases, now collectively known as the *Marriage Cases*, Judicial Council Coordination Proceeding No. 4365. Later, another case challenging the constitutionality of California's marriage laws, *Clinton, et al. v. State of California, et al.*, San Francisco County No. CGC-04-429548, was filed and added to the coordinated proceedings.

In December 2004, the trial court held simultaneous hearings in the six actions. The *CCSF, Woo, Tyler* and *Clinton* hearings were writ of mandate proceedings under Code of Civil Procedure section 1094. (AA at

---

13. *Woo* is known as *Rymer* action in this Court since the lead petitioners have withdrawn.

pp. 108-109.)  The *Fund* and *Thomasson* hearings involved cross-motions for summary judgment and for judgment on the pleadings.  (*Ibid.*)

The trial court issued its final decision in the *Marriage Cases* on April 13, 2005.  (AA at pp. 107-131.)  The court ruled that Family Code sections 300 and 308.5 violate the equal protection clause of the California Constitution.  The court concluded that California's marriage laws created a gender-based classification and infringed the fundamental right to marriage, thus requiring a strict scrutiny analysis, and that there is no compelling or even rationally-related legitimate interest in denying marriage to same-sex couples.

The trial court issued identical judgments in *CCSF, Woo, Tyler,* and *Clinton.*  The judgments declared unconstitutional Family Code sections 300 and 308.5.  They further directed the issuance of writs of mandate requiring the State Registrar of Vital Statistics (a) to furnish the forms necessary to allow for marriage between persons in a gender-neutral manner (i.e., without regard to the gender of the persons getting married), (b) to furnish instructions to local county clerks and registrars informing them of their obligation to issue and record marriage licenses and to perform marriage ceremonies in a gender-neutral manner, and (c) to implement and enforce "all duties with respect to marriage" in a gender-neutral manner.  (AA at pp. 140-141.)

In *Thomasson* and *Fund*, the trial court entered judgment for the defendants and intervenor-defendants and against the plaintiffs.  All of the judgments entered in the coordinated proceedings were final and were stayed pending appeal.

On October 5, 2006, the Court of Appeal for the First Appellate District, Division Three, issued its judgment in the six appeals, which it had consolidated for purposes of hearing and decision.  The court unanimously

held that the appellants in the *Fund* and *Thomasson* actions lacked standing to pursue their claims. (Opn. at pp. 7-12.)[14]

The court divided, however, on the question of the constitutionality of the marriage laws. The majority opinion, authored by Presiding Justice McGuiness and joined by Justice Parrilli, concluded that the historical definition of marriage did not deprive same-sex couples of a fundamental right and did not discriminate against a suspect class. (Opn. at p. 3.) Applying the rational relationship test to petitioners' equal protection claims, the majority concluded that the marriage statutes were constitutional. (*Ibid.*) The majority also held that the statutes did not violate rights of due process, privacy, freedom of association, or freedom of expression. (*Id.* at pp. 21-64.)

Justice Parrilli authored a separate concurring opinion. Justice Kline dissented from that part of the majority opinion upholding the constitutionality of the marriage statutes while concurring that the appellants in *Fund* and *Thomasson* lacked standing.

The Court of Appeal modified its opinion in an order dated November 6, 2006, denying petitions for rehearing from the City and the *Woo* petitioners.

---

14. The majority opinion in the Court of Appeal will be cited simply as "Opn." while citations to the concurring and the concurring and dissenting opinions will further specify those opinions by author.

# ARGUMENT
## I.

### CALIFORNIA'S MARRIAGE LAWS SATISFY EQUAL PROTECTION UNDER A RATIONAL BASIS TEST BECAUSE THE STATE MAY PRESERVE THE TRADITIONAL DEFINITION OF MARRIAGE WHILE AFFORDING THE SAME RIGHTS, BENEFITS AND PROTECTIONS TO DOMESTIC PARTNERS.

Petitioners contend that the marriage laws violate the equal protection clause of the California Constitution. The "promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." (*Romer v. Evans* (1996) 517 U.S. 620, 631.) Courts reconcile this principle "by stating that, if a law neither burdens a fundamental right nor targets a suspect class," it will generally be upheld "so long as it bears a rational relation to some legitimate end." (*Ibid.*) This rational basis test "manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and 'requir(es) merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.'" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 16.) The burden of demonstrating the invalidity of a classification under this standard rests upon the party who assails it. (*Id.* at pp. 16-17.) At the other end of the continuum, strict scrutiny applies "in cases involving 'suspect classifications' or touching on 'fundamental interests.'" (*Id.* at p. 17.) Under this test, the state bears the burden of establishing that it has a compelling interest that justifies the law and that the distinctions drawn are necessary to further its purpose. (*Ibid.*)

Petitioners assert that the marriage laws should receive strict scrutiny because they supposedly burden a fundamental interest and discriminate based on gender and sexual orientation. As will be explained below, the marriage laws need not receive strict scrutiny based on any of these rationales. The Court of Appeal concluded that the marriage laws satisfied the rational basis test, and the court was correct – both in its application of a rational basis standard and in holding that the marriage laws satisfied that test.

Some have argued that the question whether same-sex couples may marry falls into a special category where the usual dichotomous methodology – "rational basis" or "strict scrutiny" – seems unduly wooden, even if no fundamental interests or suspect classifications are at issue under applicable precedent. Indeed, opinions of the United States Supreme Court itself evince discomfort with a "test of extremes" in evaluating some classifications.

The state accordingly suggests that, in the event the Court should conclude that the classification at issue here warrants a showing of something more than mere rational basis, it is not necessary for the Court to leap to the other extreme – strict scrutiny. This Court's precedent is sufficiently open to the possibility of "heightened" or "intermediate" scrutiny in cases involving "sensitive" classifications, and such a level of scrutiny could reasonably be applied here without disturbing existing tests for suspect classifications. As will be demonstrated, however, the state's interest in preserving traditional marriage is sufficiently important to satisfy even a heightened level of scrutiny.

## A. The Marriage Laws Do Not Discriminate Based on Gender Because They Do Not Favor One Gender Over Another.

Petitioners contend that the marriage laws should be subject to strict scrutiny because they discriminate based on gender. This position lacks

17

merit under careful review. The marriage laws do not discriminate based on gender because they do not prefer one gender over the other. Simply stated, both men and women are equally entitled to the benefits of marriage. Family Code section 300 provides in pertinent part that "[m]arriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making the contract is necessary." Family Code section 308.5 provides that "[o]nly marriage between a man and a woman is valid or recognized in California." Nothing in the plain language of these statutes discriminates based on the basis of gender.

The equal protection clause of the California Constitution protects against "disparate" treatment of one gender over another. (*Michelle W. v. Ronald W.* (1985) 39 Cal.3d 354, 364.) Numerous cases, both from this Court and the high court, support the proposition that sex discrimination occurs when one gender is favored over another. (*Arp. v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 407 [invalidating workers' compensation law that presumed that all widows were dependent on their husbands for purposes of survivor benefits but did not extend that presumption to widowers]; *United States v. Virginia* (1996) 518 U.S. 515, 555-556 [holding that statute preventing women from attending Virginia Military Institute violated equal protection]; *Mississippi Univ. for Women v. Hogan* (1982) 458 U.S. 718, 731 [invaliding admission policy excluding males from nursing school]; *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 27 [holding that price discounts offered to women but not men violated the Unruh Act because "public policy in California demands *equal* treatment of men and women"]; *Gay Law Students Assn. v. Pac. Telephone & Telegraph Co.* (1979) 24 Cal.3d 458, 490 [holding that discrimination against homosexuals did not constitute sex discrimination under anti-discrimination law].) But equal protection is not denied if both genders are treated the same. (See

18

*Hardy v. Stumpf* (1978) 21 Cal.3d 1, 7 [holding that police department's physical agility test, which included a six-foot wall climb, was not a gender classification, because it was applied equally to men and women].)

The Vermont Supreme Court's same-sex marriage ruling squarely rejected the notion that the definition of marriage as between a man and a woman constitutes a gender classification. That court stated: "All of the seminal sex-discrimination decisions . . . have invalidated statutes that single out men or women as a discrete class for unequal treatment." (*Baker v. State of Vermont* (Vt. 1999) 744 A.2d 864, 880, fn. 13.) "The difficulty here is that the marriage laws are facially neutral; they do not single out men or women as a class for disparate treatment, but rather prohibit men and women equally from marrying a person of the same sex." (*Ibid.*)

The Court of Appeal and almost every appellate and federal court to consider the issue has concluded that marriage as traditionally defined does not constitute gender discrimination. (Opn. at pp. 33-38; *Hernandez v. Robles* (N.Y. 2006) 855 N.E.2d 1, 10 (plur. opn.); *id.* at p. 20 (conc. opn. of Graffeo, J.); *Andersen v. King County* (Wash. 2006) 138 P.3d 963, 990 (plur. opn.); *id.* at p. 1010 (conc. opn. of Johnson, J.); *Baker v. Nelson* (Minn. 1971) 191 N.W.2d 185, 186, app. dism. 409 U.S. 810; *Smelt v. County of Orange* (C.D. Cal. 2005) 374 F.Supp.2d 861, 876-877, vacated in part on other grounds (9th Cir. 2006) 447 F.2d 673; *In re Kandu* (Bankr. W.D. Wash. 2004) 315 B.R. 123, 143.) The Hawaii Supreme Court's 1993 opinion in *Baehr v. Lewin* (Hawaii 1993) 852 P.2d 44, found a gender classification, but this opinion was only a plurality decision[15] that was subsequently overturned by an amendment to the Hawaii Constitution.

---

15. See *Baehr, supra,* 852 P.2d at pp. 67-68. The *Baehr* opinion cited was only the opinion of two justices of the five-member Hawaii Supreme Court.

(Hawaii Const., art. I, § 26.)

Petitioners advance two arguments why the marriage statutes ostensibly discriminate based on gender. First, petitioners contend that the marriage laws should be analogized to the former anti-miscegenation laws. Second, petitioners contend that maintaining the traditional definition of marriage perpetuates gender-role stereotypes. Neither contention is persuasive when carefully considered.

The analogy to the anti-miscegenation cases is inapposite. In *Perez v. Sharp, supra,* 32 Cal.2d 711, and *Loving v. Virginia, supra,* 388 U.S. 1, the respective defendants argued that laws forbidding interracial marriage did not impermissibly classify based on race. This Court rejected that argument, stating: "[t]he right to marry is the right of individuals, not of racial groups. The equal protection clause of the United States Constitution does not refer to rights of the Negro race, the Caucasian race, or any other race, but to the rights of individuals." (*Perez v. Sharp, supra,* 32 Cal.2d at p. 716.) The United States Supreme Court similarly "reject[ed] the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations . . . ." (*Loving v. Virginia, supra,* 388 U.S. at p. 8.)

However, as the Court of Appeal stated in this case, "[c]lose examination of *Perez* and *Loving* reveals that these courts were especially troubled by the challenged laws' reliance on express *racial* classsifications." (Opn. at p. 36.) The anti-miscegenation laws were recognized "as measures designed to maintain White Supremacy." (*Loving v. Virginia, supra,* 388 U.S. at p. 11.) With regard to the California statute, this intention was obvious from the fact that whites were forbidden from marrying specific races while persons from other, nonwhite races were free to intermarry.

20

(*Perez v. Sharp, supra,* 32 Cal.2d at p. 721.) Thus, the superficial neutrality of these statutes was simply a sham, concealing a clearly invidious intent to prefer one race over another. By contrast, there is no evidence that California's marriage laws were devised to discriminate against males or females.

Petitioners' claim that the marriage statutes discriminate based on gender by reflecting stereotypical views of gender roles is also unconvincing. The marriage statutes do not attempt to entrench gender roles in families. Defining marriage as the union of one man and one woman does not reflect any assumption about which spouse might be the primary breadwinner or whether one spouse might eschew working outside the home in order to stay home and raise children. Nor does the statutory definition itself fit the definition of a stereotype: "a standardized mental picture that is held in common by members of a group and that represents an oversimplified opinion, affective attitude, or uncritical judgment." (Webster's Ninth New Collegiate Dictionary (1989), p. 1156.) The marriage statutes are not reflective of an opinion about the relative capabilities of men or women; they are simply a legal definition of an institution in our society.[16]

_____

16. Based on the erroneous assumption that the marriage laws are a mere vestige of sexism, petitioners cite cases in which this Court either invalidated outmoded common law rules to remove sexist assumptions (see, e.g., *Self v. Self* (1962) 58 Cal.2d 683, 684 [abandoning common law doctrine of interspousal tort immunity "[b]ecause the reasons upon which the [doctrine] was predicated no longer exist"]) or interpreted statutes governing family law situations to reflect contemporary realities. (See, e.g., *DeBurgh v. DeBurgh* (1952) 39 Cal.2d 858, 870-871 [rejecting "mechanical application" of the "widely condemned" doctrine of recrimination in divorce proceedings without invalidating the doctrine entirely].) But the judicial responsibility for removal of a "moribund rule" from the common law (Traynor, *Statutes Revolving in Common-Law Orbits,* 17 Cath. U.L. Rev. 401 (1968), reprinted in The Traynor Reader (1987) p. 169) and the ongoing application of statutes to new situations are quite distinguishable from what

Petitioners' claim that the marriage statutes should receive strict scrutiny because they supposedly discriminate based on gender should therefore be rejected, and rational basis review should be applied.

## B. The Marriage Statutes Do Not Discriminate Based on Sexual Orientation Because They Do Not Favor One Sexual Orientation Over Another.

Petitioners assert the laws restricting marriage to opposite-sex unions constitute sexual orientation discrimination. They further ask this Court to hold, for the first time, that sexual orientation classifications are subject to strict scrutiny. Their assertion is incorrect, and their request seeks an extension of the law that is unwarranted.

Family Code sections 300, 301, 302 and 308.5 do not facially discriminate against gay men and lesbians because the statutes make no mention of sexual orientation. Nor do they make heterosexuality a requirement for a marriage license. (Cf. *Koebke v. Bernardo Heights Country Club, supra,* 36 Cal.4th at pp. 853-854 [country club's policy of using marriage as criterion for allocating benefits did not constitute facial sexual orientation discrimination even though it "necessarily denies such benefits to all of its homosexual members who . . . are unable to marry"].)

The lower court held that the marriage statutes, despite their facial neutrality, amount to actionable sexual orientation discrimination based on a disparate impact theory. (Opn. at pp. 39, citing *Personnel Administrator of Mass. v. Feeney* (1979) 442 U.S. 256, 272-274.) This was incorrect.

To show that a facially neutral law discriminates unconstitutionally based on a disparate impact theory, a challenger must show that the "impact can be traced to a discriminatory purpose." (*Personnel Administrator of Mass. v. Feeney, supra,* 442 U.S. at p. 272.) "[I]mpact provides an

---

the petitioners seek: judicial rewriting of the longstanding statutory definition of marriage in California.

'important starting point,' . . . but purposeful discrimination is 'the condition that offends the Constitution.'" (*Id.* at p. 274, citations omitted; see also *Kim v. Workers' Comp. Appeals Bd.* (1999) 73 Cal.App.4th 1357, 1361 ["Neither explicit discrimination nor discrimination by 'disparate impact' is unconstitutional unless motivated at least in part by purpose of intent to harm a protected group"].)[17]

The Court of Appeal concluded that "the Legislature's manifest purpose in enacting the 1977 amendments to Family Code, section 300, was to exclude same-sex couples from the institution of marriage." (Opn. at p. 39, citing Sen. Com. on Judiciary, Analysis of Assem. Bill No. 607 (1977-1978 Reg. Sess.), as amended May 23, 1977, p. 1.) The court further found that the voters who enacted Proposition 22 in 2000 did so with "exclusionary intent." (Opn. at p. 39.)

The Court of Appeal confused impact with invidious intent. It is true that the legislators and voters who acted to preserve the state's longstanding definition of marriage wanted marriage reserved for opposite-sex couples. It is equally true that the impact of such a definition falls virtually exclusively on gay men and lesbians. But it is wrong to assume that the mere desire to preserve a definition of marriage necessarily shows an intent to discriminate on the basis of sexual orientation. Codifying a distinction that had long existed at common law without a suggestion that it was intended as

---

17. Proving an equal protection violation under a disparate impact theory requires a showing of discriminatory intent or purpose in addition to disparate impact. (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 837 [citing federal cases establishing an intent requirement for a disparate impact equal protection claim].) This is a different test from the prima facie case for showing disparate impact in employment litigation. In that context, the disparate impact test does not require the plaintiff to prove the employer's subjective intent. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1171.)

invidious discrimination against gay men and lesbians cannot be considered an act of discrimination. (Cf. 2B Sutherland, Statutes and Statutory Construction (6th ed. 2000) Reenactment of a Statute After Contemporaneous and Practical Interpretation, § 49-09, p. 103 [observing that, when statutes are reenacted that were previously given judicial and administrative interpretation, those longstanding interpretations should be "regarded as presumptively the correct interpretation of the law"].)[18/]

## C. Sexual Orientation Is Not a Suspect Classification.

In contending that sexual orientation should be deemed a suspect classification, the petitioners challenging the marriage laws fail to address the main reason why their position should be rejected. Petitioners argue extensively that gay men and lesbians have been discriminated against based on sexual orientation throughout history and up to the present day. (City Br. at pp. 6-19, 60-64; Rymer Br. at pp. 29-33; Clinton Br. at pp. 31-33.) Petitioners further assert that sexual orientation has no bearing on an individual's ability to contribute to society. (City Br. at pp. 60, 63; Rymer Br. at pp. 32-33.) Finally, while some of the petitioners believe that there is no need to show that homosexuality is an immutable characteristic and other petitioners concede that immutability is part of the test, all of them argue that homosexuality is immutable. (City Br. at pp. 64-69; Rymer Br. at pp. 35-39; Clinton Br. at p. 30; Tyler Br. at p. 28.) If determining a suspect

---

18. Cf. *Andersen v. King County, supra,* 138 P.3d at p. 981, fn. 15 (plur. opn.) [the assumption that legislators who supported law barring same-sex marriage did so out of discriminatory intent "fails to consider that traditional and generational attitudes toward marriage may have contributed to the vote by any individual legislator as well as the possibility that legislators who were favorably disposed toward same-sex marriage were nevertheless concerned with developments in other states, including the amendments to state constitutions"].

classification depended on *only* these considerations, there would be an argument that sexual orientation should be a suspect classification. The state does not contest them either, regardless of whether they are purely legal in nature, as some petitioners contend (Rymer Br. at p. 39; Tyler Br. at p. 28), or factual, as others suggest. (City Br. at pp. 28-29; Clinton Br. at p. 29.),

But as the decisions of this Court and the high court demonstrate, a "suspect" classification is appropriately recognized only for minorities who are unable to use the political process to address their needs. (*United States v. Carolene Products Co.* (1938) 304 U.S. 144, 152, fn. 4.) Suspect classification is not a reparation for historical mistreatment or a type of affirmative action to alleviate contemporary discrimination. Since the gay and lesbian community in California is obviously able to wield political power in defense of its interests, this Court should not hold that sexual orientation constitutes a suspect classification.

Contrary to the suggestion of some petitioners, this Court's 1971 decision in *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, which held that gender is a suspect classification, did not establish a definite test for determining the existence of a suspect classification. The parallel development of equal protection standards by this Court and the United States Supreme Court before and after *Sail'er Inn* shows why the considerations at issue here range beyond those mentioned in *Sail'er Inn*.

Before 1937, the U.S. Supreme Court struck down a number of regulatory laws on the ground that substantive due process protected free enterprise from regulation. (Lusky, *Footnote Redux: A Carolene Products Reminiscence* (1982) 82 Colum. L. Rev. 1093, 1094.) When the Supreme Court reversed its approach and began deferring to Congress in reviewing economic and social legislation, the Court had to decide whether its new-found deference included deference to laws implicating civil rights and

liberties. (*Ibid.*) It signaled its intent to treat such laws differently in a
footnote in *United States v. Carolene Products Co., supra,* 304 U.S. at p.
152, fn. 4 (*Carolene Products*).

　　In upholding the regulation of a milk product, *Carolene Products*
distinguished its review of laws regulating commerce from review of statutes
violating (1) a "specific prohibition of the Constitution" or (2) "statutes
directed at particular religious, or national, or racial minorities." (*Ibid.*) If
statutes were directed at particular minorities, the Court stated, judicial
inquiry should be made into "whether prejudice against discrete and insular
minorities may be a special condition, which tends seriously to curtail the
operation of those political processes ordinarily to be relied upon to protect
minorities, and which may call for a correspondingly more searching judicial
inquiry." (*Ibid.*)

　　The concern expressed in *Carolene Products* about protecting
minorities who cannot protect themselves through the political process
foreshadowed the high court's approach to equal protection under Chief
Justice Warren. (Ely, Democracy and Distrust (1980) p. 75.) In 1972,
Professor Gerald Gunther summarized that approach as follows:

> At the beginning of the 1960's, judicial intervention under the banner
> of equal protection was virtually unknown outside racial
> discrimination cases. The emergence of the "new" equal protection
> during the Warren Court's last decade brought a dramatic change.
> Strict scrutiny of selected types of legislation proliferated. The
> familiar signals of "suspect classification" and "fundamental interest"
> came to trigger the occasions for the new interventionist stance. The
> Warren Court embraced a rigid two-tier attitude. Some situations
> evoked the aggressive "new" equal protection, with scrutiny that was
> "strict" in theory and fatal in fact; in other contexts, the deferential
> "old" equal protection reigned, with minimal scrutiny in theory and
> virtually none in fact.

(Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court:
A Model for a Newer Equal Protection* (1972) 86 Harv. L. Rev. 1, 8.)

Professor Gunther described the "new equal protection" as leaving "a legacy of anticipations as well as accomplishments." (*Ibid.*) Its approach led to expectations of further judicial discovery of fundamental interests and suspect classifications. (*Ibid.*) But by late 1972, Professor Gunther described the Burger Court's reluctance to expand the scope of the new equal protection and criticism of the "rigid two-tier formulations of the Warren Court's equal protection doctrine" as creating a too-sharp dichotomy between rational review and strict scrutiny. (*Id.* at pp. 12, 17.)

During this period when equal protection standards were in flux, this Court decided *Sail'er Inn*. The plaintiffs challenged a statute prohibiting women from tending bar unless they held liquor licenses, were wives of licensees, or were sole shareholders with their husbands in the corporation holding the license. (5 Cal.3d. at p. 6.)

*Sail'er Inn* began by noting that the California Constitution contained a mandatory provision stating that women could not be barred "'because of sex, from entering or pursuing a lawful business, vocation or profession.'" (*Id.* at p.8, citing Cal. Const., former art. XX, § 18.)[19] The liquor license statute was unconstitutional based on this provision. (*Id.* at p. 10.) This Court also held that the statute violated the Civil Rights Act of 1964 (*id.* at p. 15) before turning to the federal and state equal protection challenge.

After observing that the federal and state equal protection tests are "substantially the same," *Sail'er Inn* noted that "[t]he United States Supreme Court has not designated classifications based on sex 'suspect' classifications requiring close scrutiny and a compelling state justification for their constitutionality." (*Id.* at p. 16-17 & fn. 13.) But this Court

_____

19. This provision has been amended and now states: "A person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin." (Cal. Const., art. I, § 8.)

believed that the trend in high court jurisprudence was toward strict scrutiny. "An analysis of classifications which the Supreme Court has previously designated as suspect reveals why sex is properly placed among them. Such characteristics include race, lineage or national origin, alienage and poverty, especially in conjunction with criminal procedures." (*Id.* at p. 18, citations omitted.)

> Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by accident of birth. What differentiates sex from nonsuspect classes, such as intelligence or physical disability, and aligns it with recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. The result is that the whole class is relegated to an inferior status without regard to the capabilities or characteristics of its individual members. . . . [¶] Another characteristic which underlies all suspect classifications is the stigma of inferiority and second class citizenship associated with them. Women, like Negroes, aliens and the poor have historically labored under severe legal and social disabilities.

(*Id.* at pp. 18-19.) Consequently, the Court held, strict scrutiny should apply to gender classifications. (*Id.* at p. 20.)

The high court did not proceed entirely in the direction anticipated by *Sail'er Inn*. Six months after *Sail'er Inn*, the United States Supreme Court applied a rational relationship test to a gender classification in *Reed v. Reed* (1971) 404 U.S. 71, 75. In 1973, a plurality opinion in *Frontiero v. Richardson* (1973) 411 U.S. 677, opined that gender was a suspect classification. (*Id.* at p. 682 (plur. opn.).) But in 1976 the majority in *Craig v. Boren* (1976) 429 U.S. 190, held that gender classifications would receive intermediate scrutiny rather than strict scrutiny. *Craig* stated that "classifications by gender must serve important government objectives and must be substantially related to the achievement of those objectives." (*Id.* at p. 197.)

In *United States v. Virginia* (1996) 518 U.S. 515, the Supreme Court explained why sex is not a proscribed classification. (*Id.* at p. 533.) "Supposed 'inherent differences' are no longer accepted as a ground for race or national origin discrimination," the Court stated. (*Id.* at p. 533, citing *Loving v. Virginia, supra,* 388 U.S. 1.) "Physical differences between men and women, however, are enduring . . . ." (*Id.* at p. 533.) These differences between the sexes "remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." (*Ibid.*) While the Supreme Court in *United States v. Virginia* held that Virginia failed to show an "exceedingly persuasive justification" for a differential treatment based on gender (518 U.S. at pp. 533-534), the Court subsequently held that this phrase is only synonymous with the longstanding intermediate scrutiny test. (*Nguyen v. Immigration & Naturalization Serv.* (2001) 533 U.S. 53, 73 ["[A]n 'exceedingly persuasive justification' is established 'by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives'"].)

As the United States Supreme Court's gender discrimination jurisprudence developed after *Sail'er Inn*, its general approach to determining the existence of new suspect classifications also developed. In *Graham v. Richardson* (1971) 403 U.S. 365, the high court cited the *Carolene Products* rationale in holding that legal resident aliens constituted "a prime example of a 'discrete and insular minority' for whom such heightened judicial solicitude is appropriate." (*Id.* at p. 372, citation omitted.)[20] Two years later, the Court held in *San Antonio Independent*

20. The high court later held that illegal aliens, unlike the legal aliens at issue in *Graham*, "cannot be treated as a suspect class because their

*School Dist. v. Rodriguez* (1973) 411 U.S. 1, that schoolchildren living in economically-disadvantaged school districts were not members of a suspect class. (*Id.* at p. 28.) It held that "[t]he system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." (*Ibid.*)

The high court also invoked the *Carolene Products* standard in *Massachusetts Board of Retirement v. Murgia* (1976) 427 U.S. 307, to hold that age does not constitute a suspect classification. The Court held that "old age does not define a 'discrete and insular' group . . . in need of extraordinary protection from the majoritarian political process." (*Id.* at pp. 313-314, citation omitted.)

The high court rejected a claim that mental retardation constitutes a quasi-suspect classification in *City of Cleburne v. Cleburne Living Center* (1985) 473 U.S. 432. *Cleburne* observed that "the distinctive legislative response . . . to the plight of those who are mentally retarded demonstrates not only that they have unique problems, but also that lawmakers have been addressing their difficulties in a manner than belies a continuing antipathy or prejudice and a corresponding need for more intrusive oversight by the judiciary." (*Id.* at p. 443.)[21] It further stated:

_____

presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" (*Plyler v. Doe* (1982) 457 U.S. 202, 223.) Nonetheless, the Court held that the statute at issue, which excluded illegal alien children from the public school system, was irrational because it did not further a substantial goal of the State of Texas. (*Id.* at pp. 224, 230.)

21. This holding in *City of Cleburne* contradicts the plurality opinion's approach in *Frontiero v. Richardson, supra,* 411 U.S. 677. The

> [T]he legislative response, which could hardly have occurred and survived without public support, negates any claim that the mentally retarded are politically powerless is the sense that they have no ability to attract the attention of lawmakers. Any minority can be said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect.

(*Id.* at p. 445.)

Meanwhile, the United States Supreme Court has continued to apply strict scrutiny to race-based classifications in "every context, even for so-called 'benign' racial classifications . . . ." (*Johnson v. California* (2005) 543 U.S. 449, 505 [policy of segregating inmates by race during evaluation by prison authorities violated equal protection].) Strict scrutiny applies because of "special fears" that racial classifications may be "motivated by an invidious purpose." (*Ibid.*)

The equal protection provisions in the California Constitution are "'substantially the equivalent of' the guarantees contained in the Fourteenth Amendment," but also have an "'independent vitality.'" (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481, citations omitted.) These provisions may in certain cases require an analysis that varies somewhat from the analysis employed under the United States Constitution. (*Ibid.*) Nevertheless, this Court and the courts of appeal have generally used the same criteria, finding their roots in *Carolene Products,* to determine the existence of a suspect classification that the United States Supreme Court has employed.

Using the *Carolene Products* rationale, this Court found that resident aliens are a suspect classification under both the United States and California

---

*Frontiero* plurality cited congressional efforts to combat sex discrimination in support of finding gender to be a suspect classification. (*Id.* at p. 687 (plur. opn.).) The *Rymer* petitioners cite the *Frontiero* plurality opinion on this point without noting that the later decision in *City of Cleburne* takes the contrary view. (Rymer Br. at p. 34, fn. 22.)

Constitutions because they are a minority in need of judicial protection because of their political powerlessness. (*Raffaelli v. Committee on Bar Examiners* (1972) 7 Cal.3d 288, 292, citations omitted [holding that permanent resident alien was entitled to be admitted to the bar]; see also *Purdy & Fitzpatrick v. State of California* (1969) 71 Cal.2d 566, 580 [holding that resident aliens were an identifiable minority who, "denied the right to vote, lack the most basic means of defending themselves in the political processes"].)

Applying the same *Carolene Products* rationale, this Court and the courts of appeal have followed high court precedent in rejecting claims of suspect classification status for various groups, including those based on age (*Schmidt v. Superior Court* (1989) 48 Cal.3d 370, 389 [holding that age was not a suspect classification in challenge to mobile home park age restriction]), status as an indicted defendant (*Bowens v. Superior Court* (1991) 1 Cal.4th 36, 42 [holding that the denial of a preliminary hearing to an indicted defendant did not single out a suspect class]), taxpayer status (*Amador Valley Joint Union High Sch. Dist. v. State Board of Equalization, supra*, 22 Cal.3d at p. 237 ["persons who vote in favor of tax measures may not be deemed to represent a definite, identifiable class" for equal protection purposes]), ratepayer status (*Hansen v. City of San Buenaventura* (1986) 42 Cal.3d 1172, 1189 [nonresident ratepayers served by municipal utility are not a suspect class because they "can exert political power" even without voting]), status as parents of unborn children (*Reyna v. City & County of San Francisco* (1977) 69 Cal.App.3d 876, 881 [parents of unborn children do not constitute a politically powerless suspect class]), and occupational status. (*Kenneally v. Med. Bd. of Calif.* (1994) 27 Cal.App.4th 489, 496 fn. 5 [physicians are not a suspect class under California and federal Constitutions]; *Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.

App.4th 609, 630-631 [chiropractors are not a suspect class].)

In summary, this Court and the courts of appeal have generally applied the same test that the high court has applied to find suspect classifications. The considerations have included: whether the classification affects an identifiable minority, whether that minority has been traditionally discriminated against based on a characteristic, whether the characteristic is immutable, whether the characteristic bears no relevance on the ability of those possessing it to contribute to society, and whether the group lacks power to address the discrimination through the political process.

The only apparent departure from this approach involved classification based on wealth, which has been found "suspect" only insofar as it infringes upon the exercise of a right enumerated in the Constitution. Thus, the financing system for California public elementary and secondary schools was found to be subject to strict scrutiny under the California Constitution in *Serrano v. Priest* (1977) 18 Cal.3d 728, because it created a wealth-based classification that affected the fundamental right of students to a public education. (*Id.* at p. 768.) But the *Serrano* Court specifically declined to hold that all wealth-based classifications were suspect. (*Id.* at p. 766, fn. 45.)

The *Rymer* petitioners argue that the relevance of the characteristic to a person's ability to make a contribution is "the most important overarching consideration" in determining whether to recognize a suspect classification (Rymer Br. at p. 30), but they are incorrect. The entire concept of suspect classification traces back to a primary question: How much should the courts defer to legislative judgment? The answer from *Carolene Products* and its progeny is that the courts should generally defer, and that strict scrutiny by the judiciary is appropriate where the law violates an express constitutional provision or harms a discrete and insular group that is unable to protect itself

33

through the legislative process. If such a minority group can adequately defend itself in the political process, the justification for strict scrutiny disappears.

This Court need not treat sexual orientation as a suspect classification because in California gay men and lesbians do not lack political power. (*Hernandez v. State of Texas* (1954) 347 U.S. 475, 478 [the existence of a suspect classification is determined on a community-by-community basis depending on "community prejudices [which] are not static . . ."].) Petitioners concede that the gay and lesbian community in California has achieved enormous successes in the political process. The *Rymer* petitioners state: "In the past few years, California's Legislature has enacted more provisions protecting lesbian and gay people than any other state legislature . . . . The Legislature has made plain that the public policy of this state is to strengthen family bonds for same-sex couples and their children." (Rymer Br. at p. 5; see also Buchanan, *Gays and Lesbians Gain New Rights As 8 Laws Take Effect Monday*, S.F. Chronicle, Dec. 29, 2006, p. B7 [observing that "[t]he eight laws, involving issues ranging from tax filings to court proceedings to protections from discrimination, will be the most pro-gay measures enacted at one time anywhere in the country . . ."].)

The City likewise concedes that state law guarantees "that lesbians and gay men should be allowed to work, participate in civic life and create families on equal terms with others." (City Br. at p. 39.) The City claims that the simultaneous extension of these civil rights protections and the maintenance of the traditional definition of marriage "can best be described as schizophrenic." (*Ibid.*) A more sensible characterization would be that, while the gay and lesbian community has enacted much of its legislative agenda, it has not yet succeeded in getting a same-sex marriage bill enacted. Petitioners cite the findings of Assembly Bill 849 (2005-2006 Reg. Sess.), a

bill that was passed by the Legislature and vetoed by the Governor, and essentially ask this Court to write those findings into law by judicial fiat.[22/] Yet the ability to pass this legislation through the Legislature and the numerous other pieces of recently enacted legislation addressing the gay and lesbian community's concern, demonstrate "a distinctive legislative response" that counsels against recognition of a new suspect classification. (*City of Cleburne v. Cleburne Living Ctr., supra*, 473 U.S. at p. 443.)

The *Rymer* petitioners point out that "lesbians and gay men have been the target of repeated efforts to use the majoritarian political process to deny them basic legal protections." (Rymer Br. at p. 33.) This is undoubtedly true (although the the *Rymer* petitioners are wrong to cite Proposition 22 among such measures). Nevertheless, the fact that laws reflecting homophobia have sometimes been enacted does not demonstrate an inability to use the majoritarian political process to seek redress.

The status of gay men and lesbians as a minority group likewise does not by itself support finding a suspect classification without a showing of political powerlessness. California is a very diverse state. There is no racial majority group in the state. At least 1.4 percent of couples in California are same-sex couples, the highest percentage in the United States. (S.F. R.A. 189.) According to Professor John Hart Ely, the idea of discrete and insular minorities was intended in *Carolene Products* to identify minority groups who were in such a position that they could not protect their interests in the political system even through "mutual defense pacts" with other groups.

---

22. As the Court of Appeal observed, the Governor stated in his message vetoing AB 849 that he believed that Family Code section 308.5 could not be amended without voter approval. (Opn. at pp. 20-21, citing Governor's veto message to Assem. on Assem. Bill No. 849 (Sept. 29, 2005) Recess J. No. 4 (2005-2006 Reg. Sess.) pp. 3737-3738.) The Governor also opined that signing the bill would create "confusion" regarding the constitutional issues at stake in this litigation. (*Ibid.*)

(Ely, Democracy and Distrust, *supra*, at p. 151.)  But in a society where every group needs to do at least some coalition-building to get its needs addressed, adding more suspect classifications may not make sense.  Taken to its logical extreme, continuing recognition of additional suspect classifications could result in a situation in which almost everyone is a member of some suspect classification.[23/]

Recognizing sexual orientation as a suspect classification could also imperil efforts to remedy discrimination against gay men and lesbians.  If sexual orientation is treated as a suspect classification, then heterosexuals will be able to challenge those remedial actions by arguing that there exists no compelling government interest justifying exclusion of heterosexuals.  (See, e.g., *Bakke v. Regents of the Univ. of Calif.* (1976) 18 Cal.3d 34, 50 ["We cannot agree with the proposition that deprivation based upon race is subject to a less demanding standard of review under the Fourteenth Amendment if the race discriminated against is the majority rather than a minority"], affd. in part, revd. in part sub. nom. *Regents of the Univ. of Calif. v. Bakke* (1978) 438 U.S. 265.)  Since heterosexuals compose the

---

23.  The *Rymer* petitioners cite Professor Ely for the proposition that sexual orientation classifications should be subject to strict scrutiny.  Writing in 1980, Professor Ely reasoned that the "serious social costs" entailed in revealing a homosexual orientation combined with severe prejudice against homosexuals "renders classifications that disadvantage homosexuals suspicious." (Ely, Democracy and Distrust, *supra,* at p. 163.)  However, Professor Ely acknowledged that "[t]his situation seems to be changing, precisely because gays are increasingly willing to bear the brunt of our prejudices in the short run in order to diminish them in the long run.  I'll be delighted if this book remains in print long enough to render this discussion obsolete." (*Id.* at p. 255, fn. 91.)  Thus, Professor Ely's conclusion with regard to suspect classifications appears a bit dated, as does his suggestion that anti-sodomy laws might be constitutional based on moral grounds, a conclusion that is now untenable in light of *Lawrence v. Texas.* (*Id.* at pp. 255-256, fn. 92.)

overwhelming majority of the population, recognizing sexual orientation as a
suspect classification could result in a high incidence of "reverse
discrimination" sexual orientation lawsuits brought by heterosexuals. (Cf.
*Holguin v. Flores* (2004) 122 Cal.App.4th 428, 439 [rejecting claim that
statute allowing registered domestic partners but not unmarried heterosexual
cohabitants to sue for wrongful death constituted gender discrimination].)

   Petitioners argue that sexual orientation should be recognized as a
suspect classification because some of the cases rejecting their argument
relied upon *Bowers v. Hardwick* (1986) 478 U.S. 186. (City Br. at pp. 70-
72.) While it is true that some of the cases rejecting suspect classification
status have cited *Bowers*, others have not. (See, e.g., *Holmes v. California
Army National Guard* (9th Cir. 1997) 124 F.3d 1126, 1132.) The Ninth
Circuit has found that "[s]exual orientation and sexual identity are
immutable" for purposes of concluding that sexual orientation defines a
"particular social group" such that fear of persecution based on group
membership is a basis for seeking asylum under immigration law.
(*Hernandez-Montiel v. Immigration & Naturalization Serv.* (9th Cir. 2000)
225 F.3d 1084, 1091, 1093, 1099.) But even after this finding, the Ninth
Circuit has held that gay men and lesbians are not a suspect or quasi-suspect
class for the purpose of equal protection analysis. (*Flores v. Morgan Hill
Unified Sch. Dst.* (9th Cir. 2003) 32 F.3d 1130, 1137 [gay students were not
members of a suspect class but had a right to be free from sexual orientation
discrimination].)[24/]

---

   24. Petitioners cite the concurring opinion in *Watkins v. United
States Army* (9th Cir. 1989) 875 F.2d 699 (conc. opn. of Norris, J.), for the
proposition that sexual orientation should be recognized as a suspect class.
But that concurrence argued that suspect classification was warranted
because "[i]t cannot be seriously disputed . . . that homosexuals as a group
cannot protect their right to be free from invidious discrimination by
appealing to the political branches." (*Id.* at p. 727.) While that statement

The history of discrimination based on sexual orientation is undeniable. Nonetheless, this Court should not deem sexual orientation to be a suspect classification, because doing so is not supported by the rationales used by this Court and the United States Supreme Court to justify strict judicial review.

## D. The Equal Protection Clause of the California Constitution Does Not Establish a Fundamental Right to Same-sex Marriage.

Petitioners contend that the marriage laws should be subject to strict scrutiny under the California Constitution's equal protection clause because the laws infringe upon a fundamental right. Such rights have been recognized in two circumstances, neither of which is present here.

First, fundamental rights have been recognized where they have been "'explicitly or implicitly guaranteed by the Constitution.'" (*D'Amico v. Board of Med. Examiners, supra,* 11 Cal.3d at p. 18 [no fundamental right to be licensed as an osteopath].) Thus, education is a fundamental interest under California's equal protection clause because "the California Constitution makes public education uniquely a fundamental concern of the State" (*Butt v. State of California* (1992) 4 Cal.4th 668, 685 [holding that the state has a constitutional duty to prevent a school district's budgetary difficulties from denying students of basic educational equality]), while the right to bear arms is not fundamental because it does not appear in the California Constitution. (*Kasler v. Lockyer, supra,* 23 Cal.4th at p. 481 [assault weapon law did not infringe a fundamental interest under the California Constitution].) The right to marry is not found, implicitly or explicitly, in any provision of our Constitution.

---

might have been true in Washington State when it was made in 1989, and may be true elsewhere in the United States today, it is fortunately not true in California in 2007.

Second, fundamental rights have been recognized where they are "'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [the interest were] sacrificed.'" (*Washington v. Glucksberg* (1997) 521 U.S. 702, 721 (*Glucksberg*).) This fundamental interest analysis, which is the same whether the fundamental right is asserted under principles of equal protection or due process, will be discussed below in section II. (*Vacco v. Quill* (1997) 521 U.S. 793, 799 [relying upon the holding of *Glucksberg, supra,* 521 U.S. 702, 719-728, that a fundamental right to physician-assisted suicide does not exist under the due process clause in reaching the same conclusion with regard to the equal protection clause].)

### E. If the Court Declines to Apply a Rational Basis Test, the Marriage Laws Should Nevertheless Be Sustained Because They Satisfy an Intermediate Level of Scrutiny.

Although application of a "rational basis test" is appropriate to evaluate petitioners' claims, the Court may be of the view that, in light of the issues presented in this matter, either the customary methodology for identifying fundamental liberty interests is inadequate or that the criteria for identifying suspect classifications is deficient. But even were the Court to conclude that the rational basis test is ill-suited for the claims being raised by petitioners, it does not follow that the marriage laws should be invalidated. This Court is free to adopt an intermediate level of scrutiny in this case, which is both more sensitive to petitioners' interests than is a "rational basis test," and still acknowledges that the legislative policy of preserving traditional marriage is worthy of being honored because of its importance.

The Court of Appeal properly applied this Court's longstanding equal protection precedents, which establish two tiers of equal protection review to claims under the California Constitution. (Opn. at p. 21, citing *D'Amico v.*

*Board of Medical Examiners, supra,* 11 Cal.3d at pp. 16-17; *Sail'er Inn v. Kirby, supra,* 5 Cal.3d at p. 16).) But as this Court has noted, the United States Supreme Court has in recent years applied a standard higher than rational basis review to some classifications. (*Warden v. State Bar of California* (1999) 21 Cal.4th 628, 641, fn. 7 [declining to apply intermediate scrutiny in challenge to continuing legal education program but noting federal cases decided after *D'Amico* applying intermediate scrutiny].)

Rational basis review would appropriately apply under existing California precedent as the default standard that governs when neither a suspect classification nor a fundamental interest is implicated. (*Hernandez v. City of Hanford* (June 7, 2007, S143287) __ Cal.4th __ [2007 WL 1629830, p. 12].) But the dichotomous approach has been subject to criticism from scholars as well as judges. Justice Mosk observed nearly 30 years ago that "[t]he vice of the binary theory . . . is that it applies either a standard test that is virtually always met (the rational relationship test) or one that is almost never satisfied (the strict scrutiny test)." (*Hays v. Wood* (1979) 25 Cal.3d 772, 796 (conc. opn. of Mosk, J.); see also Gunther, *Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, supra,* 86 Harv. L. Rev. at p. 8 [contrasting "scrutiny that was 'strict' in theory and fatal in fact" with traditional rational basis review that provides "minimal scrutiny in theory and virtually none in fact"].)

The United States Supreme Court has responded to the sharp dichotomy between strict scrutiny and rational basis in two ways. First, the high court has applied intermediate scrutiny to certain classifications. (*Craig v. Boren, supra,* 429 U.S. at p. 197 [gender classification subject to intermediate scrutiny].) Second, some cases have applied "rational basis review" that is functionally some form of heightened review. For example, in *U.S. Department of Agriculture v. Moreno* (1973) 413 U.S. 528, a portion

40

of the Food Stamp Act that rendered ineligible any household containing persons who were unrelated to each other was struck down upon a finding that it was intended to prevent "hippies" from utilizing the program. (*Id.* at pp. 529, 534.) In rejecting the federal government's assertion that the rule was a protection against fraud, the Supreme Court held that the law lacked a rational basis because it reflected "a bare congressional desire to harm a politically unpopular group . . . ." (*Id.* at p. 534; see also *City of Cleburne v. Cleburne Living Center, supra,* 473 U.S. at p. 450 [invalidating ordinance requiring a permit for a group home because it rested on "irrational prejudice against the mentally retarded"].)

Cases in this line have been viewed as making "unacknowledged departures from the deferential rational-based standard without defining a new kind of scrutiny." (*Baker v. State of Vermont, supra,* 744 A.2d at p. 872 fn. 5.) They have been described as demonstrating that "[t]he edges of the tripartite division [of federal equal protection analysis] have thus softened, and there has been at least a modest convergence away from tiers and toward general balancing of relevant interests." (Sunstein, *Foreward: Leaving Things Undecided* (1996) 110 Harv. L. Rev. 1, 77.)

The Court should properly be reluctant to modify formally the standards of equal protection review, but some could reasonably conclude that special considerations should govern the choice of a standard in this case. The marriage laws implicate issues of great personal significance, and while marriage is no longer the *exclusive* means of forming a family unit now that domestic partnership is available (*Koebke v. Bernardo Heights Country Club, supra,* 36 Cal.4th at p. 843), marriage undeniably provides one long-honored way to form a family. Also, the legal preservation of traditional marriage does exclude same-sex couples, and that exclusion falls almost exclusively upon gay men and lesbians. While there are reasons,

41

discussed above, why sexual orientation need not be recognized as a new suspect classification, there can be little doubt that gay men and lesbians constitute a minority group that is subject to prejudice, both as a matter of history and as a contemporary reality. Under these circumstances, it is arguable that treating the laws preserving traditional marriage as subject to mere rationality review may not be appropriate.

A possible solution was suggested by Justice Mosk in *Hawkins v. Superior Court* (1978) 22 Cal.3d 584. Concurring in his own majority opinion, Justice Mosk urged the Court to adopt a balancing approach in certain cases not subject to strict scrutiny review because of the "wide chasm between levels of review [that] is entirely unjustified, given the broad spectrum of rights and classifications that demand equal protection analysis." (*Id.* at p. 603 (conc. opn. of Mosk, J.).) Justice Mosk stated:

> I urge that we refine our articulation of the standards for applying the state equal protection clause . . . . In my view we should adopt a variation of the intermediate level of review discussed above, applicable when rights important – but not "fundamental" - are denied, or when a classification sensitive - but not "suspect" - is made. Such rights and bases of classification do not trigger strict scrutiny under traditional equal protection analysis, and should not do so; but neither is the weak rational basis standard adequate to test the constitutionality of measures which discriminatorily deny important rights or make classifications based on sensitive criteria.

> When such rights or classifications are implicated, it is necessary to examine the importance of the state interests involved and the extent to which they are promoted. The proper inquiry is this: Does the classification Significantly further Important state interests? I recognize, of course, that the emphasized concepts are no more exact than those invoked in the traditional two-tier approach. But the existence of an intermediate level of scrutiny will give California courts the flexibility needed to adjust their analysis of equal protection claims to conform with reality. A standard of review formulated in this manner will allow our courts, for example, to consider such critical factors as the "the character of the classification in question, the relative importance to individuals in the class

42

> discriminated against of the governmental benefits that they do not
> receive, and the asserted state interests in support of the
> classification."

(*Id.* at p. 601 (Mosk, J., concurring), quoting *Dandridge v. Williams* (1970)
397 U.S. 471, 521 (dis. opn. by Marshall, J.).)  Some courts in other
jurisdictions have found it appropriate to adopt a similar approach in
reviewing claims comparable to those at issue here.  (*Lewis v. Harris* (N.J.
2006) 908 A.2d 196, 212 [applying a balancing test in holding that New
Jersey was required to provide same-sex couples with the same benefits as
were provided to married couples but was not required to legalize same-sex
marriage]; *Alaska Civil Liberties Union v. State of Alaska* (Alaska 2005) 122
P.3d 781, 789, 793-794 [applying balancing test analysis to hold that Alaska
was required to give public employees in same-sex domestic partnerships the
same rights and benefits given to married couples even though same-sex
marriage was barred by a constitutional provision].)

The Court might find that adopting such an analysis to the equal
protection claims allows for broader consideration of the relative interests
involved, including but not limited to, the state's justifications for the
marriage laws.  Those interests will be discussed in the next section.

## F. The State's Maintenance of Traditional Marriage and Domestic Partnerships Promotes Important State Interests.

The state's interests in maintaining its longstanding definition of
marriage are sufficient to uphold the marriage laws – whether those interests
are considered under the rational basis test or under an intermediate scrutiny
analysis that balances those interests against the interests of same-sex
couples.  Petitioners accuse the state of invoking tradition for its "own sake."
But this attack completely misses the point: "Tradition" is not an empty
abstract concept -- it is a shorthand to describe the tangible and

psychological benefits that accrue to members of a society when they respect the teachings of their predecessors. As the political philosopher Edmund Burke observed, "[w]e owe an implicit reverence to all the institutions of our ancestors." (Burke, A Vindication of Natural Society (1757), reprinted in The Portable Edmund Burke (1999), p. 34.) "Tradition" is worthy of respect not because it is invoked talismanically by government, but rather because it draws on the wisdom of many generations and the tests of time. Revolution may sometimes be warranted, but more often it represents only the untested wisdom of a single generation.

Burke and other political philosophers have, of course, recognized that respect for tradition is not inconsistent with notions of progress. As Burke himself noted, "a state without the means of some change is without the means of its conservation." (Burke, Reflections on the Revolution in France, para. 36 (1790), reprinted in The Portable Edmund Burke, *supra*, p. 424.) But careful, measured organic change is more likely to be easily absorbed by society and less likely to run afoul of the law of unintended consequences. In the present situation, one unintended and unfortunate consequence of too radical a change is the possibility of backlash, both within the state and throughout the country that the state is currently helping to lead.

Even a child is familiar with the common-sense adage: "If it ain't broke, don't fix it." California's treatment of same-sex unions isn't remotely broken at all. Instead, it is the result of a fully-functioning political process that is treating, and will continue to treat, same-sex couples with respect and equality.

### 1. The State Has an Important Interest in Maintaining the Traditional Definition of Marriage While Providing Same-sex Couples With the Same Rights and Benefits.

The state's definition of marriage is literally older than California. Long before being written into statute in 1977, the definition of marriage was part of our common law. The drafters of the 1849 Constitution were careful to specify that there was no religious test for marriage (see note 2, *ante*), and they had no need to define marriage as a male-female union because that limitation was readily understood. The traditional definition of marriage is so entrenched that courts in other states have found it to exist even in the absence of an express provision requiring traditional marriage. (See, e.g., *Hernandez v. Robles* (N.Y. 2006) 855 N.E.2d 1, 6 (plur. opn.); *Baker v. State of Vermont, supra,* 744 A.2d at pp. 868-869.) As the Court of Appeal noted, "Marriage is more than a 'law,' of course; it is a social institution of profound significance to the citizens of this state, many of whom have expressed strong resistance to the idea of changing its historically opposite-sex nature." (Opn. at p. 59.)

The New Jersey Supreme Court, in *Lewis v. Harris, supra,* 908 A.2d 196, likewise recognized the importance of this traditional understanding of marriage. It stated:

> We cannot escape the reality that the shared societal meaning of marriage – passed down through the common law into our statutory law – has always been the union of a man and a woman. To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin.

(*Id.* at p. 922.)

Petitioners would like to view the state's maintenance of its traditional definition of marriage and its domestic partnership system in isolation from each other. But the Court of Appeal recognized that the state's interest in preserving the definition of "marriage" as a union between a man

45

and a woman must be considered in light of the entire statutory scheme.
(Opn. at p. 52, citing *Brown v. Merlo* (1973) 8 Cal.3d 855, 862.) The court
observed that, because of the provision of rights through the domestic
partnership system "the quarrel here is largely symbolic, though highly
significant." (*Id.* at p. 57.) As explained above, the state provides domestic
partners with all of the same rights that it affords to married couples while
withholding the word "marriage" to describe their relationship. The state
does not provide domestic partners with any federally-conferred rights or
benefits, but such benefits would be denied to same-sex couples pursuant to
federal law even if same-sex marriage were legalized in California. (1
U.S.C. § 7.)

Petitioners criticize the institution of domestic partnerships as
analogous to the "separate but equal" system of racially-segregated facilities
that was rejected in several landmark cases including *Brown v. Board of
Education* (1954) 347 U.S. 483. The dissent in the Court of Appeal agreed
that "[l]audable as the domestic partnership act may be as providing at least
half a loaf, it is in the end a simulacrum, a form of pseudomarriage that
stigmatizes homosexual unions in much the same way 'separate but equal'
public schools stigmatized black students." (Opn. at pp. 44-46 (dis. opn. of
Kline, J.).)

Such hyperbole ignores inconvenient historical facts. Domestic
partnerships and civil unions, unlike Jim Crow laws, were not conceived by
a majority group for the purpose of oppressing a minority group. Rather,
they were sponsored by gay and lesbian rights groups. A historian of the gay
rights movement, Professor George Chauncey, traces the impetus of the
campaign for domestic partnership rights and the current same-sex marriage

movement to the need to secure the rights associated with marriage.[25]
According to Professor Chauncey, "[n]ot until the 1990s did marriage
become a widespread goal, and even then it received more support from
lesbians and gay men at the grassroots level than from major gay
organizations." (Chauncey, Why Marriage: The History Shaping Today's
Debate Over Gay Equality (2004) p. 88.) Until that time, most people in the
gay and lesbian community viewed marriage as a "discredited patriarchal
institution" in which they did not wish to participate. (*Id.* at pp. 89, 93.)
Professor Chauncey opines that the desire for the legal protections of
marriage was prompted by the legal vulnerability that gay men and lesbians
felt when they began having children and when many in their community fell
victim to AIDS. (*Id.* at p. 95.) This desire led to the campaign for domestic
partnership rights and has also prompted the drive for same-sex marriage.
(*Id.* at pp. 116-123.) It is this history that leads law professor and same-sex
marriage supporter William Eskridge to state that analogies between legal
statuses protecting the rights of same-sex couples and racial segregation "are
out of line." (See Eskridge, Equality Practice: Civil Unions and the Future of
Gay Rights (2002) pp. 147-148, 139-145 [rejecting the analogy between
civil unions and racial segregation and arguing that creation of civil unions
in Vermont is more comparable to the *Brown* decision than *Plessy v.
Ferguson* (1896) 163 U.S. 537, because they promote respect and
tolerance].)

As the Court of Appeal noted, domestic partnerships must be viewed
as an important step toward securing acceptance of same-sex relationships.
(Opn. at pp. 57-58.) Maintaining the longstanding and traditional definition

---

25. Professor Chauncey submitted a declaration in support of the
City's position in this case and thus certainly has no bias against petitioners'
position. (S.F. R.A. 223-238.)

of marriage, while providing same-sex couples with "legal recognition comparable to marriage" (*Koebke v. Bernardo Heights Country Club, supra,* 36 Cal.4th at p. 845), is a measured approach to a complex and divisive social issue. Certainly, given the history and importance of marriage, the state's interest in preserving that balance must be seen as at least important.

## 2. The State Has an Important Interest in Carrying Out the Will of Its Citizens as Represented Through the Legislative Process.

The second state interest justifying preservation of traditional marriage is the interest in deferring to the will of Californians as expressed in the legislative process. The enactment of Proposition 22 in 2000 demonstrated the popular intent to preserve traditional marriage. (Fam. Code, § 308.5.) That initiative confirmed the previous determination by the people's representatives in the Legislature that marriage should be so limited. (Fam. Code, §§ 300, 301.) Those representatives have also declared that California public policy supports providing equal rights and responsibilities for lesbian and gay families. (Stats. 2003, ch. 421, § 1, subd. (b) [declaring that domestic partnerships further the state's interest in supporting families].)

The question here is to what extent this Court should defer to these legislative judgments. Petitioners claim that such deference would be an abdication of judicial responsibility. They imply that the state's position contradicts the principle of judicial review. Both contentions lack merit. The state is asserting only that certain social changes should more appropriately come from the people than from the judiciary – as long as constitutional rights continue to be guaranteed. The state is asserting that the judiciary should not rewrite the longstanding definition of marriage based on its view of a better solution to the social issues involved. Such respect and caution is especially warranted because the political process is actively

48

engaged on this subject. Any judgment requiring state recognition of same-sex marriage would terminate this process and would "to a great extent, place the matter outside the arena of public debate and legislative action." (*Glucksberg, supra,* 521 U.S. at p. 720.)

Like judicial review, judicial deference to legislative judgments is a principle with a distinguished pedigree. This Court has observed, in rejecting a constitutional challenge to a statute limiting claims for defamation, that

> if courts are called upon to set their judgment as to what is wise against the popular judgment they may summarily put an end to certain laws that may be foolish but also to certain laws that may be wise, and particularly to laws that may be wise in the long run although they appear foolish at the moment. "Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophesy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting at trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests – the people."

(*Werner v. Southern California Associated Newspapers* (1950) 35 Cal.2d 121, 130, citation omitted; see also *Baker v. Carr* (1962) 369 U.S. 186, 270 (dis. opn. of Frankfurter, J.) ["In a democratic society like ours, relief must come through an aroused popular conscience, that sears the conscience of the people's representatives"].)

Chief Justice Traynor echoed this principle in his academic writings on the role of the judiciary. The Chief Justice wrote: "A judge who meditates law and social change in a democratic society is bound to be preoccupied with the role of the courts. Nevertheless he is bound also to recognize that the task of law reform is that of the legislators, which is to say that it is primarily that of the people." (Traynor, *Law and Social Change in*

*a Democratic Society* 1956 U. Ill. L. F. 230, reprinted in The Traynor Reader (Hastings L. J. 1987) p. 45); see also Traynor, *The Limits of Judicial Creativity* (1978) 29 Hastings. L. J. 1025, 1030 [observing "there remains widespread agreement that the court itself cannot be the engine of social reform. The very responsibilities of a judge as an arbiter disqualify him as a crusader"].)

Whether described as judicial modesty, judicial restraint, or judicial minimalism, this principle has many contemporary advocates. United States Supreme Court Justice Stephen Breyer has written that courts should give greater deference to the legislative process in order to support what he describes as "active liberty," the right of individuals to participate in self-government. (Breyer, Active Liberty (2005) p. 21.) Judicial modesty is needed when approaching constitutional questions, according to Justice Breyer, "because a premature judicial decision risks short-circuiting, or pre-empting, a 'conversational' lawmaking process – a process that embodies our modern understanding of democracy." (*Id.* at p. 71.) His colleague on the high court, Justice Ruth Bader Ginsburg, has criticized the United States Supreme Court's decision in *Roe v. Wade* (1973) 410 U.S. 113, for this same reason:

> The political process was moving in the early 1970s, not swiftly enough for advocates of quick, complete change, but majoritarian institutions were listening and acting. Heavy-handed judicial intervention was difficult to justify and appears to have provoked, not resolved, conflict.

(Ginsburg, *Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade* (1985) 63 N. Carolina L.Rev. 375, 385-386.)[26/] This interest in

---

26. See also Sunstein, *Foreward: Leaving Things Undecided, supra,* at p. 97 [arguing that judicial invalidation of prohibitions against same-sex marriage "could jeopardize important interests" and "weaken the

deferring to the legislative process is particularly strong in California's constitutional system of government, in which political power in inherent in the People. (Cal. Const., art. II, §§ 1, 8.)[27/]

Here, all signs indicate that the legislative process is working to protect the rights of same-sex couples. The democratic "conversation," in Justice Breyer's words, continues. There has been no showing that the DPA, which did not become fully implemented until 2005, is inadequate to safeguard the rights of same-sex couples in the meantime. Under these circumstances, when there exists a possibility that the legislative process can work out a solution to this controversial matter, the importance of deference can hardly be disputed.

---

antidiscrimination movement itself as that movement is operating in democratic arenas"].

27. The consequences of failing to recognize the significant role that the people play in California's constitutional system is illustrated by one of the cases that the *Rymer* petitioners cite, *People v. Anderson* (1972) 6 Cal.3d 628. In that case, this Court distinguished between the wording of former article 1, section 6 (now article I, section 17) prohibiting "cruel *or* unusual punishment" and the Fourteenth Amendment, which prohibits "cruel *and* unusual punishment" in holding the death penalty unconstitutional. (*Id.* at pp. 641-645.) This holding "was promptly repudiated by California voters, who amended the California Constitution to make clear that the death penalty and its related statutory scheme do not constitute cruel or unusual punishment or any other violation of the state Constitution." (*People v. Hill* (1992) 3 Cal.4th 959, 1015.) While petitioners cite *Anderson* to argue against deference to the legislative process, the Court would be better advised to consider the concurring opinion of Justice Mosk in an earlier appeal brought by the *Anderson* defendant. While expressing a "personal belief in the social invalidity of the death penalty," Justice Mosk concurred in the decision upholding the death penalty because "to yield to my predilections would be to act wilfully 'in the sense of enforcing individual views instead of speaking humbly as the voice of the law by which society presumably consents to be ruled . . . .'" (*In re Anderson* (1968) 69 Cal.2d 613, 634-635 (conc. opin of Mosk, J.), quoting Frankfurter, *The Supreme Court in the Mirror of the Justices* (1957) 105 U.Pa.L.Rev. 781, 794.)

The Court of Appeal properly recognized that deferring to the legislative process is not the same as bowing to majority rule. "Majoritarian whims or prejudices will never be sufficient to sustain a law that deprives individuals of a fundamental right or discriminates against a suspect class." (Opn. at p. 61, citation omitted.) But legislative judgment can be nevertheless deferred to under either the standard rational basis test or under a test that weighs the relative interests.

If this Court applies rational basis review, the marriage statutes must be upheld as constitutional. Numerous courts in other jurisdictions have already held that the traditional definition of marriage satisfies the rational review test. (See, e.g., *Hernandez v. Robles, supra,* 855 N.E.2d at p. 12 (plur. opn.); *Morrison v. Sadler* (Ind. Ct. App. 2005) 821 N.E.2d 15, 27; *Standhardt v. Superior Court* (Ariz. Ct. App. 2003) 77 P.3d 451, 464-465.)

If this Court is inclined to apply an intermediate scrutiny standard of review such as the one proposed in *Hawkins v. Superior Court, supra,* 22 Cal.3d 584, the statutes would also pass muster. The New Jersey Supreme Court's recent analysis in *Lewis v. Harris, supra,* 908 A.2d 186, is persuasive. In deciding equal protection claims under the New Jersey Constitution, that court weighs three factors that are equivalent to those proposed in *Hawkins*: "the nature of the right at stake, the extent to which the challenged statutory scheme restricts the right, and the public need for the statutory restriction." (*Id.* at p. 443.)

Applying this test to its marriage laws, the New Jersey Supreme Court identified two distinct issues: whether the rights and privileges of marriage should be given to same-sex couples and whether same-sex couples "have a constitutional right to define their relationship by the name of marriage, the word that historically has characterized the union of a man and a woman." (*Id.* at p. 444.) Considering the first question, the *Lewis* court held that there

52

was no legitimate reason to deny same-sex couples the same rights and benefits as were given to married couples. (*Id.* at p. 453.)

   But the court declined to compel New Jersey to authorize same-sex marriage. Instead, it allowed the New Jersey Legislature to determine whether to legalize same-sex marriage or to provide the rights and benefits associated with marriage to same-sex couples through another means. (*Id.* at p. 459.) The court stated, "[b]ecause this State has no experience with a civil union construct that provides equal rights and benefits to same-sex couples, we will not speculate that identical schemes called by different names would create a distinction that would offend" equal protection. (*Ibid.*) "Under our equal protection jurisprudence, however, plaintiffs' claimed right to the name of marriage is surely not the same now that equal rights and benefits must be conferred on committed same-sex couples." (*Id.* at p. 458.) Finally, the court addressed dissenters who claimed that it should simply require same-sex marriage as a remedy rather than leaving the choice to the legislature:

> Some may think that this Court should settle the matter, insulating it from public discussion and the political process. Nevertheless, a court must discern not only the limits of its own authority, but also when to exercise forbearance, recognizing that the legitimacy of its decisions rests on reason, not power. We will not short-circuit the democratic process from running its course.

(*Id.* at p. 461.)

   The outcome in New Jersey was comparable to the holding of the Vermont Supreme Court, which concluded that same-sex couples were entitled to all of the benefits and protections given to married couples but not a marriage license. (*Baker v. State of Vermont, supra,* 740 A.2d at p. 867.) That court stated: "Whether this ultimately takes the form of inclusion within the marriage laws themselves or a parallel 'domestic partnership' system or

some equivalent statutory alternative, rests with the Legislature." (*Ibid.*)[28/]

Here, California has already implemented a domestic partnership system consistent with the outcomes in New Jersey and Vermont. Registered domestic partners already receive the same rights, benefits, and protections that the state gives to married couples. Thus, the classification made by our marriage laws is no broader than absolutely necessary to effectuate the state's interest in maintaining the traditional definition of marriage. Deference to the legislative process, "the ultimate source of constitutional authority" (*Id.* at p. 888), is no less important. The interest of same-sex couples in equal treatment under the law is undeniable, but it is being addressed comprehensively. The Court of Appeal's judgment affirming the marriage laws against equal protection should therefore be affirmed.

---

28. The Washington Supreme Court might have reached a similar result, but the plaintiffs in that case requested that the court not consider whether they would be entitled to the rights and benefits of marriage separate from the status of marriage. (*Andersen v. King County, supra,* 138 P.3d at p. 985.) Subsequently, the Washington Legislature passed a domestic partnership bill. (Wash. Stats. 2007, ch. 156.) California, Oregon, Maine and the District of Columbia also offer domestic partnerships to same-sex couples (Ore. Stats. 2007, ch. 99; Maine Rev. Stats. Ann., tit. 22, § 2710; D.C. Official Code § 32-702) while New Hampshire, Vermont, New Jersey, and Connecticut provide civil unions. (N.H. Stats. 2007, ch. 58; Vt. Stat. Ann. §§ 1201 - 1207; N.J. Stat. Ann. §§ 37:1-29 - 37:1-36; Conn. Gen. Stat. Ann. §§ 46b-38aa – 46b-38oo.) Hawaii provides certain rights to same-sex couples who register as "reciprocal beneficiaries." (Haw. Rev. Stat. § 572C-2.)

## II.

### CALIFORNIA'S CHOICE TO EQUALIZE RIGHTS FOR SAME-SEX COUPLES WHILE PRESERVING THE INSTITUTION OF MARRIAGE COMPORTS WITH THE FUNDAMENTAL RIGHT TO MARRY.

Petitioners' claim that the traditional definition of marriage violates the fundamental right to marry suffers from two related problems.[29/] First, petitioners fail in their claim that they are being denied the fundamental right to enter into a legally-recognized family relationship with the person of their choice or to enjoy other benefits associated with traditional marriage. The Domestic Partnership Act safeguards those interests to the fullest extent of the state's ability. Second, to the extent that petitioners claim a fundamental right based on the nomenclature used to describe their state-sanctioned relationship – the title "marriage" – no legal authority supports recognition of such a liberty interest.

### A. The Personal Dignity Interests That Inform the Historically Recognized "Right to Marry" Have Been Given to Same-sex Partners by the Domestic Partnership Act.

The marriage laws do not violate the fundamental right to marry because all of the personal and dignity interests that have traditionally

---

29. The petitioners assert a fundamental right to marry based on "multiple and largely overlapping constitutional guarantees, including the rights of privacy, due process, and intimate association." (Rymer Br. at p. 51.) Petitioners therefore cite constitutional precedents in all of these areas, as well as right to marry cases based on equal protection principles, in support of their fundamental rights claim. In the interests of clarity of presentation, this brief will address in this section the due process cases as well as the right to marry cases cited by petitioners. Because the California Constitution, unlike the United States Constitution, includes a specific privacy guarantee, petitioners claims of a violation of the rights to privacy, intimate association, and freedom of expression will be addressed in the next section.

informed the right to marry have been given to same-sex couples through the
Domestic Partnership Act.  Precedents of this Court and the United States
Supreme Court explain that consideration of a newly-asserted fundamental
interest must begin with a "'careful description' of the asserted liberty
interest."  (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 941, quoting
*Glucksberg, supra,* 521 U.S. at p. 721.)  "The next step is to determine
whether this interest is constitutionally protected."  (*Ibid.*)  This
determination asks whether the asserted interest is "'deeply rooted in this
Nation's history and tradition,' and 'implicit in the concept of ordered
liberty,' such that 'neither liberty nor justice would exist if [the interest were]
sacrificed.'"  (*Glucksberg, supra,* 521 U.S. at p. 721.)[30/]

---

30.  The dissent in the Court of Appeal would have disregarded these
longstanding limitations on the recognition of new fundamental rights.
Instead, the dissent suggested that *Lawrence v. Texas, supra,* 539 U.S. 558,
changed the applicable analysis.  However, *Lawrence* did not repudiate the
high court's prior approach to recognizing fundamental rights.  Rather, the
high court considered historical practices and traditions in overruling *Bowers
v. Hardwick, supra,* 478 U.S. 186.  *Lawrence* reexamined the historical
practices and traditions underlying *Bowers,* concluding that *Bowers* was
wrongly decided based on prevailing practices and traditions at the time
when it was decided.  (*Lawrence, supra,* 539 U.S. at p. 571.)  *Lawrence* also
considered more recent laws and traditions in concluding that our legal
history "show[s] an emerging awareness that liberty gives substantial
protection to adult persons in deciding how to conduct their private lives in
matters pertaining to sex."  (*Id.* at p. 572.)  Thus, the dissent's view that the
prudential limits on recognizing new fundamental rights claims have been
removed was erroneous.  This conclusion is supported by post-*Lawrence*
decisions from state and federal appellate courts that have continued to
analyze fundamental rights claims to determine if they are deeply rooted in
our constitutional traditions.  (See, e.g., *Raich v. Gonzales* (9th Cir. Mar. 27,
2007) __ F.3d ___, 2007 WL 754759 [no fundamental right to medical
marijuana use]; *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687,
709 [holding that there is no fundamental right to drink unfluoridated water];
*People v. Santos* (2007) 147 Cal.App.4th 965, 979 [holding that there is no
deeply rooted right to question jurors about their deliberative process after
the verdict as a component of the right to an impartial jury]; Note, *The*

56

Here, petitioners assert that same-sex couples have a fundamental right to have the state license their marriages without consideration of the nature of the state's past regulation of marriage or the Domestic Partnership Act. In petitioners' view, maintaining traditional marriage is a mere tautology – an assertion that same-sex marriage cannot be legal simply because it has never been legal. This perspective gives short shrift to the valid concern about recognizing new fundamental rights: that fundamental rights analysis not constitute an occasion for judicial creation of public policies. (*Dawn D. v. Superior Court, supra,* 17 Cal.4th at p. 939; see also *Lochner v. New York* (1905) 198 U.S. 45, 75 (dis. opn. of Holmes, J.) ["I strongly believe that my agreement or disagreement has nothing to do with the right of the majority to embody their opinions in law .... The 14[th] Amendment does not enact Mr. Herbert Spencer's Social Statics"].)

But perhaps more importantly, petitioners' assertion of a fundamental right to same-sex marriage begs the question of the nature and constitutional basis of the right to marriage that has historically been recognized. The right to marriage precedents have been described as "murky." (Pull, *Questioning the Fundamental Right to Marry* (2006) 90 Marq. L. Rev. 21, 34.) The early cases describing a right to marriage speak of it solely as a private relationship into which the state should not interfere or as a setting in which private sexual relations occur. (*Meyer v. State of Nebraska* (1923) 262 U.S. 390, 399 [recognizing the right "to marry, establish a home, and bring up children" in a case holding that a law criminalizing the teaching of foreign languages violated due process]; *Skinner v. Oklahoma, supra,* 316 U.S. 535, 541 [recognizing that "[m]arriage and procreation" are fundamental rights in

*Glucksberg Renaissance: Substantive Due Process Since Lawrence v. Texas* (2006) 105 Mich. L. Rev. 409, 411 [survey of cases concluding that the holding of *Glucksberg* has continued to be cited by cases throughout the country post-*Lawrence*].)

a decision striking down a state law sterilizing persons convicted of certain crimes]; *Griswold v. Connecticut* (1965) 381 U.S. 479, 485-486 [recognizing the marital relationship falls within a "zone of privacy, created by several fundamental constitutional guarantees," that made it unconstitutional for a state to bar a married couple from having access to contraceptives].)[31/]

Later cases discussing civil marriage as a state-regulated institution also do not support finding same-sex marriage to be a fundamental right. The plurality decision in *Perez v. Sharp, supra*, 32 Cal.2d 711, 731-732, and the high court's decision in *Loving v. Virginia, supra,* 388 U.S. 1, 12, held that anti-miscegenation laws constituted improper racial restrictions on the right to marriage and were therefore subject to strict scrutiny. They did not find a fundamental right beyond the context of traditional marriages.

In *Zablocki v. Redhail, supra,* 434 U.S. 374, the Supreme Court struck down on equal protection grounds a Wisconsin law that required noncustodial parents with child support obligations to seek judicial approval before being allowed to marry. (*Id.* at p. 375.) The case did not address the question of the gender of the would-be marital partners and, more importantly, *Zablocki* did not clearly apply a strict scrutiny test. While describing marriage as a right having a "fundamental character," the high court stated that a law that "significantly interferes with the exercise of a fundamental right . . . cannot be upheld unless it is supported by *sufficiently important* state interests." (*Id.* at pp. 386, 388, emphasis added.) The Court

---

31. The Court later clarified, in *Eisenstadt v. Baird* (1972) 405 U.S. 438, that the right to have access to contraception discussed in *Griswold* was not an exclusive right of married couples but rather a right of all persons, married or single, "to be free of government intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (*Id.* at p. 453.)

also stated that "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." (*Id.* at pp. 386-387, citing *Califano v. Jobst* (1977) 434 U.S. 47.)

Thus, it appears either that *Zablocki* applied a lesser standard than strict scrutiny or that it did not hold that strict scrutiny applies to all regulation of marriage. (See, e.g., *Fair Political Practices Commission v. Superior Court* (1979) 25 Cal.3d 33, 47 [citing *Zablocki* for the proposition that "although a fundamental interest may be involved, . . . not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard" and that *Zablocki* held that strict scrutiny only applies "when there is a real and appreciable impact on, or a significant interference with the exercise of the fundamental right"]; *Hawkins v. Superior Court, supra,* 22 Cal.3d, 584, 599 (conc. opn. of Mosk, J.) [arguing that *Zablocki* applied intermediate scrutiny]; 3 Rotunda & Nowak, *Treatise on Constitutional Law* (3rd ed. 1999) § 18.28, p. 580 ["Justice Marshall wrote a majority opinion for five members of the Court which was somewhat unclear as to the nature of the right to marriage and the standard of review used in the decision . . . . [T]he majority opinion seems to continue to recognize marriage as a fundamental right, although the language used is weaker than that of previous majority opinions"].)

The last of petitioners' cases discussing the right to marriage, *Turner v. Safley* (1987) 482 U.S. 78, rejected the State of Missouri's contention that prisoners had no right to marry. (*Id.* at p. 95.) The Supreme Court explained that, even though the right to marriage was subject to substantial restrictions in a prison setting, prisoner marriages would still have many important "attributes of marriage," including emotional support and commitment, spiritual significance, the expectation of future consummation after release from prison, and the fact that marriage is often a precondition for receipt of

government benefits, property rights and "less tangible benefits." (*Id.* at pp. 95-96.) As in its other cases, there can be little doubt that the high court was considering the constitutional claim in the context of a traditional male-female marriage. Moreover, the central issue in *Turner* was the test to be used in evaluating restrictions imposed upon the constitutional rights of prisoners. Thus, the Court did not speak to whether the right to marriage in issue was grounded in principles of due process or in equal protection. (See Sunstein, *The Right to Marry* (2005) 26 Cardozo L. Rev. 2081, 2089.)

In light of these cases, the "right to marriage" appears unique among fundamental rights. Although marriage is described as fundamental, the high court acknowledged that it can be subject to merely "reasonable" regulation. (*Zablocki v. Redhail, supra,* 434 U.S. at pp. 386-387.) This observation is consistent with California precedent holding that "'the Legislature has full control of the subject of marriage and may fix the conditions under which the marital status may be created or terminated . . . .'" (*Lockyer v. CCSF, supra,* 33 Cal.4th at p. 1074, citation omitted.)[32/]

Such plenary power over marriage belies the idea that marriage is a fundamental interest in the same way as other interests are deemed

---

32. State regulation of the definition of marriage in California distinguishes this case from *Goodridge v. Department of Public Health* (Mass. 2003) 798 N.E.2d 941, which involved only a common law definition of marriage. In requiring Massachusetts to authorize same-sex marriages, the *Goodridge* Court observed that the judicial imposition of that remedy was "entirely consonant with established principles of jurisprudence empowering a court to refine a common law principle in light of evolving constitutional standards." (*Id.* at p. 969.) As explained above, particularly in footnote 16, the remedy that the petitioners seek in this case -- judicial revision of a legislatively-approved definition of marriage -- implicates prudential concerns that are absent when judges are merely reconsidering the wisdom of common law precedents.

fundamental. Petitioners admit that the right to civil marriage has been subject to dynamic changes through the years. (City Br. at pp. 25-26.) And academics have even posited that the states could abolish civil marriage if they wished, leaving the institution to private institutions, including churches. (Sunstein, *The Right to Marry, supra,* 26 Cardozo L. Rev. at pp. 2115-2117, 2119-2120; Zelinsky, *Deregulating Marriage: The Pro-Marriage Case for Abolishing Civil Marriage* (2006) 27 Cardozo L. Rev. 1161, 1182 [observing that "a legal world without civil marriage is workable and not as different from the status quo as many might suppose"].) Such recognition of the state's broad authority to regulate – or not regulate – in this area underscores the difference between marriage and other asserted fundamental rights, which could hardly be "deregulated" in a similar manner.

But what cannot be deregulated is the right to have a private relationship with a beloved person. (Pull, *Questioning the Fundamental Right to Marry*, *supra,* 90 Marq. L. Rev. at p. 62.) One commentator, distinguishing this right from civil marriage, calls this "personal-marriage." (*Ibid.*) Such a right "can summon in its defense many long-recognized constitutional protections (the autonomy of the household; freedom of speech; liberty to associate with friends of one's choosing; freedom of conscience) along with more recently-birthed constitutional protections (for privacy and sexual behavior)." (*Id.* at p. 76.)

This idea of marriage was recognized at common law, which described marriage as a relationship "'by which a man and woman reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife.'" (*Mott v. Mott, supra*, 82 Cal. at p. 416, citation omitted.) This right was always described in the context of the male-female

relationship, for the simple reason that neither law nor society recognized the existence of committed same-sex relationships. But to say that the law never recognized a right in one man to marry another, or a right in one woman to marry another, is not to say that the profound human rights which are historically encompassed by the shorthand phrase "right to marry" when speaking of a man and a woman do not exist as a matter of law for persons seeking the same kind of life-partnership with another of the same sex.

The human rights that inform a man's right to marry a woman, and vice versa, *have* been recognized for same-sex couples by the California Legislature. To the extent that it derives from California law, there is no right, benefit, privilege, or responsibility that can be accomplished by a marriage contract that cannot be accomplished by a domestic partnership. This Court's explanation of common law marriage as a relationship "by which [two persons] reciprocally engage to live with each other during their joint lives, and to discharge toward each other the duties imposed by law on the relation of husband and wife" (82 Cal. at p. 416) is virtually echoed in the definition of a domestic partnership: "two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring." (Fam. Code, § 297, subd. (a).)

The judicially-recognized "right to marry" is not about the label; it is about freedom from governmental interference in personal relationships. And same-sex couples are now as free to join as life partners in domestic partnership as opposite-sex couples are free to marry. Saving only what cannot be provided by California law alone, whatever rights can be said to be guaranteed for a man and a woman by the state Constitution's due process clause under the rubric "right to marry," can now be enjoyed by persons of the same sex in the right to join together as domestic partners.

Accordingly, there can be no merit to petitioners' due process claims following adoption of the Domestic Partnership Act.

## B. There Is No Fundamental Liberty Interest in Using the Title "Marriage" to Describe a Same-sex Relationship.

Petitioners' assertion of a fundamental right also fails because there is no fundamental right to compel the state to describe a legally-sanctioned same-sex relationship as a marriage. The state is unaware of any legal precedent establishing a fundamental interest in the use of a word by the government to describe a particular legal status. And under the domestic partnership system, the word "marriage" is all that the state is denying to registered domestic partners. The fundamental right to marry can no more be the basis for same-sex couples to compel the state to denominate their committed relationships "marriage" than it could be the basis for anyone to prevent the state legislature from changing the name of the marital institution itself to "civil unions." Accordingly, petitioners' claim to a fundamental right must be denied for this reason as well.

## III.

## THE MARRIAGE LAWS COMPORT WITH THE RIGHTS OF PRIVACY, ASSOCIATION AND EXPRESSION.

Article I, section 1 of the California Constitution guarantees the right of privacy. This right encompasses "autonomy privacy" and "informational privacy." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 (*NCAA*).) Petitioners assert a right of autonomy privacy. A plaintiff alleging such a right under the California Constitution must establish each of the following: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) conduct by defendant constituting a serious invasion of privacy. (*Id.* at pp. 39-40.) Petitioners fail to show how they have been denied a legally protected

privacy interest or that the law constitutes a serious invasion of their privacy. They also cannot show that their right of freedom of association or expression has been infringed upon.

## A. There Is No Constitutionally Recognized Privacy Interest that Guarantees Same-sex Couples a Right to Marry.

Petitioners would also ground a right to same-sex marriage in the California Constitution's right to privacy. That effort must fail for the same reason that a due process right to same-sex marriage cannot be found: the absence of a fundamental interest guaranteeing same-sex couples a right to "marriage." This is not to say that same-sex couples lack an autonomy interest protecting them from government interference in their relationship. Those fundamental interests are fully secured to same-sex couples under the rubric of domestic partnership. But the privacy clause of our Constitution does not sweep so broadly as to compel the state to change its longstanding definition of marriage. "[T]he privacy provision in our state Constitution does not 'encompass all conceivable assertions of individual rights' or create 'an unbridled right' of personal freedom." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 387, quoting *NCAA, supra*, 7 Cal.4th at p. 36.) The question whether a privacy interest exists "must be determined from 'the usual sources of positive law governing the right to privacy – common law development, constitutional development, statutory enactment, and the ballot arguments accompanying the Privacy Initiative.'" (*Ibid.*)

These sources do not support finding a privacy interest in same-sex marriage. California law has recognized marriage only as a union of a man and a woman throughout the history of the state. As discussed above with regard to petitioners' due process claim, the right to marriage precedents do not establish a right to same-sex marriage. And that lack of precedent

undermines petitioners' claim to the existence of autonomy privacy in same-sex marriage. (Cf. *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 332-333 [noting that previous California cases "firmly and unequivocally" establish that the constitutional interest in autonomy privacy includes a pregnant woman's right to choose whether to continue her pregnancy].)

Nor does the ballot argument for the 1974 privacy initiative support petitioners' position. This Court has observed that the "principal focus" of the initiative was to prevent unnecessary information gathering by public and private entities. (*NCAA, supra,* 7 Cal.4th at p. 21.) And reliance on broad references such as a "right to be left alone" (see Opn. at p. 4 (dis. opn. of Kline, J.)), are unavailing. This Court has described such phrases as a group of "vague and all-encompassing terms [that] afford little guidance in developing a workable legal definition of the state constitutional right to privacy." (*NCAA, supra,* at pp. 20-21, citing Ballot Pamp., Proposed Amends. Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972, p. 27.)

Petitioners would effectively equate California's right to privacy with the United States Supreme Court's most expansive substantive due process decisions, while ignoring the prudential limitations on due process established by the high court. But no case cited by petitioners stands for the proposition that the California right to privacy is so unlimited.[33] As the

---

33. In *Ortiz v. Los Angeles Police Relief Ass'n, Inc.* (2002) 98 Cal.App.4th 1288, cited by petitioners, the Court of Appeal recognized a privacy interest in marriage, but that case does not stand for the proposition that there is a privacy interest in same-sex marriage. Rather, the employee's right to privacy was implicated by her employer's policy forbidding her from marrying a felon of the opposite sex. (*Id.* at p. 1304.) Nonetheless, the court held that the privacy interest was not violated by policy because the

Court of Appeal observed, marriage is "much more than a private relationship"; it is a "public institution." (Opn. at p. 47.) In declining to authorize the licensing of same-sex marriages, "the state is not interfering with how [same-sex couples] conduct personal aspects of their lives . . . ." (*Id.* at p. 48.) Petitioners' privacy claim must therefore fail.

## B. The Marriage Laws Do Not Infringe Upon Rights of Association or Expression.

Nor can the marriage laws be characterized as infringements on the freedoms of intimate association or expression protected by the California Constitution. Not only have these associational and expression interests never been recognized in California to include a right to same-sex marriage, but whatever "marital" interests of association and expression may be protected to opposite-sex couples by the California Constitution have been secured to same-sex couples by domestic partnership. Accordingly, the inability to obtain a marriage license cannot be said to infringe on those associational interests.

The right of intimate association has been held to protect "highly personal relationships" from government intrusion, including family relationships. (*Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594, 624-625.) But the Court of Appeal properly rejected petitioners' claim because the right to marry recognized as part of the freedom of intimate association has never included the right to same-sex marriage. (Opn. at p. 47.)

The marriage laws likewise do not infringe upon the right to freedom of expression. As the Court of Appeal held, "[t]he marriage laws do not interfere with the ability of individuals in this  to enter intimate relationships

---

employer's conflict of interest rule was supported by a rational basis. (*Id.* at p. 1313.)

with persons of their choosing, regardless of gender.  The laws do not proscribe any form of intimate conduct between same-sex partners.  Nor do they prevent same-sex couples from associating with each other or from publicly expressing their mutual commitment through some form of ceremony." (Opn. at p. 50.)  This absence of a government requirement that same-sex couples express themselves in a particular way or refrain from expressing themselves requires denial of their freedom of expression claim. (Compare *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* (2006) 547 U.S. 47, 126 S.Ct. 1297, 1310 [holding that law denying federal funds to universities that prohibited military recruiting was not a denial of the schools' freedom of expression] with *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 573 [state law forcing parade organizer to accept participant violated freedom of expression].)

## CONCLUSION

For the foregoing reasons, the state respectfully requests that the judgment of the Court of Appeal upholding the marriage statutes against constitutional challenge be affirmed.

Dated:  June 14, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Deputy Attorney General

MANUEL M. MEDEIROS
State Solicitor General

DAVID S. CHANEY
Chief Assistant Attorney General

STACY BOULWARE EURIE
Senior Assistant Attorney General

CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General

Attorneys for the State of California and
Attorney General Edmund G. Brown Jr.

SA2004MD0043
10349465.wpd

## CERTIFICATE OF COMPLIANCE
### [Pursuant to California Rules of Court, rule 8.204(c)(1)]

Pursuant to California Rules of Court, rule 8.204(c)(1), I hereby certify that the attached **ANSWER BRIEF OF STATE OF CALIFORNIA AND THE ATTORNEY GENERAL TO OPENING BRIEFS ON THE MERITS** is proportionately spaced utilizing 13-point Times New Roman font. In reliance on the word count feature of the WordPerfect 8 software used to prepare this brief, I further certify that the total number of words of this brief is 21,040, exclusive of those materials not required to be counted. Counsel for State of California and the Attorney General has submitted with this brief an application to file a brief in excess of the word limit.

Dated:  June 14, 2007

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

JAMES M. HUMES
Chief Deputy Attorney General

MANUEL M. MEDEIROS
State Solicitor General

DAVID S. CHANEY
Chief Assistant Attorney General

STACY BOULWARE EURIE
Senior Assistant Attorney General

CHRISTOPHER E. KRUEGER
Supervising Deputy Attorney General

Attorneys for the State of California and
Attorney General Edmund G. Brown Jr.

## DECLARATION OF SERVICE BY OVERNIGHT COURIER

Case Name:    **IN RE: MARRIAGE CASES**

No.:    **California Supreme Court Case No. S147999**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter; my business address is: 1300 I Street, Suite 125, P.O. Box 944255, Sacramento, CA 94244-2550.

On June 14, 2007, I served the attached **ANSWER BRIEF OF STATE OF CALIFORNIA AND THE ATTORNEY GENERAL TO OPENING BRIEFS ON THE MERITS** by placing a true copy thereof enclosed in a sealed envelope with **Golden State Overnight**, addressed as follows:

### PLEASE SEE ATTACHED SERVICE LIST

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 14, 2007, at Sacramento, California.

| | |
|---|---|
| Toni Melton | *Toni Melton* |
| Declarant | Signature |

10349425.wpd

## SERVICE LIST FOR CONSOLIDATED *MARRIAGE CASES*, CALIFORNIA SUPREME COURT CASE NO. S147999 JCCP No. 4365[1/]

### City and County of San Francisco v. State of California
### California Court of Appeal, First Appellate District Case No. A110449
### San Francisco County Superior Court Case No.  CGC-04-429539
(Consolidated for Trial with)
### San Francisco County Superior Court Case No. CGC-04-429548

| | |
|---|---|
| **Representing Petitioner City and County of San Francisco:**<br><br>Therese M. Stewart<br>Chief Deputy City Attorney<br>OFFICE OF THE CITY ATTORNEY<br>City Hall, Room 234<br>1 Dr. Carlton B. Goodlett Pl.<br>San Francisco, California  94102–4682<br><br>Telephone:      (415) 554-4708<br>Facsimile:      (415) 554-4745 | **Representing Petitioner City and County of San Francisco:**<br><br>Bobbie J. Wilson<br>Amy E. Margolin<br>HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN<br>Three Embarcadero Center, 7th Floor<br>San Francisco, CA  94111-4024<br><br>Telephone:      (415) 434-1600<br>Facsimile:      (415) 217-5910 |
| **Representing Governor Arnold Schwarzenegger and State Registrar of Vital Statistics Teresita Trinidad:**<br><br>Kenneth C. Mennemeier<br>Kelcie M. Gosling<br>MENNEMEIER, GLASSMAN & STROUD, LLP<br>980 9th Street, Suite 1700<br>Sacramento, CA  95814-2736<br><br>Telephone:      (916) 553-4000<br>Facsimile:      (916) 553-4011 | |

---

1.  These cases were consolidated by the Court of Appeal in an order dated December 1, 2005.

**Tyler, et al. v. State of California**
**California Court of Appeal, First Appellate District Case No. A110450**
**Los Angeles County Superior Court Case No. BS088506**

| Representing Petitioners Robin Tyler, et al: | Representing County of Los Angeles: |
|---|---|
| Gloria Allred<br>Michael Maroko<br>John S. West<br>ALLRED, MAROKO & GOLDBERG<br>6300 Wilshire Blvd., Ste. 1500<br>Los Angeles, CA 90048-5217<br><br>Telephone:      (323) 653-6530<br>Facsimile:      (323) 653-1660 | Lloyd W. Pellman, County Counsel<br>Raymond G. Fortner<br>  Senior Deputy County Counsel<br>Judy W. Whitehurst<br>  Senior Deputy County Counsel<br>648 Kenneth Hahn Hall of Administration<br>500 W. Temple St.<br>Los Angeles, CA 90012-2713<br><br>Telephone:      (213) 974-8948<br>Facsimile:      (213) 626-2105 |
| **Representing Respondent Equality California:** | **Representing Respondent Equality California:** |
| Stephen V. Bomse<br>Christopher F. Stoll<br>HELLER EHRMAN LLP<br>333 Bush Street<br>San Francisco, CA 94104-2878<br><br>Telephone:      (415) 772-6000<br>Facsimile:      (415) 772-6268 | Shannon Minter<br>Vanessa H. Eisemann<br>Melanie Rowen<br>Catherine Sakimura<br>NATIONAL CENTER FOR LESBIAN RIGHTS<br>870 Market Street, Suite 370<br>San Francisco, CA 94102<br><br>Telephone:      (415) 392-6257<br>Facsimile:      (415) 392-8442 |
| **Representing Respondent Equality California:** | **Representing Respondent Equality California:** |
| Jon W. Davidson<br>Jennifer C. Pizer<br>LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.<br>3325 Wilshire Boulevard, Suite 1300<br>Los Angeles, CA 90010<br><br>Telephone:      (213) 382-7600<br>Facsimile:      (213) 351-6050 | Peter J. Eliasberg<br>Clare Pastore<br>ACLU FOUNDATION OF SOUTHERN CALIFORNIA<br>1616 Beverly Boulevard<br>Los Angeles, CA 90026<br><br>Telephone:      (213) 977-9500<br>Facsimile:      (213) 250-3919 |

| **Representing Respondent Equality California:**<br><br>Alan L. Schlosser<br>Alex M. Cleghorn<br>ACLU FOUNDATION OF NORTHERN CALIFORNIA<br>39 Drumm Street<br>San Francisco, CA  94111<br><br>Telephone:   (415) 621-2493<br>Facsimile:   (415) 255-8437 | **Representing Respondent Equality California:**<br><br>David C. Codell<br>LAW OFFICE OF DAVID C. CODELL<br>9200 Sunset Blvd. Penthouse Two<br>Los Angeles, CA  90069<br><br>Telephone:   (310) 273-0306<br>Facsimile:   (310) 273-0307 |
|---|---|
| **Representing Governor Arnold Schwarzenegger and State Registrar of Vital Statistics Teresita Trinidad:**<br><br>Kenneth C. Mennemeier<br>Kelcie M. Gosling<br>MENNEMEIER, GLASSMAN & STROUD, LLP<br>*See listing above under CCSF v. State of California* | |

**Woo, et al. v. Lockyer**
**California Court of Appeal, First Appellate District Case No. A110451**
**San Francisco County Superior Court Case No. CGC 04-504038**

| **Representing Respondents Lancy Woo, et al.:**<br><br>Stephen V. Bomse<br>Christopher F. Stoll<br>HELLER EHRMAN LLP<br>*See listing above under Tyler, et al. v. State of California* | **Representing Respondents Lancy Woo, et al.:**<br><br>Shannon Minter<br>Vanessa H. Eisemann<br>Melanie Rowen<br>Catherine Sakimura<br>NATIONAL CENTER FOR LESBIAN RIGHTS<br>*See listing above under Tyler, et al. v. State of California* |
|---|---|
| **Representing Respondents Lancy Woo, et al.:**<br><br>Alan L. Schlosser<br>Alex M. Cleghorn<br>ACLU FOUNDATION OF NORTHERN CALIFORNIA<br>*See listing above under Tyler, et al. v. State of California* | **Representing Respondents Lancy Woo, et al.:**<br><br>David C. Codell<br>LAW OFFICE OF DAVID C. CODELL<br>*See listing above under Tyler, et al. v. State of California* |

| Representing Respondents Lancy Woo, et al.: | Representing Respondents Lancy Woo, et al.: |
|---|---|
| Peter J. Eliasberg<br>Clare Pastore<br>ACLU FOUNDATION OF SOUTHERN CALIFORNIA<br>*See listing above under Tyler, et al. v. State of California* | Jon W. Davidson<br>Jennifer C. Pizer<br>LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.<br>*See listing above under Tyler, et al. v. State of California* |
| **Representing Respondents Lancy Woo, et al.:** | **Representing Governor Arnold Schwarzenegger and State Registrar of Vital Statistics Teresita Trinidad:** |
| Dena L. Narbaitz<br>Clyde J. Wadsworth<br>STEEFEL, LEVIT & WEISS, a Professional Corporation<br>One Embarcadero Center, 30th Floor<br>San Francisco, CA 94111 | Kenneth C. Mennemeier<br>Kelcie M. Gosling<br>MENNEMEIER, GLASSMAN & STROUD, LLP<br>*See listing above under CCSF v. State of California* |

**Proposition 22 Legal Defense and Education Fund v. City and County of San Francisco**
**California Court of Appeal, First Appellate District Case No. A110651**
**San Francisco County Superior Court Case No. CGC-04-503943**
consolidated with
**Campaign for California Families v. Newsom**
**California Court of Appeal, First Appellate District Case No. A110652**
**San Francisco County Superior Court Case No. CGC-04-428794**

| Representing Proposition 22 Legal Defense and Education Fund: | Representing Proposition 22 Legal Defense and Education Fund: |
|---|---|
| Benjamin W. Bull<br>Glen Lavy<br>ALLIANCE DEFENSE FUND<br>15333 North Pima Road, Suite 165<br>Scottsdale, AZ  85260<br><br>Telephone:      (480) 444-0020<br>Facsimile:      (480) 444-0028 | Timothy Chandler<br>ALLIANCE DEFENSE FUND<br>101 Parkshore Drive, Suite 100<br>Folsom, CA  95630<br><br>Telephone:      (916) 932-2850<br>Facsimile:      (916) 932-2851 |

| **Representing Proposition 22 Legal Defense and Education Fund:**<br><br>Robert H. Tyler<br>ADVOCATES FOR FAITH AND FREEDOM<br>24910 Las Brisas Road, Suite 110<br>Murrieta, CA   92562<br><br>Telephone:      (951) 304-7583<br>Facsimile:      (951) 894-6430 | **Representing Proposition 22 Legal Defense and Education Fund:**<br><br>Terry L. Thompson<br>LAW OFFICES OF TERRY L. THOMPSON<br>1804 Piedras Circle<br>Alamo, CA   94507<br><br>Telephone:      (925) 608-3065<br>Facsimile:      (925) 820-6034 |
|---|---|
| **Representing Proposition 22 Legal Defense and Education Fund:**<br><br>Andrew P. Pugno<br>LAW OFFICES OF ANDREW P. PUGNO<br>101 Parkshore Drive, Suite 100<br>Folsom, CA   95630<br><br>Telephone:      (916) 608-3065<br>Facsimile:      (916) 608-3066 | **Representing Petitioner City and County of San Francisco:**<br><br>Therese M. Stewart<br>Chief Deputy City Attorney<br>OFFICE OF THE CITY ATTORNEY<br>*See listing above under CCSF v. State of California* |
| **Representing Petitioner City and County of San Francisco:**<br><br>Bobbie J. Wilson<br>Amy E. Margolin<br>HOWARD, RICE, NEMEROVSKI, CANADY, FALK & RABKIN<br>*See listing above under CCSF v. State of California* | **Representing  Campaign for California Families:**<br><br>Matthew D. Staver<br>LIBERTY COUNSEL<br>Second Floor<br>1055 Maitland Center Commons<br>Maitland, FL   32751-7214<br><br>Telephone:      (407) 875-2100<br>Facsimile:      (407) 875-0770 |
| **Representing  Campaign for California Families:**<br><br>Mary E. McAlister<br>LIBERTY COUNSEL<br>P.O. Box 11108<br>100 Mountain View Road, Suite 2775<br>Lynchburg, VA   24506<br><br>Telephone:      (434) 592-7000<br>Facsimile:      (434) 592-7700 | **Representing  Campaign for California Families:**<br><br>Ross S. Heckman<br>ATTORNEY AT LAW<br>1214 Valencia Way<br>Arcadia, CA   91006<br><br>Telephone:      (626) 256-4664<br>Facsimile:      (626) 256-4774 |

| Representing Del Martin, et al.: | Representing Del Martin, et al.: |
|---|---|
| Stephen V. Bomse<br>Christopher F. Stoll<br>HELLER EHRMAN LLP<br>*See listing above under Tyler, et al. v. State of California* | Shannon Minter<br>Vanessa H. Eisemann<br>Melanie Rowen<br>Catherine Sakimura<br>NATIONAL CENTER FOR LESBIAN RIGHTS<br>*See listing above under Tyler, et al. v. State of California* |
| **Representing Del Martin, et al.:** | **Representing Del Martin, et al.:** |
| Alan L. Schlosser<br>Alex M. Cleghorn<br>ACLU FOUNDATION OF NORTHERN CALIFORNIA<br>*See listing above under Tyler, et al. v. State of California* | David C. Codell<br>LAW OFFICE OF DAVID C. CODELL<br>*See listing above under Tyler, et al. v. State of California* |
| **Representing Del Martin, et al.:** | **Representing Del Martin, et al.:** |
| Peter J. Eliasberg<br>Clare Pastore<br>ACLU FOUNDATION OF SOUTHERN CALIFORNIA<br>*See listing above under Tyler, et al. v. State of California* | Jon W. Davidson<br>Jennifer C. Pizer<br>LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.<br>*See listing above under Tyler, et al. v. State of California* |

**Clinton, et al. v. State of California, et al.**
**California Court of Appeal, First Appellate District Case No. A110463**
**San Francisco County Superior Court Case No. CGC-04-429548**

| Representing Petitioners Clinton, et al.: | Representing Petitioners Clinton, et al.: |
|---|---|
| Jason Hasley<br>PAUL, HANLEY & HARLEY LLP<br>1608 Fourth Street, Suite 300<br>Berkeley, CA  94710<br><br>Telephone:      (510) 559-9980<br>Facsimile:      (510) 559-9970 | Waukeen Q. McCoy<br>Aldon L. Bolanos<br>LAW OFFICES OF WAUKEEN Q. MCCOY<br>703 Market Street, Suite 1407<br>San Francisco, CA  94103<br><br>Telephone:      (415) 675-7705<br>Facsimile:      (415) 675-2530 |

**Representing Governor Arnold**
**Schwarzenegger and State Registrar of**
**Vital Statistics Teresita Trinidad:**

Kenneth C. Mennemeier
Kelcie M. Gosling
MENNEMEIER, GLASSMAN & STROUD, LLP
*See listing above under CCSF v. State of*
*California*

## COURTS

| | |
|---|---|
| Honorable Richard A. Kramer<br>Judge of the Superior Court, Dept. 304<br>400 McAllister Street<br>San Francisco, CA  94102<br>(1 copy) | Court of Appeal<br>First Appellate District<br>350 McAllister Street<br>San Francisco, CA   94102<br>(1 copy) |