LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
*tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 932-2850, Facsimile: (916) 932-2851

Benjamin W. Bull (AZ Bar No. 009940)
*bbull@telladf.org*
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

Jordan W. Lorence (DC Bar No. 385022)+
*jlorence@telladf.org*
Austin R. Nimocks (TX Bar No. 24002695)+
*animocks@telladf.org*
801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 637-4610, Facsimile: (202) 347-3622

ATTORNEYS FOR PROPOSED INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*
+ *Pro hac vice* application forthcoming

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,

Plaintiffs,

v.

ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official

CASE NO. 09-CV-2292 VRW

**PROPOSED INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date: July 2, 2009
Time: 10:00 a.m.
Judge: Chief Judge Vaughn R. Walker
Location: Courtroom 6, 17th Floor

capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,

Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, and MARK A. JANSSON; and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL,

Proposed Intervenors.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTS ..... 1

ARGUMENT ..... 2

I. PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THEIR CLAIMS ..... 2

A. The Supreme Court's Decision In *Baker v. Nelson* Forecloses Plaintiffs' Claims ..... 2

1. *Baker* Is Dispositive Of The Issues Presented In This Case ..... 3

2. *Baker* Is Binding Supreme Court Precedent ..... 4

B. Plaintiffs Cannot Succeed On Their Due-Process Claim ..... 6

1. The Fundamental Right To Marry Recognized By The Supreme Court Is The Right To Enter A Legal Union Between A Man and A Woman ..... 7

2. Plaintiffs' Interest In Marrying A Person Of The Same Sex Is Not A Protected Interest Under The Due Process Clause ..... 9

3. Proposition 8 Satisfies Rational-Basis Review ..... 11

C. Plaintiffs Cannot Succeed On Their Equal-Protection Claim ..... 15

1. Proposition 8 Does Not Invidiously Discriminate Against A Class of Persons ..... 15

2. Same-Sex Couples Are Not Similarly Situated To Opposite-Sex Couples For The Purpose Of The Marriage Laws ..... 16

3. Proposition 8 Is Unlike The State Constitutional Amendment Invalidated In *Romer* ..... 17

4. Proposition 8 Does Not Impermissibly Discriminate On The Basis Of Sexual Orientation ..... 19

5. Proposition 8 Does Not Impermissibly Discriminate On The Basis Of Sex ..... 22

6. Proposition 8 Does Not Violate *Brown v. Board of Education* ..... 22

II. THE IRREPARABLE-HARM, BALANCE-OF-EQUITIES, AND PUBLIC-INTEREST FACTORS ALL WEIGH IN FAVOR OF DENYING A PRELIMINARY INJUNCTION ..... 23

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Howerton*,
486 F. Supp. 1119 (C.D. Cal. 1980) .......... 5

*Baker v. Nelson*,
409 U.S. 810 (1972) .......... 1, 2, 3, 4, 5, 6

*Ball v. Massanari*,
254 F.3d 817 (9th Cir. 2001) .......... 20

*Ben-Shalom v. Marsh*,
881 F.2d 454 (7th Cir. 1989) .......... 20

*Bd. of Trustees of Univ. of Alabama v. Garrett*,
531 U.S. 356 (2001) .......... 11

*Bowen v. Gilliard*,
483 U.S. 587 (1987) .......... 21

*Bowers v. Hardwick*,
478 U.S. 186 (1986) .......... 20

*Brown v. Board of Education*,
347 U.S. 483 (1954) .......... 15, 22, 23

*California Pharmacists Ass'n v. Maxwell-Jolly*,
563 F.3d 847 (9th Cir. 2009) .......... 2

*Chalk v. United States District Court*,
840 F.2d 701 (9th Cir. 1988) .......... 23

*Christian Gospel Church, Inc. v. City and County of San Francisco*,
896 F.2d 1221 (9th Cir. 1990) .......... 16

*Citizens for Equal Prot. v. Bruning*,
455 F.3d 859 (8th Cir. 2006) .......... 20

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Fund*,
538 U.S. 188 (2003) .......... 15, 19

*Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) .......... 15, 21

*Coalition for Economic Equality v. Wilson*,
122 F.3d 692 (9th Cir. 1997) .......... 24

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008) .......... 20

*FCC v. Beach Communications, Inc.*,
508 U.S. 307 (1993) .......... 11

*Flores v. Morgan Hill Unified Sch. Dist.*,
324 F.3d 1130 (9th Cir. 2003) ..................... 20, 21

*Frontiero v. Richardson*,
411 U.S. 677 (1973)..................... 21

*Heller v. Doe*,
509 U.S. 312 (1993)..................... 11

*Hicks v. Miranda*,
422 U.S. 332 (1975)..................... 3, 4

*High Tech Gays v. Defense Indus. Sec. Clearance Office*,
895 F.2d 563 (9th Cir. 1990) ..................... 20, 21, 22

*In re Kandu*,
315 B.R. 123 (Bankr. W.D. Wash. 2004)..................... 5, 10, 13, 22

*Jackman v. Rosenbaum Co.*,
260 U.S. 22 (1922)..................... 10

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) ..................... 20

*Katzenbach v. Morgan*,
384 U.S. 641 (1966)..................... 14

*Korematsu v. United States*,
323 U.S. 214 (1944)..................... 23

*Lawrence v. Texas*,
539 U.S. 558 (2003)..................... 1, 4, 5, 8, 20, 21

*Lofton v. Sec'y of Dep't of Children and Family Servs.*,
358 F.3d 804 (11th Cir. 2004) ..................... 20

*Loving v. Virginia*,
388 U.S. 1 (1967)..................... 7, 8

*Lyng v. Castillo*,
477 U.S. 635 (1986)..................... 20

*Mandel v. Bradley*,
432 U.S. 173 (1977)..................... 3, 5

*Maryland v. Craig*,
497 U.S. 836 (1990)..................... 11, 12

*Massachusetts Bd. of Retirement v. Murgia*,
427 U.S. 307 (1976)..................... 20

*Maynard v. Hill*,
125 U.S. 190 (1888)..................... 7

*McConnell v. Nooner*,
547 F.2d 54 (8th Cir. 1976) .................................................................................... 5

*Michael M. v. Superior Court of Sonoma County*,
450 U.S. 464 (1981)............................................................................................ 15, 16

*Miller v. Albright*,
523 U.S. 420 (1998)................................................................................................. 16

*Murphy v. Ramsey*,
114 U.S 15 (1885).................................................................................................... 10

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977)........................................................................................ 24, 25

*Palko v. Connecticut*,
302 U.S. 319 (1937)................................................................................................... 9

*Pennoyer v. Neff*,
95 U.S. 714 (1877)..................................................................................................... 9

*Reno v. Flores*,
507 U.S. 292 (1993)............................................................................................ 9, 10

*Rich v. Sec'y of the Army*,
735 F.2d 1220 (10th Cir. 1984) ............................................................................... 20

*Romer v. Evans*,
517 U.S. 620 (1996)................................................................ 4, 5, 15, 17, 18, 19, 20

*Rostker v. Goldberg*,
453 U.S. 57 (1981).................................................................................................. 16

*Scarbrough v. Morgan County Bd. of Educ.*,
470 F.3d 250 (6th Cir. 2006) .................................................................................. 20

*Skinner v. Oklahoma ex rel. Williamson*,
316 U.S. 535 (1942)............................................................................................ 8, 15

*Smelt v. County of Orange*,
374 F. Supp 2d 861 (C.D. Cal. 2005) .................................................... 5, 6, 10, 22

*Sosna v. Iowa*,
419 U.S. 393 (1975)................................................................................................... 9

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) .................................................................................. 24

*Steffan v. Perry*,
41 F.3d 677 (D.C. Cir. 1994).................................................................................. 20

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971).................................................................................................... 23

*Turner v. Safley*,
482 U.S. 78 (1987)........ 8

*Veney v. Wyche*,
293 F.3d 726 (4th Cir. 2002) ........ 20

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*,
439 U.S. 463 (1979)........ 3

*Washington v. Davis*,
426 U.S. 229 (1976)........ 15, 19

*Washington v. Glucksberg*,
521 U.S. 702 (1997)........ 6, 8, 9, 11, 13

*Wilson v. Ake*,
354 F. Supp 2d 1298 (M.D. Fla. 2005)........ 5, 10, 11

*Witt v. Dep't of the Air Force*,
527 F.3d 806 (9th Cir. 2008) ........ 8, 21

*Woodward v. United States*,
871 F.2d 1068 (Fed. Cir. 1989) ........ 20

*Wright v. Lane County Dist. Ct.*,
647 F.2d 940 (9th Cir. 1981) ........ 3

*Zablocki v. Redhail*,
434 U.S. 374 (1978)........ 7, 8, 17

**STATE CASES**

*Andersen v. King County*,
138 P.3d 963 (Wash. 2006) ........ 7, 10, 12, 22

*Baker v. Nelson*,
191 N.W.2d 185 (Minn. 1971) ........ 3

*Baker v. State*,
744 A.2d 864 (Vt. 1999)........ 22

*Conaway v. Deane*,
932 A.2d 571 (Md. 2007) ........ 7, 10, 11, 12, 14, 22

*Goodridge v. Dep't of Pub. Health*,
798 N.E.2d 941 (Mass. 2003)........ 10

*Hernandez v. Robles*,
855 N.E.2d 1 (N.Y. 2006)........ 10, 13, 14, 19, 22

*In re Marriage Cases*,
183 P.3d 384 (Cal. 2008)........ 1, 11, 22

*Lockyer v. City and County of San Francisco*,
95 P.3d 459 (Cal. 2004)........ 5

*Morrison v. Sadler*,
821 N.E.2d 15 (Ind. Ct. App. 2005) .......... 10, 13, 14

*Standhardt v. Superior Court*,
77 P.3d 451 (Ariz. Ct. App. 2003) .......... 14

**CONSTITUTIONAL PROVISIONS AND STATUTES**

1 U.S.C. § 7 .......... 10

13 Del. Code § 101 .......... 10

23 Pa. Cons. Stat. § 1704 .......... 10

750 Ill. Comp. Stat. 5/212 .......... 10

Ala. Const. art. I, § 36.03 .......... 10

Alaska Const. art. I, § 25 .......... 10

Ariz. Const. art. XXX § 1 .......... 10

Ark. Const. amend. 83, § 1-3 .......... 10

Cal. Const. art. I, § 7.5 .......... 2, 10

Cal. Civ. Code § 51 .......... 18

Cal. Civ. Code § 51.7 .......... 18

Cal. Educ. Code § 220 .......... 18

Cal. Educ. Code § 51500 .......... 18

Cal. Fam. Code § 297 .......... 18

Cal. Fam. Code § 7570(a) .......... 14

Cal. Penal Code § 422.55 .......... 18

Col. Const. art. II, § 31 .......... 10

Fla. Const. art. I, § 27 .......... 10

Ga. Const. art. I, § IV .......... 10

Haw. Rev. Stat. § 572-1 .......... 10

Haw. Rev. Stat. § 572-3 .......... 10

Idaho Const. art. III, § 28 .......... 10

Ind. Code § 31-11-1-1 .......... 10

Kan. Const. art. XV, § 16 .......... 10

Ky. Const. § 233A ........ 10

La. Const. art. XII, § 15 ........ 10

Md. Code, Fam. Law § 2-201 ........ 10

Mich. Const. art. I, § 25 ........ 10

Minn. Stat. § 517.01 ........ 10

Miss. Const. art. XIV, § 263A ........ 10

Mo. Const. art. I, § 33 ........ 10

Mont. Const. art. XIII § 7 ........ 10

Neb. Const. art. I, § 29 ........ 10

Nev. Const. art. I, § 21 ........ 10

N.C. Gen. Stat. § 51-1.2 ........ 10

N.D. Const. art. IX, § 28 ........ 10

N.J. Stat. § 37:1-1 ........ 10

N.M. Stat. § 40-1-1 ........ 10

N.Y. Dom. Rel. Law § 5-7 ........ 10

Ohio Const. art. XV, § 11 ........ 10

Okla. Const. art. II, § 35 ........ 10

Or. Const. art. XV, § 5a ........ 10

R.I. Gen. Laws § 15-1-1 – 15-1-5 ........ 10

S.C. Const. art. XVII, § 15 ........ 10

S.D. Const. art. XXI, § 9 ........ 10

Tenn. Const. art. XI, § 18 ........ 10

Tex. Const. art. I, § 32 ........ 10

Utah Const. art. I, § 29 ........ 10

Va. Const. art. I, § 15-A ........ 10

Wash. Rev. Code § 26.04.010-20 ........ 10

Wis. Const. art. XIII, § 13 ........ 10

W. Va. Code § 48-2-603 .......... 10

Wyo. Stat. § 20-1-101 .......... 10

**OTHER AUTHORITIES**

*Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Oct. Term 1972) .......... 3

Convention on the Rights of the Child, United Nations (September 2, 1990) .......... 12

*For a Better Understanding of Sexual Orientation and Homosexuality*, American Psychological Association (2008) .......... 21

Kristin Anderson Moore *et al.*, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?*, Child Trends Research Brief (June 2002) . 12

## INTRODUCTION

Plaintiffs labor mightily to frame their claimed constitutional right to same-sex marriage as a logical extension of *Lawrence v. Texas*, 539 U.S. 558 (2003). The overarching and constant theme of Plaintiffs' position is that California law, by denying them the right to marry, reflects nothing more than moral condemnation and social prejudice. But this is a grotesque caricature of California's laws and what is at stake in this case. California's laws are among the most progressive in the Nation in terms of the benefits and protections afforded gay and lesbian individuals and their committed relationships. By contrast, the Texas law at issue in *Lawrence* criminalized "the most private human conduct, sexual behavior, and in the most private of places, the home." *Lawrence*, 539 U.S. at 567. Here, punishment is simply not at issue. Instead, the issue is whether the Constitution requires the people of California to grant affirmative, official, and legal imprimatur to same-sex unions to the extent of redefining the institution of marriage, which has always been understood as the union of a man and a woman. Nothing in the Constitution requires such a radical redefinition of the ancient institution of marriage, and no court has accepted Plaintiffs' federal constitutional argument—indeed, the Supreme Court has summarily rejected Plaintiffs' core legal theory. *See Baker v. Nelson*, 409 U.S. 810 (1972).

## FACTS

The legal institution of marriage in this Nation has always been the union of one man and one woman. *See infra* fn. 3. To confirm that timeless tradition, Proposed Intervenors in the fall of 2007 began the task of qualifying Proposition 8 for the state ballot. (*See, e.g.*, Doc # 8-2 at 5 ¶ 10.) In April 2008, after six months of tireless work, they submitted signature petitions to county-election officials for verification—the last affirmative step for placing Proposition 8 before the voters. (*See, e.g.*, Doc # 8-2 at 6 ¶ 19.) Then, on May 15, 2008, the California Supreme Court issued its decision in *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008), *overruled by* Cal. Const. art. I, § 7.5, which judicially redefined marriage to include same-sex couples. Shortly thereafter, the California Secretary of State announced that Proposition 8 qualified for the November 2008 ballot. (*See, e.g.*, Doc # 8-2 at 6 ¶ 21.)

In the 2008 General Election Voter Information Guide, the California Attorney General

stated the purpose of Proposition 8 as changing "the California Constitution to eliminate the right of same-sex couples to marry in California." (Doc # 7 at 8.) Proposed Intervenors so vigorously objected to this characterization that they filed a lawsuit to compel the Attorney General to change it. *See Jansson v. Bowen*, No. 34-2008-00017351, slip op. at 1 (Cal. Super. Ct. August 7, 2008) (attached as Exhibit B). Proposed Intervenors argued that the Attorney General's proffered purpose "focus[ed] too narrowly on the measure's effect on same-sex couples." (Ex. B at 4.) Proposition 8's actual purpose was to reaffirm California's definition of marriage as the union of one man and one woman. (Ex. B at 5.) And the obvious corollary of that purpose requires the government to refrain from recognizing as marriages any variation from that definition, including but not limited to polygamous, polyamorous, and same-sex relationships. (Ex. B at 5-6.) In the end, the state court declined to force the Attorney General to change the ballot language. (Ex. B at 6.)

On November 4, 2008, more than 7 million California voters approved Proposition 8, and, on the very next day, it became Article I, Section 7.5 of the California Constitution, which states: "Only marriage between a man and a woman is valid or recognized in California." Cal. Const. art. I, § 7.5. While Californians believe that marriage is the union of a man and a woman, they have chosen to officially recognize and grant benefits to same-sex relationships, *see* Cal. Fam. Code § 297, and they have relentlessly strived to eradicate discrimination against gay and lesbian individuals from all facets of society, *see infra* fn. 7.

## ARGUMENT

Before this Court may enjoin the application of a state constitutional provision, Plaintiffs must prove that "they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 849 (9th Cir. 2009). Plaintiffs cannot satisfy any of these standards.

### I. PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THEIR CLAIMS.

#### A. The Supreme Court's Decision In *Baker v. Nelson* Forecloses Plaintiffs' Claims.

The United States Supreme Court in *Baker v. Nelson*, 409 U.S. 810 (1972), dismissed "for want of a substantial federal question" an appeal from the Supreme Court of Minnesota, which

rejected a same-sex couple's claim that the State's denial of their request to marry violated the Fourteenth Amendment. *Id.* By dismissing that appeal, the Supreme Court concluded that defining marriage as a union between one man and one woman does not violate the Fourteenth Amendment. *Baker* is binding precedent and requires that Plaintiffs' claims be dismissed.

**1. *Baker* Is Dispositive Of The Issues Presented In This Case.**

In *Baker*, 409 U.S. at 810, the Supreme Court considered and rejected claims by two men that Minnesota's law defining marriage as a union between two persons of the opposite sex violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. That ruling affirmed the Supreme Court of Minnesota's decision, which held (1) that there is no fundamental right to same-sex marriage under the Due Process Clause, and (2) that excluding same-sex couples from marriage "is no[t] irrational or invidious discrimination" under the Equal Protection Clause. *See Baker v. Nelson*, 191 N.W.2d 185, 186-87 (Minn. 1971), *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972).

The Supreme Court's dismissal of the *Baker* appeal for "want of a substantial federal question" was a decision on the merits, which binds all federal district courts:

> Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. *They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.*

*Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (emphasis added); *see also Hicks v. Miranda*, 422 U.S. 332, 344 (1975). The Supreme Court's summary dismissal in *Baker* "represents [the] view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979). And the precedential value of that "dismissal . . . extends beyond the facts of the particular case to all similar cases." *Wright v. Lane County Dist. Ct.*, 647 F.2d 940, 941 (9th Cir. 1981).

The question presented to the Court in *Baker* was whether Minnesota's marriage laws "deprive[d] [same-sex couples] of liberty . . . in violation of the due process and equal protection clauses." *Baker v. Nelson*, Jurisdictional Statement, No. 71-1027, at 11 (Oct. Term 1972) (attached

as Exhibit C). The *Baker* plaintiffs directly asserted that they, as a same-sex couple, had a fundamental right to marry "protected by the due process and equal protection clauses of the Fourteenth Amendment." *Id.* at 11. And they argued that "[b]y not allowing [them] the legitimacy of their marriages, the [S]tate [was] denying them this basic right and unlawfully meddling in their privacy." *Id.* at 18. The Supreme Court's dismissal of the *Baker* appeal directly rejected the merits of these claims. This Court is "not free to disregard this pronouncement." *Hicks*, 422 U.S. at 344. As a result, Plaintiffs lack a cognizable legal theory that can succeed on the merits.

**2. *Baker* Is Binding Supreme Court Precedent.**

Lower courts are bound by the Supreme Court's summary decision in *Baker* until "the Court informs them that they are not" either by expressly overruling that decision or through "'doctrinal developments'" that are necessarily incompatible with it. *Id.* at 344-45. To date, the Supreme Court has not expressly overruled *Baker*, nor do any of its later decisions undermine it.

Plaintiffs argue that *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Romer v. Evans*, 517 U.S. 620 (1996), represent "doctrinal developments" that release this Court from its obligation to follow *Baker*. (Doc # 7 at 16 n.6.) But that argument is unpersuasive. *Lawrence* dealt with whether criminalizing private homosexual conduct violates due process; it did not involve government recognition of a relationship. In fact, the *Lawrence* Court expressly distinguished between protecting private sexual conduct and forcing government recognition of a relationship, emphasizing that the facts of that case did not involve "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578. And, in her concurring opinion, Justice O'Connor made it clear that *Lawrence* did not disturb the principles announced in *Baker*. *See id.* at 585 (O'Connor, J, concurring) (confirming that many "laws distinguishing between heterosexuals and homosexuals," such as those "preserving the traditional institution of marriage," would not violate the Fourteenth Amendment).

Neither does *Romer* undermine the efficacy of *Baker*'s holding. The Court in *Romer* applied rational-basis review to invalidate a breathtakingly broad state constitutional amendment that "prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect . . . homosexual persons." *Romer*, 517 U.S. at 624. The Court

made no effort to revisit *Baker* or the constitutionality of defining marriage as the union of one man and one woman. Thus, neither *Lawrence* nor *Romer* "informed" the lower courts that they are no longer bound by *Baker*.

Federal courts, including one California district court, have considered *Baker*'s precedential value and consistently found it controlling. *See*, *e.g.*, *Wilson v. Ake*, 354 F. Supp 2d 1298, 1304-05 (M.D. Fla. 2005) (holding that *Baker* "is binding precedent upon this Court and Plaintiffs' case against [Federal DOMA] must be dismissed"); *McConnell v. Nooner*, 547 F.2d 54, 56 (8th Cir. 1976); *Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) (finding "the *Baker* case controlling" and concluding that a "state law which rejects a purported marriage between persons of the same sex [did] not violate the due process or the equal protection clause"), *aff'd on other grounds*, 673 F.2d 1036, 1039 n.2 (9th Cir. 1982); *see also Lockyer v. City and County of San Francisco*, 95 P.3d 459, 504 (Cal. 2004) (Kennard, J., concurring in part and dissenting in part) (stating that *Baker* "prevents lower courts . . . from coming to the conclusion that a state law barring marriage between persons of the same sex violates the equal protection or due process guarantees").

Plaintiffs point to *Smelt v. County of Orange*, 374 F. Supp 2d 861 (C.D. Cal. 2005), *rev'd in part*, 447 F.3d 673 (9th Cir. 2006), as a dissenting voice. But the court in *Smelt* held that *Baker* was not applicable because the plaintiffs in that case were seeking the federal benefits of marriage and "not address[ing] what relationships states may recognize as marriages." *Id.* at 872. "Th[e] issue of allocating benefits is different from the issue of sanctifying a relationship presented in *Baker*'s jurisdictional statement." *Id.* at 873; *see also In re Kandu*, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (distinguishing between seeking the benefits of marriage and the status of marriage). Here, Plaintiffs seek the status of marriage—the precise issue decided in *Baker*. They do not seek benefits as in *Smelt*. (*See* Doc # 7 at 6 (acknowledging that Plaintiffs have or can obtain "most of the substantive rights that accompany the status of marriage").) Thus, even under the *Smelt* court's analysis, *Baker* controls here.

In sum, "the precise issues presented and necessarily decided" in *Baker* were whether defining marriage as the union of one man and one woman violates the Due Process or Equal Protection Clauses of the Fourteenth Amendment. *See Mandel*, 432 U.S. at 176. Those same issues

are presented here. *Baker* has neither been overruled nor undermined by subsequent "doctrinal developments." Accordingly, *Baker* controls this case, and as a matter of law, Plaintiffs' motion for a preliminary injunction should be denied.[1]

**B. Plaintiffs Cannot Succeed On Their Due-Process Claim.**

Plaintiffs assert that Proposition 8 violates their due-process rights under the Fourteenth Amendment "because it impermissibly impairs their fundamental right to marry." (Doc # 7 at 11.) The right asserted by Plaintiffs, however, is not the longstanding right to marry recognized by the Supreme Court but a newly fashioned right to same-sex marriage.

Substantive-due-process analysis begins with a threshold inquiry—determining whether the right asserted is fundamental under the Fourteenth Amendment. Plaintiffs would prefer to gloss over this important inquiry, but the Court must engage in this necessary threshold analysis to prevent the improvident expansion of constitutional jurisprudence and the corresponding interference with legislative prerogatives. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("[E]xtending constitutional protection to an asserted right or liberty interest . . . place[s] the matter outside the arena of public debate and legislative action"). That inquiry requires the Court to "carefully formulat[e]" the asserted right and determine whether it "has any place in our Nation's traditions." *Id*. at 722-23. Engaging in that analysis here unmistakably demonstrates that Plaintiffs' asserted "right" does not pass this threshold test.

[1] Plaintiffs also contend that their challenge is sufficiently distinguishable from *Baker* because, in that case, Minnesota did not provide any of the legal benefits associated with marriage to couples of the same sex, whereas, in this case, California provides many such benefits to domestic partners. (Doc # 7 at 16 n.6.) But despite this factual difference, the complained-of injury in both cases is identical—the government's refusal to redefine the longstanding and clearly established definition of marriage to encompass same-sex couples. *See Smelt*, 374 F. Supp 2d at 872 (explaining that *Baker* addressed "what relationships states may recognize as marriages"—*not* the legal benefits associated with the marriage relationship); *id.* at 873 ("Th[e] issue of allocating benefits is different from the issue of sanctifying a relationship presented in *Baker*'s jurisdictional statement"); *In re Kandu*, 315 B.R. at 137 (similar). And it stands to reason that if a State does not violate the Fourteenth Amendment by refusing both to redefine the traditional understanding of marriage *and* to provide any of the legal benefits associated with that status to same-sex couples, then it certainly does not violate that constitutional provision to retain the long-established definition of marriage while granting almost all the legal benefits associated with marriage to domestic partners. Indeed, California's progressive Domestic Partnership Law confirms that Proposition 8 is not animated by any sort of discriminatory purpose.

**1. The Fundamental Right To Marry Recognized By The Supreme Court Is The Right To Enter A Legal Union Between A Man and A Woman.**

"All of the [Supreme Court's] cases infer that the right to marry enjoys its fundamental status due to the male-female nature of the relationship and/or the attendant link to fostering procreation of our species." *Conaway v. Deane*, 932 A.2d 571, 619 (Md. 2007); *see also Andersen v. King County*, 138 P.3d 963, 978 (Wash. 2006) (plurality opinion). From the earliest relevant cases, the Supreme Court has always tied the significance of marriage to its procreative aspect. In *Maynard v. Hill*, 125 U.S. 190, 211 (1888), for example, the Court described marriage as "the foundation of the family and of society, without which there would be neither civilization nor progress." *Id.* at 211. This understanding of marriage—linking that institution directly to procreation, *i.e.*, the future of "civilization"—permeates the Court's discussions of the fundamental right to marry. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Zablocki v. Redhail*, 434 U.S. 374, 384-86 (1978).

Plaintiffs pluck phrases about the fundamental right to marry from Supreme Court precedent and attempt to use those out-of-context quotes to support their effort to redefine marriage. But when those phrases are read in context, it becomes readily apparent that the fundamental right to marry recognized in the Constitution is limited to unions between one man and one woman. Plaintiffs, for example, rely heavily on *Loving*, a case which invalidated Virginia's anti-miscegenation laws. But *Loving* involved a marriage between a man and a woman, and the Court's discussion of the fundamental right focused on the link between marriage and procreation, stating that "[m]arriage is one of the basic civil rights of man, *fundamental to our very existence and survival*." *Loving*, 388 U.S. at 12 (emphasis added; quotations omitted). This recognition of the inextricable interplay between marriage and procreation demonstrates that the Court's discussion of this fundamental right contemplated the unique union of a man and a woman.

Plaintiffs also cite *Zablocki* repeatedly for the proposition that the "right to marry is of fundamental importance for all individuals." Yet again they ignore the context of the Court's statement. That case struck down a Wisconsin statute prohibiting persons obligated to pay child support from marrying without first obtaining a court order granting permission. The Court held

that the challenged statute violated the right "to marry and raise [a] child in a traditional family." *Zablocki*, 434 U.S. at 386. The Court explained:

> Long ago . . . the Court characterized marriage as the most important relation in life and as the foundation of the family and of society, without which there would be neither civilization nor progress . . . . [T]he Court recognized that the right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause . . . . [M]arriage was described as fundamental to the very existence and survival of the race.

*Id.* at 384 (quotations and citations omitted). Thus, as in *Loving*, the *Zablocki* Court's discussion of marriage's fostering "survival of the race" links its reasoning directly to procreative marriage between a man and a woman. *See also Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race").

That some married couples choose not to bear children or are infertile does not undermine the unavoidable conclusion that, for constitutional purposes, the Supreme Court has consistently linked the fundamental right to marry with the procreative aspect of marriage. For the Court, protecting the right to marry is about ensuring "our very existence and survival," *Loving*, 388 U.S. at 12; *Skinner*, 316 U.S. at 541; maintaining our "civilization," *Zablocki*, 434 U.S. at 384; and "rais[ing] . . . child[ren] in a traditional family," *id.* at 386. This inherently procreative nature of marriage is unique to opposite-sex couples, and thus, the fundamental right to marry arises from that sort of relationship. Accordingly, the right Plaintiffs assert is not the Court-recognized fundamental right to marry but a novel legal theory—the alleged "right" to same-sex marriage.[2]

---

[2] Plaintiffs also allege that Proposition 8 burdens the due-process "right to personal sexual autonomy" recognized in *Lawrence*. (Doc # 7 at 13 n.3.) But Proposition 8 affects only the publicly recognized institution of marriage, *see Turner v. Safley*, 482 U.S. 78, 95 (1987) (stating that marriage is a "public commitment"); it does not regulate Plaintiffs' private sexual behavior. Again, the *Lawrence* decision itself recognized that it did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *See Lawrence*, 539 U.S. at 578. And, for this reason, this Court should not apply the intermediate scrutiny created by the Ninth Circuit in *Witt v. Department of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008), which is reserved for cases where "the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*[.]" *Id.* That sort of government "intrusion" is not at issue here.

**2. Plaintiffs' Interest In Marrying A Person Of The Same Sex Is Not A Protected Interest Under The Due Process Clause.**

The Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in [that] unchartered area are scarce and open-ended." *Glucksberg*, 521 U.S. 702, 720 (1997). By extending constitutional protection to an asserted right or liberty interest, a federal court "place[s] the matter outside the arena of public debate and legislative action." *Id.* Courts should thus "exercise the utmost care whenever . . . asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of" the judiciary. *Id.* (quotations omitted).

This judicial restraint is particularly appropriate in the area of marriage. Domestic relations is "an area that has long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *see also Pennoyer v. Neff*, 95 U.S. 714, 734-35 (1877) ("The State . . . has [the] absolute right to prescribe the conditions upon which the marriage relation . . . shall be created."), *overruled on other grounds by Shaffer v. Heitner*, 433 U.S. 186 (1977). Federal courts should thus be reluctant to delve into a sensitive area of social policy best left to the States.

The Supreme Court has established a two-part "substantive-due-process analysis" for determining whether to recognize a fundamental right. First, a court must ascertain a "'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721. Plaintiffs throughout their memorandum of law refer broadly to their asserted liberty interest as the "right to marry." But a "careful description" of their interest is the "right" to same-sex marriage.

Second, a court must determine whether the "carefully described" interest is "so rooted in the traditions and conscience of our people" that it is considered "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325-26 (1937), "such that neither liberty nor justice would exist if [the interest] were sacrificed," *Glucksberg*, 521 U.S. at 721. "Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking." *Id.* (quotations omitted). "The mere novelty of . . . a claim is reason enough to doubt that 'substantive due process' sustains it" because such a novel "right . . . cannot be considered so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Reno v.*

*Flores*, 507 U.S. 292, 303 (1993) (quotation omitted); *see also Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31 (1922) ("If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it").

The right to same-sex marriage is not deeply rooted in our Nation's history and tradition. The Supreme Court, as demonstrated above, has always understood marriage as "the union . . . of one man and one woman." *See Murphy v. Ramsey*, 114 U.S 15, 45 (1885). Before 2003, for over two hundred years of our Nation's history, there was never a time in the United States that marriage meant anything other than the union of a man and a woman. *See Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941 (Mass. 2003) (judicially creating same-sex marriage in Massachusetts). And, recently, large majority of voters and legislators have strongly reaffirmed marriage as the union of one man and one woman. The law in 44 States now defines marriage as the union of a man and a woman, and 30 of those States have enshrined that definition in their constitutions.[3] Federal law also defines "marriage" as "a legal union between one man and one woman as husband and wife." 1 U.S.C. § 7.

In light of this background, then, it is not surprising that every federal court, and a majority of state appellate courts, that have addressed this issue have declined to find a fundamental right to same-sex marriage. *See, e.g.*, *Wilson*, 354 F. Supp 2d at 1307; *Smelt*, 374 F. Supp 2d at 879; *Kandu*, 315 B.R. at 140; *Conaway*, 932 A.2d at 627; *Hernandez v. Robles*, 855 N.E.2d 1, 9 (N.Y. 2006); *Andersen*, 138 P.3d at 978 (collecting cases); *Morrison v. Sadler*, 821 N.E.2d 15, 32-33 (Ind. Ct. App. 2005). This Court should likewise hold that there is no fundamental right to same-sex

[3] *See* Ala. Const. art. I, § 36.03; Alaska Const. art. 1, § 25; Ariz. Const. art. XXX § 1; Ark. Const. amend. 83, § 1-3; Cal. Const. art. I, § 7.5; Col. Const. art. II, § 31; 13 Del. Code § 101; Fla. Const. art. I § 27; Ga. Const. art. I, §IV; Haw. Rev. Stat. § 572-1; Haw. Rev. Stat. § 572-3; Idaho Const. art. III, § 28; Kan. Const. art. XV, § 16; Ky. Const. § 233A; La. Const. art. XII, § 15; Mich. Const. art. I, § 25; Miss. Const. art. XIV, § 263A; Mo. Const. art. I, § 33; Mont. Const. art. XIII, § 7; Neb. Const. art. I, § 29; Nev. Const. art. I, § 21; N.D. Const. art. IX, § 28; Ohio Const. art. XV, § 11; Okla. Const. art. II, § 35; Or. Const. art. XV, § 5a; S.C. Const. art. XVII, § 15; S.D. Const. art. XXI, § 9; Tenn. Const. art. XI, § 18; Tex. Const. art. I, § 32; Utah Const. art. I, § 29; Va. Const. art. I, § 15-A; Wis. Const. art. XIII, § 13; 750 Ill. Comp. Stat. 5/212; Ind. Code § 31-11-1-1; Md. Code, Fam. Law § 2-201; Minn. Stat. § 517.01; N.J. Stat. § 37:1-1; N.M. Stat. § 40-1-1; N.Y. Dom. Rel. Law § 5-7; N.C. Gen. Stat. § 51-1.2; 23 Pa. Cons. Stat. § 1704; R.I. Gen. Laws § 15-1-1 – 15-1-5; Wash. Rev. Code § 26.04.010-20; W. Va. Code § 48-2-603; Wyo. Stat. § 20-1-101.

marriage in the Fourteenth Amendment. To hold otherwise, this Court would part ways with every federal court that has addressed this issue, abandon over a century of Supreme Court precedent, and drastically change the institution of marriage in America.[4]

**3. Proposition 8 Satisfies Rational-Basis Review.**

With Plaintiffs' theory of fundamental rights foreclosed, Proposition 8 need only "be rationally related to legitimate government interests." *Glucksberg*, 521 U.S. at 728. Rational-basis review is "a paradigm of judicial restraint," and not "a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313-14 (1993) (citation omitted); *see also Wilson*, 354 F. Supp 2d at 1307 (quoting *Kandu*, 315 B.R. at 145). A law analyzed under rational-basis review has "a strong presumption of validity," *see Beach Communications*, 508 U.S. at 314; "the burden is upon the challenging party to negat[e] any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) (quotations omitted). Rational-basis review does not require that a law be crafted with precision; "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequity." *Heller v. Doe*, 509 U.S. 312, 320 (1993).

Californians possess at least two closely related interests for defining marriage as the union of one man and one woman, both of which derive from the government's legitimate—indeed compelling—interest in promoting the welfare of children, the State's most precious and vulnerable citizens.[5] *See Maryland v. Craig*, 497 U.S. 836, 852-53 (1990) ("[A] State's interest in

---

[4] Severing the fundamental right to marry from its link to procreation would subject the marriage laws in all States to searching scrutiny and would inevitably jeopardize their validity. For example, state statutes that restrict marriages between people who are closely related by blood would likely be struck down under Plaintiffs' view of strict scrutiny. While the government certainly has an interest in discouraging unions that would normatively yield genetically deficient children, Plaintiffs' reasoning, if followed to its logical conclusion, would mean that such laws, by restricting unions between infertile relatives, are over-inclusive and thus irrational. Breaking this new constitutional ground would also jeopardize the States' polygamy restrictions by subjecting them to the judiciary's most searching review. What Plaintiffs invite this Court to do reaches far beyond its application to same-sex couples and threatens to invalidate many legitimate state marriage laws.

[5] California, like other States, also has a legitimate interest in preserving the traditional understanding marriage. *See Marriage Cases*, 183 P.3d at 470 (Corrigan, J., concurring and dissenting) ("The legitimate purpose of the statutes defining marriage is to preserve the traditional understanding of the institution"); *Conaway*, 932 A.2d at 630 ("[T]he State has a legitimate interest (Continued)

safeguarding the physical and psychological well-being of [children] is compelling") (alterations and quotations omitted). First, the government has a compelling interest in creating a legal structure that promotes the raising of children by both of their biological parents. Only marriage as defined by Proposition 8 unites the biological, legal, and social dimensions of parenthood. Second, the government has a compelling interest in "responsible procreation"—that is, directing the inherent procreative capacity of sexual intercourse between men and women into stable, legally bound relationships.

Marriage between a man and a woman is the only legal construct that maintains the link between a child and both biological parents and that encourages both biological parents to jointly raise their children. Promoting this biological connection benefits children and society. Children, on average, develop best when raised by their biological mother and father. *See* Kristin Anderson Moore *et al.*, *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?*, Child Trends Research Brief, at 1-2 (June 2002) (attached as Exhibit D) ("[I]t is not simply the presence of two parents, as some have assumed, but the presence of *two biological parents* that seems to support children's development"). Well-developed children, in turn, benefit society by decreasing criminal conduct and other forms of antisocial behavior. And aside from these individual and societal benefits, the government has a profound interest in maintaining this biological cohesion and fulfilling the innate desire of every person to know and be raised by their biological parents. *See* Article 7 of the Convention on the Rights of the Child, United Nations (September 2, 1990) (excerpts attached as Exhibit E) ("The child shall . . . , as far as possible, [have] the right to know and be cared for by his or her parents").

Only a relationship between a man and a woman "is capable of producing biological offspring of both members." *Conaway*, 932 A.2d at 630-31; *see also Andersen*, 138 P.3d at 982-83. Thus, recognizing those relationships as marriages directly and rationally furthers the government's interest in encouraging the raising of children by their biological mother and father. In contrast, no

(Cont'd)
in maintaining and promoting its police powers over the traditional institution of marriage and its binary, opposite-sex nature."). Proposed Intervenors recognize that there are other government interests supporting Proposition 8, and they reserve the right to assert those later in this litigation.

matter what measures are taken by same-sex couples, they cannot both be a biological parent of the same child. In fact, the only way for same-sex couples to produce children is to involve a third party, a process that risks commoditizing children and intentionally deprives them of having both biological parents in their family. Thus, recognizing same-sex relationships as marriages does not further the government's interest in encouraging children to be raised by both biological parents. Not surprisingly, then, many courts have found that this government interest satisfies rational-basis review. *See, e.g.*, *Kandu*, 315 B.R. at 146 (collecting cases and holding that "encourag[ing] the maintenance of stable relationships that facilitate to the maximum extent possible the rearing of children by both of their biological parents is a legitimate . . . concern").

Government interests may be "symbolic and aspirational as well as practical." *Glucksberg*, 521 U.S. at 728-29. The institution of marriage—consisting of unions between one man and one woman—communicates to society that, when at all possible, children should be raised by both biological parents in a stable, legally binding relationship. But forcing Californians to redefine marriage to include same-sex couples would eradicate this timeless structure for supporting the vital connection between children and their biological mother and father. In effect, it would force the government to communicate that the biological connection between parent and child is unimportant—a message belied by social science.[6]

Furthermore, the government has an interest in promoting "responsible procreation" among its citizens. The government's interest in responsible procreation is rooted in a concern for children, *i.e.*, the natural result of sexual intercourse between men and women. Relationships between men and women are unique in that they may unintentionally result in the birth of children. *See Morrison*, 821 N.E.2d at 24 ("'Natural' procreation . . . may occur only between opposite-sex couples and with no foresight or planning"). The government has an interest in directing these unintended children into committed, legally bound relationships between both of their parents. *See*

[6] Plaintiffs incorrectly contend that defining marriage as the union of a man and a woman "is certainly not necessary to preserve or strengthen the tradition of marriage in California." (Doc # 7 at 14.) But that argument is unsupported. If marriage is redefined to include same-sex couples, it would no longer serve as society's model for preserving and promoting the bond between children and both of their biological parents. Thus, maintaining marriage as the union of a man and a woman is vitally necessary to preserve the tradition of marriage in California.

*Hernandez*, 855 N.E.2d at 3-4 (stating that marriage "create[s] more stability and permanence in the relationships that cause children to be born" and that the government "could rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father"). This interest corresponds closely with California's "compelling state interest in establishing paternity for all children." Cal. Fam. Code § 7570(a).

Same-sex relationships, however, do not naturally or unintentionally result in pregnancy and child birth. Hence, recognizing those relationships as marriages "would not further [the government's] interest in . . . 'responsible procreation.'" *Morrison*, 821 N.E.2d at 25. Many courts have considered the government's interest in responsible procreation and found it to satisfy rational-basis review. *See, e.g.*, *Hernandez*, 855 N.E.2d at 359; *Morrison*, 821 N.E.2d at 24-26, 29-31; *Standhardt v. Superior Court*, 77 P.3d 451, 462-63 (Ariz. Ct. App. 2003).

Plaintiffs do not address these legitimate, and indeed compelling, government interests but instead discuss only the government's broader interest "in promoting procreation" generally. (Doc # 7 at 14.) Even when viewed in this manner, however, the Government's interest is plainly furthered by limiting marriage to opposite-sex relationships—the only relationships that naturally produce children. *See Conaway*, 932 A.2d at 630-31 (collecting cases and holding that the "'inextricable link' between marriage and procreation reasonably could support the definition of marriage as between a man and a woman only, because it is that relationship that is capable of producing biological offspring of both members"). Plaintiffs argue that "Prop. 8 is a fatally underinclusive means of promoting procreation because it permits individuals of opposite sex who are biologically unable to bear children, or who simply have no desire for children, to marry." (Doc. # 7 at 15.) Under well-established principles of law, however, California's definition of marriage "is not invalid under the Constitution because it might have gone farther than it did" in promoting legitimate state interests. *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966). To the contrary, a State may properly focus its laws on promoting legitimate interests by "addressing itself to the phase of the problem which seems most acute to the legislative mind." *Id*. Accordingly, while the State's interest might alternatively be promoted by burdensome and intrusive regulations of the sort needed to determine the child-bearing capacity and intentions of opposite-sex couples

who desire to marry, no principle of constitutional law requires the State to enact such regulations as a prerequisite for preserving its traditional understanding of marriage.

In sum, Proposition 8 furthers compelling government interests and is narrowly tailored to promote those interests. Thus, Plaintiffs lack a cognizable legal theory that their due-process rights have been violated, and their motion for preliminary injunction should be denied.

**C. Plaintiffs Cannot Succeed On Their Equal-Protection Claim.**

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "The Constitution is violated when government . . . invidiously classifies similarly situated people on the basis of the immutable characteristics with which they were born." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 477-78 (1981). But "the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Skinner*, 316 U.S. at 541.

Plaintiffs have not stated a cognizable equal-protection claim because (1) they cannot show that Proposition 8 invidiously discriminates against any class of persons; (2) they have not demonstrated that they, as same-sex couples, are similarly situated to opposite-sex couples; (3) they have not shown that Proposition 8 violates *Romer*; (4) they cannot demonstrate that Proposition 8 impermissibly discriminates on the basis of sexual orientation; (5) they cannot show that Proposition 8 impermissibly discriminates on the basis of sex; and (6) they have not established that Proposition 8 violates *Brown v. Board of Education*, 347 U.S. 483 (1954).

**1. Proposition 8 Does Not Invidiously Discriminate Against A Class of Persons.**

A threshold requirement for any equal-protection claim is a showing of invidious discrimination. *See Michael M.*, 450 U.S. at 477-78. Invidiousness is present where the government acts irrationally or with discriminatory intent. *See City of Cuyahoga Falls v. Buckeye Cmty. Hope Fund*, 538 U.S. 188, 194 (2003); *Washington v. Davis*, 426 U.S. 229, 239 (1976). The rational-basis analysis shows that Californians have not acted irrationally in defining marriage as the union of one man and one woman. And neither can Plaintiffs show that Proposition 8 exhibits a

discriminatory intent. Consequently, Plaintiffs cannot satisfy the invidiousness requirement.

**2. Same-Sex Couples Are Not Similarly Situated To Opposite-Sex Couples For The Purpose Of The Marriage Laws.**

Another threshold requirement for an equal-protection claim is a showing that a "similarly situated [class] has been treated disparately." *Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1225-26 (9th Cir. 1990), *superseded on other grounds*, 42 U.S.C. § 2000cc. This threshold analysis focuses on whether the plaintiffs are similarly situated for the purpose of the law in question. *See Rostker v. Goldberg*, 453 U.S. 57, 78 (1981). The Supreme Court has repeatedly recognized that biological differences between men and women may preclude a plaintiff from satisfying the similarly situated requirement. *See Miller v. Albright*, 523 U.S. 420, 445 (1998) ("The biological differences between . . . men and . . . women provide a relevant basis for differing rules"); *Michael M.*, 450 U.S. at 477-78 (finding men and women not "similarly situated with respect to . . . intercourse and pregnancy"); *Rostker*, 453 U.S. at 78. "[T]he Equal Protection Clause does not mean that the physiological differences between men and women must be disregarded. . . . The Constitution surely does not require a State to pretend that demonstrable differences between men and women do not really exist." *Michael M.*, 450 U.S. at 481.

Marriage is an inherently relational construct; thus, challenges to marriage laws necessarily involve differential treatment between two classes of couples—same-sex and opposite-sex couples—rather than two classes of individuals. These two classes of couples exhibit biological, sociological, and emotional differences, most notable of which pertain to the act of procreation. In short, opposite-sex couples constitute a procreative unit; whereas, same-sex couples do not. *See id.* at 478 (noting that the "most basic" differences between males and females relate to "pregnancy" and "sexual intercourse"). Sexual intercourse between opposite-sex couples naturally produces children, but the sexual acts of same-sex couples cannot. Opposite-sex couples provide children with both of their biological parents, but same-sex couples cannot. And opposite-sex couples create a balanced parenting model by providing daily interaction with both a male and female role model, yet same-sex couples do not. These undisputed biological differences demonstrate that same-sex couples are not similarly situated to opposite-sex couples for the purpose of marriage—a

relationship that the Supreme Court has always linked to procreation. *See Zablocki*, 434 U.S. at 384. Thus, Plaintiffs' equal-protection claim does not satisfy this threshold requirement.

### 3. Proposition 8 Is Unlike The State Constitutional Amendment Invalidated In *Romer*.

Plaintiffs unrealistically endeavor to tar this case as exhibiting animus akin to *Romer*. (Doc # 7 at 17.) But that argument falls *far* short of stating a cognizable legal theory. Proposition 8's narrow focus on defining the institution of marriage is entirely unlike the Colorado constitutional amendment in *Romer* that created a far-reaching political disability against a class of individuals. Thus, Plaintiffs' *Romer* claim lacks merit.

The *Romer* Court invalidated an extensive state constitutional amendment that "prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect . . . homosexual persons." *Romer*, 517 U.S. at 624. *Romer* differs from the present case in at least four significant ways. First, the amendment at issue in *Romer* prevented the government from protecting gay and lesbian individuals against discrimination. Proposition 8, in contrast, does not involve legal protections for individuals against discrimination; it relates only to the legal promotion of a relationship. Denying legal protection from invidious discrimination hints of animosity, but denying official legal promotion does not; that factual difference sharply distinguishes Proposition 8 from the amendment at issue in *Romer*. Second, the *Romer* Court focused on that amendment's "sheer breadth," *id.* at 632, noting that it "denie[d] protection across the board," *id.* at 633. Proposition 8, however, is not broad; it involves only the issue of marriage and merely reaffirms California's ancient understanding of that institution.

Third, the *Romer* Court focused on the deprivation of political rights involved in that case. The amendment at issue in *Romer* deprived a class of individuals from "the right to seek specific protection from the [government]." *Id.* But Proposition 8 does not impose a political disability on anyone; all Californians are free to seek protection from the government. The only change accomplished by Proposition 8 was a reaffirmation of the historical definition of marriage in California. Fourth, the *Romer* Court presumed the existence of animus against gay and lesbian individuals because "the amendment seem[ed] inexplicable by anything but animus toward the class

it affects." *Id.* at 632. Plaintiffs contend that Proposition 8 evinces similar animus and "moral disapproval of gay men and lesbians." (Doc # 7 at 18.) But that speculation grossly distorts Proposition 8's history and purpose, as well as the many California laws addressing the concerns of gay and lesbian individuals.

Proposition 8 was not, as asserted by Plaintiffs, "a direct response to the California Supreme Court's decision in [the] *Marriage Cases*" or motivated by animus to "eliminate the right of same-sex couples to marry in California." (*See* Doc # 7 at 8.) To the contrary, Proposed Intervenors began the process of qualifying Proposition 8 for the ballot approximately six months before the *Marriage Cases* decision. (*See, e.g.*, Doc # 8-2 at 5 ¶ 10.) And they completed the last affirmative step to qualify Proposition 8 for the ballot—submitting the signature petitions—weeks before the decision was issued. (*See, e.g.*, Doc # 8-2 at 6 ¶ 19.) So simple chronology shows that Proposition 8 could not be a "response" to the *Marriage Cases* decision.

Moreover, Proposed Intervenors strenuously objected to the Attorney General's narrow and crabbed characterization of Proposition 8's purpose as "eliminat[ing] the right of same-sex couples to marry." Proposition 8's actual purpose is to reaffirm California's historical definition of marriage as the union of a man and a woman, and to prevent the government from recognizing any variation from that definition, including but not limited to polygamous, polyamorous, and same-sex unions. (Ex. B at 5-6.) The affirmative language of Proposition 8 shows that it was intended to protect the proven structure of marriage from a host of threats that would deconstruct it.

Nothing in California law, either Proposition 8 or otherwise, indicates that Californians harbor animus towards gay and lesbian individuals. Californians have officially recognized and granted broad legal benefits to same-sex couples. *See* Cal. Fam. Code § 297. Californians have also insistently sought to eliminate any and all forms of discrimination against those individuals.[7]

[7] *See* Cal. Fam. Code § 297 (creating domestic partnerships for same-sex couples); Cal. Civ. Code § 51 (prohibiting sexual-orientation discrimination in "all business establishments of every kind whatsoever"); Cal. Civ. Code § 51.7 (protecting against "intimidation by threat of violence" based on sexual orientation); Cal. Educ. Code § 220 (prohibiting sexual-orientation discrimination in "educational institutions"); Cal. Educ. Code § 51500 (prohibiting schools from teaching anything that could "promote a discriminatory bias" based on sexual orientation); Cal. Penal Code § 422.55 (prohibiting so-called "hate crimes" motivated by sexual orientation).

In light of this wider legal landscape, suggesting that Californians are guilty of the animus present in *Romer* is simply unsupportable.

Importantly, *Romer* requires that *voter animus must have displaced any legitimate government interest*. *See Romer*, 517 U.S. at 634 ("[A] bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest") (alteration and emphasis in original). The interests detailed in the rational-basis analysis are plainly legitimate and objectively demonstrate the lack of irrational animus by the more than 7 million Californians who voted for Proposition 8. Thus, Plaintiffs' use of *Romer* stretches that decision beyond what it can bear and should not be adopted by this Court. *See Hernandez,* 855 N.E.2d at 5 (refusing to conclude that everyone who holds the belief that marriage is the union of a man and a woman is "irrational, ignorant, or bigoted").

**4. Proposition 8 Does Not Impermissibly Discriminate On The Basis Of Sexual Orientation.**

Proposition 8 does not discriminate on the basis of sexual orientation. It does not mention sexual orientation, and neither does it require the government to ask about a person's sexual orientation. A man and a woman can marry regardless of their sexual orientation. But a same-sex couple cannot marry, regardless of whether they are "oriented" to persons of the same sex, the opposite sex, or both sexes. Thus, Proposition 8 treats heterosexual persons in precisely the same manner it treats gay and lesbian individuals: both can marry a person of the opposite sex, but neither can marry a person of the same sex.

Plaintiffs nevertheless imply that Proposition 8 amounts to sexual-orientation discrimination because it has a disparate impact on gay and lesbian individuals. But disparate impact does not establish an equal-protection violation without proof of a discriminatory intent or purpose. *See Buckeye Cmty. Hope Fund*, 538 U.S. at 194; *Washington*, 426 U.S. at 239. And, as demonstrated above, no such discriminatory intent exists here. Thus, Plaintiffs cannot succeed on their sexual-orientation discrimination claim.

Even if this Court finds that Proposition 8 discriminates on the basis of sexual orientation, controlling precedent dictates that rational-basis scrutiny applies because, contrary to Plaintiffs'

assertion, gay and lesbian individuals do not constitute a suspect or quasi-suspect class. Only a few classifications—race, alienage, national origin, sex, and illegitimacy—trigger heightened scrutiny under federal law. *See Ball v. Massanari*, 254 F.3d 817, 823-24 (9th Cir. 2001). And the Supreme Court has cautioned against creating new suspect classes because courts applying heightened scrutiny require an exacting investigation of legislative decisions, and thus, "respect for the separation of powers" weighs against expanding this area of constitutional jurisprudence. *Cleburne*, 473 U.S. at 441; *see also Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (declining to extend strict scrutiny to "[c]lose relatives"); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976) (per curiam) (declining to extend strict scrutiny to a class of older persons).

Every circuit that has applied equal-protection analysis to claims of alleged discrimination against gay and lesbian individuals has declined to create a suspect class, and many of those courts arrived at or reaffirmed their conclusions after *Romer* and *Lawrence*.[8] Ninth Circuit precedent on this point is unmistakably clear. In *High Tech Gays*, 895 F.2d at 571-74, the Ninth Circuit held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny[.]" *Id.* at 574. That conclusion was not, as suggested by Plaintiffs, premised solely on *Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence*, 539 U.S. at 578. To be sure, the court discussed *Bowers* during the initial part of its analysis, but it then proceeded to analyze the Supreme Court's suspect-class factors, noting that this reasoning provided "further support for [the] holding that homosexuals are not a suspect or quasi-suspect class." *Id.* at 573-74. Thus, the *High Tech Gays* decision remains controlling here, and this Court is not free to disregard it.

Furthermore, since its decision in *High Tech Gays*, the Ninth Circuit has at least twice reaffirmed the application of rational-basis review to equal-protection claims alleging

[8] *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003); *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Veney v. Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Rich v. Sec'y of the Army*, 735 F.2d 1220, 1229 (10th Cir. 1984); *Lofton v. Sec'y of Dep't of Children and Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Steffan v. Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989).

discrimination against gay and lesbian individuals. In its 2003 decision in *Flores*, 324 F.3d at 1137, that court cited *High Tech Gays* and stated that "homosexuals are not a suspect or quasi-suspect class" under federal law. *Id.* And in its 2008 decision in *Witt*, 527 F.3d at 821, the Ninth Circuit held that one of its prior decisions applying rational-basis review to an equal-protection claim alleging discrimination against gay and lesbian individuals "was not disturbed by *Lawrence,* which declined to address equal protection." *Id.* Thus, controlling precedent dictates that gay and lesbian individuals do not constitute a suspect class under federal law.

Even if there were no precedent to bind this Court, Plaintiffs have not made the requisite showing to establish a new suspect class. The Supreme Court has identified four distinguishing characteristics of suspect classes: (1) a history of discrimination; (2) a trait that "bears no relation to ability to perform or contribute to society"; (3) an immutable trait; and (4) political powerlessness. *See Cleburne*, 473 U.S. at 440-41; *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Plaintiffs have not demonstrated the immutability or political-powerlessness factors.

"Immutability" defines a human characteristic determined "solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). A showing of immutability is required to create a suspect class under federal law. *See id.* (grouping sex, race, and national origin, which are "immutable"). The Ninth Circuit has already analyzed this immutability factor as it relates to gay and lesbian individuals: "Homosexuality is not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender, or alienage[.]" *High Tech Gays*, 895 F.2d at 573. Indeed, the current scientific research shows that issues surrounding one's sexual orientation are far more complex than a mere "accident of birth." *See For a Better Understanding of Sexual Orientation and Homosexuality*, American Psychological Association (2008) (attached as Exhibit F).

Moreover, Plaintiffs have not established the political-powerless factor. One of the reasons the judiciary creates a suspect class is because discrimination against that class "is unlikely to be soon rectified by legislative means." *Cleburne*, 473 U.S. at 440. But, here, legislatures across this Nation, and particularly in California, have addressed and continue to address the concerns of gay and lesbian individuals. *See supra* fn. 7. Thus, "homosexuals are not without political power; they

have the ability to and do 'attract the attention of the lawmakers,' as evidenced by such legislation." *High Tech Gays*, 895 F.2d at 574 (citing *Cleburne*, 473 U.S. at 445). This Court should thus decline Plaintiffs' request to create a new suspect class.

**5. Proposition 8 Does Not Impermissibly Discriminate On The Basis Of Sex.**

"Supreme Court precedent has only found [impermissible] sex-based classifications in laws that have a disparate impact on one sex or the other." *Smelt*, 374 F. Supp 2d at 876-77 (collecting cases). Yet Proposition 8 does not have a disparate impact on one sex or the other; it treats men and women equally: neither may marry a person of the same sex. It does not separate men and women into classes and grant benefits to one of those classes while withholding them from the other. Nor does Proposition 8, either facially or in its application, place men and women in unequal positions. To the contrary, it equally prohibits men and women from the same conduct—that is, marrying another person of the same sex. All federal courts and most state appellate courts that have addressed this issue have rejected the claim that defining marriage as the union of one man and one woman discriminates on the basis of sex. *See Kandu*, 315 B.R. at 143 (concluding that "the marriage definition contained in DOMA does not classify according to gender"); *Smelt*, 374 F. Supp 2d at 876-77 ("To date, the laws in which the Supreme Court has found sex-based classifications have all treated men and women differently"); *Baker v. State*, 744 A.2d 864, 880 n.13 (Vt. 1999) (collecting cases); *Marriage Cases*, 183 P.3d at 440; *Andersen*, 138 P.3d at 988; *Conaway*, 932 A.2d at 598; *Hernandez*, 855 N.E.2d at 6.

**6. Proposition 8 Does Not Violate *Brown v. Board of Education*.**

Plaintiffs rely on *Brown v. Board of Education* to argue that the "separate institutions of civil marriage for opposite-sex couples and domestic partnerships for same-sex couples 'are inherently unequal.'" (Doc # 7 at 13.) But Plaintiffs have not shown that *Brown* has any application in the present context.

Plaintiffs' use of *Brown* is similar to their use of the Supreme Court's cases discussing the fundamental right to marry: they selectively pull quotes and concepts without regard for the context in which the law arose. The principles espoused in *Brown* have been largely, if not entirely,

confined to the issue of racial segregation in education. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 5-6 (1971). But Plaintiffs seek to expand *Brown* far from its origins, beyond the education context to eradicate a biologically based distinction between two classes of couples. The separate education systems invalidated by *Brown* and its progeny were designed to maintain the inferiority of African-Americans. *See Brown*, 347 U.S. at 494. But, here, the different domestic relations recognized under California law are not designed to discriminate against any class of persons, and Plaintiffs offer only a few conclusory assertions to show that they are. This is insufficient to state a cognizable claim under *Brown*.

Moreover, the principles expressed in *Brown* have no application here. At the time *Brown* was decided, the Court's precedent demanded that invidious racial classifications be subject to the "most rigid" judicial scrutiny. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944). Thus, *Brown*'s rejection of "separate but equal" education systems necessarily depended on the Court's engaging in searching scrutiny. But, here, as has been shown, heightened scrutiny does not apply, and thus neither does the inherently searching judicial review created by *Brown*.

Plaintiffs' broad view of *Brown* would prevent the government from ever creating different structures, labels, or institutions, even when it has rational, nondiscriminatory reasons for doing so. Plaintiffs' view of that case apparently permits the judiciary to engage in social engineering under the guise of bringing "equality" to "separate" government programs, structures, or institutions. But responsible application of precedent requires that *Brown* be confined to the Court's historical application of it, or that there be a legally principled reason for extending it to a different context. Yet Plaintiffs wholly fail—and indeed do not even attempt—to establish why *Brown* should be extended into the realm of domestic relations.

## II. THE IRREPARABLE-HARM, BALANCE-OF-EQUITIES, AND PUBLIC-INTEREST FACTORS ALL WEIGH IN FAVOR OF DENYING A PRELIMINARY INJUNCTION.

Plaintiffs' request for an injunction runs contrary to the "basic function of a preliminary injunction," which is "to preserve the status quo pending a determination of the action on the merits." *Chalk v. United States District Court*, 840 F.2d 701, 704 (9th Cir. 1988). Indeed, courts are "extremely cautious" in granting a preliminary injunction that would disturb the status quo, and

such relief "is particularly disfavored under the law of this circuit." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319-20 (9th Cir. 1994). Proposition 8 has been the governing law in California for more than six months; thus, Plaintiffs' injunction would alter the status quo and change the California Constitution. That relief would irreparably harm the State, undermine the public interest, and burden the rights of Proposed Intervenors.

A plaintiff without a meritorious constitutional claim does not suffer a threat of irreparable injury. *Coalition for Economic Equality v. Wilson*, 122 F.3d 692, 711 (9th Cir. 1997). Plaintiffs have not shown a meritorious constitutional claim; thus, they do not satisfy the irreparable-harm requirement. Additionally, Plaintiffs are not being deprived of substantive legal benefits; the only alleged injury is a particular label or status; such an ethereal injury is not irreparable.

The only irreparable injury involved here is the one imposed on the State and its citizens. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by . . . its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, Circuit Justice); *see also Coalition for Economic Equality*, 122 F.3d at 719 ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined"). Here, Plaintiffs seek to enjoin not a typical statute but rather a constitutional provision enacted by the people; thus, granting an injunction irreparably harms the State. Moreover, given the government's compelling reasons for defining marriage as the union of one man and one woman, forcing the State to abandon that choice inflicts further irreparable injury. Thus, the balance of equities tips sharply in favor of denying a preliminary injunction.

Plaintiffs admit that issuing a preliminary injunction would provide another judicially created "window" for same-sex couples to marry in California. (Doc # 7 at 24.) That legal change would directly undermine the public interest as expressed in Proposition 8. What is more, Plaintiffs suggest that, should they take advantage of this "window" and marry, the status quo in this case would not be upset temporarily but permanently. (Doc # 7 at 24 (asserting that "the California Attorney General himself has acknowledged that marriages that were legal at the time of formation" would "remain legal after an intervening change in law") (quotation marks omitted).)

Even were that not the case (and Proposed Intervenors do not suggest that it is), if this Court

later denies Plaintiffs' claims and lifts the injunction, it would create a cloud of uncertainty regarding the validity of the same-sex marriages entered during that "interim" period. *See Orrin W. Fox*, 434 U.S. at 1351 (acknowledging the harm created by a later-lifted preliminary injunction). Thus, issuing a preliminary injunction potentially harms all same-sex couples who would enter into marriages during that "interim" period, by subjecting their marriages to legal uncertainty. It also harms the State, which has an interest in the marital status of couples domiciled within its borders. That fact alone—*i.e.*, creating further legal uncertainty regarding marriage in California—weighs heavily against granting a preliminary injunction. Given the emotional sensitivity surrounding this issue, the proper course is to deny Plaintiffs' request for preliminary injunction and preserve the status quo in an area of law that has experienced much turmoil in the last year.

Additionally, issuing a preliminary injunction would nullify Proposed Intervenors' exercise of their state constitutional right to amend the California Constitution through initiative. (*See, e.g.*, Doc # 8-2 at 4 ¶ 2-4.) An injunction would also cast aside Proposed Intervenors' substantial investments of time, effort, reputation, and personal resources in qualifying Proposition 8 for the ballot and campaigning for its enactment. (*See, e.g.*, Doc # 8-2 at 7 ¶ 27.) In short, issuing an injunction would directly and significantly harm Proposed Intervenors, by undoing all that they have done in working diligently for Proposition 8's enactment.

**CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: June 11, 2009

LAW OFFICES OF ANDREW P. PUGNO
ALLIANCE DEFENSE FUND
ATTORNEYS FOR PROPOSED INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, AND PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

By: s/Brian W. Raum
Brian W. Raum