# EXHIBIT C

Supreme Court, U.S.
F I L E
FEB 11 1971
E. ROBERT SEAVER, CLERK

71- 1027
FILE COPY

IN THE

# Supreme Court of the United States

OCTOBER TERM, 1972

No. ..........

RICHARD JOHN BAKER, *et al.*,

*Appellants,*

—v.—

GERALD R. NELSON,

*Appellee.*

ON APPEAL FROM THE SUPREME COURT OF MINNESOTA

## JURISDICTIONAL STATEMENT

R. MICHAEL WETHERBEE
    Minnesota Civil Liberties Union
    2323 East Hennepin Avenue
    Minneapolis, Minnesota 55413

LYNN S. CASTNER
    1625 Park Avenue
    Minneapolis, Minnesota 55404

*Attorneys for Appellants*

# INDEX

PAGE

JURISDICTIONAL STATEMENT

Opinions Below ..................................................... 1

Jurisdiction ............................................................. 2

Statutes Involved ................................................... 2

Questions Presented .............................................. 3

Statement of the Case ........................................... 3

How the Federal Questions Were Raised .............. 6

The Questions Are Substantial ............................. 6

I.   Respondent's refusal to sanctify appellants'
     marriage deprives appellants of liberty and
     property in violation of the due process and
     equal protection clauses ................................ 11

II.  Appellee's refusal to legitimate appellants'
     marriage constitutes an unwarranted invasion
     of the privacy in violation of the Ninth and
     Fourteenth Amendments ............................... 18

CONCLUSION .............................................................. 19

APPENDIX

Statutes Involved
     Chapter 517, Minnesota Statutes .................. 1a

Alternative Writ of Mandamus ............................. 10a

ii

PAGE

Order Quashing the Writ .............................. 12a

Amended Order, Findings and Conclusions ......... 14a

Opinion of the Minnesota Supreme Court, Hennepin County ........................................ 18a

TABLE OF AUTHORITIES

*Cases:*

Bates v. City of Little Rock, 361 U.S. 516 (1960) .......... 12

Boddie v. Connecticut, 401 U.S. 371 (1971) .....11, 12, 13, 19

Cohen v. California, 403 U.S. 15 (1971) .................... 14

Griswold v. Connecticut, 381 U.S. 479 (1965) .......11, 12, 13, 14, 18, 19

Jones v. Hallihan, W-152-70 (Ct. Apps. Ky. 1971) ........ 10

Loving v. Virginia, 388 U.S. 1 (1967) ................11, 12, 13, 14, 15, 16, 18, 19

McLaughlin v. Florida, 379 U.S. 184 (1964) .........13, 16, 18

Meyer v. Nebraska, 262 U.S. 535 (1923) ..............11, 12, 13

Mindel v. United States Civil Service Commission, 312 F. Supp. 485 (N.D. Cal. 1970) ........................ 18

Reed v. Reed, 92 S. Ct. 251, 30 L. ed.2d 225 (1971) ....13, 16, 17, 18

Royster Guano Co. v. Virginia, 253 U.S. 412 (1920) ..... 17

Shapiro v. Thompson, 394 U.S. 618 (1969) .................. 16

Shelton v. Tucker, 364 U.S. 479 (1960) .................... 14

Skinner v. Oklahoma, 316 U.S. 535 (1942) ..........11, 12, 13

Street v. New York, 394 U.S. 576 (1969) ................... 14

iii

PAGE

*Constitutional Provisions:*

United States Constitution

First Amendment ........................................ 5, 6

Eighth Amendment ...................................... 5, 6

Ninth Amendment ...................................3, 5, 6, 18, 19

Fourteenth Amendment .........3, 5, 6, 11, 13, 17, 18, 19

*Rule:*

Minn. R. Civ. P. 52.01 .................................. 5

*Federal Statute:*

28 U.S.C. §1257(2) ...................................... 2

*State Statute:*

Minnesota Statutes
Chapter 517 ........................................2, 4, 6, 13

*Other Authorities:*

Abrahamsen, Crime and the Human Mind 117 (1944)   9

Churchill, Homosexual Behavior Among Males 19 (1969)   8

Final Report of the Task Force on Homosexuality of the National Institute of Mental Health, October 10, 1969   9

Finger, *Sex Beliefs and Practices Among Male College Students*, 42 J. ABNORMAL AND SOCIAL PSYCH. 57 (1947)   7

Freud, 107 Am. J. of Psychiatry 786 (1951) (reprinted)   10

iv

| | PAGE |
|---|---|
| Hart, Law, Liberty and Morality 50 (1963) | 9 |
| James, The Varieties of Religious Experience, lectures XI, XII, XIII (1902) | 8 |
| Kinsey, Sexual Behavior in the Human Male (1948) | 7 |
| Westermarck, 2 Origin and Development of the Moral Idea 484 (1926) | 8 |

In the

# Supreme Court of the United States

October Term, 1972

No. ............

Richard John Baker, *et al.,*

*Appellants,*

—v.—

Gerald R. Nelson,

*Appellee.*

ON APPEAL FROM THE SUPREME COURT OF MINNESOTA

## JURISDICTIONAL STATEMENT

Appellants appeal from the judgment of the Supreme Court of Minnesota, entered on October 15, 1971, and submit this Statement to show that the Supreme Court of the United States has jurisdiction of the appeal and that a substantial question is presented.

### Opinions Below

The opinion of the Supreme Court of Minnesota is reported at 191 N.W.2d 185. The opinion of the District Court for Hennepin County is unreported. Copies of the opinions are set out in the Appendix, *infra*, pp. 10a-17a and 18a-23a.

2

## Jurisdiction

This suit originated through an alternative writ of mandamus to compel appellee to issue the marriage license to appellants. The writ of mandamus was quashed by the Hennepin County District Court on January 8, 1971. On appeal, the judgment of the Supreme Court of Minnesota affirming the action of the District Court was entered on October 15, 1971. Notice of Appeal to the Supreme Court of the United States was filed in the Supreme Court of Minnesota on January 10, 1972. The time in which to file his Jurisdictional Statement was extended on January 12, 1972, by order of Justice Blackmun.

The jurisdiction of the Supreme Court to review this decision on appeal is conferred by Title 28 U.S.C., Section 1257(2).

## Statutes Involved

Appellants have never been advised by appellee which statute precludes the issuance of the marriage license to them, and the Supreme Court of Minnesota cites only Chapter 517, Minnesota Statutes, in its opinion. Accordingly, the whole of Chapter 517 is reproduced in App., infra, pp. a-9a.

3

## Questions Presented

1. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment.

2. Whether appellee's refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment.

3. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteenth Amendments.

## Statement of the Case[1]

Appellants Baker and McConnell, two persons of the male sex, applied for a marriage license on May 18, 1970 (T. 9; A. 2, 4) at the office of the appellee Clerk of District Court of Hennepin County[2] (T. 10).

---

[1] T. refers to the trial transcript  A. refers to the Appendix to appellants' brief before the Minnesota Supreme Court.

[2] Appellant McConnell is also petitioner before this Court in *McConnell* v. *Anderson*, petit. for cert. filed, No. 71-978 in which he seeks review of the decision of the United States Court of Appeals for the Eighth Circuit, allowing the Board of Regents of the University of Minnesota to refuse him employment as head of the catalogue division of the St. Paul Campus Library on the grounds that "His personal conduct, as represented in the public and University news media, is not consistent with the best interest of the University."
The efforts of appellants to get married evidently precipitated the Regents' decision not to employ Mr. McConnell.

4

Upon advice of the office of the Hennepin County Attorney, appellee accepted appellants' application and thereupon requested a formal opinion of the County Attorney (A. 7-8) to determine whether the marriage license should be issued. In a letter dated May 22, 1970, appellee Nelson notified appellant Baker he was "unable to issue the marriage license" because "sufficient legal impediment lies thereto prohibiting the marriage of two male persons" (A. 1; T. 11). However, neither appellant has ever been informed that he is individually incompetent to marry, and no specific reason has ever been given for not issuing the license.

Minnesota Statutes, section 517.08 states that *only* the following information will be elicited concerning a marriage license: name, residence, date and place of birth, race, termination of previous marriage, signature of applicant and date signed. Although they were asked orally at the time of application which was to be the bride and which was to be the groom (T. 15; T. 18), the forms for application for a marriage license did not inquire as to the sex of the applicants. However, appellants readily concede that both are of the male sex.

Subsequent to the denial of a license, appellants consulted with legal counsel. On December 10, 1970, appellants applied to the District Court of Hennepin County for an alternative writ of mandamus (A. 2), and such a writ was timely served upon appellee. Appellee Nelson continued to refuse to issue the appellants a marriage license. Instead, he elected to appear in court, show cause why he had not done as commanded, and make his return to the writ (A. 4).

5

The matter was tried on January 8, 1971, in District Court, City of Minneapolis, Judge Tom Bergin presiding (T. 1). Appellants Baker and McConnell testified on their own behalf (T. 9; T. 15) as the sole witnesses. After closing arguments, he quashed the writ of mandamus and ordered the Clerk of District Court "not to issue a marriage license to the individuals involved" (T. 19). An order was signed to that effect the same day (App. *infra*, p. 12a).

Subsequent to the trial, counsel for appellants moved the court to find the facts specially and state separately its conclusions of law pursuant to Minn. R. Civ. P. 52.01. Judge Bergin then made certain findings of fact and conclusions of law (App. *infra*, p. 14a) in an amended order dated January 29, 1971. Such findings and conclusions were incorporated into and made part of the order signed January 8, 1971. The Court found that the refusal of appellee to issue the marriage license was not a violation of M.S. Chapter 517, and that such refusal was not a violation of the First, Eighth, Ninth or Fourteenth Amendments to the U. S. Constitution.

A timely appeal was made to the Supreme Court of Minnesota. In an opinion filed October 15, 1971, the Supreme Court of Minnesota affirmed the action of the lower court.[*]

_____

[*] In early August, 1971, Judge Lindsay Arthur of Hennepin County Juvenile Court issued an order granting the legal adoption of Mr Baker by Mr. McConnell. The adoption permitted Mr. Baker to change his name from Richard John Baker to Pat Lynn McConnell. On August 16, Mr Michael McConnell alone applied for a marriage license in Mankato, Blue Earth County, Minnesota for himself and Mr. Baker, who used the name Pat Lynn McConnell. Under Minnesota law, only one party need apply for a marriage license. Since the marriage license application does not inquire as

6

## How the Federal Questions Were Raised

Appellants contended that if Minnesota Statutes, Chapter 517, were construed so as to not allow two persons of the same sex to marry, then the Statutes were in violation of the First, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution in their Alternative Writ of Mandamus (App. *infra*, pp. 10a-11a), at the hearing before the Hennepin County District Court on January 8, 1971 (App. *infra*, p. 12a), and to the Supreme Court of Minnesota (App. *infra*, p. 18a). These constitutional claims were expressly considered and rejected by both courts below.

## The Questions Are Substantial

The precise question is whether two individuals, solely because they are of the same sex, may be refused formal legal sanctification or ratification of their marital relationship.

At first, the question and the proposed relationship may well appear bizarre—especially to heterosexuals. But

---

to sex, the bisexual name of Pat Lynn McConnell doubtless kept the clerk from making any inquiry about the sexes of the parties. Shortly after the license issued, Mr. McConnell's adoption of Mr. Baker was made public by Judge Arthur—contrary to Minnesota law. The County Attorney for Blue Earth County then discovered that a marriage license had issued to the appellants, and on August 31, he "declared the license void on statutory grounds." Nevertheless, on September 3, the appellants were married in a private ceremony in South Minneapolis. About a week later the license was sent to the Blue Earth County Clerk of District Court. It is not known whether he filed it, but under the Minnesota statute filing is not required. Further, filing does not affect validity.

---

7

neither the question nor the proposed relationship is bizarre. Indeed, that first impulse provides us with some measure of the continuing impact on our society of prejudice against non-heterosexuals. And, as illuminated within the context of this case, this prejudice has severe consequences.

The relationships contemplated is neither grotesque nor uncommon. In fact, it has been established that homosexuality is widespread in our society (as well as all other societies). Reliable studies have indicated that a significant percentage of the total adult population of the United States have engaged in overt homosexual practices. Numerous single sex marital relationships exist de facto. See, e.g., A. KINSEY, SEXUAL BEHAVIOR IN THE HUMAN MALE (1948); Finger, *Sex Beliefs and Practices Among Male College Students*, 42 J. ABNORMAL AND SOCIAL PSYCH. 57 (1947). The refusal to sanction such relationships is a denial of reality. Further, this refusal denies to many people important property and personal interests.

This Jurisdictional Statement undertakes to outline the substantial reasons why persons of the same sex would want to be married in the sight of the law. Substantial property rights, and other interests, frequently turn on legal recognition of the marital relationship. Moreover, both the personal and public symbolic importance of legal ratification of same sex marriages cannot be underestimated. On the personal side, how better may two people pledge love and devotion to one another than by marriage. On the public side, prejudice against homosexuals, which tends to be phobic, is unlikely to be cured until the public acknowledges that homosexuals, like all people, are entitled to the full protection and recognition of the law.

8

Only then will the public perceive that homosexuals are not freaks or unfortunate abberations, to be swept under the carpet or to be reserved for anxious phantasies about one's identity or child rearing techniques.

A vast literature reveals several hypotheses to explain the deep prejudice against homosexuals. One authority maintained that hostility to homosexual conduct was originally an "aspect of economics," in that it reflected the economic importance of large family groupings in pastoral and agricultural societies. E. Westermarck, 2 Origin and Development of the Moral Idea 484 (1926). A second theory suggests that homosexuality was originally forbidden by the "early Hebrews" as part of efforts to "surround the appetitive drives with prohibitions." W. Churchill, Homosexual Behavior Among Males 19 (1969). Under this theory, opposition to homosexuality was closely related to religious imperatives; in particular the need to establish moral superiority over pagan sects. Id., at 17; see also W. James, The Varieties of Religious Experience, lectures XI, XII, XIII (1902).

Whatever the appropriate explanation of its origins, psychiatrists and sociologists are more nearly agreed on the reasons for the persistence of the hostility. It is one of those "ludicrous and harmful" prohibitions by which virtually all sexual matters are still reckoned "socially taboo, illegal, pathological, or highly controversial." W. Churchill, supra, at 26. It continues, as it may have begun, quite without regard to the actual characteristics of homosexuality. It is nourished, as are the various other sexual taboos, by an amalgam of fear and ignorance. Id., at 20-35. It is supported by a popular conception of the causes and characteristics of homosexuality that is no more deserving of our reliance than the Emperor Justinian's belief that homo-

9

sexuality causes earthquakes. H. Hart, Law, Liberty and Morality 50 (1963).

There is now responsible evidence that the public attitude toward the homosexual community is altering. Thus, the Final Report of the Task Force on Homosexuality of the National Institute of Mental Health, October 10, 1969, states (pp. 18-19):

"Although many people continue to regard homosexual activities with repugnance, there is evidence that public attitudes are changing. Discreet homosexuality, together with many other aspects of human sexual behavior, is being recognized more and more as the private business of the individual rather than a subject for public regulation through statute. Many homosexuals are good citizens, holding regular jobs and leading productive lives."

To a certain extent the new attitudes mirror increasing scientific recognition that homosexuals are "normal," and that accordingly to penalize individuals for engaging in such conduct is improper. For example, in D. Abrahamsen, Crime and the Human Mind 117 (1944), it is stated:

"All people have originally bisexual tendencies which are more or less developed and which in the course of time normally deviate either in the direction of male or female. This may indicate that a trace of homosexuality, no matter how weak it may be, exists in every human being."

Sigmund Freud summed up the present overwhelming attitude of the scientific community when he wrote as follows in 1935:

10

"Homosexuality is assuredly no advantage but it is nothing to be ashamed of, no vice, no degradation, it cannot be classified as an illness; we consider it to be a variation of the sexual function produced by a certain arrest of sexual development. Many highly respectable individuals of ancient and modern times have been homosexuals, several of the greatest men among them (Plato, Michelangelo, Leonardo da Vinci, etc.). It is a great injustice to persecute homosexuality as a crime and cruelty too." Reprinted in 107 Am. J. of Psychiatry 786-87 (1951).

In the face of scientific knowledge and changing public attitudes it is plainly, as Freud said, "a great injustice" to persecute homosexuals.

This injustice is compounded, we suggest, by the fact that there is no justification in law for the discrimination against homosexuals. Because of abiding prejudice, appellants are being deprived of a basic right—the right to marry. As a result of this deprivation, they have been denied numerous benefits awarded by law to others similarly situated—for example, childless heterosexual couples.

Since this action has been filed, others have been instituted in other states.[4] This Court's decision, therefore, would affect the marriage laws of virtually every State in the Union.

_____

[4] See, e.g., *Jones* v. *Hallihan*, W-152-70. (Ct. Apps. Ky. 1971).

11

## I.

**Respondent's refusal to sanctify appellants' marriage deprives appellants of liberty and property in violation of the due process and equal protection clauses.**

The right to marry is itself a fundamental interest, fully protected by the due process and equal protection clauses of the Fourteenth Amendment. See *Boddie* v. *Connecticut*, 401 U.S. 371 (1971); *Loving* v. *Virginia*, 388 U.S. 1 (1967); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965); *Skinner* v. *Oklahoma*, 316 U.S. 535 (1942); *Meyer* v. *Nebraska*, 262 U.S. 535 (1923). In addition, significant property interests, also protected by the due process clause, flow from the legally ratified marital relationship. In his testimony at the trial, the appellant Baker enumerated six such interests which he cannot enjoy because of the State's refusal to recognize his marriage to the appellant McConnell:

1. The ability to inherit from one another by intestate succession.

2. The availability of legal redress for the wrongful death of a partner to a marriage.

3. The ability to sue under heartbalm statutes where in effect.

4. Legal (and consequently community) recognition for their relationship.

5. Property benefits such as the ability to own property by tenancy-by-the-entirety in states where permitted.

6. Tax benefits under both Minnesota and federal statutes. (Among others, these include death tax benefits

12

and income tax benefits—even under the revised Federal Income Tax Code.)

There are innumerable other legal advantages that can be gained only in the marital relationship. Only a few of these will be listed for illustrative purposes. Some state criminal laws prohibit sexual acts between unmarried persons. Many government benefits are available only to spouses and to surviving spouses. This is true, for example, of many veterans benefits. Rights to public housing frequently turn on a marital relationship. Finally, when there is a formal marital relationship, one spouse cannot give or be forced to give evidence against the other.

The individual's interests, personal and property, in a marriage, are deemed fundamental. See, e.g., *Boddie* v. *Connecticut, supra; Loving* v. *Virginia, supra; Griswold* v. *Connecticut, supra; Skinner* v. *Oklahoma, supra; Meyer* v. *Nebraska, supra.* Thus marriage comprises a bundle of rights and interests, which may not be interfered with, under the guise of protecting the public interest, by government action which is arbitrary or invidious or without at least a reasonable relation to some important and legitimate state purpose. E.g. *Meyer* v. *Nebraska, supra.* In fact, because marriage is a fundamental human right, the state must demonstrate a subordinating interest which is compelling, before it may interfere with or prohibit marriage. Cf. *Bates* v. *City of Little Rock,* 361 U.S. 516 (1960).

In a sense, the analysis presented here involves a mixing of both due process and equal protection doctrines. As they are applied to the kind of government disability at issue in this case, however, they tend to merge. Refusal to sanctify a marriage solely because both parties to the

13

relationship are of the same sex is precisely the kind of arbitrary and invidiously discriminatory conduct that is prohibited by the Fourteenth Amendment equal protection and due process clauses. Unless the refusal to sanctify can be shown to further some legitimate government interest, important personal and property rights of the persons who wish to marry are arbitrarily denied without due process of law, and the class of persons who wish to engage in single sex marriages are being subject to invidious discrimination. With regard to the due process component, see *Boddie* v. *Connecticut, supra; Griswold* v. *Connecticut, supra* (all the majority opinions); *Meyer* v. *Nebraska, supra.* With regard to the equal protection component of this argument, see *Loving* v. *Virginia, supra; McLaughlin* v. *Florida,* 379 U.S. 184 (1964); *Skinner* v. *Oklahoma, supra;* cf. *Reed* v. *Reed,* 92 S. Ct. 251, 30 L. ed.2d 225 (1971).

Applying due process notions, in this case, the state has not shown any reason, much less a compelling one, for refusing to sanctify the marital relationship. Its action, therefore, arbitrarily invades a fundamental right.

Separately, each appellant is competent to marry under the qualifications specified in Minnesota Statutes Sections 517.08, subd. 3, 517.02-517.03. Compare *Loving* v. *Virginia, supra.* Why, then, do they become incompetent when they seek to marry each other?

The problem, according to the Minnesota Supreme Court, appears to be definitional or historical. The institution of marriage "as a union of a man and a woman, uniquely involving the procreation and rearing of children within a family, is as old as the Book of Genesis" (App., *infra,* pp. 20a-21a). On its face, however, Minnesota law neither

14

states nor implies this definition. Furthermore, the antiq-
uity of a restriction certainly has no bearing on its consti-
tutionality, and does not, without anything additional, dem-
onstrate that the state's interest in encumbering the marital
relationship is subordinating and compelling. Connecticut's
restriction on birth control devices had been on its statute
books for nearly a century before this Court struck it down
on the ground that it unconstitutionally invaded the pri-
vacy of the marital relationship. *Griswold* v. *Connecticut,
supra.*

Surely the Minnesota Supreme Court cannot be suggest-
ing that single sex marriages may be banned because they
are considered by a large segment of our population to be
socially reprehensible. Such a governmental motive would
be neither substantial, nor subordinating nor legitimate.
See, e.g., *Loving* v. *Virginia, supra; Cohen* v. *California,*
403 U.S. 15 (1971); *Street* v. *New York,* 394 U.S. 576
(1969).

Even assuming that government could constitutionally
make marriageability turn on the marriage partners' will-
ingness and ability to procreate and 'to raise children,
Minnesota's absolute ban on single sex marriages would
still be unconstitutional. "[E]ven though the governmental
purpose be legitimate and substantial, that purpose cannot
be pursued by means that broadly stifle fundamental per-
sonal liberties when the end can be more narrowly achieved.
The breadth of legislative abridgment must be viewed in
the light of less drastic means for achieving the same basic
purpose." *Shelton* v. *Tucker,* 364 U.S. 479, 488 (1960).
There is nothing in the nature of single sex marriages that
precludes procreation and child rearing. Adoption is quite

15

clearly a socially acceptable form of procreation. It already
renders procreative many marriages between persons of
opposite sexes in which the partners are physically or emo-
tionally unable to conceive their own children. Of late,
even single persons have become eligible to be adoptive
parents.

Appellants submit therefore, that the appellee cannot
describe a legitimate government interest which is so com-
pelling that no less restrictive means can be found to secure
that interest, if there is one, than to proscribe single sex
marriages. And, even if the test to be applied to determine
whether the Minnesota proscription offends due process
involves only questions of whether Minnesota has acted
arbitrarily, capriciously or unreasonably, appellants submit
that the appellee has failed under that test too. Minne-
sota's proscription simply has not been shown to be ration-
ally related to any governmental interest.

The touchstone of the equal protection doctrine as it
bears on this case is found in *Loving* v. *Virginia,* 388
U.S. 1 (1967). The issue before the Court in that case
was whether Virginia's anti-miscegenation statute, prohibit-
ing marriages between persons of the Caucasian race and
any other race was unconstitutional. The Court struck
down the statute saying:

> There is patently no legitimate overriding purpose
> independent of invidious racial discrimination which
> justifies this classification. The fact that Virginia pro-
> hibits only interracial marriages involving white per-
> sons demonstrates that the racial classifications must
> stand on their own justification as measures designed
> to maintain White Supremacy. We have consistently

16

denied the constitutionality of measures which restrict the rights of citizens on account of race. There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause. *Loving* v. *Virginia*, 388 U.S. at 11-12.

The Minnesota Supreme Court ruled that the *Loving* decision is inapplicable to the instant case on the ground that "there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex" (App., *infra*, p. 23a). It is true that the inherently suspect test which this Court applied to classifications based upon race, (see, e.g., *Loving* v. *Virginia, supra; McLaughlin* v. *Florida, supra*), has not yet been extended to classifications based upon sex (see *Reed v. Reed*, 92 S. Ct. 251, 30 L. ed.2d 225 (1971)). However, this Court has indicated that when a fundamental right—such as marriage—is denied to a group by some classification, the denial should be judged by the standard that places on government the burden of demonstrating a legitimate subordinating interest that is compelling. *Shapiro* v. *Thompson*, 394 U.S. 618 (1969). As we have already indicated neither a legitimate nor a subordinating reason for this classification has been or can be ascribed.

Even if we assume that the classification at issue in this case is not to be judged by the more stringent "constitutionally suspect" and "subordinating interest" standards, the Minnesota classification is infirm.

The discrimination in this case is one of gender. Especially significant in this regard is the Court's recent decision in *Reed* v. *Reed*, 92 S. Ct. 251, 30 L. ed.2d 225 (1971),

17

which held that an Idaho statute, which provided that as between persons equally qualified to administer estates males must be preferred to females, is violative of the equal protection clause of the Fourteenth Amendment. There the Court said (30 L. ed.2d at 229):

> In applying that clause, this Court has consistently recognized that the Fourteenth amendment does not deny to States the power to treat different classes of persons in different ways. [Citations omitted.] The Equal Protection Clause of that Amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co.* v. *Virginia*, 253 U.S. 412, 415 (1920).

Childless same sex couples, for example, are "similarly circumstanced" to childless heterosexual couples. Thus, under the *Reed* and *Royster* cases, they must be treated alike.

Even when judged by this less stringent standard, the Minnesota classification cannot pass constitutional muster. First, it is difficult to ascertain the object of the legislation construed by the Minnesota courts. Second, whatever objects are ascribed for the legislation do not bear any fair and substantial relationship to the ground upon which the

18

difference is drawn between same sex and different sex marriages.[5]

## II.

**Appellee's refusal to legitimate appellants' marriage constitutes an unwarranted invasion of the privacy in violation of the Ninth and Fourteenth Amendments.**

Marriage between two persons is a personal affair, one which the state may deny or encumber only when there is a compelling reason to do so. Marriage and marital privacy are substantial rights protected by the Ninth Amendment as well as the Fourteenth Amendment due process clause. By not allowing appellants the legitimacy of their marriages, the state is denying them this basic right and unlawfully meddling in their privacy.

To hold that a right so basic and fundamental and so deep-rooted in our society as the right of privacy in marriage may be infringed because that right is not guaranteed in so many words by the first eight amendments to the Constitution is to ignore the Ninth Amendment and to give it no effect whatsoever.

*Griswold* v. *Connecticut*, 381 U.S. 479, 491-492 (Goldberg, J., concurring); see also, *Mindel* v. *United States Civil Service Commission*, 312 F. Supp. 485 (N.D. Cal. 1970). Accordingly, Minnesota's refusal to legitimate the appellants' marriage merely because of the sex of the applicants is

---

[5] The fact that the parties to the desired same sex marriage are not barred from marriage altogether is irrelevant to the constitutional issue. See *Reed* v. *Reed*, *supra*; *Loving* v. *Virginia*, *supra*; *McLaughlin* v. *Florida*, *supra*.

19

a denial of the right to marry and to privacy reserved to them of the Ninth and Fourteenth Amendments. See *Griswold* v. *Connecticut*, *supra*; *Loving* v. *Virginia*, 388 U.S. 1 (1967); cf. *Boddie* v. *Connecticut*, 401 U.S. 371 (1971). Indeed, it is the most fundamental invasion of the privacy of the marital relationship for the state to attempt to scrutinize the internal dynamics of that relationship. Absent a showing of compelling interest, or an invitation from a party to the relationship, it is none of the state's business whether the individuals to the relationship intend to procreate or not. Nor is it the state's business to determine whether the parties intend to engage in sex acts or any particular sex acts. Cf., e.g., *Griswold* v. *Connecticut*, *supra*.

## CONCLUSION

**For the reasons set forth above, probable jurisdiction should be noted.**

Respectfully submitted,

R. MICHAEL WETHERBEE
    Minnesota Civil Liberties Union
    2323 East Hennepin Avenue
    Minneapolis, Minnesota 55413

LYNN S. CASTNER
    1625 Park Avenue
    Minneapolis, Minnesota 55404

*Attorneys for Appellants*