DENNIS J. HERRERA, State Bar #139669
City Attorney
THERESE M. STEWART, State Bar #104930
Chief Deputy City Attorney
DANNY CHOU, State Bar #180240
Chief of Complex and Special Litigation
CHRISTINE VAN AKEN, State Bar #241755
MOLLIE M. LEE,[*] State Bar #251404
Deputy City Attorneys
City Hall, Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:     (415) 554-4708
Facsimile:     (415) 554-4699

Attorneys for *Amicus Curiae*
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>       Plaintiffs,<br><br>       vs.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,<br><br>       Defendants. | Case No. 09-CV-2292 VRW<br><br>**BRIEF OF *AMICUS CURIAE* CITY AND COUNTY OF SAN FRANCISCO IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Hearing Date:      July 2, 2009<br>Time:                   10:00 a.m.<br>Place:                  Courtroom 6, 17th Fl.,<br>                             450 Golden Gate Ave.<br><br>Trial Date:            Not set |

* Admission to the Northern District of California pending.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTEREST OF *AMICUS CURIAE* ............................................................................ 1

INTRODUCTION .......................................................................................................... 3

STATEMENT OF FACTS ............................................................................................. 5

    I.     THERE IS A LONG HISTORY IN THE WESTERN WORLD OF
           DISCRIMINATION AND BACKLASH AGAINST LESBIANS AND GAY
           MEN ...................................................................................................... 5

    II.    THE STRUGGLE FOR MARRIAGE EQUALITY IN CALIFORNIA SHOWS
           PROGRESS IN ACHIEVING FORMAL RIGHTS FOLLOWED BY
           BACKLASH ......................................................................................... 13

         A.     Domestic Partnership ................................................................. 13

         B.     *In re Marriage Cases* ............................................................... 14

         C.     Proposition 8 .............................................................................. 15

         D.     *Strauss v. Horton* ..................................................................... 17

ARGUMENT ............................................................................................................... 18

    I.     PROPOSITION 8 VIOLATES THE EQUAL PROTECTION GUARANTEE
           OF THE FEDERAL CONSTITUTION BECAUSE IT STRIPPED AWAY
           CONSTITUTIONAL GUARANTEES FOR A SINGLE CLASS OF CITIZENS
           WITH NO PURPOSE OTHER THAN ANIMUS AND MORAL
           DISAPPROVAL ................................................................................... 18

         A.     Under the Rational Basis Test, A Law Violates The Equal Protection
               Clause When It Does Not Advance A Legitimate Governmental Purpose 19

         B.     Proposition 8 Violates Equal Protection Because It Does Not Advance
               Any Of The Legitimate Government Purposes Its Proponents Claim ....... 21

              1.     Eliminating the Right of Same-Sex Couples to Marry Does Not
                    Protect Marriage ................................................................ 22

              2.     Eliminating the Right of Same-Sex Couples to Marry Does Not
                    Protect Children ................................................................. 24

                  a.     Proposition 8 Does Not Protect Children in Public
                          Schools ..................................................................... 24

                  b.     Proposition 8 Does Not Protect Children by Promoting
                          Biological Parenting .............................................. 25

                  c.     Proposition 8 Does Not Encourage "Responsible
                        Procreation" ........................................................... 27

         C.     Proposition 8 Violates the Equal Protection Clause Because Its True
               Purposes Are Not Legitimate Governmental Purposes ............................ 28

              1.     Enacting a Traditional Definition of Marriage Is Not a
                    Legitimate State Interest ................................................... 29

2. Expressing Moral Disapproval and Animus Against Lesbians and Gay Men and Their Familial Relationships, an Actual Purpose of Proposition 8, Is Not a Legitimate State Interest ...........................30

D. Proposition 8 Is Also Analogous to *Romer's* Amendment 2 Because It Selectively Deprives Lesbians and Gay Men, and Them Alone, of Constitutional Rights ...............................................................................32

E. The Availability of Domestic Partnership, and the Recentness of the California Supreme Court's Acknowledgment of Same-Sex Couples' Right to Marry, Do Not Neutralize the Equal Protection Violation ..........33

II. IF THERE IS INSUFFICIENT EVIDENCE TO ESTABLISH THAT PROPOSITION 8 VIOLATES EQUAL PROTECTION, THE COURT SHOULD ENCOURAGE FURTHER FACTUAL DEVELOPMENT TO DETERMINE WHETHER HEIGHTENED SCRUTINY APPLIES....................35

CONCLUSION...............................................................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Allied Stores of Ohio, Inc. v. Bowers*
  358 U.S. 522 (1959)....................................................................................19

*Baker v. Nelson*
  409 U.S. 810 (1972)....................................................................................19

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007)....................................................................................21

*Bowen v. Gilliard*
  483 U.S. 587 (1987)....................................................................................35

*Bowers v. Hardwick*
  478 U.S. 186 (1986)..............................................................................19, 20

*Boy Scouts of Am. v. Dale*
  530 U.S. 640 (2000)....................................................................................12

*Brown v. Board of Education*
  347 U.S. 483 (1954)....................................................................................34

*Butler v. Apfel*
  144 F.3d 622 (9th Cir. 1998) .....................................................................21

*City of Cleburne v. Cleburne Living Center*
  473 U.S. 432 (1985)..............................................2, 4, 19, 20, 21, 22, 32, 35

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*
  538 U.S. 188 (2003)....................................................................................21

*City of New Orleans v. Dukes*
  427 U.S. 297 (1976)....................................................................................28

*Eisenstadt v. Baird*
  405 U.S. 438 (1972)....................................................................................19

*Fitzgerald v. Barnstable Sch. Comm.*-- U.S. --, 129 S. Ct. 788 (2009) ........................20

*Heller v. Doe*
  509 U.S. 312 (1993)..............................................................................19, 20

*Hunter v. Erickson*
  393 U.S. 385 (1969)....................................................................................33

*J.E.B. v. Alabama*
  511 U.S. 127 (1994)....................................................................................29

*Katzenbach v. Morgan*
    384 U.S. 641 (1966)..................................................................................28

*Lawrence v. Texas*
    539 U.S. 558 (2003)................................................................10, 20, 24, 29

*Lazy Y Ranch Ltd. v. Behrens*
    546 F.3d 580 (9th Cir. 2008) ...............................................................21

*Levy v. Louisiana*
    391 U.S. 68 1968).............................................................................28, 29

*Lofton v. Sec'y of the Dep't of Children & Fam. Servs.*
    377 F.3d 1275 (11th Cir. 2004) .............................................................10

*Mandel v. Bradley*
    432 U.S. 173 (1977).............................................................................19

*McLaughlin v. Florida*
    379 U.S. 184 (1964).............................................................................28

*Patsone v. Pennsylvania*
    232 U.S. 138 (1914).............................................................................28

*Pierce v. Society of Sisters*
    268 U.S. 510 (1925).............................................................................24

*Plessy v. Ferguson*
    163 U.S. 537 (1896).............................................................................34

*Reed v. Reed*
    404 U.S. 71 (1971).............................................................................20

*Reitman v. Mulkey*
    387 U.S. 369 (1967)..........................................................4, 20, 22, 25

*Romer v. Evans*
    517 U.S. 620 (1996)....................................3, 4, 12, 20, 21, 22, 25, 31, 32, 34

*San Antonio Indep. Sch. Dist. v. Rodriguez*
    411 U.S. 1 (U.S. 1973).........................................................................28

*Schwenk v. Hartford,*
    204 F.3d 1187 (9th Cir. 2000) .............................................................30

*Strauss v. Horton*
    No. S168047, S168066, S168078, -- Cal. 4th --, 2009
    WL 1444594, at *9 (Cal. May 26, 2009)..........................15, 17, 18, 32, 33

*Tucson Woman's Clinic v. Eden*
    379 F.3d 531 (9th Cir. 2004) ...............................................................21

*U.S. Dept. of Agriculture v. Moreno*
  413 U.S. 528 (1973) ............................................................20, 30

*Washington v. Seattle Sch. Dist. No. 1*
  458 U.S. 457 (1982) ...................................................................33

*Williams v. Illinois*
  399 U.S. 235 (1970) ............................................................20, 29

*Williamson v. Lee Optical Co.*
  348 U.S. 483 (1955) ...................................................................28

*Zobel v. Williams*
  457 U.S. 55 (1982) .....................................................................20

**State Cases**
*Chaffin v. Frye*
  45 Cal. App. 3d 39 (1975) ...........................................................9

*Gay Law Students Ass'n v. Pacific Tel. & Tel.Co.*
  24 Cal. 3d 458 (1979) ................................................................10

*In re Marriage Cases*
  43 Cal. 4th 757 (2008) ..........................2, 3, 4, 14, 15, 17, 18, 22, 23, 26, 33, 34

*Lockyer v. City and County of San Francisco*
  33 Cal. 4th 1055 (2004) ..........................................................1, 2

*Morell v. Dep't of Alcoholic Bev. Control*, 204 Cal. App. 2d 504 (1962) ......................9

*People v. Walter*
  7 Cal. 2d 438 (1936) ...................................................................9

*Sarac v. State Bd. of Educ.*
  249 Cal. App. 2d 58 (1957) .........................................................9

**State Statutes & Codes**
Cal. Elec. Code § 342 .......................................................................15

Cal. Fam. Code § 297.5 ....................................................................13

Cal. Fam. Code § 300 .........................................................................1

Cal. Fam. Code § 350 .........................................................................1

Cal. Fam. Code § 359 .........................................................................1

Cal. Fam. Code § 400 .........................................................................1

Cal. Fam. Code § 401 .........................................................................1

Cal. Fam. Code § 423 ..................................................................................1

Cal. Fam. Code § 67 ...................................................................................1

Cal. Fam. Code § 8600 ..............................................................................27

Cal. Fam. Code § 9000(b) .........................................................................27

Cal. Health & Safety Code § 1374.58 .......................................................13

Cal. Ins. Code § 3302 ...............................................................................13

Cal. Ins. Code § 3303 ...............................................................................13

Cal. Lab. Code § 233 ................................................................................13

Cal. Pen. Code § 286 ................................................................................10

Cal. Stats. 1992, ch. 915 ..........................................................................10

Cal. Stats. 2003, ch. 331 ..........................................................................27

Cal. Stats. 2003, ch. 421 ..........................................................................13

Cal. Welf. & Inst. Code § 16001.9(a)(23) ................................................27

Cal. Welf. & Inst. Code § 16013 ..............................................................27

Family Code § 308.5 .................................................................................18

**Constitutional Provisions**

Cal. Const. Article 1, Section 1................................................................13

Cal. Const. Article 1, Section 7................................................................13

Cal. Const. Article I, Section 7.5 ...............................................................5

U.S. Const. amend. XIV, § 1 .....................................................................19

**Other References**

"Miami Anti-Gays Win in Landslide," *S.F. Examiner*, June 8, 1977, at 1 ....................................10

"The Thirty Years War: A Timeline of the Anti-Gay Movement, Southern Poverty Law Center, Spring 2005, available at http://www.splcenter.org/intel/intelreport/article.jsp?aid=523........11

"The Wedding Zinger: The Definition of Marriage," a segment of *Uncommon Knowledge*, produced by the Hoover Institution in conjunction with KTEH-TV, San Jose.  Filmed March 28, 2008.........................................................31

"Voting Against Gay Rights," Time (May 22, 1978), available at
http://www.time.com/time/magazine/article/0,9171,919647,00.html .......................................11

A Mighty Army (Spring 2005) Southern Poverty Law Center Intelligence Report, available at
http://www.splcenter.org/intel/intelreport/article.jsp?pid=869.....................................11

Allan Berube, *Coming Out Under Fire* 255 (1990)........................................................................8

American Psychological Association, "For a Better Understanding of Sexual Orientation and
Homosexuality," at 4 (2008)...................................................................................11, 25, 26, 27

Bob Moser, *Holy War*, Southern Poverty Law Center, "Holy War," Spring 2005, available at
http://www.splcenter.org/intel/intelreport/article.jsp?pid=862.............................................10, 12

Byrne Fone, *Homophobia: A History* 47–48 (2000) ...........................................................5, 7, 9, 12

Carroll Smith-Rosenberg, "Discourses of Sexuality & Subjectivity:
The New Woman, 1870-1936" ............................................................................................8

Donald P. Haider-Markel *et al.*, "Lose, Win or Draw?  A Reexamination of
Direct Democracy & Minority Rights," 60 POL. RES. Q. 304 (2007)....................................12

Dudley Clendinen & Adam Nagourney, *Out for Good: The Struggle to
Build a Gay Rights Movement in America* 209, 303 (1999).................................................10, 11

Erwin J. Haeberle, "Swastika, Pink Triangle, Yellow Star"..................................................................8

Everything To Do With Schools, ProtectMarriage.com (2008), available at http:
//www.protectmarriage.com/video/view/7 .............................................................................24

Everything to do with Schools, ProtectMarriage.com (2008), available at
http://www.protectmarriage.com/video/view/7 .....................................................................15

Fred Fejes, *Gay Rights & Moral Panic: The Origins of America's
Debate on Homosexuality* 94-7 (2008) ...............................................................................10, 11

GAO, *Military Personnel: Financial Costs & Loss of Critical Skills Due to DOD's Homosexual
Conduct Policy Cannot Be Completely Estimated* 4 (2005)....................................................12

GOD HATES FAGS!!! (YouTube 2008, posted June 16, 2008), available at
http://www.youtube.com/watch?v=dEQuW2v6U2o....................................................................17

Gregory M. Herek, *Legal Recognition of Same-Sex Relationships in the United States:
A Social Science Perspective*, 61 Am. Psychol. 607, 611 (2006).......................................11, 27

Gregory M. Herek, *Paul Cameron Bio and Fact Sheet*,
http://psychology.ucdavis.edu/rainbow/html/facts_cameron_sheet.html...........................11, 27

Gunther, In Search of Evolving Doctrine on a Changing Court: A Model
for Newer Equal Protection, 86 Harv. L. Rev. 1, 34 (1972).......................................................20

Herman, The Antigay Agenda (1997) 62. ...................................................................11

*Hidden from History: Reclaiming the Gay & Lesbian Past* 279
   (Martin Bauml Duberman *et al.*, eds. 1989) ..................................................8

J. Gallo et al., "The Consenting Adult Homosexual and the Law: An Empirical Study of
   Enforcement and Administration in Los Angeles County,
   " 13 U.C.L.A. L. REV. 643, 674–75(1966) ................................................9

Jean Hardisty, "Constructing Homophobia: Colorado's Right-Wing
   Attack on Homosexuals," Public Eye Magazine 26 (Mar. 1993).............................12

John D'Emilio, "Gay Politics and Community in San Francisco Since World War II"................8

John Demos, *A Little Commonwealth: Family Life in Plymouth Colony* 78 (1970) ......................7

Jonathan Ned Katz, *Gay American History: Lesbians & Gay Men in the U.S.A.* 22 (1992) ......7, 8

Kristin Anderson Moore et al., "Marriage from a Child's Perspective: How Does Family
   Structure Affect Children, and What Can We Do About It?",
   *Child Trends Research Brief* (June 2002)....................................................26

Lisa Mincieli, *et al.*, "The Relationship Context of Births Outside Marriage: The Rise of
   Cohabitation," *Child Trends Research Brief*, at endnote a (May 2007).............................26, 27

Louis Crompton, *Homosexuality & Civilization* 17, 19, 57–59 (2003)......................................5, 6

Morton Kondrake, "Anita Bryant is Mad About Gays," *The New Republic*, at 13–14 (1980)......10

Nancy Levit, "A Different Kind of Sameness: Beyond Formal Equality and Antisubordination
   Strategies in Gay Legal Theory," 61 Ohio St. L.J. 867, 868 (2000).........................................12

National Coalition of Antiviolence Programs, Hate Violence Against Lesbian, Gay, Bisexual and
   Transgender People in the United States 3 (2008), available at
   http://www.ncavp.org/common/document_files/Reports
   /2008%20HV%20Report%20smaller%20file.pdf ...........................................12

Nicholas Ray, Nat'l Gay & Lesbian Task Force, *An Epidemic of Homelessness* 1–2 (2006) .......13

Questions & Answers About Proposition 8, ProtectMarriage.com, available at
   http://protectmarriage.com/files/faq.pdf ...................................................24

Randy Shilts, *The Mayor of Castro Street* (1988) ...............................................10

Robb and Robin Wirthlin's Story, ProtectMarriage.com (2008), available at
   http://www.protectmarriage.com/video/view/6 ................................................15, 30

S. Russell & K. Joyner, "Adolescent Sexual Orientation and Suicide Risk:
   Evidence from a National Study," 91 Am. J. Pub. Health 1276 (2001) ...................................13

Todd Donovan, *et al.*, "Direct Democracy & Gay Rights Initiatives After *Romer*,"
    in *The Politics of Gay Rights* 167 (Craig A. Rimmerman, *et al.*, 2000)...................................12

Video, Whether You Like It Or Not, (September 29, 2008) (available at
    http://www.protectmarriage.com/video/view/2)...........................................................................33

Wetzstein, "Gays Can't 'Marry,' 2 States Say,' *Wash. Times*, Nov. 5, 1998, at A16.....................12

Why Proposition 8, ProtectMarriage.com, available at
    http://www.protectmarriage.com/about/why ..................................................................24

William Benemann, *Male-Male Intimacy in Early America* xvi, 204 (2006) ...............................7

William N. Eskridge, Jr., "Hardwick & Historiography," 1999 Univ. Ill. L. Rev. 631, 633.........10

William Naphy, *Born to Be Gay: A History of Homosexuality* 48–50 .......................................5, 6

William Wright, *Harvard's Secret Court: The Savage 1920 Purge
    of Campus Homosexuals* (2005) ........................................................................................7

Yes on Proposition 8 Supporters Share Views - Santa Clarita Ca - Join the Impact,
    (YouTube 2008, posted October 23, 2008), available at
    http://www.youtube.com/watch?v=gtcZnLXhiJo&feature=
    PlayList&p=3BD5A4096173FD7E&index=6 ...........................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTEREST OF *AMICUS CURIAE*

The City and County of San Francisco ("San Francisco" or "the City") has an immediate and vital interest in the outcome of this case.  As a unit of local government with the responsibility to issue civil marriage licenses and to solemnize and record marriages, Cal. Fam. Code §§ 67, 300, 350, 359, 400, 401, 423, San Francisco is presently compelled by Proposition 8 to violate the federal constitutional rights of gay and lesbian citizens by denying them the marriage licenses that it daily issues to heterosexual couples – couples whose bonds are no stronger, and their claim to official recognition no greater, than those of lesbian and gay couples.  *See Lockyer v. City and County of San Francisco*, 33 Cal. 4th 1055, 1080–82, 1085–86 (2004) (city and county officials may not decline to enforce statutory restrictions on marriage until appellate court holds them unconstitutional).  Because it is required to participate in a discriminatory regime, San Francisco has a direct interest in the vindication that Kristin Perry and her co-plaintiffs seek.[1]

San Francisco has a further interest in this case:  During World War II the federal government persecuted, purged, and dishonorably discharged thousands of soldiers and sailors from the military because of their homosexuality.  Many were "processed out" in San Francisco and chose to remain here, and as a result San Francisco developed a large and vibrant lesbian and gay community.  This community is an immeasurable asset, and many of the City's most talented civic and business leaders have risen from its ranks.  From art and music to science and technology, from law and medicine to education, from the private sector to the public and non-profit arenas, our City and State have been enhanced by the contributions of lesbians and gay men who have been welcome citizens of San Francisco.

San Francisco's strong public policy interests reflect this reality.  In the 1970s, long before other municipalities, San Francisco began to adopt laws and policies to eliminate discrimination against and equalize the status of lesbians and gay men.  San Francisco enacted laws prohibiting employment discrimination by the City and its contractors (1972), prohibiting discrimination in housing, employment and public accommodations citywide (1978), establishing an entity to hear and

---

[1] For convenience, this brief will refer to the four individual plaintiffs as Perry.

BRIEF OF *AMICUS CURIAE* SAN FRANCISCO          1          n:\govli1\li2009\070779\00563430.doc
CASE NO. 09-CV-2292 VRW

mediate complaints of discrimination (1975), establishing a domestic partner registry (1990),

providing benefits to domestic partners of city employees (1991-93), and requiring its contractors to

provide the same benefits to domestic partners of employees as they provided to spouses of

heterosexual married employees (1996).  When these laws were challenged, the City vigorously

defended them.  In 2004, Mayor Gavin Newsom directed San Francisco's County Clerk to begin

issuing marriage licenses to same-sex couples on the same terms as they were issued to opposite-sex

couples.  After the California Supreme Court directed the City to stop issuing such licenses, *Lockyer*,

33 Cal. 4th 1055, 1073, the City filed suit, along with same-sex couples, successfully challenging the

State's exclusion of same-sex couples from marriage as a violation of the State Constitution.  *See In re

Marriage Cases*, 43 Cal. 4th 757 (2008).  All of these actions by San Francisco reflect the fundamental

values of San Francisco and its people that lesbian and gay citizens and their families are entitled to be

treated as fully equal to all other citizens and families.  The animus and moral disapproval expressed

by Proposition 8 against our lesbian and gay citizens is incompatible with these fundamental values.

Finally, as one of the lead plaintiffs in the historic litigation that culminated in the California

Supreme Court's recognition of the right of same-sex couples to marry as a fundamental right

guaranteed to them by the California Constitution – a right that was subsequently stripped away by a

majority of California voters when Proposition 8 passed – San Francisco has developed extensive

knowledge of many of the legal and factual issues that, in its view, this Court must consider to decide

this case, including the history of discrimination against gay men and lesbians and the connection

between that history and Proposition 8.

Thus, San Francisco files this brief to convey its knowledge and experience to the Court, and to

convey what we believe to be the unmistakable import of Supreme Court and Ninth Circuit equal

protection jurisprudence applied to this case: when a majority of California voters enacts a

constitutional amendment that excises a portion of the equal protection, liberty and privacy rights of a

single class of citizens, and where the amendment does nothing to advance the rights or interests of

other citizens except to satisfy their moral disapproval, animus, or disfavor towards a group, then

under *Romer v. Evans*, 517 U.S. 620 (1996), and *City of Cleburne v. Cleburne Living Center*, 473 U.S.

432 (1985), that amendment offends the federal Equal Protection Clause even applying the most deferential test.  This Court should enjoin its enforcement.

## INTRODUCTION

Until 2008, California law granted same-sex couples who registered as domestic partners virtually all of the tangible state law rights and obligations that flow to married opposite-sex couples but denied them the title and stature of marriage.  In May 2008, the California Supreme Court held that this was a difference of constitutional magnitude.  The State's reservation of the "familiar and highly favored" designation of marriage for opposite-sex couples and relegation of same-sex couples to a separate stature with a different and unfamiliar name worked a "real and appreciable harm" on same-couples and their children.  *Marriage Cases*, 43 Cal. 4th at 784, 855.  It sent an official message that in the eyes of the State of California same-sex relationships are different from opposite-sex relationships, and different in a way that matters.  It echoed and reinforced the message of societal disparagement lesbians and gay men have long endured, invited continued discrimination against them and reinforced the still accepted idea that they are "second-class citizens."  *Id.* at 784–85.  The Court held this separate and unequal treatment of lesbians and gay men violated California's constitutional guarantees of privacy, liberty and equality.  *Id.* at 823, 829, 855–56.

As that case was litigated, antigay organizations were obtaining the signatures needed to place a constitutional amendment on the ballot that in effect carved an exception out of the equal protection, liberty and privacy clauses of the California Constitution to deny same-sex couples the title "marriage."  When this measure passed in November 2008, it enshrined in the state constitution a separate and unequal stature for lesbian and gay relationships.

This case thus poses in stark terms the constitutionality of a measure the only conceivable purpose for which was to deny honor and respect to lesbians and gay men and their families.  As the state Supreme Court recognized, denying access to the one term that is universally understood as describing a "union unreservedly approved and favored by the community," speaks volumes about those denied access to it.  *Marriage Cases*, 43 Cal. 4th at 845.  It tells lesbians and gay men, in no uncertain terms, "the State will tolerate and even recognize your relationships, but it will not honor

them."  It is precisely because of their relationships – because they form same-sex rather than opposite-sex intimate bonds – that lesbians and gay men have so long been hated and condemned. Thus, the refusal to honor their relationships is in a very real sense a refusal to honor them as people and as citizens.

Try as they do, the initiative proponents are unable to explain any legitimate purpose served by this measure, or any purpose at all that does not boil down to distaste or discomfort with lesbian and gay couples and families.  To say, for instance, that they oppose the marriage of same-sex couples because they do not want their children to be taught about gay people and gay families at school can only be based on one reason: that they do not like, are uncomfortable with, or fear gay families or gay people – and want their children to adopt the same discomfort or dislike.  This is not mere indifference toward gay people but a reflection of the age-old antipathy toward them, for learning that same-sex couples exist can only be objectionable if there is something wrong with having a same-sex relationship – that is, with being gay at all.  Inherent in this rationale is a belief that homosexuality and homosexual people are taboo, something to which children should not be exposed.  Indeed, by stoking fears about children and schools during their campaign, Proposition 8's proponents evoked dark stereotypes of gay people as sexual perverts who would abuse and indoctrinate children.  The children-and-schools rationale is, quite simply, animus – animus cloaked in fear.[2]

Feelings of antipathy or discomfort toward a group of people – no matter how deeply felt or widely held – are not a legitimate purpose for singling that group out for unequal treatment by the law. *Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).  While the law may not be capable of eradicating people's prejudices, neither may it embody or encourage them.  *Reitman v. Mulkey*, 387 U.S. 369, 377 (1967).  Nor does the fact that such prejudices have already and for a long time been a part of our laws and traditions make them constitutionally acceptable.  For, as the California Supreme Court observed in the recent *Marriage Cases*:  "if we have learned anything from the significant evolution in the prevailing societal views and official policies

---

[2] As discussed below, the children-and-schools rationale is also a familiar refrain:  gay rights opponents have been sounding alarms about children for decades in campaigns related not only to prevent marriage equality and other recognition of same-sex relationships, but also to roll back antidiscrimination laws and to scapegoat people with HIV and AIDS.

toward members of minority races and toward women over the past half-century, it is that even the most familiar and generally accepted of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions."  43 Cal. 4th at 853–54.

## STATEMENT OF FACTS

### I.  THERE IS A LONG HISTORY IN THE WESTERN WORLD OF DISCRIMINATION AND BACKLASH AGAINST LESBIANS AND GAY MEN

Proposition 8, now codified as Article I, Section 7.5, of the California Constitution, is but the latest in a line of ballot measures intended to erase the rights of lesbians and gay men.  These ballot measures, in turn, are rooted in a tradition of legal sanctions punishing homosexuality and state-sponsored violence against homosexuals.  So that the Court may understand the traditions that inform Proposition 8 and the campaign its sponsors waged to pass it, San Francisco describes here this history of discrimination.

Same-sex relationships were not always subject to the scorn and condemnation they have received in 20th- and 21st-century America.  In ancient Greece, same-sex love was openly celebrated, such as by the playwright Aristophanes and the poet Sappho.  Louis Crompton, *Homosexuality & Civilization* 17, 19, 57–59 (2003).  And it was not only writers who extolled homosexuality; male athletes and warriors in Greek society also celebrated their love of men.  *Id.* at 69; William Naphy, *Born to Be Gay: A History of Homosexuality* 48–50.  While the ancient Romans did not praise same-sex love in the same way the Greeks did, they nonetheless treated homosexual activity as normal and natural and permitted *de facto* same-sex marriages during the Roman Empire.  Byrne Fone, *Homophobia: A History* 47–48 (2000); Naphy, *supra*, at 63.

Some of the earliest laws criminalizing same-sex relations, with death as the penalty for disobedience, were introduced in the year 533, after Christianity had become dominant in the Roman Empire.  Naphy, *supra* at 82–83.  The history of state-sponsored violence against gay men and lesbians thus began in the West during the late Roman Empire and did not end in America until the eighteenth or nineteenth century.  The laws enacted by vilifying governments during that span were brutal in the extreme.  A law enacted in Spain said that "when a man lusts after another to sin with him

1   … shall both of them … be castrated before all the people, and after three days, shall be suspended by

2   the legs until they die, and never be taken down."  Crompton, *supra*, at 200.  An Italian city declared

3   that any man engaged in homosexual activity "must be stripped of all his clothes and fastened to a

4   stake in the Street of the Locusts with a nail or rivet driven through his male member, and shall remain

5   there all day and all night under a reliable guard, and the following day be burned outside the city."

6   *Id.* at 246–47.

7       Not only were such laws enacted, they were also enforced with a vengeance.  Extensive

8   records beginning in the second millennium in Europe show executions of homosexuals, including by

9   fire, physical mutilation, decapitation, and drowning.  Naphy, *supra*, at 90–94; Fone, *supra*, at 194;

10  Crompton, *supra*, at 292–97.  At times, a hysteria similar to Puritan witch hunts would overtake a city

11  or a country.  In Florence in the fifteenth century, for instance, a council of prosecutors convicted

12  3,000 people out of 40,000 of homosexual activity.  Naphy, *supra*, at 98.  Historians do not know how

13  many gay men and lesbians were killed in these persecutions and purges.  It appears that far fewer

14  women were convicted of same-sex sexual activity than men – in part because women of those eras

15  did not lead public lives – but there are records in Europe of lesbians being put to death as well.  *Id.* at

16  141–46; Crompton, *supra*, 299, 473.[3]

17      During the Enlightenment, a movement to reform the law to purge it of religious influence

18  came about, and France and other countries repealed their sodomy prohibitions altogether.  Crompton,

19  *supra*, at 510, 524, 528.  England, by contrast, intensified its persecution of homosexuals, and public

20  hangings of sodomites in Britain increased fivefold in the late eighteenth and early nineteenth

21  centuries.  Naphy, *supra*, at 200.  Across the Atlantic Ocean, religious leaders in what would become

22

23      [3] The Western world's vilification of same-sex love was not matched in other parts of the
    world.  For instance, same-sex relationships were accepted through recorded Chinese history until the

24  latter half of the twentieth century, with the rise of the Communist government.  Naphy, *supra*, at 80,
    165–66, 254; Crompton, *supra*, at 214–15, 243-44.  Indeed, a series of Chinese emperors of the Han

25  dynasty were known to have male lovers.  *Id.* at 218.  Same-sex relationships were also a regular
    feature of Japanese society, notwithstanding the condemnation of Christian missionaries.  *Id.* at 416–

26  17; Naphy, *supra*, at 169.  By the twentieth century, however, as Japan sought to modernize and open
    its ports to increasing Western trade, same-sex love became taboo in Japan.  Crompton, *supra*, at 443.

27  In Africa, some records suggest a history of openness to same-sex relationships before colonization.
    After colonization, homosexuality became a grounds on which the colonists condemned subjugated

28  Africans.  Naphy, *supra*, at 152–53.

the United States followed the English model and conducted similar campaigns to stamp out homosexuality.  John Winthrop, the governor of the Massachusetts Bay colony, approved the execution of one sodomy offender, calling him a "monster in human shape."  Jonathan Ned Katz, *Gay American History: Lesbians & Gay Men in the U.S.A.* 22 (1992).  After the American Revolution, convictions for same-sex sexual activity continued, particularly in Philadelphia, the only American city large enough to develop a homosexual subculture.  William Benemann, *Male-Male Intimacy in Early America* xvi, 204 (2006).  At the same time, however, much of the sparsely populated new country of America allowed gay men and lesbians to hide their natures and live their lives in peace.  For instance, men dramatically outnumbered women in early America, and would often form partnerships to farm acreages together, living on and working the same land.  Romantic relationships could easily have flourished in such a setting, where there were few other people and little expectation for conventional marriage.  *Id.* at 14; John Demos, *A Little Commonwealth: Family Life in Plymouth Colony* 78 (1970).  But such relationships were almost invariably secret.

Indeed, it was not until the late nineteenth century, at a time that the cities of America were growing rapidly, that "the very concept of the homosexual as a distinct category of person developed."  Declaration of George Chauncey ¶ 5 (Exh. A to Declaration of Mollie M. Lee ("Lee Decl.").[4]  Once the concept developed, it was no longer merely that the act of sodomy was condemned but rather that the state and society began to condemn a group of its citizens on the basis of their identity or status.  *Id.*  Psychiatrists, for instance, without any scientific basis, deemed gayness and lesbianism to be afflictions that required treatment – including through castration, shock treatment, aversion therapy, or lobotomy.  Katz, *supra*, at 129–207; Fone, *supra*, at 406.[5]  The world of education responded similarly.  In 1920, Harvard College, upon learning of a gay affair between a student and an older man, convened a secret court of faculty and officials, taking evidence in a windowless room.  It ultimately expelled fourteen men for homosexuality or association with homosexuals.  William Wright, *Harvard's Secret Court: The Savage 1920 Purge of Campus Homosexuals* (2005).  College

---

[4] All subsequent exhibits are to the Declaration of Mollie M. Lee unless otherwise stated.

[5] The American Psychiatric Association did not withdraw its classification of homosexuality as a mental illness until 1973.  Chauncey Decl. ¶ 8.

1    officials wrote to the students' fathers that their expulsions were for something worse than "gambling,

2    or drink, or *ordinary* sexual intercourse." *Id.* 154–55.  Harvard's appointments office also punished

3    the men, writing to one prospective employer *thirty-three years later* that "Harvard cannot show any

4    confidence in this individual." *Id.* at 142.  Two of the victims of Harvard's secret court eventually

5    killed themselves. *Id.* at 136, 201.

6         Lesbians fared badly in the late nineteenth and early twentieth centuries as well, but the

7    question of lesbianism was more complicated because it was bound up with anxieties about the rise of

8    a new class of educated women attempting to break into the professions.  In the popular imagination,

9    feminism and lesbianism were seen as "unnatural, related in disturbing and unclear ways to increased

10   female criminality, insanity, and hereditary neurosis."  Carroll Smith-Rosenberg, "Discourses of

11   Sexuality & Subjectivity: The New Woman, 1870-1936," in *Hidden from History: Reclaiming the Gay*

12   *& Lesbian Past* 279 (Martin Bauml Duberman *et al.*, eds. 1989) [hereinafter *Hidden from History*].

13   Some women responded to these pressures by passing as men.  Katz, *supra*, at 209–79.

14        With mass mobilization and migration to the cities in World War II and the years following,

15   many gay men and lesbians left isolated rural areas and encountered, for the first time, others with

16   similar sexual identities.  Allan Berube, *Coming Out Under Fire* 255 (1990).  But this time of

17   discovery was also a time of repression, as the military and the federal government each conducted

18   purges, discharging or firing gay men and lesbians and requiring their private contractors to do the

19   same. *Id.*; Chauncey Decl. ¶¶ 19–22.[6]  At the same time, the armed forces "deposited lesbians and

20   homosexuals, sometimes hundreds at a time, in San Francisco ….  Unable or unwilling to return home

21   in disgrace to family or friends, they stayed to carve out a new gay life."  John D'Emilio, "Gay Politics

22   and Community in San Francisco Since World War II," in *Hidden from History*, *supra*, at 459.

23

24

---

25        [6] During World War II, at a time when American gays were being purged from the military, the
     Nazi government of Germany murdered 20,000 gay men in concentration camps.  After the Allies

26   defeated Germany and liberated its concentration camps, the new German government sent gay death
     camp survivors to prison to serve the *remainder* of their sentences.  The Nazi-era law criminalizing all

27   homosexual activity, known as Paragraph 175, remained in force in East and West Germany until the
     1960s.  Erwin J. Haeberle, "Swastika, Pink Triangle, Yellow Star," in *Hidden from History*, *supra*, at

28   373.

1    While they were able to establish underground or semi-underground communities in places

2    like San Francisco and Los Angeles, gay and lesbian people remained victims of state-sponsored

3    persecution in those cities and throughout California.  By 1966, California was one of five states

4    where a person could be sentenced to *life in prison* for committing sodomy.  J. Gallo et al., "The

5    Consenting Adult Homosexual and the Law: An Empirical Study of Enforcement and Administration

6    in Los Angeles County," 13 U.C.L.A. L. REV. 643, 674–75(1966).  Cities such as Los Angeles and San

7    Francisco continued to repress gay life by raiding bars and gay bookstores.  D'Emilio, *supra*, at 461–

8    62; Gallo, *supra*, 692–93, 707–08, 718–19.  The view, promoted by the medical establishment, that

9    homosexuality was a perversion and affliction to be treated or punished permeated our State's judicial

10   decisions.[7]

11   But on June 27, 1969, a galvanizing event took place:  the Stonewall Rebellion in New York,

12   when gay men responded to a police raid not with acceptance but with physical resistance.  Three

13   nights of rioting followed, and the nation's community of lesbians and gay men became more vocal in

14   demanding equal treatment.  Fone, *supra*, at 407.  In California, lesbians and gay men garnered a

15   string of political and legal victories that allowed them to begin to live openly  This included the

16   election of gay and lesbian officials like San Francisco's Harvey Milk, the repeal of California's anti-

17   sodomy law, and the interpretation of existing antidiscrimination laws to protect lesbians and gay men,

18   along with the enactment of new antidiscrimination laws.  *See* Randy Shilts, *The Mayor of Castro*

---

[7] For example, the California Supreme Court, considering the mental health of a gay criminal defendant, discussed at length his "homosexual vices and sex perversions," noting that as a gay person he suffered from "sexual abnormalities."  *People v. Walter*, 7 Cal. 2d 438, 441, 448 (1936).  The Court concluded that given his abnormal state of mind, he may have experienced "the urge of resentment or *revenge*, which is a symptom or trait of homosexuality."  *Id*. at 448 (emphasis in original).  In 1957, the California Court of Appeal addressed the situation of a male school teacher who had been fired because he made advances toward a male undercover police officer – not at school or in the presence of students, but on the beach.  *Sarac v. State Bd. of Educ.*, 249 Cal. App. 2d 58, 60–61 (1957).  The court held that gay sexual conduct or even a proposition to engage in such conduct no matter where or in what context disqualified a person from teaching in the public schools.  *Id.* at 63–64.  In 1962, the Court of Appeal upheld the Department of Alcoholic Beverage Control's revocation of the liquor license of a bar that had become known as a gathering place for gay men, reasoning that gay men are "sex perverts" and allowing them to gather and touch one another, even on the hand or knee, was dangerous and against public morals.  *Morell v. Dep't of Alcoholic Bev. Control*, 204 Cal. App. 2d 504, 509–10, 517 (1962).  In 1975, the Court of Appeal affirmed a decision denying a woman custody of her children in part because she was a lesbian, lived with her "female companion," and was believed likely to engage in "immoral conduct" in front of her children.  *Chaffin v. Frye*, 45 Cal. App. 3d 39, 43 (1975).

*Street* (1988); Cal. Pen. Code § 286 & annotations; Cal. Stats. 1992, ch. 915; *Gay Law Students Ass'n v. Pacific Tel. & Tel.Co.*, 24 Cal. 3d 458, 488–89 (1979).  And in *Lawrence v. Texas*, 539 U.S. 558 (2003), the United States Supreme Court recognized that criminal prosecuting gay men and lesbians for their sexual conduct violates the federal Constitution.[8]

Even as gay men and lesbians were making progress, they were confronted with backlash.  In 1977, the singer Anita Bryant became the head of an organization called "Save Our Children," which ran a nationally publicized campaign in Dade County, Florida, to repeal an antidiscrimination ordinance enacted by that locality.  Fred Fejes, *Gay Rights & Moral Panic: The Origins of America's Debate on Homosexuality* 94-7 (2008); *Lofton v. Sec'y of the Dep't of Children & Fam. Servs.*, 377 F.3d 1275, 1301–02 (11th Cir. 2004) (Barkett, J., dissenting from denial of rehearing *en banc*).  Bryant and her organization tried to link homosexuality with child molestation, calling gay men and lesbians "human garbage" and recruiters of children to the homosexual lifestyle.  *Lofton*, 377 F.3d at 1302; Dudley Clendinen & Adam Nagourney, *Out for Good: The Struggle to Build a Gay Rights Movement in America* 209, 303 (1999).  In fact, its specific strategy was to convince voters that gay people were "trying to recruit our children into homosexuality."  Fejes, *supra*, at 299.  Indeed, Bryant suggested that gay people were child molesters and suggested that they had to recruit children because they could not reproduce.  *Id.* at 137; Morton Kondrake, "Anita Bryant is Mad About Gays," *The New Republic*, at 13–14 (1980); Bob Moser, *Holy War*, Southern Poverty Law Center, "Holy War," Spring 2005, available at http://www.splcenter.org/intel/intelreport/article.jsp?pid=862.

Bryant's fear-mongering won the day, and the Dade County antidiscrimination ordinance was repealed by 70% of the voters.  "Miami Anti-Gays Win in Landslide," *S.F. Examiner*, June 8, 1977, at 1.  And her campaign set off a wave of successful anti-gay ballot initiative campaigns that imitated her tactics across the country, in states such as Minnesota and Oregon.  Fejes, *supra*, at 174–77.  In 1978, Bryant supported another campaign against a gay civil rights ordinance in Wichita, Kansas where the

---

[8] *Lawrence* overruled the notorious decision *Bowers v. Hardwick*, 478 U.S. 186 (1986), which decided by a 5-4 vote that criminally prosecuting gay people for private, consensual sexual intimacy did not deprive them of their substantive due process rights.  One of the Justices in the *Bowers* majority, Justice Lewis Powell, confessed after leaving the Court that this was the vote he most regretted.  William N. Eskridge, Jr., "Hardwick & Historiography," 1999 Univ. Ill. L. Rev. 631, 633.

1  campaign literature focused on the "danger" of gays as role models for children: "There is a real

2  danger that homosexual teachers … simply by public acknowledgement of their lifestyles, can

3  encourage sexual deviation in children."  "Voting Against Gay Rights," Time (May 22, 1978),

4  available at http://www.time.com/time/magazine/article/0,9171,919647,00.html.  Anti-gay

5  organizations have continued to employ the threat-to-children message through the present to stoke

6  fears that children who learn that gay people exist will be "indoctrinated" and turn into homosexuals.

7  *See, e.g.,* Fejes, *supra,* at 137, 183; A Mighty Army (Spring 2005) Southern Poverty Law Center

8  Intelligence Report, available at http://www.splcenter.org/intel/intelreport/article.jsp?pid=869;

9  Herman, The Antigay Agenda (1997) 62.

10  Many but not all of these campaigns succeeded.  One exception was Proposition 6 in

11  California, which would have allowed the dismissal of California public school teachers for supporting

12  gay civil rights (regardless of their own sexual orientation), but was defeated at the polls.  Fejes, *supra*,

13  at 183; Clendinen & Nagourney, *supra*, at 381.  The tactics of gay-baiting campaigns were

14  institutionalized with the creation of the Moral Majority, which led a national effort to elect religious

15  right candidates and included a "declaration of war" on homosexuality as part of its early fundraising

16  appeals.  "The Thirty Years War: A Timeline of the Anti-Gay Movement, Southern Poverty Law

17  Center, Spring 2005, available at http://www.splcenter.org/intel/intelreport/article.jsp?aid=523.  Also

18  institutionalized was a source of dubious research concerning homosexuality through the Institute for

19  Scientific Investigation of Human Study, founded by Paul Cameron, which began in 1980 publishing

20  "scientific" studies about the links between homosexuality and child abuse.  Gregory M. Herek, *Paul

21  Cameron Bio and Fact Sheet*, http://psychology.ucdavis.edu/rainbow/html/facts_cameron_sheet.html

22  (last visited June 15, 2009).  Cameron has since been expelled from the American Psychological

23  Association for ethical violations and condemned by other professional groups for misinterpreting and

24  misrepresenting research on homosexuality.  *Id.*

25  By the early 1990s, however, antigay campaigns shifted in tone and emphasis.  As more

26  heterosexual people encountered gays and lesbians in their daily lives, groups promoting an agenda to

27  roll back civil rights protections for lesbians and gay men could no longer claim that they were

28  relentless child predators.  They began to emphasize instead that they "simply" wanted to end the

granting of "special rights" to gays and lesbians.  Moser, *supra*.  Colorado Family Values, the

proponent organization of Colorado's Amendment 2, ran its campaign for Amendment 2 using the "no

special rights" slogan.  Jean Hardisty, "Constructing Homophobia: Colorado's Right-Wing Attack on

Homosexuals," Public Eye Magazine 26 (Mar. 1993).  (Colorado Family Values also campaigned for

Amendment 2 on the basis of a link between homosexuality and child molestation, as discussed *infra*

at 29–30.  The Supreme Court subsequently struck down Amendment 2 in *Romer*, 517 U.S. 620.)  The

"no special rights" approach was also used in a wave of successful anti-gay ballot measures throughout

the country, including in Maine, Hawaii, Alaska, Nebraska, Nevada, and other states.  Todd Donovan,

*et al.*, "Direct Democracy & Gay Rights Initiatives After *Romer*," in *The Politics of Gay Rights* 167

(Craig A. Rimmerman, *et al.*, 2000); Wetzstein, "Gays Can't 'Marry,' 2 States Say,' *Wash. Times*, Nov.

5, 1998, at A16; Donald P. Haider-Markel *et al.*, "Lose, Win or Draw?  A Reexamination of Direct

Democracy & Minority Rights," 60 POL. RES. Q. 304 (2007).

　　　　Moreover, gay men and lesbians still face hate crimes and personal discrimination on a daily

basis; indeed, a recently released study found that victims reporting violence on the basis of their

sexual orientation has increased by 26% over the last two years.  Fone, *supra*, at 413; Nancy Levit, "A

Different Kind of Sameness: Beyond Formal Equality and Antisubordination Strategies in Gay Legal

Theory," 61 Ohio St. L.J. 867, 868 (2000); National Coalition of Antiviolence Programs, Hate

Violence Against Lesbian, Gay, Bisexual and Transgender People in the United States 3 (2008),

available at http://www.ncavp.org/common/document_files/Reports/2008%20HV%20

Report%20smaller%20file.pdf.  The Boy Scouts of America continues to preclude gay men from

becoming scoutmasters on grounds that they are not "morally straight."  *Boy Scouts of Am. v. Dale*,

530 U.S. 640, 651 (2000).  The U.S. military continues to discharge gay and lesbian service members

– nearly 10,000 between 1994 and 2003.  GAO, *Military Personnel: Financial Costs & Loss of*

*Critical Skills Due to DOD's Homosexual Conduct Policy Cannot Be Completely Estimated* 4 (2005).

And perhaps most gravely, young people continue to be harassed on the basis of their actual or

perceived sexual orientation.  It is therefore no surprise that studies show that 30 percent of gay,

lesbian or bisexual youth have attempted suicide (a rate two to three times higher than that of

heterosexual youth), that gay and lesbian youth are far likelier to suffer from depression and substance

abuse, or that 20 to 40% of homeless youth identify as gay, lesbian, bisexual or transgender, having often been kicked out of their homes or forced to flee from violence after coming out. S. Russell & K. Joyner, "Adolescent Sexual Orientation and Suicide Risk: Evidence from a National Study," 91 Am. J. Pub. Health 1276 (2001); Nicholas Ray, Nat'l Gay & Lesbian Task Force, *An Epidemic of Homelessness* 1–2 (2006).

## II.   THE STRUGGLE FOR MARRIAGE EQUALITY IN CALIFORNIA SHOWS PROGRESS IN ACHIEVING FORMAL RIGHTS FOLLOWED BY BACKLASH

The movement for marriage equality for lesbians and gay men reflects the same patterns of struggle, victory, and subsequent backlash that is apparent in the larger history of discrimination against lesbians and gay men. We turn now to the story of the California marriage equality movement and Proposition 8.

### A.   Domestic Partnership

In 2003, the California Legislature adopted AB 205, which expanded state-provided tangible rights to same-sex couples to make them comparable to those of married spouses, and equalized the law relating to matters such as family leave and health care plans. *See* Cal. Stats. 2003, ch. 421; Cal. Fam. Code § 297.5; Cal. Lab. Code § 233, Cal. Ins. Code §§ 3302, 3303; Cal. Health & Safety Code § 1374.58. In adopting AB 205, the Legislature recognized the "longstanding social and economic discrimination" lesbians and gay men have faced, and found that despite it many lesbian and gay couples have formed "lasting, committed and caring relationships." Cal. Stats. 2003, ch. 421, § 1(b). It found that same-sex couples "share lives together, participate in their communities together, and many raise children and care for other dependent family members together." *Id.* It found that "[e]xpanding the rights and creating responsibilities of registered domestic partners *would further California's interests in promoting family relationships* and protecting family members during life crises." *Id*. (emphasis added); *see also id.* § 1(a). It stated its intent to "reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution" and to "move closer to fulfilling the promises of inalienable rights, liberty, and equality contained in sections 1 and 7 of article 1 of the California Constitution." *Id.* §§ 1(a) & (b).) Notably,

1    it did not find that the legislation would eliminate discrimination or fulfill the Constitution's promises

2    of liberty and equality; it understood the domestic partnership scheme fell short of that goal.

3        **B.    *In re Marriage Cases***

4        On May 15, 2008, the California Supreme Court decided that California's constitutional

5    guarantees of equal protection, privacy, and due process required that California permit same-sex

6    couples full access to the officially recognized, cherished institution of civil marriage.  *In re Marriage*

7    *Cases*, 43 Cal. 4th 757.  The Court expressly found that California's family laws, which instructed the

8    State to grant recognition to the domestic partnerships of same-sex couples but not to honor them with

9    the "historic and highly respected designation marriage," risked "denying the official family

10   relationship of same-sex couples the equal dignity and respect that is a core element of the

11   constitutional right to marry." *Id.* at 830–31. Specifically, the Court held that

12       because of the long and celebrated history of the term "marriage" and the
         widespread understanding that this term describes a union unreservedly
13       approved and favored by the community, there clearly is a considerable and
         undeniable symbolic importance to this designation. Thus, it is apparent that
14       affording access to this designation exclusively to opposite-sex couples, while
         providing same-sex couples access to only a novel alternative designation,
15       realistically must be viewed as constituting significantly unequal treatment to
         same-sex couples.

16   *Id.* at 845.  The Court also recognized that "retaining the traditional definition of marriage and

17   affording same-sex couples only a separate and differently named family relationship will, as a

18   realistic matter, impose appreciable harm on same-sex couples and their children," because "denying

19   such couples access to the familiar and highly favored designation of marriage is likely to cast doubt

20   on whether the official family relationship of same-sex couples enjoys dignity equal to that of

21   opposite-sex couples."  Further, the Court observed that "particularly in view of the widespread

22   disparagement that gay individuals historically have faced, it is all the more probable that excluding

23   same-sex couples from the legal institution of marriage is likely to be viewed as reflecting an official

24   view that their committed relationships are of lesser stature than the comparable relationships of

25   opposite-sex couples."  Worse, the Court held, reserving the status of marriage for opposite sex

26   couples "may well have the effect of perpetuating a more general premise ... that gay individuals and

27   same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated

28

BRIEF OF *AMICUS CURIAE* SAN FRANCISCO          14                    n:\govli1\li2009\070779\00563430.doc
CASE NO. 09-CV-2292 VRW

differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *Id.* at

784–85.  The Court therefore struck down California's statutory language limiting marriage to one

man and one woman.  *Id.* at 857.

### C.    Proposition 8

As the *Marriage Cases* were proceeding, the petition to place Proposition 8 on the ballot was

drafted and circulated.  *Strauss v. Horton*, No. S168047, S168066, S168078, -- Cal. 4th --, 2009 WL

1444594, at *9 (Cal. May 26, 2009).  The California Secretary of State did not, however, certify that

Proposition 8 had enough valid signatures to qualify to appear on the ballot until after the Supreme

Court decided *Marriage Cases*.  *See Strauss*, 2009 WL 1444594, at *9.  It appeared on the ballot in

California on November 4, 2008.

In the months leading up to the election, Proposition 8's proponents waged a campaign

premised on moral disapproval and fear of same-sex relationships and lesbians and gay men.  For

instance, a central theme of the Yes on 8 Campaign was that Proposition 8 would protect children.

While the Official Proponents[9] avoided the explicit animus of earlier campaigns for anti-gay

initiatives, they used the lessons of these prior campaigns to turn out voters by suggesting that

allowing equal rights for gays and lesbians threatens children.  Thus, Proponents' campaign videos

stated that "some of the most profound consequences are for children," and that voters could "protect

children" by voting "Yes on 8."  Robb and Robin Wirthlin's Story, ProtectMarriage.com (2008),

available at http://www.protectmarriage.com/video/view/6 (last viewed June 17, 2009)  The specific

threat articulated by proponents was not Anita Bryant's claim that homosexuals are child molesters,

but the more coded concern that "[g]ay marriage will be taught in our schools, unless we vote yes on

Proposition 8."  Everything to do with Schools, ProtectMarriage.com (2008), available at

http://www.protectmarriage.com/video/view/7 (last viewed June 17, 2009).  This represents a shift in

tone from outright animus to moral disapproval.  See, *e.g.*, Exh. C, Rebuttal to Argument Against

Proposition 8 ("Your YES vote ensures that parents can teach their children about marriage according

---

[9] The official proponents are those who submit a draft of a petition proposing a ballot initiative or referendum to the California Attorney General.  *See* Cal. Elec. Code § 342.  In this case, ProtectMarriage.com – Yes on 8, a Project of California Renewal is the official proponent.  *See* Proposed Intervenors' Motion to Intervene, Doc. 8, at 3:23-5:2.

to their own values and beliefs without conflicting messages being forced on young children in public schools that gay marriage is okay.")

In official campaign communications, Proponents were careful not to explain the threat to children in terms of animus or even religious disapproval. But supporters of Proposition 8 got the message, and they expressed the message of animus in urging others to support Proposition 8. *See, e.g.* Exh. D at 11 ("I do NOT want my children exposed to the filthy world of homosexuality. My children learning about natural relationships (heterosexual relationships only of course) is something that they NEED to know. Finding out that two men like to insert things into where the other defecates is not something I want my children to learn. I want them to learn that there is something very wrong with the brains of g.a.y.s and that therapy and medication, just like any other brain disorder, is what is needed, not acceptance."); Exh. E at 3 ("We cannot teach our children about gays and lesbians because there cannot be a mother and a mother or a father and a father. We will be torturing and/or misleading our children."); Exh. F ("homosexuality is not normal" and "we do not accept what they do is normal, nor do we want our school district to teach that it is normal."); Exh. G ("[T]he concern is not that it will make the kids gay, it is that it will teach innocent mind that practicing homosexuality is okay when it isn't. Please can anyone tell me why Sodom and Gomorroh was destroyed for practicing homosexuality, but our nation will not be judged for the very same thing?"); Lee Decl. ¶ 7 (Yes on Proposition 8 Supporters Share Views - Santa Clarita Ca - Join the Impact, (YouTube 2008, posted October 23, 2008), available at http://www.youtube.com/watch?v=gtcZnLXhiJo&feature= PlayList&p=3BD5A4096173FD7E&index=6 (last viewed June 17, 2009) (interviewee stating that if Prop 8 does not pass her children will be "taught that this is a normal thing that's OK, and that's not what we believe. God did not intend people to be with people of the same sex.").); Exh. H at 1 (Catholic Bishop Salvatore Cordileone of San Diego stating his support for Proposition 8 because it is an "intrinsic evil" to "destroy[] the integrity of family life"). For some supporters of Proposition 8, disapproval of same-sex relationships extended beyond peaceful statements of moral or religious disapproval and became hate or violence. See, e.g., Exh. I ("A Torrance man has been charged with a felony hate crime assault for allegedly using an anti-gay marriage 'Yes on Prop. 8' lawn sign to attack a gay man wearing a 'No on 8' button … [He] allegedly used the 'Yes on Prop. 8' lawn sign to knock

1   down the victim, who was then punched and choked while [the attacker] allegedly uttered a

2   homosexual slur.");  GOD HATES FAGS!!! (YouTube 2008, posted June 16, 2008), available at

3   http://www.youtube.com/watch?v=dEQuW2v6U2o (last viewed June 17, 2009) (woman at rally

4   shouting that homosexuals are "feces-eating brute beasts," "God hates you," "Fags are worthy of

5   death," "God hates fags" and stating that gay people should be put to death because it is "the standard

6   of God;"  man at rally calling homosexuals "perverts," who have a "filthy lifestyle" that will "doom"

7   them); Exh. J at 6 ("Homosexual "marriage" is not about rights - it's about making their immorality

8   acceptable. Look back at our country's history and you'll find that in some states homosexuals received

9   the death penalty. This is not "homophobic" but a rational based upon morality.").

10      This was the context of the successful campaign to deprive lesbians and gay men of the right to

11  marriage.  We turn finally to the legal effect of Proposition 8 on California's constitutional guarantees.

12      **D.**   ***Strauss v. Horton***

13      On May 26, 2009, the California Supreme Court decided *Strauss v. Horton*, No. S168047,

14  S168066, S168078, -- Cal 4th --, 2009 WL 1444594 (Cal. May 26, 2009), which determined that

15  Proposition 8 was a valid amendment to California's Constitution.

16      As the California Supreme Court recognized in *Strauss*, Proposition 8 selectively repealed, for

17  lesbians and gay men but no one else, a portion of the California Constitution's fundamental

18  guarantees of rights. When a slim majority of California voters approved Proposition 8 on November

19  4, 2008, they *did not* overrule *Marriage Cases*.  They lacked the power to do so; only the California

20  Supreme Court has final authority to interpret language in the state Constitution.  *Strauss*, 2009 WL

21  1444594, at *67.  When the plebiscite passed Proposition 8, it did not "declare the state of the law as it

22  existed under the California Constitution at the time of the *Marriage Cases*, but rather establishe[d] a

23  new substantive state constitutional rule that took effect upon the voters' approval."  *Id.* at *6.

24      As interpreted by the California Supreme Court in *Strauss*, the measure did not purport to deny

25  same-sex families of the rights, benefits or obligations that State law confers on married couples;

26  according to *Strauss*, California's domestic partner statute continued to guarantee these rights to same-

27  sex couples who register as domestic partners.  *Strauss*, 2009 WL 1444594, at *19.  Indeed,

28

Proposition 8 was modeled on California Family Code § 308.5,[10] which was struck down by *Marriage Cases* but had previously been interpreted to deny same-sex couples the title and stature of marriage, but not the legal rights and obligations that flow from it. *Strauss*, 2009 WL 1444594, at *20. Thus the identical language adopted by the voters in the form of Proposition 8 similarly deprives lesbian and gay couples of the title and stature of marriage, but not the legal incidents that they may receive if they register as domestic partners.

But according to California's highest court, the California Constitution before Proposition 8 provided privacy, due process, and equal protection guarantees to lesbian and gay couples that entitled them not merely to the legal incidents of marriage but to the title and stature of marriage itself. *Marriage Cases*, 43 Cal. 4th at 823, 829, 855–56. After Proposition 8, those protections no longer existed, and by approving Proposition 8 the majority reshaped the equality, privacy and due process guarantees of the state Constitution. "[T]his newly adopted provision must be understood as *carving out* an exception to the preexisting scope of the privacy and due process clauses." *Strauss*, 2009 WL 1444594, at *19 (emphasis added). Thus, when the majority passed Proposition 8, it *cut away* portions of the rights guaranteed by the equal protection, privacy and due process clauses of the California Constitution – but only for a single class of people, California's lesbian and gay citizens. And as we argue below, they did so for no purpose other than to use the California Constitution to send a message of antipathy to lesbians and gay men.

## ARGUMENT

### I.  PROPOSITION 8 VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE FEDERAL CONSTITUTION BECAUSE IT STRIPPED AWAY CONSTITUTIONAL GUARANTEES FOR A SINGLE CLASS OF CITIZENS WITH NO PURPOSE OTHER THAN ANIMUS AND MORAL DISAPPROVAL

Although San Francisco agrees with Perry that Proposition 8 is subject to heightened scrutiny because it discriminates on the bases of sexual orientation and gender, and because it infringes on the fundamental right to marry, the Court need not reach these issues if it determines that Proposition 8

---

[10] Family Code § 308.5 was enacted by Proposition 22, a statutory initiative which stated that "only marriage between a man and a woman is valid or recognized in California."

violates the equal protection rights of lesbians and gay men under rational basis review.[11]  San

Francisco respectfully submits that it does.

**A.    Under the Rational Basis Test, A Law Violates The Equal Protection Clause When It Does Not Advance A Legitimate Governmental Purpose**

The Equal Protection Clause of the federal Constitution provides that no State may "deny to

any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  At

its core, "[t]he Equal Protection Clause … den[ies States] the power to legislate that different

treatment be accorded to persons placed by a statute into different classes on the basis of criteria

wholly unrelated to the objective of that statute."  *Eisenstadt v. Baird*, 405 U.S. 438, 447 (1972).

Where economic or social legislation is at issue, the judgment of the legislature "is accorded a strong

presumption of validity," and the measure is found constitutional "if there is a rational relationship

between the disparity of treatment and some legitimate governmental purpose."  *Heller v. Doe*, 509

U.S. 312, 319–20 (1993).

Proposition 8 therefore cannot survive rational basis review unless this Court can (1) identify a

legitimate state purpose for the measure, and (2) find that eliminating a state constitutional right for

one group of Californians alone is rationally related to the achievement of that purpose.  But this test is

not toothless.  Although the rational basis test gives latitude to legislators to determine what means

appropriately suit their asserted purposes, *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 528

(1959), "[t]he State may not rely on a classification whose relationship to an asserted goal is so

attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne v. Cleburne Living

Center*, 473 U.S. 432, 446 (1985).  A "marginal relation to the proffered objective" is not enough.

*Eisenstadt*, 405 U.S. at 448.

---

[11] San Francisco agrees with Perry's analysis that *Baker v. Nelson*, 409 U.S. 810 (1972), does not control this case.  *See* Plaintiffs' Motion for a Preliminary Injunction, Doc. 7, at 11 n.6.  Moreover, this case presents facts where lesbians and gay men once possessed a state constitutional right to participate fully in the institution of marriage, but the State removed that right for illegitimate reasons.  No such facts were presented in *Baker*.  *See Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Oct. Term 1972) (Exh. C to Proposed Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction, Doc. 36).  Thus, this case does not present "the precise issues presented and necessarily decided" by the Supreme Court's dismissal of the *Baker* appeal.  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (*per curiam*).

1    Moreover, the range of permissible purposes is broad but finite.  It does not include moral

2    disapproval.  *Lawrence*, 539 U.S. at 577 ("'[T]he fact that the governing majority in a State has

3    traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law

4    prohibiting the practice.'") (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J.,

5    dissenting); *id.* at 584 (O'Connor, J., concurring in the judgment) (the State cannot single out one

6    identifiable class of citizens for punishment "with moral disapproval as the only asserted state interest

7    for the law").  It does not include naked favoritism.  *Zobel v. Williams*, 457 U.S. 55, 65 (1982)

8    (justification of favoring one group of residents over another "is constitutionally unacceptable")

9    (internal quotation marks omitted).  It does not include tradition for its own sake.  *Williams v. Illinois*,

10   399 U.S. 235, 239 (1970).  And it does not include animus.  *Romer*, 517 U.S. 620; *City of Cleburne*,

11   473 U.S. at 446–47; *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).

12   In applying the rational basis test to determine whether the government's chosen means fit its

13   ends, a court is not required to close its eyes to indications that the actual purpose of a measure is not

14   the one proffered by the government but a different, invidious motivation.  "[T]he standard of

15   rationality … must find some footing in the realities of the subject addressed by the legislation."

16   *Heller*, 509 U.S. at 321.  And where courts suspect animus against a singled-out group, they take a

17   closer look at the proffered justification.[12]  *Romer*, 517 U.S. at 626-31.  "When a law exhibits … a

18   desire to harm a politically unpopular group, we have applied a more searching form of rational basis

19   review to strike down such laws under the Equal Protection Clause."  *Lawrence*, 539 U.S. at 580

20   (O'Connor, J., concurring in the judgment).

21   In order to determine the actual purpose of a statute, the court considers its "immediate

22   objective, its ultimate effect and its historical context and the conditions existing prior to its

23   enactment."  *Reitman v. Mulkey*, 387 U.S. 369, 373 (1967) (internal quotation marks omitted).  The

24   more searching form of rational basis review may include looking to actual evidence of the intent

---

[12] This closer look has been dubbed "rational basis with bite" by commentators, and the Supreme Court has at least obliquely recognized this term.  *See Fitzgerald v. Barnstable Sch. Comm.*, -- U.S. --, 129 S. Ct. 788, 797 n.2 (2009) (identifying *Reed v. Reed*, 404 U.S. 71 (1971), as a rational-basis equal protection case, noting "But see Gunther, In Search of Evolving Doctrine on a Changing Court: A Model for Newer Equal Protection, 86 Harv. L. Rev. 1, 34 (1972) (*Reed* exemplified the application of rationality review 'with bite')").

underlying the enactment. *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 195 (2003) (citing *Cleburne* as a rational basis case that looked to "decisionmakers' statements as evidence of … intent"); *City of Cleburne*, 473 U.S. at 448 (assessing whether "the record" revealed any rational basis behind a requirement that group homes for the mentally retarded but not most group homes must obtain a permit); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590-91 (9th Cir. 2008) (where needed to assess "'the realities of the subject addressed by the legislation,' [plaintiffs may be permitted] to rebut the facts underlying defendants' asserted rationale for a classification, to show that the challenged classification could not reasonably be viewed to further the asserted purpose"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 546 (9th Cir. 2004) (affirming summary judgment on equal protection grounds where "no evidence has been presented that is sufficient to create an issue of material fact as to whether there is a stigmatizing or animus based purpose to the law").[13]

Ultimately, by applying the rational basis test and "requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [courts] ensure that classifications are not *drawn for the purpose* of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633 (emphasis added).

### B. Proposition 8 Violates Equal Protection Because It Does Not Advance Any Of The Legitimate Government Purposes Its Proponents Claim

In ballot materials presented to California voters, proponents of Proposition 8 identified three possible purposes for defining marriage to exclude same-sex couples: (1) protecting marriage, (2) protecting children from being taught that gay marriage is acceptable, (3) and enacting a traditional definition of marriage.[14] Exh. C. In pleadings before this Court, Proponents suggest two new purposes, both asserted to relate to the state interest in protecting the welfare of children:

---

[13] Generally, of course, on rational basis review, the court may ascertain legislative intent from the enactment itself and there will be no need to take evidence. *See, e.g., Butler v. Apfel*, 144 F.3d 622 (9th Cir. 1998) (affirming motion to dismiss equal protection claim related to government benefits on the pleadings). But where there is a specific allegation of improper motive or pretext, with sufficient factual content to survive a motion to dismiss, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57, 570 (2007), then the Ninth Circuit has recognized that evidence may be required to resolve any factual dispute concerning purpose. *See, e.g., Tucson Woman's Clinic*, 359 F.3d at 546.

[14] Proponents also argued that Proposition 8 "*overturns the outrageous decision of four activist Supreme Court judges …*" Exh. C (emphasis in original). Heated rhetoric aside, this is simply an (incorrect) description of the effect of Proposition 8 and not an independent purpose.

(4) encouraging children to be raised by their biological parents, and (5) channeling heterosexual sexual activity so that procreation occurs in the context of marriage.  Proposed Intervenors' Opposition to Plaintiffs' Motion for Preliminary Injunction ("Int. Opp."), Doc. 36, at 12:2–7.

While proponents have struggled mightily to find a purpose that will survive rational basis review, none of purposes they propose satisfy the dual requirement of advancing a legitimate state end *and* rationally relating to the classification drawn by Proposition 8.  Promoting marriage and protecting children are legitimate state ends, and noble goals, but excluding same-sex couples from marriage does nothing to advance these goals.  By contrast, preserving a traditional definition of marriage may be a rational reason for excluding same-sex couples from the institution of marriage, but preserving tradition is not a legitimate state end in equal protection jurisprudence, as discussed *infra* in Argument Section I.C.  Ultimately, none of the proposed purposes for Proposition 8 survives "[t]he search for the link between classification and objective [that] gives substance to the Equal Protection Clause."  *Romer*, 517 U.S. at 632.

### 1. Eliminating the Right of Same-Sex Couples to Marry Does Not Protect Marriage

Protecting or promoting marriage is a legitimate state purpose, but classifying couples on the basis of sexual orientation is not rationally related to achieving this goal.  Proposition 8 purports to "protect marriage as an essential institution of society," Exh. C (Argument in Favor of Proposition 8), by eliminating the right of same-sex couples to marry.  But the "relationship to [this] asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.  Proposition 8 eliminates the right of same-sex couples to marry but does nothing to protect marriage.

An inquiry into the "facts and … circumstances" of Proposition 8's passage, *Reitman*, 387 U.S. at 378, shows that its immediate objective was to abrogate the holding of the California Supreme Court that same-sex couples had a right to marry under the state constitution.  *See, e.g.,* Exh. C (Argument in Favor of Proposition 8).  Yet *Marriage Cases* had not changed marriage but rather made it available to same-sex couples.  It did not prohibit or discourage marriage between opposite-sex couples.  Nor did it reduce or otherwise alter the general rights, privileges and duties of marriage.  *Id.* at 854 ("permitting same-sex couples access to the designation of marriage will not alter the

substantive nature of the legal institution of marriage").  As the Court explained, its decision had no

affect at all on the marriage rights of opposite-sex couples:

> [O]ur recognition that the constitutional right to marry applies to same-sex couples as well as to opposite-sex couples does not diminish any other person's constitutional rights. Opposite-sex couples will continue to enjoy precisely the same constitutional rights they traditionally have possessed, unimpaired by our recognition that this basic civil right is applicable, as well, to gay individuals and same-sex couples.

*Id.* at 825.

The narrow scope of the holding in *Marriage Cases* undermines Proponents' arguments that

the purpose of Proposition 8 was to protect marriage.  The decision did not change the marriage rights

of opposite-sex couples at all, and it altered the marriage rights of same-sex couples only by requiring

the State to confer on their unions the title of "marriage."  And so one must ask what how denying

lesbian and gay couples the name "marriage" even as the state-conferred incidents of marriage are

made available to them could conceivably protect marriage as an institution or the marriages of

opposite-sex couples.  The answer is almost self-evident.

As the California Supreme Court recognized, the designation "marriage" is "familiar and

highly favored," *Marriage Cases*, 43 Cal. 4th at 704, has a "long and celebrated history," *id*. at 845,

and there is "widespread understanding" that "it describes a union that is universally approved and

favored by the community." *Id*.  Proposition 8 denied that highly favored social status to same-sex

couples, sending the message that they are less worthy of respect and dignity than opposite-sex

relationships.  The idea that denying respect and dignity to same-sex relationships "protects marriage"

only makes sense if one believes that lesbians and gay men and the same-sex relationships that define

them are so base or unworthy that their association with marriage will tarnish and defame the

institution.  Although couched in terms that sound noble and benign, the "protect marriage" argument

is at bottom a reflection of antipathy and moral disapproval.  And, as discussed in Section I.C.2, *infra*,

sending the message of moral disapproval of and animus toward a group is not a legitimate state

purpose.

2.    **Eliminating the Right of Same-Sex Couples to Marry Does Not Protect Children**

Before the voters of California and before this Court, Proponents have presented various arguments in support of the assertion that eliminating the right of same-sex couples to marry would protect children. These arguments are addressed and considered in turn below. As explained below, none of these asserted purposes advances a legitimate state interest in protecting the welfare of children – but taken together, they demonstrate that Proponents learned well the lessons of Anita Bryant and the campaigns that followed her model: demonizing lesbians and gay men as a threat to children is an effective means to pass anti-gay initiatives.

a.    **Proposition 8 Does Not Protect Children in Public Schools**

A key campaign argument made in support of Proposition 8 was the claim that it "protects our children from being taught in public schools that 'same-sex marriage' is the same as traditional marriage." Exh. C (Argument in Favor of Proposition 8). The proponents of Proposition 8 ran commercials on radio and television claiming that if Proposition 8 did not pass, schools would be forced to "teach homosexuality." *See* Exh. F to Lee Decl. (Everything To Do With Schools, ProtectMarriage.com (2008), available at http: //www.protectmarriage.com/video/view/7 (last viewed June 17, 2009); Why Proposition 8, ProtectMarriage.com, available at http://www.protectmarriage.com/about/why (last viewed June 17, 2009) ("schools will now be required to teach students that gay marriage is the same as traditional marriage, starting with kindergartners"); Questions & Answers About Proposition 8, ProtectMarriage.com, available at http://protectmarriage.com/files/faq.pdf (last visited June 17, 2009) ("[Proposition 8] protects our children from being taught in public schools that "same-sex marriage" is the same as traditional marriage.").) Yet the fear that same-sex couples' marriages might be discussed in schools does not transform moral disapproval into a legitimate state purpose. While parents have the right to educate their children according to their beliefs, *see, e.g., Pierce v. Society of Sisters*, 268 U.S. 510 (1925), they may not demand that the state educate children according to their prejudices. *Cf. Lawrence*, 539 U.S. at 571 (answering no to the question "whether the majority may use the power of the state to enforce these views on the whole society through operation of the criminal law").

Proponents do not explain how it would threaten children's well-being to teach them – in the context of otherwise sanctioned discussions of marriage – that it is "okay" for same-sex couples to marry.  To the contrary, evidence proffered on this motion by Proponents themselves suggests that the real threat to children in schools results not from teaching children to value equality, but from children's ignorance concerning people who are different from them:

> Young people who identify as lesbian, gay, or bisexual may be more likely to face certain problems, *including being bullied and having negative experiences in school*.  These experiences are associated with negative outcomes, such as suicidal thoughts, and high-risk activities, such as unprotected sex and alcohol and drug use.  On the other hand, many lesbian, gay, and bisexual youths appear to experience no greater level of health or mental health risks.  Where problems occur, they are closely associated with experiences of bias and discrimination in their environments.  Support from important people in the teen's life can provide a very helpful counterpart to bias and discrimination.  Support in the family, *at school*, and in the broader society helps to reduce risk and encourage healthy development. . . . All young people who come out may experience *bias, discrimination, or even violence in their schools*, social groups, work places, and faith communities.  Supportive families, friends, *and schools* are important buffers against the negative impacts of these experiences.

Exh. F to Int. Opp. Ex. (American Psychological Association, "For a Better Understanding of Sexual Orientation and Homosexuality," at 4 (2008)) (emphasis added).

Ultimately, the attempt to prohibit any public school from teaching that same-sex couples may marry does not advance a legitimate state purpose in protecting the welfare of children.  Instead, it supports the illegitimate purpose of  making the State an agent of private discrimination.  *See Reitman*, 387 U.S. at 378; *Romer*, 517 U.S. at 635.

**b.    Proposition 8 Does Not Protect Children by Promoting Biological Parenting**

Perhaps recognizing the legal infirmities in the "public schools" argument presented to the voters, in briefing before this Court Proponents now offer two new arguments that purport to explain how Proposition 8 protects children.  In the first of these arguments, Proponents assert that it is best for children to be raised by two biological parents, and that this provides a rational basis for defining marriage to exclude same-sex couples.  This rationale is belied by the fact that marriage is not and never has been limited to those who can or intend to have children of their own; thus, the old, the infirm, the infertile and the imprisoned are all permitted to marry without limitation.  Further, Proponents make no effort to explain how limiting marriage to heterosexual couples will encourage those who are

able to reproduce to do so more often or discourage those who are unable from having and raising children not biologically connected to both.  The biological parenting rationale is just not credible.  See *Marriage Cases*, 43 Cal. 4th at 825–26.

But the Court need look no further than *the very evidence that Proponents themselves present* to understand that this asserted purpose is so attenuated as to render Proposition 8 arbitrary.  Proponents cite a 2002 research brief finding that children raised by stepparents have lower levels of well-being than those raised by biological parents.  *See* Int. Opp. at 12.  But this 2002 research brief only considers subsets of heterosexual couples (married, remarried, divorced, cohabiting) and does not evaluate the relative well-being of children raised by same-sex couples or even by opposite-sex couples who adopt.  *See* Exh. D to Int. Opp. (Kristin Anderson Moore et al., "Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It?", *Child Trends Research Brief* (June 2002).)  And in fact, the American Psychological Association brochure that Proponents cite for other purposes actually rebuts Proponents' misguided assertions that children of same-sex couples have lower levels of well-being.  *See* Exh. F to Int. Opp. (American Psychological Association, *supra*, at 5.)  It states,

> In summary, social science has shown that the concerns often raised about the children of lesbian and gay parents – *concerns that are generally grounded in prejudice against and stereotypes about gay people* – are unfounded.  Overall, the research indicates that the children of lesbian and gay parents do not differ markedly from the children of heterosexual parents in their development, adjustment, or overall well-being.

*Id.* (emphasis added).  If the evidence that Proponents cherry-picked to present to this Court so undermines the link between the legitimate purpose they embrace and the means the voters chose to achieve it, this only serves to demonstrate that the purposes Proponents offer are pretextual.

Proponents also fail to cite subsequent research sponsored by the same organization that issued the Moore paper Proponents cite.  In fact, a 2007 research brief issued by the same organization but not discussed by Proponents addresses these issues and makes explicit that the benefits to children of being raised by married parents extend to *adoptive* parents.  Exh. B (Lisa Mincieli, *et al.*, "The Relationship Context of Births Outside Marriage: The Rise of Cohabitation," *Child Trends Research Brief*, at endnote a (May 2007)).  This more recent research also emphasizes that "children born into

cohabiting unions face greater risks than children born into marital unions." *Id.* The overarching finding of this body of research is that children are better off when they are raised by "two married biological or adoptive parents who are in a low-conflict relationship." *Id.*[15] It would be irrational in the extreme to conclude that Proposition 8 advances this purpose by denying the children of same-sex couples the benefit of being raised by married parents – indeed, the Mincieli paper suggests that Proposition 8 harms children of same-sex couples of relegating them to a household of cohabiting parents.

When carefully examined, Proponents' emphasis on biological parenting turns out to be nothing more than a variation on the now discredited notion that lesbians and gay men are less suitable parents than their heterosexual counterparts. "Empirical studies comparing children raised by sexual minority parents have not found reliable disparities in mental health or social adjustment." Herek, *Legal Recognition of Same-Sex Relationships in the United States: A Social Science Perspective*, 61 Am. Psychol. 607, 611 (2006). Furthermore, this notion is inconsistent with California law, which treats lesbians and gay men as equally capable foster parents and adoptive parents. Cal. Welf. & Inst. Code §§ 16001.9(a)(23), 16013; Cal. Stats. 2003, ch. 331; Cal. Fam. Code §§ 8600, 9000(b). And in fact, as argued *infra* in Section I.C.2, Proponents' reliance on discredited ideas about what is necessary to protect children only recalls the fear-mongering of the Anita Bryant campaigns and belies Proponents' proffered purposes.

### c.   Proposition 8 Does Not Encourage "Responsible Procreation"

Finally, Proponents argue that an asserted state interest in "responsible procreation" provides a rational basis for defining marriage as the union of a man and a woman. As proponents describe it, responsible procreation requires directing the sexual impulses of heterosexual couples towards marriage so that unplanned children are not born out of wedlock. While this may be a legitimate state interest, it fails to provide a rational basis for Proposition 8. At most, an interest in responsible

---

[15] This brief states, however, that "rigorous research is as yet unavailable on the proportion of nonmarital births that occur to same-sex couples or the implications of these family structures for children." Exh. B (Mincieli *et al., supra,* at endnote a). *But see* American Psychological Association, *supra,* at 5; Gregory M. Herek, *Legal Recognition of Same-Sex Relationships in the United States: A Social Science Perspective*, 61 Am. Psychol. 607, 611 (2006).

procreation is a reason to define marriage to *include* the union of a man and a woman.  It is not a reason to define marriage to *exclude* the union of a same-sex couple.  Put simply, there is no rational relationship between channeling the sexual impulses of heterosexual couples and eliminating the right to marry of same-sex couples.

Nor is Proposition 8 a valid exercise of the legislative prerogative, under rational basis review, to "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955)).  Proposition 8 was not enacted as part of a step-by-step program "that only partially ameliorate[s] a perceived evil and defer[s] complete elimination of the evil to future regulations."  *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), or a general "reform that benefits some more than others."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 39 (U.S. 1973).  Furthermore, if the intent of Proposition 8 was to address unplanned pregnancies, or to otherwise affect the sexual conduct of heterosexual couples, it targets the wrong group.  "This is not, therefore, a case where the class defined in the law is that from which 'the evil mainly is to be feared.'" *McLaughlin v. Florida*, 379 U.S. 184, 194 (1964) (quoting *Patsone v. Pennsylvania*, 232 U.S. 138, 144 (1914)); *see also Levy v. Louisiana*, 391 U.S. 68, 72 (1968) (justification for a statutory exclusion must relate to some characteristic of the excluded group).  Thus, the Legislature's prerogative to act incrementally does not and cannot provide a rational basis for the marriage exclusion.

### C.    Proposition 8 Violates the Equal Protection Clause Because Its True Purposes Are Not Legitimate Governmental Purposes

While Proposition 8 is ill-suited to advance the state purposes that Proponents now claim for it, it is exceedingly well suited to advance its real aim of harming gays and lesbians and expressing moral disapproval of them as a class.  This section argues that the only true purpose of Proposition 8 avowed by its proponents, upholding tradition, is not a legitimate purpose at all, and that the other actual purposes of Proposition 8, to express hostility and moral disapproval against lesbians and gay men and their most cherished relationships, are similarly not legitimate as motivators for State action.  This section concludes with the obvious constitutional consequence of Proposition 8's actual purposes:

because none of these purposes is a legitimate aim for government to seek, this Court should grant the preliminary injunction and enjoin enforcement of Proposition 8.

### 1. Enacting a Traditional Definition of Marriage Is Not a Legitimate State Interest

Proponents' ballot argument stated that Proposition 8 "*restores the definition of marriage* to what the vast majority of California voters already approved and human history has understood marriage to be." Exh. C (Argument in Favor of Proposition 8) (emphasis in original). Proponents now argue that this is the "actual purpose" of Proposition 8. *See* Int. Opp. at 18. But a tradition of exclusion is inimical to equal protection and preserving that tradition is not a legitimate state purpose. The Supreme Court has held that "neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack." *Williams v. Illinois*, 399 U.S. 235, 239 (1970). And tradition is especially ill-suited to justify discrimination challenged under the Equal Protection Clause:

> That clause is emphatically not an effort to protect traditionally held values against novel or short-term deviations. The clause is not backward looking at all; it was consciously designed to eliminate practices that existed at the time of ratification and that were expected to endure. The function of the Equal Protection Clause is to protect disadvantaged groups against the effects of past and present discrimination by political majorities. It is not rooted in common law or status quo baselines or in Anglo-American conventions. The baseline is instead a principle of equality that operates as a criticism of existing practice. The clause does not safeguard traditions; it protects against traditions, however long standing and deeply rooted.

*Lawrence v. Texas*, 41 S.W.3d 349, 377 n.12 (Tx. Ct. App. 2001) (Anderson, J., dissenting) (reversed, 539 U.S. 558). Thus, the fact that a practice was traditionally accepted does not justify its continuance in the face of an equal protection challenge. *See J.E.B. v. Alabama*, 511 U.S. 127, 142 n.15 (1994) ("We do not dispute that this Court long has tolerated the discriminatory use of peremptory challenges, but this is not a reason to continue to do so. Many of 'our people's traditions,' … such as *de jure* segregation and the total exclusion of women from juries, are now unconstitutional even though they once coexisted with the Equal Protection Clause."); *see also Levy v. Louisiana*, 391 U.S. 68, 71, 72 (1968) (using the rational basis test to evaluate a statute that barred illegitimate children from suing for the wrongful death of their mother and holding that the statute violated the Equal Protection Clause "even though it had history and tradition on its side").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2. Expressing Moral Disapproval and Animus Against Lesbians and Gay Men and Their Familial Relationships, an Actual Purpose of Proposition 8, Is Not a Legitimate State Interest

The facts available to this Court on this preliminary injunction motion are ample to demonstrate that moral disapproval and animus are motivating purposes behind Proposition 8.[16] The arguments made by Proponents that the failure to pass Proposition 8 would have "profound consequences" for children and would result in messages about gay marriage being "*forced on young children* in public schools," Video, "Robb and Robin Wirthlin's Story," (Oct. 20, 2008), available at http://www.protectmarriage.com/video/view/6 (last visited June 11, 2009); Exh. C, Rebuttal to Argument Against Proposition 8 (emphasis added), are directly linked to the Anita Bryant ballot campaigns of the 1970s and 80s, which were fueled by the demonization of lesbians and gay men, and particularly lesbian and gay teachers, as child molesters. Similarly, Proponents' claim that passing Proposition 8 would overturn the acts of "activist judges," Exh. B, bears a close relationship to the "no special rights" theme that anti-gay initiative campaigns adopted in the 1990s after the public could no longer be manipulated through the child-molester bogeyman. As described in the Statement of Facts, *supra*, the sexual predator and "no special rights" themes were frequently invoked in the context of campaigns to roll back antidiscrimination protections passed by legislatures. In this case, they are transmuted into arguments against marriage equality. Dozens of incidents that occurred during the campaign reflect the animus supporters of Proposition 8 harbored toward lesbians and gay men. *See, e.g., supra,* at 15–16. Moreover, Proposition 8 Proponents' attorney Andrew Pugno has publicly stated that the purpose of Proposition 22, the predecessor statute that Proposition 8 mirrors in the form of a constitutional amendment, was to express moral disapproval of lesbians and gay men generally, and to

---

[16] In discussing animus-based enactments, the Supreme Court has stated that "if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534. But "animus" need not mean outright hatred. In construing the term "animus" in a statute, the Ninth Circuit has relied on a definition of "[a] mental impulse, actuating feeling, disposition in a particular direction, animating spirit or temper, usually of a hostile character." *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000).

Indeed, the history of discrimination against lesbians and gay men, offered above, illustrates that discriminatory impulses take different and more restrained forms over time. But because even moral disapproval of an identifiable class of people is a sufficiently hostile feeling to be an impermissible governmental purpose, the Court need not formulate a precise definition of animus here.

1    ensure that "people who have moral objections to the idea of same-sex marriage [are not ] compelled

2    to participate through their government in sanctioning and promoting a kind of lifestyle *they don't feel*

3    *comfortable with*."[17]

4         If the message about lesbians and gay men, and the special rights they are purportedly seeking,

5    is the same no matter what the precise issue on the ballot, then what does that message really convey?

6    The Supreme Court offered an answer based on a similar set of facts in *Romer v. Evans*, 517 U.S. 620

7    (1996).  In *Romer*, the Court considered Amendment 2, an initiative that amended the Colorado

8    Constitution to prohibit any governmental action that protected lesbians and gay men from

9    discrimination.  *Id.* at 624.  The State justified Amendment 2 because it purportedly "[did] no more

10   than deny homosexuals *special rights*."  *Id.* at 626 (emphasis added).  Moreover, the *Romer* Court was

11   presented with extensive evidence of the same kind of fear-based campaign that has long characterized

12   anti-gay initiatives.  Amendment 2's proponent, for instance, asserted that "gay men and lesbians are

13   'morally depraved' persons who undermine 'traditional family values and structures.'"  Respondents'

14   Brief, *Romer v. Evans*, No. 94-1039, 1995 WL 417786, at *7 (quoting record exhibits [Pl.Ex. 11 at

15   32–33, R.6:55; Pl.Ex. 12 at 55, R.6:56]).  Proponents' campaign materials also contended that

16   "'[s]exual molestation of children is a large part of many homosexuals' lifestyle-part of the very

17   lifestyle 'gay-rights' activists want government to give special class, ethnic status!'"  *Id.* (quoting

18   record exhibits [Df.Ex. W at 2; R.15:735]).

19        The Supreme Court disagreed with the State's assertion that Amendment 2 merely withheld

20   "special rights" from lesbians and gay men, instead finding that the initiative worked a far reaching

21   change in the legal status of lesbians and gay men, leaving them (alone among groups of Colorado's

22   citizens) without the ability to resort to the political process to seek protection from discrimination by

23   public or private actors.  *Id.* at 627–31.  The Supreme Court also held that the singular nature of

24   Amendment 2 "raise[d] the inevitable inference that the disadvantage imposed is born of animosity

25   toward the class of persons affected."  *Id.* at 634.  The Court stated,

26

27        [17] Oral statement of Anthony Pugno on the television program "The Wedding Zinger: The
     Definition of Marriage," a segment of *Uncommon Knowledge*, produced by the Hoover Institution in
28   conjunction with KTEH-TV, San Jose.  Filmed March 28, 2008 (emphasis added).

> The breadth of the amendment is so far removed from [the] particular justifications [offered by the State] that we find it impossible to credit them. We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective.  It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit. …
>
> We must conclude that Amendment 2 classifies homosexuals *not to further a proper legislative end but to make them unequal to everyone else*.  This Colorado cannot do.

*Id.* at 635 (emphasis added).

In the present case, too, Proposition 8 sets lesbians and gay men apart from the institution of marriage "not to further a proper legislative end but to make them unequal to everyone else": to preserve the traditional institution of marriage precisely by excluding them from it.  The official ballot materials for Proposition 8, as well as the arguments of its proponents, played on the fears and resentments of heterosexual voters (who are by far the majority of voters in California, of course), and were but a subtler version of the decades-old fear tactics deployed by campaigners who morally disapprove of same-sex relationships.  Finally, all of the purposes for the law articulated by the Proponents, in the campaign and in this Court, are lacking even on the most cursory scrutiny.  In short, Proposition 8 was "a voter initiative clearly motivated at least in part by group bias." *Strauss*, 2009 WL 1444594, at *68 (Werdegar, J., concurring).  Just as "mere negative attitudes," "fear" and "irrational prejudice" on the part of a majority were insufficient to justify the zoning law that targeted a group home for the mentally retarded in *Cleburne*, the same kinds of considerations at the foundation of Proposition 8 cannot justify its singling out of lesbians and gay men for disfavorable treatment here.  Because it advances only impermissible governmental interests, Proposition 8 is unconstitutional, and this Court should enjoin its enforcement.

### D.   Proposition 8 Is Also Analogous to *Romer's* Amendment 2 Because It Selectively Deprives Lesbians and Gay Men, and Them Alone, of Constitutional Rights

The Proponents argue in their opposition to the preliminary injunction that Proposition 8 differs from Amendment 2 because it does not work the kind of far-reaching changes to political rights that Amendment 2 enacted.  In part, this argument is wrong because Proposition 8 did work a change to political rights: unlike all other groups in California, lesbians and gay men can no longer petition their legislators to modify their marriage rights by statute. *Cf. Washington v. Seattle Sch. Dist. No. 1,*

1   458 U.S. 457, 470–80 (1982) (finding equal protection violation where local government enacted law

2   that imposed unique political burdens on minorities); *Hunter v. Erickson*, 393 U.S. 385, 390–93 (1969)

3   (same).  Marriage rights have been placed on a higher shelf for lesbians and gay men, who therefore

4   have correspondingly diminished options for using the political process.  More importantly,

5   Proponents' argument is based on a misunderstanding of the effect of Proposition 8.  It did not overrule

6   *Marriage Cases*: as noted above, it could not, because the California Supreme Court has the final

7   authority to interpret an existing provision of the California Constitution.  What Proposition 8 did

8   instead, however, was equally disturbing: it repealed a portion of the State's constitutional guarantees

9   to equal protection, due process, and privacy to *a select class of its citizens*.  *Strauss*, 2009 WL

10   1444594, at *19 ("[T]his newly adopted provision must be understood as *carving out* an exception to

11   the preexisting scope of the privacy and due process clauses.") (emphasis added).  For Proponents to

12   argue that the excision of certain state constitutional rights from an identifiable class of people is not a

13   constitutionally fraught event is simply unpersuasive.

### E.   The Availability of Domestic Partnership, and the Recentness of the California Supreme Court's Acknowledgment of Same-Sex Couples' Right to Marry, Do Not Neutralize the Equal Protection Violation

16   Proponents may also argue that the fact that Proposition 8 deprives lesbians and gay men of

17   equal protection, due process, and privacy rights that all other Californians enjoy does not matter

18   because Proposition 8 had sufficient signatures to appear on the ballot before *Marriage Cases* was

19   decided, because Proposition 8 was adopted shortly after the California Supreme Court recognized a

20   right to marriage, or because California's domestic partnership laws establish a separate but equal

21   regime for same-sex couples in California.  These arguments are easily rebutted.

22   First, the petition to place Proposition 8 on the ballot was drafted and circulated in anticipation

23   of the Supreme Court's decision in the *Marriage Cases*, 43 Cal.4th 757, and proponents characterized

24   the measure as a necessary response to the California Supreme Court's holding that same-sex couples

25   had the right to marry.  *See* Argument in Favor of Proposition 8 ("*It overturns the outrageous decision*

26   *of four activist Supreme Court judges …*") (emphasis in original); *see also* Video, Whether You Like

27   It Or Not, (September 29, 2008) (available at http://www.protectmarriage.com/video/view/2)

28

1   (campaign ad concerning activist judges).  It begs credulity for Proponents now to deny the

2   characterization of Proposition 8 that they used to such great effect during the campaign.

3        Second, the argument that it is constitutionally permissible to eliminate rights in order to

4   restore the status quo was made and rejected in *Romer*: the State argued that "Amendment 2 simply

5   restores and maintains the status quo ante regarding special protections for homosexuals and

6   bisexuals," Petitioners' Reply Brief, *Romer v. Evans*, No. 94-1039, 1995 WL 466395 (Aug. 4, 1995),

7   at *8.  The Court did not find the denial of these recently enacted "special rights" to be trivial.  The

8   argument is even less persuasive here, where Proposition 8 eliminated constitutional rights rather than

9   mere statutory rights.  This targeted removal of constitutional rights conflicts with "the history of our

10  constitution, [which] is the story of the extension of constitutional rights and protections to people

11  once ignored or excluded."  *United States v. Virginia*, 518 U.S. 515, 557 (1996).

12       Finally, the Proponents may argue that the availability of domestic partnerships to same-sex

13  couples, and the intact holding of *Marriage Cases* that same-sex couples have privacy, equal

14  protection, and due process rights to official recognition of their intimate relationships, *Marriage*

15  *Cases*, 43 Cal. 4th at 829, neutralize the constitutional sting of Proposition 8.  But this argument rests

16  on the false premise that domestic partnership can ever be the equivalent of the venerable institution of

17  marriage.  The California Supreme Court recognized that the domestic partnership designation can

18  never provide the dignity and recognition that marriage entails in the *Marriage Cases*, when it held

19  that reserving the designation "marriage" for opposite-sex couples risked "denying the official family

20  relationship of same-sex couples the equal dignity and respect that is a core element of the

21  constitutional right to marry."  *Id.* at 830–31.  Any regime that relegates a class of people to an inferior

22  institution without a legitimate reason, especially where it does so out of prejudice, commits the

23  separate-but-equal fallacy of *Plessy v. Ferguson*, 163 U.S. 537 (1896), which held that laws enforcing

24  the racial segregation of train cars did not deny equal protection to blacks so long as there is legal

25  equality between the train cars.  In *Brown v. Board of Education*, 347 U.S. 483 (1954), the Supreme

26  Court recognized the *Plessy* fallacy and held that "officially segregated public facilities" are not equal,

27  in part because the very existence of separate facilities "denot[es] the inferiority" of the minority

28  group.  *Id.* at 494.  In sum, Proposition 8 was intended to, and did, eliminate the constitutional rights of

a historically disfavored minority.  In so doing, it communicated a unmistakable message of inferiority to lesbians and gay men, their families, and society at large.

## II.   IF THERE IS INSUFFICIENT EVIDENCE TO ESTABLISH THAT PROPOSITION 8 VIOLATES EQUAL PROTECTION, THE COURT SHOULD ENCOURAGE FURTHER FACTUAL DEVELOPMENT TO DETERMINE WHETHER HEIGHTENED SCRUTINY APPLIES

If the court determines that Proposition 8 survives rational basis review, and it is not persuaded that Plaintiffs' arguments are sufficient to grant a preliminary injunction, it should deny the injunction on the narrow ground that facts must be developed to determine whether heightened scrutiny applies.

In determining whether a government classification is "suspect," and therefore subject to heightened scrutiny for the purposes of equal protection review, courts look at the following factors: (1) a history of purposeful discrimination against the class, (2) whether the class is defined by an immutable trait, and (3) political powerlessness of the class.  *See Bowen v. Gilliard*, 483 U.S. 587, 602–603 (1987).  Courts also ask whether there is relationship between the trait used to define the class and an individual's ability to contribute to society.  *See Cleburne*, 473 U.S. at 440–41.  As Plaintiffs explain, *see* Motion for PI at 13–15, cases considering these factors in isolation have determined that sexual orientation satisfies each factor.  But no federal court has ever had the benefit of a full factual record that would permit it to undertake a considered evaluation of these factors and determine whether historical, scientific, and sociological evidence demonstrates that sexual orientation must be viewed as a suspect classification.

Amici respectfully suggest that further factual development would show that historical discrimination against lesbians and gay men is comparable to discrimination against other suspect classes; that the best available scientific evidence establishes that homosexuality is a trait that has existed in every time period and culture over history and that sexual orientation cannot readily be changed, if at all, and attempting to change it causes serious harm; that there is no relationship between sexual orientation and an individual's ability to be a productive member of society; and that despite great advances, gays and lesbians lack the political power to ensure protection of their rights through the normal political process.  Further, an opportunity for factual development would allow a

1    more complete development of a record regarding the antipathy toward lesbians and gay men that is at

2    the foundation of Proposition 8.

3                                    **CONCLUSION**

4           For the foregoing reasons, *amicus curiae* City and County of San Francisco supports Plaintiffs'

5    motion for preliminary injunction and, in the event the Court denies the injunction, encourages the

6    Court to permit further development of a factual record in this case.

7    Dated:  June 18, 2009                    DENNIS J. HERRERA
                                              City Attorney
8                                             THERESE M. STEWART
                                              Chief Deputy City Attorney
9                                             DANNY CHOU
                                              Chief of Complex & Special Litigation
10                                            CHRISTINE VAN AKEN
                                              MOLLIE M. LEE
11                                            Deputy City Attorneys

12

13                                    By:_____/s/_____
                                              THERESE M. STEWART
14
                                              Attorneys for *Amicus Curiae*
15                                            CITY AND COUNTY OF SAN FRANCISCO

16

17

18

19

20

21

22

23

24

25

26

27

28