JAMES J. BROSNAHAN (CA SBN 34555)
JBrosnahan@mofo.com
STUART C. PLUNKETT (CA SBN 187971)
SPlunkett@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

TOBIAS BARRINGTON WOLFF (*Pro Hac Vice*
Application Pending)
UNIVERSITY OF PENNSYLVANIA SCHOOL OF LAW
3400 Chestnut Street
Philadelphia, Pennsylvania  19104
Telephone: 215.898.7471
Facsimile: 215.898.9606

Attorneys for *Amicus Curiae*
EQUALITY CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KRISTIN M. PERRY et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER et al.,<br><br>Defendants. | Case No. 09-CV-2292 VRW<br><br>**BRIEF OF *AMICUS CURIAE*<br>EQUALITY CALIFORNIA**<br><br>Date:      July 2, 2009<br>Time:     10:00 a.m.<br>Place:    Ctrm. 6, 17th Floor |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................ii

STATEMENT OF INTEREST OF *AMICUS CURIAE* ................................................1

INTRODUCTION ............................................................................................................2

ARGUMENT ....................................................................................................................3

I.      PROPOSITION 8 CREATES A CLASSIFICATION FOR ITS
        OWN SAKE THAT DEPRIVES GAY, LESBIAN, AND
        BISEXUAL CALIFORNIANS OF EXISTING RIGHTS AND IS
        UNSUPPORTED BY ANY LEGITIMATE PURPOSE.................................3

        A.      The Only Purpose of Proposition 8 Is to Relegate Same-Sex
                Couples to Second-Class Status.........................................................4

        B.      Proposition 8 Has Deprived Gay, Lesbian, and Bisexual
                Citizens of a Right that Occupies the Highest Status Under
                California Law ..................................................................................10

CONCLUSION ...............................................................................................................15

1

2

## <u>TABLE OF AUTHORITIES</u>

3                                                                                    **Page(s)**

**CASES**

4

5        *Abrams v. United States*,
         250 U.S. 616 (1919) ...................................................................................15

6        *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*,
7        488 U.S. 336 (1989) .....................................................................................7

8        *FCC v. Beach Commc'ns, Inc.*,
         508 U.S. 307 (1993) .....................................................................................8

9
         *Heller v. Doe*,
10       509 U.S. 312 (1993) .....................................................................................8

11       *In re Marriage Cases*,
12       183 P.3d 384 (Cal. 2008) ............................................................ 6, 12, 14, 15

13       *In re Marriage Cases*,
         49 Cal. Rptr. 3d 675 (Cal. Ct. App. 2006),
14       *rev'd on other grounds*, 183 P.3d 384 (Cal. 2008) .........................................7, 8

15       *Koebke v. Bernardo Heights Country Club*,
         115 P.3d 1212 (Cal. 2005) .............................................................................5
16

17       *Lawrence v. Texas*,
         539 U.S. 558 (2003) ...........................................................................3, 4, 16

18
         *Loving v. Virginia*,
19       388 U.S. 1 (1967) ......................................................................................16

20       *McCabe v. Atchison, Topeka & Santa Fe Ry. Co.*,
         235 U.S. 151 (1914) ...................................................................................12
21

22       *McCulloch v. Maryland*,
         17 U.S. 316 (1819) .....................................................................................16

23       *Missouri ex rel. Gaines v. Canada*,
24       305 U.S. 337 (1938) ...................................................................................12

25       *Pedersen v. Burton*,
         400 F. Supp. 960 (D.D.C. 1975) .....................................................................8
26

27       *Plyler v. Doe*,
         457 U.S. 202 (1982) ...........................................................................*passim*

28

*Reitman v. Mulkey,*
   387 U.S. 369 (1967) ...................................................................................................13

*Romer v. Evans,*
   517 U.S. 620 (1996) ...................................................................................3, 9, 10, 17

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
   411 U.S. 1 (1973) .......................................................................................................14

*Servin-Espinoza v. Ashcroft,*
   309 F.3d 1193 (9th Cir. 2002) .....................................................................................7

*Strauss v. Horton,*
   207 P.3d 48 (Cal. 2009)......................................................................................*passim*

*Sweatt v. Painter,*
   339 U.S. 629 (1950) .............................................................................................3, 17

*Watchtower Bible & Tract Soc'y of N.Y. v. Stratton,*
   536 U.S. 150 (2002) .....................................................................................................8

**STATUTES**

Cal. Fam. Code
   § 297.5(a)......................................................................................................................5

**OTHER AUTHORITIES**

Assemb. 849, 2005–2006 Leg., Reg. Sess. (Cal. 2005)..................................................6

Assemb. 102, 2007–2008 Leg., Reg. Sess. (Cal. 2007).................................................6

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Equality California is a state-wide advocacy group protecting the needs and interests of same-sex couples and their children in California.  It is also California's largest lesbian, gay, bisexual, and transgender civil rights organization, with tens of thousands of members throughout the state.  Many Equality California members are in committed same-sex relationships and wish to marry.  One of Equality California's primary missions is to preserve the right of all Californians to participate equally in the state institution of civil marriage without regard for the sex or sexual orientation of their chosen spouse.

Equality California has a substantial interest in participating in these proceedings.  The issues raised by Plaintiffs' motion for preliminary injunction will directly affect Equality California's members and supporters.  Also, Equality California has developed extensive expertise regarding the legal and factual issues raised by Plaintiffs' motion.  Equality California has participated in other judicial proceedings concerning marriage equality, including as a petitioner in *Strauss v. Horton*, 207 P.3d 48 (Cal. 2009).  Equality California also spearheaded the "No" on Proposition 8 campaign, and was one of the leading fund-raising organizations for the campaign.  As a result of its involvement in marriage equality advocacy, Equality California has developed significant expertise in the gay rights movement, the marriage equality movement, the legal issues surrounding same-sex marriage rights in the states and at the federal level, and state and federal constitutional issues specific to Proposition 8.

**INTRODUCTION**

Equality California urges this Court to declare article I, section 7.5, of the California Constitution ("Proposition 8") invalid under the Equal Protection Clause of the Fourteenth Amendment on the basis of the distinctive constitutional injury that has been inflicted upon same-sex couples in California.  Three circumstances set the constitutional violation in this case apart from the denial of marriage equality in any other State:

(1)  *According to every source of authority in the State of California, Proposition 8 is a classification for its own sake, unsupported by any legitimate interest.*

The laws of California and the authoritative rulings of its highest court establish that the State has no legitimate interest in depriving same-sex couples of the equal right to marry, and the State's executive has affirmatively disclaimed any such interest in this proceeding and the marriage equality case that preceded it.

(2)  *Proposition 8 singled out the gay citizens of California and deprived them of their established right to equal marriage.*

Proposition 8 was a targeted deprivation of a real, tangible right from a disfavored population.

(3)  *The Supreme Court of California has ruled that this right is fundamental under state law and that selective discrimination against gay Californians is antithetical to the State's governing charter.*

The rulings of the California Supreme Court in the *Marriage Cases* and *Strauss v. Horton* make it clear that the harm inflicted by Proposition 8 is among the most acute and burdensome forms of individual deprivation under California law.

In no other State have same-sex couples been deprived of the equal right to marry under such conditions.

*Amicus* submits this brief to emphasize one of the grounds for a finding that Proposition 8 is unconstitutional.  The singular conditions in California call for a ruling that strikes down Proposition 8 as failing even the rational basis standard of review.

**STATEMENT OF FACTS**

For purposes of this brief, *amicus* endorses and incorporates by reference the statement of facts that is contained in the *amicus* brief filed by the City and County of San Francisco

1   concerning the history of discrimination against gay men and lesbians, the history of marriage

2   discrimination in the State of California, and the enactment of Proposition 8.

3                                              **ARGUMENT**

4   **I.      PROPOSITION 8 CREATES A CLASSIFICATION FOR ITS OWN SAKE
            THAT DEPRIVES GAY, LESBIAN, AND BISEXUAL CALIFORNIANS OF**
5           **EXISTING RIGHTS AND IS UNSUPPORTED BY ANY LEGITIMATE
            PURPOSE**
6

7           In its landmark ruling in *Romer v. Evans*, 517 U.S. 620 (1996), the Supreme Court of the

8   United States reaffirmed a core principle of constitutional law:  "[T]he Constitution 'neither

9   knows nor tolerates classes among citizens'." *Id.* at 623 (quoting *Plessy v. Ferguson*, 163 U.S.

10  537, 559 (1896) (Harlan, J., dissenting)).  Invoking the legacy of the first Justice Harlan and the

11  line of cases in which it ultimately dismantled *Plessy*, the Court held that gay and lesbian citizens

12  may not be subjected to arbitrary discrimination.  *See Romer*, 517 U.S. at 633–34 (discussing

13  *Sweatt v. Painter*, 339 U.S. 629, 635 (1950)).  When the law subjects citizens to discrimination

14  for no legitimate purpose, the Court explained, acting only upon the "bare [] desire to harm a

15  politically unpopular group" or to express sentiments of "animus," then government has taken the

16  impermissible step of creating "classes among citizens." *Id.* at 623, 632, 634 (internal quotations

17  omitted).  Illegitimate discrimination of this type constitutes the creation of "a classification of

18  persons undertaken for its own sake," — differential treatment that has no purpose other than to

19  make one class of citizens "unequal to everyone else,"  by marking them as separate, apart, other,

20  and less than.  *Id.* at 635.

21          The enactment that served as the occasion for this statement of principle in *Romer* was

22  singular in nature — a state constitutional amendment that excluded gay, lesbian, and bisexual

23  people from protection from arbitrary discrimination under state law, by any state institution, in

24  any context.  *See id.* at 626–31 (describing the nature of the burden imposed by Amendment 2 as

25  "far-reaching," "sweeping," and "comprehensive").  In its next ruling on the issue, however, the

26  Supreme Court applied that principle to a wholly different context, relying upon *Romer* as one of

27  the major pillars of its decision to overrule *Bowers v. Hardwick*, and forbid states from using their

28  criminal code to outlaw same-sex intimacy and demean the relationships of same-sex couples.

1   *See Lawrence v. Texas*, 539 U.S. 558, 574–75 (2003).  In her separate opinion in that case, Justice

2   O'Connor relied even more squarely on this equality principle, affirming that, under *Romer*, state

3   law can never discriminate against gay people or same-sex couples solely for reasons of dislike or

4   disapproval, no matter what the context.  *See Lawrence*, 539 U.S. at 579–85 (O'Connor, J.,

5   concurring in the judgment) ("A law branding one class of persons as criminal solely based on the

6   State's moral disapproval of that class and the conduct associated with that class runs contrary to

7   the values of the Constitution and the *Equal Protection Clause*, under any standard of review.").

8   The majority, in turn, embraced Justice O'Connor's opinion as a tenable alternative basis for its

9   ruling, even as it ultimately resolved to repudiate its earlier decision in *Bowers* more directly.  *Id.*

10  at 574–75.

11        This line of cases directly controls the issue before this Court.  Proposition 8 has subjected

12  the gay, lesbian, and bisexual citizens of California to a singular type of discrimination.  The

13  legislature, executive, and judiciary of California had all proclaimed that same-sex couples were

14  entitled to fully equal treatment under the civil marriage laws of the State, and they implemented

15  that equal treatment, with thousands of couples getting married during the spring, summer, and

16  fall of 2008.  By a bare majority vote, the electorate then employed a ballot initiative to create an

17  exception to that principle of equality and relegate those couples to second-class status.  Under

18  the California Supreme Court's authoritative construction, issued subsequent to the election,

19  Proposition 8 cannot and does not have any purpose other than to mark same-sex couples as a

20  disfavored minority within the State.  This is a classification for its own sake — the creation of

21  classes among citizens unsupported by any legitimate purpose.  *Romer* requires that Proposition 8

22  be struck down on that basis.

23        **A.    The Only Purpose of Proposition 8 Is to Relegate Same-Sex Couples to**
             **Second-Class Status**
24

25        In *Strauss v. Horton*, 207 P.3d 48 (Cal. 2009), the California Supreme Court defined the

26  legal landscape against which Proposition 8 must be measured.  Prior to the enactment of

27  Proposition 8, every branch of California government — legislative, judicial, and executive —

28  had squarely held that (1) California has no interest in, or policy of, treating same-sex couples

1   differently from opposite-sex couples in any material respect whatsoever, and (2) same-sex

2   couples are entitled to be afforded the same dignified status as opposite-sex couples through the

3   institution of civil marriage.  Although Proposition 8 selectively deprived same-sex couples of

4   their equal status and dignity under state law, the *Strauss* Court held that the provision had not

5   affected in any way the interests or policies of California regarding the imperative to treat same-

6   sex couples with the fullest measure of material equality available.  In other words, *Strauss* held

7   that Proposition 8 is a pure status enactment of which the only purpose is to mark same-sex

8   couples as unequal for the sake of proclaiming their inequality.  Such an enactment has no

9   legitimate purpose and cannot survive even the most deferential standard of review under the

10  Equal Protection Clause.

11          For years now, California law has provided that gay and lesbian citizens may not be

12  subjected to treatment that differs in any material way from the treatment that straight citizens

13  receive with respect to their families, their relationships, and their children.  This principle was

14  fully established in the statutory laws of the State even before the California Supreme Court

15  issued its ruling in the *Marriage Cases*.  Under the domestic partnership law, which became fully

16  effective in pertinent part on January 1, 2005, registered domestic partners in California are

17  "[entitled to] the same rights, protections, and benefits, and . . . subject to the same

18  responsibilities, obligations, and duties under law, whether they derive from statutes,

19  administrative regulations, court rules, government policies, common law, or any other provisions

20  or sources of law, as are granted to and imposed upon [opposite-sex] spouses."  Cal. Fam. Code

21  § 297.5(a) (henceforth "AB 205").  *See also Koebke v. Bernardo Heights Country Club*,

22  115 P.3d 1212, 1218–19 (Cal. 2005) (observing that AB 205 "us[ed] the broadest terms possible

23

24

25

26

27

28

1   to grant, and impose upon, registered domestic partners the same rights and responsibilities as

2   spouses . . . .").[1]  As a consequence, California's

> current policies and conduct regarding homosexuality recognize
> that gay individuals are entitled to the same legal rights and the
> same respect and dignity afforded all other individuals and are
> protected from discrimination on the basis of their sexual
> orientation, and, more specifically, recognize that gay individuals
> are fully capable of entering into the kind of loving and enduring
> committed relationships that may serve as the foundation of a
> family and of responsibly caring for and raising children.

8   *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

9           That principle of fully equal treatment occupies the highest order of constitutional

10   magnitude in California.  In the *Marriage Cases*, the California Supreme Court held that same-

11   sex couples enjoy a fundamental right under the state constitution "to have their official family

12   relationship accorded the same dignity, respect, and stature as that accorded to all other officially

13   recognized family relationships" and that the selective withholding of equal treatment from same-

14   sex couples constitutes one of the most serious forms of discrimination under California law.  *Id.*

15   at 434, 445.  The Court's subsequent ruling in *Strauss* confirmed that the constitutional principle

16   of fully equal treatment survived Proposition 8 in every respect save the one before this Court —

17   the exclusion of same-sex couples from the status of civil marriage.  Proposition 8 "does not

18   purport to alter or affect the more general holding in the *Marriage Cases* that same-sex couples,

19   as well as opposite-sex couples, enjoy the constitutional right, under the privacy and due process

20   clauses of the California Constitution, to establish an officially recognized family relationship."

21   *Strauss*, 207 P.3d at 75.  Nor does Proposition 8 qualify the constitutional mandate under

22   California's Equal Protection Clause that state law must treat gay people, their relationships, and

23   their families with full equality and subject any discriminatory policies to searching constitutional

24   ───────────────

[1] In addition, the California legislature has twice enacted marriage equality by statute.
25   The Governor vetoed those bills, explaining his belief on both occasions that the 1999 ballot
     initiative that was struck down in the *Marriage Cases* required him to do so.  *See* Assemb. 849,
26   2005–2006 Leg., Reg. Sess. (Cal. 2005), vetoed by Governor, Sept. 29, 2005; Religious Freedom
     and Civil Marriage Protection Act (Assemb. 102, 2007–2008 Leg., Reg. Sess. (Cal. 2007)),
27   vetoed by Governor, Oct. 12, 2007.

28

1  scrutiny. *Id*. at 73–75; *see also id*. at 63 ("Proposition 8 does not abrogate any of these state

2  constitutional rights . . . .").

3       In the *Marriage Cases* last year and again in these proceedings, California's executive

4  branch verified that the principle of fully equal treatment for gay and lesbian citizens is binding

5  law in California, affirmatively disclaiming any interest on the part of the State in treating same-

6  sex couples differently from opposite-sex couples.  *See, e.g.*, *In re Marriage Cases*, 49 Cal.

7  Rptr. 3d 675, 724 n.33 (Cal. Ct. App. 2006) ("Although some appellants and *amici curiae* argue

8  [that a] 'responsible procreation' incentive justifies the state's continued definition of marriage as

9  opposite-sex, we do not analyze the legitimacy of this asserted state interest because the Attorney

10  General has expressly disavowed it."), *rev'd on other grounds*, 183 P.3d 384 (Cal. 2008); *id*.

11  ("[T]he Attorney General takes the position that arguments suggesting families headed by

12  opposite-sex parents are somehow better for children, or more deserving of state recognition, are

13  contrary to California policy."); (Answer of Attorney General Edmund G. Brown, Jr. filed

14  June 12, 2009 ("Brown Answer") ¶¶ 37–43).

15       In short, every branch of the California Government has affirmed that the State has no

16  material interest in treating gay, lesbian, and bisexual people, their relationships, or their families

17  unequally, and the State's highest court has held that this affirmative disclaimer of any material or

18  tangible interest in treating same-sex couples differently has survived the enactment of

19  Proposition 8.

20       These holdings are binding upon the federal courts, not only as statements of California

21  law, but also as constraints upon the range of purported justifications that may be considered

22  under rational basis review.  *See Servin-Espinoza v. Ashcroft*, 309 F.3d 1193, 1198 (9th Cir.

23  2002) (holding that the "standard of rationality [that] is required under equal protection to justify

24  a systematic difference in treatment" that is contrary to federal law is "substantially less forgiving

25  than when the difference in treatment" is consistent with underlying federal law); *cf. Allegheny

26  Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U.S. 336 (1989) (striking down

27  county tax policy as a violation of equal protection under rational basis standard and refusing to

28  consider conceivable rational bases that were inconsistent with state law).  Even the most

1    deferential form of analysis under the Equal Protection Clause requires that the challenged

2    provision be measured against some "reasonably conceivable state of facts" that might actually be

3    reflected in the policies of the State. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).

4    When every branch of state government has affirmatively disclaimed any reliance upon a

5    governmental interest — in this case, any material justification for treating same-sex couples

6    differently — that disclaimer defines and constrains the range of interests that the federal courts

7    may consider in conducting their analysis. *Cf. Pedersen v. Burton*, 400 F. Supp. 960, 963

8    (D.D.C. 1975) (three-judge court) (law requiring all people who wanted a marriage license from

9    District of Columbia to identify themselves by race was not supported by any rational basis when

10   the political branches of the District had urged that the rule was "outmoded and archaic" and did

11   "not appear to serve any useful purpose," despite efforts by litigation counsel to defend law).

12          The California Court of Appeal itself recognized this principle at an earlier stage of the

13   marriage litigation.  Applying a rational basis standard of review in its intermediate ruling in the

14   *Marriage Cases*, that court recognized that its analysis was necessarily constrained by the State

15   executive's authoritative statements disclaiming any California interest in subjecting same-sex

16   couples to materially unequal treatment.  *See In re Marriage Cases*, 49 Cal. Rptr. 3d at 724 n.33

17   (declining to consider putative state interests urged by intervenors because they had been

18   "expressly disavowed" by the State), *rev'd on other grounds*, 183 P.3d 384 (Cal. 2008).  Despite

19   what the California Supreme Court later found to be an insufficiently robust view of the principle

20   of equality under the state constitution, the Court of Appeal still understood that it was bound by

21   the Executive's affirmative disclaimer of hypothesized interests that were inconsistent with the

22   express policies of the State.

23          As the Supreme Court of the United States has made clear, "even the standard of

24   rationality . . . must find some footing in the realities of the subject addressed by the legislation."

25   *Heller v. Doe*, 509 U.S. 312, 321 (1993).  *Cf. Watchtower Bible & Tract Soc'y of N.Y. v. Stratton*,

26   536 U.S. 150, 169–71 (2002) (Breyer, J., concurring) (explaining that courts should not

27   "accept . . . implausible conjecture offered not by [government parties] but only by an *amicus*,"

28   even where only an intermediate level of scrutiny applies).  The reality of the subject addressed

1    by Proposition 8, as the *Strauss* decision confirms, is the relegation of same-sex couples to a

2    separate relationship category with absolutely no tangible or material justification — indeed, with

3    a continuing constitutional mandate to secure the greatest measure of tangible, material, and

4    dignitary equality possible for those couples following the deprivation of their right to marry. *See*

5    *Strauss*, 207 P.3d at 74–78.

6        Proposition 8 thus separates same-sex couples from the civil institution of marriage for

7    only one purpose: "to make them unequal to everyone else." *Romer*, 517 U.S. at 635–36.  In

8    *Romer*, it was the sheer breadth of Colorado's Amendment 2 that led the Supreme Court to

9    conclude that the provision was not "directed to any identifiable legitimate purpose or discrete

10   objective." *Id*. at 635.  In the present case, the controlling factor is California's pervasive policy

11   concerning the imperative to treat same-sex couples with full tangible equality.  Measured against

12   that singular legal landscape, Proposition 8 can only be understood as a "status-based enactment,"

13   *id*., the purpose of which is to mark same-sex couples as a separate and disfavored class of

14   Californians.

15       In its *amicus curiae* brief, the City and County of San Francisco persuasively argues that

16   Proposition 8 constitutes an expression of animus toward same-sex couples — a statement of

17   outright hostility — and the Attorney General admits that this is an accurate characterization of

18   the amendment.  (*See* Brief of *Amicus Curiae* City and County of San Francisco in Support of

19   Plaintiffs' Motion for a Preliminary Injunction, filed June 18, 2009, at 18–33; Brown Answer,

20   ¶ 43.)  This argument is sufficient under *Romer* to establish the constitutional invalidity of

21   Proposition 8, and Equality California endorses it fully.  But we do not believe that it is necessary

22   for the Court to conclude that Proposition 8 was inspired by animus.  It is enough that, under

23   California law, Proposition 8 excludes same-sex couples from access to civil marriage for no

24   reason other than to impose upon their relationships an unequal status.

25       As the U.S. Supreme Court has said repeatedly in its landmark equality cases — from

26   *Shelley v. Kraemer* and *Sweatt v. Painter* to *Romer* itself — "[e]qual protection of the laws is not

27   achieved through indiscriminate imposition of inequalities." *Romer*, 517 U.S. at 633 (quoting

28   *Sweatt*, 339 U.S. at 635) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948)).  If the State of

California were to enact a law proclaiming: "Henceforth, right-handed people shall be known as 'first-class citizens' but left-handed people shall be known as 'second-class citizens,'" there can be no question that such a law would violate the principle of equal protection. The reason is simple. "The *Equal Protection Clause* was intended to work nothing less than the abolition of all caste-based . . . legislation." *Plyler v. Doe*, 457 U.S. 202, 213 (1982). History and tradition have at times appeared to support the persecution of many disfavored minorities. But under the "constitutional tradition" that the Court invoked in *Romer*, the desire to declare a group of people unequal merely for the sake of declaring their inequality is the essence of a law impermissibly based on status, class, and caste. *Romer*, 517 U.S. at 633.

That is exactly what the voters of California were led to do in enacting Proposition 8. This case does not present the question of whether same-sex couples may rationally be excluded from civil marriage because of putative differences in the commitments they share, the families they form, or their ability to raise their children. Those questions must be left for another lawsuit and another State, as California has repeatedly disclaimed any such differences among its gay and non-gay citizens. Rather, Proposition 8 constitutes a proclamation: "Henceforth, opposite-sex couples who celebrate their relationships shall be known as 'married' but same-sex couples who celebrate their relationships shall be known as 'domestically partnered.'" When such a proclamation of inequality is embodied in the laws of a State, lacking any grounding in a legitimate tangible or material state interest, it constitutes "a classification of persons undertaken for its own sake, something the *Equal Protection Clause* does not permit." *Romer*, 517 U.S. at 635.

> **B.    Proposition 8 Has Deprived Gay, Lesbian, and Bisexual Citizens of a Right that Occupies the Highest Status Under California Law**

Proposition 8 combines its lack of any legitimate state interest with a burden upon same-sex couples that is unique. Proposition 8 has deprived gay, lesbian, and bisexual Californians of an existing state constitutional right to marry. That constitutional right was exercised by an estimated 18,000 couples and was identified by the California Supreme Court in both the *Marriage Cases* and *Strauss* as occupying the highest order of concern under California state law

1  principles of individual liberty.  Unlike states engaged in a process of incremental reform where

2  civil union or domestic partnership law have been adopted as a step toward equality, California's

3  Proposition 8 has singled out its gay, lesbian, and bisexual citizens for an unprecedented form of

4  deprivation.[2]  As the Supreme Court of the United States has made clear, this Court must conduct

5  its equal protection analysis with eyes open to the context that establishes the nature of the

6  deprivation that has been imposed, even in the absence of any finding of a fundamental right or

7  suspect classification under the Federal Constitution.

8      Two axioms of federal equal protection law inform the question before this Court.  First, it

9  is necessary to ascertain the nature of the burden imposed by a discriminatory law in order to

10  determine the law's validity.  Second, it is equally necessary to determine the status that a

11  discriminatory provision occupies within the state law system in which it has been enacted in

12  order to take the full measure of the burden that it imposes.  When a State amends its constitution

13  to deprive one class of citizens of a right or benefit that state law itself has identified as one of its

14  most important, that fact alone indicates that a heavy burden has been imposed upon the

15  disfavored population.  Before reaching any question of an independent federal standard of

16  fundamental rights or suspect classifications, a reviewing court may properly find that the burden

17  of the discrimination under state law is itself enough to mark the law as constitutionally

18  problematic.

19      The necessary starting point for any analysis under the Equal Protection Clause of the

20  Fourteenth Amendment is to measure how a discriminatory provision operates under the laws of

21  _____

[2] In the *Marriage Cases*, the California Supreme Court struck down the 1999 ballot
initiative commonly referred to as Proposition 22, which prohibited same-sex couples from
marrying and superseded legislative efforts to enact marriage equality by statute.  The state of
affairs that the court confronted in that case thus combined the legislature's effort to secure
incremental reform to the maximum equality possible under state law, ultimately culminating in
AB 205, with a ballot initiative that prohibited the State from affording full marriage equality.
Equality California joined in the successful effort to have this particular configuration of
inequality declared a violation of the California Constitution.  Whatever relationship the state of
affairs presented to the court in the *Marriage Cases* might bear to the situation in other states that
have enacted civil union statutes (under judicial mandate or otherwise), the present case differs
from all those scenarios.  Only in California have gay and lesbian couples been deprived of the
equal right to marry after that right had been recognized as a state constitutional principle of the
highest order and actually carried into effect.

1    the state itself.  In proclaiming that "[n]o State shall . . . deny to any person within its jurisdiction

2    the equal protection of the laws," the Clause calls upon a reviewing court to measure the

3    treatment of targeted persons within the whole system of laws operated by the State.  "That

4    obligation," the Court has explained, "is imposed by the Constitution upon the States severally as

5    governmental entities, -- each responsible for its own laws establishing the rights and duties of

6    persons within its borders." *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938)

7    (striking down a provision of the Missouri Constitution that required segregation in public higher

8    education and rejecting the argument that the State could cure the problem by sending black law

9    students to be educated in another State's law school).  *See also Plyler v. Doe*, 457 U.S. at 210

10    (framing threshold question in case involving exclusion of undocumented immigrant children

11    from Texas public school system as whether such children are entitled to "the equal protection of

12    Texas law" as it then existed); *McCabe v. Atchison, Topeka & Santa Fe Ry. Co.*, 235 U.S. 151,

13    161 (1914) (noting the unconstitutionality of a state statute that authorized the exclusion of black

14    passengers from railway service and explaining:  "Whether or not particular facilities shall be

15    provided may doubtless be conditioned upon there being a reasonable demand therefor, but, if

16    facilities are provided, substantial equality of treatment of persons traveling under like conditions

17    cannot be refused.").

18           Prior to the enactment of Proposition 8, the California Supreme Court held that the denial

19    of equal marriage rights constituted the most serious deprivation under the California

20    Constitution, subjecting gay, lesbian, and bisexual citizens to invidious discrimination and

21    depriving them of rights treated as fundamental under the state charter.  *See Marriage Cases*,

22    183 P.3d at 400–02.  In its authoritative construction following the November election, the

23    California Supreme Court confirmed that the deprivation that Proposition 8 imposes under

24    California's constitutional scheme stands on the same footing as prior uses of the ballot initiative

25    to encourage private discrimination against racial minorities in housing and to deprive non-

26    English speakers of the right to vote — forms of discrimination that implicate the most urgent

27    state-law principles of equality and individual liberty.  *Strauss*, 207 P.3d at 103–06.

28

1    Such rulings by the State's highest court — establishing the meaning of a state

2    constitutional provision, the significance of the rights at issue within the state constitutional

3    framework, and the burden imposed by a selective deprivation of those rights — are necessary

4    points of reference in equal protection analysis.  As the Supreme Court of the United States has

5    explained, the federal courts must give "careful consideration" to the pronouncements of state

6    courts when those statements "concern the purpose, scope, and operative effect of a provision of"

7    state law or a state constitutional amendment.  *Reitman v. Mulkey*, 387 U.S. 369, 373–77 (1967).

8    The rulings of the California Supreme Court make it clear that the selective deprivation

9    involved in this case is a singular one.  In no other State have voters been led to amend their

10   constitution to strip same-sex couples of a right to marry that the highest court of the State had

11   previously confirmed and carried into effect.  While discriminatory prohibitions on the right of

12   same-sex couples to marry always raise serious constitutional concerns, a distinctive injury was

13   inflicted in California when the state constitution was amended to deprive couples of an existing

14   right that the state's highest court had identified as an individual liberty of the highest order.

15   Under the U.S. Supreme Court's holding in *Reitman v. Mulkey*, a reviewing court must scrutinize

16   such a provision's "immediate objective, its ultimate effect and its historical context and the

17   conditions existing prior to its enactment" when assessing the nature of the burden that it

18   imposes.  *Reitman*, 387 U.S. at 373 (internal quotations omitted).

19   This proposition — the fact that an amendment that selectively eliminates rights that

20   occupy a central place in the state constitutional framework necessarily informs any assessment

21   of the burden being imposed for federal constitutional purposes — is merely an application of a

22   principle that already finds voice in the Supreme Court's equality cases.  Even absent a federal

23   fundamental right or a classification subject to strict scrutiny, the nature of the burden that a

24   discriminatory provision imposes, in context, must occupy a prominent role in federal equal

25   protection analysis.

26   *Plyler v. Doe*, 457 U.S. 202 (1982), illustrates this principle well.  *Plyler* involved a

27   statute enacted by the Texas legislature that aimed to exclude the children of undocumented

28   immigrants from Texas public schools, forcing the children to pay tuition by withholding funds to

1    local districts and authorizing the districts to deny enrollment to the children altogether.  *See id.*

2    at 205–06.  The Court struck down the statute as a violation of equal protection.  In an earlier case

3    also arising in Texas, the Supreme Court had squarely held that access to education does not

4    constitute a "fundamental right," and hence that laws resulting in unequal access or funding levels

5    for public education do not provoke heightened or strict scrutiny — a holding that the *Plyler*

6    Court reaffirmed.  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 38 (1973); *Plyler*,

7    457 U.S. at 222 ("Nor is education a fundamental right; a State need not justify by compelling

8    necessity every variation in the manner in which education is provided to its population.").  The

9    Court further held that "[u]ndocumented aliens cannot be treated as a suspect class" under the

10   Equal Protection Clause.  *Plyler*, 457 U.S. at 219 n.19 & 223.  *Plyler*, in other words, involved a

11   statute that discriminated on a basis that the Court had found not to be inherently constitutionally

12   suspect and burdened access to a state institution that the Court had found not to be

13   constitutionally fundamental.

14          Nonetheless, the Court found that the nature of the burden that Texas inflicted upon these

15   children by excluding them from the public schools violated a core principle of equal protection,

16   requiring that the law be invalidated.  Even in the absence of fundamental rights and suspect

17   classifications, the Court found that it had to assess the lasting impact that the Texas law would

18   have upon the status of undocumented children in the State.  Those children, the Court found,

19   were threatened with lasting harm to their "social, economic, intellectual, and psychological well-

20   being" as a result of this "status-based" enactment.  *Id*. at 222.  "[M]ore [was] involved," the

21   Court concluded, "than the abstract question whether [the Texas law] discriminates against a

22   suspect class, or whether education is a fundamental right."  *Id*.  Texas had imposed "a lifetime

23   hardship on a discrete class of children not accountable for their disabling status" and a "stigma"

24   that would continue to follow them.  *Id*. at 223.

25          In the *Marriage Cases*, the California Supreme Court held that same-sex couples were

26   entitled to enjoy the fundamental constitutional right to marry under the state constitution on an

27   equal basis.  *See Marriage Cases*, 183 P.3d at 419–34.  Though the federal courts have not yet

28   determined whether the same holds true of the cognate right under the Fourteenth Amendment,

1  *Plyler* makes it clear that no such formal finding is necessary in order for a federal court to take

2  account of the nature of the burden that is imposed by the denial of access to such an important

3  institution.  Whatever the specific contours of the fundamental right to marry under the applicable

4  federal standard, there can be no question that California's same-sex couples and their children

5  feel just as keenly the burden of having civil marriage taken away from them.  As the California

6  Supreme Court has said, "entry into a formal, officially recognized family relationship provides

7  an individual with the opportunity to become a part of one's partner's family, providing a wider

8  and often critical network of economic and emotional security."  *Marriage Cases*, 183 P.3d

9  at 424.  These benefits flow to the children of the married couple, who enjoy the stability and

10  confidence that comes from "an officially recognized family."  *Id*. at 424–25.  By depriving

11  same-sex couples and their children of these substantial benefits, Proposition 8 imposes "a

12  lifetime hardship."  *Plyler*, 457 U.S. at 223.

13  Even if California could assert some substantial tangible justification for excluding same-

14  sex couples and their children from the State's most recognized family relationship, the

15  magnitude of the burden that Proposition 8 imposes would require scrutiny, for "[t]he *opportunity*

16  to establish an officially recognized family with a loved one and to obtain the substantial benefits

17  such a relationship may offer is of the deepest and utmost importance to any individual and

18  couple who wish to make such a choice."  *Marriage Cases*, 183 P.3d at 425.  *See also id*. at 425–

19  26 (acknowledging the singular importance of civil marriage under California law in providing

20  that opportunity for official family recognition).  In light of the fact that California has

21  affirmatively disclaimed any such tangible justification, leaving Proposition 8 as nothing but a

22  "status-based" enactment, *Plyler*, 457 U.S. at 222, it becomes all the more clear that Proposition 8

23  fails even the most deferential form of review.

24  ## CONCLUSION

25  In his dissenting opinion in *Abrams v. U.S.*, one of the U.S. Supreme Court's earliest

26  decisions interpreting the First Amendment, Justice Oliver Wendell Holmes famously observed

27  that "time has upset many fighting faiths . . . ."  *Abrams v. United States*, 250 U.S. 616, 630

28

1  (1919) (Holmes, J., dissenting).  The salience of Justice Holmes's observation to our

2  constitutional system extends beyond the free speech context in which he wrote.

3        Our Constitution embodies a set of principles that are always in the process of being

4  imperfectly realized.  The men who wrote the unqualified mandate of "equal protection of the

5  laws" into the Fourteenth Amendment were hardly egalitarians, contenting themselves as they did

6  with a system of government in which women were denied the vote and had never held federal

7  office or played a direct role in drafting the Constitution that governed them.  For generations of

8  Americans, racial segregation seemed not just rational but inevitable, with Jim Crow laws as the

9  proper expression of a divinely inspired plan.  *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1, 3 (1967)

10  (quoting Virginia trial court opinion that upheld an antimiscegenation conviction in part because

11  "Almighty God created the races white, black, yellow, malay and red, and he placed them on

12  separate continents.  And but for the interference with his arrangement there would be no cause

13  for such marriages.  The fact that he separated the races shows that he did not intend for the races

14  to mix.").  Our Constitution anticipates that the fighting faiths of one era will sometimes become

15  the shameful history of the next.  The gradual realization of the Constitution's grand principles

16  will always be an incomplete endeavor.

17        Justice Kennedy recognized this basic feature of our founding charter when he observed in

18  *Lawrence v. Texas* that "those who drew and ratified . . . the Fourteenth Amendment . . . knew

19  [that] times can blind us to certain truths and later generations can see that laws once thought

20  necessary and proper in fact serve only to oppress."  539 U.S. at 578–79.  "As the Constitution

21  endures," Justice Kennedy wrote for the Court, "persons in every generation can invoke its

22  principles in their own search for greater freedom."  *Id.*  In this, the Court echoed Chief Justice

23  Marshall, who long ago realized that "[a] constitution['s] . . . nature . . . requires . . . that only its

24  great outlines should be marked, its important objects designated, and the minor ingredients

25  which compose those objects be deduced from the nature of the objects themselves."

26  *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819).

27        For generations, discrimination against gay men and lesbians has been so pervasive that

28  challenging that discrimination has seemed ludicrous to many.  As with discrimination against

1   people of color, women, and so many others whose place in the Constitution has only recently

2   become secure, that long history of discrimination has been self-reinforcing:  The longer a group

3   has been treated unequally, the more natural the inequality has come to seem.  The road toward

4   recognizing that gay, lesbian, and bisexual Americans are entitled to the benefits of equal

5   citizenship has been long and is not yet fully traveled.  But as with the fighting faiths of White

6   Supremacy and male superiority, the Supreme Court has finally come to realize that homophobia

7   and the relegation of gay people to second-class status must finally be exiled from our

8   "constitutional tradition" as acceptable bases for state regulation.  *Romer*, 517 U.S. at 633

9   (discussing *Sweatt v. Painter*, 339 U.S. at 635).

10          In California, the right of same-sex couples to marry has already been recognized as a

11   state constitutional mandate and has been embraced by the political branches of government.  The

12   equal enjoyment of that right has been interrupted by Proposition 8, a provision that has been

13   authoritatively construed to have no purpose other than the relegation of same-sex couples to a

14   classification that is separate and unequal.  *Romer* and *Lawrence* already mark out a clear path for

15   the invalidation of this status-based enactment.  This Court need reach no further in declaring

16   Proposition 8 unconstitutional.

17          Dated: June 26, 2009                JAMES J. BROSNAHAN
                                                STUART C. PLUNKETT
18                                              MORRISON & FOERSTER LLP

19                                              TOBIAS BARRINGTON WOLFF
                                                UNIVERSITY OF PENNSYLVANIA
20                                              SCHOOL OF LAW

21

22                                              By:  /s/ James J. Brosnahan
                                                     James J. Brosnahan
23
                                                Attorneys for *Amicus Curiae*
24                                              EQUALITY CALIFORNIA

25

26

27

28