# EXHIBIT 1

DENNIS J. HERRERA, State Bar #139669
City Attorney
THERESE M. STEWART, State Bar #104930
Chief Deputy City Attorney
WAYNE K. SNODGRASS, State Bar #148137
MARGARET W. BAUMGARTNER, State Bar #151762
JIM EMERY, State Bar#153630
JULIA M.C. FRIEDLANDER, State Bar#165767
YVONNE MERE, State Bar #173594
KATHLEEN S. MORRIS, State Bar #196672
SHERRI SOKELAND KAISER, State Bar #197986
GINA M. ROCCANOVA, State Bar #201594
NELI PALMA, State Bar #203374
PHILIP LEIDER, State Bar #229751
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:    (415) 554-4700
Facsimile:    (415) 554-4747

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

BOBBIE J. WILSON, State Bar #147317
PAMELA K. FULMER, State Bar #154736
AMY E. MARGOLIN, State Bar #168192
SARAH M. KING, State Bar #189621
KEVIN H. LEWIS, State Bar #197421
CEIDE ZAPPARONI, State Bar #200708
JEFFREY T. NORBERG, State Bar #215087
HOWARD RICE NEMEROVSKI
CANADY FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024
Telephone:    (415) 434-1600
Facsimile: (415) 217-5910

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br>**MARRIAGE CASES**<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, a charter city and county,<br><br>   Plaintiff/Petitioner,<br><br>   vs.<br><br>**STATE OF CALIFORNIA**, et al.<br><br>   Defendants/Respondents. | JUDICIAL COUNCIL COORDINATION<br>PROCEEDING NO. 4365<br><br>Case No. 429-539<br>(Consolidated with Case No. 504-038)<br><br>**REVISED PROPOSED FINDINGS OF FACT**<br><br>Judge:      Richard A. Kramer<br>Place:      Dept. 304 |

# PREFATORY NOTE

The Court has requested that the parties prepare proposed findings on all facts they believe are material to the legal issues the Court has been asked to decide, with citations to the evidence supporting the findings and an explanation of the materiality of each finding to one or more legal issues in the case.

We start by noting that the facts at issue in this case are predominantly legislative facts rather than adjudicative facts,[1] that is to say, rather than facts about the particular parties or about specific events, they are generalized facts about such matters as:

- the historic and current discrimination against, and marginalization of, gay men and lesbians legally, socially and politically;

- the fact that a substantial number of gay men and lesbians are in long-term committed relationships and that many gay and lesbian couples are raising children;

- the fact that in significant respects the demographics of gay and lesbian couples are the same as or similar to those of married heterosexual couples;

- the history of civil marriage and of its regulation;

- the meaning of marriage;

- the legal, institutional and social benefits and obligations that flow from civil marriage;

- the meaning of domestic partnership;

- the legal, institutional and social benefits (or lack of them) that flow from domestic partnership, etc.

---

[1] See K. Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv. L. Rev. 364, 4202, 404 (1942) (defining as "legislative facts" facts that "inform[] a court's legislative judgment on questons of law and policy" and "adjudicative facts" as facts regarding "what the parties did, what the circumstances were, what the background conditions were." Neither the Advisory Committee on the Federal Rules of Evidence nor the California Law Revision Commission undertook to regulate judicial reception of evidence regarding legislative facts in the Federal Rules of Evidence or the Evidence Code. See Fed. R. Evid. 201, Advisory Comm. Note to Subdivision (a); Cal. Evid. Code § 450, Law Rev. Comm'n Comment.

1    Legislative facts are commonly pertinent in litigation involving interpretation of statutes

2  and/or the constitution.  *See* 1 B. Witkin, California Evidence, Judicial Notice § 6.  Courts have,

3  in varying contexts, been willing to derive such facts from a variety of sources, ranging from

4  assumptions to the personal experience of the judge, from facts believed to be commonly known

5  to published books and studies, and from judicially noticeable material to expert and lay

6  declarations and testimony.  In the context of a case like this one, of constitutional dimension, it

7  is important that the factfinding process with respect to legislative facts be as thoughtful, careful

8  and judicious as it is with respect to adjudicative facts.  Grounding facts material to a decision on

9  *evidence* that is part of the *record*—as opposed to the court's own assumptions or beliefs or even

10  its own research—promotes fairness of the decisionmaking process and the legitimacy of the

11  Court's ultimate decision.  For these reasons, the City has gathered and presented both

12  adjudicative *and* legislative facts through declarations and, to a limited extent, requests for

13  judicial notice, rather than via amicus briefs or citations to published or unpublished books,

14  articles or other such materials.

15    We remind the Court that the State has not objected to any of the City's evidence nor

16  presented any counterevidence, and thus in the *CCSF v. State* case, at least, although there are

17  material facts, there is *no dispute of fact* that this Court need resolve.  Finally, we encourage the

18  Court to make factual findings on all facts it determines are material to—and to render a decision

19  on—each and every one of the four legal challenges the City has raised to the marriage statutes,

20  including violation of due process liberty interests, violation of due process privacy interests,

21  denial of equal protection based on gender discrimination and denial of equal protection based on

22  sexual orientation discrimination.  By addressing all of these issues and making the findings

23  relevant to them, the Court will lessen the likelihood of a remand in the event the Court of

24  Appeal or Supreme Court disagrees with this Court's decision in any particular respect.

25    The following Proposed Findings are presented in two columns, with the left hand

26  column containing the proposed finding and, beneath that, reference to the legal issues to which

27  it is material, and the right hand column containing citations to evidence supporting the finding

28  and, beneath it, citation to some of the other cases that have made similar findings.  The latter is

3

not exhaustive; there are now many marriage cases, and time did not permit our listing every case that made a finding on every one of these issues; instead, we have provided a representative selection.

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | 1. | Civil marriage is a deeply meaningful institution to individuals, families, communities, and the State. Enhanced by government recognition for so long, legal marriage is a symbol of privilege. The idea that marriage is the happy ending, the ultimate reward, the sign of adult belonging, and the definitive expression of love and commitment is deeply engrained in our society. Nothing has the same meaning, obligations, rights and benefits except marriage itself. Moreover, marriage is a primary source of well-being for adults in the United States.<br><br>**These facts are material to the following legal issues:**<br>**(1) what the fundamental right to marriage consists of;**<br>**(2) whether all citizens have this fundamental right; and**<br>**(3) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection.** | (Declaration of Nancy F. Cott In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Cott Dec."] ¶¶ 6-11; Declaration of Steven L. Nock In Support Of San Francisco's Reply To State Of California's Opposition To Petition For Writ Of Mandate ["Nock Dec."] ¶¶ 11-12; Declaration of Helen Zia In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["H. Zia Dec."] ¶¶ 3, 9, 11-15, 17; Declaration of Beilun Woo Zia In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["B. Woo Zia Dec."] ¶¶ 3-5, 8-12; Declaration of Richard Park In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Park Dec."] ¶¶ 1, 4-8.)<br><br>**Courts in the following cases have found similar facts:**<br><br>***Goodridge v. Dep't of Public Health*, 440 Mass. 309, 322, 798 N.E.2d 941, 954-55 (2003) ("[Civil marriage] is a `social institution of the highest importance.' . . . Civil marriage anchors an ordered society by encouraging stable relationships over transient ones. It is central to thw way the Commonwealth identifies individuals, ... Civil marriage is at once a deeply personal commitment to another human being and a highly public celebration of the ideals of mutuality, companionship, intimacy, fidelity and family. . . . Because it fulfills yearnings for security, safe haven, and connection that express our common humanity, civil marriage is an esteemed institution, and the decision whether and whom to marry is among life's momentous acts of self-definition."); *Fourie v. Minister of Home Affairs*, Supreme Court of Appeal of South Africa, Case No. 232/2003 (Nov. 30, 2004) at 9 (marriage is** |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | | institution that "is vital to society and central to social life and human relationships"; "marriage and the capacity to get married remain central to our self-definition as humans"; "[The capacity to choose to get married] offers [a couple committed for life to each other] the option of entering an honourable and profound estate that is adorned with legal and social recognition, rewarded with many privileges and secured by many automatic obligations.  It offers a social and legal shrine for love and for commitment and for a future shared with another human being to the exclusion of all others."). |
| 2. | Marriage brings with it a host of tangible legal rights, privileges, benefits and obligations.<br><br>**These facts are material to the following legal issues:**<br>**(1) what the fundamental right to marriage consists of;**<br>**(2) whether all citizens have this fundamental right; and**<br>**(3) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection.** | (Cott Dec. ¶ 6; Nock Dec. ¶¶ 11-15; Declaration Of M.V. Lee Badgett In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Badgett Dec."] ¶¶ 20-47; Declaration Of Gregory M. Herek In Support Of San Francisco's Reply To State Of California's Opposition To Petition For Writ Of Mandate ["Herek Dec."] ¶¶ 29-33; H. Zia Dec. ¶¶ 3, 9, 11-15, 17; B. Woo Zia Dec. ¶¶ 3-5, 8-12; Park Dec. ¶¶ 1, 4-8.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 323-25, 798 N.E.2d 941, 955-56 (2003) ("Tangible as well as intangible benefits flow from marriage.  The marriage license grants valuable property rights to those who meet the entry requirements, and who agree to what might otherwise be a burdensome degree of government regulation of their activities. . . . The benefits accessible only by way of a marriage license are enormous, touching nearly every aspect of life and death." (discussing examples)); *Baker v. Vermont*, 170 Vt. 194, 220, 744 A.2d 864, 883 (1999) ("[A] marriage contract, although similar to other civil agreements, represents much more because once formed, the law imposes a variety of obligations, protections, and benefits. . . . [T]he marriage laws transform a private agreement into a source of significant public benefits and protections."); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, |

5

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | | 2004) at 3–4 ("many legal rights and responsibilities have become tied into a person's marital status" and providing examples). |
| 3. | Marriage also confers significant intangible benefits on the spouses.<br><br>**These facts are material to the following legal issues:**<br>**(1) what the fundamental right to marriage consists of;**<br>**(2) whether all citizens have this fundamental right; and**<br>**(3) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection.** | (Nock Dec. ¶¶ 11-15; Cott Dec. ¶ 8; Badgett Dec. ¶¶ 48-60; Herek Dec. ¶¶ 29-33; H. Zia Dec. ¶¶ 3, 9, 11-15, 17; B. Woo Zia Dec. ¶¶ 3-5, 8-12; Park Dec. ¶¶ 1, 4-8.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 322, 798 N.E.2d 941, 954-55 (2003) ("Marriage also bestows enormous private and social advantages on those who choose to marry."); *People v. West*, 780 N.Y.S.2d 723, 725 (June 10, 2004) ("Even if the financial issues could be addressed in some comprehensive way short of allowing same-sex partners to marry, there would still be no emotional substitute for marriage"). |

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| 4. | The tangible and intangible benefits of marriage flow not only to those who marry, but also to their children. Marriage ensures that both spouses will have rights and duties to protect and support their children; it legitimizes children born to the couple; and it provides a sense of security and support for the family.<br><br>**These facts are material to the following legal issues:**<br>**(1) what the fundamental right to marriage consists of;**<br>**(2) whether all citizens have this fundamental right;**<br>**(3) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;**<br>**(4) whether denying marriage to gay and lesbian couples and their families based on the interests of children rationally furthers any legitimate state interest; and**<br>**(5) whether the state can demonstrate a compelling state interest based on the interests of children justifying denial of marriage to lesbian and gay couples and their families.** | (Cott Dec. ¶¶ 6, 13, 47; Badgett Dec. ¶¶ 15-19; Nock Dec. ¶¶ 12-15; Herek Dec. ¶¶ 48-51; Declaration of Douglas H. Okun In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Okun Dec."] ¶¶ 4-8; Declaration Of Marina Gatto In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Gatto Dec."] ¶¶ 6, 9; Declaration Of Michael Allen Quenneville In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Quinneville Dec."] ¶3.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 325, 798 N.E.2d 941, 956-57 (2003) ("Where a married couple has children, their children are also directly or indirectly, but no less auspiciously, the recipients of the special legal and economic protections obtained by civil marriage. Notwithstanding the Commonwealth's strong public policy to abolish legal distinctions between marital and nonmarital children in providing for the support and care of minors, . . . , the fact remains that marital children reap a measure of family stability and economic security based on their parents' legally privileged status that is largely inaccessible, or not as readily accessible, to nonmarital children. Some of these benefits are social, such as the enhanced approval that still attends the status of being a marital child. Others are material, such as the greater ease of access to family-based State and Federal benefits that attend the presumptions of one's parentage."). |
| 5. | Many gay men and lesbians have "formed lasting, committed, and caring relationships" with persons of the same sex, and these same-sex couples "share lives together, participate in their communities together, and . . . raise children and care for other dependent family members together."<br><br>**These facts are material to the following legal issues:**<br>**(1) whether lesbians and gay men are** | (Fam. Code § 297, Note [Operative Jan. 1, 2005]; *see* Badgett Dec. ¶¶ 12, 14, 16; Declaration Of Dr. Robert Galatzer-Levy In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Gallatzer-Levy Dec."] ¶ 12.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 334-35, 798 N.E.2d 941, 963 (2003) ("[Same-sex] couples (including four of the plaintiff couples) have children |

| Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|
| situated similarly to heterosexual persons with respect to the purposes of civil marriage; (2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and (3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | for the reasons others do—to love them, to care for them, to nurture them."); *Fourie v. Minster of Home Affairs*, Supreme Court of Appeal of South Africa, Case No. 232/2003 (Nov. 30, 2004) at 8 ("Gays and lesbians in same-sex life partnerships are `as capable as heterosexual spouses of expressing and sharing love in its manifold forms'. They are likewise `as capable of forming intimate, permanent, committed, monogamous, loyal and enduring relationships; of furnishing emotional and spiritual support; and of providing physical care, financial support and assistance in running the common household.' They are individually able to adopt children and in the case of lesbians to bear them'.... Finally, they are `capable of constituting a family, whether nuclear or extended, and of establishing, enjoying and benefiting from family life' in a way that is 'not distinguishable in any significant respect from that of heterosexual spouses."); see also *Baker v. Vermont*, 170 Vt. 194, 218, 744 A.2d 864, 889 (1999) ("The extension of the Common Benefits Clause to acknowledge plaintiffs as Vermonters who seek nothing more, nor less, than legal protection and security for their avowed commitment to an intimate and lasting relationship is simply, when all is said and done, a recognition of our common humanity.") |
| 6. Approximately thirty-two percent of same-sex couples in California are raising children. Approximately 70,500 California children live in households headed by a same-sex couple.<br><br>These facts are material to the following legal issues:<br>(1) whether lesbians and gay men are situated similarly to heterosexual persons with respect to the purposes of civil marriage;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay | (Badgett Dec. ¶15.)<br><br>See *Baker v. Vermont*, 170 Vt. 194, 218, 744 A.2d 864, 881-82 (1999) ("while accurate statistics are difficult to obtain, there is no dispute that a significant number of children today are actually being raised by same-sex parents, and that increasing numbers of children are being conceived by such parents through a variety of assisted-reproductive techniques"); *Fourie v. Minster of Home Affairs*, Supreme Court of Appeal of South Africa, Case No. 232/2003 (Nov. 30, 2004) at 10 ("The suggestion that gays and lesbians cannot procreate has already been authoritatively rejected as a mistaken stereotype."); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. |

8

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | couples and their families. | Aug. 4, 2004) at 8 ("plaintiffs [], thanks to government recognition of the fact that their sexual orientation is no bar to good parenting, are presently able to enjoy family lives with children"); *id.* at 9 ("[W]hen one peers into the future, one circumstances is far more certain to occur. Many, many children are going to be raised in the homes of gay and lesbian partners. Present social trends will undoubtedly continue. Gay and lesbian couples will feel the human instinct to wish to raise children, they will have available either the supportive adoption laws or the technological means to begin raising a family and they will enjoy the increasing public acceptance of such families. All this is certain."); *People v. Greenleaf*, 780 N.Y.S.2d 899, 2004 N.Y. Misc. LEXIS 1121 at 4 (July 13, 2004) ("Many same-sex couples raise children, adopted or conceived by one of the partners. Some are raising the children of one partner that were conceived during a heterosexual marriage that failed.") |
| 7. | Like heterosexuals, gay men and lesbians are of every race and ethnicity, live in every county throughout the state, are similar in family size to heterosexual families (on average two children), are gainfully employed and thus contribute to the state's economy, accounting for education (and gender discrimination) have incomes similar to heterosexuals, pay proportionately more taxes than their heterosexual counterparts, despite longstanding discrimination have served their country in similar numbers to heterosexuals, contribute in myriad ways to schools, churches and the communities in which they live.<br><br>These facts are material to the following legal issues:<br>(1) whether lesbians and gay men are situated similarly to heterosexual persons with respect to the purposes of civil marriage;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and | (Badgett Dec. ¶¶ 10-19, 21-23, 29-33; (Galatzer-Levy Dec. ¶¶ 12-13; Herek Dec. ¶ 22; *see* Fam. Code § 297 Note (Stats. 2003 ch. 421).) |

9

| Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|
| (3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | |
| **8.** The State of California has an interest in "promoting [lesbian and gay] family relationships and protecting [lesbian and gay] family members during life crises, and . . . reduc[ing] discrimination on the bases of sex and sexual orientation"<br><br>**These facts are material to the following legal issues:**<br>(1) whether lesbians and gay men are situated similarly to purposes for civil marriage;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | Fam. Code § 297, Note [Operative Jan. 1, 2005]; Welf. & Inst. Code § 16013; Cal. Code Regs., tit. 22 §§ 88030, 89002, 89317 [prohibiting sexual orientation discrimination in connection with foster parenting and adoption]; *Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 442 [upholding the validity of popular adoption procedure used by thousands of gay and lesbian couples]; see also Gov't Code §§ 12920, 12921, 12926, 12940, 12944.<br><br>See *Baker v. Vermont*, 170 Vt. 194, 218, 744 A.2d 864, 881-82 (1999) ("The Vermont Legislature has not only recognized this reality [that increasing numbers of same-sex couples are conceiving and raising children], but has acted affirmatively to remove legal barriers so that same-sex couples may legally adopt and rear the children conceived through such efforts. . . . The state has also acted to expand the domestic relations laws to safeguard the interests of same-sex parents and their children when such couples terminate their domestic relationship."); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at 8 (recognizing that state's laws permit adoption and procreation by same-sex couples, reflecting state recognition of the fact that their sexual orientation is no bar to good parenting); *People v. Greenleaf*, 780 N.Y.S.2d 899, 2004 N.Y. Misc. LEXIS 1121 at 4-5 (July 13, 2004) ("It has long been recognized that sexual orientation, alone, is not a factor in determining the appropriateness of adoption or custody of a child." (citing gay and lesbian adoption and custody laws); "New York's highest court has consistently extended rights and benefits to same-sex partners" (citing cases re rent control, adoption and custody) and "new York statutes have regularly been amended to prohibit discrimination against any individuals on the basis of sexual orientation and to extend rights |

10

| Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|
| | and benefits to same-sex partners" (citing statutes and regulations)); *People v. West*, 780 N.Y.S. 2d 723, 724 (June 10, 2004) (No recent act of the legislature suggests a policy favoring any form of discrimination against homosexuals or same-sex partnerships. The New York Attorney General has questioned the constitutionality of current New York law which denies marriage to same-sex couples. . . . [R]ecent court decisions and legislative enactments addressing related issues leave no doubt that New York policy favors ameliorating the discriminatory effect of current laws (or the lack thereof) on homosexuals. For example, the New York Court of Appeals has said that a `realistic and valid' view of family `includes two adult lifetime partners whose relationship is long term and characterized by an emotional and financial commitment and interdependence." (citing cases involvivg rent control, adoption, wrongful death, right to compensation for loss of partner on September 11). |
| 9.    In a minority of married couples and a minority of same-sex couples in California, one person is employed while the other person is not in the labor force. Where children are involved, lesbian and gay couples are more likely than heterosexual couples to have one partner stay at home to care for the children.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether lesbian and gay couples are situated similarly to heterosexual couples with respect to the rights, benefits and obligations afforded by marriage;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and**<br>**(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | Badgett Dec. ¶¶ 12, 57.<br><br>**See also *Goodridge v. Dep't of Public Health*, 440 Mass. 309, 336, 798 N.E.2d 941, 964 (2003) ("the department's conclusory generalization—that same-sex couples are less financially dependent on each other than opposite-sex couples— ignores that many same-sex couples, such as many of the plaintiffs in this case, have children and other dependents (here aged parents) in their care.").** |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| 10. | | Same-sex parents as a group have fewer economic resources to provide for their children than do married parents, partly as a result of the financial disadvantages that attach to marriage discrimination.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether lesbian and gay couples are situated similarly to heterosexual couples with respect to the rights, benefits and obligations afforded by marriage;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and**<br>**(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | Badgett Dec. ¶¶ 17-19. |
| 11. | | Prohibiting same-sex couples from marrying gravely harms lesbians and gay men and their children.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether lesbians and gay men have liberty and privacy interests that are injured by denying them the right to marry the person of their choice;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest;**<br>**(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families;**<br>**(4) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection.** | (Badgett Dec. ¶¶ 15-19, 20-60; Nock Dec. ¶¶ 12-15; Galatzer-Levy Dec. ¶¶ 13-14; Herek Dec. ¶¶ 40-47; Okun Dec. ¶¶ 4-8; Gatto Dec. ¶¶ 6, 9; Quinneville Dec. ¶3; H Zia Dec. ¶¶ 13-17; B. Zia Dec. ¶¶7-13.)<br><br>*Goodridge v. Dep't of Social Servs.*, 440 Mass. 309, 326, 798 N.E.2d 941, 957 (2003) ("Without the right to marry—or more properly, the right to choose to marry— one is excluded from the full range of human experience and denied full protection of the laws for one's `avowed commitment to an intimate and lasting human relationship'"); *id.* at 334-35, 798 N.E.2d at 962-64 (restricting marriage to different-sex couples "cannot plausibly further" the policy of protecting the welfare of children; "While the enhanced income provided by marital benefits is an important source of security and stability for married couples and their children, those benefits are denied to families headed by same-sex couples"; the marriage ban "prevent[s] children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized"); *id.* at 341, 798 N.E.2d at 968 (ban on same-sex marriage "works a |

12

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | | deep and scarring hardship on a very real segment of the community"); *Baker v. State*, 170 Vt. 194, 210, 744 A.2d 864 (1999) ("If anything, exclusion of same-sex couples from the legal protections incident to marriage exposes their children to the precise risks that the State argues the marriage laws are designed to secure against"); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at 9 ("the goal of nururing and providing for the emotional wellbeing of children would be rationally served by allowing same-sex couples to marry; that same goal is impaired by prohibiting such marriages"); *People v. Greenleaf*, 780 N.Y.S.2d 899, 2004 N.Y. Misc. LEXIS 1121 at 4 (July 13, 2004) ("Excluding same-sex couples from civil marriage makes [the[ children [conceived, adopted, and/or otherwise being raised by same-sex couples] less, not more, secure.") |
| 12. | Civil marriage has never been a static institution.  Historically, it has changed, sometimes dramatically, to reflect the changing needs, values and understanding of our evolving society.<br><br>**These facts are material to the following legal issues:<br>(1) whether denying marriage to gay and lesbian couples and their families based on tradition, definitions, or the "common understanding" of marriage rationally furthers any legitimate state interest;<br>(2) whether the state can demonstrate a compelling state interest based on tradition, definitions, or the "common understanding" of marriage justifying denial of marriage to lesbian and gay couples and their families.** | (Cott Dec. ¶¶ 17-51.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 339, 798 N.E.2d 941, 967 (2003) ("As a public institution and a right of fundamental importance, civil marriage is an evolving paradigm."); *Baker v. Vermont*, 170 Vt. 194, 221, 744 A.2d 864, 883 (1999) ("the laws relating to marriage have undergone many changes during the last century"); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at7 ("[T]he shape of marriage has drastically changed over the years.  It took a long time for courts (with legislative bodies sometimes understandably following just a little behind) to break down the traditional stereotypes that relegated women to second class status in society and in the marital relationship."); *People v. Greenleaf*, 780 N.Y.S.2d 899, 2004 N.Y. Misc. LEXIS 1121 at 2-3 (July 13, 2004) ("The definition of marriage, it appears, is flexible and subject to change – an `evolving paradigm.'"; describing changes). |
| 13. | In this country, the institution of marriage has evolved to reflect changing attitudes toward race discrimination.  During the | (Cott Dec. ¶¶ 15, 19-26.) |

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | | slave-holding era, slaves had no right to marry.  In many colonies and in 41 states, marriage between Caucasian citizens and freepersons of African descent was also prohibited throughout much of our history.  But now, all citizens enjoy full civil rights regardless of race, and legal restrictions on racial intermarriage have all been struck down as unconstitutional.  These developments in the institution of marriage paralleled larger social changes that eliminated slavery and recognized racial equality.<br><br>**These facts are material to the following legal issues:<br>(1) whether denying marriage to gay and lesbian couples and their families based on tradition, definitions, or the "common understanding" of marriage rationally furthers any legitimate state interest;<br>(2) whether the state can demonstrate a compelling state interest based on tradition, definitions, or the "common understanding" of marriage justifying denial of marriage to lesbian and gay couples and their families.** | |
| 14. | | In this country, the institution of marriage has evolved to reflect changing attitudes toward sex discrimination, including sex-role stereotyping.  Under the coverture doctrine, women, once married, lost their independent legal identity and vanished into the authority of their husbands.  In its strictest form, coverture deprived women of their right to hold or dispose of property and deemed them to have consented to rape or battery at the hands of their husbands.  During the late nineteenth century, the doctrine of coverture started to erode in response to women's changing social role.  Change was gradual, but now, other than the sex-based restrictions on entry into marriage, there are no longer sex-based assignments of roles, rights, or duties in civil marriage law.  These developments paralleled shifting American views about the equality of women and men.<br><br>**These facts are material to the following legal issues:** | (Cott Dec. ¶¶ 27-51.)<br><br>***Goodridge v. Dep't of Public Health*, 440 Mass. 309, 339, 798 N.E.2d 941, 967 (2003) (describing court and legislative changes in married women's rights); *Baker v. Vermont*, 170 Vt. 194, 221, 744 A.2d 864, 883 (1999) (changes in marriage laws during last century were "largely toward the goal of equalizing the status of husbands and wives"); *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at7 ("[T]he shape of marriage has drastically changed over the years.  It took a long time for courts (with legislative bodies sometimes understandably following just a little behind) to break down the traditional stereotypes that relegated women to second class status in society and in the marital relationship.")** |

14

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | | (1) whether limiting marriage to one male and one female is based on sex role stereotyping, a form of sex discrimination;<br>(2) whether denying marriage to gay and lesbian couples and their families based on tradition, definitions, or the "common understanding" of marriage rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest based on tradition, definitions, or the "common understanding" of marriage justifying denial of marriage to lesbian and gay couples and their families. | |
| | 15. | Neither the race- nor sex-based reforms in civil marriage law deprived marriage of its vitality and importance as a social institution.<br><br>These facts are material to the following legal issues:<br>(1) whether denying marriage to gay and lesbian couples and their families based on tradition, definitions, or the "common understanding" of marriage rationally furthers any legitimate state interest; and<br>(2) whether the state can demonstrate a compelling state interest based on tradition, definitions, or the "common understanding" of marriage justifying denial of marriage to lesbian and gay couples and their families. | (Cott Dec. ¶¶ 6, 8.)<br><br>See *Goodridge v. Dep't of Public Health*, 440 Mass. 309, 340, 798 N.E.2d 941, 967 (2003) ("Alarms about the imminent erosion of the `natural' order of marriage were sounded over the demise of the antimiscegenation laws, the expansion of the rights of married women, and the introduction of `no-fault' divorce. Marriage has survived all of these transformations, and we have no doubt that marriage will continue to be a vibrant and revered institution."); *id.* at 309, 337, 798 N.E.2d 941, 965 (2004) ("Certainly our decision today marks a significant change in the definition of marriage as it has been inherited from the common law, and understood by many societies for centuries.  But it does not disturb the fundamental value of marriage in our society.  ¶Here plaintiffs seek only to be married, not to undermine the institution of civil marriage. ... Recognizing the right of an individual to marry a person of the same sex will not diminish the validity or dignity of opposite-sex marriage, any more than recognizing the right of an individual to marry a person of a different race devalues the marriage of a person who marries someone of her own race.  If anything, extending civil marriage to same-sex couples reinforces the importance of marriage to individuals and communities.  That same-sex couples are willing to embrace marriage's solemn |

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | | | obligations of exclusivity, mutual support, and commitment to one another is a testament to the enduring place of marriage in our laws and in the human spirit."); *Baker v. Vermont*, 170 Vt. 194, 221, 744 A.2d 864, 883 (1999) (Notwithstanding changes in marriage laws during last century, "the benefits of marriage have not diminished in value. On the contrary, the benefits and protections incident to a marriage license under Vermont law have never been greater."); see also *Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at7 (observing that at time of *Maynard v. Hill*, in which U.S. Supreme Court recognized right to marry as fundamental, tradition of parliamentary or legislative divorce without notice was permitted and husband's divorce without notice left wife and children with nothing upon his death, and stating "Today, with new traditions having replaced the old, we can all be assured [Maynard's former wife and children] would have fared better.") |
| 16. | | There has been a recent upswell in challenges to the marriage laws' exclusion of same-sex couples both nationally and internationally. A number of American courts, and even more international courts have recognized that denying marriage to same-sex couples is at odds with shared notions of equality and human dignity.<br><br>These facts are material to the following legal issues:<br>(1) whether continuing to deny gay men and lesbians the right to marry the person of their choice violates current concepts of privacy, liberty and equality;<br>(2) whether denying marriage to gay and lesbian couples and their families based on tradition, definitions, or the "common understanding" of marriage rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest based on tradition, definitions, or the "common understanding" of marriage justifying denial of marriage to lesbian and gay couples and their families. | (Declaration Of Roy Douglas Elliott In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Elliott Dec."] ¶¶ 4-19.)<br><br>*Anderson v. King County* 2004 WL 1738447 (Wash. Super. Aug. 4, 2004) at 3 (describing "dramatic shifts in public attitudes toward homosexuality" including American Psychological Association's official endorsement of same-sex marriage as well as court decisions in the U.S. and other countries); |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| 17. | The purpose of the 1977 amendment to California Family Code Section 300 was to ensure that State law explicitly denied to lesbians and gay men the right to marry their chosen partners. The legislative history of this amendment shows that the use of the State's power to exclude gays and lesbians from marriage was intentionally discriminatory rather than a mere unintended disparate impact.<br><br>**These facts are material to the following legal issue:**<br>**Whether Family Code Section 300 intetionally discriminates based on sexual orientation and strict scrutiny should therefore be applied to California Family Code Section 300.** | (Request For Judicial Notice In Support of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["RFJN"] Ex. E.) |
| 18. | The legislative history of the 1977 amendment to California Family Code Section 300 reflects that it was based on sex role steriotypes, such as that women and not men are dependent spouses and that women rather than men do and should remain at home and out of the workforce to care for children.<br><br>**These facts are material to the following legal issue:**<br>**Whether limiting marriage to one male and one female is based on sex role stereotyping, a form of sex discrimination.** | (RFJN, Ex. E; Cott Dec. ¶¶ 27-37.)<br><br>*See Baker v. Vermont, supra,* **744 A.2d 864, 906 ["the sex-based classification contained in the marriage laws is . . . a vestige of sex-role stereotyping that applies to both men and women . . . ."] (conc. & dis. opn. of Johnson, J.). See also** *Holguin v. Flores* **(2004) 122 Cal.App.4[th] 428, 439 [declining to apply strict scrutiny to the plaintiff's claims because, unlike same-sex domestic partners, he and his different-sex partner "were never members of the class of couples who, because of their gender . . . were barred from marrying"];** *Goodridge,* **440 Mass. at pp. 345–46 ("[b]ecause our marriage statutes intend, and state, the ordinary understanding that marriage under our law consists only of a union between a man and a woman, they create a statutory classification based on the sex of the two people who wish to marry. . . . That the classification is sex based is self-evident." (conc. opn. of Greaney, J.).** |
| 19. | The purpose of Proposition 22, the 2000 statutory initiative codified as Family Code § 308.5, was to ensure that marriages between persons of the same sex would not be valid or recognized in Califomia.<br><br>**These facts are material to the following legal issue:** | (RJFN, Ex. B at pp. 50, 52.) |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|
| **Whether Family Code Section 308.5 intentionally discriminates on the basis of sexual orientation and strict scrutiny should therefore be applied to California Family Code Section 308.5.** | |
| 20. The San Francisco City Controller estimates that prohibiting same-sex couples from marrying costs the City between $15.3 and $19.6 million dollars per year. These figures include the cost of public health and social services to people who, if allowed to marry, would not need such services. They also include lost revenue from sales tax and hotel taxes from wedding and honeymoon-related purchases.<br><br>These facts are material to the following legal issues:<br>(1) whether the City has a beneficial interest in rectifying the exclusion of gay men and lesbians from marriage;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | (Declaration Of Ed Harrington In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Harrington Dec."] ¶¶ 8, 10-25.) |
| 21. San Francisco suffers a series of intangible injuries from the prohibition on marriage between persons of the same sex. This marriage ban limits the ability of the City to ensure that its citizens are treated equally regardless of sexual orientation, which in turn harms the community in general and gay and lesbian San Franciscans in particular.<br><br>These facts are material to the following legal issues:<br>(1) whether the City has a beneficial interest in rectifying the exclusion of gay men and lesbians from marriage;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a | (Declaration Of Cynthia G. Goldstein In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Goldstein Dec."] ¶¶ 6-45.)<br><br>See *Citizens for Responsible Behavior v. Superior Court* (1991) 1 Cal.App.4th 1013, 1028-29 ("The city council has enacted ordinances and resolutions which recognize that discrimination against homosexuals and/or persons suffering from AIDS constitutes a social problem within its borders, and which attempt to address the biases and injustices thus arising. The initiative ordinance would repeal these provisions, replacing them with an implicit affirmance of the right of all persons to discriminate as they choose against the affected classes. The City |

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | would thus become 'a partner in the ... act of discrimination ...'."); see also, e.g., *People v. Garcia* (2000) 77 Cal.App.4th 1269, 1279 ("While injustice to any individual is intolerable under our system of justice, and denial of the rights of a cognizable group is unconstitutional, in the long run, the greatest threat of failure to guarantee the rights of gays and lesbians . . . is to the commonwealth"); *Perez v. Sharp* (1948) 32 Cal.2d 711, 725 ("The effect of . . . prejudice upon any community is unquestionably detrimental both to the minority that is singled out for discrimination and to the dominant group that would perpetuate the prejudice"). |
| 22. | The Controller's findings regarding the impact of the marriage ban on the City's fiscal health mirror analyses of the adverse fiscal impact at other levels of government. According to the Congressional Budget Office, allowing same-sex couples to marry would reduce the federal deficit.<br><br>These facts are material to the following legal issues:<br>(1) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(2) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | (RFJN Ex. I ["The Potential Budgetary Impact of Recognizing Same-Sex Marriages," Congressional Budget Office, June 1, 2004].<br><br>See *Goodridge v. Dep't of Public Health*, 440 Mass. 309, 322, 798 N.E.2d 941, 954 (2003) ("[Civil marriage] is central to the way the Commonwealth . . . ensures that children and adults are cared for and supported whenever possible from private rather than public funds . . . ."). |
| 23. | Sexual orientation bears no relation to a person's ability to perform or contribute to society and is no longer considered an illness or disorder by the medical and psychiatric communities.<br><br>These facts are material to the following legal issues:<br>(1) whether laws that discriminate based on sexual orientation should be judged by a strict scrutiny standard;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying | (Gallatzer-Levy Dec. ¶¶ 5, 7-13; Herek Dec. ¶¶ 18-20; see Fam. Code § 297, Note [Operative Jan. 1, 2005].) |

19

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | denial of marriage to lesbian and gay couples and their families. | |
| 24. | The persecution suffered by gays and lesbians in the United States has been severe throughout the twentieth century. Beginning in the late nineteenth century, the medical community (and later, the federal government) labeled gays and lesbians as deviants, degenerates, sex criminals, and perverts.  Federal, state and local governments forced gays and lesbians out of the military and civilian employment.  The police harassed gays and lesbians in public and private gathering places.<br><br>**These facts are material to the following legal issue:**<br>**Whether laws that discriminate based on sexual orientation should be judged by a strict scrutiny standard.** | (Declaration Of George Chauncey In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Chauncey Dec."] ¶¶ 6-26; Okun Dec. ¶ 9; Declaration Of Cecilia Manning In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes ["Manning Dec."] ¶¶ 4-5.)<br><br>*Rowland v. Mad River School Dist.*, 470 U.S. 1009, 1014 (1985) (Brennan, J., dissenting from denial of certiorari) ("Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena.  Moreover, homosexuals have historically been the object of pernicious and sustained hostility, and it is fair to say that discrimination against homosexuals is `likely . . . to reflect deep-seated prejudice rather than . . . rationality.'"); *Smith v. Fair Employment and Housing Comm'n*, 12 Cal. 4th 1143, 1210 n. 7 (conc. & dis. opn. of Kennard, J.) ("homosexual couples have been subject to a . . . continuing . . . history of discrimination"); *People v. Garcia*, 77 Cal. App. 4th 1269, 1276 (2000) (homosexuals "share a history of persecution comparable to that of blacks and women"); *id.* at 1279 (homosexuals suffer "pernicious and sustained hostility" and "immediate and severe opprobrium" in society); *Fourie v. Minster of Home Affairs*, Supreme Court of Appeal of South Africa, Case No. 232/2003 (Nov. 30, 2004) at 7 ("Gays and lesbians are a permanent minority in society who in the past have suffered from patterns of disadvantage. ¶Because they are a minority unable on their own to use political power to secure legislative advantages, they are exclusively reliant on the Bill of Rights for their protection. ¶The impact of discrimination on them has been severe, affecting their dignity, personhood and identity at many levels. ¶ The sting of past and continuing |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | | discrimination against both gays and lesbians' lies in the messages it conveys, namely that, viewed as individuals or in their same-sex relationships, they `do not have the inherent dignity and are not worthy of the human respect possessed by and accorded to heterosexuals and their relationships.'"); *Tanner v. OHSU*, 157 Or.App. 502, 524 (1998) ("Sexual orientation, like gender, race, alienage, and religious affiliation is widely regarded as defining a distinct, socially recognized group of citizens, and certainly it is beyond dispute that homosexuals in our society have been and continue to be the subject of adverse social and political stereotyping and prejudice."); *see Lawrence v. Texas*, 539 U.S. 538, 583-84 (2003) (O'Connor, J., concurring) ("because Texas so rarely enforces its sodomy law as applied to private, consensual acts, the law serves more as a statement of dislike and disapproval against homosexuals than as a tool to stop criminal behavior. The Texas sodomy law "raises the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected. ... ¶ While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class. "After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal. ... ¶The State has admitted that because of the sodomy law, *being* homosexual carries the presumption of being a criminal. ... Texas' sodomy law therefore results in discrimination against homosexuals as a class in an array of areas outside the criminal law. ... ¶The Texas sodomy statute subjects homosexuals to "a lifelong penalty and stigma."); *Romer v. Evans*, 516 U.S. 620, 634-35 (1996) (Colorado initiative banning anti-discrimination laws protecting gay men and lesbians were "born of animosity" toward that class of persons and "a bare ... desire to harm [that] politically |

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | | unpopular group."); *Citizens for Responsible Behavior v. Superior Court*, 1 Cal. App. 4th 1012, 1027 (1991) (proposed initiative ordinance barring antidiscrimination laws protecting persons with AIDS, homosexuals and bisexuals would "result[] in a `real, substantial, and invidious denial of the equal protection of the laws.'") |
| 25. | Persecution of gays and lesbians was particularly brutal in the McCarthy era after World War II.  Senator Joseph McCarthy and his Senate Committee announced that homosexuals, like communists, constituted "security risks." In 1953, President Eisenhower ordered the discharge of all gay and lesbian employees from federal employment, and the U.S. State Department in fact fired more homosexuals than suspected communists.<br><br>**These facts are material to the following legal issue:**<br>**Whether laws that discriminate based on sexual orientation should be judged by a strict scrutiny standard.** | (Chauncey Dec. ¶¶ 20-23.) |
| 26. | Although social antipathy toward gays and lesbians has moderated, these groups suffer from continuing political disabilities and discrimination.  In most states, discrimination against lesbians and gay men is not illegal.  Congress has repeatedly rejected legislation that would provide job protection for homosexuals, and social antipathy is evident in federal statutes denying recognition of marriages when the spouses are of the same sex and providing for discharge from the military if a servicemember's homosexuality becomes known.  Gays and lesbians have filed suit for the right to marry in numerous states, including Alaska, Hawaii, Massachusetts, New Jersey, Arizona and California.  In Hawaii and Alaska, where lawsuits were successful or appeared on the verge of success, gay couples lost that right when voters passed state constitutional amendments barring same-sex couples from marrying.<br><br>**These facts are material to the following** | (Chauncey Dec. ¶¶ 27-32.)<br><br>See *Lawrence v. Texas*, 539 U.S. 558, 602 (2003) (Scalia, J., dissenting) ("Many Americans do not want persons who openly engage in homosexual conduct as partners in their business, as scoutmasters for their children, as teachers in their children's schools, or as boarders in their home. They view this as protecting themselves and their families from a lifestyle that they believe to be immoral and destructive. ... [T]he attitudes of [the "anti-anti-homosexual"] culture are obviously not `mainstream'; [] in most States what the Court calls "discrimination" against those who engage in homosexual acts is perfectly legal; that proposals to ban such `discrimination' under Title VII have repeatedly been rejected by Congress ...; [] in some cases such `discrimination' is *mandated* by federal statute ...."). |

22

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| | legal issues:<br>(1) whether laws that discriminate based on sexual orientation should be judged by a strict scrutiny standard;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | |
| 27. | Establishing a separate legal institution for State recognition and support of lesbian and gay families, even if well-intentioned, marginalizes and stigmatizes gay families.<br><br>These facts are material to the following legal issues:<br>(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families. | (Declaration Of David Theo Goldberg In Support Of San Francisco's Reply To State Of California's Opposition To Petition For Writ Of Mandate ["Goldberg Dec."] ¶¶ 5, 14; Herek Dec. ¶¶ 40-47.)<br><br>*Goodridge v. Dep't of Public Health*, 440 Mass. 309, 333, 798 N.E.2d 941, 962 (2003) (denying marriage to lesbians and gay men based on procreation rationale "confers an official stamp of approval on the destructive stereotype that same-sex relationships are inherently unstable and inferior to opposite-sex relationships and are not worthy of respect"); *In re Opinions of the Justices to the Senate*, 802 N.E.2d 565, 570 (2004) ("The bill's absolute prohibition of the use of the word `marriage' by `spouses' who are the same sex is more than semantic. The dissimilitude between the terms `civil marriage' and `civil union' is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status. . . . The bill would have the effect of maintaining and fostering a stigma of exclusion that the Constitution prohibits. It would deny to same-sex `spouses' only a status that is specially recognized in society and has signficant social and other advantages. The Massachusetts Constitution . . . does not permit such invidious discrimination, no matter how well intentioned."); *Fourie v. Minister of Home Affairs*, Supreme Court of Appeal of South Africa, Case No. 232/2003 (Nov. 30, 2004) at 9-10 ("More deeply, the exclusionary definition of marriage injures gays and lesbians |

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | | | because it implies a judgment on them. It suggests not only that their relationships and commitments and loving bonds are inferior, but that they themselves can never be fully part of the community of moral equals that the Constitution promises to create for all.").. |
| | 28. | The author of AB 205 recognized that even the greatly enhanced California domestic partnership laws still would not provide equal treatment to gay and lesbian couples and their families.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and**<br>**(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Supplemental Request For Judicial Notice "Supp. RFJN" Ex. A.) |
| | 29. | AB 205 does not allow registered domestic partners to file their taxes jointly, even for state income tax purposes.  This can dramatically affect couples in which one partner earns substantially more than the other.  Such couples pay significantly higher taxes than their married counterparts each year, and the negative financial impact of this tax penalty compounds as the years pass.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and**<br>**(3) whether the state can demonstrate a compelling state interest justifying** | (Fam. Code § 297.5 subd. (g); H. Zia Dec. ¶ 8; Badgett Dec. ¶  .) |

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539

| | | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|---|
| | | denial of marriage to lesbian and gay couples and their families. | |
| | 30. | AB 205 does not allow registered domestic partners an exemption from property tax reassessments in the event that one partners transfers an interest in their jointly owned real property to the other partner.  This tax penalty forces some domestic partners to choose between paying potentially thousands of dollars in additional taxes each year or foregoing actions necessary to arrange their affairs in the manner that best suits their needs.<br><br>**These facts are material to the following legal issues:<br>(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Fam. Code § 297.5 subd. (g); Manning Dec. ¶ 8; H.Zia Dec. ¶ 8.) |
| | 31. | Despite AB 205, gay men and lesbians who are not employed in the public sector may continue to be underpaid for the work they perform in comparison to the heterosexual population because their partners and dependents may not enjoy equal access to employee benefits or pension plans.<br><br>**These facts are material to the following legal issues:<br>(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Fam. Code § 297.5 subd. (h); Supplemental Declaration of Cynthia G. Goldstein ¶ 3; Badgett Dec. ¶¶ 24, 27; Manning Dec. ¶ 9; H. Zia Dec. ¶ 8.) |

25

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| 32. | California's refusal to allow gay men and lesbians to marry means that other states and countries who would or might otherwise recognize their relationships need not do so. | *See, e.g.*, Fam. Code § 308. |
| 33. | There is a significant symbolic disparity between domestic partnership and marriage.  Entering a domestic partnership is not generally acknowledged as a solemn and meaningful occasion, nor do the couples, their families, or their friends attribute the same meaning to that legal institution that they do to the institution of marriage.<br><br>**These facts are material to the following legal issues:<br>(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Manning Dec. ¶¶ 12-18; Okun Dec. ¶¶ 7, 10-11; Quinneville Dec. ¶¶ 8-11; H. Zia Dec. ¶¶ 5, 10-12.) |
| 34. | The inability to marry relegates gay and lesbian relationships to second-class status. The creation of the alternative regime of domestic partnership reinforces anti-gay prejudice, which has the potential to escalate into violence.<br><br>**These facts are material to the following legal issues:<br>(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;<br>(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and<br>(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Goldberg Dec. ¶¶ 5-14; Herek Dec. ¶¶ 40-47.) |

26

| | Proposed Findings of Fact | Evidence In Support of Proposed Findings |
|---|---|---|
| 35. | The stigma associated with discrimination and second-class treatment takes a toll on the well-being of gay men and lesbians and their families.<br><br>**These facts are material to the following legal issues:**<br>**(1) whether the relatively new concept of domestic partnership can be considered equal to marriage for purposes of equal protection;**<br>**(2) whether denying marriage to gay and lesbian couples and their families rationally furthers any legitimate state interest; and**<br>**(3) whether the state can demonstrate a compelling state interest justifying denial of marriage to lesbian and gay couples and their families.** | (Galatzer-Levy Dec. ¶ 14; Herek Dec. ¶¶ 40-47; Okun Dec. ¶¶ 6-9; Manning Dec. ¶¶ 8-9.) |

Dated:  January 14, 2005

                         DENNIS J. HERRERA
                         City Attorney
                         THERESE M. STEWART
                         Chief Deputy City Attorney
                         KATHLEEN S. MORRIS
                         SHERRI SOKELAND KAISER
                         Deputy City Attorneys

                         HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN

By: _____
                         THERESE M. STEWART

By: _____
                         SHERRI SOKELAND KAISER

                         Attorneys for Plaintiff
                         City and County of San Francisco

REV. PROP. FINDINGS OF FACT; PROCEEDING NO. 4365; S/C 429-539