# EXHIBIT 10B

| | |
|---|---|
| 1    DENNIS J. HERRERA, City Attorney, State Bar #139669 | BOBBIE J. WILSON, State Bar #147317 |
|        THERESE M. STEWART, State Bar #104930 | PAMELA K. FULMER, State Bar #154736 |
| 2    Chief Deputy City Attorney | AMY E. MARGOLIN, State Bar #168192 |
|        WAYNE K. SNODGRASS, State Bar #148137 | JEFFREY T. NORBERG, State Bar # 215087 |
| 3    MARGARET W. BAUMGARTNER, State Bar #151762 | CHANDRA MILLER FIENEN, State Bar # 225502 |
|        JIM EMERY, State Bar #153630 | HOWARD RICE NEMEROVSKI CANADY |
| 4    JULIA M.C. FRIEDLANDER, State Bar #165767 | FALK & RABKIN |
|        YVONNE MERE, State Bar #173594 | A Professional Corporation |
| 5    KATHLEEN S. MORRIS, State Bar #196672 | Three Embarcadero Center, 7th Floor |
|        SHERRI SOKELAND KAISER, State Bar #197986 | San Francisco, California 94111-4024 |
| 6    GINA M. ROCCANOVA, State Bar #201594 | Telephone: (415) 434-1600 |
|        NELI PALMA, State Bar #203374 | Facsimile: (415) 217-5910 |
| 7    PHILIP LEIDER, State Bar #229751 | |

Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4700; Facsimile: (415) 554-4747

Attorneys for Respondents/Defendants
CITY AND COUNTY OF SAN FRANCISCO

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO
UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br>**MARRIAGE CASES**<br><br>RANDY THOMASSON, et al.,<br><br>      Petitioners/Plaintiffs,<br><br>vs.<br><br>GAVIN NEWSOM, et al.,<br><br>      Respondents/Defendants. | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 4365<br><br>Case No. **428-794**<br>(Consolidated with Case No. **503-943**)<br><br>**DECLARATION OF ROBERT GALATZER-LEVY IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **PROPOSITION 22 LEGAL DEFENSE AND EDUCATION FUND**, et al.,<br><br>      Petitioners/Plaintiffs,<br><br>vs.<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, et al.,<br><br>      Respondents/Defendants | Date Action Filed:    March 11, 2004<br>Trial Date:             Not set |

1

I, ROBERT GALATZER-LEVY, declare as follows:

1. I know the facts stated herein of my own personal knowledge, except those facts known on information and belief, and if called as a witness I could and would testify competently thereto.

2. I am a psychiatrist, a psychoanalyst, a child and adolescent psychiatrist and a Lecturer in psychiatry at the University of Chicago. I received an M.D. from the Washington University School of Medicine in 1971. I was licensed as a physician by the State of Illinois in 1974 following a Residency in Psychiatry at the University of Chicago. I have maintained a private practice in psychiatry since that time. I have been a member of the American Psychoanalytic Association since 1984 and have served on a number of committees within that organization, including as chair of its Committee on Scientific Activities. I have co-authored or co-edited four books in my field, including *The Course of Gay and Lesbian Lives: Social and Psychoanalytic Perspectives*, which was co-authored with Dr. Bertram J. Cohler and published in 2000. I have previously submitted a declaration in a related case on September 2, 2004. A copy of my *curriculum vitae* is attached hereto as Exhibit A.

**CHILDREN RAISED BY SAME-SEX COUPLES DEVELOP JUST AS WELL AS THOSE RAISED BY OPPOSITE-SEX COUPLES**

3. In their brief, movants claim that "[t]here is no generally applicable social science evidence that children raised by a same-sex couple do as well as children raised by their own biological parents." (Opening Brief In Support Of Declaratory Judgment That The California Marriage Laws Are Constitutional at 25). This is incorrect. I am aware of several studies which conclude that being raised by a same-sex couple has no impact on a child's development. Two of these studies are discussed in a chapter of the book *The Course of Gay and Lesbian Lives: Social and Psychoanalytical Perspectives*, which I co-edited. These studies compared the development of children raised by same-sex couples against that of children raised by opposite-sex couples. The

conclusion of both was that, although there were some differences between the two groups of children, there was no significant effect on child development.

4.   More recently, the November issue of <u>Child Development</u> published the results of a study comparing adolescents raised by opposite-sex couples against adolescents raised by same-sex couples. <u>Child Development</u> is the most prestigious journal on the subject of its title and has a very high level of credibility in the psychiatric, psychological and human development professions. It is my understanding that any study published there is subject to extensive pre-publication peer review. The conclusion of that study was that having same-sex parents did not significantly affect the psycholsocial adjustment and school outcomes of adolescents. Attached hereto as Exhibit B is a true and correct copy of this study.

5.   The conclusions of these three studies are similar to the conclusions of most of the social science research in this area. I am aware of no scientifically sound research suggesting that these conclusions are incorrect.

6.   I have reviewed the paper by Sotiros Sarantakos upon which the movants' experts heavily rely (hereinafter the "Sarantakos Study"). Attached hereto as Exhibit C is a true and correct copy of this paper. The Sarantakos Study is methodologically flawed and irrelevant to the discussion of the development of children raised by same-sex couples for several reasons.

7.   First, that study used a "snowball sample" of same-sex parents rather than a random sample. A "snowball sample" is a group of participants selected through referrals from a small number of initial participants. For example, one could create a snowball sample by asking a single same-sex couple for referrals to ten other same-sex couples. Conducting studies based upon such samples is scientifically problematic because the participants in the study are not representative of the larger population, but rather are biased by self-selection. The preferred practice for conducting such studies is to utilize a random sample of the group being studied. The comparison heterosexual

3

group was constructed from a random sample so that the two groups being compared are not comparable.

8. Second, the Sarantakos Study was conducted on children in Australia. Australian culture is sufficiently different from that of the United States such that the findings for that culture do not necessarily apply in this country.

9. Finally, and most importantly, the Sarantakos Study is not as much a comparison of children of same-sex couples as it is a study of children from broken homes. The Sarantakos Study admittedly does not examine children born into same-sex families, but rather children "born in a previous relationship (marriage, cohabitation or unmarried motherhood) [who] were subsequently brought into the homosexual relationship." Exhibit C at 24. It is generally accepted in the psychological community that a change in family structure due to divorce or the death of a parent can have a detrimental effect on child development. It is therefore impossible to determine to what extent the differences in child development reported by that study were attributable to the prior disruption of the family unit.

10. It should be noted that there is currently no research comparing the development of children raised in the homes of married opposite-sex couples against children raised in the homes of *married* same-sex couples. There is currently no research on such families because, at least in the United States, no same-sex *married* couples existed until very recently. The lack of research in this area requires any expert attempting to analyze the potential effect of allowing such marriages to look at studies of analogous situations. Opponents of same-sex marriage, including movants' experts, often attempt to predict the possible outcome of allowing such marriages by examining children raised in single-parent or step-parent families. However, both of these situations nearly always involve a traumatic family event, such as the death of a parent or divorce, which in and of itself has a negative effect on child development. It is important to note that in discussing same-sex

marriage I am not talking about plucking children from the homes of their biological heterosexual parents. Rather, this discussion is one of allowing existing family units to participate in the institution of marriage. As stated in my prior declaration, it is my opinion that allowing such marriages would have a beneficial effect on child development. (See Declaration Of Dr. Robert Galatzer Levy In Support Of City And County Of San Francisco's Constitutional Challenge To Marriage Statutes [filed in Case No. 429-539] ¶ 14.)

## HOMOSEXUALITY IS NEITHER A "MOVING TARGET" NOR A "TREND"

11. Homosexuality is an identifiable characteristic of any given individual. Although homosexuality is not sharply identifiable in psychiatry, there are strongly overlapping definitions that are commonly used. The term refers to an area of behaviors and feeling states that, while not separable by a bright line test, are nonetheless identifiable. Thus, while not being discrete in the sense that a disease or mental illness is, homosexuality is easily identifiable through examination of an individual's actions and mental state.

12. Nor can homosexuality be classified as a "fashion" or "trend". For any individual in a given society at a given moment, sexual orientation is clearly a trait of that individual. People experience sexual orientation as intrinsic and stable. While it is true that some individuals experience a shift in sexual orientation over the course of a lifetime, the cause of such shifts is currently unknown. It is also true that at various times in history people have experienced varying degrees of openness with respect to sexual experience, and during periods of greater openness people acted more on their sex interests than during other periods. This is not specific to homosexuality; it speaks to sexual behavior of all types. Looking solely at the behavioral response to increasing societal acceptance of various sexual interests ignores the internal experience of the individual. While an individual's sexual behavior may change as a result of increasing societal openness, this does not mean the individual experienced an internal shift in sexual orientation.

## MOVANTS' CLAIM THAT HOMOSEXUALITY IS "PRIMARILY" INFLUENCED BY "EXTERNAL INFLUENCES" AND "ACTUAL SEXUAL EXPERIENCES" IS INCORRECT

13. I understand that movants make the following claim in their Statement of Undisputed Facts: "studies performed on the issue of the origins of homosexuality have found that the establishment of sexual orientation is influenced primarily by external influences and actual sexual experiences." (Plaintiffs' [CCF's] Statement Of Undisputed Material Facts In Support Of CCF's Motion For Summary Judgment Or In The Alternative For Summary Adjudication Of Issues ¶ 10.) There is no generally accepted science to support this. While there have been numerous studies of the cause or origin of the homosexual characteristic, none of these studies has provided any conclusion that has been generally accepted by the psychiatric community. The assertion that "actual sexual experience" has some effect on sexual orientation is particularly troubling. I am unaware of any methodologically sound studies examining the effect of "actual sexual experience" on sexual orientation. In fact, in my 30 years of clinical experience, I have not encountered a patient who has experienced a shift in sexual orientation due to an "actual sexual experience".

## HOMOSEXUALITY IS NOT A DISEASE OR MENTAL ILLNESS AND ATTEMPTS TO CHANGE SEXUALITY THROUGH THERAPY ARE HARMFUL TO THE PATIENT

14. Movants' position that homosexuality is a developmental disorder and can be changed through so-called reparative therapy is contrary to the view of the vast majority of psychiatrists and other mental health care providers. The three largest mental health care providers' professional associations have long since adopted the position that homosexuality is not a disease or mental illness.

15. Movants' claim that the declassification of homosexuality as a disease or mental illness was a decision based on politics rather than science is also incorrect. Despite political pressure in both directions, the American Psychiatric Association's removal of homosexuality from

6

its classification was based on scientific evidence. I chaired the committee which recommended the American Psychoanalitic Association's position that homosexuality is not a disorder.[1] Our decision to recommend declassification was based on a survey of the available science on the subject and was not a political decision.

16. The fact that gay and lesbian researchers may have been involved in some of the science used to support our recommendation is irrelevant. The studies upon which we relied were conducted using neutral and generally accepted scientific principals.

17. Because sexual orientation is not a disease or mental illness, it is not appropriate to attempt to change through therapy. Any attempts to do so will likely have a negative mental impact. There are several reasons for this.

18. Initially, when a person goes to a therapist, that person will often adopt a major portion of the therapists' evaluation. If a therapist tells a patient that they are "sick" or "deviant," the patient is likely to adopt this. Most people experience sexual orientation as close to the core of who they are. When a therapist attacks a core portion of a patient's identity, it can be devastating to the well being and self-esteem of the patient. For homosexual patients, a major problem exists in that they often have already internalized society's condemnation. The therapist's evaluation backs this up and so damages the patient.

19. Attempts to change a patient's sexual orientation also hinders the person's ability to adapt well to the orientation they already have. The steps that people ordinarily take to adjust to their sexual orientation, such as becoming part of a community, association with people sympathetic to them, and becoming aware of the cultural associated with their sexual orientation, are likely to be interfered with when the individual works with an anti-homosexual therapist. When patients

---

[1] A more complete discussion of my research and conclusions in my role as chair of that committee can be found in paragraphs 3-11 of the declaration I refer to in paragraph 10.

attempt to change sexual orientation under pressure from a therapist, the patient may later experience a personal crisis and even more confusion in personal and sexual identity, leading to greater feelings of depression and anxiety or to suicidal ideation.

## ALLOWING SAME-SEX MARRIAGE WOULD LIKELY REDUCE ANY INCREASED HEALTH RISKS SUFFERED BY GAY MEN AND LESBIANS

20. Finally, Dr. Satinover's attempts to correlate homosexuality with other diseases or mental illnesses are misplaced. (See Declaration Of Jeffrey B. Satinover In Support Of Proposition 22's Motion For Summary Judgment/Summary Adjudication ¶¶ 29-36.). The broad finding of the mental health community is that, insofar as there are any greater instances of mental health problems among gay men and to a lesser extent lesbians, they are the direct result of prejudice. These problems are of a similar type found in other minority populations which are subject to prejudice, such as African Americans. The idea of "curing" homosexuality to alleviate the problems caused by prejudice is analogous to Benjamin Rush's idea of treating black skin to alleviate the societal problems African Americans encountered because of the color of their skin.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 29 day of December, 2004, at Chicago, Illinois.

_____
ROBERT GALATZER-LEVY