# EXHIBIT 12A

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  THERESE M. STEWART, State Bar #104930
   Chief Deputy City Attorney
3  WAYNE K. SNODGRASS, State Bar #148137
   JIM EMERY, State Bar#153630
4  JULIA M.C. FRIEDLANDER, State Bar#165767
   YVONNE MERE, State Bar #173594
5  KATHLEEN S. MORRIS, State Bar #196672
   SHERRI SOKELAND KAISER, State Bar #197986
6  GINA M. ROCCANOVA, State Bar #201594
   NELI PALMA, State Bar #203374
7  PHILIP LEIDER, State Bar #229751
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4682
   Telephone:    (415) 554-4700
10 Facsimile:    (415) 554-4747

11 Attorneys for Plaintiff
   CITY AND COUNTY OF SAN FRANCISCO
12

BOBBIE J. WILSON, State Bar #147317
PAMELA K. FULMER, State Bar #154736
AMY E. MARGOLIN, State Bar #168192
SARAH M. KING, State Bar #189621
KEVIN H. LEWIS, State Bar #197421
CEIDE ZAPPARONI, State Bar #200708
JEFFREY T. NORBERG, State Bar # 215087
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:    (415) 434-1600
Facsimile: (415) 217-5910

ENDORSED
FILED
San Francisco County Superior Court

SEP - 2 2004

GORDON PARK-LI, Clerk
BY: _____
                Deputy Clerk

13                SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                            COUNTY OF SAN FRANCISCO

15                            UNLIMITED CIVIL JURISDICTION

16

17 Coordination Proceeding
   Special Title (Rule 1550(b))
18 **MARRIAGE CASES**

19 **CITY AND COUNTY OF SAN
   FRANCISCO**, a charter city and county,
20
            Plaintiff/Petitioner,
21
       vs.
22
   **STATE OF CALIFORNIA**, et al.
23
            Defendants/Respondents.
24

JUDICIAL COUNCIL COORDINATION
PROCEEDING NO. **4365**

Case No. **429-539**
(Consolidated with Case No. 504-038)

**DECLARATION OF CYNTHIA G.
GOLDSTEIN IN SUPPORT OF CITY
AND COUNTY OF SAN FRANCISCO'S
CONSTITUTIONAL CHALLENGE TO
MARRIAGE STATUTES**

Hearing Date:     TBD
Hearing Judge:    Richard A. Kramer
Time:             TBD
Place:            304

Date Action Filed:  March 11, 2004
Trial Date:         Not set

---

DECL. OF CYNTHIA GOLDSTEIN; PROCEEDING NO. 4365          1          N:\GOVLIT\LI2004\041629\00259990.DOC

I, Cynthia G. Goldstein declare as follows:

1. I have personal knowledge of the matters set forth herein, except as to matters based on information and belief, and could competently testify thereto.

2. I am a Senior Contract Compliance Officer with the San Francisco Human Rights Commission ("HRC"), charged with enforcing City and County of San Francisco ("City") Ordinances relating to civil rights and nondiscrimination. These Ordinances include the City's nondiscrimination in contracts and equal benefits laws, found in S.F. Administrative Code, chs. 12B-12C, and its nondiscrimination in employment, housing and public accommodations laws (S.F. Police Code, arts. 33 & 38). I oversee the HRC division that has responsibility for enforcement of these laws with respect to sexual orientation and domestic partner status discrimination.

3. I have been employed by the HRC for the past fourteen years, during which time my work has focused on addressing sexual orientation and domestic partner status discrimination. I have had primary responsibility for overseeing the implementation and enforcement of the City's Equal Benefits Ordinance (S.F. Administrative Code, chs. 12B & 12C) since its inception in November 1996. This contract compliance program was the first of its kind in the nation. It requires City contractors to offer the same benefits to employees, customers and clients in domestic partnerships as are offered to those who are married. My duties have included developing and designing the infrastructure for this new program, including drafting rules of procedure and resource and educational materials; and developing compliance tracking, auditing and reporting mechanisms. I also manage the day-to-day contract compliance work carried out by a team of nine HRC staff members, and plan and implement program enhancements. I have extensive public speaking experience before a wide variety of audiences on the topics of sexual orientation discrimination and the rights and responsibilities of domestic partners, including experience testifying before state and local government bodies on proposed equal benefits legislation. During my employment at the HRC I have also investigated and/or mediated over 200 complaints of discrimination, and have drafted anti-discrimination and domestic partner-related legislation and Board of Supervisor-sponsored ballot measures.

## INTRODUCTION

4. The origins of the HRC stem back to 1964. In that year a group of African American San Franciscans picketed hotels and automobile showrooms asserting that those employers were discriminating against them. In response to these demonstrations and to further address intergroup tensions, then-Mayor Jack Shelley formed a Human Rights Committee. That Committee successfully negotiated a resolution to that original dispute.

5. The success of the Human Rights Committee prompted the Mayor and the Board of Supervisors to turn it into a City department. The San Francisco Administrative Code was then amended to create the HRC (S.F. Administrative Code, ch. 12A). The HRC consists of mayoral-appointed Commissioners and civil service staff charged with protecting San Franciscans from discrimination and helping the City "resolve intergroup tensions." The language establishing the HRC declared: "A substantial number of the aforementioned evils in this City and County are beyond the regulation of applicable State law, and insofar as State law is applicable, voluntary compliance therewith should be fostered by a local human relations commission." The people of San Francisco later voted to enshrine HRC in the City's Charter (S.F. Charter § 4.107).

## THE CITY'S EFFORTS TO END DISCRIMINATION BASED ON SEXUAL ORIENTATION

6. In the late 1960s and early 1970s, HRC staff noticed an increasing number of complaints alleging sexual orientation discrimination. These complaints were coming from members of the public as well as from City employees who were themselves encountering discrimination. Further, public comment at HRC meetings included testimony from lesbians and gay men that documented rampant sexual orientation discrimination in San Francisco.

7. In early 1972, in response to the growing number of sexual orientation complaints filed by City employees, the Civil Service Commission amended the Civil Service Code to protect City employees and applicants for City employment from sexual orientation discrimination.

//

8. Later in 1972, the Board of Supervisors amended San Francisco Administrative Code Chapters 12B and 12C to add sexual orientation as a protected category. The amended Code chapters prohibited companies who contracted with the City from discriminating against their employees or members of the public. In adopting Chapters 12B and 12C, the City and County of San Francisco codified that it would not do business with companies with discriminatory practices, including companies that discriminate on the basis of sexual orientation. In so acting, the San Francisco Board of Supervisors was the first legislative body in the United States to protect people in the private sector from sexual orientation discrimination.

9. The public contracting legislation demonstrated San Francisco's relatively early commitment to civil rights for all people, including gay men and lesbians (and as later identified bisexuals and transgender persons). The inclusion of gay men and lesbians in the discussion of civil rights for all people was articulated by complainants alleging discrimination, by scholars and activists in the gay and lesbian community, by legislators and political leaders, by members of the clergy, and increasingly by the courts.

10. Chapters 12A, 12B and 12C identified HRC as the agency charged with chronicling, investigating and educating individuals and businesses about the discriminatory practices affecting lesbian, gay, bisexual and transgender San Franciscans. One of the earliest examples of HRC's commitment to Chapter 12B occurred in 1975, when HRC successfully challenged the discriminatory practices of Pacific Telephone Company, which at the time banned the hiring and employment of openly gay employees. HRC negotiated a resolution to a complaint filed with the agency in which Pacific Telephone agreed to drop all practices and policies that discriminated against gay and lesbian employees and applicants.

11. Also in 1975, HRC created the position of Lesbian/Gay Community Liaison, the first such governmental position in the United States. The Liaison worked as a link between HRC and the community, recommending legislation, giving testimony to the Board of Supervisors, taking complaints from the public, and acting as a mediator to resolve complaints of discrimination.

//

12. In 1975 HRC created the Gay Advisory Committee to serve as a place for the public to identify community issues, air its grievances, recommend solutions, and advise HRC Commissioners on actions they should take to remedy discrimination. The Board of Supervisors later mandated by Ordinance that the Gay Advisory Committee become a standing committee of the HRC. The Gay Advisory Committee, now called the Lesbian Gay Bisexual Transgender (LGBT) Advisory Committee, is still in operation today. The committee, made up of LGBT San Franciscans and staffed by HRC employees, has organized panel presentations and public hearings for HRC to hear testimony and make recommendations for achieving equality for the LGBT community. Panels and hearings have focused on such issues as domestic partners, same-sex marriage, discrimination against persons with HIV/AIDS, family and children's issues, lesbian health issues, racism in the LGBT community, LGBT youth and senior issues and hate-based violence.

13. In 1978 Harvey Milk, the first openly gay man to be elected to the Board of Supervisors, took office, and San Francisco took a giant leap toward making the dream of inclusion a reality. Supervisor Milk sponsored legislation in 1978 that added Article 33 to the San Francisco Police Code. Among other things, Article 33 prohibits discrimination based on sexual orientation in employment, housing, and public accommodations.

14. Article 33, which was one of the first bills in the United States to include sexual orientation as a protected class, was written with at least three goals in mind.

15. The first goal was to create a legislative response to the increasing number of discrimination complaints that were being filed with HRC, which revealed the depth of discrimination experienced by the City's gay and lesbian community. To take just a few examples, complaints included a landlord who said he did not want to rent to gay men; two gay men working as temporary workers for a company that did not want to hire gay men or lesbians into permanent positions; lesbians and gay men who were suffering harassment by co-workers and supervisors; and a teacher who was fired when she revealed she was a lesbian. Before the passage of Article 33, there was no redress for these complainants since no City contractors were involved and sexual orientation was not at that time included as a protected category under either

state or federal law.

16. The second goal of Article 33 was to provide a deterrent to discrimination. The mere presence of the term "sexual orientation" in an anti-discrimination ordinance, and in related City literature, sends a strong message to landlords, employers, co-workers, and business owners that discrimination against gay men and lesbians would come with a price. Even the most ardent anti-gay potential perpetrators might think twice about discriminating when they could face lawsuits and judgments.

17. The third, and in some ways most important, goal of Article 33 was to bring gay men and lesbians within the bounds of legal protections. Its proponents believed that adding sexual orientation as a protected class would bring a new sense of inclusion, equality, and citizenship to the San Francisco gay and lesbian population. This community, similar to other socially and politically marginalized groups, would for the first time be reassured that their right to equality was recognized and protected by the law.

18. In the years since sexual orientation became a protected class in the San Francisco Administrative and Police Codes, HRC has received thousands of complaints of anti-gay discrimination. Typical complaints have included employees being fired because of their sexual orientation; employees being harassed by supervisors or co-workers using anti-gay epithets; landlords refusing to rent to lesbians or gay men; and same-sex couples being asked to leave restaurants for even mild displays of affection.

19. Complaints alleging violations of Article 33 are typically handled by HRC using a mediative model, and although these mediations often lead to settlements and resolutions, what is perhaps most important in this process is that respondent employers, landlords, and business managers end up coming face to face with gay men and lesbians they have treated unfairly. Complainants have the chance to explain how the discrimination made them feel, and what being treated as a second-class citizen is like. Respondents often gain a greater understanding of gay men and lesbians, their own responsibilities under the law, and a deeper understanding of what "equality" actually means.

//

20. In 1983, HRC staffing divisions were restructured so that a new Lesbian/Gay Unit (now known as the Lesbian Gay Bisexual Transgender and HIV Division) was formed complete with its own manager and subordinate staff. Today that division has nine members who investigate and mediate discrimination complaints, enforce the Equal Benefits Ordinance ("EBO"), provide staff support to the LGBT Advisory Committee, and conduct LGBT sensitivity training sessions for City employees, corporations, nonprofit organizations and the public.

21. In addition to handling complaints, HRC has worked to identify affirmative measures that would aid the LGBT community in achieving full equality.

22. For example, in 1985, HRC held public hearings on the status of people of color within the gay and lesbian community. The hearing focused on hiring practices of lesbian- and gay-owned bars and restaurants. HRC recommended actions to the business community directed at creating more diverse employee rosters in these businesses.

23. In 1996 HRC held a public hearing focused on gay and lesbian youth, and heard testimony on the difficulties young lesbians and gay men face when they come to San Francisco seeking safety and support and are met with a lack of services, discrimination, and potential violence. HRC made recommendations to the Board of Supervisors, community organizations and businesses on ways to improve the lives of young lesbians and gay men in the areas of education, housing, health, social services and safety. One of HRC's recommendations resulted in the passage of legislation requiring LGBT sensitivity training for youth service providers who contract with the City.

24. In 2000, HRC held a public hearing on economic empowerment issues in the gay and lesbian community, and specifically examined the myth of gay and lesbian wealth. HRC found that the gay and lesbian community suffers economic detriment as a result of discrimination. Recommendations were made to the Board of Supervisors, other governmental agencies, the business community and non-profit organizations in such areas as employment and housing discrimination, health, lending practices of financial institutions, and access to economic development programs. HRC paid particular attention to the financial disadvantages suffered due to marriage discrimination.

25. In 2002, HRC held a public hearing on aging in the gay and lesbian community. It heard testimony from gay and lesbian elders and from the organizations serving them. HRC found very serious discrimination against lesbian and gay elders in senior services organizations, and identified isolation as a primary issue for elder lesbians and gay men who are afraid to be open about who they are because of decades of discrimination. Among HRC's recommendations to the Board of Supervisors, senior service providers and the funders of those organizations was a call to advocate for equal rights for same-sex couples, including the right to marry, so that surviving partners of a same-sex relationship would potentially be eligible for survivors' pensions, such as Social Security, and so that same-sex couples could live together in retirement and convalescent facilities.

26. In the years 2000-2002, the Board of Supervisors passed legislation to strengthen Article 33. Among other things, the Board of Supervisors amended Article 33 to prevent discrimination in business transactions. This legislative change stemmed from complaints filed with HRC that documented, for example, a building owner who would not approve the sale of a restaurant in his building because the prospective purchasers were gay men. Additional changes to Article 33 required businesses to post notices for employees regarding their rights under the City's anti-discrimination laws, and outlawed discrimination against those who associate with people in protected categories, who are perceived to be members of that category, or are retaliated against for complaining about unlawful discrimination.

**THE CITY'S EFFORTS TO SUPPORT SAME-SEX COUPLES AND THEIR FAMILIES**

27. From its inception, HRC consistently received a heavy complaint load from people reporting discrimination against them due to the non-recognition of their primary relationship, in the areas of employment, housing and public accommodations. Gay and lesbian partners filed complaints stating that they were harassed or denied access to housing by landlords; they experienced harassment and other adverse employment actions based on their having a same-sex partner; and they were denied access to the same benefits and privileges offered to married couples by public accommodations.

//

28. In November 1982, in an effort to stem discrimination against same-sex couples in San Francisco, the Board of Supervisors passed domestic partnership legislation which, if signed into law, would have granted City and County recognition of these couples, and provided various benefits to these couples and to partners of City employees. HRC supported this legislation. Despite an 8-3 approval of this legislation by the Board of Supervisors, in December of that year then-Mayor Dianne Feinstein vetoed the legislation.

29. In March of 1989 HRC sponsored a public hearing entitled "Investigation into Domestic Partnership, Marital Status and Extended Family Policies." The hearing was designed, in large part, to investigate and document the unequal treatment faced by same-sex couples due to marriage discrimination. The hearing gave the public an opportunity to express its views on the need for legislation addressing this discrimination, and what form such legislation should take.

30. Representatives of the Board of Supervisors and then-Mayor Art Agnos attended the 1989 hearing. The hearing addressed various areas of concern, including existing laws and policies; the psycho-social dynamics of families headed by gay or lesbian parents; and views from representatives of business establishments, labor organizations, religious groups and interested individuals. All but one of the thirty speakers testifying that night supported the domestic partner concept and domestic partner legislation.

31. The HRC report that came out of the 1989 hearing found that same-sex couples have systematically and institutionally been denied the right to be treated equally under the law, and recommended that the City and County of San Francisco enact legislation that would offer City recognition of domestic partnership status.

32. Later that year, the Board of Supervisors and Mayor Agnos created a task force to examine the feasibility of extending health benefits to the domestic partners of City employees. The resolution forming this task force specifically noted that same-sex couples have long been denied the fundamental right to form private relationships of mutual caring and economic interdependence without fear of prejudice. Further, it committed the City and County to work aggressively to end discrimination against gay and lesbian couples who are denied the

DECL. OF CYNTHIA GOLDSTEIN; PROCEEDING NO. 4365     9

recognition given to opposite sex couples.

33.   In June of 1989, Mayor Agnos signed legislation creating a San Francisco domestic partnership registry and prohibiting the City and County from discriminating against domestic partners in any way. This legislation also created visitation rights for domestic partners in health care facilities. HRC was given the authority to enforce this measure.

34.   In July of 1989, before the domestic partnership registry could go into effect, religious groups gathered enough signatures to place a repeal of the law on the November 1989 ballot. In the months leading up to the November election, a campaign against domestic partner benefits was waged, spearheaded by the Catholic Archdiocese of San Francisco funded by local and out-of-town religious conservatives. These groups and individuals succeeded in convincing the voters to repeal the domestic partnership registry.

35.   In June 1990, another domestic partner-related ballot measure was placed before the voters, this time only asking for voter approval of a domestic partnership registry, and not any additional benefits. This measure passed, and a subsequent repeal effort placed on the November 1990 ballot failed. The San Francisco domestic partnership registry opened its rolls on Valentines Day, February 14, 1991. This marked the first time a major U.S. city had allowed gay and lesbian couples to register their relationships with the government.

36.   Two months after San Francisco began allowing couples to register as domestic partners, the City's Health Services Board approved a plan to offer health insurance to domestic partners of City employees. After approval by the Board of Supervisors and Mayor Agnos, these benefits were made available to City and County employees in July of 1991, at the start of the next benefits plan year. Two years later, the City Charter was amended by a vote of the people to extend retirement benefits to the domestic partners of City employees.

37.   In February 1996, the Board of Supervisors passed a resolution calling on HRC to investigate whether religiously affiliated non-profit organizations funded by the City to provide social services were discriminating against gay men and lesbians in the provision of these services. This Board action stemmed from a statement published by one such organization (The Salvation Army) that expressed negative views on homosexuality, and the concern that such

views could present a barrier to potential employees or clients who were lesbian, gay, bisexual or transgender; and from complaints by gay and lesbian clients and employees of various organizations claiming discrimination based on sexual orientation and/or domestic partner status.

38. In November 1996 the Board of Supervisors and then-Mayor Willie Brown took action with respect to City contractors. Specifically, they amended the City's nondiscrimination in contracts laws (S.F. Administrative Code, chs. 12B & 12C) to require City contractors to offer the same benefits to their employees and clients or customers who are in domestic partnerships as they do to those who are married. These amendments, commonly referred to as the Equal Benefits Ordinance ("EBO"), took effect on June 1, 1997.

39. HRC, already named as the City's enforcement authority for Administrative Code Chapters 12B and 12C, was given the responsibility of enforcing the EBO. HRC developed Rules of Procedure and a variety of resources to aid contractors in their compliance effort. Great effort went into, and continues to go into, educating potential City contractors about the ways in which their policies discriminate against employees or consumers with domestic partners and how such discriminatory policies can be corrected.

40. Shortly after the EBO was signed into law, two lawsuits were filed in Federal District Court challenging the City's ability to enforce such a measure. This litigation continued for over six years, with the final court determination issued in March 2004, denying Plaintiff's petition for *certiorari* to the U.S. Supreme Court.

41. In June 1998, Mayor Brown issued an executive order reaffirming the City's policy of nondiscrimination against domestic partners and requiring each City department to extend the same benefits to married couples and couples in domestic partnerships. His order acknowledged that same-sex couples are denied most of the benefits accorded to married couples and stated his intent to offer these couples every marriage benefit within the City's jurisdiction.

42. Notwithstanding the City's moves toward equality for gay men and lesbians, HRC continued to receive numerous complaints from domestic partners alleging discriminatory treatment by businesses and service providers. For example, complaints were filed against various athletic clubs because they offered family membership rates to married couples but not to

domestic partners. In 1998, the Board of Supervisors and Mayor Brown amended Police Code Article 33 to prohibit public accommodation discrimination on the basis of domestic partner and marital status.

43. In 2001 HRC sent a letter to members of the U.S. Congress expressing its support for the Permanent Partners Act (H.R. No. 832, 109th Cong., 1st Sess. (2003), formerly H.R. No. 690, 107th Cong., 1st Sess. (2001)), which would provide foreign-born domestic partners of U.S. citizens the same U.S. residency privileges as foreign-born spouses of U.S. citizens. As the law currently stands, many bi-national same-sex couples are forced to live apart or move out of the United States in order to avoid violating U.S. immigration policies.

44. In February 2004, HRC sponsored a public forum on the legal issues affecting domestic partners. Since these couples are prohibited from marrying, they must use a range of other legal instruments in their attempt to approximate the rights and responsibilities associated with marriage. This forum was designed to give interested members of the public information about recent changes in California and local laws and to explore the impact of these changes on the methods used to create legal protections for domestic partners.

## CONCLUSION

45. Over the last forty years, HRC has addressed discrimination in San Francisco, and has helped San Francisco become a city that is well known throughout the country as one that celebrates diversity and works to both prevent and respond to discrimination.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed in San Francisco, California.

Dated: August 31, 2004

By: *Cynthia G. Goldstein*

CYNTHIA G. GOLDSTEIN