# EXHIBIT 13

| | |
|---|---|
| 1  DENNIS J. HERRERA, State Bar #139669 | BOBBIE J. WILSON, State Bar #147317 |
|    City Attorney | PAMELA K. FULMER, State Bar #154736 |
| 2  THERESE M. STEWART, State Bar #104930 | AMY E. MARGOLIN, State Bar #168192 |
|    Chief Deputy City Attorney | SARAH M. KING, State Bar #189621 |
| 3  WAYNE K. SNODGRASS, State Bar #148137 | KEVIN H. LEWIS, State Bar #197421 |
|    JIM EMERY, State Bar#153630 | CEIDE ZAPPARONI, State Bar #200708 |
| 4  JULIA M.C. FRIEDLANDER, State Bar#165767 | JEFFREY T. NORBERG, State Bar # 215087 |
|    YVONNE MERE, State Bar #173594 | HOWARD RICE NEMEROVSKI CANADY |
| 5  KATHLEEN S. MORRIS, State Bar #196672 | FALK & RABKIN |
|    SHERRI SOKELAND KAISER, State Bar #197986 | A Professional Corporation |
| 6  GINA M. ROCCANOVA, State Bar #201594 | Three Embarcadero Center, 7th Floor |
|    NELI PALMA, State Bar #203374 | San Francisco, California 94111-4024 |
| 7  PHILIP LEIDER, State Bar #229751 | Telephone:   (415) 434-1600 |
|    Deputy City Attorneys | Facsimile: (415) 217-5910 |

City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:   (415) 554-4700
Facsimile:   (415) 554-4747

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO



ENDORSED
FILED
San Francisco County Superior Court

SEP - 2 2004

GORDON PARK-LI, Clerk
BY: _____
            Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br>**MARRIAGE CASES**<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, a charter city and county,<br><br>Plaintiff/Petitioner,<br><br>vs.<br><br>**STATE OF CALIFORNIA**, et al.<br><br>Defendants/Respondents. | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. **4365**<br><br>Case No. **429-539**<br>(Consolidated with Case No. 504-038)<br><br>**DECLARATION OF ED HARRINGTON IN SUPPORT OF CITY AND COUNTY OF SAN FRANCISCO'S CONSTITUTIONAL CHALLENGE TO MARRIAGE STATUTES**<br><br>Hearing Date:       TBD<br>Hearing Judge:    Richard A. Kramer<br>Time:                    TBD<br>Place:                   304<br><br>Date Action Filed:   March 11, 2004<br>Trial Date:               Not set |

DECL. OF ED HARRINGTON; PROCEEDING NO. 4365         1         N:\GOVLIT\LI2004\041629\00259765.DOC

I, Ed Harrington, declare as follows:

1. I have personal knowledge of the matters set forth herein, except as to matters based on information and belief, and could competently testify thereto.

2. I am employed by the City and County of San Francisco (the "City") as Controller. I have held this position since 1991. Prior to holding this position, I was the assistant general manager and finance director for the San Francisco Public Utilities Commission. Prior to my service with the City, I worked for a private firm that provided audit services to the City and County of San Francisco. I have a CPA license and over 23 years of experience in analysis and management of public sector finances.

3. As Controller for the City, my job responsibilities include:

   (a) Oversee management of the City's budgeting, accounting, payroll, auditing, and financial reporting functions;

   (b) Serve as advisor to the Mayor and the Board of Supervisors on financial and economic matters, and on City management issues;

   (c) Provide financial data, analysis, and recommendations on financial matters to the Mayor, Board of Supervisors, Boards and Commissions, other public agencies, the media, and citizens, as needed; and

   (d) As required by the Charter, prepare and issue periodic reports on the City's financial condition, and ensure that an independent audit of the City's finances is conducted and issued each year.

4. I was asked to analyze the estimated fiscal impact on the City of the inability of same-sex couples to marry. I limited the scope of my analysis to the impact on expenditures from local general fund supported operations where the projected impact exceeds $100,000. I did not include the impact of pass-through funding from State and Federal governments. With the exception of sales tax revenue estimates, the fiscal impact described in this declaration is in addition to the costs described by the Congressional Budget Office, "The Potential Budgetary Impact of Recognizing Same-Sex Marriages," (June 21, 2004) and UCLA's Williams Project, R. Bradley Sears & the University of Massachusetts Amherst's Institute for Gay and Lesbian

Strategic Studies, M. V. Lee Badgett, "The Impact on California's Budget of Allowing Same-Sex Couples to Marry," (May 2004.) Moreover, I limited my analysis to an examination of costs that would be affected by a favorable California Supreme Court ruling. I therefore excluded potential cost savings to the City from federal policies, such as those affecting some public assistance benefit programs and those affecting payroll taxes.

5. In order to analyze the cost to the City of denying same-sex couples the right to marry, it is necessary to estimate the percentage of gay and lesbian people in the city population. My office conducts an annual survey entitled the City Survey to evaluate the provision of City services. This survey collects demographic information about respondents. The survey uses a sample size and sampling techniques that assure a representative sample of the San Francisco population. In the 2004 City Survey, 14% of respondents identified themselves as gay or lesbian.

6. In order to analyze the cost to the City of denying same-sex couples the right to marry, it is necessary to estimate the percentage of couples in same-sex households that would marry given the opportunity. The Census reported that 50.7 percent of households include a married couple. For purposes of this analysis, I have assumed there is one couple per household, and that a comparable 50.7 percent of couples in same-sex households would marry if given the opportunity.

7. Denying same-sex couples the ability to marry results in foregone revenues and increased costs for the City and its taxpayers. Exhibit A, which is attached hereto and incorporated as a part of this declaration, summarizes the estimated net impact of foregone revenues and increased costs for the City and County of San Francisco considering only impacts estimated to exceed $100,000 annually.

8. Specifically, I have concluded that the inability of same-sex couples to marry affects the City by more than $100,000 per year in two principal categories: 1) the City as a Public Benefits Provider, and 2) the City as a Tax and Fee Revenue Collector. The combined estimated impact of the inability of same-sex couples to marry on the City's annual budget is

1  $15.3 to $19.6 million per year. Further detail for both of these categories is provided below
2  and in Exhibit A.

3     9.     While studies that I have read regarding the impact of same-sex marriage on the
4  state and federal governments show both economic benefits and costs, I did not identify any
5  significant incremental unrecoverable costs at the local level. While we would certainly have
6  cost increases related to staffing at the County Clerk's Office and Recorder's Office if marriage
7  license volumes increased with the legalization of same-sex marriages, the City is authorized
8  under State law to charge fees for services up to the total cost of providing those services. Since
9  the City could recover these increased costs from licensees, I have excluded them. Similarly,
10 the City already makes available health and spousal-equivalent pension benefits to the
11 registered domestic partner of any of the City's 27,000 employees; I do not project any
12 incremental costs in this area.

### THE CITY AS PUBLIC BENEFITS PROVIDER

14    10.    If same-sex couples had the right to marry, the City would have a combined
15 estimated public assistance (aid benefits) cost savings of between $13.2 and $13.5 million per
16 year, attributed mainly to reduced caseloads and a reduction in the number of uninsured
17 patients. Currently, nearly 1/3 of San Francisco's total $5.02 billion budget is related to the
18 provision of services by the Department of Public Health and the Department of Human
19 Services. Many of these services are based on means-tested criteria that take account of marital
20 status. If same-sex couples could marry, some of these couples would become ineligible for
21 public assistance services. This would result in savings for an already stretched social safety net
22 and reduce the burden on local taxpayers.

23    11.    **Department of Human Services.** If same-sex couples had the ability to marry
24 this would result in estimated savings to the Department of Human Services between $0.3 and
25 $0.6 million due to a decrease in the number of eligible beneficiaries. This savings projection is
26 derived by taking the amount of unreimbursed aid costs (i.e. the City's cost excluding all
27 Federal and State pass-through funding) times the proportion of gays and lesbians in San
28 Francisco times the average marriage rate times the proportion of the population anticipated to

be impacted (between 5 to 10 percent). This latter factor reduces the cost savings, as some beneficiaries may not marry because doing so would make them ineligible for assistance benefits. These savings are derived from programs that have means-tested eligibility requirements, where spousal income affects eligibility and where the City has incremental costs above and beyond what is covered by Federal and State pass-through funding. Savings are related to the following programs: In Home Supportive Services (where eligibility is currently linked to SSI eligibility which includes spousal income in the eligibility test) and the County Adult Assistance Program (where the eligibility test also includes spousal income).

12. **Department of Public Health.** The San Francisco Department of Public Health is a provider of last resort for uninsured patients in the City. The Department of Public Health serves uninsured patients at San Francisco General Hospital, Laguna Honda Hospital and Rehabilitation Center, and over 15 primary care clinics.

13. Two recent studies (the National Health Interview Study and a study based on the Current Population Survey) show that people in same-sex couples in the United States are much more likely to be uninsured than are people in married couples. The higher rates of being uninsured for same-sex couples remain after controlling for age, education, income, children and full-time employment status. This likely results from lack of access to employment related spousal benefits.

14. Since most adults rely on employers to provide health insurance, the percentage of uninsured among the gay and lesbian population and their dependant children is expected to decrease if same-sex couples are afforded the right marry because of the increased opportunity to qualify for spousal health benefits. Based on the 2001 California Health Interview Survey, 91.1 percent of married respondents living in San Francisco are covered by health insurance compared to only 79.2 percents of respondents who indicated that they were single and never married.

15. The City has budgeted $1,040.8 million for Public Health in Fiscal Year 2004-05. For Fiscal Year 2004-05, $231 million is projected to go unreimbursed and ultimately be a cost to local taxpayers. Unreimbursed costs are principally due to the cost of the uninsured.

16. If same-sex couples had the right to marry, projected savings from lower Public Health related costs is $12.9 million per year. Savings in healthcare costs pertain to having fewer uninsured residents drawing upon the City's hospital and clinic facilities. The projected savings is derived by taking unreimbursed costs (i.e. the City's cost excluding all federal and state pass-through funding and fee collections) at our county hospitals and clinics times the proportion of gays and lesbians in San Francisco times the average marriage rate times the proportion of married San Franciscans who have health insurance. This formula results in a conservative estimate of savings, given the recent studies indicate that gays and lesbians are more frequently uninsured than their married counterparts.

## THE CITY AS FEE REVENUE AND TAX COLLECTOR

17. If same-sex couples could marry, the City is projected to have increased revenue of between $2.1 and $6.1 million. This increased revenue would derive from three sources: 1) increased fee collections from delinquent accounts, 2) increased Sales Taxes revenue, and 3) increased Hotel Room Tax revenue.

18. **Fee Revenue Collection.** If same-sex couples had the right to marry, collectability would increase due to having two legally obligated adults responsible for the financial commitments of each partner, thereby lowering delinquency rates. The revenues most likely to be impacted, where increased collections are greater than $100,000, are hospital and ambulance bills, as well as parking fines.

19. I estimate increased fee collections of between $ 0.3 to $0.5 million annually. The estimated increase is derived by taking average year-end delinquent account balances, times the proportion of gays and lesbians in San Francisco, times the average marriage rate, times a conservative collection factor of 5 to 10%.

20. **Sales Tax Collection.** If same-sex couples had the ability to marry, there would be an estimated initial three-year surge in the number of such weddings for non-residents, as well as an ongoing increase for residents. This increase would result in greater sales tax revenue due to wedding spending by residents and non-residents, as well as honeymoon visits.

DECL. OF ED HARRINGTON; PROCEEDING NO. 4365      6

21. Currently, the City issues approximately 8,000 marriage licenses annually. This represents only weddings attributed to the 86% of the adult population who do not identify as gay or lesbian. If same-sex couples had the ability to marry, I project the number of weddings for California residents would increase by 1,300 per year. I have calculated this by using 8,000 weddings per year divided by the proportion of the population who identify as not being gay or lesbian to get an estimated level of marriages including both same-sex and opposite-sex weddings (for a total of approximately 9,300 weddings per year). This estimate is supported by US Census data for San Francisco, which shows that there were 8,902 same sex couples living within the City. Using those 8,902 couples and assuming (per paragraph 6, *supra*) that approximately 50 percent were to marry over a three-year period (one-third marrying in each of three years), an estimated 1,500 weddings would result per year. The 1,300 annual increase assumed in my fiscal impact analysis is slightly more conservative.

22. The estimated growth in marriages by California residents would result in projected increased sales tax revenue of $0.9 million per year. This estimated revenue increase is derived by multiplying the projected 1,300 weddings, times an average cost of $11,000 per wedding (one-half that of the $22,000 average for opposite-sex couples), times 2.75% (the locally accrued portion of the 8.50% total sales tax rate), times a 2.3 economic multiplier. This multiplier approximates the ripple effect of subsequent spending of each dollar in the local economy. An economic multiplier of 2.3 means that for every $1 of original spending another $1.30 would subsequently occur.

23. If same-sex couples were allowed to marry, this would also likely result in an increase in the number of non-resident weddings. The UCLA Williams Project & IGLSS research published in May 2004 estimated increased visitors to California of between 50,225 and 170,818. This would imply some 25,100 to 85,400 potential non-resident same-sex weddings. Assuming that one-third of these couples come to California to wed in each of the next three years, non-resident California weddings would number 8,400 to 28,500 per year during this period. Further, assuming that San Francisco hosts between 40 to 60 percent of these non-resident wedding parties, some 3,300 to 17,000 would occur in the City annually.

1  24.  I estimate an increase in sales tax revenue of $0.4 to $1.9 million due to non-resident same-sex weddings. This estimate is derived by taking the range of 3,300 to 17,000 weddings, times average non-hotel spending of $1,740 per wedding, times 2.75% (the locally accrued portion of the 8.50% total sales tax rate), times an economic multiplier of 2.3. The $1,740 in non-hotel spending is based on the assumption that average same-sex wedding spending is $11,000 (half that of the national average of $22,000 for opposite sex wedding) of which only $2,250 will be spent in San Francisco and that $510 of the $2,250 would be spent on hotel room costs (discussed separately below).

25.  **Hotel Tax Collection.** San Francisco has a 14% Hotel Room Tax. I estimate $0.6 to $2.8 million in increased hotel room tax revenue related to non-residents weddings. This figure is derived by taking 3,300 to 17,000 weddings, times $146 per night, times an average stay of 3.5 days, times the 14% Hotel Room Tax rate times an economic impact multiplier of 2.3. I believe this to be a conservative estimate, as I have not assumed that any friends, family members or witnesses would travel with the marrying couple. If they did, additional revenue for hotel room tax and sales tax would be expected.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed in San Francisco, California.

Dated: August 31, 2004

ED HARRINGTON