# EXHIBIT 14B

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  THERESE M. STEWART, State Bar #104930
   Chief Deputy City Attorney
3  WAYNE K. SNODGRASS, State Bar #148137
   MARGARET W. BAUMGARTNER, State Bar #151762
4  JIM EMERY, State Bar#153630
   JULIA M.C. FRIEDLANDER, State Bar#165767
5  YVONNE MERE, State Bar #173594
   KATHLEEN S. MORRIS, State Bar #196672
6  SHERRI SOKELAND KAISER, State Bar #197986
   GINA M. ROCCANOVA, State Bar #201594
7  NELI PALMA, State Bar #203374
   PHILIP LEIDER, State Bar #229751
8  Deputy City Attorneys
   City Hall, Room 234
9  1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
10 Telephone:    (415) 554-4700
   Facsimile:    (415) 554-4747

BOBBIE J. WILSON, State Bar #147317
PAMELA K. FULMER, State Bar #154736
AMY E. MARGOLIN, State Bar #168192
SARAH M. KING, State Bar #189621
KEVIN H. LEWIS, State Bar #197421
CEIDE ZAPPARONI, State Bar #200708
JEFFREY T. NORBERG, State Bar # 215087
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:    (415) 434-1600
Facsimile: (415) 217-5910

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF SAN FRANCISCO
UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br>**MARRIAGE CASES**<br><br>**RANDY THOMASSON**, et al.,<br><br>Petitioners/Plaintiffs,<br><br>vs.<br><br>**GAVIN NEWSOM**, et al.,<br><br>Respondents/Defendants.<br><br>**PROPOSITION 22 LEGAL DEFENSE AND EDUCATION FUND**, et al.,<br><br>Petitioners/Plaintiffs,<br><br>vs.<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, et al.,<br><br>Respondents/Defendants | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. **4365**<br><br>Case No. **428-794**<br>(Consolidated with Case No. 503-943)<br><br>**DECLARATION OF GREGORY M. HEREK, Ph.D., IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>BY FAX<br><br><br>Date Action Filed:   March 11, 2004<br>Trial Date:   Not set |

1

I, GREGORY M. HEREK, declare as follows:

1. I make this declaration of my own personal knowledge and would testify competently to the matters stated herein if called upon to do so.

2. I am a tenured Professor of Psychology at the University of California at Davis. A description of my qualifications is in my declaration dated November 18, 2004, and the curriculum vitae I appended to that declaration is still accurate.

3. I was asked to review declarations submitted in this consolidated action and to render expert opinion about information contained therein. In preparing this declaration, I reviewed the declarations filed in this case by Dean Byrd, Maggie Gallagher, George A. Rekers, and Jeffery B. Satinover. I also reviewed those portions of Proposition 22 Legal Defense and Education Fund's *Plaintiffs' Statement of Undisputed Facts in Support of CCF's Motion For Summary Judgment* and the *Opening Brief in Support of Declaratory Judgment that California Marriage Laws Are Constitutional* that purported to summarize scientific data.

4. For purposes of the present declaration, I have limited the scope of my review and comments to two main areas. First, I respond to assertions made in the above-listed declarations concerning the nature of homosexuality. Consistent with my previous declaration, and with the official views of the major professional associations of psychologists and psychiatrists, I conclude that homosexuality is a normal variant of human sexuality. It is not a pathology. Sexual orientation — whether homosexual, heterosexual, or bisexual — is an enduring part of an individual's being. To label homosexuality or heterosexuality a "fashion" or "trend" is to trivialize the central role that sexuality plays in the lives of individuals. Claims that interventions such as "conversion therapy" reliably change individuals' sexual orientation are not supported by scientific evidence. However, evidence is available that such interventions can cause harm to individuals who submit to them.

5. Second, I review assertions made in the declarations about same-sex couples and their children. Consistent with my previous declaration, I conclude that scientific research has consistently failed to find reliable, noteworthy differences between gay and lesbian parents and appropriately matched groups of heterosexual parents. Claims to the contrary in the declarations

that I reviewed reflect a selective use of empirical studies and inappropriate generalizations from studies that were not conducted with lesbian and gay parents and their children.

## I. THE NATURE OF HOMOSEXUALITY AND HETEROSEXUALITY

6. The declarations from Drs. Satinover and Byrd express a large number of opinions about the nature of homosexuality. I address four general themes in their assertions: (a) that homosexuality is ephemeral — a "fashion" or "trend" in the words of Dr. Satinover, (b) that homosexuality is a form of pathology that warrants prevention or intervention, (c) that scientific evidence unequivocally shows that homosexuality and (by implication) heterosexuality are overwhelmingly determined by cultural factors, and (d) that a person's sexual orientation can be changed through interventions such as "conversion therapy" or "reparative therapy."

7. Sexual orientation refers to an enduring pattern or disposition to experience sexual, affectional, or romantic attractions primarily to men, to women, or to both sexes. It also refers to an individual's patterns of behaviors expressing those attractions, intimate relationships based on them, sense of personal and social identity derived from them, and membership in a community of others who share them. This definition of *sexual orientation*, which is consistent with the definitions used by most scientists and mainstream mental health professionals, encompasses heterosexuality and bisexuality as well as homosexuality.

8. Dr. Satinover asserts that "'sexual orientation' is not so much a true characteristic of an individual...but rather a collective trend or fashion that waxes or wanes with the times" [Declaration of Jeffrey B. Satinover in Support of Proposition 22's Motion for Summary Judgment/Summary Adjudication ("Satinover Declaration"), p. 19] and that "the self-report of a homosexual or bisexual 'identity' varies strongly ....in consequence of *external cultural* factors — e.g., 'what's cool,' what's on TV, what is taught in sex education class, what shibboleth a Supreme Court justice repeats in her ruling without first confirming the scientific evidence" (Satinover Declaration, p. 8, emphasis in original). In these comments and throughout his declaration, he shifts between two types of analysis: a sociological analysis of entire societies and cultures, on the one hand, and a psychological analysis of individual subjective experience, on the other. It is true that historians and anthropologists have identified variations in cultural norms and beliefs about

3

sexuality across different societies and different eras. However, the fact that such beliefs vary from one society to another, or between different historical periods within a society, does not mean that an *individual's* experience of her or his sexuality can be reasonably compared to dressing in the latest fashions or participating in a fad. People living in our own culture today typically experience their sexuality and intimate relationships as central to their lives and their sense of self and identity, *not* as mere conformity to a popular fashion.

9. Mainstream mental health professionals have long recognized that homosexuality is a normal expression of human sexuality; that being homosexual poses no inherent obstacle to leading a happy, healthy, and productive life; and that the vast majority of gay, lesbian, and bisexual people function well in a broad array of social institutions and interpersonal relationships. Such functioning includes the capacity to form a healthy and mutually satisfying intimate relationship with another person of the same sex and to raise healthy and well-adjusted children.

10. In my previous declaration, I briefly summarized the history of the mental health profession's initial classification of homosexuality as a mental illness in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM) and the deletion of homosexuality from the DSM in the early 1970s. In response to Dr. Satinover's declaration, I would like to supplement that summary with the following points.

11. First, it is important to recognize that the initial inclusion of homosexuality in the first edition of the DSM (published in 1951) was not based on systematic empirical research. Rather, it reflected longstanding value assumptions buttressed largely by clinical observations of homosexual individuals who were either incarcerated or undergoing psychiatric treatment. When researchers began to use the scientific method to study the social and psychological characteristics of homosexual men and women who were neither patients nor prisoners, they found that most research subjects were functioning effectively in society. In other words, homosexuality per se was not inherently linked with mental illness.

12. Second, the American Psychiatric Association membership's vote on the status of homosexuality was brought about by a small group of psychiatrists who, like Dr. Satinover, held the opinion that homosexuality was a mental illness. In 1973, the Association's Board of Trustees,



4

acting on the recommendations of its organizational components charged with studying the matter, decided to remove homosexuality from the DSM. Some psychiatrists who fiercely opposed their action subsequently circulated a petition calling for a vote on the issue by the Association's membership. The same source that Dr. Satinover cited[1] comments:

> It is thus rather remarkable that the same psychiatrists who had charged the APA's board with an unscientific and unseemly capitulation to political pressure now invoked the referendum procedure. When the APA's constitution had been amended to permit such votes, it was to guarantee psychiatrists a voice in the "extra-scientific" policy of the Association. Certainly there had never been an expectation that diagnostic matters would be opened to a vote. (p. 142)[2]

13. Dr. Satinover derided that referendum, asserting "it is a parody worthy of Jonathan Swift to think that the scientific truth of *any* matter could be determined in such a fashion" (Satinover Declaration, p. 20, emphasis in original). His criticism fails to acknowledge that the membership referendum was a failed attempt to undo the Association's removal of homosexuality from the DSM, a decision that had been reached by the Board of Trustees through established procedures. It seems ironic that the 1974 referendum would be dismissed today by someone like

---

[1] Contrary to Dr. Satinover's citation, the text that he footnoted does not appear on page 102 of the Bayer (1981) book. However, text that nearly matches Dr. Satinover's quotation appears on pages 3-4 of that book.

[2] Dr. Satinover quotes Ronald Bayer to support his argument that the American Psychiatric Association decision represented a political process rather than a review of scientific research. However, because Dr. Bayer is a political scientist by training, it is inevitable that his historical analysis would focus on the political aspects of the Association's decision (see the "Education" section of his biographical sketch at http://www.hivcenternyc.org/people/ronaldbayer.html). He stated his own disciplinary assumptions in the Introduction to his book: "This book presents a *political analysis* of the psychiatric battle over homosexuality. Such an analysis is not, however, external to the 'real issue' of whether homosexuality represents a psychiatric disorder. To assume that there is no answer to this question that is not ultimately political is to assume that it is possible to determine, with the appropriate scientific methodology, whether homosexuality is a disease given in nature. I do not accept that assumption, seeing in it a mistaken view of the problem. The status of homosexuality is a political question, representing a historically rooted, socially determined choice regarding the ends of human sexuality. It requires a political analysis" (Bayer, 1981, pp. 4-5, emphasis added). Thus, in Dr. Bayer's analysis, it is not only the psychiatrists' decision to remove homosexuality from the DSM that requires a political analysis. The psychiatrists' initial classification of homosexuality as a disease also could be understood only through such an analysis. Indeed, several chapters of his book are devoted to historical discussion of psychiatric views of homosexuality during the first half of the twentieth century. Moreover, a careful reading of his entire book makes it clear that he would have analyzed the psychiatrists' decision concerning the diagnostic status of homosexuality through a political lens, regardless of the outcome.

Dr. Satinover, whose stance toward homosexuality is the same as that of the individuals who initiated the referendum.

14. In paragraphs 2-4 of his declaration, Dr. Byrd describes the results of a study he co-authored, which was published in *Psychological Reports* in 2000. A self-administered questionnaire was completed by 206 individuals who practiced some form of conversion therapy (i.e., therapy that attempts to change or "convert" an individual from homosexual to heterosexual). The sample included clinical social workers (25%), psychologists (20%), psychoanalysts (12%), marriage and family therapists (11%), psychiatrists (9%), and pastoral counselors (7%). However, roughly 1 respondent in 6 (17%) did not fit into any of these professional groups, and 19% of the respondents were not licensed to practice psychotherapy.

15. In this group of 206 respondents, 187 (91%) believed homosexuality is a disorder and felt that the American Psychiatric Association decision to remove homosexuality from the DSM in 1973 was politically motivated and unscientific. The respondents also believed that most homosexually oriented individuals who seek conversion therapy benefit from it. These results are not surprising because the sample was recruited largely through what researchers term a snowball sampling technique that began with personal acquaintances of the study's first author, Dr. Nicolosi. According to the paper, the sampling procedures were as follows:

> During 1996 [Nicolosi] sent copies of the survey to conversion therapists he knew throughout the United States. He asked these therapists to pass out copies of the survey to other therapists they knew who practiced conversion therapy. These therapists were also asked to give surveys to therapists they knew. Some therapists were also contacted at ex-gay ministry groups, e.g., Courage, Exodus International, Evergreen International. Advertisements were also placed in newsletters of these organizations and announced at their conferences. (p. 693)

16. Given this approach, which concentrated on locating individuals who practice conversion therapy, it is not surprising that the vast majority of the sample expressed the opinions described above. It would be a mistake, however, to conclude that this sample is in any way representative of mental health professionals as a group. To the contrary, the realization that homosexuality is *not* a form of mental illness or pathology is now largely taken for granted among mainstream mental health researchers. This is the official position of the American Psychiatric

Association, which has more than 35,000 members,[3] and the American Psychological Association, which has more than 150,000 members.[4]

17. In various studies that have assessed participants' histories of sexual attraction during adulthood, most respondents report they have been attracted exclusively to the members of one sex or the other. Similarly, studies that have assessed adult sexual behavior have found that most respondents have engaged in sex exclusively with men or exclusively with women.[5]

18. Interventions aimed at changing an individuals' sexual orientation have not been empirically demonstrated to be effective or safe. Critical examinations of published reports of the effectiveness of such interventions have highlighted numerous methodological problems, including failures to adequately assess the sexual orientation of individuals before they submitted to the intervention, failure to clearly define the criteria for "success," and failure to obtain assessments of the outcomes from independent, unbiased observers.[6]

19. In addition to the lack of scientific evidence for the effectiveness of conversion therapy and similar interventions, there is reason to believe such efforts can be harmful to the psychological well-being of those who attempt them. Clinical observations and self-reports indicate that many individuals who unsuccessfully attempt to change their sexual orientation experience considerable psychological distress.[7]

20. Dr. Byrd's declaration states on page 5 that "what the evidence demonstrates is that '[n]o one has to stay homosexual or lesbian, in orientation or behavior, if he or she doesn't want to and informed support is available.'" His source for this assertion is not a scholarly literature review. Nor is it a peer-reviewed study published in a respected academic journal or an academic

---

[3] This membership figure was obtained from <http://www.psych.org/about_apa/>.

[4] This membership figure was obtained from <http://www.apa.org/about/>.

[5] The research literature in this area includes relatively recent national surveys with probability samples (Laumann et al., 1994; Smith, 1992) and older studies with non-probability samples (e.g., Kinsey, Pomeroy, & Martin, 1948; Kinsey, Pomeroy, Martin, & Gebhard, 1953). Data from a New Zealand study cited by Dr. Satinover (Dickson, Paul, & Herbison, 2003) also follow this pattern.

[6] Haldeman (1994).

[7] Haldeman (2001); Shidlo & Schroeder (2002).

7

monograph. Rather, he cites a book titled *My Genes Made Me Do It!* which was published by a small Christian publishing house. Most social and behavioral scientists would not consider such a book to be a reliable source of scientific information.

21. The mainstream view in the mental health professions is that homosexuality is neither a mental illness that requires cure nor a pathological condition that should be changed. Rather, therapists should assist their lesbian, gay, and bisexual clients in overcoming the negative psychological effects of stigmatization in order to lead a happy and satisfying life.[8] Reflecting this view, virtually all of the major mental health professional associations have adopted policy statements cautioning the profession and the public about treatments that purport to change sexual orientation. These include the American Psychiatric Association (1998), American Psychological Association (1998), American Counseling Association, and National Association of Social Workers.[9] In addition, reflecting the fact that such treatments are often directed at adolescents, the American Academy of Pediatrics has also adopted a policy statement advising that therapy directed specifically at attempting to change an adolescent's sexual orientation is contraindicated and unlikely to result in change (Committee on Adolescence, 1993).

22. Dr. Satinover's declaration is used to support the assertion in the *Plaintiffs' Statement of Undisputed Material Facts* that "studies performed on the issue of the origins of homosexuality have found that the establishment of sexual orientation is influenced primarily by external influences and actual sexual experiences" (p. 3, Item 10). This assertion is based mainly on Dr. Satinover's discussion of the heritability of sexual orientation. His comments in this regard are fundamentally misleading, however, because he frames the issue in terms of a dichotomy between genetic and environmental influences, with only the former assumed to be relevant to the issue of mutability.

---

[8] Division 44/Committee on Lesbian, Gay, and Bisexual Concerns Joint Task Force on Guidelines for Psychotherapy with Lesbian, Gay, and Bisexual Clients (2000).

[9] The texts of the relevant policy statements by the American Counseling Association, National Association of Social Workers, and other organizations are available on the American Psychological Association's web site: <http://www.apa.org/pi/lgbc/publications/justthefacts.html#2>.

DECL HEREK IN OPP PLTFFS' MOT SUMM JDMT; PROC NO. 4365

23. A trait need not be genetic to be considered outside the control or choice of the people who possess it. For example, a fetus is strongly affected by the intrauterine environment. A mother's quality of nutrition during her pregnancy, her use of alcohol or drugs, and her exposure to environmental toxins can all have substantial, sometimes permanent effects on the physical and mental well-being of her baby. These effects are congenital but they are not genetic. Moreover, events in early life — including an infant's nutrition, exposure to toxic substances, exposure to sensory and intellectual stimulation, and emotional experiences with caregivers — can also have permanent or long-lasting effects for good or for ill. In terms of the gene-environment dichotomy drawn by Dr. Satinover, all of those effects are environmental in origin. Thus, a characteristic need not be genetic in order to be permanent or immutable.

24. The factors that cause an individual to become heterosexual, homosexual, or bisexual are not well understood. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, no findings have emerged that permit scientists to conclude that sexual orientation is determined by any one factor or combination of factors. Although some of this research may hold promise for eventually facilitating a greater understanding of the development of sexual orientation, it does not permit a conclusion based in sound science at the present time as to the cause or causes of sexual orientation, whether homosexual, bisexual, or heterosexual.

25. This is not to deny that many scientific researchers hold strong opinions about the origins of sexual orientation. Debates about this topic are longstanding and opinions are often strongly held. However, there are no conclusive data to resolve this question.

26. On page 15 of his declaration, Dr. Satinover asserted "...*all* the evidence, when accurately presented, points toward the influence of environment" on homosexuality (emphasis in original). This statement was made in his discussion of a 2003 paper[10] describing a study conducted in New Zealand, from whose abstract Dr. Satinover quoted extensively on pages 14-15 of his declaration. Dr. Satinover's remarks focused on the study's findings about the members of the

---

[10] Dickson, Paul, & Herbison (2003).

9

sample who were primarily heterosexual but who had incidental homosexual attractions. Interestingly, in the section of the abstract that he did *not* quote, the study's authors reached a rather different conclusion from that of Dr. Satinover. They noted that, in contrast to research participants who reported only incidental homosexual attraction, the portion of the study sample that evidenced "major same-sex attraction" (i.e., those who were attracted mainly to their own sex or equally to both sexes) was fairly consistent in reporting such attractions at both ages 21 and 26. Furthermore, that group's prevalence of same-sex attraction did not differ by educational levels. The final two sentence of the abstract, which Dr. Satinover did not include in his quoted material, read as follows:

> The smaller group with major same-sex attraction, which changed less over time, and did not differ by education, is consistent with a basic biological dimension to sexual attraction. Overall these findings argue against any single explanation for homosexual attraction.

27. Thus, contrary to Dr. Satinover's characterization of the research study, the authors interpreted their own data as showing that people can arrive at an adult sexual orientation in more than one way, and that biological factors may play a role in the sexual orientation of some people.

## II. SAME-SEX COUPLES AND THEIR CHILDREN

28. The declaration submitted by George A. Rekers posits that "[h]eterosexual marriage is the optimal family structure in which to raise children" and that "[c]hild well-being is significantly higher in households of married couples versus other family structures" (Rekers Declaration, p. 3). The bulk of the research cited in Dr. Rekers' declaration cannot be used to support his opinions about lesbian and gay parents, however, because it is based on samples of children from various types of heterosexual households (e.g., married versus cohabiting) but did not examine outcomes with children of lesbian or gay parents.

29. Similarly, in asserting that children raised by same-sex couples fare worse than those raised by married, heterosexual couples, Maggie Gallagher inappropriately bases her opinion on studies that did not examine children raised by same-sex couples. Indeed, she acknowledges in footnote 90 that the research brief she cites "does not compare outcomes for children in same-sex couple households to children in other types of families" [Declaration of Maggie Gallagher in Support of CCF's Motion for Summary Judgment ("Gallagher Declaration"), p. 26].

10

30. I have read the article titled "Children in Three Contexts: Family, Education, and Social Development," by Sotirios Sarantakos, which was published in 1996 in a journal called *Children Australia*.[11] Before seeing the extensive discussion of this article in Dr. Rekers' declaration, I was unaware of its existence. This is because *Children Australia* is an extremely obscure journal that is not indexed in the major psychological and sociological abstracting services. The library staff at the University of California, Davis, reported to me that *Children Australia* was not available at any major college or university library in California. After searching, they ultimately obtained a copy of the article for me from a library in Connecticut. As I explained in my previous declaration, in summarizing the research literature on lesbian and gay parents and their children I relied as much as possible on original empirical studies and literature reviews published in the most highly respected peer-reviewed journals in the behavioral and social sciences. Given its obscurity and its general unavailability outside Australia, *Children Australia* cannot be considered such a journal.

31. As far as I am aware, the article by Sarantakos reports the only academic study to date that found that the children of gay and lesbian parents differed substantially from the children of heterosexual parents in important respects, with most of those differences indicating that the children of lesbian and gay parents were functioning more poorly than the children of heterosexual parents. Based mainly on teacher ratings, children were compared in the areas of language skills, mathematical abilities, social studies, sports, class work, sociability and popularity, attitudes toward school and learning, their parents' school involvement, the child's gender identity, parental assistance with schoolwork, parents' aspirations for the child, the child's personal autonomy at home, the child's contribution to household chores, and the parents' administration of punishment.

32. Comparing children from three different types of households (married heterosexual parents, cohabiting heterosexual parents, cohabiting homosexual parents), no statistically significant differences were observed in class work or parental punishment styles. The children of homosexual parents performed better in the area of social studies, were perceived by their teachers to have

---

[11] Sarantakos, 1996

11

greater personal autonomy at home, and performed household chores more regularly than the other children. Children of homosexual couples were rated significantly lower than the other children on language skills, mathematical abilities, sports, sociability and popularity, attitudes toward school and learning, parents' school involvement, parental assistance with school work, and parents' aspirations for the child. For reasons not explained in the article, no quantitative data were reported for gender identity, but the author reported "[t]eachers felt that a number of students of homosexual parents were confused about their [gender] identity and what was considered right and expected of them in certain situations" (p. 26).

33.     As I explained in my earlier declaration, scientific knowledge is cumulative. Greater confidence is placed in conclusions that are supported by multiple studies employing different methods with different samples than in conclusions based on a single study. When one study reports anomalous findings, as the Sarantakos study does, scientists typically assess the plausibility of various hypotheses for explaining the inconsistency between that study and others. One hypothesis, of course, is that the anomalous study describes the population more accurately than all other published research. An alternative, more plausible hypothesis is that the anomalous study's findings result from idiosyncrasies of its methodology or sample. Consistent with this latter hypothesis, three aspects of the Sarantakos study's methods are problematic and seem likely to explain the differences he observed among children from different types of families.

34.     First, the author reports that many of the children of lesbian and gay parents in his sample had experienced unusually high levels of ostracism and prejudice, some to the point of actually being forced to move to a different town. On page 25, for example, he notes that "a number of students ... preferred not to work with [the children of lesbian and gay parents], to sit next to them, or work together on a project," and describes the children experiencing ridicule because of their parents' sexual orientation, including being called names (sissies, lesbians, gays). Sarantakos comments:

> Such incidents were one of the reasons for these children to move to another school, to refuse to go to that school, or even for the parents to move away from that neighborhood or town .... Parents and teachers alike reported that comments such as "the pervs are coming," "don't mix with the sissies," or "sisterhood is filthy," made by some pupils, were not uncommon. (p. 25)

35. After further describing such harassment and ridicule on page 26, the author states:

> In certain cases, heterosexual parents advised their children not to associate with children of homosexuals, or gave instructions to the teachers to keep their children as much as possible away from children of homosexual couples. Teachers also reported exceptional cases where a group of "concerned parents" demanded that three children of homosexuals be removed from their school. Others approached the homosexual parents with the same request.

36. This extremely hostile environment probably accounts for some of the differences that the author detected among the children, especially in areas such as sports, sociability and popularity, and attitudes toward school. It would not be surprising if children who were repeatedly exposed to ostracism, ridicule, and abuse from their schoolmates would be reluctant to join the latter in team sports or social activities. Nor would it be surprising if they developed a generally negative attitude toward school.

37. A second important fact is that most of the study's outcome variables were measured mainly by reports from each child's teacher. In contrast to most papers published in major journals, the Sarantakos article does not systematically detail the exact sources or methods used to arrive at each rating. Apparently, the teachers provided a subjective score (on a 1 to 9 scale) for each student on most outcome variables. It is noteworthy that the author cautions in at least three separate passages (on pages 24, 26, and 30) that these ratings may have been biased. For example, on page 26, he states, "Obviously, the influence of the attitudes of teachers to life styles on the process of evaluation of students' performance cannot be underestimated" and notes that "a separate study of these attitudes is currently under way." On page 30, he again warns that the ratings "might have been biased — consciously and/or unconsciously — by the personal views and beliefs of the teachers. In this sense, the attributes of children described in this study might reflect perceptions of attributes rather than actual attributes or differences. Such perceptions might have favoured children of married couples more than children of other couples." He again states his plan to report elsewhere on "teachers' attitudes to life styles and their implications for the quality reports on children's performance." I have been unable to locate a publication reporting the results of such a study.

38. A third important methodological consideration is that the comparison groups differed systematically on a key variable highly likely to influence the results. The author reports that "the majority of children of cohabiting homosexual and heterosexual couples have experienced parental divorce, and in many cases not long ago" (p. 30). He implies that the children in the third group, those living in married heterosexual households, had *not* experienced the divorce of their parents.

39. Whereas having gay or lesbian parents has not been linked to poor adjustment or academic performance, the negative effects of divorce on children are well documented. For example, a recent review of research on divorce during the 1990s concluded that "[c]ompared with children with continuously married parents, children with divorced parents continued to score significantly lower on measures of academic achievement, conduct, psychological adjustment, self-concept, and social relations."[12] Sarantakos acknowledges this fact on page 30. After noting the deleterious consequences of divorce on children, he concludes "[I]t is then reasonable to assume that parental divorce explains in part the differences in educational development of the children in the three contexts."

40. To summarize, the three groups of children compared in the Sarantakos study differed in important ways apart from the sexual orientation of their parents. Most children of same-sex couples had experienced divorce, many in the recent past, whereas the children of married parents apparently had not. This fact alone could explain most of the differences observed among groups. Because the negative consequences for children of their parents' divorce are well-documented, attempting to draw conclusions from a study that does not control for this variable is clearly problematic. In addition, the children of homosexual parents faced an unusually high level of prejudice which, in some cases, caused the children go to a different school or their families to move to another town. Given the extent to which they were ostracized, it is not surprising that many of these children were reluctant to participate in sports and group activities where they would

---

[12] Amato (2001: abstract). See also the earlier review by Amato and Keith (1991) (Amato, 2001, Abstract; Amato & Keith, 1991).

most likely experience further harassment and perhaps even violence. Finally, in such a milieu, it would not be surprising to find that some — perhaps many — of the teachers shared the biases that pervaded the social environment. Such biases are highly likely to have influenced the teachers' subjective ratings of the students, which constituted the principal source of data for the study. The author's repeated mentions of teacher bias suggest he was aware of this potential problem and planned to investigate it in a subsequent study.

41. In his declaration, Dr. Rekers argues that studies "that purport to find that there are no differences in the childhood outcomes of homosexual parents compared to heterosexual parents are not adequate sources of empirical data for policy making for several reasons." Among the reasons he lists for this assertion are that "most of the children of homosexual parents studied to date had spent a significant portion of their childhood growing up in a heterosexual married couple home before the divorce of their parents" (Rekers Declaration, p. 13). He characterizes research in this area as studying "highly selective small groups," "not generalizable to the general population of homosexual parents, and clearly not definitive" (Rekers Declaration, p. 14).

42. These statements accurately describe the Sarantakos study, which Dr. Rekers summarizes uncritically at length.

43. Dr. Rekers uses the Sarantakos study to argue that children are disadvantaged by having gay or lesbian parents, while dismissing wholesale the dozens of other studies on parenting by lesbians and gay men that conclude otherwise. He cannot logically reject the latter while embracing the former, since the Sarantakos study evidences many of the very same weaknesses Dr. Rekers criticizes in other research. Indeed, many of the studies he rejects are methodologically much stronger than the Sarantakos study. Dr. Rekers is correct in noting that the Sarantakos study is "very rare" (p. 13). Its distinctiveness derives from its conclusion that children of homosexual parents are disadvantaged relative to children of married heterosexual parents.

44. As I noted above, science is cumulative and scientists generally place greater faith in the accumulated findings of many research studies than in a single study, especially when that single study is published in an obscure regional journal. Given the high probability that the anomalous results of the Sarantakos study can be explained by idiosyncrasies of the sample and

15

methodological shortcomings. I do not believe it is appropriate to treat that study as definitive in any respect. Thus, I believe it is inappropriate for Dr. Rekers to use the Sarantakos study as the basis for his argument that the children of lesbian and gay parents are at risk because of their sexual orientation.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct. Signed this 29th day of December, in BERKELEY, CALIFORNIA.

_____
GREGORY M. HEREK, Ph.D.
16

DECL HEREK IN OPP PLTFFS' MOT SUMM JDMT; PROC NO. 4365

References

Amato, P. R. (2001). Children of divorce in the 1990s: An update of the Amato and Keith (1991) meta-analysis. *Journal of Family Psychology, 15*, 355-370.

Amato, P. R., & Keith, B. (1991). Parental divorce and the well-being of children: A meta-analysis. *Psychological Bulletin, 110*, 26-46.

American Psychiatric Association. (1998, December 11). *APA position statement on psychiatric treatment and sexual orientation.* Available online at http://www.psych.org/edu/other_res/lib_archives/archives/200001.pdf

American Psychological Association. (1997, August 14). *Resolution on appropriate therapeutic responses to sexual orientation.* Available online at http://www.apa.org/pi/lgbc/policy/statements.html#10

Bayer, R. (1981). *Homosexuality and American psychiatry: The politics of diagnosis* (1st ed.). New York: Basic Books.

Committee on Adolescence, American Academy of Pediatrics. (1993). Homosexuality and adolescence. *Pediatrics, 92*, 631-634.

Dickson, N., Paul, C., & Herbison, P. (2003). Same-sex attraction in a birth cohort: prevalence and persistence in early adulthood. *Social Science and Medicine, 56*, 1607-1615.

Division 44/Committee on Lesbian, Gay, and Bisexual Concerns Joint Task Force on Guidelines for Psychotherapy with Lesbian, Gay, and Bisexual Clients. (2000). Guidelines for psychotherapy with lesbian, gay, and bisexual clients. *American Psychologist, 55*, 1440-1451.

Haldeman, D. C. (1994). The practice and ethics of sexual orientation conversion therapy. *Journal of Consulting and Clinical Psychology, 62*, 221-227.

Haldeman, D. C. (2001). Therapeutic antidotes: Helping gay and bisexual men recover from conversion therapies. *Journal of Gay and Lesbian Psychotherapy, 5*(3-4), 117-130.

Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male*. Philadelphia, PA: W. B. Saunders.

Kinsey, A. C., Pomeroy, W. B., Martin, C. E., & Gebhard, P. H. (1953). *Sexual behavior in the human female*. Philadelphia: W.B. Saunders.

Michaels, S. (1996). The prevalence of homosexuality in the United States. In R.P. Cabaj & T.S. Stein (Eds.), *Textbook of homosexuality and mental health* (pp. 43-63). Washington, DC: American Psychiatric Press.

Sarantakos, S. (1996). Children in three contexts: Family, education, and social development. *Children Australia, 21*(3), 23-31.

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumers' report. *Professional Psychology: Research and Practice, 33*, 249-259.