# EXHIBIT 15

DENNIS J. HERRERA, City Attorney, State Bar #139669
THERESE M. STEWART, State Bar #104930
Chief Deputy City Attorney
WAYNE K. SNODGRASS, State Bar #148137
JIM EMERY, State Bar#153630
JULIA M.C. FRIEDLANDER, State Bar#165767
YVONNE MERE, State Bar #173594
KATHLEEN S. MORRIS, State Bar #196672
SHERRI SOKELAND KAISER, State Bar #197986
GINA M. ROCCANOVA, State Bar #201594
NELI PALMA, State Bar #203374
PHILIP LEIDER, State Bar #229751
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4700; Facsimile: (415) 554-4747

BOBBIE J. WILSON, State Bar #147317
PAMELA K. FULMER, State Bar #154736
AMY E. MARGOLIN, State Bar #168192
JEFFREY T. NORBERG, State Bar # 215087
CHANDRA MILLER FIENEN, State Bar # 225502
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4024
Telephone:    (415) 434-1600
Facsimile: (415) 217-5910

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br>**MARRIAGE CASES**<br><br>**RANDY THOMASSON**, et al.,<br><br>Petitioners/Plaintiffs,<br><br>vs.<br><br>**GAVIN NEWSOM**, et al.,<br><br>Respondents/Defendants. | JUDICIAL COUNCIL COORDINATION<br>PROCEEDING NO. **4365**<br><br>Case No. **428-794**<br>(Consolidated with Case No. **503-943**)<br><br>**DECLARATION OF RANDALL KENNEDY IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| **PROPOSITION 22 LEGAL DEFENSE AND EDUCATION FUND**, et al.,<br><br>Petitioners/Plaintiffs,<br><br>vs.<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, et al.,<br><br>Respondents/Defendants | BY FAX<br><br><br><br>Date Action Filed:     March 11, 2004<br>Trial Date:             Not set |

1

I, RANDALL KENNEDY, declare as follows:

1.      I am a professor of law at Harvard Law School, where I have been a member of the faculty since 1984. I received my undergraduate degree from Princeton University, attended Balliol College, Oxford University as a Rhodes Scholar, and received my law degree from Yale Law School. I served as a law clerk to Judge J. Skelly Wright of the United States Court of Appeals and to Justice Thurgood Marshall of the United States Supreme Court. I am a Fellow of the Massachusetts Historical Society, a Fellow of the American Academy of Arts and Sciences, a Member of the American Philosophical Society, and a Member of the American Law Institute. I am admitted to the Bar of the District of Columbia and the to the Bar of the Supreme Court of the United States.

2.      Much of my teaching, research, and writing focuses on the intersection of racial conflict and legal institutions. I have written numerous articles for general interest and scholarly publications, including *Racial Critiques of Legal Education* (1989) 102 Harvard Law Review 1745, *Martin Luther King's Constitution: A Legal History of the Montgomery Bus Boycott* (1989) 98 Yale Law Journal 999, and *McClesky v. Kemp: Race, Capital Punishment, and The Supreme Court* (1988) 101 Harvard Law Review 1388. I have also written three books: *Race, Crime, and the Law* (1997) (recipient of the Robert F. Kennedy Book Prize), *Nigger: The Strange Career of a Troublesome Word* (2002), and *Interracial Intimacies: Sex, Marriage, Identity, and Adoption* (2003).

3.      I have personal knowledge of the facts set forth in this declaration and opinions I express are my true opinions as an expert in the history of race relations law and the regulation of intimate association.

4.      America's long and tragic experience with prohibitions that once barred people of different races from marrying one another offers important lessons to those seeking to resolve controversies today involving prohibitions that bar same-sex couples from marrying.

5.      Anti-miscegenation laws—that is, provisions outlawing or otherwise discouraging interracial marriages—were among the oldest and most pervasive racial regulations in the United States. Originating in the 1660s in the colonies of Maryland and Virginia, anti-miscegenation



1   laws subsequently spread throughout what became the United States of America. At one time or

2   another, forty-two states prohibited marriages across racial lines. Every state whose black

3   population reached five percent of the total enacted an anti-miscegenation law. The only states

4   that never enacted anti-miscegenation laws were Alaska, Connecticut, Hawaii, Minnesota, New

5   Hampshire, New Jersey, Vermont, and Wisconsin. The District of Columbia was also spared.

6         6.      All anti-miscegenation laws stigmatized African Americans; racial

7   discriminations in matrimony uniformly rendered blacks ineligible to marry whites. But other

8   peoples of color were also stigmatized by anti-miscegenation laws. California, for example,

9   prohibited whites from marrying "mulattoes," "Mongolians," "Malays,"and "Filipinos," as well

10  as "Negroes." (See *Perez v. Sharp* (1948) 198 P. 2d 17.)

11        7.      The race bar at the marriage altar was profoundly destructive. Anti-

12  miscegenation laws led to criminal prosecutions in which individual liberty turned on such

13  questions as whether a person's great-grandmother was "black." (See, e.g., *McPherson v.*

14  *Commonwealth* (1877) 69 Va. (Gratt) 939.) Such laws also prompted private parties to delve

15  surreptitiously into the backgrounds of spouses, relatives, and neighbors in hopes of revealing

16  that they had, in violation of law, crossed racial lines in matrimony. White men seeking to

17  escape marriages, for example, charged that their wives were "colored" and that their marriages

18  were thus void—allegations which, if substantiated, could relieve complainants of alimony

19  payments or even child support. (See, e.g., *Sunsori v. Cassagne* (1938) 19 La. 209 (1938); *Kirby*

20  *v. Kirby* (1922) 24 Ariz. 9.) Another all too common scenario involved relatives who, resentful

21  of a surviving spouse's inheritance from a deceased spouse, would attack the survivor's

22  entitlement to the inheritance on the ground that his or her marriage was unlawful insofar as the

23  parties to it were of different races. By "outing" inter-racial couples, such relatives could attain

24  for themselves property that would have otherwise gone to decedents' spouses and children.

25  (See, e.g., *Bennett v. Bennett* (1940) 10 S.E. 2d 23.) Anti-miscegenation laws thus represented

26  an especially ugly manifestation of American racism, one that deployed legal institutions to

27  stymie, harass, and punish intimate, loving relationships between consenting adults solely on the

28  basis of entrenched mythologies. (See generally Randall Kennedy, *Interracial Intimacies: Sex,*

3

1   *Marriage, Identity and Adoption* (2003); Renee C. Romano, *Race Mixing: Black-White Marriage*

2   *in Postwar America* (2003).)

3        8.    Anti-miscegenation laws poisoned the legal, moral, and cultural environment in

4   ways that Americans are still struggling to overcome.  Even though there no longer exist active

5   legal bars to interracial marriage, the customs, habits, and sentiments that those prohibitions

6   helped to generate and reinforce over the centuries continue to manifest themselves in invidious

7   discriminations against interracial couples in housing and employment as well as in acts of arson

8   and other forms of violence.  (See, e.g., *United States v. Hartbarger* (1998) 148 F. 3d 777;

9   *United States v. Ramey* (1994), 24 F. 3d 602; *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.

10  2d 888 (1986).  See generally *Romano, supra*, at 262-263.)

11       9.    Just as the history of anti-miscegenation laws offers an instructive, cautionary

12  tale, the history of the eventual discrediting of these laws offers an instructive, inspirational tale.

13  From the founding of the United States until the middle of the twentieth century, the wisdom and

14  legitimacy of anti-miscegenation laws were commonly taken for granted.  By the end of World·

15  War II, nine had repealed their anti-miscegenation laws.  (See Harvey M. Applebaum,

16  *Miscegenation Statutes: A Constitutional and Social Problem*, 53 Georgetown Law Journal

17  (1964) 49.)  But even so, white public opinion everywhere eschewed such unions and brutally

18  stigmatized those who transgressed this racial taboo.  A Gallup Poll in 1958 indicated that only 1

19  percent of southern whites and 5 percent of whites outside the South approved of marriages

20  between blacks and whites.  Most whites saw the possibility of an actual intermarriage involving

21  their family or friend as a crisis they should mobilize to prevent.

22       10.    The race line in matrimony was effectively erased in the United States through

23  litigation.  Three key cases in this process were *Perez v. Sharp* (1948), 198 P. 2d 17; *Naim v.*

24  *Naim* (1955), 87 S.E. 2d 749; vacated, 350 U.S. 891; 90 S.E. 2d 849 (1956); 350 U.S. 985; and

25  *Loving v. Virginia* (1967), 388 U.S. 1.

26       11.    In *Perez v. Sharp*, (sometimes also denoted as *Perez v. Lippold*) the Supreme

27  Court of California handed down a landmark ruling that invalidated the state's anti-

28  miscegenation law despite widespread and intense public disapproval of racial intermarriage.

4

12.     The controversy that generated the case arose when Andrea D. Perez and Sylvester S. Davis, Jr., applied to the County Clerk of Los Angeles County for a marriage license. On the requisite forms, she designated herself as "white" and he designated himself as "Negro." The Clerk refused to issue a license, citing a California law which stated that "no license may be issued authorizing the marriage of a white person with a Negro, mulatto, Mongolian or member of the Malay race." California's anti-miscegenation law had deep roots. In 1850 the state enacted a law that prohibited whites from marrying Negroes or mulattoes. In 1880 "Mongolians" — by which was meant people of Chinese and Japanese ancestry — were added to the list of those whom whites were prohibited from marrying. In 1933, the California Supreme Court ruled that, as written, the state's anti-miscegenation law did not prohibit whites from marrying Filipinos. But the state assembly immediately "cured" that flaw by adding "Malays" to the statute.

13.     Perez and Davis complained that the Clerk's refusal to issue them a marriage license was unlawful and sought a court order directing the clerk to act. They asserted that the state law provided no excuse because it was invalid under the federal constitution. The California Supreme Court agreed. The vote was close – four to three. Three Justices voted to invalidate the anti-miscegenation law pursuant to the due process and equal protection clauses of the federal constitution. One Justice voted to strike down the law on the basis of the freedom of religion clause of the federal constitution. Three Justices voted to uphold the law.

14.     The principal opinion of the majority was written by Justice Roger J. Traynor. He began by noting the petitioners' principal argument: that the state's prohibition against inter-racial marriage violated their First Amendment right to the free exercise of their religion. They averred that since their Church — the Roman Catholic Church — did not forbid interracial marriage they were entitled to receive the sacrament of matrimony notwithstanding the state's anti-miscegenation statute. Justice Traynor did not set forth expressly a holding with respect to this prong of the petitioners' challenge. He seems, however, to have implicitly rejected that challenge, observing that "Although freedom of conscience and the freedom to believe are absolute, the freedom to act is not." In dissent Justice John W. Shenk maintained that "the

5

1   petitioners' alleged right to marry is not a part of their religion in the broad sense that it is a duty

2   enjoined by the church." Rather, their marriage would simply have been permissive under

3   Church doctrine.

4        15.    Albeit unmentioned, another argument against the petitioners' freedom of religion

5   argument, is that while the Catholic Church did not itself bar inter-racial marriages, it did

6   counsel priests and parishioners to respect local anti-miscegenation laws — a fact that rather

7   sharply undercut the petitioners' claim that the state's prohibition impinged upon their freedom

8   of religious observance. If, in the view of the Church, anti-miscegenation laws prevented

9   Catholics from practicing their religion, the Church would have presumably desisted from urging

10  followers to abide by such laws.

11       16.    Although a majority of the Justices appear to have rejected the petitioners'

12  freedom of religion argument, it played an important, perhaps even decisive, role in the outcome

13  of the case. Justice Douglas L. Edmonds, the majority's key fourth vote, embraced and

14  emphasized the freedom of religion argument in his concurring opinion. (See also *Lovell,*

15  *Marriage and the Freedom of Religion*, 22 Southern California Law Review 27 (1948).)

16       17.    At the heart of Justice Traynor's opinion are two propositions. One is that

17  marriage is "a fundamental right" that cannot be impinged upon "except for an important social

18  objective and by reasonable means." The other is that "race restrictions must be viewed with

19  great suspicion." In Justice Traynor's view, either of these propositions justified subjecting anti-

20  miscegenation laws to the most intense form of judicial scrutiny.

21       18.    Few observers doubted that the anti-miscegenation law under challenge raised a

22  color bar. The only dispute was over the propriety of such a bar. A substantial number of

23  observers, however, questioned Justice Traynor's conclusion that the color bar impaired the right

24  to marry. After all, they argued, under the law, both Perez and Davis were free to marry. It was

25  just that Perez was barred from marrying a Negro, mulatto, Mongolian or Malay, while Davis

26  was barred from marrying any white person. To Justice Traynor, this restriction represented a

27  grave infringement on the right to marry because "the essence of the right to marry is freedom to

28  join in marriage with the person of one's choice." A difficulty that faced that argument in 1948

6

1   is that segregation was still deemed to be permissible under the federal constitution.  Under the

2   then existing precedents of the United States Supreme Court, state-mandated segregation did not

3   wrongfully burden a person's right to enjoy goods or services so long as those goods or services

4   were equal, albeit separate, to those reserved to people of a different race.  The Court thus

5   assumed that goods and services would be fungible, with a white railway car or school having

6   essentially the same properties as a separate but equal black railway car or school.  Justice

7   Traynor maintained, however, that the fungibility arguably present with respect to some goods

8   and services was absent with respect to marriage.  "Since the essence of the right to marry," he

9   wrote, "is freedom to join in marriage with the person of one's choice, a segregation statute for

10  marriage necessarily impairs the right to marry."  Human beings, he insisted, would be

11  diminished "by a doctrine that would make them as interchangeable as trains."

12          19.     Segregationists had long argued that properly drawn anti-miscegenation laws

13  were consistent with the federal equal protection clause because they apply to all persons on the

14  same basis.  According to this argument, Perez, the white woman, was barred from her choice of

15  a marriage partner on equal terms as Davis the black man.[1]  By contrast, Justice Traynor

16  maintained that the "decisive question is not whether different races, each considered as a group,

17  are equally treated because the equal protection clause "does not refer to rights of the Negro race,

18  the Caucasian race, or any other race, but to the rights of individuals."  In Traynor's view,

19  therefore, restricting the freedom of action of an individual because of his race in the absence of

20  an extraordinary justification constituted a violation of the Equal Protection Clause.  That people

21  of another race were similarly restricted did not cure the violation.

22  / / /

23  / / /

24

25

26  _____

    [1] Under the California anti-miscegenation law, whites were actually more "burdened" –
    some would see it as "protected" – than others.  While the law foreclosed whites from marrying
27  Negroes, mulattoes, Mongolians and Malays, it only foreclosed Negroes form marrying whites;
    Negroes were free to marry mulattoes, Mongolians, and Malays.

28

1   Quoting the federal Supreme Court's decision in *Shelley v. Kraemer*, Justice Traynor declared

2   that "equal protection of the laws is not achieved through indiscriminate imposition of

3   inequalities."[2]

4       20.    Acting on the premise that laws restricting marital freedom or distinguishing

5   between persons exclusively on a racial basis are presumptively suspicious, Justice Traynor

6   assessed the California anti-miscegenation law to determine whether it suitably advanced the

7   purposes that defenders voiced in justification.  Lawyers defending the statute claimed that the

8   law aimed to minimize the number of offspring created by interracial unions.  They deemed this

9   to be a worthy project because, they maintained, interbreeding created offspring inferior to the

10  racial stock of the parents.  They also argued that the law was justified because the colored

11  groups designated by the law are inferior physically and mentally to whites and would thus, if

12  unrestrained, diminish the quality of the population's overall genetic inheritance.

13      21.    Justice Traynor responded to these arguments along two lines.  First, he attacked

14  their empirical basis, contending that the best biological and social scientific knowledge rejected

15  the notion that racial admixture caused genetic degeneration.

16  / / /

17  / / /

18  / / /

19

20

21

22      [2] In *Shelley v. Kraemer* the United State Supreme Court held that state courts violated the federal constitution when they specifically enforced restrictive covenants which stipulated that property was not to be purchased or sold to persons of a given race.  334 U.S. 1 (1948).  The Court invalidated equitable enforcement of racially restrictive covenants despite the argument in their defense that such covenants are race neutral insofar as private parties could decided to proscribe whites, blacks, Asian-Americans or any other set of individuals.  Since anyone was subject to proscription, depending on the tastes of private parties, no one race was being singled out by the state.  All persons were equally vulnerable to private discrimination.

26      This equal application theory of equal protection has deep roots. (See *Roberts v. City of Boston*, 59 Mass. 198 (1850); *Pace v. Alabama*, 106 U.S. 583 (1882); *Plessy v. Ferguson*, 193 U.S. 537 (1896).  It continues to be voiced from time to time.  See, e.g., *Batson v. Kentucky*, 476 U.S. 79 (1996) (Rehnquist, C.J., dissenting).)

28

DECL KENNEDY IN OPP TO PLTFFS' MOT SUMMARY JDMT; PROC NO. 4365

1  Justice Shenk maintained that, at the very least, there existed a dispute over this point — that a

2  host of scholars and jurists provided "authority for the conclusion that the crossing of the primary

3  races leads gradually to retrogression and to the eventual extinction of the resultant type" — and

4  that it was the province of the legislature to resolve such disputes.[3]  But Justice Traynor rejected

5  the intellectual authority of those whom Justice Shenk cited.  His ability to do so persuasively

6  rested in large part upon the work of scores of intellectuals who undermined the authority of

7  scientific racism during the first half of the twentieth century.  In 1900 the notion of an objective

8  racial hierarchy of intelligence and morality (with whites atop the ladder) was widely accepted

9  amongst educated elites as a fact of nature.  By 1948, however, a pall of skepticism had been

10  placed over this conviction by influential thinkers such as Franz Boas, Gunnar Myrdal, Ralph

11  Linton, Ruth Benedict, Otto Klineberg, and M.F. Ashley Montagu.  Evidencing the importance

12  of extra-judicial intellectual currents to the judicial determination of "facts," Justice Traynor

13  declared that "Modern experts are agreed that the progeny of marriages between persons of

14  different races are not inferior to both races."  Similarly, Justice Traynor summarily dismissed

15  the assertion of a real, justifiable, and scientifically verifiable racial hierarchy.  "There is no

16  scientific proof," he declared, "that one race is superior to another in native ability."

17        22.     Justice Traynor did not rest upon a rejection of the state's empirical claims.

18  Stipulating for the sake of argument that interracial marriage produces inferior progeny, Justice

19  Traynor declared that he was "unable to find any clear policy in the statute against marriage on

20  that ground."  That is because California law did not rigorously attempt to prevent the

21  procreation of mixed race children.  It did not criminalize miscegenation.  It did not prohibit

22  whites from marrying Indians and other "races."  It did not prevent Negroes, mulattoes,

23

24

---

25      [3] The virtue of what is sometimes referred to as "judicial restraint" is a constant sub-
theme in Shenk's opinion.  Hence, he writes that "Earnest conflict of opinion makes it especially
26  a question for the legislature and not for the courts." (*Perez v. Sharp*, 32 Cal.2d, 754 (1948).)  At
another point he declares: "Courts are neither peculiarly qualified nor organized to determine the
27  underlying questions of fact with reference to which the validity of the legislation must be
determined.  Differing ideas of public policy do not properly concern them" *Id.* at 755.

28

DECL KENNEDY IN OPP TO PLTFFS' MOT SUMMARY JDMT; PROC NO. 4365

1   Mongolians, and Malays from stepping over racial lines to marry one another.  It did not

2   withhold recognition of interracial marriages so long as the couples were married elsewhere.

3      23.    With respect to the matter of physical and intellectual inferiority, Justice Traynor

4   noted that the legislature was free to prohibit marriages that were socially dangerous because of

5   the disabilities of the parties concerned.  That however, was not what the anti-miscegenation law

6   did.  It condemned certain races "as unfit to marry with Caucasians on the premise of a

7   hypothetical racial disability, regardless of the of the physical qualifications of the individuals

8   concerned."

9      24.    In regards to the alleged mental inferiority of the colored races, Justice Traynor

10  observed the notable absence of an intelligence test for marriage that was applicable to the

11  population as a whole.  He remarked, too, that if the state's blanket condemnation of the mental

12  ability of designated races were accepted, there would be no limit to discriminations based upon

13  the purported inferiority of certain races.  It would then be logical to forbid Negroes to marry

14  Negroes, or Mongolians, to marry Mongolians or to decrease their numbers by sterilization.

15  Justice Traynor emphasized, in short, the under-inclusiveness of the California statute, its logical

16  looseness, and the gaping holes that would have prevented it from achieving its purported goals.

17  / / /

18  / / /

19  / / /

20

21

22

23

24

25

26

27

28

10

1   The absence of a tight fit between the asserted aims of the anti-miscegenation legislation and the

2   state's chosen means for reaching those aims permitted the inference, according to Justice

3   Traynor, that the announced goals were not the state's real reasons for enacting and maintaining

4   the challenged legislation but only a cover for something else, something covert, something

5   unmentionable and constitutionally illicit: state supported expression of white supremacist

6   prejudice.[4]

7        25.    A concurring opinion by Justice Jesse W. Carter is often overlooked.  In it he

8   wrote:

9          It is my considered opinion that the statutes here involved . . . are the
    product of ignorance, prejudice and intolerance, and I am happy to join the
10         decision of this court holding that they are invalid and unenforceable. . . .
    The Declaration of Independence is a part of the law of our land. . . .  It
11         declares that "All men are created equal; that they are endowed by their
    Creator with certain inalienable rights; that among these are life, liberty,
12         and the pursuit of happiness; . . . ."  No one will question that, so far as
    petitioners are concerned, this case involves the pursuit of happiness in it
13         clearest and most universally approved form.

14       26.    At the same time that the prevailing faction of the California Supreme Court

15  articulated anti-racist views with a rhetoric that presaged the Civil Rights Movement, the faction

16  of the Court represented by the dissenters cited as authority the postulates of white supremacists

17  in America and abroad.

18  / / /

19  / / /

20  / / /

21

22

23      [4] Another basis on which Justice Traynor voted to strike down the anti-miscegenation law
    was that it was "too vague and uncertain" because "precision is essential in a statute regulating a
24  fundamental right." (*Perez, supra*, at 27.)  In Justice Traynor's view, the statute failed to put
    Californians on notice of who was prohibited from marrying whom.  First, the statute was silent
25  with respect to the proper racial classification of persons of mixed race.  The statute did refer to
    "mulattoes," but Justice Traynor complained that that word itself was left undefined by the
26  legislature.  Second, and perhaps even more damning, is that California law left uncertain the
    meaning of "white person," "Mongolians," and "members of the Malay race."  According to
27  Justice Traynor, it was not at all clear under state law whether persons should be racially labeled
    on the basis of their appearance or on the basis of their ancestry.

28

11

The very year that President Harry Truman ordered the desegregation of the armed forces and that Jackie Robinson broke the color barrier in white professional baseball, three justices of the California Supreme Court continued to defend the constitutional legitimacy of anti-miscegenation laws on the grounds that Negroes represented a racial menace to whites.[5]

27.     In *Perez v. Sharp*, the California Supreme Court became the first court in the twentieth century to invalidate an anti-miscegenation law pursuant to the federal constitution. Some jurists and commentators cite *Perez* as the first case in which any court invalidated an anti-miscegenation law. (See, e.g., Perez v. Sharp, *supra*, (Shenk, J., dissenting) ("Research has not disclosed a single case where a miscegenetic marriage law has been declared invalid.").)  This assertion is incorrect.  In *Burns v. State* (1872), 48 Ala. 195, the Supreme Court of Alabama invoked the Federal Civil Right Act of 1866 to invalidate that state's prohibition against interracial marriage.  *Burns*, however, was overruled five years later in *Green v. State* (1877), 58 Ala. 190 (1877).  In 1874, a Louisiana court, invoking the Civil Rights Act of 1864 and the equal protection clause of the federal constitution, invalidated that state's anti-miscegenation law, but only under a reading of the state's marriage law which deemed marriage to be nothing more than an ordinary civil contract.  (See *Hart v. Hoss & Elder* (1874), 26 La. Ann. 90.)  In *Ex parte Brown* a federal judge in Texas declared that the abolition of slavery had effectively repealed that state's anti-miscegenation law but reversed himself two years later.  (See *Ex parte Francois* (1879), 9 F. Cas. 699 (1879) (printing Ex *parte Brown* in full).)  This same judge ruled that the Texas statute violated the equal protection clause of the federal constitution but only because the law singled out for punishment the white person in an interracial union.

28.     In sum, the caselaw regarding the validity of anti-miscegenation statutes is more complex than often portrayed.  Still, taking this correction into account, it remains accurate to

---

[5] The state did not appeal *Perez* to the federal Supreme Court.  Whether the state's Governor, Earl Warren, had anything to do with that decision is unclear.  In any event, nineteen years later, Warren would face the issue in a different setting as the Chief Justice of the United States Supreme Court.

posit *Perez* as a landmark case that reflected and facilitated the discreditation of racial barriers in matrimony in the twentieth century.

29.     The second case that is essential to an understanding of the banishment of anti-miscegenation laws is *Naim v. Naim*, a dispute in which the Supreme Court of Virginia upheld that state's prohibition against interracial marriage.  The Supreme Court of the United States initially indicated that it would review the Virginia courts' handling of the controversy but then changed its mind, mainly due to concern about adverse public opinion.  *Naim* illustrates the unique status of southern anti-miscegenation laws at mid-century.  For many policy-makers, including a majority of the Justices of the Supreme Court, these laws constituted an untouchable third rail of racial politics.  *Naim* is also noteworthy because it involves the relationship of a white woman and a man of Chinese ancestry.  Although most of the case law generated by anti-miscegenation laws involved blacks and whites, people from other racial backgrounds were also directly and adversely affected by these restraints.

30.     Ham Say Naim was a Chinese sailor who came to the United States in 1942.  A decade later, he married Ruby Elaine Lamberth, a white woman.  Though prior to their marriage they lived together in Norfolk, Virginia, they traveled to North Carolina to be married because they were aware that Virginia law barred whites and people of Asian ancestry from marrying one another.  They got married in Elizabeth, North Carolina and returned to Norfolk immediately afterwards.  After only a year, their marriage disintegrated.  She filed for an annulment or divorce, claiming that Virginia's Racial Integrity Act rendered their marriage a nullity from the outset.  He resisted, arguing that the Act itself was a nullity under the federal constitution and that therefore their marriage was valid.

31.     Nowadays, because of remarkable declines in anti-Asian prejudice — and indeed, the emergence of the notion of Asian Americans as a "model" minority — it is difficult to reconstruct clearly the contempt and fear and detestation with which Asians and Asian Americans were widely viewed and treated during the first half of the twentieth century.  Recovering that aspect of American race relations is essential, however, for an understanding of opposition to intimacy between whites and Asians.  Just as racist imagery portrayed black

13

women as immoral, so, too, were women of Chinese and Japanese ancestry stigmatized as sexually incontinent. Just as racist imagery vilified African American men as sexual fiends, so, too, did racist stereotyping depict as fearsome and repulsive the sexuality of Asian American men. Just as the prospect of blacks and whites joining together to create and enjoy sex, marriage, and children generated paroxysms of disapproval among racists, so too did racists rage at the prospect of intimacy between European Americans and Asian Americans. Illustrative of this animus was a statement made by a farmer from Sacramento, California in 1924 before the United States Senate Committee on Immigration:

> Near my home is an eighty-acre tract of as fine land as there is in California. On that tract lives a Japanese. With that Japanese lives a white woman. In that woman's arms is a baby. What is that baby? It isn't Japanese. It isn't white. I'll tell you what that baby is. It is a germ of the mightiest problem that ever faced this state; a problem that will make the black problem of the South look white.

32. Ham Say Naim resisted the application of the Racial Integrity Act by challenging its validity under the federal constitution. His arguments were rejected by a trial court and the Virginia Supreme Court of Appeals in an opinion by Justice Archibald Chapman Buchanan that took pains to distinguish Virginia's anti-miscegenation law from the one struck down by *Perez*. Echoing a point made by several law review commentators, Justice Buchanan suggested that loopholes in the California anti-miscegenation law undermined its legitimacy. The California statute (unlike others) provided no criminal penalties for its violation. California, moreover, recognized interracial marriages contracted abroad, even in those cases in which parties, intending to return, married elsewhere simply for the purpose of avoiding the state's bar to racially mixed marriages. To some observers, the presence of these loopholes precluded California from plausibly claiming that, in that state, preventing interracial marriage and the creation of interracial children was of major importance. Justice Buchanan stressed that the situation was very different in Virginia. There the state did deploy criminal penalties to enforce its prohibition against interracial marriage and expressly forbade parties from knowingly circumventing its anti-miscegenation statute. Justice Buchanan emphasized in other words the tight fit between Virginia's anti-miscegenation law and its asserted aims. He also reaffirmed

14

certain well-worn arguments in favor of the state's authority to enact a prohibition of interracial marriages. One was that the law was perfectly race-neutral: since the law applied to everyone, no one was being discriminated against. Another argument was that while the equal protection clause of the federal Constitution applied to civil and political rights (e.g., jury service, voting, education), it did not apply to the "social legislation" that governed family life. That, Justice Buchanan insisted, was a sphere of governmental concern delegated exclusively to the states.

33.     Although the United States Supreme Court had never explicitly upheld the constitutionality of an anti-miscegenation law, in *Pace v. Alabama*, it had explicitly upheld the constitutionality of a law that imposed a heightened penalty on interracial as opposed to intra-racial fornication. Justice Buchanan also noted that the Supreme Court had recently declined an opportunity to review the constitutionality of Alabama's anti-miscegenation statute.[6]* In light of these and other considerations, Justice Buchanan and his colleagues unanimously concluded that there existed nothing in the federal constitution "which prohibits the state from enacting legislation to preserve the racial integrity of its citizens, or which denies the power of the state to regulate the marriage relation so that it shall not have a mongrel breed of citizen."

34.     Ham Say Naim appealed to the United States Supreme Court. Although that Court had a large amount of discretion in selecting its docket of cases, in some situations the Justices' discretion was superceded by statute. *Naim* arose in one of those situations. Under the federal statute governing appeals of state court decisions to the Supreme Court, the Justices were obligated either to determine the validity of the state court's judgement or to declare that the dispute failed to pose a "substantial" federal question. Several of the Justices felt torn. Clearly

---

[6] In February and April 1954, the Alabama appellate courts affirmed the criminal conviction of a black woman, Linnie Jackson, who was prosecuted for marrying a white man. (See *Jackson v. State*, 72 So. 2d 114 (1954).)   The United States Supreme Court denied her petition for review of her conviction. 348 U.S. 888 (1954).  For more on the *Jackson* case see Peter Wallenstein, *Race, Marriage, and the Law of Freedom: Alabama and Virginia*, 1860s - 1960s, 70 Chicago Kent Law Review 371, 414-416 (1994).
.

DECL KENNEDY IN OPP TO PLTFFS' MOT SUMMARY JDMT; PROC NO. 4365

1    *Naim* posed a substantial federal question; powerful arguments pointed to the constitutional

2    infirmity of Virginia's Racial Integrity Act and indeed all anti-miscegenation laws.  On the other

3    hand, certain Justices felt that, having recently invalidated *de jure* segregation in public

4    schooling in *Brown v. Board of Education*, it would be imprudent to strike down racial

5    segregation at the altar.  One unnamed Justice reportedly remarked:  "One bombshell at a time is

6    enough."

7          35.    A problem for the Justices was that the statute governing the federal Supreme

8    Court's jurisdiction appeared to preclude evasion; it seemed to require the Court to confirm or

9    reject the Virginia court's judgment.  Under prodding from Justice Felix Frankfurter, however,

10   the Court announced that it could not properly decide the case on the basis of the record before

11   it.  The Court vacated the ruling of the state judges and remanded the case to the Virginia Courts

12   for further proceedings.  The Virginia Supreme Court of Appeals, however, refused to send the

13   case back to the trial judge and instead declared that the record was sufficiently clear to decide

14   the issue in question.  The Virginia court then reaffirmed its adherence to its original decision.

15         36.    Newspapers in Virginia lauded the state supreme court.  The headline in the

16   Richmond *Times-Dispatch* is illustrative:  "State's High Court Spurns U.S. Order."  Hay Say

17   Naim's attorneys sought to capitalize on the defiance by suggesting that it constituted yet another

18   reason for the Supreme Court to review the Virginia jurists' assessment of the Racial Integrity

19   Act.  Voices within the Supreme Court agreed.  One of Justice Douglass' law clerks commented

20   that "It will begin to look obvious if the case is not taken that the [Supreme] Court is trying to

21   run away from its obligation to decide the case."  Several of the Justices agreed, including Chief

22   Justice Earl Warren.  Ultimately, though, the caution of Frankfurter prevailed.

23   ///

24   ///

25   ///

26

27

28

DECL KENNEDY IN OPP TO PLTFFS' MOT SUMMARY JDMT; PROC NO. 4365

1    After the Virginia Supreme Court stood firm, the federal Supreme Court declined to review the

2    controversy, maintaining that the state court's handling of the matter "leaves the case devoid of a

3    properly presented federal question."[7]  Chief Justice Earl Warren prepared a memorandum that

4    would have voiced publicly his disagreement.  "Since I regard the order of dismissal as

5    completely impermissible in view of this Court's obligatory jurisdiction," he wrote, "I am

6    constrained to express my dissent.  I would NOTE PROBABLE JURISDICTION AND SET

7    THE CASE DOWN FOR ARGUMENT."  Chief Justice Warren reconsidered, however, and

8    decided to forego publicizing his discontent.

9         37.    Little suspense attended the announcement of the Court's ruling in *Loving* on June

10   12, 1967.  Its decision was practically a forgone conclusion, especially since, in *McLaughlin v.*

11   *Florida* (1964), the Court had invalidated a Florida statute that criminalized interracial

12   fornication.  That case arose from the arrest in Miami Beach, Florida of Dewey McLaughlin, a

13   black man, and Connie Hoffman (also known as Connie Gonzalez), a white woman.  They were

14   convicted of violating a Florida statute which provided that "Any negro man and white woman,

15   or any white man and negro woman, who are not married to each other, who shall habitually live

16   in and occupy in the nighttime the same room shall each be punished by imprisonment not

17   exceeding twelve months, or by fine not exceeding five hundred dollars."  Although Florida

18   criminalized lewd cohabitation and fornication without regard to race, convictions for those

19   crimes required proof of intercourse.  By contrast, the law proscribing Negroes and whites from

20   occupying the same room required no such proof; the mere fact of sharing a room at night was

21   sufficient.

22        38.    The Florida Supreme Court affirmed the convictions on the strength of *Pace v.*

23   *Alabama*, the 1882 decision in which the federal Supreme Court upheld an Alabama statute that

24

---

25       [7] Several distinguished commentators criticized the Court's decision to avoid deciding
     *Naim*. Herbert Wechsler maintained, for example, that the Court's stratagem was "wholly

26   without basis in the law."  Toward Neutral Principles of Constitutional Law, in *Principles,*
     *Politics and Fundamental Law*, 3, 47 (1961).  See also Gerald Gunther, *The Subtle Vices of the*

27   *"Passive Virtues" — A Comment on Principle and Expediency in Judicial Review*, 64 Columbia
     Law Review 1, 10-13 (1964).)

28

1    enhanced punishment for interracial fornication. In *McLaughlin*, the United States Supreme

2    Court overruled *Pace* and reversed the Florida Court. The Supreme Court, however, expressly

3    declined to review Florida's prohibition against interracial marriage since, in the Justices' view,

4    that statute had not been put directly into question. Still, observers expected the Supreme Court

5    to seize an opportunity soon to strike down the nation's oldest form of segregation law.

6        39.    That expectation was satisfied when the Court nullified Virginia's authority to

7    punish Richard Loving and Mildred Jeter for marrying one another. Their marriage in 1958

8    stemmed from a courtship that reached back to a courtship begun in the 1940s in the rural

9    community of Central Point, in Caroline County, Virginia. This community had historically

10   sheltered a substantial amount of interracial sex involving whites, blacks, and Indians. Its

11   population clearly bore the markings of this mixing. Alongside people conventionally perceived

12   as one race or another resided substantial numbers of individuals who, at one time or another,

13   resided on both sides of the race line.

14       40.    Richard Loving and Mildrewd Jeter traveled to Washington, D.C. to marry,

15   apparently believing that that was all they needed to do to evade their home state's anti-

16   miscegenation law. They returned to Virginia immediately afterwards and moved in with

17   Mildred's parents. Five-weeks later law enforcement officials rousted them out of bed in the

18   middle of the night on the strength of an anonymous tip. Sheriff R. Garnett Brooks asked them

19   what they were doing in bed together. When the Loving's pointed to a District of Columbia

20   marriage license that hung on their bedroom wall, the Sheriff insisted that that authorization was

21   invalid in Virginia. He arrested the couple and jailed them. Later, a grand jury indicted them for

22   violating the state's Racial Integrity Act. The Lovings waived their right to a trial by jury, pled

23   guilty, and were sentenced to a one year jail term, suspended on the condition that they leave the

24   state of Virginia and desist from returning together for a period of twenty-five years.

25       41.    The Lovings moved to D.C and over the next five years became the parents of

26   three children. Discontented with exile, Mildred Loving took steps to better their situation. She

27   wrote a letter in 1963 detailing her predicament to Attorney General Robert F. Kennedy. The

28   Department of Justice forwarded the letter to the American Civil Liberties Union which put the

18

1    Lovings in touch with attorneys who agreed to represent them pro bono.  After a flurry of action

2    in both federal and state courts, the Lovings' attorneys succeeded in getting the Supreme Court

3    of Virginia once again to affirm the constitutionality of the Racial Integrity Act.  This time the

4    United States Supreme Court noted probable jurisdiction, heard oral argument, and rendered a

5    unanimous decision written by Chief Justice Warren that reversed the Virginia courts and, after

6    300 years, put an end to the enforceability of anti-miscegenation laws.

7        42.    Chief Justice Warren's opinion for the Court in *Loving* completely rejects the

8    equal application theory that had long been relied upon by defenders of anti-miscegenation

9    statutes. "The fact of equal application," Chief Justice Warren remarks, "does not immunize the

10   statute from the very heavy burden of justification which the Fourteenth Amendment has

11   traditionally required of state statutes drawn according to race."  Virginia's anti-miscegenation

12   law could not sustain this "very heavy burden" because there was "patently no legitimate

13   overriding purpose independent of invidious racial discrimination" supporting the statute.  As

14   evidence of invidiousness, Warren notes that the Racial Integrity Act prohibited only whites

15   from marrying across racial lines; it permitted other racial groups to intermarry freely among

16   themselves.  Protective of the racial integrity of whites, the Act was indifferent to the racial

17   integrity of non-whites.  Hence, to Chief Justice Warren, the Act was clearly a measure

18   "designed to maintain White Supremacy."  To pre-empt any effort to save anti-miscegenation

19   statutes by modification, however, Chief Justice Warren declared that no racial regulation of

20   marriage would survive the Court's scrutiny.  "We find the racial classifications in [the Act]

21   repugnant," he wrote, "even assuming an even-handed state purpose to protect the 'integrity' of

22   all races."  "There can be no doubt," he maintains, "that restricting the freedom to marry solely

23   because of racial classifications violates the central meaning of the Equal Protection Clause."

24       43.    Echoing Justice Traynor, Chief Justice Warren also concludes that Virginia's

25   Racial Integrity Act was unconstitutional because it unjustifiably infringed on a fundamental

26   freedom.  Describing marriage as "one of the basic civil rights of man," Warren wrote that "To

27   deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied

28   in [the Act] . . . is surely to deprive all the State's citizens of liberty without due process of law. .

19

1   . . Under our Constitution, the freedom to marry, or not marry, a person of another race resides

2   with the individual and cannot be infringed by the State."[8]

3        44.    A noteworthy feature of *Loving* is the Court's silence over whether, as originally

4   conceived, the Fourteenth Amendment was meant to invalidate state anti-miscegenation laws.

5   This matter is of some interest because several members of the Supreme Court and a substantial

6   sector of public opinion contends that constitutional provisions should be read largely, if not

7   decisively, in terms of their original intent.  When the Fourteenth Amendment was designed and

8   ratified, the vast majority of its supporters did not envision it as a bar to anti-miscegenation laws

9   so long as they applied to all persons.  Indeed, some of the most influential of the amendment's

10   framers expressly declared that it would not encroach upon state authority to impose racially

11   neutral prohibitions on interracial marriages.

12        45.    When *Perez* was handed down, when *Loving* was decided white public opinion

13   continued to oppose interracial marriages.  In 1965, a Gallup Poll indicated that 72 percent of

14   southern whites and 42 percent of nonsouthern whites approved of laws that prohibited

15   interracial matrimony.

16        46.    The legal challenges to anti-miscegenation statutes are similar in a variety of ways

17   to legal challenges to policies excluding same-sex couples from matrimony.  First, as a practical

18   matter, those seeking to open marriage to same-sex couples have been prompted to turn to courts

19   as opposed to legislation because of entrenched prejudice against gays and lesbians and

20   widespread indifference to their ongoing oppression.  Although homophobic animus against gays

21   and lesbians has declined over the past several decades, gays and lesbians continue to be subject

22   to all manner of invidious legal and extra-legal discriminations.  (See, e.g., *Department of*

23   *Defense, Overview, Directives Implementing the New DOD Policy on Homosexual Conduct in*

24   *the Armed Forces*, Dec. 21, 1994.  See generally Nan D. Hunter, Courtney G. Joslin, and Sharon

---

25        [8] Traynor made much of what he saw as a defective vagueness in the state anti-
miscegenation law that he helped to bury in *Perez*. Warren, on the other hand, declined to press
26   the vagueness argument. "The Lovings," he noted, "have never disputed [that] Mrs. Loving is a
'colored person' or that Mr. Loving is a 'white person' within the meanings given those terms by
27   the Virginia statutes." (*Loving v. Virginia*, 388 U.S. 1, 5 (1967).)

28

1    M. McGowan, *The Rights of Lesbians, Gay Men, Bisexuals, and Transgender People* (Fourth

2    Edition 2004).)

3        47.    By the nineteen sixties, racist animus against people of color had declined

4    considerably from its ugly peak at the turn of the century.  In 1967, however, even after *Brown v.*

5    *Board of Education*, the Civil Rights Act of 1964, and the Voting Rights Act of 1965, sixteen

6    states continued to retain statutes or state constitutional provisions that prohibited marriage

7    across various racial lines.  The only feasible way of uprooting those provisions was by

8    challenging them in court.  Such challenges did not represent any sort of illicit short-circuiting of

9    democracy.  Rather, the challenges underscored that in American governance, majority will,

10   though important, is not alone determinative of democratic virtue.  There are certain essential

11   requirements of decent, democratic government—due process, equal protection of the laws,

12   deference to certain other fundamental individual rights—that cannot rightly be nullified by

13   ordinary, majoritarian politics.  Opponents of anti-miscegenation laws petitioned judicial

14   tribunals to check majoritarian prejudices in the name of these essential requirements.  In *Perez*

15   and *Loving*, the California Supreme Court and the Supreme Court of the United States answered

16   those petitions affirmatively, issuing landmark decisions that are no longer seriously

17   controversial.

18       48.    One cannot know for certain how long anti-miscegenation laws would have

19   remained in force absent judicial intervention.  It is likely, however, that in some states such laws

20   would have been enforced for a substantial number of years beyond 1967 and despite the

21   changes wrought by the Civil Rights Revolution.  Several states (Virginia, West, Virginia, Texas,

22   Florida, Oklahoma, and Missouri) repealed their anti-miscegenation statutes within two years of

23   the Supreme Court's decision in *Loving v. Virginia*.  Delaware and Kentucky did not follow suit

24   until 1974.  Tennessee did not repeal its anti-miscegenation law until 1978.  South Carolina

25   voters revoked the anti-miscegenation provision in that state's constitution in 1998.  It took until

26   the year 2000 for the last anti-miscegenation provision in the United States to be formally

27   repealed.  The Alabama Constitution contained a clause declaring that "The Legislature shall

28   never pass any law to authorize or legalize any marriage between any white person and a Negro

1   or descendant of a Negro."  In November 2000 that provision was repealed by a referendum.

2   Even at that late date, however, the outcome was soberingly close, with forty percent of the

3   Alabama electorate voting to *retain* the provision in question.

4        49.     Same-sex couples today—like differently raced couples in yesteryears—face a

5   social environment in which majoritarian prejudice deprives them of rights to marriage to which

6   they are entitled.  To analogize anti-miscegenation laws to laws prohibiting marriages between

7   persons of the same sex is not to claim that the histories of these two types of invidious

8   discrimination are the same.  They are different in various ways.  Anti-miscegenation laws,

9   though prevalent, were never as pervasive as bars to same-sex marriage.  On the other hand,

10  while criminal punishments played a large role in the enforcement of anti-miscegenation statutes,

11  criminal law has played almost no direct part in the enforcement of bars prohibiting same-sex

12  couples from marrying (though it was not until 2003 that the Supreme Court barred states from

13  punishing sexual intimacy solely on the grounds that the people involved are of the same gender.

14  See *Lawrence v. Texas*, (2003), 539 U.S. 558. ).

15       50.     The purpose of analogizing anti-miscegenation statutes and sex-based bars to

16  marriage is not to assert that these two forms of invidious discrimination are the same; the

17  purpose is to highlight their striking and revealing similarities.  In both cases, popular prejudices

18  nourished by deeply entrenched mythologies are transformed into laws or policies that needlessly

19  impede otherwise eligible couples from expressing affections and commitments through

20  matrimony.

21       51.     The litany of rationales summoned as defenses for anti-miscegenation laws has

22  reappeared in defenses for prohibitions to marriage for same-sex couples.  Defenders of the sex

23  restriction on marriage frequently invoke religion to justify the exclusion.  But, of course, so, too,

24  did defenders of anti-miscegenation laws.  Voicing support for anti-miscegenation laws,

25  alongside other forms of racial segregation, the Supreme Court of Pennsylvania invoked "the

26  Creator": "Why the Creator made one [race] black and the other white, we know not but the fact

27  is apparent, and the races distinct, each producing its own kind, and following the peculiar law of

28  its constitution . . . . The natural law that forbids their intermarriage and that social amalgamation

22

1    which leads to the corruption of races are as clearly divine as that which imparted to them

2    different natures." (See *West Chester R.R. Co. v. Miles* (1867), 55 Pa 209, 213.) In the course of

3    sentencing Richard and Mildred Loving for violating Virginia's anti-miscegenation statute, a

4    judge famously declared: "Almighty God created the races, white, black, yellow, Malay, and

5    red, and placed them on separate continents. And but for the interference with his arrangement,

6    there would be no call for such marriages. The fact that he separated races shows that he did not

7    intend for the races to mix."

8         52.    Defenders of prohibitions to marriage for couples of the same sex often claim that

9    dropping this exclusion would offer sanctuary to "unnatural" unions. Defenders of anti-

10   miscegenation laws made a similar claim. For example, upholding Georgia's anti-miscegenation

11   law, the Georgia Supreme Court asserted that "amalgamation of the races . . . is unnatural."

12   (*Scott v. Georgia* (1869) 39 Ga. 321, 324.)

13        53.    Defenders of anti-miscegenation laws often invoked concerns about procreation

14   and the welfare of offspring as a basis for barring interracial matrimony. One belief stubbornly

15   embraced despite clear empirical contradiction was the notion that interracial couples would be

16   unable to conceive children. (See, e.g. *State v. Jackson* (1883), 80 Mo. 175 (asserting that it is "a

17   well authenticated fact.") A related myth was the notion that the mixed race offspring of

18   interracial unions would be physically and mentally inferior to so-called "pure" stock. "The

19   amalgamation of the races," the Supreme Court of Georgia announced in *Scott v. State*, "is

20   always productive of deplorable results." The dissenting Justices in *Perez v. Sharp*, attested to

21   the influence of this myth. Citing "scientific" studies, Justice Shenk declared that "On the

22   biological phase there is authority for the conclusion that the crossing of the primary races leads

23   gradually to retrogression. . . ." (See also *Lonas v. State* (1871), 50 Tenn. 287 (asserting that

24   anti-miscegenation law is socially useful to "prevent violence and bloodshed which would arise

25   from such cohabitation, distasteful to our people, and unfit to produce the human race in any of

26   the types in which it was created.").)

27        54.    Defenders of the sex-restriction on marriage frequently cite tradition as a

28   justification for perpetuating the prohibition. But so, too, did many defenders of anti-

                                          23

1  miscegenation laws invoke naked tradition.  Dissenting in *Perez*, Justice Shenk repeatedly and

2  vigorously advanced tradition as a major basis for sustaining anti-miscegenation laws in general

3  and California's prohibition in particular.  Antimiscgenation laws, Justice Shenk intoned, "have

4  been in effect in this country since before our national independence and in [California] since our

5  first legislative session. . . . It is difficult to see why such laws, valid when enacted and

6  constitutionally enforeceable in this state for nearly 100 years and elsewhere for a much longer

7  period of time, are now unconstitutional under the same Constitution and with no change in the

8  factual situation."

9       55.     Many defenders of a sex restriction on marriage dispute that the restriction in

10  question reflects "invidious" discrimination.  They reject the claim that the position they espouse

11  is "anti-gay," "anti-lesbian," homophobic, or in any sense a manifestation of bigotry.  But, of

12  course, many defenders of anti-miscegenation laws similarly eschewed charges that those

13  provisions displayed animus towards people of color.   In its infamous decision in *Plessy v.*

14  *Ferguson,* (1896), 163 U.S. 537, upholding the constitutionality of a Louisiana statute that

15  required the separation of the races in railroad cars, the federal Supreme Court rejected the claim

16  that segregation stigmatized blacks.  According to the Court, the enforced separation of the two

17  races did not stamp "the colored race" with a badge of inferiority.   "If this be so," the Court

18  averred, "it is not by anything found in the act, but solely because the colored race chooses to put

19  that construction upon it."

20       56.     Jim Crow segregation in its paradigmatic form was defended on the ground that it

21  accorded "equal" treatment to whites and blacks alike.  According to apologists for segregation,

22  blacks were excluded from attending schools reserved for whites, but whites were similarly

23  excluded from attending schools reserved for blacks.  Blacks were excluded from matrimony

24  with whites, but whites were simultaneously excluded from matrimony with blacks.  Whites as a

25  group and blacks as a group were burdened equally, so neither group nor anyone in either group

26  had reason to complain.  Indeed, the society as a whole—including racial minorities—was

27  supposedly benefited by Jim Crow racial discrimination because such arrangements, by keeping

28

1   everyone in their traditional "place," reduced the risk that social frictions would ignite racial

2   animosities that would almost certainly redound to the detriment of peoples of color.

3       57.    Today Americans look back upon segregationist apologetics with disbelief. Many

4   are amazed that apparently sensible people could have accepted these rationalizations and

5   misperceived the reality of segregation—the fact that segregation mirrored and reinforced a

6   white supremacist racial hierarchy. Among those who deemed Jim Crow segregation to be

7   consistent with federal constitutional requirements were some of the leading jurists of the

8   twentieth century, including Justices Oliver Wendell Holmes, Jr., Louis Brandeis, and Benjamin

9   Cardozo. That such distinguished figures could fall victim to the power of segregation to

10   disguise itself should sensitize successors, including today's jurists, to the possibility that

11   familiarity might also blind them to forms of oppression which are inconsistent with fundamental

12   constitutional requirements. The great achievement of the Civil Rights Movement was to

13   remove the layers of obfuscation and denial that confused people about the actuality of

14   segregation. The great accomplishment of the litigation that produced *Brown v. Board of*

15   *Education* and *Loving v. Virginia* was to enable courts to see that laws requiring segregation did

16   not represent mere innocent racial distinctions but represented instead invidious manifestations

17   of racial subordination.

18       58.    There are some observers who object to analogizing anti-miscegenation laws and

19   prohibitions on marriage for same-sex couples. (See, e.g., David Organ Coolidge, *Playing the*

20   *Loving Card: Same-Sex Marriage and the Politics of Analogy*, 12 Brigham Young University

21   Journal of Public Law (1998). See also Shelby Steele, *Selma to San Francisco?* Wall Street

22   Journal (March 20, 2004); Sherri Williams, *Comparing Gay, Civil Rights a Divisive Issue for*

23   *Blacks*, The Columbus (Ohio) Dispatch (July 2, 2004).) They claim that gays and lesbians are

24   situated far differently—and far more favorably—than blacks or other discrete and insular

25   minorities whose visibility through skin color or other characteristics is immutable. An

26   implication of this claim is that governmental discriminations drawn along lines of sexual

27   orientation should not receive the heightened judicial scrutiny applied to governmental

28   discriminations drawn along racial lines. This argument is mistaken in several respects.

25

59.     First, it assumes that the status of being gay or lesbian is, to some large extent, a chosen and changeable identity, whereas racial status is imposed and unchangeable. Various aspects of this assumption are doubtful, including the proposition that racial identity is almost invariably imposed and immutable. A substantial number of people who think of themselves and present themselves as "black" have physical characteristics that would prompt many onlookers to describe them as "white." It is also true that a substantial number of people who are, by certain definitions, "black" (perhaps they have black parents or grandparents) choose to think of themselves and present themselves as "white." To an appreciable extent, then, race is or can be a chosen category. Walter White, the crusading executive secretary of the National Association for the Advancement of Colored People (NAACP) referred to himself as a "voluntary Negro" because his outward appearance permitted him to "pass" as a white man. In *Life on the Color Line: The True Story of a White Boy Who Discovered He Was Black* (1995), Gregory Howard Williams, the current president of the City College of New York, describes how his father alternated between living as a "black" man and living as a "white" man and how he himself has lived on both sides of the race line. The ingredients that give rise to individuals' identities are thus considerably more complex than what is suggested by the misleading oversimplification that categorizes gay or lesbian identity as mutable, chosen conduct and racial identity as immutable, ascribed status.

60.     More important is the erroneous belief that the degree of judicial scrutiny applied to governmental discriminations should depend substantially on whether the discrimination in question tracks a characteristic that is deemed to be immutable. That gays or lesbians can hide themselves by closeting their sexual or affectional orientation should offer no sanctuary for laws that invidiously discriminate on the basis of sexual orientation. It would be inconceivable, after all, to lessen the degree of judicial scrutiny applied to racial discriminations in the event that a potion was discovered that would allow any black person to take on the appearance of a white person. That a person can hide his or her identity should offer no excuse for condoning governmental distinctions between persons that cannot legitimately be justified.

12/30/2004 14:11 FAX                                                                                   ☒001
DEC-30-2004 10:06        CITY ATTY STE 600                        415 437 4644      P.02/02



61.    It is erroneous to assume that, in terms of political and social power, gays and lesbians are better off than racial minorities because of their ability to "pass," to obtain the sanctuary of the closet, to enjoy invisibility. This belief assumes that social invisibility is a political and social advantage. As leading academic commentators have argued, group visibility and insularity can be politically advantageous. (See, e.g., Bruce Ackerman, *Beyond Carolene Products* (1985) 98 Harvard Law Review 713; Kenji Yoshino, Assimilationist Bias in Equal Protection: The Visibility Presumption and 'Don't Ask, Don't Tell,' 108 Yale Law Journal (1998) 485.) Consider the case of blacks. Far from being an invariable hindrance, the visible "uniform" of skin color has often been an asset by easing the task of identifying other blacks. By contrast, invisibility is one of the most difficult problems that gays and lesbians have confronted in their efforts to organize. That is why many activists championing gay and lesbian causes have sought so fervently to persuade hidden gays and lesbians to "come out of the closet."

62.    The analogy between antimiscegenation laws and laws that bar same-sex couples is a powerful heuristic device that underscores disturbing similarities between these two prohibitions. The justifications voiced for excluding same-sex couples from the institution of marriage hauntingly echo the justifications that were voiced for barring interracial marriage. Just as judicial intervention was required and proper to permit interracial couples to marry, so, too, is judicial intervention required and proper to permit same-race coupled to marry.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 30th day of December, 2004, at Boston, Masschusetts.



_____
                RANDALL KENNEDY

TOTAL P.02