1   Most Rev. Dr. Mark S. Shirilau
    Archbishop and Primate
2   The Ecumenical Catholic Church
    8539 Barnwood Lane
3   Riverside, CA  92508-7126
    T: (951) 789-7008  F: (951) 789-0783
4   archbishop@ecchurch.org

5   *Amicus Curiae pro se*

6

7

**FILED**

**JUL 2 4 2009**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8           **UNITED STATES DISTRICT COURT**
9           **NORTHERN DISTRICT OF CALIFORNIA**

10   KRISTIN M. PERRY, SANDRA B. STIER,          CASE NO.  09-CV-2292 VRW
     PAUL T. KATAMI, and JEFFREY J.
11   ZARRILLO,
                    Plaintiffs,
12
                                                 |
13          v.                                   **BRIEF OF *AMICUS CURIAE***
                                                 **ARCHBISHOP MARK SHIRILAU**
14   ARNOLD SCHWARZENEGGER, in his official      **IN SUPPORT OF PLAINTIFFS**
     capacity as governor of California; EDMUND
15   G. BROWN JR., in his official capacity as
     attorney general of California; MARK B.
16   HORTON, in his official capacity as director of
     the California Department of Public Health and
17   state registrar of vital statistics; LINETTE
     SCOTT, in her official capacity as deputy
18   director of health information and strategic
     planning for the California Department of Public
19   Health; PATRICK O'CONNELL, in his official
     capacity as clerk-recorder for the County of
20   Alameda; and DEAN C. LOGAN, in his official
     capacity as registrar-recorder/county clerk for
21   the County of Los Angeles,

22                 Defendants

23   DENNIS HOLLINGSWORTH, GAIL J. KNIGHT,
     MARTIN F. GUTIERREZ, HAKSHING
24   WILLIAM TAM, and MARK A. JANNSON, as
     official proponents of Proposition 8,
25                 Defendant-Intervenors

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Interest of Amicus Curiae ......................................................................................... 1

Introduction ............................................................................................................... 2

Discussion of Issues Raised ....................................................................................... 8

    1. History of Discrimination Against Gays ........................................................ 9

    2. Defining Characteristics and Social Contribution ....................................... 10

    3. Can Sexual Orientation Be Changed? ........................................................ 11

    4. Relative Political Power of Gays ................................................................ 12

    5. History of Marriage and Its Changes .......................................................... 13

    6. Definition of Marriage in California ........................................................... 15

    7. Stability Effects of Same-Sex Marriage on Opposite-Sex Marriage .......... 16

    8. Is a Married Mother and Father the Optimal Child-Rearing Environment? .............. 17

    9. Has California Acted to Promote These Interests? ..................................... 19

    10. Does Prop 8 Discriminate Based on Sexual Orientation, Gender, or Both? ............. 20

    11. History and Development of California's Ban on Same-Sex Marriage .................. 21

    12. Is Opposite-Sex Marriage a Meaningful Option for Gays and Lesbians? ............... 21

    13. Does the Ban on Same-Sex Marriage Meaningfully Restrict Heterosexuals? ......... 22

    14. Does Requiring One Man and One Woman Marriage Promote Stereotypes? .......... 23

    15. Was Prop 8 Passed with a Discriminatory Intent? ................................... 23

    16. Voters' Motivation for Supporting Prop 8 ................................................ 28

    17. Are Married Couples Treated Differently from Domestic Partners? ............ 31

Conclusion ............................................................................................................... 33

Proof of Service ....................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Loving v. Virginia*, 388 U.S. 1 (1967) ................................................................. 7, 33

*Varnum v. Brien,* 763 NW2d 862 (Iowa 2009) ....................................................... 2, 22

*Turner v. Safley*, 482 U.S. 78 (1987) ................................................................. 19, 33

*Zablocki v. Redhail*, 434 U.S. 375 (1978) .............................................................. 19, 33


## Constitutions

Cal. Const., Art. 1, §7.5 ................................................................................ 3, 34

U.S. Const., Amend. 1 ................................................................................... 4


## Laws and Regulations

Cal. Health & Safety Code §103175(3) ................................................................ 5


## Other Authorities

Bagemihl, Bruce, *Biological Exhuberance* (St. Martin's, 1999) .................................. 14

Blow, Steve, "Gay Marriage, Why Would It Affect Me?" *Dallas Morning News* ..................... 26

Book of Genesis ....................................................................................... 14-15

Book of Leviticus ..................................................................................... 10

Canon Law of the Ecumenical Catholic Church (1987) ................................................. 1

*Codex Iuris Canonici Auctoritate Ioannis Pauli PP. II* (1983) .................................. 1, 3-5

Dobson, James, "Eleven Arguments Against Same-Sex Marriage" ...................................... 26

Focus on the Family, "Marriage" ...................................................................... 24

Graff, E. J., *What Is Marriage For?* (Beacon, 1999) ................................................ 15

Monson, Thomas, et al, "Preserving Traditional Marriage and Strengthening Families" ........... 29

Protectmarriage.com, "Everything to Do With Schools" television commercial ........................ 29

Protectmarriage.com, "Finally the Truth" television commercial ................................................ 30

Protectmarriage.com, "Myth and Facts about Proposition 8" ..................................................... 23

76th General Convention of The Episcopal Church, Resolution C056 ......................................... 7

1

2

## INTEREST OF *AMICUS CURIAE*

3       Archbishop Mark Shirilau is the primate of the Ecumenical Catholic Church. He is a

4   resident of California, a registered voter who voted against Proposition 8, and the chief

5   ecclesiastical officer of The Ecumenical Catholic Church, a Christian denomination with local

6   ministries in California as well as other locations in the United States and world. While all of the

7   statements made within this *amicus* brief have the support of the clergy and laity of the

8   denomination, in accordance with Ecumenical Catholic canon law the archbishop is the sole

9   person with authority to speak fully and completely for the denomination. As such, *amicus*

10  addresses the court both on his personal behalf and on behalf of the Ecumenical Catholic Church.

11      *Amicus* believes that same-sex marriage is theologically, sacramentally, liturgically,

12  emotionally, and practically identical to different-sex marriage. The Ecumenical Catholic has

13  always held this as part of its theology of marriage. "No distinction shall be made in this

14  denomination or any of its constituent organizations or authorities between heterosexual and

15  homosexual marriages." (Canon XX, Article 14, available at www.ecchurch.org/canons.htm).

16  In accordance with this belief, *amicus* believes that same-sex couples should be afforded the

17  exact same fundamental right of access to civil marriage as are male-female couples.

18      *Amicus* believes that prohibiting the state to grant equal civil marriage opportunity to

19  same-sex and different-sex couples violates his personal freedom of religion as a priest and the

20  freedom for his Christian denomination to have its canons and ceremonies granted the same civil

21  stature as are the canons and ceremonies of some other denominations and religions.

22      *Amicus* is also personally aware of the emotional harm done to many same-sex couples

23  by the state's inability to recognize same-sex marriages. As chief pastor of his denomination,

24  *amicus* has a personal ministerial responsibility to assure the well-being of his flock. This

25  includes their emotional health. For those members who are in valid sacramental same-sex

1   marriages, this emotional health is bolstered by the legal recognition of their marriages and

2   seriously damaged when the state is prohibited from granting such recognition. While the

3   discrepancy between states, and now the on-again-off-again status in California does not

4   necessarily make the legal situation worse than it had been, it clearly worsens the emotional

5   component and brings to light the "my marriage is not complete" phenomenon, which causes

6   great emotional harm to many same-sex couples.

7

8

9                                    **INTRODUCTION**

10

11        Marriage is unique as an institution because it has both religious and civil components

12   that are significant parts of its character and definition. Most religions and most civil

13   governments have laws and regulations dealing with marriage. For this reason marriage provides

14   a particularly difficult challenge to the "separation of church and state" that permeates most of

15   United States law. Gradually civil courts are weighing, evaluating, and separating these religious

16   and civil factors, and as they do so, they recognize that there is no valid *civil* reason for limiting

17   marriage to male-female couples. The Iowa Supreme Court perhaps addressed this issue most

18   eloquently and deliberately in its ruling in *Varnum v. Brien,* 763 NW2d 862 (Iowa 2009), "While

19   unexpressed, religious sentiment most likely motivates many, if not most, opponents of same-sex

20   civil marriage and perhaps even shapes the views of those people who may accept gay and

21   lesbian unions but find the notion of same-sex marriage unsettling." (p. 63 of the internet PDF).

22   The Iowa court correctly recognized that "we give respect to the views of all Iowans on the issue

23   of same-sex marriage – religious or otherwise – by giving respect to our constitutional principles.

24   These principles require that the state recognize both opposite-sex and same-sex civil marriage.

25

1 Religious doctrine and views contrary to this principle of law are unaffected, and people can
2 continue to associate with the religion that best reflects their views." (p. 66).

3  The courts are required to uphold their respective constitutions. The people, however, are
4 not so constrained. In fact, Proposition 8 exactly demonstrated the ability of the people to insert
5 religious doctrine into law, even into the state constitution. Proposition 8, now Section 7.5 of
6 Article 1 of the California Constitution, bears remarkable similarity to Article 1 of Canon 1055
7 of the Roman Catholic Church, "*Matrimoniale foedus, quo vir et mulier inter se totius vitae*
8 *consortium constituunt...*" ("The matrimonial covenant, by which a man and a woman establish
9 themselves a partnership for the whole of life...") (*Codex Iuris Canonici Auctoritate Ioannis*
10 *Pauli PP. II Promulgatus*, 1983).

11  Because the people are not constrained in their legislative actions, and because the
12 California Constitution is easily amended, a small majority of California voters inserted a
13 religious doctrine into the state constitution. Once it found the amendment *process* to be in
14 accordance with the constitution, the California Supreme Court felt it was was forced to once
15 again enforce a religious doctrine – that marriage is only between a man and a woman – onto
16 state officials even though it had previously rejected that doctrine as unconstitutional. Marriage
17 equality thus died in California, and discrimination against same-sex couples was restored.
18 Furthermore, religious freedom itself was stifled because the religious doctrine inserted into the
19 state constitution is not a universally accepted religious doctrine, in spite of what the Proposition
20 8 proponents would have one believe.

21  This is now evidently clear. Consider the Right Reverend Bruce LeBlanc, the
22 Ecumenical Catholic bishop of Davenport, Iowa, and the first person personally ordained by
23 *amicus* Archbishop Shirilau in 1991. When Bishop Bruce performs a wedding in Iowa, the
24 couple is granted equal civil recognition and benefits whether it is two men, two women, or a
25 man and a woman. When *amicus* performs a wedding in California, the civil recognition and

1    benefits are only directly available to the couple if it is a man and a woman. If the couple is two

2    men or two women, they must separately form a domestic partnership, even though the religious

3    ceremony would have been exactly the same for any of these couples – the Iowan same-sex

4    couple, the Iowan different-sex couple, the Californian same-sex couple, or the Californian

5    different-sex couple. To complicate the situation even further, if the Iowan same-sex couple

6    were to move to California, would their civil marriage suddenly disappear? Would they have to

7    apply for a California domestic partnership in order to protect themselves? Or if the Californian

8    same-sex couple were to move to Iowa, would they have to be re-married in a civil ceremony in

9    order to receive the protections they would have automatically received had they actually been

10   married in Iowa or had they been a different-sex couple married in California? What about the

11   basic legal concept that a contract enacted in one state is valid if the parties move to another

12   state? It is protection against these interstate discrepancies that the federal constitution must

13   provide. The Ecumenical Catholic Church, like all other religious organizations, is guaranteed

14   the freedom to practice its religion. "Congress shall make no law respecting an establishment of

15   religion, or prohibiting the free exercise thereof ..." (U.S. Const., Amend. 1) Proposition 8 and

16   its insertion into the California Constitution of a religious doctrine that we consider false,

17   repugnant, and discriminatory is a clear violation of our religious freedom. Unlike school prayer

18   or Nativity sets at city hall, Proposition 8 does not just honor a religion but literally *establishes*

19   religion by forcing the religious doctrine of limiting marriage to a male-female couple upon

20   those religious organizations that disagree, upon those religious people who disagree, and upon

21   those non-religious people who disagree.

22        Anyone who doubts that Proposition 8 infringed religious freedom should consider this

23   parallel example. Suppose rather than inserting a version of Roman Catholic Canon 1055 (man

24   and woman marriage) into the state constitution, 52% of the voters approved a ballot initiative

25   that inserted Roman Catholic Canon 1024 ("*Sacrum ordinationem valide recipit solus vir*

1  *baptizatus*," "Only a baptized male validly receives sacred ordination.") into the state

2  constitution. The hypothetical ballot initiative actually inserted a section into the California

3  Constitution that read, "Only the ordination of a male is valid or recognized in California."

4  Since the main religious organizations that vigorously supported Proposition 8 have male-only

5  clergy, the possibility that such a proposition could be passed is not beyond doubt.

6  　　Those denominations, including the Ecumenical Catholic Church, that presently ordain

7  females would not *theologically* be affected. *Amicus* would continue to ordain women, even in

8  California, just as he continues to perform same-sex marriages in California. We do not pretend

9  that the state (or federal) constitution can define the validity of our sacraments. However, the

10  state does grant certain rights to clergy. Consider California Health and Safety Code §103175(3)

11  concerning the marriage license form, "The third section shall include the certification of one

12  person performing the ceremony, that shall show his or her official position including the

13  denomination if he or she is a clergy or clergyperson..." In spite of the words "he or she" the

14  new constitutional amendment would make "or she" invalid and only males would be accepted

15  as clergy people. Would then the marriages of people performed by female priests, ministers,

16  rabbis, or other clergy be valid? Would the couple married by such people have to fill out the

17  additional forms required for religious denominations that do not have formal clergy? Would it

18  affect the emotions of the married couple, instilling doubt as to whether they were truly married

19  because in the state's eyes they did not have a valid minister? How would it affect the emotional

20  health of the ministers themselves, who know in their hearts that their ordinations are valid, but

21  are slapped with a constitutional amendment that says they are not?

22  　　The example seems implausible because we are so used to considering ordination as only

23  a religious matter and we can easily compartmentalize marriage into its various components.

24  While large portions of our population – religious and nonreligious people alike – aspire to be

25  married, ordination is typically the quest only of very religious people.

1    Yet it is only the religious component of marriage that inspires the discrimination

2  embodied in Proposition 8. Proposition 8 is no more or less biased and inappropriate than is its

3  exact parallel, "Only the ordination of a male is valid or recognized in California." It is not a

4  coincidence that the two Roman Catholic canons cited (1055 for marriage and 1024 for

5  ordination) appear so closely together. Theologically ordination and marriage are very closely

6  related, both being commitments for service ultimately derived from Baptism. The male-only

7  ordination constitutional amendment immediately strikes most as repugnant because it is widely

8  known that large numbers of religious people (including many Roman Catholics) do not agree

9  with it. Yet it is no more or less repugnant than the heterosexual-only amendment for marriage.

10  It is exactly the same – a desire to assert one religious view and impose it on the entire state.

11  Tradition can be cited for both. Multiple religious groups that differ on much more important

12  theological issues still agree on either or both of these two issues (male-only ordination and

13  heterosexual-only marriage). In fact, the correlation between the two beliefs is high and not

14  coincidental. The *only* difference is that blatant discrimination against women has become

15  socially unacceptable to the majority of people, while society is still in transition toward such

16  enlightenment with regard to homosexuality. Sexism has become taboo, while heterosexism is

17  only starting down the path toward unacceptability. Just as the courts played active roles in the

18  elimination of sexism, so they must also play active roles in the elimination of heterosexism.

19    Interestingly as well, the larger Christian denominations are processing these same issues

20  in their ecclesiastical legislative and judicial systems. Most mainline Protestant denominations

21  now ordain women, and a woman serves as presiding bishop of the Episcopal Church (which is

22  not without controversy in the worldwide Anglican Communion of which the Episcopal Church

23  is a part). These same denominations are moving through the long and tedious process of

24  achieving marriage equality. The United Church of Christ allows its ministers to celebrate same-

25  sex marriages. Just days ago the triennial general convention of the Episcopal Church passed a

resolution that "the 76th General Convention acknowledge[s] the changing circumstances in the United States and in other nations ... that call ... for an open process for the consideration of theological and liturgical resources for the blessing of same gender relationships." The resolution enables bishops and clergy "particularly those in dioceses within civil jurisdictions where same-gender marriage, civil unions, or domestic partnerships are legal, [to] provide generous pastoral response to meet the needs of members of this church." (Resolution C056, passed July 17, 2009, at the 76th General Convention in Anaheim, California, available at http://www.gc2009.org/ViewLegislation/view_leg_detail.aspx?id=898&type=Current). The United Methodist Church, Presbyterian Church (USA), the Evangelical Lutheran Church in America, and other mainline denominations wrestle with similar issues in the advancement of marriage equality. The movement of equality within the Christian denominations roughly parallels that within the U.S. states, where each system progresses through its own regulations. In both the churches and the states gay rights lag behind women's rights by thirty to forty years, which is another reason why the hypothetical "male-only clergy" constitutional amendment appears at first glance to be more repugnant than its exact and equally repugnant parallel, the "man-and-woman-only marriage" constitutional amendment.

The California Supreme Court became bound by an amendment that cemented discrimination into the state constitution, but the United States Constitution has no such amendment, and the amendment process for the U.S. Constitution is far more stringent than that for the state. A viral bit of offensive religious doctrine has not been inserted into the United States Constitution. This federal court is thereby not as constrained as the California courts. Both equal protection and religious freedom demand that the federal courts follow in the footsteps of the several state courts that have found it unconstitutional to arbitrarily limit marriage to one segment of the population. Since the evolution of human perception of ultimate truth is continuous and progressive, the courts are ultimately destined to recognize the obvious –

1 | the same constitutional principles that opened the door to mixed-race marriage in *Loving v.*

2 | *Virginia*, 388 U.S. 1 (1967), must also open the door to same-sex marriage because mixed-race

3 | and same-sex marriage are exactly analogous, as is the bias and discrimination against both.

### DISCUSSION OF ISSUES RAISED

This court posited several topics or questions for exploration in its order filed June 30, 2009 (Document #76). As a religious institution with a long history of marriage equality, we offer our experience and wisdom with regard to some of these topics raised by the court. Among the topics are the following:

(1) The history of discrimination gays and lesbians have faced;

(2) Whether the characteristics defining gays and lesbians as a class might in any way affect their ability to contribute to society;

(3) Whether sexual orientation can be changed, and if so, whether gays and lesbians should be encouraged to change it;

(4) The relative political power of gays and lesbians, including successes of both pro-gay and anti-gay legislation;

(5) The history of marriage and whether and why its confines may have evolved over time;

(6) The longstanding definition of marriage in California;

(7) Whether the exclusion of same-sex couples from marriage leads to increased stability in opposite-sex marriages, or alternatively whether permitting same-sex couples to marry destabilizes opposite-sex marriage;

(8) Whether a married mother and father provide the optimal child-rearing environment and whether excluding same-sex couples from marriage promotes this environment;

(9)     Whether and how California has acted to promote these interests in other family law
        contexts;

(10)    Whether or not Prop 8 discriminates based on sexual orientation or gender or both;

(11)    The history and development of California's ban on same-sex marriage;

(12)    Whether the availability of opposite-sex marriage is a meaningful option for gays and
        lesbians;

(13)    Whether the ban on same-sex marriage meaningfully restricts options available to
        heterosexuals;

(14)    Whether requiring one man and one woman marriage promotes stereotypical gender
        roles;

(15)    Whether Prop 8 was passed with a discriminatory intent;

(16)    The voters' motivation or motivations for supporting Prop 8; and

(17)    Whether married couples are treated differently from domestic partners in governmental
        and non-governmental contexts.

## 1. History of Discrimination against Gays

The City and County of San Francisco has presented a detailed history of anti-gay discrimination in its *amicus curiae* brief (Document 53). We need not repeat that very informative history, but do point out that the cited examples of discrimination came from religious and non-religious sources, including some (*i.e.* the Nazis) that most people today would consider the antithesis of religion. The Christian Church is certainly not innocent in the history of discrimination against either gay people or women. It is, however, inaccurate to point the blame (as some gay rights advocates do) on the Church. There are several facts that demonstrate that the Church is more caught up in a general social upheaval of discrimination than it is the source.

1        For one, religious discrimination against gays permeates religious boundaries. The

2 alignment of religious groups supporting Proposition 8 is a clear example. Roman Catholics,

3 Protestant fundamentalists, and Mormons all could find unity in their fight for discrimination,

4 and yet these three groups diverge radically with respect to the core doctrines of Christianity. In

5 fact, each of those three groups officially questions the true and full Christianity of the other two,

6 and yet they were able to form an unholy trinity to fight against marriage equality. This fact

7 alone demonstrates that the anti-gay discrimination even of religious groups is based more upon

8 social fears and prejudices than it is based on truly religious doctrines.

9        Likewise the use of the Bible to support anti-gay discrimination is disingenuous. While

10 Leviticus contains passages that can be interpreted against homosexual activity (18:22 and

11 20:13), the very same chapter demands that a man who has intercourse with a menstruating

12 woman shall be banished from the community (20:18), yet we do not see the Proposition 8

13 proponents sponsoring a ballot initiative to take away the citizenship of anyone who has sex

14 during menstruation. Leviticus also forbids eating shellfish (11:12), yet we do not see a ballot

15 initiative to take away the business license of the Red Lobster. Leviticus contains detailed

16 regulations about how to treat a house with mildew, including cleansing it by using a live bird to

17 fling the blood of a dead bird on the walls and tearing the house down completely if the mildew

18 persists (14:34-53), yet no one has suggested that the Environmental Protection Agency adopt

19 these regulations. Simply put, when people use the Bible to argue against homosexuality,

20 including same-sex marriage, they are merely using it as an excuse for their prejudice, otherwise

21 they would fight equally hard for the other regulations contained within the Bible that are no

22 longer socially acceptable or relevant.

23

24

25

## 2. Defining Characteristics and Social Contribution

The "characteristics defining gays and lesbians as a class" are solely their desire to form sexual and/or affectional relationships with members of their own sex. History is full of examples of the outstanding social contributions of gays and lesbians, but these contributions are not directly related to their defining characteristics. The enhanced ability of these people to contribute to society – both civil and ecclesiastical – may be related to their lack of family burdens and responsibilities, their need to wrestle with social norms and expectations at an early age, or other factors tangentially related to their same-sex attraction, but it does not seem possible to categorically state that the defining characteristics of gays and/or lesbians affect their ability either positively or negatively to contribute to society.

Nor does this determination appear relevant to the issue of marriage. Heterosexual marriages are full of examples of couples who contribute greatly to society, couples who provide little if any social impact, and couples who are actually burdens to society. Thus where homosexual couples would appear on this spectrum is irrelevant.

## 3. Can Sexual Orientation Be Changed?

This question is rigorously debated by proponents and opponents of gay rights and marriage equality as if it makes a difference. The bottom line is that the question is irrelevant. Discrimination based upon race is illegal, and race is clearly something that can never be changed. Discrimination based upon religion is also illegal, and religion is not only something that can easily be changed, but often is. Race and religion represent opposite poles on the spectrum of changeability. Therefore, whether sexual orientation is mutable is irrelevant with regards to whether discrimination is valid.

The evangelistic religions (primarily Christianity and Islam) have as primary goals the conversion of others to their religion. Christianity clearly teaches that it is desirable for someone

1 to accept Christ and become a Christian. In fact, this relates to the first and most important
2 commandment.

3 That being said, no Christian would propose that civil marriage should only be between
4 two Christians. This is technically true in most Christian theologies, since the purpose of
5 marriage derives from the Baptismal Covenant. Even though socially liberal, the Ecumenical
6 Catholic Church does not perform different-faith marriages because they do not match with our
7 sacramental theology of marriage. Our clergy can participate in the blessing of a mixed-faith
8 relationship, but it would not be termed "marriage." Yet we would not impose this religious
9 view of marriage unto *civil* marriage, enforcing it for all citizens of the state. And yet, because
10 religion is easily changed, the same argument used by some with regards to different-sex
11 marriage being available to gays and lesbians would apply. A mixed-faith couple could easily
12 comply with this hypothetical law by having the non-Christian accept baptism.

13 The example is, or at least should be, offensive to anyone who accepts even a limited
14 concept of the separation of church and state. But the example is an exact and direct parallel to
15 the concept of a gay man being able to marry, as long as he marries a woman. While this change
16 to our marriage law (recognizing only the marriage of baptized people) would help promote a
17 major goal of Christianity (and a more important goal that anything having to do with sex), it,
18 like limiting marriage to a man and a woman, is a tactic more in tune with the Middle Ages than
19 the 21st Century.

20 The Ecumenical Catholic Church clearly does not believe that it desirable for gay people
21 to convert to heterosexuality or even to recommend that they do. However, even if a religion did
22 accept some sort of moral reason for believing in that conversion, it is irrelevant to the concept of
23 civil marriage.

24 Limiting marriage to male-female couples is discrimination. It is discrimination if
25 homosexuality is immutable. It is discrimination if homosexuality is merely a choice. It is the

1   same thing as limiting marriage to couples consisting of different hair colors because, after all,

2   any blond can eventually find a brunette to marry and not marry another blond.

3

4   **4. Relative Political Power of Gays**

5        In the past, and even in the present in some societies, marriage is related to political

6   power.  In fact, since marriage is related to property rights in many past and present societies,

7   there was no reason to even address the concept of marriage among non-property-owning people.

8   However, that is not the present condition in American society.  Marriage is not seen primarily as

9   a property rights issue (although it does convey property rights).  Marriage is not primarily a

10   political issue.  Heterosexual marriage is not limited by political power.  Even convicted felons

11   who are stripped of their right to vote are given the right to marry.  Whether gays have more or

12   less political power than straights has no bearing on the fact that limiting marriage to different-

13   sex couples is blatant discrimination.

14

15   **5. History of Marriage and Its Changes**

16        Marriage, whether heterosexual or homosexual, is not "natural."  In its motion for

17   intervention, the Campaign for California Families uses the term "natural marriage" as if this

18   term meant "different-sex marriage."  (Document 91, Page 9).  The term is misleading.  Like

19   much of the pro-Proposition 8 propaganda, it plays on the public's, and even the court's, lack of

20   distinction between "marriage" and other sexual or reproductive activities.  Heterosexual sex is

21   natural, although it is not the only type of sex common within nature.  Heterosexual marriage –

22   the lifelong intimate and possibly exclusive bonding of one male and one female of the species –

23   is not a natural phenomenon and is extremely rare outside of the human species.

24        The dishonesty of those who imply otherwise should be relatively apparent, but

25   underlying bias can easily block out scientific truth.  Dogs, cats, cattle, horses, and other

domestic animals do not get married, nor do they desire to do so. While it may be true that a male and female dog spend their lives together and become each other's sole sexual companions, that is a result of human confinement rather than nature. Wolves do not behave this way, and nor would our own canine pets if given other opportunities. Bonobos (*Pan paniscus*), probably our closest biological relatives, are extremely promiscuous and readily engage in gay male sex, lesbian sex, and non-procreative heterosexual sex. When a female bonobo becomes pregnant, she does not seek out the baby's father as her life-long companion. In fact, she probably doesn't know for sure who the baby's father is. (See, for example, Dr. Bruce Bagemihl, *Biological Exhuberance*, pp. 269-275 [St. Martin's Press, 1999].)

Marriage is a condition that evolved within human society, probably for a variety of reasons, and perhaps very early in our history. To call any marriage "natural" or to use a term like "natural marriage" is dishonest and misleading. To imply that only heterosexual marriage is "natural" is simply to add another layer of dishonesty.

Even the story of Adam and Eve – so commonly used to argue for only-male-female marriage – does not support the idea. When God created Eve and brought her to Adam, Adam was delighted because she was "bone of my bones and flesh of my flesh." (Genesis 2:23). God had just brought all of the animals to Adam for him to find a true helper, a "soulmate" to use a trendy contemporary term. Presumably the animals God brought to Adam included not just the bull and stallion, but the cow and mare as well. Adam had already seen *femaleness*. What Adam had not seen before was *humanness*. Adam was delighted in Eve because she was human, not because she was female. Even if the story is accepted as literally true history (which few Christian churches do), it cannot be used to argue that marriage should only be between a man and a woman. It could more easily be used to argue that marriage should only be between people who delight each other, who are each others' "soulmates."

1    Furthermore, even though some people like to imply that Adam and Eve are somehow

2  "God's plan for marriage" (and even more restrictively, "God's *only* plan for marriage"), the

3  Bible does not support that concept. In Genesis 4:1-2 we read of Adam and Eve having two

4  children, Cain and Abel. In 4:17 we hear that Cain had sex with his wife, though she seems to

5  appear out of nowhere. (Literalists must ponder whether she was his sister.) In 4:19 we learn

6  that Cain's great-great-great-grandson Lamech took two wives, Adah and Zillah. So it took no

7  more than six generations to establish polygamy. As virtually everyone knows, polygamy is

8  common in the Old Testament. The Twelve Tribes of Israel are Jacob's descendants from four

9  women – his two wives (both of whom were his cousins that he bought from his uncle – Genesis

10  29) and his two wives' slave-girls.

11    The idea that "biblical family values" would somehow be the same as the modern

12  concept of one-man-one-woman marriage is simply ludicrous.

13    There are many books, including *What Is Marriage For?* by E.J. Graff (Beacon Press,

14  1999) that delineate the evolution of marriage and how it has changed throughout history. We

15  need not repeat that knowledge here. We simply point out, by the biblical references above and

16  by the history of civil marriage, that the concept of "marriage" is not static and never has been.

17  There is no such thing as "natural marriage," and "biblical family values" would be repugnant to

18  the vast majority of modern Americans.

19

20  **6. Definition of Marriage in California**

21    A governmental agency is not capable of defining words as they are used *within* its

22  jurisdiction; it is only capable of defining words as they are used *by* the government and its

23  agencies. Proposition 8 inserted a false statement into the California Constitution. Same-sex

24  marriages are valid and recognized *in* California. They have been recognized by the Ecumenical

25  Catholic Church since 1987 and will continue to be held valid regardless of the outcome of any

law, court case, or voter initiative because civil law has no jurisdiction over religious affairs. If two men were married tomorrow in California in a religious ceremony, ECC or otherwise, and two months later one of those men wished to marry a woman in the ECC, he would be told that he could not do so until his same-sex marriage were dissolved. If he went ahead and married the woman in a civil ceremony (because the state did not recognize his same-sex marriage), the church would not recognize the civil ceremony, considering it void on the grounds of bigamy.

Furthermore, the mainline Christian and Jewish (and perhaps other religious) denominations are gradually moving forward on the issues of marriage equality. This progress is essentially a push-pull relationship going on between the church and the state. As churches begin recognizing same-sex marriage, the false statements of the anti-equality proponents become more apparent; the bias of their public appeal to "tradition" and "morality" becomes more obvious. Likewise, as states such as Massachusetts and Iowa move forward with marriage equality, the religious denominations are forced to deal with the reality of their parishioners desiring marriage equality. Because religious denominations cross state lines and most denominations make marriage policy at the national level, time will gradually see more and more mainline denominations approving same-sex marriage within their ecclesiastical systems. For more and more people, then, the formal definition of marriage will begin to include same-sex marriage. This will happen independently of state law and state constitutions because people do not look to these documents to define words.

The history of the definition of marriage used *by* (as opposed to *in*) the State of California is accurately presented by the City and County of San Francisco in its *amicus curiae* brief (Document 53) and need not be repeated here.

1    **7. Stability Effects of Same-Sex Marriage on Opposite-Sex Marriage**

2         It defies logic to believe that one marriage destabilizes another one. This is particularly

3    true about healthy marriage. One might posit that a dysfunctional marriage next door, with a

4    close family member, or a close friend could adversely affect one's own marriage. There is no

5    rational basis, however, to the concept that moving a stable couple, whether same-sex or

6    different-sex, from the status of unmarried to married would negatively affect existing marriages.

7         Although the proponents of Proposition 8 used the phrase "protect marriage," they never

8    offered a viable explanation as to how limiting marriage to different-sex couples protected those

9    marriages. They relied, rather, on the lack of rational thinking among at least a percentage of the

10   voters. Even if only 3% of the voters bought into the ridiculous argument that limiting one type

11   of marriage could protect another type of marriage, that was enough to sway the proposition's

12   outcome in their favor and get it passed. Sadly, in politics, deception often works.

13        Furthermore, even asking the question assumes that it matters. Why is the question not

14   asked about interracial marriage? Does permitting black-white marriage destabilize white-white

15   or black-black marriage? We do not suggest that it does or even could, but the question

16   nonetheless needs to be asked about interracial marriage if it is asked about same-sex marriage.

17        Unlike either interracial or same-sex marriage, there probably are some types of marriage

18   that do destabilize or at least trivialize the whole concept of marriage. Most churches, for

19   example, require premarital counseling before they will perform marriages. The state, however,

20   has no such requirement, and there is no test prior to receiving a marriage license to determine

21   whether the couple are psychologically fit for marriage or whether they even understand what

22   marriage is all about. The rampant divorce rate among heterosexual marriages is evidence that

23   the system is not optimized. There is no evidence to suggest that eliminating same-sex marriage

24   would decrease the divorce rate. In fact, the opposite may be true because a significant number

25   of heterosexual marriages end when one partner accepts his or her gay or lesbian orientation.