GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
Amir C. Tayrani, SBN 229609
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
Sarah E. Piepmeier, SBN 227094
Theane Evangelis Kapur, SBN 243570
Enrique A. Monagas, SBN 239087
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
Theodore H. Uno, SBN 248603
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Attorneys for Plaintiffs KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,<br><br>Defendants. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' CASE MANAGEMENT STATEMENT**<br><br>Date:        August 19, 2009<br>Time:        10:00 a.m.<br>Judge:       Chief Judge Walker<br>Location:   Courtroom 6, 17th Floor |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     OVERVIEW OF PLAINTIFFS' POSITION ON CASE MANAGEMENT ......................... 3

        A.      Trial ......................................................................................................... 3

        B.      Discovery.................................................................................................. 6

        C.      Dispositive Motions ................................................................................ 7

III.    PLAINTIFFS' CASE MANAGEMENT PLAN WITH RESPECT TO THE
        DEVELOPMENT AND RESOLUTION OF SPECIFIC FACTUAL ISSUES ...................... 8

        A.      Facts Pertaining to the Appropriate Level of Scrutiny............................... 9

                1.      The History of Discrimination Faced by Gay and Lesbian
                        Individuals................................................................................ 10

                2.      Whether the Characteristics Defining Gays and Lesbians as a
                        Class Might Affect Their Ability to Contribute to Society............ 11

                3.      Whether Sexual Orientation Can Be Changed and, If So,
                        Whether Gay and Lesbian Individuals Should Be Encouraged to
                        Change It. ................................................................................ 12

                4.      The Relative Political Power of Gay and Lesbian Individuals,
                        Including Successes of Both Pro-Gay and Anti-Gay Legislation. ......... 12

        B.      Facts Pertaining to Whether Plaintiffs' Claims Involve a Fundamental
                Right and Warrant Strict Scrutiny on That Basis. ....................................... 13

                1.      The History of Marriage and Why Its Confines Have Evolved
                        Over Time. ............................................................................... 13

        C.      Facts Pertaining to Potential State Interests Raised by Intervenors. ............ 14

                1.      The Longstanding Definition of Marriage in California................ 14

                2.      Whether the Exclusion of Same-Sex Couples from Marriage
                        Leads to Increased Stability in Opposite-Sex Marriages or
                        Whether Permitting Same-Sex Couples to Marry Destabilizes
                        Opposite-Sex Marriages............................................................ 14

                3.      Whether a Married Mother and Father Provide the Optimal
                        Child-Rearing Environment and Whether Excluding Same-Sex
                        Couples from Marriage Promotes This Environment. ................... 15

                4.      Whether and How California Has Acted to Promote These
                        Interests in Other Family Law Contexts. ..................................... 15

        D.      Facts Pertaining to Whether Prop. 8 Discriminates Based on Sexual
                Orientation, Gender, or Both.......................................................... 16

Gibson, Dunn &
Crutcher LLP

i

**TABLE OF CONTENTS**
**[Continued]**

Page

    1.    The History and Development of California's Exclusion of Same-Sex Couples from Marriage. .................................................................. 16

    2.    Whether the Availability of Opposite-Sex Marriage Is a Meaningful Option for Gays and Lesbians. ................................................ 16

    3.    Whether the Exclusion of Same-Sex Couples from Marriage Meaningfully Restricts Options Available to Heterosexuals. ......................... 17

    4.    Whether Requiring One Man and One Woman in Marriage Promotes Stereotypical Gender Roles. .............................................. 17

E.    Facts Pertaining to Whether Prop. 8 Was Passed with Discriminatory Intent. ................................................................................................... 18

    1.    The Voters' Motivation or Motivations for Supporting Prop. 8, Including Advertisements and Ballot Literature Considered by California Voters. ...................................................................... 19

    2.    The Differences in Actual Practice of Registered Domestic Partnerships, Civil Unions and Marriage, Including Whether Married Couples Are Treated Differently from Domestic Partners in Governmental and Non-Governmental Contexts. ........................ 19

IV.    PROPOSED SCHEDULE ..................................................................... 20

# I.
## INTRODUCTION

Plaintiffs have brought this federal lawsuit because Proposition 8, the California ballot initiative that stripped gay and lesbian individuals of their recognized right to marry the person they love, violates their rights under the United States Constitution.  Prop. 8 violates the Due Process Clause of the Fourteenth Amendment because it denies a single disfavored group, gay and lesbian individuals, the fundamental right to marry.  Prop. 8 violates the Equal Protection Clause of the Fourteenth Amendment because it discriminates against Plaintiffs on the basis of their sexual orientation and gender without any compelling, or even rational, basis for the discrimination.  Every day that Prop. 8 remains the law of California, Plaintiffs and thousands of other gay and lesbian individuals are denied fundamental rights that are cherished and enjoyed by others, and they suffer substantial, irreparable harm.

Plaintiffs intend to present to the Court a robust record of evidence—including testimony from Plaintiffs, Defendants, the proponents of Prop. 8 ("Intervenors"), other fact witnesses and leading experts—that will powerfully demonstrate both the unconstitutionality of Prop. 8 and the devastating harm that it causes.  Plaintiffs will prove their claims in a public trial consisting of live witness testimony, cross-examination, and argument, except as to those issues that may be resolved in Plaintiffs' favor as a matter of law through summary judgment.  A prompt, thorough trial on all disputed factual issues is the most effective and efficient way to present the record on which this case will be decided.  Plaintiffs respectfully request that the Court set this case for trial before the end of the calendar year.

This Court has recognized the importance of building a complete record in this case and proceeding promptly to trial.  In its June 30, 2009 Order, this Court recognized that Plaintiffs' claims raise "serious questions" and stated its intention to "proceed directly and expeditiously to the merits of Plaintiffs' claims and to determine, on a complete record, whether injunctive relief may be appropriate."  Doc #76 at 5.  The Court identified a number of factual issues that may have an impact on Plaintiffs' claims and stated that "[t]he just, speedy and inexpensive determination of these issues would appear to call for *proceeding promptly to trial*."  *Id.* at 9 (emphasis added).

Gibson, Dunn &
Crutcher LLP

1

1    Intervenors argue that there should be no trial in this case, and that numerous factual and legal

2    issues should be disposed of before discovery is even conducted.  Intervenors urge the Court not to

3    follow the steps through which trial courts traditionally build factual records and decide cases—

4    discovery, followed by motions for summary judgment, followed by trial—but instead to have an

5    early round of pre-discovery dispositive motions followed by extensive, post-discovery submissions

6    on all issues that remain to be resolved.  Intervenors' approach is neither just nor efficient.  It would

7    deprive Plaintiffs of the opportunity to build a complete factual record, to present their case through

8    live witness testimony, and to cross-examine in open court those who seek to defend and justify the

9    denial of their constitutional rights.  It would similarly deprive the Court of the opportunity to

10   question fact and expert witnesses and to assess their credibility in Court.  Lastly, the preparation of

11   extensive briefing on every issue that may possibly affect the merits of Plaintiffs' claims, and the

12   submission of voluminous written testimony, deposition excerpts, and exhibits is in no way more

13   efficient or effective than having experienced lawyers try their case before the Court.

14   Plaintiffs respectfully submit this Case Management Statement to address how this case

15   should proceed up to and including trial on the merits.  *See* July 2, 2009 Tr. at 34:2-12 (directing the

16   parties to submit case management statements describing "what facts you think can be determined by

17   the Court without the necessity of further proceedings, those facts that you think may require

18   discovery, those facts which may require resolution by some means other than judicial notice, and a

19   plan of action, whether it's a motion for summary judgment or motions, plural, for summary

20   judgment on one side or the other.  But I would like to get down to the specifics of how we are going

21   to proceed.").[1]  First, Plaintiffs will provide a general overview of their position on case management

22

23

24       [1]   Plaintiffs, Defendants, and Intervenors have had several telephonic discussions of the issues
25   raised by the Court.  These included a detailed telephonic meet-and-confer on July 20, 2009 in
     which the parties discussed their overall approaches to case management and how they
26   intended to address the specific factual issues identified by the Court.  The parties concluded
     that it would be better to submit separate Case Management Statements than to attempt to
27   agree on a joint Case Management Statement.  The parties exchanged draft Case Management
     Statements on August 5, 2009.  Plaintiffs' understanding of Intervenors' positions with
28   respect to case management is based on these communications and exchanges.

in this action.  Second, Plaintiffs will address each specific factual issue raised in the Court's June 30, 2009 Order.  Third, Plaintiffs will propose a pre-trial and trial calendar for this action.

## II.
## OVERVIEW OF PLAINTIFFS' POSITION ON CASE MANAGEMENT

### A.    Trial

Plaintiffs will prove their claims in a public trial consisting of live witness testimony, cross-examination, and argument.  The trial record will include testimony from Plaintiffs, Defendants, Intervenors and other fact witnesses, documentary evidence relating to the Prop. 8 campaign, and testimony from leading experts in several fields relevant to Plaintiffs' claims.[2]  Plaintiffs expect trial to last between two and three weeks and respectfully request that it be scheduled for December 2009.  Plaintiffs' approach is consistent with this Court's prior direction concerning building a record and proceeding promptly to trial.  *See* Doc #76 at 9 ("The just, speedy and inexpensive determination of these issues would appear to call for proceeding promptly to trial."); *see* July 2, 2009 Tr. at 25:4 ("We develop records with trials.").

The crux of Intervenors' case management plan is that there should be no trial at all.  Intervenors appear to base their position that trial is unnecessary on their view that many, although certainly not all, of the facts at issue in this case are "legislative facts" as to which the Court is not required to follow strict evidentiary procedures or take judicial notice.[3]  For several reasons, this

---

[2]  Plaintiffs had hoped it might be possible to use stipulations between Plaintiffs and Intervenors to narrow the issues that the Court must resolve.  However, after close analysis of the areas of dispute and several meet-and-confer discussions with Intervenors, Plaintiffs do not anticipate that stipulations will significantly narrow the issues before the Court.  Discussions between Plaintiffs and Intervenors since the July 2, 2009 Case Management Conference have led to no meaningful agreements.  While the parties may be able to stipulate to certain specific, publicly known and objectively verifiable facts that may be relevant to the factual issues identified in the Court's June 30, 3009 Order, any such stipulations are unlikely to resolve the larger factual issues themselves or to eliminate the need for evidence on such issues.

[3]  Generally, legislative facts are "those applicable to the entire class of cases," whereas adjudicative facts are "those applicable only to the case before" the court.  *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir. 1989).  "Adjudicative facts are facts about the parties and their activities, businesses, and properties, usually answering the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case.  Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion."  *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir.

[Footnote continued on next page]

Gibson, Dunn & Crutcher LLP

1    Court should decline Intervenors' invitation to resolve the important issues presented by this case

2    without any trial and live testimony.

3           Plaintiffs should have the opportunity to put on their case before the Court, including their

4    live testimony and the live testimony of experienced experts who will address subjects of great

5    importance to the resolution of Plaintiffs' claims.  *See United States v. Yida*, 498 F.3d 945, 950 (9th

6    Cir. 2007 ("Underlying both the constitutional principles and the rules of evidence is a preference for

7    live testimony.").  The Court should have the opportunity to observe and question the witnesses in

8    this case, including both fact and expert witnesses, in order to assess their credibility and better

9    understand the relevant testimony and the issues presented.  *See id.* ("Live testimony gives the jury

10   (or other trier of fact) the opportunity to observe the demeanor of the witness while testifying.").

11   Similarly, Plaintiffs should have the opportunity to cross-examine, in open court and before the finder

12   of fact, those defending and seeking to justify the discriminatory scheme established by Prop. 8.  *See*

13   *Govt. of the Virgin Is. v. Aquino*, 378 F.2d 540, 548 (3d Cir. 1967) ("It is indeed rarely that a cross-

14   examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is

15   not infrequently that he leads a hostile witness to reveal by his demeanor—his tone of voice, the

16   evidence of fear which grips him at the height of cross-examination, or even his defiance—that his

17   evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy,

18   as well as outright untruthfulness.").  Lastly, given the breadth of issues presented by Plaintiffs'

19   claims and the existence of alternative theories and standards of review, a traditional, live trial will be

20   more efficient and effective than having the parties brief any and all issues that remain in dispute and

21   leaving the Court to sort through those submissions in chambers.

22          The distinction that Intervenors seek to draw between legislative and adjudicative facts does

23   not justify a case management plan that bypasses trial.  First, Intervenors do not and cannot contend

24   that all of the facts implicated by Plaintiffs' claims are legislative as opposed to adjudicative, yet they

25   ────────────────

26   [Footnote continued from previous page]
          1966) (internal citation and quotation marks omitted).  Rule 201 of the Federal Rules of
27        Evidence, which sets forth the circumstances under which a Court may take judicial notice of
          facts, is limited on its face to adjudicative facts, thus giving courts greater latitude and
28        discretion when deciding legislative facts.  *See* Fed. R. Evid. 201 advisory committee's note.

1   offer no explanation of why the relevant adjudicative facts should not be decided through trial.  This

2   case will require resolution of numerous adjudicative facts that pertain specifically to the parties,

3   including the circumstances of and injuries to each Plaintiff and the campaign by Intervenors to pass

4   the specific initiative that is challenged here.  Under Intervenors' proposed case management plan,

5   even true adjudicative facts would be resolved solely on the papers and without a trial.

6        Second, while a court may not be *required* to follow formal evidentiary and trial procedures

7   with respect to legislative facts, it undoubtedly has discretion to do so and Intervenors cite no

8   authority to the contrary.  Indeed, courts have found that "[e]videntiary hearings, although not

9   necessary to determine legislative facts, nevertheless may be helpful in certain circumstances."

10  *Ass'n of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1163-64 (D.C. Cir. 1979) (observing that

11  some legislative facts "justify exploration in a trial-type format because they are sufficiently narrow

12  in focus and sufficiently material to the outcome of the proceeding to make it reasonable and useful

13  for the agency to resort to trial-type procedure to resolve them."); *H.B.R.R. Co. v. Am. Cyanamid Co*,

14  916 F.2d 1174, 1183 (7th Cir. 1990) (Posner, J.) (noting that the line between adjudicative and

15  legislative facts is not "hard and fast" and that "[i]f facts critical to a decision on whether [a particular

16  legal standard should apply] cannot be determined with reasonable accuracy without an evidentiary

17  hearing, such a hearing can and should be held . . . "); *see also* Fed. R. Evid. 201 advisory

18  committee's note (Judicial determination of legislative facts "should, however, leave open the

19  possibility of introducing evidence through regular channels in appropriate situations.").  In this case,

20  a traditional trial is the best possible course of action.  For example, because many of the facts that

21  Intervenors portray as legislative are likely to be presented through experts, there is every reason to

22  use the usual methods of testing those experts' opinions, including live testimony and cross-

23  examination.[4]

24  _____

25  [4]   Intervenors suggest that a trial is unnecessary because, when addressing true legislative facts,
      an appellate court can consider evidence not in the record.  This misses the point.  Both sides
26    have made clear that they intend to rely on expert testimony with respect to many of the facts
      at issue in this case.  Expert testimony must be solicited in the district court and is not
27    admissible for the first time on appeal.  *See Dietary Supplemental Coalition, Inc. v. Sullivan*,
      978 F.2d 560, 562 (9th Cir. 1992) ("Because the expert testimony was not before the district
28    court, it is not part of the record on appeal."); *Hart v. Sheahan*, 396 F.3d 887, 894 (7th Cir.

[Footnote continued on next page]

Third, while Intervenors note that some other courts have decided cases involving marriage equality without a trial, they ignore the fact that *Romer v. Evans* was decided following a three week trial. *See Romer v. Evans,* 517 U.S. 620, 625 (1996).  In *Romer*, as here, the plaintiffs challenged a ballot initiative that amended a state constitution to strip gay and lesbian individuals of rights that they previously enjoyed.  The trial court built a record through trial, the case went up on appeal, and the plaintiffs' rights were ultimately vindicated.  Given the importance of the issues presented by this case and the likelihood that, regardless of the outcome, it will be reviewed on appeal, this Court should conduct a full trial on the merits as to all disputed facts.[5]

**B.     Discovery**

Plaintiffs intend to use written discovery and depositions to build the factual record in this case.  One important area of discovery will be the Prop. 8 campaign itself, including without limitation: (1) how it came about and who was behind it; (2) how the campaign formulated the arguments that it would make to the voters in favor of stripping gay and lesbian individuals of the right to marry; (3) the intent of the campaign and the voters in proposing and passing Prop. 8; and (4) the role that animus toward and/or disapproval of gay and lesbian individuals played in Prop. 8.

Plaintiffs wish to conduct discovery on an expedited basis and will commit to such discovery whatever resources are necessary to build a complete factual record as quickly as possible.  Plaintiffs propose that all fact discovery be completed by October 2, 2009.  Plaintiffs propose that the time for responding to written discovery be shortened to 14 calendar days.  Because Plaintiffs anticipate that Intervenors may resist certain discovery to which Plaintiffs are entitled, Plaintiffs request that the Court implement a procedure through which all discovery disputes would be briefed and decided within two weeks of the dispute arising.

---

[Footnote continued from previous page]
2005) (only "academic or other studies" regarding "legislative" facts may be cited for the first time on appeal).  For the reasons explained above, the best way to solicit expert testimony is through a live trial in which the Court can assess the credibility of each expert and ask questions of each expert.

[5]     If the Court is considering adjusting trial procedures based on the role of legislative facts in this case, Plaintiffs respectfully request that the parties be given a full opportunity to brief how, if at all, this distinction should affect the presentation of evidence, which specific facts are indeed properly characterized as legislative, and which are adjudicative.

Gibson, Dunn & Crutcher LLP

1    Plaintiffs intend to present testimony from expert witnesses on several subjects pertaining to

2    Plaintiffs' claims.  Plaintiffs understand that Intervenors also will be relying on expert witnesses for

3    numerous subjects.  Plaintiffs propose that the parties exchange reports from all designated experts on

4    October 9, 2009, one week after the close of fact discovery.  The parties would then exchange reports

5    from true rebuttal witnesses (witnesses testifying to matters that could not have been foreseen at the

6    time of the initial exchange of reports) by October 19, 2009 and complete all expert depositions by

7    October 23, 2009.

8    It is clear from Intervenors' positions on case management that they will try to restrict the

9    issues on which Plaintiffs even get the benefit of discovery, first by asking the Court to resolve

10   certain factual and legal issues on an early dispositive motion before discovery can be taken, and

11   second by arguing that certain broad subjects—including the intent of the proponents of Prop. 8 and

12   the voters who passed it—are wholly irrelevant and therefore off-limits for discovery.  Of course, the

13   Federal Rules of Civil Procedure entitle Plaintiffs to liberal discovery that need only be "reasonably

14   calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  While

15   Plaintiffs believe that they can build the factual record they require through targeted and expedited

16   discovery, any attempt by Intervenors to prevent Plaintiffs from building that factual record should be

17   rejected.  *See* July 2, 2009 Tr. at 12:8-13 ("I want to give the plaintiffs, the defendants and the

18   intervenors the opportunity to make the record they think is appropriate for the decision.").

19   **C.   Dispositive Motions**

20   Plaintiffs propose that there be a single round of dispositive motions, to be filed after fact and

21   expert discovery are completed.  Plaintiffs propose that all such dispositive motions be filed by

22   October 30, 2009, one week after the close of discovery, and that dispositive motions be heard by the

23   Court three weeks later, on November 20, 2009.

24   Intervenors propose an initial round of briefing on supposedly dispositive or controlling legal

25   issues *before* discovery has been taken and a complete factual record assembled.  This proposal by

26   Intervenors, like their paper trial proposal, is an attempt to avoid a trial on the merits in which

27   Plaintiffs will have an opportunity to present live witness testimony and cross-examine Intervenors'

28   witnesses.  It is an unsubtle attempt to take issues off the table before Plaintiffs even have access to

discovery.[6] Early motions for partial summary judgment would be wasteful under the circumstances of this case, where Plaintiffs' claims raise numerous disputed factual issues and the entire proceeding, including dispositive motions, can and should be conducted on an expedited basis. Such a procedure would almost inevitably lead to duplicative briefing, where issues are briefed once before discovery and yet again after discovery is closed (not to mention a third time if Intervenors get the "paper trial" they desire). Plaintiffs propose that all dispositive motions be filed after fact and expert discovery are completed, giving each side one opportunity to seek adjudication of claims or issues as to which they believe no triable issue of material fact exists.

## III.
## PLAINTIFFS' CASE MANAGEMENT PLAN WITH RESPECT TO THE DEVELOPMENT AND RESOLUTION OF SPECIFIC FACTUAL ISSUES

This Court has identified certain specific issues that may need to be resolved in order to decide Plaintiffs' claims, and it also has asked that the parties address which facts can be resolved without further proceedings, which ones will require discovery, and which may require resolution by a means other than judicial notice. Plaintiffs will address each issue in turn.[7] As a general matter,

---

[6] Intervenors take the position that *Baker v. Nelson*, 409 U.S. 810 (1972) controls the outcome of this case. Intervenors are wrong. In *Baker*, over 25 years ago, the Supreme Court dismissed "for want of a substantial federal question" an appeal from a Minnesota Supreme Court decision rejecting federal due process and equal protection challenges to the State's refusal to issue a marriage license to a same-sex couple. 191 N.W.2d 185 (Minn. 1971). But summary dismissals are binding only "on the precise issues presented and necessarily decided," *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam), and only to the extent they have not been undermined by later "doctrinal developments" in Supreme Court case law. *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (internal quotation marks omitted). Neither requirement is met here. The issue decided in *Baker*—a State's complete refusal to recognize same-sex relationships—is different from the issue presented here, namely whether California may constitutionally reserve marriage for opposite-sex couples and relegate same-sex couples to the lesser and unequal status of domestic partnership. Moreover, the Supreme Court's subsequent decisions in *Lawrence*—which invalidated a state prohibition on same-sex intimate conduct on due process grounds—and *Romer*—which struck down a state initiative prohibiting any government action to protect gay and lesbian individuals from discrimination on equal protection grounds—have fatally undermined *Baker*. Indeed, at least one federal district court in California has concluded as much. *See Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *rev'd in part on other grounds*, 447 F.3d 673 (9th Cir. 2006).

[7] Plaintiffs have limited their discussion to the factual issues specifically identified by the Court. While Plaintiffs believe that the Court's list is quite comprehensive, they reserve the

[Footnote continued on next page]

1    Plaintiffs believe that further proceedings will likely be required as to each of the issues identified by

2    the Court.  Plaintiffs expect that Intervenors will be unable to come forward with competent evidence

3    sufficient to raise a genuine issue of material fact as to some or all elements of Plaintiffs' claims, and

4    as to those elements Plaintiffs will seek summary judgment in its favor at the close of discovery.

5    However, with respect to any remaining factual disputes between the parties, a public trial on the

6    merits is the appropriate proceeding through which to resolve those disputes.

7    **A.     Facts Pertaining to the Appropriate Level of Scrutiny.**

8         Plaintiffs will demonstrate that Prop. 8 violates the Equal Protection Clause of the Fourteenth

9    Amendment because it denies to a single, disfavored group—gay and lesbian individuals—the right

10   to marry the person they love, a right that is cherished and enjoyed by virtually all other citizens.

11   Plaintiffs believe that Prop. 8 should be evaluated under strict or at least heightened scrutiny, both

12   because a fundamental right is at issue and because gay and lesbian individuals as a group satisfy the

13   established legal standard for heightened scrutiny.  *See United States v. Hancock*, 231 F.3d 557, 565

14   (9th Cir. 2000) (a "law is subject to strict scrutiny if it targets a suspect class or burdens the exercise

15   of a fundamental right"); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442-47

16   (1985) (identifying four factors that guide the Court's suspect class inquiry, including (1) whether the

17   group at issue has suffered a history of purposeful discrimination; (2) whether the characteristics that

18   distinguish the group bear any relation to the group's ability to participate in and contribute to

19   society; (3) whether the distinguishing characteristic is immutable; and (4) the political power of the

20   subject class).  However, Plaintiffs also contend and will demonstrate that Prop. 8 fails even under

21   rational basis scrutiny because no rational basis exists for Prop. 8's exclusion of gay and lesbian

22   individuals from civil marriage.

23        Intervenors have taken the position that gay and lesbian individuals should not be treated as a

24   suspect class, and thus not receive the benefit of heightened scrutiny, because sexual orientation has

25   no settled definition and is somehow illusive or subjective as a concept.  This position only reflects

26

27   [Footnote continued from previous page]
         right to raise additional factual issues as necessary, or to modify their position on particular

28       issues discussed herein as fact and expert discovery progress in this matter.

the depth of the dispute between Plaintiffs and Intervenors that this Court will need to resolve. Plaintiffs will demonstrate that a person's sexual orientation is an integral part of that individual's identity, and that people whose sexual orientation is gay or lesbian make up a group that should be treated as a suspect class for purposes of equal protection analysis.[8]

### 1.     The History of Discrimination Faced by Gay and Lesbian Individuals.

Plaintiffs intend to present evidence at trial demonstrating that gay and lesbian individuals have faced a long, pervasive and harmful history of discrimination, both governmental and private, that continues today.  Plaintiffs' evidence will include their own testimony, possibly the testimony of other fact witnesses, and expert testimony.  Plaintiffs will depose any experts put forth by Intervenors on this subject.

The parties are unlikely to be able to reach a stipulation that would eliminate the need for evidence concerning the history of discrimination against gay and lesbian individuals.  While Intervenors have indicated that they do not dispute that gay and lesbian individuals have faced past discrimination based on their sexual *conduct*, they seem unwilling to concede that gay and lesbian individuals have faced discrimination based on their sexual *orientation* and their status as gay or lesbian.  Plaintiffs will argue that the discrimination faced by gay and lesbian individuals has gone far beyond their sexual *conduct*, and is often based on perceptions, prejudices, or other impressions that are not based on or related to any specific conduct, whether sexual in nature or not.  Intervenors also apparently intend to argue that discrimination against gay and lesbian individuals has decreased

---

[8]   Contrary to Intervenors' position, courts have proven quite capable of understanding the concept of sexual orientation and applying that definition to a group of people who are gay or lesbian.  *See Romer v. Evans*, 517 U.S. 620, 623 (1996) (recognizing that the constitutional amendment challenged in that case "prohibits all legislative, executive or judicial action at any level of state or local government designed to protect the named class, *a class we shall refer to as homosexual persons or gays or lesbians*.") (emphasis added); *In re Marriage Cases*, 183 P.3d 384, 442 (2008) ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment.").  Similarly, the State of California expressly bars discrimination on the basis of sexual orientation through the Unruh Civil Rights Act.  *See* Cal. Civ. Code § 51(b) ("All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or *sexual orientation* are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.") (emphasis added).

Gibson, Dunn & Crutcher LLP

1   significantly in recent years, further evidencing their intent to dispute that the existence of

2   discrimination merits heightened scrutiny.

3          Moreover, even if Intervenors were willing to concede that this element of the test for

4   heightened scrutiny is met in this case, this would not eliminate the need for the Court to hear

5   evidence concerning the discrimination suffered by gay and lesbian individuals.  First, such evidence

6   is relevant to issues other than heightened scrutiny, such as the role of animus in California's passage

7   of Prop. 8.  Second, there are clearly aspects of the discrimination issue on which the parties will be

8   unable to reach agreement, such as whether specific examples of law or conduct constitute

9   discrimination and the pervasiveness of such discrimination both historically and today.

10         **2.      Whether the Characteristics Defining Gays and Lesbians as a Class Might
                    Affect Their Ability to Contribute to Society.**

11         Plaintiffs intend to present evidence at trial demonstrating that being gay or lesbian bears no

12   relationship to a person's ability to contribute to society, and that gay and lesbian individuals have

13   made and will continue to make significant contributions to society.  Plaintiffs' evidence will include

14   their own testimony, possibly the testimony of other fact witnesses, and expert testimony.  Plaintiffs

15   will depose any experts that Intervenors put forth on this subject.

16         Intervenors have indicated that they may be willing to stipulate that, other than as to

17   procreative ability, gay and lesbian individuals are as able to contribute to society as are

18   heterosexuals, although they have not proposed specific language for any such stipulation.

19   Intervenors also could represent, on the record, that they will not dispute that this element of the test

20   for heightened scrutiny under the Equal Protection Clause is met in this case.  But as with the issue of

21   historical discrimination, Plaintiffs do not believe that these steps would eliminate the need for

22   evidence.  For example, evidence of the contributions of gay and lesbian individuals to society is

23   fundamental to demonstrating and understanding the irrationality and injustice of singling them out

24   for exclusion from civil marriage.  Moreover, Plaintiffs anticipate that there are aspects of the extent

25   and ability of gay and lesbian individuals to contribute to society, including as parents and with

26   respect to responsible and planned procreation, to which Intervenors will not be willing to stipulate.

27

28

Gibson, Dunn &
Crutcher LLP

**3.    Whether Sexual Orientation Can Be Changed and, If So, Whether Gay and Lesbian Individuals Should Be Encouraged to Change It.**

Plaintiffs will present evidence at trial that sexual orientation is fundamental to a person's identity, that there is no credible evidence that sexual orientation can or should be changed, and that it can be harmful to an individual to attempt to change it.  The Ninth Circuit and the California Supreme Court have both held that sexual orientation is "immutable" because it is so fundamental to a person's identity that a person should not be required to abandon it as a condition to enjoying a legal right.  *See Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("Sexual orientation and sexual identity . . . are so fundamental to one's identity that a person should not be required to abandon them."); *In re Marriage Cases*, 183 P.3d 384, 442 (2008) ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment.").  Plaintiffs' evidence will include their own testimony, possibly the testimony of other fact witnesses, and expert testimony, and Plaintiffs will depose Intervenors' experts.  Intervenors have stated their intent to present evidence that sexual orientation can be changed and to take the position that any consideration of whether one should be encouraged to change it is irrelevant.  Therefore, stipulation on this subject likely will not be possible.

**4.    The Relative Political Power of Gay and Lesbian Individuals, Including Successes of Both Pro-Gay and Anti-Gay Legislation.**

Plaintiffs intend to present evidence at trial that gay and lesbian individuals lack the political power to adequately protect their rights and interests from infringement by the majority, and that they are at least as lacking in such power as other groups as to whom courts consistently have applied heightened scrutiny with respect to equal protection claims.  Plaintiffs will present primarily expert testimony on this subject.  Plaintiffs may propound discovery on this issue to the governmental defendants, and will depose Intervenors' experts.  Plaintiffs and Intervenors agree that while it may be possible to stipulate to certain publicly known and objectively verified facts, such as the passage or failure of a law that might serve or disserve the interests of gay and lesbian individuals, they are not likely to be able to stipulate as to the existence or lack of political power.

Gibson, Dunn & Crutcher LLP

**B.     Facts Pertaining to Whether Plaintiffs' Claims Involve a Fundamental Right and Warrant Strict Scrutiny on That Basis.**

The United States Supreme Court has long recognized that the right to marry is a fundamental right protected under the Due Process Clause and that any restriction of that right must withstand strict scrutiny.  *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard or disrespect"); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men").  By amending the California Constitution to limit the definition of marriage to a man and a woman, and thus excluding same-sex couples from the institution of civil marriage, Prop. 8 deprives gay and lesbian individuals of their fundamental right to marry.  Thus, the strict scrutiny standard must be applied to Prop. 8.

Intervenors do not dispute that the right to marry is a fundamental right, nor do they seriously contend that Prop. 8 would withstand strict scrutiny.  Instead, Intervenors seek to cast the right at issue in this case not as the long-established right to "marriage," but rather as some new right to "same-sex marriage."  This is a word game that could be used to justify virtually any discrimination that has existed for a sufficiently long period of time.  This case no more involves some new right to "same-sex marriage" than *Loving v. Virginia* involved a new right to "interracial marriage."  Thus, the issue in this trial will not be, as Intervenors would have it, whether "same sex marriage" is deeply rooted in this nation's history and tradition.  Rather, the issue will be whether the deeply rooted right to marry has been denied to a single, disfavored group without a compelling state interest for doing so.

**1.     The History of Marriage and Why Its Confines Have Evolved Over Time.**

Plaintiffs intend to present evidence at trial concerning the history of marriage and how it has evolved over time, particularly to rebut any argument by Intervenors that marriage has somehow had a singular or static definition over time.  Plaintiffs also will present evidence of historical limitations to and burdens on marriage that were once considered "definitional" but are now universally deemed untenable and, in many cases, unconstitutional.  Plaintiffs expect to present primarily expert testimony on this subject and will depose Intervenors' experts.  Plaintiffs and Intervenors agree that

Gibson, Dunn & Crutcher LLP

they may be able to stipulate to certain publicly known and objectively verifiable facts about the history of marriage, but certain aspects of the history of marriage will remain to be resolved by the Court.

**C.      Facts Pertaining to Potential State Interests Raised by Intervenors.**

Regardless of the level of scrutiny ultimately applied in this case, resolution of the merits of Plaintiffs' claims will require the Court to evaluate interests offered by Intervenors to justify Prop. 8 and determine whether they satisfy the applicable standard of scrutiny.  Plaintiffs will show that none of the supposed interests offered to justify Prop. 8 provides even a rational basis, let alone a compelling basis, for its unequal treatment of gay and lesbian individuals.

**1.      The Longstanding Definition of Marriage in California.**

Plaintiffs intend to present evidence concerning the evolution of the definition of marriage in California over time, including specifically (a) the abandonment of restrictions and qualifications once considered "definitional," and (b) the repeated and concerted efforts of groups disapproving of gay and lesbian individuals to prevent or undo any advances that those individuals made toward obtaining marriage equality.  Plaintiffs will rely primarily on expert testimony for this subject and will depose Intervenors' experts.  Plaintiffs and Intervenors agree that it will likely be possible to stipulate to certain publicly known and objectively verifiable facts about the historical definition of marriage in California, but that there will be other aspects of this topic as to which the parties will disagree.

**2.      Whether the Exclusion of Same-Sex Couples from Marriage Leads to Increased Stability in Opposite-Sex Marriages or Whether Permitting Same-Sex Couples to Marry Destabilizes Opposite-Sex Marriages.**

One justification that repeatedly has been offered for excluding gay and lesbian individuals from civil marriage is that doing so somehow "protects" marriage, presumably for opposite-sex couples.  In order to refute that purported justification and show that it provides no rational basis for Prop. 8, Plaintiffs intend to present evidence at trial both that excluding same-sex couples does not increase the stability of opposite-sex marriage and that including same-sex couples would not destabilize opposite-sex marriages.  Plaintiffs will show that recognizing the loving and committed relationships of same-sex couples in the same manner that we recognize similar, opposite-sex

1   relationships will have no adverse affect whatsoever on opposite-sex relationships.  Plaintiffs will

2   rely primarily on expert testimony on this issue and will depose Intervenors' experts.  Intervenors

3   have indicated they may present evidence that permitting same-sex marriages would destabilize

4   opposite-sex marriages.

### 3. Whether a Married Mother and Father Provide the Optimal Child-Rearing Environment and Whether Excluding Same-Sex Couples from Marriage Promotes This Environment.

7   Plaintiffs intend to present evidence at trial that there is no difference between the ability of a

8   same-sex couple to provide a healthy, positive child-rearing environment and the ability of an

9   opposite-sex couple to provide such an environment.  Plaintiffs also will present evidence at trial that

10   excluding same-sex couples from marriage does not advance, and indeed actually harms, the

11   objective of providing an optimal child-rearing environment for children.  Plaintiffs will depose

12   Intervenors' experts on this subject.  Intervenors have acknowledged that agreement on this subject is

13   not likely.

### 4. Whether and How California Has Acted to Promote These Interests in Other Family Law Contexts.

15   Plaintiffs intend to present at trial two categories of evidence relevant to this issue.  First,

16   Plaintiffs intend to present evidence that California has, through various legislative enactments, taken

17   positions that are contrary to certain of the justifications offered in support of Prop. 8, such as the

18   suggestion that same-sex couples provide a less-than-optimal child-rearing environment, have not

19   been subjected to discrimination, or are not fully contributing and equal members of society.  Second,

20   Plaintiffs intend to present evidence that California has *not* enacted legislation that would better and

21   more directly serve some of the purposes articulated in support of Prop. 8, thus demonstrating that

22   Prop. 8 is underinclusive and driven not by the proffered justifications but rather by animus toward

23   gay and lesbian individuals.  Plaintiffs intend to present expert testimony on this issue and will

24   depose Intervenors' experts.  Stipulations may be possible as to publicly known and objectively

25   verifiable facts concerning laws that have or have not been passed in California, but other facts on

26   this issue and concerning the implications of agreed-upon facts likely will require resolution by

27   the Court.

28

**D.    Facts Pertaining to Whether Prop. 8 Discriminates Based on Sexual Orientation, Gender, or Both.**

Plaintiffs will demonstrate at trial that Prop. 8 discriminates both on the basis of sexual orientation and on the basis of gender.  It discriminates on the basis of sexual orientation because it prohibits gay and lesbian individuals from marrying the person they love.  It discriminates on the basis of gender because it either allows or does not allow a person to marry a particular other person based solely on the first person's gender.

**1.    The History and Development of California's Exclusion of Same-Sex Couples from Marriage.**

Plaintiffs intend to present evidence concerning the history and development of California's exclusion of same-sex couples from civil marriage, focusing specifically on Prop. 8, but also addressing earlier similar efforts.  Plaintiffs intend to present fact witness testimony from the proponents of Prop. 8 and others who supported the campaign and documentary evidence.  Plaintiffs also will present expert testimony on this subject.  While it may be possible for the parties to stipulate as to certain publicly known and objectively verifiable facts concerning the history and development of California's ban on same-sex marriage, Plaintiffs do not believe that a more comprehensive stipulation with Intervenors on this subject is likely.

**2.    Whether the Availability of Opposite-Sex Marriage Is a Meaningful Option for Gays and Lesbians.**

Plaintiffs will present evidence at trial that excluding same-sex couples from the definition of marriage in California's constitution denies gay and lesbian individuals the right to marry and that telling gay and lesbian individuals that they are free to marry someone of the opposite sex does not provide a meaningful option or meaningful access to civil marriage.  Plaintiffs will present their own testimony on this issue, possibly the testimony of other fact witnesses, and expert testimony.  Plaintiffs will depose Intervenors' experts.  Intervenors have indicated that they may dispute this point by presenting evidence that some gay and lesbian individuals do marry people of the opposite sex.

Plaintiffs note that their claims are not dependent on whether it is a "meaningful option" for a gay or lesbian individual to marry someone of the opposite sex rather than the person they wish to marry who is of the same sex.  The fundamental right to marry has been construed as the right to

16

Gibson, Dunn & Crutcher LLP

marry the person of one's choice.  For example, the plaintiffs prevailed in *Loving v. Virginia*, 388 U.S. 1 (1967), even though it may well have been a "meaningful option" for the plaintiffs to marry someone of the same race.  Similarly, even if it were a "meaningful option" for a person of one religion to marry someone of the same religion, a ballot initiative barring inter-faith marriages would certainly fail to pass constitutional muster.

> ### 3. Whether the Exclusion of Same-Sex Couples from Marriage Meaningfully Restricts Options Available to Heterosexuals.

Plaintiffs will present evidence that Prop. 8 discriminates against gays and lesbians because it restricts their ability to marry the person of their choice, while not restricting the ability of heterosexuals to marry the person of their choice.  Importantly, heterosexuals are not restricted from marrying someone of the opposite sex even if that marriage will not further procreative purposes (for example, if the person he or she would marry is infertile or has no interest in bearing children), or would provide a less-than-optimal child-rearing environment (for example, if the person he or she would marry has a history of physical abuse or has a substance abuse problem).  Plaintiffs may present testimony from fact witnesses other than themselves on this issue, and they will present expert testimony.  Plaintiffs will depose Intervenors' experts on this subject.  Intervenors have indicated that they may be willing to stipulate that Prop. 8 does not meaningfully restrict the options available to heterosexuals, although they have not proposed specific language.

> ### 4. Whether Requiring One Man and One Woman in Marriage Promotes Stereotypical Gender Roles.

Plaintiffs will present evidence at trial that excluding same-sex couples from the definition of marriage serves no legitimate or rational purpose.  Plaintiffs also will present evidence at trial that Prop. 8 impermissibly discriminates on the basis of gender in addition to sexual orientation.  This is so because, under Prop. 8, a man is free to marry a person that a woman would be barred from marrying solely because of her gender, and vice-versa.  Plaintiffs believe that the issue of gender stereotypes may become relevant to the extent Intervenors point to "tradition" as a justification for Prop. 8, as perpetuation of tradition for tradition's sake may well perpetuate both stereotypes and historical discrimination.  This issue could also be relevant to the extent Intervenors argue that a household with a mother and father is an inherently better environment in which to raise children

Gibson, Dunn & Crutcher LLP

than one with two parents of the same sex, as such an argument may well draw on gender stereotypes.  To the extent evidence on this issue is necessary, Plaintiffs would likely present it through expert witness testimony.  Plaintiffs will depose Intervenors' experts.

**E.     Facts Pertaining to Whether Prop. 8 Was Passed with Discriminatory Intent.**

Plaintiffs will demonstrate that Prop. 8 lacks any compelling justification or even rational basis, and was driven by discriminatory intent, animus, and moral disapproval of gay and lesbian individuals.  Numerous cases have recognized that the presence of animus or discriminatory intent is directly relevant to whether a challenged law passes constitutional muster.  *See Romer v. Evans*, 517 U.S. 620, 634 (1996) (laws such as Amendment 2 "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected"); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (striking down zoning ordinance requiring a home for the mentally retarded to obtain a special use permit and finding that "[r]equiring the permit in this case appears to rest on an irrational prejudice against the mentally retarded").

Intervenors oppose any inquiry into the role of animus or discriminatory intent toward gay and lesbian individuals on the part of the backers of Prop. 8 and those who supported it.  Their position cannot stand given the clear relevance of animus and discriminatory intent under *Romer*, *Moreno*, and other controlling authorities.  Intervenors argument that an inquiry into animus or discriminatory intent is nevertheless improper because the Supreme Court in *Romer* did not specifically address record evidence of animus in its passage, and focused instead on the absence of any rational basis for Amendment 2, is without merit.  Intervenors do not and cannot assert, of course, that plaintiffs in *Romer* did not present evidence of animus behind Amendment 2.  They did.  Moreover, the fact that a court may be able to infer animus and discriminatory intent from the fact that a law lacks even a rational basis does not mean, as Intervenors seems to argue, that Plaintiffs cannot present and the Court cannot consider direct evidence of animus and discriminatory intent to

1   support that conclusion.  Lastly, the Supreme Court has directly addressed evidence of animus and

2   discriminatory intent in other cases such as *Moreno* and *City of Cleburne*.

### 1.   The Voters' Motivation or Motivations for Supporting Prop. 8, Including Advertisements and Ballot Literature Considered by California Voters.

As discussed above, Plaintiffs will present evidence at trial that Prop. 8 was driven by animus and moral disapproval of gay and lesbian individuals, both on the part of those driving the initiative and on the part of voters.  Plaintiffs will prove this through testimony from the proponents of Prop. 8 and other fact witnesses, documents pertaining to the initiative, and expert testimony.  Plaintiffs will require fact discovery on this issue in the form of testimony and documents from the proponents of Prop. 8 and possibly other fact witnesses.  Intervenors have taken the position that evidence of their motivations or those of the voters is irrelevant.  Plaintiffs strongly disagree and submit that evidence of animus and discriminatory intent on the part of the proponents of Prop. 8 and those who supported it is directly relevant to Plaintiffs' claims and the controlling legal standard.

### 2.   The Differences in Actual Practice of Registered Domestic Partnerships, Civil Unions and Marriage, Including Whether Married Couples Are Treated Differently from Domestic Partners in Governmental and Non-Governmental Contexts.

Plaintiffs will present evidence at trial that although California affords to gay and lesbian citizens many of the same substantive rights available to married couples through domestic partnerships, there are significant and meaningful differences between those institutions.  Plaintiffs will present their own testimony concerning the significance of marriage, and also expert testimony concerning differences between the institutions and how people are treated in both the governmental and non-governmental context.  Plaintiffs and Intervenors agree that they will likely be able to stipulate to differences in treatment by the government that are reflected in statutes or regulations, but that agreements as to how people may be treated differently in the private sphere will be more difficult.

///

///

///

# IV.
## PROPOSED SCHEDULE

Plaintiffs respectfully propose the following schedule for this action.

| | |
|---|---|
| Fact Discovery Cutoff | October 2, 2009 |
| Exchange Expert Reports | October 9, 2009 |
| Exchange Rebuttal Expert Reports | October 19, 2009 |
| Expert Discovery Cutoff | October 23, 2009 |
| Dispositive Motions Due | October 30, 2009 |
| Hearing on Dispositive Motions | November 20, 2009 |
| Pre-Trial Conference | December 7, 2009 |
| Trial | December 14, 2009 |

In order to facilitate the above-described expedited schedule, Plaintiffs propose that the time for responding to all written discovery be shortened to 14 calendar days, that all documents be produced on the day that written responses to document requests are served, and that all discovery disputes be resolved on an abbreviated schedule whereby a motion is filed, the response is due seven days later, and the Court decides the motion within fourteen days of filing.

///

///

///

1    Intervenors propose a schedule that consists of two rounds of briefing, no trial, and would not

2   be concluded before July 2010 at the earliest.  While Intervenors offer speed as one reason to bypass

3   a trial in this action, Plaintiffs' proposed schedule would bring this case to conclusion roughly seven

4   months earlier than Intervenors' proposal.  Given the importance of the issues raised by Plaintiffs'

5   claims, the Court's decision to defer ruling on Plaintiffs' motion for preliminary injunction, and the

6   fact that Plaintiffs suffer irreparable harm each day that Prop. 8 remains in effect, the Court should

7   not impose a schedule that takes more than a year to get from the filing of Plaintiffs' Complaint to

8   a Judgment.

9

10   DATED:  August 7, 2009

11                                                       GIBSON, DUNN & CRUTCHER LLP

12

13                                                       By:_____/s/_____

14                                                                    Theodore B. Olson

15                                                       and

16                                                       BOIES, SCHILLER & FLEXNER LLP

17                                                       David Boies

18                                                       Attorneys for Plaintiffs KRISTIN M. PERRY,
                                                         SANDRA B. STIER, PAUL T. KATAMI, and
19                                                       JEFFREY J. ZARRILLO

20

21

22

23

24

25

26

27

28