ALAN L. SCHLOSSER (SBN 49957)
ELIZABETH O. GILL (SBN 218311)
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
T: (415) 621-2493/F: (415) 255-8437
E-mail: egill@aclunc.org

JON W. DAVIDSON (SBN 89301)
JENNIFER C. PIZER (SBN 152327)
TARA BORELLI (SBN 216961)
LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
3325 Wilshire Boulevard, Suite 1300
Los Angeles, CA 90010
T: (213) 382-7600/F: (213) 351-6050
E-mail: jpizer@lambdalegal.org

SHANNON P. MINTER (SBN 168907)
CHRISTOPHER F. STOLL (SBN 179046)
ILONA M. TURNER (SBN 256219)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: (415) 392-6257/F: (415) 392-8442
E-mail: sminter@nclrights.org

Attorneys for Proposed Plaintiff-Intervenors Our Family Coalition;
Lavender Seniors of the East Bay; and Parents, Families, and Friends of Lesbians and Gays

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles, <br><br> Defendants, | CASE NO. 09-CV-2292 VRW <br><br> **[PROPOSED] CASE MANAGEMENT STATEMENT** <br><br> The Honorable Chief Judge Vaughn R. Walker <br><br> Date:         August 19, 2009 <br> Time:         10:00 a.m. <br> Location:   Courtroom 6, 17th Floor <br><br> Trial Date:   Not Set |

and

Proposition 8 Official Proponents Dennis
Hollingsworth, Gail J. Knight, Martin F. Gutierrez,
Hakshing William Tam, and Mark A. Jansson; and
ProtectMarriage.com – Yes on 8, a Project of
California Renewal,

                    Defendant-Intervenors.

<u>Additional Counsel for Proposed Plaintiff-Intervenors</u>**:**

MARK ROSENBAUM (SBN 59940)
LORI RIFKIN (SBN 244081)
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
T: (213) 977-9500/ F: (213) 250-3919
E-mail: mrosenbaum@aclu-sc.org

DAVID BLAIR-LOY (SBN 229235)
ACLU FOUNDATION OF SAN DIEGO AND IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138
T: (619) 232-2121/F: (619) 232-0036
E-mail: dblairloy@aclusandiego.org

MATTHEW A. COLES (SBN 76090)
JAMES D. ESSEKS (SBN 159360)
LGBT & AIDS PROJECT
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10005
T: (212) 549-2500/F: (212) 549-2650
E-mail: jesseks@aclu.org

# TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................1

II.   THE LGBT COMMUNITY ORGANIZATIONS' RESPONSES TO THE COURT'S
      AUGUST 12, 2009 CASE MANAGEMENT ORDER.........................................1

      A.  The Specific Elements of the Claims Plaintiffs Assert and the Defenses, If Any,
          Defendants and Intervenors Contend Apply..........................................1

          1.   Equal Protection Claims...........................................................1

          2.   Due Process Claims...................................................................5

      B.  Admissions And Stipulations That The Parties Are Prepared To Enter Into
          With Respect To The Foregoing Elements And Applicable Defenses At
          Issue...........................................................................................6

      C.  Discovery That The Parties Seek That May Lead To The Discovery Of
          Admissible Evidence With Reference To:..............................................6

          1.   Level Of Scrutiny Relevant To Plaintiffs' And The LGBT
               Community Organizations' Equal Protection Claims................................6

               a.  The History Of Discrimination Against Lesbians And Gay Men..........7

               b.  Whether The Characteristics Defining Gay People As A Class Affect
                   Their Ability To Contribute To Society..................................9

               c.  Whether Individuals Can Change Their Sexual Orientation And,
                   If So, Whether The Government Should Require Lesbian And Gay
                   Individuals To Change As A Condition Of Equal Treatment..............11

               d.  The Relative Political Power Of Gay People.........................12

          2.   The Campaign By Which Proposition 8 Was Adopted.............................14

               a.  The Voters' Motivation Or Motivations For Supporting
                   Proposition 8, Including Ballot Materials And Advertisements
                   Presented To California Voters......................................14

               b.  The History And Development Of California's Exclusion Of
                   Same-Sex Couples From Marriage......... ............. ........... ......... ........16

               c.  Claims In The Proposition 8 Ballot Materials Regarding What
                   Would Be Taught In California Schools About Marriage, And
                   Evidence About California's Curriculum......... ......... .........17

3.    Character Of The Rights Plaintiffs and the LGBT Community
Organizations Contend Are Infringed Or Violated.................................18

    a.  The History And Evolution Of Marriage In California.....................18

    b.  The Longstanding Definition Of Marriage In California...................19

4.    Effect Of Proposition 8 Upon Plaintiffs, The LGBT Community
Organizations' Members, And Similarly Situated
Individuals.................................................................................................20

    a.  The Differences In Actual Practice Of Registered Domestic
Partnerships, Civil Unions And Marriage, Including Whether
Married Persons Are Treated Differently From Domestic Partners
In Governmental And Non-Governmental Contexts..........................20

    b.  Whether The Availability Of Different-Sex Marriage Is A
Meaningful Option For Lesbians And Gay Men....................22

5.    Effect of Proposition 8 Upon Opposite-Sex Couples And Others
Not In Same-Sex Relationships In California...............................23

    a.  Whether The Exclusion Of Same-Sex Couples From Marriage
Leads To Increased Stability In Different-Sex Couples'
Marriages Or Whether Permitting Same-Sex Couples To Marry
Destabilizes Different-Sex Couples' Marriages.....................23

    b.  Whether The Exclusion Of Same-Sex Couples From Marriage
Meaningfully Restricts Options Available To Heterosexuals...........24

    c.  Whether Requiring One Man And One Woman In Marriage
Promotes Stereotypical Gender Roles...............................................25

6.    Other Issues Pertinent To The Parties' Claims Or Defenses.......27

    a.  Whether A Married Mother And Father Provide The Optimal
Child-Rearing Environment And Whether Excluding
Same-Sex Couples From Marriage Promotes This
Environment.......................................................................................27

    b.  Whether And How California Has Acted To Promote These
Interests In Other Family Law Contexts....................................29

D.  Subject Matter (By Discipline Or Expertise) Of The Opinion/Expert
Evidence That The Parties Intend To Present.................................30

III.    STATEMENTS ADDITIONALLY REQUIRED BY L-R 16-9.............................32

I.      INTRODUCTION

        Proposed Plaintiffs-Intervenors Our Family Coalition, Lavender Seniors of the East Bay, and Parents, Families, and Friends of Lesbians and Gays (collectively, the "LGBT Community Organizations"), respectfully submit the following proposed Case Management Statement to assist the Court in the event that their motion to intervene is granted.  The LGBT Community Organizations are committed to preparation of a record that will assist this Court and reviewing courts, as well as to avoidance of delay.  In order to further those goals, the LGBT Community Organizations offer this proposed statement in advance of a ruling on their motion to intervene so as to have it available to the Court as it considers scheduling in this case and in order to be immediately in compliance with the Court's July 30 and August 12 Orders, as well as Local Rule 16-9, should they be permitted to join this case as parties.

II.     THE LGBT COMMUNITY ORGANIZATIONS' RESPONSES TO THE COURT'S AUGUST 12, 2009 CASE MANAGEMENT ORDER.

        A.      The Specific Elements of the Claims Plaintiffs Assert and the Defenses, If Any, Defendants and Intervenors Contend Apply.

        The LGBT Community Organizations' Proposed Complaint in Intervention alleges that Proposition 8 violates the equal protection and the due process clauses of the fourteenth amendment to the United States Constitution.

                1.      Equal Protection Claims.

        Proposition 8 violates the federal equal protection clause in the following separate ways, each of which independently is sufficient to invalidate the amendment.  These distinct claims are:

        a)      Because California permits same-sex couples to enter registered domestic partnerships that provide all of the same legal rights, benefits, and responsibilities as marriage, California previously allowed same-sex couples to marry, and California law does not otherwise discriminate based on sexual orientation or sex against lesbian and gay individuals or couples or their children, depriving same-sex couples of the freedom to marry serves no purpose other than to mark lesbian and gay individuals and couples and their children as second-class citizens and to encourage private discrimination against them, which the federal Constitution's guarantee of equal protection does not permit.  *Romer v. Evans*, 517 U.S. 620 (1996).  The elements of this claim are:

- Proposition 8 intentionally treats lesbian and gay individuals and couples differently than heterosexual individuals and couples by barring same-sex couples from obtaining the preferred legal status and relationship designation of "marriage," while not altering the established state constitutional requirement that the state must otherwise treat their relationships equally;

- It withdraws from lesbian and gay individuals and couples a previously acknowledged right to full participation in the fundamental right to marry, including a right to the legal designation of "marriage" on an equal basis with heterosexual individuals and couples;

- It does so based on sexual orientation;

- It does so not in order to further any legitimate government interest, but rather in order to mark lesbian and gay individuals and couples as unequal;

- It was enacted with animus, or at a minimum, discriminatory intent; and

- It inflicts harm on lesbian and gay individuals and couples and their families.

b)      Proposition 8 violates the federal equal protection clause under any level of equal protection scrutiny because it was motivated by animus towards gay people and, at a minimum, intentionally discriminates without rationally furthering a legitimate state interest.  *Romer*, 517 U.S. at 620.  The elements of this claim are:

- Proposition 8 intentionally treats lesbian and gay individuals and couples differently than heterosexual individuals and couples;

- It classifies Californians based on their sexual orientation;

- It was enacted with animus, or at a minimum, discriminatory intent;

- It does not further any legitimate state interest; and

- It inflicts harm on lesbian and lesbian individuals and couples and their families.

c)      Proposition 8 violates the federal equal protection clause under the more close form of scrutiny applicable to laws that inhibit personal relationships and exhibit a desire to harm a politically unpopular group.  *Romer*, 517 U.S. at 620; *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring).  The elements of this claim are:

- Proposition 8 intentionally treats lesbian and gay individuals and couples differently than heterosexual individuals and couples;

- It classifies Californians based on their sexual orientation;

- It was enacted with animus, or at a minimum, discriminatory intent;

- It does not further any legitimate state interest; and

2

- It inflicts harm on lesbian and lesbian individuals and couples and their families.

d)      Proposition 8 classifies Californians based on their sexual orientation, a government classification that should be considered suspect and therefore should trigger strict scrutiny under the equal protection clause.  In order to survive strict scrutiny, defendants would have to prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest.  *Johnson v. California*, 543 U.S. 499, 505 (2005).  The elements of this claim are:

- Proposition 8 intentionally treats lesbian and gay individuals and couples differently than heterosexual individuals and couples;

- It classifies Californians based on their sexual orientation;

- It is subject to strict scrutiny because it classifies based on sexual orientation, which:

   o   Is a classification that historically has been used to discriminate invidiously against lesbians and gay men; and

   o   Is not relevant to a person's ability to participate in or contribute to society.

- While not required to be considered a suspect classification, sexual orientation also:

   o   Is a characteristic that a person cannot or should not have to change in order to avoid government discrimination; and

   o   Hinders the ability of lesbians and gay men to secure equal protection through the political process.

- Defendants cannot prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest; and

- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

e)      Proposition 8 classifies Californians based on their sex, a government classification that is considered quasi-suspect and therefore triggers intermediate scrutiny under the equal protection clause.  In order to survive intermediate scrutiny, defendants would have to provide an "exceedingly persuasive" justification for the discrimination and prove "at least that [Proposition 8] serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citations and internal quotations omitted).  The elements of this claim are:

- Proposition 8 intentionally treats lesbian and gay individuals differently than heterosexual individuals;

3

- It classifies Californians based on their sex;

- Defendants cannot provide an exceedingly persuasive justification for it or that it substantially furthers an important government purpose; and

- Proposition 8 inflicts harm on lesbian and gay individuals and their families.

f)      Proposition 8 bars lesbian and gay Californians from access to the fundamental right to marry, while allowing all other Californians to exercise that right.  A government classification that provides differential access to a fundamental right triggers strict scrutiny, regardless of whether the classification is otherwise subject to heightened scrutiny.  *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969).  In order to survive strict scrutiny, defendants would have to prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest.  The elements of this claim are:

- The federal constitution protects the fundamental right to marry the person of one's choice;

- Proposition 8 intentionally bars lesbian and gay Californians from exercising the fundamental right to marry while expressly affirming the continuing right of heterosexual individuals to do so;

- Defendants cannot prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest; and

- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

g)      Proposition 8 classifies Californians based on the manner in which they exercise their fundamental right to form intimate relationships.  A government classification that provides differential access to a fundamental right triggers strict scrutiny.  *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969).  In order to survive strict scrutiny, defendants would have to prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest.  The elements of this claim are:

- The federal constitution protects the fundamental right to form intimate relationships;

- Proposition 8 intentionally classifies Californians based on how they exercise that fundamental right—those who form intimate relationships with a person of a different sex may marry, while those who form intimate relationships with a person of the same sex may not marry;

- Defendants cannot prove that Proposition 8 is narrowly tailored to discriminate no more than necessary to further a compelling state interest; and

4

- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

**2.      Due Process Claims.**

Proposition 8 violates the federal due process clause in the following separate ways, each of which independently is sufficient to invalidate the amendment.  These distinct claims are:

a)      Proposition 8 violates the due process clause because it burdens the long-established fundamental right to marry, the scope of which is not defined by historical limitations on who has been allowed to exercise the right.  Defendants must demonstrate a compelling reason for denying same-sex couples the right to marry.  *Loving v. Virginia*, 388 U.S. 1 (1967); *Zablocki v. Redhail*, 434 U.S. 374 (1978).  The elements of this claim are:

- The federal constitution protects the fundamental right to marry the person of one's choice;
- Proposition 8 intentionally prevents lesbian and gay Californians from marrying the person of their choice;
- Defendants cannot prove that Proposition 8 is narrowly tailored to burden the right to marry no more than necessary to further a compelling state interest; and
- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

b)      Proposition 8 violates the due process clause because it burdens individuals' fundamental right to form intimate relationships.  Defendants must demonstrate a compelling reason for burdening the decisions of lesbians and gay men about what intimate relationships to form. *Lawrence v. Texas*, 539 U.S. 558 (2003).  The elements of this claim are:

- The federal constitution protects the fundamental right to form intimate relationships;
- Proposition 8 intentionally burdens the right of lesbian and gay Californians to form intimate relationships by depriving them of the unique public validation, social recognition, respect, and support, and the private and personal value that comes with marriage;
- Defendants cannot prove that Proposition 8 is narrowly tailored to burden the right to form intimate relationships no more than necessary to further a compelling state interest; and
- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

c)      Proposition 8 violates the due process clause because "it intrude[s] upon the personal and private lives of [lesbians and gay men], in a manner that implicates the rights identified in

5

*Lawrence* [*v. Texas*, 539 U.S. 558 (2003)]." To justify this intrusion, "the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest. In other words, for the third factor, a less intrusive means must be unlikely to achieve substantially the government's interest." *Witt v. Dep't of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008). The elements of this claim are:

- The liberty protected by the due process clause includes the freedom to form intimate relationships;

- Proposition 8 intentionally burdens the right of lesbian and gay Californians to form intimate relationships by depriving them of the unique public validation, social recognition, respect, and support, and the private and personal value that comes with marriage;

- Defendants cannot prove that Proposition 8 advances an important governmental interest, that its intrusion significantly furthers that interest, and that the intrusion is necessary to further that interest, i.e., that a less intrusive means is unlikely to achieve substantially the government's interest; and

- Proposition 8 inflicts harm on lesbian and gay individuals and couples and their families.

**B.    Admissions And Stipulations That The Parties Are Prepared To Enter Into With Respect To The Foregoing Elements And Applicable Defenses At Issue.**

Because the LGBT Community Organizations are not yet parties, they have not been able to discuss with the existing parties what admissions and stipulations might be possible. If the Organizations' motion to intervene is granted, they will confer promptly with the existing parties and will submit a revised Case Management Statement should the Court find that appropriate.

**C.    Discovery That The Parties Seek That May Lead To The Discovery Of Admissible Evidence With Reference To:**

**1.    Level Of Scrutiny Relevant To Plaintiffs' And The LGBT Community Organizations' Equal Protection Claims.[1]**

Two factors (whether the group defined by the classification has suffered a history of invidious discrimination and whether the characteristics defining that classification are relevant to

---

[1] Discovery relevant to Plaintiffs' and the LGBT Community Organizations' due process claims is separately discussed in Sections II.C.2 and II.C.4, below, because the Court's August 12, 2009 order directed the parties to address separately the "[c]haracter of the rights plaintiffs contend are infringed or violated" and the "[e]ffect of Proposition 8 upon plaintiffs and similarly situated individuals," which encompass the discovery relating to the level of scrutiny relevant to Plaintiffs' and the LGBT Community Organizations due process claims.

individual's ability to participate in society) form the core of the test for whether sexual orientation classifications by government are suspect.  Two other factors (whether sexual orientation can be changed and whether lesbians and gay men can protect themselves adequately in the political process) are sometimes mentioned in the case law and may be relevant to whether a classification should be considered suspect.

> **a**        **The History Of Discrimination Against Lesbians And Gay Men.**

Nature Of Anticipated Dispute: Proponent-Intervenors have conceded that gay people have faced a history of discrimination in the United States based on "their sexual conduct."  (Proponent-Intervenors' Initial Case Management Statement (filed Aug. 7, 2009) ("Proponent-Ints.' Init. Stmnt.") at 14.[2])  But Proponent-Intervenors' Initial Statement suggests they are unlikely to agree to the full scope of the past and current discrimination against gay people in America, which means it would be important to provide the Court with a detailed understanding of these facts.[3]

Discovery And Evidence:

Expert Witness Testimony:  The LGBT Community Organizations would present evidence through expert witnesses regarding the history of the treatment of gay people in society in the United States, showing that lesbians and gay men faced widespread discrimination in the twentieth century that was historically unique and unprecedented.  This discrimination emanated from a late nineteenth century America marked by rigid gender roles for men and women, which resulted in disapproval of a broad range of cross-gender behavior deemed deviant, of which homosexuality was one example.

The LGBT Community Organizations would present evidence showing how, in the twentieth century, states began to classify and penalize citizens on the basis of their identity or status as homosexuals, enacting discriminatory measures and other forms of anti-gay treatment, including

---

[2] The LGBT Community Organizations refer herein to Defendant-Intervenors, the Proposition 8 Proponents, as "Proponent-Intervenors" to distinguish them from other intervenors.

[3] In addition, it appears that Proponent-Intervenors' position will be that gay people could avoid the discrimination they have faced if they simply did not engage in same-sex relationships.  (Proponent-Ints.' Stmnt. at 14-15.)  Such a position evidences a startling misunderstanding of the very concept of sexual orientation, a subject upon which separate expert testimony apparently will be necessary.  *See* Section II.C.1.c., below.

harassment and assaults on freedom of association, as well as forms of demonization and censorship. The Organizations would show how growing visibility and openness of gay people more recently have prompted a sharp anti-gay response in society of a sort similar to how the gains of the African-American civil rights movement promoted a powerful backlash in the 1950s and 1960s.

This evidence would include discussion of the laws that have been used, both in the past and continuing to the present, to treat lesbians and gay men differently in a range of societal contexts. These include laws criminalizing same-sex intimacy in all thirteen original American colonies and almost every state at one time, laws and practices of excluding gay people from government employment and security clearances, laws excluding gay people from military service, and laws and court decisions penalizing lesbian and gay parents in child custody and other family law settings.

The LGBT Community Organizations would also present evidence of the reality of contemporary discrimination against gay people in America, including both differential treatment by the federal government (such as the military exclusion currently embodied in the "Don't Ask Don't Tell" policy, the so-called "Defense of Marriage Act," and federal immigration policy) and state governments (including state laws barring same-sex couples from marriage and other relationship protections and state-level bans on adoption or foster parenting by gay people that recently were struck down or revoked in Arkansas, Florida, and Missouri), and within the private sector (including statistics regarding the prevalence of employment discrimination against gay people, the incidence of hate crimes against gay people, and the pervasiveness of anti-gay harassment in schools and other facilities for youth).

The LGBT Community Organizations would wish to offer expert testimony establishing these points from historians (who might include George Chauncey, Professor of History at Yale University, with whom counsel for the LGBT Community Organizations worked to prepare and present his testimony in the recent Iowa marriage lawsuit, *Varnum v. Brien*, 763 N.W. 2d 862 (Iowa 2009) (hereinafter "*Varnum*"), as well as in the Colorado state court trial in *Romer v. Evans*, Denver County District Court, Case No. 92 CV 7223 (Dec. 14, 1993) (Bayless, J.), *aff'd*, 882 P.2d 1335 (Colo. 1994), *aff'd on different grounds*, 517 U.S. at 620 (hereinafter "*Romer*").  The Organizations also would propose to offer expert testimony from scholars of legal history (who might include William

8

Eskridge, Professor of Law at Yale Law School), and from economists (who might include Professor M.V. Lee Badgett of the Williams Institute at UCLA School of Law and the University of Massachusetts, with whom counsel for the Organizations worked to prepare and present her expert testimony in *Varnum*, as well as in connection with the economic studies the Williams Institute prepared in connection with the following California legislation concerning registered domestic partnership and marriage for same-sex couples:  AB 205, AB 2580, SB 1827, AB 849, and AB 43).

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate presenting lay witness testimony on this issue at this time.

*Documentary Evidence*:  The LGBT Community Organizations may conduct written discovery of the state defendants regarding the state's past discriminatory practices and measures and its current treatment of lesbians and gay men.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding the history of discrimination.

*Rule 30(b)(6) depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the history of discrimination against lesbians and gay men.

### b    Whether The Characteristics Defining Gay People As A Class Affect Their Ability To Contribute To Society.

Nature Of Anticipated Dispute:  The parties disagree on this issue in at least two respects: First, Proponent-Intervenors appear to contend that the "characteristics defining gay people as a class" are defined solely by their sexual conduct, whereas Plaintiffs and the LGBT Community Organizations agree that gay people are defined by their sexual orientation, which has meaning independent of conduct.  (Proponent-Ints.' Init. Stmnt. at 14-15, Plaintiffs' Initial Statement at 11 (filed Aug. 7, 2009) ("Pls.' Init. Stmnt.").)  Second, the parties dispute the procreative ability of gay people and whether any differences in procreation affect the ability of gay people to participate in and contribute to society.  (Proponent-Ints.' Init. Stmnt. at 15, Pls.' Init. Stmnt. at 11.)

9

1    <u>Discovery And Evidence</u>:

2    *Expert Witness Testimony*:  The LGBT Community Organizations would offer evidence

3    demonstrating that a person's sexual orientation has nothing to do with his or her ability to participate

4    in or contribute to society.  Mainstream mental health and medical professionals long have

5    recognized that homosexuality is not a disorder, but merely a normal expression of human sexuality

6    and a neutral feature of a person's identity, just as heterosexuality is.  Gay and lesbian persons have

7    the capacity to contribute to society and to form lasting, committed, healthy, and mutually satisfying

8    intimate relationships, just as heterosexual persons do.

9        The LGBT Community Organizations would offer testimony from experts on the nature of

10    sexual orientation (which might include Gregory Herek, Professor of Psychology at the University of

11    California at Davis) and on the nature of couples' relationships, addressing both gay and non-gay

12    individuals and couples (which might include Letitia Anne Peplau, Professor of Psychology at

13    UCLA, or Pepper Schwartz, Professor of Sociology at the University of Washington in Seattle).

14    Counsel for Organizations have worked with these experts in the past in cases such as *Varnum;*

15    *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993) (case challenging Hawaii's exclusion of same-sex couples

16    from marriage) (hereinafter "*Baehr*"); *Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006)

17    (case challenging constitutionality of Arkansas state regulation that prohibited an individual from

18    being a foster parent if an adult member of that person's household was gay) (hereinafter "*Howard*");

19    and *In re Adoption of Doe*, 2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008) (case challenging

20    constitutionality of Florida statute prohibiting gay people from adopting children) (hereinafter "*In re*

21    *Adoption of Doe*").  The LGBT Community Organizations might also seek to present expert

22    testimony about the contributions to society made by gay and lesbian individuals in recent history,

23    which might include testimony from historian George Chauncey and economist and demographer

24    Lee Badgett, both discussed above.

25        The LGBT Community Organizations additionally would depose any experts put forth by the

26    opposing parties.

27    *Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate presenting

28    lay witness testimony on this issue at this time.

10

*Documentary Evidence*: The LGBT Community Organizations might conduct written discovery of the opposing parties regarding any evidence in their possession on the ability of lesbians and gay men to participate in and contribute to society.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding the ability of lesbians and gay men to participate in and contribute to society.

*Rule 30(b)(6) depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the ability of lesbians and gay men to contribute to society.

### c.    Whether Individuals Can Change Their Sexual Orientation And, If So, Whether The Government Should Require Lesbian And Gay Individuals To Change As A Condition Of Equal Treatment.

<u>Nature Of Anticipated Dispute</u>:  The parties dispute whether individuals can change their sexual orientation and whether the government should require such change as a condition of equal treatment.  (Proponent-Ints.' Init. Stmnt. at 15; Pls.' Init. Stmnt. at 12.)

<u>Discovery And Evidence</u>:

*Expert Witness Testimony*: The LGBT Community Organizations would present evidence demonstrating that a person's sexual orientation is fixed at an early age and is highly resistant to change.  Marriage to someone of a different sex is not a meaningful option for a gay or lesbian person and would not be a healthy, stable arrangement.  Purportedly therapeutic interventions aimed at changing an individual's sexual orientation generally are both ineffective and extremely harmful, and have been repudiated by mainstream mental health professionals, including the American Psychological Association.  Therapy designed to help a lesbian or gay individual repress or control same-sex romantic and sexual expression does not change the individual's homosexual orientation.

The LGBT Community Organizations would present testimony from experts on the nature of sexual orientation and on the nature of couples' relationships, addressing both gay and non-gay individuals and couples, and on the harms caused by attempts to change a person's sexual orientation, which might include testimony by psychologist Gregory Herek, psychologist Letitia Anne Peplau, sociologist Pepper Schwartz, and Caitlin Ryan, Director of Adolescent Health Initiatives at the Cesar

11

E. Chavez Institute, at San Francisco State University.  As noted above, counsel for the Organizations have worked with Drs. Herek, Peplau, and Schwartz as experts in the past for live witness testimony and cross-examination in deposition and/or at trial in *Varnum*, *Baehr*, *Howard*, and *In re Adoption of Doe*, and they worked with Dr. Ryan when she testified in *R.G v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) (case challenging anti-LGBT harassment by staff at state youth correctional facility) (hereinafter "*Koller*").

The LGBT Community Organizations additionally would depose any expert witnesses put forward by the opposing parties.

*Lay Witness Testimony*: The LGBT Community Organizations do not anticipate presenting lay witness testimony on this issue at this time.

*Documentary Evidence*:  The LGBT Community Organizations might conduct written discovery of the opposing parties regarding their knowledge of efforts to change the sexual orientation of individuals and the efficacy of such efforts.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding whether lesbians, gay men, or heterosexuals can change their sexual orientation.

*Rule 30(b)(6) depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the ability of lesbians, gay men, and heterosexuals to change their sexual orientation.

### d.  The Relative Political Power Of Gay People.

<u>Nature Of Anticipated Dispute</u>:  The parties disagree about whether gay people lack political power in the sense that term is used in the suspect classification analysis.  (Proponent-Ints.' Init. Stmnt. at 15, Pls.' Init. Stmnt. at 12.)

<u>Discovery And Evidence</u>:

*Expert Witness Testimony*:  The LGBT Community Organization would present testimony that significant barriers remain that prevent gay people from protecting themselves from government and private discrimination through civil rights legislation and that those barriers are at least as

12

1  formidable as those faced by other groups as to which the courts have long applied heightened

2  scrutiny under equal protection analysis.

3  The LGBT Community Organizations would present evidence that lesbians and gay men are

4  disadvantaged in the political process for various reasons, including that they constitute a very small

5  proportion of society; that many gay people remain "closeted" or private about their identity, and that

6  this makes them less likely to engage in political activity to advance gay rights; that many legislators

7  are unwilling to express support for legislation that would protect gay people for fear of political

8  backlash, including the accusation or perception that they themselves are gay; that there are very few

9  openly lesbian or gay public officials in the country; and that those gay people who already hold

10  public office often are closeted themselves and therefore are unwilling to advance legislation to

11  protect gay people.  The LGBT Community Organizations also would seek to present evidence

12  regarding the barriers faced by openly lesbian or gay candidates for public office.  Such evidence

13  might include a showing that, even where majority support exists in the general public for pro-gay

14  legislation, it remains very difficult to pass such legislation, and super-majority support among the

15  general public often is required before such legislation has any chance of passing in most state

16  legislatures, and even that level of support nationally has not translated into passage of protective

17  legislation by Congress.

18  The LGBT Community Organizations would present evidence about popular initiatives

19  through which voters have passed anti-gay ordinances, state-wide laws, and state constitutional

20  amendments on issues ranging from bans on adoption and foster parenting by gay people, to bans on

21  non-discrimination protections for gay people, to bans on marriage and other forms of relationship

22  protection for same-sex couples.  This evidence would include the margins by which these laws have

23  passed, the resources expended on each side, and the appeals to anti-gay bias in the campaigns.

24  The LGBT Community Organizations' expert testimony establishing these points would come

25  from political scientists, who might include Kenneth Sherrill, Professor of Political Science, Hunter

26  College, CUNY, with whom counsel for the LGBT Community Organizations worked to prepare and

27  present his testimony in the trial in *Romer* and in the trial in *Equality Foundation of Greater*

28  *Cincinnati v. City of Cincinnati*, 128 F.3d 289 (6th Cir. 1997) (case challenging constitutionality of

13

Cincinnati ordinance that removed gay men, lesbians and bisexuals from protection under the city's non-discrimination law), and Justin H. Phillips, Assistant Professor of Political Science, Columbia University.  The Organizations might also present evidence from individuals with expertise regarding the barriers faced by openly gay candidates for political office and the difficulties faced by openly gay public officials.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate presenting lay witness testimony on this issue at this time.

*Documentary Evidence*:  The LGBT Community Organizations might conduct written discovery of the opposing parties regarding any evidence in their possession regarding the political power of lesbians and gay men.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding the political power of lesbians and gay men.

*Rule 30(b)(6) depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the political power of lesbians and gay men.

**2.      The Campaign By Which Proposition 8 Was Adopted.**

**a.      The Voters' Motivation Or Motivations For Supporting Proposition 8, Including Ballot Materials And Advertisements Presented To California Voters.**

<u>Nature Of Anticipated Dispute</u>:  Proponent-Intervenors contend that evidence of the motivation behind the passage of Proposition 8 is "legally impermissible" and "unnecessary." (Proponent-Ints.' Init. Stmnt. at 20.)  Plaintiffs and the LGBT Community Organizations agree that evidence of the motivation behind Proposition 8 is relevant to their legal claims.  *See City of Los Angeles v. County of Kern*, 462 F. Supp. 2d 1105, 1113-14 (C.D. Cal. 2006) ("the Court may look to the nature of the initiative campaign to determine the intent of the drafters and voters in enacting it"). The LGBT Community Organizations of course would not seek discovery from *individual* voters,

thereby intruding on the privacy of the ballot box, which is all that the case cited by Proponent-Intervenors prohibits.  *See SASSO v. Union City*, 424 F.2d 291, 295 (9th Cir. 1970).  Plaintiffs and the LGBT Community Organizations also agree that Proposition 8 was motivated by hostility towards and disapproval of gay people and a desire to ensure that gay people could not share the name and status of marriage.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations might present expert testimony regarding the impact of the public messaging around Proposition 8 on the election results.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations would depose the Proponent-Intervenors regarding the widely disseminated messages they put forth during the Proposition 8 campaign.  The LGBT Community Organizations would also present lay witness testimony from "No on 8" campaign professionals regarding the widely disseminated messages put forth by the "Yes on 8" campaign.

*Documentary Evidence*:  The LGBT Community Organizations would seek documentary evidence, both from Proponent-Intervenors and others, about the messages supporting a "Yes" vote on Proposition 8.  This evidence likely would include the following:

- Media reporting on the initiative, including opinion pieces published in print sources and online, see *City of Los Angeles v. County of Kern*, 509 F. Supp. 2d 865, 876-80 (C.D. Cal 2007) (citing statements made in print and online newspaper articles and editorials submitted by proponents and linked to from campaign website in determining whether voters were motivated by animosity toward plaintiff);

- The public statements of the proponents of Proposition 8, see *Seattle Sch. Dist. No. 1 v. Washington*, 473 F. Supp. 996, 1008-09 (W.D. Wash. 1979) (considering "represent[ations]" and "assert[ions]" made by proponents, "speeches given by [campaign] representatives," "legal analysis" published by proponents and "widely circulated" during campaign, and other references in "campaign publicity" as evidence of whether voters enacted initiative with discriminatory intent), *aff'd on other grounds*, 633 F.2d 1338 (9th Cir. 1980); and

- Political advertising, see *Amalgamated Ass'n of St., Ry. and Motor Coach Emps., Div. 1225 v. Las Vegas-Tonopah-Reno Stage Line, Inc.*, 202 F. Supp. 726, 736 n.7 (D.C. Nev. 1962) (referencing "paid advertisement" sponsored by proponents as evidence of voter intent).

15

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on Proponents-Intervenors regarding the messages disseminated in support of Proposition 8.

*Rule 30(b)(6) depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of Proponents-Intervenors regarding their messaging in support of Proposition 8.

### b. The History And Development Of California's Exclusion Of Same-Sex Couples From Marriage.

Nature Of Anticipated Dispute:  While some facts surrounding the history and development of California's exclusion of same-sex couples from marriage could be the subject of stipulation or judicial notice, other facts likely will be contested.  One area where the LGBT Community Organizations expect the parties to disagree is the historical circumstances that led to the amendment of the California Family Code in 1977 to add for the first time an express statutory limitation of marriage to different-sex couples.  The LGBT Community Organizations believe this history would show that the 1977 amendment was grounded in both anti-gay animus and sex stereotypes and that the exclusion of same-sex couples from marriage has not been mere oversight, but has been intentionally discriminatory.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations might present expert testimony from one or more historians regarding the history and development of California's exclusion of same-sex couples from marriage.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations might present lay witnesses who have personal knowledge of the circumstances leading to the 1977 amendment to California's marriage law.

*Documentary Evidence*:  The LGBT Community Organizations might seek documentary evidence from the opposing parties and others regarding the circumstances leading to the 1977 amendment to California's marriage law.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations do not presently believe that they would serve interrogatories regarding this issue.  The LGBT Community Organizations might serve requests to admit on the opposing parties regarding the circumstances leading to the 1977 amendment to California's marriage law.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations do not presently believe that they would notice 30(b)(6) depositions regarding this issue.

### c. Claims In The Proposition 8 Ballot Materials Regarding What Would Be Taught In California Schools About Marriage, And Evidence About California's Curriculum.

<u>Nature Of Anticipated Dispute</u>:  The LGBT Community Organization believe it may be necessary to address those claims made in the ballot materials prepared in support of Proposition 8 regarding the purported effects of civil marriage for same-sex couples on what is taught in California's schools.  While the LGBT Community Organizations primarily would argue that Proposition 8 does not rationally advance the educational goals specified in its proponents' ballot materials because marriage equality for same-sex couples had no effect on required curricula, the LGBT Community Organizations anticipate that some evidence supporting their legal argument likely would be contested and the issues would need to be resolved at trial, including how the subjects of marriage and other family relationships are actually taught in the state's public schools.

<u>Discovery And Evidence</u>:

*Expert Witness Testimony*:  The LGBT Community Organizations might present expert testimony from one or more individuals who work in or oversee California schools, such as superintendents, principals, or educational advocates— who would testify as to how the subjects of marriage and other family relationships are actually taught in the state's public schools.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they would present lay witness testimony about this issue.

*Documentary Evidence*:  The LGBT Community Organizations might seek documentary evidence from the state defendants and others regarding the curricula for California's public schools.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations might serve interrogatories and requests to admit on the opposing parties regarding the curricula for California's public schools.

*Rule 30(b)(6) Depositions*: The LGBT Community Organizations might notice 30(b)(6) depositions of the state defendants regarding the curricula for California's public schools.

### 3.   Character Of The Rights Plaintiffs and the LGBT Community Organizations Contend Are Infringed Or Violated.

#### a   The History And Evolution Of Marriage In California

Nature Of Anticipated Dispute:  Proponent-Intervenors appear to contend that marriage has had a static definition essentially for all time.  (Proponent-Ints.' Init. Stmnt. at 16-17.)  Plaintiffs and the LGBT Community Organizations disagree with that contention, and believe that evidence concerning the nature and history of marriage may be useful to the Court and any reviewing courts in evaluating the fundamental right to marry claim in this case.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations would present evidence that (1) the law and social understanding regarding marriage have evolved over time, both in legislatures and courts, to meet the changing needs of society and to embody fuller notions of consent and personal choice;  (2) despite these many changes, marriage remains a highly respected institution that plays a unique and central social, legal and economic role in society; and (3) marriage in the United States today differs from its historical common law counterpart, having undergone major changes in laws governing who may marry (including racial regulation), when marriages may end (e.g., no-fault divorce), and the legal significance and consequences of marriage for the individuals involved (including increasing elimination of stereotyping and discrimination against men and women), to name a few.

While determination of some of these facts, particularly certain facts concerning changes in marriage law over time, may be feasible through legal briefing and argument, stipulation or judicial notice, the LGBT Community Organizations anticipate that others would benefit from augmentation through expert testimony from historians.  Those historians might include Nancy F. Cott, Jonathan Trumbull Professor of American History at Harvard University, who might be offered to testify

18

concerning all of the above issues relating to the historical evolution of marriage and its current status and social meaning, and Michael J. Rosenfeld, Associate Professor of Sociology at Stanford University, who might be offered concerning the demographics of marriage and the family and their evolution over time.  Counsel for the LGBT Community Organizations worked with Professor Cott in connection with her testimony in *Varnum*.

The LGBT Community Organizations additionally would depose any expert witnesses presented by the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate presenting lay witness testimony on this issue at this time.

*Documentary Evidence*:  The LGBT Community Organizations might conduct written discovery of the opposing parties regarding any evidence in their possession on the definition of marriage and how it has or has not changed over time.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties on the definition of marriage over time.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the definition of marriage over time.

### b.    The Longstanding Definition Of Marriage In California.

<u>Nature Of Anticipated Dispute</u>:  The LGBT Community Organizations believe that the majority of the facts about California's own definitions of marriage may be established through legal briefing and argument, stipulation, and/or judicial notice.  There may be a dispute about whether and how the definition of marriage has changed over time, as discussed in Section II.C.3.a, above, which would be relevant here as well.  There may also be a dispute concerning the historical circumstances that led to the amendment of the California Family Code in 1977 to add for the first time an express statutory limitation of marriage to different-sex couples, as discussed in Section II.C.2.b, above.

19

1     <u>Discovery And Evidence</u>:

2     *Expert Witness Testimony*:  The LGBT Community Organizations might present expert

3     testimony from one or more historians regarding the history and development of California's

4     exclusion of same-sex couples from marriage.

5     The LGBT Community Organizations additionally would depose any expert witnesses for the

6     opposing parties.

7     *Lay Witness Testimony*:  The LGBT Community Organizations might present lay witnesses

8     who have personal knowledge of the circumstances leading to the 1977 amendment to California's

9     marriage law.

10    *Documentary Evidence*:  The LGBT Community Organizations might seek documentary

11    evidence from the state defendants or others regarding the circumstances leading to the 1977

12    amendment to California's marriage law.

13    *Interrogatories and Requests to Admit*:  The LGBT Community Organizations do not

14    presently believe that they would serve interrogatories regarding this issue.  The LGBT Community

15    Organizations might serve requests to admit on the opposing parties regarding the history and

16    development of California's exclusion of same-sex couples from marriage, including the

17    circumstances leading to the 1977 amendment to California's marriage law.

18    *Rule 30(b)(6) Depositions*:  The LGBT Community Organizations do not presently believe

19    that they would notice 30(b)(6) depositions on this issue.

20         **4.        Effect Of Proposition 8 Upon Plaintiffs, The LGBT Community
                       Organizations' Members, And Similarly Situated Individuals**

21

22              **a.        The Differences In Actual Practice Of Registered Domestic
                            Partnerships, Civil Unions And Marriage, Including Whether
                            Married Persons Are Treated Differently From Domestic Partners**

23                          **In Governmental And Non-Governmental Contexts.**

24    <u>Nature Of Anticipated Dispute</u>:  A significant dispute exists between the parties regarding

25    what the practical differences are in the recognition of domestic partnerships and marriage, and the

26    nature of those differences go to the core of the equal protection and due process claims in this case.

27    The LGBT Community Organizations would adduce evidence of the practical harms faced by same-

28    sex couples who are relegated to registering as California domestic partners because the registered

20

domestic partnership status is not widely understood and is not given the same respect and status as marriage.  The LGBT Community Organizations expect that much of this testimony would be contested and that such disputes would need to be resolved at trial.

Discovery And Evidence:

*Expert Witness Testimony*. The LGBT Community Organizations would adduce evidence that the state's maintenance of two separate statuses for committed adult relationships, one for same-sex couples and another for different-sex couples, encourages Californians to treat same-sex couples differently from and less well than married heterosexual couples.  The LGBT Community Organizations would present expert testimony in support of this point, which might include testimony by Gregory Herek, with whom, as previously noted, counsel for the LGBT Community Organizations have worked in the past, regarding how the existence of two different and unequal relationship-protection systems causes stigma and related harms for same-sex couples.  The LGBT Community Organizations might also present expert testimony by Randall Kennedy, Professor of Law at Harvard Law School regarding how restrictions on marriage were used to enforce second-class status for African Americans during and after slavery, and/or expert testimony from a family law expert who specializes in providing legal representation and advice to same-sex couples in California regarding the practical problems and harms faced by same-sex couples due to the differences between domestic partnership and marriage.

The LGBT Community Organizations might also present expert testimony that allowing same-sex couples to marry alleviates these harms.  For example, according to data compiled by the Commonwealth of Massachusetts, legally married same-sex couples in that state are more likely to have health insurance than non-married couples, and marriage equality appears to be helping to improve the health of lesbian, gay, and bisexual people compared to heterosexuals.  (*See* http://www.mass.gov/Eeohhs2/docs/dph/commissioner/lgbt_health_report.pdf .)

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations anticipate that lay witnesses, including from members of Our Family Coalition, Lavender Seniors and PFLAG, would testify about

21

the harms they have suffered from being relegated to registering as California domestic partners. This testimony likely would include descriptions of denial of access to hospital rooms for visitation, denial of equal treatment by insurance companies and other businesses, denial of employee benefits, denial of social and family support including for children, and other refusals to recognize and respect same-sex couples' non-marital relationships.

*Documentary Evidence*:  The LGBT Community Organizations anticipate that documentary support would include reports from legislative commissions in Vermont and New Jersey that studied whether civil unions were an adequate substitute for marriage.

*Interrogatories and Requests to Admit:* The LGBT Community Organizations might serve interrogatories and requests to admit on the opposing parties regarding the differences between domestic partnership and marriage.

*Rule 30(b)(6) Depositions*: The LGBT Community Organizations might notice 30(b)(6) depositions of the opposing parties regarding those parties' position on the differences between domestic partnership and marriage.

### b.     Whether The Availability Of Different-Sex Marriage Is A Meaningful Option For Lesbians And Gay Men.

Nature Of Anticipated Dispute:  The Proponent-Intervenors contend that this issue is irrelevant to the legal claims in the case, but also note that some gay people marry a person of a different sex.  (Proponent-Ints.' Init. Stmnt. at 19.)  Plaintiffs agree that this issue is not dispositive but also note that they will present evidence on this issue.  The LGBT Community Organizations submit that, while some lesbians and gay men may marry individuals of a different sex, what it means to be gay or lesbian is to desire to be in a romantic and sexual relationship with someone of the same sex and therefore the availability of different-sex marriage is not a meaningful option for lesbians and gay men just as it would not be a meaningful option for heterosexuals were marriage limited to same-sex couples, and Proposition 8 therefore must be understood as categorically barring lesbian and gay persons from marriage.

Discovery And Evidence:

*Expert Witness Testimony*:  As noted above, the LGBT Community Organizations would seek to present evidence demonstrating that a person's sexual orientation is fixed at an early age and highly resistant to change.  Marriage to someone of a different sex therefore is not a meaningful option for a gay or lesbian person and would not generally be a healthy or stable arrangement.  The Organizations would establish these points with testimony from experts such as psychologist Gregory Herek, on the nature of sexual orientation, and psychologist Letitia Anne Peplau or sociologist Pepper Schwartz, on the nature of couples' relationships, addressing both gay and non-gay individuals and couples.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate presenting lay witness testimony on this issue at this time.

*Documentary Evidence*:  The LGBT Community Organizations might conduct written discovery of Proponent-Intervenors regarding whether the availability of different-sex marriage is a meaningful option for lesbians and gay men.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding whether the availability of different-sex marriage is a meaningful option for lesbians and gay.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on whether the availability of different-sex marriage is a meaningful option for lesbians and gay men.

**5.     Effect of Proposition 8 Upon Opposite-Sex Couples And Others Not In Same-Sex Relationships In California.**

**a.     Whether The Exclusion Of Same-Sex Couples From Marriage Leads To Increased Stability In Different-Sex Couples' Marriages Or Whether Permitting Same-Sex Couples To Marry Destabilizes Different-Sex Couples' Marriages.**

Nature Of Anticipated Dispute:  Some opponents of marriage for same-sex couples argue that laws that exclude same-sex couples from marriage increase stability in different-sex couples'

23

1    marriages.  Plaintiffs and the LGBT Community Organizations believe this assertion is demonstrably

2    false and seek to present evidence to prove that point.

3            Discovery And Evidence:

4            *Expert Witness Testimony*:  The LGBT Community Organizations would present expert

5    testimony discussing the known predictors of marriage stability and showing that there is no basis to

6    conclude that allowing same-sex couples to marry has or would have any impact on heterosexual

7    couples' marriages, including any impact on their stability.  Potential experts might include Letitia

8    Anne Peplau or Pepper Schwartz and Professor M.V. Lee Badgett, all of whom, as noted above, the

9    Organizations' counsel have worked with in other cases involving similar issues.

10           The LGBT Community Organizations additionally would depose any expert witnesses for the

11   opposing parties.

12           *Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they

13   would present lay witness testimony regarding these issues.

14           *Documentary Evidence*:  The LGBT Community Organizations may conduct written

15   discovery of Proponent-Intervenors regarding whether excluding same-sex couples from marriage

16   affects the stability of different-sex marriages.

17           *Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve

18   interrogatories and requests to admit on the opposing parties regarding whether excluding same-sex

19   couples from marriage affects the stability of different-sex marriages.

20           *Rule 30(b)(6) Depositions*:  The LGBT Community Organizations would notice 30(b)(6)

21   depositions of the opposing parties regarding those parties' position on whether excluding same-sex

22   couples from marriage affects the stability of different-sex marriages.

23                   **b.       Whether The Exclusion Of Same-Sex Couples From Marriage
                               Meaningfully Restricts Options Available To Heterosexuals.**

24

25           Nature Of Anticipated Dispute.  It is not clear to the LGBT Community Organizations that

26   there will be a dispute about this issue.  Proponent-Intervenors contend that this issue is irrelevant to

27   the legal claims in the case.  (Proponent-Ints.' Init. Stmt. at 19.)  To the extent that Proponent-

28   Intervenors contest the very concept of sexual orientation (*see id.* at 14), the LGBT Community

Organizations would develop evidence regarding that topic, which would demonstrate that excluding same-sex couples from marriage would not meaningfully restrict options available to heterosexuals.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations would seek to present evidence demonstrating that a person's sexual orientation is fixed at an early age and highly resistant to change.  Preventing heterosexuals from marrying people of the same sex therefore would not be a meaningful restriction for them.  The LGBT Community Organizations would establish these points with testimony from experts such as psychologist Gregory Herek, on the nature of sexual orientation, and psychologist Letitia Anne Peplau or sociologist Pepper Schwartz, on the nature of couples' relationships, addressing both gay and non-gay individuals and couples.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they would present lay witness testimony regarding these issues.

*Documentary Evidence*: The LGBT Community Organizations may conduct written discovery of the Proponent-Intervenors regarding whether excluding same-sex couples from marriage meaningfully restricts options for heterosexuals.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding whether excluding same-sex couples from marriage meaningfully restricts options for heterosexuals.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on whether excluding same-sex couples from marriage meaningfully restricts options for heterosexuals.

### c.   Whether Requiring One Man And One Woman In Marriage Promotes Stereotypical Gender Roles.

Nature Of Anticipated Dispute:  Establishing that requiring one man and one woman in marriage promotes stereotypical gender roles is relevant to proving Plaintiffs' and the LGBT Community Organizations' sex discrimination claim.  The LGBT Community Organizations

25

anticipate that some of these facts, such as the historical change in gender-based legal distinctions in marriage, may be amenable to stipulation or judicial notice.  Establishing other such facts, however, would benefit from expert testimony to show that retaining a gendered definition of who may marry reinforces stereotypical sex roles and subjects gay and lesbian people to discrimination, harassment and misunderstanding, primarily because they are perceived as departing from the gender roles expected of each sex.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations would present expert witnesses on this issue, who might include Professor Nancy F. Cott, who might testify concerning the changing roles of men and women in marriage over time; Professor George Chauncey, who might testify that, historically and to the present, lesbian and gay people have been subjected to discrimination, harassment and misunderstanding because they are perceived as departing from the gender roles expected of each sex; and Gregory Herek or others who might testify concerning social science research that demonstrates a relationship between sex stereotyping and animus against lesbians and gay men.  As noted above, counsel for the LGBT Community Organizations has worked with each of these experts with regard to these issues in depositions and trials in in a number of other cases raising similar issues, including, among others: *Romer*, *Varnum*, *Baehr*, *Howard*, *In re Adoption of Doe*, and *Koller*.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they would present lay witness testimony regarding these issues.

*Documentary Evidence*:  The LGBT Community Organizations may conduct written discovery of Proponent-Intervenors regarding these issues.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve interrogatories and requests to admit on the opposing parties regarding whether requiring one man and one woman in marriage promotes stereotypical gender roles.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations would notice 30(b)(6) depositions of the opposing parties regarding those parties' position on whether requiring one man and one woman in marriage promotes stereotypical gender roles.

### 6.      Other Issues Pertinent To The Parties' Claims Or Defenses

#### a.      Whether A Married Mother And Father Provide The Optimal Child-Rearing Environment And Whether Excluding Same-Sex Couples From Marriage Promotes This Environment.

Nature Of Anticipated Dispute:  One of the primary arguments offered by proponents of measures like Proposition 8 is that marriage should be limited to different-sex couples because married mothers and fathers purportedly provide the optimal child-rearing environment.  The LGBT Community Organizations would offer a range of evidence refuting both the contention that married mothers and fathers are the optimal child-rearing environment and the contention that excluding same-sex couples from marriage furthers the raising of children in such an environment.

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations would present expert testimony as follows:

*Whether excluding same-sex couples from marriage promotes mother/father child-rearing environment.*  The LGBT Community Organizations would put on expert testimony establishing that a large number of lesbian and gay couples are raising children under the age of 18 in California and nationwide.  Lesbian and gay couples create families through procreation and adoption, and also through foster care.  Excluding same-sex couples from marriage does not result in more children being raised by a mother and a father or discourage same-sex couples from having and raising their own children.  The Organizations also would propose to present expert testimony showing that attempting to steer gay people into having and raising children in the context of different-sex couple relationships does not and would not create families that are stable, happy, and otherwise optimal environments for raising children.

*Whether a married mother and father provide the optimal child-rearing environment.*  The LGBT Community Organizations would present expert testimony showing that there is no factual basis for the asserted optimality for children of being raised by a mother and a father.  This evidence

27

would show that mainstream mental health and medical professionals have reached consensus that the factors that predict healthy child development are:

- The quality of the relationship between the parent(s) and child (e.g. nurturing, sensitive, authoritative parenting promotes healthy adjustment);

- The quality of the relationship between the child's parents if there are two parents (a harmonious adult relationships promotes adjustment while parental conflict promotes maladjustment); and

- Adequate resources.

According to the mainstream professional consensus, neither the sex nor the sexual orientation of a parent, nor whether a child is related to a parent through biology or adoption, affects a parent's capacity to be a good parent or a child's healthy development.  Both men and women have equal capacity to be good parents and there is no empirical support for the notion that children need both male and female role models in their homes to adjust well.  Every major national professional association dedicated to children's health and welfare—including the American Psychological Association, the American Academy of Pediatrics, the Academy of Child and Adolescent Psychiatry, the American Psychiatric Association, the American Psychoanalytic Association, the National Association of Social Workers and the Child Welfare League of America, and the North American Council on Adoptable Children—has issued a policy statement confirming that lesbian and gay parents are as effective as heterosexual parents in raising healthy, well-adjusted children and, in the interests of their children as well as themselves, should not face legal discrimination.

The LGBT Community Organizations also would propose expert testimony discussing the scientific research on same-sex couples' relationships, which shows that lesbian and gay couples can and do have stable, committed, harmonious relationships—the kinds of relationships that foster healthy child adjustment.  Finally, the LGBT Community Organizations' proposed evidence would show that children of lesbian and gay couples would benefit if their parents could marry, just as children of heterosexual couples benefit currently.

The LGBT Community Organizations' potential experts, subject to availability, would include Michael Lamb (one of the world's most distinguished experts on children's development and currently head of the department of psychology at Cambridge University in England), and Letitia

28

1   Anne Peplau or Pepper Schwartz, all of whom have worked with the LGBT Community

2   Organizations' counsel in other cases involving similar issues, including *Varnum*, *Baehr*, *Howard*,

3   and/or *Adoption of Doe*.

4          The LGBT Community Organizations additionally would depose any expert witnesses for the

5   opposing parties.

6          *Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they

7   would present lay witness testimony regarding these issues.

8          *Documentary Evidence*:  The LGBT Community Organizations might conduct written

9   discovery of Proponent-Intervenors regarding these issues.

10          *Interrogatories and Requests to Admit*:  The LGBT Community Organizations would serve

11   interrogatories or requests to admit on the opposing parties regarding these issues.

12          *Rule 30(b)(6) Depositions*:  The LGBT Community Organizations might notice 30(b)(6)

13   depositions of the opposing parties regarding these issues.

14              **b.       Whether And How California Has Acted To Promote These
                           Interests In Other Family Law Contexts.**

15

16          <u>Nature Of Anticipated Dispute</u>:  Proponent-Intervenors contend that California policy

17   promotes biological parenting in certain contexts.  (Proponent-Ints.' Init. Stmnt. at 18.)  Plaintiffs

18   contend that California policy is contrary to several justifications advanced for Proposition 8,

19   including the suggestion that same-sex couples provide a less-than-optimal child-rearing

20   environment, have not been subjected to discrimination, or are not fully contributing and equal

21   members of society.  Plaintiffs also contend that California has not enacted legislation that would

22   better and more directly serve some of the purposes articulated in support of Proposition 8, thus

23   demonstrating that Proposition 8 was not driven by the proffered justifications but rather by animus

24   toward lesbians and gay men.  (Pls.' Init. Stmnt. at 15.)  The LGBT Community Groups agree with

25   Plaintiffs about the reality and consequences of California policy in various family law contexts and

26   believe that much of this evidence, although perhaps not all, could be determined through

27   stipulations, judicial notice, and legal briefing.

28

Discovery And Evidence:

*Expert Witness Testimony*:  The LGBT Community Organizations might present expert witness testimony regarding the development and current landscape of California family law and related policies.

The LGBT Community Organizations additionally would depose any expert witnesses for the opposing parties.

*Lay Witness Testimony*:  The LGBT Community Organizations do not anticipate that they would present lay witness testimony regarding these issues.

*Documentary Evidence*:  The LGBT Community Organizations might conduct written discovery of the opposing parties regarding these issues.

*Interrogatories and Requests to Admit*:  The LGBT Community Organizations might serve interrogatories or requests to admit on the opposing parties regarding these issues.

*Rule 30(b)(6) Depositions*:  The LGBT Community Organizations might notice 30(b)(6) depositions of the opposing parties regarding these issues.

**D.     Subject Matter (By Discipline Or Expertise) Of The Opinion/Expert Evidence That The Parties Intend To Present.**

Set out below is a summary of the expert witness evidence that the LGBT Community Organizations would present:

      1.     Economists/Demographers:

- M.V. Lee Badgett of the Williams Institute at UCLA School of Law and the University of Massachusetts, regarding current and historical discrimination against lesbians and gay men.

- Michael J. Rosenfeld, Associate Professor of Sociology at Stanford University, concerning the demographics of marriage and the family and their evolution over time.

      2.     Educators:

- Individuals who work in or oversee the California public schools, such as superintendents, principals, or educational advocates, regarding how the subjects of marriage and other family relationships are actually taught, if at all, in the state's public schools.

      3.     Historians:

- George Chauncy, Professor of History at Yale University, regarding the history of discrimination against lesbians and gay men.

30

- Nancy F. Cott, Jonathan Trumbull Professor of American History at Harvard University, regarding the historical evolution of marriage and its current rules and social meaning.

- William Eskridge, Professor of Law at Yale Law School, regarding current and historical discrimination against lesbians and gay men.

- Randall Kennedy, Professor of Law at Harvard Law School, regarding how exclusion from marriage was used to enforce second-class status for African Americans during and after slavery.

        4.     <u>Political Scientists:</u>

- Justin H. Phillips, Assistant Professor of Political Science, Columbia University, regarding the relative political power of lesbians and gay men.

- Kenneth Sherrill, Professor of Political Science, Hunter College, CUNY, regarding the relative political power of lesbians and gay men.

        5.     <u>Psychologists/Sociologists:</u>

- Gregory Herek, Professor of Psychology at the University of California at Davis, regarding the nature of sexual orientation, stigma faced by lesbians and gay men, the significance of the state having two systems for relationship recognition, and the relationship between sex role stereotyping and animus against lesbians and gay men..

- Michael Lamb, head of the department of psychology at Cambridge University in England and former head of the Section on Social and Emotional Development at the U.S. National Institute of Child Health and Human Development (NICHD) within the National Institutes of Health (NIH), regarding child development and children raised by lesbian and gay parents.

- Letitia Anne Peplau, Professor of Psychology at UCLA, regarding the nature of couple relationships, including both same-sex and different-sex couple relationships.

- Caitlin Ryan, Director of Adolescent Health Initiatives at the Cesar E. Chavez Institute, at San Francisco State University, regarding the harms caused by attempts to change a person's sexual orientation.

- Pepper Schwartz, Professor of Sociology at the University of Washington in Seattle, regarding the nature of couple relationships, including both same-sex and different-sex couple relationships.

31

**IV.    STATEMENTS ADDITIONALLY REQUIRED BY L-R 16-9.**

The LGBT Community Organizations cannot speak to certain aspects of the below categories that would require knowledge of parties' plans, as they are not themselves yet parties and have not met and conferred with the existing parties.  The Organizations have indicated, however, how they would address the enumerated categories of Local Rule 16-9, in the event that their motion to intervene is granted.

1.    <u>Jurisdiction and Service</u>:  The Court has jurisdiction over all the LGBT Community Organizations' claims pursuant to 28 U.S.C. § 1331.  If their motion to intervene is granted, the Organizations promptly will file their proposed complaint (attached as Exh. A to the Declaration of Elizabeth Gill in Support of the Motion to Intervene (Jul. 7, 2009)) and serve it on Defendants and Proponent-Intervenors.

2.    <u>Facts</u>:  The facts that the LGBT Community Organizations believe are in dispute are described in Section III hereof, above.

3.    <u>Legal Issues</u>:  The law that the LGBT Community Organizations believe applies in this case is described in Section II hereof, above.

4.    <u>Motions</u>:  The LGBT Community Organizations anticipate that they will file a motion for partial summary judgment, following the close of discovery.

5.    <u>Amendment of Pleadings</u>: The LGBT Community Organizations do not currently anticipate any amendment to their proposed Complaint.

6.    <u>Evidence Preservation</u>:  If their motion to intervene is granted, the LGBT Community Organizations will promptly take any steps necessary to preserve evidence relevant to the issues reasonably evident in this action.

7.    <u>Disclosures</u>:  If their motion to intervene is granted, the LGBT Community Organizations will promptly comply with the initial disclosure requirements of FRCP 26(a)(1)(A).

8.    <u>Discovery</u>: The LGBT Community Organizations have not met and conferred with the parties, so they cannot definitively speak to the scope of anticipated discovery, specific proposed limitations or modifications of the discovery rules, or the proposed discovery plans pursuant to Fed.

R. Civ. P. 26(f).  The Organizations believe that some limitation and modification of the discovery rules will be required in this case, including expanding the number of interrogatories and depositions.

9.　　Class Actions:  The LGBT Community Organizations' complaint is not a class action.

10.　　Related Cases:  The LGBT Community Organizations do not know of any related cases or proceedings.

11.　　Relief:  The LGBT Community Organizations seek declaratory and injunctive relief.

12.　　Settlement and ADR:  The LGBT Community Organizations do not believe that it will be possible to settle this case.

13.　　Consent to Magistrate Judge For All Purposes:  The LGBT Community Organizations would not consent to referral to a Magistrate Judge.

14.　　Other References: The LGBT Community Organizations do not believe that this case is suitable for referral to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

15.　　Narrowing of Issues:  The LGBT Community Organizations are prepared and would be happy to meet and confer with the parties to determine whether there are issues in the case that can be narrowed by agreement or by motion and whether they can agree to ways to expedite the presentation of evidence at trial (e.g., through stipulated facts).  The LGBT Community Organizations do not seek to bifurcate issues, claims, or defenses.

16.　　Expedited Schedule:  The LGBT Community Organizations believe that the case is amenable to certain expedited procedures, such as referral to a discovery referee, limited response time to written discovery, and direct examination of expert witnesses by declaration.

17.　　Scheduling:  The LGBT Community Organizations have not met and conferred with the parties and they therefore do not yet know what evidence the other parties are planning to present. Without more complete information, the LGBT Community Organizations cannot presently propose specific dates for the designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference, and trial.  Having reviewed the dates proposed by Plaintiffs and Proponent-Intervenors in their Initial Case Management Statements, however, the LGBT Community Organizations believe that a schedule, including a trial, that falls somewhere between those proposals would likely be

1  optimal.  (Plaintiffs propose a schedule that anticipates discovery, dispositive motions, and trial being

2  completed by December 2009; Defendants-Intervenors propose a schedule that does not contemplate

3  a trial, but sets briefing for dispositive motions in July 2010.)

4        The LGBT Community Organizations agree with Plaintiffs that discovery should precede

5  dispositive motions, which should precede trial.  In addition, however, the LGBT Community

6  Organizations submit that a great deal of the case will consist of expert discovery and therefore

7  recommend advancing the expert discovery process and allocating considerably more of the

8  discovery period to that portion of the case preparation.  Expert discovery nonetheless should follow

9  basic written discovery in the initial time period, or else all parties' expert reports may need to be

10  amended before expert depositions can be taken and rebuttal expert discovery can be conducted,

11  which would be less efficient.

12        In considering what period would be appropriate for discovery in this case, the LGBT

13  Community Organizations urge the Court and the parties to ensure sufficient time for full

14  development of the expert witness portion of this case.  Plaintiffs have identified expert witnesses

15  covering at least 14 areas, Proponents-Intervenors have said they will present competing experts on

16  most of those topics, and the LGBT Community Organizations, if allowed to intervene, would seek to

17  present expert witnesses as well (although they expect that they would coordinate with Plaintiffs and

18  agree on one set of experts to present to the Court together).  In setting any discovery schedule, it

19  should be kept in mind that many of these experts may have scheduling conflicts and that it will be

20  important for all parties to be able to review the extensive prior writings of the experts presented by

21  both sides and what may be lengthy reports from them.

22        The LGBT Community Organizations further submit for the Court's and parties' information

23  that trials in prior cases that covered many of the same issues identified in the Court's June 30, 2009

24  Order were accomplished after discovery periods somewhere between those proposed by Plaintiffs

25  and Proponents-Intervenors. For example, in *Varnum*, in which the parties had identified fewer

26  contested issues than the Court has identified in this case, the parties exchanged paper discovery in a

27  standard manner and then conducted 18 expert witness depositions over a 67 day period in Iowa,

28

1   Northern and Southern California, Connecticut, Illinois, Massachusetts, Utah, Virginia, Washington,

2   Canada and the United Kingdom.

3        18.    Trial:  This case would be tried to the Court.  The Community Organizations

4   anticipate that trial would take approximately three weeks.

5        19.    Disclosure of Non-party Interested Entities or Persons:  If their motion to intervene is

6   granted, the LGBT Community Organizations will promptly comply with the "Certification of

7   Interested Entities or Persons" requirement of Civil Local Rule 3-16.  The Organizations have no

8   persons, firms, partnerships, corporations (including parent corporations) or other known entities to

9   disclose pursuant to the Rule.

10

11  Dated:  August 14, 2009             ALAN L. SCHLOSSER
                                        ELIZABETH O. GILL
12                                      ACLU Foundation of Northern California

13                                      JON W. DAVIDSON
                                        JENNIFER C. PIZER
14                                      TARA BORELLI
                                        Lambda Legal Defense and Education Fund, Inc.
15
                                        SHANNON P. MINTER
16                                      CHRISTOPHER F. STOLL
                                        ILONA M. TURNER
17                                      National Center for Lesbian Rights

18                                      MARK ROSENBAUM
                                        LORI RIFKIN
19                                      ACLU Foundation of Southern California

20                                      DAVID BLAIR-LOY
                                        ACLU Foundation of San Diego and Imperial Counties
21
                                        MATTHEW A. COLES
22                                      JAMES D. ESSEKS
                                        LGBT & AIDS Project
23                                      American Civil Liberties Union Foundation

24
                                        By:        /s/
25                                             ELIZABETH O. GILL

26                                      Attorneys for Proposed Plaintiff-Intervenors Our Family
                                        Coalition; Lavender Seniors of the East Bay; and
27                                      Parents, Families, and Friends of Lesbians and Gays

28

                                        35