Volume 1

                                              Pages 1 – 70

                    UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE VAUGHN R. WALKER, JUDGE

KRISTIN PERRY, ET AL.,            )
                                  )
            Plaintiffs,           )
                                  )
  VS.                             ) NO. C 09–2292 VRW
                                  )
ARNOLD SCHWARZENEGGER, ET AL.,    )
                                  )  San Francisco, California
            Defendants.           )  Wednesday
                                  )  August 19, 2009
_____)  10:02 a.m.


                  TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:        Gibson, Dunn & Crutcher
                       333 South Grand Avenue
                       Los Angeles, California  90071–3197
                BY:    CHRISTOPHER D. DUSSEAULT, ESQ.
                       THEANE E. KAPUR, ESQ.
                       THEODORE J. BOUTROUS, JR., ESQ.
                       and
                       Gibson, Dunn & Crutcher
                       555 Mission Street
                       Suite 3000
                       San Francisco, California  94105–2933
                BY:    ENRIQUE A. MONAGAS, ESQ.
                       and
                       Gibson, Dunn & Crutcher
                       1050 Connecticut Avenue, N.W.
                       Washington, D.C.  20036–5306
                BY:    THEODORE B. OLSON, ESQ.
                       MATTHEW D. MCGILL, ESQ.

Reported By:      Belle Ball, CSR 8785, RMR, CRR
                  Official Reporter, U.S. District Court

(Appearances continued, next page)

APPEARANCES, CONTINUED:

Also For Plaintiffs:     BOIES, SCHILLER & FLEXNER
                         333 Main Street
                         Armonk, New York  10504
                    BY:  DAVID BOIES, ESQ.
                         JEREMY M. GOLDMAN, ESQ.
                         THEODORE H. UNO, ESQ.


For Defendants Schwarzenegger, Scott and Horton:
                         Mennemeier, Glassman & Stroud
                         980 9th Street
                         Suite 1700
                         Sacramento, California  95814
                    BY:  KENNETH C. MENNEMEIER, ESQ.


For Defendant Attorney General Edmund G. Brown, Jr.:
                         California Department of Justice
                         Office of the Attorney General
                         1300 I Street
                         17th Floor
                         SACRAMENTO, CALIFORNIA  95814
                    BY:  GORDON B. BURNS
                         Deputy Solicitor General
                         and
                         California Department of Justice
                         455 Golden Gate Avenue
                         Suite 11000
                         San Francisco, California  94102
                    BY:  TAMAR PACHTER, ESQ.


For Defendant Logan:
                         Office of the County Counsel
                         County of Los Angeles
                         500 West Temple Street
                         Room 652
                         Los Angeles, California  90012
                    BY:  JUDY W. WHITEHURST
                         Principal Deputy County Counsel


(Appearances continued, next page)

```
APPEARANCES, CONTINUED:

For Defendant Patrick O'Connell:
                         Office of County Counsel
                         County of Alameda
                         1221 Oak Street
                         Suite 450
                         Oakland, California  94612
                  BY:    CLAUDE F. KOLM
                         LINDSEY STERN
                         Deputy County Counsel


For Proposed Intervenor Plaintiffs Our Family Coalition,
Lavender Seniors of East Bay, and PFLAG:
                         American Civil Liberties
                             Union Foundation
                         125 Broad Street
                         18th Floor
                         New York City, New York  10004-2400
                  BY:    JAMES D. ESSEKS, ESQ.
                         and
                         American Civil Liberties Union
                             Foundation of Northern California
                         39 Drumm Street
                         San Francisco, California  94111
                  BY:    ELIZABETH GILL, ESQ.
                         and
                         Lambda Legal
                         3325 Wilshire Boulevard
                         Suite 1300
                         Los Angeles, California  90010
                  BY:    JENNIFER C. PIZER, ESQ.
                         and
                         National Center for Lesbian Rights
                         870 Market Street
                         Suite 370
                         San Francisco, California 94102
                  BY:    SHANNON PRICE MINTER, ESQ.
                         CHRISTOPHER STOLL, ESQ.




(Appearances continued, next page)
```

**APPEARANCES, CONTINUED:**

**For Proposed Intervenor Defendant Campaign for California Families:**
Liberty Counsel
Post Office Box 11108
Lynchburg, Virginia  24506
BY:  RENA M. LINDEVALDSEN, ESQ.


**For Intervenor Defendants:**
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
BY:  CHARLES J. COOPER, ESQ.
DAVID H. THOMPSON, ESQ.


**For Intervenor Defendants:**
Alliance Defense Fund
15100 North 90th Street
Scottsdale, Arizona 85260
BY:  BRIAN W. RAUM, ESQ.
JAMES A. CAMPBELL, ESQ.


**For City and County of San Francisco:**
City and County of San Francisco
Office of the City Attorney
1390 Market Street
Seventh Floor
San Francisco, California 94102
BY:  THERESE STEWART, ESQ.
ERIN BERNSTEIN, ESQ.
CHRISTINE VAN AKEN, ESQ.
DENNIS HERRERA, ESQ.


**Reported By:**      Belle Ball, CSR 8785, RMR, CRR
Official Reporter, U.S. District Court

PROCEEDINGS

```
 1  WEDNESDAY, AUGUST 19, 2009

 2                                              10:02 A.M.

 3                  P R O C E E D I N G S

 4          THE CLERK:  Calling Civil Case 09-2292, Christine

 5  Perry, et al. versus Arnold Schwarzenegger, et al.

 6          Appearances on the Plaintiffs' side, please.

 7          MR. OLSON:  Good morning, Your Honor.  Theodore B.

 8  Olson, Gibson, Dunn & Crutcher, on behalf of the Plaintiffs.

 9          THE COURT:  Good morning, Mr. Olson.

10          MR. BOIES:  Good morning, Your Honor.  David Boies of

11  Boies, Schiller & Flexner, on behalf of Plaintiffs.

12          THE COURT:  Mr. Boies, good morning.

13          MR. BOUTROUS:  Theodore J. Boutrous, Jr., for the

14  Plaintiffs.  Good morning, Your Honor.

15          THE COURT:  Mr. Boutrous, good morning.

16          MS. KAPUR:  Good morning.  Theane Kapur for the

17  Plaintiff.

18          MR. MONAGAS:  Good morning, Your Honor.  Enrique

19  Monagas for the Plaintiffs.

20          THE COURT:  Good morning.

21          MR. GOLDMAN:  Good morning, Your Honor.  Jeremy

22  Goldman  of Boies, Schiller & Flexner, for the Plaintiffs.

23          MR. UNO:  Good morning, Your Honor.  Theodore Uno,

24  Boies, Schiller & Flexner, for the Plaintiffs.

25          MR. McGILL:  Good morning, Your Honor.  Matthew
```

PROCEEDINGS

1   McGill, Gibson, Dunn & Crutcher, for the Plaintiffs.

2           **THE COURT:**  Good morning.

3           **MR. DUSSEAULT:**  Good morning, Your Honor.

4   Christopher Dusseault, also of Gibson, Dunn & Crutcher, for the

5   Plaintiffs.

6           **THE COURT:**  Good morning.  Any more on the

7   Plaintiffs' side?  Very well.

8           How about the other side?

9           **MR. MENNEMEIER:**  Good morning, Your Honor.  Ken

10  Mennemeier on behalf of Governor Schwarzenegger and two members

11  of his administration.

12          **THE COURT:**  Good morning, Mr. Mennemeier.

13          **MR. MENNEMEIER:**  Thank you.

14          **MS. LINDEVALDSEN:**  Rena Lindevaldsen, Proposed

15  Intervenor Defendant, Campaign for California Families.

16          **THE COURT:**  Good morning.

17          **MS. PACHTER:**  Good morning, Your Honor.  Deputy

18  Attorney General Tamar Pachter, for the Attorney General.

19          **THE COURT:**  Good morning.

20          **MR. BURNS:**  Good morning.  Deputy Solicitor Gordon

21  Burns for the Attorney General.

22          **THE COURT:**  Good morning.

23          **MS. WHITEHURST:**  Good morning, Your Honor.  Judy

24  Whitehurst with the Los Angeles County Counsel's office, on

25  behalf of Dean C. Logan.

PROCEEDINGS

```
1              THE COURT:  Good morning.

2              MR. KOLM:  Good morning, Your Honor.  Claude Kolm,

3  Alameda County Counsel's Office, on behalf of Defendant Patrick

4  O'Connell, the Alameda County Clerk Recorder.

5              THE COURT:  Good morning.

6              MS. STERN:  Good morning, Your Honor.  Lindsey Stern,

7  Alameda County Counsel's Office, on behalf of Defendant Patrick

8  O'Connell.

9              MR. ESSEKS:  Good morning, Your Honor.  James Esseks

10 from the American Civil Liberties Union, on behalf of Proposed

11 Plaintiff Intervenors Our Family Coalition, Lavender Seniors of

12 East Bay, and PFLAG.

13             THE COURT:  I'm sorry.

14             MR. ESSEKS:  And PFLAG.

15             THE COURT:  Yes, all right.

16             MR. ESSEKS:  Thank Your Honor.

17             MS. PIZER:  Good morning, Your Honor.  Jennifer

18 Pizer, Lambda Legal Defense and Education Fund, also for the

19 Proposed Plaintiff Intervenors, Our Family Coalition,

20 et cetera.

21             THE COURT:  Good morning.

22             MR. MINTER:  Good morning.  Shannon Minter, National

23 Center for Lesbian Rights, also on behalf of Proposed

24 Intervenor Plaintiffs.

25             THE COURT:  Good morning.
```

PROCEEDINGS

1          **MS. STEWART:**  Good morning, Chief Judge Walker.
2  Terry Stewart and City Attorney Dennis Herrera, Erin Bernstein,
3  and Christine Van Aken on behalf of the City and County of
4  San Francisco.
5          **THE COURT:**  Very well.  Good morning.
6          **MR. COOPER:**  Good morning, Mr. Chief Judge.  Charles
7  Cooper of Cooper & Kirk, for the Defendant Intervenors.
8          **THE COURT:**  Good morning, Mr. Cooper.
9          **MR. THOMPSON:**  Good morning, Your Honor.  David
10  Thompson from Cooper & Kirk, for the Defendant Intervenors.
11          **MR. RAUM:**  Good morning, Your Honor.  Brian Raum for
12  Defendant Intervenor.
13          **THE COURT:**  Good morning.
14          **MR. CAMPBELL:**  Good morning, Your Honor.  Jim
15  Campbell from -- I'm sorry, on behalf of the Proposed
16  Plaintiffs Intervenors -- or, I'm sorry, the Prop 8 proponent.
17          **THE COURT:**  All right.  Any other appearances?  All
18  right, that's quite a lineup.
19          Now, we have basically, I think, two things to do
20  this morning.  We have the motions to intervene which need to
21  be addressed, and I think we should probably take up those
22  issues first.  And then after we address the motions to
23  intervene, I want to talk to Counsel about case management.
24  But because the case management issues may depend upon who's in
25  the case and who's not in the case, and exactly what role

PROCEEDINGS

1  various parties have, I think we should take up the motions to

2  intervene first.

3          My inclination is to hear the motions to intervene by

4  the Our Family Coalition and the Campaign for California

5  Families first.  And then because I think there are somewhat

6  different issues raised by the City and County of

7  San Francisco, to take up that motion.

8          So, that would be the agenda that I would set for

9  this morning.  Do counsel have any alternatives that he or she

10  would like to propose?

11          **MR. OLSON:**  (Shakes head)

12          **THE COURT:**  All right.  Let's proceed, then.  Who

13  would like to lead off for the Our Family Coalition?

14          **MR. ESSEKS:**  Your Honor --

15          **THE COURT:**  Let's see, you are Mister --

16          **MR. ESSEKS:**  Esseks.

17          **THE COURT:**  Esseks.

18          **MR. ESSEKS:**  Yes, Your Honor.  I'm James Esseks from

19  the ACLU.  Together with my colleagues at Lambda Legal and the

20  National Center for Lesbian Rights, we represent three LGBT

21  community organizations, Your Honor, that wish to intervene in

22  the lawsuit.

23          Those organizations are Our Family Coalition, which

24  is an organization that consists of families headed by same-sex

25  couples and LGBT individuals; Lavender Seniors of the East Bay,

PROCEEDINGS

1   which is an organization that is made up of LGBT seniors; and

2   PFLAG, Parents, Friends and Families of Lesbians and Gays,

3   which is an organization that consists both of the LGBT

4   individuals and people who are their family and their

5   supporters.

6           Your Honor, these three community organizations move

7   to intervene here for three reasons.  First off, the rights of

8   these organizations' members will be significantly affected by

9   the rulings of this Court.

10          Second, these organizations want to join the lawsuit

11  in order to help illustrate the various different harms that

12  Proposition 8 inflicts on same-sex couples throughout

13  California.

14          And third, these organizations seek to intervene,

15  Your Honor, because through their counsel, they bring expertise

16  and -- a deep understanding of the issues and expertise in

17  putting together the kind of factual record that the Court has

18  indicated it is interested in developing in this case.

19          Given the liberal standards for intervention in the

20  Ninth Circuit, Your Honor, we believe that these three

21  organizations should be allowed to intervene.  Either under

22  intervention as of right, or intervention with the Court's

23  permission.

24          **THE COURT:**  Well, tell me what the significant

25  protectable interest of these organizations is.

PROCEEDINGS                                                11

1           **MR. ESSEKS:**  Your Honor, the significant protectable

2    interests would be the interests of the organization's members.

3    That is, each is these organizations has among its members

4    same-sex couples who live in California who would like to

5    marry.  And Proposition 8 obviously makes that impossible at

6    the moment.

7           **THE COURT:**  But isn't that interest represented by

8    the Plaintiffs?

9           **MR. ESSEKS:**  That is an interest that is represented

10   by the Plaintiffs, Your Honor.  But in terms of getting to the

11   adequacy-of-representation prong of the

12   intervention-as-of-right analysis, they are -- first off, we do

13   share the same ultimate objective with the Plaintiffs.  That

14   is, the objective of striking down Proposition 8.

15           That raises a presumption that indeed, the Plaintiffs

16   will adequately represent the interests of our clients, the

17   community organizations and their members.  However, that

18   presumption is easily rebutted if the interests of our

19   organizations and the interests of the Plaintiffs' may diverge.

20   And they may diverge in multiple ways, Your Honor.

21           First off, the community organizations, through their

22   members, have experienced a range of harms from Proposition 8

23   that the two Plaintiffs -- and quite frankly, Your Honor, any

24   two couples -- cannot have experienced.

25           **THE COURT:**  Well, as a practical matter, it is not

PROCEEDINGS

1  going to be possible to bring in every individual, with his or

2  her background, his or her socioeconomic status, views on these

3  issues.  So, it's simply going to be impossible to represent

4  the entire mosaic of the backgrounds of the individuals who

5  wish to marry but are precluded from doing so by Proposition 8.

6            So, really, what does adding your group or groups to

7  this lawsuit bring that is not otherwise presented by the

8  Plaintiffs?

9            MR. ESSEKS:  Your Honor, the -- the variety of

10  interests that the members of the community organizations can

11  present to the Court are directly relevant to legal questions

12  that this Court is going to have to grapple with.

13            For example, one of the questions the Court is going

14  to have to deal with is whether the registered domestic

15  partnership system that California has set up is an adequate

16  substitute for marriage or not.  It goes to the core issue of

17  whether there is inequality here, and the degree of that

18  inequality.

19            THE COURT:  Is that a legal question?  Or a factual

20  question?

21            MR. ESSEKS:  I think it's both, Your Honor.  But

22  certainly, the facts that the community organizations can bring

23  to the Court to show the full range of harms inflicted by on

24  same-sex couples by Proposition 8, and how those harms are not

25  remediated by access to the domestic partnership system can

PROCEEDINGS

1   help this Court grapple with the degree and the nature of the

2   inequality that is prepared by Proposition 8.

3           So, for example, members of the community

4   organizations have lived for a number of years with domestic

5   partnership registries.  And they have experienced how, in very

6   concrete terms, that registry and that registration has not

7   solved the problems that we expect the proponents to say they

8   have solved.

9           For example, situations where, for example, older

10  LGBT couples --

11          **THE COURT:**  Well, but does -- is it necessary for

12  your organizations to enter as parties in the litigation, for

13  that evidence to be presented?

14          **MR. ESSEKS:**  Well, Your Honor, certainly we would be

15  hard-pressed to present that evidence ourselves if we were

16  solely appearing before the Court amicus.  It is possible, Your

17  Honor, that the Plaintiffs could present similar evidence.

18          But, we don't have to show, in terms of the

19  adequacy-of-representation prong of the

20  intervention-as-of-right test, that they won't represent our

21  interests.  We simply need to show that the interests may

22  diverge.

23          And these organizations, with their members, are very

24  well-suited to bring to the Court and present the wide range of

25  harms, and with very specific concrete detail, in a way that

PROCEEDINGS

1   will give the Court a better ability to grapple with the

2   factual issues and the legal issues that the Court has to

3   decide in the course of putting together the case.

4           A second example, Your Honor, of how the -- the

5   myriad experiences of the members of our community

6   organizations are relevant to legal issues is in the -- one of

7   the in-process claims that is in both the Plaintiffs' complaint

8   and the complaint that the community organizations would file.

9   One.

10          Of those due-process claims, Your Honor, is based on

11  not only the right to marry, but --

12          **THE COURT:**  Not on what?

13          **MR. ESSEKS:**  Not on the right to marry, but on the

14  right to form intimate relationships, which is a right

15  protected by the U.S. Supreme Court decision in *Lawrence versus*

16  *Texas*.

17          In the Ninth Circuit's decision in *Witt versus*

18  *Department of the Air Force*, Your Honor, which is a case about

19  the don't ask, don't tell restriction on gay people in the

20  military, the Ninth Circuit said that if a law intrudes upon

21  the rights protected by the Supreme Court's decision in

22  *Lawrence versus Texas*, that then this Court's job is to do a

23  balancing act, to weigh two different competing interests.  On

24  the one hand, the interests of the government that undergird

25  the law at question -- in that case it was don't ask, don't

PROCEEDINGS

1    tell; in this case, obviously, it would be Proposition 8 -- and

2    to weigh thoughts interests against the interests of the

3    individuals whose rights are compromised by that law.

4          And Your Honor, we submit that for this Court to

5    adequately do that balancing, it needs to have or it would be

6    helpful for it to have before it the full range of facts that

7    our clients can provide about all the different ways in which

8    Proposition 8 hurts those individuals.

9          And while it is possible, as I said earlier, that the

10   Plaintiffs could present at least some of that evidence, our --

11         **THE COURT:**  No, you're not presenting actual

12   plaintiffs who have personal experience, and are able to

13   present evidence based upon that personal experience.  You --

14   you're a group of organizations.  And whatever rights your

15   organizations have are derivative of your members.

16         **MR. ESSEKS:**  Indeed.

17         **THE COURT:**  Whereas the Plaintiffs, of course, are

18   directly affected by the law that is at issue here.

19         **MR. ESSEKS:**  That's correct, Your Honor.  But it's

20   clear that organizations can bring claims on behalf of their

21   members.

22         And one of the advantages -- and I think it's an

23   advantages that the U.S. Supreme Court has identified of using

24   organizations as plaintiffs, is -- that these organizations who

25   have -- it's not a random collection of individuals.  It's

PROCEEDINGS

1  people who have come together, for the express purpose of

2  protecting certain rights and advancing certain agendas.

3         And so, these are organizations that collectively

4  have the best interests of the community at heart, and can, you

5  know, bring easily together a full range of the harms that are

6  inflicted by Proposition 8.

7         **THE COURT:**  So, basically what you're saying is that

8  the factual record would be richer if your organizations were

9  made parties to the litigation, as opposed to simply

10  participating as amici.

11        **MR. ESSEKS:**  Your Honor, I think that is -- that is

12  absolutely correct, that is part of our argument.  There.

13        Is a second way, Your Honor, in which the interests

14  of the proposed community organization intervenors may diverge

15  from the interests of the Plaintiffs.  And that is that the

16  Plaintiffs, obviously, are interested in this case because it's

17  about marriage.  And the community organizations are also

18  interested in this case because of the core issues about

19  marriage, and access to marriage for same-sex couples that the

20  case will raise.

21        In the course of deciding the issues in this

22  litigation, Your Honor, the Court will make rulings and factual

23  findings that affect not just the question of whether

24  restrictions on the right to marry for gay people violate the

25  Constitution, but will also be relevant to other issues in gay

PROCEEDINGS

1   rights litigation and gay rights law.  And these are issues

2   that are directly relevant and of great concern to the

3   community organizations, in a range of issues outside of

4   marriage.

5           And there is a concern, Your Honor, that the

6   arguments by the Plaintiffs may be pitched solely in terms of

7   the right to marry, and without considering other issues that

8   may affect other parts of LGBT rights law.

9           **THE COURT:**  Very well.  Thank you very much,

10  Mr. Esseks.

11          And, let's hear from the Campaign for California

12  Families.  Is that Ms. --

13          **MS. LINDEVALDSEN:**  Lindevaldsen, yes.

14          **THE COURT:**  Yes, Lindevaldsen.  Good morning.

15          **MS. LINDEVALDSEN:**  Good morning, Your Honor.  Rena

16  Lindevaldsen.

17          The case management statement filed by the

18  Proposition 8 Defendants makes very clear -- the one that was

19  just filed on August 17th -- why it is the Campaign's motion

20  should be grated, to intervene in this case.

21          In light of the stipulations that the Proposition 8

22  Defendants have indicated they're willing to agree in whole to,

23  or in part, it is very clear that the interests of the

24  Campaign, and in fact, those who voted to protect marriages

25  between a man and a woman, are inadequately represented in this

PROCEEDINGS

1  litigation.

2          It bears emphasis at the outset that the motion to

3  intervene is to be liberally construed in favor of

4  intervention, but --

5          (Reporter interruption)

6          **THE COURT:**  Well, are you saying -- are you saying

7  that your client's interests go beyond those that are

8  represented by the Intervenor Defendants, represented by

9  Mr. Cooper?  Is that what you're saying?

10         **MS. LINDEVALDSEN:**  They include and go beyond those

11  represented by the current Defendants, insofar as the Campaign

12  for California Families has fought for 15 years in this state

13  on behalf of voters to both protect the name of marriage, which

14  is what Proposition 8 does, as well as the substantive rights

15  of marriage and benefits.

16         **THE COURT:**  Okay.  Explain, then, to me where your

17  client's interests go beyond those represented by Mr. Cooper's

18  client.

19         **MS. LINDEVALDSEN:**  Sure.  The interests -- and

20  probably the best way to show this is I've actually gone

21  through the case management statement, and come up with eleven

22  arguments or facts that the Proposition 8 Defendants are

23  willing to stipulate to, in whole or part, that the Campaign,

24  in order to vigorously defend marriage as between a man and a

25  woman, which is what the voters so voted to protect in November

PROCEEDINGS

1   of 2008, they're willing to concede too much of Plaintiffs'

2   case, both with regard to the similarly-situated aspect of the

3   case, and the factors that Plaintiff have to show to be a

4   suspect classification.

5            So, I can point those out to the Court, but with

6   regard to the interests -- and in fact, this is the

7   give-and-take --

8            **THE COURT:**  Well, that would be interesting, if you

9   would do so.

10           **MS. LINDEVALDSEN:**  Sure.  The Campaign --

11           **THE COURT:**  Let me catch up with you, and get the

12  case management statement.

13           **MS. LINDEVALDSEN:**  The August 17th filing, yes.

14           **THE COURT:**  Yes.

15           **MS. LINDEVALDSEN:**  Exhibit B to the case management

16  statement filed by Proposition 8 Defendants has a list of

17  proposed stipulations by the Plaintiffs that the Proposition 8

18  Defendants are willing to agree, in whole or in part.

19           **THE COURT:**  All right.

20           **MS. LINDEVALDSEN:**  And I have gone through those, and

21  can indicate where the Campaign stands ready to make arguments

22  that the Proposition 8 Defendants are not ready to make

23  arguments on, that are necessary to preserve marriage.

24           **THE COURT:**  Okay.  Well, give me have a couple of

25  examples, here.

PROCEEDINGS

```
 1          MS. LINDEVALDSEN:  Sure.  For example, Proposition 8
 2   Defendants -- I'll start with No. 64.
 3          THE COURT:  Okay.  Hold on.
 4          MS. LINDEVALDSEN:  -- are ready -- have agreed --
 5   have agreed in whole that gays and lesbians, including
 6   Plaintiffs, have formed lasting, committed relationships.  And,
 7   the Proposition 8 Defendants stand ready to agree to that one.
 8          Based -- first of all, there's no -- there's no
 9   evidence in the sociological research that's out there that
10   indicates this should be agreed to, in whole.  Perhaps in part.
11   And this goes to the similarly-situated aspect of Plaintiffs'
12   case.
13          No. 19.  Proposition 8 Defendants are willing to
14   agree in whole that with the exception of, quote, "certain
15   matters related to procreation," end quote, sexual orientation
16   bears no relationship on the ability to contribute to society.
17          It does impact more than the ability to procreate.
18   It impacts the ability to raise children, according to
19   sociological research, educate them, and also given high-risk
20   factors of certain pathologies, is going to go to the four
21   factors necessary to show sexual orientations as suspect
22   classification.
23          No. 21, "Same-sex sexual orientation does not result
24   in any impairment of judgment..."  Given the high risk factors
25   that is out there right now in the scientific and psychological
```

1   research, concerning medical, psychological and relationship

2   dysfunctions.  This concedes too much to agree to this in

3   whole.  And this will relate to the suspect classification

4   aspect.

5              One more that they've agreed in whole, Nos. 35 and

6   36, that lesbians and gays are unable to secure hate crimes in

7   federal legislation protecting them in employment, housing,

8   et cetera.

9              While it's true they haven't secured the legislation,

10  it goes too far to agree to this in whole, because there is no

11  evidence to indicate, as the Congressional testimony back and

12  forth has indicated, that they need protecting in this area

13  because there's no evidence of discrimination in this area.

14             Some of the other ones in particular that they

15  indicate they are willing to agree in part go directly to the

16  suspect classifications.

17             No. 14, that gays and lesbians have suffered severe

18  discrimination.  This will go to the history of discrimination.

19  And the Campaign stands ready to make arguments that it appears

20  the Proposition 8 Defendants are not.

21             That discrimination, including hate crimes, exists

22  today, No. 29.  Again, the Campaign is willing to make

23  arguments Proposition 8 is not.

24             "Sexual orientation is the kind of distinguishing

25  characteristic that defines gays and lesbians as a discrete

PROCEEDINGS

1  group."  This practically gives away Factor 2 in the suspect

2  classification.

3          And according to the research, there's no evidence

4  for the Proposition 8 Defendants to agree to this, even in

5  part.

6          **MR. COOPER:**  Forgive me.  I didn't follow --

7          **MS. LINDEVALDSEN:**  Oh, that was No. 28.  I apologize.

8          No. 27, again going to suspect classification, that

9  sexual orientation is fundamental to a person's identity.

10         I have three more.

11         No. 26, "harmful to an individual to attempt to

12  change sexual orientation."  In light of the APA -- the

13  American Psychological Association's task force report that

14  just came out in August of 2009, even that report by the APA

15  indicates that there is no research to show that it's harmful

16  to attempt to change your sexual orientation.

17         And yet, No. 26, the Proposition 8 Defendants are

18  willing to concede to some form of stipulation on this, which

19  gives away part of Plaintiffs' case, that they will have to

20  show that they are entitled to suspect classification.

21         There are two more, Nos. 20 and 59, that are related

22  to this, again, that help to identify for suspect

23  classification.

24         The medical and psychological communities do not

25  consider sexual orientation to be an illness or disorder.

PROCEEDINGS

1  Again, the APA task force report just issued in the beginning

2  of August admits that part of the reason the APA declassified

3  homosexuality as a disorder was based in politics.  The report

4  admits that.

5          And there are major medical organizations today that

6  believe that individuals should be entitled to treatment to

7  change your sexual orientation, that it's not harmful.  And in

8  fact, two past presidents of the APA indicate that individuals

9  should be able to change their sexual orientation.

10          And finally, No. 59, an individual's capacity to

11  raise children does not depend on one's sexual orientation.

12  Proposition 8 Defendants stand ready to stipulate in some form

13  to this, when the sociological and psychological research

14  suggests that it is relevant to raising children.

15          And, the Campaign stands ready to make argument,

16  based on the scientific literature, that Proposition 8

17  Defendants apparently stand ready not to make.

18          Going back again, since one of the factors is the

19  inability -- the -- there are arguments that are likely not to

20  be made by existing parties, I went through those arguments on

21  that factor.

22          Back to the interest just briefly -- and then I'll

23  conclude, Your Honor -- the Campaign's interests includes in

24  part defense of the definition of "marriage."  But the Campaign

25  has a broader interest it's fought for for years that if this

PROCEEDINGS

1  case goes the wrong way, it will not be able to pursue.

2          If the Plaintiffs win this case, the Campaign will

3  not be able to pursue, as it has tried to do for the past 15

4  years, to fully protect the rights of marriage solely for a man

5  and a woman.

6          **THE COURT:**  How so?

7          **MS. LINDEVALDSEN:**  If the Plaintiffs win their case

8  here, and it's declared unconstitutional simply to define

9  "marriage" as one man and one woman, it's going to impair the

10 Campaign's ability to seek an even stronger amendment, as I

11 would characterize it, that preserves the name and the rights

12 of marriage.

13         Not only will the Campaign's interests be impaired if

14 the Plaintiffs win, but the Campaign's interests will be

15 impaired if the Plaintiffs lose, and the Defendants have

16 conceded too much on sexual orientation and suspect

17 classification.

18         This Court is being asked to be the first court in

19 this -- federal court in this nation to declare sexual

20 orientation to be a suspect classification.  Proposition 8's

21 case management statement makes very clear that they do not

22 stand ready to make all of the available arguments based on the

23 available sociological, psychological, and medical research to

24 defend against a classification of sexual orientation as a

25 suspect classification.

PROCEEDINGS

1          The Campaign stands ready do that, and it must be

2    done, in order to preserve marriage in the state of California.

3          **THE COURT:**  Very well.  Well, thank you very much,

4    Ms. Lindevaldsen.

5          Now let's hear from the City and County of

6    San Francisco.  Ms. Stewart?

7          **MS. STEWART:**  Thank you, Your Honor.

8          As the Court's aware, the City has sought

9    intervention under the permissive part of Rule 24, which really

10   is, focuses on a bit of a different inquiry than 24(a).

11         Instead of really being about a movant's right to be

12   at the table, the focus of the Rule 24(b) inquiry really is

13   about whether the moving party will contribute to the

14   development of a factual and legal record, and help assist the

15   Court in arriving at a good and solid legal and factual

16   decision.

17         **THE COURT:**  You make an interesting argument that's a

18   little different from those that we have heard from the Our

19   Family Coalition or the Campaign for California Families.

20         And, that is that the City and County of

21   San Francisco has a governmental interest in the outcome of

22   this litigation that is different from the Plaintiffs, and

23   different from any of the intervenors.

24         Just exactly what is that interest?

25         **MS. STEWART:**  Thank you, Your Honor.  It is a

PROCEEDINGS

1  perspective, number one, that comes from being a city that has

2  one of the highest lesbian and gay populations -- in fact, the

3  highest, I think -- of any city across the nation, and has been

4  long involved in trying to eliminate sexual-orientation

5  discrimination because of its experience with the very real

6  economic and public health costs that come with discrimination

7  against a part of its citizenry.

8          **THE COURT:**  What are you prepared to show in that

9  regard?

10         **MS. STEWART:**  Well, we would put on, in addition to

11 the experts that the Perry Plaintiffs Perry have listed in

12 their case management statement, we would suggest that we might

13 offer the testimony of someone like the controller, who can

14 inform the Court about -- I mean, one of the key issues in the

15 case, as the Court knows, is is there is a legitimate and very

16 real government interest that supports this law.  That's a key

17 issue.

18         And what the controller of our city -- and it might

19 not be from our city, but our experience is that the costs are

20 very high on cities, and in fact, on the state and the federal

21 government.

22         Now the State is here, and there are two other

23 counties.  But those entities have indicated that they don't

24 plan to play an active role in the trial of this case.  And I

25 think we -- we bring, both because our work on these issues

PROCEEDINGS

1   goes quite far back, and in part also because of our work on

2   the marriage cases --

3           **THE COURT:**  Well, if there is a financial impact on

4   the City and County of San Francisco, there should, I would

5   think, be a similar impact on the State of California.

6           **MS. STEWART:**  That's correct, Your Honor.

7           **THE COURT:**  The Governor's represented here, and the

8   Attorney General.  Isn't that sufficient to bring these issues

9   to the fore?

10          **MS. STEWART:**  Well, for two reasons, I don't think it

11  is, Your Honor.  Most significantly, the Governor and the State

12  have indicated they don't intend to play an active role in the

13  litigation.

14          Secondly, the City has been studying these issues for

15  quite a long time, and it has a developed body of evidence.

16  And it is also familiar with the evidence that goes to the

17  costs to the State and the federal government as well as to

18  local government.

19          But remember that local governments really serve as

20  the bottom-line social safety net for individuals and families

21  who end up falling apart when they're not adequately recognized

22  and supported.

23          And so, the City and the County, in a way that is

24  different from the State, ends up being responsible when

25  families fall apart if there are no obligations.

PROCEEDINGS

1        **THE COURT:**  Well, explain to me the sequential facts

2  that you're going to attempt to show that how the elimination

3  of Proposition 8 would minimize or ameliorate these social

4  costs that the City you allege has to bear.

5        **MS. STEWART:**  Sure.  The City would put on evidence

6  to show that first of all, recent studies indicate that where

7  same-sex couples are offered marriage, they are far more likely

8  to marry than they are to enter into civil unions or domestic

9  partnerships.

10        **THE COURT:**  And how does that relieve the City of

11  certain social costs of the kind that you are talking about?

12        **MS. STEWART:**  When couples enter into marriage, they

13  take on the reciprocal obligations, legal obligations, they get

14  the social support that comes with marriage, and they take on

15  obligations to the children of the couple that the couple is

16  responsible for.  What --

17        **THE COURT:**  And they don't do this in a domestic

18  partnership?

19        **MS. STEWART:**  They can do it in a domestic

20  partnership, but as -- again, as the evidence shows, couples

21  are far more likely to enter into marriage where it's

22  available.

23        One of the reasons for that, I think, Your Honor, is

24  because when you enter into a domestic partnership, it's not a

25  recognized institution.  It gets questioned a lot.  It is not

PROCEEDINGS

1  something that people immediately understand.

2          Furthermore, at this point in time, you are not

3  getting even the whole thing that marriage conveys, in terms of

4  the federal rights.  So, without either of those two things,

5  domestic partnership is less attractive.

6          Now, marriage today doesn't provide the federal

7  benefits that come with marriage for heterosexual couples.

8  But, the social valuation, the validation that the government

9  gives and that society gives, induces people to marry.

10         There are many people who have indicated -- and in

11  fact, that is probably why some of the Plaintiffs may have not

12  married, and some of the people in the groups, that they are

13  not going to do it until they get the entire social validation

14  that comes with marriage equality.

15         And so, because of that, with couples not entering

16  into those kinds of relationships where they're bound together

17  and have mutual obligations, they then are much more likely to

18  fall on the government.

19         There's a case, incidentally, that the California

20  Supreme Court heard not too long ago that involved a couple

21  that was in a domestic partnership, where one partner tried to

22  walk away from the child.  And, you know, the county ended up

23  trying to sue for support, and in the end, did obtain support.

24         But the problem with relationships that are not fully

25  recognized or relationships --

PROCEEDINGS

1           **THE COURT:**  And that would have been different, had

2    they been married?

3           **MS. STEWART:**  It would have, Your Honor.  I mean, I

4    think there's no question that with marriage comes presumed

5    family status, presumed parent status.

6           Now, that is true in California, but at every level,

7    every time an issue like this comes up with domestic

8    partnership, it gets litigated.  And people question it.

9           And further, there are a number of public benefits

10   that are determined, eligibility that is determined by marital

11   status.  So for all of those reasons, the City brings a unique

12   perspective.

13          It also -- there's another aspect of it, Your Honor,

14   besides the purely economic one.  And that has to do with the

15   fact that when society has a law, when the government has a law

16   that makes this distinction between lesbians and gay men on the

17   one hand and heterosexual people on the other, it sends the

18   message that there is something different about them.  And it

19   is a difference that matters.

20          And that has tremendous public health consequences

21   that go far beyond just the economic ones.  The City of

22   San Francisco is the home to literally hundreds, and I think

23   thousands of lesbian and gay youth who come here from other

24   states where they are kicked out of their homes, and from

25   counties around California, because they are gay.

PROCEEDINGS

1          The message that something is wrong with being gay is

2     still alive and well in California, because of Proposition 8.

3     And so, the public health costs that counties like

4     San Francisco have to incur to deal with discrimination and its

5     effects on youth, its effects on the elderly, its effects on

6     all levels of society are very real.

7          So, another area of testimony that we would bring

8     would be someone from our Public Health Department, to talk

9     about what those effects are.

10          We believe that this will go a long way to showing

11     the utter lack of justification, any kind of government

12     interests and in fact, the -- the counter interest, the

13     interest of the government in eliminating discrimination.

14          **THE COURT:**  All right.

15          **MS. STEWART:**  So, in the *Romer* case, I wanted to

16     remind the Court, *Romer versus Evans*, the city government, city

17     and county local governments were the lead plaintiffs in this

18     case.

19          And they actually put on testimony of the kind that I

20     just described to the Court.  They had public officials talking

21     about --

22          **THE COURT:**  That was in state court, wasn't it?

23          **MS. STEWART:**  It started out in state court, that's

24     correct, Your Honor.  However, it went all the way to the U.S.

25     Supreme Court, as the Court knows, and those cities remain --

PROCEEDINGS

```
1            THE COURT:  (Inaudible) familiar with the

2   intervention principals under Colorado law.

3            MS. STEWART:  Correct, Your Honor.  It wasn't an

4   intervention matter, actually.  They were party plaintiffs.

5            THE COURT:  They were initial parties, were they?

6            MS. STEWART:  Right.  And they remained parties.  And

7   the Supreme Court did not suggest in any way that there was

8   anything to question about that.

9            I am happy to address the arguments -- I would say

10  that neither the state nor the local government entities object

11  to our appearing.  I think some of them, at least, support it.

12           The Plaintiffs have objected solely about a concern

13  about delay, but I think that we have demonstrated, in the way

14  that we have dealt with them and with the Court, that we won't

15  delay the case.

16           We did not submit a case management statement because

17  the Court had not decided that we were a party, and I didn't

18  want to be presumptuous.  If we were to submit one, it would be

19  in many respects quite similar to the Plaintiffs'.  It --

20  probably wouldn't even repeat it, but would join in theirs.  I

21  would add the witnesses I mentioned.

22           I would also suggest that an education expert of some

23  sort may need to be called, because so much of the campaign

24  focused on education issues and supposed changes to the

25  curriculum that would be necessitated if same-sex couples were
```

PROCEEDINGS

1   permitted to marry.

2           And, one other area of difference we would have would

3   concern the schedule.  And I think that -- the schedule that

4   the Perry Plaintiffs are arguing.  It's very important

5   obviously to get the case decided quickly, but the Court has to

6   balance the need to have a really full factual record.  And we

7   think that it may be too ambitious a schedule.

8           **THE COURT:**  All right.  Anything further,

9   Ms. Stewart?

10          **MS. STEWART:**  I will leave it at that, Your Honor.

11          **THE COURT:**  Very well.

12          Mr. Olson.  Now, most, most folks who are in your

13  situation and they have people who are trying to come in on the

14  same side welcome intervenors.  Why aren't you taking that

15  attitude?

16          **MR. OLSON:**  Well, I will explain.  Thank you,

17  Your Honor.  And I know that the Court has read the briefs and

18  knows the law, so I will try to be brief in response to your

19  question.

20          First, it is very important for me to say that we

21  have the greatest respect for counsel for the proposed

22  intervenors.  Particularly I'm focusing now on the Our Family

23  Coalition.  We have worked with them from the outset of this

24  case.  And we have the greatest respect for their experience,

25  and their points of view.

PROCEEDINGS

1          However, experience and reputation of counsel is not

2     a basis for intervention.  And we are concerned that the

3     consequent dilution of the rights of the Plaintiffs to control

4     the strategy, timing, and issues in this case that they brought

5     to this Court and the proposed intervenors chose not to bring

6     to this Court to validate their constitutional rights can be

7     affected by the addition of additional parties, no matter how

8     much they might want to help.

9          **THE COURT:**  How so, other than possibly slowing down

10    the process?

11         **MR. OLSON:**  Well, slowing down the process is very

12    important, as you recognized on July 2.

13         I think you must have said five times in your

14    June 30th order and a number of times during that hearing on

15    July 2, that in -- in not granting the motion for a preliminary

16    injunction, however serious these issues are, that it was

17    important to have a prompt expeditious and efficient resolution

18    of the merits of this case.

19         **THE COURT:**  I'm glad that message got through.

20         **MR. OLSON:**  It certainly got through to us, because

21    we went along with -- and you may have come to the same

22    conclusion anyway, what -- we agreed with Your Honor about

23    proceeding to the resolution on the merits and not granting a

24    preliminary injunction, although we fully felt the Plaintiffs

25    were entitled to it because their constitutional rights are

PROCEEDINGS

1  being violated, the State of California admits.  And that is

2  irrepairable injury every day.

3          However, we were persuaded by your statement in your

4  order of June 30th, that it is important to get to a resolution

5  on the merits, and you were balancing the uncertainty that

6  might come from a preliminary injunction with the importance of

7  getting to a resolution on the merits.

8          Every additional party that the Court adds as

9  intervenors will add to the complexity and the time that this

10  case takes.  And as you heard from Our Family Our Families

11  Coalition, they say, they acknowledge, that their interests

12  diverge.  They talked about other issues besides the right to

13  marry that they might want to have ventilated in this Court.

14  I'm not sure that I know all of those issues.

15          Our Plaintiffs, our clients, are concerned with the

16  right to marry.  And they are concerned that they are being

17  deprived of that right every single day.  The State of

18  California acknowledges that that's a violation of the

19  Constitution.

20          Let me add that the intervenors Our Family -- I'm

21  focusing on them for a moment -- assert the same injury, make

22  essentially the same arguments, and seek the same relief,

23  ultimate relief as the Plaintiffs.  So they are adding nothing

24  there.  I think your question suggested that you are at least

25  sensitive to that point.

PROCEEDINGS

1          The diversity of their membership adds nothing to the

2     actual claims.  It doesn't change the actual claims, it doesn't

3     change the actual relief sought by the Plaintiffs.  At bottom,

4     they tender nothing new to this case, other than the talent and

5     experience of the lawyers that they have selected.  And, we

6     respect that.  But that is not a basis for intervention.

7          And the Plaintiffs chose lawyers whose talents and

8     expertise they respected.  And their choice should not be

9     usurped by the proposed intervenors, by --

10         **THE COURT:**  What about the other two intervenors, the

11    Campaign for California Families, and then the City and County?

12         **MR. OLSON:**  Well, the Campaign for California

13    Families demonstrated today that it's going to be a great deal

14    longer and more complicated case, because they are not willing

15    to stipulate to things that the State of California implicitly

16    agrees to by acknowledging that the statute -- the proposition

17    is unconstitutional, that the proponents of Proposition 8 --

18    and they are very skilled individuals represented by very

19    skilled lawyers -- they are willing to stipulate to certain

20    things because, I'm confident, they believe that we could prove

21    those things if we had to go through a six-month trial with

22    expert witnesses and all of that.

23         To their credit, and as you suggested in your orders

24    and in hearing on July 2nd, we need to work together to resolve

25    those issues that don't need to be contested.  This, this

PROCEEDINGS

1   intervening -- proposed intervening group wants to challenge

2   virtually everything.

3          And I submit that you could find any number of

4   groups, any number of permutations of groups in the United

5   States that were willing to say "The proponents are not being

6   adequately represented because they are admitting something

7   that I'm not willing to admit, and I want to put them to their

8   proof, and I'm going to bring in evidence and so forth."

9          And so I think that they only add delay which

10  competent counsel -- very competent counsel are willing to

11  avoid.

12         **THE COURT:**  What about the City and County of

13  San Francisco?

14         **MR. OLSON:**  The City and County of San Francisco I

15  think is, as you suggested, a slightly different case.  I

16  listened to the presentation by Ms. Stewart this morning, and I

17  read the materials very carefully.

18         We have the same concerns about additional parties

19  and additional -- because it's a permutation thing, everything

20  takes a little bit longer.  But I do acknowledge that the City

21  of San Francisco, because in a sense, it's a *parens patriae*

22  kind of thing.  They are looking out for citizens that are

23  affected by an unconstitutional statute.

24         And they do indicate that they are capable of

25  addressing and willing to address governmental perspectives

1    that cause this statute to be unconstitutional, and cause this

2    statute to discriminate and hurt individuals in their city.

3    Many -- so many individuals that are affected live in the City

4    of San Francisco.

5              And they are apparently willing to present reasons

6    that the State of California, through the Governor and the

7    Attorney General's office, while they are willing to concede

8    that Proposition 8 is unconstitutional, they are not willing to

9    say why they think, as representative of the citizens of

10   California, why it is unconstitutional.  They want to play --

11   and I respect this, but they want to play a passive role.

12             The City of San Francisco seems to me willing to add

13   something to this case that we probably, on behalf of the

14   Plaintiffs, are not in a position very well to add.  We don't

15   see things from the perspective of a government being adversely

16   affected by an unconstitutional constitutional provision.

17             So although we're not withdrawing our opposition, I

18   do think it is a separate situation, that -- the other thing

19   about The City and County of San Francisco is what they wish to

20   add seems to me does not appreciably encumber the proceedings

21   or delay the process.

22             They want to focus on certain narrow things about

23   which they do have expertise.  They're not interested in

24   duplicating the things that the Plaintiffs are interested in

25   doing.  So, I do think it's a slightly different story.

PROCEEDINGS

1          I think at the end of the day, whatever you decide

2    with respect to intervention, I can't stress enough that -- and

3    again I'm turning back to the Coalition.  These are individuals

4    and attorneys who had the opportunity to raise federal

5    constitutional questions in the Proposition 8 litigation in the

6    California Supreme Court.

7          For reasons that --

8          **THE COURT:**  So did the Attorney General.

9          **MR. OLSON:**  Yes.

10         **THE COURT:**  And the Attorney General is under an oath

11   to uphold the Constitution of the United States.  And he didn't

12   raise these issues in the California Supreme Court.

13         **MR. OLSON:**  And I'm not going to criticize the

14   Attorney General of California, because the Attorney General of

15   California -- particularly because the Attorney General of

16   California has now recognized that it is an unconstitutional

17   statute.  And we welcome that.

18         But my point, I guess, is that the issues were not --

19   that were not raised before the California courts and then were

20   not raised by the attorneys who wish to participate now, those

21   decisions were made for tactical, strategic reasons.  And we

22   respect that, and we respect them.

23         But, these Plaintiffs are real people.  They have

24   announced their intention to get married now, if they possibly

25   can.  They're not groups.  And I respect the fact that these

PROCEEDINGS

1   groups represent interests.  But we represent real people with

2   real concerns that are -- present, ripe for adjudication now,

3   and represent issues.  And they have demonstrated that they are

4   going to present the issues responsibly, professionally,

5   thoroughly and expeditiously.

6           We respectfully submit that whatever you decide with

7   respect to intervention, the lawyers that were selected by the

8   Plaintiffs should remain in control of this case.

9           And I refer to the *Stringfellow* case, which is a

10  Ninth Circuit decision that went to the Supreme Court, where

11  limitations were imposed.

12          And I simply request in closing that if there is any

13  further intervention on the side of the Plaintiffs, at least,

14  that the Plaintiffs' lawyers who were carefully selected by the

15  Plaintiffs who are willing to take the chance by bringing this

16  case remain in full control, unequivocal control, and

17  undisputable control over the destiny of the case they choose

18  to bring, and others chose not to bring.

19          **THE COURT:**  Very well.  Thank you, Mr. Olson.

20          Mr. Cooper, are you going to be speaking on behalf of

21  the proponents of Proposition 8?

22          **MR. COOPER:**  With the Court's permission, my

23  colleague Mr. Thompson would like to address the Court on

24  intervention.  Thank you.

25          **THE COURT:**  That's fine.

PROCEEDINGS

```
1              Well, Mr. Thompson, that was kind of an unkind cut
2    that Ms. Lindevaldsen cast in your direction.  What is your
3    response?
4              MR. THOMPSON:  Well, we saw vivid reflection and
5    example, Your Honor, of the complexity that will be brought to
6    trying to resolve this expeditiously if another Defendant
7    Intervenor is permitted into the case.
8              In terms of negotiating stipulations, they don't
9    become easier the more lawyers you put in a room, Your Honor.
10   The experts will multiply like locusts, if they are permitted
11   and other intervenors are permitted to come into this.
12             So we would respectfully suggest that in terms of
13   permissive intervention, it would be a grave error.
14             In terms --
15             THE COURT:  Well, Ms. Lindevaldsen says that you're
16   not raising the issues, you're not adequately defending all of
17   the interests at stake here.
18             MR. THOMPSON:  Well, we are -- she -- they have not
19   identified any interest that we are not going to vigorously
20   pursue.
21             What they are saying is they disagree on tactics with
22   us.  They say it's a tactical mistake not to contest each one
23   of these points that the Plaintiffs could make the rubber
24   bounce on, and that we need to be in the trenches fighting
25   every war, even battles that can't be won.  And, that is a
```

PROCEEDINGS

1  tactical concern.

2          And under Rule 24(a), that is not sufficient to show

3  inadequacy of representation.  And moreover -- it's rather,

4  which arguments should be advanced.  They need to be able to

5  show that there's some divergence of interests.  They need to

6  be able to establish under 24(a) that they have an interest

7  that is different from ours.  And they haven't done it.

8          In their brief, they try to conjure up the notion

9  that, well, there are three other statutes that reference

10 marriage is between a man and a woman.  And, all those statutes

11 are being challenged, and the proponents are only interested in

12 upholding the validity of Proposition 8.

13         Your Honor, we will defend all -- all those three

14 statutes and Proposition 8.  And those three statutes raise or

15 fall with Proposition 8.  So there's just no separate interest.

16 All we have heard are tactical concerns about what is

17 well-advised and not advised to stipulate to.

18         So that, that would be our submission on the

19 California Families.  They were denied the right to intervene

20 in the *Strauss* case in the California Supreme Court, and we

21 would respectfully suggest they should be -- the same result

22 should obtain here.

23         **THE COURT:**  What about the other two intervenors?

24         **MR. THOMPSON:**  With respect to the ACLU, the

25 community organizations, we've read their briefs very

1   carefully, and listened very carefully this morning, looking

2   for -- they say that their interests may diverge.  But they

3   never explain how that is so.

4          They talk about subjective reasons why their members

5   may want to have Proposition 8 struck down, but when you look

6   at how could there be a divergence of interest between what

7   their members want and what the Plaintiffs want, you see

8   nothing.  So under 24(a), they haven't been able to show that

9   they're inadequately represented.

10         And under 24(b), their case management statement

11   shows that they want to bring on at least 14 new experts.  In

12   terms of delay, it will necessarily delay the trial, and the

13   amount of discovery, if they can bring in 14 experts from

14   different countries and different continents, as they promise

15   to do in their case management statement.  So, we would

16   suggest, under 24(b), they should be kept out.

17         With respect to the City of San Francisco, they

18   articulated this morning a governmental interest.  And we would

19   submit that binding Ninth Circuit precedent precludes their

20   being able to intervene under 24(b).

21         We cited in our brief *EEOC versus Pan American,* which

22   is 897 F.2d, 1499.  And that in turn cited to *EEOC versus*

23   *Nevada Resort,* 792 F.2d, 882.  And those --

24         **THE COURT:**  What is the logic of those decisions?

25         **MR. THOMPSON:**  Those cases are very interesting, Your

PROCEEDINGS

1  Honor, because what they say is that when the EEOC is

2  litigating and then an entity that has standing -- in the

3  *Nevada Resorts* case, an organization that had a member that was

4  injured, the injury was caused by the action, and it was

5  redressable.

6          They nevertheless were -- and the District Court

7  granted 24(b) intervention, and it was reversed by the Ninth

8  Circuit.  And the reason was is because there was no private

9  right of action.  The permissive intervenor that the show that

10 there was a subject matter jurisdiction for their claim.

11         And because there was no private right of action

12 under that provision of Title VII that was at issue, the Ninth

13 Circuit said they're not allowed in.

14         And this is exactly the flip of it.  There's no

15 public right of action under the Supreme Court cases that we've

16 identified.  In other words, no one disputes that the

17 plaintiffs have a private right of action under 1983 to bring

18 this claim, but the City cannot turn on its creator like a

19 Frankenstein monster and then try to challenge the

20 constitutionality of its conduct.

21         And when they say, "Oh, but the Attorney General and

22 the Governor aren't contesting it," it is the people of

23 California that enacted Proposition 8.  And they are sovereign

24 in this matter.  And they have not given San Francisco the

25 right to come in and challenge their will.

PROCEEDINGS

1           So in terms of the governmental interest, it just

2    doesn't hold water.  And these two EEOC cases, especially

3    *Nevada Resorts,* show quite conclusively that there is no

4    subject matter jurisdiction, and they cannot be permitted in

5    this case.

6           And with respect to the interests and the -- and the

7    complexity, these issues about the public health effects of

8    Proposition 8 will be very nuanced and complex, and will

9    necessitate expert evidence on both sides, and we would

10   respectfully suggest, are really a sideshow to the main issues

11   in this litigation.

12          And if the Court were inclined to grant their

13   intervention, we would at the very least ask the Court to

14   confine their activity to the issues that are unique to the

15   City, as opposed to allowing them to put on evidence on all the

16   various issues.

17          **THE COURT:**  Very well.  Thank you, Mr. Thompson.

18          **MR. THOMPSON:**  Thank you.

19          **THE COURT:**  Well, we have three motions to intervene

20   presently before the Court.  And, as we have discussed this

21   morning, the speedy determination of this action requires that

22   these motions be ruled upon promptly.

23          The Our Family Coalition; Lavender Seniors of the

24   East Bay; and Parents, Families and Friends of Lesbians and

25   Gays move to intervene as of right under Rule 24(a), and

PROCEEDINGS

1    alternatively, seek permissive intervention under Rule 24(b).

2           The Campaign for California Families moves to

3    intervene of right as a defendant, or alternatively, for

4    permissive intervention.

5           In addition, the City and County of San Francisco

6    seeks the Court's permission to intervene under Rule 24(b),

7    permissive intervention.

8           All three of these motions were filed within the time

9    frame provided in the Court's July 13 order.  And accordingly,

10   all three motions are timely.

11          Turning first to the motions to intervene as of right

12   by the Campaign and by the Our Family Coalition, intervention

13   as of right requires the applicants for intervention to make a

14   four-part showing:

15          One, their motion is timely; two, they have a

16   significant protectable interest relating to the transaction

17   that is the subject matter of the action; three, they are so

18   situated that the disposition of the action may practically

19   impair or impede their ability to protect their interest; and

20   four, their interest is not adequately represented by the

21   parties to the action.

22          The applicants must demonstrate all four factors to

23   intervene as of right.  Although the motions are timely,

24   neither the Campaign nor the Our Family Coalition demonstrate

25   the remaining factors.

PROCEEDINGS

1             The second factor that must be shown for a party to

2    intervene as of right is that the party seeking intervention

3    must have a significant protectable interest in the

4    controversy.

5             An interest is significantly protectable if:  One, it

6    is protected under some law; and two, applicants show a

7    relationship between the legally protected interest and the

8    claims at issue.

9             Applicants here need not assert a specific legal or

10   equitable interest in the underlying action.  And no bright

11   line rule determines whether applicants have a significant

12   interest.

13            The Campaign asserts that it has a significant

14   protectable interest in assuring marriage is defined only as

15   the union between one man and one woman.  The Campaign argues

16   that this interest arises from its work to ensure the passage

17   of Proposition 8.

18            But because the Campaign is not the official sponsor

19   of Proposition 8, its interest in Proposition 8 is essentially

20   no different from the interest of a voter who supported

21   Proposition 8, and is insufficient to allow the Campaign to

22   intervene as of right.  The Campaign's motion to intervene of

23   right thus fails to demonstrate that the Campaign has a

24   protectible interest in the action.

25            Indeed, the Campaign asserts that its interests are

PROCEEDINGS

1  broader than merely upholding Proposition 8 because it wishes

2  to assure marriage is defined only as an opposite-sex union.

3  But the Campaign fails to explain the practical effect of this

4  broader interest, or to explain how the Court could protect

5  this interest, or how Proposition 8, if upheld as

6  constitutional, would fail to assure this claimed broader

7  interest in defining marriage as only an opposite-sex union.

8         Accordingly, the Campaign's interest is not

9  significantly protectible, and intervention of right is not

10 appropriate.

11        Even if the Campaign had asserted a protectible

12 interest in the litigation, however, the Campaign has failed to

13 explain that its interest is not adequately represented by the

14 Intervenor Defendants who are, after all, the official

15 proponents of Proposition 8.

16        The Court considers several factors to determine

17 whether representation is adequate, including whether the

18 current parties will undoubtedly make all of the Intervenors'

19 arguments appropriate to the case in controversy, whether the

20 current parties are capable and willing to make such arguments,

21 and whether the intervenor offers a necessary element to the

22 proceedings that would otherwise be neglected.

23        And I'm essentially quoting from the *Sagebrush*

24 *Rebellion* case in the Ninth Circuit, of 1983.

25        The burden of making this showing is minimal.  But

PROCEEDINGS

1  where the existing party and the applicant have the same

2  ultimate objective, the current representative is presumptively

3  adequate.

4          The Campaign argues that the proponents of

5  Proposition 8 will not make all of the arguments the Campaign

6  wishes to present, because the Campaign has this broader

7  interest it claims in not only upholding Proposition 8 but also

8  in securing a definition of marriage as an opposite-sex union.

9          The Campaign attempts to distinguish this interest

10 from that of the proponents of Proposition 8, who, according to

11 the Campaign, seek only to uphold Proposition 8.  But the

12 Campaign does not explain how its interest is meaningfully

13 distinct from the proponents' interest, or how the Court could

14 fashion a remedy for this claimed broader interest.

15         Perhaps more importantly, the Campaign fails to

16 counter proponents' assertions that they are willing and able

17 to present all of the arguments the Campaign wishes to

18 introduce that are consistent with the law and the facts.

19 Accordingly, the Campaign's interest is represented adequately

20 by the proponents of Proposition 8.

21         Because the Campaign has neither shown that it has a

22 significant protectible interest in this litigation nor that

23 the proponents of Proposition 8 would not adequately represent

24 its claimed interest, the Campaign's motion to intervene as of

25 right is denied.

PROCEEDINGS

1          Our Family's motion to intervene of right is

2    similarly flawed, because the Our Family Coalition fails to

3    identify an interest that is not adequately represented by the

4    current Plaintiffs.

5          Unlike the Campaign, it appears that the Our Family

6    Coalition may have a significant protectible interest in this

7    litigation, because many of the organization's members are

8    individuals who wish to marry a person of the same sex but

9    cannot do so because of Proposition 8.

10         It is possible that this derivative or organizational

11   interest may rise to the level of a protectible interest for

12   purposes of intervention.  This is, after all, the very

13   interest that the Plaintiffs assert.  But Plaintiffs possess

14   this interest directly as they are the parties who allege that

15   they seek to marry but are barred by Proposition 8 from doing

16   so.  The Our Family Coalition, if it possesses this interest,

17   does so only indirectly or derivatively.

18         Nonetheless, the Our Family Coalition fails to

19   overcome the presumption that the Plaintiffs' representation of

20   the interests the Our Family Coalition alleges is adequate.

21   The Our Family Coalition does not identify an interest that

22   Plaintiffs are unwilling or unable to protect or an argument

23   that Plaintiffs are unwilling or unable to make.

24         The Our Family Coalition argues that it represents a

25   broad spectrum of individuals who wishes to enter same-sex

1  marriages, including individuals who may differ from the

2  current Plaintiffs, based on age, race, parental status or

3  socioeconomic class.

4           While the Our Family Coalition asserts that the

5  effect on an individual of denial of same-sex marriage may be

6  distinct, based in part on an individual's peculiar

7  circumstances, the Our Family Coalition fails to identify the

8  relevance of this distinction.

9           No doubt, those seeking to marry a person of the same

10 sex possess a great variety of backgrounds and probably have

11 varied reasons for seeking marital status.  But both the

12 Plaintiffs and the Our Family Coalition assert that the root of

13 the harms they face is the alleged discrimination based on

14 sexual orientation or sex worked by Proposition 8.

15          The remedy the Plaintiffs and the Our Family

16 Coalition seek is identical.  Accordingly, the Court finds that

17 the interests identified by the Our Family Coalition can be

18 adequately represented by the current Plaintiffs.  And the Our

19 Family Coalition's motion to intervene of right is therefore

20 denied.

21          Next, the Court considers whether to permit any party

22 to intervene under Rule 24(b), permissive intervention.  Rule

23 24(b) permits the Court, in its discretion, to allow an

24 applicant to intervene when its motion is timely and it has a

25 claim or defense that it shares with the main action, in short,

PROCEEDINGS

1  possesses a common question of law or fact with that raised by

2  the parties.

3        The Court considers several factors in making this

4  determination.  These include the nature and extent of the

5  applicants' interest, their standing to raise relevant legal

6  issues, the legal position they seek to advance and its

7  probable relation to the merits of the case.  These factors are

8  explained by the Ninth Circuit in *Spangler versus Pasadena City*

9  *Board of Education*, reported at 552 F.2d, a 1977 decision of

10 our circuit.

11       Additional factors include whether the applicants'

12 interests are adequately represented by the other parties,

13 whether intervention will prolong or unduly delay the

14 litigation, and whether parties seeking intervention will

15 significantly contribute to the full development of the

16 underlying factual issues in the suit and to the just and

17 equitable adjudication of the legal questions presented.

18       In this case, in addition to the Campaign and the Our

19 Family Coalition, the City and County of San Francisco seeks

20 permissive intervention under Rule 24(b).

21       Turning first to the motions by the Our Family

22 Coalition and the Campaign, the *Spangler* factors weigh against

23 permitting Our Family Coalition and the Campaign to intervene.

24 Their interests are represented by the current parties to the

25 action.

PROCEEDINGS

1          While the Our Family Coalition and the Campaign

2     appear capable of presenting evidence and developing a record

3     on the factual issues at stake in this litigation, nothing in

4     the record before the Court suggests that the current parties

5     are not independently capable of developing a complete factual

6     record encompassing all of the applicants' interests.

7     Furthermore, permitting the Our Family Coalition and the

8     Campaign to intervene might very well delay the proceedings, as

9     each group would need to conduct discovery on substantially

10    similar issues.

11         As noted, the interests asserted by the Campaign and

12    the Our Family Coalition are indistinguishable from those

13    advanced by the Plaintiffs.  Hence, the participation of these

14    additional parties would add very little, if anything, to the

15    factual record, but in all probability would consume additional

16    time and resources of both the Court and the parties that have

17    a direct stake in the outcome of these proceedings.

18         Accordingly, the motions to intervene of the Our

19    Family Coalition and the Campaign are denied.  Of course, the

20    Our Family Coalition and the Campaign may seek to file amicus

21    briefs on specific legal issues that they believe require

22    elaboration or explication that the parties fail to provide.

23    Those applications will be considered, and if appropriate,

24    granted.

25         Now, San Francisco's motion to intervene presents a

PROCEEDINGS

1  somewhat different circumstance.  Unlike the Our Family

2  Coalition and the Campaign's, San Francisco has identified an

3  independent interest in the action:  It claims a financial

4  interest that it alleges is adversely affected by Proposition

5  8.

6          The City points out that it acts as a social and

7  economic safety net for those individuals it asserts lay claim

8  to City services who would not require those services if

9  Proposition 8 were invalidated.  Currently, San Francisco is

10 the only governmental entity seeking to present evidence on the

11 effects of Proposition 8 on governmental services and budgets.

12 Despite Defendant Intervenors' argument to the contrary,

13 San Francisco does not need independent standing to intervene

14 permissively.

15         Plaintiffs acknowledge what they describe as the

16 extraordinary factual record that San Francisco appends to its

17 motion, and strongly suggests that San Francisco is well on its

18 way to contributing to full development of the underlying

19 factual issues in the suit.

20         Despite the timeliness of the City's motion to

21 intervene, the factual record that San Francisco appends to its

22 motion, standing alone, would probably not be sufficient to

23 warrant intervention, with the additional complications that

24 attend adding an additional party.

25         This is especially the case here, given that the

PROCEEDINGS

1   factual record the City seeks to present is largely, if not

2   entirely, a record based upon testimony and evidence presented

3   by expert witnesses.  These witnesses are as available to

4   Plaintiffs as well as the City.  And to the extent the

5   Plaintiffs believe such evidence is necessary, Plaintiffs can

6   call these witnesses, and no doubt obtain cooperation of the

7   City in the development of such evidence.

8            Rather, it seems to the Court that what distinguishes

9   San Francisco as an intervenor, especially from the others

10  seeking intervention, that is San Francisco claims a

11  governmental interest that no other party, including the

12  Governor and the Attorney General of California, has asserted.

13           Because of this interest, it appears that

14  San Francisco has an independent interest in the proceedings,

15  and the ability to contribute to the development of the

16  underlying issues without materially delaying the proceedings.

17           The Court notes that the City has filed a proposed

18  complaint in intervention that appears straightforward, and it

19  should not require prolonged effort for the other parties to

20  answer or otherwise respond to this pleading promptly.

21           Because it is San Francisco's governmental interest

22  that warrants the decision to allow it to intervene, it seems

23  that San Francisco shares interests with the State Defendants,

24  the Governor and the Attorney General.  Furthermore, as the

25  Attorney General has taken the position that Proposition 8 is

1  unconstitutional, it would appear appropriate in the interest

2  of a speedy determination of the issues that the Attorney

3  General and San Francisco work together in presenting facts

4  pertaining to the affected governmental interests.

5          Counsel for San Francisco and the Attorney General

6  are therefore directed to confer, and if possible, agree on

7  ways to present these facts so as to avoid unnecessary

8  duplication of effort and delay.

9          But I want to emphasize that I believe on the general

10  issues that pertain to the interests of Californians who seek

11  to marry but are barred by Proposition 8 from doing so, it

12  appears that Plaintiffs adequately represent those interests,

13  and unnecessary duplication would be involved in San Francisco

14  seeking to present those facts, especially under these

15  circumstances, and that San Francisco should cooperate with the

16  Plaintiffs and Plaintiffs' counsel in presenting whatever

17  issues pertain to these general interests.

18          To the extent that San Francisco claims a government

19  interest in the controversy about the constitutionality of

20  Proposition 8, it may represent that interest and present such

21  evidence as necessary for the Court to decide that issue.

22          Hence, San Francisco's involvement in this litigation

23  may very well be quite limited.  But as the City's interest

24  does appear distinct from any other party except possibly the

25  State Defendants, it is unclear at this point the extent to

PROCEEDINGS

1    which the -- and it is unclear at this point the degree to

2    which the State Defendants may seek to defend these alleged

3    governmental interests, San Francisco's motion for permissive

4    intervention under Rule 24(b) will be granted.

5             And I would suggest, unless any of the parties

6    object, that any answer or otherwise -- any answer or

7    responsive pleading to the complaint and intervention by the

8    City and County of San Francisco be answered in ten days.

9             Is that possible, Mr. Cooper, on your side?

10            **MR. COOPER:**  It is, indeed, Your Honor.

11            **THE COURT:**  Very well.  Now, let's turn to case

12   management.  And first of all, I want to commend the parties,

13   and particularly Mr. Olson and Mr. Cooper.  You have obviously

14   taken to heart the discussion that we had here last month, and

15   the order that was issued in the wake of the earlier case

16   management statements.

17            I thought that the specification of issues that the

18   Plaintiffs proposed and the responses by the Intervenor

19   Defendants was very helpful, very helpful indeed, in narrowing

20   the issues, and defining what it is that is before us, in terms

21   of how we are going to develop the record in this case.

22            Obviously, not every one of these facts is agreed to

23   by the Intervenors, but a number of them were.  And, quite

24   understandable that in some instances Mr. Cooper might have a

25   little different verbal formulation of some of them.

PROCEEDINGS

1            But nonetheless, I think we have made and you have

2   made some very considerable progress in shaping up the issues

3   so that we can proceed to a prompt determination of the cause

4   that is before the Court.

5            Now, before telling you what schedule I have in mind,

6   I gather, Mr. Cooper, at some point or other, it would be your

7   intent to file a motion for judgment on the pleadings as to

8   some -- perhaps more than some issues.  Perhaps quite a number

9   of issues.  Is that a fair reading?

10           **MR. COOPER:**  That is, Your Honor, yes, sir.  We -- we

11  believe that there are several issues on which -- on which this

12  Court's not free to depart from binding precedent in the Ninth

13  Circuit.  And that -- and that if we are right on that, it

14  would significantly skinny down the -- now the discovery

15  burdens that will face the Plaintiffs and the Defendant

16  Intervenors as we go forward.

17           We may not be right, but we -- we would certainly --

18  we believe we are, and we would like an initial opportunity to

19  present those arguments to the Court.

20           **THE COURT:**  I'm inclined to think that while we

21  should, in view of your position, schedule a dispositive motion

22  schedule with a hearing date, that at least some of the basic

23  discovery in the case can and should go forward very promptly.

24           I assume you want to take the depositions of the

25  Plaintiffs.  And, Mr. Olson has indicated that he has some

PROCEEDINGS

1  depositions in mind of your folks.  And, seems to me we can get

2  those depositions out of the way very quickly.  And, should do

3  so.

4          What's your reaction to that?

5      **MR. COOPER:**  Your Honor, I don't quarrel with that

6  proposition.

7          I will say that some of the things that Mr. Olson

8  would like to inquire into of my clients -- the official

9  Proposition 8 proponents -- going  to voter motivation are

10  issues that we earnestly believe are not fit and appropriate

11  for judicial inquiry, and that in fact, would raise the gravest

12  possible First-Amendment issues.

13          And we -- we have cited to the Court a case called

14  *Sasso* (Phonetic), but we would like an opportunity to fully

15  brief that proposition before we get off in the direction of

16  taking depositions of our clients and subpoenaeing their

17  e-mails and the rest of it, going to their internal campaign

18  strategies and the rest of it.

19      **THE COURT:**  Disagreements as to the scope of

20  discovery are not unusual.

21      **MR. COOPER:**  No, Your Honor, they're not.  But

22  discovery that at least we believe we would be privileged

23  against on a constitutional basis are pretty unusual.

24          And we think this is a -- this, at least as we

25  understand their intentions, would be unprecedented insofar as

PROCEEDINGS

1  we have been able to tell.  We have not been able to find a

2  single case where this kind of discovery was taken of the

3  proponents of a referendum measure in this state or in any

4  other.

5          And, so we think it's gravely serious issue, Your

6  Honor.  We would urge the Court to give us an opportunity to

7  fight this out in briefing to the Court before we get down that

8  road.

9          And if we do go down that road, obviously we will

10 want to take the same kind of deposition testimony, as well as

11 document inquiries of those --

12         **THE COURT:**  Who oppose Proposition 8.

13         **MR. COOPER:**  Of course, Your Honor.

14         **THE COURT:**  All right.

15         **MR. COOPER:**  But --

16         **THE COURT:**  What, in your view -- without getting too

17 far down the road, in your view, what is the scope of

18 appropriate discovery with reference to the proponents and the

19 opponents of Proposition 8?

20         **MR. COOPER:**  That -- and I don't want to get too far

21 in front of myself, because to be quite honest with Your Honor,

22 I'm not sure where that line can safely be drawn as a

23 First-Amendment matter.

24         I do believe that when a judicial inquiry into the

25 intendment and meaning and purpose of a voter referendum is

PROCEEDINGS

```
 1  before the Court, that the one clear and certain analysis is to
 2  test the conceivable legitimate state interests that it might
 3  serve.  And if it will serve none, the inference that flows
 4  from that is that there was some illegitimate purpose at work.
 5  That was the Romer case.
 6          The Romer case concluded, the Court concluded that
 7  "We have assessed against the language of the statute, we have
 8  assessed against every conceivable purpose offered to us, or
 9  that we could think of ourselves," the Court.  "And we've
10  assessed it against its various impacts and effects."
11          And --
12          THE COURT:  What discovery was taken in the Romer
13  case on that issue?
14          MR. COOPER:  Your Honor, the interesting thing, I
15  understand there was a trial in this case.  I don't understand
16  there was any discovery taken into the --
17          THE COURT:  Well, that's refreshing, a trial without
18  discovery.  That's like the old days.
19          MR. COOPER:  Well, actually, there was discovery, but
20  it -- but there was no discovery taken into -- that we've been
21  able to find, in that case or any other, into the subjective
22  motivations of the voters, which -- or into the subjective
23  motivation presumably of their proxies, those that organized
24  the referendum effort, and those who organized and provided the
25  strategy for the campaign for the referendum, itself.  We
```

PROCEEDINGS

1   haven't been able to find any evidence that a party was allowed

2   to make inquiry into those things.

3            And, think of what that might mean.  How could

4   proposition proponents, future proposItion proponents, not be

5   chilled in the exercise of their First-Amendment rights as they

6   sought to bring forward for consideration by the people these

7   types of propositions.  So, Your Honor, we think that that's

8   off the table.

9            Clearly, the kind of inquiry that *Romer* engaged in is

10  plenty on the table.  I think it is going to be hard for me

11  probably to convince myself, let alone you, that -- that the

12  types of public statements, official campaign literature,

13  certainly the official ballot information and brochures that

14  have the imprimatur of the state, and go to every voter, those

15  things are, it would appear, legitimate sources of information

16  about the purposes of the referendum.

17           But again, Your Honor, the -- the inquiries that we

18  think neither side should be allowed to take of the other are

19  those that go to -- and we believe would encroach and gravely

20  threaten First-Amendment freedoms.

21           **THE COURT:**  Mr. Olson, what are your views on this

22  subject?

23           **MR. OLSON:**  I would like to have my colleague,

24  Mr. Boies, address the case management issues.

25           **THE COURT:**  All right.  Mr. Boies?  You've taken a

PROCEEDINGS

 1   lot of discovery in your life.

 2          **MR. BOIES:**  I have, Your Honor.  And one of the

 3   things that I think it underscores is what the Court said,

 4   which is that discovery disputes are not uncommon, and that

 5   they ordinarily are worked out in the course of discovery.

 6          I think the very issue that Mr. Cooper candidly

 7   addresses, which is the difficulty of finding exactly where

 8   that line is, is something that experiences counsel can try to

 9   work out among themselves, and if there's a problem, bring to

10   the Court.

11          I frankly do not believe that we will have a problem,

12   at least at the initial stages of the discovery, in limiting

13   discovery in a way that does not impermissibly infringe on any

14   First-Amendment issues.  I think --

15          **THE COURT:**  But I gather that you are planning some

16   discovery of the proponents.

17          **MR. BOIES:**  Yes, Your Honor.  And for example, I

18   think Mr. Cooper's exactly right, that there is some stuff that

19   is clearly on the table; there's some stuff that I think is

20   probably not on the table unless we were to make a showing that

21   we have not yet made; and then there's a number of things that

22   are in the middle.

23          I think that in terms of their official statements,

24   the statements that were made publicly, none of those, I think,

25   are something that can be plausibly argued should not be

PROCEEDINGS

1   subject to discovery.  Certainly, there are subjective,

2   unexpressed motivations.  Those things I think we would not be

3   inquiring into, because we do not believe that those would

4   actually go to the issues that we are presenting to the Court.

5           So, I think that if there is a -- if there's a gray

6   area, there will be some objectively-stated assertions,

7   propositions, that may be encompassed in documents and the like

8   that may or may not have become public, and there may be some

9   issue as to what it means to say something has become public.

10  How broad does have it to be distributed in order to be

11  classified as public?

12          Those are all the kinds of gray-area discovery

13  decisions that we will make along the way.  And I don't think

14  that any of those ought to hold up the commencement of

15  discovery, because no matter whose view you take, and -- and it

16  may be that we're not even in disagreement as to where the line

17  will ultimately be drawn, we are in agreement that there are

18  many areas that are going to be subject to discovery.

19          And if we are going to get this process going, and

20  really achieve what I know the Court's objective is and what

21  all of our objective is, which is a prompt resolution of this,

22  I think we need to get started.  And I think that we can get

23  started on fact discovery, we can get started in preparing

24  expert reports now.

25          That doesn't mean that you can't have dispositive

PROCEEDINGS

1   motions.  But what it means is that we don't have to delay the

2   commencement of the work towards trial until we go through the

3   dispositive motions.

4           THE COURT:  Well, with that in mind, let me discuss

5   with you and Mr. Cooper a schedule that I have in mind, based

6   upon what lies before me in the next several months.

7           And, that would be that we commence discovery in this

8   case today.  That by the 2nd of October, experts, expert

9   witnesses, opinion witnesses, will be designated.  We will have

10  a close of discovery by November 30, except for rebuttal

11  witnesses, which will be designated at that time, rebuttal

12  expert witnesses.

13          We will have a pretrial conference on the 17th of

14  December, a close of rebuttal expert recovery on the 31st of

15  December, and a trial beginning January 11.

16          Is that --

17          MR. BOIES:  Your Honor, I think that is easily

18  doable.

19          THE COURT:  Good.  Mr. Cooper?

20          MR. COOPER:  Your Honor, I wasn't able, honestly, to

21  get all of that down, but --

22          THE COURT:  Well, let's go through it again.

23          MR. COOPER:  Yeah, thank you.

24          THE COURT:  Close of all discovery except expert

25  rebuttal discovery, November 30.  Designation of experts,

PROCEEDINGS

```
 1   October 2.  Pretrial conference, December 17.  We will have to

 2   pick a time.  The Clerk will remind me, that's a Wednesday, I

 3   believe.  Is it not?

 4              THE CLERK:  December 17, Your Honor?

 5              THE COURT:  No, it's a Thursday.

 6              THE CLERK:  That's a Thursday.

 7              THE COURT:  Maybe we ought to --

 8              THE CLERK:  Move it up to 16?

 9              THE COURT:  Why don't we make that the 16th.  That is

10   a Wednesday, I believe.

11              THE CLERK:  It is a Wednesday, Your Honor.

12              THE COURT:  And what does the calendar look like on

13   the 16th?

14              (Off-the-Record discussion)

15              THE COURT:  Well, we're in trial on the 16th.  Let's

16   set it for the 16th, in any event.  I may be in trial that

17   week, but we can work around that in some fashion.

18              And in any event, in any event, if you have to wait

19   and listen to the evidence in that case, it is an interesting

20   case.

21              MR. COOPER:  Well, that's a relief, Your Honor.

22              THE COURT:  All right.

23              MR. COOPER:  Your Honor, this schedule, while a

24   bit -- a bit more relaxed than the one which the Plaintiffs

25   initially offered, is quite an aggressive schedule.  I don't
```

PROCEEDINGS

1  think it's impossible.  I think it is something we may be able

2  to cope with.

3          I am mainly concerned, frankly, about the expert

4  witness and expert discovery element of this.  And in all

5  candor, Your Honor, we -- we have been in a reactive profile,

6  of course, as -- as is typical of Defendants, especially

7  Defendant Intervenors.

8          And so, it isn't -- it hasn't been, honestly, until

9  we received the supplemental case management papers from

10 Plaintiffs, which were, as you say, very -- very helpful, that

11 we became clear on -- on exactly where the Plaintiffs were

12 going, and -- and came to our own resolves, that okay, we are

13 going to now need to really hurry up and line up expert

14 analysis -- experts, in order to help us analyze some subject

15 matters that we weren't altogether clear we were going to be

16 involved with.

17         And so the truth is, we haven't done the hundreds and

18 hundreds of hours or had a chance to do the hundreds and

19 hundreds of hours that the City of San Francisco, in their

20 papers, indicated it took them to identify potential experts,

21 interview those experts, assess their backgrounds, and all the

22 things that you know, as a litigator, one has to do before one

23 commits oneself to designating an expert.

24         But with all that having been said, Your Honor, I

25 have -- I -- we will commit all the resources that we have

PROCEEDINGS

1   available to us to comply with this schedule, with the hope

2   that the Court will keep an open mind as this thing unfolds.

3        **THE COURT:**  Well, I do remember what it is like to

4   practice law, so --

5        **MR. COOPER:**  Yes, Your Honor.

6        **THE COURT:**  But I think if I were to set anything

7   other than an ambitious schedule, why, this case might

8   metastasize into something that would be un- --

9        **MR. COOPER:**  I don't think so with these guys, but --

10  I might also add, I very much welcome Mr. Boies's

11  clarification, perhaps, of some of the points that were made in

12  their supplemental case management order, in terms of what they

13  intended to inquire of the proponents.

14       And with the comments that he's made, which I accept,

15  it may well be possible --

16       **THE COURT:**  I suspect most of these issues, you will

17  be able to work out between yourselves.  But, I'm prepared to

18  rule on any discovery disputes that you have, to do so

19  informally.  I commend to you our local rules with respect to

20  how those are handled, on the telephone or a short letter.

21       And in the event you have a dispute and I'm

22  unavailable, I'm going to appoint Magistrate Judge Spero to

23  handle any of those discovery disputes, so that you get a very

24  prompt resolution.  And so the discovery can move on and not be

25  impeded by having to wait for some kind of a decision on a

PROCEEDINGS

1  discovery dispute.

2          So, I'm sure you will have some disputes on

3  discovery, but probably less than in the hands -- in

4  less-capable hands would arise.

5          **MR. COOPER:**  Very well, Your Honor.  Thank you.

6          **THE COURT:**  All right?  Now.  I have not built in a

7  dispositive motion hearing date.  The date that I had in mind

8  for that -- and Mr. Cooper, this is probably of more interest

9  to you than it is to the Plaintiffs, although the Plaintiffs

10  may have some issues that they want to bring forward by a

11  motion -- I was thinking about October 14th.

12          I don't know whether that's too soon, or whether that

13  date works on your calendars, but we can build in that date.

14          **MR. BOIES:**  We can do that, Your Honor.

15          **THE COURT:**  Mr. Cooper?

16          **MR. COOPER:**  Your Honor, that should work fine.

17          **THE COURT:**  All right.  Fine.  Now, what else do we

18  have to do this morning?

19          **MR. BOIES:**  I don't think anything, from our

20  standpoint, Your Honor.

21          **THE COURT:**  Mr. Cooper?

22          **MR. COOPER:**  We have no further business, Your Honor.

23          **THE COURT:**  Very well.  Mr. Mennemeier, anything

24  further on behalf of the Governor?

25          **MR. MENNEMEIER:**  Nothing, Your Honor.  Thank you.

PROCEEDINGS

1          **THE COURT:**  I must say I'm surprised at the

2  Governor's position in this case.  I know he has a budget to

3  worry about, and water, and fires, and other things, but this

4  is a matter of some importance to the people of the state.

5          And you're his lawyer, and I'm sure you have his

6  attention, and it would be quite useful to have his input on a

7  constitutional issue of this magnitude that affects the state

8  in the way that it does.  The Governor's thoughts and views

9  would be very helpful, and very much appreciated.

10          **MR. MENNEMEIER:**  I will share that, Your Honor.

11          **THE COURT:**  Very well.  If there's nothing further,

12  Counsel, thank you.  And I will see you at our next proceeding.

13          (Conclusion of Proceedings)

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

   I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 09-2292 VRW, Perry, et al. v. Schwarzenegger , et al., were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


      _____/S/ Belle Ball_____

     Belle Ball, CSR 8785, CRR, RMR

      Friday, August 21, 2009