COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Peter A. Patterson (Ohio Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic | CASE NO. 09-CV-2292 VRW<br><br>**DEFENDANT-INTERVENORS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  October 14, 2009<br>Time:  10:00 a.m.<br>Judge:  Chief Judge Vaughn R. Walker<br>Location:  Courtroom 6, 17th Floor |

1    Planning for the California Department of Public
     Health; PATRICK O'CONNELL, in his official
2    capacity as Clerk-Recorder for the County of
3    Alameda; and DEAN C. LOGAN, in his official
     capacity as Registrar-Recorder/County Clerk for
4    the County of Los Angeles,

5                    Defendants,

6    and

7    PROPOSITION 8 OFFICIAL PROPONENTS
     DENNIS HOLLINGSWORTH, GAIL J.
8    KNIGHT, MARTIN F. GUTIERREZ, HAK-
     SHING WILLIAM TAM, and MARK A.
9    JANSSON; and PROTECTMARRIAGE.COM –
     YES ON 8, A PROJECT OF CALIFORNIA
10   RENEWAL,

11                   Defendant-Intervenors.

12

13   Additional Counsel for Defendant-Intervenors

14

15   ALLIANCE DEFENSE FUND
     Timothy Chandler (CA Bar No. 234325)
     *tchandler@telladf.org*
16   101 Parkshore Drive, Suite 100, Folsom, California 95630
     Telephone: (916) 932-2850, Facsimile: (916) 932-2851
17
     Jordan W. Lorence (DC Bar No. 385022)*
18   *jlorence@telladf.org*
     Austin R. Nimocks (TX Bar No. 24002695)*
19   *animocks@telladf.org*
     801 G Street NW, Suite 509, Washington, D.C. 20001
20   Telephone: (202) 393-8690, Facsimile: (202) 347-3622

21   * Admitted *pro hac vice*

22

23

24

25

26

27

28

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

## TABLE OF CONTENTS

**Page**

ISSUES TO BE DECIDED ....................................................................................1

INTRODUCTION .................................................................................................2

FACTS ..................................................................................................................8

ARGUMENT ......................................................................................................11

I.     The Supreme Court's Decision in *Baker* Controls the Outcome of this Case. ......................13

      A.     *Baker* Is Dispositive Of The Issues Presented In This Case......................................13

      B.     *Baker* Retains Its Controlling Force. ....................................................15

II.    There is no Fundamental Right to Same-Sex Marriage under the Due Process Clause ........18

      A.     *Washington v. Glucksberg* Precludes Judicial Recognition Of A Fundamental Right to Same-Sex Marriage. .............................................18

            1.     A right to same-sex marriage has no roots in this Nation's history and tradition ............................................................19

            2.     Same-sex marriage is not implicit in the concept of ordered liberty ............21

            3.     The contemporary understanding of marriage remains unchanged ..............22

      B.     The Supreme Court Decisions Recognizing A "Fundamental Right To Marry" Confirm That There Is No Fundamental Right To Same-Sex Marriage .................23

      C.     *Loving v. Virginia* Does Not Support A Right To Same-Sex Marriage ...................24

      D.     *Lawrence v. Texas* Does Not Support A Right To Same-Sex Marriage .................27

      E.     Adopting Plaintiffs' View Of The Fundamental Right To Marry Would Have Far-Ranging Consequences. ............................................31

III.   Proposition 8 Is Not Subject To Heightened Scrutiny Under The Equal Protection Clause. 34

      A.     Same-Sex and Opposite-Sex Couples Are Not Similarly Situated With Respect To Marriage. .................................................35

      B.     Sexual Orientation Is Not A Suspect Or Quasi-Suspect Classification Under The Equal Protection Clause...............................................36

            1.     Controlling precedent establishes that laws that discriminate on the basis of sexual orientation are subject only to rational basis review. ...........36

2.     The precedential rule that classifications on the basis of sexual orientation are subject only to rational basis review is plainly correct..........38

    a.     Sexual orientation is not immutable. ..................................38

    b.     Gays and lesbians wield substantial political power. ........................44

C.     Proposition 8 Does Not Discriminate On The Basis Of Sex .....................................46

IV.     It Is Rational For The People Of California To Preserve The Traditional Institution Of Marriage.................................................................................................................48

    A.     Preserving The Traditional Institution Of Marriage Is Itself A Legitimate State Interest ...................................................................................51

       1.     The people of California have a legitimate interest in calling different things by different names. ............................................................51

       2.     The people of California have a legitimate interest in taking a cautious, incremental approach in addressing controversial social issues..................52

       3.     Establishing parallel institutions allows California flexibility to separately address the needs of different types of relationships..................56

    B.     The Traditional Institution Of Marriage Advances Legitimate State Interests Arising Out Of The Unique Natural Capacity Of Male-Female Relationships To Produce Offspring.....................................................................................58

       1.     The traditional institution of marriage promotes the formation of naturally procreative unions. .......................................................59

       2.     The traditional institution of marriage promotes stability and responsibility in naturally procreative relationships.....................................63

       3.     The traditional institution of marriage promotes the natural and mutually beneficial bond between parents and their biological children. ..................68

       4.     California does not undermine the legitimacy of its marriage laws by extending domestic partnership benefits to same-sex couples. ....................72

       5.     California does not undermine its marriage laws by allowing couples who cannot or intend not to have children to marry.....................................73

       6.     The rational basis test does not require any showing that declining to extend marriage to same-sex couples furthers legitimate state interests. ......76

    C.     California Has A Legitimate Interest In Ensuring That Its Marriages Are Recognized In Other Jurisdictions...................................................................79

V.     Proposition 8 Is Not Tainted By Animus Or Any Impermissible Considerations. ..............81

    A.     Because Proposition 8 Is Rationally Related To Legitimate State Interests, Plaintiffs' Assertions Of Animus Or Improper Purposes Fail At The Threshold. ....82

ii

B.    Comparison Of Proposition 8 With The Law At Issue In *Romer* Confirms That Plaintiffs' Claims Of Animus Lack Merit. ................................................................85

C.    Plaintiffs' Other Arguments Lack Merit...............................................................90

    1.    Support for traditional marriage is not a mark of bigotry.............................90

    2.    California's provision of domestic partnerships does not stigmatize gays and lesbians ...........................................................................................93

    3.    The fact that Proposition 8 reflects the deeply held moral views of many of its supporters does not render it invalid..........................................94

CONCLUSION......................................................................................................................98

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Adams v. Howerton*, 486 F. Supp. 1119 (C.D. Cal. 1980), *aff'd on other grounds*,
    673 F.2d 1036 (9th Cir. 1982) ........................................................................................16, 62

*Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982) ........................................................50

*Ah Sin v. Wittman*, 198 U.S. 500 (1905) ........................................................................97

*Andersen v. King County*, 138 P.3d 963 (Wash. 2006) ...............................................*passim*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................11, 13

*Aufort v. Aufort*, 49 P.2d 620 (Cal. Ct. App. 1935) ........................................................62

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993) ...............................................................47, 63

*Baker v. General Motors Corp.*, 522 U.S. 222 (1998) ....................................................80

*Baker v. Nelson*, 409 U.S. 810 (1972) .............................................................1, 4, 13, 24

*Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Oct. Term 1972) .....................14

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971),
    *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972) ...................13

*Baker v. Vermont*, 744 A.2d 864 (Vt. 1999) ...........................................................47, 48

*Barbato v. Commissioner of Social Sec. Admin.*, 923 F. Supp. 1273 (C.D. Cal. 1996) ...................44

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ........................................................97

*Bell v. Massanari*, 254 F.3d 817 (9th Cir. 2001) .............................................................36

*Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989) ...............................................37, 44

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) ..............................................58, 77, 84

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ...........................................................95, 97

*Brause v. Bureau of Vital Statistics*, No. 3AN-95-6562, 1998 WL 88743
    (Alaska Super. Ct. Feb. 27, 1998), *superseded by constitutional amendment*,
    Alaska Const. art. I, § 25........................................................................................47

*Brown v. Board of Educ.*, 347 U.S. 483 (1954)................................................................93

*Bruce v. Bruce*, 163 P.2d 95 (Cal. Ct. App. 1945) ........................................................62

*Burns v. State*, 48 Ala. 195 (1872)................................................................................25

*Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006) ...............................37, 48, 66, 86

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...............................34, 38, 40, 44, 83

*Conaway v. Deane*, 932 A.2d 571 (Md. Ct. App. 2007) ......................................................59, 62, 66

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008) ...........................................................................................37

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................................................................47

*Crawford v. Board of Educ.*, 458 U.S. 527 (1982)..............................................................................89

*Daggett v. Commission on Governmental Ethics & Election Practices*,
      172 F.3d 104 (1st Cir. 1999)................................................................................................... 12

*Dean v. District of Columbia*, 653 A.2d 307 (D.C. Ct. App. 1995) ..................................................62

*Doe v. United States*, 419 F.3d 1058 (9th Cir. 2005) .........................................................................75

*Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146 (2008) ...........................................................34

*Equality Found. v. City of Cincinnati*, 54 F.3d 261 (6th Cir. 1995)..............................................40

*FCC v. Beach Communications*, 508 U.S. 307 (1993)...............................................................49, 83

*Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003) .......................................37

*Frontiero v. Richardson*, 411 U.S. 677 (1973)..............................................................................38, 42, 47

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ...........................................................................................68

*Goodridge v. Department of Public Health*, 798 N.E.2d 941 (Mass. 2003) ........................47, 54, 68

*Greenhow v. Secretary of Health and Human Servs.*, 863 F.2d 633 (9th Cir. 1988),
      *overruled in part*, *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) ............................44

*Griswold v. Connecticut*, 381 U.S. 479 (1965)..............................................................................28, 75

*Hart v. Hoss & Elder*, 26 La. Ann. 90 (1874) ......................................................................................25

*Hayes v. Missouri*, 120 U.S. 68 (1887)................................................................................................ 34

*Heller v. Doe*, 509 U.S. 312 (1993) ................................................................................................ *passim*

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006) ........................................................................*passim*

*Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084 (9th Cir. 2000) ..........................................................43

*Hicks v. Miranda*, 422 U.S. 332 (1975)..........................................................................................14, 15

*High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990)..........*passim*

v

*Holmes v. California Army Nat'l Guard*, 124 F.3d 1126 (9th Cir. Cal. 1997).................................37

*Hrynda v. United States*, 933 F. Supp. 1047 (M.D. Fla. 1996) ........................................................43

*In re Kandu*, 315 B.R. 123 (Bankr. W.D. Wash. 2004) ...........................................17, 47, 48, 59, 68

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) .....................................................................*passim*

*In re Marriage Cases*, 143 Cal. App. 4th 873 (Cal. Ct. App. 2006) ..........................7, 29, 50, 52, 73

*In re Marriage of Meagher and Maleki*, 131 Cal. App. 4th. 1 (Cal. Ct. App. 2005) ........................63

*Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004)..........................................................................37

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) ..................................................................................73

*Kerrigan v. Commissioner of Pub. Health*, 957 A.2d 407 (Conn. 2008) ............31, 52, 62, 67, 68, 90

*Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000)......................................................................74

*Langevin v. Chenango Court, Inc.*, 447 F.2d 296 (2d Cir. 1971)......................................................12

*Lawrence v. Texas*, 539 U.S. 558 (2003).................................................................................*passim*

*Lehr v. Robertson*, 463 U.S. 248 (1983).........................................................................................68

*Lewis v. Harris*, 908 A.2d 196 (N.J. 2006).......................................................................31, 52, 58

*LHote v. New Orleans*, 177 U.S. 587 (1900)....................................................................................97

*Li v. Oregon*, No. 0403-03057, 2004 WL 1258167 (Or. Cir. Ct. Apr. 20, 2004),
    *rev'd on other grounds by*, 110 P.3d 91 (Or. 2005) ...................................................................47

*Lockyer v. City and County of San Francisco*, 95 P.3d 459 (Cal. 2004)......................................8, 16

*Lofton v. Secretary of Dep't of Children and Family Svcs.*, 358 F.3d 804
    (11th Cir. 2004) ........................................................................................................................37

*Loving v. Virginia*, 388 U.S. 1 (1967) ....................................................................24, 26, 27, 62, 95

*Maher v. Roe*, 432 U.S. 464 (1977)..................................................................................................

*Mandel v. Bradley*, 432 U.S. 173 (1977)..............................................................................14, 17

*Marshall v. Marshall*, 300 P. 816 (Cal. 1931)................................................................................63

*Massachusetts v. United States Department of Health and Human Svcs.*,
    1:09-cv-11156-JLT (D. Mass., July 8, 2009) ...............................................................................

*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976) .................................................74

*Mayer v. Mayer*, 279 P. 783 (Cal. 1929) ................................................................63, 71

*Maynard v. Hill*, 125 U.S. 190 (1888) ...........................................................23, 32, 52

*McConnell v. Nooner*, 547 F.2d 54 (8th Cir. 1976) ..............................................16

*McGowan v. Maryland*, 366 U.S. 420 (1961) .......................................................95

*Meyer v. Nebraska*, 202 U.S. 390 (1923) .........................................................24, 96

*Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464 (1981) ...........36

*Millar v. Millar*, 167 P. 394 (Cal. 1917) ................................................................63

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) .......................11, 49

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) .........................47

*Morrison v. Sadler*, 821 N.E.2d 15 (Ind. Ct. App. 2005) ..........................59, 64, 66, 76

*Mugler v. Kansas*, 123 U.S. 623 (1887) ................................................................97

*Nevada v. Hall*, 440 U.S. 410 (1976) ....................................................................80

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) .......................................55

*Nguyen v. INS*, 533 U.S. 53 (2001) ........................................................................68

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ............................................................35, 36

*Norwood v. Harrison*, 413 U.S. 455 (1973) .........................................................96

*Parents and Friends of Ex-Gays, Inc. v. Government of the Dist. Office of Human Rights*,
   No. 2008 CA 003662 (D.C. Sup. Ct. June 26, 2009) ...............................43

*Parham v. J. R.*, 442 U.S. 584 (1979) ...................................................................68

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973) .......................................97

*Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) .............................88

*Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997) ...............................................37

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) ..........................................68, 96

*Planned Parenthood v. Casey*, 505 US. 833 (1992) ......................................30, 96

*Planned Parenthood of Cent. Ariz. v. Arizona*, 718 F.2d 938
   (9th Cir. 1983) .....................................................................................96

*Reed v. Reed*, 404 U.S. 71 (1971) .........................................................................47

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................4, 18

*Rich v. Secretary of the Army*, 735 F.2d 1220 (10th Cir. 1984) ......................................37

*Roe v. Wade*, 410 U.S. 113 (1973) ...............................................................................96

*Romer v. Evans*, 517 U.S. 620 (1996) .....................................................15, 16, 37, 84, 85

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ......................................................................35

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ....................................44

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006) ....................37

*Singer v. Hara*, 522 P.2d 1187 (Wash. Ct. App. 1974) .............................................47, 59

*Skinner v. Oklahoma*, 316 U.S. 535 (1942) ...................................................24, 58, 62, 95

*Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005), *rev'd in part*,
   447 F.3d 673 (9th Cir. 2006) ...........................................................................*passim*

*Sosna v. Iowa*, 419 U.S. 393 (1975) ..........................................................32, 48, 79, 80

*Standhardt v. Superior Court of the State of Ariz.*, 77 P.3d 451 (Ariz. Ct. App. 2003) ........59, 66, 75

*Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) .............................................................37

*Strauss v. Horton*, 207 P.3d 48 (Cal. 2009) ...............................................................*passim*

*Troxel v. Granville*, 530 U.S. 57 (2000) .......................................................................69

*Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001) ...............................................................36

*Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004) ......................................83

*United States Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973) ..............................83

*United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166 (1980) .........................49, 77, 83

*United States v. Carolene Prods.*, 304 U.S. 144 (1938) .................................................34

*United States v. Virginia*, 518 U.S. 515 (1996) .............................................................47

*Vance v. Bradley*, 440 U.S. 93 (1979) .....................................................12, 49, 50, 77, 83

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) ..............................................................37

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation*,
   439 U.S. 463 (1979)...........................................................................................14

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .......................................................*passim*

viii

*Williams v. North Carolina*, 317 U.S. 287 (1942) ........................................................52

*Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483 (1955) .................................55, 74

*Wilson v. Ake*, 354 F. Supp. 2d 1298 (M.D. Fla. 2005) ..........................16, 47, 48

*Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir. 2008) ..........................28, 37

*Woodward v. United States*, 871 F.2d 1068 (Fed. Cir. 1989) ..........................37, 43

*Wright v. Lane County Dist. Ct.*, 647 F.2d 940 (9th Cir. 1981) ......................................14

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ..........................................24, 62, 95

## **Constitutional and Legislative Materials**

1 U.S.C. § 7 ..................................................................................22, 81

28 U.S.C. § 1738C ..................................................................................80

42 U.S.C. § 1983 ..................................................................................10

H.R. Rep. No. 104-664 (1996) ..................................................................6, 58

Ala. Const. art. I, § 36.03 ..................................................................................22

Ala. Const. art. I, § 36.03(e) ..................................................................................80

Alaska Const. art. 1, § 25 (1998) ..........................................................22, 47

Ariz. Const. art. XXX, § 1 (2008) ..................................................................................22

Ark. Const. amend. 83, § 1-3 ..................................................................................22

Ark. Const. amend. 83, § 2 ..................................................................................80

Cal. Const. art. I, § 7.5 ..................................................................................9, 22

Cal. Fam. Code § 297.5 ..........................................................................54, 93

Cal. Fam. Code § 301 ..................................................................................32

Cal. Fam. Code § 308.5 ..................................................................................8

Cal. Fam. Code § 310 ..................................................................................67

Cal. Fam. Code § 720 ..................................................................................67

Cal. Fam. Code § 1620 ..................................................................................67

CAL. FAM. CODE § 2200 ................................................................................32

CAL. FAM. CODE § 2201 ................................................................................66

CAL. FAM. CODE § 2210(d) ...........................................................................62

CAL. FAM. CODE § 2400(a)(3) ........................................................................67

CAL. FAM. CODE § 3900 ................................................................................67

CAL. FAM. CODE § 7540 ................................................................................67

CAL. FAM. CODE § 8616.5 ..............................................................................70

CAL. FAM. CODE § 8616.5(a) ..........................................................................70

CAL. GOV'T CODE § 12926(m) ........................................................................40

CAL. GOV'T CODE § 12955(m) ........................................................................40

CAL. GOV'T CODE §§ 11135 ...........................................................................40

CAL. PENAL CODE §§ 283-85 ..........................................................................32

CAL. WELF. & INST. CODE § 16001.9(a)(6) .......................................................69

CAL. WELF. & INST. CODE § 16001.9(a)(7) .......................................................69

CAL. WELF. & INST. CODE § 18993 .................................................................67

CAL. WELF. & INST. CODE § 18993.1(g) ..........................................................67

CAL. WELF. & INST. CODE § 18993.2(b)(1)-(3) ................................................67

California Registered Domestic Partner Rights & Responsibilities Act of 2003,
2003 CAL. STAT. 421, § 15 ........................................................................86

COLO. CONST. art. II, § 31.............................................................................22

CONN. GEN. STAT. § 46a-81a .........................................................................40

DEL. CODE ANN. tit. 13, § 101 .......................................................................22

D.C. CODE § 2-1401.02(28)............................................................................41

FLA. CONST. art. I, § 27.............................................................................22, 80

FLA. STAT. 741.212......................................................................................80

GA. CONST. art. I, § IV, ¶ I ...........................................................................22

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

Haw. Const. art. I, § 23 ........................................................................................47

Haw. Rev. Stat. § 572-1 .......................................................................................22

Haw. Rev. Stat. § 572-3 .......................................................................................22

Idaho Const. art. III, § 28 .....................................................................................22

750 Ill. Comp. Stat. 5/212 ...................................................................................22

Ind. Code § 31-11-1-1 ..........................................................................................22

Ind. Code § 31-11-1-1(b) .....................................................................................80

Kan. Const. art. XV, § 16 .....................................................................................22

Ky. Const. § 233a .................................................................................................22

La. Const. art. XII, § 15 ........................................................................................22

Md. Code Ann., Fam. Law § 2-201 ......................................................................22

Mass. Gen. Laws ch. 151B, § 3(6) .......................................................................40

Mich. Const. art. I, § 25 .................................................................................22, 80

Minn. Stat. § 517.01 .............................................................................................22

Miss. Const. art. XIV, § 263A ..............................................................................22

Mo. Const. art. I, § 33 ..........................................................................................22

Mont. Const. art. XIII, § 7 ....................................................................................22

Neb. Const. art. I, § 29 .........................................................................................22

Nev. Const. art. I, § 21 .........................................................................................22

N.J. Stat. Ann. § 37:1-1 ........................................................................................22

N.M. Stat. §§ 40-1-1 – 40-1-7 .............................................................................22

N.Y. Dom. Rel. Law § 5-7 ....................................................................................22

N.C. Gen. Stat. § 51-1.2 .......................................................................................22

N.D. Const. art. XI, § 28 .......................................................................................22

Ohio Const. art. XV, § 11 .....................................................................................22

Okla. Const. art. II, § 35 .......................................................................................22

OR. CONST. art. XV, § 5a ............................................................................................22

23 PA. CONST. STAT. § 1704 .......................................................................................22

R.I. GEN.LAWS §§ 15-1-1 – 15-1-5 ...........................................................................22

S.C. CONST. art. XVII, § 15 .......................................................................................22

S.D. CONST. art. XXI, § 9 ...........................................................................................22

TENN. CONST. art. XI, § 18 ........................................................................................22

TEX. CONST. art. I, § 32 ..............................................................................................22

UTAH CONST. art. I, § 29 ......................................................................................22, 80

VA. CONST. art. I, § 15-A ............................................................................................22

WASH. REV. CODE § 26.04.010-20 .............................................................................22

W. VA. CODE § 48-2-603 ............................................................................................22

WIS. CONST. art. XIII, § 13 .........................................................................................22

WYO. STAT. ANN. § 20-1-101 .....................................................................................22

S.F. ADMIN. CODE § 12A.3 .........................................................................................41

FED. R. CIV. PROC. 56(c) ............................................................................................11

FED. R. EVID. 201 .......................................................................................................12

### Other Publications

AMERICAN HERITAGE DICTIONARY (4th ed. 2000) ........................................................20

Annette R. Appell, *The Endurance of Biological Connection: Heteronormativity, Same-sex Parenting, and the Lessons of Adoption*, 22 BYU J. PUB. L. 289, 303 (2008) ...........69

Annette Baran & Reuben Pannor, *Perspectives on Open Adoption*, 3 THE FUTURE OF CHILDREN 119, 122 (1993) ......................................................................................................70

A Sharp Thrust at Polygamy, N.Y. TIMES, Mar. 2, 1867 ...............................................20

Jessica Bennett, *Only You. And You. And You.*, Newsweek Web Exclusive, July 29, 2009, *available at* http://www.newsweek.com/id/209164/output/print .................................33

APA Online, Answers *to Your Questions for a Better Understanding of Sexual Orientation & Homosexuality*, *available at* http://www.apa.org/topics/sorientation.html ................39

Gail S. Bernstein, *Defining Sexual Orientation*, *available at*
http://www.selfhelpmagazine.com/article/sexual_orientation ....................................38

BLACKS LAW'S DICTIONARY.................................................................................21

1 WILLIAM BLACKSTONE, COMMENTARIES *435..................................................3, 21, 65

JANIS S. BOHAN, PSYCHOLOGY AND SEXUAL ORIENTATION: COMING TO TERMS (1996).................39

David Boies, *Gay Marriage and the Constitution*, THE WALL STREET JOURNAL, July 20, 2009,
*available at* http://online.wsj.com/article/SB124804515860263587.html.............................5, 90

JOHN BOUVIER, A LAW DICTIONARY ADAPTED TO THE CONSTITUTION AND LAWS OF THE
UNITED STATES 105 (1874)...............................................................................20

Tammy Bruce, *Respecting Marriage* and *Equal Rights*, *available at*
http://mensnewsdaily.com/archive/a-b/bruce/2004/bruce022504.htm........................................92

Building a State of Equality, *available at*
http://www.eqca.org/site/pp.asp?c=kuLRJ9MRKrH&b=4025493 ............................................45

EDMUND BURKE, REFLECTIONS ON THE REVOLUTION IN FRANCE (1790) ...........................................7

Cal. Sec'y of State, Votes for and Against November 4, 2008 State Ballot Measures, *available
at* http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf........................10

CIA, THE WORLD FACTBOOK, COUNTRY COMPARISON: TOTAL FERTILITY RATE (2009), *available
at* https://www.cia.gov/library/publications/the-world-factbook/rankorder/2127rank.html .59, 60

President Clinton, Statement on Signing the Defense of Marriage Act, 32 WEEKLY COMP. PRES.
DOCS. 1829 (Sept. 20, 1996) ....................................................................................91

Council for Responsible Genetics, *Brief on Genetic Determinism* (2006), *available at*
http://www.councilforresponsiblegenetics.org/ViewPage.aspx?pageId=66 ...............................43

Kingsley Davis, *The Meaning and Significance of Marriage in Contemporary Society*, *in*
CONTEMPORARY MARRIAGE at 5 (1985).........................................................................58, 65

Democratic Party Platform 2008: Renewing America's Promise, available at
http://www.democrats.org/a/party/platform.html.......................................................46

Lisa M. Diamond and Ritch C. Savin-Williams, *Gender and Sexual Identity*, in HANDBOOK OF
APPLIED DEVELOPMENTAL SCIENCE VOL. 1 AT 102 (Richard L. Lerner et al., eds., 2003) .........38

Lisa M. Diamond, *Female bisexuality from adolescence to adulthood: Results from a 10-year
longitudinal study*, 44 DEVELOPMENTAL PSYCHOLOGY 5, 9 (2008)...........................................42

C.W. Elliott, *Life in the Great Cities: Yedo*, PUTNAM'S MONTHLY MAGAZINE OF AMERICAN
LITERATURE 444-55 (Apr. 1868) ...............................................................................20

Equality California Press Release, *Governor Davis Makes History With Signature On Domestic*

*Partner Rights and Responsibilities Act of 2003*, September 19, 2003, *at* http://www.eqca.org/site/apps/nlnet/content2.aspx?c=kuLRJ9MRKrH&b=4025653&ct=5197843 ..............................................................................................................................94

WILLIAM ESKRIDGE, GAYLAW:  CHALLENGING THE APARTHEID OF THE CLOSET at 134 (2002).......33

Paula Ettelbrick, *Since When Is Marriage a Path to Liberation*, OUT/LOOK National Gay and Lesbian Quarterly, No. 6, Fall 1989, SAME-SEX MARRIAGE PRO AND CON: A READER 119-20 (Andrew Sullivan, ed. 1997) .......................................................................92

Paula Ettelbrick, *Since When is Marriage a Path to Liberation?*, in LESBIANS, GAY MEN, AND THE LAW 401-05 (William B. Rubenstein, ed. 1993) ........................................57

Caitlin *Flanagan*, *Is There Hope for the American Marriage?*, TIME, July 2, 2009, available at http://www.time.com/time/printout/0,8816,1908243,00.html................................7, 79

Maggie Gallagher, *(How) Will Gay Marriage Weaken Marriage as a Social Institution*, 2 U. ST. THOMAS. L. J. 33, 48 (2004) ...................................................................64, 76

Maggie Gallagher, *Does Sex Make Babies?  Marriage, Same-Sex Marriage and Legal Justifications for the Regulation of Intimacy in a post-Lawrence World*, 23 QUINNIPIAC L. REV. 447, 463 (2004) .....................................................................................59, 61, 63

Linda D. Garnets and Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, *available at* http://www.csw.ucla.edu/Newsletter/Dec06/garnets_peplau.html .....42

Gary J. Gates, et al., *Marriage, Registration, and Dissolution by Same-Sex Couples in the U.S.* at 10 (July 2008), *available at* http://www.law.ucla.edu/williamsinstitute/publications/Couples%20Marr%20Regis%20Diss.pdf ..............................................................................................................42

Gay/Lesbian/Bisexuals, *at* http://www.healthyminds.org/More-Info-For/Gay LesbianBisexuals.aspx....................................................................................................42

JACKIE GOLDBERG, ASSEM. MEMBER, AB 205 (GOLDBERG) FACT SHEET, A.B. 205, 2003-2004 Reg. Sess., at A.P. 242-45 (Cal. 2003) ...................................................................93

JACKIE GOLDBERG, ASSEM. MEMBER, AB 205 (GOLDBERG) FACT SHEET, A.B. 205, 2003-2004 Reg. Sess., at S.P. 29-32 (Cal. 2003) ...................................................................93

E.J. Graff, "Retying the Knot," in SAME-SEX MARRIAGE:  PRO AND CON, A READER 136 (Andrew Sullivan, ed. 1997).........................................................................................53

H.D. GROTEVANT & R.G. MCROY, OPENNESS IN ADOPTION: EXPLORING FAMILY CONNECTIONS 92 (1998)..................................................................................................................69

http://www.regjeringen.no/nb/dep/bld/dok/regpubl/otprp/2007-2008/otprp-nr-33-2007-2008-/16.html?id=502804.....................................................................................................22

http://www.searchingformyspermdonorfather.org/ ........................................................70

xiv

Human Rights Campaign, *2008 Presidential Questionnaire—Senator Barack Obama* at 3, *available at* http://news.nationaljournal.com/pdfs/questionnaires/obama.pdf ............................91

Human Rights Campaign, *Congressional Scorecard*, available at http://www.hrc.org/documents/Congress_Scorecard-110th.pdf .................................46

ALDOUS HUXLEY, BRAVE NEW WORLD 1-32 (1932) ........................................................71

*Iowa Gay Marriage Drawing Out-Of-State Couples*, THE KANSAS CITY STAR, Aug. 30, 2009, *at* http://www.kansascity.com/news/breaking_news/story/1414726.html ......................81

Henry James, *The Woman Thou gavest with me*, THE ATLANTIC MONTHLY 69 (Jan. 1870) ............20

SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (1755) ...........................19

Michael R. Kauth and Seth C. Kalichman, *Sexual Orientation and Devleopment:  An Interactive Approach*, in THE PSYCHOLOGY OF SEXUAL ORIENTATION, BEHAVIOR, AND IDENTITY 83 (Louis Diamant and Richard D. McAnulty, eds., 1995)...............................................41

ALFRED CHARLES KINSEY, SEXUAL BEHAVIOR IN THE HUMAN MALE (1948)...................................39

Könsneutrala äktenskap och vigselfrågor (Civilutskottets Betänkande 2008/09:CU19) (Swed.), *available at* http://www.riksdagen.se/Webbnav/index.aspx?nid=3322&dok_id=GW01CU19..22

Edward Lewine, *The Gay Baby Boom*, DETAILS MAGAZINE (May 2008) .......................................70

JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT § 78 (1690) ...........................................3, 65

Loving More, New Models for New Relationships, *at* http://lovemore.com ....................................33

Robert K. Merton, "The Unanticipated Consequences of Purposive Social Action," 1 AMERICAN SOCIOLOGICAL REVIEW 894 (1936) ............................................................................53

Kristin Anderson Moore, et al., *Marriage from  a Child's Perspective:  How Does Family Structure Affect Children and What Can We Do About It?*, Child Trends Research Brief at 1-2 (June 2002), *available at* http://www.childtrends.org/files/MarriageRB602.pdf .............71

NEW OXFORD AMERICAN DICTIONARY (2001) .................................................................20

Martha Nussbaum, *A Right to Marry? Same-sex Marriage and Constitutional Law*, DISSENT MAGAZINE, Summer 2009, available at http://dissentmagazine.org/article/?article=1935 ........33

BARACK OBAMA, THE AUDACITY OF HOPE (2006)..........................................................................91

Richard Posner, *Should There Be Homosexual? And If So, Who Should Decide?* 95 MICH. L. REV. 1578 (1997) ......................................................................................................56, 90

Proclamation 8387, Lesbian, Gay, Bisexual and Transgender Pride Month, 2009, 74 Fed. Reg. 29,929 (June 4, 2009)...................................................................................45, 91

Jonathan Rauch, author of *Gay Marriage: Why it is Good for Gays, Good for Straights,*

*and Good for Marriage*, An argument for same-sex marriage, an interview with Jonathan Rauch, *available at* http://pewforum.org/events/?EventID=179 .................................................55

Jeffrey A. Redding, *Proposition 8 and the Future of American Same-Sex Marriage Activism*, 14 Nexus J. Op. 113, 122-23 (2009) ...............................................................51, 57

Charles Frank Robinson, Dangerous Liaisons (2006) ............................................25

Todd A. Salzman & Michael G. Lawler, The Sexual Person (2008) ........................38

Ritch C. Savin-Williams, *Then and Now:  Recruitment, Definition, Diversity, and Positive Attributes of Same-Sex Populations*, 44 Dev. Psychology 136 (2008) .....................39

Randy Shilts, The Mayor of Castro Street (2008)....................................................57

Michelangelo Signorile, *Bridal wave*, Out Magazine (December/January 1994) .........53

Monte Neil Stewart, *Marriage Facts*, 31 Harv. J.L. & Pub. Pol'y 313 (2008)........................53, 65

Maura I. Strassberg, *The Challenge of Post-modern Polygamy: Considering Polyamory*, 31 Cap. U. L. Rev. 439 (2003) ...................................................................33

Text of President Obama's Father's Day Speech, 2008, *available at* http://dyn.politico.com/printstory.cfm?uuid=8D513671-3048-5C12-00362F14531AFFDF .....64

The National Marriage Project, *The State of Our Unions 2008:  The Social Health of Marriage in America*, Figure 8, *available at* http://marriage.rutgers.edu/Publications/SOOU/2008update.pdf................................60

The Dialogues of Plato, 719 (B. Jowett trans. Random House 1937) ..........................71

U.N. Dep't of Econ. & Soc. Affairs, Population Div., *Possible Responses to Population Aging and Population Decline: Of the Case of Italy*, 2, U.N. Doc. UN/POP/PRA/2000/7 (Sept. 26, 2000) (*prepared by* Antonio Golini, *available at* http://www.un.org/esa/population/publications/popdecline/Golini.pdf .....................60

U.N. Dep't of Econ. & Soc. Affairs, Population Div., *The Inversion of the Age Pyramid and the Future Population Decline in France: Implications and Policy Responses*, 3, U.N. Doc. UN/POP/PRA/2000/3 (Aug. 15, 2000) (*prepared by* Jean Claude Chesnais), *available at* http://www.un.org/esa/population/publications/popdecline/Chesnais.pdf .................61

U.N. Dep't of Econ. & Soc. Affairs, Population. Div., *World Population Prospects: The 2002 Revision: Highlights*, 15, U.N. Doc. ESA/P/WP.180 (Feb. 26, 2003), *available at* http://www.un.org/esa/population/publications/wpp2002/WPP2002-HIGHLIGHTSrev1.PDFKönsneutrala äktenskap och vigselfrågor (Civilutskottets Betänkande 2008/09:CU19) (Swed.), *available at* http://www.riksdagen.se/Webbnav/index.aspx?nid=3322&dok_id=GW01CU191 U.S.C. § 7..60

United Nations Convention on the Rights of the Child, Art. 7, Nov. 20, 1989, 28 I. L. M. 1456 ....69

xvi

Mark Vernon, *We Don't Need Gay Marriage*, THE GUARDIAN, July 4, 2009, available at http://www.guardian.co.uk/commentisfree/2009/jul/04/gay-marriage-civil-partnerships ..........57

Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage: Interstate Comity, Racial Identity, and Miscegenation Laws in North Carolina, South Carolina, and Virginia, 1860s-1960s*, 32 AKRON L. REV. 557, 558, 561 (1999).......................26

PETER WALLENSTEIN, TELL THE COURT I LOVE MY WIFE (2002) .....................................................25

Lynn D. Wardle, *Multiply and Replenish: Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 HARV. J.L. & PUB. POL'Y 771 (2001)................................61

Lynn Wardle and Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 HOW. L.J. 117 (2007) ....................................................................25

NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1828) ....3, 19, 65

NOAH WEBSTER, ETYMOLOGICAL DICTIONARY 130 (1869) ............................................................19

KATH WESTON, FAMILIES WE CHOOSE: LESBIANS, GAYS, KINSHIP (1991).........................................70

PHILIPS WHARTON I DO, I DON'T: QUEERS ON MARRIAGE (2004).....................................................53

Ellen Willis, contribution to "Can Marriage be Saved? A Forum," NATION, July 5, 2004 .............53

James Q. Wilson, THE MARRIAGE PROBLEM (2003) ..................................................................64, 65

Joseph E. Worcester, A Primary Dictionary of the English Language (1871) .................................19

Yongmin Sun, The Well-Being of Adolescents in Households with No Biological Parents, 65 J. OF MARRIAGE & FAMILY 894 (2003) ........................................................................................71

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 14, 2009, at 10:00 a.m., before the Honorable Vaughn R. Walker, United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Defendant-Intervenors will move the Court for summary judgment.

For the reasons that follow, Defendant-Intervenors (also referred to as "Proponents") respectfully request entry of summary judgment dismissing Plaintiffs' and Plaintiff-Intervenors' claims.

## ISSUES TO BE DECIDED

1.    Whether California has violated the Due Process Clause of the Fourteenth Amendment by preserving the traditional definition of marriage as the union of a man and a woman.

2.    Whether California has violated the Equal Protection Clause of the Fourteenth Amendment by preserving the traditional definition of marriage as the union of a man and a woman.

3.    Whether *Baker v. Nelson*, 409 U.S. 810 (1972), forecloses Plaintiffs' claims that California's decision to preserve the traditional definition of marriage as the union of a man and a woman violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

4.    Whether the fundamental right to marry protected by the Due Process Clause requires California to recognize same-sex relationships as marriages.

5.    Whether the Due Process Clause of the Fourteenth Amendment protects a fundamental right to have a same-sex relationship denominated as a marriage.

6    Whether the right to privacy protected by the Due Process Clause of the Fourteenth Amendment requires California to recognize same-sex relationships as marriages.

7.    Whether under the Equal Protection Clause of the Fourteenth Amendment same-sex couples and opposite-sex couples are similarly situated with respect to the institution of marriage.

1

8. Whether gays and lesbians constitute a suspect or quasi-suspect class for purposes of the Equal Protection Clause of the Fourteenth Amendment.

9. Whether the traditional definition of marriage as the union of a man and a woman constitutes sex discrimination under the Equal Protection Clause of the Fourteenth Amendment.

10. Whether the California's decision to preserve and restore the traditional definition of marriage as the union of a man and a woman bears a rational relationship to any legitimate government interest.

11. Whether Plaintiffs' arguments that Proposition 8 was tainted by animus or other improper motivations fail as a matter of law.

## **INTRODUCTION**

Since the time that California became a State in 1849, her constitution and laws have "clearly assumed that the marriage relationship necessarily involved persons of the opposite sex." *In re Marriage Cases*, 183 P.3d 384, 407 (Cal. 2008). There was no debate about the meaning of the word "marriage" preceding the passage of California's initial laws on the subject, nor any discussion of the meaning of the terms "husband" and "wife." No discussion was needed because California's first lawmakers were using words whose meanings were well known to all: marriage *meant* the relationship between a husband and a wife. Nor was there any debate among the State's first lawmakers about the *purpose* of recognizing and regulating marriage. Again, it was common ground that the purpose of enacting laws governing the terms and conditions of marriage, as well as restrictions on the eligibility of the parties, was to legitimate and regulate the *procreative* sexual activity of men and women. The central purpose of marriage, in California and everywhere else, had always been to promote naturally procreative sexual relationships and to channel them into stable, enduring unions for the sake of producing and raising the next generation. California's laws pertaining to the marital relationship, then and now, could not be justified—indeed would be

2

unintelligible—apart from this purpose.

California's understanding of the meaning and purpose of marriage was confirmed by all of the esteemed authorities. Webster defined marriage as "the act of uniting a man and a woman for life," and explained that it "was instituted…for the purpose of preventing the promiscuous intercourse of the sexes, for promoting domestic felicity, and for securing the maintenance and education of children." *See* NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1828). Blackstone, too, spoke of the institution's purpose: "[T]he establishment of marriage in all civilized states is built on this natural obligation of the father to provide for his children; for that ascertains and makes known the person who is bound to fulfill this obligation; whereas, in promiscuous and illicit conjunctions, the father is unknown; and the mother finds a thousand obstacles in her way . . . ." 1 *Commentaries* \*435. And Locke, in his SECOND TREATISE OF CIVIL GOVERNMENT § 78 (1690), said of marriage that it "is made by a voluntary compact between man and woman; and tho' it consist chiefly in such a communion and right in one another's bodies as is necessary to its chief end, procreation; yet it draws with it mutual support and assistance . . . necessary to their common off-spring, who have a right to be nourished, and maintained by them, till they are able to provide for themselves."

California's understanding of marriage was also confirmed by an authority even more eminent: the ages. Every civilized society in recorded history, from the ancients to the American states, had always limited marriage to opposite-sex relationships. None had ever defined marriage to include a union between two persons of the same sex.

Today, the vast bulk of the world continues to restrict marriage to opposite-sex couples. A tiny handful of countries have very recently begun to recognize same-sex marriage, as have six American states, although three of them have had the experiment imposed on them by judicial decree.

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

It is against this historical and contemporary backdrop that the Plaintiffs in this case assert that the traditional opposite-sex definition of marriage serves no legitimate societal purpose whatever.  Plaintiffs argue that laws restricting the institution of marriage to opposite-sex couples are so bereft of a rational justification that they violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  And they presumably have violated the Fourteenth Amendment, according to Plaintiffs, since its ratification, notwithstanding that such laws have coexisted peacefully with the Fourteenth Amendment for over 150 years.  Thus, they ask this Court not only to invalidate Proposition 8, which specifically restored and reaffirmed the traditional definition of marriage in California, but to effectively sweep aside the marriage laws of 43 other states and the federal government as well.

The first hurdle, then, that Plaintiffs' constitutional argument must somehow clear is the sheer implausibility of its central premise—namely, that marriage has deliberately been defined by virtually every society throughout history as an opposite-sex union *for no good reason*.  If there is any truth at all to the notion that "[t]he mere novelty of a claim is reason enough to doubt that substantive due process sustains it," *Reno v. Flores*, 507 U.S. 292, 303 (1993), then Plaintiffs' due process challenge to Proposition 8 surely must fail.

And fail it already has, along with their equal protection claim. For while Plaintiffs' constitutional claims are novel, they are not unprecedented.  Precisely the same Fourteenth Amendment claims were presented to, and rejected on the merits by, the Supreme Court in *Baker v. Nelson*, 409 U.S. 810 (1972).  Not a single Justice found the constitutional challenge to Minnesota's opposite-sex definition of marriage substantial enough to afford it plenary review.  *Baker* controls this case, we submit, and thus compels its dismissal.  But even if Plaintiffs' claims could survive *Baker*, they cannot survive careful analysis.

Plaintiffs say that the traditional opposite-sex definition of marriage is so irrational that it

4

is inexplicable on any grounds other than "naked 'animosity' " and " 'antipathy' " toward gays and lesbians.  P.I. Reply, Doc # 52 at 6; P.I. Motion, Doc # 7 at 20.  Indeed, one of Plaintiffs' lead counsel recently wrote that the traditional definition of marriage reflects nothing but "the residue of centuries of figurative and literal gay-bashing."  David Boies, *Gay Marriage and the Constitution*, The Wall Street Journal, July 20, 2009, *available at* http://online.wsj.com/article/SB124804515860263587.html.  Plaintiffs thus condemn as bigoted not only a majority of Californians, but also an overwhelming majority of Americans—decent people from all walks of life, all political parties, and all races and creeds.  It is answer enough to this regrettable charge that same-sex marriage is opposed by President Obama, Vice President Biden, large majorities of the Members of both Houses of Congress, and numerous well-known champions of gay rights.  The point was put crisply by New York's high court:

> The idea that same-sex marriage is even possible is a relatively new one.  Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex.  A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted.  We do not so conclude.

*Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006).

But the more pertinent point here, the legally dispositive point, is that the traditional definition of marriage is rationally grounded in a variety of legitimate state interests, as every federal judge, save one—whose decision was unanimously reversed on appeal—and the large majority of state judges have concluded in reviewing challenges to state and federal marriage laws.  Two of these state interests are particularly vital:  the state's existential interest in its own perpetuation, through the production and rearing of the next generation; and the state's vital interest in ensuring that children are raised in a stable, enduring family environment by the couple who brought them into the world, rather than becoming the responsibility of the state.  As recognized by the United States Congress, "At bottom, civil society has an interest in maintaining and protecting the institution of heterosexual marriage because it has a deep and abiding interest

in encouraging responsible procreation and child-rearing. Simply put, government has an interest in marriage because it has an interest in children." H.R. REP. NO. 104-664, at 13 (1996).

The inescapable biological reality is that sexual relationships between members of the same sex are not naturally procreative, and therefore neither threaten nor further these vital state interests in the manner, or to the degree, that such relationships between members of the opposite-sex do. Plaintiffs themselves bring this point into sharp focus, unwittingly, with their hypothetical example of the reprobate opposite-sex couple who "can get married the morning after meeting each other at a night club," while an upstanding same-sex couple in an enduring, committed relationship cannot. P.I. Motion, Doc # 7 at 15. But society plainly has a vital interest in encouraging the opposite-sex couple, if and when they decide to have sexual relations, to marry and to commit themselves to take responsibility for raising any children produced by their union, whether intentionally or *unintentionally*, into responsible, productive citizens. These vital societal interests are plainly related to the uniquely procreative capacity of opposite-sex relationships, and it is plainly rational for the state to maintain a unique institution to serve these interests. The Constitution requires nothing more.

Plaintiffs, however, discard the procreative purposes of marriage: "[T]he promotion of procreation is not a remotely sufficient ground for preventing a couple from getting married." P.I. Motion, Doc # 7 at 14. Rather, the purpose of marriage, they say, is to provide couples the "personal fulfillment" that comes with official recognition of loving, committed family relationships. P.I. Motion, Doc # 7 at 12. Plaintiffs therefore have, they argue, a fundamental right "to marry the person they love." Plaintiffs' Supp. Case Mgt. Statement, Doc # 157 at 4; P.I. Motion, Doc # 7 at 23.

The question of the basic purpose of marriage—personal fulfillment versus responsible procreation and childrearing—is at the center of the public debate over the meaning and purpose

of marriage now raging in many areas of the country.  As one commenter has asked:

> The fundamental question we must ask … is this:  What is the purpose of marriage?  Is it . . . simply an institution that has the capacity to increase the pleasure of the adults who enter into it? . . .  Or is marriage an institution that still hews to its old intention and function—to raise the next generation, to protect and teach it, to instill in it the habits of conduct and character that will ensure the generation's own safe passage into adulthood? . . . What we teach about the true meaning of marriage will determine a great deal about our fate.

Caitlin Flanagan, *Is There Hope for the American Marriage?*, TIME, July 2, 2009, *available at* http://www.time.com/time/printout/0,8816,1908243,00.html.  The implications of this public debate are profound, going to the basic nature of our culture.  And it is not surprising that the issue of same-sex marriage, which directly implicates this debate, has inflamed passions and aroused deeply held moral values, religious convictions, and political beliefs on both sides of the debate.

The people of California have recently resolved the issue, at least for the time being, electing to retain the traditional definition of marriage and, thus, to maintain its abiding link to the naturally procreative capacity of male-female unions.  At the same time, they have preserved a parallel statutory structure, the Domestic Partnership Act, for recognizing the committed family relationships of gay and lesbian couples, with essentially all the benefits and obligations of marriage.  "By maintaining the traditional definition of marriage while simultaneously granting legal recognition and expanded rights to same-sex relationships, the [State] has struck a careful balance to satisfy the diverse needs and desires of Californians."  *In re Marriage Cases*, 143 Cal. App. 4th 873, 935-36 (Cal. Ct. App. 2006).  The people of California had every right to move incrementally, and with caution, in addressing novel and highly controversial experiments with this venerable and bedrock social institution.  For, in the famous words of Edmund Burke, "it is with infinite caution that any man ought to venture upon pulling down an edifice which has answered in any tolerable degree for ages to common purposes of society or on building it up again, without having models and patterns of approved utility before his eyes."  REFLECTIONS ON THE REVOLUTION IN FRANCE 90 (1790).

7

A small handful of states, on the other hand, have very recently begun to experiment with same-sex marriage, and they too have every right to do so.  Innovation and change are the hallmarks of a democratic and pluralistic society, and are the genius of our constitutional federalism.  Perhaps the examples provided by these states will persuade others, including California, to imitate them.  Or perhaps not.

But the question for this Court is whether the Constitution itself resolves the debate, halts the experiments, and prescribes same-sex marriage from coast-to-coast.  This is truly a momentous question, but it is not a hard one, as we demonstrate at length in the pages that follow.

## FACTS

"From the beginning of California statehood, the legal institution of civil marriage has been understood to refer to the relationship of a man and a woman." *In re Marriage Cases*, 183 P.3d 384, 407 (Cal. 2008) (footnote omitted).  In 2000, the people of California, with 61.4 percent of the voters voting in favor, passed an initiative statute (Proposition 22) reaffirming this traditional understanding.  *Id.* at 467 (Baxter, J., concurring and dissenting).  "Only marriage between a man and a woman," the statute provides, "is valid or recognized in California."  CAL. FAM. CODE § 308.5.

Notwithstanding this statutory directive, the City and County of San Francisco began issuing civil marriage licenses to same-sex couples in February 2004.  *Marriage Cases*, 183 P.3d at 402.  San Francisco's actions were challenged in state court, and in August 2004 the California Supreme Court held that the City had exceeded its authority, ordered it to conform to California law, and declared the same-sex marriages recognized by the City a legal nullity.  *See Lockyer v. City and County of San Francisco*, 95 P.3d 459, 499 (Cal. 2004).

San Francisco turned to litigation, contending that the traditional definition of marriage as the union of a man and a woman violated the State Constitution.  *Marriage Cases*, 183 P.3d at

402-03.  San Francisco's suit was joined with other similar challenges to California's marriage laws in a single proceeding titled *In re Marriage Cases*.

As the matter worked its way through the State courts, Proponents worked to obtain the signatures necessary to place an initiative measure before the State's voters that would enshrine the traditional definition of marriage in the State Constitution.  *Strauss v. Horton*, 207 P.3d 48, 66 (Cal. 2009); *see also* Doc # 8-2 at 5-6.  Proponents succeeded in their petition drive, and in April 2008 submitted signature petitions to county-election officials for verification.  *See* Doc # 8-2 at 6.  The measure—which would come to be designated as Proposition 8—proposed to add a single new section to the California Constitution.  That section would read:  "Only the marriage between a man and a woman is valid or recognized in California."  CAL. CONST. art. I, § 7.5.  "As we have seen, these are the identical 14 words that were embodied in Proposition 22 ….  The [only] difference between the measure proposed by Proposition 8 and the one contained in Proposition 22 is that Proposition 8 proposed to add this language as a provision of the California Constitution, whereas by Proposition 22 this language had been adopted as a statutory provision."  *Strauss*, 207 P.3d at 66 (emphases removed).

On May 15, 2008, before the Secretary of State certified Proposition 8 for the November ballot—and before the definition of marriage could be put to a state-wide vote of the people of California—a 4-3 majority of the California Supreme Court issued its decision in the *Marriage Cases*.  *See Marriage Cases*, 183 P.3d at 452 n.73.  Although the Court did "not suggest that the [challenged] marriage provisions were enacted with an invidious intent or purpose," it nevertheless held that reserving the denomination "marriage" for opposite-sex couples violated the State Constitution.  *Id.*  Claiming that it was merely following "the ultimate expression of the people's will" in applying the State Constitution, the majority struck down the statutory provisions embodying the traditional definition of marriage and directed the State to begin issuing marriage

9

licenses to same-sex couples.  *Id.* at 450, 453.

This decision proved short-lived.  On November 4, 52.3 percent of California's voters—more than seven million people—voted to approve Proposition 8, and the measure took effect the next day.  *Strauss*, 207 P.3d at 68; Cal. Sec'y of State, Votes for and Against November 4, 2008 State Ballot Measures, *available at* http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf.  The same day Proposition 8 took effect, its opponents challenged it in State court, alleging that the amendment was invalid under the State Constitution.  *See Strauss*, 207 P.3d at 68-69.  Like Plaintiffs here, the state court petitioners characterized "Proposition 8 as 'eliminating' or 'stripping' same-sex couples of a fundamental constitutional right."  *Strauss*, 207 P.3d at 102.  The California Supreme Court rejected any such hyperbole, however, explaining that such a "description drastically overstates the effect of Proposition 8 on the fundamental state constitutional rights of same-sex couples."  *Id*.  On the contrary, the California Supreme Court concluded that Proposition 8 was a "narrowly drawn" measure with a purpose "simply to restore the traditional definition of marriage as referring to a union between a man and a woman."  *Id*. at 76, 102.  Accordingly it upheld Proposition 8 under the State Constitution.[1]

On May 22, 2009—four days before the California Supreme Court issued its decision in *Strauss*—Plaintiffs filed this lawsuit in federal district court, challenging California's reservation of marriage for unions of a man and a woman.  *See* Doc # 1-1 at 2-3.  Plaintiffs seek a declaration that Proposition 8 violates the Due Process and Equal Protection Clauses of the federal Constitution and 42 U.S.C. § 1983, and a permanent injunction preventing California from defining marriage as it has from its founding.  *Id*. at 11.  On June 30, the Court denied Plaintiffs' motion for a preliminary injunction and granted Proponents' motion to intervene as defendants.

---

[1] The Court also held that "that the marriages of same-sex couples performed prior to the (Continued)

*See* Doc # 76 at 3.[2]

## ARGUMENT

Proponents are entitled to summary judgment because there are no genuine issues of material fact that must be resolved at trial and because Proponents are entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). As we will explain, binding precedent establishes that limiting marriage to opposite-sex unions does not violate the Due Process Clause or the Equal Protection Clause, that government classifications on the basis of sexual orientation are subject to rational basis review, and that defining marriage as the union of a man and a woman satisfies rational basis review. Furthermore, as a matter of law, the Due Process Clause does not guarantee a fundamental right to same-sex marriage, and opposite-sex marriage does not classify individuals on the basis of sex.

Even if this Court finds it necessary to resolve the "underlying factual disputes" that it has identified, *see* Doc # 76 at 6, summary judgment in favor of Proponents remains appropriate. For one, "in ruling on a motion for summary judgment, the [Court] must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). And to prevail in this case, Plaintiffs must disprove "any reasonably conceivable state of facts that could provide a rational basis for" preserving marriage in its traditional form. *Heller v. Doe*, 509 U.S. 312, 320 (1993). Furthermore, they "must convince the court that the legislative facts on which the classification [drawn by Proposition 8] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981). The issue for this Court is

(Cont'd)
effective date of Proposition 8 remain valid." *Strauss*, 207 P.3d at 122.
   [2] On August 19, the Court permitted San Francisco to intervene as a plaintiff "to present [the] issue of [Proposition 8's] alleged effect on government interests." Doc # 160. As San Francisco brings the same claims and seeks the same relief as Plaintiffs, this Court should dismiss their claims for the same reasons it should dismiss Plaintiffs'. *See* Doc # 111-23 at 12-13.

thus not whether marriage advances legitimate government interests, but whether a reasonable person could believe that it does.  In short, so long as the question whether Proposition 8 furthers legitimate government interests is debatable, Plaintiffs cannot prevail.  For as the Supreme Court has explained, "It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength.  It is not within the competency of the courts to arbitrate in such contrariety."  *Vance v. Bradley*, 440 U.S. 93, 111 (1979) (quotation marks omitted).  Thus, unlike a motion for summary judgment arising in other contexts, the existence of evidence for and against our position that Proposition 8 furthers legitimate interests is not a ground for denying summary judgment, but rather confirmation that summary judgment must be granted.

For another, and as we have explained elsewhere, *see* Doc # 139 at 10-16, the facts that will serve to resolve these underlying disputes are not adjudicative facts specific to this case. Rather, they are legislative facts—"general facts which help the tribunal decide questions of law and policy and discretion."  *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, C.J.) (quotation marks and citation omitted).  Legislative facts "usually are … proved … by material set forth in the briefs."  *Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999) (Boudin, J.).  Furthermore, when considering legislative facts, a court has considerable flexibility.  It is not constrained by the rules of judicial notice.  *See* FED. R. EVID. 201.  And it is "unrestricted in … investigation and conclusion": it may "reject the propositions of either party or of both parties" and may "consult the sources of pertinent data to which they refer, or … refuse to do so."  The Court may even "make an independent search for persuasive data" if not "content with what … the parties present."  FED. R. EVID. 201, advisory committee's note (quotation marks omitted).  We respectfully submit that the information we reference in connection with our arguments in this memorandum suffices to allow this Court to resolve any issues of legislative fact it finds necessary to confront.

In sum, whether because the issues are controlled by binding precedent, involve questions of law, or implicate legislative facts, this case does not present "a genuine issue for trial," *Anderson*, 477 U.S. at 248, and Plaintiffs' claims should be dismissed as a matter of law.

## I.   **The Supreme Court's Decision In *Baker* Controls The Outcome Of This Case.**

The United States Supreme Court, in *Baker v. Nelson*, 409 U.S. 810 (1972), dismissed "for want of a substantial federal question" an appeal from the Supreme Court of Minnesota, which rejected a same-sex couple's claim that the State's denial of their request to marry violated the Fourteenth Amendment. *Id.* By dismissing that appeal, the Supreme Court concluded that defining marriage as a union between one man and one woman does not violate the Fourteenth Amendment. *Baker* is binding precedent and requires this Court to dismiss Plaintiffs' claims as a matter of law.

### A.   ***Baker* Is Dispositive Of The Issues Presented In This Case.**

In *Baker*, 409 U.S. at 810, the Supreme Court considered and rejected claims by two men that Minnesota's law defining marriage as a union between two persons of the opposite sex violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment, precisely the same claims asserted by Plaintiffs here. That ruling affirmed the Supreme Court of Minnesota's decision, which held (1) that there is no fundamental right to same-sex marriage under the Due Process Clause, and (2) that excluding same-sex couples from marriage "is no[t] irrational or invidious discrimination" under the Equal Protection Clause. *See Baker v. Nelson*, 191 N.W.2d 185, 186-87 (Minn. 1971), *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972).

The Supreme Court's dismissal of the *Baker* appeal for "want of a substantial federal question" was a decision on the merits, which binds all federal district courts:

> Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction

13

and do leave undisturbed the judgment appealed from. *They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.*

*Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (emphasis added); *see also Hicks v. Miranda,* 422 U.S. 332, 344 (1975). The Supreme Court's summary dismissal in *Baker* "represents [the] view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979). And the precedential value of that "dismissal . . . extends beyond the facts of the particular case to all similar cases." *Wright v. Lane County Dist. Ct.*, 647 F.2d 940, 941 (9th Cir. 1981).

The questions presented to the Supreme Court in *Baker* were:

1.    Whether appellee's refusal to sanctify appellant's marriage deprives appellants of their liberty to marry and their property without due process of law under the Fourteenth Amendment.

2.    Whether appellee's refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment.

3.    Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteenth Amendments.

*Baker v. Nelson*, Jurisdictional Statement, No. 71-1027 (Oct. Term 1972), Doc # 36-3 at 6. The *Baker* plaintiffs directly asserted that they, as a same-sex couple, had a fundamental right to marry "protected by the due process and equal protection clauses of the Fourteenth Amendment." *Id.* at 10. And they argued that "[b]y not allowing [them] the legitimacy of their marriages, the [S]tate [was] denying them this basic right and unlawfully meddling in their privacy." *Id.* at 14. The Supreme Court's dismissal of the *Baker* appeal directly rejected the merits of these claims. This Court is "not free to disregard this pronouncement." *Hicks*, 422 U.S. at 344. As a result, Plaintiffs' claims must be rejected.

**B.** **_Baker_ Retains Its Controlling Force.**

Lower courts are bound by the Supreme Court's summary decision in _Baker_ until "the Court informs them that they are not" either by expressly overruling that decision or through " 'doctrinal developments' " that are necessarily incompatible with it. _Id._ at 344-45. To date, the Supreme Court has not expressly overruled _Baker_, nor do any of its later decisions undermine it.

Neither _Lawrence v. Texas_, 539 U.S. 558 (2003), nor _Romer v. Evans_, 517 U.S. 620 (1996), represent "doctrinal developments" that release this Court from its obligation to follow _Baker_. _Lawrence_ dealt with whether criminalizing private homosexual conduct violates due process; it did not involve government recognition of a relationship. In fact, the _Lawrence_ Court expressly distinguished between protecting private sexual conduct and forcing government recognition of a relationship, emphasizing that the facts of that case did not implicate the question "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." _Lawrence_, 539 U.S. at 578. Justice O'Connor's concurring opinion likewise made clear that _Lawrence_ did not disturb the principles announced in _Baker_. As Justice O'Connor explained:

> That this law as applied to private, consensual conduct is unconstitutional . . . does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review. Texas cannot assert any legitimate state interest here, such as . . . preserving the traditional institution of marriage. Unlike the moral disapproval of same-sex relations—the asserted state interest in this case— other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.

_Id._ at 585 (O'Connor, J., concurring). Indeed, even the petitioners in _Lawrence_—who sought only "equality under the criminal law, to keep the State out of their bedrooms, not any affirmative access to marriage or other legal structures or benefits"— emphasized that official recognition of their relationship was not at issue. Reply Brief for Petitioners at 19, _Lawrence_, 539 U.S. 558 (Mar. 10, 2003), 2002 U.S. Briefs 102, 19.

Nor does *Romer* undermine the efficacy of *Baker*'s holding. The Court in *Romer* applied rational-basis review to invalidate a sweeping state constitutional amendment that "prohibit[ed] all legislative, executive or judicial action at any level of state or local government designed to protect . . . homosexual persons." *Romer*, 517 U.S. at 624. Critical to the Court's decision was the fact that "imposing a broad and undifferentiated disability on a single named group" was "peculiar," "exceptional," and indeed "unprecedented in our jurisprudence." *Romer*, 517 U.S. at 632, 633. As the Court explained, "it is not within our constitutional tradition to enact laws of this sort." *Id*. at 633. But marriage has, from the beginning of the history of this State and this Nation, been defined as the union of a man and a woman. It is Plaintiffs' claimed right to marry a person of the same sex that is "peculiar," "exceptional," and, save for a very few recent exceptions, "unprecedented in our jurisprudence." Thus, neither *Lawrence* nor *Romer* can be plausibly understood to have informed the lower courts that they are no longer bound by *Baker*.

Federal courts, including one California district court, have considered *Baker*'s precedential value and consistently found it controlling. *See*, *e.g.*, *Wilson v. Ake*, 354 F. Supp. 2d 1298, 1304-05 (M.D. Fla. 2005) (*Baker* "is binding precedent upon this Court and Plaintiffs' case against [Federal DOMA] must be dismissed"); *McConnell v. Nooner*, 547 F.2d 54, 56 (8th Cir. 1976); *Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980) (finding "the *Baker* case controlling" and concluding that a "state law which rejects a purported marriage between persons of the same sex [did] not violate the due process or the equal protection clause"), *aff'd on other grounds*, 673 F.2d 1036, 1039 n.2 (9th Cir. 1982); *see also Lockyer v. City and County of San Francisco*, 95 P.3d at 504 (Kennard, J., concurring in part and dissenting in part) (stating that *Baker* "prevents lower courts . . . from coming to the conclusion that a state law barring marriage between persons of the same sex violates the equal protection or due process guarantees").

*Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005), *rev'd in part*, 447 F.3d

673 (9th Cir. 2006), does not hold otherwise. The court in *Smelt* held that *Baker* was not applicable because the plaintiffs in that case were challenging the federal Defense of Marriage Act (DOMA) and were seeking the federal benefits of marriage; DOMA does "*not* address what relationships states may recognize as marriages." *Id.* at 872 (emphasis added). "Th[e] issue of allocating benefits is different from the issue of sanctifying a relationship presented in *Baker*'s jurisdictional statement." *Id.* at 873; *see also In re Kandu*, 315 B.R. 123, 137 (Bankr. W.D. Wash. 2004) (distinguishing between seeking the federal benefits of marriage and the status of marriage). Here, Plaintiffs seek precisely what the plaintiffs in *Baker* sought: State recognition of their same-sex relationships as marriages. They do not challenge DOMA and do not seek federal benefits as in *Smelt*. Thus, even under the *Smelt* court's analysis, *Baker* controls here.

It is thus of no moment that Minnesota did not provide any of the legal benefits associated with marriage to couples of the same sex, whereas, in this case, California provides essentially all such benefits to domestic partners. Despite this factual difference, the complained-of injury in both cases is identical—the government's refusal to redefine the longstanding and clearly established definition of marriage to encompass same-sex couples. *See Smelt*, 374 F. Supp. 2d at 872, 873; *In re Kandu*, 315 B.R. at 137. And it stands to reason that if a State does not violate the Fourteenth Amendment by refusing both to redefine the traditional understanding of marriage *and* to provide any of the legal benefits associated with that status to same-sex couples, then it certainly does not violate that constitutional provision to retain the long-established definition of marriage while granting almost all the legal benefits associated with marriage to domestic partners.

In sum, "the precise issues presented and necessarily decided" in *Baker* were whether defining marriage as the union of one man and one woman violates the Due Process or Equal Protection Clauses of the Fourteenth Amendment. *See Mandel*, 432 U.S. at 176. Those same

17

issues are presented here. *Baker* has neither been overruled nor undermined by subsequent doctrinal developments. Accordingly, *Baker* controls this case, and as a matter of law, Plaintiffs' claims must be rejected.

## II.   There Is No Fundamental Right To Same-Sex Marriage Under The Due Process Clause.

Marriage, defined as the union of a man and a woman, is one of the central institutions of our society. It has a deep and rich history in our laws and culture. Legal recognition of same-sex relationships as marriages, on the other hand, is a novel and highly controversial concept. Until 2004, not a single State extended marriage to such relationships, and the overwhelming majority of States and the federal government have chosen to retain the institution of marriage in its traditional form.

Plaintiffs acknowledge the centuries-old pedigree of the traditional definition of marriage in American law and culture, but they attempt to dismiss its significance. "[T]radition alone," they say, "is a manifestly insufficient basis for a State to impair a person's constitutionally protected right to marry." Plaintiffs' P.I. Motion, Doc # 7 at 13. Nowhere, however, do Plaintiffs come to grips with the fact that substantive due process rights are *defined* by "our Nation's history, legal traditions, and practices." *Washington v. Glucksberg*, 521 U.S. 702, 710 (1997). Indeed, "[t]he mere novelty of [Plaintiffs'] claim is reason enough to doubt that 'substantive due process' sustains it." *Reno v. Flores*, 507 U.S. at 303. The recent and still rare innovation of same-sex marriage clearly does not constitute a fundamental right.

### A.   *Washington v. Glucksberg* Precludes Judicial Recognition Of A Fundamental Right to Same-Sex Marriage.

Plaintiffs ask this Court to recognize, and thus to impose, permanently, a radical and highly controversial social experiment on the people of California and the Nation as a whole. The controlling precedent on the recognition of fundamental rights under the Due Process Clause is *Glucksberg*. Under the *Glucksberg* test, substantive due process "specially protects those

18

fundamental rights and liberties which are," (1) "objectively, deeply rooted in this Nation's history and tradition," and (2) "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." 521 U.S. at 720-21 (internal quotation marks and citations omitted). The identification of such rights requires a "careful description of the asserted fundamental liberty interest." *Id.* (internal quotation marks and citations omitted). *Glucksberg* emphasized that courts must be reluctant to "break new ground in this field," lest due process "be subtly transformed into the policy preferences" of judges. *Id. Glucksberg* also specifically *rejected* a free-floating methodology that asks whether state law sets up "arbitrary impositions" or "purposeless restraints." *Id.* (citations omitted).

> **1.** **A right to same-sex marriage has no roots in this Nation's history and tradition.**

The central and hitherto universal understanding of the nature of marriage is reflected in dictionaries throughout the ages, which have uniformly defined its meaning by reference to a man and a woman. Samuel Johnson, for example, defined marriage as the "act of uniting a man and woman for life." A DICTIONARY OF THE ENGLISH LANGUAGE (1755). The first edition of Webster's AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) gave the same definition, and tellingly added that marriage has been instituted "for the purpose of preventing the promiscuous intercourse of the sexes, for promoting domestic felicity, and for securing the maintenance and education of children." Subsequent dictionaries, including dictionaries from the time of the framing and ratification of the Fourteenth Amendment, have consistently reflected the same understanding. *See, e.g.*, NOAH WEBSTER, ETYMOLOGICAL DICTIONARY 130 (1869) (defining marriage as "the uniting of man and woman for life"); Joseph E. Worcester, A PRIMARY DICTIONARY OF THE ENGLISH LANGUAGE 176 (1871) (defining marriage as the "[a]ct of uniting a

man and a woman for life").[3]  Modern dictionaries continue to define marriage in the same way.

For example, the NEW OXFORD AMERICAN DICTIONARY (2001) defines marriage as "the formal

union of a man and a woman, typically recognized by law, by which they become husband and

wife."[4]

Not surprisingly, marriage has always had the same meaning in the law.  For example, a

leading legal dictionary from the time of the framing and ratification of the Fourteenth

Amendment defined marriage as "[a] contract, made in due form of law, by which a man and a

woman reciprocally engage to live with each other during their joint lives, and to discharge

towards each other the duties imposed by law on the relation of husband and wife."  John Bouvier,

A LAW DICTIONARY ADAPTED TO THE CONSTITUTION AND LAWS OF THE UNITED STATES 105

(1874).[5]  The same understanding appears in Blackstone's *Commentaries*, which "not only

provided a definitive summary of the common law but was also a primary legal authority for 18th-

and 19th-century American lawyers."  *Glucksberg*, 521 U.S. at 712.  According to Blackstone:

> [T]he establishment of marriage in all civilized states is built on this natural obligation
> of the father to provide for his children; for that ascertains and makes known the
> person who is bound to fulfil this obligation; whereas, in promiscuous and illicit
> conjunctions, the father is unknown; and the mother finds a thousand obstacles in her
> way . . . .

---

[3] Popular sources from this period demonstrate the same understanding.  *See, e.g.*, C.W. Elliott, *Life in the Great Cities: Yedo*, PUTNAM'S MONTHLY MAGAZINE OF AMERICAN LITERATURE Apr. 1686 at 444-45 (observing that in Japan, "[o]ne man marries one woman, the same as with us"); Henry James, *The Woman Thou gavest with me*, THE ATLANTIC MONTHLY 69 (Jan. 1870) ("But in every marriage contract there are three inevitable parties; a particular man and woman, professing mutual affection for each other, on one hand, and the society of which they are members, on the other.").

[4] While some very recent dictionaries do acknowledge the modern phenomenon of same-sex marriages, they continue to retain the traditional understanding of marriage as their primary definition of that term.  For example, the *American Heritage Dictionary* (4th ed. 2000) lists as its first definition of marriage the "legal union of man and woman as husband and wife," but also recognizes, as its fourth definition, a "union between two persons having the customary but usually not the legal force of marriage: *a same-sex marriage*."

[5] The same understanding is consistently reflected in other legal sources from this period.  *See, e.g.*, A Sharp Thrust at Polygamy, N.Y. TIMES, Mar. 2, 1867, quoting Pungent Report of the Judiciary Committee of the House of Representatives on the Memorial of the Legislature of Utah, Praying for the Repeal of all Laws against Polygamy ("[O]ne woman only should be the wife of one man.  The marriage relationship thus constituted is the foundation of the family and of the State.").

1 *Commentaries* \*435; *see also id.* at \*443 (invoking this understanding to explain why English law is superior to Roman or civil law with respect to the legitimation of offspring conceived out of wedlock). Likewise, from the first edition of BLACK'S LAW DICTIONARY in 1891 to the seventh edition in 1999, the term "marriage" has been reserved for the union of a man and a woman.[6] The historical record is simply barren of any objective evidence of a right to same-sex marriage "deeply rooted in this Nation's history and tradition."

### 2. Same-sex marriage is not implicit in the concept of ordered liberty.

Deep historical roots alone do not suffice to qualify an asserted right as fundamental under *Glucksberg*. The right must also be "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed." 521 U.S. at 720-21 (internal quotation marks and citations omitted). The striking lack of historical precedent for extending marriage to same-sex couples provides strong evidence that liberty and justice can exist in a regime that does not recognize same-sex marriages. The issue of whether and how same-sex relationships should be officially recognized is one that has only recently come to the fore, and it blinks reality to conclude that ordered liberty requires not only that such relationships be recognized but that they be recognized *and* denominated "marriages." Indeed, doing so would deny all individuals the ability to participate in the institution of marriage as it has always been understood, *i.e.*, as the union of a man and a woman. Liberty and justice are not sacrificed when a State declines to take this drastic step.

---

[6] The eighth edition in 2004 provides a separate entry for same-sex marriages, recognizing the fact that some state courts had recently created this new legal category.

### 3. The contemporary understanding of marriage remains unchanged.

Notwithstanding a few very recent and isolated experiments, the traditional understanding of marriage as a union of a man and woman prevails almost universally throughout the world.[7] The federal government has taken the same position,[8] as do the overwhelming majority of states.[9]

Here, just as in *Glucksberg*, see 521 U.S. at 717-18, innovations in a small handful of jurisdictions provoked a reaffirmation of the traditional understanding in many others, and since 2004 over half the States have enshrined in their Constitutions the legal definition of marriage as the union of a man and a woman. *See supra* at 29, n.9. Here, just as in *Glucksberg*, "[t]he history of the law's treatment of [the asserted right] in this country has been and continues to be one of the rejection of nearly all efforts to permit it. That being the case, … the asserted 'right' … is not a fundamental liberty interest protected by the Due Process Clause." 521 U.S. at 728. Here, just as

---

[7] The Netherlands, Belgium, Spain, Canada, South Africa, Norway, and Sweden are the only nations that extend marriage to same-sex couples. *See Marriage Cases*, 183 P.3d at 451 n.70 (describing the then-current status of foreign law, when same-sex marriage was only permitted in five countries: the Netherlands, Belgium, Spain, Canada, and South Africa). The Norwegian Parliament passed a law on June 11, 2008, effective January 1, 2009, permitting same-sex marriage. *See* http://www.regjeringen.no/nb/dep/bld/dok/regpubl/otprp/2007-2008/otprp-nr-33-2007-2008-/16.html?id=502804. On April 1, 2009, Sweden became the seventh nation to allow same-sex marriage when its parliament passed a gender-neutral marriage law, effective May 1, 2009. *See* Könsneutrala äktenskap och vigselfrågor (Civilutskottets Betänkande 2008/09:CU19) (Swed.), *available at* http://www.riksdagen.se/Webbnav/index.aspx?nid=3322&dok_id=GW01CU19.

[8] *See* 1 U.S.C. § 7.

[9] 44 States limit marriages to opposite-sex relationships. *See* ALA. CONST. art. I, § 36.03 (2006); ALASKA CONST. art. 1, § 25 (1998); ARIZ. CONST. art. XXX, § 1 (2008); ARK. CONST. amend. 83, § 1-3 (2004); CAL. CONST. art. I, § 7.5 (2008); COLO. CONST. art. II, § 31 (2006); FLA. CONST. art. I § 27 (2008); GA. CONST. art. I, §IV, ¶ I (2004); IDAHO CONST. art. III, § 28 (2006); KAN. CONST. art. XV, § 16 (2005); KY. CONST. § 233a (2004); LA. CONST. art. XII, § 15 (2004); MICH. CONST. art. I, § 25 (2004); MISS. CONST. art. XIV, § 263A (2004); MO. CONST. art. I, § 33 (2004); MONT. CONST. art. XIII, § 7 (2004); NEB. CONST. art. I, § 29 (2000); NEV. CONST. art. I, § 21 (2002); N.D. CONST. art. XI, § 28 (2004); OHIO CONST. art. XV, § 11 (2004); OKLA. CONST. art. II, § 35 (2004); OR. CONST. art. XV, § 5a (2004); S.C. CONST. art. XVII, § 15 (2006); S.D. CONST. art. XXI, § 9 (2006); TENN. CONST. art. XI, § 18 (2006); TEX. CONST. art. I, § 32 (2005); UTAH CONST. art. I, § 29 (2004); VA. CONST. art. I, § 15-A (2006); WIS. CONST. art. XIII, § 13 (2006); DEL. CODE ANN. tit. 13, § 101; HAW. REV. STAT. § 572-1; HAW. REV. STAT. § 572-3; 750 ILL. COMP. STAT. 5/212; IND. CODE § 31-11-1-1; MD. CODE ANN., FAM. LAW § 2-201; MINN. STAT. § 517.01; N.J. STAT. § 37:1-1; N.M. STAT. §§ 40-1-1 – 40-1-7; N.Y. DOM. REL. LAW §§ 5-7; N.C. GEN. STAT. § 51-1.2; 23 PA. CONS. STAT. § 1704; R.I. GEN.LAWS §§ 15-1-1 – 15-1-5; WASH. REV. CODE § 26.04.010-20; W. VA. CODE § 48-2-603; WYO. STAT. ANN. § 20-1-101.

1   in *Glucksberg*, "Americans are engaged in an earnest and profound debate about the morality,

2   legality, and practicality" of same-sex marriage.   521 U.S. at 735.  And here, just as in

3   *Glucksberg*, this Court should "permi[t] this debate to continue, as it should in a democratic

4   society." *Id*.

5

6   **B.**   **The Supreme Court Decisions Recognizing A "Fundamental Right To Marry"**
        **Confirm That There Is No Fundamental Right To Same-Sex Marriage.**

7          The Supreme Court cases recognizing a fundamental right to marry are demonstrably

8   rooted in the traditional understanding of marriage as a union between a man and a woman and

9   plainly establish a fundamental right only to enter into an officially recognized opposite-sex union.

10  These cases provide no support whatsoever either for *redefining* marriage to include same-sex

11  relationships or for creating a *new* fundamental right to enter into same-sex relationships

12  denominated as marriages.

13

14         As an initial matter, the Supreme Court has always emphasized that the marital union,

15  alone among all other human relationships, is uniquely important to society and is therefore

16  uniquely regulated by law, with both benefits and obligations.  Marriage

17          is something more than a mere contract. . . .  The relation once formed, the law steps
         in and holds the parties to various obligations and liabilities.  It is an institution, in the
18       maintenance of which its purity the public is deeply interested, for it is the
         foundation of the family and of society, without which there would be neither
19       civilization nor progress.

20  *Maynard v. Hill*, 125 U.S. 190, 210-11 (1888).  The public is deeply and uniquely interested in the

21  institution of marriage because civilization depends on it, and civilization depends on it because of

22  the inherently and uniquely procreative nature of the union between a man and a woman.

23

24         All of the Supreme Court cases addressing the fundamental right to marry arose, of course,

25  in the traditional context of marriage between a man and a woman.  Not only did the facts of each

26  case involve an opposite-sex union, but the Court's reasoning in each case reflects the clear and

27  unmistakable understanding that the right of a man and woman to marry grows out of and is

28

23

inextricably tied to the traditional procreative purposes animating that institution. In *Loving v. Virginia*, for example, the Court explained that "[m]arriage is one of the basic civil rights of man, *fundamental to our very existence and survival*." 388 U.S. 1, 12 (1967) (quotation marks omitted, emphasis added). Similarly, *Zablocki v. Redhail* recognized marriage as "fundamental to the very existence and survival of the race." 434 U.S. 374, 384 (1978) (quotation marks omitted). Any doubt that the procreative nature of male-female unions is the defining feature of the marital relationship is removed by numerous other Supreme Court cases addressing marriage in other contexts. These cases repeatedly emphasize that "[m]arriage and procreation are fundamental to the very existence and survival of the race," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and that the right to "marry, establish a home and bring up children . . . [is] essential to the orderly pursuit of happiness by free men," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

It is thus not possible to understand these cases as addressing anything other than the traditional institution of marriage between a man and a woman. Same-sex relationships simply do not implicate the interests identified by these cases. Plaintiffs' claim that same-sex couples have a fundamental right to marry thus cannot plausibly be bootstrapped onto the fundamental right to traditional marriage uniformly recognized by the Supreme Court's decisions. Rather, any such right to same-sex marriage must be shown, apart from these cases, to have a firm and deeply rooted basis in our Nation's history and traditions. And Plaintiffs, obviously, cannot make such a showing.

### C. *Loving v. Virginia* Does Not Support A Right To Same-Sex Marriage.

Contrary to Plaintiffs' suggestion, *see* Plaintiffs' P.I. Motion, Doc # 7 at 14, nothing in the Supreme Court's decision in *Loving* supports redefining the fundamental right to marry to include same-sex marriages. As an initial matter, we note again that the plaintiffs in *Baker v. Nelson*, like Plaintiffs here, relied heavily on *Loving* in support of their claimed right under the Fourteenth

Amendment to same-sex marriage.  Yet not a single Justice of the Supreme Court considered the claim substantial enough even to warrant plenary review.  Nor is it surprising that the *Baker* Court saw nothing in *Loving* to give it pause in rejecting on the merits a constitutional right to same-sex marriage.

Although *Loving* struck down racist laws prohibiting inter-racial marriages, it did not involve a fundamental redefinition of the institution of marriage.  On the contrary, like other cases recognizing a fundamental right to marry, *Loving* addressed a relationship between a man and a woman and, as noted above, expressly invoked the central procreative purposes of marriage.  As we have demonstrated, *see supra at* 19-21,  marriage has always been defined as the union between a man and a woman.  Indeed, throughout history, and in essentially every society that has recognized marriages, the institution has been limited to opposite-sex unions.  The same cannot be said for racial restrictions on those who can enter this union of a man and a woman.  Such laws had an ugly and peculiar pedigree in the United States, but they have certainly been far from universal throughout history, across civilizations, or even in this Country.  For example, many of the original states—including New York, New Jersey, Connecticut, and New Hampshire—never enacted anti-miscegenation laws.  *See* PETER WALLENSTEIN, TELL THE COURT I LOVE MY WIFE 253 (2002).  Other States abandoned such laws in the wake of the adoption of the Fourteenth Amendment, at least until Reconstruction gave way to the Jim Crow system of White Supremacy.[10]  And outside the Jim Crow south anti-miscegenation laws were both rare and rapidly

---

[10] *See Hart v. Hoss & Elder*, 26 La. Ann. 90 (1874) (holding that the Civil Rights Act of 1866 invalidated anti-miscegenation law); *Burns v. State*, 48 Ala. 195, 198-199 (1872)  (holding that the Fourteenth Amendment invalidated anti-miscegenation law); CHARLES FRANK ROBINSON, DANGEROUS LIAISONS 29 (2006) (noting that in 1874 Arkansas omitted its anti-miscegenation law from its revised civil code); *id.* (noting that in 1871 Mississippi omitted its anti-miscegenation law from its revised civil code); *id.* at 30 (noting that in 1868 the Louisiana legislature repealed the state's anti-miscegenation law); Lynn Wardle and Lincoln C. Oliphant, *In Praise of Loving: Reflections on the 'Loving Analogy' for Same-Sex Marriage*, 51 HOW. L.J. 117, 180 (2007) (noting that the Illinois legislature repealed its anti-miscegenation law in 1874); *see also* ROBINSON, DANGEROUS LIAISONS 29 (noting that in 1868 "South Carolina implicitly abrogated its (Continued)

disappearing from the statute books at the time *Loving* was decided.[11]  Furthermore, racial distinctions have never been thought to go to the very definition of the institution of marriage. Indeed, as demonstrated above, prominent dictionaries have always defined marriage as the union of a man and a woman—not as the union of a man and woman of the same race.  And they have done so even during periods when anti-miscegenation laws were on the books.  Any claim that the Court's decision in *Loving* constituted a fundamental redefinition of marriage simply cannot withstand scrutiny.

In addition, although the traditional definition of marriage as the union of a man and a woman follows from the institution's traditional procreative purposes, the racial distinctions at issue in *Loving* served no legitimate purposes whatsoever.  Indeed the avowedly racist purposes of the anti-miscegenation laws—"to preserve . . . racial integrity[,] . . . prevent the corruption of the blood; [and prevent] a mongrel breed of citizens," *Loving*, 388 U.S. at 7—recognized the procreative potential of inter-racial marital relationships, but sought to thwart this core purpose of marriage for racist ends.  Far from reflecting the traditional understanding and purposes of marriage, the anti-miscegenation laws were thus at war with that understanding and those purposes.

(Cont'd)
intermarriage law by adopting a constitutional provision that 'distinctions on account of race or color in any case whatever, shall be prohibited, and all class of citizens shall enjoy all common, public, legal and political privileges'"); Peter Wallenstein, *Law and the Boundaries of Place and Race in Interracial Marriage: Interstate Comity, Racial Identity, and Miscegenation Laws in North Carolina, South Carolina, and Virginia, 1860s-1960s*, 32 AKRON L. REV. 557, 558, 561 (1999) (noting that after 1868 South Carolina had a "temporary tolerance of interracial marriage" that "attracted interracial couples from a … neighboring state").

[11] As the Court in *Loving* explained, fourteen states had repealed their bans on inter-racial marriages in the fifteen years leading up the *Loving* decision; such restrictions remained in only 16 States, concentrated in the South.  *Loving*, 388 U.S. at 6 n.5.  By contrast, although a handful of States have during the last decade chosen to recognize same-sex marriage, during the same period many times that number of states, and the federal government, have affirmatively taken action to retain the traditional understanding of marriage as the union of a man and a woman.  *See supra* at 22 nn. 8 & 9.

26

Furthermore, although any sort of right to same-sex marriage is indisputably remote from the central purposes and contemporaneous understanding of the Fourteenth Amendment, the Court's decision in *Loving* plainly furthered "[t]he clear and central purpose of" of the Fourteenth Amendment, namely "to eliminate all official state sources of invidious racial discrimination in the States." 388 U.S. at 10. In addition, it is well worth noting the close relationship between the struggle to eliminate odious racial restrictions on marriage and the procreative nature of the traditional marriage relationship. Prohibiting the only relationships capable of producing offspring with roots in more than one racial background was a vital component of the Jim Crow effort to maintain segregation and racial inequality. Racists recognized the integrative power of cross-racial marriages and the danger they posed to their doctrines of White Supremacy, which is why they sought to prohibit them. The centrality of marriage in the struggle for racial equality is thus intimately tied with the institution's procreative nature as the union of a man and a woman.

In short, *Loving* simply vindicated the core purpose of the Equal Protection Clause by invalidating an odious racial barrier imposed on individuals seeking to enter a marital relationship. It did not re-define that relationship in any way, let alone in the radical fashion proposed by Plaintiffs in this case. Thus, as recognized by the district court in *Smelt*, "*Loving* held, in effect, the race restriction on the fundamental right to marry was invidious discrimination, unsupportable under any standard. *Loving* did not confer a new fundamental right or hold the fundamental right to marry included the unrestricted right to marry whomever one chooses." 374 F. Supp. 2d at 879.

### D. *Lawrence v. Texas* Does Not Support A Right To Same-Sex Marriage.

*Lawrence v. Texas*, 539 U.S. 558 (2003), likewise provides no support for Plaintiffs' asserted right to same-sex marriage. There, the Supreme Court held that the criminalization of private, consensual sodomy, whether by heterosexuals or homosexuals, violates the Due Process Clause. The Court stressed that its conclusion was based on the severe deprivation of personal

27

liberty entailed in the challenged statute, which was crucial to its decision *not* to decide the case under the Equal Protection Clause: "Were we to hold the statute invalid under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants."  539 U.S. at 575.

The Court's very deliberate decision to invalidate *all* anti-sodomy statutes, not just those applying to same-sex couples, reflects its central concern with the personal liberty at stake in *private* sexual relations.  As the Court emphasized, the laws at issue criminalized "the most private human conduct, sexual behavior, and in the most private of places, the home."  *Id.* at 567.  "When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons the right to make *this choice*."  539 U.S. at 567 (emphasis added).  But the liberty to make *this choice* says nothing about "whether or not [same-sex relationships are] entitled to formal recognition in the law," *id.*, a point that both the Court and Justice O'Connor took pains to emphasize.  *See supra* at 15.

The sharp focus on the deprivation of personal liberty was reinforced by the *Lawrence* Court's decision to treat *Griswold v. Connecticut*, 381 U.S. 479 (1965), as the starting point for its analysis of precedent.  The Court's lengthy discussion of the line of cases beginning with *Griswold* and continuing through the abortion decisions, *see* 539 U.S. at 564-66, 573-74, highlights and reinforces the conclusion that *Lawrence* is a case about the individual's personal liberty to make private decisions about private expressions of sexuality, and nothing else.

Because *Lawrence* was a case entirely about government infringements on personal privacy, it has no bearing on this case.[12]  Plaintiffs seek *public recognition* of their same-sex

---

[12] For the same reasons that *Lawrence* has no bearing on this case, neither does the Ninth Circuit's holding in *Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir.2008), that a form of intermediate scrutiny applies "when the government attempts to intrude upon the personal and
(Continued)

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

relationships as marriages.  Plaintiffs "desire to marry," as they put it themselves, "to demonstrate publicly their commitment to their partner and to obtain all the benefits that come with this official recognition of their family relationship."  Plaintiffs' Supplemental Case Management Statement, Doc # 157 at 4.  Far from finding any support in the right to engage in private homosexual activity recognized in *Lawrence*, the Plaintiffs' alleged right to have their same-sex relationships given public and official recognition as marriages is the very antithesis of it.  As the California Court of Appeal aptly put the matter, "[t]he right to be let alone from government interference is the polar opposite of insistence that the government acknowledge and regulate a particular relationship, and afford it rights and benefits that have historically been reserved for others."  *In re Marriage Cases*, 143 Cal. App. 4th at 926; *see also id.* ("by contorting these privacy holdings to fit same-sex marriage, the dissent stands the notion of 'autonomy privacy' on its head")[13]; *Hernandez v. Robles*, 855 N.E.2d at 10 ("Plaintiffs here do not, as the petitioners in *Lawrence* did, seek protection against state intrusion on intimate, private activity. They seek from the courts access to a state-conferred benefit that the Legislature has rationally limited to opposite-sex couples. We conclude that, by defining marriage as it has, the New York Legislature has not restricted the exercise of a fundamental right.").

*Lawrence*, moreover, dealt with a class of laws that had rarely been enforced and were rapidly disappearing.  539 U.S. at 568-73.  This sharply contrasts with traditional marriage laws, which have been consistently enforced for centuries and have recently been reaffirmed by the overwhelming majority of states, as well as by the federal government.  *See supra* at 22 nn.8-9.  In this important respect, this case is like *Glucksberg*, and unlike *Lawrence*.  What these Plaintiffs

(Cont'd)
private lives of homosexuals, *in a manner that implicates the rights identified in* Lawrence." *Id*. at 819 (emphasis added).
   [13] Although the decision of the California Court of Appeal was reversed by the California Supreme Court, we believe its analysis of this and many other issues is both persuasive and correct.

demand is not the liberty to engage in private, consensual sexual activity, but the right to overrule the considered judgment of their fellow citizens by using the federal courts to dictate a new definition of marriage. Nothing in *Lawrence* gives them such an extraordinary power.

The *Lawrence* Court also emphasized the substantial and concrete adverse consequences that result from a criminal conviction, even for a misdemeanor, and especially one involving illegal sexual conduct. 539 U.S. at 575-76. In this case, by contrast, California's adoption of the traditional definition of marriage has no adverse effects at all on Plaintiffs' liberty. They are not asking to be spared from punishment, or even from official disapproval, for conduct protected by the Constitution. Rather these Plaintiffs are demanding the right to impose their own preferences on their fellow citizens (not just in California but throughout the Nation) by using the courts to effect a fundamental reengineering of an ancient institution that stands at the center of our civilization.

*Lawrence* reaffirmed that "[a]t the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." 539 U.S. at 574 (quoting *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 851 (1992)). Plaintiffs would turn this proposition upside down by using the compulsion of the federal courts to impose their own concept of marriage on everyone else. *Lawrence* cautioned against such a misreading when it quoted *Casey*: "Our obligation is to define the liberty of all, not to mandate our own moral code." 539 U.S. at 571. Plaintiffs ask this court to violate *Lawrence*'s injunction by imposing their own moral and political values on California, every other State in the Union, and the federal government. No such step is required or indeed permitted by the law.

E.    **Adopting Plaintiffs' View Of The Fundamental Right To Marry Would Have Far-Ranging Consequences.**

A holding that the fundamental right to marry extends to same-sex couples threatens to have far-reaching consequences.  As we have noted, same-sex marriage is foreign to our nation's history and tradition, and it has aroused great public controversy and tumult in those very few states that have begun to experiment with it.  In order to bring this novel concept within the fundamental right to marry, that right must be conceived of at an extremely high level of generality.  Once conceived of at that level of abstraction, however, it is difficult to discern why other relationships that have traditionally been excluded from marriage would not also fall within the ambit of the fundamental right to marry.  As explained by the Supreme Court of New Jersey:

> The dissent posits that we have defined the right too narrowly and that the fundamental right to marry involves nothing less than the liberty to choose, as a matter of personal autonomy. That expansively stated formulation, however, would eviscerate any logic behind the State's authority to forbid incestuous and polygamous marriages.

*Lewis v. Harris*, 908 A.2d 196, 208 n.10 (N.J. 2006) (quotation marks and citation omitted).

Other judges have recognized this point as well.[14]

Plaintiffs' due process claim is beguilingly simple: they have a fundamental constitutional right to marry the "person of their choice," and Proposition 8's prohibition on same-sex marriage is therefore unconstitutional because it denies them the right "to marry the person they love." Complaint, Doc # 1-1 at 7; Plaintiffs Supplemental Case Mgt Statement, Doc # 157 at 4.  Of course, neither Plaintiffs nor anyone else has an absolute constitutional right "to marry the person

---

[14] *See Andersen v. King County*, 138 P.3d 963, 1001 (Wash. 2006) (Johnson, J., concurring in judgment) ("Inclusion of same-sex couples within the definition of 'marriage' by redefining the right 'broadly' has no support in case law.  Indeed, the polygamy claims were better supported since those claims were also founded in a claim of a right to practice an established religion, which allowed polygamy."); *Kerrigan v. Commisssioner of Pub. Health*, 957 A.2d 407, 523 n.14 (Conn. 2008) (Zarella, J., dissenting) ("[I]f consensual, loving commitment among adults is the essence of marriage, then the state has no basis for prohibiting polygamous marriage.").

of their choice."  If they did, the Supreme Court in *Baker v. Nelson* would surely have summarily reversed, rather than summarily affirmed, the Minnesota Supreme Court's rejection of precisely this same claim.  To the contrary, eligibility restrictions on marriage have always been at the core of the "regulation of domestic relations, an area that has long been regarded as the virtually exclusive province of the States."  *Sosna v. Iowa*, 419 U.S. 393, 404 (1975).  Indeed, from the earliest days of our history, the Supreme Court has recognized that "[m]arriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature."  *Maynard*, 125 U.S. at 205.

The prohibition against marriage between persons of the same sex is not California's only restriction on marital eligibility.  California, like all other states, also forbids marriage to a person who is already married, a person who is related by blood within a certain degree of consanguinity, and a person who has not reached the age of consent.  *See* CAL. FAM. CODE § 301; *id.* § 2200; CAL. PENAL CODE §§ 283-85.  If Plaintiffs' claimed absolute fundamental right to marry the "person of their choice" is taken at face value, all of these familiar restrictions on such choice would, obviously, fall along with the prohibition on marriage to a person of the same sex.  Complaint, Doc # 1-1 at 7.

But even if Plaintiffs' claimed right is not taken at face value—that is, even if it allows for the play of individualized rationales for specific restrictions on marital choice—it is difficult, very difficult, to see how any of these venerable and universal restrictions could survive in the face of a ruling invalidating laws restricting marriage to opposite-sex couples.  In other words, it is very difficult to see how a state that could not constitutionally restrict the "fundamental right to marry" to opposite-sex couples could nonetheless restrict marriage eligibility according to fixed limits on number, degrees of consanguinity, or age.

For example, if gays and lesbians have a constitutional right to marry the person they love, what rationale would justify restricting them (or heterosexuals for that matter) from marrying the persons they love?  In 1972 a group of gay rights organizations recognized the close connection between these questions, producing a platform calling for "[r]epeal of all legislative provisions that restrict the sex *or number of persons* entering into a marriage unit."  *See* WILLIAM ESKRIDGE, GAYLAW:  CHALLENGING THE APARTHEID OF THE CLOSET 134 (2002) (emphasis added).  Indeed, how could a bisexual who cannot find complete fulfillment of his or her sexual identity in a marriage with a person of the same sex, be denied the right also to marry a person of the opposite sex?[15]  Would the arguments and rationales found insufficient to justify the State's prohibition on same-sex marriage somehow suffice to justify its ban on polygamous marriages?[16]

Incestuous relationships present a somewhat different case, but it is nevertheless difficult to fathom how a blanket ban on incestuous marriages could pass constitutional muster in a regime in which the fundamental right to marry is viewed broadly enough to require same-sex marriages.  As with limitations on polygamy, limitations on incestuous marriages restrict an individual's freedom of choice in marriage.  Because of the higher likelihood of producing children with genetic birth defects, bans on incestuous marriages that have the capability of producing

---

[15] Polygamy is closely related to polyamory, a social movement that has been called "post-modern polygamy."  *See, e.g.*, Maura I. Strassberg, *The Challenge of Post-modern Polygamy:  Considering Polyamory*, 31 CAP. U.L. REV. 439 (2003).  Polyamory takes a variety of forms, but generally rejects the traditional notion that intimate relationships are best limited to couples.  "Researchers . . . estimate that openly polyamorous families in the United States number more than half a million, Jessica Bennett, *Only You.  And You.  And You.*, Newsweek Web Exclusive, July 29, 2009, *available at* http://www.newsweek.com/id/209164/output/print, and organizations supporting the practice have developed, *see, e.g.*, Loving More, New Models for New Relationships, *at* http://lovemore.com.  A broadly defined fundamental right to marriage that would include polygamous unions would also include polyamorous ones in all their variety.

[16] According to one prominent scholar, the legal arguments against polygamy are "extremely weak. The primary state interest that is strong enough to justify legal restriction is an interest in the equality of the sexes, which would not tell against a regime of sex-equal polygamy."  Martha Nussbaum, *A Right to Marry? Same-sex Marriage and Constitutional Law*, Dissent Magazine, Summer 2009, available at http://dissentmagazine.org/article/?article=1935.

children—opposite-sex marriages—might survive judicial scrutiny even if same-sex marital

restrictions were struck down as unconstitutional.  But any such restriction on same-sex marriages

would clearly be overinclusive:  what reason, for example, could the government give for refusing

to allow two brothers or two sisters to marry?  Nor is it clear how a fixed age limit on marriage

could be justified in light of the wide variation in rates at which individuals mature.

In short, as conceived by Plaintiffs, the "fundamental right to marry" would threaten a

wholesale transformation in the institution of marriage, rendering it wholly unrecognizable to a

society that has always practiced it in its traditional form.

### III.   Proposition 8 Is Not Subject To Heightened Scrutiny Under The Equal Protection Clause.

Proposition 8 is, at most, subject to rational basis review under the Equal Protection

Clause.  At bottom, that constitutional provision is "concerned with arbitrary government

classification."  *Engquist v. Oregon Dep't of Agric.*, 128 S. Ct. 2146, 2153 (2008).  As the

Supreme Court "explained long ago, the Fourteenth Amendment 'requires that all persons

subjected to . . . legislation shall be treated alike, in like circumstances and conditions.' "  *Id.*

(quoting *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887) (alterations in original)).  To assure that the

government does not classify arbitrarily, laws that treat differently those in "like circumstances

and conditions" (in other words, laws that treat the "similarly situated" differently) must be

supported by a rational basis.  *Id.*  In most cases, nothing more is required.  That is, judicial review

under the Equal Protection Clause is ordinarily limited to determining whether a challenged

classification is rationally related to a legitimate government interest, for in general, "the

Constitution presumes that even improvident decisions will eventually be rectified by the

democratic processes."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).

Such deferential review, however, is not always appropriate—some classifications "tend[]

seriously to curtail the operation of those political processes ordinarily to be relied upon to protect

34

minorities, and [thus] may call for a correspondingly more searching judicial inquiry." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). Thus, the Court subjects to strict judicial scrutiny government action that classifies on the basis of the "suspect" characteristics of race, national origin, and alienage, and to intermediate judicial scrutiny classifications based on the "quasi-suspect" traits of sex and legitimacy. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990).

Because same-sex and opposite-sex couples are not similarly situated with respect to the institution of marriage, and because Proposition 8 does not implicate a suspect or quasi-suspect class, the Equal Protection Clause requires only a rational basis for California's reservation of the civil institution of marriage for unions consisting of a man and a woman.

### A.   Same-Sex And Opposite-Sex Couples Are Not Similarly Situated With Respect To Marriage.

In adopting Proposition 8, the people of California reaffirmed and restored the traditional understanding of marriage, under which that institution is reserved for unions between a man and a woman. Proposition 8 thus draws a distinction between opposite-sex couples, on the one hand, and any other type of relationship, including same-sex couples, on the other hand. "The Equal Protection Clause," however, "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Accordingly, to press a viable equal protection claim, Plaintiffs must first prove that they are similarly situated to the class of individuals allegedly receiving favorable governmental treatment. For as the Supreme Court has explained, "[t]he Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality." *Rostker v. Goldberg*, 453 U.S. 57, 79 (1981).

Plaintiffs' equal protection claim fails at the threshold because, with respect to the institution of marriage, same-sex couples are not situated similarly to their opposite-sex

35

counterparts.  As we have explained, *see supra* at 23-24, the institution of marriage is and always has been bound up with the procreative nature of sexual relationships between men and women.  Every species, including humans, must develop a means of sustaining itself across time, and societies throughout history and across the globe have relied primarily on the institution of marriage for this vital purpose.  Viewed in this light, it is clear that in the critically important "relevant respect[]," *Nordlinger*, 505 U.S. at 10, of biology, same-sex couples are not similarly situated to opposite-sex couples with respect to the institution of marriage.  And as the Supreme Court has recognized, "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it."  *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 63 (2001)); *cf. also Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 472 (1981) (plurality) ("We need not be medical doctors to discern that young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse.  Only women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity.").  For this reason alone, Plaintiffs' equal protection claim must be rejected.

### B. Sexual Orientation Is Not A Suspect Or Quasi-Suspect Classification Under The Equal Protection Clause.

To the extent the traditional definition of marriage draws a distinction based on sexual orientation, controlling precedent establishes that it is subject only to rational basis scrutiny.  And even if it were open to this Court to question the conclusion compelled by controlling precedent, that conclusion is plainly correct.

#### 1. Controlling precedent establishes that laws that discriminate on the basis of sexual orientation are subject only to rational basis review.

Again, heightened judicial scrutiny under the Equal Protection Clause is reserved for laws that burden so-called "suspect" or "quasi-suspect" classes.  *See Bell v. Massanari*, 254 F.3d 817,

36

823 (9th Cir. 2001).  The Supreme Court has never suggested, let alone held, that classifications based on sexual orientation should receive a heightened level of judicial scrutiny.  *See Romer v. Evans*, 517 U.S. at 632 (holding that Colorado's Amendment 2 "fails . . . th[e] conventional [rational basis] inquiry").  And in *High Tech Gays v. Defense Indus. Sec. Clearance Office*, the Ninth Circuit squarely held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny."  895 F.2d at 574.  This decision accords with the conclusion of every other federal circuit court that has considered the issue.  *See Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008); *Veney v. Wyche*, 293 F.3d 726, 731-32 (4th Cir. 2002); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Rich v. Sec'y of the Army*, 735 F.2d 1220, 1229 (10th Cir. 1984); *Lofton v. Secretary of Dep't of Children and Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004); *Steffan v. Perry*, 41 F.3d 677, 684 n.3 (D.C. Cir. 1994); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989).

Since *High Tech Gays*, the Ninth Circuit has continued to review laws that classify on the basis of sexual orientation for a rational basis, and this Court is bound to apply that standard as well.  *See Witt v. Department of the Air Force*, 527 F.3d at 821 (applying rational basis review to an equal protection challenge to a classification based on sexual orientation); *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003) ("homosexuals are not a suspect or quasi-suspect class"); *Holmes v. California Army Nat'l Guard*, 124 F.3d 1126, 1132 (9th Cir. Cal. 1997) ("homosexuals do not constitute a suspect or quasi-suspect class"); *Philips v. Perry*, 106 F.3d 1420, 1425 (9th Cir. 1997) ("homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment") (quotation marks omitted).  Accordingly, the level of

equal protection scrutiny applicable to this case is not an open question, but even if it were, the conclusion of the Ninth Circuit, and every other court of appeals, is plainly correct.

### 2. The precedential rule that classifications on the basis of sexual orientation are subject only to rational basis review is plainly correct.

To qualify for the extraordinary protections accorded suspect or quasi-suspect classifications, Plaintiffs must show, among other things, that gays and lesbians (a) are defined by an "immutable" characteristic, *e.g.*, *Frontiero v. Richardson*, 411 U.S. at 686 (plurality), and (b) are "politically powerless," *e.g.*, *Cleburne*, 473 U.S. at 445. *See also High Tech Gays*, 895 F.2d at 573. As demonstrated below, Plaintiffs cannot make either showing.

### a. Sexual orientation is not immutable.

1. Sexual orientation is a complex and amorphous phenomenon that defies consistent and uniform definition. Indeed, unlike classifications deemed by the Supreme Court as suspect, there is no objective way by which to identify a person as having a particular sexual orientation. This difficulty is reflected throughout the scholarly literature, which recognizes the lack of any settled definition for sexual orientation. *See e.g.*, TODD A. SALZMAN & MICHAEL G. LAWLER, THE SEXUAL PERSON 150 (2008)("The meaning of the phrase 'sexual orientation' is complex and not universally agreed upon."); Gail S. Bernstein, *Defining Sexual Orientation*, *available at* http://www.selfhelpmagazine.com/article/sexual_orientation ("Much of the confusion about sexual orientation occurs because there is no single agreed upon definition of the term."). Likewise, "[t]here is currently no scientific or popular consensus on the exact constellation of experiences that definitively 'qualify' an individual as lesbian, gay, or bisexual." Lisa M. Diamond and Ritch C. Savin-Williams, *Gender and Sexual Identity*, in HANDBOOK OF APPLIED DEVELOPMENTAL SCIENCE VOL. 1 AT 102 (Richard M. Lerner et al., eds., 2002). Indeed, the "more carefully researchers map these constellations—differentiating, for example, between gender identity and sexual identity, desire and behavior, sexual versus affectional feelings, early-appearing versus late-

38

appearing attractions and fantasies, or social identifications and sexual profiles—the more

complicated the picture becomes, because few individuals report uniform inter-correlations among

these domains." *Id*.

> This complexity understandably poses problems for researchers:
>
> In most cases, space [for inquiring about sexual orientation] is allocated for only one question, but little agreement exists on what it should be or the proper response options.  Who one has sex with? Who one is attracted to? How one identifies?  Should options be categorical (gay, lesbian, bisexual, heterosexual) or dimensional (1–7 scale from exclusively heterosexual to exclusively homosexual)?  Sexual behavior, sexual attraction, and sexual identity questions do not always solicit similar populations, and individuals might have aspects of one attribute but not exclusively so.

Ritch C. Savin-Williams, *Then and Now:  Recruitment, Definition, Diversity, and Positive

Attributes of Same-Sex Populations*, 44 DEV. PSYCHOLOGY 136 (2008).  In short, "the concept of

sexual orientation . . . is fraught with vagaries, the terminology is ambiguous and ill-defined, and

the apparently exclusive and stable categories commonly employed actually disguise complex

dimensionality and fluidity."  JANIS S. BOHAN, PSYCHOLOGY AND SEXUAL ORIENTATION:  COMING

TO TERMS 13 (1996).

Compounding this definitional confusion is the fact that, as the American Psychological

Association puts it:  "Research over several decades has demonstrated that sexual orientation

ranges along a continuum, from exclusive attraction to the other sex to exclusive attraction to the

same sex."  APA Online, *Answers to Your Questions for a Better Understanding of Sexual

Orientation & Homosexuality*, *available at* http://www.apa.org/topics/sorientation.html.[17]  This

reality of sexual orientation further confounds any effort to group individuals into a discrete

category of sexual orientation.  Indeed, according to an expert declaration filed by plaintiff-

---

[17] This is similar to the view taken by Kinsey:  "Only the human mind invents categories and tries to force facts into separated pigeon-holes.  The living world is a continuum in each and every one of its aspects.  The sooner we learn this concerning human sexual behavior the sooner we shall reach a sound understanding of the realities of sex."  ALFRED CHARLES KINSEY, SEXUAL BEHAVIOR IN THE HUMAN MALE 639 (1948).

intervenor City of San Francisco in this case, sexual orientation is not "discrete"; "[t]he sexual orientation of any given individual falls within a spectrum between same-gender orientation and opposite-gender orientation"; and "no sharp line distinguishes homosexuality and heterosexuality." Declaration of Dr. Robert Galatzer Levy in Support of City and County of San Francisco's Constitutional Challenge to Marriage Statutes in *Marriage Cases*, Doc # 111-11 at 4-5. It would be unprecedented for a court to give heightened protection to a status consisting of an "unidentifiable group or class of individuals whose identity is defined by subjective and unapparent characteristics such as innate desires, drives, and thoughts." *Equality Found. v. City of Cincinnati*, 54 F.3d 261, 267 (6th Cir. 1995); *see also Cleburne*, 473 U.S. at 445 (explaining that the "amorphous" nature of the class of mentally retarded individuals counseled against deeming it quasi-suspect).

2. Given that scholars and leading professional organizations have not been able to agree on a stable understanding of sexual orientation, it is unsurprising that laws dealing with sexual orientation likewise define the term in a variety of complex, amorphous, and inconsistent ways. Indeed, such laws define sexual orientation using some combination of several distinct factors, including:

- Preference or attraction. *See, e.g.*, CONN. GEN. STAT. § 46a-81a (" '[S]exual orientation' means having a preference for heterosexuality, homosexuality or bisexuality . . . .").

- External perception. *See, e.g.*, CAL. GOV. CODE §§ 11135, 12926(m), 12955(m) (" '[S]exual orientation' . . . includes a perception that a person has any of those characteristics . . . .").

- Social identity. *See, e.g.*, MASS. GEN. LAWS ch. 151B, § 3(6) (" '[S]exual orientation' mean[s] . . . being identified as having an orientation for

heterosexuality, bisexuality, or homosexuality . . . .").

- Conduct.  *See, e.g,* D.C. CODE § 2-1401.02(28) (" '[S]exual orientation' means male or female homosexuality, heterosexuality and bisexuality, by preference or *practice*.") (emphasis added).

- Relationship.  *See, e.g.*, S.F. ADMIN. CODE § 12A.3 (" '[S]exual orientation' shall mean the choice of human adult sexual partner according to gender.")

Legislatures, of course, have the advantage of being able to set down a prospective definition of sexual orientation that will be used for purposes of a state's laws.  Courts, on the other hand, will necessarily be faced with the challenge of addressing the nature of sexual orientation on a case-by-case basis, with any definition that may be settled upon sure to be challenged as scholarly opinion continues to shift or as a litigant excluded from a certain orientation by one definition seeks a more inclusive definition.  This is simply not firm ground upon which to build a suspect classification.

3.    Amid all of the uncertainty surrounding the concept of sexual orientation, one fact is clear: sexual orientation shifts over time for a significant number of people.  As a matter of theory, sexual orientation is "the cumulative experience and interaction of erotic fantasy, romantic-emotional feelings, and sexual behavior directed toward one or both genders.  These three somewhat independent and parallel dimensions are traditionally conceived as being overlaid on a plane of sexual orientation . . . . This model suggests that sexual orientation is not static and may vary throughout the course of a lifetime."  Michael R. Kauth and Seth C. Kalichman, *Sexual Orientation and Devleopment:  An Interactive Approach*, in THE PSYCHOLOGY OF SEXUAL ORIENTATION, BEHAVIOR, AND IDENTITY 82 (Louis Diamant and Richard D. McAnulty, eds., 1995).  And there is abundant evidence of this phenomenon in fact.  To take just one example, a recent  study concluded that twenty percent of men and twenty-nine percent of women in same-

41

sex domestic partnerships in California had previously been married to a member of the opposite sex.  *See* Gary J. Gates, et al., *Marriage, Registration, and Dissolution by Same-Sex Couples in the U.S.* at 10 (July 2008), *available at*

http://www.law.ucla.edu/williamsinstitute/publications/Couples%20Marr%20Regis%20Diss.pdf.

Indeed, the evidence of mutability of the sexual orientation of women is especially striking.  "Scholars from many disciplines have noted that women's sexuality tends to be fluid, malleable, shaped by life experiences, and capable of change over time. . . .  [M]ultiple changes in sexual orientation are possible . . . [due to] social, cognitive, and environmental influences."  Linda D. Garnets and Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, *available at* http://www.csw.ucla.edu/Newsletter/Dec06/garnets_peplau.html.  This mutability was tellingly demonstrated by the results of a ten-year longitudinal study published by the American Psychological Association in 2008:  67% of the women studied changed their sexual orientation at least once and 36% changed it two or more times.  Only 33% of the women retained the same sexual orientation across the ten-year time period.  Lisa M. Diamond, *Female bisexuality from adolescence to adulthood: Results from a 10-year longitudinal study*, 44 DEVELOPMENTAL PSYCHOLOGY 5, 9 (2008).

The evidence of this variability overwhelms the scant evidence that sexual orientation, like classifications deemed suspect by the Supreme Court, is "determined solely by the accident of birth."  *Frontiero v. Richardson*, 411 U.S. at 686 (plurality).  While early studies on the origins of homosexuality raised the possibility of a "gay gene," more recent, extensive, and scientifically sound research does not support such a possibility.  According to the American Psychiatric Association, for instance, "there are no replicated scientific studies supporting any specific biological etiology for homosexuality." *See* Gay/Lesbian/Bisexuals, *at* http://www.healthyminds.org/More-Info-For/GayLesbianBisexuals.aspx.  The Council for

Responsible Genetics concurs that "to date, no conclusive link between genetics and sexual orientation has been found."  Council for Responsible Genetics, *Brief on Sexual Orientation and Genetic Determinism* (2006), *available at*

http://www.councilforresponsiblegenetics.org/ViewPage.aspx?pageId=66.

In addition, most conceptions of sexual orientation contain a behavioral component; an individual's actions, in other words, play a role in identifying that individual's sexual orientation. "The behavior or conduct of . . . already recognized [suspect] classes," however, "is irrelevant to their identification."  *High Tech Gays*, 895 F.2d at 573-74.  And sexual behavior (unlike, say, non-behavioral characteristics such as race or sex) will not necessary run in the same direction throughout an individual's lifetime.

In short, whatever the cause, "some individuals experience a shift in sexual orientation over the course of a lifetime."  Declaration of Dr. Robert Galatzer-Levy for the City and County of San Francisco in Opposition to Plaintiffs Motion for Summary Judgment in the *Marriage Cases*, Doc # 111-12 at 6.  Indeed, the existence of organizations such as Parents and Friends of Ex-Gays, *see* http://www.pfox.org, stands as a testament to this variability.  *See also Parents and Friends of Ex-Gays, Inc. v. Government of the Dist. Office of Human Rights*, C.A. No. 2008 CA 003662 P (MPA), Memorandum Opinion at 5-6 (D.C. Sup. Ct. June 26, 2009) (holding that "ex-gays" are "protected from discrimination" under law barring discrimination on account of sexual orientation), attached as Exhibit A.  Accordingly, the Ninth Circuit quite properly held in *High Tech Gays*, that sexual orientation is not immutable.  *See* 895 F.2d at 573.[18]  Not only is this conclusion binding on this Court,[19] it is sound in theory and fact.

---

[18] Other courts have reached the same conclusion.  *See Woodward v. United States*, 871 F.2d 1068, 1076 (Fed. Cir. 1989) (holding that sexual orientation is not immutable); *Hrynda v. United States*, 933 F. Supp. 1047, 1053 (M.D. Fla. 1996) (same).

[19] In a different context, a subsequent panel asserted, without addressing *High Tech Gays*, that sexual orientation is immutable.  *See Hernandez-Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th (Continued)

43

### b.  <u>Gays and lesbians wield substantial political power.</u>

It cannot seriously be contended that gays and lesbians "are politically powerless in the sense that they have no ability to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445. This fact alone strongly counsels against inserting the judiciary deeply into the political processes that produce laws that impact them. *See id.* at 440; *San Antonio Indep. Sch. Dist. v, Rodriguez*, 411 U.S. 1, 28 (1973); *Carolene Products*, 304 U.S. at 152 n.4. And as with immutability, the Ninth Circuit has already determined that gays and lesbians are not politically powerless: "[L]egislatures have addressed and continue to address the discrimination suffered by homosexuals on account of their sexual orientation through the passage of anti-discrimination legislation. Thus, homosexuals are not without political power; they have the ability to and do attract the attention of the lawmakers, as evidenced by such legislation." *High Tech Gays*, 895 F.2d at 574; *see also Ben-Shalom v. Marsh*, 881 F.2d at 466 ("In these times homosexuals are proving that they are not without growing political power. It cannot be said they have no ability to attract the attention of the lawmakers.") (quotation marks omitted).

If anything, the political power of gays and lesbians has significantly *increased* in the nearly two decades since the Ninth Circuit decided *High Tech Gays*. Legislatures continue to pass laws that ban discrimination on the basis of sexual orientation and otherwise advance the interests of gays and lesbians. California provides a prime case in point. The State has dozens of laws that grant rights, benefits, and protections to gays and lesbians. *See* Exhibit B. The growing political power of gays and lesbians in California is well described by Equality California, a group dedicated to advancing the rights of gays, lesbians, bisexuals, and transgendered people: "In the

(Cont'd)
Cir. 2000). To the extent this precedent conflicts with *High Tech Gays*, *High Tech Gays* is controlling in this Court. *See Greenhow v. Secretary of Health and Human Servs.*, 863 F.2d 633, 636 (9th Cir. 1988), *overruled in part*, *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) (en banc); *Barbato v. Commissioner of Social Sec. Admin.*, 923 F. Supp. 1273, 1278 (C.D. Cal. 1996) (explaining that *Greenhow* analysis still applies to District Court).

44

past 10 years, . . . California [has moved] from a state with extremely limited legal protections for lesbian, gay, bisexual and transgender (LGBT) individuals to a state with some of the most comprehensive civil rights protections in the nation."  Building a State of Equality, *available at* http://www.eqca.org/site/pp.asp?c=kuLRJ9MRKrH&b=4025493.  Indeed, with the exception of a right for same-sex couples to enter into relationships denominated as marriages, virtually every policy supported by Equality California has been enacted into California law.

The positions taken by the named defendants to this case demonstrate the ability of gays and lesbians to attract the attention of the political class.  Not one official, or government body, of the California government is defending Proposition 8.  The Administration has not taken a position one way or the other, and the Attorney General has taken the position that Proposition 8 is unconstitutional.  The City of San Francisco is intervening as a Plaintiff.  And in support of its motion to intervene, the City explains that it "has a long history of efforts to achieve full equality for its LGBT citizens. The City's interest [is] evidenced by its active legislation, human rights commission work, and litigation over the last four decades."   San Francisco's Motion to Intervene, Doc # 109 at 8.

Gay and lesbian political power is by no means limited to the state or local level.   On the contrary, their strength reaches to the highest office in the land, as evidenced by President Obama's strong expression of support for their concerns:

> My Administration has partnered with the LGBT community to advance a wide range of initiatives. At the international level, I have joined efforts at the United Nations to decriminalize homosexuality around the world. Here at home, I continue to support measures to bring the full spectrum of equal rights to LGBT Americans. These measures include enhancing hate crimes laws, supporting civil unions and Federal rights for LGBT couples, outlawing discrimination in the workplace, ensuring adoption rights, and ending the existing "Don't Ask Don't Tell" policy in a way that strengthens our Armed Forces and our national security. We must also commit ourselves to fighting the HIV/AIDS epidemic by both reducing the number of HIV infections and providing care and support services to people living with HIV/AIDS across the United States.

Proclamation 8387, Lesbian, Gay, Bisexual and Transgender Pride Month, 2009, 74 Fed. Reg.

45

26,929 (June 4, 2009).

The influence of gays and lesbians also reaches into the halls of Congress.  This is illustrated by the fact that the Human Rights Campaign—another organization committed to advancing the rights of gays, lesbians, bisexuals, and transgendered persons—gave ratings of 90 percent or better to 31 Senators and 128 congressmen in the 110th Congress.  *See* Human Rights Campaign, *Congressional Scorecard*, available at http://www.hrc.org/documents/Congress_Scorecard-110th.pdf.

As demonstrated by its platform for the 2008 election cycle, the national Democratic Party also promotes a gay- and lesbian-friendly agenda:

> We support the repeal of "Don't Ask Don't Tell" and the implementation of policies to allow qualified men and women to serve openly regardless of sexual orientation.
>
> …
>
> We support the full inclusion of all families, including same-sex couples, in the life of our nation, and support equal responsibility, benefits, and protections. We will enact a comprehensive bipartisan employment non-discrimination act. We oppose the Defense of Marriage Act and all attempts to use this issue to divide us.
>
> …
>
> Democrats will fight to end discrimination based on . . . sexual orientation . . . in every corner of our country, because that's the America we believe in.

Democratic Party Platform 2008: Renewing America's Promise, available at http://www.democrats.org/a/party/platform.html.

These examples barely scratch the surface of gay and lesbian political clout, but suffice to show that gays and lesbians are hardly politically powerless.

### C.      Proposition 8 Does Not Discriminate On The Basis of Sex.

Plaintiffs also allege that Prop. 8 impermissibly discriminates on the basis of sex.  But the claim that the traditional definition of marriage as the union of a man and a woman discriminates on the basis of sex has rightly been rejected by every federal court, and nearly every state court

46

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(including the California Supreme Court), to address the issue.  *See In re Marriage Cases*, 183

P.3d at 439; *Conaway v. Deane*, 932 A.2d 571, 598 (Md. Ct. App. 2007); *Andersen v. King

County*, 138 P.3d at 988; *Hernandez v. Robles*, 855 N.E.2d at 6; *Smelt v. County of Orange*, 374 F.

Supp. 2d at 876; *Wilson v. Ake*, 354 F. Supp. 2d at 1307-08; *In re Kandu*, 315 B.R. at 143; *Baker

v. Vermont*, 744 A.2d 864, 880 n.13 (Vt. 1999); *Singer v. Hara*, 522 P.2d 1187, 1192 (Wash. Ct.

App. 1974).  *See also Goodridge v. Department of Public Health*, 798 N.E.2d 941, 992 (Mass.

2003) (Cordy, J., dissenting).[20]

      These decisions are plainly correct.  The traditional definition of marriage reaffirmed by

Prop. 8 does not discriminate on the basis of sex.  "[T]he laws in which the Supreme Court has

found sex-based classifications have all treated men and women differently."  *Smelt*, 374 F. Supp.

2d at 876 (citing *United States v. Virginia*, 518 U.S. 515, 519-20 (1996); *Mississippi Univ. for

Women v. Hogan*, 458 U.S. 718, 719 (1982); *Craig v. Boren*, 429 U.S. 190, 191-92 (1976);

*Frontiero v. Richardson*, 411 U.S. at 678-79; *Reed v. Reed*, 404 U.S. 71, 73 (1971)); *accord Baker

v. Vermont*, 744 A.2d at 880 n.13 ("All of the seminal sex-discrimination decisions … have

invalidated statutes that single out men or women as a discrete class for unequal treatment.")

(citing *Virginia*, 518 U.S. at 555-56; *Mississippi Univ. for Women*, 458 U.S. at 731; *Craig*, 429

U.S. at 204; *Frontiero*, 411 U.S. at 690).  But Proposition 8 does not treat men and women

differently: each man or woman may marry one person of the opposite sex, and each man or

woman is prohibited from any other marital arrangement.  As recognized by the high court of

Maryland, the limitation of marriage to opposite-sex couples does not "separate men and women

into discrete classes for the purpose of granting to one class of person benefits at the expense of

---

[20] *But see Li v. Oregon*, No. 0403-03057, 2004 WL 1258167, at *5-6 (Or. Cir. Ct. Apr. 20,
2004), *rev'd on other grounds by* 110 P.3d 91 (Or. 2005) (en banc); *Brause v. Bureau of Vital
Statistics*, No. 3AN-95-6562, 1998 WL 88743, at *6 (Alaska Super. Ct. Feb. 27, 1998),
superseded by constitutional amendment, ALASKA CONST. art. I, § 25; *Baehr v. Lewin*, 852 P.2d
44, 64 (Haw. 1993), superseded by constitutional amendment, HAW. CONST. art. I, § 23.

the other class.  Nor does the [provision], facially or in its application, place men and women on an uneven playing field.  Rather, the [provision] prohibits equally both men and women from the same conduct." *Conway v. Deane*, 932 A.2d at 598; s*ee also id.* at 599 ("The limitation does not put men and women in different classes, and give one class a benefit not given to the other.").  Numerous other courts have reached the same conclusion.[21]  This Court should follow these persuasive authorities and reject Plaintiffs' claim that Proposition 8 discriminates on the basis of sex.

## IV.     It Is Rational For The People Of California To Preserve The Traditional Institution Of Marriage.

Proposition 8 is not subject to heightened scrutiny under either the Due Process Clause or the Equal Protection Clause.  It therefore must be sustained if it is rationally related to a legitimate government interest, a standard it readily meets.  *See Glucksberg*, 521 U.S. at 728 (due process); *Heller v. Doe*, 509 U.S. at 319-20 (equal protection).  Indeed, because "the institution of marriage has always been, in our federal system, the predominant concern of state government…. rational-basis review must be particularly deferential."  *Citizens for Equal Protection v. Bruning*, 455 F.3d at 867; *see also Sosna*, 419 U.S. at 404 (explaining that the "regulation of domestic relations," including marriage, "has long been regarded as the virtually exclusive province of the states").

Even in the typical case, rational basis review is a "paradigm of judicial restraint," and it does not give courts "a license . . . to judge the wisdom, fairness, or logic of legislative choices."

---

[21] *See Andersen*, 138 P.3d at 988 ("Men and women are treated identically under DOMA; neither may marry a person of the same sex.  DOMA therefore does not make any classification by sex, and it does not discriminate on account of sex."); *Baker*, 744 A.2d at 880 n.13 ("The difficulty here is that the marriage laws are facially neutral; they do not single out men or women as a class for disparate treatment, but rather prohibit men and women equally from marrying a person of the same sex…. [E]ach sex is equally prohibited from precisely the same conduct."); *Smelt*, 374 F. Supp. 2d at 876-77 ("DOMA does not treat men and women differently."); *In re Kandu*, 315 B.R. at 143 ("DOMA … does not single out men or women as a discrete class for unequal treatment," but rather "prohibits men and women equally from marrying a person of the same sex.  Women, as members of one class, are not being treated differently from men, as members of a different class."); *Wilson*, 354 F. Supp. 2d at 1307-08 ("DOMA does not (Continued)

*FCC v. Beach Commc'ns*, 508 U.S. 307, 313-14 (1993).  Proposition 8 thus "comes to [the Court] bearing a strong presumption of validity," *id.* at 314, and Plaintiffs bear the heavy burden "to negative every conceivable basis which might support it," *Heller*, 509 U.S. at 320.

This strong presumption of validity informs both the process of identifying legitimate interests and of determining whether Proposition 8 is rationally related to those interests.  As an initial matter, a law need only serve a *single* legitimate interest; once such an interest has been identified, the judicial "inquiry is at an end."  *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980).  Furthermore, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *Beach Communications*, 508 U.S. at 315.  *Any* legitimate interest will do, and the challengers bear the burden of refuting "any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Heller*, 509 U.S. at 320.

Once a legitimate interest for a law has been identified, lawmakers are under "no obligation to produce evidence to sustain the rationality of a statutory classification."  *Id.*   Rather, their policy judgment "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."  *Beach Commc'ns*, 508 U.S. at 315.  "[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based *could not* reasonably be conceived to be true by the governmental decisionmaker."  *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. at 464 (emphasis added).  Ground for debate is insufficient:  "It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength.  It is not within the competency of the courts to arbitrate in such contrariety."  *Vance v. Bradley*, 440 U.S. at 111 (quotation marks omitted).

(Cont'd)
discriminate on the basis of sex because it treats women and men equally.").

Finally, any imperfection between means and ends is of no moment—"courts are compelled under rational-basis review to accept . . . generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321. Indeed, "it [is] irrelevant . . . that other alternatives might achieve approximately the same results." *Vance*, 440 U.S. at 102 n.20.

Applying these familiar principles, the Ninth Circuit has already held that limiting marriage to traditional opposite-sex unions satisfies rational basis review. In *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982), a same-sex couple purporting to be married lodged due process and equal protection challenges to a federal immigration law that granted an admissions preference to spouses of United States citizens—a preference the Court interpreted as limited to opposite-sex spouses. *Id.* at 1038, 1041. Upholding the validity of this limitation, the Court held that "Congress's decision to confer spouse status . . . only upon the parties to heterosexual marriages has a rational basis and therefore comports with the due process clause and its equal protection requirements." *Id.* at 1042. As the Court explained:

> In effect, Congress has determined that preferential status is not warranted for the spouses of homosexual marriages. Perhaps this is because homosexual marriages never produce offspring, because they are not recognized in most, if in any, of the states, or because they violate traditional and often prevailing societal mores. In any event, having found that Congress rationally intended to deny preferential status to the spouses of such marriages, we need not further probe and test the justifications for the legislative decision.

*Id.* at 1042-43 (quotation marks omitted); *cf. id.* at 1039 (finding it unnecessary to resolve whether the alleged "marriage" was valid under state law). It follows that California's decision to restrict marital status to members of opposite-sex unions is likewise rational under this Circuit's controlling precedent. Indeed, the California Court of Appeal, applying rational basis review, in the *Marriage Cases*, upheld Proposition 22, a statutory definition of marriage worded identically to Proposition 8. That court concluded:

> [W]e believe it is rational for the Legislature to preserve the opposite-sex definition of marriage, which has existed throughout history and which continues to represent the common understanding of marriage in most other countries and states of our

union, while at the same time providing equal rights and benefits to same-sex partners through a comprehensive domestic partnership system.  The state may legitimately support these parallel institutions while also acknowledging their differences.

*In Re Marriage Cases*, 143 Cal. App. at 931.[22]

The California Court of Appeal got it right, as we demonstrate below.

### A.   Preserving The Traditional Institution Of Marriage Is Itself A Legitimate State Interest.

As recognized by the California Supreme Court, "the purpose of [Proposition 8] was simply to restore the traditional definition of marriage as referring to a union between a man and a woman."  *Strauss v. Horton*, 207 P.3d at 76.  And as explained by Justice O'Connor and demonstrated below, "preserving the traditional institution of marriage" is itself a "legitimate state interest."  *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring).

### 1.   The people of California have a legitimate interest in calling different things by different names.

The word "marriage" means the union of a man and a woman.  *See supra* at 19-21 (citing dictionaries).  And it is true that the word marriage, as the California Supreme Court has put it, has a "long and celebrated history" and "describes a union unreservedly approved and favored by the community."  *In re Marriage Cases*, 183 P.3d at 445.  Indeed, the institution of marriage has its own unique and venerated vocabulary, with constituent terms that reflect its traditional opposite-sex definition ("bride" and "groom"; "husband" and "wife").  Redefining the word marriage to include same-sex relationships will require that the entire vocabulary of marriage be redefined or, more likely, discarded.[23]

---

[22]  As noted above, we believe the reasoning of the Court of Appeal retains its persuasive force, despite that court's reversal by the California Supreme Court.  Furthermore, because the California Supreme Court held that Proposition 22 was subject to heightened scrutiny under the State Constitution, it had no occasion to address the Court of Appeal's rational-basis analysis.

[23]  Among the "achievements of the gay and lesbian civil rights movement" is that it "has managed to convince many heterosexuals to stop using the gendered terms 'husband' and 'wife,' or even the term 'spouse,' and instead use the term 'partner' to describe their 'significant other.' "  Jeffrey Redding, *Proposition 8 and the Future of American Same-Sex Marriage Activism*, 14 Nexus J. Op. 113, 123 (2009).

Plaintiffs say that marriage must nonetheless be redefined in this manner because calling committed, loving same-sex unions by any other name necessarily stigmatizes and demeans them. But as we discuss in detail below, *infra* at 58-71, the traditional opposite-sex definition of marriage flows from the procreative nature of such unions.  In this critical, *definitional* respect, same-sex unions are simple different—not necessarily better or worse, just different.  And it is hardly irrational to call different things by different names.[24]  Nor is it stigmatizing.  The orchid is not demeaned because we do not call it a rose.

2. **The people of California have a legitimate interest in taking a cautious, incremental approach in addressing controversial social issues.**

"[T]he marriage relation [is] an institution more basic in our civilization than any other." *Williams v. North Carolina*, 317 U.S. 287, 303 (1942).  As the Supreme Court explained long ago, it is the very "foundation of the family and of society, without which there would be neither civilization nor progress."  *Maynard v. Hill*, 125 U.S. 190, 211 (1888).  It is supported by "a web of history, tradition, custom, culture, widely shared expectations and law," *Kerrigan v. Commissioner Public Health*, 957 A.2d at 503-04 (Borden, J., dissenting), and its continuing importance is demonstrated by the passion that animates both sides in the debate over whether to expand its definition beyond traditional bounds.

The redefinition of marriage sought by Plaintiffs would work a profound change, going to the very essence of the institution of marriage.  One "cannot escape the reality that the shared societal meaning of marriage . . . has always been the union of a man and a woman.  To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin."  *Lewis v. Harris*, 908 A.2d at 222. Indeed, "well-informed observers of marriage—regardless of their sexual, political, or theoretical orientations—uniformly

---

[24]  "Words do matter and there is much in favor of using terms that differentiate to describe biologically different models." *In re Marriage Cases*, 143 Cal. App. 4th at 941.
(Continued)

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

1   acknowledge the magnitude of the differences between the two possible institutions of marriage."

2   Monte Neil Stewart, *Marriage Facts*, 31 HARV. J.L. & PUB. POL'Y 313, 324 (2008).

3       Any change so momentous is bound to have significant consequences, many of which may

4   be unforeseen.[25]  It is entirely rational for the people of California to be concerned, for example,

5   that severing the inherent link between marriage and the bearing and rearing of children may

6   reduce the institution's ability to channel opposite-sex relationships into the lasting, stable unions

7   that are best for raising children of the union.  Even the words of some same-sex marriage

8   advocates reinforce these concerns: as one such advocate put it, gays and lesbians should "demand

9   the right to marry not as a way of adhering to society's moral codes but rather to debunk a myth

10  and radically alter an archaic institution."  Michelangelo Signorile, *Bridal wave*, OUT MAGAZINE

11  (December/January 1994); *see also id.* (arguing also that gays and lesbians should "fight for same-

12  sex marriage and its benefits, and then, once granted, redefine the institution of marriage

13  completely" and that "the most subversive action lesbian and gay men can undertake . . . is to

14  transform the notion of 'family' altogether").  Nor are these views unique—many others likewise

15  argue that marriage should be extended to same-sex couples *because of* its potential to radically

16  transform the institution.[26]

17      Concern about the potential effects of redefining marriage is particularly warranted given

18  the novelty of same-sex marriage.  California has scant experience with same-sex marriage, and

19  

20      (Cont'd)

21  

22      [25] *See* Robert K. Merton, "The Unanticipated Consequences of Purposive Social Action," 1 AMERICAN SOCIOLOGICAL REVIEW 894 (1936).

23      [26] *See, e.g.*, Ellen Willis, contribution to "Can Marriage be Saved? A Forum," *Nation*, July 5, 2004 16-17 ("[C]onferring the legitimacy of marriage on homosexual relations will introduce an implicit revolt against the institution to its very heart, further promoting the democratization and secularization of personal and sexual life."); WHARTON, PHILIPS, I DO, I DON'T:  QUEERS ON MARRIAGE  58-59 (2004) ("Bush is correct, however, when he states that allowing same-sex couples to marry will weaken the institution of marriage.  It most certainly will do so, and that will make marriage a far better concept than it previously has been."); E.J. Graff, "Retying the Knot," in SAME-SEX MARRIAGE:  PRO AND CON, A READER 136 (Andrew Sullivan, ed., 1st ed. 1997) ("If same-sex marriage becomes legal, that venerable institution will ever after stand for sexual choice,
    (Continued)

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

the handful of other jurisdictions that have begun to experiment with it have not produced enough data upon which to make confident judgments.  "Given the critical importance of civil marriage as an organizing and stabilizing institution of society, it is eminently rational for [California] to postpone making fundamental changes to it until such time as there is unanimous scientific evidence, or popular consensus, or both, that such changes can safely be made."  *Goodridge v. Department of Public Health*, 798 N.E. 2d at 1003 (Cordy, J., dissenting); *see also Andersen*, 138 P.3d at 1006 (Johnson, J., concurring in judgment) ("The Washington Legislature could rationally reject outright or conclude that further study is required before engaging in a dramatic alteration of our society's social fabric with profound negative or unforeseeable consequences.").  "Popular consensus" is particularly important in the context of marriage, as much of the institution's strength derives from "the widespread understanding that [the] term describes a union unreservedly approved and favored by the community."  *Marriage Cases*, 183 P.3d at 445.

California, of course, was among the first states to recognize same-sex relationships.  It first enacted a state-wide domestic partnership registry in 1999.  *See id.* at 413.   Domestic partnerships initially provided limited benefits to same-sex couples, but the State has consistently expanded them.  Since 2005, domestic partners have been granted "the same rights, protections, and benefits" under California law as spouses.  CAL. FAM. CODE § 297.5.  As Attorney General Brown previously acknowledged, "Maintaining the longstanding and traditional definition of marriage, while providing same-sex couples with legal recognition comparable to marriage, is a measured approach to a complex and divisive social issue."  Answer Brief of State of California and the Attorney General to Opening Briefs on the Merits in *Marriage Cases* at 47-48 (Cal. June 14, 2007), attached as Exhibit C (quotation marks and citation omitted).   After gaining additional experience with domestic partnerships, and as more evidence from other jurisdictions regarding

(Cont'd)

for cutting the link between sex and diapers.").

the impact of extending marriage to same-sex couples becomes available, the people of California may well decide that recognizing same-sex marriage poses little risk—or they may continue to believe that the potential risk is real.  The California Supreme Court's decision in the *Marriage Cases* left the people with no choice but to amend their constitution to preserve their flexibility to address this issue in a measured and incremental fashion, and it is plainly proper for them to do so.  *See Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955) ("[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.").

By passing Proposition 8, the people of California have decided, for now, to reserve the title "marriage" for opposite-sex relationships.  The vast majority of California's sister states (and the federal government) have also made the same choice.  If California has acted irrationally by doing so, it follows that these jurisdictions have as well, and the Nation will be forced to expose one of its most cherished institutions to a novel social experiment on a continental scale.  Surely our Constitution does not require this; to the contrary, it governs a federal system that is designed to foster a diversity of approaches to novel social arrangements:  "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).  The rest of the country, meanwhile, may learn from such experiments.  As Jonathan Rauch, author of *Gay Marriage: Why it is Good for Gays, Good for Straights, and Good for Marriage*, recently put it:

> [T]o my great gratitude—and I think it's almost inspirational how right the country has gotten this—the public has refused to be rushed. The public has come to understand that we can take our time with this. And the way to do this is let different states do different things. Let's find out how gay marriage works in a few states. Let's find out how civil unions work. In the meantime, let the other states hold back.
>
> Marriage is not like voting, something the government just gives you at the stroke of a pen by fiat. Marriage must be a community institution to have its full power, which is to make couples actually closer. It actually fortifies and not just ratifies relationships.

> Your marriage has to be recognized by your community, your friends, your family, your kids' teachers, your co-workers, all of the people around you as a marriage with all of the expectations and social support that goes with that. The law can't give you that. That comes from community and that's something gay couples are going to have to build by showing, as I think we are in Massachusetts, that we can be good marital citizens, that we're not hurting anybody else's marriage.

An argument for same-sex marriage, an interview with Jonathan Rauch, *available at*

http://pewforum.org/events/?EventID=179.

Regardless of whether Rauch's predictions about the effects of same-sex marriage prove accurate, he is surely correct that this issue should play out in the democratic arena, and that it should not be short-circuited by the courts mandating an immediate one-size-fits-all outcome. *See also, e.g.*, Richard Posner, *Should There Be Homosexual Marriage? And If So, Who Should Decide?* 95 MICH. L. REV. 1578, 1579 (1997) (finding "unconvincing" the argument "that the courts in the name of the Constitution should force acceptance of same-sex marriage on all the states at once"). California, for now, has chosen to recognize same-sex relationships while at the same time preserving the traditional institution of marriage. Surely, "the People themselves cannot be considered irrational in deciding, for the time being, that the fundamental definition of marriage, as it has universally existed until very recently, should be preserved." *In re Marriage Cases*, 183 P.3d at 467 (Baxter, J., concurring and dissenting). On the contrary, it is clearly rational for the people of California to choose to proceed with caution when considering the radical transformation of a bedrock social institution as important as marriage. It is likewise clear that this is a choice that the Constitution permits the people of California to make.

### 3.   **Establishing parallel institutions allows California flexibility to separately address the needs of different types of relationships.**

Given the objective differences between opposite-sex and same-sex relationships, it is also entirely rational for the people of California to establish domestic partnerships as a parallel institution well-positioned to evolve to meet the unique needs of those in same-sex relationships.

Many gays and lesbians, and many of their supporters, recognize the difference between

56

same-sex and opposite-sex relationships and favor a parallel legal institution to recognize same-sex relationships. Some "worry what will happen to gay and lesbian agency … if gays and lesbians get subsumed into an institution of marriage which has been built … for and by heterosexuals." Jeffrey A. Redding, *Proposition 8 and the Future of American Same-Sex Marriage Activism*, 14 Nexus J. Op. 113, 122-23 (2009). It stands to reason that same-sex couples will "have a much greater voice in the future legislation and elaboration of these [parallel] relationship recognition and regulation regimes than they ever will in a heterosexually-dominated, majoritarian marriage system." *Id.* Others worry that marriage would encourage same-sex couples to conform to the expectations and practices of opposite-sex couples. "In arguing for the right to legal marriage, lesbians and gay men [are] forced to claim that [they] are just like heterosexual couples, have the same goals and purposes, and vow to structure [their] lives similarly." Paula Ettelbrick, *Since When is Marriage a Path to Liberation?*, in William B. Rubenstein, Lesbians, Gay Men, and the Law at 401-05 (New York: The New Press 1993).[27] Implicit in these concerns is the recognition by many gays and lesbians that "there are differences between gay and straight relationships. …. [T]he language of equality is overdone when it demands absolute and unequivocal sameness for all people … [and i]t's a risk when deploying the rhetoric of human rights that humanly valuable differences can be smothered." Mark Vernon, *We Don't Need Gay Marriage*, The Guardian, July 4, 2009, available at http://www.guardian.co.uk/commentisfree/2009/jul/04/gay-marriage-civil-partnerships.

Consistent with these concerns, the Supreme Court of New Jersey has observed and

---

[27] *See also* Randy Shilts, The Mayor of Castro Street, 237-38 (2008) (quoting Harvey Milk): "As homosexuals, we can't depend on the heterosexual model. . . . We grow up with the heterosexual model, but we don't have to follow it. We should be developing our own life-style. There's no reason why you can't love more than one person at the same time. You don't have to love them all the same. You love some less, love some more—and always be honest with everybody about where you're at. They in turn can do the same thing and it can open up a bigger sphere.").

1   predicted that "[n]ew language is developing to describe new social and familial relationships, and

2   in time will find its place in our common vocabulary. Through a better understanding of those new

3   relationships and acceptance forged in the democratic process, rather than by judicial fiat, the

4   proper labels will take hold." *Lewis v. Harris*, 908 A.2d at 223.  Whether or not the concerns of

5   many in the gay and lesbian community or the predictions of the Supreme Court of New Jersey

6   prove well founded, it is perfectly rational for California to preserve its flexibility to address the

7   treatment and terminology of same-sex relationships through the democratic process.

8

9       **B.      The Traditional Institution Of Marriage Advances Legitimate State Interests
                   Arising Out Of The Unique Natural Capacity Of Male-Female Relationships
10                 To Produce Offspring.**

11          As we have explained, marriage is a vital social institution, designed to foster, support, and

12   regulate naturally procreative sexual relationships for the sake of producing and raising the next

13   generation.  "Although the details of getting married . . . vary from group to group, . . . the unique

14   trait of what is commonly called marriage is social recognition and approval of a couple's

15   engaging in sexual intercourse and bearing and rearing offspring." Kingsley Davis, *The Meaning

16   and Significance of Marriage in Contemporary Society*, *in* CONTEMPORARY MARRIAGE 5 (1985).

17   "At bottom, civil society has an interest in maintaining and protecting the institution of

18   heterosexual marriage because it has a deep and abiding interest in encouraging responsible

19   procreation and child-rearing.  Simply put, government has an interest in marriage because it has

20   an interest in children." H.R. REP. NO. 104-664, at 13 (1996).  Because of the naturally

21   procreative capacity of male-female unions, traditional opposite-sex marriages *uniquely* further

22   interests in procreation and childrearing.  Accordingly, it is entirely rational for the people of

23   California (to say nothing of the people of 43 sister states and of the Nation as a whole) to reserve

24   the status of marriage uniquely for opposite-sex relationships.  For as the Supreme Court has

25   explained, "Under rational-basis review, where a group possesses distinguishing characteristics

26   relevant to interests the State has authority to implement, a State's decision to act on the basis of

27

28

58

those differences does not give rise to a constitutional violation." *Board of Trustees v. Garrett*, 531 U.S. 356, 366-67 (2001) (quotation marks omitted).

A closer examination of several of these interests—promoting the formation of naturally procreative relationships, promoting stability and responsibility in naturally procreative relationships, and promoting the natural and mutually beneficial bond between parents and their biological children—confirms that the traditional definition of marriage embodied in Proposition 8 furthers legitimate—indeed vital—interests. And it is undeniably *conceivable* that it does so, which is all that rational basis review requires.[28]

### 1. The traditional institution of marriage promotes the formation of naturally procreative unions.

Fostering relationships that are capable of producing offspring is a vital social and governmental interest, for as the Supreme Court has recognized, procreation is essential to our survival. *See Skinner*, 316 U.S. at 541. This interest has alarming force in present times, as many of the developed countries of the world are now facing low and decreasing birth rates inadequate to maintain their populations.

"The experience of most of the developed nations of the world makes clear that depopulation, not overpopulation, is the threat most to be feared in the contemporary context." Maggie Gallagher, *(How) Will Gay Marriage Weaken Marriage as a Social Institution*, 2 U. St. Thomas. L. J. 33, 48 (2004) (hereinafter, "Gallagher, *Marriage as a Social Institution*). A birth rate below 2.0 children per woman is below the replacement rate, CIA, THE WORLD FACTBOOK, REFERENCES: DEFINITIONS AND NOTES: TOTAL FERTILITY RATE (2009), *available at*

---

[28] Numerous courts have repeatedly recognized that marriage advances legitimate state interests related to procreation and childrearing. *See, e.g., In re Kandu*, 315 B.R. at 146; *Conaway v. Deane*, 932 A.2d at 630; *Andersen v. King County*, 138 P.3d at 983; *Hernandez v. Robles*, 855 N.E.2d at 7; *Morrison v. Sadler*, 821 N.E.2d 15, 24 (Ind. Ct. App. 2005); *Stanhardt v. Superior Court of the State of Ariz.*, 77 P.3d 451, 463-64 (Ariz. Ct. App. 2003); *Singer v. Hara*, 522 P.2d at 1197.
(Continued)

https://www.cia.gov/library/publications/the-world-

factbook/docs/notesanddefs.html?countryName=France&countryCode=fr&regionCode=eu#2127,

and many countries are now well below this level.  Europe has been hit hard, but the problem is

by no means limited to that continent.  Nations with particularly low birth rates include

Switzerland (1.45), Germany (1.41), Russia (1.41), Italy (1.31), Spain (1.31), Czech Republic

(1.24), and Japan (1.21).  CIA, THE WORLD FACTBOOK, COUNTRY COMPARISON: TOTAL FERTILITY

RATE (2009) (reporting estimated rates for 2009), *available at*

https://www.cia.gov/library/publications/the-world-factbook/rankorder/2127rank.html.  The

situation in the United States is not yet so dire, but our Nation has not escaped this downward

trend:  In 1960, the birth rate in the United States was 3.65; by 2006 this figure had dropped to

2.101—barely replacement level.  *See* The National Marriage Project, *The State of Our Unions

2008:  The Social Health of Marriage in America*, Figure 8*, available at*

http://marriage.rutgers.edu/Publications/SOOU/2008update.pdf.

  The effects of declining birth rates on overall population are profound.  For one example,

if its low birth rates persist, Italy's population of 57 million will fall to 37 million by 2050[29]—that

is a population decline not seen since the Black Plague.  For another example, by 2000 the number

of adults over the age of 60 in the developed world had surpassed the number of children under

the age of 14.[30] By way of comparison, in 1950 these regions had more than twice as many

children under 14 as adults over 60.  The financial consequences for industrialized countries with

well-developed social safety nets for the elderly are severe.  There are few young workers to be

(Cont'd)

---

[29] *See* U.N. Dep't of Econ. & Soc. Affairs, Population Div., *Possible Responses to Population Aging and Population Decline: Of the Case of Italy*, 2, U.N. Doc UN/POP/PRA/2000/7 (Sept. 26, 2000) (*prepared by* Antonio Golini, *available at* http://www.un.org/esa/population/publications/popdecline/Golini.pdf.

[30] U.N. Dep't of Econ. & Soc. Affairs, Population. Div., *World Population Prospects: The 2002 Revision: Highlights*, 15, U.N. Doc ESA/P/WP.180 (Feb. 26, 2003), *available at* (Continued)

taxed and to support benefits extended to the elderly.  As the burdens increase on the young, there is a further disincentive for young people to have more children.[31]  Thus, as one United Nations demographer explained, "a growing number of countries view their low birth rates . . . to be a serious crisis, jeopardizing the basic foundations of the nation and threatening its survival."  Gallagher, *Marriage as a Social Institution* at 48 (quoting Joseph Chamie, *Low Fertility: Can Governments Make a Difference?* at 2, *available at* http://paa2004.princeton.edu/download.asp?submissionId=42278).

The institution of marriage promotes society's interest in procreation by fostering the relationships between members of the opposite sex that are necessary for producing and raising the next generation.  While procreation, of course, can occur outside of the context of marriage, marriage encourages the formation of the kind of stable, enduring relationships that are conducive to childbearing and childrearing.  The birth of a child has a profound impact on the lives of its parents.  The mother, especially, must handle the unique challenges of pregnancy and childbirth.  More generally, taking responsibility for a new life—both materially and emotionally—can be a daunting task.  The institution of marriage addresses these concerns not only by providing substantive rights and benefits to married couples, but also by expressing the community's support and preference for lasting, stable relationships between men and women.  "Traditional marriage," in other words, "facilitates procreation by increasing the relational commitment, complementarity, and stability needed for the long term responsibilities that result from procreation."  Lynn D. Wardle, *Multiply and Replenish:  Considering Same-Sex Marriage in Light of State Interests in Marital Procreation*, 24 HARV. J.L. & PUB. POL'Y 771, 792 (2001).  By entering a marriage, a man

(Cont'd)
http://www.un.org/esa/population/publications/wpp2002/WPP2002-HIGHLIGHTSrev1.PDF.
    [31] *See* U.N. Dep't of Econ. & Soc. Affairs, Population Div., *The Inversion of the Age Pyramid and the Future Population Decline in France: Implications and Policy Responses*, 3, U.N. Doc UN/POP/PRA/2000/3 (Aug. 15, 2000) (*prepared by* Jean-Claude Chesnais), *available at* http://www.un.org/esa/population/publications/popdecline/Chesnais.pdf.

61

and a woman communicate to each other and to the larger community their intent to strive for fidelity, loyalty, and permanence.  It is certainly reasonable to expect that a couple will be more willing to take on the life-altering status of parents within the context of such a relationship.

Case law reflects this understanding.  The Supreme Court has consistently recognized the inextricable, definitional link between marriage and procreation, illustrating that the two go hand-in-hand.  *See, e.g.*, *Zablocki*, 434 U.S. at 384; *Loving*, 388 U.S. at 12; *Skinner*, 316 U.S. at 541. Other courts, including two federal district courts in this State considering challenges to the traditional institution of marriage, have emphasized this connection.  *Smelt v. County of Orange*, 374 F.  Supp. 2d at 880 ("Because procreation is necessary to perpetuate humankind, encouraging the optimal union for procreation is a legitimate governmental interest."); *Adams v. Howerton*, 486 F. Supp. at 1124 ("The main justification in this age for societal recognition and protection of the institution of marriage is procreation, perpetuation of the race.").  *See also Conaway v. Deane*, 932 A.2d at 630; *Andersen v. King County*, 138 P.3d at 985.[32]

The overarching importance of procreation to the institution of marriage is also reflected in California law.  The rules governing annulments provide a telling example.  Unlike divorce, annulment declares a marriage never to have legally existed.  Accordingly, all of the justifications for annulment go to the initial legal status of the union—either the ability of the parties to consent or the ability of the parties to perform the marriage contract.  Although California recognizes fraud as one of very few grounds for annulment, CAL. FAM. CODE § 2210(d), it does so only "if the fraud relates to a matter which the state deems vital to the marriage relationship."  *Bruce v. Bruce*, 163 P.2d 95, 96 (Cal. Ct. App. 1945).  As "[t]he procreation of children is the most important end of matrimony," *Aufort v. Aufort*, 49 P.2d 620, 621 (Cal. Ct. App. 1935),

---

[32]   For other judges who have emphasized this connection, see *Andersen*, 138 P.3d at 1002 (Johnson, J., concurring in judgment); *Dean v. District of Columbia*, 653 A.2d 307, 364-65 (D.C. Ct. App. 1995) (Steadman, J. concurring); *Kerrigan*, 957 A.2d at 528  (Zarella, J., (Continued)

"[A]nnulments on the basis of fraud are generally granted *only* in cases where the fraud related in some way to the sexual or procreative aspects of marriage," *In re Marriage of Meagher and Maleki*, 131 Cal. App. 4th. 1 (Cal. Ct. App. 2005) (emphasis added).  Examples of such fraud include concealing intent not to consummate the marriage, *see id.* at 9; *Mayer v. Mayer*, 279 P. 783, 785, 787 (Cal. 1929); *Millar v. Millar*, 167 P. 394 (Cal. 1917), concealing known sterility from the other, *Aufort*, 49 P.2 at 620, and concealing a venereal disease, such as syphilis, that renders sexual reproduction dangerous to the innocent spouse or the couple's offspring, *see Marshall v. Marshall*, 300 P. 816, 817 (Cal. 1931).  These rules plainly illustrate the central procreative purposes of marriage.

Demographic statistics showing that couples who are married tend to have more children than non-married couples confirm the common-sense proposition that promoting marriage between members of the opposite sex promotes procreation.  *See* Maggie Gallagher, *Does Sex Make Babies?  Marriage, Same-Sex Marriage and Legal Justifications for the Regulation of Intimacy in a post-Lawrence World*, 23 QUINNIPIAC L. REV. 447, 463 (2004).  It follows, of course, that lower marriage rates will tend to correspond with lower birth rates.  *Id.*  It is plainly rational for California to avoid this risk by retaining the traditional institution of marriage.

### 2. The traditional institution of marriage promotes stability and responsibility in naturally procreative relationships.

Society's interest in procreation goes beyond mere numbers.  The environment in which procreation occurs is also critically important.  When mothers and fathers do not provide their children with the care and support necessary for their proper development into healthy, responsible, productive citizens, society at large must shoulder this considerable burden.  And if parents neglect their responsibilities in raising their children, the risk increases that society will suffer as and when these children grow up to be adults.  The government thus has a compelling

(Cont'd)
dissenting); *Baehr v. Lewin*, 852 P.2d at 74 (Heen, J., dissenting).

interest in promoting "responsible procreation"—that is, "the procreation and raising of children by persons who have contemplated, and are well-suited for, the required commitment and challenges of child-rearing." *Morrison v. Sadler*, 821 N.E.2d at 23 n.13.

Opposite-sex couples pose a unique challenge to society in this respect, for they alone have the capacity to produce children *unintentionally*. "Despite legal contraception, numerous studies have shown that unintended pregnancy is the common, not rare, consequence of sexual relationships between men and women." Gallagher, *Marriage as a Social Institution* at 47; *see id.* at 47-48 & n.39-43 (citing and discussing studies). For this reason, there is a strong social interest in encouraging men and women to take the procreative nature of their sexual union seriously, and to channel such activity into relationships that are most conducive to raising children responsibly.

This interest is particularly acute with respect to fathers. Nature does not provide a ready means for establishing paternity. Some social mechanism is required to bind fathers to their children: "If [a] man wishes to devote his scarce resources to caring for his own children—and the overwhelming majority of men do—then he has to be certain of his paternity." JAMES Q. WILSON, THE MARRIAGE PROBLEM 59 (2003). The importance of fathers to the well-being of their children is becoming increasingly clear. President (then-Senator) Obama addressed the topic eloquently on Father's Day, 2008:

> Of all the rocks upon which we build our lives, we are reminded today that family is the most important. And we are called to recognize and honor how critical every father is to that foundation.
> …
> We know the statistics—that children who grow up without a father are five times more likely to live in poverty and commit crime; nine times more likely to drop out of schools and 20 times more likely to end up in prison. They are more likely to have behavioral problems, or run away from home or become teenage parents themselves. And the foundations of our community are weaker because of it.
> …
> We need fathers to realize that responsibility does not end at conception. We need them to realize that what makes you a man is not the ability to have a child—it's the courage to raise one.

Text of President Obama's Father's Day Speech, 2008, *available at*

http://dyn.politico.com/printstory.cfm?uuid=8D513671-3048-5C12-00362F14531AFFDF.

The President's statements are supported by research, as "the weight of scientific evidence seems clearly to support the view that fathers matter." JAMES Q. WILSON, THE MARRIAGE PROBLEM 169 (2003). Fathers who do not take responsibility for their children thus not only burden society financially, but they also burden society with children who are more likely to experience a host of social problems.

Marriage has been the institution that civilized societies throughout history have looked to for binding mothers and fathers in a stable, enduring relationship that is conducive to rearing children responsibly. "Marriage," in other words, "is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve." *Id.* at 41. And throughout history, prominent jurists, linguists, and philosophers have repeatedly emphasized this bedrock purpose of marriage. *See* 1 *Blackstone's Commentaries* *435; NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1st ed. 1828); JOHN LOCKE, SECOND TREATISE OF CIVIL GOVERNMENT § 78 (1690). As President Obama's comments make clear, there can be no doubt that this purpose retains its salience today.[33]

---

[33] *See also e.g.*, JAMES Q. WILSON, THE MARRIAGE PROBLEM 41 (2003); Kingsley Davis, *The Meaning and Significance of Marriage in Contemporary Society*, *in* CONTEMPORARY MARRIAGE 7-8 (1985) ("The family is the part of the institutional system through which the creation, nurture, and socialization of the next generation is mainly accomplished. If these vital and extremely demanding tasks are to be performed efficiently, some individuals must be held responsible for them and rewarded for the effort. The genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and their offspring. By identifying children with their parents, … the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring."); Monte Neil Stewart, *Marriage Facts*, 31 Harv. J. L. & PUB. POL'Y 314, 327 (2008)("A fundamental purpose of marriage, then, is to situate heterosexual passion within a social institution that will to the largest practical extent
(Continued)

Courts have likewise recognized the importance of responsible procreation, repeatedly and expressly holding that this interest justifies distinguishing traditional marriage from same-sex relationships.  In the words of New York's high court, for instance:

> [T]he Legislature could rationally decide that, for the welfare of children, it is more important to promote stability, and to avoid instability, in opposite-sex than in same-sex relationships. Heterosexual intercourse has a natural tendency to lead to the birth of children; homosexual intercourse does not. … The Legislature could … find that such relationships are all too often casual or temporary. It could find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born. It thus could choose to offer an inducement--in the form of marriage and its attendant benefits--to opposite-sex couples who make a solemn, long-term commitment to each other.
>
> The Legislature could find that this rationale for marriage does not apply with comparable force to same-sex couples. These couples can become parents by adoption, or by artificial insemination or other technological marvels, but they do not become parents as a result of accident or impulse. The Legislature could find that unstable relationships between people of the opposite sex present a greater danger that children will be born into or grow up in unstable homes than is the case with same-sex couples, and thus that promoting stability in opposite-sex relationships will help children more. This is one reason why the Legislature could rationally offer the benefits of marriage to opposite-sex couples only.

*Hernandez v. Robles*, 855 N.E. 2d at 7.  *See also Citizens for Equal Prot. v. Bruning*, 455 F.3d at 867-68; *Conaway v. Dean*, 932 A.2d at 630; *Morrison v. Sadler*, 821 N.E.2d at 24-25; *Standhardt v. Superior Court*, 77 P.3d at 462-63.[34]

The legal structure of civil marriage in California illustrates the continuing importance of this interest.  Many venerable features of the institution of marriage are designed to bind husband and wife together in a stable relationship conducive to bringing up children.  These features include the monogamous nature of the marriage relationship, *see* CAL. FAM. CODE § 2201, the

(Cont'd)
assure that the consequences of procreative passion (namely, children) begin and continue life with adequate private welfare. Although the immediate objects of the protective aspects of this private welfare purpose are the child and the often vulnerable mother, society itself is the ultimate beneficiary.").

[34]   Other judges have recognized the importance of this interest, see *Andersen*, 138 P.3d at
(Continued)

66

lifelong term of the marriage commitment, *see id.* § 310, the expectation of fidelity between marital partners, *see id.* § 720, and the presumption of paternity afforded to fathers married to the mother of a child, *see id.* § 7540. The persistence of these timeless rules—which spouses are not free to contract around*, see id.* § 1620—is difficult to understand apart from the central importance that creating an environment conducive to raising children continues to have for the institution of marriage.

The importance of responsible procreation to California is also reflected in laws regulating dissolution of a marital relationship. As an initial matter, summary dissolution is available only when the relationship has not produced any children. *See id.* § 2400(a)(3). Additionally, "the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances." *Id.* § 3900. California also has a statutory grant program aimed directly at encouraging parents to take responsibility for their children, and the program expressly recognizes that marriage plays an important role in this context. The "Community Challenge Grant Program" seeks to "reduce the number of . . . unwed pregnancies" in the State, CAL. WELF. & INST. CODE § 18993, a problem that the legislature recognized "affect[s] community health and success," *id.* § 18993.1(g). Under the program, the State issues grants to non-profit organizations and local governments for the purpose of implementing strategies to (a) "[r]educe the number of teenage and unwed pregnancies"; (b) "[r]educe the number of children growing up in homes without fathers as a result of these pregnancies"; and (c) "[p]romote *responsible parenting* and the involvement of the father in the economic, social, and emotional support of his children." *Id.* § 18993.2(b)(1)-(3) (emphasis added).

Both the general structure of marriage and the Community Challenge Grant Program in particular illustrate that a key purpose of the institution of marriage in California continues to be

(Cont'd)

1002 (Johnson, J., concurring in judgment.); *Kerrigan*, 957 A.2d at 528 (Zarella, J., dissenting); (Continued)

the promotion of responsible procreation.  It is plainly rational for California to preserve the traditional institution of marriage as the central component of its efforts to promote this vital interest.

### 3.  The traditional institution of marriage promotes the natural and mutually beneficial bond between parents and their biological children.

It is settled law that "facilitation of a relationship between parent and child is an important governmental interest." *Nguyen v. I.N.S.*, 533 U.S. 53, 68 (2001).  Whether by virtue of genetics or culture, nature or nurture, it cannot be denied that a unique bond exists between parents and the offspring of their union.  In the words of the Supreme Court, "The intangible fibers that connect parent and child have infinite variety.  They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility." *Lehr v. Robertson*, 463 U.S. 248, 256 (1983); *see also Gonzales v. Carhart*, 550 U.S. 124, 159 (2007) ("Respect for human life finds an ultimate expression in the bond of love the mother has for her child.").  By binding together a man and a woman in a stable, lasting relationship, the institution of marriage is society's most powerful tool for fostering this singular and vital connection.  More than any other institution, marriage directly "furthers the State's interests in … encouraging families with a mother and father and children biologically related to both." *Andersen*, 138 P.3d at 985; *see also Smelt*, 374 F. Supp. 2d at 880 ("Encouraging the optimal union for rearing children by both biological parents is … a legitimate purpose of government."); *Kandu*, 315 B.R. 123, 146 (Bankr. W.D. Wash. 2004); *Kerrigan*, 957 A.2d at 527 (Zarella, J., dissenting).

The law "historically . . . has recognized that natural bonds of affection lead parents to act in the best interests of their children." *Parham* v. *J. R.,* 442 U.S. 584, 602 (1979).  Constitutional doctrine reflects this understanding by protecting the fundamental liberty interest of parents to direct the upbringing of their children against government interference. *See Pierce v. Society of*

(Cont'd)
*Goodridge*, 798 N.E. 2d at 995 (Cordy, J., dissenting).

*Sisters*, 268 U.S. 510, 535 (1925).  Indeed, this "liberty interest . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality).

Not only do "natural bonds of affection" connect parents with their children, but children desire and benefit from a relationship with their parents.  The United Nations Convention on the Rights of the Child reflects this reality by providing that, "as far as possible, [a child has the] right to know and be cared for by his or her parents."  United Nations Convention on the Rights of the Child, Art. 7, Nov. 20, 1989, 28 I. L. M. 1456, 1460.  California's laws governing foster care also recognize that biological ties are meaningful to children, as they grant those in foster care the right to "contact family members, unless prohibited by Court order."  CAL. WELF. & INST. CODE § 16001.9(a)(6); *cf. id.* § 16001.9(a)(7) (protecting the right of foster children to "visit and contact brothers and sisters, unless prohibited by court order").

The instinctive longing that children have to know their natural parents has been demonstrated in the context of adoption.  "[M]ental health and adoption experts have noted that adoptees have great and nearly universal interest in their origins.  Quantitative and qualitative studies, as well as the theoretical literature, have found that the vast majority of adoptees are curious about their birth families, think about them at various rites of social and developmental passage, and have an interest in meeting their birth parents."  Annette R. Appell, *The Endurance of Biological Connection:  Heteronormativity, Same-sex Parenting, and the Lessons of Adoption*, 22 BYU J. Pub. L. 289, 303 (2008) (footnotes omitted).  Furthermore, "[h]aving an information link to one's birth parents gives the adoptive child a sense of continuity with his past and therefore better self-esteem."  H.D. Grotevant & R.G. McRoy, *Openness in Adoption: Exploring Family Connections* 92 (1998).

As society has become increasingly aware of these facts, "open" adoptions, which allow

for varying degrees of contact between adopted children and their birth parents, have become

increasingly common.  California, for instance, permits and enforces post-adoption contact

agreements in some circumstances.  *See* CAL. FAM. CODE § 8616.5.  In passing the law governing

such agreements, the California legislature acknowledged the importance of biological

generational ties, stating that "some adoptive children may benefit from either direct or indirect

contact with birth relatives, including the birth parent or parents."  *Id.* § 8616.5(a).[35]

Evidence of the instinctive nature of the biological bond between parent and child comes

from the gay and lesbian community itself.  Rather than adopt, many gay and lesbian individuals

choose to have biological children with the assistance of a surrogate mother or a sperm donor.

Indeed, some have observed that we are in the midst of a "gay baby boom."  *See, e.g.*, Edward

Lewine, *The Gay Baby Boom*, DETAILS MAGAZINE (May 2008).  "As the practice of alternative

insemination [has] spread among lesbians, relations conceived as blood ties surfaced where one

might least expect them: in the midst of gay families that had been defined in *opposition* to the

biological relations gays and lesbians ascribed to the straight family."  Kath Weston, FAMILIES WE

CHOOSE: LESBIANS, GAYS, KINSHIP 169 (1991).  Children conceived by alternative insemination

also desire to know their biological fathers, further demonstrating the importance of biological ties

between parent and child.  *See, e.g.*, http://www.searchingformyspermdonorfather.org/ (described

as "a website detailing donor-conceived people who are searching for their sperm-donor fathers").

In light of all of this, it is surely rational to adhere to the common sense proposition that

society benefits when children are raised by the couple who brought them into the world.  This has

been the traditional understanding in our society, and there are studies that support this

---

[35] The push for more openness in adoption also highlights the health benefits a connection with biological parents provides to children.  "In open adoption . . . [i]mportant background information—including genetic and medical histories—is readily available."  Annette Baran & Reuben Pannor, *Perspectives on Open Adoption*, 3 THE FUTURE OF CHILDREN 119, 122 (1993).
(Continued)

70

understanding.  *See, e.g.*, Yongmin Sun, The Well-Being of Adolescents in Households with No Biological Parents, 65 J. OF MARRIAGE & FAMILY 894, 903 (2003) ("When compared with their peers from two-biological-parent families, students from non-biological-parent families fared less well in all six outcomes [academic performance, educational aspiration, locus of control, self-esteem, behavior problems, and smoking].").  "[I]t is not simply the presence of two parents, … but the presence of *two biological parents* that seems to support children's development."  Kristin Anderson Moore, et al., *Marriage from  a Child's Perspective:  How Does Family Structure Affect Children and What Can We Do About It?*, Child Trends Research Brief at 1-2 (June 2002), *available at* http://www.childtrends.org/files/MarriageRB602.pdf.

The testimony of history, however, is more important than the results of any study.  While some philosophers have imagined (whether seriously or not) a society in which biology and child rearing are disconnected, *see* THE DIALOGUES OF PLATO, 719 (B. Jowett trans., Random House 1937) ("the wives of our guardians are to be common, and their children are to be common, and no parent is to know his child, nor any child his parent"), this radical idea is at war with basic human nature and, understandably, has not taken root at any time or any place in the world.  Indeed, severing the link between parents and children has been more persuasively portrayed as distinctly dystopian, *see* Aldous Huxley, BRAVE NEW WORLD 1-32 (1932), and any State that attempted to carry out such a program would do "violence to both [the] letter and spirit of the Constitution," *Meyer v. Nebraska*, 262 U.S. at 402.  It is surely rational for California, through its traditional definition of marriage, to provide special recognition to the family structure most conducive to promoting natural and mutually beneficial relationships between parents and their biological children.

    (Cont'd)
The same is not true of children who lack knowledge of their biological parents.

71

**4.**     **California does not undermine the legitimacy of its marriage laws by extending domestic partnership benefits to same-sex couples.**

Plaintiffs argue that by enacting progressive domestic partnership laws and allowing same-sex parenting, California has somehow renounced the compelling procreative interests furthered by the traditional institution of marriage. *See* Plaintiffs' P.I. Reply, Doc # 52 at 10. To be sure, California has established a parallel institution—domestic partnerships—with essentially the same benefits and obligations as marriage. But the State has also insisted on preserving the traditional institution of marriage, and of reserving for it alone the name it has had throughout history. And while the effect of California's decision to reserve the name of marriage to traditional opposite-sex unions is symbolic, that does not mean it is insignificant or unimportant. On the contrary, Proposition 8 would not have been proposed or opposed if the names used to describe different sorts of unions did not matter. Nor would Plaintiffs be challenging Proposition 8. True, the name of marriage cloaks traditional, opposite-sex unions with a unique and highly favorable imprimatur that is not available to any other sort of relationship. But the State has plainly legitimate reasons for signaling its special approval and endorsement of such relationships, and thus for promoting such relationships and encouraging people to enter them: the vital interests in procreation and childrearing served by traditional opposite-sex unions simply are not advanced—or at least not advanced to the same extent—by any other type of relationship.

It is true that reserving to traditional opposite-sex unions not only the name of marriage, but also the benefits traditionally associated with that institution, might provide additional incentives for people to enter such unions and thereby further advance the legitimate interests served by those unions. But the fact that California could do more to advance those interests does not mean that what it has done does not serve those interests. Nor does it mean those interests are not genuine. No principle of law requires the State to advance each of its legitimate interests to the hilt, or not at all. On the contrary, especially where rational basis scrutiny is involved, it is

72

well settled that a law "is not invalid under the Constitution because it might have gone farther than it did." *Katzenbach v. Morgan*, 384 U.S. 641, 658 (1966) (internal quotations omitted).

Lawmaking inevitably entails balancing, compromises, and accommodations among competing interests. And it is evident that California has determined that same-sex unions further legitimate state interests. Restricting the benefits traditionally associated with marriage to opposite-sex unions might further the interests served by marriage, but would necessarily frustrate the separate interests served by California's domestic partnership law. The people of California are not required to make an all-or-nothing choice between these interests. Rather,

> It is the proper role of the Legislature, not the court, to fashion laws that serve competing public policies. "The legislative process involves setting priorities, making difficult decisions, making imperfect decisions and approaching problems incrementally, and rational basis analysis does not require that a legislature take the ideal or best approach [citations]."

*In re Marriage Cases*, 143 Cal. App. 4th at 936, quoting *Hernandez v. Robles*, 26 A.D.3d 98, 106 (Sup. Ct. N.Y. 2005.), *affirmed by Hernandez*, 855 N.E. 2d 1.

The Constitution permits the people of California to seek a balance and accommodation among these interests, and it does not invalidate the balance and accommodation they have chosen. For it would be ironic indeed if California's solicitude for the gay and lesbian community and the interests served by its progressive domestic partnership laws put it on a *weaker* constitutional footing in resisting a fundamental redefinition of the traditional institution of marriage to include same-sex relationships than the federal government and the numerous States that provide little or no recognition or protection to such relationships.

### 5. California does not undermine its marriage laws by allowing couples who cannot or intend not to have children to marry.

Contrary to Plaintiffs' contentions, *see, e.g.*, Plaintiffs' P.I. Motion, Doc # 7 at 15, the fact that California allows opposite-sex couples to marry who cannot or do not intend to have children is of no legal significance. It is well settled that rational basis review does not require a perfect fit

73

between a law and the interests it furthers.  *See, e.g.*, *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 83 (2000) ("The rationality commanded by the Equal Protection Clause does not require States to match [classifications] and the legitimate interests they serve with razorlike precision."); *Heller*, 509 U.S. at 321 ("[C]ourts are compelled under rational-basis review to accept . . . generalizations even when there is an imperfect fit between means and ends.").  There is no requirement that the law be narrowly tailored to the interests it serves: so long as the distinctions drawn by the law bear a rational relationship to those interests, neither over-inclusiveness nor under-inclusiveness is constitutionally objectionable.  *See, e.g.*, *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 316 (1976) (over-inclusiveness); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. at 489 (under-inclusiveness).  Here, it is plainly reasonable to distinguish between opposite-sex couples who in general, though not in every case, are capable of procreation, on the one hand, and same-sex couples, who are never capable of natural procreation, on the other hand.

California's decision not to draw a line between opposite-sex couples who are able and willing to procreate and those who are not, and thus to treat opposite-sex couples who cannot or do not intend to have children differently from same-sex couples, is eminently reasonable.  First, although the State can categorically identify same-sex couples as incapable of natural procreation, it could only identify opposite-sex couples who are unable or unwilling to have children through case-by-case determinations.  It is well settled that rational basis scrutiny allows a State to draw bright lines that are reasonably related to legitimate interests rather than to engage in case-by-case determinations.  *See, e.g.*, *Murgia*, 427 at 316 ("That the State chooses not to determine fitness more precisely through individualized testing after age 50 is not to say that the objective of assuring physical fitness is not rationally furthered by a maximum-age limitation.  It is only to say that with regard to the interest of all concerned, the State perhaps has not chosen the best means to accomplish this purpose.  But where rationality is the test, a State does not violate the Equal

Protection Clause merely because the classifications made by its laws are imperfect.")  (internal

quotations omitted).  As the Ninth Circuit has explained, any contention that individual

circumstances must be considered when judging the reasonableness of a bright-line classification

constitutes "an impermissible attempt to ratchet up [the] standard of review from rational basis

toward strict scrutiny."  *Doe v. United States*, 419 F.3d 1058, 1063 (9th Cir. 2005).

Second, the case-by-case inquiries that would be required to distinguish opposite-sex

couples who are able and willing to have children from those who are not would be intrusive,

burdensome, and unreliable.  Indeed, because the vast majority of infertile couples do not know

that they are incapable of having children until *after* they are married, the State presumably would

have to administer some type of pre-marital fertility testing in order to block such marriages.  Such

inquiries would intrude intolerably on the privacy interests of those wishing to marry and impose

administrative burdens on the State.  *See Griswold v. Connecticut*, 381 U.S. 479 (1965).

Third, unlike same-sex couples, opposite-sex couples have a fundamental right to marry

that has been repeatedly recognized by the courts.  Accordingly, any distinctions that the State

might draw between opposite-sex couples who are able and willing to have children and those

who are not would be subject to strict scrutiny.

The Arizona Court of Appeals has recognized these points in a similar context:

> Allowing all opposite-sex couples to enter marriage under Arizona law, regardless of
> their willingness or ability to procreate, does not defeat the reasonableness of the link
> between opposite-sex marriage, procreation, and child-rearing. First, if the State
> excluded opposite-sex couples from marriage based on their intention or ability to
> procreate, the State would have to inquire about that subject before issuing a license,
> thereby implicating constitutionally rooted privacy concerns. *See Griswold*, 381 U.S.
> at 485-86; *Eisenstadt [v. Baird],* 405 U.S. [438] at 453-54 [1972]; *Adams*, 486 F.
> Supp. at 1124-25 (recognizing government inquiry about couples' procreation plans
> or requiring sterility tests before issuing marriage licenses would "raise serious
> constitutional questions").  Second, in light of medical advances affecting sterility, the
> ability to adopt, and the fact that intentionally childless couples may eventually
> choose to have a child or have an unplanned pregnancy, the State would have a
> difficult, if not impossible, task in identifying couples who will never bear and/or
> raise children. Third, because opposite-sex couples have a fundamental right to marry,
> *Loving*, 388 U.S. at 12, excluding such couples from marriage could only be justified
> by a compelling state interest, narrowly tailored to achieve that interest, *Glucksberg*,

75

521 U.S. at 721, which is not readily apparent.

*Standhardt v. Superior Court*, 77 P.3d at 462-63.

More fundamentally, extending marriage to opposite-sex couples who cannot or do not intend to have children does in many ways further the central procreative purposes of marriage.  Most obviously:

> even where an opposite-sex couple enters into a marriage with no intention of having children, "accidents" do happen, or people often change their minds about wanting to have children.  The institution of marriage not only encourages opposite-sex couples to form a relatively stable environment for the "natural" procreation of children in the first place, but it also encourages them to stay together if there is a "change in plans."

*Morrison*, 821 N.E.2d at 24-25 (footnotes omitted); *see also* Gallagher, *Marriage as a Social Institution* at 47 ("numerous studies have shown that unintended pregnancy is the common, not rare, consequence of sexual relationships between men and women").  More generally, by allowing even infertile opposite-sex couples to marry, the State reinforces cultural norms channeling sexual relationships between men and women into marriage.  And since such relationships are capable of producing offspring in most cases, these norms plainly serve to promote the interests in procreation and childrearing that animate the institution of marriage.

Finally, California's annulment laws have always coexisted with the State's policy of allowing opposite-sex couples who cannot or do not intend to have children to marry.  As discussed above, these laws provide that concealing matters such as known sterility that would thwart the procreative potential of a particular marriage are among the very few grounds for annulment.  The rules plainly confirm the central procreative purposes of marriage.

### 6.   The rational basis test does not require any showing that declining to extend marriage to same-sex couples furthers legitimate state interests.

Plaintiffs' argue that we must prove not only that the traditional definition of marriage, restored by Proposition 8, furthers the vital procreative interests we have identified, but also that recognizing same-sex relationships would actually *harm* those interests. *See, e.g.*, Plaintiffs' P.I.

76

Reply, Doc # 52 at 11.  Plaintiffs are plainly wrong.  Under rational basis scrutiny, as we have explained, a law must be upheld if it bears a rational relationship to *any* conceivable legitimate state interest.  *See supra* at 48-49.  We have identified a number of vital procreative interests furthered by opposite-sex unions that are not furthered, or are not furthered to the same extent, by same-sex unions.  This showing alone establishes that the line drawn by Proposition 8 between opposite-sex unions and same-sex unions bears a rational relationship to those interests.  *See, e.g.*, *Board of Trustees v. Garrett*, 531 U.S. at 366-67 ("Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation.") (quotation marks omitted).

Plaintiffs' insistence that we must prove that denying marriage to same-sex couples furthers the interests we have identified—or that extending marriage to same-sex couples would undermine these interests, which is the same thing—is nothing more than a transparent attempt to smuggle strict scrutiny into the rational basis inquiry.  While rational basis scrutiny asks only whether the challenged law bears *a rational relationship* to a legitimate state interest, strict scrutiny requires the State to prove that the law is *necessary* to further a compelling interest.  Accordingly, while courts applying strict scrutiny ask whether the State's interests could be served by less restrictive alternatives, courts applying rational basis review routinely reject arguments that the State could have drawn a different line than it did, that exceptions or changes to a State law would not undermine the interests that it serves, or that the State could achieve its interests through different, less restrictive means.  *See, e.g., Fritz*, 449 U.S. at 179 ("[T]he fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial consideration."); *Vance*, 440 U.S. at 102 n.20 ("it [is] irrelevant . . . that other alternatives might achieve approximately the same results"); *Heller*, 509 U.S. at 330 ("We do not require [the State]

77

to have chose the least restrictive means of achieving its legislative end."). By arguing that we must show that extending marriage to same-sex couples would undermine the legitimate interests we have identified, Plaintiffs are demanding that we prove that Proposition 8 is necessary to further those interests, and that less restrictive alternatives (such as extending marriage to committed same-sex couples) would not adequately protect those interests.  But that is strict scrutiny, not rational basis review.  And under rational basis review, we are not required to make any such showing.

> The Washington Supreme Court explicitly recognized these points:

> Finally, Justice Fairhurst's dissent incorrectly asserts that we have engaged in an incorrect analysis because, the dissent believes, the question is not whether allowing opposite-sex couples the right to marry furthers governmental interests in procreation and raising children in a healthy environment but, rather, whether those interests are furthered by denying same-sex couples the right to marry. Initially, the dissent's rewording of the issue fails to acknowledge that over- and underinclusiveness do not invalidate an enactment under rational basis review. Moreover, the correct inquiry under rational basis review is whether allowing opposite-sex couples to marry furthers legitimate governmental interests. As the United States Supreme Court has explained: "In the ordinary case, a law will be sustained *if it can be said to advance a legitimate government interest*, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer*, 517 U.S. at 632 (emphasis added). Granting the right to marry to opposite-sex couples clearly furthers the governmental interests advanced by the State.

*Andersen v. King County*, 138 P.3d at 984 (plurality).

Thus, contrary to Plaintiffs' argument, we need not show that recognizing same-sex relationships as marriages would undermine the State's vital interests in procreation and childrearing.  This is not to say, however, that such a radical transformation of the institution of marriage would not undermine those vital interests.  As demonstrated above, Plaintiffs' claim requires the federal judiciary to redefine the institution of marriage.  *See supra* at 51-52.  Redefining marriage as nothing more than a loving, committed relationship between consenting adults, unconnected to its traditional procreative purposes, would fundamentally change the meaning and public understanding of marriage, which would necessarily entail a serious risk of attendant negative consequences over time for the traditional purposes of marriage

78

that we have identified.   In the words of one commentator:

> The fundamental question we must ask … is this:  What is the purpose of marriage?  Is it . . . simply an institution that has the capacity to increase the pleasure of the adults who enter into it? . . .  Or is marriage an institution that still hews to its old intention and function—to raise the next generation, to protect and teach it, to instill in it the habits of conduct and character that will ensure the generation's own safe passage into adulthood? . . .  What we teach about the true meaning of marriage will determine a great deal about our fate.

Caitlin Flanagan, *Is There Hope for the American Marriage?*, Time, July 2, 2009, available at http://www.time.com/time/printout/0,8816,1908243,00.html.  But whether (and how) redefining marriage to include same-sex relations would affect the institution of marriage and the interests it has traditional served is a debate that we need not enter, and this Court need not resolve, for it is plain that Proposition 8 serves legitimate state interests, and it is undeniably *conceivable* that it does so.

### C.     California Has A Legitimate Interest In Ensuring That Its Marriages Are Recognized In Other Jurisdictions.

The State of California also has a legitimate interest in seeing that the marriages it licenses are recognized outside the State.  The Supreme Court has specifically credited such an interest as sufficient to justify regulation of the marital relationship.  In *Sosna v. Iowa*, 419 U.S. 393 (1975), the Court upheld Iowa's one-year residency requirement for divorce, finding that "[s]uch a requirement … furthers the State's … interest[] in minimizing the susceptibility of its own divorce decrees to collateral attack."  *Id.* at 407.  The Court explained that "Iowa's interests extend beyond its borders and include the recognition of its divorce decrees by other States under the Full Faith and Credit Clause of the Constitution."  *Id.*  The one-year residency requirement "provide[d] a greater safeguard against successful collateral attack than would a requirement of bona fide residence alone."  *Id.* at 408.

Here, the people of California were entitled to take note of facts that make it highly unlikely that same-sex marriages sanctioned by the State would be recognized by the vast majority

79

of other jurisdictions.  Under DOMA, "[n]o State … [is] required to give effect to any public act, record, or judicial proceeding of any other State … respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State … or a right or claim arising from such relationship."  28 U.S.C. § 1738C.  *See also Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998) ("A court may be guided by the forum State's 'public policy' in determining the *law* applicable to a controversy.") (citing *Nevada v. Hall*, 440 U.S. 410 (1976)).  Thus, no other state would be required to recognize same-sex marriages performed in California (or anywhere else).  And, indeed, the overwhelming majority of states do not themselves license same-sex marriages and specifically do not recognize same-sex marriages performed in other jurisdictions.[36]  Under *Sosna*, it is perfectly reasonable for California, in retaining the traditional definition of marriage, to take cognizance of the fact that same-sex marriages performed in California would be subject to disapproval and disregarded by the overwhelming majority of its sister states.

The fact that most states refuse to grant or recognize same-sex marriages also highlights another conceivable rational basis supporting Proposition 8.  As the reasoning of *Sosna* makes clear, a state may legitimately regulate the institution of marriage so as to avoid becoming a marriage mill for couples who could not obtain a marriage in their home state.  *See* 419 U.S. at 407 ("A State such as Iowa may quite reasonably decide that it does not want to become a divorce mill for unhappy spouses….").  Because so few states sanction marriages other than those between one man and one woman, California could legitimately seek to conform its law to that near-universal definition of marriage to avoid becoming a magnet for persons across the nation seeking

---

[36] *See, e.g.*, ALA. CONST., art. I, § 36.03(e) ("The State of Alabama shall not recognize as valid any marriage of parties of the same sex that occurred or was alleged to have occurred as a result of the law of any jurisdiction regardless of whether a marriage license was issued."); ARK. CONST., amend. 83 § 2; FLA. CONST., art. I; MICH. CONST., art. I, § 25; VA. CONST., art. I, § 15-A § 27; FLA. STAT. 741.212; IND. CODE § 31-11-1-1(b).

80

official recognition of some other arrangement.  The concerns California might have on this score are not hypothetical.  In Iowa, for instance, over 46% of same-sex marriages performed in the first three months after that State's courts mandated same-sex marriage involved out-of-state couples. *See Iowa Gay Marriage Drawing Out-Of-State Couples*, The Kansas City Star, Aug. 30, 2009, *at* http://www.kansascity.com/news/breaking_news/story/1414726.html.

The people of California are also entitled to take into account that the *federal* government would not recognize any same-sex marriages performed in the State.  *See* 1 U.S.C. § 7. Massachusetts recently explained the significance of this in a federal suit challenging DOMA. According to Massachusetts—one of the few States that does recognize same-sex marriage—there are "1,138 statutory provisions in which marital status is a factor in determining eligibility for or entitlement to federal benefits, rights, and privileges."  Complaint, *Massachusetts v. United States Dep't of Health and Human Svcs.*, 1:09-cv-11156-JLT, at 4 (D. Mass., July 8, 2009).  By definition, of course, only marriages between members of the opposite sex are relevant for purposes of those federal programs.  By conforming its definition of marriage to that of the federal government, California thus relieves both the federal government and itself (when administering joint federal-state programs) of the burden of distinguishing between same-sex and opposite-sex marriages.  "California must distinguish same-sex from opposite-sex couples in administering the numerous federal-state programs that are governed by federal law.  A separate nomenclature applicable to the family relationship of same-sex couples undoubtedly facilitates the administration of such programs."  *See In re Marriage Cases*, 183 P.3d 384, 467 (Cal. 2008) (Baxter, J., dissenting).

## V.     Proposition 8 Is Not Tainted By Animus Or Any Impermissible Considerations.

Plaintiffs have prominently and repeatedly alleged that California's decision to adhere to the traditional definition of marriage is " 'inexplicable by anything but animus,' " Plaintiffs' P.I.

Reply, Doc # 52 at 5 (quoting *Romer*, 517 U.S. at 632), and necessarily based on "an irrational

'disapproval of. . . same-sex…couples," *id*. at 10.   Similarly, Plaintiffs insist that Proposition 8

reflects a " 'bare . . . desire to harm a politically unpopular group,' " Plaintiffs' P.I. Motion, Doc #

7 at 17 (quoting *Romer*, 517 U.S. at 634), "for no other reason than to express the majority's

moral disapproval of gay men and lesbians," *id*. at 18.

   It is certainly true that "[t]hroughout the Nation, Americans are engaged in an earnest and

profound debate about the morality, legality, and practicality of" redefining marriage to include

same-sex unions.  *Glucksberg*, 521 U.S. at 735.  Given the central role of marriage in our society,

it is hardly surprising that both the *supporters* and *opponents* of such a change have invoked

deeply felt moral and religious beliefs.  Nor is it surprising that people on *both* sides of the debate

have voiced their opinions forcefully, passionately, and sometimes intemperately.  But as

demonstrated below, the constitutionality of Proposition 8 does not turn on the beliefs or passions

of its supporters or opponents, but on whether it is rationally related to legitimate government

interests.

   As we have demonstrated, Proposition 8 *is* rationally related to vital government interests.

Under controlling Supreme Court precedent, this fact alone forecloses any conclusion that

Proposition 8 reflects animus or any other improper consideration.  A comparison of Proposition 8

with the law at issue in *Romer* only reinforces this conclusion, and Plaintiffs' contrary arguments

all lack merit.

   **A.**   **Because Proposition 8 Is Rationally Related To Legitimate State Interests,**
   **Plaintiffs' Assertions Of Animus Or Improper Purposes Fail At The**
   **Threshold**.

   As we explain below, the claim that Proposition 8 (and, by implication, the institution of

marriage as it has always been defined and practiced) is the product of animus against gays and

lesbians is specious.  More importantly, however, the issue is legally irrelevant.  By preserving the

traditional institution of marriage, Proposition 8 advances several legitimate—indeed,

compelling—government interests.  *See supra* at 51-81.  Because this is the case, judicial "inquiry is at an end," *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. at 179.  Under rational basis review, a law that bears some conceivable rational relation to any legitimate government interest—whether or not that interest actually motivated the lawmaking body, *see Beach Communications*, 508 U.S. at 315—simply "*cannot* run afoul of" the Fourteenth Amendment, *Heller v. Doe*, 509 U.S. at 320 (emphasis added).  "Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function."  *FCC v. Beach Communications*, 508 U.S. at 315 (quotation marks omitted).

Not every law, of course, will pass even this deferential standard of review.  And when a law cannot find any support in rationality, a court may rightly conclude that it was driven by irrational prejudice.  But it is only when a law is "unrelated to the achievement of any combination of legitimate purposes" that courts will find "that [a lawmaker's] actions were irrational."  *Vance*, 440 U.S. at 97; *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004) ("[S]ome laws are so irrational or absurd on their face it is clear they can be motivated by nothing other than animus or prejudice against a group.").  A conclusion that a law was the product of improper motives, in other words, is the *result* of a fruitless search for a rational basis.  *See, e.g.*, *Cleburne*, 473 U.S. at 448 (affirming district court decision invalidating a zoning ordinance affecting a group home for the mentally retarded because it could not find "any rational basis for believing that the . . . home would pose any special threat to the city's legitimate interests," and concluding that the ordinance thus "appears to us to rest on an irrational prejudice against the mentally retarded"); *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 538 (1973) (holding that "the classification here in issue is not only 'imprecise,' it is wholly without any rational basis").

Courts do not, on the other hand, perform an independent, stand-alone inquiry into the motivations of a law's supporters to determine its rationality.  While "biases" such as "negative attitudes or fear … may often *accompany* irrational … discrimination, their presence *alone* does not a constitutional violation make."  *Board of Trustees v. Garrett*, 531 U.S. at 367 (emphases added).  A law "will not be found unconstitutional on the basis that it was motivated by animus unless it … lacks any rational relationship to a legitimate governmental purpose."  *Andersen v. King County*, 138 P.3d at 981.

*Romer* only reinforces these well-established principles.  There, the Court recounted that, under rational basis review, a "legislative classification [will be upheld] so long as it bears a rational relation to some legitimate end."  *Romer*, 517 U.S. at 631 (citing *Heller*, 509 U.S. at 319-20).  The Court also explained that the device courts use to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law" is to insist that "the classification bear a rational relationship to an independent and legitimate legislative end."  *Id*. at 633.  The Court applied these precepts to strike down Colorado's Amendment 2:  Because the law did not serve "*any* identifiable legitimate purpose or discrete objective," the Court concluded, it supported an "*inference* that the disadvantage imposed [was] born of animosity toward the class of persons affected." *Id.* at 634-35 (emphases added).  The Court did not perform a wide-ranging inquiry into the statements, beliefs, or motives of Colorado's voters; its conclusion that Amendment 2 reflected animosity toward gays and lesbians *followed* from its finding that the law failed "conventional and venerable" rational basis scrutiny.  *Id*. at 634-35.

Despite Plaintiffs' heavy reliance on *Romer*, then, that case provides no support for Plaintiffs' claim that this law is tainted by animus or any other improper motivation.  On the contrary, *Romer* confirms that the vital government interests served by Proposition 8 doom Plaintiffs' claims of animus at the threshold.

**B.** **Comparison Of Proposition 8 With The Law At Issue In *Romer* Confirms That Plaintiffs' Claims Of Animus Lack Merit.**

While the foregoing analysis alone suffices to foreclose Plaintiffs' claims of animus, a comparison of Proposition 8 with the law at issue in *Romer* further demonstrates that that decision provides no support for Plaintiffs here.   In *Romer*, the Supreme Court invalidated "Amendment 2," a state constitutional provision adopted by referendum in Colorado, which prohibited "all legislative, executive or judicial actions at any level of state or local government designed to protect the named class [of] homosexual persons or gays and lesbians."  517 U.S. at 624, 627. Not only did this "[s]weeping and comprehensive" provision repeal local anti-discrimination provisions, it had the much broader effect of "making a general announcement that gays and lesbians shall not have *any* particular protections from the law."  *Id.* at 627, 635 (emphasis added). The Supreme Court stressed that Amendment 2 was "unprecedented in our jurisprudence" because it "[i]dentifie[d] persons by a single trait and then denie[d] them protection across the board."  *Id.* at 633.  Indeed, the Amendment denied gays and lesbians even "the right to seek specific protection from the law."  *Id.* at 633.  By so "deem[ing] a class of persons a stranger to the laws," *id.* at 635, Amendment 2 constituted "a denial of equal protection of the laws in the most literal sense," *id.* at 633.

In so holding, the Supreme Court placed great weight on the "peculiar," "exceptional," and indeed "unprecedented" nature of Amendment 2.  *Id.* at 632, 633.   As the Court explained, "it is not within our constitutional tradition to enact laws of this sort."  *Id.* at 633.  The Court found that "[t]he absence of precedent for Amendment 2 is itself instructive; discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision."  *Id.* (quotation marks omitted).

Proposition 8 differs sharply from Amendment 2 in every material respect.

*First*, far from being "unprecedented in our jurisprudence," or foreign to "our

constitutional tradition," *id.* (quotation marks omitted), Proposition 8 simply restored the

traditional definition of marriage as it has existed throughout history, not only in California

(except for the few brief months between the decision in the *Marriage Cases* and the adoption of

Proposition 8), but in federal law and the laws of nearly all of California's sister States.

*Second*, unlike Amendment 2, Proposition 8 neither "imposes a broad and undifferentiated

disability" on gays and lesbians nor "denies them protection across the board." *Id.* at 632, 633.[37]

In marked contrast to Amendment 2, it leaves undisturbed all of the numerous state laws

protecting gays and lesbians from discrimination in public and private employment, business

services, education, housing, insurance, medical care, publicly funded programs and activities,

public contracting, and a wide array of other contexts. *See* Exhibit B.  Nor does it repeal

California's progressive domestic partnership laws, which provide gays and lesbians essentially

the same rights, privileges, and benefits as marriage. *See, e.g.*, California Registered Domestic

Partner Rights & Responsibilities Act of 2003, 2003 Cal. Stat. 421, § 15.[38]  Indeed, Proposition 8

overturned the State Supreme Court's decision in the *Marriage Cases* only with respect to the

denomination of marriage, leaving "undisturbed all of the other extremely significant substantive

aspects of a same-sex couple's state constitutional right to establish an officially recognized and

protected family relationship and the guarantee of equal protection of the laws." *Strauss v.*

*Horton*, 207 P.3d at 61.

In short, by enacting Proposition 8, the people of California acted in the narrowest way

---

[37] The Eighth Circuit recognized this point in a similar (albeit more restrictive) context, "reject[ing]" a comparison to *Romer* and holding that a law "limit[ing to opposite-sex couples] the class of people who may validly enter into marriage and the legal equivalents to marriage emerging in other States—civil unions and domestic partnerships … is not so broad as to render Nebraska's reasons for its enactment 'inexplicable by anything but animus' towards same-sex couples." *Citizens for Equal Protection v. Bruning*, 455 F.3d at 868.

[38] Efforts to repeal the domestic partnership statute failed even to gather enough signatures to qualify for a ballot initiative, *Strauss v. Horton*, 207 P.3d at 76 n.8, and California's voters were well aware that Proposition 8 would not diminish the rights of same-sex couples under the domestic partnership statute in any way, *id.* at 77.

1   possible to "restore the traditional definition of marriage as referring to a union between a man

2   and a woman," *Strauss v. Horton*, 207 P.3d at 76, without disturbing any other laws protecting

3   gays and lesbians.  While they did amend the State Constitution, there is nothing *less* they could

4   have done to preserve marriage in its traditional form in light of the State Supreme Court's

5   decision in the *Marriage Cases*.[39]  The differences between the scalpel of Proposition 8 and the

6   machete of Amendment 2 could not be more striking.

7          *Third*, unlike Amendment 2, Proposition 8 does not single out gays and lesbians for unique

8   disabilities; indeed, it does not mention them at all.  Rather, Proposition 8 simply reserves the

9   definition of marriage as the union of a man and a woman, the form it has traditionally taken.  To

10  the extent Proposition 8 is exclusive, it prevents *any* arrangement of persons other than an

11  opposite-sex couple from obtaining a marriage license.  Gays and lesbians (and bisexuals), like

12  other Californians, may still marry a member of the opposite sex; and neither they nor anyone else

13  can marry a person of the same sex or multiple persons of either sex.  This is not to suggest that

14  gays and lesbians should disregard their expressed preferences and marry a member of the

15  opposite sex, but rather to explain that Proposition 8 would place no barrier before such an

16  individual who sought to do so.

17         While Proposition 8 undoubtedly has a disparate impact on gays and lesbians, this does not

18  mean that it reflects animus or any improper motivation.  On the contrary, the effects of this law

19  are an unavoidable consequence of the traditional definition of marriage.  As we have

20  demonstrated, marriage is an ancient institution, and it has always been understood to consist of

21  the union of a man and a woman.  Marriage developed in this way to serve society's vital interests

22  in the procreative relationships between men and women and the upbringing of the children that

_____

[39] It bears emphasis that the people of California first sought to preserve the traditional definition of marriage through an initiative statute (Proposition 22) and turned to a constitutional amendment only after the decision in the *Marriage Cases* forced their hand.

are the natural offspring of such relationships.  Ideas regarding "sexual orientation" simply did not play a role in the institution's development.  *See Hernandez v. Robles*, 855 N.E.2d at 7 ("[T]he traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind."); *cf. Lawrence*, 539 U.S. at 568 ("[A]ccording to some scholars the concept of the homosexual as a distinct category of person did not emerge until the late 19th century.").

Notably, when invalidating California's traditional definition of marriage as embodied in Proposition 22 (Proposition 8's identically worded statutory predecessor) and other statutes, the California Supreme Court expressly disclaimed any suggestion "that the current marriage provisions were enacted with an invidious intent or purpose."  *See In re Marriage Cases*, 183 P.3d at 452 n.73.  And as that court subsequently recognized, "the purpose of [Proposition 8] was simply to restore the traditional definition of marriage as referring to a union between a man and a woman."  *See Strauss v. Horton*, 207 P.3d at 76.  It is simply implausible that in acting with surgical precision to preserve and restore the venerable definition of marriage, the people of California somehow transformed that institution into an instrument of bigotry against gays and lesbians.  While the resulting impact on gays and lesbians is a foreseeable consequence of Proposition 8, it does not follow that the *purpose* of Proposition 8 was discriminatory. *Cf. Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (internal citations omitted).  Rather**,** Proposition 8's effects "are essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate." *Id.* at 279 n.25.

In sum, Plaintiffs engage in gross exaggeration when they attempt to liken Proposition 8 to the law at issue in *Romer*.  Even the refrain, echoed by Plaintiffs here, that Proposition 8

" 'eliminat[ed]' or 'stripp[ed] same-sex couples of a fundamental constitutional right" has already

been dismissed by the California Supreme Court as "drastically overstat[ing] the effect of

Proposition 8 on the fundamental state constitutional rights of same-sex couples." 207 P.3d at 102.

Indeed, that court, citing *Romer*, expressly distinguished Proposition 8—with its narrow purpose

and effect of "restor[ing] the traditional definition of marriage," 207 P.3d at 76—from "a measure

that actually deprives a minority group of the *entire* protection of a fundamental constitutional

right or, even more sweepingly, leaves such a group vulnerable to public or private discrimination

in *all* areas without legal recourse." 207 P.3d at 102.

　　　　To be sure, in amending the California Constitution to restore the traditional definition of

marriage, Proposition 8 eliminated the right to same-sex marriage established by the State

Supreme Court.  But *Romer* never so much as hinted that the Constitution bars a State from

restoring a longstanding law that had suddenly been suspended by its courts. The fatal flaw in

Amendment 2 was the breadth and nature of the rights it denied, not the mere fact that it worked

some change in preexisting law. Any different reading of this case is foreclosed by *Crawford v.*

*Board of Education*, 458 U.S. 527 (1982), which upheld a California constitutional amendment

that reduced the remedial tools available to state courts in school desegregation cases. There the

Court stated:

> We reject[] the contention that once a State chooses to do "more" than the Fourteenth
> Amendment requires, it may never recede. We reject an interpretation of the
> Fourteenth Amendment so destructive of a State's democratic processes and of its
> ability to experiment. This interpretation has no support in the decisions of this Court.

458 U.S. at 535.  Furthermore, as if writing with this case in mind, the Supreme Court said that

"we would not interpret the Fourteenth Amendment to require the people of a State to adhere to a

judicial construction of their State Constitution when that Constitution itself vests final authority

in the people." 458 U.S. at 540.  "In short, having gone beyond the requirements of the Federal

Constitution, the State was free to return in part to the standard prevailing generally throughout

the United States." *Id.* at 542.  Thus the fact that Proposition 8 withdrew a privilege that had been conferred on same-sex couples for a brief period of time by a sharply divided California court is utterly irrelevant to its validity under the Federal Constitution. Neither *Romer* nor any other decision even arguably suggests a different conclusion.

### C.   Plaintiffs' Other Arguments Lack Merit.

Plaintiffs also raise a variety of other arguments in support of their claim that Proposition 8 is somehow tainted by animus or other improper motivations.  As demonstrated below, all lack merit.

### 1.   Support for traditional marriage is not a mark of bigotry.

Plaintiffs' repeatedly assert that support for Proposition 8 is inexplicable apart from "naked" animus and "antipathy" towards gays and lesbians.  *See, e.g.*, Plaintiffs' P.I. Motion, Doc # 7 at 20; Plaintiffs' P.I. Reply, Doc # 52 at 5, 6, 9.  Indeed, counsel for Plaintiffs has charged publically that "Proposition 8 is the residue of centuries of figurative and literal gay-bashing." David Boies, *Gay Marriage and the Constitution*, The Wall Street Journal, July 20, 2009 at A13, *available at* http://online.wsj.com/article/SB124804515860263587.html.  It is difficult to take this argument seriously.

"The idea that same-sex marriage is even possible is a relatively new one.  Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted." *Hernandez v. Robles*, 855 N.E.2d at 8.  Indeed, "even societies in which homosexual conduct was the norm and was well accepted have not recognized same sex marriage."  *Kerrigan v. Commissioner of Pub. Health*, 957 A.2d at 522-23 (Zarella, J., dissenting); *see also* Richard Posner, *Should There Be Homosexual Marriage?  And If So, Who Should Decide?*, 95 Mich. L.

Rev. 1578, 1579 (1997) ("[H]omosexual marriage has nowhere been a common practice, even in societies in which homosexuality was common."). The claim that only benighted gay bashers can continue to support this ancient, and, for many, sacred, institution is a vile insult to countless Americans. *See Andersen v. King County*, 138 P.3d at 981 ("Assuming that everyone who [supports traditional marriage] is a bigot … is … wrong."); *Kerrigan*, 957 A.2d at 523 n.12 (Zarella, J., dissenting) ("strongly" disagreeing with position "that anyone who opposes same sex marriage must harbor animus toward gay persons"). .

President Obama, for example, surely harbors no ill will toward gays and lesbians. *See, e.g.*, Proclamation 8387, Lesbian, Gay, Bisexual and Transgender Pride Month, 2009, 74 Fed. Reg. 26,929 (June 4, 2009). Yet he "believe[s] that American society can choose to carve out a special place for the union of a man and a woman as the unit of child rearing most common to every culture." BARACK OBAMA, THE AUDACITY OF HOPE 222 (2006). Not only does the President believe that American society can continue specially to nurture opposite-sex relationships, but he has stated that he personally "do[es] not support gay marriage." Human Rights Campaign, *2008 Presidential Questionnaire—Senator Barack Obama* at 3, *available at* http://news.nationaljournal.com/pdfs/questionnaires/obama.pdf. He respects the institution's "religious and social connotations," and considers it "to be between a man and a woman." *Id.* And President Obama's position is hardly unique among prominent public figures.

Of course, support for traditional marriage is reflected not just in public figures' statements but also in their official actions. President Clinton signed DOMA into law in 1996, explaining that he had "long opposed governmental recognition of same-gender marriages." President Clinton, Statement on Signing the Defense of Marriage Act, 32 WEEKLY COMP. PRES. DOC. 1829 (Sept. 20, 1996). DOMA also received broad support in Congress, passing both houses by wide margins: the House of Representatives by a 342-67 tally, and the Senate by vote of 85-14.

91

Among DOMA's supporters were Senators Biden, Daschle, Reid, Bradley, Wellstone, and Leahy, as well as Representatives Hoyer, Gephardt, and then-Representative Schumer—hardly a roll call of anti-gay bigotry.

This is only the tip of the iceberg—we have yet to mention the people of the forty-four states that continue to reserve marriage for unions of a man and a woman, *see supra* at 22 n.9, or the scores of state and federal judges who have held that "preserving the traditional institution of marriage" is a "legitimate state interest," *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring). And that still leaves perhaps the biggest hurdle to any claim that anti-gay animus is the only explanation for opposition to same-sex marriage:  the many gays and lesbians who take that very position.  *See supra* at 56-57.  For some, this opposition reflects "respect and understand[ing] [of] the growing concern about the disintegration of our…values," Tammy Bruce, *Respecting Marriage* and *Equal Rights*, *available at* http://mensnewsdaily.com/archive/a-b/bruce/2004/bruce022504.htm, while for others it is based on a view that "[m]arriage runs contrary to two of the primary goals of the lesbian and gay movement:  the affirmation of gay identity and culture and the validation of many forms of relationships," Paula Ettelbrick, *Since When Is Marriage a Path to Liberation*, OUT/LOOK National Gay and Lesbian Quarterly, No. 6, Fall 1989, SAME-SEX MARRIAGE PRO AND CON: A READER 119-20 (Andrew Sullivan, ed., 1997). Indeed, even some gays and lesbians who support same-sex marriage as a policy matter nevertheless oppose efforts to impose it immediately through judicial decree.  *See supra* at 55-56. Whatever its source, the diversity of gay and lesbian opposition to same-sex marriage can hardly be said to be the result of irrational moral opprobrium.

In sum, Plaintiffs' claim that animus against gays and lesbians is the only possible explanation for the enactment of Proposition 8 is false, reckless, and regrettable.

2.   **California's provision of domestic partnerships does not stigmatize gays and lesbians.**

California has gone far beyond any legal requirement, and far beyond the practice of almost every other state, in granting gays and lesbians legal protections, including virtually all of the rights, benefits, and privileges of marriage.  *See* Cal. Fam. Code § 297.5.  Plaintiffs claim that California, by this solicitude for the interests of gays and lesbians, has put itself on worse footing than states that have done nothing to recognize same-sex relationships.  *See* Plaintiffs' P.I. Reply, Doc # 52 at 8.  But Plaintiffs cannot credibly claim that California's domestic partnership law is comparable to the separate-but-equal fiction rejected in *Brown v. Board of Education*, 347 U.S. 483 (1954), and its progeny.  *See* Plaintiffs' P.I. Reply, Doc # 52 at 8.  "Quite the opposite of the Jim Crow laws, the Domestic Partner Act was enacted not to perpetuate discrimination but to remedy it. Unlike the racial segregation regime ratified in *Plessy*, the Domestic Partner Act did not strip rights away from members of the minority group; rather, the Domestic Partner Act granted same-sex couples a panoply of rights and protections they had never previously enjoyed." *In re Marriage Cases*, 143 Cal. App. 4th at 926.  Attorney General Brown pointed out the obvious: "Such hyperbole ignores inconvenient historical facts. Domestic partnerships and civil unions, unlike Jim Crow laws, were not conceived by a majority group for the purpose of oppressing a minority group. Rather, they were sponsored by gay and lesbian rights groups." *See* Answer Brief of State of California and the Attorney General to Opening Briefs on the Merits in *Marriage Cases* at 46-48 (Cal. June 14, 2007), attached as Exhibit C.

Indeed, Equality California sponsored the Domestic Partners Rights and Responsibilities Act of 2003, and that group along with the Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, and the ACLU contributed to drafting it.  *See* JACKIE GOLDBERG, ASSEM. MEMBER, AB 205 (GOLDBERG) FACT SHEET, A.B. 205, 2003-2004 Reg. Sess., at A.P. 242-45 (Cal. 2003); JACKIE GOLDBERG, ASSEM. MEMBER, AB 205 (GOLDBERG) FACT

SHEET, A.B. 205, 2003-2004 Reg. Sess., at S.P. 29-32 (Cal. 2003), attached as Exhibit D.  When

the bill was signed into law, Equality California issued a press release extolling it and praising the

Act as " 'a tremendous civil rights victory for LGBT people' " and " 'an incredible personal

victory for those of us who will now have the kind of legal recognition that we have spent a

lifetime dreaming about.' "  Equality California Press Release, *Governor Davis Makes History*

*With Signature On Domestic Partner Rights and Responsibilities Act of 2003*, September 19,

2003, *at*

http://www.eqca.org/site/apps/nlnet/content2.aspx?c=kuLRJ9MRKrH&b=4025653&ct=5197843.

The press release also elaborated on the gay and lesbian community's support for the measure:

> Equality California, the bill's sponsor, was joined in working for the passage of AB
> 205 by a broad coalition of civil rights, labor, religious, and senior organizations.
> EQCA also spearheaded community outreach to increase the participation of LGBT
> Californians in the democratic process that resulted in the bill's enactment. Dozens of
> lesbian, gay, bisexual, and transgender groups across the state—including San
> Francisco Pride and LGBT Community Centers—mobilized their supporters to
> advocate for AB 205. The National Gay & Lesbian Task Force and the Federation of
> Statewide LGBT Advocacy Organizations provided technology that allowed EQCA
> to conduct a massive online campaign resulting in tens of thousands of emails to state
> legislators asking for their support of AB 205. Fifty organizations from across the
> state also participated in EQCA's Lobby Day in May.

*Id.*  Plaintiffs' claim of stigma rings hollow in light of the broad-based gay and lesbian support for

California's domestic partnership law.

### 3.   The fact that Proposition 8 reflects the deeply held moral views of many of its supporters does not render it invalid.

As noted above, it is hardly surprising that the debate over the proper definition of

marriage implicates the deeply held moral beliefs of many individuals on both sides of that debate.

Contrary to Plaintiffs' contentions, however, the fact that Proposition 8 reflects the deeply held

moral views of many of its supporters does not render it constitutionally objectionable.

It is true that *Lawrence* quoted language from Justice Stevens' dissent in *Bowers v.*

*Hardwick* that "the fact that the governing majority in a State has traditionally *viewed a particular*

*practice as immoral* is not a *sufficient* reason for upholding a law *prohibiting* the practice,"

*Lawrence*, 539 U.S. at 577 (quoting *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J.,

dissenting)) (emphases added), and observed that the analysis of which this statement formed a

part "should have been controlling in *Bowers* and should control here," *id*. at 578. For several

reasons this observation has no bearing on the issue presented here.

*First*, unlike the law at issue in *Lawrence*, the traditional definition of marriage furthers

vital government interests "fundamental to our very existence and survival." *Loving*, 388 U.S. at

12 (quotation marks omitted, emphasis added); *accord Zablocki*, 434 U.S. at 384; *Skinner*, 316

U.S. at 541. These interests more than suffice to sustain the rationality of Proposition 8, whatever

the nature of any moral views it may also reflect. *See, e.g*., *Lawrence v. Texas*, 539 U.S. at 585

(O'Connor, J., concurring in the judgment) ("[R]easons exist to promote the institution of

marriage beyond mere moral disapproval of an excluded group."); *cf. McGowan v. Maryland*, 366

U.S. 420, 442 (1961) ("the 'Establishment' Clause does not ban federal or state regulation of

conduct whose reason or effect happens to coincide or harmonize with the tenets of some or all

religions.").

*Second*, in light of the long and celebrated history of marriage, as well as the vital purposes

served by that institution, it is simplistic and false to equate moral support for that institution with

the moral judgments at issue in *Lawrence*. *See, e.g*., *Hernandez*, 855 N.E.2d at 7. It is obvious

that there are moral grounds for supporting the traditional institution of marriage that have nothing

to do with disapproval of homosexual conduct.

*Third*, even if there were no difference between the moral views supporting Proposition 8

and those at issue in *Lawrence*, that decision did not hold that the moral views at issue there were

illegitimate. On the contrary, it recognized that "[f]or many persons, these are not trivial concerns

but profound and deep convictions accepted as ethical and moral principles to which they aspire

and which thus determine the course of their lives." 539 U.S. at 571. Nevertheless, it held that

95

the majority could not "use the power of the State to enforce these views on the whole society *through operation of criminal law*." *Id.* (emphasis added).  And, as noted above, *Lawrence* emphasized the substantial and concrete adverse consequences that result from a criminal conviction, especially one involving illegal sexual conduct. 539 U.S. at 575-75.

It is well settled, however, that a State need not promote or facilitate what it cannot prohibit.  Thus, for example, although the Constitution protects the right of parents to choose private rather than public schools for their children, *see Pierce v. Society of Sisters*, 268 U.S. 510 (1925), it does not require a State to subsidize private schools, *see Norwood v. Harrison*, 413 U.S. 455, 462 (1973).  As the Court explained, "[i]t is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid."  *Id.*  Likewise, although with few exceptions a State cannot prohibit abortions, *see Planned Parenthood v. Casey,* 505 U.S. 833 (1992); *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court has "unequivocally" held "that a state has no constitutional obligation to fund or promote abortion and 'is not required to show a compelling interest for its policy choice to favor normal childbirth.' " *Planned Parenthood of Cent. and N. Arizona v. Arizona*, 718 F.2d 938, 943 (9th Cir. 1983) (quoting *Maher v. Roe*, 432 U.S. 464, 477 (1977)).  As the Supreme Court has made clear:

> There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader.

*Maher*, 432 U.S. at 475-76.

Under these precedents, the fact that a State may not prohibit same-sex relationships in no way suggests that it must facilitate or promote such relationships, that it must provide those relationships equal recognition with traditional opposite-sex marriages, or that it cannot uniquely promote or otherwise express any preference for traditional marriage relationships.  *See*

96

*Hernandez*, 855 N.E.2d at 10 ("Plaintiffs here do not, as the petitioners in *Lawrence* did, seek

protection against state intrusion on intimate, private activity. They seek from the courts access to

a state-conferred benefit that the Legislature has rationally limited to opposite-sex couples."); *In*

*re Marriage Cases*, 143 Cal. App. 4th at 926 ("[t]he right to be let alone from government

interference is the polar opposite of insistence that the government acknowledge and regulate a

particular relationship, and afford it rights and benefits that have historically been reserved for

others").  Indeed even Justice Stevens' dissenting opinion in *Bowers v. Hardwick*, on which

*Lawrence* relied, argued that while it could not *prohibit* sodomy, "Society has every right to

*encourage* its individual members to follow particular traditions in expressing affection for one

another and in gratifying their personal desires."  478 U.S. at 217 (emphasis added).

Given these critical differences between the law invalidated in *Lawrence* and Proposition

8, it may well be that moral support for the institution of marriage in its traditional form *itself*

constitutes a legitimate interest sufficient to satisfy rational basis.  As the Supreme Court has

explained, "[t]he traditional police power of the States is defined as the authority to provide for

the public health, safety, and *morals*," *Barnes v. Glen Theatre, Inc*., 501 U.S. 560, 569 (1991)

(plurality) (emphasis addes), and venerable lines of authority have invoked the public interests in

order and morality to uphold regulation of a range of conduct including drinking, obscenity,

gambling, and prostitution.  *See, e.g., Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973); *Ah Sin*

*v. Wittman*, 198 U.S. 500 (1905); *L'Hote v. New Orleans*, 177 U.S. 587 (1900); *Mugler v. Kansas*,

123 U.S. 623 (1887).

But regardless of whether this traditional understanding of the scope of the police power

retains vitality today, it is clear that the fact that the traditional definition of marriage reflects the

deeply held moral views of many people does not somehow impugn the legitimacy of the other

vital interests supporting that definition.  Indeed, in staying its hand to allow the "earnest and

profound debate" about assisted suicide to continue in the democratic arena, the Supreme Court expressly recognized the role of "morality," along with other considerations, in that debate. *Glucksberg*, 521 U.S. at 735.  The same result must obtain here.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Proponents' motion for summary judgment and dismiss Plaintiffs' and Plaintiff-Intervenor's claims as a matter of law.

Dated: September 9, 2009

COOPER AND KIRK, PLLC
ATTORNEYS FOR DEFENDANTS-INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, AND PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

By:/s/Charles J. Cooper
    Charles J. Cooper