COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Nicole J. Moss
*nmoss@cooperkirk.com* (DC Bar No. 472424)
Jesse Panuccio
*jpanuccio@cooperkirk.com* (DC Bar No. 981634)
Peter A. Patterson (Ohio Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of | CASE NO. 09-CV-2292 VRW <br><br> **DEFENDANT-INTERVENORS' NOTICE OF MOTION AND MOTION FOR PROTECTIVE ORDER** <br><br> Date:  September 25, 2009 <br> Time:  10:00 a.m. <br> Judge:  Chief Judge Vaughn R. Walker <br> Location:  Courtroom 6, 17th Floor |

1  the California Department of Public Health and
   State Registrar of Vital Statistics; LINETTE
2  SCOTT, in her official capacity as Deputy
   Director of Health Information & Strategic
3  Planning for the California Department of Public
   Health; PATRICK O'CONNELL, in his official
4  capacity as Clerk-Recorder for the County of
   Alameda; and DEAN C. LOGAN, in his official
5  capacity as Registrar-Recorder/County Clerk for
   the County of Los Angeles,
6
7                    Defendants,

8  and

9  PROPOSITION 8 OFFICIAL PROPONENTS
   DENNIS HOLLINGSWORTH, GAIL J.
10 KNIGHT, MARTIN F. GUTIERREZ, HAK-
   SHING WILLIAM TAM, and MARK A.
11 JANSSON; and PROTECTMARRIAGE.COM –
   YES ON 8, A PROJECT OF CALIFORNIA
12 RENEWAL,

13                  Defendant-Intervenors.

14

15   Additional Counsel for Defendant-Intervenors

16

17 ALLIANCE DEFENSE FUND
   Timothy Chandler (CA Bar No. 234325)
18 *tchandler@telladf.org*
   101 Parkshore Drive, Suite 100, Folsom, California 95630
19 Telephone: (916) 932-2850, Facsimile: (916) 932-2851

20 Jordan W. Lorence (DC Bar No. 385022)*
   *jlorence@telladf.org*
21 Austin R. Nimocks (TX Bar No. 24002695)*
   *animocks@telladf.org*
22 801 G Street NW, Suite 509, Washington, D.C. 20001
   Telephone: (202) 393-8690, Facsimile: (202) 347-3622
23
   * Admitted *pro hac vice*
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

I.    BACKGROUND ................................................................................................................ 1

II.   ARGUMENT ..................................................................................................................... 3

A.    Plaintiffs Seek Irrelevant, Burdensome Discovery ........................................................ 4

      1.    Ninth Circuit Precedent Precludes Resort to the Discovery at Issue ................... 4

      2.    Supreme Court and Other Circuit Precedent Is to the Same Effect ..................... 6

B.    Plaintiffs Seek Material that Is Privileged Under the First Amendment ....................... 8

      1.    At Issue Here Are Core First Amendment Rights ............................................... 10

      2.    Relevancy ............................................................................................................ 13

      3.    Balancing ............................................................................................................. 13

CONCLUSION ........................................................................................................................... 15

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

## TABLE OF AUTHORITES

**Cases**                                                                                    **Page**

*Adolph Coors Co. v. Wallace*, 570 F. Supp. 202 (N.D. Cal. 1983) ............................................ 9, 10, 13

*Am. Const. Law Found., Inc. v. Meyer*, 120 F.3d 1092 (10th Cir. 1997),
    *aff'd Buckley*, 525 U.S. 182 ........................................................................................ 14

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................................ 11

*Anderson v. Hale*, 2001 U.S. Dist. LEXIS 6127 (N.D. Ill. 2001) ...................................... 9, 13

*Arias v. Superior Court of San Joaquin*, 209 P.3d 923 (Cal. 2009) ...................................... 6

*Arthur v. Toledo*, 782 F.2d 565 (6th Cir. 1986) ........................................................................ 8

*Austl./E. USA Shipping Conf. v. United States*, 537 F. Supp. 807 (D.D.C. 1982) .............................. 13

*Barcenas v. Ford Motor Co.*, 2004 U.S. Dist. LEXIS 25279 (N.D. Cal. 2004) ................................... 8

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ...................................................................... 9

*Beinin v. Ctr. for the Study of Pop. Culture*, 2007 U.S. Dist. LEXIS 47546 (N.D. Cal. 2007) ..... 13, 15

*Blumenthal v. Drudge*, 186 F.R.D. 236 (D.D.C. 1999) ......................................................... 8, 13

*Brock v. Local 375*, 860 F.2d 346 (9th Cir. 1988) ................................................................. 12

*Brown's Crew Car of Wyo. LLC v. State Transp. Auth.*,
    2009 U.S. Dist. LEXIS 39469 (D. Nev. 2009) ......................................................................... 8

*Buckley v. Am. Const. Law Found.*, 525 U.S. 182 (1999) ................................................. 11, 14

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..................................................................................... 9, 15

*Canyon Ferry Rd. Baptist Church v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009) ................................ 11

*Christ Covenant Church v. Town of Sw. Ranches*,
    2008 U.S. Dist. LEXIS 49483 (S.D. Fla. 2008) ........................................................... 9, 10, 12, 13

*Citizens United v. FEC*, No. 08-205 (U.S. Mar. 17, 2009) ........................................................ 1

*Crawford v. Bd. of Educ.*, 113 Cal. App. 3d 633 (Cal. Ct. App. 1980) ........................................... 7

*Crawford v. Board of Education*, 458 U.S. 527 (1982) ....................................................................... 7

*Dawson v. Delaware*, 503 U.S. 159 (1992) ................................................................................ 13

*Doe v. Reed*, No. 09-05456 (W.D. Wash. Sept. 10, 2009) ....................................................... 11

DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 09-CV-2292 VRW

*Dole v. Serv. Employees Union, AFL-CIO*, 950 F.2d 1456 (9th Cir. 1991) ........................................ 13

*Equality Found. of Greater Cincinnati v. Cincinnati*, 128 F.3d 289 (6th Cir. 1997) ........................... 8

*ETSI Pipeline Project v. Burlington N., Inc.*, 674 F. Supp. 1489 (D.D.C. 1987) .............................. 13

*First Nat'l Bank v. Bellotti*, 435 U.S. 765 (1978) .................................................................... 8

*Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963) ................................................ 9

*Grandbouche v. Clancy*, 825 F.2d 1463 (10th Cir. 1987) ......................................................... 9

*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*,
    2007 U.S. Dist. LEXIS 19475 (D. Kan. 2007) ................................................................ 12

*Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633 (Cal. 1994) ............................................. 6

*Hoffart v. United States Gov't*, 24 Fed. Appx. 659 (9th Cir. 2001) ........................................... 8

*Hunter v. Erickson*, 393 U.S. 385 (1969) ......................................................................... 7

*In re: Motor Fuel Temp. Sales Practices Litig.*, 2009 U.S. Dist. LEXIS 66005 (D. Kan. 2009) ... 12, 13

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
    1985 U.S. Dist. LEXIS 22188 (S.D.N.Y. 1985) ............................................................. 10

*James v. Valtierra*, 402 U.S. 137 (1971) .......................................................................... 7

*Jones v. Bates*, 127 F.3d 839 (9th Cir. 1997) ................................................................. 5, 6

*Klayman v. Freedom Watch, Inc.*, 2007 U.S. Dist. LEXIS 83653 (S.D. Fla. 2007) ........................ 13

*McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995) ...................................... 10, 11, 14, 15

*Meyer v. Grant*, 486 U.S. 414 (1988) ......................................................................... 11, 14

*NAACP v. Alabama*, 357 U.S. 449 (1958) ......................................................................... 9

*Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722 F.2d 449 (9th Cir. 1983) ...................... 8

*Prof'l Eng'rs in Cal. Gov't v. Kempton*, 155 P.3d 226 (Cal. 2007) ........................................... 6

*ProtectMarriage.com v. Bowen*, No. 09-00058 (E.D. Cal. filed Jan. 9, 2009) ............................. 14

*Reitman v. Mulkey*, 387 U.S. 369 (1967) ......................................................................... 4

*Robert L. v. Superior Court of Orange County*, 69 P.3d 951 (Cal. 2003) .................................. 6

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................................. 7

*S.D. Meyers v. San Francisco*, 253 F.3d 461 (9th Cir. 2001) ................................................. 6

iii

*SASSO v. Union City*, 424 F.2d 291 (9th Cir. 1970) .......................................................... 4, 5

*Strauss v. California*, 46 Cal. 4th 364 (Cal. 2009) ............................................................. 6

*Talley v. California*, 362 U.S. 60 (1960) ................................................................. 11, 14

*Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982) ........................................ 7, 8

## **Other**

FED. R. CIV. P. 26(b)(1) ........................................................................................ 3

Bob Egelko, *Prop. 8 Stands; More Ballot Measures Ahead*,
   San Francisco Chronicle (May 27, 2009) ...................................................... 14

Website of the Secretary of State of California,
   http://www.sos.ca.gov/elections/elections_j.htm#circ (listing circulating ballot petitions) .......... 15

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**  PLEASE TAKE NOTICE

that on September 25 at 10:00 a.m., before the Honorable Vaughn R. Walker, United States District

Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Defen-

dant-Intervenors will move the Court for a protective order.

For the following reasons, Defendant-Intervenors respectfully request entry of a protective order.

The issue to be decided is:  Do Plaintiffs seek irrelevant and/or privileged discovery?

## INTRODUCTION

This case—supposed to be about the constitutionality of Prop. 8—is quickly morphing into one

about protection of core First Amendment activities.  For in discovery, Plaintiffs are seeking virtually

the entire universe of nonpublic information related in even the remotest sense to the Prop. 8 cam-

paign.  Such information is both irrelevant and privileged.  Defendant-Intervenors thus respectfully

move this Court for a protective order.  In the absence of such an order, Defendant-Intervenors will be

forced to disclose core political speech and associational activities—disclosure of which will chill the

exercise of First Amendment rights.  The Court need not take our word for it, however, for Plaintiffs'

counsel has recently made our case to the Supreme Court in quite candid and forceful terms:

> [I]nterests [in disclosure are] outweighed by the extraordinary burdens that those re-
> quirements impose on First Amendment freedoms—including the risk of harassment and
> retaliation faced by … financial supporters, and the substantial compliance costs borne by
> [the association]….[T]he risk of reprisal … has vastly increased in recent years… *The*
> *widespread economic reprisals against financial supporters of California's Proposition 8*
> *dramatically illustrate the unsettling consequences of disseminating contributors' names*
> *and addresses to the public through searchable websites*—some of which even helpfully
> provide those intent upon retribution with a map to each donor's residence.

Reply Br. for Appellant. 28-29, *Citizens United v. FEC*, No. 08-205 (U.S. Mar. 17, 2009) (emphasis

added) (attached hereto as Ex. A.).

### I. BACKGROUND

Defendant-Intervenors are (i) five California voters who were the "Official Proponents" of Prop.

8 and (ii) a "primarily formed committee" designated as the official Prop. 8 campaign committee

("Protect Marriage"), which was made up almost exclusively of volunteers.  *See* Ex. B (Prentice

1

Decl.).  In their Case Management Statements, Plaintiffs announced that they plan to prove that Prop. 8 was "driven by irrational considerations," and therefore to seek virtually every nonpublic document relating in any way to the Prop. 8 campaign.  Doc # 157 at 12.  Defendant-Intervenors objected to this venture as seeking information that is both irrelevant and privileged under the First Amendment.  *See* Doc # 139 at 26; Doc # 159 at 9; Hr'g of Aug. 19, 2009, Tr. 57-62.  At the August 19 hearing, Plaintiffs' counsel attempted to answer this concern: "I frankly do not believe that we will have a problem, at least at the initial stages … in limiting discovery in a way that does not impermissibly infringe on any First-Amendment issues….[S]tatements that were made publicly" are "subject to discovery," but not "subjective, unexpressed motivations."  *Id.* at 63-64.

Plaintiffs' Document Requests, unfortunately, are not so limited.  *See* Ex. C (Pls.' First Set of Reqs. for Prod.); Ex. D (Def.-Ints.' Resps.).  For example Request No. 8 seeks "[a]ll versions of any documents that constitute communications relating to Proposition 8, between you and any third party" from January 2006 to the present.  Plaintiffs, then, are seeking *all* correspondence Defendant-Intervenors may have had with any "third party" bearing any relationship to Proposition 8 whatsoever.  Such documents include nonpublic communications with individual donors, volunteers, voters, political strategists or other agents, and even family, friends, and colleagues.[1]  Plaintiffs, in an effort to prove the motivations of the electorate at large, also intend to depose numerous individuals.  *See* Doc # 134 at 22; Doc # 157 at 12.

Counsel have unsuccessfully attempted to resolve this dispute both by letter and telephone conference.  *See* Ex. E (Ltr. of Aug. 27, 2009); Ex. F (Ltr. of Aug. 31, 2009); Ex. G (Moss Decl.).  Counsel have also conferred regarding the extent to which Plaintiffs currently seek Defendant-Intervenors' wholly internal communications.  *See* Ex. D, Gen. Obj. # 12; Ex. G.

---

[1] Other Requests are similarly sweeping, encompassing wholly internal drafts of documents, personal posts on invite-only social-networking websites, names and other information regarding volunteers and/or employees of Protect Marriage that are not publicly known, information regarding

## II. ARGUMENT

The Federal Rules place at least three limitations on discovery: (i) the requested material must be "relevant to any party's claim or defense," in that it "appears reasonably calculated to lead to the discovery of admissible evidence"; (ii) the requested material cannot be privileged; and (iii) producing the requested material cannot be overly burdensome. FED. R. CIV. P. 26(b)(1), (b)(2)(C)(iii). Plaintiffs' requests for the production of information and materials that were never publicly disclosed to the electorate at large fail on all three counts.[2]

Plaintiffs seek, for example, documents or testimony about: (i) communications between and among Defendant-Intervenors, campaign donors, volunteers, and agents; (ii) draft versions of communications never actually distributed to the electorate at large; (iii) the identity of affiliated persons and organizations not already publicly disclosed; (iv) post-election information; and (v) the subjective and/or private motivations of a voter or campaign participant. Such communications and information are both legally irrelevant and privileged under controlling caselaw, however. Further, denying Plaintiffs' requests will have the practical benefit of avoiding difficult subsidiary questions. For example, Plaintiffs appear to recognize a distinction between wholly "internal" communications among the Defendant-Intervenors and communications between Defendant-Intervenors and a "third-party," *see* Ex. D Gen. Obj. 12,[3] but the parties may not ultimately agree on who is "internal" and who is a "third party."[4] Additionally, issues of reciprocity in discovery will likely lead to further disputes.

---

documents created and/or communicated *after* the vote on Prop. 8, and much more.

[2] In an effort to minimize dispute, we are producing documents that were available to the electorate at large (such as print ads, the text of radio ads, and the content of public Internet posts). We do not, however, concede the legal relevance of such documents under controlling Supreme Court and Ninth Circuit precedent. *See infra* at 4-8.

[3] *But see* Doc. #157 at 12 ("Specifically, Plaintiffs plan to seek documents relating to … Intervenors' communications with each other….").

[4] Even if such a line could be drawn, definitional problems would persist. If a Protect Marriage volunteer served as a representative from another association or religious group, are communications between the volunteer and the outside group "internal"? What if the volunteer was also an employee of another group? At what point are communications about Prop. 8 ones made as a volunteer of Protect Marriage as opposed to ones made as an employee of the outside group?

1    While we have not yet sought similar types of information from the Plaintiffs and the many groups that

2    campaigned against Prop. 8—such as the ACLU, Lambda, and the NCLR—we will have no choice but

3    to do so if Plaintiffs are permitted to obtain such information.[5]  Indeed, Plaintiffs' theory is boundless:

4    if the discovery they seek is relevant and not privileged, then so too is discovery from any and every

5    California voter or any person who weighed in on the Prop. 8 debate.

6

7    **A.    Plaintiffs Seek Irrelevant, Burdensome Discovery**

8        Plaintiffs "seek documents relating to Prop. 8's genesis, drafting, strategy, objectives, advertis-

9    ing, campaign literature, and Intervenors' communications with each other, supporters, and donors."

10   Doc # 157 at 12.  The Supreme Court, however, has never authorized the use of the type of information

11   at issue here to ascertain the purpose of an initiative, and the Ninth Circuit has specifically ruled out

12   resort to such evidence of voter intent.

13

14       **1.    Ninth Circuit Precedent Precludes Resort to the Discovery at Issue**

15       In *SASSO v. Union City*, the Ninth Circuit addressed an equal protection challenge to a referen-

16   dum measure.  The plaintiffs there, as here, contended that "the purpose and the result of the referen-

17   dum were to discriminate."  424 F.2d 291, 295 (9th Cir. 1970).  The Court held "the question of

18   motivation for [a] referendum (apart from a consideration of its effect) is [not] an appropriate one for

19   judicial inquiry."  *Id.* at 295.  Pointing to the Supreme Court's analysis of another equal protection

20   challenge to another California referendum, the Ninth Circuit explained that in *Reitman v. Mulkey*, 387

21   U.S. 369 (1967), "purpose was treated as a relevant consideration," but it "was judged … in terms of

22

23   _____

24   [5] In a September 11 letter to the Court, Plaintiff-Intervenors charge that we are seeking from
     third parties involved in the campaign *against* Prop. 8 the very types of documents that we argue here
     are not discoverable.  Defendant-Intervenors, however, instructed in a cover letter to these parties that
25   we are not seeking "any of the organization's internal communications and documents, including
     communications between the organization and its agents, contractors, attorneys, or others in a
26   similarly private and confidential relationship with the organization" and that "the requests contained
     in this subpoena, to the extent they call for communications or documents prepared for public
27   distribution, include only documents that were actually disclosed to the public."  To the extent that
     there is any misunderstanding, we wish to make clear that we are not seeking disclosure of any
28   nonpublic communications, unless and until the Court rules such information is discoverable.

ultimate effect and historical context." *SASSO*, 424 F.2d at 295. "The only 'conceivable' purpose [of the *Reitman* referendum], judged by wholly objective standards, was to restore [a] right to … private racial discrimination." *Id.* (citing *Reitman*, 387 U.S. at 381); *see also* 387 U.S. at 375-76. But where discrimination is not the only conceivable purpose—where "many environmental and social values are involved"—a determination of "the voters' purpose … would seem to require far more than simple application of objective standards." *SASSO*, 424 F.2d at 295. And this, the Ninth Circuit explained, is not a legitimate judicial inquiry: "If the true motive is to be ascertained not through speculation but through a probing of the private attitudes of the voters, the inquiry would entail an intolerable invasion of the privacy that must protect an exercise of the franchise." *Id.*

As the Ninth Circuit has more recently explained, even in contexts where questions of voter intent are legally relevant—for example when interpreting the meaning of ambiguous referendum text—materials such as those sought by plaintiffs here are not permissible sources for determining that intent. In *Jones v. Bates*, 127 F.3d 839 (9th Cir. 1997), the Ninth Circuit held that a California referendum was infirm because the electorate did not have proper notice that the law would create a lifetime ban on legislative service (the effect the California Supreme Court deemed it to have). The Ninth Circuit repeatedly stressed that the text of the referendum "on its face contained no reference to *lifetime* limits, and the ballot arguments submitted by the initiative's proponents failed to mention that the measure contemplated such a ban; so, too, the materials prepared by the state were wholly silent on the point." *Id.* at 855. *See also id.* at 844, 856. The Court explained:

> [T]he search for the people's intent in passing initiatives is far different from the attempt to discern legislative intent…. There is nothing, other than the facially ambiguous initiative, the official ballot arguments and the state-prepared materials, to look to in order to discern the people's intent in passing the measure.

*Id.* at 860. Thus, the Ninth Circuit held that where a particular purpose cannot be found on the face of a ballot measure itself, in the official ballot arguments in favor of the referendum, or in the official

statements prepared by the State, a court is not free to infer such a purpose. Indeed, *Jones* specifically makes clear that resort even to publicly disclosed advertisements is improper: "Such materials are, at bottom, only advertisements. Relying on them as indicative of the voters' intent would be tantamount to relying on political parties' campaign advertisements to interpret legislative acts." *Id.* at 860 n.32.[6]

The California Supreme Court, whose interpretations and methodology the Ninth Circuit looks to when resolving the meaning of a state law, *S.D. Meyers v. San Francisco*, 253 F.3d 461, 473 (9th Cir. 2001), follows the same approach. In construing the meaning of ballot measures, the California high court holds that the electorate's intent controls. *See, e.g.*, *Robert L. v. Superior Court of Orange County*, 69 P.3d 951, 955 (Cal. 2003); *Hill v. Nat'l Collegiate Athletic Ass'n*, 865 P.2d 633, 641 (Cal. 1994). Yet, that court has squarely ruled out resort to the types of materials and information Plaintiffs seek here: "The opinion of drafters or legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent. *Robert L.*, 69 P.3d at 957.[7] Instead, where intent cannot be derived from the text alone, the court turns only to "those extrinsic aids that bear on the enactors' intent" because they were publicly disclosed to the electorate and can inform the court as to an objective view of voter intent. *Id.* at 957-58.[8] Thus, the California Supreme Court construed the electorate's intent in enacting Prop. 8—the question here—by looking solely to official ballot materials and judicial rulings preceding the vote. *See Strauss v. California*, 46 Cal. 4th 364, 406, 408-10, 470-72 (Cal. 2009).[9]

### 2. Supreme Court and Other Circuit Precedent Is to the Same Effect

---

[6] Even the dissent in *Jones*, which argued that "it is appropriate for the court to examine indications of voter intent that lie outside the four corners of the initiative," resorted only to materials publicly available to the electorate at large. *Id.* at 864-66 (Sneed, J., dissenting).

[7] *See also id.* at 958 ("[O]ur court has never strayed from our pronouncement … that legislative antecedents not directly presented to the voters … are not relevant to our inquiry.").

[8] *See also Hill*, 865 P.2d at 644; *Prof'l Eng'rs in Cal. Gov't v. Kempton*, 155 P.3d 226, 241 (Cal. 2007); *Robert L.*, 69 P.3d at 955, 958; *Arias v. Superior Court of San Joaquin*, 209 P.3d 923, 929 (Cal. 2009).

[9] Plaintiffs' Requests are not even limited to materials that pre-date the Prop. 8 election. Obviously, post-election materials do not have any possible relevance to the electorate's purpose.

6

Supreme Court cases addressing referenda confirm that the information at issue here is wholly irrelevant. Most prominent is Plaintiffs' principal case: *Romer v. Evans*, 517 U.S. 620 (1996). *See, e.g.*, Doc # 7 at 7, 13, 17; Doc # 134 at 9 (relying on *Romer* to argue for a trial here). There, as in *Reitman*, the Court's conclusion "that the disadvantage imposed [by the challenged referendum was] born of animosity" was an "inevitable inference" derived from looking solely at the language and effects of the law which "belie any legitimate justifications that may be claimed for it." 517 U.S. at 634-35. The Court ascribed a discriminatory motivation to the electorate only when every other conceivable motivation proved objectively implausible. The Court did not look to any other evidence.

Similarly, in *Crawford v. Board of Education*, 458 U.S. 527 (1982), the Court considered a claim that a California law enacted by referendum was motivated by a racially discriminatory purpose. In determining whether such a purpose existed, the Court deferred to the findings of the California Court of Appeal. *Id.* at 544-45. That court reasoned, and the Supreme Court agreed, that because "legitimate, nondiscriminatory" "purposes of the Proposition were well stated in the Proposition itself," *id.* at 543-45, it would be "pure speculation to suppose that voters who supported Proposition 1[] … were motivated by the specific intent to effect racial segregation and by discriminatory purpose," *Crawford v. Bd. of Educ.*, 113 Cal. App. 3d 633, 655 (Cal. Ct. App. 1980). Tellingly, neither the California court nor the Supreme Court resorted to evidence outside the four corners of the proposition itself—and certainly not to nonpublic communications expressing subjective views of the measure's supporters. Where a plausible legitimate rationale was conceivable, the inquiry was over.[10] *See also* Doc # 172-1 (Def.-Ints.' Mot. for Summ. J.) at 82-84.

In *Washington v. Seattle School Dist. No. 1*, the Court concluded a facially neutral initiative had

---

[10] In *James v. Valtierra*, 402 U.S. 137 (1971), the Supreme Court considered an equal protection claim about yet another California law enacted by referendum. Again, the Court found the law facially neutral, *id.* at 141; and while the Court considered the law's effects, *id.* at 142, it did not resort to evidence of the electorate's purpose, and especially not to evidence of individual voters' purposes. In *Hunter v. Erickson*, 393 U.S. 385 (1969), the Court did not need to turn to the purpose of the electorate

7

1  a "racial nature."  458 U.S. 457, 471 (1982).  Two aspects of its analysis stand out.  First, just as in

2  *Romer*, the *Seattle* Court examined the text of the statute and its effect and ascribed an unconstitutional

3  discriminatory purpose to the electorate only after concluding that the design of the law ruled out any

4  other purpose.  Second, although unnecessary to its analysis, the Court cited official and/or public

5  statements about the law's effects—statements which the "electorate surely was aware of." *Id.*  No

6  citations were made to nonpublic statements unavailable to the electorate at large, and the Court

7  certainly did not engage in an examination of individual voters' or sponsors' subjective intent or

8

9  private communications.  Thus, nothing in *Seattle* supports discovery of the information at issue here.

10      Notably, the Sixth Circuit has adopted this same understanding of the Supreme Court's referen-

11  dum cases.  *See Arthur v. Toledo*, 782 F.2d 565, 573-74 (6th Cir. 1986) (explaining the reasons

12  undergirding a bar on examination of voters' subjective intent).  *See also Equality Found. of Greater

13  Cincinnati v. Cincinnati*, 128 F.3d 289, 293 n.4 (6th Cir. 1997) (reaffirming *Arthur*, noting that "a

14  reviewing court in this circuit may not even inquire into the electorate's possible actual motivations for

15

16  adopting a measure via initiative and referendum").[11]

17  **B.    Plaintiffs Seek Material that Is Privileged Under the First Amendment**

18      Plaintiffs' discovery requests seek to compel disclosure of speech by an advocacy association

19  during a referendum election—speech that "is at the heart of the First Amendment's protection," and

20  "the type of speech indispensable to decisionmaking in a democracy." *First Nat'l Bank v. Bellotti*, 435

21  U.S. 765, 776 (1978).  A long line of federal cases recognizes that the fundamental rights of free

22

23  _____

24  because the referendum at issue contained "an explicitly racial classification." *Id.* at 389.
   [11]  *See Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722 F.2d 449, 454 (9th Cir. 1983)
25  (protective order where requested discovery was "irrelevant and immaterial"); *Hoffart v. United States
   Gov't*, 24 Fed. Appx. 659, 665-66 (9th Cir. 2001) (refusal to issue subpoena for information not
26  reasonably calculated to lead to the discovery of admissible evidence); *Barcenas v. Ford Motor Co.*,
   2004 U.S. Dist. LEXIS 25279 at *6 (N.D. Cal. 2004) ("'some threshold showing of relevance must be
27  made before parties are required to open wide the doors of discovery'") (quoting *Hofer v. Mack Trucks,
   Inc.*, 981 F.2d 377, 380 (8th Cir. 1992)); *Brown's Crew Car of Wyo. LLC v. State Transp. Auth.*, 2009
28  U.S. Dist. LEXIS 39469 at *18-19 (D. Nev. 2009); *Blumenthal v. Drudge*, 186 F.R.D. 236, 245
   (D.D.C. 1999).

speech and association in the political realm lie at the core of the First Amendment, that anonymity in the exercise of those rights is vital to their protection, and that compelled disclosure of speech and association—even in the discovery context—violates those rights.

The Supreme Court long ago held that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association," and that there is a "vital relationship between freedom to associate and privacy in one's associations." *NAACP v. Alabama*, 357 U.S. 449, 460, 462 (1958). "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960). Thus, the Court has repeatedly held that compelled disclosure of an advocacy association's membership lists would "affect adversely the ability of [the association] and its members to pursue their collective effort to foster beliefs which they … have a right to advocate, in that it may induce members to withdraw from the [a]ssociation and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP*, 357 U.S. at 462-63. *See also Bates*, 361 U.S. at 523; *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539 (1963).

Applying the insight and logic of the *NAACP* line, lower federal courts have found that "[t]he First Amendment associational privilege emerges when a discovery request specifically asks for … information that goes to the heart of an organization's associational activities, and such disclosure could arguably infringe upon associational rights." *Anderson v. Hale*, 2001 U.S. Dist. LEXIS 6127, at *9 (N.D. Ill. 2001).[12] And as this Court has explained, "a private litigant is entitled to as much solicitude to its constitutional guarantees of freedom of associational privacy when challenged by another private party, as when challenged by a government body." *Adolph Coors Co. v. Wallace*, 570

---

[12] *See also Christ Covenant Church v. Town of Sw. Ranches*, 2008 U.S. Dist. LEXIS 49483 at *16 (S.D. Fla. 2008); *Buckley v. Valeo*, 424 U.S. 1, 65 (1976); *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987).

9

F. Supp. 202, 208 (N.D. Cal. 1983) (Williams, J.).

*Coors* explained that when faced with a good faith claim of First Amendment privilege, the Court must first "ascertain whether the precise material sought by discovery is truly 'relevant' to the gravamen of the complaint."  570 F. Supp. at 208.  The Court must "demand a heightened showing of 'relevancy'": to weigh in favor of disclosure, the requested discovery must "go[] to the 'heart of the matter.'"  *Id.* at 208-09.[13]  "This enhanced scrutiny is appropriate since civil lawsuits could be misused as coercive devices to cripple, or subdue, vocal opponents."  *Coors*, 570 F. Supp. at 209.  And even then "the court must balance the rights and interests of each litigant, the particular circumstances of the parties to the controversy, and the public interest in overriding the private litigants' representations as to resultant injury or to unavoidable need."  *Id.* at 208.  On the First Amendment side of the ledger, "the litigant seeking protection need not prove to a certainty that its First Amendment rights will be chilled by disclosure."  *Id.* at 210.  "[I]n making a prima facie case of harm, the burden is light."  *Christ Covenant*, 2008 U.S. Dist. LEXIS 49483, at *17.

### 1.    At Issue Here Are Core First Amendment Rights

The rationale undergirding *NAACP* and its progeny—that anonymity is vital to the freedoms of speech and association and thus cannot be constitutionally abrogated absent a compelling interest—is not limited, either by logic or precedent, to compelled disclosure of membership lists.  Indeed, in the specific context of referendum campaigns, the Supreme Court has held that there is a First Amendment right to anonymity with respect to political communications.  And lower courts have specifically held that private communications made in connection with political activity are privileged from discovery.

In *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), the Court held that "the First Amendment's protection of anonymity encompasses documents intended to influence the electoral process."  *Id.* at 344.  The incident under review involved an individual's anonymous public distribu-

---

[13] *See also Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 1985 U.S. Dist. LEXIS 22188, at

10

tion of an argument against a proposed referendum in violation of a state law requiring identifying information on such communications.  The Court held that "[t]he freedom to publish anonymously extends" to the political realm where there is "a respected tradition of anonymity in the advocacy of political causes."  *Id.* at 342-43.[14]  "This tradition is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation."  *Id.*  Because the speech at issue "occupie[d] the core of the protection afforded by the First Amendment,"—indeed "[wa]s the essence of First Amendment expression"—the Court found that the state law did not pass muster under "exacting scrutiny."  *Id.* at 346-47.  *See also Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) ("the right of individuals to associate for the advancement of political beliefs … rank[s] among our most precious freedoms").  Indeed, that "this advocacy occurred in the heat of a controversial referendum vote only strengthen[ed] the protection afforded to [it]."  *McIntyre*, 514 U.S. at 347.[15]

*McIntyre* thus stands for the proposition that political activity and speech surrounding a referendum election implicate core First Amendment rights worthy of the utmost solicitude.[16]  *NAACP* stands for the proposition that core First Amendment activity can be unconstitutionally burdened by compelled disclosure in the litigation context.  Taken together, the conclusion is inescapable the First Amendment would be improperly infringed if Defendant-Intervenors are compelled to answer

---

*24 (S.D.N.Y. 1985); *Anderson*, 2001 U.S. Dist. LEXIS 6127 at *8-9.

[14] *McIntyre* relied extensively on *Talley v. California*, 362 U.S. 60 (1960).  *Talley* invalidated an ordinance banning the distribution of anonymous handbills.

[15] *See also Meyer v. Grant*, 486 U.S. 414, 421-22 (1988) ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change…. Thus, the circulation of a petition involves the type of interactive communication concerning political change that is … 'core political speech.'").

The fact that a speaker in a referendum campaign is not just an individual voter, but also a sponsor, does not somehow strip the speaker of First Amendment rights.  *See Buckley v. Am. Const. Law Found.*, 525 U.S. 182 (1999).

[16] *See also Canyon Ferry Rd. Baptist Church v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009) (invalidating disclosure law as applied to church's collection of petition signatures); *Doe v. Reed*, No. 09-05456, Doc # 63 (W.D. Wash. Sept. 10, 2009) (granting preliminary injunction barring disclosure of identities of traditional marriage supporters because "[t]he weight of authority … counsels toward the finding that supporting the referral of a referendum is likely protected political speech") (attached as Ex. H).

Plaintiffs' wide-ranging requests for disclosure of substantially all of their internal, private, and/or otherwise nonpublic political speech and associational activity surrounding the Prop. 8 campaign.[17]

Lower federal courts have repeatedly found that nonpublic political communications, such as lobbying and campaign strategy documents, are entitled to First Amendment protection.  For example, the District of Kansas, on First Amendment privilege grounds, recently shielded from discovery "information about defendants' communications with trade associations, weights and measures associations, and state or federal agencies."  *In re: Motor Fuel Temp. Sales Practices Litig.*, 2009 U.S. Dist. LEXIS 66005, at *34 (D. Kan. 2009).  *See also id.* at *45 (describing information at issue as "past political activit[y]" and "information related to … associations' legislative affairs and lobbying efforts").  The court held that

> the trade associations' internal communications and evaluations about advocacy of their members' positions on contested political issues, as well as their actual lobbying on such issues, would appear to be a type of political or economic association that would … be protected by the First Amendment privilege.

*Id.* at *47.  The court rejected the argument that merely shielding the identities listed on communications would be sufficient because members or potential members of the associations could fear reprisal against "the motor fuel industry as a whole" and because disclosure of the "associations' evaluations of possible lobbying and legislative strategy certainly could be used … to gain an unfair advantage over [the associations] in the political arena" in an ongoing policy debate.  *Id.* at *49-50.[18]

---

[17] Political speech, association, and petition rights are not the only First Amendment rights threatened here.  *See Brock v. Local 375*, 860 F.2d 346, 349 (9th Cir. 1988) ("'Implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.'") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).  Because religious groups participated in the campaign for Prop. 8, free exercise of religion—and the freedom to associate in that exercise—are also at stake.  *See Christ Covenant*, 2008 U.S. Dist. LEXIS 49483 at *16.

[18] Several other cases are to the same effect.  *See Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist. LEXIS 19475 at *15-20 (D. Kan. 2007) (protecting an association's "documents related to … strategy of advocating for bills in the Kansas legislature" because "petitioning the government is … central to first amendment values," and thus the privilege extends not only to membership lists "but also encompass[es] the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with

12

Similarly, the Ninth Circuit has found First Amendment rights threatened by discovery requests for a union's minutes of meetings at which "highly political issues" were discussed. *Dole v. Serv. Employees Union, AFL-CIO*, 950 F.2d 1456, 1459 (9th Cir. 1991).[19]

And as for Plaintiffs' requests for post-election documents, those run afoul of this Court's holding that "[c]ompelled disclosure of the names of individuals or groups supporting a … lawsuit … creates a risk of interference with First Amendment-protected activities." *Beinin*, 2007 U.S. Dist. LEXIS 47546, at *8-9. *See also Blumenthal v. Drudge*, 186 F.R.D. 236, 245 (D.D.C. 1999) (denying discovery of membership list of legal defense fund on First Amendment grounds).

## 2.  **Relevancy**

As explained above, the information sought by Plaintiffs is wholly irrelevant to their claims. This alone justifies granting our motion. *See Dawson v. Delaware*, 503 U.S. 159, 168 (1992); *Hale*, 2001 U.S. Dist. LEXIS 6127, at *24. Plaintiffs simply cannot maintain that such information bears on, let alone goes to the "heart of," the matters in this case. *Coors*, 570 F. Supp. at 208-09.

## 3.  **Balancing**

Balancing the interests at stake here results in a scale tipped far in Defendant-Intervenors' direction. First, there need only be "some probability" that disclosure would chill the exercise of First Amendment rights, *id.* at 210, and "the burden is light," *Christ Covenant*, 2008 U.S. Dist. LEXIS 49483, at *17. Supporters of Prop. 8 have been subjected to social disapprobation, verbal abuse,

---

other like-minded person so as to effectively convey the message of protest"); *ETSI Pipeline Project v. Burlington N., Inc.*, 674 F. Supp. 1489 (D.D.C. 1987) (shielding a party from having to be deposed on legislative, lobbying, and political communications); *Austl./E. USA Shipping Conf. v. United States*, 537 F. Supp. 807, 808-10 (D.D.C. 1982) (barring discovery into "efforts to influence government to pass or enforce laws" because "petitioning the government is equally central to first amendment values as the interests involved" in *NAACP*).

[19] *See also Beinin v. Ctr. for the Study of Pop. Culture*, 2007 U.S. Dist. LEXIS 47546 (N.D. Cal. 2007) (Ware, J.); *Klayman v. Freedom Watch, Inc.*, 2007 U.S. Dist. LEXIS 83653 at *17 (S.D. Fla. 2007) ("Defendants shall not be required to identify any donors, other than those whose disclosure is already in the public domain or is otherwise required by law."); *Hale*, 2001 U.S. Dist. LEXIS 6127 at *4-5, 22-23 (describing prior order quashing discovery into membership lists, telephone records, and email messages; quashing discovery into anonymous members' Internet subscription information).

economic reprisal, vandalism of property, threats of physical violence, and actual physical violence. As the declarations attached hereto demonstrate, such responses have chilled and threaten to continue to chill the exercise of First Amendment rights by supporters of the traditional definition of marriage. *See* Ex. B (Prentice Decl.); Ex. I (Schubert Decl.); Ex. J (Jannson Decl.); Ex. L (Tam Decl.); Ex. K (articles on effects of disclosure); Ex. M; Docs # 32-33, 35-40, 45, 113-162, *ProtectMarriage.com v. Bowen*, No. 09-00058 (E.D. Cal. filed Jan. 9, 2009) (declarations regarding reprisal and harassment).[20]

As noted above, Plaintiffs' counsel has explicitly recognized the harassment of and reprisal against Prop. 8's supporters. *See* Ex. A. And *Citizens United* concerned only the disclosure of the identity of donors. Here, Plaintiffs seek the much more invasive, chilling disclosure of specific nonpublic communications and thoughts, which "is particularly intrusive" and "reveals unmistakably the content of [the speaker's] thoughts on a controversial issue." *McIntyre*, 514 U.S. at 355. Matching a speaker's identity not only with a donation, but with specific speech (such as a petition) "more clearly identifies the circulator with the precisely defined point of view he or she is personally encouraging others to support." *Am. Const. Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1103 (10th Cir. 1997), *aff'd Buckley*, 525 U.S. 182.[21] Here, where the political debate over the definition of marriage wages on, and where another ballot measure is likely in the offing, the chill from disclosure would be no less.[22]

---

[20] *ProtectMarriage.com v. Bowen* is a case challenging aspects of California's referendum finance disclosure laws. The declarations filed therein demonstrate some of the results even limited disclosure has had in the Prop. 8 context. To expedite consideration of this motion and the progression of discovery, we cite directly to those documents. Should the Court so desire, we can attempt to have the Doe declarants in *Bowen* submit additional declarations here.

[21] *See also Talley*, 362 U.S. at 64 ("identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression"); *id.* at 65 ("identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance"); *Motor Fuel Litig.*, 2009 U.S. Dist. LEXIS 66005 at *47-50 (disclosure of legislative affairs and lobbying would interfere with associational activities by causing member withdrawal, dissuading potential members, and by unfairly disclosing political strategy). *Cf. Meyer*, 486 U.S. at 422-23 (invalidating restriction on method of circulating a ballot petition that "limits the number of voices who will convey [a sponsor's] message" and "the size of the audience they can reach").

[22] *See* Ex. I; Bob Egelko, *Prop. 8 Stands; More Ballot Measures Ahead*, San Francisco

14

Moreover, harassment and reprisal are not the only tools for chilling speech in this arena. Establishing a precedent that ballot sponsors and their supporters will be subject to sweeping discovery every time a successful ballot measure is challenged would surely chill core First Amendment activity of speakers of all stripes on initiative measures of all kinds, simply because the speakers might prefer to remain anonymous. *See* Ex. I; Ex. L; *McIntyre*, 514 U.S. at 341-42 ("The decision in favor of anonymity may be motivated by fear of … retaliation … or merely by a desire to preserve as much of one's privacy as possible."); *Beinin*, 2007 U.S. Dist. LEXIS 47546, at *10 (Ware, J.) ("Had Plaintiff's email correspondents realized that privately supporting his litigation would potentially subject them to intrusive depositions or other discovery, they may have chosen to refrain from speaking.").

Finally, the public interest weighs strongly in favor of shielding Defendant-Intervenors from this discovery. In many states, and in California especially, successful referenda are challenged in court with regularity. The Supreme Court has found that the referendum process is vitally important, *James*, 402 U.S. at 142-43, and that individuals' freedom to engage in that process lies at the core of the First Amendment, *McIntyre*, 514 U.S. at 347. If a mere lawsuit can open up participants' in that process to wide-ranging discovery into their private communications during a campaign, only the fearless or reckless few will continue to participate. *See, e.g.*, *id.* at 357; *Buckley*, 424 U.S. at 71 ("the public interest also suffers" from chilled political participation).

## **CONCLUSION**

For the foregoing reasons, the Court should grant this motion for a protective order.

Dated: September 15, 2009

> COOPER AND KIRK, PLLC
> ATTORNEYS FOR DEFENDANTS-INTERVENORS
> By:    /s/Charles J. Cooper
>          Charles J. Cooper

---

Chronicle (May 27, 2009); Website of the Secretary of State of California, http://www.sos.ca.gov/elections/elections_j.htm#circ (listing circulating ballot petitions).

15