# Exhibit A

No. 08-205

## IN THE

# Supreme Court of the United States

---

CITIZENS UNITED,

*Appellant,*

v.

FEDERAL ELECTION COMMISSION,

*Appellee.*

---

**On Appeal
From The United States District Court
For The District Of Columbia**

---

**REPLY BRIEF FOR APPELLANT**

---

THEODORE B. OLSON
  *Counsel of Record*
MATTHEW D. MCGILL
AMIR C. TAYRANI
JUSTIN S. HERRING
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Appellant*

## RULE 29.6 STATEMENT

The corporate disclosure statement included in the Brief for Appellant remains accurate.

ii

## TABLE OF CONTENTS

**Page**

RULE 29.6 STATEMENT ............................................i

TABLE OF AUTHORITIES......................................iv

REPLY BRIEF FOR APPELLANT ...........................1

  I.  THE GOVERNMENT'S SUPPRESSION OF
      HILLARY: THE MOVIE CANNOT BE
      RECONCILED WITH THE FIRST
      AMENDMENT ....................................................4

      A.  The Government's Brief Confirms
          That It Has No Compelling
          Interest In Suppressing Video On
          Demand Distribution Of Feature-
          Length Films ...........................................5

      B.  The Government's Brief Identifies
          No Compelling Basis For
          Suppressing Corporate Speech
          That Is Funded Almost Entirely
          By Individuals .......................................13

      C.  The Government's Brief Confirms
          That Hillary: The Movie Is Open
          To Interpretations Other Than As
          An Appeal To Vote ................................17

  II.  THE BURDENS THE GOVERNMENT
      WOULD IMPOSE ON ADVERTISEMENTS
      FOR HILLARY: THE MOVIE VIOLATE THE
      FIRST AMENDMENT .......................................20

      A.  BCRA's Disclaimer, Disclosure,
          And Reporting Requirements
          Cannot Survive Strict Scrutiny.............21

      B.  BCRA's Disclaimer, Disclosure,
          And Reporting Requirements
          Cannot Survive Exacting Scrutiny........22

iii

1.  The Government's Informa-
    tional Interest Is Inapplicable
    To Citizens United's
    Advertisements.................................22

2.  The Government's Enforce-
    ment Interest Is Inapplicable
    To Citizens United's
    Advertisements.................................27

3.  The Burdens Imposed By
    BCRA §§ 201 And 311
    Outweigh Any Government
    Interest In Applying Those
    Speech Restrictions To
    Citizens United.................................28

CONCLUSION ........................................................30

28

rate-funded electioneering communications. And, as applied to Citizens United, not even the reporting requirement could further the government's enforcement interest (or its purported informational interest, for that matter) because, as the government concedes, Citizens United "already discloses its identify at the website referred to in the advertisements." FEC Br. 51. In this case, then, the government's supposed enforcement interest is pure fiction.

### 3. The Burdens Imposed By BCRA §§ 201 And 311 Outweigh Any Government Interest In Applying Those Speech Restrictions To Citizens United.

Even if the government did have an informational or enforcement interest in applying BCRA's disclaimer, disclosure, and reporting requirements to Citizens United, those interests would be outweighed by the extraordinary burdens that those requirements impose on First Amendment freedoms—including the risk of harassment and retaliation faced by Citizens United's financial supporters, and the substantial compliance costs borne by Citizens United.

The government dismisses the risk of reprisal against Citizens United's supporters because the record does not document previous acts of retaliation. But the risk of reprisal against contributors to Citizens United—and other groups that espouse controversial ideological messages—has vastly increased in recent years as a result of the same "technological advances" that the government touts in BCRA's defense, which "make it possible . . . for the public to review and even search the [contribution] data with ease." FEC Br. 40-41. The widespread economic re-

29

prisals against financial supporters of California's Proposition 8 dramatically illustrate the unsettling consequences of disseminating contributors' names and addresses to the public through searchable websites (*see*, *e.g.*, CCP Br. 13; IJ Br. 13)—some of which even helpfully provide those intent upon retribution with a map to each donor's residence. *See* Brad Stone, *Prop 8 Donor Web Site Shows Disclosure Is 2-Edged Sword*, N.Y. Times, Feb. 8, 2009.

The chilling effect on First Amendment expression generated by the specter of retribution is substantiated by empirical studies, which have found that "'[e]ven those who strongly support forced disclosure laws will be less likely to contribute'" where their personal information will be disclosed. IJ Br. 10 (quoting Dick Carpenter, *Disclosure Costs: Unintended Consequences of Campaign Finance Reform* 8 (2007)). And this chilling effect on First Amendment freedoms is compounded by the extreme administrative burdens generated by BCRA's disclosure requirements, which are notoriously difficult to implement for even the lawyers and accountants who advocacy groups are inevitably required to retain to monitor their disclosure obligations. *See id.* at 19 (discussing an empirical study in which none of the 255 participants was able to comply successfully with campaign disclosure requirements).

The fact that the record does not explicitly document the burdens that BCRA's disclaimer, disclosure, and reporting requirements impose on Citizens United's First Amendment rights is not a sufficient basis for discounting these very real impositions on Citizens United's freedom of expression. In this as-applied challenge, it is the *government* that bears the burden of establishing that BCRA's speech restrictions are compatible with the First Amendment

30

(*WRTL II*, 127 S. Ct. at 2664 (opinion of Roberts, C.J.))—and it therefore falls to the government to demonstrate that BCRA does not intolerably restrict Citizens United's First Amendment freedoms.  The government has not met that burden.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted.

THEODORE B. OLSON
 *Counsel of Record*
MATTHEW D. MCGILL
AMIR C. TAYRANI
JUSTIN S. HERRING
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Appellant*

March 17, 2009

# Ex. A-1

(Brief of Amicus Curiae Center for
Competitive Politics in Support of
Appellant, No. 08-205, Cited in Reply
Brief for Appellants)

No. 08-205

In The

## Supreme Court of the United States

————

Citizens United,
*Appellant,*

v.

Federal Election Commission,
*Appellee.*

————

**On Appeal from the United States
District Court for the District of Columbia**

————

**BRIEF OF *AMICUS CURIAE*
CENTER FOR COMPETITIVE POLITICS
IN SUPPORT OF APPELLANT**

————

Stephen M. Hoersting
  *Counsel of Record*
Bradley A. Smith
Reid Alan Cox
Center For Competitive Politics
124 S. West Street
Suite 201
Alexandria, VA 22314
(703) 894-6800

*Counsel for Amicus Curiae*

January 15, 2009

Wilson-Epes Printing Co., Inc. – (202) 789-0096 – Washington, D. C. 20002

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................ iii

INTEREST OF *AMICUS CURIAE* .................... 1

SUMMARY OF THE ARGUMENT ................... 2

ARGUMENT ......................................................... 4

  I.  INTRODUCTION .................................... 4

  II.  LIKE DISCLOSURE IN CANDIDATE ELECTIONS, ANONYMITY BEYOND ELECTIONS PROTECTS CITIZENS FROM CORRUPT AND ABUSIVE OFFICEHOLDERS .................................. 6

  III.  THE DANGER OF RETRIBUTION IS REAL .......................................................... 9

  IV.  CONGRESS HAS NO AUTHORITY TO REGULATE POLITICAL SPEECH BEYOND ELECTIONS, AND FURTHERS NO IMPORTANT OR COMPELLING GOVERNMENT INTEREST BY DOING SO .......................................... 20

    A. Congress Has No Authority to Regulate Political Speech Beyond Elections ............................................... 20

    B. The Interests Recognized In *Buckley*, and by Extension *McConnell*, Are Inapplicable To The Disclosure Of Issue Advocacy .................................... 22

    C. This Case is Not About Electoral Speech, and, Therefore, Not About The Right to Engage in Anonymous Electioneering ...................................... 24

(i)

ii

TABLE OF CONTENTS—Continued

Page

V. THIS COURT HAS ALREADY INVALI-
DATED CONGRESSIONAL ATTEMPTS
TO COMPEL THE DISCLOSURE
OF ISSUE ADVOCACY ON CON-
STITUTIONAL GROUNDS ...................   28

VI. CITIZENS UNITED NEED NOT DEM-
ONSTRATE THAT IT WILL BE
SUBJECT TO THREATS, HARASS-
MENT, OR REPRISALS BECAUSE
THE DISCLOSURE PROVISIONS ARE
UNCONSTITUTIONAL AS-APPLIED
TO ANY ORGANIZATION ENGAGED
IN ISSUE ADVOCACY ..........................   30

VII. THE ENFORCEMENT OF OTHER
PROVISIONS CAN BE ADDRESSED
BY EXISTING MEANS MORE
NARROWLY TAILORED THAN
MANDATORY PUBLIC DISCLOSURE..   32

CONCLUSION ...................................................   36

13

Mandatory disclosure in ballot-initiative and referenda campaigns also carries heavy burdens for citizens that would participate, but unlike candidate races, doesn't even further the ability of citizens to monitor the performance of their elected officials. "[T]he invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for '[f]inancial transactions can reveal much about a person's activities, associations, and beliefs.'" *Buckley,* 424 U.S. at 66 (internal citations omitted).

For example, in the wake of voting on California's controversial Proposition 8 to prohibit same sex marriage, Scott Eckern, formerly the artistic director of the California Musical Theatre was forced to resign "amid controversy over a donation he made to the Proposition 8 campaign." Niesha Lofing, *CMT artistic director quits in fallout from Prop. 8 support,* SACRAMENTO BEE, Nov. 12, 2008 (available at <http://www.sacbee.com/1089/story/1391705.html>). The theatre board "thanked Eckern for '25 years of invaluable service to the organization and the advancement of musical theatre as an art form.'" *Id.* Eckern gave $1,000 to support Proposition 8, "a donation that sparked criticism from theater workers and the gay, lesbian, bisexual and transgender community." *Id.* Eckern "'honestly had no idea' that the contribution would spark such outrage and made the donation … on his belief [that] the traditional definition of marriage be preserved." *Id.* Eckern said he is "disappointed that my personal convictions have cost me the opportunity to do what I love most … to

_____

prohibit same-sex marriage. These are the people who donated in order to pass it."

14

continue enriching the Sacramento arts and theatre community." *Id.*

In another example, after Proposition 8 passed, dozens of "activists descended on the El Coyote restaurant with signs and placards. They chanted 'Shame on you,' cussed at patrons and began a boycott of the cafe." Jim Carlton, *Gay Activists Boycott Backers of Proposition 8,* WALL ST. J., Dec. 27, 2008, at A3. "The restaurant's crime: A daughter of the owner donated $100 to support Prop 8." *Id.*

Richard Raddon, former director of the Los Angeles Film Festival, resigned after "being at the center of controversy" for giving "$1500 to Proposition 8." Rachel Abramowitz, *Film fest director resigns; Richard Raddon steps down over reaction to his support of Prop. 8.*, L.A. TIMES, Nov. 26, 2008, at E1. Raddon, a Mormon, gave for religious reasons. *Id.* After Raddon's contribution was "made public online," Film Independent was "swamped with criticism from No on 8 supporters," and "in the blogosphere." *Id.* One fellow board member noted, "Someone has lost his job and possibly his livelihood because of privately held religious beliefs." *Id.* Since Proposition 8 has passed, "Hollywood has been debating whether and how to publicly punish those who supported the … amendment," including boycotts of the "Cinemark theater chain, whose chief executive, Alan Stock, donated $9,999 to 'Yes on 8.'" *Id.*

These are not isolated examples. In the aftermath of Proposition 8, numerous blacklists are now being established, and those establishing them note that the existence of reliable data over the internet makes such lists easier to compile. "Years ago we would never have been able to get a blacklist that fast and quickly," said one opponent of Proposition 8. Richard

15

Abowitz, *Where's the Outrage? Online.*, LAS VEGAS WEEKLY, Jan. 8, 2009 (available at <http://www.las vegasweekly.com/news/2009/jan/08/wheres-outrage-on line/>). While citizens have a right to organize boycotts that do not violate anti-trust or non-discrimination laws, the government does not have a compelling interest in making political preferences public so that citizens who support the "wrong" side can be subjected to harassment and blacklisting. This harassment emphasizes *Amicus'* point, *see* Section II, *supra*, that, unlike information on dona-tions to candidates, once a ballot initiative has been enacted, mandatory public disclosure of financial donors serves no anti-corruption purpose because it does not allow citizens to evaluate the performance and character of their elected officials. But it does allow for efforts to chill and intimidate speakers in the future.

Even worse, mandatory disclosure for issue advo-cacy has the danger of intimidating funding and supporters away from issues, not just candidates and campaigns.

For example, in a letter[6] to ExxonMobil CEO Rex Tillerson, Senators Olympia Snowe and Jay Rockfeller "urge[d]" the company to end its support of what the Senators called "climate change denial front groups" like the Competitive Enterprise Institute, and said the company "should repudiate its climate change denial campaign and make public its funding history." Editorial, *Nobles and Knaves*, WASH. TIMES, Nov. 11, 2006, at A12; Editorial, *Political Science,*

---

[6] The letter is available at <http://snowe.senate.gov/public/ index.cfm?FuseAction=PressRoom.PressReleases&ContentReco rd_id=9εcba744-802a-23ad-47be-2683985c724e>.

# Ex. A-2

(Brief of The Institute for Justice as Amicus Curiae in Support of Appellant, Citizens United, No. 08-205, Cited in Reply Brief for Appellants)

No. 08-205

## In The
## Supreme Court of the United States

————————◆————————

CITIZENS UNITED,

*Appellant,*

v.

FEDERAL ELECTION COMMISSION,

*Appellee.*

————————◆————————

**On Appeal From
The United States District Court
For The District Of Columbia**

————————◆————————

**BRIEF OF THE INSTITUTE FOR JUSTICE
AS AMICUS CURIAE IN SUPPORT OF
APPELLANT, CITIZENS UNITED**

————————◆————————

INSTITUTE FOR JUSTICE
WILLIAM R. MAURER*
101 Yesler Way
Suite 603
Seattle, WA 98104
(206) 341-9300
*\*Counsel of Record*

INSTITUTE FOR JUSTICE
JENNIFER M. PERKINS
398 South Mill Avenue
Suite 301
Tempe, AZ 85281
(480) 577-6877

INSTITUTE FOR JUSTICE
WILLIAM H. MELLOR
STEVEN M. SIMPSON
PAUL SHERMAN
901 North Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320

*Counsel for Amicus Curiae*

COCKLE LAW BRIEF PRINTING CO. (800) 225-6964
OR CALL COLLECT (402) 342-2831

i

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................... i

TABLE OF AUTHORITIES ................................. ii

INTEREST OF THE AMICUS............................. 1

SUMMARY OF ARGUMENT .............................. 2

ARGUMENT........................................................ 3

  I.  DISCLOSURE REGULATIONS CHILL SPEECH BY BURDENING CITIZENS' RIGHT TO ENGAGE IN ANONYMOUS SPEECH AND BY ENABLING PERSONAL AND ECONOMIC REPRISALS..... 6

    A.  Disclosure Creates A Disincentive To Engage in Political Activity................ 8

    B.  Fear Of Political Reprisal Is Both Real and Reasonable .......................... 13

    C.  The FEC's Regulations Violate the First Amendment ............................... 16

  II.  BURDENSOME REPORTING REQUIREMENTS CHILL SPEECH ......................... 18

  III.  THE GOVERNMENT SHOULD CARRY THE BURDEN TO DEMONSTRATE THE NEED FOR DISCLOSURE INSTEAD OF SPEAKERS BEARING THE BURDEN TO PROVE THE NEED TO REMAIN ANONYMOUS .......................... 26

CONCLUSION.................................................... 30

13

## B. Fear Of Political Reprisal Is Both Real and Reasonable

In the most recent election cycle, supporters of California's Proposition 8, relating to same-sex marriage, found themselves subject to reprisals in a variety of forms following the proposition's success. *See* Steve Lopez, *A Life Thrown in Turmoil by $100 Donation for Prop. 8*, Los Angeles Times, December 14, 2008 (describing the experience of a restaurant manager who made a personal donation in support of Proposition 8, ultimately resulting in the boycott of her restaurant); John R. Lott, Jr. and Bradley Smith, *Donor Disclosure Has Its Downsides: Supporters of California's Prop. 8 Have Faced a Backlash*, Wall St. J., Dec. 26, 2008 (summarizing examples of individuals who faced economic retaliation for donations in support of Proposition 8); Amy Bounds, *Gay rights advocates picket Boulder Cineplex*, Rocky Mountain News, November 30, 2008 (business picketed and boycotted based on CEO's personal donation). In fact, a website recently appeared providing an interactive map with pinpoint locations, names, addresses, and donation amounts for individuals and entities that supported Proposition 8 – in this circumstance, access to this personal information regarding political activities is even easier. *See* www.eightmaps.com (last visited January 12, 2009).

The experience of Proposition 8 supporters in 2008 is by no means unique. Exacting political retribution for individuals' support or opposition of particular candidates or causes specifically based on data

14

gleaned from campaign finance reports is becoming a new field of battle in politics. *See* Michael Luo, *Group Plans Campaign Against G.O.P. Donors*, N.Y. Times, August 8, 2008 (describing the planned campaign of liberal nonprofit group Accountable America, which planned "to confront donors to conservative groups, hoping to create a chilling effect that will dry up contributions"); *see also* Associated Press, *John Kerry Grills Belgium Ambassador Nominee Over Swift Boat Donation*, FoxNews.com, February 28, 2007 ("A Senate hearing that began with glowing tributes to a St. Louis businessman and his qualifications to become ambassador to Belgium turned bitterly divisive Tuesday after he was criticized for supporting a controversial conservative group.").

The rising acceptance of this type of political retribution is already generating anecdotal evidence of a chilling effect on political speech and association. For instance, in West Virginia's most recent race for state attorney general, a newcomer challenged the incumbent, a man described by the Wall Street Journal as "a case study of abuse in office." Kimberley A Strassel, *Challenging Spitzerism at the Polls*, Wall St. J., August 1, 2008. Because of the effect of mandatory reporting requirements, the challenger alleged he faced a significant uphill battle in fundraising:

> [Incumbent Attorney General Darrell McGraw's] other main asset is fear. [Challenger] Mr. Grear admits a big hurdle is fund

raising, even among a business community that is desperate to throw out Mr. McGraw. "I go to so many people and hear the same thing: 'I sure hope you beat him, but I can't afford to have my name on your records. He might come after me next.'" This is a frightening example of how the power of an attorney general can corrupt even the electoral process.

*Id.*

Reprisals for political contributions can also come in forms unrelated to the donation itself. Gigi Brienza discovered this when her name and address appeared on the website of an animal-rights organization, which had culled FEC records for donors whose employers perform animal testing. *See* Gigi Brienza, *I Got Inspired. I Gave. Then I Got Scared.*, Wash. Post, July 1, 2007 at B03.

Quite simply, the easy accessibility of information about one's political leanings, address, employer, and occupation suggests that it is time for this Court to reexamine its conclusions about the cost of mandatory disclosure rules. In 2009, a person wishing to harass citizens with a different viewpoint no longer needs to visit a government office to sift by hand through published data to access political information. Now, data regarding one's political leanings, address, employer, and occupation are searchable from any computer, day or night. In such an environment, it is perfectly understandable that

reasonable individuals fear the implications of publicizing their political positions.

### C. The FEC's Regulations Violate the First Amendment

In *McIntyre v. Ohio Elections Commission*, this Court struck down a law that required the disclosure of one's identity on written election communications. 514 U.S. 334, 357 (1995). This Court held that individuals have a right to anonymous speech and that a law requiring them to disclose their views on controversial issues did so in violation of that right. *Id.* "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* This Court also emphasized the importance of anonymity in protecting rights to speech and association. "Anonymity is a shield from the tyranny of the majority" which "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation – and their ideas from suppression – at the hand of an intolerant society." *Id.*

*Disclosure Costs* (supra), the first study to question the general presumption that mandatory disclosures are cost-free, demonstrates that this Court's conclusions in *McIntyre* were not only correct, they

# Ex. A-3

(*Prop 8 Donor Web Site Shows Disclosure Law is 2-Edged Sword*, NY Times, Cited in Reply Brief for Appellants)

# The New York Times

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



PRINTER-FRIENDLY FORMAT
SPONSORED BY

**February 8, 2009**

## SLIPSTREAM

# Prop 8 Donor Web Site Shows Disclosure Law Is 2-Edged Sword

**By BRAD STONE**

FOR the backers of Proposition 8, the state ballot measure to stop single-sex couples from marrying in California, victory has been soured by the ugly specter of intimidation.

Some donors to groups supporting the measure have received death threats and envelopes containing a powdery white substance, and their businesses have been boycotted.

The targets of this harassment blame a controversial and provocative Web site, eightmaps.com.

The site takes the names and ZIP codes of people who donated to the ballot measure — information that California collects and makes public under state campaign finance disclosure laws — and overlays the data on a Google map.

Visitors can see markers indicating a contributor's name, approximate location, amount donated and, if the donor listed it, employer. That is often enough information for interested parties to find the rest — like an e-mail or home address. The identity of the site's creators, meanwhile, is unknown; they have maintained their anonymity.

Eightmaps.com is the latest, most striking example of how information collected through disclosure laws intended to increase the transparency of the political process, magnified by the powerful lens of the Web, may be undermining the same democratic values that the regulations were to promote.

With tools like eightmaps — and there are bound to be more of them — strident political partisans can challenge their opponents directly, one voter at a time. The results, some activists fear, could discourage people from participating in the political process altogether.

That is why the soundtrack to eightmaps.com is a loud gnashing of teeth among civil libertarians, privacy advocates and people supporting open government. The site pits their cherished values against each other: political transparency and untarnished democracy versus privacy and freedom of speech.

"When I see those maps, it does leave me with a bit of a sick feeling in my stomach," said Kim Alexander, president of the California Voter Foundation, which has advocated for open democracy. "This is not really the intention of voter disclosure laws. But that's the thing about technology. You don't really know where it is going to take you."

Ms. Alexander and many Internet activists have good reason to be queasy. California's Political Reform Act of 1974, and laws like it across the country, sought to cast disinfecting sunlight on the political process by requiring contributions of more than $100 to be made public.

Eightmaps takes that data, formerly of interest mainly to social scientists, pollsters and journalists, and publishes it in a way not foreseen when the open-government laws were passed. As a result, donors are exposed to a wide audience and, in some cases, to harassment or worse.

A college professor from the University of California, San Francisco, wrote a $100 check in support of Proposition 8 in August, because he said he supported civil unions for gay couples but did not want to change the traditional definition of marriage. He has received many confrontational e-mail messages, some anonymous, since eightmaps listed his donation and employer. One signed message blasted him for supporting the measure and was copied to a dozen of his colleagues and supervisors at the university, he said.

"I thought what the eightmaps creators did with the information was actually sort of neat," the professor said, who asked that his name not be used to avoid becoming more of a target. "But people who use that site to send out intimidating or harassing messages cross the line."

Joseph Clare, a San Francisco accountant who donated $500 to supporters of Proposition 8, said he had received several e-mail messages accusing him of "donating to hate." Mr. Clare said the site perverts the meaning of disclosure laws that were originally intended to expose large corporate donors who might be seeking to influence big state projects.

"I don't think the law was designed to identify people for direct feedback to them from others on the other side," Mr. Clare said. "I think it's been misused."

Many civil liberties advocates, including those who disagree with his views on marriage, say he has a point. They wonder if open-government rules intended to protect political influence of the individual voter, combined with the power of the Internet, might be having the opposite effect on citizens.

"These are very small donations given by individuals, and now they are subject to harassment that ultimately makes them less able to engage in democratic decision making," said Chris Jay Hoofnagle, senior fellow at the Berkeley Center for Law and Technology at the University of California.

THANKS to eightmaps.com, the Internet is abuzz with bloggers, academics and other pundits

offering potential ways to resolve the tension between these competing principles. One idea is to raise the minimum donation that must be reported publicly from $100, to protect the anonymity of small donors.

Another idea, proposed by a Georgetown professor, is for the state Web sites that make donor information available to ask people who want to download and repurpose the data to provide some form of identification, like a name and credit card number.

"The key here is developing a process that balances the sometimes competing goals of transparency and privacy," said the professor, Ned Moran, whose undergraduate class on information privacy spent a day discussing the eightmaps site last month.

"Both goals are essential for a healthy democracy," he said, "and I think we are currently witnessing, as demonstrated by eightmaps, how the increased accessibility of personal information is disrupting the delicate balance between them."

Copyright 2009 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map