# EXHIBIT B





## Passing Prop 8: smart timing and messaging convinced California voters to support traditional marriage.(CASE STUDY)(California Proposition 8)

Politics Magazine | February 1, 2009 | Schubert, Frank; Flint, Jeff

When we signed our firm up to manage the Yes on Proposition 8 campaign to put the traditional definition of marriage--one man, one woman--into California's constitution, Frank Schubert's brother told him we had "no chance" to win the campaign. That view reflected conventional wisdom. After all, California is one of the most liberal states in the nation. It's a state whose Supreme Court had just legalized same-sex marriage. A state where the Democratic nominee for president hasn't had to aggressively campaign in nearly two decades. A state where millions of young, first-time voters were poised to go to the polls to send a message to George Bush and elect Barack Obama. And a state where for the first time in history, according to a major polling outfit, a majority of voters supported gay marriage.

[ILLUSTRATION OMITTED]

This is the story of how conventional wisdom was stood on its head and how Proposition 8 was enacted by a 700,000-vote margin.

### The Early Campaign Period

Schubert Flint Public Affairs signed onto the Yes on Prop 8 campaign right before the first of what would eventually total 18,000 gay weddings took place after the California Supreme Court legalized gay marriage. We immediately faced our first important strategic challenge: How to respond to the marriages? We decided to withhold criticism of the same-sex couples who were getting married (after all, they were simply taking advantage of the rights the Court had granted them), and urged all our supporters to refrain from demonstrations, protests or rallies opposing the marriages. This initial strategic positioning, later validated in qualitative and quantitative research, recognized that passing Proposition 8 would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship.

On the first day that same-sex marriages took place, June 16, we fielded nearly 300 media calls from reporters around the globe. Our message was calm and low-key: Our fight was not with the gay couples getting married, our fight was with the flawed reasoning of a narrow majority of the California Supreme Court.

Over the next three months, sympathetic news articles and television reports appeared daily across the state. Traditional marriage supporters were routinely portrayed as right-wingers holding onto outdated, bigoted ideas. Gay marriage backers spent $6 million airing a sympathetic 60-second issue advocacy ad. And state Attorney General Jerry Brown shamelessly rewrote the official summary of the measure in a way clearly designed to bias voters against the initiative.

A survey released by the Field Institute in mid-September showed that fully 55 percent of likely voters were opposed to Prop 8, with just 38 percent in favor. The political elite all but wrote off Proposition 8 as being dead once the Field Poll was published. To make matters worse for us, less than a week after the Field Poll came out, the No on 8 campaign began its television advertising in the state's major media markets.

We worked hard during this period to urge our supporters to have faith that Prop 8 could still be enacted despite what they saw on the news. We organized countless meetings and conference calls of pastors and other campaign leaders. And we restructured our online presence and delivered a stream of messages to supporters designed to keep them informed and engaged.

### Define the Terms; Win the Debate

One of the most important aspects of our behind-the-scenes work during this critical early period was to develop messages that would result in voters casting a Yes vote for traditional marriage. To do so, we had to have messages that appealed to a much broader audience than the 40 percent or so of voters who made up our base.

The dynamics of the Proposition 8 campaign were unique. We were asking voters for a Yes vote to ban same-sex

marriage and restore traditional marriage. We strongly believed that a campaign in favor of traditional marriage would not be enough to prevail. We needed to convince voters that gay marriage was not simply "live and let live"--that there would be consequences if gay marriage were to be permanently legalized. But how to raise consequences when gay marriage was so recently legalized and not yet taken hold? We made one of the key strategic decisions in the campaign, to apply the principles of running a "No" campaign--raising doubts and pointing to potential problems--in seeking a "Yes" vote. As far as we know, this strategic approach has never before been used by a Yes campaign.

We reconfirmed in our early focus groups our own views that Californians had a tolerant opinion of gays. But there were limits to the degree of tolerance that Californians would afford the gay community. They would entertain allowing gay marriage, but not if doing so had significant implications for the rest of society.

We probed long and hard in countless focus groups and surveys to explore reactions to a variety of consequences our issue experts identified. The California Supreme Court ruling put gay couples in a protected legal class on the basis of sexual orientation, and then found that gay couples had a fundamental constitutional right to marriage. This decision significantly changed the legal landscape. No longer would it be enough for Californians to tolerate gay relationships, they would have to accept gay marriage as being equivalent to traditional marriage. Tolerance is one thing; forced acceptance of something you personally oppose is a very different matter.

Whenever a conflict occurred between the rights of a gay couple and other rights, the rights of the gay couple would prevail because of their "protected class" legal status. We settled on three broad areas where this conflict of rights was most likely to occur: in the area of religious freedom, in the area of individual freedom of expression, and in how this new "fundamental right" would be inculcated in young children through the public schools. And we made sure that we had very concrete examples we could share with voters of things that had actually occurred.

Of equal importance to developing "consequence" messages was assembling a massive grassroots campaign. In most ballot measure campaigns, volunteers and activists are generally not as inspired as they are in candidate campaigns, where they feel a personal connection to the cause. This is particularly true in California, a state with 40 million residents, 17 million registered voters and well over 20,000 voting precincts. But we knew from the petition phase, where we gathered more than 500,000 signatures, that this campaign could very well prove to be the exception.

Our ability to organize a massive volunteer effort through religious denominations gave us a huge advantage, and we set ambitious goals: to conduct a statewide Voter ID canvass of every voter; to distribute 1.25 million yard signs and an equal number of bumper strips; to have our volunteers re-contact every undecided, soft yes and soft no voter; and to have 100,000 volunteers, five per voting precinct, working on Election Day to make sure every identified Yes on 8 voter would vote. All of these goals, and more, were achieved.

We built a campaign volunteer structure around both time-honored campaign grassroots tactics of organizing in churches, with a ground-up structure of church captains, precinct captains, zip code supervisors and area directors; and the latest Internet and web-based grassroots tools. Our campaign website was rebuilt to serve as an incredibly effective organizing tool. Online volunteer sign-ups were immediately sent electronically to the appropriate ZIP code supervisor for follow up. We set up a statewide voter file with remote access for regional volunteer leaders, which allowed them to input results for canvassing efforts remotely, and then download and print updated voter lists.

We held the campaign's first statewide precinct walk the weekend of Aug. 16. We had hoped for 20,000 volunteers, which would have been unprecedented in California ballot initiative politics, but were stunned when almost 30,000 people walked their neighborhoods that first weekend.

We produced campaign materials in more than 40 languages, and worked with church and community leaders to distribute these through the many ethnic networks that make up the fabric of California.

[ILLUSTRATION OMITTED]

This intense commitment to distributing materials throughout the state was the result of another key strategic decision. Supporting traditional marriage is not considered to be "politically correct."We wanted voters who supported our position to know that they were not alone and so we made sure they saw our signs in their neighborhoods and our campaign materials at their church. And if they were part of an ethnic minority, all these were in their native language.

The final phase of the volunteer campaign, GOTV, was really a month-long operation. California allows early voting,

starting 29 days ahead of Election Day. From Day 1 of this period, we tracked voters who either appeared on the permanent absentee voter list, or had applied for a vote-by-mail ballot. Those who were identified as persuadable received additional volunteer and direct mail contacts. Definite Yes on 8 voters were reminded to return their ballots as early as possible. The effort paid off, as the early returns reported on Election Night--which consisted of votes cast before Election Day--showed us with a commanding 57 percent to 43 percent lead.

Fundraising was also a critical activity of this early period, the success of which enabled us to ultimately exceed our initial voter contact objectives. By this time, leaders of the Church of Jesus Christ of Latter Day Saints had endorsed Prop 8 and joined the campaign executive committee. Even though the LDS were the last major denomination to join the campaign, their members were immensely helpful in early fundraising, providing much-needed contributions while we were busy organizing Catholic and Evangelical fundraising efforts. Ultimately, we raised $22 million from July through September with upwards of 40 percent coming from members of the LDS Church. Our fundraising operation also relied heavily on small contributions from some 60,000 individual donors via an extensive direct mail operation, and an extraordinarily effective online fundraising campaign. When we filed our finance report electronically with the secretary of state, it was more than 5,000 pages thick and crashed the fishing system. We ultimately raised more than $5 million online, and $3 million from direct mail.

Our initial television ad began airing on Sept. 29, a week after the other side began its campaign ads, and six weeks after its issue advocacy spot began airing. We knew that this initial ad needed to be a home run--and boy was it! Our campaign's general counsel had alerted us to a press conference San Francisco Mayor Gavin Newsom held following the Supreme Court's marriage decision in May. Like Howard Dean once did, Newsom got increasingly excited the longer he addressed the crowd until, with a smirk on his face and his arms fully extended, he exclaimed, "This door's wide open now. It's gonna happen--whether you like it or not." That 7-second sound bite perfectly summarized for California voters why this issue was before them, reminding voters that four judges had overruled four million voters by imposing same-sex marriage on California. We then segued into potential consequences by featuring a prominent law school professor warning about implications for religious freedom and freedom of expression, and letting voters know that as a result of the court's decision, gay marriage would be taught in the public schools.

The "Whether You Like It or Not" television ad immediately solidified (and excited) our base and captured the attention of voters across the state. We invested heavily in airing this television ad and a companion radio spot. We had a lot of ground to make up (our internal polls had us behind by 6 points), but more importantly, it was critical for us to define Prop 8 on our terms. In a little over a week of advertising, we went from being significantly behind, to taking the lead in two published polls.

The Response Period

The gay community sounded the alarm by releasing to the gay media an internal poll showing them behind and telling their supporters they would lose unless more money was raised. This emergency cry for contributions was incredibly effective. Whereas they had raised $15 million in the previous nine months, they raised another $25 million in the ensuing seven weeks of the campaign.

But their failure to respond to the "consequences" messages (especially the education message) in a timely fashion ultimately led to their downfall. After blanketing the state with "Whether You Like It or Not," we focused our message on education. We ran an ad featuring a young Hispanic girl coming home from school, explaining how she had learned in class that a prince could marry another prince, and she could marry a princess! This ad was based on the actual experience in Massachusetts, the only state in the nation where gay marriage had been legalized long enough to see how it would be handled by the public school system. This was followed by another education ad, this one featuring a Massachusetts couple whose son had been introduced to gay marriage in second grade. The launch of that ad included a press conference with the Massachusetts couple and corresponded with the kick-off of a statewide bus tour designed to rally our supporters before the final push on Election Day.

The response to our ads from the No on 8 campaign was slow and ineffectual. They enlisted their allies in the education system to claim that we were lying. They held press conferences with education leaders to dismiss our claims. They got newspaper editorial boards to condemn the ads as false. What they never did do, because they couldn't do, was contest the accuracy of what had happened in Massachusetts.

Finally, three weeks after the Yes on 8 campaign had introduced education as a message, the No on 8 campaign

responded with what would be their best ad of the campaign. It featured State Superintendent of Public Instruction Jack O'Connell claiming that Prop 8 had nothing to do with education and that our use of children in our ads was "shameful." This in-your-face response, much delayed but very effective, foretold the final period of the campaign--it would be largely about education.

Even though our campaign clearly had the better ads and grassroots operation, the success of the No side's fundraising effort threatened to undo all our work. Voters were seeing their commercials at least twice as often as ours as the campaign headed into its final 12 days. Our lead evaporated. Frank Schubert wrote an e-mail to our 90,000 online supporters called "Code Blue for Marriage," letting them know we needed more money to be victorious. This e-mail, along with other emergency fundraising activities, helped produce $7.5 million in contributions from people of faith in the next 72 hours.

The Final Push

Our strategy had anticipated that the No on 8 campaign would label as "shameful lies" any claim that gay marriage had anything to do with schools, so we went to great lengths to document our ads. We were prepared to play this scenario out to the finish, trading our ads of what happened in Massachusetts, with the No side's ads saying it wouldn't happen in California. But then we got the break of the election. In what may prove to be the most ill-considered publicity stunt ever mounted in an initiative campaign, a public school in San Francisco took a class of first graders to City Hall to witness the wedding of their lesbian teacher. And they brought along the media.

Now we not only had an example of something that had happened in California (as opposed to might happen), we had video footage to prove it. Within 24 hours of the No side airing their best ad, the one featuring O'Connell claiming that Prop 8 had nothing to do with schools, we were on statewide TV showing bewildered six-year-olds at a lesbian wedding courtesy of their local public school.

There were multiple skirmishes in the press over the education issue during the final days of the campaign. The other side claimed the wedding episode wasn't really as we described it, while we defended the ad as accurate and highlighted other examples where gays had forced their agenda into the public schools (including an episode in Hayward where a school celebrated "coming out week" while urging kindergartners to sign pledge cards promising to be an ally of gay students).

After several days of dueling ads featuring Jack O'Connell and kids at the lesbian wedding, the No side effectively conceded they had lost the education debate. They pulled the O'Connell ad and went in a new direction in the final few days--attempting to equate a Yes vote with racial discrimination. One ad with U.S. Sen. Dianne Feinstein said that regardless of how people felt about gay marriage, "we must always oppose" discrimination. They even tried to compare banning gay marriage to interning Japanese Americans during World War II camps in an ad narrated by Samuel L. Jackson.

We decided to not respond to this line of attack, confident that it would backfire. The basic message that supporters of traditional marriage are bigots, guilty of discrimination, had never worked in focus groups. For liberal whites like Feinstein to lecture black Californians about discrimination was not a winning message. We brought into rotation a positive ad that reminded voters, in a non-threatening, calm way about the potential consequences to California, and especially children, if gay marriage was permanently legalized.

As the campaign headed into the final days, we launched a "Google surge." We spent more than a halfmillion dollars to place ads on every single website that had advertising controlled by Google. Whenever anyone in California went online, they saw one of our ads in the final two days of the election.

We always believed that if we went into Election Day tied, or even a point or two behind, that we would win. This was because of the superior nature of our GOTV effort and because the history of polling on the gay marriage issue always understated support for traditional marriage.

Our last pre-election tracking poll showed the race tied at 48 percent on Election morning. We won 52.3 percent to 47.7 percent, a 700,000-vote margin. Post-election polls showed that upwards of 70 percent of African American voters supported Prop 8. Latinos voted Yes by about 56 percent, as did a majority of Asian voters.

Members of the Mormon faith played an important part of the Yes on 8 coalition, but were only a part of our winning coalition. We had the support of virtually the entire faith community in California. Prop 8 didn't win because of the

Mormons. It won because we created superior advertising that defined the issues on our terms; because we built a diverse coalition; and, most importantly, because we activated that coalition at the grassroots level in a way that had never before been done.

The Prop 8 victory proves something that readers of Politics magazine know very well: campaigns matter.

Frank Schubert is president of Schubert Flint Public Affairs. Jeff Flint is a partner at the firm.

COPYRIGHT 2009 Campaigns & Elections, Inc. This material is published under license from the publisher through the Gale Group, Farmington Hills, Michigan. All inquiries regarding rights should be directed to the Gale Group.

---

©2009 Gale, a part of Cengage Learning. All rights reserved.
www.accessmylibrary.com