GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
Amir C. Tayrani, SBN 229609
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
Sarah E. Piepmeier, SBN 227094
Theane Evangelis Kapur, SBN 243570
Enrique A. Monagas, SBN 239087
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
Theodore H. Uno, SBN 248603
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Attorneys for Plaintiffs KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>                Plaintiffs,<br><br>        v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,<br><br>                Defendants. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:  October 14, 2009<br>Time:  10:00 a.m.<br>Judge:  Chief Judge Walker<br>Location:  Courtroom 6, 17th Floor |

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ....................................................................................................................... 6

I.   SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANT-
     INTERVENORS HAVE NOT IDENTIFIED A LEGALLY SUFFICIENT BASIS FOR
     UPHOLDING PROP. 8 ............................................................................................ 6

     A.   *Baker v. Nelson* Does Not Control This Case ................................................ 7

     B.   Defendant-Intervenors' Request For Summary Judgment On Plaintiffs'
          Equal Protection Claim Fails As A Matter Of Law ....................................... 11

          1.   Defendant-Intervenors Have Not Established That
               Classifications Based On Sexual Orientation Are Subject To
               Rational Basis Review .......................................................................... 11

          2.   Defendant-Intervenors Have Not Established That Gay And
               Lesbian Individuals Are Differently Situated From
               Heterosexual Individuals For Purposes Of Marriage ....................... 13

          3.   Defendant-Intervenors Have Not Identified A Legitimate State
               Interest That Is Rationally Related To Prop. 8 .................................. 15

          4.   Defendant-Intervenors Have Not Established That Prop. 8
               Satisfies The Constitutional Requirements For Sex-Based
               Classifications ....................................................................................... 21

     C.   Defendant-Intervenors' Request For Summary Judgment On Plaintiffs'
          Due Process Claim Fails As A Matter Of Law .............................................. 22

II.  SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANT-
     INTERVENORS HAVE NOT MET THEIR BURDEN OF ESTABLISHING THE ABSENCE
     OF GENUINE ISSUES OF MATERIAL FACT ........................................................... 24

     A.   Defendant-Intervenors Have Not Met Their Burden To Establish That
          There Are No Genuine Issues Of Material Fact As To The Appropriate
          Level of Scrutiny Applicable To Classifications Based On Sexual
          Orientation ...................................................................................................... 27

          1.   There Are Disputed Issues Of Material Fact Concerning
               Whether Gay And Lesbian Individuals Are "Defined By An
               'Immutable' Characteristic". ............................................................... 29

          2.   There Are Disputed Issues Of Material Fact Concerning
               Whether Gay And Lesbian Individuals "Wield Substantial
               Political Power" .................................................................................... 30

B. Defendant-Intervenors Have Not Met Their Burden To Establish That There Are No Genuine Issues Of Material Fact As To The Existence Of A Legitimate State Interest That Is Rationally Related To Prop. 8 ............... 32

 1. Defendant-Intervenors' Proffered State Interests............................ 32

 2. Defendant-Intervenors Have Failed To Establish The Absence Of Dispute Concerning Any Discriminatory Intent That May Underlie Prop. 8 ................................................................................... 37

 3. Defendant-Intervenors Have Not Met Their Burden To Establish The Absence of Material Dispute As To Whether Prop. 8 Is Properly Characterized As A Sex-Based Classification................................................................................... 39

C. Defendant-Intervenors Have Not Met Their Burden To Establish That There Are No Genuine Issues Of Material Fact As To Plaintiffs' Due Process Claims ................................................................................... 39

III. IN THE ALTERNATIVE, THE COURT SHOULD DENY SUMMARY JUDGMENT ON THE GROUND THAT PLAINTIFFS HAVE NOT HAD SUFFICIENT OPPORTUNITY TO OBTAIN DISCOVERY NECESSARY TO OPPOSE THE MOTION ....................................... 40

A. Plaintiffs Are Currently Developing The Facts Identified By The Court In Its June 30 Order And On Which Their Claims Will Turn ...................... 42

 1. Plaintiffs Will Use Discovery To Develop Facts Related To Plaintiffs' Equal Protection Claim ....................................................... 42

 2. Plaintiffs Will Use Discovery To Develop Facts Related To Their Due Process Claim ................................................................... 47

B. The Court Should Deny Rather Than Continue Defendant-Intervenors' Motion For Summary Judgment ................................................................... 48

CONCLUSION................................................................................................ 49

ATTESTATION PURSUANT TO GENERAL ORDER NO. 45 ................................... 49

iii

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Howerton,*
 673 F.2d 1036 (9th Cir. 1982) ................................................................................ 11

*Adarand Constructors, Inc. v. Pena,*
 515 U.S. 200 (1995) ............................................................................................... 14

*Adickes v. S.H. Kress & Co.,*
 398 U.S. 144 (1970) ................................................................................................. 6

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986) ........................................................................................... 6, 41

*Baker v. Nelson,*
 409 U.S. 810 (1972) ................................................................................................. 8

*Beyene v. Coleman Sec. Servs.,*
 854 F.2d 1179 (9th Cir. 1988) ................................................................................ 27

*Boddie v. Connecticut,*
 401 U.S. 371 (1971) ................................................................................................. 3

*Bowen v. Gilliard,*
 483 U.S. 587 (1987) ............................................................................................... 14

*Bowers v. Hardwick,*
 478 U.S. 186 (1986) ............................................................................................... 13

*Brown v. Bd. of Educ.,*
 347 U.S. 483 (1954) ................................................................................................. 1

*Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes,*
 323 F.3d 767 (9th Cir. 2003) .................................................................................. 41

*California v. Campbell,*
 138 F.3d 772 (9th Cir. 1998) .................................................................................. 41

*Carey v. Populations Servs. Int'l, Inc.,*
 431 U.S. 678 (1977) ............................................................................................... 24

*Christian Science Reading Room Jointly Maintained v. City & County of San Francisco,*
 784 F.2d 1010 (9th Cir. 1986) ................................................................................ 14

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
 473 U.S. 432 (1985) ......................................................................................... 14, 15

*Cleveland Bd. of Educ. v. LaFleur,*
 414 U.S. 632 (1974) ............................................................................................... 23

*Craig v. Boren,*
 429 U.S. 190 (1976) ......................................................................................... 10, 21

*Crawford v. Bd. of Educ.,*
 458 U.S. 527 (1982) ................................................................................................. 9

*Flores v. Morgan Hill Unified Sch. Dist.*
 324 F.3d 1130 (9th Cir. 2003) .................................................................................. 9

*Frontiero v. Richardson,*
 411 U.S. 677 (1973) ............................................................................................... 10

Gibson, Dunn &
Crutcher LLP

*Griswold v. Connecticut,*
    381 U.S. 479 (1965) ............................................................................ 3, 14, 23

*Harkin Amusement Enters., Inc. v. General Cinema Corp.*
    850 F.2d 477 (9th Cir. 1988) ................................................................... 42

*Hicks v. Miranda,*
    422 U.S. 332 (1975) ................................................................................... 9

*High Tech Gays v. Defense Industrial Security Clearance Office,*
    895 F.2d 563 (9th Cir. 1990) ............................................................ 13, 31

*Jones v. Blanas,*
    393 F.3d 918 (9th Cir. 2004) ................................................................... 42

*Katz v. Children's Hosp. of Orange County,*
    28 F.3d 1520 (9th Cir. 1994) ................................................................... 28

*Kerrigan v. Comm'r of Pub. Health,*
    957 A.2d 407 (Conn. 2008) ............................................................... 12, 15

*Lawrence v. Texas,*
    539 U.S. 558 (2003) ............................................. 1, 2, 3, 10, 18, 19, 23

*Loving v. Virginia,*
    388 U.S. 1 (1967) ........................................................ 1, 2, 3, 4, 5, 18, 21

*M.L.B. v. S.L.J.,*
    519 U.S. 102 (1996) ............................................................................ 3, 22

*Mandel v. Bradley,*
    432 U.S. 173 (1977) ................................................................................... 7

*In re Marriage Cases,*
    183 P.3d 384 (Cal. 2008) ........................................ 1, 2, 3, 5, 16, 18, 23

*Mass. Bd. of Ret. v. Murgia,*
    427 U.S. 307 (1976) ................................................................................. 13

*Mem'l Hosp. v. Maricopa County,*
    415 U.S. 250 (1974) ................................................................................. 20

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ................................................................... 14

*Minnesota v. Clover Leaf Creamery,*
    449 U.S. 456 (1981) ................................................................................. 32

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.,*
    210 F.3d 1099 (9th Cir. 2000) ............................................................. 6, 27

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ................................................................................. 19

*Perez v. Sharp,*
    198 P.2d 17 (Cal. 1948) ...................................................................... 1, 2, 3

*Philips v. Perry,*
    106 F.3d 1420 (9th Cir. 1997) ................................................................. 31

*Reitman v. Mulkey,*
    387 U.S. 369 (1967) ............................................................................... 5, 9

*Romer v. Evans,*
    517 U.S. 610 (1996) ......................................................................... *passim*

*Smelt v. County of Orange*,
  374 F. Supp. 2d 861 (C.D. Cal. 2005) ..................................................... 11

*Turner v. Safley*,
  482 U.S. 78 (1987)............................................... 3, 4, 14, 15, 23

*United States v. Virginia*,
  518 U.S. 515 (1996)............................................... 1, 10, 21, 22

*Utah v. Green*,
  99 P.3d 820 (Utah 2004) ..................................................... 23

*Varnum v. Brien*,
  763 N.W.2d 862 (Iowa 2009) ..................................................... 15, 17

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)..................................................... 22, 41

*Williams v. Illinois*,
  399 U.S. 235 (1970)..................................................... 1, 2, 18

*Witt v. Dep't of the Air Force*,
  527 F.3d 806 (9th Cir. 2008)..................................................... 11, 14

*Zablocki v. Redhail*,
  434 U.S. 374 (1978)..................................................... 3, 4, 19

**Statutes**

1 U.S.C. § 7 ..................................................... 31

**Rules**

Fed. R.Civ. P. 56(c)..................................................... 6

Fed. R. Civ. P. 56(e)..................................................... 27

Fed. R. Civ. P. 56(f)..................................................... 42, 48

**Other Authorities**

Jason Clayworth & Thomas Beaumont, *Iowa Poll: Iowans Evenly Divided on Gay
  Marriage Ban*, Des Moines Register, Sept. 21, 2009 ................................ 17

Nancy Cott, Public Vows: A History of Marriage and the Nation (2000)................................... 36, 41

Amy Doherty, *Constitutional Methodology and Same-Sex Marriage*, 11 J. Contemp.
  Legal Issues 110 (2000) ..................................................... 23

*Everything to Do with Schools*, Yes on 8 Television Advertisement, *at*
  http://www.protectmarriage.com/video/view/7 ..................................................... 40

David. R. Francis, *Is Population Growth a Ponzi Scheme?*, Christian Science Monitor,
  Aug. 17, 2009, *at* http://features.csmonitor.com/economyrebuild/ 2009/08/17/
  economic-scene-is-population-growth-a-ponzi-scheme/ ..................................................... 33, 34

*Gay Marriage Already Being Taught in Schools in Massachusetts—The Parker Family*,
  http://www.youtube.com/watch?v=puI4pfRB0w0 ..................................................... 40

Gay/Lesbian/Bisexuals, *at* http://www.healthyminds.org/More-Info-
  For/GayLesbianBisexuals.aspx ..................................................... 34

*It's Already Happened*, Yes on 8 Television Advertisement, *at*
  http://www.protectmarriage.com/video/view/5 ..................................................... 40

Herma Hill Kay, *From the Second Sex to the Joint Venture: An Overview of Women's
  Rights and Family Law in the Twentieth Century*, 88 Cal. L. Rev. 2017 (2000) ................ 36, 41

Gibson, Dunn &
Crutcher LLP

March 28, 2009 American Association of Political Consultants (AAPC) Proposition 8
Case Study from the 2009 Pollie Awards and Conference in D.C., 5:46 – 6:17, at
http://www.youtube.com/watch?v=ngbAPVVPD5k. ................................................. 39

Kristin Anderson Moore, et al., *Marriage from a Child's Perspective: How Does Family
Structure Affect Children and What Can We Do About It?*, Child Trends Research
Brief (June 2002) ...................................................................................................... 34

Alana Semuels, *Gay Marriage a Gift to California's Economy*, L.A. Times, June 15,
2008 .......................................................................................................................... 37

Therapeutic Responses Report, www.apa.org/pi/lgbc/publications/therapeutic-
response.pdf ............................................................................................................. 30

*Whether You Like It Or Not*, Yes on 8 Television advertisement, available at:
http://www.youtube.com/watch?v=4kKn5LNhNto ..................................................... 39

Yongmin Sun, *The Well-Being of Adolescents in Households with No Biological
Parents*, 65 J. of Marriage & Fam. 894, Nov. 2003 ................................................. 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **INTRODUCTION**

The 98-page exegesis offered by Defendant-Intervenors in support of their bold assertion that Proposition 8 ("Prop. 8") is plainly constitutional as a matter of law—stripped of its exhaustive compilation of news articles, speeches, social science reports, and quotations from authorities such as Edmund Burke, Aldous Huxley, Samuel Johnson, Barack Obama, and Plato—distills to a single mantra.  The phrase "*traditional definition of marriage*" is invoked 39 times in precisely those words, and in countless additional verbal variations, like a Greek chorus punctuating virtually every paragraph.

The notion that "marriage" has "traditionally" been between "a man and a woman" is, of course, true enough.  But that truism does not begin to resolve the constitutional questions presented by this case.  "[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it *through the centuries* insulates it from constitutional attack."  *Williams v. Illinois*, 399 U.S. 235, 239 (1970) (emphasis added).  Nor does the fact that the Supreme Court of the United States might, in the past, have tacitly approved a fundamental right to marry presented in that factual context.  In fact, the California Supreme Court has rejected this precise argument, at least twice, in marriage litigation.  It did so first in *Perez v. Sharp*, 198 P.2d 17 (Cal. 1948), the Nation's first decision striking down prohibitions on interracial marriages as inconsistent with "the fundamental constitutional right to marry, *notwithstanding . . . that [the] . . . prohibitions . . . had existed since the founding of the state.*"  *In re Marriage Cases*, 183 P.3d 384, 399 (Cal. 2008) (emphasis added).  That conclusion was unanimously vindicated 20 years later by the U.S. Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967), and is now "a judicial opinion whose legitimacy and constitutional soundness are . . . universally recognized."  *Marriage Cases*, 183 P.3d at 399.

The same appeal to the-way-things-have-always-been was squarely rejected by the California Supreme Court most recently in *The Marriage Cases*, which overturned California's statutory prohibition on marriage by individuals of the same sex, and has been rejected again and again by the U.S. Supreme Court.  *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *United States v. Virginia*, 518 U.S. 515 (1996); *Lawrence v. Texas*, 539 U.S. 558 (2003).

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

"Tradition" is important, of course, but it cannot be used to justify the denial of constitutional rights to selected individuals, particularly when those rights are rooted in fundamental freedoms such as liberty, privacy, association, and equality.  *See, e.g.*, *Lawrence*, 539 U.S. at 578; *Griswold*, 381 U.S. at 486; *Williams*, 399 U.S. at 244.

If Defendant-Intervenors' lengthy treatise establishes anything, it is the absence of any constitutional justification for singling out a class of California's citizens—indeed, only a portion of California's gay and lesbian population—for differential, and subordinate, treatment in the exercise of the right of individuals "'to join in marriage *with the person of one's choice*.'"  *Marriage Cases*, 183 P.3d at 420 (quoting *Perez*, 198 P.2d at 19) (emphasis in original).

Nor have Defendant-Intervenors advanced any credible or rational justification for transforming the tradition of marriage between a man and a woman into an insurmountable barrier to Plaintiffs' rights to select a marital partner of the same sex.  They argue that the exclusion is necessary to preserve an institution that encourages procreation and ensures that children are raised by the two people who conceived them.  But denying gay and lesbian individuals the right to marry in no way promotes marriage by heterosexuals or parental responsibility to the children they may conceive.  Nor does opposite-sex exclusivity in the slightest deter marriage by literally millions of individuals who have either no desire or no ability to conceive children and who, if they do, may not fulfill Defendant-Intervenors' hope that they will remain together to raise them.  And the curious reference to a population crisis in places like Italy—which has never permitted marriage by individuals of the same sex—is, to put it bluntly, incomprehensible.

Defendant-Intervenors' summary judgment brief, and its almost exclusive reliance on tradition and the advancement of procreation, exposes their position in this case for the unsustainable edifice that it really is.  Ninety-eight pages have revealed and not overcome the inescapable flaws in their position.  Just a few examples:

1.        This case involves the fundamental right of an *individual* to marry.  The courts were concerned with the right of an individual "to join in marriage with the person of one's choice," not a right to *interracial marriage*, in *Perez* and, later, in *Loving*.  *Perez*, 198 P.2d at 19; *see also Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights

Gibson, Dunn &
Crutcher LLP

2

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1  essential to the orderly pursuit of happiness by free men.").  And, today, it is that same *individual*

2  right to choose one's life companion, not a narrower right to something called "same-sex marriage,"

3  that is before the Court.  This Court should resist the temptation tendered by Defendant-Intervenors

4  to "define narrowly the right to marry," as the California Supreme Court cautioned in the *Marriage*

5  *Cases* and *Perez.  Marriage Cases*, 183 P.3d at 430.  To do otherwise would be to define the scope of

6  the right to marry based on the partner chosen rather than based on the constitutional liberty to select

7  the partner of one's choice.

8      2.     Defendant-Intervenors see the right to marry as a bond sanctioned by the State to serve

9  the State's goal of encouraging procreation.  But that perceives the right through the prism of the

10  State's interest, and thus as a right that could be withdrawn if the State became interested in limiting

11  procreation rather than promoting it.  That is not how the courts have characterized marriage.  *See*

12  *Perez*, 198 P.2d at 18-19.  In fact, the right to marry is "a subset of the right of intimate association"

13  (*Marriage Cases*, 183 P.3d at 423), not simply a social policy, changeable according to the changing

14  goals of the State, by which the State encourages the growth or maintenance of its population.

15      3.     The U.S. Supreme Court has characterized the right to marry as one of the most—if

16  not *the* most—fundamental rights an individual may exercise.  *Loving*, 388 U.S. at 12.  It is defined

17  by the Supreme Court as a right of liberty (*Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)), privacy

18  (*Griswold*, 381 U.S. at 486), intimate choice (*Lawrence*, 539 U.S. at 574), and association (*M.L.B. v.*

19  *S.L.J.*, 519 U.S. 102, 116 (1996)).  It is "essential to the orderly pursuit of happiness by free men."

20  *Loving*, 388 U.S. at 12.  The right may not be circumscribed because of racial considerations (*id.*),

21  but, far beyond that, "the right to marry is of fundamental importance *for all individuals*."  *Zablocki*,

22  434 U.S. at 384 (emphasis added).

23      The personal associational interest in the individual's choice of marriage is so fundamental

24  that it extends to persons in prison (*Turner v. Safley*, 482 U.S. 78, 95 (1987)), despite the lower

25  standard of review for inmate restrictions, and prohibits filing fee barriers to divorce—which would

26  seem unobjectionable if the right of marriage were tied to the State's interest in marital procreation.

27  *Boddie v. Connecticut*, 401 U.S. 371, 380 (1971).

28

Gibson, Dunn & Crutcher LLP

3

4.      As the *Turner* Court put it, marriage is an expression of emotional support and public commitment, the exercise of spiritual unity, and a fulfillment of one's self.  482 U.S. at 95-96.  These attributes of the right to marry go far beyond the procreational interest repeatedly emphasized by Defendant-Intervenors (and acknowledged as only *one* goal of marriage by the *Turner* Court (*id.* at 96)).  *Turner* is not cited in Defendant-Intervenors' 98 pages—which may explain why its explanation of the other aspects of marriage escaped their attention.

5.      The California Supreme Court squarely found a right to marry in California's constitution—unrestricted by the sex of the proposed marital partner.  Prop. 8, just like the measure considered in *Romer v. Evans*, 517 U.S. 620 (1996), repealed the constitutional protection against "'discrimination based on sexual orientation.'"  *Id.* at 627.  In the words of *Romer*, gay and lesbian individuals are thus "put in a solitary class" with respect to marriage.  *Id*.  While Prop. 8 did not put them in such a class with respect to all transactions and relations, as was the case in *Romer*, surely California cannot do piecemeal what Colorado was attempting to do in one fell swoop.

6.      Notwithstanding the 14 words of Prop. 8, California does not limit recognition of marriages to only those "between a man and a woman."  Eighteen thousand marriages between individuals of the same sex have been "recognized" by California.  California therefore not only discriminates between heterosexuals and gay and lesbian individuals, but has also put gay and lesbian individuals into two classes, and discriminates between them.

7.      California's chief law enforcement officer concedes that Prop. 8 is unconstitutional (Doc # 39 at 2), as does one of California's largest cities.  Surely the State and its municipalities know discrimination when they see it, and surely their voices carry more weight than those of Defendant-Intervenors, who have no responsibilities to the victims of their discriminatory measure.

8.      Ignoring *Loving*, Defendant-Intervenors argue that Prop. 8 is not discriminatory because it quite evenhandedly prohibits choosing a mate of the same sex by everyone, whatever their sexual orientation.  Each class, in the words of *Loving*, is therefore "punished to the same degree."  388 U.S. at 8.  In the first place, that argument ignores the 18,000 marriages between individuals of the same sex that have been recognized by the State.  More importantly, that line of reasoning was

Gibson, Dunn &
Crutcher LLP

4

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

flatly rejected in *Loving*. *See id.* at 11.  The choice of a marital partner has been restricted for only one class of persons:  only gay and lesbian individuals are punished by Prop. 8, not heterosexuals.

9.     The California Supreme Court found that denying the right to marry a person of the same sex denied a right on the basis of a characteristic "integral" to "one's identity, . . . a deeply personal characteristic that is either unchangeable or changeable only at unacceptable personal costs." *Marriage Cases*, 183 P.3d at 442-43 (internal quotation marks omitted).  As explained in *Lawrence*, laws such as this, "once thought necessary and proper in fact serve only to oppress."  539 U.S. at 579. Ability to marry "may be crucial to [an] individual's development as a person and achievement of his or her full potential" and permits an individual to join "the broader family social structure that is a significant feature of community life."  *Marriage Cases*, 183 P.3d at 424, 425.  The right to marry is a "fundamental right of free men and women."  *Id.* at 426 (internal quotation marks and alteration omitted).  These findings are binding on this Court (*Reitman v. Mulkey*, 387 U.S. 369, 374 (1967)), and Prop. 8 cannot co-exist with them.

10.     Defendant-Intervenors tacitly acknowledge that no purpose is served by withholding the status of marriage from those who wish to marry someone of the same sex except to preserve the "traditional definition of marriage."  The difference, they argue, is nothing more than nomenclature. The "orchid," they say, "is not demeaned because we do not call it a rose."  Doc # 172-1 at 71.  This is, of course, manifest nonsense.  What if California were to withhold the name "citizen" from those who came to build its railroads?  Would Defendant-Intervenors so cavalierly dismiss the anguish of those persons?

At the same time, Defendant-Intervenors switch directions when it serves their purpose. Forgetting their memorable line about orchids and roses, they go on to admit that the label "marriage" is a "unique and highly favorable imprimatur."  Doc # 172-1 at 91.  Indeed it is, and Defendant-Intervenors concede that truth on page 91 even while denying it on page 71.

But Defendant-Intervenors cannot have it both ways.  They cannot say from one side of their mouth that the institution of marriage will be destroyed if gay and lesbian individuals are allowed to participate, and, from the other, that it is just a name—get over it.

Gibson, Dunn & Crutcher LLP

5

1                                    *       *       *

2          Ultimately, Defendant-Intervenors' summary judgment brief not only fails to demonstrate that

3  they are entitled to judgment as a matter of law, but it affirmatively establishes that the discriminatory

4  and gratuitously harmful provision they seek to defend is, in fact, *unconstitutional* as a matter of law.

5                            <u>**STANDARD OF REVIEW**</u>

6          Summary judgment is only appropriate upon a "show[ing] that there is no genuine issue as to

7  any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

8  To obtain summary judgment, "the moving party must either produce evidence negating an essential

9  element of the nonmoving party's claim . . . or show that the nonmoving party does not have enough

10 evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

11 *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If a moving party fails to carry its

12 initial burden of production, the nonmoving party has no obligation to produce anything, even if the

13 nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102-03. If the moving

14 party meets its initial burden of production, the nonmovant must "produce enough evidence to create a

15 genuine issue of material fact." *Id*. at 1102-03.

16         "Material" facts are those that might affect the outcome of the case. *Anderson v. Liberty*

17 *Lobby, Inc*., 477 U.S. 242, 248 (1986). There is a "genuine" dispute of material fact if there is sufficient

18 evidence for a reasonable factfinder to find for the plaintiff in light of the appropriate evidentiary burden.

19 *Id.* at 251-54. In determining sufficiency, the "evidence of the non-movant is to be believed, and all

20 justifiable inferences are to be drawn in his favor." *Id.* at 255. Even where basic facts are undisputed, if

21 reasonable minds could differ as to the inferences to be drawn from those facts, summary judgment

22 should be denied. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

23                            <u>**ARGUMENT**</u>

24  **I.   SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANT-INTERVENORS HAVE
         NOT IDENTIFIED ANY "BINDING PRECEDENT" THAT COMPELS DISMISSAL OF PLAINTIFFS'**
25       **CLAIMS FOR RELIEF**

26         Defendant-Intervenors urge that several assertedly binding precedents of the Supreme Court

27 and the Ninth Circuit control this case and compel dismissal of Plaintiffs' claims. As demonstrated

28 below, the precedents Defendant-Intervenors invoke do nothing of the sort. Indeed, close inspection

Gibson, Dunn &
Crutcher LLP

6

of those authorities reveals not a legally sufficient governmental justification for Prop. 8's arbitrary and stigmatizing brand of discrimination, but only its absence.

### A.   *Baker v. Nelson* Does Not Control This Case.

Defendant-Intervenors contend that they are entitled to summary judgment based on the U.S. Supreme Court's summary order in *Baker v. Nelson*, 409 U.S. 810 (1972), which dismissed without opinion an appeal from a Minnesota Supreme Court decision rejecting federal equal protection and due process challenges to that State's prohibition on marriage by individuals of the same sex.  Doc # 172-1 at 32.  Defendant-Intervenors' attempt to accord controlling force to the Supreme Court's nearly forty-year-old summary order fails because *Baker* did not consider the precise issues raised by Plaintiffs' constitutional challenge to Prop. 8 and because that decision has been undermined by later jurisprudential developments.

1.  The Supreme Court's summary dismissals are binding on lower courts only "on the *precise* issues presented and necessarily decided" by the Court.  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (emphasis added).  In several respects, the issues in *Baker* are different from the issues presented by Plaintiffs' constitutional challenge to Prop. 8.  For example, *Baker* presented an equal protection challenge based only on sex discrimination and therefore cannot conceivably foreclose Plaintiffs' claim that Prop. 8 discriminates against gay and lesbian individuals on the basis of their sexual orientation.  *See* Jurisdictional Statement at 16, *Baker* (No. 71-1027) ("The discrimination in this case is one of gender.").

Moreover, in addition to the absence of any issue of discrimination based on sexual orientation in *Baker*, the Supreme Court's summary dismissal in that case addressed equal protection and due process challenges to a marriage framework that is far different from the one that Plaintiffs are challenging here, and therefore cannot be controlling on any component of Plaintiffs' equal protection and due process claims.  Whereas *Baker* concerned the constitutionality of an outright refusal by a State to afford *any* recognition to same-sex relationships, Plaintiffs' suit challenges California voters' use of the ballot initiative process to strip unmarried gay and lesbian individuals of their state constitutional right to marry and to relegate them to the inherently unequal institution of domestic partnership.  Whatever the constitutional flaws in Minnesota's blanket denial of recognition

Gibson, Dunn & Crutcher LLP

1    to same-sex relationships, Prop. 8 is uniquely irrational:  California voters used the initiative process

2    to single out unmarried gay and lesbian individuals for a "special disability" (*Romer*, 517 U.S. at 631)

3    by extinguishing their state constitutional right to marry, while at the same time preserving the

4    existing marriages of gay and lesbian couples and affording unmarried gay and lesbian individuals

5    the right to enter into domestic partnerships that carry virtually all the same rights and obligations—

6    but not the highly venerated label—associated with opposite-sex marriages (and existing same-sex

7    marriages).  The Supreme Court had no occasion in *Baker* to consider the constitutionality of such an

8    arbitrary legal framework under either the Equal Protection Clause or the Due Process Clause.

9          Defendants-Intervenors acknowledge the "factual difference[s]" between *Baker* and this case.

10   Doc # 172-1 at 36.  They nevertheless insist that *Baker* remains controlling because it purportedly

11   "stands to reason that if a State does not violate the Fourteenth Amendment by refusing both to

12   redefine the traditional understanding of marriage *and* to provide any of the legal benefits associated

13   with that status to same-sex couples, then it certainly does not violate that constitutional provision to

14   retain the long-established definition of marriage while granting almost all the legal benefits

15   associated with marriage to domestic partners." *Id.* (emphasis in original).  This is simply wrong.

16   The fact that individuals in same-sex relationships possess many of the same substantive rights as

17   individuals in opposite-sex relationships bears directly on the rationality of relegating gay and lesbian

18   individuals to the separate-but-inherently-unequal status of domestic partnership.  Even if *Baker* had

19   not been authoritatively undermined by the later jurisprudential developments discussed below, that

20   decision would not, as Defendant-Intervenors suggest, authorize California to promulgate an arbitrary

21   system of marriage laws that irrationally discriminates against gay and lesbian individuals.  *Baker*,

22   for example, would not foreclose a due process and equal protection challenge to a law that arbitrarily

23   authorized marriage by individuals of the same sex if both individuals had last names beginning with

24   the letters A through M but prohibited marriage by all other same-sex individuals.  *Baker* similarly

25   lacks precedential force in this constitutional challenge to California's irrational marriage framework,

26   which grants full marriage rights to opposite-sex couples, recognizes 18,000 pre-Prop. 8 marriages by

27   individuals of the same sex (but does not allow those individuals to remarry if they divorce their

28   current spouse), and strips unmarried gay and lesbian individuals of their state constitutional right to

Gibson, Dunn & Crutcher LLP

8

1   marry, in turn relegating them to the second-class status of domestic partnership (while granting them

2   virtually all the substantive rights of marriage).

3       2.   The Supreme Court's summary dismissals are binding only to the extent that they have not

4   been undermined by subsequent "doctrinal developments" in the Supreme Court's case law.  *Hicks v.*

5   *Miranda*, 422 U.S. 332, 344 (1975) (internal quotation marks omitted).  *Baker* has been conclusively

6   undermined by the Supreme Court's subsequent equal protection and due process precedent, most

7   notably the Court's decisions in *Romer* and *Lawrence*.

8       In *Romer*, the Court struck down on equal protection grounds a Colorado constitutional

9   amendment prohibiting governmental action to protect gay and lesbian individuals against

10  discrimination because the measure "withdr[ew] from homosexuals, but no others, specific legal

11  protection" and "impose[d] a special disability upon those persons alone."  517 U.S. at 627, 631.

12  After *Romer*, all laws that single out gay and lesbian individuals for disfavored treatment—including

13  laws prohibiting marriage by same-sex individuals—are constitutionally suspect.  *See Flores v.*

14  *Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003) ("state employees who treat

15  individuals differently on the basis of their sexual orientation violate the constitutional guarantee of

16  equal protection").  Thus, even if *Baker* had addressed a sexual-orientation-based equal protection

17  claim—and it did not—the decision still would not foreclose Plaintiffs' argument that Prop. 8

18  unconstitutionally discriminates against gay and lesbian individuals based on their sexual orientation

19  and therefore violates the Equal Protection Clause.[1]

20  

---

21  [1] Defendant-Intervenors attempt to distinguish *Romer* on various grounds including that, unlike
    Colorado's Amendment 2, Prop. 8 purportedly "does not single out gays and lesbians for unique

22  disabilities."  Doc # 172-1 at 106.  But Prop. 8 shares all the salient—and constitutionally
    unacceptable—features of Amendment 2 because, in the absence of any conceivably legitimate

23  government interest, it imposes a "special disability" on gay and lesbian individuals.  *Romer*, 517
    U.S. at 631.  Alone among California's citizens, gay and lesbian individuals have been deprived

24  of their preexisting state constitutional right to marry and denied, in the words of Defendant-
    Intervenors themselves, the "unique and highly favorable imprimatur" that "cloaks traditional,

25  opposite-sex unions."  Doc # 172-1 at 91.  Even before *Romer*, such targeted nullification of a
    disfavored group's state-law rights was constitutionally proscribed.  *See Reitman v. Mulkey*, 387

26  U.S. 369, 381 (1967) (invalidating a voter-enacted California constitutional provision that
    extinguished state-law protections that minorities had previously possessed against housing

27  discrimination).  *Romer* and *Reitman* do not establish that "once a State chooses to do 'more' than
    the Fourteenth Amendment requires, it may never recede."  Doc # 172-1 at 108 (quoting

28  *Crawford v. Bd. of Educ.*, 458 U.S. 527, 535 (1982)).  They do hold, however, that voters may not

[Footnote continued on next page]

Gibson, Dunn &
Crutcher LLP

1   The Court's summary disposition of the due process question in *Baker* is also at odds with

2   later precedent.  Most notably, the due process aspect of *Baker* cannot be reconciled with the Court's

3   subsequent decision in *Lawrence*, which invalidated a state criminal prohibition on same-sex intimate

4   conduct under the Due Process Clause.  While Defendant-Intervenors attempt to distinguish

5   *Lawrence* on the ground that it "did not involve government recognition of a relationship" (Doc

6   # 172-1 at 34), *Lawrence* explicitly recognized that the Constitution "afford[s] . . . protection to

7   personal decisions relating to marriage, procreation, contraception, family relationships, [and] child

8   rearing" and that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just

9   as heterosexual persons do."  539 U.S. at 574.  That constitutionally protected personal autonomy

10  extends to the decision of a gay or lesbian individual to marry the person with whom they are in a

11  loving, committed relationship.  *See also Turner v. Safley*, 482 U.S. 78, 95 (1987) (holding that the

12  fundamental right to marry extends to incarcerated inmates because "inmate marriages, like others,

13  are expressions of emotional support and public commitment").

14  Nor does *Baker*'s summary treatment of the gender-based equal protection challenge to

15  Minnesota's marriage law survive later doctrinal developments.  *Baker* was decided before the

16  Supreme Court recognized that gender is a quasi-suspect classification (*see Frontiero v. Richardson*,

17  411 U.S. 677 (1973) (plurality opinion); *Craig v. Boren*, 429 U.S. 190 (1976)), and that the Equal

18  Protection Clause prohibits "differential treatment or denial of opportunity" based on a person's sex

19  in the absence of an "exceedingly persuasive" justification.  *United States v. Virginia*, 518 U.S. 515,

20  532-33 (1996) (internal quotation marks omitted).

21  *Romer*, *Lawrence*, and other developments in the Supreme Court's due process and equal

22  protection jurisprudence have thus deprived *Baker* of any precedential force.  Indeed, at least one

23  California district court has already concluded as much in a decision holding that *Baker* did not

24  foreclose the court from considering a federal constitutional challenge to the Defense of Marriage Act

25  ("DOMA").  *See Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal

26  _____

[Footnote continued from previous page]

27  modify state law in an arbitrary and discriminatory manner that extinguishes a minority group's
    rights while leaving undisturbed the rights of the majority.

28

Gibson, Dunn &
Crutcher LLP

10

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    developments show it is not reasonable to conclude the questions presented in the *Baker*

2    jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *rev'd in*

3    *part on other grounds*, 447 F.3d 673 (9th Cir. 2006).  Defendant-Intervenors attempt to distinguish

4    *Smelt* on the ground that it presented a challenge to DOMA, rather than to a state-law prohibition on

5    marriage by individuals of the same sex.  Doc # 172-1 at 36.  But the *Smelt* court did not rest its

6    rejection of *Baker* solely on this factual distinction.  The court instead expressly held that *Baker* had

7    been undermined in its entirety by subsequent jurisprudential developments, explaining that

8    "Supreme Court cases decided since *Baker* show the Supreme Court does not consider unsubstantial

9    a constitutional challenge brought by homosexual individuals on equal protection grounds, *Romer v.*

10   *Evans*, or on due process grounds, *Lawrence v. Texas*."  374 F. Supp. 2d at 873 (citations omitted).

11       *Baker* therefore presents no impediment to reaching the merits of any aspect of Plaintiffs'

12   constitutional challenge to Prop. 8.[2]

### B.   Defendant-Intervenors Fail To Demonstrate That Prop 8 Is Consistent With The Equal Protection Clause.

15       Separate and apart from Defendant-Intervenors' misplaced reliance on *Baker*, their request for

16   summary judgment on Plaintiffs' equal protection claim is beset by several additional legal flaws that

17   require the denial of their motion.

#### 1.   Defendant-Intervenors Have Not Established The Factual Proposition That Gay And Lesbian Individuals Are Differently Situated From Heterosexual Individuals For Purposes Of Marriage.

20       Defendant-Intervenors argue that they are entitled to summary judgment on Plaintiffs' equal

21   protection claim because "same-sex and opposite-sex couples are not similarly situated with respect

---

[2]  For many of the same reasons that *Baker* does not entitle Defendant-Intervenors to summary judgment, their reliance on *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982), is also misplaced.  *See* Doc # 172-1 at 69.  That decision upheld a federal immigration law that granted an admissions preference to opposite-sex—but not same-sex—spouses of American citizens.  The court explained that "Congress has almost plenary power to admit or exclude aliens" and "the decisions of Congress" in the area of immigration are therefore "subject only to limited judicial review."  *Adams*, 673 F.2d at 1041.  No such "plenary power" is implicated in this case, and the "limited judicial review" undertaken in *Adams* is therefore inapplicable to Plaintiffs' constitutional challenge to Prop. 8.  In any event, this Court is free to depart from *Adams*'s reasoning in light of the subsequent jurisprudential developments in *Romer* and *Lawrence*.  *See Witt v. Dep't of the Air Force*, 527 F.3d 806, 820-21 (9th Cir. 2008).

Gibson, Dunn & Crutcher LLP

11

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1   to the institution of marriage." Doc # 172-1 at 54 (capitalization altered).  According to Defendant-

2   Intervenors, "the institution of marriage is and always has been bound up with the procreative nature

3   of sexual relationships between men and women."  *Id.* at 36.  This is a bald assertion of fact—one

4   that, as shown *infra*, is contravened not only by publicly available and judicially noticeable data and

5   remains a subject of Plaintiffs' discovery efforts.  But it also fails as a matter of law.

6            The Supreme Court has made clear that the importance of marriage transcends its role in

7   facilitating natural human reproduction and extends to individuals who, through biology or

8   circumstance, are unable (or unwilling) to reproduce naturally with their spouse.  *See, e.g.*, *Turner*,

9   482 U.S. at 95 (incarcerated inmates); *see also Griswold v. Connecticut*, 381 U.S. 479, 485 (1965)

10  (upholding the right of married individuals to use contraception to prevent procreation).  If marriage

11  were, as Defendant-Intervenors assert, inextricably bound up with reproductive capacity, for what

12  reason would the Supreme Court recognize the fundamental right of two prisoners, each indefinitely

13  incarcerated in a separate institution, to marry?  Regardless of a person's procreative capacity,

14  marriage is "the most important relation in life" (*Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)

15  (internal quotation marks omitted)) and an "expression[ ] of emotional support and public

16  commitment."  *Turner*, 482 U.S. at 95.  In this regard, gay and lesbian individuals are unquestionably

17  situated identically to heterosexual individuals because, regardless of sexual orientation, people share

18  a virtually universal desire to formalize their relationship with the person they love by entering into

19  the institution of civil marriage.  *See Kerrigan*, 957 A.2d at 424 (same-sex couples are similarly

20  situated to opposite-sex couples for purposes of marriage because they "share the same interest in a

21  committed and loving relationship as heterosexual couples who wish to marry, and they share the

22  same interest in having a family and raising their children in a loving and supportive environment");

23  *Varnum v. Brien*, 763 N.W.2d 862, 883 (Iowa 2009) (same).  A state law that denies gay and lesbian

24  individuals marriage rights afforded to heterosexual individuals must therefore satisfy the rigors of

25  the Equal Protection Clause.

26

27

28

Gibson, Dunn &
Crutcher LLP

12

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

### 2.     Defendant-Intervenors Have Not Established That Classifications Based On Sexual Orientation Are Subject To Rational Basis Review.

Defendant-Intervenors' request for summary judgment on Plaintiffs' equal protection claim is premised on the contention that sexual orientation is not a suspect or quasi-suspect classification and that rational basis review of Prop. 8's discriminatory and stigmatizing treatment of gay and lesbian individuals is therefore appropriate.  Defendant-Intervenors make no attempt to satisfy the rigorous requirements of strict or intermediate scrutiny that would be applicable if, as Plaintiffs contend, sexual orientation is a suspect or quasi-suspect classification.  As discussed in Part II, *infra*, Defendant-Intervenors are not entitled to summary judgment on Plaintiffs' equal protection claim because they have not met their burden of establishing that there are no disputed issues of material fact that bear upon the appropriate level of equal protection scrutiny.  Summary judgment is also inappropriate because Defendant-Intervenors' effort to establish that sexual orientation is neither a suspect nor a quasi-suspect classification fails as a matter of law.

1.  Defendant-Intervenors contend that the Ninth Circuit's decision in *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563 (1990), compels a conclusion from this Court that sexual orientation is not a suspect classification and that rational basis review must apply to all such classifications.  Doc # 172-1 at 56.  Defendant-Intervenors reliance on *High Tech Gays* is misplaced because that decision was premised on the Supreme Court's since-overruled decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986).  *High Tech Gays* reasoned that, "by the *Hardwick* majority holding that the Constitution confers no fundamental right upon homosexuals to engage in sodomy, and because homosexual conduct can thus be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes."  895 F.2d at 571.  *Lawrence*'s holding that the government may not criminalize same-sex intimate conduct and its explicit overruling of *Hardwick* leaves this Court free to reexamine whether sexual orientation is a suspect or quasi-suspect classification.  *See Witt v. Dep't of the Air Force*, 527 F.3d 806, 820-21 (9th Cir. 2008) (where "'the relevant court of last resort . . . ha[s] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable[,] . . . district courts should consider themselves bound by the intervening higher

13

Gibson, Dunn &
Crutcher LLP

1   authority and reject the prior opinion of this court'") (quoting *Miller v. Gammie*, 335 F.3d 889, 900

2   (9th Cir. 2003) (en banc)).[3]

3       2. A classification is suspect or quasi-suspect where it targets a group that has been subject to

4   a history of discrimination (*Bowen v. Gilliard*, 483 U.S. 587, 602 (1987)) and that is defined by a

5   "characteristic" that "frequently bears no relation to ability to perform or contribute to society." *City*

6   *of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-41 (1985) (internal quotation marks

7   omitted). Defendant-Intervenors' summary judgment motion nowhere disputes that "gay persons

8   historically have been, and continue to be, the target of purposeful and pernicious discrimination due

9   solely to their sexual orientation" (*Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 432 (Conn.

10  2008)) or that sexual orientation has absolutely no "relation to [the] ability" of a person "to perform

11  or contribute to society." *City of Cleburne*, 473 U.S. at 440-41. Defendant-Intervenors' failure to

12  mount any argument on these two points requires the denial of summary judgment on Plaintiffs'

13  equal protection claim because the long history of discrimination against gay and lesbian individuals

14  and the absence of any connection between sexual orientation and the ability of gay and lesbian

15  individuals to contribute to society are sufficient to establish that sexual orientation is a suspect or

16  quasi-suspect classification.

17      Rather than address the history of discrimination against gay men and lesbians and their

18  ability to contribute to society—perhaps because to do so would uncover a dispute of fact (*see*

19  Declaration of Enrique Monagas in Support of Plaintiffs' and Plaintiff-Intervenor's Opposition to

20  Defendant-Intervenors' Motion for Summary Judgment ("Monagas Decl."), Exh. C (Defendant-

21  Intervenors' Responses to Plaintiffs' Requests for Admission), Defendant-Intervenors press

22  exclusively two other factors that, though relevant to a suspect classification inquiry, have never been

23  recognized as necessary to or dispositive of the inquiry: immutability of the characteristic, and

24  whether persons sharing that characteristic have substantial political power. *See Christian Science*

---

25

26  [3] Moreover, nothing in the Ninth Circuit's post-*Lawrence* decision in *Witt* forecloses that
    reexamination. In *Witt*, the plaintiff's equal protection challenge to the Defense Department's
    "Don't Ask, Don't Tell" policy was not premised on the government's differential treatment of
27  heterosexuals and gay and lesbian individuals. *See id.* at 821; *see also id.* at 823-24 & n.4
    (Canby, J., concurring in part and dissenting in part).

28

Gibson, Dunn &
Crutcher LLP

*Reading Room Jointly Maintained v. City & County of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986) (holding that "an individual religion meets the requirements for treatment as a suspect class," even though religion is not immutable); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that all racial classifications are inherently suspect, even though many racial groups exercise substantial political power). Specifically, Defendant-Intervenors argue sexual orientation is not immutable and that gay and lesbian individuals exercise substantial political power.

Here, again, Defendant-Intervenors' argument hinges upon their assertions of factual propositions that are (to put it charitably) contestable. But whether or not sexual orientation is immutable and whether or not gay mean and lesbians currently wield the levers of political power, the Supreme Court has concluded that where a group has "experienced a history of purposeful unequal treatment" and have "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities" (*Mass Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (internal quotation marks omitted)), there is an overwhelming probability that laws singling out such a group for adverse treatment are grounded on irrational and illegitimate considerations. *City of Cleburne*, 473 U.S. at 440. Such classifications demand especially exacting equal protection scrutiny. The mere fact that Defendant-Intervenors are willing to blind themselves to the long history of discrimination against gay men and lesbians and, at the same time, cling steadfastly to the belief that a person's sexual orientation alters their ability to contribute to society, (*see* Monagas Decl., Exh. C), cannot itself entitle Defendant-Intervenors to summary judgment.

### 3. Defendant-Intervenors Have Not Identified A Legitimate State Interest That Is Rationally Related To Prop. 8.

To prevail in this case, whether on summary judgment or at trial, Defendant-Intervenors must establish that there is a constitutionally sufficient interest underpinning Prop. 8's discriminatory treatment of gay and lesbian individuals. While Plaintiffs and Defendant-Intervenors disagree about the appropriate standard of equal protection scrutiny, Defendant-Intervenors' request for summary judgment on Plaintiffs' equal protection claim fails even on its own rational basis terms because Defendant-Intervenors have not identified any legitimate state interest that is furthered by Prop. 8.

As an initial matter, Defendant-Intervenors contend that the "rational basis test does not

Gibson, Dunn & Crutcher LLP

require any showing that declining to extend marriage to same-sex couples furthers legitimate state interests." Doc # 172-1 at 95. According to Defendant-Intervenors, Plaintiffs' equal protection claim fails simply because recognizing marriage by individuals of the opposite sex furthers a legitimate state interest. But Plaintiffs are not challenging the constitutionality of California's laws granting individuals of the opposite sex the right to marry. They are challenging a ballot initiative that extinguished the pre-existing state constitutional right of gay and lesbian individuals to marry and consigned unmarried gay and lesbian individuals to domestic partnership—an institution that the California Supreme Court found as a matter of fact and California law to "perpetuat[e]" the "general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *Marriage Cases*, 183 P.3d at 402. To satisfy the rational basis standard, Defendant-Intervenors must therefore demonstrate that *Prop. 8*—not California's laws granting heterosexual individuals the right to marry—furthers a legitimate state interest.

The Supreme Court's decisions invalidating laws under the rational basis standard reinforce the fact that Defendant-Intervenors have misframed their defense of Prop. 8. In *Romer*, for example, the Court held that Colorado's Amendment 2 was unconstitutional because that state constitutional measure—which stripped gay and lesbian individuals of the protections of state anti-discrimination law—did not further a legitimate government interest. 517 U.S. at 635. The Court did not inquire, in contrast, whether Colorado's anti-discrimination laws protecting other minority groups furthered a legitimate state interest (as they surely did)—which is how Defendant-Intervenors would have had the Court frame its constitutional inquiry. Similarly, in *Cleburne*, the Court inquired whether a municipality had a rational basis for requiring a special-use zoning permit for homes for mentally disabled individuals—not whether it had a rational basis for granting zoning permits without special-use permits for other types of structures. 473 U.S. at 450. Thus, in both *Romer* and *Cleburne*, the focus of the equal protection inquiry was on the measure that discriminated against the targeted group—not on other laws that extended the disputed rights to groups that had not been singled out for discriminatory treatment.

Gibson, Dunn &
Crutcher LLP

Defendant-Intervenors' effort to sustain Prop. 8 based on the interests served by California's laws recognizing marriage by individuals of the opposite sex is therefore entirely misplaced. And those interests that are allegedly advanced by Prop. 8's prohibition on marriage by individuals of the same sex are either constitutionally illegitimate or not promoted by a measure that prospectively excludes gay and lesbian individuals from the institution of civil marriage all while leaving 18,000 same-sex marriages on the books. Accordingly, none of the six state interests identified by Defendant-Intervenors is a legally sufficient basis for granting them summary judgment.

a.      ***Procreation.*** Defendant-Intervenors contend that the "traditional institution of marriage promotes the formation of naturally procreative unions." Doc # 172-1 at 78. If understood to describe a tendency (because many marriages do result in "naturally procreative unions") rather than an inescapable truth (because many marriages cannot possibly result in such "naturally procreative unions"), this statement might not seem false as a factual matter. But whether or not the State has a legitimate interest in promoting procreation, the fact that marriage between individuals of the opposite sex may facilitate natural procreation provides absolutely no justification for Prop. 8, which stripped gay and lesbian individuals of their state constitutional right to marry and relegated them to the inherently inferior institution of domestic partnership. *A state interest furthered by the recognition of opposite-sex marriage is not a constitutionally sufficient basis for prohibiting same-sex marriage.*

The *only* ways in which Prop. 8 possibly could promote California's interest in procreation are if (1) Prop. 8 encouraged gay and lesbian individuals to marry a person of the opposite sex or (2) Prop. 8 increased or preserved marriages between heterosexual individuals. Yet, Defendant-Intervenors cannot even bring themselves to articulate either far-fetched argument—which other courts have rejected as a matter of law and "common sense." *See Varnum*, 763 N.W.2d at 902 ("[T]he sole conceivable avenue by which exclusion of gay and lesbian people from civil marriage could promote more procreation is if the unavailability of civil marriage for same-sex partners caused homosexual individuals to 'become' heterosexual . . . . The briefs, the record, our research, and common sense do not suggest such an outcome."). And, to the extent that these implausible positions are implicit in Defendant-Intervenors' request for summary judgment, they are, at a minimum,

Gibson, Dunn & Crutcher LLP

1   disputed issues of fact suitable for resolution at trial.

2       b.      **"Responsible Procreation."**  Defendant-Intervenors also argue that Prop. 8 advances

3   the State's interest in "responsible procreation" by "channel[ing] opposite-sex relationships into the

4   lasting, stable unions that are best for raising children of the union."  Doc # 172-1 at 72.  This basis,

5   too, rests on a factual assertion—that opposite-sex unions offer a child-rearing environment superior

6   to that offered by same-sex couples.  As described *infra*, that assertion is factually baseless and

7   remains the subject of discovery.  But even a factually-supportable interest in "responsible

8   procreation" could not justify Prop. 8.  It would collapse for the same reason as the State's interest in

9   promoting natural procreation:  Prop. 8's prohibition on marriage by individuals of the same sex does

10  not make it any more likely either that heterosexual individuals will marry or that that the children

11  produced as a result of heterosexual relationships will be raised by a married opposite-sex couple.

12  Indeed, Defendant-Intervenors do not even assert that permitting marriage by gay and lesbian

13  individuals will discourage heterosexual individuals from marrying and thus somehow impair the

14  State's purported interest in "channel[ing] opposite-sex relationships" into marriages.  Thus, while

15  "responsible procreation" may provide a rational basis for the State's recognition of marriages by

16  individuals of the opposite sex, it provides absolutely no justification for the voters' decision to strip

17  gay and lesbian individuals of their right to marry.

18      c.      **Tradition.**  Defendant-Intervenors further contend that "[p]reserving the traditional

19  institution of marriage is itself a legitimate state interest."  Doc # 172-1 at 70.  It bears noting that this

20  asserted basis also takes as a factual *predicate* one of the facts the Court stated "the record may need

21  to establish": "the longstanding definition of marriage."  Doc # 76 at 7.  But, in any event, tradition

22  alone is a manifestly insufficient basis for a State to impair a person's constitutionally protected right

23  to marry.  "[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial

24  adherence to it through the centuries insulates it from constitutional attack."  *Williams v. Illinois*, 399

25  U.S. 235, 239 (1970).  A state practice of restricting citizens' constitutional rights thus cannot be

26  perpetuated merely "for its own sake."  *Romer*, 517 U.S. at 635.  As the Supreme Court recently

27  recognized when invalidating Texas's criminal prohibition on same-sex intimate conduct, "times can

28  blind us to certain truths and later generations can see that laws once thought necessary and proper in

Gibson, Dunn &
Crutcher LLP

18

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1   fact serve only to oppress." *Lawrence*, 539 U.S. at 579.  Accordingly, California's longstanding

2   tradition of prohibiting marriage by individuals of the same sex cannot shield Prop. 8 from federal

3   constitutional scrutiny any more than Virginia's longstanding tradition of prohibiting marriage by

4   individuals of different races—which dated back to "the colonial period"—could shield its anti-

5   miscegenation law from the Fourteenth Amendment's requirements.  *Loving v. Virginia*, 388 U.S. 1,

6   6 (1967); *see also Marriage Cases*, 183 P.3d at 451 ("even the most familiar and generally accepted

7   of social practices and traditions often mask an unfairness and inequality that frequently is not

8   recognized or appreciated by those not directly harmed by those practices or traditions").

9        Defendant-Intervenors' suggestion that "moral support for the institution of marriage in its

10   traditional form itself constitutes a legitimate interest" fares no better.  Doc # 172-1 at 116 (emphasis

11   omitted).  The Supreme Court has already made clear that "[m]oral disapproval" of gay and lesbian

12   individuals, "like a bare desire to harm the group, is an interest that is insufficient to satisfy" rational

13   basis review. *Lawrence*, 539 U.S. at 582.  Indeed, in *Loving*, Virginia made an argument

14   indistinguishable from Defendant-Intervenors' morality-based defense of Prop. 8 in an effort to

15   defend its prohibition on interracial marriage.  *See* Br. of Virginia at 45, *Loving* (No. 395) ("[T]here

16   are grave reasons against any general practice of intermarriage between the members of different

17   racial groups.  These reasons, where clearly verified, amount to a moral prohibition of such a

18   practice.") (alteration in original).  The invocation of morality in defense of discrimination was

19   unanimously rejected in *Loving* and carries no greater persuasive force here because, while "[p]rivate

20   biases may be outside the reach of the law," the "law cannot, directly or indirectly, give them effect"

21   at the expense of a disfavored group's constitutional rights. *Palmore v. Sidoti*, 466 U.S. 429, 433

22   (1984).

23        d.    ***Recognition of California's Marriages in Other States.***  Defendant-Intervenors

24   suggest that Prop. 8 survives equal protection scrutiny because California has a legitimate interest in

25   ensuring that its marriages are recognized in other jurisdictions.  Doc # 172-1 at 98.  Tellingly,

26   neither the Governor nor the Attorney General of the State give credence to this newly-discovered

27   basis for Prop. 8.  But, in any event, Prop. 8 could not be rationally related to the State's interest in

28   ensuring the out-of-state recognition of its marriages because the measure preserves the validity of

Gibson, Dunn &
Crutcher LLP

19

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

the 18,000 same-sex marriages that were performed between the California Supreme Court's decision in the *Marriage Cases* and the passage of Prop. 8.  The measure therefore bears, at most, only an exceedingly attenuated connection to California's purported interest in ensuring the recognition of its marriages in other States because it leaves on the books thousands of marriages that may not be recognized in those States that prohibit marriage by individuals of the same sex.  Moreover, whatever conceivable benefit California might obtain from ensuring that its marriages are recognized in other States is a manifestly insufficient basis for denying gay and lesbian individuals their constitutional right to equal treatment under the law and excluding them from what the Supreme Court has recognized to be "the most important relation in life."  *Zablocki*, 434 U.S. at 384 (internal quotation marks omitted).  Indeed, even if California's supposed interest in facilitating the out-of-state recognition of its marriages is legitimate in some contexts, it is unquestionably illegitimate here because the refusal of other States to recognize same-sex marriages is unconstitutional for the same reason that Prop. 8 is unconstitutional:  It deprives gay and lesbian individuals of their constitutionally guaranteed rights to due process and equal protection.  Defendant-Intervenors cannot defend the constitutionality of Prop. 8 on the ground that other States may take the unconstitutional step of refusing to recognize marriages by same-sex individuals performed in California.

   e. ***"Marriage Mill."*** Defendant-Intervenors also argue that Prop. 8 is constitutional because it serves the State's interest in not becoming a so-called "marriage mill" for persons who reside in other States.  Doc # 172-1 at 99.  Like so many others Defendant-Intervenors have offered, this assertedly rational basis rests on a factual premise—namely, that California does not wish nonresidents to marry in California.  As discussed *infra*, that factual premise is disputed and remains the subject of discovery.  Yet whether or not this is a legitimate government interest—and there is substantial doubt that this justification is compatible with the fundamental right to interstate travel repeatedly recognized by the Supreme Court (*see, e.g.*, *Mem'l Hosp. v. Maricopa County*, 415 U.S. 250, 254 (1974))—California cannot advance it through an irrational and discriminatory measure that explicitly targets gay and lesbian individuals and that singles them out for a "special disability."  *Romer*, 517 U.S. at 631.  If California has a legitimate interest in not being inundated by out-of-state

1   citizens seeking marriage licenses, it must further that interest in a non-discriminatory manner that

2   applies equally to same-sex and opposite-sex couples.

3          f.     ***Administrative Ease.***  Finally, Defendant-Intervenors assert that Prop. 8's

4   discriminatory treatment of gay and lesbian individuals can be justified on the basis of administrative

5   convenience.  According to Defendant-Intervenors, "[b]y conforming its definition of marriage to

6   that of the federal government, California thus relieves both the federal government and itself . . . of

7   the burden of distinguishing between same-sex and opposite-sex marriages."  Doc # 172-1 at 100.

8   First, Defendant-Intervenors fail to articulate any reason why the State needs to distinguish between

9   same-sex and opposite-sex relationships, and provide absolutely no details regarding the supposed

10  link between Prop. 8 and the State's purported interest in administrative efficiency.  Nor does the

11  State itself have an interest in relieving the federal government of the burden of enforcing its own

12  discriminatory marriage law (DOMA).  Moreover, it is well established, that administrative ease

13  alone is not an adequate ground for discrimination.  *See Craig*, 429 U.S. at 198.  Finally, even if

14  California had a valid interest in easing its administrative burden in differentiating between same-sex

15  and opposite-sex unions, Prop. 8 would be an irrational means of promoting that objective because it

16  does not invalidate the 18,000 same-sex marriages that were performed in California before the

17  measure was enacted.

18      **4.     Defendant-Intervenors Have Not Established That Prop. 8 Satisfies The**
            **Constitutional Requirements For Sex-Based Classifications.**
19

20         For many of the same reasons that Defendant-Intervenors are not entitled to summary

21  judgment on Plaintiffs' claim that Prop. 8 unconstitutionally discriminates against gay and lesbian

22  individuals on the basis of their sexual orientation, they have also failed to meet their burden of

23  demonstrating that Prop. 8 does not impermissibly discriminate against gay and lesbian individuals

24  on the basis of their sex.

25         If either Plaintiff Katami or Zarrillo were female, and if either Plaintiff Perry or Stier were

26  male, then California law would permit each of them to marry the person with whom they are in a

27  long-term, committed relationship.  The Equal Protection Clause prohibits such sex-based

28  classifications unless they are "substantially related" to an "important governmental objective[ ]."

Gibson, Dunn &
Crutcher LLP

21

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

*Virginia*, 518 U.S. at 533.  Defendant-Intervenors have not attempted to satisfy this standard on summary judgment.  Indeed, as explained above, the only interests identified by Defendant-Intervenors are not even legitimate government interests rationally related to Prop. 8's prohibition on marriage by individuals of the same sex—let alone, important interests that are substantially related to Prop. 8's discriminatory and irrational sex-based classifications.

Defendant-Intervenors instead argue that Prop. 8 "does not treat men and women differently" because "each man or woman may marry one person of the opposite sex, and each man or woman is prohibited from any other marital arrangement."  Doc # 172-1 at 66.  But the Supreme Court explicitly rejected an identical argument in *Loving*, where Virginia defended its criminal prohibition on miscegenation on the ground that it "punish[ed] equally both the white and the Negro participants in an interracial marriage."  388 U.S. at 8.  The Court explained that the mere "fact of equal application d[id] not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race."  *Id.* at 9.  So too here.  While Prop. 8 applies with equal force to men and women, it treats prospective spouses differently based on their sex—a man can marry a woman but a woman cannot—and it is therefore unconstitutional in the absence of an "exceedingly persuasive" justification.  *Virginia*, 518 U.S. at 532-33.  Because Defendant-Intervenors do not even contend that Prop. 8 can survive this exacting judicial scrutiny, summary judgment on Plaintiffs' sex discrimination claim is  inappropriate.

### C.    Defendant-Intervenors' Request For Summary Judgment On Plaintiffs' Due Process Claim Fails As A Matter Of Law.

Defendant-Intervenors' request for summary judgment on Plaintiffs' due process claim fails for many of the same reasons as their request for summary judgment on the equal protection claim.  Defendant-Intervenors' argument that Plaintiffs' due process claim is subject to rational basis review is incorrect as a matter of law and, in any event, Defendant-Intervenors have failed to meet their burden under the rational basis standard of establishing that Prop. 8's infringement of Plaintiffs' constitutionally protected right to marry furthers a legitimate state interest.

Defendant-Intervenors contend that the "recent and still rare innovation of same-sex marriage clearly does not constitute a fundamental right" and that Plaintiffs' due process claim is therefore

Gibson, Dunn &
Crutcher LLP

subject to rational basis review.  Doc # 172-1 at 37.  But Defendant-Intervenors' attempt to secure application of the rational basis standard to Plaintiffs' due process challenge rests on the legally flawed proposition that Plaintiffs are seeking recognition of a new fundamental right—the right to "same-sex marriage"—rather than access to the well-established fundamental right to "freedom of personal choice in matters of marriage," which the Supreme Court has frequently held to be "one of the liberties protected by the Due Process Clause."  *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639 (1974); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect").  Defendant-Intervenors' heavy reliance on *Washington v. Glucksberg*, 521 U.S. 702 (1997), is therefore misplaced.  Indeed, Plaintiffs are seeking to secure the same "freedom of personal choice" to marry the person with whom they are in a loving, long-term relationship that the State has long afforded to heterosexual individuals.  And, just as striking down Virginia's prohibition on marriage between persons of different races did not require the Supreme Court to recognize a new constitutional right to interracial marriage, invalidating Prop. 8 would not require recognition of a new right to same-sex marriage but would instead vindicate the longstanding right of *all* persons to exercise "freedom of personal choice" in deciding whether and whom to marry.  *See Marriage Cases*, 183 P.3d at 421 (Plaintiffs "are not seeking to create a new constitutional right—the right to 'same-sex marriage' . . . .  Instead, plaintiffs contend that, properly interpreted, the state constitutional right to marry affords same-sex couples the same rights and benefits . . . as this constitutional right affords to opposite-sex couples."); *see also Lawrence*, 539 U.S. at 566 (invalidating Texas's criminal prohibition on same-sex intimate conduct because it violated the right to personal sexual autonomy guaranteed by the Due Process Clause, not because it violated a "'fundamental right'" of "'homosexuals to engage in sodomy'").

Defendant-Intervenors argue that the fundamental right to marry does not encompass marriage by persons of the same sex because marriage is inextricably linked to "the inherently and uniquely procreative nature of the union between a man and a woman."  Doc # 172-1 at 42.  But this is simply not the case.  The Supreme Court has expressly recognized that the right to marry extends to individuals unable to procreate with their spouse and that married couples have a fundamental right

23

Gibson, Dunn &
Crutcher LLP

1   *not* to procreate.  *See Turner*, 482 U.S. at 95; *Griswold*, 381 U.S. at 485.  Indeed, "[n]o State

2   marriage statute mentions procreation or even the desire to procreate among its conditions for legal

3   marriage," and "[n]o State requires that heterosexual couples who wish to marry be capable or even

4   desirous of procreation."  Amy Doherty, *Constitutional Methodology and Same-Sex Marriage*, 11 J.

5   Contemp. Legal Issues 110, 113 (2000).[4]

6          Because Prop. 8 infringes upon gay and lesbian individuals' fundamental right to marry,

7   Defendant-Intervenors are not entitled to summary judgment on Plaintiffs' due process claim.

8   Indeed, Defendant-Intervenors do not even attempt to demonstrate that Prop. 8 can survive strict

9   scrutiny, which requires that any law that burdens a fundamental right be "narrowly drawn" to further

10  a "compelling state interest[ ]."  *Carey v. Populations Servs. Int'l, Inc.*, 431 U.S. 678, 686 (1977).

11  But even if this Court concludes that rational basis review should be applied to Plaintiffs' due process

12  claim, summary judgment would still be inappropriate because, as discussed in conjunction with

13  Defendant-Intervenors' request for summary judgment on the equal protection claim, Defendant-

14  Intervenors have failed as a matter of law to meet their burden of establishing that Prop. 8's arbitrary

15  and irrational restriction on the right of gay and lesbian individuals to marry furthers *any* legitimate

16  state interest.  Summary judgment upholding Prop. 8 is therefore inappropriate.

17  **II.    SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE DEFENDANT-INTERVENORS HAVE
         NOT MET THEIR BURDEN OF ESTABLISHING THE ABSENCE OF GENUINE ISSUES OF
18       MATERIAL FACT.**

19         Summary judgment should also be denied because Defendant-Intervenors' arguments with

20  respect to each of Plaintiffs' claims rests on numerous assertions of fact that are demonstrably false or, at

21  _____

22   4  Defendant-Intervenors contend that a decision recognizing that the fundamental right to marry
        extends to gay and lesbian individuals would "eviscerate any logic behind the State's authority to
23      forbid incestuous and polygamous relationships" and also invalidate prohibitions on marriage to
        persons who have not reached the age of consent.  Doc # 172-1 at 50.  They are wrong.  While the
24      government has no legitimate interest in prohibiting marriage between individuals of the same
        sex, there are weighty government interests underlying each of these other restrictions, including
25      preventing the birth of genetically compromised children produced through incestuous
        relationships, ameliorating the risk of spousal and child abuse that courts have found is often
        associated with polygamous relationships, and safeguarding minors unable to make informed
26      decisions about marriage.  *See, e.g.*, *Utah v. Green*, 99 P.3d 820, 830 (Utah 2004) ("Utah's
        bigamy statute serves the State's interest in protecting vulnerable individuals from exploitation
27      and abuse.  The practice of polygamy, in particular, often coincides with crimes targeting women
        and children.").

28

Gibson, Dunn &
Crutcher LLP

24

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

the very minimum, genuinely disputed by the parties.  Indeed, in many cases, Defendant-Intervenors'

assertions of fact are directly contradicted by the binding admissions of the chief legal officer of the

State.  *See* Monagas Decl., Exh. A (Attorney General's Responses To Plaintiff's Requests for

Admission, Set One).  That Defendant-Intervenors have decided to move for summary judgment at this

stage of the case—when discovery is scarcely underway but already tenaciously resisted by Defendant-

Intervenors—thus is nothing short of extraordinary.

Plaintiffs filed a motion for preliminary injunction in conjunction with their complaint because

they believed that this case could be resolved in their favor as a matter of law, without significant factual

investigation or discovery.  In response to that motion, however, the Court stated its view that disposition

of Plaintiffs' claims potentially required resolution of numerous factual questions including:

(1) "whether sexual orientation can be changed, and if so, whether gays and lesbians should be

encouraged to change it"; (2) "the relative political power of gays and lesbians, including successes

of both pro-gay and anti-gay legislation"; (3) "whether the characteristics defining gays and lesbians

as a class might in any way affect their ability to contribute to society"; (4) "the history of marriage

and whether and why its confines may have evolved over time"; (5) "the longstanding definition of

marriage in California"; (6) "whether the exclusion of same-sex couples from marriage leads to

increased stability in opposite-sex marriage or alternatively whether permitting same-sex couples to

marry same-sex couples to marry destabilizes opposite-sex marriage"; (7) "whether a married mother

and father provide the optimal child-rearing environment and whether excluding same-sex couples

from marriage promotes that environment"; (8) "whether and how California has acted to promote

these interests in other family law contexts"; and (9) "the voters' motivation or motivations for

supporting Prop 8, including advertisements and ballot literature considered by California voters."

Doc # 76 at 6-9.

Mindful of the fact that the ongoing harm to Plaintiffs commanded a "just, speedy and

inexpensive determination of these issues" (Doc # 76 at 9), the Court set an expedited schedule for

discovery and trial, with October 2, 2009 as the deadline for expert disclosure and reports, November

30, 2009 for all discovery other than rebuttal experts, December 31, 2009 for completion of rebuttal

expert discovery, and January 11, 2010 for commencement of trial.  Doc # 160.

Gibson, Dunn &
Crutcher LLP

25

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    Defendant-Intervenors requested an early opportunity to submit a motion in the nature of a

2    motion for judgment on the pleadings to dispose of those issues for which they contend "this Court's

3    not free to depart from binding precedent in the Ninth Circuit."  Monagas Decl., Exh. B (Aug. 19

4    Hearing Tr. at 58-59).  The Court therefore included a hearing date of October 14, 2009 for

5    dispositive motions.  Doc # 160.

6    But instead of a narrow motion presenting targeted arguments based on supposedly binding

7    precedent, Defendant-Intervenors have filed their 98-page tome that, while offering numerous

8    assertions of fact, presents no admissible evidence and have asked this Court to resolve every

9    question before it as if Defendant-Intervenors' assertions of fact about the nature of the institution of

10   civil marriage and etiology of sexual orientation and cause of the Italian depopulation and many,

11   many other matters all were universally-accepted truths.  Defendant-Intervenors' motion thus appears

12   calculated to prevent Plaintiffs from testing any of Defendant-Intervenors' assertions of fact in

13   discovery or trial and, ultimately, to preclude this Court from developing any factual record at all.

14   That Defendant-Intervenors' now seek to have this case decided not in a factual vacuum, but

15   on the basis of their own highly tendentious views on the very factual questions the Court posed to

16   the parties in its June 30, 2009 order (Doc # 76) is doubly concerning when viewed in light of

17   Defendant-Intervenors' efforts to frustrate Plaintiffs' ability to build a record on those same

18   questions.  When the Court first posed its factual questions to the parties, Defendant-Intervenors

19   represented that they would endeavor to minimize discovery burdens by reaching stipulations of fact

20   with Plaintiffs on at least some of the Court's factual inquiries.  But, though they professed openness

21   to reaching such agreements Defendant-Intervenors' ultimately agreed to none.  And when Plaintiffs

22   served a request for production of documents, Defendant-Intervenors took the surprising position that

23   *none* of the Court's factual questions were relevant to the legal questions before the Court, that *none*

24   of the documents requested by Plaintiffs (even those that Defendant-Intervenors ultimately produced)

25   were relevant to Plaintiffs' claims, and that, if any withheld documents were relevant, *all* of them

26   were privileged from discovery under the First Amendment.  Doc # 187.

27   Left with only the narrow pool of documents Defendant-Intervenors have deemed producible

28   (even if not relevant), Plaintiffs have inadequate documentary evidence to meaningfully depose any

Gibson, Dunn &
Crutcher LLP

26

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

witnesses.  Moreover, due to the October 2, 2009 deadline for expert disclosures, Plaintiffs have not

completed their own disclosures, and they do not know what factual issues will be raised by

Defendant-Intervenors' expert reports.  And because those reports are not yet available, Plaintiffs are

unable to depose Defendant-Intervenors' experts to determine what disputed factual issues exist.[5]

Nevertheless, even the thin record currently available to the parties lays bare the fallacious

nature of Defendant-Intervenors' many assertions of fact.  As a threshold matter, because Defendant-

Intervenors have not offered *any* admissible evidence, they have not "produce[d] evidence negating an

essential element of the nonmoving party's claim" (*Fritz*, 210 F.3d at 1102) and therefore cannot

conceivably have met their summary judgment burden.  *Id.*[6]  But even setting that deficiency aside, the

numerous assertions of fact that Defendant-Intervenors position as indisputable are very much so.

And as demonstrated below, many of those factual assertions are very plainly wrong.

### A.    Defendant-Intervenors Have Not Met Their Burden To Establish That There Are No Genuine Issues Of Material Fact As To The Appropriate Level Of Scrutiny Applicable To Classifications Based On Sexual Orientation.

As discussed in Part I, *supra*, Defendant-Intervenors assert (but fail to prove) that rational

basis review governs the inquiry at issue in this case and turn a willfully blind eye to the rigorous

requirements of strict or intermediate scrutiny that would apply if, as Plaintiffs contend, sexual

orientation is a suspect or quasi-suspect classification.  In addition to their failure to meet their legal

---

[5] Furthermore, Defendant-Intervenors only recently disclosed some of the state interests allegedly furthered by Prop. 8.  Until Defendant-Intervenors served their responses to Plaintiffs' first set of interrogatories on September 11, 2009, Plaintiffs were unaware of the alleged state interests in "seeing that the marriages [California] licenses are recognized outside the State" (Doc # 172-1 at 98), ensuring that California does not "becom[e] a magnet for persons across the nation seeking official recognition of" relationships between individuals of the same sex (*id.* at 99-100), and "conforming [California's] definition of marriage to that of the federal government" (*id.* at 100).  As a result, Plaintiffs have been unable to seek discovery related to those interests.

[6] In general, only admissible evidence is considered by a Court when ruling on summary judgment.  *See Beyene v. Coleman Sec. Servs.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988); Fed. R. Civ. P. 56(e).  To the degree that Defendant-Intervenors' factual assertions are meant to serve as evidentiary support, Plaintiffs object that none of the requirements of Rule 56(e) has been met:  there are no attached affidavits, Defendant-Intervenors have not properly sought judicial notice under Fed. R. Evid. 201 for Exhibits A–D and have not qualified any cited study as expert testimony under Fed. R. Evid. 702, and the exhibits and cited reports contain inadmissible hearsay under Fed. R. Evid. 801 and 802.

Gibson, Dunn & Crutcher LLP

burden on this central issue, Defendant-Intervenors also fail to meet their burden of establishing that there are no disputed issues of material fact that bear upon the appropriate level of equal protection scrutiny.  As such, summary judgment must be denied on this ground as well.

As this Court has recognized, a determination of the appropriate level of scrutiny applicable to Prop. 8's classification based on sexual orientation is a pivotal issue in this case.  Yet, Defendant-Intervenors provide no evidence on two of the requisite elements used to determine whether classifications based on sexual orientation are suspect or quasi-suspect: the history of discrimination against gay and lesbian individuals and whether characteristics defining gay and lesbian individuals affect their ability to contribute to society.  (*See* Part I.)  There is a reason for these glaring omissions—they are either indisputably satisfied in this case or, at the very least, there is substantial and material dispute on each of them.  *See, e.g.*, Monagas Decl., Exh. C (Defendant-Intervenors' Responses to Plaintiffs' First Set of Requests for Admission Nos. 14-18, 19); Exh. D (Plaintiffs' Responses to Defendant-Intervenors Proposition 8 Proponents' First Set of Interrogatories No. 15); Exh. A (Nos. 14-22, 29).  By failing to even address these two factors, Defendant-Intervenors apparently concede that, at the very least, factual issues exist as to the two most important elements of the heightened scrutiny inquiry.  That alone is sufficient to raise a genuine issue of material fact.[7]

Putting aside these issues, even the "evidence" Defendant-Intervenors offer to support their assertion that sexual orientation is not a suspect classification is rife with material factual disputes.  Defendant-Intervenors proffer two factors they believe are relevant to the determination of the appropriate level of scrutiny—whether gay and lesbian individuals (1) "are defined by an 'immutable' characteristic" and (2) "are politically powerless."  Doc # 172-1 at 57.  On both issues, Defendant-Intervenors have failed to meet their burden of establishing the absence of disputed material facts.

---

[7] The opposing party is not required to address issues outside those specifically raised by the moving party.  *See Katz v. Children's Hosp. of Orange County*, 28 F.3d 1520, 1534-35 (9th Cir. 1994) (denying a summary judgment motion because the moving party, in omitting a basis for summary judgment from its motion, failed to provide adequate notice to the opposing party).

Gibson, Dunn &
Crutcher LLP

28

**1.      There Are Disputed Issues Of Material Fact Concerning Whether Gay And Lesbian Individuals Are "Defined By An 'Immutable' Characteristic."**

Defendant-Intervenors first assert that "unlike classifications deemed by the Supreme Court as suspect, there is no objective way by which to identify a person as having a particular sexual orientation" (Doc #172-1 at 57) and suggest that selected statements in various articles somehow prove this point.  But whether there is an objective way to identify whether a person "belongs" to a particular group has nothing to do with the "immutability" of sexual orientation.  Indeed, even if that were somehow relevant, the issue weighs in favor of denying Defendant-Intervenors' motion so that the Court can hear the full range of evidence regarding the current understanding of sexual orientation.  *See, e.g.*, Monagas Decl., Ex. D (Nos. 11, 16); Exh. A (Nos. 9, 23-28).

Moreover, the Court need look no further than Defendant-Intervenors' own motion for summary judgment to find evidence of the multiple disputes underlying these issues.  For example, Defendant-Intervenors' attempt to support their contention by asserting that "sexual orientation shifts over time for a significant number of people."  Doc # 172-1 at 60.  Of course, even assuming arguendo that sexual orientation for some people may change naturally over time, that certainly does not mean that one's orientation at a particular instance in time can be changed by the individual's "choice" or, worse yet, by compulsion of the State.  But in any event, Defendant-Intervenors' argument against immutability is premised on a few sound bite quotations taken out of context, and ignores the weight of authority on this issue, including research on the harms associated with efforts to "shift" sexual orientation.  For example, Defendant-Intervenors quote Dr. Robert Galatzer-Levy's declaration from the *Marriage Cases* as stating "some individuals experience a shift in sexual orientation over the course of a lifetime."  Doc # 111-12 at 5.  But when that statement is read in context in the declaration, it is clear that Dr. Galatzer-Levy was *refuting* arguments that point to changes in behavior as evidence of a change in sexual orientation.  He states:  "Looking solely at the behavioral response to increasing societal acceptance of various sexual interests ignores the internal experience of the individual.  While an individual's sexual behavior may change as a result of increasing societal openness, this does not mean the individual experienced an internal shift in sexual orientation."  *Id*.  This is directly contrary to the point Defendant-Intervenors seek to prove, and it

Gibson, Dunn & Crutcher LLP

29

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1   demonstrates the existence of disputed material facts on which experts may voice their opinions

2   without the selective quotation and distortion employed here.

3        Likewise, the most recent report from the American Psychological Association Task Force on

4   Appropriate Therapeutic Responses to Sexual Orientation, published in August 2009, states: "[T]he

5   results of scientifically valid research indicate that it is unlikely that individuals will be able to reduce

6   same-sex attractions or increase other-sex attractions through SOCE [sexual orientation change

7   efforts]." Monagas Decl., Exh. E (Am. Psychological Ass'n, *Appropriate Therapeutic Responses to*

8   *Sexual Orientation* 3 (2009), at www.apa.org/pi/lgbc/publications/therapeutic-response.pdf

9   (hereinafter "Therapeutic Responses Report")).   And the report states that the task force "found that

10  there was some evidence to indicate that individuals experienced harm from SOCE." *Id.*  These

11  examples highlight Defendant-Intervenors' failure to meet their burden on the question of whether

12  sexual orientation can be changed, and if so, whether gay and lesbian individuals should be

13  encouraged to change it.  Indeed, Defendant-Intervenors' outlandish claims on this point only

14  underscore that, to the extent these issues are even relevant to the Court's determination, there is no

15  credible evidence that sexual orientation can (or should) be altered.

16   **2.      There Are Disputed Issues Of Material Fact Concerning Whether Gay And
17          Lesbian Individuals "Wield Substantial Political Power."**

18        Defendant-Intervenors also contend that the appropriate level of scrutiny applied to Prop. 8

19  depends on whether gay and lesbian individuals can be said to "wield substantial political power."

20  Again, putting aside whether this question is ultimately relevant to the legal determination at issue,

21  Defendant-Intervenors fail to provide any evidence that could meet their burden to establish that there

22  is no genuine issue of material fact on this question in at least two ways.  First, they fail to offer a

23  single comparison of the political power of gay and lesbian individuals to other groups and, as a

24  result offer no evidence establishing the *relative* political power of gay and lesbian individuals.

25  Second, and perhaps more importantly, Defendant-Intervenors ignore the substantial available

26  evidence that gay and lesbian individuals are politically vulnerable and unable to protect even their

27  most basic, fundamental rights against the will of the majority.  Indeed, Prop. 8 and the other

28  constitutional amendments forbidding same-sex marriage provide one of the clearest examples of that

Gibson, Dunn &
Crutcher LLP

1  vulnerability.  The willingness and ability to amend state constitutions and effectively shut down

2  political avenues that protect minority rights is a testament to the vulnerability of this group.

3       Moreover, it is manifest that there are numerous factual disputes concerning the scope and

4  impact of ongoing discrimination against gay and lesbian individuals.  *See, e.g.*, Monagas Decl., Exh.

5  F (Plaintiffs' Responses to Defendant-Intervenors' First Set of Requests for Admission Nos. 1-4);

6  Exh. D (No. 12).  Incredibly, Defendant-Intervenors deny that such discrimination exists.  Monagas

7  Decl., Exh. C (Nos. 14-19).  This denial can only demonstrate a willful ignorance of objective facts

8  and does not entitle them to summary judgment.  Indeed, the federal government still engages in

9  institutionalized discrimination against gay and lesbian individuals through the military's

10  discriminatory policies such as "don't ask/don't tell."  *See, e.g.*, *Philips v. Perry*, 106 F.3d 1420, 1421

11  & n.1 (9th Cir. 1997) (describing "don't ask/don't tell"); *High-Tech Gays*, 895 F.2d at 565 (reviewing

12  the Department of Defense's policy of "subjecting all homosexual applicants for Secret and Top

13  Secret Clearances to expanded investigations and mandatory adjudications").  Similarly, the Defense

14  of Marriage Act, 1 U.S.C. § 7, denies gay and lesbian individuals the federal benefits of marriage,

15  even when gay and lesbian individuals get married in accordance with state law.  There can be no

16  credible dispute about the existence of these facts or that these laws operate to deprive gay and

17  lesbian individuals of rights that all other U.S. citizens enjoy.

18       Defendant-Intervenors have admitted that gay and lesbian individuals have not been able to

19  secure national legislation to protect them from discrimination in housing, employment, or public

20  accommodations or to protect them from hate crimes.  *See* Monagas Decl., Exh. C (Nos. 35-36).

21  Because gay and lesbian individuals in many areas of the United States cannot protect themselves

22  from being fired, kicked out of an apartment, or refused service at a restaurant because of their sexual

23  orientation, there are disputed issues of fact as to whether they are at least as vulnerable as any other

24  identified group that receives the protection of heightened scrutiny.

25       Likewise, that gay and lesbian individuals are underrepresented in government demonstrates

26  their political vulnerability as a group.  Defendant-Intervenors have admitted that there are only three

27  openly gay members of the U.S. House of Representatives, no openly gay Senators, and no openly

28  gay governors.  *See* Monagas Decl., Exh. C (Nos. 30-31).  No openly gay person has ever been

Gibson, Dunn &
Crutcher LLP

31

appointed to a Cabinet Secretary position.  *See* Monagas Decl., Exh. C (No. 32).  This establishes multiple disputed issues concerning the relative political power of the group.

**B.      Defendant-Intervenors Have Not Met Their Burden To Establish That There Are No Genuine Issues Of Material Fact As To The Existence Of A Legitimate State Interest That Is Rationally Related To Prop. 8.**

Putting aside the extensive factual and legal disputes related to the appropriate level of scrutiny, Defendant-Intervenors even fail to meet their self-described burden to establish the absence of disputed material facts with respect to whether Prop. 8 meets the rational basis standard.   As Plaintiffs explained in Part I, to satisfy that standard, Defendant-Intervenors must demonstrate that *Prop. 8*—not California's laws granting heterosexual individuals the right to marry—furthers a legitimate state interest.  Not only have they failed to meet this burden as a legal matter, Defendant-Intervenors acknowledge that Prop. 8 will fail rational basis review if "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true."  Doc # 172-1 at 30 (citing *Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 464 (1981)).  As set forth below, Defendant-Intervenors have failed to meet their burden to show the absence of disputed material facts with respect to that question as to each of the six state interests they identify.  Indeed, many of the "legislative facts" on which Defendant-Intervenors explicitly or implicitly rely are demonstrably false or, at a minimum, sufficiently contestable to require denial of the instant motion.

**1.      Defendant-Intervenors' Proffered State Interests**

a.      ***Procreation.***  Defendant-Intervenors contend that the "traditional institution of marriage promotes the formation of naturally procreative unions."  Doc # 172-1 at 78.  The *only* manner in which Prop. 8 could conceivably promote California's interest in procreation would be if a prohibition on marriage by individuals of the same sex encouraged gay and lesbian individuals to marry a person of the opposite sex or increased the number of marriages between heterosexual individuals.  Defendant-Intervenors provide no evidence to support these implausible positions and, they are, at a minimum, disputed issues of fact suitable for resolution at trial, not on summary judgment.  *See, e.g.*, Monagas Decl., Exh. F (Nos. 113, 116-119); Exh. D (Nos. 7, 17).

Gibson, Dunn & Crutcher LLP

Defendant-Intervenors' assertions regarding procreation and parenting rely on the faulty premise that "depopulation, not overpopulation, is the threat most to be feared in the contemporary context." Doc # 172-1 at 78-82 (citation omitted). This is, to put it mildly, not a universally accepted idea. For example, one of the sources cited by Defendant-Intervenors for the alarm regarding depopulation is Joseph Chamie, former director of the population division of the United Nations. Doc # 172-1 at 80. But Chamie actually has argued that this use of population statistics is misdirected. A recent article quotes him as stating that "notions that population growth is a boon for prosperity – or that national political success depends on it – are 'Ponzi demography' . . . . The profits of growth go to the few, and everyone else picks up the tab." Monagas Decl., Exh. G (David R. Francis, *Is Population Growth a Ponzi Scheme?*, CHRISTIAN SCIENCE MONITOR, Aug. 17, 2009, *at* http://features.csmonitor.com/economyrebuild/2009/08/17/economic-scene-is-population-growth-a-ponzi-scheme/). "A stable or falling population, he says, 'is not a disaster. It is a success.'" *Id.* Of course, it is unnecessary to even engage in Defendant-Intervenors' misguided population debate as they provide no evidence to establish that permitting same-sex couples to marry would decrease the rates of opposite-sex marriage or of birth rates.

b. ***"Responsible Procreation."*** Defendant-Intervenors also argue that Prop. 8 advances the State's interest in "responsible procreation" by "channel[ing] opposite-sex relationships into the lasting, stable unions that are best for raising children of the union." Doc # 172-1 at 72. The suggestion that same-sex couples are worse parents than opposite-sex parents because children are generally better off when raised by both of their biological parents (Doc # 172-1 at 87-90) is a statement of prejudice, not fact. According to the American Psychiatric Association, "Numerous studies have shown that the children of gay parents are as likely to be healthy and well adjusted as children raised in heterosexual households. Children raised in gay or lesbian households do not show any greater incidence of homosexuality or gender identity issues than other children." Monagas Decl., Exh. H (Am. Psychiatric Ass'n, Gay/Lesbian/Bisexuals, *at* http://www.healthyminds.org/More-Info-For/GayLesbianBisexuals.aspx).

Defendant-Intervenors cite a 2002 research brief finding that children raised by stepparents have lower levels of well-being than those raised by biological parents. Doc #172-1 at 90. But this

Gibson, Dunn &
Crutcher LLP

33

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

2002 research brief considers only subsets of heterosexual couples (married, remarried, divorced, cohabiting) and does not evaluate the relative well-being of children raised by same-sex couples or even by opposite-sex couples who adopt. *See* Monagas Decl., Exh. I (Kristin Anderson Moore et al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children and What Can We Do About It?*, Child Trends Research Brief at 1-2 (June 2002)). The 2003 study of Yongmin Sun has the same flaws as Moore's research brief. Moreover, Sun's research indicates that resources and trauma may account for all of the differences observed between children living with a biological parent and those who were not. Monagas Decl., Exh. J (Yongmin Sun, *The Well-Being of Adolescents in Households with No Biological Parents*, 65 J. MARRIAGE & FAM. 894, 905-08 (2003)). To the degree this is relevant at all, it weighs against a finding that a biological connection determines outcomes for children.[8]

Most importantly, Defendant-Intervenors have failed to show how excluding same-sex couples from civil marriage would in any way undermine the relationship that parents have with their biological children. *See, e.g.*, Monagas Decl., Exh. D (Nos. 8, 14). At best, their argument implies that if same-sex couples marry, they are more likely to have children. If anything, this illustrates why an attack on same-sex marriage is truly an attack on gay and lesbian families. It undermines a potential source of strength for those families, while at the same time seeking to discredit and stigmatize the value of their existence.

c.    ***Tradition.*** Defendant-Intervenors further contend that "[p]reserving the traditional institution of marriage is itself a legitimate state interest." Doc # 172-1 at 70. As explained in Part I, Defendant-Intervenors' attempt to constrain the fundamental right defined by the Supreme Court as a

---

[8] Defendant-Intervenors' citation to literature related to adoption is similarly inapposite and misleading. Doc # 172-1 at 88-89. At best, it stands for the simple proposition that children want to know the full stories about themselves and that familial connections, based on biology or experience, are important to children. What is most unfortunate about this assertion is that it obscures and demeans the determination, skill, and love of parents—both heterosexual and non-heterosexual—who adopt and privileges a biological connection over good parenting. Not surprisingly, valid studies such as those referenced by the American Psychological Association show that good parenting is about how one relates to and interacts with a child, not a genetic connection, thereby creating additional disputes of material fact.

Gibson, Dunn &
Crutcher LLP

right to opposite-sex marriage is unsupportable as a legal matter and therefore cannot be a rational basis justifying Prop. 8.  Additionally, Defendant-Intervenors' arguments on this point underscore the many disputed factual issues at the heart of this asserted basis.  *See, e.g.*, Monagas Decl., Exh. F (Nos. 123-129, 131); Exh. D (Nos. 3, 13); Exh. A (No. 10).

For example, Defendant-Intervenors focus on how same-sex marriage has only recently been recognized by state governments within the United States.  Doc # 172-1 at 38.[9]  But this ignores the larger, and more pertinent, question of whether marriage has retained a stable definition throughout history.  This is an issue on which there are significant factual disputes because there is substantial evidence that the role of marriage in the United States and the legal rules surrounding and defining marriage have evolved over time.  *See, e.g.*, Monagas Decl., Exh. K (Nancy Cott, *Public Vows: A History of Marriage and the Nation* (2000); Herma Hill Kay, *From the Second Sex to the Joint Venture: An Overview of Women's Rights and Family Law in the United States During the Twentieth Century*, 88 CAL. L. REV. 2017 (2000)).  A full explanation of this evolution and its bases is beyond the scope of this brief.  Rather, it is more properly the subject of factual investigation and expert testimony, which only weighs in favor of denying summary judgment and proceeding to trial.

d.   ***Defendant-Intervenors' Other Proffered State Interests.***  Defendant-Intervenors list three other (newly discovered)[10] bases they assert would support Prop. 8 if it is reviewed under the rational basis standard—(1) that California has a legitimate interest in ensuring that its marriages are recognized in other jurisdictions (Doc # 172-1 at 99); (2) that Prop. 8 serves the State's interest in not becoming a so-called "marriage mill" for persons who reside in other States (Doc # 172-1 at 80); and (3) administrative convenience (Doc # 172-1 at 100).  But like the other bases they rely on, Defendant-Intervenors fail to establish that there are no genuine issues of material fact that these bases would meet the rational basis standard (if it is applied).  Their silence is telling; each basis

---

[9]  Defendant-Intervenors make this effort in an attempt to frame the "fundamental right" as the right to "same-sex marriage."  As described in Part I, Defendant-Intervenors are wrong.

[10]  These interests first surfaced in Defendant-Intervenors' responses to Plaintiffs' first set of interrogatories (served on September 11, 2009).  Defendant-Intervenors had not previously raised these interests in either their Answer or their response to Plaintiffs motion for preliminary injunction.

Gibson, Dunn & Crutcher LLP

35

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    requires the resolution of significant factual disputes.  Defendant-Intervenors cannot meet their

2    burden by simply asserting, in the abstract, that the State might have an interest.  They must show

3    that there is no genuine issue of disputed fact that the classification drawn by Prop. 8 is rationally

4    related to the asserted state interest.  Because Defendant-Intervenors have failed to meet that burden

5    with respect to each of these interests and because each of these interests raises issues of disputed

6    fact, the motion must be denied.

7         First, Defendant-Intervenors fail to demonstrate that California's purported interest in

8    ensuring that its marriages are recognized by other jurisdiction is rationally related to the

9    classification drawn by Prop. 8.  Defendant-Intervenors rely on case law discussing state interests in

10   the validity of divorces and the desire not to become "divorce mills" for this proposition.  (Doc #

11   172-1 at 98-99)  From a policy perspective, given the traditional negative attitudes about divorce, it

12   makes sense that one would not want to serve as a "divorce capital," but that does not necessarily

13   equate to an identical concern about marriage.  While there are certainly public policy justifications

14   for refusing to honor marriages performed in other jurisdictions (*e.g.*, if another State might allow

15   people to get married under your state's legal age, etc.), it is by no means clear from the case law on

16   which Defendant-Intervenors rely that California should not perform marriages simply because they

17   may not be recognized in other States.

18        Second, with respect to whether Prop. 8 serves the State's purported interest in not becoming

19   a so-called "marriage mill," there is a material dispute on at least two central issues –(1) whether the

20   invalidation of Prop. 8 is likely to result in any negative effects (Defendant-Intervenors fail to outline

21   any); and (2) whether there is any rational reason to believe that such a "marriage mill" effect is

22   likely.  Indeed, California did not appear to have any such concern during the period of time that

23   same-sex marriages were permitted in California.  Quite the opposite – the State experienced a

24   substantial financial windfall from those couples from outside the state who came to have their

25   marriages performed in California.  *See, e.g.*, Monagas Decl., Exh. L (Alana Semuels, *Gay Marriage*

26   *a Gift to California's Economy,* L.A. TIMES, June 15, 2008, *at* http://articles.latimes.com/Alana

27   Semuels*, Gay Marriage a Gift to California's Economy,* L.A. TIMES, June 15, 2008, *at*

28   http://articles.latimes.com/2008/jun/02/business/fi-wedding2,2008/jun/02/business/fi-wedding2).

Gibson, Dunn &
Crutcher LLP

36

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

Finally, to determine whether the interest of administrative convenience is served by Prop. 8, the Court may need to examine (at least) the relative administrative burdens and benefits that may or may not flow from a law prohibiting marriage by same-sex couples.  Defendant-Intervenors argue that "[b]y conforming its definition of marriage to that of the federal government, California thus relieves both the federal government and itself . . . of the burden of distinguishing between same-sex and opposite-sex marriages."  Doc # 172-1 at 100.  But they do not offer any evidence to support that contention and they cannot evade the requirement to do so.  It is by no means clear that invalidation of Prop. 8 would result in any material burden to the State of California.  In fact, publicly available evidence indicates that the opposite is true.  *See, e.g.*, Monagas Decl., Exh. M (Ballot Pamphlet materials for Proposition 8, California General Election, November 4, 2008).  This is particularly true given the many benefits that may accrue to the State if same sex marriage is not prohibited.

### 2. Defendant-Intervenors Have Failed To Establish The Absence Of Dispute Concerning Any Discriminatory Intent That May Underlie Prop. 8.

Placed in the light of the substantial disputes concerning whether any of Defendant-Intervenors' asserted state interests are "rational", Defendant-Intervenors' admission that "when a law cannot find any support in rationality, a court may rightly conclude that it was driven by irrational prejudice" establishes further grounds for denial of the instant motion.  Doc # 172-1 at 102.  Defendant-Intervenors offer nothing sufficient to meet their burden to establish the absence of any dispute on material facts related to this inquiry.  Instead, they resort to labeling the concern that Prop. 8 may have been the product of animus against gay and lesbian individuals as "specious."  Doc # 172-1 at 101.  Such a cursory treatment of a serious and concerning issue is insufficient, particularly in light of publicly available evidence which may yield very different conclusions.  *See, e.g.*, Monagas Decl., Exh. F (No. 132); Exh. D (No. 4); Exh. A (No. 51).

For example, even the evidence presently available in this case illustrates that the campaign materials used in conjunction with Prop. 8 emphasize messages that bear no relationship to any of the state interests asserted by Defendant-Intervenors.  Indeed, there is evidence that the campaign in support of Prop. 8 was designed to avoid using interests such as "traditional marriage" as a means to appeal to California voters.  Frank Schubert, the campaign manager for Yes on Proposition 8, has stated:

Gibson, Dunn & Crutcher LLP

37

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

> We knew from the very beginning that a campaign that was simply an affirmation of traditional marriage that did not develop a path that led voters to consider consequences to legaliz[ing] same-sex marriage in California—that formula would not be successful, we would not get fifty percent of the vote.  And so we redefined the measure as not being about tolerance of gay relationships but being about consequences of gay marriage.

American Association of Political Consultants Proposition 8 Case Study, 2009 Pollie Awards and Conference (Mar. 28. 2009), *at* http://www.youtube.com/watch?v=ngbAPVVPD5k.

Likewise, none of the "consequences" offered by the Prop. 8 campaign accords with the purported interests now advanced by Defendant-Intervenors in this lawsuit.  The campaign raised the specter of: (1) "people sued over personal beliefs," (2) "churches could lose their tax exemption," and most especially (3) "gay marriage taught in public schools."  *See, e.g.*, *Whether You Like It Or Not*, Yes on 8 Television advertisement, *at* http://www.youtube.com/watch?v=4kKn5LNhNto.

These consequences tied into fear and disapproval of gay and lesbian individuals and their relationships.  For example, Andrew Pugno, in a letter supporting the factual claims made in *Whether You Like It Or Not*, stated "A well documented trend in current litigation is claims against private individuals and organizations who morally object to homosexual relationships.  These suits usually arise under California's laws forbidding discrimination on the basis of sexual orientation in employment, public accommodations, and housing."  *See* Monagas Decl., Exh. N (Letter from Andrew P. Pugno to Station Managers (Sept. 29, 2008), produced by Defendant-Intervenors, *at* DEFINT_PM_003184).

As the campaign progressed, the Yes on 8 advertisements focused increasingly on education and children, advancing interests and justifications that bear no relationship to the state interests asserted by Defendant-Intervenors.  *See, e.g.*, *Everything to do with Schools*, Yes on 8 Television advertisement, *at* http://www.protectmarriage.com/video/view/7; *It's Already Happened*, Yes on 8 Television advertisement, *at* http://www.protectmarriage.com/video/view/5.  In *It's Already Happened*, a young girl runs up to her mother and says, "Mom, guess what I learned in school today?" The mother responds, "What sweetie?"  The girl says, "I learned how a prince married a prince, and I can marry a princess," and hands a book to her mother.  The mother looks at the book in horror and disapproval.  In an attempt to show that these were not theoretical concerns, the Yes on 8

Gibson, Dunn & Crutcher LLP

38

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

campaign gave example of legal actions within other states.  One example was that of the Parker family.  In describing what happened when he objected to school administrators about the picture of a gay male couple with a child in a "diversity bookbag," David Parker stated:  "One of the reasons they give is they said, 'Same-sex marriage is legal in Massachusetts, therefore we can broach it any time with your child.'  And when they are putting forward that it's equal, they are putting forward that it's a morally equal alternative and affirming it in the minds of children."  *Gay Marriage Already Being Taught in Schools in Massachusetts—The Parker Family*, *at* http://www.youtube.com/watch?v= puI4pfRB0w0.  This sampling of the publicly available evidence reveals both factual disputes concerning the basis for the enactment of Prop. 8 as well as the discontinuity between the interests Defendant-Intervenors now assert and those they used to convince voters to vote in favor of Prop. 8.

> **3.**    **Defendant-Intervenors Have Not Met Their Burden To Establish The Absence of Material Dispute As To Whether Prop. 8 Is Properly Characterized As A Sex-Based Classification.**

Many of the same reasons that preclude summary judgment for Defendant-Intervenors on Plaintiffs' claim that Prop. 8 unconstitutionally discriminates against gay and lesbian individuals on the basis of their sexual orientation also establish that they have failed to establish the absence of disputed fact as to whether Prop. 8 impermissibly discriminates against gay and lesbian individuals on the basis of their sex.  Putting aside the fact that Defendant-Intervenors have offered nothing that could satisfy their burden if Prop. 8 is a sex-based classification, as explained above, the state interests identified by Defendant-Intervenors are not legitimate government interests rationally related to Prop. 8's prohibition on marriage by individuals of the same sex—let alone, important interests that are substantially related to Prop. 8's discriminatory and irrational treatment of gay and lesbian individuals.

> **C.**    **Defendant-Intervenors Have Not Met Their Burden To Establish That There Are No Genuine Issues Of Material Fact As To Plaintiffs' Due Process Claims.**

As Plaintiffs noted with respect to the legal issues in Part I, Defendant-Intervenors' request for summary judgment on Plaintiffs' due process claim fails for many of the same reasons as their request for summary judgment on the equal protection claim.  First, because Prop. 8 infringes upon gay and lesbian individuals' fundamental right to marry, Defendant-Intervenors' failure to offer any

Gibson, Dunn & Crutcher LLP

39

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1    evidence sufficient to show that Prop. 8 can survive strict scrutiny requires denial of their motion.

2    Indeed, there is substantial and material dispute about whether analysis of this case properly hinges

3    on Plaintiffs' fundamental right to "marriage" or whether, as Defendant-Intervenors contend, it

4    should concern gay and lesbian individuals' right to "same-sex marriage." *See, e.g.*, Monagas Decl.

5    Exh. A (No. 44).  This dispute itself makes clear why Defendant-Intervenors' reliance on *Glucksberg*,

6    521 U.S. at 702, is misguided, misperceives Plaintiffs' allegations, and is insufficient to warrant

7    summary judgment.

8         Likewise, even if this Court concludes that rational basis review should be applied to

9    Plaintiffs' due process claim, summary judgment would still be inappropriate because, as discussed

10   *infra*, Defendant-Intervenors have failed to meet their burden to establish that there are no genuine

11   issues of disputed fact as to whether Prop. 8's arbitrary and irrational restriction on the right of gay

12   and lesbian individuals to marry furthers *any* legitimate state interest.  Indeed, as discussed in the

13   previous section, there is substantial evidence that the role of marriage in the United States and the

14   legal rules surrounding and defining marriage have evolved over time.  *See, e.g.*, Monagas Decl.,

15   Exh. K (Nancy Cott, Public Vows: A History of Marriage and the Nation (2000); Herma Hill Kay,

16   *From the Second Sex to the Joint Venture: An Overview of Women's Rights and Family Law in the*

17   *United States During the Twentieth Century*,  88 Cal. L. Rev. 2017 (2000)).  Defendant-Intervenors

18   offer nothing to counter this evidence beyond assertions about the way they believe society has

19   always viewed the institution of marriage.

20   **III.    In The Alternative, The Court Should Deny Summary Judgment On The Ground**
     **That Plaintiffs Have Not Had Sufficient Opportunity To Obtain Discovery**
21   **Necessary To Oppose The Motion.**

22        Defendant-Intervenors' extraordinary summary judgment motion asks this Court to resolve

23   *every* factual issue presented in this case in their favor as a matter of law, and to do so at a time when

24   expedited discovery has only just begun.  As explained above, Plaintiffs believe that the Court can

25   and should deny the motion on its merits because it is legally unfounded and because even the partial

26   record currently available shows the existence of numerous genuine issues of material fact.  But in

27   the event this Court disagrees, then the Court should, in the alternative, deny Defendant-Intervenors'

28   motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  *See, e.g.*, *Harkins Amusement*

Gibson, Dunn &
Crutcher LLP

40

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1   *Enterprises, Inc. v. General Cinema Corp.*, 850 F.2d 477, 490 (9th Cir. 1988) (Rule 56(f) asserted as

2   alternative grounds for denial of motion for summary judgment).  With the parties only about one

3   month in to a several-month discovery schedule, it would be both unjust and contrary to the Rules of

4   Civil Procedure to grant summary judgment before Plaintiffs have the opportunity to build a record

5   on the factual issues presented by their claims.

6          Rule 56(f) provides that a court may deny a motion for summary judgment "[i]f a party

7   opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to

8   justify its opposition."  Thus, the requirement that a party opposing summary judgment demonstrate

9   genuine issues in dispute "is qualified by Rule 56(f)'s provision that summary judgment be refused

10  where the nonmoving party has not had the opportunity to discover information that is essential to his

11  opposition."  *Anderson*, 477 U.S. at 250 n.5.  Summary judgment in the face of requests for

12  additional discovery is appropriate only where such discovery would be "'fruitless' with respect to

13  the proof of a viable claim."  *Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004) (citations omitted);

14  *see also Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes,* 323 F.3d 767, 773 (9th Cir.

15  2003) ("Where . . . a summary judgment motion is filed so early in the litigation, before a party has

16  had any realistic opportunity to pursue discovery relating to its theory of the case, district courts

17  should grant any Rule 56(f) motion fairly freely.") (citation omitted).

18         Thus, summary judgment should be denied whenever the party opposing summary judgment

19  demonstrates that it has (1) "set forth in affidavit form the specific facts that [it] hope[s] to elicit from

20  further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to

21  resist the summary judgment motion."  *California v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998).

22  But where, as here, virtually no discovery has taken place, a lesser showing of specificity is

23  permissible because "the party making a Rule 56(f) motion cannot be expected to frame its motion

24  with great specificity as to the kind of discovery likely to turn up useful information, as the ground

25  for such specificity has not been laid."  *Burlington N.*, 323 F.3d at 774.

26         If the Court is not inclined to deny Defendant-Intervenors' motion on its merits at this stage,

27  then it should deny the motion pursuant to Rule 56(f).

28

Gibson, Dunn &
Crutcher LLP

41

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

**A.      Plaintiffs Are Currently Developing The Facts Identified By The Court In Its June 30 Order And On Which Their Claims Will Turn.**

As explained in Part II, *supra*, Defendant-Intervenors fail to establish any undisputed issues of material fact.  But even if they did, the Court should nonetheless deny summary judgment under Rule 56(f) because Plaintiffs—if given the opportunity—can and will develop the facts identified by the Court in its June 30 Order and refute the factual assertions made by Defendant-Intervenors.  Those facts exist, are currently being developed, and are essential to Plaintiffs' opposition to summary judgment in this case because they will demonstrate the existence of genuine issues of material fact that cannot be decided in Defendant-Intervenors' favor as a matter of law.  As set forth in more detail in the accompanying Declaration of Christopher D. Dusseault, Plaintiffs are currently taking steps to develop those facts through discovery and to build the complete factual record the Court requested at the outset.  *See* Declaration of Christopher D. Dusseault in Support of Plaintiffs' and Plaintiff-Intervenor's Joint Opposition to Defendant-Intervenors' Motion for Summary Judgment ("Dusseault Decl.").  Plaintiffs will develop these facts through documentary evidence, fact witnesses, and a combination of testimony by their experts as well as concessions obtained from Defendants-Intervenors' experts.

**1.      Plaintiffs Will Use Discovery To Develop Facts Related To Plaintiffs' Equal Protection Claim.**

If given an opportunity, Plaintiffs can and will develop a substantial factual record in support of their equal protection claim.  Those facts relate to the following issues:

a.      ***Prop. 8 Discriminates on the Basis of Sexual Orientation.***  Plaintiffs expect to discover facts demonstrating that Prop. 8 discriminates against, and disproportionately impacts, gay and lesbian individuals, depriving them of rights and opportunities enjoyed by those with a different sexual orientation.  Plaintiffs are currently working with experts to review and analyze the social and psychological conditions of marriage to demonstrate that same-sex couples and opposite-sex couples are similarly situated with respect to marriage.  Plaintiffs expect to obtain significant concessions from Defendant-Intervenors' experts with regard to Prop. 8's discrimination on the basis of sexual orientation.  Plaintiffs also seek to obtain admissions from Defendant-Intervenors on this issue that

42

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

Gibson, Dunn &
Crutcher LLP

would be binding on them as a party, and to obtain statements that contradict their positions and arguments on this issue from document and deposition testimony.  Dusseault Decl. ¶ 6.  The evidence sought by Plaintiffs will refute, among other things, Defendant-Intervenors' contention that "same-sex couples are not situated similarly to their opposite-sex counterparts" because "the institution of marriage is and always has been bound up with the procreative nature of sexual relationships between men and women."  Doc # 172-1 at 54-55.

> b. ***Strict Scrutiny Applies to Plaintiffs' Claims.***  Plaintiffs are currently developing facts directly relevant to the appropriate level of scrutiny applicable to classifications based on sexual orientation.  These facts will demonstrate that classifications based on sexual orientation are subject to strict scrutiny.  For example, Plaintiffs are currently working with historians to review and analyze the history of discrimination against gay and lesbian individuals.  Plaintiffs are currently working with experts to demonstrate that gay and lesbian individuals are defined by a characteristic that bears no relation to ability to perform or contribute to society and that gay and lesbian individuals exhibit obviously immutable or distinguishing characteristics that define them as a discrete group.  Finally, Plaintiffs are currently working with political historians to demonstrate that gay and lesbian individuals have been prevented from protecting themselves through the political process.  Plaintiffs expect that their experts will opine that the persecution suffered by gay and lesbian individuals in the United States has been severe; the characteristics defining gay and lesbian individuals as a class do not in any way affect their ability to contribute to society; sexual orientation and sexual identity are so fundamental to one's identity that a person should not be required to abandon them; and gay and lesbian individuals are politically disadvantaged.  Plaintiffs also expect to obtain significant concessions from Defendant-Intervenors' experts with regard to the factors considered when determining the appropriate level of scrutiny.  Plaintiffs also seek to obtain admissions from Defendant-Intervenors on this issue that would be binding on them as a party on some or all of these issues, and to obtain statements that contradict their positions and arguments on this issue from document and deposition testimony.  Dusseault Decl. ¶ 8.  The evidence sought by Plaintiffs will refute, among other things, Defendant-Intervenors' contention that "sexual orientation is not immutable" and that "gays and lesbians wield substantial political power."  Doc # 172-1 at 57, 63.

43

Gibson, Dunn & Crutcher LLP

c.      ***There Are No Rational Bases for Prop. 8.***  Even if strict scrutiny does not apply,

Plaintiffs will demonstrate that there is no rational basis for Prop. 8.  Plaintiffs are currently working

with experts to demonstrate that the various purported state interests Defendant-Intervenors advance

are neither legitimate nor rationally related to Prop. 8.  Dusseault Decl. ¶ 9.  Plaintiffs' experts own

research has refuted many of Defendant-Intervenors' purported state interests, including Defendant-

Intervenors' assertion that the primary purpose of marriage is the furtherance of "naturally

procreative" relationships and the stabilization of "traditional" families, consisting of "biological

parents" and their "biological children."  Plaintiffs will also refute Defendant-Intervenors' assertions

that heterosexual parents who "naturally procreate" and produce "biological" offspring make better

parents than same-sex couples, and the corollary that same-sex couples (or other couples) who adopt

or have children through assisted reproductive techniques are sub-optimal parents.  *See* Doc # 172-1

at 87-90.  Plaintiffs also expect to obtain significant concessions from Defendant-Intervenors and

their experts with regard to the purported state interests Defendant-Intervenors proffer, including

acknowledgments that there is no nexus between the stated justifications and Prop. 8.  Plaintiffs also

seek to obtain admissions from Defendant-Intervenors on this issue that would be binding on them as

a party, such as, for example, concessions that certain justifications for Prop. 8 being advanced in this

litigation are not rational and would not be accepted by rational voters.  Indeed, many of these

justifications were never presented to the voters, likely for that reason.  Plaintiff also seek to obtain

statements that contradict Defendant-Intervenors' positions and arguments on this issue from

document and deposition testimony.    The evidence sought by Plaintiffs will refute Defendant-

Intervenors' contentions that, among other things,  "The people of California have a legitimate

interest in calling different things by different names"; "The people of California have a legitimate

interest in taking a cautious, incremental approach in addressing controversial social issues";

"Establishing parallel institutions allows California flexibility to separately address the needs of

different types of relationships"; "The traditional institution of marriage promotes the formation of

naturally procreative unions"; "The traditional institution of marriage promotes stability and

responsibility in naturally procreative relationships"; "The traditional institution of marriage

promotes the natural and mutually beneficial bond between parents and their biological children";

Gibson, Dunn &
Crutcher LLP

1   "California does not undermine the legitimacy of its marriage laws by extending domestic partnership

2   benefits to same-sex couples"; "California does not undermine its marriage laws by allowing couples

3   who cannot or intend not to have children to marry"; and "California has a legitimate interest in

4   ensuring that its marriages are recognized in other jurisdictions."  Doc # 172-1 at 70-100.

5        Plaintiffs also will demonstrate that Prop. 8 harms the interests of state and local

6   governments.  For example, Plaintiffs are currently working with experts to demonstrate and quantify

7   the harms lesbian and gay adults and youth, as well as their families and children, experience as a

8   result of Prop. 8, and the costs associated with addressing and ameliorating these harms.  Plaintiffs

9   are also seeking documentary evidence from the State that will address California's laws and public

10  policies governing families, including those headed by lesbians and gay men as well as those headed

11  by opposite-sex couples.  Plaintiffs expect to obtain significant concessions from Defendant-

12  Intervenors' experts with regard to the fact that Prop. 8 harms the interests of state and local

13  governments.  Additionally, through document requests and deposition testimony, Plaintiffs expect to

14  obtain admissions and impeachment evidence from the Defendant-Intervenors themselves that would

15  be binding on them as a party.  Dusseault Decl. ¶ 10.  The evidence sought by Plaintiffs will refute,

16  among other things, Defendant-Intervenors' contention that "it is rational for the people of California

17  to preserve the traditional institution of marriage."  Doc # 172-1 at 48.

18        d.    ***Prop. 8 Was Passed with a Discriminatory Intent.***  Plaintiffs are currently developing

19  facts that will demonstrate that the purported state interests raised by Defendant-Intervenors are

20  neither legitimate nor rationally related to Prop. 8.  As part of this showing, Plaintiffs expect to

21  discover facts demonstrating that Prop. 8 was instead driven by irrational considerations, including

22  but not limited to misconceptions, animus and moral disapproval of gay and lesbian individuals, and

23  that Prop. 8 was devised, promoted, and supported by groups and individuals that morally disapprove

24  of gay and lesbian individuals and did not want the committed, long-term relationships of gay and

25  lesbian individuals to be deemed "okay" or "as good as" the marital relationships entered into by

26  couples of the opposite sex.  In particular, Plaintiffs are seeking documents and written discovery

27  from Defendant-Intervenors and their campaign consultants, which together with depositions

28  Plaintiffs plan to take of persons and organizations who orchestrated and implemented the Yes On 8

Gibson, Dunn &
Crutcher LLP

45

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

campaign, will demonstrate that the purpose of Prop. 8 was to prevent the State from projecting the message that lesbian and gay couples and their families are equal to heterosexual couples and families.  Also, evidence developed in discovery will show that the justifications now being offered for Prop. 8 are neither compelling nor rational tends to prove the presence of animus due to the absence of any other rational justification for the initiative.  Dusseault Decl. ¶ 11.  Plaintiffs expect to obtain significant concessions from Defendant-Intervenors' experts with regard to the fact that Prop. 8 was passed with discriminatory intent.  Plaintiffs also seek to obtain admissions from Defendant-Intervenors on this issue that would be binding on them as a party, and to obtain statements that contradict their positions and arguments on this issue from document and deposition testimony.  This evidence goes directly to issues identified by this Court, including "whether or not Prop 8 discriminates based on sexual orientation" and "whether Prop 8 was passed with a discriminatory intent."  Doc # 76 at 9.  And it will refute the Defendant-Intervenors' summary judgment contentions concerning "animus."[11]  The evidence sought by Plaintiffs also will refute, among other things, Defendant-Intervenors' contention that "It is simply implausible that in acting with surgical precision to preserve and restore the venerable definition of marriage, the people of California somehow transformed that institution into an instrument of bigotry against gays and lesbians" and that "Plaintiffs' claim that animus against gays and lesbians is the only possible explanation for the enactment of Proposition 8 is false[.]"  Doc # 172-1 at 107, 111.

     e.    ***Prop. 8 Discriminates on the Basis of Sex.***  Plaintiffs are currently developing facts that will demonstrate that Prop. 8 discriminates on the basis of sex.  For example, Plaintiffs are working with experts to review and analyze the social and psychological conditions of marriage to demonstrate that marriage laws in California, and the rest of the Nation, historically enforced societally prescribed gender roles for women and men and that, except for Prop. 8 and other laws that limit marriage to opposite-sex couples, marriage has been transformed from an institution of gender inequality and sex-based roles to one in which the sex of the spouses is immaterial to their legal

---

[11]  Notably, Defendant-Intervenors have resisted much of this discovery, and this Court is scheduled to address their motion for protective order seeking to avoid the discovery on September 25, 2009.  *See* Doc # 184.

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

obligations and benefits.  Plaintiffs also expect to obtain significant concessions from Defendant-Intervenors' experts with regard to Prop. 8's discrimination on the basis of sex, for example recognizing that many conceptions that people may have with respect to an "optimal" relationship or parenting environment are based on gender stereotypes that cannot withstand scrutiny.  Additionally, through document requests and deposition testimony, Plaintiffs expect to obtain admissions and impeachment evidence from the Defendant-Intervenors themselves that would be binding on them as a party acknowledging that Prop. 8 denies rights to individuals based upon their sex.  Dusseault Decl. ¶ 7.  The evidence sought by Plaintiffs will refute, among other things, Defendant-Intervenors' contention that "[t]he traditional definition of marriage reaffirmed by Prop. 8 does not discriminate on the basis of sex."  Doc # 172-1 at 66.

## 2.   Plaintiffs Will Use Discovery To Develop Facts Related To Their Due Process Claim.

Plaintiffs are currently developing facts that will demonstrate that the right to marry is a fundamental right.  These facts will establish that the fundamental right to marry necessarily means the right to marry the person of one's choice.  For example, Plaintiffs are currently working with historians to review and analyze the history of marriage.  Plaintiffs' experts will testify that civil marriage has never been a static institution and has changed over time, sometimes dramatically, to reflect the changing needs, values, and understanding of our evolving society.  Plaintiffs also expect to obtain significant concessions from Defendant-Intervenors' experts with regard to the history of marriage.  These facts will refute, among other things, the contention of Defendant-Intervenors that that "[t]he central purpose of marriage . . . ha[s] always been to promote naturally procreative sexual relationships and to channel them into stable, enduring unions for the sake of producing and raising the next generation."  Doc # 172-1 at 21, 77.  Plaintiffs expect to obtain significant concessions from Defendant-Intervenors' experts with regard to the fact that the right to marry the person of one's choice is a fundamental right.  Plaintiffs also seek to obtain admissions from Defendant-Intervenors on this issue that would be binding on them as a party, and to obtain statements that contradict their positions and arguments on this issue from document and deposition testimony.  Dusseault Decl. ¶ 5.

Gibson, Dunn &
Crutcher LLP

1   All the evidence described above is essential to refuting the factual assertions made by

2   Defendant-Intervenors in their motion for summary judgment and demonstrating the existence of

3   numerous genuine issues of material fact.  Plaintiffs should have the opportunity to build this record

4   to oppose summary judgment, and this Court should have such evidence before it when it decides the

5   merits of Plaintiffs' claims.  Accordingly, this Court should deny Defendant-Intervenors' summary

6   judgment motion pursuant to Rule 56(f).

7   **B.      The Court Should Deny Rather Than Continue Defendant-Intervenors'**
           **Motion For Summary Judgment.**
8

9   Rule 56(f) allows the Court to "(1) deny [Defendant-Intervenors'] motion; (2) order a

10  continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be

11  undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).  Under the circumstances,

12  denial—not a continuance—is the appropriate course of action.

13  In light of the Court's repeated admonitions that Plaintiffs' claims should be resolved on a full

14  factual record, it would be inappropriate to resolve them until discovery is complete.  Based on the

15  expedited schedule in this case, discovery will not be completed until December 31, 2009—less than

16  two weeks before trial.  Accordingly, it would make little sense for the Court to continue Defendant-

17  Intervenors' motion until after the close of discovery when that falls on the eve of trial.  Moreover,

18  because this case will involve a bench trial, the Court will be the decisionmaker in any event.  Thus,

19  the most appropriate course is to deny Defendant-Intervenors' motion and proceed to trial.

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

48

1

## CONCLUSION

2        For the foregoing reasons, Defendant-Intervenors' Motion for Summary Judgment should be

3  denied.

4  Dated:  September 23, 2009

5                                          GIBSON, DUNN & CRUTCHER LLP

6

7                                          By:_____/s/_____

8                                                    Theodore B. Olson

9                                          and

10                                         BOIES, SCHILLER & FLEXNER LLP

11                                         David Boies

12                                         Attorneys for Plaintiffs KRISTIN M. PERRY,
                                           SANDRA B. STIER, PAUL T. KATAMI, AND
13                                         JEFFREY J. ZARRILLO

14                                         DENNIS J. HERRERA
                                           City Attorney
15                                         THERESE M. STEWART
                                           Chief Deputy City Attorney
16                                         DANNY CHOU
                                           Chief of Complex and Special Litigation
17                                         RONALD P. FLYNN
                                           VINCE CHHABRIA
18                                         ERIN BERNSTEIN
                                           CHRISTINE VAN AKEN
19                                         MOLLIE M. LEE
                                           Deputy City Attorneys
20

21                                         By:_____/s/_____

22                                                    Therese M. Stewart

23                                         Attorneys for Plaintiff-Intervenor
                                           CITY AND COUNTY OF SAN FRANCISCO

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

49

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S JOINT OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

## **ATTESTATION PURSUANT TO GENERAL ORDER NO. 45**

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

By:＿＿＿＿＿＿＿＿＿＿/s/＿＿＿＿＿＿＿＿＿

Theodore B. Olson