# Exhibit D

GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
Amir C. Tayrani, SBN 229609
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
Sarah E. Piepmeier, SBN 227094
Theane Evangelis Kapur, SBN 243570
Enrique A. Monagas, SBN 239087
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
Theodore H. Uno, SBN 248603
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Attorneys for Plaintiffs KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,<br><br>　　　　　　　Defendants. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES** |

1

## **<u>GENERAL OBJECTIONS</u>**

2      1.      Plaintiffs object to these Interrogatories on the ground that they are compound in that

3  they seek (1) separate contentions of at least four Plaintiff individuals, and in some instances, their

4  children, (2) the documentary and/or other evidentiary basis for any such contentions, (3) the identity

5  of any and all possible exhibits, (4) the identity of any and all possible witnesses, and (5) the identity

6  of any evidence Plaintiffs have contradicting their contentions.

7      2.      Plaintiffs object to these Interrogatories on the ground that they exceed the 25 written

8  interrogatories, including all discrete subparts, permitted by Federal Rule of Civil Procedure 33.

9      3.      Plaintiffs object to these Interrogatories to the extent they seek to alter the schedule

10  imposed by the Court's August 19, 2009 and August 24, 2004 pretrial scheduling orders.  Doc ##160,

11  164.  Specifically, "[d]esignation of witnesses presenting evidence under FRE 702, 703 or 705 and

12  production of written reports pursuant to FRCP 26(a)(2)(B)" is due on October 2, 2009.  Doc #160

13  at 2.  Additionally, the identity of proposed exhibits and witnesses is due on December 2, 2009.  Doc

14  #164 at 1-2.

15      4.      Plaintiffs object to each Interrogatory to the extent that it is premature and/or seeks

16  information that is more properly the subject of expert testimony.

17      5.      Plaintiffs object to each Interrogatory as unduly burdensome and oppressive to the

18  extent that it purports to require Plaintiffs to provide information not in their possession, custody, or

19  control.

20      6.      Plaintiffs object to each Interrogatory to the extent that it purports to impose any

21  requirement or discovery obligation on Plaintiffs other than those set forth in the Federal Rules of

22  Civil Procedure, the Civil Local Rules of the Northern District of California, and the applicable

23  Orders of Chief Judge Walker.

24      7.      Plaintiffs object to each Interrogatory to the extent it calls for an answer that can be

25  derived or ascertained from records Plaintiffs have produced or will produce in this action pursuant to

26  Federal Rule of Civil Procedure 34.  Plaintiffs will refer to the appropriate record or records for each

27  said Interrogatory.

28

Gibson, Dunn &
Crutcher LLP

1

8. Plaintiffs object to each Interrogatory to the extent that it purports to require Plaintiffs to identify documentary evidence that is in the possession, custody, or control of Defendants, Defendant-Intervenors, or third parties.

9. Plaintiffs object to each Interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. Any disclosure of such protected or privileged information is inadvertent and is not intended to waive those privileges or protections.

10. Plaintiffs object to the "Definitions" and "Instructions" that Defendant-Intervenors purport to incorporate in its Interrogatories to the extent that they are inconsistent with or seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Civil Local Rules of the Northern District of California, and the applicable Orders of Chief Judge Walker.

11. Plaintiffs object to each Interrogatory to the extent that it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.

12. The subject matter of these Interrogatories is under continuing investigation. Plaintiffs will respond to the Interrogatories with their current knowledge and reserve the right to supplement these responses if any additional information is identified at a later time and to make any additional objections that may become apparent. Plaintiffs also reserve the right to make any use of, or introduce at any hearing or at trial, information not known or thought to be responsive at the time of responding to these Interrogatories.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

Please identify any and all distinct contentions you may make to the effect that, as a result of Proposition 8, the Defendants and/or the State are causing gays and lesbians and/or their children and families significant hardship and/or irreparable harm, including reference to each and every instance of humiliation, emotional distress, pain, suffering, psychological harm, and/or stigma you contend Plaintiffs and/or their children and families have experienced, the time period in and/or date on which you contend Plaintiffs, their children or families suffered the significant hardship and/or irreparable harm, and the full Documentary and/or other evidentiary basis for any such contention(s), including

2

Gibson, Dunn &
Crutcher LLP

identifying any and all possible exhibits and witnesses, and identifying any evidence you have contradicting your contentions.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to their General Objections, Plaintiffs object to this Interrogatory to the extent it seeks private information, which is protected by Plaintiffs' right to privacy under Article I, Section 1 of the California Constitution. Plaintiffs further object to this Interrogatory on the grounds it is overly broad and unduly burdensome, as it would be literally impossible to identify "each and every instance of humiliation, emotional distress, pain, suffering, psychological harm, and/or stigma you contend Plaintiffs and/or their children and families have experienced."

Subject to these objections, Plaintiffs respond as follows: Plaintiffs contend that marriage is a highly valued and respected social institution made available to some, but not all, loving and devoted couples. It provides not only a wealth of legal and social rights and responsibilities, but it also describes and defines a person's relationship to and place in society. Excluding gay and lesbian individuals from the institution of civil marriage, and instead relegating them to second-class status, inflicts on gay and lesbian individuals and their children humiliation, emotional distress, pain, suffering, psychological harm, and stigma. This harm would be greatly diminished or eliminated if gay and lesbian individuals' right to marry the person they love was recognized, since the State would no longer be treating same-sex couples as second-class citizens by excluding them, and only them, from such a valued and honored social institution.

The harm inflicted on the Plaintiffs specifically is pervasive and constant. Accordingly, documenting "each and every instance" of the harm is impossible. Nonetheless, in a good-faith effort to respond to the interrogatory, Plaintiffs have documented types of harm they have experienced as well as specific instances of harm they have suffered, attached hereto as Attachment A. In addition to expert witnesses who will be identified at the appropriate time, Plaintiffs will testify regarding the harms they have suffered as a result of Prop. 8 and their inability to marry, and third-party witnesses may also testify. Documentary evidence Plaintiffs may rely on to demonstrate the harm and embarrassment caused to gay and lesbian individuals includes, without limitation, the campaign materials, advertisements, and other materials used in the campaign in favor of Prop. 8 by Defendant-

Gibson, Dunn & Crutcher LLP

3

1    Intervenors and their fellow supporters of Prop. 8., as well as documents that Plaintiffs' experts may

2    rely upon in forming their opinions (which will be identified at the appropriate time).

3    **INTERROGATORY NO. 2:**

4         Please identify and describe any contentions you may make as to whether, how, and why, as a

5    result of Proposition 8, the Defendants and/or the State are stigmatizing gays and lesbians, and/or

6    their children and families, identifying the full Documentary and/or other evidentiary basis for any

7    such contention(s), including identifying any and all possible exhibits and witnesses, and identifying

8    any evidence you have contradicting your contentions.

9    **RESPONSE TO INTERROGATORY NO. 2:**

10        Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that one

11   of the "core elements of th[e] fundamental right [to marry] is the right of same-sex couples to have

12   their official family relationship accorded the same dignity, respect, and stature as that accorded to all

13   other officially recognized family relationships." *See In re Marriage Cases,* 183 P.3d 384, 434 (Cal.

14   2008).  By "reserving the historic and highly respected designation of 'marriage' exclusively to

15   opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of

16   domestic partnership," Prop. 8 communicates the "official view that [same-sex couples'] committed

17   relationships are of lesser stature than the comparable relationships of opposite-sex couples" and

18   impermissibly stamps gay and lesbian individuals and their children with a "mark of second-class

19   citizenship." *See id.* at 402, 434, 445.

20        Documentary evidence Plaintiffs may rely on to demonstrate stigmatization of gay and

21   lesbian individuals includes, without limitation, the campaign materials, advertisements, and other

22   materials used in the campaign in favor of Prop. 8 by Defendant-Intervenors and their fellow

23   supporters of Prop. 8., as well as documents that Plaintiffs' experts may rely upon in forming their

24   opinions (which will be identified at the appropriate time).  Potential witnesses will include, in

25   addition to expert witnesses to be identified at the appropriate time, the Plaintiffs, third-party

26   witnesses, the Defendant-Intervenors and other supporters of Prop. 8.

27

28

Gibson, Dunn &
Crutcher LLP

4

1    **INTERROGATORY NO. 3:**

2          Please identify and describe any contentions you may make as to whether, how, and why any

3    asserted interest in extending the civil status of "marriage" to same-sex relationships is objectively,

4    deeply rooted in this nation's history and tradition, identifying the full Documentary and/or other

5    evidentiary basis for any such contention(s), including identifying any and all possible exhibits and

6    witnesses, and identifying any evidence you have contradicting your contentions.

7    **RESPONSE TO INTERROGATORY NO. 3:**

8          In addition to their General Objections, Plaintiffs object to this Interrogatory on the ground

9    that it is misleading and not susceptible to a meaningful response in that it incompletely and/or

10   incorrectly states the facts relating to the subject matter of the Interrogatory.

11         Subject to these objections, Plaintiffs respond as follows:  Plaintiffs contend that the right to

12   marry is a fundamental right protected under the Due Process Clause and that there is no compelling

13   or even rational basis on which to distinguish, and treat differently, same-sex and opposite-sex

14   couples with respect to the fundamental right to marry.  As the Supreme Court declared in *Loving v.*

15   *Virginia,* the "freedom to marry" is "one of the vital personal rights essential to the orderly pursuit of

16   happiness by free men."  388 U.S. 1, 12 (1967).  Because "the right to marry is of fundamental

17   importance for all individuals" (*Zablocki v. Redhail,* 434 U.S. 374, 384 (1978)), "freedom of personal

18   choice in matters of marriage and family life is one of the liberties protected by the Due Process

19   Clause."  *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 639 (1974).  Indeed, this Nation has a

20   deeply rooted—and frequently reaffirmed—"tradition" of "afford[ing] constitutional protection to

21   personal decisions relating to marriage," "family relationships," and "child rearing."  *Lawrence v.*

22   *Texas,* 539 U.S. 558, 573-74 (2003).

23         In addition, the principle of equal protection of the laws is powerful and longstanding in our

24   country and in our laws.  Denying a minority of citizens an important right enjoyed by all other

25   citizens, without any compelling or even rational basis for excluding that minority from enjoying that

26   important right, is contrary to the long-standing and deeply rooted traditions of our country.  *See*

27   *Romer v. Evans*, 517 U.S. 620, 633-34 (1996) ("It is not within our constitutional tradition to enact

28   laws of this sort.  Central both to the idea of the rule of law and to our own Constitution's guarantee

Gibson, Dunn &
Crutcher LLP

5

of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance.  'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.' (citation omitted).  Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare.  A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. 'The guaranty of 'equal protection of the laws  is a pledge of the protection of equal laws.' *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356 (1886))"); *see also Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 300 (1990) (Scalia, J., concurring) ("Our salvation is the Equal Protection Clause, which requires the democratic majority to accept for themselves and their loved ones what they impose on you and me.").

Documentary evidence Plaintiffs may rely on to demonstrate that same-sex couples have a fundamental right to marry may include, without limitation, documents that Plaintiffs may produce, documents that Plaintiffs' experts may rely upon in forming their opinions (which will be identified at the appropriate time), and other documents that may be produced by Defendant-Intervenors or others in this litigation.  Potential witnesses include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs and third-party witnesses.

**INTERROGATORY NO. 4:**

Please identify and describe any contentions you may make as to whether, how, and why the history of the enactment of and/or a Person's support for Proposition 8 demonstrates animus by that Person, the Defendants, and/or the State against gays and lesbians, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses, and identifying any evidence you have contradicting your contentions.

**RESPONSE TO INTERROGATORY NO. 4:**

Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that Prop. 8 purposely singled out gay and lesbians individuals for disparate treatment and enshrined discrimination against gay and lesbian individuals into the California Constitution.  Prop. 8 was narrowly approved by California voters in November 2008—160 years after the adoption of the

State's first constitution—and was a direct response to the California Supreme Court's decision in *In re Marriage Cases,* 183 P.3d 384 (Cal. 2008). That decision held that the California Family Code's prohibition of same-sex couples from civil marriage was unconstitutional under the due process and equal protection guarantees of the California Constitution. *Id.* at 452. According to the official General Election Voter Information Guide, Prop. 8 "[c]hange[d] the California Constitution to eliminate the right of same-sex couples to marry in California." *Strauss v. Horton,* 207 P.3d 48, 77 (Cal. 2009) (internal quotation marks omitted). Thus, the express and stated purpose of the ballot initiative was to strip gays and lesbians of constitutional rights afforded to them by the California Constitution and to impose a special disability on gays and lesbians alone by stripping them of state constitutional protections that apply to all other citizens.

Documentary evidence Plaintiffs may rely on to demonstrate animus against gay and lesbian individuals includes, without limitation, the campaign materials, advertisements, and other materials used in the campaign in favor of Prop. 8 by Defendant-Intervenors and their fellow supporters of Prop. 8, as well as other documents that may be produced by Defendant-Intervenors or others in this litigation. Plaintiffs may also seek to admit documents that Plaintiffs' experts rely upon in forming their opinions (which will be identified at the appropriate time). Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs, third-party witnesses, the Defendant-Intervenors and other supporters of Prop. 8.

**INTERROGATORY NO. 5:**

Please identify and describe any contentions you may make as to whether, how, and why, as a result of Proposition 8, the Defendants and/or the State accord same-sex couples and/or their children and families less respect and dignity than they accord opposite-sex couples, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses, and identifying any evidence you have contradicting your contentions.

**RESPONSE TO INTERROGATORY NO. 5:**

Subject to their General Objections, Plaintiffs respond as follows: Plaintiffs contend that one of the "core elements of th[e] fundamental right [to marry] is the right of same-sex couples to have

7

their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships." *See In re Marriage Cases,* 183 P.3d at 434. By "reserving the historic and highly respected designation of 'marriage' exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership," Prop. 8 communicates the "official view that [same-sex couples'] committed relationships are of lesser stature than the comparable relationships of opposite-sex couples" and impermissibly stamps gay and lesbian individuals—and their children—with a "mark of second-class citizenship." *See id.* at 402, 434, 445.

Documentary evidence Plaintiffs may rely on to demonstrate the lack of dignity and respect accorded gay and lesbian individuals includes, without limitation, the campaign materials, advertisements, and other materials used in the campaign in favor of Prop. 8 by Defendant-Intervenors and their fellow supporters of Prop. 8, as well as other documents that may be produced by Defendant-Intervenors or others in this litigation. Plaintiffs may also seek to admit documents that Plaintiffs' experts rely upon in forming their opinions (which will be identified at the appropriate time). Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs, third-party witnesses, the Defendant-Intervenors and other supporters of Prop. 8.

**INTERROGATORY NO. 6:**

Please identify and describe any contentions you may make as to whether, how, and why, as a result of Proposition 8, the Defendants and/or the State deny social, legal, and/or other benefits to same-sex couples, and/or their children and families, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses, and identifying any evidence you have contradicting your contentions.

**RESPONSE TO INTERROGATORY NO. 6:**

In addition to their General Objections, Plaintiffs object to this Interrogatory on the ground that the terms "social benefits" and "other benefits" are vague and ambiguous. Plaintiffs also object to this Interrogatory on the ground, and to the extent, that it calls for a legal conclusion.

Gibson, Dunn & Crutcher LLP

8

Subject to these objections, Plaintiffs respond as follows:  Plaintiffs contend that one of the "core elements of th[e] fundamental right [to marry] is the right of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships."  *See In re Marriage Cases,* 183 P.3d at 434.  By "reserving the historic and highly respected designation of 'marriage' exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership," Prop. 8 communicates the "official view that [same-sex couples'] committed relationships are of lesser stature than the comparable relationships of opposite-sex couples" and impermissibly stamps gay and lesbian individuals—and their children—with a "mark of second-class citizenship."  *See id.* at 402, 434, 445.

While Plaintiffs cannot describe or document every instance of discrimination, embarrassment, and other harm resulting from Prop. 8 and their inability to marry, Plaintiffs refer Defendant-Intervenors to the response to Interrogatory No. 1 for examples.  Documentary evidence Plaintiffs may rely on to demonstrate denial of social and other benefits to gay and lesbian individuals includes, without limitation, the campaign materials, advertisements, and other materials used in the campaign in favor of Prop. 8 by Defendant-Intervenors and their fellow supporters of Prop. 8, as well as other documents that may be produced by Defendant-Intervenors or others in this litigation.  Plaintiffs may also seek to admit documents that Plaintiffs' experts rely upon in forming their opinions (which will be identified at the appropriate time).  Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs, third-party witnesses, the Defendant-Intervenors and other supporters of Prop. 8.

## INTERROGATORY NO. 7:

Please identify and describe any contentions you may make as to whether, how, and why child-rearing is not optimized by limiting marriage to opposite-sex couples, identifying the full Documentary and/or evidentiary basis for any such contention(s) including identifying any and all possible exhibits and witnesses and identifying any evidence you have contradicting your contention(s).

Gibson, Dunn &
Crutcher LLP

1  **RESPONSE TO INTERROGATORY NO. 7:**

2        Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that

3  there is no difference between the ability of a same-sex couple to provide a healthy, positive child-

4  rearing environment and the ability of an opposite-sex couple to provide such an environment.  The

5  well-being of children is not contingent on the parents' sexual orientation.  Excluding same-sex

6  couples from marriage does not advance, and indeed actually harms, the objective of providing an

7  optimal child-rearing environment for all children, including the children of gay and lesbian couples

8  who have been denied the rights and status attendant to civil marriage.  Lastly, excluding gay and

9  lesbian individuals from the institution of marriage and relegating them to the separate-but-unequal

10  status of domestic partnership does not prevent same-sex couples from raising children or change the

11  fact that many children in California are raised by same-sex couples.  It does, however, change the

12  respect and dignity afforded to those families.

13        Documentary evidence Plaintiffs may rely on to demonstrate that there is no difference

14  between the ability of a same-sex couple to provide a healthy, positive child-rearing environment and

15  the ability of an opposite-sex couple of provide such an environment includes, without limitation,

16  documents that may be produced by Plaintiffs, documents relied upon by experts in this matter, as

17  well as other documents that may be produced by Defendant-Intervenors or others in this litigation.

18  Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate

19  time, the Plaintiffs, and third-parties.

20  **INTERROGATORY NO. 8:**

21        Please identify and describe any contentions you may make regarding the comparative

22  stability of homosexual relationships versus traditional, opposite-sex married relationships, breaking

23  your contention down where possible by gay men and lesbian women, and identifying the full

24  Documentary and/or other evidentiary basis for any such contention(s), including identifying any and

25  all possible exhibits and witnesses, and any evidence you have contradicting your contention(s).

26  **RESPONSE TO INTERROGATORY NO. 8:**

27        In addition to their General Objections, Plaintiffs object to this Interrogatory on the ground

28  that the term "homosexual relationships" is vague and ambiguous.

Gibson, Dunn &
Crutcher LLP

10

1   Subject to these objections, Plaintiffs respond as follows:  Plaintiffs contend that marriage

2   improves the stability of relationships, whether they be committed same-sex relationships or

3   committed opposite-sex relationships.  Marriage gives legally wed spouses access to a host of

4   economic and social benefits and obligations, and serves as a barrier to the dissolution of

5   relationships.  The rights and responsibilities of marriage help to improve and ensure the stability of a

6   couple's relationship.  Further, many opposite-sex married relationships are unstable for any number

7   of reasons, and indeed less stable than many same-sex relationships.

8   Documentary evidence that Plaintiffs may rely on to demonstrate that marriage improves the

9   stability of relationships includes, without limitation, the campaign materials, advertisements, and

10   other materials used in the campaign in favor of Prop. 8 by Defendant-Intervenors and their fellow

11   supporters of Prop. 8, as well as other documents that may be produced by Defendant-Intervenors or

12   others in this litigation.  They may also include documents relied upon by Plaintiffs' experts, which

13   will be identified at the appropriate time.  Potential witnesses will include, in addition to expert

14   witnesses to be identified at the appropriate time, the Plaintiffs, third-party witnesses, the Defendant-

15   Intervenors and other supporters of Prop. 8.

16   **INTERROGATORY NO. 9:**

17   Please identify and describe any contentions you may make regarding the number of

18   1) homosexual persons in the United States, 2) the number of homosexual persons in California,

19   3) the number of homosexual parents in the United States, 4) the number of homosexual parents in

20   California, 5) the number of homosexual persons in the United States in committed, long-term

21   relationships; and 6) the number of homosexual persons in California in committed, long-term

22   relationships, breaking your contentions down, where possible by gay men and lesbian women and

23   identifying the full Documentary and/or other evidentiary basis for any such contention(s), including

24   identifying any and all possible exhibits and witnesses, and any evidence you have contradicting your

25   contention(s).

26   **RESPONSE TO INTERROGATORY NO. 9:**

27   In addition to their General Objections, Plaintiffs objects to this Interrogatory to the extent

28   that it seeks information not relevant to the subject matter of this action and not reasonably calculated

Gibson, Dunn &
Crutcher LLP

11

to lead to the discovery of admissible evidence.  Plaintiffs further object to this Interrogatory on the grounds it is overly broad and unduly burdensome.  Plaintiffs further object to this Interrogatory to the extent that the information requested is not within Plaintiffs' knowledge and the inquiry is properly directed at other parties.

Subject to these objections, Plaintiffs respond as follows:  The information sought in this Interrogatory is expected to be the subject of expert evidence and is therefore premature.  Plaintiffs will supplement their response as appropriate and required by the Scheduling Order set forth by the Court.

**INTERROGATORY NO. 10:**

Please identify and describe any contentions you may make as to whether, how, and why, as a result of Proposition 8, it is less likely gays and lesbians will formalize their relationships, including any contentions you may have as to whether, how, and why same-sex couples are significantly less likely to enter into domestic partnerships than to enter into marriages, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses, and identifying any evidence you have contradicting your contentions.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to their General Objections, Plaintiffs object to this Interrogatory on the ground that the phrase "formalize their relationships" is vague and ambiguous.

Subject to these objections, Plaintiffs respond as follows:  Plaintiffs contend that the separate institutions of civil marriage for opposite-sex couples and domestic partnership for same-sex couples are inherently unequal and thus, same-sex couples are significantly less likely to enter into domestic partnerships than to enter into marriages.  One of the "core elements of th[e] fundamental right [to marry] is the right of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships." *See In re Marriage Cases,* 183 P.3d at 434.  By "reserving the historic and highly respected designation of 'marriage' exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership," Prop. 8 communicates the "official

12

Gibson, Dunn &
Crutcher LLP

view that [same-sex couples'] committed relationships are of lesser stature than the comparable relationships of opposite-sex couples" and impermissibly stamps gay and lesbian individuals—and their children—with a "mark of second-class citizenship." *See id.* at 402, 434, 445.

Documentary evidence Plaintiffs may rely on to demonstrate that gay and lesbian individuals desire the same recognition of their committed relationships that opposite-sex couples enjoy through marriage includes, without limitation, documents that Plaintiffs may produce or that Plaintiffs' experts may rely upon in forming their opinions, as well as other documents that may be produced by Defendant-Intervenors or others in this litigation. Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs and third-party witnesses.

**INTERROGATORY NO. 11:**

Please identify any and all distinct contentions you may make to the effect that sexual orientation is immutable, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses and identifying any evidence you have contradicting your contention(s).

**RESPONSE TO INTERROGATORY NO. 11:**

Subject to their General Objections, Plaintiffs respond as follows: Plaintiffs contend that the Ninth Circuit has concluded that "[s]exual orientation and sexual identity are immutable," and that "[h]omosexuality is as deeply ingrained as heterosexuality." *Hernandez-Montiel v. INS,* 225 F.3d 1084, 1093 (9th Cir. 2000) (internal quotation marks omitted). Furthermore, because sexual orientation is "so fundamental to one's identity," a "person should not be required to abandon" it in order to secure access to fundamental rights that the Constitution guarantees to all persons. *Id.*

Documentary evidence Plaintiffs may rely on to demonstrate that sexual orientation and sexual identity are immutable includes, without limitation, documents that Plaintiffs' experts may rely upon in forming their opinions. Potential witnesses include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs and third-party witnesses.

**INTERROGATORY NO. 12:**

Please identify and describe any contentions you may make as to whether, how, and why gays and lesbians lack political power, including any contentions you may have as to whether, how, and

why gays and lesbians cannot protect their rights through the political process, identifying the full Documentary and/or other evidentiary basis for any such contention(s), including identifying any and all possible exhibits and witnesses and identifying any evidence you have contradicting your contention(s).

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to their General Objections, Plaintiffs object to this Interrogatory on the ground that the term "political power" as used in this interrogatory is vague and ambiguous. Plaintiffs further object to this interrogatory to the extent it calls for a legal conclusion.

Subject to these objections, Plaintiffs respond as follows: Plaintiffs contend that gay and lesbian individuals possess less political power than other groups that are afforded the protection of suspect or quasi-suspect status under the Equal Protection Clause, including African-Americans and women. Indeed, of the more than half million people who hold political office at the local, state, and national levels in this country, fewer than 300 are openly gay. *Kerrigan v. Comm'r of Pub. Health,* 957 A.2d 407, 446 (Conn. 2008). No openly gay person has ever served in the United States Cabinet, on any federal court of appeals, or in the United States Senate. *Id.* at 447. In contrast, African-Americans have served as President of the United States, Attorney General, and Secretary of State, as well as in the United States Senate, and on the U.S. Supreme Court. Similarly, women currently head the Departments of State, Homeland Security, and Labor, and the 111th Congress includes seventeen female Senators and seventy-eight female representatives. *See* Congressional Research Service, *Membership of the 111th Congress: A Profile* 5 (2008).

Congress has passed no law affording protection from discrimination on the basis of sexual orientation. Instead, there are two major federal laws that explicitly discriminate against gay and lesbian individuals: Don't Ask, Don't Tell and the Defense of Marriage Act ("DOMA"). There are no similar such laws discriminating against racial and ethnic minorities or women. There is no hate crimes legislation at the federal level that includes gay and lesbian individuals, and no federal legislation that prohibits discrimination against them in employment, housing, education or public accommodations. A majority of states lack statewide legislation prohibiting discrimination on the basis of sexual orientation in employment, housing, education or public accommodations. A majority

Gibson, Dunn & Crutcher LLP

1  of states contain explicitly discriminatory laws prohibiting marriage, and in some instances, any kind

2  of relationship recognition for same-sex couples.  Gay and lesbian individuals have faced a barrage of

3  anti-gay initiatives and referenda that far exceed in number and frequency the use of such measures

4  to target any other unpopular groups.  While comparisons among types of discrimination must be

5  made cautiously, it is apparent that gay and lesbian individuals have not yet come close to making the

6  great political strides accomplished by other groups subject to similar histories of discrimination in

7  this country.

8       Documentary evidence Plaintiffs may rely on to demonstrate that gay and lesbian individuals

9  possess less political power than other groups that are afforded the protection of suspect or quasi-

10  suspect status under the Equal Protection Class includes, without limitation, documents that

11  Plaintiffs' experts may rely upon in forming their opinions; as well as other documents that may be

12  produced by Defendant-Intervenors or others in this litigation.  Potential witnesses include, in

13  addition to expert witnesses to be identified at the appropriate time, the Plaintiffs and third-party

14  witnesses.

15  **INTERROGATORY NO. 13:**

16       Please identify and describe any contentions you may make as to whether, how, and why the

17  definition of marriage has evolved over time, identifying the full Documentary and/or evidentiary

18  basis for any such contention(s) including identifying any and all possible exhibits and witnesses and

19  identifying any evidence you have contradicting your contention(s).

20  **RESPONSE TO INTERROGATORY NO. 13:**

21       Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that

22  marriage is not a static institution, but rather has evolved over time.  Indeed, marriage has been a

23  successful civil institution precisely because it has been flexible.  For example, race-based restrictions

24  on marriage were common until the Supreme Court declared such restrictions unconstitutional in

25  *Loving v. Virginia,* 388 U.S. 1 (1967).  More recently, several states, including California, have

26  recognized gay and lesbian individuals' right to marry.  In California alone there are 18,000 same-sex

27  married couples.

28

Gibson, Dunn &
Crutcher LLP

1        Documentary evidence Plaintiffs may rely on to demonstrate that marriage is not a static

2    institution includes, without limitation, documents that Plaintiffs' experts may rely upon in forming

3    their opinions.  Potential witnesses include expert witnesses to be identified at the appropriate time.

4    Other third-parties may also testify.

5    **INTERROGATORY NO. 14:**

6        Please identify and describe any contentions you may make as to whether, how, and why

7    same-sex marriage would not destabilize the marriages of opposite-sex couples, identifying the full

8    Documentary and/or evidentiary basis for any such contention(s) including identifying any and all

9    possible exhibits and witnesses and identifying any evidence you have contradicting your

10   contention(s).

11   **RESPONSE TO INTERROGATORY NO. 14:**

12       Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that

13   there is no reputable evidence suggesting that the exclusion of same-sex couples from marriage

14   increases the stability of opposite-sex marriage or that including same-sex couples destabilizes

15   opposite-sex marriages.

16       Documentary evidence Plaintiffs may rely on to demonstrate that exclusion of same-sex

17   couples from marriage does not increase the stability of opposite-sex marriage includes, without

18   limitation, documents that Plaintiffs' experts may rely upon in forming their opinions.  Potential

19   witnesses include expert witnesses to be identified at the appropriate time.  Other third-parties may

20   also testify.

21   **INTERROGATORY NO. 15:**

22       Please identify and describe any contentions you may make as to whether, how, and why gay

23   and lesbian individuals have suffered persecution, and/or purposeful and invidious discrimination that

24   continues to this day, identifying the full Documentary and/or evidentiary basis for any such

25   contention(s) including identifying any and all possible exhibits and witnesses and identifying any

26   evidence you have contradicting your contention(s).

27

28

**RESPONSE TO INTERROGATORY NO. 15:**

Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that gay and lesbian individuals have suffered persecution and purposeful and invidious discrimination that continues to this day, and that Proposition 8 itself is an example of how gay and lesbian individuals have suffered persecution, and purposeful and invidious discrimination that continues to this day. The widespread discrimination faced by gay and lesbian individuals has been historically unique and unprecedented.  There are far too many examples of persecution and purposeful and invidious discrimination to list them here.  For example, gays and lesbians have been executed for being homosexual, classified as mental degenerates, targeted by police, discriminated against in the workplace, censored, demonized as child molesters, excluded from the United States military, arrested for engaging in private sexual relations, and, as evident in this case, had their state constitutional rights stripped away by popular vote.

Documentary evidence Plaintiffs may rely on to demonstrate that gay and lesbian individuals have suffered persecution includes, without limitation, documents that Plaintiffs' experts may rely upon in forming their opinions.  Potential witnesses will include, in addition to expert witnesses to be identified at the appropriate time, the Plaintiffs, third-party witnesses, the Defendant-Intervenors and other supporters of Prop. 8.

**INTERROGATORY NO. 16:**

Please identify and describe what you contend to be the appropriate definition of "sexual orientation," identifying the full Documentary and/or evidentiary basis supporting the use of your suggested definition, and identifying any evidence you have contradicting your suggested definition.

**RESPONSE TO INTERROGATORY NO. 16:**

Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that "sexual orientation" refers to an enduring pattern or disposition to experience sexual, affectional, or romantic desires for and attractions to men, women, or both sexes.  The term is also used to refer to an individual's sense of personal and social identity based on those desires and attractions, behaviors expressing them, and membership in a community of others who share them.

Gibson, Dunn &
Crutcher LLP

1    Documentary evidence Plaintiffs may rely on to support the definition of sexual orientation

2    includes documents that Plaintiffs' experts may rely upon in forming their opinions.  Potential

3    witnesses include, in addition to expert witnesses to be identified at the appropriate time, the

4    Plaintiffs and third-party witnesses.

5    **INTERROGATORY NO. 17:**

6    Please identify and describe any contentions you may make as to whether, how, and why, as a

7    result of Proposition 8, Plaintiff-Intervenor, the Defendants, and/or the State are promoting

8    stereotypical gender roles, identifying the full Documentary and/or evidentiary basis for any such

9    contention(s) including identifying any and all possible exhibits and witnesses, and identifying any

10   evidence you have contradicting your contention(s).

11   **RESPONSE TO INTERROGATORY NO. 17:**

12   Subject to their General Objections, Plaintiffs respond as follows:  Plaintiffs contend that to

13   the extent Defendant-Intervenors and other supporters of Prop. 8 have stated and continue to state

14   that the optimal parents or optimal family consists of a mother, a father, and their children, such

15   statements are based on and designed to promote gender-based stereotypes about the roles mothers

16   and fathers are supposed to play in raising children.  Similarly, to the extent Defendant-Intervenors

17   and other supporters of Prop. 8 have stated and continue to state that same-sex couples are not

18   optimal parents, such assertions are based on and designed to promote the idea that women play

19   distinct, prescribed roles in raising children that cannot or should not be performed by men and vice

20   versa.  Likewise, to the extent Defendant-Intervenors and other supporters of Prop. 8 have stated and

21   continue to state that "traditional" marriage is better or needs protection, or that retaining the

22   opposite-sex definition of marriage is justified by "tradition," such assertions are based, at least in

23   part, on the idea that women can and should play distinct roles in the marital relationship and/or in

24   raising children that cannot be performed by men and vice versa.

25   **INTERROGATORY NO. 18:**

26   Please identify and describe any contention you may make as to whether, how, and why,

27   Proposition 8 hurts the State of California financially, identifying the full Documentary and/or

28

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES

1    evidentiary basis for any such contention(s) including identifying any and all possible exhibits and

2    witnesses, and identifying any evidence you have contradicting your contention(s).

3    **RESPONSE TO INTERROGATORY NO. 18:**

4        In addition to their General Objections, Plaintiffs object to this interrogatory on the grounds

5    that the information requested is not within Plaintiffs' knowledge and the inquiry is properly directed

6    at other parties.

7    DATED:  September 16, 2009                    GIBSON, DUNN & CRUTCHER LLP

8

9                                                  By:_____/s/Ethan D. Dettmer_____

10                                                              Ethan D. Dettmer

11                                                 and

12                                                 BOIES, SCHILLER & FLEXNER LLP

13                                                 David Boies

14                                                 Attorneys for Plaintiffs KRISTIN M. PERRY,
                                                   SANDRA B. STIER, PAUL T. KATAMI, and
15                                                 JEFFREY J. ZARRILLO

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

KRISTIN M. PERRY

1.      Having been denied access to the institution of civil marriage that most other Californians have, and instead being relegated to second-class status, has caused me humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

2.      People view marriage as a sign of stability and commitment.  My relationship with Sandy is not as valued by some of my friends, family, and community because we are not married.  Introducing Sandy as my "partner" or "girlfriend" is confusing to others, painful to me and Sandy and, in a very real sense, wrong, because it does not express proper respect to Sandy, nor does it express the importance of our commitment to one another.  People who are told we are "domestic partners" or "girlfriends" are unable to appreciate our profound commitment to one another and the validity of our relationship, as they would if they were told that we were married.

3.      My family does not treat Sandy like they treat other in-laws.  Although I believe they respect her, she is not as accepted or welcomed as my family's opposite-sex spouses.

4.      Because we are not married, Sandy and I do not have a wedding anniversary date to celebrate.  Instead, we celebrate various milestones in our relationship but never our "anniversary," like every married couple enjoys.  Our friends and family do not have a date that they can celebrate our relationship along with us, as they do for friends and family who are married.

5.      On May 21, 2009, Sandy and I attempted to get a marriage license from the Alameda County Clerk-Registrar, but were denied because we are a same-sex couple.  The experience was embarrassing and painful for us because we were so clearly being treated differently from opposite-sex couples.  In fact, at the same time the clerk was explaining to us that we could not get married because we are both women, opposite-sex couples next to us were getting marriage certificates without any delay or difficulty.

6.      Hearing of my straight friends' weddings and anniversaries is a painful experience.  Sandy and I desire our own legally recognized wedding but are denied that fundamental right.  We are happy for our friends, but just the same, are constantly reminded of what we are wrongfully denied by Proposition 8.

Gibson, Dunn & Crutcher LLP

7.      Being asked "What does your husband do?" when people notice my ring is embarrassing and painful because it is a reminder of the fact that California does not recognize the importance of the relationship that I have with the person I love.

8.      Being asked "Are you married?" is embarrassing and painful because we cannot get married, and the question brings that fact home.  For the same reason, explaining why I am not married is difficult and painful—I am forced to confront and articulate that the State does not value my relationship with Sandy.

9.      Being asked whether we are sisters in the context of situations where a spouse should be present (for example, the hospital) is embarrassing and painful because it reminds me of the fact that we cannot be married in California and because it reminds me of the vulnerability of our relationship because we can't be married.  It reminds me that, if Sandy or I should be in an accident or become seriously ill, hospitals and other caregivers could prevent us from having the ability to protect and care for each other simply because we are not legally married.

10.     Although Sandy and I are registered domestic partners, we are not treated equally with our heterosexual peers.  At times, I have had to show my official domestic partnership registration to get benefits, where straight couples did not have to show their marriage licenses.  In fact, getting the domestic partnership registration materials in the first place is a far more difficult, onerous and expensive process than getting a marriage license and getting married.  Sandy and I have spent thousands of dollars paying lawyers to help us with matters, such as a "domestic partner co-ownership agreement," that a married couple would never have to get.

11.     Having to create an elaborate estate plan because the law does not recognize our relationship is an expensive burden that is embarrassing and painful because it is a stark reminder of our second-class citizenship.

12.     When checking-in to hotel rooms, the front-desk clerks often do not acknowledge that Sandy and I are a couple.  They look and act uncomfortable about giving us a room with a single bed and ask multiple times if we really want a single room with a single bed.  If our relationship was recognized as a "marriage" by the State of California, I believe that we would not experience this treatment.  At the very least, knowing that our relationship was honored by the State of California as

Gibson, Dunn & Crutcher LLP

2

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

"marriage," and being able to explain to the clerks that we are married, would give us a much greater sense of security and minimize the embarrassment and humiliation of having to justify our relationship to strangers.

13.     Having to fill-out forms that require information from a "husband" and wife," such as medical history forms and parental permission slips, is embarrassing and painful because it is a reminder that we cannot be married in California.

14.     I cannot access shared accounts that are held in just one of our names, such as our power or water accounts.  If I were married to Sandy I could easily access the account and make decisions for the family.

15.     In a business setting, I struggle with whether I should bring Sandy with me and when I do, how I should introduce her.  When Sandy accompanies to me to a work event, I fear that the focus becomes my "gay relationship" and not my work.  I have to make tactical decisions every time my "spouse" is invited to a client event, meeting, speech, or even holiday party.  Proposition 8's official disapproval of my relationship with Sandy creates this difficulty and embarrassment.  If we were married, and our relationship had the state-sanctioned privilege and approval of marriage, this would not be the difficult and painful experience that it is.

16.     Communicating to our child's teacher about our relationship is difficult because we are not married.  I fear that my children will be treated differently if the teacher knows that we are in a same-sex relationship, but we would not be treated differently if we were married and California recognized that marriage.

17.     As a result of our domestic partnership, Sandy and I have additional expenses and burdens associated with our state and federal income tax filings.  If we were married, our tax preparer's fees would be significantly reduced and the process for filing taxes would be simplified.

18.     Sandy and I fear traveling to other states because they do not recognize our relationship.  For example, if Sandy or I needed to be hospitalized while in another state, we would not have any right to visit one another in the hospital.  I believe that, if we were married, such fears would be much less disturbing, because being able to explain to people that we are married, and

Gibson, Dunn & Crutcher LLP

3

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

1    knowing that our marriage was recognized by California, would cause people to afford us more

2    respect and make them more likely to recognize our relationship as a marriage like any other.

3         19.    When Sandy and I go shopping together, the sales personnel do not know who to

4    address. They don't see us as a married couple, but rather as a customer and her friend. If we and

5    other same-sex couples could be married, we would be much less likely to be treated as something

6    different and less than the loving and devoted couple that we are, and much more like any other

7    loving and devoted couple.

8         20.    When Sandy and I attend parties thrown by our straight friends we feel reluctant to

9    dance because of the looks we receive; married couples are not treated the same way. On one

10   occasion, we were at a country music night club and restaurant in Bakersfield, California and started

11   to dance together. Because of the uncomfortable looks we received, we immediately stopped dancing

12   together. If we could be legally married, I believe we would be more accepted by society as a couple

13   and would feel less intimidated about being ourselves in public.

14        21.    Sandy and I have attended high school reunions separately because we are fearful of

15   how people are going to react to our relationship. If we were married, we would feel very differently

16   about attending these events because our relationship would be officially approved by the State.

17        22.    Sandy and I are fearful to simply hold hands in public because of how people will

18   react. We have been yelled at by strangers just for holding hands in public, and it is frightening and

19   intimidating. If we were married, we would feel much more secure in this simple and ordinary

20   gesture of affection and solidarity because our relationship would be recognized by the State as equal

21   to other peoples' relationships.

22        23.    Sandy's nieces and nephews do not refer to me as their aunt because I am not married

23   to Sandy. On two occasions, most recently the summer 2008, they used the term "Miss Kris." If we

24   were married, I would clearly be their aunt and they would refer to me as their aunt, instead of

25   making up awkward and uncomfortable substitute names.

26        24.    Because Sandy and I are not married, there isn't a good word to describe our blended

27   family. We awkwardly use "stepson" or "stepmother" but feel it is off limits since we are not

28

Gibson, Dunn &
Crutcher LLP

4

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

married.  Not having the language to describe our family and refer to one another causes us pain and embarrassment.

25.    The passage of Prop. 8 brought back painful memories of the invalidation of our 2004 marriage when the California Supreme Court, prior to its decision in *In re Marriage Cases,* held that marriages conducted earlier that year were void.

26.    The Yes on Prop. 8 advertisements and campaign literature were painful and caused me distress given that they sought to portray our family as less than equal and a threat to all families.

27.    When Sandy and I had our wedding ceremony in 2004, we gave my parents our wedding photo as a gift.  Later, when I visited my parents, I found the photo hidden away in a sewing closet.  If our marriage were recognized by the State I believe my parents would not be embarrassed of my relationship with Sandy and would display our photo.

28.    On multiple occasions when I have visited my doctors' offices, they have not been able to locate Sandy's medical insurance information on their respective computer systems.  The office clerks sometimes do not understand what domestic partners are and why Sandy is covered under my plan.  I have been shocked and embarrassed when the clerks have proceeded to loudly state in the waiting room "who is she?" (meaning "what is your relationship to Sandy?") and have demanded to know why she should be covered under my insurance.  If I could have simply told these clerks that we were "married," this would not have happened.

29.    Every year my family celebrates a family reunion.  No one knows what to call Sandy or how to treat her.  We take a picture every year of all the family members and of all those who married into the family.  Because we are not married, we and other members of the family are confused and awkward as to whether Sandy should be included in the picture.  If Sandy and I were married, it would be very clear to everyone that she should be included in this family event just like all the married people in our family.

30.    Sandy's family does not acknowledge me as a member of their family.  I do not feel warmly welcomed at family events or annual visits.  I believe that, if we were married, it would be easier for members of Sandy's family to include and welcome me.

///

Gibson, Dunn &
Crutcher LLP

5

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

SANDRA B. STIER

31.     Having been denied access to the institution of civil marriage that most other Californians have, and instead being relegated to second-class status, has caused me humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

32.     People view marriage as a sign of stability and commitment.  My relationship with Kris is not as valued by some of my friends, family, and community because we are not married. Introducing Kris as my "partner" or "girlfriend" is confusing to others, painful to me and Kris and, in a very real sense, wrong, because it does not express proper respect to Kris, nor does it express the importance of our commitment to one another.  People who are told we are "domestic partners" or "girlfriends" are unable to appreciate our profound commitment to one another and the validity of our relationship, as they would if they were told that we were married.

33.     When Kris asked me to marry her in 2004, before gay marriages were performed in San Francisco, I answered "Yes. . . What does that mean?"  It is terribly painful to me that such a special event was marred by the fact that the State does not allow us to express our relationship in this most meaningful and commonly-shared way.

34.     When Kris and I had our wedding ceremony in 2004, we gave my parents our wedding photo as a gift.  Later, when I visited my parents, I found the photo hidden away in a bureau. This was especially painful given that my parents display photos of my siblings' opposite-sex relationships prominently in their home.  If our marriage were recognized by the State I believe my parents would not be embarrassed of my relationship with Kris and would display our photo.

35.     On one occasion, I asked one of my nephews if he would call Kris "Aunt Kris."  He told me he wouldn't because "you are not married.  Two girls can't get married."

36.     At my parents' 50th anniversary celebration, which all of my family members attended but that Kris was not invited to attend, my family performed a ceremony where they acknowledged everyone's husband and wife.  My relationship from Kris was deliberately excluded from that ceremony so as "not to upset mom and dad."  If we were married, I don't believe that Kris and I would have been excluded from acknowledgement at this family event.

Gibson, Dunn & Crutcher LLP

37.     When we were married in 2004, my parents, and several other close members of my family, did not come to the wedding.  If it had been a "legitimate" wedding, I believe they would have come.

38.     As a recent example, on September 11, 2009, I attended a 10-year wedding anniversary party for an opposite-sex couple, where they renewed their vows.  They proclaimed that their marriage had been the most joyous experience of their lives and recalled that their wedding day was the best day of their lives.  They told their guests that they were honored to be husband and wife.  It felt embarrassed and hurt.  It was a vivid reminder of what Kris and I are denied – our right to marry the person we love.

39.     As a way to get to know one another, I am frequently asked by people I have just met if I am married and have children.  While I wear a wedding band and have a committed relationship and legal domestic partnership with Kris, I cannot simply answer that question "yes" because I am not married and instead, find myself worrying about the comfort level of the individual with whom I'm speaking—will they understand and/or accept my same-sex relationship?

40.     My family does not treat Kris like they treat other in-laws.  Although I believe they respect her, she is not as accepted or welcomed as my family's opposite-sex spouses.

41.     Because we are not married, Kris and I do not have a wedding anniversary date to celebrate.  Instead, we celebrate various milestones in our relationship but never our "anniversary," like every married couple enjoys.  Our friends and family do not have a date that they can celebrate our relationship along with us, as they do for friends and family who are married.

42.     On May 21, 2009, Kris and I attempted to get a marriage license from the Alameda County Clerk-Registrar, but were denied because we are a same-sex couple.  The experience was embarrassing and painful for us because we were so clearly being treated differently from opposite-sex couples.  In fact, at the same time the clerk was explaining to us that we could not get married because we are both women, opposite-sex couples next to us were getting marriage certificates without any delay or difficulty.

43.     Hearing of my straight friends' weddings and anniversaries is a painful experience.  Kris and I desire our own legally recognized wedding but are denied that fundamental right.  We are

Gibson, Dunn &
Crutcher LLP

1   happy for our friends, but just the same, are constantly reminded of what we are wrongfully denied

2   by Proposition 8.

3       44.    Being asked "What does your husband do?" when people notice my ring is

4   embarrassing and painful because it is a reminder of the fact that California does not recognize the

5   importance of the relationship that I have with the person I love.

6       45.    Being asked "Are you married?" is embarrassing and painful because we cannot get

7   married, and the question brings that fact home.  For the same reason, explaining why I am not

8   married is difficult and painful—I am forced to confront and articulate that the State does not value

9   my relationship with Kris.

10       46.    For example, in March 2009, I met with a high school college counselor to seek advice

11   on college admissions and loans.  The counselor asked "are you married?"  I answered "yes, but not

12   legally."  The college counselor apologized for the question; but I felt embarrassed for both of us.

13       47.    Being asked whether we are sisters in the context of situations where a spouse should

14   be present (for example, the hospital) is embarrassing and painful because it reminds me of the fact

15   that we cannot be married in California and because it reminds me of the vulnerability of our

16   relationship because we can't be married.  It reminds me that, if Kris or I should be in an accident or

17   become seriously ill, hospitals and other caregivers could prevent us from having the ability to

18   protect and care for each other simply because we are not legally married.

19       48.    Although Kris and I are registered domestic partners, we are not treated equally with

20   our heterosexual peers.  At times, I have had to show my official domestic partnership registration to

21   get benefits, where straight couples did not have to show their marriage licenses.  In fact, getting the

22   domestic partnership registration materials in the first place is a far more difficult, onerous and

23   expensive process than getting a marriage license and getting married.  Kris and I have spent

24   thousands of dollars paying lawyers to help us with matters, such as a "domestic partner

25   co-ownership agreement," that a married couple would never have to get.

26       49.    Having to create an elaborate estate plan because the law does not recognize our

27   relationship is an expensive burden that is embarrassing and painful because it is a stark reminder of

28   our second-class citizenship.

Gibson, Dunn &
Crutcher LLP

8

50.     When checking-in to hotel rooms, the front-desk clerks often do not acknowledge that Kris and I are a couple.  They look and act uncomfortable about giving us a room with a single bed and ask multiple times if we really want a single room with a single bed.  If our relationship was recognized as a "marriage" by the State of California, I believe that we would not experience this treatment.  At the very least, knowing that our relationship was honored by the State of California as "marriage," and being able to explain to the clerks that we are married, would give us a much greater sense of security and minimize the embarrassment and humiliation of having to justify our relationship to strangers.

51.     Having to fill-out forms that require information from a "husband" and wife," such as medical history forms and parental permission slips, is embarrassing and painful because it is a reminder that we cannot be married in California.

52.     I cannot access shared accounts that are held in just one of our names, such as our power or water accounts.  If I were married to Kris I could easily access the account and make decisions for the family.

53.     In a business setting, I struggle with whether I should bring Kris with me and when I do, how I should introduce her.  When Kris accompanies to me to a work event, I fear that the focus becomes my "gay relationship" and not my work.  I have to make tactical decisions every time my "spouse" is invited to a client event, meeting, speech, or even holiday party.  Proposition 8's official disapproval of my relationship with Kris creates this difficulty and embarrassment.  If we were married, and our relationship had the state-sanctioned privilege and approval of marriage, this would not be the difficult and painful experience that it is.

54.     Communicating to our child's teacher about our relationship is difficult because we are not married.  I fear that my children will be treated differently if the teacher knows that we are in a same-sex relationship, but we would not be treated differently if we were married and California recognized that marriage.

55.     As a result of our domestic partnership, Kris and I have additional expenses and burdens associated with our state and federal income tax filings.  If we were married, our tax preparer's fees would be significantly reduced and the process for filing taxes would be simplified.

Gibson, Dunn & Crutcher LLP

56.     Kris and I fear traveling to other states because they do not recognize our relationship. For example, if Kris or I needed to be hospitalized while in another state, we would not have any right to visit one another in the hospital.  I believe that, if we were married, such fears would be much less disturbing, because being able to explain to people that we are married, and knowing that our marriage was recognized by California, would cause people to afford us more respect and make them more likely to recognize our relationship as a marriage like any other.

57.     When Kris and I go shopping together, the sales personnel do not know who to address.  They don't see us as a married couple, but rather as a customer and her friend.  If we and other same-sex couples could be married, we would be much less likely to be treated as something different and less than the loving and devoted couple that we are, and much more like any other loving and devoted couple.

58.     When Kris and I attend parties thrown by our straight friends we feel reluctant to dance because of the looks we receive; married couples are not treated the same way.  On one occasion, we were at a country music night club and restaurant in Bakersfield, California and started to dance together.  Because of the uncomfortable looks we received, we immediately stopped dancing together.  If we could be legally married, I believe we would be more accepted by society as a couple and would feel less intimidated about being ourselves in public.

59.     Kris and I have attended high school reunions separately because we are fearful of how people are going to react to our relationship.  If we were married, we would feel very differently about attending these events because our relationship would be officially approved by the State.

60.     Kris and I are fearful to simply hold hands in public because of how people will react. We have been yelled at by strangers just for holding hands in public, and it is frightening and intimidating.  If we were married, we would feel much more secure in this simple and ordinary gesture of affection and solidarity because our relationship would be recognized by the State as equal to other peoples' relationships.

61.     My nieces and nephews do not refer to Kris as their aunt because I am not married to Kris.  On two occasions, most recently the summer 2008, they used the term "Miss Kris."  If we were

Gibson, Dunn & Crutcher LLP

married, Kris would clearly be their aunt and they would refer to her as their aunt, instead of making up awkward and uncomfortable substitute names.

62.     Because Kris and I are not married, there isn't a good word to describe our blended family. We awkwardly use "stepson" or "stepmother" but feel it is off limits since we are not married. Not having the language to describe our family and refer to one another causes us pain and embarrassment.

63.     The passage of Prop. 8 brought back painful memories of the invalidation of our 2004 marriage when the California Supreme Court, prior to its decision in *In re Marriage Cases,* held that marriages conducted earlier that year were void.

64.     The Yes on Prop. 8 advertisements and campaign literature were painful and caused me distress given that they sought to portray our family as less than equal and a threat to all families.

65.     During the campaign against Prop. 8, I stood on a street corner at a rally in Oakland and held a sign against Prop. 8. I was told by a Yes on 8 supporter who went by that if I married Kris it would be like me marrying a dog.

PAUL T. KATAMI

66.     Having been denied access to the institution of civil marriage that most other Californians have, and instead being relegated to second-class status, has caused me humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

67.     People view marriage as a sign of stability and commitment. My relationship with Jeff is not as valued by some of my friends, family, and community because we are not married. Introducing Jeff as my "partner" or "boyfriend" is confusing to others, painful to me and Jeff and, in a very real sense, wrong, because it does not express proper respect to Jeff, nor does it express the importance of our commitment to one another. People who are told we are "domestic partners" or "boyfriends" are unable to appreciate our profound commitment to one another and the validity of our relationship, as they would if they were told that we were married.

68.     On May 20, 2009, Jeff and I attempted to get a marriage license from the Los Angeles County Clerk, but were denied because we are a same-sex couple. The experience was embarrassing and painful for us because we were so clearly being treated differently from opposite-sex couples. In

Gibson, Dunn & Crutcher LLP

11

09-CV-2292 VRW   PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

fact, at the same time the clerk was explaining to us that we could not get married because we are both men, opposite-sex couples next to us were getting marriage certificates without any delay, difficulty, or questioning.

69.     A member of my immediate family has harassed, disparaged and threatened me as a result of my relationship with Jeff.  When I asked him why he did not support our relationship he told me "because it's not natural."  If Jeff and I were married, and the State of California recognized and honored our relationship like any other one, I believe my family member would be much more likely to accept us for what we are—a loving and devoted couple like any other, and not harbor this irrational anger and fear about us.

70.     Because of this experience with my family member, at times, I fear that I will be physically harmed because I am not in an opposite-sex relationship.  Before going to an unfamiliar location or even before getting into my own car, I look around to make sure I have not been followed. I believe that if the State recognized my relationship with Jeff and granted us marriage, then more and more people would recognize that we are a loving and devoted couple like any other loving and devoted couple.  Fewer and fewer people would feel the irrational fear and hate of same-sex couples that some now do, and Jeff, me, and other same-sex couples would have much less reason to fear for our safety.

71.     Members of my family are ashamed of and angered by my relationship with Jeff. I have even been asked to change my last name so that people do not associate me with the Katami family.  No one has ever asked a family member in an opposite-sex relationship to change his or her last name.  I believe Proposition 8's official condemnation of same-sex relationships has given my family reason to be ashamed of and angered by my relationship with Jeff.

72.     Because Proposition 8 officially sanctioned discrimination, fear, and hatred against gay and lesbian individuals, members of my family believe that they can lose their jobs if their employers learn about my relationship with Jeff.  It is painful to think that my family believes that my love for Jeff will cost them their livelihoods.  If I had the right to marry the person I love, and if the State recognized and honored my relationship with Jeff, my family would not shoulder this fear.

Gibson, Dunn &
Crutcher LLP

73.     Because we are not married, Jeff and I do not have a wedding anniversary date to celebrate.  Instead, we celebrate various milestones in our relationship but never our "anniversary," like every married couple enjoys.  Our friends and family do not have a date that they can celebrate our relationship along with us, as they do for friends and family who are married.

74.     Hearing of my straight friends' weddings and anniversaries is a painful experience. Jeff and I desire our own legally recognized wedding but are denied that fundamental right.  We are happy for our friends, but just the same, are constantly reminded of what we are wrongfully denied by Proposition 8.

75.     Being asked "What does your wife do?" when people notice my ring is embarrassing and painful because it is a reminder of the fact that California does not recognize the importance of the relationship that I have with the person I love.

76.     Being asked "Are you married?" or "How long have you been married?" is embarrassing and painful because we cannot get married, and the question brings that fact home.  For the same reason, explaining why I am not married is difficult and painful—I am forced by the very question to confront and articulate that the State does not value my relationship with Jeff.

77.     Being asked whether we are brothers by our neighbors, or in other contexts where a spouse should be present (for example, at the hospital), is embarrassing and painful because it reminds me of the fact that we cannot be married in California and because it reminds me of the vulnerability of our relationship because we can't be married.  It reminds me that, if Jeff or I should be in an accident or become seriously ill, hospitals and other caregivers could easily prevent us from having the ability to protect and care for each other simply because we are not legally married.

78.     Having to create an elaborate estate plan because the law does not recognize our relationship is an expensive burden that is embarrassing and painful because it is a stark reminder of our second-class citizenship.

79.     Opening a joint bank account is a far more difficult and onerous when you are not married and instead are treated as two "single" individuals.

80.     Because we are not a married couple, Jeff and I must have our medical authorizations readily available just in case one of us is hospitalized.  Without the authorizations we would not be

allowed to visit one another in the hospital.  If we were married, this would not be a fear and daily concern for us.

81.     Because we are not married, Jeff has to pay additional taxes for including me on his medical plan.

82.     When checking-in to hotel rooms, the front-desk clerks often do not acknowledge that Jeff and I are a couple.  They look and act uncomfortable about giving us a room with a single bed and ask multiple times if we really want a single room with a single bed.  If our relationship was recognized as a "marriage" by the State of California, I believe that we would not experience this treatment, or, at the very least, we could explain to the clerks that we are married and feel much more secure in the knowledge that our relationship is recognized and valued by the State.

83.     Having to fill-out forms that require information from a "husband" and wife," or to acknowledge if you are "single" or "married," such as medical history forms and employment applications, is embarrassing and painful because it is a reminder that we cannot be married in California.

84.     Jeff and I fear traveling to other states because they do not recognize our relationship. For example, if Jeff or I needed to be hospitalized while in another state, we would not have any right to visit one another in the hospital.  I believe that, if we were actually married, the honor and respect accorded this status and the very term would make people with whom we interact more likely to recognize and honor our relationship to one another.

85.     When I introduce Jeff as my "partner," I am sometimes asked "Do you work together?"  It is painful and embarrassing that people do not recognize our relationship.  If I could simply call Jeff my husband, the pain and embarrassment I am subjected to every time I introduce Jeff as my "partner" would be entirely avoided.

86.     The Yes on Prop. 8 advertisements and campaign literature were painful and caused me distress given that they sought to portray my relationship with Jeff as less than equal and a threat to all Californians.

87.     During the campaign against Prop. 8, I was told by a supporter of Yes on 8 that "marriage isn't for your people anyway."  This struck me hard and I thought to myself this person

Gibson, Dunn &
Crutcher LLP

14

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

1   doesn't even know me, and simply wants to see me and Jeff as different from and less than opposite-

2   sex couples.  I felt like I was punched in the gut.

3        JEFFREY J. ZARRILLO

4        88.    Having been denied access to the institution of civil marriage that most other

5   Californians have, and instead being relegated to second-class status, has caused me humiliation,

6   emotional distress, pain, suffering, psychological harm, and stigma.

7        89.    People view marriage as a sign of stability and commitment.  My relationship with

8   Paul is not as valued by some of my friends, family, and community because we are not married.

9   Introducing Paul as my "partner" or "boyfriend" is confusing to others, painful to me and Paul and, in

10  a very real sense, wrong, because it does not express proper respect to Paul, nor does it express the

11  importance of our commitment to one another.  People who are told we are "domestic partners" or

12  "boyfriends" are unable to appreciate our profound commitment to one another and the validity of

13  our relationship, as they would if they were told that we were married.

14       90.    In 2004, Paul and I lived next door to a co-worker of mine and had a friendly

15  relationship with this neighbor.  On or about January 2004, my neighbor/co-worker told my manager

16  at work that "Jeff is my neighbor.  He lives with his brother."  My manager, who knew that Paul and

17  I were in a committed relationship, advised me of what my neighbor had informed her.  I was

18  embarrassed that my neighbor and co-worker did not recognize my relationship with Paul.  I doubt he

19  would have thought that I lived with my sister if I lived with a woman.  I believe that if the State were

20  to recognize same-sex marriages my neighbor would come to realize that two men living together are

21  not necessarily brothers, and rather might be a committed same-sex couple, thus avoiding the pain

22  and embarrassment he caused me.

23       91.    On our about January 2006, my company merged with another company.  At the prior

24  company, I had included Paul in my medical coverage since he was my domestic partner.  After the

25  companies merged, a human resources representative contacted me because they noticed that Paul

26  and I did not share a last name and demanded that I provide proof that Paul was my domestic partner.

27  Not only did I have to provide materials proving the validity of my relationship, I had to wait and see

28  whether Paul would be accepted on my medical plan.  Married couples at my company did not have

Gibson, Dunn &
Crutcher LLP

15

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (ATTACHMENT A)

1   to complete the same administrative work to prove their marriage or have to worry about whether

2   their spouse would be covered on the company medical plan.

3        92.    In 2007, Paul and I had a neighbor who was studying to be a pastor.  We were very

4   good friends with him and his family.  On or about January 2007, this neighbor asked whether he

5   could interview Paul and I for his religious schooling.  We agreed.  He asked us general questions

6   about our relationship and faith.  Toward the end of the interview, we asked him how he felt about

7   same-sex relationships in light of his religious studies.  He pulled out the bible and told us "I believe

8   the lifestyle is wrong and that the bible is right."  We were shocked and hurt that our friend was

9   condemning our relationship and our existence.  When we pressed him on the point, he explained that

10  he was right because "society does not agree with you.  You are not allowed to be married.  You

11  cannot share and display your relationship in public.  Don't you see that this is indicative that your

12  lifestyle is perverted and not right?"  If the State recognized our marriage, people like our neighbor,

13  would not use the lack of our marital status as proof that we are not deserving of respect and equal

14  rights.

15       93.    On May 20, 2009, Paul and I attempted to get a marriage license from the Los Angeles

16  County Clerk, but were denied because we are a same-sex couple.  The experience was embarrassing

17  and painful for us because we were so clearly being treated differently from opposite-sex couples.  In

18  fact, at the same time the clerk was explaining to us that we could not get married because we are

19  both men, opposite-sex couples next to us were getting marriage certificates without any delay,

20  difficulty, or questioning.

21       94.    My nieces love spending time with their two uncles, but have never had a conversation

22  with their parents about our relationship.  My brother feels that it is necessary for them to be older

23  before he has "the conversation" with them about our same-sex relationship.  If Paul and I were

24  married, it would be much easier and simpler for my brother to have this conversation with his

25  daughters.  If he could simply tell them we were married it would explain our relationship perfectly

26  and succinctly.

27       95.    Although my family accepts my relationship with Paul, they specifically asked that I

28  not inform my grandfathers because "they come from a different time."  I honored their request and

Gibson, Dunn &
Crutcher LLP

16

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES (**ATTACHMENT A**)

never told my grandfathers.  It was painful not to share my relationship with Paul with my grandfathers.  It was also painful to realize that my family believes that certain people should not know about Paul and I.  If we were married, it would be easier for my family to accept our relationship and easier for them to share it with other people.

96.     Because we are not married, Paul and I do not have a wedding anniversary date to celebrate.  Instead, we celebrate various milestones in our relationship but never our "anniversary," like every married couple enjoys.  Our friends and family do not have a date that they can celebrate our relationship along with us, as they do for friends and family who are married.

97.     Hearing of my straight friends' weddings and anniversaries is a painful experience. Paul and I desire our own legally recognized wedding but are denied that fundamental right.  We are happy for our friends, but just the same, are constantly reminded of what we are wrongfully denied by Proposition 8.

98.     Being asked "What does your wife do?" when people notice my ring is embarrassing and painful because it is a reminder of the fact that California does not recognize the importance of the relationship that I have with the person I love.

99.     Being asked "Are you married?" or "How long have you been married?" is embarrassing and painful because we cannot get married, and the question brings that fact home.  For the same reason, explaining why I am not married is difficult and painful—I am forced by the very question to confront and articulate that the State does not value my relationship with Paul.

100.    Being asked whether we are brothers by our neighbors, or in other contexts where a spouse should be present (for example, at the hospital), is embarrassing and painful because it reminds me of the fact that we cannot be married in California and because it reminds me of the vulnerability of our relationship because we can't be married.  It reminds me that, if Paul or I should be in an accident or become seriously ill, hospitals and other caregivers could easily prevent us from having the ability to protect and care for each other simply because we are not legally married.

101.    Having to create an elaborate estate plan because the law does not recognize our relationship is an expensive burden that is embarrassing and painful because it is a stark reminder of our second-class citizenship.

Gibson, Dunn & Crutcher LLP

102.    Opening a joint bank account is a far more difficult and onerous when you are not married and instead are treated as two "single" individuals.

103.    Because we are not a married couple, Paul and I must have our medical authorizations readily available just in case one of us is hospitalized.  Without the authorizations we would not be allowed to visit one another in the hospital.  If we were married, this would not be a fear and daily concern for us.

104.    Because we are not married, I have to pay additional taxes for including Paul on my medical plan.

105.    When checking-in to hotel rooms, the front-desk clerks often do not acknowledge that Paul and I are a couple.  They look and act uncomfortable about giving us a room with a single bed and ask multiple times if we really want a single room with a single bed.  If our relationship was recognized as a "marriage" by the State of California, I believe that we would not experience this treatment, or, at the very least, we could explain to the clerks that we are married and feel much more secure in the knowledge that our relationship is recognized and valued by the State.

106.    Having to fill-out forms that require information from a "husband" and wife," or to acknowledge if you are "single" or "married," such as medical history forms and employment applications, is embarrassing and painful because it is a reminder that we cannot be married in California.

107.    Paul and I fear traveling to other states because they do not recognize our relationship. For example, if Paul or I needed to be hospitalized while in another state, we would not have any right to visit one another in the hospital.  I believe that, if we were actually married, the honor and respect accorded this status and the very term would make people with whom we interact more likely to recognize and honor our relationship to one another.

108.    When I introduce Paul as my "partner," I am sometimes asked "Do you work together?"  It is painful and embarrassing that people do not recognize our relationship.  If I could simply call Paul my husband, the pain and embarrassment I am subjected to every time I introduce Paul as my "partner" would be entirely avoided.

Gibson, Dunn & Crutcher LLP

109.    The Yes on Prop. 8 advertisements and campaign literature were painful and caused me distress given that they sought to portray my relationship with Paul as less than equal and a threat to all Californians.

110.    On our about November 5, 2008, I attended a Proposition 8 rally attended by both pro and anti-Prop. 8 supporters.  It was painful to see people carrying signs that read "Fags are going to hell,"  "God doesn't love you,"  and "Marriage is not for you," and shouting out vitriolic hate speech.

Gibson, Dunn &
Crutcher LLP

## VERIFICATION

I, Kristin M. Perry, declare as follows:

I have read **PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES** served August 26, 2009 and know its contents. The factual matters stated therein, and those factual matters discussed under my name in Attachment A thereto, are true of my own knowledge. On that ground, I certify and declare under penalty of perjury under the laws of the United States that the same are true and correct. This verification was executed at _Berkeley_, California on September _15_, 2009.

_____
Kristin M. Perry

Gibson, Dunn &
Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES **(VERIFICATION)**

1

**VERIFICATION**

2    I, Sandra B. Stier, declare as follows:

3    I have read **PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS**

4    **PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES** served August 26,

5    2009 and know its contents. The factual matters stated therein, and those factual matters discussed

6    under my name in Attachment A thereto, are true of my own knowledge. On that ground, I certify

7    and declare under penalty of perjury under the laws of the United States that the same are true and

8    correct. This verification was executed at ___Oakland___, California on September 15, 2009.

9

10    _____
        Sandra B. Stier

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

2

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES **(VERIFICATION)**

1

## **VERIFICATION**

I, Paul T. Katami, declare as follows:

I have read **PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES** served August 26, 2009 and know its contents. The factual matters stated therein, and those factual matters discussed under my name in Attachment A thereto, are true of my own knowledge. On that ground, I certify and declare under penalty of perjury under the laws of the United States that the same are true and correct. This verification was executed at ___BURBANK___, California on September _16_, 2009.

_____
Paul T. Katami

Gibson, Dunn &
Crutcher LLP

1

## VERIFICATION

I, Jeffrey J. Zarrillo, declare as follows:

I have read **PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS**

**PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES** served August 26,

2009 and know its contents. The factual matters stated therein, and those factual matters discussed

under my name in Attachment A thereto, are true of my own knowledge. On that ground, I certify

and declare under penalty of perjury under the laws of the United States that the same are true and

correct. This verification was executed at _____Burbank_____, California on September _16_, 2009.

_____
Jeffrey J. Zarrillo

Gibson, Dunn &
Crutcher LLP

4

09-CV-2292 VRW  PLAINTIFFS' RESPONSES TO DEFENDANT-INTERVENORS
PROPOSITION 8 PROPONENTS' FIRST SET OF INTERROGATORIES