# Exhibit K

Westlaw.

88 CALR 2017                                                                                            Page 1
88 Cal. L. Rev. 2017

c

California Law Review
December, 2000

Symposium of the Law in the Twentieth Century

***2017** FROM THE SECOND SEX TO THE JOINT VENTURE: AN OVERVIEW OF WOMEN'S RIGHTS AND FAM-
ILY LAW IN THE UNITED STATES DURING THE TWENTIETH CENTURY

Herma Hill Kay [FNd1]

Copyright (c) 2000 California Law Review, Inc.; Herma Hill Kay [FNa1]

Table of Contents

| | | |
|---|---|---|
| | Introduction | 2019 |
| I. | Family Law in the Nineteenth Century | 2021 |
| | A. Marriage Defines Women's Status | 2021 |
| | B. Women Begin to Define Themselves | 2022 |
| | C. Beyond Indissolubility: Divorce Laws in the New Nation | 2024 |
| | 1. The Debate Over the "Marriage Question" | 2026 |
| | 2. The Conservative Attack on "Easy Divorce" | 2028 |
| | D. The Nineteenth-Century Women's Movement: Focus on the Ballot | 2032 |
| II. | Family Law Reform and Women's Rights in the Twentieth Century | 2034 |

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page3 of 73

Page 2

A. The Early Twentieth-Century Women's Movement:Winning the Ballot; Splitting over the ERA — 2034

B. Marriage Law Reform — 2035

1. The Rise and Fall of Miscegenation Laws — 2035

2. The Decline of Common Law Marriage — 2037

C. Pre-World War I Divorce Reform — 2038

1. The Failure to End "Easy" Divorce — 2038

2. The Rise of Migratory Divorce — 2039

D. Women at Work During the War Years — 2040

E. Post-World-War II Divorce Reform — 2040

1. The Impact of the Rising Divorce Rate — 2040

2. The Tension Between the "Law in Action Versus theLaw of the Books" — 2046

F. The Reemergence of the Women's Movement in the 1960s:Focus on Civil Rights, the Birth Control Pill, and N.O.W. — 2048

G. The Triumph of No-Fault Divorce — 2050

1. California Leads the Way — 2050

   2. The Uniform Marriage and Divorce Act ....................................................... 2055

   H. The Women's Movement in the 1970s: Focus on Abortionand the ERA ........... 2057

   I. Constitutional Campaigns for Women's Equality and Self-Determination ........ 2062

      1. Ruth Bader Ginsburg and the Equal Protection Clause .......................... 2062

      2. The Due Process Clause: Abortion as Privacy .................................... 2064

   J. The Critique of No-Fault Divorce .......................................................... 2066

      1. Lenore Weitzman and the Exaggerated "Gender Gap" ............................ 2066

      2. The Conservative Call for a Return to "Family Values" ......................... 2068

   K. Fixing No-Fault: The ALI's "Principles of Family Dissolution" ...................... 2069

   L. The Women's Movement After the Defeat of the ERA:Focus on Access to Abortion and Sexual Harassment ........... 2073

   M. Marriage Law Reform at the Century's End: Same-SexMarriage and DOMA ........ 2076

   N. The Renewed Debate Over "Easy" Divorce ............................................... 2080

      1. The Call For a Return to Fault ...................................................... 2081

      2. Covenant Marriage .................................................................... 2083

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page5 of 73

| | | |
|---|---|---|
| | O. The Women's Movement at the Century's End: Focus onWomen's Sports, an ERA Reprise, and an Abortion Pill | " 2086 |
| III. | Challenges for the Twenty-First Century | 2088 |

**\*2019** From the beginning of colonial history, the family has defined U.S. women's identity and life circumstances, while the market has defined men's role and opportunities. Over the past two centuries women's struggle for political independence and socio-economic equality has been intertwined with family law reform, and more recently with the emerging law of employment discrimination. While the most dramatic changes in family law occurred in the latter half of the twentieth century, many of these changes were foreshadowed by events during the nineteenth century. As we look forward to the twenty-first century, much of the intellectual challenge for those concerned about women's rights will necessarily focus on securing, interpreting, and building on the advances won during the twentieth century.

## Introduction

The movement of twentieth century family law in the United States has been away from a patriarchal model and toward a more egalitarian one. Formerly, the husband was the legal head of the household, responsible for its support and its links to the external society, while the wife was the mistress of the home, responsible for the day-to-day management of its internal affairs and the care and education of children. More recently, these roles have tended to converge and the family is sometimes characterized as a partnership or a family firm. This trend did not, of course, begin in the twentieth century. Its origins can be traced to the greater independence enjoyed by married women in the American colonies and on the frontier than by their British sisters. [FN1] Dating the clear emergence of the modern American family to the 1830s, [FN2] Carl Degler argues that its history over the **\*2020** next 150 years was closely entwined with and influenced by the American woman's "push for autonomy and individuality." [FN3]

Beginning at roughly the same period and continuing through the end of the 1990s, a similar influence has been at work in shaping the contours of American family law. As we look forward to the twenty-first century, the sea change in the nation's economy and culture that has become evident in the last decade of the twentieth century, represented by the information revolution and the emergence of the Internet, may offer the potential for resolving what Degler saw as the intense dilemma between "the values of family and the realization of women's individuality." Degler maintained that this dilemma had put "the future of the family and the fulfillment of women as persons" at odds with each other. [FN4] The playing out of this trend suggests that, rather than a partnership, marriage in the twenty-first century may become more like a joint venture, formed for a specific transaction, and renewable at the pleasure of the venturers. In the closing years of the present century, however, a nascent counter-trend has emerged, rooted in nostalgia for "the way things were," that offers couples the choice of a "covenant marriage" requiring a greater formal commitment and the ideal of a lifelong relationship. [FN5] As the Millennium approaches, the question remains open whether one of these two trends will prevail or whether both will co-exist in ideological, if not functional, opposition.

Part I of this Essay briefly describes the major changes in American family law during the nineteenth century that help explain the legal reforms that dominated the twentieth century, drawing on historical and sociological accounts of related developments affecting the American family and the status of women during the same period. Part II examines in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page6 of 73

more detail the twentieth-century family law reform movements and their aftermath, as well as contemporaneous wo-men's issues and advancements. Finally, Part III offers a few modest speculations about how family law may evolve in the twenty-first century.

### *2021 I Family Law in the Nineteenth Century

#### A. Marriage Defines Women's Status

At the time colonial America was settled, marriage was the primary occupation for women. [FN6] By the mid-eighteenth century, in both common understanding and legal definition, marriage was an institution created by the state for the purpose of regulating and carrying on family life. Rejecting the idea that marriage was a "civil contract" like other private contracts, Joseph Madden observed: "Individuals have free choice as to whether they will marry or not, but if they do marry, the state immediately becomes a party vitally interested in the new status which their marriage created, and will not permit them to vitally modify, or rescind the terms which the law attaches to their relation, without the state's consent." [FN7]

The marital status thus created was one that conferred virtually all legal rights upon the husband, who became the head of the newly established household. Blackstone's mid-eighteenth century description of the English law of marriage [FN8] as subsuming the legal personality of the wife into that of the husband so that the two became one was considered to be the defining characteristic of the American common law of marriage as well. [FN9] The nineteenth-century family was organized into "separate spheres," in which husbands and wives had well-recognized and different functions, the one public, the other private, and in which wives were considered to be in charge of the moral and spiritual needs of the family. [FN10]

Nineteenth-century American feminists, however, rejected Blackstone's concept of marriage. Less than a century after his treatise appeared, both the 1848 Seneca Falls Declaration of Sentiments [FN11] and the *2022 1855 Marriage Protest signed by Lucy Stone and Henry B. Blackwell on their wedding day [FN12] included an indictment of the very provisions that Blackstone had seen as "for the most part intended for [the wife's] protection and benefit." [FN13] In the 1840s, state legislatures began to enact the Married Women's Property Acts designed to eliminate or modify the harsh common law doctrines affecting the legal status of married women. [FN14] By the 1850s, state legislatures had turned their attention to "earnings statutes" that gave married women property rights in their labor outside the home. [FN15] The more radical demand of nineteenth-century feminists for joint property rights in their household labor [FN16] posed a fundamental assault on the husband's right to the wife's services during marriage and was not successful. [FN17]

#### B. Women Begin to Define Themselves

This legal shift in the status of married women in the nineteenth century was preceded by the gradual emergence of women, both married and single, from their confinement in the private sphere of family life into the public sphere of community, regional, and ultimately national affairs. The milestones along this momentous path mark women's acquisition of the essential preconditions for social, economic and political independence: education, paid employment, and a measure of self-determination over their lives. At the time of the American Revolution, only 40% of *2023 American women were literate, compared to 80% of men. Private girls' schools began to open in the 1780s and 1790s, and girls were included in the public schools so that by the mid-nineteenth century, the literacy rate for women reached that of men. [FN18] By 1900, 5000 women and 22,000 men were college graduates. [FN19]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Industrialization instituted factories as the means of production, and by 1822 about 65% of the 100,000 textile workers in the United States were girls and women. [FN20] The well-known textile mills of Lowell, Massachusetts, set an example for good working conditions, [FN21] and events there demonstrated how women workers could employ strikes to obtain better wages. [FN22] Later in the century, the Civil War provided an impetus for women's employment as many women left the domestic sphere and were pressed into service as nurses and teachers. [FN23]

The availability of transportation made possible a wider distribution of goods and services, lightening the married woman's childcare and housekeeping duties and creating the opportunity for social and political activities. [FN24] Towards the end of the nineteenth century, women's social and professional organizations grew, giving women new forums in which to learn administrative and political skills. [FN25]

Because women lacked the right to vote, however, they were excluded from full participation in the political life of the republic. In addition to its repudiation of the treatment of women by the English law of marriage, the Seneca Falls Convention of 1848 demanded the vote for women, [FN26] thus energizing the nineteenth-century women's movement and setting off a **2024** seventy-two year struggle that culminated in the adoption of the Nineteenth Amendment to the United States Constitution in 1920. [FN27]

While winning the franchise may have "made little difference to the feminine condition," [FN28] suffrage provided the essential cornerstone upon which women's participation in twentieth-century politics was built. It took sixty-four years after ratification for a woman to be nominated in 1984 as vice president on the ticket of one of the two major national parties, [FN29] but only fifteen more before the first woman to qualify as a serious candidate announced her run for the presidency on the ticket of the other major national party in 1999. [FN30] In the nineteenth century, however, the vote, along with other marks of full citizenship for women, including jury service, [FN31] elective and appointive office, and military service remained unattainable.

C. Beyond Indissolubility: Divorce Laws in the New Nation

While the colonies adopted the English common law of marriage, they resisted the ecclesiastical law of marriage and divorce. Canon law, which held sway in England until the time of Henry VIII, regarded marriage as a sacrament and therefore indissoluble. [FN32] The ecclesiastical courts **2025** exercised jurisdiction over marriage and allowed only judicial separation between lawfully married spouses. [FN33] Since there were no ecclesiastical courts in the colonies, and no clear provision for civil divorce, marriage dissolution was handled on an ad hoc basis in the New England colonies. [FN34] Under these circumstances, divorce laws emerged that have been characterized as "the easiest in Christendom at a time when the eloquence of a Milton was unable to loosen the bonds of matrimony in England." [FN35] Bolder experiments, however, were not always successful. Thus the Pennsylvania Assembly's approval in 1772 of a private bill of divorce to a husband who charged his wife with adultery was disallowed by the British authorities, who issued an instruction to all royal governors on November 24, 1773, ordering them to refrain from giving their assent to any private bills "for the divorce of persons joined together in Holy Marriage." [FN36] After the colonies won their independence in 1776, Pennsylvania, among others, was quick to assert its new authority over marriage dissolution, granting eleven private bills of divorce between 1776 and 1785. This practice lasted until the Pennsylvania General Assembly passed a civil divorce statute on September 19, 1785 conferring jurisdiction on the supreme court to dissolve marriages on the grounds of impotence, bigamy, adultery, or willful desertion for four years. [FN37]

Like Pennsylvania, the other states had to determine how and whether divorce could be obtained. Since the post-Revolutionary courts of equity did not regard themselves as having inherent power over marriage and divorce, it was left to the legislatures either to grant special Acts of divorce, as the English Parliament had sometimes done, [FN38] or to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

confer divorce **2026** jurisdiction upon the civil courts. [FN39] Thus, unlike England, which did not permit absolute divorce until 1857, [FN40] state legislatures acted to grant such jurisdiction to the civil courts much earlier. By 1799, twelve states and the Northwest Territory had adopted divorce statutes, [FN41] and by 1860, only South Carolina refused to permit absolute divorce. [FN42] The southern states, along with a few bordering neighbors, clung to legislative divorce longer than most: Virginia and Maryland finally abolished private Acts in 1851, while the last hold-out, Delaware, ended the practice at the century's close in 1897. [FN43]

### 1. The Debate Over the "Marriage Question"

Divorce was and is a legal proceeding, which usually takes place in a public forum. As such, it sometimes has become a public spectacle. [FN44] By the mid-nineteenth century, divorce proceedings had attracted a wide audience. Norma Basch provides an account of the fascination among the citizens of Boston with the Dunham divorce trial of 1842, [FN45] and documents the existence of divorce trial pamphlets, "a large and lurid body of popular works that began to emerge in the 1830s as publishers learned to capitalize fully on the public thirst for sensationalism." [FN46] The growing awareness of divorce stimulated public debate. Horace Greeley, editor of The New York Tribune and a vigorous defender of the indissolubility of marriage, debated the "marriage question" against proponents of liberal divorce--and of "free love"--both in the early 1850s and in 1860. [FN47]

**2027** In addition to press coverage of the "marriage question," the wider availability of divorce stimulated debate between conservatives and liberals both before and after the Civil War. During the 1850s and early 1860s, leaders of the nineteenth-century women's movement took up the matter as well. Both Susan B. Anthony and Elizabeth Cady Stanton supported liberalized divorce, [FN48] Stanton on the ground that it was necessary for the liberation of women. [FN49] The Reverend Antoinette Brown Blackwell, however, defended the indissolubility of marriage. [FN50] After the Civil War, the debate resurfaced with renewed fervor. In 1868, with the financial support of George Francis Train, Stanton and Anthony began publishing a weekly paper titled The Revolution, [FN51] in which they advocated both women's suffrage and reform of the divorce laws. [FN52] Stanton's uncompromising support of liberalized divorce was one factor that contributed to a split among nineteenth-century feminists over the most effective strategy for achieving suffrage. [FN53] Her public condemnation of the 1870 acquittal of Daniel McFarland for shooting and killing his wife's lover, Albert D. Richardson, added fuel to the fervor over divorce. In 1867, Abby McFarland had left her husband, described as a man who "drank too much and was unable to earn a steady income," [FN54] and accepted the protection of Richardson. Lacking grounds for divorce in her home state of New York, she travelled to Indiana, lived there for sixteen months, and obtained a divorce in 1869. [FN55] The couple planned to marry upon her return to New York, but their plans were thwarted when McFarland shot his rival: Richardson nonetheless managed to marry Abby on his deathbed. [FN56] The trial, combining as it did the drama of a failed marriage, adultery, intrigue, migratory divorce, and **2028** violent death involving socially prominent New Yorkers, immediately became the centerpiece of the debate over divorce. [FN57] McFarland's acquittal in May 1870 was denounced in public lectures by Elizabeth Cady Stanton, who saw the verdict as a vindication of the husband's domination over the wife, and indissoluble marriage as the equivalent of slavery. [FN58]

### 2. The Conservative Attack on "Easy Divorce"

The last decades of the nineteenth century witnessed an organized effort by conservatives to repudiate what they saw as easy divorce. The movement began in Connecticut in the late 1860s, where President Theodore Woolsey of Yale University, following in the footsteps of his predecessor, President Timothy Dwight, published a series of articles on divorce in the New Englander in 1867, which were collected in a book published in 1869. [FN59] Beginning with the Hebrews, Greeks, and Romans, described as "nations, to one or another of which we owe our religion and most of the leading ele-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ments of our civilization," [FN60] he traced the history of divorce to his own time and place. He was quick to condemn what he saw:

> [W]e perceive that the number of causes for which divorce may be obtained has been very considerably increased in modern times. There is an increasing desire to be free from the marriage bond on grounds which were, of old, regarded as insufficient; and an increasing willingness on the part of law-makers to gratify such a desire, as well as an increasing tendency to legislate on marriage as being a mere contract, to the neglect of its moral aspect. . . . Moral indignation, it is thought, no longer visits the adulterer or adulteress; the more vulgar newspapers joke about the crime, and divorced persons are no longer under that frown which met them formerly, even when divorced for causes below the greatest. [FN61]

Turning to an examination of the admittedly "scanty" divorce statistics available to him, Woolsey proceeded to show that the divorce rate had been climbing since 1860 in Vermont, Massachusetts, Ohio, and Connecticut, and that Connecticut was "at the bottom of the list altogether" so that "[t]he ratio of divorces to marriages is here double what it is in Vermont, nearly four-fold that in Massachusetts . . . [and] in 1866, more than half as many as in Ohio, a State with almost five times the population." [FN62] He placed the blame for this increase in the divorce rate *2029 squarely on the divorce laws, thus laying the foundation for a conservative attack on liberal divorce legislation that endures to this day:

> A somewhat similar train of thought [to that expressed by the Ohio Commisioner of Statistics] has occurred to us in regard to Connecticut, where, for several years, one divorce has taken place to about ten marriages. Deduct now the Catholics, deduct also the better class of society, than whom a class more observant of the family tie exists nowhere on earth, and we shall conclude that out of every seven couples that call themselves Protestants one will be divorced, while according to Mr. Loomis's tables in the New Englander, July, 1866, two-thirds of the divorces will occur in less than six years after marriage. And we believe that the present law must bear the burden of this social immorality. [FN63]

In a concluding chapter on "Principles of Divorce Legislation," Woolsey set out nine principles, paraphrased below, which he believed should go into the formation of a good divorce law:

> (1) The husband or wife found guilty of adultery ought never to be allowed to marry the partner of his or her crime; (2) Adultery ought to be made a criminal offense, and the penalty should follow the granting of a divorce without any other trial; (3) A waiting period should be imposed before a blameworthy partner is allowed to marry again; (4) Legal separation may be utilized in some cases and as a temporary measure prior to the granting of an absolute divorce; (5) Property disposition following divorce should be such as to ensure that the injured party shall sustain as little pecuniary loss as possible, and the culpable party shall be deprived of the benefits which may have been provided in a marriage settlement; (6) Custody of the children, if any, should be given to the injured party; [FN64] (7) The law ought to be drafted in specific terms and seek to leave little discretion in the hands of judges; (8) The divorce laws of the several states ought to be brought into substantial uniformity; and (9) In cases where adultery is not the ground for divorce, attempts should be made by the magistrates to reconcile the parties. [FN65]

Woolsey's discussion of these principles makes clear that he accepted the different moral standards traditionally applied to the sexes. In considering differential treatment of the sexes under his second principle, the criminalization of adultery, he remarked:

> *2030 The question here arises whether adultery ought to have the same definition for the man and for the woman, and the same penalty, whichever sex is guilty. According to all the ancient codes and many of the modern there is a distinction made between the sexes, and the distinction affects the law of divorce. The crime is the same, except that it is justly regarded as a greater advance in wickedness for women as a class to be unfaithful in the marriage relation than for men. The harm done to society by such unfaithfulness is far greater for the woman,

when her guilt is, so to speak, inside of the family, than when the father of the family commits the crime. [FN66] Woolsey's seventh and eighth principles became, in effect, the working agenda for conservative reformers. The seventh principle was aimed at Connecticut's "omnibus" ground for divorce, which had been enacted in 1849 and which permitted divorce for "any such misconduct as permanently destroys the happiness of the petitioner and defeats the purpose of the marriage relation." [FN67] Responding to pressure exerted by conservative reformers, the Connecticut legislature commissioned a study of divorce, which resulted in statistics showing an increase in the number of divorces granted in the state from 544 during the period 1849-1852 to 1253 during 1861-1864. [FN68] In 1878, Connecticut repealed the offending omnibus clause, [FN69] and on January 24, 1881, the victorious conservatives formed the New England Divorce Reform League with Woolsey as president to carry the struggle into other states. [FN70] By 1885, the regional organization had expanded, becoming The National Divorce Reform League; [FN71] twelve years later, in a move that foreshadowed events occurring at the end of the twentieth century, the group had broadened its agenda and renamed itself The National League for the Protection of the Family. [FN72]

Woolsey expanded upon his eighth principle, which sought, in part, to end migratory divorce, taking aim at the practices of Indiana. [FN73] If it had not been clear earlier, the McFarland-Richardson affair had made it obvious that no state had effective control over its own divorce policies as long as another state, one with less rigid divorce laws and a flexible attitude **2031** toward which persons might call themselves residents, was willing to entertain the interstate traffic. [FN74] Early on, Indiana made itself available to unhappy spouses from other states with its capital, Indianapolis, easily accessible to New Yorkers by railroad. [FN75] Woolsey and his fellow conservatives had two strategies to close these avenues of easy divorce: a federal divorce law and the enactment of uniform laws by individual states. To achieve the first goal, they turned to Congress, sending the Secretary of the National League, Reverend Samuel W. Dike, to Washington in 1884 to lobby for a national study of divorce statistics. [FN76] This mission bore fruit three years later, when Congress authorized the first national report of statistics on marriage and divorce under the supervision of the Commissioner of Labor, Carroll D. Wright. [FN77] The report, submitted to Congress in 1889, showed that the number of divorces had risen by 157% between 1867 and 1886, [FN78] but it did not conclude that migratory divorce was a significant part of the increase. [FN79] Somewhat disappointed, the conservatives turned their efforts toward their second strategy: the enactment of similar divorce provisions by the various states. [FN80]

Perhaps the most significant, and certainly the most enduring, by-product of this second strategy was the creation in New York in 1890 of an organization to address the issue of uniform state laws. [FN81] This organization ultimately became known as the National Conference of Commissioners on Uniform State Laws (NCCUSL), one of the country's two premier institutions devoted to law reform. [FN82] Although NCCUSL ultimately promulgated a Uniform Marriage and Divorce Act in 1970, its initial efforts in the direction of marriage and divorce reform failed and were soon abandoned in favor of more successful ventures in the commercial law field. [FN83] While the conservative initiatives toward strengthening the divorce laws carried **2032** over into the early decades of the twentieth century, [FN84] they ultimately foundered. [FN85]

D. The Nineteenth-Century Women's Movement: Focus on the Ballot

Meanwhile, the nineteenth-century women's movement had refocused its attention on suffrage. Once it became clear that the Fifteenth Amendment, which had granted formal suffrage to African-American males in 1870, would not include women, [FN86] efforts were made to unite the rival factions and to go forward under a common banner. [FN87] In 1890, Elizabeth Cady Stanton became president of the newly-created National American Woman Suffrage Association. [FN88] While her interest in divorce reform continued, Stanton's chief projects became the suffrage and a critique of the role of organized religion in the subordination of women. [FN89]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

As the nineteenth century closed, the laws governing marriage and divorce had been entrusted by the state legislatures to the civil courts, subject to minimal constitutional control. [FN90] While Blackstone's doctrine of coverture had not yet been entirely repudiated, it had surely been weakened by the statutory recognition of the married woman's right to control her property and her right to sue for divorce. As Norma Basch observed, the post-Revolutionary divorce statutes that began to be enacted at the end of the eighteenth century represented "a conceptual reconfiguration of the marriage contract" because "[t]he old common law fiction that husband and wife were one and the husband was the one could no longer hold quite the same authority once divorce challenged the male-dominated corporatism of marriage." [FN91]

Still, at the beginning of the twentieth century, most middle-and upper-class women married, and domestic responsibilites continued to be their primary occupation. Writing in 1964, Esther Peterson, [FN92] the Director of the Women's Bureau, described the situation in terms reminiscent of the nineteenth-century notion of the "Cult of True Womanhood":

*2033 Married or single, a woman's course through life at the turn of the century was almost as sure as death and taxes, and marriage was the determining factor. Working women were, in general, single women or those who were widowed, divorced, or separated from their husbands, and who had to support themselves and, in all probability, their families. Married women devoted their time to home and children and "good works" in the church or community, if there was time. The young woman who entered the work force seldom had any intention of remaining long. As soon as "Mr. Right" came along she handed in her resignation, put the finishing touches on her hope chest and made plans for the wedding. After the honeymoon she settled down to devote her life to the physical, intellectual and spiritual needs of her family. Only the tragedy of penniless widow-hood or a broken marriage could drive her back into the labor market. [FN93]

Peterson's portrait did not apply to African-American women. While the African-American family showed great strength and durability even during slavery, [FN94] and the freed slaves were permitted to marry after Emancipation, their families did not have the financial security to permit wives the option of remaining at home. [FN95] In 1880, 50% of African-American women were in the work force, compared to less than 15% of white women. [FN96] Overall, women workers were concentrated in four occupational categories: teachers, servants and laundresses, clerks and salespersons, and dressmakers, seamstresses, and milliners. [FN97]

*2034 II Family Law Reform and Women's Rights in the Twentieth Century

A. The Early Twentieth-Century Women's Movement: Winning the Ballot; Splitting over the ERA

During the first two decades of the twentieth century, while the conservative attack on "easy divorce" noted above was playing itself out, family law reform was not a priority for the women's movement. Instead, the movement concentrated its energies on the struggle for the vote. [FN98] Once the Nineteenth Amendment was adopted, however, it soon became apparent that what had been won was the vote for women rather than a woman's vote. [FN99] In 1923, three years after ratification, Alice Paul, founder of the National Women's Party, began lobbying for another amendment--an Equal Rights Amendment--that might do for women what she and other radical suffragists had hoped for from the Nineteenth. [FN100] Then, as later, the ERA divided feminists. Florence Kelley, of the Consumer's League, opposed the ERA in part because it would rule out the possibility of protective legislation for working women. [FN101] The dispute came to a head in the United States Supreme Court, where equal rights versus special rights for women appeared on the Court's docket in 1923. Paul and Kelley supported opposite sides of the matter in Adkins v. Children's Hospital, [FN102] a case that divided the women's movement. [FN103]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page12 of 73

**\*2035** These differences probably spelled the end of the nineteenth-century women's movement. For all practical purposes, the movement had spent itself in the drive for the ballot. The non-partisan League of Women Voters, founded by Carrie Chapman Catt, [FN104] is the sole organizational survivor of the period. Although much remained to be done in restructuring marriage and divorce to put women and men on a more equal footing, the family law reforms that began in the mid-twentieth century were conceived, and largely drafted, without the active participation of an organized women's movement.

## B. Marriage Law Reform

Two major changes in the law of marriage that began in the first half of the twentieth century also passed largely unnoticed by the women's movement. One was the attack on laws prohibiting interracial marriage; the other was the decline of common law marriage. Yet both developments had an impact on the emancipation of women. Miscegenation laws had sought to preserve white women as marriage partners for white men, while preventing African-American women, who not infrequently bore children fathered by white men, from making legal claims based on the relationship. [FN105] Their demise enlarged the pool of marriage partners for both sexes and all races. [FN106] Common law marriage had enabled pioneer and frontier women to enter into formal unions, but towards mid-century had come to be seen as anachronistic. [FN107]

### 1. The Rise and Fall of Miscegenation Laws

The first widely adopted change in marriage law to occur in the late nineteenth and early twentieth centuries was one that was declared unconstitutional in the late 1960s. While prohibitions against interracial **\*2036** fornication and intermarriage can be traced to colonial times, [FN108] the impetus for the enactment of miscegenation laws prohibiting racial intermarriage between whites and African-Americans, and in some states, between whites and Indians or Asians as well, apparently accompanied Emancipation and persisted beyond World War I. [FN109] Like the plethora of other enactments that sprang up in the late 1890s to maintain the social separation of whites and African-Americans, [FN110] the miscegenation laws were designed to stigmatize the former slaves and their descendents by preventing the mixing of their blood with that of their white fellow countrymen. [FN111] By the late 1920s, twenty-nine states had enacted such prohibitions. [FN112]

In the last two decades of the nineteenth century, the United States Supreme Court upheld the segregation laws by deciding that they did not offend the newly-adopted Equal Protection Clause of the Fourteenth Amendment, [FN113] establishing a precedent that created a "separate but equal" gloss on the interpretation of the Clause. This decision left the southern caste system undisturbed until 1954, when Chief Justice Earl Warren, writing for a unanimous Court, handed down Brown v. Board of Education. [FN114] Ten years after Brown, the Court struck down a Florida statute punishing interracial cohabitation. [FN115] While there was scholarly disagreement about whether the Fourteenth Amendment had been intended to **\*2037** apply to miscegenation laws, [FN116] the Court invalidated the Virginia enactment three years later in Loving v. Virginia. [FN117] In Loving, Chief Justice Warren acknowledged that "[t]he fact that Virginia prohibits only interracial marriages involving white persons demonstrates that the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy." [FN118] So characterized, they could not be sustained.

### 2. The Decline of Common Law Marriage

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The second major change in marriage law was the decline of common law marriage in the first half of the twentieth century. Joseph Madden characterized common law marriage [FN119] as a natural outgrowth of the pioneer settlements in the United States, where "access to priests, ministers and magistrates was by no means easy, yet the natural desire to mate and have offspring was present, and was socially desirable." [FN120] By the early 1930s, more than half the states recognized common law marriage. [FN121] By the end of the century, however, most of these states had abolished common law marriage as no longer necessary, as facilitating hasty and ill-conceived unions, or as inconsistent with the trend to require blood tests of marriage license applicants. By 1999 the number continuing to recognize common law marriage had been reduced to eleven states and the District of **2038** Columbia. [FN122] A recent feminist appraisal of common law marriage challenges Madden's "frontier" explanation as "stereotypical," [FN123] pointing out that the doctrine existed in some non-frontier states like New York and was rejected by some frontier states like Wyoming. [FN124] Cynthia Grant Bowman urges that states reenact comon law marriage in order to extend the financial protections of marriage, such as inheritance, divorce remedies, and status-based benefits including social security and worker's compensation, to women who live in non-marital cohabitation. [FN125] She acknowledges, however, that these protections could be made available, albeit with less convenience, through appropriate statutory amendments and equitable doctrines extending eligibility to cohabitants or dependants. [FN126]

C. Pre-World War I Divorce Reform

### 1. The Failure to End "Easy" Divorce

As we have seen, the debate over divorce that began in the late nineteenth century ended in the first decade of the twentieth century as a stand-off rather than as a clear victory for either side. [FN127] Far from a rational discussion over opposing policy choices, the debate became polarized early on around issues of public and private morality: as Connecticut clergyman Henry Loomis, Jr., put it in 1866, it was a conflict between "infidels" and "Christians." [FN128] By 1905, when Governor Samuel W. Pennypacker of Pennsylvania convened a National Congress on Uniform Divorce Laws, the states were divided along a spectrum that placed South Carolina, with no provision whatsoever for absolute divorce, and New York, with adultery as the sole ground for divorce, at the most rigid extreme, while other states allowed a longer list of grounds such as bigamy, extreme or **2039** intolerable cruelty, conviction of a felony, habitual drunkenness, and willful desertion for a period of time. [FN129] When the National Congress held its first meeting in February 1906, it included representatives of forty of the forty-five then-existing states, but it was unable to achieve meaningful compromise on a uniform list of grounds for divorce. New York was unwilling to go beyond its sole ground for divorce, while South Carolina did not attend. [FN130] Although a compromise of sorts was reached, including a provision refusing to extend recognition to a migratory divorce granted on a ground not recognized by the parties' home state, a model divorce statute based on the compromise approved in November 1906 by the National Congress was adopted in only three states (not including Pennsylvania). [FN131]

Commenting on this history in 1984, Lawrence M. Friedman observed:

Because divorce was so deeply mired in ethical controversy, change did not take the route it might have taken; it did not move in the direction of clarity, simplicity, and efficiency. Instead, divorce law stagnated. Trapped in controversy, the divorce laws froze into peculiar shapes. The law of divorce took on a form radically different from the forms in the rest of family law. [FN132]

### 2. The Rise of Migratory Divorce

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Divorce law reform, which was to become the twentieth century's most significant contribution to family law, was not seriously addressed at the national level again until after World War II. Meanwhile, Nevada solidified its position as the nation's leading capital of migratory divorce, shortening its residence requirements and expanding its grounds for divorce. [FN133] The United States Supreme Court provided a constitutional foundation for Nevada's interstate divorce business in the 1940s with a series of decisions that required sister states to give Full Faith and Credit to migratory divorces granted on a jurisdictional finding that plaintiff was domiciled in the forum state. [FN134]

**\*2040** D. Women at Work During the War Years

In the early decades of the twentieth century, women continued to enter the labor market in gradually increasing numbers. In June, 1900, women constituted 18.1% of all workers; by January 1920, the figure had increased to 20.4%; and by April, 1930, to 21.9%. [FN135] During World War I, as during the Civil War, women entered the labor market to take up the positions left vacant by men who served in the war effort. But in both cases, after the hostilities were over, most women returned home. This pattern did not repeat itself after World War II. An estimated 6.5 million women, more than half of them homemakers, took jobs between 1941 and 1944; when the war in Europe ended in May 1945, women constituted 57% of the workforce. [FN136] Predictably, large numbers of these women workers either resigned from their jobs or were laid off after the war ended. But contrary to the expectations of some observers, other women took their places. [FN137]

E. Post-World-War II Divorce Reform

1. The Impact of the Rising Divorce Rate

The United States divorce rate, which had been rising steadily since the 1860s, increased dramatically following the end of both World War I and II: in 1867, the number of divorces per 100 marriages occurring in the same year was estimated to be 2.8; in 1890, 5.8; in 1910, 8.8; in 1930, 17.4; and in 1949, 25.1. [FN138] A national preoccupation with divorce emerged after World War II, fueled by the rising divorce statistics and a renewed **\*2041** interest in the "problem" of American families on the part of social scientists and psychiatrists. [FN139]

The organized Bar was concerned about the divorce "problem" as well. In May 1948, the American Bar Association (ABA) joined with 125 private organizations and five Federal Government Agencies in sponsoring a National Conference on Family Life, convened by President Harry S. Truman at the White House. [FN140] Before the Conference, Reginald Heber Smith, who chaired the ABA's delegation, condemned the existing divorce laws in "strong terms," stating that "[i]n the whole administration of justice, there is nothing that even remotely can compare in terms of rottenness with divorce proceedings." [FN141] Smith proposed a "fresh start" in the legal approach to divorce, one that would eliminate the adversary system marred by perjured testimony and substitute an effort to prevent divorce through reconciliation under the auspices of the court. [FN142] If reconciliation failed, the law should treat marriage as a contract, not as a sacrament, and grant a divorce through the following procedure:

Persons seeking a divorce would petition the court where they reside. Their petition would recite, not legal "causes," but the vital facts about themselves and their children. The judge would then talk to the man and woman, together or singly, or both. He would talk with each as long and as many times as he considered beneficial. The case would then stand over for six months. During this period the judge would have his social investigations made. At the end of the six-month period, the judge would again talk with husband and wife. If, having used all the power

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and influence and persuasiveness at his disposal, he failed to effect a reconciliation, or a reconsideration, or even a post-ponement, he would grant the divorce. Except in very rare instances, there would be no fight in open court about "causes."

The judge would then take firm control of the welfare of the children and determine their custody and provision for their support. This control he would keep throughout the children's minority.

The contract theory will not only let fresh air into an atmosphere that is now suffocating: it will substitute honesty for hypocrisy, and it will end up with decrees that are enforceable. [FN143] *2042 This proposal of marriage as a contract was well-received, [FN144] and stimulated the Legal Section of the Conference to recommend the appointment of a pres-idential commission to "re-examine our laws regulating both marriage and divorce, and our legal proceedings in divorce cases." [FN145] The ABA responded to this recommendation in 1948 by creating a Special Committee on Divorce and Marriage Laws to assist in carrying out the National Conference's proposals, [FN146] and again in 1950 (after it had be-come clear that no Presidential Commission would be appointed) by creating the Interprofessional Commission on Mar-riage and Divorce, to study and improve marriage and divorce laws and procedures, [FN147] both under the leadership of Judge Paul Alexander of the Family Court of Toledo, Ohio. [FN148]

Judge Alexander's concept of how to approach the problem of divorce was uncomplicated. As a judge of the Juvenile Court, he had championed its non-adversary, therapeutic approach. As a judge in the divorce courts, he believed the same approach would be equally effective. In a much-quoted passage, he argued:

> Why not rescue the embattled spouses as well as their battered children (battered emotionally and economic-ally if not physically), why not rescue the ailing families of America from their almost certain doom under "the self-help theory in trials" ? Why not elevate the resolution of their conflicts from the "competitive, adversary concept of litigation," from the "private fight concept," to the affirmatively helpful, noncompetitive, therapeutic concept that motivated the establishment of the juvenile court? Why should the child have the benefit of this treat-ment and not his parents? Delinquency and divorce both result from intra-family conflict. Commonly the treatment that solves one problem is efficacious for the other. [FN149] *2043 Judge Alexander's proposals may have en-joyed widespread support in the organized Bar, but they were challenged by contemporary critics. At the Confer-ence on Divorce held at the University of Chicago Law School on February 29, 1952, a psychiatrist questioned "whether a specifically therapeutic approach is best associated with compulsory agencies such as the courts," [FN150] while a sociologist doubted whether the largely middle class marriage counselors envisioned by the plan were capable, without special training, of understanding the different cultural perspectives of lower class clients. [FN151] A social worker was more positive, stating that Judge Alexander's plan represented "a step well in ad-vance of the current legal situation" and affirming that "the social worker and marriage counselor can make a valu-able contribution to it." [FN152]

The Juvenile Court, however, ultimately proved to be an unreliable model for the proposed Family Court. For one thing, at the time juvenile courts were established, the state's authority over minors was thought to be greater than its au-thority over adults. [FN153] For another, the "therapeutic" practices of the juvenile court were subject to due process ob-jections, [FN154] which were sustained by the United States Supreme Court in 1967. [FN155] At the time the Interpro-fessional Commission was established, however, these legal objections were not anticipated, and the time appeared ripe for a study of the family court proposal.

In 1951, the Interprofessional Commission approved three assumptions for study: "[b]asing divorce on guilt and pun-ishment has proven harmful to family stability," "[t]he use of adversary procedures in divorce cases should be displaced" and "[t]he approach to the subject of divorce should be therapeutic with the interest of the family as the motivating

factor." [FN156] Hampered by lack of funds, the Interprofessional Commission decided to focus on its third assumption. [FN157] It secured the donated services **2044** of Maxine Boord Virtue to act as Executive Secretary and to conduct studies of procedures used in several family courts. She focused on the courts in San Francisco, Chicago, Indianapolis, and Toledo, with comparative material drawn from Milwaukee, Cincinnati, and Ann Arbor. Her study, which appeared in 1956, [FN158] functioned as the Commission's Report. Not surprisingly, the study came out in favor of the family court concept, both as to structure [FN159] and therapeutic mission. [FN160] Nelson Blake reported that, "Mrs.Virtue's findings strongly support the contention that the starting point for divorce law reform should be the establishment of unified family courts to put an end to the splintering of jurisdiction under which separate courts deal with divorce, custody of children, adoptions, bastardy, and juvenile delinquency." [FN161] Ten years later, the Report of the California Governor's Commission on the Family made a similar structural recommendation for a family court with a unified jurisdiction, [FN162] but unlike the emphasis placed on reconciliation by Virtue and Alexander, the California approach stressed divorce counseling, [FN163] a difference sometimes overlooked by commentators. [FN164]

Virtue's overall assessment of existing divorce procedure was stark. She found that "[t]here is something very wrong with the handling of divorce cases." [FN165] Her study of the Chicago court had found that "[a] distaste for handling divorce cases appears to be universal among judges," [FN166] and her reproduction of the "universally applicable formula," that is, the standard questions and answers used by Chicago divorce **2045** lawyers and their clients in 1953 to prove the most common ground for divorce, "extreme and repeated physical or mental cruelty," [FN167] gave ample reason for their distaste:



Q. [Lawyer] Calling your attention to such and such a date, what happened?

* * *

A. [Client] He (she) struck me.

Q Did it leave visible marks?

A. Yes.

Q. Where did he (she) strike you?

A. In the face.

Q. Did it cause you great pain and suffering?

A. Yes.

* * *

Q. What happened next?

A. He (she) hit me again.

Q. Where?

A. In the face.

Q. Cause pain and suffering?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW    Document204-11    Filed09/23/09    Page17 of 73

A. Yes.

Q. Did you give him (her) any cause?

A. No.

Q. How did you conduct yourself during your marriage?

A. As a good wife (husband) should.

Q. How did he (she) treat you?

A. (The answer to this question permits more leeway: "Cruel," "Bad," "Real Mean," "With a kind of an indifferent attitude, sort of," are all acceptable. The preferred response, however, is: "Terrible.") [FN168]

Although the Interprofessional Commission had determined to stay away from recommendations about the grounds for divorce, [FN169] Virtue permitted herself the following sarcastic observation after setting forth the above formula:

The number of cruel spouses in Chicago, both male and female, who strike their marriage partners in the face exactly twice, without provocation, leaving visible marks, is remarkable. It appears to be the generally accepted single conjugal rejection among widely variegated cultural, educational, and economic groups. [FN170]

**\*2046** 2. The Tension Between the "Law in Action Versus the Law of the Books"

Law professor Max Rheinstein, a member of the Interprofessional Commission, had no compunctions about drawing his own conclusions concerning the grounds for divorce. Rheinstein discerned a tension between what he termed "the law in action versus the law of the books," [FN171] a widely influential phrase used as a title to one of his articles on the subject. Stanford law professor Lawrence Friedman later attributed the "peculiar shape" of divorce law to this tension. [FN172] As Rheinstein described this conflict, the law of the books was very strict: the various state statutes listed specified acts of marital misconduct that constituted grounds for divorce, one of which must be proved in court. Moreover, if the plaintiff had also committed one of these acts of misconduct, there could be no divorce, for divorce was a remedy granted only to an innocent spouse against a guilty spouse. Finally, the court was empowered to investigate what had really happened in the marriage; the testimony of corroborating witnesses was necessary. Since the state was a party to every divorce proceeding, if the judge was not satisfied that the law had been observed, the divorce must be denied. [FN173] The law in action, as Rheinstein portrayed it, was quite different:

The practice as we all know looks considerably different. Where parties are really in agreement, they can get a divorce for the asking. The wife appears before the court with two witnesses, her sister and her mother or her friend, or two friends, and they swear that they saw the husband slap his wife twice. Then the divorce is granted, and it is a quick and painless procedure except for the payment of the lawyer's fee.

In New York, as you know, there is the famous practice of hotel evidence. It is arranged that at a certain hour the husband will be found in a hotel room together with a woman not his wife, and then the court draws the necessary conclusions. [FN174]

For parties who could afford it, Rheinstein explained, migratory divorce was available:

One thing must not be forgotten: There are people in New York who cannot afford the social expense of being found guilty of adultery. In Chicago it is not to everybody's taste to be officially certified to have beaten up his

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

wife twice. So, in that case, they go to Reno or the Virgin Islands. Of course, anybody who seeks a divorce in the Virgin Islands or in Nevada, and who does not **2047** happen to belong to the select but small group of real residents of these states, has to perjure himself. He has to swear that he has come to that state or to those islands with the intention of staying there indefinitely. Well, the truthfulness of that oath is a little doubtful when one already has his return ticket in his pocket. [FN175]

Rheinstein warned that the situation he had described was "fraught with dangers," and went on to specify what those dangers were: "The most dangerous possibility is that these practices will cause disrespect for the law in general, disrespect for the priests of the law, and a very real danger of corruption of the bar." [FN176]

Lawrence Friedman, later describing the same dual system of divorce in greater detail, stated uncompromisingly that its "main element was simply collusion, between husband and wife, and among husband, wife, lawyers, and judges." [FN177] Friedman went on to expand on Rheinstein's earlier warning:

> Why did judges, and the whole legal system, put up with a regime of massive lying and deceit? In almost every state, perjury or something close to it was a way of life in divorce court. . . .

Here was a system that nobody could honestly defend in its entirety. It was, in the first instance, collusive and underhanded; it was also irrational and unfair. It was costly for people who wanted divorce; for the people who opposed divorce, it contained far too many loopholes. Yet the system persisted. It persisted because there was no acceptable alternative. Divorce law was a compromise between two irreconcilable social demands. On the one hand, there was a genuine demand for divorce--a demand for ways to regularize legal status inside the family, and thus ensure rights of property, inheritance, and the smooth operation of the land market. Such a status was available, legitimately, only through divorce. This demand interacted with, and fed upon, a demand for moral legitimacy in relationships of family and sex. Once a marriage broke up, divorce was, for all its stigma, the sole route to this kind of legitimacy. There were also competing demands for strict divorce laws, to protect family structure, to strengthen the home, and to prevent immorality and sin. [FN178]

Friedman's analysis is perceptive and trenchant. Yet the system he described was more vulnerable than it appeared. At the bottom, it rested on a tacit societal agreement to condemn experimentation with sexuality, while condoning sufficient flexibility in practice to accommodate necessary access to remarriage. But the exceptions made for those unhappy spouses willing to misrepresent either their conduct or their domicilliary **2048** intent in a court of law ultimately became too numerous, and too prominent, [FN179] to be tolerated.

F. The Reemergence of the Women's Movement in the 1960s: Focus on Civil Rights, the Birth Control Pill, and N.O.W.

The period of the 1960s was one of extraordinary social and political ferment in the United States. In 1960, the Federal Drug Administration approved the first birth control pill for contraceptive use, thus for the first time providing women with a reliable method of controlling their fertility. [FN180] African-American students began their lunch counter sit-ins in Greensboro, North Carolina in February 1960, adding a new element to the civil rights movement. [FN181] The first President of the United States to be born in the twentieth century, John Fitzgerald Kennedy, was elected that November. He kindled a mood of optimism and energy in the country, particularly among young people. [FN182] In 1961 he established the Presidential Commission on Women, and named Eleanor Roosevelt its Chair. [FN183] As an advocate for the emancipation of women, the Commission had a somewhat mixed record: it opposed the perennial Equal Rights Amendment as unnecessary, but it recommended the adoption of a federal statute guaranteeing that working women would be paid the same as men for performing the same work. [FN184] The resulting Equal Pay Act was enacted in 1963. [FN185]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*2049** Responding to the efforts of liberals and African Americans under the leadership of the Reverend Martin Luther King, Jr., and pressured by the Birmingham riots in April and May of 1963, President Kennedy sent a civil rights bill to Congress on June 19, 1963. [FN186] It was enacted in 1964 after his assassination made Lyndon Johnson President. [FN187] The Civil Rights Act of 1964, [FN188] meant to redress the situation of African Americans, contained an unexpected bonus for women. Title VII of the Act, as originally drafted, forbade discrimination in employment based on "race, color, religion, or national origin." [FN189] As enacted, however, it also applied to discrimination based on "sex." [FN190] These favorable federal laws and comparable state laws [FN191] may have facilitated the entry of women into the labor force in dramatically increased numbers: between 1960 and 1980, the number of women workers almost doubled, from 23 million in 1960 to 45.5 million in 1980. [FN192] In 1963, Betty Friedan, a Smith College graduate and a full-time housewife, published The Feminine Mystique, [FN193] a book credited with helping to reawaken the twentieth-century women's movement. [FN194] Three years later, on June 29, 1966, a small group of women, convinced that Title VII would never be enforced to benefit women unless an advocacy group for women equivalent to the National Association for the **\*2050** Advancement of Colored People existed, founded the National Organization for Women (NOW). [FN195]

G. The Triumph of No-Fault Divorce

### 1. California Leads the Way

In 1963, the same year that Friedan's book was published, the groundwork was being laid in California that culminated six years later in the enactment of the country's first "pure" no-fault divorce law. [FN196] The California Assembly established an Interim Committee on the Judiciary, which commenced a round of hearings to inquire into how judges applied California's divorce laws, looking to the possibility of developing guidelines for the judiciary. [FN197] The inquiry as conceived was not much broader than the earlier courtroom studies conducted by Maxine Virtue in San Francisco and elsewhere for the Interprofessional Commission. [FN198] At the first hearing, however, two of the witnesses invited to testify, the author of this Essay and law professor Aidan Gough of Santa Clara University, suggested a more ambitious inquiry, one that might include the possibility of eliminating fault as the basis for divorce and establishing a family court. [FN199] These two ideas formed the core of the approach taken in 1966 by the Governor's Commission on the Family, a group appointed after the legislative inquiry had run its course. [FN200]

At about the same time that the Interim Committee held its first hearing on divorce on January 8 and 9, 1964, the Archbishop of Canterbury appointed a group of clergymen, lawyers, and laypersons to examine the divorce laws of England. [FN201] The Report of the Archbishop's Group and that of the California Governor's Commission were remarkably similar in their analysis and recommendations. Both concluded that divorce based on fault **\*2051** no longer represented sound legal or social policy, and both recommended the adoption of a marriage breakdown standard, administered in a non-adversary setting, as the sole basis for marital dissolution. [FN202] Both reports appeared in 1966, that of the Archbishop's Group earlier by five months. [FN203] Although the members of the California Governor's Commission had obtained copies of the Report of the Archbishop's Group in late summer 1966 and cited it at several points, [FN204] the California Commission had arrived at the concept of no-fault divorce and the recommendation for a family court independently. [FN205] Thus, the suggestion that the Governor's Commission Report merely reflected the conclusions of the Archbishop's Group is inaccurate. [FN206]

In 1966, the New York legislature also managed to free itself from the political stalemate that had hindered earlier efforts at divorce law reform [FN207] and enacted legislation expanding the grounds for divorce beyond adultery. [FN208] While New York did not initially go as far as the California and English proposals, the confluence of these three inde-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

pendent events all **2052** occurring ten years after Maxine Virtue's book appeared in 1956, [FN209] signaled the beginning of the twentieth-century breakthrough in divorce reform. Bills embodying the proposals of the Governor's Commission were introduced into the legislature in 1967, and were referred to the California State Bar Association for study. [FN210] During the two-year period of revision and negotiation that ensued before a revised bill was introduced in 1969, [FN211] opposition to the Family Court and to the complete removal of fault from the financial and child custody provisions of the proposal had emerged in Southern California. [FN212] The opponents succeeded in obtaining major changes in the Governor's Commission proposal. [FN213] These included the choice of language to express the standard for dissolution; the removal of the Family Court; the continued use of fault on the issue of child custody; and the drafting of the financial provisions. [FN214] Each is discussed briefly below.

The standard for dissolution proposed by the Governor's Commission was drawn from Justice Roger Traynor's path-breaking California Supreme Court opinion in De Burgh v. De Burgh, [FN215] which effectively abolished the defense of recrimination by granting divorces to both parties when both were proved to be at fault. The Commission's proposal read as follows:

> [A]n order shall be made by the court dissolving the marriage if the court, after having read and considered the counselor's report and any other evidence presented by the parties, makes a finding that **2053** the legitimate objects of matrimony have been destroyed and that there is no reasonable likelihood that the marriage can be saved. [FN216]

By comparison, the Family Law Act's standard for dissolution was phrased as follows:

> Sec. 4506. A Court may decree a dissolution of the marriage or legal separation on either of the following grounds, which shall be pleaded generally:
> (1) Irreconcilable differences, which have caused the irremedial breakdown of the marriage.
>
> (2) Incurable insanity.
>
> Sec. 4507. Irreconcilable differences are those grounds which are determined by the court to be substantial reasons for not continuing the marriage and which make it appear that the marriage should be dissolved. [FN217] The two drafts differed significantly in their expression of the no-fault philosophy. The Governor's Commission proposal did not assign blame to a "guilty" party as the fault approach had done, but rather carried the connotation that both parties share responsibility for the breakdown of their marriage. [FN218] In contrast, the Family Law Act focused on the conflict between the parties, and its reference to "grounds," reinforced by a related provision in section 4509 which permitted the trial court judge to refer to "specific acts of misconduct" to establish the existence of irreconcilable differences, [FN219] harked back to the fault approach. [FN220] Assessing the two provisions, Rheinstein was critical of the Family Law Act version:

> This text is a compromise that was worked out obviously in a hurry and in the last stage of discussions that had extended over many years and in the course of which the most diverse ideas had been expressed. In the early stages carefully considered plans had been suggested. The version that was ultimately adopted is poorly drafted. Indeed, its literal application is impossible. Any court may give it almost any meaning. [FN221] **2054** The deletion of the Family Court virtually guaranteed the impossibility of securing a consistent application of the no-fault provisions throughout the state. The Family Law Act offered no context for its sketchy provisions, and judges schooled in the fault approach were left to puzzle over how to apply the new approach.

The exception in section 4509 for admitting evidence of "specific acts of misconduct" unfortunately was not limited to proof of irreconcilable differences. The exception also applied "where child custody is in issue and such evidence is

relevant to establish that parental custody would be detrimental to the child." [FN222] This provision, which allowed battling spouses to use the custody issue as a vehicle for retaliation, remained in the law until 1994. [FN223]

Finally, the Family Law Act made two significant changes in the drafting of the property division and spousal support provisions. [FN224] The first was in the phrasing of the equal division requirement. The Commission, harking back to a provision enacted by California's first legislature, had recommended an equal division of the community property, but made clear that an unequal division could be ordered if the economic circumstances of the parties required it. [FN225] The Family Law Act provided for a much narrower exception to the equal division rule, allowing the court "where economic circumstances warrant [[to award] any asset to one party on such conditions as the court deems proper to effect a substantially equal division of the property." [FN226] This provision caused substantial confusion among practitioners and judges, and had to be clarified in a subsequent Legislative Report drafted by Assemblyman James A. Hayes, Chair of the Assembly Committee on Judiciary. [FN227]

The second change was in the spousal support provision. In addition to directing the court to take account of the circumstances of the parties and the duration of the marriage as the Governor's Commission had proposed, the Family Law Act directed courts to consider "the ability of the *2055 supported spouse to engage in gainful employment without interfering with the interests of the children in the custody of such spouse." [FN228] The accompanying Legislative Report referred to the increasing rate of employment of women, and went on to observe that "[women's] approaching equality with the male should be reflected in the law governing marriage dissolution and in the decisions of courts with respect to matters incident to dissolution." [FN229] Some judges, who apparently took this gloss on the statute as a legislative directive to eliminate spousal support, were corrected within two years by a California appellate court and ultimately by the California Supreme Court. [FN230]

## 2. The Uniform Marriage and Divorce Act

The Family Law Act became effective on January 1, 1970. Seven months later, a recommendation for no-fault divorce appeared at the national level when NCCUSL promulgated the 1970 version of the Uniform Marriage and Divorce Act (UMDA). [FN231] Under the leadership of Professors Robert J. Levy and the author, who served as Co-Reporters, [FN232] the broad outlines of the 1970 UMDA were heavily influenced by the California experience. [FN233] The standard for dissolution, however, more closely resembled the approach taken by the California Governor's Commission in providing for a breakdown of marriage standard uncluttered by any requirement of a showing of irreconcilable differences. [FN234] As in California, the undiluted *2056 breakdown approach proved controversial. The American Bar Association, which traditionally approves NCCUSL's proposed statutes, backed the opposition of its Family Law Section to the 1970 UMDA and withheld its concurrence. [FN235] The addition of a provision in 1973 requiring that irretrievable breakdown be established either by a showing of separation for 180 days or that "there is serious marital discord adversely affecting the attitude of one or both of the parties toward the marriage" [FN236] satisfied the Family Law Section, and in 1974 the ABA approved the 1973 version of UMDA. Other changes obtained during the negotiations included the deletion of a deferred marital property provision originally included in section 307 and the substitution of a provision applicable to non-community property states permitting an equitable distribution of all assets. [FN237] These changes effectively jettisoned NCCUSL's attempt to fashion what Reporter Levy called "path-breaking and imaginative divorce-property doctrines" [FN238] in favor of continuing to confer discretion on judges to fashion equitable property distributions on a case-by-case basis.

The endorsement of no-fault divorce at the national level by NCCUSL and the ABA, even in a watered-down version, represented a triumph of the twentieth-century family law reform effort. [FN239] State legislatures had *2057 be-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

gun to consider the new approach even before the ABA's final concurrence was forthcoming, [FN240] and as they did, the newly reorganized women's movement made its presence felt.

## H. The Women's Movement in the 1970s: Focus on Abortion and the ERA

Divorce reform was no more a high priority on the agenda of the women's movement in the 1970s than it had been in the 1870s. Other pressing issues, including abortion and ratification of the Equal Rights Amendment, took precedence. [FN241] As in divorce, California was a leader in the abortion reform movement. Following the ALI's 1959 tentative proposal in support of a therapeutic abortion law, [FN242] the California Senate Interim Committee on Judiciary held hearings on abortion on November 30, 1960. [FN243] At that time California, [FN244] like most states, [FN245] prohibited abortion subject only to an exception for procedures necessary to save the life of the mother. As in the case of divorce, however, a dichotomy existed between hospital practice and the criminal law of abortion, [FN246] between the "law in action versus the law of the books." [FN247] A survey of a sample of California hospitals covering the period 1952-1956 disclosed that three-fourths of them were aware that some of the therapeutic abortions they performed were not within the exception contained in the statute. [FN248] A few courageous physicians openly defied the law. [FN249] At the time the Model **2058** Penal Code was drafted, estimates of the annual number of abortions performed in the United States ranged from 333,000 to 2 million. [FN250] After seven years of hearings, debate, and study, California, along with Colorado and North Carolina, [FN251] became one of the first states to enact therapeutic abortion laws based on the Model Penal Code. [FN252]

In the 1960s, the proponents of abortion law reform were primarily the professionals who handled the cases, physicians, lawyers, social workers, as well as representatives of some non-Catholic religious denominations, and their related organizations. [FN253] By 1970, the women's movement, represented both by the more traditional NOW and the Redstockings, a radical group that had split off from the New York Radical Feminists, [FN254] had intervened in the debate to argue for "repeal," not "reform," of the abortion laws. [FN255] Statutes enacted in 1970 first in Hawaii and then in New York responded to these arguments. [FN256]

**2059** Not all of the proponents of abortion reform, however, were content to concentrate their attention on appeals to state legislatures. In 1970, plaintiffs Jane Roe [FN257] and Mary Doe [FN258] began separate proceedings in federal court to challenge the constitutionality of both the criminal abortion law of Texas and the newly-enacted therapeutic abortion law of Georgia. [FN259] These challenges were ultimately successful in 1973, when the United States Supreme Court, by a vote of seven to two, struck down the Texas statute in Roe v. Wade [FN260] and invalidated the Georgia therapeutic abortion law in Doe v. Bolton. [FN261] The ALI Commentary on the Model Penal Code treated these cases as superseding state criminal abortion laws. [FN262] As time went on, however, it became clear that the struggle over abortion which consumed the nation in the latter decades of the twentieth century began, rather than ended, with the Supreme Court's 1973 decisions. [FN263]

Along with abortion law reform, the Equal Rights Amendment occupied the attention of the women's movement in the 1970s. NOW demanded Congressional hearings on the proposed Equal Rights Amendment in 1970, [FN264] and, after a protracted debate, Congress sent the ERA to the states for ratification on March 22, 1972. [FN265] The initial seven-year period allowed for ratification of the ERA was scheduled to end in 1979, but as **2060** the deadline approached with only 35 affirmative votes cast of the 38 needed to reach the required three-fourths of the states, Congress acted in 1978 to extend the ratification period to June 30, 1982. [FN266]

The timetable set for ratification of the ERA meant that state legislatures were considering abortion measures, proposals for no-fault divorce reform, and the ERA during the same period: roughly between the late 1960s to the early

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1980s. It is not surprising that the efforts of ERA proponents to build a wall of separation between ratification and the abortion issue were unsuccessful. [FN267] Indeed, the debates on all three matters converged, as they centered on the role of women. Ultimately, proponents embraced the concept that the ERA would mandate equal treatment in the financial aspects of divorce, in particular the obligation of support during marriage, the award of spousal support after separation, and property division. [FN268] In doing so, they attracted opposition from conservative women led by Phyllis Schlafly, the founder of an organization called STOP ERA who perceived the amendment as a threat to housewives. [FN269]

The confluence of these issues first occurred in California. The California Advisory Commission on the Status of Women had supported no-fault divorce in 1969 on the ground that removal of fault would eliminate hypocrisy from the legal system. [FN270] Two years earlier, at the same time that the California Therapeutic Abortion Law was enacted, [FN271] the Commission had called for a "major legislative study" of the community property laws, in order to propose legislation to "equalize both the rights and duties of the husband and wife in the control, management and disposition of their community property to create a true economic partnership between the spouses." [FN272] In 1971, after a year of watching the courts struggle with the financial provisions of the Family Law Act, Judge Isabella Grant called attention to these recommendations, urging that **2061** community property reform was necessary to carry out the no-fault philosophy. [FN273] By the time the Legislature responded by holding hearings on community property in September and October 1972, [FN274] a drive to ratify the ERA was under way; it was concluded successfully in November 1972. [FN275] As a result of the hearings, three changes were made in the community property laws, all designed to expand the financial power of wives by more nearly equalizing their managerial rights with those of their husbands consistent with the call for equal rights. [FN276] A report filed in 1977 cited these laws as indicating that "the California situation is probably the best in the nation for married women at the present time." [FN277]

Also notable is the Wisconsin experience with divorce reform. A small group of feminists, actively involved in the reform effort and leaders in the successful ERA ratification effort in Wisconsin, [FN278] prevented enactment of a no-fault provision until legislators built financial protections for women into the divorce reform package. [FN279] After the no-fault divorce law was enacted in 1977, they continued to work for reform of Wisconsin's common law property system. [FN280] In 1986, Wisconsin became the first, and to date the only, common law state to adopt the Uniform Marital Property **2062** Act, [FN281] which had been promulgated in 1983 by NCCUSL to serve as a model for common law states in adopting a community property system. [FN282]

I. Constitutional Campaigns for Women's Equality and Self-Determination

### 1. Ruth Bader Ginsburg and the Equal Protection Clause

During the 1970s, while the state legislatures were occupied with divorce reform, abortion reform, and ratification of the ERA, a quiet campaign was underway in the federal courts to create a secure place for women in the United States Constitution. This campaign was conceived, implemented, and carried out by the Women's Rights Project of the American Civil Liberties Union, under the leadership of law professor Ruth Bader Ginsburg. [FN283] When the campaign began, the United States Supreme Court's interpretation of the Equal Protection Clause consisted of a two-tier review process: claims were tested either under the deferential or "rational relationship" standard, or under the "strict scrutiny" standard. The first standard was said to be "offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. . . . A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [FN284] The higher standard was reserved for "suspect classifications" such as race or national origin, as well as where "fundamental interests," such as voting, were involved. [FN285] In such cases, the government was required to show a much closer fit between ends and means: that it was pursuing a "compelling" state in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

terest and that the classification was necessary to promote that interest. [FN286] Professor Gerald Gunther observed that, during the years of the Warren Court, the two-tier standard was characterized by an upper-level "scrutiny that was 'strict' in theory and fatal in fact" and a lower-level test characterized by "minimal scrutiny in theory and virtually none in fact." [FN287]

**\*2063** Equal protection claims brought by women had been relegated to the lower tier of this approach and were decided under the "rational relationship" standard. Not surprisingly, most of these claims were unsuccessful. [FN288] As Ruth Bader Ginsburg later observed, the constitutional text was "an empty cupboard for people seeking to promote the equal stature of women and men as individuals under the law." [FN289] She and the feminist strategists of the ACLU undertook the ambitious task of changing the Court's interpretation of the Equal Protection Clause to make sex, like race, a "suspect classification." [FN290] Their argument received its first hearing in the Supreme Court in Reed v. Reed, [FN291] and resulted in the creation of a new tier of review, [FN292] one that came to be known as an "intermediate" standard. [FN293] Two years later, in Frontiero v. Richardson, [FN294] the Court came within one vote of classifying sex as a "suspect classification." [FN295] Ginsburg later described her strategy in choosing cases to bring before the Court as "basic education," [FN296] explaining that

> [t]he 1970s cases . . . all rested on the same fundamental premise: that the law's differential treatment of men and women, **\*2064** typically rationalized as reflecting "natural" differences between the sexes, historically had tended to contribute to women's subordination--their confined "place" in man's world--even when conceived as protective of the fairer, but weaker and dependent-prone sex. [FN297] Ginsburg's strategy succeeded brilliantly. When she left the academy to accept appointment to the federal bench in 1980, [FN298] the intermediate scrutiny standard was well established and, with it, women's enhanced ability to assert constitutional claims for equality. [FN299]

## 2. The Due Process Clause: Abortion as Privacy

By the mid-1980s, when President Ronald Reagan appointed Justice Sandra Day O'Connor as the first woman member of the Supreme Court, [FN300] no-fault divorce had been adopted, in one version or another, in all fifty states, [FN301] the ERA had failed by three votes to secure ratification, [FN302] and a determined effort to overturn Roe and Doe was under way. The opponents of abortion were not ready to concede the power of state law to hinder, if not to prevent, women from obtaining legal abortions. Although ill-conceived tactics designed to avoid the Supreme Court's constitutional holding were quickly struck down, [FN303] abortion remained on the agenda of **\*2065** state legislatures throughout the 1980s as opponents sought repressive measures designed to test the limits of Roe and Doe. [FN304] As the decade wore on, it became increasingly evident that the Supreme Court's emphasis on the physician's medical autonomy rather than the woman's right of choice, in its articulation of the Roe standard applicable during the first trimester of pregnancy, [FN305] had committed the Justices to the uncomfortable and apparently unending task of parsing the latest developments in medicine and measuring them against the newly-created right of privacy. [FN306] During this period, the struggle over abortion became a pivotal factor in political elections and even spilled over into the process of selection of Supreme Court Justices. In 1987, pro-choice advocates joined other liberal groups in persuading the Senate to deny confirmation to President Reagan's anti-choice nominee, Robert H. Bork. [FN307]

It was not until 1992, when the Court reaffirmed "the essential holding of Roe v. Wade" in Planned Parenthood v. Casey, [FN308] and Justices Sandra Day O'Connor, Anthony Kennedy, and David Souter in their joint opinion announced their intention to abandon the trimester timetable approach of Roe, [FN309] that the Court began to shift the legal focus of abortion analysis from the physician to the pregnant woman. The joint opinion in Casey drew the line at viability; before that point, it stated plainly, "the woman has a right to choose to terminate her pregnancy." [FN310] The

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page25 of 73

joint opinion also recognized, however, that "the State's profound interest in potential life" exists throughout pregnancy, and that state regulation of abortion must meet an "undue burden" standard, defined as follows: "An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman **\*2066** seeking an abortion before the fetus attains viability." [FN311] The Supreme Court has not revisited the question of overruling Roe and Doe since Casey was handed down in 1992, and the "undue burden" standard proposed by the joint opinion commanded a majority of the Court in Stenberg v. Carhart. [FN312]

J. The Critique of No-Fault Divorce

### 1. Lenore Weitzman and the Exaggerated "Gender Gap"

In the mid-to-late-1980s, feminist criticism of no-fault divorce began to emerge, at roughly the same time that conservatives were calling for a return to "family values." [FN313] Sociologist Lenore Weitzman published her empirical study of the California Family Law Act in 1985. [FN314] Although earlier critiques had appeared, [FN315] Weitzman's study was the most influential. [FN316] She found both that the no-fault philosophy had been accepted by California judges and lawyers as an improvement over the fault system, and that most divorcing couples saw it as "fair." [FN317] She also concluded, however, that the removal of fault from the divorce process had fundamentally altered the framework for bargaining between the spouses. No-fault divorce tipped the balance of power away from the one who wanted to preserve the marriage (whose consent, or at least non-objection to the divorce, had to be secured under the fault regime) to the one who wanted to end the relationship and effectively could do so unilaterally. [FN318] This structural change, plus the failure of judges to implement the spousal **\*2067** and child support laws in the way that reformers had envisaged, led Weitzman to conclude that no-fault divorce had "radically different economic consequences for men and women." [FN319] In particular, Weitzman found that "[j]ust one year after legal divorce, [m]en experience a 42 percent improvement in their postdivorce standard of living, while women experience a 73 percent decline." [FN320]

Weitzman's startling finding of a substantial "gender gap" in the standard of living following divorce was front page news around the country [FN321] and led to widespread demands for revision of the laws. [FN322] But her finding was questioned by other researchers at the time it was announced. [FN323] When researchers were unable to replicate her findings using her data, [FN324] Weitzman acknowledged in 1996 that her original figures had been incorrect. [FN325] A more recent refinement in the methodology used to make such calculations--by using after-tax rather than gross income figures, and taking account of monetary transfers between the two households in addition to the payment of court-ordered spousal and child support awards--is said to reduce the gender gap to 10%: an 8% decline for women and a 2% increase for men. [FN326]

**\*2068** Before Weitzman corrected her original findings, however, the impression that divorce reform had been an economic disaster for women in California took hold of the public imagination [FN327] and distorted the national debate over no-fault divorce. [FN328] Professor Mary Ann Glendon's conclusion, based on a comparative analysis of divorce reform provisions in the U.S. and twenty Western nations, that "[m]ore than any other country among those examined here, the United States has accepted the idea of no-fault, no-responsibility divorce[,]" [FN329] added to the growing sense that additional reforms were required to complement the no-fault laws. [FN330]

### 2. The Conservative Call for a Return to "Family Values"

Conservatives sought reform by calling for a return to more traditional values. In February 1986, Attorney General

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Edwin Meese, acting in his capacity as Chair of the White House Domestic Policy Council, appointed a Working Group on the Family. On December 2, 1986, the Working Group submitted a Report to President Reagan that sounded familiar themes:

> It is time to reaffirm some "home truths" and to restate the obvious. Intact families are good. Families who choose to have children are making a desirable decision. Mothers and fathers who then decide to spend a good deal of time raising those children themselves rather than leaving it to others are demonstrably doing a good thing for those children. Countless Americans do these things every day. **\*2069** They ask for no special favors--they do these things naturally out of love, loyalty and a commitment to the future. They are the bedrock of our society. Public policy and the culture in general must support and reaffirm these decisions--not undermine and be hostile to them or send a message that we are neutral. [FN331]

The Working Group also implicated no-fault divorce in the weakening of traditional family values. It advised that "we all have an interest--whether ethical or economic--in reversing the recent trend toward automatic divorce." [FN332]


K. Fixing No-Fault: The ALI's "Principles of Family Dissolution"

In contrast to the criticism of no-fault divorce by some feminists and conservatives, the American Law Institute sought to build on, clarify, and complete the earlier reforms. In 1989, it reopened the family law reform effort by commencing a project called The Principles of the Law of Family Dissolution. [FN333] Noting that the law of family dissolution had undergone fundamental revision in the previous two decades, the ALI spelled out the scope of its proposed project:

> These evolving legal developments generally have dealt incompletely with issues, have overlapped one another, and sometimes have resulted in internal conflict in the law itself. The resulting uncertainty suggests a need to examine the present state of legal development, to clarify underlying principles, and to suggest the future direction for public policy. [FN334] The ALI did not plan to revisit the grounds for divorce. Instead, it accepted the nationwide adoption of no-fault divorce, and undertook to complete that reform by drafting provisions dealing with the process of dissolution and the substantive standards relevant to child support, spousal support, property division, and custody of children. [FN335] Under the current leadership of Chief Reporter Ira Mark Ellman and Co-Reporters Grace Ganz **\*2070** Blumberg and Katharine T. Bartlett, the ALI project received final approval from the Institute in May 2000. [FN336]

The Principles are both imaginative and practical. The property division sections offer a redefinition of "marital" and "separate" property for use at dissolution that generally follows community property concepts. [FN337] They steer a middle course between the "equitable division" and "equal division" states by calling for a presumptive equal division of marital property subject to specified exceptions. [FN338] They also provide for the gradual recharacterization in lengthy marriages of a portion of separate property into marital property. [FN339]

"Maintenance" is renamed "Compensatory Spousal Payments" in the Principles, and the draft draws on Professor Ira Mark Ellman's earlier work on alimony [FN340] in seeking to allocate financial losses that arise at the dissolution of marriage according to specified principles rather than simply basing income transfers on need and ability to pay. [FN341] Five categories of compensable loss are recognized: (1) those arising from the loss of a higher living standard by the spouse with less wealth or earning capacity at the end of a marriage of significant duration; [FN342] (2) those arising from the loss of earning capacity during marriage and continuing after dissolution because of one spouse's undertaking a disproportionate share of the care of children; [FN343] (3) those arising from the loss of earning capacity during marriage and continuing after dissolution because of one spouse's caring for a sick, elderly, or disabled third party in fulfill-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment of a joint moral obligation; [FN344] (4) those arising from the loss incurred by either spouse when the marriage is dissolved before that spouse "realizes a fair return from his or her investment in the other spouse's earning capacity"; [FN345] and (5) an "unfairly disproportionate disparity between the spouses in their respective abilities to recover their pre-marital living standard after the dissolution of a short marriage." [FN346] Some of the policy choices reflected in the draft have been criticized, [FN347] but they are important advances beyond present law.

**\*2071** The ALI child custody recommendations seek to avoid the "best interests of the child" standard, criticizing it as too subjective to produce predictable results. Instead, the Principles rely on private ordering, requiring that each party who seeks "a judicial allocation of custodial responsibility or decisionmaking responsibility" file a parenting plan. [FN348] If the parents agree to one or more provisions of a parenting agreement, the court should enforce the agreement unless it finds either that the agreement is not "knowing or voluntary" or that "the plan would be harmful to the child." [FN349] If the parents are unable to agree, the draft allocates custodial responsibility "so that the proportion of custodial time the child spends with each parent approximates the proportion of time each parent spent performing caretaking functions for the child prior to the parents' separation." [FN350]

The context of the Principles' child support provisions is the requirement of federal law that each state seeking federal funding under the Temporary Assistance to Needy Families (TANF) program must have in place nonbinding guidelines for establishing child support obligations. [FN351] All states have established such guidelines, using one of four models. [FN352] State officials are required to review their guidelines every four years. [FN353] **\*2072** The approach taken in the Principles is addressed to state officials responsible for reviewing the federally mandated state child support guidelines. [FN354]

The draft began with the marginal expenditure formula and drew inspiration from the Massachusetts formula. [FN355] The method set out in Chapter Three of the Principles [FN356] uses a balancing process that identifies the "cognizable" interests of all parties, including the child, the residential parent, the nonresidential parent, and the state, as well as the social and cultural values implicated in the formulation and execution of child support rules. [FN357] Unlike prior child support formulas, the Principles recognize that some of these interests and values may be competing. The formula and auxiliary rules set out in Chapter Three undertake to compromise and harmonize them in accordance with a set of specified objectives. [FN358]

Chapter Six extends most of the provisions governing financial claims between spouses to domestic partners, defined as "two persons of the same or opposite sex, not married to one another, who for a significant period of time share a primary residence and a life together as a couple." [FN359] Persons who maintain a common household with their common child for a specified continuous period of time are deemed to be domestic partners; [FN360] if these circumstances are not present, the person claiming benefits must prove that the parties met the definition. [FN361] Domestic partners may contract out of these provisions. [FN362]

Chapter Seven undertakes to reformulate and clarify the law relating to premarital agreements, marital agreements, and separation agreements. [FN363] They are tailored to the substantive provisions of the draft.

While the Principles are still a work in progress at the century's end, it is apparent that, after nearly ten years of development and refinement, the ALI's Family Law Project has achieved its goal of clarifying the **\*2073** underlying principles relevant to family dissolution and offering a sound basis for future public policy making. Family breakdown is accepted as a given, and an appropriate, basis for dissolution, and the legal framework surrounding the Project's implementation is oriented towards fair treatment that is nonpunitive, nonsexist, nonpaternalistic, and designed as far as possible to facilitate positive outcomes for each of the individuals involved. [FN364] The means chosen to achieve these ends are

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

practical and predictable. Furthermore, they avoid undue deference to the often subjective discretion of judges to a larger extent than do the compromises imposed on both the Family Law Act and the UMDA. [FN365] Fortunately, the American Law Institute approved the Principles without subjecting them to similar compromises. Now that the Principles have won approval, they deserve serious and sympathetic consideration from twenty-first century lawmakers, for they have responded to the major criticisms of no-fault divorce.

## L. The Women's Movement After the Defeat of the ERA: Focus on Access to Abortion and Sexual Harassment

During the first half of the 1990s, when the ALI Family Law Project was being drafted, two women's issues, abortion and sexual harassment, took center stage. The ongoing battle over abortion focused on the tactics of anti-abortion demonstrators who blocked the entrances to abortion clinics to "rescue" fetuses. The issue of sexual harassment captured the nation's attention during the confirmation hearings of Justice Clarence Thomas, and the ensuing political reaction helped boost women candidates for national public office to a record number of electoral successes.

In the late 1980s, a coalition of anti-abortion groups united under the name Operation Rescue, led by Randall A. Terry, began performing "rescue" demonstrations at abortion clinics around the country. Women's organizations responded by filing lawsuits. [FN366] Justice Stevens, dissenting from the Supreme Court's refusal in 1993 to recognize a cause of action against the protestors under the Ku Klux Klan Act, [FN367] thus described their tactics:

Pursuant to their overall conspiracy, petitioners have repeatedly engaged in "rescue" operations that violate local law *2074 and harm innocent women. Petitioners trespass on clinic property and physically block access to the clinic, preventing patients, as well as physicians and medical staff, from entering the clinic to receive or receive medical or counseling services. Uncontradicted trial testimony demonstrates that petitioners' conduct created a "substantial risk that existing or prospective patients may suffer physical or mental harm." Petitioners make no claim that their conduct is a legitimate form of protected expression. [FN368]

Congress responded in 1994 by enacting the Freedom of Access to Clinic Entrances Act, (FACE), [FN369] a measure that has been upheld uniformly against constitutional challenge. [FN370] Since that time, the radical abortion-protest movement is said to have gone underground, though its tactics apparently have not become less violent, [FN371] and some groups have maintained a presence on the Internet.

Public awareness of the second of these two women's issues, sexual harassment, increased substantially in the early 1990s because of the nationally televised hearings on the confirmation of Supreme Court nominee Clarence Thomas. The legal theory that applied Title VII's prohibition against sex discrimination to cover sexual harassment on the job was developed in the late 1970s, [FN372] first recognized by the United States Supreme Court in 1986, [FN373] and extended to same-sex harassment in 1998. [FN374] Sexual *2075 harassment did not become a household word, [FN375] however, until the fall of 1991, when law professor Anita Hill charged that Clarence Thomas had sexually harassed her during the time she had worked for him first at the Department of Education and later at the Equal Employment Opportunity Commission. [FN376] The Senate confirmed Justice Thomas despite Hill's testimony. [FN377] A sufficient number of voters, however, apparently agreed with the slogan, "[t]hey just don't get it," directed at the apparently obtuse all-male Judiciary Committee that conducted the confirmation hearings, to turn the 1992 elections into "The Year of the Woman" when a record number of women were elected to Congress. [FN378] Nineteenth-century suffragists were vindicated, as women's political organizations raised unprecedented amounts of money to support the record number of women candidates who ran successfully. [FN379]

The 1992 election also brought President William Jefferson Clinton into the White House, and in 1993 he placed the second woman, Justice Ruth Bader Ginsburg, on the Supreme Court. [FN380] In her first published opinion, a concur-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

rance in a sexual harassment case, Justice Ginsburg signalled her intention to revisit a matter left open from her days as an advocate: the appropriate standard of review in sex-based equal protection claims. [FN381] In her 1996 opinion for the Court in United States v. Virginia, [FN382] *2076 Justice Ginsburg brought the Court a step closer to affording claims of constitutional sex discrimination the highest review. [FN383]

M. Marriage Law Reform at the Century's End: Same-Sex Marriage and DOMA

Marriage law reappeared on the family law reform agenda in the early 1990s in the shape of litigation designed to force state officials to issue marriage licenses to same-sex couples. Similar efforts seeking to invoke the Due Process and Equal Protection Clauses of the United States Constitution had failed at the national level twenty years earlier when the United States Supreme Court dismissed an appeal from a Minnesota judgment that declined to extend the rationale of Loving v. Virginia [FN384] to invalidate the practice of denying licenses to same-sex couples. [FN385] A challenge based on Washington's State Equal Rights Amendment also failed. [FN386] In 1993, however, the supreme court of Hawaii invoked the state Equal Protection Clause and used a strict scrutiny standard of review to reverse a lower court's judgment dismissing a claim that denial of marriage licenses to same-sex couples constituted sex-based discrimination in violation of the state constitution, and the court remanded the matter for trial. [FN387] The unprecedented Hawaii decision touched off a storm of controversy. Advocates of same-sex marriage immediately began researching the obscure corners of the Full Faith and Credit Clause [FN388] to see whether a marriage in Hawaii between residents of mainland states would be recognized in a *2077 couple's home state. [FN389] In response to the court's decision, the Hawaii legislature amended the state marriage laws in 1994 to require that "the marriage contract . . . shall be only between a man and a woman." [FN390] For good measure, the Hawaii legislature also proposed a constitutional amendment banning same-sex marriage in 1997, [FN391] which was adopted by popular vote in the 1998 election. [FN392] Other states, as well, amended their marriage laws to prohibit same-sex marriage. [FN393]

Opponents of same-sex marriage moved swiftly to protect mainland states against the threat that courts might indeed read the Full Faith and Credit Clause to require recognition of same-sex marriages performed in Hawaii. In May 1996, Representative Robert Barr of Georgia introduced a bill entitled "The Defense of Marriage Act" (DOMA) into the Congress. [FN394] The bill moved with uncommon speed: the House of Representatives held hearings less than two weeks after the bill's introduction, and the House Judiciary Committee approved it in mid-June by a vote of 20 to 10. [FN395] It passed the House on July 12, 1996, by a vote of 342 to 67, and the Senate on September 10, 1996, by a vote of 85 to 14. [FN396] President Clinton signed the measure on September 21, 1996. [FN397] A torrent of legal commentary, *2078 most of it negative, greeted DOMA's enactment. [FN398] Conflict of laws scholars viewed the measure as at best unnecessary and at worst unconstitutional. [FN399]

From a family law perspective, DOMA was ill-advised regardless of what one's attitudes may be toward the legalization of same-sex marriage. The measure introduced a federal definition of "marriage" and "spouse" that displaces a uniform and long-standing, if voluntary, deference to state law on matters affecting the family. [FN400] Eligibility for federal entitlement programs, such as social security, medicare, and veteran's benefits, traditionally have been measured by state, not federal law. [FN401] This long-standing practice appropriately recognizes the prerogative of state legislatures to regulate the family as a matter of local policy, and the relatively greater experience of state court judges in implementing those policies.

DOMA does not, of course, foreclose the possibility open to advocates of same-sex marriage of seeking state legislation recognizing such marriages. An appeal to the legislature, rather than to the courts, would *2079 have the advantage of placing the issue on the public policy agenda and inviting open debate on its merits. [FN402] Such a debate took place

in Vermont in the early months of 2000, as a result of the state Supreme Court's decision in Baker v. Vermont. [FN403] The Vermont Court relied on the "principle of inclusion" expressed in the common benefits clause of the state constitution to hold that

> . . . The legal benefits and protections flowing from a marriage license are of such significance that any statutory exclusion must necessarily be grounded on public concerns of sufficient weight, cogency, and authority that the justice of the deprivation cannot seriously be questioned. Considered in light of the extreme logical disjunction between the classification and the stated purposes of the law--protecting children and "furthering the link between procreation and child rearing"--the exclusion falls substantially short of this standard. The laudable governmental goal of promoting a commitment between married couples to promote the security of their children and the community as a whole provides no reasonable basis for denying the legal benefits and protections of marriage to same-sex couples, who are no differently situated with respect to this goal than their opposite-sex counterparts. Promoting a link between procreation and childrearing similarly fails to support the exclusion. [FN404]

In deciding the remedy phase of the litigation, however, a majority of the Court stopped short of holding that the same-sex couples were entitled to a marriage license. Instead, it deferred to the Vermont legislature to craft an appropriate means of ensuring that plaintiffs "obtain the same benefits and protections afforded by Vermont law to married opposite-sex couples." [FN405] It noted that a decision to grant the plaintiffs a marriage license would obviously meet this mandate, but observed that a "domestic partnership" provision might also satisfy its mandate. [FN406]

The Court's opinion turned the national spotlight on Vermont, [FN407] and produced an outpouring of popular, if contentious, discussion among the *2080 citizens. [FN408] In mid-March, the Vermont House of Representatives approved a bill creating a "civil union," [FN409] defined as a relationship between two eligible persons and providing that "parties to a civil union shall have all the same benefits, protections and responsibilities under law, whether they derive from statute, administrative or court rule, policy, common law or any other source of civil law, as are granted to spouses in a marriage." [FN410]

The impact of DOMA upon Vermont's civil unions, if any, raises an interesting question. The House bill expressly provides that a civil union is not a marriage, [FN411] so DOMA, which refers to "a relationship between persons of the same sex that is treated as a marriage" [FN412] literally may not apply.

## N. The Renewed Debate Over "Easy" Divorce

In the mid-1990s, no-fault divorce came under attack again, this time not from feminists but from the conservative right. Their leader, Representative Newt Gingrich of Georgia, was elected Speaker of the House in January 1995 and used that post to publicize the conservative agenda in unprecedented public media appearances and statements. [FN413] In the 1994 mid-term federal elections, Republicans running on a "Contract with America," designed to reduce the role of government through such measures as a balanced budget amendment, tax relief for families, welfare reform, and term limits, captured the House of Representatives for the first time in forty-two years. [FN414] A complementary "Contract with the American Family" was issued by the Christian Coalition in May 1995, calling on Congress to enact its "bold agenda . . . intended to strengthen families and restore traditional values." [FN415] While the document did not directly mention divorce, its focus on local control of schools, opposition to funding for organizations that promote and perform abortions, and support for *2081 "transforming the bureaucratic welfare state into a system of private and faith-based compassion" [FN416] suggest a preference for the traditional family form. And, buried deep in the Coalition's recommendation for ending federal funding of the Legal Services Corporation (LSC), created in 1974 to provide legal services to the poor, [FN417] was the statement that the LSC fostered rather than reduced poverty by obtaining divorces for its

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

clients. This practice, the Coalition claimed, exposes children in single-parent households to greater danger of being poor than children in intact households. [FN418]

### 1. The Call For a Return to Fault

In the closing years of the twentieth century, a full-scale campaign to reverse the no-fault revolution emerged, not unlike the condemnation of "easy" divorce that had characterized the latter decades of the nineteenth century. [FN419] Like Reverend Woolsey and his followers a century before them, the new proponents of fault-based divorce believed that liberalization of the grounds for divorce had caused an increase in the divorce rate. [FN420] Several also argued that a no-fault divorce regime harmed children since it provided no incentives for the spouses to resolve their marital problems. [FN421] A Michigan legislator, Representative Jessie Dalman, touched off the current wave of renewed interest in fault-based divorce by announcing on Valentine's Day, 1996, her intention to introduce a series of bills to strengthen marriage by ending no-fault divorce. [FN422] Other states, several using the Michigan model, also began considering measures to modify or repeal their no-fault divorce laws. [FN423]

Although academic reevaluations of the divorce reform movement appeared in the early 1990s to mark the twentieth and twenty-fifth **\*2082** anniversaries of the enactment of the first no-fault divorce statutes, [FN424] few commentators expressed interest in a return to fault-based grounds for divorce. [FN425] Not surprisingly, academic commentary was largely critical of the effort inspired by Representative Dalman to turn back the clock on divorce reform by reinstating fault grounds. [FN426] For example, Professor Ira Mark Ellman, the Chief Reporter for the ALI Principles, defended the no-fault reforms. As to the rising divorce rate, Ellman pointed out that the U.S. divorce rate has been rising steadily since the 1860s and that repeated studies have failed to show any lasting effect of the no-fault laws on divorce rates. [FN427] On the lack of incentives to preserve marriage for the sake of children, Ellman demurs:

> I am sceptical that very many people now casually destroy their happy marriages, or that the introduction of prolonged waiting periods would be likely to preserve many unhappy ones. Its effect will rather be to increase the number of marriages that are, at any given time, legally intact but factually dead, to keep many victims of failed marriages from building new lives for themselves and their children, and perhaps to increase the proportion of children born out of wedlock. [FN428] Moreover, Ellman has shown convincingly that tort law, rather than divorce law, affords a more appropriate remedy for spousal violence. [FN429] To date, none of the recent proposals to return to fault-based divorce grounds **\*2083** has been successful, with the exception, discussed below, of the enactment of "covenant marriage" laws in Louisiana and Arizona. [FN430]

### 2. Covenant Marriage

Louisiana's Covenant Marriage Act, in the words of its drafter, Professor Katherine Shaw Spaht, was inspired by a larger ambition than mere reinstatement of the fault basis for divorce. Rather, her goal was to rehabilitate lifelong marriage:

> If a father and a mother committed to each other through lifelong marriage represents the ideal environment for the rearing of responsible, prosperous, and well-adjusted citizens, can the law restore and strengthen the institution of marriage? Law played an indispensable role in the near-destruction of marriage, so surely it can and must in light of its complicity, contribute to the rehabilitation of marriage--for the sake of the children. How best to restore the ideal of eternal, self-sacrificial love is the question. [FN431] The Covenant Marriage Act offers an alternative form of marriage to what is called "regular" marriage. Covenanting spouses must undergo pre-marital counseling, in which they must discuss with a counselor the seriousness of marriage, their intention to have a lifelong

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

marriage, their willingness to agree that they will "seek marital counseling in times of marital difficulties," and their understanding that, if they choose covenant marriage, their marriage may be dissolved only for specified fault-based grounds [FN432] or a no-fault ground of living separate and apart for two years. [FN433] If, after counseling, the prospective husband and wife choose covenant marriage rather than regular marriage, they are required to sign and file a "Declaration of Intent," which provides:

We do solemnly declare that marriage is a covenant between a man and a woman who agree to live together for so long as they both may live. We have chosen each other carefully and disclosed to one another everything which could adversely affect the decision to enter into this marriage. We have **2084** received premarital counseling on the nature, purposes, and responsibilities of marriage. We have read the Covenant Marriage Act, and we understand that a Covenant Marriage is for life. If we experience marital difficulties, we commit ourselves to take all reasonable efforts to preserve our marriage, including marital counseling.

With full knowledge of what this commitment means, we do hereby declare that our marriage will be bound by Louisiana law on Covenant Marriages and we promise to love, honor, and care for one another as husband and wife for the rest of our lives. [FN434] According to Professor Spaht, while the clause stating the couple's intention that their marriage be lifelong is inspirational, [FN435] the clause stating their commitment to "take all reasonable efforts to preserve our marriage, including marital counseling," is a valid contractual obligation. [FN436] She argues that, as a matter of public policy, such a contractual obligation cannot cannot be altered by the parties. [FN437] Moreover, the agreement must be performed in good faith, [FN438] and potentially gives rise to contractual remedies for breach, including damages, [FN439] for both pecuniary and non-pecuniary losses. [FN440] If, despite the performance of this agreement, a covenant marriage is dissolved, the Act "empowers the 'innocent' spouse by bestowing upon her the exclusive right to a divorce for a two-year period." [FN441] If the "innocent" spouse chooses not to seek dissolution of the covenant marriage, the other spouse is required to wait two years to seek relief. [FN442] Spaht observes that:

The other spouse, who, by his own fault, has "broken up" the family unit, must wait two years to seek his own divorce. While he waits, he will be paying a significantly higher sum in spousal support than he will pay after the divorce. He also may be obligated to pay damages for breach of his contract to seek counseling. In addition if he wants to remarry, he will be the especially vulnerable target of this shift in divorce law policy. [FN443] Spaht does not hesitate to admit that this "shift in divorce law policy" will permit blackmail [FN444] if the "innocent" spouse chooses to exact a high price for her willingness to file for divorce prior to the termination of the two year period. However, she is unapologetic that punishment should be **2085** meted out to a spouse who has breached the covenant marriage contract. [FN445] She calls attention to the historical significance of the Act, pointing out that "the covenant marriage legislation represents the first time, as a general trend, in two hundred years in any Western country that divorce has become more difficult rather than easier." [FN446] This claim is somewhat overstated, ignoring as it does the success of Theodor Woolsey and his followers in securing the repeal of the Connecticut "omnibus" ground for divorce in 1878. [FN447]

Covenant marriage got off to a slow start: in the first year of its availability, only one percent of Louisiana couples chose it over regular marriage. [FN448] Spaht, however, appears prepared for a long campaign, recognizing that: "To promote the selection of a stronger marital commitment, proponents of covenant marriage must convince each couple of the desirability of covenant marriage, which requires intensive missionary work, winning converts one couple at a time." [FN449]

The Covenant Marriage Act has drawn opposition from a variety of groups, including the ACLU, which presented testimony against the bill. [FN450] Academic commentary to date has been mixed, but predominently critical of the Act. [FN451] Professor Ira Mark Ellman's opposition to the Arizona version of covenant marriage succeeded in modifying the bill to permit the covenanting couple to end their marriage upon a showing that they "both agree to a dissolution of mar-

riage." [FN452] No other state has yet followed Louisiana's restrictive approach by enacting a covenant marriage bill. [FN453]

**\*2086** O. The Women's Movement at the Century's End: Focus on Women's Sports, an ERA Reprise, and an Abortion Pill

The national focus shifted from family law reform to women's rights in the summer of 1999, as two feminist initiatives of the 1970s, Title IX of the Education Amendments of 1972 [FN454] and the Equal Rights Amendment, reappeared on the agenda. At the same time, a new development in the on-going struggle over abortion reform, the availability of a new technique for abortion, appeared as well. The victory of the U.S. Women's Soccer Team over China in the Women's World Cup competition touched off a national celebration [FN455] and realized the promise of Title IX's guarantee of "equal play." [FN456] Future generations of girls will continue to be inspired by the success of these women in testing their skills on the playing fields of team sports.

In addition, the success of Iowa and Florida in adding equal rights-like provisions to their state constitutions in 1998 [FN457] encouraged serious discussion of a renewed drive to ratify the Equal Rights Amendment. ERA proponents like Kim Gandy, Executive Vice-President of NOW, argue that the amendment is still necessary despite the increasingly heightened scrutiny given constitutional sex-discrimination claims by the United States Supreme Court, pointing out that "[n]o matter how much legislation is in place, we are only one president or one Congress or one Supreme Court away from losing what we've gained." [FN458] Phyllis Schafley counters that "[t]his was an idea that had a 10-year debate. It was rejected." [FN459] Proponents have not decided whether to launch a new ERA or to reopen the 1972 ratification drive. [FN460] Alice Paul's dream may yet be realized.

While at the time of this writing a woman's legal right to an abortion is constitutionally protected, the question of how an abortion can be performed remains open. The development of the French abortion pill, RU-486, by Roussel-Uclaf in the 1980s is as significant as the earlier birth control pill in affording women an effective method of fertility control that is safe and private. But its distribution in the United States was banned until recently. In 1994, Roussel-Uclaf donated the U.S. rights to RU-486 to the Population Council, and in 1996, the F.D.A. declared the pill "approvable." In the summer of 1999, it appeared that a manufacturer had **\*2087** been found and that plans for a release of the drug in 1999 were under way, [FN461] but the FDA delayed final approval of the drug, to be marketed as Mifeprex, until September 28, 2000. [FN462] Pro-choice advocates believe that RU-486 will have a profound impact on the delivery of reproductive health services in many cases by making specialized abortion clinics obsolete, and thus avoiding anti-abortion demonstrations at clinic doors. [FN463]

In summary, as the United States enters the closing months of the twentieth century, the ALI family law reform effort has completed a predictable legal framework designed to achieve fairness in financial settlements attendant upon family dissolution and to provide a sensible and reliable basis for the placement and support of children. This framework is built upon the earlier successes of the California Governor's Commission and NCCUSL in achieving a no-fault alternative to fault-based grounds for divorce in every state. Taken together, these three initiatives provide trial court judges rule-based standards for adjudicating the claims of the divorcing adults, as well as cohabitants who have lived together with their children and who must now create an alternative mode of co-parenting. These initiatives do not dwell on the past by assigning guilt or imposing punishment for marital misconduct, but rather focus on the future by creating a foundation on which the parties can rely as they rebuild their lives.

Two states have looked in a different direction, "for the sake of the children," seeking to recreate "self-sacrificial love" [FN464] through the use of findings of guilt and the imposition of punishment backed up by threats of extortion to

compel compliance with the covenant of marriage. As the proponents of this approach recognize, its success may require a cultural change. [FN465] The culture that they seek to change is one in which state no-fault divorce laws have removed the stigma of divorce from both women and men and ensured fair treatment to both parties and federal laws forbidding discrimination in employment and education and requiring equal pay for equal work have contributed to women's economic independence. At the same time, Supreme Court decisions have supported women's right to control their reproductive capacity and new technology is at hand that will enable women to exercise that right more effectively and with greater privacy. This culture is the manifestation of a trend that has evolved over two centuries to facilitate the emergence of women as autonomous individuals, able to choose the direction of their lives. That trend is now well-established and is unlikely to be reversed by calls for a return to **2088** "self-sacrificial love" and the implicit model it invokes of a society built on a tradition of family life in which women are the "second" sex.

### III Challenges for the Twenty-First Century

Carl Degler characterized the differing attitudes of nineteenth- and early twentieth-century men and women toward their work:

> Although women have been a part of the industrial system in the United States virtually from its inception, their relation to that system has always been different in certain fundamental ways from that of men. From the outset woman's employment was shaped around the family, while man's work, in a real sense, shaped the family. The family moved, lived, and functioned as man's work decreed; woman's employment, on the other hand, ceased when the family began, and from then on, as we have seen, it adjusted to the needs of the family, for the family was a woman's first responsibility. [FN466] As the twenty-first century opens, this observation has lost much of its force for a relatively small, but growing, number of career women working in the professions, politics, and business. These women come from all racial and ethnic backgrounds and all socioeconomic classes. Unlike many of their mothers and grandmothers, they do not expect to forego family life to take on full-time careers, nor do they derive their identities from their husbands or companions. They are no longer the "second" sex. Their influence as trend-setters has not yet spread to all women, but their example as role models is powerful.

Some social critics perceive these career women and their lifestyles as a threat to family life. Elisabeth S. Scott characterizes the critics' position:

> The trend, according to this account, is toward a society in which liberal principles of autonomy and equality define the legal relationship of family members to the state and to each other in much the same way as those principles define the relationship of individual citizens to the state. In the liberal state, individuals have freedom to pursue their own self-defined ends, and relationships are voluntary and contractual. [FN467] Scott's response to these critics, greatly oversimplified, is that liberalism permits individuals to enter into self-limiting agreements in order to **2089** achieve their goals. She proposes a "conceptualization of marriage itself as a relationship that is in the nature of a long-term relational contract." [FN468]

Perhaps a more realistic analogy for marriage in the twenty-first century is the joint venture, given the unilateral nature of no-fault divorce. [FN469] A joint venture is defined in the commercial setting as "[a] legal entity in the nature of a partnership engaged in the joint undertaking of a particular transaction for mutual profit." [FN470] A joint venture differs from a partnership in that it "does not entail a continuing relationship among the parties." [FN471] At first glance, the joint venture may seem to be the exact antithesis of a stable relationship and therefore poorly suited as a conceptualization of an enterprise that typically involves the rearing of children. But on closer inspection, the difficulties are less daunting. A joint venture presupposes persons capable of contributing assets to the enterprise and sharing in the risks, thus fitting the model of spouses who are self-sufficient at the outset of the undertaking. A joint venture also "requires a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

community of interest in the performance of the subject matter," [FN472] surely the hallmark of an agreement to have children and to rear them jointly, and one of its features is "a right to direct and govern" the undertaking as well as the ability to alter by agreement the duty to share both in profits and losses, [FN473] thus opening the possibility of affording protection to the joint venturer who may take time out from work to provide a greater share of the child-rearing responsibilities. The most attractive aspect of the analogy, however, is the possibility of renewal. As each stage of the project of family life is completed, the couple must decide whether the venture should be continued to the next stage. Making this decision with the recognition that either spouse is free to terminate the undertaking will afford the opportunity to reexamine and, if desired, to reconfirm the commitment of both to the enterprise. [FN474]

   *2090 Of course, a concept of marriage as a joint venture is not yet an appropriate model for all couples. The trend towards independence and self-sufficiency for women described above has made clear, however, that traditional marriage is not well-adapted to dual-career couples. Laws governing married names, domicile, and marital property all assume a primary breadwinner/dependent homemaker model of marriage, while the current marriage tax and anti-nepotism policies could serve as deterrents to marriage. [FN475] If the couple has children, the assumption that a mother has primary responsibility for their care, combined with the difficulties associated with performing that function while juggling a demanding job in the absence of available and affordable child care, creates enormous pressure. It is not surprising that dual-career couples tend to marry later and postpone childbearing. [FN476]

   The other side of this story--its impact on men--has as yet been only imperfectly explored. The liberal feminists who touched off the second wave of the United States women's movement saw themselves as combatting stereotypical sex roles that limited both men and women. [FN477] As women sought to break down barriers to their own participation in the public sphere, some men sought expression for their nurturing capacities in the private sphere. This pattern is reflected in the early Supreme Court sex discrimination litigation, which exhibited a two-way exchange of power, with women gaining access to job opportunities formerly limited to men, while men acquired a larger role in the family, formerly the exclusive province of women. [FN478]

   This vision of equality between men and women in the home as well as the market-place, however, has not yet been realized. Fathers who have primary child care responsibility are unusual in our culture. The work force, especially at the most prestigious and highly rewarded levels, continues to be organized along a male model and to feature a "glass ceiling" hindering the advancement of women. Dual-career couples typically do not share the home front duties. Instead, women work a "second shift" at home, [FN479] or, if they can afford to do so, hire mother-substitutes.

   *2091 As we have seen, children and the traditional family are the focal point around which conservatives rally to implement their call for a return to "family values." In particular, the religious conservative critique of twentieth-century family life seems to suggest that feminists and homosexuals in search of social approval of alternative lifestyles and even access to same-sex marriages threaten to destroy the sanctuary once provided by the father-dominated, home-centered, mother-dependent, traditional family. [FN480] Rather than seek solutions appropriate to a changing culture, these critics call for a return to the nineteenth-century model of family life as the most appropriate one for the new millenium. [FN481] At the same time, as Katharine T. Bartlett has observed, feminist involvement in modern family law reform has reawakened tensions experienced earlier by mid-nineteenth century feminists around issues that concern "the preservation or elimination, of traditional gender roles." [FN482] The conflict between religious conservatives on the one hand and feminists and gay and lesbian activists on the other hand that has emerged at the century's end will continue to dominate the landscape of family law reform and women's rights for years to come.

   Law typically follows, rather than leads, social change. The trends identified in this paper form the context within which family law must respond to the further evolving roles of women and men over the twenty-first century. These

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

trends, however, are not limited to the family and cannot be accommodated entirely within family law. Broader societal *2092 initiatives are needed to enable the trend toward equality between men and women to flourish. Some of these initiatives have already begun; others were prematurely rejected. All of them, however, should be given high priority on the agenda for the twenty-first century.

This agenda should include the following proposals. First, social support for children should become part of our national policy. As a nation we have placed great value on independence and privacy. This policy has led us to assign the primary responsibility for childrearing and child support to parents, with few social supports that can provide a safety net for children when parents are unwilling or unable to discharge their responsibility. Feminist analysis of no-fault divorce and its aftermath has repeatedly suggested that our national leaders explore the child-centered policies available in other Western industrial countries, [FN483] and consider broader changes that would positively affect family life. [FN484] The greater representation of women in legislative and policy-making roles should facilitate such reconsideration. Second, the government must continue vigorous enforcement of existing laws prohibiting discrimination in the workplace. One of the major sources of different standards of living in households headed by women and those headed by men is the continued wage gap between men and women. As Professor Stephen Sugarman has noted, "[a]lthough women typically begin their divorces with lower standards of living than their former husbands, it is also the case that they typically enter marriage with lower personal economic prospects in the paid labor force." [FN485] The ALI family dissolution project has undertaken to compensate women for losses they incur during marriage as a result of child care and dependent care, but employment law and policy must ensure that women are not penalized when they return to work. Third, employers must create flexible work schedules to accommodate parents with child care responsibility. Rapid advances have already occurred in information technology, and further innovation can be expected. Today, a workstation can be on the employer's premises, aboard an airplane or train, or at home. A workstation at home with access to the office and the Internet would enable parents to be with their children while working full-time. Employers are already experimenting with these new ways of doing business. State and federal policies should create incentives to encourage further experimentation.

In addition to these societal initiatives, family law reform might well supplement the ALI Principles by considering two further matters. First, legislatures should enact marital property regimes that recognize the *2093 contribution of both spouses to the income produced by either during the marriage. The Uniform Marital Property Act provides a model for states that wish to incorporate sharing principles as part of their family law regulations. A system of deferred property sharing at divorce, such as that proposed in the ALI Principles, is vastly preferable to the older method of allocating property according to its title, but is not as coherent as a regime that incorporates sharing principles throughout the marriage. [FN486] Only Wisconsin has adopted the UMPA. Other states should consider doing so as well. Second, a family court should be created to improve divorce procedure. A family court, in which mental health professionals attached to the court would provide both divorce and marriage counseling, if shorn of its original limited mission to achieve reconciliation, would go far to soften the sharp edges of divorce procedure and add dignity to the marriage dissolution process. [FN487]

These suggestions are not meant as solutions to the cultural strains and moral conflicts that have accompanied the rapid period of change that family law has experienced over the past thirty years. They are among the necessary steps to facilitate further development, and to recognize and consolidate the valuable reforms that have been made.

The challenges of the twenty-first century cannot be met by a return to nineteenth-century family law, which required women to function as the "second sex." The fundamental changes in women's opportunities highlighted in this paper were hard-won and will not be abandoned by tomorrow's women. Young girls growing up today have very different expectations about their lives than their mothers did. Their daughters are likely to be even less constrained, either by the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

law, the marketplace, or social arrangements. Still, it is a safe prediction that family life will continue to be attractive. If it is to continue to offer the best opportunity for happiness and fulfillment for adults and children, it must receive more than society's blessing. Defining and facilitating family life in egalitarian terms must become a high priority on the national agenda as we approach the new millennium.

[FNd1]. Barbara Nachtrieb Armstrong Professor of Law, School of Law, University of California, Berkeley (Boalt Hall); J.D., University of Chicago, 1959; B.A., Southern Methodist University, 1956.

[FNa1]. California Law Review, Incorporated (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.

[FN1]. See Carl N. Degler, Out of Our Past 61-63 (3d ed. 1984).

[FN2]. See Carl N. Degler, At Odds 8-9 (1980) (describing the nineteenth century American family as exhibiting four broad characteristics that distinguished it from its Western European counterparts:(1)marriage was based on affection and mutual respect between the partners, and the woman enjoyed an increasing autonomy within the family;(2)the married partners lived and functioned in two separate spheres, with the wife responsible for the care of the children and the maintenance of the home, while the husband's role was perfomed largely outside the home at work;(3)the focus of both spouses turned largely to their children, who were seen as entitled to a special period of nurturance and rearing before they left home to make their own way in the world; and(4)the size of the nineteenth-century family was significantly smaller than that of the families of the eighteenth and previous centuries).

[FN3]. Id. at 450.

[FN4]. Id. at 473.

[FN5]. See Katherine Shaw Spaht, Louisiana's Covenant Marriage:Social Analysis and Legal Implications, 59 La. L. Rev. 63 (1998). The Louisiana Covenant Marriage Act, the first of its kind to be enacted, went into effect on August 15, 1997, and is codified at La. Civ. Code Ann. arts. 102, 103 (West 1991 & Supp. 1999) and at La. Rev. Stat. Ann. §§9:234, 9:272-275; 9:307-309 (West 1999).

[FN6]. See Degler, supra note 2, at 151 (noting that the number of unmarried women in the colonial period "was usually severely limited if only because of the paucity of economic opportunities for a woman in an overwhelmingly agricultural society").

[FN7]. Joseph W. Madden, Handbook of the Law of Persons and Domestic Relations 3 (1931) (footnote omitted); see also id. at 4 & n.11 (noting that the courts had consistently held that marriage is not a "contract" within the protection of the Contract Clause and citing Maynard v. Hill, 125 U.S. 190, 210-11 (1888)).

[FN8]. See 1 William Blackstone, Commentaries *442:
     By marriage, the husband and wife are one person in law:that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband:under whose wing, protection, and cover, she performs everything;...and her condition during her marriage is called her coverture.

[FN9]. See Madden, supra note 7, at 82.

[FN10]. See Degler, supra note 2, at 26 (pointing out that "[s]ome historians have called the ideology of the woman's

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sphere the 'Cult of True Womanhood'").

[FN11]. Seneca Falls Declaration of Sentiments:Adoption of the First Women's Rights Convention, Seneca Falls, New York, July 19, 1848 [hereinafter Seneca Falls Declaration] ("The history of mankind is a history of repeated injuries and usurpations on the part of man toward woman, having in direct object the establishment of an absolute tyranny over her. To prove this, let facts be submitted to a candid world....He has made her, if married, in the eye of the law, civilly dead."), reprinted in The Sesquicentennial of the 1848 Seneca Falls Women's Rights Convention:American Women's Unfinished Quest for Legal, Economic, Political, and Social Equality, 84 Ky. L.J. 713, 713 (1995-96)).

[FN12]. See Henry B. Blackwell & Lucy Stone, Protest, Worcester Spy, 1855, reprinted in Herma Hill Kay & Martha S. West, Text, Cases and Materials on Sex-based Discrimination 246-47 (4th ed. 1996):

While we acknowledge our mutual affection by publicly assuming the relationship of husband and wife, yet in justice to ourselves and a great principle, we deem it a duty to declare that this act on our part implies no sanction of...such of the present laws of marriage as refuse to recognize the wife as an independent, rational being, while they confer upon the husband an injurious and unnatural superiority, investing him with legal powers which no honorable man would exercise and which no man should possess. We protest... [ [6.] Finally, against the whole system by which "the legal existence of the wife is suspended during marriage" so that, in most States, she neither has a legal part in the choice of her residence, nor can she make a will, nor sue or be sued in her own name, nor inherit property.

[FN13]. Blackstone, supra note 8, at *445 ("These are the chief legal effects of marriage during the coverture; upon which we may observe, that even the disabilities, which the wife lies under, are for the most part intended for her protection and benefit. So great a favorite is the female sex of the laws of England.").

[FN14]. See Madden, supra note 7, at 111 (observing that the first of these statutes was enacted in Mississippi in 1839); see also id. at 3 & n.7.

[FN15]. See Reva Siegel, Home As Work:The First Woman's Rights Claims Concerning Wives' Household Labor, 1850-1880, 103 Yale L.J. 1073, 1082-83 (1994).

[FN16]. See id. at 1112-46 (discussing Joint Property Advocacy in the Antebellum Era).

[FN17]. See id. at 1177-89 (discussing the abandonment of the joint property claim by the postbellum advocates in the 1870s, and noting that court interpretation of the earnings statutes excluded wives' work in the household from such statutory terms as "personal labor").

[FN18]. See Degler, supra note 1, at 105.

[FN19]. See Degler, supra note 2, at 156; see also Eleanor Flexner, Century of Struggle:The Woman's Rights Movement in the United States 23-40, 122-30 (Atheneum 1968).

[FN20]. See Degler, supra note 1, at 130.

[FN21]. See Degler, supra note 2, at 370-71 (pointing out that the Lowell mill owners had provided dormitories for the convenience of the young, unmarried farm girls who provided the initial workforce for the mill).

[FN22]. See id. at 396. The "Lowell girls" formed a local women's trade union to support their strikes against wage cuts in 1834 and 1836. Not long thereafter, the native born work force at the Lowell mills was replaced by immigrant workers. While only 4% of the Lowell workers were foreign-born in 1836, by 1860 approximately 60% of them were foreign-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

born, primarily Irish. See id. at 371; see also Flexner, supra note 19, at 55 (identifying two factory strikes involving women workers that preceded the Lowell strike:women joined men in striking against a wage cut and longer hours at Pawtucket, Rhode Island, in 1824, while women struck alone in Dover, New Hampshire, in 1828).

[FN23]. See Degler, supra note 1, at 209 (noting that in 1860 women made up about a quarter of the nation's teachers, while that figure rose to nearly two-thirds by 1870).

[FN24]. See id. at 390-92; see also Flexner, supra note 19, at 179.

[FN25]. See Degler, supra note 1, at 392-93. Most of these organizations were formed in the 1890s. By 1901, Congress granted a national charter to the General Federation of Women's Clubs; see also Flexner, supra note 19, at 179-92.

[FN26]. See Seneca Falls Declaration, supra note 11 (declaring that the first of the "facts submitted to a candid world" to prove man's injuries to woman was that "[h]e has never permitted her to exercise her inalienable right to the elective franchise").

[FN27]. U.S. Const., amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex. Congress shall have power to enforce this article by appropriate legislation.").

[FN28]. William L. O'Neill, Everyone was Brave vii (1971) (observing that "[t]he ballot did not materially help women to advance their most urgent causes; even worse, it did not help women to better themselves or improve their status").

[FN29]. See Geraldine A. Ferraro (with Linda Bird Francke), My Story (1985). The Mondale-Ferraro Democratic ticket lost to Republicans Reagan and Bush.

[FN30]. Elizabeth Dole announced the formation of her Presidential Exploratory Committee to seek the Republican nomination on March 10, 1999. See Richard L. Berke, Dole Presents herself as Both Nonpolitical and an Insider, N.Y. Times, Mar. 11, 1999, at A28. She withdrew on October 20, 1999, citing lack of funds. See Katherine Q. Seeley, Low on Cash, Dole Withdraws from G.O.P. Race, N.Y. Times, Oct. 21, 1999, at A1. Both Senator Margaret Chase Smith and Representative Shirley Chisholm had made long-shot bids earlier. See Mrs. Dole Leaps Into the Gap, N.Y. Times, Mar. 11, 1999 at A30. Public financing has enabled women to enter presidential politics more freely as candidates of independent parties. See Jacqueline Salit, Third Parties Show Us the Money, S.F. Chron., Aug. 10, 1999, at A19 (noting that Lenora B. Fulani, the first African-American woman to qualify for the presidential ballot in all 50 states in 1988, received close to $1 million in public primary financing).

[FN31]. See Cristina M. Rodríguez, Clearing the Smoke-Filled Room:Women Jurors and the Disruption of an Old-Boys' Network in Nineteenth-Century America, 108 Yale L. J. 1805 (1999) (arguing that while suffrage may have been a necessary condition for jury service, the more appropriate historical analogy to the woman juror is the woman lawyer, not the woman voter).

[FN32]. See Madden, supra note 7 at 256. Tracing the history of the attitude of the Church to civil divorce laws, the Archbishop of Canterbury's Group noted that by the Middle Ages the Church had successfully established the primacy of the canon law over the civil law, so that "all matrimonial law in the West was founded on the principle of the absolute indissolubility of valid consummated marriage." Report of a Group Appointed by the Archbishop of Canterbury in January 1964, Putting Asunder:A Divorce Law for Contemporary Society, app.A (1966), (footnote omitted) [hereinafter Putting Asunder]. The Biblical authority for this doctrine is said to be a reply by Jesus to a Pharisee who asked whether it was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawful to divorce one's wife for any cause:"Have you not read that he who made them from the beginning made them male and female, and said, 'For this reason a man shall leave his father and mother and be joined to his wife, and the two shall become one'? So they are no longer two but one. What therefore God has joined together, let not man put asunder." Matthew 19:4-6, reprinted in Nelson Manfred Blake, The Road to Reno 10 (1962).

[FN33]. See Madden, supra note 7, at 256-57. The practice of canonical annulments in ecclesiastical courts in medieval times tested the concept of "lawfully married" to the breaking point, and served as one of the major criticisms of the six-teenth-century Protestant reformers. See Blake, supra note 32, at 14-24.

[FN34]. See Blake, supra note 32, at 34-47.

[FN35]. Degler, supra note 1, at 13. The reference to Milton may have been to John Milton, Doctrine and Discipline of Divorce (1644).

[FN36]. Blake, supra note 32, at 46-47.

[FN37]. See id. at 49.

[FN38]. Parliamentary divorces were available only to the rich and powerful and were more easily available to men than to women. See Blake, supra note 32, at 31-32 (noting that only five Parliamentary divorces were granted prior to 1715, but by 1800 the procedure had been standardized to handle the larger volume of 90 cases between 1801 and 1850, and pointing out that while a husband need show only his wife's adultery to make out a case, a wife was required to show that her husband had aggravated the offense of adultery by extreme cruelty or other infamous conduct); see also Madden, supra note 7, at 259 ("Only five Parliamentary divorces were granted upon the petition of aggrieved wives. In all of these cases there were aggravating circumstances, in addition to adultery on the part of the husband, which would make future reconciliation impossible. Thus different standards of morality were enforced between the sexes.").

[FN39]. See Madden, supra note 7, at 260.

[FN40]. The Matrimonial Causes Act of 1857 allowed "absolute" divorce, that is, the permanent civil termination of mar-riage rather than legal separation on the ground of adultery. See Putting Asunder, supra note 32, at 14 n.18 (observing that the 1857 Act "revolutionized matrimonial law by introducing divorce with the right of remarriage, and at the same time transferred matrimonial jurisdiction from the Ecclesiastical Courts to a new Court for Divorce and Matrimonial Causes. The Judicature Act of 1873 made a further transfer of jurisdiction, this time to the High Court of Justice").

[FN41]. See Norma Basch, Framing American Divorce 23 (1999).

[FN42]. See Blake, supra note 32, at 63. Between 1872 and 1878, South Carolina briefly permitted absolute divorce on the grounds of adultery or abandonment for a period of two years. See Lawrence M. Friedman, Rights of Pas-sage:Divorce Law in Historical Perspective, 63 Or. L. Rev. 649, 651 n.9 (1984). South Carolina did not authorize abso-lute divorce again until 1948, after a cautious Legislature submitted a constitutional amendment to the voters that would authorize divorce on the grounds of adultery, desertion, physical cruelty, or habitual drunkenness. The measure passed by a vote of 57,000 to 42,000. See Blake, supra note 32, at 234-35.

[FN43]. See Friedman, supra note 42, at 652.

[FN44]. For the observation that King Charles II of England was in daily attendance at the House of Lords during its consideration in 1669 of a private Act permitting Lord Roos to remarry following an Ecclesiastical separation, and that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

he declared the proceedings "better than going to a play," see Blake, supra note 32, at 31-32 (quoting John Macqueen, A Practical Treatise on the Appellate Jurisdiction of the House of Lords & Privy Council 554 (1842)).

[FN45]. See Basch, supra note 41, at 147.

[FN46]. Id. at 148 (adding that the trial pamphlets "were sold in corner bookstalls, at railroad depots, and by traveling peddlers").

[FN47]. See Basch, supra note 41, at 84-85, 91-93; Blake, supra note 32, at 82-86, 89-92.

[FN48]. See Blake, supra note 32, at 87-92.

[FN49]. Stanton argued at the 1860 Woman's Rights Convention that marriage was a civil contract that ought to be treated like other contracts. See Kathleen Barry, Susan B. Anthony:A Biography of a Singular Feminist 137 (1988) (suggesting that, in making this argument Stanton "intended to rescue the family from the power of privatized domination and to challenge the religious, romantic, and mystical beliefs in women's inferior nature, which had kept marriage from being contracted on a rational basis. In one swift gesture, she demoted marriage from a sacred act to a civil function and raised divorce from an offense against God to a civil, contractual right"). Moreover, Stanton opposed common law marriage, in part because it might trap unwary women into contracting for marriages that they could not contractually dissolve. See Ariela R. Dubler, Note, Governing Through Contract:Common Law Marriage in the Nineteenth Century, 107 Yale L.J. 1885, 1908-12 (1998).

[FN50]. See Blake, supra note 32, at 93.

[FN51]. See id. at 99.

[FN52]. See id.

[FN53]. See id. at 100. Stanton left the Equal Rights Association in 1869 to become the founding President of the National Women Suffrage Association; the more moderate group organized the American Woman Suffrage Association under the leadership of Henry Ward Beecher. See Flexner, supra note 19, at 220 (pointing out that the rift was mended in 1890, when the two organizations merged to become the National American Sufferage Association with Stanton as president).

[FN54]. Blake, supra note 32 at 101.

[FN55]. See id.

[FN56]. See id.

[FN57]. See id. at 101-05. For a modern feminist analysis of these events, see Melissa J. Ganz, Wicked Women and Veiled Ladies:Gendered Narratives of the McFarland-Richardson Tragedy, 9 Yale J.L. & Feminism 255 (1997).

[FN58]. See Basch, supra note 41, at 68-69.

[FN59]. Theodore D. Woolsey, Essay on Divorce and Divorce Legislation (1869).

[FN60]. Id. at 9.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN61]. Id. at 216-17.

[FN62]. Id. at 223. Woolsey's comparison of the United States divorce statistics with those of Prussia is omitted.

[FN63]. Id. at 229. The reference to Loomis is to Reverend Henry Loomis Jr., Divorce Legislation in Connecticut, 25 New Englander 436 (1866). An excerpt from the article appears in an Appendix to Woolsey's book as note 5 to ch. V, at 292-94.

[FN64]. See Woolsey, supra note 59, at 267 ("The general principle here is that misconduct, which has broken up the family state and made light of all household endearments, shows unfitness to take charge of the children.").

[FN65]. For the full text of the nine principles as set forth by Woolsey, see id. at 258-74.

[FN66]. Id. at 260-61 (footnote omitted).

[FN67]. Id. at 269 ("It tempts parties to marry improvidently, and opens the door through which they can escape from matrimony, for it amounts to not liking one another, and the dislike is enhanced by the prospect offered to the hopes of one or the other of making a more advantageous connection.").

[FN68]. See Blake, supra note 32, at 130.

[FN69]. See id. at 131.

[FN70]. See id. at 132.

[FN71]. See id.

[FN72]. See id.

[FN73]. See Woolsey, supra note 59, at 274:

The subject of divorce is complicated in this country by the number of jurisdictions and the ease of emigration. Just as a good paper currency was impossible when every State licensed its own banks, so it is with divorce laws. He who cannot get what he wants under the severe laws of New York, can become a free man by a short stay in Indiana.

[FN74]. See Blake, supra note 32, at 116-19 (describing the "divorce colonies" in Pennsylvania, Ohio, and Illinois which preceded those of Indiana). Indeed, the publicity arising from the McFarland trial forced the Indiana legislature in 1873 to change the laws that had attracted the interstate divorce trade. See id. at 121.

[FN75]. See Basch, supra note 41, at 90-95 (discussing the 1860 Indiana divorce of Heinrich Schliemann).

[FN76]. See Blake, supra note 32, at 133.

[FN77]. See id. at 134.

[FN78]. See id.

[FN79]. See id. at 135-36.

[FN80]. See id. at 137.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN81]. See id. The group, known as Commissioners for the Promotion of Uniformity of Legislation in the United States, held its first annual meeting at Saratoga, New York, in August 1892.

[FN82]. The second is the American Law Institute (ALI), founded in Washington, D.C. on February 23, 1923. Its Certificate of Incorporation, filed on the same day in the District of Columbia, states in part that its purpose is "to promote the clarification and simplification of the law and its better adaptation to social needs...." Like NCCUSL, the ALI played a significant role in the twentieth-century family law reform movement. See infra Part II.

[FN83]. See Unif. Marriage and Divorce Act, Prefatory Note, 9A U.L.A. Part I, 159, 160 (Master ed. 1998). [Hereinafter UMDA]. The UMDA was amended in 1971 and 1973.

[FN84]. See Blake, supra note 32, at 137-51.

[FN85]. See id. at 150.

[FN86]. See Flexner, supra note 19, at 147-49. The Fifteenth Amendment reads:"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State, on account of race, color, or previous condition of servitude." U.S. Const., amend. XV.

[FN87]. See Flexner, supra note 19, at 220. Under the influence of Anita Stone Blackwell, the daughter of Lucy Stone and Henry Blackwell, the National Woman Suffrage Association and the American Woman Suffrage Association were merged.

[FN88]. See id. Mrs. Stanton was replaced two years later as president by Susan B. Anthony.

[FN89]. See id. Stanton published successive volumes of The Woman's Bible between 1895 and 1898.

[FN90]. See Maynard v. Hill, 125 U.S. 190 (1888) (holding that a legislative divorce enacted by the Territory of Oregon did not violate the Contract Clause by impairing the obligation of marriage).

[FN91]. Basch, supra note 41, at 42.

[FN92]. See Degler, supra note 2, at 26.

[FN93]. Esther Peterson, Working Women, 93 Daedalus 671, 673 (1964); see also Degler, supra note 2, at 375-76 (describing "[t]he economic basis of the cult of domesticity").

[FN94]. See Degler, supra note 1, at 476 (noting that the U.S. Army chaplains who came South during the Civil War to solemnize marriages between slaves discovered a large number of lengthy marriages:42% of the approximately 4600 marriages solemnized in Mississippi and Louisiana had been in existence from 5 to 14 years).

[FN95]. See Degler, supra note 2, at 389 (noting that "[b]lack women, whether married or single, had to work to supplement the lower earnings of husbands and fathers"); see also Katherine M. Franke, Becoming a Citizen:Reconstruction Era Regulation of African American Marriage, 11 Yale J.L. Human. 251, 274-92 (1999) (arguing that postbellum marriage laws imposed a Victorian Model of marriage on African Americans, driving out informal mating practices that had developed during slavery, in order to turn the freed slaves into "responsible" citizens).

[FN96]. See Degler, supra note 2, at 389; see also Twilla L. Perry, Race Matters:Change, Choice, and Family Law at the Millennium, 33 Fam. L. Q. 461, 464 (1999) (noting that because of the disparity of Black men to Black women at optim-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

al marriage ages, and the "precarious economic situation of many Black men," Black women are unlikely to find Black marital partners, and concluding "of all the women in this country, Black women are the least likely to marry, the most likely to divorce, and the least likely to remarry").

[FN97]. See Degler, supra note 1, at 385.

[FN98]. See Flexner, supra note 19, at 248-324. In 1900, Carrie Chapman Catt replaced Susan B. Anthony as president of the National American Woman Suffrage association, a post she relinquished in 1904 to Anna Howard Shaw. See id. at 237-38; see also O'Neill, supra note 28, at 49-76.

[FN99]. See Degler, supra note 2, at 328; Flexner, supra note 19, at 325-26; O'Neill, supra note 28, at 264-66.

[FN100]. See Degler, supra note 2, at 359-60.

[FN101]. See id. at 403. Kelley was one of the two women who had helped gather the data that Louis Brandeis used in his brief in support of protective laws in Mueller v. Oregon, 208 U.S. 412 (1908) (upholding a statute limiting women's employment in factories and laundries to 10 hours a day); see also Katherine M. Franke, The Central Mistake of Sex Discrimination Law:The Disaggregation of Sex From Gender, 144 U. Pa. L. Rev. 1, 15-19 (1995) (discussing the debate among feminists over the ERA).

[FN102]. 261 U.S. 525 (1923) (invalidating an Act of Congress setting minimum wages for women in the District of Columbia). Paul's side, urging that women be treated the same as men, prevailed.

[FN103]. The same conflict between equality and difference reappeared on the Court's docket sixty-four years later when east coast feminists and west coast feminists opposed each other in California Fed. Sav. & Loan Association v. Guerra, 479 U.S. 272 (1987) (upholding a California statute requiring employers to grant unpaid short-term leave and reinstatement for pregnancy, but not for other disabilities). West coast feminists, urging the recognition of special accommodations for pregnancy, prevailed. See generally Herma Hill Kay, Equality and Difference:The Case of Pregnancy, 1 Berkeley Women's. L. J. 1 (1985) (supporting special treatment for pregnant women in the workplace and offering an episodic analysis of reproductive sex differences, treating them as legally significant only during the episodes when they are being utilized); Linda J. Krieger & Patricia N. Cooney, The Miller-Wohl Controversy:Equal Treatment, Positive Action, and the Meaning of Women's Equality, 13 Golden Gate U. L. Rev. 513 (1983) (supporting "positive action" for pregnancy in the workplace because equal treatment of pregnancy-related disabilities results in inequality for women); Wendy Webster Williams, Equality's Riddle:Pregnancy and the Equal Treatment/Special Treatment Debate, 13 N.Y.U. Rev. L. & Soc. Change 325 (1984-85) (supporting equal treatment of men and women in the workplace because a concept of legal equality, rather than special treatment, has served both sexes well by breaking down legal barriers that restricted each sex to a predefined role and created a hierarchy based on gender). Fortunately, both groups were able to find merit in the Cal Fed opinion, thus avoiding a permanent rift.

[FN104]. See O'Neill, supra note 28, at 266.

[FN105]. See Laurence C. Nolan, The Meaning of Loving:Marriage, Due Process and Equal Protection (1967-1990) as Equality and Marriage, from Loving to Zablocki, 41 How. L.J. 245, 248-49 (1998).

[FN106]. See Robert A. Pratt, Crossing the Color Line:A Historical Assessment and Personal Narrative of Loving v. Virginia, 41 How. L. J. 229, 230 (1998) (telling the story of Richard Loving and Mildred Jeter and noting that 8223 interracial couples currently live in Virginia). See generally Rachel Moran, Interracial Intimacy: The Regulation of Race and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Romance (forthcoming 2001) (examining the history of anti-miscegenation laws, their judicial dismantlement, and their continuing controversy surrounding race, identity, and intimacy).

[FN107]. See Judith Areen, Cases and Materials on Family Law 93 (4th ed. 1999).

[FN108]. See Walter Wadlington, The Loving Case: Virginia's Anti-Miscegenation Statute in Historical Perspective, 52 Va. L. Rev. 1189, 1191-93 (1966) (noting that the Governor's Council punished acts of fornication between whites and blacks as early as 1630, and that the first general statutory proscription against miscegenous marriage was adopted in 1691).

[FN109]. See Madden, supra note 7, at 38-39 (noting that unlike much of U.S. marriage law, these enactments had no counterpart in English law: "[a]t common law, and in England to-day, no impediment to marriage exists on account of race, color, religion, or social rank").

[FN110]. See Degler, supra note 1, at 252-57.

[FN111]. See Comment, Intermarriage With Negroes--A Survey of State Statutes, 36 Yale L.J. 858, 860-61 (1927).

[FN112]. See id. at 859 (noting that "[i]n these states the Negroes comprise from over fifty to less than one per cent of the entire population" while in the 19 states that had not enacted similar legislation, "in no one of these states do the Negroes comprise more than five, while in seven of these states they actually form less than one per cent of the total population"). In 6 states in the deep South, the prohibition was enshrined in the state constitution. See Wadlington, supra note 108, at 1190 & n.8 (listing Alabama, Florida, Mississippi, North Carolina, South Carolina, and Tennessee). Plotting these 29 states on a map of the United States shows that the 19 that had not enacted such provisions included the 6 New England states and a band of contiguous Northeast and Central states stretching from New York, New Jersey, and Pennsylvania across Ohio, Michigan, Illinois, Wisconsin, Iowa, and Minnesota, finishing up with 3 Western states (Washington, Arizona, and New Mexico) and Kansas.

[FN113]. See Plessy v. Ferguson, 163 U.S. 537 (1896) (upholding an 1890 Louisiana law requiring separate railroad cars for African-American and white passengers), overruled by Brown v. Board of Educ., 347 U.S. 483 (1954); the Slaughter House Cases, 16 Wall. 36 (1873) (striking down the Civil Rights Act of 1875).

[FN114]. 347 U.S. 483 (1954) (invalidating under the Equal Protection Clause statutes enacted by four states providing for segregated public schools).

[FN115]. See McLaughlin v. Florida, 379 U.S. 184 (1964).

[FN116]. Compare Wadlington, supra note 108, with Alfred Avins, Anti-Miscegenation Laws and The Fourteenth Amendment: The Original Intent, 52 Va. L. Rev. 1224 (1966).

[FN117]. 388 U.S. 1 (1967). The California Supreme Court, in a four to three decision authored by Justice Roger Traynor, was the only state court to invalidate its own statute; it had done so 19 years before Loving was handed down. See Perez v. Sharp, 32 Cal. 2d 711 (1948). Many other states had also repealed their statutes. The U.S. Supreme Court noted that only 16 states of the original 29 still retained miscegenation statutes. See Loving, 388 U.S. at 6. Alabama voters repealed the last such prohibition, 60% to 40%, in 2000. See Somini Sengupta, Marry at Will, N.Y. Times, Nov. 12, 2000, at WR2.

[FN118]. Loving, 388 U.S. at 11.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN119]. The term "common law marriage" was not uniformly defined, but was usually taken to mean an agreement or consent to become husband and wife immediately at the time the agreement was made. This agreement was known as a marriage "per verba de praesenti," which was recognized in the United States, and was to be distinguished from consent "per verba de futuro com copula," which was not valid. See Madden, supra note 7, at 58 (pointing out that "[t]he American rule is that a mere agreement to marry in the future, though followed by cohabitation, is not a marriage, unless such cohabitation is intended and understood by the parties as a consummation of the marriage, and as converting the executory agreement into a present actual marriage").

[FN120]. Id. at 50 (noting that "[t]he historical facts were that even the Roman Church, prior to the Council of Trent in 1563, did not require a solemnization of marriages, but permitted parties to become husband and wife by agreement, and that the change made by the Roman Church in 1563 was not recognized in England, where the law was that no marriage ceremony was necessary" and dating the reception of the doctrine in the United States from the New York opinion in Fenton v. Reed, 4 Johns. 52 (1809), which "gave vitality to the doctrine of common-law marriage, and hence it secured a foothold in this country," that was buttressed by respected commentators, such as Chancellor Kent and Greenleaf).

[FN121]. See Madden, supra note 7, at 51-53 & n.38 (citing cases from 33 states, the District of Columbia, and Hawaii; some of the states listed had prospectively changed their law).

[FN122]. See Areen, supra note 107, at 93 (listing Alabama, Colorado, Idaho, Iowa, Kansas, Montana, Oklahoma, Pennsylvania, Rhode Island, South Carolina, and Texas).

[FN123]. Cynthia Grant Bowman, A Feminist Proposal to Bring Back Common Law Marriage, 75 Or. L. Rev. 709, 717 (1996).

[FN124]. See id. at 723. But see Dubler, supra note 49, at 1908 (noting that Elizabeth Cady Stanton opposed common law marriage).

[FN125]. See Bowman, supra note 123, at 757-65; see also John B. Crawley, Is the Honeymoon Over for Common-Law Marriage:A Consideration of the Continued Viability of the Common-Law Marriage Doctrine, 29 Cumb. L. Rev. 397, 424-25 (1999) (noting that many states that had abolished common law marriage have invented other less precise equitable doctrines to perform the function of allowing cohabitants to recover in circumstances in which their attempted ceremonial marriages were invalid, and urging the legislators of Alabama to "weigh the public policy reasons for retaining the doctrine, as well as the ease and certainty of applying the doctrine, against the uncertainty of what might replace it").

[FN126]. See Bowman, supra note 123, at 770-76. The ALI Principles of Family Dissolution provide these benefits to cohabitants who qualify as "domestic partners" without reviving common law marriage. See infra text at notes 359-361.

[FN127]. See supra text accompanying notes 67-85.

[FN128]. Basch, supra note 41, at 80-81 (quoting Henry Loomis, Jr., Divorce Legislation in Connecticut, 25 New Englander 436 (1866)).

[FN129]. See O'Neill, supra note 28, at 140-42.

[FN130]. See id. at 141-42.

[FN131]. See id. at 142-45.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN132]. Friedman, supra note 42, at 659.

[FN133]. See O'Neill, supra note 28, at 152-58 (noting that the Nevada courts granted about 1000 divorces per year in the 1920s, over 2500 in 1928, and 5260 in 1931, with the increases following the statutory changes in divorce law and procedure).

[FN134]. See Williams v. North Carolina, 317 U.S. 287 (1942) (reversing North Carolina convictions of bigamous co-habitation against two North Carolina residents who had obtained ex parte divorces in Nevada, based on testimony tending to prove their residences and bona fide domiciles in Nevada, and who had then married each other in Nevada before returning to North Carolina); Williams v. North Carolina, 325 U.S. 226 (1945) (affirming North Carolina convictions of bigamous cohabitation against the same defendants when North Carolina, after giving "appropriate weight" to the Nevada findings of bona fide domicile, had determined that the parties did not establish domiciles in Nevada); Sherrer v. Sherrer, 334 U.S. 343 (1948) (holding that a husband who had participated in his wife's Florida divorce proceeding by entering an appearance and filing an answer contesting her allegations as to residence was subsequently foreclosed from attacking the divorce decree in their former home state of Massachusetts); Estin v. Estin, 334 U.S. 541 (1948) (holding that a husband's ex parte 1945 Nevada divorce did not terminate his wife's prior 1943 New York separate maintenance decree, thus establishing the doctrine of divisible divorce). These cases made it plain that, while an ex parte divorce was vulnerable to an attack on jurisdictional grounds in other states, a bilateral "consent" divorce, in which the defendant appeared and had the opportunity to challenge the plaintiff's sworn testimony as to domicile, was secure. The Supreme Court has never decided the ultimate question of whether Nevada is required to recognize a sister state's judgment declaring one of its ex parte decrees void for lack of jurisdiction. Nevada made clear in Colby v. Colby, 78 Nev. 150 (1962), that it will not voluntarily recognize such judgments. For a wonderfully entertaining account of the Nevada divorce trade, see Thomas Reed Powell, And Repent At Leisure, 58 Harv. L. Rev. 930 (1945).

[FN135]. See Women's Bureau, U.S. Dep't of labor, Bull. No. 294, Handbook on Women Workers 10 tbl.1 (1969).

[FN136]. See Degler, supra note 2, at 420.

[FN137]. See id. at 422-23 (estimating that 2.25 million women left voluntarily in the first year after the war ended, while another l million were laid off; but 2.75 million women joined the labor force at about the same time, so that the total loss of women workers was about half a million, and arguing that the observers ignored "contrary signs," including a Women's Bureau survey which found that three-fourths of working women, in particular large numbers of those over 45, said they wanted to keep their jobs after the war).

[FN138]. See Max Rheinstein, The Law of Divorce and the Problem of Marriage Stability, 9 Vand. L. Rev. 633, 633 n.2 (1956).

[FN139]. See Lynne Carol Halem, Divorce Reform 194-98 (1980).

[FN140]. See Report of Inter-Agency Committee on Background Materials, The American Family:A Factual Background, Foreword at ii (May 1948). In explaining the interest of the ABA, the ABA Journal editorialized that the conference "offers the opportunity to focus nationwide attention on efforts to clean up the scandals attending our divorce laws and their administration." Editorial, 33 A.B.A. J. 1207 (1947).

[FN141]. Reginald Heber Smith, Dishonest Divorce, Atlantic Monthly, Dec. 1947, at 42, 43-44.

[FN142]. See id.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN143]. Id. at 44.

[FN144]. See Report on Divorce Laws Acclaimed at National Conference on Family Life, 34 A.B.A. J. 448 (1948) (Judge Paul Alexander of the Family Court of Toledo, Ohio, gave the report on the Conference).

[FN145]. Association Offers Specific Solutions for Marriage and Divorce Law Evils, 34 A.B.A. J. 894, 894 (1948).

[FN146]. See id. at 895. The Special Committee was renewed in 1950, see Proceedings of the House of Delegates, 36 A.B.A. J. 948, 965 (1950), and continued to function until 1958, when the ABA replaced it with the Section on Family Law. Proceedings of the House of Delegates, 44 A.B.A. J. 338, 380 (1958).

[FN147]. See Maxine Boord Virtue, Family Cases in Court at xxv (1956).

[FN148]. Judge Alexander was a dominant figure both in juvenile court circles and in the divorce reform effort of the 1940s and 1950s. A list of his affiliations published with a 1953 article included the following:"Chairman ABA Special Committee on Divorce and Marriage Laws and Family Courts; Chairman Interprofessional Commission on Marriage and Divorce Laws; Acting Chairman Legal Section, National Conference on Family Life; Past President, National Council of Juvenile Court Judges; Past President, National Conference of Juvenile Agencies." Paul W. Alexander, Let's Get the Embattled Spouses Out of the Trenches, 18 Law. & Contemp. Probs. 98 n.* (1953).

[FN149]. Id. at 101.

[FN150]. Thomas M. French, Contributions to a Therapeutic Solution to the Divorce Problem:Psychiatry, Conference on Divorce, 9 U. Chi. L. Sch. Conf. Series 62, 62 (1952).

[FN151]. See Meyer F. Nimkoff, Contributions to a Therapeutic Solution to the Divorce Problem:Sociology, Conference on Divorce, 9 U. Chi. L. Sch. Conf. Series 55, 58 (1952).

[FN152]. Emily H. Mudd, Contributions to a Therapeutic Solution to the Divorce Problem:Social Work and Marriage Counseling, Conference on Divorce, 9 U. Chi. L. Sch. Conf. Series 65, 65 (1952).

[FN153]. Madden, supra note 7, at 379-82 (noting at 381 that "[t]he state's function as parens patriae, as well as its general power to make reasonable classifications in its regulatory and penal laws, make possible the large number of provisions found in the statutes for the special protection of children").

[FN154]. See Frank Allen, The Borderland of Criminal Justice 43-61(1964).

[FN155]. In re Gault, 387 U.S. 1 (1967) (setting aside the commitment of a 15-year-old boy to training school for the duration of his minority in part because of his participation in a lewd telephone call, which act if committed by an adult would result in a fine of $5 to $50 or imprisonment for not more than two months; the boy's parents were not notified of his arrest or detention, and neither he nor they were represented by counsel; no record of the hearing was kept).

[FN156]. Paul W. Alexander, Introduction to Virtue, supra note 147, at xxx-xxxi.

[FN157]. See id. at xxxii.

[FN158]. See Virtue, supra note 147.

[FN159]. See id. at 239-41 ("The family court as it exists in Ohio may be highly recommended as an appropriate pattern

of jurisdiction and court structure for the development of humane and practicable methods of dealing with personal problem cases.").

[FN160]. See id. at 248-50.

It seems to me that the use of marriage counselors and the widespread interest in expansion of this service is most important as showing recognition by court and community that viable marriages must be saved, and that the court ought not to ignore but rather to act affirmatively on behalf of the social and moral values implicit in preserving family life.
Id. at 248.

[FN161]. Blake, supra note 32, at 239.

[FN162]. See Report of the Governor's Commission on the Family 5-16 (1966) (citing Virtue, supra note 147, at 7-8 n.4) [hereinafter California Governor's Commission Report]. This recommendation was not adopted by the Legislature. See Max Rheinstein, Marriage Stability, Divorce, and the Law 378 (1972) (noting that the California bar "may have been primarily responsible for the elimination from California divorce reform of the family court plan").

[FN163]. California Governor's Commission Report, supra note 162, at 9; see also Herma Hill Kay, A Family Court:The California Proposal, 56 Calif L. Rev. 1205, 1226-27 (1968) (pointing out that "[i]t should be clearly understood that the California proposal does not provide for mandatory attempts at reconciliation"); id at 1205-12 (distinguishing the California proposal from Judge Alexander's model).

[FN164]. See John Leslie Goddard, The Proposal for Divorce Upon Petition and Without Fault, 43 Cal. St. B.J. 90, 98 (1968).

[FN165]. Virtue, supra note 147, at 228.

[FN166]. Id. at 84.

[FN167]. 750 Ill. Comp. Stat. Ann. 5/401 (West Supp. 1999).

[FN168]. Virtue, supra note 147, at 89-90.

[FN169]. See Alexander, supra note 156, at xxxi-xxxii.

[FN170]. Virtue, supra note 147, at 90.

[FN171]. Max Rheinstein, Our Dual Law of Divorce:The Law in Action Versus the Law of the Books, Conference on Divorce, 9 U. Chi. L. Sch. Conf. Series 39 (1952).

[FN172]. Friedman, supra note 42, at 659.

[FN173]. See Rheinstein, supra note 171, at 41.

[FN174]. Id.

[FN175]. Id. at 42.

[FN176]. Id. at 41.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN177]. Friedman, supra note 42, at 659.

[FN178]. Id. at 662-63.

[FN179]. See Herbert Jacob, Silent Revolution:The Transformation of Divorce Law in the United States 37 (1988) (pointing out the social and political significance of New York Governor Nelson Rockefeller's reelection in 1962 following the out of state divorce secured by his wife); see also Justice Felix Frankfurter's caustic comment about divorce practice in the late 1940s in his dissenting opinion in Sherrer v. Sherrer, 334 U.S. 343, 367 (1948) (Frankfurter, J., dissenting) (requiring Massachusetts to give Full Faith and Credit to a Florida divorce decree obtained by a Massachusetts wife where the husband had appeared in the Florida proceedings but did not contest the wife's testimony as to her Florida domicile) ("[T]he practical result [of Sherrer] will be to offer new inducements for conduct by parties and counsel, which, in any other type of litigation, would be regarded as perjury, but which is not so regarded where divorce is involved because ladies and gentlemen indulge in it.").

[FN180]. See John Rock, The Time Has Come (1963). During the nineteenth century, the most commonly used method of birth control was probably coitus interruptus. See Degler, supra, note 2, at 211-13. The social and legal struggles over contraception in the late nineteenth and early twentieth centuries are typified by the contrast between the Comstock law enacted in New York in 1873 to prevent the use of the mails to convey "obscene matter" and Margaret Sanger's efforts to teach women how to regulate their fertility. See Lawrence Lader, The Margaret Sanger Story and the Fight for Birth Control (1955).

[FN181]. See Arthur M. Schlesinger, A Thousand Days:John F. Kennedy in the White House 927-28 (1965).

[FN182]. See id. at 729.

[FN183]. See Degler, supra note 2, at 441.

[FN184]. See id. at 441-42.

[FN185]. 29 U.S.C. § 206(d) (1994). Section 206(d)(1)provides:
    No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to(i)a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex; Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.
See generally Caruthers Gholson Berger, Equal Pay, Equal Opportunity and Equal Enforcement of the Law for Women, 5 Val. U. L. Rev. 326 (1971) (reviewing the legislative background and judicial construction of the Equal Pay Act and Title VII of the Civil Rights Act and urging a liberal interpretation of both Acts).

[FN186]. Schlesinger, supra note 181, at 950-77.

[FN187]. Theodore H. White, The Making of the President--1964, at 173-77 (1965).

[FN188]. Civil Rights Act of 1964 §§ 701-716, 42 U.S.C. §§ 2000e to 2000e-15 (1994).

[FN189]. See Developments in the Law--Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Harv. L. Rev. 1109, 1166-67 (1971).

[FN190]. See 42 U.S.C. § 2000e-2(a) (1994). The expanded coverage came about when a southern Congressman, hoping to defeat the bill, moved to add "sex" to the list of categories protected from discrimination. See Carolyn Bird, Born Female 1-15 (1969); Leo Kanowitz, Women and the Law:The Unfinished Revolution 104-05 (1969). The move backfired; over the opposition of Congresswoman Edith Green, but with the support of five other Congresswomen, the amendment passed. See Jo Freeman, How "Sex" Got into Title VII:Persistent Opportunism as a Maker of Public Policy, 9 Law & Ineq. J. 163 (1991).

[FN191]. See Cal. Govt. C. § 12900 et seq. ("California Fair Employment and Housing Act") (West 1992 & 2000 Supp.); N. Y. Executive Law § 290 et seq. ("Human Rights Law") (McKinney 1993).

[FN192]. See Bureau of the Census, U.S. Dep't of Commerce, Statistical Abstract of the United States:1994 (Table No. 616) (114th ed. 1994).

[FN193]. Betty Friedan, The Feminine Mystique (1963).

[FN194]. See Maren Lockwood Carden, The New Feminist Movement 154-55 (1974); Degler, supra note 2, at 443. Another influential work appeared earlier in France:Simone de Beauvoir, The Second Sex (1949).

[FN195]. See Carden, supra note 194, at 104-05 (noting that Betty Friedan was elected President and that Dr. Kathryn Clarenbach of Wisconsin became Chair of the Board); see also Marcia Cohen, The Sisterhood:The True Story of the Women who Changed the World 129-37 (1988).

[FN196]. I have traced these developments in detail elsewhere. See Herma Hill Kay, Equality and Difference:A Perspective on No-Fault Divorce and Its Aftermath, 56 U. Cinn. L. Rev. 1, 26-44 (1987). I there defined a "pure" no-fault divorce law as one that "abolish[es] all fault-based grounds for divorce and install[s] in their stead a pure no-fault law based on marriage breakdown" and indicated that 15 states had enacted such laws. Id. at 5 & n.19.

[FN197]. See Howard A. Krom, California's Divorce Law Reform:An Historical Analysis, 1 Pac. L.J. 156, 158 (1970).

[FN198]. See Virtue, supra note 147, at 3-51.

[FN199]. Others who testified included a number of family law judges, most prominently Judge Roger A. Pfaff of the Los Angeles Conciliation Court, practitioners, and state officials. See Kay, supra note 196, at 29-30; Krom, supra note 197, at 160-61.

[FN200]. See California Governor's Commission Report, supra note 162, at 5-32. Gough was named Executive Director of the Commission and the author was a member. See id. at 145-46.

[FN201]. See Stephen Cretney, Law, Law Reform and the Family 32-50 (1998) (noting at 34-36 and at 42-48 that the Archbishop's Group was appointed in response to the most recent of two efforts to pass a private member's bill permitting divorce based on separation for seven years).

[FN202]. See California Governor's Commission Report, supra note 162, at 28-29; Putting Asunder, supra note 32, at 18-19.

[FN203]. See Cretney, supra note 201, at 54 (noting that the Archbishop's Group published its report on July 29, 1966).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Report of the Governor's Commission was transmitted to Governor Edmund G. Brown on December 15, 1966. See California Governor's Commission Report, supra note 162, at 1.

[FN204]. See California Governor's Commission Report, supra note 162, at 27 & n.17, 29 & n.18, 32 & n.26.

[FN205]. See Jacob, supra note 179 at 52-53 (noting that the Assembly hearings in January and October 1964 "provided an opportunity for Kay and others to introduce the no-fault concept and some of the other innovations which later marked the 1969 law" and concluding that "two years before the Archbishop of Canterbury's report made no-fault a widely discussed concept and before New York's divorce reform law, Kay outlined the basic features of a complete reform of American divorce law").

[FN206]. See J. Herbie DiFonzo, Beneath the Fault Line:The Popular and Legal Culture of Divorce in Twentieth-century America 162 (1997):

The governor's commission...concentrated its proposals on one integrated scheme, heavily influenced by the archbishop of Canterbury's group:no-fault dissolution of marriage, to be processed by a therapeutic family court. Not only did the commission quote at length from Putting Asunder, but its proposal linking the removal of fault to a transfer of domestic cases to an administrative and therapeutic--rather than purely adjudicative--body replicated the heart of the Church of England report.

[FN207]. See Blake, supra note 32, at 203-25.

[FN208]. See N.Y. Dom. Rel. Law § 170 (McKinney 1999) (effective September 1, 1967). The additional grounds for divorce were cruel and inhuman treatment that so endangers the physical or mental well being of the plaintiff as to render it unsafe or improper for plaintiff to cohabit with defendant, abandonment for a period of two or more years, confinement in prison after marriage for three or more consecutive years, and living separate and apart for two or more years pursuant to a separation decree or a recorded separation agreement. See Halem, supra note 139, at 254-69; see also Comment, New York's New Divorce Law:Beyond the Sixth Commandment, 5 Colum. J. L. & Soc. Probs. 1 (1969). South Carolina had enacted a statute authorizing courts to grant decrees of absolute divorce on the grounds of adultery, desertion, physical cruelty, and habitual drunkenness in 1949, and added its version of no-fault divorce, voluntary separation for one year, in 1976. See S.C. Code Ann. § 20-3-10 (Law. Co-op 1999).

[FN209]. See Virtue, supra note 147.

[FN210]. See Kay, supra note 196, at 37-38.

[FN211]. See id. at 38-39; see also Krom, supra note 197, at 170-74.

[FN212]. See Goddard, supra note 164, at 90:

These basic proposals...would result in a sudden and profound change in the law and procedure governing divorce as known and developed in Anglo-American jurisprudence for several centuries...Such cataclysmic changes should only be adopted after the most careful thought and analysis, inasmuch as there are few precedents on which to base any forecast of the far-reaching effects of divorce upon petition and without fault.

See also Kay, supra note 196, at 37 n.175, 39-40. The opposition was centered in the Los Angeles Conciliation Court. Judge Roger A. Pfaff had been active throughout the California reform period, and was a member of the Governor's Commission. Ill health prevented him from attending its meetings, but he followed its proceedings and wrote a letter expressing his reservations to the Commission's Co-Chair, attorney Richard Dinkelspiel.

[FN213]. See Kay, supra note 196, at 40-41 (pointing out that "[t]he California Family Law Act of 1969 was quite a dif-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ferent document from the Family Court Act proposed in 1966 by the Governor's Commission on the Family"); see also Krom, supra note 197, at 174-80.

[FN214]. See Kay, supra note 196, at 40-44.

[FN215]. 39 Cal. 2d 858, 864, 250 P.2d 598, 601 (1952):

    Since the family is the core of our society, the law seeks to foster and preserve marriage. But when a marriage has failed and the family has ceased to be a unit, the purposes of family life are no longer served and divorce will be permitted. "[P]ublic policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed." (quoting Gibson, C. J., in Hill v. Hill, 23 Cal. 2d 82, 93, 142 P. 2d 417, 422 (1943)).

[FN216]. California Governor's Commission Report, supra note 162, at 91 (Section 028 and accompanying Comment).

[FN217]. Family Law Act of 1969 § 8, 1969 Cal. Stat. 3324 (originally codified at Cal. Civ. Code §§ 4506-4507 (West 1970)).

[FN218]. The defense of recrimination, which arose upon "a showing by the defendant of any cause of divorce against the plaintiff, in bar of the plaintiff's cause of divorce," would have ruled out such an acknowledgement of mutual fault if the causes were "in bar" of each other. Former Cal. Civ. C. § 122 (Deering 1961), repealed by 1969 Cal. Stat. ch. 1608, sec. 3, at 3313, operative Jan. 1, 1970. Both drafts abolished this defense. See California Governor's Commission Report, supra note 162, at 77; 1969 Cal. Stat. ch. 1608, sec 3, at 3312, operative January 1, 1970.

[FN219]. Family Law Act of 1969 § 8, 1969 Cal. Stat. 3325, amended by Act effective Jan. 1, 1970, ch. 1609, § 14 1969 Cal. Stat. 3355 (originally codified at Cal. Civ. Code § 4509 (West 1970)).

[FN220]. This provision was repealed in 1975. See Act of Apr. 18, 1975, ch. 35 § 1, 1975 Cal. Stat. 59.

[FN221]. Rheinstein, supra note 162, at 368.

[FN222]. Cal. Fam. Code § 2335 (West 1994) (the successor to Cal. Civ. Code § 4509).

[FN223]. See Cal. Stat. 1993, ch. 219, § 110, 1617 (A.B. 1500), amending Cal. Fam. Code § 2335 to delete former subsections(a)&(b)(Deering 1994 & Supp. 1999).

[FN224]. See Kay, supra note 196, at 42-44.

[FN225]. See California Governor's Commission Report, supra note 162, at 45-46.

[FN226]. Family Law Act of 1969 § 8, 1969 Cal. Stat. at 3333 (originally codified at Cal. Civ. Code §4800 (West 1970)).

[FN227]. California Assembly Committee on Judiciary Report on A.B. No. 530 and S.B. No. 252 (The Family Law Act), 4 Cal. Assembly Daily J. 8053, 8061-62 (Aug. 8, 1969) [hereinafter California Assembly Report]. Assemblyman Hayes was the author of A.B. 530. The Report was designed as a statement of legislative intent. The report explained that "if the nature of the property is such that an equal division is not possible without impairment of a principal asset, then the court shall have discretion to establish conditions which will result in a substantially equal division." It gave the example of a business, where the court "could award the entire business to the husband and grant the wife her one-half interest in cash or give her a greater share of other property or a greater support allowance."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN228]. Family Law Act of 1969 § 8, 1969 Cal. Stat. 3333 (originally codified at Cal. Civ. Code §4801 (West 1970)).

[FN229]. California Assembly Report, supra note 227, at 8062. Assemblyman Hayes subsequently quoted this statement in support of his motion to terminate his obligation to support his former wife. See Riane Tennenhaus Eisler, Dissolution:No-Fault Divorce, Marriage, and the Future of Women 24-31 (1977).

[FN230]. See In re Marriage of Rosan, 101 Cal. Rptr. 295, 304 (1972) (reversing a spousal support order as inadequate in a case where the wife had not worked outside the home in 17 years and noting "[w]e find nothing in the Family Law Act...indicating any legislative intent that a wife of a marriage of longstanding...should be...relegated to a standard of living substantially below that enjoyed by the parties during the marriage..."). Rosan was subsequently approved, and contrary cases disapproved, by the California Supreme Court. See In re Marriage of Morrison, 143 Cal. Rptr. 139 (1978).

[FN231]. See supra note 83. NCCUSL had approved the project in 1965.

[FN232]. See id. Professor Levy was appointed as Reporter in 1965; the author was named Co-Reporter in 1967.

[FN233]. See Rheinstein, supra note 162, at 385-86; Kay, supra note 196, at 44-51; Maurice H. Merrill, Section 305:Genesis and Effect, 18 S.D. L. Rev. 538, 540 (1973).

[FN234]. Section 305 of the 1970 UMDA provided as follows:

(a) If both of the parties by petition or otherwise have stated under oath or affirmation that the marriage is irretrievably broken, or one of the parties has so stated and the other has not denied it, the court, after hearing, shall make a finding whether the marriage is irretrievably broken.(b)If one of the parties has denied under oath or affirmation that the marriage is irretrievably broken, the court shall consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation, and shall(1)make a finding whether the marriage is irretrievably broken, or(2)continue the matter for further hearing not less than 30 or more than 60 days later, or as soon thereafter as the matter may be reached on the court's calendar and may suggest to the parties that they seek counseling. At the adjourned hearing, the court shall make a finding whether the marriage is irretrievably broken.
UMDA § 305 (1970).

[FN235]. See Harvey L. Zuckman, The ABA Family Law Section v. The NCCUSL:Alienation, Separation, and Forced Reconciliation Over the Uniform Marriage and Divorce Act, 24 Cath. U. L. Rev. 61, 63, 71-73 (1974).

[FN236]. UMDA § 302 (a)(2), 9B U.L.A. Part II, 1 (Master Ed. 1998).

[FN237]. See Kay, supra note 196, at 49-51.

[FN238]. Robert Levy, Uniform Marriage and Divorce Legislation:A Preliminary Analysis 138 (1969) (unpublished monograph prepared for NCCUSL, on file with author).

[FN239]. See Jacob, supra note 179, at 77-78. Jacob asserts that the UMDA's

most important effect was to legitimate no-fault in a way that California's adoption could not. Whereas California's adoption might be discounted because California often adopted avant-garde ideas belittled elsewhere, the NCCUSL and ABA's endorsement of no-fault divorce indicated that this was a reasonable idea that warranted serious consideration by state legislatures, for the NCCUSL and ABA were middle-of-the-road, conservative organizations little given to extravagant social experimentation.
Id.    See also Robert J. Levy, A Reminiscence About The Uniform Marriage and Divorce Act--and Some Reflections About Its Critics and Its Policies, 1991 BYU L. Rev. 43, 44. Levy notes that, while only parts of the UMDA were

adopted in any jurisdiction,

the Uniform Act has been identified as the policy vehicle for the rapid spread through the United States of two important divorce law trends:1) "no-fault divorce"--that is, the abolition of the "fault grounds" for divorce which had been a formal feature of the English and American divorce law for centuries; and 2) "equitable distribution of marital property"--the concept that marriage should be treated as a partnership whose assets must be fairly distributed between the spousal partners at divorce without regard to their formal ownership.

Id. The UMDA's influence on divorce law reform far outstripped its impact on the law of marriage. See Robert J. Levy, Trends in Legislative Regulation of Family Law Doctrine:Millennial Musings, 33 Fam. L. Q. 543, 548 (1999) (noting that although only eight states adopted the UMDA's divorce provisions more or less intact, almost every state substantially modified its statutory grounds for divorce, while no state followed "in recognizable form" its marriage doctrines).

[FN240]. See Kay, supra note 196, at 51-55.

[FN241]. See Deborah L. Rhode & Martha Minow, Reforming the Questions, Questioning the Reforms, in Divorce Reform at the Crossroads 191, 195 (Stephen D. Sugarman and Herma Hill Kay eds., 1990) (noting that "[t]he newly emerging women's rights movement was not significantly involved with early divorce reforms, in part because it was understaffed and overextended during this period, but more important, because the implications of such reforms were not yet apparent").

[FN242]. See Model Penal Code § 207.11 (Tent. Draft No. 9, 1959).

[FN243]. Zad Leavy & Alan F. Charles, California's New Therapeutic Abortion Act:An Analysis and Guide to Medical and Legal Procedure, 15 UCLA L. Rev. 1, 1 & n.3 (1967).

[FN244]. See Cal. Penal Code § 274, Historical and Statutory Notes (West 1999) (amended 1967) (proscribing the performance of an abortion upon a woman "unless the same is necessary to preserve her life").

[FN245]. See Model Penal Code § 230.3 cmt. 1 at 426-27 (1980).

[FN246]. See Mary Ann Glendon, Abortion and Divorce in Western Law 63 (1987).

[FN247]. Rheinstein, supra note 171, at 39.

[FN248]. See Herbert L. Packer & Ralph J. Gampell, Therapeutic Abortion:A Problem in Law and Medicine, 11 Stan. L. Rev. 417, 447 (1959) (The survey was sent to 29 hospitals and 26 responded). The authors observe that

[t]he abortion problem exhibits a dramatic variation between legal norm and social fact. The legal norm is condemnation, save for a limited exception, varied in its statement but always narrow in its reach. The social fact is omnipresence, on a scale of which we are just beginning to be aware.

Id. at 417.

[FN249]. See Shively v. Stewart, 421 P.2d 65 (1966) (granting discovery to doctors in an administrative disciplinary action charging unprofessional conduct brought by the California State Board of Medical Examiners against nine San Francisco physicians for performing abortions on women who had contracted German measles in the early stages of pregnancy). An amicus curiae brief filed in the case on November 28, 1966, by more than 200 deans of medical schools and heads of pediatrics, obstetrics, and gynecology departments across the country asserted that "'[t]ermination of pregnancy to preserve the health and well-being of the pregnant woman, or to prevent the birth of a severely deformed child, is a procedure firmly established by medical science and approved as clinically sound by an overwhelming majority of med-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ical opinion."' Leavy & Charles, supra note 243, at 26 (quoting amicus curiae brief).

[FN250]. See Model Penal Code § 230.3 cmt. 1, at 426 n.4 (1980).

[FN251]. See Leavy & Charles, supra note 243, at 2; Roy Lucas, Federal Constitutional Limitations on the Enforcement and Administration of State Abortion Statutes, 46 N.C. L. Rev. 730 (1968); Robert I. Sanders & Carlton R. Stoiber, Note, Colorado's New Abortion Law, 40 U. Colo. L. Rev. 297, 297 (1967). Unlike Colorado and North Carolina, the California statute omitted the fetal deformity (German measles) provision in order to avoid a veto by Governor Ronald Reagan. See Leavy & Charles, supra note 243, at 3 & n.15.

[FN252]. See Model Penal Code § 230.3 (1962) provided in part:
    (1) Unjustified Abortion. A person who purposely and unjustifiably terminates the pregnancy of another otherwise than by a live birth commits a felony of the third degree or, where the pregnancy has continued beyond the twenty-sixth week, a felony of the second degree.
    (2) Justifiable Abortion. A licensed physician is justified in terminating a pregnancy if he believes there is substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother or that the child would be born with grave physical or mental defect, or that the pregnancy resulted from rape, incest, or other felonious intercourse. All illicit intercourse with a girl below the age of 16 shall be deemed felonious for purposes of this subsection. Justifiable abortions shall be performed only in a licensed hospital except in case of emergency when hospital facilities are unavailable.
Subsection 230.3(3)required a written certificate from two physicians specifying the circumstances they believed to justify the abortion.
[FN253]. See Michael S. Sands, The Therapeutic Abortion Act:An Answer to the Opposition, 13 UCLA. L. Rev. 285, 287 n.16 (1966) (listing a few women's "civic" organizations that supported the California reform effort, including University Women for the Humane Abortion Law and the California Division of the American Association of University Women).

[FN254]. See Cohen, supra note 195, at 179-80, 391.

[FN255]. Lucinda Cisler, Unfinished Business:Birth Control and Women's Liberation, in Sisterhood is Powerful 245, 274-81 (Robin Morgan ed., 1970).

[FN256]. See Haw. Rev. Stat. § 453-16 (Michie 1998) (permitting abortion of nonviable fetuses); McKinney's 1970 N.Y. Session Laws, ch. 127, 170, eff. July 1, 1970 (codified at N.Y. Penal Code §125.05(3)) (permitting abortion within the first 24 weeks of pregnancy).

[FN257]. Roe v. Wade, 314 F. Supp. 1217 (N.D. Tex. 1970), aff'd in part and rev'd in part, 410 U.S. 113 (1973).

[FN258]. Doe v. Bolton, 319 F. Supp. 1048 (N.D. Ga. 1970), judgment modified and aff'd, 410 U.S. 179 (1973).

[FN259]. See generally Sarah Weddington, A Question of Choice (1992) (Weddington represented plaintiff Jane Roe).

[FN260]. 410 U.S. 113 (1973) (holding that the constitutional right of privacy, inherent in the concept of liberty found in the due process clause, encompasses a woman's decision, in consultation with her physician, to terminate her pregnancy, though her right may be qualified by the state's interests, which grow in importance as the pregnancy progresses to term, in protecting her health and in guarding the potential life of the fetus).

[FN261]. 410 U.S. 179 (1973) (invalidating both the statutory indications for justifiable abortion and the procedural re-

quirement that the abortion take place only in a licensed hospital with the concurrence of two physicians as imposing impermissible constraints on a woman's right of privacy).

[FN262]. See Model Penal Code § 230.3 cmt. 4 at 443-44 (1980) ("[T]he effect of Roe and Doe is largely to abrogate the criminal law of abortion as stated in the Model Penal Code.").

[FN263]. See Ruth Bader Ginsburg, Speaking in a Judicial Voice, 67 N.Y.U. L. Rev. 1185, 1198-1209 (1992) (suggesting at 1200 that "[t]he Roe decision might have been less of a storm center had it both homed in more precisely on the woman's equality dimension of the issue and, correspondingly, attempted nothing more bold at that time than the mode of decisionmaking the Court employed in the 1970s gender classification cases.").

[FN264]. See Cohen, supra note 195, at 393.

[FN265]. See S. Rep. No. 92-689 (1972); Equal Rights for Men and Women 1971:Hearings Before Subcomm. No. 4 of the Comm. on the Judiciary House of Representatives, 92d Cong., 1st Sess. (1971); H.R. Rep. No. 92-259 (1971); The Equal Rights Amendment:Hearings Before the Subcomm. on Constitutional Amendments of the Comm. on the Judiciary U.S. Senate, 91st Cong., 2d Sess. (1970); Equal Rights 1970:Hearings Before the Comm. on the Judiciary U.S. Senate, 91st Cong., 2d Sess. (1970). The text of clause 1 of the proposed ERA reads as follows:"Equality of rights under the law shall not be denied or abridged by the United States or by any state on account of sex" (quoted in Hearings, and in Mansbridge, infra note 267, at 1).

[FN266]. See Ruth Bader Ginsburg, Ratification of the Equal Rights Amendment:A Question of Time, 57 Tex. L. Rev. 919, 919 (1979).

[FN267]. See Barbara A. Brown et al., The Equal Rights Amendment:A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871, 909 (1971) (noting that article was written to provide a definitive interpretation of the proposed Amendment, does not discuss abortion, but notes that "most of the objections which have been addressed to the absolute form of the Amendment are answered by the fact that the Amendment is inapplicable to laws dealing with unique physical characteristics of one sex or by application of the constitutional right of privacy"); see also Jane J. Mansbridge, Why We Lost the ERA 124-28 (1986).

[FN268]. See Mansbridge, supra note 267, at 91-98 (noting that other family law issues, such as child custody, domicile of married women, married women's names, and the age at which marriage was permitted were also raised); Brown, supra note 265, at 944-49, 951-52; see also Deborah L. Rhode, Equal Rights in Retrospect, 1 Law & Ineq. J. 1 (1983).

[FN269]. See Cohen, supra note 195, at 359; Mansbridge, supra note 267, at 112-17.

[FN270]. See Report of the Advisory Comm'n on the Status of Women, California Women 79-80 (1969).

[FN271]. See supra text accompanying notes 242-252.

[FN272]. Report of the Advisory Comm'n on the Status of Women, California Women 31 (1967).

[FN273]. See Isabella Grant, How Much of a Partnership is Marriage? Community Property Rights Under the California Family Law Act of 1969, 23 Hastings L.J. 249, 256-57 (1971).

[FN274]. See Cal. Joint Interim Comm. on Judiciary, Hearings on Community Property (Sept. 25-26, 1972; Oct. 10, 1972; Oct. 20, 1972).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN275]. See S.J. Res. 20, 1972 Reg. Sess., 4 Cal. Assembly Daily J. 7596 (Nov. 13, 1972) The debate over the ERA questioned, among other things, the husband's power to control the community property. The power of control extended to wives in 1975 was strengthened in 1987 by a requirement that each spouse manage the property in "good faith" and that provided remedies for violation. See Carol S. Bruch, Protecting the Rights of Spouses in Intact Marriages:The 1987 California Community Property Reform and Why It Was So Hard to Get, 1990 Wis. L. Rev. 731, 744-56.

[FN276]. See Herma Hill Kay, An Appraisal of California's No-Fault Divorce Law, 75 Calif. L. Rev. 291, 303-04 (1987) (noting that the three changes in laws were measures(1)prohibiting the denial of credit to a married woman whose property and income would have supported the grant of credit to a married man;(2)granting wives equal power with husbands to manage the community property; and(3)authorizing widows to assume ownership of the community estate without having the entire estate administered in probate).

[FN277]. National Comm'n on the Observance of the International Women's Year, The Legal Status of Homemakers in California 2 (1977).

[FN278]. See Martha L. Fineman, Implementing Equality:Ideology, Contradiction and Social Change:A Study of Rhetoric and Results in the Regulation of the Consequences of Divorce, 1983 Wis. L. Rev. 789, 843 & n.170.

[FN279]. See id. at 847-50; Jacob, supra note 179, at 99-101.

[FN280]. See Richard W. Bartke & Lori A. Zurvalec, The Low, Middle and High Road to Marital Property Law Reform in Common Law Jurisdictions, 7 Community Prop. J. 200, 219-32 (1980); see also id. at 221 (noting that Professor June Weisberger was the primary draftsperson of a bill circulated in August 1979).

[FN281]. See June Miller Weisberger, The Wisconsin Marital Property Act:Highlights of the Wisconsin Experience in Developing a Model for Comprehensive Common Law Property Reform, 1 Wis. Womens L.J. 5 (1985).

[FN282]. See Uniform Marital Property Act (UMPA), 9A U.L.A. Part I, 103 (Master Ed. 1998).

[FN283]. See Ginsberg & Flagg, infra note 289, at 11.

[FN284]. McGowan v. Maryland, 366 U.S. 420, 425-26 (1961) (upholding Maryland's "blue laws" forbidding most commercial activities on Sunday); see also F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920) (invalidating a Virginia law that taxed the income of local corporations derived from business done both within and without the state, while exempting the outside income of local corporations which did no local business:"[T]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike").

[FN285]. See Gunther, infra note 287, at 8-9.

[FN286]. See John E. Nowak et al., Handbook on Constitutional Law 524 (1978); see also Developments in the Law--Equal Protection, 82 Harv. L. Rev. 1065, 1087-88 (1969).

[FN287]. Gerald Gunther, The Supreme Court, 1971 Term--Forward:In Search of Evolving Doctrine on a Changing Court:A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972).

[FN288]. See, e.g., Hoyt v. Florida, 368 U.S. 57 (1961) (upholding a "volunteers only" requirement of jury service for women); Goesaert v. Cleary, 335 U.S. 464 (1948) (upholding a statute prohibiting women from working as bartenders,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

except for the wives and daughters of male tavern owners); Muller v. Oregon, 208 U.S. 412 (1908) (upholding protective laws for women; although the case was decided principally on due process grounds, an equal protection argument contended that the statute constituted impermissible "class legislation"). Earlier cases upheld discrimination against women on other constitutional grounds. See, e.g., Minor v. Happersett, 88 U.S. (21 Wall.) 162 (1874) (holding that the right to vote is not among the privileges and immunities of U.S. citizenship); Bradwell v. Illinois, 83 U.S. (16 Wall.) 130 (1873) (holding that the right to practice law is not protected by the Privileges and Immunities Clause).

[FN289]. Hon. Ruth Bader Ginsburg & Barbara Flagg, Some Reflections on the Feminist Legal Thought of the 1970s, 1989 U. Chi. Legal F. 9, 13.

[FN290]. See Reed v. Reed, 404 U.S. 71 (1971) ("It is appellant's principal position that the sex line drawn by Sec. 15-314 of the Idaho Code, mandating subordination of women to men without regard to individual capacity, creates a 'suspect classification' for which no compelling justification can be shown.") (quoting appellant's brief).

[FN291]. 404 U.S. 71 (1971) (striking down an Idaho statute giving preference to men over women as administrators of decedents' estates).

[FN292]. See Gunther, supra note 287, at 34. ("It is difficult to understand the result without an assumption that some special sensitivity to sex as a classifying factor entered into the analysis.").

[FN293]. Judge Harrison L. Winter may have been the first to use the new term in Eslinger v. Thomas, 476 F.2d 225, 230-31 (4th Cir. 1973) (invalidating practice of South Carolina Senate not to hire women as Senate Pages) (footnotes omitted):

> Thus Reed, in a case of invidious sex discrimination, prescribed as a test of validity the presence of a "fair and substantial" relation between the basis of the classification and the object of the classification. A classification based upon sex is less than suspect; a validating relationship must be more than minimal. What emerges is an "intermediate approach" between rational basis and compelling interest as a test under the equal protection clause.

[FN294]. 411 U.S. 677 (1973) (invalidating requirement that a female member of the uniformed services, unlike a male member, must show that her spouse is dependent on her for over one-half of his support in order to claim him as a "dependent" for purposes of obtaining increased quarters allowances and medical and dental benefits).

[FN295]. Id. at 688 (opinion of Brennan, Douglas, White, and Marshall, JJ.).

[FN296]. Ginsburg & Flagg, supra note 289, at 18.

[FN297]. Id. at 11.

[FN298]. President Carter appointed Ruth Bader Ginsburg to the Court of Appeals for the District of Columbia Circuit for the Term beginning June 30, 1980. See The American Bench:Judges of the Nation 43 (10th ed. 1999-2000).

[FN299]. During this same period, the Court was hammering out the meaning of the statutory prohibition against sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e to 2000e-15, with mixed results. I have elsewhere compared the Court's statutory and constitutional sex discrimination cases. See Herma Hill Kay, Models of Equality, 1985 U. Ill. L. Rev. 39.

[FN300]. Justice O'Connor took the oath of office on September 26, 1981. The Supreme Court Justices 509 (Clare Cushman ed., 2d ed. 1995). It bears mention that President Reagan, as governor of California from 1966-1974, had signed

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

both the Family Law Act of 1969 and the Therapeutic Abortion Act of 1967.

[FN301]. See Kay, supra note 196, at 51-55. South Dakota, the last state to enact a no-fault provision, did so in 1985. See S.D. Codified Laws § 25-4-2(7) (Lexis 1999 Revision) (adding "Irreconcilable differences" to its list of grounds). See also Friedman, supra note 42, at 664, describing the explosive force of the "no-fault revolution":"Then, suddenly, the dam seemed to burst in divorce law. Twenty years ago, consensual divorce was a radical idea. Today, it is unquestioned fact. The old system collapsed completely; no-fault rushed into the vacuum. California was a pioneer state, but no-fault is now the rule almost everywhere."

[FN302]. No additional ratifications were secured during the extended period allowed by Congress. See Mansbridge, supra note 267, at 13.

[FN303]. Rhode Island enacted a statute in March 1973 creating a conclusive presumption "that human life commences at the instant of conception and that said human life at said instant of conception is a person within the language and meaning of the fourteenth amendment of the Constitution of the United States." This provision was declared unconstitutional in Doe v. Israel, 358 F. Supp. 1193 (D. R.I. 1973). Opponents also pursued the possibility of an amendment to the U.S. Constitution. By the summer of 1973, 16 proposed anti-abortion amendments were pending before the House Judiciary Subcommittee No. 4, and one had been introduced into the Senate. See Kay & West, supra note 12, at 532-33. To date Congress has not sent any such amendment to the states for ratification. During the 1999 Senate debate over "partial birth abortion," however, Senator Tom Harkin, D-Iowa, exposed the strength of the opposition to Roe itself by offering a nonbinding amendment in support of Roe. The amendment passed by a vote of only 51-47. See Alison Mitchell, Senate Votes to Ban a Controversial Abortion Procedure, N.Y. Times, Oct. 22, 1999, at A18 (noting that a "partial birth abortion" refers to a procedure used in the second and third trimester of pregnancy in which the fetus is partly extracted feet first and the brain removed before the fetus is fully taken out of the womb). The Supreme Court struck down a partial birth abortion statute as unconstitutional in Stenberg v. Carhart, 120 S. Ct. 2597 (2000).

[FN304]. See generally B.J. George, Jr., State Legislatures versus the Supreme Court:Abortion Legislation in the 1980's, 12 Pepp. L. Rev. 427 (1985) (reviewing state legislation regulating abortion between 1973 and 1984 and concluding that further abortion legislation is currently unnecessary and unproductive).

[FN305]. See Roe, 410 U.S. at 163 ("[F]or the period of pregnancy prior to this 'compelling' point, the attending physician, in consultation with his patient, is free to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated.").

[FN306]. See Susan Frelich Appleton, Doctors, Patients and the Constitution:A Theoretical Analysis of the Physician's Role in 'Private' Reproductive Decisions, 63 Wash. U. L.Q. 183, 192-226 (1985).

[FN307]. See Robert H. Bork, The Tempting of America 271-321 (1990).

[FN308]. 505 U.S. 833, 846 (1992).

[FN309]. See id. at 872-73 (opinion of O'Connor, Kennedy, and Souter, JJ.). Justice Blackmun, the author of Roe and Doe, adhered to the trimester framework, see id. at 934 (opinion of Blackmun, J.), as did Justice Stevens, see id. at 914 (opinion of Stevens, J.).

[FN310]. Id. at 870 (opinion of O'Connor, Kennedy, and Souter, JJ.).

[FN311]. Id. at 878.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN312]. 120 S. Ct. 2597, 2617 (2000). In granting certiorari, the Court limited review to questions one and two presented by the petition, see 120 S. Ct. 865 (2000), thus declining the invitation in question four to reconsider the wisdom of Roe v. Wade. Justice Blackmun reminded the Court in Casey that "[t]hree years ago, in Webster v. Reproductive Health Services, 492 U.S. 490 (1989), four Members of this Court appeared poised to 'cas[t] into darkness the hopes and visions of every woman in this country' who had come to believe that the Constitution guaranteed her the right to reproductive choice," id. at 922 (opinion of Blackmun, J.) (citations omitted), and went on to warn that "I am 83 years old. I cannot remain on this Court forever, and when I do step down, the confirmation process for my successor well may focus on the issue before us today." Id. at 943. Justice Blackmun retired in 1994; his successor was Justice Steven Breyer, who wrote the majority opinion in Stenberg. The vote was 5-4, with Justice Kennedy joining the dissenters.

[FN313]. See White House Working Group on the family, The Family:Preserving America's Future 3 (1986).

[FN314]. See Leonore J. Weitzman, The Divorce Revolution:The Unexpected Social and Economic Consequences for Women and Children in America (1985).

[FN315]. Martha Fineman first published her critique in a 1983 law review article, see Fineman, supra note 278, and later expanded it into a book, Martha Alberson Fineman, The Illusion of Equality (1991).

[FN316]. See Jacob, supra note 179, at 159. I have commented elsewhere on Weitzman's criticisms of the California Family Law Act. See Kay, supra note 196, at 59-77; see also Levy, supra note 239, at 53 (observing that "[a]t least some of Weitzman's claims about the doctrinal goals of the [UMDA] were either misplaced or simply wrong").

[FN317]. Weitzman, supra note 314, at 25-26.

[FN318]. See id. at 27.

[FN319]. Id. at 323.

[FN320]. Id. at 339.

[FN321]. See Sanford L. Braver, Ph.D., The Gender Gap in Standard of Living After Divorce:Vanishingly Small?, 33 Fam. L. Q. 111, 113 (1999) ("It would probably be fair to say that Weitzman's findings are the most widely known and influential social science results of the last twenty years.").

[FN322]. The California legislature, for example, created a Task Force on Family Equity in 1985 and charged it with reviewing Weitzman's book and making appropriate recommendations. Cal. S. Res. 28, 1985-86 Reg. Sess. § 4. I have reviewed the work of this Task Force elsewhere. See Herma Hill Kay, Beyond No-Fault:New Directions in Divorce Reform, in Divorce Reform at the Crossroads, supra note 241, at 6, 18-28.

[FN323]. See Saul D. Hoffman & Greg J. Duncan, What Are the Economic Consequences of Divorce, 25 Demography 641, 641 (1988) (noting that Weitzman's result is "at considerable variance with the findings of other researchers who have examined the economic consequences of divorce" and claiming that her findings on this point "are almost certainly in error"); Jacob, supra note 179, at 159-64.

[FN324]. See Richard R. Peterson, A Re-Evaluation of the Economic Consequences of Divorce, 61 Am. Soc. Rev. 528, 532 (1996). The author notes that

      [r]esults based on the corrected raw data file using the measures of the income/needs ratio described above show that the effects of divorce are not nearly as large as those reported by Weitzman.... The mean income/needs ratio is 10

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

percent higher for men in the year after divorce than it was in the year before separation; for women the mean income/ needs ratio was 27 percent lower.

Id.

[FN325]. See Lenore J. Weitzman, The Economic Consequences of Divorce are Still Unequal:Comment on Peterson, 61 Am. Soc. Rev. 537, 538 (1996). Weitzman states that

[w]hile it is likely...that the gender gap is less than I reported, even if the post-divorce standards of living, as Peterson contends, drop an average of only about 30 percent for women, and rise only about 10 percent for men, that is still a 40 percent difference between the two--and that outcome is unconscionable for a legal system and a society committed to fairness, justice, and equality.

Id.

[FN326]. See Braver, supra note 321, at 130.

[FN327]. See Peterson, supra note 324, at 529 ("The Divorce Revolution was also discussed widely in the popular press:It was cited over 85 times in newspapers, and over 25 times in national magazines from 1985 to 1993.").

[FN328]. See id. at 535:

The inaccurate findings have distorted the debate over no-fault legislation because some critics attributed differences between Weitzman's results, based on a California sample, and those of other studies to California's no-fault divorce laws. These critics argued that the economic consequences of divorce for women were much more severe in California than elsewhere in the United States because of California's no-fault divorce legislation. In fact, I have demonstrated that the findings reported by Weitzman were inaccurate. The corrected findings reported here do not support the argument that the economic consequences of divorce for women were more severe in California than elsewhere.

[FN329]. Glendon, supra note 246, at 105; see also Ira Mark Ellman, The Misguided Movement to Revive Fault Divorce, And Why Reformers Should Look Instead to The American Law Institute, 11 Int'l J. L., Pol'y & Fam. 216, 229-30 (1997) (criticizing the "slogan" no-fault, no-responsibility divorce, but appreciating Glendon's insight that a sound divorce law must "recognize and enforce the responsibilities that arise both from marriage and from the procreation of children").

[FN330]. See Marsha Garrison, The Economics of Divorce:Changing Rules, Changing Results, in Divorce Reform at the Crossroads, supra note 241, at 75, 75-101 (calling for more information concerning the responsibility of the no-fault movement for divorced wives' declining fortunes, and noting that many avenues exist to approach the situation, including more rigorous appellate review of awards by trial judges); see also Richard R. Peterson, Statistical Errors, Faulty Conclusions, Misguided Policy:Reply to Weitzman, 61 Am. Soc. Rev. 539, 539 (1996) ("Lenore Weitzman...and I agree that there is a significant gender gap in the economic consequences of divorce, that this gap results in financial hardship for many divorced women and their children, and that legal reforms and public policy must address this hardship.").

[FN331]. White House Working Group on the Family, supra note 313, at 6.

[FN332]. Id. at 21.

[FN333]. See American Law Institute, Conference on the Law and Public Policy of Family Dissolution:Conference Materials 1 (January 4, 1990). The ALI noted that "[s]uch a project will serve two functions":

(1) It will help rationalize the law in an area where there has been rapid and revolutionary development in the last two decades but which now may be at a point where a document analyzing the basic principles would serve a useful function; and

(2) It will focus the attention of one of the most prestigious institutions of the law, the American Law Institute, on an area that has long lacked major intellectual attention by the legal profession.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page63 of 73

[FN334]. Id. at 3.

[FN335]. See id. at iv (letter from Reporter Marygold S. Melli to conference participants); see also Marygold S. Melli, Whatever Happened to Divorce?, 2000 Wis. L. Rev. 637, 638 (pointing out that "[t]oday, divorce is not an end of a relationship but a restructuring of a continuing relationship.").

[FN336]. See Report of the Director, 1999 A.L.I. Ann. Rep. 1, 8. The Co-Reporters of the UMDA, the author and Robert J. Levy, are among the Advisors to the ALI Project. See Principles of the Law of Family Dissolution:Analysis & Recommendations v-vi (Tentative Draft No. 3, Part I, 1998).

[FN337]. See Principles of the Law of Family Dissolution:Analysis & Recommendations, §§ 4.03-4.08 (Proposed Final Draft, Part I, 1997).

[FN338]. See id. § 4.15.

[FN339]. See id. § 4.18.

[FN340]. See Ira Mark Ellman, The Theory of Alimony, 77 Calif. L. Rev. 1 (1989).

[FN341]. See Principles of the Law of Family Dissolution, supra note 337, §§5.02-5.03.

[FN342]. See id. § 5.03(2)(a).

[FN343]. See id. § 5.03(2)(b).

[FN344]. See id. § 5.03(2)(c).

[FN345]. Id. § 5.03(3)(a).

[FN346]. Id. § 5.03(3)(b).

[FN347]. See J. Thomas Oldham, ALI Principles of Family Dissolution:Some Comments, 1997 U. Ill. L. Rev. 801, 830 (suggesting that section 5.05, which recognizes a right to postdivorce income sharing based on length of marriage and difference between the income of the former spouses, be abolished, and criticizing the requirement of a minimum period of caregiving to qualify the caregiver for career damages in section 5.06).

[FN348]. Principles of the Law of Family Dissolution, supra note 336, § 2.06(1). Section 2.03(4) defines the term "custodial responsibility" to mean physical custodianship and supervision of a child, and section 2.03(5) defines the term "decisionmaking responsibility" to mean authority for making significant life decisions on behalf of a child.

[FN349]. Id. § 2.07.

[FN350]. Principles of the Law of Family Dissolution:Analysis & Recommendations § 2.09(1). (Preliminary Draft No. 9, 1999). This general directive is followed by a list of exceptions in subsections 2.09(1)(a) through 2.09(1)(h) that may be required to achieve any of the following objectives: (a)permitting the child to have a relationship with each parent for a specified amount of time;(b)accommodating the child's "firm and reasonable" preferences; (c)keeping siblings together if doing so is necessary to their welfare; (d)protecting "the child's welfare when the presumptive allocation under this section would harm the child because of a gross disparity in the quality of the emotional attachment between each parent and the child or in each parent's demonstrated ability or availability to meet the child's needs";(e)taking account of a pri-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

or agreement of the parents that is appropriate to consider in light of specified circumstances;(f)avoiding allocations "of custodial responsibility that would be extremely impractical or that would interfere substantially with the child's need for stability" in light of specified circumstances;(g)dealing with parental relocation; and(h)"to avoid substantial and almost certain harm to the child."

[FN351]. See The Family Support Act of 1988, 42 U.S.C. § 667(a) (1994). TANF is the successor to the previous AFDC (Aid to Families with Dependent Children) program.

[FN352]. See Jane C. Venohr & Robert G. Williams, The Implementation and Periodic Review of State Child Support Guidelines, 33 Fam. L.Q. 7, 10 (1999) (listing the following models:"(1) Percentage of Obligor Income; (2)Income Shares;(3)Melson formula; or(4)the Massachusetts/District of Columbia hybrid of the percentage of obligor income model").

[FN353]. See id. at 8.

[FN354]. See Grace Ganz Blumberg, Balancing the Interests:The American Law Institute's Treatment of Child Support, 33 Fam. L.Q. 39, 41 (1999).

[FN355]. See id. at 44-45. The "marginal expenditure formula" holds that "an absent parent's child support obligation should generally be the marginal amount (expressed as a percentage of obligor income) that the absent parent would contribute to the support of the child if the absent parent were sharing a home with the child and the child's custodial, or residential, parent." Id. at 42. The "Massachusetts formula" makes a "preliminary assessment" of gross income earned by the obligor and then increases the amount payable as child support as the child grows older, topping out at age 18. Id. at 44 & n.10.

[FN356]. See Principles of the Law of Family Dissolution §§ 3.03-3.06 (Tentative Draft No. 3, Part II 1998).

[FN357]. See Blumberg, supra note 354, at 47 (defining cognizable interests as those "that are taken into account in establishing the operative objectives of Chapter 3").

[FN358]. See Principles of the Law of Family Dissolution, supra note 356, § 3.03; Blumberg, supra note 354, at 47.

[FN359]. Principles of the Law of Family Dissolution, supra note 350, § 6.03(1).

[FN360]. See id. § 6.03(2).

[FN361]. See id. § 6.03(6).

[FN362]. See id. § 6.01(2).

[FN363]. See id. §§ 7.01-7.15.

[FN364]. See Kay, supra note 322, at 36 (calling for "a nonpunitive, nonsexist, and nonpaternalistic" framework for marriage dissolution).

[FN365]. See Ira Mark Ellman, Inventing Family Law, 32 U.C. Davis L. Rev. 855, 875-76 (1999) (describing how he and his two ALI Co-Reporters went about the task of replacing the traditional family law rules of discretion with principles that set out a presumptively correct result embodying the Institute's value choices, and requiring a judge who believes a departure from the result is necessary to explain that departure in written findings).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN366]. See, e.g., National Organization for Women v. Operation Rescue, 726 F. Supp. 1483 (E.D. Va. 1989) (enjoining demonstrators), aff'd 914 F.2d 582 (4th Cir. 1990), rev'd in part, vacated in part, and remanded sub nom. Bray v. Alexandria Women's Health Clinic, 506 U.S. 263 (1993).

[FN367]. 42 U.S.C. § 1985(3) (1994).

[FN368]. Bray, 506 U.S. at 310 (Stevens, J., dissenting) (footnote omitted).

[FN369]. See 18 U.S.C. § 248 (1994) (providing both criminal penalties and civil remedies against anyone who commits violent, threatening, obstructive, and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services).

[FN370]. See Cheffer v. Reno, 55 F.3d 1517 (11th Cir. 1995); United States v. Wilson, 73 F.3d 675 (7th Cir. 1995), cert. denied, 519 U.S. 806 (1996), on remand, 2 F. Supp.2d 1170, 1172 (E.D. Wis. 1998) (finding defendant Wilson guilty of violating FACE and rejecting his argument that he did not interfere with the receipt or provision of "reproductive health services" since he was preventing the killing of babies; ruling that "the defendants, by admitting that their motive for obstructing the clinic was to protect pre-born babies from being killed in their mothers' wombs, admit to a motive proscribed by the statute"); American Life League, Inc. v. Reno, 47 F.3d 642 (4th Cir. 1995), cert. denied, 516 U.S. 809 (1995). A motion by Randall A. Terry and Operation Rescue to vacate a permanent injunction against their activities on the ground that FACE had rendered it moot was denied in New York State National Organization of Women v. Terry, 159 F.3d 86 (2d Cir. 1998), cert. denied sub nom. Pearson v. Planned Parenthood Margaret Sanger Clinic, 119 S. Ct. 2336 (1999).

[FN371]. See David Samuels, The Making of a Fugitive, N.Y. Times, March 21, 1999, § 6 (Magazine), at 47.

[FN372]. See Catherine A. MacKinnon, Sexual Harassment of Working Women 32, 32-47 (1979) (identifying two types of sexual harassment:"quid pro quo" in which sex is demanded in return for job benefits, and "condition of work" in which the woman is treated as a sexual object at work, but not explicitly promised favors or threatened with punitive action).

[FN373]. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986) (holding that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment).

[FN374]. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998) (holding that if a plaintiff is harassed because of sex, Title VII does not require that the alleged harasser be of the opposite sex).

[FN375]. See Nina Totenberg, Preface, in The Complete Transcript of the Clarence Thomas-Anita Hill Hearings 5, 7 (Anita Hill ed., 1994) ("The hearings ripped open the subject of sexual harrasment like some sort of long-festering sore.").

[FN376]. See Nomination of Judge Clarence Thomas To Be Associate Justice of the Supreme Court of the United States:Hearings Before the Comm. on the Judiciary U.S. Senate, 102nd Cong., 1st sess., 1 (1993) (opening statement of Chairman Joseph R. Biden, Jr.); id. at 36-39 (testimony of Anita Hill); id. at 157-58 (testimony of Clarence Thomas) (denouncing the proceedings as a "high-tech lynching").

[FN377]. The Senate confirmed Justice Thomas by a vote of 52 to 48 on October 15, 1991. See How the Senators Voted on Thomas, N.Y. Times, Oct. 16, 1991, at A19.

[FN378]. See Totenberg, supra, note 375, at 7 (noting that Senator Carol Mosely-Braun of Illinois, who defeated Alan Dixon, one of the 11 Democrats who voted to confirm Justice Thomas, in the primary, became the first of four women who were newly elected to the United States Senate in 1992); the other three were Dianne Feinstein and Barbara Boxer of California, and Patty Murray of Washington.

[FN379]. See Michael X. Delli Carpini & Ester R. Fuchs, The Year of the Woman? Candidates, Voters, and the 1992 Elections, 108 Pol. Sci. Q. 29, 35-36 (1993) (noting that the women's campaign fund more than doubled its receipts and Emily's List quadrupled its donations from 1990 to 1992; that more women ran for public office in 1992 than ever before in the nation's history, and that women scored record successes in state offices (except for governorships) and at the national level). But see Marian Lief Palley, Elections 1992 and the Thomas Appointment, PS:Pol. Sci. & Pol., March 1993, at 28, 29 (1993) (noting that, although the November 1992 electorate was 54% female and 46% male, some women lost elections in states and districts where women voters outnumbered men voters).

[FN380]. Justice Ginsburg took the oath of office on August 10, 1993. See The Supreme Court Justices 535 (Clare Cushman ed., 2d ed. 1995).

[FN381]. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 26 n.* (1993) (Ginsburg, J., concurring) (observing that "it remains an open question whether 'classifications based upon gender are inherently suspect'") (citation omitted); see also supra text accompanying notes 284-299.

[FN382]. 518 U.S. 515 (1996). In Virginia, the Court invalidated the single-sex admissions policy of the Virginia Military Institute, and announced a "skeptical scrutiny of official action denying rights or opportunities based on sex" in these terms:

> Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is "exceedingly persuasive." The burden of justification is demanding and it rests entirely on the State. The State must show "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.

Id. at 531-33 (citations omitted).

[FN383]. See Cass Sunstein, The Supreme Court, 1995 Term-- Foreword:Leaving Things Undecided, 110 Harv. L. Rev. 4, 73 (1996) (declaring that "Virginia heightens the level of scrutiny and brings it closer to the 'strict scrutiny' that is applied to discrimination on the basis of race").

[FN384]. 388 U.S. 1 (1967) (holding Virginia's miscegenation statute invalid); see supra text accompanying notes 108-118.

[FN385]. See Baker v. Nelson, 191 N.W.2d 185 (1971), appeal dismissed, 409 U.S. 810 (1972).

[FN386]. See Singer v. Hara, 522 P.2d 1187 (1974), review denied, 84 Wash. 2d 1008 (1974).

[FN387]. See Baehr v. Lewin, 852 P.2d 44 (1993). On remand, the trial court held that the state had failed to bear its burden of overcoming the presumption that the statute was unconsitional by demonstrating that it furthered compelling state interests and was narrowly drawn to avoid unnecessary abridgement of constitutional rights. See Baehr v. Miike, CIV. No. 91-1394, 1996 WL 694235, (Haw. Cir. Ct. Dec. 3, 1996) The Hawaii Supreme Court dismissed the case in light of the 1998 constitutional amendment adopted by the voters. See Lyle Denniston, Hawaii Court Rules Against Gay Marriage, S.F. Chron., Dec. 11, 1999, at A1. See infra note 390.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN388]. See U.S. Const. art. IV, § 1.

[FN389]. See, e.g., Barbara J. Cox, Same-Sex Marriage and Choice-of-Law:If We Marry in Hawaii, Are We Still Married When We Return Home?, 1994 Wis. L. Rev. 1033; Deborah M. Henson, Will Same-Sex Marriages Be Recognized in Sister States? Full Faith and Credit and Due Process Limitations on States' Choice of Law Regarding Marital Status and Incidents of Homosexual Marriage Following Hawaii's Baehr v. Lewin, 32 J. Fam. L. 551 (1994); Candace L. Sage, Sister-State Recognition of Valid Same-Sex Marriages:Baehr v. Lewin--How Will it Play in Peoria?, 28 Ind. L. Rev. 115 (1994); Thomas M. Keane, Note, Aloha, Marriage? Constitutional and Choice of Law Arguments for Recognition of Same-Sex Marriage, 47 Stan. L. Rev. 499 (1995).

[FN390]. Haw. Rev. Stat. Ann. § 572-1 (Michie 1997). The constitutionality of this provision would appear to be doubtful, given the rationale of Baehr. See Baehr, 852 P.2d at 60, 67 (construing the Hawaii marriage statute to restrict the marital relation "to a male and a female" and remanding for trial on the constitutionality of the provision as thus construed). Nonetheless, on December 9, 1999, the Hawaii Supreme Court interpreted the 1998 amendment as having revived the 1995 statute restricting the issuance of marriage licenses to couples of the opposite sex. See Lyle Denniston, Hawaii Court Rules Against Gay Marriage, S.F. Chron., Dec. 11, 1999, at A1, A14.

[FN391]. See H.R. 117, 19th Leg. (1997).

[FN392]. See David L. Chambers and Nancy D. Polikoff, Family Law and Gay and Lesbian Family Issues in the Twentieth Century, 33 Fam. L. Q. 523, 529 (discussing the legal status of the same sex marriage litigation in Hawaii after the 1998 election).

[FN393]. See Jennifer Wriggins, Maine's 'Act to Protect Traditional Marriage and Prohibit Same-Sex Marriages':Questions of Constitutionality Under State and Federal Law, 50 Me. L. Rev. 345, 347-48 (1998).

[FN394]. H.R. 3396, 104th Cong., 2d Sess. (1996) (enacted).

[FN395]. See Eric Schmitt, Panel Passes Bill to Let States Refuse to Recognize Gay Marriage, N.Y. Times, June 13, 1996, at A15.

[FN396]. See 142 Cong. Rec. H7505-06 (daily ed. July 12, 1996); 142 Cong. Rec. S10129 (daily ed. Sept. 10, 1996).

[FN397]. See Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (codified at 1 U.S.C. § 7 (Supp. II 1997)). DOMA contains two substantive provisions. Section 2 exempts states from any obligation imposed by the Full Faith and Credit Clause or its implementing statute "to give effect to any public act, record, or judicial proceeding or any other State, territory, possession, or tribe, respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship." Section 3 defines the terms "marriage" and "spouse" for the purpose of federal law, including eligibility for federal benefit programs, as follows:"The word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife."

[FN398]. See, e.g., Andrew Koppelman, Same-Sex Marriage, Choice of Law, and Public Policy, 76 Tex. L. Rev. 921 (1998); Andrew Koppelman, Dumb and DOMA:Why the Defense of Marriage Act is Unconstitutional, 83 Iowa L. Rev. 1 (1997); Scott Ruskay-Kidd, Note, The Defense of Marriage Act and the Overextension of Congressional Authority, 97 Colum. L. Rev. 1435 (1997); see also authorities cited supra note 389.

[FN399]. See Herma Hill Kay, Same-Sex Marriage in the Conflict of Laws:A Critique of the Proposed "Defense of Mar-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page68 of 73
Page 67

riage Act" in The Civil Law in the 21st Century:Festschrift in Honor of Koji Ono on the Occasion of his 60th Birthday 902, 906-11 (1997) (arguing that DOMA is superfluous for conflict of laws purposes); Larry Kramer, Same-Sex Marriage, Conflict of Laws, and the Unconstitutional Public Policy Exception, 106 Yale L.J. 1965, 1999-2007 (1997) (arguing that the public policy exception, counted on by opponents of single-sex marriage to permit states to decline to recognize marriages not permitted in the forum, is unconstitutional, thus making DOMA essential for non-recognition, but concluding that DOMA was beyond the power of Congress).

[FN400]. See Barber v. Barber, 62 U.S. (21 How.) 582, 584 (1859) (recognizing in dictum a voluntary "domestic relations exception" for the federal courts); see also Homer H. Clark, Jr., The Law of Domestic Relations in the United States 414-16 (2d ed. 1988); Ruskay-Kidd, supra note 398, at 1467-82. But see Adams v. Howerton, 673 F.2d 1036 (9th Cir.), cert. denied, 458 U.S. 1111 (1982) (declining to admit a male alien to the United States as the "spouse" of a male American citizen despite the couple's having obtained a marriage license and participating in a marriage ceremony in Colorado, reasoning that Congress had established its own definition of a "spouse" for purposes of the immigration laws). Adams was decided at a time when the INS refused to admit homosexuals as immigrants under the "psychopathic personality" exception, subsequently removed in 1990. See Robert J. Foss, The Demise of the Homosexual Exclusion:New Possibilities for Gay and Lesbian Immigration, 29 Harv. C.R.-C.L. L. Rev. 439 (1994).

[FN401]. See Marjorie Dick Rombauer, Marital Status and Eligibility for Federal Statutory Income Benefits:A Historical Survey, 52 Wash. L. Rev. 227 (1977); see also Kristian D. Whitten, Section Three of the Defense of Marriage Act:Is Marriage Reserved to the States?, 26 Hastings Const. L.Q. 419, 421, 444-58 (1999) (arguing that section 3 so "seriously impairs a state's power to define the 'marriage' relationship for its people" that it violates the Tenth Amendment).

[FN402]. See Herma Hill Kay, Private Choice and Public Policy:Confronting the Limitations of Marriage, 5 Austl. J. Fam. L. 69, 81-84 (1991); see also William N. Eskridge, Jr., The Case for Same Sex Marriage (1996); Richard A. Posner, Should There Be Homosexual Marriage? And If So, Who Should Decide?, 95 Mich. L. Rev. 1578, 1578-79 (1997) (book review) (noting that, while Eskridge's case for legislative reform is "a powerful one," and that "it would not trouble me if a state were persuaded by it and adopted such a law[,]" the case is "unconvincing" that "the courts, in the name of the Constitution should force acceptance of same-sex marriage on all the states at once").

[FN403]. 744 A.2d 864 (Vt. 1999).

[FN404]. Id. at 884.

[FN405]. Id. at 886.

[FN406]. Id.

[FN407]. See Carey Goldberg, Vermont's High Court Extends Full Rights to Same-Sex Couples, N.Y. Times, Dec. 21, 1999, at A1; Editorial, Vermont's Momentous Ruling, N.Y. Times, Dec. 22, 1999, at A30; Editorial, A Vermont Ruling Advances Gay Rights, S.F. Chron., Dec. 22, 1999, at A28.

[FN408]. See Carey Goldberg, Forced to Act on Gay Marriage, Vermont Finds Itself Deeply Split, N.Y. Times, Feb. 3, 2000, at A1 (describing legislative hearings).

[FN409]. See Carey Goldberg, Vermont's House Backs Wide Rights for Gay Couples, N.Y. Times, Mar. 17, 2000, at A1 (noting that the vote was 76 to 69, and that the bill is expected to pass "more easily" in the senate in April and that Governor Howard Dean has said he will sign it).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN410]. See H.847, Vermont House of Representatives, Sec. 3, adding 15 V.S.A. Chapter 23, § 1201(2), § 1204(a), (visited May 26, 2000) http:// www.leg.state.vt.us/docs/2000/bills/intro/H-847.HTM. Governor Dean signed the bill on April 26, 2000. See N.Y. Times, April 27, 2000, at A19.

[FN411]. Id. at sec. 1(15) "a parallel system of civil unions does not bestow the status of civil marriage...". See also sec. 1(4) ("Civil marriage under Vermont's marriage statute consists of a union between a man and a woman").

[FN412]. See supra note 397.

[FN413]. See Douglas B. Harris, The Rise of the Public Speakership, 113 Pol. Sci. Q. 193, 195-200 (1998).

[FN414]. See Gary C. Jacobson, The 1994 House Elections In Perspective, 111 Pol. Sci. Q. 203, 203, 209 (1996) (noting that "[a]lthough the contract got some attention, in the media and was a target of Democratic counterattacks, most voters went to the polls blissfully unaware of its existence.").

[FN415]. Christian Coalition, Contract with the American family 1 (May 1995) (on file with author).

[FN416]. Id. at 19.

[FN417]. See The Legal Services Act of 1974, 42 U.S.C. § 2996 (1994).

[FN418]. See Christian Coalition, supra note 415, at 25.

[FN419]. See supra text accompanying notes 59-85.

[FN420]. Others had made the same point earlier. See Lynn D. Wardle, No-Fault Divorce and the Divorce Conundrum, 1991 BYU L. Rev. 79, 116-119 ("[I]t is apparent that the significant rise in the divorce rate in the United States did not begin until the no-fault divorce reform movement was well-underway.").

[FN421]. See, e.g., Robert M. Gordon, Note, The Limits of Limits on Divorce, 107 Yale L.J. 1435, 1438-41 (1998). In homes characterized by a high degree of marital conflict, however, children may be better served if their parents do not remain together. See Donna Ruane Morrison & Mary Jo Coiro, Parental Conflict and Marital Disruption:Do Children Benefit When High-Conflict Marriages are Dissolved?, 61 J. Marriage & Fam. 626, 636 (1999) (finding, based on a study of 727 children between the ages of 4 and 9 in 1988 who lived in intact families to determine the relation between parents' marital conflict and childrens' level of behavior problems in 1994, that "frequent marital conflict has a deleterious effect on children, possibly even exceeding the adverse effects of physical separation or divorce").

[FN422]. See Laura Bradford, Note, The Counterrevolution:A Critique of Recent Proposals to Reform No-Fault Divorce Laws, 49 Stan. L. Rev. 607, 607 (1997).

[FN423]. See id. at 618-19.

[FN424]. See, e.g., Divorce Reform at the Crossroads, supra note 241; Symposium on Family Law, 1991 BYU L. Rev. 1; Symposium, Twenty-Five Years of Divorce Revolution, 1994 Utah L. Rev. 501.

[FN425]. Even Lynn Wardle, whose critique of no-fault divorce was one of the most trenchant, disavowed a "root and branch" approach. Though he maintained that "[m]any of the problems that prompted the adoption of no-fault grounds for divorce, such as hostile litigation, deceit in legal processes, the existence of a 'gap' between law and practice, and loss of privacy, still remain-- disguised and perhaps embedded more firmly in the legal and social fabric than they were

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

twenty years ago," (Wardle, supra note 420, at 135) he explained that reforming "the first generation of no-fault divorce laws....does not mean we should 'turn the clock back' and reenact 1950s-era divorce laws." Id. at 137.

[FN426]. Some argued that the fault initiatives were out of line with Supreme Court decisions safeguarding individual privacy within the family and therefore possibly unconstitutional, see, e.g., Bradford, supra note 422, at 621-32; others believed that measures ostensibly designed for the protection of children actually harmed them, see, e.g., Gordon, supra note 421, at 1456-61.

[FN427]. See Ira Mark Ellman and Sharon Lohr, Marriage as Contract, Opportunistic Violence, and Other Bad Arguments for Fault Divorce, 1997 U. Ill. L. Rev. 719, 725 & n.18.

[FN428]. Ira Mark Ellman, The Misguided Movement to Revive Fault Divorce, And Why Reformers Should Look Instead to The American Law Institute, 11 Int'l J. L. Pol. & Fam. 216, 225 (1997) (footnote omitted).

[FN429]. See Ira Mark Ellman, The Place of Fault in Modern Divorce Law, 28 Ariz. St. L. J. 773, 789-802 (1996) (arguing that it is unnecessary and unproductive to encourage marital tort claims to be presented in dissolution suits); see also Ira Mark Ellman and Stephen D. Sugarman, Spousal Emotional Abuse as a Tort?, 55 Md. L. Rev. 1268 (1996) (exploring whether spousal emotional abuse should be a tort, and concluding that it is probably a mistake).

[FN430]. See Linda D. Elrod et al., A Review of the Year in Family Law:Children's Issues Dominate, 32 Fam. L.Q. 661, 715 (1999) (Chart 4:Grounds for Divorce and Residency Requirements). It should be remembered, as Chart 4 makes clear, that 34 states still retain fault grounds for divorce, having simply added their no-fault ground to the existing list.

[FN431]. Spaht, supra note 5, at 69-70 (footnotes omitted).

[FN432]. Id. at 87-88, 107-08 (noting that ["i]f a spouse agrees to a covenant marriage, divorce requires proof of fault in the nature of adultery, conviction of a felony and a sentence of imprisonment at hard labor or death, abandonment (for one year) physical or sexual abuse of a spouse or child of the parties, habitual intemperance or cruel treatment and a period of time living separate and apart thereafter"). As originally introduced, the Covenant Marriage Bill permitted only two grounds for the dissolution of a Covenant Marriage:adultery and abandonment for one year. See id. at 123.

[FN433]. Id. at 108 & n.292. Louisiana's "no-fault" ground for a regular marriage is voluntary separation for one year.

[FN434]. La. Rev. Stat. Ann. § 9.273(A)(1) (West 1999).

[FN435]. See Spaht, supra note 5, at 89-90.

[FN436]. See id. at 95 (footnote omitted).

[FN437]. See id. at 97.

[FN438]. See id. at 97-98.

[FN439]. See id. at 98, 100.

[FN440]. See id. at 103-05 (observing that nonpecuniary losses include "embarrassment, mental anguish, humiliation, and psychological damage" and pointing out that sums awarded "need not be nominal").

[FN441]. Id. at 78-79.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case3:09-cv-02292-VRW   Document204-11   Filed09/23/09   Page71 of 73

[FN442]. See id. at 79.

[FN443]. Id. at 79-80 (footnote omitted).

[FN444]. Id. at 78 & n. 61.

[FN445]. See id. at 80 & n.73 (noting that "[a]n important function of law, i.e., tort and contract, is to punish. It seems particularly appropriate to punish a spouse for breaching his promise which was made solemnly and which is of such importance to third parties, principally his children but also to society at large").

[FN446]. Id. at 107.

[FN447]. See supra text at note 69.

[FN448]. See Christine B. Whelan, No Honeymoon for Covenant Marriage, Wall St. J., Aug. 17, 1998, at A14.

[FN449]. Spaht, supra note 5, at 71-72.

[FN450]. See id. at 73 & n.35.

[FN451]. See, e.g., Jeanne Louise Carriere, "It's Deja Vu All Over Again":The Covenant Marriage Act in Popular Cultural Perception and Legal Reality, 72 Tul. L. Rev. 1701 (1998); Amy L. Stewart, Covenant Marriage:Legislating Family Values, 32 Ind. L. Rev. 509 (1999); but see Gary H. Nichols, Note, Covenant Marriage:Should Tennessee Join the Noble Experiment?, 29 U. Mem. L. Rev. 397, 460 (1999) (concluding, after a lengthy review of pros and cons, that "the Legislature should provide a law which affirms that marriage is important and that couples should not enter marriage without serious consideration").

[FN452]. Ariz. Rev. Stat. Ann. § 25-903(8) (1999). See also Ira Mark Ellman et al., Teacher's Manual for Family Law, Cases, Text, Problems 27-34 (3d ed. 1998).

[FN453]. See Nichols, supra note 451, at 457 (noting that, as of October 27, 1998, 19 states, including Louisiana, had had or had at the time, covenant marriage bills pending in the state legislature).

[FN454]. 20 U.S.C. § 1681(a) (1994).

[FN455]. See N.Y. Times, July 11, 1999, at A1, A19.

[FN456]. See Kay & West, supra note 12, at 1059 (the phrase "equal play" was created by former co-author Ruth Bader Ginsburg to apply to claims of sex segregation in athletics).

[FN457]. See Debra Baker, The Fight Ain't Over, 85 A.B.A. J. 52, 55 (1999) (noting that neither measure used the text of the federal equal rights amendment that passed Congress in 1972).

[FN458]. Id. at 54. See also supra text accompanying notes 380-383.

[FN459]. Id. at 55 (going on to note that, while concerns about drafting women may have faded, "abortion rights and gay marriage continue to be real concerns").

[FN460]. See id. at 55-56.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN461]. See Margaret Talbot, The Little White Bombshell, N.Y. Times, July 11, 1999, § 6 (Magazine), at 39.

[FN462]. See Gina Kolata, U.S. Approves Abortion Pill, N.Y. Times, Sept. 29, 2000, at A1.

[FN463]. See id.

[FN464]. Spaht, supra note 5, at 70.

[FN465]. See id. at 71.

[FN466]. Degler, supra note 2, at 395.

[FN467]. Elisabeth S. Scott, Rehabilitating Liberalism in Modern Divorce Law, 1994 Utah L. Rev. 687.

[FN468]. Id. at 722. She also notes that "[i]n the commercial setting, a relational contract is one that extends indefinitely over time, and that may serve multiple varied purposes, creating a complex interdependent relationship." Id. at 723.

[FN469]. See Glendon, supra note 246, at 81 ("In Sweden and in most American states, where there is no legal obstacle to unilateral divorce on nonfault grounds, a 'right' to divorce exists in the popular sense....[T]he virtually universal understanding in practice is that the breakdown of a marriage is irretrievable if one spouse says it is.").

[FN470]. Black's Law Dictionary 839 (6th ed. 1990).

[FN471]. Id.

[FN472]. Id.

[FN473]. Id.

[FN474]. Some empirical evidence shows that a pattern of two phases of decline in marital quality is normative over a 10-year period, occurring after four years of marriage, then stabilizing, and declining again at about the eighth year of marriage. See Lawrence A. Kurdek, The Nature and Predictors of the Trajectory of Change in Marital Quality for Husbands and Wives Over the First 10 Years of Marriage, 35 Developmental Psychol. 1283, 1293-95 (1999). Although the researcher does not claim that the couples studied were representative, since they were disproportionately white and college educated, the sample was fairly large, including 522 newlyweds at year 1, and ending with 93 newlyweds at year 10. The suggestion of identifiable periods of marital reexamination lends support to a pattern of marital interaction that fits quite nicely with a joint venture analogy. See also Marvin v. Marvin, 18 Cal. 3d 660, 684, 557 P. 2d 106, 122, 134 Cal. Rptr. 815, 831 (1976) (listing joint ventures among other possible legal relationships available to couples who choose to live together in nonmarital cohabitation).

[FN475]. I have shown this elsewhere. See Herma Hill Kay, Legal and Social Impediments to Dual Career Marriages, 12 U.C. Davis L. Rev. 207, 211-18 (1979).

[FN476]. See id. at 219-20.

[FN477]. See Ruth Bader Ginsburg, Gender and the Constitution, 44 U. Cin. L. Rev. 1, 42 (1975) ("The breadwinning male/homemaking female division of functions deserves neither special favor nor condemnation by the law. It is a pattern individuals should be free to adopt or reject, without government coercion.").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN478]. See Kay, Models of Equality, supra note 299, at 63-77.

[FN479]. See generally Arlie Hochschild, The Second Shift:Working Parents and the Revolution at Home (1989). See also Marion Crain, "Where Have All the Cowboys Gone?" Marriage and Breadwinning in Postindustrial Society, 60 Ohio St. L. J. 1877, 1932-62 (1999) (advocating a reduction of the forty-hour work week and integrating paid work with family life as a way of facilitating egalitarian co-provider marriage.).

[FN480]. These attitudes were manifested most recently in the support by the Mormon and Catholic churches for Proposition 22 on the 2000 California primary ballot. Proposition 22 added Section 308.5 to the Family Code, to read as follows:"Only marriage between a man and a woman is valid or recognized in California." Calif. Voter Information Guide, March 7, 2000 Primary Election, p. 132. Proponents of Proposition 22 raised $10 million for the campaign, with the help of the Mormon and Catholic churches. After the measure was approved by a vote of 61 to 39% of voters, President Gordon Hinckley of the Church of Jesus Christ of Latter Day Saints thanked California voters for their support. Stressing the Mormon position as "pro-family" rather than "anti-gay," Hinckley characterized the vote as having upheld "a moral issue of great importance." S.F. Chron., March 9, 2000, at A6. See also Robert Nugent, The U.S. Catholic Bishops and Gay Civil Rights, 38 Catholic Lawyer 1 (1998) (reporting on the Vatican's 1992 document on potential gay rights legislation).

[FN481]. See Baptists in Texas Reject a Call for Wives to 'Submit' to Husbands, N.Y. Times, Nov. 10, 1999, at A2 (reporting that the Texas convention refused to accept an amendment overwhelmingly adopted in 1988 by the 15.7 million-member Southern Baptist Convention which declared that "A wife is to submit graciously to the servant leadership of her husband, even as the church willingly submits to the headship of Christ"). A spokesperson for the Southern Baptist Convention said the Texas convention had rejected "a clear teaching of the Bible."

[FN482]. Katharine T. Bartlett, Feminism and Family Law, 33 Fam. L. Q. 475, 500 (1999). See also Ira Mark Ellman, Divorce Rates, Marriage Rates, and the Problematic Persistence of Traditional Marital Roles, 34 Fam. L. Q. 1, 21-42 (2000) (exploring the "hypothesis of an inverse connection between gender income equality and marriage rates, mediated by resistence to changing gender roles" and concluding that encouraging marriage may replace preventing divorce as the new social concern).

[FN483]. See Glendon, supra note 246, at 88-91; see also Judith T. Younger, More Light Thoughts and Night Thoughts on the American Family, 17 L. & Ineq. J. 723, 734-37 (1999).

[FN484]. See Rhode and Minow, supra note 241, at 209-10; see also Kay, supra note 196, at 88-89.

[FN485]. Stephen D. Sugarman, Dividing Financial Interests on Divorce, in Divorce Reform at the Crossroads, supra note 241, at 130, 152.

[FN486]. See Herma Hill Kay, Commentary:Toward a Theory of Fair Distribution, 57 Brook. L. Rev. 755, 759-61 (1991).

[FN487]. See Kay, supra note 163, at 1225-30.

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.