# Exhibit N

# LAW OFFICES OF ANDREW P. PUGNO

andrew@pugnolaw.com

September 29, 2008

Station Managers
California Broadcast and Cable Television Stations

>Re:  **ProtectMarriage.com – Yes on 8 TV ad**
>      **"Whether you like it or not"**

Dear Station Managers:

The undersigned serves as general counsel for the official proponents of Proposition 8 and *ProtectMarriage.com – Yes on 8*, a Project of California Renewal. This letter provides the basic substantiation for the campaign's first television advertisement, entitled "Whether you like it or not". Additional information and documentation is available upon request.

The advertisement addresses three likely consequences of the Supreme Court's recent decision in *In Re Marriage Cases* (2008) 43 Cal.4th 757 and the failure to pass Proposition 8 to amend the state constitution to restore the definition of marriage as only between a man and a woman. The advertisement makes three general claims, each of which is supported as follows.

## I.   "People sued over personal beliefs."

A well documented trend in current litigation is claims against private individuals and organizations who morally object to homosexual relationships. These suits usually arise under California's laws forbidding discrimination on the basis of sexual orientation in employment, public accommodations, and housing.

An unprecedented holding of the *In Re Marriage Cases* decision was that *the traditional definition of marriage* "realistically must be viewed as discriminating against gay persons on the basis of their homosexual orientation" (*In Re Marriage Cases* (2008) 43 Cal.4th at 840.) As a result, private individuals and organizations that fail or refuse to honor same-sex *marriages* are now subject to lawsuits brought under all state laws forbidding discrimination on the basis of sexual orientation. This is a significant expansion of legal liability for individuals, employers, businesses, churches, as well as charitable and educational institutions.

Also significant is that the Supreme Court in *In Re Marriage Cases*, for the first time ever, elevated same-sex couples to the status of a "protected class" for purposes of all statutes that forbid different treatment on the basis of sexual orientation. (*In Re Marriage Cases* (2008)

Tel (916) 608-3065
Fax (916) 608-3066
www.pugnolaw.com

101 Parkshore Drive
Suite 100
Folsom, CA 95630

**DEFINT_PM_003184**

43 Cal.4[th] 757, 840-841.)  This highest legal standard is the same degree of "strict scrutiny" applied to enforce laws forbidding discrimination based on *race*.  As a result, the authority for legal action against those who oppose same-sex marriage on personal grounds, under state laws banning sexual orientation discrimination, is now much stronger than prior to the gay marriage ruling, and will lead to an explosion of "people [being] sued over personal beliefs."

These likely consequences are well-recognized in contemporary published analysis.  As reported by National Public Radio immediately following the Supreme Court's decision:

> In recent years, some states have passed laws giving residents the right to same-sex unions in various forms. Gay couples may marry in Massachusetts and California. …
>
> Armed with those legal protections, same-sex couples are beginning to challenge policies of religious organizations that exclude them, claiming that a religious group's view that homosexual marriage is a sin cannot be used to violate their right to equal treatment. Now "parochial" schools, "parachurch" organizations such as Catholic Charities and businesses **that refuse to serve gay couples are being sued — and so far, the religious groups are losing.**

(Barbara Bradley Hagerty, *When Gay Rights and Religious Liberties Clash*, NPR 6/13/2008.)

Without a doubt, expanded government recognition of same-sex relationships as marriage will only further support lawsuits against individuals who object to such relationships on the basis of religious or "personal beliefs":

> As states have legalized same-sex partnerships, **the rights of gay couples have consistently trumped the rights of religious groups.** Marc Stern, general counsel for the American Jewish Congress, says that does not mean that a pastor can be sued for **preaching against same-sex marriage.** But, he says, that **may be just about the only religious activity that will be protected.**
>
> "What if a church offers marriage counseling? Will they be able to say 'No, we're not going to help gay couples get along because it violates our religious principles to do so? What about summer camps? Will they be able to insist that gay couples not serve as staff because they're a bad example?" Stern asks.
>
> **Stern says if the early cases are any guide, the outlook is grim for religious groups.**

(Barbara Bradley Hagerty, *Gay Rights, Religious Liberties: A Three-Act Story*, NPR 6/13/2008.)

September 29, 2008
Prop 8 Ad: *"Whether you like it or Not"*

In a recent publication, Stern also acknowledges that enforced recognition of same-sex marriage will result in a wide range of legal problems for private individuals, including "restriction on speech against same-sex marriage in public employment and educational contexts, and elsewhere in the public square; the withholding of licenses and accreditations from professionals and institutions that oppose same-sex marriage and civil rights laws that prohibit discrimination in employment, public accommodations, housing, and education." (Douglas Laycock (editor), *Same-Sex Marriage and Religious Liberty: Emerging Conflicts*, Becket Fund for Religious Liberty (2008).)

Moreover, legal scholars are increasingly recognizing that laws requiring recognition of same-sex relationships will result in *successful* lawsuits against businesses and religious groups that serve the public, overriding religious freedoms:

> Georgetown University professor Chai Feldblum says it is a compelling case of what happens in a moment of culture clash. Feldblum, who is an active proponent of gay rights, says the culture and state laws are shifting irrevocably to recognize same-sex unions. And while she knows it's hard for some to hear, she says **companies and religious groups that serve the public need to recognize that their customers will be gay couples.**
>
> "They need to start thinking now, proactively, how they want to address that. **Because I do think that if a gay couple ends up being told their wedding cannot be filmed, five couples will not sue, but the sixth couple will."**
>
> And as one legal expert puts it, the **gay couples "would win in a walk."**

(Barbara Bradley Hagerty, *Gay Rights, Religious Liberties: A Three-Act Story*, NPR 6/16/2008).)

There are numerous examples of individuals and organizations who have been sued for their personal beliefs against same-sex relationships:

- Health care: In *North Coast Women's Care Medical Group, Inc. v San Diego Superior Court*, the California Supreme Court held that two doctors' personal religious beliefs against same-sex relationships did not insulate them from civil liability for refusing to perform artificial insemination requested by a same-sex couple when the same service was available to opposite-sex couples.

- Housing: In New York City, Yeshiva University's Albert Einstein College of Medicine, a school under Orthodox Jewish auspices, banned same-sex couples from its married dormitory. In 2001, New York State's highest court ruled Yeshiva violated New York City's ban on sexual orientation discrimination. Yeshiva now allows all same-sex couples in the dorm.

- Counseling services:   A mental health counselor at North Mississippi Health Services refused therapy for a woman who wanted help in improving her lesbian relationship. The counselor said doing so would violate her religious beliefs. The counselor was fired for discrimination.

- Adoption services:   Catholic Charities of Boston was forced to close its adoption services in Massachusetts after that state legalized same-sex marriage and directed that adoption services must place children with same-sex couples, contrary to the religious beliefs of the Catholic Church.

- Small businesses:   In April 2008, the New Mexico Human Rights Commission ruled against a private photographer when a lesbian couple filed a complaint that the photographer's refusal to photograph a same-sex commitment ceremony constituted discrimination in public accommodations.   The photographer was found guilty of discrimination and ordered to pay more than $6,000 in attorney fees to the prevailing complainant. (*Vanessa Willock v. Elane Photography.*)

- Community programs:   In Iowa, the Des Moines Human Rights Commission found the local YMCA in violation of public accommodation laws because it refused to extend "family membership" privileges to a lesbian couple that had entered a civil union in Vermont.   The YMCA was forced to recognize gay and lesbian unions as "families" for membership purposes, or lose $102,000 in government support for the YMCA's community programs.

- Public facilities: A religious organization was charged with illegal discrimination and had its tax-exempt status partially revoked by the New Jersey Division of Civil Rights, Office of the Attorney General, after a same-sex couple filed complaints against the Ocean Grove Camp Meeting Association for refusing to allow the couple to use its property to perform a same-sex commitment ceremony. The property owner's religious beliefs were determined to *not* be a sufficient justification for the group, which generally made its property available to the public for heterosexual weddings, to exclude same-sex couples. (*Bernstein and Paster v. Ocean Grove Camp Meeting Association*, DCR Docket No. PN34XB-03008.)

In short, the claim that the gay marriage ruling will result in more "people [being] sued over personal beliefs" is substantially supported by: the Supreme Court's elevation of same-sex relationships to protected class status; its determination that honoring only traditional marriage violates state laws that forbid discrimination on the basis of sexual orientation; and the growing list of examples where private individuals and organizations are successfully sued over their personal beliefs against same-sex relationships.

///

Page 5 of 9
September 29, 2008
Prop 8 Ad: *"Whether you like it or Not"*

## II.     "Churches could lose their tax exemption."

This claim is supported by specific examples, as well as the growing body of legal commentary about the possibility of churches losing their tax-exempt status for retaining policies and practices that are contrary to government recognition of same-sex marriage.

In the *Ocean Grove Camp Meeting Association* case, *supra,* a church-sponsored organization's tax-exempt status was revoked in connection with a boardwalk pavilion on its property that was generally made available to the public for traditional weddings, but not for same-sex commitment ceremonies. The church's constitutional "free exercise of religion" rights were held *not* to be a sufficient to avoid being targeted for enforcement of New Jersey's anti-discrimination laws. (Jill P. Capuzzo, *Group Loses Tax Break Over Gay Union Issue*, The New York Times, 9/18/2007.)

The potential for the IRS and other taxing authorities to revoke the tax-exempt status of churches has also been recently examined by Jonathan Turley, a law professor at George Washington University. His analysis in included in a new collection of written works by seven distinguished Constitutional scholars, on both sides of the same-sex marriage issue, who all agree that same-sex marriage poses a direct threat to the civil liberties of religious Americans who oppose homosexuality and support traditional marriage. (Douglas Laycock (editor), *Same-Sex Marriage and Religious Liberty: Emerging Conflicts*, Becket Fund for Religious Liberty (2008).)

In 2000, the Board of Supervisors of the City and County of San Francisco enacted legislation calling on the IRS to investigate and revoke the tax-exempt status of the LDS Church for its support of traditional marriage and Proposition 22.

Most recently, law professor Robert DeKoven of California Western School of Law has argued that churches and other religious that oppose same-sex marriage and support Proposition 8 should lose their tax-exempt status. (Robert DeKoven, *Anti-Gay Clergy Should Fear Backlash*, Gay & Lesbian Times 7/2/2008.)

The issue has also been raised in pro-gay rights publications:

> **Could churches in time risk their tax-exempt status by refusing to marry gays?**
>
> That remains to be seen and will likely result in a steady stream of court battles.
>
> Chai Feldblum, a lesbian and professor of law at Georgetown University, said lawsuits in this area are inevitable ...

(Joey Diguglielmo, *Answering tough questions raised by Calif. Ruling: Legal experts address concerns over adoption, church weddings, more*, Washington Blade 5/30/2008.)

DEFINT_PM_003188

Page 6 of 9
September 29, 2008
Prop 8 Ad: *"Whether you like it or Not"*

Finally, because the Supreme Court in *In Re Marriage Cases* declared same-sex couples to be a "protected class" and likened the traditional definition of marriage to invidious racial discrimination, there is significant potential for the IRS and state taxing authorities to revoke the tax-exempt status of churches and other private religious institutions such as schools, adoption agencies, clinics, retreat centers, etc., *notwithstanding the religious freedoms of those groups.* That is because United States Supreme Court precedent indicates that religious freedoms are generally *not* a sufficient justification for religious organizations to retain policies that treat individuals differently on the basis of a protected class status. (See *Bob Jones Univ. v. United States* (1983) 461 U.S. 574, 604 (holding the IRS could, under a "common law" public interest requirement in the statute governing tax-exempt charitable status, revoke the tax-exempt status of organizations that are contrary to established public policy; and that the federal government's compelling interest in eradicating racial discrimination outweighed the private university's religious freedoms.)

In light of these legal authorities and the current legal debate over this issue of tax-exempt status for religious organizations that oppose same-sex marriage, there is substantial justification for the claim that, as a result of the State Supreme Court's gay marriage ruling, "Churches could lose their tax exemption."

## III.   "Gay marriage taught in public schools."

This claim is based on three principles: (1) marriage is a topic covered in family life and health education classes in most public schools; (2) Education Code statutes banning sexual orientation bias in public education will not allow teachers to continue presenting marriage as only between a man and a woman; and (3) the natural result that gay marriage will be taught in public schools has already proven itself in Massachusetts when same-sex marriage was legalized in that state.

### 1.   Marriage is taught in public schools.

The California Comprehensive Sexual Health and HIV/AIDS Prevention Act (Educ. Code, §§ 51930 *et seq.*) provides for both comprehensive sexual health education and HIV/AIDS prevention instruction. The HIV/AIDS component is mandatory, but comprehensive sexual health education is optional. However, a study commissioned by ACLU of Northern California, the results of which are cited and relied upon by the California Department of Education, finds that **96%** of California school districts provide comprehensive sexual health education. (*Sex Education in California Public Schools* (PB Consulting and ACLU Northern California, 2003).)[1]

These 96% of school districts that offer comprehensive sexual health education are required to comply with the requirements of the state law, which state: "**Instruction and materials shall teach respect for marriage** and committed relationships." (Educ. Code, §

---

[1] See http://www.aclunc.org/docs/reproductive_rights/sex_ed_in_ca_public_schools_2003_full_report.pdf?ht=.

DEFINT_PM_003189

51933(b)(7).)[2]    The Department of Education's website confirms that "school districts are not required to provide comprehensive sexual health education, **but if they choose to do so, they shall comply with all of the requirements**" of Section 51933. (Emphasis in original.) [3]

Pursuant to these statutes, the State Board of Education has adopted Health Education Content Standards that also include instruction on "Essential Concepts" regarding marriage. (*See* Health Education Content Standards for California Public Schools, Standard HS.1.G.3: *"Discuss the characteristics of healthy relationships, dating, committed relationships, and marriage."* Adopted March 2008.)[4]  The CDE's Health Curriculum Framework similarly calls for instruction on marriage:

> Honor and respect for monogamous, heterosexual **marriage** should be an important emphasis of the curriculum at this level. Students should be able to contrast a dating relationship with a **marriage** relationship. Dating can be a way to learn about other people, about romantic feelings and expressions, and about what it is like to be in a love relationship. **Marriage** is a legal commitment that a man and a woman make to share their lives and family responsibilities.

(Health Framework for California Public Schools, Kindergarten Through Grade Twelve, page 136.)[5]

It is beyond dispute that marriage *is* taught in almost all public schools.

### 2.    Under *In Re Marriage Cases*, educators cannot continue to teach children that marriage is only between a man and a woman.

While gay marriage is legal in California, new legislation effective January 1, 2008 legally requires teachers to present both traditional and same-sex marriage as equal when giving instruction that in any way involves marriage.   The new legislation provides that: "No teacher shall give instruction nor shall a school district sponsor any activity that promotes a discriminatory bias because of a characteristic listed in Section 220." (Educ. Code, § 51500, as amended by Stats. 2007, ch. 569 (S.B. 777), § 29.)  Section 220, in turn, lists the characteristic of "sexual orientation".  However, the traditional definition of marriage, according to the Supreme Court, "realistically must be viewed as discriminating against gay persons on the basis of their *homosexual orientation*" [6]--- a bias strictly forbidden in the classroom under the Education Code.

---

[2] Similarly, curriculum should include instruction about "the legal… aspects and responsibilities of **marriage**". (Educ. Code, § 51890(a)(1)(D).)
[3] Comprehensive Sexual Health Education, CDE Website: http://www.cde.ca.gov/ls/he/se/sexeducation.asp
[4] Available at http://www.cde.ca.gov/be/ag/ag/yr08/documents/mar08item11.doc .
[5] Available at http://www.cde.ca.gov/ci/cr/cf/documents/healthfw.pdf .
[6] *In Re Marriage Cases* (2008) 43 Cal.4th 757, 840 (emphasis added)

DEFINT_PM_003190

Page 8 of 9
September 29, 2008
Prop 8 Ad: *"Whether you like it or Not"*

Therefore, a public school teacher's failure to present same-sex and opposite-sex marriage equally would unquestionably constitute a violation of the new Education Code provision that prohibits "instruction… that promotes a discriminatory bias" on the basis of sexual orientation. <u>It simply lacks credibility for opponents to argue that, even while gay marriage is legal in California, teachers may continue to instruct children that marriage is a heterosexual-only relationship.</u>

Also, with specific reference to the topic of *marriage,* the Education Code explicitly forbids mentioning marriage in a way that reflects a discriminatory bias on the basis of sexual orientation. The same code section (§ 51933) that states "[a] school district that elects to offer comprehensive sexual health education … shall teach respect for marriage" also provides: "If a school district elects to offer comprehensive sexual health education… the school district shall comply with the following: …*Instruction and materials may not reflect or promote bias against any person on the basis of [sexual orientation].*" (Educ. Code, § 51933(d)(2), referring to the list of prohibited biases in § 220.) As noted above, the Supreme Court has expressly stated that the traditional definition of marriage *is* sexual orientation discrimination.

The claim that gay marriage will be taught in public schools was a subject of litigation over the arguments appearing in the official voters pamphlet. In that case, the Superior Court ruled that it is "an accurate statement of the law" for Proposition 8's proponents to claim as follows, which appears in the final voter pamphlet:

> State law may require teachers to instruct children as young as kindergarteners about marriage. (Education Code §51890.) If the gay marriage ruling is not overturned, TEACHERS COULD BE REQUIRED to teach young children there is *no difference* between gay marriage and traditional marriage."
>
> We should not accept a court decision that may result in public schools teaching our kids that gay marriage is okay.

(*Jenkins v. Bowen*, Sacramento Superior Court, Case No. 34-2008-00017366, at p. 3 and Exh. A.) This ruling was not appealed by the No on 8 litigants.

In short, for several different reasons and based on multiple legal authorities, the claim that "Gay marriage [will be] taught in public schools" is completely substantiated.

### 3.    It has already happened in Massachusetts.

On November 18, 2003, a divided Supreme Judicial Court of Massachusetts held, in *Goodridge v. Department of Public Health*, 798 N.E.2d 941 (2003), that the state constitution mandates the recognition of same-sex marriage. In a recent court decision involving the teaching of gay marriage in public schools after it was legalized in that state, the 1st Circuit Court of Appeals noted:

Page 9 of 9
September 29, 2008
Prop 8 Ad: *"Whether you like it or Not"*

> Given that Massachusetts has recognized gay marriage under its
> state constitution, *it is entirely rational for its schools to educate
> their students regarding that recognition.*

(*Parker v. Hurley* (1st Cir.2008) 414 F.3d 87, 95 (emphasis added).)

In that case, a teacher in the Estabrook Elementary School in Lexington, Massachusetts, read aloud to her classroom of second-grade students *King and King*, a book that depicted a gay marriage between two princes. The parents of one of the students in that class, Joey Wirthlin, requested but were denied both notice of such instruction and an opportunity to exempt their child from such instruction about gay marriage. The Court observed:

> Joey has a more significant claim, both because he was required to
> sit through a classroom reading of *King and King* and because that
> book affirmatively endorses homosexuality and gay marriage. It is
> a fair inference that the reading of *King and King* was precisely
> *intended* to influence the listening children toward tolerance of gay
> marriage.

(*Parker v. Hurley* (1st Cir.2008) 414 F.3d 87, 106 (emphasis in original).)

Ultimately, the court in *Parker* ruled that the state's interest in educating public school children about gay marriage outweighed the religious freedoms and parental rights of parents who object to same-sex marriage on moral grounds. In particular, the Court ruled that Joey Wirthlin's parents had no right to advance notice or to withdraw their child from such instructions in the public schools.

Because California has legalized same-sex marriage, and such legalization was followed in Massachusetts by gay marriage being taught in public schools, there is substantial evidence to claim that the same will happen here in California.

Thank you for your attention. Please contact me directly if there are any questions, (916) 608-3065.

Very truly yours,

ANDREW P. PUGNO
Attorney at Law