Pages 1 - 73

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vaughn R. Walker, Chief Judge

Kristin Perry, et al.,          )
                                )
          Plaintiffs,           )
                                )
  VS.                           )     NO. C 09-2292 VRW
                                )
Arnold Schwarzenegger, et       )
al.,                            )
                                )
          Defendants.           )
_____ )


San Francisco, California
Friday, September 25, 2009

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    GIBSON, DUNN & CRUTCHER
                    333 South Grand Avenue
                    Los Angeles, California  90017
          BY:  **CHRISTOPHER D. DUSSEAULT**
               **ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, N.W.
                    Washington, D.C. 20036
          BY:  **MATTHEW D. MCGILL**
               **ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:        Kelly L. Bryce, CSR No. 13476
                    Court Reporter Pro Tem

          Computerized Transcription By Eclipse

1   **APPEARANCES**:   (CONTINUED)

2   For Plaintiffs:

3                                  GIBSON, DUNN & CRUTCHER
                                   555 Mission Street - Suite 3000
                                   San Francisco, California  94105
4                         BY:  **ENRIQUE A. MONAGAS**
                              **SARAH E. PIEPMEIER**
5                             **ATTORNEYS AT LAW**

6                                  BOIES, SCHILLER & FLEXNER LLP
                                   1999 Harrison Street - Suite 900
7                                  Oakland, California 94612
                          BY:  **JEREMY M. GOLDMAN**
8                             **ATTORNEY AT LAW**

9   For Plaintiff Intervenors:
                                   DENNIS J. HERRERA
10                                 OFFICE OF THE CITY ATTORNEY
                                   1390 Market Street - Seventh Floor
11                                 San Francisco, California 94102
                          BY:  **RONALD P. FLYNN**
12                            **DEPUTY CITY ATTORNEY**

13                                 DENNIS J. HERRERA
                                   OFFICE OF THE CITY ATTORNEY
14                                 City Hall - Room 234
                                   1 Dr. Carlton V. Goodlett Place
15                                 **SAN FRANCISCO, CALIFORNIA 94102**
                          BY:  **MOLLIE LEE**
16                            **DEPUTY CITY ATTORNEY**
    For Defendants:
17                                 Mennemeier Glassman & Stroud LLP
                                   980 9th Street - Suite 1700
18                                 Sacramento, California 95814
                          BY:  **KENNETH C. MENNEMEIER (VIA TELEPHONE)**
19                            **ATTORNEY AT LAW**

20                                 Attorney of the Office General
                                   1300 I Street - 17th Floor
21                                 Sacramento, California 95814
                          BY:  **GORDON B. BURNS**
22                            **DEPUTY SOLICITOR GENERAL**

23

24

25

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant Intervenors:
                         COOPER & KIRK
 3                       1523 New Hampshire Avenue, N.W.
                         Washington, DC 20036
 4             BY:  CHARLES J. COOPER
                    JESSE PANUCCIO
 5                  ATTORNEYS AT LAW

 6                       ALLIANCE DEFENSE FUND
                         15100 N. 90th Street
 7                       Scottsdale, Arizona 85260
               BY:  BRIAN W. RAUM
 8                  ATTORNEY AT LAW

 9                       ALLIANCE DEFENSE FUND
                         101 Parkshore Drive - Suite 100
10                       Folsom, California 94630
               BY:  TIMOTHY D. CHANDLER
11                  ATTORNEY AT LAW

12                       LAW OFFICES OF ANDREW P. PUGNO
                         101 Parkshore Drive - Suite 100
13                       Folsom, California 95630
               BY:  ANDREW PERRY PUGNO
14                  ATTORNEY AT LAW

15

16

17

18

19

20

21

22

23

24

25
```

<u>Friday - September 25, 2009</u>                              <u>10:05 a.m.</u>

               **THE CLERK:**  Calling Civil Case 09-2292, Kristin

Perry, et al. versus Arnold Schwarzenegger, et al.

               Can I get appearance for the plaintiffs, please.

               **MR. DUSSEAULT:**  Good morning, Your Honor.  Chris

Dusseault of Gibson, Dunn & Crutcher on behalf of the

plaintiffs.

               **THE COURT:**  Good morning.

               **MR. DUSSEAULT:**  Good morning.

               **MR. McGILL:**  Good morning, Your Honor.  Matthew

McGill of Gibson, Dunn & Crutcher for the plaintiffs.

               **MR. MONAGAS:**  Good morning, Your Honor.  Enrique

Monagas for the plaintiffs.

               **MS. PIEPMEIER:**  Good morning, Your Honor.  Sarah

Piepmeier also with Gibson, Dunn for the plaintiffs.

               **MR. FLYNN:**  Good Morning, Your Honor.  Ron Flynn,

City and County of San Francisco, for plaintiff intervenor City

and County of San Francisco.

               **THE COURT:**  Good morning.

               **MS. LEE:**  Good Morning, Your Honor.  Mollie Lee,

City and County of San Francisco, also for the plaintiff

intervenor City and County of San Francisco.

               **MR. GOLDMAN:**  Good morning, Your Honor.  Jeremy

Goldman, Boies, Schiller & Flexner.

1          **THE COURT:**  Very well.

2          **MR. COOPER:**  Good morning, Mr. Chief Judge.  Chuck

3    Cooper of Cooper & Kirk for the defendant intervenors.  I would

4    like to introduce the Court to my colleague, Mr. Jesse

5    Panuccio.

6          **MR. PANUCCIO:**  Good morning, Your Honor.

7          **MR. COOPER:**  And I'd like to ask the Court's special

8    permission, since his pro hac motion is pending, that the Court

9    allow him to sit with me at counsel today above the bar.

10          **THE COURT:**  Well, that would be fine.  I trust that

11    you vouch for him.

12          **MR. COOPER:**  Without reservation.

13          **THE COURT:**  Good.  All right.  That will be fine.

14          **MR. RAUM:**  Good Morning, Your Honor.  Brian Raum,

15    Alliance Defense Fund, for the defendant intervenor.

16          **MR. CHANDLER:**  Timothy Chandler, Alliance Defense

17    Fund, defendant intervenor.

18          **MR. BURNS:**  Deputy Solicitor General Gordan Burns

19    for the Attorney General.

20          **THE COURT:**  Good morning.

21          **MR. BURNS:**  Good Morning.

22          **THE COURT:**  Very well.  And I believe we have

23    Mr. Mennemeier on the telephone representing the Governor; is

24    that correct?

25          **MR. MENNEMEIER:**  Yes, Your Honor.

1          **THE COURT:**  Very well.  Mr. Mennemeier indicated

2   that he did not think that he needed to weigh in on this issue

3   and, to save money, which is a pressing concern of the State

4   these days, that he thought telephone appearance would be

5   appropriate, and I agreed to do that.

6          In thinking about the problem that you've presented,

7   I've done a little thinking and some research on something that

8   I've not heretofore been familiar with, that is the law in

9   California that applies to individuals and organizations that

10  sponsor initiative and referenda that are placed before the

11  voters, and have taken a look at the Political Reform Act of

12  1974, which is codified in the Government Code and some

13  provisions in the Election Code.

14          And, so, at the outset, before we get into the

15  specific arguments on the issue that is before us this morning,

16  I'd like a little help from both sides, since I'm sure you're

17  far more knowledgeable on these subjects than am I.  And tell

18  me a bit about the requirements that apply to individuals and

19  organizations, in this case ProtectMarriage.com is the

20  organization as I understand it, that sponsor and put before

21  the voters an initiative measure.

22          Some of these questions probably should be directed

23  first to you, Mr. Cooper, since ProtectMarriage.com is your

24  organization.  When was that entity organized?

25          **MR. COOPER:**  Your Honor, the Court kindly assumes a

1   level of knowledge with these State Court provisions that I'm

2   frank to confess to the Court, with some embarrassment, that

3   I'm not an expert on, but I have at hand a genuine expert on

4   this in the courtroom.  His name is Andy Pugno, Andrew Pugno.

5   He was the ad hoc general counsel to ProtectMarriage, and with

6   the Court's permission I think the Court would be edified very

7   much if I would call my colleague to the podium to treat to

8   these questions.

9           **THE COURT:**  That certainly would be fine.

10          **MR. COOPER:**  Thank you.

11          **THE COURT:**  Mr. Cuneo, is it?

12          **MR. COOPER:**  Pugno, P-U-G-N-O.

13          **THE COURT:**  Thank you.

14          Good morning.

15          **MR. PUGNO:**  Good morning, Your Honor.  I cannot say

16   that I was expecting to have to visit with you this morning.

17          **THE COURT:**  I beg your pardon?

18          **MR. PUGNO:**  I cannot say that I was expecting to

19   visit with you and talk about this this morning.

20          **THE COURT:**  Well, this is a discovery dispute and,

21   so, we don't need be too formal about it.

22          **MR. PUGNO:**  ProtectMarriage.com, Yes on 8, is a

23   ballot, primarily formed Ballot Measure Committee.  There are

24   different kinds of Ballot Measure Committees.  One is primarily

25   formed when its sole purpose is the passage or defeat of one

1    ballot measure.  And, so, ProtectMarriage.com is registered as

2    such a committee, as a creature of statute of the Political

3    Reform Act.  And I would say that it was either -- I want to

4    say that it was October or November of 2007.

5              THE COURT:  2000 what?

6              MR. PUGNO:  And '7.

7              THE COURT:  Okay.

8              MR. PUGNO:  Roughly one year before the election

9    date.  It was roughly around the time that the official

10   proponents which, under the Elections Code, has a different

11   standing.  Only a registered elector, a voter, can sponsor a

12   ballot measure.  A nonprofit organization, a Ballot Measure

13   Committee cannot submit to the Attorney General to begin the

14   process an initiative.  Only a registered voter can.  So in

15   this case there were five registered voters that together

16   submitted the measure to begin the process.

17             THE COURT:  And those five registered voters are the

18   intervenors here; is that correct?

19             MR. PUGNO:  They're five of the six intervenors.

20             THE COURT:  Five of the six.

21             MR. PUGNO:  Yes.

22             THE COURT:  So there were six?

23             MR. PUGNO:  The sixth intervenor is the committee,

24   the creature of statute.

25             THE COURT:  I see.  But the registered voters for

1    purposes of putting the initiative on the ballot were the five

2    individual intervenors here; is that correct?

3            **MR. PUGNO:**  That's correct.

4            **THE COURT:**  All right.

5            **MR. PUGNO:**  And then a Ballot Measure Committee

6    primarily formed can also be a vanilla variety or what's called

7    a sponsored committee.  In this case it was sponsored in that

8    it's administrative.

9            The California Renewal, a California nonprofit

10   organization, basically said, "We're going to create this

11   creature of statute and that's going to be this campaign

12   committee."  And, so, in this case you will see a project of

13   California Renewal in the name of the committee, which by law

14   the sponsor of the committee has to be named in the committee's

15   legal name as registered with the State.  So that's why it has

16   a long name.

17           **THE COURT:**  Okay.  Now, once formed, how long does

18   one of these organizations have to remain in existence?

19           **MR. PUGNO:**  Well, the committee can terminate at any

20   time.  However, most of the time they go on, if the initiative

21   makes the ballot and the campaign proceeds and concludes,

22   generally speaking there is a postelection audit conducted by

23   the State to make sure that all the expenditures were correctly

24   reported and all the contributions were correctly reported, and

25   that all expenditures were authorized by law under the

1  Political Reform Act.

2          And then you get either a fine from the Fair

3  Political Practices Commission or a clean bill of health, and

4  at that point you're permitted to terminate the committee and

5  it ceases to exist.

6          So the lifespan of a committee, of a registered

7  committee, begins at the point that a statement of organization

8  is filed with the State and it ends when a statement of

9  termination is filed.

10          **THE COURT:**  What is the present status of

11  ProtectMarriage.com?

12          **MR. PUGNO:**  It is still a registered Ballot Measure

13  Committee, and it is awaiting the conclusion of that audit,

14  which often takes a year to a year and a half after the

15  election day.

16          **THE COURT:**  I see.  So that audit has not been

17  completed and, thus, the termination has not yet taken place.

18          **MR. PUGNO:**  That's right.  We're not permitted to

19  terminate the committee until we have that audit report from

20  the State.

21          **THE COURT:**  Is that audit ongoing or what's the

22  status?

23          **MR. PUGNO:**  The State asks for documents and then

24  they're supplied, and they may ask for more, it's a back and

25  forth.  And if they find an irregularity, maybe a missing page,

1   they'll say, "Go look for that"; and, so, we're still in the

2   middle of that audit.  We started but it is not completed.

3          **THE COURT:**  Okay.  Now, does one of these

4   organizations have officers and directors like a corporation?

5          **MR. PUGNO:**  Unlike a corporation in California,

6   which has to have by law certain officers and directors, the

7   creature of statute, the Ballot Measure Committee, may have

8   multiple what are called responsible officers.  In this case,

9   the only responsible officer, as far as the State is concerned,

10  is the Treasurer David Bauer.  It only takes one person.

11          I guess the term "committee" is a misnomer because

12  it really is a vehicle for conducting a campaign, and in this

13  case the only officer of record in the filings with the Fair

14  Political Practices Commission and with the Political Reform

15  Division of the Secretary of State is David Bauer, the

16  treasurer of the committee.

17          **THE COURT:**  Okay.  Now he's not a party to this

18  action?

19          **MR. PUGNO:**  That's correct.

20          **THE COURT:**  And what is the relationship to the

21  committee as -- I'm sorry, to ProtectMarriage.com as it

22  presently exists of the individual intervenors here, the

23  individual defendant intervenors?

24          **MR. PUGNO:**  Could you restate that question for me?

25          **THE COURT:**  What is the relationship to

1    ProtectMarriage.com --

2             **MR. PUGNO:**  Between the intervenors, the registered

3    voters?

4             **THE COURT:**  Yes.  Between Mr. Hollingsworth,

5    Ms. Knight -- is it Gutierrez?

6             **MR. PUGNO:**  Gutierrez, Tam, and Jansson.

7             **THE COURT:**  -- Tam and Jansson.

8             **MR. PUGNO:**  Sure.  Those five electors had special

9    things that they -- and the responsibilities and duties and

10   rights and privileges under the Election Code that they carried

11   out as official proponents.  They pointed to

12   ProtectMarriage.com and said, "This is who we would like to

13   manage this campaign."

14            **THE COURT:**  So the way to think about them, from a

15   legal point of view, would be as directors of the organization;

16   is that fair?

17            **MR. PUGNO:**  Not at all, Your Honor.

18            **THE COURT:**  Okay.  How is that incorrect?

19            **MR. PUGNO:**  Well, because under California law, once

20   the official proponents -- the official proponents have a duty

21   and then responsibility and powers unto themselves.  Any

22   organization or any group of people or any one person can go

23   out and form a Ballot Measure Committee.  In fact there were

24   multiple committees formed and operated in support of the

25   Yes on 8 position.  I think at least three or four, maybe more.

1          On the No on 8 side there was one principal

2    committee, but there were others, kind of free actors, that

3    started their own committees as well.

4          And, so, there is -- at this moment I cannot think

5    of a legally significant connection where a proponent points to

6    a committee and says, "We govern that committee," unless they

7    were to themselves go out and register the entity as

8    themselves.

9          In this case we have a very broad coalition, a lot

10   of people involved that work with the proponents; and the

11   proponents and the rest of the coalition said, "We want to form

12   a committee and we want this treasurer to form the committee

13   for us."

14         So the proponents by virtue of their status as

15   proponents do not have any legal authority over the campaign by

16   virtue of their status having submitted the measure for the

17   voters, just in the same way that they don't have any official

18   director status over any of the other five or six organizations

19   that went out and started a Ballot Measure Committee of their

20   own.

21         THE COURT:  Well, is the implication of that that

22   ProtectMarriage.com is really an entity that's separate from

23   these five individuals or is there a connection here that --

24         MR. PUGNO:  The connection is that they were all

25   working together, that this was a coalition, and that the

1    proponents acknowledged this committee as the vehicle, the

2    creature of statute, the vehicle selected for this broad

3    coalition of many people through and by which to conduct this

4    campaign.

5            THE COURT:  Now who has possession of the books and

6    records of ProtectMarriage.com?

7            MR. PUGNO:  Well, the financial books and records

8    are all in the possession of the treasurer, David Bauer.

9            THE COURT:  Okay.  And he would be responsible,

10   then, for maintaining those and presumably making those

11   available to the auditors who come in to do the postelection

12   audit?

13           MR. PUGNO:  He has two responsibilities, both

14   dealing with the postelection audit and filing the periodic

15   statements that have to be filed for public disclosure.

16           THE COURT:  Let's see, the audit is conducted by the

17   Fair Political Practices Commission; is that correct?

18           MR. PUGNO:  Well, I'm going to have to plead a

19   little bit of ignorance.  I think that it's handed over,

20   believe it or not, to auditors of the Franchise Tax Board who

21   come in and do this for Political Reform, the Political Reform

22   Division of the Secretary of State's Office.  I blend the two

23   because the Fair Political Practices Commission also has

24   jurisdiction to investigate and prosecute failure to disclose

25   and things like that.

1          **THE COURT:**  All right.  Where are the books and

2     records of ProtectMarriage.com maintained and located?

3          **MR. PUGNO:**  I would have to say, Your Honor, in many

4     places.  I mean, there was a professional campaign manager that

5     was hired to conduct the campaign.  Many of those records are

6     located there, and we have many volunteers and independent

7     contractors who work for the campaign and with the campaign.

8          And, so, depending on what the scope of the books

9     and records of the campaign is understood to be, that would

10     define how big the circle is of where those are located.

11          I mean, there were literally hundreds of people

12     involved in this campaign.  This was a 40-million-dollar

13     campaign involving hundreds or thousands of volunteers and

14     workers all the way from the very minimal involvement to a

15     great deal of involvement.  And, so, these campaigns are

16     typically conducted in this fashion where it's a coalition and

17     lots of people involved, and the records are enormous because

18     there's a lot of work associated with qualifying and passing a

19     ballot measure.

20          **THE COURT:**  Okay.  Well, this all bears on the

21     burden issue in a discovery dispute.

22          All right.  We'll we may have some more questions on

23     this line as we go along --

24          **MR. PUGNO:**  Thank you, Your Honor.

25          **THE COURT:**  -- but that was most helpful indeed, and

1     I appreciate your assistance.

2               **MR. PUGNO:**  All right.  Thank you, Your Honor.

3               **THE COURT:**  You bet.

4               **MS. LEE:**  Your Honor, may I make one clarification?

5               **THE COURT:**  Yes.  You are?

6               **MS. LEE:**  I'm Mollie Lee, Deputy City Attorney for

7     the City and County of San Francisco, for plaintiffs

8     intervenors.

9               **THE COURT:**  Tell me your name again.

10              **MS. LEE:**  Mollie Lee.

11              **THE COURT:**  Ms. Lee.

12              **MS. LEE:**  Good morning, Your Honor.

13              **THE COURT:**  You didn't -- oh, yes, you did sign in.

14    All right.

15              **MS. LEE:**  I want to clarify the relationship between

16    the primarily formed Ballot Measure Committee

17    ProtectMarriage.com, which you were inquiring about, and the

18    five individuals who are also listed as defendant intervenors.

19              The defendant intervenors state in their own papers

20    that ProtectMarriage.com was designated by these five

21    individuals who have an official status and act in a

22    legislative capacity in proposing a ballot measure and

23    submitting it for circulation and eventually advocating for its

24    passage.

25              And in thinking about this in the larger scheme of

1    California's direct democracy, system of direct democracy, you

2    see individuals take on the specific role under the California

3    Elections Code, and they then in this case say that they

4    designated ProtectMarriage.com as the official Proposition 8

5    campaign committee.

6            And, so, to the extent that defendant intervenors

7    are now attempting to sort of disaggregate that, I think that's

8    an unfair characterization of what's going on here, where we

9    see a clear link between five individual voters who assume a

10   legislative role and the campaign committee that they designate

11   to carry out that function.

12           **THE COURT:**  What's the implication of that for

13   purposes of the discovery dispute before the Court this

14   morning?

15           **MS. LEE:**  You know, I think the implication really

16   goes to the public interests that are at stake here.  And, as

17   you note, the Political Reform Act recogni -- or you noted the

18   Political Reform Act may be relevant here; and the Political

19   Reform Act, as well as the California Constitution and other

20   open meeting and public records laws, recognize there's a

21   strong public interest in open government and in public access

22   to information about the conduct of government, which includes

23   the legislative -- access to legislative records that relate to

24   statutes and proposed constitutional amendments.

25           And, so, here when you see individuals who are

1  acting in a legislative capacity, they are assuming a

2  legislative role, and the general interest in open government

3  also extends to an interest in their activities in furtherance

4  of this legislative function.

5       THE COURT:  Well, we are getting a little ahead of

6  ourselves, and I haven't heard from Mr. Cooper; but one of the

7  questions that occurred to me in reading these papers, and in

8  fairness to both sides I should probably put this on the table,

9  is the application of California's open meeting and open

10  records laws to individuals or organizations which undertake

11  what is, in essence, a legislative function.

12       And, obviously, it's a little different when you're

13  attempting to apply those to Boards of Supervisors or City

14  Councils or the State legislature or some State commission.

15  But when citizens organize to perform that same function, there

16  would seem to be some carryover to the activities of those

17  individuals, but I can well understand the carryover may not be

18  direct.

19       MS. LEE:  Exactly, Your Honor, and if you'd like,

20  I'd be happy to speak to that later or now.

21       THE COURT:  All right.  Fine.

22       All right.  Anything further on setting the

23  groundwork before we turn to Mr. Cooper for his argument?

24            (No response.)

25       MR. COOPER:  Thank you, again, Chief Judge Walker.

1   I have nothing further on the terrain that this discovery

2   dispute is based on; and I'd like to, I guess, frame our

3   dispute by identifying what, at least by my reckoning, I think

4   we are agreed on.

5          The plaintiffs, as we understand it, are not seeking

6   production of any internal, private communications between and

7   among the defendant intervenors, which have been identified,

8   the five individuals and the committee ProtectMarriage.com,

9   number one.

10          Number two, the defendant intervenors are producing

11   and have produced and are continuing to search for and produce,

12   as we find them, all communications that were made or

13   distributed to members of the public at large, what we call

14   public communications; and that includes communications that

15   were targeted to particular types of members of the public at

16   large, such as members who have an affiliation with, say, the

17   Republican Party.

18          But what we're not producing, pending this Court's

19   consideration of our petition and its ruling, are

20   communications between and among the defendant intervenors and

21   the others that Mr. Pugno has described to you that have formed

22   an associational bond for purposes of this political activity,

23   this core political activity.  And that obviously includes

24   people as close to the ground zero, if you will, of this

25   campaign as the ad hoc Executive Committee that gave it much of

1    its direction and management; and the campaign consultants,

2    Mr. Frank Schubert, whose name has been forwarded previously;

3    and other paid consultants and agents; the donors who step

4    forward to fund this very large campaign; and the people who

5    step forward to volunteer; and these can be some pretty large

6    numbers, as Mr. Pugno has indicated.

7                But, Your Honor, the lines aren't easy to draw in

8    this case but, by our lights anyway, we think that is the line

9    that is compelled by core First Amendment issues.

10               What the plaintiffs are seeking are communications

11   between and among the defendant intervenors and any third

12   party, any third party, including members of the ad hoc

13   Executive Committee as we understand it, individual donors,

14   e-mail communications that are one on one, all the

15   communications between the political consultant that gave the

16   strategy or at least informed the strategy of this campaign,

17   and the individuals who formed to manage and to give it its

18   direction and in the fuel of funding.

19               **THE COURT:**  Who were the members of this ad hoc

20   committee?

21               **MR. COOPER:**  Your Honor, that's never been

22   disclosed.  I think I have seen -- we have admitted that

23   they're about six or eight members of the ad hoc Executive

24   Committee, some of whom had relationships with larger

25   organizations, including religious organizations, that had a

1    key and central interest in the campaign to advance

2    Proposition 8.

3            But we've never seen where -- and I don't believe,

4    Your Honor, it's ever been publically disclosed who those

5    ad hoc members were, and the law requires that donors be

6    disclosed at least if they've given a hundred dollars or more;

7    and we have thousands of donors, Your Honor, who gave $99 or

8    less, some of whom to avoid the disclosure that this very

9    discovery dispute would bring forward publically.

10           **THE COURT:**  Well, those donors who gave more than a

11   hundred dollars names are already on some Web site.  I don't

12   know whether it's an official Web site or one that's been

13   picked up in some fashion, but that information is already out

14   in the public; is it not?

15           **MR. COOPER:**  Those names are out there, yes,

16   Your Honor.

17           And one other area where we have some very important

18   agreement is, and these are the proponents' words -- excuse me,

19   the plaintiffs' words themselves, and that is that the

20   proponents' communications concerning Proposition 8 referendum

21   campaign are core political speech and are undeniably entitled

22   to First Amendment protection.

23           There's also no dispute here that the disclosure of

24   the names of those donors brought forward widespread economic

25   reprisal, widespread harassment, widespread abusive practices

1    that are detailed in our motion papers and detailed graphically

2    in another case that we've called the Court's attention to also

3    brought by ProtectMarriage.com.

4                 **THE COURT:**  Is that the case in Sacramento before

5    Judge England?

6                 **MR. COOPER:**  Yes, Your Honor.

7                 **THE COURT:**  I read that.

8                 **MR. COOPER:**  And that is the case that raises what

9    we believe are grave constitutional objections to the

10   disclosure requirement itself.

11                **THE COURT:**  Let me go back for a minute to this ad

12   hoc Executive Committee.  What role did it play in the

13   campaign?

14                **MR. COOPER:**  Your Honor, I believe that it is most

15   accurate to say that it provided the executive direction to the

16   campaign.  It made decisions relating to, for example, who the

17   campaign itself would engage for professional political

18   consulting services and such things as that, including --

19                **THE COURT:**  So it hired the consultants?

20                **MR. COOPER:**  That's among the things, yes, sir, but

21   also gave it its strategy direction in consultation with

22   obviously professional political advisers and others.

23                It was primarily responsible for giving management

24   and direction to the fundraising effort.  Many of the members

25   of the ad hoc Executive Committee were themselves large --

1    responsible for large amounts of the funding.

2              So the ad hoc Executive Committee was a group of

3    volunteers just like anyone clicking a volunteer button on the

4    Web site, but they were -- they volunteered, you know, at a

5    very intensive level in order to assist this campaign and give

6    it direction and executive management.

7              But they really weren't any different from the

8    volunteers who came to lick envelopes and stamps and help in

9    the sense that these individuals, small groups like the ad hoc

10   committee and large groups like the whole of the volunteers,

11   formed an associational bond to advance this critical, to them,

12   political effort and engage in this political activity.

13             Your Honor, to put -- and I think the First

14   Amendment, elements of the First Amendment privilege balancing

15   test that the cases that we've cited to the Court go through

16   when this kind of claim is being made to resist a discovery

17   inquiry into core political activity, the First Amendment

18   elements of that are established by agreement to the parties.

19   The parties agree this is core political speech, that there has

20   been this widespread economic and other types of reprisal.

21             The next step for this Court is to examine, well,

22   okay, what compelling interest is there for requiring this

23   disclosure, for requiring the disclosure that the plaintiffs --

24             **THE COURT:**  Before getting into exploring the First

25   Amendment privilege that you're claiming --

1          **MR. COOPER:**  Yes, Your Honor.

2          **THE COURT:**  -- and dealing only with the issue you

3     just touched upon, namely, the concern about reprisals or

4     threats of one kind or another if there were disclosures, why

5     wouldn't a protective order that required the disclosure of

6     certain materials on an attorneys'-eyes-only basis be

7     sufficient to protect against those concerns?

8          **MR. COOPER:**  Your Honor, that's a fair question.

9     It's come up -- it's come up before and in several cases, and

10    it is typically denied in the same way attorney-client

11    privilege isn't something that privileged materials are simply

12    provided to the other side on an attorneys'-eyes-only basis.

13          And this actually gets a little bit ahead of at

14    least the logic, it seems to us, of the First Amendment

15    interest at stake here, but there are three cases that have

16    permitted, that we've been able to find, a protective order

17    like the Court is suggesting.  I think we've cited them all to

18    the Court.

19          **THE COURT:**  Let's see, those cases are what?

20    They're cited in your papers?

21          **MR. COOPER:**  They are cited in our papers,

22    Your Honor.

23          **THE COURT:**  All right.

24          **MR. COOPER:**  Yes.  They're the *Christ Covenant* case

25    from the Southern District of Florida, *Anderson against Hale*

1    from the Northern District of Illinois, and *Dole against*

2    *Service Employees Union*, a Ninth Circuit case.

3              **THE COURT:**  Okay.

4              **MR. COOPER:**  And each one of those cases, and I

5    offer the *Christ Covenant* case that it seems to me is the most

6    elucidating on this point, all three of those cases involved an

7    eyes-only device but only after the Court concluded that the

8    information that was sought had overriding relevance to a

9    central issue in the case.

10             And even then, for example, in the *Christ Church*

11   case, the issue was whether or not the church should be allowed

12   to build a new facility because it claimed under a federal law

13   that its religious practices and exercise of its religious

14   freedoms were being burdened because its congregation wasn't

15   able to fit in the sanctuary anymore.  They had to turn people

16   away.

17             And, Your Honor, the town that had denied them

18   authority to build a new building then sought discovery of

19   individual members.  They wanted the members so they could go

20   and depose the members themselves.  The Court denied that

21   request limiting it to only those members who had actually been

22   turned away from a sanctuary.  The church had to identify those

23   members.  And the attorney and only the attorney could ask

24   questions only about:  Is it true you were turned away from a

25   sanctuary service?

1          The point I'm making here, Your Honor, is that the

2     circumstances which, in this balancing process, which made it

3     appropriate to invade those associational freedoms, those First

4     Amendment freedoms of protecting them, for example, the

5     membership, the names of members of a church, were overridden

6     because of the overriding relevance of the information.

7          This brings me back to a point, Your Honor, that

8     seems to me puts this into, you know, very, at least for me,

9     illuminating terms.  Suppose that the California Legislature

10    enacted an election law requiring that the official proponents

11    of a referendum measure, any referendum, were required on a

12    realtime basis during the campaign to provide the internal,

13    nonpublic kind of information that the plaintiffs seek here to

14    the opponents of the referendum, something like this open

15    meetings law perhaps.

16          Your Honor, I would submit to you that a law like

17    that would not stand a moment's chance under a First Amendment

18    review because it would go to the core of, as these discovery

19    requests do, go to the core of political associational

20    activity.

21          **THE COURT:**  Well, picking up on that and Ms. Lee's

22    point, a legislative committee, City Council that meets to

23    discuss some proposed policy must meet in open, the discussions

24    amongst the members must be on the record and open and

25    accessible to those who would oppose whatever policy is being

1    fostered.

2          Why wouldn't the same -- and that seems to not

3    interfere with the legislative process.  Why wouldn't the same

4    principle apply here when citizens undertake what is, in

5    essence, a legislative process?

6          **MR. COOPER:**  Your Honor, the first point I would

7    make is because the citizens themselves are engaged in this

8    democratic political activity themselves not as elected

9    representatives in public hearings or public mark-up sessions,

10   or things such as that.

11         Even in that context, Your Honor, I can't imagine

12   that the kind of information that plaintiffs are asking for

13   could be required of legislators even.  Their e-mail exchanges

14   with fellow legislators, their written communications with

15   individual constituents, could those things be brought forward

16   in order to test, for example, what the real purpose was as

17   opposed to the public information that was available?

18         The law we have here does not place those kinds of

19   public disclosure burdens on one of these initiative

20   committees, and I suggest to you that it couldn't.

21         **THE COURT:**  That touches on one of the reasons I was

22   interested in when ProtectMarriage.com was organized.  It would

23   seem to me -- let me be the devil's advocate here.  If you and

24   I engage in a discussion that some law ought to be changed or

25   there ought to be some initiative measure developed, of course

1   our discussions would be private discussions; but once we

2   organize a committee, register that committee with the State

3   authorities to promote that particular initiative or

4   legislative measure, then the activities associated with that

5   organization take on a different character; do they not?  They

6   are no longer private discussions subject to the kinds of First

7   Amendment protections that you're speaking about.

8           **MR. COOPER:**  Well, but, Your Honor, I believe that

9   they are.

10          **THE COURT:**  Okay.  Why?

11          **MR. COOPER:**  They continue to be private discussions

12  because there's no law that has ever suggested that they're

13  not.  And, so, the individuals who are involved in this

14  campaign, when they exchange their views and their thoughts and

15  their ideas about political strategy and things that are at the

16  very core of their freedom of political activity and speech,

17  they exchanged without any inkling of a notion that there might

18  be a statute that could be enacted, because certainly there had

19  never been, or that there might be a judge who could come along

20  and say, "Those communications that you engaged in, I want your

21  political opponents to hear them now."

22          It may well be that the law could, for future

23  political activity of this down the road, be crafted like the

24  law you're suggesting here, an open meetings kind of law.  I

25  don't think so.  I suggest to you that it would raise the

1   gravest First Amendment questions, but at least it wouldn't be

2   a retroactive disclosure of communications that were uttered in

3   a nonpublic way.

4           And communications, Your Honor, and this really is

5   also at the heart of our petition here to you as well as at the

6   heart of the First Amendment balancing test that the Courts go

7   through when this kind of discovery is sought.  And that is,

8   what private communication or nonpublic communication that any

9   of the people who formed an associational bond with one another

10  to get this thing passed or, for that matter, people who formed

11  associational bonds on the other side of it to defeat it, what

12  nonpublic communication could possibly be relevant to the

13  central issues in this case?

14          **THE COURT:**  That's quite a different argument, and

15  before we get into that, I think that's something we need to

16  talk about.

17          Is this First Amendment privilege that you are

18  contending applies here different in character from any other

19  privilege; attorney-client privilege, the priest-penitent

20  privilege, and so forth?  Is it a different privilege in any

21  qualitative sense?

22          **MR. COOPER:**  I think it is, Your Honor, in the sense

23  that its origins come from the First Amendment.  They don't

24  come from the common law the way the attorney-client privilege

25  does, even though it obviously is infused with due process

1    consideration, which are constitutional in nature; but at least

2    in that --

3              **THE COURT:**  Let me put the cards on the table.  The

4    reason I ask is, as you well know, assertion of a privilege or

5    work-product protection requires certain disclosures.  You have

6    to disclose the items that you are withholding from production,

7    identify them sufficiently so that the individual on the other

8    side or the party on the other side is able to determine

9    whether the privilege is well taken.

10             Why would that requirement not apply to this First

11   Amendment privilege that you are asserting?

12             **MR. COOPER:**  Your Honor, I don't think that

13   requirement could apply and I will put to the side the question

14   of burden the Court mentioned earlier, which would be

15   unimaginable.  But the attorney-client privilege is designed to

16   protect an attorney's communications with his client; and if

17   those communications aren't with his client, then they're not

18   protected.

19             These communications, Your Honor, they go to the

20   very identity of the individuals with whom the communications

21   are taking place.  That is the -- that is the font, if you

22   will, from which this whole line of First Amendment cases comes

23   from, the *NAACP against Alabama* case, the membership list.  It

24   is the identity of the individuals, which a privilege log

25   requires understandably, that is itself at the essence of this

1    First Amendment privilege, the identity of the donors.

2              The point here is even under the existing law, which

3    we think raises gravely serious First Amendment concerns, the

4    existing law requiring simple disclosure of the name of donors

5    above a hundred dollars, that led to the very chill in the

6    associational privileges that the First Amendment is designed

7    to prevent.

8              **THE COURT:**  I realize there are protections that the

9    cases have purported to membership lists, such as the *NAACP*

10   case many years ago and similar organizations.

11             But there's also a line of cases which holds that it

12   is quite relevant to the voters' consideration of initiative

13   and referendum to be able to identify the sponsors, the

14   individuals who are behind the particular initiative or

15   referendum.

16             So the identity of supporters of a particular

17   measure is a relevant consideration for voters, and the

18   Political Reform Act requires a fair amount of identification,

19   and that identification is consistent with the First Amendment.

20   It doesn't infringe on this First Amendment association

21   activity, does it?

22             **MR. COOPER:**  Yes, Your Honor, I do believe that just

23   the disclosure requirement, even though it is indeed supported

24   by a strong interest in public and public information

25   concerning who are the sponsors of a particular campaign

1     initiative, referendum initiative, but I also believe that the

2     First Amendment interests that are at stake at that are of core

3     importance.

4              And this -- you know, I've called your attention to

5     my friend's very fine brief in the *Citizens United* case in

6     which they themselves have challenged the federal disclosure

7     requirements under the First Amendment citing the widespread

8     economic reprisals suffered by donors disclosed in California

9     in the Prop. 8 campaign.  These implicate First Amendment

10    interests of the highest order.

11             And, Your Honor, when we are talking about more than

12    just disclosing a name, we're talking about disclosing the

13    actual content of speech like the private communication that

14    you and I might have if we were involved in this campaign, it

15    goes beyond, well beyond, in terms of its encroachment into

16    these First Amendment values, than just the name of a donor.

17             And I want to share with the Court a passage from

18    this *McIntyre* case, which I think speaks directly to the

19    issues, from the United States Supreme Court at 514 at

20    page 348.  Your Honor, that case, and we describe it very

21    succinctly in our paper, our opening paper to the Court, dealt

22    with the validity of a law requiring one Mrs. McIntyre to

23    provide her name and address on a leaflet that she distributed

24    at a middle school which urged her fellow citizens there to

25    oppose a local referendum raising taxes for educational

1   purposes.  And that's all it was, just a disclosure

2   requirement.  She was fined a hundred dollars because her

3   leaflet didn't have that disclosure on it and she refused to

4   put it on there.

5            Here's what the majority of the Supreme Court said

6   as it struck down that requirement.  And keep in mind this was

7   a woman who brought her own leaflet, nobody doubted who the

8   author was, to this gathering.  Here's what they said in

9   striking down that disclosure requirement:  (reading)

10                "We think the identity of the speaker is no

11                different from other components of the

12                document's content that the author is free to

13                include or exclude."

14                And they continue:  (reading)

15                "The simple interest in providing voters

16                with additional relevant information does not

17                justify," again, "the simple interest in

18                providing voters with additional relevant

19                information does not justify a state requirement

20                that a writer makes statements or disclosures

21                she would otherwise omit."

22            So it's very clear that not only did she have a

23   First Amendment right not to disclose her name on her leaflet,

24   but she clearly had a First Amendment right to be her own

25   editor, to not disclose what she didn't want to disclose

1    publicly.

2            And, Your Honor, could the State in this case have

3    compelled Mrs. McIntyre to disclose her drafts of that leaflet?

4    Plaintiffs seek drafts of all of my information.  Could they

5    have required Mrs. McIntyre to disclose her e-mail

6    communications with her own political confidants as she's

7    forming her own speech, her own strategy of how she will

8    persuade her fellow citizens to join her in opposing that

9    measure?  Your Honor, we submit to the Court, no.

10           And, so, the question becomes:  Is there a more

11   compelling reason in the context of this discovery?  Because I

12   can't imagine that this could have been compelled of us, this

13   kind of information, just, you know, in the open political --

14   open political arena.

15           THE COURT:  Well, that brings us to your relevancy

16   issue.

17           MR. COOPER:  Yes, Your Honor.  Yes, it does.

18           THE COURT:  All right.

19           MR. COOPER:  And in the cases, Your Honor, that have

20   gone through this balancing process, and I mentioned earlier

21   three cases that did find appealing your -- the idea you

22   suggested of a possible kind of attorneys' eyes only type of

23   protective order.

24           But, Your Honor, the key question in these cases is:

25   Well, is the information sought of overriding relevance to a

1    central issue in the case?

2              And, Your Honor, the plaintiffs haven't identified

3    any issue in this case other than voter motivation, other than

4    the purposes of this referendum, which is itself inseparable

5    from voter motivation, to say that their inquires are relevant;

6    and we would submit to Your Honor the nonpublic communications

7    of individuals involved on either side of this debate can't

8    possibly weigh.

9              **THE COURT:**  How do we determine whether a

10   communication is public or not public, and who makes that

11   determination?

12             **MR. COOPER:**  Well, you're going to make it.

13             **THE COURT:**  What's that?

14             **MR. COOPER:**  You're going to make it.

15             **THE COURT:**  Well, but that means I have to look at

16   each communication.  I'm happy to work on this case, but I

17   don't know that I want to read all of those.

18             **MR. COOPER:**  Well, here's the principle that I want

19   to submit to the Court, this is the principle and it doesn't

20   obey quantitative laws here because this principle does indeed

21   shield communications that were shared among large numbers of

22   people.  But the principle I want to suggest to the Court is

23   that a communication is public when it is distributed and

24   intended to go to members of the general public, even if it has

25   some targeting theory.

1    But it isn't public if it's going to people and is

2    intended only for people with whom you have formed what I call

3    an associational bond, a political associational bond.  These

4    rights flow from our right to associate for political purposes

5    and our right --

6         **THE COURT:**  Let's try some examples.  Obviously a

7    leaflet or a radio or television advertisement that is

8    broadcast, that clearly is a public communication.

9         **MR. COOPER:**  Yes, Your Honor.

10        **THE COURT:**  There's no question about that.

11        **MR. COOPER:**  And we've already produced those,

12   though with reservations of our right to suggest that some or

13   all of them may not be admissible when we get to our trial;

14   but, yes, Your Honor, we've produced them.

15        **THE COURT:**  Admissibility, we're not at that stage

16   now.

17        **MR. COOPER:**  True.

18        **THE COURT:**  How about mailers to identified groups,

19   say members of the Republican Party you mentioned, or members

20   of a particular organization, a church, Boy Scouts, whatever,

21   Boy Scout leaders?  We're going to send a mailer to all of the

22   Boy Scout leaders in California.  Would that be a public

23   communication?

24        **MR. COOPER:**  I believe that it would and,

25   Your Honor, the kind of inquiry we're going through right now,

1    we obviously have tried to think through and we've done a lot

2    of, you know, backing and forthing with our friends for the

3    plaintiffs; and, in fact, it was as a result of that backing

4    and forthing that our own position was adjusted.

5            Because we suggested early on in our conversations

6    with Mr. McGill, I'm told by my colleagues, that perhaps some

7    of those kinds of communications would not be public.  We, as a

8    result of those discussions, we thought better of it and they

9    would.  We do believe that they would.

10           **THE COURT:**  Okay.  What about a proponent, one of

11   the proponents meeting with a coffee klatch of some

12   organization, rather like the coffee klatches that political

13   candidates have?  They go around to churches, groups, the

14   Kiwanis Club, and whatnot, and speak to members of that

15   organization.  Is that a public communication?

16           **MR. COOPER:**  It probably is, Your Honor.  And I say

17   "probably" only because it is entirely conceivable to me that

18   it could be a gathering of people who have made known their

19   support for Proposition 8 and they want to hear how they can

20   help advance this campaign and convince their fellow

21   Californians to support it.  I believe that would not be a

22   public discussion.

23           **THE COURT:**  Would not be?

24           **MR. COOPER:**  Would not be.  If the individuals are

25   donors, for example, a coffee klatch with donors, a coffee

1    klatch with volunteers, here's -- those kinds of things; but a

2    coffee klatch of just some people who want to hear our side of

3    this and we're there to persuade, they're just members of the

4    public, yes.

5              **THE COURT:**  That suggests that the distinction

6    between private and public is a communication to the converted

7    is private; to the unconverted, it's public.

8              **MR. COOPER:**  Well --

9              **THE COURT:**  Is that the distinction?

10             **MR. COOPER:**  That is one way I think of, perhaps,

11   describing this principle I'm offering to the Court, which is:

12   Has there been some associational bond?  Do we have a political

13   association?  Are we in association one with another for First

14   Amendment purposes?  Have we joined the NAACP together?

15             And, Your Honor, this is a hard -- these are hard

16   lines.  I don't deny it.  But if we have formed -- if we are in

17   political association one with another, even if it's one with a

18   thousand others, what we say to each other and the fact of our

19   membership in the association are protected by the First

20   Amendment.  That's my submission to the Court.

21             And, as I mentioned earlier, it doesn't obey, you

22   know, quantitative lines here; and in the context of a

23   referendum fight in this state where you have, you know,

24   roughly 7,000 -- 7 million people on both sides, yes, the

25   people who have formed associational bonds can grow large.

1          We had, I'm not sure how many but 10s of thousands

2     of donors.  They stepped forward.  They sent money to support

3     this campaign.  Yes, if they -- to me, Your Honor, they clearly

4     formed associational bonds by doing that, like joining a

5     membership organization; and if they contributed more than a

6     hundred dollars, they understood, presumably, that their

7     association with this cause would be disclosed publicly.

8          So, yes, I accept the Court's characterization that

9     it does in a sense, at least the principle I'm suggesting to

10    the Court, does in a sense turn on whether you're preaching to

11    the converted or you're trying to convert people to your -- to

12    form associational bond with you.

13         **THE COURT:**  All right.  Thank you very much,

14    Mr. Cooper.

15         **MR. DUSSEAULT:**  Good morning, Your Honor.  Chris

16    Dusseault of Gibson, Dunn & Crutcher on behalf of the

17    plaintiffs.

18         Just organizationally, the way we had intended to

19    present the argument to you is, if it's acceptable to

20    Your Honor, to divide.  I would address the relevance issues

21    and the concerns that plaintiffs have raised in that regard,

22    and my colleague, Mr. McGill, would speak to the First

23    Amendment concerns.

24         **THE COURT:**  Well, you know, ordinarily I enforce a

25    rule that this is not moot court.  We have one lawyer on a

1    side.  Now, we had a little help from Mr. Cooper on an issue

2    that he properly and I can well understand did not feel

3    comfortable speaking to; but going forward, this is not moot

4    court.  So one lawyer argues each proceeding and no other

5    lawyer.

6              **MR. DUSSEAULT:**  Understood, Your Honor.  We'll

7    certainly observe that going forward.  I appreciate your

8    diligence here.

9              Let me speak very briefly to the issue that we think

10   is really an antecedent issue to the First Amendment concern,

11   which is the fact that these requests are seeking relevant

12   information and that the proponents have not established

13   otherwise in a motion which they don't --

14             **THE COURT:**  Let's begin not at the last point where

15   Mr. Cooper left off but his penultimate point.

16             What's the relevance of these third-party

17   communications?  How is that something that is going to lead to

18   admissible evidence in this case?

19             **MR. DUSSEAULT:**  Absolutely, Your Honor.  I think

20   that's the key question, and there are a number of factual

21   issues that this Court has already recognized the Court may

22   need to resolve to reach the merits of the case.

23             **THE COURT:**  Now remember, Counsel, I didn't make up

24   those factual issues.

25             **MR. DUSSEAULT:**  Absolutely.

1          **THE COURT:**  I got those out of the initial case

2     management statements that you all filed.

3          **MR. DUSSEAULT:**  Absolutely.  And we believe,

4     Your Honor, and we agree that those are issues that are

5     presented by our claims that may, depending on determinations

6     made on one issue or another, need to be reached.

7          But let me give an example.  We believe that there

8     are factual determinations before the Court about the

9     applicable level of scrutiny that applies to these claims.

10    There are factors that the courts have addressed that involve

11    factual inquiries.

12         **THE COURT:**  How does this discovery relate to those

13    factors?

14         **MR. DUSSEAULT:**  The defendant intervenors are

15    parties to this case, Your Honor.  They have chosen to become

16    involved in this case and to make factual and legal arguments

17    to the Court on particular issues; for example, the relative

18    political power of gay and lesbian individuals, immutability,

19    history of discrimination.

20         If they have documents, and I would submit public or

21    not public, that make statements that contradict the positions

22    they are taking in this case, how would that not be relevant

23    evidence?

24         And let me give you an example.  Let's just assume

25    hypothetically --

1          THE COURT:  Impeachment evidence.

2          MR. DUSSEAULT:  Impeachment evidence or admissions,

3     Your Honor.  Let's assume that --

4          THE COURT:  To what degree is the intent of a

5     legislator relevant to the validity of the legislation that he

6     sponsors?

7          MR. DUSSEAULT:  Your Honor, I believe that there are

8     cases that we have pointed to in our brief showing that the

9     intent of the proponents of the initiative is something that

10    courts should look to, in the initiative context, to discern

11    voter motivation, but my point I think is broader than that.

12         THE COURT:  Different from an elected legislator?

13         MR. DUSSEAULT:  Your Honor, honestly, I have focused

14    more on how it applies in the initiative context given that

15    that's where we are; but there are cases to which we pointed

16    the Court, including the *Washington* case, that have

17    demonstrated that in this sort of a context, the Court should

18    look at the overall campaign and the --

19         THE COURT:  Which *Washington* case?

20         MR. DUSSEAULT:  I'm sorry, Your Honor.  Let me give

21    you the cite.  The *Washington versus Seattle* case, looking at

22    statements of the proponents -- that was a Boston case I

23    believe, Your Honor -- looking at the statements of the

24    proponents to understand whether that was racially motivated.

25    It involved school integration.

1    I believe that it is relevant to that purpose, but

2    the point that I hope will be clear here is that there is

3    another maybe even more direct path to relevance here, and that

4    is admissions of particular facts.

5    And let me use as an example a fact like whether

6    sexual orientation is immutable.  This is something that has

7    been briefed in the summary judgment brief.  It's been talked

8    about.

9    Suppose hypothetically that one of the defendant

10   intervenors did or commissioned a study, a 60-page study, that

11   went through this issue and said, "We have determined that

12   sexual orientation is immutable and here's why, and we don't

13   want to get into this issue in the campaign because we're wrong

14   on it."

15   And now they're in this case and they're trying to

16   argue, as an element for not applying higher scrutiny, the

17   opposite side of exactly what their documents show.  The notion

18   that their direct on-point admissions on factual issues before

19   the Court are not only not admissible, Your Honor, but not even

20   discoverable?  We can't even go try to find out who did that

21   study, perhaps that person would be a good witness in this case

22   I think is unsupported.

23   And I would note in all the cases that the defendant

24   intervenors have offered, you don't see cases barring discovery

25   in the manner that they're seeking.

1          **THE COURT:**  That's pretty speculative, isn't it,

2     Mr. Dusseault?  Maybe you can find something a little closer to

3     home.

4          **MR. DUSSEAULT:**  Your Honor, frankly, we are in

5     something of a difficult position in that we have been denied,

6     and Mr. Cooper I think has made quite clear today that he

7     intends to continue to deny, access to any of their nonpublic

8     documents.  So, unfortunately, at this stage it is somewhat

9     difficult for us to be too specific because we have not seen

10    any of their particular documents.

11         **THE COURT:**  Well, you have had access to, I believe,

12    at least understanding Mr. Cooper's comment to suggest that you

13    had access to a very substantial amount of public commentary

14    regarding Proposition 8 by the proponents; have you not?

15         **MR. DUSSEAULT:**  Well, we have, Your Honor, been

16    provided, I think, in the last couple of weeks a body of

17    publicly disseminated documents.  And our original

18    understanding, based on their representations, was that that

19    was not targeted, that would only be things available to the

20    public at large.  Mr. Cooper now represents that they're

21    including in some of their production things to larger groups.

22         But I would submit, Your Honor, and I think the

23    defendant intervenors have shown this in their own

24    declarations, there is a real difference between what they

25    might say in their most cleansed, most public documents versus

1    what they say internally.

2              And on the issue of relevance --

3         **THE COURT:**  But if you can find in the wealth of

4    public statements some inconsistencies of the kind that you

5    just described, that would be a pretty persuasive reason to

6    open the door for some of these nonpublic communications.

7         **MR. DUSSEAULT:**  But, Your Honor, I would submit from

8    a discoverability perspective in this case, why should the

9    defendant intervenors have control over what we see?  So if

10   they have had -- let's say they've done a good job and all the

11   bad stuff is private and only the good things come out.

12        **THE COURT:**  In a campaign, it's a dream world if

13   anybody thinks cats don't come out of the bag in a political

14   campaign.

15        **MR. DUSSEAULT:**  Understood, Your Honor, but I think

16   one of the fundamental premises of liberal discovery is the

17   notion that documents that are not public are very often the

18   ones that are most candid, most probative to a case.

19             And they have submitted declarations in this case,

20   in fact specifically saying under oath, "If I knew that this

21   discussion was going to be public, I would have been more,"

22   quote-unquote, "guarded."

23             I would submit that on fact issues before the Court

24   we have a right to unguarded admissions from a relevance and

25   discoverability perspective; and that goes, we believe, to

1    issues of voter intent and motivation, but it also goes to the

2    numerous issues that we've talked about, not just level of

3    scrutiny but let's say potential state interests.  I think this

4    is a very important issue.

5              **THE COURT:**  Potential what?

6              **MR. DUSSEAULT:**  Potential state interests.

7              **THE COURT:**  Okay.

8              **MR. DUSSEAULT:**  Mr. Cooper's brief repeatedly says

9    that under their standard, the only question is whether there's

10   any conceivable basis for passing Prop. 8 and, therefore, the

11   actual intent of the voters is irrelevant.  A couple strong

12   reactions to that.

13             One is that presumes the correctness of an issue

14   that has not yet been resolved, which is the level of scrutiny.

15   And in discovery we should be permitted to take discovery that

16   would apply to any standard.

17             But maybe even more importantly, documents may very

18   well go to even the narrow issue that the defendant intervenors

19   present which is, is there any conceivable basis.

20             Again, one thing that is unique about this case,

21   Your Honor, is there is almost a complete disconnect between

22   the justifications offered in the ads and the promotions in the

23   public discourse about Prop. 8 and the ones that they're now

24   presenting to you.  They are --

25             **THE COURT:**  That's what I was driving at.  What can

1    you show in that regard?

2          **MR. DUSSEAULT:**  Well, and if there are internal

3    documents -- and again, Your Honor, I admit that we are forced

4    to speculate to some degree because we have not seen the

5    documents -- if there are documents that say, for example, one

6    possible justification is this notion of responsible

7    procreation.  Our testing and studies show that no rational

8    person could conceivably buy that.  Don't do it.  Don't talk

9    about it.  Don't put it in the ads, because no one could

10   conceivably believe it.  A statement like that is relevant even

11   to the issue as most narrowly presented by the defendant

12   intervenors.

13         Now we submit that that is, again, their best case

14   scenario.  If there is a heightened level of scrutiny, then the

15   actual intent becomes relevant and I don't believe defendant

16   intervenors have even submitted for a moment that that sort of

17   information would not be relevant.

18         But I just think it's important to note that they

19   don't get out of the relevance box that they're in by saying

20   that the question is whether a justification is rational.

21   These are political professionals who are working with this

22   campaign, working on this campaign in addition to volunteers.

23   If they have studies or documents that talk about the

24   rationality of a potential justification, the conceivability of

25   it, that is, I think, number one, admissible; and, number two,

1  at the very least something that we should be able to use as a

2  starting block.

3          The final point I'll make, Your Honor, on relevance,

4  and then I'll sit down, is the approach that the plaintiffs are

5  taking here really turns the discovery process on its head.

6  The way this works normally in the trial courts is there is

7  liberal discovery at the outset followed later, as Your Honor

8  stated earlier, by specific determinations about what's

9  admissible.

10         For the defendant intervenors to take the position

11  right now under their best view of the case we should be denied

12  virtually every document regardless of the substance -- and I

13  think that's really important.  The defendant intervenors'

14  argument about internal documents in particular has nothing to

15  do with substance.  There's just no statement they could make,

16  according to them, that could be relevant to any issue.

17         This is not the stage of a litigation where that

18  decision is made.  The documents should be produced.  If with a

19  specific document we discuss its admissibility, then we get to

20  that point.

21         We are not suggesting, as they say in their reply

22  brief, that somehow there's no limitations on discovery.  The

23  limitation that is imposed is whether our requests are tailored

24  to lead to the discovery of admissible evidence.

25         **THE COURT:**  Well, let's talk about tailoring.  Your

```
1    request number 8 is exceedingly broad:   (reading)

2                    "Any communication by the proponents with

3               any third party."

4               Well, that could cover quite a lot of individuals

5    and organizations.  And I can well understand that the

6    proponents might have a lot of this information and, in fact,

7    find it not only burdensome to respond to an inquiry that

8    broadly drafted, but to be in the position where they could not

9    reasonably be assured that they had complied with the discovery

10   request.

11              Any third party.  Now, can you not focus and narrow

12   that inquiry?  Could you address the burden objection which the

13   proponents have made?

14              MR. DUSSEAULT:  Your Honor, I suspect that we could;

15   and, in fact, we set out in the meet-and-confer process to

16   negotiate, and that's what normally happens in a case like this

17   is, you say, "Okay.  What do you really want?  What can we get

18   you?"

19              But, frankly, we were told in no uncertain terms at

20   the outset that unless it went to every member of the public,

21   we were not getting it.  So those discussions didn't go very

22   far.

23              I do think if --

24              THE COURT:  I gather some progress has been made in

25   that regard.
```

1      **MR. DUSSEAULT:**  Well, really just in the briefs,

2   Your Honor, but not really in the discussions.  We're sort of

3   learning some of these concessions in the briefs and their

4   argument.

5          But we would, I think, be willing, according that we

6   can do it, like we're doing everything else in this case in an

7   expedited way so as not to affect the schedule, to talk about

8   some reasonable limitations of third-party communications that

9   would go after the issues in the case.

10         **THE COURT:**  What limitations do you think would be

11  reasonable at least as a starting point?

12         **MR. DUSSEAULT:**  Well, I think I made reference to

13  the factual issues and the category of factual issues that

14  we've already talked about a number of times in the case.

15  Generally the level of scrutiny, the potential state interests,

16  the presence of discriminatory intent, and whether there's a

17  fundamental right involved.

18         We may be able in a meet-and-confer process to

19  identify the specific subjects, for example, where we would

20  want any documents that address those issues.  And I think we

21  can rule out -- and, again, if there's something about, and you

22  often do get documents like this in discovery, but if there's

23  something like, "Hey, let's meet at 5:00 o'clock before this

24  meeting," and they're talking to a third party, I'm not

25  suggesting that that's relevant, but the relevance is going to

1    turn on the subject matter of what they discuss.  If they get

2    into factual subjects that are at issue in this case, we would

3    think it needs to be produced.  If they don't, then we could

4    probably work out a limitation.

5              THE COURT:  Well, we've had some discussion here

6    this morning about some of the relationships that exist.

7    Mr. Cooper has mentioned the ad hoc Executive Committee.  The

8    consultants have been mentioned; and, indeed, the consultant,

9    whose name escapes me, but a speech I read in which he

10   described the campaign, which was quite forthcoming with

11   respect to various aspects of the campaign.  I should think a

12   discussion along the lines of identifying who some of these

13   third parties are would be very helpful --

14             MR. DUSSEAULT:  I think so, Your Honor.

15             THE COURT:  -- in bridging the gap.

16             MR. DUSSEAULT:  And the way we have approached

17   discovery is we started with the parties, the defendant

18   intervenors.  We have since served requests on a narrow group

19   of entities and individuals who are the political consultants

20   and advisers to the parties for this case.

21             THE COURT:  These are third-party subpoenas.

22             MR. DUSSEAULT:  We have served third-party

23   subpoenas, although I would submit, Your Honor, particularly

24   based on some of what was said today, I think that some of

25   those documents should be deemed in the possession, custody,

1    and control of ProtectMarriage.  I think if Mr. Schubert is

2    running the campaign, and I understood Mr. Pugno to say that

3    some of the documents may reside with him, I would think those

4    should be deemed to be in ProtectMarriage.com's possession,

5    custody, and control.  But we have, in abundance of caution,

6    sought a subpoena for him.

7            What we have not yet done is served subpoenas to

8    third-party groups that also worked on the campaign, and I

9    think that is something that we have some intention of doing in

10   a narrow fashion to try to get documents that may be

11   discoverable and relevant, but we had not yet done that.

12           And we don't intend, Your Honor, I think to get out

13   to every individual by any means, but there are certain bodies

14   that threw themselves completely into running this campaign and

15   trying to get this initiative passed, and they may well have

16   documents that are at the very least discoverable.

17                   THE COURT:  Very well, Mr. Dusseault, anything else?

18                   MR. DUSSEAULT:  No, Your Honor.  Thank you.

19                   THE COURT:  You are Mr. McGill?

20                   MR. McGILL:  Yes, sir.  Thank you, Your Honor.

21                   THE COURT:  Your Honor is usually the way you talk

22   to a judge.

23                   MR. McGILL:  Thank you, Your Honor, for the

24   correction.

25                   I want to address just three key points of

1    Mr. Cooper's First Amendment presentation.  The first, it bears

2    noting at the outset that defendant intervenors have chosen to

3    be a part of this litigation and that, of course, sets them

4    much apart from many of the cases they cite, including the

5    NAACP line of cases.

6              I think Mr. Cooper in his reply brief actually

7    identifies the correct way to analyze this as a constitutional

8    matter, and that's the question of whether compliance with

9    normal discovery burdens, normal party discovery burdens in

10   effect constitutes an unconstitutional condition on their right

11   to proceed in this litigation.

12             And the cases that they cite as illustrative of the

13   fact that a plaintiff can also bring this kind of First

14   Amendment privilege claim -- the *Christ Church* case, the *Beinin*

15   case, the *Black Panther* case -- all those cases have in common

16   is that -- what they have in common is that the plaintiffs in

17   those cases had rights under federal law that they were seeking

18   to vindicate in that litigation.

19             So that the discovery basically did present them

20   with the Hobson's choice of either vindicating their rights

21   under federal law -- in the *Christ Church* case it was the

22   RyuPa, rights under RyuPa; in *Beinin* it was a copyright claim;

23   and the *Black Panther* case it was a Section 1985 claim --

24   either vindicate your rights under those federal laws or give

25   up your First Amendment rights.

1              And the key difference in this case is that the

2      defendant intervenors have no rights at stake in this

3      litigation.  They have no rights that they are seeking to

4      vindicate of their own in this litigation, and that means that

5      it's not an unconstitutional condition to require them to

6      comply with normal discovery.

7              The second point would be, even under the typical

8      First Amendment privilege analysis, if they get in the First

9      Amendment door, then under the Ninth Circuit's decision in

10     *Dole*, it's their burden, they have to establish a prima facie

11     burden that the disclosure will result in harassment,

12     membership withdrawal, or discouragement of new members, or

13     other chilling of members' associational rights.

14             The declarations that appended to the motion simply

15     don't meet that burden.  The Ninth Circuit emphasized the

16     evidence has to contain objective and articulable facts which

17     go beyond broad allegations or subjective fears.  That's

18     page 1460 of 950 F.2d in the *Dole* case.

19             If you actually walk through what the declarations

20     say, for instance, the Prentice declaration, paragraph 14, he

21     says:  (reading)

22                  "I would have done things differently.  My

23                  communications would have been more guarded.  We

24                  would have warned people that their

25                  communications might be subject to disclosure."

1          That doesn't make him appreciably different from

2     many other clients I have who are on the wrong side of

3     discovery; but above and beyond that, there's no allegation of

4     a chilling effect in that declaration.  There's no allegation

5     that if he complies with the discovery burdens in this case,

6     that he is actually going -- that his speech will be -- that he

7     will not engage in the associational activities in which he's

8     currently engaged.

9          The Schubert declaration is actually

10    indistinguishable from the declaration the Ninth Circuit found

11    insufficient in the prior iteration of the *Dole* case.  There in

12    the first version, or I believe at that point it was known as

13    SEU1, in SEU1, the Ninth Circuit said -- looked at a

14    declaration from the attorney of the union that basically

15    opined, based on his experience, that he -- that the union

16    members' associational rights would be burdened if they were

17    compelled to submit the minutes of these union meetings; and

18    the Ninth Circuit found that insufficient as a matter of law to

19    meet a prima facie burden, the prima facie burden that the

20    plaintiff has to -- or that the litigant has to establish.

21          Schubert goes on to say that he will change the way

22    he does business; but that, again, is not a statement that he

23    will -- he will reduce his speech.  He's saying he will change

24    the way he communicates, he will change the way he does

25    business; but he's not saying, "I will not engage in this

1    speech anymore."

2              The Jansson declaration, paragraphs 2 and 5:

3    (reading)

4                   "I will dramatically alter my speech.  I

5                   will be less willing.  I will seriously

6                   reconsider my speech."

7              This, again, is not the types of declarations that

8    the Court found sufficient in the *Dole* case where there the

9    union members said, "I will no longer go to union meetings.  I

10   am not participating anymore."

11             I think that based on the *Dole* case, it's difficult

12   to see how the declarations appended to the -- appended to the

13   motion satisfy their prima facie burden of their First

14   Amendment privilege.

15             The final point is that they've asserted the First

16   Amendment privilege in gross, and they urge the application of

17   a balancing test.  They urge the application of an examination

18   of relevance versus our need for the evidence versus the costs

19   it will exact on their associational freedoms, but there's no

20   way to meaningfully analyze that when you're talking about an

21   assertion that every relevant document is privileged.

22             So I don't understand how we could meaningfully

23   engage in any kind of balancing at this juncture.

24             If, Your Honor, has no questions....

25             **THE COURT:**  Very well.  Mr. Cooper, I suspect you

1   want a very brief rebuttal; is that correct?

2          And then what I would like to do is to take a very

3   brief break and then meet in chambers with a court reporter and

4   one lawyer from each of the parties about a case-management

5   issue that we may confront in the case, and that will be simply

6   an informal discussion not on any of the merits or any of the

7   issues but simply how we organize going forward.

8          But the floor is yours, Mr. Cooper.

9          **MR. COOPER:**  Certainly, Your Honor.  Thank you very

10  much, Your Honor.

11         And also I would like now to ask the Court's

12  permission that Mr. Pugno may come back to the podium after

13  you're finished with me because there's something that he

14  believes he needs to correct.

15         **THE COURT:**  All right.  Fine.  I appreciate that.

16         **MR. COOPER:**  Your Honor, I'm going to begin with

17  this notion that the defendant intervenors did not meet their

18  prima facie First Amendment showing.

19         We have, out of the plaintiffs' counsel own mouth,

20  the acknowledgment of the widespread economic reprisals,

21  reprisals, Your Honor, that continue to go on to this day as

22  was dramatically illustrated on the Web site of Equality

23  California earlier this week; that is, the main No on 8 group.

24  Earlier this week, as they reiterated on this Web site, they

25  are called to continue a boycott against a prominent business

1   owned by a man who was a No on 8 donor, and for that reason

2   because -- he was a Yes on 8 donor.

3          Your Honor the declarations that we've submitted and

4   the declarations that were submitted and that we've referred

5   the Court to and we'll be -- you know, hopefully we won't have

6   to redo them and submit them here, but that were submitted in

7   this other case that we discussed earlier --

8          **THE COURT:**  Well, these disclosure requirements have

9   already passed constitutional muster and those are the

10  disclosures that would, it seems to me, to have the chilling

11  effect that you're concerned about.  That's already been found

12  to be acceptable under the First Amendment.  So why cannot, if

13  there are these concerns, a protective order be fashioned along

14  the lines that we discussed earlier to avert any further harm

15  that may result from additional disclosure?

16         **MR. COOPER:**  Well, those disclosures, yes, they have

17  created harm and they continue to do so, but that harm would

18  be -- would only be, we submit to the Court, increased if

19  additional individuals, those, for example, donated less than

20  99, $100, were brought forward publicly as a result of this, of

21  this discovery; or the internal actual speech that was used by

22  these donors in their associational -- in exercising their

23  associational free speech freedoms was disclosed publicly.

24         *NAACP against Alabama* held that:  (reading)

25         "Past showings of economic reprisal," this

1          is quoting, "economic reprisal, loss of

2          employment, threat of physical coercion, and

3          other manifestations of public hostility are

4          sufficient to trigger First Amendment past."

5     Your Honor, the record is replete with, and admitted

6 by the plaintiff -- the plaintiffs here, of this type of -- of

7 this type of chill activity by virtue of those disclosures.  It

8 is simply a fortiori that that chill and that type of activity

9 will not -- somehow not attend additional disclosures that come

10 forward as a result of this discovery.

11     But, Your Honor, I want to go back to this question

12 of relevance and my friend Mr. Dusseault, some of his points.

13 I want to keep in mind that the issues that he has identified

14 are issues of legislative fact.  For example, immutability.

15 Let's assume there's some kind of internal discussion about the

16 immutability of sexual orientation; that the proponents decided

17 not to share with the electorate.  How could that somehow weigh

18 or bear on any issue this Court has to decide?

19     Could it be that some study saying, "There's no

20 question that sexual orientation is immutable, that it is

21 internal," could be binding, that could be an admission by the

22 defendant intervenors?  Could we bind the State of California?

23 Could we bind the electorate?  Of course not.

24     Could it -- really, could it help this Court's

25 analysis of that legislative fact on which expert witnesses

1    will be brought forward?  I suggest not.  And I think the Court

2    was quite correct, that is an extraordinary stretch for

3    relevance.

4              You know, the closer is the notion that there's some

5    type of nonpublic internal documents going to the issue of

6    voter motivation or going to the issue of some of the plausible

7    purposes that Proposition 8 could serve.

8              Those are --

9              **THE COURT:**  Well, he also touched upon the

10   governmental interest in marriage, and the governmental

11   interest in limiting the privileges and responsibilities of

12   marriage to opposite sex couples.  So that's something that may

13   very well come out in these kinds of communications.

14             **MR. COOPER:**  Well, Your Honor, it could.

15             **THE COURT:**  And that's going to be an issue in our

16   case.

17             **MR. COOPER:**  It will be very much an issue in our

18   case; and the issue will be, Your Honor, we submit, under

19   binding Ninth Circuit precedent, again we submit respectfully,

20   whether or not there is any conceivable legitimate state

21   interest supporting or state purpose supporting Proposition 8.

22             But, Your Honor, regardless of the level of

23   scrutiny, and we're obviously suggesting it will be rational

24   basis, but regardless of what level of scrutiny it is, the

25   information they seek, nonpublic information that never got to

1    a voter, that could not have weighed on the mind of the

2    electorate itself has -- is simply irrelevant to that question

3    whether or not the electorate embraced any particular purpose,

4    and it doesn't matter.

5           And the other thing, Your Honor, is I do believe I

6    have to disagree with Mr. Dusseault in terms of whether any

7    Court, any Supreme Court case has looked at that.  Our

8    submission to you is that no Supreme Court case, not one, in

9    which the purpose or intent of a referendum measure was at

10   issue has considered the type of information, nonpublic

11   information, never disclosed or presented to the electorate

12   that the plaintiffs seek to discover in this case, not one.

13          *Romer* is their key case, is a perfect example of

14   what the Court really does.  It examines the purpose of the

15   legislation on the basis of its text known to the voters, on

16   the basis of its historical context, on the basis of how it

17   fits into the rest of the legislative scheme, and on the basis

18   of its effect.

19          In that case those, in *Romer*, those elements, no

20   internal information whatsoever but those elements concluded --

21   brought the Court to conclude that all conceivable legitimate

22   purposes could be excluded.  It only had one and one evil and

23   bad purpose.

24          *Washington versus Seattle* Mr. Dusseault cites.  That

25   case is a good example of exactly what I'm talking about.

1    Proposition I think it was 350 there, Initiative 350 in the

2    State of Washington, the only thing that any of the Courts

3    involved in that case looked at were public information like

4    the text of the statute, the official ballot information

5    provided to the voters, information in the media openly and at

6    large.

7              There is -- not only is there no Supreme Court case,

8    there's no Ninth Circuit case that looks at this kind of

9    material in determining the purpose or intent, not one; and --

10             **THE COURT:**  How about that Eighth Circuit case, the

11   *South Dakota Farm Bureau* case?

12             **MR. COOPER:**  Well, that's his case.  That's his case

13   and it's wrong.

14             **THE COURT:**  We all have our cases.

15                        (Laughter)

16             **MR. COOPER:**  That's his case, okay, and I'm going to

17   trudge through all of my cases and, Your Honor, I've got lots

18   of them.  And I simply submit to you that the issue never was

19   really examined by Judge Bowman in that case, that South Dakota

20   case.  It appears that there wasn't any dispute among the

21   parties in terms of this type of internal stuff that was indeed

22   called upon, although I would simply hasten to add that even

23   the Eighth Circuit in that case acknowledged that the most

24   important, the most relevant material were the official ballot

25   materials submitted to the voters themselves.

1          The *SASSO* case in this circuit, though, Your Honor,

2     we think is the most directly on point case that we have; and,

3     of course, the en banc decision, my friends correctly noted

4     went en banc, as we had discussed the panel decision to the

5     Court, but that case, too, looked only at these publicly-

6     available-and-presented-to-the-voters-themselves information.

7          Finally, Your Honor, there's no California Supreme

8     Court case.  When the California Supreme Court is interpreting

9     or identifying the purpose and the intent of a referendum in

10    this state, it looks only at the text of the referendum, the

11    official ballot literature, and the effect its context, its

12    historical placement in context, and here's why.  In fact, in

13    the *Straus* case, when this very initiative was before the

14    California Supreme Court and it had to be interpreted, that's

15    all they looked at and here's why.

16         The Court explained, not in *Straus* but in another

17    case, my colleague can remind me which case this comes from,

18    but the opinion of the drafters who sponsor an initiative is

19    not relevant since it does not represent the intent of the

20    electorate.  And we cannot say with assurance that the voters

21    were aware of the drafters' intent.  Yes, they have the South

22    Dakota case.  I suggest to you it just doesn't provide either

23    binding authority or, for that matter, persuasive authority.

24         The final point I want to make before Mr. Pugno

25    comes -- and thank you for your indulgence, Your Honor -- is

1    that this -- these inquiries to whatever extent, you know,

2    these materials are relevant to the plaintiffs' case, these

3    materials from the other side are relevant to our case, and

4    this -- this dispute I hope will not degenerate into --

5            **THE COURT:**  Nope.  I think that's why I was

6    exploring with Mr. Dusseault some of the alternatives that we

7    might pursue here.

8            **MR. COOPER:**  Thank you, Your Honor.

9            **THE COURT:**  Very well.  Yes, Mr. Pugno?

10           **MR. PUGNO:**  Thank you, Your Honor.  Andrew Pugno.

11           And just to clarify, I'm not just wandering in.  I

12   am counsel of record in this case, and it just so happens that

13   I have published and done some teaching on the Political Reform

14   Act and the open meeting laws, both of which were brought up by

15   the Court today, so I wanted to address those two items.

16           **THE COURT:**  All right.

17           **MR. PUGNO:**  I want to submit, the current Political

18   Reform Act in California marks the outer boundaries of what can

19   constitutionally be compelled in the way of disclosure with

20   regard to political activity.  It all traces back to *Buckley*

21   *versus Valeo* and that is when we're dealing with core

22   protective First Amendment interests, there is a compelling

23   interest, public interest in the knowing, in the disclosure of

24   public information about the source of money and its corrupted

25   influence -- because of its corrupted influence in politics.

1    And so all of the political --

2              THE COURT:  Money is the only corrupting influence

3    in politics?

4              MR. PUGNO:  Well, I am sure there are others, but

5    the special corruptive influence of money and politics

6    underpins what had to be a compelling of public interest to

7    justify forcing disclosure of political speech and political

8    information.

9              The -- and really the entire Political Reform Act

10   flows from that.  Everything that it requires has to do with

11   the source of money in campaigns.  We haven't really talked

12   about that today, but really everything from a hundred dollars

13   plus, that has to be -- a donor has to be disclosed.  When a

14   campaign has received $50,000 or more from a donor, its

15   advertisements have to say, "Major funding by," and then

16   identify the top two donors to a ballot measure campaign.  We

17   see that at the bottom of television commercials now when

18   they're run in California.

19             The paid political spokesperson who's paid $5,000 or

20   more, the Political Reform Act requires the campaign to

21   disclose and to put a disclaimer on saying, "This is a paid

22   spokesperson."

23             The identity of a sponsor who provides funding and

24   infrastructure, like a labor union or a corporation that

25   provides the infrastructure and covers the overhead of a

1   political action committee, has to be disclosed.

2           **THE COURT:**  Why would that be a good model for

3   fashioning the limitations on third parties in this case?

4           **MR. PUGNO:**  Our submission is the disclosure that's

5   permissible with regard to the sources of funding has already

6   all been made in compliance with the Political Reform Act

7   through the periodic disclosures that are made, all of which

8   are public documents, all of which the plaintiffs, intervenor

9   plaintiffs, have.

10          What they seek in this case today is far beyond all

11  of that, and it would be completely foreign to the Political

12  Reform Act because the Political Reform Act nowhere requires

13  the disclosure of who's making the decisions, what -- their

14  internal communications, their deliberative process, anything

15  that is not 200 or more pieces of mail, a billboard, a,

16  television commercial, and so on, those don't even have to have

17  disclaimers on them unless they are communicated to the public

18  at large.

19          In other words, what I'm trying to say is that the

20  Political Reform Act, and it didn't really occur to me until

21  the Court brought it up today, really is the measuring stick

22  for what constitutionally can be compelled in the way of

23  disclosure; and it all traces back to the compelling government

24  interest, public interest, in knowing the source of money in

25  politics, and all of that has been disclosed.  What is being

1     sought here is far beyond that.  So I think that's very

2     instructive.

3              The second point on the open meeting laws, on the

4     open meeting laws, the Brown Act in California, the whole

5     purpose is that public decisions be made in open and public.

6              **THE COURT:**  This is the Ralph M. Brown Act; right?

7              **MR. PUGNO:**  Yes, the Brown Act, that's correct.

8              There are really three purposes of the Act and that

9     is that the public be given notice when a decision is going to

10    be made, that the public be given a chance to be heard by the

11    decision makers before the decision is made; and, third, that

12    the decisions be made in an open and public forum with

13    exceptions.

14             Okay.  Private conversations among City Council

15    members, members of the governing enacting body are not subject

16    to the open meeting laws.  A meeting with a constituent, the

17    content of that meeting is not covered by the Ralph M. Brown

18    Act.

19             So that tells us that that has nothing to do with

20    this case, because there the decision makers are the City

21    Council members or the County Board of Supervisors, and the

22    public has an interest in seeing public decisions made in a

23    noticed forum where there's an opportunity to be heard by the

24    public and the decision is made publicly.

25             In this case, the enacting body is the electorate,

1     the people of California.  And, so, it cannot be said that

2     anything that bears on the decision of the electorate was not

3     available to the electorate; or I should say that anything that

4     is relevant to -- went into the voters' decision making was not

5     available because it was public.

6              In other words, if our proponents, if our

7     intervenors were City Council and they tried to make this

8     decision to pass or not pass Proposition 8 in the backroom,

9     that would violate the open meeting laws.  But because they are

10    not the decision makers, they're the proponents, the decision

11    maker is the electorate, the open meeting law actually tells us

12    that all of the public interest in notice and opportunity to be

13    heard and that the decision is made publicly, all of that is

14    satisfied in the open initiative process where the people

15    themselves are the enacting body.

16              **THE COURT:**  All right.

17              **MR. PUGNO:**  Thank you.

18              **THE COURT:**  Thank you.

19              Now may I take a brief break and then we'll set up

20    in the jury room?  And can I see Mr. Cooper, Mr. Burns, and

21    Mr. Dusseault and Ms. Lee.  Just an organizational matter going

22    forward.

23                  (Recess taken at 11:49 a.m.)

24                (Proceedings resumed at 11:54 a.m.)

25              (The following proceedings were heard in chambers:)

1          THE COURT:  Ordinarily, Counsel, this is something

2    we just discuss off the record; but given this case, I thought

3    we better have it on the record in case anybody asks what we're

4    talking about.

5          I wanted to alert you.  There has obviously been a

6    lot of public interest in this case.  I was, therefore, pleased

7    to see a rather sparse turnout in the courtroom this morning.

8    I suppose discovery disputes don't generate the kind of

9    interest that we've had in the past.

10          MR. COOPER:  I actually thought I was in the wrong

11    place.

12          THE COURT:  But I don't think we can count on that

13    going forward.  And what we have done in similar situations

14    where there has been more interest in the case than there are

15    seats in the courtroom, is to set up an arrangement whereby the

16    images of counsel, the witness, and the judge can be relayed

17    into another courtroom.  We use the ceremonial courtroom on the

18    19th floor of this building, which has a substantial amount of

19    seating capacity.

20          So we can accommodate a lot more people in a case

21    that has widespread public interest, and that proves to be of

22    some value and interest to the media as well because they're

23    able to come and go a lot more readily than they can in a

24    courtroom where the proceedings are actually transpiring.

25          You saw in the courtroom today three cameras and

1    they aren't positioned where they would be, but they were

2    approximately where they would be.  I assume that none of you

3    have any objection to that procedure.

4            **ALL:**  No objection.  None at all.

5            **THE COURT:**  I appreciate that.

6            And we've also received some inquiries, although I

7    have not responded to these inquiries, about projecting this

8    image even beyond an overflow courtroom, and you might consider

9    what your position is with respect to that.

10           I haven't acted on that in any way.  I haven't even

11   responded, but you might consider whether you have a concern

12   about that, or you don't object to it, what limitations, if

13   any, you think ought to be placed on it.

14           The case is going to generate the kind of attention

15   that this case has already generated, will generate, is

16   something that we ought to be aware of.  So give it some

17   thought, confer amongst yourselves.

18           Obviously, what we do is open and public and should

19   be, but we want to do it in a way that's consistent with the

20   rights of the parties and the appropriate decorum and dignity

21   of the judicial process.

22           So, anyway, that's what I wanted to talk to you

23   about.

24           **MR. DUESSEAULT:**  Thank you, Your Honor.

25           How would you like us to get back to you on our

1    thoughts about that?

2            THE COURT:  I suspect you can confer amongst

3    yourselves and either get back to me in writing, a joint

4    letter; or, perhaps, if you have separate positions, you can do

5    that.

6            And maybe you don't need to.  Maybe if you're

7    perfectly happy with what I've told you about the overflow

8    courtroom and you don't have any concern about, say, this image

9    being broadcast beyond that, then you don't have to respond.  I

10   just wanted to give you a heads up.  I didn't want you to be

11   surprised.

12           MR. COOPER:  Your Honor, may I ask you --

13           THE COURT:  Sure.

14           MR. COOPER:  -- what the display of the image beyond

15   the overflow courtroom might contemplate?  A public broadcast?

16           THE COURT:  The image itself would be counsel, the

17   witness, and the judge on a split screen, and that's what would

18   be shown in the overflow courtroom; and if it extended beyond

19   that, that's what would be shown.

20           MR. COOPER:  I see.  And do you contemplate that it

21   might be shown on a public television station or something like

22   that?  I mean --

23           THE COURT:  I certainly received an inquiry about

24   that.

25           MR. COOPER:  Okay.  No surprise.

1              **THE COURT:**  No, it isn't a surprise.  It isn't a

2    surprise.  There are, of course, Judicial Conference positions

3    on this.  This is all in flux.  As you know, the Ninth Circuit

4    has broadcast certain arguments.  I'm sure you know the recall

5    litigation in, what was that, 2003?

6              **MR. BURNS:**  Actually the *In Re: Marriage* and the

7    *Straus* cases were televised.

8              **THE COURT:**  Well, I was thinking of the Ninth

9    Circuit, the challenge to the Governor Davis recall, that was

10   broadcast in Ninth Circuit.

11             No, the State is far ahead of the Federal courts in

12   both the technology and the sophistication in handling these

13   issues; but the Ninth Circuit has, at least in that case, and I

14   think in some other cases, permitted broadcast of those

15   proceedings.

16             **MR. FLYNN:**  And the Ninth Circuit also pretty

17   regularly has the close-circuit to deal with overflow rooms

18   because their rooms are much smaller.

19             **THE COURT:**  Yes.  So, anyway, I wanted to give you a

20   heads up.

21             **MR. COOPER:**  Thank you very much, sir.  I appreciate

22   that.

23                       (Pause in proceedings.)

24             **MR. DUESSEAULT:**  May I clarify one more thing,

25   Your Honor?

1             THE COURT:  Sure.

2             MR. DUESSEAULT:  Your moot court rule, no moot court

3    rule, if we have, for example, on the motion for summary

4    judgment that's coming up, we've got one moving party, two

5    opposing parties on the same brief, one person --

6             THE COURT:  Well, each party gets to speak, but what

7    I don't like are seriatims.

8             MR. COOPER:  We appreciate the patience today.

9             THE COURT:  One lawyer takes one issue, another

10   lawyer takes another issue, and so forth.

11            ALL:  Thank you.

12            THE COURT:  Thank you very much, Counsel.

13                 (Proceedings adjourned at 12:01 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, KELLY BRYCE, Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 09-2292 VRW, Kristin Perry, et al v. Arnold Schwarzenegger, et al., were reported by me, a shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_Kelly Bryce_

Kelly Bryce, CSR No. 13476

Monday, September 28, 2009