1  COOPER AND KIRK, PLLC
   Charles J. Cooper (DC Bar No. 248070)*
2  *ccooper@cooperkirk.com*
   David H. Thompson (DC Bar No. 450503)*
3  *dthompson@cooperkirk.com*
   Howard C. Nielson, Jr. (DC Bar No. 473018)*
4  *hnielson@cooperkirk.com*
   Nicole J. Moss (DC Bar No. 472424)*
5  *nmoss@cooperkirk.com*
   Peter A. Patterson (OH Bar No. 0080840)*
6  *ppatterson@cooperkirk.com*
   1523 New Hampshire Ave. N.W., Washington, D.C. 20036
7  Telephone: (202) 220-9600, Facsimile: (202) 220-9601

8  LAW OFFICES OF ANDREW P. PUGNO
   Andrew P. Pugno (CA Bar No. 206587)
9  *andrew@pugnolaw.com*
   101 Parkshore Drive, Suite 100, Folsom, California 95630
10 Telephone: (916) 608-3065, Facsimile: (916) 608-3066

11 ALLIANCE DEFENSE FUND
   Brian W. Raum (NY Bar No. 2856102)*
12 *braum@telladf.org*
   James A. Campbell (OH Bar No. 0081501)*
13 *jcampbell@telladf.org*
   15100 North 90th Street, Scottsdale, Arizona 85260
14 Telephone: (480) 444-0020, Facsimile: (480) 444-0028

15 ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
   GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
16 MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A
   PROJECT OF CALIFORNIA RENEWAL

17
   * Admitted *pro hac vice*
18

19              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

20 KRISTIN M. PERRY, SANDRA B. STIER,
   PAUL T. KATAMI, and JEFFREY J.
21 ZARRILLO,                                      CASE NO. 09-CV-2292 VRW

22              Plaintiffs,                        DEFENDANT-INTERVENORS'
                                                   REPLY IN SUPPORT OF MOTION
23        v.                                       FOR SUMMARY JUDGMENT

24                                                 Date:  October 14, 2009
   ARNOLD SCHWARZENEGGER, in his official         Time:  10:00 a.m.
25 capacity as Governor of California; EDMUND     Judge:  Chief Judge Vaughn R. Walker
   G. BROWN, JR., in his official capacity as      Location:  Courtroom 6, 17th Floor
26 Attorney General of California; MARK B.
   HORTON, in his official capacity as Director of
27 the California Department of Public Health and
   State Registrar of Vital Statistics; LINETTE
28

1  SCOTT, in her official capacity as Deputy
   Director of Health Information & Strategic
2  Planning for the California Department of Public
   Health; PATRICK O'CONNELL, in his official
3  capacity as Clerk-Recorder for the County of
   Alameda; and DEAN C. LOGAN, in his official
4  capacity as Registrar-Recorder/County Clerk for
   the County of Los Angeles,
5

6          Defendants,

7  and

8  PROPOSITION 8 OFFICIAL PROPONENTS
   DENNIS HOLLINGSWORTH, GAIL J.
9  KNIGHT, MARTIN F. GUTIERREZ, HAK-
   SHING WILLIAM TAM, and MARK A.
10 JANSSON; and PROTECTMARRIAGE.COM –
   YES ON 8, A PROJECT OF CALIFORNIA
11 RENEWAL,

12         Defendant-Intervenors.

13

14    Additional Counsel for Defendant-Intervenors

15

16 ALLIANCE DEFENSE FUND
   Timothy Chandler (CA Bar No. 234325)
17 *tchandler@telladf.org*
   101 Parkshore Drive, Suite 100, Folsom, California 95630
18 Telephone: (916) 932-2850, Facsimile: (916) 932-2851

19 Jordan W. Lorence (DC Bar No. 385022)*
   *jlorence@telladf.org*
20 Austin R. Nimocks (TX Bar No. 24002695)*
   *animocks@telladf.org*
21 801 G Street NW, Suite 509, Washington, D.C. 20001
   Telephone: (202) 393-8690, Facsimile: (202) 347-3622
22
   * Admitted *pro hac vice*
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 4

I.    *Baker v. Nelson* Controls This Case ........................................................................ 4

II.   The Due Process Clause Does Not Protect A Fundamental Right To Same-Sex Marriage ............ 5

III.  Proposition 8 Is Subject To Rational Basis Review Under The Equal Protection Clause ............. 9

      A.  Same-Sex Couples Are Differently Situated With Respect to Marriage ................................. 9

      B.  Classifications Based On Sexual Orientation Receive Rational Basis Review ...................... 10

      C.  Proposition 8 Does Not Discrimination On The Basis Of Sex ............................................... 14

IV.   Proposition 8 Is Rationally Related To Legitimate State Interests ............................................... 15

      A.  *Adams v. Howerton* Controls The Rational Basis Inquiry ................................................. 15

      B.  Plaintiffs Misconstrue The Requirements Of Rational Basis Review .................................... 16

      C.  Proposition 8 Advances Several Legitimate Government Interests ....................................... 19

V.    Proposition 8 Is Not Tainted By Animus Or Any Impermissible Considerations ....................... 23

CONCLUSION ................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                **Page**

*Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982)..............................................................15

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)....................................................10

*Andersen v. King County*, 138 P.3d 963 (Wash. 2006) ...........................................................3

*Baker v. Nelson*, 409 U.S. 810 (1972) ......................................................................................1

*Baker v. Vermont*, 744 A.2d 864 (Vt. 1999)...........................................................................15

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) .................................................3, 17, 18, 19

*Boddie v. Connecticut*, 401 U.S. 371 (1971) .............................................................................7

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ..............................................................................11

*Christian Science Reading Room Jointly Maintained v. City and County of San Francisco*,
   784 F.2d 1010 (9th Cir. 1986) ...........................................................................................13

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)....................................3, 12, 14

*Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974)..........................................................7

*Connolly v. McCall*, 254 F.3d 36 (2d Cir. 2001) ....................................................................19

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................................................23

*DA's Office v. Osbourne*, 129 S. Ct. 2308 (2009) .....................................................................5

*DeBoer v. DeBoer*, 509 U.S. 1301 (1993) ...............................................................................22

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) .................................................................................7

*FCC v. Beach Communications*, 508 U.S. 307 (1993)........................................................16, 18

*Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003) ................................5

*Frontiero v. Richardson*, 411 U.S. 677 (1973)..........................................................................5

*Goodridge v. Department of Public Health*, 798 N.E.2d 941 (Mass. 2003) ...........................15

*Griswold v. Connecticut*, 381 U.S. 479 (1965)..........................................................................7

*Heller v. Doe*, 509 U.S. 312 (1993)............................................................................5, 17, 23

*Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006) ...................................................................15

*High Tech Gays v. Defense Industrial Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990).....10, 11, 13

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) ............................................................2, 6, 14, 15, 20

*Johnson v. Robison*, 415 U.S. 361 (1974) ............................................................................3, 10,16

*Jones v. Blanas*, 393 F.3d 918 (9th Cir.2004) ............................................................................9

*Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988) ............................................................18

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) ............................................................................17

*Knapp v. Hanson*, 183 F.3d 786 (8th Cir. 1999) ............................................................................19

*Lawrence v. Texas*, 539 U.S. 558 (2003)........................................................4, 5, 7, 9, 19, 25

*Locke v. Davey*, 540 U.S. 712 (2004) ............................................................................13

*Loving v. Virginia*, 388 U.S. 1 (1967) ............................................................................1, 7, 14

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ............................................................................7

*Maher v. Roe*, 432 U.S. 464 (1977) ............................................................................4

*Maldonado v. Harris*, 370 F.3d 945 (9th Cir. 2004) ............................................................................24

*Mandel v. Bradley*, 432 U.S. 173 (1977)............................................................................4

*Michael H. v. Gerald D.*, 491 U.S. 110 (1989)............................................................................8

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981) ............................................................17

*Morrison v. Sadler*, 821 N.E.2d 15 (Ind. Ct. App. 2005) ............................................................3

*National Union Fire Ins. Co. v. The Stroh Cos.*, 265 F.3d 97 (2d Cir. 2001) ............................................9

*Perez v. Sharp*, 198 P.2d 17 (Cal. 1948) ............................................................................6

*Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997) ............................................................................11

*Pinsky v. JP Morgan Chase & Co.*, 576 F. Supp. 2d 564 (S.D.N.Y. 2008)............................................9

*Price-Cornelison v. Brooks*, 524 F.3d 1103 (10th Cir. 2008) ............................................................11

*Reed v. Reed*, 404 U.S. 71 (1971)............................................................................5

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)............................................................13

*Reitman v. Mulkey*, 387 U.S. 369 (1967)............................................................................24

*Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565 (11th Cir. 1987)............................................24

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................................4, 16

*Rossi v. Brown*, 889 P.2d 557 (Cal. 1995).............................................................2

*Saenz v. Roe*, 526 U.S. 489 (1999) ........................................................................23

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...........................12

*Santosky v. Kramer*, 455 U.S. 745 (1982) ..........................................................23

*Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005), *aff'd in part, vacated in part*,
    447 F.3d 673 (9th Cir. 2006) ........................................................................5

*Stenberg v. Carhart*, 530 U.S. 914 (2000)...........................................................24

*Strauss v. Horton*, 207 P.3d 48 (Cal. 2009)......................................................2, 24

*Turner v. Safley*, 482 U.S. 78 (1987).................................................................7, 8

*United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166 (1980)...................18, 23

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ......................12, 13

*Vance v. Bradley*, 440 U.S. 93 (1979) ..............................................................4, 17

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................1, 6, 9

*Williams v. Illinois*, 399 U.S. 235 (1970) ..............................................................1

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .......................................................24

*Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir. 2008) ..................11, 16

## Constitutional, Legislative Materials and Rules

U.S. CONST. amend. 14, § 1 ...................................................................................20

28 U.S.C. § 534.......................................................................................................12

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 280003, 108 Stat.
    1796 (1994) (codified at 28 U.S.C. § 994 note) ............................................12

S. 1584, 111th Cong. (2009)...................................................................................12

H.R. 2981, 111th Cong. (2009) ..............................................................................12

Local Law Enforcement Hate Crimes Prevention Act of 2009, H.R. 1913, 111th Cong. § 6 (2009).....12

Military Readiness Enhancement Act of 2009, H.R. 1283, 111th Cong. § 2 (2009) ...........................12

Respect for Marriage Act, H.R. 3567, 111th Cong. §§ 2-3 (2009) ........................12

ME. CONST. art. IV, pt. 3, § 17.................................................................................6

FED. R. CIV. PROC. 56(f) ......................................................................................9

FED. R. EVID. 201 .................................................................................................9

## **Other**

BERTRAND RUSSELL, MARRIAGE AND MORALS 156 (1929) .................................10

Douglas W. Allen, *An Economic Assessment of Same-Sex Marriage Laws*,
    29 HARV. J. L. & PUB. POL'Y 949 (2006) .......................................................21

Maine Department of the Secretary of State, Upcoming Elections, *at*
    http://www.maine.gov/sos/cec/elec/upcoming.html..........................................6

Wendy D. Manning, et al., *The Relative Stability of Cohabitating and Marital Unions for Children*,
    23 POPULATION RESEARCH & POL'Y REV. 135 (2004) .....................................22

Statistics Netherlands, Marriages and Partnership Registrations, *at*
    http://statline.cbs.nl/StatWeb/publication/?VW=T&DM=SLEN&PA=37772eng&D1=0,2-12,
    35,37-39&D2=0,50-57&HD=080929-0715&LA=EN&HDR=T&STB=G1 ..................20

WILLIAM BLACKSTONE, COMMENTARIES.....................................................................9

# **INTRODUCTION**

We scarcely recognize our side of this case from Plaintiffs' response to it. Many of the arguments and assertions attributed to us are either nowhere to be found in our briefing, or are found in a form bearing little resemblance to Plaintiffs' caricatures of them. On the other hand, many of the arguments that we *do* make, emphatically, are nowhere answered, or even mentioned, in their lengthy opposition brief. And none of Plaintiffs' arguments, regardless of where they land, if at all, on the target provided by our brief, come close to sustaining their startling, radical claim that the people of California, and of the Nation as a whole, are constitutionally prohibited from continuing to adhere to the age-old definition of marriage as a union between a man and a woman.

Plaintiffs, for example, repeatedly chide us for invoking history and tradition, noting that " 'the antiquity of a practice . . . [cannot] *insulate*[ ] it from constitutional attack.' " Doc # 202 at 8, 18, quoting *Williams v. Illinois*, 399 U.S. 235, 239 (1970) (emphasis added). While this general rule is true enough, it is equally true both that Plaintiffs' substantive due process claim requires proof that the right at issue is "objectively, deeply rooted in this Nation's history and tradition," and that "[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it." *Washington v. Glucksberg*, 521 U.S. 702, 720-21, 723 (1997). And no institution is more deeply rooted in this Nation's history and tradition, nor more universally practiced by common consent, than that of marriage as the union of a man and a woman.

Plaintiffs insist, however, that the constitutional right at issue is not a "narrowly" defined right of a man and a woman to marry, but a broad right to marry "the person of one's choice," a right "to choose one's life companion." *E.g.*, Doc # 202 at 9, 10. This right has been repeatedly recognized, Plaintiffs say, by the Supreme Court in cases such as *Loving v. Virginia*, 388 U.S. 1 (1967). It follows, then, that under Plaintiffs' conception of the right to marry, Mr. Loving was no less constitutionally entitled to marry another man than he was to marry a woman of a different race. The patent implausibility of this notion was specifically confirmed by a unanimous Supreme Court, which found Plaintiffs' reading of *Loving*, and their genderless conception of the right to marry, so utterly meritless that it summarily rejected the claim without hearing argument. *Baker v. Nelson*, 409 U.S. 810 (1972).

Although Plaintiffs make light of the ancient pedigree, in California and everywhere else, of the

1

traditional definition of marriage, they do not reject history altogether. To the contrary, an overarching theme of their case is that Proposition 8 "stripped" them of their *preexisting* state constitutional right to same-sex marriage. This preexisting right was newly minted just last year, however, when a bare majority of the California Supreme Court, claiming to be giving effect to "the people's will," invalidated a statutory referendum, Proposition 22, passed in 2000 by 61.4 percent of those people. *See In re Marriage Cases*, 183 P.3d 384, 450 (Cal. 2008); *id.* at 459 (Baxter, J., concurring and dissenting). The people of California, exercising their "reserved powers of initiative and referendum," *Rossi v. Brown*, 889 P.2d 557, 560 (Cal. 1995), seized the first opportunity to correct their high court's patent error in interpreting their will. In the November 2008 election, less than six months after the *Marriage Cases* decision, the people reenacted the language of Proposition 22, this time as a constitutional amendment, Proposition 8. The California Supreme Court's 2008 decision invalidating the State's 158-year-old definition of marriage was thus no more final than was the earlier California Court of Appeal decision upholding it. It was reviewed and overturned by a higher tribunal—the people themselves.

Plaintiffs also repeatedly highlight California's continued recognition of the same-sex marriages performed during the brief period between the *Marriage Cases* and passage of Proposition 8. But this is simply because the California Supreme Court interpreted Proposition 8 to apply only prospectively. *See Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009). Assuming this interpretation is correct, the reasons for the electorate's forbearance in preserving same-sex marriages entered in reliance on the California Supreme Court's ruling are neither difficult to grasp nor anything but benign. And Plaintiffs insist that Proposition 8 would be on firmer ground if it withheld *any* legal recognition from same-sex couples. We are mystified by this charge that California's domestic partnership regime, hailed by gay and lesbian rights advocates and generous in its provision of rights and benefits, specially handicaps the State's ability to reserve marriage for opposite-sex couples. Plaintiffs' repeated assertions that California's generous treatment of same-sex couples and the historical accidents surrounding the adoption and interpretation of Proposition 8 somehow render California's traditional definition of marriage uniquely arbitrary and irrational are difficult to take seriously. In any event, even Plaintiffs are less than earnest about their efforts to tie Proposition 8's constitutionality to these idiosyncratic

grounds. To the contrary, they expressly charge that the failure "of other States to recognize same-sex marriages is unconstitutional *for the same reason* that Prop. 8 is unconstitutional," Doc # 202 at 27 (emphasis added), and they likewise reveal their view that the federal government's adherence to the traditional definition of marriage is unconstitutional as well, *id.* at 28.

To support their radical claim—that marriage as it has universally been practiced throughout recorded history is unconstitutional—Plaintiffs distort the nature of rational basis review.  Throughout their brief, Plaintiffs repeatedly assert that it is not enough for us to show that the traditional institution of marriage serves legitimate state purposes.  Proposition 8 must fall, they say, unless we can also prove that denying same-sex couples the right to marry would advance the governmental interests that are served by opposite-sex marriage.  *See*, *e.g.*, Doc # 202 at 9, 23.  Indeed, Plaintiffs argue, with emphasis in original, that "*[a] state interest furthered by the recognition of opposite-sex marriage is not a constitutionally sufficient basis for prohibiting same-sex marriage*."  Doc # 202 at 24.  In other words, according to Plaintiffs, when the State recognizes opposite-sex marriages *because* they serve certain state interests, the State is constitutionally obliged to also recognize same-sex marriages even though they *do not* further those state interests.  This *non sequitur* is not, of course, the law.  As demonstrated in our opening brief, marriage between opposite-sex couples is rationally related to legitimate government interests that would not be advanced (or at least not advanced to the same degree) by same-sex marriages. This alone suffices to meet rational basis review, for as the Supreme Court has specifically explained, "[w]hen, as in this case, the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory." *Johnson v. Robison*, 415 U.S. 361, 383 (1974); *see also  Board of Trustees v. Garrett*, 531 U.S. 356, 366-67 (2001); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).  Accordingly, the State is not obliged additionally to show that *denying* marriage to same-sex couples is necessary to further the interests we have identified. *See, e.g.*, *Andersen v. King County*, 138 P.3d 963, 984 (Wash. 2006) (plurality); *Morrison v. Sadler*, 821 N.E.2d 15, 23 (Ind. Ct. App. 2005).

The nature of rational basis review also belies Plaintiffs' claims that factual disputes bar summary judgment and that additional discovery has the potential to generate such disputes. Plaintiffs'

3

burden is to show that "the legislative facts on which the classification [between same-sex and opposite-sex couples drawn by Proposition 8] is apparently based *could not reasonably be conceived* to be true." *Vance v. Bradley*, 440 U.S. 93, 111 (1979) (emphasis added). It is simply not enough to show that these legislative facts are, or could be, contested. Plaintiffs, of course, have not identified, and indeed cannot identify, a genuine issue of material fact regarding whether the people of California *could conceivably believe* that the institution of marriage will continue to serve the ends that it always has.

For all of these reasons, it is clear that "the appropriate forum" for resolving "policy choices as sensitive as those implicated" by same-sex marriage is the political arena, not the federal judiciary. *Maher v. Roe*, 432 U.S. 464, 479 (1977).  Plaintiffs' claims thus must be rejected as a matter of law.

**ARGUMENT**

**I.   *Baker v. Nelson* Controls This Case**

In *Baker v. Nelson*, 409 U.S. 810 (1972), the Supreme Court dismissed for "want of substantial federal question" an appeal presenting the issues of whether a state's failure to recognize same-sex marriage violates the Due Process or Equal Protection Clauses. *Baker* remains good law and controls Plaintiffs' challenge to Proposition 8. *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam).

1. Plaintiffs tacitly acknowledge that *Baker* rejected claims that the Due Process Clause protects a fundamental right to same-sex marriage and that the traditional definition of marriage constitutes sex discrimination under the Equal Protection Clause. *See* Doc # 202 at 14. And their attempt to portray *Baker* as not presenting an issue of sexual orientation discrimination is untenable.  Not only did the Jurisdictional Statement spend several pages arguing that Minnesota's refusal to recognize same-sex marriages was attributable solely to "the continuing impact on our society of prejudice against non-heterosexuals," it also plainly argued that this refusal subjected "*the class of persons who wish to engage in single sex marriages*" to "invidious discrimination," Doc # 36-3 at 8, 11 (emphasis added).

2. Neither *Romer v. Evans*, 517 U.S. 620 (1996) nor *Lawrence v. Texas*, 539 U.S. 558 (2003) calls into question *Baker*'s continuing validity.  It is simply not the case that, after *Romer*, "all laws that single out gay and lesbian individuals for disfavored treatment … are constitutionally suspect." *See* Doc # 202 at 16.  On the contrary, the federal circuits have continued, since *Romer*, to review

4

government classifications on the basis of sexual orientation only for a rational basis. Thus, far from being "constitutionally suspect," such classifications carry "a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). The Ninth Circuit agrees. As *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130 (9th Cir. 2003), clearly holds, statutes subjecting gays and lesbians to different treatment from heterosexuals are subject only "to rational basis scrutiny for equal protection purposes." *Id.* at 1137.

*Lawrence* likewise leaves *Baker* intact. Plaintiffs simply cannot avoid the Court's express statement that the case did "*not* involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578 (emphasis added). Furthermore, the Court's unremarkable recognition that the Constitution protects for all people "personal decisions relating to marriage" merely recognizes longstanding constitutional doctrine established well before *Baker* in cases such as *Loving*. *Id.* at 574. It says nothing about a fundamental right to same-sex marriage.

3. *Baker*'s sex discrimination holding also remains undisturbed. While the Court has refined its sex discrimination jurisprudence since *Baker* was decided, the 1971 decision in *Reed v. Reed*, 404 U.S. 71, 73 (1971) clearly "depart[ed] from 'traditional' rational-basis analysis with respect to sex-based classifications." *Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) (plurality). And while *Frontiero* was decided after *Baker*, it was decided *during the same term*.[1]

## II.   The Due Process Clause Does Not Protect A Fundamental Right To Same-Sex Marriage

Just this Term, the Supreme Court reemphasized that it "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended" and that "the mere novelty of … a claim is reason enough to doubt that 'substantive due process' sustains it." *DA's Office v. Osborne*, 129 S. Ct. 2308, 2322

---

[1] Plaintiffs also point out that, after holding that a challenge to DOMA presented different issues from *Baker* such that *Baker* was not binding, the court in *Smelt v. County of Orange*, 374 F. Supp. 2d 861 (C.D. Cal. 2005), *aff'd in part, vacated in part*, 447 F.3d 673 (9th Cir. 2006), went on to opine that subsequent doctrinal developments had undermined *Baker*'s precedential value. Even if this is a holding rather than dictum, it is plainly not binding on this Court and, as we explained in our opening brief (and Plaintiffs do not contest), other federal courts have consistently affirmed *Baker*'s continuing vitality.

(2009) (quotation marks omitted). Plaintiffs' claim runs counter to both principles: expanding the fundamental right to marry to encompass same-sex unions would radically redefine marriage, eliminating the "guideposts for responsible decisionmaking" provided by the very meaning of the term "marriage"; furthermore, the novelty of same-sex marriage is not, and cannot be, disputed. Plaintiffs' arguments for heightened scrutiny under the Due Process Clause cannot clear these substantial hurdles.

1.  Plaintiffs stress that this case involves "the fundamental right of an *individual* to marry." Doc # 202 at 9. We submit that Plaintiffs have placed the emphasis on the wrong word—to decide this case the Court must assess the contours of the fundamental right of an individual to *marry*. That assessment must "begin … by examining our Nation's history, legal traditions, and practices." *Glucksberg*, 521 U.S. at 710. As demonstrated in our opening brief, our society's history, legal tradition, and practices demonstrate that the central defining feature of marriage is and always has been its status as the union of a man and a woman. Indeed, Plaintiffs are forced to concede that " 'marriage' has 'traditionally' been between 'a man and a woman.' " Doc # 202 at 8. Further, every Supreme Court case to address the fundamental right to marriage has arisen in this traditional context, and the Supreme Court in *Baker* unanimously and summarily rejected a due process claim identical to Plaintiffs'. And the current legal landscape demonstrates the continuing vitality of the traditional definition of marriage, as forty-four states, the federal government, and nearly every nation in the world continue to follow it.[2]

Plaintiffs acknowledge that same-sex marriage is a recent experiment in this country, *see* Doc # 202 at 42, and they do not dispute that it remains exceedingly rare. Their attempt to nevertheless shoe-horn this novel concept into the venerable fundamental right to marry fails. First, as noted above, Plaintiffs insist that the fundamental right to marry is the right "to join in marriage with the person of one's choice." *Id*. at 9 (quoting *Marriage Cases*, 183 P.3d at 420 and *Perez v. Sharp*, 198 P.2d 17, 19 (Cal. 1948)). It is both noteworthy and unsurprising that Plaintiffs have looked to the California Supreme Court for this language: the United States Supreme Court has never described the fundamental right to marry in this way. Indeed, such a description is demonstrably inaccurate: States

---

[2] Although we are counting Maine as one of six states that recognizes same-sex marriage, the statute extending marriage to same-sex couples there will take effect only if the people of the State do not veto it this November. *See* Maine Department of the Secretary of State, Upcoming Elections, *at* http://www.maine.gov/sos/cec/elec/upcoming.html; *see also* ME. CONST. art. IV, pt. 3, § 17.

1   do and always have imposed a variety of eligibility restrictions on the persons one can marry, ranging

2   from age requirements to laws against incest and bigamy.[3]

3       Furthermore, while the Supreme Court *has* recognized that due process protects "the freedom of

4   choice to marry," *Loving*, 388 U.S. at 12, this recognition does not get Plaintiffs very far—for it leaves

5   untouched the question of what marriage *is*. And, contrary to Plaintiffs' assertion, it is not we who are

6   "define[ing] the scope of the right to marry based on the partner chosen," Doc # 202 at 10; rather, it is

7   controlling Supreme Court precedent that insists on defining the right to marry, like all fundamental

8   rights, in light of our Nation's historical and continuing legal traditions and practices.

9       Plaintiffs' authorities do not help their case. To begin, neither *Cleveland Board of Education v.*

10  *LaFleur*, 414 U.S. 632 (1974), nor *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), are about the fundamental

11  right to marry. The former addressed a mandatory maternity leave rule, *see LaFleur*, 414 U.S. at 634,

12  while the latter concerned a fee imposed on parents seeking to appeal an adverse parental termination

13  decree, *see M.L.B.*, 519 U.S. at 106. *Boddie v. Connecticut*, 401 U.S. 371 (1971), invalidated filing

14  fees required to initiate divorce proceedings "in light of the principles enunciated in … due process

15  decisions that delimit rights of defendants compelled to litigate their differences in the judicial forum."

16  *Id.* at 377. *Griswold v. Connecticut*, 381 U.S. 479 (1965), held that the Constitution prohibits a state

17  from forbidding a married couple to use contraceptives, *id.* at 486, but the Supreme Court has

18  subsequently made clear that the privacy interests recognized in *Griswold* are not unique to the marital

19  relationship, *see Eisenstadt v. Baird*, 405 U.S. 438, 554-55 (1972). At any rate, that a state may not

20  intrude into the privacy of the marital bedroom says nothing about who the state must recognize as

21  married. *Cf. Lawrence*, 539 U.S. at 578.

22      Nor does *Turner v. Safley*, 482 U.S. 78 (1987), suggest a different result. Like all of the

23  Supreme Court's cases recognizing a fundamental right to marry, *Turner* addressed a limitation on

24

25      [3] The interests that Plaintiffs cursorily assert as supporting such laws, *see* Doc # 202 at 31 n.4,
    plainly would not survive the type of scrutiny Plaintiffs seek to bring to bear here. Thus, for example,

26  Plaintiffs never explain how bans on gender-neutral polygamy, marriages between related persons of
    the same sex, and marriages violating blanket age-of-consent regulations could survive judicial

27  scrutiny in a regime holding that same-sex marriage is guaranteed by a fundamental right to "join in
    marriage with the person of one's choice" unmoored from our society's history, legal tradition, and

28  practices.

marriages between men and women.  And unlike same-sex marriages, opposite-sex marriages in which one or both of the members is imprisoned—the type of marriage at issue in *Turner*, *id.* at 96-97—indisputably fall within the traditional definition of marriage.  Such marriages also further society's interest in channeling opposite-sex relationships in stable, long-lasting unions—particularly when one of the members of the union is a civilian. *Turner*, moreover, expressly recognized the conjugal bond at the heart of the marriage relationship:  because "most inmates will eventually be released by parole or commutation . . . most inmate marriages are formed in the expectation that they ultimately will be fully consummated." *Id.* at 96.  The Court did recognize *additional* attributes of marriage, *e.g.*, "expressi[ng] … emotional support and public commitment," "exercis[ing] … religious faith," and "legitimizing" children, *id.* at 95-96, but the Court nowhere implied that the fundamental right to marry encompasses *any* relationship possessing some or all of these attributes.

2.  Plaintiffs' final resort is to insist that there exists (or will exist following discovery) a genuine issue of material fact with respect to the scope of the fundamental right to marry. *See* Doc # 202 at 42, 54.  But Plaintiffs do not contest that marriage has always been defined as the union of a man and a woman. *See id.* at 8.  Rather, they point out that features of marriage *other than* this definition have "evolved over time." *See id.* at 42.  Plaintiffs, however, offer no support for the suggestion that the features they identify have *ever* been regarded as definitional, let alone that they have been *uniformly* so regarded *across societies* and *throughout history*.  Simply put, the changes Plaintiffs have identified are fundamentally different in kind from that which they seek here.  Further, those changes simply do not bear on the question of whether the fundamental right to marry extends to same-sex unions.

More important for present purposes, the Supreme Court has expressly and repeatedly treated the determination of the proper scope of an asserted fundamental right, and the examination of our Nation's history, legal traditions, and practices that informs that determination, not as factual questions requiring discovery, expert testimony, and courtroom fact-finding but as "legal issue[s]." *Michael H. v. Gerald D.*, 491 U.S. 110, 124 (1989) (plurality) ("[T]he *legal issue* in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society.") (emphasis added). *Glucksberg*, for example, examined these issues not by looking to discovery materials or expert reports, but rather in

8

1  reliance on sources of precisely the same type we have presented, including Supreme Court precedent,

2  state and foreign laws (both current and historical), legal treatises, law review articles, government

3  agency reports, Blackstone's *Commentaries*, books, newspaper articles, and scholarly journals. *See*

4  521 U.S. at 710-19, 722-35; *cf. Lawrence*, 539 U.S. at 564-79 (discussing Supreme Court precedent,

5  state and foreign laws (current and historical), legal treatises, law review articles, and books). [4]

6  **III.  Proposition 8 Is Subject To Rational Basis Review Under The Equal Protection Clause**

7       Neither the Supreme Court nor any federal circuit court has ever treated classifications based on

8  sexual orientation as suspect under the Equal Protection Clause, and binding Ninth Circuit precedent

9  holds that such classifications are subject only to rational basis review.  Plaintiffs offer nothing that

10  could possibly justify a departure from that standard in this case.

11       **A.    Same-Sex Couples Are Differently Situated With Respect to Marriage**

12       Plaintiffs insist that same-sex and opposite-sex couples are similarly situated with respect to

13  marriage because gays and lesbians, like their heterosexual counterparts, "desire to formalize their

14  relationship with the person they love by entering into the institution of civil marriage." Doc # 202 at

15

16  _____

   [4] These and other legal questions presented by this case implicate legislative facts, and Plaintiffs'
   arguments regarding the admissibility of our evidence are therefore unfounded. *See* Doc # 202 at 34
17  n.6. Usual evidentiary strictures do not apply to legislative facts. *See* Fed. R. Evid. 201 note. For
   similar reasons, there is no merit in Plaintiffs' claim that because discovery is ongoing they "*cannot*
18  present facts *essential* to justify [their] opposition" to our argument that rational basis review applies.
   *See* Doc # 202 at 50, 53-55; Fed. R. Civ. Proc. 56(f). *First*, binding precedent forecloses Plaintiffs'
19  claims (*Baker*) and establishes that classifications based on sexual orientation are subject to rational
   basis review (*High Tech Gays*).  Plaintiffs argue that these precedents do not control.  That, however, is
20  a legal issue, and one that the Court should resolve even if it declines to resolve the underlying issues at
   this stage. *See Pinsky v. JP Morgan Chase & Co.*, 576 F. Supp. 2d 564, 569 (S.D.N.Y. 2008). *Second*,
21  even if these precedents do not control, the issues that inform the level-of-scrutiny determination—*i.e.*,
   is same-sex marriage a fundamental right, are gays and lesbians entitled to suspect class status, does
22  Proposition 8 impermissibly classify by sex—are also legal in nature. *Third*, to the extent these legal
   issues are informed by facts, those facts are legislative in nature. Nothing prevented Plaintiffs from
23  engaging the materials we cited as evidence of legislative facts and responding with any similar
   materials supporting their arguments, and nothing prevents this Court from adjudicating any disputed
24  legislative facts (though we do not concede that any material disputes are present) at this stage of the
   proceedings. *See* Fed. R. Evid. 201 note. *Fourth*, Plaintiffs cannot rely on their undisclosed expert
25  evidence to preclude summary judgment under Rule 56(f). *See* Doc. # 202 at 51 ("Plaintiffs' experts
   own research has refuted many of Defendant-Intervenors' purported state interests . . ."). Arguments
26  under that Rule are based on sought-but-unable-to-be-acquired evidence, not on evidence within the
   nonmoving party's control. *See Jones v. Blanas*, 393 F.3d 918, 930-31 (9th Cir. 2004); *Finally*,
27  Plaintiffs cannot rely on speculative concessions that they might obtain from Defendant-Intervenors'
   experts or admissions that they might elicit from Defendant-Intervenors. *See National Union Fire Ins.*
   *Co. v. The Stroh Cos.*, 265 F.3d 97, 117 (2d Cir. 2001).

28

19. "[A] common characteristic shared by beneficiaries and nonbeneficiaries alike," however, "is not sufficient to invalidate a statute when other characteristics peculiar to only one group rationally explain the statute's different treatment of the two groups," as is plainly the case here.  *Johnson*, 415 U.S. at 378.  Indeed, Plaintiffs reduction of the purpose of marriage to nothing more than formalizing "committed and loving relationship[s]," Doc # 202 at 19 (quotation marks omitted), not only does the institution a disservice, it is also untenable. For one, it conflates private reasons for getting married with the public purposes that marriage serves. Couples may seek to get married for myriad reasons— out of a desire to express publicly their love and commitment, to be sure, but also for companionship, financial security, and social status, to name but a few examples. Society, however, has different reasons for recognizing and regulating intimate relationships between men and women. Indeed, it is difficult to imagine any state interest in recognizing and regulating intimate relationships between adults apart from the vital role that opposite-sex relationships have always played in creating and nurturing the next generation. *See* BERTRAND RUSSELL, MARRIAGE AND MORALS 156 (1929) ("it is through children alone that sexual relations become of importance to society and worthy to be taken cognizance of by a legal institution").

Further, Plaintiffs' reductionist, adult-focused view of marriage cannot be squared with historical and contemporary evidence.  Plaintiffs concede that marriage has traditionally been the union of a man and a woman and that same-sex marriage is a recent innovation. While the notion that the only purpose of the institution is to celebrate loving, committed relationships has perhaps gained some currency in some circles in recent years, it has certainly not eclipsed the traditional view that marriage is uniquely and centrally concerned with procreation, childrearing, and the propagation of society, as evidenced, among other things, by the overwhelming majority of jurisdictions that continue to reserve marriage for opposite-sex unions.[5]

**B.**      **Classifications Based On Sexual Orientation Receive Rational Basis Review**

In *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563 (9th Cir.

---

[5] Contrary to Plaintiffs' suggestion, determining whether same-sex couples are similarly situated to opposite-sex couples for purposes of this case is a legal rather than a factual inquiry. The Court must determine the legal significance of the undeniable differences (rooted in biology and history) between same-sex and opposite-sex couples with respect to marriage.

1990), the Ninth Circuit held that gays and lesbians do not constitute a suspect or quasi-suspect class, and that laws that classify by sexual orientation are subject only to rational basis review.  *Id*. at 574.  *High Tech Gays* and other Ninth Circuit precedents reaffirming its holdings are binding on this Court.

1. Plaintiffs contend that *High Tech Gays* was "premised on the Supreme Court's since-overruled decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986)" and that this Court is thus free to ignore it. Doc # 202 at 20.  But *High Tech Gays* cannot be brushed aside so easily.  While the Ninth Circuit did observe that *Bowers* was "incongruous" with deeming sexual orientation a suspect or quasi-suspect classification, the court independently analyzed the case for subjecting sexual orientation classifications to heightened scrutiny and found it wanting.  *High Tech Gays*, 895 F.2d at 571, 573-74. After setting forth the requirements for treatment as a suspect or quasi-suspect class—a history of discrimination, immutability, and political powerlessness—the court held that gays and lesbians met the first of these requirements but failed the latter two.  *Id*. at 573-74.  This analysis "compel[led]" the holding "that homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny."  *Id*. at 574.  That holding and analysis are controlling here.

Indeed, in *Witt v. Department of the Air Force*, 527 F.3d 806 (9th Cir. 2008), the Ninth Circuit squarely held that because "*Lawrence* . . . declined to address equal protection," the precedential rule that "rational basis review" applies to laws that classify on the basis of sexual orientation "was not disturbed."  *Id.* at 821.[6]  Other circuits have uniformly reached the same conclusion.  *See* Doc # 172-1 at 37 (collecting cases); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008).

2. *High Tech Gays* held that gays and lesbians have suffered from discrimination, and we have never contended otherwise. *See* Defendant-Intervenors' (hereinafter "Proponents") Proposed Stipulations, Doc # 159-1 at 1. *High Tech Gays*' holdings that gays and lesbians are not political

_____

[6] Plaintiffs attempt to distinguish *Witt*—which addressed the military's Don't Ask Don't Tell policy—on the basis that it did not involve a claim of discrimination between homosexuals and heterosexuals, but rather between homosexuals and others "whose presence may also cause discomfort among other service members, such as child molesters." *Witt*, 527 F.3d at 821 (quotation marks omitted); *see* Doc # 202 at 13 n.3. Witt, however, clearly complained of being treated differently because of her homosexual behavior, *id.*, and in rejecting her claim, the Ninth Circuit referenced its earlier holding in *Philips v. Perry*, 106 F.3d 1420, 1424 (9th Cir. 1997), that Don't Ask Don't Tell satisfied rational basis review under the equal protection clause. *Witt*, 527 F.3d at 821. The plaintiff in *Philips* challenged the policy on the basis of its differing treatment of homosexuals and heterosexuals. *See* 106 F.3d at 1424-25.

11

1  powerless and sexual orientation is not immutable are also binding and correct. Plaintiffs contend,

2  however, that a genuine issue of material fact exists (or will exist following discovery) regarding the

3  relative political power of gays and lesbians. *See* Doc # 202 at 38-39, 50. But in light of gay and

4  lesbians' numerous political successes, Plaintiffs simply cannot show that gays and lesbians "have *no*

5  *ability* to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445 (emphasis added); *High*

6  *Tech Gays*, 895 F.2d at 574. Indeed, to meet this standard, Plaintiffs would have to show that gays and

7  lesbians have *less* political power today than they did in 1990, when *High Tech Gays* was decided,

8  which they surely do not.[7]

9      Plaintiffs also contend that political powerlessness, while "relevant," is not "necessary to or

10  dispositive of the [suspect class] inquiry." Doc # 202 at 21. This bald assertion cannot be squared with

11  *High Tech Gays*, nor with controlling Supreme Court precedent establishing political powerlessness as

12  the *linchpin* of this inquiry. As the Court has explained, equal protection review is typically deferential

13  because our system of government "presumes that even improvident decisions will eventually be

14  rectified by the democratic processes." *Cleburne*, 473 U.S. at 440. This presumption may be

15  unwarranted, however, when "prejudice against discrete and insular minorities … seriously …

16  curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities."

17  *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). Minority groups "relegated to

18  such a position of political powerlessness" may merit "extraordinary protection from the majoritarian

---

19  [7] In addition to their substantial and growing political power in California (our evidence of which

20  Plaintiffs have not disputed), gays and lesbians have attracted the attention of Congress on the very fronts Plaintiffs discuss. *See, e.g.*, Violent Crime Control and Law Enforcement Act of 1994, Pub. L.

21  No. 103-322, § 280003, 108 Stat. 1796, 2096 (1994) (codified at 28 U.S.C. § 994 note) (prescribing sentencing enhancements for "hate crimes" in which "the defendant intentionally selects a victim …

22  because of … sexual orientation"); 28 U.S.C. § 534 note (requiring the Attorney General to acquire and publish an annual summary of data "about crimes that manifest evidence of prejudice based on …

23  sexual orientation"); Local Law Enforcement Hate Crimes Prevention Act of 2009, H.R. 1913, 111th Cong. § 6 (2009) (pending bill that would make it a federal crime to "willfully cause[] body injury to

24  any person … because of … sexual orientation [or] gender identity"); H.R. 2981, 111th Cong. (2009), S. 1584, 111th Cong. (2009) (pending bills with co-sponsorship from 175 members and 39 senators

25  that would ban employment discrimination on account of sexual orientation); Respect for Marriage Act, H.R. 3567, 111th Cong. §§ 2-3 (2009) (pending bill with 94 co-sponsors that would repeal DOMA

26  and recognize same-sex marriages "valid in the State where the marriage was entered into"); Military Readiness Enhancement Act of 2009, H.R. 1283, 111th Cong. § 2 (2009) (pending bill with 173 co-

27  sponsors that would "institute in the Armed Forces a policy of non-discrimination based on sexual orientation"). Thus it is plainly not true that gays and lesbians have "no ability to attract the attention of

28  lawmakers"—either at the state or federal level.

---

12

political process" in the form of heightened equal protection scrutiny.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  Because gays and lesbians have demonstrated that they are not politically powerless, they do not require such extraordinary protection.[8]

Plaintiffs likewise contend that the issue of immutability of sexual orientation is disputed and that such immutability is in all events unnecessary for sexual orientation to be a suspect classification.  *See* Doc # 202 at 21-22.  They have not, however, countered the clear evidence that sexual orientation is complex, amorphous, and defies consistent definition—and is thus unlike any suspect or quasi-suspect classification recognized by the Supreme Court.  Indeed, the American Psychological Association report that they cite acknowledges that "[s]exual orientation is a complex human characteristic involving attractions, behaviors, emotions, and identity" and that "a great deal of debate surrounds the question of how best to assess sexual orientation in research."  Doc # 204-5 at 38, 39.  Nor have Plaintiffs countered our evidence that sexual orientation can and often does vary over a lifetime.  Instead, they focus on knocking down straw men, arguing, for example, that sexual orientation should not be changed "by compulsion of the State" and that some individuals may be harmed by trying to change their sexual orientation.  Doc # 202 at 36-37.  But our case does not address either proposition.  Instead, the lack of clear, stable, and well-defined distinctions between differing sexual orientations indicates that the characteristic is not an immutable one marking a "discrete and insular" minority.  *Carolene Products*, 304 U.S. at 152 n.4; *see also High Tech Gays*, 895 F.2d at 573.[9]

---

[8] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995), does not hold or imply that political powerlessness is not a prerequisite for heightened equal protection scrutiny, but only that *all* government discrimination, including "reverse discrimination," predicated on constitutionally suspect characteristics such as race is subject to heightened equal protection scrutiny. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90 (1978) (opinion of Powell, J). If *Adarand* were taken to suggest that political powerlessness is unnecessary to establish suspect class status in the first instance, it would also entail the surprising suggestion that a history of discrimination is unnecessary as well.

[9] Plaintiffs claim that *Christian Science Reading Room Jointly Maintained v. San Francisco*, 784 F.2d 1010 (9th Cir. 1986), held that "an individual religion meets the requirements for treatment as a suspect class, even though religion is not immutable." Doc # 202 at 21-22 (quotation marks omitted). That case, however, applied rational basis review to strike down a regulation distinguishing between "religious organizations and all others." *Id.* at 1012. The dictum on which Plaintiffs rely was based only on dicta from two other cases as well as cases discussing the general requirements for suspect classifications. *Id.* The Supreme Court has not held that religion is a suspect classification, indicating instead that the Free Exercise Clause, not the Equal Protection Clause, is the source of heightened constitutional protection against religious discrimination, *see Locke v. Davey*, 540 U.S. 712, 720 n.3 (Continued)

13

3. Finally, Plaintiffs contend that heightened scrutiny is required because sexual orientation "frequently bears no relation to ability to perform or contribute to society." Doc # 202 at 21 (quotation marks omitted). Although *High Tech Gays* does not identify this factor in its heightened scrutiny analysis, Supreme Court cases such as *Cleburne* do discuss it. And in the context of marriage, at any rate, it cuts sharply against heightened scrutiny of classifications based on sexual orientation. While we agree with the general proposition that sexual orientation does not affect individuals' ability to contribute to society, there is one critical exception: same-sex relationships lack the natural procreative capacity of opposite-sex relationships. *See* Proponents' Proposed Stipulations, Doc # 159-1 at 1; Proponents' Responses to Plaintiffs' Proposed Stipulations, Doc # 159-2 at 3. As we have explained, procreation—including unintentional procreation—presents society with unique benefits and challenges that the institution of marriage is designed to address. In cases such as this,

> where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued. In such cases, the Equal Protection Clause requires only a rational means to serve a legitimate end.

*Cleburne*, 473 U.S. at 442.

## C.  Proposition 8 Does Not Discriminate On The Basis Of Sex

As we have demonstrated, Plaintiffs' sex-discrimination claim is foreclosed by the overwhelming weight of authority holding that the traditional definition of marriage does not discriminate on the basis of sex. Nor does *Loving* support Plaintiffs' claim. That case held that Virginia's antimiscegenation statute was "invidious," regardless of its alleged equal application across races. 388 U.S at 11. Further, "[t]he fact that Virginia prohibit[ed] only interracial marriages involving white persons demonstrate[d] that" the prohibition was "designed to maintain White Supremacy." *Id*. As the California Supreme Court explained in *Marriage Cases*, 183 P.3d at 437:

> The decisions in *Perez* . . . and *Loving v. Virginia* . . . , however, are clearly distinguishable from this case, because the antimiscegenation statutes at issue in those cases plainly treated members of minority races differently from White persons, prohibiting only intermarriage that involved White persons . . . . Under these circumstances, there can be no doubt that the reference to race in the statutes at issue in (Cont'd)

(2004) (applying rational basis scrutiny under the Equal Protection Clause to a claim of religious discrimination absent "a violation of the Free Exercise Clause").

14

1    *Perez* and *Loving* unquestionably reflected the kind of racial discrimination that always has been recognized as calling for strict scrutiny under equal protection analysis.[10]

2

3    Plaintiffs cannot seriously contend that Proposition 8 was likewise designed to maintain

4    male (or female) supremacy.  Indeed, the California Supreme Court squarely rejected the

5    proposition that California's traditional definition of marriage "reflects illegitimate gender-

6    related stereotyping." *Id.* at 439. Further, while the only interests served by the

7    antimiscegenation statute at issue in *Loving* were racist and invidious, the traditional definition of

8    marriage as the union of a man and a woman furthers numerous vital societal interests that have

9    nothing to do with sex discrimination.

10   In addition, Plaintiffs' argument "improperly conflates two concepts—discrimination on the

11   basis of sex, and discrimination on the basis of sexual orientation—that [the law has] traditionally

12   viewed as distinct phenomenon.  Under [Plaintiffs'] argument, discrimination on the basis of sexual

13   orientation always would constitute a subset of discrimination on the basis of sex." *Id.* (citation

14   omitted).  This improper conflation is illustrated by Plaintiffs' assertion that if "either Plaintiff Katami

15   or Zarrillo were female, and if either Plaintiff Perry or Stier were male," they could marry.  Doc # 202

16   at 28.  This assertion, however, is belied by the central theory of Plaintiffs' case: that because of their

17   sexual orientation, marriage to a member of the opposite sex is not a meaningful option.

18   **IV.   Proposition 8 Is Rationally Related To Legitimate State Interests**

19       **A.   *Adams v. Howerton* Controls The Rational Basis Inquiry**

20   As we have explained, *Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982), held that limiting

21   marriage to opposite-sex couples satisfies rational basis review.  *Id.* at 1042.  Plaintiffs' efforts to

22   distinguish this controlling precedent, *see* Doc # 202 at 18 n.2, are unavailing. Although *Adams* arose

23   in the context of immigration law, where "Congress has almost plenary power to admit or exclude

24   aliens," 673 F.2d at 1041, the Ninth Circuit did not base its holding on this ground. Rather it applied

25

26   _____

      [10] *See also Hernandez v. Robles*, 855 N.E.2d 1, 6 (N.Y. 2006) (explaining that "the statute [in *Loving*] … was in substance anti-black legislation"); *Baker v. Vermont*, 744 A.2d 864, 880 n.13 (Vt. 1999) ("Virginia's anti-miscegenation statute['s] … real purpose was to maintain the pernicious doctrine of white supremacy…."); *Goodridge v. Department of Public Health*, 798 N.E.2d 941, 992 (Mass. 2003) (Cordy, J., dissenting) ("The [*Loving*] statute's … purpose was not merely to punish interracial marriage, but to do so for the sole benefit of the white race.").

27

28

15

traditional rational basis review: "We need not … delineate the exact outer boundaries of [the] limited judicial review," that would apply in the immigration context the court explained, because "[w]e hold that Congress's decision to confer spouse status … only upon the parties to heterosexual marriages has a rational basis …. *There is no occasion to consider in this case whether some lesser standard of review should apply*." *Id.* at 1042 (emphasis added).  Nor have *Romer* and *Lawrence* undercut *Adams'* rational basis analysis "in such a way that the cases are clearly irreconcilable."  *Witt*, 527 F.3d at 820 (quotation marks omitted). As we have explained, neither case addressed, let alone called into question, the traditional definition of marriage.  Nor did either case alter the traditional standards of rational basis review employed in *Adams* and applicable here.  *See, e.g.*, *Romer*, 517 U.S. at 635. *Adams* therefore compels the conclusion that Proposition 8 satisfies rational basis review.

**B.    Plaintiffs Misconstrue The Requirements Of Rational Basis Review**

In our opening brief, we explained that rational basis review is "a paradigm of judicial restraint," reflecting the constitutional principle that "judicial intervention is generally unwarranted no matter how unwisely [courts] may think a political branch has acted."  *FCC v. Beach Communications*, 508 U.S. 307, 314 (1993) (quotation marks omitted).  Plaintiffs' arguments are wholly inconsistent with numerous well-settled features of this deferential standard of review.

1.  Rational basis review does not require *Proponents* to "establish that there is a constitutionally sufficient interest underpinning" Proposition 8.  *Id.* at 22.  Rather, *Plaintiffs* bear "the burden to negative every *conceivable* basis which might support" it.  *Beach Communications*, 508 U.S. at 315 (emphasis added) (quotation marks omitted).  Plaintiffs do not even attempt to meet this burden.

2.  As previously discussed, *supra* at 3, rational basis review does not require us to identify a legitimate state interest that is advanced *by denying marriage to same-sex couples*. Contrary to Plaintiffs' argument, we have not "misframed" our defense of Proposition 8. Doc # 202 at 23.  We do not contend that Plaintiffs' claims fail simply because "recognizing marriage by individuals of the opposite sex furthers a legitimate interest," *id.*, but rather because recognizing traditional marriages furthers legitimate interests *that would not be furthered (or would  not be furthered to the same degree) by same-sex marriages*. And under controlling Supreme Court precedent, a statutory classification has a rational basis where "the inclusion of one group promotes a legitimate government purpose, and the

16

addition of other groups would not." *Johnson*, 415 U.S. at 383. Thus, we are not asking the Court to ignore Proposition 8 and focus on "California's laws granting heterosexual individuals the right to marry." Doc # 202 at 23. Rather, we are defending the distinction drawn by Proposition 8 itself— between unions of "a man and a woman" and all other types of relationships, including same-sex ones.[11] In sum, "[u]nder rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." *Garrett*, 531 U.S. at 366-67; *accord Cleburne*, 473 U.S. at 442.[12]

3. Rational basis review requires Plaintiffs to demonstrate that the people of California *could not rationally believe* that Proposition 8 advances any conceivable legitimate interest. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981). "Whether *in fact*" it promotes such an interest "is not the question." *Id.* Room for disagreement about the latter question (as Plaintiffs allege with respect to several interests we have identified, *see, e.g.*, Doc # 202 at 39-44) is thus not enough. Indeed, "the very admission that the facts are arguable … immunizes [Proposition 8] from constitutional attack." *Vance v. Bradley*, 440 U.S. at 112. Simply put, Plaintiffs "cannot prevail" so long as Proposition 8's rationality "is at least debatable." *Clover Leaf Creamery Co.*, 449 U.S. at 464.

4. Under rational basis review, it does not matter whether the line drawn in Proposition 8 could have been drawn differently, whether Proposition 8 could have been more closely tailored to the interests we have identified, or whether the State might have gone further than it did in advancing these interests. *See Vance*, 440 U.S. at 102 n.20; *Heller*, 509 U.S. at 321; *Katzenbach v. Morgan*, 384 U.S.

---

[11] These clarifications demonstrate that our position is not akin to simply asking whether the city in *Cleburne* "had a rational basis for granting zoning permits without special use permits for" structures other than group homes for the mentally disabled or "whether Colorado's anti-discrimination laws protecting … minority groups [other than gays and lesbians] furthered a legitimate state interest." Doc # 202 at 23. Even accepting Plaintiffs' characterization of the laws at issue in these cases—and their characterization of the law at issue in *Romer*, at least, dramatically understates the scope and effect of that law—the defendants in those cases would have been required to show also that granting zoning permits without special use permits to group homes for the mentally disabled *would not* further the interests served by granting such permits to other structures, and that anti-discrimination laws protecting gays and lesbians *would not* further the interests served by Colorado's existing antidiscrimination laws. Plainly the defendants in those cases could not have made such showings.

[12] As is readily apparent, this analysis in no way depends on the notion that Proposition 8 will "encourage[] gay and lesbian individuals to marry a person of the opposite sex." Doc # 202 at 39.

17

641, 658 (1966).   Thus it simply does not matter that Proposition 8 does not, for example, "deter marriage by … individuals who have either no desire or no ability to conceive children," *see, e.g.*, Doc # 202 at 9, or invalidate the marriages of same-sex couples entered into before its enactment, *see, e.g., id.* at 15.   Nor does it matter that California could have taken additional measures to advance the interests we have identified, such as seeking to guarantee that married couples who do have children "will remain together to raise them."   *Id*. at 9.

5.   Under rational basis review, it does not matter whether the interests we have identified were ever "articulate[d]" by Proponents or anyone else.   *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980).   Indeed, whether any of these interests actually motivated California's voters is "entirely irrelevant for constitutional purposes."   *Beach Communications*, 508 U.S. at 315.   Further, the Court need not limit its consideration even to the interests we have identified in this litigation, for "[i]n performing [rational basis] analysis, [courts] are not bound by explanations of the statute's rationality that may be offered by litigants."   *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 463 (1988).   Any "admissions" or "concessions" Plaintiffs might obtain from Proponents regarding the purpose of Proposition 8 would thus be irrelevant.   *See* Doc # 202 at 51.[13]

6.   Rational basis review does not require us to introduce *any* evidence to support Proposition 8; "rational speculation unsupported by evidence or empirical data" is sufficient.   *Beach Communications*, 508 U.S. at 315.   Even apart from the legislative nature of the facts at issue, it therefore does not matter if we have "provide[d] no evidence to support" a connection between Proposition 8 and any particular interest it serves (although we have provided ample such evidence).   Doc # 202 at 39.

7.   If Proposition 8 is rationally related to a legitimate state interest, whether or not it was also accompanied by *irrational* attitudes such as animus is irrelevant.   *See Garrett*, 531 U.S. at 367.

---

[13]   We do not, however, concede that the interests we have identified did not actually motivate the enactment of Proposition 8. Indeed, the official ballot materials illustrate the close connection between the arguments presented to the voters and the interests we are asserting here. For example, "restor[ing] the definition of marriage to what the vast majority of California voters already approved and what human history has understood marriage to be" encompasses most of the societal interests we assert, as those interests are tied to the traditional understanding and purposes of marriage. Doc # 54-1 at 24. Furthermore, "protect[ing] our children from being taught in public schools that 'same-sex marriage' is the same as traditional marriage" reflects interests in reserving different names for different relationships and respecting moral beliefs regarding the institution of marriage. *Id.*

1    Plaintiffs' efforts to uncover evidence of irrational motivations for Proposition 8 can therefore have no

2    bearing on the outcome of this case.  *See* Doc # 202 at 52-53.  If Proposition 8 is rationally related to a

3    legitimate state interest, any such evidence will not invalidate it, and if Proposition 8 is *not* rationally

4    related to a legitimate state interest, it will be struck down with or without it.

5         8.  Rational basis review does not call for balancing the interests served by Proposition 8 against

6    its impact on the Plaintiffs or anyone else.  *See, e.g.*, *Garrett*, 531 U.S. at 367-68.  Plaintiffs'

7    suggestions that the "benefit" of Proposition 8 to California must be weighed against its cost to gays

8    and lesbians are thus wide of the mark.  *See, e.g.*, Doc # 202 at 27, 52.

9         **C.      Proposition 8 Advances Several Legitimate Government Interests**

10        Viewing the vital state interests we have identified through the proper legal prism, it is readily

11   apparent that Proposition 8 more than satisfies rational basis review.[14]

12        1.  "[P]reserving the traditional institution of marriage" is itself a "legitimate state interest."

13   *Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring in the judgment).  Plaintiffs dismiss this as

14   merely an "appeal-to-the-way-things-have-always-been," but they fail to engage the present-day

15   interests advanced by preserving this ancient institution.  Doc # 202 at 8.

16        *First*, by preserving the traditional definition of marriage and providing an alternative title

17   ("domestic partnership") for same-sex unions, California recognizes different types of relationships

18   with different names.  The name "marriage" is reserved for the type of relationship it has always

19   identified.  Same-sex relationships, which are biologically, historically, and culturally different from

20   opposite-sex relationships, receive a different name.  This, and not that marriage is "just a name," *id.* at

21   12, is the point illustrated by our discussion of orchids and roses:  Just as the uniqueness of orchids and

22   roses is evoked and honored by their different names, the people of California rationally acknowledge

23   and respect the differences between same-sex and opposite-sex relationships by reserving different

24

25        [14] Plaintiffs' Rule 56(f) claim with respect to whether rational basis review is satisfied fails for
     many of the same reasons as Plaintiffs' Rule 56(f) arguments about whether that standard applies.  *See*
26   Doc # 202 at 51-53; *supra* at 9 n.4.  Indeed, as we have explained, their proposed fact development is
     particularly unnecessary in the context of rational basis review.  *See Knapp v. Hanson*, 183 F.3d 786,
27   789 (8th Cir. 1999) ("When all that must be shown is 'any reasonably conceivable state of facts that
     could provide a rational basis for the classification,' it is not necessary to wait for further factual
28   development"); *Connolly v. McCall*, 254 F.3d 36, 42 (2d Cir. 2001) (similar).

names for them.[15]

*Second*, California maintains flexibility to respond to differing needs of same-sex and opposite-sex relationships by reserving a separate parallel institution for each. Indeed, we have shown that many gays and lesbians are concerned about the effects of lumping together same-sex and opposite-sex relationships. Plaintiffs do not seriously contest these points.

*Third*, Proposition 8 preserves California's ability to respond cautiously to a proposed radical redefinition of the bedrock social institution of marriage. As we have shown, even some ardent supporters of same-sex marriage recognize such restraint with respect to experimentation with marriage as not only rational but "almost inspirational." Doc # 172-1 at 74. In light of the *Marriage Cases*, Proposition 8 was the *narrowest* way—indeed, the *only* way—to effectuate this interest.

Although we emphasize again that it is not necessary for us to show that extending marriage to same-sex relationships would harm the institution, Californians reasonably could fear that changing the meaning and public understanding of marriage could undermine that institution's traditional purposes. *See* Doc # 172-1 at 97. Redefining marriage in this manner might also lead to additional changes in the laws governing marriage and domestic partnerships that could undermine the traditional purposes of marriage. For example, under Plaintiffs' legal theory, domestic partnerships would almost certainly have to be opened to opposite-sex couples. In the Netherlands, where this dual structure exists, partnerships have proven to be a powerful competitor to traditional marriage and have weakened the government's ability to channel opposite-sex couples into traditional marriages. *See* Statistics Netherlands, Marriages and Partnership Registrations, *at* http://statline.cbs.nl/StatWeb/publication/ ?VW=T&DM=SLEN&PA=37772eng&D1=0,2-12,35,37-39&D2=0,50-57&HD=080929-0715&LA =EN&HDR=T&STB=G1. And eliminating the exclusive imprimatur California now grants to traditional marriages, and extending that imprimatur to unions not "unreservedly approved and favored by the community," *Marriage Cases*, 183 P.3d at 445, might significantly alter the nature and

---

[15] It is Plaintiffs' attempt to equate Proposition 8 with a hypothetical withholding of "citizenship" status that is "manifest nonsense." Doc # 202 at 12. The Fourteenth Amendment itself establishes a constitutional definition of citizenship, *see* U.S. CONST. amend. 14, § 1, precisely to prevent states from restricting citizenship on invidious grounds such as those suggested by Plaintiffs. Further, California has not denied the denomination of marriage to anyone who meets its objective, deeply rooted purposes and legal qualifications.

effectiveness of California's efforts to channel potentially procreative relationships into marriages. Nothing in the Constitution requires Californians to run these risks with the vital institution of marriage.

History demonstrates that concerns that changes to the legal rules governing marriage may have unintended and adverse consequences are not far-fetched. During the debate surrounding no-fault divorce, for example, advocates for the innovation asserted that "intact marriages would be unaffected by the legal change and the social impact would be minimal." Douglas W. Allen, *An Economic Assessment of Same-Sex Marriage Laws*, 29 HARV. J. L. & PUB. POL'Y 949, 965-66 (2006). In fact, however, no-fault divorce contributed to a dramatic rise in the divorce rate, and the "real negative impact of the no-fault divorce regime [has been] on children." *Id.* at 968-69. Like same-sex marriage, no-fault divorce reflected a narrow focus on the needs and desires of adult partners, *id.* at 978—a focus that in hindsight plainly came at the expense of the traditional purposes of marriage. Californians could rationally fear the consequences of further moves toward treating marriage as serving no other purpose than recognizing "a committed and loving relationship" between adults, Doc # 202 at 19.

To be sure, the novelty of same-sex marriage makes it impossible to determine definitively whether such concerns are well founded. This, however, is the crux of our argument—Plaintiffs simply cannot prove that it is *irrational* to believe that extending marriage to same-sex couples carries a risk of weakening the institution of marriage and undermining the vital interests it serves.

2. Traditional marriage promotes vital state interests that arise from the potential for relationships between men and women to produce natural offspring. Because same-sex unions cannot do so, these interests would not be equally served by extending marriage to include them.

*First*, it is undeniable that every society must reproduce to survive. It is reasonable to believe that traditional marriage, by promoting stable, enduring relationships between men and women, advances this interest. Indeed, Plaintiffs concede "that marriage between individuals of the opposite sex may facilitate natural procreation." Doc # 202 at 24. As we explained in our opening brief, society's ever-present interest in procreation is particularly pertinent today, as there is a broad global trend toward low and decreasing birthrates. The fact some observers view low birthrates as "a success," *see* Doc # 202 at 40, is irrelevant—rational basis review leaves such policy disagreements to

21

1   the political process.

2      *Second*, it is also undeniable that only intimate relationships between men and women can

3   produce children *unintentionally*.  It is thus reasonable for Californians to be particularly concerned

4   with promoting stable and lasting opposite-sex relationships, and to conclude that traditional marriage

5   facilitates this interest.[16]  This argument does not, as Plaintiffs charge, rest on an assertion that

6   opposite-sex parents are better than same-sex parents.  *See* Doc # 202 at 25.  Rather, it rests on the

7   entirely rational conclusions that when unintended parenthood happens—as it most surely does—

8   society is best off if the child's parents take responsibility for his or her upbringing, and that the child is

9   best off in a stable family environment.  Indeed, Plaintiffs concede that " 'responsible procreation' may

10  provide a rational basis for the State's recognition of marriages by individuals of the opposite-sex."

11  *Id*.

12     *Third*, it is undeniable that parents and their biological children share a unique bond.

13  Californians could rationally conclude that traditional marriage, by facilitating and encouraging

14  stability in naturally procreative unions, uniquely promotes this natural and mutually beneficial

15  connection.  As with "responsible procreation," Plaintiffs erroneously caricature this interest as an

16  assertion that "same-sex parents are worse parents than opposite-sex parents."  *Id*. at 40.  But that is not

17  the point.[17]  Rather, it is that a genetic bond exists between parents and their natural children not

18  present in any other human relationship, and that the state has an interest in promoting and nurturing

19  this bond.  Illustrating this, our legal tradition does not permit "unrelated persons to retain custody of a

20  child whose natural parents have not been found to be unfit *simply because they may be better able to*

21  *provide for her future and her education*."  *DeBoer v. DeBoer*, 509 U.S. 1301, 1302 (1993) (Stevens,

22

23  [16] Marriage may not always fulfill the "hope" that parents "will remain together to raise" their
24  children, Doc # 202 at 9, but rational basis review requires no such showing. At any rate, it is certainly
    reasonable to believe that biological parents who are married are more likely to stay together.  Indeed,
25  "[a] well-known difference between cohabitation and marriage is that cohabiting unions are generally
    quite short-lived."  Wendy D. Manning, et al., *The Relative Stability of Cohabitating and Marital
    Unions for Children*, 23 POPULATION RESEARCH & POL'Y REV. 135, 136 (2004).
26  [17] We do maintain that the optimal environment for childrearing is a household headed by
    married, biological parents, and Plaintiffs surely cannot prove that this long and widely-held view is
27  *irrational*. But even this position does not reflect an assumption that same-sex parents are less loving,
    committed, or supportive of the children they raise than are biological parents. Rather, it simply
28  recognizes the unique value of the biological connection between parents and their natural children.

J., in chambers) (emphasis added); *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State.").

3.  We have also identified several legitimate interests served by Proposition 8 that are rooted in the undeniable fact that the overwhelming majority of California's sister states and the federal government adhere to the traditional definition of marriage.  Many of Plaintiffs' responses to these interests simply misapprehend the nature of rational basis review.  For example, they assert that "administrative ease" is insufficient to justify Proposition 8.  The case they cite, however, *Craig v. Boren*, 429 U.S. 190 (1976), holds only that "administrative ease and convenience" is not an interest sufficient to meet the *heightened scrutiny* applied to sex-based classifications.  *Id*. at 198-99.[18]

Nor are Plaintiffs' other arguments convincing.  We plainly "articulate[d] … why the State needs to distinguish between same-sex and opposite-sex relationships," Doc # 202 at 28—such a distinction is required by more than 1000 federal programs, *see* Doc # 172-1 at 100.  And, contrary to Plaintiffs' bald suggestion, Proposition 8 does not even implicate *any* of the components of the right to interstate travel.  *See Saenz v. Roe*, 526 U.S. 489, 500 (1999).

## V.   Proposition 8 Is Not Tainted By Animus Or Any Impermissible Considerations

Because Proposition 8 is rationally related to legitimate state interests, Proposition 8 simply "cannot run afoul" of the Fourteenth Amendment, *Heller*, 509 U.S. at 320, and the rational basis "inquiry is at an end," *Fritz*, 449 U.S. at 179.  Not only is Plaintiffs' attempt to tie Proposition 8 to improper motives thus irrelevant, it also fails on its own terms.

1.  Plaintiffs invest heavily in the argument that Proposition 8 is "just like" Colorado's Amendment 2 that the Supreme Court struck down in *Romer*.  Doc # 202 at 11.  Faced with the

---

[18] Other arguments Plaintiffs make sound in line-drawing, *see, e.g.*, Doc # 202 at 27, 28 (convenience and encouraging marriages recognition in other states not served because Proposition 8 did not invalidate pre-existing same-sex marriage); *id.* (for marriage mill concern to be legitimate, California must bar all marriages by out-of-state couples), interest balancing, *see id.* at 27 (encouraging marriage recognition illegitimate because of harm imposed on gays and lesbians), policy disagreement, *see id.* at 43 (State could benefit financially from becoming a "marriage mill"); and an improper understanding of the relative burdens of proof imposed by rational basis review, *see id*. at 44 (Proponents need to offer evidence to support administrative convenience argument).

23

obvious absurdity of this comparison, Plaintiffs' fallback position is that California "cannot do piecemeal what Colorado was attempting to do in one fell swoop"—namely, to put gays and lesbians in a solitary class "with respect to all transactions and relations." *Id.* But of course it was the very breadth of the law at issue in *Romer*, as well its uniqueness, that rendered it unconstitutional. Proposition 8, in contrast, merely restored the traditional definition of marriage which had prevailed in California, and everywhere else, since time immemorial. It did not repeal *any* of the numerous statutes that California has enacted protecting gays and lesbians from discrimination in numerous contexts, it left intact California's progressive domestic partnership laws and even all of the state constitutional rights recognized by the California Supreme Court's ruling in the *Marriage Cases*, except for the putative right to have same-sex relationships denominated as marriages. *See Strauss*, 207 P.3d at 61. Any suggestion that Proposition 8 is a first step toward dismantling the numerous protections and benefits California offers gays and lesbians is thus absurd on its face.

Nor does *Reitman v. Mulkey*, 387 U.S. 369 (1967), support Plaintiffs' case. There, as in *Romer* but unlike here, the only conceivable purpose for the challenged law was impermissible—"authorizing the perpetration of … private discrimination." *Id.* at 375.[19] Further, that law did not "just repeal an existing law forbidding private racial discriminations" but instead "struck more deeply and widely," essentially licensing private discrimination. *Id.* at 377, 380-81. In any event, the issue in *Reitman* was not whether the challenged law passed rational basis review, but whether the State's facilitation of private racial discrimination constituted race discrimination by the State. *See id.* at 378.

---

[19] Plaintiffs seize on the *Reitman* Court's "careful consideration" of the California Supreme Court's conclusions, 387 U.S. at 374, to assert that observations made in the *Marriage Cases* are "binding on this Court." Doc # 202 at 12. *Reitman*, however, did not hold that the California Supreme Court's conclusions were binding even though there, unlike here, the *Reitman* Court was (1) directly reviewing (2) the same challenged law (3) under the same Constitution. Further, the Supreme Court has squarely held that a state supreme court's conclusions that do "not, strictly speaking, construe [state law] in the sense of defining the meaning of a particular word or phrase" are *not* binding on federal courts. *Wisconsin v. Mitchell*, 508 U.S. 476, 483, 484 (1993).

Plaintiffs also argue (a) that this Court should follow the *Attorney General's* legal opinion that Proposition 8 is unconstitutional and (b) that his factual admissions are binding. *See* Doc # 202 at 11, 32. But even the Attorney General's interpretation of *state law* does not bind this Court, *see Stenberg v. Carhart*, 530 U.S. 914, 940 (2000), *Maldonado v. Harris*, 370 F.3d 945, 953 n.5 (9th Cir. 2004), much less his opinions about the federal Constitution. As to the latter, although still nominally a defendant, the Attorney General's admissions do not bind (and cannot be used as evidence against) Proponents. *See*, *e.g.*, *Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565, 566-57 (11th Cir. 1987).

2.  Plaintiffs next take aim at our defense of moral values as a potential rational basis for Proposition 8.  As an initial matter, Plaintiffs improperly conflate moral support for marriage in its traditional form with moral disapproval of gays and lesbians, *see* Doc # 202 at 26; even the Attorney General denies that Proposition 8 was "driven" by the latter.  Doc # 204-1 at 14.  Quite apart from this critical distinction, the Supreme Court has *not*, as Plaintiffs would have it, "made clear that moral disapproval of gay and lesbian individuals, like a bare desire to harm the group, is insufficient to satisfy rational basis review."  Doc # 202 at 26 (quotation marks omitted).  On the contrary, the *Lawrence* majority held only that the State could not "enforce" moral objections to homosexual conduct "through operation of the criminal law."  *Lawrence*, 539 U.S. at 571.  In all events, given the other vital interests it advances, Proposition 8 is constitutional regardless of whether moral support for the traditional definition of marriage is itself a legitimate state interest.

3.  Finally, we and Plaintiffs agree that the denomination "marriage" grants opposite-sex unions a "unique and highly favorable imprimatur."  Doc # 202 at 12.  Reserving this title for opposite-sex unions, however, does not inherently demean other types of relationships.  It is simply not true that the government cannot afford special recognition to one class of individuals for their special service to vital societal interests without demeaning others.  For example, the title "veteran" has a venerable and favorable imprimatur, and by bestowing it on individuals who have served in our armed forces the government both recognizes their service and provides an incentive for others to serve.  Doing so certainly does not, however, demean former *civilian* government servants (and it would not do so even if former civilian government servants were offered all of the same benefits as veterans). Similarly, opposite-sex couples who marry serve vital societal interests by pledging commitment to their union and the natural children it may produce.  The denomination "marriage" thus both recognizes the unique contributions married couples make to society and encourages opposite-sex couples to marry.

## CONCLUSION

For the foregoing reasons, the Court should grant Proponents' motion for summary judgment.

Dated: September 30, 2009

COOPER AND KIRK, PLLC
ATTORNEYS FOR DEFENDANTS-INTERVENORS

By: /s/ Charles J. Cooper
        Charles J. Cooper

25