Pages 1 - 103

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

| | | |
|---|---|---|
| KRISTIN M. PERRY, | ) | |
| SANDRA B. STIER, PAUL T. KATAMI, | ) | |
| and JEFFREY J. ZARRILLO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | NO. C 09-2292-VRW |
| | ) | |
| ARNOLD SCHWARZENEGGER, in his | ) | |
| official capacity as Governor of | ) | |
| California; EDMUND G. BROWN, JR., | ) | |
| in his official capacity as | ) | |
| Attorney General of California; | ) | |
| MARK B. HORTON, in his official | ) | |
| capacity as Director of the | ) | |
| California Department of Public | ) | |
| Health and State Registrar of | ) | |
| Vital Statistics; LINETTE SCOTT, | ) | |
| in her official capacity as Deputy | ) | |
| Director of Health Information & | ) | |
| Strategic Plainning for the | ) | |
| California Department of Public | ) | |
| Health; PATRICK O'CONNELL, in his | ) | |
| official capacity as | ) | |
| Clerk-Recorder for the County of | ) | |
| Alameda; and DEAN C. LOGAN, in his | ) | |
| official capacity as | ) | |
| Registrar-Recorder/County Clerk | ) | |
| for the County of Los Angeles, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| | ) | October 14, 2009 |
| _____ | ) | 10:05 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:    Lydia Zinn, CSR #9223, RPR**
**                Official Reporter - U.S. District Court**

```
 1   Appearances:

 2   For Plaintiffs:        Gibson, Dunn & Crutcher
                            1050 Connecticut Avenue, N.W.
 3                          Washington, D.C. 20036
                            (202) 955-8668
 4                          (202) 467-0539 (fax)
                      BY:   THEODORE B. OLSON
 5                          AMIR CAMERON TAYRANI
                            MATTHEW D. MC GILL
 6
                            Gibson, Dunn & Crutcher
 7                          333 South Grand Avenue
                            Los Angeles, CA  90071
 8                          (213) 229-7804
                            (213) 229-7520 (fax)
 9                    BY:   THEODORE J. BOUTROUS, JR.
                            CHRISTOPHER D. DUSSEAULT
10
     Also for Plaintiffs:   Boies, Schiller & Flexner
11                          333 Main Street
                            Armonk, NY  10504
12                          (914) 749-8200
                            (914) 749-8300 (fax)
13                    BY:   THEODORE H. UNO
                            JEREMY M. GOLDMAN
14
     Also for Plaintiffs:   Dennis J. Herrera, City Attorney
15                          Office of the City Attorney
                            Fox Plaza
16                          1390 Market Street, Sixth Floor
                            San Francisco, CA  94102-5408
17                    BY:   DANNY YEH CHOU

18                          San Francisco City Attorney's Office
                            1 Dr. Carlton B. Goodlett Place
19                          San Francisco, CA  94102
                            (415) 554-4655
20                    BY:   THERESE STEWART

21   For Defendant-         Cooper & Kirk
     Intervenors:           1523 New Hampshire Avenue, N.W.
22                          Washington, D.C.  20036
                            (202) 220-9600
23                    BY:   CHARLES J. COOPER
                            HOWARD C. NIELSON, JR.
24                          PETER A. PATTERSON

25   (Appearances continued on next page)
```

*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

```
 1   Appearances (Cont'd)

 2   Also for Defendant-      Alliance Defense Fund
     Intervenors:             15100 N. 90th Street
 3                            Scottsdale, AZ  85260
                              (480) 444-0020
 4                            (480) 444-0028 (fax)
                        BY:   BRIAN W. RAUM
 5                            JAMES A. CAMPBELL

 6   For Defendants:          Mennemeier, Glassman & Stroud
                              980 9th Street, Suite 1700
 7                            Sacramento, CA  95814-2736
                              (916) 553-4000
 8                      BY:   ANDREW WALTER STROUD

 9   Also for Defendants:     County of Alameda
                              1221 Oak Street, Suite 450
10                            Oakland, CA  94612-4296
                              (510) 272-6710
11                      BY:   CLAUDE FRANKLIN KOLM

12   Also For Defendant:      State Attorney General's Office
                              455 Golden Gate Avenue, Suite 11000
13                            San Francisco, CA  94102-7004
                              (415) 703-5506
14                            (415) 703-5480 (fax)
                        BY:   TAMAR PACHTER
15
                              Office of the Attorney General
16                            State of California
                              Department of Justice
17                            1300 I Street, 17th Floor
                              Sacramento, California  95814
18                            (916) 324-3081
                        BY:   GORDON BRUCE BURNS
19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Calling Civil Case 09-2292,
 2   Kristine Perry, et al., versus Arnold Schwarzenegger, et al.
 3              State your appearances for the plaintiffs, please.
 4              MR. OLSON:  Good morning, your Honor.
 5   Theodore Olson, Gibson, Dunn & Crutcher, for the plaintiffs.
 6   Thank you.
 7              THE COURT:  Good morning, Mr. Olson.
 8              MR. BOUTROUS:  Good morning, your Honor.
 9   Theodore Boutrous, for the plaintiffs.
10              THE COURT:  Mr. Boutrous, good morning.
11              MR. DUSSEAULT:  Good morning, your Honor.
12   Christopher Dusseault, of Gibson, Dunn & Crutcher, also for the
13   plaintiffs.
14              THE COURT:  Good morning.
15              MR. MC GILL:  Good morning, your Honor.
16   Matthew McGill, Gibson, Dunn & Crutcher, for the plaintiffs.
17              THE COURT:  Good morning.
18              MR. TAYRANI:  Good morning, your Honor.
19   Amir Tayrani, for the plaintiffs.
20              THE COURT:  Good morning.
21              MR. GOLDMAN:  Good morning, your Honor.
22   Jeremy Goldman, from Boies, Schiller & Flexner, for the
23   plaintiffs.
24              THE COURT:  Mr. Goldman.
25              MR. UNO:  Good morning, your Honor.  Theodore Uno,
```

```
 1  Boies, Schiller & Flexner, for the plaintiffs.

 2              MS. STEWART:  Good morning, your Honor.

 3  Therese Stewart, for the plaintiff, City and County of

 4  San Francisco.

 5              THE COURT:  Ms. Stewart, good morning.

 6              MR. CHOU:  Danny Chou, for the City and County of

 7  San Francisco.  Danny Chou.

 8              THE COURT:  Mr. Chou, good morning.

 9              MR. COOPER:  Good morning, Chief Judge Walker.

10  Chuck Cooper, for the Defendant-Intervenors.  Thank you.

11              THE COURT:  Mr. Cooper, good morning.

12              MR. NIELSON:  Good morning, Chief Judge Walker.

13  Howard Nielson, also of Cooper & Kirk, for the

14  Defendant-Intervenors.

15              THE COURT:  Mr. Nielson.

16              MR. PATTERSON:  Good morning, Chief Judge Walker.

17  Pete Patterson, also from Cooper & Kirk, for the

18  Defendant-Intervenors.

19              MR. STROUD:  Good morning, your Honor.

20  Andrew Stroud, Mennemeier, Glassman & Stroud, on behalf of

21  Governor Schwarzenegger and the Administration defendants.

22              THE COURT:  Good morning.

23              MR. STROUD:  Good morning.

24              MR. RAUM:  Good morning, your Honor.  Brian Raum,

25  Alliance Defense Fund, for the Defendant-Intervenors.
```

```
 1            THE COURT:  Mr. Raum, good morning.
 2            MR. CAMPBELL:  Good morning, your Honor.
 3   James Campbell, with the Alliance Defense Fund, on behalf of
 4   the Defendant-Intervenors.
 5            THE COURT:  Good morning.
 6            Anybody else?
 7            MR. KOLM:  Good morning, your Honor.  Claude Kolm,
 8   from the Alameda County Counsel's office, for Defendant Alameda
 9   County Clerk-Recorder.
10            THE COURT:  Good morning.
11            MS. PACHTER:  Good morning, your Honor.
12   Tamar Pachter, for the California Attorney General.
13            THE COURT:  Good morning.
14            MR. BURNS:  Good morning, your Honor.  Gordon Burns,
15   for the California Attorney General.
16            THE COURT:  Very well.  Good morning.  I believe
17   that's all.
18            All right.  Well, Mr. Cooper, it's your motion that I
19   think we're going to spend most of the time on.
20            We have a couple of items that are before us.  We
21   have a motion for summary judgment that the proponents have
22   filed.
23            We have also a motion to stay which has not been
24   fully briefed, as I understand it; and furthermore, that may
25   possibly be mooted by a ruling on the motion for summary
```

1   judgment.  So it would be my inclination to postpone hearing

2   the motion to stay until we work through the motion for summary

3   judgment.

4            And so, unless counsel have some other plan or need

5   that they feel that the proper management of the case demands,

6   I would suggest we proceed immediately to the motion for

7   summary judgment.  How does that sound to you, Mr. Cooper?

8            **MR. COOPER:**  Your Honor, that suits me just fine.

9   Thank you very much.

10           **THE COURT:**  And you, Mr. Olson?

11           **MR. OLSON:**  Thank you, your Honor.  That's fine with

12   us.

13           **THE COURT:**  All right.  Fine.

14           Now, let's begin.  If you don't mind, before you get

15   into your argument, talk a little bit about civil procedure;

16   the subject that is of some interest to me, at least.

17           As I understand the five grounds that you have

18   asserted in support of your motion for summary judgment, there

19   is only one -- the first ground, the *Baker v. Nelson* ground --

20   that would dispose of the case in its entirety.

21           **MR. COOPER:**  Yes, your Honor.

22           **THE COURT:**  Is that correct?

23           **MR. COOPER:**  That is correct, except to the extent

24   that the Court would agree with our submission that the facts

25   relevant to the various issues before you are legislative

1  facts, as we've submitted before, and that they don't require a

2  trial in order for you to fully master -- fully master the

3  relevant factual information to render your decisions.  That

4  would be the only other scenario I can think of in which a

5  summary judgment would be appropriate.

6          And, in fact, that is the procedure that, as we've

7  noted before, all the other same-sex-marriage cases have

8  essentially followed; but as a matter of law, the only case I

9  have that -- that takes care of everything, in my opinion, is

10  *Baker against Nelson*, yes, sir.

11          **THE COURT:**  All right.  The others are essentially

12  motions for partial summary judgment, having to do with the

13  standard of review, or perhaps one of your grounds is to

14  eliminate the Due Process claim, which would be one of the

15  plaintiffs' claims, and so forth; but essentially, four out of

16  the five grounds should be analyzed under Rule 54(b) rather

17  than summary judgment on the entire case.

18          **MR. COOPER:**  That's right, your Honor.  And I should

19  only add that one of our purposes, as we mentioned from the

20  outset, was to submit to the Court partial motions on -- on

21  discrete legal issues that we thought might skinny down the

22  discovery, and skinny down this trial.

23          **THE COURT:**  All right.

24          **MR. COOPER:**  So that is the purpose of those other --

25          **THE COURT:**  Sure.  Well, that's a perfectly

1   reasonable approach.  And -- and I fully understand that.

2          So why don't we bite off the big one first, and talk

3   about *Baker versus Nelson*?

4          **MR. COOPER:**  Very well, your Honor.  If the Court

5   please, however, I'd like to place the -- our arguments under

6   *Baker against Nelson* and the other ones in a perspective here;

7   kind of an introductory perspective.

8          The purpose of Proposition 8, according to the

9   California Supreme Court in the *Strauss* case, your Honor -- and

10  these are its words -- was simply to restore the traditional

11  definition of marriage, referring to a union of a man and a

12  woman.

13         So the voters, last November in California, elected

14  to restore the definition of marriage that had prevailed not

15  only in the State of California since it became a state, but

16  had prevailed in every civilized society throughout the ages.

17  And the traditional definition of marriage still prevails,

18  your Honor, everywhere in the world, with the exception of five

19  American states and seven foreign countries.

20         Now, plaintiffs' constitutional challenge to

21  Proposition 8 is founded, in large part, on their claim that

22  the traditional opposite-sex definition of marriage serves no

23  legitimate societal purpose; that is to say the opposite-sex

24  definition of marriage that has been adopted by all societies

25  in all places at all times in recorded history has been adopted

1    for no good societal reason.

2           Now, your Honor, the plaintiffs go even farther,

3    because they say that the opposite-sex definition -- the

4    traditional definition of marriage -- is so irrational, so

5    utterly baseless, that it can only be explained on grounds of

6    naked animus to gays and lesbians:  antipathy.

7           Mr. Boies has put it, too, discussing this very case,

8    in these terms; that marriage is nothing more than the residue

9    of centuries of figurative and literal gay bashing.

10          Now, your Honor, this claim we resist and we reject.

11   It condemns as bigoted most Californians; the vast majority of

12   all Americans, including, for example, President Obama; large

13   majorities in both houses of Congress -- at least, the Congress

14   that passed DOMA; a large majority of every state and federal

15   judge that has examined the issues that are now before you.

16          By our count, 70 of 108 judges -- state and

17   federal -- have concluded that marriage is, indeed, supported

18   by a rational justification, and they either did uphold it, or

19   they would have upheld it.

20          Justice O'Connor, in her concurring opinion, in

21   *Lawrence*, said that preserving traditional marriage is

22   supported by legitimate state interests other than moral

23   disapproval of gays; but, your Honor, I think the point that

24   I'm trying to make here is best put by the New York Court of

25   Appeals in the *Robles* case, when they said this, very

1    efficiently.

2              Until a few decades ago, it was an

3              accepted truth for almost everyone who ever

4              lived in any society in which marriage

5              existed that there could be no -- marriages

6              only between participants of different sex.

7              A court should not lightly conclude that everyone who

8    held this belief was irrational ignorant or bigoted.

9              Your Honor, this case -- at the heart of it are two

10   competing conceptions of the institution of marriage, and of

11   its central purpose.

12             We say that the central and defining purpose of

13   marriage is to channel naturally procreative sexual activity

14   between men and women into stable, enduring unions for the sake

15   of begetting, nurturing, and raising the next generation.

16             Plaintiffs say that the central and the

17   constitutionally mandated purpose of marriage is simply to

18   provide formal government recognition to loving, committed

19   relationships.  And, in keeping with that purpose, the

20   plaintiffs say that they have a fundamental constitutional

21   right to marry the person of their choice; to marry the person

22   that they love.

23             Now, there are several implications that I want to

24   draw out at the outset of the Court's consideration here for

25   acceptance of that conception of the institution, and of its

1 defining purpose.

2           The first one is simply this.  We submitted -- this

3 is really difficult to think and to imagine what general

4 governmental interest the state has in recognizing and

5 regulating all committed loving relationships.

6           The second point is this.  There are a host of

7 personal -- uniquely idiosyncratic, sometimes -- reasons and

8 motivations for people to get married.  Love and commitment is,

9 to be sure, common and perhaps hopefully most common, but it's

10 not the only motivation for people to get married.

11           And the -- and the state certainly doesn't -- and

12 it's impossible to imagine how it could -- restrict marriage to

13 people who are loving, committed couples.  And so, your Honor,

14 the underinclusiveness --

15           THE COURT:  I suppose also the state could not

16 require that, could they?

17           MR. COOPER:  No, that's -- they could not.  And so

18 the underinclusiveness problem --

19           THE COURT:  Well --

20           MR. COOPER:  -- that my friends claim --

21           THE COURT:  Underinclusive?

22           MR. COOPER:  I'm sorry?

23           THE COURT:  Underinclusiveness?

24           MR. COOPER:  The plaintiffs challenge our conception,

25 our procreation-based definition and conception of marriage as

1  being fatally underinclusive, your Honor, because it is not

2  confined to people who intend to or are able to procreate.

3         **THE COURT:**  Well, the last marriage that I performed,

4  Mr. Cooper, involved a groom who was 95 and the bride was 83.

5  I did not demand that they prove that they intended to engage

6  in procreative activity.

7         Now, was I missing something?

8         **MR. COOPER:**  No, your Honor, you weren't.  Of course,

9  you didn't.

10        **THE COURT:**  And I might say it was a very happy

11 relationship.

12        **MR. COOPER:**  I'm very -- I rejoice to hear that,

13 your Honor.

14        Our point is the institution of marriage, like other

15 institutions that states establish, that governments establish

16 and they bring into being to serve certain important societal

17 interests --

18        **THE COURT:**  Well, apropos that, what is the

19 difference, from the point of view of the state, between an

20 opposite-sex marriage and a same-sex marriage?  From the

21 state's point of view, how are they different?

22        **MR. COOPER:**  Your Honor, they're different in one

23 fundamental respect, with respect to this purpose, this -- the

24 central purposes that we cite to you for the institution of

25 marriage:  it's simple biological reality that same-sex couples

1   do not naturally procreate.  Opposite-sex couples -- that is

2   the -- the natural outcome of sexual activity between

3   opposite-sex couples.

4          **THE COURT:**  Well, fair enough; but procreation

5   doesn't require marriage.

6          **MR. COOPER:**  No.  No, your Honor, it doesn't; but the

7   state's purpose --

8          **THE COURT:**  And I think I -- I don't want to base any

9   decisions on what I hear on the radio coming to Court in the

10  morning, but there was some statistic that 40 percent -- can

11  this be right? -- 40 percent of female pregnancies in the

12  United States are to unwed females?  Is that -- is that right?

13         **MR. COOPER:**  I've -- I would not be surprised.  I

14  can't confirm it myself, your Honor, but I've heard similar

15  depressing statistics such as that.  And so, yes -- no, the

16  state doesn't require people to get married in order to

17  procreate or to have sexual activity.

18         It doesn't prohibit sexual activity among people who

19  are not married, but it definitely attempts to discourage it

20  through -- and especially to discourage sexual activity outside

21  of the marriage union.  That's the purpose of the fidelity

22  requirement in the state statute, the pledge of fidelity that

23  civil marriage places on -- on both parties to the marriage;

24  but my -- but my central point here, your Honor -- the

25  difference -- the key difference -- is that the state has vital

1   interests in the procreative -- naturally procreative activity
2   of opposite-sex couples.  It has vital interests to encourage
3   it, to promote it, and to provide benefits to it.  That has
4   been the purpose of marriage through the ages.
5          And its purpose is related to two central concerns;
6   concerns that are the state's, in a defensive sense, and that
7   are concerns of the state about its citizenry.
8          The first concern is its own vital interest --
9   existential interest -- in perpetuating society.  Without the
10  procreative activity of opposite-sex couples, as every
11  Supreme Court on marriage has said, the existence of and
12  survival of society would be threatened; but equally important,
13  your Honor, is this notion of responsible procreation.  That is
14  the closely related interest in ensuring or at least promoting
15  and encouraging that children are raised in stable, lasting
16  environments by the couple who brought them into the world.
17  That is -- that is both a defensive interest, as I say, so that
18  the state itself does not have to endure the burdens of raising
19  that child, either through the kind of public assistance that
20  often -- almost always accompanies the depressing statistic
21  that the Court referenced earlier, or through other means by
22  which the body politic ultimately has to take responsibility or
23  shoulder some burdens in connection with the raising of
24  children, when their natural parents -- the people who brought
25  them into the world -- don't take that responsibility properly.

1            This is what Congress said, your Honor.  This is what

2     Congress said in passing DOMA.

3            **THE COURT:**  Well --

4            **MR. COOPER:**  At bottom, civil society has an interest

5     in maintaining and protecting the institution of heterosexual

6     marriage because it has a deep and abiding interest in

7     encouraging responsible procreation and child rearing.  That

8     was Congress' judgment in DOMA.

9            It plainly is a rational interest on the part of

10    society; we would say, indeed, a vital interest on the part of

11    society.

12           And the Court referenced a vivid reason why that is

13    so and -- with the statistic you reference about the

14    phenomenon -- the unfortunate phenomenon of many children

15    growing up in this country without both of their parents to

16    nurture them.

17           **THE COURT:**  Well, let's assume I agree with you that

18    that's an unfortunate phenomenon; but how does that convert to

19    a constitutional standard?

20           It may be unfortunate.  It may be unwise.  It might

21    not be desirable from a societal point of view, but how does

22    that convert to a prohibition to people who do have all of the

23    essential incidents of the marital relationship?  How does that

24    justify precluding them from the marriage estate?

25           **MR. COOPER:**  Your Honor, that gets to the heart of

1  what is a real, fundamental disagreement with my side and

2  Mr. Olson's side about the nature of the Equal Protection

3  analysis before the Court; the nature of rational basis review,

4  which, as you know -- as we submit -- is the governing

5  standard.  And I will come back in due time, I hope, to why we

6  think the Court is bound by -- by that standard; but,

7  your Honor, to -- to just go back quickly, and bring into

8  hopefully a clearer focus my point about the state's interests

9  -- its legitimate interests in responsible procreation, it's

10  not just to ensure that the child is brought up by its natural

11  parents.  It's, again, to ensure that the state doesn't have to

12  suffer the additional and shoulder the additional

13  responsibilities that would naturally and inevitably devolve

14  upon it for the nurturing of this child in the absence of its

15  natural parents taking responsibility to do that.

16          President Obama's Father's Day speech just this past

17  Father's Day is a vivid statement for -- for why this is so,

18  and why this -- and why society -- the government -- has a

19  crucial interest in promoting these stable, enduring,

20  heterosexual relationships as marriages; why it has that

21  interest.

22          **THE COURT:**  This is all very interesting, but let

23  come down out of the mountain for a moment, and talk about a

24  little law, and get back to *Baker versus Nelson.*

25          And in that connection, I'm just reading again --

1    rereading again this morning Justice O'Connor's opinion in

2    *Turner versus Safely*, which I'm sure you're familiar with.

3    That's the prison-marriage case.

4                **MR. COOPER:**  Yes, your Honor.

5                **THE COURT:**  1987, I believe; a decision in the

6    Supreme Court.  Yes.  '87.

7                Justice O'Connor wrote,

8                     The right to marry, like many other

9                     rights, is subject to substantial

10                    restrictions as a result of incarceration.

11                    Many important attributes of marriage

12                    remain, however, after taking into account

13                    the limitations imposed by prison life.

14                    First, inmate marriages, like others, are

15                    expressions of emotional support and public

16                    commitment.  These elements are an

17                    important and significant aspect of the

18                    marital relationship.  In addition, many

19                    religions recognize marriage as having

20                    spiritual significance for some inmates and

21                    their spouses.  Therefore, the commitment

22                    of marriage may be an exercise of religious

23                    faith as well as an expression of personal

24                    dedication.  Third, most inmates eventually

25                    will be released by parole or commutation,

1                 and therefore, most inmate marriages are

2                 formed in the expectation that they will

3                 ultimately be fully consummated.  Finally,

4                 marital status often is a precondition to

5                 the receipt of government benefits, and so

6                 forth.

7            These incidents of marriage, like the religious and

8   personal aspects of the marriage commitment, are unaffected by

9   the fact of confinement or the pursuit of legitimate

10  correctional goals.  There's nothing in there about

11  procreation.

12            **MR. COOPER:**  Well --

13            **THE COURT:**  That -- that was an essential element of

14  permitting the individuals in that case to marry.

15            And what of those elements that Justice O'Connor

16  identified would not apply equally to a same-sex marriage?

17            **MR. COOPER:**  Your Honor, I disagree with the

18  proposition that none of those elements made reference to -- a

19  necessary reference to the procreative element of marriage.

20            Justice O'Connor recognized that in most -- even

21  inmate -- marriages, the conjugal element of marriage,

22  consummating that marriage -- that the naturally procreative

23  element of that marriage was an expectation of taking place,

24  even with respect to inmates who are confined.

25            In that respect, there --

1    **THE COURT:** But the marriage wasn't delayed until

2  that event.

3    **MR. COOPER:** No, your Honor. No. And we don't pass

4  perfectly -- we don't ask couples to delay their marriage until

5  they assure the state that now they're ready to have -- to

6  have -- to have children.

7    **THE COURT:** And it's certainly not a precondition of

8  marriage to be able to prove that you can have children.

9    **MR. COOPER:** No, your Honor, that's true. And --

10  and, your Honor, there's no -- and this does get back to my

11  earlier point. There is no purpose of marriage -- there is no

12  definition of marriage that would -- that would offer clear and

13  dividing lines between those people who enter into it, and --

14  and its purposes; even this purpose that the -- and maybe I

15  should say especially this purpose that the plaintiffs cite as

16  being the central purpose of marriage: to recognize loving,

17  committed relationships. Even that can't possibly be

18  restricted to only those couples who can fulfill that purpose

19  or who intend to fulfill that purpose.

20    And -- but what we have to step back and try to

21  analyze is: what is the state's -- what is government's

22  purpose in regulating marriage, in recognizing these unions?

23    Not: what is the individuals' motivation to get

24  married?

25    It's the state's purpose that's important here. And

1   if the state has any conceivable rational purpose, I have to

2   win.  Proposition 8 has to be upheld, we believe, under the

3   authorities that control this issue.  And so the focus has to

4   be on:  what is the state's purpose?

5          And, your Honor, the state has, we submit, two vital

6   purposes for restricting, among its many eligibility

7   requirements --

8          **THE COURT:**  Well --

9          **MR. COOPER:**  -- restricting marriage to opposite-sex

10  couples.  Yeah.

11         **THE COURT:**  All right.  Let me throw in a question

12  here.

13         Assume I agree with you that the state's interest in

14  marriage is essentially procreative, as you've put it.

15         **MR. COOPER:**  Yes, your Honor.

16         **THE COURT:**  Assume that I agree with that.

17         How does permitting same-sex marriages impair or

18  adversely affect that interest?

19         **MR. COOPER:**  Your Honor, I have two responses I want

20  to make to you.

21         The first one is:  that's not the legally relevant

22  question.  And I will come back and walk through and examine

23  why I believe that to be so.

24         **THE COURT:**  It depends upon the standard of review we

25  apply.  And we're going to come to that, I'm sure, before we're

 1   done this morning.

 2          MR. COOPER:  Obviously, my submission here to you is

 3   that this rational-basis standard applies.  And so, yes, my

 4   arguments here are premised upon --

 5          THE COURT:  I've given you one assumption.  Give me

 6   one, for purposes of argument.  And that is that this is not

 7   rational basis review; this is intermediate scrutiny.

 8          MR. COOPER:  Well, then, your Honor, I'm going to be

 9   coming back to you with arguments.

10          THE COURT:  Now we're having a dialogue here.  Now

11   assume that you have to have established that this is the

12   minimally effective means of imposing this discrimination

13   between same-sex marriages and opposite-sex marriages.  So what

14   is the harm to the procreative purpose or function of marriage

15   that you outline of permitting same-sex marriages?

16          MR. COOPER:  Your Honor, even under a

17   compelling-state-interest standard, I would submit to the Court

18   that the state's interests in channeling procreative activity

19   into enduring relationships would be vital, and would satisfy a

20   compelling-interest standard.

21          And I would also submit to the Court that there would

22   be no reasonable available way for -- for that purpose to be

23   fulfilled and advanced, other than the way the state has

24   chosen -- every state has chosen, with five exceptions, and

25   California has chosen through Proposition 8.  And, your Honor,

1   that gets to the -- to the fundamental, I think, theoretical

2   disagreement that I mentioned earlier between the Plaintiffs

3   and the Defendant-Intervenors here.

4          They say that it's not enough, as you were suggesting

5   here, for opposite-sex unions to further and advance these

6   vital state interests; that we have to prove, in addition to

7   that, that including same-sex unions into the definition of

8   marriage would actually harm those purposes and interests.

9   That is not the Equal Protection construct, your Honor.

10         **THE COURT:**  I'm asking you to tell me how it would

11  harm opposite-sex marriages.

12         **MR. COOPER:**  All right.

13         **THE COURT:**  All right.  Let's play on the same

14  playing field for once.  Okay.

15         **MR. COOPER:**  Your Honor, my answer is:  I don't know.

16  I don't know.

17         **THE COURT:**  Does that mean -- does that mean if this

18  is not determined to be subject to rational basis review, you

19  lose?

20         **MR. COOPER:**  No, your Honor.

21         **THE COURT:**  Okay.

22         **MR. COOPER:**  I don't believe it -- it does.

23         **THE COURT:**  Just haven't figured out how you're going

24  to win on that basis yet?

25         **MR. COOPER:**  Well, your Honor, by -- by saying that

1  the state and its electorate are entitled, when dealing with

2  radical proposals for change, to a bedrock institution such as

3  this to move with incrementally, to move with caution, and to

4  adopt a wait-and-see attitude.

5          Keep in mind, your Honor, this same-sex marriage is a

6  very recent innovation.  Its implications of a social and

7  cultural nature, not to mention its impact on marriage over

8  time, can't possibly be known now.

9          **THE COURT:**  So this is a political question, and the

10  Court should abstain?  Is that it?

11          **MR. COOPER:**  Well, your Honor, certainly at the root

12  of all our arguments here are that this is a question of

13  social/cultural dimension that the people themselves in this

14  state -- and every other -- have the authority to answer.  So,

15  yes, the Court -- the Court should do as the Supreme Court did

16  in the assisted-suicide case, and say that this issue is being

17  debated throughout the land on -- in terms of its legality, its

18  morality -- its morality, and its practicality in the

19  democratic process.  And that's where it should be, and that's

20  where it should remain.  So, yes, your Honor that's at the root

21  of our --

22          **THE COURT:**  All right.  Let's talk about that.  It's

23  an appropriate matter.

24          As we discussed when the case came here for the first

25  case-management conference, I made the observation that I

1  didn't think this case was doing more than touching down in

2  this court; it was going to go on.

3      What you've just outlined is an appropriate decision

4  for the Supreme Court to make from its position, but now that

5  the case has been filed here and been presented, is that an

6  appropriate approach for the District Court to make, or should

7  I simply decide the issue the best I can, based upon what is

8  presented; and if the Supreme Court decides one way or the

9  other not to review the matter, that's a matter -- prudential

10  decision on the part of the Court, but it's really not a

11  decision that I should exercise?

12      **MR. COOPER:**  Your Honor, I think that the inescapable

13  responsibility, unfortunately, for all of us here, including

14  you -- especially you -- is to do our level best to use the

15  legal standards that we've -- we have from what we believe,

16  anyway, are the controlling precedents, and, you know, follow

17  them where ever they lead, your Honor.

18      We -- it's our earnest submission to you that they

19  lead to the proposition that, in fact, our Constitution, our

20  Equal Protection and our Due Process Clauses of the Fourteenth

21  Amendment haven't decided this question for California and

22  everyone else in the country.  They haven't decided this.

23      Opposite-sex marriage --

24      **THE COURT:**  Shouldn't I bite the bullet here?

25  Shouldn't I decide one way or the other, and not just abstain,

1  and say, "Oh, this is a political question, and it's too soon

2  for the federal courts to get involved"?

3          MR. COOPER:  Yes, your Honor, you have to do that.

4          It's not my submission -- and forgive me if I wasn't

5  clear.  It's not my submission that the Court should simply

6  decline to answer these constitutional issues.  They are before

7  the Court.  This isn't a political question in the sense that

8  the Court doesn't have jurisdiction over it; but our submission

9  is it's a political question in the sense that the Constitution

10 doesn't mandate the plaintiffs' conception of marriage, nor

11 does it mandate my conception of marriage.

12         If California had decided this the other way,

13 your Honor, I have no doubt that there would be rational bases

14 for it to have come to that conclusion.  And I would be content

15 to defend the State of California's judgment on that score.

16         The Constitution isn't the decision maker here; it's

17 the people acting here, and everywhere else in this country.

18         THE COURT:  I mean, why do we have this series of

19 Supreme Court decisions applying constitutional principles to

20 marital relationships?

21         MR. COOPER:  Well, your Honor --

22         THE COURT:  The *Turner* case, the *Loving* case, all --

23 I mean, there was a whole string of those cases.

24         MR. COOPER:  Yes, your Honor.  And the question

25 becomes:  do those -- do -- does application of those decisions

1    and the principles in those decisions compel the Court to

2    invalidate Proposition 8, and the traditional opposite-sex

3    definition of marriage?  Do they compel that?

4              You know, just an objective, careful, unbiased

5    application of those principles.

6              And, your Honor, our submission -- earnest submission

7    is:  no, they don't.  You can't get there from here.  You

8    can't -- they -- they don't compel that conclusion.

9              And, in fact, a careful application of them leads to

10   my proposition, your Honor, I earnestly submit, that, in fact,

11   this is a decision over -- which the people in a democratic

12   process are free to make.

13             Your Honor -- and again, this does come back to my

14   points about rational basis review.  The fact that, under

15   rational basis review, any conceivable state interest, even if

16   I haven't conceived of it, but you can, whether or not it was

17   ever articulated, for example, by the Legislature or here in

18   the Proposition 8 campaign -- if any conceivable state interest

19   is rationally served by Proposition 8 and the opposite-sex

20   definition of marriage, then it has to be upheld.

21             And, your Honor, we've offered, we believe, several;

22   including several vital state interests.

23             In addition, though, as I said, it is a perfectly

24   rational thing for the state and its people not to act

25   precipitously with a bedrock institution such as marriage, but

1  to proceed incrementally.  And on this score, I have Attorney

2  General Brown to call upon for support, to my great

3  satisfaction.  In the marriage cases in the brief that the

4  Attorney General put in defending Proposition 22, he said,

5              -- maintaining the longstanding and

6              traditional definition of marriage while

7              providing same-sex couples with legal

8              recognition comparable to marriage is a

9              measured approach to a complex and divisive

10             social issue.

11             **THE COURT:**  Well, it does appear the Attorney

12  General's views have evolved on this.

13             **MR. COOPER:**  Yes, it appears they have.  It does,

14  indeed; but, your Honor, in my opinion, he was right when he

15  was defending Proposition 22; but, your Honor, I guess it's

16  important now to come back to this -- to this point about why

17  it's not necessary for me to prove including same-sex unions in

18  the traditional definition of marriage would actually harm that

19  institution, or harm the vital purposes that that

20  institution --

21             **THE COURT:**  Well, I understand your answer to that

22  question is you don't know.  You don't know.

23             **MR. COOPER:**  No.  Well, your Honor, that's --

24             **THE COURT:**  It's a fair answer.  If you don't know,

25  you don't know; or if you can't -- you can't say, or it depends

1   on the development of a factual records, well, but --

2           **MR. COOPER:**  Well, your Honor, it depends on things

3   we can't know.  This is a -- this is a -- that's my point.

4           And the people of the State of California were

5   entitled to step back and watch this experiment unfold in

6   Massachusetts and the other places where it's unfolding, and to

7   assess whether or not -- oh, our concerns about this -- about

8   this new and -- and heretofore unknown marital union have

9   either been confirmed by what's happening in marriage in

10  Massachusetts, or perhaps they've been completely allayed; but

11  my point is:  California was entitled not to follow those

12  examples, and to wait and see.  That's the whole purpose of

13  federalism.

14          The whole purpose of it, your Honor -- they were --

15  and when dealing with a bedrock, fundamental institution such

16  as marriage, the state -- it's perfectly rational for it to be

17  risk averse.  It doesn't know what possible harms may flow.  It

18  may well be that there are no harms; but the state isn't

19  required by the Constitution to take that risk.

20          Does the Constitution demand that the state proceed

21  itself with this experiment, and -- and run the risks of

22  whatever possible adverse consequences might flow?

23          It doesn't.  That's our point.  And it's rational.

24          **THE COURT:**  What are those potential adverse

25  consequences?

1          MR. COOPER:  Well, your Honor --

2          THE COURT:  Has anybody identified them?

3          MR. COOPER:  There have been some, yes, your Honor.

4   For example, there seems to us to be little doubt that if the

5   plaintiffs prevail here, and the definition of marriage is to

6   be expanded to include same-sex couples, then the existing

7   parallel institution of domestic partnership will also have to

8   be expanded to include opposite-sex couples.  And that parallel

9   institution, with all the same benefits, will be available to

10  opposite-sex couples.  That's exactly how things are proceeding

11  in The Netherlands.  And in The Netherlands --

12         THE COURT:  What's the effect of that?  Is that

13  harmful?

14         MR. COOPER:  Well, your Honor, there do appear to be

15  a number of adverse social consequences in The Netherlands from

16  this.  Domestic partnership is now used, apparently, more by

17  heterosexual couples -- opposite-sex couples -- than is

18  marriage.  So marriage -- the effort to channel procreative

19  activity into that institution has abated quite a bit.

20         There's -- there are -- there are other socially

21  unfortunate --

22         THE COURT:  But --

23         MR. COOPER:  Whether there's a causal relationship,

24  your Honor --

25         THE COURT:  Has that been harmful to the society in

1  The Netherlands?  Has it been harmful to children?  What's the

2  adverse effect?

3         **MR. COOPER:**  Well, your Honor, again, I don't -- I

4  don't have a presentation for you on that; but I do,

5  your Honor, submit that it is not self-evident that there is no

6  chance of any harm.  And unless it is, the people of California

7  are entitled not to run the risk.  And unless he can prove --

8  Mr. Olson and his colleagues can prove that there is no harm

9  that can possibly come from this, then the people of California

10  are entitled to make the decision that they did.

11         **THE COURT:**  When do constitutional rights depend upon

12  proof of no harm?

13         Freedom of speech?  Freedom of press?

14         Lots of harm flows from those fundamental and basic

15  freedoms of ours -- misinformation, incitement to passion, and

16  so forth -- but we tolerate those risks in a free society.

17         So when does the application of a constitutional

18  principle require proof that its application will not impose

19  any risk?

20         **MR. COOPER:**  When, your Honor, the state is not

21  entitled to make a social decision if it has a rational purpose

22  and interest that is served by that decision.

23         And, once again, if its rational and legitimate basis

24  for the eligibility restriction of opposite-sex couples in the

25  marriage institution is procreation based, then it follows that

1   opposite-sex couples serve that interest in a way that same-sex

2   couples do not.

3        They also threaten that interest in a way that

4   same-sex couples do not, because, again, it is the naturally

5   procreative activity of opposite-sex couples that raises the

6   natural result of -- of procreation and childbirth that

7   represents concern for the body politic.

8        And, your Honor, if -- if -- it just doesn't follow

9   that because the state creates an institution for the purpose

10  and -- and nurtures an institution like marriage for a social

11  purpose that opposite-sex couples serve, that it must also

12  include within that institution couples that do not serve it.

13  They're simply not similarly situated with respect to that

14  rational -- and we would say vital -- purpose of this

15  institution.

16       And, your Honor, that's the ultimate --

17       **THE COURT:**  Okay.

18       **MR. COOPER:**  That's the ultimate proposition.

19       We don't have to prove that including them, in fact,

20  would bring about a positive harm.  It's simply that not

21  including them is rational because they don't serve the

22  interest.

23       Let me share with you, your Honor, the Court's -- the

24  Supreme Court's commonsense observation on precisely this

25  point.

1              When the inclusion of one group

2         promotes a legitimate government purpose,

3         and the addition of other groups would not,

4         we cannot say that the state's

5         classification of beneficiaries and

6         nonbeneficiaries is invidiously

7         discriminatory.

8         **THE COURT:**  What case are you referring to?

9         **MR. COOPER:**  This is *Johnson against Robison*,

10   your Honor:  415 united States at 385.

11         I would also offer the Court the *University of*

12   *Alabama against Garrett* case, where the Court said this:

13              Under rational basis review, where a

14         group possesses distinguishing

15         characteristics relevant to the interests

16         the state has authority to implement, a

17         state's decision to act on the basis of

18         those differences does not give rise to a

19         constitutional violation.

20         And this is my point precisely, your Honor.  The

21   state -- the group of opposite-sex couples possess a

22   distinguishing characteristic that is -- that is plainly

23   relevant to the state's purpose of -- that are related to

24   procreation.

25         **THE COURT:**  All right.  You've done a very good job

1   of covering basically issues two through five.

2           I want to bring you back to *Baker versus Nelson*.

3           **MR. COOPER:**  Very well, your Honor.

4           **THE COURT:**  All right.  We can't put very much stock

5   in that case, now, can we?  It's old.  Old cases are usually

6   the best cases, in the view of some of us; but this is a --

7   it's a very limited case.  It's not a considered decision of

8   the Supreme Court.

9           **MR. COOPER:**  No, no.

10          **THE COURT:**  The issue came up out of Minnesota.  The

11  statute there was neutral on its face.  It didn't prohibit

12  same-sex marriage.  The issue really wasn't squarely presented

13  to the Supreme Court to decide in *Baker versus Nelson*.

14          And there have been very substantial doctrinal

15  developments in Equal Protection jurisprudence since 1972.

16  So --

17          **MR. COOPER:**  Well, let me -- let me --

18          **THE COURT:**  Can we put any stock in that case at all?

19          **MR. COOPER:**  Yes, your Honor.  I believe it continues

20  to be binding on this Court.

21          **THE COURT:**  All right.

22          **MR. COOPER:**  And certainly with respect to the Due

23  Process claim and the sex-discrimination claim; but the first

24  point I want to make is this:  that four out of five District

25  Courts that have looked at this have concluded that it is, in

1 | fact, binding.

2 |         One District Court -- the *Smelt* Court -- said that it

3 | isn't binding.

4 |         **THE COURT:**  That was the don't-ask-don't-tell case,

5 | wasn't it?

6 |         **MR. COOPER:**  The *Smelt* case?

7 |         **THE COURT:**  Yes.  Wasn't it?

8 |         **MR. CAMPBELL:**  (Shakes head from side to side).

9 |         **THE COURT:**  Was that the DOMA case?

10 |         **MR. COOPER:**  Yes, it was the DOMA case.

11 |         And the Court distinguished *Baker against Carr* [sic]

12 | because it was dealing with DOMA, and it was dealing with a

13 | claim to federal benefits of marriage; but, your Honor, in

14 | *Baker against Carr* [sic], the Court was looking at really --

15 |         **THE COURT:**  *Baker against Carr*, or *Baker versus*

16 | *Nelson*?  That's a whole different --

17 |         **MR. COOPER:**  I'm sorry.  Forgive me.

18 |         **THE COURT:**  A whole different ball of wax,

19 | Mr. Cooper.

20 |         **MR. COOPER:**  Yes, it is.

21 |         **THE COURT:**  We can only tackle one of these big

22 | issues.

23 |         **MR. COOPER:**  Yes.  Your political question got me off

24 | on the wrong track here.

25 |         **THE COURT:**  All right.

1           **MR. COOPER:** *Baker against Nelson*, your Honor, we

2   believe brought forward exactly the same claims that you are

3   now treating under the Fourteenth Amendment the Due Process

4   clause and the Equal Protection clause.

5           And the Due Process claim was -- it sounded in all of

6   the terms that the plaintiffs use here -- the plaintiffs

7   there -- the same-sex couple there -- their right to marry the

8   person of their choice, relying specifically, your Honor, on

9   the case that the plaintiffs here specifically and heavily

10  primarily rely on: *Loving against Viragina*.

11          The Court did not see enough merit in that argument

12  even to take it up and consider it, your Honor.  So the Due

13  Process claim and the plaintiffs' definition of their Due

14  Process right simply can't be squared with *Baker against*

15  *Nelson*.  And, again, four federal district courts, as I read

16  them, anyway, have held that.

17          With respect to the language of the Minnesota

18  statute, yes, it doesn't specifically forbid same-sex marriage.

19  It only allowed -- permitted opposite-sex marriage.  In that

20  respect, it's precisely like Proposition 8.

21          And in terms of *Lawrence*, your Honor, *Lawrence*

22  specifically held -- or specifically observed, I should say,

23  that the question before you here was not before that Court,

24  and the Court was not making any adjudgments about at all; and

25  that is the question whether the government must give formal

1  recognition to any relationships that homosexual persons seek

2  to enter.

3          So the Court negated -- the *Lawrence* Court negated

4  the notion that its judgment about private sexual activity

5  among consenting adults in that most private of places -- the

6  bedroom -- that that judgment had -- had any relevance or was

7  treating with this very different question.  So it took care,

8  your Honor, not, I would submit to you, to cast doubt on *Baker*

9  *against Nelson* and its Due Process ruling.

10         And there's just no way to understand a Court that

11 summarily rejects the claim that, from two -- from a same-sex

12 couple that we have a constitutional Fourteenth Amendment right

13 to marry the person of our choice.  There's no way to

14 understand -- to attribute any substance to that claim, in

15 light of the fact that, in *Baker*, it was rejected without any

16 hearing argument.

17         With respect to the sex claim as well -- that is,

18 that -- that Proposition 8 discriminates on the basis of

19 gender -- that was foursquare the claim made by the plaintiffs

20 in *Baker against Nelson*.

21         That the opposite sex-eligibility restriction in

22 Minnesota law, just like the one here, was a gender-based

23 discrimination.  And the Court didn't find enough merit in it

24 to hear argument.

25         It did resolve it on the merits, though, your Honor.

1  And, as a merits decision, it is binding.  And we would submit

2  that there's -- there's simply no basis for concluding that

3  this -- that the plaintiffs' claims on those two scores,

4  anyway, can survive *Baker*.

5          **THE COURT:**  Well, if you could, wrap up.

6          **MR. COOPER:**  Your Honor, I do want to come to why we

7  believe that this Court is bound with respect to the Equal

8  Protection claims that the plaintiffs have advanced to apply a

9  rational basis standard of review; that is, its level of

10  scrutiny must be a rational basis.  We believe that that is not

11  an open question here; and that is controlled, instead, by the

12  Ninth Circuit's decision in *High Tech Gays*.

13          The Court there held specifically homosexuals do not

14  constitute a suspect or quasi-suspect class entitled to greater

15  than rational basis scrutiny.

16          Now, it is true, as the plaintiffs say, that the

17  Court reference to *Bowers*, an incongruous incongruity that

18  would be created if, in the face of the *Bowers* case, which has

19  been --

20          **THE COURT:**  Well, relied on *Bowers*.  In the *High Tech*

21  case, *Bowers* was overruled.

22          **MR. COOPER:**  True.  True enough, your Honor, but the

23  Court, after noting the incongruity with the claim of

24  quasi-suspect-class classification in the *Bowers* decision, the

25  Court went on to quite independently analyze whether sexual

1  orientation is a suspect class under the standard factors.  And

2  it concluded that -- that sexual orientation is not, because

3  it's not immutable, and because the class affected that are

4  gays and lesbians are not politically powerless.  So it

5  independently concluded that rational basis review applies, and

6  that this class is not a quasi-suspect class, your Honor.

7           And since that time, the Ninth Circuit, after

8  *Lawrence*, overruled *Bowers*.  The Ninth Circuit has credited

9  that ruling and -- and the judgment made by the Ninth Circuit

10 in *High Tech Gays* that rational basis review applies.  And that

11 is the *Witt* case.  And that is the don't-ask-don't-tell case,

12 your Honor.

13          The other point I want to emphasize --

14     **THE COURT:**  Well, "Don't ask; don't tell" is

15 different, isn't it?  "Don't ask; don't tell" condemns conduct

16 or expression, whereas we're not dealing here with expressive

17 conduct; we're dealing with a classification.

18     **MR. COOPER:**  But the -- but, your Honor, it's the

19 same classification that was at issue in *Witt*.

20          And the Court there said that the ruling in *High Tech*

21 *Gays* was not disturbed by *Lawrence* with respect to Equal

22 Protection.

23          It then went on and said that, under Due Process

24 considerations, we -- they applied a heightened standard of

25 scrutiny to that rule; but it wasn't under Equal Protection --

1  the Equal Protection clause, your Honor.

2          And the other point, your Honor, I want to emphasize

3  here is that every court of appeals that has looked at the

4  issue of whether or not gays and lesbians are a quasi suspect

5  or a suspect class has ruled that they're not, and that

6  rational basis review obtains.  That's ten circuit courts of

7  appeal; six of them reiterating it after *Lawrence*.

8          So, your Honor, this is -- this is an issue that not

9  only is the Court bound by, but it -- it is an issue, we

10 submit, is plainly correct.

11         **THE COURT:**  All right.

12         **MR. COOPER:**  Your Honor, thank you.

13         **THE COURT:**  Thank you, Mr. Cooper.

14         Mr. Olson.

15         **MR. OLSON:**  Thank you, your Honor.

16         **THE COURT:**  Why don't you begin where Mr. Cooper left

17 off, with discussion of *Baker versus Nelson*?

18         **MR. OLSON:**  I will, your Honor.

19         I think that the points that you made in your

20 question are the points that I would make, but let me make them

21 item by item.  It is a 1972 decision.  A lot has happened since

22 then.

23         It is a summary of affirmance which the Court, in

24 *Mandel versus Bradley*, specifically said is limited.  Its

25 precedential value is limited to the precise issues presented,

1    and necessarily decided.

2           And, as the Court pointed out in *Morse versus*

3    *Republican Party*, it is a slender reed on which to rest future

4    decisions, which is very close to the words that you used.

5           Secondly, as the Court pointed out in *Mandel*, it's

6    very important that the Court -- this Court -- look at the

7    facts of that case and the doctrinal basis of that case.  The

8    facts here are very, very different.

9           **THE COURT:**  How so?

10          **MR. OLSON:**  One, the domestic partnerships which --

11   that was a big, important point for the Court in *Baker*, because

12   it said:  if the same-sex marriage right is upheld, it will

13   disturb laws with respect to inheritance, contracts, taxation,

14   and so on, and so forth.  It pointed out this is the Minnesota

15   Supreme Court; that there were many things that would fall if

16   that distinction fell.

17          That is not true here, because, as everyone

18   recognizes, the rights of domestic partners are virtually

19   identical in most respects -- virtually all respects -- to the

20   responsibilities and obligations of marriage individuals.  So

21   that's different.

22          Secondly, another fact that's different is the 18,000

23   marriages that the State of California recognized between

24   same-sex individuals, so you have three classes of persons.

25          And there are other -- the -- the third fact that is

1    different is the whole *Romer* situation -- California's

2    counterpart to the *Romer* situation, where a recognized right is

3    taken away from a class of individuals; but those are not the

4    only differences.

5           The *Baker* case -- the Minnesota Supreme Court in

6    *Baker* relied on -- referred to the *Loving* case, which was cited

7    by the proponents of the change, and specifically rejected

8    that, distinguished *Loving* on the ground that it was a

9    racial -- it was based upon racial considerations.

10          The United States Supreme Court, in *Zablocki*,

11   specifically addressed that point, and said, "No, no.  While

12   *Loving* involved racial classifications, the right to marry is

13   of fundamental importance to all individuals."

14          So the basis that the -- the Minnesota Supreme Court

15   used as distinguishing *Loving* is no longer effective.

16          There are other aspects of this.  *Baker* was -- the

17   *Baker* case did not involve a specific claim of discrimination

18   based upon sexual orientation.  I think you noted that in your

19   questions to Mr. Cooper.

20          So that is an issue that's here, but not in that

21   case.  The *Romer* case has been decided since then.  The

22   sex-discrimination cases, the law of the Supreme Court has

23   changed; evolved enormously.  It was 20 years before the V.M.I.

24   *U.S. versus Virginia* case in which Justice Ginsburg articulated

25   for the Court different standards for reviewing

1  sexual-discrimination cases.

2          And, importantly, you cited the *Turner* case for the

3  various different characteristics that make marriage valuable

4  to individuals:  the associational right, the liberty right,

5  the privacy right, the spiritual -- spirituality right.

6          That same page from which you were quoting -- right

7  in the very next paragraph, the *Turner* Court rejects an

8  argument based upon summary affirmance.  Of another case

9  involving prisoners and life imprisonment, the Court said,

10 "Well, that involved life imprisonment."

11         This doesn't involve, necessarily, life imprisonment,

12 so we're not going to be bound by or persuaded by the summary

13 affirmance in the case that the Court was referring to there.

14         So there were eight or nine reasons why *Baker versus*

15 *Nelson* is not controlling on this Court.  And it's not of

16 precedential value if the Court is to do what the Supreme Court

17 has said in the *Mandel* case and others:  to look at how the

18 facts have changed, and the distinctions that have occurred

19 indoctrinally from the Supreme Court.  All of those things have

20 changed.  The ground has shifted enormously since 1972.

21         **THE COURT:**  All right.

22         **MR. OLSON:**  Now --

23         **THE COURT:**  Now, if there is essentially no

24 difference between the incidents of domestic partnership and

25 marriage, how can denying same-sex couples the term "marriage"

1  constitute an Equal Protection violation?

2          **MR. OLSON:**  Well, there are a number -- in the first

3  place, as our opponents have acknowledged, the entitlement to

4  the recognition by the state as marriage is important in and of

5  itself.  It has symbolic personal value to the individuals that

6  are engaged in that relationship.

7          **THE COURT:**  Are there other instances where symbolic

8  significance has -- the denial of symbolic significance has

9  been held to mean an Equal Protection violation?

10         **MR. OLSON:**  I don't know of a direct, specific answer

11  to that in terms a case citation; but let me posit this

12  example.

13         Suppose that the State of California decided -- and

14  it could have decided something like this a hundred years

15  ago -- that if you came from another country and you went

16  through the various processes and you had lived here for a

17  while, you would be entitled to all of the characteristics of

18  citizenship -- you could vote; you could do all of the things

19  that citizens did -- but you could not call yourself a citizen.

20         That is is a significant difference.  And I think --

21  and there's no question that you, the Ninth Circuit, the

22  United States Supreme Court would have said that is a denial of

23  Equal Protection to say that you are a little bit different;

24  you will be characterized differently; you will have to explain

25  to your children.

1          Now, I'm not just saying this from the standpoint of

2   the plaintiffs, which can prove, if we do have the trial, that

3   there are various different ways -- and we're in the midst of

4   discovery, as you know, with respect to various different

5   facets of the case; facts which you said you thought might be

6   important for us to prove.

7          That is one of the things we could prove, but I

8   submit that it is self-evident that, to say -- and the -- and

9   the Defendant-Intervenors admit this -- that it is a very

10  important quality.  In fact, they defend -- the whole defense

11  of their case is that it is really a meaningful distinction

12  when you call it "marriage."  It means so much to so many

13  people, the individuals affected, the people that are viewing

14  these individuals affected, their neighbors, their employers,

15  and so forth.

16         Plus the government, in connection with the defense

17  of DOMA case, referred to -- when DOMA was coming along,

18  referred to something over a thousand different distinctions at

19  the federal level that are affected by whether the state

20  recognizes your relationship as marriage.

21         So, while the state is, in a sense, undermined -- and

22  the Attorney General admits it -- any claim that marriage

23  would -- by same-sex individuals would harm any state

24  objectives -- and you were asking questions about that -- the

25  federal government does make a difference.  And there are

1   effects of the ability to call oneself marriage --

2          **THE COURT:**  Well, that gets to the point that

3   Mr. Cooper made repeatedly and very ably; and that is, with all

4   of the changes that are going on in the states that are, one by

5   one, recognizing same-sex marriage, and the expansion of

6   domestic-partnership rights, and so forth, aren't you just

7   getting ahead of yourself by asserting this claim under the

8   federal constitutional provisions?

9          **MR. OLSON:**  Well, that would be exactly the same

10  argument that was made and was rejected in *Loving versus*

11  *Virginia.*

12         **THE COURT:**  Well, but at that time, if I remember

13  correctly, only about a third of the states prohibited

14  interracial marriage at that time.  Is that not correct?

15         **MR. OLSON:**  That's correct, but there was a trend in

16  the direction of states eliminating those prohibitions that

17  were -- the U.S. Supreme Court held to be unconstitutional.

18         **THE COURT:**  Right.

19         **MR. OLSON:**  We don't say to the people in this

20  country, "Wait until the population agrees that your

21  constitutional rights can be recognized."

22         **THE COURT:**  Why, then, did the Supreme Court wait

23  from 1948, when California decided the *Perez* case, to 1960 --

24  what was it?  '64?

25         **MR. OLSON:**  '67, in *Loving.*

1          **THE COURT:**  '67 in *Loving*.  Almost 30 years; 20

2    years.

3          **MR. OLSON:**  I know what Justices of the Supreme Court

4    would say.  "We don't determine our own agenda.  We have to

5    wait until a case comes to us."

6          Why did the Supreme Court -- and, in fact, the fact

7    that there was that 20-some-year difference doesn't mean that

8    it was constitutional in 1965, two years before *Loving*, or

9    1961, six years before.  That doesn't mean it was

10   constitutional during that period of time.

11         When the Supreme Court rendered that decision in

12   *Loving*, it said that that practice that had been practiced and

13   the -- and the state of Virginia was making the same arguments

14   that Mr. Cooper was making:  it's been that way for a long,

15   long time, and therefore, it ought to stay that way.

16         The Supreme Court said, "No.  That violates the

17   constitutional rights of those individuals."

18         The people that we represent in this case --

19         **THE COURT:**  Well, when did same-sex marriage become

20   unconstitutional?

21         **MR. OLSON:**  Well, the Supreme Court of the State of

22   California --

23         **THE COURT:**  The prohibition of same-sex marriage

24   become unconstitutional?

25         **MR. OLSON:**  It didn't become unconstitutional,

1   your Honor.

2          We submit that when the Supreme Court of California

3   decided that it violated the State's Constitution, it was

4   deciding what the State of California Constitution required

5   from its beginning.  It had not been recognized.

6          And the United States Supreme Court says that when it

7   decides a constitutional question, it isn't deciding

8   prospectively what the Constitution means; it is deciding what

9   the law is, in the words of *Marbury versus Madison*.

10         So what we're asking you is to declare in this case

11  ultimately what the law is; and that is that it is

12  unconstitutional.

13         **THE COURT:**  But what makes a single Federal District

14  Judge in San Francisco able to recognize these profound

15  constitutional principles that 52 or -3 percent of the people

16  of the State of California could not?

17         **MR. OLSON:**  That is why you are there.  And that is

18  why we have a federal Constitution.  That is why we have a

19  federal judiciary.  And that is the obligation that's given to

20  you when you took the oath of office.

21         Whether or not the *City of Cleburne* case by the

22  United States Supreme Court, the Religious Freedom Restoration

23  Act, and that whole lineup of cases -- the argument was being

24  made in that case that, 97 to one or 97 to zero, the Senate of

25  the United States had voted for this enactment.

```
1              It didn't make any difference when it came to the
2    United States Supreme Court.  If it was unconstitutional, it's
3    unconstitutional.  And it is your burden to recognize that if
4    you come to that conclusion, that you -- whether or not
5    52 percent or 51 percent or whatever percentage of the voters
6    of the State of California are, they do not decide federal
7    Constitutional questions.
8              My opponents' 123 pages of argumentation, and the
9    very --
10             THE COURT:  I think it was 117.  Give him credit for
11   six pages.
12             MR. OLSON:  I thought it was 98, and 25 of them --
13   maybe it was 98 and 15.
14             THE COURT:  Well, it may have seemed like that.
15             MR. OLSON:  It seemed like that when I got to about
16   page 15, your Honor --
17             THE COURT:  All right.
18             MR. OLSON:  -- but that exhaustive presentation of
19   arguments and the arguments that Mr. Cooper, as you said, very
20   articulately made today are virtually identical to the very
21   same points made by Justice Scalia in his opinions in *Romer* and
22   *Lawrence*, but those were dissenting opinions.
23             The majority of the Court -- six justices in each of
24   those cases -- rejected what Justice Scalia had to say, and
25   rejected, therefore, what Mr. Cooper is saying.  And at the end
```

1  of his dissent, Mr. Cooper pointed out that Justice Kennedy, in

2  his opinion for the Court in *Lawrence*, said, "We're not

3  deciding relationships such as marriage," but Justice Scalia

4  knew he was defeated.

5          And at the end of his dissenting opinion,

6  Justice Scalia said -- he had acknowledged that defeat.  He

7  said, "What justification could there possibly be for denying

8  the benefit of marriage to homosexual couples exercising the

9  liberty protected by the Constitution?  Surely not the

10  encouragement of procreation," he added, "since the sterile and

11  the elderly are allowed to marry."

12          **THE COURT:**  Perhaps it shows why dissenters shouldn't

13  always write an opinion?

14          **MR. OLSON:**  It hasn't discouraged Justice Scalia.

15          As much as I respect him, he was outvoted in those

16  two cases, but he was right about that point.  What is the

17  justification?

18          We do have a difference -- Mr. Cooper and I -- with

19  respect to this right of marriage that the Supreme Court has

20  mentioned over and over again, and has said is among the most

21  fundamental rights, if not the most fundamental right.  It is a

22  right of the individual.  It is not a right granted by the

23  state.  It's a right of an individual.

24          And Mr. Cooper's arguments about the right -- the

25  recognition of marriage as serving procreational values might

1   well be true; I mean, it might be true that allowing people of

2   opposite sex to marry or have the institution of marriage might

3   have some -- scarcely provable, as you pointed out, because of

4   the number of children that are born out of wedlock, if you

5   didn't get into the statistics about the number of divorces.

6          Mr. Cooper talks about the importance of children

7   being raised by both of their biological parents.  The

8   recognition -- the exclusion of same-sex individuals to the

9   relationship of marriage doesn't change any of those things;

10  nor does the recognition -- the recognition of same-sex

11  individuals to marry will not harm the right of heterosexual

12  couples to get married.  It doesn't have any effect on

13  procreation.

14         And if the whole thing is about procreation, what if

15  California decided tomorrow:  we have a population explosion.

16  We can't feed all of the people.  Let's not -- let's discourage

17  procreation.  Let's stop this right of marriage.

18         If the -- if my opponents are right --

19         Let's take away marriage, because we want to

20  discourage procreation.

21         I have no doubt that the Supreme Court would say that

22  that was unconstitutional.

23         I think, because we covered so thoroughly in our

24  reply brief, and I --

25         **THE COURT:**  Well, let's talk about rational basis.

1          Mr. Cooper argues very effectively that if

2   Proposition 8 is assessed under the rational basis standard,

3   then there is a rational basis in the tradition and history of

4   opposite-sex marriage.  Why isn't he absolutely correct?

5          MR. OLSON:  Because he's asking the wrong question.

6   He's saying:  is there a rational basis for opposite-sex

7   couples to get married?

8          Of course, there's a rational basis for that.  And

9   there's --

10         THE COURT:  Sometimes there's not a rational basis.

11         MR. OLSON:  That's -- someone once told me that's the

12  elevation of hope over experience.

13         THE COURT:  Hope over experience, right.

14  Dr. Johnson, I think it was.  All right.

15         MR. OLSON:  But that's the wrong question.

16         THE COURT:  Why?

17         MR. OLSON:  Because, as the Court taught us in *Romer*

18  and as the Court taught us in *Lawrence*, it's the exclusion that

19  has to be -- there has to be a rational basis for the

20  classification.  And the classification is excluding a group of

21  individuals which the Supreme Court said in those cases is a

22  distinct class of individuals.

23         The Court has to determine whether -- and the state

24  has to establish a rational basis for the exclusion of those

25  individuals.

1          **THE COURT:**  Well, Mr. Cooper has said, "Look.  This

2    train is moving down the track":  Massachusetts, Maine, various

3    other states, Iowa, and so forth.  Why isn't it rational for

4    California to sit back and see how this plays out, and decide

5    at some point or other whether it wants to get on board or not

6    get on board?  Why isn't that perfectly rational?

7          **MR. OLSON:**  Is it a rational?

8          I would ask, rhetorically:  is it rational to say to

9    individuals who may have a constitutional right to be married

10   that you have got to wait until that popular evolution takes

11   place?

12         That has never been in any case that has been cited

13   to me that I remember reading.  In Mr. Cooper's excellent

14   briefs, there is no case that says, "Well, the idea the state

15   doesn't want to do it now, but might want to recognize it

16   later" -- that's not a rational basis.

17         The Court in *Lawrence* and the Court in *Romer* -- and

18   there are other cases, too, but those, of course, stand out,

19   because they focus directly on this issue -- say that common

20   sense must be applied to the rational-basis thing.

21         **THE COURT:**  *Lawrence* was a criminal statute.

22         We're not dealing with a criminal statute here.

23   There's no criminal penalty that's involved.  It's simply the

24   denial of the incidents or the terminology of marriage to

25   individuals who otherwise would seek it.

1          **MR. OLSON:**  Well, what *Lawrence* said was not that not

2     only could the state not prosecute the conduct, but that the

3     conduct was protected; the intimate conduct between individuals

4     was protected; was a protected liberty interest under the

5     Constitution, protected by Constitution.  So the conduct itself

6     is protected by the Constitution.

7          To say that, well, we can't put someone in jail for

8     engaging in constitutionally protected activity, but we can

9     deny them rights we give to other people because of that

10    conduct -- because of that -- that is the conduct that connotes

11    the relationship between same-sex individuals.

12         That -- when the Supreme Court has said -- and it

13    says it in *Romer*, too -- cutting these people out because of

14    that conduct, because of that label we give to that conduct,

15    and take away the rights that the state has recognized is

16    unconstitutional.

17         And in *Lawrence* -- and that's why Justice Scalia said

18    what he did; because he said, "You can't say that it would not

19    apply to marriage."  He points out if you are concerned at all

20    about logic and principle, you can't get to that point by

21    limiting *Lawrence* to a criminal context, and then say that the

22    practice itself is protected by the Constitution, but because

23    you engage in that practice, you can't have the same rights as

24    other citizens in the State of California.

25         The questions you are asking are a part, I submit, of

1    some of the reasons procreation doesn't require marriage.

2              The -- the other part --

3              Let me interrupt myself.

4              The other part of what Mr. Cooper says is that if you

5    can envision any conceivable argument at all, then -- then the

6    prohibition on same-sex marriage must stand.  That's not the

7    test.

8              And, as you pointed out, if you can't -- if you can,

9    hypothetically imagine:  Well, California doesn't want to

10   become a marriage mill.

11             I mean, that's nonsense.  I submit it's not a good

12   argument.

13             California doesn't want its citizens to have rights

14   in California, and then be denied those rights in other states.

15             I could go through the various points that were made

16   by our opponents in their brief about what the rational basis

17   would be.  They don't make any sense.

18             What does -- what -- the reason why they keep coming

19   back to procreation and the raising of children is that that

20   might be a rational basis, but it doesn't work in terms of

21   excluding individuals who wish to marry someone of the same

22   sex, because procreation doesn't require marriage, as your

23   question pointed out.  Marriage doesn't yield procreation.

24             Same-sex marriage does not dilute, diminish, inhibit,

25   or deter opposite-sex persons from getting marriage.

1        And the prohibition of same-sex marriage doesn't mean

2   that individuals who would prefer to be married to someone of

3   the same sex is going to go out and marry someone of the

4   opposite sex, produce children, and raise them in a happy

5   relationship.  That blinks reality.

6        All of those arguments that are made about -- you

7   asked the point:  if you had to prove that there was a harm by

8   allowing same-sex marriages to exist alongside heterosexual

9   marriages, what would that harm be?

10       And I think I heard Mr. Cooper say he didn't know.

11       Now, he's spent a lot of time on this case.  And I

12  don't know, either, what the harm could be to heterosexual

13  marriages by allowing same-sex marriage.  What it comes back to

14  is the phrase that you see over and over again in the briefs of

15  my opponents:  the traditional definition of marriage.

16       **THE COURT:**  Tradition is not an unimportant

17  consideration when it comes to interpreting constitutional

18  principles.

19       **MR. OLSON:**  It is not.

20       **THE COURT:**  It's very important, isn't it?

21       **MR. OLSON:**  It is the -- but it is not dispositive.

22  And that's what the Court said in the Illinois case, where,

23  when the Supreme Court of the United States says centuries of

24  tradition --

25       **THE COURT:**  The Illinois case?

1              MR. OLSON:  *Winter*?

2              MR. BOUTROUS:  *Williams*.

3              MR. OLSON:  *Williams versus Illinois*.  It's the case

4    that said that no longer may we in this country put someone in

5    jail because they can't pay the fine $30 or 30 days, which we

6    used to see here on television.  The Supreme Court said,

7    "Centuries of tradition does not mean that we can continue to

8    put people in jail because they can't pay the fine."

9              The same argument was made in *Lawrence*.  Years,

10   decades of tradition of prohibiting conduct -- that was

11   mentioned in *Lawrence*.

12             Yes, tradition is important, but the tradition that

13   we're talking about here is marriage.  It has been recognized

14   in the past for a long time as a relationship between

15   individuals of the opposite sex.  We can see that.  There's no

16   argument about that; but the points you were making, I think,

17   by reading that paragraph or two from the *Turner* case, is what

18   the Supreme Court has said.  It is the right of an individual

19   to associate oneself in a permanent relationship with an

20   individual of one's choice.

21             None of those Supreme Court decisions preclude

22   recognition of the -- the status of a marriage between people

23   of the same sex.

24             And if the interests are privacy, liberty,

25   spiritual -- spirituality, a union with another individual, the

```
 1  same things that Justice O'Connor was talking about in the
 2  Turner case that made marriage so important, then those things
 3  apply with equal force to people who are of the opposite sex,
 4  and the -- whatever interests of the state are served by
 5  marriage between opposite-sex individuals.
 6          I have yet to see anyone identify a harm to that
 7  relationship by allowing someone else who has a loving
 8  relationship such as the plaintiffs in this case:  the loving
 9  relationship with another individual of the same sex.  That is
10  not harming.  That is not --
11          THE COURT:  In your view, what are the state
12  interests that are advanced by permitting opposite-sex
13  marriages?
14          MR. OLSON:  The right -- I'll use the words of the
15  Supreme Court.
16          The recognition by the state of the value of a
17  relationship between two individuals and -- and the recognition
18  by the state of the unity of that, and that that provides
19  stability and an acknowledgment that this is a good
20  relationship.  It forms the back -- backbone for our society.
21          It doesn't mean that those people must procreate or
22  can procreate.
23          You married a couple just recently -- a 95-year-old
24  person and an 87-year-old person, or something like that.  And
25  my mother was married three years ago.  And she, at the time,
```

1  was 87, and married someone who was the same age.  I don't mean

2  to bring this down to particular examples of individuals; but

3  we want in our society the relationship between -- the loving,

4  stable relationship between the individuals, because that's

5  good for the stability of our society and the relationships of

6  people to one another.

7          That -- every single one of those things apply to

8  people of the same sex.

9          **THE COURT:**  Now, are we in a different situation in

10 this case, Mr. Olson, because, as matters have been left by the

11 California Supreme Court after the *Strauss* case, it has left

12 this intact:  some 18,000 marriages that were performed between

13 the marriage cases in the *Strauss* case?

14         And, perhaps even more complicated now, in some

15 sense, because, although I haven't read the Bill, it's my

16 understanding the Legislature has authorized recognition of

17 out-of-state-performed marriages in California.  Does that put

18 a different wrinkle on this case that would, say, not apply in

19 a case that didn't have that particular history?

20         **MR. OLSON:**  Yes.  And that's one of the reasons why

21 this case is completely unlike *Baker versus Nelson*.  That was

22 not the case in Minnesota in 1972.

23         Yes, we have pointed out in our complaint and in our

24 briefs that the irrationality is brought into bright focus by

25 California saying that some people who are heterosexuals can

1    get married; homosexuals -- gay and lesbian people -- can stay

2    married if they were married.  18,000 couples who were married

3    during that period -- we will recognize those marriages; but

4    gays and lesbians who weren't married during that window cannot

5    be married.  That's three classes of individuals.

6           And now you're mentioning -- and I did read the same

7    thing that the Legislature is proposing.  And I think the

8    Governor said he would sign a Bill that would provide those

9    rights to people who were married outside of the state.

10          We have a crazy quilt of relationships in California.

11          **THE COURT:**  What's the implication of that?  I know I

12   didn't allow the Intervenors from the Alliance Group, who

13   wanted to argue that these 18,000 marriages were invalidly

14   performed and should be annulled in some fashion.  Mr. Cooper

15   is not taking that position, but isn't that the -- a logical

16   conclusion to be drawn from the crazy-quilt situation that

17   you've described?

18          **MR. OLSON:**  Well, I don't think that it would --

19   under -- I haven't heard an argument that would say there was a

20   federal constitutional right that somehow has to be undone

21   because California, under its law, has recognized those 18,000

22   relationships.

23          What it does do, your Honor, it seems to me, is to

24   point out the irrationality of the distinctions that are being

25   made; because whether we talk about rational basis or what we

1  believe the heightened scrutiny that would apply because of

2  gender discrimination or -- or strict scrutiny -- the reasons

3  that would justify that pattern of recognition of relationships

4  in California do not make sense.

5       **THE COURT:**  Well, does that mean that you could

6  prevail in this case against Proposition 8, but that would not

7  necessarily establish a basis to overturn a similar provision

8  in a state that had never recognized same-sex marriages?

9       **MR. OLSON:**  That is entirely possible because, I

10  mean, the exercise that you, as a Judge, go through is to look

11  at the facts of the situation.

12       What the *Mandel* Court said, when you do look at

13  summary affirmance, is:  what are the facts of the situation?

14  What doctrinal changes are being made?

15       I would say that many of the arguments that we are

16  making could be made in a state that has never recognized any

17  same-sex marriages, but they are enhanced and put into very

18  sharp focus by the strange pattern that now exists in

19  California.

20       And one other part of that is that -- what if one of

21  those 18,000 couples gets divorced, and then they decide they'd

22  like to remarry?  Can they in California, or can't they in

23  California?

24       **THE COURT:**  Well, they can go to Massachusetts.

25       **MR. OLSON:**  Well, but they shouldn't have to, if they

1   have a constitutional right to be married in this state and a

2   constitutional right not to be treated as a second-class

3   citizen in this state and a constitutional right not to be put

4   in a separate class and -- and treated irrationally.  We think,

5   your Honor, that it is very clear.

6            And I want to make a point that Mr. Cooper made at

7   the very beginning -- he's made it before -- that we are -- we

8   are making an argument that everyone who supported

9   Proposition 8 or was opposed to same-sex marriage is a bigot.

10            We are not making that point, and we do not believe

11   that to be the case.  And, if anything has been said by anyone,

12   I expressly disavow it.

13            What we're saying is that there may be an animus, as

14   the Supreme Court has said, against certain practices.  There

15   may be a feeling that certain relationships just aren't the

16   same thing.

17            Mr. Cooper calls the idea of same-sex marriage

18   radical, and novel, and that sort of thing.  Well, many people

19   might feel that that relationship is radical or novel or just

20   not right.  And they might feel that should be -- it always

21   should be the way it is.

22            That's what we mean by an animus towards the

23   relationship or towards the conduct which the Supreme Court has

24   said is constitutionally protected.

25            What California has done is created a

1  classification -- individuals who are gay or lesbian -- and put

2  them in a different status with respect to rights accorded by

3  the State of California:  recognition of the fundamental right

4  of marriage.

5          That is constitutionally impermissible.  It violates

6  the Due Process clause, and it violates the Equal Protection

7  clause.

8          If anything, the motion by the proponents for summary

9  judgment has illustrated the fact that judgment, in fact,

10  should be entered in favor of the plaintiffs, and that

11  injunction that we seek, which we hope we will have an

12  opportunity to talk to you about again on January 11th, should

13  be granted.

14          **THE COURT:**  Very well.  Thank you, Mr. Olson.

15          Do you want a quick rebuttal, Mr. --

16          **MR. COOPER:**  Cooper.

17          **THE COURT:**  -- Cooper?

18          **MR. COOPER:**  Your Honor, I would appreciate a few

19  moments, if you don't mind.

20          **THE COURT:**  Sure.

21          **MR. COOPER:**  First of all, with respect to this

22  repeated point that the burden is on us to show that some harm

23  would come forward if same-sex couples were included within the

24  definition of marriage is simply not right under rational basis

25  review.

```
1            We simply and only have to show that the rational
2   purpose that is served by the traditional definition of
3   marriage is one that would not be served or not served as well
4   if the excluded group was included.
5            THE COURT:  Take up the --
6            MR. COOPER:  That's what makes it rational.
7            THE COURT:  Take up the point that Mr. Olson made,
8   that the -- as he put it, the crazy-quilt fashion in which this
9   issue has developed in California --
10           MR. COOPER:  Yes.
11           THE COURT:  -- might very well result in what at
12  first glance might appear to be an anomalous situation, in that
13  Proposition 8 is unconstitutional, but that a similar provision
14  in a state that had never permitted same-sex marriage might
15  not.
16           MR. COOPER:  Your Honor --
17           THE COURT:  What's your response to that?
18           MR. COOPER:  Well, certainly it is true that, as a
19  result of the California Supreme Court's decision in the
20  Strauss case, there are some number of valid same-sex marriages
21  in -- in this state.
22           And that isn't -- that isn't a surprising or unusual
23  phenomenon when a state makes a decision to step back and, say,
24  repeal a measure that went beyond what the Constitution of the
25  federal government required them to do, and to step back and go
```

1   back to a previous policy.

2          If you analogize this case to the *Crawford* case,

3   there is nothing in the Constitution that prevents them.

4          And grandfathering the individuals who were married

5   during that interregnum is not an unusual phenomenon in the

6   law.  They were simply grandfathered.

7          **THE COURT:**  Are there analogous situations?

8          **MR. COOPER:**  I'm sorry?

9          **THE COURT:**  Are there analogous situations?

10         **MR. COOPER:**  I think there are analogous situations

11  every time you have a change in the law, but you don't apply it

12  retroactively.

13         The California Supreme Court concluded that

14  Proposition 8 does not apply retroactively.  Whether that was

15  right or not, as a matter of interpretation, that was their

16  ruling.  And it obviously is binding.  And they concluded that

17  the individuals -- it should not be retroactive, because there

18  were reliance interests that were at stake that were important.

19  So those individuals were grandfathered.

20         Does that create some new constitutional -- does

21  that, by itself, render Proposition 8 unconstitutional?

22         No, your Honor, it doesn't.

23         And, to the extent the crazy-quilt character of it

24  that Mr. Olson has referenced would threaten the

25  Constitutionality of either the Proposition 8 or the laws

1   that -- under which these marriages that he's referencing --

2   this new law that Mr. Olson referenced, and the 18,000

3   grandfathered marriages came into collision, then I think,

4   under standard federal constitutional remedial practice, the

5   policy contained in Proposition 8 would have to prevail.

6          So if there's -- if -- if something has to fall here,

7   it not going to be Proposition 8, which is the most prominent

8   and forceful voice of the State of California with respect to

9   the policy on this.

10         And the case of *Heckler against Matthews*, at 465 U.S.

11  728, I believe, supports that proposition.

12         Your Honor, with respect to --

13         **THE COURT:**  The name of that case, again, is what?

14         **MR. COOPER:**  *Heckler against Matthews*, 465 U.S. 728.

15         **THE COURT:**  Is that a Social Security case of some

16  kind?

17         **MR. COOPER:**  Honestly, your Honor, you may have a

18  better recollection.  I'm not recalling.

19         **THE COURT:**  Okay.

20         **MR. COOPER:**  But, your Honor, with respect to the

21  point that it's simply not rational for the State of California

22  to wait, and if there's a constitutional right at stake, I

23  agree with Mr. Olson on that; but that begs the question.  He

24  assumes the existence of his constitutional right.  And if, in

25  fact, there's a constitutional right for same-sex couples to

1  get married, then the State of California can't wait to see how

2  this experiment in going to unfold in other jurisdictions.

3        But, your Honor, if the issue before you is:  is

4  there a rational basis for Proposition 8; any rational

5  explanation for the policy contained in Proposition 8?

6        We would submit that one of the rational bases and

7  purposes that it serves is to allow the people of California to

8  wait and to see how this experiment unfolds, and to assess

9  whatever harms either may or may not follow from that

10  innovation.

11        With respect to the *Loving* case, your Honor, that

12  involved an explicit racial prohibition on individuals getting

13  married.  It went to the heart of the Equal Protection clause

14  of the Fourteenth Amendment.  It was tested under strict

15  scrutiny.  No question about it; it was not at all neutral.

16  It, on its face, was designed to preserve the shameful concept

17  of white supremacy.  There was no rational reason for it

18  whatsoever; in fact, certainly not procreation.  It was the

19  procreative capacity and purpose of marriage that was its very

20  reason for existing.  The white supremacists didn't want that

21  ancient purpose of marriage to be fulfilled with interracial

22  couples.

23        So, your Honor, the case's just completely -- it is

24  completely nonauthoritative with respect to this much, much

25  different question.

1          Justice Scalia -- I, too, certainly, admire him very

2     much.

3          This is one occasion --

4          **THE COURT:**  Well, let's make three of us.

5          **MR. COOPER:**  This is an occasion when, to be sure, at

6     least I wish he hadn't written that dissent; but, your Honor,

7     it -- because it -- it forces me to present to you the

8     proposition that he was simply wrong in that decision.

9          He references what is -- and we submit to you is the

10    central purpose of marriage:  procreation.  And he says that

11    that wouldn't -- that wouldn't justify opposite-sex marriage,

12    because of infertility.

13         Your Honor, there is no understanding of marriage, no

14    definition of marriage, no purpose of marriage, we would submit

15    to you, in which all of the participants that the state has no

16    choice but to allow to get married or not fulfill completely.

17         How would the state, even if it constitutionally

18    could, restrict marriage to those individuals who either were

19    able to or desired to have children?  How could it possibly

20    police that restriction, your Honor?  With premarital fertility

21    tests?

22         A number of Courts have addressed this -- this issue.

23    And they have recognized that's just not -- that is not a valid

24    objection to the opposite-sex definition of marriage.

25         And if that is an objection to the opposite-sex

1   definition of marriage, it is even greater objection to the

2   definition of marriage that has been presented to you today by

3   the plaintiffs:  that its purpose is loving, committed

4   relationships.

5           How could that -- how could -- how could marriage be

6   restricted to that?

7           It wouldn't.  That isn't -- and it couldn't be,

8   your Honor.

9           So the point is that the institution of marriage,

10  like all institutions, are designed for the general case; for

11  the usual -- the usual case.

12          And certainly we don't prevent opposite couples who

13  don't intend to have -- have kids, but the state has an

14  interest in still channeling them in their sexual activity, in

15  case they have kids, notwithstanding their planning.  That is

16  not -- that is not a phenomenon that can exist with respect to

17  same-sex couples, your Honor.

18          And, your Honor, if it is true, as the plaintiffs

19  suggest -- if it is true that the universal eligibility

20  restriction of opposite-sex couples in marriage must fall for

21  these reasons, then it is very difficult to see how, in --

22  in -- in a judicial terrain in which procreation was not

23  accepted as a rational basis for the traditional definition of

24  marriage, it is very difficult to understand how the other

25  familiar eligibility restrictions for marriage could possibly

1   survive under the new legal regime.

2           Your Honor, there's -- we don't see what rational

3   basis there would be, then, to distinguish between loving,

4   committed couples of the same sex versus the opposite sex

5   versus siblings, for example, or -- nor are the age-old

6   restrictions based upon the number of individuals in the

7   marital relationship.

8           **THE COURT:**  Well, there are --

9           **MR. COOPER:**  Possibly survive --

10          **THE COURT:**  There are possibly quite different

11  considerations there, are there not, Mr. Cooper?

12          You have considerations of abusive relationships that

13  appear in polygamous relationships or in relationships that are

14  incestuous.  Those are quite different situations, aren't they?

15          **MR. COOPER:**  Well, your Honor, the question would

16  have to be:  well, what rationale?

17          **THE COURT:**  Well, the rationale is the abuse that

18  often accompanies those kinds of relationships.

19          **MR. OLSON:**  Well, your Honor, there is -- there is --

20  there's abuse that accompanies other kinds of relationships,

21  your Honor.

22          **THE COURT:**  There's certainly abuse that accompanies

23  what you characterize as traditional marriage.  That is

24  certainly true --

25          **MR. COOPER:**  Yes.

1          **THE COURT:**  -- but I do think it is probable those

2     dangers are palpable in polygamous and incestuous relationships

3     in a way that they are not in traditional marriage.  So I don't

4     know that that argument --

5          **MR. COOPER:**  Well, your Honor, that -- I would --

6          **THE COURT:**  -- is very persuasive.

7          **MR. COOPER:**  Just to refer you to our briefing for

8     further -- further argument on that point, but I want also

9     finally to address the issue of the nomenclature; a question

10    you put to Mr. Olson.

11          We agree that certainly in this context, as in many

12    others, the name "marriage" means a lot.  It does have, by --

13    by virtue of its ancient and venerable heritage, an imprimatur

14    that is -- that is special; but it nonetheless follows that it

15    is entirely rational for the State of California and for

16    virtually all other states to establish parallel institutions

17    for these two very different types of relationships; different,

18    at least, insofar as the purposes of marriage that we have

19    articulated to you -- these very different types of

20    relationships, and to call them by different names, your Honor.

21    It is not irrational to call different things by different

22    names.

23          And -- and I don't think that raises any question

24    with respect to Mr. Olson's hypothetical about a citizen who

25    was, for some reason, not called a citizen.

1    I can't think of a rational distinction to be drawn

2  between one citizen and another, although that might well

3  depend upon the context.  It might well.

4    If one citizen is competing with another for a job or

5  a college admission, and there are Affirmative Action programs

6  in place, it may well be that there are ethnic-based names that

7  will attach to different citizens for consideration of those

8  governed purposes; but in the mine run of cases, I can't

9  imagine any rational basis for simply calling citizens by

10  different names.

11    There is a rational basis to call a domestic

12  partnership, your Honor, and a marriage by different names.

13    **THE COURT:**  All right.

14    **MR. COOPER:**  Thank you very much, your Honor.

15    **THE COURT:**  Thank you, Mr. Cooper.

16    And thank you, Mr. Olson.

17    Counsel, what I'm going to suggest is that we take a

18  break; give you a chance to go have some lunch.  And then come

19  back at one o'clock, and I'll have ruling for you.

20    (Recess taken from 11:53 a.m. until 1:00 p.m.)

21    **THE COURT:**  Very well, counsel.  Good afternoon.  I

22  hope you've had a chance to do a little relaxing over the past

23  hour.

24    First of all, I want to commend and thank you both

25  for extremely able arguments, both in written form and here

1 this morning.  Obviously, it's a great pleasure to have an

2 exceedingly interesting and important case presented by such

3 able counsel.

4          I'm always a little hesitant, I confess, to hand out

5 compliments like that, because there was a Judge on this court,

6 Judge Peckham, who used to say when I was practicing law, "What

7 a wonderful argument you made, Mr. Walker.  Oh, that was so

8 impressive."  And then, of course, he'd proceed to rule against

9 me.

10          Well, I guess I have to do that with respect to one

11 of you this morning -- or this afternoon.

12          So let me proceed to that.  And then we'll take up

13 the other matters that we need to discuss going forward.

14          The Defendant-Intervenors, which everyone has been

15 characterizing and calling the "proponents" -- and I think

16 that's an appropriate terminology -- have moved for a summary

17 judgment that Proposition 8 does not violate the

18 Fourteenth Amendment's Due Process or Equal Protection Clauses.

19          In their motion papers, proponents identify five

20 issues that they claim entitle them to summary judgment.

21          One, *Baker versus Nelson*, a 1972 Supreme Court

22 decision, requires the Court to hold plaintiffs have not raised

23 a substantial federal question.

24          Two, there is no fundamental right to same-sex

25 marriage under the Due Process clause.

1          Three, Proposition 8 should receive rational basis

2     review under the Equal Protection clause.

3          Four, Proposition 8 satisfies rational basis review,

4     because it is rationally related to several legitimate state

5     interests.

6          And, five, Proposition 8 is not tainted by animus or

7     other impermissible considerations.

8          As noted at the outset of our discussion this

9     morning, this is a motion for summary judgment governed by

10    Rule 56 of the Federal Rules of Civil Procedure, and the

11    well-known trilogy of Supreme Court decisions -- the *Celotex*,

12    *Anderson versus Liberty Lobby*, and *Matsushita Electrical*

13    *Industrial Company versus Zenith Radio Corporation* cases -- and

14    their various progeny.

15         Now, despite the heft of the papers that have been

16    submitted, the effect of proponents' motion is considerably

17    more limited than might at first glance appear.

18         Of the five motions for summary judgment, only a

19    determination favorable to proponents on issue one would decide

20    the entire case.

21         With regard to the remaining issues, proponents'

22    motion would appear to call for analysis under Rule 56(d).

23    That provision has frequently but somewhat misleadingly been

24    characterized as "partial summary judgment," in that, if

25    proponents were to prevail on Issues Three and Four, the entire

1  action would not be decided.  Only the standard of review

2  applied to Proposition 8 would be determined.

3          Similarly, a grant of the motion on Issue Two would

4  simply eliminate one of plaintiffs' claims, and a grant in

5  favor of proponents on Issue Five would simply determine that

6  one of the grounds of plaintiffs' attack on Proposition 8 could

7  not proceed.

8          Inevitably, when a Court is faced with a motion for

9  so-called "partial summary judgment," the Court must consider

10  the advisability of adjudicating part of the case on motion

11  when a case will proceed to trial on other issues.  A good part

12  of the analysis the Court uses in that situation is whether

13  grant of the motion will significantly shorten or expedite the

14  trial, or whether the issues on which partial summary judgment

15  is sought can better be left for adjudication at trial.

16          In this case, because only Issue One raised by

17  proponents would decide the action as a whole, the Court will

18  turn first to that issue.

19          Now, the question basically is:  does *Baker versus*

20  *Nelson* entitle Defendant-Intervenors/proponents to judgment as

21  a matter of law?

22          The Court believes that *Baker versus Nelson* does not

23  settle the dispute that is before the Court in this case.

24  *Baker versus Nelson* dismissed "for want of a substantial

25  federal question" an appeal from the Minnesota Supreme Court.

1  That Court had held that Minnesota's marriage statutes did not

2  permit marriage for same-sex couples, and that this restriction

3  did not violate the First, Eighth, Ninth, or

4  Fourteenth Amendments.

5       A summary dismissal "for want of a substantial

6  federal question" does constitute a decision on the merits;

7  although it is not entitled to full precedential weight.

8       A summary dismissal prevents a lower court from

9  reaching opposite conclusions on the precise issues presented

10  and necessarily decided in the jurisdictional statement.

11       Lower federal courts should adhere to the view that

12  if the Court has branded a question insubstantial, it remains

13  so except when "doctrinal developments indicate otherwise."

14       If there are later developments that alter or erode

15  the summary disposition's authority, lower courts are not bound

16  by the Supreme Court's characterization of the issue presented

17  as insubstantial.

18       The Court does not agree that *Baker* is either settled

19  law, or that it addresses the issues plaintiffs have raised

20  here.  The jurisdictional statement in *Baker* dealt with

21  constitutional allegations similar to the challenges in this

22  case, but based on a different set of underlying facts.  In

23  *Baker*, plaintiffs challenged a statute which was interpreted to

24  prohibit same-sex marriage, but was neutral on its face.  That

25  is, as stated by the Minnesota Supreme Court, the Minnesota

1   statute at issue in *Baker* did not contain an express statutory

2   prohibition against same-sex marriage.

3          Proposition 8, by contrast, is not neutral with

4   respect to same-sex and opposite-sex marriage, but expressly

5   distinguishes them, and limits marriage to the latter.

6          Unlike in Minnesota, where same-sex marriage had

7   never been recognized, plaintiffs here challenge California

8   voters' use of the ballot initiative process to strip unmarried

9   gay and lesbian individuals of an existing state constitutional

10  right to marry.  Potentially, therefore, Proposition 8 may be

11  invalid, given the history in California, whereas a similar

12  enactment in another state that had never recognized same-sex

13  marriage might not be constitutionally infirm.

14         In addition, there appear to have been significant

15  doctrinal developments on both Equal Protection and Due Process

16  grounds since *Baker* was summarily dismissed in 1972.

17         Supreme Court cases decided since *Baker* show that the

18  court does not consider "insubstantial a constitutional

19  challenge brought by homosexual individuals" on Equal

20  Protection or Due Process grounds.  The *Romer* case relied on

21  the Equal Protection clause to invalidate a state

22  constitutional amendment which enough filed specific legal

23  protections for homosexuals.

24         The Court held that home sexuality cannot be singled

25  out for disfavorable treatment, and that the amendment did not

1   further a proper legislative end, but rather classified

2   homosexuals to make them unequal.  Plaintiffs' claims are more

3   similar to those made in *Romer* than those made in *Baker*,

4   because plaintiffs are challenging an initiative measure which

5   on its face singles out same-sex from opposite-sex

6   relationships.

7          *Lawrence versus Texas* would also appear to be a

8   significant doctrinal development under the Due Process clause,

9   because it holds that "persons in homosexual relationships may

10  seek autonomy under the Constitution."  The Court noted that

11  laws and traditions in the past half century show an "emerging

12  awareness that liberty gives substantial protection to adult

13  persons in deciding how to conduct their private lives in

14  matters pertaining sex."  *Lawrence* makes clear that gays and

15  lesbians are able to rely on the Fourteenth Amendment's Due

16  Process guarantee.

17          Finally, doctrinal developments appear to have

18  altered the landscape for plaintiffs' sex discrimination claim.

19  *Baker* was decided before the Supreme Court applied intermediate

20  scrutiny to gender discrimination claims.  Contemporary Equal

21  Protection doctrine emerged after *Baker*.  Although the Court

22  will address the appropriate standard of review in a few

23  moments, a key fact question appears to be whether

24  Proposition 8 is a gender-neutral enactment or whether, in

25  fact, its operation in practice discriminates on the basis of

1  gender.

2         Accordingly, the Court cannot find on the basis of

3  the present record that *Baker* entitles proponents to judgment

4  as a matter of law, and thus, the Court turns to proponents'

5  motions for partial summary judgment.

6         Are plaintiffs' Due Process claims foreclosed because

7  there is no fundamental right to marry someone of the same sex?

8         Plaintiffs and proponents agree that marriage is a

9  fundamental right protected by the Due Process clause.  There's

10 no dispute among the parties that marriage traditionally has

11 involved opposite-sex relationships.

12        Proponents rely upon *Washington versus Glucksberg* to

13 argue that the right to same-sex marriage is not grounded in

14 "our nation's history, legal traditions, and practices," and

15 cannot, therefore, be grounded in the Due Process clause.

16        Plaintiffs, on the other hand, argue that the right

17 at stake is not "the right to same-sex marriage," but instead

18 is "the right to freedom of personal choice in matters of

19 marriage."

20        In this, as in many instances in the law, how one

21 poses the question determines the answer.  Posing the right at

22 stake as the right to same-sex marriage may point in one

23 direction, while posing the question as the right to marriage

24 points in the other.  The Supreme Court cases discussing the

25 right to marry do not define the right at stake in those cases

1  as a subset of the right to marry depending on the factual

2  context in which the issue presented itself.

3          For example, *Loving* addressed marriage; not

4  interracial or opposite-race marriage.  If the Lovings had been

5  asked to demonstrate that interracial marriage was deeply

6  rooted in the nation's history and traditions, they likely

7  would have lost.

8          *Turner versus Safley* discusses marriage; not marriage

9  involving inmates in penal institutions.

10          Proponents attempt to distinguish same-sex marriage

11  from all other forms of marriage because same-sex marriage does

12  not involve procreation, but they fail to address at least two

13  circumstances in which a right to marry has been recognized

14  without regard to the possibility of procreation.

15          First, the line of authority stemming from *Turner*

16  allows for marriages that cannot resemble proponents'

17  Definition of traditional marriage, because a prisoner has --

18  particularly a prisoner with a life sentence and no possibility

19  of parole can still marry, although he cannot provide anything

20  approaching the traditional incidents of parental care,

21  support, or nurture to offspring.

22          Secondly, in when the Court, in *Zablocki*, overturned

23  the Wisconsin law requiring payment of outstanding child

24  support before marriage, the Court was concerned with an

25  individual's right to marry; not with children.  If the right

1   to marry is about "survival of the race," then a child-support
2   restriction would be unobjectionable.

3         The argument that recognition of same-sex marriage
4   simply opens the door to incestuous or polygamous marriage
5   ignores that there may well be compelling state interests
6   against recognizing these other forms of relationships,
7   including preventing exploitation and abuse.

8         Nor is it clear why it is same-sex marriage (and not,
9   for example, infertile marriage) opens the door to require
10  state recognition of polygamy and incest.  Whatever prevents
11  California now from recognizing the marriage of a brother and a
12  sister would likewise stop it from recognizing the marriage of
13  two sisters in the absence of Proposition 8.

14        The Court cannot determine that plaintiffs' Due
15  Process claims are foreclosed as a matter of law.  Unresolved
16  by the present record, which consists almost exclusively of
17  legal arguments, is the governmental interests that
18  Proposition 8 fosters.  Although that may be akin to a
19  legislative fact, as Mr. Cooper has so forcefully and ably
20  argued, embedded within such a legislative fact are certain
21  assumptions about human behavior and relationships that have
22  simply not been developed in the record that is now before the
23  Court.  And the presentation of evidence, I believe, is
24  essential to the resolution of the issues insofar as they bear
25  on that legal question.

1          Have plaintiffs raised genuine issues of fact that

2    Proposition 8 may be subject to strict scrutiny or intermediate

3    scrutiny review?

4          Proponents assert that even if plaintiffs can state

5    an Equal Protection claim, that claim must be analyzed under

6    the rational basis review standard.

7          Proponents' first argument asserts that neither the

8    Supreme Court nor circuit courts have recognized heightened

9    scrutiny, and that the Ninth Circuit's decision in *High Tech*

10   *Gays versus Defense Industry Security Clearance Office*

11   forecloses any decision to the contrary.

12         Second, proponents assert that even if the Court were

13   free to determine what level of scrutiny to apply, the Court

14   should still apply rational basis review.

15         The Supreme Court has never applied heightened

16   scrutiny to a claim of sexual-orientation discrimination.

17   *Romer* used rational basis (without discussing what level of

18   scrutiny would be appropriate) and *Lawrence*, of course, was

19   decided upon Due Process grounds.  Nothing in either decision

20   forecloses heightened scrutiny, but neither do these decisions

21   give us much guidance on what standard to apply.

22         In *High Tech Gays*, the Ninth Circuit reversed the

23   decision of Judge Henderson of this court that a law

24   discriminating against gays and lesbians needed to survive

25   heightened scrutiny.  In doing so, the Ninth Circuit relied

1 explicitly on *Bowers*, and reasoned that if homosexual conduct

2 can be criminalized, then homosexuals cannot constitute a

3 protected class.

4           Well, *Lawrence*, of course, undermined *High Tech Gays*.

5 *Bowers* was subsequently overruled by the Supreme Court's

6 decision in *Lawrence*.

7           A subsequent decision of the Ninth Circuit, *Witt*

8 *versus department of the Air Force*, addressed a challenge to

9 the military's Don't Ask Don't Tell (DADT) policy.  *Witt*

10 applied rational basis review to Witt's Equal Protection

11 claims.  Her Equal Protection claims were, however, based on

12 conduct, not sexual orientation; and for that reason it is not

13 clear whether this determination has much bearing on this case.

14           Indeed the Don't Ask Don't Tell policy itself is

15 based on homosexual conduct, or at least expression of such

16 conduct, but not on sexual orientation or definition itself.

17           Proposition 8, by contrast, does not address conduct,

18 but sexual classification or sexual orientation or both.

19           Proponents' point to other circuits that have applied

20 rational basis review to Equal Protection claims based on

21 sexual-orientation discrimination.  The cases decided after

22 *Lawrence* are perhaps the most important.  In *Cook versus Gates*,

23 the First Circuit applied rational basis review to a challenge

24 to the Don't Ask Don't Tell policy, because the Supreme Court

25 had not indicated that sexual orientation should receive

1  heightened scrutiny.  The Fifth Circuit applied rational basis

2  to a gay prisoner's Equal Protection claim that guards failed

3  to protect him adequately because of his sexual orientation.

4  And the Sixth Circuit has held that homosexuality is not a

5  suspect class.  The Eleventh Circuit agreed with that position.

6           The Supreme Court has been reluctant to expand the

7  list of classifications subject to heightened scrutiny.

8           The mixed precedent on the issue points in the

9  direction that plaintiffs claim that a heightened level of

10 scrutiny is not foreclosed as a matter of law, but requires a

11 complete factual record for decision making.

12          The test whether a group receives heightened scrutiny

13 comes, of course, from the famous footnote four in the *Carolene*

14 *Products* case.  The four factors used to determine whether a

15 group is a discrete and insular minority are:  the history of

16 invidious discrimination against the class burdened by the

17 legislation, the characteristics that distinguish the class as

18 indicating a typical class member's ability to contribute to

19 society, the distinguishing character -- whether the

20 distinguishing characteristic is "immutable" or beyond the

21 class member's control, and the political power of the subject

22 class.

23          Proponents do not present evidence on the first two

24 factors, and appear for purposes of this motion to accept that

25 gays and lesbians have faced discrimination, and contribute

1  equally to society.  Instead, proponents focus solely upon the

2  immutability and political power factors.  These four factors

3  are generally weighed, and not treated as separate elements.

4  So proponents' failure to dispute the first two claims does, in

5  fact, impair their claim that heightened scrutiny may not apply

6  to the analysis of Proposition 8.

7           Plaintiffs contest proponents' facts relating to

8  immutability and political power.  These, I think, are prime

9  issues for trial.

10          For example, while proponents put forth scholarship

11 explaining that an individual's sexual orientation may fall on

12 a continuum, plaintiffs counter that an individual does not

13 experience constant shifts in his or her sexual orientation.

14          Proponents put forth evidence that gays and lesbians

15 have had some political successes.

16          Plaintiffs counter with evidence and a Rule 56(f)

17 affidavit that evidence will be gathered that gays and lesbians

18 have been ignored or mistreated by the political process.

19          The disputed facts on these issues preclude summary

20 judgment at this stage of the proceedings.

21          Proponents also move for summary judgment that

22 Proposition 8 does not discriminate based on sex or gender.  If

23 Proposition 8 discriminated based on sex, it would be subject,

24 of course, to intermediate scrutiny.  Proponents argue that

25 Proposition 8 treats men and women the same.  Either can marry

1   someone of the opposite sex, and neither can marry someone of

2   the same sex.  Plaintiffs counter that because the

3   Supreme Court rejected a similar argument in *Loving*,

4   Proposition 8 discriminates.

5          Proponents point out that most state courts

6   addressing same-sex-marriage bans have found they do not

7   discriminate on the basis of sex.  Plaintiffs state that

8   Proposition 8 mandates gender roles in marriage, at least

9   superficially; but the California Supreme Court rejected the

10  sex-stereotyping argument in the *Marriage Cases*.

11         So I don't believe that at this juncture in the

12  proceedings it possible to determine as a matter of law that a

13  sex-discrimination claim is foreclosed of the plaintiffs.

14         Now, the plaintiffs demonstrated a genuine issue that

15  Proposition 8 is rationally unrelated to a legitimate state

16  interest.

17         Proponents put forth the following state interests:

18  preserving the traditional institution of marriage.

19         Proponents claim that California has an interest in

20  maintaining a definition of marriage that excludes same-sex

21  couples, and in taking an incremental approach to novel social

22  changes.  Plaintiffs point to *Lawrence's* "times can blind us to

23  certain truths, and later generations can see that laws once

24  thought necessary and proper, in fact, serve only to oppress."

25         Tradition alone is not enough, because "the

1   constitutional imperatives of the Equal Protection clause must

2   have priority over the comfortable convenience of the status

3   quo."

4          Plaintiffs dispute the factual basis for proponents'

5   claim that excluding same-sex couples from marriage preserves

6   traditional marriage, and argue that marriage has not had a

7   stable definition across generations.

8          These two point to issues appropriate for a fuller

9   record.

10         Proponents rely upon what they argue to be interests

11  arising out of the male-female procreation process.  Proponents

12  maintain that because of the naturally procreative nature of

13  male-female relationships, only opposite-sex marriage can

14  further interests in procreation.  These interests include

15  encouraging formation of naturally procreative unions,

16  encouraging stability within naturally procreative unions, and

17  encouraging the bond between parents and biological offspring.

18  Proponents argue that the fit between the law and the interests

19  need not be perfect, and that, therefore, the existence of

20  infertile opposite-sex marriage is irrelevant.

21         Plaintiffs argue that the interests are not

22  rationally related to Proposition 8.  Because Proposition 8

23  neither encourages gays and lesbians to marry someone of the

24  opposite sex nor makes it more likely that heterosexuals will

25  marry, Proposition 8, in plaintiffs' view, has nothing to do

1  with the state's interest in procreation.  Plaintiff states --

2  plaintiffs state that facts developed during discovery will

3  demonstrate the absence of this link.  Proponents counter that

4  they can, if they must, show a link between the procreative

5  interests and the denial of marriage to same-sex couples,

6  because allowing same-sex marriage shifts the focus of marriage

7  away from families and onto individual desires.

8          Plaintiffs dispute these issues, and claim that

9  proponents' claims state interests in procreation are

10  essentially not the compelling interests that the state has in

11  the marriage estate.

12          And these, I think, again, point in the direction of

13  issues suitable for a fuller development at trial.

14          "California has an interest in ensuring its marriages

15  are recognized in other jurisdictions, and ensuring that it

16  does not become a marriage mill for out-of-state gays" is

17  another basis for the proponents' motion.

18          Because most states and the federal government do not

19  recognize same-sex marriage, proponents claim California has an

20  interest in only issuing marriage licenses that will be

21  recognized in other states.

22          Proponents point to a case in Massachusetts -- a

23  complaint filed by the Attorney General of that state --

24  challenging the Defense of Marriage Act, because it forces

25  Massachusetts to categorize its marriage licenses.  Proponents

1  do not explain how Proposition 8 furthers this supposed

2  interest.

3          Plaintiffs state, as an initial matter, that this

4  interest cannot be furthered by Proposition 8, which allowed at

5  least 18,000 California same-sex marriages to stand.

6  Plaintiffs dispute that California has an interest in

7  preventing out-of-state couples from marrying.  Plaintiffs

8  dispute the factual basis for the claimed state interest in not

9  becoming a marriage mill, because marriages do not have the

10  same negative connotation as divorces.  The state's interest in

11  not becoming a divorce mill does not lead to a state interest

12  in not becoming a marriage mill.

13          Well, this claimed interest, in the Court's view, is

14  essentially insubstantial, and is not sufficient to warrant as

15  a matter of law that the issue that was raised with respect to

16  the legitimate state interest in Proposition 8 can be

17  determined as a matter of law.

18          Have plaintiffs raised a genuine issue that

19  Proposition 8 is tainted by animus?

20          Finally, proponents ask for summary judgment that

21  Proposition 8 was not passed with animus.  First, proponents

22  claim that because Proposition 8 is supported by legitimate

23  interests, animus is legally irrelevant.  Their argument stems

24  not from facts, but from a train of logic.  Because

25  Proposition 8 acted with surgical precision -- and I'm

1  quoting -- "with surgical precision to preserve and restore the

2  venerable definition of marriage," Californians were not acting

3  with animus, in the proponents' view.  The resulting effect on

4  gays and lesbians was "an unavoidable consequence."

5          Additionally, finding Proposition 8 was passed with

6  animus would mean that the Court concludes that everyone who

7  opposes same sex marriage is a bigot.

8          That, I think, is reading far too much into any such

9  determination.

10          Proponents' argument rests on the assumption that the

11  Court accepts that Proposition 8 is supported by legitimate

12  state interests.  Plaintiffs point to evidence of the

13  disconnect between the Proposition 8 campaign messages, and the

14  state interests claimed to argue that whether Proposition 8 was

15  passed with a discriminatory intent remains in dispute.

16          So for those reasons, the proponents' motion for a

17  summary judgment will be denied with respect to *Baker versus*

18  *Neslon* grounds.  And I don't believe that I can, based on the

19  present record, make a determination of the appropriate

20  standard of review to apply when the case is ultimately decided

21  on the merits.

22          Now, with that decision, we have some few

23  case-management matters to discuss.  One of them, of course, is

24  the motion for stay that has been filed.  And let me ask

25  Mr. Cooper if you wish to file a reply memorandum.  I think you

```
 1   have not done so.  Is that correct?
 2              MR. COOPER:  We have not yet, your Honor, had a
 3   chance to do so.  And, with the Court's permission, if the
 4   Court plans to get into any of the substance of the stay
 5   application, my colleague, Mr. Nielson, is prepared to address
 6   it, but we haven't filed a reply paper.
 7              THE COURT:  It might be --
 8              MR. COOPER:  We're content to waive filing a reply.
 9              THE COURT:  I'm sorry.  You're content to?
10              MR. COOPER:  Content to waive filing a reply to the
11   response.
12              THE COURT:  Well, far be it from me to prevent you
13   from waiving a right to file a reply brief.
14              It may be better if we don't address this on the
15   merits this afternoon.
16              MR. COOPER:  Then we would like an opportunity to
17   reply.
18              THE COURT:  All right.  Well, that's fair enough.
19   And I say that in considerable measure because I'm not sure
20   that I'm as familiar with the issues that have been raised here
21   as I'd like to be before making a determination.  And so any
22   further briefing on the subject would probably be helpful.
23              And, rather than bring you all out here again to
24   argue this motion, I'd be prepared either to decide it on the
25   papers or, if I think that further argument would be helpful,
```

1  perhaps to do that by telephone, so that if we don't argue the

2  motion to stay today, and an oral argument would be helpful to

3  the Court, I'd be happy to set up a conference call.  And we

4  could all get on the line and proceed that way.  How does that

5  sound to you, Mr. Olson?

6         **MR. OLSON:**  It does --

7         I would like to make, if I might, just one or two

8  points briefly in that connection.

9         **THE COURT:**  Sure.

10         **MR. OLSON:**  Deciding it on the papers would be

11  satisfactory.  We would not object to that.  And also a

12  telephone argument would be also satisfactory.

13         I did want to make a couple of points with respect to

14  that, and this is not in the form of arguing the merits of it

15  so much as to questions of timing.

16         **THE COURT:**  I've heard that before, Mr. Olson.  "I'm

17  not going to argue the merits."

18         **MR. OLSON:**  Well, we'll see if I slip into that.

19         **THE COURT:**  All right.

20         **MR. OLSON:**  We received a letter yesterday from the

21  proponents' counsel.  It said, "While a motion for a stay is

22  pending, our clients intend not to produce any documents

23  subject to their claim of a First Amendment privilege.  When

24  and if there is no longer a possibility for a stay from any

25  court, then our clients will produce the documents."

1        In other words, the proponents are stating -- I will

2    be willing to stand corrected by Mr. Cooper if I misunderstand

3    this letter, but they are going to resist production of these

4    documents as long as there is an application for stay pending

5    before any court.

6        Therefore, our position is:  we're very anxious to

7    have this decided as soon as possible, and we hope that if you

8    decide it to reject the stay application, you order that the

9    documents be produced within a very short period of time.

10       We -- I won't go into the merits.

11       **THE COURT:**  One question I have -- and in fairness to

12   Mr. Cooper, I should put that on the table right now.  And he

13   may want to address this in his reply memorandum -- excuse me

14   for interrupting -- is a motion to stay appropriate after a

15   petition for a writ of mandate has been filed in the Court of

16   Appeals?

17       I thought you asked the District Court to stay its

18   Order first, and then you proceed to the Court of Appeals.  I

19   wonder what the procedural posture is at the Court of Appeals.

20       **MR. OLSON:**  We would have thought so, too, but I

21   guess Mr. Cooper would answer that.

22       Let me just make one point.

23       **THE COURT:**  All right.

24       **MR. OLSON:**  The final point I was going to make is

25   that if there is a stay of discovery, which your Honor has

1  indicated is appropriate, and your Honor offered a protective

2  order -- and we'd be happy to talk about a protective order,

3  too.  So that is something that could be done with respect to

4  this, but if there is a stay of the production of documents,

5  which your Honor has already decided is appropriate for us --

6  or appropriate for us to seek.

7          **THE COURT:**  Well, of course, I ask you -- your side

8  to reframe that document request, too.

9          **MR. OLSON:**  Yes.  And we're willing to do that.  So

10  far, we have not been able to get -- that's been resisted, but

11  I understand that.  That's a perfectly good point, but if there

12  is a stay that is going to last a long period of time or any

13  substantial period of time, with respect to documents or

14  evidence that you have ruled we are entitled to, our clients

15  are entitled to, we would want to reopen the motion that was

16  considered this summer for a preliminary injunction, because

17  your decision with respect to denying that motion was based

18  upon the premise that there would be a prompt expeditious trial

19  on the merits.

20          Our position is that our clients are suffering

21  constitutional injury.  The State of California has admitted

22  that.  And they are -- we believe they are entitled; that

23  Proposition 8 be stayed so that they will not suffer every day

24  irreparable and irremediable constitutional injury.

25          We understand that if there is a trial on January 11,

1  then we will be getting the relief that we hope if the Court

2  agrees with us; but if there's going to be delays --

3          **THE COURT:**  Well, fair point.

4          Mr. Cooper.

5          **MR. COOPER:**  Your Honor, we have from the outset been

6  sensitive to the plaintiffs' stated desire to move this case

7  expeditiously.  And we have coöperated in every respect with

8  that.  We remain sensitive to that concern.

9          And it was in the light of that that we did seek to

10 notice an appeal of the Court's ruling on the discovery issue,

11 with all due respect, of course, and to seek also this Court's

12 stay of that ruling, so that the issue would not be mooted out

13 effectively by the production of the very documents at issue

14 before we had had an opportunity to seek review of the Court's

15 ruling.

16         Obviously, we are -- we are -- we are attempting to

17 do this in the traditional and proper way:  seeking the

18 District Court's consideration of a stay of the Court's ruling

19 while we seek appellate review.

20         If that isn't forthcoming, if the Court, in its

21 wisdom, decides to deny the stay, then we would ask the Ninth

22 Circuit to stay the -- stay the ruling, and we'd see what

23 happens.

24         **THE COURT:**  My clerk told me that you had received a

25 briefing schedule from the Ninth Circuit on this.  Is that

```
 1   correct?

 2              MR. MC GILL:  It is.

 3              MS. STEWART:  I think the briefing schedule that the

 4   Ninth Circuit has issued has to do with the appeal from the

 5   intervention.  Is there a briefing schedule?  Matt's correcting

 6   me.

 7              MR. MC GILL:  Go ahead.

 8              THE COURT:  What's the story?

 9              MR. MC GILL:  Your Honor, there is a briefing

10   schedule.

11              MR. MC GILL:  My name is Matt McGill.  Gibson, Dunn &

12   Crutcher.

13              THE COURT:  Mr. McGill.

14              MR. MC GILL:  There is a briefing schedule.

15              THE COURT:  On the motion for --

16              MR. MC GILL:  On Mr. Cooper's appeal of your order

17   denying his motion for protective order.

18              THE COURT:  And what is that schedule?

19              MR. MC GILL:  I believe it calls for the opening

20   briefing to be filed in January.

21              THE COURT:  In January?

22              MR. MC GILL:  That's correct.

23              MR. COOPER:  Your Honor, we've made clear --

24              THE COURT:  The Ninth Circuit grinds finely, ever so

25   slowly.
```

1          **MR. COOPER:**  We have made clear in our notice that we

2     would seek to move to expedite that appeal.  We would seek

3     expedited treatment of that; and obviously, we would expect

4     that in these circumstances.

5          And so our attempt here is in no way to try to delay

6     in any unnecessary fashion these proceedings, but it is to --

7     to exhaust every opportunity and possibility we have for

8     appropriate judicial review of our claim that our First

9     Amendment interests and rights would not be -- would not be

10    preserved if we were required to -- to produce the documents in

11    question.

12         So we're -- we're happy, of course, with the process

13    that the Court has outlined.  We -- if the Court wants to rule

14    on the papers or call us back together for a telephonic

15    argument, we'll abide by the Court's wishes, of course.

16         **MR. MC GILL:**  Your Honor, just to confirm, I am able

17    to confirm for you that the opening brief is due on

18    January 25th.

19         **THE COURT:**  January 25th?

20         **MR. MC GILL:**  That's correct.

21         **MR. COOPER:**  This must have just come down.  I am

22    not --

23         **THE COURT:**  I wonder if that was just one of their

24    automatic -- one of the automatic orders that they issue from

25    the motions panel.

1          **MR. COOPER:**  I would suspect that's the case.  It

2   hasn't gone to a motions panel yet.

3          I mean, in other words, we haven't sought a stay from

4   the Court of Appeals until -- until, obviously, we've heard

5   from you, your Honor, on that issue.

6          **THE COURT:**  You might address that question:  whether

7   or not that petition for writ of mandamus is appropriate in the

8   absence of having applied for a stay from the district court.

9          **MR. COOPER:**  Your Honor, the petition is in the

10  alternative.  We believe that the -- there is appellate

11  jurisdiction over this interlocutory appeal, under the

12  collateral order doctrine.  That's our view of the matter, but

13  certainly it is in the alternative; but yes, we will look at

14  that and address it for the court.

15         **THE COURT:**  All right.

16         **MR. COOPER:**  Absolutely.

17         **THE COURT:**  When do you think you could get your

18  reply brief in, Mr. Cooper?

19         **MR. COOPER:**  Very promptly, your Honor.

20         **THE COURT:**  Good.

21         **MR. COOPER:**  How about the day after tomorrow?  Would

22  that be all right?

23         **THE COURT:**  That's fine.  That's fine.  Absolutely.

24         **MR. COOPER:**  Yeah.

25         **THE COURT:**  All right.  I appreciate that.

1          And I understand Mr. Olson's point that if this case

2    gets hung up for a long period of time on discovery issues,

3    then that does change the equation the Court considered at the

4    outset on the plaintiffs' motion for a preliminary injunction.

5          So -- and I think it would be unfortunate, as the

6    ruling on the motion for summary judgment indicated, for this

7    case to go up in that posture before there has been a

8    development of the record.  For whichever side wins, I think

9    you're going to be benefited by a fuller record.  And so I

10   think it would be unfortunate to short-circuit that process to

11   any material degree.

12         What other issues do we have?  Any?  How about the

13   other discovery?  How's that going?  Why is it, when it comes

14   to discovery, everybody looks to the younger lawyers?

15         **MS. DUSSEAULT:**  Good afternoon, your Honor.

16   Chris Dusseault, also of Gibson, Dunn & Crutcher.

17         The other discovery on which progress is moving

18   forward is the expert discovery.  We have exchanged initial

19   expert reports.  We are scheduling as we speak, in the area of

20   15 expert depositions that will be happening in the next six

21   weeks or so.  So the expert discovery is moving forward.

22         I think the fact discovery is really not moving

23   forward based on the Defendant-Intervenors' motion.

24         **THE COURT:**  Anyway, to bifurcate or segregate those

25   issues?

1           MS. DUSSEAULT:  If --

2           THE COURT:  If we get hung up on this fact discovery

3    process?

4           MS. DUSSEAULT:  It might be something we'd want to

5    discuss.  We certainly will be moving forward, full speed

6    ahead, with the experts.  Even though, for example, we don't

7    have certain documents that some of our experts might ideally

8    hope to consider in reaching their opinions, we are moving that

9    forward, full speed ahead.

10          Whether it would be possible to, in a bifurcated

11   manner, try any issues without a full factual record, I think,

12   is something we'd need to discuss more fully.

13          THE COURT:  Any views on the other side?

14          MR. COOPER:  Just this point, your Honor.  The only

15   hangup in this discovery process that at least I'm aware of is

16   the -- are these disputed; this disputed category of documents?

17   We've already produced a large volume of documents to the

18   plaintiffs that we haven't disputed in response to their fact

19   discovery and their document requests.

20          So the only -- the only hangup I know of is this.

21   And, yes, the expert discovery is going forward.  We've

22   exchanged reports, according to the Court's --

23          THE COURT:  Schedule?

24          MR. COOPER:  -- the Court's schedule.  Yes.

25          And it was quite a back-breaking process, but we all

1  have done that, and so those depositions go forward I don't see

2  those as being in any way related or hung up on this other.

3       **THE COURT:**  All right.  What else can anybody offer

4  for the good of the Order?

5       Oh, the clerk has reminded me of another matter.

6       The clerk has reminded me to ask about the motion to

7  realign Mr. Cooper.  Do you want to realign the Attorney

8  General?  Or maybe "reorient" him would be a better way to put

9  it.

10      **MR. COOPER:**  It is with no disrespect to our friends.

11 For the Attorney General, we have asked the Court to realign

12 the Attorney General as a party plaintiff.  Yes, your Honor.

13 And we set forward our bases and the authorities we think

14 support that in our papers.  There has been no response to them

15 as of yet.  The Court's calendar evidently, you know, when --

16 under the Court's rules, as I understand it, you identify the

17 next available calendar date.  And so that's quite a ways down

18 the road.  And so there's been no briefing that has proceeded

19 on this yet.

20      **THE COURT:**  Well, why don't we set a briefing on

21 this, so we get that issue fully briefed?

22      **MR. OLSON:**  I was only going to say:  one thing in

23 connection with that is we have brought a lawsuit against the

24 State of California and against the Attorney General.  And we

25 believe that the Attorney General, whether he wants to concede

1  defeat or not, wants to concede that Proposition 8 is

2  unconstitutional, as he has.  He is and remains a defendant in

3  this case against whom a judgment will have to be entered as a

4  defendant.

5          THE COURT:  Well, why don't you file that in very

6  short order, in the next few days?  And if you submit that, and

7  Mr. Cooper, then, has -- what? -- a week to reply?

8          MR. COOPER:  A week would be entirely adequate.

9          THE COURT:  Then the matter will be submitted, and

10 ruled on on the papers.

11          Yes.  The Attorney General wants to be heard on this.

12          Now whose side do you want to be on?

13          MS. PACHTER:  Your Honor, the Attorney General will

14 oppose the motion to realign him as plaintiff in this case.

15 And we would like more than a few days to brief that

16 opposition.

17          THE COURT:  Okay.  How much do you need?

18          MS. PACHTER:  Today is Wednesday?

19          THE COURT:  Today is Wednesday.

20          MS. PACHTER:  Two weeks from today, your Honor.

21          THE COURT:  All right.  That's fine.

22          MS. PACHTER:  Thank you, your Honor.

23          THE COURT:  And then Mr. Cooper's reply can be a week

24 after?

25          MR. COOPER:  Yes, your Honor.  That would be fine.

1         MS. PACHTER:  Thank you, your Honor.

2         THE COURT:  The clerk will note those precise dates,

3  but that will be fine.

4         Anything else?

5         MR. OLSON:  I don't know of anything, your Honor,

6  that -- I don't know of any other motions that are pending.

7         MR. COOPER:  Nothing from our side, your Honor.

8         THE COURT:  All right.

9         MR. COOPER:  Thank you.

10        THE COURT:  Once again, Counsel, I appreciate your

11  good help.  Thank you, and I look forward to our next

12  get-together.

13        MR. COOPER:  Thank you, your Honor.

14        (At 1:50 p.m. the proceedings were adjourned.)

15                      -   -   -   -

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing proceedings in C. 09-2292-VRW, Kristin Perry, et al.,
vs. Arnold Schwarzenneger, were reported by me, a certified
shorthand reporter, and were thereafter transcribed under my
direction into typewriting; that the foregoing is a full,
complete and true record of said proceedings as bound by me at
the time of filing.

The validity of the reporter's certification of said
transcript may be void upon disassembly and/or removal
from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Thursday, October 15, 2009