Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

KRISTIN M. PERRY,                  )
SANDRA B. STIER, PAUL T. KATAMI,   )
and JEFFREY J. ZARRILLO,           )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )   NO. C 09-2292-VRW
                                   )
ARNOLD SCHWARZENEGGER, in his      )
official capacity as Governor of   )
California; EDMUND G. BROWN, JR.,  )
in his official capacity as        )
Attorney General of California;    )
MARK B. HORTON, in his official    )
capacity as Director of the        )
California Department of Public    )
Health and State Registrar of      )
Vital Statistics; LINETTE SCOTT,   )
in her official capacity as Deputy )
Director of Health Information &   )
Strategic Plainning for the        )
California Department of Public     )
Health; PATRICK O'CONNELL, in his  )
official capacity as               )
Clerk-Recorder for the County of   )
Alameda; and DEAN C. LOGAN, in his )
official capacity as               )
Registrar-Recorder/County Clerk    )
for the County of Los Angeles,     )
                                   )   San Francisco, California
          Defendants.              )   Monday
                                   )   November 2, 2009
_____)      2:30 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:**    **Lydia Zinn, CSR #9223, RPR**
                    **Official Reporter - U.S. District Court**

```
 1   Appearances (via speaker telephone):

 2   For Plaintiffs:        Gibson, Dunn & Crutcher
                            333 South Grand Avenue
 3                          Los Angeles, CA  90071
                            (213) 229-7804
 4                          (213) 229-7520 (fax)
                      BY:   ETHAN DETTMER
 5                          CHRISTOPHER D. DUSSEAULT
                            MATTHEW D. MC GILL
 6
     For Plaintiffs:        Dennis J. Herrera, City Attorney
 7                          Office of the City Attorney
                            Fox Plaza
 8                          1390 Market Street, Sixth Floor
                            San Francisco, CA  94102-5408
 9                    BY:   MOLLIE LEE
                            RONALD FLYNN
10
     For Defendant:         Office of County Counsel of Los Angeles
11                          500 West Temple Street
                            Los Angeles, CA  90012
12                          (213) 974-1845
                      BY:   JUDY WHITEHURST
13
     For Defendant:         Mennemeier, Glassman & Stroud
14                          980 9th Street, Suite 1700
                            Sacramento, CA  95814-2736
15                          (916) 553-4000
                      BY:   ANDREW WALTER STROUD
16
     For Defendant:         County of Alameda
17                          1221 Oak Street, Suite 450
                            Oakland, CA  94612-4296
18                          (510) 272-6710
                      BY:   MANUEL MARTINEZ
19
     For Defendant:         State Attorney General's Office
20                          455 Golden Gate Avenue, Suite 11000
                            San Francisco, CA  94102-7004
21                          (415) 703-5506
                            (415) 703-5480 (fax)
22                    BY:   TAMAR PACHTER

23

24

25   (Appearances continued on next page)
```

1  <u>Appearances via speaker telephone (Cont'd.)</u>

2  **For Defendant-**                 Cooper & Kirk
   **Intervenors:**                   1523 New Hampshire Avenue, N.W.
3                                      Washington, D.C.  20036
                                       (202) 220-9600
4                         BY:  **CHARLES J. COOPER**
                              **JESSE PANUCCIO**
5                              **HOWARD C. NIELSON, JR.**
                              **PETER A. PATTERSON**
6                              **NICOLE MOSS**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  Good afternoon, counsel.  This is

2    Judge Walker.  I'm here with a court reporter; Ms. Delfin, the

3    court clerk, whom you know; and two law clerks.

4          Can we have the appearances of counsel, please?

5          **MR. DETTMER:**  Good afternoon, your Honor.

6    Ethan Dettmer, Gibson, Dunn & Crutcher, on behalf the

7    plaintiffs.

8          **THE COURT:**  Good afternoon, Mr. Dettmer.

9          **MS. LEE:**  Good afternoon, your Honor.  Mollie Lee, on

10   behalf of Plaintiff-Intervenor, City and County of

11   San Francisco.

12         **THE COURT:**  Good afternoon.

13         **MR. COOPER:**  Good afternoon, Chief Judge Walker.

14   This is Charles Cooper, Cooper & Kirk, representing the

15   Defendant-Intervenors.

16         Present with me here in my office on the phone, my

17   colleague, Jesse Panuccio, whom you've met previously.

18         **THE COURT:**  Very well.  Good afternoon, Mr. Cooper.

19         **MR. COOPER:**  Thank you.

20         **THE COURT:**  Who else?

21         **MR. STROUD:**  Good afternoon, your Honor.  This is

22   Andrew Stroud, Mennemeier, Glassman & Stroud, on behalf of

23   governor Arnold Schwarzenegger, and the Administration

24   defendants.

25         **THE COURT:**  Good afternoon, Mr. Stroud.

1              **MS. PACHTER:**  Good afternoon, your Honor.  This is

2     Tamar Pachter, for the Attorney General.

3              **THE COURT:**  Ms. Pachter, good afternoon.

4              **MR. MARTINEZ:**  Good afternoon, your Honor.

5     Manuel Martinez, for the County of Alameda, representing

6     Defendant Patrick O'Connell.

7              **THE COURT:**  Very well.  Anyone else?

8              **MS. WHITEHURST:**  Good afternoon, your Honor.  This is

9     Judy Whitehurst, representing Dean C. Logan, the Los Angeles

10    County Registrar-Recorder.

11             **THE COURT:**  Very well.  Good afternoon.

12             Who else?  Anybody?

13             **MR. NIELSON:**  Good afternoon, Chief Judge Walker.

14    Howard Nielson, of Cooper & Kirk, representing the

15    Defendant-Intervenors.

16             **THE COURT:**  All right.  You're with Mr. Cooper?

17             **MR. NIELSON:**  A different location, but yes.

18             **THE COURT:**  I see.  Anyone else on the line?

19             **MR. PATTERSON:**  Good afternoon, Chief Judge Walker.

20    This is Pete Patterson, also with the Defendant-Intervenors,

21    from a different location.

22             **THE COURT:**  All right.

23             **MS. MOSS:**  And good afternoon, your Honor.

24    Nicole Moss, with Cooper & Kirk, also for

25    Defendant-Intervenors.

1          THE COURT:  All right.

2          MR. MC GILL:  Good afternoon, your Honor.  This is

3   Matthew McGill, from Gibson, Dunn & Crutcher, for the

4   plaintiffs.

5          THE COURT:  Very well.

6          MR. DUSSEAULT:  Chris Dusseault, also with Gibson,

7   Dunn & Crutcher for the plaintiffs.

8          THE COURT:  And good afternoon, your Honor.  I think

9   I might be the last one.  Enrique Monagas, Gibson, Dunn &

10  Crutcher, also for the plaintiffs.

11         MR. FLYNN:  City and County of San Francisco, for

12  Plaintiff-Intervenor.

13         (Reporter interruption.)

14         THE COURT:  I'm afraid we'll have to have that

15  appearance again.  The reporter did not catch it.

16         MR. FLYNN:  Ron Flynn, City and County of

17  San Francisco.

18         THE COURT:  All right.  Well, let's begin.

19         The subject of our discussion this afternoon is the

20  document request that the plaintiffs have made of the

21  Defendant-Intervenors, who I'll call "the proponents of

22  Proposition 8."  That's a nomenclature that I think we've used

23  principally throughout the case.

24         Let me just make some general comments, and then

25  allow you to react to those comments.

1          I haven't had a chance to review in great depth the

2     issues that are before us, although the issue is really, I

3     think, not a terribly complicated one.  It deals with the

4     proponents' assertion of a qualified First Amendment privilege

5     with respect to certain documents that have been requested by

6     the plaintiffs.

7          Concerning a privilege assertion, as I read the

8     cases, the Ninth Circuit, the Supreme Court, and other district

9     courts have essentially adopted three approaches to dealing

10    with the assertion of a privilege.

11         First, of course, is that provided about for in

12    Rule 26(b)(5):  the preparation of what has come to be called a

13    "privilege log."  The cases that have developed in accordance

14    with that describe some of the requirements of a privilege log.

15    And as we get into our discussion, we may find it appropriate

16    to deal with some of those specifics.

17         A second approach is that which the proponents, I

18    understand, have advanced.  And that is some form of *in camera*

19    review by the Court to test the sufficiency of the privilege

20    assertion.

21         And a third approach, which is the production of

22    redacted portions of documents, or the production of documents

23    or materials that contain privileged matter but also contain

24    nonprivileged matter, and the privileged matter is redacted

25    from the material that is produced.

```
 1              There may be other approaches, but those are the

 2     three that have come to my attention in thinking about the

 3     problem that we're going to be talking about this afternoon,

 4     and, obviously, are three approaches that have been used in

 5     cases that I'm familiar with.  And it sometimes is the

 6     situation where more than one of these approaches is

 7     appropriate.

 8              So I suppose the first question that comes at least

 9     to my mind in thinking about this problem is whether the

10     material, Mr. Cooper, over which your client is asserting a

11     qualified First Amendment privilege embraces the entirety of

12     the material that you have discussed in your recent

13     correspondence, or whether only portions of those materials

14     are, in your view, privileged; because, obviously, if it's a

15     situation in which only a portion of the material is

16     privileged, then, obviously, the redaction approach may be an

17     appropriate way to proceed, and may make a lot of sense; but if

18     not, then perhaps one or two or some combination of the other

19     two approaches might be appropriate.

20              So let me ask you whether -- of the material that

21     you're asserting the privilege over, are you asserting the

22     privilege as to the entirety of these materials, or only a

23     portion of these materials?

24              MR. COOPER:  Yes.  Thank you, Chief Judge Walker.

25              Our assertion of privilege, your Honor, is, in fact,
```

1 over the entirety of this documents that we believe are

2 privileged.  And a process of -- of redaction would not speak

3 to the nature of the privilege we've asserted.

4        And -- and even if there were some theoretical

5 possibilities that a document that was within and responsive to

6 the requests as they have now been revised in light of the

7 Court's October 1 ruling might contain information that was --

8 that was otherwise unobjectionable, the practical reality is

9 that, you know, we -- we expect to have and have now taken,

10 essentially, inventory of the -- of the universe of documents

11 from which responsive documents are being culled.  And we would

12 be talking about thousands and thousands of documents that

13 would have to be reviewed for this redaction purpose, but the

14 real and, to our mind, disqualifying answer is that we do

15 assert a privilege over the entirety of these -- of these

16 confidential nonpublic communications and documents.

17        **THE COURT:**  Well, that being the case, that would

18 appear to point us in the direction of either an *in camera*

19 review, or a privilege log with respect to -- to these

20 documents.

21        And I understand from your letter that you believe

22 that the preparation of a privilege log may be burdensome, and

23 you therefore offered to make a production of a sample of the

24 documents; but let's put that issue to one side for the moment.

25        **MR. COOPER:**  Okay.

```
 1          THE COURT:  Are there approaches that we ought to be
 2  considering, other than the two that I've mentioned:  privilege
 3  log, or in camera review?  Is there some fourth or fifth
 4  alternative that I haven't mentioned this afternoon that we
 5  ought to put on the table for discussion?
 6          MR. DETTMER:  Your Honor, if I may.  Ethan Dettmer,
 7  on behalf the plaintiffs.
 8          THE COURT:  Yes, Mr. Dettmer.
 9          MR. DETTMER:  I'm sorry, your Honor.
10          THE COURT:  Yes.  You may proceed, sir.
11          MR. DETTMER:  Thank you.
12          Your Honor, I think it's helpful to -- I do have --
13  the answer to your question is, yes, I do have another
14  alternative that I would like to propose and, in fact, have
15  proposed to the proponents --
16          THE COURT:  All right.
17          MR. DETTMER:  -- several weeks ago.
18          THE COURT:  Let me interrupt you, Mr. Dettmer.
19  Before I hear from you, let me direct that question first to
20  Mr. Cooper, and then I'll come back to you.  Is that okay?
21          MR. DETTMER:  Certainly.
22          THE COURT:  Mr. Cooper, do you have the question in
23  mind?
24          MR. COOPER:  I think I do, your Honor.
25          And our efforts to think of an approach to having the
```

1  Court make a decision -- make a judgment with respect to the

2  validity of our First Amendment claim has -- we haven't been

3  able to come up with an alternative to essentially what we take

4  to have been at least your implied suggestion in your

5  October 23rd order.  And we view that approach as combining the

6  elements of a privilege log, and *in camera* review; but as you

7  mentioned, a privilege log that attempted to log all of the

8  documents over which we are claiming a First Amendment

9  privilege would be a very, very labor-intensive, time-consuming

10 process.

11         **THE COURT:**  All right.  Well, let's -- let put -- as

12 I said, let's put the burdensome issue to one side, and come

13 back to that as it may be necessary to come back to it.

14         So I gather you would agree, then, that the two

15 alternatives that we should consider are either an *in camera*

16 review, or privilege log, or perhaps a combination of those

17 two; but those are the two that ought to be on the table for

18 discussion this afternoon.  I gather that's your position?

19         **MR. COOPER:**  Well, yes, your Honor.  We've made our

20 proposal in my letter to the Court.  And -- and, in light of

21 the Court's October 23rd order, we think that is a measured and

22 reasonable way now to proceed.

23         **THE COURT:**  All right.

24         Now, Mr. Dettmer, you indicated that you have some

25 third alternative that you think ought to be put on the table

1    for discussion?

2              **MR. DETTMER:**  Yes, your Honor.  Thank you.

3              Ethan Dettmer.

4              And the proposal, I think --

5              If I may just step back a moment and look at the

6    nature of, I think, the problem that is presented to us all

7    jointly in trying to get to a trial date as it's set, and at

8    the same time address the concerns that Mr. Cooper and his

9    colleagues have raised on behalf of their clients -- the

10   concerns as I've read them in the papers and heard them in the

11   arguments are twofold.

12             One is that production of these documents would lead

13   to a chilling of their political speech, and a potential harm

14   of, I guess -- related harm of harassment and intimidation of

15   Proposition 8 supporters.

16             And I could sort of answer that several ways.  One is

17   that the Court has already held that they have not made a

18   sufficient showing regarding that chilling and those harms.

19             And, I guess, as I had mentioned in my letter, the

20   additional answer to that is that these are the Official

21   Proponents of Proposition 8 whose documents we are most

22   interested in.  And they are obviously central to this campaign

23   and, in fact, the architects of the campaign.  And it seems to

24   me that chilling of their speech seems unlikely, given their

25   centrality to the case.

```
 1            And certainly, the NAACP case and other cases have
 2    not protected that:  the identities or the speech of those
 3    central players in campaigns.
 4            THE COURT:  Well, let me get you back on track here.
 5            MR. DETTMER:  Oh, of course, your Honor.
 6            THE COURT:  What are the approaches that I ought to
 7    be considering?
 8            MR. DETTMER:  And -- I'm sorry.
 9            THE COURT:  Other than a privileged log or in camera
10    review or a combination of the two, is there --
11            MR. DETTMER:  The --
12            THE COURT:  -- is there some other approach that
13    ought to be put on the table for consideration?
14            MR. DETTMER:  Yes, your Honor.
15            The approach that we proposed to the proponents, I
16    believe, on October 14th, but they have thus far not agreed to,
17    is that they produce these disputed documents under a
18    provisional attorneys'-eyes-only protective order until the
19    question of a stay of discovery is finally resolved at whatever
20    level they decide to stop seeking the stay of this discovery,
21    and that at that point, they may then go back and designate the
22    documents as appropriate under the Court's protective order
23    that we have proposed to be entered.
24            And that solution would allow both for their concerns
25    over these documents to be addressed by the protective order,
```

1  and the agreement to have this as an attorneys'-eyes-only

2  protective order, and at the same time, our concerns about

3  moving this case forward promptly and being able to take

4  meaningful depositions.  We'll also be able to go forward and

5  move toward a January trial date in an effective way.

6          **THE COURT:**  All right.  Well, that is a third

7  alternative that we can consider:  Production under an

8  attorneys'-eyes-only protective order.  Fair enough.

9          Now, does anybody else have any fourth approach that

10 the Court ought to put on the table for consideration?

11         Hearing none, it looks to me like we've got the

12 alternatives before us.

13         Now, let's talk about each of these.  And let me

14 direct my initial comments to Mr. Cooper.

15         I've had a lot of experience recently with production

16 of *in camera* material.  That experience has largely been in

17 cases involving the assertion of the state-secrets privilege by

18 the government in various cases.

19         I can tell you, Mr. Cooper, as a Judge who's called

20 upon to try to be impartial and fair to both sides to conduct

21 an evenhanded proceeding, there have been very few things in my

22 judicial experience which have left me with as unsatisfactory a

23 feeling as *in camera* review of materials; that is, review of

24 materials submitted by one side, but as to which access has

25 been denied to the other side.

1          And, able and experienced as you are, I'm sure you

2    can empathize with that comment.

3          It's just antithetical to our system of justice for

4    one side to furnish information to the Judge without the other

5    side having access to that material.  And so, as between the

6    two -- well, as between the three alternatives that we are

7    discussing this afternoon, an *in camera* review isn't very

8    appealing to me.

9          Now, it may be the only practical alternative, but I

10   want to hear from you why we shouldn't consider one or the

11   other of the alternatives.

12         **MR. COOPER:**  Certainly, your Honor.  Your Honor, I am

13   certainly sympathetic to the concern that you've voiced about

14   the nature of *in camera* review.

15         We view it as, frankly, the next and perhaps only

16   step available to us to have a judicial determination of -- as

17   the Court suggested in the October 23rd order, of the First

18   Amendment -- of the validity of our First Amendment privilege

19   with respect to, now, specific documents.

20         And the case that the Court cited is the *Kerr* case,

21   obviously.  And, you know, notwithstanding the limitations on

22   *in camera* review, it suggests that -- as the Court's

23   October 23rd order did, it suggests that process as, I guess,

24   essentially the only one available to now have the privilege

25   claim assessed in light of the Court's order rejecting our

1  claim of a categorical privilege; a "blanket privilege," as you

2  put it.

3         So long as there is a possibility that a

4  document-by-document review by the Court of the -- of the types

5  of documents over which we are making this claim is available,

6  it's -- it just seems to me, anyway, that -- and to us that

7  it's the only course really that now is left available for

8  ultimately deciding the First Amendment question.

9         **THE COURT:**  Well, let's talk about the alternatives.

10  We have three on the table.

11         Let's talk about the one that Mr. Dettmer has

12  suggested here this afternoon; and that is production under an

13  attorneys'-eyes-only protective order; perhaps a fairly

14  restrictive attorneys'-eyes-only protective order; one in which

15  the attorneys are specifically identified by name, so that the

16  production doesn't become widespread, and we could track back

17  to an individual attorney a disclosure of any of the material

18  that is disclosed.  What's wrong with that approach?

19         **MR. COOPER:**  Your Honor, we don't think, frankly,

20  that that approach is a viable alternative to our claim of

21  privilege.

22         First, it would -- it would contemplate this limited

23  disclosure only until such time as the -- as the plaintiffs

24  made use of the information that was disclosed to them in the

25  context of the trial itself.

1        I mean, the only purpose for the plaintiffs to desire

2    disclosure of this information is on the theory that it is

3    relevant to issues they intend to prove up.

4        And so ultimately, the disclosure -- even if one

5    assumes that it can remain attorneys' eyes only during the

6    discovery process, its ultimate purpose would be to call upon

7    and to use and introduce at trial; but beyond that, your Honor,

8    it -- the disclosure, even at the level of

9    attorneys'-eyes-only, we believe, would -- notwithstanding

10   Mr. Dettmer's very able argument, it would -- it would -- it

11   would constitute an invasion of the First Amendment freedoms of

12   my clients and -- and the individuals who were the volunteers;

13   ordinary citizens who volunteered to -- to undertake this

14   initiative campaign, and to commit their time and their efforts

15   and their resources and engage as professional -- professional

16   political consultants and campaign experts, but -- but again,

17   ordinary citizens who came forward and who -- who engaged in

18   the political process, formed associational funds with -- with

19   their colleagues who had volunteered to join them, and -- and

20   who engaged in the freest kinds of exchange of ideas and

21   political expression.

22       If you were to tell those people that -- if you

23   hadn't told those people, I would submit to the Court, before

24   this campaign got under way that everything that they said in

25   their e-mails and in their -- and in their conversations and --

1   and in their counseling with their volunteer colleagues in this

2   campaign -- that all of that information would, after the

3   election, in litigation, be open to and available to their

4   political opponents or even just the lawyers of their political

5   opponents in postelection litigation over the referendum, it is

6   our submission that many of those volunteers either would not

7   have engaged in the process at all or they would certainly have

8   censored their communications and their expression of their

9   political speech.

10        And I believe that to be true not just of the

11  ordinary citizen volunteers.  I believe it surely also to be

12  true of the professional political, you know, campaign people

13  who these -- who the proponents and the members of the ad hoc

14  executive committee and others hired to assist them in their

15  effort to wage this political campaign.

16        **THE COURT:**  Well, let me respond to that.

17        And you've certainly made a good points, but let me

18  modify the alternative that Mr. Dettmer has advanced.  And that

19  is that the disclosure of these materials subject to an

20  attorneys'-eyes-only privilege order [sic] -- protective

21  order -- excuse me -- the production of this material subject

22  to an attorneys'-eyes-only protective order would not be

23  production for all purposes in the litigation, but only for

24  purposes of testing the privilege assertion.

25        And if the privilege assertion is sustained with

1  respect to those documents, then the documents could not be

2  used for any purpose in the litigation; but the idea which I am

3  now advancing is a production of these documents on an

4  attorneys'-eyes-only basis, simply so we can get both sides in

5  the litigation sufficiently well informed about the materials

6  so that we can -- well, so that the Court can have two sides of

7  the issue, whether or not the privilege actually should apply

8  to these materials.

9           What's your reaction to the idea of, thus, an

10 attorneys'-eyes-only protective order, and a limitation that

11 the production would be simply for purposes of testing the

12 privilege assertion?

13          **MR. COOPER:**  Your Honor, my -- my admittedly

14 off-the-top-of-my-head reaction is, frankly, a negative one.

15          I remain concerned about the -- about -- I remain

16 concerned that that even limited type of production would be an

17 invasion of my clients' First Amendment freedoms.

18          And I -- and I'm also not clear if -- if the Court is

19 suggesting that all of our -- of the documents over which we

20 would claim privilege -- the responsive documents over which we

21 would claim privilege, which, you know, will be thousands and

22 thousands of them -- would be produced for this -- for this

23 purpose, or whether the Court is suggesting that the more

24 manageable -- at least, what we have suggested as being more

25 manageable sampling of documents that our proposal contemplates

1  in for *in camera* review would be shared for this -- for

2  purposes of -- of testing this issue on this -- on a limited

3  basis, such as we have proposed.

4         **THE COURT:**  Well, it's true my suggestion didn't

5  distinguish between those alternatives, but let's consider,

6  just for the sake of our discussion, the limited sampling that

7  you've referred to; say, the 25 or so -- whatever the

8  appropriate number is -- of documents necessary for a true test

9  of the adequacy of the privilege assertion.  Say we limited the

10 production of documents pursuant to an attorneys'-eyes-only

11 protective order to that number; and with the further

12 restriction that the purpose for which the production is made

13 is simply to test the adequacy of the privilege assertion.

14        In other words, putting to one side the issue of

15 burden, which does seem to me to be categorically a different

16 kind of objection --

17        **MR. COOPER:**  Your Honor, I would ask the Court to

18 permit me to consider that.  It is -- and it's with

19 appreciation for the Court's effort here with -- with the

20 parties before it to grope for a reasonable and measured

21 solution that I would ask the Court to permit me to consider

22 that; and in particular, to consider it with my client -- my

23 clients; but I -- but I'm obliged to say that I am concerned

24 that even that limited approach to disclosing these materials

25 would be -- would threaten to -- an unacceptable infringement

1  upon the confidential documents at issue here; but with that,

2  would the Court be -- would the Court be amenable to permitting

3  me to counsel with my clients on that?

4           **THE COURT:**  Well, offhand, I'm hard pressed to deny a

5  lawyer the chance to communicate with his client.  And I think

6  that's fair -- a fair request of you to make; but let's follow

7  our discussion on, and see if there might not be some other

8  alternative that we can explore.  And possibly as we explore

9  other alternatives, you'll want to place before your client

10 more than one option.

11          So, without saying, "No, you can't," or, "Yes, you

12 can consult with your client about this" -- and I must say my

13 strong inclination will be to allow you to consult with your

14 client, of course -- but let's continue our discussion to see

15 where we go next.  And that is to shift to the other

16 alternative.  And that's the alternative that I opened with in

17 our discussion this afternoon.  And that is the production of a

18 privilege log.

19          And, again, putting to one side whether we're talking

20 about a privilege log covering all of the thousands of

21 documents that you've mentioned -- putting that aside, and

22 focusing only on the 25 or so, the limited number of documents

23 that you think are a fair sample, what's wrong with the

24 production of a privilege log?

25          After all, a privilege log is generally required,

1  even for the assertion of the attorney-client privilege, which

2  is an absolute privilege; whereas here, we're dealing with a

3  qualified privilege.  What's wrong with a privilege log?

4         **MR. COOPER:**  Well, your Honor, there's nothing in --

5  in principle, wrong with a privilege log.

6         And, in fact, our proposal to the Court for this --

7  this 25-document selection for *in camera* review contemplates

8  that it would be accompanied with a privilege log, and that our

9  friends representing the plaintiffs and the

10  Plaintiff-Intervenors would have access to that -- to the

11  privilege log; but you know, a privilege log is -- is -- is

12  always nothing more than a tool and a prelude, a predicate to

13  ultimate determination of the privileged nature of the document

14  that it logs.

15         And there will certainly -- there -- you know, we

16  can't conceive of -- and our efforts to begin the process of

17  logging documents doesn't reveal to us any method by which

18  the -- by which logging the documents that are responsive and

19  privileged would -- would reveal information just on the face

20  of a log that could -- would allow the Court or even our -- our

21  friend for the plaintiffs to make any kind of determination

22  that a document either is or is not privileged.

23         In fact, to us, it simply confirms that each one of

24  the documents is within the description of the documents that

25  we believe are privileged; that is, they deal with -- as the

1    Court's October 1st opinion outlined, they deal with issues of

2    campaign strategy.   They are documents exchanged between the --

3    I guess Mr. Dettmer used the term "architects"; that is, the

4    individuals in responsible, lead roles within the campaign

5    itself.   And they are -- you know.   And they are those types of

6    communications, mainly.   I mean, the vast bulk of these

7    thousands and thousands, as I'm sure the Court suspected, are

8    e-mail messages with this kind of, you know, private

9    communication going back and forth among them.

10        So we don't oppose privilege logs on principle, but

11   it would not, it seems to us, in any way relieve the Court's --

12   you know, any burden on the Court or the parties to -- to

13   review actual documents to assess their privileged nature.

14        I guess the final point I want to make, your Honor,

15   if I may, is this.   If -- preparing a privilege log that

16   covered all of these documents wouldn't be in anyone's

17   interest.   It wouldn't be -- I mean, it would be a hugely

18   resource-intensive and costly enterprise for a party to this

19   case that is an intervenor party that is already -- believe me,

20   your Honor -- strained in terms of its resources and its

21   ability to, you know, deal with the pace and the demands of the

22   litigation, even apart from it.   And to commit the resources

23   necessary to prepare that log would -- would just be -- it

24   would -- it would take a long time, and consume enormous

25   talents and resources.

1          And -- and it would just put off what -- what seems

2    to us to be inevitable anyway; and that is, in light of the

3    Court's determination in the October 23rd order, just put off

4    the inevitability of an *in camera* review and an ultimate

5    decision -- judicial decision whether, you know, a document or

6    these documents or perhaps, you know, this category of

7    documents is or is not protected by the qualified First

8    Amendment privilege in the context of the case.

9          **THE COURT:**  Well, we are making some progress, it

10   seems to me.

11         You've indicated that there's nothing wrong with a

12   privilege log per se.  And, indeed, you point out that that is

13   an alternative that you've suggested, along with *in camera*

14   review.  And that seems fair enough.

15         And, indeed, I find that suggestion to be appealing,

16   because -- appealing in this sense, Mr. Cooper:  it allays, at

17   least to some degree, the uneasiness that I have about

18   conducting an *in camera* review of materials produced by one

19   side in litigation, without access to that information by the

20   other.

21         It's true that the plaintiffs would not have access

22   to the documents that were subject to *in camera* review, but

23   they would have the information produced by a privilege log,

24   and enable them to attempt to make a case that the assertion of

25   privilege should not extend to the documents at issue.

1          So that does seem to me to be a reasonably practical

2    step in the direction of resolving this.  And I gather that

3    that is something that your side is prepared to do promptly.

4          **MR. COOPER:**  Yes, your Honor, we -- we would.  You

5    know, we would be prepared to do that whenever the Court gave

6    us permission to do so.

7          **THE COURT:**  Now, I did take a look at, at least, a

8    couple of cases with respect to the content of a privilege log.

9          And, of course, the federal rules describe that when

10   a party withholds information otherwise discoverable by

11   claiming that the information is privileged or subject to

12   protection as trial preparation material, the party must

13   expressly make the claim, and then describe the nature of the

14   documents, communications, or tangible things not produced or

15   disclosed, and do so in the manner, without revealing the

16   information itself privileged or protected, that will enable

17   other parties to assess the claim.

18          In reviewing a fairly old Ninth Circuit case -- 1992.

19   That doesn't seem old to me, but I'm sure to some of the

20   younger lawyers who may be listening in, it seems old.

21          **MR. COOPER:**  Nor to me, your Honor.

22          **THE COURT:**  All right.  We're on the same wavelength,

23   then.

24          This is *In re:  Grand Jury Investigation*, at

25   974 F. 3d. 1046.

```
 1              And the content of the privilege log that is
 2   described by the Ninth Circuit in that case identifies, one --
 3              And parenthetically, of course, they're talking here
 4   about an attorney-client privilege, but we can extend that to
 5   our context.
 6                   One, the attorney and client involved;
 7                   two, the nature of the document; three, all
 8                   persons or entities shown on the document
 9                   to have received or sent the document;
10                   four, all persons or entities to have been
11                   furnished the document or informed of its
12                   substance; and, five, the date of the
13                   document -- the date the document was
14                   generated, prepared, or dated.
15              Now, the privilege log that you contemplate, I
16   assume, Mr. Cooper, would follow that general pattern, adapted,
17   of course, to the specifics of this privilege.  Is that a fair
18   assumption?
19              MR. COOPER:  Your Honor, it is a fair assumption.
20              I want to quickly add that, however, the privilege
21   log we would contemplate would not be able to identify all of
22   the addressees, as it is our, you know, view, as the Court
23   knows, that there are volunteers who were involved in this
24   whose -- whose anonymity has -- has never been -- has never
25   been compromised, and whose -- and for whom anonymity was
```

1  important from the beginning.

2          And so, apart from -- apart from that caveat, we

3  would contemplate that the privilege log would -- would contain

4  the information that you have referenced, but it would -- what

5  we had contemplated was that it would list as Does, which is

6  what we've done in our previous -- our previous dealings with

7  the counsel for the plaintiffs -- list as Does individuals who

8  may have been addressees on a particular document whose --

9  whose identities have not -- have never come forward.

10          **THE COURT:**  Well -- hold on.  Hold on.

11          **MR. DETTMER:**  Certainly.

12          **THE COURT:**  You say "volunteers."  Can you tell me

13  who you mean by "volunteers"?

14          I assume that a lot of people who were involved in

15  the campaign were not compensated, and therefore, might fall

16  under the rubric of a volunteer; but they might, nonetheless,

17  have had a significant role in the management and direction of

18  the campaign.

19          **MR. COOPER:**  That's certainly true, your Honor.

20  There were -- but the campaign was -- was really, apart from

21  the compensated political consultants and other -- and other

22  political professionals who were engaged by the -- by the

23  campaign, the Proposition 8 campaign was, in fact, managed,

24  and -- and staffed by volunteers.  No one was -- no one was

25  compensated.

1          And, yes, the volunteers had roles that ranged from

2    being members of the ad hoc executive committee, to licking

3    stamps.

4          And -- and the -- however, the documents that we're

5    talking about here, as Mr. Dettmer has made clear previously,

6    are -- are documents that -- that, by and large, had

7    individuals who had, you know, responsible volunteer positions

8    in the campaign.

9          I would -- I would also like to note that in the

10   context of an attorney-client privilege, the identity of

11   addressees is a crucial feature of the -- of whether the

12   privilege itself applies or not; perhaps even the most crucial;

13   but that is not the case, we would submit, with respect to the

14   privilege we're talking about.

15         The identity of individuals who -- whose anonymity

16   has never been compromised is -- is not really a necessary

17   piece of information to determine whether or not the

18   communication itself is within the privilege, at least, that we

19   are advocating for.

20         **THE COURT:**  Well, let's talk about that for a minute.

21         I wonder if there isn't an analogy here.  Looking at

22   the cases which have crafted this First Amendment qualified

23   privilege, it appears that the cases have drawn a distinction

24   between individuals who were rank-and-file members of the

25   various organizations -- principally, the NAACP, which is the

1  organization that was involved in most of the cases from which

2  this doctrine has arisen -- and those who were officers or

3  directors or managers of the NAACP, who may very well have

4  included people who were, in your phrase, "volunteers," or who

5  may not have been compensated monetarily for their efforts.

6          So there is a distinction -- isn't there? -- between

7  managers, directors, individuals who have had responsibility

8  for directing the organization, and those who were

9  rank-and-file members, such as those, as you put it, who lick

10  stamps or distribute fliers or do activities of that kind.

11          So isn't there an analogy with the attorney-client

12  privilege, at least, in this, at least, as far as this context

13  is concerned?

14          **MR. COOPER:**  Your Honor, I agree with you that in the

15  *NAACP* case, the issue of the directors and officers of that

16  branch of the NAACP was not an issue, but I would submit that

17  it wasn't an issue because there was never a claim in that case

18  over the -- over the identities of those individuals.  Either

19  they had been made public, as a number of individuals in the

20  Proposition 8 campaign have been, and whose identities we are

21  not in any way seeking to protect, or, for whatever reason, the

22  NAACP did not assert any kind of privilege over them.

23          **THE COURT:**  Well, are there individuals who were

24  involved in the management of the campaign, whether compensated

25  or not, who were equivalent to officers, directors, managing

1  agents; individuals who sat on the executive committee, and who

2  otherwise were charged with directing the campaign?  Are there

3  individuals in that role whose identity you are seeking not to

4  disclose?

5      **MR. COOPER:**  Yes, your Honor.  There are a couple of

6  members of the executive committee -- the ad hoc executive

7  committee -- whose -- whose identities have never been

8  disclosed, and who we have not disclosed before, and over whom

9  we have -- we have asserted a First Amendment privilege, yes.

10     **THE COURT:**  Well, how does the First Amendment

11 privilege extend to those individuals, as distinguished from

12 people in the position of, say, a Mrs. MacIntyre, who I'm sure

13 you remember from that case that reached the Supreme Court;

14 that is, someone who licked envelopes or who passed out

15 leaflets?  How does this First Amendment qualified privilege

16 extend to people who had a role in managing and directing the

17 Proposition 8 campaign?

18     **MR. COOPER:**  Well, your Honor, I think that our view,

19 your Honor, is that it extends to those individuals to ensure

20 that they are willing to engage in the First Amendment

21 political expression and associational activity of a campaign

22 of this kind.

23     I mean, they are -- we, frankly, don't see why or how

24 the purposes of the First Amendment privilege would not apply

25 equally to those who step forward to take and volunteer for a

1  substantial role, even a leadership role or some type of

2  volunteer managerial role, than those who -- who volunteer to

3  associate themselves with this campaign or with any type of

4  referendum campaign on some lesser basis.

5          I think the concern of the First Amendment is that

6  the type of consequences that flowed, for example, as a result

7  of the disclosure of donors who -- who donated more than a

8  hundred dollars to the campaign -- the kind of unfortunate

9  harassment and other kinds of consequences that flowed to them

10 are -- are the very kinds of things that -- that make,

11 oftentimes, individuals desire to -- desire to involve

12 themselves and associate with political efforts of -- of this

13 controversial kind only on an anonymous basis.  And it's our

14 submission that the First Amendment entitles them to do that,

15 and that if it didn't, the prospect that they would step

16 forward to take a leadership role, as opposed to some, you

17 know, lesser type of role, would, we think, be dramatically

18 reduced and chilled.

19          **THE COURT:**  Now, the campaign for Proposition 8

20 raised a substantial amount of money.  And, of course, there

21 was a substantial amount of money raised in opposition.  Did

22 this ad hoc committee that you've mentioned, Mr. Cooper, have

23 the responsibility of managing those funds?

24          **MR. COOPER:**  To be quite honest with you, your Honor,

25 I am not sure what level of -- what level of responsibility the

1  ad hoc executive committee had to that.  I feel confident in

2  telling you that it had ultimate responsibility, but I do

3  believe that there was a different group with -- with, perhaps,

4  you know, a cross membership, but a different group of -- and a

5  different committee that had particular responsibility for

6  handling of the financial issues.

7          And, of course, as the Court knows from previous

8  hearings, the Protect Marriage organization itself had a

9  treasurer who was responsible for financial -- had financial

10 responsibilities as well.

11         **THE COURT:**  Did the treasurer report to and answer to

12 the ad hoc executive committee?

13         **MR. COOPER:**  My recollection is that that is so, yes,

14 your Honor.

15         **THE COURT:**  Okay.  All right.  Well, we've covered a

16 lot of ground.  And I've held you off, Mr. Dettmer.  And I'm

17 sure you would like to join in this discussion, so let me give

18 you the floor.

19         **MR. DETTMER:**  Thank you very much, your Honor.  I

20 appreciate it.

21         And I do have a number of comments, but I'd like to

22 keep them as brief as possible; but the ultimate problem that I

23 see that we all collectively face right now is trying to meet

24 the deadlines that exist in this case, while still getting

25 these documents in this litigation that your Honor has found

1    are at least potentially relevant to the litigation.

2          And I'm concerned that a privilege log or an *in*

3    *camera* review of all of these documents would use up all of the

4    time that we have left before trial and, thus, these documents

5    would not be used in the trial or certainly in the discovery

6    process.

7          **THE COURT:**  Well, let's put that issue to one side

8    for a moment.  We can deal with that.  I understand your

9    concern and, indeed, I share your concern; but put that to one

10   side, and address these other topics that I've discussed and

11   had a nice discussion with Mr. Cooper about.

12         **MR. DETTMER:**  Certainly, your Honor.

13         Well, maybe I can address the privilege-log issue

14   first.

15         I think that, first of all, it was a little unclear

16   from the discussion about whether we were talking about a

17   privilege log that encompassed all or a substantial portion of

18   these documents, or just 25 documents.  Obviously, we would

19   have a serious concern about any *in camera* review or privilege

20   log that had such a small subset of documents that were

21   hand-selected by counsel for the proponents.

22         I think that that procedure takes the problems of an

23   *in camera* review that your Honor had mentioned, and amplifies

24   them dramatically, given that the Court is only seeing the

25   documents that the proponents' counsel have picked for that

1  purpose.  And obviously, if we're seeing a privileged log for

2  only 25 documents, that even further amplifies that concern.

3      So I -- I think that the privilege-log issue becomes

4  very difficult for that reason.  And it would be very difficult

5  for us to, based on the information that Mr. Cooper had

6  identified as being something that he'd be willing to put on a

7  privilege log, and other items, such as names, that he would

8  not -- it would be of, I think, limited value for us in

9  determining how to argue with Mr. Cooper to your Honor about

10  that privilege, and whether it is, indeed, valid.

11      With respect to the *in camera* review, your Honor has

12  mentioned that -- the concerns that we would have about that,

13  and that I think any litigant would have in having items

14  presented to the Court without them having an opportunity to

15  comment on them.

16      And I think what all of this pulls me back to is --

17  is the fundamental issue here which both you and Mr. Cooper

18  spoke about, your Honor, which is the point that this is not

19  the attorney-client privilege; this is a qualified privilege

20  that is based on very specified concerns that have been laid

21  out in a number of cases.

22      And those concerns are, as Mr. Cooper mentioned,

23  intimidation and harassment of participants in the political

24  process, and the concern that there will be a chilling of their

25  speech based on that.

1          And Mr. Cooper has also raised the issue of sharing

2    campaign strategy with the campaign's opponents.

3          And I would put a footnote there, and say:  my

4    clients are not the campaign's opponents; they're individual

5    people.  And we're not part of the campaign against

6    Proposition 8, except in, you know, the most -- the most

7    attenuated way.

8          So I guess the point of this is that those concerns

9    that are the basis for all of this case law that protects these

10   types of things from disclosure, I think, are very amply

11   protected by a good protective order.

12         And the notion that Mr. Cooper's clients are going to

13   be harmed or their speech is going to be chilled by some

14   handful of lawyers looking at these documents seems to me

15   far-fetched.

16         And, as your Honor has pointed out, there's already

17   been substantial exposure by Mr. Schubert and Mr. Flint, the

18   campaign -- the Yes on 8 campaign's political strategists, of

19   their strategy.  And they've talked about it and -- and

20   broadcast it in several different venues.  Your Honor has seen

21   one of them, and commented on it in the October 1st order.

22         In light of all of that, it seems to me that there is

23   a good way to cut this knot, which is to produce these

24   documents right away to a limited group of lawyers who can look

25   at them and analyze them and move forward.  And, at the same

1  time, Mr. Cooper's clients will be protected from the harms

2  that they've articulated until such time as there's no longer a

3  stay of discovery that can be gotten.

4          And I think the final point -- and then I'll stop,

5  your Honor -- is the notion that at some point -- and these are

6  going to be introduced in the record -- is something that -- as

7  your Honor knows, there's a whole series of rules in the

8  Court's local rules about how that happens once we get to the

9  point after we've reviewed these documents and looked at them

10 and seen which ones we may want to use at trial or to submit to

11 your Honor.

12         Then the question of whether they will be in the

13 public record or not is something that I think we could then

14 have a manageable discussion about between Mr. Cooper's team

15 and our team.  And then, if we have disagreements at that

16 point, we can bring them to your Honor and get them resolved in

17 advance of anything being submitted in the public record.

18         **THE COURT:**  Anybody else want to speak up before I go

19 back to Mr. Cooper with a little further discussion on another

20 aspect of this?

21         Ms. Lee?  Mr. Stroud?  Ms. Pachter?  Martinez?

22 Whitehurst?  Who else wants to speak?  Anybody?

23         **MS. LEE:**  This is Mollie Lee, from San Francisco.  I

24 have just one quick additional comment.

25         San Francisco agrees with Plaintiff that a protective

1    order would adequately -- is the right solution to this

2    problem, and that an attorneys'-eyes-only protective order is

3    more than sufficient to address any concerns that proponents

4    might have about possible harm or chill resulting from

5    disclosure.

6              And on that line, I wanted to note that in another

7    case, *Protect Marriage v. Mullen*, which is pending in the

8    Eastern District of California, proponents raised similar

9    concerns about disclosure of information that they believed was

10   highly sensitive.  And in that case, they did stipulate to a

11   protective order that provided access to sensitive information.

12   And it provided it, I think, particularly as relevant to some

13   of the timing issues in this case -- the protective order was

14   entered, and governed the production and disclosure of

15   confidential information through discovery in all pretrial

16   processes.

17             So I guess to me, that suggests that that's a very

18   workable solution with respect to these particular parties and

19   the particular concerns that opponents have raised here.

20             **THE COURT:**  All right.  Anyone else?

21             All right.  Let me come back to you, Mr. Cooper.  One

22   subject we didn't cover in our discussion, which I thought was

23   very helpful, is the category of the various documents or

24   information that we're talking about.

25             You mentioned e-mails.

1          In thinking about the qualified privilege as it has

2     been developed in the case law, various kinds of documents or

3     materials have been discussed:   member lists, financial

4     records.

5          What are we talking about here?   Are we talking about

6     membership lists?  Members of the campaign?  Volunteers who

7     have agreed to walk precincts?  Are we talking about financial

8     records?  Are we talking about letters from persons in a

9     management position?

10         And by "letters," I mean not just letters, but also

11    e-mails, telephone calls, documents, as defined in the Federal

12    Rules of Evidence.

13         Are we talking about communications between those in

14    a management position in the campaign, and the paid political

15    consultants?  Just exactly what are we talking about here?

16         **MR. COOPER:**  Your Honor, we're talking about most of

17    the things that you've identified.

18         We're talking about, for example, e-mails that --

19    that discuss campaign finance strategy and fund-raising

20    strategy.

21         We're talking about -- we're talking about

22    communications back and forth with respect to advertising

23    strategy, and the actual content of ads, and how those ads

24    should be -- or whether they should be revised in some fashion.

25         We're talking about communications dealing with the

1  results of focus groups, and the kind of things that -- you

2  know, just the kinds of things you would expect, I think, in

3  any kind of political effort of this kind.

4        We're talking about drafts of -- of everything from,

5  you know, advertisements to -- to letters.

6        **THE COURT:**  Hello?

7        **MR. COOPER:**  Yes.

8        And I'm just -- there are probably other -- others on

9  my team who are better -- even better acquainted to a level

10 with the kinds of -- with the kinds of internal confidential

11 communications and documents that -- that we're talking about

12 here.

13       I -- we're not -- we -- we do not have any longer --

14 as a result of the Court's October 1 ruling, we're not talking

15 about membership lists of, you know, rank and file volunteers

16 or, you know, members of ProtectMarriage.com, or donors that --

17 whose names haven't been already disclosed, because, you know,

18 we no longer understand that to be even responsive.

19       So that's not among the information that we have now.

20 You know, we're deep into the culling process, but the kinds of

21 things are along the lines of what I've just -- what I've just

22 described.

23       And I could perhaps describe a few more kinds of

24 things, if the Court would permit me to confer with my

25 colleagues -- my colleagues here.

1       **THE COURT:**  Sure, sure.  You have some colleagues on

2  the line.  Maybe -- maybe they've gotten down to a somewhat

3  more granular level in the pretrial discovery, and they might

4  be able to be helpful.  Any of those individuals?  Let's see.

5  That's Nielson, Moss.  I think there was one other name that I

6  missed:  Mr. Panuccio.

7       **MR. COOPER:**  Mr. Panuccio; but actually, I would ask

8  my colleague, Nicole Moss, who has a much more granular-level

9  understanding of the kinds of documents we're talking about.

10  Nikki, would you like to add to what I've -- what I've

11  described?

12       **MS. MOSS:**  Certainly.  This is Nicole Moss.

13       I think Chuck has very well stated the sorts of

14  documents that are at issue.

15       I would note that, while membership lists are not

16  encompassed in light of the October 1 ruling, that is not to

17  say that there are not volunteers' and members' names revealed

18  in these documents.  There -- there certainly are references to

19  individuals.  And their names are in these documents; but

20  primarily what we're dealing with, as Mr. Cooper noted, is

21  e-mail communications which go to the heart of strategy;

22  discussing specific messaging; what language to use; how to

23  craft a message; the timing of messaging; both language to use,

24  and suggesting things not to be said.  That goes to sort of the

25  heart of the strategy.

1          In addition, there is a great deal of information

2    about fund-raising.  And where strategic -- you know, strategic

3    plans for the entire fund-raising plan for the campaign is

4    reflected in some of these documents.  The communications plan

5    for the campaign is reflected in these documents.

6          I mean, on a general basis, that is what we're

7    dealing with primarily here.

8          **THE COURT:**  All right that's very helpful.  Very

9    helpful indeed.

10         Let me, before drawing this to a close, ask:  does

11   anyone have anything that he or she would like to add before I

12   make a suggestion, and see how we proceed from this point?

13   Anybody have anything that he or she thinks ought to be

14   expressed before I try to draw this matter to a close?

15         Hearing nothing --

16         **MR. COOPER:**  Nothing more from the proponents,

17   your Honor.

18         **MR. DETTMER:**  No, your Honor.  Thank you.

19         **THE COURT:**  Well, I think this has been a very

20   helpful discussion.  And I certainly share Mr. Dettmer's

21   concern about getting discovery wrapped up in time to meet the

22   scheduled trial date.

23         And I have some empathy for you all on the other end

24   of this telephone conversation.  Although I have been on this

25   side of the bench for almost 20 years, I haven't completely

1  forgotten what it's like to be on the other side, and know what

2  it's like to be dealing with discovery deadlines.

3         And I will say that, having not forgotten what it's

4  like, I'm going to try to work with you, because of the

5  schedule that we've set, which I think is a practical schedule,

6  and one that the nature of the case warrants; but I'm going to

7  try to work with you so that we can get the discovery completed

8  in an orderly fashion in time to beat the case schedule, as

9  well as to allow a full and fair opportunity to conduct the

10  discovery that's necessary, so that the case can be adequately

11  presented.

12         It seems to me that Mr. Cooper's suggestion of

13  combining a privilege log with the *in camera* disclosure of

14  documents is worth a try, to see if that is not sufficient to

15  begin sorting out this issue.

16         I'm reasonably sure that it's not going to deal with

17  all aspects of the discovery concerns that we have on both

18  sides here, but I think it is a good start.

19         So -- and I understand also Mr. Cooper's concern

20  about requiring a privilege log as to the entire universe of

21  documents that he or his clients feel are covered by the

22  qualified First Amendment privilege that his clients are

23  claiming.

24         So a privilege log and an *in camera* review of a

25  limited number of those documents, I think, is an appropriate

1  way to proceed.

2         Now, however, in order to make that meaningful and to

3  ensure fairness in the selection of the documents listed on the

4  privilege log and included within the documents offered up for

5  *in camera* review, I think there are a couple of additional

6  elements that we need to flesh out at this point.  And that is

7  a bit more detail about the nature or category of the documents

8  that are involved in the privilege assertion.

9         Certainly, that is consistent with a requirement of a

10 privilege log, which requires that the nature of the document

11 be described; but it seems to me that if there are a limited

12 number of documents -- whether it's 25, 50, or a hundred -- it

13 may not cover all categories of the kinds of documents that the

14 proponents are asserting the privilege over.  And so I think a

15 fuller description of those categories than we've had the

16 opportunity to include today would be very, very helpful.

17        Mr. Cooper has mentioned e-mails and other

18 communications involving finance of a campaign, campaign

19 strategy, advertising strategy, focus-group results, drafts of

20 advertisements, advertisements or appeals that the campaign

21 decided not to make, and internal communications.  That's, I

22 think, a helpful first start of categorizing these kinds of

23 documents, but I think in addition to a privilege log, a fuller

24 description of those kinds of materials would be extremely

25 helpful in deciding whether or not we should pursue discovery

1  of those categories of documents.

2          And the other issue that I find still to be troubling

3  is this issue of the identity of the individuals who were in

4  management responsibility for the campaign.

5          And perhaps a way to deal with that, Mr. Cooper,

6  would be for -- and I'll throw this out for your reaction --

7  would be for you to disclose the identity of all of those who

8  were in a position of management responsibility as part of the

9  *in camera* disclosure, so that I could make some kind of a

10 determination whether it seems reasonable that the identity of

11 such individuals would have the kind of chilling effect that

12 you contend applies to this situation.

13         It does seem to me that, in reading the cases -- four

14 to five in this view -- there is a pretty clear distinction

15 that is drawn between those who are running the campaign, and

16 those who were simply supporting or opposing a campaign.  And I

17 am -- I am troubled that individuals who have management

18 responsibility for a political campaign should be shielded from

19 disclosure, given all of the case law and all of the other law

20 that applies to running initiative and referendum campaigns.

21         I'm not by any means saying that I reject the

22 argument that the identity of these individuals may not

23 implicate First Amendment privileges that are important here;

24 but frankly, I do need to be persuaded of that.  And maybe the

25 only way to -- to achieve that would be for an *in camera*

1   disclosure of those individuals.  So that's what I would

2   propose.

3          And I would propose further that, with respect to the

4   preparation of a privilege log, the full list of the categories

5   of documents that you think are covered by the qualified

6   privilege and the identity of those in management positions or

7   with management responsibility for the campaign -- that if at

8   all possible, to meet Mr. Dettmer's concern about the pace of

9   discovery, that we have that production *in camera* together with

10  the log and the other disclosures that I've mentioned not later

11  than the end of this week.

12         Now, is that possible?

13         **MR. COOPER:**  Your Honor, that is possible.

14         With respect to fleshing out the categories, I hear

15  you.  We will do that.  We will do our level best to -- to make

16  the descriptions as -- as thorough and as granular as we can.

17         And with respect to the *in camera* review of all

18  identities, we will -- we will provide that information for the

19  Court's *in camera* review.  And -- and, yes, sir, we will commit

20  ourselves to get that to you by the end of the week.

21         In light of this -- the Court's further guidance on

22  this, it may be well -- and I suspect that it will be well --

23  for us to perhaps enlarge the sampling a bit; but it's been our

24  idea that -- that, you know, we didn't want to overburden the

25  Court; but I think in light of the Court's further guidance

1   here this evening, that we may want to add some number of

2   documents to the sampling that -- just to ensure that we --

3   we -- we have addressed all of the categories that we can

4   identify discretely.

5           **THE COURT:**  Good.  Well, I think that probably would

6   be helpful to you, and would certainly be helpful and

7   informative to the Court.

8           Well, counsel, I appreciate your willingness to have

9   this discussion this afternoon or evening.  And I will express

10  the hope that this may be the last time that we'll have a

11  discovery discussion, but I will not be surprised if it is not

12  the last time; but I do appreciate the good work on both sides

13  of the case.  And I think we've made some fairly significant

14  progress this afternoon.

15          So, if no one has anything further, I'll let you all

16  go.

17          **MR. DETTMER:**  Thank you very much, your Honor.

18          **THE COURT:**  Mr. Dettmer, Ms. Lee, Mr. Stroud, any of

19  the others?  Anything further?

20          **MS. LEE:**  Nothing further, your Honor.

21          **MR. STROUD:**  No thank you, your Honor.

22          **MR. DETTMER:**  Nothing further, your Honor.  Thank

23  you.

24          (At 3:55 p.m. the proceedings were adjourned.)

25                          -  -  -  -

## CERTIFICATE OF REPORTER

I, LYDIA ZINN, Official Reporter for the United States
Court, Northern District of California, hereby certify that the
foregoing proceedings in C. 09-2292-VRW, Kristin M. Perry v.
Arnold Schwarzenegger, were reported by me, a certified
shorthand reporter, and were thereafter transcribed under my
direction into typewriting; that the foregoing is a full,
complete and true record of said proceedings as bound by me at
the time of filing.

The validity of the reporter's certification of said
transcript may be void upon disassembly and/or removal
from the court file.

_____

/s/ Lydia Zinn, CSR 9223, RPR

Tuesday, November  3, 2009