# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PERRY, *et al.*, | |
| v. | CASE NO. 09-CV-2292 VRW |
| SCHWARZENEGGER, *et al.* | **DECLARATION OF**<br>**PAUL NATHANSON, PhD. ,**<br>**AS EXPERT WITNESS FOR**<br>**DEFENDANT** |

# PROPOSITION 8 AND RELIGION

1.  I, Paul Nathanson, declare as follows:

2.  In the following report, I discuss religious attitudes toward Proposition 8. As I
    will demonstrate, religious attitudes to Proposition 8 vary considerably. Several
    religious communities—such as the (Mormon) Church of Jesus Christ of Latter-
    day Saints, the Southern Baptists, and Orthodox Judaism—do support
    Proposition 8. But within these communities are dissenters and even dissenting
    organizations. Moreover, other religious communities—such as the Episcopal
    Church, the Unitarian Universalist Association, the United Church of Christ, and
    Reform Judaism—vigorously *oppose* Proposition 8. Despite their conflicting
    points of view, religious people have generally attested to the good faith of those
    on the other side.

**My qualifications**

3.  I would describe my field within religious studies as comparative religion,
    which (unlike the normative field of theology) relies on the premise that you
    cannot understand the phenomenon of religion per se without studying several
    specific religions—that is, how each is both similar to and different from the
    others. Most academics in this field use historical, textual, or anthropological
    methods to study more than one religion. And I have done so, specializing in

Judaism and Christianity. In addition, I have focused on contemporary American worldviews and how they affect traditional notions such as gender and marriage. With Katherine Young, I have developed a theoretical perspective on religion and secularity as "ideal types" at opposite ends of a continuum. Between them lies a wide range of phenomena including various hybrid worldviews (or "secular religions"). The latter function in many or almost all ways as traditional religions but lack at least one characteristic and therefore defining feature of religion.

4. I am being compensated at a rate of $300/hour for my work in this matter.

5. I study two basic kinds of evidence. In some cases, I approach topics directly by making use of current research (such as social-scientific studies or legal documents). In other cases, I approach topics indirectly by analyzing the artifacts of popular culture (especially movies and television shows) as distinct from those of elite culture (such as philosophical or theological works). Whatever their aesthetic value, these popular artifacts reveal important, but often implicit, features of the society that both produces and "consumes" them. This method is widely used in gender studies and cultural studies, and I find it very useful in religious studies as well. It relies on the pioneering work of scholars in the field of semiotics (or symbolic anthropology). Of particular interest to me, given my training, are those artifacts that provide evidence of widespread attitudes (especially in the United States) toward religion and secularity. Using one method or the other (or both), I have written and spoken extensively on *religion in relation* to topics that are relevant to the debate over Proposition 8: (a) marriage and gay marriage in general; (b) fatherhood in particular; (c) popular religion; and (d) secularity.

6. **Marriage and gay marriage:** My articles include "Pop Goes the Family: Marriage in Popular Culture," in *The Conjugal Bond: Interdisciplinary Approaches to the Institution of Marriage* (under review); [with Katherine K. Young] "Redefining Marriage or Deconstructing Society: A Canadian Case Study, *Journal of Family Studies*, 3.2 (November 2007): 133-178; "Men, Misogyny and Misandry," *Ottawa Citizen*, 6 April 2007; [with Katherine K. Young] "The Future of an Experiment," in *Divorcing Marriage*, ed. Douglas Farrow and Dan Cere (Montreal: McGill-Queen's University Press, 2004); [with Katherine K. Young] "Non au mariage gai," *La Presse*, 9 July 2003: A-15; and [with Katherine Young] "Comment: Keep It All in the Family," *Globe and Mail*, 2 May 2003: A-15.

7. My lectures include [with Katherine K. Young] "Gender Equality and Sex Differences: The Effects on Parents and Children," lecture for the conference on Who Is Called a "Parent" and Why? An Interdisciplinary Investigation of Core

2

Questions at the Heart of Today's Family Debates (Charlottesville, Virginia: 16-18 October 2008); "Pop Goes the Family: Marriage in Popular Culture," lecture for Illuminating Marriage, a conference organized by the Institute for the Study of Marriage, Law and Culture (Kananaskis, Alberta: 18-20 May 2005); [with Katherine K. Young] "Gay Adults v. Children: Rights in Conflict," guest lecture for the Lord Reading Law Society (Montreal: 4 May 2005); "Gay Marriage," guest lecture for Dr. Martha Bernstein at Vanier College (Montreal: 10 January 2005; "Marriage in Popular Culture," lecture for The Great Canadian Marriage Debate, a symposium held at Loyola High School (Montreal: 14 January 2004); "Marriage in Popular Culture," lecture for Revisioning Marriage in Postmodern Culture, a conference sponsored by Institute for the Study of Marriage, Law, and Culture (Toronto: 10-12 December 2003); [with Katherine K. Young] "Gay Marriage" lecture for Redefining Marriage: Mapping the Debate: A Symposium, sponsored by the Institute for the Study of Marriage, Law, and Culture (Toronto: 4 October 2003); [with Katherine K. Young, "Marriage-a-la-mode: Answering Advocates of Gay Marriage," lecture for Sex, Marriage, and the Family, a conference held at Emory University (Atlanta: 27-30 March 2003); and [with Katherine K. Young] "Questioning Some of the Claims for Gay Marriage," presentation for the House of Commons Standing Committee on Justice and Human Rights (Ottawa: 20 February 2003); and "Misanthropy on the Soaps," lecture for Wars of the Ring: Revisioning Marriage in Postmodern Culture, a conference sponsored by McGill University's Newman Centre (Montreal: 23 March 2002).

8.  **Fatherhood:** My publications include: [with Katherine K. Young] *Legalizing Misandry: From Public Shame to Systemic Discrimination against Men* (Montreal: McGill-Queen's University Press, 2006; especially chapter 6 and appendix 9); [with Katherine K. Young] *Spreading Misandry: The Teaching of Contempt for Men in Popular Culture* (Montreal: McGill-Queen's University Press, 2001).

9.  My lectures include: "Fatherhood," for a panel discussion on the family, tenth annual conference of World Alliance for Youth (New Haven: Yale University, 25-26 September 2009); [with Katherine K. Young] "Gender Equality and Sex Differences: The Effects on Parents and Children," lecture for a conference on Who Is Called a "Parent" and Why? An Interdisciplinary Investigation of Core Questions at the Heart of Today's Family Debates (Charlottesville, Virginia: 16-18 October 2008); [with Katherine K. Young] "Coming of Age as a Villain: What Boys Need to Know about Misandry," lecture for the conference on Boys and the Boy Crisis (Washington, D.C.: 13-14 July 2007); "Pop Goes the Family: Marriage in Popular Culture," lecture for Illuminating Marriage, a conference organized by the Institute for the Study of Marriage, Law and Culture (Kananaskis, Alberta: 18-20 May 2005); "Coming of Age in the Movies: Myth

and Manhood in *Rebel without a Cause*," in *Gender in World Religions* 5-7 (1994-1997): 28-76.

10. **Secularity:** My publications include: *Over the Rainbow*: The Wizard of Oz *as a Secular Myth of America* (Albany: State University of New York Press, 1991); [with Katherine K. Young] "From Religion to Secularity: The Continuum of Worldviews," in *What Is Religion? Religion in the Courts and the Academy*, ed. Dan Cere and Katherine K. Young [forthcoming]; "I Feel, Therefore I Am: The Princess of Passion and the Implicit Religion of Our Time," in *Implicit Religion,* 2.2 (1999): 59-87 (reprinted in *Centrepoints*, 4.1 (Spring 2000): 809); "You Can't Go Home Again, or Can You? Reflections on the Symbolism of TV Families at Christmastime," in *Journal of Popular Culture*, 27. 2 (1993): 149-162.

11. My lectures include: "*The Wizard of Oz* as a Secular Myth of America," lecture for Dr. Barbara Galli, (Montreal, Concordia University, 2 October 2008); "Science Fiction: On the Frontier between Religion and Medicine," lecture for the American Academy of Religion: Eastern International Region (Montreal: 2 May 2008); "From Babylon to Babylon-on-the-Hudson: Religion and Secularity in Modern America," lecture for Dr. Ted Trost at the University of Alabama: Judaic Studies-College of Arts and Sciences (Tuscaloosa: 14 November 1999); "Myth and Ritual in Popular Films," lecture for the Thomas More Institute of Canada (Montreal: 23 November 1996); "Cinema as Secular Myth and Secular Parable," lecture for a conference of the Learned Societies (Montreal: 2 June 1995).

12. **Popular religion:** My publications include review essays of the following books: *Myths America Lives By*, by Richard T. Hughes and *Something for Nothing: Luck in America*, by Jackson Lears, in *Implicit Religion*, 7.3 (November 2004); *The End of the World as We Know It: Faith, Fatalism, and Apocalypse in America*, by Daniel Wojcik, in *Material History Review* (Fall 2000): 89-91; *Houses of God: Region, Religion, and Architecture in the United States,* by Peter W. Williams, in *Material History Review* (Fall 1999): 95-96; *The Landscape of Belief: Encountering the Holy Land in Nineteenth-Century American Art and Culture*, by John Davis, in *Material History Review* (Spring 1999): 82-83; Material *Christianity: Religion and Popular Culture in America*, by Colleen McDannell, in *Material History Review*, 46 (Fall 1997): 93-98; *Icons of American Protestantism; The Art of Warner Sallman,* ed. David Morgan, in *Material History Review*, 45 (Spring 1997): 69-76; *Children of Peace,* by John McIntyre, in *Material History Review*, 43 (Spring 1996): 84-87; *Make Room for TV: Television and the Postwar Ideal in America,* by Lynn Spigel, in *Material History Review*, 40 (Fall 1994): 88-89.

13. My lectures include: "On Being Jewish in Canada," lecture for the Canadian Studies Center, Plymouth State College of the University System of New Hampshire (Plymouth: 1 November 1991); "Myth and Ritual in Popular Films," lecture for the Thomas More Institute of Canada (Montreal: 23 November 1996); "Cinema as Secular Myth and Secular Parable," lecture for a conference of the Learned Societies (Montreal: 2 June 1995); "Over the Rainbow," lecture for the St. James Literary Society (Montreal: 1 November 1994); "Religion and Film," lecture for the Ecumenical Jury at the World Film Festival (Montreal: 26 August 1994); "Over the Rainbow: *The Wizard of Oz* as a Secular Myth of America," lecture for The American Academy of Religion (Kansas City: 25 November 1991); "Home for Christmas," lecture for The Popular Culture Association and The American Culture Association (Toronto: March 1991); and "*The Wizard of Oz*: Sacred Time in Secular America," lecture for The Popular Culture Association and the American Culture Association (Toronto: March 1987).

**Religious attitudes toward Proposition 8**

14. In the weeks and days leading up to Election Day 2008, November 4, Californians organized either to support or to oppose Proposition 8.[1] By defining "marriage" as the union of one man and one woman, the proposition prevents gay[2] marriages in the state (but would not dissolve existing ones).

15. Many secular opponents of Proposition 8 believe that "religion" exercised an undue influence on the vote and thus undermined the separation of church and state.[3] As evidence, they point to the fact that that some churches—notably the Roman Catholic Church and the (Mormon) Church of Jesus Christ of Latter-day Saints[4]—actively promoted Proposition 8. But many other churches, including the United Church of Christ, the Episcopal dioceses of California, and the Unitarians opposed Proposition 8. This diversity of views is the background against which I consider three questions: (1) Is religion inherently incompatible with the redefinition of marriage to include gay couples? (2) Does religious support for the historical definition of marriage necessarily entail animus toward gay people, thus amounting to bigotry and "bad faith"? (3) Do secular advocates for gay marriage ignore religion? My focus is on Christian and Jewish sources; although California has many religious communities, Christian and Jewish ones have been the most involved in the debate over Proposition 8.

**Is religion inherently incompatible with opposition to Proposition 8 (and therefore with support for gay marriage)?**

16. The answer is, in a word, no. In the first place, not all religious communities are either willing or (administratively) able to make official pronouncements that are binding on all members. The Catholic Church is one of a few exceptions. Bishops of the California Catholic Conference support Proposition 8. So does a Catholic fraternal organization, the Knights of Columbus. Nonetheless, this position has "met with mixed reactions among church members, including clergy."[5] Catholics are profoundly divided over gay marriage (along with many other social and political problems); dissenters lack support from the hierarchy, it is true, but everyone hears their "voices."

17. Most religious communities affiliate themselves with denominations, but the lines of authority and levels of hierarchy within denominations vary widely. Even reasons for either supporting or opposing gay marriage can vary widely. Some denominations are relatively unified in support of Proposition 8 and others relatively unified against it. Officially supporting Proposition 8, and therefore supporting traditional marriage, are the Roman Catholic Church, the Mormon Church, the Lutheran Church-Missouri Synod, the Southern Baptist Convention, and various organizations that represent Orthodox Judaism. Officially *opposing* Proposition 8, and therefore *supporting gay marriage*, are the United Church of Christ,[6] the Unitarian Universalist Association, the Metropolitan Community Church (which was founded in 1968 by and primarily for gay people), Reform Judaism, and Reconstructionist Judaism. But most denominations, being divided or ambivalent or "evolving," have proposed various forms of compromise. Even those that overtly oppose Proposition 8, for example, sometimes experience conflict within their denominations or congregations over precisely what this might entail: presiding as religious authorities over gay "unions," say, or presiding as civil servants over gay "weddings."[7]

18. Although religious leaders usually speak officially for their denominations or their organizations, some who support Proposition 8 speak primarily for themselves—in this case, usually (though not always) as gay people or people with gay friends or relatives. At the very least, they confer religious prestige on the cause of opposition to Proposition 8. These supporters of gay rights include V. Gene Robinson (Episcopalian bishop of New Hampshire); Denise L. Eger (rabbi of Congregation Kol Ami in West Hollywood and president of the Board of Rabbis of Southern California); Mark Pelavin (associate director of the Religious Action Center for Reform Judaism in Washington D.C.); and Elliot Dorff (Conservative rabbi and rector of American Jewish University in Los Angeles).

19. In this section, I examine (a) interreligious organizations that oppose Proposition 8; (b) religious denominations that oppose Proposition 8; and (c) dissenters within denominations that support Proposition 8. My survey is by no means exhaustive, of course, because the goal here is merely to indicate that *not all* religious people oppose gay marriage.

20. **Interreligious organizations:** Opponents of Proposition 8 and therefore supporters of gay marriage have crossed the boundaries between denominations and even between religions. Many events both before and since the vote have included not only Christians of various denominations, after all, but also non-Christians.

21. In September 2008, California Faith for Equality met in a West Hollywood church to oppose Proposition 8. Director Kerry Chaplin told clergy and laypeople that they should bear in mind the "spectrum of beliefs and opinions in the religious community [about gay marriage] … Leaders in the Episcopal and United Methodist churches, two denominations torn over the homosexuality debate, oppose [Proposition 8] on civil rights grounds."[8] On 1 November 2008, San Francisco's Glide Memorial [United Methodist] Church held an interreligious celebration of gay marriage. "This … included an appearance by San Francisco Mayor Gavin Newsome, a powerful sermon by Rev. Dorsey Blake, and musical performances, including the San Francisco Gay Men's Chorus. Rev. Mark Wilson, who has led the First Congregational Gospel Choir, provided musical leadership throughout the service. About 30 married couples, both gay and straight, streamed up to the chancel to renew their marriage promises." Also present were ordained members of the United Church of Christ, including the Conference Minister Rev. Mary Susan Gast. After the service at Glide came "Get Out the Vote and Visibility Actions training." The Ecumenical Council of San Diego County organized a series of discussions by religious leaders. Rev. Gloria Espeseth came from Gethsemane Lutheran Church in San Diego, for instance, to preach that "the Bible also pushes believers to sometimes move beyond tradition to do what is right."[9] At around that time, the Council of Churches of Santa Clara County Committee against Proposition 8, consisting of approximately 25 local churches, sponsored the following announcement in the *San Jose Mercury News*: "As people of faith, we believe that all people are made in the image of God. We believe in loving, faithful, and committed relationships. We affirm everyone's right to the freedom to marry. We urge you to vote no on Proposition 8. Don't eliminate marriage for anyone."[10] Among those who signed this announcement (in addition to members of the Metropolitan Community Church) were Episcopalians, Unitarians, United Methodists, Lutherans, Baptists, Presbyterians, and members of the United Church of Christ.

22. Also on 1 November 2008, St. John's [Episcopal] Cathedral in Los Angeles sponsored "Faith for Equality: A Multi-Faith No on Prop. 8 Celebration; The First Congregational Church in Long Beach sponsored "Living Equally, Loving Equally: Interfaith Service Celebrating Love and Commitment for All Couples. St. Paul's [Episcopal] Cathedral in San Diego sponsored an interfaith service and press conference. Central United Methodist Church in Sacramento sponsored "Sing Out the Vote and Take to the Streets: An Interfaith 'No on 8' Celebration. The next day, the Orange Coast Unitarian Universalist Church in Costa Mesa sponsored an interfaith vigil and "phone banking" against Proposition 8. The Center for Spiritual Living, in Santa Rosa, sponsored "Live Equally, Love Equally: [An] Interfaith Service in Support of Marriage. The First Unitarian Church of San Jose sponsored "Day of the Dead Alter" with a "no on 8" theme. "Mixing their own prayers with politics, as many as 400 opponents of Proposition 8 showed up for the interfaith service near Balboa Park, billed as Make the Right Call in answer to TheCall [an event that supported Proposition 8] … Clergy and members of different faiths wore 'No on 8' stickers on their vestments … 'The purpose of today is to stand on the side of love,' said the Very Rev. Scott Richardson, dean of St. Paul's Episcopal Cathedral.' … The Rev. Mary Sue Brookshire of the United Church of Christ in La Mesa spoke of a lesbian friend who felt her life was incomplete because of society's treatment of gays. 'As long as she is not fully human, neither am I,' said Brookshire, whose homily was interrupted by applause several times."[11] In May 2009, San Francisco's Grace Cathedral was the venue for an interreligious prayer vigil in opposition to Proposition 8. Attending were not only Christians from various denominations but also Jews, Buddhists, and Sikhs. Rabbi Sydney Mintz, of [Reform] Congregation Emanuel-El, opened the vigil.[12]

23. California Faith for Equality, too, has strongly opposed Proposition 8: "As people of faith, many of us are called to act for justice. To heal the rift between faith communities and lesbian, gay … people, we are driven to engage our congregations and people of faith in the movement for … equality and to safeguard religious freedom. Clergy and lay leaders from a diversity of religious traditions are uniting in … a statewide network … committed to equality. The California Faith for Equality coalition helps faith leaders and communities, some of whom may not have the support of their denominational bodies, to become effectively engaged in the struggle for equality, while also helping secular LGBT leadership connect with these faith communities."[13] Another statement is more specific: "California Faith for Equality is fulfilling our *mission* through grassroots organizing by identifying and mobilizing supportive clergy, congregations and laypeople, and by entering dialogue with clergy and people of faith across the spectrum of inclusiveness toward LGBT people." California Faith for Equality is affiliated with the following organizations:

Freedom to Marry; Human Rights Campaign, Religion and Faith Program; National Black Justice Coalition; National Gay and Lesbian Task Force; Equality California; Equality for All Campaign; Jews for Marriage Equality; Let California Ring; Marriage Equality USA, California Chapter; Unitarian Universalist Legislative Ministry; API [Asian and Pacific Islander] Equality; Center for Gay and Lesbian Studies in Religion and Ministry; Barbara Jordan/Bayard Rustin Coalition; API Equality-Los Angeles; Vote for Equality; Pacific School of Religion; Network on Religion and Justice for Asian Pacific Islander, Lesbian, Gay, Bisexual, Transgender People; and the Arcus Foundation.

24. The National Gay and Lesbian Task Force is not a religious organization, but it has recognized the need to work with *and within* "progressive" religious communities to oppose Proposition 8. "We need to recognize," its report says, "that we will never win our 'rights' without the progressive faith community, because the secularist argument doesn't work."[14] The task force has planned and executed a very sophisticated campaign to enlist support for gay marriage within religious communities.

25. By its own account the task force has been very effective, and I see no reason to disagree. For example, it takes credit for mobilizing Jewish leaders: "We gained the support of 258 California rabbis—they signed our clergy statement and allowed us to publicize their names/affiliations in ads and on the Web."[15] In addition, the task force claimed that those "religious communities that had done preparatory work (both theologically and practically) to equip themselves for a secular/political campaign formed the backbone of the No on Proposition 8 religious work, particularly the Unitarian Universalist Association, many United Church of Christ and Episcopal congregations, and Reform, Reconstructionist and Renewal Jewish congregations. Two rabbinical associations came out against Proposition 8, as did Bishops in Episcopal, Lutheran, Methodist and several Black church traditions and other Christian leaders."[16] And the "interfaith worship service entitled 'Standing on the Side of Love,' held at Glide Memorial Church in San Francisco, was a great success in terms of community participation and media coverage."[17]

26. **Religious denominations:**  The fact is that many religious denominations strongly oppose Proposition 8 and therefore strongly support gay marriage. Only the Metropolitan Community Church, the United Church of Christ,[18] the Unitarian Universalist Association,[19] Reform Judaism,[20] and Reconstructionist Judaism[21] oppose Proposition 8 officially, but other denominations have generated strong opposition to it not only among members (including ordained ones) but also local congregations and affiliated organizations. They have described themselves to California's Supreme Court,[22] so there is no need to

9

repeat that exhaustive account here. A few examples will serve my purpose: (i) the Episcopal Church; (ii) the Presbyterian Church (USA); and (iii) several branches of Judaism.

27. *The Episcopal Church:* The six main[23] bishops in California oppose Proposition 8. And their opposition is consistent with opposition at the parish level. On 1 November 2008, some protesters against Proposition 8 gathered at morning prayers at St. Paul's Episcopal Cathedral in San Diego; later, Mayor Jerry Sanders and his lesbian daughter, Lisa, joined them for a candlelight vigil. Others protesters fasted and prayed at Qualcomm Stadium.[24] On 25 May 2009, moreover, San Francisco's Grace [Episcopal] Cathedral held a prayer service in support of gay marriage.[25]

28. *The Presbyterian Church (USA):* Although not all Presbyterians oppose Proposition 8, many do. Among them are members of More Light Presbyterians, an organization that is affiliated with the Presbyterian Church (USA). It has worked since 1974 to end discrimination against gay people (and others) within both the church and the state. "Since 1978, the Presbyterian Church (USA) has denounced discrimination against lesbian and gay persons in civil society. This official national nondiscrimination in civil life policy has been reaffirmed in subsequent years and the Presbyterian Church (USA) has also affirmed the right and choice for its ministers to perform blessings of same-sex couples. In June 2008, the 218th General Assembly … meeting in San Jose, California, removed the anti-gay church policy statements from 1978 and passed an overture calling for the end to discrimination … in membership and service in ministry … "[26]

29. Presbyterians were active before the vote, not surprisingly, and have remained active ever since. On 28 October 2008, a group of Presbyterians took action. With help from the Gay and Lesbian Alliance Against Defamation (GLAAD) and California Faith for Equality, the Covenant Network for Presbyterians[27] asked members to join the Presbyterian Witness Event for Marriage Equality and to Say No to Prop 8. They gathered at both Immanuel Presbyterian Church in Los Angeles and Calvary Presbyterian Church in San Francisco. "Our friends and colleagues at GLAAD," says the online notice, "are working to secure media coverage for each of these witness events. Clergy are encouraged to wear ministerial collars or stoles; elders, deacons and other church leaders are encouraged to wear identifiable religious symbols such as stoles or crosses."[28] In February 2009, moreover, Rev. David Thompson, pastor of Sacramento's Westminster Presbyterian Church, created a controversy by lamenting Proposition 8.[29]

30. *Judaism:* Jewish denominations per se have less authority over their leaders and congregations than many Christian ones do. Non-Orthodox denominations adopt

official positions on social or political controversies, for instance, but allow rabbis or congregations to adopt their own positions. Whatever positions their denominations might take on gay marriage, for instance, many Jews—both rabbis and laypeople—feel free to join either Jewish or interreligious organizations that represent other positions.

31. Several Jewish denominations explicitly oppose Proposition 8 and therefore support gay marriage: Reform Judaism, Reconstructionist Judaism, and many independent Jewish communities. Moreover, many denominational and inter-denominational Jewish organizations (most of them based in New York) take the same position. These include the American Jewish Committee; the National Council of Jewish Women, the Anti-Defamation League; the Union for Reform Judaism; and the Jewish Community Relations Council of San Francisco. (Conservative Jews are, as usual, more divided than the others.)[30] Orthodox Judaism generally supports Proposition 8 and therefore opposes gay marriage, on the other hand, but there are Orthodox dissenters; I discuss them in the next section.

**Dissenters within religious communities that support Proposition 8**

32. Not even the most conservative religious traditions are monolithic in their support for Proposition 8 and opposition to gay marriage. They now have not only individual dissenters but also organized dissenters. In this section, I discuss (a) Catholic dissenters; (b) Mormon dissenters; (c) Evangelical dissenters; and (d) Orthodox dissenters.

33. **Catholic dissenters:** According to its mandate, Dignity "is an independent support group for 'lesbians, gay, bisexual and transgendered Catholics, their families and friends.'" It originated in San Diego to provide counseling for gay people and then became a support group. In 1973, it went national and now has 53 chapters in the United States. One of its main goals is to change the church's teachings on sexuality. "We believe that gay, lesbian, bisexual and transgendered persons can express their sexuality in a manner that is consonant with Christ's teaching. We believe that we can express our sexuality physically in a unitive manner that is loving, life-giving, and life-affirming … Dignity … [is] an instrument through which we may be heard by and promote reform in the Church." In 1986, due to Dignity's opposition to Catholic teachings, the church withdrew its support."[31] Similar to Dignity is New Ways Ministry. Founded in 1977, its mission is to "promote justice and reconciliation between lesbian, gay, bisexual, and transgender … Catholics, their families, and the wider Catholic community … We work toward this end by providing resources and programs that provide the most current scientific and theological understandings of sexuality and sexual orientation  … Although the hierarchy of the Catholic

Church does not yet approve of same-sex marriage, New Ways Ministry's constituents believe that our church's social justice tradition … compels us to work for full equal rights for same-sex couples inc omitted relationships"[32]

34. More radical and politicized than Dignity is Soulforce. According to its "vision" statement, "Soulforce is determined to help end oppression against lesbian, gay, bisexual, and transgender people; determined to help change the minds and hearts of religious and political leaders whose words and influence led (directly and indirectly) to that oppression; and determined to be guided in our every action by the principles of relentless nonviolent resistance as lived and taught by M.K. Gandhi and Martin Luther King, Jr. Soulforce ultimately seeks to challenge systems of injustice, not people."[33] From the beginning, in 1999, Soulforce has been "in conversation" with the Church. "This spring, we are asking the Vatican to take a stand against harmful language and join with many at the United Nations in signing the Declaration on Sexual Orientation and Gender Identity. Working in solidarity with grassroots activists here and abroad, we are calling on the Vatican to support the safety of all individuals."[34]

35. Meanwhile, the Church has continued to support its Courage Apostolate, which operates solely as a support group. It originated in 1980 and now has more than 90 chapters in the United States. Members accept the doctrine that homosexual behavior is chosen and therefore sinful but also the doctrine that homosexual *orientation* results from a "disorder" and is therefore *not* sinful. The main goal of Courage is to support members living chastely by encouraging strong platonic friendships.[35]

36. **Mormon dissenters:** The direct Mormon equivalent to Dignity is Affirmation. It "serves the needs of gay Mormon women and men, as well as bisexual and transgender LDS and their supportive family and friends, through social and educational activities."[36] Like members of Dignity, those of Affirmation are dissenters. "Although many of us are no longer members of the LDS Church," reads one of Affirmation's documents, "we celebrate being part of the great Mormon tradition. We are a family that consists of active members of the LDS faith, former members and non-members. Our membership consists of individuals situated all over the sexual mosaic. We are all at different places in our coming-out-process. Affirmation's mission is to provide a forum for gay Mormons to associate with their peers. We seek to meet the needs of persons experiencing frustration or alienation from family, friends, and the Church because of their sexual orientation."[37]

37. **Evangelical dissenters:** Gay evangelicals, too, have organized despite lack of acceptance from their denominations. The Evangelical Network is for "Bible believing churches, ministries, Christian workers, and individuals bound

together by a common shared faith, united in purpose and witness and established as a positive resource and support for Christian gays and lesbians."[38] According to its president, Todd Ferrell, the network "has been challenged … to be more vocal when it comes to social justice issues … While we are not a political organization and will remain as such, we feel the time has come, and it is 'for such a time as this' that … we will be a voice in the wilderness that declares the Word of the Lord … as ministers, leaders and example-making Christians, we have a call to support justice and fairness for *all*."[39] Apart from anything else, the network has spoken out against Proposition 8 and on behalf of gay marriage.[40]

38. **Orthodox dissenters:** Because Orthodox Judaism is very unfamiliar to most outsiders, I see a need to explain the context of Orthodox dissent in more detail than that of dissent in other religious communities. Hebrew scripture clearly forbids (male) homosexuality. Many groups that represent Orthodox Judaism[41] *support* Proposition 8 (and therefore opposed gay marriage). Among the Orthodox organizations that take this position are the Orthodox Union, Agudath Israel of America, and Agudath Israel of California.

39. Although some Orthodox rabbis continue to argue that Jewish law *might* be able to accommodate gay marriage,[42] they do not argue that it *does*. These dissenters want to change the *halakhah* (Jewish law) *without* deviating from Orthodox tradition. And there is a way, in theory, to do so: the *takkanah*. This is a rabbinic law that has no direct foundation in scripture and sometimes implicitly contradicts scripture. One famous example is the eleventh-century *takkanah* of Rabbi Gershom ben Judah, which prohibited polygyny even though scripture clearly indicates that many early Israelites—including Abraham, Isaac, and Jacob—married more than one woman. By the prophetic period, however, a new ideal of marriage had emerged due to a new theology that linked a husband's fidelity to his one wife with God's fidelity to his (one) chosen people. By the eleventh century, very few, if any, Ashkenazi Jews (those who lived in western, central, and eastern Europe) were polygynous. Gershom found the *takkanah* necessary so that Jews could protect themselves, however, because Christians often attacked them for their alien ways. Sephardi Jews (of what are now Spain and Portugal) saw no need for a *takkanah*. They lived among Muslims, after all, who allowed men to marry up to four wives.

40. But the *takkanah* is a last resort, because it undermines the entire rabbinic system, which assumes that God revealed not only the written Torah (scripture) to Moses but also the "oral Torah" (all *rabbinic interpretations* of the former). The rabbis do not claim to have created their own interpretations; on the contrary, they claim merely to have discovered those that God had already revealed to Moses. The oral Torah's authority, in short, relies heavily on the

written Torah's authority. It relies on the assumption that God would not contradict in the oral revelation what he says in the written revelation. To undermine either source of revelation, oral or written, is therefore to risk undermining the entire system. It seems very unlikely that Orthodox rabbis will issue a *takkanah* that allows gay couples to marry in an Orthodox ceremony.

41. It is worth pointing out here that some Orthodox rabbis *personally* oppose Proposition 8, moreover, though not necessarily because they actually support gay marriage. At issue for them is not gay marriage for *Jews* but gay marriage for *non-Jews* (or at least non-Orthodox Jews). Why would they support something for non-Jews that either they or their more conservative peers actually oppose for *Jews* (at least Orthodox Jews)? Some of them might believe not only that the acceptance of gay marriage is inevitable among non-Jews (and non-Orthodox Jews) but also that it will never gain acceptance among Orthodox Jews. Many Orthodox rabbis, at any rate, can agree on historical grounds about the need for Jews to ally themselves with those who speak in the name of civil rights (even if they privately question the applicability of civil rights specifically to the cause of gay marriage).[43] This way, even the more conservative among Orthodox rabbis can have it both ways: maintaining a traditional interpretation of *Jewish* law, which unambiguously forbids not only gay marriage but also gay relationships, while advocating a radical reinterpretation of *civil* law (which makes this particular Orthodox position unlike both the Catholic and Mormon ones.)[44] But not all Orthodox Jews support gay marriage even for *non*-Jews (or non-Orthodox Jews). The Orthodox Union, for instance, worries that gay marriage will lead to legal penalties for any public opposition: "Religious institutions and people face charges of bigotry and could be denied government funding and more if same-sex marriage becomes the law of the land."[45]

42. **Conclusion:** The assumption that religion per se supports Proposition 8 (and therefore opposes gay marriage) is clearly false. But even a modified version of this assumption, that only *conservative* religion per se opposes gay marriage and gay people, is clearly much more complex than many people imagine. Although conservative dissenters could leave their communities, many choose to stay. I have no reason to doubt that they are both sincerely hopeful that the latter will eventually make room for their point of view *and* sincerely devoted to their religious traditions.

### Does religious support for the historic definition of marriage necessarily entail animus toward gay people, thus amounting to bigotry and "bad faith"?

43. In a word, the answer (once again) is no. Consider the following analogy. Most Jewish leaders distinguish carefully between those who oppose this or that

policy of Israel and those who implicitly oppose the very existence of Israel—
that is, those who reveal their underlying anti-Semitism not only by adopting a
double standard (condoning even more questionable policies of non-Jewish
states) but also by undermining efforts of the Jewish state to defend itself. At
any rate, many ordinary Jews do equate almost any opposition to Israeli policies
with anti-Semitism. In other words, they accuse other Americans of *bad faith*:
using criticism of Israel or even anti-Zionism as a front for anti-Semitism. And
some critics of Israel surely do hate it as a Jewish state. But using this accusation
so broadly tends to stifle debate over American foreign policy and even dissent
within the American Jewish community itself.

44. In this section, I discuss the accusation of bad faith in connection with (a) the
use of secular (non-religious) arguments by religious people to support
Proposition 8 and (b) some examples of good faith.

45. **The use of secular (non-religious) arguments to support Proposition 8:**
Many religious people have used *secular* arguments to support Proposition 8
instead of religious ones. This has led to the accusation that they have done so in
bad faith—that is, they have disguised their underlying religious motivations
and thus imposed religious doctrines on other people. But it does not follow
logically that these secular arguments are either irrelevant or sinister simply
because of their selection by people who happen to be religious (along with
many who are not religious). Every argument stands or falls on its own merit,
after all, no matter which people articulate it or why they do so. When religious
people use secular arguments in the public square, they demonstrate only what
religious and secular people have in common.

46. In the case of Catholicism, moreover, the use of secular arguments has a very
long history. This is due partly to the philosophical tradition of natural law,
which Thomas Aquinas established in the thirteenth century. According to
natural law, people can learn about salvation only from scripture. But they can
learn about everything else, including morality, by observing the natural order.
Not all people draw the same conclusions from nature, and not all Catholics are
going to draw conclusions that explicitly contradict scripture. Apart from
information about salvation itself, nonetheless, Catholics are open to the broad
search for knowledge; they do not owe "blind" allegiance to scripture in this
regard. If Catholics agree with other people, as they sometimes do, then that is
so much the better from their point of view.

47. Some religious people adopt secular arguments that rely ultimately not on the
rejection of civil rights for gay people, moreover, but on the acknowledgment of
*competing* civil rights for children—a population that is *even more* vulnerable
than gay adults. Given the colliding interests of two populations, people can give

15

priority to one or the other *without* arguing that one is worthy and the other unworthy of civil rights. They can disagree passionately, in other words, *without* resorting to the accusation of bad faith. The latter (using lies, pretexts, or fronts for some repressive and oppressive "hidden agenda") involves a combination in any context of dishonesty or hypocrisy, opportunism or expediency, and cynicism or selective cynicism.[46]

48. **Good faith:** Although Focus on the Family uses secular arguments for opposing gay marriage, it is an *explicitly Christian* organization. Its representative in many debates is Glenn Stanton. And opposing him in many of these debates is John Corvino, a gay man. The two have become close friends. Neither accuses the other of bad faith. Bloggers responded emotionally, both pro and con, to an article that Corvino wrote about the friendship.[47] "Over the years," wrote Craig, Stanton has "grown to know a gay man who 'doesn't fit what … [straight people have] been told about gays' and I've learned that not all people who opposes LGBT equality approach it from a hate/fear perspective."[48]

49. The California Council of Churches, which represents many Christian churches, vigorously opposes Proposition 8 but nonetheless says that support for it is merely mistaken—that is, neither stupid nor sinister. "[W]e recognize that many churches and people of faith believe they must oppose the freedom to marry based on what they have been taught the Bible has to say on the subject. Therefore, we have produced this study guide to help congregations in California struggling with differences of opinion on the subject of marriage equality to discuss the biblical texts, theology, church traditions, and civil rights from a place of compassion and love of neighbor—the central elements of Jesus' teachings."[49] Moreover, the council urges people to distinguish between civil ceremonies (which should be available to all citizens) and religious ones (which churches might not, presumably in good faith, make available to all members).

> We can agree to guarantee civil rights even as denominations deliberate with the issue of marriage equality as an element of church law/rites/blessings. Equal protection under the law, tolerance and respect for diversity, and defining one's own views while permitting other views, are consistent with authentic religious commitments where we all can live in a world of differences and ambiguities while still respecting other people's secular rights … Separation of church and state requires us to respect differences in each denomination or church. Those seeking to permit same-sex marriage must have equal standing with those that do not … It is anti-democratic to impose one religious viewpoint on everyone else… It is our prayer that people of faith throughout California will engage in open and

> honest conversation about this important issue from a place of
> compassion, love, and grace.[50]

50. **Conclusion:** A few religious people do say now and then that "God hates gay
people."[51] Although  these accusations are deeply troubling,[52] they are
exceptions to the rule. Most religious people, especially religious leaders, do not
believe this, because that would make no sense of their own theologies. Both
Jewish and Christian theology focus ultimately on divine compassion, mercy,
and forgiveness. Even though the god of both traditions forbids some forms of
behavior, the same god loves all people and seeks reconciliation with all
people—including sinners, because *all* people are sinners in one way or another
by definition (and therefore in need of either Torah or Christ).  Thus, I see no
reason to assume that religious supporters of Proposition 8 are motivated by
hostility toward gay people.  Moreover, the strategies of gay activists themselves
clearly indicate that many religious people are not consumed by anti-gay
bigotry.

**Do secular advocates of gay marriage write off religion as a pernicious force?**

51. Again, the answer is clearly no. After ignoring religious communities, the
National Gay and Lesbian Task Force now actively promotes support for gay
marriage in liberal religious communities. Their explicit premise has been that
support for gay marriage is *plentiful* in these religious communities. This
premise would make no sense if they assume that all religious people are
contaminated by animus toward gay people. At issue here, then, is *how* gay
advocates interact with religious people. The answer is very simple. They
mobilize, train, and fund members of liberal denominations—both gay and
straight—who might not otherwise become allies in the campaign against
Proposition 8. Here is the task force's mission statement along with that of its
action fund:

> The mission of the National Gay and Lesbian Task Force is to
> build the grassroots power of the lesbian, gay, bisexual and
> transgender (LGBT)[53] community. We do this by training activists,
> equipping state and local organizations with the skills needed to
> organize broad-based campaigns to defeat anti-LGBT referenda
> and advance pro-LGBT legislation, and building the organizational
> capacity of our movement. Our Policy Institute, the movement's
> premier think tank, provides research and policy analysis to
> support the struggle for complete equality and to counter right-
> wing lies. As part of a broader social justice movement, we work
> to create a nation that respects the diversity of human expression
> and identity and creates opportunity for all.

> The National Gay and Lesbian Task Force Action Fund, founded in 1974 as the National Gay and Lesbian Task Force, Inc., works to build the grassroots political power of the LGBT community to win complete equality. We do this through direct and grassroots lobbying to defeat anti-LGBT ballot initiatives and legislation and pass pro-LGBT legislation and other measures. We also analyze and report on the positions of candidates for public office on issues of importance to the LGBT community.

52. Realizing that many secular people, including many gay people, strongly disapprove of religion, the task force nonetheless tried to mobilize religious allies.

> Although the larger LGBTQQIA[54] movement continues to have an ambivalent relationship to religion as an organizing focal point and religious institutions as an organizing entry point, getting to the finish line on marriage equality, employment non-discrimination and other pro-LGBTQQIA issues will require speaking to voters who consider these issues in a language that is familiar to them. This often means setting essential information within religious contexts and having it come from religious leaders. To meet this challenge the Arcus Foundation funded the National Gay and Lesbian Task Force's National Religious Leadership Roundtable to convene a two-day gathering of 32 California and national experts in religious communities and pro-LGBTQQIA religious organizing … [which] took place in Pasadena, California, at All Saints Episcopal Church on January 15-16, 2009.[55]

53. Rebeccal Voelkel, a minister of the United Church of Christ, wrote the task force's report: "A Time To Build Up: Analysis of the No on Proposition 8 Campaign and its Implications for Future Pro-LGBTQQIA Religious Organizing." She relied on discussions at the National Gay and Lesbian Task Force's National Religious Leadership Roundtable.[56] In view of the emphasis on past failures and future strategies, I suggest that this task force spearheaded many or most of the events that I have already mentioned. Consequently, I find it worthwhile to review its report in some detail.

54. The report defines religion as both a problem and a solution. Religious people have campaigned not only to prevent gay marriage but also to prevent adoption by gay couples. "In other words," says the report, "the primary opposition to LGBTQQIA people and families is religious—in language, culture, strategy and organizing."[57] On the other hand, religion presents an opportunity. "We need to

recognize that we will never win our 'rights' without the progressive faith community, because the secularist argument doesn't work."[58] Another kind of religious "voice," in other words, could "counter the religious-based opposition and change hearts and minds if they are allowed to get out there."[59]

55. The task force's first priority is to make contact with allies behind the lines: religious people who are gay, religious people who have gay relatives or friends, and religious leaders who are either gay or "gay positive." But the task force recognizes that suitable theological rhetoric can turn almost any "progressive" parishioner into a potential ally. "Pro-LGBTQQIA faith-based leadership is a major resource and a required leader in future change efforts. Pro-LGBTQQIA faith-based leaders and leadership structures bring significant resources to the fight—the ability to speak with moral authority to large numbers and through a variety of communication vehicles. Faith-based advocates share a 'common platform' built on values of dignity of human life and a commitment to justice. These common values present the opportunity to build advocacy agendas across denominations and faith traditions in support of coordinated strategies."[60]

56. Elsewhere, the report says that gay people need to know about "the enormous influential role of religion in American public life and the social capital that religious leaders have with their congregants."[61] In that case, of course, funders should support projects that recognize the hitherto ignored power of opposition to Proposition 8 from "progressive" religious communities. "Since it is a conservative faith voice that dominates the anti-gay movement, moderate to progressive faith voices must be an integral part of campaigns from day one. It is vital that campaigns have at least one credible, politically savvy faith leader as part of the core strategy team."[62] Moreover, the task force extends its horizon beyond this or that Christian community: "Multi-faith organizing is another example of progress that can be used as a model for bridging the secular-religious divide."[63] Leaving no stone unturned, however, the task force acknowledges the possibility of gaining at least some support even in conservative communities—that is, in the "significant minority within conservative religious institutions."[64]

57. Generalities aside, the task force proposes specific strategies, each of which must be tailored for one particular community.[65] These include "using worship services, making announcements or putting information in the bulletins of different congregations, preachers doing public speaking at rallies, marches and town hall meetings, choirs representing different congregations singing about justice and abundances on the steps of the Capitol before lobbying for a just budget, using religious rites such as giving religious communities the opportunity to bless couples in public ways, employing religious symbols such as lighting candles for justice, caroling at home of legislators (if the Legislature

is your primary audience)."[66] Of particular importance in this campaign, as in any political campaign, is manipulation of the mass media. Activists from the outside or allies from the inside must "place religious leaders in the media; draw upon the language of religious communities for talking points; claim the Bible and other scriptural texts as ours ... "[67] and so on.

58. Some members of the task force are secular. To reach religious people, they must blend in with their surroundings. In this case, they must adopt the common parlance of "progressive" religious communities. They must appeal to justice, human dignity,[68] "interdependence, interconnectedness and the common good,"[69] for instance, or weave "religion, race, and family" into the message.[70] In black communities, this would mean featuring "gospel singers, personal testimonies, honoring of the NAACP and an offering—all hallmarks of the African American church experience."[71]

59. Considering future projects, moreover, the task force suggests that it identify religious "lay leaders—who often have deeper roots and longer-term vision ..."[72] This will result in a stronger coalition over time."[73] In fact, they should "create a permanent database of such leaders and use public relations professionals to help publicize those who support our cause."[74]

### Conclusion

60. This is the religious context in which we must see the campaigns over Proposition 8. I suggest that it would be tendentious to claim that the result was dictated by "religion." Religious people have campaigned on *both* sides of the debate over Proposition 8, after all, and even *conservative* religious people have campaigned *against* it. Secular gay people, moreover, have used their organizations and resources to bring out a religious vote against Proposition 8.

Paul Nathanson
Faculty of Religious Studies
McGill University
2 October 2009

---

[1] The Yes campaign brought in $39.9 million, the No campaign $43.3 million ("Proposition 8," [dated:] 12 September 2009, *California Proposition 8 (2008)*, [visited:] 21 September 2009, en.wikipedia.org/wiki/California_Proposition_8.

[2] Some women prefer to call themselves "lesbians," but others prefer "gay women." For the sake of convenience, I have used "gay" in connection with both men and women. Other gender "identities" (such as bisexual and transsexual) are irrelevant in this discussion.

[3] "Make no mistake," argued one blogger, "the quintessential issue underlying Prop 8 is the separation of church and state … Prop 8 is an attempt to inject religious belief into our legal system. It is steeped in biblical writings dating back to circa 1200 BCE" ("Prop 8 and the Separation of Church and State," [dated:] 31 October 2008, *Articlesbase*, [visited:] 23 September 2009, articlesbase.com/politics-articles/prop-8-and-the-separation-of-church-and-state).

[4] This church's official name is the Church of Jesus Christ of Latter-day Saints. "I know that the LDS church offers a lot for its members," wrote one blogger, "but what I don't understand is why they should have the right to use their resources to force the rest of us to conform to their world view. It's not only unfair and immoral, it's unconstitutional" (Deb, [Comments], [dated:] 7 November 2008, *Global Spin*, [visited:] 23 September 2009, globalspin.com/2008/11/prop-8-what-happened-to-separation-of-church-and-state?

[5] Randy Triezenberg, "Two Views of an Initiative to Overturn Court's OK of Gay Marriage," *Sacramento Bee*, 26 October 2008: E-1.

[6] Congregational churches became widely established in the Massachusetts Bay Colony, later New England. The model of Congregational churches was carried by migrating settlers from New England into New York and the Northwest: Ohio, Indiana, Michigan and Illinois. With their insistence on the independence of local bodies, they became important in many reform movements, including those for abolition of slavery, and women's suffrage. As of the early 21st century, Congregationalism in the U.S. had split into three major bodies: the United Church of Christ, which most local Congregational churches affiliated with, the National Association of Congregational Christian Churches, a fellowship of churches and individuals formed to continue and foster classic Congregationalism as the merger that created the UCC was being debated, and the Conservative Congregational Christian Conference, an evangelical group.

[7] For example, events at local churches seldom included only members of the church or even of the denomination. Under "interreligious," I have listed events that organizers specifically called "ecumenical" or "interfaith." Bishops and other denominational leaders, moreover, seldom confined their activities to official business on denominational councils or committees.

[8] Sandi Dolbee, "A Battle over 'God's Will': People of Faith Line up for and against a Ban on Same-Sex Marriage," *San Diego Union-Tribune*, 14 September 2008: A-1.

[9] Sandi Dolbee, "Ministers Define Marriage at Forum," *San Diego Union-Tribune*, 15 September 2008: B-4.

[10] "Council of Churches Urges No on Proposition 8," [undated:], *Santa Clara County Council of Churches* [visited:] 14 September 2009, councilofchurches-scc.org/article.php/aspeopleoffaith/print.

[11] Michael T. Hall and Michael Stetz, "Religious Groups Gather on Both Sides of Prop. 8," [dated:] 2 November 2008, *Sign On San Diego,* [visited:] 14 September 2009, signonsandiego.com/news/metro/2008.

[12] Meredith May, "Same-Sex Marriage Fans, Foes Await Court Ruling," *San Francisco Chronicle*, 26 May 2009: B-1.

[13] [Mission statement], [dated:] 2005, *California Faith for Equality*, [visited:] 23 September 2009, cafaithforequality.org.

[14] Task Force8.

[15] Task Force 7.

[16] Task Force 11.

[17] Task Force 13.

[18] On 4 July 2005, the United Church of Christ officially endorsed gay marriage:" Whereas the Bible affirms and celebrates human expressions of love and partnership, calling us to live out fully that gift of God in responsible, faithful, committed relationships that recognize and respect the image of God in all people; and Whereas the life and example of Jesus of Nazareth provides a model of radically inclusive love and abundant welcome for all; and Whereas we proclaim ourselves to be listening to the voice of a Still Speaking God at that at  all times in human history there is always yet more light and truth to break forth from God's holy word … Therefore let it be resolved

that the Twenty-fifth General Synod of the United Church of Christ affirms equal marriage rights for couples regardless of gender and declares that the government should not interfere with couples regardless of gender who choose to marry and share fully and equally in the rights, responsibilities and commitment of legally recognized marriage; and Let it be further resolved that the Twenty-fifth General Synod of the United Church of Christ affirms equal access to the basic rights, institutional protections and quality of life conferred by the recognition of marriage …" ("Marriage Equality," [undated], *United Church of Christ*, [visited:] 1 October 2009, ucc.org/lgbt/issues/marriage-equality/).

[19] In 1996, the Unitarian Universalist Association officially endorsed gay marriage: "Because Unitarian Universalists affirm the inherent worth and dignity of every person; and Because marriage is held in honor among the blessings of life … Therefore be it resolved that the 1996 General Assembly of the Unitarian Universalist Association adopts a position in support of legal recognition for marriage between members of the same sex …" ("Support of the right to Marry of Same-Sex Couples, [dated:] 28 March 2007, *Unitarian Universalist Association of Congregations*, [visited:] 1 October 2009, uua.org/socialjustice/socialjustice/statements/14251.shtml).

[20] In March 1996, Reform rabbis officially endorsed gay marriage as a civil right: "Be it resolved that that the Central Conference of American Rabbis support the right of gay and lesbian couples to share fully and equally in the rights of civil marriage, and Be it further resolved that the CCAR oppose governmental efforts to ban gay and lesbian marriage. Be it further resolved that this is a matter of civil law, and is separate from the question of rabbinic officiation at such marriages." In March 2000, moreover, Reform rabbis endorsed religious weddings for gay couples: "Whereas justice and human dignity are cherished Jewish values … We do hereby resolve that the relationship of a Jewish, same gender couple is worthy of affirmation through appropriate Jewish ritual, and Further resolved that we recognize the diversity of opinions within our ranks on this issue. We support the decision of those who choose to officiate at rituals of union for same-gender couples, and we support the decision of those who do not … " ("Judaism and Homosexuality: Reform Judaism," [dated:] 2000, Religious Tolerance, [visited:] 1 October 2009, religioustolerance.org/hom_jref.htm).

[21] On 16 March 2004, the Reconstructionist Rabbinical Association officially endorsed gay marriage as a civil right: "… Whereas we deem it imperative that progressive religious voices be raised in support of the equality that is currently denied to gay men and lesbians, and in opposition to attempts to present religious traditions in general, and Jewish tradition in particular, as being uniformly opposed to equality for gay men and lesbians; and Whereas the Reconstructionist movement has a twenty-year history of advocating the inclusion and equality of gay men and lesbians in Jewish life … Therefore be it resolved that the Reconstructionist Rabbinical Association endorses and

supports the right of same-sex couples to share fully and equally in the rights, responsibilities and commitments of civil marriage" ("Resolution in Support of Civil Marriage for Same-Sex Couples, [dated:] 16 March 2004, Reconstructionist Rabbinical Association, [visited:] 1 October 2009, therra.org/resolution-Mar2004.htm).

[22] Application for Leave to Join Brief of Amici Curiae California Council of Churches et al. in Support of Petitioners, Strauss et al. v. Horton et al., Nos. S168047/S168066 /S168078 (Cal. 2009).

[23] Some dioceses have suffragan, or assistant, bishops.

[24] Hall and Stetz.

[25] "[News from the] Marriage Equality Ministry Team," [undated], *First Congregational Church of Berkeley*, [visited:] 15 September 2009, fccb.org/newspages/MarrigeEqualityNews.

[26] Application 8.

[27] This organization is for Presbyterian social-justice activists. Among the topics that it has studied in connection with "diversity" are the ordination of gay people and gay marriage. According to its website, members "seek to support the mission and unity of the Presbyterian Church (USA) in a time of potentially divisive controversy. We intend to articulate and act on the church's historic, progressive vision and to work for a fully inclusive church … The Covenant Network works for needed change through active programs of Informing, Networking, and Advocating. We are committed to helping the church stay together in faithful ministry, even as we continue to study the Scriptures and seek the mind of Christ on the question of ordination standards and other matters" ("History and Purpose of the Covenant Network," [undated], *Covenant Network of Presbyterians*, [visited:] 21 September 2009, covenantnetwork.org/about_history/aboutCN.htm.

[28] "Two Presbyterian Witness Events for Marriage Equality and against the Discriminatory California Proposition 8," [dated:] 22 October 2008, *More Light Presbyterians*, [visited:] 15 September 2009, mlp.org/article.

[29] Marcos Breton, "Supporters of Reverend Seek Facts," *Sacramento Bee*, 10 May 2009: B-1; Jennifer Garza, "Pastor Fears His Outspokenness May Cost Him Job," *Sacramento Bee*, 11 February 2009: B-3.

[30] Conservative Judaism originated to occupy the middle ground between Orthodox traditionalism and Reform liberalism. It allows liberal interpretations of Jewish

scripture and liberal rulings on matters of Jewish law, but it tries also to maintain the authority of both. This strategy does not always satisfy those at either end of the continuum between traditionalism and liberalism. As a result, Conservative Judaism allows a great deal of latitude to suit the needs of individuals, whether ordained or lay, and congregations.

[31] B.A. Robinson, "The Roman Catholic Church and Homosexuality: Support Groups for Catholic Homosexuals and Bisexuals," [dated:] 20 January 2009, *Religious Tolerance*, [visited:] 21 September 2009, religioustolerance.org/hom?rom1.htm. At the Vatican's request, American bishops asked Dignity chapters in their dioceses to sign documents in which they agreed to uphold the church's teachings on sexuality; when Dignity chapters refused to sign, the bishops revoked their leases on church property (such as campus Newman Centers).

[32] Application 10.

[33] "Soulforce Vision Statement," [undated], *Soulforce*, [visited:] 23 September 2009, soulforce.org.

[34] "Soulforce Spring 2009 Catholic Action," *Soulforce*.

[35] Robinson.

[36] "The View from Here," [undated], *Affirmation: Gay and Lesbian Mormons*, [visited:] 23 September 2009, affirmation.org.

[37] "About Us," Affirmation.

[38] "About the Evangelical Network," [undated], *The Evangelical Network*, [visited:] 23 September 2009, t-e-n.org/In%20the%News/ENDA.htm.

[39] Todd Ferrell, "The Evangelical Network Responds to Recent ENDA Bill [Employment Non Discrimination Acts] Changes," *Network*.

[40] Todd Ferrell, "The Evangelical Network Speaks out on Gay Marriage," [undated], *YouTube*, [visited:] 23 September 2009, youtube.com/watch?v=jzqNAkUZUcA.

[41] There is no single organization that represents Orthodox Jews, and some organizations do not care one way or the other about matters that apply only to non-Jews (or non-Orthodox Jews).

<hr />

[42] One example would be Steven Greenberg, a gay Orthodox rabbi who calls for *revisions* to Jewish law. He does not call for the abandonment of legal rulings that he considers unacceptable, which is a Reform or Reconstructionist method. Rather, he calls for the use of traditional rabbinic methods to reach new rulings that he would find more acceptable. See his *Wrestling with God and Men: Homosexuality in the Jewish Tradition* (Madison: University of Wisconsin Press, 2004).

[43] Conservative rabbis have adopted a similarly pragmatic solution: supporting gay marriage as a civil right but not necessarily supporting it for members of their own congregations. Like all non-Orthodox denominations, in any case, no denominational policy is binding; rabbis may officiate at gay weddings but do not have to do so. Because the Conservative predicament is so widespread among religious communities, it is worth quoting its most recent statement on gay marriage.

"Founded in 1927, the Committee on Jewish Law and Standards is empowered to deal with, and rule on, halakhic [Jewish legal] issues within the Conservative movement.  The role of the CJLS is to issue rulings shaping the practice of the Conservative Jewish community. As such, it is an advisory, not a judiciary body. Parameters set by the committee guide all of the rabbis, synagogues and institutions of the Conservative movement, but within these bounds there are many variations of practice recognized as both legitimate and essential to the richness of Jewish life. As a result, there have been instances when two or more response [rabbinic opinions], representing conflicting viewpoints, are validated by the committee. When that happens, the local rabbi determines which of the responsa to follow. At the CJLS meetings, five specific *teshuvot* [answers] were extensively discussed in a spirit of collegiality and open-mindedness. Two *teshuvot*—one authored by Rabbi Joel Roth and the other authored by Rabbis Elliot Dorff, Daniel Nevins and Avram Reisner—obtained clear majority support. Rabbi Roth's responsum 'Homosexuality Revisited' reaffirmed the prior position, which denied ordination as clergy to active homosexuals and also prohibited same sex commitment ceremonies or marriage. In contrast, Rabbis Dorff, Nevins and Reisner, while retaining the Torah's explicit prohibition, as understood by the rabbis banning male homosexual intercourse, argued in 'Homosexuality, Human Dignity and Halakhah' for the full normalization of the status of gay and lesbian Jews. Under this ruling, gay and lesbian Jews may be ordained as clergy and their committed relationships may be recognized, although not as sanctified marriage. A third *teshuva* accepted by the CJLS, written by Rabbi Leonard Levy, which upheld the traditional prohibitions, argued that homosexuality is not a unitary condition and urged the development of educational programs within the community to achieve understanding, compassion and dignity for gays and lesbians. There was also some support on the committee for a more comprehensive repeal of the prior ban against homosexual relationships. All authors of *teshuvot* shared a universal appreciation for the principle of *kvod habriot* and the welfare of gays and lesbians in our community. During its deliberations the CJLS did not discuss—nor do any of the papers reflect—any

determination regarding gay marriage. The meeting of the past two days on the issue of homosexuality and *halakhah* reflects a wide diversity of ideas and opinions. These distinct and divergent opinions may be used by rabbis, synagogues, institutions and individual members of the Conservative movement as a guide in welcoming gays and lesbians in our movement. The *teshuvot* may also serve to determine the extent to which gays and lesbians may be admitted into our seminaries and guide the clergy of our movement on the question of whether to initiate commitment ceremonies for gays and lesbians. The CJLS is united in its concern for the unity of the Conservative movement worldwide. The diversity of opinions issued today reflects an essential strength of the Conservative movement—namely, its very pluralism. Indeed, a multiplicity of approaches to *halakhah* has been a key feature of the Conservative movement since its inception" ("Rabbinical Assembly Committee on Jewish Law and Standards Concludes Meeting on Issue of Homosexuality and Halakha," [dated:] 6 December 2006, *Rabbinical Assembly of America*, [visited:] 1 October 2009, rabbinicalassembly.org/.../CJLS%20Decisions%20on%20Homosexuality.doc).

This passage illustrates the complexity of deliberations. The rabbis were trying to balance concern for the needs of gay Conservative Jews with concern for the continuity of Jewish law (and therefore of the Jewish community). I see no reason whatsoever to assume that what guided these deliberations was animus toward gay people.

[44] Both Catholics and Mormons assume the relevance of their social policies (though not necessarily their theological ones) to all people; consequently, they use secular arguments to promote these policies in the public square. Not all Orthodox Jews, on the other hand, make that initial assumption. Their social policies rely directly on Orthodox interpretations of the Torah's 613 commandments and are therefore relevant only to Jews as a result of divine covenants with Abraham and Moses (the ancestors of Jews). Gentiles, they believe, are bound by the seven Noahide laws due to an earlier divine covenant with Noah and therefore with humans in general (including Jews). These seven laws include the six that Adam received in the Garden of Eden along with the one that Noah received after the Flood.   But even among these seven Noahide laws, according to the rabbis, one bans homosexual intercourse. Though by no means obvious and therefore potentially debatable, that has been the rabbinic interpretation of Genesis 2:24: "Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."

[45] Kathleen Gilbert, "Episcopal Bishops in California Support Gay 'Marriage,'" [dated:] 10 September 2008, *Catholic Online* [visited:] 15 September 2009, catholic.org.

[46] In several of our books, Katherine Young and I discuss "selective cynicism" (assuming the worst of all people except those like ourselves) as a defining feature of all ideologies, whether on the left or the right. See, for example, Paul Nathanson and

Katherine K. Young, *Spreading Misandry: The Teaching of Contempt for Men in Popular Culture* (Montreal: McGill-Queen's University Press, 2001): 206-207.

[47] John Corvino, "Corvino: Friends with the Enemy," [dated:] 12 December 2008, 365gay.com, [visited:] 21 September 2009, 365gay.com/opinioncorvino-friends-with-the-enemy.

[48] Craig Said, "Opinion," [dated:] 12 December 2008, 365 Gay.Com, [visited:] 21 September 2009, 365gay.com/opinion/corvine-friends-with-the-enemy.

[49] "Marriage Equality," [undated], *California Council of Churches*, [visited:] 15 September 2009, calchurches.org/marriage.

[50] "Marriage Equality."

[51] But both sides, religious liberals and religious conservatives, can play this game. Some religious liberals accuse their conservative adversaries of using religious rhetoric to oppose same-sex marriage and thus perpetuate obsolete and oppressive sexual hierarchies. From this point of view, theological explanations for opposition to gay marriage amount to nothing less than bad faith. They have nothing to do with religion. The underlying motivation, in short, must be "homophobia." (That word is politically loaded, because it implies that anyone who disagrees with anything that gay people say or do must by definition be either neurotic for fearing gay people or evil for hating them.) Some religious conservatives, on the other hand, accuse their liberal adversaries of using religious rhetoric to promote same-sex marriage and thus entrench notions of the family that rely ultimately on some secular political ideology. From this point of view, theological explanations for supporting gay marriage amount to nothing less than lies, pretexts, or fronts for some repressive and oppressive "hidden agenda" that has nothing to do with religion; the underlying motivation, in short, must be modernism (and thus secularism) or "political correctness."

Even though religious leaders *as such* seldom accuse each other of bad faith, at any rate, there are exceptions. In 2001, Rabbis David Mivasair and Meir Hillel Goelman submitted a document to Or Shalom, a Reconstructionist synagogue in Vancouver, British Columbia. They argued that opposition to gay marriage relied on, apart from anything else, the "fear of heterosexuals" (Rabbi David Mitvasair and Rabbi Yair Hillel Goelman, "On Broadening Our Vision of Holy Relationship: A Proposal to the Or Shalom Community," [dated:] July 2001, *Or Shalom,* [visited:] 20 September 2009, orshalom.ca/samesex). By "fear," of course, they referred to "homophobia." In other words, they were disguising their neuroticism or hatred with religious language. But some rabbis on the other side were no better. Even Rabbi Hersh, the Orthodox rabbi who urges compassion for sinners but not for their sins, accused his opponents on 5 June 2006 of being "intellectually dishonest" (Weinreb). Nonetheless, most of these

accusations by far come from laypeople, not religious leaders. When an article in the *Los Angeles Times* mentioned that a minority on the California Board of Rabbis opposed an initiative to repeal Proposition 8, one blogger responded as follows: "Thank you Board of Rabbis! … No matter how many lies one has to tell to justify discrimination," wrote Beetlebabee, "it's still wrong … I'm sorry to see religious leaders deny their faiths for the acclamation of those who would rather ridicule inconvenient religious viewpoints that tolerate them" (Beetlebabee, "Comments," [dated:] 30 September 2008, *Los Angeles Times: Local: L.A. Now*, [visited:] 20 September 2009, latimesblogs.latimes.com/lanow/2008/09/proposition-8-i.html.

This was a response to "Board of Rabbis Opposes California Anti-Gay-Marriage Initiative," *Los Angeles Times*, 26 September 2008). Another blogger at the same site, however, accused the opposite side. "It's sad to know, wrote Sally, "that Rabbi's [*sic*] will ignore the basic tenets [*sic*] of their faith in the name of political correctness" (Sally, "Comments," [dated:] 30 September 2008, *Los Angeles Times: Local: L.A. Now*, [visited:] 20 September 2009, latimesblogs.latimes.com/lanow/2008/09/proposition-8—i.html).

[52] A classic example in the context of Christianity would be the mentality of Henry VIII. No one, not even his own supporters, believed that the motivation for his ecclesiastical revolution was entirely theological; on the contrary, everyone understood that his motivation was partly and perhaps mainly the political need to divorce (or kill) one wife after another in order to produce an heir. Because he could not do so with approval from the church in Rome, he established his own church in England. In short, he tried to legitimate his behavior in religious terms. Because he had once written brilliant defenses of Catholic theology against Protestant theology, and because his new point of view coincided so closely with royal self-interest (producing an heir) and personal self-interest (acquiring the wealth of English monasteries), many people found it hard to believe that his motivations were solely or even primarily religious. But Henry's motivations were not necessarily synonymous with those of everyone who approved of the break with Rome. Many of them sincerely believed in the need for religious reform—that is, for a Protestant Reformation—and were prepared to die for their beliefs (just as many Catholics were prepared to die for theirs). We have no reason to doubt the sincerity of Thomas Cranmer, Henry's Archbishop of Canterbury, who died as a Protestant martyr under "Bloody Mary" (Elizabeth's Catholic half-sister). Ironically, in view of its nefarious political intrigues, this was an age of martyrdom. And if martyrs do not act in good faith, it is hard to imagine who would.

In one significant context, moreover, some Jews accused other Jews of acting in bad faith. The French Revolution emancipated French Jews, because failing to do so would mean failing to take revolutionary thought to its logical conclusion (which is what the American Revolution failed to do by allowing the continuation of slavery). Napoleon emancipated the Jews of his empire, too, opening and then tearing down the ghetto walls. But there was a price for emancipation. To become full citizens and

therefore worthy of emancipation, Jews would have to assimilate into the larger society. This presented Jews with an unprecedented opportunity (the unimpeded quest for personal fulfillment as the equals of all other citizens) and an equally unprecedented danger (dissolving boundaries and therefore communal disintegration). Some Jews chose the path of Samson Raphael Hirsch. He argued that Jews could be fully Jewish but also fully German or French or whatever. They could study in universities and enter the professions along with Christians, for instance, but without abandoning the sacred law of Judaism. This movement led to the reorganization of Jewish communities structurally along "modern" lines and gave rise to "Neo-Orthodoxy." Other Jews chose the path of Moses Mendelssohn. A few decades earlier, at the height of Enlightenment rationalism, he had reinterpreted Judaism in a way that linked it directly and explicitly with contemporary German philosophy. Whatever he could not reconcile with reason, whatever he could not justify in connection with some moral principle, Mendelssohn rejected as superstitious or unnecessary. In the mid-nineteenth century, Reform Judaism adopted his principles. One result was intense conflict within the Jewish community.

Both traditional and Neo-Orthodox Jews accused Reform Jews, in one way or another, of bad faith: claiming to be merely reforming or purifying Judaism but actually abandoning it *for political reasons*. And there was some truth in this accusation. Reform Jews consciously modeled their synagogues on Protestant churches, for instance, both architecturally and liturgically. And their motivation was largely political. Reform Jews argued that they were doing what Jews now *had* to do: legitimate their worthiness for citizenship and eliminate all signs of the "otherness" that sustained anti-Semitism. On the other hand, even Reform Jews did not argue that their way of life was as holy as that of traditional Jews; on the contrary, they rejected not only most forms of Jewish piety (and therefore the sacred law that governed them) but also much of Jewish theology (except for the idea of "ethical monotheism"). Unlike the early Protestant reformers, who wanted to return Christianity to its ancient purity, these Jewish reformers (and those who founded the more recent Conservative and Reconstructionist movements) wanted Judaism to embrace modernity. They wanted to be Jews, but they wanted also to be modern. And to be modern, they had to change Judaism. But after considerably more than 150 years, the charge of bad faith no longer means much in this context. Living in the United States and other stable democracies, Jews have no need to legitimate themselves as citizens or to dilute their "Jewishness" for fear of anti-Semitism. Orthodox Jews, especially Hasidic ones, still deplore what they consider the errors of non-Orthodox Jews but no longer accuse them of bad faith—that is, of being dishonest or insincere.

---

[53] Rebecca Voelkel, "A Time to Build up: Analysis of the No on Proposition 8 Campaign and Its Implications for Future Pro-LGBTQQIA Religious organizing," [n.p.] National Gay and Lesbian Task Force, 2009. LGBT means lesbian, gay, bisexual, and transgendered.

---

[54] This initialism, an even more inclusive extension of the first, stands for Lesbian, Gay, Bisexual, Transgendered, Queer, Questioning, Instersex, and Ally.

[55] Task Force 1.

[56] The task force's acknowledgments list includes the following; Rev. Darlene Nipper of the National Gay and Lesbian Task Force; Ann Craig of the Gay & Lesbian Alliance Against Defamation (Religion, Faith & Values Program); Harry Knox and Dr. Sharon Groves of the Human Rights Campaign (Religion and Faith Program); and Dr. Sylvia Rhue of the National Black Justice Coalition (Religious Affairs Program).

[57] Task Force 1.

[58] Task Force8.

[59] Task Force 19.

[60] Task Force 2.

[61] Task Force 6.

[62] Task Force 5.

[63] Task Force 12.

[64] Task Force 11.

[65] Task Force 7.

[66] Task Force 6.

[67] Task Force 6.

[68] Task Force 10.

[69] Task Force 8.

[70] Task Force 9.

[71] Task Force 9.

[72] Task Force 20.

[73] Task Force 20.

[74] Task Force 20.

# Paul Nathanson

*Religious Studies, McGill University;  3520 University St, Montreal, QC, H3A 2A7;  (514) 398-1511;  paul.nathanson@mcgill.ca*

EDUCATION:

> **PhD** (McGill University, 1989: religious studies: religion and secularity, popular culture, gender);
> **MA** (Concordia University, 1979: religious studies: Judaism; **BTh** (McGill, 1978: Christianity);
> **MLS** (McGill, 1971: library studies); **BA** (McGill, 1968: art history)

WORK EXPERIENCE:

> **Academic:** Researcher at Faculty of Religious Studies, McGill University (2002--); Senior Research Associate at The McGill Centre for Medicine, Ethics and Law, McGill University (1988-1993); Lecturer at Bishop's University (1984); Lecturer at Vancouver School of Theology (1982).):
> **Editing (freelance):** academic manuscripts in the arts, the humanities and the social sciences;
> **Editing (in-house):** editor of newsletters for Transport Canada (summer 1978) and The McGill Centre for Medicine, Ethics and Law (1991-1993); **Other:** chief librarian at The Vancouver School of Theology (1979-1982); cataloguer at The National Gallery of Canada (1973-1974); cataloguer at the Jewish Public Library, Montreal (1972-1973; 1974-1976)

PUBLICATIONS

> **Books:** [with Katherine K. Young] *Contra: The Case against Same-Sex Marriage* [in progress]; [with Katherine K. Young] *Sanctifying Misandry: Goddess Ideology and the Fall of Man* [forthcoming from McGill-Queen's University Press]; [with Katherine K. Young] *Legalizing Misandry: From Public Shame to Systemic Discrimination against Men* (Montreal: McGill-Queen's University Press, 2006); [with Katherine K. Young] *Spreading Misandry: The Teaching of Contempt for Men in Popular Culture* (Montreal: McGill-Queen's University Press, 2001), 370 pages; *Over the Rainbow*: The Wizard of Oz *as a Secular Myth of America* (Albany: State University of New York Press, 1991) 432 pages.

> **Articles or chapters:** [with Katherine K. Young] "From Religion to Secularity: The Continuum of Worldviews," in *What Is Religion? Religion in the Courts and the Academy*, ed. Dan Cere and Katherine K. Young [forthcoming]; "Don't Blame All Muslims, But Don't Blame All Men Either," *Ottawa Citizen*, 7 August 2009; "Fatherhood Can Be a Thankless Job," *Ottawa Citizen*, 23 June 2009; "Pop Goes the Family: Marriage in Popular Culture," in *The Conjugal Bond: Interdisciplinary Approaches to the Institution of Marriage* (under review); [with Katherine K. Young] "Redefining Marriage or Deconstructing Society: A Canadian Case Study, *Journal of Family Studies*, 3.2 (November 2007): 133-178; "Men, Misogyny and Misandry," *Ottawa Citizen*, 6 April 2007; "Between Time and Eternity: Theological Notes on *Shadows and Fog*," in *Representing Religion in World Cinema: Filmmaking, Mythmaking, Culture Making,* ed. Brent Plate (New York: Palgrave Macmillan, 2003), 89-106; [with Katherine K. Young]: "The Future of an Experiment," in *Divorcing Marriage*, ed. Douglas Farrow and Dan Cere (Montreal: McGill-Queen's University Press, 2004); [with Katherine K. Young] "Non au mariage gai," *La Presse*, 9 July 2003: A-15; [with Katherine Young] "Comment: Keep It All in the Family," *Globe and Mail*, 2

May 2003: A-15; "I Feel, Therefore I Am: The Princess of Passion and the Implicit Religion of Our Time," in *Implicit Religion,* 2.2 (1999): 59-87 (reprinted in *Centrepoints*, 4.1 (Spring 2000): 809); "Coming of Age in the Movies: Myth and Manhood in *Rebel without a Cause*," in *Gender in World Religions* 5-7 (1994-1997): 28-76; "You Can't Go Home Again, or Can You? Reflections on the Symbolism of TV Families at Christmastime," in *Journal of Popular Culture*, 27. 2 (1993): 149-162; [with Katherine K. Young] "Canada's Naked Public Square," in *Towards a Code of Etiquette: Interfaith Dimensions of Canadian Multiculturalism*, ed. Abdul Lodhi, Thom Parkhill, and Melynda Jarratt (Fredericton: Atlantic Human Rights Centre, 1990): 89-118 (reprinted in *Hikmat* 3.5 (1991): 8-17 and in *Ecumenism* (September 1995): 5-13).

**Review essays (movies):** "The New 'Deliverance,'" review of *The Ticking Man*, on IMDb: User Comments,  www://www.imdb.com/title/tt0380753/usercomments, 21 October 2003; "Making Sense of *The Cider House Rules*," in *Catholic New Times*, 6 February 2000: 17; "Transforming Life in *American Beauty*," in *Catholic New Times*, 14 November 1999: 14; "Charlie Chaplin Goes to Hell," review of *Life is Beautiful*, in *Catholic New Times*, 14 February 1999: 16; "Listening for God's Voice in the Whirlwind," review of *Titanic*, in *Catholic New Times*, 12 April 1998: 16; "*Pleasantville*: The Past Isn't Black and White," in *Catholic New Times*, 20 December 1998: 18; "A Tale of Two Wars," reviews of *Saving Private Ryan* and *Regeneration*, in *Catholic New Times*, 27 September 1998: 12; "Exploring the Paradoxical Nature of Human Existence," review of *Sling Blade*, in *Catholic New Times*, 15 June 1997: 16; "Experiencing a Cinematic Parable, review of *Breaking the Waves*, in *Catholic New Times*, 20 April 1997: 16; "*The Crying Game*: A Gospel Parable?" in *Catholic New Times*, 26 January 1997: 16-17 [2214 words]; "If Ingmar Bergman Had Made a Western, This Would Have Been It," review of *Dead Man*, in *Catholic New Times*, 6 October 1996: 16; "Opening the Windows of Heaven," review of *The Neon Bible*, in *Catholic New Times*, 9 June 1996: 15-16 [2700 words]; "In Defence of *Sense and Sensibility*," in *Catholic New Times*, 3 March 1996: 17 [1800 words]; "Sacrificial Love: The Missing Element in *Powder*," in *Catholic New Times*, 7 January 1996: 17 [1600 words]; "Through a Glass Darkly: A Study of *After Dark, My Sweet*," in *Gender in World Religions,* 4 (1993): 87-104; "In Search of St. Francis: The Cinematic Quest for Manhood in *Mass Appeal*" in *Grail*, 7. 4 (1991): 91-111

**Review essays (books):***Myths America Lives By*, by Richard T. Hughes and *Something for Nothing: Luck in America*, by Jackson Lears, in *Implicit Religion*, 7.3 (November 2004); *The End of the World as We Know It: Faith, Fatalism, and Apocalypse in America*, by Daniel Wojcik, in *Material History Review* (Fall 2000): 89-91; *Houses of God: Region, Religion, and Architecture in the United States,* by Peter W. Williams, in *Material History Review* (Fall 1999): 95-96; *The Landscape of Belief: Encountering the Holy Land in Nineteenth-Century American Art and Culture*, by John Davis, in *Material History Review* (Spring 1999): 82-83; Material *Christianity: Religion and Popular Culture in America*, by Colleen McDannell, in *Material History Review*, 46 (Fall 1997): 93-98; *Icons of American Protestantism; The Art of Warner Sallman,* ed. David Morgan, in *Material History Review*, 45 (Spring 1997): 69-76; *Children of Peace,* by John McIntyre, in *Material History Review*, 43 (Spring 1996): 84-87; *Make Room for TV: Television and the Postwar Ideal in America,* by Lynn Spigel, in *Material History Review*, 40 (Fall 1994): 88-89

LECTURES, CONFERENCES, HEARINGS

**Marriage:** "Fatherhood," for panel discussion on the family, tenth annual conference of World Alliance for Youth (New Haven, Yale University, 25-26 September 2009); [with Katherine K. Young] "Gender Equality and Sex Differences: The Effects on Parents and Children," lecture for conference on Who Is Called a "Parent" and Why? An Interdisciplinary Investigation of Core

Questions at the Heart of Today's Family Debates (Charlottesville, Virginia: 16-18 October 2008); "Pop Goes the Family: Marriage in Popular Culture," lecture for Illuminating Marriage, a conference organized by the Institute for the Study of Marriage, Law and Culture (Kananaskis, Alberta: 18-20 May 2005); [with Katherine K. Young] "Gay Adults v. Children: Rights in Conflict," guest lecture for the Lord Reading Law Society (Montreal: 4 May 2005); "Gay Marriage," guest lecture for Dr. Martha Bernstein at Vanier College (Montreal: 10 January 2005; "Marriage in Popular Culture," lecture for The Great Canadian Marriage Debate, a symposium held at Loyola High School (Montreal: 14 January 2004); [with Katherine K. Young] "Marriage in Popular Culture," lecture for Re-visioning Marriage in Postmodern Culture, a conference sponsored by Institute for the Study of Marriage, Law, and Culture (Toronto: 10-12 December 2003); "Gay Marriage" lecture for Redefining Marriage: Mapping the Debate: A Symposium, sponsored by the Institute for the Study of Marriage, Law, and Culture (Toronto: 4 October 2003); "Marriage-a-la-mode: Answering Advocates of Gay Marriage," lecture for Sex, Marriage, and the Family, a conference held at Emory University (Atlanta: 27-30 March 2003); "Questioning Some of the Claims for Gay Marriage," [with Katherine K. Young] presentation for the House of Commons Standing Committee on Justice and Human Rights (Ottawa: 20 February 2003); "Misanthropy on the Soaps," lecture for Wars of the Ring: Revisioning Marriage in Postmodern Culture, a conference sponsored by McGill University's Newman Centre (Montreal: 23 March 2002). **Misandry**: [with Katherine K. Young] "By Love Possessed: The Case for Intersexual Dialogue," lecture for a seminar on love (McGill Psychology Students Association, 11 February 2009); [with Katherine K. Young] "Coming of Age as a Villain: What Boys Need to Know about Misandry," lecture for the conference on Boys and the Boy Crisis (Washington, D.C.: 13-14 July 2007); [with Katherine K. Young] "The New Double Standard: Misandry and Public Discourse," lecture for the Toronto Writers' Centre (Toronto: 31 May 2007); [with Katherine K. Young] "Legalizing Misandry: From Public Shame to Systemic Discrimination against men," lecture for Dr. Miles Groth at Wagner College (New York: 28 September 2006); [with Katherine K. Young] "Spreading Misandry: The Teaching of Contempt for Men in Popular Culture," lecture for Dr. Miles Groth at Wagner College (New York: Nov. 2003); "The Problem of Misandry and the Possibility of Intersexual Dialogue," lecture for Visions of Men's Health, a conference sponsored by Catholic Community Services and the Mankind Project (Montreal: 13 June 2002); **Religion and culture:** "*The Wizard of Oz* as a Secular Myth of America," lecture for Dr. Barbara Galli, Religion 351 (Montreal, Concordia University, 2 October 2008); "From Healers to Heels: Medicine on Commercial Television," lecture for Dr. Katherine Young, Religious Studies 571 (Montreal, McGill University, 2 October 2008); "Old Age in Western Art," paper presented at the 17th International Congress on Palliative Care (Montreal, Palais des congrès, 23-26 September 2008); "Science Fiction: On the Frontier between Religion and Medicine," lecture for the American Academy of Religion: Eastern International Region (Montreal: 2 May 2008); "Remaking Methuselah: Science Fiction and the Search for Longevity," lecture for The World's Religions after September 11: A Global Congress (Montreal: 11-15 September 2006); "From Babylon to Babylon-on-the-Hudson: Religion and Secularity in Modern America," lecture for Dr. Ted Trost at the University of Alabama: Judaic Studies-College of Arts and Sciences (Tuscaloosa: 14 November 1999); "Myth and Ritual in Popular Films," lecture for the Thomas More Institute of Canada (Montreal: 23 November 1996); "Cinema as Secular Myth and Secular Parable," lecture for a conference of the Learned Societies (Montreal: 2 June 1995); "Over the Rainbow," lecture for the St. James Literary Society (Montreal: 1 November 1994); "Religion and Film," lecture for the Ecumenical Jury at the World Film Festival (Montreal: 26 August 1994); "Over the Rainbow: *The Wizard of Oz* as a Secular Myth of America," lecture for The American Academy of Religion (Kansas City: 25 November 1991); "Home for Christmas," lecture for The Popular Culture Association and The American Culture Association (Toronto: March 1991); "*The Wizard of Oz*: Sacred Time in Secular America," lecture for The Popular Culture Association and The American Culture Association (Toronto: March 1987). **Other:** "Responding to Margaret Somerville's 'A

Poetry of Ethics: Creating a Language of the Ethical Imagination,' second of Somerville's five Massey Lectures based on her book *The Ethical Imagination.* (Montreal: Newman Centre of McGill University, 7 November 2006); "On Being Jewish in Canada," lecture for the Canadian Studies Center, Plymouth State College of the University System of New Hampshire (Plymouth: 1 November 1991).

INTERVIEWS

**Same-sex marriage**: Interviewed by Lorna Dueck, "A Child's Rights: Revisiting Same-Sex Marriage,", on *Listen Up TV*, Global Quebec, Montreal, [date of taping] 29 November 2006; Interviewed by Charles Adler, "Same-Sex Marriage," on *Adler Online*, CJOB, Winnipeg, Corus [radio network], 31 January 2005; interviewed [with Katherine K. Young] by Diana Keough at www.beliefnet.com, 13 August 2003; [with Margaret A. Somerville and Douglas Farrow] interviewed by Sheila Coles, "The Case against Same-Sex Marriage," on *Sounds Like Canada*, CBC Radio, 15 July 2003. **Legalizing Misandry:** interviewed [with Katherine K. Young] by Sean Moncrief on *The Moncrief Show*, News Talk Radio, Dublin, Ireland, 3 August 2007; interviewed by Dan Bell for "Dorks, Dweebs and Dummies," *Times* [of London], 31 July 2007; nerviewed [with Katherine K. Young] by Gregory Andresen for *Dads on the Air*, Australian Broadcasting Corporation, 14 July 2007; interviewed [with Katherine K. Young] by Michael Seeber for *CPR TV*, Minnesota Cable Network, Minneapolis (and www.mcn6.org,); interviewed [with Katherine K. Young] by John McCulloch on *The Mitch Albom Show*, WJR Radio Detroit, Detroit, 28 May 2007; interviewed [with Katherine K. Young] by Matthew Stuart for "Mommy Dearest," which appeared in the print version of the *Western Standard* (20 November 2006): 33 and also on its westernstandard.ca/website/index.cfm?page=print.print_article&article_id=2128); interviewed [with Katherine K. Young] by John Gormley on *John Gormley Live*, Rawlco [radio network], CKOM, Saskatoon and CKME, Regina, 17 July 2006; interviewed with [Katherine K. Young] by Garen Daly and Louise Reilly Sacco on *The Frugal Yankee Radio Hour*, WNTN, Boston, Mass., 25 June 2006; **Spreading Misandry:** interviewed by Kari Simpson and Terry O'Neill for RoadkillRadio.com, 16 June 2009; interviewed [with Katherine K. Young] by Bernie Ahearn for *A Man's World*, www.healthylife.net, 28 July 2005; interviewed [with Katherine K. Young] by Terry Schroell for "Two Wrongs Won't Make a Right," a documentary produced at the Toronto Film School, 7 March 2005; interviewed [with Katherine K. Young] by Courtney Kane for an article in the *New York Times* on men in advertising, 14 January 2005; interviewed [with Katherine K. Young] by Dave Taylor on *Afternoons with Dave Taylor,"* CHQR radio, Calgary, 25 March 2003; interviewed [with Katherine K. Young] by Tom Clark on *The Tom Clark Show*, Wisconsin Public Radio, 13 March 2003; [with Katherine K. Young] interviewed by Tanya Spreckley on *SexTV* (the series), CityTV, Toronto, 25 October 2002; interviewed [with Katherine K. Young] by Matthew Walls for his class on "Broadcast Journalism," Concordia University, Montreal, 3 October 2002; interviewed [with Katherine K. Young] by Chantal Levigne on *Dimanche Magazine*, CBC (Radio Canada), Montreal, 1 October 2002; interviewed [with Katherine K. Young] by Joe Manthey on *The Joe Manthey Show*, MND Radio, Los Angeles, California (available online at www.mensnewsdaily.com/radio/mantheyshow.htm), 22 July 2002; interviewed [with Katherine K. Young] by Robert Sapienza and Howard Gontovnick on *Mind Excursions*, CINQ-FM, Montreal, 20 and 27 April 2002; interviewed [with Katherine K. Young and Susan Cole], by Daniel Richler on *The Word This Week*, Bravo! Toronto, 25 April 2002; interviewed [with Katherine K. Young] by Vicki Gabereau on *Vicki Gabereau*, CTV, Vancouver, 18 February 2002; interviewed [with Katherine K. Young] on *Canada Now*, CBC, [January?] 2002; interviewed [with Katherine K. Young] on *Book Television*, Bravo! Toronto, 30 January 2002; interviewed [with Katherine K. Young] by Katherine Gombay on *Art Talk,* CBC, Montreal,

Quebec; interviewed [with Katherine K. Young, Michael Rowe, and Gwen Smith] by Michael Coren on *Michael Coren Live*, CTS, Burlington, Ontario, 3 December 2001; interviewed [with Katherine K. Young] by Tommy Schnurmacher on *The Tommy Schnurmacher Show*, CBC, CJAD, Montreal, Quebec, 29 November 2001; interviewed [with Katherine K. Young] by David and Diane Nicholson during a panel discussion at their salon, 21 November 2001; interviewed [with Katherine K. Young] by John Gormley on *John Gormley Live*, Rawlko [radio network], CKOM, Saskatoon and CJME, Regina, 21 November 2001; interviewed [with Katherine K. Young] by Melanie Deveau on *Guy's Corner*, CKLW, Windsor, Ont., 20 November 2001; interviewed [with Katherine K. Young] by Peter Warren on *Warren on the Weekend*, CKVN, Vancouver, BC., 18 November 2001; interviewed [with Katherine K. Young] by Dave Rutherford on *The Rutherford Show*, Corus [radio network], CHQR, Calgary, Alb., 16 November, 2001; interviewed [with Katherine K. Young] by Anne Legace Dawson on *Home Run,* CBC, CBFM, Montreal, Que., 15 November 2001; interviewed [with Katherine K. Young] by Larry Fedoruk on *Drive Home*, Telemedia, CKTB, St. Catherines, Ont., 15 November 2001; interviewed [with Katherine K. Young] by Al Stafford on *The Stafford Show*, Corus [radio network], CHED, Edmonton, Alberta, 15 November 2001; interviewed [with Katherine K. Young] by Roy Greene on *The Roy Greene Show*, Corus [radio network], CHML, Hamilton, Ont., 14 November 2001; interviewed [with Katherine K. Young] by Paul and Carol Mott on *The Motts,* CFRB, Toronto, Ont., 14, 18 May 2001. **Religion and culture:** interviewed by Marguerite MacDonald on *Open House*, CBC, 30 August 1992 and 18 January 1992; interviewed by Daniel Richler on *Imprint*, TV Ontario, 10 February 1992; interviewed by Peter Gzowski on *Morningside*, CBC, 6 February 1992; interviewed by Jeff Hanson on *Clark and Company*, Wisconsin Public Radio, 17 December 1991; interviewed by Nancy Wood on *Radio Noon*, CBC, Montreal, Que., 13 May 2003.


## HONOURS, AWARDS, GRANTS

**Canada Research Fellowship:** $120,000 for a project called "Beyond the Fall of Man: From Ideology to Dialogue in the Conflict over Masculine Identity," (1990-1993); **Donner (Canadian) Foundation**: $180,000 for a project, with Katherine K. Young as principal investigator, called "The Future of Nature: New Reproductive Technologies and the Symbolic Frontier" (1988-1990); **Dean's Honour List**, McGill University (1989); **Ministère de l'Enseignement Supérieur et de la Science [du Québec]**: $24,000 bursary (1984-1986); **Challenge Grant,** Employment and Immigration Canada: $2,000 for student researcher (1989); **McConnell Fellowship**, McGill University: $2,000 (1983, 1984, 1985, and 1986): **University Scholarship**, McGill University (1968, 1977, and 1978); **Birks Award**, McGill University (1978); **Lobley Prize**, Montreal Diocesan Theological College (1978); **Ellegood Jubilee Scholarship**, Montreal Diocesan Theological College (1977); **H.W. Wilson Scholarship**, McGill University (1970); **Sir William MacDonald Scholarship**, McGill University (1968).


## OTHER

Grading papers, "Unit E: Introduction to World Religions," for Montreal Diocesan Theological College, 1987-


## ASSOCIATIONS:

**Academic:** Popular Culture Association-American Culture Association; American Academy of Religion; Film Studies Association of Canada. **Other:** Editors' Association of Canada.

REFERENCES:

**Katherine Young:** Faculty of Religious Studies, McGill University (514-398-4124); **Fred Bird:** Department of Religion, Concordia University (514-848-2070); **Peter Ohlin:** Department of English, McGill University (514-398-6550).

2009.10.02