# EXHIBIT E

# Rebuttal Report

## of

## Kenneth P. Miller, PhD

### PERRY, *et al.*, v. SCHWARZENEGGER, *et al.*
### CASE NO. 09-CV-2292 VRW

## INTRODUCTION

I, Kenneth P. Miller, declare:

1.      I make this rebuttal report as an expert witness on behalf of the Defendant-Intervenors in this matter, Dennis Hollingsworth, et al.  The report is based upon my personal knowledge and I am competent to testify to the contents herein.

2.      This report addresses issues raised by the plaintiffs' expert witness, Dr. Gary M. Segura, by presenting evidence that gays and lesbians, and the broader lesbian, gay, bisexual, and transgender (LGBT) rights movement have achieved significant political power in California and elsewhere in the United States, and can effectively pursue their goals through democratic institutions.

3.      I am an Associate Professor in the Department of Government at Claremont McKenna College, and the Associate Director of the Rose Institute of State and Local Government.  My research focuses on state-level politics, especially the relationship between direct democracy, courts, and representative institutions in California and in other states.  My training includes a B.A. in government from Pomona College; a J.D. from Harvard Law School; a year as a legislative assistant in the California State Senate; five years as an attorney with the law firm of Morrison & Foerster (resident in Los Angeles and Sacramento); and a Ph.D. in political science from U.C. Berkeley.

4.      My research is interdisciplinary, drawing on the fields of law, history, and political science to analyze developments in legal and political institutions. For example, in my book *Direct Democracy and the Courts* (Cambridge University Press 2009), I have analyzed the adoption and development of the initiative process in California and other states, and showed how that lawmaking process has often come in conflict with the courts, including in controversies over the definition of rights.  In my research for that book, I closely examined how the national debate over legal recognition of same-sex marriage has been engaged in various institutional venues, including state-level initiative campaigns, state legislatures, state courts, and the Congress.

5.      In another line of research, I have used the framework of political geography to analyze the changing partisan composition of California.  Political

geography is the study of geographic or spatial dimensions of politics, such as urban vs. rural or other regional or sub-regional political divides.  Working with a group of other scholars, I examined developments in the state over the past several decades to show how California has shifted from a north-south partisan divide to a new east-west divide as its densely populated coastal regions have become increasingly Democratic and the interior increasingly Republican.  We described how demographic, economic, and cultural trends have caused the Democratic Party to become dominant in the state, then analyzed the consequences for statewide elections, redistricting plans, the composition of the Legislature, and the use of direct democracy.  Our work was published as an edited volume, titled *The New Political Geography of California* (Berkeley Public Policy Press 2008).

6.      For my work on this matter, I am being compensated at a rate of $200 per hour.

## POWER

7.      "Power" is at the center of this case, but unfortunately the definition of power is highly contested by social scientists.

8.      Plaintiffs' expert relies on political scientist Robert A. Dahl's definition of power, which states that "A has power over B when A is able to compel B to do something that B would otherwise not do."  *See* Expert Report of Gary M. Segura at 4. ("Segura Report").  This definition of power, while frequently cited, is not universally accepted.   Among other things, it is criticized for too narrowly defining power as *compulsion*—to "compel B to do what B would otherwise not do."  Certainly compulsion is a form of power, but there are other forms, as well.  Political theorist Hanna Pitkin notes that "[e]tymologically, [power] is related to the French *pouvoir*, to be able, from the Latin *potere*, to be able.  That suggests, in turn, that power is a something—anything—which makes or renders somebody able to do, capable of doing something.  Power is capacity, potential, ability, or wherewithal."  Hanna Fenichel Pitkin, *Wittgenstein and Justice* (1972) at 276-277.  This broader definition of power draws from the tradition of Thomas Hobbes, who defined "power" as one's "present means to obtain some future apparent good." *Leviathan*, Ch. X.  Dahl's student, the political scientist Nelson W. Polsby, also broadened Dahl's definition by defining power as "the capacity of one actor to do something affecting another actor, which changes the probable pattern of specified future events."  Nelson W. Polsby, *Community Power and Political Theory* (1963) at 5.  These broader definitions imply that "power" is multifaceted and includes, among other things, the ability to persuade others by one's ideas, and the ability to form coalitions with sympathetic allies to achieve one's goals.

9.      Plaintiffs' expert suggests that that gays and lesbians "do not possess a meaningful degree of political power, and are politically vulnerable" because they

cannot by themselves compel outcomes in the political process, but instead must rely on unreliable allies to help them achieve or protect their interests. Segura Report at 3. Again, this is an overly restrictive definition of "power." In a pluralistic society, all movements are forced to form coalitions and alliances if they hope to achieve their goals—and the LGBT rights movement is no exception.

10. This report presents evidence that, by *any reasonable measure,* gays and lesbians are not politically powerless. In California and increasingly in other states and at the national level, the LGBT rights movement has demonstrated an impressive ability to attract the attention of the lawmakers, and, further, to win substantive victories through the legislative process. The balance of this rebuttal report presents evidence of this power.


## THE LGBT RIGHTS MOVEMENT IN CALIFORNIA

### Overview

11. Professor Segura analyzes political developments in California, including ballot initiatives in the state. *See* Segura Report at 5-6, 12. My own review of the political landscape in California leads me to the conclusion that gays and lesbians have political power within the state of California.

12. The emergence of the LGBT rights movement has been one of the most important political developments in California over the past generation. In the not-so-distant past, California offered gays and lesbians few protections against discrimination. But in recent decades, proponents of LGBT rights have made sweeping gains in the state, securing legislation that prohibits discrimination on the basis of sexual orientation in employment, housing, child adoption, education, insurance, state-funded programs and activities, among many other areas. In addition, in 1999 the California Legislature adopted a landmark domestic partnership statute and the state expanded the rights and benefits of domestic partnerships in 2001, 2002, 2003, 2004, 2005, 2006, and 2007. The Legislature designed the California Registered Domestic Partner Rights and Responsibilities Act of 2003 to provide to domestic partners "the full range of legal rights, protections and benefits, as well as all of the responsibilities, obligations, and duties to each other, to their children, to third parties and to the state, as the laws of California extend to and impose upon spouses." See 2003 Cal. Stat. 421. (Cal. Family Code sec. 297.5.)

13. Many observers, including advocates of gay rights, have recognized the magnitude of these gains. Ronald M. George, the Chief Justice of the California Supreme Court, has noted: "There can be no question but that, in recent decades, there has been a fundamental and dramatic transformation in this state's understanding and legal treatment of gay individuals and gay couples." *In re*

*Marriage Cases*, 43 Cal.4th 757, 821 (2008).  Associate Justice Carol Corrigan similarly has observed: "The California Domestic Partner Rights and Responsibilities Act of 2003 (DPA), and other recent legislative changes, represent a dramatic and fundamental transformation of the rights of gay and lesbian Californians. It is a remarkable achievement of the legislative process that the law now expressly recognizes that domestic partners have the same substantive rights and obligations as spouses."  *Id*. at 879.  Equality California, one of the state's leading LGBT rights advocacy organizations, has celebrated the fact that California has moved from "a state with extremely limited legal protections for lesbian, gay, bisexual and transgender (LGBT) individuals to a state with some of the most comprehensive civil rights protections in the nation." http://www.eqca.org/site/pp.asp?c=kuLRJ9MRKrH&b=4025479.

14.    Notably, the movement for LGBT rights has secured almost all of California's protections against sexual orientation discrimination, as well as the state's landmark domestic partnership law, through the *Legislature*, rather than through the courts.  Indeed, the LGBT rights movement in California has been a model of how to mobilize a powerful political coalition to achieve goals through democratic processes.  The coalition now includes the state's leading labor unions, many of its leading corporations, the California Democratic Party, the state's Republican Governor, other statewide elected officials including the Attorney General, stable majorities in the legislature, many local elected officials, the state's largest media outlets, private foundations, bar associations, other professional associations, and many churches, synagogues, and other faith-based organizations.  The strength of this coalition, and the legislative victories it has won, provide convincing evidence that LGBT persons, and the broader LGBT rights movement, have achieved significant political power in this state and can rely on democratic institutions, rather than courts, to pursue their goals.

15.    The California Legislature has banned discrimination on the basis of sexual orientation in state-funded programs and activities (Cal. Govt. Code § 11135(a); in employment (*Id.* §§ 12920, 12921, 12940); in housing (*Id.* §§ 12921, 12955, 12955.8); in labor organizations (*Id.* § 12940(b)); in apprenticeships (*Id.* § 12940(c)); in licensing boards (*Id.* § 12944); in civil service (*Id.* § 18500(c)(5)); in juvenile detention (Cal. Welf. & Inst.§ 224.73); in access to elder services (*Id.* § 9103.1(a), (c), (d)); in foster care and adoption (*Id., §§* 16001.9(a)(23), 16013); in state-funded educational programs (*Id*., § 14504.1(c); Cal. Educ. Code § 220); in public education (Cal. Educ. Code  § 200); in secondary education (*Id.* § 66251); in post-secondary education (*Id.* § 66270); in health insurance (Cal. Health & Safety Code § 1365.5); in adult day health care centers (*Id.* § 1586.7); in community redevelopment projects (*Id.* § 33050(a)); in court-ordered HIV-status disclosure of criminal defendants (*Id.* § 120292(a)(1)); in sexual health education programs (*Id.* § 151002(a)(6)); in insurance (Cal. Ins. Code §§ 10140(a), (e), 10141)); in children's public health insurance (*Id.* § 12693.28); in health care organizations (Cal. Lab. Code § 4600.6(g)(3)); in public contracting (Cal. Pub. Cont. Code § 6108(g)(9)); in businesses' provision of services (Cal. Civil Code §

51(b), 51.5); and in the peremptory challenges of jurors (Cal. Civ. Proc. Code § 231.5).

16.     The California Legislature has enacted laws to:  protect the right to privacy in sexual orientation for teachers (Cal. Educ. Code § 49091.24); prohibit schools from teaching anything that could "promote a discriminatory bias" based on sexual orientation (*Id.* § 51500); charge public schools to combat bias on the basis of sexual orientation (*Id.* § 32228(b)); require schools to provide sexual orientation-sensitive sex education materials (*Id.* § 51933(b)(4)); protect individuals against violence and intimidation by threat of violence based on sexual orientation (Cal. Civ. Code § 51.7); require training for domestic abuse evaluators regarding the relationship of sexual orientation to domestic violence (Cal. Fam. Code § 1816(d)(5)(B)); require certain medical personnel to receive training on how to prevent and eliminate sexual orientation discrimination (Cal. Health & Safety Code § 1257.5); provide training for California foster parents and group home and foster family agency licensing personnel on prevention of sexual orientation discrimination (*Id.* §§ 1522.41(c)(1)(H), 1563(c)(5), Cal. Welf. & Inst. Code § 16003(a)(1)); recognize the right of children in juvenile detention facilities to be free from sexual orientation discrimination (*Id.* § 224.71(i)); charge the state Commission on Disability Access with facilitating communication on sexual orientation in disability communities (Cal. Govt. Code § 8299.01(b)(2)(F)); provide assistance in resolving disputes relating to discrimination on the basis of sexual orientation (*Id.* § 12931); fund advisory and conciliation councils to study sexual orientation discrimination generally and in housing and employment (*Id.* § 12935(g)); issue publications to minimize housing discrimination on the basis of sexual orientation (*Id.* § 12930(i)); require California law enforcement officers to receive training about sensitivity to sexual orientation (*Id.* § 13519.4); charge local commissions on human relations to study and resolve discrimination and prejudice on the basis of sexual orientation (*Id.* §§ 50264(c), 50265(a)); punish hate crimes committed on the basis of sexual orientation (Cal. Penal Code §§ 422.55(a)(6), 422.6, 422.7, 422.75, 422.85, 422.865, 3053.4, Cal. Educ. Code §§ 66301(e), 67380, 94367(f), Cal. Welf. & Inst. Code § 707(d)(2)(C)(iii)); prohibit harmful insurance premium adjustment following hate crime-related claims (Cal. Ins. Code § 676.10); provide training to law enforcement personnel regarding crimes committed on the basis of the sexual orientation of the victim (Cal. Penal Code § 13519.6); recognize the right of persons of any sexual orientation to be free from fear and harm by gangs (Cal. Penal Code §§ 186.21, 11410); require that jury instructions prohibit bias on the basis of sexual orientation (*Id.* § 1127h).  As further noted below, none of these acts of the Legislature protecting LGBT persons have faced repeal or preemption through ballot initiatives or referendums.

**Domestic Partnership and Same-Sex Marriage Legislation**

17.     In addition to these broad protections against sexual orientation discrimination, the California Legislature in 1999 adopted a landmark domestic partnership law and later expanded the law to give domestic partners virtually the

same state-level substantive rights and obligations as spouses.  Notably, this victory for the LGBT rights movement was secured without pressure from the courts and, again, has not faced repeal or preemption through ballot initiatives or referendums.

18.     The domestic partnership achievement occurred in stages.  In 1984, the City of Berkeley adopted California's first law extending employee benefits to same-sex partners of city employees; in 1985, the City of West Hollywood provided legal recognition to same-sex couples in the general public through a domestic partnership ordinance.  Over the next fifteen years, 18 local governments in California established domestic partnership registries.  *See* A.B. 849 (2005) Bill Analysis, p. 3.

19.     In 1995, the California Legislature began consideration of a statewide domestic partnership law.  Assemblymember Richard Katz and principal co-author Willie Brown introduced A.B. 627 (1995), a bill that would have established a statutory scheme for the statewide registration of domestic partners.  The bill received support from 30 organizations and numerous individuals, but died in the Assembly Judiciary Committee.  In 1997, another bill to authorize state recognition of domestic partners, A.B. 54, also died in the Assembly.

20.     In 1999, Assemblymembers Carole Migden, Sheila Kuehl, and Antonio Villaraigosa introduced A.B. 26, a new effort to establish a statewide domestic partnership law in California.  The coalition supporting the bill included 14 co-authors and an expanded list of supporters, including eight of the state's largest and most influential unions.  The bill won approval in both houses of the Legislature and was signed by Governor Gray Davis in September 1999. *See* 1999 Cal. Stat. 588.

21.     In March 2000, California voters adopted Proposition 22, a citizen-initiated statute that added the following provision to the Family Code:  "Only marriage between a man and a woman is valid or recognized in California." Family Code sec. 308.5.  While Proposition 22 reinforced state law regarding the definition of marriage, it did not repeal the state's existing laws recognizing same-sex domestic partnerships. Voters approved the initiative by a vote of 4,618,673 to 2,909,370, or 61.4 percent to 38.6 percent. http://www.sos.ca.gov/elections/sov/2000_primary/measures.pdf.

22.     California Constitution Art. II sec. 10(c) protects voter-approved initiatives from subsequent legislative amendment or repeal.  Under this rule, the Legislature had no power to repeal or amend Proposition 22's limitations on marriage.

23.     Instead, the Legislature decided to enhance the legal recognition of same-sex domestic partners by granting them essentially the same state-level rights and obligations as married persons.  In 2003, Assemblymembers Jackie Goldberg,

Christine Kehoe, Paul Koretz, and John Laird, joined by 28 co-authors, introduced A.B. 205. The bill declared that "registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to, and imposed upon, spouses." (*See* California Family Code 297.5.) The Legislature ensured that same-sex partners would now be entitled to the same rights as spouses with respect to, among other things, property, inheritance and intestacy, adoption, insurance coverage, domestic violence, and alimony. (Later, the Legislature would place domestic partners on the same footing as spouses with respect to state taxation.) The authors of A.B. 205 gathered support letters from a broad coalition of over 100 organizations and 916 individuals. Official supporters included Lieutenant Governor Cruz Bustamante, Secretary of State Kevin Shelley, Attorney General Bill Lockyer, Los Angeles Mayor James K. Hahn, the City and County of San Francisco, and numerous civil rights organizations, labor unions, and religious congregations. The bill was approved by five legislative committees, and the membership of the Assembly and the Senate. Governor Gray Davis signed A.B. 205 on September 19, 2003 and the new law became fully operative on January 1, 2005. 2003 Cal. Stat. 421.

24.     Opponents of the domestic partnership law challenged it in court, arguing that it undermined Proposition 22 in violation of Cal. Const. Art. II sec. 10(c). In *Knight v. Superior Cour*t, 128  Cal.App.4th 14 (2005), the California Court of Appeal disagreed, holding that Proposition 22 "did not state an intent to repeal existing domestic partnership laws or to limit the Legislature's authority to regulate such unions." *Knight v. Superior Court*, 128 Cal.App.4th 14, 24 (2005). The state's broad domestic partnership law thus remains in force.

25.     Having secured broad domestic partnership legislation, the LGBT rights movement began to mobilize to advocate full marriage rights for same-sex couples.  In February 2004, San Francisco Mayor Gavin Newsom ordered the San Francisco county clerk to issue marriage licenses without regard to gender or sexual orientation.  Over the next month, approximately 4,000 same-sex marriage ceremonies were performed pursuant to licenses issued by San Francisco. However, in *Lockyer v. City and County of San Francisco*, 33 Cal.4th 1055 (2004), the California Supreme Court declared the same-sex marriages *ultra vires* and void.  In its decision, the court reserved judgment on the state constitutional validity of the state's marriage laws.

26.     During this period, the LGBT rights movement also turned to the Legislature to seek to end the ban on same-sex marriage.  Despite the prohibition on legislative repeal of Proposition 22, legislators, led by Assemblymember Mark Leno (D-San Francisco), forged ahead with a proposal to make the state's marriage laws gender-neutral.  Leno's first same-sex marriage bill, A.B. 1967 (2004), died in committee.  But in 2005, the Legislature adopted Leno's second

attempt (originally designated as A.B. 19 and later changed to A.B. 849).  This
bill had 30 co-authors and received support letters from no fewer than 224
organizations, including a long and diverse roster of labor unions, civil rights
groups, local governments, professional associations, and religious organizations.
Governor Arnold Schwarzenegger vetoed the bill, citing the prohibition on
legislative repeal of voter-approved initiatives.  But in his veto message, the
Governor underscored his support for LGBT rights.  "I am proud California is a
leader in recognizing and respecting domestic partnerships and the equal rights of
domestic partners.  I believe that lesbian and gay couples are entitled to full
protection under the law and should not be discriminated against based upon their
relationships.  I support current domestic partnership rights and will continue to
vigorously defend and enforce these rights and as such will not support any
rollback."  http://www.leginfo.ca.gov/cgi-
bin/postquery?bill_number=ab_849&sess=0506&house=B&author=leno.

27.     In 2007, Leno again introduced a bill (A.B. 43) to grant marriage rights to
same-sex couples.  A large political coalition again mobilized in support of the
proposal.  The bill had 42 authors or co-authors and support letters from a long
and diverse list of allies.  The bill passed through both houses of the Legislature,
but Governor Schwarzenegger again vetoed it, for the same reasons as in 2005.
The Governor also noted that a state constitutional challenge to Proposition 22
was then pending before the California Supreme Court, and that "the appropriate
resolution to the issue is to allow the court to rule on Proposition 22."
http://www.leginfo.ca.gov/cgi-
bin/postquery?bill_number=ab_43&sess=PREV&house=B&author=leno.

28.     The challenge to Proposition 22, consolidated actions titled *In re Marriage
Cases*, reached the California Supreme Court in December 2006.  The LGBT
rights coalition mobilized in support of the litigation by filing amicus briefs
urging the court to declare a state constitutional right of same sex couples to
marry.  The amici included many LGBT rights groups, as well as local
governments; sixteen state legislators; hundreds of local faith communities,
rabbis, and ministers; and numerous professional and other associations formed
by Asian-Pacific Islanders, South Asians, African Americans, Latinos, women,
psychologists, psychiatrists, social workers, university professors, and lawyers.

29.     On May 15, 2008, a narrowly-divided California Supreme Court issued its
decision in the case.  By a 4-3 vote, the court struck down Proposition 22 and
other state marriage laws on state constitutional grounds.  *In re Marriage Cases*,
43 Cal.4th 873 (2008).  Proponents of same-sex marriage celebrated, but
opponents quickly organized an effort to reverse the decision through a citizen-
initiated constitutional amendment.  As *In re Marriage Cases* was pending,
defenders of traditional marriage had been gathering signatures for a new
initiative with the same exact fourteen words as Proposition 22:  "Only marriage
between a man and a woman is valid or recognized in California."  The new

measure was qualified as a state constitutional initiative and appeared on the November 4, 2008 ballot as Proposition 8.

30.     The pre-election fight over Proposition 8 was intense.  One early skirmish involved the wording of the ballot title—a factor that can greatly influence voter attitudes toward a ballot measure.  In 2000, Proposition 22 had appeared on the ballot under the title:  "Limit on Marriages: Initiative Statute."  But in 2008, Attorney General Jerry Brown revised the title for Proposition 8 to read:  "Eliminates Right of Same-Sex Couples to Marry."  Polls indicated that this reframing of the issue in this way undermined support for the measure.  *See* Mark DiCamillo and Mervin Field, "55 percent of Voters Oppose Proposition 8, the Initiative to Ban Same-Sex Marriages in California," *The Field Poll*, Release #2287, September 18, 2008.

31.     In the weeks leading up to the election, both sides organized extensive grassroots campaigns and flooded the airwaves with paid commercial advertisements.  The campaign for and against Proposition 8 was the most expensive ever for a social issue.  According to official reports maintained by the California Secretary of State, the Yes-on-8 campaign raised approximately $40 million, while the No-on-8 campaign raised an even greater amount—more than $43 million.
http://cal-access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1302592&session=2007; http://cal-access.sos.ca.gov/Campaign/Committees/Detail.aspx?id=1259396&session=2007

32.     On Election Day, voters narrowly approved Proposition 8. The raw vote was 7,001,084 Yes to 6,401,482 No—or, in percentage terms, 52.3% Yes to 47.7% No.  Although proponents of same-sex marriage had lost for a second time in the California initiative process, the movement had demonstrated remarkable strength, and the margin had narrowed considerably in a period of 8 years.
http://www.sos.ca.gov/elections/sov/2008_general/ssov/10-ballot-measures-statewide-summary-by-county.pdf.

33.     Opponents of Proposition 8 responded to the vote with protests, legislative resolutions, litigation, and plans for a return to the ballot.  The lawsuit, *Strauss v. Horton*, was filed in the California Supreme Court the day after the election.  The petitioners argued that by eliminating a state constitutional right, Proposition 8 made fundamental change or "revision" to the California constitution, and thus fell outside the permissible scope of the state's initiative process.  Advocates of LGBT rights submitted amicus briefs.  The amici opposing Proposition 8 constituted a diverse and expanding coalition of several hundred organizations and individuals, including 65 current and former members of the Legislature, 54 labor organizations representing approximately 2.5 million workers in the state, major corporations,  bar associations and other professional associations, religious organizations, and local governments.  In the Legislature, Assemblymember Tom

9

Ammiano sponsored an Assembly resolution, HR 5, proclaiming that the Assembly opposed Proposition 8 and calling on the court to invalidate it. The resolution had 39 Democratic co-authors and was approved by the Assembly on March 2, 2009 by a 45-27 vote. In the other chamber, Mark Leno (who had moved from the Assembly to the Senate), sponsored a similar resolution, SR 7. On March 2, 2009, the Senate adopted this resolution by an 18-14 vote.

34.     On May 26, 2009, by a 6-1 vote, the California Supreme Court upheld Proposition 8 against the state constitutional challenge, while declaring valid the same-sex marriages entered into in California between the judgment in *Marriage Cases* and the adoption of Proposition 8. The court concluded: "Having determined that none of the constitutional challenges to the adoption of Proposition 8 have merit, we observe that if there is to be a change to the state constitutional rule embodied in that measure, it must find its expression at the ballot box." *Strauss v. Horton*, 46 Cal.4th 364 (2009) (internal quotations and citation omitted.)

35.     While disappointed by the outcome of the Proposition 8 battle, many in the LGBT rights movement were encouraged by the progress they had made in mobilizing allies and persuading voters to support same-sex marriage. State Senator Mark Leno, one of the movement's leaders, said: "The last point I would make on Prop. 8 is that for as many things that went wrong, keep in mind the things went right. We picked up 18 points of support for marriage equality on Nov. 4. (Proponents of Proposition 8) lost 18 points support. The identical 14 words that were on Prop. 8, were on the ballot in Prop. 22 in 2000. We lost by 22 points in 2000. So, in just eight years we've turned the dial so that we lost by just four percentage points. Our success is in that 18 points and they're never getting that back. It's only moving in the right direction . . . What an uncommon phenomenon to be battling this war and to know without a doubt or debate that we will win." http://www.politicker.com/california/4350/qa-state-sen-elect-mark-leno.

36.     Proponents of same-sex marriage are currently mobilizing to change the state constitutional rule through the ballot box. Many in the movement express confidence that they will be able to repeal Proposition 8 by popular vote in the near future. The main disagreement within the movement is whether to move forward with a campaign to repeal Prop. 8 in 2010 or in 2012.

37.     At the same time, the movement continues to work in the California Legislature. In 2009, the Legislature adopted S.B. 54 (Leno), which requires the state to recognize as valid any same-sex marriages solemnized in other states before the passage of Proposition 8, and to grant full rights and benefits of marriage to same-sex couples who are married in other states after the passage of Proposition 8. Governor Schwarzenegger signed this bill in October 2009. http://www.leginfo.ca.gov/cgi-bin/postquery?bill_number=sb_54&sess=CUR&house=B&author=leno.

**The Expanding LGBT Rights Coalition**

38.     Plaintiffs' expert claims that gays and lesbians are politically vulnerable because they "rely almost exclusively on allies who are regularly shown to be insufficiently strong or reliable to achieve or protect their interests."  Segura Report at 3.  A closer look at the expanding coalition supporting LGBT rights helps explain why the movement has been so successful in achieving legislative victories in California over the past decade, and why it can continue to rely on democratic institutions to pursue its goals.

### *Organized labor*

39.     Organized labor is powerful in California and its support is often essential to achieving policy goals.  In recent years, unions have worked hard to advance the LGBT rights agenda.  Two of the state's most influential unions, the California Teachers Association (CTA) and the Service Employees International Union (SEIU), illustrate the point.  CTA is California's largest professional employee union and one of the most powerful interest groups in the state.  CTA represents more than 340,000 public school teachers and other educational personnel in more than 1,100 chapters and local associations.  Over the past decade, CTA has promoted legislation to establish and expand domestic partnership laws and to authorize same-sex marriage, donated over $1.3 million to the No-on-8 campaign, and filed an amicus brief asking the California Supreme Court to invalidate Proposition 8.  Similarly, the California State Council of SEIU, which represents approximately 700,000 members, has solidly allied with the LGBT rights movement.  SEIU and its locals supported legislation to end the ban on same-sex marriage, donated over $500,000 to the No-on-8 campaign, and signed an amicus brief urging the California Supreme Court to invalidate Proposition 8.

40.     The roster of labor organizations that have publicly supported efforts to secure same-sex marriage (through democratic institutions or the courts) is extensive.  These organizations include state or local units of the AFL-CIO; the American Federation of Teachers; the Alameda Labor Council; the American Federation of State, County, and Municipal Employees; the Association of Flight Attendants; the California Faculty Association; the California Federation of Labor; the California Federation of Teachers; the California Labor Federation; the California Nurses Association; the California School Employees Association; the California School Employees Association; the California Teachers Association; the Communication Workers of America; the District Council of Ironworkers of the State of California and Vicinity; the International Brotherhood of Teamsters; the Los Angeles County Federation of Labor; the San Francisco Labor Council; the Screen Actors Guild; the Service Employees International Union; the South Bay Labor Council; Unite Here!; the United Educators of San Francisco; the

United Farm Workers of America; the United Food and Commercial Workers; the
United Steel Workers; the United Teachers Los Angeles; and the University
Professional and Technical Employees.  Clearly, organized labor has become a
strong political ally of the LBGT rights movement.

*Corporations*

41.     The LGBT rights movement has gained increasing support from the
corporate sector.  The Human Rights Campaign Foundation, an organization that
advocates on behalf of LGBT persons, provides evidence of this trend through its
"Corporate Equality Index: A Report Card on Lesbian, Gay, Bisexual and
Transgender Equality in Corporate America."  The 2010 Corporate Equality
Index (published in September 2009) is the eighth annual survey.  The Index rated
590 of the nation's largest businesses using a number of different criteria,
including non-discrimination policies related to sexual orientation and gender
identity or expression, diversity training, domestic partner benefits, support for
LGBT employee resource groups, appropriate and respectful advertising and
marketing, and sponsorship of LGBT community events or organizations.  The
index also downgraded a corporation if it failed to exhibit responsible behavior to
the LGBT community or engaged in action that would undermine LGBT equality.
The survey showed that 305 businesses achieved a 100 percent rating, up from
260 businesses with a perfect rating the year before.

42.     The report stated that "the Corporate Equality Index once again
demonstrates that businesses recognize the importance of working with and
providing for lesbian, gay, bisexual and transgender workers and consumers."
Among its findings, the report indicated that "99% of CEI-rated employers
provide employment protections on the basis of sexual orientation" and that "94%
of CEI-rated employers provide partner health coverage to employees … up 3
percent from last year.  Of these employers, 70% provide them to both same and
different-sex partners of employees, a three percentage point increase from last
year."  In addition, the report stated that "opposition from anti-LGBT
organizations did not stem the tide of fairness.  Major employers stepped forward
in an unprecedented ways, including steadfast support for marriage equality in
California."  In the section titled "External Engagement," the report further noted
that "[i]n 2008, many CEI-rated employers opposed Proposition 8 in
California…"
http://www.hrc.org/documents/HRC_Corporate_Equality_Index_2010.pdf.

43.     In July 2008 PG&E, one of the state's largest utility companies, donated
$250,000 in corporate funds to the No-on-8 campaign and co-founded an
organization of businesses seeking to defeat the initiative.  PG&E Senior Vice
President of Public Affairs Nancy McFadden stated:  "We are proud to join NO
on 8 and Equality California to protect the freedom to marry for all Californians.
For years, PG&E has advocated for equality and fairness in the workplace, and
across California. In that same spirit, PG&E is honored to be a founding member

of the Equality Business Advisory Council and urge our business colleagues to join us as we work to guarantee the same rights and freedoms for every Californian."
http://www.eqca.org/site/apps/nlnet/content2.aspx?c=kuLRJ9MRKrH&b=4026197&ct=5738533.

44.     On September 26, 2008, Sergey Brin, co-founder of Google, the world's largest internet company, posted a message on the official Google blog stating that the company urged a "No" vote on Proposition 8.
http://googleblog.blogspot.com/2008/09/our-position-on-californias-no-on-8.html.

45.     In the following weeks, a large coalition of Silicon Valley leaders publicly mobilized to defeat Proposition 8.  On October 31, 2008, days before the election, the coalition placed a full-page ad in the San Jose Mercury News, titled: "SILICON VALLEY LEADERS URGE YOU TO STAND FOR EQUALITY. VOTE NO ON PROPOSITION 8." The advertisement read as follows:  "As Silicon Valley leaders, we are committed to equality and fairness. We are opposed to Proposition 8 because it would change our state constitution to take away rights from one group of people. It would set our state, and our country, back in the fight for fundamental fairness and equal rights. Please join us by reaching out to friends and neighbors and asking them to stand for fairness: Vote No on Proposition 8 on November 4th."

46.     The honorary co-chairs of "Silicon Valley Leaders Say NO on Proposition 8" included Google's co-founder Sergey Brin and CEO Eric Schmidt; Yahoo! co-founders Jerry Yang and David Filo; Bill Campbell, the Chairman of Intuit; Chuck Geschke, the founder and Chairman of Adobe Systems; John Morgridge, the former CEO and Chairman of Cisco Systems; Pierre Omidyar, the founder and Chairman of eBay; and Sheryl Sandberg the COO of Facebook. The full-page No-on-8 advertisement was signed by top executives of Google, Yahoo!, eBay, Cisco, Adobe, Intuit, Facebook, Twitter, Palm, Handspring, Numenta, Pro-Tec Data, Move, CustomerSat, Akeena Solar, Shopping.com, Reunion.com, Third Millennium, Vantive Corp., AT&T California, Integrated Archive Systems, Alloy Ventures, Telosa Software, and other Silicon Valley firms, as well as numerous prominent Silicon Valley venture capitalists.

47.     Many Silicon Valley leaders, including Apple Computers, Inc. ($100,000), Google's Sergey Brin ($100,000) and Larry Page ($40,000), made major monetary contributions to the No-on-8 campaign.  In addition, after the election, Google signed an amicus brief in *Strauss*, urging the California Supreme Court to invalidate Proposition 8.

48.     California-based Levi Strauss & Co. donated $25,000 to the No-on-8 campaign and filed amicus briefs in both *In re Marriage Cases* and *Strauss v. Horton*.  Through the Levi Strauss Foundation, the Company has also provided support for "organizations fighting discrimination based on sexual orientation

such as Lambda Legal, The Gay and Lesbian Alliance Against Defamation (GLAAD), International Gay and Lesbian Human Rights Commission (IGLHRC), and Funders for Lesbian and Gay Issues."
http://www.levistrauss.com/news/PressReleaseDetail.aspx?pid=891.

49.     Many prominent corporations have also generously contributed to organizations that promote LGBT rights.  As an example, Equality California, a leading LGBT rights organization, has listed on its website corporate sponsors that have made donations ranging from $5,000 and above to $250,000 and above.  The list includes:  AT&T, Comcast, Time Warner Cable, Wells Fargo, AAA Travel, MTV Networks, Shadowrock, Agua Caliente Band of Cahuilla Indians, BankAmerica, Coors Brewing Company, Edison International, Clear Channel, AOL, E! Entertainment, WaMu, Chevron, Kaiser Permanente, Anthem, Point and Ship Software, Sterling Bank, PG&E, Amgen, Genentech, and Southern California Edison, as well as numerous other corporate, foundation, law firm, and individual donors.
http://www.eqca.org/site/pp.asp?c=kuLRJ9MRKrH&b=4026491.

50.     California's culturally and politically influential entertainment industry has also mobilized to support LGBT rights and same-sex marriage.  MTV/Viacom, LucasFilms, Sid Sheinberg, David Geffen, Steven Spielberg, Kate Capshaw, Brad Pitt, Ellen DeGeneres, Steven Bing, Michael King, and other leaders of the entertainment industry made financial contributions to the No-on-8 campaign and have otherwise supported the movement for same-sex marriage.  In one notable example, Director Gus Van Sant's film "Milk" about the life and career of gay rights activist and San Francisco Supervisor Harvey Milk, premiered in San Francisco the week before the November 2008 election and appeared in theaters across the country in the election's aftermath.  The movie, which advocated LGBT rights, won critical acclaim and Actor Sean Penn, who starred in the title role, won the Academy Award for best actor in a leading role.  At the awards ceremony, Penn used his acceptance speech to denounce Proposition 8 and to shame the voters who had supported it.
http://oscars.com/oscarnight/winners/?pn=detail&nominee=Penn%20Sean%20-%20Actor%20Leading%20Role%20Nominee.

*Professional Associations*

51.     Many bar associations and associations of other professionals have joined the movement for LGBT rights.  These associations have typically passed resolutions against sexual orientation discrimination and increasingly have become engaged in the effort to secure legal recognition of same-sex marriage.

*Newspapers*

52.     The LGBT rights movement has made strong inroads into the state's mainstream media.  In 2008, 21 of the state's 23 top-circulation metropolitan

daily newspapers wrote editorials opposing Proposition 8; the other two took no position. No major metropolitan newspaper in the state endorsed Proposition 8. *The New York Times*, which has a sizeable circulation in California, also urged voters to reject the measure.

| Newspaper | City | Circulation | Position on Prop. 8 |
|---|---|---|---|
| Los Angeles Times | Los Angeles | 1,019,388 | No |
| San Francisco Chronicle | San Francisco | 354,752 | No |
| San Diego Union-Tribune | San Diego | 330,848 | No |
| Orange County Register | Santa Ana | 300,273 | No |
| Sacramento Bee | Sacramento | 262,650 | No |
| San Jose Mercury News | San Jose | 244,661 | No |
| Contra Costa Times | Walnut Creek | 194,445 | No |
| Fresno Bee | Fresno | 165,723 | No |
| Riverside Press Enterprise | Riverside | 147,339 | No |
| Los Angeles Daily News | Los Angeles | 126,092 | No |
| Oakland Tribune | Oakland | 96,530 | No |
| La Opinion (Spanish) | Los Angeles | 92,289 | No |
| Ventura County Star | Ventura | 86,485 | No |
| Long Beach Press Telegram | Long Beach | 80,315 | No |
| North County Times | Escondido | 79,067 | N/P |
| Modesto Bee | Modesto | 77,728 | N/P |
| Santa Rosa Press Democrat | Santa Rosa | 72,906 | No |
| Bakersfield Californian | Bakersfield | 64,898 | No |
| Torrance Daily Breeze | Torrance | 64,457 | No |
| Stockton Record | Stockton | 57,325 | No |
| San Bernardino County Sun | San Bernardino | 55,746 | No |
| Palm Springs Desert Sun | Palm Springs | 55,080 | No |
| Inland Valley Daily Bulletin | Ontario | 52,616 | No |

NP = no position. Circulation figures are for the Sunday editions for all newspapers except *La Opinión* (Monday-Friday). Circulation information published by Audit Bureau of Circulations, March, 31, 2009. http://abcas3.accessabc.com/ecirc/newstitlesearchus.asp.

### Churches and other Faith-based Organizations

53.     Professor Segura maintains that Proposition 8 was the result of concerted activity by certain religious groups. *See* Segura Report at 12. Based on my own review of the relevant materials, I conclude that religious groups both supported and opposed Proposition 8.

54.     According to surveys by the Pew Forum on Religion and Public Life, California is one of the ten least religious states in the U.S., with over 20 percent of the population claiming no religious affiliation and one third stating that they seldom or never attend religious services. The San Francisco Bay Area has an especially high concentration of people who say they have no religion. One-third

of the state's residents say they attend church services at least once per week, and one-third attend at least a few times a year. African Americans and Latinos are the most religious groups in the state, as measured by their attendance at religious services. Most Californians identify as Christian—either Roman Catholic, Evangelical, or Mainline Protestant. Members of the Church of Jesus Christ of Latter Day Saints (also known as the Mormons) constitute approximately 2 percent of the state's population. Adherents of other religions, including Jews, Buddhists, Hindus, and Muslims, collectively account for less than 10 percent. http://religions.pewforum.org/pdf/report-religious-landscape-study-full.pdf.

55.     It is notable that the religious community does not speak with one voice on matters relating to same-sex marriage and homosexuality. The Catholic Church and most Evangelical churches defend the historic Christian doctrine that marriage is a union between a man and a woman. Even within these faiths, adherents can differ on the issue of same-sex marriage. Moreover, many in mainline denominations have come to believe that faith communities should be welcoming and affirming to LGBT persons and to same-sex couples. California's mainline Protestant congregations and clergy have often staked out the liberal position in these denominational controversies. Numerous Christian laypersons, clergy, local congregations, and even entire denominations, have stood at the forefront of the movement for LGBT rights and the effort to win legal recognition for same-sex marriage. The following paragraphs summarize the diversity of views within the religious community on these questions. http://pewforum.org/docs/?DocID=426.

56.     The Roman Catholic Church has consistently defended church teaching that marriage is a union between a man and a woman, and has opposed efforts to grant legal recognition to same-sex unions. In 2003, the Administrative Committee of the U.S. Conference of Catholic Bishops issued a statement declaring: "we strongly oppose any legislative and judicial attempts, both at state and federal levels, to grant same-sex unions the equivalent status and rights of marriage—by naming them marriage, civil unions or by other means." The Catholic Church actively supported Proposition 8. http://www.usccb.org/comm/archives/2003/03-179.shtml.

57.     Evangelical churches are numerous, but loosely organized. The National Association of Evangelicals (NAE) serves as an umbrella organization for 40 evangelical denominations, approximately 45,000 churches, and many other evangelical organizations. In 2004 the NAE reaffirmed its view that the Bible does not sanction homosexuality and its opposition to legal recognition of same-sex relationships. Many individual evangelical churches and organizations were active in the movement to adopt Proposition 8. http://www.nae.net/about-us

58.     The Southern Baptist Convention is the largest Protestant denomination in the United States. In 2003, the Southern Baptist Convention reaffirmed its support for the traditional definition of marriage and its opposition to legal

recognition of "same-sex marriage or other equivalent unions."
http://www.sbc.net/resolutions/amResolution.asp?ID=1128.

59.     The American Baptist Churches in the U.S.A. is considered a mainline
denomination.  In 2005, the governing body of the American Baptist Churches in
the U.S.A. affirmed that "God's design for sexual intimacy places it within the
context of marriage between one man and one woman" and that "homosexuality
is incompatible with Biblical teaching."  However, the denomination has divided
over these views.  Nearly two decades ago, a group calling itself the Association
of Welcoming and Affirming Baptists (AWAB) formed to support appointments
of openly gay ministers and acceptance of gay and lesbian relationships.
http://www.bpnews.net/bpnews.asp?ID=23275.

60.     The Church of Jesus Christ of Latter Day Saints (LDS) has approximately
6 million members in the U.S. and 700,000 in California.  The church affirms that
marriage between a man and a woman is ordained by God and it opposes legal
recognition of same-sex relationships.
http://www.lds.org/library/display/0,4945,161-1-11-1,00.html.  The LDS Church
and many of its members actively supported the Yes-on-8 campaign.
http://newsroom.lds.org/ldsnewsroom/eng/commentary/california-and-same-sex-
marriage.

61.     The United Methodist Church (UMC), the nation's second-largest
Protestant denomination (11 million members), is deeply divided over questions
of homosexuality and same-sex unions. The General Conference of the UMC, the
denomination's governing body, has affirmed that it "support[s] laws in civil
society that define marriage as the union of one man and one woman."  However,
many Methodist congregations in California have been at the forefront of a
movement in the church to affirm same-sex unions.  Numerous United Methodist
ministers in California have challenged denominational authorities by performing
weddings for same-sex couples.  In June 2009, 82 retired UMC pastors in
Northern California signed a resolution offering to perform such ceremonies on
behalf of active ministers who feel constrained by church discipline.  The two
United Methodist regional assemblies based in California declared their
opposition to Proposition 8.  The (Southern) California-Pacific assembly called on
Methodists to "work with all their might for [Proposition 8's] defeat" and many
UMC clergy and laypersons actively opposed the measure.
http://articles.latimes.com/2008/jul/17/local/me-methodist17.

62.     The Presbyterian Church (U.S.A.) is another large mainline Protestant
denomination that is internally divided on questions of homosexuality and same-
sex unions.   The General Assembly of PCUSA has not explicitly addressed the
issue of same-sex marriage.   PCUSA has denied ordination to persons in gay and
lesbian relationships as a consequence of its rule that ministers must live in
"fidelity within the covenant of marriage between a man and a woman, or chastity
in singleness."  A strong faction in the denomination has challenged this rule.

The General Assembly has voted to remove this limitation, but this action has not received the necessary ratification from local presbyteries. http://www.pcusa.org/ga218/news/ga08131.htm.

63.     The Lutheran Church-Missouri Synod supports the traditional definition of marriage and urged its members to support Proposition 8. http://www.lcms.org/pages/internal.asp?NavID=15035.

64.     The Evangelical Lutheran Church in America defines marriage as a "lifelong and committed relationship between a man and a woman." However, in August 2009, the denomination adopted (by a two-thirds vote) a social statement titled *Human Sexuality: Gift and Trust.*   Through this new policy, the ECLA "commits itself to finding ways to allow congregations that choose to do so to recognize, support, and hold publicly accountable lifelong, monogamous, same-gender relationships." http://www.iksynod.org/ChurchwideAssembly09/CWA09insert.pdf.  Many ELCA congregations identify as "reconciling" communities which openly welcome LGBT persons and advocate for their rights.  The pastor of one such congregation, Hollywood Lutheran Church, has stated:  "We are a 'No on 8' church.  We didn't support it; we voted to oppose it.  We worked to stop it.  And we haven't given up."

65.     The Episcopal Church (2.1 million members in the U.S.) has become increasingly active in promoting LGBT rights.   In 2003, the Church consecrated its first openly gay bishop and the church supports the ordination of gay clergy, a position which causes tension within the global Anglican Communion.  In 2006, the General Convention of the Episcopal Church stated its "support of gay and lesbian persons and [opposition to] any state or federal constitutional amendment prohibiting gay marriages or civil unions."  In September 2008, California's six most senior Episcopal bishops issued a joint statement urging voters to defeat Proposition 8.  The bishops argued that "the Christian values of monogamy, commitment, love, mutual respect, and witness of monogamy are enhanced for all by providing [the right to marry] to gay and straight alike." http://www.episcopalchurch.org/53785_61652_ENG_HTM.htm. In October 2008, a national newsletter published by Integrity, a group within the Episcopal Church that advocates LGBT rights, reported:  "We are delighted by the super work of our many ongoing groups in the Western Region—especially the many members, groups, and parishes opposing California's Proposition 8 (the anti-marriage amendment). We are very excited by the support of all the California bishops for the Vote No On Prop 8 campaign and by the work of many groups and parishes in hosting benefit parties, phone banks, and other anti-ballot events." http://www.integrityusa.org/newletters/InfoLetters/2008-10.pdf. In 2009, the General Convention voted to give bishops the option to bless same-sex unions. http://www.episcopalchurch.org/gc2009_8419_ENG_HTM.htm?menu=menu919 28.

66.     In 2005, the Twenty-fifth General Synod of the United Church of Christ (UCC) adopted a resolution urging congregations and individuals to "support local, state and national legislation to grant equal marriage rights to couples regardless of gender, and to work against legislation, including constitutional amendments, which denies civil marriage rights to couples based on gender." Numerous UCC congregations in California have mobilized in support of same-sex marriage, by opposing Proposition 8 and endorsing legislation to grant marriage rights to same-sex couples.  http://www.ucc.org/assets/pdfs/2005-EQUAL-MARRIAGE-RIGHTS-FOR-ALL.pdf.  After the Proposition 8 vote, the national office of the UCC purchased advertisements in California's three largest LGBT newspapers.  The advertisement stated:  "Many members, clergy and congregations of the 1.2 million member United Church of Christ—in California and across the United States—participated in the unprecedented effort to affirm marriage equality for all.  People of faith, including many in the UCC, offered significant leadership, dollars, and time. …  We stood with you in saying no to Proposition 8 and we will continue to stand with you, both in disappointment and resolve, until full marriage equality is realized." http://www.ucc.org/news/pdf/Prop8-ad.pdf.

67.     The Unitarian Universalist Association has adopted numerous resolutions supporting equal rights for LGBT persons, including support for same-sex unions. In 1996, the General Assembly of the UUA adopted a resolution reaffirming its support for legal recognition for marriage between members of the same sex and urged the organization to make its position known through the media and for local member congregations to promote it in their home communities. Unitarian Universalist congregations have actively pursued this goal. http://www.uua.org/socialjustice/socialjustice/statements/14251.shtml. The November 2008 newsletter of the Unitarian Universalist Society of Sacramento stated: "Blessings on all of you who have given time, attention and money to protect marriage equality by joining the No on Prop. 8 campaign! All across the Golden State, UUs have led the religious progressive community in working for fairness. There is still time to spend a few hours on a phone bank, put up a yard sign, or talk to friends and coworkers." http://uuss.org/Unigram/Unigram2008-11.pdf.  After the Proposition 8 election, the senior minister of the First Unitarian Universalist Society of San Francisco stated: "If we Unitarian Universalists want to build the world we dream about, it's time to get out of the house and onto the streets—again. … Those of us who have supported marriage equality in the past need to redouble our efforts now. Strategies to build support for equal rights—phone banks, big checks, rallies, marches, vigils, civil disobedience, lobbying, advertising, truth telling, coalition building, and targeted righteous anger—should be reused with greater intentionality, even as we seek new and innovative ways to get our message across. What did you do last year to support marriage equality that you could do again?"  http://www.uusf.org/Newsletters/UUSF_Newsletter_200903.pdf.

68.     The California Council of Churches is a prominent advocate of LGBT rights.  This association represents 51 different mainline Protestant and Orthodox denominations and groups with more than 1.5 million members.  Its member organizations include the denominations or local affiliates of the American Baptist Churches, African Methodist Episcopal Church, African Methodist Episcopal Zion Church, Armenian Church of America, Christian Church (Disciples of Christ), Christian Methodist Episcopal Church, Church of the Brethren, Church Women United, Community of Christ, Episcopal Church, Ethiopian Orthodox Church, Evangelical Lutheran Church of America, Greek Orthodox Church, Moravian Church, National Baptist Convention, Orthodox Clergy Council, Presbyterian Church (USA), Reformed Church in America, Swedenborgian Church, United Church of Christ, the United Fellowship of Metropolitan Community Churches, and the United Methodist Church.

69.     The California Council of Churches states that it is devoted to "creat[ing] a world that cares for all of its citizens regardless of economic class, ages, gender, race and ethnicity, religious belief, or sexual orientation."  The CCC operates an office in Sacramento to represent these member organizations on matters of public policy, and advocates on behalf of LGBT rights, including the right of same-sex couples to marry.  It opposed Proposition 8, filed amicus briefs in support of same-sex marriage in both *In re Marriage Cases* and *Strauss v. Horton*, and through California Church IMPACT, endorsed A.B. 43 (Leno), the legislative measure seeking to end the ban on same-sex marriage in California. http://www.calchurches.org/1-who-we-are.html.

70.     The leadership of Orthodox Judaism defines marriage as an institution between a man and a woman and does not accept same-sex marriage.  The Conservative Jewish movement does not sanctify gay marriage, but grants autonomy to individual rabbis to choose whether or not to recognize same-sex unions. The Reform and Reconstructionist Jewish movements strongly support LGBT rights, including the right of same-sex couples to marry.  Numerous Jewish congregations, organizations, and rabbis have mobilized in favor of same-sex marriage and in opposition to Proposition 8. http://www.ou.org/public_affairs/article/ou_restates_support_fed_marriage_amendment/ http://rac.org/Articles/index.cfm?id=3231&pge_prg_id=11176&pge_id=2413.

71.     The foregoing survey indicates that, while the record is certainly mixed, many religious laypersons, clergy, congregations, and denominations strongly affirm same-sex relationships and have mobilized to advocate LGBT rights.  In its report, "Winning Back Marriage Equality in California: Analysis and Plan" (2009), Equality California acknowledges this fact:  "While our opponents certainly invoke scripture and theology to justify their beliefs, there are many clergy and denominations that feel equally passionate that their faiths call them to stand up for marriage equality." http://www.eqca.org/atf/cf/%7B34f258b3-8482-

4943-91cb-08c4b0246a88%7D/EQCA-
WINNING_BACK_MARRIAGE_EQUALITY.PDF.

72.     In addition, Professor Segura's analysis of the dynamics of Proposition 8
and the broader debate over same-sex marriage fails to take into account popular
reaction to intimidation, vandalism, and threats of violence directed against
churches and other organizations and individuals that supported the
measure.  There were many such incidents both before and after the election.  *See*
Thomas M. Messner, "The Price of Prop 8,"
http://www.heritage.org/Research/Family/upload/bg_2328-3.pdf.  In the
American political system, intimidation and violence can be counterproductive,
engendering sympathy for the cause of the victims.

***Political Parties***

73.     California is a solidly "blue" state.  As of February 2009, Democrats
accounted for 44.5 percent of the state's registered voters, compared to the
Republican share of 31.1 percent. Democrats maintain control of both houses of
the state Legislature.  Currently, the state Assembly has 51 Democratic and 28
Republican members (one vacancy) and the Senate has 25 Democratic and 15
Republican members.  Five of the eight state constitutional offices are held by
Democrats (one vacancy). Democrats hold 34 of the state's 53 congressional seats
and both of California's seats in the U.S. Senate.  Democrats have won the state's
electoral votes in each of the last five presidential elections.  In 2008, Barack
Obama's share of the presidential vote—60.95 percent—was the highest for any
candidate in the state since FDR's landslide of 1936.

74.     The leadership of the California Democratic Party steadfastly and reliably
supports expansion of LGBT rights.  The 2008 California Democratic Party
Platform states: "We take pride in and celebrate our diversity and work to foster
the common values and commitments that unite all people regardless of their age,
cultural heritage, national origin, disability, socio-economic status, gender, race,
sexual orientation or views on religion." The platform pledges that "[t]o fight for
all people to live with dignity and equality, California Democrats will . . . .
[s]upport nondiscrimination and equality for Lesbian, Gay, Bisexual, and
Transgender people in all aspects of their lives. We support the LGBT
Community in its quest for the right to legal marriage."
http://www.cadem.org/atf/cf/{BF9D7366-E5A7-41C3-8E3F-
E06FB835FCCE}/2008%20Platform%20Combined%20Final.pdf.

75.     On April 26, 2009, the California Democratic Party adopted Resolution
Number SAC 09.20A, titled, "Support Same-Sex Couples in Their Right to Marry
by Repealing Proposition 8."  The resolution stated as follows:
"WHEREAS**,** the California Democratic Party, the California Senate and
Assembly, Democratic County Central Committees and Democratic Clubs
throughout California opposed Proposition 8, a ballot measure designed to

eliminate the fundamental right of same-sex couples to marry, both before the November election and subsequent to Proposition 8's passage; and WHEREAS, the 2008 California Democratic Party Platform states that the CDP stands in "support of the LGBT Community in its quest for the right to legal marriage;" with 2010 providing the most opportune time both to maintain the momentum for marriage equality following the post-Proposition 8 public outcry and to ensure that the top of the Democratic ticket is unified in its support for marriage equality; … THEREFORE BE IT RESOLVED, that the California Democratic Party stands in solidarity with same-sex couples and their fight to retain the right to marry by joining with them in urging the voters of the State of California to repeal Proposition 8 within the next two years, should it be upheld by the Supreme Court."

76.     Democratic candidates in California compete to be seen as advocates of LGBT rights.  In the early competition for the 2010 Democratic gubernatorial nomination, Attorney General Jerry Brown and San Francisco Mayor Gavin Newsom were no exception.  Although he has since withdrawn from the race, Newsom became a serious contender for statewide office after he famously ordered the San Francisco county clerk to issue marriage licenses to same-sex couples.   Brown risked lagging behind on the marriage issue.  In his official capacity as Attorney General, he had defended Proposition 22 in *In re Marriage Cases* and, after voters approved Proposition 8, said that he intended to defend it in court, as well.  But in December 2008, Brown switched his position and declared he would ask the California Supreme Court to invalidate Proposition 8. The Attorney General also now refuses to defend the measure against federal constitutional challenge. Indeed, no prominent Democratic elected official or current candidate for state office in California endorsed Proposition 8 or openly opposes legal recognition of same-sex marriage. http://latimesblogs.latimes.com/lanow/2008/12/attorney-genera.html.

77.     The leadership of the California Republican Party is more divided than the Democratic Party's leaders on the issues of LGBT rights and same-sex marriage. Republican state legislators and many party activists steadfastly defend the traditional definition of marriage and often resist efforts to expand rights of LGBT persons.  The California Republican Party platform states: "The California Republican Party affirms the family as the natural and indispensable institution for human development. … We support the two-parent family as the best environment for raising children, and therefore believe it is important to define marriage as being between one man and one woman. We believe public policy and education should not be exploited to present or teach homosexuality as an acceptable 'alternative' lifestyle. We oppose same-sex partner benefits, child custody, and adoption." http://www.cagop.org/index.cfm/about_party_platform.htm.

78.     However, the party does not speak with one voice on these matters.  Other California Republican leaders, including Governor Arnold Schwarzenegger and

Tom Campbell (a former five-term U.S. Congressman now running for governor), have supported expansion of LGBT rights, including broad legal recognition of same-sex relationships. Schwarzenegger, in particular, has become a leading opponent of Proposition 8.  Schwarzenegger and Campbell represent the socially liberal wing of the California Republican Party, which includes groups such as Log Cabin Republicans (a national organization of gay and lesbian Republicans based in California.)

79.     Several of the state's minor parties, including the Libertarian Party, the Green Party, and the Peace and Freedom Party, have endorsed LGBT rights, including legal recognition of same-sex marriage.

80.     The Green Party of California's platform states:  "In keeping with the Green Key Values of Diversity, Social Justice and Equal Opportunity, and Feminism, we support full legal and political equality for all persons, regardless of sex, gender, or sexual orientation.  We specifically advocate for the rights of Lesbian, Gay, Bisexual, Transgender, Intersex, and Queer (LGBTIQ) people, as follows:

- We support the freedom to marry, and all the rights, benefits, and responsibilities thereof, without discrimination based on sex, gender, or sexual orientation.
- We support state and federal legislation (including constitutional amendments) to ban discrimination based on sex, gender, and sexual orientation. We oppose measures that restrict rights or create unequal treatment based on sex, gender, or sexual orientation.
- We support the right of children to be cared for in loving homes, regardless of the sex, gender, sexual orientation, or marital status of the parents. We support the right of all persons to consideration for adoption and foster parenthood without regard to sex, gender, or sexual orientation.
- We support the right of LGBTIQ persons to receive education and care, without discrimination, harassment, or violence based on sex, gender, or sexual orientation.
- We support the right of all persons to self-determination with regard to gender identity and sex. We therefore support the right of intersex and transgender individuals to be free of coercion and involuntary assignment of gender or sex. We oppose involuntary medical or surgical treatment— including the involuntary treatment of children—to assign gender identity or sex. We support access to medical and surgical treatment for assignment or reassignment of gender or sex, based on informed consent.
- We oppose all forms of anti-LGBTIQ violence, and support legislation against all forms of hate crimes, including those directed against LGBTIQ people.
- We support the rights of artists and performers to free expression. We welcome art and performance that provokes thought and discussion of sex, gender, and sexual orientation."

http://www.cagreens.org/platform/platform_justice.shtml#sogige.

81.     The California Libertarian Party platform states:  "We support the rights of individuals to form private relationships as they see fit, either by contract or by mutual agreement. We regard marriage as one such private relationship. The State of California should not dictate, prohibit, control, or encourage any such private relationship. To implement this principle, we advocate:

A.  The repeal of all marriage and marriage dissolution laws and their replacement by contracts where desired by the parties.
B.  Property not specified as "community property" not being presumed as such.
C.  The repeal of all alimony laws.
D.  The recognition in law of marriage contracts as an addition to, or replacement for, marriage and marriage dissolution laws.
E.  The right of all consenting adults to form marriage contracts without regard to gender, sexual preference, degree of consanguinity, or number of parties to said contracts.
F.  Until such time as the state of California ends its involvement in marriage, we call upon the state to issue marriage licenses to any adults without regard to gender."  http://www.ca.lp.org/platform/Platform2006-2007.pdf.

82.     The Peace and Freedom Party platform also supports LGBT rights. Specifically, it advocates:

- Equal treatment and benefits under the law for all families.
- Guarantee equal child custody, adoption, visitation privileges, and foster parenthood rights for lesbian, gay, bisexual and transgender people.
- Equal treatment for all people in the military regardless of sexual orientation.
- The right to gay marriage and partners' benefits.
- Accurate sex education courses in public schools. Truthful information about sexuality in society and history. http://www.peaceandfreedom.org/home/about-us/platform.

***Elected Officials***

83.     In California, gays and lesbians have had success electing candidates of their choice.   The LGBT rights movement has effectively promoted the election of openly LGBT candidates to local office and the Legislature and, further, is allied with the dominant party in the state.  While there is ideological diversity within the LGBT community, LGBT voters overwhelmingly identify as liberal and Democrat.  Indeed, LGBT voters have contributed to California's shift to a solidly Democratic state and are represented by Democratic allies who share their views on many issues.

84.     After the last statewide election, for example, Equality California noted that Californians "vot[ed] into the Legislature and top state offices 95 percent of the candidates endorsed by Equality California's Political Action Committee (EQCA PAC).  The EQCA PAC … endorsed 62 candidates for the Legislature and state offices. A total of 59 of those candidates prevailed in yesterday's election, including newly-elected Lt. Governor John Garamendi, Secretary of State Debra Bowen, Controller John Chiang, Treasurer Bill Lockyer and Attorney General Jerry Brown.  Out of the 23 pro-equality incumbents running for re-election in the Legislature, each and every candidate who voted for the EQCA-sponsored Religious Freedom and Civil Marriage Act (AB 849) in 2005 won his or her race.  EQCA Executive Director Geoff Kors observed that "nearly all of the top state offices were won by candidates who strongly support LGBT rights. In California, supporting LGBT rights is a winning formula, as candidates who oppose equality are continually rejected by voters." http://www.eqca.org/site/apps/nlnet/content2.aspx?c=kuLRJ9MRKrH&b=4025925&ct=5196849.

### Statewide Elected Officials

85.     All of California's statewide officials support LGBT rights, and most support legal recognition of same-sex marriage.

•     As noted above, Governor Schwarzenegger has allied with the LGBT rights movement. He has signed LGBT rights legislation; opposed the Federal Marriage Amendment; opposed Proposition 8; and refused to defend Proposition 8 against federal constitutional challenge.

•     Former Lieutenant Governor John Garamendi endorsed the Legislature's efforts to make California's marriage laws gender-neutral and opposed Proposition 8.  When the California Supreme Court upheld Proposition 8, Garamendi stated:  "Today we lost an important battle, but on this disappointing day, it's worth remembering that the final outcome of this struggle has already been determined. Time is on our side, and Californians will one day soon repeal Proposition 8. Patti and I have been married for 43 years, and we stand shoulder-to-shoulder with the LGBT community and their allies as they work to convince the electorate that all Californians, regardless of sexual orientation, deserve access to marriage and equality. While we will always face roadblocks, our society journeys down a path of increased equality under the law." (On November 3, 2009, Garamendi was elected to Congress in a special election.) http://www.ltg.ca.gov/index.php?option=com_content&view=article&id=511:52609-lieutenant-governor-john-garamendis-statement-on-the-california-supreme-courts-ruling-on-proposition-8&catid=67:press-releases&Itemid=347.

•      Attorney General Jerry Brown, as noted above, is an ally of the LGBT rights movement.  He has sided with the movement by, among other things, writing an unfavorable ballot title for Proposition 8 and by challenging the measure in court after the election.  In June 2009, Equality California's Executive Director Gregory Kors stated:  "Equality California is extremely appreciative of the Attorney General's continued leadership in opposition to Proposition 8 and in support of ending discrimination against lesbian, gay, bisexual and transgender (LGBT) Californians. … The time has come for all elected leaders to follow Jerry Brown's example and stand up for equality for all Americans, regardless of sexual orientation or gender identity. Equality California will continue our position of not endorsing or supporting any candidate for any level of public office who does not completely and unequivocally support total equality for our community." http://ca-ripple-effect.blogspot.com/2009/06/jerry-brown-supports-federal-case.html.


•      Secretary of State Debra Bowen is another strong supporter of LGBT rights.  In a 2007 letter recognizing LGBT Pride Month, Bowen wrote:  "I am proud to stand with you in the continued fight for equal rights under the law as your Secretary of State, as I stood with you at every turn during my 14-year tenure in the Legislature on civil rights issues.  Pride events give us a chance to look back and recognize the phenomenal progress California has made toward acceptance, not just tolerance, and toward equality.  We must also look toward the future with renewed confidence in achieving the goal of marriage equality in California."   http://www.capride.org/proc/proc_ca_07bowen.pdf.

•      Treasurer (and former Attorney General) Bill Lockyer endorsed the landmark 2003 domestic partnership law, opposed Proposition 8, and made monetary contributions to the No-on-8 campaign.  In recognition of his long-term support, Lockyer has won the endorsement of LGBT rights organizations.  For example, in the last election, EQCA's Executive Director Kors wrote:  "Equality California proudly supports Bill Lockyer for State Treasurer.  The outcome of this year's election will have a significant impact on the LGBT landscape of issues, emphasizing the importance of electing equality-minded candidates to office.  Bill scored a perfect 100% on our candidate questionnaire and we are confident he will be a hard working advocate for civil rights and equality for all in the Treasurer's Office."
*See* "Leading LGBT Groups Support Lockyer in Treasurer's Race," http://docs.google.com/gview?a=v&q=cache:ukijc5qhrJUJ:www.lockyer2010.com/index2.php%3Foption%3Dcom_content%26do_pdf%3D1%26id%3D138+%22bill+lockyer%22+lgbt&hl=en&gl=us&sig=AFQjCNGB5Q3cXShxBBzqAOvYrFG79rJ4dQ.

- Controller John Chiang is also considered a strong proponent of LGBT rights. The National Gay and Lesbian Task Force recently honored Chiang for his contributions to the struggle for LGBT equality.  According to the Task Force, "Chiang has been a steadfast ally of LGBT people throughout his career in public life. … An opponent of Prop. 8, he has spoken out for marriage equality for committed same-sex couples during Pride season and throughout the year." http://www.thetaskforce.org/press/releases/pr_110609.

- Superintendent of Public Instruction Jack O'Connell is another ally of the LGBT rights movement.  He opposed Proposition 8 and appeared in No-on-8 advertisements.

- (Republican) Insurance Commissioner Steve Poizner was the only statewide elected official to support Proposition 8, but he also supports domestic partnerships for same-sex couples.

### The Legislature

86.    As noted above, the California Legislature—in particular, the Legislature's majority Democratic Caucus—has strongly allied with the LGBT rights movement.

87.    In 2002, the California Legislature was the first in the country to recognize an official caucus of openly-LGBT state legislators.  Since its founding, the LGBT Caucus has had eight members.  It currently has four members, including the current chair of the Assembly Democratic Caucus. http://www.assembly.ca.gov/LGBT_Caucus/.

88.    At the end of the 2009 legislative year, Equality California again recognized the strong alliance between the California Legislature and the LGBT rights movement.  In a statement, the organization noted that "[b]y partnering with the LGBT Legislative Caucus and allied lawmakers, EQCA helped secure approval of five bills and six resolutions, many of which included bipartisan support. Another six bills passed their first house or key committee and will move again when the legislature reconvenes in January."  EQCA Executive Director Geoff Kors stated:  "Thanks to the steadfast leadership of the LGBT Legislative Caucus and allied legislators, California has become one of the nation's only states with comprehensive rights and protections for LGBT community members. For more than decade, Equality California has worked closely with state lawmakers to ensure that LGBT Californians are treated equally under the law…" http://www.eqca.org/site/apps/nlnet/content2.aspx?c=kuLRJ9MRKrH&b=486904 1&ct=7492315.

27

89.     The California Legislature has become a national leader in promoting
LGBT rights.  In addition to establishing a wide range of legal protections for
gays and lesbians in the state, the Legislature has adopted resolutions urging
federal action to expand rights of gays and lesbians.  These resolutions include
A.J.R. 60 (2004), endorsing the Federal Permanent Partners Immigration Act,
which would have allowed U.S. citizens and permanent residents to sponsor their
same-sex partners for immigration to the United States; A.J.R. 85 of 2004,
opposing any federal measure to limit rights and obligations of same-sex couples
and their families; and A.J.R. 19 of 2009, urging Congress and the President of
the United States to repeal the federal Defense of Marriage Act (DOMA) (adopted
by the Assembly August 31, 2009).  The Legislature has adopted two resolutions,
S.J.R. 11 (2005) and S.J.R. 6 (2007), urging Congress and the President to repeal
the military's "Don't Ask, Don't Tell" policy.  The state Senate adopted a similar
resolution, S.J.R. 9 (2009), on August 24, 2009; further action is still pending in
the Assembly.

### Local Elected Officials

90.     San Francisco Mayor Newsom is a nationally-recognized leader in
advancing the rights of gays and lesbians.  Los Angeles Mayor Antonio
Villaraigosa is also a prominent supporter of LGBT rights.  Villaraigosa publicly
opposed Proposition 8 and donated $25,000 to the No-on-8 campaign.  Many of
the state's other leading local elected officials have also supported the interests of
the LGBT community.  Numerous local governments, including the City and
County of San Francisco, the cities of Berkeley, Cloverdale, Davis, Emeryville,
Long Beach, Los Angeles, Oakland, Palm Springs, Sacramento, San Diego, San
Jose, Santa Cruz, Santa Monica, Santa Rosa, Sebastopol, Signal Hill, and West
Hollywood, and the Counties of Humboldt, Marin, San Mateo, Santa Clara, Santa
Cruz, and Sonoma, have endorsed legislation promoting domestic partner
benefits, same sex marriage, or both.

### Federal representatives

91.     Many of California's federal representatives, including U.S. Senators
Barbara Boxer and Dianne Feinstein and House Speaker Nancy Pelosi, are
outspoken advocates of LGBT rights.  Senator Boxer and twenty-four members of
California's Congressional delegation received a perfect 100 rating on the Human
Rights Campaign's "Congressional Scorecard:  Measuring Support for Equality in
the 110th Congress."  http://www.hrc.org/documents/Congress_Scorecard-
110th.pdf.  And Sen. Feinstein led the opposition to Proposition 8 by appearing in
television ads for the No-on-8 campaign.

## The Initiative Process

92.     Plaintiffs' expert argues that gays and lesbians are vulnerable in the
context of direct democracy.  *See* Segura Report at 5.  It is true that the gay rights

movement has recently lost two ballot measure contests in California as the state electorate voted to codify and, later, restore the traditional definition of marriage through the initiative process (in 2000 and 2008). But California voters have *not* used the state's initiative process, nor the popular referendum, to repeal or limit the legislature's other broad expansions of LGBT rights (including the state's domestic partnership law), or to impose other disadvantages on persons based on their sexual orientation.

93.     In 1978, voters rejected Proposition 6, also known as the Briggs Initiative. This high-profile measure would have allowed public schools to fire teachers, teacher's aides, school administrators, or counselors found to be "advocating, imposing, encouraging or promoting" homosexual activity or "publicly and indiscreetly engaging in said acts." The gay community mobilized to oppose the initiative, joined by a bipartisan coalition of allies that included former Republican Governor Ronald Reagan. In the general election, California voters defeated the initiative by a 58.4 – 41.6 percent vote. In the 1980s, voters rejected three measures directed at persons with HIV/AIDS. Proposition 64 (1986) and Proposition 69 (1988) sought to make persons with HIV/AIDS subject to quarantine and isolation. California voters defeated these measures by respective margins of 70.7 – 29.3 percent and 68 – 32 percent. In 1988, voters also rejected Proposition 102, which would have required doctors, blood banks, and others to report persons suspected of having the HIV/AIDS virus. Voters rejected this measure by a 65.6 - 34.4 percent vote.

94.     More recently, opponents of California's Domestic Partnership laws have failed to qualify ballot measures designed to repeal them. *See, e.g.,* http://caag.state.ca.us/initiatives/pdf/SA2005RF0077_amdt_2_ns.pdf. Polls indicate that the LGBT rights movement has won broad popular support for the state's domestic partnership laws. *See, e.g.,* The Field Poll Release # 2087, August 29, 2003.

95.     Proponents of same-sex marriage have demonstrated increasing strength in the state's initiative process. In the recent campaign over Proposition 8, the coalition that favored same-sex marriage (and thus opposed Proposition 8) formed several committees that collectively raised and spent over $43 million to defeat the initiative—figures that exceeded the contributions and expenditures by the Yes-on-8 campaign. The No-on-8 campaign was able to make a strong case to the electorate, and, indeed, was able to shift public opinion significantly on the issue. Encouraged by these trends and by the close outcome of the election, many advocates of same-sex marriage are eager to qualify an initiative to repeal Proposition 8, either in 2010 or 2012, and thus establish a state constitutional right to same-sex marriage *through the initiative process*.

96.     On September 24, 2009, opponents of Proposition 8, led by an organization called Love, Honor, Cherish, filed an initiative to repeal Proposition 8 with the Attorney General, the first step in the process for qualifying an

initiative for the California ballot.  The measure's repeal provision reads as follows:

<u>"Section 2.</u> To provide for fairness in the government's issuance of marriage licenses, Section 7.5 of Article I of the California Constitution is hereby amended to read as follows: Sec. 7.5. O~~nly marriage between a man and a woman is valid or recognized in California.~~ <u>Marriage is between only two persons and shall not be restricted on the basis of race, color, creed, ancestry, national origin, sex, gender, sexual orientation, or religion."</u>
http://www.repeal-prop-8.org/.

97.     Meanwhile, other LGBT rights organizations are mobilizing to win the next election on the same-sex marriage question.  Equality California has produced a sophisticated campaign plan for the repeal of Proposition 8 that includes: "field, messaging and media, coalition and leadership outreach, activating our base, work in people of color communities, activating the faith community, supporting the grassroots, campus organizing, voter registration and coordination across the state.  http://www.eqca.org/atf/cf/%7B34f258b3-8482-4943-91cb-08c4b0246a88%7D/EQCA-WINNING_BACK_MARRIAGE_EQUALITY.PDF. Similarly, the Courage Campaign, a grassroots and netroots LGBT rights organization, has adopted the Obama campaign as a model and has hired former Obama campaign operatives to convince voters to overturn Proposition 8 through the initiative process.   The Courage Campaign states that "[f]rom our Camp Courage program that has trained more than 1,000 activists in grassroots organizing, to our new intensive Deputy Field Organizer program, to our 44 equality teams, we are building the foundation for victory."
https://secure.couragecampaign.org/page/contribute/Victory.

## DEVELOPMENTS IN OTHER STATES

98.     Professor Segura suggests that gays and lesbians lack political power below the national level, in part because of their underrepresentation in state and local office.  *See* Segura Report at 7.  This rebuttal report has already documented the political power of gays and lesbians in California; the LGBT rights movement has also achieved power in other states.  This power is demonstrated by the movement's increasing success advancing its priorities in state legislatures and electing openly gay and lesbian candidates to state and local office.

99.     Many state legislatures have adopted statutes that expand the protections, benefits, and rights of gays and lesbians.  According to a report by the Human Rights Campaign, 31 states and the District of Columbia have adopted laws punishing hate crimes based on sexual orientation; 21 states and the District of Columbia have adopted laws that prohibit employment discrimination on the basis of sexual orientation; 22 states and the District of Columbia provide state employees with domestic partner benefits; 9 states (California, Hawaii, Maine,

Nevada, New Hampshire, New Jersey, Oregon, and Wisconsin) and the District of Columbia have adopted domestic partnership or civil union laws. http://www.hrc.org/laws_and_elections/state.asp.  Notably, in 2009, the Washington State Legislature adopted a domestic partnership law dubbed "Everything but Marriage."  Opponents qualified a state referendum to overturn the law, but according to early returns, citizens of Washington voted to uphold the domestic partnership law by a 53-47 percent margin. http://vote.wa.gov/Elections/WEI/.

100.    In addition, LGBT candidates have had increasing success winning election to office.  According to the Gay and Lesbian Victory Fund, a national organization that provides funding and other support for gay and lesbian candidates for federal, state, and local office, more than 440 out gays and lesbians are currently serving as elected officials—up from fewer than 50 when the organization was formed in 1991.  In 2008, the Victory Fund endorsed 111 openly LGBT candidates, 80 of whom won their elections.  In 2009, the organization endorsed 79 candidates, a record for a non-election year.  Of those, 49 won their offices outright and six races are still unfinished.  For example, Charles Pugh, an openly gay African American candidate, came in first in among 18 candidates for nine at-large seats in the Detroit City Council race and will become the City Council President; Annise Parker, an openly lesbian candidate, finished first in voting for Mayor of Houston and will now advance to a run-off; Mark Kleinschmidt, an openly gay candidate, won election as Mayor of Chapel Hill, North Carolina; and in Atlanta, 15 openly gay candidates ran for city council seats, with four winning election and two making it to run-offs.  According to Chuck Wolfe, the president and CEO of the Victory Fund, "This has been the most successful non-federal election year in the Victory Fund's history.  More candidates were endorsed and more candidates won than ever before.  But just as important was where they won.  Some of these are true breakthrough victories that have the potential to change the political landscape in some communities." http://www.victoryfund.org/home.

## DEVELOPMENTS AT THE NATIONAL LEVEL

101.    Plaintiffs' expert argues that gays and lesbians are politically powerless at the national level.  *See* Segura Report at 5.  But gays and lesbians have successfully achieved significant political power nationally.

102.    The 2008 National Democratic Party platform clearly aligns the party with the LGBT rights movement.  Specifically, the platform contains the following provisions:  "Democrats will fight to end discrimination based on race, sex, ethnicity, national origin, language, religion, sexual orientation, gender identity, age, and disability in every corner of our country, because that's the America we believe in…We will also put national security above divisive politics. More than 12,500 service men and women have been discharged on the basis of sexual

orientation since the 'Don't Ask, Don't Tell' policy was implemented, at a cost of over $360 million. Many of those forced out had special skills in high demand, such as translators, engineers, and pilots. At a time when the military is having a tough time recruiting and retaining troops, it is wrong to deny our country the service of brave, qualified people. We support the repeal of 'Don't Ask, Don't Tell' and the implementation of policies to allow qualified men and women to serve openly regardless of sexual orientation. . . We support the full inclusion of all families, including same-sex couples, in the life of our nation, and support equal responsibility, benefits, and protections. We will enact a comprehensive bipartisan employment non-discrimination act. We oppose the Defense of Marriage Act and all attempts to use this issue to divide us." http://www.democrats.org/a/party/platform.html, 51, 36, 52.

103.    The LGBT rights movement is making important gains in Congress, with expanding coalitions mobilizing to pass major LGBT rights legislation.

104.    In October 2009, Congress adopted legislation that extends the protections of federal hate crime laws to LGBT persons. Formerly, federal hate crime statutes covered crimes motivated by the victim's race, color, religion, or national origin, but not sexual orientation.  See 18 U.S.C. sec. 245(b)(2).  But this year, after a long effort, Congress approved legislation officially known as the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act. The new law expands the definition of hate crimes to include crimes motivated by the victim's actual or perceived gender, sexual orientation, gender identity, or disability. In April, 2009, the House approved a version of the bill, H.R. 1913, by a decisive 249-175 margin. In July, the Senate made the proposal an amendment to the National Defense Authorization Act, and secured final passage of the bill by a 68-29 vote on October 22, 2009. President Obama signed the Act on October 28, 2009.  At a ceremony in the East Room, President Obama said:  "To all the activists, all the organizers, all the people that made this day happen, thank you for your years of advocacy and activism, pushing and protesting that made this day possible.  …  You know, as a nation, we have come far on the journey towards a more perfect union.  And today we have taken another step forward.  This afternoon, I signed into law the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act.  Time and again, the measure was defeated or delayed.  Time and again we've been reminded of the difficulty of building a nation in which we're all free to live and love as we see fit.  But the cause endured and the struggle continued, waged by the family of Matthew Shepard, by the family of James Byrd, by folks who held vigils and led marches, by those who rallied and organized and refused to give up, by the late Senator Ted Kennedy who fought so hard for this legislation and all who toiled for years to reach this day. …[T]hrough this law, we will strengthen the protections against crimes based on the color of your skin, the faith in your heart, or the place of your birth.  We will finally add federal protections against crimes based on gender, disability, gender identity, or sexual orientation. And prosecutors will have new tools to work with states in order to prosecute to the fullest those who would perpetrate such crimes.  Because no one in America

should ever be afraid to walk down the street holding the hands of the person they love." http://www.whitehouse.gov/the-press-office/remarks-president-reception-commemorating-enactment-matthew-shepard-and-james-byrd-.

105.    Support is growing in Congress to repeal the U.S. military's "Don't Ask, Don't Tell" policy through legislation known as the Military Readiness Enhancement Act of 2009, or H.R. 1283, authored by then-Rep. (now Under Secretary of State) Ellen Tauscher (D-CA).   This bill would establish "a policy of nondiscrimination on the basis of sexual orientation in the armed forces."  As of November 1, 2009, H.R. 1283 had 183 co-sponsors—34 more co-sponsors than a similar bill introduced in the prior Congress—and was pending in the House Armed Forces Committee's Subcommittee on Military Personnel.  According to news reports, Congressional leaders plan to move the bill in early 2010. http://thehill.com/homenews/house/63511-congressional-leaders-signaling-move-to-repeal-dont-ask-dont-tell-policy?tmpl=component&print=1&layout=default&page=.

106.    Congress is also considering the Employment Non-Discrimination Act (ENDA), legislation that would prevent discrimination against employees on the basis of actual or perceived sexual orientation or gender identity.   In June 2009, Rep. Barney Frank (D-MA) introduced a new version of the bill, H.R. 3017.  As of November 5, 2009, the bill had 189 co-sponsors. Sen. Jeff Merkley (D-OR) has introduced a similar bill, S. 1584, in the Senate.  As of November 5, 2009, that bill had 41 co-sponsors.

107.    Many Members of Congress are also seeking to repeal the federal Defense of Marriage Act (DOMA), which was enacted in 1996 to define marriage for purposes of federal law to be a union between a man and a woman and to allow states not to recognize same-sex marriages solemnized in other states.  Jerrold Nadler (D-NY) has introduced the Respect for Marriage Act of 2009 (H.R. 3567). The proposal would repeal DOMA and instead extend federal recognition to same-sex marriages entered into in states or places where that marriage is legally valid. As of November 5, 2009, the bill had 103 co-sponsors and was pending in the House Judiciary Committee's Subcommittee on the Constitution, Civil Rights, and Civil Liberties.   Former Representative Bob Barr, who was the original sponsor of DOMA, and former President Bill Clinton, who signed DOMA into law, now support repeal of DOMA and passage of the Respect for Marriage Act.

108.    Support is also growing in Congress to provide benefits to domestic partners of federal employees.  Rep. Tammy Baldwin (D-WI) introduced the House version of this proposal, H.R 2517, on March 20, 2009.  H.R. 2517, also known as "The Domestic Partnership Benefits and Obligations Act of 2009," defines "domestic partner" as "an adult unmarried person living with another adult unmarried person of the same sex in a committed, intimate relationship." The bill defines "benefits" to include: health insurance; enhanced dental and vision benefits; family, medical, and emergency leave; federal group life

insurance; long term care insurance; compensation for work injuries; death and disability benefits; travel, transportation, and related payments."   Sen. Joseph Lieberman (I-CT) has introduced the Senate version of the bill, S. 1102. As of November 5, 2009, H.R. 2517 had 126 co-sponsors, and S. 1102 had 24 co-sponsors.

109.    The President of the United States has repeatedly declared his support for expanding LGBT rights.  On June 4, 2009, President Obama issued a presidential proclamation declaring June to be Lesbian, Gay, Bisexual and Transgender Pride Month.  In the proclamation, the President stated:  "My Administration has partnered with the LGBT community to advance a wide range of initiatives.  At the international level, I have joined efforts at the United Nations to decriminalize homosexuality around the world.  Here at home, I continue to support measures to bring the full spectrum of equal rights to LGBT Americans.  These measures include enhancing hate crimes laws, supporting civil unions and Federal rights for LGBT couples, outlawing discrimination in the workplace, ensuring adoption rights, and ending the 'Don't Ask Don't Tell' policy in a way that strengthens our Armed Forces and our national security." (Proclamation 8387, Lesbian, Gay, Bisexual and Transgender Pride Month, 2009, 74 Fed. Reg. 26,929, June 4, 2009).

110.    On October 11, 2009, President Obama addressed a large gathering of the Human Rights Campaign, the nation's largest gay rights organization, in Washington, D.C.  In his address, the President underscored his commitment to the gay rights movement.  The President stated:

- "I can announce that after more than a decade, the [Matthew Shepard] hate crimes bill is set to pass and I will sign it into law."

- "We're pushing hard to pass an inclusive employee non-discrimination bill. For the first time ever, an administration official testified in Congress in favor of this law. Nobody in America should be fired because they're gay, despite doing a great job and meeting their responsibilities. It's not fair. It's not right. We're going to put a stop to it."

- "We are reinvigorating our response to HIV/AIDS here at home and around the world. We're working closely with the Congress to renew the Ryan White program and I look forward to signing it into law in the very near future. We are rescinding the discriminatory ban on entry to the United States based on HIV status. The regulatory process to enact this important change is already underway."

- "We are moving ahead on Don't Ask Don't Tell…. I'm working with the Pentagon, its leadership, and the members of the House and Senate on ending this policy. Legislation has been introduced in the House to make this happen. I will end Don't Ask, Don't Tell. That's my commitment to you."

- "Can we embrace our differences and look to the hopes and dreams that we share? Will we uphold the ideals on which this nation was founded: that all of us are equal, that all of us deserve the same opportunity to live our lives freely and pursue our chance at happiness? I believe we can; I believe we will. And that is why—that's why I support ensuring that committed gay couples have the same rights and responsibilities afforded to any married couple in this country. I believe strongly in stopping laws designed to take rights away and passing laws that extend equal rights to gay couples. I've required all agencies in the federal government to extend as many federal benefits as possible to LGBT families as the current law allows. And I've called on Congress to repeal the so-called Defense of Marriage Act and to pass the Domestic Partners Benefits and Obligations Act." http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-at-Human-Rights-Campaign-Dinner.

## TRENDS IN PUBLIC OPINION

111.   Plaintiffs' expert claims that "[g]ay men and lesbians face severe hostility from non-gay citizens in many parts of the country, and opinion data suggest that they are held in considerably lower regard than many groups currently receiving the protection of heightened scrutiny." *See* Segura Report at 10. However, a close reading of the evidence reveals a very different picture. While mobilizing to win support from elected officials and other political elites, gays and lesbians and the LGBT rights movement have also gained increasing acceptance and support from the general public. *See* Gerald N. Rosenberg, *The Hollow Hope:  Can Courts Bring About Social Change?*  Second Edition (2008).  Polling data indicate major shifts in public opinion, both in California and in the nation as a whole.

112.   In California, a March 2006 survey by the Field Research Corporation reported that a large percentage (41 percent) of Californians said they were now more accepting of "homosexual relations between adults" than they were when they were 18 years old, while just 8 percent were less accepting.  The survey also found that clear majorities of Californians supported anti-discrimination policies toward gays and lesbians.  Sixty-seven percent supported allowing openly gay and lesbian persons serve in the U.S. military; 59 percent supported laws prohibiting employers from discriminating against gays and lesbians; and 55 percent favored allowing gay and lesbian couples to adopt children.  A narrow majority (51 percent) continued to oppose allowing same-sex couples to marry, but nearly two-thirds (64 percent) supported some form of legal recognition of same-sex relationships, with opinion divided on whether that recognition should be in the form of civil unions or marriage.

113.    The 2006 Field survey of Californians also asked respondents to assess their personal feelings toward gays and lesbians on a "feeling thermometer"—that is, on a 0-100 scale similar to that used by the American National Election Studies (ANES).  More Californians (43 percent) described themselves as having "warm" feelings toward gays and lesbians than those who reported having "cool" feelings (25 percent).  Another 22 percent reported that they were ambivalent (a 50 on the scale.)
http://pewforum.org/newassets/images/reports/samesexmarriage09/samesexmarriage09.pdf.

114.    Similarly, national surveys indicate that the American public is increasingly accepting of gays and lesbians and supportive of rights for gay and lesbian individuals and same-sex couples. The ANES surveys cited by plaintiffs' expert demonstrate a strong positive trend in public attitudes toward gays and lesbians.  The ANES first asked respondents to rate gays and lesbians on a "feeling thermometer" in 1984.  In that year, the mean rating was 30 on a scale of 0-100.  By 2008, the mean rating was 49.4—an increase of nearly 20 degrees.

115.    Political scientists Patrick J. Egan and Kenneth Sherrill have reviewed ANES and other survey data have concluded that, while many Americans continue to have negative attitudes toward homosexuality and toward gays and lesbians, "Americans of all ages are becoming more—not less—tolerant as they grow older.  And older, colder, Americans are being replaced by citizens who express more warmth for gay people."  Importantly, they note that "[t]he public's changing views of gay people and homosexuality have been reflected in increased support for gay-related policies over time."
http://www.publicopinionpros.norc.org/features/2005/feb/sherrill_egan.asp.

116.    A 2000 report by the Policy Institute of the National Gay and Lesbian Task Force Foundation analyzed the 2000 National Election Study data and found that "[p]ublic attitudes toward three key gay and lesbian rights issues have undergone a striking liberalization over the past decade. … Public support for adoption rights, the right of gay men and lesbians to serve in the military, and sexual orientation non-discrimination laws has increased substantially."
http://www.thetaskforce.org/downloads/reports/reports/2000NationalElectionsStudy.pdf.

117.    More recently, an October 2009 survey by the Pew Research Center found that 57 percent of Americans favors allowing gay and lesbian couples to enter into civil union arrangements that would give them many of the same rights as married couples.  The report concluded that this finding "appears to continue a significant long-term trend since the question was first asked in Pew Research Center surveys in 2003, when support for civil unions stood at 45 percent."  By contrast, a majority of Americans (53 percent) opposed allowing same-sex couples to marry, with 39 percent favoring same-sex marriage.

http://pewforum.org/newassets/images/reports/samesexmarriage09/samesexmarriage09.pdf.

118.    These surveys indicate that the LGBT rights movement has forged a growing democratic consensus in favor of a broad range of rights for LGBT persons and same-sex couples. However, the movement has not yet persuaded California or much of the rest of the country to accept a change to the definition of marriage.

## CONCLUSION

119.    In recent years, the movement for gay rights has achieved major gains at both the state and federal levels, through *democratic* means—democratic persuasion, coalition-building, and mobilization, leading to a series of legislative victories. The citizens of California have broadly supported those gains, including the establishment of legal recognition of the rights of same-sex couples through domestic partner legislation. While the public increasingly embraces the expansion of rights of gays and lesbians and legal recognition of same-sex relationships, a narrow majority of voters of California, like voters in many other states, continue to believe that "marriage" should retain its traditional definition as a union between one man and one woman.  Importantly, however, popular deliberation on this fundamental social issue remains unfinished in California and in the nation as a whole.  The mobilization of a strong coalition in support of same-sex marriage, and the trends in public opinion on the issue, have convinced many advocates of same-sex marriage that they can win the struggle in this state in the foreseeable future by democratic means.

120.    This record disproves the assertion that the LGBT community's interests and policy preferences are "prevented from receiving due consideration by other actors in the political process" or that the group now experiences "effective exclusion from the political process."  Admittedly, the LGBT rights movement, like most movements, has not achieved all of its goals, but a fair reading of the evidence makes it almost impossible to conclude that gays and lesbians are politically powerless.  To the contrary, their impressive model of political mobilization, combined with an expanding record of legislative accomplishments, demonstrate that gays and lesbians and the larger LGBT rights movement have achieved the power they need to effectively pursue their goals through democratic institutions.

Dated: November 9, 2009

_____

Kenneth P. Miller

# KENNETH P. MILLER

ASSOCIATE PROFESSOR
DEPARTMENT OF GOVERNMENT                    PHONE:  909-607-2811
CLAREMONT MCKENNA COLLEGE                   FAX:      909-621-8419
CLAREMONT, CA  91711                        E-MAIL:  kmiller@cmc.edu

## ACADEMIC POSITIONS

Claremont McKenna College
        Associate Professor, Department of Government, 2009-
        Assistant Professor, Department of Government, 2003-2009
        Associate Director, Rose Institute of State and Local Government, 2009-
University of San Francisco
        Visiting Assistant Professor, Department of Politics, 2002-2003
University of California, Berkeley
        Lecturer, Department of Political Science, 2000-2001

## EDUCATION

University of California, Berkeley — Ph.D. in Political Science 2002
        Fields:  American politics, public law, political theory
Harvard Law School — J.D. 1988
Pomona College — B.A. 1985
        Major:  Government

## PUBLICATIONS

### BOOKS

Miller, Kenneth P.  (2009).  *Direct Democracy and the Courts.*  Cambridge University Press.

Douzet, Frédérick, Thad Kousser, and Kenneth P. Miller, eds.  (2008). *The New Political Geography of California.*  Berkeley, CA:  Berkeley Public Policy Press.

### BOOK CHAPTERS

Douzet, Frédérick and Kenneth P. Miller.  (2008). "California's East-West Divide" in *The New Political Geography of California,* 9-43.

Miller, Kenneth P. and Justin Levitt.  (2008). "San Joaquin Valley: Dimensions and Limits of Republican Realignment" in *The New Political Geography of California,* 177-195.

Miller, Kenneth P.  (2003). "Courts and the Initiative Process" in M. Dane Waters, ed. *The Initiative and Referendum Almanac: A Comprehensive Reference Guide to the Initiative and Referendum Process*, Raleigh Durham, N.C.:  Carolina Academic Press, 459-467.

Cain, Bruce E. and Kenneth P. Miller. (2001). "The Populist Legacy:  Initiatives and the Undermining of Representative Government" in Larry J. Sabato, Howard R. Ernst, and Bruce A. Larson, eds. *Dangerous Democracy?  The Battle Over Ballot Initiatives in America*.  Lanham, MD:  Roman & Littlefield, 33-62.

Cain, Bruce E. and Kenneth P. Miller.  (1998). "Voting Rights Mismatch: The Challenge of Applying the Voting Rights Act to 'Other Minorities'" in Mark E. Rush, ed., *Voting Rights and Redistricting in the United States*.  Westport, CT:  Greenwood Press, 141-176.

**ARTICLES**

Miller, Kenneth P.  "The Democratic Coalition's Religious Divide:  Why California Voters Supported Obama but not Same-sex Marriage," *Revue française d'études américaines* (*French Review of American Studies*) 2009/1 No. 119 (2009).

Miller, Kenneth P. and Nicolas Heidorn. (2008). "Du 'People's Rule' en Californie" *Politique Américaine*, No. 9, 65-80.

Miller, Kenneth P. (2005). "The Davis Recall and the Courts" *American Politics Research,* Vol. 33, No. 2, 135-162.

Miller, Kenneth P. (2001). "Constraining Populism: The Real Agenda of Initiative Reform," *Santa Clara Law Review,* Vol. 41, No. 4, 1037-1084.

Miller, Kenneth P. (2001).  "Courts as Watchdogs of the Washington State Initiative Process," *Seattle University Law Review*, Vol. 24, No. 4, 1053-1085.

**OTHER PUBLICATIONS**

Miller, Kenneth P.  (2005).  Review of *The Next Los Angeles: The Struggle for a Livable City,* by Robert Gottlieb, Mark Vallianatos, Regina M. Freer, and Peter Dreier, in *Southern California Quarterly,* Vol. 87, No. 3, 328-331.

Miller, Kenneth P. (2005).  "*U.S. Term Limits v. Thornton,*" in David Schultz, ed.  *The Encyclopedia of the Supreme Court*, New York:  Facts on File, Inc., 478-479.

**CURRENT RESEARCH**

Development of Miller-Rose Institute Initiative Database, a searchable database that summarizes voter-approved initiatives from all 24 initiative states and post-election legal challenges to voter-approved initiatives.  See www.initiatives.theroseinstitute.org/.

*The Seven* (book analyzing the institutional dynamics of the California Supreme Court).

**CONFERENCE PRESENTATIONS AND INVITED TALKS**

"Is California Ungovernable?" Constitution Week Panel, California State University Fullerton, September 17, 2009.

"Same-sex Marriage, Courts, Direct Democracy," Roundtable, American Political Science Association, Toronto, Ontario, Canada, September 2, 2009.

"Governing a Multi-Ethnic California: A Comparative Perspective," Colloquium, U.C. Berkeley, March 11-13, 2009.

"Federalism and Separation of Powers:  Safeguards of Liberty," Liberty Fund Colloquium, New Orleans, LA, February  26-March 1, 2009.

Election Night Commentary, Marian Miner Cook Athenaeum, Claremont McKenna College, Claremont, CA, November 4, 2008.

 "The California Economy:  What Can Be Done?" Claremont Institute Conference: California Public Policy 2008, Newport Beach, CA, May 31, 2008.

"The New Political Geography of California" panel discussion, U.C. Berkeley, April 28, 2008.

Moderator:  "Teaching the Constitution, the Constitution as Teacher:  A Panel Discussion in Honor of Leonard Levy," Claremont Discourse Lecture Series, Claremont CA, September 20, 2007.

"Direct Democracy and the Definition of Rights," Western Political Science Association, Las Vegas, NV, March 8, 2007.

"Dimensions of Republican Realignment in California's Central Valley," (with Justin Levitt), Western Political Science Association, Las Vegas, NV, March 8, 2007.

"Election Review," The California Club, Los Angeles, CA, November 7, 2006.

"Measuring California's East-West Divide" (with Frédérick Douzet and Ariane Zambiras), Borchard Foundation Conference:  California: A Franco-American Perspective, Missilac, France, July 2006.

Discussant, "Law, Diplomacy, and War," Keck Center for International and Strategic Studies, Claremont, CA, March 24, 2006.

"The California Special Election" debate with Dr. Lisa García-Bedolla, Pomona Student Union, Pomona College, Claremont, CA, November 1, 2005.

"Anatomy of a Backlash:  The Response to *Goodridge v. Department of Public Health*," American Political Science Association, Washington, D.C., September 4, 2005.

 "The Scholarship of William K. 'Sandy' Muir:  What Political Science Needs to be Now?" Western Political Science Association, Oakland, CA, March 18, 2005.

"Election Review," The California Club, Los Angeles, CA, November 3, 2004.

Election Night Commentary, Marian Miner Cook Athenaeum, Claremont McKenna College, Claremont, CA, November 2, 2004.

"The Future of Direct Democracy in California," The Claremont Institute, Claremont, CA, March 3, 2004.

"The Davis Recall and the Courts," Western Political Science Association, Portland, OR, March 12, 2004.

"Public Policy Formation by Citizen Initiative:  Failed Initiatives—Missed Opportunities?"  Symposium, Rose Institute of State and Local Government, Claremont McKenna College, Claremont, CA, October 23, 2003.

"Prospects for Initiative Reform," The California Club, Los Angeles, CA, October 20, 2003.

"Recall Politics," Symposium, Pomona College, Claremont, CA, September 30, 2003. "California Politics:  Losing Ground or Making Strides?"  Panel, Marian Miner Cook Athenaeum, Claremont McKenna College, Claremont, CA, September 29, 2003.

"Three Strikes and the Eighth Amendment," American Political Science Association, Philadelphia, PA August 2003.

"Teaching Law to Undergraduates," Roundtable, Western Political Science Association, Denver, CO, March 28, 2003.

"New Judicial Resistance to Direct Democracy," American Political Science Association, Boston, MA, August 31, 2002.

"The California Initiative:  Fourth Branch of Government?"  Symposium, Santa Clara University Law School, Santa Clara, CA, March 23, 2001.

"The Populist Legacy:  Initiatives and the Undermining of Representative Government," (co-presented with Bruce Cain) University of Virginia Center for Governmental Studies National Direct Democracy Conference, Charlottesville, VA, June 8-10, 2000.

"Judging Initiatives:  A Unique Role for Courts," Western Political Science Association, San Jose, CA, March 26, 2000.

"The Role of Courts in the Initiative Process:  A Search for Standards," American Political Science Association, Atlanta, GA, September 1999.

"The Fragile Logic of Voting Rights" (with Bruce Cain), American Political Science Association, Chicago, IL, August 1996.

**RESEARCH GRANTS**

CMC Summer Research Awards—2004-2009
University of California Humanities Research Institute Grant (Governing a multi-ethnic California, with Thad Kousser, Frédérick Douzet)—2008
U.C. Berkeley Institute of Governmental Studies Visiting Scholar—2007-2008
Albert and Elaine Borchard Foundation Grant (California political geography, with Thad Kousser, Frédérick Douzet)—2006

**TEACHING EXPERIENCE**

California Politics, Claremont McKenna College
Constitutional Law (Rights and Liberties), Claremont McKenna College
Constitutional Law (National Powers), Claremont McKenna College
Supreme Court / Criminal Procedure, Claremont McKenna College
Interdisciplinary Introduction to Law, Claremont McKenna College
Government/International Relations Honors Thesis Seminar, Claremont McKenna College
Introduction to American Politics, Claremont McKenna College
Public Policy (Poverty), University of San Francisco
Legislative Process, University of San Francisco
Introduction to Political Theory, University of San Francisco
Constitutional Law, U.C. Berkeley

**COLLEGE COMMITTEES AND OTHER SERVICE**

Associate Director, Rose Institute of State and Local Government 2009-
Fellow, Rose Institute of State and Local Government 2005-2009
Coordinator, CMC Government / International Relations Senior Honors Program, 2003-
Faculty Advisor, CMC Washington Program, 2004-
CMC Faculty Liaison, Luce Scholars Program, 2005-
CMC Faculty Advisor, California Capital Fellows Programs, 2006-
Member, CMC Truman Scholars Nomination Committee, 2004-

Advisor, CMC Political Education Fellowship, 2003-
Member, CMC Ad Hoc Committee on Pre-law Advising, 2003-2004
Member, Off-campus Study Committee, 2008-2009
Member, CMC Student Recruitment Committee, 2007-
Member, CMC Judicial Board, 2004-2008
Administrator, John Gardner Public Service Program (U.C. Berkeley-Stanford) 1997-1999

**SERVICE TO THE PROFESSION**

Member, Editorial Board, *California Journal of Politics and Policy*
Manuscript reviewer:
University of California Press
*American Politics Research*
*State Politics and Policy Quarterly*
*State and Local Politics Review*
*Journal of the European Economic Association*

**MEDIA COMMENTARY**

Political analysis and commentary in various media outlets, including television (KPIX, KRON), radio (BBC, CBC, Wisconsin Public Radio, Minnesota Public Radio, KQED, KPCC, KCRW, KNX) and print (*Financial Times, Campaigns and Elections, Los Angeles Times, San Francisco Chronicle, Orange County Register, Sacramento Bee*)

**MEMBERSHIPS**

American Political Science Association Section memberships:  Law and Courts, State
        Politics and Policy, Politics and History
California Bar Association (Bar No. 139806; Administration of Justice Committee, 1991-
        1994)
Phi Beta Kappa

**OTHER PROFESSIONAL EXPERIENCE**

Attorney, Morrison & Foerster, LLP
1989-1994:  Associate in the firm, resident in Los Angeles and Sacramento offices
        Specialized in civil litigation, administrative law, and legislative advocacy
        Co-founded Sacramento office, 1991
1994-2002: Contract attorney
         Specialized in election law

Legislative Assistant, California State Senator Rebecca Q. Morgan—1988-1989
        California Senate Fellow

Congressional Intern, Rep. David Dreier, Washington, D.C.—Fall 1983/Summer 1984
        Lyndon Baines Johnson and Margaret Martin Brock Internships