GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Jeremy M. Goldman, SBN 218888
*jgoldman@bsfllp.com*
1999 Harrison Street, Suite 900, Oakland, California 94612
Telephone: (510) 874-1000, Facsimile: (510) 874-1460

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

Dennis J. Herrera, SBN 139669
Therese M. Stewart, SBN 104930
Danny Chou, SBN 180240

One Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4708, Facsimile (415) 554-4699

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, *et al.*,<br><br>                    Plaintiffs,<br><br>and<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>                    Plaintiff-Intervenor,<br><br>          v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>                    Defendants,<br><br>and<br><br>PROPOSITION 8 OFFICIAL PROPONENTS<br>DENNIS HOLLINGSWORTH, *et al.*,<br><br>                    Defendant-Intervenors. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S PROPOSED FINDINGS OF FACT**<br><br>**Final Pretrial Conference**<br><br>Date:          December 16, 2009<br>Time:          10:00 a.m.<br>Judge:         Chief Judge Walker<br>Location:      Courtroom 6, 17th Floor<br><br>Trial Date:    January 11, 2010 |

# **Table of Contents**

I.   The Parties .................................................................................................... 1

   A.   Plaintiffs ............................................................................................... 1

   B.   City and County of San Francisco ....................................................... 1

   C.   Defendants and Their Role in Enforcing Prop. 8 and Denying Marriage Licenses ................................................................................................ 2

   D.   Proponents and Their Role in the Prop. 8 Campaign ........................... 3

II.   The Exclusion of Gay and Lesbian People from Marriage in California .......... 4

   A.   California Marriage Law Before *In re Marriage Cases* ........................ 4

   B.   Rights Afforded to Gay and Lesbian Individuals in California ............. 5

      1.   Domestic Partnership Confers Many of the Same Substantive Benefits as Marriage ................................................................. 5

      2.   Gay and Lesbian People Can Have, Adopt, and Parent Children .............. 6

      3.   Gay and Lesbian Californians Are Entitled to Equal Treatment in the Workplace, Housing, and Public Accommodations ........................... 7

   C.   *In re Marriage Cases* .......................................................................... 7

   D.   The Prop. 8 Campaign ......................................................................... 9

      1.   Direct Response to *In re Marriage Cases* ................................... 9

      2.   Arguments Advanced to Voters and Evidence of Animus ......................... 9

      3.   Passage of Prop. 8 ..................................................................... 12

   E.   *Strauss v. Horton* ............................................................................. 13

   F.   *Perry v. Schwarzenegger* ................................................................. 14

III.   The Meaning of Marriage ............................................................................ 14

   A.   The Changing Institution of Marriage ............................................... 14

   B.   Supreme Court Holdings Regarding the Fundamental Right to Marry ............... 18

   C.   Marriage Has Never Been Limited to Procreative Unions in California ............. 18

   D.   There Are No Marriage Exclusions Based on Past Conduct ................ 19

i

Gibson, Dunn & Crutcher LLP

IV.    Sexual Orientation and Same-Sex Relationships ......................................... 19

    A.    Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder..................... 19

    B.    Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm ............................................ 20

    C.    Excluding Same-Sex Couples from Marriage Does Not Affect Opposite-Sex Relationships ............................................................................................. 21

V.    Parenting by Same-Sex Couples ................................................................. 23

    A.    Children of Same-Sex Couples Are Just as Well-Adjusted as Children of Opposite-Sex Couples, and the Sexual Orientation of Parents Is Not a Determining Factor in Children's Adjustment or Well-Being............................... 23

VI.    Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws ............................................................................................................. 24

    A.    Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples ..................................................... 24

    B.    Same-Sex Couples Contribute to Society in All the Ways That Heterosexual Couples Do .................................................................................... 25

VII.    Lingering Sex and Gender Discrimination in Marriage.................................. 26

    A.    Perpetuation of Antiquated Gender Roles........................................................... 26

    B.    Whether Two People Can Marry Turns Entirely on Their Sex ............................ 27

VIII.    History of and Ongoing Discrimination Against Gay and Lesbian Individuals .............. 27

IX.    The Relative Political Powerlessness of Gay and Lesbian Individuals ............................ 31

X.    Harms From Denial of Marriage Rights ......................................................... 34

    A.    Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples .......................................................................................... 34

    B.    Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples ......................................................................................... 38

    C.    Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples .......................................................................................... 39

XI.    Prop. 8 Is Not Supported by Any Governmental Interests ............................... 42

Gibson, Dunn & Crutcher LLP

I.      **The Parties**

      A.      **Plaintiffs**

PFF 1.      Plaintiffs Kristin M. Perry ("Perry") and Sandra B. Stier ("Stier") reside in Alameda County and are raising children together.  They are lesbian individuals in a committed relationship who wish to be married.

PFF 2.      On May 21, 2009, Perry and Stier applied for a marriage license from Defendant O'Connell, the Alameda County Clerk-Registrar, but were denied because they are a same-sex couple.

PFF 3.      As a result of Proposition 8 ("Prop. 8"), Perry and Stier are barred from marrying the individual they wish to marry.

PFF 4.      Plaintiff Paul T. Katami ("Katami") and Plaintiff Jeffrey J. Zarrillo ("Zarrillo") reside in Los Angeles County together.  They are gay individuals in a committed relationship who wish to be married.

PFF 5.      On May 20, 2009, Katami and Zarrillo applied for a marriage license from Defendant Logan, the Los Angeles County Clerk, but were denied because they are a same-sex couple.

PFF 6.      As a result of Prop. 8, Katami and Zarrillo are barred from marrying the individual they wish to marry.

      B.      **City and County of San Francisco**

PFF 7.      Plaintiff-Intervenor the City and County of San Francisco ("CCSF") is a charter city and county organized and existing under the Constitution and laws of the State of California.

PFF 8.      Plaintiff-Intervenor is responsible for issuing marriage licenses, performing civil marriage ceremonies, and maintaining vital records of marriages.

PFF 9.     In February 2004, San Francisco Mayor Gavin Newsom instructed county officials to issue marriage licenses to same-sex couples.  The California Supreme Court ordered the city to stop doing so the following month, and it later nullified the marriages that had been performed.  *Lockyer v. City & County of San Francisco*, 33 Cal. 4th 1055 (2004).

PFF 10.    In March 2004, CCSF filed a separate state court action challenging the California marriage statutes' exclusion of same-sex couples under the State Constitution, and in May 2008 the California Supreme Court ruled in favor of CCSF and held that counties including CCSF were entitled and indeed required to issue marriage licenses to same-sex couples.  From June 17, 2008 until the passage of Prop. 8, Plaintiff-Intervenor issued thousands of marriage licenses to same-sex couples who applied for them during that period.

PFF 11.    Prop. 8 requires Plaintiff-Intervenor to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

**C.    Defendants and Their Role in Enforcing Prop. 8 and Denying Marriage Licenses**

PFF 12.    Arnold Schwarzenegger ("Schwarzenegger") is the Governor of the State of California.

PFF 13.    Edmund G. Brown, Jr. ("Brown") is the Attorney General of the State of California.

PFF 14.    Mark B. Horton ("Horton") is the Director of the California Department of Public Health and the State Registrar of Vital Statistics of the State of California.  In his official capacity, Horton is responsible for prescribing and furnishing the forms for the application for license

to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

PFF 15.    Linette Scott ("Scott") is the Deputy Director of Health Information & Strategic Planning for the California Department of Public Health. Scott reports to Defendant Horton and is the California Department of Public Health official responsible for prescribing and furnishing the forms for the application for license to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

PFF 16.    Patrick O'Connell ("O'Connell") is the Clerk-Registrar for the County of Alameda and is responsible for maintaining vital records of marriages, issuing marriage licenses, and performing civil marriage ceremonies.

PFF 17.    Dean C. Logan ("Logan") is the Registrar-Recorder/County Clerk for the County of Los Angeles and is responsible for maintaining vital records of marriages, issuing marriage licenses, and performing civil marriage ceremonies.

**D.    Proponents and Their Role in the Prop. 8 Campaign**

PFF 18.    Dennis Hollingsworth, Gail J. Knight, Martin F. Gutierrez, Hak-Shing William Tam, and Mark A. Jansson are the "Official Proponents" of Proposition 8.

PFF 19.    By approving the language and submitting the forms, Proponents became the "Official Proponents" of Prop. 8 within the meaning of California law.

PFF 20.    Proponents dedicated substantial time, effort, reputation, and personal resources in campaigning for Prop. 8.

Gibson, Dunn
& Crutcher
LLP

PFF 21.    Near the beginning of this initiative process, the Official Proponents helped to establish ProtectMarriage.com – Yes on 8, a Project of California Renewal ("ProtectMarriage") as a "primarily formed ballot measure committee" under the California Political Reform Act.

PFF 22.    ProtectMarriage exists with one purpose: to support Prop. 8.  It was directly responsible for all aspects of the campaign to qualify Prop. 8 for the ballot and enact it into law.

PFF 23.    The ProtectMarriage executive committee has included at least the following individuals: Ron Prentice, Yes on Prop 8 Campaign Chairman; Edward Dolejsi, Executive Director, California Catholic Conference; Mark A. Jansson; and Andrew Pugno, General Counsel. In addition, David Bauer is the Treasurer and officer of record for ProtectMarriage.

PFF 24.    ProtectMarriage is a "broad coalition" of individuals and organizations, including the Church of Jesus Christ of Latter-Day Saints, the California Catholic Conference, and a large number of evangelical churches.  These coalition members often made their own statements and efforts in support of Prop. 8.

II.    **The Exclusion of Gay and Lesbian People from Marriage in California**

A.    **California Marriage Law Before *In re Marriage Cases***

PFF 25.    Proposition 22 was enacted by California voters in 2000.  It added section 308.5, which stated "Only marriage between a man and a woman is valid or recognized in California," to the Family Code.

Gibson, Dunn
& Crutcher
LLP

4

B.    **Rights Afforded to Gay and Lesbian Individuals in California**

1.    **Domestic Partnership Confers Many of the Same Substantive Benefits as Marriage**

PFF 26.    Since 1999, California has permitted same-sex couples to register as Domestic Partners.

PFF 27.    The State of California has, at times, expanded the rights and responsibilities of Registered Domestic Partners.

PFF 28.    The California Legislature found that despite the "longstanding social and economic discrimination" that lesbians and gay men have faced, many lesbian and gay couples "have formed lasting, committed, and caring relationships" and, like heterosexual couples, same-sex couples "share lives together, participate in their communities together, and many raise children and care for other dependent family members together."  The Legislature also found that "expanding the rights and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises."  2003 Cal. Stats. ch. 421, § 1(b).

PFF 29.    A couple who registers as domestic partners is not married under California law, and registered domestic partners in the State of California are not recognized as married by the United States government.

PFF 30.    The qualifications and requirements for entering into or dissolving domestic partnership differ in certain respects from the qualifications and requirements for entering into or dissolving a marriage.

## 2.     Gay and Lesbian People Can Have, Adopt, and Parent Children

PFF 31.     Same-sex couples are legally permitted to have and raise children through assisted reproduction, adoption, and foster parenting in the State of California.

PFF 32.     California law expressly authorizes adoption by unmarried same-sex couples.

PFF 33.     Many same-sex couples in California are raising children.  One in ten of California's adopted children live with a lesbian or gay parent, and as of the 2000 census, approximately 18 percent of same-sex couples in California were raising approximately 37,300 children under the age of 18.  This was so despite the absence of any legal recognition of same-sex relationships by the State of California until 1999 and the lack of any rights flowing from the domestic partnerships created that year other than the right to visit one's domestic partner in the hospital.

PFF 34.     California freely permits and encourages gay and lesbian individuals to have children through laws that allow such methods of reproduction and permit lesbians and gay men to be foster parents and to adopt children.  In these respects, same-sex couples are indistinguishable from the many opposite-sex couples in California who use these same methods to bring children into their lives to love and raise as their own. The only difference between these couples is that same-sex couples cannot marry, and they and their children therefore do not enjoy all the social and other benefits that the title and stature of marriage bring; whereas, opposite-sex couples can marry, and they and their children can enjoy these benefits.

Gibson, Dunn & Crutcher LLP

3.   **Gay and Lesbian Californians Are Entitled to Equal Treatment in the Workplace, Housing, and Public Accommodations**

PFF 35.   The California Supreme Court has found that California's "current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

PFF 36.   The Unruh Civil Rights Act prohibits discrimination on the basis of sexual orientation in the provision of services by any business establishment.

PFF 37.   The California Government Code prohibits sexual orientation discrimination in employment and housing.  The California Government Code also prohibits discrimination on the basis of sexual orientation in any program or activity that is conducted, operated, or administered by the State or receives financial assistance from the State.

C.   *In re Marriage Cases*

PFF 38.   On May 15, 2008, the California Supreme Court decided *In re Marriage Cases*, which held that Family Code sections 300 and 308.5 were unconstitutional under the privacy, due process, and equal protection guarantees of the California Constitution.

PFF 39.   The California Supreme Court found that "[t]he ability of an individual to join in a committed, long-term, officially recognized family relationship with the person of his or her choice is often of crucial significance to the individual's happiness and well-being." *In re Marriage Cases*, 183 P.3d 384, 424 (Cal. 2008).

7

Gibson, Dunn & Crutcher LLP

PFF 40.     The California Supreme Court also found that "[t]he state's current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation, and, more specifically, recognize that gay individuals are fully capable of entering into the kind of loving and enduring committed relationships that may serve as the foundation of a family and of responsibly caring for and raising children." *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

PFF 41.     The California Supreme Court further found that "[i]n light of the fundamental nature of the substantive rights embodied in the right to marry – and their central importance to an individual's opportunity to live a happy, meaningful, and satisfying life as a full member of society – the California Constitution properly must be interpreted to guarantee this basic civil right to *all* individuals and couples, without regard to their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 427 (Cal. 2008) (emphasis in original).

PFF 42.     The California Supreme Court similarly found that "[b]ecause a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment." *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

PFF 43.     The California Supreme Court also found that "because of the long and celebrated history of the term 'marriage' and the widespread understanding that this term describes a union unreservedly approved and favored by the community, there clearly is a considerable and

8

undeniable symbolic importance to this designation." *In re Marriage Cases*, 183 P.3d 384, 445 (Cal. 2008).

PFF 44.  In addition, the California Supreme Court found that creating a separate domestic partnership regime for same-sex couples "perpetuat[ed] a more general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *In re Marriage Cases*, 183 P.3d 384, 402 (Cal. 2008).

PFF 45.  As a result of the *In re Marriage Cases* ruling, California's statutory exclusion of gay and lesbian individuals from civil marriage was invalidated, same-sex couples were permitted to marry in the State, and marriages of same-sex couples began on or about June 16, 2008. Approximately 18,000 marriages of same-sex couples were performed prior to November 5, 2008.

## D.   The Prop. 8 Campaign

### 1.   Direct Response to *In re Marriage Cases*

PFF 46.  On June 2, 2008, the Secretary of State declared that Prop. 8 could be placed on the ballot.

PFF 47.  The Prop. 8 measure was titled: "Eliminates Rights of Same-Sex Couples to Marry.  Initiative Constitutional Amendment."

### 2.   Arguments Advanced to Voters and Evidence of Animus

PFF 48.  The General Election Voter Information Guide stated that Prop. 8 would "[c]hange[] the California Constitution to eliminate the right of same-sex couples to marry in California."

Gibson, Dunn & Crutcher LLP

PFF 49.    The adoption of Prop. 8 was motivated by an intent to discriminate against gay and lesbian individuals.

PFF 50.    The express and stated purpose of Prop. 8 was to strip gay and lesbian individuals of constitutional rights afforded to them by the California Constitution and to impose a special disability on gay and lesbian individuals alone by denying them state constitutional protections that apply to all other citizens.

PFF 51.    Opponents of marriage for same-sex couples have employed some of the most enduring anti-gay stereotypes to heighten public apprehension, and several television commercials aired by the supporters of Prop. 8 played on fears that permitting same-sex couples to marry might encourage children to become homosexual themselves.

PFF 52.    The adoption of Prop. 8 was motivated by animus towards gay and lesbian individuals, which has been expressed by messages combining a fear of giving same-sex couples equal marriage rights and a belief in the superiority of heterosexuals.

PFF 53.    The "Yes on 8" campaign messages focused heavily on the supposed consequences to children if Prop. 8 did not pass.  For example, in the official argument in favor of Prop. 8 presented to the voters in the Voter Information Guide, Proponents contended that Prop. 8 "*protects our children* from being taught in public schools that 'same-sex marriage' is the same as traditional marriage."  (Emphasis in original.) The drafters of the official argument also claimed that "[i]f the gay marriage ruling is not overturned, TEACHERS COULD BE REQUIRED to teach young children there is *no difference* between gay marriage and traditional marriage[,]" and argued that "[w]e should not accept a court decision that may result in public schools teaching our

10

Gibson, Dunn & Crutcher LLP

kids that gay marriage is okay."  (Emphasis in original.)  In the Rebuttal argument, Proponents claimed that "[y]our YES vote ensures that parents can teach their children about marriage according to their own values and beliefs without conflicting messages being forced on young children in public schools that gay marriage is okay."

PFF 54.  Television advertisements generated by ProtectMarriage played on the public's fear that children would be taught that homosexuality is morally acceptable.  In the advertisement titled "It's Already Happened," a girl comes home from school and tells her mother, "guess what I learned in school today? . . . I learned how a prince married a prince and *I* can marry a princess."  In an advertisement titled "Finally the Truth," a narrator described how "a public school took first graders to a lesbian wedding, calling it 'a teachable moment.'"  That advertisement concludes, "unless we vote yes on Proposition 8, children *will* be taught about gay marriage."

PFF 55.  In addition, campaign messages discussing the protection of children were predicated on a belief that same-sex relationships are morally and socially inferior, and that opposite-sex relationships are superior and life-giving.  In the official argument in favor of Prop. 8, the drafters argued that "the best situation for a child is to be raised by a married mother and father."

PFF 56.  The "Yes on 8" campaign messages also sought to invoke a sense of general crisis by linking marriage rights for same-sex couples to social peril caused by the supposed eradication of gender roles and the family structure, as well as moral downfall through suggesting that the failure to pass Prop. 8 would inevitably lead to the legalization of incest, bestiality, and polyamory.

11

Gibson, Dunn
& Crutcher
LLP

PFF 57.    In an article written for Politics Magazine, Frank Schubert and Jeff Flint, the campaign managers for "Yes on 8," stated that the success of the campaign "would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship."  The campaign sought to convince voters that while "[t]olerance is one thing; forced acceptance of something you personally oppose is a very different matter."  Schubert and Flint decided to play on the fears and distastes of voters, framing the issue of marriage between same-sex individuals as one involving a conflict between the rights of a gay couple and "other rights[.]"  Schubert and Flint "settled on three broad areas where this conflict of rights was most likely to occur: in the area of religious freedom, in the area of individual freedom of expression, and in how this new 'fundamental right' would be inculcated in young children through the public schools."

PFF 58.    That same article stated that in the *In re Marriage Cases* decision, the California Supreme Court "put gay couples in a protected legal class on the basis of sexual orientation, and then found that gay couples had a fundamental constitutional right to marriage."

PFF 59.    Ninety-eight (98) percent of gay and lesbian individuals in California voted against Prop. 8.

### 3.    Passage of Prop. 8

PFF 60.    On November 4, 2008, California voters passed Prop. 8 by a margin of approximately 52.2% to 47.7%.

Gibson, Dunn & Crutcher LLP

PFF 61.    Prop. 8 added the following text to the Constitution of California: "Only marriage between a man and a woman is valid or recognized in California."

PFF 62.    In their Politics Magazine article, Frank Schubert and Jeff Flint attributed the success of their campaign to their message that marriage between individuals of the same sex would threaten "religious freedom" and "individual freedom of expression," and would result in the forced teaching of gay marriage in public schools.  They also claimed that their "ability to organize a massive volunteer effort through religious denominations gave [them] a huge advantage."

PFF 63.    Prop. 8 went into effect on November 5, 2008, and since that date, same-sex couples have been denied marriage licenses.

E.    *Strauss v. Horton*

PFF 64.    On November 5, 2008, three separate suits were filed to invalidate Prop. 8, and they were consolidated into *Strauss v. Horton*, Nos. S168047, S168066, S168078.  The main issue raised in *Strauss* was whether Prop. 8 constituted a revision to the California Constitution, as opposed to an amendment.

PFF 65.    The California Supreme Court heard oral argument in *Strauss v. Horton* on March 5, 2009 and issued its ruling on May 26, 2009.  That ruling upheld Prop. 8, but also upheld the 18,000 marriages of same-sex couples performed in California prior to the enactment of Prop. 8.

PFF 66.    Proponents admit that if any marriages of same-sex couples currently recognized by the State of California as married end by reason of death or divorce, the gay and lesbian individuals in those marriages would not be allowed to remarry.

13

F. *Perry v. Schwarzenegger*

PFF 67.    Plaintiffs filed their Complaint on May 22, 2009 and a Motion for Preliminary Injunction on May 27, 2009.

PFF 68.    The Court denied Plaintiffs' Motion for Preliminary Injunction on July 2, 2009.

PFF 69.    Defendant-Intervenors Proposition 8 Proponents and ProtectMarriage filed a Motion to Intervene on May 28, 2009, which was granted on July 2, 2009.

PFF 70.    Plaintiff-Intervenor City and County of San Francisco filed a Motion to Intervene on July 23, 2009, which was granted on August 19, 2009.

PFF 71.    Proponents filed a Motion for Protective Order on September 15, 2009.

PFF 72.    The Court denied, in part, Proponents' Motion for Protective Order on October 1, 2009 and ordered Proponents to produce certain non-public documents relating to the Yes on 8 campaign.

PFF 73.    Proponents filed a Motion for Summary Judgment on September 9, 2009.  The Court denied the Motion on October 14, 2009.

PFF 74.    Proponents filed a Motion to Realign Defendant Edmund G. Brown, Jr., Attorney General of California, as a Plaintiff in this matter on October 2, 2009.

III.    **The Meaning of Marriage**

A.    **The Changing Institution of Marriage**

PFF 75.    Civil marriage has never been a static institution.  Historically, it has changed, sometimes dramatically, to reflect the changing needs, values, and understanding of our evolving society.

*Gibson, Dunn & Crutcher LLP*

PFF 76.    The institution of marriage has served numerous purposes.  Among the purposes that marriage and its regulation by civil authorities have served over this county's history are facilitating governance; creating public order and economic benefit; creating stable households; legitimating children; assigning care-providers and thus limiting the public's liability to care for the vulnerable; and facilitating property ownership and inheritance.

PFF 77.    Marriage serves at least one purpose today that it did not serve at the founding of the country in 1789:  It serves to create a private arena, a haven in a heartless world.  It provides a private zone of liberty to be yourself.

PFF 78.    In the United States, the institution of marriage has evolved to reflect changing attitudes towards sex discrimination, including sex-role stereotyping.  Under the marital doctrine of *coverture*, a married woman lost her independent legal status and vanished into the authority of her husband.  The inequality between men and women under *coverture* was once seen as essential to marriage, but it was eliminated in response to the demands of economic modernization and changing values.

PFF 79.    For couples who consent to marry today, marriage has been transformed from an institution rooted in gender inequality and gender-based prescribed roles to one in which the contracting parties decide on appropriate behavior toward one another, and the sex of the spouses is immaterial to their legal obligations and benefits.  Put another way, marriage has changed significantly to meet ethical needs of sex equity, in that it is no longer marked by gender asymmetry.

PFF 80.  In the United States, the institution of marriage has also evolved to reflect changing attitudes toward race discrimination.  During the slave-holding era, slaves had no right to marry, and laws restricting marriage between whites and persons of color were passed by several of the original colonies and by as many as 41 states and territories. Supporters of such racial restrictions, including courts in the late nineteenth century, usually responded when such laws were challenged by saying that there was no discrimination involved: both blacks and whites were equally forbidden from marrying each other.  Now, citizens enjoy full civil rights regardless of race, and legal restrictions on racial intermarriage have been struck down as unconstitutional. These developments in the institution of marriage paralleled larger social changes that eliminated slavery and recognized racial equality.

PFF 81.  California was the first state to strike down racial restrictions on marriage as unconstitutional in *Perez v. Sharp*, 32 Cal. 2d 711 (1948). The United States Supreme Court in *Loving v. Virginia,* 388 U.S. 1 (1967), ended the nearly 300-year history of race-based legislation on marriage by declaring racial restrictions on marriage unconstitutional.

PFF 82.  In 1969, California enacted the nation's first complete no-fault divorce law, removing consideration of marital fault from the grounds for divorce, awards of spousal support, and division of property.  The enactment of no-fault divorce was quickly embraced nationally as a means of dealing honestly with marital breakdowns, achieving greater equality between men and women within marriage, and advancing further the notion of consent and choice as to one's spouse.  This sweeping change reflected contemporary views that continuing consent to marriage was essential.

Gibson, Dunn
& Crutcher
LLP

PFF 83.   As two economists have definitively shown, extrapolating from the rate at which divorce incidence rose during the century 1860-1960, the annual divorce rate in 2005 was approximately the same as it would have been in the absence of the no-fault system.

PFF 84.   Eliminating racial restrictions on marriage and the doctrine of coverture have not deprived marriage of its vitality and importance as a social institution.

PFF 85.   "The argument that recognition of same-sex marriage simply opens the door to incestuous or polygamous marriage ignores that there may well be compelling state interests against recognizing these other forms of relationships, including preventing exploitation and abuse.  Nor is it clear why . . . same-sex marriage (and not, for example, infertile marriage) opens the door to require state recognition of polygamy and incest.  Whatever prevents California now from recognizing the marriage of a brother and a sister would likewise stop it from recognizing the marriage of two sisters in the absence of Proposition 8."  (Doc # 228 at 81.)

PFF 86.   Marriage has also had different or evolving meanings in other societies. For example, in Indian society, a group known as the Hijras had a tradition of same-sex marriage for at least two centuries.  Similarly, Native American tribes had a tradition of same-sex marriages among those known as the berdache.  And lesbian marriages have been documented in West Africa and in China among silk workers in the nineteenth century.  In addition, same-sex marriages were documented among the Roman emperors.

**B.**   **Supreme Court Holdings Regarding the Fundamental Right to Marry**

PFF 87.   The right to marry is a fundamental right protected by the due process clause.  *Loving v. Virginia*, 388 U.S. 1, 12 (1967).  The fundamental right at stake is properly characterized as the "right to marry."

PFF 88.   "The Supreme Court cases discussing the right to marry do not define the right at stake in those cases as a subset of the right to marry depending on the factual context in which the issue presented itself.  For example, *Loving* addressed marriage; not interracial or opposite-race marriage. . . .  *Turner v. Safley* discusses marriage; not marriage involving inmates in penal institutions."  (Doc # 228 at 79-80.)

PFF 89.   The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men and is deeply meaningful to individuals, families, communities, and the State of California.

PFF 90.   The right of two consenting adults to marry is deeply rooted in the history and tradition of this Nation, and the right to marry is a significant liberty interest.

PFF 91.   The right to privacy and personal autonomy is also a fundamental right.  *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).  Similarly, the freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause.

**C.**   **Marriage Has Never Been Limited to Procreative Unions in California**

PFF 92.   The ability or willingness of married couples to produce progeny has never been necessary for marriage validity in American law.

PFF 93.   Marriage is not now, and has never in this State been, limited to those who are capable of procreating.  The State has never established as a

18

Gibson, Dunn & Crutcher LLP

legal requirement for marriage that the members of the couple be
fertile, of child-bearing age, physically or mentally healthy, or intent on
having or raising children.  In short, procreation does not require
marriage, and marriage does not require procreation.

**D.      There Are No Marriage Exclusions Based on Past Conduct**

PFF 94.      Under California law, murderers, child molesters, rapists, serial
divorcers, spousal abusers, and philanderers are permitted to marry.

PFF 95.      The United States Supreme Court has recognized that the right to marry
extends to convicted criminals in prison and rejected as
unconstitutional a law that prevented prison inmates from getting
married.  *See Turner v. Safley*, 482 U.S. 78, 99 (1987).

**IV.     Sexual Orientation and Same-Sex Relationships**

**A.      Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder**

PFF 96.      Sexual orientation refers to an enduring pattern or disposition to
experience sexual, affectional, or romantic desires for and attractions to
men, women, or both sexes.  The term is also used to refer to an
individual's sense of personal and social identity based on those desires
and attractions, behaviors expressing them, and membership in a
community of others who share them.

PFF 97.      Although sexual orientation ranges along a continuum from exclusively
heterosexual to exclusively homosexual, it is usually discussed in terms
of three categories: heterosexual, homosexual, and bisexual.

PFF 98.      Sexual orientation is commonly discussed as a characteristic of the
individual, like biological sex, gender identity, race, or age.  Although
this perspective is accurate insofar as it goes, it is incomplete because
sexual orientation is always defined in relational terms and necessarily

19

involves relationships with other individuals.  Sexual acts and romantic attractions are characterized as homosexual or heterosexual according to the biological sex of the individuals involved in them, relative to each other.  Indeed, it is by acting with another person – or expressing a desire to act – that individuals express their heterosexuality, homosexuality, or bisexuality.  This includes sexual behaviors as well as actions that simply express affection, such as holding hands with or kissing another person.

PFF 99.   Mainstream mental health professionals and researchers have long recognized that homosexuality is a normal expression of human sexuality.  Indeed, the American Psychiatric Association removed homosexuality from the *DSM* in 1973, stating that "homosexuality *per se* implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  The American Psychological Association adopted the same position in 1975, and urged all mental health professionals to help dispel the stigma of mental illness that had long been associated with homosexual orientation.

PFF 100.   Sexual orientation is fundamental to a person's identity and is the kind of distinguishing characteristic that defines gay and lesbian individuals as a discrete group.

**B.   Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm**

PFF 101.   People generally exercise little or no choice about their sexual orientation, and there is no credible evidence that sexual orientation can or should be changed.

PFF 102.   No major mental health professional organization has sanctioned efforts to change sexual orientation, and virtually all of them have

20

adopted policy statements cautioning the profession and the public about treatments that purport to change sexual orientation. To date, there has been no scientifically adequate research to show that therapy aimed at changing sexual orientation (sometimes called reparative or conversion therapy) is safe or effective. Indeed, the scientifically adequate research indicates otherwise.

PFF 103.   Sexual orientation and sexual identity are so fundamental to one's identity that a person should not be required to abandon them.

PFF 104.   Forcing an individual to change his or her sexual orientation would infringe on "the protected right of homosexual adults to engage in intimate, consensual conduct," which is "an integral part of human freedom." *Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003).

PFF 105.   The promotion of change therapies reinforces stereotypes and contributes to a negative climate for lesbian, gay, and bisexual persons.

PFF 106.   Further, it can be harmful to an individual to attempt to change his or her sexual orientation.

**C.   Excluding Same-Sex Couples from Marriage Does Not Affect Opposite-Sex Relationships**

PFF 107.   Permitting same-sex couples the right to marry does not meaningfully restrict options available to heterosexuals.

PFF 108.   There is no reputable evidence suggesting that the exclusion of same-sex couples from marriage increases the stability of opposite-sex marriage or that including same-sex couples destabilizes opposite-sex marriages.

PFF 109.   Excluding same-sex couples from marriage does not optimize the child-rearing environment of married opposite-sex couples.

21

PFF 110.   There is no support for the notion that allowing same-sex couples to marry would harm heterosexual relationships.  There is similarly no scientific basis for asserting that legalizing marriage for same-sex couples would affect the underlying processes that foster stability in heterosexual marriages.  Allowing same-sex couples to marry will not lead heterosexuals to abandon the institution of marriage.

PFF 111.   Proponents have set forth no evidence that permitting same-sex couples to marry would transform marriage as an institution.  And Proponents' purported expert conceded that he could not prove that permitting same-sex couples to marry would have any actual impact on the institution of marriage.

PFF 112.   There is no evidence that there has been any harm to the institution of marriage as a result of allowing same-sex couples to marry.  Evidence from the Netherlands suggests that the marriage rate, divorce rate, and nonmarital birth rate were not affected by permitting same-sex couples to marry beginning in 2001.

PFF 113.   In the five years that marriage has been open to couples of the same sex in Massachusetts, the divorce rate has not increased; in fact, the Massachusetts divorce rate is the lowest in the nation.

PFF 114.   During the same time period in which voters in numerous states have acted to exclude gay and lesbian individuals from marriage, those same voters have failed to undertake similar initiatives targeted at other issues that far more directly affect the institution, such as divorce or infidelity, where those initiatives would affect not only gay and lesbian individuals, but the heterosexual majority as well.

1  **V.   Parenting by Same-Sex Couples**

2     **A.   Children of Same-Sex Couples Are Just as Well-Adjusted as Children of
3          Opposite-Sex Couples, and the Sexual Orientation of Parents Is Not a
          Determining Factor in Children's Adjustment or Well-Being**

4
5          PFF 115.   Same-sex couples are raising children and have the same potential and
          desire as heterosexual couples to love and parent children.
6

7          PFF 116.   Social science has shown that the concerns often raised about children
8          of lesbian and gay parents – concerns that are generally grounded in
9          prejudice against and stereotypes about gay people – are unfounded.

10         PFF 117.   Children and adolescents raised by same-sex parents are as likely to be
11         well-adjusted as children and adolescents raised by heterosexual
12         parents.

13         PFF 118.   Indeed, it is well established that both men and women have the
14         capacity to be good parents, and that having parents of both genders
15         does not enhance child or adolescent adjustment.  Similarly, there is no
16         empirical support for the notion that the presence of both male and
17         female role models in the home promotes children's adjustment or
18         well-being.

19
20         PFF 119.   There is no difference between the ability of a same-sex couple to
          provide a healthy, positive child-rearing environment and the ability of
21         an opposite-sex couple to provide such an environment.  The well-
22         being of children is not contingent on the parents' sexual orientation.
23

24         PFF 120.   Studies of personality, self-concept, and behavior problems show few
25         differences between children of lesbian mothers and children of
26         heterosexual parents.  Evidence indicates that children of lesbian and
27         gay parents have normal social relationships with their peers and adults.
          The picture that emerges from this research shows that children of gay
28

23

Gibson, Dunn
& Crutcher
LLP

and lesbian parents enjoy a social life that is typical of their age group in terms of involvement with peers, parents, family members, and friends.

PFF 121.   There is no scientific support for fears about children of lesbian or gay parents being sexually abused by their parents or their parents' gay, lesbian, or bisexual friends or acquaintances.

PFF 122.   Excluding same-sex couples from marriage actually harms the objective of providing an optimal child-rearing environment for all children, including the children of gay and lesbian couples who have been denied the rights and status attendant to civil marriage.

PFF 123.   Sexual and gender identities (including gender identity, gender-role behavior, and sexual orientation) develop in much the same way among children of lesbian mothers as they do among children of heterosexual parents.

PFF 124.   Beliefs that lesbian and gay adults are not fit parents have no empirical foundation.

PFF 125.   Children are advantaged by increasing the durability of the relationship of the people raising them, and the durability of the relationship of a gay couple is enhanced by permitting the gay couple to marry.

PFF 126.   Prop. 8 does not change California's laws and policies that permit gay and lesbian individuals to have, adopt, or raise children.

## VI.   Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws

### A.   Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples

PFF 127.   Gay and lesbian individuals, including Plaintiffs, have formed lasting, committed, and caring relationships with persons of the same sex, and

24

Gibson, Dunn
& Crutcher
LLP

same-sex couples share their lives and participate in their communities together.  Gay and lesbian individuals, including Plaintiffs Perry and Stier, also raise children together.

PFF 128.    Gay and lesbian individuals possess the same potential and desire for sustained loving and lasting relationships as heterosexuals.

PFF 129.    Social science research clearly establishes that same-sex couples closely resemble heterosexual couples both in terms of the quality of their relationships and the processes that affect their relationships. Similarly, studies have found same-sex and heterosexual couples to be equivalent to each other on measures of relationship satisfaction and commitment.

PFF 130.    Loving relationships betweens persons of the same sex are equal in worth and dignity to loving relationships betweens persons of the opposite sex.

PFF 131.    There is no empirical support for the notion that same-sex couples who want to marry are more focused on love and personal fulfillment, or less focused on familial responsibilities, than heterosexual, married couples.  Opposite-sex couples can marry for any reasons they want, and many same-sex couples are motivated to marry in large part by a desire to raise, nurture, and protect children.

**B.    Same-Sex Couples Contribute to Society in All the Ways That Heterosexual Couples Do**

PFF 132.    Same-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities and bears no relation to a person's ability to perform or contribute to society.

PFF 133.    Same-sex couples contribute to society in the workplace and the economy, in the public sector, in the non-profit sector, in their churches

25

and synagogues, as citizens, and in caring for family members such as aging parents.

PFF 134.  Like heterosexuals, gay men and lesbians are of every race and ethnicity; live in every county throughout the State; have families similar to heterosexual families; are gainfully employed and thus contribute to the State's economy; accounting for education (and gender discrimination), have incomes similar to heterosexuals; pay proportionately more taxes than their heterosexual counterparts; despite longstanding discrimination, have served their country in similar numbers to heterosexuals; and contribute in myriad ways to schools, churches, and the communities in which they live.

## VII.    Lingering Sex and Gender Discrimination in Marriage

### A.    Perpetuation of Antiquated Gender Roles

PFF 135.  Limiting marriage to opposite-sex couples could promote gender stereotypes that in other contexts have long been rejected as an illegitimate basis for legal classifications.

PFF 136.  Notions of "traditional marriage" are based upon the idea that women can and should play distinct roles in the marital relationship and/or in raising children that cannot be performed by men and vice versa.

PFF 137.  Heterosexual marriage was traditionally organized around a gender-based division of labor, with the husband as the primary earner and the wife as the primary homemaker and caregiver for children.

PFF 138.  Early American marriage was founded on presumptions of a so-called "natural" division of labor along gender lines – notions that men alone were suited for certain types of work, women alone for other types of

26

Gibson, Dunn & Crutcher LLP

work, and that the household needed both to ensure both kinds of work could be done – that are not relevant to today's society.

PFF 139.   Proponents' arguments for Prop. 8 include that the legalization of same-sex marriage will lead to confusion about gender identity, suggesting that Proponents associate homosexuality with a disruption of traditional gender roles, and that a prohibition on same-sex marriage is based in certain beliefs about sex.

PFF 140.   Similarly Proponents' arguments for Prop. 8 include that children need both a father and a mother, indicating that Proponents believe women and men should or necessarily do perform different parental roles based on their gender.

**B.      Whether Two People Can Marry Turns Entirely on Their Sex**

PFF 141.   Marrying a person of the opposite sex is not a realistic option for gay and lesbian individuals.

PFF 142.   Prop. 8 discriminates against gay and lesbian individuals on the basis of their sex.

PFF 143.   Under Prop. 8, whether two individuals can marry is directly based on the sex of those individuals involved.  Under Prop. 8, a man is permitted to marry a woman where a woman would be prohibited from doing so, and vice-versa.  The sole distinguishing characteristic is the sex of the people involved.

**VIII.   History of and Ongoing Discrimination Against Gay and Lesbian Individuals**

PFF 144.   Gay and lesbian individuals have experienced and continue to experience discrimination in the United States.  They have been executed for being homosexual, classified as mental degenerates, targeted by police, discriminated against in the workplace, censored,

27

demonized as child molesters, excluded from the United States military, arrested for engaging in private sexual relations, and have repeatedly had their fundamental state constitutional rights stripped away by popular vote.

PFF 145.    Discrimination against gay and lesbian individuals in the United States has deep historical roots, stretching back at least to colonial American times.

PFF 146.    Through much of the twentieth century, in particular, gay and lesbian individuals suffered under the weight of medical theories that treated their desires as a disorder, penal laws that condemned their consensual adult sexual behavior as a crime, and federal policies and state regulations that discriminated against them on the basis of their homosexual status.  These state policies and ideological messages worked together to create and reinforce the belief that gay and lesbian individuals were an inferior class to be shunned by other Americans.

PFF 147.    Gay and lesbian individuals also continue to face violence motivated by anti-gay bias.  The FBI reported 1,260 hate crime incidents based on perceived sexual orientation in 1998, and 1,265 in 2007.  In 2008, a national coalition of anti-violence social service agencies identified 29 murders motivated by the assailants' hatred of lesbian, gay, bisexual, or transgender people.

PFF 148.    Gay and lesbian individuals have been subject to more hate crimes motivated by bias against their sexual orientation in California since 2004 than women, who are members of a protected class, have been subjected to hate crimes motivated by their gender.

Gibson, Dunn & Crutcher LLP

PFF 149.   The persecution suffered by gay and lesbian individuals in the United States has been severe. Indeed, even one of Proponents' purported expert does not believe that homophobia is a small, isolated, insignificant, or benign component of U.S. and world culture.

PFF 150.   The medical establishment identified homosexuality as a "disease," "mental defect," "disorder," or "degeneration." Until the American Psychiatric Association removed homosexuality from its list of disorders in 1973, such hostile medical pronouncements provided a powerful source of legitimization to anti-homosexual sentiment.

PFF 151.   The sexual orientation of gay and lesbian individuals has been associated with a stigma of inferiority and second-class citizenship, manifested by the group's history of legal and social disabilities.

PFF 152.   The widespread prejudice, discrimination, and violence to which lesbians and gay men are often subjected are significant health concerns. Sexual prejudice, sexual orientation discrimination, and antigay violence are major sources of stress for lesbian, gay, and bisexual people.

PFF 153.   The social marginalization of gay and lesbian individuals gave the police and the public broader informal authority to harass them. The threat of violence and verbal harassment deterred many gay and lesbian individuals from doing anything that might reveal their homosexuality in public.

PFF 154.   In 1950, following Senator Joseph McCarthy's denunciation of the employment of gay persons in the State Department, the Senate conducted a special investigation into "the employment of homosexuals and other sex perverts in government." The Senate Committee

29

Gibson, Dunn & Crutcher LLP

1   recommended excluding gay men and lesbians from all government

2   service, civilian as well as military.  The Senate investigation and

3   report were only part of a massive anti-homosexual campaign launched

4   by the federal government after the war.

PFF 155.   Many state and local governments followed the federal government's

5
6   lead in seeking to ferret out and discharge their homosexual employees.

7   PFF 156.   Moreover, a series of press and police campaigns in the 1940s and

8   1950s fomented demonic stereotypes of homosexuals as child

9   molesters out to recruit the young into their way of life.  At the time,

10   these demonic new stereotypes were used to justify draconian new

11   legislation as well as stricter enforcement of existing laws.

12

13   PFF 157.   Throughout the early and mid-twentieth Century, gay and lesbian

14   characters and issues were censored from theatrical productions and

15   movies.  State and federal officials banned gay and lesbian publications

16   from the mail.  Newspaper stand and book store owners that carried gay

17   and lesbian content risked being shut down or arrested.  Censorship,

18   government suppression, and the fear of both curtailed gay people's

19   freedom of speech and the freedom of all Americans to discuss gay

20   issues.  These conditions made it difficult for gay and lesbian

21   individuals to organize and speak out on their own behalf.  As a result,

22   censorship stymied and delayed democratic debate about

23   homosexuality for more than a generation.

24   PFF 158.   In 1977, Anita Bryant's "Save Our Children" campaign convinced a

25   majority of Miami voters to repeal a newly enacted gay rights

26   ordinance in Dade County, Florida.  This campaign depended heavily

27   on the use of the images of homosexuals as child molesters so prevalent

28   in the postwar years.  Her organization published a full-page

Gibson, Dunn & Crutcher LLP

advertisement the day before the vote warning that the "other side of the homosexual coin is a hair-raising pattern of recruitment and outright seductions and molestation." This campaign's victory inspired other such campaigns, and in the next three years, gay rights laws were struck down in more than half a dozen referenda.

PFF 159.     Recent studies indicate that on a yearly basis, over 200,000 California students suffer harassment based on actual or perceived sexual orientation. One-third of those students are harassed at least four times in a given 12-month period.

PFF 160.     The approval of California's Prop. 8, along with similar laws and constitutional amendments in 37 other states indicates the enduring influence of anti-gay hostility and the persistence of ideas about the inequality of gay people and their relationships.

PFF 161.     Groups that oppose gay rights continue to address homosexuality as a dangerous and inferior condition that threatens children and imperils the stability of the American family – a viewpoint at odds with the notion that gay and lesbian individuals and their relationships are fully equal to those of heterosexuals.

## IX.    The Relative Political Powerlessness of Gay and Lesbian Individuals

PFF 162.     Gay and lesbian individuals have historically lacked the political power to ensure protection through the political process, and they still lack the political power to fully ensure that protection.

PFF 163.     There are only three openly gay members of the U.S. House of Representatives and no openly gay Senators; there are no openly gay governors; and no openly gay person has ever been appointed to a Cabinet Secretary position. Gay and lesbian individuals are thus

underrepresented among elected political officials relative to their national population share.

PFF 164.    Gay and lesbian individuals have been unable to secure national legislation to protect themselves from hate crimes or discrimination in housing, employment, or public accommodations.

PFF 165.    Fewer than half of the states ban sexual orientation discrimination in employment, housing, and/or accommodations.

PFF 166.    The President and Vice President of the United States do not support allowing same-sex couples to marry.

PFF 167.    Nationwide, the initiative process has targeted gay and lesbian individuals more times than any other social group or political minority.  Indeed, nationwide, voters have used initiatives or referenda to repeal or prohibit marriage rights for gay and lesbian individuals 33 times.

PFF 168.    Gay and lesbian individuals constitute one of the least popular minorities in American society, with the American public reporting significantly cooler feelings toward them than to most other minority groups.

PFF 169.    In 2008, a majority of Americans believed that sex between two persons of the same sex is always wrong.

PFF 170.    Political mobilization by gay and lesbian individuals is hampered because members of the community are generally invisible unless they have "come out," an act with social costs.

PFF 171.    Elected officials and candidates for elected office have made public statements expressing prejudice and hostility toward gay and lesbian

32

1    individuals in a manner that would be almost inconceivable against any

2    other minority of Americans.

3    PFF 172.    Gay and lesbian individuals are politically disadvantaged by the

4            willingness of legislators and voters to support policies imposing

5            disabilities on them based on religious teachings that homosexuality is

6            sinful.

7    PFF 173.    The gay community suffers from greater political disabilities today than

8            women did in the 1970s when they were afforded quasi-suspect status

9            by the Supreme Court.  Before they were afforded quasi-suspect status

10           by the Supreme Court, women had achieved important victories in the

11           political process, including coverage in the 1964 Civil Rights Act and

12           its subsequent amendments, and specific statutory and constitutional

13           protection in several states.

14   PFF 174.    When women were afforded quasi-suspect status by the Supreme

15           Court, although sexism existed and political activism could be costly,

16           identity as a woman was not socially controversial, did not attract

17           familial scorn, and did not bar one from a large range of social

18           institutions, though some institutions were exclusively male.  Women

19           could freely identify one another, gather, coordinate, and act largely

20           free of fear of repressive tactics.

21   PFF 175.    Beginning in 1988 and hitting a peak in 1992 through 1994, groups in

22           Colorado, Maine, Oregon, and half a dozen other states used anti-gay

23           referenda and initiatives to challenge gay rights laws and build local

24           organizations.  In Oregon alone, there were sixteen local anti-gay

25           initiatives in 1993 and another eleven in 1994.  Oregon's gay activists

26           lost all but one.

27

28

Gibson, Dunn
& Crutcher
LLP

PFF 176.    Nationwide, there were 143 initiatives or referenda from the 1970s through 2005 relating to gay civil rights, and gay rights supporters lost over 70% of them.

PFF 177.    In 1996, the United States Senate passed the Defense of Marriage Act (DOMA), which provided a federal definition of marriage as the union of one man and one woman and declared that no state needed to give "full faith and credit" to same-sex marriages performed in another state. It also denied federal benefits to such married couples.  And fourteen states passed state-level DOMA statutes that year, and another eleven did the following year.

PFF 178.    In 2004, when Massachusetts became the first state to permit gay couples to marry, thirteen states passed constitutional amendments banning such marriages.

PFF 179.    Today, in as many as 28 states, there is no statutory barrier to firing, refusing to hire, or demoting a person in private sector employment solely on the basis of their identity as a gay man or lesbian.

X.    **Harms From Denial of Marriage Rights**

A.    **Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples**

PFF 180.    Civil marriage is a deeply meaningful institution to individuals, families, communities, and the State of California.  Enhanced by government recognition for so long, legal marriage is a symbol of privilege.  The idea that marriage was a happy ending, the ultimate reward, the sign of adult belonging, and the definitive expression of love and commitment is deeply engrained in our society.  Nothing has the same meaning, obligations, rights, and benefits except marriage

34

itself. Moreover, marriage is a primary source of well-being for adults in the United States.

PFF 181.   Marriage brings with it many tangible legal rights, privileges, benefits, and obligations to the married individuals, and that it also confers significant intangible benefits to the married individuals. Certain tangible and intangible benefits of marriage flow to the married couple's children.

PFF 182.   The word "marriage" has a unique meaning, and there is a significant symbolic disparity between domestic partnership and marriage.

PFF 183.   There are meaningful differences in the actual practice of registered domestic partnerships, civil unions, and marriage. Marriage is a valued social institution, and married couples are treated differently than unmarried couples. Creating a separate institution of domestic partnership stigmatizes same-sex couples and sends a message of inferiority to these couples, their children, and lesbian and gay men generally. This stigma increases the likelihood that lesbians and gay men will experience discrimination and harassment in schools, employment, and other settings.

PFF 184.   The California Supreme Court has noted at least nine ways in which statutes concerning marriage differ from corresponding statutes concerning domestic partnerships.

PFF 185.   The public recognition that attends marriage, the legal obligations created by marriage, and the emotional and tangible investments that spouses make in their joint relationship serve as deterrents to relationship dissolution.

35

PFF 186.   Civil unions and domestic partnerships are not equivalent to the well-established and highly valued institution of marriage, and same-sex couples show a clear preference for marriage over civil unions and domestic partnerships.  In California, same-sex couples are significantly less likely to enter into domestic partnerships than to enter into marriages because domestic partnerships do not offer the same dignity, respect, and stature as marriage.

PFF 187.   Thousands of same-sex couples – including many who were already registered as domestic partners – married in California during the months in 2008 when marriage was a legal option for them, and many same-sex couples have traveled long distances across state and national borders to legally marry.  Survey data show that large numbers of lesbian, gay, and bisexual Americans want to marry.

PFF 188.   Marriage has considerable social meaning.  Getting married has been seen as reaching adulthood, as having grown up, and it is a very esteemed status.  Indeed, the individual's ability to consent to marriage is the mark of the free person and possession of basic civil rights.

PFF 189.   Marriage correlates with a variety of measurable health and protective benefits that extend to children, women, and men.  And many same-sex couples would benefit both physically and psychologically from marriage just as their heterosexual counterparts do.

PFF 190.   The exclusion of gay and lesbian individuals from the institution of civil marriage relegates them to second-class status.  This is because by reserving the historic and highly respected designation of "marriage" exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of "domestic partnership," Prop. 8 communicates the official view that same-sex couples'

36

committed relationships are of a lesser stature than the comparable relationships of opposite-sex couples.

PFF 191.    Laws are perhaps the strongest of social structures that uphold and enforce stigma.  Prop. 8 is a part of the structural stigma – it reflects and propagates the stigma that gay and lesbian individuals do not have intimate relations similar to those that heterosexual couples have.  It is especially stigmatizing because of the importance of marriage in society.  Prop. 8 conveys the State's judgment that, in the realm of intimate relationships, a same-sex couple possesses an "undesired differentness" and is inherently less deserving of society's full recognition through the status of civil marriage than are heterosexual couples.  This according of disadvantaged status to the members of one group relative to another is the crux of stigma, and the distinction between same-sex and different-sex couples is stigmatizing even when same-sex couples are granted most of the legal benefits and obligations conferred by marriage through domestic partnerships.  Irrespective of such benefits, the "differentness" of domestic partnerships, compared to marriage, is evident.

PFF 192.    Stigma has a serious impact on the health of gay and lesbian individuals in the United States by causing stress and disease.  This has been recognized by public health authorities including Healthy People 2010, which sets health priorities for the United States.  Healthy People 2010 identified the "gay and lesbian population" as one of the groups targeted for reducing health disparities in the United States.

PFF 193.    Exposure to minority stressors increases the risk for mental disorders in gay and lesbian individuals as compared with heterosexual individuals.  Studies have shown that the lesbian and gay population has about twice

37

Gibson, Dunn & Crutcher LLP

as many disorders as heterosexuals, including mood, anxiety, and substance use disorders, the three classes of psychiatric disorders typically studied in community surveys.

PFF 194.  The exclusion of gay and lesbian individuals from the institution of civil marriage inflicts on them and their children humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

**B.    Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples**

PFF 195.  In addition to social and psychological harms, Prop. 8 imposes substantial economic harms on same-sex couples residing in California and their children.

PFF 196.  Denying same-sex couples the right to marry and permitting them to only register as domestic partners imposes a substantial economic cost on gay and lesbian individuals.  Similarly, permitting same-sex couples to marry would lead to a substantial economic gain for individuals in same-sex couples.

PFF 197.  Because domestic partnership is inferior to marriage and upholds and enforces the stigma attached to same-sex couples, it reduces the degree of commitment of partners and potential partners, and reduces the incentive to invest in surplus-enhancing behaviors.

PFF 198.  Compared to allowing same-sex couples to marry in California, domestic partnership results in the creation of a smaller surplus in the relationship.

PFF 199.  Although it is not possible to calculate precisely the additional surplus that would result if same-sex couples were permitted to marry, as compared to the surplus obtainable under California's domestic

38

partnership laws, an upper bound on that additional surplus would be approximately $3 billion per year.

PFF 200. The reduced incentive associated with domestic partnership as compared to marriage is reflected in lower utilization of domestic partnership and in a lesser development of specialized skills in the relationship than would occur within marriage.

PFF 201. That gay and lesbian individuals have continued to press for the right to marry in jurisdictions in which some form of civil union of domestic partnership is already available suggests that they do not see civil unions and domestic partnerships as comparable to marriage.

PFF 202. The long-term nature of marriage encourages spouses to increase household efficiency by dividing their labor in ways that increase the family's productivity in producing goods and services by family members.

PFF 203. Same-sex couples are economically interdependent in ways and to an extent similar to, not different from, different-sex couples.

**C.     Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples**

PFF 204. Local governments like San Francisco suffer a series of intangible injuries from Prop. 8's prohibition on marriage between persons of the same sex.  This marriage ban limits the ability of local governments to ensure that their citizens are treated equally regardless of sexual orientation, which in turn harms the community in general and gay and lesbian citizens in particular.

PFF 205. Prop. 8 requires local governments to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

39

PFF 206.    Notwithstanding California's domestic partnership law, its denial of marriage to same-sex couples increases the likelihood that Plaintiff-Intervenor's citizens will depend on local health and welfare programs, and imposes fiscal and economic costs on Plaintiff-Intervenor, such as through loss of tax revenues related to the denial of marriage.

PFF 207.    Prop. 8 deprives the State of California and its local governments of tax revenue generated by consumer spending on the weddings and wedding-related events that same-sex couples would hold if permitted to marry.  For example, at least in the short term, San Francisco loses an estimated $35 million in total annual economic activity and an estimated $2.75 million in tax revenue from diminished wedding-related spending.  In the next three years, the State of California will lose an estimated $491.2 million in direct spending and $38.9 million in tax revenue from diminished wedding-related spending.

PFF 208.    Taken together, Prop. 8 and federal laws restricting marriage to different-sex couples impose federal income tax burdens on same-sex couples that are not borne by different-sex couples.  Such laws also deprive same-sex couples of federal entitlements and benefits, such as Social Security survivor benefits.  These burdens in turn negatively impact the State of California and its local governments because of the loss of state and local tax revenue that result from higher federal taxes and lower federal benefits as well as increased numbers of Californians qualifying for means-tested programs for low-income people.

PFF 209.    As a general matter, institutional discrimination against gay and lesbian individuals increases social service costs to governments that provide such services.  Two examples illustrate this point.  First, the number of uninsured Californians is higher than it would be if same-sex couples

40

could marry, and this imposes a financial burden on State and local governments that reimburse providers for uncompensated care. Second, local governments like San Francisco are providers of health services and incur higher health costs because of Prop. 8 in two regards.  In providing health benefits to uninsured residents, local governments are the insurer of last resort for members of same-sex couples who do not receive insurance through their partners' employers because they are not married.  And because of the links between institutional discrimination and greater consumption of health services by targets of that discrimination, local governments like San Francisco expend disproportionate amounts on specialized health services for gay and lesbian individuals.

PFF 210.    To the extent that institutional discrimination against gay and lesbian individuals also decreases their physical and economic well-being and productivity, it reduces employees' commitment to working in California.  It also decreases state and local government revenue because this revenue is tied to the productivity of their workforces.

PFF 211.    Prop. 8 will likely make it more difficult for California to attract and retain highly skilled workers.

PFF 212.    In order to combat the discriminatory effects of California's ban on marriages of same-sex couples, the City and County of San Francisco mandates that its contractors and vendors must offer benefits to domestic partners of their employees that are equal to those benefits offered to employees' spouses.  This ordinance was costly to defend from legal challenges and results in ongoing higher contracting and procurement costs for San Francisco.  The State of California has

41

enacted a similar requirement for public contracts with a value greater than $100,000.

PFF 213.   Also in order to combat discrimination based on sexual orientation, the California Department of Fair Housing and Employment has incurred costs of approximately $1.5 million since 2004 in investigating claims of discrimination in housing and employment.

## XI.   Prop. 8 Is Not Supported by Any Governmental Interests

PFF 214.   The evidence offered by Proponents is insufficient to uphold the constitutionality of Prop. 8 under any standard of review.

PFF 215.   Proponents have identified various governmental interests that they contend are a basis to uphold Prop. 8.

PFF 216.   The purported state interests that have been set forth by Proponents are not compelling.

PFF 217.   Prop. 8 is not narrowly drawn to further a compelling state interest.

PFF 218.   The purported state interests that have been set forth by Proponents are not important state interests.

PFF 219.   Prop. 8 is not substantially related to an important state interest.

PFF 220.   The purported state interests that have been set forth by Proponents are not independent and legitimate.

PFF 221.   Prop. 8 does not bear a rational relationship to an independent and legitimate legislative end.

PFF 222.   There are no other governmental interests that would justify stripping gay and lesbian individuals of the right to marry.

//

//

DATED:  December 7, 2009                    GIBSON, DUNN & CRUTCHER LLP
                                            Theodore B. Olson
                                            Theodore J. Boutrous, Jr.
                                            Christopher D. Dusseault
                                            Ethan D. Dettmer
                                            Matthew D. McGill
                                            Amir C. Tayrani
                                            Sarah E. Piepmeier
                                            Theane Evangelis Kapur
                                            Enrique A. Monagas


                                            By:_____/s/_____
                                                        Theodore B. Olson

                                            and

                                            BOIES, SCHILLER & FLEXNER LLP
                                            David Boies
                                            Jeremy M. Goldman
                                            Roseanne C. Baxter
                                            Richard J. Bettan
                                            Beko O. Richardson
                                            Theodore H. Uno

                                            Attorneys for Plaintiffs
                                            KRISTIN M. PERRY, SANDRA B. STIER,
                                            PAUL T. KATAMI, and JEFFREY J. ZARRILLO

*Gibson, Dunn*
*& Crutcher*
*LLP*

DENNIS J. HERRERA
City Attorney
THERESE M. STEWART
Chief Deputy City Attorney
DANNY CHOU
Chief of Complex and Special Litigation
RONALD P. FLYNN
VINCE CHHABRIA
ERIN BERNSTEIN
CHRISTINE VAN AKEN
MOLLIE M. LEE
Deputy City Attorneys


By: _____/s/_____
                    Therese M. Stewart

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO


**ATTESTATION PURSUANT TO GENERAL ORDER NO. 45**

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence

in the filing of the document has been obtained from each of the other signatories to this document.


By: _____/s/_____
                    Theodore B. Olson

Gibson, Dunn
& Crutcher
LLP