GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Jeremy M. Goldman, SBN 218888
*jgoldman@bsfllp.com*
1999 Harrison Street, Suite 900, Oakland, California 94612
Telephone: (510) 874-1000, Facsimile: (510) 874-1460

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

Dennis J. Herrera, SBN 139669
Therese M. Stewart, SBN 104930
Danny Chou, SBN 180240

One Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4708, Facsimile (415) 554-4699

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, *et al.*,<br><br>           Plaintiffs,<br>and<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>           Plaintiff-Intervenor,<br><br>      v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>           Defendants,<br>and<br><br>PROPOSITION 8 OFFICIAL PROPONENTS<br>DENNIS HOLLINGSWORTH, *et al.*,<br><br>           Defendant-Intervenors. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S NOTICE OF MOTION AND MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORTS, OPINIONS, AND TESTIMONY OF KATHERINE YOUNG, LOREN MARKS AND DAVID BLANKENHORN**<br><br>**PLAINTIFFS' MIL NO. 1 OF 2**<br><br>*[Declaration of Rebecca Justice Lazarus and Proposed Order Filed Concurrently Herewith]*<br><br>**Final Pretrial Conference**<br>Date:     December 16, 2009<br>Time:     10:00 a.m.<br>Judge:    Chief Judge Walker<br>Location: Courtroom 6, 17th Floor |

Gibson, Dunn &
Crutcher LLP

1

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S NOTICE OF MOTION AND
MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that on December 16, 2009, at 10:00 a.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, San Francisco Division, Courtroom 6, located at 450 Golden Gate Avenue, San Francisco, California 94102, Plaintiffs Kristin M. Perry, Sandra B. Stier, Paul T. Katami, and Jeffrey J. Zarillo (collectively, "Plaintiffs") and Plaintiff-Intervenor the City and County of San Francisco ("Plaintiff-Intervenor") will and hereby do move *in limine* for an order excluding the expert reports, opinions, and testimony of the following individuals, each of whom were designated as an expert witness in this matter by Defendant-Intervenors Dennis Hollingsworth, Gail J. Knight, Martin F. Gutierrez, Hak-Shing William Tam, Mark A. Jansson, and ProtectMarriage.com – Yes on 8, A Project of California Renewal ("Proponents"):

(1)     Katherine Young;

(2)     Loren Marks; and

(3)     David Blankenhorn.

This Motion is made pursuant to Rules 104, 403, and 702 of the Federal Rules of Evidence, on the grounds that Katherine Young, Loren Marks and David Blenkhorn are not qualified experts and the opinions and testimony of Proponents' Proposed Experts are neither relevant nor reliable pursuant to the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny.  Moreover, the expert opinions and testimony of the Proposed Experts are inadmissible because any probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.  *See* Fed. R. Evid. 403.

Because the purported expert testimony of Katherine Young, Loren Marks, and David Blankenhorn does not meet the standards set forth in *Daubert*, it should not be admitted into evidence or, at the very least, should be accorded little to no weight.  Given that this is a bench trial, Plaintiffs and Plaintiff-Intervenor leave to the Court's discretion whether it wishes to exclude this evidence in advance of trial or, alternatively, explore these experts' qualifications during trial through direct and cross-examination and make the determination based on that more complete testimony.  In any event,

Gibson, Dunn &
Crutcher LLP

2

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S NOTICE OF MOTION AND
MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1    the testimony offered by Proponents is not admissible to prove or refute any issue germane to this

2    case.

3          This Motion is based upon this Notice of Motion and Motion, the attached Memorandum of

4    Points and Authorities, the pleadings, records, and papers on file with this Court, all matters upon

5    which this Court may take judicial notice, and such oral arguments as the Court may receive.

6

7    DATED:  December 7, 2009                    GIBSON, DUNN & CRUTCHER LLP
                                                 Theodore B. Olson
8                                                Theodore J. Boutrous, Jr.
                                                 Christopher D. Dusseault
9                                                Ethan D. Dettmer
                                                 Matthew D. McGill
10                                               Amir C. Tayrani
                                                 Sarah E. Piepmeier
11                                               Theane Evangelis Kapur
                                                 Enrique A. Monagas
12

13                                               By:                    /s/
                                                        Theodore B. Olson
14

15                                               and

16                                               BOIES, SCHILLER & FLEXNER LLP
                                                 David Boies
17                                               Jeremy M. Goldman
                                                 Roseanne C. Baxter
18                                               Richard J. Bettan
                                                 Beko O. Richardson
19                                               Theodore H. Uno

20                                               Attorneys for Plaintiffs
                                                 KRISTIN M. PERRY, SANDRA B. STIER,
21                                               PAUL T. KATAMI, and JEFFREY J. ZARRILLO

22    //

23    //

24    //

25

26

27

28

DENNIS J. HERRERA
City Attorney
THERESE M. STEWART
Chief Deputy City Attorney
DANNY CHOU
Chief of Complex and Special Litigation
RONALD P. FLYNN
VINCE CHHABRIA
ERIN BERNSTEIN
CHRISTINE VAN AKEN
MOLLIE M. LEE
Deputy City Attorneys


By:_____/s/_____
                Therese M. Stewart

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S NOTICE OF MOTION AND
MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ....................................................................................................... 1

II. THE LEGAL STANDARD GOVERNING EXPERT TESTIMONY ........................................... 3

    A.    The Witness Must Qualify as an Expert ......................................... 3

    B.    The Witness' Testimony Must Be Based on Scientific, Technical, or "Other Specialized" Knowledge and Must Concern a Matter Beyond a Layperson's Common Knowledge......................................................... 4

    C.    The Witness' Testimony Must be Reliable and Relevant......................... 4

        1.    Reliability................................................................................ 4

        2.    Relevance ............................................................................. 6

    D.    The Probative Value of the Purported Expert's Testimony Must Outweigh its Prejudicial Effect ......................................................... 6

III. THE COURT SHOULD EXCLUDE THE TESTIMONY OF PROPONENTS' PROPOSED EXPERTS – YOUNG, MARKS AND BLANKENHORN ............................... 7

    A.    Katherine Young ............................................................................... 7

        1.    Dr. Young is Not Qualified to Offer an Expert Opinion on Any Issue in This Case ....................................................... 7

        2.    Dr. Young's Opinion Lacks Relevance to the Factual Issues of this Case ................................................................ 8

        3.    Dr. Young's Opinion Lacks a Reliable Methodology ...................... 9

        4.    Dr. Young's Testimony Would Waste Time and Create Confusion and is thus Inadmissible Under Federal Rule of Evidence 403 .................................................................. 11

    B.    Loren Marks ..................................................................................... 11

        1.    Dr. Marks is Not Qualified to Offer an Expert Opinion in this Case .......................................................................... 11

        2.    Dr. Marks' Report, Opinions, and Testimony Have No Relevance to this Litigation ...................................................... 12

        3.    Dr. Marks' Report, Opinions, and Testimony are Unreliable........................ 14

        4.    Dr. Marks' Report, Opinions, and Testimony Lack Probative Value and are thus Inadmissible Under Federal Rule of Evidence 403.................................................................. 16

    C.    David Blankenhorn ......................................................................... 16

Gibson, Dunn & Crutcher LLP

i

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

# TABLE OF CONTENTS
### (Continued)

Page

1. Mr. Blankenhorn is Not Qualified to Offer an Expert Opinion in this Case ........................................................................................ 16

2. Mr. Blankenhorn Has No Relevant Opinions to Offer ................... 17

3. Mr. Blankenhorn's Conclusions Are Not Based on a Discernible Methodology and are Unreliable ............................... 17

4. Mr. Blankenhorn's Testimony Would Waste Time and Create Confusion and is thus Inadmissible Under Federal Rule of Evidence 403 ................................................................................ 20

IV. THE COURT SHOULD EITHER EXCLUDE THE TESTIMONY OF THESE PROPOSED EXPERTS BEFORE TRIAL OR REJECT SUCH TESTIMONY AFTER EXPLORING THEIR QUALIFICATIONS DURING TRIAL ............................. 21

V. CONCLUSION ............................................................................................ 22

Gibson, Dunn & Crutcher LLP

ii

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Beech Aircraft Corp. v. United States*,
  51 F.3d 834 (9th Cir. 1995)...................................................................................... 4

*Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*,
  55 F. Supp. 2d. 1024 (N.D. Cal. 1999) ..................................................................... 5

*CFM Commc'ns, LLC v. Mitts Telecasting Co.*,
  424 F. Supp. 2d 1229 (E.D. Cal. 2005)................................................................... 21

*Daubert v. Merrell Dow Pharms.*,
  43 F.3d 1311 (9th Cir. 1995) .......................................................... 5, 9, 14, 15, 16, 20

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .................................................... 4, 5, 6, 7, 9, 11, 12, 13, 17

*Domingo ex rel. Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ............................................................................... 6, 20

*Fechtig v. Sea Pac. Inc.*, No. C 03-4056 JL
  2006 WL 2982148 (N.D. Cal. Oct. 17, 2006)........................................................ 22

*Gen. Elec. v. Joiner*,
  522 U.S. 136 (1997) ............................................................................... 6, 13, 14, 18

*Jinro Am. Inc. v. Secure Invs., Inc.*,
  266 F.3d 993 (9th Cir. 2001),
  *amended by* 272 F.3d 1289 (9th Cir. 2001) ...................................................... 3, 9, 20

*Jones v. United States*,
  127 F.3d 1154 (9th Cir. 1997)................................................................................ 22

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999) ...................................................... 4, 5, 9, 14, 15, 21

*Laconner Assocs. Ltd. Liab. Co. v. Island Tug & Barge Co.*,
  2008 WL 2077948 (W.D. Wash. May 15, 2008)..................................................... 21

*LuMetta v. U.S. Robotics, Inc.*,
  824 F.2d 768 (9th Cir. 1987)....................................................................... 3, 8, 11, 12

*Mukhtar v. Cal. State Univ.*,
  299 F.3d 1053 (9th Cir. 2002),
  *amended by* 319 F.3d 1073 (9th Cir. 2003) ..................................................... 5, 10, 20

*Thomas v. Newton Int'l Enters.*,
  42 F.3d 1266 (9th Cir. 1994)................................................................................... 3

*United States v. Alatorre*,
  222 F.3d 1098 (9th Cir. 2000)................................................................................ 21

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000).................................................................................. 3

*United States v. Vallejo*,
  237 F.3d 1008 (9th Cir. 2001),
  *amended by* 246 F.3d 1150 (9th Cir. 2001) .............................................................. 4

*United States v. Verduzco*,
  373 F.3d 1022 (9th Cir. 2004).......................................................................... 6, 21

Gibson, Dunn &
Crutcher LLP

1

**<u>TABLE OF AUTHORITIES</u>**
**(Continued)**

2

3

<u>Page(s)</u>

*Varnum v. Brien*,
   No. CV5965 (Iowa Dist. Ct. 2007) ................................................ 1, 9

*Volk v. United States*,
   57 F. Supp. 2d 888 (N.D. Cal. 1999) ........................................... 21

4

5

6

**RULES**

7

Fed. R. Evid. 104 ...................................................................... 1, 3, 4, 7, 17

Fed. R. Evid. 403 ............................................................. 1, 3, 6, 7, 11, 16, 21

Fed. R. Evid. 702 ......................................................... 1, 2, 3, 4, 6, 7, 8, 9

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.  INTRODUCTION

3

Proponents have offered three purported experts – Katherine Young, Loren Marks, and David

4

Blankenhorn – who fail to meet even the minimum requirements imposed by the Federal Rules of

5

Evidence.[1]

6

***Katherine Young.***  A self-described expert in "comparative religion" with an emphasis on

7

"Hinduism," Proponents offer Dr. Young's testimony on "what universally constitutes marriage and

8

why."  But Dr. Young lacks any relevant expertise to opine on this topic, and the conclusions set

9

forth in her report and deposition consist of little more than her own personal reflections on the

10

meaning of marriage.  They are based on no scientific or specialized methodology; indeed, Dr.

11

Young has not even reviewed the vast majority of the relevant literature and policy statements

12

produced by professional associations in the fields of anthropology, psychology, medicine, or child

13

welfare (to name only a few) because she deems them "irrelevant" to her inquiry.  For many of these

14

same reasons, Dr. Young's testimony was excluded in *Varnum v. Brien*, No. CV5965 (Iowa Dist. Ct.

15

2007), a case in which she offered testimony on the same issues.  Because Dr. Young lacks the

16

necessary qualifications to serve as an expert on any issues relevant to this matter and has no reliable

17

support for her conclusions, her testimony should be found inadmissible.

18

***Loren Marks.***  Dr. Marks seeks to opine generally on why the biological, marriage-based

19

family is the "ideal" structure for child outcomes, but lacks any relevant qualifications or background

20

to address that question with respect to the issues presented by this case – whether biological,

21

marriage-based families produce child outcomes that are better, worse or the same as same-sex parent

22

families, or even opposite-sex parent, adoptive families.  Dr. Marks has no discernible methodology

23

on which to base his claims (indeed, at several points, he disavowed his own conclusions on the

24

_____

25

[1]  Rebuttal expert discovery is ongoing and, pursuant to this Court's order of August 19, 2009,

26

does not conclude until December 31, 2009.  Doc #160.  Proponents' rebuttal experts have not yet been deposed.  Accordingly, Plaintiffs and Plaintiff-Intervenor reserve the right to move *in*

27

*limine* to exclude rebuttal expert reports, opinions, and testimony pursuant to Rules 104, 403, and 702 of the Federal Rules of Evidence following the completion of rebuttal expert

28

discovery.

Gibson, Dunn &
Crutcher LLP

1

1   importance of a biological link to child outcomes) and as such, his opinions are unreliable and

2   irrelevant under Federal Rule of Evidence 702.  Thus, this Court should find Dr. Marks' testimony,

3   opinions, and report inadmissible.

4        ***David Blankenhorn.***  Mr. Blankenhorn has no expertise in any academic field relevant to this

5   litigation, but nonetheless purports to offer "expert" opinion based on nothing more than his "reading

6   and reflection" on works from various fields in which he lacks expertise.  Mr. Blankenhorn's report

7   eschews any mention of either Prop. 8 or California generally.  Instead, he seeks to offer his general

8   conclusions on the purpose of the institution of marriage and the harms he personally believes will

9   result from allowing marriage of gay and lesbian individuals.  He has neither reviewed, nor is aware

10  of any data that support his belief that the institution of marriage is designed primarily to provide a

11  stable and loving environment for the biological children produced from that marriage.  Instead, he

12  supports his views by stringing together quotations from various other authors and pointing to his list

13  of the supposed harms of allowing gay and lesbian individuals to marry.  This list consists of nothing

14  more than a partial regurgitation of a list produced during an anonymous "group thought

15  experiment," and thus is not based on a reliable methodology as is required of admissible expert

16  conclusions under the Federal Rules of Evidence.  As such, his opinions should be deemed

17  inadmissible.

18       In short, these individuals are not qualified to serve as expert witnesses.  More importantly,

19  each of their generic conclusions, untethered to any of the specific factual issues in this case,

20  combined with the lack of any discernible methodology to support them, renders each of their

21  opinions unreliable and irrelevant under Federal Rule of Evidence 702.  For the reasons explained

22  herein, it is entirely appropriate for this Court to exclude these witness' testimony in advance of trial.

23  However, if the Court determines that it would be appropriate to explore their qualifications at trial

24  through direct and cross-examination, Plaintiffs and Plaintiff-Intervenor ask the Court to exclude

25  their testimony from evidence, or accord it little or no weight, after such evidence is presented during

26  trial.

27

28

Gibson, Dunn &
Crutcher LLP

2

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

## II.   THE LEGAL STANDARD GOVERNING EXPERT TESTIMONY

Federal Rule of Evidence 702 provides that expert testimony relating to "scientific, technical, or other specialized knowledge" is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  A witness qualified as an expert may only offer testimony "in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

In practical terms, this means that: (1) Proponents' Proposed Experts must qualify as experts, (2) the testimony, reports, and opinions of Proponents' Proposed Experts must be based on scientific, technical, or "other specialized knowledge" and concern a matter beyond a layperson's understanding; and (3) the testimony, reports, and opinions of Proponents' Proposed Experts must be reliable and relevant.  *See, e.g., United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). Additionally, expert testimony is subject to general evidentiary rules, such as Federal Rule of Evidence 403.  *See id*.

### A.   The Witness Must Qualify as an Expert

As a preliminary matter, a witness must first qualify as an expert before he or she may proffer expert testimony.  *See* Fed. R. Evid. 104(a).  A witness may be qualified as an expert on the basis of "knowledge, skill, experience, training or education."  *See* Fed. R. Evid. 702.  While Rule 702 "contemplates a broad conception of expert qualifications" that may be satisfied by a "minimal foundation of knowledge, skill, and experience," *see Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994), a witness still must have some *foundation* of knowledge, skill, or experience—a witness with cursory or very limited experience does not satisfy this "foundation" requirement.  *See, e.g., Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1005–1006 (9th Cir. 2001), *amended by* 272 F.3d 1289 (9th Cir. 2001) (finding purported expert on Korean business culture unqualified because witness lacked legal, business, or financial expertise to evaluate substance of transaction at issue, and witness had no education or training as a cultural expert or on Korean culture specifically); *LuMetta v. United States Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir. 1987) (affirming district court's

Gibson, Dunn & Crutcher LLP

1 finding that proffered witnesses were unqualified to serve as experts because of their minimal

2 experience and personal knowledge regarding the subject of their proposed testimony).

**B.     The Witness' Testimony Must Be Based on Scientific, Technical, or "Other Specialized" Knowledge and Must Concern a Matter Beyond a Layperson's Common Knowledge**

3

4

5         In order to be admissible expert testimony, the testimony must be based on "scientific,

6 technical, or other specialized knowledge [that] will assist the trier of fact."  Fed. R. Evid. 702.  A

7 witness may not testify as an expert unless he or she testifies about matters that are beyond the ability

8 and experience of the average layperson.  *See United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir.

9 2001), *amended by* 246 F.3d 1150 (9th Cir. 2001) (explaining expert testimony must also "address an

10 issue beyond the common knowledge of the average layman"); *Beech Aircraft Corporation v. United*

11 *States*, 51 F.3d 834, 842 (9th Cir. 1995) (excluding purported experts who were to offer testimony

12 "deciphering" audio recordings because "hearing is within the ability and experience of the trier of

13 fact.")  Testimony on an issue not outside a layperson's understanding does not assist the trier of fact

14 and is thus not admissible expert testimony.

**C.     The Witness' Testimony Must be Reliable and Relevant**

15

16         Under Federal Rule of Evidence 702, the trial judge is charged with the task of ensuring that

17 an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.  *Daubert*

18 *v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591–592 (1993).  This "gatekeeping obligation" applies

19 not only to scientific testimony, but also to testimony based on "technical" and "other specialized"

20 knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147–150 (1999).  Accordingly,

21 Proponents bear the burden of establishing by a preponderance of the evidence that the testimony,

22 opinions, and reports of Proponents' Proposed Experts are relevant and reliable.  *See* Fed. R. Evid.

23 104(a); *Daubert*, 509 U.S. at 589–593.

**1.     Reliability**

24

25         To be reliable, an expert's conclusions must be based on the knowledge and experience of his

26 or her discipline, rather than on subjective belief or unsupported speculation.  *See, e.g., Daubert*, 509

27 U.S. at 589–590; *Kumho Tire*, 526 U.S. at 148.  The trial court must "make certain that an expert,

28 whether basing testimony upon professional studies or personal experience, employs in the courtroom

Gibson, Dunn & Crutcher LLP

4

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1   *the same level of intellectual rigor* that characterizes the practice of an expert in the relevant field."

2   *Kumho Tire*, 526 U.S. at 152 (emphasis added).  In cases of scientific testimony, this means that an

3   expert's testimony must not only reflect scientific knowledge, but it also must be "derived by the

4   scientific method" and the work product must amount to "good science."  *See Daubert v. Merrell*

5   *Dow Pharmaceuticals*, 43 F.3d 1311, 1315 (9th Cir. 1995) (emphasis added) ("*Daubert II*").  In cases

6   of "technical" or "other specialized" testimony, the same standard applies, as would be applied to that

7   particular field.  *See Kumho Tire*, 526 U.S. at 147–150.  In essence, the Court "must ensure that 'junk

8   science' plays no part in the decision."  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir.

9   2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

10      The following non-exclusive factors may be considered in evaluating the reliability of an

11   expert's methodology or technique:  (1) whether the methodology or technique used can be (and has

12   been) tested; (2) whether the methodology or technique has been subjected to peer review and

13   publication; (3) whether the methodology or technique has a known potential rate of error; and (4)

14   whether the methodology or technique is generally accepted in the relevant scientific or technical

15   community.  *See Daubert*, 509 U.S. at 591, 593–594; *Kumho Tire*, 526 U.S. at 149–150.

16      Whether the expert's testimony "grow[s] naturally and directly out of research they have

17   conducted *independent of the litigation*, or whether they have developed their opinions expressly for

18   purposes of testifying" is particularly significant in evaluating reliability.  *Daubert II*, 43 F.3d at 1317

19   (emphasis added).  The Court, with few exceptions, "may not ignore the fact that a scientist's normal

20   workplace is in the lab or the field, not the courtroom or the lawyer's office."  *Id*.  If evidence of pre-

21   litigation research or peer review is not available, the expert must (1) "explain precisely how they

22   went about reaching their conclusions" and (2) "point to some objective source – a learned treatise, a

23   policy statement of a professional association, a published article in a reputable science journal or the

24   like to show that they have followed the scientific method as it is practiced by (at least) a recognized

25   minority of scientists in their field.  *Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc.*, 55 F. Supp.

26   2d. 1024, 1030, 1034 (N.D. Cal. 1999), citing *Daubert II*, 43 F.3d at 1319.

27      Finally, the Court must inquire into whether the witness has *applied* the principles and

28   methods reliably to the facts of the case.  *See Daubert*, 509 U.S. at 593.  Although the trial court may

Gibson, Dunn &
Crutcher LLP

5

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1   not decide upon the *correctness* of the expert's conclusion, it may "conclude that there is simply too

2   great an analytical gap between the data and the opinion proffered." *Domingo ex rel. Domingo v.*

3   *T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (quoting *General Electric v. Joiner*, 522 U.S. 136, 146

4   (1997)).  In other words, the necessary connection between the expert's methodology and ultimate

5   conclusion may not be established on speculation alone.  *Joiner*, 522 U.S. at 146 ("[N]othing in either

6   *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

7   connected to existing data only by the *ipse dixit* of the expert.")

8          **2.      Relevance**

9          In addition to being based reliable, an expert's testimony must be relevant.  The Court must

10  assess whether the proffered expert testimony is sufficiently tied to the facts of the case such that it

11  will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509

12  U.S. at 591 (citing Fed. R. Evid. 702).  Specifically, there must be a "fit" or valid connection between

13  the expert's reasoning or methodology and the pertinent inquiry—the facts at issue—before the

14  Court.  *Daubert*, 509 U.S. at 591–593.

15         In the context of this case, this Court has already identified areas of factual dispute that may

16  be relevant to the issues presented in three areas:  (1) the appropriate level of scrutiny under the Equal

17  Protection clause; (2) evaluation of the state interests Proponents assert as bases for Prop. 8; and (3)

18  whether Prop. 8 discriminates based on sexual orientation or gender or both; and (4) whether Prop. 8

19  was passed with a discriminatory intent.  Doc #76 at 6–9.  With respect to each of these categories,

20  the Court elaborated the areas of factual development that may assist the Court in deciding these

21  issues:

22  **D.      The Probative Value of the Purported Expert's Testimony Must Outweigh its**
    **Prejudicial Effect**

23         Finally, as with all evidence, expert testimony may be excluded if its probative value is

24  substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time,

25  undue delay, or needless presentation of cumulative evidence.  Fed. R. Evid. 403; *United States v.*

26  *Verduzco*, 373 F.3d 1022, 1032–1035 (9th Cir. 2004) (affirming trial court's exclusion of testimony

27  of expert witness under Fed. R. Evid. 403).  Because expert evidence may be misleading and is

28

Gibson, Dunn &
Crutcher LLP

6

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

difficult to evaluate, a judge "exercises more control over experts than lay witnesses" in weighing prejudice against probative value. *Daubert*, 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules is Sound*, 138 F.R.D. 631, 632 (1991)).

### III.   THE COURT SHOULD EXCLUDE THE TESTIMONY OF PROPONENTS' PROPOSED EXPERTS – YOUNG, MARKS AND BLANKENHORN

Proponents offer Katherine Young, Loren Marks and David Blankenhorn as expert witnesses in this case.  The reports of each of these witnesses and their statements during their depositions establish that they do not meet the requirements set forth in Federal Rule of Evidence 104, 403 and 702.

### A.   Katherine Young

#### 1.   Dr. Young is Not Qualified to Offer an Expert Opinion on Any Issue in This Case

Proponents proffer Katherine Young, a professor in the Faculty of Religious Studies at McGill University, as an expert in "comparative religion."  (Young Expert Report ("Young Rep.") 1.) Dr. Young seeks to offer her "expertise" to explain "what universally constitutes marriage and why." (*Id*.)  Dr. Young is not an expert in sociology, psychology, anthropology, biology, medicine, child development, statistics, survey construction and methodology or political science.  (Young Dep. 7:8-20; 37:14-38:9, November 13, 2009.)  She admits she has not submitted any articles for peer review in any relevant field.  (*See, e.g.*, *id*. at 11:19-13:5.)  Indeed, her "expertise" is far more narrow than the term "comparative religion" might indicate.  She considers herself an expert only in the field of religious studies, and then only in Hinduism.  (*Id*. at 29:11-19; 60:19-25.)  She does not specialize in American religions, and she is not an expert on American denominations.  (*Id*. at 65:14-16; 67:5-11.) She has not studied marriage of same-sex couples in California, the United States, or in the world generally.  (*Id*. at 104:14-25.)  As an academic in the field of Hindu religious studies, Dr. Young simply has no foundation of knowledge, skill or experience necessary to serve as an expert on "comparative religion" and certainly not on any of the factual issues presented by this case.  Indeed, she has acknowledged that the separation of church and state renders any comparison between legal regimes based on religion (i.e., Hindu) to western civil law regimes inapposite to the question of whether Prop. 8 is unconstitutional under Equal Protection Clause.  (*Id*. at 232:21-233:6.)

7

Gibson, Dunn & Crutcher LLP

1   Accordingly, Dr. Young lacks even a minimal foundation of knowledge required by Federal Rule of

2   Evidence 702 to qualify her as an expert in this case. *See, e.g., LuMetta*, 824 F.2d at 771 (affirming

3   exclusion of experts for their minimal experience and lack of substantial personal knowledge of the

4   subject matter relevant to the case).

5       **2.**       **Dr. Young's Opinion Lacks Relevance to the Factual Issues of this Case**

6           This Court has identified certain factual issues that may be pertinent to the resolution of the

7   issues presented by this litigation. Doc #76 at 6–9. Those issues are specific to the factual situation

8   presented in this case – the passage of Prop. 8 in California and the resulting deprivation of the

9   constitutional rights of gay and lesbian individuals in California. Not only does Dr. Young's

10  testimony in her expert report and deposition have *no* relationship to any of the issues identified by

11  the Court, but Dr. Young has expressly disclaimed her willingness or ability to offer expert testimony

12  on those issues, even when those issues might have some interplay with her study of religion.

13  Specifically, Dr. Young has stated that she has no opinion on: (1) whether permitting marriage of

14  same-sex couples would affect the number of heterosexual marriages or divorces (*id*. at 120:3-14);

15  (2) whether permitting marriage of same-sex couples affects the desire of heterosexuals to marry (*id*.

16  at 120:15-18); (3) whether or not discrimination against gay and lesbian individuals causes stress or

17  psychological damage (*id*. at 172:5-16; 173:18-25); (4) whether or not prohibiting gay and lesbian

18  individuals from marrying would have an adverse effect on them or their children, or whether

19  permitting them to marry would benefit them and their children. (*Id*. at 191:17-192:1.) She has

20  further stated that she has no opinion on what proportion of people opposed to marriage of same-sex

21  couples in California were motivated primarily by their religious beliefs. (*Id*. at 69:6-13.)

22          In short, Dr. Young seeks to testify on some broad-based conception of the "universal"

23  features and functions of marriage that have no relationship to any of the factual issues in dispute and

24  is based on little more than her speculation that such musings might be relevant. They are not and,

25  even if testimony on such supposed "universal" truths were somehow relevant, any opinion Dr.

26  Young might provide could not meet the standards for reliable expert testimony under Federal Rule

27  of Evidence 702. Indeed, any opinions Dr. Young has – *by her own admission* – are not based on

28  review of any studies that might enable her to offer conclusions on any issue in this case, and thus her

Gibson, Dunn &
Crutcher LLP

8

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1  opinions are based on nothing more than the "subjective belief or unsupported speculation" found

2  insufficient in *Daubert*.  *Daubert*, 509 U.S. at 589–590.

3       **3.**     **Dr. Young's Opinion Lacks a Reliable Methodology**

4       As an initial matter, Dr. Young lacks any methodology for arriving at the conclusions stated

5  in her report and deposition.  Her report consists of nothing more than her examination of a random

6  selection of societies to search for patterns that she categorizes as "universal."  (Young Rep. 2, 8.)

7  And her "comparative study of the worldview of major cultures and religions and the worldviews of

8  small-scale societies" is based on nothing more than her review of the work of one other academic

9  who did not consider the possibility of marriage of same-sex couples.  (Young Rep. 2, 12; Young

10  Dep. 137:1-141:18.)  Dr. Young has no systematic criteria for determining what constitutes a

11  "pattern" or what can determine "universality" and even concedes that these characterizations are not

12  absolute.  (Young Rep. 2.)  This haphazard sampling cannot constitute a methodology and amounts to

13  little more than a recitation of Dr. Young's personal musings on what might be included in the

14  definition of marriage.  The absence of any discernible methodology renders Dr. Young's testimony

15  inadmissible as unreliable under Federal Rule of Evidence 702.  *Daubert*, 509 U.S. at 590 ("Proposed

16  testimony must be supported by appropriate validation"); *Daubert II*, 43. F.3d at 1319 ("experts must

17  explain precisely how they went about reaching their conclusions"); *Jinro America Inc.*, 266 F.3d at

18  1006 (excluding "impressionistic generalizations" based on haphazard experiences, anecdotal

19  examples, and news articles).  Indeed, Dr. Young previously offered virtually identical testimony in

20  litigation raising similar issues in *Varnum v. Brien*, No. CV5965 (Iowa Dist. Ct. 2007), and the trial

21  court there ruled Dr. Young's testimony inadmissible under the Iowa rules of evidence for precisely

22  this reason.  (*See* Declaration of Rebecca Justice Lazarus, Exh. G at 6–7.)

23       Moreover, by definition, Dr. Young cannot bring "the same level of intellectual rigor that

24  characterizes the practice of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152, to her

25  testimony because she admits that she has not studied any issues central to the factual disputes in this

26  case.  She purports to offer opinions and conclusions on the importance of protecting her defined

27  "norm" of marriage and predicts that changes in those norms would destabilize marriage.  (Young

28  Rep. 11; Young Dep. 222:12-15.)  But Dr. Young has not studied whether allowing gay and lesbian

Gibson, Dunn &
Crutcher LLP

9

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1   individuals to marry would actually affect that norm.  For example, Dr. Young has not studied:  (1)

2   the extent to which permitting marriage of same-sex couples affects the desire of heterosexuals to

3   marry (*id*. at 120:15-18); (2) the extent to which permitting marriage of same-sex couples affects the

4   stability or number of heterosexual marriages (*id*. at 119:10-120:18); (3) whether civil unions are

5   equally as successful as marriage at creating "durable" relationships (*id*. at 87:20-88:23); or (4) the

6   effects of domestic partnership laws or civil unions on marriage (*id* at. 95:4-97:18; 98:7-101:2).  In

7   effect, Dr. Young's failure to offer any support for her conclusions renders her opinions little more

8   than "junk science" that the Court "must ensure takes no part in the decision." *Mukhtar*, 299 F.3d at

9   1063.

10        Indeed, the lack of any objective data results in internal inconsistencies in Dr. Young's

11   analysis that further undermines the reliability of her conclusions.  She acknowledges that it is not

12   necessarily harmful (and, in fact, can be beneficial) if norms of the past change to accommodate

13   alterations in social values and understandings (*id*. at 197:12-18), but has not studied the conditions in

14   the United States that might be relevant to whether it is desirable for the United States and its citizens

15   to end the prohibition on marriage by gay and lesbian individuals.  (*Id*. at 211:16-23.)

16        Dr. Young also cannot offer reliable testimony because she has failed to consult, review or

17   evaluate *any* of the relevant authorities (and their associated methodologies) in *any* academic field on

18   the issues surrounding the marriage rights of gay and lesbian individuals.  She has not endeavored to

19   determine what the various professional associations who have issued opinions on the implications of

20   marriage of same-sex couples have said with respect to any of the opinions she advances in her expert

21   report.  (*Id*. at 152:15-153:23.)  Indeed, she believes that such information would not be relevant to

22   her analysis.  (*Id*. at 156:5-19.)  She does not know whether the professional associations in the fields

23   of psychology, anthropology or sociology have taken a position on whether gay and lesbian

24   individuals should be permitted to marry one another, much less what those positions are.  (*Id*. at

25   105:8-106:4; 152:15-153:23.)  She offers opinions on the "likely effects of legalizing same-sex

26   marriage on children" (Young Rep. 18), but she has not studied what proportion of children are being

27   raised by two married people of the opposite sex.  (*Id*. at 73:6-19.)  Similarly, she has no knowledge

28   of any statements by professional organizations concerning whether or not same-sex parents are as

Gibson, Dunn &
Crutcher LLP

10

effective as heterosexual parents in raising well-adjusted children.  (*Id*. at 106:5-107:16; 108:15-109:22.)  She has not looked at the question of whether psychologists and sociologists believe it is necessary to have time series data to address the effect of marriage of same-sex couples on child welfare.  (*Id*. at 91:21-92:3.)  Dr. Young simply ignores what others with actual expertise in relevant academic fields have concluded or considered in analyzing the same question she purports to answer.  Such willful blindness renders her report unreliable.  *See, e.g., Daubert*, 509 U.S. at 589–590 (holding expert conclusions must be based on the knowledge and experience of his or her discipline, not on "subjective belief or unsupported speculation"); *LuMetta*, 824 F.2d at 771 (affirming exclusion of witnesses who lacked knowledge about the relevant subject matter).

Even in the area of religion, in which Dr. Young purports to have some expertise, she has failed to review or study any information that might provide a basis for her conclusions in this case.  For example, she has not studied how the major Western religions or U.S. churches view homosexuality.  (*See, e.g.*, Young Dep. 63:7-20 (Roman Catholicism), 69:21-70:10 (Baptist), 70:11-12 (Presbyterianism)).  These deficiencies underscore that Dr. Young has not (and cannot) apply the principles she espouses to the facts of this case in any reliable manner.

### 4.    Dr. Young's Testimony Would Waste Time and Create Confusion and is thus Inadmissible Under Federal Rule of Evidence 403

Dr. Young does not even purport to offer any opinion on any factual dispute in this case, and her opinions are unreliable.  Thus, consideration of Dr. Young's testimony would waste time and create confusion.  *See* Fed. R. Evid. 403.  Accordingly, Dr. Young's testimony also fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

## B.    Loren Marks

### 1.    Dr. Marks is Not Qualified to Offer an Expert Opinion in this Case

Proponents also proffer Dr. Loren Marks, an associate professor at the College of Agriculture at Louisiana State University.  (Marks Expert Report ("Marks Rep.") 1.)  Dr. Marks seeks to testify as an expert on whether a "biological, marriage-based family" is "the ideal structure for child outcomes."  (*Id*.)  But Dr. Marks does not have the experience or education necessary to make a determination on what type of family structure is "ideal" for child outcomes.  His self-described areas

Gibson, Dunn & Crutcher LLP

11

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

of research interest include faith and families and African American families – discrete areas that hardly provide Dr. Marks an adequate foundation to opine on an "ideal structure" for child outcomes. (Marks Dep. 44:10-16, October 30, 2009.)  He has never conducted original research on children with gay or lesbian parents, and has never published or even written any works on the issue.  (*Id*. at 58:3-12.)  Similarly, Dr. Marks' work has not even focused on the general subject area of child adjustment. (*Id*. at 53:21-54:10.)  Dr. Marks' expert report further demonstrates his lack of qualifications.  As Dr. Marks has no experience in the field in which he is purported to be an expert, Dr. Marks' expert report contains no references to his own work, and he did not consider any of his own work for the report.  *See* Marks Rep.  Thus, Dr. Marks lacks the experience or knowledge required to qualify as an expert on the "ideal" family structure for "child outcomes."  *See LuMetta*, 824 F.2d at 771 (excluding experts who had some knowledge, but lacked experience with either the specific contract in question or the specific type of company in question).

### 2.   Dr. Marks' Report, Opinions, and Testimony Have No Relevance to this Litigation

Dr. Marks' expert report, opinions, and testimony should be excluded because the subjects upon which Dr. Marks opines have no relevance to the factual issues in this litigation.  To be admissible, an expert opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *See, e.g., Daubert*, 509 U.S. at 591.  The only factual dispute that Dr. Marks has been proffered to opine on is Proponents' claim that the state has an interest in preventing marriage of gay and lesbian individuals because it would negatively affect child outcomes.  This Court has specified that this specific factual dispute is whether a married mother and father provides the optimal child-rearing environment and whether excluding same-sex couples from marriage promotes this environment.  Doc #76 at 7–8.  Dr. Marks' report does not assist in answering those questions, however, because he does not address child outcomes when the parents are of the same-sex and thus cannot possibly illuminate any relevant factual disputes.  Dr. Marks himself admits that his expert report does not express an opinion about child outcomes for same-sex couples.  (*Id*. at 114:2-115:14.)  Dr. Marks' report only addresses the comparison of outcomes for children in biological, intact families with non-marital, divorced, and/or step-families.  (*Id*. at 88:17-90:9.)  All three of

Gibson, Dunn & Crutcher LLP

12

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1  these categories exclude the relevant family unit at issue here—a couple – gay or straight, that

2  biologically cannot have children, but together decide to adopt or utilize an egg or sperm donor.  As

3  Dr. Marks has asserted that his expert opinions are limited to those cited in his expert report and

4  "whatever shows up in [his] rebuttal,"[2] the universe of what Dr. Marks has to offer the Court, in way

5  of expert opinion, lies in his expert report.  (*Id.* at 61:10-62:4.)  However, Dr. Marks' expert report

6  entirely fails to address the relevant issue at hand – the outcomes of children of same-sex couples as

7  compared to children of opposite sex couples who are biologically related to their children.  Thus, Dr.

8  Marks' expert opinions must be excluded as they will not assist the Court to understand whether the

9  Proponents' claim that excluding same-sex couples from marrying will promote optimal outcomes.

10  *See Daubert*, 509 U.S. at 591 (explaining expert opinion must assist trier of fact to resolve a factual

11  dispute to be admissible).

12          Further, Dr. Marks would be unable to draw any relevant conclusions from his understanding

13  of studies comparing child outcomes in a biological, "in-tact" family with non-marital, divorced, and

14  step-families, as he concedes that same-sex parents should be studied as their own discrete category.

15  (*See id.* at 239:14-22.)  Accordingly, Dr. Marks' complete reliance on studies excluding same-sex

16  parents undermines his ability to opine on the impact same-sex parents have on child outcomes.

17  *Joiner*, 522 U.S. at 144–145 (upholding district court's rejection of expert opinions because the

18  opinions were based on studies that were too dissimilar to the facts presented in the relevant litigation

19  and the experts failed to explain how and why they were able to extrapolate their opinions from the

20  dissimilar studies).  Moreover, in his deposition, Dr. Marks withdrew his claim that *genetic* parent-

21  child relationships are important to child outcomes and noted that he knows of no empirical research

22  that identifies biology as the cause of good outcomes for children.  (*Id.* at 81:18-82:9; 147:9-21.)  Dr.

23  Marks also has no opinion as to the best family form for a child for which the "intact, biological

24  family" (as he defines it) is unavailable.  (*Id.* at 102:7-10.)  Thus, Dr. Marks should not be permitted

25

26  [2]   Given the major deficiencies in Dr. Marks' expert report, during his deposition, Dr. Marks
27      claimed that he planned to prepare and submit a rebuttal report to specifically address
       literature on same-sex parents.  (Marks Dep. 32:13-33:1, 37:8-40:1, 61:10-62:4.)  Dr. Marks
28      never submitted such a rebuttal.

Gibson, Dunn &
Crutcher LLP

13

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

to extrapolate any opinions, as he has admitted that he has no familiarity with any material that would be able to support his conclusions without causing the "analytical gap" prohibited in *Joiner*, 522 U.S. at 145.

### 3.   Dr. Marks' Report, Opinions, and Testimony are Unreliable

In addition to being irrelevant, Dr. Marks' expert opinions are unreliable.  To arrive at his conclusions, Dr. Marks utilizes no discernible methodology.  *See Daubert II*, 43 F.3d at 1319 (explaining that a failure to explain the methodology utilized to arrive at a conclusion does not satisfy the *Daubert* reliability requirement).  At best, Dr. Marks' expert report and testimony are akin to a shallow book report.  As evidenced by his expert report and deposition testimony, Dr. Marks' "opinions" are nothing more than brief, out-of-context quotations of *other* scholars.  Reciting the conclusions or summaries of others, without offering explanation or elaboration on how these out-of-context conclusions from other studies relate to the immediate case, cannot be considered to meet the "same level of *intellectual rigor* that characterizes the practice of an expert in the relevant field."  *See Kumho Tire*, 526 U.S. at 152.  Further, not only does Dr. Marks simply parrot the conclusions of others, Dr. Marks makes no effort to explain why such conclusions are applicable in the immediate case.  Although "[t]rained experts commonly extrapolate from existing data," "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" may be excluded.  *See Joiner*, 522 U.S. at 146.  Further, without any context or insight into the quoted studies, it is impossible to determine if the studies themselves are reliable or being cited in a reliable manner that is true to their full findings.

Not only does Dr. Marks fail to offer any analysis or insight into any of the studies he quoted, but he admits that he did not even completely read the studies cited in his report.  (Marks Dep. 65:10-66:6; 67:6-13.)  Failing to read the sources upon which one *entirely* relies to draw conclusions can hardly be considered a hallmark of a reliable methodology.[3]  More critically, Dr. Marks did not know

---

[3]   Further calling into question Dr. Marks' diligence, Dr. Marks admits that some of the work he has done should not be considered "high quality social science."  (Marks Dep. 50:10-14; 51:9-52:7; 54:12-17.)  Dr. Marks also admits that none of his own published articles can be characterized as "gold standard, high end work."  (*Id*. at 71:1-7.)

Gibson, Dunn & Crutcher LLP

14

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1    how the studies he cited actually defined the terms "biological" or "intact" – an essential piece to

2    understanding the meaning of the studies Dr. Marks relies upon for making his conclusions.  (*See,*

3    *e.g.,* 158:12-159:8.)  Dr. Marks was similarly unable to verify that the studies he cited that used the

4    term "biological parent" defined it in a manner which excluded adoptive parents, as Dr. Marks

5    purports the term "biological parent" should.  In one instance, Dr. Marks even cites a study, which

6    cited another study, that states most studies *do not* distinguish biological parents from adoptive

7    parents.  (*Id.* at 144:3-13.)  This lack of clarity in how his sources use "biological" is clearly not

8    because the definition of "biological" is unimportant to Dr. Marks' findings – Dr. Marks himself

9    admits that using two sources, that each define the term differently, to draw one conclusion is

10   problematic.  (*See id.* at 139:14-140:9.)  Thus, it would be hard for Dr. Marks to credibly claim that

11   he employed the *same level of intellectual rigor* that an expert in his field would be expected to

12   employ.  *See Kumho Tire*, 526 U.S. at 152 (holding trial court must "make certain that an expert . . .

13   employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

14   expert in the relevant field").

15          Dr. Marks himself also lacks familiarity with relevant studies that would assist him in coming

16   to his conclusions.  At the time of Dr. Marks' deposition, Dr. Marks could only name two studies,

17   one from 1996 and one from 2004, that compared different family structures, including same-sex

18   parents.  (*See* Marks Dep. 30:4-32:10.)  Dr. Marks was unable to provide any specificity about either

19   study at his deposition and did not cite either study in his expert report or list either study in his

20   "materials considered" index.  (*See id*; Marks Rep.)  Dr. Marks was also unable to name or even

21   generally describe any other studies comparing child outcomes by same-sex couples and heterosexual

22   couples.  (*See id.*)  Dr. Marks stated that "if he [was] a betting person" he would assume that "there

23   have been studies that have come out recently that I'm unaware of."  (Marks Dep. 33:3-7.)  Dr.

24   Marks' lack of relevant knowledge not only indicates a likely lack of methodology, it also indicates

25   the opinions Dr. Marks has to offer about "ideal" child outcomes or child outcomes in same-sex

26   families were developed purely for this litigation.  An important hallmark of evaluating reliability is

27   whether the purported expert's opinions are based in research that was conducted independently from

28   the litigation.  *See Daubert II*, 43 F.3d at 1317.  Clearly, Dr. Marks' opinions asserted in this

Gibson, Dunn &
Crutcher LLP

15

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

litigation were developed for the first time after being commissioned for this litigation. Accordingly, Dr. Marks was required to "explain precisely how [he] went about reaching [his] conclusions" – which he has entirely failed to do. *Id.*

Further, Dr. Marks' admitted personal, religious views towards traditional marriage also undermine the objectivity (and thus reliability) of his conclusions. Dr. Marks' religious conviction and personal dogma is that children are entitled to be born within the bonds of matrimony and to be reared by a father and mother who honor marital vows with complete fidelity. (Marks Dep. 260:15-262:6.) This personal dogma was developed *before* Dr. Marks graduated from college and well before Dr. Marks began to consider himself a "social scientist." (*Id.* at 275:5-276:3.) Dr. Marks admitted that this personal dogma "ran around in [his] head" when he wrote his expert report. (*Id.* at 274:8-275:4.) Accordingly, not only does Dr. Marks' lack of methodology cast severe doubt about the admissibility of his conclusions, but Dr. Marks' own possible personal bias calls his unsupported conclusions further into question.

### 4. Dr. Marks' Report, Opinions, and Testimony Lack Probative Value and are thus Inadmissible Under Federal Rule of Evidence 403

The complete irrelevance of Dr. Marks' conclusions to any issue in the case demonstrates the lack of any probative value his conclusions may offer the Court. Thus, Dr. Marks' report, opinions, and testimony are inadmissible under Fed. R. Evid. R. 403.

### C. David Blankenhorn

### 1. Mr. Blankenhorn is Not Qualified to Offer an Expert Opinion in this Case

Proponents submit David Blankenhorn as an expert on "issues of family policy and family well-being with a particular focus on the institution of marriage." (Blankenhorn Expert Report ("Blankenhorn Rep.") 1.) Mr. Blankenhorn considers himself to be an expert on marriage, fatherhood and family structure. (Blankenhorn Dep. 116:8-22, November 3, 2009.) But none of Mr. Blankenhorn's undergraduate or graduate course work focused on any of these issues. Indeed, he did not take any courses in anthropology, psychology, child welfare or sexual orientation. (*Id.* at 19:18-22; 22:6-17; 24:18-22.) Rather, his undergraduate course work was focused on labor history, and his masters thesis researched the comparative contributions of two British cabinetmakers' trade unions

Gibson, Dunn &
Crutcher LLP

16

"in shaping the emergence of the British working people." (*Id*. at 20:3-9; 23:11-24:17.)  Other than

his bachelors and masters work focused on labor history, Mr. Blankenhorn has no other academic

training. (*Id*. at 25:6-11.)  He does not have a Ph.D. (*Id*.)  His claim to "expertise" in the areas in

which he seeks to testify is based on nothing more than his work with the Institute for American

Values and his "continuing anthropological, historical and cultural study of the institution of

marriage." (*Id*. at 30:1-6; 54:3-15.)  This "study" consists of "reading and reflecting on the texts in

the field" and "discussions with other scholars." (*Id*. at 54:3-15.)  He has never published any work

in any peer-reviewed journal; most of his published work is produced by his organization, the

Institute for American Values. (*Id*. at 55:19-56:14.)  In short, Mr. Blankenhorn has no expertise in

any relevant academic field and is not qualified to serve as an expert under Federal Rule of Evidence

104.

### 2.      Mr. Blankenhorn Has No Relevant Opinions to Offer

It is not at all clear what relevance Mr. Blankenhorn's self-described "personal" views on

marriage and family have to the specific factual issues in this case. (*Id*. at 92:20-93:2.)  Mr.

Blankenhorn has not reviewed the Complaint in this action. (*Id*. at 74:12-18.)  He is not offering any

opinions about the actual motivation of voters or official proponents in passing Prop. 8. (*Id*. at 84:15-

85:2.)  Indeed, he does not mention either Prop. 8 or the state of California in his report. (*See*

*generally* Blankenhorn Rep.; *see also* Blankenhorn Dep. 76:13-17; 77:21-78:2; 89:21-90:18.)  In

these circumstances, Mr. Blankenhorn is incapable of tying his proffered testimony to the facts of the

case, and any testimony he might give would be irrelevant to the issues in this case. *See Daubert*,

509 U.S. at 591 (holding expert testimony must be sufficiently tied to the facts of the case such that it

will "assist the trier of fact to understand the evidence or to determine a fact in issue" to be

admissible).

### 3.      Mr. Blankenhorn's Conclusions Are Not Based on a Discernible Methodology and are Unreliable

Given the lack of Mr. Blankenhorn's expert qualifications, it is not surprising that his

conclusions are based on no objective data or discernible methodology, and that there are numerous

inconsistencies in his testimony.  In his report, Mr. Blankenhorn states that "[a]s an intellectual

Gibson, Dunn &
Crutcher LLP

17

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

matter, whether or not to grant equal marriage rights to gay and lesbian persons depends importantly on one's answer to the question, 'What is marriage?'" (Blankenhorn Rep. 3.)  He then groups quotations taken from a number of sources into two categories – those quotations he believes support the argument that "marriage is fundamentally a private adult commitment" and those that support the argument that "marriage is fundamentally a pro-child social institution." (Blankenhorn Rep. 3–11.)  Although he acknowledges that it is not possible to demonstrate empirically that the view that marriage is fundamentally a "pro-child" social institution is the only valid view (Blankenhorn Rep. 11), Mr. Blankenhorn nonetheless asserts that it is possible to demonstrate that that view is "consistent with much of the most respected scholarship of the modern era" and "widely embraced by intelligent, fair-minded leaders and citizens of good will." (Blankenhorn Rep. 11.)  He then argues that marriage as an institution focuses on "bringing together the male and female of the species into a common life" (Blankenhorn Rep. 12) "because humans favor the survival and success of the human child." (*Id*. at 13.)  To support this claim, Mr. Blankenhorn again lists several pages of quotations taken from various selected articles and reports. (*Id*. at 13-15.)  This list of quotations, together with Mr. Blankenhorn's personal views, are the sole basis for his conclusion that "[i]f human beings were not sexually embodied creatures who everywhere reproduce sexually and give birth to helpless, socially needy offspring who remain immature for long periods of time and who therefore depend decisively on the love and support of both of the parents who brought them into existence, the world almost certainly would not include the institution of marriage." (Blankenhorn Rep. 15; Blankenhorn Dep. at 105:16-106:9.)  Indeed, this type of testimony embodies the very type of expert testimony prohibited in *General Electric v. Joiner*, 522 U.S. at 146.

In a nutshell, Mr. Blankenhorn's conclusion is that the primary purpose of marriage is to insure that children receive love and support from their biological parents.  But that conclusion is unsupported by logic – let alone data or research.  Mr. Blankenhorn admits that the law governing who can marry does not inquire into the motivation of those individuals to marry – procreative or otherwise. (Blankenhorn Dep. 174:19-190:2; 189:17-190:2.)  Indeed, he acknowledges that people who cannot procreate at all are still allowed to marry, as are people who have had children previously and abandoned them. (*Id*. at 189:17-190:2;195:4-199:17.)  He also admits that a lesbian or gay

Gibson, Dunn &
Crutcher LLP

18

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1    couple that adopts a child is no less attentive or loving or caring toward their children than a

2    heterosexual couple.  (*Id*. at 211:8-21.)  Indeed, in a situation in which biological parents do not want

3    a child, he is not opposed to a gay or lesbian couple adopting that child.  (*Id.* at 231:6-22.)

4         Although Mr. Blankenhorn "personally" opposes marriage of same-sex couples on these

5    grounds (*id.* at 92:20-93:2), he relies on no discernible methodology to support his views.  Indeed, he

6    summarizes the process through which he arrived at these views for purposes of this litigation as

7    devoting "some days and weeks to reading and trying to organize my thoughts and trying to refresh

8    my recollection about other previous work that I have done."  (*Id*. at 116:8-22.)  He has expressly

9    disclaimed relying on anything more rigorous to form his opinion in this case (*id*. at 105:16-106:9)

10   and admits he has not even read all of the "materials considered" listed in his expert report in their

11   entirety.  (*Id*. at 110:8-22.)  Despite Mr. Blankenhorn's thesis that marriage confers advantages on

12   children biologically related to both parents in the marriage, in his deposition, he could not provide

13   the name or authors of any published studies that compare one family where both parents have a

14   biological connection to the child and a family where one or both parents is not biologically

15   connected to the child.  (*Id*. at 267:5-272:16.)  And he admits that he certainly did not consider any

16   such study in assembling his report.  *Id*.  Similarly, he is aware of no studies supporting the view that

17   children raised from birth by gay or lesbian couples have any worse outcomes than those raised by

18   biological different sex parents.  (*Id*. at 272:17-21.)  He candidly admits that allowing a same-sex

19   couple with children to marry would likely be beneficial for both the couple and their children.  (*Id.*

20   at 282:21-283:10.)

21        Mr. Blankenhorn also purports to offer the opinion that marriage of gay and lesbian

22   individuals will "deinstitutionalize" marriage, transforming it "from a pro-child social institution into

23   a post-institutional private relationship."  (Blankenhorn Rep. 22.)  Of course, Mr. Blankenhorn's

24   conclusion on this point is built on his argument that marriage is a "pro-child institution" and, as

25   explained above, he has no reliable methodology or basis to support that conclusion.  Moreover, Mr.

26   Blankenhorn admits that the "deinstitutionalization" of marriage was occurring long before marriage

27   of gay and lesbian individuals was legalized in any jurisdiction.  (Blankenhorn Dep. 293:21-294:13.)

28   Indeed, he identifies the primary drivers of the phenomenon as: "divorce, out of wedlock

Gibson, Dunn &
Crutcher LLP

19

09-CV-2292 VRW  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE PROPOSED EXPERTS YOUNG, MARKS, AND BLANKENHORN

1    childbearing and nonmarital cohabitation," not marriage between people of the same-sex.  (*Id*. at

2    288:13-290:2.)

3        Mr. Blankenhorn lists "nineteen specific answers" to the question of the potential harms he

4    believes will result from allowing gay and lesbian individuals to marry.  (Blankenhorn Rep. 22-24.)

5    But these "answers" can hardly constitute reliable expert testimony.  The list is taken word for word

6    from his book *Future of Marriage* with the exception that five "answers" in the book were omitted.

7    (Blankenhorn Dep. 314:2-315:11.)  But Mr. Blankenhorn did not develop the list in either *Future of*

8    *Marriage* or his report.  Rather, the list represents Mr. Blankenhorn's "report" on the results of a

9    "group thought experiment" in which the list was developed by a group of anonymous[4] individuals

10   who met in three one-day sessions.  (*Id*. at 315:12-316:10; 318:6-18.)  The "methodology" employed

11   by the group to generate the list consisted of writing ideas voiced by members of the group on

12   chalkboards and poster paper over the course of these three meetings.  (*Id*. at 316:21-317:16; 320:10-

13   14; 320:21-321:3; 322:1-6.)  This is a far cry from what courts in this Circuit and elsewhere have

14   required to constitute a reliable methodology on which to base expert testimony and conclusions.

15   *See, e.g., Domingo*, 289 F.3d at 607 ("reasoning between steps in a theory must be based on

16   objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in

17   the field").  Indeed, it would be impossible to even apply, much less evaluate, the factors courts

18   generally consider in evaluating the reliability of the expert's methodology because Mr.

19   Blankenhorn's "group thought experiment" is based on no methodology at all.  *See Daubert II*, 43.

20   F.3d at 1319 ("experts must explain precisely how they went about reaching their conclusions");

21   *Mukhtar*, 299 F.3d at 1063 ("the trial judge must ensure that 'junk science' plays no part in the

22   decision"); *Jinro Am. Inc.*, 266 F.3d at 1006 (excluding "impressionistic generalizations").

23       **4.    Mr. Blankenhorn's Testimony Would Waste Time and Create Confusion**
              **and is thus Inadmissible Under Federal Rule of Evidence 403**
24
25       Mr. Blankenhorn possesses no expertise in any relevant academic field.  He does not offer

26   opinions relevant to the specific facts in dispute, and his conclusions do not even approach the

27       [4]   Mr. Blankenhorn refused to identify the participants in the "group thought experiment" when
            asked to do so at his deposition.  (Blankenhorn Dep. 334:21-335:21.)
28

Gibson, Dunn &
Crutcher LLP

1   requirements for reliable expert testimony under the Federal Rules of Evidence.  Because inclusion of

2   his testimony and conclusions would provide no benefit to the Court and, indeed, is likely to waste

3   time and confuse the issues in this case, this Court should find Mr. Blankenhorn's testimony

4   inadmissible.

5   ### IV.   THE COURT SHOULD EITHER EXCLUDE THE TESTIMONY OF THESE PROPOSED EXPERTS BEFORE TRIAL OR REJECT SUCH TESTIMONY AFTER

6   EXPLORING THEIR QUALIFICATIONS DURING TRIAL

7           For the reasons set forth above, Plaintiffs and Plaintiff-Intervenor believe that this Court

8   properly could exclude the reports and testimony of Katherine Young, Loren Marks, and David

9   Blankenhorn in advance of trial and bar Proponents from calling them as witnesses.  Even in a bench

10  trial, this Court may exclude the expert testimony in limine if it wishes, as the "trial judge acting as

11  trier of fact 'has broad discretion to admit or exclude' expert testimony that is helpful to its decision."

12  *CFM Comm., LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1234 (E.D. Cal. 2005) (citing

13  *Beech Aircraft*, 51 F.3d at 842 (holding that the court properly excluded from a bench trial expert

14  opinion concerning what could be heard in a tape recorded conversation because the trial judge was

15  in a better position to make that determination)).

16          However, if the Court determines that it would be appropriate to explore these experts'

17  qualifications during trial, *see Kumho Tire*, 526 U.S. at 142; *Verduzco*, 373 F.3d at 1032; *United

18  States v. Alatorre*, 222 F.3d 1098, 1103–1104 (9th Cir. 2000), Plaintiffs and Plaintiff-Intervenor are

19  willing to defer any decision on their motion until *after* the Proponents' Proposed Experts offer full

20  testimony via direct and cross examination.  This approach is commonly used in bench trials because

21  the Court is both the "gatekeeper" and the finder of fact.  *See, e.g., Volk v. United States*, 57 F. Supp.

22  2d 888, 896 n.5 (N.D. Cal. 1999) (noting that the *Daubert* gatekeeping obligation may be less

23  pressing in connection with a bench trial and the court may properly consider *Daubert* challenges

24  either in limine or at trial); *Laconner Assoc. Ltd. Liab. Co. v. Island Tug & Barge Co.*, 2008 WL

25  2077948, at *2 (W.D. Wash. May 15, 2008) (reserving ruling on admissibility of expert testimony

26  until after vigorous cross examination and presentation of contrary evidence);  *Fechtig v. Sea Pac.*

27

28

Gibson, Dunn &
Crutcher LLP

1 | *Inc.*, 2006 WL 2982148 (N.D. Cal. 2006) (rejecting expert's theoretical conclusions after hearing

2 | expert testimony and determining what weight to give the testimony).[5]

3 | ## V.   CONCLUSION

4 | For the reasons set forth above, Plaintiffs and Plaintiff-Intervenor request that the Court find

5 | that the expert testimony of Katherine Young, Loren Marks, and David Blankenhorn is inadmissible

6 | at trial, or accord such testimony little or no weight.  Plaintiffs and Plaintiff-Intervenors leave to this

7 | Court's discretion whether it wishes to exclude the testimony in advance of the bench trial in this

8 | matter or to do so after exploring each witness' qualifications on the witness stand.

9 | //

10 | //

11 | //

Gibson, Dunn & Crutcher LLP

---

[5]   In so doing, Plaintiffs and Plaintiff-Intervenor do not waive the objections set forth in this motion by their participation in examination of Proponents' Proposed Experts.  *See, e.g.*, *Jones v. United States*, 127 F.3d 1154, 1156 (9th Cir. 1997) (noting that after two week bench trial, trial court granted Plaintiff's *Daubert* motion in limine to exclude expert).

1                                             Respectfully Submitted,

2   DATED:  December 7, 2009        GIBSON, DUNN & CRUTCHER LLP
                                             Theodore B. Olson

3                                           Theodore J. Boutrous, Jr.
Christopher D. Dusseault

4                                           Ethan D. Dettmer
Matthew D. McGill

5                                           Amir C. Tayrani
Sarah E. Piepmeier

6                                           Theane Evangelis Kapur
Enrique A. Monagas

7

8                                           By:_____/s/_____

9                                               Theodore B. Olson

10                                        and

11                                        BOIES, SCHILLER & FLEXNER LLP
David Boies

12                                        Jeremy M. Goldman
Roseanne C. Baxter

13                                      Richard J. Bettan
Beko O. Richardson

14                                      Theodore H. Uno

15                                      Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,

16                                      PAUL T. KATAMI, and JEFFREY J. ZARRILLO

17                                      DENNIS J. HERRERA

18                                      City Attorney
THERESE M. STEWART

19                                      Chief Deputy City Attorney
DANNY CHOU

20                                      Chief of Complex and Special Litigation
RONALD P. FLYNN

21                                      VINCE CHHABRIA
ERIN BERNSTEIN

22                                      CHRISTINE VAN AKEN
MOLLIE M. LEE

23                                      Deputy City Attorneys

24

25                                      By: _____/s/_____
                                           Therese M. Stewart

26

27                                      Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

28

Gibson, Dunn &
Crutcher LLP

23

**ATTESTATION PURSUANT TO GENERAL ORDER NO. 45**

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

By: _____/s/_____
Theodore B. Olson

Gibson, Dunn &
Crutcher LLP