# EXHIBIT B

Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3    KRISTIN M. PERRY, et al.,   )

 4                  Plaintiffs,   )

 5          v.                    )  No. 09-CV-2292 VRW

 6    ARNOLD SCHWARZENEGGER, in   )

 7    his official capacity as    )

 8    Governor of California,     )

 9    et al.,                     )

10                  Defendants.   )

11

12                       Washington, D.C.

13                       Friday, October 30, 2009

14    Deposition of LOREN DEAN MARKS, called for

15    examination by counsel for Plaintiffs in the

16    above-entitled matter, the witness being duly sworn

17    by CHERYL A. LORD, a Notary Public in and for the

18    District of Columbia, taken at the offices of COOPER

19    & KIRK PLLC, 1523 New Hampshire Avenue N.W.,

20    Washington, D.C., at 9:31 a.m., and the proceedings

21    being taken down by Stenotype by CHERYL A. LORD, RPR,

22    CRR.
```

Loren Dean Marks                                                    October 30, 2009

Washington, DC

Page 2

```
 1   APPEARANCES:

 2

 3   On behalf of Plaintiffs:

 4        MATTHEW D. McGILL, ESQ.

 5        MELANIE L. KATSUR, ESQ.

 6        GIBSON, DUNN & CRUTCHER LLP

 7        1050 Connecticut Avenue, N.W.

 8        Washington, D.C.  20036-5306

 9        (202) 955-8500

10

11   On behalf of Plaintiff Intervenor:

12        ERIN BERNSTEIN, ESQ.

13        CITY AND COUNTY OF SAN FRANCISCO

14        OFFICE OF THE CITY ATTORNEY

15        Deputy City Attorney

16        1390 Market Street, 7th Floor

17        San Francisco, CA  94102

18        (415) 554-3800

19

20

21

22
```

Loren Dean Marks                                          October 30, 2009
Washington, DC

1    some contexts, provide the backdrop, and we spend a

2    lot more time talking about principles than family

3    structure.

4         Q.    Is there anything specific that you can

5    name about lesbian and gay parents and the outcomes

6    of children raised under their care that we do not

7    know as compared to what we know about parents raised

8    by 2 married -- a married man and a woman?

9         A.    It's a good question.

10            The answer is that based on the empirical

11   evidence, we know little, because the research to

12   this point has almost never compared directly lesbian

13   families to use your example with 2-parent married

14   biological -- again, marriage-based families.

15            Direct scholarly comparisons there have

16   almost never been made.

17        Q.    Have they never been made?

18        A.    There have been a couple, but they are --

19   they are rare, and they are the exception to the

20   rule.

21        Q.    What are the couple that you referred to?

22        A.    One, and this is -- this is a little bit

Loren Dean Marks                                      October 30, 2009
Washington, DC

1    vague in terms of my reading of the literature.

2    There's a Wainright and colleagues study that came

3    out in 2004 that did comparisons if memory serves me

4    correctly with heterosexual parents.

5                And those may -- those may have been --

6    may include married parents there.  It's been a

7    little while since I saw that study, so it would be

8    good for me to be able to take a peek at it, but I

9    don't -- I don't believe that they said specifically,

10   but it could have included married parents.

11               One that explicitly does include 2-parent

12   married biological parents with same-sex couples was

13   published in 1996 by Sortirious Sarantakos in

14   Children Australia.

15        Q.    What did that study conclude?

16        A.    That study looked at 3 different family

17   structures, the 2 that I mentioned, as well as

18   cohabiting heterosexual couples.  And on most of the

19   child outcome measures, the findings were tiered with

20   the child outcomes of 2-parent married biological

21   parents being optimal cohabiting parents, second, and

22   the hetero- -- or the homosexual couples third, in

Loren Dean Marks                                                    October 30, 2009
                          Washington, DC

 1    that order.

 2             That was true for most but not necessarily

 3    all of the outcomes that were looked at by

 4    Sarantakos.  That's one study of, you know, many that

 5    I've looked at generally that again, almost no

 6    studies -- those -- those 1 or 2 come to mind.

 7             There may be 1 or 2 others, but virtually

 8    all of the studies that I've read compare -- do not

 9    compare, rather, 2-parent married biological families

10    directly with same-sex parents.

11       Q.    You're not aware of any other studies

12    right now as you sit here?

13             MR. THOMPSON:  And let me just state for

14    the record that Professor Marks is preparing a

15    rebuttal report dealing with the same-sex parenting

16    literature, and we're prepared to allow you to ask

17    questions about this, but his research is ongoing,

18    and he'll be submitting on November 9th a rebuttal

19    report on this.

20             So we just want the record to be clear

21    that he didn't come here today necessarily with an

22    encyclopedic knowledge of every detail of the

Loren Dean Marks                                                  October 30, 2009
Washington, DC

1    literature.

2            But go ahead.

3       A.    In -- if I were a betting person, I would

4    assume that since this is a budding field that there

5    have been studies that have come out recently that

6    I'm unaware of.  I certainly admit to that

7    possibility.

8            But in terms of studies that I've read

9    before today coming in here, again, I'll restate that

10   the studies that directly compare 2-parent married

11   biological families with same-sex parents are very

12   scant.

13           BY MR. McGILL:

14      Q.    You submitted your report in this case on

15   October 2nd; is that correct?

16      A.    Correct.

17      Q.    Are there any studies relating to

18   parenting by gay men or lesbians that you have -- are

19   aware of now but were not aware of on October 2 when

20   you signed the report?

21      A.    Yes, there are.

22      Q.    Which -- which studies are you -- were you

Loren Dean Marks                                              October 30, 2009
Washington, DC

Page 34

1   not aware of on October 2?

2       A.    That's a difficult question to answer with

3   a lot of confidence, but Professor Lamb -- of course,

4   I had the opportunity to read his report, and if

5   memory serves me correctly, there are at least, you

6   know -- at least a couple that he raised in his

7   report that -- that were new -- that were new to me

8   at least.

9            As I've been preparing my rebuttal, I have

10  found 1 or 2 others.  For example, one -- one that

11  does come to mind is a Wainright and Patterson study

12  done in 2006.  That's -- that was one that was new to

13  me.

14           I don't know if Dr. Lamb referenced it or

15  not, but it's new to me over the past month or so.

16  I've tried to keep my eye out.

17      Q.    Are there any others that you can think of

18  that you reviewed for the first time after October 2

19  when you signed the report?

20      A.    Oh, there -- I'd read pretty widely in the

21  field preceding October 2nd, but again, yes, there

22  are -- it's difficult for me to -- to disentangle.

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 35

1              I'm not trying to be evasive.  It's

2      difficult for me to disentangle when I've read, you

3      know, hundreds of studies this year on a number of

4      different subjects, you know, what ones are new for

5      the past month.  There have been some.

6          Q.    Do you know what they are?

7              Can you name any others?

8          A.    Many -- many of the studies -- now, going

9      back to your original question, Matt, are you talking

10     just about same-sex parenting studies, or how broad a

11     net are you casting?

12         Q.    Thank you for asking me to clarify the

13     question.

14             I am referring to just those studies

15     relating to same- -- to parenting by gay men or

16     lesbians.

17         A.    I've read recently several -- several of

18     Lamb's studies that -- that indirectly and opaquely

19     address same-sex issues, several of those, in

20     addition to Wainright.

21         Q.    Let me see if I can get at the question

22     this way.

Loren Dean Marks                                                October 30, 2009
Washington, DC

1          Your report attaches a list of references.

2     A.    Right.

3     Q.    And I presume your rebuttal report will do

4     the same.

5     A.    Right.

6     Q.    So can I safely assume that any reference

7     that is appended to -- on your list of references to

8     the rebuttal report that is not listed on your list

9     of references to this report would be ones that

10    you've considered for the first time?

11         MR. THOMPSON:   No.

12         And I'm going to object because this is

13    calling for legal conclusions.

14         Obviously, Professor Marks for 15 years

15    has been studying this, and for the issues that are

16    relevant to this report, namely the importance of

17    married biological parenting, all of those -- this

18    report doesn't in any way address the same-sex

19    parenting literature.

20         He has included all of the materials that

21    are directly relevant, but he comes to this with

22    having studied thousands of studies.  And just as

Loren Dean Marks                                        October 30, 2009
                        Washington, DC

                                                              Page 37

1    Professor Sagura (phonetic) earlier this week made

2    clear that he wasn't listing everything that he's

3    ever read in political science that relates to

4    something, so too Professor Marks has listed the

5    items that were directly relevant to the issues in

6    this report.

7               BY MR. McGILL:

8        Q.    Do you agree with Mr. Thompson's statement

9    that your report does not consider any of the

10   literature relating to parent gay men or lesbians?

11              MR. THOMPSON:  And that mischaracterizes

12   what I said, but --

13       A.    This -- this study that we have in front

14   of us right now, I tried to carefully reference and

15   document the studies that I referred to to address

16   the question what are the child outcomes that we're

17   aware of associated with 2-parent married biological

18   families.

19              It's -- to me, my rebuttal that I'm

20   working on for Dr. Lamb -- it's a -- it's a very

21   different document.  I imagine that there will by the

22   time I'm done be some overlap, but there will

Loren Dean Marks                                    October 30, 2009
Washington, DC

1   certainly be references given the topical difference

2   that will be new to the rebuttal report.  I know

3   there will be.

4           BY MR. McGILL:

5       Q.    Is there any reference on your list of

6   references that deals with parenting by gay men or

7   lesbians?

8       A.    On --

9       Q.    -- the list of references appended to your

10  report that you've submitted in this case.

11      A.    And there may well be.

12      Q.    Can you name any as you sit here right

13  now?

14          MR. THOMPSON:  You want him to review the

15  list?

16          Look at the list, Professor Marks.  I

17  guess Mr. McGill would like you to review the list

18  one by one.

19      A.    And what -- what page are we looking at,

20  just so that we're literally on the same page?

21          BY MR. McGILL:

22      Q.    This is page 12.  I'm asking if as you sit

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

                                                              Page 39

1    here right now -- I'm looking at your list of

2    references, which is -- has a 12 at the bottom of it.

3         A.    To me at a glance, these references -- to

4    me at a glance, these references refer to family

5    structures used relating to 2-parent married

6    biological families.

7              At a glance, I don't see -- at a glance, I

8    don't see any that -- that directly relate or that

9    are comparing 2-parent married biological families,

10   which is the focus of this report, to same-sex --

11   same-sex parenting.

12             I may be overlooking one, but --

13        Q.    Are there any references listed there that

14   deal with same- -- with parenting by gay men or

15   lesbians at all?

16        A.    Again, Matt, let's see -- at a glance, I

17   would say, no, there are not.  There may be, but, no,

18   there are not.

19             Again, my focus in this report was on

20   2-parent married biological families, and as I

21   earlier stated, there's -- there's very, very little

22   that directly compares 2-parent married biological

                    Alderson Reporting Company
                       1-800-FOR-DEPO

Loren Dean Marks                                              October 30, 2009
Washington, DC

1    families to same-sex couples.

2        Q.    And I want to confirm, because they don't

3    appear on your list, that the -- 2 of the studies in

4    the field of parenting by gay men or lesbians that

5    you referred to earlier, the Wainright study and the

6    Sarantakos -- did I --

7        A.    Sarantakos, that's correct.

8        Q.    -- the Sarantakos study, you did not

9    consider those studies in the course of preparing

10   this report?

11       A.    I did consider.  I had read both of those

12   studies before preparing this report, and because of

13   the comparison to drop in one or 2 studies at this

14   point that were outside of my central -- well, I

15   guess the Sarantakos study addressed it, Wainright.

16           I'm dealing with studies by the hundreds

17   here.  And a study here, a study there, you know, as

18   Mr. Thompson referred to earlier, those 2 studies are

19   not referred to, so are, you know, hundreds of others

20   in general.

21           There could have been but weren't.  There

22   are many, many others I could have listed, but that

Loren Dean Marks                                    October 30, 2009
Washington, DC

1    wasn't -- that wasn't my focus.

2         Q.    There are many other studies you could

3    have listed on your index of material considered?

4              MR. THOMPSON:   Yes.

5              As we have said, that Professor Marks

6    comes to this with 15 years of experience, and he did

7    not purport to list every piece of literature he's

8    ever read that in any way informs his views in this

9    case.

10             BY MR. McGILL:

11        Q.    Do you have an answer to the question?

12        A.    When you're -- when you're writing a

13   report, you're drawing off -- I think indirectly at

14   least everything that you've read, everything that

15   you've cataloged probably influences you in some way.

16             And at some point, that becomes difficult

17   to catalog.  The references that I list in here, I

18   tried dutifully to include and specifically

19   reference.  That -- that met meticulously my

20   obligation as I understand it.  Making a list of

21   everything that I've read would be impossible.

22        Q.    So this is the list of materials that you

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 42

1    primarily considered in connection with preparing the

2    report?

3              MR. THOMPSON:  Objection, mischaracterizes

4    the testimony, and objection, asked and answered.

5         A.    These -- these materials that are listed

6    here were considered in formulation of my expert

7    report.  But again, they're -- they're in no way

8    exclusive.

9              BY MR. McGILL:

10        Q.    How did you distinguish between the

11   references to list and the references not to list?

12        A.    That's a good question.

13             And in the case -- in the case of this

14   expert report, some of my judgments were based on not

15   just what studies were available to me, but I wanted

16   to focus on the highest-quality studies available.

17   And I believe that most of the studies, most of the

18   work that you'll find cited here is -- is of high

19   quality, Nobel laureates.

20             Akerlof as an economist, several pieces by

21   Paul Amato, and others, who are premier.  So among

22   the available sources, I tried to select from -- from

Loren Dean Marks                                    October 30, 2009
                    Washington, DC

                                                    Page 43

 1    the best.

 2              MR. THOMPSON:  We've been going about an

 3    hour.  We'd like to take a break.

 4              MR. McGILL:  As you wish.

 5              MR. THOMPSON:  Okay.

 6              THE VIDEOGRAPHER:  This ends videotape

 7    number 1.  The time is now 10:27 AM.

 8              (Recess.)

 9              THE VIDEOGRAPHER:  We're now back on the

10    record.

11              This is the beginning of videotape number

12    2.  The time is now 10:40 AM.  You may proceed.

13              BY MR. McGILL:

14         Q.   So when we left off, Professor Marks,

15    the -- just to close the loop on where we were, you

16    said, do I understand you correctly to say that you

17    distinguished between the materials that you chose to

18    list on your index of materials considered and those

19    you chose not to list by listing only those materials

20    of the highest quality on your index?

21         A.   The sources that I list I believe are of

22    high quality, but -- and indicate ones in most cases

Loren Dean Marks                                           October 30, 2009
                     Washington, DC

Page 44

1    I took a close look at again.  There certainly was a

2    quality factor.

3        Q.    And the sources that are not listed here

4    presumably are of lesser quality?

5        A.    Well, there are some that are -- I'm sure

6    there are some very high-quality studies generally

7    that aren't on here, but, yes, of the ones that I've

8    considered, these are -- these are high-quality

9    studies for the most part.

10       Q.    What are your primary areas of research

11   interest?

12       A.    My primary research interests are faith

13   and families and African American families.  I spend

14   quite a bit of time in both of those.

15             I do dabble in, you know, some other

16   areas, but those are focal.

17       Q.    How does your research on faith and

18   families and strong African American families relate

19   to your opinions and your report in this case?

20             MR. THOMPSON:  Objection, vague.

21             Go ahead.

22       A.    With -- with maybe one, 2 contextualizing

Loren Dean Marks                                                  October 30, 2009
Washington, DC

1    exceptions, I don't believe I cite my own work

2    directly in this -- this expert report.

3              So in terms of my direct impact, minimal

4    to -- to moderate, although I -- although those are 2

5    focal areas of my -- there -- there are probably a

6    hundred different subdisciplines within family

7    studies that I'm responsible for in some -- some

8    level as a teacher that I cover, that I read, so --

9              BY MR. McGILL:

10   Q.    Is parenting by gay men and lesbians among

11   the hundreds of subdisciplines that you're

12   responsible for?

13   A.    Yes.

14   Q.    You're a peer reviewer on several

15   journals.

16         Correct?

17   A.    I am.

18   Q.    And what do you do as a peer reviewer?

19   A.    As a peer reviewer, the editor of a

20   journal will send -- will send you a study, usually a

21   study that is within your interest area, you know,

22   your specialty area.  And they will ask -- ask you to

Loren Dean Marks                                      October 30, 2009
                    Washington, DC

1    carefully read, respond to issues that -- that are

2    raised.

3              In my instance, I have a methods specialty

4    as well, and sometimes I'm asked to give some -- some

5    input on the research method that's used.

6         Q.    Why is peer reviewing important?

7         A.    Peer reviewing is an effort to maintain

8    minimal standards in the field.

9         Q.    Does work that is peer-reviewed presumably

10   meet minimal standards in the field?

11        A.    It depends on the journal.

12              There -- there are a variety -- variety of

13   journals.  There's also a great degree of

14   subjectivity that comes into play in terms of -- in

15   terms of reviewers as most within the field will tell

16   you.

17              Social scientists are not immune from

18   cultural or biases -- cultural opinions, et cetera.

19        Q.    Now, you mentioned before -- I just want

20   to circle back to your statement that you have a

21   specialty in methodology.

22              Could you elaborate on that?

Loren Dean Marks                                            October 30, 2009
Washington, DC

1      A.     My focus in terms of methods is

2   qualitative, and there are 2 broad types of methods

3   that are used, qualitative and quantitative.

4             Quantitative tends to deal with

5   statistics, qualitative with nonnumerical data.  Any-

6   -- anyone in my field -- just about anyone deals with

7   both.

8      Q.     And your work with strong African American

9   families exemplifies that qualitative method of

10  research?

11     A.     It does.

12     Q.     And with respect to your work as a peer

13  review, you mentioned that authors of social science

14  are not immune from -- from bias.

15             What do peer reviewers do to ferret out

16  bias?

17     A.     That's a good question, Mr. McGill.  I

18  don't have an empirical response to that question.

19             I think it's -- it's cause for speculation

20  on my part.  My professional opinion would be that

21  you don't, that there's a scientific objective, you

22  know, an ideal of objectivity, but it's a target

Loren Dean Marks                                                October 30, 2009
Washington, DC

1      that's rarely hit.

2              You have your biases.  I do.  Anybody who

3      is reviewing carries those with them as well.  They

4      should try to check them, but whether they do or not,

5      I don't know for sure.

6      Q.      What are your biases?

7      A.      That's a -- that's a good question.

8              Can you -- can you be a little bit more

9      specific in terms of a given area?

10             Biases can be broad certainly.

11     Q.      You said to me that some researchers have

12     their biases and you have yours.  And I'm just really

13     asking you to elaborate on that statement.

14     A.      One of -- one of my biases is that

15     research should be very, very thoroughly documented,

16     referenced, even meticulously so, including reports.

17     I think that many within my field would say that

18     having an appreciation of qualitative methods can be

19     a bias as well.

20     Q.      Any others that you can think of?

21     A.      I think that -- that a bias I have

22     relative to many in my field is an optimism.

Loren Dean Marks                                                    October 30, 2009
                        Washington, DC

                                                                      Page 49

1              What I mean by that with specific

2    reference to my discipline is, I -- I prefer to look

3    at strengths over weaknesses or pathologies as -- as

4    a general rule.

5         Q.    Do you have -- have you published or do

6    you have in press any writings other than those

7    listed on your CV?

8         A.    I don't believe so, Mr. McGill.

9              As I said earlier, and this is -- this is

10   fairly recent.  With the exception that we addressed

11   earlier, this should be accurate.

12        Q.    Are there any publications on that list

13   that you no longer believe represent high-quality

14   social science?

15        A.    On -- on the list that I --

16        Q.    Of your own publications.

17        A.    Oh, of my own.

18        Q.    Correct.

19        A.    I -- I am, what, in my eighth year as a

20   professor.

21              One of my biases is that we should aim for

22   the gold standard.  While I've had research that's

Loren Dean Marks                                         October 30, 2009
                        Washington, DC

Page 50

1    been covered nationally in the Washington Times and

2    won awards, I tend to be -- tend to be hard on myself

3    sometimes.

4              I stand behind the research that I did as

5    the best that I was capable of at the time.  We all

6    make professional progress.

7              There are still -- I'm still aiming for

8    that -- that gold standard study by the standards

9    that I would apply myself.  I haven't hit it yet.

10       Q.    Are there any studies or writings of your

11   own or coauthored by you listed on your CV that you

12   believe should not today be considered high-quality

13   social science?

14       A.    Yes, yes.

15       Q.    Which ones?

16       A.    In -- in writing, there are different

17   audiences that one addresses.

18             You have your academic scholarly audience

19   that's addresses primarily through peer-reviewed

20   journals that you mentioned earlier.

21       Q.    Okay.

22       A.    I've also been asked on occasion to write

Loren Dean Marks                                      October 30, 2009
Washington, DC

1    lay -- more lay-targeted publications and the method,

2    the approach that you use is -- is different.  And

3    you're not necessarily trying to aim for a scholarly

4    objective or ideal.

5           You're trying to convey a principle or a

6    message, still with the scholarly mind-set.  But

7    certainly some of my work would fall under that kind

8    of category.

9      Q.    And of your work that has been published

10   in peer-reviewed journals, do you consider all of

11   that work to still be high-quality social science?

12     A.    The short answer would be no.

13          Again, my standard is high.  I apply that

14   to myself as well.

15          In my experience producing gold standard

16   research is -- it's a career goal for -- for most of

17   us within the social sciences, one that you have to

18   build toward.  I believe that I'm knocking on the

19   door of producing gold standard research in my field

20   and have spent 10 or 12 years building up a sample, a

21   national sample that's -- that's impressive or that

22   approaches a gold standard, but it takes years and

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

Page 52

1    years to -- to do that.

2                   Have I paid that price yet?

3                   Have I paid those dues?

4                   No, not fully.  And I will be the first

5    one to admit that like I said earlier, I'm still

6    striving for that gold standard.  I haven't reached

7    it.

8        Q.    In what areas do you consider yourself to

9    be an expert?

10                  MR. THOMPSON:  Objection to the extent it

11   calls for a legal conclusion.

12                  But go ahead.

13       A.    My -- my Ph.D. as you're aware is in

14   family studies.  Family studies is a broad field, and

15   so by public standards, I would be an expert in that

16   field broadly speaking, which would include some

17   elements of -- of others.

18                  BY MR. McGILL:

19       Q.    So although you are as you said still

20   learning, you consider yourself to be an expert?

21                  MR. THOMPSON:  Objection, mischaracterizes

22   the testimony.

Loren Dean Marks                                    October 30, 2009
                    Washington, DC

Page 53

1       A.    The way that I just used, expert, was in

2   connection with the -- the lay audience with the

3   general population.

4       Q.    As of approximately what date do you

5   believe that you became an expert?

6            MR. THOMPSON:   Objection to the extent it

7   calls for a legal conclusion.

8       A.    In connection with this -- this expert

9   report, the first one, in -- in academia generally,

10  once -- once one has achieved tenure, that would be a

11  widely accepted benchmark, not just landing a first

12  job or receiving a Ph.D. degree, but achieving tenure

13  would be a significant landmark.

14           I think that's -- that's as good as most.

15  Still inadequate, probably.

16           BY MR. McGILL:

17      Q.    And do I remember correctly that you

18  became a tenured professor about -- was it June of

19  2008 that you said?

20      A.    June of 2008.

21      Q.    Do you consider yourself to be an expert

22  in your areas of primary research interest?

Loren Dean Marks                                              October 30, 2009
Washington, DC

Page 54

1       A.      In the areas of faith and families and

2    specifically strong African American families, yes,

3    yes, I would.

4       Q.      Are you an expert in child adjustment?

5              MR. THOMPSON:  Objection, vague.

6       A.      Child adjustment is one of -- again one of

7    the many, many areas that I'm responsible for knowing

8    something about.

9              Is it one of my focal interest areas?

10             No, it is not.

11             BY MR. McGILL:

12      Q.      But you still consider yourself to be an

13   expert in child adjustment?

14      A.      By the standards of my field, I don't

15   study the specific concept of child adjustment.  I do

16   study child outcomes at some length, and family

17   outcomes.

18      Q.      And you would not have contended in --

19   earlier than your date of being a tenured professor

20   that you were an expert in any field, would you?

21             MR. THOMPSON:  Objection, mischaracterizes

22   the testimony.

Loren Dean Marks                                                    October 30, 2009
Washington, DC

Page 55

1        A.      In -- in the content areas that I

2    mentioned, by the field standard, I think tenure as I

3    mentioned earlier is as good of a bar as any.

4                BY MR. McGILL:

5        Q.      Prior to your engagement as an expert in

6    this case, had you ever undertaken research on the

7    effective family structure on child outcomes?

8        A.      Yes.

9        Q.      When?

10       A.      I am -- at the outset, I was a fathering

11   scholar.  My research interests transformed a little

12   bit over time from fathering to family.

13               Much of the fathering literature links

14   fathers to children's outcomes, so from the very --

15   the very inception of -- my inception into the

16   research world of family studies, it was child

17   outcome-related, father-child outcomes.

18       Q.      Have you published any original research

19   concerning the effect of family structure on

20   childhood outcomes?

21       A.      If I can go back to the qualitative,

22   quantitative question for just a moment, which was

1    asked -- which was asked previously.

2            Quantitative methods like -- meet precise

3    concepts like specific child outcomes.  You mentioned

4    I believe earlier child adjustment.

5            Qualitative research tends to be a little

6    bit more holistic.  Most of the research I've done

7    that would deal with relationships between adults

8    and -- and children would focus more on the process

9    and the interaction that takes place as opposed to

10   specific outcomes.

11           Most of my field would view that as a

12   difference in methodology and focus.

13       Q.    So you study parenting processes more than

14   parenting structures?

15       A.    I've studied both.

16       Q.    Do you have an opinion on what causes

17   better child outcomes as between processes and

18   structure?

19           MR. THOMPSON:  Objection, vague.

20       A.    That, then, is a central question in the

21   social sciences.

22           Again, as you're probably aware, I would

Loren Dean Marks                                      October 30, 2009
                        Washington, DC

1   based on my reading of the empirical literature say

2   that both play an important role.  Many -- many

3   within the social sciences are -- tend to be from the

4   more traditional set -- argue very hard for

5   structure.  Some argue for processes.

6           I think both are very, very important, and

7   it's difficult to -- to disentangle the 2.  The

8   exception that I would draw would be 2-parent married

9   biological family.

10          That -- that structure empirically stands

11  out as unique in the empirical work that I've read.

12          BY MR. McGILL:

13      Q.    And in the empirical work that you have

14  read, is it that the -- that family structure

15  correlates to good child outcomes, or is it that

16  itself causes good child outcomes?

17          MR. THOMPSON:  Objection, vague.

18      A.    The research is almost always in any --

19  any area of social science correlational and not

20  causational, and that's true across subdiscipline and

21  topic.  There -- to rephrase it, there are many, many

22  significant unanswered questions in social sciences

Loren Dean Marks                                    October 30, 2009
                    Washington, DC

                                                        Page 58

1    generally.

2              BY MR. McGILL:

3         Q.    Am I correct that you have never conducted

4    any original research on families headed by lesbian

5    or gay parents?

6         A.    Yes.

7         Q.    Do any of your published writings or

8    articles in press discuss children raised by lesbian

9    or gay parents?

10        A.    No, Mr. McGill, I don't believe they do

11   one way or the other, meaning positively or

12   negatively.

13        Q.    Are there any other qualifications

14   that you have that we have not discussed that relate

15   to your opinion as you've set it forth in your

16   report?

17        A.    In the expert report -- that's a broad

18   question.

19              None come to mind at the moment that

20   dirèctly bear on it, but there -- there may be.

21        Q.    When were you retained as an expert?

22        A.    Mr. Thompson contacted me by phone in

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

1    early September of this year.

2          Q.    Other than attorneys involved in the case,

3    which would include Mr. Thompson --

4                MR. THOMPSON:  Barely.

5                BY MR. McGILL:

6          Q.    -- did you consult with anyone before you

7    agreed to become an expert witness?

8          A.    No.

9          Q.    You did not discuss with anyone whether or

10   not you should be involved in this case?

11         A.    No.

12         Q.    Approximately how many hours did you spend

13   researching -- researching and writing your report?

14         A.    During the month of September -- basically

15   the month of September -- I think I filed the report

16   on October 2nd.  If memory serves me correctly, I was

17   contacted by Mr. Thompson on September 4th.

18               My Excel spreadsheet hours log that I sent

19   to him listed 199 and a half hours, and there were

20   probably some that were not listed.  It was a long

21   month, Mr. McGill.

22         Q.    David wishes his associates worked that

Loren Dean Marks                                      October 30, 2009
                        Washington, DC

1    hard.

2              MR. THOMPSON:   They used to.

3              BY MR. McGILL:

4       Q.    So based on what you just said there, am I

5    right in thinking that the only work you performed in

6    connection with this case was in connection with that

7    report?

8       A.    The only work -- could you please reframe

9    the question one more time.

10      Q.    Yes.

11             Did you perform any work in connection

12   with your retention as an expert that did not lead to

13   the opinions expressed in your report?

14      A.    During that month, I read and read and

15   read.  A fraction of what I read shows up in this

16   report.

17      Q.    But all the work of reading was in

18   connection with the report.

19             Correct?

20      A.    With -- with this report.

21             I also did -- did some reading more

22   broadly on same-sex parenting topics.

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

Page 61

1       Q.      Did you have any projects assigned to you

2   that were not related to this report?

3       A.      From Mr. Thompson and the firm?

4               You're not talking about LSU?

5       Q.      No.

6       A.      You're not trying to make that --

7       Q.      Of course not, no.

8       A.      No.

9               I was working on my report.

10      Q.      Okay.   Other than opinions you will

11  express in connection with your rebuttal report with

12  Dr. Lamb, do you intend to offer any opinions that

13  are not expressed in that report?

14      A.      Today -- or when you say, offer -- offer

15  opinions --

16      Q.      Do you intend -- let me rephrase the

17  question.

18              MR. THOMPSON:  At trial.

19              Right?

20              MR. McGILL:  Pardon?

21              MR. THOMPSON:  At trial.

22              BY MR. McGILL:

Loren Dean Marks                                     October 30, 2009
                     Washington, DC

Page 62

1        Q.    I'm referring to at trial, yes.

2        A.    And I'm sorry.

3              No.   My opinions will be limited to this

4    report and whatever shows up in the rebuttal.

5        Q.    Now, are -- there are materials that are

6    cited in your report that are not listed on your

7    index of material considered.

8        A.    M-m-m.

9        Q.    Let me represent that to you.

10       A.    Go ahead.

11       Q.    Is there a reason why that -- that is so?

12       A.    If -- if there are -- if I'm understanding

13   you correctly, there are citations in the body of the

14   report that don't show up in the reference section?

15       Q.    Correct.

16       A.    Okay.  If -- and I assume that you're

17   right -- that would be --

18       Q.    I'll give you an example.

19             MR. THOMPSON:  And just so the record is

20   clear, you're saying they're not in the references

21   section or in the materials considered?

22             MR. McGILL:  That's correct.

Loren Dean Marks                                          October 30, 2009
                          Washington, DC

1    think it's a good -- it's a good study.

2         Q.    Would you call it a gold standard?

3         A.    My -- my memory of that study doesn't let

4    me make a judgment one way or the other on that, same

5    as Flewelling and Bauman.

6         Q.    Did you read Flewelling and Bauman in

7    connection with preparing your report?

8         A.    Flewelling and Bauman -- the 1990 study.

9         Q.    That's correct.

10        A.    I don't think I read Flewelling and Bauman

11   entirely.  Brown -- you know, as you're reviewing

12   studies, some of them you read enough to get the

13   context and to get the gist of what they're saying.

14              Flewelling and Bauman, Rickel as well,

15   Rickel '85, less so, Brown more completely so.

16        Q.    So the studies -- the references cited in

17   the report, you did not read all of those references?

18              MR. THOMPSON:  Objection, mis- --

19        A.    No.

20              My statement was, I didn't read some of

21   them in their entirety.  Some I did.  Some I read

22   selections from.

Alderson Reporting Company
1-800-FOR-DEPO

Loren Dean Marks                                             October 30, 2009
                        Washington, DC

Page 66

1              BY MR. McGILL:

2      Q.    I just want to make sure I understand it

3    correctly, that there are some of the references that

4    are cited in your report that you did not read in

5    their entirety?

6      A.    Yes.

7      Q.    Okay.  Thank you.

8              I had questions about 2 others that did

9    not appear on your index.

10             Johnson 1996.

11     A.    Yeah.

12             I believe Johnson 1996 addresses drug

13   addiction.  And in the case of Johnson, actually, I

14   think he brought up Flewelling and Bauman with some

15   of those that addressed -- they addressed a number of

16   issues only -- only drug use I believe -- again, my

17   memory is imperfect, but I focused the portions that

18   were relevant to my report, not in its entirety.

19     Q.    Is there a reason why Johnson is not on

20   your list of index material considered?

21     A.    No.

22             It should be.

Loren Dean Marks                                    October 30, 2009
Washington, DC

1       Q.     And finally, the Moore child trends

2    research brief?

3       A.     Moore should be on there as well.  That's

4    an unintentional omission.  And that's a study I did

5    read in its entirety.

6       Q.     And so I'm clear about this aspect, now

7    focusing on your index of material considered, is it

8    true that for some of those articles that are on the

9    index, you did not read them in their entirety?

10      A.     I read the portions that were relevant

11   to -- to my report, but did I read them in their

12   entirety?

13             Not necessarily.

14      Q.     For every reference cited in the report or

15   listed on the index, you read at least part of it.

16             Correct?

17      A.     Yes.

18      Q.     Do you believe that you understood each of

19   those references, those cited in your report, those

20   on the index, as they related to your report?

21             Let me rephrase that question.

22             To the extent that the studies are

Loren Dean Marks                                    October 30, 2009
Washington, DC

Page 68

1    relevant to your report, do you believe you fully

2    understood each of the studies cited in your report

3    and listed on your index?

4        A.    I think that there -- there are

5    complexities and nuances in just about any study that

6    you read that you miss, you know, that the author or

7    researcher can't fully convey to you.

8              But in terms of basic comprehension and

9    getting the idea that was being conveyed, yes.

10       Q.    Are all of the words in the report that

11   are not in quotation marks your own words?

12       A.    Yes.

13             It was a sole -- absolutely sole-authored

14   expert report.

15       Q.    In reaching your opinions that you state

16   in the report, did you find it necessary to make any

17   assumptions?

18             MR. THOMPSON:  Objection, vague.

19       A.    If -- if memory serves me correctly, I

20   made 2 concluding points in -- in the report.  I

21   believe that both of those are empirically

22   documentable repeatedly, but in social sciences by

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

                                                              Page 69

 1    definition, any reasonable social scientist is going

 2    to admit that there are differences of

 3    interpretation.

 4              Certainly Dr. Lamb and I would agree on

 5    that point, I think.

 6              BY MR. McGILL:

 7       Q.    You mentioned Dr. Lamb.

 8              Is he an authority in his field?

 9              MR. THOMPSON:  Objection, vague.

10       A.    He is.

11              BY MR. McGILL:

12       Q.    Would you consider him an expert in his

13    field?

14              MR. THOMPSON:  Objection to the extent it

15    calls for a legal conclusion.

16       A.    I would.

17              BY MR. McGILL:

18       Q.    Let us at last turn to your actual report.

19              Could you please turn to paragraph 42,

20    which appears on page 10 of what has been marked as

21    exhibit 2.

22              There you state:  Based on available

Loren Dean Marks                                    October 30, 2009
Washington, DC

Page 70

1   social science that meets established standards, the

2   biological marriage-based, open paren, intact, close

3   paren, family is associated with better child

4   outcomes than nonmarital, divorced, or stepfamilies.

5            What are the established standards to

6   which you refer?

7        A.    In this transaction, I should have -- I

8   should defined it better I think than putting, that

9   meet established standards.

10            I am not referring just to peer-reviewed

11   standards.  I am referring to -- as you used the term

12   earlier, and I think I did too, gold standard,

13   high -- high-end research.

14        Q.    Is your expert report based only upon

15   social science that meets established standards which

16   as you have just now defined it means gold standard

17   high-end work?

18        A.    No, not exclusively.

19            But as I mentioned at the front, that --

20   that was where I spent the majority of my time.  And

21   that is the standard of the research by which I'm

22   making these claims.

Loren Dean Marks                                           October 30, 2009
                         Washington, DC

                                                              Page 71

1        Q.    And based on what you said earlier,

2    your -- your own published articles, then, none of

3    them would meet the established standards as you've

4    defined it?

5        A.    That's right.

6              It's an ideal that I continue to shoot

7    for.

8        Q.    To meet established standards, is it

9    important that the social science be based on data

10   that is reasonably current?

11             MR. THOMPSON:   Objection, vague.

12       A.    Not necessarily, because -- because

13   society is constantly changing.

14             I think it's optimal to have more recent

15   studies, but I think that -- that many scholars,

16   myself included, would prefer slightly dated gold

17   standards study, by which I mean, a large probability

18   sample, that it is generalizable, and although not

19   required, longitudinal or multiple measures across

20   time.

21             Let me -- and again, I failed to make that

22   distinction here.  But when -- when I throw out the

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 72

1    term gold standard, a gold standard study the way

2    I've defined it here would -- would meet those --

3    those criteria.

4             BY MR. McGILL:

5        Q.    To meet an established standard -- or --

6    excuse me -- to meet what you have defined as

7    established standards, a study must be longitudinal;

8    is that correct?

9        A.    Not -- not must, but it adds considerable

10   strength to the study if it can show measurement

11   across time.

12       Q.    Is there a point at which the data

13   underlying a study becomes so old that the social

14   science can no longer be considered to meet what you

15   have defined as established standards?

16            MR. THOMPSON:  Objection, vague.

17       A.    I think I interrupted myself earlier when

18   I said I would take a gold standard study that was

19   dated over a poor-quality one that was current in --

20   in many cases.

21            You know, it's a fair question to say,

22   well, at what point does that change, 20, 30, 40

Loren Dean Marks                                          October 30, 2009
Washington, DC

1    time, parent-child shared time.  They would include

2    money.  They would include contact.  They would

3    include warmth, relational quality, those kinds of

4    issues.  They would include education perhaps.

5         Q.    Would it include --

6               MR. THOMPSON:   (Making noise.)

7         Q.    Oh, I'm sorry.

8               Please complete your answer.

9         A.    It's okay, Mr. McGill.

10              Whether -- there are a number of factors

11   that have been listed by researchers that have been

12   hypothesized and even studied, but certainly the

13   structure of -- of marriage itself.  I mean, that's

14   kind of implicit in the response, as well as biology,

15   which is implicit in the response.

16              But again that's an incomplete answer, but

17   it covers some -- some of the big ones.

18        Q.    What researchers have identified biology

19   as a cause of good child outcomes?

20              And let me be more specific.

21              What researchers have identified a

22   biological connection between parent and child as the

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 82

1    cause of good adjustment outcomes?

2        A.    I know of no empirical research in the

3    social sciences that to the satisfaction of the field

4    has been able to say, this is causal rather than

5    correlational.  That is true for biology and many

6    other factors.

7            Social science generally does not -- does

8    not have the rigor and the strength to make causal

9    statements.

10       Q.    Are you saying that social science could

11   not even say that parenting skills, high parenting

12   skills cause good child outcomes?

13           MR. THOMPSON:  Objection, vague.

14       A.    There -- there are 3 -- there are 3

15   necessary components to -- to make a causal statement

16   that are -- that are usually associated in the social

17   sciences -- or in I should say science.

18           One is that the cause -- and we'll use

19   parenting skills.  Cause has to precede the effect.

20   That's kind of the low-hanging fruit and obvious.

21           Another is that you have to establish some

22   kind of a link between the 2, which we often refer to

Loren Dean Marks                                    October 30, 2009
                        Washington, DC

1          I don't lose too much sleep over either

2     one of those.  I'm still aiming for the gold

3     standard.

4          MR. McGILL:  I've been informed, our

5     videotape is nearly up, and this is a natural break

6     point for me, if it's amenable to you.

7          THE WITNESS:  Yes.

8          THE VIDEOGRAPHER:  Okay.  This ends

9     videotape number 2 in the deposition of Dr. Loren

10    Marks.  The time is now 11:49 AM.

11         (Recess.)

12         THE VIDEOGRAPHER:  We're now back on the

13    record.

14         This is the beginning of videotape number

15    3.  The time is now 12:03 PM.  You may proceed.

16         BY MR. McGILL:

17    Q.   To reorient ourselves, I'm addressing

18    paragraph 42 of your opinion, and just to recap, your

19    phrase the biological marriage-based intact family is

20    associated with better child outcomes.

21         For definitional purposes, you have told

22    me that you used the term biological and intact in

Loren Dean Marks                                              October 30, 2009
                        Washington, DC

Page 89

1    the same manner as the researchers you cite; is that

2    correct?

3         A.    To the best of my knowledge, yes.

4         Q.    And "associated with" is synonymous with

5    "correlated to"?

6         A.    Yes.

7         Q.    That brings me to the phrase than

8    nonmarital, divorced, and stepfamilies.

9              Am I correct that your opinion compares

10   only the intact family as you have defined it to

11   these other 3 categories?

12        A.    Only -- so you're saying only compares the

13   intact family to these -- to these 3.

14             Do you mean exclusive to all other family

15   forms?

16        Q.    My -- that is the nub of my question, is,

17   your sentence says that the biological marriage-based

18   intact family is associated with better outcomes than

19   nonmarital, divorced, and stepfamilies.

20        A.    Yes.

21        Q.    Are there other family structures that the

22   biological marriage-based intact family is also

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 90

1   better than?

2        A.    Well, we're just talking about child

3   outcomes.

4        Q.    With respect to child outcomes.

5        A.    With respect to child outcomes.

6              There -- there may be, but the gold

7   standard research that I reviewed focuses on

8   comparisons with -- with these 3 family forms in the

9   intact family.

10       Q.    Can you define for me the term nonmarital

11  as you use it in this report?

12       A.    I believe that in most of the cases, the

13  researchers use nonmarital as -- at least somewhat

14  synonymous with cohabiting.  We -- they also -- it's

15  a little bit of a messy term in that it can also

16  include single-parent families, which -- which are

17  sometimes included under the divorced heading,

18  sometimes not.

19             So it's a little bit messy there, but

20  certainly we've got single -- single-parent families,

21  cohabiting families would be including both.

22       Q.    When this sentence says, the biological

Loren Dean Marks                                                October 30, 2009
Washington, DC

1    it's embryonic.

2              The other family forms, at least some of

3    the others, single parent versus stepfamily, as I

4    said, it's messy.  There's -- there's some pros and

5    some cons.

6              BY MR. McGILL:

7         Q.    So you don't have any clear opinion as to

8    the best family structure for that child?

9         A.    Not -- not a scholarly opinion as to an

10   ideal family.

11        Q.    Assume the following facts:  An unmarried

12   lesbian, in a long-term committed and loving

13   relationship with another woman conceives a child and

14   gives birth to the child.

15             What is the best possible family structure

16   for that child to produce good child adjustment

17   outcomes?

18             MR. THOMPSON:  Objection, incomplete

19   hypothetical.

20        A.    The literature, empirical literature on

21   that -- on that hypothetical isn't sufficient for me

22   to form a confident, scholarly opinion.

Loren Dean Marks                                                    October 30, 2009
Washington, DC

1              BY MR. McGILL:

2       Q.    Do you believe -- referring back to the

3   same child born to an unmarried lesbian woman -- do

4   you believe it would improve that child's adjustment

5   if she -- if that lesbian were to marry a man?

6              MR. THOMPSON:  Objection, incomplete

7   hypothetical.

8       A.    That's a scenario that I don't know if

9   I've seen a single empirical study on, and I wouldn't

10  be comfortable offering a scholarly opinion on that

11  either.

12             BY MR. McGILL:

13      Q.    What about a nonscholarly opinion?

14             MR. THOMPSON:  Objection, beyond the scope

15  of his report.

16      A.    I'd be reluctant to even offer a personal

17  opinion.

18             In the report, I focus in detail -- even

19  though there's always going to be some assumption and

20  interpretation, I try to take pride on not stepping

21  outside of the data.

22             If -- if there's not a single study on the

1   matter, my -- my opinion is -- is not worth much more

2   than anybody else's who is an expert.

3       Q.   So the data that you have reviewed does

4   not support the conclusion that the intact family is

5   the best family structure for those children?

6           MR. THOMPSON:  Oh, vague as to, those

7   children, and incomplete.

8       A.   Early on, I stated that the intact family

9   has not been directly compared with a couple of

10  exceptions to children in same-sex context.

11          BY MR. McGILL:

12      Q.   Turning to the next portion of paragraph

13  2, you state that:  Comparative advantages of the

14  intact family are, quote, evident in connection with

15  critical societal concerns, including but not limited

16  to health, morality, and suicide rates, drug and

17  alcohol abuse, criminality and incarceration,

18  intergenerational poverty, education and/or labor

19  force contribution, and early child bearing.

20          How do you define the term critical

21  societal concern?

22      A.   Each of these issues is -- is not just an

Loren Dean Marks                                          October 30, 2009
                    Washington, DC

1    cross-sectional sample of the same group?

2         A.    Well put.

3               Thank you.

4         Q.    So I want to now just summarize what I

5    understand to be your opinions, and tell me if there

6    are -- at my conclusion, if there are additional

7    opinions that we need to flesh out.

8               Based on the available social science that

9    meets established standards, and you have defined

10   established standards as gold standard, high-level

11   social science research, the biological

12   marriage-based intact family which you have defined

13   to mean that -- as a child with a male parent and a

14   female parent both of whom are genetically related to

15   the child in marriage is associated with better child

16   outcomes, which is to say, is correlated with better

17   child outcomes than nonmarital, divorced, or

18   stepfamilies, and you use each of those 3 terms you

19   say in an amalgam of the way the researchers use

20   them.

21        A.    And we would add and include single and

22   cohabiting in there.

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 113

1       Q.    And to be clear:  Single and -- any single

2    parent, unwedded, never married, single parent, and

3    any cohabitating relationship, you would classify as

4    nonmarital for purposes of this report?

5       A.    It could capture it, yes.

6       Q.    Comparative advantages are evident in

7    connection with critical societal concerns, including

8    but not limited to health, mortality, and suicide

9    rates, drug and alcohol abuse, criminality and

10   incarceration, intergenerational poverty, education

11   and/or labor force contribution, and early child

12   bearing.

13           MR. THOMPSON:  Go ahead.  I just don't

14   want him to answer without my objecting.

15           Go ahead.

16           BY MR. McGILL:

17      Q.    And you added to that, early sexual

18   activity.

19           Correct?

20           MR. THOMPSON:  Objection, vague as to what

21   the comparative advantages are.

22      A.    Yes.

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 114

1          BY MR. McGILL:

2      Q.    And there are no other critical societal

3    concerns other than those that we just discussed that

4    are addressed in your report.

5      A.    Those -- those are the major ones, and I

6    believe those are the ones that I address in the

7    report.

8      Q.    So the -- just to recap it, just to make

9    sure I've got it right, based on social science that

10   is gold standard, high-level social science, the

11   intact family defined as a married man and woman

12   genetically related to each of their children is

13   correlated to better child outcomes than nonmarital,

14   meaning any single never-married parent or any

15   cohabitating couple with children, divorced, or

16   stepfamilies.

17          Does that fairly capture your opinion?

18          MR. THOMPSON:  Objection, mischaracterizes

19   the testimony, and it's compound in the extreme.

20     A.    Yes, with -- with the caveat noted

21   earlier, that there are other family forms that --

22   that are not included in the report based on

Loren Dean Marks                                                    October 30, 2009
Washington, DC

1    limited -- more limited research.

2              BY MR. McGILL:

3         Q.    And among those family forms that are not

4    included would be married adoptive families?

5         A.    M-hm, yes.

6         Q.    And also parents who are lesbian or gay

7    and raising a child?

8         A.    Yes.

9         Q.    These are separate categories you did not

10   analyze in the context of this report.

11             Correct?

12        A.    Correct.

13             And as I said, I believe those probably

14   deserve discrete categorization.

15        Q.    And other than the 6 areas of societal

16   critical concern listed here in paragraph 42 of your

17   report, which is exhibit 2, there are no other

18   critical societal concerns that you are addressing.

19             Correct?

20        A.    None that I'm addressing in the report.

21        Q.    And it is your opinion that for each of

22   those 6 issues of critical societal concern, with the

Loren Dean Marks                                                     October 30, 2009
Washington, DC

1     same 2 adults of different sex at these times for the

2     Swedish population and housing censuses.  Children

3     were categorized irrespective of whether their parent

4     or guardian were biological parents.

5             Would you agree with me that Professor

6     Weitoft included nonbiological parents in his sample?

7         A.    Yes, yes, I would.

8         Q.    And is there any reason based on the

9     Weitoft study to limit the conclusion about the

10    protective benefits of marriage to biological

11    parents?

12        A.    Based on -- based on this study, no, no,

13    one study among hundreds.

14        Q.    Moving --

15            MR. McGILL:  Would you please mark as

16    exhibit 4.

17                        (Marks Exhibit No. 4

18                        was marked for

19                        identification.)

20            BY MR. McGILL:

21        Q.    I'm moving now, Professor Marks, to

22    paragraph 15, and specifically, the last sentence of

Loren Dean Marks                                October 30, 2009
Washington, DC

Page 137

1    paragraph 15 of your report, which is marked as

2    exhibit 2, and it appears on page 4 of your report.

3             There you say:  In a recent related

4    review, Wilcox and colleagues state that, quote,

5    teens living with both biological parents are

6    significantly less likely to --

7        A.    It should say "use."

8        Q.    -- use --

9        A.    I omitted a word there.

10       Q.    -- illicit drugs, alcohol, and tobacco.

11   And you italicized the words both biological parents.

12            Why did you italicize the words both

13   biological parents?

14       A.    I was going back to the point that biology

15   is important in connection with marriage and

16   parenting.  I wanted to underscore that.

17       Q.    Okay.  This study -- or this publication

18   of Wilcox and colleagues, this is not a -- original

19   research.

20            Correct?

21       A.    This is -- this is a review, report type

22   of publication.

Page 138

1        Q.     And is the publication in which it

2    appeared a peer-review journal?

3        A.     The publication is -- it's a peer-produced

4    by a team of scholars, but I think that technically

5    it would not be classified as a peer-review journal.

6    It would not.

7        Q.     Would you please turn, Professor Marks, to

8    pages -- to page 24 and 25, which is the page that

9    you've cited for this quotation.

10           And I would ask you to just read the

11   sentence that begins on the last line of page 24 and

12   continues to page 25.  And you can read it to

13   yourself.  I'll read it for the record.

14       A.     Okay.

15       Q.     Data from the national household survey on

16   drug abuse show that even after controlling for age,

17   race, gender, and family income, teens living with

18   both biological parents are significantly less likely

19   to illicit drugs, alcohol, and tobacco.

20           Now, Wilcox and colleagues does not define

21   the term biological parents, do they?

22           MR. THOMPSON:  Are you giving him a minute

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 139

1    to look at the study, or are you asking him off the

2    top of his head?

3         A.    I don't know if they do or not,

4    Mr. McGill.

5              BY MR. McGILL:

6         Q.    But as you had -- just as you said before

7    that you used terms in the same manner in which the

8    researchers you cite used the terms, would you expect

9    Wilcox and colleagues to use the term biological

10   parents in the same manner in which the researchers

11   who they cite use the term?

12        A.    I believe I would, but there are always

13   exceptions.

14        Q.    If Wilcox and colleagues used the term

15   biological parents in a manner different from the

16   authority for which they cite, would that suggest

17   that the proposition is not supported by the

18   authority that they cite?

19        A.    Could -- could you restate --

20        Q.    Sure.

21        A.    -- please.

22        Q.    If Wilcox and colleagues defined

Loren Dean Marks                                     October 30, 2009
Washington, DC

1   biological parents differently from the authority

2   that they cited, wouldn't that suggest that the

3   proposition that Wilcox and colleagues state is not

4   supported by the citation that they give for it?

5       A.   So you're saying if it's overextended, if

6   the use is overextended -- if their definition

7   doesn't match that in the source that they cite, is

8   that a problem in essence?

9             I would say that, yeah, that's a mistake.

10      Q.   And -- but in this context, we would

11  expect Wilcox and colleagues to be using the term

12  biological parents as -- in the same way in which the

13  authority that they cite for it, would we not?

14      A.   I would imagine -- neither -- neither

15  myself on page 4 nor Wilcox on page 25 explicitly

16  indicate marriage or not, but both of them say,

17  biological, both biological.

18      Q.   Are you -- so you cited Wilcox and

19  colleagues in your report without knowing how they

20  used the term biological parents?

21            MR. THOMPSON:  Objection, mischaracterizes

22  the testimony.

Loren Dean Marks                                        October 30, 2009
                        Washington, DC

                                                        Page 141

1       A.      With -- without knowledge of their

2   citation, or of Wilcox themselves?

3               BY MR. McGILL:

4       Q.      Let me ask the question this way.

5       A.      M-hm.

6       Q.      Dr. Marks, do you know how Wilcox and

7   colleagues are using the term biological parents

8   based on reading page 25?

9       A.      To be precise, they don't mention

10  marriage, nor -- nor do I on page 4, but, no, no.

11      Q.      I'd ask you now to look at page 40 of the

12  Wilcox --

13      A.      Same report?

14      Q.      Same report.

15              This is into the footnotes.

16      A.      Okay.

17      Q.      Now, Wilcox and colleagues drop a footnote

18  called number 103 at page 25, and they cite a 1996

19  study of Robert Johnson.

20              Is that the same study that you also cite

21  as a see also in footnote 16 of your report?

22      A.      It is.

                Alderson Reporting Company
                    1-800-FOR-DEPO

Loren Dean Marks                                                    October 30, 2009
                        Washington, DC

1       Q.    Have you read the Johnson study?

2       A.    I've read portions of it, but -- I'll

3    leave it at that.

4       Q.    Do you know how Johnson defined the term

5    biological?

6       A.    I don't recall, no.

7             MR. McGILL:  Would you please mark this as

8    exhibit number 5.

9                           (Marks Exhibit No. 5

10                           was marked for

11                           identification.)

12            BY MR. McGILL:

13      Q.    Can you tell me what -- based on your

14   knowledge as you sit here, what was Johnson's primary

15   conclusion in this 1996 study?

16      A.    No.

17            And going back, we're talking about

18   hundreds of different studies.

19      Q.    Do you know what data Johnson drew upon to

20   draw his conclusions?

21      A.    I don't -- I don't remember, except that

22   it was a study that came out of one of the National

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

                                                          Page 143

1    Institutes of Health I believe here in the D.C. area.

2    Usually that data is good.

3         Q.    And Wilcox tells us in fact that it's from

4    the national household survey on drug abuse.

5              Does that refresh your recollection?

6         A.    I honestly didn't remember for sure either

7    way.

8         Q.    I'd like you to look at page -- I'd like

9    you to look at page 2 of Mr. -- Dr. Johnson's study,

10   and the very first bullet point, page 2.  I'm going

11   to read that for the record.

12        A.    Okay.

13        Q.    Adolescents living with 2 biological, open

14   paren, including adoptive, close paren, parents are

15   significantly less likely to use alcohol, cigarettes,

16   and illicit drugs or to report problems associated

17   with the use than adolescents not living with 2

18   biological parents.

19             Had you read that before you signed your

20   report?

21        A.    I don't remember reading that line.

22        Q.    Can you please now turn to page 6 of his

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 144

1     report.

2           A.    M-hm.

3           Q.    Footnote 3, which is down at the bottom of

4     the page, and I'll read it and you can read it to

5     yourself.

6                 Most studies do not distinguish biological

7     parents from adoptive parents since the latter is a

8     rare family form in virtually all studies.

9     Presumably, though, families in which both parents

10    have adopted the child are considered to be intact.

11                Had you read that footnote before you

12    signed your report?

13          A.    I don't remember reading this footnote.

14          Q.    Do you -- do you disagree with its -- with

15    the content of that footnote?

16          A.    I stated earlier in my -- in my deposition

17    that adoptive study -- or adoptive families, I

18    believe, may be included, but oftentimes authors

19    don't state -- don't -- don't make that explicit

20    statement.

21                It wouldn't surprise me if studies do

22    sometimes lump them in with intact families, but it's

Loren Dean Marks                                                    October 30, 2009
Washington, DC

1    rarely made explicit like it is here.  I mentioned

2    earlier that adoption studies specifically focus on

3    and pull out, disentangle, you might say.  Adoptive

4    families are fairly rare.  They might be included

5    under other headings.

6         Q.    Do you recall a couple hours ago when I

7    asked you if you made any assumptions when you put

8    together your report?

9         A.    Yes.

10        Q.    Did you assume when you read the term

11   biological parent in the social science literature

12   that it excluded adoptive parents?

13        A.    I think that -- that that is an assumption

14   that I made, you know, clearly with respect to

15   this -- this particular study.

16        Q.    Do you disagree with Johnson that that

17   largely is an erroneous assumption?

18        A.    I note that he doesn't offer a citation

19   here to that opinion of his.  His opinion is probably

20   worth as much as anybody else.  It is -- as I've said

21   specific studies on adoptive families are limited.

22              Whether they're included under other

Loren Dean Marks                                    October 30, 2009
                    Washington, DC

Page 146

1    headings in various studies, it's -- it's rarely

2    explicitly mentioned.

3         Q.    Is Johnson's study one that you would

4    characterize as gold standard social science?

5         A.    I think it's a fine study, yes.

6         Q.    Can you turn to page 12, please.

7         A.    M-hm.

8         Q.    Page 12, the first bullet point numbered

9    1, I'll read it and you can read along:  10 family

10   types are defined as follows in order of decreasing

11   frequency.  1, mother, father.  The respondent

12   reported the presence in the household of a mother

13   and a father, open paren, biological or adoptive,

14   close paren.  The respondent did not report in the

15   presence -- the presence in the household of any of

16   the other 7 relations, that is, the respondent did

17   not report living with a stepmother, a stepfather, an

18   other relative, a nonrelative, or a spouse.

19              Do you take that to mean that -- to mean

20   as I do that Johnson defined a mother or a father as

21   a biological or an adoptive mother or father?

22        A.    Yes.

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

1        Q.    Do you read that as I do that Johnson does

2   not distinguish between biological and adoptive

3   parents?

4        A.    He doesn't there.

5        Q.    Do you believe that Wilcox -- Wilcox's

6   statement turning back to page 25 -- you need not

7   turn to it because it's quoted in paragraph 15 of

8   your report.

9              Do you believe that Wilcox's statement

10  that teens living with both biological parents are

11  significantly less likely to use illicit drugs,

12  alcohol, tobacco -- do you believe that's accurately

13  supported by the Johnson study?

14       A.    Taking a close look at these -- at these

15  definitions as been presented, I would withdraw

16  that.

17       Q.    Would you also withdraw your emphasis on

18  both biological parents?

19       A.    Certainly so.

20       Q.    Would you delete the word biological?

21       A.    I would.

22       Q.    I want to move now to your discussion of

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

Page 158

1       Q.    And so you're familiar with this article?

2       A.    Even though I read it from beginning to

3   end, it's one of hundreds.  I remember that it was --

4   as it says here, very large.  In fact I think it was

5   the largest study that I reviewed in terms of sample

6   size.

7       Q.    Did you read it in preparation for this

8   deposition?

9       A.    No.

10             Well, I read it to prepare the report, but

11  I haven't read it recently.

12      Q.    Do you know as you sit here whether

13  Professor Brown is using the term biological parent

14  in the same way that you are in your report?

15      A.    Memory -- memory, again, I am making the

16  assumption that she did.

17      Q.    You're assuming that she excluded adoptive

18  families?

19      A.    No.

20             I'm assuming that -- that this is the

21  exact phrase that she used in her article and  I

22  italicized it.

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

1       Q.    How do you think that Susan Brown is using

2   the term biological parent?

3       A.    Well, she -- she may like -- like Johnson

4   certainly have included an adoptive -- or included a

5   small number of adoptive families on into the

6   biological.  Researchers have a right to do that.

7       Q.    Do you know one way or the other?

8       A.    I don't recall for certain.

9       Q.    Brown's study sought to investigate the

10  effects of parental cohabitation on children's

11  development.

12            Correct?

13      A.    It is a family structure issue article --

14  I remember that -- so it wouldn't surprise me if it

15  includes cohabitation.

16      Q.    And it was -- who were -- who do you --

17  what populations was she comparing?

18      A.    She was looking at 2-parent biological is

19  what was confirmed here, cohabiting couples.

20            In terms of -- in terms of memory, I can't

21  remember further than that.

22            MR. McGILL:  7?

Loren Dean Marks                                         October 30, 2009
                       Washington, DC

                                                              Page 239

1           The -- the other significant element of

2      the answer is, my benchmark for comparison was the

3      intact family compared with other family forms.  I

4      didn't mean to be intentionally exclusionary of

5      same-sex family forms.  It's just that they've very,

6      very, very rarely been -- been compared with -- with

7      I think the 1 or 2 exceptions that I mentioned.

8           So it's not just a gold standard.  As I

9      said, there are non-gold standard studies cited in

10     the research, but there are very few studies that

11     make that direct comparison.  The 2 that are at --

12     you know, open that can of worms with one -- you

13     know, one study, one study, no.

14     Q.   I believe you said before -- and correct

15     me if I'm wrong, please -- that the -- you thought

16     that the family structure of 2 gay men raising a

17     child or 2 lesbians raising a child ought to be

18     treated as a separate category, separate from other

19     unmarried families, which was your second of 4

20     categories.

21     A.   Yes, I believe I said that, that they

22     should be discrete and researched independently.

Loren Dean Marks                                                  October 30, 2009
Washington, DC

Page 240

1      Q.    And would you further state that you

2   cannot generalize from findings that relate -- or the

3   findings that emerge from a comparative study of

4   intact families to unmarried families?

5            You cannot draw conclusions about this

6   separate category of families headed by gay couples

7   and lesbian couples from a comparison between intact

8   families and unmarried families as you've defined

9   those terms?

10           MR. THOMPSON:  Objection, vague.

11     A.    To draw that comparison, other than the 2

12  studies that I've mentioned or any others that I'm

13  unaware of that exist, you would need to take at

14  least one inferential step.

15           That would be a judgment call, not a

16  black-and-white, straight comparison.

17           BY MR. McGILL:

18     Q.    And it's not your intention anywhere in

19  this report to make such an inferential step?

20     A.    No.

21     Q.    So your report has nothing whatever to say

22  about childhood adjustment outcomes of children

Loren Dean Marks                                              October 30, 2009
                          Washington, DC

1        A.    Yes.

2        Q.    Is the proclamation a statement that

3    members of the LDS church are obliged to accept and

4    follow?

5              MR. THOMPSON:   Objection, beyond his

6    expertise.

7        A.    The words that you used were obliged

8    and --

9              BY MR. McGILL:

10       Q.    -- obliged to accept and follow.

11       A.    In the LDS faith, as in the Catholic faith

12   and any other, there are wide varieties of opinion,

13   acceptance of formal documents.

14             Is this accepted by many Latter Day

15   Saints?

16             Yes, I believe it is.  I don't know what

17   percentage.

18             MR. McGILL:   I'm going to mark as an

19   exhibit a copy of -- as exhibit 13 a copy of, the

20   family, a proclamation to the world.

21                         (Marks Exhibit No. 13

22                          was marked for

Loren Dean Marks                                                    October 30, 2009
                          Washington, DC

                                                              Page 258

1                          identification.)

2              BY MR. McGILL:

3         Q.    In the first paragraph at the bottom, the

4    proclamation states that:  The proclamation contains

5    principles that are vital to the happiness and

6    well-being of every family.

7              Do you agree that the principles stated in

8    the proclamation are vital to the happiness and

9    well-being of every family?

10             MR. THOMPSON:  Objection, irrelevant.

11        A.    I believe that there are principles in

12   here that can be beneficial.

13             BY MR. McGILL:

14        Q.    Do you believe that each of the principles

15   stated in the proclamation is in the words of the

16   proclamation vital to the happiness and well-being of

17   every family?

18             MR. THOMPSON:  You're going to have to let

19   him read it if you want to ask him to sign off on

20   everything, unless it's a memory test.

21             MR. McGILL:  It's one page.  He can read

22   it if he likes.

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 259

1       A.    And Mr. McGill, if you could restate your

2   question before.

3             BY MR. McGILL:

4       Q.    My question is whether you agree that the

5   principles stated in this document are vital to the

6   happiness and well-being of every family.

7             MR. THOMPSON:  I object on the ground

8   that -- of vagueness and relevance and beyond the

9   scope of his expertise.

10      A.    This -- this is a statement of -- of

11  dogma, and I -- I came here as an empirical

12  scientist.

13            My argument earlier is that we have

14  biases, and it's important to acknowledge those

15  biases and to try to be honest and forthright, and

16  then to try and proceed in an open-minded way,

17  considering others' opinions.  I think that that is

18  true for -- for both sides.

19            Returning -- returning to point, I think

20  it's very important to draw a distinction between my

21  scholarly opinion, my evidence-based opinion, and my

22  personal dogma, which -- which everyone holds.

Loren Dean Marks                                          October 30, 2009
Washington, DC

Page 260

1          Do I believe that there are principles

2     here that would be or could be vital to the happiness

3     and well-being of every family, part of my faith and

4     my dogma is, I do believe there are worthwhile

5     principles in here that could be applied to -- to

6     other families.

7          What -- what I want to very, very clearly

8     indicate is that my personal beliefs are just that.

9     They're personal.  Although these may be in my

10    personal belief helpful to others, I do not seek to

11    impose them upon other people.

12         Sacred to me, applicable to me, and there

13    are principles of -- well, I'll just stop there.

14         BY MR. McGILL:

15    Q.    And I want to say for my part that I

16    respect that view.

17         And what I want to do is because this

18    source of potential bias was not disclosed in your

19    expert report, I want to quickly and respectfully put

20    it on the record and then be done.

21         Do you agree with the statement that

22    children are entitled to birth within the bonds of

Loren Dean Marks                                           October 30, 2009
Washington, DC

1    matrimony and to be reared by a father and a mother

2    who honor marital vows with complete fidelity?

3              MR. THOMPSON:  Objection, vague.

4         A.    Let me say in terms of personal dogma,

5    yes.

6              In terms of scholarly opinion and support,

7    it's an entirely different issue.  And as you

8    mentioned, I did not bring up issues of religious

9    bias in my report or -- or other issues, nor did

10   Dr. Lamb.

11             This -- this goes beyond technicality to

12   me.  It's -- it's an issue of fair play.  I don't

13   know what the legal technicalities are.

14             But to save you some time, do -- do I

15   honor this document as personal dogma applied to me?

16             We don't need to walk clear through the

17   document, which frankly is sacred to me, important to

18   me, meaningful to me.

19             What I wish to say is that as a scholar,

20   in the report the points that are made are documented

21   not to religious literature, to empirical

22   scholarship.  And I would ask for some respect in --

Loren Dean Marks                                          October 30, 2009

Washington, DC

Page 262

1    in the effort to be forthright, to be honest.   And

2    I'm putting my hand in front of you, Mr. McBride --

3    or -- I'm sorry -- Mr. McGill.

4              This -- this is not a scholarly issue to

5    me.   It's something more sacred, though we can

6    continue.

7              BY MR. McGILL:

8        Q.    I don't mean to be disrespectful at all.

9              Do you -- can you see -- or can you

10   understand why one -- if one learned that an expert

11   had drawn a conclusion based on -- ostensibly based

12   on social science that the intact family is the ideal

13   context for the -- for child outcomes, and that's

14   quoting from paragraph 44 of your report, can you see

15   why if that same person also believed as a matter of

16   religious dogma that children are entitled as a

17   birthright to be born within the bonds of matrimony

18   and reared by a mother and father -- can you see why

19   that might appear to be to some a source of potential

20   bias?

21             MR. THOMPSON:   Objection, calls for

22   speculation as to some unknown hypothetical person.

Loren Dean Marks                                      October 30, 2009

Washington, DC

1          MR. McGILL:  I'm asking his own opinion.

2          MR. THOMPSON:  About what some unnamed

3    person one might think somewhere in some other

4    galaxy.

5     A.    In terms of potential bias, certainly.

6          In the same way that -- that advocate and

7    activist scholars of same-sex parenting or same-sex

8    marriage would have biases as well.  The -- the fact

9    that each of us have biases -- again my argument is

10   not that that's something to be ashamed of.  It's

11   something to be forthright with so that we can be

12   challenged.

13         And I don't take -- I don't take offense.

14   I was just asking for -- for fair play in terms of

15   bias.  The issue is not limited to religion.

16         BY MR. McGILL:

17    Q.    Sir, I would agree that it is certainly

18   not limited to religion.  And I don't -- would not

19   imply otherwise.

20         I very much want to be respectful of your

21   views.  And at the same time I'm -- I want to just

22   get on the record these biases.  So, I will try it

Loren Dean Marks                                October 30, 2009
Washington, DC

1    The thought didn't cross my mind.

2              I was aware that a complete curriculum

3    vitae was being sent.  And I'm fully aware of things

4    that I've written, including the reflexivity

5    sections.

6              And it -- it just didn't seem -- didn't

7    seem relevant to restate obvious biases that are

8    discussed very candidly elsewhere, as -- as you've

9    indicated.

10             As you're looking, let me return to an

11   issue that you brought up earlier.

12             You remember that the charge on this

13   article was to address both strengths and also

14   challenges, or potential negatives.  This -- this I

15   believe, Mr. McGill, is part of the challenge to the

16   scholar, to -- to look empirically even at things

17   that fit into our dogma, and to point out flaws,

18   weaknesses, incomplete information.

19             And that's -- that's what I -- I strived

20   to do in the scholarly report.

21        Q.   Do you believe that homosexual behavior is

22   sinful?

Loren Dean Marks                                      October 30, 2009
                    Washington, DC

                                                          Page 272

1              MR. THOMPSON:  Objection, vague.

2              He's not a theologian.

3      A.      No, indeed, I'm not a theologian.

4              Again in terms of -- in terms of

5      scholarship, science is a poor -- poor informant in

6      terms of morality for my opinion.  That lies with

7      other fields, moral philosophy, theology, et cetera.

8              But let me still directly address your

9      question.

10             Is homosexuality a sin.

11             Did I hear that correctly?

12             BY MR. McGILL:

13     Q.      My question was whether you believe that

14     homosexual behavior as distinguished from same-gender

15     attraction, whether homosexual behavior is a sin.

16     A.      Is a sin.

17             As I mentioned, in connection with the

18     dogma that we read earlier, which I've already told

19     you I believe in it here in terms of personal life

20     and dogma, I believe that any sexual contact outside

21     of marriage -- traditional marriage is wrong for me.

22             In fact -- and I'm including both

Loren Dean Marks                                                October 30, 2009

Washington, DC

Page 273

1    homosexual and heterosexual sexual contact before

2    marriage or after marriage with anybody but my

3    spouse.  That is my dogma.

4              Would it be a sin for me?

5              I've made personal covenants to follow

6    that dogma, personal covenants I believe to both my

7    God and my wife.

8              Would it be a sin for me?

9              Yes, in my definition of sin.  I want to

10   explicitly state that I am referring to me.  I'm

11   referring to sexual behavior in general, not singling

12   out homosexual behavior.

13             It's a pretty high bar.  That's a pretty

14   high ideal.  Believe me, I've lived with it for a

15   long time.  But I do not impose that on anyone else.

16   I impose that by a sacred covenant to myself.

17             One of my other religious tenets -- I

18   don't know if it shows up in this article or not --

19   is judge not that you be not judged.

20             In other words, do I hold that standard

21   for myself?

22             I do.

Loren Dean Marks                                          October 30, 2009
                        Washington, DC

1           Do I impose it on others?

2           I believe in cleaning up my own backyard.

3      Q.    And for clarity sake, the -- the dogma

4    that you referred to just in your last response,

5    that's known as the law of chastity.

6           Correct?

7      A.    That is correct.

8      Q.    Did your religious convictions impact your

9    opinion that the ideal family structure is marriage

10   between man and a woman and a child biologically

11   related to each in any way?

12     A.    My exposure to -- to that -- that dogma

13   I'm sure is one of many factors that -- that ran

14   around in my head.

15          But again I was called as an expert

16   witness in the same sense that I wouldn't come in

17   here and make my argument based on what's stated in

18   the family proclamation to the world.  I took that

19   same approach in my scholarly -- my scholarly work.

20          I think I've addressed again and again

21   that I acknowledge potential for bias and that that

22   makes challenge fair play.  However, please remember

Loren Dean Marks                                    October 30, 2009
                    Washington, DC

                                                    Page 275

1    my earlier statement that I also have taken upon me

2    the burden of challenge.  This is -- you know,

3    scholarship is about strengths and challenges, not

4    just dogmatically presenting one.

5         Q.    When is the first time you held the belief

6    that the ideal family structure is marriage between a

7    man and a woman and a child biologically related to

8    each?

9              MR. THOMPSON:  Objection, relevance.

10        A.    Mr. McGill, I don't know.  I don't know

11   how to answer that question.

12             BY MR. McGILL:

13        Q.    Is it -- is it fair to say that you held

14   that view, you held that belief before your

15   engagement as an expert in this case?

16        A.    Yes.

17        Q.    Is it fair to say you held that belief

18   before you received your Ph.D. degree?

19        A.    Yes.

20        Q.    Did you hold that belief before you

21   graduated from college?

22        A.    Yes.

Loren Dean Marks                                    October 30, 2009
Washington, DC

Page 276

1        Q.    So that belief predates your work as a

2   social scientist?

3        A.    Yes.

4              MR. McGILL:  We'll take a 1- , 2-minute

5   break and find out if there are any last questions.

6              MR. THOMPSON:  Sound good.

7              THE VIDEOGRAPHER:  We're going off the

8   record.  The time is now 6:09 PM.

9              (Recess.)

10             THE VIDEOGRAPHER:  The time is now 6:13

11  PM.  You may proceed.

12             BY MR. McGILL:

13       Q.    Dr. Marks, earlier in the deposition

14  today, we addressed paragraph 15 of your report,

15  which is marked as exhibit 2.

16       A.    Okay.

17       Q.    Can you go back to that.

18       A.    I'll try -- I'll try and get there

19  quickly.  Okay.

20       Q.    And addressing the last sentence:  Wilcox

21  and colleagues state that teens living with both

22  biological parents are significantly less likely to