# EXHIBIT C

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

 1                    UNITED STATES DISTRICT COURT

 2                  NORTHERN DISTRICT OF CALIFORNIA

 3      KRISTIN M. PERRY, et al.,  )

 4                      Plaintiffs, )

 5               v.                  ) No. 09-CV-2292 VRW

 6      ARNOLD SCHWARZENEGGER, in   )

 7      his official capacity as    )

 8      Governor of California,     )

 9      et al.,                     )

10                      Defendants. )

11

12                            Washington, D.C.

13                            Tuesday, November 3, 2009

14      Deposition of DAVID GEORGE BLANKENHORN III, called

15      for examination by counsel for Plaintiffs in the

16      above-entitled matter, the witness being duly sworn

17      by CHERYL A. LORD, a Notary Public in and for the

18      District of Columbia, taken at the offices of COOPER

19      & KIRK PLLC, 1523 New Hampshire Avenue N.W.,

20      Washington, D.C., at 9:41 a.m., and the proceedings

21      being taken down by Stenotype by CHERYL A. LORD, RPR,

22      CRR.

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

                                                                        Page 2

 1    APPEARANCES:

 2

 3    On behalf of Plaintiffs:

 4          CHRISTOPHER D. DUSSEAULT, ESQ.

 5          GIBSON DUNN & CRUTCHER LLP

 6          333 S. Grand Avenue

 7          Los Angeles, CA  90071-3197

 8          (213) 229-7855

 9

10    On behalf of Plaintiff Intervenor:

11          RONALD P. FLYNN, ESQ.

12          CITY AND COUNTY OF SAN FRANCISCO

13          OFFICE OF THE CITY ATTORNEY

14          Deputy City Attorney

15          1390 Market Street, 7th Floor

16          San Francisco, CA  94102

17          (415) 554-3800

18

19

20

21

22

David George Blankenhorn III                                    November 3, 2009
                          Washington, DC

Page 3

1     APPEARANCES CONTINUED:

2

3     On behalf of Defendant Intervenors:

4          DAVID H. THOMPSON, ESQ.

5          CHARLES COOPER, ESQ.

6          COOPER & KIRK PLLC

7          1523 New Hampshire Avenue N.W.

8          Washington, D.C.   20036

9          (202) 220-9659

10

11    ALSO PRESENT:

12         Mia Marbury, videographer

13

14

15

16

17

18

19

20

21

22

David George Blankenhorn III                                    November 3, 2009
                        Washington, DC

                                                                    Page 19

1    resistance and kind of a very -- very dramatic

2    rejectionist approach to the requirement of -- to the

3    issue of desegregation.

4              And for example, when the schools were

5    required to be closed for a number of weeks in

6    January of 1971, about 50 percent of all the white

7    students in the system left immediately to attend

8    private segregated schools.  And the posture of the

9    white rule (phonetic) elites of the city was one of

10   complete and total resistance to desegregation in

11   every way they could muster.

12             And the conclusion I reached in my study

13   was that that was a very harmful -- reaction harmful

14   to society, harmful to African American people,

15   harmful to the best interest of the state and of the

16   country, and harmful to the possibility of racial

17   reconciliation in the South.

18        Q.   During your undergraduate time at Harvard,

19   did you take course work in anthropology?

20        A.   No.

21        Q.   Did you take course work in psychology?

22        A.   I don't think so.

David George Blankenhorn III                                      November 3, 2009
                              Washington, DC

1          Q.    Did you take course work in history?

2          A.    Yes.

3          Q.    Do you recall specific aspects of history

4    on which you had course work as an undergraduate?

5          A.    I was primarily interested in the subject

6    of labor history.

7          Q.    What is labor history?

8          A.    It's the history of working people and

9    their institutions.

10         Q.    Did you take any undergraduate course work

11   in sociology?

12         A.    Well, yes.

13         Q.    Do you recall on what subjects?

14         A.    Well, there was -- I recall for example a

15   course in social theory.  I recall a course in --

16   taught by Professor David Riesman on the -- I think

17   it was called the American character, I think, and

18   anyway, Professor Riesman's a very prominent

19   sociologist, sociology Professor at Harvard who

20   became kind of a mentor of mine, so those would be my

21   recollections off the top.

22         Q.    Okay.  Did you have any undergraduate

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

Page 21

1    course work on the subject of marriage?

2         A.    Well, in the history -- in the history

3    course, I studied -- my focus was more on labor

4    history, but there were some foci in that -- in that

5    study on marriage in the South, but there was no

6    course specifically or entirely devoted to the topic

7    of marriage.

8              It was more just one component of -- of --

9    of historical work, one of -- one of many aspects of

10   society that would be studied in the course.

11        Q.    Okay.  And that component specifically

12   concerned marriage in the south of the United

13   States?

14        A.    Well, I was mostly interested in labor

15   history as I mentioned, but I also had a special

16   interest in southern labor history, so that was the

17   focus of my work more -- most -- even more

18   specifically than labor history generally was,

19   southern labor history, the history of slavery, the

20   history of -- the history of working people and their

21   insti- -- and institutions affecting them in the

22   South.

David George Blankenhorn III                        November 3, 2009
                            Washington, DC

1        Q.    Was one of the things that you studied the

2    division of labor within married families?

3        A.    It's a topic that came up, but it's not a

4    topic that I studied intensely or specifically as a

5    major area of study.

6        Q.    Did you have any undergraduate course work

7    on child welfare?

8        A.    I don't think I took a course with that

9    term in the title.  I'm not sure, but I don't think

10   so.

11            I took some courses involving the issue of

12   welfare, public assistance, and so forth, and issues

13   of child well-being were fairly prominent in some of

14   those studies.

15       Q.    Did you have any undergraduate course work

16   that addressed sexual orientation?

17       A.    No.

18       Q.    Okay.  You then received a master's in

19   comparative social history from the University of

20   Warwick, in Coventry, England.

21            Correct?

22       A.    Yes.

David George Blankenhorn III                               November 3, 2009
                           Washington, DC

                                                              Page 23

1        Q.    What is comparative social history?

2        A.    It's comparing the social history of 2 or

3   more societies.

4        Q.    Was that a master's program in which you

5   attended classes with other people, or was it more of

6   a tutorial study, or something different?

7        A.    There were I think 11 or 12 of us in the

8   program.  We met once or twice a week to discuss our

9   readings, and then I worked with my tutor on my

10  thesis.

11       Q.    Okay.  And your thesis was called,

12  cabinetmakers in Victorian Britain, a study of 2

13  trade unions.

14       A.    Yes.

15       Q.    And can you describe just briefly what

16  your ultimate conclusions or opinions were in that

17  thesis?

18       A.    It was a study of 2 British trade unions

19  in the 19th century, one trade union of cabinetmakers

20  that catered primarily to the more highly trained and

21  highly paid cabinetmakers that were paid in a certain

22  way and treated a certain way, achieved a certain

David George Blankenhorn III                                    November 3, 2009
                            Washington, DC

1    social standing as a result of their position.

2                    And then the more broadly based industrial

3    workers.  They were -- they did not -- had not gone

4    through the same apprenticeship programs.  They

5    received lower pay and less status, less protection

6    generally speaking.

7                    And it was a comparison of those 2 trade

8    unions.  And I was interested really in the emergence

9    of the British labor party and the emergence of

10   socialism as a -- as a political ideal that was

11   important to a lot of working class people in

12   Britain.

13                   And I was interested in the comparative

14   contributions of those 2 trade unions in -- in

15   shaping the emergence of the British labor party and

16   shaping the kind of history of British working

17   people.

18       Q.    Okay.  Did you conduct any study of

19   anthropology in the course of your master's program?

20       A.    No.

21       Q.    Did you conduct any study of psychology in

22   the course of your master's program?

David George Blankenhorn III                                      November 3, 2009
                              Washington, DC

                                                                    Page 25

1        A.    No.

2              This was history.  This was a history

3     program.  This was a study of comparative social

4     history.  That was the rubric.

5        Q.    Okay.  All right.

6              Have you received any other education

7     post-high school other than your college degree and

8     your master's?

9        A.    No.

10       Q.    You don't hold a Ph.D.?

11       A.    No.

12       Q.    Now, you're the founder and president of

13    the Institute for American Values.

14             Correct?

15       A.    Yes.

16       Q.    When did you found the Institute for

17    American Values?

18       A.    Incorporated in 1987.

19       Q.    Why did you found the Institute for

20    American Values?

21       A.    I was -- I had been a -- I had been a

22    VISTA volunteer and a community organizer, and I was

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

Page 27

1    And they were not -- they were not typically paid by

2    us but would voluntarily participate in our

3    activities.   Sometimes they were reimbursed for their

4    expenses or sometimes they were paid honorary for

5    papers.

6              But the idea was to bring together a

7    diversity of scholars from across the human sciences

8    to focus on issues of family and child well-being,

9    and that's what we did.

10       Q.    When you say to participate in your

11   programs, what are the programs in which the

12   Institute for American Values engages?

13       A.    Currently?

14       Q.    Let's take currently.

15       A.    We have 3 program areas.

16             The first is called marriage and families.

17   And it looks at issues of -- of marriage and family

18   life.

19             And then the second area is called thrift

20   and generosity, and it looks at areas of how we as a

21   society think about the use of our resources and

22   particularly money.

David George Blankenhorn III                         November 3, 2009
                          Washington, DC

                                                            Page 28

1              And then the third area is called east

2    jihad reason, and that is a dialogue project bringing

3    together U.S. scholars of civil society with their

4    Arab and Muslim counterparts from the Middle East and

5    north Africa for a process of dialogue and exchange

6    in an effort to clarify disagreements and identify

7    areas of agreement on issues of civil society.

8         Q.    Are you personally involved in each of the

9    3 program areas?

10        A.    Yes.

11        Q.    Has the marriage and family program area

12   existed from the time of the founding of the

13   Institute for American Values?

14        A.    Yes.

15        Q.    When was the thrift and generosity program

16   initiated?

17        A.    Well, we began work in the topic I think

18   about 4 years ago, approximately 4 years ago.  And --

19   and I think that's the answer.  I think that's the

20   answer.

21              We -- the reason I'm hesitating is because

22   we actually gave it a name, center for thrift and

David George Blankenhorn III                          November 3, 2009

Washington, DC

1    generosity, fairly recently, about 6 or 8 months ago,

2    but our work in the topic began about 4 years ago.

3         Q.    And when did you work on the topic of the

4    east jihad -- east jihad reason?

5         A.    That began in 2002.

6         Q.    And are there other program areas that

7    have existed previously but no longer?

8         A.    For a while, we had an area that we tended

9    to call civil society, and that's no longer a rubric

10   that we organize our program under, but there was a

11   period of several years in which we did.

12        Q.    And let's take the marriage and family

13   program area.

14             What sorts of initiatives or activities

15   does the Institute for American Values engage in

16   within that program area?

17        A.    Currently?

18        Q.    Let's take currently, sure.

19             But let me clarify.

20             I'm sorry.

21        A.    There's about 14 projects.  I can go

22   through them all if you wish or --

David George Blankenhorn III                                 November 3, 2009
                          Washington, DC

1       Q.    What I'm most interested to start is a

2   more general description of types of projects rather

3   than specific.

4       A.    Well, we're interested in looking at the

5   status and future of marriage as a social

6   institution.

7       Q.    Do you conduct seminars?

8       A.    By, seminars, do you mean -- what do you

9   mean by, seminars?

10      Q.    Presentations where scholars will speak to

11  and teach people who will choose to attend.

12      A.    Yes, we've done that.

13      Q.    Okay.  Do you sponsor writings?

14      A.    Yes.

15      Q.    Do you pay scholars who are not employed

16  by the Institute for American Values to conduct

17  research on particular issues?

18      A.    Yes.

19      Q.    Are there others of general categories of

20  actions along those lines that you engage in that I

21  haven't mentioned?

22      A.    We issue what we call reports.  That would

David George Blankenhorn III                                    November 3, 2009
                        Washington, DC

                                                                    Page 53

1     book, excluding the advance, the advance was I think

2     40,000 dollars, and then the book did sell enough to

3     recoup that and to start giving me royalties, and I

4     think the total royalties and fees for reprints and

5     whatnot have added up to about approximately a

6     hundred thousand dollars since the book was published

7     in 1995.

8          Q.    Okay.

9          A.    That's an estimate, but I think it's a

10    reasonably accurate one.

11         Q.    Okay.  Your CV then lists a -- lists the

12    books that you've authored or edited.

13               Is this a true and complete list of all

14    books of which you're the author or editor?

15         A.    Yes, I believe it is.

16         Q.    Okay.  In paragraph 4 of your report -- if

17    you move off the CV for one moment -- paragraph 4 of

18    your report talking about the Future of Marriage --

19         A.    M-hm.

20         Q.    -- says that you drew on your continuing

21    anthropological history and cultural study of the

22    institution of marriage.

David George Blankenhorn III                                    November 3, 2009
                        Washington, DC

Page 54

1          Do you see that?

2     A.   Yes.

3     Q.   What is your continuing anthropological,

4     historical, and cultural study of the institution of

5     marriage?

6     A.   Reading and reflecting on the texts in the

7     field.

8     Q.   Anything else?

9     A.   Discussions with other scholars.

10    Q.   Anything else?

11    A.   I think reading and reflecting on the

12    texts and conversing with other scholars broadly

13    defined in seminars and in informal ways as well, I

14    think that would constitute the majority of what I

15    mean when I say, continuing study.

16    Q.   Okay.  Have you ever published work in a

17    peer-reviewed journal?

18    A.   I don't believe so.

19    Q.   Do you have a basic understanding of what

20    the term peer-reviewed journal means?

21    A.   Yes.

22    Q.   What does that mean as you use that

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

1    phrase?

2              Let me ask it a better way.

3              When you say you don't believe you've ever

4    published work in a peer-reviewed journal, how are

5    you defining a peer-reviewed journal?

6         A.    Well, in the academic world, the -- it's a

7    common practice for journals -- to -- prior to

8    publication of an article, they would circulate that

9    article to a group of scholars whose judgments they

10   would view as trustworthy and valuable.  And they

11   would seek -- the editor would seek to get the

12   comments of those scholars on the article.

13             And then they may or may not ask the

14   author to revise the article based on those comments.

15   And then they would decide whether or not to publish

16   the article as possibly revised based on the comments

17   of the peer review.

18             That's my understanding.

19        Q.    Okay.  And you've never had your work

20   published in a journal that follows that procedure?

21        A.    Well, we at the Institute for American

22   Values follow that procedure for all of our work, but

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

1      I -- I don't think that's what you're asking me.

2          Q.    Right.

3          A.     I think perhaps you're asking me, have I

4      published -- had published an article in a mag- -- in

5      a journal that is not affiliated with the Institute

6      for American Values that has this process of peer

7      review.

8               And the hon- -- I don't -- it's possible

9      that I have, but I don't think I have, and I cannot

10     now recall an instance that I have, although it's --

11     I don't think I have.

12         Q.    Okay.  And was it your testimony --

13         A.     Primarily, most of my things get published

14     by our organization.

15         Q.    Right.

16         A.     We have a peer-review process in place

17     that I think is really -- you know, meets that

18     function, but I think you're asking me a different

19     question.

20         Q.     Well, when you say that the Institute for

21     American Values has a process in place that meets

22     that function, do you mean to say that you follow

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                        Page 57

1    what you understand to be the procedures of peer

2    review as adhered to by journals that would generally

3    be acknowledged in academia as peer-reviewed

4    journals?

5         A.    Yes.

6         Q.    And can you describe it in more detail

7    what that process is?

8         A.    Well, yes.

9         Q.    Okay.  Please do.

10        A.    The most recent example would be a journal

11   that we're -- will be published -- the issue will be

12   published next month.  And the editor is -- a member

13   of our institute team commissioned the articles from

14   scholars, and then drafts of those articles were

15   shown to other scholars in the field that he had

16   identified as competent people whose opinions would

17   be valuable, and they offered comments on those

18   articles.

19             And then those articles were -- those

20   comments were a part of the revision of those

21   articles prior to publication.  And that is what I

22   understand to be the process of peer review, and

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 58

1    that's what we did.

2              And we commonly do that with -- with our

3    publications.  We have that process.  We identify

4    other scholars whose opinions we value.

5              I -- I have been asked to review articles

6    by journals, which I've done, so --

7         Q.    Is all of your own writing subjected to

8    that process that you're describing?

9         A.    Well, with trade books such as the case

10   with Fatherless America or the Future of Marriage,

11   the trade industry does not typically require or

12   expect that process to happen, although in each case,

13   with my writings, I on my own did undertake that

14   process.

15             For example, with -- well, I did -- I

16   asked other scholars to review the manuscript in

17   draft form, and I took their comments into account as

18   I did my revisions, but that was not a required

19   part -- that was not required by the publisher.  In

20   the trade book world, that is not typically a

21   requirement established by the publisher.

22        Q.    What do you mean by, a trade book?

Alderson Reporting Company
1-800-FOR-DEPO

David George Blankenhorn III                           November 3, 2009
                        Washington, DC

                                                              Page 59

1       A.    I mean that it -- it's just a term -- it's

2    a term that -- it -- the books are -- are -- it's a

3    book that's -- that's not -- the boundaries are

4    getting blurrier and blurrier, but commonly, if you

5    would say an academic book, you would mean a book

6    that's published by University Press, and they

7    commonly have a very -- they would require such a

8    process.

9            And I've worked with them and actually --

10   pretty sure I've had chapters of books published in

11   that way -- pretty sure I have.

12           Trade publishers are intended for a

13   somewhat broader audience, and they tend to be a

14   little bit less -- what's the right word?  -- they

15   tend to -- I think they're intended for a -- more of

16   a bookstore audience that's a little broader, so --

17           MR. THOMPSON:  Chris, we've been going

18   about an hour and -- I don't know -- 8 or 10 minutes.

19           Would it be okay if we took a short break?

20           MR. DUSSEAULT:  Absolutely.  Sure.

21           THE VIDEOGRAPHER:  Here marks the end of

22   videotape number 1, the tape of the deposition of

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

1          Did the report conclude that it was

2     important for children not only that there be 2

3     married parents but that those people be the ones who

4     actually created the child?

5          A.    I can't recall if that report at that time

6     made -- established that level of detailed language.

7     I don't -- I know my own thoughts about it, but I

8     don't know that that report used those words.

9          Q.    Okay.  Let's -- let's turn our focus --

10         A.    It may have.  I just don't recall whether

11    it did or it didn't.

12         Q.    Okay.  Thank you.

13              Let's turn the focus a bit to this case in

14    particular.

15              You've been retained by counsel for the

16    defendant intervenors to offer expert opinions in

17    this case.

18              Correct?

19         A.    Yes.

20         Q.    What study if any have you made of the

21    plaintiffs' allegations in this case?

22         A.    What study have I made of the plaintiffs'

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

                                                                Page 74

1    allegations?

2           Well, I've -- I reviewed the expert

3    testimony of Nancy Cott.  And I have as a matter of

4    my work for a number of years now, I've tried to

5    follow these issues as best I can.

6           I think that's -- that's the answer.

7       Q.    Okay.  Have you reviewed the -- let me ask

8    a foundational question.

9           Do you know what a complaint is?

10      A.    I'm not a lawyer.  I'm not familiar with

11   legal terms.

12      Q.    Okay.  If I represent to you that a

13   complaint is a document that plaintiffs file that

14   states their basic allegations about the case, that

15   generally it's what starts the case, have you to the

16   best of your knowledge reviewed the complaint file by

17   plaintiffs in this action?

18      A.    I have not.

19      Q.    Have you reviewed any briefs filed by

20   parties and submitted to the court in this case?

21      A.    I mentioned Nancy Cott's testimony.

22   That's all to the best of my knowledge.

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

Page 75

1        Q.    Okay.

2        A.    I've read a lot of the court cases, but I

3   think you're asking a different question.   I think

4   you're asking this specific case --

5        Q.    Right.

6        A.    -- documents related to this specific

7   case.

8              And the answer is that other than having

9   reviewed the Cott testimony and -- I have not read

10  additional documents that I recall, any additional

11  documents.

12       Q.    Do you have a basic understanding of what

13  this case is about?

14       A.    I think I do.

15       Q.    Okay.   What is that understanding?

16             MR. THOMPSON:   And I'll object to the

17  extent it calls for a legal conclusion.

18             But go ahead.

19       A.    My understanding is that the Proposition 8

20  initiative in California was passed and that that

21  established that -- I guess you could say it

22  established or reestablished the man-woman customary

David George Blankenhorn III                               November 3, 2009

Washington, DC

Page 76

1    definition of marriage.

2              And my further understanding is that the

3    plaintiffs in this case are seeking to have that --

4    have that -- have that law replaced by a different

5    understanding, and that they're seeking to object to

6    the -- the -- the law as it was established by the

7    proposition -- by the Prop 8 initiative and that they

8    are alleging that their rights are violated by this

9    law, and they're seeking to have it overturned in the

10   courts.

11             And that's my general understanding.

12             BY MR. DUSSEAULT:

13        Q.   Okay.  Now, you referred to Proposition 8.

14             I've reviewed your report, and I didn't

15   see any reference in your report to Proposition 8 by

16   name; is that correct?

17        A.   That's correct.

18        Q.   Why did you choose in your report not to

19   specifically address Proposition 8?

20        A.   Because I don't -- I wanted in the report

21   to state what I felt to be the foundational issues as

22   I saw them and as best I was able to understand them.

David George Blankenhorn III

November 3, 2009

Washington, DC

1    And so I chose to speak about the cross-cultural

2    meaning of marriage as a -- as a social institution,

3    and the purposes of marriage as a social institution

4    and the trends currently in society toward what in

5    the report are termed deinstitutionalization and what

6    some of the likely consequences of

7    deinstitutionalization could be.

8              And that is the area of this topic in

9    which I thought the most about and I feel like I have

10   the most to say.

11             I don't -- my views about political

12   matters or legislative struggles in various states,

13   although it's something that I try to understand, I

14   sought in the document to really say what based on my

15   knowledge I thought was the most important thing to

16   say about this.

17             So that's what I did.

18        Q.   Did you make any specific study of the

19   campaign to pass Proposition 8?

20        A.   No.

21        Q.   Did you make any study of the motivation

22   of the actual voters who passed Prop 8?

David George Blankenhorn III                     November 3, 2009
Washington, DC

Page 78

1       A.      If by, study, you mean a scholarly study,

2    the answer would be no.

3       Q.      Okay.

4       A.      In the course of my work, I talked with

5    people on both sides of that case and sought out

6    their views and opinions in conversation, but I

7    didn't make a scholarly investigation.

8       Q.      I think you testified earlier that you

9    have been retained by counsel for the defendant

10   intervenors, who I'll represent are the official

11   proponents of Proposition 8.

12              In preparing your report, have you

13   interviewed any of the official proponents of

14   Proposition 8?

15      A.      Well, as I mentioned, I've spoken to these

16   proponents over the -- over time in my capacity as a

17   person who is active in the public discussion of this

18   issue, but I did not specifically establish a format

19   of doing personal interviews that were for the

20   purposes exclusively of writing this document.

21      Q.      And let me clarify what may be an

22   ambiguity in the question.

David George Blankenhorn III                          November 3, 2009
                      Washington, DC

1          I wasn't interested for this question in

2    whether you talked to proponents meaning people who

3    are in favor of Prop 8.  There are a number of

4    specific individuals who are the officially

5    recognized proponents of the ballot initiative who

6    are responsible for putting the initiative on the

7    ballot and then working to pass it.

8          Have you spoken with any of those

9    individual people?

10   A.    I've spoken with people who were active in

11   the -- who were active in the Proposition 8 campaign

12   on -- you know, on the side of -- of the pro-same-sex

13   marriage side.

14         And I've discussed their views and sought

15   out their views, but I'm not aware that I -- I

16   don't -- I don't think I have spoken to the

17   individual couples, either of the couples who are

18   the -- who are the plaintiffs in the case.  I have

19   not interviewed them.

20   Q.    Right.

21         So let me -- and I wasn't asking about any

22   of the legal terms -- or confusing -- I wasn't asking

Alderson Reporting Company
1-800-FOR-DEPO

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1    if you talked to the plaintiffs.

2              I'm asking if you talked to any of the

3    named defendant intervenors who the Cooper & Kirk

4    firm represent, the people who more than just

5    favoring Prop 8 actually were the official proponents

6    of the ballot initiative.

7              Do you know if you've talked to any of

8    them?

9              MR. THOMPSON:  And just as a helpful

10   clarification, I mean, maybe using the names of those

11   5 people --

12             MR. DUSSEAULT:  I was wondering if I had

13   that handy.

14             MR. THOMPSON:  If you don't, we can get

15   them.  Maybe we can move on, and we'll get those 5

16   names for you.

17             (Mr. Cooper left the room.)

18             MR. DUSSEAULT:  Sure.

19             That would be great.

20             BY MR. DUSSEAULT:

21        Q.   In the course of preparing your expert

22   report, have you studied communications between the

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                              Page 81

1    campaign that was trying to pass Prop 8 and the

2    voters?

3         A.    No.

4         Q.    Have you viewed any internal documents

5    from the campaign to pass Prop 8 regarding their

6    strategy for getting voters to support it?

7         A.    No.

8         Q.    Did you have any role in the campaign to

9    pass Prop 8?

10        A.    Yes.

11        Q.    What was your role?

12        A.    I was asked by the editorial page editor

13   of the Los Angeles Times to write an opinion piece

14   regarding my views on marriage that would be relevant

15   to the Prop 8 discussion, and I did so.

16        Q.    Was that to the best of your recollection

17   your sole involvement in Prop 8?

18        A.    Yes.

19              (Mr. Cooper entered the room.)

20              BY MR. DUSSEAULT:

21        Q.    Mr. Cooper was kind enough to bring me the

22   names of his clients.

David George Blankenhorn III                            November 3, 2009
                          Washington, DC

                                                        Page 82

1              So let me ask:  Have you ever spoken with

2    Dennis Hollingsworth?

3        A.    No.

4        Q.    Have you ever spoken with Gail Knight?

5        A.    No.

6        Q.    Have you ever spoken with Martin

7    Gutierrez?

8        A.    No.

9        Q.    Have you ever spoken with Hak-Shing

10   William Tam, T-A-M?

11       A.    No.

12       Q.    Have you ever spoken with Mark Jansson?

13       A.    No.

14       Q.    Have you spoken with anyone who you

15   understood to be employed by protect marriage, dot,

16   com?

17       A.    No.

18       Q.    Have you ever --

19       A.    I'm not saying I haven't spoken with such

20   a person.  I'm saying I'm not aware of having spoken

21   with such a person.

22       Q.    Best I can get, yeah.

David George Blankenhorn III                                    November 3, 2009
                        Washington, DC

                                                        Page 83

1              Thank you.

2              Have you ever spoken with someone who you

3    understood to be a campaign consultant or political

4    consultant for protect marriage, dot, com?

5         A.   I've spoken with someone who I think might

6    be but is not -- I don't know for a fact that she is.

7         Q.   Who are you thinking of?

8              MR. THOMPSON:  Well, now, wait a minute.

9              Does this implicate any of the issues that

10   we're fighting about in terms of identifying people?

11             MR. COOPER:  If -- if the witness is

12   referring to someone who was engaged professionally

13   by the campaign as a paid consultant adviser or

14   advertising rep, or some such thing as that, then it

15   would not.

16             Otherwise, it likely would, and I would

17   ask you to ask the witness not to reveal a name.

18        A.   I'm not aware of anybody who worked for

19   the campaign.  I'm not saying I haven't spoken to

20   anybody who worked for the campaign.  I'm saying I'm

21   not aware of having spoken to anybody who had that

22   formal role in the campaign.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

Page 84

 1              BY MR. DUSSEAULT:

 2       Q.    I mean, I'll ask:  The woman who you had

 3   in mind who you don't know if she was involved in the

 4   campaign or not, who is that person?

 5       A.    I'd rather not say, because I don't feel

 6   it's right to be speculative about something I just

 7   don't know about.  I -- I should not have guessed

 8   about something that I don't have accurate knowledge

 9   of.

10              BY MR. DUSSEAULT:

11       Q.    It's fair.  It's not that important.

12              Have you ever talked with someone named

13   Frank Schubert?

14       A.    No.

15       Q.    Are you offering any opinions in this case

16   about the actual motivation of voters in passing Prop

17   8?

18       A.    No.

19       Q.    Are you offering --

20       A.    Not in this report.

21       Q.    Are you offering any opinions in your

22   report about the actual motivation of the official

David George Blankenhorn III                    November 3, 2009
Washington, DC

Page 85

1    proponents of Prop 8?

2         A.    Not in this report, no.

3         Q.    Okay.  Do you know whether Proposition 8

4    says anything at all about the rights of gay and

5    lesbian people to have and raise children?

6              MR. THOMPSON:  Objection to the extent it

7    calls for a legal conclusion.

8              But go ahead.

9         A.    I'm -- I'm not aware of the -- I can't

10   recall now having memorized or been familiar with the

11   specific language.

12             BY MR. DUSSEAULT:

13        Q.    Is it your best recollection that what

14   Proposition 8 did was propose a constitutional

15   amendment that defined marriage as being between one

16   man and one woman?

17        A.    It's -- it's my understanding that

18   Proposition 8 reestablished the man-woman customary

19   basis of marriage in California law.

20        Q.    Okay.  Do you have any recollection that

21   Proposition 8 also said anything about who could

22   raise children?

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

1        A.    I -- I'm not aware of what it says about

2    that issue.

3        Q.    Okay.  Do you know whether Prop 8 says

4    anything about the obligation of parents who create a

5    child to stay with and raise that child?

6        A.    I'm not aware of what the proposition's

7    specifically language is on that issue.

8        Q.    Okay.  Do you have any knowledge of

9    whether Prop 8 says anything about a child's right to

10   be raised by 2 parents that created that child?

11       A.    Again, I'm not aware of any specific

12   language that may or may not be in the proposition

13   regarding that specific issue.  That's why I did not

14   discuss it in this -- in this report.

15       Q.    So to be clear:  You're not trying to

16   offer any opinions about what Prop 8 actually does or

17   doesn't do?

18       A.    In this report?

19       Q.    Yeah.

20             MR. THOMPSON:  And let me just object that

21   that's vague.

22             But go ahead.

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1      A.    Well, let me just tell you what I'm trying

2   to do in this report.

3            BY MR. DUSSEAULT:

4      Q.    Fair enough.

5      A.    I'm trying to offer my views based on

6   study and reflection about the meaning and purpose of

7   marriage in human groups.  And then I'm trying to

8   bring that perspective to bear on the current trends

9   in society that in my view are driving toward what I

10  term deinstitutionalization.

11           And I am arguing -- I am concluding that

12  this trend of deinstitutionalization is -- has the

13  effect of weakening marriage as a pro-child social

14  institution and that, you know, good people of

15  goodwill who bear no animus toward their fellow

16  citizens on the basis of sexual orientation can and

17  do believe that this trend of deinstitutionalization

18  is potentially harmful to society, and therefore --

19  and therefore have -- have -- have the concern and

20  the goal to arrest or to -- to -- to halt the trend

21  toward deinstitutionalization.

22           And my report is an attempt to -- to state

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1    why these are very important matters to society and

2    to children and why they have to do with the

3    fundamental role and purpose of marriage in human

4    groups.  So that's really the purpose of my report.

5              That's what I'm trying to do in the

6    report.  That was my goal.

7        Q.    Now, I won't try and recite that back.  I

8    couldn't.

9              But as I heard it and took notes, I didn't

10   hear any reference to same-sex marriage.

11             Was that intentional?

12       A.    It wasn't intentional, no.

13             I do discuss the issue of same-sex

14   marriage in the report.

15       Q.    Right.

16       A.    But I was seeking to answer the question

17   of what my main goal is in the report, which is to

18   make an assessment about the nature and purpose and

19   role of marriage in societies.

20             In my evaluation of same-sex marriage in

21   the report comes under the rubric as you will -- as

22   you'll see in the report, it comes under this

David George Blankenhorn III                    November 3, 2009
Washington, DC

1    category of the trends that aim -- that -- that have

2    the effect of deinstitutionalizing, that have the

3    effect of changing marriage from a pro-child public

4    institution to a matter of private ordering that's

5    based on the affection between the spouses and whose

6    public purposes are defined by them and them alone.

7           This transformation of marriage that

8    scholars call deinstitutionalization is the analytic

9    heart of what I was trying to drive at, and the

10   purpose of focusing in the report about the meaning

11   and purpose of marriage in human groups was to

12   establish the likely consequences of

13   deinstitutionalization in the United States.

14          And I say in the report that the advocacy

15   of same-sex marriage is one important aspect of the

16   trend toward deinstitutionalization, and that persons

17   of goodwill can and are concerned about that dynamic,

18   that process, that trend, and seek with proper and

19   good motives to -- to have a different outcome.

20          That -- that's really my argument.

21       Q.   Now -- so with that background of your

22   argument and we've established that you don't

David George Blankenhorn III                        November 3, 2009
Washington, DC

1    specifically address Prop 8 in particular, I also

2    didn't see any reference in your report to the state

3    of California in particular.

4              Is that also true?

5        A.    That's correct.

6        Q.    And I take it the reason that you chose

7    not to discuss anything about California in

8    particular is the same as the reason you chose not to

9    discuss Prop 8?

10       A.    The reason I chose not to include a

11   specific discussion of California is because I felt

12   that the primary contribution I could make to this

13   discussion would be to establish the cross-cultural

14   nature and purpose of marriage in human groups, and

15   therefore, focusing specifically on California while

16   it would have been possible did not comport or did

17   not fit or did not easily fit into the -- my main

18   goal in the report.

19       Q.    Okay.  May I ask just a couple specific

20   questions on this California issue.

21             I take it you haven't done any particular

22   study of what rights gay and lesbian couples

David George Blankenhorn III                      November 3, 2009
                          Washington, DC

1    currently have in California to create and raise

2    children?

3         A.    If you mean, have I undertaken a formal

4    academic study of it that results in a published

5    article or study, the answer would be no.

6              If you are asking me, am I generally aware

7    based on conversations with people and having tried

8    to follow the public and professional discussions of

9    this, the answer would be yes, I think to some

10   degree, I am aware.

11        Q.    Okay.  And what I meant was for purposes

12   of preparing an expert report to be used in this

13   case, did you do any particular study to attempt to

14   familiarize yourself with what California currently

15   allows in terms of same-sex couple -- couples having

16   and raising children?

17        A.    I -- I did not specifically and for the

18   purposes only of writing this report engage in

19   special study of that topic.

20             But as a matter of my daily work in the

21   field of thinking about and being a public spokes- --

22   being a -- speaking publicly and writing on the issue

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

1    of marriage, I believe that I am generally familiar

2    with the topic that you're raising.

3        Q.    Okay.  And what is your general

4    understanding about California's policy as to the

5    right of same-sex couples to have and raise

6    children?

7        A.    Well, I believe that there's a domestic

8    partnership provision, and I believe that provision

9    is -- has many features that bear upon adding

10   stability and recognition to -- to -- to -- to -- to

11   those gay and lesbian families that are -- that

12   participate in that institution.

13            And I'm aware that in California as in any

14   other locations, the gay and lesbian persons can and

15   do adopt, and I'm aware that the ability of gay and

16   lesbian persons as well as heterosexual people to --

17   to participate in -- to -- to -- to -- to -- to make

18   use of third-party participation in procreation is --

19   is not prohibited.

20       Q.    Now, you have offered in your report your

21   own personal opinion that you are not in support of

22   same-sex marriage.

David George Blankenhorn III                                    November 3, 2009
                        Washington, DC

1              Correct?

2      A.    That's correct.

3      Q.    Do you support domestic partnerships such

4  as exist in California?

5      A.    Well, recently, I wrote an article with

6  Jonathan Rauch, who is I think a well-known proponent

7  of same-sex marriage.

8              We coauthored a piece in The New York

9  Times where we suggested as -- as a way of trying to

10  have some -- some -- I don't want to say compromise,

11  but some -- some way that the 2 sides could come

12  together around something positive.

13             We suggested an idea that there would

14  be -- we use the term civil unions, but we proposed

15  that under certain circumstances, there would be

16  federal recognition of civil unions.

17             And so that would be an example I think of

18  the kind of thing you're -- you're talking about.

19      Q.    I guess what I'm more interested in is --

20  your report states -- and we'll go through it in

21  detail -- your reasons that you concluded that you

22  cannot support same-sex marriage.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1              Applying those same factors and reasoning

2      and concerns to California's existing domestic

3      partnership law, do you, David Blankenhorn, support

4      domestic partnership law?

5              MR. THOMPSON:  And just to be clear:  Are

6      you asking for his personal opinion or --

7              MR. DUSSEAULT:  Yes, because I understand

8      him to offer his personal opinion in the report as to

9      marriage.

10        A.    I -- I think the answer is yes, but I

11     would feel that in order to speak definitively to

12     that issue, I would need to be more aware than I am

13     now of all of the different details and aspects of

14     the issue.

15             I'm not a resident of California.  I --

16     and although I know generally -- I for years now have

17     been a part of the broad discussion about domestic

18     partnerships and civil unions, and I have the views

19     that I have stated to you, I feel that in order to

20     say in a kind of definitive, clearcut way that I

21     support this particular piece of legislation in this

22     particular state of which I am not a resident feel

David George Blankenhorn III                      November 3, 2009
Washington, DC

Page 95

1    that I would need to be more familiar with all of the

2    different aspects of it, but I believe as a -- as

3    a -- I believe that the answer to your question given

4    that caveat is yes.

5                 BY MR. DUSSEAULT:

6         Q.    Okay.  As you sit here today and

7    considering all the same factors that lead you to not

8    be able to support same-sex marriage, do you support

9    laws that allow gay and lesbian couples to adopt

10   children?

11        A.    Yes.

12        Q.    And considering the same factors that lead

13   you to the conclusion that you cannot support

14   same-sex marriage, do you support laws that allow gay

15   and lesbian couples to use as you put it I think

16   third-party assistance in procreation?

17        A.    I have very serious concerns about that

18   practice, whether it's practiced by heterosexuals

19   or -- or homosexuals.  I haven't worked out a

20   complete position on every single aspect of it, but I

21   have serious concerns about that general cluster of

22   activities.

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                              Page 105

 1              THE VIDEOGRAPHER:  Going off the record.

 2    The time on the video screen is 12 o'clock and 38

 3    seconds.

 4              (Discussion off the record.)

 5              THE VIDEOGRAPHER:  Here marks the end of

 6    videotape number 2 taken in the deposition of

 7    Mr. David Blankenhorn III.  Going off the record.

 8    The time on the video screen is 12:01 and 38 seconds.

 9              (Recess.)

10              THE VIDEOGRAPHER:  Here begins videotape

11    number 3 taken in the deposition of Mr. David

12    Blankenship III -- I'm sorry -- Blankenhorn III.

13    Going back on the record.  The time on the video

14    screen is 12:11 and 54 seconds.  Please continue.

15              BY MR. DUSSEAULT:

16         Q.   Mr. Blankenhorn, if you would turn,

17    please, to your index of materials considered in

18    exhibit 1.

19              You were testifying before our break about

20    certain studies in which you've been involved.

21              Are any of those studies that you're

22    referring to included in this index of materials

David George Blankenhorn III

November 3, 2009

Washington, DC

1    considered?

2         A.    I'm pretty sure the answer is no, but I

3    just want to double-check.

4         Q.    Please.

5              (Pause.)

6         A.    In items 46 and 47, I have played an

7    indirect role in -- in those publications, but I did

8    not play a direct role as a primary researcher or

9    investigator.

10             BY MR. DUSSEAULT:

11        Q.    What role did you --

12        A.    Well, those individuals were colleagues of

13   mine, and I participated in them -- in reviewing

14   those works and helping them to in one case get them

15   published, and -- yeah, that was it.

16        Q.    So you provided comments to --

17        A.    Yes.

18        Q.    Which one of the 2 was published -- or did

19   you assist in getting published?

20             I'm sorry.

21        A.    Well, I -- the comments for number 46, and

22   then the state of our unions is a publication that

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1    currently my institute puts out beginning in the year

2    2009.

3              In the year 2005, when this specific thing

4    was published, my organization had no formal

5    connection to it, but both Popenoe and Whitehead were

6    long-time friends and colleagues, and I was involved

7    informally in -- in participating in that, so that's

8    all I meant to say.

9              I wasn't involved as a researcher or

10   writer.  I think I reviewed it in draft form, but I

11   didn't play a shaping role in it.

12       Q.    When you say they're colleagues, what do

13   you mean?

14             You said that Mr. Popenoe and

15   Ms. Whitehead are colleagues.

16             Did you mean that you worked at the same

17   place at any point in time?

18       A.    David Popenoe was a member of the board of

19   my organization for several years.  And Barbara Dafoe

20   Whitehead was a staff member for several years and is

21   currently a staff member after a period of about 10

22   years when she was not a staff member.

David George Blankenhorn III                                November 3, 2009

Washington, DC

1        Q.    Other than what you said about those 2

2   entries, no other items on your list of materials

3   considered that are studies that you were involved

4   in?

5        A.    That's correct.

6        Q.    Do you have a rough sense of how many

7   studies you've been involved in in the manner that

8   you were describing before the break?

9        A.    I'd really have to go back over a period

10  of many years to give you a -- the right answer.

11            5 to 10 maybe.

12       Q.    And to the best of your recollection, did

13  they all involve marriage and family?

14       A.    No.

15       Q.    I realize it's tough, but to the best of

16  your ability, how many studies would you say you've

17  been involved in in the manner you describe that

18  relate to marriage and the family?

19       A.    5 to 10 --

20       Q.    Okay.

21       A.    -- something like that.

22       Q.    Now, with respect to the materials that

David George Blankenhorn III                                  November 3, 2009
                          Washington, DC

1   are listed here, it's described as an index of

2   materials considered.

3             Do you intend this to be an exhaustive

4   list of everything that you've considered in forming

5   your opinions?

6        A.   Do I consider this list to be exhaustive

7   in all of -- in shaping my views?

8        Q.   Of everything that you have considered in

9   coming to the opinions you offer in this case.

10       A.   If you're asking me, are there things that

11  I have read and reflected upon that have shaped my

12  overall view on the subject of marriage that are not

13  listed in this index, the answer would be yes.

14       Q.   Okay.  What I'm trying to ask is, you

15  describe these materials as an index of materials

16  considered.

17            How did you determine what documents make

18  the cut of something considered and what documents

19  don't?

20       A.   Well, I was really trying to follow the

21  format that would typically be used in a footnoted

22  publication.  I was -- I wasn't -- I'm not familiar

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1    with the -- this is the first time I've provi- --

2    done this for this kind of court situation, and I was

3    simply relying upon my experience in writing

4    academic-style articles.

5            And I was simply trying to follow the

6    conventions of citation that would be customary in

7    those situations.

8        Q.    Okay.  Are all of the documents included

9    on your index of materials considered documents to

10   which there's a specific citation in the report

11   itself?

12       A.    I believe that's true.  I -- I -- I -- I

13   would have to go through and visit -- revisit every

14   single instance and just double-check --

15       Q.    Okay.

16       A.    -- but to the best of my recollection, the

17   answer to that is yes.

18       Q.    Okay.  Now, have you -- for each of the

19   materials listed here, have you read the entire

20   document?

21       A.    If you mean every word of every page of

22   every document, the answer would be no.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1          60, yes.

2          61, yes.

3          BY MR. DUSSEAULT:

4     Q.    Mr. Blankenhorn, do you consider yourself

5    to be an expert in any field that is relevant to the

6    opinions you're offering in this case?

7     A.    Yes.

8     Q.    What field -- in what field do you

9    consider yourself to be expert?

10    A.    Marriage, fatherhood, and family

11   structure.

12    Q.    And did you develop that expertise through

13   the process of reading, reflecting, and talking to

14   others that you described earlier?

15    A.    And writing.

16    Q.    And writing.

17    A.    Yes.

18          And public speaking and testimony and

19   academic seminars.

20    Q.    I'm sorry.

21          What was the last?

22    A.    Academic seminars.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1          Even if they're doing so based on a view

2     that they're doing it just for an adult committed

3     relationship.

4          Right?

5     A.    That's correct.

6     Q.    And even if they're doing so because they

7     have the view that it's important to have children

8     and protect them?

9     A.    The law -- the institution generally

10    speaking does not inquire into motivations.

11    Q.    As long as it's a man and a woman?

12    A.    Correct.

13    Q.    Okay.

14    A.    Well, there are other features too.   There

15    are other structural features.

16          The other 2 principle ones would be 2 and

17    sex, as it's understood to be a sexual relationship.

18    Those are the 3 core features.

19    Q.    The only point I'm trying to make is, if a

20    man and a woman meet each of the defined core

21    features of marriage, they can marry regardless of

22    their motivations.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

                                                        Page 175

1        A.    The institution does not require into

2   motivations.

3        Q.    If marriage is fundamentally a pro-child

4   or a child-centric --

5        A.    Actually, may I just correct this

6   statement.

7             I mean to say that the legal structure

8   that societies typically erect to support marriage

9   doesn't inquire into the motivations.

10            If the level of the civil society, the

11  supported network that surrounds the couple as they

12  marry in a house of worship that they may be getting

13  married in, the inputs of the neighbors and friends

14  who come to the wedding and send gifts and so forth

15  and offer their support, the relatives that they

16  are -- the extended families that are joined together

17  through the marriage, in all of these ways,

18  motivations are deeply attended to and much -- much

19  examined.

20            I meant to say merely as a matter of the

21  law that the society erects to protect the

22  institution, there are very many potentially reasons

David George Blankenhorn III                    November 3, 2009
Washington, DC

1    why the law cannot and should not inquire into

2    motivation.

3        Q.    If marriage is fundamentally a pro-child

4    and child-centric social institution, why are people

5    who cannot together procreate allowed to marry one

6    another?

7        A.    That's a very important question and a

8    very significant question.

9            And I'm afraid I might try your patience

10   if I gave you my full -- my full answer to it, but

11   would you like me to begin?

12       Q.    Yeah.   I've got only 7 hours.

13            Yeah, I mean, understanding that we have a

14   lot to cover, give -- give me the best answer you

15   can.

16       A.    I wrote about this extensively.

17       Q.    And I've read -- I've read your book and

18   I've read the report, but this particular question,

19   just give me the best answer you can.

20            MR. THOMPSON:   And just so the record is

21   clear:  Do you want his full answer, or do you want

22   his best summary answer?

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1              MR. DUSSEAULT:  Well, you know, if his

2    full answer is 14 hours, I don't think you want his

3    full answer.  You're going to cut me off.

4              BY MR. DUSSEAULT:

5         Q.    But let's not -- why don't we get the best

6    answer you can.  If it gets to a point where I have

7    to raise my hand and say, let's do something else,

8    I'll try.

9         A.    Okay.  My conclusion based on looking at

10   the weight of evidence is that the assertion that

11   infertility or childlessness within marriage amounts

12   to a kind of a precursor of -- or prefiguring of or

13   justification for the principles that underlie

14   same-sex marriage -- I believe that that assertion is

15   based in a very profound misunderstanding of the role

16   and meaning of marriage in human groups, a

17   misunderstanding that is tectonic and fundamental in

18   nature and not trivial.

19              And so I want to try to express myself

20   clearly on this point.

21              The way humans procreate is fundamentally

22   and overwhelming through the sex act, and therefore,

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

                                                    Page 178

1    since the sex act can and does take place inside and

2    outside of marriage and always has, we do not need

3    marriage in order to procreate.

4              Marriage happens because of we are

5    embodied as sexual creatures and that when the male

6    and female of the species have sexual intercourse,

7    commonly, that can result in a child being conceived.

8    And so that procreation does not need marriage to

9    happen.

10             And it has never been the intention of

11   marriage as a social institution to prop up the

12   concept of procreation or to ensure it or to make

13   sure it happens or to require all people within an

14   institution to procreate or to send around

15   investigative personnel to say, have you procreated

16   enough, or to say to people who are married, if you

17   have not procreated, you're somehow insufficiently

18   married, or, we should revoke your license.

19             There has never even been anything

20   remotely close to that in the idea in the history of

21   human thought with respect to marriage.  So that we

22   have to first of all be clear that procreation occurs

David George Blankenhorn III                                    November 3, 2009
                                    Washington, DC

1    through the sex act and does not need marriage.

2              Therefore, we do not inquire into the

3    fertility status of couples prior to marriage.  And

4    the institution of marriage is agnostic on the

5    question of fertility just as -- for -- for actually

6    similar reasons to it -- similar to agnosticism on

7    the of question sexual orientation.

8              We do not stand at the gate of marriage

9    and inquire about people's fertility intentions or

10   status any more than we ask them about the nature of

11   their sexual desires.  On the other hand, the

12   fundamental purpose of the institution is to make it

13   insofar as we can make it possible as a society that

14   those children that are born are raised in a stable

15   home by their natural mother and father.

16             The purpose of the institution is to see

17   that those children that are born are born to the

18   married mother and father.  That's the aim of the

19   institution.

20             So that is why we do not go to couples to

21   who seek to marry and inquire as to their desire to

22   have children, because their desire to have children

David George Blankenhorn III                                      November 3, 2009
                          Washington, DC

Page 180

1    is not -- is not a relevant consideration as much as

2    it is the fact that if they -- all those who do have

3    children should be married.

4              So that the -- so that marriage is not a

5    production order for children.  Marriage is a

6    permission slip to have children.  It says, it's okay

7    for you to have a child now that you are married.

8              That's the fundamental human idea that

9    Bronislaw Malinowski famously called the principle of

10   legitimacy.  And I quoted that in many -- many other

11   examples.  I gave you 8 or 10.  I could have given

12   you 800 I think of the same thought expressed by all

13   these scholars.

14             So they have -- they have stated very

15   clearly that in all of marriage's variation across

16   time and culture, there has been this constant idea

17   that marriage is essentially a permission slip to

18   have children.

19             Or I'm using the term permission slip

20   loosely, because I just mean to say -- if I may

21   just -- I'm sorry for the lengthiness, but I'm

22   working my way here if you can just give me another

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

Page 181

1    moment.

2              I would use the analogy of driving -- of a

3    driver's license.  You -- I have a driver's license.

4    I suspect that most of us here do, and we probably

5    all drive cars.

6              But no one goes around and inquires as to

7    your intention to drive a car when you get a driver's

8    license.  They don't revoke your driver's license if

9    you don't own a car.

10             I don't own a car, for example.  And no

11   one has tried to revoke my driver's license.  I

12   almost never drive one, and no one has said, oh, you

13   can't have a driver's license.

14             The point of a driver's license is not to

15   guarantee that we have enough people driving cars.

16   The point of a driver's license is to guarantee that

17   everyone who does drive a car is qualified to do so.

18             And that is really the analogy that I'm

19   trying to establish here.  And that is why those

20   people who argue that the existence of infertility or

21   the existence of voluntary childishness --

22   childlessness somehow constitutes some, you know,

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

 1    gotcha argument on the issue of why we should allow

 2    gay marriage, they really I believe are in my view

 3    really engaging -- they really are misunderstanding

 4    this institution at a very deep level.

 5             I also want to make a final point in this

 6    regard, which is that there is a very -- actually --

 7    I'm sorry -- I want to make 2 very quick final

 8    points, and then I'll stop.

 9             One point is that there is a great deal of

10    variability in the status of infertility in

11    childishness -- childlessness.  The couple may decide

12    at some point in their marriage that they do not want

13    to have children, but that opinion may change over

14    time.

15             And even the physical elements of

16    infertility are almost never known prior to the

17    marriage.  Very few couples get married knowing for

18    certain that there's infertility.  And even when

19    infertility problems emerge, there are -- sometimes

20    it doesn't prevent them from having a child, so this

21    very practical nature of the -- of the variability of

22    the status such that it's subjective to human --

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 183

1     changed through human opinion and agency and change

2     in the -- how are bodies are working related to

3     sexual reproduction make it a complete impracta- --

4     impracticability, even if one wanted to to somehow

5     inquire prior to marriage about the fertility

6     intentions of the couple.

7              There's another reason why we don't this

8     and why no one in the history of the world as ever

9     managed to do this, and that is because we don't need

10    to.  People like to have sex.  They frequently have

11    sex.  And they don't -- we don't need to order them

12    to do it.  We don't need to stand at the gate of

13    marriage and make sure they're going to do it.  We

14    don't need to tell them that they have to have

15    children.

16             People commonly want children.  The

17    overwhelming majority of married people in the United

18    States and throughout all of history have had

19    children.  And we don't need to order them to do it.

20    We don't need to issue a production quota.  We don't

21    need to stand around and inquire as to their status

22    about the intention to procreate.

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

1          All we have to do is literally let nature

2     take its course.  It would be like, why do we have to

3     have an order -- do we want to order birds to sing

4     and fish to swim.  People have sex, and that sexual

5     activity produces children.

6          And the point is not to stand around

7     permitting it or mandating it.  The point is to

8     regulate it in the interests of the social life of

9     the child.

10         And in order to achieve that goal, humans

11    have created an institution called marriage.  All of

12    the scholars of the modern era, all of them with very

13    few exceptions have commonly acknowledged that, no,

14    this is not a controversial assertion, that this is

15    the fundamental purpose of marriage in human groups.

16         So I've taken a moment to answer this

17    question at some length because it's a very important

18    one.  It is widely and deeply misunderstood in the

19    public discussion.

20         And those who use the argument in the way

21    that you're doing I believe really -- I -- I think

22    have not sufficiently thought through the role and

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

                                                    Page 185

1    meaning of marriage.

2        Q.    Okay.  I think you may have read a good

3    bit into my question that I didn't intend, because I

4    don't think I said anything about requiring

5    procreation or anything.

6              I know --

7        A.    Well, I'd --

8        Q.    -- the things you've talked about quite a

9    bit.

10       A.    I'd like to go back and find out what the

11   question is.

12             (Talking at the same time.)

13       A.    I would like to know what the question

14   was, because I do believe that was exactly the

15   implication.

16             MR. THOMPSON:  It's all right.  It's all

17   right.

18             MR. DUSSEAULT:  No.

19             Let's read it back.  I'd like to see if

20   what he said is connected to what he was asked.

21                   (The reporter read the record as

22                   follows:

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1                "Question:   If marriage is

2                fundamentally a pro-child and

3                child-centric social institution, why

4                are people who cannot together

5                procreate allowed to marry one

6                another?")

7       A.    To me, the implication of that question is

8   really that somehow the argument would be that they

9   should not be allowed, and you were asking me to

10  explain why they are allowed.

11           And I think that my answer was admittedly

12  lengthy but careful attempt to answer that question

13  quite exactly.

14           BY MR. DUSSEAULT:

15      Q.    The only point I was trying make is, I

16  don't think there's anything in that question about

17  requiring people to procreate.

18           The question is people who demonstrably

19  cannot procreate together, let's say 2 octogenarians

20  they both admit, yep, we can't procreate together.

21  Even though you view marriage as fundamentally a

22  pro-child institution, our society would allow these

David George Blankenhorn III                           November 3, 2009

                          Washington, DC

                                                        Page 187

1     2 people who admittedly and without reservation

2     concede that they will never have a child to marry

3     one another.

4              True?

5     A.   The older people?

6     Q.   Yeah.

7     A.   Well, there are, as I say in the report,

8     and as I have tried to state in an earlier answer to

9     your question, there are 3 basic forms that have --

10    Q.   I'm sorry.

11             Can I just get an answer to the question,

12    which is just, would they be allowed to marry?

13    A.   I am answering the question.

14    Q.   You can't say yes or no if they would or

15    not?

16    A.   I have to answer this in the way I think

17    is going to give you the accurate answer that you're

18    looking for.

19             MR. THOMPSON:  You can answer it, yes, no,

20    or, I can't answer it yes or no.  If that's what

21    Mr. Dusseault wants you to answer, you can say, yes,

22    no, or, I can't answer it yes or no.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

                                                    Page 188

1              THE WITNESS:  Could you repeat the

2    question?

3              MR. THOMPSON:  If Mr. Dusseault is willing

4    to let you give a more complete answer.

5              Go ahead.

6              THE WITNESS:  I'll -- I'll --

7              MR. DUSSEAULT:  I just want the answer to

8    the actual question.

9              If you can just repeat it.

10             (Discussion off the record.)

11                 (The reporter read the record as

12                 follows:

13                 "Question:  The only point I was

14                 trying make is, I don't think there's

15                 anything in that question about

16                 requiring people to procreate.

17                 "The question is people who

18                 demonstrably cannot procreate

19                 together, let's say 2 octogenarians

20                 they both admit, yep, we can't

21                 procreate together.  Even though you

22                 view marriage as fundamentally a

David George Blankenhorn III                     November 3, 2009
                    Washington, DC

                                              Page 189

1                    pro-child institution, our society

2                    would allow these 2 people who

3                    admittedly and without reservation

4                    concede that they will never have a

5                    child to marry one another.

6              "True?")

7         BY MR. DUSSEAULT:

8         Q.    Let me try and ask a better question.

9    That demonstrated that I can ask a much better

10   question.

11              You would agree that throughout society,

12   people who have absolutely zero chance of creating a

13   child and admit to as much are still permitted to

14   marry one another if they want to.

15              True?

16        A.    Yes.

17        Q.    Okay.  And despite that fact, it is still

18   your view -- strike that.

19              Despite the fact that people with an

20   admitted complete lack of capability to make a child

21   are permitted to marry, it is still your view that

22   marriage is fundamentally a pro-child institution.

David George Blankenhorn III                    November 3, 2009
Washington, DC

1          Correct?

2      A.    Yes.

3      Q.    Okay.  This point you made about marriage

4   as a permission slip to have children, what's the

5   percentage of children in the U.S. today who are born

6   outside of marriage to the extent you know?

7      A.    About 38.

8      Q.    So in -- in the United States today,

9   marriage is not practically a permission slip that's

10  needed to have children.

11         Correct?

12     A.    Well, most children it is.

13         I would say -- first of all, I view that

14  statistic of 38 percent as a deep tragedy, and I've

15  spent my lifetime professionally speaking trying to

16  speak out in favor of us pursuing ideas and practices

17  and values that would lower that rate significantly

18  to where we'd be a more humane and pro-child society.

19         But even -- even acknowledging that 38

20  percent, that's still leaves a majority of children

21  that are born to their own 2 married parents.  In

22  fact a majority of children today right now, a

Alderson Reporting Company
1-800-FOR-DEPO

David George Blankenhorn III                        November 3, 2009
                        Washington, DC

Page 191

1    majority of children are born to their own 2 married

2    parents.

3           So it's not true that that conception of

4    marriage is nonexistent or negligible or has been

5    completely eliminated from our public practice and

6    our private consciousness and so forth.

7    Q.    Okay.  I want to be sure I understand this

8    core analogy that you made because I think I've seen

9    it in writing too.

10          You're -- you're saying that your argument

11   is supported because, you know, the fact that

12   somebody has a car, and we don't ask them to

13   demonstrate that they're actually driving it.

14   A.    Driver's license is what I said.

15   Q.    Okay.  So it's not a car.

16          It's a driver's license?

17   A.    I said that -- what I -- it's perhaps an

18   inappropriate analogy.

19          I was trying to compare a marriage license

20   and a driver's license.  I was trying to say that the

21   license itself in both cases means that if you do the

22   thing, you have been deemed qualified and -- and --

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 192

1    or it has been deemed that the activity that you're

2    going to engage in is socially approved.

3              And in one case, it would be driving a

4    car, and in the second case, it would be having a

5    child.  But in neither case is there some mandate

6    that every person who has the license either drive

7    the car or have the child.

8              That was the analogy I was trying to make.

9              Or to take the point that you were trying

10   to raise before, is it -- is it a violation of the

11   principle of drivers' licenses, the institution of

12   drivers' licenses -- is it a violation of -- does --

13   does it violate and do violence to the norms embodied

14   in that institution that I as a holder of a driver's

15   license and one of the small minority of people who

16   do not drive, and I'm saying that it does not.

17             And I'm saying that the same is true in

18   the case of married people, the small minority of

19   married people who do not have children.

20        Q.   But to take the analogy into the debate

21   over equal marriage -- marriage rights, isn't a

22   lesbian couple where the woman is pregnant and about

David George Blankenhorn III                                    November 3, 2009
                           Washington, DC

                                                                Page 193

1    to have a child and the couple is about to raise that

2    child -- aren't they just about starting to drive the

3    car?

4         A.    They're about ready to have a child.  She

5    is about ready to have a child.

6         Q.    Okay.

7         A.    But remember the first point I made was

8    that the issue is not what you're calling

9    procreation.  The issue is not, can a woman become

10   pregnant.

11        Q.    Okay.

12        A.    Marriage is not required for a woman to

13   become pregnant.

14                   Marriage is a social institution that

15   tries to structure things such that whenever a woman

16   does become pregnant, she and the man who inseminated

17   her are going to be the legal and social parents of

18   the child that is born.

19               That's the whole -- that's the idea.

20   That's why we have marriage.  If we did not have that

21   idea as a species, we would almost certainly not have

22   marriage.

David George Blankenhorn III                                     November 3, 2009

Washington, DC

1      Q.    And in your view, it comes down to it

2    being the natural mother and the natural father

3    together?

4      A.    Well, what is commonly called and by

5    everyone mothers and fathers.

6            Now, those are the terms that we humans

7    use.  We use "mothers" and "fathers" to designate

8    those individuals whose sexual union brought us into

9    the world.

10           And we use them to mean -- we use the term

11   to mean typically not only the biological genitor,

12   but also the social and legal parents.  We have a

13   very important exception to that principle when it

14   comes to adoption, and -- but that -- that said,

15   that's -- those are the terms we use, mother and

16   father.

17           So when somebody says, my mother, or, my

18   father, what they typically mean is that there was a

19   man who had -- who had a sexual act with my mother

20   and I was born as a result, and then after I was

21   born, that man and that woman had a commitment to me

22   and to one another to -- to invest in me and to

David George Blankenhorn III                                November 3, 2009
                          Washington, DC

                                                              Page 195

1     support me and nurture me and raise me.

2              That -- that is what we mean when we say,

3     mother and father.

4        Q.    Okay.  If marriage is a fundamentally a

5     pro-child or child-centric institution in the way

6     that you've now elaborated on, why do we allow people

7     who have previously had children and walked away from

8     them and not raise them to do it again?

9              MR. THOMPSON:  Objection, vague.

10             BY MR. DUSSEAULT:

11       Q.    Yeah.

12             I don't mean "do it again" meaning walk

13    away.

14             I mean to get married again.

15       A.    To get married again?

16             Typically, I'm not aware of examples -- I

17    just want to think about this a moment, but marriage

18    has been typically institutionally silent and not

19    inquisitive when it comes to the subject of one's

20    subjective intentions.  I think that's really the

21    best way I know how to say it.

22             It does not inquire into your character.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

Page 196

1    It does not inquire into your moral beliefs.  It does

2    not inquire into whether you have committed past bad

3    acts.  It does not assess whether or not you are a

4    competent person.

5              It does all those things by the way with

6    respect to adoption, which is a very different

7    situation.  But with respect to what's generally

8    viewed as the right to marry, society does not step

9    in to in any legally significant way other than age

10   of majority and a few other really simple things --

11   it does not inquire into past conduct or future

12   intentions.

13       Q.    All right.  So if marriage --

14       A.    Just the way it does not inquire into the

15   nature of one's sexual desires.

16       Q.    But if marriage is primarily a pro-child

17   institution that's intended as you elaborated to

18   assure as best we can that a child will be raised by

19   the mother and father that created them, why on earth

20   don't we inquire into intentions or maybe somewhat

21   more clearly, past record, past evidence that one

22   doesn't live up to that conduct?

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

Page 197

1        A.    Well, that's an excellent question.   I

2   would have to reflect on it more to give you a full

3   answer.

4              But one answer I want to allow -- or want

5   to suggest at least tentatively is that marriage in

6   some way is a prelegal social institution.   It's what

7   scholars call a natural social institution, in that

8   it exists in all known human societies and everywhere

9   in human history.

10             And so it's not a creature of law in the

11  sense that, say, you couldn't imagine a thing

12  happening without the law.   You can -- the thing can

13  and does happen and could -- and probably in our

14  history has happened without the law.

15             Law is a strengthening -- law seeks to be

16  one of many ways that we recognize, strengthen, and

17  orient the institution toward its purposes, but it is

18  not a creature of law.   And so I think in that

19  natural sense, probably the -- I guess you might say

20  a certain simplicity to the institution emerged that

21  you -- the rules -- the rules are quite few and quite

22  objective, and they don't require investigative

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

1    committees and social workers and court-appointed

2    psychiatrists and -- and professional therapists, and

3    so on.

4              They just require that you be adults, that

5    you be not biologically related to one another in a

6    close way.  They require that you be a man and a

7    woman, that it be a sexual relationship, and that it

8    be only 2 of you.

9              Those are really it.  The subjective

10   nature of your conduct, et cetera, et cetera,

11   sometimes I -- sometimes I wish we could have higher

12   standards, but the institution does not -- does

13   not -- and I'm not only speaking of the United

14   States.

15             I'm speaking across history and cultures.

16   It does not get into the business of evaluating the

17   character or personal credentials of the applicant.

18             MR. THOMPSON:  We've been going about an

19   hour.

20             Would this be a --

21             MR. DUSSEAULT:  That's fine --

22             MR. THOMPSON:  -- okay time to take a

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 199

1    break?

2                MR. DUSSEAULT:  Sure.

3                THE VIDEOGRAPHER:  Here marks the end of

4    videotape number 4 taken in the deposition of

5    Mr. David Blankenhorn III.  Going off the record.

6    The time on the video screen is 14:41 and 32 seconds.

7                (Recess.)

8                THE VIDEOGRAPHER:  Here marks the

9    beginning of videotape number 5, taken in the

10   deposition of Mr. David Blankenhorn III.  Going back

11   on the record.  The time on the video screen is 14:53

12   and 37 seconds.  Please continue.

13               BY MR. DUSSEAULT:

14       Q.     Mr. Blankenhorn, let's go to your report

15   to paragraph 17, which is on page 5.

16               And I'll just read this into the record,

17   and I have a couple of questions about it.

18               It says:  A principal purpose of this

19   declaration to the court is to insist based on

20   overwhelming -- based on an overwhelming body of

21   scholarly evidence that intelligent, fair-minded

22   persons of goodwill who bear no animosity to their

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                        Page 209

1           So the question of what they call kin

2    altruism is decisive on this issue.  And while it is

3    theoretically possible that a mother with a child

4    could gain the protection and support and partnership

5    of just any old man out there, it is highly unlikely

6    that that happens.  The human record is completely

7    clear on this point.

8           Q.    Okay.  You talked about adoption earlier,

9    I think called it an exception.  But in the case of

10   adoption, certainly it's quite common, isn't it, for

11   a man and a woman to raise a child from birth where

12   perhaps neither one has a biological bond, but they

13   both act to protect the child.

14          True?

15       A.    That's true.

16          But the proposition that the existence of

17   adoption as a valuable and pro-child institution

18   somehow justifies changing our marriage laws to allow

19   same-sex partners to marry in my view is --

20   represents a very fundamental misunderstanding of the

21   purpose of adoption and what it does and what it

22   means.

David George Blankenhorn III                                November 3, 2009
                        Washington, DC

1           And I bring up this point because in the

2      public conversation about gay marriage, it's very

3      typical for advocates to bring up this question

4      about, well, because we have adoption, therefore, it

5      doesn't really matter about the biological ties.

6           And of course in my view, based on my

7      study of the evidence, that is just a fundamental

8      misunderstanding of adoption, of what is adoption.

9      So if you would like to discussion what is adoption,

10     what are its purposes, how do we understand it in

11     relationship to the 2 biological-parent married

12     couple home, I'd be happy to do that in any length

13     that you wish.

14         Q.   Well, what I'm trying to do with the

15     questions I'm actually asking you is go at some of

16     the -- some of the issues that I think are raised by

17     the way you're describing the situation.

18           And what you said in your prior answer I

19     believe was that while it's theoretically possible

20     that someone who is not a biological parent might

21     raise the child, as a practical matter, people are

22     not likely to take that on for someone who is not

David George Blankenhorn III                          November 3, 2009
                          Washington, DC

1    their own child.

2              But you would agree that our society is

3    replete with examples of people doing just that in

4    the context of adoption.

5         A.    If you're asking me, do adoptive parents

6    raise children who are not biologically related to

7    them, the answer is yes.

8         Q.    Okay.  Do you have any reason to doubt

9    that the partner of a gay person or a lesbian person

10   who marries them and they adopt a child together and

11   they take that child into their home at birth would

12   be any less committed to raising the child and

13   providing for the child and providing for the mother

14   than if they created the child biologically?

15             MR. THOMPSON:  Objection, vague.

16        A.    If you're asking me, do I have any reason

17   to believe that as a class or as a category that

18   lesbian couples are less loving or less attentive or

19   less caring toward their children than heterosexual

20   couples, the answer is that I do not have any

21   evidence to support such a conclusion.

22             BY MR. DUSSEAULT:

David George Blankenhorn III                    November 3, 2009
                     Washington, DC

1              BY MR. DUSSEAULT:

2        Q.    Let me try and clarify.

3              An adopted child might be born in poverty

4   to 2 abusive parents and face a very difficult

5   future, might be born into what's a very promising,

6   happy situation, but for whatever reason the couple

7   decides not to have it.

8              Is your position that you support adoption

9   the same in both situations?

10       A.    Maybe the best way to answer it is to say

11  why I support gay adoption.

12       Q.    Okay.

13       A.    In my view, in an ideal situation, an

14  optimal situation in a society that was most oriented

15  to thriving and success, the married couple -- the

16  married couple who has been investigated by the state

17  and found to be competent parents, prospective

18  parents, would be at the head of the queue with

19  respect to adoption of children who are in

20  institutional care because their natural parents are

21  either unwilling or unable to care for them

22  adequately.

David George Blankenhorn III                          November 3, 2009
Washington, DC

Page 229

1          However, we are not in such a situation

2     like that in the United States, because we have very

3     many children who are languishing in these state

4     facilities in which their needs are I believe in

5     general not being well served.

6          And the option for them practically is

7     between remaining in those institutions and often

8     going into a home that is not a mature, competent,

9     married couple who's been investigated by the state

10    and found to be a good prospective parent.

11          So that my -- there's a prudential

12    judgment here, so that while I would wish in ideal

13    circumstances to have certain -- these married

14    couples at the head of the queue, I recognize that,

15    A, that's not the way we do it now, and, B, the

16    real-world choices for many of these children are

17    such that the real question policymakers face is, do

18    we want to have them to continue to remain in these

19    institutions when the care is impersonal and

20    minimalist, or do we want them to go into a home

21    headed by one or more gay or lesbian people who would

22    provide loving homes for these children.

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

                                                    Page 230

1              And given that choice, I believe that

2    policymakers should allow and even encourage the --

3    this form of adoption by gay and lesbian couples

4    because it is in the best interests of these specific

5    children to have that outcome.

6         Q.   So would you limit gay and lesbian

7    adoption to situations where the child is in some

8    peril if not adopted?

9         A.   I don't believe I said that.

10        Q.   That's why I asked.

11        A.   Would I limit gay adoption to situations

12   where a child is imperiled?

13        Q.   Right.

14             So you talk about children being in

15   institutions.  Let's assume that a couple that could

16   raise a child but chooses not to for their own

17   personal reasons wants to give the child up for

18   adoption to a gay and lesbian couple.

19        A.   M-hm.

20        Q.   Would that affect your view as to whether

21   that should be permitted?

22        A.   Well, as I said, I believe in an ideal

David George Blankenhorn III                                November 3, 2009
                          Washington, DC

Page 231

1    world that the married couple should be given

2    preference when it comes to adoption.

3              But I also said that in the actual world

4    that we live in now, that is in many localities not

5    the case.

6        Q.    Let me be clear.

7              I'm not talking about who has preference

8    to adopt, a married couple or a gay and lesbian

9    couple.

10             I'm talking about a gay and lesbian couple

11   that wants to adopt a child --

12       A.    Do I --

13       Q.    You talked about a child that absent

14   adoption would in some institution.

15             I'm saying what if the circumstances were

16   different where the child would not be at risk, not

17   be in an institution, but the parents who created the

18   child want to give the child up.

19       A.    To a gay or lesbian couple.

20       Q.    Yes.

21       A.    I would not be in favor of prohibiting

22   that act.

David George Blankenhorn III                         November 3, 2009
Washington, DC

Page 265

1   biological offspring cannot have spent one day

2   outside the care of these parents?

3           Or what would be your definition of

4   continuous?

5      Q.   Well, I'm trying to distinguish it from,

6   say, a step situation where a child may have 2

7   biological parents until they're 10 years old and

8   then the mother gets div- -- the parents get divorced

9   and the mother marries another --

10     A.   There are --

11     Q.   -- person.

12     A.   -- many studies that compare those 2

13  -- (indiscernible).

14     Q.   Okay.  I'm talking about where the family

15  unit is -- and I've seen this in the literature --

16  intact throughout the child's dependent years, so

17  same father, same mother, or same 2 parents, but

18  there is no biological connection between one or both

19  of the parents and the child.

20          Has there been any comparison --

21     A.   The closest thing --

22     Q.   -- in that situation?

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

Page 266

1      A.    -- we have would be those studies that

2   compare the 2 married biological parents -- for the

3   sake of shorthand, perhaps we can at all it intact.

4           Would that be okay?

5      Q.    Sure.

6      A.    And then compare children who have been

7   adopted at very early ages -- let's say in infancy --

8   by 2 married parents.  There have been such studies.

9      Q.    And have they shown there to be difference

10  in outcomes for the children who are biologically

11  connected to both parents versus those who are not?

12     A.    My view of the weight of evidence on this

13  is that there -- yes.

14          The studies are not completely uniform.

15  There's some diversity in -- in the field, and it's a

16  little bit of an embryonic field of research, but my

17  reading of the evidence is that the weight of

18  evidence suggests that there are differences between

19  those 2 groups in terms of child outcomes.

20          And I am for example directing a study now

21  that looks at exactly this question.  And the

22  research will be published in the next year or so,

David George Blankenhorn III                     November 3, 2009
                        Washington, DC

                                                    Page 267

1    and the preliminary data do suggest the differences

2    that I've described.

3              The differences -- well, that's the

4    answer.

5        Q.    What -- give for me the names or authors

6    of published studies that have compared 2 intact

7    families, one where there's a biological connection

8    between both parents and the child and one where one

9    or both of parents is not biologically connected to

10   the child.

11       A.    Well, there is -- there is a body of

12   literature on -- on this issue, and I would have to

13   go back and refresh my -- I would have to go back and

14   pull together the -- what I consider to be the best

15   or most representative studies for you.  I'd be happy

16   to do that.

17       Q.    But you can't as you sit here even name

18   one study that has compared those 2 family

19   situations?

20       A.    I'm telling you with confidence that such

21   studies exist, that I've over the 20-year period that

22   I've been looking at this broad cluster of questions,

David George Blankenhorn III                    November 3, 2009
                   Washington, DC

                                                    Page 268

1     I've tried to familiarize myself with these studies.

2     And I'm aware of the general weight of evidence in

3     them.

4              If you want me right now without any

5     ability to refer to anything to give you specific

6     titles of articles and authors and years of

7     publication, my answer is that I would be happy to do

8     that, but I can't do it right now on this moment

9     without any ability to confirm anything.

10         Q.    And you don't include any of those studies

11    on your list of materials considered, do you?

12         A.    Well, I don't think I discuss this

13    particular issue in my paper.

14         Q.    Well, you've -- you've discussed what you

15    describe as the need of a child to be raised by the 2

16    parents who created the child.

17              Right?

18         A.    I do discuss that, yes.

19         Q.    Okay.  And you have cited to several

20    studies that address this child welfare issue and

21    that use the word biological when talking about the

22    parents.

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1              Correct?

2       A.     That's correct.

3       Q.     Okay.  But you don't to support your

4    positions cite to any of the studies that you say

5    have actually compared an intact family where both

6    parents are biologically the creators of the child --

7       A.     -- (indiscernible) -- I --

8       Q.     -- and an intact family where one or both

9    of them is not/adopt (phonetic).

10             Correct?

11      A.     Well, I am reasonably confident that a

12   number of these sources that I'm citing here discuss

13   this issue.

14             For example --

15      Q.     Like?

16      A.     -- I'm reasonably confident that David

17   Popenoe in his article discusses it.  I'm fairly

18   certain that McLanahan and Sandefur discuss it.  I'm

19   reasonably confident that Amato discusses it.

20             As I said, in the Child Trends study, I

21   just don't know how they're looked -- I don't know if

22   they broke out the adoptive category in the way that

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                          Page 270

1    you're suggesting that would have been useful, and I

2    agree with you.

3         Q.    Well, let me ask you this.

4               In --

5         A.    But it's not an unusual question.  It's

6    common among scholars, and there have been -- there

7    have been efforts to answer it.  I think in -- I'm

8    reasonably sure, including by the specific people

9    that I'm citing there.

10        Q.    Do you know whether any of the sources

11   that you quote from in paragraph 37 broke out

12   adoptive families from the biological group?

13        A.    It's common in the scholarship to do that.

14        Q.    Okay.  But do you have any actual support

15   for the premise that any of them did that?

16        A.    As I just stated, I would have to go back

17   and read the -- I would have to go back and re-read

18   the document specifically for this question of how

19   they treated the question of adoptive children, but

20   as a general rule, I can say to you with quite a

21   level of confidence that it is frequently done, and I

22   can also report to you that the general finding is

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1    that the outcomes are not identical and that those

2    children raised in adoptive homes suffer from

3    somewhat poor outcomes on some important variables

4    than do those children raised in biological intact

5    married couple homes.

6                This is a -- this is a finding in the

7    field.  And it's not -- it's not -- because of the --

8    because of the -- because of the closeness of the

9    differential, it's not true that every study finds

10   this, because remember -- recall, then, the

11   discussion of adoption.

12               Adoption is the family form that most

13   rigorously seeks to mimic the married couple form.

14   And so it would be natural to assume that the best

15   outcomes for children in the -- if I may use a

16   shorthand, nontraditional, would be in adoption.

17        Q.    But wouldn't --

18        A.    And that is in fact true.

19        Q.    Wouldn't a same-sex couple that married if

20   it were permitted to do so, quote, unquote, mimic

21   this -- as you use that word -- the traditional

22   marriage form?

David George Blankenhorn III                           November 3, 2009
                          Washington, DC

                                                          Page 272

1        A.     No.

2        Q.     Only because of the gender -- excuse me --

3    the sex of the participants?

4        A.     Yes.

5        Q.     Okay.

6        A.     And for what that difference -- for what

7    that difference means to marriage's central purpose,

8    which is to unite the male and female in a pair bond

9    that is child rearing in nature.

10            So, yes, the fact that -- the fact of the

11   man marrying the woman -- I mean, the man marrying

12   the man or a woman marrying a woman would constitute

13   a very seismic and radical negation of this

14   fundamental principle of marriage historically as a

15   human institution.  That's not a nontrivial

16   difference.

17       Q.     Okay.  Are you aware of studies showing

18   that children raised from birth by a gay or lesbian

19   couple, have worse outcomes than children raised from

20   birth by 2 biological difference-sex parents?

21       A.     No.

22       Q.     Okay.  Let's take a look at the Amato

                 Alderson Reporting Company
                    1-800-FOR-DEPO

David George Blankenhorn III                          November 3, 2009
                          Washington, DC

                                                        Page 282

1                          identification.)

2                 BY MR. DUSSEAULT:

3           Q.    Now, you referred earlier today to having

4      been asked by the LA Times to do an op ed piece

5      during the Prop 8 campaign?

6           A.    Yes.

7           Q.    Is this exhibit 7 your -- that op ed

8      piece?

9           A.    Yes.

10          Q.    Okay.  Now, I'd like to direct your

11     attention to the second page of exhibit 7 and

12     particularly the last paragraph.

13                You say:  Legalized same-sex marriage

14     almost certainly benefits those same-sex couples who

15     choose to marry as well as the children being raised

16     in those homes.

17                Do you see that?

18          A.    Yes.

19          Q.    Do you continue to hold that view today?

20          A.    Yes.

21          Q.    But your view is that although both gay

22     and lesbian couples and the children being raised by

                    Alderson Reporting Company
                      1-800-FOR-DEPO

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                              Page .283

1    gay and lesbian couples would benefit from being

2    permitted to marry --

3         A.    Would likely benefit.

4         Q.    Would likely benefit.

5               Sorry.

6               Well, would almost certainly benefit --

7         A.    Yes.

8         Q.    -- is the way you put it.

9               Right?

10        A.    Yes.

11        Q.    That the -- what you see as the potential

12   harm to society as a whole through further

13   deinstitutional- -- deinstitutionalization of

14   marriage outweighs that interest.

15              Correct?

16        A.    Correct.

17        Q.    Okay.

18        A.    I would say outweighs that -- those needs.

19        Q.    Okay.

20        A.    Or those -- the better way to say it would

21   be outweighs our concern for those goods.

22        Q.    Okay.  Now, we've talked a fair bit

David George Blankenhorn III                        November 3, 2009
                        Washington, DC

                                                    Page 284

1    already about deinstitutionalization.

2              What does deinstitutionalization mean as

3    you use that term?

4        A.    It's a term in the literature that refers

5    to the -- the changes in an institution that reduce

6    its coherence, integrity, structure, transparency,

7    and ability to perform its functions, and an overall

8    synonym that we might use is "weakening."

9        Q.    Okay.  That was going to be one of my

10   questions.

11             Is change to rules of an institution by

12   definition deinstitutionalization or only if it

13   weakens the institution?

14       A.    No.

15             I would say you would have change -- you

16   could have changes that would strengthen the

17   institution.  Sure.  And there are many examples of

18   such changes historically.

19       Q.    And could you have the elimination of

20   rules that have been core rules of an institution

21   where eliminating that rule actually strengthens the

22   institution?

David George Blankenhorn III                                    November 3, 2009
                          Washington, DC

Page 285

1              MR. THOMPSON:  Objection, vague.

2       A.    Well, I don't believe that you could

3    change the rules of opposite sex or 2 and at the same

4    time strengthen the institution.

5              BY MR. DUSSEAULT:

6       Q.    And I wasn't intending to ask specifically

7    about marriage.

8       A.    Oh.

9       Q.    So I'm not asking about marriage.  We're

10   just talking about institutions.

11      A.    Oh, any institution.

12      Q.    Yes.

13      A.    Could -- could what happen?

14      Q.    So --

15      A.    Could you change a rule and have it

16   strengthen the institution?

17      Q.    And let's say it's a -- it's a central,

18   long-standing ruling of an institution.

19            Could there be a circumstance where

20   changing a central, longstanding rule of an

21   institution does not result in deinstitutionalization

22   because it does not harm the institution?

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 286

1              MR. THOMPSON:   Objection, vague and beyond

2    the scope --

3        A.    I -- I just -- I honestly don't --

4              MR. THOMPSON:   -- of the report to talk

5    about institutions other than marriage.

6        A.    Yeah.

7              I honestly don't feel able to comment

8    competently on that kind of a broad question.

9              BY MR. DUSSEAULT:

10       Q.    Well, let me -- because I think in order

11   to understand your opinions, I have to have some

12   understanding of what deinstitutionalization means as

13   a concept.

14             Right?

15       A.    Yes.

16       Q.    So without getting into the specifics of

17   applying it to marriage, can you -- well, what I'm

18   trying to understand is, does the change of a rule

19   that you would describe as a fundamental,

20   long-standing-pillar rule of an institution

21   necessarily equal deinstitutionalization?

22             MR. THOMPSON:   Same objection.

David George Blankenhorn III                                    November 3, 2009
                           Washington, DC

                                                                  Page 287

1       A.    I would just have to -- I think perhaps if

2    you could offer me an example of what you're talking

3    about or a specific -- I guess an example would be

4    helpful.

5              BY MR. DUSSEAULT:

6       Q.    I'm not sure I have one.

7              I was wondering if you actually might have

8    one from study.

9       A.    I was just trying to think of one off the

10   top of my head.

11             I was thinking about baseball, since I

12   like basketball and I'm watching the World Series,

13   and I was thinking what if they changed the

14   fundamental rule of baseball such as the number of

15   players that could be fielded at any one time and

16   would that weaken the institution necessarily.  If

17   you could field 10 players rather than 9 at any one

18   time, would that necessarily weaken the institution.

19             In that particular case, completely

20   speculatively, having no basis in careful reflection

21   or scholarship, I would say that it would be likely

22   to weaken the institution because it would seem that

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 288

1    people were acting capriciously with respect to its

2    fundamental and long-standing rules, but that I would

3    not say categorically that it would necessarily

4    weaken the institution.

5        Q.    Okay.  And you describe

6    deinstitutionalization of marriage as a trend that's

7    been going on for some time.

8            Correct?

9        A.    Yes.

10       Q.    Okay.  I think we were talking about this

11   earlier.  This is -- no.  Actually, I was thinking of

12   something else.

13           When did the trend of

14   deinstitutionalization of marriage begin?

15       A.    That's a really difficult question to

16   answer.

17           I think I might have to reflect on it

18   really carefully, because marriage has -- there's

19   never been a period of marriage where it has been

20   completely static.  And so there have been -- pretty

21   regularly there have been changes and -- and

22   adaptations of the institution in response to social

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

Page 289

1    circumstances and so forth.

2              So I don't -- the issue of

3    deinstitutionalization as I and other scholars are

4    using the term generally refer to the following

5    trends:  high rates of divorce, high rates of

6    out-of-wedlock child bearing, high rates of

7    nonmarital cohabitation, and a diminution in the norm

8    of marital permanence.

9              And those I think 4 or 5 trends that --

10   and possib- -- possibly some scholars would include a

11   reduced proportion of the adult life cycle spent of

12   mar- -- in the married state, although some do and

13   some don't, and some scholars include the concept of

14   familism as a cultural value, the way -- familism,

15   F-A-M-I-L-I-S-M, familism -- they include that as the

16   respect that society gives to the institutions of

17   marriage and the family.

18             But I would say speaking personally that

19   the primary drivers and indicators of

20   deinstitutionalization in the scholarly literature

21   that I've studied have been the ones that I

22   enumerated, and the most important being divorce and

David George Blankenhorn III                          November 3, 2009
Washington, DC

Page 290

1    out-of-wedlock child bearing and nonmarital

2    cohabitation.

3            And as we discussed earlier, those trends

4    while slowly increasing for some time in the United

5    States experienced a kind of takeoff or ignition in

6    the 1970s and then through the 1980s, and they

7    experienced a slight diminution in the mid-1990s, and

8    now most of them are increasing again.

9        Q.    So let's look at -- at paragraph 42 of

10   your report.  I think you discuss many of these

11   things.

12           MR. THOMPSON:  It's page 16.

13       A.    Got it.

14           BY MR. DUSSEAULT:

15       Q.    Okay.  And you say:  With respect to

16   marriage, what are some of the specific

17   manifestations -- I think you meant of the trend of

18   deinstitutionalization.

19           And then you talk about rising divorce

20   rates, nonmarital cohabitation and unwed child

21   bearing, loosening of legal regula- -- regulation of

22   the many aspects of marriage, the mainstreaming of

David George Blankenhorn III                    November 3, 2009
                          Washington, DC

1    third-party participation in procreation and assisted

2    repro- -- reproductive technologies, and the rising

3    demand for and reality of same-sex marriage.

4            Are those the same factors you were trying

5    to list before?

6        A.    Well, this list includes those -- those

7    that I would consider the current -- current drivers

8    of the trend.

9            When I was speaking before, I thought we

10   were addressing the question of how -- when did the

11   trend take off and what were the driving factors

12   when -- and so now if we're speaking of the current

13   and emerging trend of deinstitutionalization, most

14   scholars would include the issue of third-party

15   participation in procreation, and a great number

16   would include the rising demand far (phonetic) in

17   reality of same-sex marriage, and most scholars would

18   I think view all -- each of these as -- well, all the

19   scholars that look at the issue of

20   deinstitutionalization would -- many scholars who

21   look at the issue of deinstitutionalization would

22   recognize these as the customary list or a -- a -- a

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

Page 292

1    noncontroversial list.

2        Q.    Okay.  You -- in paragraph 42, you

3    describe these things as manifestations of

4    deinstitutionalization.

5            One thing I'm trying to understand is, are

6    they manifestations or results of

7    deinstitutionalization, or are they causes of

8    deinstitutionalization?

9        A.    This is a question that -- that scholars

10   struggle with tremendously.  It's very hard -- if you

11   just take this list, it's very hard, and according to

12   the most respected scholars in the field in my view,

13   impossible actually to accurately disentangle these

14   from one another and to attribute numerically what

15   proportion of causality of deinstitutionalization can

16   be attributed to each one.

17           It -- it cannot be done.  And I'm unaware

18   of anyone who has competently even attempted to do

19   so.  And I'm aware of many reputable scholars who

20   have stated essentially categorically that it cannot

21   be done because of the nature of social change in

22   this instance.

David George Blankenhorn III                              November 3, 2009
                        Washington, DC

Page 293

1          When you have a cluster of trends that are

2   occurring simultaneously and are to some large degree

3   mutually reinforcing governed by the similar logics,

4   many of the effects are overlapping, they reinforce

5   one another and have feedback loops in all kind of

6   ways.

7          And even if we project into the future and

8   imagine some result, either positive or negative, it

9   will be very, very hard for scholars to be able to go

10  back and offer precise measurements of how much of

11  the trend can be -- is caused by one or the other.

12          I have my own guesses about which are the

13  major ones, and I have listed them here.  But it is

14  not -- it is not possible to be accurate, to speak

15  accurately and competently about degrees of

16  causation.

17          I would just say, my assessment based on

18  careful reflection and the reading of the literature,

19  it is -- it is not possible to speak accurately about

20  degrees of causation.

21     Q.    Okay.  Would you agree that the trend of

22  the deinstitutionalization of marriage as you see it

David George Blankenhorn III                                    November 3, 2009
                              Washington, DC

                                                                    Page 294

1    was under way long before the issue of same-sex

2    marriage became one of serious debate.

3         A.    Well, if we -- if we'll -- if we accept as

4    a working idea the idea that there was a kind of

5    ignition in the 1970s, and if we further stipulate

6    that it was probably in the early 1990s that the

7    issue of same-sex marriage emerged with some force on

8    the national agenda, then, yes, there would be that

9    period of -- between the '70s and the '90s that the

10   deinstitutionalization was -- was occurring in

11   measurable -- in discernible ways that were prior to

12   the emergence of same-sex marriage as a -- as a -- as

13   a significant issue of public policy debate.

14        Q.    Okay.  Assume hypothetically that there

15   were no same-sex marriage at all in America.

16             Do you believe that the trend of

17   deinstitutionalization of marriage would reverse

18   itself?

19        A.    Whether or not the trend reverses itself

20   is not some preordained process or preordained

21   script.

22             It is dependent upon choices that people

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

                                                          Page 295

1    make now and in the near future.  So it -- the

2    question of human agency is central here.  The --

3    there's nothing -- it is not a preordained process.

4    It's -- it's an event in freedom and in public

5    argument.

6             And so whether or not the trend reverses

7    itself depends on whether or not we change our

8    thinking and improve our thinking about what is

9    marriage and how much we value it.  If we are able to

10   change our thinking about what is marriage and how we

11   value it, we have a -- in my view a reasonable, even

12   a good chance of changing the trend toward

13   reinstitutionalization.

14            If we do not, then it's likely that the

15   trend of deinstitutionalization will continue

16   indefinitely.  But whether or not that happens

17   depends upon the actions of people now.

18       Q.    Okay.  And it depends upon the actions of

19   people now in numerous areas outside of same-sex

20   marriage as well.

21            Correct?

22       A.    That's correct.

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 296

1       Q.    Okay.   Is it your view that permitting

2   same-sex marriage would contribute to the

3   deinstitutionalization of marriage in such a way that

4   parents in heterosexual relationships would no longer

5   stay with and parent their kids?

6               MR. THOMPSON:   Would no --

7               BY MR. DUSSEAULT:

8       Q.    Would no longer stay with and parent their

9   children.

10      A.    I don't believe that as an immediate and

11  proximate consequence of changing the law in one

12  locality that those heterosexual parents in that

13  locality would immediately and dramatically flee

14  their children or cease to parent their children or

15  cease to view themselves as the providers for and

16  protectors of their children.

17              I don't believe that would happen, because

18  that is not the way social change happens in this

19  case.   Social change happens in this case in a much

20  more broad and tectonic way, and it reflects the slow

21  but very important changing of the meaning of the

22  institution itself.

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 297

1        And the effect would not -- the effects

2   would not be immediate and localized in the way your

3   question suggests in my view.

4        Q.    Okay.  But again whether it's immediate

5   and localized, are you offering the opinion that

6   allowing same-sex couples to marry would lead people

7   in heterosexual couples whether in the short term or

8   the long term not to raise their children who

9   otherwise would have?

10        MR. THOMPSON:  Objection, vague.

11        A.    I believe that the -- that if we were to

12   embrace same-sex marriage as a public policy in the

13   United States, I believe it would contribute to the

14   deinstitutionalization of marriage such that marriage

15   would accelerate and -- and -- and deepen a

16   transition from being understood fundamentally as a

17   pro-child public institution to being a private adult

18   relationship that is viewed essentially as a matter

19   of private ordering.

20        And I believe that a consequence of that

21   conceptual switch, that reconceptualization of

22   marriage aided by law, encouraged and supported by

David George Blankenhorn III                      November 3, 2009
Washington, DC

Page 298

1    law -- I believe that a consequence of that change

2    would be more and more children growing up outside

3    the protections of their own mother and father

4    raising and caring for them together.

5             BY MR. DUSSEAULT:

6        Q.    Okay.  Is there any data that you have

7    seen suggesting that in jurisdictions where same-sex

8    marriage has been permitted it has led to a

9    deinstitutionalization such that heterosexual couples

10   who might otherwise have had children and raised them

11   within marriage are not doing so?

12       A.    Well, as I mentioned, there's no reason to

13   believe that the effects of this policy change would

14   be immediate and localized in the way you're

15   suggesting, and because there's no reason to believe

16   that it would be that case, I have not searched for

17   it, and I have also not encountered any evidence of

18   that nature.

19       Q.    Okay.

20       A.    But I haven't looked for it because I

21   wouldn't expect it.

22       Q.    Okay.  Let's look at paragraphs 47 through

David George Blankenhorn III                           November 3, 2009
                          Washington, DC

                                                            Page 314

1         A.    That's correct.

2         Q.    All right.  Now, let's turn to what I

3    marked previously as exhibit 2, your Future of

4    Marriage book.

5         A.    Do you want me to refer to that now?

6         Q.    Yes, please.

7               MR. THOMPSON:  Page?

8               MR. DUSSEAULT:  Page 205.

9               BY MR. DUSSEAULT:

10        Q.    Now, I will represent to you based on my

11   review of pages 205 through 208 of this book that the

12   19 specific answers to the question that you present

13   in your report are virtually word for word the

14   negative consequences that are stated in this text

15   with the exception that 5 of them that are included

16   in your book are omitted in the report.

17              Is that true?

18        A.    I don't -- I'm not sure about the number

19   5, but I have no reason to doubt it.

20        Q.    Okay.

21        A.    There were certainly some that I omitted.

22        Q.    Okay.  So the way you arrived at the 19

                  Alderson Reporting Company
                     1-800-FOR-DEPO

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 315

1    specific answers to the question was by drawing on

2    this list of negative consequences in your book.

3              Correct?

4    A.    Yes.

5    Q.    Okay.  So let's --

6    A.    That was one way I did it, yes.

7    Q.    Well, do you agree that the consequences

8    that you include in your report from your book are

9    virtually word for word recitations of what's in the

10   book?

11   A.    Yes, I do.

12   Q.    So what is the other way that you did it

13   rather than taking them from your book?

14   A.    Well, I tried to think freshly as best I

15   could about it, because in the book, as I say, this

16   list was developed by a group of people that included

17   both proponents and opponents of same-sex marriage.

18              It was a dialogue project that we met for

19   3 times and we came up with this -- well, we -- we

20   came up with the material that is the -- we came up

21   with a list of negative, positive, and other.

22              And the list that I have done in this book

David George Blankenhorn III                    November 3, 2009
                        Washington, DC

1    as I state in the book represents my good-faith

2    effort to report on the results of that dialogue

3    project.  When I thought about this report, I did my

4    best to focus on those statements that I personally

5    found the most compelling and consistent with my

6    views, and I decided to make the choice based on my

7    own views, because I was no longer expected to be

8    faithful to a representation of a group process.

9              So that is one way in which I used -- I

10   did something other than simply transcribe lists.

11        Q.    Okay.

12        A.    And secondly, I tried to think through for

13   the purposes of this report which of the consequences

14   in each category that I viewed as the most compelling

15   and least subject to, you know, provoke controversy.

16   I tried to assess those ones that I thought would to

17   me seemed to be the most clear.

18        Q.    Okay.

19        A.    And so in those 2 ways, I used my own

20   judgment on the matter.

21        Q.    All right.  So let's walk through the way

22   you describe in the book how you come up with the

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 317

1  list in the book.

2          So you said there were 3 1-day seminars,

3  one in New York City, one in Washington, D.C., and

4  one in Atlanta in 2004.

5          Correct?

6          MR. THOMPSON:  Page are you on?

7          MR. DUSSEAULT:  202.

8          Sorry.

9          MR. THOMPSON:  Okay.

10         BY MR. DUSSEAULT:

11     Q.    So there were 3 1-day seminars, one in New

12  York City, one in D.C., and one in Atlanta.

13         Correct?

14     A.    Yes.

15     Q.    And approximately 40 participants?

16     A.    Yes.

17     Q.    Okay.  Who decided who would be invited?

18     A.    I chaired those meetings, and I was the

19  final judge of who was invited, and as a way of

20  issuing the invitations, I tried to consult with

21  other respective participants about what would

22  constitute excellence from our point of view in the

David George Blankenhorn III                           November 3, 2009
Washington, DC

                                                           Page 318

1    construction of the list.

2        Q.    Okay.  Were the participants the same at

3    all 3 meetings?

4        A.    They were largely the same although not

5    exactly.

6        Q.    Okay.  Then this is the second full

7    paragraph on page 202, you say that:  Each meeting

8    followed the same format.  After some introductory

9    discussion in which each participant expressed her or

10   his primary questions and concerns, we conducted a

11   group thought experiment.

12            Is that a true and correct description of

13   what the group did?

14       A.    Well, the phrase group thought experiment

15   is my own.  I'm not saying that other people formally

16   agreed to something called a group thought

17   experiment, but that's my characterization of what we

18   did, and I believe it's an accurate one.

19       Q.    Okay.  And then you describe it as a -- as

20   a game that had 3 rules.

21            Correct?

22       A.    I do use that word.

David George Blankenhorn III

November 3, 2009

Washington, DC

Page 319

1           I don't mean game in the frivolous sense

2    of the term.  I just meant the activity of what we

3    did.

4           Q.    Okay.  First, we stipulated that gay

5    marriage like almost any major social change would be

6    likely to generate a diverse range of consequences,

7    some of which would be positive and some negative.

8           So that was agreed upon by the group at

9    the outset?

10          A.    That was the -- that was the stipulated

11   premise of the meeting.

12          Q.    Okay.  Second, we agreed to work together

13   as a group to specify as many of those likely

14   consequences as possible, both good and bad.

15          So the goal was to come up with as many

16   things as you could.

17          Right?

18          A.    On all 3 levels.

19          Q.    On all 3 levels?

20          A.    That's correct.

21          Q.    Okay.  And third, we agreed that

22   everybody's ideas count.

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

Page 320

1      A.    Yes.

2      Q.    What does that mean?

3      A.    It just means that we wouldn't exclude

4    from the list ideas that were strongly argued by some

5    of the group, that there wouldn't be a voting process

6    whereby, say, a 70 percent majority of the group

7    could say that something that the other 30 percent

8    wanted was illegitimate or not worthy of being

9    listed.

10     Q.    Okay.  Then you talked about how you used

11   chalkboards and poster paper to work together to come

12   up with the list.

13           Correct?

14     A.    Yes.

15     Q.    And there was a list of positive

16   consequences, a list of negative consequences, and

17   then a list of other consequences where there may

18   have been some disagreement about how to characterize

19   it.

20     A.    That's correct.

21     Q.    Okay.  And the result of -- of this

22   thought experiment and white boarding are the lists

Alderson Reporting Company
1-800-FOR-DEPO

David George Blankenhorn III                                    November 3, 2009
                            Washington, DC

```
 1    that follow on pages 203 through 208 of your report.

 2              Correct?

 3        A.    Yes.

 4              That -- that -- those are -- that is my

 5    good-faith effort to be faithful to that, but I want

 6    to stipulate, and I believe I said so in the book,

 7    that I did not seek or obtain the approval of all

 8    these people in this -- for these formulations.  I

 9    believe that I conformed to our understanding of what

10    we could and couldn't do, but I -- I -- I'm speaking

11    for myself here.  I'm not attaching other people's

12    names to this list.

13              I'm saying that based on this activity

14    which I've described accurately and which we've now

15    reviewed, an exercise occurred over a 3-day period.

16    And this list is my and my alone effort to be

17    faithful to report the results of that activity.

18        Q.    Okay.  But let me be clear:  When you say,

19    my and my alone, your goal is to accurately --

20    accurately report what people put up on the white

21    board through the process that we just described.

22        A.    That's correct.
```

David George Blankenhorn III                                    November 3, 2009
                         Washington, DC

                                                              Page 322

 1        Q.    Okay.  All right.

 2              So the methodology if you will with coming

 3   up with this list was the meetings, thought

 4   experiment, white boarding process that's been

 5   described.

 6        A.    That's correct.

 7        Q.    Okay.  Now, is there any reason that you

 8   didn't include the list of positive consequences, for

 9   example, in your report on this subject?

10        A.    Well, I believe that if you look at the

11   report, we will see on page 19 a section called goods

12   in conflict, and I seek over a 3-page portion of the

13   report to state as clearly as I can this conception

14   of goods in conflict and the idea that there are --

15   there re positives as well as negatives to -- to --

16   to -- to -- on any -- no matter where one comes down

17   on this, there are possible positives and possible

18   negatives.  And I tried as carefully as I could to --

19   to make that crystal-clear to the reader.

20              When it -- when you go to the section on

21   deinstitutionalization under the category called,

22   where is the harm, I viewed it as my goal in that

David George Blankenhorn III                                    November 3, 2009

Washington, DC

Page 323

1   section to list the -- to give specificity and to

2   exemplify as concretely as I could what that

3   concept of deinstitutionalization, how it would

4   look as -- as it relates to the potential of changing

5   our marriage laws to permit same-sex couples to

6   marry.

7            So I did not consider in that section that

8   I should list the possible benefits of same-sex

9   marriage for those 2 reasons, the first one being

10  that I already had said as clearly as I knew how that

11  I viewed this as goods in conflict in which the --

12  the -- the -- the consequences were likely to be

13  diverse in good versus good and not good versus bad,

14  but when it came time to try and explain to the

15  reader what I meant by the term

16  deinstitutionalization as it related to same-sex

17  marriage, it seemed logical to confine my discussion

18  to those factors that would exemplify that trend of

19  deinstitutionalization.

20       Q.    Okay.

21       A.    So I was not attempting at all to hide

22  or -- or not state my view about the goods in

David George Blankenhorn III                     November 3, 2009
Washington, DC

Page 324

1    conflict thesis, but I was trying to remain true to

2    my purpose of trying to explicate this concept of

3    deinstitutionalization.

4         Q.    Okay.  So you talked before about the

5    filter that you tried to apply to the list of

6    negative consequences when converting that into a

7    report on the court of potential harm of same-sex

8    marriage.

9              And I think you described that process as

10   basically thinking about and reflecting on them and

11   seeing which ones you believe you could support?

12        A.    And also that I felt were the most

13   compelling and least likely to generate disagreements

14   and dissensus.

15             In other words I felt that these were the

16   ones that seemed to be the most compelling and

17   important ones for the purposes of explicating my

18   argument about deinstitutionalization.

19             D-I-S-S-E-N-S-U-S, I think.

20        Q.    Okay.  And with respect to the 19

21   consequences -- I know you said you couldn't endorse

22   the exact number -- but with respect to the 19

David George Blankenhorn III                    November 3, 2009
                    Washington, DC

1    of societal readers with respect to same-sex marriage

2    and same-sex parenting, that practice was eliminated

3    and is currently eliminated from British medical

4    practice.

5            And I could give you many, many other

6    examples of the same thing, but --

7            BY MR. DUSSEAULT:

8        Q.    I don't think you need to to answer my

9    question, but that's okay.

10           Let's talk about number 5 on your list.

11       A.    I think I tried to answer the question of,

12   could I tell you why the trend toward same-sex

13   marriage would contribute to the public idea that

14   children do not really need a mother and father.  So

15   my belief is that these examples I've given you are

16   very crystal-clear.

17       Q.    Thanks.

18           I want to ask you about number 5.

19           MR. THOMPSON:  Let's go off the record.

20           THE VIDEOGRAPHER:  Going off the record,

21   18:01 and 53 seconds.

22           (Recess.)

David George Blankenhorn III                    November 3, 2009
                         Washington, DC

                                                      Page 333

1                THE VIDEOGRAPHER:   Going back on the

2       record.   The time on the video screen 18:05 and 45

3       seconds.   Please continue.

4                BY MR. DUSSEAULT:

5           Q.    Mr. Blankenhorn, who were to the best you

6       can recall as you sit here today the people who

7       participated in this thought experiment?

8           A.    I'm not comfortable giving their names

9       because we agreed at the outset that the participants

10      would not be a matter of public disclosure.

11          Q.    Okay.   I -- I -- I resp- -- I understand

12      that, but I don't think whether you're comfortable

13      telling me is necessarily the standard we can have

14      with a protective order.

15               MR. THOMPSON:   What about if you put it

16      under -- this portion of it under seal and if you

17      ever need to use it, then we can talk about it.

18               MR. DUSSEAULT:   Yeah.

19               I think or -- under seal, I mean, agree

20      that it's --

21               MR. THOMPSON:   Lawyers' eyes only.

22               MR. DUSSEAULT:   Yeah, lawyers' eyes only.

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 334

1          MR. THOMPSON:  So what this means, David,

2     is, if they want to use it -- and this won't count --

3     if they want to use it outside -- if anyone other

4     than Gibson Dunn or San Francisco or Boies Schiller

5     want to look at it, you know, there's going to be

6     further conversation.

7          THE WITNESS:  What happens if people start

8     calling these people up and asking questions about

9     this meeting?

10         MR. DUSSEAULT:  Do you guys want to go off

11    the record for a second?

12         MR. THOMPSON:  Yeah.

13         Let's go off the record for a second.

14         THE VIDEOGRAPHER:  Going off the record.

15    The time on the video screen is 18:06 and 59 seconds.

16         (Discussion off the record.)

17         THE VIDEOGRAPHER:  Going back on the

18    record.  The time on the video screen is 18:10 and 9

19    seconds.  Please continue.

20         BY MR. DUSSEAULT:

21    Q.   Okay.  Mr. Blankenhorn, we've -- we've had

22    some discussion of this off the record, but let's go

David George Blankenhorn III                          November 3, 2009
                        Washington, DC

1    back on now and discuss it.

2              Let me ask you again:  Who were the 40

3    people who participated in coming up with the list of

4    negative consequences of allowing same-sex marriage?

5         A.    The rules of our meeting, which I

6    believe were stated by me in the book, I believe,

7    were that we would -- none of the participants in

8    the book would publicize the names of other

9    participants.

10             And so for that reason, I don't feel

11   comfortable sharing those names with you now.

12        Q.    Okay.  And again as I said, whether you --

13             MR. DUSSEAULT:  I don't believe there's

14   any basis for not answering a question because a

15   witness doesn't feel comfortable.  It doesn't appear

16   to be a subject of privilege.

17             BY MR. DUSSEAULT:

18        Q.    So I would ask you to name the people.

19             Are you tell me that you refuse to do

20   so?

21        A.    I am.

22             MR. DUSSEAULT:  Okay.  Given the hour and

David George Blankenhorn III                    November 3, 2009
Washington, DC

Page 336

1    where we are, I think that we'll mark this, state our

2    objection to it, and reserve our rights to resume if

3    necessary and to use the witness's declining to

4    answer against him.

5              But with that said, we'll go ahead and

6    move on.

7              BY MR. DUSSEAULT:

8        Q.    You mentioned earlier that I think the

9    only document you've read in this case was -- sorry.

10             Let me make that clear.

11             The only document generated specifically

12   in this case that you've read is the report of Nancy

13   Cott?

14       A.    I said that in formulating this report,

15   this was the main document that I recall reading

16   carefully, yes.

17       Q.    Well, no.

18             Let me make this clear.

19             Didn't you say that it was the only

20   document created in the litigation, you know, briefs,

21   transcripts, et cetera, that you recalled reading,

22   the Cott report?