# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PERRY, *et al.*,<br><br>v.<br><br>SCHWARZENEGGER, *et al.* | CASE NO. 09-CV-2292 VRW<br><br>**DECLARATION OF**<br>**DAVID BLANKENHORN,**<br>**AS EXPERT WITNESS FOR**<br>**DEFENDANT** |

# Declaration of David G. Blankenhorn

1.      I, David G. Blankenhorn, make this declaration based on my own personal knowledge.  If called to testify, I could and would testify competently regarding the facts and conclusions contained in this declaration.

**Qualifications**

2.      For the past twenty-three years, I have dedicated my professional life to studying, writing, and educating others about issues of family policy and family well-being, with a particular focus on the institution of marriage.  During this time, I have delivered many academic lectures and public addresses, written extensively, and testified on several occasions before federal and state legislative committees on the topic of marriage.

3.      I am the founder and President of the Institute for American Values, a non-partisan organization devoted to research, publication, and public education on issues of family policy, family well-being, and civil society.  In my role as President, I study these issues extensively and frequently write and speak publicly about them.

4.      I have authored published books about marriage, family life, and the role that marriage plays in society, including:

- *The Future of Marriage* (2006).  In *The Future of Marriage*, I drew on my continuing anthropological, historical, and cultural study of the institution of marriage to address issues including what the institution of marriage is, why marriage has developed in the way that it has, the societal interests that the institution of marriage serves, and the impact that could result from changes to the institution (including its potential extension to same-sex couples).

- *Fatherless America: Confronting our Most Urgent Social Problem* (1995). *Fatherless in America* drew on my continuing study into the impact of family structure on childhood development and wellbeing to chronicle the increasing experience of fatherlessness, detail the negative consequences that flow from fatherlessness, and offer proposals to promote active, responsible fatherhood.

5.      In addition, I have served as co-editor of several published books on the topic of marriage, including *The Book of Marriage: The Wisest Answers to the Toughest Questions* (2001) and *Promises to Keep: Decline and Renewal of Marriage in America* (1996). *The Book of Marriage* is an anthology of source readings on marriage and is intended to combat the lack of intellectually engaging and morally serious pedagogical literature on marriage and family life. *Promises to Keep* collects essays written by social scientists, theologians, lawyers, and policy makers about the problems the institution of marriage faces in contemporary society.

6.      Other published books on marriage and family life that I have co-edited include *Black Fathers in Contemporary American Society* (2003) and *Rebuilding the Nest: A New Commitment to the American Family* (1990).

7.      My essays addressing marriage and family life have appeared in popular publications such as the New York Times, Washington Post, Wall Street Journal, Public Interest, and First Things, among others.

8.      I have shared my expertise about the institution of marriage in testimony before committees of the United States House of Representatives, the Pennsylvania state legislature, and the Michigan state legislature.

9.      In 1992, President Bush appointed me as a member of the National Commission on America's Urban Families.  As a member, I participated in Commission's work of examining the condition of urban families and developing recommendations for government policies and programs (as well as actions by other institutions) to strengthen urban families.

10.      I am also the founding chairman of the National Fatherhood Initiative, a non-partisan organization whose mission is to improve the well-being of children by increasing the proportion of children growing up with involved, responsible, and committed fathers.

11.      In addition to my study of marriage and family life, early in my career I worked for five years as a VISTA Volunteer and a community organizer in Massachusetts and Virginia, focusing on issues affecting minority and low-income Americans.

12.      My education includes an M.A. with distinction in Comparative Labor History from the University of Warwick in Coventry, England, where I studied as a

recipient of a John Knox Fellowship, awarded by Harvard University.  In 1977, I received a B.A. and graduated magna cum laude from Harvard University.

13.    I am being compensated at a rate of $300 an hour for my work in this matter.

## What is Marriage?

14.    As an intellectual matter, whether or not to grant equal marriage rights to gay and lesbian persons depends importantly on one's answer to the question, "What is marriage?"  In today's debate, there are two main ways to answer this question.

**Idea One:**

**Marriage is fundamentally a private adult commitment.**

15.    Consider these recent, representative examples of prominent persons making precisely this argument:

*Now marriage is seen by most people as love, intimacy, happiness.*

Barbara Risman, a University of Illinois sociology professor who writes frequently about families [1]

*The state's objectives underlying contemporary regulation of marriage relate essentially to the facilitation of private ordering: providing an orderly framework in which people can express their commitment to each other, receive public recognition and support, and voluntarily assume a range of legal rights and obligations.*

The Law Commission of Canada, 2001[2]

*In the wake of significant transformation, marriage has survived, all the while remaining true to its core purpose of recognizing committed, interdependent partnerships between consenting adults.*

---

[1] Barbara J. Risman, quoted in Barbara Barrett, "Does marriage need government's help?" (Raleigh) *News & Observer*, January 19, 2004.
[2] Law Commission of Canada, *Beyond Conjugality: Recognizing and supporting close personal adult relationships* (Ottawa: Law Commission of Canada, 2001), 129, xviii.

30 U.S. professors of history and family law, 2005 [3]

*Marriage is sometimes referred to as an "institution," but that's an odd application of the term. The Department of Defense is an institution. The University of California is an institution. A marriage is a private arrangement between parties committed to love.*

Professor Crispin Sartwell, Dickenson College, 2004 [4]

*No matter what language we speak – from Arabic to Yiddish, from Chinook to Chinese – marriage is what we use to describe a specific relationship of love and dedication to another person.*

The attorney and author Evan Wolfson, 2004 [5]

*If I had to pare marriage down to its essential core, I would say that marriage is two people's lifelong commitment, recognized by law and society, to care for each other.*

The journalist and author Jonathan Rauch, 2004 [6]

*Marriage is not simply a private contract; it is a social and public recognition of a private commitment.*

The journalist and author Andrew Sullivan [7]

*In today's society the importance of marriage is relational and not procreational.*

The Yale Law School professor William N. Eskridge, Jr., 1996 [8]

---

[3] "Brief of the Professors …" *Lewis v. Harris*, Supreme Court of New Jersey, Docket 58389 (Newark, October 6, 2005), 1-2, 16.
[4] Crispin Sartwell, "'Marriage amendment' a threat to Constitution," *Philadelphia Inquirer*, February 25, 2004.
[5] Evan Wolfson, *Why Marriage Matters: America, Equality, and Gay People's Right to Marry* (New York: Simon & Shuster, 2004), 3.
[6] Jonathan Rauch, *Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America* (New York: Times Books, 2004), 24.
[7] Andrew Sullivan, *Virtually Normal* (New York: Alfred A. Knopf, 1995), 179.
[8] William N. Eskridge, Jr., *The Case for Same-Sex Marriage* (New York: The Free Press, 1996), 11.

16.    This understanding of marriage is reasonably widespread today, particularly among U.S. journalists and advocates of same-sex marriage.  But there is also a second, and quite different, way of understanding what marriage is.

## Idea Two:

## Marriage is fundamentally a pro-child social institution.

17.    A principal purpose of this declaration to the Court is to insist, based on an overwhelming body of scholarly evidence, that intelligent, fair-minded persons of good will who bear no animosity to their fellow citizens on the basis of their sexual orientation can rationally conclude that the primary purpose of marriage in human groups (including those in North America) is to solve the problem of sexual embodiment – the species' division into male and female – and that problem's primary consequence, sexual reproduction.  The core need that marriage aims to meet is the child's need to be emotionally, morally, practically, and legally affiliated with the woman and the man whose sexual union brought the child into the world.  That is not all that marriage is or does. But nearly everywhere on the planet, that is fundamentally what marriage is and does.

18.    Indeed, scholarship shows that this core purpose of marriage is also universal, or at least nearly universal.  Human groups from around the world, despite their great diversity in so many areas, typically fashion marriage rules aimed *primarily* at guaranteeing that, insofar as possible, each child is emotionally, morally, practically, and legally affiliated with both of its natural parents.

19.    According to those who have studied the evolution of our species, a primary reason for the emergence of human pair-bonding is to insure that mothers are not forced to raise children alone.[9]  The evolutionary record suggests that, early in the

---

[9]   Some species deliver "precocial" young, or offspring that enter the world in a state of relative maturity. A few hours after birth, for example, a foal (a young horse) can see and walk. By contrast, humans deliver "altricial" young, or offspring that enter the world in a state of unusual helplessness and dependency. In fact, human infants are more helpless, and more dependent, than the offspring of any other primate. For example, for lemur young, the time of virtually complete physical dependency – let's call it "infancy" – lasts about six months. For gibbons, two years. For chimpanzees, three years. For humans? Six years.

But of course, even through and long past the age of six, the human child's larger need for intimate care and connectedness to others is profound. As the anthropologist Sarah Blaffer Hrdy puts it, human beings are "born to attach." Despite some of our myths, none of us are self-made. We talk only because others talk to us. We are smiled into smiling and loved into loving.

The main reason for sexually based pair-bonding among humans is that mothers cannot and should not do this work alone. For the prematurely born, large-brained, slowly developing, deeply psychologically needy human infant, a mother working by herself is, in general, not enough.  To improve the likelihood of survival and success, the infant also needs its father, and the mother needs the active, on-going social cooperation of the man who "fathered" her child.  That  fact, according to best available scholarship, lies at the  very heart of the emergence, universality, and continuation of the marital institution in human societies.

development of our species, men and women developed a particular and unusual way of living together – a way of living that would later be called marriage – primarily because, to survive and flourish, the human infant needs its father and the human mother needs a mate.

20.   The record of marriage in human groups shows that marriage is humanity's fundamental cultural expression of this evolutionary fact. It is our main way of *naming* that evolutionary fact, of fully acknowledging it, and of creating the expectations and rules of conduct – creating the *social institution* – capable of reflecting and culturally responding to its requirements.

21.   After all, why did we humans invent marriage in the first place?  Why do we keep it around?  Here is a proposition that is almost certainly true: If human beings did not reproduce sexually and did not start out in life as helpless infants – if, for example, new humans arrived on earth fully grown, brought to society by storks – our species would never have developed an institution called marriage.

22.   These views are mine, but certainly not mine alone. On the contrary, they rest on an extraordinary and all but incontrovertible body of high-quality scholarship regarding the purposes of marriage in human groups that has come to us courtesy of the most distinguished anthropologists, historians, and sociologists.  Until fairly recently – and in particular, until same-sex marriage in recent years became an important political and social issue in the United States – these finding from these eminent scholars were widely viewed as well-established and essentially non-controversial.

23.   Consider some representative examples of these scholars and others articulating precisely these findings:

*The process begins with the copulation of two adults of opposite sex.*

The anthropologist Peter J. Wilson puts it, describing the origins of human kinship forms, 1983 [10]

*Copulation produces the relation between the mates which is the foundation of marriage and parenthood.*

The anthropologist Robin Fox, 1967 [11]

---

See, for example, Helen E. Fisher, *Anatomy of Love* (New York: W. W. Norton, 1992), 151, 335; and Sarah Blaffer Hrdy, *Mother Nature: A History of Mothers, Infants, and Natural Selection* (New York: Pantheon, 1999), 383-393.

[10] Peter J. Wilson, *Man the Promising Primate: The Conditions of Human Evolution, 2nd Edition* (New Haven: Yale University Press, 1983), 55.

[11] Robin Fox, *Kinship and Marriage: An Anthropological Perspective* (Baltimore: Penguin Books, 1967), 27.

*This brings us back to the proposition that no one [in human groups] can become a complete social person if he is not presentable as legitimately fathered as well as mothered. He must have a demonstrable pater, ideally one who is individually specified as his responsible upbringer, for he must be equipped to relate himself to other persons and to society at large bilaterally, by both matri-kinship and patri-kinship. Lacking either side, he will be handicapped, either in respect of the ritual statuses and moral capacities that every complete person must have ... or in the political-jural and economic capacities and attributes that are indispensable for conducting himself as a normal right-and-duty bearing person.*

The British anthropologist Meyer Fortes, concluding that the communal achievement of "bilateral filiation" stands as a universal, foundational social purpose of marriage as a human institution, 1969 [12]

*Marriage is a relationship within which a group socially approves and encourages sexual intercourse and the birth of children.*

The anthropologist Suzanne G. Frayser, 1985 [13]

*Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies. Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature.*

The historian of marriage Robina G. Quayle, 1988 [14]

*Granted that the unique trait of what is commonly called marriage is social recognition and approval, one must still ask, approval of what? The answer is that it is approval of a couple's engaging in sexual intercourse and bearing and rearing offspring.*

University of Southern California sociologist and family scholar Kingsely Davis, 1985.[15]

---

[12] Meyer Fortes, "Filiation Reconsidered," in Fortes, *Kinship and the Social Order* (Chicago: Aldine Publishing Company, 1969), 261-262.  For these reasons, Fortes also (p. 253) defines filiation as "the relationship created by the fact of being the legitimate child of one's parents."

[13] Suzanne G. Frayser, *Varieties of Sexual Experience: An Anthropological Perspective on Human Sexuality* (New Haven, CT: HRAF Press, 1985), 248.

[14] Robina G. Quale, *A History of Marriage Systems* (Westport, CT: Greenwood Press, 1988), 2.

[15] Kingsley Davis, "The Meaning and Significance of Marriage in Contemporary Society," in Davis (ed.), *Contemporary Marriage: Comparative Perspectives on a Changing Institution* (New York: Russell Sage, 1985), 5.

*People wed primarily to reproduce.*

The anthropologist Helen E. Fisher, 1992 [16]

*Marriage is defined as a union between a man and a woman such that children borne by the woman are recognized as the legitimate offspring of both partners.*

Probably the most widely cited and influential definition of marriage in the history of world anthropology, prepared by a committee of distinguished scholars, and intended as a practical guide for trained anthropologists doing field work, 1951 [17]

*The universality of some order of incest taboo is of course directly connected with the fact that the nuclear family is also universal to all known human societies. The minimum criteria for the nuclear family are, I suggest, first that there should be a solidary relationship between mother and child lasting over a period of years and transcending physical care in its significance. Second, in her motherhood of this child the woman should have a special relationship to a man outside her own descent group who is sociologically the "father" of the child, and that this relationship is the focus of the "legitimacy" of the child, of his referential status in the larger kinship system. The common sense of social science has tended to see in the universality and constancy of structure of the nuclear family a simple reflection of its biological function and composition: sexual reproduction, the generation difference and the differentiation by sex in the biological sense.*

Harvard sociologist Talcott Parsons, 1954 [18]

*Marriage, it will be objected, is a cultural institution. Therefore it is wrong to confuse it with sex. After all, much sex takes place outside of marriage, and conversely, sex is only a small part of marriage. Here I shall argue that, while this is all true, marriage is nevertheless the cultural codification of a biological program. Marriage is the socially sanctioned pair-bond for the avowed social purpose of procreation.*

The evolutionary anthropologist Pierre van den Berghe, 1979 [19]

---

[16] Helen E. Fisher, *Anatomy of Love: The Natural History of Monogamy, Adultery, and Divorce* (New York: W. W. Norton, 1992), 102.

[17] *Notes and Queries on Anthropology*, 6th Edition (London: Routledge and Keegan Paul, 1951), 71.

[18] Talcott Parsons, "The Incest Taboo in Relation to Social Structure and the Socialization of the Child," *The British Journal of Sociology* 5, no. 2 (June 1954): 102.

[19] Pierre van den Berghe, *Human Family Systems* (Prospect Heights, IL: Waveland Press, 1979), 46.

*Marriage on the whole is rather a contract for the production and maintenance of children than an authorization of sexual intercourse.*

Bronislaw Malinowski, 1962 [20]


*We are thus led at all stages of our argument to the conclusion that the institution of marriage is primarily determined by the needs of the offspring, by the dependence of the children upon their parents.*

Malinowski, 1962 [21]


*Conception must be socially authorized.*

Dr. L. P. Mair, discussing the fundamental purposes of marriage in Africa, 1953 [22]


*Before concluding this brief sketch of the main distinctive features of African customary marriage, we must not omit to mention the emphasis laid on procreation as the chief end of marriage.*

Arthur Phillips, the director of the Survey of African Marriage and Family Life, 1953 [23]


*The emphasis given in this account to the sexual and reproductive aspects of marriage reflects the great importance that the Walbiri themselves attribute to them. Ideally, reproduction exclusively concerns jurally-recognized spouses, and in fact little latitude about this norm is permitted. Extra-marital intercourse is regarded somewhat more tolerantly, provided it does not endanger the marriages of the people concerned.*

The anthropologist M. J. Meggitt, discussing marriage among the Walbiri people, an Aboriginal tribe in Central Australia, 1962 [24]

---

[20]  Bronislaw Malinowski, *Sex, Culture, and Myth* (New York: Harcourt, Brace, & World, Inc., 1962), 4.

[21]  Ibid., 11.

[22]  L. P. Mair, "African Marriage and Social Change," in Arthur Phillips (ed.), *Survey of African Marriage and Family Life* (London: Oxford University Press, 1953), 3.

[23]  Arthur Phillips, "An Introductory Essay," in Arthur Phillips (ed.), *Survey of African Marriage and Family Life* (London: Oxford University Press, 1953), xvii.

[24]  M. J. Meggitt, *Desert People* (Sydney, Australia: Angus and Robertson, 1962), 108.

*With a … [decree], I made the father support his children. I made the child support his father. I made the father stand by his children. I made the child stand by his father.*

> Lipit-Ishtar, the ruler of Sumer and Akkad, in one of the earliest surviving legal codes in human history regarding the question of "What is marriage?", about 1900 BCE [25]

*Conjugal Society is made by a voluntary Compact between Man and Woman: and tho' it consists chiefly in such a Communion and Right in one anothers Bodies, as is necessary to its chief end, Procreation; yet it draws with it mutual Support, and Assistance, and a Community of Interest too, as necessary to unite not only their Care, and Affection, but also necessary to their common Off-spring, who have a right to be nourished and maintained by them, till they are able to provide for themselves.*

> John Locke, the philosophical father of Anglo-American liberalism, 1698[26]

*But for children, there would be no need of any institution connected with sex, but as soon as children enter in, husband and wife, if they have any sense of responsibility or any affection for their offspring, are compelled to realize that their feelings toward each other are no longer what is of most importance … [I]t is through children alone that sexual relations become of importance to society, and worthy to be taken cognizance of by a legal institution.*

> The Nobel Prize-winning mathematician, philosopher, and social critic (who was no friend of conventional sexual morality) Bertrand Russell, 1929 [27]

*Generally, the history of the marital institution is above all else (if not exclusively) that of a procreative function where the major issue is ensuring the survival of the group, and thus the personal desires of the individuals are sacrificed to that cause. At yet something else is equally at stake: marriage is a social act not only because it ensures procreation, but because it also allows man and woman to accede simultaneously to social creativity, and this necessitates a conscious commitment on their part … through marriage, the most intimate aspect of existence is linked by a public act of commitment to the social*

---

[25] Laws of Lipit-Ishtar, Prologue, in Martha T. Roth, *Law Collections from Mesopotamia and Asia Minor* (Atlanta, GA: Scholars Press, 1997), 25.
[26] John Locke, *Two Treatises on Government* (Cambridge, U.K.: Cambridge University Press, 1965; first published 1698), 319.
[27] Bertrand Russell, *Marriage and Morals* (London: George Allen & Unwin Ltd, 1929), 64, 125.

*responsibility of the spouses. In this respect, we can say that man and woman, by marrying, renounce marrying only for their own sakes.*

The historian and theologian Eric Fuchs, 1983 [28]

*… the family [is] based on a union, more or less durable, but socially approved, of two individuals of opposite sexes who establish a household and bear and raise children.*

The famous anthropologist Claude Levi-Strauss, 1985 [29]

*Marriage was not instituted to legalize heterosexuality, but to regulate filiation.*

The French feminist philosopher Sylviane Agacinski, 2001 [30]

24.     Every child is a mother's child.

25.     Every child is a father's child.

26.     To encompass this fundamental human fact and aspiration, marriage.

27.     It is possible to demonstrate empirically, and beyond any doubt, that this view of marriage's core purposes is the only valid view?  No.

28.     It is possible to demonstrate empirically, and beyond any reasonable doubt, that this view of marriage's core purposes is consistent with much of the most respected scholarship of the modern era, and that this view not only can be, but has been and is still, widely embraced by intelligent, fair-minded leaders and citizens of good will, both in the United States and around the world, who from all available indicators appear to bear no animosity toward their fellow citizens on the basis of their sexual orientation? I am absolutely certain that the answer is yes.

---

[28] Eric Fuchs, *Sexual Desire and Love: Origins and History of the Christian Ethic of Sexuality and Marriage* (New York: The Seabury Press, 1983), 185-186.
[29] Claude Levi-Strauss, *The View from Afar* (New York: Basic Books, 1985), 40-41.
[30]  Sylviane Agacinski, *Parity of the Sexes* (New York: Columbia University Press, 2001), xiii-xiv.

### *Why* Does Marriage Regulate Filiation?

29.     If this view of marriage's core purposes in human societies is at least valid – if scholars and others of good will from around the world can rationally and humanely conclude that marriage is fundamentally a pro-child social institution, anchored in socially approved sexual intercourse between a woman and a man – the next logical question is, *Why?*  Why would this institution be structured in such a particular way, and so decisively oriented to this particular purpose?   More specifically for our present purposes, why does this universal human institution focus with such precision and insistence on bringing together the *male and female* of the species into a common life?

  *Religion?*

30.     Is this central feature of human marriage an artifact of Judeo-Christian religious teaching, or of religion generally?  No.

31.     On this point there is no serious disagreement among competent scholars. Marriage as a man-woman bond is fundamentally a natural and social institution – what the famous anthropologist Claude Levi-Strauss calls "a social institution with a biological foundation"[31] – that exists in all or nearly human societies. Marriage was not created by religion, and marriage as a cross-cultural human institution certainly does not owe its definition or existence to any particular religion, or to religion in general. Obviously in many societies (including our own) religion does *influence* marriage. Indeed, religion influences nearly every important sphere of human life. But to suggest that man-woman marriage is in any meaningful sense a "religious institution" – created by and intelligible to only those people who embrace a certain religious doctrine – is simply and fundamentally untrue.

  *Homophobia?*

32.     Alternatively, is this core feature of human marriage an artifact of homophobia?  No.

33.     I answer "no" to this question *not* because I believe that homophobia is a small or isolated or insignificant or benign component of U.S. and world culture – *I strongly believe the exact opposite* – but rather because the historical and ethnographic record of human marriage strongly suggests that marriage's fundamental anchor and organizing principle is embodiment, not orientation.

---

[31] Claude Levi-Strauss, "Introduction," in Andre Burguiere, Christiane Klapish-Zuber, Martine Segalen, and Francoise Zonabend (eds.), *A History of the Family: Vol. 1, Distant Worlds, Ancient Worlds* (Cambridge: Harvard University Press, 1996), 5.

34.     Traditional marriage is institutionally alive to the hard facticity of sexual embodiment and, flowing from it, sexual reproduction.  Regarding the subjective and often complex issue of sexual orientation, marriage is institutionally deaf, blind, and dumb. It doesn't ask, tell, require, record, stipulate, accept, judge, or reject on the basis of individual sexual desire.

35.     Marriage exists for public purposes that can be, and have been, quite clearly specified. There is little if any credible scholarly evidence to suggest that promoting or protecting homophobia is one of those public purposes.

### Child Well-Being?

36.     The answer to our question is simple.  According to a large and ever-growing body of scholarly evidence, humans institute marriage consciously to regulate filiation because humans favor the survival and success of the human child.

37.     Consider some representative examples of leading scholars articulating the core bases of this answer:

> *Research clearly demonstrates that family structure matters for children, and the family structure that helps children the most is a family headed by two biological parents in a low-conflict marriage.*
>
> A team of scholars from Child Trends, a non-partisan, left-of-center research group, 2002 [32]

> *Thus, it is not simply the presence of two parents, as some have assumed, but the presence of* two biological parents *that seems to support children's development.*
>
> Child Trends, 2002 [33]

> *Children raised by both biological parents are less likely than children raised in single- or step-parent families to be poor, to drop out of school, to have difficulty finding a job, to become teen parents or to experience emotional or behavioral problems.*
>
> A report from the National Council on Family Relations, 2003 [34]

---

[32] Kristin Anderson Moore, et. al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?* (Washington, D.C.: Child Trends, June 2002): 1-2.
[33] Ibid., 6.

*From a child's point of view, according to a growing body of social research, the most supportive household is one with the two biological parents in a low-conflict marriage.*

> New York Times, page one story describing the emergence of a "powerful consensus" among social scientists, 2001 [35]

*Children who grow up in a household with only one biological parent are worse off, on average, than children who grow up in a household with both of their biological parents, regardless of the parents' race or educational background, regardless of whether the parents are married when the child is born, and regardless of whether the parent remarries.*

> The family sociologists Sara McLanahan and Gary Sandefur, 1994 [36]

*Research clearly demonstrates the children growing up with two continuously married parents are less likely than other children to experience a wide range of cognitive, emotional, and social problems, not only during childhood, but also in adulthood. Although it is not possible to demonstrate that family structure is the cause of these differences, studies that have used a variety of sophisticated statistical methods, including controls for genetic factors, suggest that this is the case. This distinction is even stronger if we focus on children growing up with two happily married biological parents.*

> The family sociologist Paul Amato, 2005 [37]

*Based on accumulated social research, there can now be little doubt that successful and well-adjusted children in modern societies are most likely to come from families consisting of the biological father and mother.*

> The family sociologist David Popenoe of Rutgers University, 1999 [38]

---

[34] *Marriage Promotion in Low-Income Familes* (Minneapolis: National Council on Family Relations, April 2003).

[35] "2-Parent Families Rise After Change in Welfare Laws," *New York Times*, August 12, 2001.

[36] Sara McLanahan and Gary Sandefur, *Growing Up with a Single Parent: What Hurts, What Helps* (Cambridge: Harvard University Press, 1994), 1.

[37] Paul R. Amato, "The Impact of Family Formation Change on the Cognitive, Social, and Emotional Well-Being of the Next Generation," *The Future of Children* 15, no. 2 (Fall 2005): 89-90.

[38] David Popenoe, "Can the Nuclear Family be Revived?", *Society* 35, no. 5 (July-August, 1999), republished in David Popenoe, *War Over the Family* (New Brunswick: Transaction Publishers, 2005): 207.

> *A central purpose of the institution of marriage is to ensure the responsible and long-term involvement of both biological parents in the difficult and time-consuming task of raising the next generation.*
>
> David Popenoe, 2005 [39]

38.     The primary division in our species is between male and female. Scholarship reveals that marriage is *the* key human institution seeking to bridge that divide, primarily so that, insofar as possible, every child's natural parents will also be its social parents. That is the reason, in a nutshell, why marriage is society's most pro-child social institution.

39.     A core human and social institution such as marriage can exist over time only if it meets basic human needs. And an institution that exists everywhere on the planet, in addition to whatever else it may be doing in this or that specific locale, is also obviously meeting at least one primary, cross-cultural human need. Regarding marriage, leading scholars have clearly identified that need. If human beings were not sexually embodied creatures who everywhere reproduce sexually and give birth to helpless, socially needy offspring who remain immature for long periods of time and who therefore depend decisively on the love and support of *both* of the parents who brought them into existence, the world almost certainly would not include the institution of marriage.

---

[39] David Popenoe and Barbara Dafoe Whitehead, *The State of Our Unions 2005* (New Brunswick:  Rutgers University, 2005), 24.

## Should We Deinstitutionalize Marriage?

     40.     One of the most important marriage trends of our era is what scholars often call deinstitutionalization.

     41.     A social institution is a relatively stable pattern of rules and structures intended to meet basic social (communal) needs.  Accordingly, to weaken a social institution – to deinstitutionalize it – is to take steps to dissolve or make less clear its rules, to disassemble its basic structures, and to seek to transfer its core meaning from the public to the private realm.

     42.     With respect to marriage, what are some of the specific manifestations the trend of deinstitutionalization?  Rising rates of divorce, nonmarital cohabitation, and unwed child bearing, the loosening legal regulation of many aspects of marriage (such as divorce), the mainstreaming of third-party participation in procreation and assisted reproductive technologies, and the rising demand for and reality of  same-sex marriage – all of these phenomena are examples and expressions of the deinstitutionalization of marriage.

     43.     Some persons strongly favor the deinstitutionalization.  Others oppose the trend, and seek what amounts to reinstitutionalization.  Still others favor or at least willingly accept some aspects of deinstitutionalization, while being more worried or unsure about others.

     44.     For our present purposes, it is also important to note that prominent family scholars on both sides of the gay marriage divide – those who favor same-sex marriage and those who do not – acknowledge that extending equal marriage rights to gay and lesbian couples would further, and perhaps in some respects even culminate, the deinstitutionalization of marriage.  For example, Andrew J. Cherlin of Johns Hopkins University, a supporter of same-sex marriage, describes "the movement to legalize same-sex marriage" as "the most recent development in the deinstitutionalization of marriage" in the United States.[40]  Similarly, Norval D. Glenn of the University of Texas, who has voiced reservations about same-sex marriage, observes the current shift in our society from an institutional to a couple-centered conception of marriage, and points out that

> acceptance of the arguments made by some advocates of same-sex marriage would bring this trend to its logical conclusion, namely, the definition of marriage as being for the benefit of those who enter into it rather than as an institution for the benefit of society, the community, or any social entity larger than the couple.[41]

---

[40] Andrew J. Cherlin, "The Deinstitutionalization of American Marriage," *Journal of Marriage and the Family* 66 (November 2004): 850.

[41]  Norval D. Glenn, "The Struggle for Same-Sex Marriage," *Society* 41, no. 6 (September-October 2004): 26.

45.     To consider further why Cherlin and Glenn, who disagree on the policy question, would largely agree regarding the underlying analysis, let's pursue a bit further the subject of rules.  Why?  Because many sociologists and economists suggest that *an institution's single most important component is its rules*.  Accordingly, Douglass C. North, who won the 1993 Nobel Prize in Economics, succinctly describes social institutions as "the rules of the game" that "define the incentive structures of society." For North, institutions are

> the humanly devised constraints that structure human interaction. They are made up of formal constraints (e.g., rules, laws, constitutions), informal constraints (e.g., norms of behavior, conventions, self-imposed codes of conduct), and their enforcement characteristics.[42]

46.     Similarly, the eminent anthropologist and marriage scholar A. R. Radcliffe-Brown reminds us that social institutions are "the ordering by society of the interactions of persons in social relationships." You know you are part of an institution when what you encounter is not "haphazard conjunctions of individuals," but instead situations in which "the conduct of persons in their interactions with others is controlled by norms, rules, or patterns." Accordingly, a sign and consequence of participating in a social institution is that "a person knows that he is expected to behave according to these norms and that other persons should do the same."[43]

47.     What are the main "humanly devised constraints" – the main "rules of the game" – when it comes to marriage?  There are three of them.  They are quite familiar.

48.     The first is the rule of opposites:  Marriage is a man and a woman.

49.     The second is the rule of two:  Marriage is for two people. [44]

50.     The third is the rule of sex:  Marriage is socially sanctioned sex and procreation.

51.     Because each rule helps to meet the same social need – ensuring that, insofar as possible, a child's natural parents are also its social parents – these three core rules naturally hang together, support one another, and therefore (to a significant degree) depend upon one another. It seems likely that getting rid of any one of them would make getting rid of one or both of the others significantly easier and, as a matter of logic, more plausible.

52.     Virtually by definition, embracing same-sex marriage requires us as a society to dissolve the rule of opposites.  In both law and (to a significant and growing

---

[42] Douglass C. North, "Economic Performance Through Time," *The American Economic Review* 84, no. 3 (June 1994): 360-361.

[43] A. R. Radcliffe-Brown, *Structure and Function in Primitive Society* (Glencoe, IL: The Free Press, 1952), 10-11.

[44] See Appendix B: A Note on Polygamy and Polyandry.

degree) in culture, it means that we must collectively remove the "male-female" part from our legal and public understanding of what marriage is.

53.     The process of deinstitutionalization is like turning off lights. We simply turn off one light after another – we get rid of one defining idea after another – until it's dark enough to suit us. Removing the male-female part from our public understanding of marriage would be to turn off marriage's heretofore single brightest and most unmistakable light.

54.     Would such a change measurably weaken the institution of marriage over time for all of those who participate in it?  No one can know for sure. But in my view, the most likely answer is yes. After all, to believe otherwise requires us to assume that altering an institution's form does not change its content.  It requires us to assume that changing a thing's public meaning does not change the thing. And it requires us to assume that, if we shrink marriage down to a private adult commitment, a matter in most respects of private ordering only, we have not at the same time institutionally weakened marriage, which always and everywhere has existed for important *public* purposes that can be specified.

55.     That is my studied view, based on extensive research and reflection.  But for the purposes of this declaration, I wish to rest ultimately on a much narrower proposition, and one that I believe is more easily established and therefore less contentious.

56.     Permit me to put this proposition in the form of a question. Can intelligent, rational scholars and other citizens of good will who by all reasonable indicators appear *not* to be motivated or influenced by homophobia sincerely and plausibly believe that the deinstitutionalization of customary marriage, up to and including allowing same-sex marriage, constitutes a legitimately worrisome and potentially harmful social trend?  I am absolutely confident that the answer to this question is yes.

## Goods in Conflict

*Is Our Choice Good Versus Bad?*

57.     For so many persons on both sides of the same-sex marriage debate, the essential intellectual, moral, and rhetorical framework is *good versus bad*.

Tolerance versus bigotry.

Enlightened rationalism versus religious fundamentalism.

Normal versus perverted.

Good will versus bad faith.

Moral versus immoral.

Progressive versus reactionary.

Family values versus anti-family values.

Love versus hate.

58.     I reject each of these dichotomies specifically.  Moreover, I also reject, with respect to the question of changing our marriage laws to permit same-sex couples to marry, the entire epistemology of *good versus bad*.

*Is Our Choice Good Versus Good?*

59.     For me, the conflict over same-sex marriage is instead a conflict of *good versus good*.

60.     **One good is the equal dignity of homosexual love** – the idea that loving relationships betwees persons of the same sex are equal in worth and dignity to loving relationships betwees persons of the opposite sex. [45]

---

[45] For many – I believe most – people who strongly support same-sex marriage, the single biggest and most deeply felt reason for supporting the reform is less about marriage *per se* than it is about something else. That something else is human dignity. For these proponents, the case for same-sex marriage does ultimately not center on what marriage is, but instead on the societal imperative of equal rights.

For these proponents, then, the essential *fact* on the table is equal human dignity.  And therefore the essential *argument*, from their point of view, is the argument for the equality of human and civil rights.

61.   *Another good is the double origin of the human child* – the idea that the human child needs and deserves, insofar as society can make it possible, to love and be loved by the male and the female whose union brought the child into the world.[46]

62.   Many thinkers, perhaps most notably Isaiah Berlin, the great 20th century philosopher of liberalism, have pointed out that many important choices we face do not involve choosing between good and bad, but between good and good.

63.   Berlin's concept of goods in conflict is central to my understanding of society's need to make choices regarding the definition of marriage.[47]  One good is the equal dignity of homosexual love. Another good is my right as a child to the mother and father who made me.

64.   Today, in this debate, these goods are at least partially in conflict. In my view, working out that agonizing conflict lies at the very heart of the debate on same-sex marriage.

Which Good Do We Favor?

65.   I *endorse* the goal of gaining social recognition of the equality dignity of homosexual love.

---

[46] The term "double origin" comes from the feminist philosopher Sylviane Agacinski.  Agacinski refuses all propositions, including the proposition of gay marriage, that would deny this fact and (from the child's point of view) this birthright.  For example, she tells an interviewer: "I think there is no absolute right to a child, since the right implies an increasingly artificial fabrication of children. In the interests of the child, one cannot efface its double origin."  In her important book, *Parity of the Sexes*, Agacinski examines the consequences of disconnecting legal from natural parenthood and of insisting that marriage is no longer based on male-female reunion. For example, she points out that

> if we suspend [i.e., seek to deny] sexual duality, there is no longer any reason why there must be two and only two parents. Why not three fathers, or four mothers? The binary model for the couple is not produced by love or pleasure, but by sexuation, that is, genital differentiation. There are not two parents because they love each other, but because heterogeneity of the race is necessary and sufficient for creating life. On the other hand, sexual practices and amorous ties do not necessarily involve either mixed partners, or even a couple's relationship.

See Sylviane Agacinski, *Parity of the Sexes* (New York: Columbia University Press, 2001), xiii-xiv. Agacinski's interview comments cited here are from "Questions autour de la filiation," *Ex aequo* (July 1998), as translated from the French by Judith Butler.

[47] See Isaiah Berlin, "Two Conceptions of Liberty," in  Berlin, *Four Essays on Liberty* (Oxford, U.K.: Oxford University Press, 1969); and William A. Galston, *Liberal Pluralism: The Implications of Value Pluralism for Political Theory and Practice* (Cambridge, U.K.: Cambridge University Press, 2002).

66.     But I do *not* endorse changing our marriage laws to achieve that good goal.

67.     We as a society can, and in my view should, accept the equal dignity of homosexual love and the equal worth of gay and lesbian persons. But must we shrink and restructure *marriage* in what are likely to be institution-maiming, child-threatening ways in order to achieve this social progress?  I do not suggest that the answer is easy. But to me, and I believe to many scholars and others of good will, the answer is no.

# Where's the Harm?

*Please clarify for me: How exactly would my marrying my partner of more than four years threaten the institution of marriage?*

    Letter to the Editor, *USA Today*, February 23, 2004

68.    Here, in my view, is my main *general* answer to this question.

69.    Permitting same-sex marriage almost certainly would mean the further, and in some respects full, deinstitutionalization of marriage. Deinstitutionalization may not require same-sex marriage, but scholars on both sides of the policy question recognize that same-sex marriage in important respects presupposes and requires deinstitutionalization.  Do we want, even in pursuit of a good cause, to transform marriage possibly once and for all from a pro-child social institution into a post-institutional private relationship?  For me, and for many other scholars and leaders of good will, the answer is no.

70.    Here, in my view, are the nineteen main *specific* answers to this question.

1.   Adopting same-sex marriage would likely contribute significantly to changing the public meaning of marriage from a structured social form to a private relationship, from an institution with defined social purposes to a right of personal expression.

2.   To the degree that adopting same-sex marriage requires the further deinstitutionalization of marriage, adopting same-sex marriage would be likely to contribute over time to a further social devaluation of marriage, as expressed primarily in lower marriage rates, higher rates of divorce and non-marital cohabitation, and more children raised outside of marriage and separated from at least one of their natural parents.

3.   Accepting same-sex marriage would require explicit public endorsement of the idea that a child does not really need a mother and a father. The main likely consequence would be fewer children growing up with fathers.

4.   Legally permitting same-sex marriage would eradicate in law and weaken further in culture the idea that what society favors – that what is typically best for child and the community – is the natural mother married to the natural father, together raising the child. This change would likely result over time in smaller proportions of  children being raised by their own, married mothers and fathers.

5.   Same-sex marriage would likely mean, to some measurable degree, publicly replacing the idea that parenting is largely gendered (the sex of the parent matters a lot) with the idea that parenting is largely unisex (the sex of the parent is not

very important). The main likely consequence would be that fewer men will believe that it is important for them to become active, hands-on parents.

6. Adopting same-sex marriage probably means supporting and subsidizing a range of reproductive technologies – including donor insemination, the sale of eggs, contract pregnancy, and other forms of third-party-participant procreation, as well as newer technologies up to and likely soon including reproductive cloning and creating a child from the genetic material of two persons of the same sex – all of which share one feature: almost by definition, the resulting child will not be raised by her own mother and father.

7. Adopting same-sex marriage will likely contribute to replacing the norm of the natural parent with the norm of the legal parent. The two main probable consequences of this change would be a growing disjuncture between the biological and the legal-social dimensions of parenthood and, relatedly, a significant expansion of the power of the state to determine who is a parent.

8. A likely consequence of shifting from a man-woman to a two-person conception of marriage is that U.S. law will effectively be viewing the homosexual experience, rather than the heterosexual experience, as its baseline model for evaluating the meaning and public purposes of marriage.

9. Social acceptance of same-sex marriage would likely increase the social acceptability of other alternative marriage forms, in particular polyamory and polygamy.

10. Adopting same-sex marriage would legally enshrine the principle that sexual orientation (as opposed to sexual embodiment)  is a valid determinant of marriage's structure and meaning – even though orientation, compared to embodiment, is more subjective and complex, arguably much more fluid, and a subject about which our social understanding remains fragmentary and provisional.

11. If same-sex orientation becomes a legitimate grounding for same-sex marriage, it is likely that bisexual orientation could become a legitimate grounding for group marriage.

12. Adopting same-sex marriage would likely require all relevant branches and agencies of government formally to replace the idea that marriage centers on opposite-sex bonding and male-female procreation with the idea that marriage is a private relationship between two consenting adults.

13. Same-sex marriage would likely mean that the public socialization of heterosexual young people into a marriage culture – in children's books and entertainments, in church teachings, in school curricula, in youth organizations, and in the popular culture – would either end altogether or be significantly diluted

in order to avoid what would have become the possibly illegal suggestion that marriage fundamentally concerns heterosexual bonding and procreation.

14. Adopting same-sex marriage might cause many Americans who dissent on gay marriage to abandon some or all of those public institutions that champion the new definition of marriage and declare that the old one is morally and legally repugnant, probably resulting in the weakening of those institutions and a further rending of our common culture.

15. The redefinition of marriage from man-woman to two persons implies that the understanding of marriage embraced by millions of orthodox Christian, Jewish, and Muslim Americans will no longer be legally or morally acceptable, thereby probably forcing many of these Americans to choose between being a believer and being a good citizen.

16. Adopting same-sex marriage might lead to new state-imposed restrictions of religious freedom and freedom of expression.

17. Adopting same-sex marriage might mean that some religious organizations now receiving public support to provide services to the poor and to others will no longer provide them, due to state disqualification over refusing programmatically to endorse same-sex marriage.

18. Adopting same-sex marriage could contribute to the public belief that marriage in our society is now politicized.

19. To the degree that adopting same-sex marriage means that marriage under the law becomes primarily a right of intimate expression, largely disconnected from defined public purposes, unmarried people might increasingly, and logically, complain that the legal and practical benefits currently attached to marriage properly belong to everyone, not just married people. Many single people also have interdependent personal relationships.

## Conclusion

71.     A broad consensus of the leading scholars suggests that, across history and cultures, marriage is fundamentally a pro-child social institution, anchored in socially approved sexual intercourse between a woman and a man.

72.     Marriage in important respects is *also* a private, affective adult relationship. No one denies this significant dimension of marriage. But scholarship clearly shows that marriage in human groups is fundamentally a set of fairly stable *social* rules and forms intended to solve key communal problems and meet key communal needs. The key *problem* that marriage aims to solve is the problem of sexual embodiment

– the species' division into male and female – and that problem's primary consequence, sexual reproduction. The core *need* that marriage aims to meet is the child's need to be emotionally, morally, practically, and legally affiliated with the woman and the man whose sexual union brought the child into the world. That is not *all* that marriage is or does. But nearly everywhere on the planet, that is *fundamentally* what marriage is and does. [48]

73.    Persons of intelligence and good will, relying on the modern era's best available scholarship, and according to all external indicators bearing no animosity to their fellow citizens based on sexual orientation, can – and very many do – rationally and humanely conclude that changing our marriage laws to accept same-sex marriage would be likely, over time, further and significantly to undermine marriage's core purposes and weaken marriage as a pro-child social institution.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

*David Blankenhorn*

David G. Blankenhorn

David G. Blankenhorn
President
Institute for American Values
1841 Broadway, Suite 211
New York, New York 10023
Phone: 212.246.3942
Email: blankenhorn@americanvalues.org

---

[48] From this *positive* proposition logically flow two important *negative* ones:
- First, marriage in human groups does *not* exist in order to address or solve the problem of sexual orientation, or to reduce, or buttress, homophobia;
- And second, marriage in human groups does *not* exist in order to embody the principle of family diversity, or to maximine adult choice in the area of procreation and child rearing.

Of course, morally serious cases can be made for both of these objectives. But we know from the best scholarship available that marriage as a cross-cultural human institution was never established or intended to pursue either of them.

25

**David Blankenhorn**

Institute for American Values
1841 Broadway, Suite 211
New York, New York 10023
Tel: (212) 246-3942 / Fax: (212) 541-6665

**Education:**

| | |
|---|---|
| 1979 | **University of Warwick, Coventry, England.**<br>M.A. with distinction, Comparative Social History. Thesis: "Cabinet Makers in Victorian Britain: A Study of Two Trade Unions." |
| 1977 | **Harvard University, Cambridge, MA.**<br>B.A., magna cum laude, Social Studies. Honors thesis: "The Message from Jackson: School Integration in a Deep-Southern City". |
| 1973 | **Andrew Lewis High School, Salem, VA.**<br>High School diploma. |
| 1969-1972 | **Robert Callaway Jr-Sr High School, Jackson, MS.** |

**Employment:**

| | |
|---|---|
| 1986 to<br>Present | **Institute for American Values, New York City.**<br>Founder and President.<br>A New York-based organization devoted to research, publication and public education on issues of family policy, family well-being, and civil society. Responsible for overall program direction, including research topics, publications, fundraising, staff supervision and coordination (with Board Chairman) of Board of Directors and Academic Advisory Committee. Includes frequent public speaking, writing, and media appearances. |
| 1984-1986 | **Fundraising and political research.**<br>Consultant.<br>Clients included: United States Catholic Conference, Youth Project, National Center for Policy Alternatives, and Clean Water Action. |
| 1982-1984 | **Virginia Action.**<br>Program Director (1982-83) and Associate Director (1983-84).<br>A statewide citizen action coalition based in Richmond, VA. Experience in staff hiring and supervision, legislative lobbying, fundraising and policy research. |

| | |
|---|---|
| 1978-1982 | **Massachusetts Fair Share.**<br>Community Organizer (1978-81) and Regional Director (1981-82).<br>A statewide citizens' organization based in Boston, MA. Experience in researching and lobbying on issues before the state legislature affecting consumers and lower-income families. |

**Books:**

| | |
|---|---|
| 2009 | David Blankenhorn, Barbara Dafoe Whitehead and Sorcha Brophy-Warren, eds., **Franklin's Thrift: The Lost History of an American Virtue** (Conshohocken, PA: Templeton Press). |
| 2008 | **Thrift: A Cyclopedia** (Conshohocken, PA: Templeton Press). |
| 2006 | **The Future of Marriage** (New York: Encounter Books). |
| 2005 | David Blankenhorn, Abdou Filili-Ansary, Hassan I. Mneimneh, and Alex Roberts, eds., **The Islam/West Debate: Documents from a Global Debate on Terrorism, U.S. Policy, and the Middle East** (Lanham, MD: Rowman & Littlefield). |
| 2004 | David Blankenhorn, Don Browning, and Mary Stewart Van Leeuwen, eds., **Does Christianity Teach Male Headship?  The Equal Regard Marriage and Its Critics** (Grand Rapids: Eerdmans Publishing). |
| 2003: | Obie Clayton, Ronald B. Mincy, and David Blankenhorn, eds., **Black Fathers in Contemporary American Society: Strengths, Weaknesses and Strategies for Change** (New York: Russage Sage Foundation |
| 2001 | Dana Mack and David Blankenhorn, eds., **The Book of Marriage: The Wisest Answers to the Toughest Questions** (Grand Rapids: Eerdmans Publishing). |
| 1999 | Wade F. Horn, David Blankenhorn, and Mitchell B. Pearlstein, eds., **The Fatherhood Movement: A Call to Action** (Lanham, MD: Lexington Books). |
| 1996 | David Popenoe, Jean Bethke Elshtain, and David Blankenhorn, eds.,  **Promises to Keep: Decline and Renewal of Marriage in America** (Lanham, MD: Rowman & Littlefield). |
| 1995 | **Fatherless America: Confronting Our Most Urgent Social Problem** (New York: Basic Books). |
| 1995 | Mary Ann Glendon and David Blankenhorn, eds., **Seedbeds of Virtue: Sources of Competence, Character, and Citizenship in American Society** (Lanham, MD: Madison Books). |
| 1990 | David Blankenhorn, Steven Bayme and Jean Bethke Elshtain, eds., **Rebuilding the Nest: A New Commitment to the American Family** (Milwaukee: Family Service America). |

**Essays:**     Essays on family and civil society issues have appeared in the **New York Times, Washington Post, Wall Street Journal, Los Angeles Times, USA Today, Public Interest, First Things, Christianity Today**, other publications.

**Testimony:**

1996        State Legislature, Commonwealth of Pennsylvania

1995        State Legislature, State of Michigan

1992        House of Representatives, United States Congress

**Leadership Positions:**

- Founding Chairman, National Fatherhood Initiative
- Member (appointed by President Bush), National Commission on America's Urban Families (1992)

**Personal:**

Married to Raina Sacks Blankenhorn.  Three children, a son Raymond and twin daughters, Sophia and Alexandra.  Resides in New York.

Last revised:  September 2009

## Index of Materials Considered

1.  Anthropological Quarterly, Volume 71 Number 1, January 1998

2.  Douglas Allen, *An Economic Assessment of Same-Sex Marriage Laws*, Harvard Society for Law and Public Policy, Inc., Summer, 2006.

3.  Sylviane Agacinski, *Parity of the Sexes* (New York: Columbia University Press, 2001), xiii-xiv

4.  Paul R. Amato, "The Impact of Family Formation Change on the Cognitive, Social, and Emotional Well-Being of the Next Generation," *The Future of Children* 15, no. 2 (Fall 2005): 89-90.

5.  Alan Barnard, "Rules and Prohibitions: The Form and Content of Human Kinship," in Tim Ingold (ed.), *Companion Encyclopedia of Anthropology* (London: Routledge, 1994).

6.  Barbara Barrett, *Does Gay Marriage Need Government's Help?*  The News and Observer (Raleigh), January 19, 2004.

7.  Isaiah Berlin, "Two Conceptions of Liberty," in Berlin, *Four Essays on Liberty* (Oxford, U.K.: Oxford University Press, 1969), xvii

8.  "Brief of the Professors …" *Lewis v. Harris*, Supreme Court of New Jersey, Docket 58389 (Newark, October 6, 2005), 1-2, 16.

9.  Declaration of A. Dean Byrd in Support of CCF's Motion for Summary Judgment, In the Superior Court of the County of San Francisco, No. 04-428794.

10. Declaration of Allan C. Carlson in Support of Motion for Summary Judgment/Summary Adjudication, In the Superior Court of the County of San Francisco, No. 04-428794.

11. CCF's Request for Judicial Notice, In the Superior Court of the County of San Francisco, No. 04-428794.

12. Declaration of Alan Chambers in Support of CCF's Motion for Summary Judgment, In the Superior Court of the County of San Francisco, No. 04-428794.

13. Andrew J. Cherlin, "The Deinstitutionalization of American Marriage," *Journal of Marriage and the Family* 66 (November 2004): 850.

14. Declaration of Nancy F. Cott in Opposition to Plaintiffs' Motion for Summary Judgment, in the Superior Court of the State of California, No. 04-428794

15. Declaration of Nancy F. Cott in Support of City and County of San Francisco's Constitutional Challenge to Marriage Statutes, In the Superior Court of the State of California, No. 429-539.

16. Kingsley Davis, "The Meaning and Significance of Marriage in Contemporary Society," in Davis (ed.), *Contemporary Marriage: Comparative Perspectives on a Changing Institution* (New York: Russell Sage, 1985).

17. Defendant-Intervenors' Notice of Motion and Motion for Summary Judgement, and Memorandum of Points and Authorities in Support of Motion for Summary Judgment, In the United States District Court for the Northern District of California, Case. No. 09-2292.

18. William N. Eskridge, Jr., *The Case for Same-Sex Marriage* (New York: The Free Press, 1996).

19. Helen E. Fisher, *Anatomy of Love* (New York: W. W. Norton, 1992).

20. Meyer Fortes, "Filiation Reconsidered," in Fortes, *Kinship and the Social Order* (Chicago: Aldine Publishing Company, 1969).

21. Robin Fox, *Kinship and Marriage: An Anthropological Perspective* (Baltimore: Penguin Books, 1967).

22. Suzanne G. Frayser, *Varieties of Sexual Experience: An Anthropological Perspective on Human Sexuality* (New Haven, CT: HRAF Press, 1985).

23. Eric Fuchs, *Sexual Desire and Love: Origins and History of the Christian Ethic of Sexuality and      Marriage* (New York: The Seabury Press, 1983).

24. Declaration of Maggie Gallagher in Support of CCF's Motion for Summary Judgment, In the Superior Court of the County of San Francisco, No. 04-428794.

25. William A. Galston*, Liberal Pluralism: The Implications of Value Pluralism for Political Theory and Practice* (Cambridge, U.K.: Cambridge University Press, 2002).

26. *Gay Marriage Debate will steer votes*, USA Today, February 23, 2004.

27. Norval D. Glenn, "The Struggle for Same-Sex Marriage," *Society* 41, no. 6 (September-October 2004).

28. Kathleen Gough, "Nayar: Central Kerala," in David M. Schneider and Kathleen Gough (eds.), *Matrilineal Kinship* (Berkeley: University of California Press, 1961)..

29. Sarah Blaffer Hrdy, *Mother Nature: A History of Mothers, Infants, and Natural Selection* (New York: Pantheon, 1999).

30. Claude Levi-Strauss, *The View from Afar* (New York: Basic Books, 1985).

31. Claude Levi-Strauss, "Introduction," in Andre Burguiere, Christiane Klapish-Zuber, Martine Segalen, and Francoise Zonabend (eds.), *A History of the Family:      Vol. 1, Distant Worlds, Ancient Worlds* (Cambridge: Harvard University Press, 1996).

32. John Locke, *Two Treatises on Government* (Cambridge, U.K.: Cambridge University Press, 1965; first published 1698).

33. Bronislaw Malinowski, *Sex, Culture, and Myth* (New York: Harcourt, Brace, & World, Inc., 1962).

34. Bronislaw Malinowski, *The Sexual Life of Savages in North-Western Melanesia* (Boston: Beacon Press, 1987; first published 1929).

35. *Marriage Promotion in Low-Income Familes* (Minneapolis: National Council on Family Relations, April 2003).

36. M. J. Meggitt, *Desert People* (Sydney, Australia: Angus and Robertson, 1962).

37. Kristin Anderson Moore, et. al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It?* (Washington, D.C.: Child Trends, June 2002).

38. Declaration of Steven L. Nock in Opposition to Plaintiffs' Motion for Summary Judgment, in the Superior Court of the State of California, No. 428-794.

39. Declaration of Steven L. Nock in Support of San Francisco's Reply to State of California's Opposition to Petition for Write of Mandate, in the Superior Court of the State of California, No. 428-794.

40. Douglass C. North, "Economic Performance Through Time," *The American Economic Review* 84, no. 3 (June 1994).

41. *Notes and Queries on Anthropology*, 6th Edition (London: Routledge and Keegan Paul, 1951).

42. See Opinion of the Justices, in *Goodridge vs. Department of Public Health* (Boston: Massachusetts Supreme Judicial Court, November 18, 2003).

43. Talcott Parsons, "The Incest Taboo in Relation to Social Structure and the Socialization of the Child," *The British Journal of Sociology* 5, no. 2 (June 1954).

44. Declaration of Ellen Perrin in Opposition to Plaintiffs' Motion for Summary Judgment, in the Superior Court of the State of California, No. 428-794.

45. L. P. Mair, "African Marriage and Social Change," in Arthur Phillips (ed.), *Survey of African Marriage and Family Life* (London: Oxford University Press, 1953).

46. David Popenoe, "Can the Nuclear Family be Revived?", *Society* 35, no. 5 (July-August, 1999), republished in David Popenoe, *War Over the Family* (New Brunswick: Transaction Publishers, 2005).

47. David Popenoe and Barbara Dafoe Whitehead, *The State of Our Unions 2005* (New Brunswick: Rutgers University, 2005).

48. Plaintiffs' Statement of Undisputed Material Facts in Support of CCF's Motion for Summary Judgment or in the Alternative for Summary Adjudication of Issues, In the Superior Court of the County of San Francisco, No. 04-428794.

49. Robina G. Quale, *A History of Marriage Systems* (Westport, CT: Greenwood Press, 1988).

50. R. Radcliffe-Brown, *Structure and Function in Primitive Society* (Glencoe, IL: The Free Press, 1952).

51. Jonathan Rauch, *Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America* (New York: Times Books, 2004).

52. Declaration of George A. Rekers In Support of Proposition 22's Motion for Summary Judgment/Summary Adjudication, In the Superior Court of the County of San Francisco, No. 04-428794.

53. Bertrand Russell, *Marriage and Morals* (London: George Allen & Unwin Ltd, 1929).

54. Crispin Sartwell, "'Marriage amendment' a threat to Constitution," *Philadelphia Inquirer*, February 25, 2004.

55. Declaration of Jeffrey Satinover in Support of Proposition 22's Motion for Summary Judgment/Summary Adjudication, In the Superior Court of the County of San Francisco, No. 04-428794.

56. Declaration of Jeffrey Satinover in Support of Proposition 22's Motion for Summary Judgment/Summary Adjudication, In the Superior Court of the County of San Francisco, No. 04-428794.

57. Andrew Sullivan, *Virtually Normal* (New York: Alfred A. Knopf, 1995).

58. Declaration of Randy Thomas in Support of CCF's Motion for Summary Judgment, In the Superior Court of the County of San Francisco, No. 04-428794.

*59.* Pierre van den Berghe, *Human Family Systems* (Prospect Heights, IL: Waveland Press, 1979).

60. Peter J. Wilson, *Man the Promising Primate: The Conditions of Human Evolution, 2ⁿᵈ Edition* (New Haven: Yale University Press, 1983).

61. Evan Wolfson, *Why Marriage Matters: America, Equality, and Gay People's Right to Marry*    (New York: Simon & Shuster, 2004).