# EXHIBIT G

### IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| KATHERINE VARNUM, et al.,<br><br>**Plaintiffs,**<br><br>**vs**<br><br>TIMOTHY J. BRIEN,<br><br>**Defendant.** | Case No. CV5965<br><br><br>**RULING ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT** |

This matter came before the Court for hearing on the parties' competing motions for summary judgment on May 4, 2007. Representing Plaintiffs were attorneys Dennis Johnson, Camilla Taylor, and Kenneth Upton, Jr. Representing Defendant was Assistant Polk County Attorney Roger Kuhle. Having entertained the arguments of counsel, having reviewed the parties' motions, resistances, and all supporting submissions, and being otherwise fully advised in the premises, the Court now makes its ruling on said motions.

### I. STANDARD OF REVIEW

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Robinson v. Poured Walls of Iowa, Inc., 553 N.W.2d 873, 875 (Iowa 1996); IOWA R. CIV. P. 1.981(3). The Court shall determine whether summary judgment is appropriate by first examining the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, to determine whether there is any genuine issue of material fact. IOWA R. CIV. P. 1.981(3); Wilson v. Darr, 553 N.W.2d 579, 582 (Iowa 1996). When the facts are undisputed and the only issue is what consequences flow from the facts,

summary judgment is appropriate. Smith v. CRST Int'l, Inc., 553 N.W.2d 890, 893 (Iowa 1996).

"A fact issue is generated if reasonable minds can differ on how the issue should be resolved." Schlueter v. Grinnell Mut. Reins. Co., 553 N.W.2d 614, 616 (Iowa Ct. App. 1996). "An issue of fact is 'material' only when the dispute is over facts that might affect the outcome of the suit, given the applicable governing law." Junkins v. Branstad, 421 N.W.2d 130, 132 (Iowa 1988) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The requirement of a 'genuine' issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The moving party has the burden to show the nonexistence of any genuine issue of material fact and the record must be viewed in the light most favorable to the nonmoving party. Schlueter, 553 N.W.2d at 615; Thorp Credit, Inc., v. Gott, 387 N.W.2d 342, 343 (Iowa 1986). The statement of undisputed facts submitted by the moving party does not "constitute a part of the record from which genuine issues of material fact may be determined" except insofar as the statement of undisputed facts may contain "express stipulations concerning the anticipated summary judgment ruling." Griglione v. Martin, 525 N.W.2d 810, 813 (Iowa 1994) (citing Glen Haven Homes, Inc. v. Mills County Bd. Of Review, 507 N.W.2d 179, 182 (Iowa 1993)). The statement of undisputed facts "is intended to be a mere summary of claims that must rise or fall on the actual contents of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.'" Id.

To resist the motion, the nonmoving party must set forth specific facts

constituting competent evidence to support a prima facie claim. Hoefer v. Wisconsin Educ. Ass'n Ins. Trust, 470 N.W.2d 336, 339 (Iowa 1991). If the moving party has supported its motion for summary judgment, the nonmoving party "may not rest upon the allegations or denials in his pleadings, but must show there is a genuine issue of fact." Colonial Baking Co. of Des Moines v. Dowie, 330 N.W.2d 279, 282 (Iowa 1983) (citing IOWA RULE CIV. PRO. 1.981(5)). The nonmoving party must plead "ultimate facts and cannot rely upon conclusions by themselves." Schulte v. Mauer, 219 N.W.2d 496, 500 (Iowa 1974). An expert's affidavit submitted in resistance to a motion for summary judgment must "set forth specific facts in order to create an issue of fact for trial." Bell v. Swift Adhesives, Inc., 804 F.Supp. 1577 (S.D. Ga. 1992) (citations omitted); See Brody v. Ruby, 267 N.W.2d 902, 904 (federal interpretations of Federal Rule of Civil Procedure 56 are persuasive in considering Iowa Rule of Civil Procedure 1.981). When the expert's opinion is based on speculation, hypothesis and is otherwise unsubstantiated by evidence in the record, it is inadequate to prevent the entry of summary judgment. Merit Motors, Inc. v. Chrysler Corp., 569 F.2d 666 (D.C. App. 1977).

## II. UNDISPUTED FACTS

### A. Preface to Statement of Undisputed Facts

Both the Defendant and the Plaintiffs have submitted, by affidavit, the statements of several purported expert witnesses in support of and in resistance to the opposing motions for summary judgment. In ruling on a motion for summary judgment, the Court should only consider evidence which would be admissible at trial. Pink Supply Corp. v. Hiebert, Inc., 612 F. Supp. 1334, 1338 (D.C. Minn. 1985) (citing FED.R.CIV.P. 56(e)); See McSpadden v. Mullins, 456 F.2d 428 (8th Cir. 1972); Chambers v. United States, 357

F.2d 224, 228 (8th Cir. 1966). For the reasons articulated below, this Court rejects

certain expert testimony submitted by the parties.

In order for the opinion of an expert witness to be admissible at trial, the proffered

evidence must meet several standards set forth by the Iowa Supreme Court in Leaf v.

Goodyear Tire & Rubber Co. First, the evidence must be relevant. Leaf v. Goodyear

Tire & Rubber Co., 590 N.W.2d 525, 533 (Iowa 1999) (citing IOWA R. EVID. 5.402).

Relevant evidence is "evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence" IOWA R. EVID. 5.401. Secondly, the evidence

"...must be evidence in the form of 'scientific, technical, or other specialized knowledge

[that] will assist the trier of fact to understand the evidence or to determine a fact in

issue.'" Leaf, 590 N.W.2d at 525 (citing IOWA R. EVID. 5.702). Lastly, "...the witness

must be 'qualified as an expert by knowledge, skill, experience, training or education.'"

Id. Additionally, it is not sufficient that an expert witness "be generally qualified in a

field of expertise; the witness must also be qualified to answer the particular question

propounded." Tappe v. Iowa Methodist Medical Center, 477 N.W.2d 396, 402 (Iowa

1991).

If a case is particularly complex, the Iowa Supreme Court has indicated that a trial

court is free to utilize one or more relevant considerations articulated by the United States

Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc.. Leaf, 590 N.W.2d at

533. The Court, pursuant to Daubert, is free to consider the following factors in

evaluating the reliability of expert testimony: "(1) whether the theory or technique is

scientific knowledge that can and has been tested, (2) whether the theory or technique has

4

been subjected to peer review or publication, (3) the known or potential rate of error, or (4) whether it is generally accepted within the relevant scientific community." Leaf, 590 N.W.2d at 533 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94, 113 S.Ct at 2797, 125 L.Ed.2d at 483 (1993)). The United States Supreme Court has since extended the application of Daubert to all expert testimony involving "technical and other specialized knowledge" See Kumho Tire Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**1. The Defendant's Expert Witnesses:**

The Plaintiffs object to several of the Defendant's expert witnesses. First, the Defendant has submitted the statement of Margaret Somerville. Ms. Somerville possesses a post-graduate degree in comparative law and is the Founding Director of the McGill Centre for Medicine, Ethics and Law. Ms. Somerville describes herself as:

> an ethicist with expertise in ethical aspects of new technoscience, including new reproductive technologies, which requires taking into account their impact on social values, including in the context of marriage, and the cultural meaning, symbolism and moral values that traditional marriage places around the inherently procreative male/female relationship, thereby protecting that relationship and the children who result from it.

Ex. F, Appendix to Defendant's Reply Brief and Brief in Resistance to Plaintiffs' Motion for Summary Judgment, Vol. 1 (hereafter "Defendant's Appendix"). Ms. Somerville intends to testify "about the ways in which redefining marriage to include same-sex couples would undermine these roles of the institution of marriage, in turn undermining marriage's ability and society's capacity to protect the inherently procreative relationship and the children who result from it, and related matters." Id at 1-2. She also intends to testify regarding "the impact that redefining marriage to include same-sex couples would

have on the affiliative rights of children to relationships with their biological parents, and related matters." Id at 2. The Defendants have also submitted the statements and deposition of Paul Nathanson, Ph.D. Dr. Nathanson is a senior researcher in the Department of Religious Studies at McGill University and possesses a Ph.D. in Religious Studies. Nathanson indicates that he possesses expertise in the areas of: "the relation between religion and secularity; ethics (new reproductive technologies; children's rights); popular culture (family and marriage); and gender (especially, maleness/masculinity)." Ex. C, Defendant's Appendix. He indicates that he will testify "regarding the significance of marriage as a social institution and the state's role in maintaining it, and related matters." Id. The Defendant also submits the testimony of Dr. Katherine Young, a professor of Religious Studies at McGill University. Dr. Young also possesses a Ph.D. in Religious Studies. Dr. Young seeks to testify on "what universally constitutes marriage and why." Ex. H, Defendant's Appendix.

The Court believes that the proposed expert testimony of Ms. Somerville, Dr. Nathanson and Dr. Young would be inadmissible at trial. Though the testimony of these individuals is potentially relevant to assist the trier of fact in determining what the State may have considered to be rational bases for the enactment of Iowa Code §595.1, the Court does not believe that the expected testimony of these individuals is scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue as required by the Iowa Rules of Evidence and Leaf. Leaf, 590 N.W.2d at 525 (citing Iowa R. Evid. 5.702). Additionally, the Court concludes that these individuals are not qualified to testify as experts regarding the issues in this matter. Id. Though they may have expertise in certain areas, such expertise is

insufficient to qualify Ms. Somerville, Dr. Young and Dr. Nathanson to answer the

particular questions that they are asked. Tappe, 477 N.W.2d at 402. Though these

experts desire to make statements regarding gender, results of same-sex marriage on

children and the universal definition of marriage, they do not appear to possess expertise

in relevant fields such as sociology, child development, psychology or psychiatry. Ms.

Somerville specifically eschews empirical research and methods of logical reasoning in

favor of "moral intuition." She has no training in empirical research and admits having

no knowledge of existing social science research relevant to this case. She concedes that

her views do not reflect the mainstream views of other ethicists. Dr. Young claims that

she pulls together factors from many academic disciplines, including sociological,

economic, political and religious factors, though she does not profess expertise in these

areas. Nathanson indicates that his methodology involves observing "what people say

about religion." The views espoused by these individuals appear to be largely personal

and not based on observation supported by scientific methodology or based on empirical

research in any sense. They do not meet the criteria for the admission of expert

testimony under the Iowa Supreme Court's test in Leaf and certainly fail the more

stringent test articulated by the United States Supreme Court in Daubert.

The Defendant also submits the statements of Allan Carlson, Ph.D. Dr. Carlson

possesses a Ph.D. in Modern European History and is the President of the Howard Center

for Family, Religion & Society. Carlson intends to testify as to "the history and public

purposes of marriage in the United States and the relationship of marriage to broader

family policy." Ex. A, Defendant's Appendix. The consequences of marriage for

children are relevant factual determinations to be made in this case. Though Carlson

7

proposes to testify regarding the importance of marriage to children and family policy, he

also conducts no empirical data collection and possesses no formal training in empirical

research. He has no formal training in a relevant social science discipline enabling him to

make reasoned and informed conclusions regarding the impact of marriage on children.

This Court does not believe that Dr. Carlson possesses scientific, technical or specialized

knowledge which will assist the trier of fact in its determination of whether a rational

basis exists for preventing same-sex marriage. Leaf, 590 N.W.2d at 525 (citing IOWA R.

EVID. 5.702). Despite Carlson's impressive academic credentials, the Court does not

believe he possesses the knowledge or experience to answer the specific questions

propounded to him. See Tappe, 477 N.W.2d at 402.

The Defendant also submits the statements of purported economist Dr. Steven

Rhoads. Dr. Rhoads possesses a Ph.D. in government and an M.P.A. in Economic

Analysis and Public Policy. Dr. Rhoads describes his research as "…big synthetic stuff

and wander[ing] into other people's territories." Dr. Rhoads indicates that he intends to

testify "regarding the significance of marriage in an overall scheme of laws and public

policy founded on an accurate understanding of biological differences between men and

women, the ways in which typical male and female parenting styles each contribute

uniquely to the healthy development of children and related matters." Dr. Rhoads has no

expertise relating to child development nor has he conducted any empirical research

concerning same. The Court believes that Rhoad's testimony will not provide the trier of

fact with scientific, technical, or other specialized knowledge that will assist the trier of

fact to understand the evidence or to determine a fact in issue as required by the Iowa

Rules of Evidence and Leaf. Leaf, 590 N.W.2d at 525 (citing Iowa R. Evid. 5.702). Dr.

Rhoad's admitted "wandering" into other disciplines is further indication that he lacks the qualifications to answer the specific questions posed in this case. *See* <u>Tappe</u>, 477 N.W.2d at 402.

As a consequence, none of the factual propositions contained in "Defendant's Statement of Material Facts in Dispute Which Bar Plaintiff's Motion for Summary Judgment" which come from these experts are admissible and they will not be considered for that reason. The Plaintiffs concede that the Defendant's three remaining experts - Alan Hawkins, Warren Throckmorten, and Sharon Quick - are "professionals in potentially relevant fields (medicine, mental health, or child development)". As such, the Court will consider the statements of these experts to the extent they are relied upon by the Defendant.

**2. The Plaintiffs' Expert Witnesses:**

The Plaintiffs have also submitted the statements of several purported experts in resistance to the Defendant's motion for summary judgment and in support of their own motion for summary judgment. The Defendants specifically object to a few of the Plaintiffs' expert witnesses. With regard to the remainder of the Plaintiffs' experts, the Defendant attacks the weight to be given to their testimony, but does not specifically challenge its admissibility. The Defendant also alleges that many of the Plaintiffs' expert witnesses exhibit bias or are "advocates." However, the potential bias exhibited by a witness also goes to the weight of the evidence and not to the admissibility of the evidence. <u>Hubby v. State</u>, 331 N.W.2d 690, 698 (Iowa 1983).

The Defendant objects to the proffered testimony of Plaintiffs' expert witness, Dan Johnston. Mr. Johnston is licensed to practice law in the State of Iowa and served as

the Polk County Attorney from 1977 – 85.  He also served as an Assistant Iowa Attorney

General.  Mr. Johnston purports to be an expert on anti-gay bias and discrimination in

Iowa, the efforts of gays and lesbians to exercise political power and the obstacles faced

by the gay and lesbian community.  Such facts would be potentially relevant in this case.

However, while Mr. Johnston's statement recounting his life experience as a gay man in

Iowa is an emotional one, it is essentially anecdotal and, for that reason, the Court does

not believe that Mr. Johnston's statements are admissible as expert testimony, as Mr.

Johnston's personal experiences do not provide scientific, technical, or other specialized

knowledge as required by Leaf and Iowa Rule of Evidence 5.702.  Leaf, 590 N.W.2d at

525 (citing IOWA R. EVID. 5.702).

    The Defendant also objects to the statements of purported expert witness Mr. John

Schmaker.  Mr. Schmaker is currently the Chief Financial Officer for the Central Iowa

Chapter of the American Red Cross and has previously been employed by several other

organizations including the Iowa Democratic Party, the Greater Iowa Chapter of the

Alzheimer's Association, the Varsity Café, and the Iowa Communications Group.  Mr.

Schmaker purports to be an expert on anti-gay bias and discrimination in Iowa, the efforts

by gays and lesbians to exercise political power and the obstacles they face in the

exercise of political power.  Testimony regarding the political power of gays and lesbians

and the discrimination they face in Iowa could be relevant to determining facts of

consequence in this case.  However, much like Mr. Johnston, the Court believes that Mr.

Schmaker's statements are also essentially anecdotal as they are all based on his personal

experiences while living in Iowa.  For that reason, his testimony likewise does not

constitute scientific, technical, or other specialized knowledge and would not be admissible at trial. Leaf, 590 N.W.2d at 525 (citing Iowa R. Evid. 5.702).

The Defendant also objects to the statements of Plaintiffs' expert witnesses Sharon Malheiro and Deborah Tharnish, attorneys licensed to practice law in the State of Iowa. Ms. Malheiro has represented gay and lesbian clients in over 200 family-related matters. Ms. Tharnish has participated in over 100 adoption proceedings, approximately 10 of which have involved same-sex couples. Both Ms. Tharnish and Ms. Malheiro intend to testify as to their experiences as attorneys with regard to certain legal difficulties or financial costs faced by gay and lesbian individuals because of their inability to marry. Their statements regarding these challenges and costs involve facts of consequence in this case such that their testimony would be relevant. *See* Iowa R. Evid. 5.401. Ms. Malheiro's testimony as to the legal challenges and costs incurred by gay couples is also evidence in the form of specialized knowledge that would assist the trier of fact. *See* Leaf, 590 N.W.2d at 525 (citing Iowa R. Evid. 5.702). She is qualified to testify with regard to these specific issues by reason of her experience as an attorney representing gay and lesbian clients in approximately 200 family-related matters. Id. Ms. Tharnish's testimony regarding the requirements for adoption and, more specifically, same-sex adoption is also evidence in the form of specialized knowledge. Id.  Ms. Tharnish is qualified to testify with regard to these matters by virtue of her experience as an attorney having participated in 100 adoptions, including several same-sex adoptions. Both Ms. Tharnish's and Ms. Malheiro's testimony would be admissible as expert testimony at trial and as such, their statements are properly considered by this Court.

### 3. Sources of Undisputed Facts

This Court considers certain facts to be undisputed because they are expressly admitted by the parties. *See* Plaintiffs' "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment", "Defendant's Response to Plaintiffs' Statement of Material Facts", "Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment", "Amended Statement of Undisputed Facts by Defendant Timothy Brien", "All Plaintiffs' Resistance to Defendant's Motion for Summary Judgment" (p.1), and "Reply in Support of All Plaintiffs' Motion for Summary Judgment" (p.1).

Defendant has denied "for lack of knowledge" a number of other facts contained in the "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment." *See* "Defendant's Response to Plaintiffs' Statement of Material Facts." These denials for lack of knowledge are not accompanied by any specific references to the record as required by Iowa Rule of Civil Procedure 1.981(5) and (8). The facts which have been denied for lack of knowledge by Defendants (indeed all the facts contained in the "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment") <u>are</u> accompanied by specific references to the record. Further, it appears to the Court that none of them are contradicted by any of the admissible facts (*See* "Preface to Statement of Undisputed Facts" above) contained in "Defendant's Statement of Material Facts in Dispute Which Bar Plaintiffs' Motion for Summary Judgment" <u>nor</u> are they contradicted by any of the facts contained in either "Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment"or the "Amended Statement of Undisputed Facts by Defendant Timothy Brien", none of which are disputed

by Plaintiffs. For all these reasons, the Court considers all of the facts contained in the "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment", which were denied for lack of knowledge by Defendant, as undisputed.

Finally, Defendant has denied – without any qualification – certain other facts contained in the "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment." *See* "Defendant's Response to Plaintiffs' Statement of Material Facts." Those facts are all accompanied by references to the record but, once again, Defendant's denials are not. None of these facts are contradicted by any of the facts contained in either "Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment" or the "Amended Statement of Undisputed Facts by Defendant Timothy Brien." Careful examination of the record reveals that none of these facts are contradicted by any of the admissible facts in "Defendant's Statement of Material Facts in Dispute Which Bar Plaintiffs' Motion for Summary Judgment," either.

Paragraph 2 of Defendant's Statement of Material Facts in Dispute Which Bar Plaintiffs' Motion for Summary Judgment reads as follows:

> 2.  Gay couples choose to bring children into the relationship by way of adoption or other means.

The Court believes the operative word in this paragraph is "choose." Defendant and his authorities strive to make the point that same-sex couples do not procreate by accident. In other words, because they have to utilize methods such as adoption or artificial insemination to have children, their decisions are viewed as necessarily involving planning and investment of resources. On the other hand, heterosexual couples may procreate and frequently do procreate without forethought or planning, which gives rise to the purported governmental interest in encouraging heterosexual couples to

procreate responsibly, i.e., within the context of a stable, committed relationship –

marriage. The Court does not perceive any substantial disagreement between the parties

on this proposition. *See*, e.g., par. 73 of "Statement of Material Facts in Support of All

Plaintiffs' Motion for Summary Judgment."

Paragraphs 10 and 11 of the same statement read as follows:

10.     Social science literature demonstrates that children who are reared by
        a married mother and father have more positive outcomes on a wide
        variety of important factors compared to children in other adequately
        studied family structures, and these outcome differences exist even
        when controlling statistically for important socio-demographic
        differences between children reared in different family structures.
        Ex. B.

11.     Children reared in a stable married family are likely to do better on
        various measures of educational attainment; exhibit fewer behavioral
        problems, including conduct disorders, alcohol and drug abuse, and
        juvenile delinquency; will not be as likely to engage in criminal
        behavior as adults; engage in sexual relations as teenagers, and to
        experience an unwed pregnancy; have a decreased risk for
        mental/emotional illness; have a decreased risk of physical illness and
        infant mortality; experience decreased risk of suicide; have a greater
        average life expectancy; likely to benefit from high levels of parental
        investment, commitment, and closeness (particularly with their
        fathers); be victims of physical and sexual abuse; experience higher
        levels of family stability as adults, including a decreased divorce risk.
        Ex. B.

However, Dr. Hawkins makes it clear in his deposition that he has not read the

vast majority of the studies concerning gay and lesbian parenting, that he has performed

no related research himself and that he is unaware of the existence of many recently-

published studies cited by Plaintiffs' expert, Michael Lamb. Hawkins Deposition

Transcript, page 33, lines 3-13; page 98, line 16; page 110, line 25. Because he

admittedly is unable to evaluate current social science regarding gay and lesbian

parenting generally or critique the methodology upon which that science is based, Dr.

Hawkins apparently is not commenting upon the relative frequency of positive outcomes

in child-rearing by heterosexual couples as opposed to same-sex couples nor apparently is

he commenting upon how children do by various measures when reared by stably

married heterosexual couples as opposed to same-sex couples.  Given this understanding

of his opinions, it is apparent to the Court that what is said in paragraphs 10 and 11 is not

disputed by Plaintiffs' evidence.  *See* p. 6, "Reply in Support of All Plaintiffs' Motion for

Summary Judgment."

Paragraph 17 of the same statement reads as follows:

Some kind of change in sexual behavior, desire and/or identity over time is not
theoretically unfounded or empirically unprecedented for at least some people.
Ex. G.

Plaintiffs admit that their evidence does not conflict with this statement.  *See* p. 6,

"Reply in Support of All Plaintiffs' Motion for Summary Judgment."

Paragraph 23 of the same statement is purportedly derived from Plaintiffs' own

exhibits, specifically Plaintiffs' Exhibit 15.  The Court's review of Exhibit 15 does not

reveal any support for this proposition.  However, the Court's review of the transcript of

the deposition of Dr. Greg Hereck, one of Plaintiffs' experts, supports the proposition that

"expressions of hostility" towards people with AIDS and "anti-gay prejudice" are

"correlated."  *See* Hereck Deposition, pages 80-87.  Consequently, paragraph 23 is

stricken because it is not supported by the record cited.  However, it is not disputed that

expressions of hostility towards persons afflicted with AIDS and anti-gay prejudice are

correlated.

Finally, as to paragraph 24 of the same statement, no record support is cited and,

therefore, the paragraph is stricken.

As stated previously, it is therefore the Court's conclusion that, for all the foregoing reasons, there is no dispute as to all those facts contained in the "Statement of Material Facts in Support of All Plaintiffs' Motion for Summary Judgment" which were "denied" in "Defendant's Response to Plaintiffs' Statement of Material Facts," excepting those based upon the affidavits of Messrs. Johnson and Schmaker.

## B. Material Facts as to Which There is No Genuine Issue

### 1. The Parties

**1.** Plaintiffs each have chosen and consented to marry the one unique person who is irreplaceable to them and with whom they have formed a deeply intimate bond and share daily family life, but have been denied this right by the government.

**2.** Plaintiffs are twelve lesbians and gay men, who comprise six same-sex couples, who reside throughout the State of Iowa and who wish to marry their partners in Iowa. Minor Plaintiffs are the children of two of Plaintiff couples.

**3.** The Plaintiffs are same sex couples who have applied for and were denied marriage licenses by the Defendant Timothy J. Brien, acting in his official capacity as the Recorder for Polk County, Iowa.

**4.** Plaintiffs Katherine Varnum ("Kate"), 33, and Patricia Varnum ("Trish"), 41, are a lesbian couple who reside in Cedar Rapids. Kate and Trish have been in a loving, committed relationship for almost 6 years. They have had a commitment ceremony and intend to become parents.

**5.** Plaintiffs Jennifer BarbouRoske ("Jen"), 36, and Dawn BarbouRoske ("Dawn"), 38, are a lesbian couple residing in Iowa City with their two daughters, McKinley and Breeana. Jen and Dawn have been in a loving, committed relationship for

over 16 years. They have had a private commitment ceremony and are registered domestic partners in Iowa City.

6. Plaintiffs David Twombley ("David"), 65, and Lawrence Hoch ("Larry"), 64, are a gay male couple residing in Urbandale. David and Larry have been in a loving, committed relationship for over 5 years, and obtained a civil union in a private ceremony in Vermont in 2002.

7. Plaintiffs Jason Morgan ("Jason"), 36, and Charles Swaggerty ("Chuck"), 34, are a gay male couple residing in Sioux City. Jason and Chuck have been in a loving, committed relationship for 9 years, are licensed foster parents, and intend to adopt in the future.

8. Plaintiffs William M. Musser ("Bill"), 48, and Otter Dreaming ("Otter"), 49, are a gay male couple residing in Decorah. They have been together as a same-sex couple in a loving, committed relationship for over 5 years, obtained a civil union in Vermont in 2002, are licensed foster parents and intend to adopt in the future.

9. Plaintiffs Ingrid Olson ("Ingrid"), 28, and Reva Evans ("Reva"), 32, are a lesbian couple residing in Council Bluffs with their son, Jamison Olson. Ingrid and Reva have held a commitment ceremony and have been in a loving, committed relationship for 9 years.

10. Minor Plaintiff McKinley BarbouRoske ("McKinley") is the older daughter of Jen and Dawn, her legal parents. Jen gave birth to McKinley in 1998 after conceiving via donor insemination. McKinley became Dawn's legal daughter via an adoption in which Jen also joined.

**11.** Minor Plaintiff Breeanna BarbouRoske ("Bre") is the younger daughter of Jen and Dawn, her legal parents. In 2002, Bre was an Iowa foster child who was placed in Jen and Dawn's home at three weeks old. In 2003, Jen and dawn jointly adopted Bre.

**12.** Minor Plaintiff Jamison Olson is the son of Ingrid and Reva, his legal parents. Reva gave birth to Jamison in 2006. In September, 2006, Ingrid adopted Jamison.

**13.** Defendant Timothy J. Brien ("Brien") was at all times relevant the Polk County Recorder and the Polk County Registrar.

**14.** Julie M. Haggarty is the current Polk County Recorder and the Polk County Registrar.

## 2. Defendant's Denial of Marriage Licenses and Applications to Plaintiffs

**15.** As Polk County Recorder and the Polk County Registrar, Brien and his agents and employees ("Defendant"), furnished and processed applications for licenses to marry in Iowa, including accepting and denying applications for marriage licenses.

**16.** At all relevant times, Defendant executed these duties from the Office of the Polk County Recorder in Des Moines, Polk County, Iowa.

**17.** On various dates between November 23, 2005 and January 24, 2006, each Plaintiff appeared in person with his or her partner at the Des Moines office of Defendant, accompanied by a suitable witness and prepared to tender the required application fee and identification documents to obtain a marriage license.

**18.** Each Plaintiff couple attempted to submit their application for a marriage license to Defendant in order that they could marry each other in the State of Iowa.

**19.** In each case, Defendant refused to accept Plaintiffs' applications for marriage licenses or to issue marriage licenses to Plaintiffs, citing Iowa law, "gender restrictions" in the law or the fact that the couple was a same-sex couple.

**20.** On or about November 23, 2005, Jen BarbouRoske and Dawn BarbouRoske appeared in person, accompanied by a witness and prepared to tender the application fee and identification documents, at the office of the Polk County Recorder. The two women asked to submit their application for a marriage license so that they could marry each other in the State of Iowa. An agent or employee of Defendant Brien told them that, under the Iowa Code, she could not accept their application to marry.

**21.** On or about November 29, 2005, David Twombley and Larry Hoch appeared in person, accompanied by a witness and prepared to tender the application fee and identification documents, at the office of the Polk County Recorder. The two men asked to submit their application for a marriage license so that they could marry each other in the State of Iowa. At that time, an agent or employee of Defendant Brien refused to accept their application, stating that to do so would violate Iowa law.

**22.** On or about November 29, 2005, Jason Morgan and Chuck Swaggerty appeared in person, accompanied by a witness and prepared to tender the application fee and identification documents, at the office of the Polk County Recorder. The two men asked to submit their application for a marriage license so that they could marry each other in the State of Iowa. At that time, an agent or employee of Defendant Brien refused to accept their application on the ground that people of the same sex legally cannot marry in the State of Iowa.

**23.** On or about November 30, 2005, Ingrid Olson and Reva Evans appeared in person, accompanied by a witness and prepared to tender the application fee and identification documents, at the office of the Polk County Recorder. The two women asked to submit their application for a marriage license so that they could marry each other in the State of Iowa. An agent or employee of Defendant Brien refused to accept their application, stating that, under the Iowa Code, marriage is exclusively between a man and a woman.

**24.** On or about December 2, 2005, Kate Varnum and Trish Hyde appeared in person, accompanied by a witness and prepared to tender the application fee and identification documents, at the office of the Polk County Recorder. The two women asked to submit their application for a marriage license so that they could marry each other in the State of Iowa. Upon learning that the two are both women, an agent or employee of Defendant Brien refused to permit them to apply for a marriage license because of what were described as "gender specifications" in the Iowa Code.

**25.** On or about December 5, 2005, Bill Musser and Otter Dreaming informed the office of the Polk County Recorder by telephone that they intended to drive to Polk County in order to submit an application to marry in the State of Iowa in person. At that time, an agent or employee of Defendant Brien told them that, even if they did so, the office would refuse to accept their application on the ground that people of the same sex legally cannot marry in Iowa.

**26.** Plaintiffs otherwise met all legal requirements to obtain a marriage license and to marry in Iowa.

27. Polk County Recorder and Polk County Registrar Timothy J. Brien, and his agents and employees, denied Jen BarbouRoske and Dawn BarbouRoske, David Twombley and Larry Hoch, Jason Morgan and Chuck Swaggerty, Ingrid Olson and Reva Evans, Kate Varnum and Trish Hyde, and Bill Musser and Otter Dreaming the opportunity to apply for and obtain marriage licenses solely because each of them wish to marry a partner of the same sex.

28. That the Defendant Brien did deny Plaintiffs' request because the Iowa Legislature has enacted §595.2, Iowa Code which in essence provides that only persons of the opposite sex may marry in the state of Iowa when it states: "Only a marriage between a male and female is valid."

29. The Code also requires that the applicants for a marriage license meet other criteria regarding their ages, consent, competency and not being related by a certain degree of consanguinity, etc. §§595.2, 595.3 and 595.13, Iowa Code. Defendant concedes the adult Plaintiffs met all those other eligibility criteria.

30. Iowa Code §§ 595.2(1) and (20) were passed in response to marriage litigation brought by same-sex couples in Hawaii in order to ensure that lesbian and gay people are treated unequally to everyone else in Iowa with respect to their relationships.

31. Defendant does not contest that the Plaintiffs are in committed relationships for the purpose of this motion but states that none of the personal circumstances of the Plaintiffs were considered in the decision not to accept Plaintiffs' application. The reasons for not accepting the license application were purely legal.

## 3. Harms from the Denial of Marriage Rights

32. Plaintiffs proceed solely on claims under the Iowa Constitution.

**33.** Plaintiffs and their families are harmed in numerous tangible and intangible (including dignitary) respects by their exclusion from the right to marry in Iowa.

**34.** As a result of their exclusion from the civil institution of marriage, Plaintiffs, their relationships and their families are stigmatized and made more vulnerable in comparison to heterosexuals. Through the marriage exclusion the State devalues and de-legitimizes relationships at the very core of the adult Plaintiffs' sexual orientation and expresses, compounds, and perpetuates the stigma historically attached to homosexuality, for them and all gay persons.

**35.** Plaintiffs suffer great dignitary harm because the State's denial to Plaintiffs of access to an institution, so woven into the fabric of daily life and so determinative of legal rights and status, amounts to a badge of inferiority imposed on them and Minor Plaintiffs. Plaintiffs are continually reminded of their own and their family's second-class status in daily interactions in their neighborhoods, workplaces, schools, and other arenas in which their relationships and families are poorly or unequally treated, or are not recognized at all.

**36.** Because their parents cannot marry, Minor Plaintiffs are subjected to the historical stigma of "illegitimacy" or "bastardy" which, though of diminished social and legal force, is still a status widely considered undesirable. Minor Plaintiffs also experience the effects of stigma directed at them and at their parents because of how their parents are treated unequally by the government as a result of their parents' sexual orientation. The Minor Plaintiffs would benefit from having even the threat of such stigma removed from their lives.

**37.** Without access to the institution, familiar language and legal label of marriage, Plaintiffs are unable instantly or adequately to communicate the depth and permanence of their commitment to others, or to obtain respect for that commitment, as others do simply by invoking their married status.

**38.** Plaintiffs' inability to marry their chosen partners is a painful frustration of their life goals and dreams, their personal happiness and their self-determination.

**39.** Civil marriage in Iowa is the only gateway to an extensive legal structure that protects a married couple's relationship and family in and outside the State. Iowa reserves an unparalleled array of rights, obligations and benefits to married couples and their families, privileging married couples as a financial and legal unit and stigmatizing same-sex couples.

**40.** Plaintiffs and their families are in just as much or more need of the rights, obligations, benefits and privileges of marriage as heterosexuals and their families, but cannot access them.

**41.** Plaintiffs are harmed in an infinite number of daily transactions as a result of being denied the right to marry, including transactions with employers, hospital, courts, preschools, insurance companies, businesses such as health clubs, and public agencies including taxing bodies.

**42.** As a result of their exclusion from marriage, Plaintiffs and their children or future children may be denied the full benefit of laws that determine custody, visitation, child and spousal support, and parentage.

**43.** Marriage uniquely secures the legal bonds between parents and children welcomed into their home. Plaintiffs who are or will be parents, as well as their children,

are significantly harmed by their inability to access the presumptions of parenthood afforded to married couples. The child of a married woman who was conceived via donor insemination automatically is considered to have a legal parent-child relationship with both spouses even though there is no biological or genetic tie to one parent. Thus, if Plaintiffs were able to marry, adoptions (which are costly, time-consuming, and invasive of privacy) would not be necessary. Likewise, with marriage, a child who has had only one legal parent could be readily adopted by a same-sex spouse as a stepparent upon the consent of the partner, saving substantial time, money and uncertainty.

**44.** Plaintiffs incur significant expenses to secure parent-child relationships that automatically would be secured if Plaintiffs were married, rendering funds unavailable for other uses such as educational savings for the children. The alternative of "second-parent adoption" by one's partner, even where available and within the couple's financial means, is a laborious, intrusive, lengthy and expensive process, during which the partner and the child have a legally insecure relationship that is at risk. Some Plaintiffs have found it difficult to afford the expenses of adoption.

**45.** Plaintiffs are denied the automatic spousal right to make health care decisions for a partner when the partner cannot, including the right to withhold or withdraw life-sustaining procedures and the right to donate a spouse's organs and tissues. A spouse has the unquestioned right to make important medical decisions for an incapacitated partner, but Plaintiffs cannot walk into a hospital in an emergency and count on equal treatment. Documents like health care proxies must be carried at all times as proof to have a chance of being honored, but emergencies do not always allow Plaintiffs time to prepare.

46. Iowa law also grants married couples such additional protections as the right to make decisions concerning admission to or transfer from a healthcare facility, the right to receive medical information from a mental health professional, the right to request the release of a patient from a mental hospital, and the right to make crucial decisions concerning burial, autopsies, handling and disposition of remains, and even anatomical gifts.

47. Plaintiffs are denied economic and property protections that married persons have upon the death of one member of the couple, such as intestacy rights permitting a spouse to inherit automatically from the deceased spouse's estate if there are no parents or issue; the ability to elect the minimum one-third share of the deceased's estate even if there is a will; the right to an allowance or to occupy the marital homestead while the estate is being settled; the right to file a wrongful death lawsuit when a spouse is killed, and presumptions benefiting spouses in the absence of a designated beneficiary for death benefits and life insurance policies.

48. A Plaintiff whose partner dies as a result of a workplace accident at an eligible job would be denied the right to file for or receive workers' compensation death benefits that a surviving spouse could pursue, even though the employee may pay precisely the same taxes and insurance premiums as their work colleagues.

49. Spouses of public employees are often entitled to pension benefits, including death benefits that are not available to unmarried partners. Spouses of public employees who receive health insurance under a state plan also may request the continuation of coverage after the death of the public employee and will have the same status as a public employee with regard to the plan.

50. Plaintiffs are deprived of numerous spousal rights under tax laws, including the option to file jointly to reduce tax liability, and tax benefits when transferring or inheriting interests in real and personal property. Spouses also receive deductions on the state income taxes and other protections in the tax code, as well as protection from creditors.

51. Marriage also imposes reciprocal responsibilities on spouses, such as the legal requirement that they provide each other with financial support or face legal redress in certain circumstances, such as if one spouse is a recipient of public assistance. Thus, Iowa laws make it easier for married couples to own property jointly and communally and recognize married couples as economic units. Although Plaintiff couples have intertwined their finances and are committed to care for one another financially as well as emotionally, they are deprived of significant legal and economic help in doing so.

52. In addition to legal rights and obligations embodied in Iowa statutes, many private parties rely on the State's definition of a "spouse" in providing benefits and protections, such as from employers, banks, and insurers. Plaintiffs and their children therefore suffer deprivation of many privately conferred benefits and protections as well. Significantly, health insurance coverage, is frequently available through an employee health plan for a spouse, but infrequently for an employee's same-sex partner. Further, unlike spousal coverage, an employer's contribution to any domestic partner coverage that is provided is deemed additional taxable income to the employee under both state and federal law. Under COBRA laws, domestic partner coverage need not be offered for continuation after a job ends. An uninsured partner must find a job that provides insurance coverage to employees (sometimes leaving a child in daycare), find another

source of group insurance, obtain an individual insurance policy with higher premiums and deductibles, or run the risks of remaining uninsured.

53. Likewise, auto or home insurance, membership fees to health and swim clubs, and other expenses offered at a discount for families or spouses may be unavailable to Plaintiffs and their families. For example, Iowa law specifies that spouses are authorized drivers on each other's car rentals. Same-sex partners, who typically are viewed as two unrelated individuals who might as well be strangers to one another, often face additional costs for comparable access or coverage, when it is even possible to obtain. The many added costs faced by same-sex couples like Plaintiffs stretch their financial means and leave them and their children with fewer resources.

54. Despite the efforts of some Plaintiffs with means to protect their families and commitments insofar as is possible with legal documents such as will, these piecemeal efforts are costly, and many may be revoked and/or undone by a court. It is impossible for Plaintiffs by any alternate means to come close to achieving the security and certainty that the law automatically affords to married spouses, nor do Plaintiffs have any means to access countless benefits reserved to married persons and children of the marriage.

**4. Sexual Orientation and Same-Sex Relationships**

55. "Sexual orientation" refers to an enduring pattern or disposition to experience sexual, affectional, or romantic desires for and attractions primarily or exclusively to members of a different sex ("heterosexual') or the same sex ("homosexual"), or to experience a significant degree of attraction to both men and women ("bisexual").

56. Sexual orientation is a characteristic of the individual, like biological sex, gender identity, race or age, that is always defined in relational terms and necessarily

involves relationships with other individuals. Sexual orientation is integrally linked to the intimate personal relationships that human beings form with others to meet their deeply felt needs for love, attachment and intimacy. One's sexual orientation defines the universe of persons with whom one is likely to find the satisfying and fulfilling relationships that, for many individuals, comprise an essential component of human identity and life. The bonds formed in these relationships encompass not only sexual behavior, but also nonphysical affection between partners, shared goals and values, mutual support, and ongoing commitment.

**57.** Homosexuality is a normal expression of human sexuality. Although homosexuality once was classified as a mental disorder or abnormality, empirical research since the 1950's consistently has failed to provide an empirical or scientific basis for this view, which has been renounced by professionals in multiple disciplines.

**58.** As lesbians and gay men, each of the Plaintiffs experiences an innate attraction to people of the same sex. Plaintiffs cannot help (and would not change) that they have fallen in love with a person of the same sex.

**59.** A person's sexual orientation is highly resistant to change.

**60.** Interventions aimed at changing an individual's sexual orientation have not been demonstrated by empirical research to be effective or safe. They are considered ethically suspect, and have generated cautionary statements from virtually all of the major mental health professional associations because such interventions can be and have been harmful to the psychological well-being of those who attempt them.

**61.** Some kind of change in sexual behavior, desire and/or identity over time is not theoretically unfounded or empirically unprecedented for at least some people.

62. Sexual orientation is a trait unrelated to ability. It bears no relation to a person's ability to perform, to contribute to, or to participate in society, and one's sexual orientation (whether heterosexual, homosexual or bisexual) implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.

63. Being gay or lesbian poses no inherent obstacle to leading a happy, healthy and productive life. Gay and lesbian persons have the capacity to form and are successful at forming lasting, committed, healthy, and mutually satisfying intimate relationships, just as heterosexual persons do, and which are equivalent to heterosexual relationships. The prevalence and durability of same-sex relationships are striking especially considering lack of access to marriage and marriage's attendant obstacles to separation. Marriage offers unique benefits beyond the material necessities of life, including increased relationship durability, higher levels of reported happiness, physical and mental health benefits, and decreased stress during times of illness or death of a partner. Gay and lesbian persons who wish to marry are likely to benefit in the ways that heterosexuals do.

## 5. Sexual Orientation, Male and Female Parenting, and Parenting by Same-Sex Couples.

64. Iowa's interest in the welfare of children of lesbian and gay parents is as great as its interest in the welfare of any other children.

65. More than 5800 same-sex couples live in Iowa. There are same-sex couples in literally every Iowa county. Approximately 37% of same-sex couple households in Iowa are raising children under 18. Approximately 3158 of Iowa's children are living in households headed by same-sex couples.

66. Gay couples choose to bring children into the relationship by way of adoption or other means.

67. Lesbian and gay individuals and couples, including some of the Plaintiff couples, have been licensed by the State of Iowa as, and have served as, foster parents.

68. Under Iowa's adoption law, assuming all other legal requirements are met, a lesbian or gay couple may adopt jointly, or one partner may adopt his or her partner's child, in each case giving the child two permanent parent-child relationships with parents of the same sex.

69. Factors accounting for children's adjustment in both "traditional" and "non-traditional" family structures, including families headed by same-sex couples, include: 1) the quality of a child's relationship with the parent who is primarily responsible for his or her care; 2) the quality of the child's relationship with a second parent figure, if the child has two important parental figures; 3) the quality of the adults' intimate relationship, with conflict predicting maladjustment and a harmonious relationship predicting healthy adjustment; and, 4) the availability of economic resources, with adequate resources predicting better adjustment.

70. Social science literature demonstrates that children who are reared by a married mother and father have more positive outcomes on a wide variety of important factors compared to children in other adequately studied family structures, and these outcome differences exist even when controlling statistically for important socio-demographic differences between children reared in different family structures. However, same-sex couples are not included amongst the "other adequately studied family structures" referred to above.

71. Children reared in a stable married family are likely to do better on various measures of educational attainment; exhibit fewer behavioral problems, including conduct disorders, alcohol and drug abuse, and juvenile delinquency; will not be as likely to engage in criminal behavior as adults; engage in sexual relations as teenagers, and to experience an unwed pregnancy; have a decreased risk for mental/emotional illness; have a decreased risk of physical illness and infant mortality; experience decreased risk of suicide; have a greater average life expectancy; are likely to benefit from high levels of parental investment, commitment and closeness; are less likely to be victims of physical and sexual abuse; experience higher levels of family stability as adults, including a decreased divorce risk.  In the foregoing statement, no distinction is being drawn between a stable same-sex marriage and a stable opposite-sex marriage.

72. Nothing about a parent's sex or sexual orientation affects either that parent's capacity to be a good parent or a child's healthy development ("adjustment").  Lesbian and gay persons have the capacity to raise healthy and well-adjusted children.

73. There is consensus within the mainstream scientific community that parental sexual orientation has no effect on children's adjustment.  Numerous leading organizations representing mental health and child welfare professionals (e.g., the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, the National Association of Social Workers and the Child Welfare League of America)  have issued statements confirming that lesbian and gay parents are as effective as heterosexual parents in raising well-adjusted children and that these parents and their children should not face discrimination.

**74.** Children raised by gay and lesbian parents are as well-adjusted and as psychologically, emotionally, educationally and socially successful as children raised by heterosexual parents. This has been documented by numerous studies conducted over 25 years by respected researchers, including more than 50 peer-reviewed empirical reports. The material facts set forth in paragraphs 55 through 67 hereof are based on studies published in mainstream journals in developmental and child clinical psychology, including the flagship peer-review journals (*Child Development, Developmental Psychology* and the *Journal of Child Psychology and Psychiatry*). These periodicals are rigorously peer-reviewed and highly selective and their standards reflect expert consensus on generally accepted social scientific standards for research on child development. The studies discussed in these paragraphs represent the type of research that members of these professions consider reliable.

**75.** This body of research uses standard, reliable methodologies and standard sample types and sizes that are well-accepted in the field of developmental psychology and psychology generally. The methods used in some studies of gay and lesbian parents and their children have been criticized by certain advocacy groups, but not based on standards in the field. Recognized experts in developmental psychology have not criticized the methods used in these studies.

**76.** As a result of over 50 years of research into nontraditional families, it also is well-established that children do not need a parent of each gender to be well adjusted, that both men and women have the capacity to be good parents, and that children do not need male and female role models in the home to develop normally.

77. There is no empirical support in the social science literature for the claim that there is an optimal gender mix of parents or that children with two female or two male parents suffer any developmental disadvantages relative to children with two different-sex parents.

78. There is no empirical support for the notion that children need both male and female role models in their homes to adjust well. Children encounter many role models in addition to their parents in everyday life. Despite the absence of male role models in the home, for example, children who have only one resident female parent are no more likely than other children to have gender identity disorders or gender roles that differ from their peers.

79. The gender identity of a child is not affected by the gender of parents or parent figures in the home, nor by having one rather than two parents.

80. There is nothing about the sex of a parent that directly affects that parent's capacity to be a good parent. Disparities in parenting skills reflect greater or lesser "on the job" experience and opportunities to learn rather than biological differences. Nothing about a parent's sex determines one's parenting style. While, on average, men and women tend to assume different styles when parenting the same child, men who parent alone or are the child's primary caregiver tend to adopt the parenting style often characteristic of mothers. Observed differences appear to reflect differences between the responsibilities of the primary or secondary parent rather than sex-based differences. Many parents do not assume traditional gender roles or offer both of the typical male and female parenting styles and this has been shown not to affect a child's adjustment.

81. Studies reporting that children of gay and lesbian parents have less sex-stereotyped beliefs, and are more open-minded in their views of societal norms and standards about appropriate gender roles (e.g., seeing becoming a nurse, doctor or astronaut as appropriate aspirations for both boys and girls) are consistent with findings as to children in other types of non-traditional families (e.g., families with two employed parents). Reported differences in sex-stereotyped beliefs and behavior are not differences in adjustment. The past view of some developmental psychologists that conformance to these stereotypes is a component of healthy adjustment has been discredited and abandoned by authorities in the field of psychology.

82. Research showing that children in one-parent families are at greater risk of maladjustment than children raised in heterosexual married-couple families has been mischaracterized by advocates as supporting the notions that children need families headed by a mother and father and/or that heterosexual couples make the best parents, which that research does not support. The research on one-parent families looks exclusively at heterosexual parents and elucidates nothing about parental sexual orientation or gender. Instead, the studies suggest that, all else being equal, children tend to do better with two parents than one, which only supports extending marriage rights to same-sex couples to solidify family ties.

83. Likewise, some advocates point to research demonstrating that children thrive with so-called "biological" parents to argue that parenting by same-sex couples cannot provide children with the advantages of being raised by two biological parents. In fact, in many studies the term "biological parent" is used collectively to refer to and distinguish *both* biological and adoptive parents from children raised in step-families. These studies

34

do not explore differences between biologically-related and non-related parents. Nor do these studies examine children being raised by lesbian and gay couples, including those who jointly planned to have children. Children raised by reconstituted stepfamilies are at a higher risk for adverse outcomes, but one would not expect to see comparable adjustment difficulties among lesbian and gay parents who jointly plan to raise children. Research comparing lesbian and gay families with heterosexual families reveals no reliable difference in outcomes.

## 6. All Plaintiffs are Similarly Situated to Those Benefited by Iowa Marriage Laws

**84.** Plaintiffs are similarly situated to different-sex couples who have the option to marry.

**85.** Plaintiffs' backgrounds and their daily lives and experiences as Iowans are very similar to those of different-sex couples who freely may marry.

**86.** The emotional, romantic and dignitary reasons Plaintiffs seek to marry are very similar to those of different-sex couples who freely may marry.

**87.** The economic, legal and practical needs Plaintiffs have that only marriage fully addresses are very similar to those of different-sex couples who freely may marry. These needs include the stabilizing impact of marriage and its rights on a family's finances and legal ties.

**88.** Some Plaintiffs have used, are using or anticipate using methods commonly used by heterosexual parents to conceive, foster or adopt children. As with heterosexuals engaging in unprotected sexual intercourse, using these methods is known to bring children into a family, but the children may arrive at unplanned times.

89. Minor Plaintiffs are similarly situated to the children of heterosexual couples who have the option to marry.

90. Minor Plaintiffs have similar daily lives and family interactions to those of children of different-sex couples.

91. Minor Plaintiffs were born to and/or adopted by their parents, and receive parenting that is very similar to and no less healthy and effective than the parenting other children receive from two different-sex parents.

92. The benefits of marriage are needed as much by children in homes headed by same-sex couples as they are by children reared in the homes of different-sex couples. Marriage is as likely to benefit the Minor Plaintiffs emotionally, economically and legally as it does other children, and would secure greater dignity and social legitimacy for them and their families.

93. Minor Plaintiffs have the same needs for emotional, legal and economic security; personal dignity; familial stability; and social acceptance and legitimacy for their families and themselves as do children of different-sex couples, including the need for clearly defined and recognized legal relationships with both parents. Children whose parents cannot access or afford adoption especially would benefit from the automatic parent-child ties that marriage law provides children born into the marriage.

94. Legal security in Minor Plaintiffs' parent-child relationships is especially important during time of crisis, such as medical emergencies or the death of a parent. A parent's death is highly stressful for a child and likely to have effects on the child's well-being. Secure legal ties can assure continuity in the child's relation ship with the surviving parent and minimize the risk of claims by others for custody. Likewise, should

the parents separate, secure legal ties make it unlawful for one parent arbitrarily to seek to cut off the other parent-child relationship. Marriage and its benefits also increase the overall economic resources available to the children whether the marriage continues or ends by death or divorce.

**95.** Allowing same-sex couples to marry is in the best interests of and will benefit children being raised by same-sex couples and the couples themselves, without having any detrimental effect on heterosexual couples or their children.

## 7. Changing Nature and Meaning of Marriage

**96.** Marriage has evolved over time, in legislatures and courts, to meet the changing needs of American society and to embody fuller notions of consent and personal choice.

**97.** Despite these many changes, marriage remains a fundamental right and a highly respected institution that plays a unique and central social, legal and economic role in American society, including in Iowa.

**98.** Marriage in the United States is virtually unrecognizable from its earlier common law counterpart, having undergone radical, unthinkable changes in laws governing who may marry, when marriages may end, and the legal significance and consequences of marriage for the individuals involved.

**99.** American marriage law has vastly changed in its treatment of men and women. When Iowa's first marriage law was passed, the centuries-old doctrine of coverture, in which the woman's separate legal identity disappeared into the man's upon marriage, reigned in Iowa as elsewhere. Married women were essentially chattel; they were not considered legal "persons" who could exercise rights, hold property, earn

money, or deny their husbands access to their bodies.  Men were expected alone to support the family and to represent and make decisions for the family in the external world.

**100.**  Marriage law in Iowa today reflects a steady elimination of stereotyping and discrimination against both women and men.  The sexes are equal before the law and have reciprocal obligations within marriage.  Iowa courts and legislatures have remedied numerous longstanding gender-based inequities, many of which previously had been considered inherent in marriage and reflective of the proper and natural roles of men and of women.

**101.**  For hundreds of years in the United States there also were legal barriers to marriage, originating in colonial times, based on the races of the partners wishing to marry.  Slaves, not being considered legal persons, could not lawfully consent and therefore could not legally marry.  The vast majority of States had laws prohibiting certain marriages based on racial and ethnic classifications; most of these laws survived long after Emancipation.

**102.**  As in other states, Iowa has committed to eliminating racial and ethnic discrimination in marriage and family law.  It was the third state to repeal its anti-miscegenation law that had denied individual freedom of choice in marriage partners on the basis of race.  Iowa courts also have worked to eliminate considerations of racial prejudice in custody and parenting decisions.

**103.**  The ability to end a marriage to which one or both spouses no longer consent is another fundamental change that has transformed American marriage law.  Divorce first became available in some states and territories shortly after the American

Revolution, but only in very narrow circumstances involving findings of fault in one spouse's failure to meet his or her (largely gender-driven) marital responsibilities to the other spouse and to the state. Divorce took this form in Iowa as well and, though the grounds for divorce expanded over time, continued as a fault-driven process well into the 20th century.

**104.** In 1970, Iowa became only the second state to institute no-fault divorce.

**105.** This fundamental change permitted spouses to exercise continuing choice over whether to be married, to set their own goals for the marriage and to evaluate for themselves whether their goals for the marriage were being met.

**106.** Other remarkable changes in marriage and related laws have included: rising age requirements for entry into marriage; elimination of the legal categories of "illegitimates" and "bastards" for those children born out of wedlock; treatment of men as legal parents of children born out of wedlock; separation of marital misconduct from determinations of child custody and visitation; and the removal of criminal restrictions on extramarital and non-procreative sexual activities.

## 8. Lingering Sex and Gender Discrimination in Marriage

**107.** Each Plaintiff would have been able to marry his or her partner had the Plaintiff been of a different sex.

**108.** Historically and to the present, lesbian and gay people have been subjected to discrimination, harassment and misunderstanding because they are perceived as departing from the gender roles expected of each sex.

**109.** Lesbians and gay men (as well as heterosexuals perceived to be gay or as acting or appearing gay) are commonly debased though slurs, jokes and stereotypical

references to same-sex attraction, appearance, dress, mannerisms, sexual practices,

occupations and the like. These remarks reflect personal and/or societal animus, and fear

or discomfort with gay people's perceived departures from sex role norms; such remarks

seek to and do coerce conformity with those norms.

**110.** Sex-role conformity remains embedded in Iowa marriage law. As a

condition of marriage in Iowa, male Plaintiffs must conform to the State's view that men

should fall in love with, be intimate with and marry only women, while female Plaintiffs

must conform to the State's view that women should fall in love with, be intimate with

and marry only men. In fact, these are old and overbroad stereotypes that do not reflect

the diversity of individual men and women.

### 9. History of Anti-Gay Discrimination

**111.** There is a long history of prejudice by individuals against lesbian and gay

people both in Iowa and nationally.

**112.** Pervasive public and private discrimination has kept many lesbian and gay

people in fear of being identified as gay and then targeted for discrimination. Many

lesbian and gay people in Iowa remain "closeted" to try to prevent retribution; even

family members may be unaware of their sexual orientation. Anti-gay discrimination in

Iowa commonly goes unreported because of these concerns and because there is no

remedy for most of them.

**113.** Anti-gay discrimination and purposeful unequal treatment by individuals

and organizations in the private sector have taken many forms, including but not limited

to: vicious physical assaults and threats; damage to property; verbal harassment of gay

people, including students in public schools; propagation of stereotypes; discrimination in

employment, public accommodations, and housing; past classification of homosexuality

as a mental disorder and "treatments" including electroshock and aversion therapies;

efforts to blackmail gay people; shunning by family members and neighbors; refusal to

recognize a same-sex partner as family, as the intended next of kin to make medical and

death-related decision, or as the intended.

114. Discrimination against gay people in the public sector nationally has

included: bans on military service including the inaptly named "Don't Ask, Don't Tell";

initiatives, referenda and lawsuits orchestrated by national anti-gay groups to repeal or

prevent passage of marriage, anti-discrimination, domestic partner and civil union laws

benefiting gay people; pervasive invocation of stereotypes and falsehoods to advance

anti-gay public policies; state and military laws criminalizing consensual sodomy and

discrimination in other sectors justified by such laws; bans on employment by the federal

government and federal contractors, and related invasive FBI surveillance programs;

treatment of gay people as security risks; prohibitions on service to or congregating by

gay people in bars, restaurants and other establishments; prohibitions on gay characters

and issues in films; police campaigns against gay people in public and private places; and

restrictions on adoption and foster parenting.

115. Discrimination against gay people in the public sector in Iowa also has

included not only the marriage exclusion and its effects but also: criminal laws against

sodomy and related solicitation and conspiracy; laws permitting the exclusion from the

United States and the indefinite confinement of gay people as "sexual psychopaths;"

rounding up of gay people on morals charges as a form of harassment; refusals of

political parties to slate openly gay candidates, and of public bodies and officials to

appoint them; political and personal attacks on public officials who are openly gay or perceived to be pro-gay; and "outing" of and personal attacks against gay public officials to cause them political and personal harm.

**116.** There is a correlation between expressions of hostility towards persons afflicted with AIDS and antigay prejudice.

## 10. Relative Political Powerlessness of the Gay Community

**117.** No Iowa state law remedies discrimination on the basis of sexual orientation, except the State's hate crimes law.

**118.** Bills were introduced to include sexual orientation as a protected category within the Iowa Civil Rights Act approximately 15 years ago, but the Iowa legislature has repeatedly declined to pass it. The legislature also has declined to pass proposed legislation to address pervasive problems of anti-gay bullying in schools. Iowa has not passed other types of legislation that other states have passed, including for civil unions; domestic partnerships; anti-discrimination protection or domestic partner benefits for state employees; requirements against discrimination by professions or to obtain licenses.

**119.** The Iowa House passed legislation in 1995 to ban lectures at state universities that would depict gay people in a positive light. Legislators successfully sued to invalidate Governor Vilsack's executive order prohibiting sexual orientation discrimination in State employment. Legislators filed an extraordinary writ petition to invalidate an Iowa court's dissolution of a lesbian couple's civil union. The legislature passed §§ 595.2(1) and (20) to make certain that marriages by lesbian and gay couples would not occur or be recognized in Iowa.

**120**. Only eight Iowa cities, six in eastern Iowa and none west of Des Moines,

have passed limited protections against some forms of sexual orientation discrimination

(Ames, Bettendorf, Cedar Rapids, Davenport, Decorah, Des Moines, Dubuque and Iowa

City).

### III. ANALYSIS

#### A. Due Process

The Plaintiffs argue that Iowa Code §595.2(1) violates their fundamental right to

marry under the Due Process Clause of the Iowa Constitution.  The Iowa Constitution in

Article I, Section §9 states:

> "...[N]o person shall be deprived of life, liberty, or property without due
> process of law."

Both the Iowa Supreme Court and the United States Supreme Court have

recognized that the right to marry is a fundamental right.  Sioux City Police Officers'

Ass'n v. City of Sioux City, 495 N.W.2d 687, 695 (Iowa 1993); Loving v. Virginia, 388

U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).  Though not all laws that affect marriage

are subject to strict scrutiny review, state law that "significantly interferes" with the right

to marry is subject to strict scrutiny review.  See Sioux City Police Officers'Ass'n, 495

N.W.2d at 696 (citing Zablocki v. Redhail, 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54

L.Ed.2d 618, 631 (1978)).  When strict scrutiny analysis is employed by a Court, the

burden of proof no longer lies with the challenger, but with the party seeking to uphold

the law.  See Sanchez v. State, 692 N.W.2d 812, 817 (Iowa 2005) (citing City of

Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d

313, 320 (1985)).  In this case, the Defendant must prove that the law is narrowly tailored

to the achievement of a compelling state interest."  Id.

The Defendant repeatedly makes the argument that because no state Supreme Court or United States Supreme Court decision has declared same-sex marriage to be a fundamental right, this Court is precluded from finding the existence of such a right. However, the Iowa's appellate courts have acknowledged that Due Process rights are fluid, and that such protections "should not ultimately hinge upon whether the right sought to be recognized has been historically afforded. Our constitution is not merely tied to tradition, but recognizes the changing nature of society." Callender v. Skiles, 591 N.W.2d 182, 190 (Iowa 1999). Iowa Courts have generally been at the forefront in preserving the civil rights of their citizens in areas such as race, gender and sexual orientation. See In Re Ralph, 1 Brandf. 3, 1 Morris 1, 7, 1839 WL 764 (Iowa 1839) (rejecting a claim by a slave owner seeking a slave's return); Cole v. Cole, 23 Iowa 433, 1867 WL 355 (Iowa 1867) (allowing for a gender-neutral rule in child custody determinations); In Re Marriage of Walsh, 451 N.W.2d 492 (Iowa 1990) (holding that a restriction of a gay father's visitation "to times when 'no unrelated adult' is present' was inappropriate in light of statutory goal of keeping children in close contact with parents) State v. Pilcher, 242 N.W.2d 348 (Iowa 1976) (declaring Iowa's sodomy statute to be unconstitutional).  The Defendant's argument that this Court is precluded from finding a "fundamental right to same-sex marriage" is not accurate or persuasive.  In Loving v. Virginia, the United States Supreme Court found that Virginia's statutory prohibition of interracial marriage violated an individual's fundamental right to marriage. Loving, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). The Court struck down the Virginia statute on Due Process grounds despite its observation that, "[p]enalties for miscegenation arose as an incident to slavery and have been common in Virginia since

the colonial period." Loving, 388 U.S. 1, 6 87 S.Ct. 1817, 1820 – 21 18 L.Ed.2d 1010 (1967). The fact that there was no historical tradition of interracial marriage in Virginia did not preclude the Court from holding that the fundamental right to marriage was violated through Virginia's prohibition against interracial marriage.

Unlike the anti-nepotism provision at issue in Sioux City Police Officers' Ass'n, Iowa Code §595.2(1) constitutes the most intrusive means by the State to regulate marriage. This statute is an absolute prohibition on the ability of gay and lesbian individuals to marry a person of their choosing. Accordingly, this statute warrants the application of strict scrutiny. Regardless of the potential rationales for the enactment of §595.2(1) proposed by the Defendant, this Court concludes that the statute significantly interferes with the decision to enter into a marital relationship in its prohibition of same-sex marriage. The Defendant argues that possible rationales for §595.2(1) may include: promoting procreation, child rearing by a mother and father in a marriage relationship, promoting stability in opposite sex relationships, conservation of state and private resources, and promoting the concept or integrity of traditional marriage. Though the Defendant cites an abundance of case law indicating that Courts have long considered marriage to be an important relationship, the Defendant makes no argument that promoting procreation, child rearing by a mother and father in a marriage relationship, promoting stability in opposite sex relationships, promoting the concept of traditional marriage or conservation of state and private resources are compelling state interests, despite the fact that it is his burden to do so. This Court concludes that the Defendant has not sustained his burden of proof in articulating compelling reasons for Iowa Code §595.2(1). This Court concludes for similar reasons that an absolute prohibition of

same-sex marriages is not "closely tailored to effectuate *only* those interests" articulated

by the Defendant. *See* Sioux City Police Officers' Ass'n, 495 N.W.2d at 696 (citing

Zablocki v. Redhail, 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618, 631 (1978))

(emphasis added)).   The Defendant has cited no evidence that precluding gay and lesbian

individuals from marrying other gay and lesbian individuals will promote procreation,

will encourage child rearing by mothers and fathers, will promote stability for opposite

sex marriages, will conserve resources or will promote heterosexual marriage.   Iowa

Code §595.2(1) manages to be both over and under-inclusive while effectuating none of

its purported rationales.   The law is extremely overinclusive in its attempt to strengthen

heterosexual marriage and procreation by preventing an entirely distinct group of

individuals – homosexuals - from marrying.   The law is also extremely underinclusive by

failing to regulate at all how heterosexuals enter into marriage and procreative

relationships, despite the narrow focus of the legislation's goals on that group of

individuals.   The Defendant fails to sustain his burden of proof that §595.2(1) is narrowly

tailored to effectuate the achievement of a compelling state interest.   Consequently, this

Court concludes that §595.2(1) violates Plaintiffs' Due Process rights guaranteed by

Article I, §9 of the Iowa Constitution.

The Plaintiffs also assert that the minor childrens' fundamental rights of privacy

and familial association under the Iowa Constitution have been violated through the

application of Iowa Code §595.2(1).   While the Court is sympathetic to the children's

claims of stigma and hardship created by the statutory scheme prohibiting their same-sex

parents from marrying in Iowa, the Court is unable to find any precedent directly on point

supporting the proposition that the minor Plaintiffs may assert such "derivative" claims.

The statutory classification outlined in §595.2(1) directly prohibits same-sex individuals from marrying but does not directly address the rights of the children. However, in granting relief to the adult Plaintiffs, the Court believes it will also satisfy the concerns of the minor Plaintiffs.

## B. Equal Protection

The Plaintiffs also argue that Iowa Code §595.2(1) violates their Equal Protection rights under the Iowa Constitution by prohibiting an individual from marrying another individual of the same sex. The Iowa Constitution in Article I, Section §6 states:

> "All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." <u>Racing Ass'n of Central Iowa v. Fitzgerald</u>, 675 N.W.2d 1, 7 (Iowa 2004). The Plaintiffs are men and women who wish to enter into a civil marriage with another person, albeit one of the same sex. Absent the operation of Iowa Code §595.2(1), the Plaintiffs meet the requirements for a civil marriage in the State of Iowa. The Plaintiffs' own sex precludes them from marrying an individual of their choosing. Such a classification is sex-based and would be entitled to an intermediate level of scrutiny. *See* <u>M.R.M. Inc. v. City of Davenport</u>, 290 N.W.2d 338, 340 -341 (Iowa 1980) (indicating that a city ordinance prohibiting individuals from giving massages to members of the opposite sex is a sex-based classification). A statute which classifies individuals based upon their sex or gender "is subject to intermediate scrutiny and will only be upheld if it is substantially related to an important state interest." <u>State v. Sanchez</u>, 692 N.W.2d 812, 817 (Iowa 2005). As with strict scrutiny, when a Court

applies an intermediate level of scrutiny to a statute, the burden of proof lies not with the challenger but with the "party seeking to uphold the challenged classification." Sherman v. Pella Corp., 576 N.W.2d 312, 317 (Iowa 1998).

The Defendant argues that because the statute operates equally on men and women, the statute is not a sex-based classification warranting intermediate scrutiny. However, the United States Supreme Court in Loving rejected an identical line of reasoning with regard to race and held that despite the Virginia law's application to both white and black citizens, the statute nonetheless violated the Equal Protection Clause. Loving, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010.

This Court concludes that the sex-based classification promulgated by Iowa Code §595.2(1) is not substantially related to an important state interest. First, the Defendant has not sustained his burden of proof that any of the five rationales articulated above are important state interests. The Defendant makes only a cursory statement that, even if this Court applies a greater level of scrutiny than rational basis, the law would meet such a heightened test. Such a statement is not adequate to sustain the heavy burden of proof placed on the Defendant to prove the law's constitutionality. However, even if the Court assumes for the purposes of argument that the rationales articulated by the Defendant were important state interests, the means by which the State seeks to achieve these goals are not substantially related. Regulating two classes of individuals, who happen to be homosexual, based on their sex, has no bearing on any of the goals articulated by the Defendant. The Defendant has produced no evidence indicating that precluding men from marrying other men and women from marrying other women will promote procreation, will encourage child rearing by mothers and fathers, will promote stability

for opposite sex marriages, will conserve resources or will promote heterosexual marriage. Based upon the foregoing, the Court concludes that §595.2(1) violates Plaintiffs' rights to Equal Protection under the laws as guaranteed by Article I, §6 of the Iowa Constitution.

The Plaintiffs also assert that the minor children's Equal Protection right under the Iowa Constitution have been violated through the application of Iowa Code §595.2(1). The Plaintiffs argue that §595.2(1) and related laws draw an impermissible classification with regard to the minor children, as the failure to allow their parents to marry condemns the children to the lifelong stigma of illegitimacy. Given the historical mistreatment of illegitimate children in the United States, the Court is particularly sympathetic to the claims of the children with regard to the stigma of illegitimacy that the children may suffer due to the statute's categorical prohibition of same-sex marriage. However, the Court is again unable to find any precedent directly on point supporting the minor Plaintiffs ability to assert such derivative constitutional rights. The statutory classification outlined in §595.2(1) directly prohibits same-sex individuals from marrying but does not expressly create a classification with regard to the children. Once again, however, the Court believes it will address the concerns of the minor Plaintiffs by ruling in favor of the adult Plaintiffs.

## C.  Rational Basis

Notwithstanding the foregoing, the Court concludes that Iowa Code §595.2 violates the Due Process and Equal Protection provisions contained in Article I, §6 and 9,

in that it is not rationally related to a legitimate government interest. In this regard and as previously stated, Defendant has offered the following propositions as legitimate government interests advanced by the statute:

1) promoting procreation;

2) promoting child rearing by a father and a mother in a marriage relationship;

3) promoting stability in opposite-sex relationships where children may be born;

4) conserving state and private resources; and

5) promoting the concept of fundamental marriage or the integrity of traditional marriage.

(Defendant's Brief, p. 49). Under the rational basis test, a statute is presumed constitutional and the challenging party has the burden to negate every reasonable basis that might support it. Racing Ass'n of Central Iowa v. Fitzgerald, 675 N.W.2d 1, 7-8 (Iowa 2004). Having said that, this matter has been briefed extensively by all parties. In addition, the Court has had the benefit of an amicus brief supporting the Defendant's motion. No other possible interests have been cited. As a consequence, the Court feels comfortable confining its analysis to those purported legitimate government interests identified by defendant. With respect to either equal protection or due process analysis, assuming for the sake of argument that this matter does not involve a suspect classification or a fundamental right, then the subject statute must be analyzed by application of a rational basis test. Glowacki v. State Board of Medical Examiners, 501 N.W.2d 539, 541 (Iowa 1993). "Under the rational basis analysis, a statute is constitutional unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest... This is a two-prong test: (1) the statute must serve a

50

legitimate governmental interest; and (2) the means employed by the statute must bear a rational relationship to that governmental interest." Id. (Citations omitted.)

**1. Legitimate Governmental Interests**

This Court's first task is to "...determine whether the Iowa Legislature had a valid reason..." for excluding all but different-sex couples from being able to enter into a civil marriage. Racing Association of Central Iowa v. Fitzgerald, 675 N.W.2d 1, 7 (Iowa 2004). "In this regard, 'the statute must serve a legitimate governmental interest.'" Id. "Moreover, the claimed state interest must be 'realistically conceivable.'" 675 N.W.2d at 8. "Realistically conceivable" means credible. Id. In making this determination, "...the Court is permitted 'to probe to determine if the constitutional requirement of some rationality...'" is met. Id.

The Court is willing to assume that the first four possible governmental interests offered by Defendant – the first three hereinafter collectively referred to as "responsible procreation" and the fourth being the conservation of state and private resources – are legitimate. However, the Court believes that the fifth purported governmental interest – "promoting the concept of fundamental marriage or the integrity of traditional marriage" - is not. In this Court's view, to say one wishes to promote "the concept of fundamental marriage" or "to promote the integrity of traditional marriage" by amending a statute to add language saying "[o]nly a marriage between a male and a female is valid," means simply that one wishes to exclude same-sex couples from entering into that union because that is the way things always have been. More specifically, such unions have never been officially recognized in the past because they were morally unacceptable therefore they won't be so recognized now.

The United States Supreme Court has recently stated that its own case law makes the following two propositions "abundantly clear":

> First, the fact that the governing majority in a state has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack.

Lawrence v. Texas, 539 U.S. 558, 577-78, 123 S.Ct. 2472, 2483 (2003). It continued, stating as follows:

> Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

539 U.S. at 578-79, 123 S.Ct. at 2484; See Callendar v. Skiles, 591 N.W.2d 182, 190 (Iowa 1999) ("Our constitution is not merely tied to tradition, but recognizes the changing nature of society."). As Justice Scalia commented in his dissent, "…'[P]reserving the traditional institution of marriage' is just a kinder way of describing the State's moral disapproval of same-sex couples." 539 U.S. at 601, 123 S.Ct. at 2496. In her concurring opinion, Justice O'Connor stated as follows:

> We have consistently held, however, that some objectives such as "a bare … desire to harm a politically unpopular group," are not legitimate state interests. (Citations omitted.) When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.
> We have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships. (Citations omitted.)
> ***
> Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause. (Citations omitted.) Indeed, we have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale

under the Equal Protection Clause to justify a law that discriminates among groups of persons.

Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be "drawn for the purpose of disadvantaging the group burdened by the law." (Citations omitted.) ... [T]he Equal Protection Clause prevents a state from creating "a classification of persons undertaken for its own sake."
***

Unlike the moral disapproval of same-sex relations – the asserted state interest in this case – other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.

539 U.S. at 580-86, 123 S.Ct. at 2485-88.  Because the due process and equal protection

clauses of the Iowa Constitution are at least coextensive with those found in the United

States Constitution, such purposes are likewise illegitimate under the Iowa Constitution.

## 2.  Whether §595.2(1) Bears a Rational Relationship to Accomplishment of the Following Governmental Interests:  Responsible Procreation and Preserving Resources

The next step in the Court's rational basis analysis is to "... decide whether [the

proposed governmental interest] has a basis in fact."  675 N.W.2d at 8.  The Iowa

Supreme Court has explained that, while there is no requirement in a case such as this

that the government supply proof in the traditional sense, " ... the Court will undertake

some examination of the credibility of the asserted factual basis for the [proposed

governmental interest] rather than simply accepting it at face value."  Id.

The final step in the Court's analysis is to consider whether the relationship

between the governmental interest and the means employed to advance it is so weak as to

be considered arbitrary.  Id.  In other words, there must be a fit between the purpose and

the means that is not attenuated.  Id.  If the means involves extreme degrees of

overinclusion and underinclusion in relation to any particular goal, it cannot be said to

reasonably further that goal.  675 N.W.2d at 10 (citing Bierkamp v. Rogers, 293 N.W.2d

577, 581 (Iowa 1980); *See also* City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432,

105 S.Ct. 3249 (1985) (Lack of rational relationship between state requirement and

purported government objective evidenced by over- and under-inclusiveness of said

requirement.).

        At all times, the Court must obey certain general legal principles governing its

review of the constitutionality of a statute.  675 N.W.2d at 8.  These include 1) that

statutes are cloaked with a strong presumption of constitutionality, 2) the person

challenging the constitutionality of a statute bears the burden of rebutting this

presumption, and 3) the burden includes negating every reasonable basis that might

support the statute.  Id.  However, while rational basis analysis of a statute is "…

admittedly deferential to legislative judgment, 'it is not a toothless one.'"  675 N.W.2d at

9.  A statute is unconstitutional if legislative goals are achieved in a manner which is

wholly arbitrary or which amounts to invidious discrimination.  Id.  A meaningful review

of social and economic legislation is mandated by this Court's "…constitutional

obligation to safeguard constitutional values by ensuring all legislation complies with

those values."  Id.

### a.   **Responsible Procreation**

        As previously indicated, this Court has grouped the first three proposed state

interests – "…the purposes of promoting procreation, child-rearing by a father and a

mother in a marriage relationship and promoting stability in opposite-sex relationships

where children may be born …" – together under the term "responsible procreation."

This is a term which was apparently originally coined by the Court of Appeals of Indiana

in its opinion in <u>Morrison v. Sadler</u>, 821 N.E.2d 15 (Ind. Ct. App., 2005). The Indiana

Court explained that it meant "...procreation and raising of children by persons who have

contemplated, and are well-suited for the required commitment and challenges of child-

rearing." 821 N.E.2d at 25 (ftnte. 13). Certainly, this term appears to embody most all of

the concepts identified in the first three proposed state interests advanced herein by

Defendant, the only difference being the Defendant's substitution/addition of the "a

father and a mother in a marriage relationship" and "opposite sex" language in its

articulation. Undoubtedly, these "modifications" of the Indiana Court's terminology

relate to the actual language of §595.2(1) and it is the very language of that statute which

begs the question of how the categorical <u>exclusion</u> of same-sex couples from the

institution of marriage serves the advancement of those governmental interests, assuming

for the sake of argument that these are legitimate government interests which, as this

Court has previously stated, it is willing to do.

Examination of the statutory language itself is of no use. The language is plain,

simple, and unambiguous. It is in no way subject to different interpretations as to what it

means. The Court has not been shown any admissible evidence as to the legislative

history of the enactment. Unlike in the Iowa Supreme Court in <u>Racing Association of</u>

<u>Central Iowa</u>, this Court has not been given the benefit of the comments or

recommendations of any legislative study committee. The Court recognizes that

Defendant does not have the burden of proof in this lawsuit. However, this matter is

presented to the Court in the form of competing motions for summary judgment. When

the assertion is made by Plaintiffs that, as a matter of law, there is no rational relationship

between the government's interest in promoting responsible procreation and the statute

enacted, Defendant is, as a practical matter, obliged to respond. More importantly, to the extent that Plaintiffs support their motion with admissible evidence, Defendant must respond in kind in order to demonstrate the existence of genuine issues of material fact. In this instance, Defendant has failed to do so and/or has actually admitted many of Plaintiffs' factual assertions. This Court has yet to hear any convincing argument as to how excluding same-sex couples from getting married promotes responsible reproduction in general or by different-sex couples in particular. So far as this Court can tell, §595.2(1) operates only to harm same-sex couples and their children.

§595.2(1) is at the same time grossly under-inclusive and grossly over-inclusive. As to its over-inclusiveness, it must first be stated that this Court does not accept as valid any assertion that same-sex couples, as a class, are in any way inferior to opposite-sex couples insofar as their child-rearing capabilities are concerned. Defendant has admitted as much. Defendant admits that sexual orientation bears no relation to a person's ability to perform in, to contribute to, or to participate in society and a given sexual orientation implies no impairment in judgment, stability, reliability, or social or vocational capabilities generally. Defendant admits that nothing about a parent's sex or sexual orientation affects either that parent's capacity to be a good parent or a child's healthy development ("adjustment"). Defendant admits that lesbian and gay persons have the capacity to raise healthy and well-adjusted children. Defendant admits that factors accounting for a child's adjustment in both "traditional" and "non-traditional" family structures, including families headed by same-sex couples, include: 1) the quality of the child's relationship with the parent who is primarily responsible for the child's care; 2) the quality of the child's relationship with a second parent figure, if the child has two

56

important parental figures; 3) the quality of the two parental figures' intimate relationship, with conflict predicting maladjustment and a harmonious relationship predicting healthy adjustment; and, 4) the availability of economic resources, with adequate resources predicting better adjustment.

Defendant admits that lesbian and gay individuals have been licensed by the State of Iowa and have served the State of Iowa as foster parents. Defendant admits that, assuming they meet all legal requirements, a lesbian or gay couple may adopt a child jointly, or one partner may adopt his or her partner's child, resulting in the child having two permanent parents of the same sex.

In addition, Iowa courts have refused to limit or restrict parents' custody or visitation rights or obligations based upon their sexual orientation. *See, e.g.*, In re Marriage of Kraft, 2000 WL 1289135 (Iowa Ct. App. 2000) (Streit, J.) (refusing to limit gay ex-husband's visitation and refusing to require dissolution decree to spell out details of how and when ex-husband could speak to children about his sexual orientation); In re Marriage of Cupples, 531 N.W.2d 656 (Iowa Ct. App. 1995) (treating parent's sexual orientation as a "nonissue" ); In re Marriage of Walsh, 451 N.W.2d 492, 493 (Iowa 1990) (restriction on visitation with gay father "to times when 'no unrelated adult' is present" is inappropriate in light of statutory goal of keeping children in close contact with both parents); Hodson v. Moore, 464 N.W.2d 699 (Iowa Ct. App. 1990); In re Marriage of Wiarda, 505 N.W.2d 506, 508 (Iowa Ct. App. 1993); *See also* Hartman by Hartman v. Stassis, 504 N.W.2d 129, 133-34 (Iowa Ct. App. 1993) (rejecting, in a paternity and child support action, relevance of allegations that mother fraudulently entered sexual relationship with putative father for the purpose of raising child in a lesbian relationship).

These cases are consistent with the proposition that eligibility for the institution of marriage should not be tied to sexual orientation. If responsible procreation is the goal, then the institution of marriage should be made available to all couples who can responsibly procreate, regardless of whether the couple is a traditionally recognized one. The traditional make-up of the family has changed. <u>Callendar</u>, 591 N.W.2d at 190. Family rights should not be denied "...simply because they arise in another set of circumstances involving consenting adults that have not traditionally been embraced." <u>Id.</u> Indeed, by excluding all same-sex couples from marriage, the statute actually defeats the purpose of responsible procreation by excluding qualified individuals from marriage. In addition, their exclusion defeats the state's admitted interest in the welfare of <u>all</u> of its children, regardless of whether they are parented by different-sex couples, same-sex couples or any other family unit. *See* Undisputed Facts, Nos. 58 – 77, *supra.* Ironically, one of the principal legal authorities cited by Defendant has justified the exclusion of same-sex couples from marriage by reasoning that, because same-sex couples can only have children by means of adoption or assisted reproduction – processes which require a great deal of foresight and planning and which, therefore, require the prospective parents to be heavily invested, financially and emotionally, in those processes which, in turn, means they are very likely to be able to provide stable environments in which to raise children – they do not need the encouragement to form a stable environment within which to procreate and raise children and, therefore, allowing same-sex marriages would not <u>advance</u> the State's interest in responsible procreation by heterosexual couples. <u>Morrison v. Sadler</u>, 821 N.E.2d 15, 23-26 (Ind. Ct. App. 2005). While Plaintiffs may appreciate this back-handed compliment, the Court believes Plaintiffs' parenting abilities

are not so good that they couldn't use the benefits attaching to marriage to improve their

children's lots in life, to say nothing of their own.  With all due respect to the Indiana

Court of Appeals, this Court simply cannot accept the notion that allowing same-sex

couples to marry would not advance the purpose of responsible procreation to some

degree.

At the same time, §595.2(1) is grossly under-inclusive.  Only same-sex couples

cannot marry.  On the other hand, no eligibility requirements relating to procreative

potential or intent or to parenting abilities are imposed.  The sterile, the infertile, the

elderly, and those having no interest in sex or procreation are allowed to marry.

Convicted felons (including those guilty of child and/or spousal abuse), persons who

don't fulfill child support obligations, and persons suffering from mental health and/or

substance abuse problems are all allowed to marry.  As Justice Scalia observed in his

dissent to the majority's opinion in Lawrence v. Texas, "…[w]hat justification could

there possibly be for denying the benefits of marriage to homosexual couples exercising

'[t]he liberty protected by the Constitution' (citations omitted)?  Surely not the

encouragement of procreation, since the sterile and the elderly are allowed to marry."

539 U.S. at 605, 123 S.Ct. at 2498.

Defendant also argues that "[b]y legally sanctioning heterosexual relationships

through marriage, the legislation communicates to parents and prospective parents that

their traditional and long-term, committed relationships are uniquely important as a

public concern."  This Court has already addressed the legitimacy of the State's interest

in preserving the concept of fundamental marriage and/or the integrity of traditional

marriage.  Notwithstanding the presumed legitimacy of the State's interest in promoting

long-term committed relationships for parents and prospective parents, this Court again asks how <u>excluding</u> same-sex couples from marriage furthers that interest. Having heard no convincing explanation, this Court is left to conclude that the argument that excluding same-sex couples from marriage somehow encourages heterosexual parents or prospective parents to get married is specious at best.

This Court concludes that, while this proposition — that promotion of responsible procreation is an underlying reason for §595.2(1) — may be credible, the relationship between this purported governmental interest and the means employed to advance it – the total exclusion of same-sex couples from marriage – is completely arbitrary. The exclusion of same-sex couples from entering into a marriage bears no discernable relationship to the promotion of responsible procreation by heterosexual couples. The means and the purpose are without question attenuated.

**b.   Conserving State and Private Resources**

In his brief, Defendant suggests that conserving state and private resources would be a legitimate governmental interest which the state might attempt to advance by enacting §595.2(1). Once again, this court is willing to assume that such an interest would be legitimate but must determine whether the connection between that interest and §595.2(1) is a rational one or whether it is so weak as to be considered arbitrary.

Plaintiffs make the assertion in their motion for summary judgment and supporting documents that allowing same-sex couples to marry would not expend state and private resources but would actually save them and have supported this assertion with affidavits. Defendants have not responded with their own affidavits as allowed by the rules but have instead elected to admit certain factual assertions, deny other assertions

altogether, or deny them for lack of information sufficient to form a belief. The non-moving party cannot create a genuine issue of material fact by resting on mere denials but must respond with affidavits itself. Defendant has failed to do so and stands on its denials. Defendant has not explained this purported purpose at all and has cited no authorities or evidence supporting it. As a consequence, this Court concludes that there is no rational relationship between this purported governmental interest and the exclusion created by §595.2(1). The means and the purpose are attenuated. Thus, the exclusion of same-sex couples from marriage is, once again, arbitrary

## IV. CONCLUSION

The Court concludes that there are no genuine issues of material fact and that Plaintiffs are entitled to judgment as a matter of law but Defendant is not. Because §595.2(1) violates Plaintiffs' due process and equal protection rights for the aforementioned reasons including, but not limited to, the absence of a rational relationship to the achievement of any legitimate governmental interest, the Court concludes it is unconstitutional and invalid. Couples, such as Plaintiffs, who are otherwise qualified to marry one another may not be denied licenses to marry or certificates of marriage or in any other way prevented from entering into a civil marriage pursuant to Iowa Code Chapter 595 by reason of the fact that both persons comprising such a couple are of the same sex.

§595.2(1) must be nullified, severed and stricken from Chapter 595 and all remaining provisions of Chapter 595 must be read and applied in a gender neutral manner so as to permit same-sex couples to enter into a civil marriage pursuant to said chapter.

## ORDER

61

It Is Therefore Ordered, Adjudged, and Decreed as follows:

1. Plaintiffs' motion for summary judgment is **GRANTED** and Defendant's
   opposing motion for summary judgment is **DENIED**.

2. Iowa Code §595.2(1) is hereby nullified, severed and stricken from Iowa
   Code Chapter 595.

3. All remaining provisions of Iowa Code Chapter 595 are to be interpreted in a
   gender-neutral manner so as not to exclude couples of the same sex from
   eligibility for a marriage license.

4. Defendant is hereby enjoined from refusing to issue marriage licenses to
   Plaintiffs or any other same-sex couples who a) are otherwise eligible for said
   licenses pursuant to Chapter 595 as amended and interpreted by this order,
   and b) who properly apply for such licenses.

5. Court costs are hereby taxed to Defendant.

Dated this 30th day of August, 2007.

**ROBERT B. HANSON, JUDGE**
Fifth Judicial District of Iowa

Copies to:

√ Michael B. O'Meara

62

Roger J. Kuhle
Assistant Polk County Attorneys
111 Court Avenue, Rm. 340
Des Moines, Iowa 50309
(515) 286-3341

Dennis W. Johnson
Amy M. Bjork
801 Grand Avenue, Suite 3900
Des Moines, Iowa 50309-2790
(515) 283-1000

Camilla B. Taylor
Kenneth Upton, Jr.
Lambda Legal Defense and Education Fund, Inc.
Midwest Regional Office
11 East Adams, Suite 1008
Chicago, Illinois 60603
(312) 663-4413