1   COOPER AND KIRK, PLLC
    Charles J. Cooper (DC Bar No. 248070)*
2   *ccooper@cooperkirk.com*
    David H. Thompson (DC Bar No. 450503)*
3   *dthompson@cooperkirk.com*
    Howard C. Nielson, Jr. (DC Bar No. 473018)*
4   *hnielson@cooperkirk.com*
    Nicole J. Moss (DC Bar No. 472424)*
5   *nmoss@cooperkirk.com*
    Peter A. Patterson (OH Bar No. 0080840)*
6   *ppatterson@cooperkirk.com*
    1523 New Hampshire Ave. N.W., Washington, D.C. 20036
7   Telephone: (202) 220-9600, Facsimile: (202) 220-9601

8   LAW OFFICES OF ANDREW P. PUGNO
    Andrew P. Pugno (CA Bar No. 206587)
9   *andrew@pugnolaw.com*
    101 Parkshore Drive, Suite 100, Folsom, California 95630
10  Telephone: (916) 608-3065, Facsimile: (916) 608-3066

11  ALLIANCE DEFENSE FUND
    Brian W. Raum (NY Bar No. 2856102)*
12  *braum@telladf.org*
    James A. Campbell (OH Bar No. 0081501)*
13  *jcampbell@telladf.org*
    15100 North 90th Street, Scottsdale, Arizona 85260
14  Telephone: (480) 444-0020, Facsimile: (480) 444-0028

15  ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
    GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
16  MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A
    PROJECT OF CALIFORNIA RENEWAL
17
    * Admitted *pro hac vice*
18
                    **UNITED STATES DISTRICT COURT**
19                  **NORTHERN DISTRICT OF CALIFORNIA**

20  KRISTIN M. PERRY, SANDRA B. STIER, PAUL
    T. KATAMI, and JEFFREY J. ZARRILLO,          CASE NO. 09-CV-2292 VRW
21
                                                 **DEFENDANT-INTERVENORS'**
22           Plaintiffs,                         **PROPOSED FINDINGS OF FACT**

23  CITY AND COUNTY OF SAN FRANCISCO,            **Pretrial Conference**

24           Plaintiff-Intervenor,              Date:    December 16, 2009
                                                Time:    10:00 a.m.
25        v.                                    Judge: Chief Judge Vaughn R. Walker
                                                Location: Courtroom 6, 17th Floor
26  ARNOLD SCHWARZENEGGER, in his official
    capacity as Governor of California; EDMUND G.  Trial Date: January 11, 2010
27  BROWN, JR., in his official capacity as Attorney
    General of California; MARK B. HORTON, in his
28

official capacity as Director of the California
Department of Public Health and State Registrar of
Vital Statistics; LINETTE SCOTT, in her official
capacity as Deputy Director of Health Information
& Strategic Planning for the California Department
of Public Health; PATRICK O'CONNELL, in his
official capacity as Clerk-Recorder for the County
of Alameda; and DEAN C. LOGAN, in his official
capacity as Registrar-Recorder/County Clerk for
the County of Los Angeles,

                    Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, GAIL J.
KNIGHT, MARTIN F. GUTIERREZ, HAK-
SHING WILLIAM TAM, and MARK A.
JANSSON; and PROTECTMARRIAGE.COM –
YES ON 8, A PROJECT OF CALIFORNIA
RENEWAL,

                    Defendant-Intervenors.

Additional Counsel for Defendant-Intervenors

ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
*tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 932-2850, Facsimile: (916) 932-2851

Jordan W. Lorence (DC Bar No. 385022)*
*jlorence@telladf.org*
Austin R. Nimocks (TX Bar No. 24002695)*
*animocks@telladf.org*
801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 393-8690, Facsimile: (202) 347-3622

* Admitted *pro hac vice*

### Proposed Findings of Fact[1]

**The Institution of Marriage**

1. Marriage is a complex social institution.

2. Marriage forms the foundation of the family and society.

3. Marriage has its roots in pair bonding between men and women that emerged early in our evolution as a species.

4. Every society has had some form of the institution of marriage.

5. Throughout history and across societies, marriage has always been defined, in both law and language, as the union of a man and a woman.

6. Marriage is a relationship within which a group socially approves and encourages sexual intercourse and the birth of children.

7. A core purpose of marriage is to guarantee that, insofar as possible, each child is emotionally, morally, practically, and legally affiliated with the woman and the man whose sexual union brought the child into the world.

8. As a matter of biological reality, societies must develop a method to bind men to their offspring.

9. Although certain aspects of the institution of marriage have varied from society to society, it has *universal functions*. These universal functions are:

   a. Complementing nature with culture to ensure the reproductive cycle;

   b. Providing children with both a mother and a father whenever possible:

   c. Providing children with their biological parents whenever possible;

   d. Bringing men and women together for both practical and symbolic purposes; and

   e. Providing men with a stake in family and society.

10. In light of its universal functions, the institution of marriage has been marked by *universal features*. These universal features include:

---

[1] In proposing these findings of fact, Defendant-Intervenors reserve the right to argue legal theories that, if adopted by the court, would result in some of the proposed findings being irrelevant to the outcome of this case. By proposing these findings in other words, they do not concede their relevance. Nor do they concede that they constitute adjudicative, as opposed to legislative facts.

a.  High social and legal authority and attractive incentives supporting the institution;

b.  Maleness and femaleness;

c.  A definition of eligible partners;

d.  A public dimension;

e.  Encouragement of procreation under specific conditions;

f.  Mutual support between men and women and duties toward children; and

g.  An emphasis on durable parental relationships.

11.  Mutual affection and companionship between partners is a common, although not universal, feature of marriage.

12.  The doctrine of coverture is not, and has never been, a universal feature of marriage.

13.  The doctrine of coverture is not, and has never been, a definitional feature of marriage.

14.  Restrictions based on the race of the partners are not, and have never been, a universal feature of marriage.

15.  Restrictions based on the race of the partners are not, and have never been, a definitional feature of marriage.

16.  Different rules have governed divorce at different times and in different places.

17.  A particular set of rules governing divorce is not, and has never been, a universal feature of marriage.

18.  A particular set of rules governing divorce is not, and has never been, a definitional feature of marriage.

19.  No society has established same-sex marriage as a cultural norm. Leading linguists, lawyers, philosophers, and social scientists have always understood marriage to be uniquely concerned with regulating naturally procreative relationships between men and women and providing for the nurture and care of the children who result from those relationships.

20.  The institution of marriage has always been indifferent to sexual orientation.

21.  Extending marriage to same-sex couples would result in a profound change to the definition, structure, and public meaning of marriage.

22.  Advocates for extending marriage to same-sex couples recognize (and many celebrate) that

2

doing so would radically alter the institution of marriage.

23. Many advocates for extending marriage to same-sex couples recognize the wisdom in taking a cautious approach to making such a significant change to the institution of marriage.

24. Many gays and lesbians recognize that same-sex relationships and opposite-sex relationships differ in important ways.

25. Prominent public figures, including President Obama, support the traditional definition of marriage, and oppose extending marriage to same-sex couples.

26. Numerous individuals, including prominent supporters of gay and lesbian rights, and even many gay and lesbian individuals, oppose recognizing same-sex relationships as marriages in good faith for legitimate reasons that have nothing to do with animus against gays and lesbians.

27. Historically and today, many societies and governments that embrace same-sex relationships and/or strongly affirm gay and lesbian rights have nevertheless determined that same-sex relationships should not be recognized as marriages.

**Marriage in the United States and Across the Globe**

28. Massachusetts was the first state to extend marriage to same-sex couples.  Massachusetts licensed its first same-sex marriages in 2004.

29. Until 2004, marriage in the United States had always been limited to opposite-sex couples.

30. In addition to Massachusetts, Connecticut, Iowa, and Vermont are the only other states that currently license same-sex marriages.  New Hampshire will also begin licensing same-sex marriages in January 2010.  In three of these States—Massachusetts, Connecticut, and Iowa—same-sex marriage was imposed by judicial decision.

31. The overwhelming majority of states continue to limit marriage to opposite-sex unions.

32. Twenty-nine states including California have Constitutional provisions defining marriage as the union of a man and a woman.   These amendments have all been enacted since 1998; twenty-six of them have been enacted since 2004.

33. Under federal law, the Defense of Marriage Act provides that only the union of a man and a woman is recognized as marriage.

3

34. In 2001, the Netherlands became the first nation to license same-sex marriages.  Since 2001, only Belgium, Spain, Canada, South Africa, Norway, and Sweden have extended marriage to same-sex couples.

35. The overwhelming majority of nations continue to limit marriage to opposite-sex unions.

36. Many countries throughout the world have declined to recognize same-sex relationships as marriages.

37. Where same-sex marriage is legal, the proportion of the gay and lesbian population that chooses to marry is significantly lower than the proportion of the heterosexual population that chooses to marry.

**Marriage in California**

38. From the beginning of California statehood, the legal institution of civil marriage has been understood to refer to the relationship of a man and a woman.

39. In 2000, 61.4% of the people of California voted to approve Proposition 22, a citizen-initiated statutory measure providing that "Only marriage between a man and a woman is valid or recognized in California."

40. Notwithstanding Proposition 22, the City and County of San Francisco, at the direction of Mayor Gavin Newsom, began issuing civil marriage licenses to same-sex couples in February 2004.

41. In August 2004, the California Supreme Court held that the City and County of San Francisco had exceeded its authority by issuing marriage licenses to same-sex couples and declared those marriages a legal nullity.

42. Despite not having the authority to repeal Proposition 22, in 2005 the California Legislature, supported by gay rights activists and groups, civil rights groups, labor unions, local governments, professional organizations, and religious organizations, passed a bill purporting to extend marriage to same-sex couples.  Governor Schwarzenegger vetoed the bill in light of Proposition 22.

43. In 2007, the California Legislature again passed a bill purporting to extend marriage to same-sex couples, and Governor Schwarzenegger again vetoed the bill.  In vetoing the bill,

1    Governor Schwarzenegger noted that a legal challenge to Proposition 22 under the California

2    Constitution was pending before the California Supreme Court.

3  44.  Legal actions challenging the traditional definition of marriage, including one filed by the

4    City and County of San Francisco, were joined in a single proceeding titled *In re Marriage*

5    *Cases*.

6  45.  Amici supporting the challenge to Proposition 22 included gay and lesbian rights

7    organizations; local governments; state legislators; hundreds of local faith communities;

8    rabbis, and ministers; and numerous professional and other associations.

9  46.  While the challenge to the traditional definition of marriage was pending in State court,

10    Proponents worked to obtain the signatures necessary to place an initiative measure before the

11    State's voters that would place the traditional definition of marriage in the California

12    Constitution.

13  47.  The initiative appeared on the November 4, 2008 ballot as Proposition 8, and proposed adding

14    a provision to the California Constitution providing that "Only marriage between a man and a

15    woman is valid or recognized in California."

16  48.  On May 15, 2008, a bare majority of a divided California Supreme Court held that reserving

17    marriage for opposite-sex couples violated the State Constitution.

18  49.  The campaign for and against Proposition 8 was the most expensive ever for a social issue.

19    According to reports maintained by the California Secretary of State, the Yes-on-8 campaign

20    raised approximately $40 million, while the No-on-8 campaign raised more than $43 million.

21  50.  On November 4, 2008, 52.3% of California's voters—over seven million people—voted to

22    approve Proposition 8.

23  51.  After the vote, both chambers of the California Legislature passed resolutions opposing

24    Proposition 8.

25  52.  Opponents of Proposition 8 also sought to invalidate it in State court, arguing that Proposition

26    8 was an improper "revision" to the California Constitution.  Amici supporting this suit

27    included dozens of current and former California legislators, labor organizations representing

28    approximately 2.5 million workers in the state, bar associations and other professional

5

organizations, and local governments.  In May 2009, the California Supreme Court held that Proposition 8 was a valid amendment to the California Constitution.

53.  Supporters of extending marriage to same-sex couples are currently mobilizing to repeal Proposition 8 through the ballot box.

54.  California's laws continue to reflect the understanding that marriage is uniquely concerned with regulating naturally procreative relationships between men and women and providing for the nurture and care of the children who result from those relationships.

55.  California's marriage laws, including Proposition 8, do not reflect or promote improper gender stereotypes or the supremacy of one sex over the other.

56.  Proposition 8 was not designed to reflect or promote improper gender stereotypes or the supremacy of one sex over the other.

**Domestic Partnerships in California**

57.  Through its domestic partnership laws, California currently makes available to same-sex couples virtually all of the state-level rights and benefits provided by marriage.

58.  California's domestic partnerships have developed to their present status over the past 25 years.

59.  California's domestic partnerships have developed without pressure from the courts and have not faced repeal through ballot initiatives or referenda.

60.  California's domestic partnerships have developed with the support and sponsorship of gay and lesbian rights groups.

61.  In 1984, the City of Berkeley adopted a law extending employee benefits to same-sex partners of city employees.  The next year, 1985, the City of West Hollywood provided legal recognition to same-sex couples in the general public through a domestic partnership ordinance.

62.  Over the next 15 years, 18 local governments in California established domestic partnership registries that provided legal recognition to same-sex couples.

63.  In 1995, the California Legislature first considered a bill that would establish a state-wide domestic partnership registry.

64. In 1999, the California Legislature passed and Governor Davis signed into law a bill establishing a statewide domestic partnership registry.

65. In 2003, the California Legislature passed and Governor Davis signed into law a bill, the Domestic Partner Rights and Responsibilities Act of 2003, granting domestic partners essentially the same state-level rights and obligations as spouses. The law became fully operative on January 1, 2005.

66. The Domestic Partner Rights and Responsibilities Act of 2003 garnered broad support from California's state and local public officials, civil rights organizations, labor unions, and religious congregations.

67. Equality California, a group that champions gay and lesbian interests, sponsored the Domestic Partner Rights and Responsibilities Act of 2003. That group, along with the Lambda Legal Defense Fund and the National Center for Lesbian Rights, helped draft the legislation.

68. Dozens of gay and lesbian groups across the state mobilized their supporters to advocate for the Domestic Partner Rights and Responsibilities Act of 2003.

69. Equality California hailed the enactment of the Domestic Partner Rights and Responsibilities Act of 2003 as "a tremendous civil rights victory for LGBT people" and "an incredible personal victory for those of us who will now have the kind of legal recognition that we have spent a lifetime dreaming about."

70. From January 2005 through September 2009, over 23,000 domestic partnerships were registered in California. The highest one-month total for domestic partnership registrations during that time was about 600; the lowest just below 300.

71. California's domestic partnerships do not stigmatize gays and lesbians.

72. Gays and lesbians in other countries regularly embrace alternative statuses to marriage.

73. Where same-sex marriage and alternative institutions such as domestic partnerships or civil unions are both available, a significant number of same-sex couples choose to enter the alternative institution.

**Child Well-Being**

74. Social science research indicates that, on average, the ideal family structure for a child is a

7

1   family headed by two biological parents in a low-conflict marriage.

2   75.   Social science research indicates that, on average, children who grow up with one biological

3        parent and one step-parent experience worse outcomes than children who grow up with both

4        of their biological parents.

5   76.   Social science research indicates that, on average, children who grow up with one parent

6        experience worse outcomes than children who grow up with both of their biological parents.

7   77.   Social science research indicates that children who do not live with their married, biological

8        parents are at a heightened risk for health problems, mortality, and suicide.

9   78.   Social science research indicates that children who do not live with their married, biological

10       parents are at a heightened risk for problems related to drug and alcohol abuse.

11  79.   Social science research indicates that children who do not live with their married, biological

12       parents are at a heightened risk for criminal behavior and incarceration.

13  80.   Social science research indicates that children who do not live with their married, biological

14       parents are at a heightened risk for intergenerational poverty.

15  81.   Social science research indicates that children who do not live with their married, biological

16       parents are at a heightened risk for problems in education and/or labor force contribution.

17  82.   Social science research indicates that children who do not live with their married, biological

18       parents are at a heightened risk for sexual activity and early childbearing.

19  83.   Many of the negative outcomes associated with not being raised by married, biological

20       parents become more pronounced (or at least more measurable) in adolescence or early

21       adulthood.

22  84.   No meaningful conclusions can be drawn from social science research into the effect that

23       being raised by same-sex parents has on children because of methodological flaws in the

24       research.

25  85.   The rarity and novelty of same-sex parenting means social scientists are currently unable to

26       draw meaningful conclusions about its impact on children.

27  **Effects of Extending Marriage to Same-Sex Couples**

28  86.   Although it is impossible at this time to identify with absolute certainty all the negative

8

consequences that will flow from redefining marriage to include same sex couples, it is likely that such a redefinition would harm the institution and the vital interests it serves.

87. Extending marriage to same-sex couples would change the public meaning of the institution of marriage.

88. The public meaning of the institution of marriage is important to society.

89. A change in the public meaning of marriage will have real world consequences for society.

90. It will take many years, and possibly decades, for all of the consequences of a change in the public meaning of marriage to manifest themselves.

91. Because marriage is a complex institution, it may never be possible to isolate the causal consequences of same sex marriage on marriage rates, out of wedlock birth rates, divorce rates, and other aspects of family relations that are of vital importance to society.

92. Extending marriage to same-sex couples would entail the further, and in some respects full, deinstitutionalization of marriage.

93. Extending marriage to same-sex couples would contribute to significantly changing the legal and public meaning of marriage from an institution with defined legal and social structure and purposes to a right of personal expression.

94. Extending marriage to same-sex couples would likely lead to the further erosion of the institution of marriage, as reflected primarily in lower marriage rates, higher rates of divorce and non-marital cohabitation, and more children raised outside of marriage and separated from at least one natural parent.

95. Extending marriage to same-sex couples would result in explicit public endorsement of the idea that a child does not need both a mother and a father. This would likely result in fewer children growing up with fathers.

96. Extending marriage to same-sex couples would weaken in the culture and eradicate in the law the idea that a natural mother married to a natural father is generally the best environment for raising a child. This would likely result in fewer children being raised by their own married parents.

97. Extending marriage to same-sex couples would weaken the idea that each parent—both

9

mother and father—makes a unique contribution to parenting. This would likely result in fewer men believing it is important for them to be active, hands-on parents of their children.

98. Extending marriage to same-sex couples would contribute to replacing the norm of the natural parent with that of the legal parent, likely increasing the disjuncture between the biological and legal-social dimensions of parenthood and increasing the power of the state to determine who is entitled to parental rights.

99. Extending marriage to same-sex couples could increase the social acceptability of other alternative forms of intimate relationships, such as polygamy and polyamory.

100. Extending marriage to same-sex couples would increase the likelihood that the recognition as marriages of other alternative forms of intimate relationships, such as polyamory and polygamy, will become a judicially enforceable legal entitlement.

101. Extending marriage to same-sex couples would legally enshrine the principle that sexual orientation, as opposed to sexual embodiment is a valid determinant of the structure and meaning of marriage.

102. Extending marriage to same-sex couples would increase the likelihood that bisexual orientation could form a basis for a legal entitlement to group marriage.

103. Extending marriage to same-sex couples would likely result in all relevant branches and agencies of government formally replacing the idea that marriage centers on opposite-sex bonding and male-female procreation with the idea that marriage is merely a private relationship between consenting adults.

104. Extending marriage to same-sex couples could end or significantly dilute the public socialization of heterosexual young people into a marriage culture.

105. Extending marriage to same-sex couples could cause many Americans opposed to same-sex marriage to abandon the public institutions that promote it, possibly resulting in the weakening of those institutions and further rending our common culture.

106. Extending marriage to same-sex couples would render the traditional definition of marriage embraced by millions of Christian, Jewish, and Muslim Americans no longer legally or socially acceptable, thereby forcing many of these Americans to choose between being a

10

believer and being a good citizen.

107. Extending marriage to same-sex couples could lead to new state-imposed restrictions of First Amendment freedoms.

108. Extending marriage to same-sex couples could curtail the religious liberty of citizens whose religious beliefs lead them to support the traditional definition of marriage.

109. Extending marriage to same-sex couples could force some religious organizations that currently receive public support to cease providing charitable services to the poor and others.

110. Extending marriage to same-sex couples could contribute to the public belief that marriage is politicized.

111. Extending marriage to same-sex couples could lead unmarried people to increasingly—and logically—complain that the legal and practical benefits currently attached to marriage properly belong to everyone.

112. Extending marriage to same-sex couples would seriously threaten the functions and symbolism of marriage, thereby posing a risk to children and the demographic continuity of society.

113. Extending marriage to same-sex couples would send a message to men that they have no significant place in family life, weakening the connection of fathers to their children.

114. Extending marriage to same-sex couples would move marriage further away from its grounding in reproduction and the intergenerational cycle.

115. Extending marriage to same-sex couples would likely lead to changes in the laws governing marriage and parallel institutions in a manner that undercuts the effectiveness of marriage in achieving its traditional purposes.

**Motivations for Supporting and Opposing Proposition 8**

116. Californians voted for Proposition 8 because they thought it would strengthen the institution of marriage.

117. Californians voted Proposition 8 because they thought it would strengthen traditional families.

118. Californians voted for Proposition 8 because they thought it would benefit children.

119. Californians voted for Proposition 8 because they thought the issue of extending marriage to

11

same-sex couples should be decided by the people, not by the courts.

120. Californians voted for Proposition 8 because they thought it would further the interests that have been identified by Proponents in this litigation.

121. Californians who voted on Proposition 8 were aware of the vital interests furthered by the traditional definition of marriage.

122. Californians voted for Proposition 8 in reaction against the tactics—including violence and intimidation—engaged in by Proposition 8 opponents.

123. Californians voted for Proposition 8 because they thought it would protect the ability of parents to direct the education and upbringing of their children.

124. Californians voted for Proposition 8 because they thought it would protect their religious liberty and other First Amendment rights.

125. Gays and lesbians voted for Proposition 8.

126. Californians voted against Proposition 8 out of animus towards Mormons and the Catholic Church.

127. Californians voted against Proposition 8 out of animus towards organizations, individuals, and groups who embrace traditional values.

128. Californians voted against Proposition 8 out of animus towards its supporters.

129. Californians voted against Proposition 8 on moral grounds.

130. Californians voted against Proposition 8 for religious reasons.

131. Both supporters and opponents of Proposition 8 (and same-sex marriage in general) have voiced their opinions forcefully, passionately, and sometimes intemperately.

132. Gay rights organizations such as the National Gay and Lesbian Task Force actively promote support for gay marriage in religious communities.

133. Interfaith groups in California, such as California Faith for Equality, support extending marriage to same-sex couples and thus opposed Proposition 8.

134. The United Church of Christ supports extending marriage to same-sex couples and thus opposed Proposition 8.

135. The Metropolitan Church supports extending marriage to same-sex marriage and thus opposed

12

Proposition 8.

136. The Unitarian Universalist Association supports extending marriage to same-sex couples and thus opposed Proposition 8.

137. Reform Judaism supports extending marriage to same-sex couples and thus opposed Proposition 8.

138. Reconstructionist Judaism supports extending marriage to same-sex couples and thus opposed Proposition 8.

139. The six main Episcopal bishops in California opposed Proposition 8.

140. Many California Presbyterians opposed Proposition 8.

141. Many individual Catholics, Mormons, Evangelical Christians, and Orthodox Jews support extending marriage to same-sex couples and thus opposed Proposition 8.

142. Many religious people who oppose extending marriage to same-sex couples support their position with secular arguments made in good faith.

143. The sincerely held moral and religious beliefs of many people require them to love and accept gays and lesbians despite disapproving certain aspects of their conduct.

## Sexual Orientation

144. There is no consensus definition of "sexual orientation" in the general public, the scientific community, among elected officials, and among academics who study sexual orientation.

145. Sexual orientation is a complex and amorphous phenomenon that defies consistent and uniform definition.

146. The literature uses three basic definitions of sexual orientation.

147. One definition of sexual orientation is based on sexual attraction.

148. One definition of sexual orientation is based on sexual behavior.

149. One definition of sexual orientation is based on self-ascribed sexual identity.

150. Within each of these definitions of sexual orientation, distinctions between different sexual orientations are arguable.

151. A given individual's sexual orientation may not be consistent across the three basic definitions.

152. Researchers have concluded that homosexuality is fundamentally a multidimensional phenomenon that has manifold meanings and interpretations, depending on context and purpose.

153. Psychologists' views about homosexuality, including whether it can be changed and whether it is a "disorder" or a normal variant of human sexuality, have varied over time.

154. Variations in psychologists' views about homosexuality are not attributable to new factual discoveries or scientific investigation, but rather to changed perspectives.

155. Legislatures have defined sexual orientation in law in a variety of ways, looking to factors such as attraction, external perception, social identity, behavior, and relationships.

156. Homosexuality is not genetically determined.

157. No aspect of sexual orientation has been shown to be immutable.

158. An individual's sexual orientation can change over the course of a lifetime.

159. Research shows that many individuals' sexual orientation does change over the course of a lifetime.

160. Women's sexual orientation tends to be particularly fluid, malleable, shaped by life experiences, and capable of change over time.

161. For many people, adopting a particular sexual orientation is a conscious choice.

162. Many gays and lesbians have at one time been married to individuals of the opposite sex.

**Political Power**

163. Gays and lesbians have substantial political power. This political power manifests itself in numerous ways: the ability to force lawmakers to take actions against their will, the ability to achieve legislative and regulatory victories, the powerful and reliable political allies of the LGBT community (including leading professional organizations, labor unions, the Democratic party, the elite media, traditional civil rights organizations, Hollywood, and numerous politicians), and the ability to attract the attention of lawmakers.

164. Many heterosexuals are reliable political allies of gays and lesbians.

165. Gays and lesbians are able to mobilize significant financial resources in support of their political agenda.

14

166. Gays and lesbians in 31 states and the District of Columbia have secured legislation punishing hate crimes based on sexual orientation.

167. Gays and lesbians in 21 states and the District of Columbia have secured legislation prohibiting employment discrimination on the basis of sexual orientation.

168. Gays and lesbians in 22 states and the District of Columbia have secured domestic partnership benefits for state employees.

169. Gays and lesbians in 9 states and the District of Columbia have secured legislation adopting civil unions or domestic partnerships.

170. Gays and lesbians have had increasing success securing election to public office.  According to the Gay and Lesbian Victory Fund, in 1991 fewer than 50 served as elected officials, whereas today more than 440 do.

171. In 2008, the Victory Fund endorsed 111 openly LGBT candidates; 80 won their elections.  In 2009, 49 out of 79 such candidates won their elections.

172. Gays and lesbians have achieved significant political power at the national level.

173. The Democratic Party is closely aligned with the gay and lesbian rights movement.

174. President Obama is a strong advocate for expanding the rights of gays and lesbians.

175. Gays and lesbians have significant influence in Congress.

176. Gays and lesbians have secured national legislation extending hate crimes protection to LGBT people.

177. Gays and lesbians have gained significant Congressional support for repealing the military's Don't Ask, Don't Tell policy, repealing the Defense of Marriage Act, prohibiting employment discrimination on the basis of sexual orientation, and providing domestic partnership benefits to federal employees.

178. Gays and lesbians in California, in other states, and at the national level have demonstrated the ability to attract the attention of lawmakers.

179. Gays and lesbians have achieved the power they need to effectively pursue their goals through democratic institutions.

180. Gays and lesbians in California have the power to extract favorable policy outcomes from the

15

1    political system.

2    181. California provides gays and lesbians some of the most comprehensive civil rights protections

3         in the nation.

4    182. With the exception of extending marriage to same-sex couples, virtually every policy

5         supported by the gay and lesbian lobby in California has been enacted into California law,

6         including enhanced punishment for crimes committed on the basis of the victim's sexual

7         orientation, and prohibitions on sexual-orientation discrimination in public and private

8         employment, business services, education, housing, insurance, medical care, publicly funded

9         programs and activities, public contracting, and a wide array of other contexts.

10   183. The political power of gays and lesbians in California is reflected by the refusal of the State

11        Defendants, including the Governor, to support Proposition 8.

12   184. The Attorney General has taken the position that Proposition 8 is unconstitutional.

13   185. The City and County of San Francisco displayed its active commitment to the interests of the

14        gay and lesbian lobby by intervening in this lawsuit to challenge Proposition 8.

15   186. The political coalition supporting gay and lesbian rights in California includes leading labor

16        unions, leading corporations, the California Democratic Party, the state's Republican

17        Governor, other statewide elected officials including the Attorney General, stable legislative

18        majorities, local governments including the City and County of San Francisco, local elected

19        officials, the state's largest media outlets, private foundations, bar associations and other

20        professional organizations, and many churches and other faith-based organizations.

21   187. Other than Propositions 22 and 8, Californians have not used the initiative and referendum

22        processes to establish the state's public policy respecting gay and lesbian rights.

23   188. The coalition that opposed Proposition 8 raised and spent more money than the proposition's

24        proponents.

25   189. The public is increasingly accepting of gays and lesbians and increasingly supportive of rights

26        for gay and lesbian individuals and same-sex couples.

27   190. To the extent the LGBT community sometimes exercises less political power than some might

28        desire, the tactics and statements of members of this community play a contributing role.

16

**History of Discrimination**

191.  At present, discrimination against gays and lesbians is far less severe and common than in times past, and is growing increasingly rare.

192.  Gays and lesbians are not subject to official discrimination by the state of California.

193.  While gays and lesbians continue to experience private discrimination to some degree, instances of such discrimination are increasingly rare, and gays and lesbians in California have secured comprehensive legal protection from such discrimination through the political process.

194.  California is one of the most gay-friendly states in the United States.

195.  California is a popular destination for gay and lesbian tourists.

**Marriage, Procreation, and the Distinct Contribution of Opposite-Sex Couples**

196.  Same-sex couples are different than opposite-sex couples in that only opposite-sex couples have the capacity to procreate naturally; same-sex couples are inherently incapable of doing so.

197.  Only opposite-sex couples have the capacity to raise children that are emotionally, naturally, practically, and legally affiliated with the woman and the man whose sexual union brought the child into the world.

198.  Only opposite-sex couples have the capacity to raise children with both a mother and a father.

199.  Society's continued survival depends upon opposite-sex couples having and raising children.

200.  Unintended pregnancies, which can only occur in opposite-sex relationships, present society with unique challenges.

201.  Society is harmed when mothers and fathers do not take responsibility for raising their children.

202.  Because they lack the natural procreative capacity of opposite-sex relationships, same-sex relationships do not pose the unique benefits and challenges to society that follow from the natural procreative capacity of opposite-sex relationships.

203.  Many developed nations are facing low and declining birthrates inadequate to maintain their populations.

204. The fertility rate in the United States is barely at replacement level.

205. Nations view their low and declining birthrates as a serious crisis that could jeopardize their basic societal foundations and threaten their survival as nations.

206. The traditional institution of marriage promotes formation of naturally procreative relationships.

207. The traditional institution of marriage promotes stability in naturally procreative relationships.

208. The traditional institution of marriage promotes enduring and stable family structures for the responsible raising and care of children by their biological parents.

209. Traditional marriage promotes procreation by encouraging stability and commitment in opposite-sex relationships conducive to undertaking the responsibilities associated with raising children.

210. Married opposite-sex couples tend to have more children than non-married opposite-sex couples.

211. Opposite-sex couples are more likely to raise children than same-sex couples.

212. Opposite-sex couples with children raise, on average, more children than same-sex couples who raise children.

213. The relationships of married, opposite-sex couples are, on average, more stable than the relationships of unmarried, opposite-sex couples.

214. There is a natural and mutually beneficial bond between children and their biological parents.

215. Children desire to know and have a relationship with their biological parents.

216. The traditional institution of marriage nurtures and promotes the bond between children and their biological parents.

217. The traditional institution of marriage increases the probability that natural procreation will occur within stable, enduring, and supporting family structures.

218. The traditional institution of marriage increases the probability that each child will be raised by both of his or her biological parents.

219. The traditional institution of marriage increases the probability that each child will be raised by both a mother and a father.

18

220. The traditional institution of marriage increases the probability that each child will have a legally recognized mother and father.

221. Allowing all opposite-sex couples to marry promotes a stable framework for raising any children that might result when a couple that does not intend to have children has an accidental or intentional change in plans.

222. Allowing all opposite-sex couples to marry discourages the fertile partner of a sterile spouse from engaging in irresponsible, potentially procreative activity with other individuals.

223. Allowing all opposite-sex couples to marry reinforces cultural norms that heterosexual relationships—which generally are potentially procreative—should take place within the framework of marriage.

Dated:        December 7, 2009

COOPER AND KIRK, PLLC
ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

By: /s/Charles J. Cooper
      Charles J. Cooper