COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)\*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)\*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)\*
*hnielson@cooperkirk.com*
Nicole J. Moss (DC Bar No. 472424)\*
*nmoss@cooperkirk.com*
Peter A. Patterson (OH Bar No. 0080840)\*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)\*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)\*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

\* Admitted *pro hac vice*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, <br><br> Plaintiffs, <br><br> CITY AND COUNTY OF SAN FRANCISCO, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his | CASE NO. 09-CV-2292 VRW <br><br> **DEFENDANT-INTERVENORS' TRIAL MEMORANDUM** <br><br> <u>Pretrial Conference</u> <br><br> Date: December 16, 2009 <br> Time: 10:00 a.m. <br> Judge: Chief Judge Vaughn R. Walker <br> Location: Courtroom 6, 17th Floor <br><br> Trial Date: January 11, 2010 |

official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,

          Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, and MARK A. JANSSON; and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL,

          Defendant-Intervenors.

<u>Additional Counsel for Defendant-Intervenors</u>

ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
*tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 932-2850, Facsimile: (916) 932-2851

Jordan W. Lorence (DC Bar No. 385022)*
*jlorence@telladf.org*
Austin R. Nimocks (TX Bar No. 24002695)*
*animocks@telladf.org*
801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 393-8690, Facsimile: (202) 347-3622

* Admitted *pro hac vice*

**TABLE OF CONTENTS**

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT ...................................................................................................................................2

I. The Supreme Court's Decision in *Baker* Requires Rejection of Plaintiffs' Claims. ...............2

II. Proposition 8 Is Not Subject to Heightened Scrutiny under the Due Process Clause .............2

III. Proposition 8 Is Not Subject To Heightened Scrutiny Under The Equal Protection Clause ...4

IV. Proposition 8 Satisfies Rational Basis Review. ....................................................................... 6

V. Proposition 8 Satisfies Heightened Scrutiny ..........................................................................12

VI. Proposition 8 Is Not Tainted By Animus Or Any Improper Motivation ...............................12

    A. This Court Should Evaluate the Constitutionality of Proposition 8 Solely by Considering Its Language and Legal Operation. ...........................................................12

    B. The Language and Operation of Proposition 8 Refute Plaintiffs' Claim of Animus. 13

    C. An Examination of the "Actual Purposes" of Proposition 8 Would Refute Plaintiffs' Claims of Animus. ............................................................................................................13

CONCLUSION..............................................................................................................................15

# TABLE OF AUTHORITIES

**Cases** **Page**

*Adams v. Howerton*, 673 F.2d 1036 (9th Cir. 1982)..........................................................................7

*Baker v. Nelson*, 409 U.S. 810 (1972) ..........................................................................................2, 4

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) .......................................................................15

*Citizens for Equal Prot. v. Bruning*, 455 F.3d 859 (8th Cir. 2006) .................................................7

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)......................................................6

*Crawford v. Board of Educ.*, 458 U.S. 527 (1982).......................................................................13

*FCC v. Beach Communications*, 508 U.S. 307 (1993)..............................................................6, 12

*Frontiero v. Richardson*, 411 U.S. 677 (1973)...............................................................................5

*Heckler v. Mathews*, 465 U.S. 728 (1984)....................................................................................12

*Heller v. Doe*, 509 U.S. 312 (1993)..........................................................................................6, 11

*High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990)...................4

*In re Marriage Cases*, 1183 P.3d 384 (Cal. 2008) ....................................................................1, 13

*Johnson v. Robison*, 415 U.S. 361 (1974) ......................................................................................8

*Katzenbach v. Morgan*, 384 U.S. 641 (1966) ...............................................................................11

*Lawrence v. Texas*, 539 U.S. 558 (2003)..................................................................................4, 14

*Las Vegas v Foley*, 747 F.2d 1294 (9th Cir. 1984)........................................................................12

*Maher v. Roe*, 432 U.S. 464 (1977)...............................................................................................14

*McGowan v. Maryland*, 366 U.S. 420 (1961) ..............................................................................14

*Nguyen v. INS*, 533 U.S. 53 (2001)................................................................................................12

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..........................................................................................4

*SASSO v. Union City*, 424 F.2d 291 (9th Cir. 1970) .....................................................................12

*Strauss v. Horton*, 207 P.3d 48 (Cal. 2009).................................................................................13

*United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166 (1980)..................................................12

*Vance v. Bradley*, 440 U.S. 93 (1979) .....................................................................................6, 11

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ..................................................................2, 6, 14

Save for a few brief months between the California Supreme Court's decision in *In re Marriage Cases*, 183 P.3d 384 (Cal. 2008), and the adoption of Proposition 8, California has from its inception always limited marriage to the union of a man and a woman. Indeed, until this decade, every State, nation, and civilized society in every period of history had always limited marriage to opposite-sex relationships. And although a handful of States and foreign nations have very recently begun to experiment with extending marriage to same-sex relationships, the overwhelming majority of States and nations continue to limit marriage in this manner. Contrary to Plaintiffs' contentions, the traditional definition of marriage does not reflect animus against gays and lesbians—in California or anywhere else. Nor is it in anyway arbitrary or irrational. Rather, it simply reflects the fact that the institution of marriage is, and always has been, uniquely concerned with promoting and regulating naturally procreative relationships between men and women to provide for the nurture and upbringing of the next generation. Although sharply disputed by Plaintiffs, this understanding of the central purposes of marriage has been repeatedly and persuasively articulated by leading lawyers, linguists, philosophers, and social scientists throughout history up to and including the present day. Indeed, until the recent advent of the movement to extend marriage to same-sex couples, this understanding of the central purposes of marriage was essentially undisputed.

Because same-sex marriage is a very recent and still extremely limited phenomenon, it is impossible to determine with certainty how redefining marriage to include same-sex relationships would affect the institution and the vital interests it has always served. But there is every reason to believe—as do many supporters as well as opponents of same-sex marriage—that redefining marriage in this manner will fundamentally change the public meaning of marriage in ways that will weaken this institution and harm the interests it has traditionally served.

For this reason, Proposition 8—which simply preserves the traditional definition of marriage and allows the people of California to proceed incrementally, and with caution, in addressing novel, controversial, and far-reaching changes to this venerable and bedrock social institution—is plainly constitutional. Neither the Due Process Clause nor the Equal Protection Clause requires this Court to invalidate the traditional definition of marriage and effectively sweep aside not only Proposition

8 but the marriage laws of 44 other states and the federal government as well.

## ARGUMENT

Proponents will demonstrate, through evidence presented at trial and post-trial briefing, if ordered by the Court, that Plaintiffs' claims should be rejected and judgment entered for the Defendants for the reasons set forth below.

### I. The Supreme Court's Decision in *Baker* Requires Rejection of Plaintiffs' Claims.

As demonstrated in our summary judgment papers, the United States Supreme Court's decision in *Baker v. Nelson*, 409 U.S. 810 (1972), conclusively establishes that the traditional definition of marriage as the union of a man and a woman does not violate the Fourteenth Amendment.[1]

### II. Proposition 8 Is Not Subject to Heightened Scrutiny under the Due Process Clause.

Under controlling Supreme Court precedent, substantive due process "specifically protects those fundamental rights and liberties which are," (1) "objectively, deeply rooted in this Nation's history and tradition," and (2) "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks omitted). The identification of such rights requires a "careful description of the asserted fundamental liberty interest." *Id*. The inquiry mandated by this controlling precedent makes clear that Proposition 8 does not infringe upon a fundamental right. Accordingly, it is subject only to rational-basis review under the Due Process Clause. *See id*. at 728.

1. Under *Glucksberg*, any claim that there is a fundamental right to have a same-sex relationship recognized as a marriage plainly lacks merit. Proponents will demonstrate, through documentary evidence, expert testimony, and/or legal materials that until this decade marriage has always been limited to opposite-sex unions, both in California and throughout the United States. The same limitation has existed in every civilized society throughout every period of history. While a handful of States and foreign countries have very recently begun to experiment with same-

---

[1] Although this Court remains free to revisit this issue, *see* Local Rules 56-2, we recognize that this Court rejected this and other arguments in its summary judgment ruling. Thus, although we wish to preserve the issue, we will not belabor it here. More generally, we hereby explicitly incorporate and preserve all of the arguments made in our summary judgment papers, including our contention that the disputed issues in this case are legal in nature and/or involve legislative facts and thus need not be established through trial. *See* Doc # 172-1; Doc # 213.

sex marriages, the overwhelming majority of States and nations continue to limit marriage to opposite-sex unions. Indeed, more than half of the States, like California, have enshrined this limitation in their Constitutions during the past five years alone.

Proponents will also demonstrate that throughout history, marriage has always been understood—indeed *defined*—both in law and language, as the union of a man and a woman. Nor is this definition in anyway arbitrary or accidental. On the contrary, leading linguists, lawyers, philosophers, and social scientists have always understood marriage to be uniquely concerned with regulating naturally procreative relationships between men and women and providing for the nurture and care of the children who result from those relationships. California's laws continue to reflect this understanding.

2. Nor can a right to have a same-sex relationship recognized as a marriage be shoehorned into the fundamental right to marry that has been recognized by the Supreme Court. Any attempt to define the latter right in so highly generalized and ahistorical a manner as would be necessary for it to encompass same-sex relationships is plainly contrary to the careful inquiry mandated by *Glucksberg*.[2] Not surprisingly, the Supreme Court has never so much as hinted that the fundamental right to marry extends beyond opposite-sex unions. On the contrary, all of its cases upholding this right have addressed opposite-sex unions, and the reasoning and language of these cases are demonstrably rooted in the traditional understanding of marriage as the union of a man and a woman.

Citing the abolishment of anti-miscegenation laws and coverture, as well as the advent of no-fault divorce, Plaintiffs contend that the institution of marriage is capacious and fluid enough to encompass same-sex relationships. Even if Plaintiffs' historical account were correct, the changes they identify simply do not bear on whether the fundamental right to marry protected by the Due Process Clause extends to same-sex relationships. In all events, Proponents will demonstrate that the changes cited by Plaintiffs are different in kind from the radical redefinition of marriage that

---

[2] Furthermore, if the fundamental right to marry were conceived of in so abstract and ahistorical a manner, it is difficult to see why it would not also encompass other types of relationships, such as polygamous, polyamorous, and even some incestuous or underage relationships, that the state has traditionally refused to recognize as marriages.

3

would be required under Plaintiffs' legal theory. Among other things, these changes all involved features of marriage that were never universal, much less definitional—even in the United States, let alone throughout history and across civilizations. Furthermore, all of these changes had already taken place, or were at least underway, at the time the Supreme Court determined that the fundamental right to marry does not extend to same-sex relationships in *Baker*, 409 U.S. at 810.

3. Finally, *Lawrence v. Texas*, which held that the Due Process Clause bars the criminalization of "the most private human conduct, sexual behavior, in the most private of places, the home," 539 U.S. 558, 567 (2003), does not support a right to have a same-sex relationship recognized as a marriage. Indeed the Court explicitly stated that it was not addressing the question whether or not same-sex relationships are "entitled to formal recognition in the law." *Id*. at 567; *see also id*. at 585 (O'Connor, J., concurring in judgment).

### III. Proposition 8 Is Not Subject to Heightened Scrutiny Under the Equal Protection Clause.

The distinction drawn by Proposition 8 between opposite-sex couples, on the one hand, and any other kind of relationship, including same-sex relationships, on the other hand, is subject only to rational basis review under the Equal Protection Clause.

1. It is an undeniable biological fact that same-sex couples are inherently incapable of natural procreation. Because the institution of marriage has always been uniquely concerned with regulating naturally procreative relationships, same-sex couples are not similarly situated to opposite-sex couples for purposes of marriage. Accordingly, Plaintiffs' Equal Protection claim should be rejected. *See, e.g., Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

2. To the extent Proposition 8 draws a distinction based on sexual orientation, it is subject only to rational basis review under the Equal Protection Clause. Like every other federal court of appeals to address the issue, the Ninth Circuit has squarely held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny." *E.g., High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). Specifically, it has held that suspect or quasi-suspect classification requires a showing that a group (1) has suffered a history of discrimination, (2) is defined by an immutable characteristic, and (3) is politically

4

powerless, and that gays and lesbians do not satisfy the second and third requirements. *Id*. at 573-74. These holdings are binding, but Proponents will nonetheless demonstrate that they are plainly correct.

*First*, Proponents will demonstrate that, far from being immutable, sexual orientation is a complex and amorphous phenomenon that defies consistent and uniform definition. Proponents will further demonstrate that however it is defined, sexual orientation can shift over time and does so for a significant number of people. And while its nature and determinants are not fully understood, it is plain that sexual orientation is not "determined solely by accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality). The evidence at trial will show that many people freely choose their sexual orientation.

*Second*, Proponents will demonstrate that, far from being politically powerless, gays and lesbians have substantial political power. This political power manifests itself in numerous ways, including the ability to force lawmakers to take positions and actions against their preferences, the ability to achieve legislative and regulatory victories, the existence of powerful and reliable political allies of the LGBT community (including leading professional organizations, labor unions, the Democratic party, the elite media, traditional civil rights organizations, Hollywood, and numerous politicians), and the ability to attract the attention of lawmakers. Indeed, with the exception of extending the denomination of marriage to same-sex relationships, virtually every policy supported by the gay and lesbian lobby in California has been enacted into California law. The positions taken by the Government defendants in this litigation likewise reflect the political reality that gays and lesbians are far from powerless. To the extent the LGBT community sometimes exercises less political power than some might desire, the tactics and statements of members of this community play a contributing role.

*Third*, Plaintiffs vastly overstate the significance of prior discrimination against gays and lesbians. To be sure, in the past there was governmental discrimination against gay and lesbian individuals. But in 2009 in California, the government of California does not discriminate against gays and lesbians. In fact, gays and lesbians enjoy more social acceptance than ever before in this country. To be sure, there are segments of the citizenry that adhere to traditional moral and/or

5

religious views that disapprove of homosexual conduct. But sincerely held moral or religious views that require acceptance and love of gay people, while disapproving certain aspects of their conduct, are not tantamount to discrimination.

*Finally*, to the extent the relationship between sexual orientation and an individual's ability to contribute to society bears on the proper level of scrutiny under the Equal Protection Clause, this factor cuts sharply against heightened scrutiny here. For while sexual orientation may not affect individuals' ability to contribute to society as a general matter, there is one critical exception: because they lack the natural procreative capacity of opposite-sex relations, same-sex relationships do not pose the unique benefits and challenges to society that follow from the natural procreative capacity of heterosexual relationships. Because it is precisely these benefits and challenges that the institution of marriage is primarily designed to address, it follows that Proposition 8 should be subject only to rational-basis review under the Equal Protection Clause. *See*, *e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).

3. Because the traditional definition of marriage as the union of a man and a woman does not treat men and women differently, every federal court, and nearly every state court to address the issue has determined that this definition does not discriminate on the basis of sex. Nor is there any credible evidence that the traditional opposite-sex definition of marriage functions to maintain male (or female) supremacy or improper stereotypes. Further, Plaintiffs' sex-discrimination claim improperly conflates discrimination on the basis of sex with discrimination on the basis of sexual orientation. For all of these reasons, Proposition 8 is not subject to heightened scrutiny on this ground.

**IV.    Proposition 8 Satisfies Rational Basis Review.**

Under rational basis review, Proposition 8 must be sustained if it is rationally related to any legitimate governmental interest. *See, e.g., Glucksberg*, 521 U.S. at 728; *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Under this highly deferential standard, Proposition 8 "comes to [the Court] bearing a strong presumption of validity," and Plaintiffs bear "the burden to negative every conceivable basis which might support it." *FCC v. Beach Commc'ns*, 508 U.S. 307, 313-15 (1993). Indeed, Plaintiffs "must convince the court that the legislative facts on which the classification

[drawn by Proposition 8] is apparently based could not reasonably be conceived to be true." *Vance v. Bradley*, 440 U.S. 93, 111 (1979).[3] Proponents' summary judgment papers elaborate upon these familiar standards, and we will not further belabor them here. Proponents will demonstrate Plaintiffs' failure to carry their burden under this standard.

1. Controlling Ninth Circuit precedent, precedent from every other federal court save one (whose decision was unanimously reversed on appeal), and the large majority of state court judges to address the issue have concluded that the traditional definition of marriage as the union of a man and a woman satisfies rational basis review. *See, e.g.*, *Adams v. Howerton*, 673 F.2d 1036, 1042-43 (9th Cir. 1982). This Court should follow suit.

2. Proponents will demonstrate that the traditional definition of marriage, as preserved by Proposition 8, furthers numerous vital governmental interests that would not be furthered, or would not be furthered to the same degree, by recognizing same-sex relationships as marriages. These interests include the following:

- Preserving the traditional institution of marriage as the union of a man and a woman.
- Preserving the traditional public, social, and legal meaning and symbolism of marriage.
- Preserving the traditional social and legal purposes, functions, and structure of marriage.
- Preserving the traditional meaning of marriage as it has always been defined in the English language.
- Expressing support for the traditional institution of marriage.
- Acting incrementally and with caution when considering a radical transformation to the fundamental nature of a bedrock social institution.
- Decreasing the probability of weakening the institution of marriage.
- Decreasing the probability of adverse consequences that could result from weakening the institution of marriage.
- Promoting the formation of naturally procreative unions.

---

[3] Because "the institution of marriage has always been, in our federal system, the predominant concern of state government . . . rational-basis review must be particularly deferential." *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 867 (8th Cir. 1995).

- Promoting stability and responsibility in naturally procreative relationships.
- Promoting enduring and stable family structures for the responsible raising and care of children by their biological parents.
- Increasing the probability that natural procreation will occur within stable, enduring, and supporting family structures.
- Promoting the natural and mutually beneficial bond between parents and their biological children.
- Increasing the probability that each child will be raised by both of his or her biological parents.
- Increasing the probability that each child will be raised by both a father and a mother.
- Increasing the probability that each child will have a legally recognized father and mother.
- Decreasing the probability of the potential adverse consequences of same-sex marriage identified below.
- Preserving the prerogative and responsibility of parents to provide for the ethical and moral development and education of their own children.
- Accommodating the First Amendment rights of individuals and institutions that oppose same-sex marriage on religious or moral grounds.
- Using different names for different things.
- Maintaining the flexibility to separately address the needs of different types of relationships.
- Ensuring that California marriages are recognized in other jurisdictions.
- Conforming California's definition of marriage to federal law.
- Any other conceivable legitimate interests identified by the parties, amici, or the court at any stage of the proceedings.

It follows that Proposition 8 is constitutional, for "[w]hen, as in this case, the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that a statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory." *Johnson v. Robison*, 415 U.S. 361, 383 (1974).

3. Although they are not required to do so, Proponents will further demonstrate that redefining

8

marriage to encompass same-sex relationships would very likely harm these and other interests. Among other things, allowing same-sex marriage would or could:

- Entail the further, and in some respects full, deinstitutionalization of marriage.
- Change the legal and public meaning of marriage from an institution with defined legal and social structure and purposes to a right of personal expression.
- Contribute over time to the further erosion of the institution of marriage, as reflected primarily in lower marriage rates, higher rates of divorce and non-marital cohabitation, and more children raised outside of marriage and separated from at least one of their natural parents.
- Require explicit public endorsement of the idea that a child does not really need both a mother and a father, likely resulting in fewer children growing up with fathers.
- Eradicate in law, and weaken further in culture the idea that what society favors—that what is typically best for the child, the parents, and the community—is the natural mother married to the natural father, together raising their children, likely resulting over time in smaller proportions of children being raised by their own, married mothers and fathers.
- Publicly replace the idea that parenting is largely gendered, ideally involving both a mother and a father, with the idea that parenting is largely unisex, likely resulting in fewer men believing it is important for them to be active, hands-on parents of their children.
- Contribute to replacing the norm of the natural parent with the norm of the legal parent, likely resulting in a growing disjuncture between the biological and legal-social dimensions of parenthood and a significant expansion of the power of the state to determine who is entitled to parental rights.
- Increase the social acceptability of other alternative forms of intimate relationships, such as polyamory and polygamy.
- Increase the likelihood that the recognition as marriages of other alternative forms of intimate relationships, such as polyamory and polygamy, will become a judicially enforceable legal entitlement.

- Legally enshrine the principle that sexual orientation, as opposed to sexual embodiment, is a valid determinant of marriage's structure and meaning.
- Increase the likelihood that bisexual orientation could become a legitimate grounding for a legal entitlement to group marriage.
- Require all relevant branches and agencies of government formally to replace the idea that marriage centers on opposite-sex bonding and male-female procreation with the idea that marriage is a private relationship between consenting adults.
- Either end altogether, or significantly dilute, the public socialization of heterosexual young people into a marriage culture.
- Cause many Americans opposed to same-sex marriage to abandon some or all of those public institutions that promote the new definition of marriage, probably resulting in the weakening of those institutions and a further rending of our common culture.
- Render the traditional definition of marriage embraced by millions of Christian, Jewish, and Muslim Americans no longer legally or socially acceptable, thereby probably forcing many of these Americans to choose between being a believer and being a good citizen.
- Lead to new state-imposed restrictions of First Amendment freedoms.
- Force some religious organizations now receiving public support to cease providing charitable services to the poor and to others.
- Contribute to the public belief that marriage in our society is now politicized.
- Result in unmarried people increasingly, and logically, complaining that the legal and practical benefits currently attached to marriage properly belong to everyone.
- Seriously threaten the functions and symbolism of marriage, thereby posing a risk to children and the demographic continuity of society.
- Send a message to men that they have no significant place in family life, weakening the connection of fathers to their children.
- Move marriage further away from its grounding in reproduction and the intergenerational cycle.

- Lead to changes in the laws governing marriage and parallel institutions in a manner that undercuts the effectiveness of marriage in achieving its traditional purposes.

4. Contrary to Plaintiffs' contentions, California has not undermined the vital interests served by Proposition 8 by allowing opposite-sex couples who do not intend to, or cannot have children to marry; by allowing same-sex couples to adopt children and enter into domestic partnerships with essentially all the rights of marriage; or by recognizing a limited number of same-sex marriages that took place before Proposition 8 was enacted.

*First*, for purposes of rational-basis review, it does not matter whether the lines drawn by Proposition 8 could have been drawn differently, whether Proposition 8 could have been more closely tailored to the interests we have identified, or whether the State might have gone further than it did in advancing those interests. *See Vance*, 440 U.S. at 102 n.20; *Heller*, 509 U.S. at 321; *Katzenbach v. Morgan*, 384 U.S. 641, 658 (1966).

*Second*, the features of California law identified by Plaintiffs are not inconsistent with the interests we have identified. For example, allowing all opposite-sex couples to marry furthers the interests we have identified by, *inter alia*, (1) promoting a stable framework for raising any children that may result if a couple who did not intend to have children has an accidental or intentional change of plans, (2) discouraging the fertile partner of a sterile spouse from engaging in irresponsible, potentially procreative activity with other individuals, and (3) reinforcing cultural norms that heterosexual relationships—which at least as a general matter are potentially procreative—should take place within the framework of marriage. Similarly, whatever other benefits California may provide to other types of relationships, by reserving the venerable designation of marriage to traditional opposite-sex unions alone, California uniquely promotes those relationships most likely to further the interests we have identified.

*Third*, it would be ironic indeed if California's solicitude for the relationships of gays and lesbians, as well as for the vested interests of the limited number of individuals who entered into lawful same-sex unions prior to Proposition 8, somehow placed that provision on weaker constitutional footing than the comparable provisions of nearly all of California's sister states.

*Finally*, if the juxtaposition of Proposition 8 with any other feature of California law results in

11

constitutional infirmity, it does not follow that Proposition 8 must fall. Rather, any other inconsistent features of California law should yield to the constitutional expression of the people of California's will. *See Heckler v. Mathews*, 465 U.S. 728, 739 n.5 (1984).

## V. Proposition 8 Satisfies Heightened Scrutiny.

If necessary, Proponents will demonstrate that many of the interests listed above are sufficiently compelling, and that Proposition 8 bears a sufficiently close relationship to those interests, that Proposition 8 can survive whatever level of scrutiny is applied.

## VI. Proposition 8 Is Not Tainted by Animus or Any Improper Motivation.

### A. This Court Should Evaluate the Constitutionality of Proposition 8 Solely by Considering Its Language and Legal Operation.

1. Because Proposition 8 is subject only to rational-basis review, its constitutionality turns solely on whether it bears a rational relationship to any conceivable legitimate governmental purpose. Whether the conceived purpose "actually motivated" the electorate "is entirely irrelevant for constitutional purposes." *Beach Commc'ns*, 508 U.S. at 313. And so long as Proposition 8 satisfies this inquiry, judicial scrutiny "is at an end." *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). No separate inquiry into voter motivations or intent is required, or even permitted.

2. Even if heightened scrutiny applies, the purposes of Proposition 8 can and should be determined "by drawing logical conclusions from its text, structure, and operation." *Nguyen v. INS*, 533 US 53, 67-68 (2001). Any attempt to divine the actual motives of the voters who enacted it would be "impracticable," "futile," *Las Vegas v. Foley*, 747 F.2d 1294, 1296-98 (9th Cir. 1984), and beyond the scope of legitimate "judicial inquiry," *SASSO v. Union City*, 424 F.2d 291, 295 (9th Cir. 1970). In particular, given the cacophony of voices raised for and against Proposition 8, it would be impossible to isolate and evaluate the effect of particular advertisements or messages on the motivations of the electorate as a whole. For these reasons, campaign messages, advertisements, and other communications relating to the adoption of Proposition 8 are simply irrelevant to its constitutionality.

**B.      The Language and Operation of Proposition 8 Refute Plaintiffs' Claims of Animus.**

As the California Supreme Court has recognized, "the purpose of [Proposition 8] was simply to restore the traditional definition of marriage as referring to a union between a man and a woman." *Strauss v. Horton*, 207 P.3d 48, 76 (Cal. 2009).  And in enacting Proposition 8, the voters acted in the narrowest possible way to achieve this purpose, without unnecessarily disturbing any of the numerous legal benefits and protections afforded gays and lesbians under California law.[4]  As discussed above, Proponents will demonstrate that this traditional definition furthers vital governmental interests.  Notably, in invalidating Proposition 8's identically worded statutory predecessor, the California Supreme Court expressly disclaimed any suggestion "that the current marriage provisions were enacted with an invidious intent or purpose."  *In re Marriage Cases*, 183 P.3d 384, 452 n.73 (Cal. 2008).  It is simply implausible that Proposition 8 somehow transformed the venerable definition and institution of marriage into an instrument of bigotry against gays and lesbians.

   **C. An Examination of the "Actual Purposes" of Proposition 8 Would Refute Plaintiffs' Claims of Animus.**

Even if the Court attempts to ascertain the actual motivations of the California electorate in enacting Proposition 8, Proponents will refute Plaintiffs' claims that the motives of the electorate render Proposition 8 constitutionally infirm.

1. Proponents will demonstrate that the vital interests furthered by the traditional definition of marriage were articulated to the California voters.

2. Proponents will demonstrate that numerous individuals, including prominent supporters of gay and lesbian rights, and even many gay and lesbian individuals, oppose recognizing same-sex relationships in good faith and for legitimate reasons that have nothing to with animus against gays and lesbians.  Proponents will also demonstrate that, both historically and today, many societies and governments—throughout the United States and the world—that embrace same-sex relationships

---

[4] That Proposition 8 narrowly withdrew a right briefly recognized by the State Supreme Court does not render it unconstitutional.  *See Crawford v. Board of Educ.*, 458 U.S. 527 (1982).

13

and/or strongly affirm gay and lesbian rights have nevertheless determined that same-sex relationships should not be recognized as marriages.

3. Proponents will demonstrate that recognizing same-sex relationships as domestic partnerships rather than marriages does not stigmatize gays and lesbians. Far from being an instrument of oppression, California's domestic partnership legislation was strongly supported by gay and lesbian groups, and when offered the choice between marriage and domestic partnership many same-sex couples choose the latter. Further, it is simply not true that the government cannot afford special recognition to one class of individuals for their unique service to vital societal interests without demeaning others.

4. The fact that Proposition 8 accords with the religious beliefs of some Californians, and may have been supported by some voters for religious reasons, does not render it constitutionally infirm. *See, e.g., McGowan v. Maryland*, 366 U.S. 420, 442 (1961). Further, proponents will demonstrate that many Californians opposed Proposition 8 on religious grounds.

5. The fact that Proposition 8 accords with the moral beliefs of some Californians, and may have been supported by some voters on moral grounds, does not render it constitutionally infirm. While the Supreme Court has held that moral views do not justify criminalization of private same-sex relationships, *Lawrence*, 539 U.S. at 571, it simply does not follow that a State must facilitate or promote such relationships, that it must provide those relationships equal recognition with traditional opposite-sex marriages, or that it cannot uniquely promote or otherwise express any preference for traditional marriage relationships, *see, e.g., Maher v. Roe*, 432 U.S. 464 (1977). Moreover, there are material differences between the moral views at issue in *Lawrence* and moral support for the traditional institution of marriage. In all events, there can be no doubt that many individuals opposed Proposition 8 on moral grounds.

6. It is certainly true that "[t]hroughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of" redefining marriage to include same-sex relationships. *Glucksberg*, 521 U.S. at 735. Given the central role of marriage in our society, it is hardly surprising that people on *both* sides of this debate have voiced their opinions forcefully, passionately, and sometimes intemperately. Indeed, many opponents of Proposition 8

14

voiced opinions and engaged in actions that plainly reflected animus against religious organizations and individuals as well as other supporters of Proposition 8 and may well have provoked a backlash in support of Proposition 8. Regardless of whether certain supporters or opponents of Proposition 8 acted out of animus, however, there is simply no basis for imputing the motivations of any given individual or individuals to the electorate as a whole. And in all events, while "biases" such as "negative attitudes or fear . . . may often accompany irrational . . . discrimination, their presence alone does not a constitutional violation make." *Board of Trustees v. Garrett*, 531 U.S. 356, 367 (2001).

\* \* \*

For the foregoing reasons, Proponents will demonstrate that Plaintiffs' claims should be rejected and judgment entered for the Defendants.

Dated: December 7, 2009

COOPER AND KIRK, PLLC
ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, MARK A. JANSSON, AND PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

By: /s/Charles J. Cooper
　　Charles J. Cooper