# Exhibit B

# GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

555 Mission Street, Suite 3000  San Francisco, California 94105-2933
(415) 393-8200
www.gibsondunn.com

EDettmer@gibsondunn.com

December 8, 2009

Direct Dial                                                                                      Client No.
(415) 393-8292                                                                          T 36330-00001
Fax No.
(415) 374-8444

*VIA ELECTRONIC MAIL*

Jesse Panuccio, Esq.
Cooper & Kirk PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036

Re:    *Perry v. Schwarzenegger, et al.*, N.D. Cal. Case No. C-09-2292-VRW

Dear Jesse:

Thank you for your letter of yesterday. This letter responds to your points, and addresses your office's failure to produce documents and refusal to permit basic deposition questioning.

*First*, you accuse us of withholding the "What If We Lose" letter as part of some sort of "tactic." But this is *your client's* document. We were fortunate to discover it before Dr. Tam's deposition and introduce it into the record in this case. Nevertheless, it was your obligation to determine if your claim of privilege over this document was well-founded, and produce the document when you determined it was not. Indeed, your letter of yesterday indicates that you were aware of this letter but chose not to produce it. As mentioned in my letter of last week to Nicole Moss, this is the second significant document we have brought to your attention that should have been produced but was not. And in addition to the "What If We Lose" letter, at a bare minimum, Exhibits 4, 10, 12, 14 and 31 to Dr. Tam's deposition are non-privileged, specifically responsive to Plaintiffs' discovery requests, and undoubtedly should have been produced already. (Copies of these documents are attached for your convenience.)

Given that this is your client's document that your office should have produced months ago, your objection to Ted Boutrous' arguments in the Ninth Circuit is not well taken. We did not choose the time when we obtained this document. Further, given the constantly-evolving nature of your clients' claim of privilege under the First Amendment, we had no choice but to inform the panel of the most recent iteration of the scope of that privilege claim. Based on your letter of yesterday, it appears to have evolved again.

GIBSON, DUNN & CRUTCHER LLP

Jesse Panuccio, Esq.
December 8, 2009
Page 2

 *Second*, your explanation as to why the "What If We Lose" letter and similar documents are non-responsive is wrong. That letter is squarely and plainly responsive to document request number one, which requests "[a]ll documents constituting literature, pamphlets, flyers, direct mail, advertisements, emails, text messages, press releases, or other materials that were distributed to voters, donors, potential donors, or members of the media regarding Proposition 8."

 As you recall, the Proponents sought a very broad protective order asking the Court to find irrelevant all "materials and information that were never available to the electorate at large," and also finding that all such documents were subject to a blanket First Amendment privilege. Doc #187-14 at 3. The Court denied this request, except insofar as it found Plaintiffs' Request number 8 to be overbroad. Doc #214. In so holding, the Court noted that "proponents now agree to produce communications targeted to discrete voter groups." *Id.* at 2, citing Doc #197 at 6. The Court's order did not limit the scope of any other discovery requests, and no subsequent order has either. Your claim that the Court's November 11 Order "clarified and limited the scope of relevant discovery" mischaracterizes that Order, which only addressed the *responsiveness* of the documents you submitted *in camera* to document request number eight, and no others. Doc. #252 at 2. Indeed, my partner Matt McGill informs me that your colleague Ms. Moss agreed during a telephone call on November 20 that Chief Judge Walker's November 11 Order addressed responsiveness *only* in connection with request number eight.

 *Third*, the foundational basis of your First Amendment claim is not established with respect to this document because I was not allowed, at Dr. Tam's deposition, to ask basic questions to probe that foundation. *E.g.*, Tam Dep. Tr. (Rough) at 42:13-43:14 (relevant portions of the rough Tam deposition transcript are attached). I also note that your, and Dr. Tam's, claim that he sent this letter just to "friends" is belied by the fact that he signed it in an official capacity as executive director of an organization that campaigned for Prop. 8. *Id.* at 43:16-45:6. This document self-evidently was not in the nature of correspondence between friends, but rather was a campaign letter to voters as voters, seeking to rally support for the passage of Prop. 8. (A copy of the "What If We Lose" Letter is attached for your convenience.)

 *Fourth*, the notion that Dr. Tam has a privilege not to answer my questions about "his personal beliefs, his subjective, unexpressed motivations, his 'private sentiments,' and the 'speaker's intent'" is wrong. Panuccio Ltr. of Dec. 7, 2009 at 4, quoting *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 468 (2007). Unsurprisingly, your quotation to authority is highly selective, but in any event, Dr. Tam's "subjective … motivations" are not "unexpressed" here, but rather very clearly "expressed." I asked him to explain the "personal beliefs," "subjective … motivations" and "[non-] private sentiments" set forth in his letter to voters. Surely, asking questions about what he wrote and disseminated to voters on the topic of Prop. 8 is reasonably calculated to lead to the discovery of admissible evidence.

GIBSON, DUNN & CRUTCHER LLP

Jesse Panuccio, Esq.
December 8, 2009
Page 3

In any event, the notion that these are actually Dr. Tam's "private" sentiments is not credible. As you know from your review of Dr. Tam's deposition transcript, he has published very similar sentiments at greater length on his personal website and in a newspaper, which writings he authenticated and admitted at deposition that he continues to believe are true and accurate. *E.g.*, Tam Dep. Tr. (Rough) at 132:23-144:6.

Similarly unjustifiable instructions not to answer have been given to other witnesses, as well. For example, Proponents Mark Jansson and Martin Gutierrez were not permitted to answer even the most basic questions about the process of drafting the language of Prop. 8. *E.g.*, Jansson Dep. Tr. at 85:2-95:6; Gutierrez Dep. Tr. (Rough) at 33:20-35:15 (copies of these portions of the Jansson transcript and the Gutierrez rough transcript are attached).

In light of the foregoing, we demand that you produce all documents responsive to all discovery requests—not just the modified request number 8—and that you provide us with a meaningful privilege log with respect to any and all documents withheld on the basis of privilege. *Burlington Nort. & Santa Fe Ry v. Dist. Ct., Mt.*, 408 F.3d 1142, 1149 (9th Cir. 2005). For example, to the extent you claim a privilege over documents that, like the What If We Lose document, are responsive to request number one but are, in your view "nonpublic," then the privilege log must identify the recipients of that communication. (Per our longstanding agreement, such a disclosure may be made without revealing the names of individual recipients whose affiliation with the Yes on 8 campaign is currently confidential.). The log must also state whether the sender requested confidential treatment of the communication, for if it did not, your clients' claim to privilege would be unfounded. The log also must describe the contents of the communication in detail sufficient for us to analyze and test your contention that the contents of the communication have little or no relevance to the underlying proceeding and must otherwise conform to the dictates of Fed. R. Civ. P 26.

We further demand that inappropriate objections—including objections to basic foundational questions regarding the alleged First Amendment privilege—not be made, and that witnesses be allowed to answer such questions. Further, questions about public documents are certainly within the reasonable realm of what can be answered. We also seek your agreement to reconvene the depositions that occurred last week, and complete them without improper objection.

I look forward to hearing back from you shortly.

Very truly yours,

Ethan Dettmer

cc:     All Counsel

# Tam Deposition: Exhibit 4



沙崙華人浸信會
**Sharon Chinese Baptist Church**



Search this site

**Contact Us**



Click for Map:
1620 Irving St.
San Francisco
CA 94122
415.664.3303

**Navigation**

『使用諸般智慧 引人到神面前』
Mission Statement
Announcements & Prayer Items
Photo & Video Albums
Agape Fellowship
Elim Fellowship
Sermons Online

**Sermons Online**

下下載收聽
**Click to Listen:**
November 22
再思感恩

November 21
Thanksgiving Evangelical Worship
　　　Part 1
　　　Part 2

November 15
效法主耶穌 退到神的面前

November 8
效法主耶穌 面對生命
的起伏

主日崇拜事奉人員：

11/29/2009
講員：　Rev. Owen Koon
主席：　Alan Tang
領詩：　Dickson Lo

『使用諸般智慧 引人到神面前』 > Announcements & Prayer Items >

# A Message from Bill Tam

posted May 27, 2009 3:34 PM by Alan Tang

Dear friends,

We praise God for working in the hearts of the judges.  6-1 win on Prop 8 is beyond our expectation.  Your prayers have been answered.  Tonight, I'll be on Channel 26's Talk Tonight (11 p.m.) program talking about the results of the ruling.

On the other hand, in spite of hundreds of complaints and emails  from Asian speakers and parents, the Alameda School Board passed 3-2 to introduce a Gay, Lesbian, Bisexual and Transgender program to K-5 children in Alameda schools.  Education such as this is used to brainwash children so that one day they'll vote for same-sex marriage.  I encourage you to keep writing emails to the school board members and complain about their vote (McMahon and Spenser voted against the program and they are on our side).   The Asian member Niel Tam voted for it, along with Mooney and Jenson.

A while back, San Jose City Council voted against putting Internet porn filters in San Jose Libraries.  The proposal was initiated by a Christian city councilman, Pete Constant and seconded by the mayor, a Catholic.  http://www.sanjoseca.gov/council.asp    After a lot of pressure from the Christian community, the council still voted against porn filters. Here both Asian council members voted against the porn filter.  This past Sunday, I was a panel speaker at the APAPA townhall meeting on education.  God arranged me to sit next to one of the Asian councilman, Kensen Chu.  I told him I was for installing porn filters in libraries and asked him why he voted it down.  He was shocked and looked very tense.

I was told by Ron Prentice that the hearing on the lawsuit against Prop 8, by the gays, at the Federal District Court, will start in August.  Given the California Supreme Court ruling, their chance of winning at the federal level is pretty slim.

I'd like to ask you to talk to your church pastor about educating your church youths on the issue of SSM.  I suggest the church to teach youths about the issues of sex, marriage and family, as a package.  SSM can be part of the curriculum.  We must give them the proper Biblical values so that they are immune to the teachings from the public schools.  This is our biggest battle field --- our next generation.  It's a battle of the mind.  Satan is working on our youths.  If we and our churches don't do our part, we'll certainly lose our kids.  They'll one day surrender to Satan. Everything we do in building Prop 8 would be given up by the next generation.  If you would like

me to speak to your pastor about this, let me know.

God bless,

Bill Tam

| | |
|---|---|
| 司琴: | Cherie Wan |
| 司事: | Wilfred Kong |
| | Jenny Lai |

### November Birthdays

Leon C.

Peter W.

Alan L.

Daniel L.

Sue W.

Virginia L.

Lyre W.

Winston C.

# Tam Deposition: Exhibit 10



VOLUME 1, ISSUE 1

TRADITIONAL FAMILY COALITION

# T F C   N E W S



JAN-FEB, 2006

傳統家庭促進會

**INSIDE THIS ISSUE:**

TFC STEPS FOR-WARD.   1

TFC REBUKES *BROKEBACK MOUNTAIN*   2

THE FUTURE OF MARRIAGE IN U.S.A.   2

WHAT CAN YOU DO?   2

「傳統家庭促進會」的誕生   3

「斷背山」破壞家庭   3

美國婚姻的前瞻   3

你可作什麼   4

**PRINCIPLES**

- Rev. Thomas Wang, Chairman of the Board
- Rev. John Lo, Vice-chairman of the Board
- Rev. Luke Poon, Financial Secretary
- Dr. Bill Tam, Executive Director

## TRADITIONAL FAMILY COALITION STEPS FORWARD

2005 finished as the birth year of Traditional Family Coalition. After the nation-wide movement to save traditional marriage in 2004, Rev. Thomas Wang and Rev. John Lo met with some of the movement's leaders and decided to form an organization to support traditional marriage. A monumental meeting was held at Great Commission Center International in January 2005 and thus formed the idea of the Support Traditional Marriage Foundation. Months went by as the directors formulated more concrete ideas to promote the cause. In the Fall, Dr. Bill Tam accepted the board's invitation to join the organization as the executive director. To broaden its scope of work, a new name was adopted: Tradi-



tional Family Coalition. The first project was to defend traditional marriage on a TV debate.

On July 30, 2005, Dr. Bill Tam debated the president of Chinese Progressive Association on the issue of same-sex marriage. Argument against legalizing same sex marriage based on human rights was presented. Moral reasons and the benefit of dual sex parent for children were presented.

In December, TFC was informed by ProtectMarriage.com that a total of

300,000 signatures were collected at ProtectMarriage.com in an attempt to amend the Marriage Law of the California Constitution. Although this satisfied only half of the qualifying requirement, nevertheless the united effort of many churches in California was demonstrated.

In January, 2006, TFC voiced its concern regarding the movie *Brokeback Mountain*, which destroys traditional family values. Articles disputing this movie were sent to various newspapers and Christian websites.

## TFC REBUKES *BROKEBACK MOUNTAIN*

Disguised as a romantic western movie, "*Brokeback Mountain*" attempts to break the backbone of the family. It portrays an entangling homosexual relationship between two cowboys and their rendezvous on the slopes of the beautiful Brokeback Mountain. Their bond is so strong that it spans two decades and brings adultery into their respective marriages. In the end, one divorces his wife and the other dies of an accident.

The movie attempts to break the back of several social and moral standards:

1) The heroic and chivalrous image of American cowboys, as traditionally symbolized by Gary Cooper, John Wayne and Clint Eastwood, is broken by the selfish and animal-like behavior of the main characters.

2) The honorable and pure man-to-man friendship is

broken by bringing sex into the relationship. The ugly effect is to introduce such deviant behaviors into the minds of young audiences, who might work in environments that require close male contact (e.g. the Army, Boy Scouts, athletic teams, dormitories, etc.).

3) It breaks the heterosexual marriage by showing its troublesome daily routines. It portrays homosexual relationships

## BROKEBACK ... CONT'D.



as romantic and trouble-free that it deserves the painful sacrifice of the wife and children. Even when the wife does not understand, the children do -- implying the acceptance of homosexuality in the next generation.

4) It breaks the moral standard of the society. By showing the agony of this homosexual relationship in the sixties, the movie suggests that the source of pain is the restrictive moral standard of the society. It suggests that if the society had accepted same-sex marriages, it would

have been a beautiful, long-lasting relationship.

5) It breaks the good-girl image of Ann Hathaway, as portrayed in *Princess Diaries*. Her performance in *Brokeback Mountain* breaks the heart and respect of many young teenage girls who need a clean and respectable role model.

Although plagued by low box-office figures, when compared with *The Chronicles of Narnia*, Hollywood hails *Brokeback Mountain* as a beautiful love story and

showers it with prestigious movie-making awards. Such commendation of deviant behavior and the attack of the traditional family illustrate the tragedy of the pop culture today. When an Asian director joins the destructive force in breaking the moral code of what most Asian parents believe in, it is a tragedy for Asian Americans.

*The Chronicles of Narnia* promotes healthy family values such as decency, loyalty, courage and sacrifice.

## THE FUTURE OF MARRIAGE IN U.S.A.

While many states have passed state constitution amendments to define marriage as between one man and one woman, Vermont and California are giving same-sex couple rights almost equivalent to those of marriage. In late 2005, the Democrat controlled California legislature passed AB849 to recognize same-sex marriage, only to be vetoed by Republican Governor Arnold

Schwarzenegger. In November 2005, four of Governor Schwarzenegger's propositions were defeated by California voters. If he loses the re-election in 2006, it is highly likely that a Democrat governor will assume his position. If this happens, the legislature will easily pass another same-sex marriage bill and have the new Democrat governor sign it into law. Then California will join Mas-

sachusetts as another state in the US which legalizes same-sex marriage. A poll done by CNN/USA Today has shown that throughout the last decade, the percentage of youth who favor same-sex marriage has risen from 41% to 59%. Unless we change their views through education, the future of marriage in the US is at stake.



## WHAT CAN YOU DO?

1. Register to vote.
2. Cast your vote wisely on election day.
3. Join TFC membership and get informed.
4. Donate to TFC.

**Membership Application:**

Name: _____

Address: _____

_____

_____

E-mail: _____

Phone: _____

2006 membership: $10

Please cut and send application with $10 payable to:

Traditional Family Coalition

848 Stewart Dr., #200,

Sunnyvale, CA 94085.

*TFC's mission:*

*To protect healthy traditional family values through education.*

New books coming soon:

*1. "Churches, Stand Up as Salt and Light !"* by Dr. Bill Tam

*2. "America, Return to God"* by Rev. Thomas Wang

## 「 傳統家庭促進會 」 的誕生

自從2004年發動全美性的保衛傳統婚姻運動後，在2005年初，王永信牧師與勞伯祥牧師會吾了一群基督教領袖，決定成立一個長久性的維護家庭的組織，名為「傳統婚姻基金會」，初期數月用作籌備、議定目標和發展的方向，同年秋季，譚克成博士接受邀請成為總幹事，將事工範圍推廣至維護傳



統家庭，故改名為「傳統

家庭促進會」，並在電視辯論節目「明正言順」中維護傳統婚姻。

在七月三十日，譚博士

辯論了華人進步會主席，談及同性婚姻不可單以平權為理當由而合法化，道德和兒童在雙性父母家庭中成長也是極為重要。

在十二月，促進會接到「保衛婚姻組織」的消息說加州保衛婚姻憲法修正案動議的簽名運動中，總共收到了大概三十萬個簽名，雖然不能達到六十萬的要求數目，但也看到很多教會的同心和熱烈維護

在2006年一月「促進會」發表了對電影「斷背山」的關注，將其破壞道德的不良意識公諸報章及基督教的網址上。

## 「 斷背山 」 破壞家庭

李安導演的「斷背山」，被荷李活譽為羅曼蒂克的愛情故事，故事描述六十年代兩青年牛郎在斷背山上看羊時，由友誼關係發展成同性戀的性關係，後來二人分別與女子結婚生子，可是不能禁止同性戀的情慾，屢次欺騙妻子到斷背山幽會，後來其中一人為此而離婚，另一人要求兩人同居，但因社會環境保守而不能如願，電影最終以一人意外身亡而落幕。

「斷背山」不論拍得如何美化，也遮掩不了它的醜惡一面：

1. 破壞男子漢的形像

美國中部的牛郎 (cowboy)，是男子漢的形像，以往持有像榮榮 (John Wayne) 和奇連伊士活 (Clint Eastwood) 的剛強和英雄的形像，是美國男孩子追求的模範，這套電影把他們醜化為好勇鬥狠，頭腦簡單的人，不斷以蠻力和打鬥來解決問題，而兩男主角的性愛，也是充滿了野獸般的粗野。

2. 誤導男人間的友誼昇華時就變成性接觸

很多男人在各種不同工作的環境

或許需要作近距離的相處，例如軍隊、童子軍、球隊、大學宿舍等。此電影將「性」帶入了兩男人的工作關係中，不單染污了男性間單純的友誼。對於愛慕仿電影中的人物的年輕人，現將這可能性向他們宣傳，後果不堪設想。

3. 同性戀關係較婚姻崇高

「斷背山」可能沒有明顯推崇這觀念，而且還描寫了同性婚外情對妻子的傷害，但影評家、荷李活和傳媒都漠視了這一點，反而高舉這段同性戀情，(接第4頁)

新書推介：

**教會興起作光鹽**

譚克成博士著

**America, Return to God**

王永信牧師編著

## 美國婚姻的前瞻

儘管很多州都更改了州憲法，只承認一男一女的婚姻，加州和 Vermont 州因被自由思想的民主黨控制，在立法上將傳統婚姻的權利，大都給與同性戀伴侶，在2005年末，加州參、眾兩院通過了 AB849 提案，將婚姻改為任何兩人的結合，後被共和黨的州長 (亞諾舒華申力加) 否決了。到了十一月，州

長提出的四個懦弱工會權力的提案，都被選民推反了，假若他在2006年十一月的連任選舉失敗的話，加州很可能會選出一個民主黨的州長，那麼參眾兩院將可通過另一同性婚姻的議案，到時新州長便可能將它簽成法律，那樣加州便會與麻省一起成為美國承認同性婚姻的州份。

據CNN和今日美國過去十年的調查，美國的成年人在1996年祇有27%接受同性婚姻，到了2004年已升到41%；而年青人在1996年祇有41%接受同性婚姻，但到2004年卻升至59%。若果我們不改變下一代的思想的話，婚姻的定義遲早也被改寫。



Www.TFCUS.org

**TRADITIONAL FAMILY COALITION**

848 Stewart Drive, Suite 200
Sunnyvale
CA 94085
Phone: 408-636-0037
Fax: 408-636-0033
E-mail: Marriage@stmfusa.org



**會員申請表:**

英文姓名: _____

地址: _____

_____

_____

電郵: _____

電話: _____

2006 會員費: $10

請剪下連同支票寄往左方地址。支票寫給:

**Traditional Family Coalition**

你可作什麼:

1. 登記作選民

2. 積極投票

3. 加入「傳統家庭促進會」為會員,瞭解社會問題

4. 對本會支持捐助

目標 : 以教育言論與行動保衛健康傳統家庭

## 「斷背山」破壞家庭　<span>(上接第 3 頁)</span>

是值得犧牲家庭的;片中又暗示有妻子和兒女的家庭是多麼麻煩,同性戀是多麼浪漫,作妻子的不明白,可是作女兒的卻明白,體諒與母親離婚的父親,間接地教導下一代要接受同性戀,這些隱藏著而帶破壞性的信息,對下一代為害無窮。

4. 暗示社會禮教是害人的

此片描述這段同性戀情的痛苦,使主角以罵妻子、打架、嫖男妓等方式來發洩。最後以一方死、一方痿的悲劇收場,表面是表現同性戀負面的信息,但暗裏卻抱怨

這悲劇的發生是因為六十年代社會太保守,不能容許同性伴侶,否則他們會活得很快樂。

5. 破壞純情少女的模範

片中女角 Ann Hathaway 在 *Princess Diaries* 一片中建立了清純和真誠的形象,是很多少女的榜樣。她在此片的演出,破了仰慕者的心。

儘管「斷背山」的票房紀錄遠不及老少咸宜的「魔幻王國」*The Chronicles of Narnia*, 荷李活高捧這套同性戀的電影,不單止給與好評,還頒發 4 個金球獎,娛

樂界要極力介紹同性戀的電影,是要打破傳統的禮教,讓放縱情慾的人,可在無罪惡感的情況下自由自在地繼放縱,而社會需要無條件地接受。利用潮流文化來推廣破壞家庭的電影,是現代文化的悲劇;李安導演拍這種片子,等於加入破壞的行列,是華人的悲劇和恥辱。



「魔幻王國」*The Chronicles of Narnia* 教導年青人正義、勇敢、忠心和犧牲精神。

# Tam Deposition: Exhibit 12



**Media**

敬愛的牧者和主內同工：

加州眾議員 Mark Leno 連同自由派的議員，屢次用納稅人的錢，在加州議會提出

「同性婚姻法」（如 AB1967, AB19），企圖使用立法程序，不需選民投票通過的方

法，來使同性婚姻合法化，最近通過參眾兩院的AB849，更表明了他們已控制了兩
院，

同性婚姻在加州合法，只是時日的問題，所以我們若不在加州憲法上來保衛一男一女

的婚姻，同性婚姻在加州將有一天如加拿大一樣，被自由派政府逼使通過成為合法。


現在我們有機會在加州婚姻法的憲法上作修正，經過詳細的研討和考慮，我們決定

支持由基督徒發起的組織 ProtectMarriage.com，一起推動加州婚姻法的憲法修正

動議，其內容說：「一男一女的婚姻，才是本州唯一承認的合法結合。」
marriage between a man and a woman is the only legal union that shall be valid or
recognized
in this state.


為達成這憲法修正的目標，我們已發起簽名運動，在本年十一月底前在華人教會間，

收集十萬個選民簽名，聯合其他族裔的簽名，務求集合共六十萬合法選民簽名，才

可將這修正動議，以提案方式在2006年6月提供加州選民投票。若這提案在投票中通過，神設定的一男一女婚姻制度便可以不再受同性戀者、政客或法官任意改寫，我們的後代也可接受正確的婚姻思想及生活。

請下載「支持選民簽名表格」，籲請貴教會整體行動。

請您們在貴教會中，選一位「簽名運動」負責人：

呼籲公民註冊及選民登記。(填寫選民簽名表格指引)

推動選民簽名支持「婚姻憲法修正案」，簽名指引參照如下。

在十一月底前集合簽名寄回「傳統家庭促進會」或「大使命中心」 (848 Stewart Drive, Suite 200, Sunnyvale, CA 94085)

這是我們作鹽作光的時候，願大家在此行動上與我們一起同工，在這屬靈的戰爭中，為 神作精兵，此行動成功與否，全賴我們的努力。我們願供應更多資料，並與貴教會的代表合作，完成這選民簽名運動。

捐助此簽名運動：

1. 可將支票付給 GCCI，並寄往「大使命中心」，寫上「簽名運動」字樣。

2. 可到以下網址捐獻：http://protectmarriage.com/donate/default.aspx

# Tam Deposition: Exhibit 14

# Bill Tam , Ph.D.





   Born in Hong Kong, Dr. Bill Tam (also known as Hak-Shing Tam) received his bachelor degree in Chemical Engineering at the University of Wisconsin, Madison.  He finished his graduate work at Columbia University while doing interdisciplinary research in Bioengineering.  He has published 8 scientific papers in major international, medical and engineering journals.  He spoke in scientific conferences, and also co-authored a graduate level textbook in Biomedical Engineering.  He worked as a research faculty member at Columbia's College of Physicians and Surgeons and as a senior research scientist at Becton-Dickinson, a major medical products firm.  His specialty is in heat transfer, human thermoregulation, exercise physiology and mathematical modeling.  In business, Dr. Tam has managed cosmetics companies both in Hong Kong and the US.  He held membership at various professional organizations as well as positions at the Lions Club, Hong Kong.

   Dr. Tam became a born-again Christian in 1984 and has been active in various ministries.  His main interest is in keeping the integrity of the family and marriage.  He is the executive director of Chinese Family alliance and Traditional Family Coalition, both are pro-traditional family value organizations.  He is also a guest lecturer at America Chinese Evangelical Seminary.  For the past decade, he has been a columnist with Chinese Christian Herald and a member of the board of directors of Chinese Christian Herald Crusade, Northern California division.  Working with ProtectMarriage.com, he co-initiated the California Protect Marriage Amendment, Proposition 8.  Bill also serves as the secretary for America, Return to God Prayer Movement.

   Dr. Tam has written many articles on parenting, education, religion, creation science, family, media, homosexuality, and other political, ethnic and social issues.  They are published in major newspapers and Christian magazines.  Some of them appear on this website.  In 2006, he wrote a book  entitled: *Church, Stand up as Salt and Light*.  He recently co-authored a book *America, Return to God* with Rev. Thomas Wang.  He is often interviewed on radio, TV, newspaper, and news conferences in the San Francisco Bay Area.  His knowledge and experience with science,  social and Christian issues makes him a popular speaker at various seminars and church functions.  Dr. Tam is an elder of San Francisco Sunset Chinese Baptist Church, married to Hazel and has three children.

Back



**Tam Deposition: Exhibit 31**



**Media**

敬愛的牧者和主內同工：

加州眾議員 Mark Leno 連同自由派的議員，屢次用納稅人的錢，在加州議會提出

「同性婚姻法」( 如 AB1967, AB19 )，企圖使用立法程序，不需選民投票通過的方

法，來使同性婚姻合法化，最近通過參眾兩院的AB849，更表明了他們已控制了兩
院，

同性婚姻在加州合法，只是時日的問題，所以我們若不在加州憲法上來保衛一男一女

的婚姻，同性婚姻在加州將有一天如加拿大一樣，被自由派政府逼使通過成為合法。

現在我們有機會在加州婚姻法的憲法上作修正，經過詳細的研討和考慮，我們決定

支持由基督徒發起的組織 ProtectMarriage.com，一起推動加州婚姻法的憲法修正

動議，其內容說：「一男一女的婚姻，才是本州唯一承認的合法結合。」
marriage between a man and a woman is the only legal union that shall be valid or recognized
in this state.

為達成這憲法修正的目標，我們已發起簽名運動，在本年十一月底前在華人教會間，

收集十萬個選民簽名，聯合其他族裔的簽名，務求集合共六十萬合法選民簽名，才

可將這修正動議，以提案方式在2006年6月提供加州選民投票。若這提案在投票中通

過，神設定的一男一女婚姻制度便可以不再受同性戀者、政客或法官任意改寫，我們

的後代也可接受正確的婚姻思想及生活。

請下載「支持選民簽名表格」，籲請貴教會整體行動。

請您們在貴教會中，選一位「簽名運動」負責人：

呼籲公民註冊及選民登記。(填寫選民簽名表格指引)


推動選民簽名支持「婚姻憲法修正案」，簽名指引參照如下。

在十一月底前集合簽名寄回「傳統家庭促進會」或「大使命中心」(848 Stewart

Drive, Suite 200, Sunnyvale, CA 94085)

這是我們作鹽作光的時候，願大家在此行動上與我們一起同工，在這屬靈的戰爭中，

為 神作精兵，此行動成功與否，全賴我們的努力。我們願供應更多資料，並與貴

教會的代表合作，完成這選民簽名運動。


捐助此簽名運動：

1. 可將支票付給 GCCI，並寄往「大使命中心」，寫上「簽名運動」字樣。

2. 可到以下網址捐獻：http://protectmarriage.com/donate/default.aspx

# Media

敬愛的牧者和主內同工：

Respectful Pastors and Spiritual Followers:

加州眾議員 Mark Leno 連同自由派的議員，屢次用納稅人的錢，在加州議會提出「同性婚姻法」( 如 AB1967, AB19 )，企圖使用立法程序，不需選民投票通過的方法，來使同性婚姻合法化，最近通過參眾兩院的AB849，更表明了他們已控制了兩院，同性婚姻在加州合法，只是時日的問題，所以我們若不在加州憲法上來保衛一男一女的婚姻，同性婚姻在加州將有一天如加拿大一樣，被自由派政府逼使通過成為合法。

In California, Congressman Mark Leno and other liberal representatives have often used taxpayer money to raise the issue of「same-sex marriage」(ex: AB1967, AB19)．They try to use the legislative process, bypassing voter approval, to legalize same-sex marriage．Recently, both houses of the State Assembly passed AB 849, further indicating their control of both houses．The legalization of same-sex marriage in California is only a matter of time．Therefore, if we do not protect the Constitutional future of one man, one woman marriages in California, same-sex marriage in California will one day be like it is in Canada, forced through by a liberal government.

現在我們有機會在加州婚姻法的憲法上作修正，經過詳細的研討和考慮，我們決定支持由基督徒發起的組織 ProtectMarriage.com，一起推動加州婚姻法的憲法修正動議，其內容說：「一男一女的婚姻，才是本州唯一承認的合法結合。」marriage between a man and a woman is the only legal union that shall be valid or recognized in this state.

Right now we have the opportunity to revise marriage policy by amending the California Constitution．After detailed deliberation and consideration, we have decided to support the Christian organization ProtectMarriage.com．Together, we will promote a constitutional revision to the California Constitution that changes marriage law．The content of the revision:「marriage between a man and a woman is the only legal union that shall be valid or recognized in this state.」

為達成這憲法修正的目標，我們已發起簽名運動，在本年十一月底前在華人教會間，收集十萬個選民簽名，聯合其他族裔的簽名，務求集合共六十萬合法選民簽名，才可將這修正動議，以提案方式在2006年6月提供加州選民投票。若這提案在投票中通過，神設定的一男一女婚姻制度便可以不再受同性戀者、政客或法官任意改寫，我們的後代也可接受正確的婚姻思想及生活。

In order to reach the goal of amending the Constitution, we have launched a signature campaign．Before the end of November, we want to collect a hundred thousand signatures from Chinese Church organizations．Moreover, together with other nationalities, we want to collect six

hundred thousand total signatures.  Only then will we be able to raise a motion to amend the
Constitution through a June 2006 proposal to California voters.  If this bill is passed by voters,
then the God-designated one man, one woman marriage will not accept homosexuality.
Politicians and judges will not be able to change the law according to their own desire.  Our
future generations will also be able to enjoy proper marriage and life.

請下載「支持選民簽名表格」，籲請貴教會整體行動。
請您們在貴教會中，選一位「簽名運動」負責人：
呼籲公民註冊及選民登記。(填寫選民簽名表格指引)
推動選民簽名支持「婚姻憲法修正案」，簽名指引參照如下。

Please download the 「Voter Signature Support Forms」 and call upon the entire Church to
support your actions.  When at Church, please select a 「Signature Campaign」 point-person to
be responsible for voter signatures:  Call citizens and voters to register.  (Guidelines for filling
out voter signature forms).  Promote the support of voters for the 「Constitutional revision to
marriage」, according to the signature instructions that follow.

在十一月底前集合簽名寄回「傳統家庭促進會」或「大使命中心」 (848 Stewart
Drive, Suite 200, Sunnyvale, CA 94085)

Before the end of November, send the signatures to 「Traditional Family Promotion Society」 or
「Big Mission Center」 (848 Stewart Drive, Suite 200, Sunnyvale, CA 94085)

這是我們作鹽作光的時候，願大家在此行動上與我們一起同工，在這屬靈的戰爭中，
為 神作精兵，此行動成功與否，全賴我們的努力。我們願供應更多資料，並與貴
教會的代表合作，完成這選民簽名運動。

This is our time to shine.  We hope everyone works together with us on this as a soldier of God.
The success of our act depends on our effort.  We would like to provide more information and
collaborate with other Church representatives to finish this collection of signatures.

捐助此簽名運動：
1. 可將支票付給 GCCI，並寄往「大使命中心」，寫上「簽名運動」字樣。
2. 可到以下網址捐獻：http://protectmarriage.com/donate/default.aspx

Support this signature collection movement:

1. By check payable to GCCI, and mailed to 「Big Mission Center」, with the words 「signature
campaign」.

2. By going to the following website: http://protectmarriage.com/donate/default.aspx

# Tam Deposition: Rough Transcript

## 42:13-43:14

## 43:16-45:6

## 132:23-144:6

TamRoughDraft.TXT

1

1    UNCERTIFIED ROUGH DRAFT

2    DEPOSITION OF HAKSHING WILLIAM TAM

3    Perry v. Schwarzenegger, et al.

4    December 1, 2009

5    Exhibits marked: 1 through 32

6

7         UNDER CCP 2025(R)(2), THIS TRANSCRIPT MAY

8    NOT BE USED, CITED, OR TRANSCRIBED AS THE

9    CERTIFIED TRANSCRIPT, NOR MAY IT BE CITED OR USED

10   IN ANY WAY OR AT ANY TIME TO REBUT OR CONTRADICT

11   THE CERTIFIED TRANSCRIPT.  THIS TRANSCRIPT HAS NOT

12   BEEN REVIEWED OR PROOFREAD BY THE COURT REPORTER.

13   ANY REFERENCE TO PAGE AND LINE NUMBERS WILL NOT BE

14   ACCURATE.

15                      << >>

16        THE VIDEOGRAPHER:  Good morning.  We

17   are on the record, ladies and gentlemen, at

18   9:04 a.m.  I am Benjamin Gerald from Alderson

19   Court Reporting in Washington, D.C.  The phone

20   number is (202) 289-2260.  This is a matter

21   pending before the United States District Court,

22   Northern District of California, in the case

23   captioned Kristin Perry, et al., versus Arnold

24   Schwarzenegger, et al.  Case number is 09-CV-2292

25   VRW.  This is the beginning of tape No. 1,

UNCERTIFIED ROUGH DRAFT

TamRoughDraft.TXT

1    volume 1, of the deposition of Dr. Hakshing

2    William Tam, taken on December 1st 2009.  We are

3    located at 3638 Lawton Street in the city of San

4    Francisco, California.  This is taken on behalf of

5    the plaintiff.

6          Counsel, would you please identify

7    yourselves starting with the questioning attorney.

8          MR. DETTMER:  Good morning.  Ethan

9    Dettmer of Gibson, Dunn & Crutcher on behalf of

10   the plaintiffs.

11         MS. STEWART:  And Therese Stewart on

12   behalf of the City and County of San Francisco.

13         MS. MOSS:  Nicole Moss with Cooper &

14   Kirk representing Dr. Tam on behalf of the

15   defendant-intervenors.

16         THE WITNESS:  Hakshing William Tam.

17         THE VIDEOGRAPHER:  Thank you.  Would

18   the reporter please swear the witness.

19           HAKSHING WILLIAM TAM,

20         having been first duly sworn, was

21   examined and testified as follows:

22         THE VIDEOGRAPHER:  Thank you.  Please

23   proceed.

24                    EXAMINATION

25   BY MR. DETTMER:

UNCERTIFIED ROUGH DRAFT

Page 2

TamRoughDraft.TXT

6       dollar sign and manpower, closed parentheses, into

7       Prop 8.  We have great power if we pool our

8       resources together.  Let's win this battle.  After

9       victory your congregation would be energized and

10      go back to the original projects with joy and

11      cheer.  They may want to give more and build a

12      bigger building to thank God.  Our God would be

13      pleased and bless us more.

14              Do you see that paragraph there?

15          A   Yes.

16          Q   And do you believe that to be true?

17              MS. MOSS:  Objection.  Instruct you not

18      to answer.

19          A   No answer.

20      BY MR. DETTMER:

21          Q   And then the final paragraph there

22      says, but if we lose, our congregation would lose

23      heart, they might not want to work as hard.  Our

24      opponents would be overjoyed.  They would do more

25      and change more laws so as to persecute us easier.


                      UNCERTIFIED ROUGH DRAFT


                                                          42


1       Churches would have a much harder time to survive.

2       We would be collecting offerings to fight lawsuits

3       instead of building new buildings.  I pray that

4       day would not come.  The choice is yours.  Talk to

5       leaders of your church.  Your actions would change

6       the history in either direction.

                            Page 40

TamRoughDraft.TXT

7           Do you see that paragraph there?

8      A    Yes.

9      Q    Do you believe that to be true?

10          MS. MOSS:  I object and instruct you

11   not to answer.

12     A    No answer.

13   BY MR. DETTMER:

14     Q    Was your goal in writing this letter to

15   encourage people to raise funds for passing

16   Proposition 8?

17          MS. MOSS:  I am going to again I am

18   going to object to the extent that you are asking

19   him about a document that he specifically said was

20   intended for private communication.  And I am

21   going to instruct him not to answer.

22     A    No answer.

23   BY MR. DETTMER:

24     Q    Was your goal in writing this letter to

25   encourage people to vote in favor of


                UNCERTIFIED ROUGH DRAFT



                                                43


1    Proposition 8?

2           MS. MOSS:  Same objection.  Same

3    instruction.

4      A    No answer.

5    BY MR. DETTMER:

6      Q    Can you think of anybody at Presence

7    Ministry who is affiliated with Presence Ministry

                 Page 41

TamRoughDraft.TXT

8      who you might have sent this letter to who may

9      have published it at Presence Ministry?

10          A   I'm not going to answer that.

11              MS. MOSS:  I was going to say too, to

12      the extent that is asking him to reveal a private

13      association that he might have.  And he obviously

14      indicated he is not going to answer already.

15      BY MR. DETTMER:

16          Q   I note at the bottom that it's under

17      your name, Bill Tam, it says Traditional Family

18      Coalition.

19          A   Uh-huh.

20          Q   What is -- you are associated with the

21      Traditional Family Coalition I gather from this?

22          A   Yes.

23          Q   What is your role with the Traditional

24      Family Coalition?

25          A   I am the executive director.


                    UNCERTIFIED ROUGH DRAFT



                                                    44


1           Q   And did the Traditional Family

2       Coalition campaign in favor of Proposition 8?

3       Come?

4               MS. MOSS:  To the extent that -- well,

5       I am going to object on the ground it is not clear

6       what you mean by campaign.  If you are referring

7       to sort of public campaigning, then I would allow

8       him to answer.  If it is referring to sort of

                    Page 42

TamRoughDraft.TXT

```
 9        internal associational campaigning, then I would

10        object and instruct you not to answer.

11    BY MR. DETTMER:

12        Q   Well, let me ask a slightly different

13        question.  Did the Traditional Family Coalition

14        either or both urge people to vote for

15        Proposition 8 or raise money for the passage of

16        Proposition 8?

17            MR. PUGNO:  Objection.  I don't

18        understand that question.  It is compound.  Is it

19        yes to one or both or --

20    BY MR. DETTMER:

21        Q   Did the Traditional Family Coalition

22        urge people to vote for Proposition 8?

23            MS. MOSS:  And again if by people I am

24        going to object to the extent that people is not

25        defined.  If it is within the association I am
```

UNCERTIFIED ROUGH DRAFT

45

```
 1        going to instruct you not to answer.  If you are

 2        referring to voters generally, then feel free to

 3        answer.

 4        A   We have some memberships in the

 5        organization.  So I encouraged them to vote yes on

 6        Prop 8.

 7    BY MR. DETTMER:

 8        Q   And did the Traditional Family

 9        Coalition work to raise money to pass
```

Page 43

TamRoughDraft.TXT
10      Proposition 8?

11              A    No.

12              Q    I ask the court reporter to mark this

13      document as Tam Exhibit 4.

14                      (Exhibit No. 4 marked.)

15              Q    Dr. Tam, if you please read that

16      document.  And while you are reading it I am just

17      going to identify it for the record.  This is

18      another print out from another web page.  The

19      title at the top says, a message from Bill Tam,

20      parens, Sharon, S-h-a-r-o-n, Chinese Baptist

21      Church of San Francisco, closed quote.  There is a

22      web address at the bottom.  Let me know when you

23      have finished looking at that document, Dr. Tam.

24              A    Okay, I am done.

25              Q    Did you write this letter that is here


                    UNCERTIFIED ROUGH DRAFT



                                                            46


1       on this document, Exhibit 4?

2               A    Yes.

3               Q    And are you familiar with Sharon

4       Chinese Baptist Church?

5               A    Yes.

6               Q    Is that a church here in San Francisco?

7               A    Yes.

8               Q    And to whom did you write this letter

9       that is here on Exhibit 4?

10                      MS. MOSS:  I am going to object to the
                    Page 44

TamRoughDraft.TXT

2      and let me know if again as we have done before
3      today -- before earlier today, just let me know
4      whether that translation is fairly represents what
5      you wrote in Chinese.
6          A   Okay.  Let's look at the fifth line
7      from the bottom.  In the Chinese I wrote that
8      politicians want us to accept homosexuality as
9      normal and also want to legalize same sex
10     marriage.  But English translation here is if the
11     politician insists we accept homosexuality as
12     normal phenomena and make it legal.  Homosexuality
13     is already legal.  I was saying to make same sex
14     marriage legal.
15         Q   I see.
16         A   Okay.
17         Q   Thank you for that clarification.
18         A   On the line that start with, therefore,
19     okay, homosexuality is against common sense, I did
20     not write common sense.  I wrote against the
21     natural -- the direct translation should be
22     heavenly logic or it may be like natural reasoning
23     or something like that.
24         Q   Okay.
25         A   Which is a little spiritual sense

UNCERTIFIED ROUGH DRAFT

132

1      rather than just common sense as human take it.
2          Q   Okay.  Understood.  Thank you.

TamRoughDraft.TXT

3          A    Yeah, the rest is by and large okay.

4          Q    And again you wrote that language

5     there, the Chinese language above that?

6          A    Uh-huh, yes.

7          Q    And believe it to be accurate?

8          A    Yes.  Why are we going through this?

9     Is this not Prop 8 related.  This happened way

10    before Prop 8.

11         Q    Well, we believe this is relevant to

12    the case.  And again as I mentioned earlier your

13    lawyer -- your lawyers and we will have debates

14    about that in front of a judge and we will work

15    that out.  So for now I am -- I know this feels

16    like it is a lot of time to spend but I am moving

17    through it as quickly as I can and should be --

18    actually I have one more document with your web

19    site and then I think we can be done with your web

20    site.

21              I believe it is Exhibit 21.

22              (Exhibit No. 21 marked.)

23         Q    So Exhibit 21 the first two pages are

24    printed from Mr. -- Dr. Tam's web site.  And then

25    the third, fourth, fifth and sixth pages are same

UNCERTIFIED ROUGH DRAFT

133

1     Chinese with an English translation.  As to these

2     first two pages here, Dr. Tam, do you recognize

3     that document?

TamRoughDraft.TXT

```
 4          A    Yes.
 5          Q    And can you tell me what that article
 6     is?
 7          A    This is as it says here, the harmful
 8     effects of same sex marriage on children.
 9          Q    Did you write this article?
10          A    Yes.
11          Q    Do you remember about when you wrote
12     it?
13          A    I think it is about the same period of
14     time of 2004.
15          Q    So what I would ask you to do is turn
16     to the second page of the translation document,
17     which I think is the fourth page of the exhibit.
18     And if you look at the English there in the top
19     half of the page it says, because the majority of
20     homosexuals live an indulgent lifestyle, they
21     suffer from AIDS and other serious illnesses and
22     many of them die.  Therefore, there is a need to
23     attract new blood into the ranks of the
24     homosexuals.  In addition, many homosexuals are
25     involved with young people and children.
```

UNCERTIFIED ROUGH DRAFT

134

```
 1     Therefore, attracting young people to become
 2     homosexuals has become an important method of
 3     maintaining the population.  If same sex marriage
 4     is legalized, attracting children will be much
```

TamRoughDraft.TXT

5          easier than it is currently.  At that time schools
6          from kindergarten onwards will teach children that
7          homosexuality is normal and that homosexual
8          families can be happy.  Children will receive
9          these preconceived notions and as teenagers will
10         be more accepting of homosexuality in sex
11         education.  The chance of trying out homosexuality
12         will greatly increase.  If the father or mother
13         says that homosexuality is wrong, they may be
14         charged with a quote, hate crime, end quote.  Not
15         only this television, movies, toys and all other
16         entertainment media will see an opportunity to
17         enter this new market and will introduce
18         homosexual goods.  Feminine men and masculine
19         females will become fashionable.  Will our
20         children be able to resist?
21              Do you see where I have read there?
22         A   Uh-huh, yes.
23         Q   Can you as we have done before let me
24         know whether that is accurately states what you
25         have written here in Chinese, I guess in the


                    UNCERTIFIED ROUGH DRAFT


                                                        135


1          paragraph right above that and going over to the
2          earlier page?
3              A   Okay.  The third line, in addition, I
4          did not write, many homosexuals are involved with
5          young children.  I wrote, is it not a small

TamRoughDraft.TXT

```
 6        number.
 7              Q    So it is not a small number of
 8        homosexuals are involved with young people and
 9        children?
10              A    Right; in Chinese it means it does not
11        mean many.  But it does not mean very tiny amount.
12        So --
13              Q    Okay.
14              A    So it is like -- so many is not
15        accurate.
16              Q    Okay.
17              A    Okay.  The rest are by and large, by
18        and large fine.
19              Q    Okay.  So with the exception of that
20        one change that we just talked about, many should
21        be more like it's not a small number, other than
22        that change, this is basically captures what you
23        wrote there in Chinese?
24              A    Uh-huh, yes.
25              Q    And do you believe that to be an
```

UNCERTIFIED ROUGH DRAFT

136

```
 1        accurate statement?  Do you believe what is stated
 2        there to be accurate and true?
 3              A    Yeah.
 4              Q    Going down to the next, to the bottom
 5        of the page, the heading there says, lowering the
 6        legal age for sex.  And at the bottom it says,
```

TamRoughDraft.TXT

```
 7        following same sex marriage will be a request to
 8        lower the legal age for sex.  In Europe when a
 9        country lowers the legal age for sex, the ones
10        dancing in the street to celebrate are mostly
11        homosexuals.  According to Dr. James Dobson's
12        book, Bringing Up Boys, a few years ago the United
13        Kingdom lowered the legal age for sex to 16 years
14        of age and France and Sweden lowered their legal
15        age to 15.  Canada, Germany, Italy, and Iceland
16        lowered their limit to 14 years of age.  Most
17        astonishing were Spain, Portugal, and the
18        Netherlands which all changed their legal age to
19        as low as 12 years of age.  The lower the minimum
20        age, the easier it is to lure young people without
21        fear of legal sanction.
22               Do you see where I have read there?
23        A    Yes.
24        Q    And if you compare that English that I
25        just read to the Chinese that you wrote right
```

UNCERTIFIED ROUGH DRAFT

137

```
 1        above it, does the English accurately reflect what
 2        you wrote in Chinese or would you make some
 3        changes to it?
 4        A    Yeah, should be by and large is fine.
 5        Q    So by and large this is an accurate
 6        representation of what you wrote --
 7        A    Uh-huh you.
```

Page 132

TamRoughDraft.TXT

8           Q    -- in Chinese?  All right.  If you turn
9      to the next page, this is page 3 of the
10     translation.  And I guess page 5 of the whole
11     exhibit.
12          A    Uh-huh.
13          Q    At the very top of the page the subject
14     heading is, legalizing evil.  And the next says it
15     is does not stop there.  Drugs, prostitution, and
16     polygamy could all be legalized as well which is
17     the ultimate goal of the homosexual movement.
18               Do you see that?
19          A    Uh-huh, yes.
20          Q    And does that English accurately
21     represent what you wrote in Chinese?
22          A    Yes.
23          Q    And as to both the section under
24     lowering the legal age for sex and the section
25     that sentence right there under legalizing evil do


               UNCERTIFIED ROUGH DRAFT


                                                  138


1      you believe those statements to be true and
2      accurate?
3           A    Yes.
4           Q    And finally will I want to just read
5      that last part of this here on the bottom half of
6      the same page at payable 3 of the translation.  In
7      English it says in the Netherlands besides the
8      legalization of polygamy all the other goals of
                    Page 133

TamRoughDraft.TXT

```
 9        the homosexual movement have basically been
10        achieved.  Back in the '80s the Netherlands
11        legalized prostitution.  In 2001 same sex marriage
12        was legalized.  And nowadays coffee shops are
13        selling drugs.  In a plaza outside Rotterdam
14        Central Station called Platform Zero young people
15        openly squat and do drugs.  The police turn a
16        blind eye and it is a pity that the Netherlands is
17        the biggest exporter of Ecstasy.  In neighboring
18        countries young people have also suffered.  In
19        Denmark same sex marriage was legalized in the
20        early '90s.  Looking at the country today the
21        sexual education CD produced by the Denmark
22        ministry of education features pictures of -- I
23        believe those are quotation marks -- human animal
24        intercourse, end quote, and, quote, humans eating
25        feces, end quote.  And it says, parens, note,
```

UNCERTIFIED ROUGH DRAFT

139

```
 1        colon, eating feces is a common practice for some
 2        homosexuals, closed quote -- I'm sorry -- closed
 3        parens.  One member of parliament even put the
 4        contents of the CD on his own website allowing
 5        children to view it.  Recently in a northern
 6        province of Canada new cases of syphilis have come
 7        almost entirely from homosexuals.  Nonetheless,
 8        the Canadian government still had to legalize same
 9        sex marriage.  In Norway there is a liberal city
```

TamRoughDraft.TXT

10      called Nordland where 80 person of the children
11      are born to unwed mothers.  Because there is no --
12      I am going over to the next page -- relationship
13      with the father, children will be raised under the
14      thumb of the government like young calves
15      separated from their mothers and kept by farmers.
16      The problems faced by these nations might be the
17      ones faced by America in the future.
18              Do you see where I have read there?
19          A   Yes.
20          Q   And I ask you one more time to look at
21      the Chinese above that English that I just read
22      and let me know whether the English accurately
23      reflects what you wrote in Chinese.
24          A   On the fourth line after the Platform
25      Zero, I have -- I qualified the youth, the young

                    UNCERTIFIED ROUGH DRAFT


                                                        140


1       people as a little; okay.  But here it says young
2       people openly squat and do drugs.  Looks like all
3       young people are doing that.  It is not what I was
4       saying there.
5           Q   So you would say some or a few young
6       people?
7           A   Yeah, a few.
8               MS. MOSS:  Ethan, Andy needs to -- he
9       needs to take off.  Can we take a quick break so I
10      can speak with him before he leaves?
                        Page 135

TamRoughDraft.TXT

11          MR. DETTMER:  Sure.  Can we just finish

12     with this one part and then we can take a break?

13     Is that all right?

14          MS. MOSS:  Sure.

15          MR. DETTMER:  I think you guys know

16     what questions I am going to ask about this.

17          THE WITNESS:   Okay.  The rest more or

18     less fine.

19     BY MR. DETTMER:

20          Q   Okay.  So just to be clear then, we

21     have added a few or some or a few young people

22     there in the fourth line but apart from that it is

23     essentially accurate representation of what you

24     wrote in Chinese?

25          A   Yes.


                    UNCERTIFIED ROUGH DRAFT


                                                     141

1          Q   And do you believe the statements in

2     there to be true and accurate statements?

3          A   Yes.

4          MR. DETTMER:  All right.  Why don't we

5     take a break.

6          THE VIDEOGRAPHER:   This marks the end

7     of disk No. 2 in the deposition of Hakshing

8     William Tam.  The time is 2:15 p.m., and we are

9     off the record.

10          (Recess 2:15 p.m.-2:21 p.m.)

11          THE VIDEOGRAPHER:   This marks the
                      Page 136

TamRoughDraft.TXT

12    beginning of disk No. 3 in the deposition of
13    Hakshing William Tam.  The time is 2:21 p.m., and
14    we are back on the record.
15                   EXAMINATION (Continuing)
16    BY MR. DETTMER:
17        Q    Dr. Tam, thank you.  You know, I
18    neglected to ask you one question about each of
19    these articles that we looked at.  And if I just
20    refer you back it to the articles from your web
21    site that we looked at, which are article -- I'm
22    sorry -- Exhibit 16 which was the article about
23    Brokeback Mountain, Exhibit 17, which was the
24    article about divorce, Exhibit 18, which was the
25    article about your interview with Dr. Wong?


                   UNCERTIFIED ROUGH DRAFT


                                                          142


 1        A    Uh-huh.
 2        Q    -- Exhibit 19 was not an article, I
 3    believe, that was the second -- the second page in
 4    your web site that contained links to other
 5    articles?
 6        A    Yes.
 7        Q    Exhibit 20 was your article on same sex
 8    marriage from 2004 that we discussed.  And
 9    Exhibit 21 was the one that we were just talking
10    about, the harmful effects of same sex marriage on
11    children.
12                   Do you know whether all of those
                           Page 137

TamRoughDraft.TXT

13    articles were published in the Chinese Christian

14    Herald, the magazine -- I'm sorry -- the newspaper

15    that we talked about earlier?

16        A    The one interview with Dr. Wong, it was

17    published there.  This one --

18        Q    Which one is that just for the record

19    the one you are --

20        A    Exhibit 18 was published in the

21    newspaper.  Exhibit 17, I forgot.  I don't

22    remember.

23        Q    That's fine.

24        A    Exhibit 16, I would think that it was

25    published there.  I'm not too sure I don't see any

UNCERTIFIED ROUGH DRAFT

143

1    reference to this article.  Where do you get it

2    from?

3        Q    I'm sorry.  Which one are you referring

4    to?

5        A    16, the one on Brokeback Mountain.

6        Q    I believe if you look at Exhibit 15, on

7    the second page?

8        A    Okay, yeah.  So this is from my web

9    site.  I don't really remember if I publish it in

10    the newspaper or not.  Maybe yes, maybe no.

11        Q    Okay.  And how about Exhibit 18?  I

12    don't know if we --

13        A    18 was published, yeah.
                    Page 138

TamRoughDraft.TXT

14          Q    Sorry.  And 19 was -- that is the --
15     how about Exhibit 20?
16          A    20, I don't think it is published.
17          Q    In the newspaper, that is, in the
18     Chinese Christian Herald?
19          A    I don't believe so.
20          Q    Do you know whether it is published
21     anywhere other than your web site?
22          A    I don't recall.  Sorry --
23          Q    No, no, that's fine.  And how about
24     Exhibit 21?
25          A    21 --


                    UNCERTIFIED ROUGH DRAFT


                                                            144

 1          Q    Do you know whether that was published
 2     in the Chinese Christian Herald?
 3          A    It could be.  Yeah, if you look at
 4     19 -- Exhibit 19, it talks about same sex
 5     marriage.  Maybe that's the link.  I'm not too
 6     sure.
 7          Q    Okay.  Thank you.  All right.  I want
 8     to direct you back to Exhibit 9, which we looked
 9     at this morning.  I believe you testified this is
10     the Traditional Family Coalition web site.
11          A    Yes.
12          Q    Now, if you look at the bottom of that
13     page, the first page and looks over to the second
14     page, there are a number of links, at least it
                          Page 139

# "What if We Lose" Letter



Presence Ministry

search...

About Presence | Speakers | Articles | Products | Theater | Contact Us

**Main Menu**

- Home
- Speakers
- Newsflash
- Upcoming Events
- Newsletters
- Friends of Presence
- Email Updates
- Support Us

**Family**

- Marriage
- Parenting
- Age 6-12

**Faith**

- Current News
  - Prop. 8 Updates
- Apologetics
- Engaging the Culture
- Testimony
- Education

**Other**

- Articles
- Products
- Past Events

Home > Current News > What if We Lose

# What if We Lose

Dear friends,

This November, San Francisco voters will vote on a ballot to "legalize prostitution". This is put forth by the SF city government, which is under the rule of homosexuals. They lose no time in pushing the gay agenda --- after legalizing same-sex marriage, they want to legalize prostitution. What will be next? On their agenda list is: legalize having sex with children.

I hope we all wake up now and really work to pass Prop 8. We have only 48 days left. Even if you have church building projects, mission projects, concert projects, etc, please consider postponing them and put all the church man/woman power to work on Prop 8. We can't lose this critical battle. If we lose, this will very likely happen......

1. Same-Sex marriage will be a permanent law in California. One by one, other states would fall into Satan's hand.

2. Every child, when growing up, would fantasize marrying someone of the same sex. More children would become homosexuals. Even if our children is safe, our grandchildren may not. What about our children's grandchildren?

3. Gay activists would target the big churches and request to be married by their pastors. If the church refuse, they would sue the church. Even if they know they may not win, they would still sue because they have a big army of lawyers from ACLU who would work for free. They know a prolonged law suit would cripple the church. They had sued the California government many times before. They sue until they win. They would not be afraid to sue a church. The church would have to spend lots of money in defending the case. The court fight would be long and the congregation would be discouraged and leave --- how long are they willing to shoulder the law suit costs. The church may give in and accept them, their membership would grow and take over the church. Then a righteous pastor would have to leave. Such scenarios have happened in Scandinavian countries. At that time, churches would keep quiet, hoping that they won't be picked as the next target. If your church is sued, don't expect others to help your church. You would be in the battle alone, and chances are you would lose. If that happens, whatever nice building your church have built now would become meaningless.

In order not to let this happen, we better team up at the current battle to defeat same-sex marriage. Collectively, we have a chance to win. Right now, each church sacrifice a little. For 48 days, delay your projects, put your resources ($ and manpower) into Prop 8. We'd have great power if we pool our resources together. Let's win this battle. After victory, your congregation would be energized and go back to the original projects with joy and cheer. They may want to give more and build a bigger building to thank God. Our God would be pleased and bless us more.

But if we lose, our congregation would lose heart. They might not want to work as hard. Our opponents would be overjoyed. They would do more and change more laws so as to persecute us easier. Churchs would have a much much harder time to survive. **We would be collecting offerings to fight law suits instead of building new buildings.** I pray that day would not come. The choice is yours. Talk to the leaders of your church. Your actions would change the history in either direction.

Thanks for your efforts,
Bill Tam
Traditional Family Coalition
Last Updated on Friday, 04 September 2009 09:50

**Our Community**

**Support Us**

Donate

**Featured Products**

**Panel Discussion: "Protecting Our Children from the Moral Crisis**

$12.00
Add to Cart

**Pastor's Legal Seminar**

$15.00
Add to Cart

**移風易俗的同性戀運動**

$10.00
Add to Cart

Become a fan facebook

©2009 Presence Ministry

# Gutierrez Deposition: Rough Transcript
# 33:20-35:15

120409GUTIERREZ.txt

```
 1                    DISCLAIMER
 2   THIS REALTIME ROUGH DRAFT TRANSCRIPT IS BEING
 3   PROVIDED TO COUNSEL PURSUANT TO CODE OF CIVIL
 4   PROCEDURE SECTION 2025 (R) (2), WHICH PROVIDES AS
 5   FOLLOWS:
 6       "WHEN PREPARED AS A ROUGH DRAFT TRANSCRIPT, THE
 7   TRANSCRIPT OF THE DEPOSITION MAY NOT BE CERTIFIED
 8   AND MAY NOT BE USED, CITED, OR TRANSCRIBED AS THE
 9   CERTIFIED TRANSCRIPT OF THE DEPOSITION
10   PROCEEDINGS.  THE ROUGH DRAFT TRANSCRIPT MAY NOT
11   BE CITED OR USED IN ANY WAY OR AT ANY TIME TO
12   REBUT OR CONTRADICT THE CERTIFIED TRANSCRIPT OF
13   DEPOSITION PROCEEDINGS AS PROVIDED BY THE
14   DEPOSITION OFFICER."
15
16   IT IS AGREED BY ALL PARTIES RECEIVING A COPY OF
17   THE REAL-TIME ROUGH DRAFT TRANSCRIPT TO USE IT
18   ONLY FOR THE PURPOSE OF AUGMENTING YOUR NOTES AND
19   NOT TO USE OR CITE IT IN ANY COURT PROCEEDING OR
20   TO DISTRIBUTE IT IN ANY FORM TO ANY PERSON OR
21   PARTY OUTSIDE OF THIS LITIGATION WITHOUT THE
22   APPROVAL OF THE CERTIFIED SHORTHAND REPORTER.
23
24
25
                                              1




 1        REPORTER'S NOTE:  THIS IS AN UNEDITED
```

120409GUTIERREZ.txt
2    DRAFT TRANSCRIPT BEING PREPARED ON A REALTIME

3    BASIS AND MAY CONTAIN STENOGRAPHIC OUTLINES THAT

4    ARE NOT TRANSLATED AND/OR INCORRECT ENGLISH

5    TRANSLATIONS OF WORDS.  FOR THESE REASONS, THIS

6    TRANSCRIPT SHOULD NOT BE RELIED UPON AS AN

7    OFFICIAL TRANSCRIPT.

8         A FINAL OFFICIAL TRANSCRIPT WILL

9    SUBSEQUENTLY BE PREPARED CHECKING THE TRANSLATED

10   COPY AGAINST THE RAW DATA INPUT FROM THE

11   REPORTER'S WRITER AS WELL AS VARIOUS SPELLING

12   REFERENCE SOURCES.

13        ACCEPTANCE OF THIS REALTIME DRAFT IS AN

14   AUTOMATIC FINAL COPY ORDER.

15        REAL-TIME ROUGH DRAFT TRANSCRIPT OF

16   MARTIN GUTIERREZ

17   DECEMBER 4, 2009

18        THE VIDEOGRAPHER:  GOOD MORNING.  WE'RE

19   GOING ON THE THE RECORD.  TIME ON THE SCREEN ASK

20   ANYONE 30 A.M..  TODAY'S DATE, DECEMBER 4TH, 2009.

21        WE ARE LOCATED AT THE LAW OFFICES OF

22   ANDREW PUGNO, 101 PARKSHORE DRIVE, FOLSOM,

23   CALIFORNIA, 95630.

24        THIS IS DVD NO. 1 OF THE DEPOSITION OF

25   MARTIN GUTIERREZ, CASE NAME PERRY VERSUS

                                        2

1    SCHWARZENEGGER, VENUED IN THE UNITED STATES

2    DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA.

3         MY NAME IS KEVIN MCMANN, A LEGAL VIDEO

4    SPECIALIST FOR MAGNA LEGAL SERVICES.

5         WILL ALL COUNSEL PLEASE IDENTIFY

120409GUTIERREZ.txt

6   THEMSELVES FOR THE RECORD.

7          MR. UNO:  THEODORE UNO, BOIES SCHILLER AND

8   FLEXNER FOR THE PLAINTIFFS.

9          MR. PUGNO:  ANDREW PUGNO, FOR THE

10  DEFENDANT INTERVENOR MARTIN GUTIERREZ.

11         THE VIDEOGRAPHER:  IF THERE ARE NO

12  STIPULATIONS, WILL THE COURT REPORTER PLEASE SWEAR

13  IN THE WITNESS.  WITNESS SWORN.

14         THE VIDEOGRAPHER:  PLEASE PROCEED.

15  BY MR. UNO:

16     Q.  GOOD MORNING MR. GUTIERREZ?

17     A.  GOOD MORNING.

18     Q.  AS YOU JUST HEARD, MY NAME IS THEODORE UNO

19  AND I REPRESENT THE PLAINTIFFS.

20         COULD YOU PLEASE STATE YOUR WHOLE NAME FOR

21  THE RECORD?

22     A.  MARTIN F GUTIERREZ.

23     Q.  AND WHAT DOES YOUR MIDDLE NAME STAND FOR?

24     A.  FLORES.

25     Q.  WHAT IS YOUR PERSONAL ADDRESS?

                                                3

1      A.  1040 MARSTON STREET, WEST SACRAMENTO,

2   CALIFORNIA, 95605.

3      Q.  WHAT IS YOUR BUSINESS ADDRESS?

4      A.  4661 BELL DRIVE, THAT'S WHERE I WORK,

5   SACRAMENTO, CALIFORNIA, 95883.

6      Q.  HAVE YOU BEEN DEPOSED BEFORE?

7      A.  NO.

8      Q.  HAVE YOU EVER TESTIFIED AT A TRIAL BEFORE?

120409GUTIERREZ.txt

13   SUPERVISED THE PREPARATION OF THE APPROPRIATE
14   LANGUAGE FOR PROPOSITION EIGHT.
15          DO YOU SEE THAT?
16      A.  YES.
17      Q.  WHAT DID YOU MEAN BY PROPOSITION EIGHT
18   THERE?
19      A.  I DON'T KNOW.
20      Q.  DID YOU KNOW AT THE TIME YOU SIGNED THIS
21   DECLARATION?
22      A.  NO.
23      Q.  LET'S GO BACK TO EXHIBIT 2.
24          NOW, I BELIEVE YOU SAID THIS WAS THE
25   LETTER YOU SUBMITTED TO THE SECRETARY OF STATE OR
                                                    32


1    SENT TO THE SECRETARY OF STATE ALONG WITH THE
2    LANGUAGE OF WHAT BECAME PROPOSITION EIGHT;
3    CORRECT.
4       A.  CORRECT.
5       Q.  NOW, WHEN I'M USING THE TERM, PHRASE
6    PROPOSITION EIGHT, WITH REFERENCE TO THIS LETTER,
7    DO YOU UNDERSTAND WHAT I MEAN?
8       A.  YES.
9       Q.  AND WHAT DO YOU UNDERSTAND ME TO MEAN WHEN
10   I REFERENCE PROPOSITION EIGHT WITH REGARD TO
11   EXHIBIT 2, THE LETTER IN EXHIBIT 2?
12      A.  I DON'T KNOW.
13      Q.  I THOUGHT YOU JUST SAID THAT YOU DID
14   TESTIFY ME WHEN I USED THE TERM PROPOSITION EIGHT
15   IN REFERENCE TO THIS LETTER?

                     Page 29

120409GUTIERREZ.txt
16      A.  WELL, YOU'RE GOING BACK AND FORTH, AND
17   I'M, AGAIN --
18      Q.  THAT'S WHY I WENT TO CLARIFY, I'M TRYING
19   TO FOCUSING ON ONE DOCUMENT.
20          SO LET HAVE EXHIBIT 2 IN FRONT OF US.
21          LET FOR THE MOMENT PUT ASIDE EXHIBIT 1.
22          LOOKING -- IF YOU COULD TURN TO THE PAGE
23   WITH YOUR NAME AND SIGNATURE ON IT.
24          AND I BELIEVE YOU PREVIOUSLY TESTIFIED
25   THAT THIS LETTER WAS MEANT TO SUBMIT THE TEXT OR

                                                    33


1   THE LANGUAGE OF PROPOSITION -- WHAT LATER BECAME
2   PROPOSITION EIGHT TO THE SECRETARY OF STATE OF
3   CALIFORNIA; IS THAT CORRECT?
4      A.  CORRECT.
5      Q.  WHAT DO YOU UNDERSTAND TO BE THE TEXT OF
6   WHAT LATER BECAME PROPOSITION EIGHT?
7      A.  CAN YOU REPEAT THE QUESTION?
8      Q.  SURE.
9          WHAT DO YOU UNDERSTAND TO BE THE TEXT OR
10   THE LANGUAGE OF WHAT LATER BECAME PROPOSITION
11   EIGHT?
12      A.  I DON'T KNOW.
13      Q.  EARLIER, I BELIEVE, MUCH EARLIER IN THE
14   DEPOSITION, I ASKED YOU WHAT PROPOSITION EIGHT WAS
15   THE FIRST TIME I ASKED YOU; DO YOU RECALL THAT?
16      A.  YES AND YOU SAID IT WAS MEANT TO PROTECT
17   MARRIAGE.
18      A.  YES.
19      Q.  HOW DID YOU UNDERSTAND PROPOSITION EIGHT
                    Page 30

120409GUTIERREZ.txt

20    TO PROTECT MARRIAGE?

21         MR. PUGNO:  OBJECTION; THE QUESTION CALLS

22    FOR THE SUBJECTIVE.INTENT AND UNDERSTANDING OF AN

23    OFFICIAL PROTEIN WHICH IS OFF LIMITS AND I

24    INSTRUCT THE CLIENT NOT TO TO ANSWER.

25         MR. UNO:  COUNSEL, I'M JUST TRYING TO

                                                    34


1     UNDERSTAND IF HE HAS ANY IDEA AT ALL ABOUT WHAT

2     PROPOSITION EIGHT IS, AND SO FAR HE'S SAID HE

3     DOESN'T EVEN UNDERSTAND WHAT IT MEANS IN HIS

4     DECLARATION.  HE DOESN'T UNDERSTAND WHAT IT MEANS

5     IN THE LETTER HE SUBMITTED THE TEXT TO THE

6     SECRETARY OF STATE OF CALIFORNIA.

7          MR. PUGNO:  IS THERE A QUESTION.

8     BY MR. UNO:

9        Q.  SO ARE YOU GOING TO ALLOW HIM TO ANSWER

10    ANY QUESTIONS ABOUT WHAT HIS UNDERSTANDING OF

11    PROPOSITION EIGHT IS?

12         MR. PUGNO:  I AM NOT GOING TO OBJECT TO

13    QUESTIONS ASKING WHAT PROPOSITION IS, BUT ANY

14    QUESTIONS ABOUT WHAT HIS UNDERSTANDING OF WHAT IT

15    DID, I WILL OBJECT TO.

16    BY MR. UNO:

17       Q.  GREAT.

18         LET ME TRY AGAIN.

19         REMOVE FROM ANY OF THE DOCUMENTS YOU SEE

20    BEFORE YOU, NOT REFERENCING EXHIBIT 1 OR

21    EXHIBIT 2?

22       A.  OKAY.

                        Page 31

# Jansson Deposition: Final Transcript

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    KRISTIN M. PERRY, SANDRA      )
     B. STIER, PAUL T. KATAMI,     )
5    JEFFREY J. ZARRILLO,          )
                                   )
6           Plaintiffs,            )   No. 09-CV-2292
                                   )        VRW
7    vs.                           )
                                   )
8    ARNOLD SCHWARZENEGGER, in     )
     his official capacity as      )
9    Governor of California;       )
     EDMUND G. BROWN, JR. in       )
10   his official capacity as      )
     Attorney General of           )
11   California; MARK B.           )
     HORTON, in his official       )
12   capacity as Director of       )
     the California Department     )
13   of Public Health and          )
     State Registrar of Vital      )
14   Statistics; LINETTE           )
     SCOTT, in her official        )
15   capacity as Deputy            )
     Director of Health            )
16   Information & Strategic        )
     Planning for the             )
17   California Department of      )
     Public Health; PATRICK        )
18   O'CONNELL, in his             )
     official capacity as          )
19   Clerk-Recorder for the        )
     County of Alameda; and        )
20   DEAN C. LOGAN, in his         )
     official capacity as          )
21   Registrar-Recorder/County     )
     Clerk for the County of       )
22   Los Angeles,                  )
                                   )
23           Defendants,           )
                                   )
24

25

1      and

2
       PROPOSITION & OFFICIAL
3      PROPONENTS DENNIS
       HOLLINGSWORTH, GAIL J.
4      KNIGHT, MARTIN F.
       GUTIERREZ, HAKSHING
5      WILLIAM TAM, and MARK A.
       JANSSON; and
6      PROTECTMARRIAGE COM-YES
       ON 8; A PROJECT OF
7      CALIFORNIA RENEWAL,

8          Defendant-Intervenors.

9

10

11

12

13

14

15              DEPOSITION OF MARK A. JANSSON

16                  Folsom, California

17              Thursday, December 3, 2009

18

19

20

21

22     REPORTED BY:  YVONNE FENNELLY, CSR NO. 5495
       California Certified Realtime Reporter
23

24     FILE NO.:     35818

25     Pages 1 - 304

```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3      KRISTIN M. PERRY, SANDRA    )
        B. STIER, PAUL T. KATAMI,   )
 4      JEFFREY J. ZARRILLO,        )
                                    )
 5                  Plaintiffs,     )   No. 09-CV-2292
                                    )            VRW
 6      vs.                         )
                                    )
 7      ARNOLD SCHWARZENEGGER, in   )
        his official capacity as    )
 8      Governor of California;     )
        EDMUND G. BROWN, JR. in     )
 9      his official capacity as    )
        Attorney General of         )
10      California; MARK B.         )
        HORTON, in his official     )
11      capacity as Director of     )
        the California Department    )
12      of Public Health and        )
        State Registrar of Vital    )
13      Statistics; LINETTE         )
        SCOTT, in her official      )
14      capacity as Deputy          )
        Director of Health          )
15      Information & Strategic     )
        Planning for the            )
16      California Department of    )
        Public Health; PATRICK      )
17      O'CONNELL, in his           )
        official capacity as        )
18      Clerk-Recorder for the      )
        County of Alameda; and      )
19      DEAN C. LOGAN, in his       )
        official capacity as        )
20      Registrar-Recorder/County   )
        Clerk for the County of     )
21      Los Angeles,                )
                                    )
22                  Defendants,     )
                                    )
23

24

25
```

1     and

2     PROPOSITION & OFFICIAL
      PROPONENTS DENNIS
3     HOLLINGSWORTH, GAIL J.
      KNIGHT, MARTIN F.
4     GUTIERREZ, HAKSHING
      WILLIAM TAM, and MARK A.
5     JANSSON; and
      PROTECTMARRIAGE COM-YES
6     ON 8; A PROJECT OF
      CALIFORNIA RENEWAL,
7
      Defendant-Intervenors.
8

9

10

11

12

13          Deposition of MARK JANSSON, taken on

14    behalf of Plaintiffs, at 101 Parkshore Drive,

15    Folsom, California, commencing at 9:30 a.m. and

16    ending at 6:30 p.m., on Thursday, January 3, 2009,

17    before Yvonne Fennelly, CSR No. 5495, California

18    Certified Realtime Reporter.

19

20

21

22

23

24

25

```
1     APPEARANCES OF COUNSEL:

2

3     FOR PLAINTIFFS:

4

5          BOIES, SCHILLER & FLEXNER, LLP

6          By:  THEODORE H. UNO, Esq.

7          1999 Harrison Street

8          Suite 900

9          Oakland, California 94612

10         (510) 874-1000

11         tuno@bsfllp.com

12

13

14    FOR DEFENDANTS:

15

16         COOPER & KIRK

17         By:  NICOLE J. MOSS, Esq.

18         1523 New Hampshire Avenue, N.W.

19         Washington, D.C.  20036

20         (910) 270-8768

21         (202) 220-9601

22

23

24

25
```

1       **A.   Reviewed, discussed, edited, decided upon.**

2       Q.   Now, did you draft the language of

3    Proposition 8?

4            MS. MOSS:  I'm going to --I think that,

5    again, I think by asking him what specifically he

6    drafted goes beyond what he's testified to, and I

7    think it would reveal -- the language is what it

8    is and what role he had in terms of selecting

9    specific language is --gets into protected First

10   Amendment areas.

11           The language speaks for itself, and he's

12   indicated what he understood by supervising.

13           MR. UNO:  Counsel, when you say the

14   language speaks for itself, did I ask anything

15   about what the meaning of the language was?

16           MS. MOSS:  What you asked him specifically

17   was did he draft the language, and he has said

18   that he supervised it, and whether he -- what

19   editorial control or role that he played in what

20   that specific language is what your question is

21   necessarily soliciting.

22           And to that extent, I think it's

23   protected.

24   BY MR. UNO:

25       Q.   I think you said that as part of the

1    supervision you did regarding the preparation of

2    the appropriate language for Proposition 8, you

3    reviewed the language of Proposition 8.

4            Is that correct?

5        **A.  Yes.**

6        Q.   And the first time you reviewed the

7    language for Proposition 8, was it the same as it

8    is now?

9            MS. MOSS:  Objection; and I'm going to

10   instruct you not to answer.  I don't think it's

11   appropriate to be inquiring into any prior drafts,

12   whether there were prior drafts, any changes that

13   went through.

14           It is -- the language is what it is and

15   that's all that I want you to testify about.

16       Q.   All right.

17           Are you following your attorney's advice

18   not to --

19       **A.  Yes.**

20       Q.   You said as part of your supervision of

21   the preparation of the appropriate language for

22   Proposition 8 that you discussed the language of

23   Proposition 8; correct?

24       **A.  I did say that.**

25       Q.   With whom did you discuss the language of

1    Proposition 8 in preparation?

2            MS. MOSS:  I'm going to instruct you not

3    to answer that on First Amendment grounds.

4            THE WITNESS:  I've been instructed not to

5    answer.

6    BY MR. UNO:

7        Q.  Are you following that instruction?

8        **A.   Yes.**

9        Q.  You said that as part of the supervision

10   of the preparation of the appropriate language for

11   Proposition 8 you edited the language for

12   Proposition 8.

13           Correct?

14       **A.   Yes, I did say that.**

15       Q.  When you say you edited, does that mean

16   you provided suggestions for the language of

17   Proposition 8?

18           MS. MOSS:  I'm going to object and say his

19   testimony speaks for itself, and I'm going to

20   instruct you not to provide further information

21   with respect to the message or the drafting of

22   specific language.

23           MR. UNO:  Counsel, I'm asking him for what

24   he meant by the term edited.

25           Are you saying that he cannot explain the

1   use of his own term?

2           MS. MOSS:  Well, to the extent of what

3   you're asking him to do is to get into the

4   internal workings of how the messaging came about

5   and who was involved in the messaging and what

6   process it went through is off limit.

7           The language is what it is.

8   BY MR. UNO:

9       Q.  What did you mean when you said as part of

10  your supervision of the preparation of the

11  appropriate language for Proposition 8 -- scratch

12  that.  Let me try again.

13          When you use the termed edited as part of

14  your supervision of the preparation of the

15  appropriate language for Proposition 8, what did

16  you mean by the term edited?

17      **A.  Ensured that the context of the sentencing**

18  **in the proposition was grammatically correct.**

19      Q.  Was the only thing you were doing when you

20  were editing the appropriate language for

21  Proposition 8 -- I'm sorry.

22          Was the only thing when you were editing

23  as part of your supervision of the preparation of

24  the appropriate languages of Proposition 8 looking

25  for grammatical errors?

```
1          MS. MOSS:  I'm going to object.  I think,
2     one, it's asked and answered; and two, again, I
3     think what you're getting into is trying to get
4     into the substance of was anything else considered
5     or, you know, sort of the background behind it
6     when I think the language speaks for itself.
7          And as you know, we have a dispute over
8     whether it's appropriate to be inquiring into
9     drafts or predecisional issues.
10         MR. UNO:  I'm really not.  I'm really
11    trying to find out what he meant by the word
12    edited, and so far he said that he ensured that --
13    that meant he ensured it was grammatically
14    correct.
15         And all I'm asking is, did it mean
16    anything else?  Was that all?  And if that's his
17    answer, that's all I did, was look to see if it
18    was ensured for grammatically correct, I'll take
19    that answer.
20         But my question is, is there anything
21    else?
22         Now, you may object to the follow-up
23    question, which is what else was it?  And I'm
24    happy to hear that objection if you want to make
25    it.
```

1     But surely you're not making the position

2   he can't answer the question whether -- when he

3   used the term edited it meant anything other than

4   ensuring it was -- the language it was

5   propositioning was grammatically correct.

6         Is that your position?

7         MS. MOSS:  Do you understand the limited

8   parameters he placing on that question?

9         In other words, I don't want you to go

10  beyond --

11        THE WITNESS:  Yes.

12        MS. MOSS:  -- providing details.

13  BY MR. UNO:

14     Q.  So when you edited the language of

15  Proposition 8 as part of your supervision of the

16  preparation of the appropriate language for

17  Proposition 8, was the only thing you did ensuring

18  it was grammatically correct?

19     **A.   No.**

20     Q.  And are those other things you did to edit

21  the language of Proposition 8, as part of your

22  role of supervising the preparation of the

23  appropriate language for the initiative, are those

24  things you're not telling me based on your

25  counsel's instruction?

1   **A.   Yes.**

2   Q.   Now, you said, I believe, that as part of

3   the supervision of the preparation of the

4   appropriate language of Proposition 8, you decided

5   upon the language of Proposition 8.

6        Is that correct?

7   **A.   Yes.**

8   Q.   Did you alone decide what the appropriate

9   language was for Proposition 8?

10  **A.   No.**

11  Q.   Who were the other people you worked with

12  to decide upon the language of Proposition 8?

13       MS. MOSS:   I'm going to object to the

14  extent it would either, A, reveal the identities

15  of anybody who is not publically known and

16  associated with this, I would instruct you not to

17  answer; and to the extent that it would reveal any

18  privileged communications that you might have with

19  counsel, I would instruct you not to answer.

20       THE WITNESS:   Would you restate the

21  question?

22       MR. UNO:   Can I have the court reporter

23  read it back?

24       (Record read.)

25       MS. MOSS:   And let me -- I'm sorry, let me

1    just also add that, you know, to the extent that

2    this is asking for who gave input or internal

3    thoughts and thought processes about the title

4    language, then I would instruct you not to answer.

5              MR. UNO:  That's a fair enough.  That's

6    fair enough.

7              Let me focus it a little bit.  That worked

8    with, I think, added something that made it

9    broader than I intended.

10   BY MR. UNO:

11       Q.  When you said that you decided upon the

12   language of Proposition 8 as part of your

13   supervision of the development of the appropriate

14   language for Proposition 8, who were the other

15   people who with you decided to approve that

16   language?

17       **A.  I have been counseled not to reveal any**

18   **information this is not already public.**

19       Q.  Well, do you know if any of those people

20   have been publically revealed?

21       **A.  I can't answer that question.**

22       Q.  Do you believe that any of the other

23   official proponents have revealed their identity

24   as people who decided upon the language of

25   Proposition 8?

1        **A.   Yes.**

2        Q.   All right.

3             So when you just told me that you didn't

4    know, you actually do know.

5             MS. MOSS:   Well, objection; I think it

6    misstates his testimony.

7             MR. UNO:   All right.

8    BY MR. UNO:

9        Q.   Who else can you reveal to me who decided

10   upon the language of Proposition 8?

11       **A.   You just made a statement about the**

12   **proponents.   That is public information.**

13       Q.   Okay.

14       **A.   To the extent there are others, I've been**

15   **be counseled not to answer.**

16       Q.   Okay.

17            Can you tell me the names of the other

18   official proponents?

19       **A.   May I refer you to line 11, page 1, where**

20   **the names of the intervenors are listed?**

21       Q.   Are you referring to the first page of

22   your declaration?

23       **A.   Yes, I am.**

24       Q.   Okay.

25            Were there any other people, other than

1    the official proponents who played a role -- I'm

2    sorry, scratch that.

3            Were there any other people other than the

4    official proponents who decided upon the language

5    of Proposition 8?

6            MS. MOSS:  And, again, same instruction as

7    earlier.

8            To the extent that these are not -- to the

9    extent that this would be getting into the

10   internal declarations and thought processes and

11   how the committee worked, I'm going to instruct

12   you not to answer.  And certainly to the extent it

13   would reveal the names of anybody who's not

14   publically known.

15   BY MR. UNO:

16       Q.  I'm actually looking for a yes or no.

17       **A.  Yes.**

18       Q.  And I take it you're not revealing the

19   names of the other people who decided upon the

20   language of Proposition 8 based on your counsel's

21   instruction?

22       **A.  Yes.**

23       Q.  Did you discuss the language of

24   Proposition 8 with the other official proponents?

25           MS. MOSS:  I think this entire line about

1    who he discussed -- I'm going to state for the

2    record that who he discussed it with, it gets into

3    their internal deliberations over -- or over

4    crafting language, and I think all of that sort of

5    internal deliberations, thought processes,

6    strategy is protected by the First Amendment.

7         At least, you know, we'll lodge the

8    objection until this issue has been decided.

9    BY MR. UNO:

10   Q.   Could you please turn to paragraph 13 in

11   your declaration.

12        Do you see where it says, As an Official

13   Proponent -- I'm sorry.  I'll wait till you get

14   there.

15        Do you see where paragraph 13 begins?

16   **A.   Yes.**

17   Q.   Do you see where it says, As an Official

18   Proponent, I endorsed ProtectMarriage.com - Yes on

19   8, a Project of California Renewal (a "primarily

20   formed ballot measure committee" under California

21   law registered with the California Secretary of

22   State) to conduct a petition-gathering campaign

23   for the purpose of qualifying Proposition 8 for

24   the ballot?

25   **A.   Yes.**