1    COOPER AND KIRK, PLLC
     Charles J. Cooper (DC Bar No. 248070)*
2    *ccooper@cooperkirk.com*
     David H. Thompson (DC Bar No. 450503)*
3    *dthompson@cooperkirk.com*
     Howard C. Nielson, Jr. (DC Bar No. 473018)*
4    *hnielson@cooperkirk.com*
     Nicole J. Moss (DC Bar No. 472424)*
5    *nmoss@cooperkirk.com*
     Peter A. Patterson (OH Bar No. 0080840)*
6    *ppatterson@cooperkirk.com*
     1523 New Hampshire Ave. N.W., Washington, D.C. 20036
7    Telephone: (202) 220-9600, Facsimile: (202) 220-9601

8    LAW OFFICES OF ANDREW P. PUGNO
     Andrew P. Pugno (CA Bar No. 206587)
9    *andrew@pugnolaw.com*
     101 Parkshore Drive, Suite 100, Folsom, California 95630
10   Telephone: (916) 608-3065, Facsimile: (916) 608-3066

11   ALLIANCE DEFENSE FUND
     Brian W. Raum (NY Bar No. 2856102)*
12   *braum@telladf.org*
     James A. Campbell (OH Bar No. 0081501)*
13   *jcampbell@telladf.org*
     15100 North 90th Street, Scottsdale, Arizona 85260
14   Telephone: (480) 444-0020, Facsimile: (480) 444-0028

15   ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
     GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
16   MARK A. JANSSON, and PROTECTMARRIAGE.COM – YES ON 8, A
     PROJECT OF CALIFORNIA RENEWAL
17
     * Admitted *pro hac vice*
18

             **UNITED STATES DISTRICT COURT**
19           **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20   KRISTIN M. PERRY, SANDRA B. STIER, PAUL | |
| 21   T. KATAMI, and JEFFREY J. ZARRILLO, | CASE NO. 09-CV-2292 VRW |
| 22         Plaintiffs, | **DEFENDANT-INTERVENORS' MEMORANDUM IN OPPOSITON TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORTS, OPINIONS, AND TESTIMONY OF KATHERINE YOUNG, LOREN MARKS, AND DAVID BLANKENHORN** |
| 23   CITY AND COUNTY OF SAN FRANCISCO, | |
| 24        Plaintiff-Intervenor, | |
| 25         v. | |
| 26 | **Pretrial Conference** |
| 27   ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. | |
|    BROWN, JR., in his official capacity as Attorney | Date:   December 16, 2009 |
| 28   General of California; MARK B. HORTON, in his | Time:   10:00 a.m. |

1   official capacity as Director of the California
Department of Public Health and State Registrar of
2   Vital Statistics; LINETTE SCOTT, in her official
capacity as Deputy Director of Health Information
3   & Strategic Planning for the California Department
of Public Health; PATRICK O'CONNELL, in his
4   official capacity as Clerk-Recorder for the County
of Alameda; and DEAN C. LOGAN, in his official
5   capacity as Registrar-Recorder/County Clerk for
the County of Los Angeles,
6
7                   Defendants,
8   and
9   PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, GAIL J.
10  KNIGHT, MARTIN F. GUTIERREZ, HAK-
SHING WILLIAM TAM, and MARK A.
11  JANSSON; and PROTECTMARRIAGE.COM –
YES ON 8, A PROJECT OF CALIFORNIA
12  RENEWAL,
13                   Defendant-Intervenors.
14

Judge:  Chief Judge Vaughn R. Walker
Location:  Courtroom 6, 17th Floor

Trial Date:  January 11, 2010

15      Additional Counsel for Defendant-Intervenors
16
17  ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
18  *tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
19  Telephone: (916) 932-2850, Facsimile: (916) 932-2851

20  Jordan W. Lorence (DC Bar No. 385022)*
*jlorence@telladf.org*
21  Austin R. Nimocks (TX Bar No. 24002695)*
*animocks@telladf.org*
22  801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 393-8690, Facsimile: (202) 347-3622
23
    * Admitted *pro hac vice*
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

ARGUMENT .................................................................................................................1

I.     Katherine Young ..............................................................................................4

       a.   Professor Young is Qualified to Offer Expert Opinions in this Case .........4

       b.   Professor Young's Opinions Are Relevant ................................................6

       c.   Professor Young's Opinions are Reliable ..................................................8

II.    Loren Marks    .................................................................................................10

       a.   Professor Marks is Qualified to Offer Expert Opinions in this Case .......10

       b.   Professor Marks' Opinions Are Relevant ................................................11

       c.   Professor Marks' Opinions Are Reliable ..................................................12

III.   David Blankenhorn    .....................................................................................14

       a.   Mr. Blankenhorn is Qualified to Offer an Expert Opinion in this Case ...14

       b.   Mr. Blankenhorn's Opinions Are Relevant ..............................................18

       c.   Mr. Blankenhorn's Opinions Are Reliable ...............................................18

CONCLUSION............................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                    <u>Page</u>

*Dang Vang v. Toyed*, 944 F.2d 476 (9th Cir. 1991) ............................................................7

*Daubert v. Merrell Dow Pharm.*, 43 F.3d 1317 (9th Cir. 1995) ............................................9, 11, 20

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ..........................................................2

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) ................................ 3

*Douglas v. University Hosp.*, 150 F.R.D. 165 (E.D. Mo. 1993) ......................................14

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ..........................................................12, 19

*Gibbs v. Gibbs*, 210 F.3d 491 (5th Cir. 2000) ..............................................................3

*Hangerter v. Providence Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)...........................1

*Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993 (9th Cir.), *amended by* 272 F.3d 1289
   (9th Cir. 2001) ......................................................................................3

*Johnson v. Robison*, 415 U.S. 361 (1974) ......................................................................12

*Kumho Tire Co. v. Charmicahel*, 526 U.S. 137 (1999) ................................................. 2, 8, 9, 10, 19

*Marshall v. Sawyer*, 365 F.2d 105 (9th Cir. 1966) .......................................................18

*Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1142 (9th Cir. 1997)  ............................13

*Stillwell v. Smith & Nephew, Inc.*, 482 F.3d 1187 (9th Cir. 2007) ......................................12, 13, 20

*Thomas v. Newton Int'l Enter.*, 42 F.3d 1266 (9th Cir. 1994)..........................................1

*United States v. $124,579 U.S. Currency*, 873 F.2d 1240 (9th Cir. 1989)....................................18

*United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*, 80 F.3d 1074
   (5th Cir. 1996) ........................................................................................3

*United States v. Bilson*, 648 F.2d 1238 (9th Cir. 1981)...................................................2, 11

*United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005) ...................................................3

*United States v. Chischilly*, 30 F.3d 1144 (9th Cir. 1994)..............................................1

*United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002)...................................................2, 11

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000)..................................................3

*United States v. Moore*, 604 F.2d 1228 (9th Cir. 1979) ..................................................2

ii

*United States v. Rahm*, 993 F.2d 1405 (9th Cir. 1993)..........................................................8

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009) ................................................................4

**Rules**                                                                                                    **Page**

Fᴇᴅ. R. Eᴠɪᴅ. 201.....................................................................................................................3

Fᴇᴅ. R. Eᴠɪᴅ. 401.....................................................................................................................2

Fᴇᴅ. R. Eᴠɪᴅ. 702...............................................................................................................*passim*

**Other**                                                                                                    **Page**

Cʜᴀʀʟᴇs Aʟᴀɴ Wʀɪɢʜᴛ & Vɪᴄᴛᴏʀ Jᴀᴍᴇs Gᴏʟᴅ, 29 Fᴇᴅᴇʀᴀʟ Pʀᴀᴄᴛɪᴄᴇ &
    Pʀᴏᴄᴇᴅᴜʀᴇ Eᴠɪᴅ. § 6265.   ........................................................................................1

DEFENDANT-INTERVENORS' MEMORANUM IN OPPOSITION TO PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S
MOTION IN LIMINE CASE NO. 09-CV-2292 VRW

1    Professor Katherine Young, Professor Loren Marks, and Mr. David Blankenhorn are

2    prominent and distinguished individuals who by training and experience are well equipped to offer

3    reliable expert opinions on matters highly relevant to this case.  Plaintiffs' arguments for excluding

4    their testimony not only lack merit, they would almost certainly require the exclusion of Plaintiffs'

5    experts as well.  Plaintiffs' motion *in limine* should be denied.

6    <u>**ARGUMENT**</u>

7    Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides

8    that

9        If scientific, technical, or other specialized knowledge will assist the trier of fact to
         understand the evidence or to determine a fact in issue, a witness qualified as an
10        expert by knowledge, skill, experience, training, or education, may testify thereto in
         the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
11        or data, (2) the testimony is the product of reliable principles and methods, and (3) the
         witness has applied the principles and methods reliably to the facts of the case.

12

13    The rule logically is broken down into three basic components: (1) qualifications; (2)

14    relevance; and (3) reliability.[1]

15    *Qualifications*.  Rule 702 "contemplates a broad conception of expert qualifications."

16    *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994).  As it makes clear, a

17    witness may be qualified as an expert by knowledge, skill, experience, training, *or* education.  Any

18    one of these bases, in other words, may be the source for a witness's expertise.  *See* Charles Alan

19    Wright & Victor James Gold, 29 FED. PRAC. & P. EVID. § 6265.  Furthermore, the *degree* of the

20    witness's "knowledge, skill, experience, training, or education" may be quite modest and need only

21    be sufficient to "assist the trier of fact" to some degree.  *Id*. (quotation marks omitted).  As the

22    Ninth Circuit has explained, a proffered expert need possess only the "*minimal foundation* of

23    knowledge, skill, and experience required" by Rule 702's "*broad conception* of expert

24    qualifications."  *Hangarter v. Providence Life & Accident Ins. Co.*, 373 F.3d 998, 1015, 1016 (9th

25

26    ───────────────
     [1] Of course, expert testimony, like other forms of testimony, is subject to Federal Rule of Evidence
27    403.  *See United States v. Chischilly*, 30 F.3d 1144, 1156 (9th Cir. 1994).  Plaintiffs' claims that
     the expert testimony of Blankenhorn, Young, and Marks runs afoul of Rule 403, however, rests
28    entirely on their contentions regarding qualifications, relevance, and reliability.  *See* Doc # 285 at
     19, 24, & 28-29.  These claims thus require no independent attention.

1

Cir. 2004) (quotation marks omitted, emphases in original).  Indeed, in *United States v. Moore*, 604 F.2d 1228, 1235 (9th Cir. 1979), the Ninth Circuit held that the district court properly permitted an expert to testify on a subject it would have taken the jury "a day of training" to master.  Once this requisite "minimal foundation" of expertise is established, *Newton Int'l*, 42 F.3d at 1269-70, issues related to the extent of a witness's expertise go to the weight to be accorded the testimony, not its admissibility, *see United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir. 1981) (holding that the "absence of a specialty degree in psychology did not disqualify [a] psychiatrist" from basing expert testimony on the results of psychological tests" but instead went "to the weight of his testimony").

*Relevance*.  The requirement that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," FED. R. EVID. 702, is "primarily" one of relevance, *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 591 (1993).  This flows from the common-sense observation that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  *Id.* (quotation marks omitted).  Evidence is relevant, of course, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401.  Relevant expert testimony must also be proper for treatment by an expert; it in other words must "exceed the common knowledge of the average layperson." *United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002)

*Reliability*.  The "gatekeeping" function imposed on district courts by Rule 702 extends to all types of expert testimony, and requires district courts to assess not only the relevance of proffered expert testimony but also its reliability.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999).  Rule 702 guides this reliability inquiry, stating that an expert may testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  District courts have "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho*, 526 U.S. at 152. Factors such as whether an expert's approach has been subject to peer review, can be tested, or has a known error rate may be relevant—or may not be. *See id.* at 149-50.  The inquiry is a "flexible

2

one," and it depends on the nature of the case at hand.  *Id*. at 150 (quotation marks omitted).  In all events, "the rejection of expert testimony is the exception rather than the rule"; "'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" Notes of Advisory Committee on 2000 Amendments, FED .R. EVID. 702 (quoting *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996)).

District courts are always granted "broad discretion" when applying these principles under Rule 702.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  But for at least two reasons, the Court's discretion to consider expert testimony should be *particularly* broad in this case.

*First*, the Court, not a jury, is the finder of fact in this case.  "The 'gatekeeper' doctrine, however, "was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004); *see also Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").  The concern that a jury will grant "special weight" to the testimony of a witness "cloaked with the mantle of an expert" is simply absent in this case.  *Jinro Am., Inc. v. Secure Invs., Inc*., 266 F.3d 993, 1004 (9th Cir. 2001), *amended by* 272 F.3d 1289 (9th Cir. 2001).

*Second*, an overly restrictive view of permissible expert testimony would be especially perverse here given the legislative nature of the facts at issue.  The essential and universal functions, features, and purposes of marriage, the likely impact of extending marriage to same-sex couples, and the ideal family context for raising children are paradigmatic examples of legislative facts; *i.e.* facts that go beyond the parties to the dispute "which have relevance to legal reasoning and the lawmaking process."  Advisory Committee Note, FED. R. EVID. 201.  As we have explained, the Court is unlimited in the material it can consider with respect to legislative facts—it "may consult the sources of pertinent data to which [the parties] refer, or [it] may refuse to do so. [It] may make an independent search for persuasive data or rest content with what [it] has or what the parties present."

DEFENDANT-INTERVENORS' OPPOSITION TO MOTION *IN LIMINE* RE YOUNG, MARKS, AND BLANKENHORN
CASE NO. 09-CV-2292 VRW

*Id.*; *see also* Doc # 139 at 9-16; Doc # 172-1 at 30-31.  The Court is thus free, for example, to study *The Future of Marriage* to assist it in determining the likely consequences of same-sex marriage.  There is no logical reason why it should not also be free to consider the live expert testimony of David Blankenhorn, the book's author, on these issues.  Likewise, the Court is free to delve into the social science studies on parenting discussed in Professor Marks' expert report; surely the Court's ability to synthesize and interpret those studies would be assisted by Professor Marks' testimony.[2]

## I.   Katherine Young

### a.   Professor Young is Qualified to Offer Expert Opinions in this Case

A brief, non-exhaustive overview of Professor Young's qualifications demonstrates that she is eminently qualified to provide her opinion, "as an expert in comparative religion, on what universally constitutes marriage and why."  Declaration of Katherine Young, PhD. ("Young Decl."), Doc # 286-4 at 2.

Professor Young has a master's degree in comparative religion from the University of Chicago, and she earned her PhD. in the history of religions, comparative religion from McGill University.  *See* Young Decl., Doc # 286-4 at 24.  She is currently a full professor in McGill University's Faculty of Religious Studies, a position she has held since 1997.  *Id.*  She is also a James McGill Professor, an honor the university bestows upon its most productive and internationally renowned researchers.  *Id.* at 4 n.3.  She has taught graduate level courses including Theories in Religious Ethics; Bioethics and World Religions; Gender and World Religions; and Methodologies in the Study of Gender and World Religions; her undergraduate courses include Theories of Religion; World Religions; Comparative Religion; Introduction to World Religion; and Religion, Pluralism, and Human Rights.  *Id.* at 25.

Professor Young's scholarly work within the field of comparative religion is wide-ranging.

---

[2] The Iowa Supreme Court recognized and applied these principles when determining whether that State's constitution required extending marriage to same-sex couples.  Applying state law, the Court held that the trial court erred in its refusal to consider "all of the material tendered by the parties" in the case—including the expert report Professor Young submitted in the matter. *Varnum v. Brien*, 763 N.W.2d 862, 881 (Iowa 2009).  The Iowa courts' treatment of Professor Young's expertise thus goes to show not that her testimony should be excluded, *see* Doc # 285 at 17, but rather that it is proper for the Court to consider it.

1   Her scholarship frequently draws on cultural anthropology, and she has not only studied the topic,

2   but has also taken several research trips to India to perform her own field work.  *Id*. at 4, 27.  Her

3   scholarly work has also extended to topics as diverse as women and religion, men and religion,

4   comparative ethics, reproduction and marriage, and religion, pluralism, and human rights, among

5   others.  *See id*. at 4-8.

6        Professor Young's expertise is further demonstrated by her prolific body of written work.

7   Her publications on issues related to marriage and the family include:  "Redefining Marriage or

8   Deconstructing Society; a Canadian Case Study," an article written with Dr. Paul Nathanson

9   published in the *Journal of Family Studies*; "The Future of an Experiment," a chapter written with

10  Dr. Nathanson in the book Divorcing Marriage:  Unveiling the Danger's in Canada's New Social

11  Experiment; a series of books with Dr. Nathanson on the subject of misandry (or contempt for

12  men); "The Institution of Marriage:  a Mediation of Nature and Culture in Cross-Cultural

13  Perspective," a chapter under review for inclusion in a book titled The Conjugal Bond:

14  Interdisciplinary Perspectives on the Institution of Marriage; "Hindu Marriage," an article written

15  with Arvind Sharma published in *Ecumenism*; "Gender Equality and Sex Differences:  The Effects

16  on Parents and Children," a paper written with Dr. Nathanson for a conference at the University of

17  Virginia; "Gay Adults v. Children:  Rights in Conflict," a lecture presented to the Lord Reading

18  Law Society; and "Homosexuality and Religion:  A Comparative Perspective," a paper presented at

19  the University of Toronto.  These publications are only the tip of the iceberg; Professor Young has

20  brought her expertise to bear on ethics and law, gender, Hinduism, and other topics.  *See id.* at 31-

21  51.  Her writings also include over 30 encyclopedia entries.  *Id*.

22        Professor Young's expertise has not gone unnoticed by the government of Canada.  In 2000,

23  the Canadian Department of Justice contracted with her to research marriage from the perspective

24  of comparative religion.  *Id*. at 27.  She also gave an invited presentation to the Canadian House of

25  Commons Standing Committee on Justice and Human Rights on "Questioning Some of the Claims

26  for Gay Marriage."  *Id*.  In 2005, she presented her views to the House of Commons' Legislative

27  Committee on Bill C-38 (the act that extended marriage to same-sex couples in Canada) and she

28  addressed the Standing Senate Committee on Legal and Constitutional Affairs of the Canadian

1    Parliament.  *Id.*

2         Plaintiffs do not meaningfully engage the extensive indicia of Professor Young's expertise.

3    For example, Plaintiffs claim that Professor Young is not an expert in anthropology.[3]  To be sure,

4    she is not an *anthropologist*, but as she has explained her field of comparative religion includes the

5    study of anthropology, *see* Young Decl., Doc # 286-4 at 5; Young Dep., Doc # 28601 at 9:14-16,

6    November 13, 2009, she has read extensively in the area, *id.* at 8:3-20, she considers anthropology

7    to be part of her expertise, *id.*, her writings include anthropological elements, *id.* at 8:24-9:2, and

8    she is working on books that will include the results of her own field research in India, *id.*  On these

9    grounds, she is surely qualified to provide expert testimony in comparative religion that draws in

10   part on her knowledge, skill, experience, training, and education in anthropology.[4]

11        It is also not the case that Professor Young's sole expertise is in Hinduism.  *See* Doc # 285

12   at 15.  Hinduism, to be sure, is the religion in which she has particular expertise, but she also has

13   expertise generally in comparative religion.  Doc # 286-4 at 4.  And in the field of comparative

14   religion, "to know one religion, alone, is to know none."  *Id*.  "True understanding," Professor

15   Young explains, "requires knowing what makes a particular religion similar or different than others.

16   *Id*.  Professor Young's experience, including teaching introductory courses in world religion, has

17   advanced her knowledge of religions other than Hinduism.  *Id*.

18        **b.  Professor Young's Opinions Are Relevant**

19        The subject of Professor Young's testimony certainly "exceed[s] the common knowledge of

20   the average layperson," *Finley*, 301 F.3d at 1013, an issue Plaintiffs do not contest.  What they do

21   claim is that is that her testimony is somehow not relevant because it is not "specific to the factual

22   situation presented in this case"; *i.e.* it does not address directly "the passage of Prop. 8 in

23   _____

24   [3] Plaintiffs also contend that Professor Young is not an expert in fields such as sociology,
     psychology, biology, medicine, child development, statistics, survey construction and methodology,
     or political science.  *See* Doc # 285 at 15.  True or not, any lack of expertise in these areas has no
     bearing on Professor Young's qualifications to discuss what universally constitutes marriage and
     why by applying the methods of comparative religion.

26   [4] Plaintiffs' claim that "she has not submitted any articles for peer review in any relevant field" is
     similarly faulty.  Doc # 285 at 15.  She has an extensive publication history, *see* Doc # 286-4 at 31-
27   51, and Plaintiffs' claim is supported with a citation to Professor Young's deposition testimony that
     she has not published a peer-reviewed article "in an anthropological journal."  *See id*. (citing Young
28   Dep. 11:19-13:5).

DEFENDANT-INTERVENORS' OPPOSITION TO MOTION *IN LIMINE* RE YOUNG, MARKS, AND BLANKENHORN
CASE NO. 09-CV-2292 VRW

California and the resulting deprivation of the constitutional rights of gay and lesbian individuals in California."  Doc # 285 at 16; *but c.f. Dang Vang v. Toyed*, 944 F.2d 476, 481 (9th Cir. 1991) (affirming district court's permitting expert to testify "*generally* as to the Hmong culture, but [precluding testimony] regarding the *specifics* of [the] case") (emphasis added).  The matters relevant to the Court's decision in this case, however, extend well beyond the confines of modern-day California.  *See, e.g.*, Doc # 76 at 7 (identifying "the history of marriage and whether and why its confines may have evolved over time" as an issue for factual development distinct from "the longstanding definition of marriage in California").  A key question in this case is what marriage *is*, at an essential and definitional level.  *See, e.g.*, Doc # 213 at 13.  Professor Young's expert testimony will assist the Court in answering that question; as her expert report demonstrates, across time and across cultures, marriage has always served certain functions and consisted of certain features.  Doc # 286-4 at 2-3.  Many of the universal functions and features she identifies center on facilitating and mediating the procreative nature of relationships between men and women.  *Id*.  That marriage has *universally* served these ends throughout time and across cultures sharply undercuts Plaintiffs' claims that same-sex marriage is a fundamental right, that same-sex and opposite-sex couples are similarly situated for purposes of access to civil marriage, that the traditional institution of marriage does not advance vital (or even legitimate) government interests, and that support for the traditional definition of marriage can only be ascribed to animus or bigotry against gays and lesbians.  Indeed, a key premise of her testimony is that an institution such as marriage that is present across societies and cultures *cannot* be understood adequately with reference to its characteristics in one particular culture.  *Id*. at 3.[5]

In all events, Plaintiffs' complaint that Professor Young has declined to opine on certain matters relevant to the Court's decision in this case is built on an incorrect legal premise.  As the

_____

[5] Plaintiffs' claim that Professor Young has "acknowledged that the separation of church and state renders any comparison between legal regimes based on religion … to western civil law regimes inapposite to the question of whether Prop. 8 is unconstitutional under Equal Protection Clause" is unsupported.  Doc # 285 at 15.  In the deposition testimony they cite, Professor Young merely acknowledges that the law in the United States today is not based on religion.  *See* Young Dep., Doc # 286-1 at 232:21-233:6.  This in no way undercuts her thesis that something basic about human nature is revealed by a phenomenon that has been universally present across time and cultures.

1    Ninth Circuit has made clear, "not every expert need express, nor even hold, an opinion with regard

2    to the issues involved in a trial." *United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir. 1993).

3    Instead, "the key concern is whether expert *testimony* will assist the trier of fact in drawing its own

4    conclusion as to a 'fact in issue.'" *Id*.  Professor Young's testimony regarding what universally

5    constitutes marriage and why will assist the Court's determination of myriad issues presented by

6    this case.

        **c.  Professor Young's Opinions Are Reliable**

8         Professor Young's expert testimony is sufficiently reliable.  *Kumho*, 526 U.S. at 152.  *First*,

9    her "testimony is based on sufficient facts or data."  FED. R. EVID. 702(1).  As the rule writers made

10   clear, this requirement "calls for a quantitative rather than a qualitative analysis."  Notes of

11   Advisory Committee on 2000 Amendments, FED. R. EVID. 702.  Professor Young's testimony is

12   based on her "comparative study of the marriage norms of those world religions that have survived

13   from earlier civilizations," namely Judaism, Confucianism, Hinduism, Islam, and Christianity, and

14   the anthropological work of Suzanne Frayser, whose definition of marriage "is based on a sub

15   sample (every third example) from the full Standard Cross-Cultural Sample of 186 societies

16   designed by Murdock and White."[6]  Doc # 286-4 at 15.  She excludes Buddhism, not because its

17   marriage norms run counter to her conclusions but rather because due to its unique features it has

18   not developed a robust tradition on marriage and the family.  *See id*. at 15 n.21.  Plaintiffs chide her

19   for not examining the positions of "professional associations" in various fields on "whether gay and

20   lesbian individuals should be permitted to marry one another," Doc # 285 at 18, but it is unclear

21   how these positions could inform an inquiry grounded in comparative religion into what universally

---

[6] Plaintiffs' claim that Professor Young's comparative study of world religions consists of "nothing
more than her review of the work of one other academic who did not consider the possibility of
marriage of same-sex couples" is at best misleading.  Doc # 285 at 17.  As an initial matter, it is
unclear how a scholar in this field would "consider" the possibility of same-sex marriage; a given
society's marital norms presumably are what they are.  Furthermore, the deposition testimony cited
by Plaintiffs makes clear that she has not only reviewed another scholar's work but also brought her
own knowledge of world religions to bear on the matter.  *See* Young Dep., Doc # 286-1 at 140:11-
17; *see also* Katherine K. Young and Paul Nathanson, "Redefining Marriage or Deconstructing
Society:  a Canadian Case Study." *Journal of Family Studies* (Australia) Vol. 13 Issue 2 at 141
(November 2007) (attached as Exhibit A).

constitutes marriage and why. The same goes for the opinions of such organizations with respect to whether same-sex parents are as effective at raising children as opposite-sex parents. *Id.* at 18-19.

*Second*, Professor Young's testimony is "the product of reliable principles and methods." FED. R. EVID. 702(2). Those principles and methods are simply the principles and methods of her field, comparative religion: "Scholars in [comparative religion] examine traditions to find general patterns (apart from anything else). The patterns found are used to make inductive generalizations. These generalizations, in turn, invite explanations." Doc # 286-4 at 10. This is precisely what Professor Young has done in preparing her testimony. She has examined the traditions of world religions, identified general patterns that have enabled her to make generalizations about what universally constitutes marriage, and reasoned from those generalizations to arrive at explanations for why that is the case—and to identify some likely consequences of departing from these universals. Surely Plaintiffs do not claim comparative religion is a discipline, like "astrology or necromancy," that "itself lacks reliability." *Kumho*, 526 U.S. at 151.

Young's particular methodology also bears additional indicia of reliability that courts have sometimes considered relevant. For one, it has grown "naturally and directly out of research [she has] conducted independent of the litigation." *Daubert v. Merrell Dow Pharm*, 43 F.3d 1211, 1317 (9th Cir. 1995). Indeed, Professor Young's research on marriage from the perspective of comparative religion spans nearly a decade since Justice Canada contracted with her to perform research on the subject in 2000. *See* Doc # 286-4 at 8 n.9. Her publications on the subject include "Hindu Marriage," written with Arvind Sharma, an article published in the journal *Ecumenism*. Ecumenism 163 (September 2006) 4-11 (attached as Exhibit B). That article "analyzed Hindu marriage from a comparative perspective," reasoning that it "can be viewed as a constellation of … universal, nearly universal, and variable features." *Id.* at 4-5. They also include "Redefining Marriage or Deconstructing Society: A Canadian Case Study," an article written by Professor Young with Dr. Nathanson that appeared in the Australian *Journal of Family Studies*. Journal of Family Studies Australia, Vol. 13 Issue 2 (Nov. 2007) (attached as Exhibit A). That article sets forth the results of Professor Young's cross-cultural study of marriage in the context of analyzing Canada's adoption of same-sex marriage. *See id.* at 140-43. Professor Young, by all indications,

9

1    will "employ[] in the courtroom the same level of intellectual rigor that characterizes" her study of

2    marriage from the perspective of comparative religion generally. *Kumho*, 526 U.S. at 152.

3         For another, Young's conclusions "can be … tested" empirically. *Daubert*, 509 U.S. at 593.

4    As Young explains, "[c]omparative religion is an empirical and social scientific approach to

5    religion." Doc # 286-4 at 4. "Empirical data" in comparative religion "comes from the

6    anthropological study of both small-scale and large-scale societies." *Id*. at 10. Young's

7    conclusions are thus subject to test by others employing this data.

8         *Third*, Professor Young "has applied the principles and methods reliably to the facts of the

9    case." FED. R. EVID. 702(3). As we have explained, she has applied the principles and methods of

10   comparative religion to the marriage norms in world religions to derive what universally constitutes

11   marriage and why. Plaintiffs' complaint that Young has not considered the views of particular

12   denominations within American Christianity misses the mark—pursuant to her scholarly

13   methodology she has undertaken a historical, cross-cultural analysis of marital norms rather than

14   engaging in a more particularistic analysis. *See* Doc # 286-4 at 3 & n.2.

15   **II.    Loren Marks**

16        **a.   Professor Marks is Qualified to Offer Expert Opinions in this Case**

17        Professor Marks is well-qualified to provide an expert opinion with respect to the question,

18   "Based on available social science that meets established standards, is the biological, marriage-

19   based family the ideal structure for child outcomes?" Doc # 286-5 at 2.

20        Professor Marks has a master's degree in family sciences and human development and a

21   PhD. in family studies. *Id*. at 16. The "primary" aim of the field of family studies or family

22   sciences, in Professor Marks' words, is to "figure out why some families struggle and why some

23   families succeed." Marks Dep., Ex. C at 14:8-15.

24        Professor Marks is a tenured professor in the Division of Family, Child, and Computer

25   Sciences in the Agriculture Department at Louisiana State University. Doc. 286-5 at 16. The

26   courses he has taught include Theories of Family Science, Qualitative Research Methods, Marriage

27   and Family Relationships, and Family Dynamics, *id*., and issues related to marriage or parenting by

28   same-sex couples are addressed in nearly all of his courses, *see* Marks Dep., Ex. C at 23:8-16.

1    Within the field of family studies, Professor Marks' primary research has been in the

2    substantive areas of faith and families and African-American families.  *Id*. at 44:10-16.  As part of

3    his work, he studies child outcomes and family outcomes, *id.* at 54:12-17, and he also specializes in

4    research methods, *id.* at 46:3-5.  He has had published or has in press over forty peer-reviewed

5    articles and chapters on matters related to family and family science, he serves as a reviewer for

6    several peer-reviewed journals, and his teaching and scholarship has earned several honors.  *See*

7    Doc # 286-5 at 2, 26.  He is also a member of the National Council on Family Relations, a

8    "professional organization focused solely on family research, practice and education."  About

9    NCFR – Who We Are, at http://www.ncfr.org/about/index.asp.

10    Plaintiffs' primary complaint with Professor Marks' qualifications is that his scholarship has

11    not focused on the narrow question addressed by his report, as evidenced by the fact that he does

12    not reference any of his own writings.  But as a family studies scholar with a specialty in research

13    methods, Professor Marks is well-positioned to comment on the studies that he considers in his

14    report.  *See Bilson*, 648 F.2d at 1239 (holding that a psychiatrist could base expert testimony on

15    psychological tests despite not being a licensed psychologist). Indeed, although he has not written

16    any of the studies, several have appeared in the *Journal of Marriage and Family*, a journal for

17    which he performs peer-reviews.  *See* Doc # 286-5 at 27-31.

18    **b.  Professor Marks' Opinions Are Relevant**

19    Not only is Professor Marks qualified, but his testimony is relevant; it "logically advances a

20    material aspect of the proposing party's case."[7]  *Daubert*, 43 F.3d at 1315.  As Proponents have

21    explained, one of the vital governmental and societal interests the traditional institution of marriage

22    serves is promoting the natural and mutually beneficial bond between parents and their biological

23    children.  *See* Doc # 172-1 at 87-90.  Professor Marks' testimony advances this argument by

24    demonstrating that the existence of such a beneficial bond is consistent with high-quality social

25    science.[8]

26    _____

27    [7] Plaintiffs do not contest that the subject of Professor Marks' testimony is a proper one for expert
testimony.  *See Finley*, 301 F.3d at 1013.

28    [8] Contrary to Plaintiffs' claims, Professor Marks in his deposition did not as a general matter
"withdr[a]w his claim that genetic parent-child relationships are important to child outcomes."  Doc
(Continued)

11

In contesting the relevance of Professor Marks' testimony, Plaintiffs once again mischaracterize Proponents' case as resting on the assertion that biological parents are better parents than same-sex parents.[9] Doc # 285 at 20; *see also* Doc # 202 at 40 (characterizing Proponents' arguments as resting on an assertion that "same-sex parents are worse parents than opposite-sex parents"). But as we have explained, *see* Doc # 213 at 29-30, that is not the point. Rather, the pertinent line of reasoning is (a) there is a unique and mutually beneficial bond between married, natural parents and their biological children, (b) the traditional definition of marriage as the union of a man and a woman promotes this bond, and (c) extending marriage to same-sex couples *would not*. *See Johnson v. Robison*, 415 U.S. 361, 383 (1974).

Furthermore, an expert's testimony is relevant if it provides just one "link" in a larger "chain necessary to prevail on a claim." *Stillwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007). Thus even playing on Plaintiffs' turf, Professor Marks' testimony, despite declining to opine on the relative parenting abilities of same-sex parents and married, natural parents, is relevant to the question of whether extending marriage to same-sex couples could be detrimental to children in another way. Proponents contend that extending marriage to same-sex couples could weaken the institution of marriage, leading to more children being raised by single parents, step-parents, and divorcees. Professor Marks' testimony indicates that this would on average be a bad outcome for children.

### c.  Professor Marks' Opinions Are Reliable

Finally, Professor Marks' testimony is sufficiently reliable that it will assist the Court in

(Cont'd)

# 285 at 21 (emphasis removed). The portion of the deposition transcript cited by Plaintiffs shows only that Professor Marks withdrew his emphasis on biology with respect to one study that he cited; as a general matter, however, he testified that he "stand[s] behind the report as is." Marks Dep., Ex. C at 277:12-20. Plaintiffs' assertion that Professor Marks knew of no empirical studies establishing a causal connection between biology and good outcomes for children is similarly misleading. Doc # 285 at 21. Professor Marks' report focuses on *correlation*, not causation; as he made clear "[s]ocial science *generally* does not … have the rigor and the strength to make causal statements." Marks Dep., Ex. C at 82:7-9 (emphasis added).

[9] Plaintiffs' reliance on *General Electric v. Joiner*, 522 U.S. 136 (1997) also rests on this faulty premise. In *Joiner*, the Court upheld the lower court's decision to exclude experts who "extrapolated their opinions from … seemingly far-removed … studies. *Id.* at 144. Because Professor Marks does not offer an opinion on the "impact same-sex parents have on child outcomes," Doc # 285 at 21, *Joiner* is simply inapposite.

1    deciding the facts at issue in this case.  First, Professor Marks' "testimony is based on sufficient

2    facts or data."  FED. R. EVID. 702(1).  His report expressly refers to scores of studies, *see* Doc #

3    286-5 at 28-31, and he explains that his findings could have been supported by "hundreds" more.

4    *Id*. at 11 n.69.  Plaintiffs, to be sure, do not identify a single study that he should have considered

5    but did not.

6          Second, Professor Marks' testimony is "the product of reliable principles and methods."

7    FED. R. EVID. 702(2).  The methodology he has employed is that of the literature review—he has

8    broadly surveyed high-quality social science on the effect of married, biological families on child

9    outcomes.  The principle behind this methodology is that one can understand the state of the

10   learning in a particular field by surveying the best research in the area.  It is unremarkable that in

11   conducting this review Professor Marks has relied on the opinions of other scholars.  *Southland Sod*

12   *Farms v. Stover Seed Co*., 108 F.3d 1134, 1142 (9th Cir. 1997) ("[T]he fact that [an expert's]

13   opinions are based on data collected by others is immaterial.").  And while Plaintiffs may disagree

14   with the conclusions Professor Marks draws from his review, the Court's gatekeeping function is to

15   test "not the not the correctness of the expert's conclusions but the soundness of his methodology."

16   *Stilwell*, 482 F.3d at 1192 (quotation marks omitted).

17         Third, Professor Marks "has applied the principles and methods reliably to the facts of the

18   case."  FED. R. EVID. 702(3).  Professor Marks' conclusion that "the biological, marriage-based

19   (intact) family is associated with better child outcomes than nonmarital, divorced, or step-families"

20   flows directly from the research that he considered.  Doc # 286-5 at 11.  That Professor Marks did

21   not in every case ensure that the studies he considered did not include adoptive families in the

22   "intact" category does not render his conclusions unreliable; as he explained the relatively small

23   prevalence of adoptive families means that their inclusion would at most introduce some degree of

24   "noise" into the studies.  Marks Dep., Ex. C at 184:14-185:1.  Furthermore, Plaintiffs' contention

25   that Professor Marks "lacks familiarity with relevant studies that would assist him in coming to his

26   conclusions" lacks any meaningful support. Doc # 285 at 23.  Professor Marks, to be sure, only

27   identified at his deposition two studies that compared (or may have compared) married, biological

28   parents to same-sex parents.  *See* Marks Dep., Doc # 286-2 at 30:4-32:10.  Plaintiffs, however, do

1   not identify any *additional* such studies that Professor Marks overlooked. At any rate, such studies

2   would not be relevant to Professor Marks' analysis as he concededly did not compare same-sex

3   parents to married, biological parents.

4        Lastly, Plaintiffs impugn the reliability of Professor Marks' testimony on the basis of his

5   personal and religious views about marriage and family life. *See* Doc # 285 at 24. Notably, this

6   attack is completely *ad hominem*—Plaintiffs fail to point to any particular aspect of Professor

7   Marks' report that evinces bias. And if experts with personal views about the matters at issue were

8   precluded from testifying, the trial in this case would likely be a short one. At any rate, courts have

9   permitted the testimony of experts with much closer ties than Professor Marks has to this case. *See,*

10  *e.g.*, *Douglas v. University Hosp.*, 150 F.R.D. 165, 169 (E.D. Mo. 1993) (permitting physician to

11  testify as an expert against a hospital in a medical malpractice action for the death of his mother).

12  **III.   David Blankenhorn**

13       **a.   Mr. Blankenhorn is Qualified to Offer an Expert Opinion in this Case**

14       Plaintiffs assert that Mr. Blankenhorn is not qualified to offer an expert opinion in this case

15  because (1) he lacks a Ph.D. and none of his "undergraduate or graduate course work focused" on

16  the issues as to which he seeks to offer an expert opinion, and (2) he does not generally publish his

17  work in peer-reviewed academic journals. Doc # 285 at 24-25. But Rule 702 does not mention any

18  specific credentials or qualifications; instead it provides that an expert may be qualified "by

19  knowledge, skill, experience, training, *or* education." FED. R. EVID. 702 (emphasis added). In short,

20  the federal rules recognize—and even a brief review of Mr. Blankenhorn's qualifications and

21  publications demonstrates—that contrary to Plaintiffs' suggestion, professional academics do not

22  hold a monopoly on expertise that may be helpful to a court. Indeed, Mr. Blankenhorn has achieved

23  a prominence in his fields of expertise that most professional academics only dream about.

24       "For the past twenty-three years," Mr. Blankenhorn has "dedicated [his] professional life to

25  studying, writing, and educating others about issues of family policy and family well-being, with a

26  particular focus on the institution of marriage." Blankenhorn Decl. ¶ 2. "During this time" he has

27  "delivered many academic lectures and public addresses, written extensively, and testified on

28  several occasions before federal and state legislative committees on the topic of marriage." *Id*. He

1    was appointed by President George H.W. Bush to serve as a member of the National Commission

2    on America's Urban Families, and "participated in the Commission's work of examining the

3    condition of urban families and developing recommendations for government policies and programs

4    (as well as actions by other institutions) to strengthen urban families." *Id*. ¶ 9.  He was also "the

5    founding chairman of the National Fatherhood Initiative, a nonpartisan organization whose mission

6    is to improve the well-being of children by increasing the proportion of children growing up with

7    involved, responsible, and committed fathers." *Id*. ¶ 10.

8         Notably, Mr. Blankenhorn is "the founder and President of the Institute for American

9    Values, a non-partisan organization devoted to research, publication, and public education on issues

10   of family policy, family well-being, and civil society."  Blankenhorn Decl. ¶ 3.  In his "role as

11   President," Mr. Blankenhorn "stud[ies] these issues extensively and frequently write[s] and speak[s]

12   publicly about them."  *Id*.  The Institute and its work have been widely praised.  To take just one

13   example, Professor William A. Galston of the University of Maryland wrote in 2003 that

14        For more than a decade, the Institute for American Values has tackled some of the
         toughest issues facing our country, at home and abroad.  Working across partisan lines
15        and with a deep respect for solid evidence and civil argument, the Institute has helped
         enlighten public opinion and shape public policy on matters ranging from marriage and
16        the family to the Bush doctrine and America's relations with the Islamic world.

17   http://www.americanvalues.org/html/what_others_are_saying.html (collecting this and many other

18   similar reviews).

19        From its inception in 1987, the Institute has sponsored a "marriage and family" program

20   area, which focuses on "the status and future of marriage as a social institution."  Blankenhorn Dep.,

21   Doc # 286-3 at 25:18, 28:11-14, 30:4-6.  In connection with this program area, the Institute

22   "conduct[s] seminars," and "sponsor[s] writings" and "research."  *Id*. 30:7-18.  It also issues

23   "reports" written by "team[s] of scholars working collaboratively," regular "research briefs," and

24   "an annual survey of marriage called, the state of our unions."  *Id*. 30:22-31:7.  Mr. Blankenhorn is,

25   and has been, "personally involved" in this work.  *Id*. 28:8-10.

26        In connection with his work at the Institute, Mr. Blankenhorn has also been personally

27   involved in many scientific studies.  Blankenhorn Dep., Ex. D at 102:20-103:8.  "Usually," his "role

28   has been that [of] conceptualizing the topic of inquiry, of recruiting the scholars to carry out the

15

1  work," of "participating in or supervising that work" and of "assisting in either a primary way or a

2  nonprimary way in writing up the results and in disseminating those results to the public." *Id.*

3  103:10-16.  On a number of occasions he has been involved in these studies as "the principle author

4  of the report," "the person who had the lead role in conceptualizing, developing the methodology,"

5  or "in actually carrying out the research itself." *Id.* 104:3-8.

6        Perhaps most importantly, Mr. Blankenhorn has demonstrated his expertise through his

7  published writings.  He has written and published two books that are directly relevant to the issues

8  on which he seeks to offer an expert opinion here.  These are *The Future of Marriage* (2006), and

9  *Fatherless America: Confronting our Most Urgent Social Problem* (1995).  Blankenhorn Decl. ¶ 4.

10  The *Future of Marriage* draws upon Mr. Blankenhorn's "continuing anthropological, historical, and

11  cultural study of the institution of marriage to address issues including what the institution of

12  marriage is, why marriage has developed the way that it has, the societal interests that the institution

13  of marriage serves, and the impact that could result from changes to the institution (including its

14  potential extension to same-sex couples)." *Id.*  *Fatherless America* draws on Mr. Blankenhorn's

15  "continuing study into the impact of family structure on childhood development and wellbeing to

16  chronicle the increasing experience of fatherlessness, detail the negative consequences that flow

17  from fatherlessness, and offer proposals to promote active, responsible fatherhood." *Id.*   Mr.

18  Blankenhorn has also been the co-editor of several published books on the topics of marriage and

19  family life, including *The Book of Marriage: The Wisest Answers to the Toughest Questions* (2001),

20  *Promises to Keep: Decline and Renewal of Marriage in America* (1996), *Black Fathers in*

21  *Contemporary American Society* (2003), and *Rebuilding the Nest: A New Commitment to the*

22  *American Family* (1990). *Id.* ¶¶ 5-6.  In addition, he has published extensively through the Institute

23  for American Values, Blankenhorn Dep., Doc # 286-3 at 56:13-14, and written numerous "essays

24  addressing marriage and family life" in "popular publications such as the New York Times,

25  Washington Post, Wall Street Journal, Public Interest, and First Things, among others."

26  Blankenhorn Decl. ¶ 7.

27        The fact that Mr. Blankenhorn has generally published through his own organization, trade

28  publishers, and popular publications rather than academic peer-reviewed journals is of little

16

moment.[10]  For one thing, the Institute for American Values, through which Mr. Blankenhorn publishes most of his work, has its own "peer-review process in place."  Blankenhorn Dep., Doc # 286-3 at 56:16-18.  For another, peer-reviewed journals plainly recognize Mr. Blankenhorn's stature and expertise, as evidenced, among other things, by the fact that he has been asked to review (and has reviewed) articles by these journals as part of the peer-review process.  *Id.* 58:5-6.

Most important, Mr. Blankenhorn's publications have been widely praised by leading scholars in his fields of expertise.  For example, Professor Mary Ann Glendon calls him "distinguished and impressive" and states that "[n]o one writes about the crisis in American family life with more candor, intelligence, and sympathetic understanding." http://www.learnoutloud.com/Free-Audio-Video/Education-and-Professional/Law/Gay-Marriage-Debate/26547.  And even scholars who disagree with his positions praise the quality of his work. For example Dale Carpenter, a University of Minnesota law professor and gay marriage advocate calls *The Future of Marriage* "probably the best single book yet written opposing gay marriage." http://www.americanvalues.org/html/what_others_are_saying.html.  Indeed, even Plaintiffs' expert, Michael Lamb, describes *Fatherless America* as "easily the most interesting, provocative, and eloquent piece of social commentary published in 1995, whether judged by the quality of the writing or the importance of its topic."  Michael E. Lamb, Book Review, *Fatherless America: Confronting Our Most Urgent Social Problem by David Blankenhorn*, 58 JOURNAL OF MARRIAGE AND FAMILY 526, 527 (1996).  Lamb further states that this book "deserves to be widely read and thoughtfully discussed."  *Id.*

In short, far from being unqualified to offer any expert opinion in this case—as Plaintiffs would have it—Mr. Blankenhorn is one of the most distinguished and influential experts in the fields of family policy, family well-being, marriage, fatherhood, and family structure.  *See* Blankenhorn Decl. ¶ 1; Blankenhorn Dep., Doc # 286-3 at 116:10-11.  Indeed, with respect to the institution of marriage, his extensive study, writing, and expertise extend to the fields of

---

[10] Further, Mr. Blankenhorn testified at his deposition that he was "pretty sure" that he has written "chapters of books" that have been published through an academic peer-review process. Blankenhorn Dep., Doc # 286-3 at 59:9-11.

anthropology, psychology, history, political science, sociology, and American law. *See* Blankenhorn Dep., Ex. D at 121:13-126:6.

### b. **Mr. Blankenhorn's Opinions Are Relevant**

Among other things, Mr. Blankenhorn intends to offer his opinion regarding the history and purposes of marriage, the interests served by the traditional definition of marriage, and the likely affects of redefining marriage to include same-sex relationships. These issues are plainly relevant to the issues this Court has identified for trial and the constitutionality of Proposition 8. Further, Mr. Blankenhorn's opinions on these matters "logically advance[] a material aspect of the proposing party's case." *Daubert*, 43 F.3d at 1315. That Mr. Blankenhorn does not plan to offer his opinions about the actual motivation of voters or the official proponents in passing Proposition 8 is of no consequence. Even assuming the relevance of these inquiries (which Proponents do not concede are relevant), they are plainly not the only relevant issues in the case. Nor does it matter that Mr. Blankenhorn's opinions do not focus on Plaintiffs' specific allegations, Proposition 8, or the State of California. As his answers at deposition make clear, Mr. Blankenhorn is plainly familiar with Plaintiffs' legal theory, Blankenhorn Dep., Doc # 286-3 at 75:19-76:11, with the effect of Proposition 8, *id.* 132:10-134:16, and those features of California law that Plaintiffs' contend are relevant to its constitutionality, *id.* 92:7-19. Further, given that Proposition 8 simply restores the traditional definition of marriage, Mr. Blankenhorn's analysis of that definition is surely relevant. And as the general nature of many of the issues identified for trial by this Court make clear, this is simply not a case that turns on specific or peculiar adjudicative facts applicable only to this specific case. *See United States v. $124,579 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir. 1989). Rather, it turns on legislative facts of broader application—precisely the subject of Mr. Blankenhorn's opinions. *See id.*; *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966).

### c. **Mr. Blankenhorn's Opinions are Reliable**

Mr. Blankenhorn's opinions readily satisfy the requirements of FED. R. EVID. 702. *First*, his opinions are "based on sufficient facts or data." As he explained at his deposition, his "view of what marriage is and its public purposes and its dimensions are a result of [his] study of the actual— the actual history, the textured history of the institution itself." Blankenhorn Dep., Ex. D at 157:7-

18

10.  The viewpoints and quotations that he presents regarding the purposes of marriage and its relationship to child well-being are representative samples drawn from Mr. Blankenhorn's "careful[] and comprehensive[]" collection of definitions gathered over "several years" from a search of "the public record of debate and the corpus of modern scholarship." *Id*. 153:5-19.

*Second*, Mr. Blankenhorn's opinions are based on "reliable principles and methods." FED. R. EVID. 702(2).  Mr. Blankenhorn's opinions regarding the historical structure of marriage, and the prevalence of the "historically foundational and historically very widespread and commonly accepted understanding" of marriage, Blankenhorn Dep., Ex. D at 152:1-3, are verifiable empirically.  *See, e.g., id*. 184:11-15.  And the normative conclusions that he draws from his historical inquiry follow logically from that inquiry and are fully consonant with the views of numerous other prominent scholars, as illustrated by the numerous quotations and studies cited throughout his report.  *See, e.g*., Blankenhorn Decl. ¶¶ 23, 37.

Mr. Blankenhorn's predictions regarding the likely effects of redefining marriage to include same-sex relationships are likewise based on reliable principles and methods.  Given the novelty of experiments with recognizing same-sex relationships as marriages, empirical evidence of the effects of these experiments is very scarce.  However, Mr. Blankenhorn explains why redefining marriage in this manner would further the deinstitutionalization of marriage and shows that prominent supporters and opponents of such a redefinition agree.  *See* Blankenhorn Decl. ¶ 44.  His predictions as to the likely consequences of such deinstitutionalization are logical, were developed thoughtfully, based on his own reflection and his systematic discussions with both proponents and opponents of extending marriage to same-sex relationships, and are consistent with the results of other legal changes that have furthered the deinstitutionalization of marriage.  *See, e.g*., Blankenhorn Dep., Doc # 286-3 at 315:14-316:20.  Indeed, Mr. Blankenhorn's predictions about the likely effects of the recognition of same-sex relationships as marriages are at least as methodologically rigorous as—and far more persuasive than—the predictions offered by Plaintiffs' experts.

In all of these respects, it is plain that far from being "ipse dixit," *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997),  Mr. Blankenhorn's opinions reflect "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[s]," *Kumho*, 526 at 152, of,

19

*inter alia*, history and family policy analysis. In arguing otherwise, Plaintiffs' simply disagree with, or mischaracterize, Mr. Blankenhorn's testimony. For example, Plaintiffs' claims that Mr. Blankenhorn's opinions regarding the purposes of marriage are illogical are simply a reiteration of their litigation positions and amount to no more than a disagreement with Mr. Blankenhorn's conclusions. The Court's gatekeeping function, however, is to test "not the correctness of the expert's conclusions but the soundness of his methodology." *Stilwell*, 482 F.3d at 1192. Furthermore, at his deposition Blankenhorn logically and forcefully explained why Plaintiffs' arguments do not undermine his conclusions. *See* Blankenhorn Dep. Tr. 177:9-193:22.[11] Similarly, Plaintiffs' claims that Mr. Blankenhorn is unfamiliar with and did not rely upon any "studies that compare one family where both parents have a biological connection to the child and a family where one or both parents is not biologically connected to the child," Pls' Mot. 19, is simply false. Mr. Blankenhorn's declaration and deposition testimony plainly addressed studies comparing children raised by intact biological families with children raised, *inter alia*, by stepfamilies. *See, e.g.*, Blankenhorn Decl. 37, Blankenhorn Dep., Ex. D at 262:13-263:10. Furthermore, Mr. Blankenhorn's deposition testimony demonstrated that Mr. Blankenhorn is conversant with the literature comparing children raised by intact biological families with children raised by adoptive families. *See id*. 263:22-271:18. Indeed he is currently "directing a study now that looks at exactly this question." *Id*. 266:20-21. And Plaintiffs' suggestion that Mr. Blankenhorn's opinions regarding children raised by same-sex parents are somehow inconsistent with his other opinions simply reflects a misunderstanding of Mr. Blankenhorn's opinions, as well as Proponents' theory of the case. *See supra*, pp. 12-13.

Likewise, given that Mr. Blankenhorn's opinions offered in this case have grown "naturally and directly out of research [he has] conducted independent of the litigation," *Daubert* 43 F.3d at 1317, there is no methodological inadequacy in his having prepared his report by devoting "some days and weeks to reading and trying to organize [his] thoughts and trying to refresh [his]

---

[11] Plaintiffs' claim that Mr. Blankenhorn's acknowledgement that there have been other causes of the deinstitutionalization of marriage is somehow inconsistent with his conclusion that recognizing same-sex relationships as marriage would "mean the *further*, and in some respects *full*, deinstitutionalization of marriage," Blankenhorn Decl. ¶ 69 (emphasis added), likewise lacks merit.

recollection about other previous work" that he had done.  Blankenhorn Dep., Ex. D at 101:17-21.
And Plaintiffs' claim that Mr. Blankenhorn had not read the materials considered listed in his expert
report is a blatant distortion of the deposition testimony, which makes clear that Mr. Blankenhorn
read the overwhelming majority of these materials in full, and the remaining works in relevant part.
*See* Blankenhorn Dep. Tr. 112:4-116:2 (discussing each source specifically).

*Finally*, Mr. Blankenhorn has applied his principles and methods reliably to the legislative
facts at issue in this case.  As discussed above, the fact that he has not addressed the specific
adjudicative facts of Plaintiffs' claims simply reflect that this case turns not on such particular
matters but on more general propositions.

### CONCLUSION

For these reasons, Plaintiffs' motion *in limine* should be denied.


 Dated:      December 11, 2009

                                        COOPER AND KIRK, PLLC
                                        ATTORNEYS   FOR   DEFENDANT-INTERVENORS
                                        DENNIS   HOLLINGSWORTH,   GAIL   J.   KNIGHT,
                                        MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM,
                                        MARK A. JANSSON, and PROTECTMARRIAGE.COM –
                                        YES ON 8, A PROJECT OF CALIFORNIA RENEWAL


                                        By: /s/Charles J. Cooper
                                            Charles J. Cooper