# Exhibit C

Case3:09-cv-02292-VRW   Document302-3   Filed12/11/09   Page1 of 10

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3   KRISTIN M. PERRY, et al.,   )

 4              Plaintiffs,      )

 5          v.                   ) No. 09-CV-2292 VRW

 6   ARNOLD SCHWARZENEGGER, in   )

 7   his official capacity as    )

 8   Governor of California,     )

 9   et al.,                     )

10              Defendants.      )

11

12                          Washington, D.C.

13                          Friday, October 30, 2009

14   Deposition of LOREN DEAN MARKS, called for

15   examination by counsel for Plaintiffs in the

16   above-entitled matter, the witness being duly sworn

17   by CHERYL A. LORD, a Notary Public in and for the

18   District of Columbia, taken at the offices of COOPER

19   & KIRK PLLC, 1523 New Hampshire Avenue N.W.,

20   Washington, D.C., at 9:31 a.m., and the proceedings

21   being taken down by Stenotype by CHERYL A. LORD, RPR,

22   CRR.
```

Page 14

1  terminal -- not just your terminal degree, but where
2  you receive your degrees. Nothing more complex than
3  that.
4      Q.  I note that your major at -- your
5  undergraduate major at Brigham Young was family
6  sciences, and your major in your master's program was
7  family sciences and human development.
8          What does the study of family sciences
9  entail?
10     A.  There -- there are a number different
11 aims. The primary aim is to -- to do our best to --
12 to understand -- and -- and these are my terms -- to
13 figure out why some families struggle and why some
14 families succeed. In -- in laymen's terms, that's
15 the way that I'd put it.
16     Q.  What would you define as -- or how would
17 the field of family sciences define success as a
18 family?
19     A.  There are 2 different units of analysis
20 that are typically looked at.
21         One would be individuals, and if
22 individuals are flourishing, doing well

Page 15

1  developmentally. Also, we look at the marital level.
2          I might say 3 levels instead of 2.
3          The individual level, you know, is the
4  individual doing well. Number 2, is the marriage
5  doing well, has it ended in divorce, are they still
6  married, are they reporting that they're satisfied
7  that they're happy. And at the family level are the
8  relationships strong, encouraging, nurturing.
9          There -- there are many, many, many
10 different ways that each of those are measured in
11 different studies by different individuals, but
12 that's -- that's the bottom line.
13     Q.  Your major at the University of Delaware
14 was family studies?
15     A.  M-hm.
16     Q.  Is that different in any way from family
17 sciences?
18     A.  Not significantly.
19         I think it's a terminology difference.
20 Sometimes it's called family studies, sometimes
21 family science, sometimes family sciences.
22         But there's -- there's not a significant

Page 16

1  difference.
2      Q.  What fields of research do family science
3  or family studies draw upon?
4      A.  Psychology, sociology, and of course
5  family studies as well. You know, like -- like any
6  discipline, we borrow a little bit here and there
7  from others, history, demography, et cetera, but
8  primarily psychology and sociology.
9      Q.  Turning now -- oh, before I leave
10 education, can -- how many years were you at Brigham
11 Young as an undergraduate?
12     A.  I began at Brigham Young in January of
13 1994, I believe, 1994, and finished up there in 1997.
14 I applied, admitted -- and was admitted to the M.S.
15 program, which you see here. And that took me just
16 about exactly 2 calendar years, so January 1994
17 through early July of 1999.
18     Q.  So 2 years as a graduate student and 3 and
19 a half years or thereabouts as an undergraduate
20 student?
21     A.  Yeah, about 3 and a half.
22     Q.  Turning now to the employment section.

Page 17

1      A.  M-hm.
2      Q.  In what position are you currently
3  employed?
4      A.  I'm the Kathyrn Norwood and Claude Fussel
5  alumni professor in the college of agriculture,
6  specifically within the school of human ecology in
7  the division of family, child, and consumer sciences.
8          I know that's a mouthful, but --
9      Q.  Is the Kathryn Norwood and Claude Fussel
10 alumni professorship -- is that reserved for people
11 in a particular field or from a particular
12 background?
13     A.  You know, that's a good question, Matt,
14 and I don't know if it is or not. I just -- I
15 actually haven't even met the donors yet. I just
16 received it a month ago plus or minus or so.
17         But it's -- I will tell you that it's a
18 teaching -- a teaching-based professorship at the
19 research -- research excellence was also factored in,
20 but that was the merit basis, teaching and -- and
21 research.
22     Q.  Unfortunately, you won't meet Mrs. Norwood

Loren Dean Marks

Washington, DC

October 30, 2009

Page 22

1 One of the -- let's see, it's been a
2 little while since I taught 7051, but typically in
3 that course, which I taught a couple of times I
4 think, I required 9 texts, 9 texts or books, several
5 journal articles that were largely up to the
6 discretion of the students. They got to pick those.
7 One of the books that was required reading
8 was Judith Stacey's In the Name of the Family, which
9 addresses same-sex -- I don't know how much depth it
10 goes into in terms of parenting, but it does address
11 same-sex issues at some length.
12 We also read chapters from different
13 handbooks that addressed same-sex issues in 7051.
14 Q. Do you recall the names, titles of any of
15 those handbooks?
16 A. Charlotte Patterson's Journal of Marriage
17 and Family Review in 2000. I think it's the
18 November -- not that that's important, but November
19 2000 Journal of Marriage and Family. She has a
20 review in that issue that we -- that we read.
21 I taught the class twice, once before and
22 once after the 2004 handbook that I mentioned earlier

Page 23

1 came out. I can't -- I can't remember who authored
2 the same-sex chapter or chapters in that book, but
3 that was a book that we would refer to pretty
4 regularly.
5 There may well be others that -- '03, '05,
6 taught several classes since then, I'm a little --
7 I'm a little fuzzy, but certainly those I'd stand by.
8 Q. Have you taught in any of your classes
9 since 2005 any issues relating to either marriage or
10 parenting as among lesbians or -- and gay men?
11 A. Since 2005?
12 And you're talking about undergraduate and
13 graduate classes?
14 Q. That's correct.
15 A. It comes up and is addressed at some level
16 in just about every -- every class that I teach.
17 I'm trying to think if there's -- the
18 easier answer would be, are there any classes
19 where -- where I do not address it at some level.
20 2065 is a course -- although it says here,
21 2008, I'm currently teaching that. We addressed it
22 in that course just last week.

Page 24

1 Q. When you addressed it last week, what --
2 what texts did you use?
3 A. When it was addressed last week, I had a
4 student give a presentation based on her review of
5 literature to the class.
6 Q. Do you recall what literature she
7 reviewed?
8 A. She -- she used the Patterson review that
9 I mentioned earlier. She -- she also referenced --
10 which did she use? -- Patterson actually has a
11 number of -- a number of studies in this area as
12 you're probably aware. I believe the Wain- -- some
13 of the Wainright literature may have been used and
14 also some of the Golombok studies from England.
15 The presentation was a few minutes, not
16 comprehensive, but a research paper that she
17 selected.
18 Q. Would you say that you yourself are
19 familiar with the research of Patterson, Golombok,
20 Wainright?
21 A. Yes.
22 Q. In your -- in the course of your teaching

Page 25

1 emerging lifestyles in 2002 at the University of
2 Delaware, did you in the context of that class
3 address parenting and marriage in the lesbian and gay
4 context?
5 A. We did.
6 Q. Did you reference the same texts as you
7 use now?
8 A. Many of -- many of the ones that we use
9 now were unavailable then. And I was -- I was less
10 familiar with the literature then as well.
11 As -- as a result, I did bring in -- we
12 had a guest expert lecturer come in to help fill in
13 that gap, since I had a working knowledge of the
14 literature, at that point, but thought it was
15 important to have -- have an expert come in.
16 Q. Who was the guest expert?
17 A. Tara Woolfolk.
18 When I say, guest expert, she knew a lot
19 more than me, you know, at that point in time about
20 the literature, not nationally renowned.
21 Q. Since emerging lifestyles in 2002, what
22 new texts have you added to your teachings of these

|  | Page 42 | | Page 44 |
|---|---|---|---|
| 1 | primarily considered in connection with preparing the | 1 | I took a close look at again. There certainly was a |
| 2 | report? | 2 | quality factor. |
| 3 | MR. THOMPSON: Objection, mischaracterizes | 3 | Q. And the sources that are not listed here |
| 4 | the testimony, and objection, asked and answered. | 4 | presumably are of lesser quality? |
| 5 | A. These -- these materials that are listed | 5 | A. Well, there are some that are -- I'm sure |
| 6 | here were considered in formulation of my expert | 6 | there are some very high-quality studies generally |
| 7 | report. But again, they're -- they're in no way | 7 | that aren't on here, but, yes, of the ones that I've |
| 8 | exclusive. | 8 | considered, these are -- these are high-quality |
| 9 | BY MR. McGILL: | 9 | studies for the most part. |
| 10 | Q. How did you distinguish between the | 10 | Q. What are your primary areas of research |
| 11 | references to list and the references not to list? | 11 | interest? |
| 12 | A. That's a good question. | 12 | A. My primary research interests are faith |
| 13 | And in the case -- in the case of this | 13 | and families and African American families. I spend |
| 14 | expert report, some of my judgments were based on not | 14 | quite a bit of time in both of those. |
| 15 | just what studies were available to me, but I wanted | 15 | I do dabble in, you know, some other |
| 16 | to focus on the highest-quality studies available. | 16 | areas, but those are focal. |
| 17 | And I believe that most of the studies, most of the | 17 | Q. How does your research on faith and |
| 18 | work that you'll find cited here is -- is of high | 18 | families and strong African American families relate |
| 19 | quality, Nobel laureates. | 19 | to your opinions and your report in this case? |
| 20 | Akerlof as an economist, several pieces by | 20 | MR. THOMPSON: Objection, vague. |
| 21 | Paul Amato, and others, who are premier. So among | 21 | Go ahead. |
| 22 | the available sources, I tried to select from -- from | 22 | A. With -- with maybe one, 2 contextualizing |
|  | **Page 43** | | **Page 45** |
| 1 | the best. | 1 | exceptions, I don't believe I cite my own work |
| 2 | MR. THOMPSON: We've been going about an | 2 | directly in this -- this expert report. |
| 3 | hour. We'd like to take a break. | 3 | So in terms of my direct impact, minimal |
| 4 | MR. McGILL: As you wish. | 4 | to -- to moderate, although I -- although those are 2 |
| 5 | MR. THOMPSON: Okay. | 5 | focal areas of my -- there -- there are probably a |
| 6 | THE VIDEOGRAPHER: This ends videotape | 6 | hundred different subdisciplines within family |
| 7 | number 1. The time is now 10:27 AM. | 7 | studies that I'm responsible for in some -- some |
| 8 | (Recess.) | 8 | level as a teacher that I cover, that I read, so -- |
| 9 | THE VIDEOGRAPHER: We're now back on the | 9 | BY MR. McGILL: |
| 10 | record. | 10 | Q. Is parenting by gay men and lesbians among |
| 11 | This is the beginning of videotape number | 11 | the hundreds of subdisciplines that you're |
| 12 | 2. The time is now 10:40 AM. You may proceed. | 12 | responsible for? |
| 13 | BY MR. McGILL: | 13 | A. Yes. |
| 14 | Q. So when we left off, Professor Marks, | 14 | Q. You're a peer reviewer on several |
| 15 | the -- just to close the loop on where we were, you | 15 | journals. |
| 16 | said, do I understand you correctly to say that you | 16 | Correct? |
| 17 | distinguished between the materials that you chose to | 17 | A. I am. |
| 18 | list on your index of materials considered and those | 18 | Q. And what do you do as a peer reviewer? |
| 19 | you chose not to list by listing only those materials | 19 | A. As a peer reviewer, the editor of a |
| 20 | of the highest quality on your index? | 20 | journal will send -- will send you a study, usually a |
| 21 | A. The sources that I list I believe are of | 21 | study that is within your interest area, you know, |
| 22 | high quality, but -- and indicate ones in most cases | 22 | your specialty area. And they will ask -- ask you to |

Page 46

1 carefully read, respond to issues that -- that are
2 raised.
3     In my instance, I have a methods specialty
4 as well, and sometimes I'm asked to give some -- some
5 input on the research method that's used.
6     Q.  Why is peer reviewing important?
7     A.  Peer reviewing is an effort to maintain
8 minimal standards in the field.
9     Q.  Does work that is peer-reviewed presumably
10 meet minimal standards in the field?
11    A.  It depends on the journal.
12        There -- there are a variety -- variety of
13 journals.  There's also a great degree of
14 subjectivity that comes into play in terms of -- in
15 terms of reviewers as most within the field will tell
16 you.
17       Social scientists are not immune from
18 cultural or biases -- cultural opinions, et cetera.
19    Q.  Now, you mentioned before -- I just want
20 to circle back to your statement that you have a
21 specialty in methodology.
22       Could you elaborate on that?

Page 47

1     A.  My focus in terms of methods is
2 qualitative, and there are 2 broad types of methods
3 that are used, qualitative and quantitative.
4         Quantitative tends to deal with
5 statistics, qualitative with nonnumerical data.  Any-
6 -- anyone in my field -- just about anyone deals with
7 both.
8     Q.  And your work with strong African American
9 families exemplifies that qualitative method of
10 research?
11    A.  It does.
12    Q.  And with respect to your work as a peer
13 review, you mentioned that authors of social science
14 are not immune from -- from bias.
15        What do peer reviewers do to ferret out
16 bias?
17    A.  That's a good question, Mr. McGill.  I
18 don't have an empirical response to that question.
19        I think it's -- it's cause for speculation
20 on my part.  My professional opinion would be that
21 you don't, that there's a scientific objective, you
22 know, an ideal of objectivity, but it's a target

Page 48

1 that's rarely hit.
2     You have your biases.  I do.  Anybody who
3 is reviewing carries those with them as well.  They
4 should try to check them, but whether they do or not,
5 I don't know for sure.
6     Q.  What are your biases?
7     A.  That's a -- that's a good question.
8         Can you -- can you be a little bit more
9 specific in terms of a given area?
10        Biases can be broad certainly.
11    Q.  You said to me that some researchers have
12 their biases and you have yours.  And I'm just really
13 asking you to elaborate on that statement.
14    A.  One of -- one of my biases is that
15 research should be very, very thoroughly documented,
16 referenced, even meticulously so, including reports.
17 I think that many within my field would say that
18 having an appreciation of qualitative methods can be
19 a bias as well.
20    Q.  Any others that you can think of?
21    A.  I think that -- that a bias I have
22 relative to many in my field is an optimism.

Page 49

1     What I mean by that with specific
2 reference to my discipline is, I -- I prefer to look
3 at strengths over weaknesses or pathologies as -- as
4 a general rule.
5     Q.  Do you have -- have you published or do
6 you have in press any writings other than those
7 listed on your CV?
8     A.  I don't believe so, Mr. McGill.
9         As I said earlier, and this is -- this is
10 fairly recent.  With the exception that we addressed
11 earlier, this should be accurate.
12    Q.  Are there any publications on that list
13 that you no longer believe represent high-quality
14 social science?
15    A.  On -- on the list that I --
16    Q.  Of your own publications.
17    A.  Oh, of my own.
18    Q.  Correct.
19    A.  I -- I am, what, in my eighth year as a
20 professor.
21        One of my biases is that we should aim for
22 the gold standard.  While I've had research that's

13 (Pages 46 to 49)

Page 54

1   A.   In the areas of faith and families and
2   specifically strong African American families, yes,
3   yes, I would.
4   Q.   Are you an expert in child adjustment?
5        MR. THOMPSON:  Objection, vague.
6   A.   Child adjustment is one of -- again one of
7   the many, many areas that I'm responsible for knowing
8   something about.
9        Is it one of my focal interest areas?
10       No, it is not.
11       BY MR. McGILL:
12  Q.   But you still consider yourself to be an
13  expert in child adjustment?
14  A.   By the standards of my field, I don't
15  study the specific concept of child adjustment.  I do
16  study child outcomes at some length, and family
17  outcomes.
18  Q.   And you would not have contended in --
19  earlier than your date of being a tenured professor
20  that you were an expert in any field, would you?
21       MR. THOMPSON:  Objection, mischaracterizes
22  the testimony.

Page 55

1   A.   In -- in the content areas that I
2   mentioned, by the field standard, I think tenure as I
3   mentioned earlier is as good of a bar as any.
4        BY MR. McGILL:
5   Q.   Prior to your engagement as an expert in
6   this case, had you ever undertaken research on the
7   effective family structure on child outcomes?
8   A.   Yes.
9   Q.   When?
10  A.   I am -- at the outset, I was a fathering
11  scholar.  My research interests transformed a little
12  bit over time from fathering to family.
13       Much of the fathering literature links
14  fathers to children's outcomes, so from the very --
15  the very inception of -- my inception into the
16  research world of family studies, it was child
17  outcome-related, father-child outcomes.
18  Q.   Have you published any original research
19  concerning the effect of family structure on
20  childhood outcomes?
21  A.   If I can go back to the qualitative,
22  quantitative question for just a moment, which was

Page 56

1   asked -- which was asked previously.
2        Quantitative methods like -- meet precise
3   concepts like specific child outcomes.  You mentioned
4   I believe earlier child adjustment.
5        Qualitative research tends to be a little
6   bit more holistic.  Most of the research I've done
7   that would deal with relationships between adults
8   and -- and children would focus more on the process
9   and the interaction that takes place as opposed to
10  specific outcomes.
11       Most of my field would view that as a
12  difference in methodology and focus.
13  Q.   So you study parenting processes more than
14  parenting structures?
15  A.   I've studied both.
16  Q.   Do you have an opinion on what causes
17  better child outcomes as between processes and
18  structure?
19       MR. THOMPSON:  Objection, vague.
20  A.   That, then, is a central question in the
21  social sciences.
22       Again, as you're probably aware, I would

Page 57

1   based on my reading of the empirical literature say
2   that both play an important role.  Many -- many
3   within the social sciences are -- tend to be from the
4   more traditional set -- argue very hard for
5   structure.  Some argue for processes.
6        I think both are very, very important, and
7   it's difficult to -- to disentangle the 2.  The
8   exception that I would draw would be 2-parent married
9   biological family.
10       That -- that structure empirically stands
11  out as unique in the empirical work that I've read.
12       BY MR. McGILL:
13  Q.   And in the empirical work that you have
14  read, is it that the -- that family structure
15  correlates to good child outcomes, or is it that
16  itself causes good child outcomes?
17       MR. THOMPSON:  Objection, vague.
18  A.   The research is almost always in any --
19  any area of social science correlational and not
20  causational, and that's true across subdiscipline and
21  topic.  There -- to rephrase it, there are many, many
22  significant unanswered questions in social sciences

```
                                    Page 82
 1   cause of good adjustment outcomes?
 2      A.  I know of no empirical research in the
 3   social sciences that to the satisfaction of the field
 4   has been able to say, this is causal rather than
 5   correlational.  That is true for biology and many
 6   other factors.
 7         Social science generally does not -- does
 8   not have the rigor and the strength to make causal
 9   statements.
10      Q.  Are you saying that social science could
11   not even say that parenting skills, high parenting
12   skills cause good child outcomes?
13         MR. THOMPSON:  Objection, vague.
14      A.  There -- there are 3 -- there are 3
15   necessary components to -- to make a causal statement
16   that are -- that are usually associated in the social
17   sciences -- or in I should say science.
18         One is that the cause -- and we'll use
19   parenting skills.  Cause has to precede the effect.
20   That's kind of the low-hanging fruit and obvious.
21         Another is that you have to establish some
22   kind of a link between the 2, which we often refer to

                                    Page 83
 1   as correlation.
 2         A third is that you have to rule out all
 3   other alternative explanations.  That would be called
 4   from a scientific vantage a purely experimental
 5   design, and we cannot execute that in the social
 6   sciences because of ethical considerations.
 7         You can't raise a kid in a lab, and so
 8   even though we can correlate parenting skills perhaps
 9   with better outcomes, we can never -- "never" is a
10   strong word, but it's one that I use cautiously.
11         It's very difficult to make any causal
12   statement about child outcomes, which is the topic of
13   my expert report because of that third one.
14         1 and 2, we can get in place.  Third, we
15   cannot, not for biology, not -- not for --
16         BY MR. McGILL:
17      Q.  Have --
18         MR. THOMPSON:  Let him finish.
19         Not for biology what?
20      A.  And not for most other variables that I
21   mentioned.
22         You can look at them, study them, and get

                                    Page 84
 1   correlation.  Cause and effect is tough.
 2         BY MR. McGILL:
 3      Q.  Are you aware of any study that has
 4   compared biological married parents -- and I'm using
 5   biological as you have defined it here.
 6      A.  Intact.
 7         Go ahead.
 8      Q.  And that, just so we're clear:  And that
 9   is as -- that is how you say the researchers you rely
10   upon define the term?
11      A.  Yes.
12      Q.  So is there any study of which you're
13   aware that compares biological parents to -- who are
14   married and have similar money, contact, warmth,
15   education with adopted children who have -- with
16   married parents similar money, contact, warmth,
17   education?
18      A.  I follow you.
19         The adoption literature is nascent.
20   It's -- it's very, very new from a social science
21   perspective.
22         The most recent study that I've read that

                                    Page 85
 1   looks at adoption issues and, you know, the study --
 2   a study would fit the bill that you just described, a
 3   study by Wilcox and Wilson says that that -- that
 4   that field is embryonic.  That's their word, not
 5   mine.  It's brand-new.
 6         Coming back to directly respond to your
 7   question, a handful at best I would say -- that I'm
 8   aware of, including one by Lansford and colleagues,
 9   2001 Journal of Marriage and Family, maybe a couple
10   of others.
11         That's -- that's a tough -- it's a tough
12   study to pull off, especially meeting the standards
13   that I discussed earlier.
14      Q.  Do you think parenting processes are
15   important?
16      A.  I do.  I think process is -- is very
17   important.
18         As I said earlier, I also think that
19   structure is important in -- at least in the case of,
20   you know, intact families as we defined them earlier.
21      Q.  And in your opinion, it is simply not
22   known whether processes as opposed to structure
```

Page 182

1    Well, I've listed here that that was drawn
2  from Popenoe.
3    Q.   Is your reference to intact families
4  accurate?
5    A.   May -- may include adopted as well, but
6  memory doesn't -- doesn't serve me there.
7    Q.   Onward we go.
8       Paragraph 37.
9    A.   M-hm.
10   Q.   Here you quote at some length from
11 Lorraine Blackmon's review:  For African American
12 children, parental marriage produces important
13 benefits.
14      And then it ends by saying:  Marriage
15 itself appears to be contributing strongly to better
16 outcomes for black children.
17      And then you drop a footnote, footnote 59.
18      And you state there that:  The researchers
19 are again referring to marriage between the
20 biological father and the mother.
21      Are you sure that's the case?
22   A.   Well, as we've seen in a few of these

Page 183

1  studies, they include -- some of them include intact,
2  adoptive families under -- under biological.  That
3  certainly is possible if not probable in some of
4  these studies cited by Blackmon, since it's a review
5  where they cite -- they claimed to cite 120 or so.
6       In this case, I would anticipate that they
7  would probably have at least some studies.  They
8  included a handful of adopted marriage-based families
9  in there.
10   Q.   Do you wish to revise your statement that
11 the phrase parental marriage refers to marriage
12 between the biological father and mother?
13   A.   I think that what I would do there is say
14 typically, conceptually, although some of the
15 studies, Johnson, et al., and others do include in
16 their definition adoptive families under that
17 heading.
18   Q.   So we couldn't conclude from Blackmon's
19 conclusion here that the benefits of marriage to --
20 for black children are in any way limited to
21 biological parents?
22   A.   I think that that's an overstatement,

Page 184

1  although in several of the studies that we've pulled
2  out, they mention that they include in -- different
3  social scientists want to be -- and, you know, more
4  or less inclusive or claiming the definition of who
5  they include in the study.  We've seen in several of
6  these cases that they decide to include adoptive
7  families, which are a small, small minority in the
8  general population, a small minority.  I don't know
9  the exact figures.
10      But when you're dealing as these
11 researchers are with broad national-based samples,
12 they are as I mentioned earlier, sometimes painting
13 with a broad brush.
14      If some of these studies we're talking
15 about, they use the term biological or intact and
16 they throw in some -- some adopted studies, we would
17 call that noise at some level, that there's a little
18 bit of -- there's a little bit of muddying of
19 concepts, but unless we -- unless we know that
20 conceptually, they're including so many adoptive
21 families, I find that very hard to believe to
22 overthrow the general conclusion of a study based on

Page 185

1  thousands and thousands of people.
2       It's --
3    Q.   Well, but --
4    A.   Well, it's -- it's conceptually an
5  inconvenience to -- to have a nonclear-cut
6  definition, but the points that are being made, if --
7  if adoptive families comprise 1 or 2 or 3 percent of
8  the subgroup of what they're calling intact
9  biological families, we're talking about a study
10 that's still 97 percent pure.
11      It doesn't overthrow -- it makes my
12 definition, which is necessarily messy upfront, less
13 convenient, less clean, but it -- you don't throw out
14 the baby with the bath water because they decided to
15 include a few adoptive families under the intact
16 heading.  That's ridiculous.
17      Further if -- if they decided to put the
18 intact families or the marriage-based adoptive
19 families in for whatever reason in with stepparent
20 families, and it only accounted for a very small
21 minority of the studies in that total population,
22 it's -- it's again impure conceptually, but it

Page 274

1     Do I impose it on others?
2          I believe in cleaning up my own backyard.
3     Q.   And for clarity sake, the -- the dogma
4  that you referred to just in your last response,
5  that's known as the law of chastity.
6          Correct?
7     A.   That is correct.
8     Q.   Did your religious convictions impact your
9  opinion that the ideal family structure is marriage
10 between man and a woman and a child biologically
11 related to each in any way?
12    A.   My exposure to -- to that -- that dogma
13 I'm sure is one of many factors that -- that ran
14 around in my head.
15         But again I was called as an expert
16 witness in the same sense that I wouldn't come in
17 here and make my argument based on what's stated in
18 the family proclamation to the world.  I took that
19 same approach in my scholarly -- my scholarly work.
20         I think I've addressed again and again
21 that I acknowledge potential for bias and that that
22 makes challenge fair play.  However, please remember

Page 275

1  my earlier statement that I also have taken upon me
2  the burden of challenge.  This is -- you know,
3  scholarship is about strengths and challenges, not
4  just dogmatically presenting one.
5     Q.   When is the first time you held the belief
6  that the ideal family structure is marriage between a
7  man and a woman and a child biologically related to
8  each?
9          MR. THOMPSON:  Objection, relevance.
10    A.   Mr. McGill, I don't know.  I don't know
11 how to answer that question.
12         BY MR. McGILL:
13    Q.   Is it -- is it fair to say that you held
14 that view, you held that belief before your
15 engagement as an expert in this case?
16    A.   Yes.
17    Q.   Is it fair to say you held that belief
18 before you received your Ph.D. degree?
19    A.   Yes.
20    Q.   Did you hold that belief before you
21 graduated from college?
22    A.   Yes.

Page 276

1     Q.   So that belief predates your work as a
2  social scientist?
3     A.   Yes.
4          MR. McGILL:  We'll take a 1- , 2-minute
5  break and find out if there are any last questions.
6          MR. THOMPSON:  Sound good.
7          THE VIDEOGRAPHER:  We're going off the
8  record.  The time is now 6:09 PM.
9          (Recess.)
10         THE VIDEOGRAPHER:  The time is now 6:13
11 PM.  You may proceed.
12         BY MR. McGILL:
13    Q.   Dr. Marks, earlier in the deposition
14 today, we addressed paragraph 15 of your report,
15 which is marked as exhibit 2.
16    A.   Okay.
17    Q.   Can you go back to that.
18    A.   I'll try -- I'll try and get there
19 quickly.  Okay.
20    Q.   And addressing the last sentence:  Wilcox
21 and colleagues state that teens living with both
22 biological parents are significantly less likely to

Page 277

1  illicit drugs alcohol and tobacco.
2          And you said that on reflection, having
3  reviewed with me the Johnson study, you would delete
4  the word biological.
5     A.   Said, delete.
6          I probably would have contextualized it
7  differently, added to it to make it accurate for the
8  1996 study and more precisely consistent with 1996.
9     Q.   So you might have said, teens living with
10 both biological and adoptive families?
11    A.   Including adoptive, yeah.
12    Q.   And my question, which is my very last
13 question, is, are there any other changes you would
14 make to this report that you would -- or any words
15 you would like to delete before trial?
16    A.   No.
17         I would want to be more precise on the
18 definitions than I was in a couple of cases.  It's
19 the danger of large studies.  I would want to be more
20 precise, but I stand behind the report as is.
21    Q.   Do you stand behind the -- do you
22 recall -- excuse me -- do you recall when we went --