# Exhibit D

David George Blankenhorn III                                            November 3, 2009
                              Washington, DC

                                                                              Page 1

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3    KRISTIN M. PERRY, et al.,   )

 4              Plaintiffs, )

 5          v.              ) No. 09-CV-2292 VRW

 6    ARNOLD SCHWARZENEGGER, in   )

 7    his official capacity as   )

 8    Governor of California,    )

 9    et al.,                    )

10              Defendants. )

11

12                          Washington, D.C.

13                          Tuesday, November 3, 2009

14    Deposition of DAVID GEORGE BLANKENHORN III, called

15    for examination by counsel for Plaintiffs in the

16    above-entitled matter, the witness being duly sworn

17    by CHERYL A. LORD, a Notary Public in and for the

18    District of Columbia, taken at the offices of COOPER

19    & KIRK PLLC, 1523 New Hampshire Avenue N.W.,

20    Washington, D.C., at 9:41 a.m., and the proceedings

21    being taken down by Stenotype by CHERYL A. LORD, RPR,

22    CRR.
```

Page 98

1  Q.  Okay. So is it fair to say, then, that
2  you don't intend to be offering opinions about what
3  the impact of allowing same-sex marriages
4  specifically in California in a context that has
5  certain laws that already apply about child rearing,
6  et cetera -- what that impact would be particularly
7  in the state of California?
8       MR. THOMPSON: Objection, mischaracterizes
9  the testimony.
10      Go ahead.
11 A.  Yeah.
12      I would prefer to say what -- what I am
13 saying rather than to have it stated that way.
14      What I'm trying to do is that in human
15 groups, we can discern a -- we can discern the basic
16 contours and dimensions and purposes and social
17 functions of an institution called marriage, and that
18 as we evaluate our future in California and also
19 possibly in other states that this understanding of
20 what it means to -- to -- to -- what marriage means
21 in the human experience is valuable. And it is a
22 valuable contribution to the discussion to be

Page 99

1  familiar with this.
2       And further that the trend in the United
3  States and elsewhere toward deinstitutionalization
4  can be measured and -- and can -- can -- I don't want
5  to say measure. I want to say assessed and can be
6  evaluated by persons of goodwill with respect to the
7  impact of that trend on children and societies.
8       And further, I'm arguing that the advocacy
9  of gay marriage is a part of that trend toward
10 deinstitutionalization. And so that as people in
11 California and as people in any state evaluate the
12 topic of same-sex marriage or the possibility of
13 changing their laws to grant the right of same-sex
14 couples to marry, I believe that it is valuable and
15 useful to have as a context and as a foundational
16 basis of understanding what is the institution we're
17 talking about and in what direction is it headed in
18 our nation, in -- in the world, and what are the
19 likely consequences of that direction, and what is
20 the apparent role of the current push or the current
21 desire or the current campaign for same-sex marriage,
22 what role, if any, does that play in this trend of

Page 100

1  deinstitutionalization.
2       I believe that those are -- are -- do not
3  constitute the entire realm of useful knowledge when
4  it comes to making an informed assessment, but --
5  regarding the issue of same-sex marriage in
6  California, but I do believe that that -- those
7  assessments and that way of organizing a body of
8  knowledge could potentially be useful to people
9  who -- who are making this decision.
10      BY MR. DUSSEAULT:
11 Q.  Okay. Would you agree that to evaluate
12 the likely impact of allowing marriage -- same-sex
13 marriage in a single state on the institution of
14 marriage and whether it would lead to
15 deinstitutionalization that it is relevant to
16 consider what other practices and actions are
17 currently allowed under the laws of that state?
18 A.  Would I consider as a general matter that
19 it would be relevant?
20 Q.  Yes.
21 A.  I would consider it relevant, yes.
22 Q.  You've drawn a distinction a couple times

Page 101

1  in your testimony about things done specifically for
2  this case versus things done over the course of your
3  career. That's certainly a fair distinction.
4       Have you engaged in any studies or
5  analysis that you did specifically for the purpose of
6  offering an expert opinion in this particular
7  litigation?
8  A.  Have I undertaken a study --
9  Q.  You can break them down if you want.
10 A.  -- that is a study undertaken specifically
11 and exclusively for the purpose of preparing this
12 document?
13 Q.  Let's say specifically, because I don't
14 care if you plan to use it later, that's fine, but
15 specifically because you were hired to give an
16 opinion here, so you conducted a study.
17 A.  Well, if by, study, do you mean that I
18 devoted some days and weeks to reading and trying to
19 organize my thoughts and trying to refresh my
20 recollection about other previous work that I have
21 done, the answer is yes.
22 Q.  Okay. Anything else?

26 (Pages 98 to 101)

Page 102

1  A. No.
2  Q. Okay.
3  A. Not that I recall.
4  Q. Okay. And I know the word study could
5  have various meanings. I'm trying to use it as it's
6  often used in the field of sociology, and I see
7  people refer to studies.
8      Have you personally conducted any studies
9  on which you're relying in forming your opinions in
10 this case?
11     MR. THOMPSON: Objection, vague.
12 A. I have -- as I mentioned, I have -- I have
13 read and re-read things. I have tried to organize my
14 thoughts in a way that I thought I could present them
15 usefully, and I've -- I've tried to refresh my memory
16 of the body of work that I've done over the years as
17 it may pertain to achieving excellence in this
18 document.
19     BY MR. DUSSEAULT:
20 Q. Okay. In your professional life, you
21 don't conduct studies in the sense of dealing with a
22 certain number of subjects who are -- who fill out

Page 103

1  questionnaires, are observed, interviewed, and their
2  answers and responses are gauged. We see a lot of
3  that in some of the things that you rely on.
4      I'm just trying to understand --
5  A. Have I personally been involved in those
6  kinds of activities?
7  Q. Yes.
8  A. Yes, I have.
9  Q. In what role?
10 A. Well, usually my role has been that of --
11 of conceptualizing the topic of inquiry, of
12 recruiting the scholars to carry out the work by
13 participating in and supervising that work and by
14 assisting either in a primary way or in a nonprimary
15 way in writing up the results and in disseminating
16 those results to the public.
17 Q. But you will typically bring in someone
18 else who conducts the study?
19 A. Well, typically, our studies are done by
20 groups of scholars. We tend to have a model that is
21 interdisciplinary and collabora- -- collaborational
22 -- if that's a word -- in nature.

Page 104

1      So for a number studies that have been
2  carried out by -- by the Institute for American
3  Values in -- over the past 20 years, I have a number
4  of times been involved as, say, the principal author
5  of the report or often as the person who had the lead
6  role in conceptualizing, developing the methodology,
7  and so on, in -- in -- in actually carrying out the
8  research itself.
9      But I -- we typically work in -- we work
10 in a group -- we work as groups of scholars, and if
11 you wanted to, you could look at each of our reports
12 that have occurred over the past 20 years, and you
13 can see in each report in what way my role was
14 described, and we've tried to be fairly clear about
15 that.
16 Q. Okay. Let's turn to your -- your index of
17 materials considered, which is at the end of exhibit
18 1.
19     MR. THOMPSON: Could we go off the record
20 just a moment?
21     MR. DUSSEAULT: Sure.
22     (Discussion off the record.)

Page 105

1      THE VIDEOGRAPHER: Going off the record.
2  The time on the video screen is 12 o'clock and 38
3  seconds.
4      (Discussion off the record.)
5      THE VIDEOGRAPHER: Here marks the end of
6  videotape number 2 taken in the deposition of
7  Mr. David Blankenhorn III. Going off the record.
8  The time on the video screen is 12:01 and 38 seconds.
9      (Recess.)
10     THE VIDEOGRAPHER: Here begins videotape
11 number 3 taken in the deposition of Mr. David
12 Blankenship III -- I'm sorry -- Blankenhorn III.
13 Going back on the record. The time on the video
14 screen is 12:11 and 54 seconds. Please continue.
15     BY MR. DUSSEAULT:
16 Q. Mr. Blankenhorn, if you would turn,
17 please, to your index of materials considered in
18 exhibit 1.
19     You were testifying before our break about
20 certain studies in which you've been involved.
21     Are any of those studies that you're
22 referring to included in this index of materials

David George Blankenhorn III                                    November 3, 2009
Washington, DC

Page 110

1   with the -- this is the first time I've provi- --
2   done this for this kind of court situation, and I was
3   simply relying upon my experience in writing
4   academic-style articles.
5        And I was simply trying to follow the
6   conventions of citation that would be customary in
7   those situations.
8        Q.  Okay.  Are all of the documents included
9   on your index of materials considered documents to
10  which there's a specific citation in the report
11  itself?
12       A.  I believe that's true.  I -- I -- I -- I
13  would have to go through and visit -- revisit every
14  single instance and just double-check --
15       Q.  Okay.
16       A.  -- but to the best of my recollection, the
17  answer to that is yes.
18       Q.  Okay.  Now, have you -- for each of the
19  materials listed here, have you read the entire
20  document?
21       A.  If you mean every word of every page of
22  every document, the answer would be no.

Page 111

1        Q.  Okay.  Are there -- strike that.
2        Are there any documents that you include
3   here as to which you can say with confidence that
4   you've read the whole document?
5        A.  Yes.
6        Q.  Which ones?
7        A.  Do you want to go down the list --
8        Q.  Sure.
9        A.  -- of all of them?
10       Q.  Just the ones that you can say with
11  confidence you've read the entire document.
12       A.  Well, let's begin with the first one.
13       Trying to find footnote number 1 if
14  somebody can help me.
15       MR. THOMPSON:  Oh, you can refer to the
16  index of materials considered, is probably the
17  easiest, at the end of the --
18       THE WITNESS:  But I need to see -- I need
19  to see --
20       MR. THOMPSON:  That's fine.
21       So Mr. Dusseault, the way I think he's
22  going to do it --

Page 112

1        A.  Oh, no.
2        I'm not -- this isn't related.  I'm not --
3        I see.  I understand.
4        The anthropological quarterly 1998, I'm
5   trying to remember the title of the article, so I
6   can't say that I have read every word of every page
7   of that particular article, because I'm not -- I'm
8   not recalling in my mind right now which article that
9   was.
10       In the second instance, I'm pretty sure I
11  read everything.  I may have skipped a page or 2, but
12  I think I'm pretty familiar or was familiar with that
13  at the time.
14       Number 3, yes.
15       Number 4, yes.
16       Number 5, yes.
17       Number 6, yes.
18       Number 7, yes.
19       Number 8, yes.
20       Number 9, yes.
21       Number 10, I may have skipped a few pages,
22  but I'm fairly familiar.

Page 113

1        Number 11, I'm not recalling the
2   specifics.  I would need to see the document to
3   recall if I've read every word of every page.
4        Same with number 12.
5        13, yes.
6        14, yes, although I may have skipped a
7   page or 2.
8        15 the same.
9        16, yes.
10       17, I would have to see the document
11  again.
12       18, yes.
13       19, yes, although I skipped a couple of
14  chapters of that book.
15       20, yes.
16       21, yes, although I may have skipped a few
17  pages.
18       22, yes.
19       23, I skimmed it pretty carefully in those
20  areas that I didn't read in its entirety.  I was
21  really focusing on a specific question, and so there
22  were other chapters of that book that did not relate

29 (Pages 110 to 113)

```
                                          Page 130
 1        BY MR. DUSSEAULT:
 2    Q.   Are you not able to answer --
 3    A.   I have an opinion --
 4    Q.   Are you not able to answer the question
 5  whether gay and lesbian persons in California had
 6  equal marriage rights as you use that phrase in
 7  paragraph 14 the day before Proposition 8 passed?
 8        MR. THOMPSON:  Objection to the extent it
 9  calls for a legal conclusion.
10    A.   If by equal marriage rights we mean, did
11  gay and lesbian persons in California have the right
12  prior to the passage of Prop 8 to marry one another,
13  then, I believe that they did have that right prior
14  to Proposition 8 in the immediate preceding months of
15  the passage of that initiative.
16        BY MR. DUSSEAULT:
17    Q.   Okay.  And just since this is a phrase
18  that you've used in your report, is that how you mean
19  the phrase equal marriage rights, the right of a gay
20  and lesbian person to marry someone of the same-sex?
21    A.   I'm using the term out of respect for
22  those advocates of same-sex marriage.  I use the term
```

```
                                          Page 131
 1  to -- to show respect, because that is the term
 2  that's commonly abused by those advocates.
 3        And when they use the term, what they mean
 4  to say is that an individual has the right to marry
 5  the person of their choosing.  And that's what they
 6  mean.
 7        And so I use the term understanding that
 8  that's the meaning, and I use the term out of respect
 9  for wanting to use the exact language of those whose
10  argument I'm contesting.
11    Q.   I just want to understand the parameters
12  of what you're talking about since you've presented a
13  question whether or not to grant equal marriage
14  rights.
15        As you use that term here, you're using it
16  to mean the right of someone to marry someone of the
17  same sex as well as someone of the opposite sex.
18  True?
19    A.   I'm using it to mean the right to marry
20  the person of their choice, irrespective of the
21  person's sexual embodiment or gender or orientation.
22  That's what I'm meaning.
```

```
                                          Page 132
 1    Q.   Now, you present the question as whether
 2  or not to grant equal marriage rights to gay and
 3  lesbian persons.
 4        Would you agree that in Prop 8 the
 5  question that was actually presented to voters was
 6  whether to take away those equal marriage rights that
 7  had already been deemed to exist?
 8        MR. THOMPSON:  Objection, calls for a
 9  legal conclusion.
10    A.   I -- I would not view it that way.
11        I view -- I view the -- although I am
12  fully aware that those proponents -- I'm sorry -- the
13  opponents, those who opposed Proposition 8, phrased
14  it exactly that way.
15        But my own understanding, which is perhaps
16  somewhat of a variation on that -- on that
17  formulation is that I view the Prop 8 initiative as
18  the reinstating of the customary man-woman nature of
19  marriage that has existed in California and in all
20  human groups in almost all of human history.
21        And so that while it is true that the
22  equal marriage rights as I have -- we are -- as I
```

```
                                          Page 133
 1  have defined them existed as you put it on the day
 2  prior to Prop 8's passage, I view the larger social
 3  and political process there as bringing to bear the
 4  will of the voters on the question of the restoring
 5  of the customary marriage form that had heretofore
 6  existed in California and throughout history and the
 7  world.
 8        BY MR. DUSSEAULT:
 9    Q.   So in your view as an intellectual matter,
10  as you're saying here, does it make any difference
11  whether the issue is whether to grant equal marriage
12  rights that have never been granted or restore a
13  definition that existed at some prior point in time?
14        Does -- does how you come to this
15  situation affect how you approach this as an
16  intellectual matter from your perspective?
17        MR. THOMPSON:  Objection, vague.
18    A.   I certainly understand the proposition and
19  the validity of the -- I certainly can see how a
20  person -- particularly a person who was a supporter
21  of same-sex marriage could say that the purpose of
22  Proposition 8 is to take away a right that I now
```

David George Blankenhorn III                                                    November 3, 2009
Washington, DC

Page 150

1   A.  Well, the way I think about it is that if
2   you put up these 2 normative or descriptions of
3   marriage, if your question is, how many people lean
4   strongly toward one versus the other, I -- and if
5   your question concerns U.S. adults, I don't -- I
6   don't have an opinion as to the current breakdown.
7       Q.  I guess what I was going for but more as
8   you present these as 2 alternative ideas, but
9   wouldn't you agree that many people view marriage as
10  both a private, loving commitment between adults and
11  something that benefits and protects any children who
12  come into that marriage?
13      A.  Well, the important words that I tried to
14  use in the document are -- I'm not looking at it
15  right now -- but I used words like primarily or
16  fundamentally or in essence.  And the reason I used
17  words of that nature is because whatever else -- I
18  mean, the -- the -- to take one example of why I used
19  that phrasing, the proponents of the view that
20  marriage is fundamentally a pro-child social
21  institution would also readily recognize and
22  understand that marriage has an individual private

Page 151

1   affective dimension between the spouses.
2           So it's not a case that those people who
3   hold that view deny that that dimension of marriage
4   exists.  And I have written about that dimension in
5   my book.
6           So I'm happy to discuss it, but the --
7   the -- the issue before us is not that one.  The
8   issue before us is, what if anything do we think can
9   be stated about the public purposes of marriage.
10          And if the answer to that question is a
11  statement that the definition of marriage is that
12  it's an interdependent relationship between 2 people,
13  then in essence or fundamentally or primarily, then
14  that is indicative of the fact that the person who is
15  saying that is very much oriented toward this first
16  view of marriage I've talked about.
17          Whereas if the person were to say,
18  while -- you know, while acknowledging the multiple
19  purposes of marriage, the fundamental and primary and
20  cross-cultural purpose of marriage in human groups is
21  to be a pro-child social institution, that would --
22  that would indicate that that person was veering

Page 152

1   toward this other more historically foundational and
2   historically very widespread and commonly accepted
3   understanding.
4       Q.  Okay.  In paragraph 15 of your report, you
5   offer by my count 8 quotes that you characterize as
6   representative examples of prominent persons making
7   precisely this argument, which I assume refers to
8   idea 1.
9       A.  Can you tell me the page?
10      Q.  Oh, yes.
11          Page 3.
12      A.  Yes.
13      Q.  So just -- just to set the table again:
14  On page 3, you say, idea 1, marriage is fundamentally
15  a private adult commitment.
16          Then in paragraph 15 you say:  Consider
17  these recent representative examples of prominent
18  persons making precisely this argument.
19          And you follow that with 8 quotes?
20      A.  Yes.
21      Q.  Now, this is something that you do in at
22  least 3 spots in your report, make a statement and

Page 153

1   then have a series of quotes that you list.
2           Right?
3       A.  Yes.
4       Q.  Okay.  How do you go about identifying
5   what quotes you're going to put into your report?
6       A.  I try to -- what I did during -- over a
7   period of several years was to search the public
8   record of debate and the corpus of modern
9   scholarship, and I sought as carefully as I could to
10  literally collect these definitions.  And I tried
11  to -- if the person was a -- was a -- I use the word
12  prominent just to -- somewhat loosely to really mean
13  a person whose views are deemed worthy of publication
14  in some significant publication and has some standing
15  in society where that person would be viewed as
16  having an opinion that is, you know, worth listening
17  to by others, and so forth, and I tried to as
18  carefully and as comprehensively as I could collect
19  those definitions.
20          And then I sought for the purposes of this
21  report to choose those that I thought were
22  representative of the argument that I think is --

39 (Pages 150 to 153)

Page 154

1  to -- to illustrate my point, to be examples of the
2  point I'm trying to make.
3       And I tried to -- you know, I tried to be
4  as fair-minded as possible, and I tried to not choose
5  obscure people or obscure formulations.  I chose 8
6  here, but I could just have easily have given you 80.
7       Q.   Okay.  And if I understand your answer,
8  what you're trying to do is not endorse or dispute a
9  view, not test its validity, just give examples of
10 arguments that people have made?
11      A.   That is exactly right.
12      Q.   Okay.  With respect to the 8 authors that
13 you quote in paragraph 15, do you know whether any of
14 them also talk about the role of child well-being and
15 protection of children in marriage elsewhere in their
16 work?
17      A.   Well, I know that some of them do.  I
18 suspect that all of them do.
19      Yes, I think it's fair to say that all of
20 them do.
21      Q.   Okay.  In paragraph 16, you say: This
22 understanding of marriage is reasonably widespread

Page 155

1  today particularly among U.S. journalists and
2  advocates of same-sex marriage.
3       Do you see that paragraph?
4       A.   Yes.
5       Q.   What do you mean when you say, the
6  understanding is reasonably widespread?
7       A.   Well, I mean that if one follows the
8  public debate on this issue, and if one tries to be
9  reasonably well informed about the scholarly and
10 legal and journalistic and civic and religious
11 discussions of the topic of marriage, that one will
12 commonly hear this idea being given -- one will
13 commonly hear this idea expressed.
14      It's not unusual or rare to hear it
15 expressed.  I would say it's -- it's -- it's as a
16 reasonably widespread idea in the sense that it is
17 frequently voiced, particularly by these groups I've
18 mentioned.
19      Q.   And it's -- but it's also an idea that is
20 expressed well beyond just U.S. journalists and
21 same-sex marriage advocates.
22      True?

Page 156

1       A.   Well, if you mean, does that idea also
2  have valence in the citizenry as a whole, I would say
3  the answer is yes.
4       Q.   Okay.  And would you say that this view is
5  also reflected in laws that in past several decades
6  have been passed in states of the country?
7       A.   I'm not really -- don't feel able to
8  answer that question precisely.
9       In a -- in a general way, I would -- I
10 would be able to say I think with some confidence
11 that in a general way, my view is that a broad
12 tendency in family law as a scholarly discipline is
13 toward endorsement or a greater -- a growing
14 acceptance of this view, and some trends in legal
15 changes themselves have tended toward this view but
16 while others have not.
17      Q.   Do you know -- accepting that you're not
18 an expert in law, but someone who has read a lot on
19 these subjects, do you know whether this view of
20 marriage as fundamentally commitment between adults
21 has been expressed by judicial decisions of the U.S.
22 Supreme Court?

Page 157

1       A.   I'm not aware.
2       Q.   Okay.  Do you believe it would affect any
3  of the opinions you're offering in this case if in
4  fact it had?
5       MR. THOMPSON:  Objection to the extent it
6  calls for a legal conclusion.
7       A.   My -- my view of what marriage is and its
8  public purposes and its dimensions are a result of my
9  study of the actual -- the actual history, the
10 textured history of the institution itself.
11      And while -- while law is certainly an
12 important influence on that institution, it's by no
13 means the only one.  And so while I would always be
14 interested and influenced -- I would always be
15 interested as a topic of knowledge to know what legal
16 thinkers have stated about this, my overall
17 understanding of what marriage is would be informed
18 by a multiplicity of sources, and contemporary views
19 of jurists would be one of them but not the only one.
20      BY MR. DUSSEAULT:
21      Q.   When did this understanding of marriage as
22 primarily an adult commitment first arise in the

Page 182

1  gotcha argument on the issue of why we should allow
2  gay marriage, they really I believe are in my view
3  really engaging -- they really are misunderstanding
4  this institution at a very deep level.
5       I also want to make a final point in this
6  regard, which is that there is a very -- actually --
7  I'm sorry -- I want to make 2 very quick final
8  points, and then I'll stop.
9       One point is that there is a great deal of
10 variability in the status of infertility in
11 childishness -- childlessness.  The couple may decide
12 at some point in their marriage that they do not want
13 to have children, but that opinion may change over
14 time.
15      And even the physical elements of
16 infertility are almost never known prior to the
17 marriage.  Very few couples get married knowing for
18 certain that there's infertility.  And even when
19 infertility problems emerge, there are -- sometimes
20 it doesn't prevent them from having a child, so this
21 very practical nature of the -- of the variability of
22 the status such that it's subjective to human --

Page 183

1  changed through human opinion and agency and change
2  in the -- how are bodies are working related to
3  sexual reproduction make it a complete impracta- --
4  impracticability, even if one wanted to to somehow
5  inquire prior to marriage about the fertility
6  intentions of the couple.
7       There's another reason why we don't this
8  and why no one in the history of the world as ever
9  managed to do this, and that is because we don't need
10 to.  People like to have sex.  They frequently have
11 sex.  And they don't -- we don't need to order them
12 to do it.  We don't need to stand at the gate of
13 marriage and make sure they're going to do it.  We
14 don't need to tell them that they have to have
15 children.
16      People commonly want children.  The
17 overwhelming majority of married people in the United
18 States and throughout all of history have had
19 children.  And we don't need to order them to do it.
20 We don't need to issue a production quota.  We don't
21 need to stand around and inquire as to their status
22 about the intention to procreate.

Page 184

1       All we have to do is literally let nature
2  take its course.  It would be like, why do we have to
3  have an order -- do we want to order birds to sing
4  and fish to swim.  People have sex, and that sexual
5  activity produces children.
6       And the point is not to stand around
7  permitting it or mandating it.  The point is to
8  regulate it in the interests of the social life of
9  the child.
10      And in order to achieve that goal, humans
11 have created an institution called marriage.  All of
12 the scholars of the modern era, all of them with very
13 few exceptions have commonly acknowledged that, no,
14 this is not a controversial assertion, that this is
15 the fundamental purpose of marriage in human groups.
16      So I've taken a moment to answer this
17 question at some length because it's a very important
18 one.  It is widely and deeply misunderstood in the
19 public discussion.
20      And those who use the argument in the way
21 that you're doing I believe really -- I -- I think
22 have not sufficiently thought through the role and

Page 185

1  meaning of marriage.
2       Q.  Okay.  I think you may have read a good
3  bit into my question that I didn't intend, because I
4  don't think I said anything about requiring
5  procreation or anything.
6       I know --
7       A.  Well, I'd --
8       Q.  -- the things you've talked about quite a
9  bit.
10      A.  I'd like to go back and find out what the
11 question is.
12      (Talking at the same time.)
13      A.  I would like to know what the question
14 was, because I do believe that was exactly the
15 implication.
16      MR. THOMPSON:  It's all right.  It's all
17 right.
18      MR. DUSSEAULT:  No.
19      Let's read it back.  I'd like to see if
20 what he said is connected to what he was asked.
21      (The reporter read the record as
22      follows:

47 (Pages 182 to 185)

David George Blankenhorn III                                                       November 3, 2009
Washington, DC

Page 262

1   raised from birth by 2 biological parents versus
2   raised from birth by 2 other people?
3       A.   Well, I can only refer you to what the
4   researchers themselves say --
5       Q.   Okay.
6       A.   -- in their conclusion and in their
7   summation of the findings.
8           I'll just read it to you:
9           First, this is under the -- this is in
10  their conclusion section, what they call implications
11  of the research --
12      Q.   Okay.
13      A.   -- for the broader public discussion.
14          First, research clearly demonstrates that
15  family structures matters for children, and the
16  family structure that helps children the most is a
17  family headed by 2 biological parents in a
18  low-conflict marriage.  Children in single-parent
19  families, children born to unmarried mothers, and
20  children in stepfamilies or cohabiting relationships
21  face higher risks of poor outcomes than do children
22  in intact families headed by 2 biological parents.

Page 263

1           Thus is -- I'm skipping a sentence.  I can
2   read it if you want, but the concluding sentence
3   says:  There is thus value for children in promoting
4   strong, stable marriages between biological parents.
5       Q.   Okay.  But so even just taking just that
6   language, the authors are comparing 2 biological
7   parents in a low-conflict marriage to single-parent
8   families, children born to unmarried mothers, and
9   children in stepfamilies.
10      A.   And cohabiting.
11      Q.   And cohabiting.
12          But not for example to a situation where a
13  man and woman through adoption or otherwise together
14  raise a child from birth.
15      A.   I'm not sure how they treated the issue of
16  adoption in this sample.
17          It's a fairly small number of children.
18  And I don't think it would have affected it much one
19  way or the other, but it's an interesting question.
20          I don't know if in the methodology they
21  say how they handled adoption.
22      Q.   Are you aware of any study that has

Page 264

1   compared the outcomes where children are raised
2   continuously with 2 parents who are biological
3   parents versus a child raised continually by 2 people
4   where one or both is not the biological parent?
5       A.   Yes.
6       Q.   What is -- what's an example of such a
7   study?
8           When I say, continuously, again, I don't
9   mean stepfamilies.  I mean from birth.
10      A.   Oh, I thought you were including -- I
11  thought you might be including issues of stepfamilies
12  on issues of adoption.
13      Q.   What I'm looking at is, are there any
14  studies that you're aware of where in both samples,
15  the child is raised by the same 2 people
16  continuously, but in one, the 2 people are biological
17  mother and father, and in the other, one or both of
18  the people is not the biological mother and father.
19      A.   Well, I think the answer is yes.
20          But the problem means -- the problem is
21  what exactly is your definition of continuously.
22          Do you mean that the child who's not the

Page 265

1   biological offspring cannot have spent one day
2   outside the care of these parents?
3           Or what would be your definition of
4   continuous?
5       Q.   Well, I'm trying to distinguish it from,
6   say, a step situation where a child may have 2
7   biological parents until they're 10 years old and
8   then the mother gets div- -- the parents get divorced
9   and the mother marries another --
10      A.   There are --
11      Q.   -- person.
12      A.   -- many studies that compare those 2
13  -- (indiscernible).
14      Q.   Okay.  I'm talking about where the family
15  unit is -- and I've seen this in the literature --
16  intact throughout the child's dependent years, so
17  same father, same mother, or same 2 parents, but
18  there is no biological connection between one or both
19  of the parents and the child.
20          Has there been any comparison --
21      A.   The closest thing --
22      Q.   -- in that situation?

Alderson Reporting Company
1-800-FOR-DEPO

David George Blankenhorn III
Washington, DC
November 3, 2009

Page 266

1    A.   -- we have would be those studies that
2    compare the 2 married biological parents -- for the
3    sake of shorthand, perhaps we can at all it intact.
4         Would that be okay?
5    Q.   Sure.
6    A.   And then compare children who have been
7    adopted at very early ages -- let's say in infancy --
8    by 2 married parents.  There have been such studies.
9    Q.   And have they shown there to be difference
10   in outcomes for the children who are biologically
11   connected to both parents versus those who are not?
12   A.   My view of the weight of evidence on this
13   is that there -- yes.
14        The studies are not completely uniform.
15   There's some diversity in -- in the field, and it's a
16   little bit of an embryonic field of research, but my
17   reading of the evidence is that the weight of
18   evidence suggests that there are differences between
19   those 2 groups in terms of child outcomes.
20        And I am for example directing a study now
21   that looks at exactly this question.  And the
22   research will be published in the next year or so,

Page 267

1    and the preliminary data do suggest the differences
2    that I've described.
3         The differences -- well, that's the
4    answer.
5    Q.   What -- give for me the names or authors
6    of published studies that have compared 2 intact
7    families, one where there's a biological connection
8    between both parents and the child and one where one
9    or both of parents is not biologically connected to
10   the child.
11   A.   Well, there is -- there is a body of
12   literature on -- on this issue, and I would have to
13   go back and refresh my -- I would have to go back and
14   pull together the -- what I consider to be the best
15   or most representative studies for you.  I'd be happy
16   to do that.
17   Q.   But you can't as you sit here even name
18   one study that has compared those 2 family
19   situations?
20   A.   I'm telling you with confidence that such
21   studies exist, that I've over the 20-year period that
22   I've been looking at this broad cluster of questions,

Page 268

1    I've tried to familiarize myself with these studies.
2    And I'm aware of the general weight of evidence in
3    them.
4         If you want me right now without any
5    ability to refer to anything to give you specific
6    titles of articles and authors and years of
7    publication, my answer is that I would be happy to do
8    that, but I can't do it right now on this moment
9    without any ability to confirm anything.
10   Q.   And you don't include any of those studies
11   on your list of materials considered, do you?
12   A.   Well, I don't think I discuss this
13   particular issue in my paper.
14   Q.   Well, you've -- you've discussed what you
15   describe as the need of a child to be raised by the 2
16   parents who created the child.
17        Right?
18   A.   I do discuss that, yes.
19   Q.   Okay.  And you have cited to several
20   studies that address this child welfare issue and
21   that use the word biological when talking about the
22   parents.

Page 269

1         Correct?
2    A.   That's correct.
3    Q.   Okay.  But you don't to support your
4    positions cite to any of the studies that you say
5    have actually compared an intact family where both
6    parents are biologically the creators of the child --
7    A.   -- (indiscernible) -- I --
8    Q.   -- and an intact family where one or both
9    of them is not/adopt (phonetic).
10        Correct?
11   A.   Well, I am reasonably confident that a
12   number of these sources that I'm citing here discuss
13   this issue.
14        For example --
15   Q.   Like?
16   A.   -- I'm reasonably confident that David
17   Popenoe in his article discusses it.  I'm fairly
18   certain that McLanahan and Sandefur discuss it.  I'm
19   reasonably confident that Amato discusses it.
20        As I said, in the Child Trends study, I
21   just don't know how they're looked -- I don't know if
22   they broke out the adoptive category in the way that

Page 270

1  you're suggesting that would have been useful, and I
2  agree with you.
3      Q.  Well, let me ask you this.
4          In --
5      A.  But it's not an unusual question.  It's
6  common among scholars, and there have been -- there
7  have been efforts to answer it.  I think in -- I'm
8  reasonably sure, including by the specific people
9  that I'm citing there.
10     Q.  Do you know whether any of the sources
11 that you quote from in paragraph 37 broke out
12 adoptive families from the biological group?
13     A.  It's common in the scholarship to do that.
14     Q.  Okay.  But do you have any actual support
15 for the premise that any of them did that?
16     A.  As I just stated, I would have to go back
17 and read the -- I would have to go back and re-read
18 the document specifically for this question of how
19 they treated the question of adoptive children, but
20 as a general rule, I can say to you with quite a
21 level of confidence that it is frequently done, and I
22 can also report to you that the general finding is

Page 271

1  that the outcomes are not identical and that those
2  children raised in adoptive homes suffer from
3  somewhat poor outcomes on some important variables
4  than do those children raised in biological intact
5  married couple homes.
6          This is a -- this is a finding in the
7  field.  And it's not -- it's not -- because of the --
8  because of the -- because of the closeness of the
9  differential, it's not true that every study finds
10 this, because remember -- recall, then, the
11 discussion of adoption.
12         Adoption is the family form that most
13 rigorously seeks to mimic the married couple form.
14 And so it would be natural to assume that the best
15 outcomes for children in the -- if I may use a
16 shorthand, nontraditional, would be in adoption.
17     Q.  But wouldn't --
18     A.  And that is in fact true.
19     Q.  Wouldn't a same-sex couple that married if
20 it were permitted to do so, quote, unquote, mimic
21 this -- as you use that word -- the traditional
22 marriage form?

Page 272

1      A.  No.
2      Q.  Only because of the gender -- excuse me --
3  the sex of the participants?
4      A.  Yes.
5      Q.  Okay.
6      A.  And for what that difference -- for what
7  that difference means to marriage's central purpose,
8  which is to unite the male and female in a pair bond
9  that is child rearing in nature.
10         So, yes, the fact that -- the fact of the
11 man marrying the woman -- I mean, the man marrying
12 the man or a woman marrying a woman would constitute
13 a very seismic and radical negation of this
14 fundamental principle of marriage historically as a
15 human institution.  That's not a nontrivial
16 difference.
17     Q.  Okay.  Are you aware of studies showing
18 that children raised from birth by a gay or lesbian
19 couple, have worse outcomes than children raised from
20 birth by 2 biological difference-sex parents?
21     A.  No.
22     Q.  Okay.  Let's take a look at the Amato

Page 273

1  article that you mentioned.
2              (Blankenhorn Exhibit No. 6
3               was marked for
4               identification.)
5      BY MR. DUSSEAULT:
6      Q.  Now, the portion of the Amato article that
7  you quote refers to in the first couple of lines to
8  continuously married parents, and then at the end
9  says:  The distinction is even stronger if we focus
10 on children growing up with 2 happily married
11 biological parents.
12         Do you see that?
13     A.  M-hm, yes.
14     Q.  Do you know whether Amato in his work
15 wrote adoptive families out from the biological
16 group?
17     A.  Right now, I do not.
18     Q.  Turn if you would to page 96.  It has a 96
19 on the bottom.
20     A.  Yes.
21     Q.  Do you see footnote 63?
22     A.  Yes.