Pages 1 - 120

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

| | |
|---|---|
| KRISTIN M. PERRY,<br>SANDRA B. STIER, PAUL T. KATAMI,<br>and JEFFREY J. ZARRILLO,<br><br>          Plaintiffs,<br><br>VS.<br><br>ARNOLD SCHWARZENEGGER, in his<br>official capacity as Governor of<br>California; EDMUND G. BROWN, JR.,<br>in his official capacity as<br>Attorney General of California;<br>MARK B. HORTON, in his official<br>capacity as Director of the<br>California Department of Public<br>Health and State Registrar of<br>Vital Statistics; LINETTE SCOTT,<br>in her official capacity as Deputy<br>Director of Health Information &<br>Strategic Planning for the<br>California Department of Public<br>Health; PATRICK O'CONNELL, in his<br>official capacity as<br>Clerk-Recorder for the County of<br>Alameda; and DEAN C. LOGAN, in his<br>official capacity as<br>Registrar-Recorder/County Clerk<br>for the County of Los Angeles,<br><br>          Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) NO. C 09-2292-VRW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) San Francisco, California<br>) Wednesday<br>) December 16, 2009<br>) 10:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                        *Official Reporter - U.S. District Court*

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiffs:** | GIBSON, DUNN & CRUTCHER LLP |
| | 1050 Connecticut Avenue, N.W. |
| | Washington, D.C. 20036-5306 |
| BY: | **THEODORE B. OLSON, ESQUIRE** |
| | **MATTHEW D. MCGILL, ESQUIRE** |
| | |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 333 South Grand Avenue |
| | Los Angeles, California  90071-3197 |
| BY: | **THEODORE J. BOUTROUS, JR., ESQUIRE** |
| | **CHRISTOPHER D. DUSSEAULT, ESQUIRE** |
| | |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 333 Main Street |
| | Armonk, New York 10504 |
| BY: | **DAVID BOIES, ESQUIRE** |
| | |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 575 Lexington Avenue, 7th Floor |
| | New York, New York  10022 |
| BY: | **JOSHUA I. SCHILLER, ESQUIRE** |
| | |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 1999 Harrison Street, Suite 900 |
| | Oakland, California  94612 |
| BY: | **JEREMY MICHAEL GOLDMAN, ESQUIRE** |
| | |
| **For Plaintiff-Intervenor:** | CITY AND COUNTY OF SAN FRANCISCO |
| | OFFICE OF THE CITY ATTORNEY |
| | One Drive Carlton B. Goodlett Place |
| | San Francisco, California 94102-4682 |
| BY: | **THERESE STEWART, DEPUTY CITY ATTORNEY** |
| | **DANNY CHOU, DEPUTY CITY ATTORNEY** |
| | |
| **For Defendant Gov. Schwarzenegger:** | MENNEMEIER, GLASSMAN & STROUD |
| | 980 9th Street, Suite 1700 |
| | Sacramento, California  95814-2736 |
| BY: | **ANDREW WALTER STROUD, ESQUIRE** |
| | |
| **For Defendant Edmund G. Brown Jr.:** | STATE ATTORNEY GENERAL'S OFFICE |
| | 455 Golden Gate Avenue, Suite 11000 |
| | San Francisco, California  94102-7004 |
| BY: | **TAMAR PACHTER, DEPUTY ATTORNEY GENERAL** |

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Defendant-**<br>**Intervenors:** | COOPER & KIRK<br>1523 New Hampshire Avenue, N.W.<br>Washington, D.C.  20036 |

                BY: **CHARLES J. COOPER, ESQUIRE**
                     **DAVID H. THOMPSON, ESQUIRE**
                     **HOWARD C. NIELSON, JR.,  ESQUIRE**
                     **JESSE PANUCCIO, ESQUIRE**

                     ALLIANCE DEFENSE FUND
                     15100 North 90th Street
                     Scottsdale, Arizona 85260
                BY: **BRIAN W. RAUM, SENIOR COUNSEL**

**For Defendant**
**Dean C. Logan:**       OFFICE OF LOS ANGELES COUNTY COUNSEL
                     500 West Temple Street, Room 652
                     Los Angeles, California 90012
                BY: **JUDY WHITEHURST, DEPUTY COUNTY COUNSEL**

**For Defendant**
**Patrick O'Connell:**    OFFICE OF ALAMEDA COUNTY COUNSEL
                     1221 Oak Street, Suite 450
                     Oakland, California  94612
                BY: **CLAUDE F. KOLM, DEPUTY COUNTY COUNSEL**
                     **MANUEL MARTINEZ, DEPUTY COUNTY COUNSEL**

**For Proposed**
**Intervenor Imperial**  ADVOCATES FOR FAITH AND FREEDOM
**County, et al.:**     24910 Las Brisas Road, Suite 110
                     Murrieta, California  92562
                BY: **JENNIFER L. MONK, ESQUIRE**

```
 1                    P R O C E E D I N G S
 2   DECEMBER 16, 2009                              10:00 A.M.
 3
 4            THE CLERK:  Calling civil case 09-2292, Kristin
 5   Perry, et al. versus Arnold Schwarzenegger, et al.
 6            Can I get the appearances from the plaintiffs' side,
 7   please.
 8            MR. OLSON:  Good morning, Your Honor.
 9            Theodore B. Olson, Gibson, Dunn & Crutcher, on behalf
10   of the plaintiffs.
11            THE COURT:  Good morning, Mr. Olson.
12            MR. BOIES:  Good morning, Your Honor.
13            David Boies, Boise, Schiller & Flexner, also on
14   behalf of plaintiffs.
15            THE COURT:  Good morning, Mr. Boies.
16            MR. BOUTROUS:  Good morning, Your Honor.
17            Theodore Boutrous, also from Gibson, Dunn & Crutcher,
18   for plaintiffs.
19            THE COURT:  Good morning.
20            MR. DUSSEAULT:  Good morning, Your Honor.
21            Chris Dusseault, Gibson, Dunn & Crutcher, on behalf
22   of plaintiffs.
23            THE COURT:  Good morning.
24            MR. MCGILL:  Good morning, Your Honor.
25            Matthew McGill, Gibson, Dunn & Crutcher, for the
```

1  plaintiffs.

2          **THE COURT:**  Good morning.

3          **MR. GOLDMAN:**  Good morning, Your Honor.

4          Jeremy Goldman, Boies, Schiller & Flexner, for the

5  plaintiffs.

6          **THE COURT:**  Good morning, sir.

7          **MR. SCHILLER:**  Good morning, Your Honor.

8          Josh Schiller, from Boies, Schiller & Flexner, on

9  behalf of the plaintiffs.

10          **THE COURT:**  Good morning.

11          I am sure Mr. Boies will tell you to keep your voice

12  up when you are in the courtroom.

13          **MS. STEWART:**  Good morning, Your Honor.

14          Therese Stewart for the City and County of San

15  Francisco, plaintiff-intervenor.

16          **THE COURT:**  Good morning.

17          **MR. CHOU:**  Good morning, Your Honor.

18          Danny Chou for the City and County of San Francisco.

19          **THE COURT:**  Good morning.

20          **MR. COOPER:**  Good morning, Chief Judge Walker.

21          Charles Cooper, with Cooper & Kirk, for the

22  defendant-intervenors, known here, I think, as the proponents.

23          **THE COURT:**  Good morning.

24          **MR. THOMPSON:**  Good morning, Your Honor.

25          David Thompson, from Cooper & Kirk, for the

1   defendant-intervenors.

2      **THE COURT:**   Good morning.

3      **MR. NIELSON:**   Good morning, Chief Judge Walker.

4      Howard Nielson, of Cooper & Kirk, for the

5   defendant-intervenors.

6      **THE COURT:**   Good morning.

7      **MR. PANUCCIO:**   Good morning, Your Honor.

8      Jesse Panuccio, of Cooper & Kirk, for the

9   defendant-intervenors.

10      **THE COURT:**   Good morning.

11      **MR. RAUM:**   Good morning, Your Honor.

12      Brian Raum, Alliance Defense Fund,

13   defendant-intervenors.

14      **THE COURT:**   Good morning.

15      **MS. WHITEHURST:**   Good morning, Your Honor.

16      Judy Whitehurst, with the Los Angeles County

17   Counsel's Office, representing Dean C. Logan, Los Angeles

18   County Registrar-Recorder/County Clerk.

19      **THE COURT:**   Good morning.

20      **MR. KOLM:**   Good morning, Your Honor.

21      Claude Kolm, from the Alameda County Counsel's

22   Office, representing Patrick O'Connell, the Alameda County

23   Clerk Recorder.

24      **THE COURT:**   Good morning.

25      **MR. MARTINEZ:**   Good morning, Your Honor.

1          Manuel Martinez, also representing the County of

2    Alameda.

3          THE COURT:  Good morning.

4          MR. STROUD:  Good morning, Your Honor.

5          Andrew Stroud, Mennemeier, Glassman & Stroud, on

6    behalf of Governor Schwarzenegger and the Administration

7    defendants.

8          THE COURT:  Good morning.

9          MS. PACHTER:  Good morning, Your Honor.

10         Tamar Pachter on behalf of the Attorney General.

11         THE COURT:  Good morning.  Any others?

12         Well, welcome back to the District Court.  Delighted

13   to have you.

14         (Laughter)

15         THE COURT:  And we have an agenda of several items

16   that I want to discuss with you this morning, and I'm sure you

17   want to discuss with me.  And there may be some other things

18   that are not on my list.

19         And, in addition, I have some news that may be of

20   interest.  But, apart from the news which I'll relay to you in

21   a moment, as I understand it, the issues that we need to deal

22   with this morning are essentially three disputes or matters

23   that require resolution.

24         The first is the motion to intervene, filed by

25   Imperial County.  And, on that, my inclination is not to hear

1  the merits of that motion at this time because plaintiffs have

2  not had an opportunity to brief it.

3          But I think we can discuss and perhaps even resolve

4  the motion for an order shortening time to hear that motion,

5  and decide on what schedule that motion should proceed.

6          Then we have the motion to realign the Attorney

7  General.  And I believe that has been fully briefed, and we can

8  address it and resolve that matter.  And it would be helpful,

9  I'm sure, to resolve that before the trial.

10          Then we have some outstanding discovery disputes that

11 we can discuss, and motions in limine, and, finally, a trial

12 schedule.

13          So those are the matters that, as I see it, we should

14 and need to discuss today.

15          In addition, you should know that I have, just

16 moments ago, received a telephone call from the Ninth Circuit,

17 indicating that there has been a call for an en banc panel in

18 connection with the discovery matter which was decided by the

19 Ninth Circuit very recently.

20          My understanding from the Ninth Circuit is that you

21 will receive an order later today indicating that the matter --

22 at least there has been a call for an en banc, and a request

23 for expedited briefing.  And the Court is going to attempt

24 every effort to resolve the matter prior to the start of the

25 trial date in this case.

1          So the Court of Appeals did an excellent job of

2     expediting the matter, and hearing it and giving it full

3     consideration when it went up the first time.  And I understand

4     that the Court of Appeals is going to make a similar good

5     effort to move that issue along expeditiously.

6          So you'll know more about that later today.  And so I

7     guess it's fair to say that at least in one aspect of this

8     case, you're just touching down here today, and you're soon

9     going to be bouncing back to the Court of Appeals.

10         (Laughter)

11         **THE COURT:**  But we are going to make every effort to

12    bring you back here in time for our January 11 trial date.

13         Now, I've mentioned the things that I think need to

14    be resolved and I think we can accomplish this morning.  Are

15    there any things that I've overlooked?

16         First, from the plaintiffs and the

17    plaintiff-intervenors, any other items you'd like to add to the

18    agenda?  Mr. Olson?

19         **MR. OLSON:**  I think these are mostly in the nature of

20    trial issues and logistic or procedural things.

21         We had a reference earlier in these proceedings to

22    the possibility of televising the trial.  And I think that's

23    still an open item.  We expressed support for that, if it could

24    be done.  Our opponents were opposed.

25         And I don't know whether you wish to get into that or

 1  not, but I wanted to mention it.

 2          **THE COURT:**  I appreciate that.

 3          My understanding is that under current Ninth Circuit

 4  policy and rules -- and this is true of our local rules, as

 5  well -- that is not permitted; that is, dissemination of

 6  courtroom proceedings outside the courthouse is not permitted.

 7          However, two years ago the Ninth Circuit Judicial

 8  Conference voted for a pilot or experimental program to permit

 9  dissemination of District Court proceedings that are nonjury

10  proceedings in civil cases.

11          The Circuit Council has taken up the issue of whether

12  it wishes to implement that resolution that was adopted by the

13  Conference.

14          My understanding is that a proposal to implement that

15  is pending before the Judicial Council of the Ninth Circuit,

16  and may very well be enacted in the very near future.

17          And, if it is, then I think this is an issue that we

18  should probably discuss and decide whether we are going to do

19  it; if so, on what basis we're going to do it, and how we can

20  do it consistent with the needs of the case, and to do it in a

21  way that does not interfere in any way with the processing of

22  this case.

23          But, at the moment, I don't think we have a green

24  light for it.  And I'm inclined to wait to discuss this with

25  you after we get a green light, if in fact one comes through.

1           **MR. OLSON:**  That's perfectly acceptable, of course,

2    to us.  And we're happy to address it whenas and if it's an

3    appropriate time to do so.

4           **THE COURT:**  Very well.

5           The Ninth Circuit, of course, has had a good deal of

6    experience with this in appellate proceedings, and has

7    broadcast or permitted broadcasting of appellate proceedings in

8    quite a large number of cases.

9           That, of course, is somewhat different than a

10   District Court proceeding, in that those proceedings last an

11   hour, two hours, three hours at most.

12          Three hours won't do very much for us here in this

13   proceeding, so --

14          **MR. OLSON:**  Well, we have a great deal to say about

15   it when it's appropriate and an a propitious time for us to do

16   so.  I won't attempt to get into our point of view on it at

17   this time, then.

18          **THE COURT:**  That's fine.  I think it's probably

19   something we should discuss, if it is possible.

20          There certainly has been a good deal of interest in

21   the case.  And it would appear to fit the formula that the

22   Ninth Circuit Judicial Conference contemplated in 2007, when it

23   adopted that resolution that I referred to.

24          **MR. OLSON:**  One or two other items --

25          **THE COURT:**  Certainly.

1          **MR. OLSON:**  -- such as that.

2          We have been approached by a party interested in

3    filing an amicus brief.  I don't know if we'll be approached

4    again or not about that.  And I thought I'd ask whether the

5    Court would entertain the filing of amicus briefs, and if and

6    when the Court would want them, if you would entertain that.

7          **THE COURT:**  Well, is there anything wrong with at

8    least entertaining applications to file amici?

9          **MR. OLSON:**  I think not.  I mean, there is a

10   widespread interest in this case for the reasons we all know.

11         Different parties who are not entities, or

12   individuals who are not parties to the case have an interest in

13   the outcome and a point of view, I'm sure, on both sides.

14         And I think that it may be -- add an additional

15   burden to your responsibilities, but I -- from our point of

16   view, the points of view and attitudes and information are

17   probably something that should be welcome in this case.

18         They would certainly be filed in an appellate phase

19   of this case, in any event.  Now, but -- but I just wanted to

20   raise that with you.

21         And I would guess you would want those at some point

22   before the beginning of the trial, or certainly before the end

23   of trial, so that it will not delay the deliberation that has

24   to take place once the trial takes place.

25         **THE COURT:**  Well, I can certainly see someone or some

1   entity that has an interest in these matters wanting to state

2   its position both before trial but also observing the

3   proceedings and perhaps adding something that they or it feels

4   has not been adequately developed by the parties, and wishing

5   to apply for amicus participation after the trial, in the

6   post-trial briefing.  So I have an open mind with respect to

7   this.

8          I believe, at the time that I heard the motion by the

9   group that wanted to intervene on behalf of the defendants, the

10  proponents, the name of which escapes me, Ms. --

11          **MR. OLSON:**  It happened so long ago, Your Honor.

12          **THE COURT:**  In any event, I'm sure you all recall.

13          (Laughter)

14          **THE COURT:**  I think I said -- the record may prove me

15  wrong, but I think I said that I would certainly contemplate an

16  amicus brief from that party.

17          **MR. OLSON:**  The same dialogue occurred with respect

18  to the parties that sought to intervene on the side of the

19  plaintiffs.  And you denied that motion.  But we did discuss

20  the possibility that those views could be expressed in amicus

21  briefs.

22          **THE COURT:**  Okay.  That's a clue, isn't it, as to who

23  the party is?

24          (Laughter)

25          **THE COURT:**  All right.  Well, I have an open mind

1   with respect to that.  I will certainly entertain amici

2   applications.

3          Well, before saying that, you've indicated from the

4   plaintiffs' point of view that you would welcome amicus

5   participation.

6          Mr. Cooper, what's your view?  I realize that there

7   may be some additional burden on the parties if we have a

8   flurry of amici come into the case.

9          **MR. COOPER:**  I think you're raising a very good

10  point, and the thought was occurring to me as well, Your Honor,

11  that if the Court basically opened itself to amicus

12  participation, you might see replicated here what we saw in

13  some of the other cases in this state, the marriage cases in

14  particular, where the Court was literally inundated with amicus

15  briefs and views.

16         In a normal circumstance, that -- that would be --

17  that would be not objectionable.  But I have to say I have

18  concerns about the kinds of demands that would place upon our

19  side of the case and, I think, all sides of the case.

20         Perhaps the Court would entertain the possibility.

21  But apart from that consideration -- and, normally, in this

22  circumstance we would welcome amicus help on my side and would

23  certainly not object to it on Mr. Olson's side.

24         With that consideration, perhaps there's a way to

25  limit, for the Court's own burdens as well as the parties', the

1  amicus participation.

2          I don't know -- I don't have an idea on how that

3  might be effectuated, but I don't -- by the same token, if the

4  Court ends up effectively welcoming amici, it may well inundate

5  the Court.

6          **THE COURT:**  Perhaps a way to deal with this would be

7  to set a deadline, as part of the case management order, that

8  any amici who wish to file briefs, memoranda, prior to trial

9  must do so by a date certain.  And that, at least, would flush

10 out any folks who have been observing the proceedings and wish

11 to submit an amicus brief prior to trial.

12         Is that a sensible way to proceed?

13         **MR. OLSON:**  I believe it is, Your Honor.

14         And with respect to -- because the pretrial

15 conference filings have been so thorough in terms of

16 identifying the witnesses, identifying factual contentions and

17 exhibits, and the whole works, the -- there's been a very

18 substantial preview of the trial available to parties who feel

19 that something else needs to be said.

20         So I think that's a reasonable way to do it.  Then

21 someone else can come along and make some motion with -- if

22 there's good cause later on, I suppose.  I mean, that would be

23 up to you.

24         **THE COURT:**  How does that sound to you, Mr. Cooper?

25         **MR. COOPER:**  Well, Your Honor, I think I would make a

1  friendly amendment to that, because it does seem to me that

2  receiving amicus briefs after the trial and in connection with

3  any post-trial filings the Court may want -- I'm sure that's

4  one of the trial practice issues we're likely to raise and

5  discuss here now, but, to my mind, that might make more sense.

6          I frankly --

7          **THE COURT:**  Make more sense to do what?

8          **MR. COOPER:**  It might make more sense to open --

9  consider the possibility of amicus filings after the trial.

10         **THE COURT:**  After the trial, rather than before?

11         **MR. COOPER:**  Rather than before.

12         I frankly don't want to, honestly, have to cope with

13 an avalanche of amicus filings as we are preparing to make our

14 presentations to the Court.

15         **THE COURT:**  It's hard for me to believe, given the

16 extensive work that's gone into this, that there's a stone left

17 unturned.

18         (Laughter)

19         **MR. COOPER:**  I'm sure there are, Your Honor.  I'm

20 sure there are.

21         **MR. OLSON:**  If there are any, I think we would be

22 perfectly fine with what Mr. Cooper suggested.

23         If there are unturned stones, it might be nice to

24 know about them before the trial, in case, you know, it might

25 affect either side's strategy with respect to covering

1   something in a question to a witness or something like that.

2           But I don't want to make this too much of a

3   back-and-forth thing.  I just wanted to raise it because there

4   are interested groups or citizens who wish to have some sort of

5   input, I'm confident, and so it needs to be resolved in some

6   fashion.

7           **THE COURT:**  What if we set a deadline for

8   applications to participate as amici pretrial, with a 15-page

9   limitation and the understanding that the participation would

10  have to be based upon a showing of a particular interest in the

11  case that is not otherwise being represented, to avoid an

12  amicus brief that simply says amen to one side or the other?

13          And then leave open the possibility, after the

14  conclusion of trial, that if a party believes that there is

15  some issue that has not been adequately addressed in the trial,

16  that party can apply for an amicus participation?

17          Does that help assuage your concern, Mr. Cooper?

18          **MR. COOPER:**  Your Honor, that seems like a very

19  sensible approach to me.

20          **THE COURT:**  All right.

21          **MR. OLSON:**  We are all in favor of page limitations,

22  Your Honor.

23          (Laughter)

24          **THE COURT:**  Now, let's see, you had another --

25          **MR. OLSON:**  These are just housekeeping, and you may

1  have gotten to these later on, but our plaintiffs, our four

2  plaintiffs, have jobs.  And we were hoping that it would be

3  understandable and permissible for them not necessarily to be

4  here every day during the trial, because of those commitments;

5  not because they are not interested, but because they do have

6  responsibilities to their families.

7         **THE COURT:**  That will be fine.

8         **MR. OLSON:**  And we wanted to raise a question about

9  seating in the courtroom.  Because of --

10         **THE COURT:**  Because of what?

11         **MR. OLSON:**  Seating in the courtroom.

12         We were wondering whether it might be possible, and

13  we've discussed this with Mr. Cooper's team, to set aside the

14  first two rows in the courtroom, on either side, for the

15  parties and relations of the parties and participants in our

16  collective teams, so that we would have the availability of

17  getting them in here.

18         That's a very minor -- that's a housekeeping thing,

19  but it may be important when we --

20         **THE COURT:**  Well, it is important.

21         And I have been dealing with our excellent staff here

22  on the court, which has had a fair amount of experience,

23  recently, with cases in which there's been widespread interest

24  and the courtrooms are not large enough to accommodate all who

25  are interested in participating.

1          And Joan Anyon, of the court's Clerk's Office, has

2    worked out a procedure which limits the number of observers in

3    the courtroom itself.

4          We are arranging for transmission to the overflow

5    courtrooms -- I think you know that -- so that spectators and

6    media people, as well, could either get a pass to come to the

7    courtroom itself or to the overflow courtroom and observe the

8    proceedings.

9          So there will be a limitation on the number of

10   spectators in the courtroom itself, with adequate space for

11   spectators who cannot get into the courtroom to observe the

12   proceedings in the overflow courtroom.

13         And I would suggest that you let us know how many

14   spaces you need for your teams here in the courtroom.  And if

15   you need the first two rows, that's what you'll have.

16         **MR. OLSON:**  Thank you, Your Honor.

17         I think there were a couple of other items that

18   Mr. Cooper's team has raised.  But the points that were going

19   to be housekeeping-type things, I'll let them mention those

20   items because we've discussed those.

21         With respect to the open items that you mentioned

22   that you will come back to, with respect to the open -- the

23   discovery issues, I'd like my partner, Ted Boutrous, to address

24   those, with the Court's permission.

25         **THE COURT:**  Certainly.

```
 1           MR. OLSON:  And with respect to the in limine motions
 2   having to do with expert witnesses, Mr. Boies would be in a
 3   position to address that, also with the Court's permission.
 4           THE COURT:  That will be fine.
 5           MR. OLSON:  Thank you, Your Honor.
 6           THE COURT:  All right.  Mr. Cooper.
 7           MR. COOPER:  Thank you again, Your Honor.
 8           We do have, as Mr. Olson suggested, a number of other
 9   kind of trial-practice issues that we have been treating with
10   our friends for the plaintiffs on.  And my colleague, David
11   Thompson, has been in that dialogue.  And with the Court's
12   permission, I would like him to address those issues to the
13   Court.
14           Also, with respect to the motions in limine,
15   Mr. Nielson, if the Court will permit, would like to address
16   our side of those issues.
17           THE COURT:  That would be fine.
18           MR. COOPER:  And with respect to the discovery
19   disputes that we still seem to have, sadly, Mr. Panuccio, will
20   address the Court, with the Court's permission.
21           I should say, in light of the news that the Court
22   has -- has brought to the parties, that obviously will have a
23   direct bearing on, I suspect, the discovery issues that still
24   divide us.  And I'm not sure the extent to which we can resolve
25   those in light of that, but, in any event --
```

1          **THE COURT:**  Well, I fully understand.  But I think

2    it's imperative that we do our best to resolve all that we can

3    resolve, and work together to move things along so that when we

4    receive any additional guidance from the Court of Appeals,

5    we're in a position to implement that guidance.

6          **MR. COOPER:**  Certainly.

7          **THE COURT:**  All right.  Then shall we turn to the

8    order for an application -- or an application for order

9    shortening time by Imperial County, to hear their motion to

10   intervene?

11         **MR. COOPER:**  Your Honor, we are aware of the motion.

12   We support the motion.

13         The counsel who represents Imperial County, I was

14   informed before the Court took the bench that he's on his way

15   here now.

16         **THE COURT:**  Ah, well, maybe --

17         **MR. COOPER:**  And if we could put that to the end of

18   the list, I think it makes sense.

19         **THE COURT:**  That will be fine.

20         If counsel is on his way, then let's move to the

21   second item that I would like to discuss with you this morning,

22   and that is the motion to realign the Attorney General.

23         **MR. COOPER:**  Thank you, Your Honor.  And I will

24   address the Court on that issue.

25         Your Honor, I don't really have much to say beyond

1  our briefing on the issue.  Our position is straightforward,

2  and it can be stated quite succinctly.

3        Attorney General Brown has made clear in this case

4  that he is a de facto plaintiff.  He is adverse to the

5  defendants in every significant respect, and allied with the

6  plaintiffs in every significant respect.

7        In his filings before the Court, the Attorney

8  General's Office has openly endorsed the plaintiffs' equal

9  protection and due process claims, has made clear his belief

10  that Proposition 8 is unconstitutional under those provisions.

11        He has admitted the material allegations of the

12  complaint in his answers to the -- to both complaints.

13        He has provided admissions, Your Honor, to the

14  overwhelming 64 of 68 requests for admissions proposed by the

15  plaintiffs to the State; that is, to the Attorney General's

16  Office.  And the plaintiffs, of course, have cited those as

17  binding, binding on the State.  A proposition, of course, we

18  disagree with.

19        **THE COURT:**  But he is the chief law enforcement

20  officer of the state.

21        **MR. COOPER:**  Yes, Your Honor.

22        **THE COURT:**  And my understanding from his papers is

23  that he is implementing Proposition 8 as interpreted by the

24  California Supreme Court.

25        That is to say, he is doing what the Attorney General

1   would do to prevent the issuance of marriage licenses to

2   same-sex couples, and presumably he will comply with whatever

3   directive results in the final judgment from this Court.

4           So isn't he required to be on the defense side, in

5   that he would implement whatever judgment is entered in this

6   case?

7           **MR. COOPER:**  Well, Your Honor --

8           **THE COURT:**  And how can he do so if he's the

9   plaintiff?

10          **MR. COOPER:**  Your Honor, he's implementing

11  Proposition 8, we would submit, because he has no choice but to

12  do so.  It is the constitutional rule in this state.  It has

13  been upheld against state constitutional challenge by the

14  California Supreme Court.

15          And we certainly resist the notion that the Attorney

16  General could somehow unilaterally effectively repeal

17  Proposition 8, by virtue of his power as a chief legal officer

18  of the State.

19          The implementation -- and the plaintiffs have taken

20  care to name county clerks and counties who are the ones who

21  really actually implement the marriage-licensing process.

22          The question here is, he is the State's legal

23  representative.  And our submission is that -- is that his role

24  in this courtroom is as an advocate.  And he is an advocate for

25  the plaintiffs' side.

1        **THE COURT:**  How is that different from a situation in

2  which a party is sued and admits the allegations in the

3  complaint, and essentially accepts judgment on that basis?

4        That's -- that doesn't convert that individual from a

5  defendant to a plaintiff.  He's still a defendant.

6        **MR. COOPER:**  Your Honor, the -- the cases that we

7  have cited to you, we read them to say that a defendant -- and

8  including a government -- a government official defendant, has

9  to be -- his position within the case has to be tested based

10  upon his position on the primary and controlling matter in

11  dispute.

12        And there is no question here that -- and this, in

13  fact, is, we think, a -- a support for our position.  There's

14  no question here that there will remain a dispute,

15  notwithstanding the fact that the Attorney General is

16  realigned.

17        We think the Court should follow, for example, the

18  Larios case, which we have cited to the Court, in which a suit

19  was brought by plaintiffs challenging a redistricting plan.

20        And one of the defendant governmental officials there

21  was, as the Attorney General is here, thoroughly aligned with

22  the plaintiffs' side.  And the Court, in the light of that

23  fact, concluded that that government official should be

24  realigned to the plaintiffs' side.

25        There's another case, the Delchamps case, from a

1  District Court in Alabama, where the Attorney General of

2  Alabama also took the position supporting the plaintiffs in

3  that case.

4       **THE COURT:**  This was the Republican senators in

5  Alabama case?

6       **MR. COOPER:**  That's the Larios case, I believe, Your

7  Honor, the Georgia --

8       **THE COURT:**  The Georgia.  I'm sorry.

9       **MR. COOPER:**  The Delchamps case involved the Alabama

10  Attorney General.

11       And, to be sure, as the plaintiffs have noted and the

12  Attorney General has noted, in that case, the Attorney General

13  wanted to be realigned.  But the motion to realign was opposed,

14  and the judge had to decide whether or not, according to the

15  applicable standards, that was the appropriate approach.

16       And the applicable standard was:  What was the

17  officer's primary -- position on the primary and controlling

18  matter in dispute?

19       **THE COURT:**  Let me ask a couple of other questions.

20       One, isn't this realignment procedure usually

21  reserved for one of two situations?

22       One is a jurisdictional situation, where it's

23  necessary either to maintain or defeat diversity.

24       And, secondly, in the patent context, where a party

25  is seeking declaratory relief but in fact is claiming or

1  denying infringement, we do realign parties with some

2  regularity.

3          **MR. COOPER:**  Sure.

4          **THE COURT:**  But isn't that the usual situation for

5  realignment?

6          **MR. COOPER:**  Your Honor, certainly, the

7  jurisdictional context represents the most pressing situation

8  for realignment, where jurisdictional issues may hinge on the

9  issue.  We don't --

10         **THE COURT:**  But that's not present here, is it?

11         **MR. COOPER:**  No, no, Your Honor, it's not.

12         But we haven't found any authority for the

13  proposition that that is the only occasion on which realignment

14  is proper.

15         In fact, Your Honor, we think the authority is to the

16  contrary of that; that it is, even in a rising under case, as

17  opposed to a diversity case or a case where the issue has

18  direct jurisdictional implications, it is not just appropriate

19  but it's essentially the Court's responsibility to align the

20  parties in accordance with their -- their genuine positions.

21         **THE COURT:**  How -- I'm sorry.  Go ahead.

22         **MR. COOPER:**  Not at all, Your Honor.  Please.

23         **THE COURT:**  Well, how are your clients prejudiced by

24  the Attorney General being aligned as a defendant as opposed to

25  a plaintiff?

1          **MR. COOPER:**  Your Honor, I walked through, in my

2     opening, the ways in which the Attorney General has effectively

3     given aid and comfort to the case being advanced here by the

4     plaintiffs.

5          It seems to me obvious why we want the Attorney

6     General to be made a plaintiff.  What I think is not at all

7     obvious is why the plaintiffs don't want the Attorney General

8     to be a plaintiff.

9          Normally, you would -- you would welcome the State's

10    chief legal officer to your side of the case.  He is more

11    useful to the plaintiffs on the defendants' side of the case,

12    offering positions that can then be advanced as binding

13    positions on the State itself.

14         So it's easy to understand why this wolf in sheep's

15    clothing is not something I want over on my side of the case.

16    The real tough question is why -- and I think it's obvious on

17    both sides, frankly --

18         **THE COURT:**  An unfair, kind of an unkind cut to

19    suggest that the Attorney General is in sheep's clothing?

20         (Laughter)

21         **MR. COOPER:**  You put me in mind of Justice Scalia's

22    quote, "Yes, this wolf comes as a wolf."

23         **THE COURT:**  Well, we certainly face this kind of

24    situation in criminal cases, from time to time, where there are

25    multiple defendants, and one defendant is cooperating to one

1    degree or the other with the prosecution.  There are all kinds

2    of issues that come up in that context.  But that doesn't

3    result in a realignment of a cooperating defendant into the

4    prosecution side.

5           And the Attorney General does have constitutional

6    responsibilities which he is duty-bound to fulfill.

7           What is so special about this situation that perhaps

8    different points of view, different interests on the

9    defendants' side, necessarily requires that we take a defendant

10   and put him on the other side of the courtroom?

11          **MR. COOPER:**  Your Honor, it's -- I think it's an

12   extraordinary situation that is before you on this.

13          It's an extraordinary situation where the State's

14   chief legal officer not only is agnostic, as the Governor is,

15   on the legal issues relating to a constitutional challenge to a

16   constitutional provision duly and properly enacted by the

17   people at large, but, in fact, not only refuses to defend it,

18   and leaves that responsibility to others, but goes beyond that

19   and is heard to say in the court, "I oppose this.  I endorse

20   the plaintiffs' side of the case.  I agree with the plaintiffs'

21   allegations.  The admissions they have asked me as the chief

22   legal officer of the State to make, that aid their case, I

23   readily provide.  The opposition to the summary judgment motion

24   put in by those who have stepped forward to defend the

25   constitutionality of the provision, I endorse and I embrace."

1   And, apparently, on a review that took place while the

2   opposition that the plaintiffs filed was in its draft form.

3          The relationship between the plaintiffs and the

4   Attorney General is one of alliance.  And this brings us to our

5   request that it be one of alliance formally, and not just

6   de facto.

7          **THE COURT:**  Fair enough.

8          Does the Attorney General wish to be heard?  Or

9   perhaps I should ask before, does anyone wish to weigh in on

10  the side of realignment?

11         All right.  Let me hear from the Attorney General.

12         **MS. PACHTER:**  Good morning, Your Honor.

13         **THE COURT:**  So you are wearing sheep's clothing.

14         **MS. PACHTER:**  I have to admit, Your Honor, the motion

15  was fascinating to research.  It never occurred to me that

16  outside the jurisdictional or patent context that this would

17  come up.

18         And Your Honor has been very practical in the conduct

19  of this case so far, so I guess what I'd like to do in my

20  comments is limit myself to practical issues.

21         Since Mr. Cooper first and formally raised this with

22  one of my colleagues following a hearing, I tried to talk to

23  him about, What are the practical issues that you're trying to

24  address?

25         And based on the reply brief, it seems to me that the

1  practical issues that the defendant-intervenors are trying to

2  address are the admissions, and whether those admissions will

3  be conclusive against them in the case.

4         And what I said to Mr. Cooper and what I believe is

5  true now is, those admissions are before Your Honor as every

6  other piece of evidence will be in this case; and it is really

7  a question of weight, and what weight you will give to those

8  admissions in considering all the evidence that is before you

9  in this case.

10        And, otherwise, I really don't think there is any

11 reason to realign the Attorney General in this case.  I think

12 we fully briefed the circumstances under which that would be a

13 reasonable thing to do.

14        I think Mr. Cooper's argument would be a lot more

15 compelling if the Attorney General had participated in any way

16 in the depositions in this case in any really active way.  But

17 that just hasn't been the case.  And there's no legal grounds

18 for it.

19        **THE COURT:**  Well, it's certainly true, isn't it, that

20 the Attorney General would like to see the plaintiffs prevail?

21 So why doesn't that make him in league with the plaintiffs?

22        **MS. PACHTER:**  Well, while I agree, Your Honor, it is

23 unusual, there are many cases, several of which we cited to you

24 in the briefs, in which the chief law officer -- sometimes it

25 is on the federal level -- agrees with the principal

1   contentions of the plaintiffs' case; and those courts never

2   consider realignment, not unless the chief law officer actually

3   seeks to be realigned in the case.

4           And, presumably, that's for the purpose of pursuing a

5   case, of advancing a case.  And that's not the position of the

6   Attorney General here.

7           **THE COURT:**  Well, if the Attorney General is taking

8   the position that Proposition 8 is unconstitutional, doesn't

9   that, if not formally, at least as a practical matter, since

10  you put things in practical terms, if not undermine, at least

11  it harms the proponents' position?

12          Doesn't it make their task in defending Proposition 8

13  all the more difficult?

14          **MS. PACHTER:**  It certainly does, but that will not be

15  addressed by moving the Attorney General to the plaintiffs'

16  side.

17          Wherever he sits, the Attorney General is the chief

18  law officer of the State, and will be a problem for the

19  defendant-intervenors.  But realigning the Attorney General is

20  not going to solve that problem.

21          **THE COURT:**  All right.  Anything else?

22          **MS. PACHTER:**  That's it.  Thank you, Your Honor.

23          **THE COURT:**  All right.  Mr. Olson.

24          **MR. OLSON:**  The Attorney General is being sued in his

25  official capacity.  We may have a different Attorney General

1   three months from now, if the incumbent Attorney General

2   decides to run for a different office.  Just a wild

3   hypothetical speculation.

4            (Laughter)

5            **MR. OLSON:**  But my point is that this is an action

6   against the Attorney General as an officer of the State of

7   California, not against an individual person.

8            The Attorney General is enforcing the law.  A

9   judgment is being sought against the Attorney General, against

10  the State of California, in that forum, which would result, if

11  we're successful, in an injunction.

12           The plaintiffs are suing --

13           **THE COURT:**  Well, how are the plaintiffs hurt if the

14  Attorney General is realigned?

15           Let's assume that you prevail here.  You would still

16  have a judgment that would be binding on the State of

17  California; would you not?

18           **MR. OLSON:**  Well, it's a little confusing as to

19  whether or not a plaintiff bringing a case is going to get a

20  judgment against another plaintiff in the case.

21           How would we be affected if the Court decides -- if a

22  court decides to start putting other people in the position of

23  the plaintiffs at this table, who can call witnesses and

24  conduct the trial?  It's the same thing we talked about with

25  respect to the intervention.

1        The proper place for the State of California in this

2 case is as a defendant.

3        Now, what Mr. Cooper doesn't like is that the

4 Attorney General has made some admissions in the best tradition

5 of law enforcement officials.

6        The government wins its case when justice is done.

7 And so the Attorney General, in the tradition, the honorable

8 tradition, having come to the conclusion that a law of the

9 State of California is unconstitutional, has courageously, I

10 suppose, said so.  That does not make that Attorney General

11 into a plaintiff.

12        The Attorney General is continuing to enforce the

13 law, and a judgment is sought against him to prevent him from

14 enforcing the law.  That is the right position for a defendant

15 in this case, as chief law enforcement official.

16        As you pointed out, if a plaintiff -- if a defendant

17 in a tort case or in a contract case admits liability, that

18 does not make the defendant a plaintiff.  It makes that

19 defendant an honest defendant.

20        (Laughter)

21      **MR. OLSON:**  And he may concede facts that are

22 frustrating to other codefendants, and so forth, but it doesn't

23 require an realignment of the party.

24        The government, from time to time, confesses error,

25 as it should, when it is wrong or when it believes it is wrong.

1  And that's all that's happened here.

2       I can understand Mr. Cooper's frustration that a law

3  enforcement official says that, Well, this statute that we

4  passed, I think, is unconstitutional.  But that's not really

5  making it any harder for Mr. Cooper to present all the

6  arguments.

7       The Court has not defaulted the State of California.

8  The Court allowed the proponents to intervene precisely so that

9  they can make the case that they want, that Proposition 8 is

10 constitutional.

11      I'm submitting that there isn't case law

12 justification, and, certainly, the facts of this case don't

13 justify moving the State of California to the other side of the

14 ledger in this case.

15      And the plaintiffs are entitled to conduct their own

16 case, without people being added against whom they are seeking

17 a judgment.

18      **THE COURT:**  All right.  Thank you.

19      Anything further on this issue?

20      **MR. COOPER:**  Just one quick point, Your Honor.

21      Certainly, if in a few months from now there is a new

22 Attorney General, and that Attorney General takes our view of

23 it, we will welcome that Attorney General with open arms, and

24 Mr. Olson's effort to realign him.

25      (Laughter)

1          **THE COURT:**  All right.  Well, I'll issue a written

2    order on this matter.

3          I am disinclined, I will say, Mr. Cooper, to realign

4    the Attorney General formally.  I think the Attorney General's

5    counsel has well stated that this is a practical matter more

6    than a legal matter.

7          And it's not at all unusual that there are different

8    perspectives on one side of the case.  And I don't believe that

9    the fact that the Attorney General has made the admissions that

10   you've referred to necessarily prejudices the proponents in any

11   material way.

12         But, I will give you an order that will finally

13   resolve this matter.

14         Now, discovery matters.  Let's see.  We have quite a

15   number of these.  How would you like to address them?  What do

16   you need the most, in order to move things along so that we can

17   begin our trial on the 11th of January?

18         **MR. BOUTROUS:**  Thank you, Your Honor.  Theodore

19   Boutrous for plaintiffs.

20         What we need the most, I think, are two things:

21         First, the privilege log that the Ninth Circuit has

22   ordered in confirming this Court's order that plaintiffs'

23   proponents must present.  We still have not received that.

24         That, I think, will help us in all other respects, in

25   a practical way and a speedy way, to get the documents we think

1   we are entitled to under the Ninth Circuit's order as it stands

2   today.

3          Secondly, the Ninth Circuit in its opinion said, I

4   think, at least a half a dozen times, that its ruling was

5   limited to private internal communications regarding campaign

6   strategy and messaging.

7          And it left on the table, we believe, all the public

8   communications by the proponents to voters, to discreet voter

9   groups, to individuals, communications that were meant to

10  inspire people to go out and work to pass Proposition 8.

11         The proponents are taking an extraordinarily broad

12  view of what -- of what this privilege means, at this point.

13         They are declining to produce documents that would

14  be -- we attached it, I think, to the December 7 letter that we

15  submitted to the Court, this document from Mr. Tam, the "What

16  If We Lose" document that he signed in his official capacity as

17  the head of the Traditional Family council.

18         They take the position that that type of document is

19  privileged because it was sent to a smaller group of family and

20  friends, even though it was urging those people to go out and

21  vote and to work to pass Proposition 8.

22         And so I think what we need is a definition of what

23  an internal communication really means in this context.

24         We have a proposal that I think is fair and

25  reasonable.  We made it to the proponents, and they rejected

1    it.

2         But it seems to us that the core group, the control

3    group, we could sort of call them, the proponents themselves,

4    and the top officers of protectmarriage.com, and basically the

5    way the Court outlined it in the October 1 order, when talking

6    about No. 8, our Request No. 8, those people, I would think,

7    would be the folks who could generate internal documents,

8    communications to each other, and the like.

9         I assume --

10        **THE COURT:**  What about a communication from Mr. and

11   Mrs. John Q. Public to either protectmarriage.com or to one of

12   the officers or directors, managing agents of that entity,

13   saying, "I'd like to have a neighborhood party in support of

14   Proposition 8.  What are the materials that I can distribute,

15   and signs, and whatnot"?  Is that an internal communication?

16        **MR. BOUTROUS:**  No, Your Honor, I do not think it is,

17   because it's a communication with someone in the public with

18   whom there is no connection, no official connection or

19   managerial capacity in the organization.

20        The way I'm starting to read the proponents'

21   argument, it's that everyone is internal who voted for

22   Proposition 8, at this point, who was part of the efforts to

23   pass Proposition 8, which obviously is too broad.

24        So I think that would -- we could redact the names,

25   if private citizens wrote in, and there were communications,

1  into the kind of protective order that we had talked about

2  before.

3          But I don't think the Ninth Circuit was contemplating

4  that that would be a private communication because, as the

5  Court will recall, Mr. Cooper had used this phrase about an

6  "associational bond."  And I used the example in the Ninth

7  Circuit argument that under their interpretation, if they

8  asserted an associational bond, they could send documents to

9  thousands of people as long as they claimed that they were

10 doing it in this world of the bond.

11         The Court rejected that.  And the proponents have

12 seized on that language in Footnote 12, of the opinion,

13 however, to argue to us that unless the documents were

14 communicated to a large swath of the electorate, they are

15 private.

16         And I don't think the meaning of the word "private"

17 or the meaning of the word "internal" would support that

18 interpretation.

19         And the Court, the Ninth Circuit, was very clear

20 that, "Our holding is limited to private internal campaign

21 communications concerning the formulation of campaign strategy

22 and messages, not the messages themselves that were conveyed to

23 voters."

24         So we think it's a very reasonable proposition that

25 all the external communications to -- whether it be to one

voter or five voters or ten voters, where the campaign was

seeking to inspire people to pass Proposition 8, are on the

table and should be discoverable if they relate to efforts, and

could reasonably be interpreted to be an effort to prompt the

passage of the proposition.

**THE COURT:** Tell me what the proposal is that you

have made to the proponents, that you say they have rejected.

**MR. BOUTROUS:** We -- essentially, what I've outlined.

One, that we would get a privilege log; that the

privilege log could be limited to external communications;

that --

**THE COURT:** External in what sense?

**MR. BOUTROUS:** External to the core group that we

would define to include the individual proponents who have

intervened in the case, the executive committee members of

protectmarriage.com and other -- I think the Court talked about

it as sort of individuals with managerial capacity.

So people who are actually part of the campaign

itself and the proponents' group that intervened in this case.

And one other, I think, limiting factor, Your Honor,

I presume that Mr. Cooper and his team, diligent lawyers that

they are, conducted a search of all the people and all the

individuals' documents who they believe are subject to this

internal -- internal privilege.

And I think that would be another way to limit it.

1    The people that they view as part of the campaign and the

2    people they view who were subject to our discovery requests,

3    that group, communications amongst those people for present

4    purposes, without regard to the Ninth Circuit proceedings, we

5    would leave off the table for now.  They would not have to do a

6    privilege log.

7             This is what we proposed before we heard about the en

8    banc issue.

9             And then the documents that we would seek would be

10   communications outside of that group to individuals and

11   citizens that could be reasonably interpreted to have it as

12   their goal the prompting of a vote or some other form of

13   support of Proposition 8.

14            And so I think that's a very targeted, limited

15   interpretation.

16            The other issue we've had, Your Honor, is that

17   proponents claim that now that we've got the ruling from the

18   Ninth Circuit, that requests -- our Request No. 1, for example,

19   which sought all communications with voters, are somehow

20   resolved and they are not required to produce documents

21   responsive to that document -- to document requests; which

22   there's no support for that.

23            The only issue that was dealt with in this Court's

24   November 11th order, which was before the Ninth Circuit and

25   that they dealt with, was our No. 8 request as revised.

1          So a related issue to this, Your Honor, is the

2    identity of the executive committee.  This kind of puts in

3    context, I think, the extreme nature of this privilege claim.

4          We've been fighting to find out the fifth person who

5    was a member of this executive committee of

6    protectmarriage.com, that ran this $40 million campaign.

7          This wasn't like Mrs. McIntyre, in the Supreme Court

8    case, out there anonymously leafletting.  This was this huge

9    campaign.

10         The proponents have refused to disclose the name of

11   this fifth person, claiming it's privileged and nonpublic.

12         Well, yesterday we received a document during

13   production, which was an e-mail trail from the executive

14   committee members of protectmarriage.com to the Wall Street

15   Journal, asking the Wall Street Journal to publish a letter by

16   the executive committee members.

17         And I can provide the Court with a copy, but it

18   has -- it's signed.  This is to the editors, asking this to be

19   published to millions of people.  It has the five members of

20   the executive committee.  But on our copy, they redacted the

21   name of the fifth person.

22         So they are taking the position that somehow, under

23   some version of the First Amendment, information they gave the

24   Wall Street Journal is privileged and confidential and private.

25         And I just don't think the Ninth Circuit's ruling or

1  any case of this Court, the Ninth Circuit, or the Supreme Court
2  supports that interpretation.
3         Once you communicate with someone outside the group
4  that is private and confidential, First Amendment protection is
5  waived in that context.
6         And that principle, I think, is being disregarded
7  here.  And we are simply getting blocked, in terms of any
8  discovery regarding things that weren't broadcast on TV and the
9  like.
10        **THE COURT:**  One of the issues that the Ninth Circuit
11  panel focused on was the availability of much of this
12  information from other sources.
13        Why is it that you can't develop this information
14  from sources outside the proponents' campaign?
15        **MR. BOUTROUS:**  We are developing it to the extent we
16  can, Your Honor, in terms of publicly-available information.
17        But we served, I think, 15 to 20 subpoenas on
18  third-party groups during the argument that I think Judge
19  Wardlaw made the point:  Why can't you go to these other groups
20  and get their documents?
21        They have all been refraining from producing
22  documents because they are prepared to ride the First Amendment
23  privilege, however it pans out, that the proponents are urging.
24        So I presume they would take the position that unless
25  they were communications on television or very broad, public --

1   the "electorate at large" is the language that proponents have

2   used -- their communications to voter groups and to

3   individuals, and door-to-door communications from script would

4   be privileged.

5           And so we are being blocked from that discovery.  We

6   served this discovery months and months ago, and so it really

7   is hindering us.

8           As the Court knows, we have many, many arguments that

9   do not depend on this information.  So I'm not standing here

10  telling the Court that we can't make our case without it.  But

11  it seems fair game.  And it's clearly outside the narrow

12  privilege, in terms of the documents that are covered by the

13  Ninth Circuit's ruling, internal communications that were

14  private.

15          **THE COURT:**  What are the entities to which these

16  subpoenas have been served?

17          **MR. BOUTROUS:**  I think we have some church

18  organizations, other advocacy groups or other organizations

19  that were supporting Proposition 8.

20          And we're -- you know, we would limit it to the same

21  sort of sphere of documents.

22          **THE COURT:**  Were these entities all supporters of

23  Proposition 8, as opposed to, say, the Wall Street Journal,

24  which is obviously not involved in the campaign except as a

25  media organization?

1          **MR. BOUTROUS:**  They were organizations that were

2    involved in the effort to pass Prop 8, and that supported the

3    organization.

4          So we haven't subpoenaed the Wall Street Journal or

5    other --

6          **THE COURT:**  You have not?

7          **MR. BOUTROUS:**  -- entities.

8          We have not, no.

9          And entities that might have accumulated this

10   information, as well, we've limited ourselves there to public

11   information, advertisements and things that we were able to

12   find on the Internet.

13         We found some things on the Internet, like this

14   document from Mr. Tam, which contains all kinds of inflammatory

15   rhetoric and urges people to help --

16         **THE COURT:**  Would it not be a fair interpretation of

17   the Ninth Circuit Panel decision that a communication from

18   protectmarriage.com to a church organization or some other

19   group that is supporting the passage of Proposition 8 is one of

20   these internal communications that the First Amendment

21   privilege and the Ninth Circuit found implicates?

22         **MR. BOUTROUS:**  No, Your Honor, I don't think so.

23         The court, the Ninth Circuit, cited the In Re Motor

24   Fuels case, which is what they cited in Footnote 12.  And the

25   District Court in that case specifically rejected the notion

1  that communications between trade associations, which would be

2  very analogous to our situation, would be covered by the

3  First Amendment privilege that the District Court recognized

4  there.

5          And the District Court in the Motor Fuels case

6  said -- emphasized -- I am only talking about internal

7  documents in evaluations of lobbying and legislation, and

8  everything else is subject to normal discovery rules.

9          And then I think it's in a footnote the Court said,

10  "When one trade association engaged in First Amendment advocacy

11  communicates with another group, the confidentiality interests

12  fade."

13          **THE COURT:**  Well, the footnote, in its second

14  sentence, states, "Proponents cannot avoid disclosure of

15  broadly-disseminated material by stamping them 'private' and

16  claiming an associational bond with large swaths of the

17  electorate."

18          But would that foreclose the privilege covering a

19  communication from protectmarriage.com to the governing body of

20  a church organization, or some other organization that was

21  supportive of Proposition 8, if that communication was not

22  broadly disseminated?

23          **MR. BOUTROUS:**  I don't think it would foreclose, Your

24  Honor.  I think the Court was giving an example.  In part, I --

25  I mean, I maybe gave them the -- suggested this example,

1   because I said, well, under the proponents' interpretation,

2   this sort of material would be covered.  And they -- I'm glad

3   they did -- said, no, it would not be covered by the privilege.

4            But Footnote 12 is connected to the sentence that

5   says, "Proponents have already agreed to produce all

6   communications actually disseminated to voters, including

7   communications targeted to discreet voter groups."

8            And I would think that a church group or some other

9   smaller unit of people, a group of family and friends and

10  associates that one citizen is saying, "Go out there and pass

11  this law, vote for it" -- Mr. Schubert, in his article which I

12  know the Court is familiar with, in analyzing the campaign

13  strategy, touted the grass roots strategy that really was

14  crucial to the effort, which does not involve big rallies or

15  public -- sort of the traditional campaign style event.

16           It would include smaller targeting of groups, telling

17  one neighbor to go tell another neighbor, "Here's the message.

18  Carry this with you out into the world and convince people to

19  vote for this proposition."

20           And I do not think that is the kind of internal,

21  private communication that the Ninth Circuit was concerned

22  about.

23           And I think the opinion really focuses on the

24  internal files of the group.  "These are our files.  This is

25  what we are thinking of doing.  This is why we are thinking of

1  doing it."  That was the focus of the briefing and the focus of

2  the Court's concerns in the opinion.

3          The other issue, Your Honor, that is related to this,

4  in the depositions of the proponents, the proponents' lawyers

5  have taken extreme positions in terms of the scope of the

6  inquiry.

7          We are sensitive to the fact -- well, first of all,

8  this Court ruled that unexpressed sentiments about why a

9  proponent engaged in the battle for Proposition 8 were not

10  something that were discoverable.  We are very sensitive to

11  that.  But that's different than expressed sentiments.

12          In Mr. Tam's deposition, based on this First

13  Amendment privilege and this notion of private communication,

14  when we were questioning Mr. Tam about the document that was

15  posted on the Internet, that was addressed to friends and

16  signed by him in his official capacity, the counsel for

17  proponents objected to this question:

18          "Was your goal in writing this letter to

19          encourage people to vote in favor of

20          Proposition 8?"

21          And that's a good example of the -- she objected that

22  since the document was intended by him to be private, questions

23  just about the foundation of the document, its purpose and

24  meaning, and identifying what it was and what it was supposed

25  to do, were off limits.

1          And, again, we think that is far broader than

2     anything the Ninth Circuit was contemplating.

3          Senator Hollingsworth, the government official, when

4     asked in the last sentence of the official materials, "Voting

5     Yes Protects Our Children," counsel for the proponents objected

6     and instructed him not to answer the question:

7               "What did that mean?  What do you mean by

8               that phrase?"

9          So it's really made the proponent depositions

10    extraordinarily unhelpful and unilluminating.  And the huge

11    inquiries, huge swaths of inquiry have been blocked, we think,

12    by asserting a vastly overbroad interpretation of the

13    First Amendment.

14         **THE COURT:**  Well, let me ask a couple of other

15    questions.  The first is focusing on the first footnote of the

16    panel's decision.

17         As often is the case, really interesting stuff is in

18    the footnote.

19         **MR. BOUTROUS:**  It really is interesting.

20         **THE COURT:**  In any event, the first footnote states,

21    "The District Court observed that proponents had failed to

22    produce a privilege log, as required by Federal Rule of Civil

23    Procedure 26(b)(5)(A)(2).  We agree that some form of a

24    privilege log is required, and reject proponents' contention

25    that producing any privilege log would impose an

1    unconstitutional burden."

2            Focusing now on that language, "some form of a

3    privilege log," well, I know you're familiar with the general

4    form of a privilege log when you're dealing with the

5    attorney-client privilege.  What's the appropriate form of a

6    privilege log in this context?

7            **MR. BOUTROUS:**  Your Honor, I think it would be

8    tailored to the proposal I have made about a core group, in the

9    way -- how I would propose we define "internal."

10           So it would include a description of the document

11   along the lines that this Court used in its November 11 order,

12   then giving us a sense of the nature of the document, what is

13   the document.

14           Then, I think, in order to make a judgment call for

15   us as to whether to go after the document, and for the Court a

16   description of the recipients in a manner that gives us a sense

17   who these people were, if their identities are confidential or

18   it being asserted to be confidential, that could be redacted or

19   not explicitly stated, but something that tells us how many

20   people received the document; was there a confidentiality

21   designation of the document when it was sent, unlike some of

22   the documents we're seeing; something that just lets us look at

23   the documents and make a judgment call as to whether it sounds

24   like it's a valid claim of privilege.

25           If it were a document sent to 15 people at a

1  different organization, we would argue that is not covered by

2  the privilege, and that sort of information would allow us to

3  target our challenges, and if we have to bother the Court again

4  with these issues, at least we could narrow the universe to the

5  documents that really seem to be in play under the definition

6  of --

7        **THE COURT:**  So what you contemplate is, basically, a

8  privilege log very much akin to the privilege log that you see

9  in the attorney-client privilege context, from whom, to whom,

10 date, and the general nature of the communication, without

11 disclosing the communication itself.

12       **MR. BOUTROUS:**  Essentially, Your Honor, and with some

13 general description of the topics covered.  And, again, we are

14 for now limiting our requests and our inquiry with the Ninth

15 Circuit issues pending to documents that were -- can reasonably

16 be interpreted to have been intended to persuade people to

17 support Proposition 8.

18       **THE COURT:**  Now, another issue and a more strategic

19 one, from the point of view of both parties, it's pretty clear

20 this First Amendment issue is an important one and a very

21 interesting one, and one that has implications that go far

22 beyond this case.

23       To what degree should -- to what degree is it in

24 plaintiffs' interest to mix this First Amendment issue with the

25 merits of the equal protection and due process claim that

1    you're making against Proposition 8?

2              Could it be that if discovery goes too broad in this

3    case, to impinge upon the First Amendment, you would jeopardize

4    any judgment that you obtain adverse to the constitutionality

5    of Proposition 8?

6              **MR. BOUTROUS:**  We do want to be careful on that, Your

7    Honor.  We believe that we -- I want to be very clear.  We

8    believe we can -- we can prevail and will prevail, ultimately,

9    on these issues, even if we don't have these documents; that

10   the Romer test -- we think there are alternative ways to

11   prevail under Romer and under the Supreme Court's other

12   decisions, that, yes, if we have evidence that shows improper

13   motivations, that adds to the case.

14             And so we would be sensitive to that, I think.  And I

15   think, though, that if we receive discovery, we receive

16   documents, and the Court were to analyze the case as -- with

17   the documents and with the information, and without it, there

18   would be a way to ensure that any ruling that was favorable to

19   us did not rise or fall on those documents.  And the fact that

20   they had been produced or compelled to be produced would not

21   affect the judgment.

22             **THE COURT:**  Well, under those circumstances, doesn't

23   that undermine the position which the Ninth Circuit has told us

24   the plaintiffs must demonstrate in order to obtain this

25   discovery; that is, it must meet a higher than usual standard

1   of relevance and make a compelling showing of need?

2          **MR. BOUTROUS:**  Absolutely, Your Honor, as to the

3   documents that are covered by the privilege, the internal

4   communications.

5          And right now, today, I'm only talking about our

6   efforts to seek things that we think are clearly outside the

7   privilege, which are subject to the normal rules because they

8   are not private internal campaign communications.

9          But I do take your point.  We are very sensitive to

10  that fact.  We want to build the best record for our clients we

11  can, and don't want to take risks.  And we have thought we have

12  been well within the heart of the First Amendment, and very

13  respectful of those interests.  It's something we would take

14  into account.

15         As for discovery, I don't think that having discovery

16  on issues, particularly things that are clearly outside the

17  privileges laid out by the Ninth Circuit, would jeopardize our

18  arguments and jeopardize any judgment we might obtain.

19         **THE COURT:**  Thank you.  Anything further?

20         **MR. BOUTROUS:**  I think that's it, Your Honor.  Thank

21  you very much.

22         **THE COURT:**  All right.  Let's see, Mr. Cooper, you

23  said which of your colleagues, Mr. Thompson, is --

24         **MR. COOPER:**  No, Your Honor.  Mr. Panuccio.

25         **THE COURT:**  What's that?

1          **MR. COOPER:**  Mr. Panuccio.

2          **THE COURT:**  Mr. Panuccio.  All right.  Fine.

3          **MR. PANUCCIO:**  Thank you, Your Honor.  Again,

4    Jesse Panuccio for the defendant-intervenors.

5          What we have here today, I guess, is the latest

6    iteration of plaintiffs' discovery request.  This would be the

7    third iteration of No. 8.

8          They now say that -- what happened in this court, if

9    you remember, we had the October 1st order, the November 11th

10   order.  Each of those sort of narrowed what the Court felt

11   would be relevant to this case.

12         On the First Amendment issue, we took it up to the

13   Ninth Circuit on what was still left after that narrowing, and

14   said we believe the First Amendment privilege is implicated

15   there.  And the Ninth Circuit vindicated us on that claim.

16         Now, what was left, after the November 11th order,

17   was this -- what Mr. Boutrous is now calling this control

18   group.  It would have been this set of internal communications

19   between or among a list of people that was in that revised

20   request.

21         Having lost in the Ninth Circuit, they take that

22   opinion -- and there was no cross-appeal.  They take that

23   opinion, and they say, Okay, we lost on that.  We now want

24   everything that is on the other side of the line that this

25   Court already narrowed.

1           And their view is that everything this Court had

2     previously done, even though they didn't cross-appeal, is now

3     off the table and they can start anew, three weeks before

4     trial, with a brand-new discovery request.

5           That's what we are facing.  That is the practical

6     nature of what we are facing.

7           They are asking us now to go back through the 90- to

8     100,000 documents we've had to look through in response to

9     their request.  "Look through it again and take out everything

10    you sorted out based on the November 11th order, and give it to

11    us."

12          And we'll have to litigate the First Amendment nature

13    of that again because we didn't have to do that under the

14    November 11th order.

15          **THE COURT:**  Well, explain that to me.  I'm not sure I

16    follow that.

17          There were, basically, three elements to the Ninth

18    Circuit opinion.  One, they determined that these internal

19    communications met the discoverability standard of Rule 26;

20    two, that in order to preserve the First Amendment privilege, a

21    privilege log is necessary; and, three, that a higher than

22    usual standard, a high standard of relevance, is necessary in

23    order to obtain that discovery, which went considerably beyond

24    what the Supreme Court had provided in other cases, but it's

25    certainly a fair reading of the First Amendment privilege.

1          So how does Mr. Boutrous's argument somehow or other

2     run counter to that fundamental three-part holding of the Ninth

3     Circuit?

4          **MR. PANUCCIO:**  Yes, Your Honor.  I think it's

5     important to remember, again, what was -- what they say in

6     their letter to us is, they say, you know, the Ninth Circuit

7     ruled that the privilege is limited to the following.  That's

8     not actually what the sentence is.

9          The Ninth Circuit said our holding is limited, and

10    the reason our holding is limited is because we appealed -- and

11    if you look at both of our notices of appeal, we appealed the

12    October 1st order and the November 11th order, to the extent

13    they denied our claim of First Amendment privilege.

14         And what documents were at issue after the

15    November 11th order?  Well, only those documents that this

16    Court said would be relevant and responsive.

17         Before the Ninth Circuit, Mr. Boutrous repeatedly

18    endorsed this Court's limiting and said, yes, that limiting

19    controls, that's what's before the Court.

20         So that's all the Ninth Circuit had to consider.

21    There was no cross-appeal about the limiting that this Court

22    engaged in.

23         The plaintiffs didn't say --

24         **THE COURT:**  Well, I don't understand that the

25    plaintiffs are challenging the determination which I made, that

1  purely internal expression of sentiments or even strategy

2  documents such as, "Shall we hire such and such polling firm?

3  Or shall we conduct canvassing of this group and that group?"

4       I'm not sure that the plaintiffs are seeking that

5  kind of information, are they, if those are internal

6  communications?

7       **MR. PANUCCIO:**  So there were a few different aspects

8  of the limiting between the Tuesday, October 1st, and November

9  11th orders.

10       One was the subject matter limiting.  But another

11  was -- well, you said it should be sufficient for this case to

12  get documents from this group of people.

13       What they -- what plaintiffs said to us when they

14  came back with revised requests, they said, We were just

15  following exactly what the Court said in terms of the list we

16  have given you here.  So this is the list of people we are

17  interested in and is sufficient to get the information we need

18  for this case.

19       Having now lost on getting those documents, they are

20  going back to original request No. 8 -- or, actually, to a

21  third request now and saying, We want -- here's the basis for

22  what they want:  We want every communication you might have had

23  with anyone who is a, quote, voter; anyone outside.  And they

24  say, And, by the way, "outside" means anyone who wasn't in this

25  control group.

1            So their -- basically, their position now is if

2    Dr. Tam or Mr. Jannson has a one-on-one communication with a

3    family member, a friend, a known political associate, a church

4    leader they have known for 20 years, and the church leader came

5    to them and said, "I am on board.  What can I do to help?"

6    Those communications are now discoverable.

7            So there is no First Amendment right for individuals,

8    is what they claim.  You have to be a member of a 501c3, and

9    then you get First Amendment protection if you have an official

10   title.  Which, by the way, in a volunteer campaign you often

11   don't have.

12           But what they would say is, if Dr. Tam, who wasn't a

13   member of protectmarriage.com, if he has individual

14   communications, we get those.

15           And I suppose it would extend -- their own

16   plaintiffs, Kristin Perry, has no First Amendment rights to

17   talk about this issue, under the plaintiffs' view of the

18   First Amendment, after the Ninth Circuit's order.  It's

19   remarkable.

20           **THE COURT:**  Well, Mr. Boutrous pointed out Footnote

21   12 of the Ninth Circuit's opinion, which you pointed out.

22           The Court stated, "Our holding is limited to private,

23   internal campaign communications concerning the formulation of

24   campaign strategy and messages."

25           In fact, the November order that I issued was really

1  only directed to campaign messages.  And of the 60 documents

2  that I reviewed, I think I did not order the production of the

3  strategy documents, but only those that referred or related in

4  some manner to messages disseminated to the voters, and that

5  that is what will form a universe of information from which we

6  might determine voter intent.

7          But, in any event, it would appear that in some ways

8  the Ninth Circuit might approve the disclosure, assuming you

9  meet a high standard of relevance, of these campaign strategy

10  documents, as well as those that relate to messages

11  disseminated to voters.

12          **MR. PANUCCIO:**  A few points on that, if I may

13  respond.

14          The first point would be, the Ninth Circuit, yes,

15  there is this footnote and, you know, we obviously have a

16  competing view.  They say it opened up whole new worlds.  We

17  say it basically confirmed the discovery we have already given

18  you.  We have agreed from the outset to give them materials

19  disseminated to large swaths of voters.

20          What the Ninth Circuit also said is, you know, with

21  respect to internal campaign documents, we are not saying that

22  a party seeking discovery can never get internal campaign

23  documents.  But the request has to meet a heightened standard

24  of relevancy, and must be narrowly tailored.

25          We have never received from the plaintiffs a

1   narrowly-tailored request.  And we still don't.  Now we just

2   have this new request, which asks for all communications,

3   again, back to the first request, No. 8, which this Court said

4   was overbroad, both in the hearing and in its opinions.

5         So we have nothing to work from with this request

6   that requires us to go through, sort, resort again and again

7   and again these tens of thousands of documents, just draining

8   untold resources from our side of the case.

9         So I don't think they have met, at any point now --

10  they also haven't issued a revised request.  They just have a

11  letter saying --

12        **THE COURT:**  Well, if there are 10,000 or thousands

13  upon thousands of these documents, how can they be internal

14  documents?

15        **MR. PANUCCIO:**  Well, so what we have --

16        (Simultaneously colloquy.)

17        **THE COURT:**  I mean, they can't exchange that many

18  documents in the course of a campaign.

19        **MR. PANUCCIO:**  Well, if you think about it, if you

20  have -- just talking about somebody's e-mail account, imagine

21  the daily traffic of e-mail that goes -- someone who is running

22  a campaign.

23        Now, they may have 20 messages that day about

24  messaging.  They may have 20 messages that day about whether

25  they are going to hire a janitorial staff for the building.

1      We have to look at all of those, every time, to

2  figure out their -- you know, if they say Prop 8, you know, the

3  Prop 8, Yes on 8, building needs a new janitorial staff, we

4  have to look at every one of those and sort and resort, to

5  figure out whether they are responsive to the ever-shifting

6  request for documents in this case.

7      The other response I would make, again with respect

8  to the Ninth Circuit's opinion, when they say their holding is

9  limited, the only thing before them was this set of documents

10  that resulted from the November 11th order.

11      They actually looked at the 60 documents Your Honor

12  looked at, and they quoted the language Your Honor --

13      **THE COURT:**  I think they looked at 21, if I remember.

14      **MR. PANUCCIO:**  I'm sorry.  You're right.  I stand

15  corrected.

16      **THE COURT:**  They requested only the 21 documents.

17  They didn't look at the others.

18      **MR. PANUCCIO:**  I stand corrected.  I should know

19  because I helped get that shipment out the door.  Sorry.

20      But they basically -- they quote this Court's

21  November 11th order, and what the universe of documents was

22  restricted to.  So I really don't think you can say the Ninth

23  Circuit addressed this new universe that plaintiffs want to get

24  into.

25      I also would think it's important to look at what is

1    out of the footnotes but actually in the core of the opinion.

2              The Ninth Circuit said --

3         **THE COURT:**  Where are you?

4         **MR. PANUCCIO:**  Well, you know, I neglected a couple

5    of pin cites.  One of the places will be at the slip opinion at

6    page 30.  And I will furnish you with the others immediately

7    after I sit down.  But I would like to just read the quotes,

8    and then I can give you the pin cites right after.

9              The Ninth Circuit said, "The compelled disclosure of

10   political associations can have just such a chilling effect."

11   And the chilling effect they are referring to is an

12   unconstitutional chilling effect.

13             They also said, "Disclosures of political

14   affiliations and activities that have a deterrent effect on the

15   exercise of First Amendment rights are, therefore, subject to

16   exacting scrutiny."

17             So when they say that they can get, say, Mark

18   Jannson's one-on-one communications with somebody he happens to

19   associate with in his neighborhood on a political issue, I

20   believe that would get to the type of chilling effect they were

21   worried about in the opinion.

22             They were focused, I suppose, on protectmarriage.com

23   as an entity because that's where the parties have often

24   focused.  But that is not the only thing implicated in this

25   case.  There are individuals.  And it is the individual right

1   to associate, whether it be through a formal organization or

2   informally, that is implicated.

3          **THE COURT:**  They did say that Mr. Jannson's

4   declaration was lacking particularity, and the chilling effect

5   is not as serious as that involved in the *NAACP vs. Alabama*

6   case and so forth.  It's very definitely a measured approach to

7   this problem.

8          **MR. PANUCCIO:**  Measured.  But, nonetheless, they

9   credited it, and the holding went in our favor.  So they may

10  have stepped back and said, Well, this isn't *NAACP vs. Alabama*,

11  but we are going to vindicate the First Amendment issues that

12  proponents have raised in this case.

13         **THE COURT:**  What about a privilege log?

14         **MR. PANUCCIO:**  Okay.  The issue of the privilege

15  log --

16         **THE COURT:**  It's pretty clear the Court of Appeals

17  said in order to preserve this privilege, you have to prepare a

18  privilege log.

19         **MR. PANUCCIO:**  And, as you point out, I think, in a

20  somewhat cryptic footnote about what that would look like, they

21  did say there would be no unconstitutional burden.

22         If you're asking me from a factual standpoint where

23  we stand on constructing a privilege log, based on if the

24  Court's orders of October 1st and November 11th still stand in

25  terms of the universe of documents we need to look at as

1   responsive and relevant in this case, then I believe we could

2   have a privilege log probably by Monday of next week.

3          You know, that's with the qualification that if the

4   Ninth Circuit orders very significant en banc briefing, that

5   may adjust the schedule a little bit.

6          I do believe we are getting in a position to be

7   able --

8          **THE COURT:**  That undoubtedly would be most helpful.

9          **MR. PANUCCIO:**  And, again, that would be if the

10  universe of documents -- if we have to deal with the third

11  request or letter that plaintiffs have issued revising their

12  request, that burden and time would increase significantly.

13         I wanted to -- unless Your Honor would like more on

14  the issue of documents, Mr. Boutrous brought up the issue of

15  depositions, and I would like to address that if I may.

16         **THE COURT:**  Very well.  Please do so.

17         **MR. PANUCCIO:**  With respect to deposition testimony,

18  I would like to just read the Court a few examples of what it

19  is plaintiffs' counsel is asking the deponents in this case.

20  And I have listed more of these at document 297-1, Footnote 3.

21         But here are some of the questions:

22         Quote, "And do you believe that to be true, what is

23         written there?"  End quote.

24         Quote, "Do you believe that Satan is behind the

25         same-sex marriage movement?"  End quote.

1          **THE COURT:**  Do you believe what, sir?

2          **MR. PANUCCIO:**  "... that Satan is behind the same-sex

3    marriage movement?"  End quote.

4          Another one:

5          Quote, "Was your goal in writing this letter to

6          encourage people to vote in favor of Proposition 8?"

7          End quote.

8          Now I would like to read this Court's October 1st

9    order.  Quote, "Discovery directed to uncovering whether

10   proponents harbor private sentiments that may have prompted

11   their efforts is simply not relevant."  End quote.  That's

12   document 214 at 16.

13         Now, let me read again, here's the question they're

14   asking:

15          "Was your goal in writing this letter to encourage

16          people to vote in favor of Proposition 8?"

17         What they are seeking to do in depositions is get to

18   what they are not allowed to get to in document requests, which

19   is the subjective, private views of individuals who engage in

20   this political campaign, what this Court has said is irrelevant

21   and what the Ninth Circuit has now said is protected.

22         And here's the practical implication of their view.

23   If I were engaged in a campaign with Mr. Cooper, and I wrote to

24   him in an e-mail, "I really think we need to do the following

25   four things in the campaign, and the flier we put out should

1   have this language on it," and Mr. Cooper rejects that, and

2   that never goes public, it's just our internal communication,

3   under the Ninth Circuit's order that's protected.

4          But if, in my head, I rejected an idea because

5   Mr. Cooper would think it's ridiculous, that they can get to in

6   a deposition.  So what's in my own head is less protected than

7   what is in the private communications that I send to my

8   political associates.

9          I don't think that follows both logically or legally

10  from the Ninth Circuit's order and the cases they rely on

11  there.  And the Ninth Circuit said, in fact -- well, they cited

12  *McIntyre*, and *ACLU vs. Heller*.

13         And they said, "Associations no less than individuals

14  have the right to shape their own messages."  Individuals have

15  a right to shape a message to the public and let the public

16  take it for what it is.

17     **THE COURT:**  Well, but is there anything wrong with

18  asking someone who has disseminated a message to the public

19  what it was that he or she intended to accomplish?  That would

20  be permissible discovery; would it not?

21     **MR. PANUCCIO:**  Well, I don't think so.

22         I think a good -- I think an analogous case here is

23  the *Wisconsin Right to Life* case in the Supreme Court.  And

24  that's 551 U.S.  And the pin cite would be 468.

25         And in that case, which was -- you know, it's one of

1  these campaign finance cases, and the question is:  Were these

2  electioneering communications?

3       Chief Justice Roberts said in his opinion that

4  something that turns, that is a non-objective inquiry,

5  subjective inquiry into the ad-maker's intent, would -- I

6  believe the exact quote, "They declined to adopt such a test

7  turning on speaker's intent because it would," quote, "chill

8  core political speech and would also lead to bizarre results."

9       So if one speaker -- all that the public sees is

10  what's on the face of the document.  So if one deponent said,

11  "Yeah, my intent was X,' and another deponent said, "My intent

12  was Y," I guess the result in two cases with that testimony

13  would be different, even though the public saw the same

14  document and would have had the same reactions.

15       The Ninth Circuit also addressed this and said, Look,

16  if that's the kind of information you're interested in, voter

17  reaction, you can get that information from other sources.

18       **THE COURT:**  Wouldn't it be fair for a lawyer in

19  deposition to ask, "When you disseminated this message to the

20  electorate or to this group of the electorate, you used certain

21  words that we deemed to be code words; and weren't you seeking

22  to elicit some response on the part of the electorate based

23  upon the use of that particular word or phrase?"

24       Wouldn't that be an appropriate avenue of inquiry,

25  once you deal with -- once you have a message that has, in

1    fact, been disseminated --

2           **MR. PANUCCIO:**  Well --

3           **THE COURT:**  -- as opposed to, say, a communication

4    between people who are attempting to formulate strategy?

5           **MR. PANUCCIO:**  If the question -- and, please,

6    correct me if I'm wrong.

7           If the legal question the Court is trying to address

8    is what would the voter reaction be --

9           **THE COURT:**  Voter intent is, yes.

10          **MR. PANUCCIO:**  The voter intent.

11          **THE COURT:**  Correct.

12          **MR. PANUCCIO:**  But, again, the question is the people

13   who saw the document, what did the code word -- what

14   motivations did it actuate for them?

15          The subjective intent of the person who made that

16   document, who is a non-expert on psychology or voter intent or

17   whatever the case may be, is not going to be probative of that

18   reaction.  You would have to have experts or just the Court

19   bringing its judgment to bear on what's on the face of the

20   document.

21          This is precisely Chief Justice Roberts' insight in

22   *Wisconsin Right to Life*, is that that kind of inquiry would be

23   chilling to the First Amendment because everybody who put out a

24   poster and chooses their speech, and just wants to let it ride

25   in the public as it is on the face of the document, would have

1   to worry -- if they got involved in a political campaign, would

2   have to worry about facing depositions about what's in their

3   own head about the document.

4        I think that would -- in many ways, that would be

5   more chilling.

6        **THE COURT:**  The question would not be, "What was in

7   your head?" but, "What was your effort?  What did you expect

8   the voter reaction to be to the use of this phrase or word or

9   formulation?"

10        **MR. PANUCCIO:**  Well, I mean --

11        **THE COURT:**  That would be a fair inquiry; would it

12   not?

13        **MR. PANUCCIO:**  Well, I think just under the law of

14   the case here, under the October 1st order, the Court said

15   discovery directed to uncovering whether proponents harbor

16   private sentiments that may have prompted their efforts is

17   simply not relevant.

18        And so if my effort is to put out a flier, it's just

19   simply not relevant what prompted that, my private sentiment as

20   to what I wanted that flier to do or why I posted it on the

21   telephone pole.  It isn't relevant.  And, beyond being not

22   relevant, it's highly privileged.

23        If communications between two people are privileged,

24   certainly your own thoughts, your own inner thoughts about

25   First Amendment speech are at the very core, you know, even

1   more privileged, even more chilling.

2          The disclosure would be even more chilling than the

3   communications between two people because at least you've aired

4   the thought to somebody.  But if you've aired your thought to

5   nobody, how could it possibly be that that doesn't violate the

6   First Amendment privilege?

7          **THE COURT:**  Well, but here you have a situation where

8   there has been an airing of thoughts to somebody, and probably,

9   in this instance, a large number of somebodies.  And that would

10  seem to open the door to the intent behind that dissemination.

11         **MR. PANUCCIO:**  Well, I think Mr. Cooper put it well

12  before the Ninth Circuit, citing to both the *McIntyre* case and

13  *ACLU vs. Heller*, which was the Ninth Circuit's post-McIntyre

14  iteration of that principle which is -- in *McIntyre*, there is a

15  quote, and we've quoted it in our briefings.  I don't have the

16  exact language at hand.  They say that individuals have the

17  right to be their own editors.

18         So when you have a pamphlet and you leave snippets on

19  the editing room floor, that state can't come in and pick up

20  those snippets and say, "Give them to me.  Air them to the

21  public."

22         **THE COURT:**  Are we dealing with Mrs. McIntyre, or are

23  we dealing with the individuals who are the proponents of

24  Proposition 8 --

25         **MR. PANUCCIO:**  Well --

1        **THE COURT:**  -- like Hollingsworth, like Tam, Jannson?

2        **MR. PANUCCIO:**  We are dealing with those individuals,

3   as well as all the other individuals that -- the over 20

4   third-party subpoenas that plaintiffs have issued in this case.

5        And we are also setting a principle of law that I

6   guess would apply in every referendum campaign.  And we are

7   also dealing with outside organizations like the ACLU, who put

8   in the amicus brief in the Ninth Circuit.

9        But I believe the Ninth Circuit -- I mean, that

10   argument that the proponents are different because they are

11   proponents, that was raised in the Ninth Circuit.  Plaintiffs

12   raised that.  It was clearly rejected.

13        The Ninth Circuit did not bite on that argument.  So

14   I don't think that we can say there's a constitutional

15   difference between status as a proponent and status as an

16   individual.

17        Simply because you get involved in the referendum

18   process, be it officially or unofficially, it cannot subject

19   you to lesser First Amendment protection.

20        **THE COURT:**  Well, but the proponents of

21   Proposition 8, these individuals and others, and the

22   organization itself is required to file a whole panoply of

23   financial disclosure documents.  And that has been consistently

24   held not to violate the First Amendment privilege.

25        Those disclosures are very sweeping and detailed, as

1   I'm sure your clients don't need to be told that.

2           **MR. PANUCCIO:**  Thank you, Your Honor.  That's right.

3   And you are perfectly right.  And so those cases -- those laws,

4   of course, in the robust campaign finance law that's out there,

5   have been challenged multiple times in the Ninth Circuit and

6   the Supreme Court.  And every time they are upheld the Supreme

7   Court says, The state has a compelling interest for the need to

8   this information.

9           Now, plaintiffs -- we went to the Ninth Circuit, and

10  plaintiffs took their case and said, Here is our compelling

11  interest.  And the Ninth Circuit said, I'm sorry, but that is

12  not compelling.  Come back with something more narrowly

13  tailored and more compelling, and maybe you can have this

14  stuff.

15          But they have not demonstrated that.  So, you know,

16  citing those laws, they met the standard.  So far nothing in

17  this case has met the standard of compelling interest and

18  heightened relevance.

19          **THE COURT:**  Very well.

20          **MR. PANUCCIO:**  If I may, Your Honor, there was one

21  more issue about this document that has surfaced with the last

22  name -- the name of the last member of the executive committee.

23          **THE COURT:**  All right.  That would be helpful to

24  address.

25          **MR. PANUCCIO:**  And I just want to -- there are some

1  factual development, I think, that would be helpful to the

2  Court.   That surfaced as we have been culling our documents,

3  creating a log, inevitably, in a discovery effort like this --

4           (Reporter interrupts.)

5           **MR. PANUCCIO:**  Inevitably, in a discovery effort like

6  this, you come up with more documents.

7           We found this document, and realized that the name

8  was on it.  But I believe, as the Court is aware, this

9  particular Doe member is represented by separate counsel, and

10 is asserting his privilege individually as well.  And that

11 document has not been disclosed to the public; although, it was

12 sent to a reporter.  And he instructed us that he would like to

13 continue to assert his privilege to anonymity, at this point.

14          And we felt it was not our place to waive it --

15          **THE COURT:**  Has that defendant been served?  Has he

16 entered an appearance?  What's the status?  I'm not aware there

17 are any Doe defendants in the case.

18          **MR. PANUCCIO:**  I'm sorry.  It is a Doe member of the

19 executive committee.  And this issue has surfaced with the

20 Court before that -- that that name we had asserted -- we have

21 asserted, is privileged.  It was -- has not been disclosed to

22 the public.

23          But he has not entered a separate appearance as a

24 separate party to the case, no.

25          **THE COURT:**  So that individual is not before the

1   Court?

2         **MR. PANUCCIO:**  I believe that's -- I mean, only in

3   the sense of there -- he was a volunteer of the organization

4   that is before the Court.

5         **THE COURT:**  But he was a member of this executive

6   committee of the campaign; was he not?

7         **MR. PANUCCIO:**  Yes, Your Honor.

8         **THE COURT:**  Well, how do you -- since you've raised

9   that, how do you justify the failure to disclose someone who is

10   an officer, director, managing agent of a corporate entity

11   which is a party to the litigation?

12         **MR. PANUCCIO:**  Well, Your Honor, as with other

13   instances in which a third-party may have a privilege that is

14   implicated, you know, they argue they have a privilege that is

15   implicated in litigation, and they can come in and try to

16   defend that privilege.

17         The parties who might be in a position to waive that

18   privilege will, quite frequently, allow that third-party to

19   come in and assert that privilege.

20         You know, now there will be this battle over this

21   document, and we would allow this third-party, through his

22   counsel, to defend that privilege as he sees -- he or she sees

23   fit.

24         You know, an example is if a -- you know, all these

25   third-party subpoenas in this case, you know, some of those --

1  an agent of the Yes On 8 or No On 8 campaign, a vendor who has

2  documents that would, you know, fit within the Ninth Circuit's

3  definition of these internal campaign communications, if the

4  vendor were to simply say, "I am ready to turn these documents

5  over," a No On 8 group or Yes On 8 group could come into court

6  and say, "Well, now, hold on.  This is my privilege and I would

7  like a chance to litigate it."  And that is the situation we

8  would be faced with here.

9           **THE COURT:**  That's an interesting wrinkle.

10          All right.  Anything further, sir?

11          **MR. PANUCCIO:**  That's all on discovery, sir.  Thank

12  you, Your Honor.

13          **THE COURT:**  All right.  Mr. Boutrous.

14          **MR. BOUTROUS:**  Yes, Your Honor.  Thank you.

15          I would just like to refocus things a bit.

16  Mr. Panuccio is just simply wrong about the discovery requests

17  that are on the table.

18          Our request for the public communications to

19  voters -- and this is a narrow request that was meant to affect

20  the election and prompt people to support Proposition 8 -- was

21  Request No. 1.

22          And, as the Court will recall, the proponents filed a

23  really broad motion for protective order.  They proposed to the

24  Court exactly the standard they are now articulating, that

25  "nonpublic" basically means anything that wasn't broadcast on

1  TV or sent to the public at large.

2          The Court granted the protective order motion only as

3  to No. 8, which was "all communications with third parties,"

4  which the Court, I think, correctly found was a little bit

5  broad.

6          But Request No. 1 is still on the table.  This isn't

7  a new request.  We've been seeking this information.  Voter

8  communications -- and Counsel points to the one-on-one, the

9  truly private communications.  We are not talking about that.

10 We are talking about efforts by the proponents and this

11 organization to sway and woo voters to vote for this

12 proposition.  And that's clearly encompassed in our request.

13         **THE COURT:**  Isn't Mr. Panuccio's statement that,

14 We're going to have a privilege log by Monday, isn't that going

15 to be a good first step toward the resolution of this?

16         **MR. BOUTROUS:**  Absolutely, Your Honor.  And I think

17 that if it contains the information we need -- we're going to

18 be -- we're going to be reasonable.  And we want to get to

19 trial.  We're going to pick our spots.

20         If we get a privilege log that encompasses -- but I

21 want to make clear, and I would request that the Court make

22 clear, that documents responsive to our Request No. 1, this

23 Court has not ruled in any way -- the Court denied the

24 protective order motion on October 1, as to their complaints

25 about Request for Production No. 1, which was, essentially, I

1   paraphrase, all documents constituting communications to

2   voters, donors, potential donors, or members of the media

3   regarding Proposition 8.

4           There's not a protective order.  Their motion was

5   denied.  That was not the issue on appeal.  It only related to

6   private, internal communication.

7           So I would -- if the Court can make clear that the

8   privilege log must cover all of the documents that are

9   responsive to our requests that remain standing and remain

10  viable, that would, I think, be helpful.

11          **THE COURT:**  Well, it does seem to me that -- and,

12  Mr. Panuccio, you might want to join into this conversation.

13          It does seem to me that if there is anything crystal

14  clear in the Ninth Circuit panel's decision -- and it is, by

15  and large, a very clear and thoughtful opinion -- it is that

16  the preservation of this First Amendment privilege requires the

17  production of a privilege log.  And the proponents, I think,

18  concede that.  And that even these internal communications do

19  meet the discoverability standard of Rule 26; although, they do

20  not meet what the Court believes is the heightened relevancy

21  standard that the First Amendment requires.

22          So if we have a privilege log with respect to all of

23  the materials as to which the proponents are asserting a

24  First Amendment privilege, I think that will help move this

25  issue along to a reasonable resolution.

1          And, furthermore, in terms of case management, it's

2    possible that this discovery can continue even as the trial

3    proceeds.

4          I can understand there might be volumes of this

5    information that might be difficult to compile in time for the

6    January 11 trial date.  But I'm not sure we have to wait for

7    the last document to fall in response to the document request

8    in order to wrap up the core issues that are before the Court.

9          So the first step, the order will be that the

10   privilege log be produced.

11         You said on Monday?

12         **MR. PANUCCIO:**  Well, there would be a qualification

13   to that, Your Honor.

14         **THE COURT:**  Well, I know, in case the Ninth Circuit

15   throws you a curve.

16         **MR. PANUCCIO:**  And one more, which is, as I said, if

17   we are talking about sorting for responsiveness based on the

18   November 11th order, then, yes, we could do that.

19         Significantly, as the Court said, you should cull

20   your inventory of documents based on this order.  That would be

21   a log we could produce by Monday.

22         But if we are talking about opening up the world of

23   documents to everything that had already been culled out,

24   Monday would not be achievable.

25         **THE COURT:**  Well, let's do the best we can on Monday,

1  and that will move things along considerably.

2       **MR. BOUTROUS:**  Your Honor, may I just add one point?

3       I think it's a very serious matter that they are

4  interpreting your October 1 order, denying the protective order

5  motion, to take off the table all communications that were sent

6  to voters.

7       And they have known for four months that we were

8  requesting that information, and represented to us that they

9  have been collecting those documents in the event they were

10  ordered to be produced.

11       And so we feel very strongly that Monday -- well,

12  we'll take what we can get, when we can get it.  I agree -- we

13  agree with Your Honor, that we don't have to hold anything up

14  for this, but we feel very strongly that the privilege log --

15  they need to respond to the other preceding seven discovery

16  requests, which this Court rejected their protective order

17  motion on, including the one that goes to the communications

18  that I'm asking for today, the communications to voters

19  external to the campaign.

20       So we feel very strongly about that, but we

21  appreciate the Court hearing us out on this.

22       **MR. PANUCCIO:**  Your Honor, if I may have one chance

23  to respond.

24       **THE COURT:**  Well, what about these communications to

25  voters?

1          **MR. PANUCCIO:**  Yes.  This is an important point, and

2     I'm sorry I neglected to bring it up before.

3          They are now taking Request No. 1 -- we have said

4     repeatedly we will produce the communications that went out to

5     the electorate at large, that went to targeted groups of

6     voters.  But what they are doing now is, they are saying, We

7     couldn't get it under Request No. 8, so let's define "voter" as

8     any single person in California.  And Mr. Boutrous now says, We

9     are not talking about one-on-one communications.  I would

10    encourage the Court to go back to the transcript of what he

11    said in his opening argument, where he said, We are talking

12    about one-on-one communications.

13          That is how they are defining "voter" and "donor"

14    now, or "potential donor," which is any communication you have

15    with any third-party in California is discoverable.  That was

16    original request No. 8.

17          And the Court said, in its October 1st order,

18    Discovery not sufficiently related to what the voters could

19    have considered is not relevant and will not be permitted.

20          The October 1st order talked about what the relevant

21    sphere of discovery in this case would be.  And we think that

22    applies.

23          I'm sorry.

24          **THE COURT:**  Go ahead.

25          **MR. PANUCCIO:**  Well, and to the extent they are

1   relying on the denial of our motion for protective order, of

2   course, that was what was appealed to the Ninth Circuit.  We

3   said, To the extent the October 1st and November 11th order is

4   denied, our motion, we are appealing.

5          And the Ninth Circuit said, We recognize the appeal;

6   you prevail; and a protective order should be entered in the

7   case below.  That's the opinion.

8          So they can't well say -- rest on the denial, the

9   overturned denial of our protective order -- motion for

10  protective order.

11         **THE COURT:**  Well, it does seem to me we need, first,

12  a privilege log with respect to the documents as to which the

13  proponents are seeking to assert the First Amendment privilege.

14         To the extent that there are communications to voters

15  that are not internal communications but external

16  communications from the campaign or the individual-named

17  defendants, that the proponents are asserting some other

18  objection to other than a First Amendment objection, that the

19  documents that are being withheld on the basis of those

20  objections need to be spelled out so that the plaintiffs and

21  the Court can make a determination whether that's a proper

22  objection, whether it's burdensomeness or whatever it may be.

23         **MR. PANUCCIO:**  So -- I'm sorry.  Are you talking

24  about an attorney-client privilege type of --

25         **THE COURT:**  Well, that would be one.  There may be

1   some of those documents, as well, that you're -- you're

2   asserting an attorney-client privilege about, but --

3           **MR. PANUCCIO:**  It's hard to know what exactly we

4   should log.

5           I mean, if a communication to seven friends who are

6   political -- who have said, you know, "I want to be in this

7   effort, I'm with you," we would not view that as a

8   communication to voters.  And if we have to log that type of

9   document, we are talking about an exponential increase in the

10  size of this log.

11          Again, that would get to -- basically that becomes --

12          **THE COURT:**  Well, what would be the basis for

13  withholding that document?  It's not one of these internal

14  documents to which the First Amendment privilege covers.

15          **MR. PANUCCIO:**  Well, it is a -- we would contend the

16  First Amendment privilege does extend to communications between

17  people who have banded together, whether officially or

18  unofficially, to advance a political cause.

19          I mean, again, this comes back to the plaintiffs

20  saying, If you are a member of a 501c3 and you have internal

21  communications, that's fine.  But if you are Mrs. McIntyre and

22  you and your neighbor get together in your home and make a

23  flier, and you communicate about it, no privilege there.

24          **THE COURT:**  What you're saying is that your assertion

25  of the First Amendment privilege is going to embrace these

1   communications with the small, discreet voter groups; is that

2   it?

3          MR. PANUCCIO:  Well, we think the privilege would

4   embrace that, but we also think it's a responsiveness point.

5          THE COURT:  Did I understand you correctly?  Are you

6   saying that the First Amendment privilege extends to

7   communications from the campaign to these, what you've

8   described as discreet, small voter groups?

9          MR. PANUCCIO:  I'm sorry.  I misheard the question.

10  What I'm saying is --

11         THE COURT:  Yes or no?

12         MR. PANUCCIO:  Well, I mean, when you say "the

13  campaign," you know, for instance, when we are talking about

14  Dr. Tam, he was not the campaign.  He was an individual who

15  engaged in some political activity of his own.

16         THE COURT:  He is a defendant.

17         MR. PANUCCIO:  Correct.

18         THE COURT:  And the document request extends to him

19  as a defendant.

20         MR. PANUCCIO:  Right.

21         THE COURT:  Okay.  So we're talking about the

22  defendants, the named defendants, protectmarriage.com and the

23  individual-named defendants.

24         MR. PANUCCIO:  And all I'm saying is that I don't

25  think the individuals can be called "the campaign."  They might

1    have engaged in -- and so it's --

2              THE COURT:  All right.  That's a fair point.

3              Communications to or from the defendants to what you

4    describe as small, discreet voter groups, are those

5    communications covered by this First Amendment privilege, in

6    your view?

7              MR. PANUCCIO:  I think what we need is a definition

8    of what a "small, discreet voter group" is.  If it was a group

9    of unknown --

10             THE COURT:  I didn't come up with that.  You did.

11             MR. PANUCCIO:  What's that?

12             THE COURT:  I didn't come up with that phrase.  You

13   did.

14             MR. PANUCCIO:  Well, what I'm saying -- I did not

15   mean to say "voter group."  I believe I said "political

16   associates."  And I would say that if it were to a group of

17   known political associates, then, yes --

18             THE COURT:  Known political associates?

19             MR. PANUCCIO:  Yes.

20             But if you were sending them communication and just

21   sending it out there to unknown -- saying, "Voters, come vote,"

22   I would agree that there is no privilege over that.

23             There is certainly a tension here.  We have to figure

24   out what is public and what is private.  There is no doubt that

25   we need to do that.  But I think the Ninth Circuit gave us some

1  guidance on that, which said, Look, get discovery into what was

2  sent to large swaths of the electorate.  And we have repeatedly

3  said from the beginning we will give them that; and we have

4  given them that.

5           They have hundreds of e-mails that -- blast e-mails

6  that the campaign sent, of the scripts and the video of the

7  television and radio commercials, of the Robocalls, of the --

8  you know, anything like that, they have.  They have all that.

9  It's hard to see what is left.

10          I have -- we have asked them in letters repeatedly,

11 Give us an example of what concerns you have, what types of

12 documents.  So they sent us five documents.  All of them, but

13 one, were nonresponsive.

14          The one that was responsive was Dr. Tam's website

15 biography.  And there was one line in it that mentioned Prop 8.

16 It said, "I was a proponent for Proposition 8."

17          And we admit we missed that document, that website

18 biography, in the tens of thousands of documents we were

19 looking at.

20          The other documents they said we should have produced

21 related to -- not to Prop 8, to the 2006 campaign for a similar

22 ballot measure.

23          So we are trying to pin them down on what they want,

24 and it's a constantly moving target.

25          **THE COURT:**  It sounds like we are going to make some

1    progress when we see the privilege log and we see exactly how

2    you log in those documents.  And I have a feeling we are going

3    to be discussing this further and more fully later.

4              **MR. PANUCCIO:**  Thank you, Your Honor.

5              **THE COURT:**  I think we probably made as much progress

6    as we can on this issue, then.

7              The court reporter has requested a break.  And it

8    probably would be a good idea.

9              And I should advise counsel that we have a jury

10   that's deliberating, and we may have an interruption for a

11   verdict or a question from the jury at any time.  So I'll check

12   on that as well.

13             So why don't we take 15 minutes, and we'll resume at

14   12:15.

15             (Recess taken from 11:58 a.m. to 12:18 p.m.)

16             **THE COURT:**  All right.  Counsel --

17             **MR. COOPER:**  Your Honor, I would just like to inform

18   the Court that the lawyer representing the County of Imperial

19   has arrived in the courtroom --

20             **THE COURT:**  Oh, well, let's hear that matter.

21             Let's see.  Would that lawyer identify herself.

22             **MS. MONK:**  Good morning, Your Honor.  I apologize for

23   not being here earlier.

24             Jennifer Monk on behalf of the County of Imperial.

25             **THE COURT:**  Welcome.  Did you come all the way

```
 1    from --
 2              MS. MONK:  Murrieta.
 3              THE COURT:  -- Imperial County?
 4              MS. MONK:  Murrieta, California.
 5              THE COURT:  Murrieta.
 6              MS. MONK:  Not quite as far.
 7              THE COURT:  Welcome.
 8              MS. MONK:  Thank you.
 9              THE COURT:  Now, what I told the lawyers at the
10    outset, when we discussed this, is, I don't think it is
11    appropriate, at this time, to discuss the merits of your motion
12    because the parties have not had an opportunity to respond to
13    your motion.
14              But it does seem to me that we can address the
15    application for order shortening time to hear your motion --
16              MS. MONK:  Thank you, Your Honor.
17              THE COURT:  -- and would like to do that.
18              Let me begin with this question.  You state that you
19    do not intend to participate in the presentation of the
20    evidence, to call any witnesses, and otherwise participate in
21    the trial.  Your primary interest is to preserve a right of
22    appeal, in the event that a final judgment is entered in the
23    case.
24              Well, under those circumstances, is it really
25    necessary to hear this motion on an accelerated basis?
```

1          **MS. MONK:**  Your Honor, it is our hope to get involved

2   before the trial, so that the County can represent their

3   interests just by being a party and being able to support,

4   largely, the defendant-intervenors that have already been

5   admitted.

6          We understand that we're not going to make a

7   substantial difference at the trial, but the motion currently

8   is set for in the middle of the trial, so it would seem, if

9   nothing else, just to push it up slightly so that it can be

10  heard before the trial would begin.

11         **THE COURT:**  Well, you're not going to call witnesses.

12  You're not going to present evidence.

13         Provide some moral support to the proponents.  I'm

14  sure that will be welcomed.  But other than that, what do you

15  plan to do?

16         **MS. MONK:**  At the trial, Your Honor, we do not plan

17  to have an active participation.

18         **THE COURT:**  All right.  But you would like to get

19  into the case before the trial starts, and you think that might

20  be helpful.

21         Let me ask the plaintiffs what their view is with

22  reference to when we could hear the merits of the County of

23  Imperial's motion to intervene.

24         Mr. Olson.

25         **MR. OLSON:**  We will be opposing the motion.  We will

1  be happy to accommodate schedule of counsel and the Court with

2  respect to shortening time and having the hearing.  We'll have

3  someone here.  I don't know whether it will be me, but we will

4  have a representative of our team here.  And we will put

5  something together in writing as fast as is convenient for you.

6         I mean, we're entirely willing to accommodate

7  whatever is convenient for the Court.

8         **THE COURT:**  Okay.  Who else?  What about the Attorney

9  General, any of the other government parties, do they have any

10 view on this?

11        **MS. PACHTER:**  Your Honor, the Attorney General is

12 taking the same position with respect --

13        **THE COURT:**  I'm sorry.  You are going to have to come

14 to the podium.

15        **MS. PACHTER:**  The Attorney General is taking the same

16 position on these proposed intervenors as on all the other

17 intervenors who have sought to come into the case, which is we

18 do not oppose.

19        **MR. KOLM:**  Claude Kolm, for the Alameda County Clerk

20 Recorder.

21        Same position for the Alameda County Clerk Recorder.

22 We do not oppose.

23        **MS. WHITEHURST:**  Judy Whitehurst, with Los Angeles

24 County.

25        Same here, Your Honor.  We do not oppose.

1        **MR. STROUD:**  Andrew Stroud on behalf of the governor

2   and administration defendants.

3        The governor and the administration defendants do not

4   oppose, so long as there is no continuance of the trial date.

5   We do want to see the trial date maintained, Your Honor.

6        **THE COURT:**  All right.  Well, let's see what would be

7   a reasonable schedule.

8        Mr. Olson, you said that your team is going to oppose

9   the motion.  Let's say I grant an order shortening time.  Could

10  we have any opposition submitted -- could we get it in next

11  week -- it's a very short week -- or early the following week?

12  That would be --

13       **MR. OLSON:**  Well, earlier the following week would be

14  a little bit easier on the people who are going to have to do

15  it.

16       (Laughter)

17       **MR. OLSON:**  But as the person that's making the

18  promise, I think it would be best early the following week,

19  maybe two weeks from -- today is Wednesday.  Maybe two weeks

20  from today.

21       **THE COURT:**  That's the 30th of December.

22       **MR. OLSON:**  Is that okay?  We'll try to do it sooner

23  than that, if we can.

24       **THE COURT:**  That's fine.  30th of December for the

25  opposition.

1          And any reply, then, should be submitted -- can you

2  submit that reply by not later than the 7th of January?

3          **MS. MONK:**  Certainly, Your Honor.

4          **THE COURT:**  All right.

5          And I'm inclined, unless -- unless I change my

6  mind --

7          (Laughter)

8          **THE COURT:**  -- I'm inclined to try to decide this on

9  the papers, to obviate any further proceedings with reference

10  to this issue.

11          All right.  And I suppose, Mr. Cooper, you may want

12  to weigh in on this as well; although, I don't know that you

13  have to.

14          **MR. COOPER:**  Your Honor, we will plan to support the

15  motion, yes, Your Honor.

16          **THE COURT:**  On the same schedule?

17          **MR. COOPER:**  On the schedule you have set.

18          **THE COURT:**  That will be fine.

19          All right.  Anything else with reference to Imperial

20  County?

21          **MS. MONK:**  No.  Thank you, Your Honor.

22          **THE COURT:**  Certainly.

23          Now, let's talk about some of these other issues.  We

24  have motions in limine.  Motions in limine, I confess, are not

25  the favorite motions that I hear.

1          And how significant and important are these motions

2    in limine in a bench trial?

3          And I see, Mr. Boies, you raising yourself to come to

4    the podium.

5          **MR. BOIES:**  Your Honor, I think --

6          **THE COURT:**  Why shouldn't I just hear these folks,

7    and allow cross-examination as to their credentials and their

8    testimony, and simply make a determination based upon that?

9          **MR. BOIES:**  I think with respect to three of the

10   experts to which we have directed our motions in limine, that

11   would be a perfectly sensible approach.

12         **THE COURT:**  And you're talking now about Young, Marks

13   and Blankenhorn; is that correct?

14         **MR. BOIES:**  Yes.  Exactly, Your Honor.

15         And I've always been ambivalent about what the rule,

16   if any, was about motions in limine addressed to experts when

17   you have a bench trial.

18         I think the only advantage of it is, sometimes, to

19   make decisions ahead of time that will streamline the trial and

20   make it more efficient.  I think that's entirely something for

21   the Court to consider.

22         I think we have put before the Court what our issues

23   are with respect to these people's expertise.  I think we can

24   make those points on cross-examination.  The Court can consider

25   it in the context of the entire trial.  And if that is a way

1  the Court would prefer to do it, I think that's entirely

2  appropriate to do.

3          **THE COURT:**  That is my preference.

4          **MR. BOIES:**  I will then move only to the other one.

5          **THE COURT:**  Obviously, this not being a jury trial,

6  we don't have to be as concerned about bringing those folks --

7  deciding whether those folks are going to testify or not.

8          And it isn't going to materially streamline the case

9  to grant these motions in limine, so ...

10          **MR. BOIES:**  I don't disagree with that at all, Your

11  Honor.

12          **THE COURT:**  Fine.  What about, let's see, Miller?

13          **MR. BOIES:**  Miller.  Miller is quite a different

14  case.  With respect to Miller, we're not moving against his

15  testimony in its entirety.  He has got 120 paragraphs.  We're

16  only moving against paragraphs 53 to 72.

17          And the issue there is an issue as to whether he is

18  an appropriate rebuttal expert or not.  If he's an appropriate

19  rebuttal expert, then I think both we and the proponents would

20  agree that he testifies on this.

21          If he is not an appropriate rebuttal expert, as

22  opposed to an expert-in-chief, then I think we both agree that

23  he is not timely identified, and he should not be permitted to

24  testify as to these paragraphs.

25          The background is that they identified two experts in

1  religion.  Particularly, a Dr. Paul Nathanson, whose expert

2  report substantially was the same as paragraphs 53 to 72 of

3  Mr. Miller's purported rebuttal report.

4          I took Mr. Nathanson's -- Dr. Nathanson's deposition,

5  and he made a number of admissions that I suspect has led the

6  proponents to decide maybe he's not their strongest expert and

7  perhaps they don't even want to call him.

8          They have then made the tactical judgment that they

9  would try to substitute in Mr. Miller, Dr. Miller,

10 Professor Miller, to testify as to these paragraphs.

11         There is, I think, no room for doubt, at all, that

12 they were totally aware of the subject matter of this testimony

13 and the relevance, if any, of that testimony at the time they

14 put in their expert reports in chief.

15         Indeed, that's what Dr. Nathanson addressed.  And if

16 you look at the materials -- and we cited this in our motion.

17 If you look at the materials that Professor Miller relies on,

18 they are essentially the same materials that Dr. Nathanson

19 relied on.

20         And if you look at the materials that come from

21 websites, the last date visited was, in general,

22 September 27th, 2009, which was even before our expert reports

23 went in, before there was any supposed need for rebuttal.  And

24 it was exactly the same date that they were visited in

25 connection with Dr. Nathanson's report.

1          **THE COURT:**  You referred me to specific paragraphs of

2   Miller's rebuttal report.  Now that I have that before me,

3   remind me which paragraphs.

4          **MR. BOIES:**  Paragraphs 53 through 72.

5          And they are the paragraphs that essentially deal

6   with the role of religious organizations in the Proposition 8

7   campaign.  This was the subject both of Dr. Nathanson's report

8   and Dr. Young's report and testimony to a lesser extent.

9          But what is here in paragraphs 53 to 72 is

10  essentially duplicated from what Dr. Nathanson was going to

11  say.

12         The proponents say, We are using it for a different

13  purpose.  But that's not what the rule addresses.  What the

14  rule addresses is that a rebuttal witness's testimony must be

15  limited solely -- and "solely" is in the rule -- solely to

16  contradict or rebut evidence on the same subject matter

17  identified by another party.

18         So in order to bring themselves within the rebuttal

19  rule, they have got to come forward with something that they

20  are putting forward solely to contradict or rebut evidence that

21  we have offered in one of our expert reports.

22         And we think that's obviously not what's going on

23  here.  For one thing, they knew about it when they put in the

24  Nathanson report.  For another, the materials that -- here

25  simply duplicate that Nathanson report.  For another, they knew

1  about these materials prior to the time that the expert

2  reports -- our expert reports were even put in.

3          That's what the relevance is of the website, that

4  we've demonstrated.  They pulled this stuff off the website

5  before we even put our expert reports in.  They pulled it off

6  to support the Nathanson report.

7          **THE COURT:**  Well, if the Miller paragraphs that

8  you're moving to strike simply duplicate what's in the

9  Nathanson report, what's the harm of leaving the Miller

10 rebuttal report in?

11         **MR. BOIES:**  Your Honor, there is a sense in which,

12 with the various teams that we have, there's almost never harm

13 in adding an additional witness to the --

14         **THE COURT:**  I have noticed that.

15         (Laughter)

16         **MR. BOIES:**  And I would be hard pressed to tell you

17 that because he was added at the rebuttal stage, as opposed to

18 the expert-in-chief stage, that's going to prevent us from

19 getting ready to cross-examine him.

20         However, I think the purpose of having these rules in

21 which you say, Here's when you identify certain witnesses, and

22 if you don't identify them then you can't call them later, is

23 to impose a certain discipline.  I think that discipline is

24 useful.

25         I don't think there's any prejudice to them.  They

1   still have Dr. Nathanson.  The only prejudice to them is they

2   have decided, after Dr. Nathanson's deposition, that they don't

3   want to rely on him.  So it is something in which I think there

4   is no prejudice to them in any normal sense of the word.

5           And they had complete notice that they needed to put

6   in experts at a particular date.  We had a pretrial schedule

7   where each of us had to get certain things done.  They knew

8   they had to get it done.  They didn't get it done.  And now

9   they're trying to add a new witness to testify to the same

10  thing.

11          On the other hand, if the Court says, can we get

12  ready to cross-examine him, the answer is, of course we can.

13          **THE COURT:**  Well, Nathanson has been withdrawn?

14          **MR. BOIES:**  No, they haven't formally withdrawn him.

15  But -- and, of course, we have his deposition, and we can use

16  his deposition to the extent we think it's useful to us.

17          But this is, as we indicated in our papers, so

18  duplicative of what Nathanson's testimony is, that it's hard to

19  believe that they would be trying to shoehorn in this testimony

20  into Miller's report, if they really intended to call

21  Nathanson.  Indeed, if they tried to call Nathanson and Miller

22  to testify to the same points, that seems to be probably

23  something the Court might not --

24          **THE COURT:**  Has Miller been deposed?

25          **MR. BOIES:**  That is a question I don't know the

1   answer to, Your Honor.

2             **PLAINTIFFS' COUNSEL:**  Yes.

3             **MR. BOIES:**  He has been deposed.  Because -- and in

4   part, because he -- we weren't objecting at all to most of his

5   testimony.  In other words, from 1 through 52, and from 73 to

6   120, we didn't try to strike him even on our general motion in

7   limine.

8             **THE COURT:**  All right.  Who is going to be arguing

9   this, Mr. --

10            **MR. NIELSON:**  Nielson.

11            **THE COURT:**  Mr. Nielson.

12            **MR. NIELSON:**  Good afternoon, Chief Judge Walker.

13            **THE COURT:**  Good afternoon, sir.

14            **MR. NIELSON:**  I want to clarify the record, if I may,

15   first.

16            We put Miller in before Nathanson was deposed.  And

17   we have not withdrawn Nathanson.  And I'll tell you that while

18   they have similar testimony, the purposes are different.

19            Nathanson's testimony is directed to showing that

20   religious opinion regarding Proposition 8 is not uniform.  The

21   religious opposition to Proposition 8 doesn't necessarily

22   constitute animus or an inappropriate motive.

23            He is not being offered to testify to whether gays

24   and lesbians have political power.  That is what

25   Professor Miller is prepared to testify to.

1          So while, on the one hand, it would not be

2     prejudicial to the plaintiffs to have both of these experts

3     testifying, it would be prejudicial to us not to have

4     Professor Miller be able to testify to the fact that religious

5     support for same-sex marriage demonstrates the political power

6     of the gay and lesbian community.

7          Now, with those clarifications, I think if you

8     actually look at Professor Segura's report, specifically page

9     12 --

10          **THE COURT:**  Of Miller's report?

11          **MR. NIELSON:**  No.  Professor Segura's report.

12          **THE COURT:**  Segura.

13          **MR. NIELSON:**  That's the report that Miller was

14     offered to rebut.

15          **THE COURT:**  I see.  All right.  Hold on.  I think I

16     have that here.

17          **MR. NIELSON:**  If Your Honor would look on page 12,

18     there is two headings there.  There is "Moral and Political

19     Condemnation" -- excuse me.  I will wait just a moment.

20          **THE COURT:**  What page, sir?

21          **MR. NIELSON:**  It's page 12.

22          **THE COURT:**  I have it.

23          **MR. NIELSON:**  Very good.

24          The testimony Professor Miller offers about religion

25     is related to these two paragraphs that are headed, "Moral and

1    Political Condemnation," and "Powerful, Numerous and

2    Well-funded Opposition."

3              Now, it's simply not the case that his report

4    contains just a single line about the impact religion has on

5    the political power of gays and lesbians.

6              These two headings are in a larger heading called,

7    "The Political Powerlessness of Gays and Lesbians."  And these

8    are factors that contribute to that, according to Professor

9    Segura.

10             But I'd call your attention to, for example, the

11   second paragraph of the second heading -- the second sentence

12   of the second heading.  He quotes a statement that, "Opposition

13   to same sex marriages united leadership and core believers

14   across religious traditions."

15             He talks about, towards the bottom of that, after

16   talking about the religious groups that oppose same-sex

17   marriage, he talks about -- he ends that paragraph by saying,

18   "Gay and lesbians lack the resources, numbers, and reach to

19   counter this kind of committed organized opposition to their

20   interests."

21             The clear inference here, Your Honor, is that

22   religion is a unified, cohesive force pitted against the

23   interests of gays and lesbians.  And Professor Miller's

24   testimony is directly responsive to that.

25             Also, more generally, the subject matter of

1   Professor Segura's report is the political power of gays and

2   lesbians.  He argues that gay men and lesbians do not have

3   political power.

4            And, plainly, in discussing all of the groups that

5   supported -- or that opposed Proposition 8 and supported

6   same-sex marriage in California, Professor Miller demonstrates

7   that gays and lesbians do have political power and that, in

8   fact, many religious organizations and religious individuals

9   are part of the coalition that has, by and large, successfully

10  supported gay and lesbian rights in California.

11           So I would submit that Professor Miller's testimony

12  is directly responsive both at a specific level and at the

13  general level of political power.

14           Now, Dr. Nathanson uses the same material or similar

15  material for a different purpose.  And less to his --

16  Professor Nathanson's testimony was not intended to speak to

17  political power and whether gays and lesbians constitute a

18  suspect class.  It was intended to go to the issue of whether

19  Proposition 8 reflects improper animus of some sort.

20           And that is the purpose for which we offered

21  Professor Nathanson's testimony.

22           So I would also -- and with regard to the suggestion

23  that somehow, because we could have anticipated that plaintiffs

24  would have put on this evidence, we should have put it in

25  earlier, the advisory notes are quite clear, the advisory notes

1    to the Federal Rule of Civil Procedure 26, that governs that,

2    where one party bears the burden of proof on an issue, the

3    other party can wait and respond to that with their expert

4    report.  It says, quote, "In most cases, the party with the

5    burden of proof on an issue should disclose its expert

6    testimony on that issue before other parties are required to

7    make their disclosures with respect to that issue."

8            And plaintiffs clearly bear the burden of proof on

9    the proposition that gays and lesbians are a suspect class

10   entitled to heightened scrutiny.  So we were entitled to await

11   their evidence so we could decide how to rebut it.

12           In fact, the courts have recognized that.  I'll cite

13   this court to the *Crowley vs. Chait* case.  It's a District

14   Court case.  There isn't much in the way of precedent, except

15   at the District Court level, on this issue.

16           But the Court rejected the argument that rebuttal

17   information is improper simply because the expert, quote,

18   "could have included it in his or her original report."  And it

19   went on to explain, "Such a rule would lead to the inclusion of

20   vast amounts of arguably irrelevant material in an expert's

21   report on the off chance that failing to include any

22   information in anticipation of a particular criticism would

23   forever bar the expert from later introducing the relevant

24   material."

25           In other words, if we were required to anticipate

1   everything we might want to say in response to plaintiffs' case

2   about political power, we would have had to put in something

3   before, that would potentially contain all sorts of irrelevant

4   material, things that just are not responsive to what their

5   expert actually ends up saying.

6          So for all of those reasons, I would suggest that the

7   motion in limine should be denied.  And unless the Court has

8   further questions, that's all I have.

9          **THE COURT:**  Very well.  Thank you, Mr. Nielson.

10         Last word, Mr. Boies?  Anything further, or shall we

11  submit the matter?

12         **MR. BOIES:**  I think we can submit the matter, Your

13  Honor.

14         **THE COURT:**  Ordinarily, the rules of procedure with

15  respect to putting in affirmative evidence and rebuttal

16  evidence are important, and play a significant role in

17  management of evidence and presentation of evidence in a case,

18  and, typically, should be strictly adhered to.

19         In this case, however, the parties have been very

20  ably and effectively proceeding with an accelerated trial

21  preparation schedule.  And under those circumstances, it's

22  understandable that some of the formalisms that normally

23  accompany the pretrial preparation process might be observed

24  more informally than otherwise.

25         And so I don't believe the fact that the sequence of

1   the presentation of these pieces of -- pieces of testimony are

2   at all unusual under the circumstances that we face here.

3           Further, the issues in this case, many of them, are

4   obviously very broad-gauged.  The issues that are highlighted

5   in the Segura testimony or the Segura report and the Miller

6   rebuttal report deal with an important issue in the case,

7   having to do with the level of scrutiny to be applied to

8   Proposition 8.

9           And so my inclination is not to exclude the

10  paragraphs of the Miller expert rebuttal report, but to

11  consider that information; to allow Mr. Miller to be

12  cross-examined fully on his report; and to not be too

13  punctilious in enforcing the scheduling rules with the

14  preparation of expert testimony.

15          So, I don't want to send a signal that I'm not going

16  to be punctilious in other regards --

17          (Laughter)

18          **THE COURT:**  -- but in this area, I think maybe we

19  will just kind of rise above the problem.

20          All right.  What else?

21          Trial schedule.  Any other issues before we deal with

22  the trial schedule?

23          Yes, sir.

24          **MR. THOMPSON:**  Your Honor, this relates to the trial

25  schedule.

1              THE COURT:  All right.  Fine.

2              MR. THOMPSON:  And there were a few issues that we

3     wanted to seek some guidance from the Court from.  And I've

4     raised them with our friends, in at least a preliminary

5     function, at Gibson, Dunn.

6              And one issue relates to the timing of disclosure of

7     witnesses.  And we're familiar with the Court's guidelines for

8     the conduct of trials in which, in a typical case, disclosure

9     must be 24 hours ahead of time.

10             But the plaintiffs have 32 witnesses, not including

11    our experts, who are also on their expert report, but 32

12    witnesses.  And if we are going to find out on the morning of

13    January 10th who their first witness is going to be, we will

14    have to show up in San Francisco, ready to cross-examine any of

15    32 individuals, and that would place an enormous burden on us.

16    We are going to have hundreds of thousands of pages of binders

17    for the 32 cross-examinations.

18             So we would request -- and we won't have all the

19    lawyers here for the entire trial.  So we would request that

20    one week before a case -- the case-in-chief commences for each

21    side, that they disclose the order of the witnesses that

22    they're going to call, bearing in mind that they are free not

23    to call every witness, and that there'll inevitably be

24    scheduling issues where a professor can only testify on a

25    particular day.  And as long as there was reasonable notice, we

1  would have no problem with having there be a change in the

2  order.

3          And we're not requesting that all the exhibits in

4  connection with all 32 witnesses be disclosed a week before the

5  case-in-chief.

6          But if we were permitted to have that order -- and we

7  would, of course, extend the same courtesy to them -- it would

8  dramatically alleviate the burdens of trying this case.

9          **THE COURT:**  Well, I think that's a fair request.  I

10  don't know about a week, but -- particularly after we get into

11  trial, but, certainly, I think you're perfectly entitled to

12  know who the first few witnesses of the plaintiffs are going to

13  be.

14          What have they told you they will tell you, and when

15  will they tell that to you?

16          **MR. THOMPSON:**  They like your rule, Your Honor, of 24

17  hours beforehand, precisely because of the enormous burden that

18  it places on our side, I suspect, even though they didn't give

19  voice to that.  So that's why we've had to raise the issue with

20  the Court --

21          **THE COURT:**  I see.

22          **MR. THOMPSON:**  -- but if they would like to speak to

23  it ...

24          **THE COURT:**  Well, Mr. Olson told me a minute ago that

25  the named plaintiffs have jobs and occupational obligations.  I

1  assume, therefore, that they would like to pin down precisely

2  when they are going to testify.

3          And perhaps they are going to be the first witnesses;

4  are they?

5          **MR. OLSON:**  I don't know for sure; but, yes, that's

6  probably correct.

7          And I think -- we take the point, your point on it as

8  well.  I don't see any reason why we couldn't give -- we're

9  starting on the 11th of January.  I don't see any reason why we

10 couldn't, several days before that, identify the first two days

11 worth of witnesses, Your Honor.

12         The need for flexibility and the reason that the rule

13 has 24 hours in it is -- there are lots of good reasons for

14 that, and we would prefer adhering to that with respect to the

15 balance of the trial.

16         But I do think that we could accommodate counsel, our

17 opponents, in the manner in which you suggested.

18         **THE COURT:**  Can you tell them who the first two days

19 of testimony are going to be coming from on the 6th of January?

20         **MR. OLSON:**  Yes.

21         **THE COURT:**  Okay.

22         **MR. THOMPSON:**  And that would be extremely useful,

23 Your Honor, as a start, but, you know, we have this sort of

24 continuing issue.

25         Would it be possible to maintain this kind of on a

1  rolling basis, so that if they say, well, here -- out of our 32

2  witnesses, here are the first two, you know, or three, for the

3  first two days, we still have the problem of not knowing, okay,

4  well, who are the next 29?

5          And I strongly suspect, Your Honor, if their

6  witnesses are like our witnesses, they are very busy academics,

7  with many different obligations, that they have some sense as

8  to roughly the week or the days -- many of the witnesses, at

9  least on our side, have very specific availability.

10          So we would appreciate if there could be that

11  continuing rolling at least 72 hours beforehand, to know

12  who's --

13          **THE COURT:**  I think after we get started, 48 hours

14  would be more reasonable than 72, given the schedule.

15          One of the things that I happily gave up when I

16  stopped practicing law was managing witnesses at trial.  So I

17  don't want to be too strict about that.

18          I understand you both have problems.  This is a bench

19  trial.  We can accommodate unexpected events to the extent

20  necessary.

21          But I think 48 hours should probably be sufficient

22  after we get started.

23          **MR. THOMPSON:**  Thank you, Your Honor.

24          **THE COURT:**  And, of course, the same is going to

25  apply to your side.

 1           **MR. OLSON:**  We accept that, Your Honor.

 2           **THE COURT:**  Fine.

 3           Now, there is one witness that appears on the

 4  plaintiffs' witness list, that raises some concern on my part,

 5  and that is Mr. Pugno, who is designated on the plaintiffs'

 6  witness list.

 7           He is an attorney in the case, is he not?  Is he

 8  not -- has he not appeared in the case, representing the

 9  proponents?

10           **MR. THOMPSON:**  He has, Your Honor.

11           **THE COURT:**  Is it your intent to call one of the

12  lawyers on the other side?

13           **MR. OLSON:**  May I ask Mr. Boutrous to respond to

14  that?

15           **THE COURT:**  Of course.

16           Mr. Boutrous.

17           **MR. BOUTROUS:**  Yes, Your Honor.  He is an attorney.

18  We're cognizant and sensitive to that.

19           He does appear, for example, in the Wall Street

20  Journal letter to the editor as a member of the executive

21  committee.  So some of these issues we're just exploring.

22           To the extent we call him as a witness, it would be

23  on non-privileged, and -- and efforts by him that did not

24  involve providing legal advice.  We would be very careful of

25  that.  We listed him in an abundance of caution and would,

1  going forward, be very careful that we respect the

2  attorney-client relationship.

3       **THE COURT:**  I would urge you to make every effort to

4  obtain whatever information you think Mr. Pugno can offer from

5  other witnesses, so that it's not necessary to call him.

6       **MR. BOUTROUS:**  We will do that, Your Honor.  Thank

7  you.

8       **THE COURT:**  All right.

9       **MR. THOMPSON:**  Your Honor, three more issues, if I

10 may, that have practical significance.  I apologize.  I will be

11 very brief.

12      **THE COURT:**  Don't apologize.  Let's get this out on

13 the table.

14      **MR. THOMPSON:**  The second issue is whether we need a

15 sponsoring witness to move documentary evidence into the record

16 of the case.

17            As we have submitted previously, there are

18 legislative facts that are at issue in this case.  And, as a

19 consequence, the Court is free to consider materials that amici

20 discuss but the parties don't discuss.  And the Court is free

21 to analyze materials that none of the parties bring to it.  And

22 that is true of the appellate courts, as well.

23            And, so, the reason I make that point is, it's clear

24 that there's no requirement that, for legislative facts, that a

25 sponsoring witness speak to a document in order to get it into

1    record.  It's distinct from adjudicated facts in that way.

2         And I raise this because the trial will be at least

3    twice, if not three times, as long if every document that we

4    want into this record has to be used with a witness.

5         We oftentimes will want to establish a proposition,

6    and will use one or two documents, but we might have a hundred

7    that say the same thing.  And we want to show that this is a

8    point that was well-understood and there's a depth to it.  And

9    we wouldn't want to waste the Court's time with moving these

10   documents in one at a time.

11        We have raised this with plaintiffs, and they -- I'll

12   let them speak for themselves as to what their position is,

13   but, as I understand it, they agree that we don't need to have

14   a sponsoring witness for each document that would come into the

15   record.  But they're proposing that the lawyers get up and then

16   identify why each document is relevant.  That might be slightly

17   less time consuming than using a witness, but not much.

18        We have entire books that we want to have moved into

19   the record.  And if we have to explain, on this page there's

20   this relevance, and on that page there's that relevance, we

21   don't think that makes sense.

22        **THE COURT:**  Well, I must say, you both have submitted

23   pretty awesome exhibit lists; 1500 for the plaintiff, and over

24   3,000 for the proponents.  I trust that we are not going to

25   have all of these admitted into evidence; there is going to be

1  some selectivity as the case is presented.

2         **MR. THOMPSON:**  There may be some, Your Honor.  But,

3  quite frankly, you know, given the magnitude and the sorts of

4  issues that are at stake in this, and the numerosity of those

5  issues and the amount of evidence that pertains into it, I

6  would think that, at least speaking for ourselves, the majority

7  of our exhibit list we intend to move into evidence.

8         We put a little asterisk next to, you know, what we

9  thought we were required to under Rule 26, of what we intend to

10 move into evidence and --

11        **THE COURT:**  Including the vital statistics from

12 Iceland?

13        **MR. THOMPSON:**  Exactly.  And Denmark.  Don't forget

14 that.

15        So we do intend to move a lot of the evidence into

16 the record.  And we don't mean to burden the Court with a huge

17 mountain of evidence that hasn't been explained.  Rather, we

18 would say for most of it we think it will be clear why we're

19 moving it in.

20        And if it's not, in our post-trial findings of fact

21 we will then, for each finding of fact, you know, specify which

22 piece of evidence relates to which finding, so that we think

23 that would alleviate any burden on the Court.

24        **THE COURT:**  Well, I suspect that if you're moving in

25 materials that have some very generalized application to the

1  issues here, there will not be an objection by the plaintiffs,

2  and this shouldn't be a problem.

3          What, in your discussions, have you determined you

4  think is going to be a problem?  Are there particular documents

5  on this exhibit list that you anticipate there may be an

6  objection to without a sponsoring witness?

7          **MR. THOMPSON:**  Well, that relates, actually, to the

8  third issue, which is, we would like -- we have had dialogue

9  with Gibson, Dunn about trying to identify the extent to which

10  we have problems with the other parties' exhibits, to their

11  admissibility and authenticity.

12          And we would like the Court to impose a deadline on

13  the parties by which we would identify problems we have with

14  authenticity, for example, and admissibility, so that if we

15  have to bring in witnesses to authenticate hundreds and

16  hundreds of documents, we know that in advance.

17          I can tell the Court, having looked very carefully at

18  many of the exhibits on their exhibit list, we don't anticipate

19  that sort of objection from us, especially given these are

20  legislative facts.  And we believe the Court is entitled to

21  look at whatever it chooses to, with respect to these

22  legislative facts, unless --

23          **THE COURT:**  Well, why don't you point out an exhibit

24  on your exhibit list that you believe falls within that

25  category of a legislative fact, so that I have some idea of

1    what we are dealing with here.

2           MR. THOMPSON:  I've opened at random, but happily,

3    since almost everything is legislative -- so page -- if we

4    looked at Exhibit DIX8 -- this is page 55.  And -- all right.

5    We could look at DIX eight five zero.

6           THE COURT:  This is an article from what appears to

7    be a journal; is that correct?

8           MR. THOMPSON:  Yes, Your Honor.  And there are

9    hundreds of journals or articles.  And they go -- many of them

10   go to the issue of whether the optimal environment to raise a

11   child is a married biological mother and father.  And I believe

12   that this is one of those articles that has some relevance to

13   that issue.

14          And the point is, if we have an expert, Dr. Marks,

15   for example, who is going to speak to the importance of having

16   a married biological parent, and he's got a hundred articles

17   that support him, we don't think it's a beneficial use of the

18   trial time to say, "And now what's the next report, Dr. Marks,

19   that supports this proposition or that?"

20          THE COURT:  Well, if that's how these are going to

21   come in, could he not simply refer to the group of documents,

22   and those documents could be included within one exhibit, what

23   we used to call a "banker box exhibit"?

24          MR. THOMPSON:  We could do that, Your Honor.  And as

25   long as that's permitted, where we in bulk are allowed to move

1   in documents, without having to sift through them one by one,

2   then I think that would alleviate our concerns.

3          But we still would maintain that there's no support

4   for the notion that legislative facts have to have a sponsoring

5   witness to get a document into evidence because, of course, the

6   Court is free to examine materials that the parties have not

7   brought to its attention.  And the Court of Appeals and the

8   United States Supreme Court are, as well.

9          So we want clarity on how the process would work, but

10  I think we have a shared premise that it's not necessary.

11          **THE COURT:**  I understand your -- I appreciate your

12  concern.

13          My objective in this proceeding, as much as any other

14  objective, is the preparation of a record which will allow

15  appellate review of this issue.

16          And so while I appreciate that the range of issues is

17  very broad-gauged, and may cover a lot of material of the kind

18  that you've described, I do think we want to, if not be too

19  strict about the introduction of this material, nevertheless,

20  enforce rules of authenticity and reliability, so that we've

21  got a pretty concrete record when the case takes the next step.

22          So I'm rather disinclined just to let in wholesale

23  materials that deal with some of these issues, unless there is

24  a witness who can say, "These are materials that are pertinent

25  to the question.  These are materials that I have relied upon.

1    These are materials that I believe are reliable to establish or

2    to refute whatever proposition is at issue."

3              So ...

4         **MR. THOMPSON:**  May I propose, perhaps, what might be

5    a compromise -- because we certainly don't want to flout, in

6    any way, the rules of evidence -- but would be, a week before

7    each party's case-in-chief they would identify, Here are the

8    documents we intend to move into evidence, and we may or may

9    not use a witness.

10             And they'd only have to disclose the ones they knew

11   they weren't going to use a witness with.  And the other side

12   would have an opportunity to object, These aren't authentic,

13   you know.

14        **THE COURT:**  I understand when a witness is identified

15   for testimony that, along with the designation of a witness and

16   when he or she is going to testify, that the other side is

17   alerted as to the documents or exhibits that that witness is

18   going to sponsor in his or her affirmative testimony.

19             I think that's a standard part of this two-day alert

20   that you're going to have as to the first two days of trial,

21   and then the 48-hour alert that you are going to have

22   thereafter.

23        **MR. THOMPSON:**  And we appreciate that, Your Honor.

24   So this would be in addition to that, for those documents that

25   the parties were not planning on using with a witness, to

1  encompass those at the beginning of a parties' case-in-chief,

2  maybe a week beforehand, so the other side, if they wanted to

3  use that document in cross-examination, they would know about

4  it.  If the other side wanted to object to authenticity or

5  admissibility, they would be put on notice that this is coming

6  into the record, if there is an objection lodged.

7          **THE COURT:**  Here's my inclination.  Let me see what

8  your reaction to that is.  And that is, if we pretty much

9  enforce the rule that every document or every exhibit to be

10  introduced in the course of a trial must have a sponsoring

11  witness, but at the conclusion of the testimonial part of the

12  trial, if one side or the other believes that there are

13  additional materials that are necessary, as to which it did not

14  have an opportunity to present a sponsoring witness or a

15  sponsoring witness would not be brought to court without undue

16  expense or inconvenience, then I will permit that party to seek

17  to move into evidence that additional exhibit or group of

18  exhibits.

19          **MR. THOMPSON:**  And we appreciate that, Your Honor,

20  because I think that resolution of this issue is consistent

21  with our point, which is that the Federal Rules of Evidence are

22  clear that it's not required to have a sponsoring witness for a

23  legislative fact.

24          **THE COURT:**  Well, we'll make a good-cause

25  determination at the end of the trial.

1          What's the plaintiffs' view with respect to that,

2     Mr. Boies?

3          **MR. BOIES:**  Your Honor, we think that's a sensible

4     approach.

5          We do think there needs to be some good cause shown

6     at the end, rather than just laying -- dumping all the

7     documents in.  And we believe that part of that good cause will

8     be to show what the relevance is of the documents.

9          We think it would be unfortunate if we had a record

10    that went up to the appellate courts with three or four

11    thousand documents.  That's an unmanageable record,

12    particularly if there is no tether that demonstrates the

13    reliability or relevance of all the documents that are in the

14    record.

15         So, we basically agree with what the Court proposes.

16         **THE COURT:**  Then that will be the order, that

17    exhibits to be received during the course of the trial will

18    require a sponsoring witness.

19         The Court will consider the admission of additional

20    materials for good cause shown based on unavailability, undue

21    expense or burden, and a showing of relevance to the issues

22    that need to be adjudicated.

23         **MR. THOMPSON:**  Your Honor, thank you.

24         Two more of these points.

25         **THE COURT:**  Okay.

1              **MR. THOMPSON:**  The third one is, we would

2     appreciate -- we think both parties would be served by having a

3     deadline by which we had to at least identify concerns over

4     authenticity of these documents.

5              Because if we're going to have to call witnesses in

6     to authenticate, one by one, different documents, it would

7     certainly be beneficial, I think, to the parties to know that.

8     Hopefully, we can avoid that.  But --

9              **THE COURT:**  It's been years since I've had a serious

10    authenticity objection.

11             **MR. THOMPSON:**  Okay.  Very well, Your Honor.

12             And then the last issue, Your Honor, is post-trial

13    briefing.  And I know --

14             **THE COURT:**  Oh, my goodness gracious, are you

15    getting --

16             (Laughter)

17             **MR. THOMPSON:**  The cart before the horse, I know,

18    Your Honor.

19             We are entirely at the Court's pleasure on whatever

20    the Court would find most helpful.  But if there were going to

21    be post-trial briefing, and if it were going to be a

22    highly-compressed schedule, we would like to know about that

23    beforehand so that we can do something that's meaningful.

24             But, our view is that we could not do anything

25    meaningful in less than 30 days.

1          **THE COURT:**  All right.  Well, we'll deal with that

2     when we need to.  I've already, by setting this schedule,

3     ruined your holiday plans, so I'm not going to ruin any other

4     at this juncture.

5          **MR. THOMPSON:**  Thank you, Your Honor.

6          **THE COURT:**  Absolutely.  Anybody else?

7          Does that mean we're done?

8          **MR. OLSON:**  Thank you, Your Honor.

9          **MR. BOIES:**  Thank you, Your Honor.

10         **THE COURT:**  Thank you, Counsel.

11         Let me give you one other piece of advice, because I

12    don't think -- except as we may have some discussions with

13    regard to further discovery, I think it's unlikely that we will

14    all be together again until the 11th of January.

15         It would be my plan to proceed beginning at 9 o'clock

16    on January 11.  And we'll go until approximately the noon hour,

17    and then we'll take about an hour or so for lunch, and then go

18    until about 4 o'clock in the afternoon.

19         But after the 11th, we'll probably start about 8:30

20    in the morning.  But you may need a little more time to get

21    organized on that first day, so I will be happy to accommodate

22    that.

23         Now, if you have additional problems that you need to

24    discuss with me, and if the proceedings at 7th and Mission

25    Street, or wherever the Court of Appeals deals with some of

1  these discovery disputes, necessitates you discussing further

2  issues with me, I'm available and happy to accommodate you.  I

3  will be around.  So I should have no problem in trying to move

4  these issues along so we tee off on the 11th of January.

5          **MR. BOIES:**  Great.

6          **THE COURT:**  All right.

7          (Counsel thank the Court.)

8          **THE COURT:**  Thank you.  And happy holidays to

9  everybody.

10          (Counsel respond.)

11          (At 1:09 p.m. the proceedings were adjourned.)

12                              -   -   -   -

13

14                    <u>**CERTIFICATE OF REPORTER**</u>

15          I certify that the foregoing is a correct transcript

16  from the record of proceedings in the above-entitled matter.

17

18  DATE:   Tuesday, December 22, 2009

19

                        s/b Katherine Powell Sullivan
20          _____

21          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                          U.S. Court Reporter
22

23

24

25