# EXHIBIT D (CONT'D)

## TABLE V-4

### General Attitudinal Factor Analysis Items Grouped By Factors

| Factor Name | Item from Survey | |
|---|---|---|
| 1. General Effects Factor | Q.1. | Extended media coverage (EMC, popularly referred to as "Cameras in the court") of courtroomproceedings will not detract from the decorum of the judicial process. |
| | Q3. | EMC of courtroom proceedings will increase citizens' willingness to become involved in the judicial process. |
| | Q.4. | EMC of courtroomproceedings will improve the quality of courtroom advocacy. |
| | Q.10. | EMC of courtroom proceedings will not affect a judge's ability to maintain courtroom order. |
| | Q.16. | EMC of courtroom proceedings will increase jurors' attentiveness to testimony. |
| | Q.26a. | EMC should be allowed in Appellate Proceedings |
| | Q.26b. | EMC should be allowed in Civil Proceedings |
| | Q.26c. | EMC should be allowed in Criminal Proceedings. |
| 2. Influence Factor | Q.7. | EMC of courtroom proceedings will cause judges to avoid unpopular positiones or decision. |
| | Q.8. | EMC of courtroom proceedings will affect voting at the next election of elected officials represented at the proceeding. |
| | Q.9. | Jurors' decision making will be influenced by their friends' and acquaintances' attitudes about the case because of EMC of the trial. |
| | Q.15. | EMC of bail proceedings will improperly influence a judge in setting bail. |
| | Q.18. | EMC of courtroom proceedings will cause prosecutors to "play up" to the media to enhance the re-election prospects of the District Attorney. |
| | Q.24 | EMC of sentencing proceedings will will improperly influence a judge in the sentencing decision. |

Table V-4 cont.

3. Civilian Concern Factor

    Q.19.  BMC will make witnesses more reluctant to testify.

    Q.22.  BMC of courtroom proceedings will make people more apprehensive about parti-
cipating in legal processes.

4. Mutual Consent Factor

    Q.17  BMC of criminal proceedings should be allowed only with the consent of the
parties.

    Q.25  BMC of noncriminal proceedings should be allowed only with the consent of
the parties.

431

that high confidence can be placed in the accuracy
and consistency of the attitude measures taken in this
evaluation.  The coefficients indicate that, if used
again, the same items would group together again, form-
ing the same factors, even with different samples of
judges, prosecutors, and defenders.  In short, the Gen-
eral Attitudinal Survey accurately measures the atti-
tudes of the target populations sampled.

TABLE V-5

RELIABILITY OF ITEMS IN EACH FACTOR IN THE GENERAL
ATTITUDINAL SURVEY ANALYSIS

| Factor Name | Reliability Coefficients | | |
| --- | --- | --- | --- |
| | Pretest | During Posttest | Posttest |
| 1. General Effects Factor (Items 1,3,4,10,16,26a, 26b,26c) | .87 | .85 | .88 |
| 2. Influence Factor (Items 7,8,9,15,18,24) | .85 | .86 | .88 |
| 3. Civilian Concern Factor (Items 19,22) | .79 | .90 | .84 |
| 4. Mutual Consent Factor (Items 17,25) | .79 | .80 | .81 |

Slopes Analysis:  Rates of Change Over Time

Between Occupational Groups

Question: Over time, are attitude changes, if any, occur-
ring uniformly to judges, prosecutors, and defenders?
Is any one of the three groups changing their attitudes
toward EMC faster or slower than others?  Is one group
becoming more negative toward EMC while others become
more positive?

To determine if EMC-Inexperienced judges, prosecutors
and defenders rates (or slopes) of change on attitudinal
factors from pretest to after posttest differed from one
occupational group to the other (between groups), slopes
of regression lines were generated from pairs of pre and
post measures for each group.  The same was done for EMC-
Experienced judges, prosecutors and defenders.

Table V-6 summarizes the result.  On three of the four
factors, significantly different rates of change were
found between the EMC-Inexperienced judges, prosecutors,
and defenders.  The same was true between EMC-Experienced
groups.  In general, it can be concluded that for both
EMC-Inexperienced occupational groups and EMC-Experienced
occupational groups, the changes in their attitude
measures are occurring at different rates.  Put another
way, judges, prosecutors, and defenders changed at sig-
nificantly different rates over time (pre to post) on
their attitudes toward EMC whether or not they had direct
EMC experience.

Why would both Experienced and Inexperienced occupational
groups show different rates of change?  One could presume
that the indirect or vicarious effects of such a high
publicity occurrence such as the "cameras in the courts"
phenomenon might affect equally all three occupational

-142-

TABLE V-6

RESULTS OF PRE TO POST SLOPES ANALYSIS ON FACTORS BETWEEN OCCUPATIONS

| Factor | EXPERIENCE LEVEL | |
|---|---|---|
| | EMC-Inexperienced Judges, Prosecutors and Defenders | EMC-Experienced Judges, Prosecutors, and Defenders |
| [1] General Effects | Not significant | Significant beyond .01 level |
| [2] Influence | Significant beyond .01 level | Significant beyond .025 level |
| [3] Civilian Concern | Significant beyond .025 level | Not significant |
| [4] Mutual Consent | Significant beyond .01 level | Significant beyond .01 level |

142-A

groups.  Any one individual in any of the groups, whether
receiving direct EMC experience or not, was undoubtedly
aware of and affected by news about and knowledge of the
experiment.  Receiving an attitude survey from the evalu-
ation team would be an example of such vicarious parti-
cipation.  Hence, it is not too surprising that changes
in attitude measures occurred in even the EMC-Inexperienced
groups.

EMC-Inexperienced.  The three EMC-Inexperienced occupa-
tional groups rates of change on Factor 1, General Effects,
were not significantly different.  Whatever changes may
have occurred on this factor did so uniformly over time
across groups.  On Factor 2, Influence, however, the
three groups changed at different rates.  Factor 2 is
comprised of Survey items 7, 8, 9, 15, 18, and 24, all
of which highlight concern that EMC possibly may have a
deleterious effect on either the decision makers in court
proceedings or on those public figures who could gain or
lose from media exposure.  To understand how the slopes
analysis works, Table V-7 below, extracted from Table
V-8, illustrates the sense of this result.

### TABLE V-7

General Attitudinal Survey Factor 2 Mean Scores

| Factor 2 | Judges | EMC-Inexperienced Prosecutors | Defenders |
|---|---|---|---|
| Pretest Mean Score | 2.91 | 2.99 | 1.82 |
| Posttest Mean Score | 3.01 | 3.08 | 1.84 |

-143-

Case3:09-cv-02292-VRW   Document335-5   Filed12/31/09   Page9 of 207

TABLE V-8

General Attitudinal Survey Factor Means Used to
Calculate Pre-Post Slopes Between
Occupations and Within Occupations

| Factor | EMC-Inexperienced Pre | (After) Post | | EMC-Experienced Pre | (After) Post |
|--------|------|------|-------------|------|------|
| 1* | 3.11 | 3.10 | Judges | 2.86 | 2.79 |
| | 2.61 | 3.38 | Prosecutors | 3.14 | 2.88 |
| | 3.74 | 3.72 | Defenders | 3.92 | 4.00 |
| 2** | 2.91 | 3.01 | Judges | 2.95 | 3.05 |
| | 2.99 | 3.08 | Prosecutors | 3.22 | 3.33 |
| | 1.82 | 1.84 | Defenders | 1.74 | 1.87 |
| 3** | 2.41 | 2.51 | Judges | 2.65 | 2.90 |
| | 2.00 | 2.06 | Prosecutors | 2.24 | 2.44 |
| | 2.02 | 2.05 | Defenders | 1.88 | 1.88 |
| 4** | 2.12 | 2.49 | Judges | 2.38 | 2.86 |
| | 2.02 | 2.16 | Prosecutors | 2.00 | 2.6 |
| | 1.64 | 1.68 | Defenders | 1.44 | 1.4 |

*Lower mean score indicates a more positive attitude toward EMC

**Higher mean score indicates a more positive attitude toward E

-144-

436

The judges pretest mean score of 2.91 is the summed score
for all six items on this factor for all judges divided
by six and divided by the number of judges.  Their post-
test mean score is 3.01, a gain, or change, of .10 units.
The same amount of change in the same direction occurred
for prosecutors, but not for defenders.  The overtime
change from pre to post, (the rate of change), is signi-
ficantly different for the defenders than for judges and
prosecutors.  Hence, for Factor 2, Influence, we can say
confidently that the three occupational groups are chang-
ing at significantly different rates and that the defenders,
by not changing, are the cause of the significance.

On Factor 3, Civilian Concern, the three EMC-Inexperienced
groups changed at significantly different rates also.
Factor 3 consists of Survey items 19 and 22, indicating
potential EMC effects of reluctance and apprehension in
witnesses and in people in general.  Table V-8 shows
that the judges and prosecutors change but the defenders
do not.  The pattern continues even more graphically on
Factor 4, Mutual Consent, consisting of Survey items 17
and 25, the "Party Consent" questions.  From the means
listed in Table V-8, it can be seen that all three groups
are changing at very different rates:  the defenders
not at all; the judges considerably; and the prosecutors
in between.

EMC-Experienced.  The rates of change for the three EMC-
Experienced occupational groups on Factors 1, 2, and 4
are significantly different.

Factor 1, General Effects, consists of Survey items 1,
3, 4, 10, 16, 26a, 26b, and 26c, all of which when taken
together describe general, or global, "good-bad" effects
attributable to EMC.  Factor 1 items are also those items

-145-

which are likely to be affected by direct EMC experi-
ence.   In other words, a judge who had had EMC in his
courtroom may have first-hand knowledge that his ability
to maintain order (item 10) was not diminished.   His
pre to post measure on that item might reflect his exper-
ience, a fact which might not hold time for those indi-
viduals who remained inexperienced.   As seen in Table
V-8, it is the EMC-Experienced prosecutors whose rate
of change (.26 units) is significantly different from
the other two groups.   The defenders' score in this case
changed in the opposite direction, a fact which magnifies
the change rate differences between the groups; hence,
the passage of time resulted in different growth rates
in attitude for this measure.

In Factor 2, Influence, the defenders show the greatest
change in magnitude while in Factor 4, Mutual Consent,
the prosecutors' and judges' rates of change are vastly
different from those of defenders.

Overall, the rates of change over time in attitude meas-
ures for the three occupational groups for both EMC-
Experienced and EMC-Inexperienced show significant dif-
ferences on the four factors.   The attitude scores for
judges and prosecutors, by-and-large, change over time.
The EMC-Experienced judges and prosecutors, in addition,
have the largest change rates.   Defenders, on the aver-
age, seem to have changed only minimally, if at all.
In summary, attitude changes over time are occurring,
but not uniformly between the three occupational groups.

## Within Occupational Groups

Question:  Does experience with EMC affect the rate at
which attitude scores change?  Would Experienced judges'

attitudes change faster in regard to EMC than Inexperi-
enced? Will Experienced prosecutors develop a negative
attitude toward EMC while Inexperienced prosecutors stay
the same? What happens within each occupational group
to the rates at which its members' attitudes change?

To determine if rates of change (or slopes) on attitude
measures from Pretest to After Posttest differed within
occupational groups between EMC-Inexperienced members
and EMC-Experienced members, slopes of regression lines
were generated from pairs of pre and post measures.

Table V-9 summarizes the results and indicates that the
rate of change pre to post for EMC-Inexperienced vs.
EMC-Experienced members was not significantly different
for any of the three occupational groups on any of the
four factors. For illustration purposes, Table V-10

### TABLE V-9

**Results of Pre-Post Slopes Analysis on Factors
Within Occupational Groups**

| Factor | EMC-Inexperienced and EMC-Experienced | | |
|:------:|:---------:|:-----------:|:---------:|
|        | Judges | Prosecutors | Defenders |
| 1 | Not Significant | Not Significant | Not Significant |
| 2 | Not Significant | Not Significant | Not Significant |
| 3 | Not Significant | Not Significant | Not Significant |
| 4 | Not Significant | Not Significant | Not Significant |

439

TABLE V-10

General Attitude Survey Factor 4 Mean Scores

| Factor Four | EMC Inexperienced Judges | EMC Experienced Judges |
|---|---|---|
| Pretest Mean Score | 2.12 | 2.38 |
| Posttest Mean Score | 2.49 | 2.86 |

For illustration purposes, Table V-10 above depicts the
mean scores (from Table V-8) for judges on Factor 4.
As indicated, the amount of change made by the EMC-
Inexperienced judges pre to post (2.12 to 2.49) is
roughly paralleled by the amount of change made by the
EMC-Experienced judges pre to post (2.38 to 2.86).
Thus, the EMC-Inexperienced judges changed their atti-
tude at the same rate as did EMC-Experienced judges;
the rate of change is similar and not significantly
different.

In similar fashion, no significant rates of changes are
found for any factor within any of the occupational
groups.  Direct experienced with EMC was not a factor
which affected the rates at which the groups changed
their attitudes toward EMC.

As stated at the beginning of this section, it is not
surprising that parallel changes were made by members
of one occupational group with or without EMC experi-
ence.  The vicarious experience that was available to
these individuals appears to have transcended actual

440

and direct EMC experience.  The general effects of the
statewide experiment in EMC evidently were received
in the same manner by members of an occupational group.
As will be seen below, the magnitude of the changes in
attitude varied, even though the rates of change were
similar.

## Correlated t-Tests on Factor Means

### Within Occupational Groups

Question:  How large were the changes in attitude as
measured by the factors made by members of each occu-
pational subgroup?  Were the changes, pre to post with-
in groups, large enough to be considered significant?
Did any groups not change at all?  Which groups showed
the largest amounts of significant changes in their
attitudes toward EMC?

Table V-11 summarizes the results of the correlated t-
tests on factor means for each of the seven groups on
which pre to post pairs of measures were available.

__Defenders.__  On none of the four factors for either group
of defenders were the mean difference pre to post scores
significant.  In other words, the defenders' attitude
factor scores were very similar in June, 1980 and July,
1981.

__Prosecutors.__   EMC-Inexperienced prosecutors mean scores
changed pre to post on Factor 1 significantly.  Located
in Table V-8, the mean score is seen to drop from 3.61
to 3.38, a lowering of their concern for possible gen-
eral negative effects of EMC.  Their change is in the
positive direction, though still on the negative side
of the attitude midpoint.  Thus, the EMC-Inexperienced

TABLE V-11

Correlated T-Teat on Factors Pre to Post
Within Occupational Groups

| Factor | EMC Inexp. Judges | EMC Exper. Judges (after) | EMC Exper. Judges (during) | EMC Inexp. Prosec. | EMC Exper. Prosec. | EMC Inexp. Defenders | EMC Exper. Defenders |
|---|---|---|---|---|---|---|---|
| 1 General Effects | --- | --- | --- | signif. beyond .01 | --- | --- | --- |
| 2 Influence | signif. beyond .01 | --- | signif. beyond .01 | --- | --- | --- | --- |
| 3 Civilian Concern | --- | --- | signif. beyond .01 | --- | --- | --- | --- |
| 4 Mutual Consent | signif. beyond .01 | signif. beyond .01 | signif. beyond .01 | --- | signif. beyond .01 | --- | --- |

-150-

prosecutors are significantly less negative, though
not positive, about the possible adverse general effects
of EMC.  The survey items in Factor 1 relate to decorum,
citizen apprehension, quality of advocacy, judge ability
to maintain order, juror distraction, and type of pro-
ceeding in which EMC should be permitted.

The EMC-Inexperienced prosecutors came to believe that
on this "good-bad" general factor there was less cause
for concern after one year of the experiment.

EMC-Experienced prosecutors also changed significantly
on only one factor--Factor 4, Mutual Consent.  From
Table V-8 their mean score is seen to move significantly
from 2.0 to 2.69, pre to post.  This factor consists of
survey items 17 and 25 which polled the respondents on
their attitude about party consent.  The EMC-Experienced
prosecutors, while still on the negative side of the
attitude midpoint, shifted dramatically on this issue.

Judges.  EMC-Inexperienced judges showed significant
mean score change on Factor 2, Influence, and Factor 4,
Mutual Consent.  Mean scores (Table V-8) on Factor 2
changed from 2.91 to 3.01 and 2.12 to 2.49 on Factor 4.
The EMC-Inexperienced judges moved exactly to the mid-
point on the agree-disagree attitude scale on Factor 2.
On Factor 4 they still are on the negative side of the
attitude midpoint although their movement is significant
and toward the positive.

The After Posttest EMC-Experienced judges (those meas-
ured in July, 1981) showed significant mean score change
on Factor 4, Mutual Consent, from 2.38 pre to 2.86 post.
The movement is large, toward the positive side of the
scale, but remains on the negative side of the attitude
midpoint.

-151-

443

The During Posttest EMC-Experienced judges (those meas-
ured right after an EMC event in the courtroom during
the experimental data collection year) are the one group
showing the most numerous and the largest pre-to-post
changes on the Factors.  Factors 2, 3, and 4 all exhibit
significant change scores.  Table V-12 shows the pre-
post mean scores for this group of judges.

TABLE V-12

Pretest to During Posttest Means for Judges
on Factors on General Attitudinal Survey

| Factor | Pretest Mean Score | During Posttest Mean Score |
|--------|--------------------|----------------------------|
| 1*     | 2.82               | 2.61                       |
| 2**    | 3.08               | 3.33                       |
| 3**    | 2.37               | 2.94                       |
| 4**    | 2.48               | 3.26                       |

*Lower mean score indicates a more positive attitude
  toward EMC.
**Higher mean score indicates a more positive attitude
   toward EMC.

For this group of EMC-Experienced judges, all their
mean scores show change toward a more positive atti-
tude about EMC.  On Factor 4, Mutual Consent, the mean
scores change Pretest to During Posttest from 2.48 to

-152-

444

3.26, from well below to well past the midpoint on the
agree-disagree attitude scale.  Though not a resounding
endorsement of the no party consent rule, these judges
do, on the average, favor it, and their score represents
them as the only group whose overall attitude is positive
toward the no party consent rule.

On Factor 3, Civilian Concern, these interim-measured
judges show a significant mean score change.  Factor 3
refers to reluctance and apprehension in witnesses and
other civilian participants; i.e., the judges feel that
there is now less cause for concern about these elements.
On Factor 2, Influence, these judges, whose scores on
the Pretest already were at the midpoint on the agree-
disagree attitude scale moved further toward positive
(3.08 to 3.28), indicating a further relaxation of con-
cern about the potential negative effects represented by
the elements in this factor.

Even though not significant at the .05 level, the change
score on Factor 1 continued the above positive trend
and changed a sizeable amount, from 2.82 to 2.61 (trans-
posed for direction correction to achieve consistency
with the other factors, the means moved from 3.18 to 3.39).
This score (3.39) for this group of judges (during Post-
test) represents the most positive attitude of any
group on any factor on the Survey.

Overall Attitude Characteristics

The bar graphs, in Figures V-13A-D provide visual illustration
of the attitudes in general and of the attitude differences
between and among the groups measured by the Survey.
The bar graphs show the practical significance of the



FIGURE V-13A

FACTOR ONE BAR GRAPHS

GENERAL ATTITUDINAL SURVEY

PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR ONE: GENERAL EFFECTS

Survey Items: 1, 3, 4, 10, 16, 26a, b, c

-154-



FIGURE V-13B
FACTOR TWO BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR TWO:  DECISION INFLUENCE
Survey Items:  7, 8, 9, 15, 18, 24

-155-

447

FIGURE V-13C
FACTOR THREE BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR THREE:  CIVILIAN CONCERN
Survey Items:  19, 22



FIGURE V-13D
FACTOR FOUR BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR FOUR: MUTUAL CONSENT
Survey Items: 17, 25

-157-

Survey results.  It is best for a reader to examine the
graphs as a group of four in relation to one another,
using Table V-14, which shows the means for each item,
as an aid.  Factor 1 scores were transposed directionally.

The four most outstanding characteristics shown by the
graphs are: 1) the predominantly negative to only mildly
neutral tone in attitudes toward EMC across all groups;
2) the clear trend in post-testing toward a more posi-
tive attitude except for defenders; 3) the overwhelming
and persistent negative attitude on all factors by the
defender groups, and 4) the posttest factor scores of
experienced judges and prosecutors.

Negative Attitude Toward EMC.  Although some of the
analysis results showed significant changes in a posi-
tive direction on the attitude scale in several groups
on several factors, the general or overall attitude of
respondents can only be characterized as negative.  On
Factor 1, only, for judges and prosecutors and Factor 2
for judges can one conclude even a neutral or mildly
positive attitude toward EMC.  There is not a widespread
or strongly positive attitude among the three professional
groups toward EMC.

Posttest Trend. On every factor, all groups except defense
attorneys showed posttest movement toward a less negative
attitude.  The trend seems to indicate an openness in
examining the results of the current experiment, in terms
of personal experience and perceived effects.  For
judges, their posttest trend toward the positive may
be the manifestation of an attempt to bring their own
attitudes in line with the U.S. Supreme Court decision
on Chandler, which allows states to permit EMC over the
objections of defendants.  Each of the three judge groups
made significant changes on Factor 4, which is the party
consent issue.  While judges (and perhaps prosecutors as
well) may feel some inclination to align themselves with

-158-

450

## TABLE V-14

CORRELATED T-TEST RESULTS ON PRE-POST SURVEY ITEM MEANS GROUPED BY FACTOR WITHIN OCCUPATIONS

| Factor | Survey Item | Inexp. Judges Pre | Post | Exp. Judges Pre | Post (after) | Exp. Judges Pre | Post (during) | Inexp. Prosecutors Pre | Post | Exp. Prosecutors Pre | Post | Inexp. Defense Pre | Post | Exp. Defense Pre | Post |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1_B | Q1 Decorum | 3.22 | 3.31 | *2.94 | 2.60 | *2.93 | 2.36 | *3.98 | 3.54 | *3.64 | 2.93 | 4.02 | 3.88 | 4.6 | 6.53 |
|  | Q3 Willingness | 3.47 | 3.61 | 3.19 | 3.44 | *3.59 | 3.28 | 3.86 | 3.86 | 3.54 | 3.46 | 3.89 | 3.91 | 3.7 | 3.96 |
|  | Q4 Advocacy | *3.32 | 3.52 | 3.37 | 3.50 | 3.25 | 3.39 | 3.96 | 3.82 | 3.57 | 3.36 | 3.95 | 3.84 | 4.30 | 6.48 |
|  | Q10 Order | 2.48 | 2.59 | 2.27 | 2.21 | 2.00 | 2.03 | *3.32 | 3.00 | 2.54 | 2.46 | 3.05 | 3.05 | 3.33 | 3.30 |
|  | Q16 Attentive-ness | 3.51 | 3.50 | 3.28 | 3.39 | 3.23 | 3.30 | 3.72 | 3.54 | 3.59 | 3.63 | 3.73 | 3.73 | *3.62 | 4.11 |
|  | Q26a Appellate EMC | *2.79 | 2.42 | 2.35 | 2.07 | 2.37 | 2.17 | 2.53 | 2.60 | *2.30 | 1.89 | 3.37 | 3.50 | 3.62 | 3.38 |
|  | Q26b Civil EMC | 3.02 | 3.88 | *2.72 | 2.46 | *2.63 | 2.17 | *3.53 | 3.21 | 2.93 | 2.52 | 3.66 | 3.63 | 3.96 | 3.73 |
|  | Q26c Criminal EMC | 3.13 | 3.02 | 2.76 | 2.65 | 2.93 | 2.57 | *3.91 | 3.52 | 3.26 | 2.78 | 4.19 | 4.18 | 4.54 | 4.46 |
| 2_B | Q7 Decisions | 3.10 | 3.18 | 3.27 | 3.15 | *3.33 | 3.67 | 2.58 | 2.68 | 2.71 | 3.07 | 1.75 | 1.64 | 1.74 | 1.48 |
|  | Q8 Elections | *2.34 | 2.68 | *2.38 | 2.73 | 2.52 | 2.78 | 2.54 | 2.60 | 2.57 | 2.71 | 1.91 | 2.06 | 1.96 | 2.31 |
|  | Q9 Influence Juror | 3.01 | 3.20 | 3.31 | 3.21 | 3.32 | 3.46 | 2.95 | 3.09 | 3.11 | 3.21 | 2.23 | 2.27 | 2.07 | 2.07 |
|  | Q15 Bail | 3.24 | 3.20 | 3.21 | 3.26 | 3.33 | 3.52 | 3.02 | 3.09 | 3.36 | 3.50 | 1.67 | 1.60 | 1.56 | 1.56 |
|  | Q18 Grandstanding | *2.67 | 2.89 | 2.51 | 2.62 | *2.45 | 2.83 | 3.65 | 3.74 | 3.85 | 4.19 | 1.77 | 1.77 | *1.59 | 1.93 |
|  | Q24 Sentencing | *3.15 | 3.38 | 3.24 | 3.50 | 3.45 | 3.59 | 3.21 | 3.23 | 3.59 | 3.44 | 1.56 | 1.69 | 1.44 | 1.70 |

TABLE V-14 cont.

CORRELATED T-TEST RESULTS ON PRE-POST SURVEY ITEM MEANS GROUPED BY FACTOR WITHIN OCCUPATIONS

| Fac-tor | Survey Item | Inexp. Judges Pre Post | Exp. Judges Pre Post (after) | Exp. Judges Pre Post (during) | Inexp. Prosecutors Pre Post | Exp. Prosecutors Pre Post | Inexp. Defense Pre Post | Exp. Defense Pre Post |
|---|---|---|---|---|---|---|---|---|
| $3_B$ | Q19 Reluctance | 2.33  2.46 | 2.57  2.77 | *2.32  2.86 | 1.89  2.07 | 2.15  2.38 | 1.95  1.97 | 1.88  1.8 |
|  | Q22 Apprehension | 2.50  2.56 | 2.78  3.09 | *2.50  3.11 | 2.11  2.05 | 2.35  2.46 | 2.08  2.13 | 1.85  1.9 |
| $4_B$ | Q17 Criminal Consent | *2.09  2.43 | *2.24  2.80 | *2.21  3.21 | 1.91  2.04 | 1.96  2.52 | 1.44  1.44 | 1.23  1. |
|  | Q25 Noncriminal Consent | *2.32  2.56 | *2.52  2.91 | *2.76  3.31 | 2.12  2.28 | *2.04  2.85 | 1.83  1.92 | 1.67  1. |

A = Lower mean score indicates more positive attitude toward EWC.

B = Higher mean score indicates more positive attitude toward EWC.

* = Difference pre to post significant .05 and beyond.

a newly promulgated legal guideline, defenders, in con-
trast, apparently feel no such obligation.

Defender Attitude. In interpreting the strong anti-EMC
attitude possessed by defense attorneys, the evaluators
were reminded of many personal interviews held with
defense attorneys during the course of data collection.
Many attorneys held that EMC on principle was wrong,
and that they would never change their minds. The survey
results seem to correspond with these interview com-
ments.  No change in scores of any consequence occurs
for defenders during the 13 months between testing.
Attitudes which are based on perceived principle are
much less susceptible to change by either additional
information or personal experience. What is perceived
as morally or politically wrong becomes a tenacious
perception.

Other actors, judges notably, may have attitudes toward
EMC which are based less on moral premises and more on
rational examination of the issues involved. Such an
attitude dynamic is more maleable and much more vulner-
able to revision.

Experienced judges and prosecutors. For judges and pro-
secutors, experience appears to alter attitude. Of par-
ticular interest is the judge group whose posttest was
taken during the year, soon after an EMC event in their
courtroom. These judges show the most positive, or
least negative, attitude toward EMC.

From on-site observation, the evaluation team found,
generally, that actual EMC events were not negative

-161-

453

experiences for participants and when interviewed, most
judges concurred.  As a result, when a particular judge
completed an attitudinal survey soon after an EMC event
in his courtroom, very likely he could have responded
from the framework of a relatively positive recent exper-
ience.  Hence, these "during posttest" judge attitudes
may reflect their views of the specific event just con-
cluded.  The other two judge groups responded to the
Survey from a more abstract or distant perspective; i.e.,
EMC in general, a perspective of overall attitude and
overall experience with the media, and not from the per-
spective of a recently completed event.

Attitudes toward EMC are long held and probably rather
firmly held.  There may be an immediate impact on a
judge from an EMC event which could alter temporarily
the attitude only to have it revert back toward the
older (more negative) attitude after the passage of
time.  The "After Posttest" scores therefore may be
somewhat lower than the During Posttest scores because
of this "regression toward the mean" phenomenon.

## Discriminant Function Analysis

Question:  How cohesive are the patterns of attitude
response within occupational groups?  Can occupation
of respondent be predicted from response patterns on
the survey?  Is there any relationship between group
cohesiveness and attitudes toward EMC?

The discriminant analysis procedure when applied to the
685 valid General Attitudinal Survey pretests and the
432 valid Survey posttest resulted in 53% and 55% of
the grouped cases correctly classified.  Table V-15
illustrates how the discriminant function analysis
supports the other findings in this evaluation.

-162-

454

TABLE V-15

CLASSIFICATION RESULTS
DISCRIMINANT FUNCTION ON PRETEST FACTORS BY OCCUPATION

| Actual Group | No. of Cases | Predicted Group membership | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| Judge 1 | 352 | 144 41% | 102 29% | 106 30% |
| Prosecutor 2 | 168 | 46 27% | 94 56% | 28 17% |
| Defender 3 | 165 | 28 17% | 9 5% | 128 78% |

Percent of grouped cases correctly classified: 53%

---

CLASSIFICATION RESULTS
DISCRIMINANT FUNCTION ON POSTTEST FACTORS BY OCCUPATION

| Actual Group | No. of Cases | Predicted Group Membership | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| Judge 1 | 219 | 88 40% | 84 38% | 47 22% |
| Prosecutor 2 | 109 | 31 28% | 64 59% | 14 13% |
| Defender | 104 | 12 11% | 8 8% | 84 81% |

Percent of grouped cases correctly classified:  55%

455

Judges and prosecutors, on the average, in the posttest classification become more similar to one another. In the pretest classification results, 70% of the judges were predicted into either the judge or prosecutor groups. On the posttest, 78% of the judges were predicted into either the judge or prosecutor group. In the pretest, 83% of the prosecutors were predicted into either the prosecutor or judge groups while in the post-test 87% of the prosecutors were predicted into either prosecutor or judge groups. Attitude differences between judges and prosecutors faded over the course of the year. Fewer judges and prosecutors on the posttest were predicted into the defender group than on the pretest. Put another way, the attitudes toward EMC of both judges and prosecutors on the posttest measures became less like the attitudes of defenders.

The defenders were the easiest group to classify correctly. On the pretest, 78% of the defenders were classified as defenders and on the posttest the percentage rose to 81%. Defenders were least likely to be predicted in the prosecutor category. This means that the response pattern of the defender group is very homogeneous and predictable. On the posttest, 81% of the time the defender's occupation can be predicted correctly on the basis of their responses on the Survey. In a graphic way, the defenders became, one year later, an even more cohesive group. One might say they became more predictably "defenders", showing a more unified force in the display of their attitudes toward EMC.

There was on the pretest and remained on the posttest more diversity in the prosecutor group than the defender group. Prosecutors are least likely to be classified as defenders (13% on the posttest) and most likely to be classified as prosecutors (59% on the posttest).

-164-

The judges are the most diverse and least cohesive
group.  On the posttest, 22% of the judges' response
patterns result in their being classified as defenders
and 38% of them are classified as prosecutors.  On both
the pre and posttest, only about 40% of the judges are
classified correctly as judges.  Because of the diversity
of their opinions, it is very difficult to predict cor-
rectly the occupation of judges on the basis of their
responses to the survey.  Due to the diversity of atti-
tude in the judge and prosecutor groups, the percentage
of grouped cases correctly classified remains at 55%.
This is relatively low although it indicates predicta-
bility above that of pure chance.

The classification results also indicate that the prose-
cutors and judges are groups which are shifting their
attitudes toward EMC while defenders appear not to be
changing.  These findings are entirely consistent with
other earlier findings on rates and amounts of attitude
change.

One might extrapolate from the most recent discriminant
function Posttest-Classification a description of the
political forces operating in California among these
three occupational groups in regard to EMC.  Defense
attorneys seem adamant in their opposition to EMC and
present a unified front with few dissenters.  Prosecutors
are less cohesive as a group than defenders and more
likely to line up with non-defender-like judges.  Judges
are the least unified group, the most diverse of the
three groups, as of July 1981.  About four-fifths of
the judges are similar to non-defender-like prosecutors.
The non-defender-like judges and prosecutors may repre-
sent the pro-EMC forces.

457

If one assumes (as the earlier data analysis show) that
the defenders are, as a group, the most opposed or nega-
tive toward EMC, there still remains a sizeable group
of prosecutors (13%) and a larger group of judges (22%)
who stand with the defenders in their opposition to
EMC.

## Frequency Distributions

Question: What frequency of distribution patterns in
general occur pre post among the total judge, prosecutor
and defender groups on each item in the survey? What
do particular patterns among the groups' frequency dis-
tributions illustrate about their overall attitudes
toward EMC and the no party consent rule?

Among all three occupational groups sampled by the survey,
there is considerable and persistent opposition to the
ruling which removed party consent as a condition for
EMC. Judges and prosecutors over the course of one year's
time during the experiment did modify their views and
object somewhat less to the ruling by July, 1981. Defenders
made no such change.

Table V-16 shows the frequency distribution of responses
for all judges, prosecutors and defenders pre and post
on item 25, Noncriminal Consent. Judges mean scores
change from 2.31 pre to 2.71 post; prosecutors from 2.12
to 2.50 and defenders from 1.85 to 1.87. By July, 1981,
55% of the judges, 57% of the prosecutors and 82% of the
defenders either Agree or Strongly Agree with the item
(requiring consent). At the same point in time 37% of
the judges, 18% of the prosecutors and 7% of the defenders
either Disagree or Strongly Disagree with the item (no
consent needed). Consistent with the general findings
in the analysis of the Survey results, the defense attorneys

-166-

458

TABLE V-16

OPPOSITION TO NO CONSENT RULE
FREQUENCY DISTRIBUTION OF SURVEY ITEM 25
"EMC of noncriminal proceedings
needs consent of parties."

| Category Label | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| STRONGLY AGREE 1 | 85 | 22 | 34 | 15 | 50 | 29 | 19 | 17 | 74 | 43 | 45 | 41 |
| AGREE 2 | 184 | 49 | 91 | 40 | 80 | 46 | 45 | 40 | 65 | 38 | 45 | 41 |
| NO OPINION 3 | 26 | 7 | 18 | 8 | 20 | 11 | 27 | 24 | 18 | 11 | 12 | 11 |
| DISAGREE 4 | 69 | 18 | 71 | 32 | 24 | 14 | 13 | 12 | 12 | 7 | 2 | 2 |
| STRONGLY DISAGREE 5 | 13 | 3 | 11 | 5 | 1 | 1 | 7 | 6 | 2 | 1 | 5 | 5 |
| Number of Cases | 377 | | 225 | | 175 | | 111 | | 171 | | 109 | |
| Mean | 2.31 | | 2.71 | | 2.12 | | 2.50 | | 1.85 | | 1.87 | |

are in solid and unchanging opposition to removing the
consent rule on noncriminal EMC proceedings.  As well,
neither the judge nor prosecutor group, on the average,
are in favor of removing the consent rule.

Table V-17 shows the frequency distribution of responses
for all judges, prosecutors and defenders pre and post
on Item 17, Criminal Consent.  Opposition to no party
consent in criminal proceedings for the three groups,
judges, prosecutors, and defenders, on pretest (combin-
ing Agree and Strongly Agree) starts out at 80%, 79%,
and 91% respectively for the three groups.  A small min-
ority of 16%, 18%, and 7% (combining Disagree and Strongly
Disagree) respectively favors no party consent.  Almost
none of the respondents in any group has No Opinion.

One year later judges opposition to the no party consent
rate changed considerably.  Their percentage of Agree
plus Strongly Agree responses favoring party consent
being required dropped to 61%, with a corresponding in-
crease from 16% to 35% in those who favor no party con-
sent.  Prosecutors made smaller changes though in the
same direction.  Defenders made no change at all.

As of July, 1981, judges, prosecutors, and defense attor-
neys in California as groups oppose the no party consent
required rule for EMC of criminal proceedings by the
large percentages of 61%, 79%, and 90%.  The graphs
shown in Figure V-18 illustrate the magnitude of opposi-
tion to the no party consent rule and the spread of
levels of opposition between the respondent groups.

Frequency distributions for survey Items 26a, b, and c
are located in Table V-1 in the Results Overview (page
of this section of the report.  The tables for the re-
maining items in the survey are located in Appendix I.

TABLE V-17

OPPOSITION TO NO CONSENT RULE
FREQUENCY DISTRIBUTION OF SURVEY ITEM 17
"EMC of criminal proceedings should be
Allowed only with the consent of the parties"

| Category Label | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| STRONGLY AGREE 1 | 149 | 40 | 45 | 20 | 88 | 50 | 42 | 38 | 126 | 74 | 77 | 71 |
| AGREE 2 | 151 | 40 | 92 | 41 | 51 | 29 | 37 | 33 | 28 | 17 | 21 | 19 |
| NO OPINION 3 | 12 | 3 | 9 | 4 | 4 | 2 | 3 | 3 | 4 | 2 | 1 | 1 |
| DISAGREE 4 | 54 | 14 | 68 | 30 | 23 | 13 | 24 | 22 | 8 | 5 | 6 | 5 |
| STRONGLY DISAGREE 5 | 9 | 2 | 10 | 5 | 9 | 5 | 5 | 4 | 4 | 2 | 3 | 3 |
| Number of Cases | 375 | | 220 | | 175 | | 111 | | 170 | | 108 | |
| Mean | 2.00 | | 2.58 | | 1.94 | | 2.22 | | 1.45 | | 1.49 | |

-169-

461

FIGURE V-18

LEVEL OF OPPOSITION PRE AND POST
TO REMOVAL OF THE PARTY CONSENT RULE
JUDGES, PROSECUTORS AND DEFENDERS



-170-

462

Finally, the frequency distribution tables of remaining
items in Appendix I and table of means in Appendix J.
show the continued general trend of transference of
responsibility (items 4, 7, 8, 10, 13, 14, 15, 18, 24,
and 27). Transference of responsibility if a phenomenon
which permits respondents to agree with statements that
suggest possible negative effects of EMC on the behaviors
or the required roles of members of one or both of the
other two groups, but not with statements that suggest
their own professional group will be somehow negatively
impacted by EMC. The phenomenon can best be seen on
Item 18 (refer to Table V-14, in this section) which
suggests that prosecutors will "play up to the camera."
On the pretest and the posttest defenders strongly
agree with this statement. Prosecutors strongly disa-
gree. EMC experience and the passage of time does
little for these groups to modify this human tendency
to see the problem as centered in the other party,
not oneself.

5. Discussion and Summary

The attitude measures are important since decisions and
actions are, at times, determined by attitudes. If
attitude changes follow from experience, as theory sug-
gests, then the trends found in the present evaluation
paint a relatively bright picture for eventual acceptance
of EMC by judges and attorneys, despite the current
level of mixed findings. The evaluation evidence strongly
suggests that specific EMC experience altered attitudes
toward EMC in judges and prosecutors. Even many of those
who did not have direct EMC experience evidenced changes.
For those subgroups within these two groups and for defense
attorneys who oppose EMC on principle, experience may not
so easily modify their attitudes.

To sum up briefly, the data analysis first yielded
four reliable factors which summarize the respondents'
general attitudes:  General Effects; Decision Influence;
Civilian Concern; and Mutual Consent.

When each factor was tested for change over time, the
three occupational groups (judges, prosecutors, and
attorneys) showed significantly different rates of
change on most factors.  Experience with EMC did not
prove to be an element affecting rates of change; occu-
pation was the element.  Within occupational groups,
each occupational group showed similar change rates
over time on the factors irrespective of EMC experience.

Magnitude of change over time on the factors (within
occupational groups divided into Experience and Inex-
perience subgroups) proved significant on a selective
basis.

- Neither Experienced nor Inexperienced defenders
  changed on any factor attitude scores pre to post.

- Inexperienced prosecutors became less concerned
  about the potential negative EMC general effects.

- Experienced prosecutors became less concerned about
  the potential negative effects of removing the
  party consent rule.

- Inexperienced judges a) became less concerned about
  potential negative EMC influence on decisions; and,
  b) became less concerned about the potential nega-
  tive effects of removing the party consent rule.

- Experienced judges during (posttested during the
  year right after an event) a) became less concerned
  about potential negative EMC influence on decisions;
  b) became less concerned about the potential nega-
  tive EMC effects on civilian participants; and, c)
  became less concerned about the potential negative
  effects of removing the party consent rule.

-172-

464

- Experienced judges after (posttested in July, 1981) became less concerned about the potential negative effects of removing the party consent rule.

Except for defenders, all other experienced groups became significantly less concerned about the negative effects of removing the party consent rule. However, only the Experienced judges, posttested during the year, ended up on the positive side of midpoint on the scale measuring this factor. Thus, while the no party consent issue stirred the greatest amount of attitude change among experienced judges and prosecutors, their current attitude can best be described as neutral.

In the discriminant function analysis, the defender group proved to be the most cohesive and predictable of the three groups, followed by prosecutors, with judges least cohesive. The history of controversy surrounding EMC in California seemed validated by these results.

Unanswered, and unknown at this point is why do judges, prosecutors, and defenders have such negative overall attitudes toward EMC? In direct contrast to the observed events and most of the interview data, the global negative to neutral attitudes toward EMC of the three professional groups is puzzling. However, we do know, now, that the attitudes, as measured, are complex and multi-faceted. There is not a single, overall attitude; rather there are attitudes toward EMC. The factors uncovered in the analysis are constructs which seemed to identify the major sources of vitality for these differences in attitude.

-173-

465

B.   Juror Attitudinal Questionnaires

1. Results Overview

Just as there is no one overall measure of the attitudes
of judges, prosecutors and defenders toward EMC, there
is no parallel global indicator of juror attitudes.
Contrary to the negative aggregate range of attitudes
for the professional groups in court proceedings,
however, the juror group's aggregate range of attitudes
varies from neutral to positive.

To support this Attitudinal Questionnaire finding,
Table V-19 below summarizes the general opinion jurors
have toward EMC as gathered using interviews.

### Table V-19

**General Opinion About EMC
Expressed by Jurors in Interviews**

| Opinion Category | Abs. Freq. | Pct. |
|---|---|---|
| Very Unfavorable | 7 | 13% |
| Unfavorable | 1 | 2% |
| Neutral | 13 | 23% |
| Favorable | 18 | 32% |
| Very Favorable | 17 | 30% |

EMC-Experienced jurors show an overall favorable
percentage of 62%.  Strong objection to EMC is not com-
ing from this citizen group.  The second major trend

found in the study of juror attitudes toward EMC is that the EMC-Experienced Jurors basically see themselves, see others in and out of the system, and see the judicial system itself as able to withstand whatever potential negative effects the intrusion of EMC may bring. These two overall results provide a background against which the more detailed analyses of the juror attitude questionnaire is positioned.

2.   Survey Administration, Sample Size and Sample Charac-
     teristics

A total of 1,340 prospective jurors were sampled for their perception of and attitudes toward conventional and extended media coverage of proceedings in California state courts. Table V-20 shows the geographical and chronological breakdown of the jury pool sample. All 1,340 individuals had been called for jury service and were gathered in juror pools when surveyed. The Questionnaire was administered to groups of prospective jurors as they received their orientation from the jury commissioner. Either a member of the evaluation team or a member of the jury commissioner's staff administered the Questionnaire. Throughout the balance of this section, this sample of jurors will be referred to as the Inexperienced group, meaning that they did not have EMC experience.

In addition to the Inexperienced group, a small sample of Experienced jurors was measured for their attitudes toward conventional and extended media coverage. In total, 34 jurors who served at conventional high publicity trials and 79 jurors who served at EMC high publicity trials responded to the Questionnaire. Experience means that these jurors had actual trial experience with either conventional or extended media coverage. The total number of Experienced and Inexperienced jurors sampled was 1,453.

-175-

467

TABLE V-20

Statewide Jury Pool Sample Sizes

|  | Fresno | Los Angeles | Sacramento | San Diego | Total |
|---|---|---|---|---|---|
| Baseline | 0 | 171 | 223 | 0 | 394 |
| Experimental | 87 | 443 | 215 | 201 | 946 |
| Total | 87 | 614 | 438 | 201 | 1,340 |

This evaluation focused primarily on possible effects
of extended media coverage on the conduct of trials and
on the behaviors of trial participants.  To establish an
existing frame of reference for understanding issues
relating to EMC, it was deemed useful to sample the
public's perception (through prospective jurors) of the
impact of conventional media coverage (i.e., reporters
and sketch artists) on courtroom atmosphere and trial
conduct.  This step was accomplished prior to the begin-
ning of the experimental year by designing and adminis-
tering a Juror Attitudinal Questionnaire comprised of
14 items which sought to tap the perceived impact of the
conventional media on the courts. (See Section II Research
Design.)  This questionnaire was administered to a sample
of 394 prospective jurors in Sacramento and Los Agneles.
Prospective jurors were defined as those who had been
called for service but who as yet had not been assigned
to a trial.  They may or may not have had prior jury duty.

Because the items on the Questionnaire for conventional
coverage attitudes differed from those on the Questionnaire
for EMC attitudes, subsequent comparisons of the latter

468

(This page intentionally left blank)

-177-

with the former instrument is not possible, other than
from a heuristic perspective. Nevertheless, as empha-
sized above, responses to the Questionnaire measuring
perceived attitudes toward conventional media coverage
provide a useful descriptive frame of reference for
assessing juror perceptions of the additional impact,
if any, of EMC.

During the experimental year between July 1, 1980 and
June 30, 1981, a second, larger group of prospective
jurors was sampled for their perceived attitudes toward
the impact of extended media coverage. The Juror Attitu-
dinal Questionnaire used in this assessment also was
comprised of 14 items. The items were identical to the
ones used in the earlier instrument. EMC phrasing was
substituted for conventional media phrasing. Thus, it
was expected that roughly the same kinds of attitudes would
be measured. Sampling from jury pools in Sacramento,
San Diego and Los Angeles, the evaluators measured 946
prospective jurors. In addition, this EMC Questionnaire
was collected from 79 EMC-Experienced jurors, those who
had served on high publicity EMC trials during the year.

The characteristics of the Inexpereienced jurors are
summarized in Table V-21. Two thirds of the 1,340 had
not served before on a jury. Of those who had prior
experience, only 5% could remember any media attention
paid to the trial(s) on which they served as jurors. As
a result of this fact, it is reasonable to conclude that
at the time of survey administration this sample of
prospective jurors was almost totally unfamiliar with
media coverage of any kind associated with the courts
other than experience gained in normal life activity as
a citizen of the community.

TABLE V-21

CHARACTERISTICS OF JURY POOL SAMPLE

INEXPERIENCED JURORS

( N = 1,340 )

| PRIOR JURY DUTY | | EDUCATION | |
|---|---|---|---|
| YES | 34% | ELEMENTARY SCHOOL | 2% |
| NO | 66% | HIGH SCHOOL | 40% |
| | | ATTENDED COLLEGE | 50% |
| | | GRADUATE DEGREE | 9% |

AMOUNT OF MEDIA
COVERAGE FOR THOSE
WITH PRIOR JURY DUTY

| DON'T KNOW | 49% |
|---|---|
| NONE | 45% |
| SOME | 4% |
| EXTENSIVE | 1% |

OCCUPATION

| | | PROFESSIONAL/ MANAGERIAL | 32% |
|---|---|---|---|
| SEX | | BUSINESS/SALES SERVICE | 14% |
| MALE | 46% | TECHNICAL | 9% |
| FEMALE | 54% | TRADE/AGRICULTURE | 8% |
| | | CLERICAL | 12% |
| AGE | | HOUSEWIFE/STUDENT RETIRED/UNEMPLOYED | 22% |
| UNDER 25 | 10% | UNSKILLED | 3% |
| 25 - 34 | 24% | | |
| 35 - 44 | 21% | | |
| 45 - 54 | 21% | | |
| 55 + | 25% | | |

-179-

471

Fifty-four percent of the sample was female; 46% was
male.  About 25% of the sample was between the ages of 25
and 34.  Another 25% was 55 or older.  Ten percent was
under age 25 and the remaining two-fifths of the sample
evenly divided between the 35-44 age group and the 45-54
age group.

The prospective juror sample seemed well educated. Nine
percent held Masters degrees or some other graduate degree.
One-half of the sample had attended college.  Forty-two
percent had terminated their education at or below high
school.

One-third of the prospective juror sample identified their
occupation as managerial or professional.  Those in busi-
ness sales or service totalled 14%.  Technical occupations,
skilled trade, and agriculture accounted for 17%.  Cleri-
cal occupations were represented by 12% of the sample.
Only 3% were unskilled.  The remaining 22% were housewives,
students, unemployed or retired.

3.  Analysis Procedures

Factor Analysis

The 14 items comprising the Juror Attitudinal Questionnaire
were subjected to factor analysis using a varimax rota-
tion.  The same procedures were applied to these Question-
naires as were applied to the General Attitudinal Surveys
for judges, prosecutors, and defenders.  Attitude scores
for each factor were arrived at by summing each respond-
ent's answers to the items contained in the factor and
by dividing by the number of items.  Thus, each respondent
had one measure for each of the factors derived instead
of 14 measures (one from each item).

472

t-Tests on Factor Means

It was determined that the EMC-Inexperienced Juror group
measures on factors would be compared to those of the EMC-
Experienced Juror group measures, since it appeared on
examination of the early printouts on frequency distri-
bution that the two groups were responding differently.
These calculations yielded information about whether or
not the magnitude of change in mean scores on the factors
was significant.

Frequency Distribution Analyses:  Conventional Media
Coverage Questionnaire

The frequency distributions of all 14 Questionnaire items
were examined for trends and differences showing between
the EMC-Inexperienced Jurors and the EMC-Experienced
Jurors.  These descriptive analyses would show potential
differences in response approaches between these two
groups.

Cross-Tabulations: EMC Questionnaire

Cross-tabulations were computed between certain Question-
naire items and demographic variables.  Sex, education,
and age were examined in contrast to EMC-Inexperienced
jurors' responses to certain items on the Questionnaire.

Chi-square

Chi-square tests were applied to determine the signifi-
cance of frequency distribution deviations on all
Questionnaire items grouped by factors for the EMC-
Inexperienced Jurors in contrast to the EMC-Experienced
Jurors.

-181-

473

4.  Analysis Results

Factor Analysis

Question:  What patterns of intercorrelations are there
between the items on the Questionnaire such that the
minimum number of factors will emerge?  Which items load
onto the factors and what is the reliability of the items
on the factors?

Five factors emerged from the factor analysis of the Juror
Attitudinal Questionnaire.  The factors are identified
in Table V-22 along with the 14 items from the question-
naire which comprise, or "load onto", the factors.

Factor 1, which consists of two items (items 4 and 5),
is characterized by statements suggestive of a positive
motivating effect on jurors and witnesses.  It is labeled
Positive Task Motivation.  Factor 2 consists of two items
(items 10 and 13) referring to EMC effects on judge and
and juror ability to perform within their prescribed roles,
and is thus labeled Role Performance.  Factor 3 consists
of three items (items 6, 7, and 11) which allude to ways
in which EMC might exert a coercive or restrictive influ-
ence, especially on decisions and is thus labeled Decision
Influence.  Factor 4, which consists of two items (items
9 and 12) suggests EMC may have a general effect on
jurors in producing an uneasiness or discomfort in pro-
jected or actual service.  It is labeled General Juror
Attitude.  Factor 5 consists of the remaining five items
(items 1, 8, 2, 3, and 14).  Each of these items refers
to one of a combination of affects, such as distraction,
disturbance, wariness, uneasiness, or tempering behavior.
It is labeled Distraction and Inhibition.

TABLE V-22

ITEM COMPOSITION OF FACTORS IN
JUROR ATTITUDINAL QUESTIONNAIRE

| FACTOR | FACTOR NAME | | ITEM ON QUESTIONNAIRE |
|---|---|---|---|
| 1 | POSITIVE TASK MOTIVATION | Q 4. | Allowing television cameras, still cameras, and radio equipment in the courtroom will motivate witnesses to be truthful in their testimony. |
| | | Q 5. | Allowing television cameras, still cameras, and radio equipment in the courtroom will increase jurors' attentiveness to testimony. |
| 2 | ROLE PERFORMANCE | Q10. | Allowing television cameras, still cameras, and radio equipment in the courtroom will not affect my ability to judge wisely the merits of the case. |
| | | Q13. | Allowing television cameras, still cameras, and radio in the courtroom will not affect a judge's ability to maintain courtroom order. |
| 3 | DECISION INFLUENCE | Q 6. | Allowing television cameras, still cameras, and radio equipment in the courtroom will affect sentencing decisions. |
| | | Q 7. | Allowing television cameras, still cameras, and radio equipment in the courtroom will cause judges to avoid unpopular positions or decisions. |
| | | Q11. | Allowing television cameras, still cameras, and radio equipment in the courtroom sil affect the outcome of trials. |

-183-

475

TABLE V-22 Cont'd.

| FACTOR | FACTOR NAME | ITEM ON QUESTIONNAIRE |
|---|---|---|
| 4 | GENERAL JUROR ATTITUDE | Q 9. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect my willingness to serve. |
| | | Q12. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause me to have to defend my actions as a juror. |
| 5 | DISTRACTION AND INHIBITION | Q 1. The presence and operation of television cameras, still cameras, and radio equipment will lead to disruption of courtroom proceedings. |
| | | Q 8. Allowing television cameras, still cameras, and radio equipment in the courtroom will lead to increased distraction of participants. |
| | | Q 2. Juror's decision-making will be influenced by their friends' and acquaintances attitudes about the case because of television, radio, and still camera coverage of the trial. |
| | | Q 3. Allowing television cameras, still cameras, and radio equipment in the courtroom will make people more apprehensive about participating in legal processes. |
| | | Q14. Allowing television cameras, still cameras, and radio in the courtroom will cause witnesses to be overly guarded in their testimony. |

-184-

476

The results and recommendations in this evaluation are related
to and predicated on the rules of the experiment.  The evaluation
findings and conclusions only apply in the context of the rules;
any weakening of these rules would tend to invalidate the appli-
cability of the research results.  The generally high marks for
the experiment thus far should not be taken as license to grant
*carte blanche* access by extended media or to ignore the guide-
lines in the rules.

California's experiment thus far with cameras in the courts
has not been tainted by an <u>Estes</u> or a <u>Hauptman</u>. The safeguards
against turning the judicial arena into a circus arena are
working.  Indeed, no "circus-like" atmosphere, to send a clear
signal that justice is threatened, may occur under present
controls.  The threat to a fair trial in the present era of
cameras in the courts is a more subtle one.  It would take a mixing
of subtle elements to create real problems, and the wrong com-
bination of elements could result in injustice.  For example, cameras
in the courts in the context of an overly aggresive media, a
susceptible judge, a vulnerable witness, and a volatile com-
munity issue could do irreparable harm to justice in the case.

The structure of Clifornia's rules on extended media coverage
place the judge in a pivotal position.  It is up to the
judge to recognize when the wrong combination of elements is
present and to take steps to diffuse the danger.  Because the
judge's role is so central, it should be protected from  com-
promise.  The media should not assume an absolute right to
access with their cameras and microphones.  The burden to
obtain consent should remain with the media; no burden should be
placed on the judge to justify to the satisfaction of the
media that denial of access is appropriate.

-244-

477

function of jurors and demonstrate that past experience and
present safeguards minimize the likelihood of EMC-related
problems.  This EMC-orientation could be accomplished in a
neutral fashion without advocating and promoting EMC as
inherently good or bad.  The EMC phenomenon when it occurs
can and should be treated as simply one more aspect of court
life about which jurors need and should have briefing prior
to service.

## D.  Conclusion

One of the most intriguing aspects to this evaluation has been the
perspective gained from in-court observation.  The evaluators were
able to see for themselves if witnesses were nervous, if prosecutors
"played up to the camera", if jurors were distracted, and if judges
were unable to keep order.  In general, none of the postulated
disturbance-distraction-decorum effects occurred.  There seemed
little reason, in event and after event, to have many fears about
the presence of EMC equipment and personnel inside the courtroom,
under the controlled experimental conditions.

The experiment was highly structured, heavily monitored and tightly
controlled.  Media representatives were asked to conform to strict
rules and procedures, request in writing to cover a news event,
wait for approval, and then gather their news under controlled
conditions.  As the experiment developed, it would have been quite
unexpected and shocking if grossly disruptive or wildly distracting
episodes had occurred.  The rules and resultant structure virtually
eliminated all possibility of extreme immediate impact.  In response,
the evaluators developed increasingly refined discriminations to
analyze behavior attributes and verbal comments from interviews.
The "ordinariness" of EMC at court proceedings, is, of course, a
major finding.  The lack of extremes in behavioral and environmental
impacts is important.

478

The critics of "cameras in the courts" point to this very
fact, the brevity of television news reports, as an argument
against allowing cameras coverage in judicial proceedings.
Some even suggest that the media should be forced to show
"all of it or none at all".  Public education in light of
this highly selective editing cannot possibly take place,
say these critics.

This evaluation was not required to offer an opinion on the
quality of television news coverage of judicial proceedings.
Suffice it to say that highly selective editing does occur
and that this necessary practice is one of the most con-
troversial issues associated with cameras in the courts.
Little scientific inquiry has been done to contribute
knowledge to the debate.  This issue and other long range
effects on society at large represent the main frontier of
"cameras in the courts" research.

3.   Inexperienced Jurors

Prior to their service in an EMC event, some jurors evidence
concern about their own abilities to remain free of EMC
influence.  These prospective jurors believe that their own
functioning and that of the judicial system in general may be
somewhat impaired with the presence of EMC.  Experience with
EMC changes this perception.  If EMC becomes a permanent fix-
ture in the courts, the California judiciary may want to con-
sider how jurors who are assigned to EMC trials could come to
enter the experience with their confidence high, rather than
low.  Jurors should be assured that their ability, role and
functioning, that of other trial participants and of the system
itself will not be diminished by the presence of EMC.

Methods exist today to orient and instruct jury pools in the
phenomena and issues associated with EMC.  Video tape programs
could be developed and shown to prospective jurors.  These
tapes would present factual information relevant to the role a.

-242-

The first group is a vocal minority of persons, particularly judges and attorneys, who were skeptical about the media's ability or inclination to cover the courts fairly and accurately. These individuals point to the commercial aspect of the media and assert that sensationalism and a desire to "sell soap" dominates the coverage. In the recent camera coverage of oral arguments at the Supreme Court (an historic first) one Justice expressed disappointment that the Court had "bowed to the persistence of an entertainment medium."

The second group is a substantial number of individuals who applauded the introduction of electronic and photographic media in the courtroom as contributing to public revelation on how the system works--its failings and its strengths. These persons viewed the media more as an essential component in the workings of democracy than as a commercial industry.

The largest group of interviewees offering an opinion on this issue had a totally different attitude. They recognized that the time constraints for a news story are such that only small portions of the courtroom proceeding can be used. Therefore, say these persons, little opportunity exists either to educate or bias the public. Generally, these individuals felt that on balance the TV news reporters "did a good job" in covering the story accurately and fairly. What stands out to many of these persons (and to the evaluators) is how little in-court material actually is used in the story. Much of the in-court footage that is used is "dubbed over" by a reporter's summary of events, relegating the camera coverage to visual background. Sound and visual images combined constitute a small portion of the story and the story is at best only a few minutes long.[37]

---

[37] As documented in Section III, the overwhelming number of EMC applications are for news stories. Very few "gavel to gavel" broadcasts of trials occurred.

This evaluation inquired as to "fear of harm" to jurors
witnesses, and defendants, but no follow-up has been
possible to determine if any harm actually ensued (physi-
cal, psychological, reputational, or financial).  Only
a few jurors, witnesses, and defendants expressed any
sense of "fear of harm" due to EMC and some of these
responses referred as much to a general opinion that
EMC could facilitate harm as much as any specifically
defined fear.  Defendants raised the only specific
"fear of harm" opinion.  A few feared retribution from
prison inmates for the type of crime they committed
(e.g. rape) and two politician defendants sensed possi-
ble damage to their reputations.  Otherwise, the "fear
of harm " issue did not seem significant.

Another unaddressed area warranting further study is
that of community reaction to televised trials and
published photographs of trials.  What is the immediate
result of EMC on the public?  Do they feel better in-
formed on the case than they would have with conventional-
only coverage?  Does the broadcast of trials cumulatively
serve to educate the public on the judicial process?

The answers to these questions are related to the ques-
tion, how does the media present stories from EMC trials?
Clearly, this issue was of concern to interviewees
among all participant types.  Although the evaluators
did not formally research opinions on the quality of
the broadcast product, the interviewees offered opinions
and reactions on this subject quite frequently.  These
comments may be categorized in three broad groups.

481

tunity to negotiate with the media on certain practices
and behaviors in the corridors and courthouse generally.
Whether additional governance of media in this regard
is embodied in rules or achieved by presiding judges
at specific events, the opportunity to make progress
towards a mutually agreeable set of ground rules for
covering the courts outside the courtroom should not
be ignored.

The results of this evaluation offer some assurance
that, under the guidance of specific rules, the courts
and the media were able to negotiate relatively satis-
factory agreements which minimized obtrusiveness and
other potential problems posed by the presence of EMC
inside courtrooms.  If courthouse and courtroom EMC
issues can be linked and if, in the negotiation process
of granting such coverage, greater restraints on or
control of obtrusiveness and other problems outside
the courtroom can be achieved, then the courts and
the media together will have made rational headway in
resolving some of the real sources of occasional media
obtrusiveness and subsequent ill-feelings.

2. "Type C" Effects

A model depicting the "universe" of potential effects
of electronic/photographic court coverage is presented
in Section I.B. (p.10 ).  In placing this study in the
context of that model, it was stated that few issues
within the "Type C" Effects could be addressed.  Type
C Effects are those effects of broadcast and publication
of EMC products which occur after the completion of the
proceeding being covered, of both a short-term and
long-term nature.

-239-

482

instance the melee of media behavior in the courthouse
created a concern for safety. The judge emerged from
the experience recommending that the California Rules
of Court govern the behavior of media, particularly
television cameramen, within the courthouse, on the
courthouse grounds, and in juror parking areas as well
as in the courtroom. Additionally, the judge observed
that the issue of media coverage consumed over two days
of discussion in chambers before the start of jury se-
lection. This is the only instance in which the issue
of efficiency impairment due to media coverage was raised
by an interviewee.

A serious incident involving cameras in the courts during
the experimental year occurred as a result of a television
camera peering through the courtroom door. A still
camera was inside the courtroom, having duly obtained
consent, but the television station had not completed
the request and consent process. A witness, who was
later characterized by the judge as "unstable to begin
with" was testifying without obvious problem until she
saw the television camera operating through the courtroom
door. At this point she became hysterical. The television
crew was reprimanded and in deference to the witness,
the still camera was removed from the courtroom for the
remainder of her testimony. This anecdote reinforces
the need to control actively extended coverage of court
proceedings. Certainly, obtaining camera shots through
courtroom door windows is contrary to the intent of EMC
guidelines and restrictions.

Granting courtroom access to the media's cameras and
microphones gives the California court system an oppor-

Media coverage of judicial proceedings has always
entailed the presence of reporters, cameras, micro-
phones, and equipment operators in the hallway out-
side courtrooms and in and around the courthouse gen-
erally.  The bigger the story, the larger the size of
this press corps, and in the high publicity cases, this
gathering can include a dozen TV cameras, numerous
still cameras, and dozens of reporters.  When consid-
ering the issue of media obtrusiveness in covering
judicial proceedings, the presence and behavior of
media in the corridors and courthouse generally stands
out as a much greater problem than in-court presence
and behavior.

In several EMC events, judges and attorneys offerred
unsolicited information to the evaluators regarding
the corridor/courthouse issue.  Among the concerns are:

- intimidation or harrassment of witnesses or defend-
  ants as they circulate in the courthouse;

- influence on jurors who are cognizant of the media
  "commotion" in the corridor, inadvertent exposure
  to biasing input from media in the courthouse, and
  harrassment of jurors after the trial by media
  aggressively seeking interviews;

- disturbance of surrounding courtrooms by media
  hallway commotion; and

- improper conduct in obtaining camera shots through
  the courtroom door.

In one major trial (People v. Robbins) the conduct of
the press outside the courtroom was a serious problem
in the opinion of the judge.  Harrassment of the defend-
ant in seeking camera coverage and interview responses
became an issue before the court and in at least one

-237-

484

rules which permits artificial lights or some other
relaxation of the rules at the discretion of the judge
might be advisable.  The occassional relaxation of
the standards for equipment and operator presence would
then not be a technical violation of the rules.

*Recommendation. Rule 980.2 should be amended to permit
at the discretion of the judge a relaxation of the
restrictions on EMC equipment and operator presence.
The reasons for any rule relaxation in this regard should
be articulated on the record.*

## C.  Related Issues

This report has documented the process of applying rigorous
evaluation techniques to the study of California's experi-
ment with extended media coverage of courtroom proceedings.
The evaluation has focused on specific inquiries which encom-
pass many but not all of the issues involved.  Among the
issues not addressed, the research process has identified
three key concerns which warrant direct comment.

### 1. Cameras in the Courthouse

It has not been the purpose of this study to analyze
media coverage of courtroom proceedings generally,
except in the observation of in-court conventional media
presence for comparison with extended media presence.
Left unaddressed is the issue of hallway/courthouse
media coverage practices.  In the course of attending
highly publicized courtroom proceedings and interview-
ing participants, the opinion was offered several times
that "hallway pandemonium" and media aggressiveness
outside the courtroom (yet inside the courthouse) was
much more of a problem than in-court coverage, parti-
cularly with respect to the issue of media obtrusiveness.

-236-

485

permanent basis, it is the opinion of the evaluators
that it should do so without a criminal case party
consent requirement.  The result of such a requirement
would be to stifle the extended media process to the
extent that it may as well not be allowed at all.
Since the evaluation has not produced evidence to indi-
cate the necessity of reverting to a complete prohibi-
tion of extended coverage, it is recommended that the
rules continue with no party consent required, given
that the trial judge has the ultimate authority to
allow or disallow EMC.

*Recommendation. Rule of Court 980.2 should remain as
presently formulated in requiring only the consent of
the judge before EMC may take place.*

5. Equipment and Operator Criteria

In Section III of this report, it was noted that several
instances of rule "relaxations" occurred.  (Rule relaxa-
tions are sanctioned occurrences which are contrary to
the letter of the rules.)  Most prominent among these
instances were the use of artificial lights and the
admission of three or more cameras.  These rule relaxa-
tions were permitted at the discretion of the judge and
occurred under controlled conditions.  None of them
resulted in chaos, a "circus-like" atmosphere, or obvi-
ous disruption or distraction.

To the extent that these relaxations of the rules occur,
there exists an inconsistency in rule requirements and
actual EMC practice.  It is not suggested that any of
the equipment and operator criteria be specifically
repealed.  However, the addition of a clause to the

-235-

486

a party <u>shall</u> be made part of the record.  As a matter
of openness and fairness and for the purpose of aiding
judges in the consent decision process, the practice
of hearing arguments for and against EMC from the
parties to the action and the media should be encouraged.
A written request facilitates the process of notifying
attorneys and litigants that EMC of the proceeding is
under consideration.  The presence of cameras and micro-
phones in the courtroom should never come as a complete
surprise to attorneys and litigants.  This occurred in
at least one case during the experimental year[36] and
the reaction of the defense attorney and his client was
understandably negative.  An effective control for this
potential problem would be to require the Court to notify
attorneys and litigants of a pending EMC request suffi-
ciently in advance to permit their input.

## 4. Party Consent

One of the most fundamental and important issues associ-
ated with "cameras in the courts" is the question of
party consent.  The California experiment operated under
both a party consent required and no party consent
required condition for criminal trial level proceedings.
A basic finding of the research on this point is that
a party consent requirement in criminal cases results
in very little extended media coverage.  Generally,
defendants and their attorneys reject EMC requests if
empowered to do so, and the media predominantly is
interested in criminal cases.

If the Judicial Council decides to allow electronic
and photographic coverage of court proceedings  on a

---

[36] <u>People v. Roemer</u> in Ventura County.

487

proceeding and the number of media organizations seek-
ing to participate in the extended coverage.   The
several "major case" events required several days or
a few weeks advanced notice to allow enough time for
arrangements and coordination to take place.   The
large number of more minor EMC events often required
no more than a few hours advanced notice.

The question legitimately is raised whether or not use
of a request form ought to be required if EMC is allowed
on a permanent basis.  Naturally, the preference of
the media is to dispense with this paperwork, particu-
larly since the electronic and photographic media gen-
erally feel that they should have the same access as
the print media to court proceedings.  Although the
research indicates that generally EMC has little or no
effect on the proceeding, there remains the reservoir
of negativity in the reports of those having experienced
EMC, reports which include a few bitter experiences and
more than a few strong preferences against EMC presence.
Requests for extended coverage should be reviewed in
every instance by the judge for determination of possi-
ble negative impacts, some of which may be logically
predicted or even likely.  Covering the testimony of,
for example, a rape victim is obviously unwise.  A
written request process provides a checkpoint for making
these screening decisions.

*Recommendation*.  *To facilitate the screening and decision
process of the judge, <u>written</u> request for EMC (i.e.
use of the AOC Request Form) should continue to be required.*

Another argument for a written request is persuasive.
The rules require that an objection of an attorney for

jurors are more negative towards EMC than judges and
witnesses (although less negative than attorneys).
Attitude data show them to be suspicious of media
coverage of court proceedings by both conventional
and electronic/photographic means.  Jurors are some-
what more skeptical towards EMC than conventional media
coverage although their apprehension diminishes after
an experience with EMC.  Many jurors support the intro-
duction of cameras in the court room, but just as many
predict negative impacts of EMC on the case or on them-
selves.  A total ban on EMC of jurors would go far to
alleviate the apprehension of some without compromising
the ability of the media to thoroughly cover the story.

*Recommendation.  Rule 980.2 should be amended to prohibit
extended coverage of jurors.  Emphasis should be placed
on prohibiting side or front face shots of any juror.*

## 3. Notice Procedures

The rules require submission of written requests for EMC
a reasonable time in advance of the proceeding for which
it is being requested.  Throughout the experimental year,
the requirement that the request be written proved to be
an effective means of instilling structure into a request
process which could easily become informal and "loose".
As it was, some judges disregarded or never were cogni-
zant of this aspect of the rule and permitted cameras
without a written request.  The "reasonable time in
advance" requirement also proved successful; the absence
of a specific time period permitted a measure of flexi-
bility in the negotiations and arrangements between
courts and the media.  What constituted a reasonable
time in advance varied greatly with the nature of the

489

*Recommendation. Rule of Court 980.2 should be amended
to strengthen its control over still camera shutter
noise. Blimping devices should be mandatory on all
but the quietest cameras presently on the approved
cameras list.*

## 2. Juror Anonymity

The rules presently prohibit "close-up" coverage of
jurors.  In only a few instances was this rule violated
by the media but in several other instances an unavoid-
able "gray area" was broached.  The most common TV
camera placement is "over the shoulder" of the jury,
a placement which makes any shot of the jury a close
up of at least the most proximate jurors.  This fact,
coupled with the fact that jurors generally desire
complete anonymity in the performance of their duty,
suggests a possible revision of the rules.

In some trials, the judge invoked a complete ban on
juror coverage.  This restriction occurred in "sensa-
tional crime" type EMC events, the type of case in
which the media has great and constant interest.  In
the opinion of the evaluators, these instances of re-
strictions on juror coverage were appropriately invoked
and well received by the jurors in the case.  A rule
amendment creating a total ban on extended coverage
of jurors is worth considering.  Jurors would be
assured that the justice system had taken every pre-
caution to preserve their anonymity and safety.

The evaluation interviews show jurors to be an outspoken
group, and although the range of opinions is wide,
jurors appear to be moderately skeptical about the
effects of EMC of court proceedings.  As a group,

-231-

490

## 1. Still Camera Shutter Noise

Observational and interview data both reveal a distrac-
tion problem with the shutter noise of still cameras.
While this problem does not occur in a majority of
cases, it does occur frequently enough to warrant
action.  The cameras causing the problem are among
those in the list of approved makes and models attached
to the Rules.  The control of still camera obtrusive-
ness is the only area in which the rules are not
"tough" enough.

Rarely did the evaluators observe or receive reports
of the use of a blimping device which completely mutes
the noise of still cameras.  In the People v. Robbins
trial, a sheath was used to mute still camera noise,
but even this did not completely eliminate the problem.
The use of a blimping device represents an additional
cost or convenience factor which evidently the media
generally prefers to avoid, particularly since the rules
do not require their use so long as an approved camera
is used.

The Judicial Council has available alternative approaches
to dealing with the still camera noise problem should
it decide to do so.  It may refine the list of approved
cameras to include only those with relatively quiet
shutter clicks (such as the Leica model).  Or, it may
require the use of a blimping or sheathing device on
all still cameras having shutter click noise louder
than the quietest models.  Or, it may leave the rules
as is and rely upon the discretion of an informed judge
to control the problem.

-230-

B.   Implications of Research Findings for Rules Content

A primary objective of the Rules of Court 980.2 and 980.3
is to set guidelines for the physical presence of electronic
and photographic media such that obtrusiveness is minimized.
By all indications of this research, this objective was
accomplished quite satisfactorily.  In virtually no instance
did EMC cause a major disruption of the proceeding being
covered.  Except in the minds of the most sensitive and
negatively predisposed individuals,  EMC never created a
"circus-like" atmosphere.

Despite the fact that the rules were functional throughout
the experimental year in controlling obtrusiveness, the
year's experience does suggest certain refinements in this
regard as well as other respects.  The areas needing refine-
ment are addressed below by a brief description of the problem
or issue accompained by alternative approaches to its resolu-
tion.

The areas addressed in recommending possible rule changes are:

- still camera shutter noise;

- juror anonymity;

- notice procedures; and

- equipment and operator criteria .

Additionally, the recommendation is made to leave the rules
regarding consent requirements as presently configured.

The issues involved in the decision to allow EMC, and the conditions under which to do so, are complex indeed.  The jury needs to be protected from exposure and influence. Judges need to remain as independent as possible and free from unnecessary burdensome management responsibilities. Witnesses should not be subject to unnecessary pressure or embarrassment.  Parties to the proceedings should not find their case judged by the television-watching public before judged by the jury.

Does EMC add significantly enough to the existing court enviornment problems caused by conventional media coverage to warrant its exclusion?  The answer is plainly no.  With minor problems, most of which are solvable through rules revision, standarized enforcement of rules and increased experience, EMC does not add significantly to exsisting disturbance-distraction-dignity-decorum problems.

Does EMC cause trial participants and prospective trial participants to change their behavior in a way that interferes with the fair and efficient adminstration of justice more than those changes caused by conventional media coverage to warrant its exclusion?  The answer is a qualified no.  While the observations showed little behavioral impact due to EMC, interview data showed that some individuals felt apprehension and other concerns. Few reported actual changes in their own behavior.  Many did not like EMC, just as many did not like conventional media representatives present.  Attitude measures and the relationship between attitude and behavior are what remain unanswered.  To the extent that attitude and behavior are linked, there remains some qualification in the answer to this question.  Taken globally, there is little evidence in this evaluation to suggest that EMC causes significantly more changes in behavior than does conventional media coverage.

-228-

**493**

(and other media as well), the majority showed positive
attitudes.  Experienced jurors, especially, felt little
damage would ensue from EMC presence.  Their attitudes
match closely their observed behavior and data obtained
in interviews.  The discrepancies mentioned above for
judges, prosecutors and defenders are not present for
jurors.

## Integration of Research Findings

The evaluation research pinpointed several issues which will
continue to be of major concern.  The party consent question
will remain a controversial issue, as will concern about
potential impacts on civilian participants in court proceedings,
and the potential influence of EMC on decision-making will
continue to be a primary issue.  Balancing EMC access to courts
with the need to protect courts from outside influence will
likely be the central question on which the fate of EMC rests.
The evaluation yielded other conclusions with predictive value.
Among them are:

- The generally negative attitude toward EMC will be slow
  to change.

- Defenders will persist in their negative attitude.  If EMC
  continues in its present form, the defenders will continue
  to pressure judges to invoke their discretion in denying or
  restricting EMC.

- As more experience is accumulated, prosecutors, judges, and
  the general public (jurors) will continue to reduce their
  apprehension toward EMC, unless an uncontrolled, high
  disturbance event occurs.

- At a process level, the administrative support system of
  the courts occasionally will be burdened by major cameras
  in the courts events.  There will be times when a court
  will not be staffed or equipped sufficiently to deal with
  an EMC event.  Physical remodeling or other logistical
  accommodations may eventuate.

- Judges are going to feel burdened occasionally in their
  decision-maker role.  They will at times be "put on the
  spot", since the rules, as presently structured, position
  them as the key decision-maker.

-227-

494

It is possible that when measured in an attitude survey, apprehension, concern or negativity is a global and general perception, one which is not necessarily borne out by actual, specific experience. In courtrooms the evaluators observed little apprehension, little disruption and, in general, found little evidence for anyone to have a very negative set of attitudes about EMC--on an event-specific basis. A judge might feel or believe that witnesses will be apprehensive while the actual event over which he presided did not verify his prior held attitude.

It is also possible that defenders, for instance, whose anti-EMC position remained unchanged throughout the experimental year, may actually have had relatively positive experiences at EMC proceedings, but reported them to be negative because they hold a negative set of attitudes about EMC in general. As such, their general attitude overrides the specific event experience.

Finally, it is possible that respondents retain long-held fears about general EMC effects, despite the lack of negative experiences in specific events. The time span during which EMC has been tried experimentally in California is short. Knowledge and information about its effects are not widely known. Individual respondents may even doubt the validity of their own experience (especially if it was a single, brief event) and yield to the longer-held, easily tapped general attitude.

Jurors showed a different picture. Though a reservoir of 10 to 30 percent af all jurors are skeptical of EMC

495

- As of July, 1981, 54% of judges, 47% of prosecutors and 13% of defenders approve of EMC for criminal proceedings.

- The attitude measures revealed that judges, attorneys, and jurors possess a complex multi-factor set of attitudes toward EMC. Factor analysis yielded four reliable indices on which measures of judges and attorneys attitudes toward EMC can be conceptualized.

- Overall, the aggregate attitude measures are negative to neutral for judges and attorneys. Defense attorneys are considerably more negative than either judges or prosecutors in their attitudes toward EMC.

- Judges and prosecutors developed a more positive set of attitudes toward EMC in the course of the experimental year. Defenders remained strongly negative in their attitudes.

- Transference of responsibility, a phenomenon in which one group sees other groups but not their own group as being affected negatively by EMC, persisted in posttesting.

- Factor analysis yielded five reliable indices on which measures of jurors' attitudes toward EMC can be conceptualized.

- Overall, the aggregate attitude measures are neutral to positive for jurors.

- Large numbers of jurors, especially the inexperienced, felt that even the presence of conventional reporters and sketch artist (as well as EMC) creates the potential for disruption, distraction, and participant apprehension.

- Experience with EMC left jurors with positive attitudes toward EMC.

Defenders, to a great extent, and judges and prosecutors to a lesser extent, seem to display one set of attitudes when measured by the Survey and another set when interviewed after an EMC event. In puzzling over the possible explanations for this apparent discrepancy, the evaluators postulated several options.

-225-

Clearly, the number of "uneventful" EMC proceedings
far outnumber those having some obvious or perceived
problem.  The frequency and nature of these problems
have been identified in this evaluation as input to
the forthcoming decision on continuation of EMC.  The
evaluation uncovers the rate at which these problems
occur and provides a basis for determining the proba-
bility of more serious problems occurring.

3.   Summary of Attitudinal Data

Attitudinal data, presented in Section V and summarized
below, present a considerably more skeptical though
mixed picture than event specific data.  However, shifts
in attitude due to time and experience are almost always
in a direction more favorable towards EMC.

The following summary statements about the attitudes of
judges, attorneys, and jurors should be viewed in combin-
ation with the comparative perspective offered earlier
by the event-specific data.  When considered together,
these data provide a more definitive answer to the eval-
uation questions posed than provided by either data
group viewed in isolation.

- As of July, 1981 judges (61%), prosecutors (79%),
  and defenders (90%), all strongly disagree with
  the removal of the party consent requirement as
  a condition for EMC of criminal proceedings.

- As of July, 1981 judges (69%) and prosecutors (70%)
  approve of EMC for appellate proceedings.  Only
  30% of defenders approve of appellate EMC.

- As of July 1981, 58% of judges, 43% of prosecutors,
  and 20% of defenders approve of EMC for civil
  proceedings.

497

- Judges were evenly divided in characterizing their experience with EMC as positive or neutral. Only a few respondents (7%) reported that their experience was negative. Attorneys show a similar split although a greater percentage (27%) reported having a negative experience.

- In terms of personal preference, about one-fifth to one-fourth of all judge, witness, and juror respondents said they would have preferred EMC not be present. Over one-third (38%) of all attorney respondents so indicated.

- Half of all judge respondents concluded that EMC had virtually no effect on the proceeding. One-fifth said it had a positive effect, another fifth said it had mixed positive and negative effects, and a few (8%) said it had a negative overall effect. Jurors were more negative in their assessment of overall impact: 21% perceived a negative effect from electronic or photographic media presence.

The above summary statements are based upon interview and observational data, which together establish clear patterns regarding the effects of EMC. Throughout the interview data (and to a lesser extent the observational data) there exists a reservoir of skepticism or reported negativity about EMC. In gross terms, this reservoir can be said to hover around the 10% level.

The discussion in Section IV attempts to describe the specific substance of the negativity found in interview and observational data. In the opinion of the evaluators, EMC never was responsible for a "travesty of justice". In only a few instances did experienced attorneys present a specific theory that EMC did or very well could have altered case outcome or otherwise impeded the fair administration of justice. In several other interviews, a more general speculation about negative EMC impacts was offered, without arguing that these negative effects occurred in the case in question.

498

at the forefront of the "cameras in the courts" issue. In authorizing a rigorous evaluation of the experiment, the findings of which are summarized below, California has contributed to the acquisition of greater knowledge about the ramifications and consequences of permitting extended media in the courtroom.

## 2. Summary of Case Specific Data Analysis

Participant interview and evaluator observation data contributed greatly to the formulation of findings and conclusions about both major research questions.  Section IV contains 28 tables summarizing the responses of interviewees and results of observational data analysis.  The following series of statements further distill the findings and conclusions in that portion of the report.

- Generally speaking, the response patterns of attorneys are more negatively disposed towards EMC than other participant types.  Among attorneys, defense attorneys clearly are the most negative toward EMC.  Judges' and witnesses' response patterns are generally more positive towards EMC than other participant types.  Jurors' response patterns are more positive towards EMC than attorneys and more negative towards EMC than judges or witnesses.

- The presence of EMC equipment and operators generally was not distracting to proceeding participants.  Only 10% of participants interviewed said that EMC was either somewhat, definitely, or extremely distracting.

- Over 80% of interviewed judges and attorneys perceived no impairment to "dignity and decorum" because of EMC.  About 10% of respondents detected slight impairment and 10% detected more than slight impairment due to EMC.

-222-

- In three-fourths of all EMC events during the year, judges reported little or no increase in their supervisory responsibility. Ten percent (10%) of judge respondents reported definite or extreme increase to their supervisory responsibility.

- Observational data confirm interview data in the conclusion that EMC generally was not distracting to participants. These data show that courtrooms were "calm" environments with both EMC and conventional-only media presence.

- Observational data indicate that potential sources of distraction other than EMC (conventional media, court personnel, trial participants, audience, and external noises) were approximately equal to EMC in causing distraction and disruption. All these factors generally cause little problem inside the courtroom.

- The ability of judges, attorneys, and witnesses to "effecitvely communicate" generally was not impaired by EMC.

- Large majorities of attorney and juror interviewees perceived no change in judge behavior due to EMC although some defense attorneys and jurors (26% and 14% respectively) perceived a negative change.

- Judges, opposing counsel, and jurors generally saw no change in attorney behavior due to EMC although a few in each group (10-15%) perceived a negative change.

- Judges, attorneys, and jurors generally saw no change in witness behavior due to EMC although some (12%, 22%, and 16% respectively) perceived negative changes due to EMC.

- Judges overwhelmingly saw no effect of EMC on juror behavior but 18% of attorney respondents saw negative effects.

- There is a distinct trend in interview response data which may be labeled: Transference of Responsibility. That is, a particular participant group tended to see greater negative effect on other participant groups than on their own group.

-22]-

500

- The media's predominant interest is in criminal cases. Civil cases attract less than half the interest of criminal cases and very few requests are submitted for appellate level or juvenile cases.

- EMC events took place twice as often in Superior Court as in lower courts.

- Electronic and photographic media covered all proceeding stages of litigation (evenly distributed) from arraignments to motions to trials.

- Television camera presence at court proceedings was somewhat more frequent than still camera presence and both were considerably more common than radio.

- The predominant purpose of EMC was for daily news stories on the particular case being covered. Relatively few "feature stories" or purely educational applications of EMC occurred.

- In over a dozen cases, judges exercised their discretion in EMC decision-making by restricting coverage beyond the criteria in the California Rules of Court governing the experiment.

- In several cases, "violations" or relaxations of the rules occurred but in no instance was EMC so obtrusive as to disrupt or seriously disturb the proceeding.

- The experimental year was highlighted by about a half dozen extremely high media events having "cameras in the courts". These events include sensational crime cases, public figure trials (politicians), a social issue case, and a libel suit between a celebrity and a newspaper.

In all it was an active and interesting experimental year. At this writing, the experiment continues and even more experience with EMC of court proceedings is being accumulated. In early September, 1981, cameras (one television camera and one still camera) were permitted for the first time in California's history to cover oral arguments at the Supreme Court. Its active experiment places California

The research is documented in the previous five sections of
this report with data analysis occurring in Sections III and
IV.  Section I provides an historical and contextual perspec-
tive for California's experiment with EMC of court proceedings.
The basic purpose of the evaluation of the experiment is set
forth along with a review of prior reserach on the "cameras
in the courtroom" issue.  A summary of the Rules of Court
governing California's experiment (980.2 and 980.3) completes
Section I.  Section II documents in some detail the evaluation
research design.  Sections III, IV, and V are summarized below.

### 1. Factual Summary of the Experimental Year

Section III of this report presents factual information
about the one year experimental period (July 1, 1980-
June 30, 1981).  Request record data and descriptive
analysis from evaluation data (interviews and observa-
tions) produced this body of factual knowledge.

The requirement that the media notify the evaluators
of EMC requests provided a means of measuring the
volume and characteristics of EMC activity for the
one year time period.  The following statements sum-
marize the pertinent findings emerging from the factual
analysis.

- About 350 requests were submitted to the courts
  and just over 200 of these subsequently resulted
  in an EMC event.

- The requirement in the first seven months of the
  experiment that party consent to EMC in criminal
  trial level proceedings be obtained resulted in
  little criminal case EMC activity.  The removal
  of the party consent requirement resulted in a
  sharp increase in EMC criminal case activity.

-219-

## VI.   CONCLUSIONS AND RECOMMENDATIONS

### A.   Summary of Analysis and Findings

California's experiment with extended media coverage (EMC)
of court proceedings was evaluated by an 18 month study
during which data were collected for over one year.  A multi-
faceted data collection approach was employed, relying upon
interviews with court proceeding participants, evaluator
observations of EMC events, and general attitudinal surveys
to judges, attorneys, and jurors.  For baseline comparative
purposes, observational data were collected from conventional-
only media coverage court proceedings.  Attitudinal data were
collected before, during, and after the one year period to
measure shifts in attitude over time, and survey respondents
were grouped into direct EMC experienced and no EMC experience
groups to determine the effects of experience on attitude.

The research focused on two major evaluation questions.
The first question  asked whether or not the "physical pres-
ence" of EMC equipment and operators caused distraction,
disruption, or impairment to dignity and decorum in the
courtroom.  The second question centered on participant
behavior--was that behavior altered by EMC presence in a
manner which threatened the fair administration of justice?
The evaluators formulated a comprehensive list of potential
negative EMC effects related to the two major evaluation
questions and determined the content of data collection
instruments accordingly.

-218-

503

public providing a service to their community EMC-
Experienced jurors have little to gain in stating a posi-
tive attitude toward EMC other than as an honest expres-
sion of exactly what happened to them as a consequence
of service.

Judge after judge interviewed by the evaluation team
expressed a concern about the central role (and utter
necessity of protecting it) played by jurors in the
American judicial system.  They indicated that these
crucially independent individuals must believe that
their role and their function is not compromised by the
presence of EMC.  The Questionnaire results show with
little doubt that the EMC-Experienced jurors themselves
are solid in their perceptions of their own abilities
and those of others and the system to withstand the
intrustion of EMC.

504

EMC-Experienced jurors are less concerned about a nega-
tive impact from EMC.  On issues surrounding "other
participant" distraction, apprehension, giving testi-
mony, and task motivation, the two groups are closer
to one another in their pattern of responses, and a
strong negative "minority vote" is cast.  Moderate per-
centages in both groups expected or saw negative impacts.
While neutral to positive overall attitudes toward EMC
exists among both groups, the EMC-Experienced jurors are
far more positive on the average.

5.   Discussion and Summary

The results of the analyses of juror attitudes are very
important.  The trends of all of the findings for jurors
are consistent.  One conclusion stands out:  the EMC-
Experienced jurors clearly have a different point of
view, a different attitude of EMC and its effects than
those jurors who have not served in an EMC trial.  The
attitude is relatively positive.

Experience with EMC left jurors with positive attitudes.
By virtue of their own direct experience as a juror in
an EMC event, the Experienced jurors are confident of
themselves, of judges, and of the system in general to
withstand whatever effect (imagined or real) which EMC
may bring into the courtroom or to the justice system.

Postured  in their silent role of attentive observers
of the entire trial process from beginning to end, they,
and they alone, among those studied, observed all other
actors without themselves playing an interacting role.
Their observations and views can be understood as a
separate set of observations.  As members of the general

-216-

505

The results in Factor 5 are startling.  In Item 1,
only 19% of the EMC-Experienced jurors felt that EMC
will be disruptive vs. 51% of the Inexperienced.  Almost
a full reversal of attitude occurs.  On Item 8, 59% of
the EMC-Inexperienced indicated concern about EMC lead-
ing to increased distraction among participants vs. 33%
in the Expereienced group.  It should be noted, however,
that one-third of the EMC-Experienced jurors do believe
that increased distraction occurs.

Juror concern that friends would inhibit their clear think-
ing about a case (item 2) varied from 43% in the EMC-
Inexperienced group to 13% in the Experienced group.  A
decisive 70% of the Experienced group disagreed that
friends would alter their thinking.

Anticipated apprehension (item 3) about participation in
legal processes varied from 40% in the EMC-Experienced
group to 56% in the Inexperienced group.  Concern that
EMC will cause witnesses to be overly guarded (item 14)
was registered at 52% for Inexperienced and at 34% for
Experienced.

Overall, the distribution of respondent frequencies on
the 14 questionnaire items shows definite attitude dif-
ferences between EMC-Inexperienced and EMC-Experienced
jurors.  Compared to the large percentage of EMC-
Inexperienced jurors who are of the opinion that the
press *per se* is a disturbing, distracting, or negatively
influencing element in the courtroom, considerably fewer
EMC-Experienced jurors are so inclined.

On issues relating to disturbance, juror motives and
ability, judge ability, decision and trial outcome the

-215-

506

TABLE V-33 cont.

*Q2.   Juror's decision-making will be influenced by their
       freinds' and acquaintances' attitudes about the case
       because of television, radio, and still camera coverage
       of the trial.

| | EMC<br>INEXPERIENCED JUROR | EMC<br>EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE<br>OR AGREE | 43% | 13% |
| NO OPINION | 13% | 18% |
| DISAGREE OR<br>STRONGLY DISAGREE | 44% | 70% |

*Q3.   Allowing television cameras, still cameras, and radio
       equipment in the courtroom will make people more
       apprehensive about participating in legal processes.

| | EMC<br>INEXPERIENCED JUROR | EMC<br>EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE<br>OR AGREE | 56% | 40% |
| NO OPINION | 13% | 20% |
| DISAGREE OR<br>STRONGLY DISAGREE | 31% | 39% |

*Q14.  Allowing television cameras, still cameras, and radio
       in the courtroom will cause witnesses to be overly
       guarded in their testimony.

| | EMC<br>INEXPERIENCED JUROR | EMC<br>EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE<br>OR AGREE | 52% | 34% |
| NO OPINION | 21% | 23% |
| DISAGREE OR<br>STRONGLY DISAGREE | 27% | 43% |

*Frequency distribution differences between groups significant
 beyond .05 level.

507

TABLE V-33


FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR FIVE ITEMS


FACTOR FIVE: Distraction and Inhibition.  Suggests concern that
media presence may distract or disrupt proceedings
or cause some participants to worry.


*Q1. The presence and operation of television cameras, still
cameras, and radio equipment will lead to disruption
of courtroom proceedings.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 51% | 19% |
| NO OPINION | 13% | 8% |
| DISAGREE OR STRONGLY DISAGREE | 36% | 73% |


*Q8. Allowing television cameras, still cameras, and radio
equipment in the courtroom will lead to increased
distraction of participants.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 59% | 33% |
| NO OPINION | 12% | 10% |
| DISAGREE OR STRONGLY DISAGREE | 29% | 57% |


-213-

508

TABLE V-32

FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR FOUR ITEMS

FACTOR FOUR: General Juror Attitude. Suggests concern that media presence may cause an overall juror attitude of wariness.

*Q9. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect my willingness to serve as a juror.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 26% | 18% |
| NO OPINION | 13% | 5% |
| DISAGREE OR STRONGLY DISAGREE | 60% | 77% |

Q12. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause me to have to defend my actions as a juror.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 27% | 27% |
| NO OPINION | 19% | 11% |
| DISAGREE OR STRONGLY DISAGREE | 54% | 61% |

*Frequency distribution differences between groups significant beyond .05 level.

-212-

509

TABLE V-31

FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR THREE ITEMS

FACTOR THREE: Decision Influence.  Suggests concern that media
presence may interfere in the decision making process.

*Q6. Allowing television cameras, still cameras, and radio
equipment in the courtroom will affect sentencing decisions.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 25% | 14% |
| NO OPINION | 24% | 19% |
| DISAGREE OR STRONGLY DISAGREE | 50% | 67% |

Q7. Allowing television cameras, still cameras, and radio
equipment in the courtroom will cause judges to avoid
unpopular positions or decisions.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 28% | 17% |
| NO OPINION | 24% | 22% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 61% |

*Q11. Allowing television cameras, still cameras, and radio
equipment in the courtroom will affect the outcome of trials.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 31% | 19% |
| NO OPINION | 21% | 11% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 69% |

*Frequency distribution differences between groups significant
beyond .05 level.

sentencing decisions (item 6).  A similar, though not
significant, trend on item 7 shows that the EMC-
Experienced group is more sure by 61% to 48% that EMC
will not cause judges to avoid unpopular positions or
decisions.  The distributions on item 11 show that 69%
of EMC-Experienced Jurors are sure that EMC will not
affect the outcome of trials, vs. 48% for Inexperienced
jurors.  Less than one-fifth of the EMC-Experienced
jurors on each item in Factor 3 believe that EMC will
negatively affect decisions.  It is important to note
that in the EMC-Experienced group there exists a dis-
tinct minority who see negative effects to EMC involve-
ment in court-related decisions.

Table V-32 shows that the distribution of the frequencies
of the two groups of respondent answers to item 9 in
Factor 4 (General Juror Attitude) was significantly
different.

The EMC-Experienced jurors believed by a margin of 77%
to 60% over the Inexperienced jurors that EMC would not
affect their willingness to serve; 18% and 26% respec-
tively felt it would.  On the matter of EMC causing
jurors to defend their actions (item 12) 27% of each
group believed so.  Over half of each group thought not
and the differences were not significant.

Table V-33 shows the distribution of the frequencies
of the two groups of respondent answers on items in
Factor 5, (Distraction and Inhibition).  The distribu-
tion of answers on every item significantly differenti-
ated the two groups.

TABLE V-30


FREQUENCY DISTRIBUTION COMPARISIONS
BETWEEN EMC EXPERIENCED AND INEXPERIENCED
JURORS ON FACTOR TWO ITEMS


FACTOR TWO: Role Performance.  Suggests concern that media
presence may reduce the quality of participant
performance required by their role.


*Q10. Allowing television cameras, still cameras, and radio
equipment in the courtroom will not affect my ability
to judge wisely the merits of the case.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 71% | 89% |
| NO OPINION | 12% | 2% |
| DISAGREE OR STRONGLY DISAGREE | 17% | 9% |


*Q13. Allowing television cameras, still cameras, and radio
equipment in the courtroom will not affect a judge's
ability to maintain courtroom order.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 58% | 80% |
| NO OPINION | 19% | 10% |
| DISAGREE OR STRONGLY DISAGREE | 23% | 10% |


*Frequency distribution differences between groups significant
beyond .05 level.

512

ficantly different between EMC-Inexperienced and Experienced jurors, although shifts occur in each item.
Note that about one-third of the EMC-Experienced jurors believe that the presence of EMC will motivate witnesses in their task. On Item 5 it is seen that about 60% of EMC-Experienced jurors, compared to 47% of the Inexperienced, feel that EMC will not motivate jurors to be more attentive.

The distribution of the frequencies of the two groups of respondent answers to items 10 and 13 shown in Table V-30 were significantly different on the items in Factor 2 (Role Performance), Inexperienced and Experienced jurors display different attitudes. While both groups show some concern that the presence of EMC will negatively affect ability to perform, the experienced jurors were far more confident that EMC would have little impact on either the judges or their ability to perform within their role. The differences between the two groups are striking. Fully 89% of the EMC-Experienced group compared to 71% of the Inexperienced group feels confident in their ability to make a wise decision. As for their perception of a judge's ability to maintain order (item 13), 80% of the EMC-Experienced group, in contrast to 58% of the Inexperienced jurors, agree that EMC will not have an impact.

Table V-31 shows that the distribution of the frequencies of the two groups of respondent answers to items 6 and 11 in Factor 3 (Decision Influence) were significantly different.

Over two-thirds of the EMC-Experienced group, vs. 50% of the Inexperienced group think EMC will not affect

TABLE V-29

FREQUENCY DISTRIBTUION COMPARISIONS
BETWEEN EMC EXPEREINCED AND INEXPERIENCED
JURORS ON FACTOR ONE ITEMS

FACTOR ONE: Positive Task Motivation.  Suggest concern that
media presence may diminish participant motivation
required in their task.

Q4. Allowing television cameras, still cameras, and radio
equipment in the courtroom will motivate witnesses
to be truthful in their testimony.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 24% | 32% |
| NO OPINION | 27% | 28% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 40% |

Q5. Allowing television cameras, still cameras, and radio
equipment in the courtroom will increase jurors'
attentiveness to testimony.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 33% | 23% |
| NO OPINION | 20% | 18% |
| DISAGREE OR STRONGLY DISAGREE | 47% | 59% |

may suggest an area for future, more detailed, research.
However, the jury pool sample in this evaluation appears
to be a representative slice of California jury pools.
There seems little reason  to believe that these potential
differences due to education will affect the present
research findings, since the effects of education are
most likely randomly spread through the juror samples.

Overall, these frequency distribution discrepancies sug-
gest that opinion solidifies with increased education,
and generally, attitude toward EMC becomes somewhat more
liberal.  These inexperienced jurors also suggest that
their view of their own abilities (i.e. confidence in
themselves) increases somewhat with education.  The more
educated the juror, the more confident he or she feels
able to withstand the intrusion of EMC into the courtroom.

## Chi-square Tests

Question:  Are the frequency distributions on all items
on the Questionnaire similar for both EMC-Inexperienced
and EMC-Experienced jurors?  Are any of the frequency
distributions between the two groups on any item deviant
enough to be significant?

Tables V-29, 30, 31, 32, and 33 show the results of the
application of the Chi-square tests to the frequency
distributions for each item.  The items are grouped by
Factors.  An asterisk by the item number in the table
indicates whether or not the distribution of frequencies
is sufficiently deviant for significance.

Table V-29 shows that the distribution of respondent
frequencies on items 4 and 5 (Factor 1) were not signi-

-206-

515

TABLE V-28E

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 12

ITEM 12: Allowing television cameras, still cameras, and radio
equipment in the courtroom will cause me to have to
defend my actions as a juror.

HIGHEST EDUCATION LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0% | 8% | 4% | 1% |
| AGREE | 23% | 17% | 23% | 33% |
| NO OPINION | 54% | 20% | 19% | 15% |
| DISAGREE | 15% | 45% | 49% | 33% |
| STRONGLY DISAGREE | 8% | 10% | 6% | 19% |

This table again shows that beyond the elementary school category
there is considerably less EMC-related frequency of response
in the No Opinion category on juror defensiveness. Correspond-
ingly in each of the higher educational categories there is an
increased response in Disagreeing with the item. Again, those
with graduate degrees, while being the least undecided, increase
their response frequency in the Agree categories. This suggests
a perceived new dimension in attitude toward EMC and juror
behavior.

-205-

516

TABLE V-28D


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 11


ITEM 11:   Allowing television cameras, still cameras and radio
equipment in the courtroom will affect the outcome
of trials.


### HIGHEST EDUCATIONAL LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0% | 6% | 6% | 6% |
| AGREE | 31% | 21% | 25% | 36% |
| NO OPINION | 39% | 20% | 22% | 22% |
| DISAGREE | 23% | 44% | 42% | 24% |
| STRONGLY DISAGREE | 8% | 9% | 5% | 12% |


On the assertion that EMC will affect the trial outcome, this
table shows that beyond the elementary school category, there
is less frequency of response in the No Opinion category and
for the high school and college categories there is an increase
in the Disagree categories.  Those with graduate degrees change
the frequency distribution with an increase in the frequency
in the Agree categories.  Perhaps those with much higher amounts
of education sense, perceive, or worry about a new complexity
for trial outcome with EMC.

TABLE V28C


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 10


ITEM 10:  Allowing television cameras, still cameras, and radio
          equipment in the courtroom will not affect my ability
          to judge wisely the merits of the case.


|  | HIGHEST EDUCATIONAL LEVEL | | | |
|---|---|---|---|---|
|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
| STRONGLY AGREE | 8% | 20% | 22% | 31% |
| AGREE | 31% | 47% | 51% | 52% |
| NO OPINION | 53% | 12% | 12% | 9% |
| DISAGREE | 8% | 18% | 14% | 7% |
| STRONGLY DISAGREE | 0 | 4% | 1% | 2% |


This table shows once again that with increased education there
is a higher frequency of response in the Agree and Strongly
Agree categories with corresponding movement away from No
Opinion.  The high frequency (53%) response for those in the
lowest educational category suggests their lack of confidence
to be able to judge objectively the merits of a case covered
by EMC.


-203-

518

TABLE V-28B


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 9


ITEM 9:  Allowing television cameras, still cameras, and radio
equipment into the courtroom will affect willingness
to serve as a juror.


HIGHEST EDUCATIONAL LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0 | 9% | 7% | 2% |
| AGREE | 33% | 19% | 18% | 16% |
| NO OPINION | 42% | 13% | 13% | 12% |
| DISAGREE | 17% | 44% | 49% | 44% |
| STRONGLY DISAGREE | 8% | 14% | 13% | 26% |


This table shows rather decisively that with increased education
there is a higher frequency of response in the Disagree and
Strongly Disagree categories with corresponding movement away
from Agree and No Opinion categories.  Of those with graduate
degrees, 70%, compared to 25% of those with elementary school
education, believe that EMC will not affect their willingness
to serve as a juror.


-202-


519

TABLE V-28A


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 3


ITEM 3:  Allowing television cameras, still cameras, and radio
equipment in the courtroom will make people more
apprehensive about participating in legal processes.

HIGHEST EDUCATION LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 7% | 16% | 16% | 8% |
| AGREE | 50% | 37% | 41% | 53% |
| NO OPINION | 21% | 18% | 11% | 8% |
| DISAGREE | 21% | 25% | 29% | 25% |
| STRONGLY DISAGREE | 0 | 4% | 3% | 6% |

This table shows a slight trend among those with less education
to have a higher frequency of response in the No Opinion
category.  In other words, with increasing education the atti-
tude about participant apprehension solidifies.

520

TABLE V-27C


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY AGE
ON ITEM 13


ITEM 13:   Allowing television cameras, still cameras and
           radio equipment in the courtroom will <u>not</u> affect
           a judge's ability to maintain courtroom order.


|                   | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|-------------------|----------|-------|-------|-------|-----|
| STRONGLY AGREE    | 9%       | 13%   | 8%    | 14%   | 4%  |
| AGREE             | 51%      | 48%   | 52%   | 46%   | 50% |
| NO OPINION        | 21%      | 18%   | 17%   | 16%   | 23% |
| DISAGREE          | 16%      | 17%   | 21%   | 21%   | 23% |
| STRONGLY DISAGREE | 3%       | 4%    | 2%    | 4%    | 1%  |

This table shows that the 25-34 and 45-54 age group increase

the frequency of their responses in the extreme categories,

suggesting a slight trend in these age groups of a more

diversified opinion on the matter of EMC affecting a judge's

ability to maintain order.

TABLE V-27B


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY AGE
ON ITEM 5


ITEM 5:   Allowing television cameras, still cameras and radio
equipment in the courtroom will increase jurors'
attentiveness to testimony.


|  | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| STRONGLY AGREE | 5% | 3% | 4% | 2% | 5% |
| AGREE | 27% | 29% | 27% | 26% | 34% |
| NO OPINION | 29% | 22% | 21% | 19% | 15% |
| DISAGREE | 39% | 44% | 43% | 43% | 41% |
| STRONGLY DISAGREE | 0 | 3% | 5% | 10% | 6% |


This table shows a slight increase in No Opinion as the age of
the respondent decreases on the question of EMC stimulating
jurors to be more attentive.  A similar general trend toward
increasing frequency of disagreement with this concept occurs
with advancing age.

-199-

522

TABLE V-27A

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTION BY AGE
ON ITEM 4

ITEM 4: Allowing television cameras, still cameras, and radio
equipment in the courtroom will motivate witnesses
to be truthful in their testimony.

|  | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| STRONGLY AGREE | 5% | 3% | 3% | 3% | 7% |
| AGREE | 22% | 18% | 20% | 19% | 24% |
| NO OPINION | 39% | 25% | 29% | 25% | 27% |
| DISAGREE | 35% | 50% | 38% | 40% | 38% |
| STRONGLY DISAGREE | 0 | 5% | 11% | 13% | 5% |

This table shows a slight tendency among the youngest group to
have No Opinion at a higher frequency and the three middle age
groups to have a higher frequency of combined Disagree and
Strongly Disagree frequencies that EMC will motivate witness to
be truthful. Certainty of opinion on this matter may be some-
what age related.

TABLE V-26B


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY SEX
ON ITEM 5


ITEM 5:   Allowing television cameras, still cameras and radio
          equipment in the courtroom will increase jurors
          attentiveness to testimony.


|                    | MALE | FEMALE |
|--------------------|------|--------|
| STRONGLY AGREE     | 3%   | 4%     |
| AGREE              | 33%  | 25%    |
| NO OPINION         | 22%  | 18%    |
| DISAGREE           | 37%  | 48%    |
| STRONGLY DISAGREE  | 5%   | 5%     |


This table shows that women in the EMC-Inexperienced jury pool

sample disagree somewhat more than men 53% to 42% that EMC

will increase juror attentiveness.

TABLE V-26A

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY SEX
ON ITEM 1

ITEM 1: The presence and operation of television cameras,
still cameras, and radio equipment will lead to
disruption of courtroom proceedings.

|  | MALE | FEMALE |
|---|---|---|
| STRONGLY AGREE | 14% | 15% |
| AGREE | 33% | 42% |
| NO OPINION | 15% | 11% |
| DISAGREE | 32% | 28% |
| STRONGLY DISAGREE | 7% | 5% |

This table indicates that women in the EMC-Inexperienced jury
pool sample agree slightly more than men 47% to 38% that EMC
will be a disruption in the courtroom.

-196-

525

Cross-tabulations were computed between all Question-
naire items and the demographic variables of sex, age,
and education for the 946 EMC-Inexperienced Jurors.

Sex of Respondent.  Men and women responded to the
Questionnaire in almost identical ways, as shown in
Tables V-26A and V-26B.  Only two questions (items 1
and 5) showed sex differences in the response frequencies,
and the differences appear minor.  It seems safe to
assume that sex of respondent played no role in the
ultimate display of juror attitude toward EMC.

Age of Respondent.  The 946 respondents in the EMC-
Inexperienced subgroup within the jury pool sample showed
a consistent pattern of answers regardless of their age,
except for the distribution of responses on items 4, 5,
and 13 (see Tables V-27A, B, and C).  Even these differ-
ences are slight, showing only vague trends associated
with age.  It is safe to assume that age of respondent
played no significant role in their pattern of answers
to the questionnaire.

Education of Respondent.  On five items in the attitude
questionnaire, the 946 EMC-Inexperienced Jurors showed
some differences in response patterns as a function of
their educational level.  These differences in frequency
distribution on items 3, 9, 10, 11, and 12 suggest that
opinion/attitude in several EMC related matters may vary
according to the education of the respondent (see Tables
V-28A, B, C, D, and E).  Since the juror sample is a
sample with variety in educational backgrounds (contrasted
to judges, prosecutors, and defenders whose educational
backgrounds are homogeneous), these descriptive findings

Q2.    Jurors' decision-making will be influenced by their friends/and acquaint-
       ances' attitudes about the case because of reporters and sketch artists'
       coverage of the trial.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 32% | 9% |
| No Opinion | 13% | 12% |
| Percent Disagree or Strongly Disagree | 55% | 79% |

Q3.    Allowing reporters and sketch artists in the courtroom will make people
       more apprehensive about participating in legal processes.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 43% | 30% |
| No Opinion | 12% | 12% |
| Percent Disagree or Strongly Disagree | 45% | 58% |

Q14.   Allowing reporters and sketch artists in the courtroom will cause
       witnesses to be overly guarded in their testimony.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 40% | 21% |
| No Opinion | 21% | 27% |
| Percent Disagree or Strongly Disagree | 39% | 51% |

*Surveyed while in the jury pool prior to assignment to a trial.

**Surveyed after service as a juror on a high publicity trial which received
 conventional media coverage only.

527

TABLE V-25 Cont'd.

FACTOR FOUR:   General Juror Attitude.  Suggests concern that media presence may cause an overall juror attitude of wariness.

Q9.   Allowing reporters and sketch artists in the courtroom will affect my willingness to serve as a juror.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 19% | 18% |
| No Opinion | 11% | 0% |
| Percent Disagree or Strongly Disagree | 70% | 82% |

Q12.   Allowing reporters and sketch artists in the courtroom will cause me to have to defend my actions as a juror.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 21% | 18% |
| No Opinion | 16% | 9% |
| Percent Disagree or Strongly Disagree | 63% | 74% |

FACTOR FIVE:   Distraction and Inhibition.  Suggests concern that media presence may distract or disrupt proceedings or cause some participants to worry.

Q1.   The presence of reporters and sketch artists will lead to disruption of courtroom proceedings.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 29% | 21% |
| No Opinion | 12% | 6% |
| Percent Disagree or Strongly Disagree | 59% | 73% |

Q8.   Allowing reporters and sketch artists in the courtroom will lead to increased distraction of participants.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 40% | 23% |
| No Opinion | 16% | 9% |
| Percent Disagree or Strongly Disagree | 44% | 68% |

-193-

528

TABLE V-29 Cont'd.

Q13.    Allowing reporters and sketch artists in the courtroom will not affect
        a judge's ability to maintain courtroom order.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 65% | 82% |
| No Opinion | 17% | 6% |
| Percent Disagree or Strongly Disagree | 19% | 12% |

FACTOR THREE: Decision Influence.  Suggests concern that media
            presence may interfere in the decision-making process.

Q6.     Allowing reporters and sketch artists in the courtroom will affect sen-
        tencing decisions.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 18% | 3% |
| No Opinion | 16% | 12% |
| Percent Disagree or Strongly Disagree | 66% | 95% |

Q7.     Allowing reporters and sketch artists in the courtroom will cause judges
        to avoid unpopular positions or decisions.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 21% | 3% |
| No Opinion | 16% | 24% |
| Percent Disagree or Strongly Disagree | 63% | 73% |

Q11.    Allowing reporters and sketch artists in the courtroom will affect the
        outcome of trials.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 20% | 6% |
| No Opinion | 17% | 12% |
| Percent Disagree or Strongly Disagree | 53% | 82% |

-192-

529

TABLE V-25

Frequency Distribution Comparisons Between Conventional
Media Coverage Experienced and Inexperienced Jurors
on Factor Items From Attitude Questionnaire

FACTOR ONE:  Positive Task Motivation.  Suggests concern that
media presence may diminish participant motivation
required in their task.

Q4.   Allowing reporters and sketch artists in the courtroom will motivate
witnesses to be truthful in their testimony.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 29% | 18% |
| No Opinion | 22% | 24% |
| Percent Disagree or Strongly Disagree | 49% | 58% |

Q5.   Allowing reporters and sketch artists in the courtroom will increase
jurors' attentiveness to testimony.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 33% | 18% |
| No Opinion | 20% | 26% |
| Percent Disagree or Strongly Disagree | 47% | 56% |

FACTOR TWO:  Role Performance.  Suggests concern that media presence
may reduce the quality of participant performance re-
quired by their role.

Q10.  Allowing reporters and sketch artists in the courtroom will not affect
my ability to judge wisely the merits of the case.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 75% | 75% |
| No Opinion | 9% | 3% |
| Percent Disagree or Strongly Disagree | 17% | 23% |

-191-

530

The items in Table V-25 are arranged according to their
presence on the five factors.  In Factor 3, for instance,
each item shows a sharp increase in the percentage of
Experienced Jurors whose attitude suggests that they
believe that the decision process will be unaffected
by the presence of media.  In Factor 5, Distraction and
Inhibition, much larger percentages of experienced
jurors see less disruption and distraction potential,
although sizeable percentages still perceive, even after
experience as a juror, that some participants will be
apprehensive about their participation because of media
presence (items 3 and 14).

Large numbers of jurors, especially the inexperienced,
feel that even the presence of conventional reporters
and sketch artists creates the potential for disruption,
distraction and participant apprehension.  This observa-
tion is important because it underscores the fact that
in the eyes of these prospective juror respondents,
initial problems associated with a shift from conven-
tional to extended media coverage are problems of degree
rather than kind.  While hardly earthshaking, the find-
ing points to the likelihood that conventional levels of
media coverage of the courts are seen as cause for con-
cern by many citizens and emphasizes the relative nature
of any contemplated shift to more extensive media intru-
sion into the courtroom.

## Cross-Tabulations: EMC Questionnaire

Question:  Is there any relationship between sex, age,
and education and the ways the EMC-Inexperienced jurors
responded to the Questionnaire?  Are the relationships
between these variables and certain items strong enough
to suggest that the variables affect the patterns of
responses?

-190-

531

Inexperienced and EMC-Experienced Jurors by factors.
The means for Factors 1 and 2 have been corrected for
direction, so that a positive attitude toward EMC is
consistently indicated by the larger numbers.  As is
obvious, EMC-Experienced Jurors show very positive atti-
tudes toward EMC on all factors, except Factor 1, which
was discussed above.  The overall attitude of all jurors,
EMC-Experienced or Inexperienced, is neutral to positive.
The EMC-Experienced group appears confident that the nega-
tive effects of EMC are minimal.

<u>Frequency Distribution Analysis:  Conventional Media
Coverage Questionnaire</u>

Question:  What frequency distribution patterns occur
on the 14 Questionnaire items for jurors, inexperienced
and experienced, with conventional media coverage?  Are
there any general conclusions that can be drawn from
an examination of the response patterns?

Service as a juror in a high publicity trial receiving
conventional media coverage appears to systematically
and uniformly reduce many of the concerns about conven-
tional media coverage which pre-service prospective
jurors held.  Table V-25 illustrates this graphic change.
The comparisons made here are suggestive only due to
limited analyses.  The sample size of jurors who had
experience with conventional media coverage is very
small.  The trend of the reduction of concerns about
negative effects of conventional media presence is worth
noting.  The concerns do not disappear, but the trend
here is parallel to the trend in juror attitude toward
EMC concerns discussed elsewhere in this section (i.e.;
experienced tends to reduce apprehension).

-189-

532



FIGURE V-24

EMC-INEXPERIENCED AND EMC-EXPERIENCED
JUROR ATTITUDES TOWARD EMC BY FACTOR MEANS

*Score transposed to correct for direction on the scale.

-188-

their role and also that EMC will not affect a judge's
ability to conduct the affairs of the court well.

On Factor 3, Decision Influence, the EMC-Experienced
group is significantly more sure that EMC and its effects
will not interfere with court decisions.

On Factor 4, General Juror Attitude, once again the EMC-
Experienced group shows significantly more confidence
that their willingness to serve and their acceptance of
service will be unaffected by EMC. The EMC-Inexperienced
group feels the same way, though more mildly.  On Factor
5, Distraction and Inhibition, the significant change in
scores moves the EMC-Experienced group across the scale
midpoint (3.00) so that as a group, their attitude is
now favorable.  EMC will not have an overall distracting
or inhibiting effect in the opinion of EMC--Experienced
Jurors.

Factor 1, Positive Motivation, shows no difference between
the groups.  Both groups seem to be ambivalent on the
issue of whether or not the presence of EMC will have a
salutary effect on witness and juror motivation to task
with a slight trend toward the negative.  Said another
way, the respondents state that they do not know if EMC
will or will not motivate toward truthfulness or attentive-
ness.  They may very well as a whole group be indicating
that EMC will probably not have such an effect, and that
the questions or concepts raised by the items may be
irrelevant.

Figure V-24 illustrates with bar graphs the level of and
the differences in attitude levels between the EMC-

TABLE V-23

T-TEST ON FACTOR MEANS FOR EMC
INEXPERIENCED AND EXPERIENCED JURORS

| FACTOR AND FACTOR NAME | NUMBER OF CASES | FACTOR RELIABILITY | MEAN | STANDARD DEVIATION | PROB BILI |
|---|---|---|---|---|---|
| 1.POSITIVE TASK MOTIVATION | | .64 | | | |
|     INEXPERIENCED | 912 | | A3.21 | .86 | 0.4 |
|     EXPERIENCED | 77 | | 3.29 | .88 | |
| 2.ROLE PERFOMANCE | | .50 | | | |
|     INEXPERIENCED | 909 | | A2.42 | .82 | |
|     EXPERIENCED | 79 | | 1.94 | .77 | 0.0 |
| 3.DECSION INFLUENCE | | .79 | | | |
|     INEXPERIENCED | 911 | | B3.22 | .89 | |
|     EXPERIENCED | 79 | | 3.64 | .81 | 0.0 |
| 4.GENERAL JUROR ATTITUDE | | .70 | | | |
|     INEXPERIENCED | 906 | | B3.37 | .97 | |
|     EXPERIENCED | 78 | | 3.65 | .92 | 0.0 |
| 5.DISTRATION AND INHIBITION | | .85 | | | |
|     INEXPERIENCED | 899 | | B2.72 | .88 | |
|     EXPERIENCED | 79 | | 3.35 | .86 | 0.0 |

*= Significant at .05 level or better.

A= Lower  score indicates more positive attitude toward EMC

B= Higher score indicates more positive attitude toward EMC

Reliability coefficients were calculated to determine
the reliability of the items in each survey factor.
Table V-23 indicates the reliabilities for each factor.
They range from a low (and minimally acceptable) .50 to
a high of .85.  Medium to very high confidence can be
placed in the accuracy and consistency of the attitude
measures taken by this Questionnaire in this evaluation.
No doubt due to the wide variation in response patterns
in the juror sample, there is a corresponding fluxuation
in the reliability of the items on the factors.  There
is reasonable evidence to believe, however, that if used
again, the same items would group together again, forming
the same factors, even with a different sample of jurors.
The evaluators are quite confident that the Juror Atti-
tudinal Questionnaire accurately measures the attitudes
of the jurors sampled.


t-Tests on Factor Mean Scores

Question:  How large are the differences between EMC-
Inexperienced and EMC-Experienced jurors' mean scores
of attitudes as measured by the five factors?  Are any
of the differences large enough to be considered signi-
ficant?

Table V-23 summarizes the result of the t-test of factor
means.  The reader should keep in mind that this analysis
was completed on only the EMC-related Questionnaire.
The table identifies the factor, the factor means for
each group (EMC-Experienced and EMC-Inexperienced), the
standard deviation and the probability statement.

Four of the five factors show significant differences
between the mean scores of the two groups.  On Factor 2,
Role Performance, EMC-Experienced Jurors' mean score is
1.94 while EMC-Inexperienced Jurors' mean score is 2.42.
The significant difference means that the EMC-Experienced
group seems confident of their ability to perform in

-185-

536

The judicial system plays a special role in that it is a forum of last resort where justice ultimately is rendered or occasionally forfeited. Our system of government to some extent insulates the judiciary from the strong forces, political and economic, which operate in our society. Courts preserve delicate and precious rights. Indeed, this is at the root of why cameras have been denied access to courtrooms for so long. If access finally is to be granted to extended media, it should be done carefully.

APPENDIX F

Description of Data Base Characteriestics

1    individual media or network involved in extended coverage.

2         Only equipment that does not produce distracting sound

3    or light shall be employed to cover judicial proceedings.

4         It shall be the affirmative duty of extended coverage

5    personnel to demonstrate to the Judge adequately in advance

6    any proceeding that the equipment sought to be used meets the

7    sound and light criteria enumerated herein.

8         Except to increase the wattage of existing courtroom

9    lights, there shall be no modificiations or additions to light

10   equipment existing in a courtroom.  Any increases in wattage

11   shall be with permission of the Judge and, if authorized, shall

12   be installed, maintained, and removed without public expense.

13        No light or signal visible or audible to trial partici-

14   pants shall be used on any equipment during extended coverage

15   to indicate whether it is operating.

16        Extended coverage personnel and equipment shall be

17   positioned so as to provide reasonable coverage in such

18   location in the Court facility as shall be designated by the

19   Judge.  Equipment that is not a component part of a television

20   camera, and video and sound recording equipment, shall be

21   located outside the courtroom, unless other arrangements are

22   approved in advance by the Judge.

23        Extended coverage equipment shall not be placed in or

24   removed from the courtroom except prior to or after proceedings

25   each day, or during a recess.

26        All extended coverage equipment operators shall assume

27   their assigned, fixed position within the designated area and

28   once established in that position shall act in a manner   so

539

not to call attention to their activities. Extended coverage equipment operators shall not be permitted to move about during the Court session.

Pooling arrangements among members of the media shall be the sole responsibility of the media and shall not require the Judge or Court personnel to mediate disputes. In the absence of agreement or in the event of unresolved disputes relating to pooling arrangements, the Judge may terminate all or any portions of extended coverage.

DATED:

_____
JUDGE OF THE SUPERIOR COURT

1   To protect the attorney-client privilege and the
2   effective right to counsel of all trial parties, there shall
3   be no audio coverage of conferences between attorneys and
4   clients or parties, or between co-counsel and clients or
5   parties, or between counsel and the Judge held at the bench.

6       There shall be no extended coverage of any conference
7   held in the chambers of a Judge.

8       In order to preclude extended coverage of any matters
9   presented to the Court in the absence of the jury which are
10  for the purpose of determining the admissibility of evidence,
11  the Judge may conduct a hearing in chambers.

12      Extended coverage in the courtroom shall be allowed
13  during and only during:

14          (a)   The opening statement of the attorney
15      for the People;

16          (b)   The opening statement of the attorney
17      for the Defendant;

18          (c)   The opening argument of the attorney
19      for the People;

20          (d)   The argument of the attorney for the
21      Defendant; and

22          (e)   The closing argument of the attorney
23      for the People.

24      There shall be no extended coverage of courtroom pro-
25  ceedings through any open courtroom door or window in any door
26  or through any access to or aperture in the courtroom.

27      Equipment from one television station or network--
28  ///

-3-

541

designated as the pooling station or network--shall be permitted access to a courtroom proceeding at one time. The pooling station or network may use a portable television camera that is silent, a videotape electronic camera, or, in the absence of such equipment, a silent 16mm sound on film (self-blimped) camera. One television camera, operated by one camera person, shall be admitted to record the proceeding.

One audio system for broadcast purposes shall be permitted in a proceeding. Where possible, audio for all media shall be from audio systems present in the Court. If no technically suitable audio system exists, a microphone and related wiring essential for media purposes shall be unobtrusive, located in places designated in advance by the Judge, and operated by one person.

One still photographer, using not more than two still cameras with not more than two lenses for each camera, shall be permitted in a proceeding subject to extended coverage. A second still photographer, using not more than two still cameras with not more than two lenses for each camera, may be admitted in the discretion of the Judge. Such still cameras shall not produce distracting clicking sounds or light during the permitted coverage of the proceedings, regardless of Schedules A and B set forth in Rule 980.2(k) of California Rules of Court. No motorized drive equipment shall be permi and no moving lights, flash attachments, or sudden lighting changes shall be permitted during Court proceedings.

No equipment or clothing of any extended coverage personnel shall bear any insignia or identification of the

-4-

542

1
2
3
4
5
6
7
8
9
10
11
12
13
14

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SACRAMENTO

PEOPLE OF THE STATE OF CALIFORNIA,)   NO. 59201           DEPT. 18
                                    )
                vs.                 )       ORDER ESTABLISHING
                                    )   EXTENDED COVERAGE OF TRIAL
ALAN ROBBINS,                       )
                                    )
                      .Defendant.)  )
_____

15      Photographing, recording for broadcasting and broadcasting
16  shall not be permitted within the courtroom while Court is in
17  session or during any mid-morning or mid-afternoon recess except
18  as authorized by this Order.

19      "Extended coverage" means any media recording or broad-
20  casting of proceedings by the use of television, radio, photo-
21  graphic, or recording equipment.

22      "Trial participants" means all parties, attorneys, jurors
23  witnesses, Court personnel and the Judge or Judges present
24  during the conduct of proceedings.

25      "Media" means any news gathering or reporting agencies
26  and the individual persons involved, and includes newspapers,
27  radio, television, radio and television networks, news services
28  magazines, trade papers, in-house publications, professio

543

1  journals, or other news reporting or news gathering agencies

2  whose function it is to inform the public or some segment

3  thereof.

4      Extended coverage shall be conducted so as not to be dis-

5  tracting and not to interfere with the solemnity, decorum, and

6  dignity which must attend the making of decisions that affect

7  the life, liberty, or property of citizens.

8      No extended coverage shall be allowed except with the

9  consent of the Judge.  Such consent shall be in writing, filed

10  in the record of the proceedings, and recorded in the minutes

11  of the Court.

12      The Judge may, in the interests of justice, refuse, limit

13  or terminate extended coverage if a party objects to extended

14  coverage.

15      The consent of the attorney for a party shall not be

16  required, but the attorney may direct a motion to the Judge to

17  refuse, limit, or terminate extended coverage.  Such motion

18  shall be directed to the discretion of the Judge.  The

19  objection of the attorney for a party shall be noted in the

20  record of the proceedings and in the minutes of the Court.

21      The Judge may in the intersts of justice, refuse, limit

22  or terminate extended coverage of any witness who objects to

23  extended coverage.

24      There shall be no closeup or "zoom" extended coverage

25  of individual members of the jury while in the jury box, while

26  within the courtroom, while in the jury deliberation room

27  during recess, or while going to or from the deliberation ro

28  at any time.

544

1 | pursuant to California Rules of Court.

2 | On October 30, 1980, none of the persons operating the electronic

3 | equipment gave their names or affiliation to the Clerk.

4 | Therefore, it appearing (1) that there was a failure of the media to

5 | comply with the Court's request that they identify each individual operating

6 | the equipment and identify their media affiliation and (2) since the appoint-

7 | ment of counsel neither the defendant nor his attorney, or either of them,

8 | has filed a written consent authorizing extended media coverage, further

9 | media coverage in the case of The People of the State of California vs.

10 | Mark Venters McDermand is hereby DENIED.

11 | "It shall be the responsibility of the media to make a separate

12 | request for later extended coverage".  California Rules of Court 980.2(e)(2).

Dated: *November 5, 1980*

GARY W. THOMAS
Judge of the Municipal Court

MUNICIPAL COURT OF CALIFORNIA, COUNTY OF MARIN

CENTRAL JUDICIAL DISTRICT

STATE OF CALIFORNIA     ) ss.
COUNTY OF MARIN         )

People            vs.   McDermand

ACTION NO.   C 35470

(PROOF OF SERVICE BY MAIL — 1013A, 2015.5 C.C.P.)

I AM A CITIZEN OF THE UNITED STATES AND A RESIDENT OF THE COUNTY AFORESAID; I AM OVER THE AGE

OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ABOVE ENTITLED ACTION; MY BUSINESS ADDRESS IS:

MARIN COUNTY HALL OF JUSTICE, CIVIC CENTER, SAN PEDRO ROAD, SAN RAFAEL, CALIF. 94903.

ON   November 5, 1980      . I SERVED THE WITHIN   Request For Extended Media

Coverage

ON THE      parties      IN SAID ACTION, BY PLACING A TRUE COPY THEREOF ENCLOSED IN A

SEALED ENVELOPE WITH POSTAGE THEREON FULLY PREPAID, IN THE UNITED STATES POST OFFICE MAIL

BOX AT SAN RAFAEL, CALIFORNIA, ADDRESSED AS FOLLOWS:

HAND CARRIED:
Jerry R. Herman, District Attorney
Room 155, Hall of Justice
San Rafael, CA 94903

Ernest H. Short & Assoc., Inc.
2709 Marconi Ave.
Sanramento,CA 95821

Mark Cohen
Executive News Producer
KPIX News
855 Battery Street
San Francisco, CA

A. Leonard Bjorklund
765 Bridgeway
Sausalito, CA 94965

Linda Yee
KRON - TV
1001 Van Ness Ave.
San Francisco, CA

I CERTIFY (OR DECLARE), UNDER PENALTY OF PERJURY *
THAT THE FOREGOING IS TRUE AND CORRECT.

DATE     November 5, 1980

203-56 (11-72).

* NOTARIZATION NOT REQUIRED

546

RECEIVED NOV  7 1980

FILED

NOV  5 1980

KENNETH C. VINN
Clerk of the Municipal Court of California
County of Marin Central Judicial District
By _____ Deputy Clerk

MUNICIPAL COURT OF CALIFORNIA, CENTRAL JUDICIAL DISTRICT

COUNTY OF MARIN

THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
                          Plaintiff,      )
                                          )          C 35470
              vs.                         )
                                          )          REQUEST FOR EXTENDED
MARK VENTERS McDERMAND,                   )          MEDIA COVERAGE
                          Defendant.      )

    On October 28, 1980, there was filed with the Court a request for
extended media coverage pursuant to 980.2 Rules of Court.  With the request
was filed a consent by District Attorney Jerry R. Herman and the defendant
Mark Venters McDermand, who was not represented by counsel.

    At 1:00 P.M. on October 28, 1980, I did advise the media in open
court that I would consent to the request for use of electronic equipment
in the courtroom providing certain conditions were met, among those being
that the Clerk must be given the names and media affiliation of each person
operating the various electronic equipment.  This information was not pro-
vided to the Clerk on October 28th.

    The defendant appeared.  Also appearing was Frank J. Cox, Chief Deputy
Public Defender, who advised the Court that Mr. McDermand was eligible for
court-appointed counsel and he further advised that the Public Defender
would not be able to represent Mr. McDermand due to a conflict of interest.
A list of three names was given to the Clerk regarding appointment of counsel
and the matter was continued one day to October 29th at 1:00 P.M. for
arraignment, appointment of counsel and entry of plea.  The defendant

547

1   advised by the Court that although he had given his consent to extended

2   media coverage, he may wish to discuss this with his court-appointed counsel

3   as to whether such consent would continue.

4        On October 29th at 1:00 P.M. Mr. Bruce B. Bales appeared, advising

5   the Court he may be able to accept the appointment.  The defendant indicated

6   to the Court that Mr. Bales had participated in the prosecution of Mr.

7   McDermand within the near past.  Therefore, the matter was continued one

8   day for either the appearance of Mr. Louis Hawkins or Mr. A. Leonard

9   Bjorklund for acceptance of appointment.  The defendant was again advised

10   with regard to the consent to extended media coverage; that he may wish

11   to reconsider this matter and further advise the Court whether he wished

12   to continue to give such consent.  Matter was continued to October 30, 1980

13   at 1:00 P.M. for arraignment, appearance of counsel and acceptance of

14   appointment, entry of plea and setting of the Preliminary Hearing.  The

15   names of the persons operating the electronic equipment and the media

16   affiliation were not given to the Clerk.

17        On October 30th at 1:00 P.M. Mr. A. Leonard Bjorklund appeared with

18   the defendant advising the Court that he would accept the appointment and

19   the defendant was advised of the charges against him and personally entered

20   pleas of not guilty.  Time was waived by both the defendant and counsel

21   for Preliminary Hearing and matter was set for December 2nd for Preliminary

22   Hearing.  Neither the defendant nor his counsel objected to the appearance

23   of the media in the courtroom or the use of the electronic recording systems.

24   The Court requested that the defendant and his counsel advise whether they

25   wish to continue consent of extended media coverage or withdraw their con-

26   sent (although no objection was made to the appearance of the media for

27   October 30, 1980).  No affirmation was made by or on behalf of the defendant

28   or his counsel that they wish to consent to any further extended coverage

1     exhibits except by order of the Court.

2  11.  At all recesses and adjournments, and at any other

3     time the Jury is retiring from the courtroom, or

4     while the defendant is being moved to or from the

5     courtroom, spectators shall remain seated until the

6     Jury and the defendant have had ample time to withdraw

7  12.  All media personnel shall conduct themselves in

8     accordance with Rule 980.2 of the California Rules of

9     Court. Any violation of said rule or of the provision

10     of this order shall be deemed sufficient cause for

11     excluding the violator from the courtroom and such

12     other action as the Court may deem legally proper.

13  DATED: JUNE 9, 1981

JUDGE OF THE SUPERIOR COURT

549

RECEIVED JUN 1 5 1981

FILED

JUN   1981

CLARK A. NELSON, County Clerk

By L. Yates      Dep.

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF BUTTE

THE PEOPLE OF THE STATE OF CALIFORNIA,

                Plaintiff,

       vs.

FRANK JACK HESKETT,

                Defendant.

NO. 74934

ORDER FOR EXTENDED MEDIA COVERAGE

     AUTHORIZATION IS HEREBY GIVEN to Chico Enterprise-Record to conduct extended media coverage in the above entitled matter.  Only one still camera is to be in the courtroom in a fixed position and the equipment to be used shall consist of a Minolta 75  35mm still camera.

     The media is prohibited from photographing any witness posing an objection, and it shall be limited to open courtroom sessions in front of the jury, and not during voir dire examination in the selection thereof.

     There will be no close-up shots or zoom lenses in this extended coverage of individual members of the jury.

     Dated:  June 8th, 1981.

Reginald M. Watt
Reginald N. Watt, Judge

cc:   District Attorney
      Jerry Kenkel, Defense Counsel
      Chico Enterprise-Record
      Ernest H. Short & Associates

550

IN THE SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA

--oOo--

PEOPLE OF THE STATE OF CALIFORNIA,

        Plaintiff,

   vs.

KENNETH EUGENE PARNELL,

        Defendant.

No. 70511

ORDER RE EXTENDED COVERAGE

From the wide attention attracted to this case resulting in massive publicity, the Court is of the opinion that the following rules are necessary to a constitutionally guaranteed, orderly and fair trial by an impartial jury, and therefore orders:

The request of the media for extended coverage of the trial herein is granted, subject to the following terms and conditions:

1. There shall be no extended coverage of the selection of the prospective jury during voir dire.

2. There shall be no extended coverage of any proceedings not had in open court.

3. No more than one (1) television camera shall be permitted in the courtroom at any given time.  It shall be the responsibility of the media to determine whose camera will be used.

4. No more than one still photographer, using not more

1   than two still cameras with not more than two lenses
2   for each camera, shall be permitted in the courtroom
3   at any given time.  It shall be the responsibility
4   of the media to determine whose camera will be used.
5   5.   One audio system for broadcast purposes shall be
6        permitted in the courtroom at any given time.  It
7        shall be the responsibility of the media to determine
8        whose audio system will be used.  This order is not
9        meant to proscribe the use of small, pocket-size
10       recorders by individual members of the media.
11  6.   The Court reserves the right to amend, modify, or
12       otherwise change this order at any time during the
13       proceedings.
14  7.   Members of the news media shall not interfere in any
15       way with prospective jurors, nor shall any attempt be
16       made to talk to any juror.
17  8.   All entrance ways, corridors and approaches to the
18       courtroom will be kept clear at all times for free
19       access thereto by those using them in the course of
20       their employment or those having business to transact
21       therein.
22  9.   **The area of the courtroom inside the rail is reserved**
23       **for the defendant, counsel, members of the Bar, Court**
24       **personnel and such witnesses as counsel may desire to**
25       **be within the bar for consultation purposes.  No one**
26       **else will enter without permission of the Court.**
27  10.  No one except attorneys of record, their agents,
28       Court personnel, witnesses and Jurors may handle

552

APPENDIX E


Examples of Orders Regarding
Extended Media Coverage

CASE _____

NAME _____

DATE _____                    JUROR

BASE./EXP.

| | condensed answer | comments/explanation |
|---|---|---|
| Media noticed | | |
| Favor/unfavor | | very unfav-orable \|  \|  \|  \|  \| very favor-able |
| distraction/ courtroom environment | | |
| Behavioral effects | | |
| Prefer presence/ reluctant to serve | | |
| Potential harm | | |
| Portion specially important | | |
| Media influence deliberation | | |

How many times have you served on a jury? _____

Types of cases _____

Nature of media coverage case received

_____

Sex: M  F

Age: under 25    25-34    35-44    45-54    over 55

Occupation: _____

Education:  No formal schooling
            Elementary:  1  2  3  4  5  6  7  8
            High School:    9  10  11  12
            College:        13  14  15  16
            Graduate degree: _____

554

CASE_____          INTERVIEWER_____

NAME_____

FOR   PLTF./DEF./PEOPLE          WITNESS

BASE./EXP.

| | condensed answer | comments/explanation | |
|---|---|---|---|
| Media noticed | | | |
| favor/unfavor | | very unfavor- able        very favor- able | |
| Distract/ affect testimony | | | |
| Potential harm | | | |
| Prefer presence/ testify/again | | | |
| Number of times a witness | | | |

Sex:  M  F
Age:  under 25   25-34   35-44   45-54   over 55
Education:  No formal schooling
            Elementary School:  1  2  3  4  5  6  7  8
            High School:  9  10  11  12
            College:     13  14  15  16
            Graduate Level: _____



**555**

POST-EVENT JUROR INTERVIEW - EXPERIMENTAL

1. What specific media personnel and equipment did you notice during the proceedings?

2. You have just participated as a juror in a trial which had TV cameras, still cameras, and/or radio coverage.  Do you favor allowing this type of media coverage in the courtroom? (Mark answer on interview sheet).

3. Were you distracted by the presence of TV cameras, still cameras, and/or radio?  Create nervous reaction? Nature of distraction.  What effects, if any, did you perceive that the cameras had on the courtroom environment?  Flow of proceedings?

4. What, if any, behavioral effects on trial participants resulted from EMC?

    attorneys/judge/witness/party

5. Would you prefer cameras not be present?  Would you be reluctant to serve as a juror again solely because of the presence of TV cameras, still cameras, or radio?

6. Are you fearful that some harm (psychological, reputational, physical, or financial) could come to you or your family as a result of possible media coverage of this trial?  If yes, what portion of your fear is attributable to coverage by TV cameras, still camera or radio?

7. Was there any portion of the trial which seemed to carry a particularly special importance in influencing your decision-making?

8. In your opinion, did media exposure influence deliberations?

    (Complete information on interview summary form.)

556

POST-EVENT ATTORNEY INTERVIEW - EXPERIMENTAL

1. What specific media personnel and equipment did you notice during the proceedings?

2. Please discuss any adverse effects you perceived on the dignity and decorum of the courtroom as a result of EMC.

3. Behavioral effects on trial participants.
   Judge:  supervision/decisions/order
   Witness: truthfulness/nervousness/completeness
   Other Attorneys:  quality of representation/strategy
   Jurors:  fair verdict/distracted

4. How, if at all, was your strategy and representational quality affect by EMC?
   Witness called or not called
   question/area not addressed or specifically addressed
   strategy
   nervousness/behavior action

5. In what ways was EMC a positive or negative experience? What surprise or problems, if any, occurred?

6. What regrets, if any, do you have in consenting to EMC?

7. Would you prefer cameras not be present?  Participate again?

8. Describe the differences you noticed in editing practices used by conventional media.  Your feelings about these changes?

9. How many years have you been a practicing trial attorney? Number of highly visible media trials?

557

POST-EVENT WITNESS INTERVIEW - EXPERIMENTAL

1.   What specific media personnel and equipment did you notice during the proceeding?

2.   You have just participated as a witness in a trial which had TV cameras, still cameras, and/or radio coverage.  Do you favor allowing this type of media coverage in the courtroom?  (Mark answer on interview sheet)

3.   To what extent, if any, did TV cameras, still cameras, or radio equipment distract you in giving testimony?  In what way, if any, was the context of your testimony or the manner of your responding different due to the presence of this equipment and the knowledge that your testimony might be broadcast by these media?  (e.g. nervousness)

4.   Are you fearful that some harm (psychological, reputational, physical or financial) could come to you or your family as a result of possible coverage of your testimony by television (i.e. cameras)?

5.   Would you prefer to have testified without the cameras?  Would you be reluctant to testify again either in this trial or some other proceeding with camera coverage?

6.   How many times have you been a witness?  (get details)

     (Complete summary interview questionnaire.)

558

CASE_____   _____   _____   INTERV_____

NAME_____

DATE_____

BASE./EXP.                                    JUDGE

| | condensed answer | comments/explanation |
|---|---|---|
| Media noticed | | |
| Increased supervisory responsibility and how | | |
| Dignity & Decorum | | |
| Witness Effects | | |
| Attorney Effects | | |
| Juror Effects | | |
| Positive or Negative experience, surprises, problems | | |
| Regrets | | |
| Prefer presence/ participate again | | |
| Editing Effects | | |
| Number of cases | | |
| General Added Effects | | |
| Other | | |

CASE _____

NAME _____

DATE _____          ATTORNEY

BASE./EXP.

| | condensed answer | comments/explanation |
|---|---|---|
| Media noticed | | |
| Dignity & Decorum | | |
| Judge effect | | |
| Witness effects | | |
| Other attorney effects | | |
| Juror effects | | |
| Your behavior/ strategy | | |
| Positive or negative exper- ience, surprises, problems | | |
| Regrets | | |
| Prefer presence/ participate again | | |
| Editing Effects | | |
| Years attorney and number of cases | | |
| General added effects | | |
| Other | | |

560

Personal Interview Question
and Answer Sheets

\*Judge

\*Attorney

\*Witness

\*Juror

POST-EVENT JUDGE INTERVIEW - EXPERIMENTAL

1. What specific media personnel and equipment did you notice during the proceeding?

2. Describe the extent to which EMC increased your supervisory responsibilities. How did those increased responsibilities interfere with your principal duties as judge?

3. Please discuss any adverse effects you perceived on the dignity and decorum of the courtroom as a result of EMC.

4. What, if any, behavioral effects on trial participants did EMC have?
   Witness: truthfulness/nervousness/completeness
   Attorneys: quality of representation/strategy
   Jurors: fair verdict/distraction

5. In what ways was EMC a positive or negative experience? What surprises or problems, if any, occurred?

6. What regrets, if any, do you have in consenting to EMC?

7. Would you prefer cameras not be present? Participate again?

8. Describe the differences you noticed in editing practices used by EMC compared to those used by conventional media. Your feelings about these changes?

9. How many cases have you presided over in which there was high media visibility?

562

CAMERAS IN THE COURTROOM JUROR QUESTIONNAIRE

| Name | Case |
|---|---|
| Proceeding Type | Date of Proceeding |
| (For evaluator use only) | |

1. What specific media personnel and equipment did you notice during the proceedings?

   How noticeable and/or distracting would you say the equipment and personnel were?

2. You have just participated as a juror in a trial which had TV cameras, still cameras, and/or radio coverage. Do you favor allowing this type of media coverage in the court-room? (Please mark below as appropriate.)

   Very
   Unfavorable |———|———|———|———|———|———| Very
   1    2    3    4    5    6    Favorable

3. What effects, if any, did you perceive the cameras had on the courtroom environment?

   Did the cameras affect the flow of the proceedings?

4. Do you think the presence of cameras had any effects on the other trial participants (judge, attorneys, parties, or witnesses?)

5. Would you prefer cameras not have been present?

   Would you be reluctant to serve as a juror again solely because of the possible presen of TV cameras, still cameras, or radio at the trial?

(OVER)

563

6. Are you fearful that some harm (psychological, reputational, physical, or financial) could come to you or your family as a result of possible media coverage of this trial?

If yes, what portion of your fear is attributable to coverage by TV cameras, still camera or radio?

7. Was there any portion of the trial which seemed to carry a particularly special importance in influencing your decision-making?

8. In your opinion, did media exposure influence deliberations?

9. What main impression do you have regarding this "cameras in the courtroom" experience?

10. BACKGROUND INFORMATION

How many times have you served on a jury?_____

Types of Cases_____

Nature of media coverage case received_____

_____

Sex:  M   F

Age:   under 25        25-34        35-44        45-54        over 55

Occupation:_____

Education:    No formal schooling
              Elementary:  1  2  3  4  5  6  7  8
              High School:  9  10  11  12
              College:     13  14  15  16
              Graduate degree:_____

564

Name

Proceeding Type | Date of Proceeding

(For evaluator use only)

1. What specific media personnel and equipment do you remember being present at the camera event in your courtroom?

   How noticeable and/or distracting would you say the equipment and personnel were?

2. Describe the extent to which the camera event increased your supervisory responsibilities.

   How did those increased responsibilities interfere with your principal duties as judge?

3. Please describe all adverse effects you perceived on the dignity and decorum of the courtroom as a result of the presence of cameras.

4. What, if any, behavioral effects on trial participants did the presence of cameras have?

   On Witnesses? (truthfulness? nervousness? completeness?)

   On Attorneys? (general behavior? quality of representation?)

   On Jurors? (distraction? fair verdict?)

   On Parties? (general behavior?)

(OVER)

5.  In what ways was the presence of cameras a positive or negative experience for you? That is, what surprises or problems did it create and how did you end up feeling?

6.  What regrets, if any, do you have in consenting to the cameras?

7.  Would you prefer cameras <u>not</u> be present?

    Would you participate again in a cameras in the court event?

8.  (Optional) If you saw a subsequent media broadcast of the event covered in your courtr describe the differences you noticed in editing practices used by television compared to those used by the conventional (print) media. What are your feelings about thes changes?

9.  How many cases have you presided over in your career as a judge which you would say h high "visibility" in the media?

10. What main impression do you have regarding this "cameras in the courtroom" experience?

Mail Questionnaire Form:

*Judge

*Juror

APPENDIX D


Interview Instruments

## ATTENTIVENESS

WITNESS

| 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 4.0 | 5.0 | 6.0 |
|---|---|---|---|---|---|---|---|
| Tennis match Alert upright tho not tense. Intent concentration on the action,all the action. Impressive in energy put into paying attention. | Intent concentration on witness. May be taking notes. Alert,upright somewhat stiff Takes job seriously. | IDEAL NORM Normal eye contact with witness and with lawyer. Some break in following the action. Is in contact with mainstream of activity. May watch witness only. May take notes. Good posture. | Occasional, inconsequential glances at audience or elsewhere. May be watching attorney intently. May be taking notes. Posture relxd. | Shifting post. Intermitt.yawn Concentration is in and out. Gazes at spectators or else where. Gazes rather than watching the action. | Freq. yawns Constant gaze or turning away from action. Clear lack of concentration. Reading or writing at length. Posture slipping. Has to bring self back to concentration. | Dozes Slouching Freq. position shifts. Fighting off sleep. Jerks back to attention | Asleep |
| ATTENTIVE | ATTENTIVE | ATTENTIVE | | IN AND OUT | | INATTENTIVE | |

## CALM

COURTROOM

| 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 4.0 | 5.0 | 6.0 |
|---|---|---|---|---|---|---|---|
| Reflective Dignified Serious Atmosphere. No intrusions or noise. The ideally perfect courtroom. Calm is as a result of judge behavior and compelling nature of the activity. | Reflective and dignified by default due to few people or unnoticed trial. | NORMAL in and out movements and noises such as chairs and feet. Ordinary activity that varies with # of people. | Attempts to reduce noise and disturb fail. Attempt to move to a 1.0 have not been success. due to large # of people or highly visible trial | Intermittent distractions which could be avoided. | Clearly a distracted and noisy setting. Noticable constant of noise clatter movement which could be controlled or stopped. | Very constant noise,clatter factor. Disturbing to the proceedings. Much physical activity.Conversations and other distractions predominate | Very disturbing setting consta... physical an... audible no... and movem... Unable to co... conduct bus... of the cou... Uncontrol... intrusions |
| VERY CALM | | NORMALLY CALM | | DISTRACTED | | DISTURBED | |

**EFFECTIVE COMMUNICATION**

| | 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 4.0 | 5.0 | 6.0 |
|---|---|---|---|---|---|---|---|---|
| | OUTSTANDING | | APPROPRIATE | | INAPPROPRIATE | | INTOLERABLE | |
| **JUDGE** | Clear, concise correct. No spch disflu. Is polished. At ease. Intervenes self. Reiterates, clarifies, teaches. Timing outstanding. Relaxed.Commands respect & awe. Not acting. | Only occasion disfluency. Spch rate stable. Is polished. Is self. Timing outstanding. Commands rspct and awe. Not acting. A master of language. | NORM. Norm spch disflu. approp. spch rate. Some nerv. though relaxed. Not lose train of thought. Commands rspct those receiving commun. are responsive. Little need for clarification. | Personal spch patterns show. Incrs. disflu. Not tense but not relxd. Spch rate variable. Message commun. approp. express of emotion. | Reacts from emo-tional base. Or is flat. Does not verbalize when needed. Little eye contact. Allows confusing comm. defensive. Tools problem for fast or tooslow listeners. Or, increasing disfluencies. | Unwarranted emotional react. Ill-humored, cranky. Confuz is theme. Many disfluencies. Very defensive. rate of speech Allows confusing comm. expres flat or monotone. Needs prompting. | Abusive. Negative, blaming others for own lack. Message very confused. Listur works hard to get it. Disflu. comm predominate. Speech rate an impossible problem. | Commun. void. Obscenities. Senile, word salad. Irre outbursts. Listeners unable to get message. Or total silen catatonic w verbalize is req understandi is impossible |
| **LAWYER** | Clear, concise correct. No spch disfluence. At ease, relxd polished. Is self. Timing outstanding. Commands rspct and awe. Not acting. A master of language. | Only occasion disfluency. Spch rate is stable. Is relaxed. to misunderstnd. Commands respect. Clear and distinct. Everyone is responsive. | NORM. Norm spch disfluencies. Approp spch rate. Some nerv though intent and relaxed. Not lose train of thought. Receivers are responsive, esp.witnesses. Commands attn. | Personal spch patterns show. Incrs. disflu. Not tense but not relxd.Spch rate variable. Message is commanic. Appr confuzd comm. May be defens. for repeated emotion. Some need for repeat or clar. | Reacts from emotional base. or is flat. Does not verbalize when needed. Little eye contact.Allows confuzd comm. for repeated too fast or too slow. Increas. disfluencies. Emot. utteranc under control. | Unwarranted emot. reaction. Confuz cranky. is theme. Many disfluencies. Witness asks to clarif. Rate of spch is problm. Excess. flat or monotone. Needs prompting. | Abusive, Negative, lack others for own lack. Message very confuzd. Listnr works hard to get it Disflu. common Spch rate is imposs-problem witness left in quandry. Judge bcms upset. | Commun. vo Obscenitie senile, wo salad. Irr Listeners able to ge message. Or silence, ca tonic. The standing/sp possible. |
| **WITNESS** | Clear, concise correct. No spch disflu. At ease, relx Polished. Not acting. Is self. Commands respect, awe | Occ.disfluenc. Spch rate stabl Makes relxd. point clearly distinctly. No misunderstand. | NORM Exprt Wt. Few Disfluenc. Minor nervous. Intent & relxd Does not lose train of thoght Spch rate stbl Aware of spot light. | Incr.disfluenc. Some nervous. Not tense but not relxd. Spch rate variable. what nervous. Sch rate up and down, in approp. emotion Message clear. | NORM lay witns. Intermitt disfl Message gets across. Some-what confz nervous. Coast or too up and down, in normal way. Emot. words an under control. | Fgnt disfluenc react. Abusive, negative,blamin Somewhat confz in message. Way start in middl of thought. Or flat, monotone Needs prompting needs clarif. | Unwarranted e react. Abusive, negative,blami crying sobbing Message out-bursts. Constant cative.Constant reminders and prompting | @ Comm. voi Obscenitie Senile, salad. I shocking silent. Or tonic. Th understand the messag |

570

## ATTENTIVENESS

| 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 4.0 | 5.0 | 6.0 |
|---|---|---|---|---|---|---|---|
| Intent. Verbal izes or takes well toward action. Ahead of the activities. Hi energy output for paying strict attn. visually fol- lows every- thing closely. Impressive in this ability. | Takes special care to notice all activities anticipated action. Total attnt. Nonvbl to relevant events. No conversations. Enthusiastic/ relaxed. High level of con- centration. Visual contact with activitie Notetaking, on occasion. No reading. Moderately impressive. | No verbaliz. needed. No action needed. Verbally rspnd Heedful. Cor- centrating. Observant, not taking. No more than one side convers. Ordin ary shifts in posture and glances/gazes. Nonverb relxd courteous & generally towrd the action. Good.The NORM. | Courteous. Non verb is slight away from media Verbalizations when needed ar not anticip. Lower energy output or may be somewhat tense. Note taking. Watch clock. Adequate | Restless or uneasy concern about media or other matters. Misses some action.Struggle to concentrate shifts. Slight nervous. concentr. is intermittent. Not impressive | Fgnt yawns & unnec. gaze into space Or very nervous. Iligh & confer. Demos inatten by missing the Iligh & of posi point and need correcting or reminding.Dr- gaged in irrel evant activity Appears bored or distracted. Nonverb is away from act. Rarely watches action. | Irrelevant talk,actions and activity typical. Dozes Frozen face. Does not know what is going on. Inattentiv Not watching the activity. | Asleep |
| ATTENTIVE | | ATTENTIVE | | IN AND OUT | | INATTENTIVE | |

## EFFECTIVE CONTROL

| 1.0 | 1.5 | 2.0 | 2.5 | 3.0 | 4.0 | 5.0 | 6.0 |
|---|---|---|---|---|---|---|---|
| Verbalizations prevent controll due to problems.Takes immediate & effective actio from judge. Timing excellnt Controls by Totally in whole is not charge with by default or a positive by rulings.If response by all verbalizes, it affected. is in response Positive,upbeat to anticipated Control derives need. from respect. | No verbaliz needed due to proper tone & messages prior | Good. the NORM Is in charge. Typic. no verb needed, no action needed. Consist. with 2.0 in attent. No disrupt. Controls by default. Some time lag.Does not have to "do"anything to control. Pro- cedure flows. | Responds, tho tardy to needs for control & intervention. Controls by ruling, at times has to repeat former ruling. Few disruptions. Adequate. | Reacts. No an- ticipation. Needs for intervention Uses unmet.Ineffect respns to dist urbance,disrup or probs.Missed opport.needing control. Led by prompts from others. Not adequate | Very ineffect. respns to freq to inter vene. Uses gavel. Frustr ated. Occas has to remind of former rule Others directl task judge for rulings and fo order & contro | Constant need to exercise re petitious controls & in- terventions. Which are in effective.No one gets messg Some needs for control ignord | All need control by judge. unaware of th situation. apathy Anger and inapprprt demonstration occur which go uncontrol |
| CONTROLLED | CONTROLLED | CONTROLLING | CONTROLLING | NEED FOR CONTROL | | OUT OF CONTROL | |

571

APPENDIX C


Rating Criteria For
Evaluation Observations

# REQUEST TO CONDUCT EXTENDED MEDIA COVERAGE

FOR COURT USE ONLY

1. NAME OF MEDIA ORGANIZATION:
2. INDIVIDUAL SUBMITTING REQUEST:
   ADDRESS:
   PHONE:

2. NAME OF COURT:
   STREET ADDRESS:
   MAILING ADDRESS:
   CITY AND ZIP:
   BRANCH NAME:

3. NAME OF JUDGE:

4. NAME OF CASE:

CASE NUMBER.

5. TYPE OF PROCEEDING AND PART(S) OF PROCEEDING TO BE COVERED

   ☐ Criminal (specify charges):

   ☐ Civil (specify type, e.g., personal injury, domestic relations, etc.):

   Specific parts to be covered (e.g., bail hearing, preliminary hearing, particular witness(es) at trial, sentencing hearing):

   Date(s) of proposed coverage:

6. CONTEMPLATED USE OF EXTENDED MEDIA COVERAGE *(Please briefly indicate intended use of this extended media coverage—e.g., as news story, feature, public affairs program, etc. This notation in no way limits intended use.)*

7. CONTEMPLATED DISSEMINATION OF COVERAGE *(Please check appropriate boxes. Notation does not limit dissemination.)*

   ☐ Local Only                          ☐ Network or Syndication
      ☐ TV                    ☐ TV
      ☐ Print Media           ☐ Print (wire service or
      ☐ Radio                    or nonlocal periodical)
                                             ☐ Radio

8. EQUIPMENT TO BE USED *(Please list type, brand and specifications of all equipment to be used for this extended media coverage.)*

9. CERTIFICATION OF NOTIFICATION OF EVALUATOR (AND IN CRIMINAL TRIALS, OF DEFENDANT AND PROSECUTOR) AND OF COMPLIANCE WITH EXTENDED MEDIA COVERAGE RULES.
   I hereby certify that prior to submission of this request:

   a. The evaluation team was contacted by calling collect to (916) 486-9131 and was informed of intended submission of the request.

   b. A copy of this completed request was mailed to Ernest H. Short & Associates, 2709 Marconi Avenue, Sacramento, CA 95821.

   c. If this is a criminal case in a trial court, a copy of this form and of the form, CONSENT FOR EXTENDED MEDIA COVERAGE, were delivered to the prosecutor and to each defendant's attorney, or, if any defendant is not represented by an attorney, to the defendant personally.

   I further certify that if consent is granted to conduct extended media coverage in this case, all personnel of this media organization will abide by the provisions of rule 980.2, California Rules of Court.

   By_____
                                (Signature)

   _____
                          (Printed Name)

   _____
      (Supervisory Position in Media Organization)

   SEE THE REVERSE SIDE FOR INSTRUCTIONS

## REQUEST TO CONDUCT EXTENDED
## MEDIA COVERAGE

573

# INSTRUCTIONS FOR USING THIS FORM

## IN CRIMINAL CASES IN TRIAL COURTS

### Filling Out the Form

Be sure to supply all requested information. If you are not sure of information for items 2, 3, or 4, contact the clerk of court. A supervisor should sign the certification in item 9.

When the form is completed, copies should be made and handled as follows:

### Delivery of the Copies

A copy of this completed form and one of the form CONSENT FOR EXTENDED MEDIA COVERAGE, with items 1 through 4 filled in, should be delivered to the prosecutor and one to the attorney for each defendant. If any defendant is not represented by a lawyer, then the copies should be delivered to the defendant personally.

A copy of this completed form should also be mailed to the following address:

> Ernest H. Short & Associates
> 2709 Marconi Avenue
> Sacramento, CA 95821

Delivery and mailing of all copies should be completed before the original of this form is delivered to the court.

### Submitting the Original

Deliver the original of this form to the clerk of the court where the proceeding to be covered is held. This should be done a reasonable time in advance of the event to be covered.

## IN CIVIL AND ALL OTHER CASES

### Filling Out the Form

Be sure to supply all requested information. If you are not sure of information for items 2, 3, or 4, contact the clerk of court. A supervisor should sign the certification of compliance in item 9.

Once the form is completed, make one copy in addition to the original. The forms are to be handled as follows:

### Mailing the Copy

Mail the completed copy to the following address:

> Ernest H. Short & Associates
> 2709 Marconi Avenue
> Sacramento, CA 95821

Mailing of the copy should be completed before the original of the form is delivered to the court.

### Submitting the Original

Deliver the original of this form to the clerk of the court where the proceeding to be covered is held. This should be done a reasonable time in advance of the event to be covered.

574

APPENDIX B


Form Developed by
Administrative Office of the Courts
Request To Conduct Extended Media Coverage

SCHEDULE A

FILM CAMERAS       16mm Sound on Film  (self-blimped)

| | | | |
|---|---|---|---|
| 1. | CINEMA PRODUCTS | CP-16A-R | Sound Camera |
| 2. | ARRIFLEX | 16mm-16BL Model | Sound Camera |
| 3. | FREZZOLINI | 16mm  (LW16) | Sound on Film Camera |
| 4. | AURICON | "Cini-Voice" | Sound Camera |
| 5. | AURICON | "Pro-600" | Sound Camera |
| 6. | GENERAL CAMERA | SS III | Sound Camera |
| 7. | ECLAIR | Model ACL | Sound Camera |
| 8. | GENERAL CAMERA | DGX | Sound Camera |
| 9. | WILCAM REFLEX | 16mm | Sound Camera |

VIDEO TAPE ELECTRONIC CAMERAS

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. | Ikegami | HL-77 | HL-33 | HL-35 | HL-34 | HL-5 |
| 2. | RCA | TK 76 | | | | |
| 3. | Sony | DXC-1600 Trinicon | | | | |
| 3a. | ASACA | ACC-2006 | | | | |
| 4. | Hitachi | SK 80 | SK 90 | | | |
| 5. | Hitachi | FP-3030 | | | | |
| 6. | Philips | LDK-25 | | | | |
| 7. | Sony BVP-200 | ENG Camera | | | | |
| 8. | Fornseh | Video Camera | | | | |
| 9. | JVC-8800 u | ENG Camera | | | | |
| 10. | AKAI | CVC-150   VTS-150 | | | | |
| 11. | Panasonic | WV-3085   NV-3085 | | | | |
| 12. | JVC | GC-4800u | | | | |

VIDEO TAPE RECORDERS/used with video cameras

| | | |
|---|---|---|
| 1. | Ikagami | 3800 |
| 2. | Sony | 3800 |
| 3. | Sony | BVU-100 |
| 4. | Ampex | Video Recorder |
| 5. | Panasonic | 1 inch Video Recorder |
| 6. | JVC | 4400 |
| 7. | Sony | 3800H |

[over]

SCHEDULE   B

Rangefinder

Leica M42

Single Lens Reflex

Nikon FM
Nikon FE
Canon A1
Canon AE1
Canon AT1
Minolta XD11
Pentax MX
Olympus OM-I

12

577

unresolved disputes relating to pooling arrangements, the
judge may terminate all or any portions of extended
coverage.

(j)  [Liaison]

(1)  When more than one media representative requests
extended coverage of any kind, the media collectively
shall designate one representative to coordinate with the
court representative any matters relating to extended
coverage.

(2)  A court may designate a judge or court represen-
tative to coordinate with the media relating to extended
coverage.

(k)  [Ruling on matters not covered by these rules]

(1)  Should a decision be required on any issue that
is not covered by these rules, it shall be within the sole
discretion of the judge to make such decision.

(2)  Nothing in these rules shall be interpreted to
limit or restrict the power of the judge to control the
conduct of the proceedings, including, but not limited
to, daily hours of court, order of proof, attendance
of trial participants, location of hearings outside
the courtroom when necessary, or any other matters
within the discretion of a trial judge.


Rule 980.3.  Experimental extended coverage for educa-
              tional use

(a)  During the period that this rule is in effect,
the provisions of rule 980 shall not apply to the photo-
graphing or recording for educational use of court pro-
ceedings within the courts of the State of California,
if the requirements of this rule are observed.  This rule
shall take effect on June 1, 1980, and shall continue in
effect to and including May 31, 1981.

(b)  A judge may authorize photographic or electronic
recording of appropriate court proceedings for educational
use under the following conditions:


                        [over]


                                                    578

(1)   The means of recording will not distract partic-
ipants or impair the dignity of the proceedings;
    (2)   The trial participants consent to being depicted;
    (3)   The reproduction will not be exhibited until
after the proceeding has been concluded and all direct
appeals have been exhausted; and
    (4)   The reproduction will be exhibited only for in-
structional purposes.

10

579

APPENDIX J


General Attitude Survey Pre-Post

Mean Scores for Judges, Prosecutors,

and Defenders, Items 1 through 27

EM of courtroom proceedings ... peoples ... legal proce... in
legal proce...

| Response Category | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENSE PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree 1 | 34 | 9% | 11 | 5% | 49 | 28% | 23 | 21% | 48 | 28% | 23 | 21% |
| Agree 2 | 216 | 57% | 107 | 48% | 77 | 44% | 57 | 51% | 88 | 52% | 66 | 61% |
| No Opinion 3 | 41 | 11% | 35 | 16% | 21 | 12% | 10 | 9% | 17 | 10% | 9 | 8% |
| Disagree 4 | 74 | 20% | 62 | 28% | 25 | 14% | 21 | 19% | 17 | 10% | 11 | 10% |
| Strongly Disagree 5 | 12 | 3% | 8 | 4% | 2 | 1% | 0 | 0% | 1 | 1% | 0 | 0% |
| Total Number of Cases | 377 | | 223 | | 174 | | 111 | | 171 | | 109 | |
| Mean Score | 2.51 | | 2.77 | | 2.16 | | 2.26 | | 2.04 | | 2.07 | |

Survey Item # 23
EM of courtroom proceedings will adversely affect the truthfulness of witness testimony.

| Response Category | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENSE PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree 1 | 5 | 1% | 6 | 3% | 8 | 5% | 7 | 6% | 24 | 14% | 21 | 19% |
| Agree 2 | 53 | 14% | 21 | 9% | 45 | 26% | 20 | 18% | 49 | 28% | 33 | 30% |
| No Opinion 3 | 101 | 27% | 56 | 25% | 46 | 26% | 21 | 19% | 48 | 28% | 25 | 23% |
| Disagree 4 | 194 | 52% | 128 | 57% | 63 | 36% | 54 | 49% | 47 | 28% | 29 | 27% |
| Strongly Disagree 5 | 24 | 6% | 13 | 6% | 13 | 7% | 9 | 8% | 3 | 2% | 1 | 1% |
| Total Number of Cases | 377 | | 224 | | 175 | | 111 | | 171 | | 109 | |
| Mean Score | 3.48 | | 3.54 | | 3.16 | | 3.34 | | 2.74 | | 2.60 | |

581

Survey Item #24
IMC sentencing proceedings will improperly influence a judge in the sentencing decision.

| | | JUDGES | | | PROSECUTORS | | | DEFENDERS | | |
| | | PRE | POST | | PRE | POST | | PRE | POST | |
| Response Category | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree | 1 | 29 | 8% | 11 | 5% | 7 | 4% | 3 | 3% | 87 | 51% | 54 | 50% |
| Agree | 2 | 112 | 30% | 44 | 20% | 44 | 25% | 22 | 20% | 64 | 37% | 39 | 36% |
| No Opinion | 3 | 47 | 13% | 28 | 13% | 30 | 17% | 23 | 21% | 7 | 4% | 8 | 7% |
| Disagree | 4 | 163 | 44% | 117 | 52% | 79 | 45% | 57 | 51% | 11 | 6% | 7 | 7% |
| Strongly Disagree | 5 | 24 | 6% | 24 | 11% | 14 | 8% | 6 | 5% | 2 | 1% | 0 | 0% |
| Total Number of Cases | | 375 | | 224 | | 174 | | 111 | | 171 | | 108 | |
| Mean Score | | 3.11 | | 3.44 | | 3.28 | | 3.37 | | 1.70 | | 1.70 | |

582

Survey Item #18
DMC of courtroom proceedings will cause prosecutors to "play up" to the media to enhance the re-election prospects of the District Attorney.

| | | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 41 | 11% | 12 | 5% | 6 | 3% | 12 | 11% | 66 | 39% | 47 | 43% |
| Agree | 2 | 155 | 41% | 88 | 40% | 30 | 17% | 17 | 15% | 69 | 40% | 44 | 40% |
| No Opinion | 3 | 81 | 22% | 47 | 21% | 29 | 17% | 57 | 51% | 25 | 15% | 9 | 8% |
| Disagree | 4 | 88 | 24% | 74 | 33% | 72 | 41% | 25 | 23% | 11 | 6% | 9 | 8% |
| Strongly Disagree | 5 | 9 | 2% | 2 | 1% | 37 | 21% | 0 | 0% | 0 | 0% | 0 | 0% |
| Total Number of Cases | | 374 | | 223 | | 174 | | 111 | | 171 | | 109 | |
| Mean Score | | 2.65 | | 2.85 | | 3.60 | | 3.86 | | 1.89 | | 1.82 | |

Survey Item #19
DMC will make witnesses more reluctant to testify.

| | | JUDGES | | | | PROSECUTORS | | | | DEFENSE | | | |
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 48 | 13% | 14 | 6% | 58 | 33% | 19 | 17% | 50 | 29% | 33 | 31% |
| Agree | 2 | 214 | 57% | 119 | 53% | 86 | 49% | 65 | 59% | 89 | 52% | 54 | 51% |
| No Opinion | 3 | 49 | 13% | 35 | 16% | 12 | 7% | 14 | 13% | 19 | 11% | 12 | 11% |
| Disagree | 4 | 59 | 16% | 54 | 24% | 17 | 10% | 12 | 11% | 12 | 7% | 7 | 7% |
| Strongly Disagree | 5 | 5 | 1% | 2 | 1% | 1 | 1% | 0 | 0% | 1 | 1% | 1 | 1% |
| Total Number of Cases | | 375 | | 224 | | 174 | | 110 | | 171 | | 107 | |
| Mean Score | | 2.35 | | 2.60 | | 1.95 | | 2.17 | | 1.98 | | 1.96 | |

583

Survey Item #20
DMC of noncriminal proceedings will not discourage cis from filing suit.

| Response Category | | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 44 | 12% | 23 | 10% | 10 | 6% | 4 | 4% | 9 | 5% | 6 | 6% |
| Agree | 2 | 257 | 68% | 162 | 73% | 88 | 50% | 55 | 50% | 66 | 39% | 48 | 44% |
| No Opinion | 3 | 51 | 14% | 30 | 14% | 49 | 28% | 40 | 36% | 65 | 38% | 40 | 37% |
| Disagree | 4 | 22 | 6% | 6 | 3% | 24 | 14% | 8 | 7% | 26 | 15% | 13 | 12% |
| Strongly Disagree | 5 | 3 | 1% | 2 | 1% | 4 | 2% | 3 | 3% | 5 | 3% | 2 | 2% |
| Total Number of Cases | | 377 | | 223 | | 175 | | 110 | | 171 | | 109 | |
| Mean Score | | 2.16 | | 2.11 | | 2.57 | | 2.56 | | 2.72 | | 2.61 | |

Survey Item #21
DMC of criminal proceedings will not result in unfair damage to the reputation of participants.

| Response Category | | JUDGES | | | | PROSECUTORS | | | | DEFENSE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 8 | 2% | 8 | 4% | 8 | 5% | 4 | 4% | 5 | 3% | 8 | 7% |
| Agree | 2 | 142 | 38% | 94 | 42% | 53 | 30% | 36 | 32% | 17 | 10% | 13 | 12% |
| No Opinion | 3 | 59 | 16% | 34 | 15% | 22 | 13% | 19 | 17% | 12 | 7% | 44 | 41% |
| Disagree | 4 | 147 | 39% | 76 | 34% | 74 | 42% | 47 | 42% | 69 | 41% | 43 | 40% |
| Strongly Disagree | 5 | 22 | 6% | 11 | 5% | 18 | 10% | 5 | 5% | 67 | 39% | 0 | 0 |
| Total Number of Cases | | 378 | | 223 | | 175 | | 111 | | 170 | | 108 | |
| Mean Score | | 3.09 | | 2.95 | | 3.23 | | 3.12 | | 4.04 | | 4.13 | |

584

| Response Category | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENDERS PRE | | DEFENDERS POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree 1 | 3 | 1% | 3 | 1% | 9 | 5% | 6 | 5% | 19 | 11% | 16 | 15% |
| Agree 2 | 42 | 11% | 21 | 9% | 35 | 20% | 20 | 18% | 56 | 33% | 32 | 30% |
| No Opinion 3 | 83 | 22% | 40 | 18% | 52 | 30% | 18 | 16% | 29 | 17% | 20 | 19% |
| Disagree 4 | 210 | 55% | 145 | 64% | 69 | 39% | 57 | 51% | 55 | 32% | 34 | 32% |
| Strongly Disagree 5 | 41 | 11% | 19 | 8% | 11 | 6% | 11 | 10% | 12 | 7% | 5 | 5% |
| Total Number of Cases | 379 | | 228 | | 176 | | 112 | | 171 | | 107 | |
| Mean Score | 3.64 | | 3.68 | | 3.22 | | 3.42 | | 2.91 | | 2.81 | |

Survey Item #14
The possibility of EMC of courtroom proceedings will be a factor in attorney negotiations in a case.

| Response Category | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENSE PRE | | DEFENSE POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree 1 | 17 | 5% | 5 | 2% | 16 | 9% | 7 | 6% | 33 | 19% | 21 | 19% |
| Agree 2 | 191 | 50% | 103 | 45% | 98 | 56% | 48 | 43% | 96 | 56% | 58 | 53% |
| No Opinion 3 | 109 | 29% | 63 | 28% | 32 | 18% | 24 | 21% | 26 | 15% | 16 | 15% |
| Disagree 4 | 54 | 14% | 50 | 22% | 24 | 14% | 31 | 28% | 16 | 9% | 13 | 12% |
| Strongly Disagree 5 | 9 | 2% | 6 | 3% | 5 | 3% | 2 | 2% | 0 | 0% | 1 | 1% |
| Total Number of Cases | 380 | | 227 | | 175 | | 112 | | 171 | | 109 | |
| Mean Score | 2.60 | | 2.78 | | 2.45 | | 2.76 | | 2.15 | | 2.22 | |

585

Survey Item ...
EMC of bail proceedings will improperly influence a ju... setting bail.

| Response Category | | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENDERS PRE | | DEFENDERS POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 24 | 6% | 6 | 3% | 10 | 6% | 2 | 2% | 84 | 49% | 53 | 50% |
| Agree | 2 | 125 | 33% | 63 | 28% | 56 | 32% | 31 | 28% | 62 | 36% | 46 | 43% |
| No Opinion | 3 | 53 | 14% | 35 | 16% | 30 | 17% | 22 | 20% | 12 | 7% | 5 | 5% |
| Disagree | 4 | 147 | 39% | 112 | 50% | 69 | 39% | 49 | 44% | 13 | 8% | 3 | 3% |
| Strongly Disagree | 5 | 30 | 8% | 9 | 4% | 11 | 6% | 7 | 6% | 0 | 0% | 0 | 0% |
| Total Number of Cases | | 379 | | 225 | | 176 | | 111 | | 171 | | 107 | |
| Mean Score | | 3.09 | | 3.24 | | 3.09 | | 3.25 | | 1.73 | | 1.61 | |

Survey Item #16
EMC of courtroom proceedings will increase jurors' attentiveness to testimony.

| Response Category | | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENSE PRE | | DEFENSE POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 6 | 2% | 1 | 0% | 2 | 1% | 21 | 19% | 1 | 1% | 9 | 8% |
| Agree | 2 | 76 | 20% | 40 | 18% | 27 | 15% | 21 | 19% | 20 | 12% | 15 | 14% |
| No Opinion | 3 | 83 | 22% | 45 | 20% | 31 | 18% | 62 | 56% | 38 | 22% | 69 | 64% |
| Disagree | 4 | 194 | 52% | 134 | 60% | 95 | 54% | 7 | 6% | 94 | 55% | 15 | 14% |
| Strongly Disagree | 5 | 17 | 5% | 4 | 2% | 20 | 11% | 0 | 0% | 18 | 11% | 0 | 0% |
| Total Number of Cases | | 376 | | 224 | | 175 | | 111 | | 171 | | 108 | |
| Mean Score | | 3.37 | | 3.45 | | 3.59 | | 3.50 | | 3.63 | | 3.83 | |

Jurors' decision making process by their ... and acquired ... attitudes about the case ... ause of EMC of the trial.

| Response Category | | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENDERS PRE | | DEFENDERS POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 21 | 6% | 8 | 4% | 7 | 4% | 4 | 4% | 39 | 23% | 28 | 26% |
| Agree | 2 | 123 | 33% | 51 | 23% | 75 | 43% | 33 | 29% | 84 | 49% | 47 | 44% |
| No Opinion | 3 | 72 | 19% | 54 | 24% | 30 | 17% | 21 | 19% | 21 | 12% | 10 | 9% |
| Disagree | 4 | 144 | 38% | 100 | 44% | 56 | 32% | 51 | 45% | 22 | 13% | 23 | 21% |
| Strongly Disagree | 5 | 19 | 5% | 12 | 5% | 8 | 5% | 3 | 3% | 4 | 2% | 0 | 0% |
| Total Number of Cases | | 379 | | 225 | | 176 | | 112 | | 170 | | 108 | |
| Mean Score | | 3.05 | | 3.25 | | 2.90 | | 3.14 | | 2.22 | | 2.26 | |

Survey Item #10
EMC of courtroom proceedings will **not** affect a judge's ability to maintain courtroom order.

| Response Category | | JUDGES PRE | | JUDGES POST | | PROSECUTORS PRE | | PROSECUTORS POST | | DEFENSE PRE | | DEFENSE POST | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 40 | 11% | 25 | 11% | 6 | 3% | 6 | 5% | 4 | 2% | 3 | 3% |
| Agree | 2 | 236 | 62% | 141 | 62% | 72 | 41% | 63 | 57% | 65 | 38% | 41 | 38% |
| No Opinion | 3 | 29 | 8% | 10 | 4% | 14 | 8% | 4 | 4% | 28 | 16% | 15 | 14% |
| Disagree | 4 | 65 | 17% | 45 | 20% | 76 | 43% | 33 | 30% | 59 | 35% | 40 | 37% |
| Strongly Disagree | 5 | 10 | 3% | 7 | 3% | 8 | 5% | 5 | 5% | 15 | 9% | 10 | 9% |
| Total Number of Cases | | 380 | | 228 | | 176 | | 111 | | 171 | | 109 | |
| Mean Score | | 2.39 | | 2.42 | | 3.05 | | 2.71 | | 3.09 | | 3.12 | |

587

EMC of court... proceedings will lead to increased dis...on of the participants.

| Response Category | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENDERS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree 1 | 27 | 7% | 15 | 7% | 46 | 26% | 22 | 20% | 60 | 35% | 40 | 37% |
| Agree 2 | 213 | 56% | 109 | 48% | 95 | 54% | 58 | 52% | 84 | 49% | 53 | 49% |
| No Opinion 3 | 39 | 10% | 23 | 10% | 8 | 5% | 2 | 2% | 10 | 6% | 5 | 5% |
| Disagree 4 | 89 | 24% | 75 | 33% | 24 | 14% | 29 | 26% | 16 | 9% | 11 | 10% |
| Strongly Disagree 5 | 11 | 3% | 5 | 2% | 3 | 2% | 1 | 1% | 1 | 1% | 0 | 0% |
| Total Number of Cases | 379 | | 227 | | 176 | | 112 | | 171 | | 109 | |
| Mean Score | 2.59 | | 2.76 | | 2.11 | | 2.37 | | 1.91 | | 1.88 | |

Survey Item #12
EMC of noncriminal proceedings will result in unfair damage to the reputation of litigants.

| Response Category | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENSE PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree 1 | 10 | 3% | 6 | 3% | 7 | 4% | 5 | 5% | 17 | 10% | 15 | 14% |
| Agree 2 | 112 | 30% | 51 | 23% | 62 | 35% | 27 | 24% | 65 | 38% | 40 | 37% |
| No Opinion 3 | 94 | 25% | 55 | 24% | 59 | 34% | 47 | 42% | 56 | 33% | 31 | 28% |
| Disagree 4 | 147 | 39% | 106 | 47% | 41 | 23% | 28 | 25% | 30 | 18% | 22 | 20% |
| Strongly Disagree 5 | 15 | 4% | 8 | 4% | 6 | 3% | 5 | 5% | 2 | 1% | 1 | 1% |
| Total Number of Cases | 378 | | 226 | | 175 | | 112 | | 170 | | 109 | |
| Mean Score | 3.12 | | 3.26 | | 2.87 | | 3.01 | | 2.62 | | 2.58 | |

Survey I??
EMC will cause witnesses to be overly guarded in the...testimony.

| Response Category | | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENDERS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree | 1 | 31 | 8% | 17 | 8% | 38 | 22% | 17 | 15% | 42 | 25% | 38 | 35% |
| Agree | 2 | 168 | 44% | 93 | 41% | 79 | 45% | 55 | 49% | 69 | 40% | 38 | 35% |
| No Opinion | 3 | 68 | 18% | 35 | 15% | 27 | 15% | 14 | 13% | 29 | 17% | 14 | 13% |
| Disagree | 4 | 105 | 28% | 79 | 35% | 30 | 17% | 25 | 22% | 27 | 16% | 19 | 17% |
| Strongly Disagree | 5 | 6 | 2% | 3 | 1% | 1 | 1% | 1 | 1% | 4 | 2% | 0 | 0% |
| Total Number of Cases | | 378 | | 227 | | 175 | | 112 | | 171 | | 109 | |
| Mean Score | | 2.70 | | 2.82 | | 2.30 | | 2.45 | | 2.31 | | 2.13 | |

Survey Item #6
The physical presence and operation of additional media equipment will itself lead to greater disruption of courtroom proceedings.

| Response Category | | JUDGES PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | PROSECUTORS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. | DEFENDERS PRE Abs. Freq. | Pct. | POST Abs. Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Strongly Agree | 1 | 32 | 8% | 18 | 8% | 40 | 23% | 19 | 17% | 53 | 31% | 30 | 2 |
| Agree | 2 | 176 | 46% | 87 | 38% | 92 | 52% | 52 | 46% | 78 | 46% | 56 | 5 |
| No Opinion | 3 | 59 | 16% | 22 | 10% | 11 | 6% | 4 | 4% | 17 | 10% | 11 | 1 |
| Disagree | 4 | 102 | 27% | 89 | 39% | 30 | 17% | 34 | 30% | 20 | 12% | 11 | 1 |
| Strongly Disagree | 5 | 10 | 3% | 11 | 5% | 3 | 2% | 3 | 3% | 3 | 2% | 1 | |
| Total Number of Cases | | 379 | | 227 | | 176 | | 112 | | 171 | | 109 | |
| Mean Score | | 2.69 | | 2.95 | | 2.23 | | 2.55 | | 2.08 | | 2.06 | |

589

Survey Item
IMC of courtroom proceedings will cause judges to avoid unpopular positions or decisions.

| Response Category | | JUDGES | | | | PROSECUTORS | | | | DEFENSE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 31 | 8% | 14 | 6% | 18 | 10% | 12 | 11% | 76 | 44% | 59 | 55% |
| Agree | 2 | 119 | 32% | 62 | 27% | 82 | 47% | 36 | 32% | 67 | 39% | 39 | 36% |
| No Opinion | 3 | 56 | 15% | 30 | 13% | 32 | 18% | 24 | 21% | 5 | 3% | 7 | 7% |
| Disagree | 4 | 143 | 38% | 94 | 41% | 38 | 22% | 37 | 33% | 20 | 12% | 2 | 2% |
| Strongly Disagree | 5 | 29 | 8% | 27 | 12% | 5 | 3% | 3 | 3% | 3 | 2% | 1 | 1% |
| Total Number of Cases | | 378 | | 227 | | 175 | | 112 | | 171 | | 108 | |
| Mean Score | | 3.05 | | 3.27 | | 2.60 | | 2.85 | | 1.87 | | 1.58 | |

Survey Item #8
IMC of courtroom proceedings will affect voting at the next election of elected officials represented at the proceeding.

| Response Category | | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 38 | 10% | 11 | 5% | 15 | 7% | 5 | 5% | 46 | 27% | 21 | 19% |
| Agree | 2 | 194 | 52% | 94 | 41% | 83 | 48% | 47 | 42% | 80 | 47% | 61 | 56% |
| No Opinion | 3 | 94 | 25% | 71 | 31% | 51 | 29% | 36 | 32% | 35 | 21% | 22 | 20% |
| Disagree | 4 | 44 | 12% | 47 | 21% | 24 | 14% | 22 | 20% | 8 | 5% | 5 | 5% |
| Strongly Disagree | 5 | 6 | 2% | 4 | 2% | 1 | 1% | 2 | 2% | 1 | 1% | 0 | 0% |
| Total Number of Cases | | 376 | | 227 | | 174 | | 112 | | 170 | | 109 | |
| Mean Score | | 2.42 | | 2.73 | | 2.50 | | 2.72 | | 2.05 | | 2.10 | |

590

Extended TV coverage (ETC, popularly referred to "cameras in the court") of courtroom proceedings will <u>not</u> detract from the decorum of the judicial process.

| | | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 20 | 5% | 17 | 8% | 4 | 2% | 10 | 9% | 2 | 1% | 3 | 3% |
| Agree | 2 | 114 | 30% | 89 | 39% | 35 | 20% | 32 | 29% | 25 | 15% | 14 | 13% |
| No Opinion | 3 | 35 | 9% | 19 | 8% | 5 | 3% | 7 | 6% | 7 | 4% | 4 | 4% |
| Disagree | 4 | 151 | 40% | 76 | 37% | 68 | 39% | 44 | 40% | 52 | 30% | 36 | 33% |
| Strongly Disagree | 5 | 55 | 15% | 25 | 11% | 64 | 36% | 18 | 16% | 85 | 50% | 52 | 48% |
| Total Number of Cases | | 375 | | 226 | | 176 | | 111 | | 171 | | 109 | |
| Mean Score | | 3.29 | | 3.01 | | 3.87 | | 3.25 | | 4.13 | | 4.10 | |

Survey Item #2
ETC of courtroom proceedings will make it more difficult to find jurors who have not been exposed to prejudicial publicity about a case.

| | | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree | 1 | 22 | 6% | 9 | 4% | 21 | 12% | 17 | 15% | 44 | 26% | 36 | 33% |
| Agree | 2 | 154 | 41% | 75 | 33% | 74 | 43% | 32 | 29% | 76 | 44% | 45 | 42% |
| No Opinion | 3 | 61 | 16% | 37 | 16% | 22 | 13% | 15 | 13% | 24 | 14% | 9 | 8% |
| Disagree | 4 | 128 | 34% | 94 | 42% | 52 | 30% | 45 | 40% | 25 | 15% | 16 | 15% |
| Strongly Disagree | 5 | 14 | 4% | 11 | 5% | 5 | 3% | 3 | 3% | 2 | 1% | 2 | 2% |
| Total Number of Cases | | 379 | | 226 | | 174 | | 112 | | 171 | | 108 | |
| Mean Score | | 2.89 | | 3.10 | | 2.69 | | 2.87 | | 2.21 | | 2.10 | |

591

Survey Item #
EMC of courtroom proceedings will increase citizens' wi...ness to become involved in the judicial process.

| | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree 1 | 12 | 3% | 4 | 2% | 3 | 2% | 1 | 1% | 2 | 1% | 2 | 2% |
| Agree 2 | 53 | 14% | 30 | 13% | 22 | 13% | 13 | 12% | 20 | 12% | 7 | 6% |
| No Opinion 3 | 99 | 26% | 61 | 27% | 26 | 15% | 24 | 21% | 38 | 22% | 18 | 17% |
| Disagree 4 | 177 | 47% | 111 | 49% | 82 | 47% | 52 | 46% | 70 | 41% | 52 | 48% |
| Strongly Disagree 5 | 39 | 10% | 21 | 9% | 42 | 24% | 22 | 20% | 41 | 24% | 30 | 28% |
| Total Number of Cases | 380 | | 227 | | 175 | | 112 | | 171 | | 109 | |
| Mean Score | 3.47 | | 3.51 | | 3.79 | | 3.72 | | 3.75 | | 3.93 | |

Survey Item #4
EMC of courtroom proceedings will improve the quality of courtroom advocacy.

| | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| Response Category | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Strongly Agree 1 | 11 | 3% | 4 | 2% | 5 | 3% | 4 | 4% | 5 | 3% | 2 | 2% |
| Agree 2 | 87 | 23% | 50 | 22% | 31 | 18% | 20 | 18% | 26 | 15% | 14 | 13% |
| No Opinion 3 | 65 | 17% | 35 | 16% | 18 | 10% | 10 | 9% | 14 | 8% | 8 | 7% |
| Disagree 4 | 169 | 45% | 107 | 47% | 69 | 39% | 54 | 48% | 69 | 41% | 42 | 39% |
| Strongly Disagree 5 | 45 | 12% | 30 | 13% | 52 | 30% | 24 | 21% | 56 | 33% | 43 | 39% |
| Total Number of Cases | 377 | | 226 | | 175 | | 112 | | 170 | | 109 | |
| Mean Score | 3.40 | | 3.48 | | 3.75 | | 3.66 | | 3.85 | | 4.01 | |

592

APPENDIX I

Frequency Distributions and Means Pre-Post

For Judges, Prosecutors, and Defenders on

General Attitude Survey Items 1-16 and 18-24

APPENDIX H

WITNESS EFFECTIVE COMMUNICATON

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 0 | 0% | Excellent (1.0 - 1.4) | 1 | 6% |
| Very Good (1.5 - 1.9) | 8 | 44% | Very Good (1.5 - 1.9) | 6 | 38% |
| Good (2.0 - 2.4] | 2 | 11% | Good (2.0 - 2.4) | 3 | 19% |
| Average (2.5 - 2.9] | 1 | 6% | Average (2.5 - 2.9] | 1 | 6% |
| Below Average (3.0+) | 7 | 39% | Below Average (3.0+] | 5 | 31% |

APPENDIX H

DISTRIBUTION OF MEANS BY CASE

JUDGE EFFECTIVE COMMUNICATION

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs.<br>Freq. | Pct. | | Abs.<br>Freq. | Pct. |
| Excellent<br>(1.0 - 1.4) | 2 | 11% | Excellent<br>(1.0 - 1.4) | 0 | 0% |
| Very Good<br>(1.5 - 1.9) | 8 | 44% | Very Good<br>(1.5 - 1.9) | 3 | 19% |
| Good<br>(2.0 - 2.4) | 7 | 39% | Good<br>(2.0 - 2.4) | 12 | 75% |
| Average<br>(2.5 - 2.9) | 0 | 0% | Average<br>(2.5 - 2.9) | 0 | 0% |
| Below Average<br>(3.0+) | 1 | 6% | Below Average<br>(3.0+) | 1 | 6% |

PLAINTIFF ATTORNEY EFFECTIVE COMMUNICATION

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs.<br>Freq. | Pct. | | Abs.<br>Freq. | Pct. |
| Excellent<br>(1.0 - 1.4) | 1 | 6% | Excellent<br>(1.0 - 1.4) | 1 | 6% |
| Very Good<br>(1.5 - 1.9) | 3 | 18% | Very Good<br>(1.5 - 1.9) | 1 | 6% |
| Good<br>(2.0 - 2.4) | 4 | 23% | Good<br>(2.0 - 2.4) | 1 | 6% |
| Average<br>(2.5 - 2.9) | 1 | 6% | Average<br>(2.5 - 2.9) | 1 | 6% |
| Below Average<br>(3.0+) | 8 | 47% | Below Average<br>(3.0+) | 12 | 76% |

PROSECUTOR EFFECTIVE COMMUNICATION

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 2 | 13% | Excellent (1.0 - 1.4) | 3 | 19% |
| Very Good (1.5 - 1.9) | 3 | 20% | Very Good (1.5 - 1.9) | 3 | 19% |
| Good (2.0 - 2.4) | 4 | 27% | Good (2.0 - 2.4) | 6 | 37% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 0 | 0% |
| Below Average (3.0+) | 6 | 40% | Below Average (3.0+) | 4 | 25% |

DEFENSE ATTORNEY EFFECTIVE COMMUNICATION

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 4 | 22% | Excellent (1.0 - 1.4) | 1 | 6% |
| Very Good (1.5 - 1.9) | 6 | 33% | Very Good (1.5 - 1.9) | 6 | 38% |
| Good (2.0 - 2.4) | 7 | 39% | Good (2.0 - 2.4) | 8 | 50% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 0 | 0 |
| Below Average (3.0+) | 1 | 6% | Below Average (3.0+) | 1 | 6% |

APPENDIX H

Frequency Distribution of Evaluator Observations

By Case Means:

Effective Communication

APPENDIX G

## JUDGE ATTENTIVENESS

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 6 | 33% | Excellent (1.0 - 1.4) | 3 | 19% |
| Very Good (1.5 - 1.9) | 8 | 44% | Very Good (1.5 - 1.9) | 5 | 31% |
| Good (2.0 - 2.4) | 3 | 17% | Good (2.0 - 2.4) | 8 | 50% |
| Average (2.5 - 3.0) | 1 | 6% | Average (2.5 - 3.0) | 0 | 0% |
| Below Average (3.0+) | 0 | 0% | Below Average (3.0+) | 0 | 0% |

## JUDGE CONTROL

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 1 | 6% | Excellent (1.0 - 1.4) | 0 | 0% |
| Very Good (1.5 - 1.9) | 13 | 72% | Very Good (1.5 - 1.9) | 4 | 25% |
| Good (2.0 - 2.4) | 3 | 17% | Good (2.0 - 2.4) | 10 | 63% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 1 | 6% |
| Below Average (3.0+) | 1 | 6% | Below Average (3.0+) | 1 | 6% |

598

## JUROR ATTENTIVENESS

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 6 | 35% | Excellent (1.0 - 1.4) | 4 | 25% |
| Very Good (1.5 - 1.9) | 3 | 18% | Very Good (1.5 - 1.9) | 4 | 25% |
| Good (2.0 - 2.4) | 2 | .12% | Good (2.0 - 2.4) | 3 | 19% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 1 | 6% |
| Below Average (3.0+) | 6 | 35% | Below Average (3.0+) | 4 | 25% |

## COURTROOM CALM

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 3 | 17% | Excellent (1.0 - 1.4) | 4 | 25% |
| Very Good (1.5 - 1.9) | 10 | 56% | Very Good (1.5 - 1.9) | 3 | 19% |
| Good (2.0 - 2.4) | 3 | 17% | Good (2.0 - 2.4) | 9 | 56% |
| Average (2.5 - 2.9) | 1 | 6% | Average (2.5 - 2.9) | 0 | 0% |
| Below Average (3.0+) | 1 | 6% | Below Average (3.0+) | 0 | 0% |

599

DISTRIBUTION OF MEANS BY CASE

## JUDGE ATTENTIVENESS

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 6 | 33% | Excellent (1.0 - 1.4) | 3 | 19% |
| Very Good (1.5 - 1.9) | 8 | 44% | Very Good (1.5 - 1.9) | 5 | 31% |
| Good (2.0 - 2.4) | 3 | 17% | Good (2.0 - 2.4) | 8 | 50% |
| Average (2.5 - 3.0) | 1 | 6% | Average (2.5 - 3.0) | 0 | 0% |
| Below Average (3.0+) | 0 | 0% | Below Average (3.0+) | 0 | 0% |

## JUDGE CONTROL

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 1 | 6% | Excellent (1.0 - 1.4) | 0 | 0% |
| Very Good (1.5 - 1.9) | 13 | 72% | Very Good (1.5 - 1.9) | 4 | 25% |
| Good (2.0 - 2.4) | 3 | 16% | Good (2.0 - 2.4) | 10 | 63% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 1 | 6% |
| Below Average (3.0+) | 1 | 6% | Below Average (3.0+) | 1 | 6% |

APPENDIX G

JUROR ATTENTIVENESS

| | EMC CASES | | | BASELINE CASES | |
| --- | --- | --- | --- | --- | --- |
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 6 | 35% | Excellent (1.0 - 1.4) | 4 | 25% |
| Very Good (1.5 - 1.9) | 3 | 18% | Very Good (1.5 - 1.9) | 4 | 25% |
| Good (2.0 - 2.4) | 2 | 12% | Good (2.0 - 2.4) | 3 | 19% |
| Average (2.5 - 2.9) | 0 | 0% | Average (2.5 - 2.9) | 1 | 6% |
| Below Average (3.0+) | 6 | 35% | Below Average (3.0+) | 4 | 25% |

COURTROOM CALM

| | EMC CASES | | | BASELINE CASES | |
| --- | --- | --- | --- | --- | --- |
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Excellent (1.0 - 1.4) | 3 | 17% | Excellent (1.0 - 1.4) | 4 | 25% |
| Very Good (1.5 - 1.9) | 10 | 56% | Very Good (1.5 - 1.9) | 3 | 19% |
| Good (2.0 - 2.4) | 3 | 17% | Good (2.0 - 2.4) | 9 | 56% |
| Average (2.5 - 2.9) | 1 | 5% | Average (2.5 - 2.9) | 0 | 0 |
| Below Average (3.0+) | 1 | 5% | Below Average (3.0+) | 0 | 0% |

601

<u>APPENDIX G</u>

Frequency Distribution of Evaluator Observations

By Case Means:

Distraction Issue Attributes

PARTY DEMOGRAPHICS AND EXPERIENCE

|  | SEX | | | | AGE | |
|---|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | | | Abs. Freq. | Pct. |
| Male | 6 | 86% | 0 – 24 | | 0 | 0% |
| Female | 1 | 14% | 25 – 34 | | 0 | 0% |
|  |  |  | 35 – 44 | | 4 | 57% |
|  | EDUCATION | | 45 – 54 | | 3 | 43% |
|  | Abs. Freq. | Pct. | 55+ | | 0 | 0% |
| 0 – 8 | 0 | 0% | | | | |
| 9 – 12 | 1 | 14% | | | EXPERIENCE | |
| 13 – 16 | 4 | 57% | | | Abs. Freq. | Pct. |
| Graduate School | 2 | 29% | No | | 3 | 43% |
|  |  |  | Yes | | 4 | 57% |

603

APPENDIX F

JUROR DEMOGRAPHICS AND EXPERIENCE

## SEX

| | Abs. Freq. | Pct. |
|---|---|---|
| Male | 24 | 44% |
| Female | 31 | 56% |

## EDUCATION

| Grades | Abs. Freq. | Pct. |
|---|---|---|
| 0 - 8 | 1 | 2% |
| 9 - 12 | 15 | 28% |
| 13 - 16 | 32 | 59% |
| Graduate School | 6 | 11% |

## OCCUPATION

| | Abs. Freq. | Pct. |
|---|---|---|
| Professional/ Managerial | 7 | 21% |
| Business/Sales/ Service | 2 | 6% |
| Technical | 6 | 18% |
| Trades & Agriculture | 1 | 3% |
| Clerical | 2 | 6% |
| Housewife/ Student? Retired | 15 | 46% |

## AGE

| | Abs. Freq. | Pct. |
|---|---|---|
| 0 - 24 | 9 | 15% |
| 25 - 34 | 12 | 19% |
| 35 - 44 | 15 | 24% |
| 45 - 54 | 6 | 10% |
| 55% | 20 | 32% |

## EXPERIENCE

| | Abs. Freq. | Pct. |
|---|---|---|
| None | 40 | 75% |
| Once Before | 6 | 11% |
| 2, 3, 4 | 5 | 9% |
| 5+ | 2 | 4% |

604

JUDGE AND ATTORNEY EXPERIENCE WITH "HIGH MEDIA" CASES

| | JUDGES | | | ATTORNEYS | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| None | 5 | 5% | None | 9 | 19% |
| 1 - 5 | 21 | 21% | 1 - 5 | 16 | 33% |
| 6 - 10 | 33 | 34% | 6 - 10 | 9 | 19% |
| 11 - 15 | 23 | 24% | 11 - 15 | 4 | 8% |
| 16+ | 9 | 9% | 16+ | 4 | 8% |
| No Answer | 7 | 7% | No Answer | 6 | 13% |

**605**

APPENDIX F

WITNESS DEMOGRAPHICS AND EXPERIENCE

### SEX

|        | Abs. Freq. | Pct. |
|--------|-----------|------|
| Male   | 42        | 75%  |
| Female | 14        | 25%  |

### EDUCATION

| Grades          | Abs. Freq. | Pct. |
|-----------------|-----------|------|
| 0 – 8           | 1         | 2%   |
| 9 – 12          | 8         | 15%  |
| 13 – 16         | 26        | 49%  |
| Graduate School | 18        | 34%  |

### AGE

|         | Abs. Freq. | Pct. |
|---------|-----------|------|
| 0 – 24  | 2         | 4%   |
| 25 – 34 | 11        | 21%  |
| 35 – 44 | 18        | 34%  |
| 45 – 54 | 18        | 34%  |
| 55+     | 4         | 7%   |

### EXPERIENCE

|         | Abs. Freq. | Pct. |
|---------|-----------|------|
| None    | 21        | 37%  |
| 1 – 5   | 9         | 16%  |
| 6 – 10  | 6         | 11%  |
| 11 – 15 | 1         | 2%   |
| 16+     | 19        | 34%  |

606

APPENDIX F

VOLUME OF COVERAGE

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Once Only | 2 | 2% | Once Only | 0 | 0 |
| Intermittent | 33 | 32% | Intermittent | 10 | 56% |
| Continuous | 67 | 66% | Continuous | 8 | 44% |

IMPORTANCE RATING

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Low Import 1 | 12 | 12% | Low Import 1 | 1 | 6% |
| 2 | 16 | 16% | 2 | 0 | 0 |
| 3 | 28 | 27% | 3 | 2 | 11% |
| 4 | 16 | 16% | 4 | 3 | 17% |
| 5 | 11 | 11% | 5 | 8 | 42% |
| 6 | 8 | 8% | 6 | 1 | 6% |
| 7 | 4 | 4% | 7 | 1 | 6% |
| 8 | 3 | 3% | 8 | 1 | 6% |
| High Import 9 | 4 | 3% | High Import 9 | 1 | 6% |

APPENDIX F

TOTAL PRESS CORPS PRESENT

|  | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. |  | Abs. Freq. | Pct. |
| 0 - 3 | 87 | 85% | 0 - 3 | 13 | 71% |
| 4 - 6 | 8 | 8% | 4 - 6 | 3 | 17% |
| 7 - 10 | 2 | 2% | 7 - 10 | 1 | 6% |
| 11 - 20 | 1 | 1% | 11 - 20 | 0 | 0% |
| 21+ | 4 | 4% | 21+ | 1 | 6% |

608

APPENDIX F

## VOLUME AND TIME DISTRIBUTION

|  | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| 7/1/80 to 1/31/80 | 31 | 30% | Before 7/1/80 | 9 | 50% |
| 1/31/81 to 6/30/81 | 71 | 70% | After 7/1/80 | 9 | 50% |

## CASE TYPE

|  | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Civil | 32 | 31% | Civil | 4 | 22% |
| Criminal | 70 | 69% | Criminal | 14 | 78% |

## COURT TYPE

|  | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Lower | 37 | 36% | Lower | 2 | 11% |
| Superior | 65 | 64% | Superior | 16 | 89% |

609

PROCEEDING TYPE

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Arraignments | 12 | 12% | Arraignments | 0 | 0 |
| Preliminary Hearings | 6 | 6% | Preliminary Hearings | 0 | 0 |
| Motions | 32 | 32% | Motions | 3 | 17% |
| Trial | 43 | 42% | Trials | 14 | 78% |
| Sentencings | 9 | 9% | Sentencings | 1 | 5% |

COVERAGE TYPE

| | EMC CASES | | | BASELINE CASES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pc |
| TV Only | 29 | 28% | Conventional | 11 | 61 |
| Still Camera Only | 14 | 14% | Conventional & Sketch Artist | 7 | 39 |
| TV and Still Camera | 39 | 38% | | | |
| TV, Still Camera, and Radio | 20 | 20% | | | |

## APPENDIX A

Rules of Court 980.2 and 980.3

Adopted March, 1980

Note: The rules were amended
      prior to the beginning
      of the experimental year
      (July 1, 1980) to include
      a party consent requirement
      in criminal trial level
      proceedings.  This re-
      quirement subsequently was
      removed effective February
      1, 1981, reverting the
      rules back to the status
      reflected in this appendix.

Rule 980.2.   Experimental electronic and photographic
                coverage of court proceedings

(a)  [Authority]  The provisions of this rule and
rule 980.3 are adopted pursuant to the authority granted
to the Judicial Council by the Constitution, article VI,
section 6, to adopt rules for court administration, prac-
tice and procedure.

(b)  [Applicability]  During the period that this
rule is in effect, the provisions of rule 980 shall not
apply to the photographing, recording for broadcasting, or
broadcasting of court proceedings within the courts of the
State of California if the requirements of this rule are
observed.  This rule shall take effect on June 1, 1980 and
shall continue in effect to and including May 31, 1981.

(c)  [Definitions]  As used in these rules, unless
the context otherwise requires:

(1)  "These rules" means this rule and rule 980.3.

(2)  "Proceeding" means any trial, hearing, motion,
hearing on an order to show cause or petition, or any
other matter held in open court which the public is en-
titled to attend.

(3)  "Extended coverage" means any media recording
or broadcasting of proceedings by the use of television,
radio, photographic, or recording equipment.

(4)  "Judge" means the justice, judge, judicial
officer, or magistrate presiding over the proceedings
in which extended coverage is or is requested to be tak-
ing place.  In courts with more than one "judge" presiding
over the proceedings, any decision required to be made by
the "judge" shall be made by a majority of the judges.

(5)  "Presiding judge" means the judge selected to
perform administrative duties in a court with more than
one judicial officer.

(6)  "Party" means a named litigant of record who has
appeared in the case.

(7)  "Attorney" means the attorney of record appear-

ing for a party.  A party may have only one attorney of
record authorized to act on behalf of that party in the
proceeding at any one time but may designate a different
attorney or change attorneys at any time as permitted
by law.

(8)  "Trial participants" means all parties, attor-
neys, jurors, witnesses, court personnel and the judge or
judges present during the conduct of proceedings.

(9)  "Media" means any news gathering or reporting
agencies and the individual persons involved, and in-
cludes newspapers, radio, television, radio and televi-
sion networks, news services, magazines, trade papers,
in-house publications, professional journals, or other
news reporting or news gathering agencies whose function
it is to inform the public or some segment thereof.

(d)  [General provisions and exclusions]

(1)  Nothing in this rule is intended to restrict
in any way the present rights of the media to report
proceedings.

(2)  No proceedings shall be delayed or continued
to allow for extended coverage, nor shall the requirements
of extended coverage in any way affect legitimate motions
for continuances or challenges to the judge.

(3)  Nothing in this rule is intended, nor shall it be
interpreted, to alter, modify, or change any rules of pro-
fessional conduct or canons of ethics of attorneys or
judges, except as provided for specifically in these
rules.

(4)  Extended coverage shall be conducted so as not
to be distracting and not to interfere with the solemnity,
decorum, and dignity which must attend the making of deci-
sions that affect the life, liberty, or property of
citizens.

(e)  [Request for extended coverage]

(1)  All requests for extended coverage shall be made
by the media to the court or judge a reasonable time in

4

613

advance of the commencement of the extended coverage to
allow compliance with all the provisions of these rules.

(2)  Requests for extended coverage shall be made in
writing, and shall refer to the individual proceeding with
sufficient identification to assist the judge in con-
sidering the request.  Requests for extended coverage on a
blanket basis shall not be honored, but shall be acted
upon only for the purpose of a particular individual pro-
ceeding.  Where proceedings are continued other than for
normal or routine recesses, weekends, or holidays, it
shall be the responsibility of the media to make a sep-
arate request for later extended coverage.

(f)      [Consent to extended coverage]

(1)  No extended coverage shall be allowed except
with the consent of the judge.  Such consent shall be
in writing, filed in the record of the proceedings, and
recorded in the minutes of the court.

(2) The judge may, in the interests of justice,
refuse, limit or terminate extended coverage if a party
objects to extended coverage.

(3)  The consent of the attorney for a party shall
not be required, but the attorney may direct a motion to
the judge to refuse, limit or terminate extended coverage.
Such motion shall be directed to the discretion of the
judge.  The objection of the attorney for a party shall
be noted in the record of the proceedings and in the min-
utes of the court.

(4)  The judge may in the interests of justice, re-
fuse, limit or terminate extended coverage of any witness
who objects to extended coverage.

(5)  The consent of jurors shall not be required for
extended coverage, but such extended coverage shall be
subject to the limitations and exclusions provided in
subdivision (g).

(g)  [Restrictions on extended coverage]

(1)  There shall be no extended coverage of any pro-

[over]

614

ceedings which are by law closed to the public, or which may be closed to the public and which have been closed by the judge.

(2)  There shall be no extended coverage of the selection of the prospective jury during voir dire.

(3)  There shall be no closeup or "zoom" extended coverage of individual members of the jury while in the jury box, while within the courtroom, while in the jury deliberation room during recess, or while going to or from the deliberation room at any time.

(4)  To protect the attorney-client privilege and the effective right to counsel of all trial parties, there shall be no audio coverage of conferences between attorneys and clients or parties, or between co-counsel and clients or parties, or between counsel and the judge held at the bench.

(5)  There shall be no extended coverage of any conference held in the chambers of a judge.

(6)  In order to preclude extended coverage of any matters presented to the court in the absence of the jury which are for the purpose of determining the admissibility of evidence, the judge may conduct a hearing in chambers.

(h)  [Extended coverage media standards]

(1)  Equipment and personnel

(i)  Equipment from one television station or network --designated as the pooling station or network--shall be permitted access to a courtroom proceeding at one time.  The pooling station or network may use portable television cameras that are silent videotape electronic cameras or, in the absence of such equipment, silent 16mm sound on film (self-blimped) cameras.  One television camera, operated by one camera person, shall be admitted to record a proceeding.  A second camera may be admitted for live coverage in the discretion of the judge.

(ii)  One audio system for broadcast purposes

6

615

shall be permitted in a proceeding.  Where possible,
audio for all media shall be from audio systems present in
the court.  If no technically suitable audio system exists,
microphones and related wiring essential for media purposes
shall be unobtrusive, located in places designated in ad-
vance by the judge, and operated by one person.

(iii)  One still photographer, using not more than
two still cameras with not more than two lenses for each
camera, shall be permitted in a proceeding subject to
extended coverage.  A second still photographer, using not
more than two still cameras with not more than two lenses
for each camera, may be admitted in the discretion of the
judge.

(iv)  No equipment or clothing of any extended coverage
personnel shall bear any insignia or identification of the
individual media or network involved in extended coverage.

(2)  Sound and light criteria

(i)  Only equipment that does not produce distracting
sound or light shall be employed to cover judicial pro-
ceedings.  Specifically, camera and audio equipment shall
produce no greater sound and light than the equipment de-
signated in Schedule A, annexed hereto, when the same is
in good working order; still camera equipment shall pro-
duce no greater sound than the camera equipment designated
in Schedule B, annexed hereto, when the same is in good
working order.  No motorized drives shall be permitted, and
no moving lights, flash attachments, or sudden lighting
changes shall be permitted during court proceedings.

(ii)  It shall be the affirmative duty of extended
coverage personnel to demonstrate to the judge
adequately in advance of any proceeding that the equip-
ment sought to be used meets the sound and light cri-
teria enumerated herein.

(iii)  Except to increase the wattage of existing
courtroom lights, there shall be no modifications or
additions to light equipment existing in a courtroom.

[over]

616

Any increases in wattage shall be with permission of the
judge and if authorized, shall be installed, maintained,
and removed without public expense.

(iv)  No light or signal visible or audible to trial
participants shall be used on any equipment during ex-
tended coverage to indicate whether it is operating.

(3)  Position and movement during proceedings

(i)  Extended coverage personnel and equipment shall
be positioned so as to provide reasonable coverage in such
location in the court facility as shall be designated by
the judge.  Equipment that is not a component part of
a television camera, and video and sound recording
equipment, shall be located outside the courtroom, unless
other arrangements are approved in advance by the judge.

(ii)  Extended coverage equipment shall not be placed
in or removed from the courtroom except prior to or after
proceedings each day, or during a recess.

(iii)  All extended coverage equipment operators shall
assume their assigned, fixed position within the desig-
nated area and once established in that position shall act
in a manner so as not to call attention to their activi-
ties.  Extended coverage equipment operators shall not be
permitted to move about during the court session.

(i)  [Pooling]

(1)  Consent to extended coverage when it is granted
shall be given impartially to all media representatives
and without discrimination based upon local, national, or
international coverage.  If it is necessary to limit the
number of media personnel or equipment in the courtroom in
compliance with these rules, pooling arrangements shall be
instituted to insure that all media requesting extended
coverage are provided with access to extended coverage.

(2)  Pooling arrangements among members of the media
shall be the sole responsibility of the media and shall
not require the judge or court personnel to mediate dis-
putes.  In the absence of agreement or in the event of

8

617

General Attitude Survey Pre-Post Mean Scores for
Judges, Prosecutors and Defenders Items 1 - 27

| | JUDGES | | | | PROSECUTORS | | | | DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Inexp | | Exp | | Inexp | | Exp | | Inexp | | Exp | |
| | Pre | After Post | Pre | After Post | Pre | Post | Pre | Post | Pre | Post | Pre | Post |
| 1 | 3.37 | 3.33 | 2.95 | 2.54 | 3.91 | 3.46 | 3.64 | 2.76 | 4.08 | 3.96 | 4.41 | 4.52 |
| 2 | 2.84 | 3.03 | 3.05 | 3.21 | 2.66 | 2.79 | 2.86 | 3.06 | 2.26 | 2.21 | 1.93 | 1.84 |
| 3 | 3.50 | 3.62 | 3.30 | 3.36 | 3.84 | 3.79 | 3.54 | 3.58 | 3.74 | 3.91 | 3.78 | 3.97 |
| 4 | 3.42 | 3.59 | 3.33 | 3.37 | 3.79 | 3.76 | 3.57 | 3.42 | 3.77 | 3.82 | 4.30 | 4.48 |
| 5 | 2.67 | 2.66 | 2.71 | 3.05 | 2.26 | 2.29 | 2.50 | 2.82 | 2.37 | 2.21 | 2.00 | 1.94 |
| 6 | 2.63 | 2.74 | 2.94 | 3.24 | 2.22 | 2.42 | 2.29 | 2.88 | 2.13 | 2.12 | 1.82 | 1.90 |
| 7 | 3.00 | 3.23 | 3.23 | 3.26 | 2.58 | 2.72 | 2.71 | 3.15 | 1.90 | 1.62 | 1.74 | 1.48 |
| 8 | 2.42 | 2.70 | 2.38 | 2.78 | 2.49 | 2.73 | 1.57 | 2.70 | 2.06 | 2.04 | 1.96 | 2.26 |
| 9 | 2.98 | 3.20 | 3.34 | 3.31 | 2.87 | 3.05 | 3.11 | 3.36 | 2.25 | 2.31 | 2.07 | 2.13 |
| 10 | 2.44 | 2.57 | 2.25 | 2.22 | 3.14 | 2.86 | 2.26 | 2.36 | 3.05 | 3.06 | 3.33 | 3.26 |
| 11 | 2.53 | 2.60 | 2.84 | 3.00 | 2.07 | 2.17 | 2.32 | 2.85 | 1.94 | 1.99 | 1.74 | 1.61 |
| 12 | 3.07 | 3.13 | 3.25 | 3.45 | 2.86 | 2.95 | 2.89 | 3.15 | 2.62 | 2.62 | 2.63 | 2.48 |
| 13 | 3.61 | 3.54 | 3.77 | 3.89 | 3.15 | 3.35 | 3.57 | 3.58 | 2.97 | 2.90 | 2.59 | 2.61 |
| 14 | 2.61 | 2.70 | 2.50 | 2.93 | 2.42 | 2.62 | 2.64 | 3.09 | 2.13 | 2.17 | 2.26 | 2.36 |
| 15 | 3.05 | 3.21 | 3.22 | 3.27 | 3.03 | 3.13 | 3.36 | 3.55 | 1.76 | 1.63 | 1.56 | 1.55 |
| 16 | 3.40 | 3.48 | 3.25 | 3.42 | 3.59 | 3.46 | 3.64 | 3.59 | 3.63 | 3.77 | 3.63 | 4.00 |
| 17 | 1.93 | 2.39 | 2.10 | 2.85 | 1.94 | 2.09 | 1.93 | 2.53 | 1.48 | 1.55 | 1.26 | 1.33 |
| 18 | 2.69 | 2.88 | 2.50 | 2.77 | 3.54 | 3.71 | 3.89 | 4.22 | 1.94 | 1.80 | 1.59 | 1.87 |
| 19 | 2.32 | 2.47 | 2.53 | 2.80 | 1.90 | 2.09 | 2.18 | 2.39 | 2.00 | 2.00 | 1.85 | 1.87 |
| 20 | 2.17 | 2.16 | 2.13 | 2.08 | 2.61 | 2.46 | 2.32 | 2.78 | 2.74 | 2.68 | 2.63 | 2.45 |
| 21 | 3.13 | 3.10 | 3.02 | 2.70 | 3.27 | 3.24 | 3.04 | 2.81 | 4.06 | 4.13 | 3.89 | 4.13 |
| 22 | 2.46 | 2.56 | 2.68 | 3.07 | 2.14 | 2.15 | 2.30 | 2.53 | 2.07 | 2.10 | 1.85 | 2.00 |
| 23 | 3.41 | 3.44 | 3.73 | 3.67 | 3.10 | 3.19 | 3.50 | 3.72 | 2.78 | 2.68 | 2.56 | 2.42 |
| 24 | 3.06 | 3.39 | 3.25 | 3.49 | 3.23 | 3.28 | 3.57 | 3.59 | 1.74 | 1.71 | 1.44 | 1.68 |
| 25 | 2.34 | 2.54 | 2.52 | 2.93 | 2.14 | 2.30 | 2.00 | 2.97 | 1.88 | 1.95 | 1.67 | 1.68 |
| 26a | 2.72 | 2.44 | 2.33 | 2.12 | 2.51 | 2.49 | 2.40 | 1.78 | 3.10 | 3.57 | 3.67 | 3.20 |
| 26b | 3.09 | 2.88 | 2.75 | 2.42 | 3.38 | 3.12 | 3.00 | 2.47 | 3.54 | 3.73 | 4.00 | 3.67 |
| 26c | 3.22 | 3.03 | 2.92 | 2.61 | 3.78 | 3.40 | 3.32 | 2.63 | 4.18 | 4.23 | 4.56 | 4.37 |
| 27 | 3.97 | 4.05 | 4.00 | 4.10 | 3.96 | 4.06 | 4.23 | 4.20 | 3.99 | 3.92 | 3.74 | 3.97 |