Pages 1 - 126

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE

KRISTIN M. PERRY,                          )
SANDRA B. STIER, PAUL T. KATAMI,           )
and JEFFREY J. ZARRILLO,                   )
                                           )
            Plaintiffs,                    )
                                           )
VS.                                        ) NO. C 09-2292-VRW
                                           )
ARNOLD SCHWARZENEGGER, in his              )
official capacity as Governor of           )
California; EDMUND G. BROWN, JR.,          )
in his official capacity as                )
Attorney General of California;            )
MARK B. HORTON, in his official            )
capacity as Director of the                )
California Department of Public            )
Health and State Registrar of             )
Vital Statistics; LINETTE SCOTT,           )
in her official capacity as Deputy )
Director of Health Information &           )
Strategic Planning for the                 )
California Department of Public            )
Health; PATRICK O'CONNELL, in his          )
official capacity as                       )
Clerk-Recorder for the County of           )
Alameda; and DEAN C. LOGAN, in his )
official capacity as                       )
Registrar-Recorder/County Clerk            )
for the County of Los Angeles,             )
                                           )San Francisco, California
            Defendants.                    ) Wednesday
_____) January 6, 2010


**TRANSCRIPT OF PROCEEDINGS**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
           Official Reporter - US District Court
           Computerized Transcription By Eclipse

**APPEARANCES**:

**For Plaintiffs:**          GIBSON, DUNN & CRUTCHER, LLP
                            1050 Connecticut Avenue, N.W.
                            Washington, D.C. 20036-5306
                    BY:   **MATTHEW D. MCGILL, ESQUIRE**


                            GIBSON, DUNN & CRUTCHER LLP
                            333 South Grand Avenue
                            Los Angeles, California  90071-3197
                    BY:   **THEODORE J. BOUTROUS, JR., ESQUIRE**
                          **CHRISTOPHER D. DUSSEAULT, ESQUIRE**


                            GIBSON, DUNN & CRUTCHER LLP
                            555 Mission Street, Suite 3000
                            San Francisco, California  94105-2933
                    BY:   **ETHAN D. DETTMER, JR., ESQUIRE**


                            BOIES, SCHILLER & FLEXNER LLP
                            1999 Harrison Street, Suite 900
                            Oakland, California  94612
                    BY:   **JEREMY MICHAEL GOLDMAN, ESQUIRE**


**For Plaintiff-**          CITY AND COUNTY OF SAN FRANCISCO
**Intervenor:**             OFFICE OF THE CITY ATTORNEY
                            One Drive Carlton B. Goodlett Place
                            San Francisco, California 94102-4682
                    BY:   **DANNY CHOU, DEPUTY CITY ATTORNEY**


**For Defendant**           MENNEMEIER, GLASSMAN & STROUD
**Gov. Schwarzenegger:**    980 9th Street, Suite 1700
                            Sacramento, California  95814-2736
                    BY:   **ANDREW WALTER STROUD, ESQUIRE**


**For Defendant**           STATE ATTORNEY GENERAL'S OFFICE
**Edmund G. Brown Jr.:**    455 Golden Gate Avenue, Suite 11000
                            San Francisco, California  94102-7004
                    BY:   **TAMAR PACHTER, DEPUTY ATTY GENERAL**


(APPEARANCES CONTINUED ON FOLLOWING PAGE)

 1   **APPEARANCES (CONTINUED):**

 2   **For Defendant-**          COOPER & KIRK
     **Intervenors:**            1523 New Hampshire Avenue, N.W.
 3                               Washington, D.C.  20036
                         BY:  **MICHAEL W. KIRK, ESQUIRE**
 4                            **JESSE PANUCCIO, ESQUIRE**

 5

 6                    _   _   _   _

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2   **JANUARY 6, 2010**                                    **1:33 p.m.**

3

4           **THE CLERK:**  Calling Case C09-2292, Kristin Perry

5   versus Arnold Schwarzenegger.

6               Counsel, please state your appearances.

7           **MR. BOUTROUS:**  Good afternoon, your Honor.

8   Theodore Boutrous for the plaintiffs.

9           **THE COURT:**  Good afternoon, Mr. Boutrous.

10          **MR. McGILL:**  Good afternoon, your Honor.  Matthew

11  McGill of Gibson, Dunn and Crutcher for the plaintiffs.

12          **THE COURT:**  Mr. McGill.

13          **MR. DUSSEAULT:**  Good afternoon, your Honor.  Chris

14  Dusseault of Gibson, Dunn and Crutcher also for the

15  plaintiffs.

16          **THE COURT:**  Mr. Dusseault.

17          **MR. DETTMER:**  Good afternoon, your Honor.  Ethan

18  Dettmer of Gibson, Dunn and Crutcher for the plaintiffs.

19          **THE COURT:**  Mr. Dettmer.

20          **MR. GOLDMAN:**  Good afternoon, your Honor.  Jeremy

21  Goldman from Boies, Schiller and Flexner for the plaintiffs.

22          **THE COURT:**  Welcome.

23          **MR. CHOU:**  Good afternoon, your Honor.  Danny Chou

24  for plaintiff-intervenor, City and County of San Francisco.

25          **THE COURT:**  Welcome, sir.

1          **MR. KIRK:**  Good afternoon, your Honor.  I'm Michael

2  Kirk with Cooper and Kirk for the defendant-intervenors.

3          **THE COURT:**  I see this morning wasn't your last

4  appearance.

5          (Laughter.)

6          **MR. PANUCCIO:**  Good afternoon, your Honor.  My name

7  is Jesse Panuccio from Cooper and Kirk also --

8          **THE COURT:**  Panuccio.

9          **MR. PANUCCIO:**  Panuccio, yes, your Honor.  Also for

10  defendant-intervenors.  Thank you.

11          **THE COURT:**  Welcome.

12          **MR. STROUD:**  Good afternoon, your Honor.  Andrew

13  Stroud, Mennemeier, Glassman & Stroud on behalf of Governor

14  Schwarzenegger and the administration defendants.

15          **THE COURT:**  Mr. Stroud.

16          **MS. PACHTER:**  Good afternoon, your Honor.  Deputy

17  A.G. Tamara Pachter on behalf of the Attorney General.

18          **THE COURT:**  Welcome.

19          I thought for a moment we were going to get to deal

20  with the deposition questions as well, but it sounds like

21  that was largely resolved, is that right?

22          **MR. BOUTROUS:**  Your Honor, I do want to clarify.  I

23  think when I said today that we could do it without

24  depositions, particularly since we've got document issues, we

25  very much would prefer at least to have the opportunity to

1   review the documents and determine whether some of these

2   depositions need to be reopened.

3           **THE COURT:**  Here's what I will do.  I won't revisit

4   what I think you admitted in front of Judge Walker, but if

5   you review the documents and based on those you think that

6   you now have information you didn't know at that hearing, you

7   can make an appropriate application.

8           **MR. BOUTROUS:**  Okay, your Honor.  Thank you.

9           **THE COURT:**  I just don't feel like we should --

10  having watched that proceeding, that we should change that

11  unless there is some actual application that has some new

12  reason.

13          **MR. BOUTROUS:**  That's fine, your Honor.  I just

14  want -- I don't mean to be -- try to evade what I -- but I

15  did -- you know, I think we can do it, but -- if needed, but

16  we would much prefer -- if we find additional information, we

17  will look at the documents.

18          And on the issue of burdens on the other side, I

19  think at least 12 lawyers made appearances.  So I think it's

20  doable to do depositions and I appreciate your giving us the

21  opportunity once we look at the documents to come back.

22          **THE COURT:**  Look at the documents.  You can talk

23  about it.  I can't tell you how, or he, depending on who gets

24  to resolve that question.

25          **MR. BOUTROUS:**  Thank you, your Honor.

1          **MR. KIRK:**  I could tell you what our position would

2     be, your Honor.  It would be the same as upstairs.

3          **THE COURT:**  I thought that.

4          So with regards to documents.  As I understand it,

5     I have a list of the sort of issues that I gleaned from your

6     papers and you will need to help me on whether I have got all

7     the issues, or there are other issues, but the document

8     requests that are principally at issue are, obviously,

9     document request number eight, which there has been much

10    litigation about, but also now one and six, which are the

11    ones that the plaintiffs have flagged for compelling

12    production in their papers, and that there are a number

13    issues that have arisen and I've got a list of them.  And

14    there are others that you may need to add, but my list is as

15    follows.

16          The first is the issue that was actually identified

17    in connection with the depositions.  Did the District Court

18    impose some relevance limits with respect to production of

19    documents?  And that could be characterized in a number ways,

20    one of which is maybe it's limitation to internal campaign

21    communications regarding strategy or -- and Mr. Kirk may want

22    to characterize it some other way, but did the Court have

23    some relevance limitation first; general relevance

24    limitations, not just with respect to a particular document

25    request.

```
 1            Second, with respect to the First Amendment

 2   privilege, what's the scope of that privilege in terms of

 3   what are internal communications of the campaign that are

 4   protected?   I think that's been largely answered by the

 5   footnote in the amended Ninth Circuit ruling, but --

 6   regarding the core group, but I think that there needs to be

 7   some discussion about the -- whether or not the party -- what

 8   the parties' positions are on the scope of the production in

 9   that regard, whether or not -- you know, how far does the

10   protection go that the Ninth Circuit has laid down.   Is it

11   limited to internal communications among the core group?   And

12   in this context, who would be the core group?   We are going

13   to need to actually air that question.

14            Next is sort of notwithstanding what we decide

15   about what the courts determined with respect to relevance,

16   whether there are appropriate relevance limits the Court

17   should impose now on production of documents.   And I don't

18   know that, other than saying they have to be documents

19   responsive and they have to be documents that aren't within

20   whatever we decide or I decide is the scope of the privileges

21   set down by the Ninth Circuit, should the Court impose on

22   production of these three document requests any other kind of

23   relevance limits?

24            What I'm thinking about is Chief Judge Walker's

25   comments fairly early on that if you ask for all
```

1   communications about Prop 8, you get, you know, "Are you

2   available Tuesday," as well as, "The reason you should vote

3   for Prop 8 is X."  And is there a way of describing or should

4   I embark on an endeavor of describing any kind of a relevance

5   limit with regard to these three document requests?

6           We need to address the issue of the protective

7   order, which was sort of postponed while the Circuit was

8   ruling.  I got the versions that everyone proposed.

9           We need to address the issue of what exactly is

10  going to be redacted.  Maybe that's not a controversial

11  subject at this point.

12          At some point, as I recall, there was some

13  stipulation that your rank and file volunteers could be

14  redacted, their names could be redacted, how that's going to

15  occur with respect to these documents.

16          And finally what sort of, if any, additional

17  privilege log is going to be provided.

18          So that's my list of things we need to accomplish

19  in the next 10 minutes.  Have I forgotten anything?  Is

20  anyone expecting to address something else that I haven't

21  listed?

22          **MR. BOUTROUS:**  That covers it, your Honor.

23          **THE COURT:**  Okay.  So let's start with the issue

24  that we left off with in front of Judge Walker.

25          Did the District Court place any relevance

1  limitations with regard to document discovery in general?

2  Anybody want to start?

3       **MR. BOUTROUS:**  Certainly, your Honor.  Theodore

4  Boutrous for the plaintiffs.

5       The position as you, I think, are aware that the

6  proponents have taken is that somehow the order of October 1

7  and November 11 from Chief Judge Walker dealing with request

8  number eight also constituted a ruling that the only relevant

9  information was internal information.  And we just believe

10  that is simply wrong on the face of Chief Judge Walker's

11  orders and -- which denied the motion to compel, except as it

12  related to request number eight.

13       And with request number eight, which we, in light

14  of the judges's order, reformulated and narrowed to focus on

15  the internal communications.  But we had request number one,

16  request number six, which explicitly dealt with

17  communications meant for public consumption, things that went

18  to voters, potential voters, donors and the like.

19       **THE COURT:**  I actually have never seen a

20  reformulated request number eight, which would be very useful

21  if someone could come up with that.

22       But what you are saying it was reformulated to

23  focus on the internal campaign communications.

24       **MR. BOUTROUS:**  Exactly.  And so we reformulated --

25  in its original format it was basically all communications to

1   third parties relating to Proposition 8.

2           Chief Judge Walker found that to be too broad and

3   we then narrowed it in light of his ruling to focus on

4   communications among the -- the core group of participants in

5   the campaign, and that is what was the subject of the Ninth

6   Circuit appeal.

7           The other requests, which included request number

8   one, number six, we also had a number of requests that sought

9   documents that tend to refute the positions that the

10  proponents are taking now, dealt with information sent to the

11  voters, which is the core of what Chief Judge Walker found

12  was relevant.

13          On page 16 of the October 1 ruling, Chief Judge

14  Walker said the test was -- and this goes to your Honor's

15  suggestion about relevance standard -- information that

16  documents that share a clear nexus with the information put

17  before the voters.

18          So I don't think there is any way to read this

19  order or any of the other orders to suggest that the

20  information that the campaign, the core group of the campaign

21  sent to voters, discrete groups of voters, individual voters,

22  as the Ninth Circuit noted in footnote 12, that those are not

23  responsive and relevant under our requests and Chief Judge

24  Walker's prior orders.  It's just not a reasonable reading of

25  any of those materials.

1          In particular, your Honor, the proponents have

2    filed their protective order motion.  The original one was

3    very broad.  It applied to everything.  And they wanted a

4    ruling that said only materials sent to the public-at-large,

5    the electorate-at-large would be responsive.  And Judge

6    Walker rejected that, denied the motion and only granted it

7    as to number eight, saying it's very clear that all these

8    documents that were sent to voters are responsive.

9          And I will save my privilege arguments for later,

10   but I just think it's straightforward, clear, and those

11   documents need to be produced immediately.

12          **THE COURT:**  Okay.  Thank you.

13          **MR. BOUTROUS:**  Thank you, your Honor.

14          **MR. KIRK:**  Your Honor, if the Court please, my

15   colleague, Mr. Panuccio, is going to speak for us today.

16          **THE COURT:**  Yes.

17          **MR. PANUCCIO:**  Thank you, your Honor.

18          May it please the Court.  As you -- as your Honor

19   heard upstairs, I believe, counsel for plaintiffs has stated

20   that the Ninth Circuit opinion, quote, puts many documents

21   back on the table.  And I think that that's not -- that's

22   just not accurate.  Plaintiffs have not been --

23          **THE COURT:**  I'm going to stop you there because

24   we're not talking about their version.

25          All I want to talk about is, do you think that

1    Judge Walker in his rulings that were reversed by the Ninth

2    Circuit, in part at least, imposed any relevance limitations

3    on production of documents in the case?

4           **MR. PANUCCIO:**  Yes, your Honor.  I think that those

5    -- the October 1st, November 11th orders did place

6    limitations on the production of documents.

7           And the point I wanted to make is, I don't think

8    anything that's happened since then has changed those

9    limitations, specifically with the question of relevance in

10   mind.

11          What the litigation -- what the October 1st and

12   November 11 orders dealt with was a request that asked for

13   communications from defendant-intervenors to any third party.

14   And the Court dealt with this sweeping request, said that

15   just goes too far.

16          What the Court said it was concerned with was

17   determining the intent behind the measure enacted by the

18   voters.  This is the October 1st docket entry 214 at 13.  And

19   the Court credited that for virtually every communication by

20   anyone included in or associated with Protect Marriage cannot

21   be relevant.  And then the Court said, a request seeking

22   every communication is, quote, simply too broad.

23          What plaintiffs are now doing, because they lost on

24   request number eight and revised request number eight, they

25   said, Okay, we've lost that.  Let's go back to our request

1   number one and our request number six, and let's define

2   "voter" or "the public" as any third party.  And so it's --

3   it's just a matter of logic, your Honor.

4          **THE COURT:**  It doesn't answer the question

5   actually.  What were the relevance limitations that the judge

6   imposed?

7          He certainly wasn't saying -- and I think you

8   probably agree with this.  He certainly wasn't saying that no

9   communications outside the core group are relevant.  He is

10  not saying that.

11         He is saying that if you say, I want every single

12  thing you sent to anyone about Prop 8, even if it's "Let's

13  have lunch on Tuesday," that's too broad.  What are the

14  limitations that you claim he set for the case?

15         **MR. PANUCCIO:**  That's right.  Well, first of all,

16  we agreed to produce communications that went to voters.  And

17  by that you have to take some reasonable interpretation of

18  what "voter" means.

19         If "voter" is determined to mean any communication

20  to any friend, to any colleague at any time about Prop 8, we

21  are right back to that original request.

22         So the limit that the Court set -- the Court said,

23  you know, there are going to be some key documents that went

24  to just a few people and those key documents are going to be

25  these internal campaign communications among this group of

1    managers and leaders because that's going to speak to these

2    documents that did go to voters.  That's going to illuminate

3    those documents.

4           And so that's what -- that's what we sorted based

5    on --

6           **THE COURT:**  So your view is the judge said the only

7    relevant documents that are reasonably calculated to lead to

8    discoverable admissible evidence are internal campaign

9    discussions.

10          **MR. PANUCCIO:**  Well, in light of a request that

11   seeks any document to any third party.  I think we conceded

12   from the outset.  We said, look, communications that went to

13   voters, that were put out by the campaign or the

14   defendant-intervenor to persuade voters out there, we're

15   going to produce them.  We have produced them --

16          **THE COURT:**  This is a fight about what that means,

17   because who is a voter and who is not a voter?  Are you

18   talking qua voters?  Are you talking qua friend?

19          You know, when you are trying to persuade someone

20   who is on your side to work harder, are you talking as a

21   voter?  Are you not talking as a voter?

22          What I'm asking for is Judge Walker's limitations.

23   I have my own ideas, which we may or may not ever get to,

24   about what a reasonable limitation might be.  I'm wondering

25   whether or not I'm writing on a blank slate.

1            So where is it that Judge Walker said what he

2    wants, that thou shalt only get internal campaign

3    contributions?

4            MR. PANUCCIO:  I don't believe that Judge Walker

5    said the only thing producible or relevant in this case is

6    solely internal campaign contributions, but I believe he said

7    in the October --

8            THE COURT:  Communications.  I'm sorry.  I said

9    "contributions."

10           MR. PANUCCIO:  I'm sorry, your Honor.  I picked up

11   on that.

12           THE COURT:  We both meant communications.

13           MR. PANUCCIO:  Excuse me, your Honor.

14           One of the things that Chief Judge Walker said in

15   the October 1st order was it would be impossible to corral

16   all of the information that went to every voter or any voter

17   in the State of California.  And, therefore, I think a

18   reasonable reading of the request and of the course of

19   litigation we had is that we would endeavor to produce and

20   have produced those documents that were put out to -- to the

21   electorate, even -- and including subset groups of the

22   electorate.  We have even given them --

23           THE COURT:  Church groups?

24           MR. PANUCCIO:  We have given them PowerPoint

25   presentations that were given to church groups, small church

1   groups.

2          I believe their reading goes so far as to say if a

3   defendant-intervenor sends himself or herself a document --

4   sometimes you do that over email if you want to get a draft

5   on your file -- that technically goes to a voter because the

6   defendant-intervenor --

7          **THE COURT:**  That is a bad example because I will

8   probably get a stipulation that it falls within internal

9   communications.

10         **MR. PANUCCIO:**  But we can never get that definition

11   out of them.  It's after every order of this Court, after

12   every significant and minor event --

13         **THE COURT:**  I'm not concerned about that.  I'm

14   concerned about whether or not I'm writing on a blank slate.

15         **MR. PANUCCIO:**  I don't think you are, your Honor.

16   I believe that the orders of October 1st and November 11th

17   are controlling here and provide a lot of guidance.

18         I mean, at the end of the November 11th order,

19   Chief Judge Walker stated:

20         "I hope that this gives sufficient

21      guidance for defendant-intervenors to cull

22      their inventory."

23         So we did that.  We spent weeks and weeks culling

24   tens of thousands of documents to get to this point.  Then

25   the core groups that was left were these internal core group

1  privilege documents.  We took that to the Ninth Circuit and

2  we get the mandamus on that, on the privilege issue.

3            So now having lost that, plaintiffs have --

4        **THE COURT:**  Well, you didn't get mandamus on the

5  privilege log.  You got mandamus on the 22 documents you

6  already produced, right?

7        **MR. PANUCCIO:**  Well, the --

8        **THE COURT:**  Isn't that right?  That that's -- the

9  only thing they had before them is the orders that they

10  already entered.

11       **MR. PANUCCIO:**  Yes.

12       **THE COURT:**  And so he -- they didn't have your

13  multi-page thousands of document privilege log being the

14  record of the Circuit, right?

15       **MR. PANUCCIO:**  Yes, that's correct.

16       **THE COURT:**  So they weren't ruling on whether or

17  not those -- whether it was properly corralled or whatever.

18  They were just trying to figure out whether or not these were

19  the right standards.

20       **MR. PANUCCIO:**  Well, on the First Amendment issue.

21  Actually, what they said with regard to the relevance or

22  responsiveness limitations, in two places in the note they

23  are very specific about this.  We will not address those

24  questions, the Ninth Circuit said.

25       **THE COURT:**  They didn't change that at all.

1       **MR. PANUCCIO:**  So since plaintiffs did not cross

2  appeal and we, of course -- to the extent that the

3  October 1st and November 11th orders went in our favor and

4  limited the universe of documents, we didn't appeal that.

5       **THE COURT:**  Okay.  You still haven't explained to

6  me any place in the order where it did anything, other than

7  with respect to relevance, saying that if you ask for every

8  communication in the world about Prop 8, that's too broad.

9       There is no place in that order, is there -- you

10  can point it out to me -- where it says you can only seek

11  documents that were actually sent to significant groups of

12  voters?  Is there anywhere where it says that's the

13  limitation?

14       I know you think that's the limitation.  Show me

15  where it says that.

16       **MR. PANUCCIO:**  I want to be clear.  I don't think

17  that's the limitation that the only document that plaintiffs

18  concede are those that were internal.  Certainly documents

19  that went from the campaign or from a defendant-intervenor

20  out to the world --

21       **THE COURT:**  Out to which parts of the world?

22       **MR. PANUCCIO:**  Okay.  Well, that is a question.

23       **THE COURT:**  But that's the question.  My question

24  is this -- and maybe I'm not being clear, which wouldn't be

25  the first time.

1          You said that the appropriate limitation is no

2    internal campaign discussions.  Fine.  The Ninth Circuit

3    ruled on that, said we will discuss what that means.  And

4    that in terms some of external communications, there is a

5    limitation imposed by the Chief's order which says you can

6    only get documents that were provided to, call it significant

7    numbers of voters, maybe even small, but discrete groups of

8    voters or a large swath; but that's your view, right?

9    That's the -- that's the relevance limitation you are looking

10   for?

11          **MR. PANUCCIO:**  At the beginning -- I mean, I think

12   that certainly makes very good sense, your Honor, since what

13   the October 1st order said was you can't corral everything.

14          And so, yes, the stuff that went to even subsets of

15   the electorate, even so far as a church group, yes, okay, we

16   have given that over.  But when you start to get into whether

17   one proponent sent an email to an --

18          **THE COURT:**  You are still getting off track.  We

19   are talking about whether or not I can figure out, if it

20   makes sense, whether I have it within my purview to do that

21   or whether it's already been figured out for me by the judge

22   presiding over the case.

23          And I take it what you are saying is we have to go

24   to step two, because the judge didn't actually come down and

25   say this is the relevance limitation there.

1          **MR. PANUCCIO:**  Well, there is one further point I

2    make about the October 1st order.   I don't have it in front

3    of me right now, but I believe at the beginning of the

4    opinion Chief Judge Walker said, "Defendant-intervenors have

5    agreed to produce," and he had some formulation about the

6    types of documents that went out to voters, to the public.

7          And then he -- Chief Judge Walker went on to say,

8    And now I'm looking at this request that goes to any third

9    party.   And that's where he set limits.

10          So I think you can take that, what he saw, as a

11    concession in the beginning as carving out one universe of

12    documents and now dealing with something --

13          **THE COURT:**  Okay, I understand that.

14          All right.   On this issue, the Court has not set

15    relevance limitations as yet.

16          As respects all discovery in the case, I don't

17    think there is any merit to the defendants' argument.

18          The Court was only ruling on question number eight

19    in the first instance, the document request number eight, not

20    all discovery in the case.   And while the Court identified an

21    overbroad request, the Court did not cabin what within that

22    overbroad request might not be overbroad.

23          It also didn't -- the Court also did not previously

24    address the issues regarding the two other document requests

25    that are at issue today.

1       So I think that -- and not to mention that as comes

2   to -- as regards to discovery, while there are issues of

3   delay and prejudice and that sort of thing, there hasn't been

4   law of the case.

5       So I think for all of those reasons I need to look

6   afresh at the question of would it be, if any, a relevance

7   limitation.  And you will see, I have some thoughts on what

8   that might be, and we'll get to that.

9       The second issue I had was -- I wanted to take it

10  in this order because it made logical sense, but -- the

11  better order to do it in, but my first instance reaction when

12  I got the opinion was you all should go back and talk before

13  we had this hearing, because having now looked at the amended

14  opinion, it gives -- thankfully, gives a much clearer

15  definition, at least, to the First Amendment privilege the

16  Court was talking about.

17      And so the question for me is, leaving aside any

18  relevance considerations that we might want to address, and

19  we will do that next, with these three document requests, is

20  what is the limitation imposed by the Circuit with respect to

21  the First Amendment privilege?  And they made various

22  comments about it in the text and then, again, in great

23  detail in footnote 12, but I think that's the next question.

24      What is the scope of the internal communications

25  that are protected by the First Amendment privilege, and what

1   is outside of that scope, and what kind of limitation should

2   the Court, therefore, allow and otherwise disallow with

3   respect to it?

4           So why don't I hear from the plaintiffs first.

5           **MR. BOUTROUS:**   Thank you, your Honor.

6           I do believe footnote 12 does really very

7   specifically lay out the very narrow parameters of the First

8   Amendment privilege.  And, in fact, this formulation is very

9   much like the one we had proposed, the way we read the Ninth

10  Circuit's opinion and proposed at the pretrial conference.

11          We did -- just to answer the Court's question, we

12  did at least try to open a dialogue concerning this footnote

13  with defendants' counsel before to see if we could start

14  getting documents, but I think the limitation is squarely as

15  to private internal communications, though tests for

16  determining what is private and internal focuses on the who

17  are the core group, the core group of persons engaged in a

18  formulation of campaign strategy and messages.

19          And the Ninth Circuit left it to the District Court

20  to determine who that core group is.  And we agree.  I think

21  your Honor suggested that we need to figure out who that core

22  group is.

23          We believe it's pretty clear that it's the

24  executive committee members of the ProtectMarriage.com and,

25  perhaps, the Schubert Flint, their consultants, and

1  Mr. Pugno, who was their lawyer and, apparently, made them a

2  member of the executive committee.

3          The proponents themselves, I think, have indicated

4  that they do not believe that Dr. Tam or Gail Knight, who

5  actually was one of the proponents, is a member of the core

6  group.

7          In their notice of filing their privilege log they

8  said that, that -- it's page 13 of the document that:

9          "Gail Knight and Dr. William Tam,

10      although official proponents, had virtually

11      nothing to do with ProtectMarriage.com's

12      campaign."

13          So I think that it's that -- the executive

14  committee and Mr. Pugno and --

15          **THE COURT:**  So the proponents except for Knight and

16  Tam?

17          **MR. BOUTROUS:**  Yes.

18          **THE COURT:**  Consultants, executive committee,

19  Mr. Pugno.  We are going to have to list the consultants

20  because they had more than the Schubert firm.

21          **MR. BOUTROUS:**  Yes.  And on that, in that regard,

22  your Honor, late last night -- not late last night, but

23  yesterday Mr. Criswell, who was the outside -- I guess,

24  assisted with the -- was a vendor who assisted with the

25  dissemination of the advertising, I believe, filed a motion

1   to quash the trial subpoena we served on him where he

2   basically says he had nothing to do with the formulation of

3   messages and strategy.  He was simply the person

4   communicating these things.  So we don't think he falls

5   within that group of the core group.

6           But you are correct, your Honor.  We would want a

7   list specifically, and we think it should be a very narrow

8   group, of people who are in that core group.

9           **THE COURT:**  All right.  We will talk further about

10  that.

11          **MR. BOUTROUS:**  Yes.  So that's -- that's the first

12  test.  Once we determine who is in the core group,

13  communications amongst those people, at least, are subject to

14  the privilege.  Then we have the higher standard that needs

15  to be met.

16          But beyond that, the documents, the Dr. Tam letter

17  that the Court of Appeals attached to its opinion as an

18  appendix, is used as an example, a letter that is urging

19  support of Propsotion 8.  It really goes to the core of what

20  we were seeking to begin with.

21          And the Ninth Circuit used the language:

22          "The privilege certainly does not apply

23      to documents or messages conveyed to the

24      electorate-at-large, discrete groups of

25      voters or individual voters for purposes such

1        as persuasion, recruitment or motivation,

2        activities beyond the formulation of strategy

3        and messages."

4             So the -- the Ninth Circuit really focused on those

5    internal documents that involved the formulation of the

6    messages and strategy, but documents conveyed outside that

7    core group that were actually conveying the messages to the

8    people of California are not subject to the privilege and

9    must be produced, we believe.

10            **THE COURT:**  Well, it says, "...or documents outside

11   the core group or documents that were not concerned with the

12   formulation of campaign strategy and messages."

13            **MR. BOUTROUS:**  Correct.  And so I think it really

14   does lay it out very clearly.  And we believe there are on --

15   under proponent's own briefing there are thousands of

16   documents that are responsive.

17            And during the process, your Honor, of discovery we

18   were told a number of times that while this discovery dispute

19   was brewing, proponents were gathering and preparing the

20   documents in the event they were required to produce them.

21            So I anticipate an argument about burden and

22   timing.  They have known for months and months and months we

23   were seeking these documents, and they have been withholding

24   them.  They have been on notice.  And they told us that they

25   were preparing to produce them in the event they were

1    required to do so.

2            So we think if the -- the resolution is very

3    straightforward here in terms of the privilege issues.

4            **THE COURT:**  Okay.

5            **MR. BOUTROUS:**  Thank you.

6            **THE COURT:**  Counsel?  So let me ask you a

7    preliminary question.  You can come up, I'm sorry.

8            I take it from the papers that you were filed

9    before the amended Ninth Circuit decision that the test you

10   apply to your privilege log was not precisely the test that

11   the Circuit came up with in its -- not the test the Circuit

12   came up with in footnote 14.

13           **MR. PANUCCIO:**  Well, I think for number 12, your

14   Honor, yes.

15           **MR. BOUTROUS:**  12 -- I'm sorry.

16           **MR. PANUCCIO:**  I think that's not entirely

17   accurate.

18           **THE COURT:**  Okay.

19           **MR. PANUCCIO:**  I mean, what was before the Ninth

20   Circuit, as your Honor has said, are these -- the 21

21   documents and what they implicated.

22           And that was -- I mean, we got to those documents

23   because we sorted based on these relevance determinations

24   made on the October 1st and November 11th orders, including

25   all the subject matter, the 39 documents that were -- out of

1  the 60 that were culled out by the District Court.  I mean,

2  we sorted on those grounds.

3         And so what went up to them was -- what went up to

4  the Ninth Circuit was this core group of documents and they

5  said all of those are privileged.  So that was our privilege

6  assertion, and it remains our privilege assertion.

7         **THE COURT:**  Well, do you disagree with

8  Mr. Boutrous' assertion that the privilege is now limited to

9  communications among the core group of individuals who

10 formulate strategy and messages, and that outside of that

11 communication of that group it's -- the privilege doesn't

12 apply?

13        **MR. PANUCCIO:**  Well, I think it's important to,

14 again, remember what was before the Ninth Circuit, which were

15 21 documents that were from within this -- within the

16 management and leadership of ProtectMarriage.com.  But I

17 don't think it's a fair reading.

18        Let's not lose sight of the forest for the trees.

19 It's not fair to take one footnote of a Ninth Circuit opinion

20 and say that is the opinion.  If we are going to define "core

21 group," the opinion also says at the *Slip* opinion at page 30,

22 note nine, says:

23        "The freedom of members of a political

24     association to deliberate internally over

25     strategy and messaging is an incident of

1       associational autonomy."

2           And at note nine on page 31 the *Slip* opinion says:

3        "Association is no less than individuals

4       have the right to shape their own messages."

5           So to argue that you have to carry a business card

6    that says "Core Group" on it and then you get First Amendment

7    protections, but if you don't carry that business card, you

8    lose your First Amendment protections if you are

9    corresponding with somebody about an associational -- a

10   political matter and the formulation of messages, I think is

11   not a proper reading of the opinion.

12          **THE COURT:**  Doesn't it prove too much?  Doesn't

13   that read footnote 12 out of the opinion?

14          **MR. PANUCCIO:**  Well, no.  I think it reads footnote

15   12 in light of what the Ninth Circuit was looking at.

16          **THE COURT:**  How do you understand the Ninth Circuit

17   to be ruling when it says:

18        "Our holding is, therefore, limited to

19        communications among the core group of

20        persons engaged in the formulation of

21        campaign strategy and messages.  We leave it

22        to the District Court to decide who is in the

23        core group, and then to say it certainly does

24        not apply to documents or messages conveyed

25        to electorate-at-large, discrete peer voters

1      or individuals to persuade, recruit or

2      motivate beyond the formulational strategy

3      and messages."

4          What is left of your discussion of the Ninth

5  Circuit's test if you -- there if we go along with your

6  version of what they meant?

7          **MR. PANUCCIO:**  Well, again, they say "our holding

8  is limited".  And their holding is limited to what was before

9  them, which are documents that were from this entity called

10  ProtectMarriage.com.

11          But now plaintiffs' counsel has got up and said --

12  and stood up here and said, well, that means if Gail Knight

13  has documents, those aren't privileged, but the -- I don't

14  think the opinion as a whole can be read to say --

15          **THE COURT:**  What if I add Gail Knight?  What if I

16  add the proponents?  Does that change your thoughts on this?

17  What if I say the core group is everything, everything

18  everyone said plus the two proponents, official proponents

19  who they say were not involved in the campaign strategy?

20          **MR. PANUCCIO:**  Well, I think for purposes of the

21  core -- I mean, that would go a certain way, but if the --

22          **THE COURT:**  So you think anybody can be in the core

23  group?

24          **MR. PANUCCIO:**  Well, I mean, not everybody can be

25  in the core group of ProtectMarriage.com, but certainly the

1  opinion is recognized.  At page 19 of the District Court's

2  opinion, it says:

3       "Under its interpretation associations

4       that support or oppose initiatives face the

5       risk that they will be compelled to disclose

6       their internal campaign communications in

7       civil discovery.  This risk applies not only

8       to the official proponents, but also to the

9       myriad social, economic, religious and

10      political organizations that publicly support

11      ballot measures."

12      Now, take someone like Dr. Tam, for instance.  He

13  wasn't a member of ProtectMarriage.com.  He wasn't in any

14  core group of ProtectMarriage.com, but he was a -- in the

15  core group of another myriad social political, economic,

16  religious organization.

17      So I don't think you need to register with the

18  State of California to be in support of Prop 8 to have --

19      **THE COURT:**  Why do you pick him?  They specifically

20  said his communication was not privileged.

21      **MR. PANUCCIO:**  They said that specific

22  communication.  I don't think they said any communication

23  Dr. Tam has in the world was not privileged.  That wasn't

24  before them.

25      **THE COURT:**  Okay.

1          MR. PANUCCIO:  I would also --

2          THE COURT:  Can I ask, are these -- one, six and

3    eight, are these document requests addressed to all of the

4    intervenor defendants, or are they addressed to a particular

5    intervenor defendant?

6          MR. PANUCCIO:  I believe they are -- I mean, I

7    think they say defendant-intervenors.

8          THE COURT:  You say they are for

9    ProtectMarriage.com, but they were actually at every point

10   addressed to all of the intervenor defendants.  And so that's

11   what the District Court was working with and that's what the

12   Circuit Court was working with, right?

13         MR. PANUCCIO:  Yes.

14         Your Honor, one more point about the Ninth Circuit

15   opinion that I think is important just for procedural

16   clarity.

17         I would like to point out the mandate has not

18   issued yet from the Ninth Circuit and until it does, I don't

19   believe that jurisdiction returns to this Court under *Greggs*

20   *versus Provident Consumer Discount Company*, which is at

21   459 U.S., pin cite 58, and, also, under Ninth Circuit case

22   entitled *Beardsley versus Brown,* which is 393 F.3d at pin

23   cite 901.  That is for purposes of if we are getting into

24   scope of privilege and so forth, I believe the mandate has to

25   issue before we can have a definitive ruling from the

1   District Court.

2          **THE COURT:**  You know, it's an odd thing with

3   discovery.  That applies to a discovery question in an

4   ongoing case?  We still have jurisdiction over the case.

5   Presumably their opinion supersedes their stay order.  We can

6   have discovery in the case.

7          Why do you think that we are not allowed to have a

8   discussion about privilege?

9          **MR. PANUCCIO:**  Well, for instance, the Ninth

10  Circuit already amended the opinion.  Imagine there had been

11  some kind of District Court ruling on the privilege in the

12  interim between, I believe, it was December 11th and

13  January 4th or 5th when the amended opinion came out.

14         The reason for this rule, this sort of firm

15  rule --

16         **THE COURT:**  You would like me to not rule on this

17  so you can try this case without having this decided?

18         **MR. PANUCCIO:**  Well, I just think --

19         **THE COURT:**  You don't want to be too transparent

20  about this.  I will tell you, I'm going to rule today.  If

21  you want to go to the Court of Appeals and say, Oh, he

22  shouldn't have done that and they'll stay it, it's fine.

23         I'm happy to entertain the substantive arguments,

24  but on discovery I think the Court has at least said what he

25  thinks the scope of the privilege is.  We have a trial coming

1  up.  As far as actual jurisdiction, if you are wrong, he'll

2  stay it.

3          MR. PANUCCIO:  Thank you, your Honor.

4          THE COURT:  Well, thank you.

5          Let me ask you another question, Mister -- Mr.

6  Panuccio.

7          MR. PANUCCIO:  Panuccio.

8          THE COURT:  Mr. Panuccio.  I don't see you all

9  nearly enough.

10          If I were to define a core group that included, for

11  example, the executive committee of ProtectMarriage.com,

12  that's a known group of individuals and everybody on both

13  sides knows so if I describe it that way, it's clear enough.

14  Is that okay?

15          MR. PANUCCIO:  What you mean by executive --

16          THE COURT:  Yes, yes.  Because I --

17          MR. PANUCCIO:  Yes.

18          THE COURT:  I know there are various sensitivities

19  here and I'm not sure which names are out and which names

20  aren't.  That's one of the reasons I'm going through this

21  exercise.

22          There is also -- let me get my notes -- the

23  campaign consultants.  And what I think is -- so you had --

24  and one was mentioned.  I guess it's the Schubert firm, is

25  that right?

1          **MR. PANUCCIO:**  Schubert Flint Public Affairs is

2    one.

3          **THE COURT:**  And, you know, I have access to sealed

4    materials that the plaintiffs do not.  So, for example, I

5    have heard the sealed submission in connection with the

6    in camera examination.

7          And are there other consultants that we can talk

8    about -- I mean, I think the point was made that the

9    consultants, qua consultants, their names are out, but I want

10   to come up with a list, other than Schubert Flint, who you

11   thought were the consultants that should be on the list of

12   campaign consultants that dealt with campaign strategy and

13   messaging strategy.

14         **MR. PANUCCIO:**  Your Honor, I have to admit that

15   standing here today on the fly would be a little difficult

16   for me to do that.  I think it would be something that I

17   would need to consult -- I'd need to consult with my clients

18   about to sort of come up with a list.

19         **THE COURT:**  Why don't you -- am I permitted to

20   identify the name of the person who filed -- there is a

21   declaration.

22         **MR. PANUCCIO:**  I'm not entirely certain --

23         **THE COURT:**  Here is what I'm going to do.  I'm

24   going to hand you -- you have got it?

25         **LAW CLERK:**  Yes.

1        THE COURT:  We are going to hand you a portion of

2    the filing that was submitted under seal.  You take a look at

3    that while I'm hearing from Mr. Boutrous, at least, and see

4    if we can come up with, from your perspective, beyond the

5    core group, if it's limited to the people -- I mean, who were

6    the campaign consultants, and there were a couple others you

7    might want to do.  Okay?

8        MR. PANUCCIO:  Okay.

9        THE COURT:  Thank you.

10       MR. BOUTROUS:  Yes, your Honor.  Thank you.

11       I wanted to clarify.  I think in terms of the

12   official proponents, I think the only official proponent who

13   could really be called part of the core group is Mr. Jansson.

14   The others really weren't looking at the privilege log.

15       And just looking at the record, the other official

16   proponents, even though they were proponents on the ballot

17   measure, does not appear they played a key role, or kind of a

18   role the Ninth Circuit contemplated.

19       Mr. Jansson was on the executive committee.  The

20   others were not.  So Dr. Tam, Ms. Knight, Senator

21   Hollingsworth and Mr. Gutierrez, I think, would not qualify

22   under the test, but Mr. Jansson would.

23       THE COURT:  Well, one of my thoughts is to not get

24   too far into that on the following theory; that you need to

25   get discovery to try the case and that at some point there --

1    the extra that you might get from not making a finding that

2    they didn't have a sufficiently large role in formulating a

3    strategy, even though their official proponents might not

4    warrant that intrusion.  I would like to set a standard

5    that's really clear and really easy to deal with and, also,

6    it's fairly broad actually so that it's -- so that one

7    looking at it, you can say, well, that gives credence to what

8    the proponents might say, the people most involved in the

9    campaign.  That's the thinking, at least, on doing that.

10            MR. BOUTROUS:  I think, in our view, it would be --

11   it should be this narrower group, but if I'm understanding

12   what you are saying, that would mean, though, that

13   communications, the fact that someone was deemed in a control

14   group, that doesn't mean that their communications to people,

15   voters, and the people outside that group are privileged

16   under the Ninth Circuit's order.

17            So we would urge the narrower view because one of

18   the things we have seen, as we saw today, everybody is part

19   of a core group of something.  So the proponents keep

20   expanding the core group so that we're all, apparently, part

21   of the core group, and that's what I'm worried about if we

22   broaden it.

23            And on the privilege log, for example, these are

24   not documents that would fall in this category.  These were

25   the documents that were -- they claimed were part of the

1  internal communication.

2          But they had one, for example, from Dr. Tam to

3  Does 1 through 82, and then they claimed that was part of the

4  internal private deliberations privilege.

5          So I just would urge a definition that's narrow

6  enough so it doesn't sweep too broadly.  And I think the

7  executive committee and the consultants would be the best way

8  and I appreciate the Court considering that.

9          **THE COURT:**  My thought would be to come up with

10  specific names.  I don't know how many names there are,

11  whether it's one or fifty, but to come up with specific names

12  so that we are not back here again arguing what I meant.  You

13  can argue with someone else about whether I was right, but

14  not to argue about what I meant.

15          **MR. BOUTROUS:**  Thank you, your Honor.

16          **THE COURT:**  So, yes.

17          **MR. PANUCCIO:**  Thank you, your Honor.  A few points

18  I would like to make in response to both your Honor's

19  question and Mr. Boutrous' representations.

20          **THE COURT:**  Sure.

21          **MR. PANUCCIO:**  First, with respect to what you have

22  handed me, which was an under seal declaration, the name of

23  the person who authored the declaration, submitted the

24  declaration, is certainly publicly known.

25          **THE COURT:**  Okay.  So then maybe you can refer to

1   it by name.

2         **MR. PANUCCIO:**  Mr. Prentice.

3         Now, this declaration, however, was submitted not

4   with the -- as your Honor knows, it was submitted with that

5   group of 60 documents.  And so I believe the representations

6   made in it were to illuminate who some of the people were in

7   those documents, but, certainly, those documents aren't

8   reflective of the whole world of every consultant or person

9   who was involved.

10        **THE COURT:**  Well, I mean, that doesn't answer the

11   question.  The judge asked you to put in information so that

12   he could identify the structure of the decision making of the

13   campaign, and that's what that declaration is supposed to do,

14   right?

15        I don't think you are going to be able to walk away

16   from his description of -- you may say there are other groups

17   that you consider, you should consider, Judge, but you can't

18   walk away from this being the decision making -- people

19   involved in the decision making --

20        **MR. PANUCCIO:**  I'm not saying -- these people are

21   included.  I also think, however --

22        **THE COURT:**  When you say "these people."  I think

23   actually all of the names are public, but let's go through

24   them.

25        So you have got the executive committee.  You have

1   got the official proponents potentially.  Maybe not all of

2   them.  You have campaign consultants, the Schubert Flint

3   Public Affairs firm.

4           Who else?  What other campaign consultants should

5   we be discussing?

6           MR. PANUCCIO:  Well, at the very least, your Honor,

7   there was the entire list -- well, first of all, I would -- I

8   would ask, your Honor, I think it would help enormously if at

9   the end of this we could have 24 hours to sort of submit a

10  paper on this, rather than have me do it on the fly.  I can't

11  tell you in my head I have all of the knowledge --

12          THE COURT:  We are going to do it right now, I'm

13  afraid.  We are going to have to do it now.  You have had

14  plenty of time to consider these issues.  You have had since

15  the Circuit made its ruling to consider the implications of

16  that.  You have -- you have filed things with the Court.

17          They talked to you again on Monday.  The Court, the

18  Ninth Circuit issued an opinion that said you have to focus

19  on the core group and here's how to define that.

20          I would expect you to come today prepared to do it,

21  because we have got a trial on Monday.  I don't have time to

22  wait 24 hours before things --

23          MR. PANUCCIO:  Or even less, your Honor.  Even by

24  the end of the day today.  It's just that, certainly, there

25  are a lot of groups named in the revised request number

1   eight.  That would be a start.

2           There are -- some of the folks -- some of the

3   people who would be identified are Doe'd out in the privilege

4   log and I -- standing here, I can't just look and say who

5   that Doe is.  I would actually have to go back and look.

6           Any amount of time to be able to do that, I just

7   don't have that knowledge in my head.  Some of them are Does,

8   so I couldn't announce them right now if I had them.

9           **THE COURT:**  You wouldn't announce them.  I mean,

10  you Doe'd them out.

11          **MR. PANUCCIO:**  Right.  I'm sorry.  Maybe I'm

12  misunderstanding.  I thought you were asking me to identify

13  specific people for the Court.

14          **THE COURT:**  I don't know whether I'm going to give

15  you that opportunity.  I think you have had plenty of time to

16  come to identify exactly what the Court -- the Ninth Circuit

17  told you on Monday it had to do to identify a core group.

18  You should be doing it now because today is Wednesday.

19          I'm going to have to set a schedule for production

20  of documents, and that schedule of production of documents

21  has to anticipate that we have got a trial coming up.  And so

22  I don't know -- you know, you want to come back here in an

23  hour and tell me whatever additional information, maybe we

24  can do something like that.  But I need to get this -- I want

25  to make a ruling on the record here -- I don't think it's

1   necessary to have a full-blown written order -- that will

2   describe for you what to do and when to do it.   Otherwise --

3   otherwise, it would be a big mess and you will be handicapped

4   in doing it.

5          So you might persuade me to -- I can't see the

6   clock, but it's now 2:30 or approaching 2:30.   We will work

7   on this for a little while longer.   I will give you a

8   tentative rule or ruling subject to coming back here in an

9   hour telling me why I shouldn't add to the list.   That's

10  fine.   But the conceptual idea about who, if anybody, could

11  be added to the list are to be decided now.

12         **MR. PANUCCIO:**   If I may, your Honor, on the

13  conceptual idea as to what plaintiffs had previously said

14  they would view this group as, although they are trying for a

15  smaller group today, they said anybody who was implicated by

16  our revised request number eight.   And that request said,

17  quote:

18         "Anyone who had a role in managing or

19      directing or provided advice, counseling,

20      information or services."

21         Now, it seems like they are trying to shrink that

22  group to a much smaller group, essentially to the executive

23  committee and the proponents.

24         **THE COURT:**   They are, because the Ninth Circuit

25  said this is the definition, not what they set down in their

1   rulings.  They weren't responding to the Ninth Circuit's

2   ruling at the time.  I don't think that has anything to do

3   with the definition.  It's relevant for the privilege.

4         But let's -- continue with me on the -- for the

5   moment on my exercise in going through the declarations we

6   have.

7         And so the campaign consultants will be the

8   Schubert Flint firm.

9         What other campaign consultants -- and they are in

10  there, I think -- are involved in the management decisions?

11         MR. PANUCCIO:  Sorry, your Honor.  I'm just

12  looking -- is there a specific paragraph you are pointing to?

13         THE COURT:  Sure.  We have Mr. Pugno, who was

14  counsel, right?

15         MR. PANUCCIO:  Yes.

16         THE COURT:  So Mr. Andrew Pugno.

17         MR. PANUCCIO:  And a lot of these people identified

18  also have assistants who would, you know, help them prepare

19  documents and so forth and transmit emails.  Certainly, those

20  assistants, I would think, by the nature of their job, who

21  would be included.

22         Again, there is a more fulsome list, I believe, of

23  consultants in our revised request number eight itself.  I

24  have the record in front of me.

25         THE COURT:  Look at paragraphs 11 and 12.

```
 1              MR. PANUCCIO:  All of those would be included, your

 2   Honor --

 3              THE COURT:  So everyone will know what we are

 4   talking about, I would propose to speak those names out loud.

 5   I don't think that any of these names are secret, are they?

 6   Certainly, not the campaign consultants.

 7              MR. PANUCCIO:  I believe that paragraph 12 says

 8   that the three that were listed, sort of the one, two, three.

 9              THE COURT:  It's publicly known, yes.

10              So Schubert Flint.  There's the Lawrence Research

11   firm.  And there is the Sterling Corporation.  Okay.  So

12   those are the -- those would be the campaign consultants.

13              It doesn't really say -- the involvement of

14   paragraph -- persons in Paragraph 11, but I don't know how

15   controversial that is.

16              Do you have any information you can provide to me

17   about that?

18              MR. PANUCCIO:  I'm not sure to the extent the

19   involvement of these two individuals in their individual

20   capacity is publicly known.

21              THE COURT:  Are these names -- well, their

22   involvement in the campaign at all is publicly known?

23              MR. PANUCCIO:  Not in -- well --

24              THE COURT:  I'm sorry to be having this sort of odd

25   conversation.
```

1          **MR. PANUCCIO:**  I'm sorry, your Honor, that I just

2    don't --

3          **THE COURT:**  No, no.  But the question is whether or

4    not those two individuals are names that have come up before.

5          **MR. PANUCCIO:**  One proposal, your Honor, that might

6    help this, if your Honor would indulge us with a little

7    additional time, Mr. Pugno is the person with the most

8    information about this.  We might be able to patch him in by

9    phone, with some ability.  I just don't have the sort of

10   working knowledge of the campaign from day-to-day --

11         **THE COURT:**  What we will do is get to the end.  I

12   will give you a list of who I think I want to put on the core

13   group and I will give you a half hour.  Call whoever you

14   want.  Get whatever information you want.  And we will come

15   back and talk about it.

16         **MR. KIRK:**  Your Honor, if I could interrupt.  If

17   you could excuse me.  With all respect, a half an hour is --

18         **THE COURT:**  Okay, an hour.

19         **MR. KIRK:**  Your Honor, with respect, that's not

20   reasonable either, and let me try to articulate why.

21         As you point out, the Ninth Circuit issued a

22   revised opinion on Monday, two days ago.  That revised

23   opinion changed a bunch of things.  Changed some stuff about

24   jurisdiction.  It changed some stuff about mandamus.  And the

25   plaintiffs have focused on some changes the Court made to

1   footnote 12, which talked about the scope of the privilege

2   and scope of the core group.

3           No one told us that we had to come here with a list

4   of who we thought would be in the core group.  Had we been

5   given notice of that, I can assure the Court we would have

6   done our darnedest to get that list prepared.

7           I don't know that in a half an hour or an hour we

8   would be able to get somebody on the phone and get a complete

9   list of who, reasonably speaking, fits within the concept, as

10  the Court defines it, as somebody who is within the core

11  group.

12          If I could respectfully suggest, it seems to me it

13  would be much more reasonable to lay out the Court's ruling

14  conceptually --

15          **THE COURT:**  I won't do that.  I simply won't do

16  that because if I do that, there will be fights about that.

17  So I won't do that.

18          **MR. KIRK:**  Could I finish the proposal, your Honor?

19          **THE COURT:**  Sure.

20          **MR. KIRK:**  And give us 24 hours.  Yes, a trial

21  starts Monday, but it's not our fault.

22          **THE COURT:**  I'm not putting any blame on you or

23  anyone else.  We have the schedule that we have.

24          **MR. KIRK:**  Yes, we do.

25          **THE COURT:**  And this was teed up a couple weeks

1  ago, and after the first Ninth Circuit opinion came out.

2          MR. KIRK:  That's true.

3          THE COURT:  And everybody filed issues, their

4  pleadings.  You filed your pleadings about what you thought

5  the scope of the privilege was and filed your privilege log.

6  And then they filed something saying, no, your scope of the

7  privilege is wrong.

8          Well, you knew you were going to come here and

9  discuss the scope of the privilege.  Now you want to -- and

10 if I say to you today, for example, which is very possible,

11 "I want you to produce X scope of documents," you are going

12 to say to me, "We need time to do that."

13         MR. KIRK:  I will say that.  Yes, I will.

14         THE COURT:  If you say it to me tomorrow, that's

15 one less day that you have to work on it.

16         MR. KIRK:  I understand that, your Honor.  But at

17 the same time, as we stand here today, neither me nor Mr.

18 Panuccio know who is in the core group --

19         THE COURT:  I'm sorry.  You filed a pleading.  It

20 may not have been you.  It may have been your partner or

21 other counsel.  You filed a pleading which describes in great

22 detail who they think are the management people involved in

23 this campaign.  Why can't I just rely on that?

24         MR. KIRK:  Your Honor, my understanding of that

25 declaration -- and I could be wrong.

1          THE COURT:  Well, read it.  Have you read it?

2          MR. KIRK:  No, your Honor.

3          THE COURT:  You have to read it before you argue

4    about it, because I don't want you to say something --

5          MR. KIRK:  I'm not going to say what's in it, but

6    I'm going to say what I understood the purpose of it was.  It

7    was to describe the people that were implicated in the 60

8    documents that were given to Judge Walker.

9          THE COURT:  That's not correct.

10         MR. KIRK:  Well, again, I could be wrong.

11         THE COURT:  It's got a much broader purpose than

12   that and you need to read it to understand where I'm coming

13   from in discussing it, because I think that the Court in the

14   transcript of November 2nd instructed you to disclose during

15   an in camera review the identity of all those persons who

16   were in a position of management responsibility for the

17   campaign for Prop 8.  That's the purpose of this declaration.

18         So you can see why, you know, one would think

19   coming in that, number one, you would have already known that

20   you had to discuss the scope of the privilege.

21         Number two, that you would already have discussed

22   who was in the core group.

23         And, number three, that you would have already gone

24   on record in deciding who was in the core group.

25         Now, you may want to argue -- you may want to argue

1  that, no, Judge, you should consider these other kinds of

2  groups outside of it, and I'm willing to entertain that

3  argument.  But if I reject that argument, conceptually I

4  think I'm left with this.

5        **MR. KIRK:**  If I understood what you just said, your

6  Honor, that strikes me as fair.  And I'm not standing here

7  trying to walk away from something I haven't even read.

8        And as I read the first paragraphs, it does appear

9  to be describing the management structure of the campaign,

10 and we are certainly not going to disavow what's in that.

11       That being said, I don't know that this is the

12 known universe.  To the extent that what was being addressed

13 here in any way differs from the concept articulated in

14 footnote 12 or that your Honor might articulate in issuing an

15 order.  And all I'm asking for is 24 hours to supplement the

16 list.

17       **THE COURT:**  Maybe -- it depends what the concept

18 ends up being.  If the concept ends up being that it extends

19 beyond the people who were involved in the campaign strategy

20 for on ProtectMarriage.com and its official campaign

21 consultants and proponents, if it gets beyond that, I don't

22 have any list in front of me and we would need more

23 information.

24       If it's narrowed to that, then maybe I have the

25 list in front of me.  That's all I'm saying.

```
 1          If I don't have enough information to decide who

 2   was in -- within the category of people that I include are

 3   within the core group, then I don't have information.  Then,

 4   of course, you need more time to do it, but it depends on the

 5   scope.

 6          And where we stopped is we were talking about -- my

 7   guess is everybody in the room except me knows about the

 8   people contained in paragraph 11, and I just wanted to talk

 9   about them.  I didn't want to say it out loud in case I'm

10   wrong.

11          MR. KIRK:  If I could have 30 seconds, your Honor.

12          THE COURT:  Yes.

13          (Discussion held off the record amongst

14           defense counsel.)

15          MR. KIRK:  It appears, your Honor, we know that

16   Mr. Lawrence is known.  We don't know the answer with respect

17   to --

18          THE COURT:  Gary Lawrence?

19          MR. KIRK:  Yes, sir.

20          THE COURT:  Does anyone in the room know what his

21   role was?

22          MR. PANUCCIO:  I believe it's in the next

23   paragraph.  It says -- there is a company.

24          THE COURT:  Oh, he is one of the Lawrence Research.

25   I see.  I see.
```

1          **MR. KIRK:**  Okay.

2          **THE COURT:**  Well, then, you have to define the

3   other individuals.  Okay.  All right.

4          Well, so I was about to take argument from -- who

5   was I about to take argument from -- from Mr. Panuccio about

6   concept.

7          Conceptually, if we wanted to identify the core

8   group -- and assuming that we have identified the core group,

9   if we are talking about the management of a campaign -- why

10   should it go beyond the management of the campaign?  And if

11   it does go beyond the corporate, goes beyond the management

12   of the campaign, to whom does it go?  To what -- conceptually

13   to what people or entities?

14          **MR. PANUCCIO:**  Conceptually I would say that the

15   best place to look is the October 1st and November 11th

16   orders to the extent they said, Revise -- to the extent they

17   said, Please revise the request this way.

18          **THE COURT:**  I'm talking about a privilege.  I want

19   to know -- and the judge didn't have before him the Ninth

20   Circuit's ruling.

21          Under the Ninth Circuit's ruling how broad does the

22   core group go?  That's the question.

23          **MR. PANUCCIO:**  I don't believe that this footnote

24   say's who the core group would be.  I think it leaves it to

25   the District Court.

1    And why I'm referencing your earlier orders is

2 because I think that they already had this in mind when they

3 went from any third party to this -- to a definition of who

4 would be most relevant.  That's what those orders had in

5 mind, which was trying to get to this kind of --

6    **THE COURT:**  That wasn't they.  That wasn't the

7 judge.  That was them formulating a document request.

8    I don't care what the document requests are.  I

9 want to figure out, for the purposes of the privilege, how

10 far out you think constitutionally the core group goes.

11    The argument from the other side is, it's the

12 campaign core group.  It is the people involved, persons

13 involved in the formulation of campaign strategy and messages

14 and not communications to other individuals or groups.

15    And so I want to know how far you think it goes and

16 conceptually how you describe the institutions or individuals

17 outside of the individuals who are actually involved in the

18 management of the campaign set forth in Mr. Prentice's

19 declaration.

20    **MR. PANUCCIO:**  Conceptually, I believe, if you are

21 talking about a core group, first of all, I think certainly

22 leaders of the campaign, managers of the campaign, the

23 consultants they engage, those who provide them advice about

24 formulation of message --

25    **THE COURT:**  That's the Prentice declaration, right?

```
 1   That's the Prentice declaration.  He's saying, these are the
 2   people who are involved in the formulation of messaging
 3   strategy and gives us advice on messaging strategy and
 4   campaign strategy.  The people involved in the decision
 5   making for the campaign.
 6           MR. PANUCCIO:  Yes, although I believe that this
 7   declaration also may talk about groups without identifying
 8   every individual within a group.  In other words, if --
 9           THE COURT:  I don't think so.  I mean --
10           MR. PANUCCIO:  So, for instance --
11           THE COURT:  It says we have lots of vendors, but
12   the vendors involved in the management and formulation of the
13   strategy are.  It's not --
14           MR. PANUCCIO:  Well, your Honor --
15           THE COURT:  It says whatever it says, but whatever
16   is in there, that's the narrow version of core group.
17           MR. PANUCCIO:  I would also say, your Honor, that
18   to conceptually illuminate the concept in footnote 12, look
19   elsewhere in the Ninth Circuit's opinion.
20               For instance, when they say:
21               "The freedom of members of a political
22          association to deliberate internally over
23          strategy and messaging is an incident of
24          associational autonomy."
25               So if two members of an association themselves
```

1  talked about a message, it would be hard to say they have no

2  privilege.

3         **THE COURT:**  Well, but it -- they -- they were

4  balancing a number of things in the opinion, right, in

5  deciding the scope of the privilege.  It wasn't everything

6  that has anything to do with the exercise of First Amendment

7  freedoms is protected by the privilege, right?

8         So that's why they came down with its only got to

9  be core group formulation of strategy.  How can you have a

10  core group if any person who is a member of any of these --

11  of any groups that are involved in this talk to another

12  person about messaging, that they are automatically part of a

13  core group?

14        **MR. PANUCCIO:**  I don't know that the Ninth Circuit

15  was only talking about identities and then not also subject

16  matter.

17        So imagine if you have a -- any kind of political

18  or social religious organization where you have a leadership,

19  but a good idea springs up from the mind of one of the rank

20  and file members.  I don't think that that idea has no

21  associational First Amendment rights simply because it came

22  from the brain of someone without the right --

23        **THE COURT:**  So that means any communication about

24  messaging with anyone in any of the many groups that may

25  loosely be organized to work on this campaign, volunteer or

1  otherwise, any communication about messaging is covered by

2  the privilege.  Is that your --

3        MR. PANUCCIO:  I think internal communications

4  about messaging are covered by the privilege --

5        THE COURT:  By "internal" you mean anybody within

6  any group, communications about messaging?

7        MR. PANUCCIO:  Well, when you say within any group

8  or by any group.  I mean, yes, the people who were in

9  ProtectMarriage.com, whether they were volunteers of the

10 leaders or the vendors that they hired and said, Help us form

11 the art signs and so forth.  That is how they form that

12 messaging strategy.  That would include people --

13       THE COURT:  So take the example of Mr. Tam, that is

14 on the privilege log, not this one.  It goes to ADP.  All 80

15 of those people are in the core group, you are saying?

16       MR. PANUCCIO:  Well, I believe with Dr. Tam, I

17 think again I would just like to stress there is a difference

18 between Dr. Tam and other associations or organizations he

19 was a member of, where he may have discussed Proposition 8 in

20 any internal communication in that organization versus

21 ProtectMarriage.com.

22       So within his other organizations or his other

23 associations, there may well be core groups within that.  So

24 that would be a very different definition than

25 ProtectMarriage.com's core group.

1           **THE COURT:**  "Core group responsible for formulating

2    campaign strategy and messaging."  Tell me what those core

3    groups --

4           **MR. PANUCCIO:**  I guess what is meant by "campaign."

5    "Campaign" is meant ProtectMarriage.com.  Dr. Tam had other

6    organizations that could be said to be part of a campaign,

7    that campaign for ProtectMarriage.com.  So they would have

8    their own core group.

9           Take Ron Prentice, the chairman of

10   ProtectMarriage.com.  He had nothing to do with any of

11   Dr. Tam's side organizations.  He wouldn't have been involved

12   in their formation or strategy or messaging, but there may

13   well be that -- they were a myriad social group that was

14   involved with strategy and messaging, just like the ACLU had

15   their strategy and messaging for this campaign.

16          And so these requests, because they go to all

17   defendant-intervenors, don't implicate only

18   ProtectMarriage.com.  Maybe that's where there is some

19   disconnect here, and I apologize for that.  There has always

20   been this sort of notion that there are other groups out

21   there.  There were a lot of voices in this campaign and a lot

22   of organizations.

23          So, you know, it would seem that a focus on

24   ProtectMarriage.com would make a lot of sense.  It's not the

25   official major campaign.  We can talk more informed about who

1   makes up that organization, as opposed to any other group

2   that somebody may have been a member of.  That requires a lot

3   more elucidation.

4        **THE COURT:**  Which you are not in a position to do

5   right now.  There is nothing in the record before this Court

6   about what those other groups might be, or who they are, or

7   what their structure is, or anything about that, right?

8        **MR. PANUCCIO:**  I believe there is nothing in the

9   record, your Honor.  There may be from -- well, from the

10  depositions that are in the record, and I'm not sure to what

11  extent they are in those.

12       Just as, your Honor, I would note that one of the

13  things that's now implicated here is the reciprocal

14  discovery.  We issued many subpoenas to "No On 8" groups to

15  the extent that we would be -- to the extent that this kind

16  of information comes before the Court, the information on the

17  other side is going to be relevant.  And those groups will

18  have to define a core group versus a non-core group.

19       The ACLU is going to have to define its core group

20  and give over any documents outside of the core group.

21       **THE COURT:**  All I'm saying is you never bothered to

22  define a core group.  You have nothing before this Court that

23  supports in the slightest any core group, other than the

24  Prentice declaration.  There is nothing before the Court.

25       So you come before the Court and say, Don't give

1   them anything until we define a core group.

2            MR. PANUCCIO:  Your Honor, I would submit that our

3   privilege log -- actually, the names identified in the

4   privilege log for the ProtectMarriage.com documents goes very

5   far --

6            THE COURT:  No, it doesn't.  You have 80 Does on

7   one of those things.

8            MR. PANUCCIO:  I'm sorry.  That's with respect to

9   Dr. Tam.

10           THE COURT:  Well, ProtectMarriage.com is not at

11  issue.  That's the Prentice declaration.  I mean, or some

12  version close to that.  That's not what we are talking about.

13           I bet if we were just talking about

14  ProtectMarriage.com, we might come to some conclusion, and

15  maybe we are.  I don't know.  When we get to them, we will

16  see if they take you up on your suggestion.

17           But if we are talking beyond, to the other

18  individuals who I would consider part of the core group of

19  ProtectMarriage.com but have other interests, like the

20  official proponents have other interests and other members of

21  other groups, there is nothing in front of the Court to

22  suggest that any of the people that they suggest are part of

23  their core groups actually are part of a core group, right?

24  There is nothing in front of the Court on that.

25           MR. PANUCCIO:  I'm --

1          **THE COURT:**  There is no supporting evidence to

2     validate the privilege as to -- you have got this long

3     privilege log with -- on -- is it Dr. Tam?  Dr. Tam's -- I'm

4     sorry.  I'm just reading from the Circuit.

5          Dr. Tam lists a document sent to 80 people with no

6     evidence whatsoever that they are within the core group.  I

7     don't know how I can sustain a privilege on that basis.

8          **MR. PANUCCIO:**  Well, your Honor, the Ninth Circuit

9     opinion says some form of a privilege log is required.

10          We submitted a privilege log with the 60 documents

11     that the Court did not say was inadequate.  The Court

12     generated an order based on that log.  And so we produced our

13     second log similar to the first, which was adequate for the

14     Court --

15          **THE COURT:**  It wasn't adequate for the Court

16     because the Court had the actual documents.  You're still --

17     you still have the burden of proof on privilege issues.  It's

18     your burden to sustain that these are privileged documents.

19          I'm just wondering how I deal with this when I

20     don't have anything, any evidence before the Court.  I don't

21     even have any description of what we are talking about, who

22     these organizations might be, who are the core groups of

23     these organizations that might be implicated by these

24     documents requests.

25          **MR. PANUCCIO:**  Well, your Honor, to the extent that

1  we needed to define a core group, and the reliance is on

2  footnote 12, of course, the privilege log was submitted

3  before -- before the amended footnote 12 came out.

4         If further evidence is needed to sort of figure out

5  what now fits within footnote 12, we could provide that, your

6  Honor; but before having footnote 12, we wouldn't have been

7  in a position to set out the metes and bounds of something

8  that didn't exist yet.

9         **THE COURT:**  I'm not entirely sure that's right.

10 Let me hear from the other side about it a little bit.  Here

11 is the, if I could use the word, core of my argument.

12        As respects what you have all understood to be the

13 campaign, ProtectMarriage.com, I'm beginning to develop a

14 sense of what the Court rule might be under the Circuit.

15        It's not lost on me that there might be other

16 groups who are campaigning in the sense that they are

17 figuring out messaging.  They are talking to each other about

18 messaging, and maybe even putting out messages that aren't

19 run through ProtectMarriage.com.  So that some of the

20 official firms, Dr. Tam might be one of them, at least the

21 argument goes, are involved in other groups doing other

22 things.  That's the way the argument goes.  And those groups

23 have their on own associational rights and their own core

24 groups.  And Dr. Tam is one of them, and so are others.

25        And so you can't, even if you could define a core

1  group for ProtectMarriage.com, that's fine.  Their

2  communications are one thing.

3          But before the individuals are identified, the

4  official proponents, those people have their own other

5  organizations who have their own associational rights.

6          Is there a simple way through that?

7          **MR. BOUTROUS:**  I think there is, your Honor, and

8  you alluded to the fact that the burden is on the proponents,

9  all the proponents and the defendant-intervenors to justify

10  their privilege claims.

11          This has gone on for months and months.  They have

12  been on notice.  We suggested this core group idea before the

13  pretrial conference.  They have been on notice, all of them.

14  Dr. Tam certainly has.  We deposed him on this.  The Ninth

15  Circuit -- we brought it to the Ninth Circuit's attention.

16          If they had a claim of this nature, that there was

17  some core group of some other organization, that they should

18  have filed things months and months ago raising that kind of

19  privilege claim.

20          And what I -- what we are hearing is and it's

21  just -- we must -- I fully support the Court's suggestion

22  that we need to define the core group now, get the list

23  today.  Because what we have been hearing is basically double

24  lock.  It's either -- everybody is part of some core group,

25  so no documents need to be discovered.  We need more time.

1   The Court has before it -- apparently, we haven't seen any of

2   this, as the Court knows -- this Prentice declaration, which

3   they claim that was the management structure.  It sounds like

4   it's broader than the core group definition in the Ninth

5   Circuit's opinions, which is the core group of persons

6   engaged in the formulation of campaign strategy and messages,

7   but nonetheless they put down on paper this group.

8           So, and it sounds like it's broader because if --

9   counsel suggested that their privilege log might be some clue

10  to this core group.  Well, they have Dr. Tam on there.  He

11  had nothing to do, according to them, with the formulation of

12  the campaign strategy.

13          They have Mr. Criswell on there.  Mr. Criswell's

14  declaration, signed under penalty of perjury and filed

15  yesterday, he declares:

16          "At no time did I develop or assist in

17      the development of the messages or themes

18      conveyed by the campaign to the voting

19      populace."

20          And he's on the privilege log.  I don't know if he

21  is in the Prentice declaration, but he certainly isn't part

22  of the core group.

23          And so what I'm concerned about is if we don't --

24  it's too late for other core organizations.  We did subpoena

25  other groups, who have been withholding documents.  And so

1  theoretically they could make their own -- we need to know

2  their core groups, but they are not before the Court today.

3  They have been waiting.  They haven't produced any documents.

4  They have been waiting to see what happened here.

5      I think with respect to Dr. Tam and proponents, the

6  intervenors here who we have served this discovery on, it's

7  the core group of ProtectMarriage.com and it's -- and it

8  should be the narrow group that was the core group that

9  formulated strategy and messaging.

10      And I think we need certainty.  We have a trial

11  coming up.  They could get Mr. Pugno on the phone right now

12  and we could resolve this.  And the notion that somehow we

13  are burdening them, it's really -- it's outrageous.  We have

14  been trying to get this information, and we have the trial.

15      And so we would ask the Court to draw a clear line,

16  order production of documents as soon as possible.

17      And with respect to the other potential groups, no

18  one has filed a motion or ever made that argument and they

19  should have done it a long time ago if they were going to do

20  it.

21          **MR. KIRK:**  May I respond?

22          **THE COURT:**  Just one small point before you do and

23  then you can.

24          **MR. KIRK:**  Yes, your Honor.  Thank you.

25          **THE COURT:**  Who are their assistants on their

```
 1   behalf, core group members or their assistants on their

 2   behalf?

 3          MR. BOUTROUS:  I think if -- the way I would look

 4   at it would be in a situation where you have someone who was

 5   assisting that person in their job.  So if -- if my

 6   assistant, as I was participating as a core group member

 7   formulating a message and I handed a document to that

 8   assistant and that assistant then worked on it, I think that

 9   would fall within it.  So I think that would sort of be

10   acting as an agent in that narrow sense.

11          And, again, I think beyond that if we are talking

12   about someone who is not participating in the formulation of

13   messages, but instead who was out sending out documents and

14   making communications --

15          THE COURT:  Well, it's got to be -- the

16   communication still has to be --

17          MR. BOUTROUS:  Still needs to be internal, you are

18   right.  Yes, you're right, your Honor.

19          THE COURT:  Thank you very much.  That takes care

20   of that issue.

21          MR. BOUTROUS:  You are right, your Honor.

22          THE COURT:  Okay.

23          MR. BOUTROUS:  Thank you, your Honor.

24          THE COURT:  Mr. Kirk?

25          MR. KIRK:  Your Honor, I don't think Mr. Boutrous
```

1  answered your question, and I want to take a crack at

2  answering your question.

3          Your question, as I understood it, went to, okay,

4  if I take this Prentice declaration and that defines the

5  metes and bounds of the Protect Marriage core group, what do

6  I do about people who belong to One and One Association?  And

7  the example you gave, your Honor, was Dr. Tam.  He belongs to

8  other groups with whom he communicates and with whom he

9  separately has an associational privilege.

10         Just because the communication is not with the --

11 it's the same as I belong to the Independent Party of

12 Arlington County and I belong to the Virginia State

13 Independent Party.  That's two different core groups that you

14 have to deal with.

15         Now, Mr. Boutrous says, well, wait a minute.  Why

16 didn't they come forward with all this stuff about the core

17 groups before now?  It's outrageous, he says.

18         The answer is simple, your Honor.  Footnote 12, in

19 footnote 12 is the first time core group entered into the

20 equation here.  And unfortunately, your Honor, that leaves us

21 with a hard practical problem.

22         If this case was going to trial in July, the

23 obvious solution would be to go back and redo the privilege

24 log and identify, this communication is a communication among

25 this association.  This communication is a communication

1  among that association, and so forth.  And that would be a

2  reasonable solution.

3        There is no practical way to do that before Monday

4  and, you know, when we get to the problems we face in terms

5  of burden, there is no practical way to do that beyond that.

6        And the solution I would like to something to your

7  Honor is this, and I think this is quoted in our papers.

8  During the pretrial conference when this discussion came up

9  in a colloquy between Chief Judge Walker and Mr. Boutrous, in

10 response to a question from Mr. Judge Walker as to, Aren't

11 you worried that you are going to all this trouble, trying to

12 get all these documents and you end up winning the case and

13 you are going to get reversed on appeal?  Obviously, I'm

14 paraphrasing based on that.  And Mr. Boutrous' response was

15 quite telling.  Don't worry about it, your Honor.  You can

16 write the judgment in our favor in a way that doesn't even

17 look at these documents.

18        The bottom line is in the greater scheme of things,

19 these documents aren't that important to them.

20        THE COURT:  Well, but I can't -- you know, I can't

21 say that.

22        MR. KIRK:  He says it.  I'm not asking you to say

23 it.  I'm asking you to credit it from him.

24        THE COURT:  I understand that, but that's not my

25 job.  My job is to figure out what is reasonably relevant to

1    the case, and it seems to me that documents about arguments

2    for and against Proposition 8 and messaging for and against

3    Proposition 8 which went to others are things that the

4    Circuit has already said may be relevant to the case.

5             Now, it may be in the end that some judge will

6    decide, no, they are not really relevant to the case.  That's

7    fine.  But for my purposes, I think that's settled law for

8    the discovery.  And all I have to do -- I mean, I -- I

9    understand that it's a complex question, but I don't think

10   that it's my position to second guess at this point.

11            **MR. KIRK:**  I'm certainly not asking you to second

12   guess the Ninth Circuit or Chief Judge Walker, but in making

13   a practical ruling to deal with a practical problem in a very

14   short time frame, I don't think it's unreasonable to take

15   plaintiffs at their word.

16            **THE COURT:**  Take plaintiffs at their word?  What do

17   you mean?  Take them at their word and say, Oh, the judge can

18   write it some other way.  But the judge may not want to write

19   it that way.  He may want to write it differently.  So it

20   doesn't matter what the plaintiffs say.

21            **MR. KIRK:**  They get to decide what matters to them.

22            **THE COURT:**  They get to decide what evidence they

23   are going to put on.  The judge will decide what is

24   important.

25            And the judge has already decided, several times,

1 | and the circuit agreed that this type of information that I
2 | have described outside of some privilege is important.
3 |         So I don't -- I'm not prepared -- I mean, there are
4 | many cabins to this information and we are going to talk
5 | about that next, but it seems to me that I don't cabin it
6 | beyond that.  The messages that went out and arguments that
7 | went out about this proposition are discoverable.
8 |         **MR. KIRK:**  Then I return to the point that you
9 | can't limit the privilege ruling to just one association.
10 | The one association -- the Protect Marriage campaign is one
11 | association, but to the extent that communications within
12 | other associations, those -- the law recognizes that First
13 | Amendment right, too.  You don't get to -- there is no limit
14 | that you only get to belong to one association.
15 |         **THE COURT:**  Why isn't that a burden issue?  I mean,
16 | they challenge your privilege log and you don't identify the
17 | particular associations involved in the privilege log -- you
18 | don't identify at all.  Why can't I just say, Well, you
19 | didn't sustain your burden?
20 |         **MR. KIRK:**  I would respectfully submit, your Honor,
21 | that the Court would need to give me a reasonable chance to
22 | meet that burden.  And I would respectfully submit that the
23 | introduction of the concept of the core group limit on the
24 | privilege on Monday is not enough reasonable opportunity for
25 | me to meet that burden.

1          So I don't think that's a reasonable basis to

2   decide against it.

3          **THE COURT:**  Well, you know, they filed their -- I

4   suppose what amounts to the motion to compel, the response to

5   the privilege log on the 28th.  It's a week later, about a

6   week later, something like that.  You had some chance to do

7   something, but instead you come to court without anything

8   on -- I mean, here is my problem.

9          I'm trying to figure out what the balance is

10  between practicalities and the situation as imposed on you by

11  those practicalities and how much is your fault.

12         You know for a long time that the scope of the

13  First Amendment privilege is at -- it's in *Clay*.  You have

14  known that for a long time.  And you know that the discussion

15  about internal campaign materials and the extent of their

16  protection has been at issue.  And you get a decision from

17  the Circuit and you interpret it in a particular way and you

18  file a privilege log.

19         The privilege log makes no effort by itself to

20  justify why those documents fall within the scope of the

21  privilege as defined by the Circuit, because it leaves out

22  who these people are completely.  It's got a million Does in

23  this privilege log.

24         Then they say -- they don't make their burden,

25  compelling, and you wait and you don't do anything in

```
 1   response to that.  You come here and you say, Give us a

 2   lot -- presumably you need a lot more time to enable you to

 3   figure out -- the week you could have had, been doing it this

 4   last week, you now want to do it for the next week or the

 5   next two weeks.  Why should I allow that?

 6          MR. KIRK:  Let me respond to that, your Honor,

 7   because it's a fair question, but I think I have a good

 8   answer to that.

 9          The Ninth Circuit's original opinion said that --

10   and this was what we argued in the brief that we put in on

11   this -- said that the defining line is you can't claim

12   privilege if it went to large swaths of the electorate.

13          THE COURT:  Or discrete groups.

14          MR. KIRK:  Or discrete groups.

15          Our position was, is, and still is that we produced

16   everything that went to discrete groups and certainly

17   everything that went to large swaths of the electorate.

18          So when we found on paper, our position was and is

19   we have done everything we were supposed to do --

20          THE COURT:  Of course, I can't tell that by the

21   privilege log.  I mean, you don't even sustain your burden on

22   the privilege log.

23          MR. KIRK:  If I could disagree with that, your

24   Honor.  The privilege log doesn't -- it Does people out who

25   are people that had chosen to remain anonymous.  And that's
```

1  under the privilege as recognized in the *McIntyre* case.

2         But none of the documents listed on the privilege

3  log went to anything approaching why it's wrong for the

4  electorate.  There were --

5         **THE COURT:**  Discrete groups, discrete groups.  If

6  you sent something to 80 people, why isn't that a discrete

7  group?

8         **MR. KIRK:**  If they are 80 of your political

9  associates, that's not a discrete group of voters.  If you

10  sent something to --

11         **THE COURT:**  Well, I can understand.  You understand

12  how looking at that one might think there was an issue here.

13         **MR. KIRK:**  There was an issue --

14         **THE COURT:**  And, of course, obviously, in the end

15  you are wrong because what the Circuit meant is two

16  individuals, to persuade them or motivate them.  So your

17  associates doesn't do it enough.

18         **MR. KIRK:**  If I could finish, your Honor.  That was

19  the state of play before Monday.

20         Monday, out of the blue, the Court of Appeals

21  issues a new opinion, an amended opinion.  It now for the

22  first time says, no, we want you to look at this, this

23  concept called core groups.

24         I would respectfully submit it's not fair to say to

25  proponents, to say to defendant-intervenors, your privilege

1   log didn't satisfy your burden of proof because it didn't

2   anticipate that the Court of Appeals would rewrite its

3   opinion.

4           THE COURT:  No, no, no.  I'm not saying that.  My

5   question is whether or not given the state of play after the

6   first opinion, you have satisfied your burden.

7           MR. KIRK:  And my answer to that is yes --

8           THE COURT:  I understand it's yes, but my question

9   is:  If you don't identify sufficiently why these people fall

10  within the privilege, it's still internal campaign

11  information.  You have to do something to show that it is.

12           I mean, there are --

13           MR. KIRK:  The privilege log asserts accurately

14  that -- you know, communication-by-communication.  This

15  communication was from one associate to another concerning

16  matters of their political association.

17           THE COURT:  Which was not even the standard set

18  forth in the first Ninth Circuit opinion.

19           MR. KIRK:  I think it was, your Honor.  There was

20  nothing in the first Ninth Circuit opinion or, really, in the

21  second one that limits it that way.

22           The limitation that was introduced in the second

23  one was this notion that somehow it had to be core groups,

24  whatever that means.

25           THE COURT:  Well, I appreciate your -- does

1  somebody have a copy of the privilege log?

2          **MR. PANUCCIO:**  I do.

3          **THE COURT:**  Can I see it?  Because I want to get an

4  idea of the dimension of what I'm talking about.  Do you have

5  an unmarked copy?

6          **MR. KIRK:**  We do, your Honor, and I hope the Court

7  has a magnifying glass.

8          **THE COURT:**  I want to get an idea of dimensions.  I

9  think it's divided among the various responding parties.

10          **MR. KIRK:**  I believe so, but I want to make one

11  other point in terms of the number of people.

12          **THE COURT:**  I'm not worried about the number of

13  people.

14          **MR. KIRK:**  On communications.

15          **THE COURT:**  Yes, go ahead.

16          **MR. KIRK:**  I don't believe -- and I could be

17  corrected.  There may be one or two, but virtually all of the

18  communications listed went to less than 200 people.

19          And in terms of trying to find an objective

20  dividing line between sending something out to voters or

21  sending something out to your own associates, California law

22  specifically identifies the number 200 as the -- as the

23  dividing line.  I think that was in our papers, right?

24  Perhaps not.

25          **THE COURT:**  That's different -- well, okay.  I

1  understand that.

2          Where is it in here that you divide among the

3  various defendant-intervenors who have -- who are producing

4  these or not producing these documents?  I can't really tell

5  from looking at them.

6          MR. PANUCCIO:  I'm sorry.  Can your Honor just

7  repeat the question?

8          THE COURT:  Just to be clear what I'm saying, maybe

9  there isn't, but is there a way of looking at this privilege

10 log where it's divided up by who is claiming the privilege as

11 to those?  It looks like it's the defendant-intervenor's

12 privilege log.  You put a bunch of stuff together so it

13 doesn't say -- it doesn't say that a particular

14 defendant-intervenor is asserting an associational privilege

15 or anything, right?

16         MR. PANUCCIO:  Well, I think if you looked at, I

17 think, the author's line, certainly the documents come

18 from -- often if they come from a defendant-intervenor, they

19 are the author or someone who is --

20         THE COURT:  But you can't say that.  You can't say,

21 well, you got the document.  It could have been from a

22 ProtectMarriage.com file.

23         MR. PANUCCIO:  Well, yes.  ProtectMarriage.com's

24 files were typically its documents.  The --

25         THE COURT:  I understand.  My point is this.  You

1  said, when you were arguing to me, we should consider the

2  associational privileges of groups other than what we have

3  understood to be the campaign ProtectMarriage.com; that I

4  should specifically consider that there are a number of

5  defendant-intervenors.

6          The document requests are addressed to a number of

7  the defendant-intervenors and some of them are not producing

8  documents that are identified in the privilege log because

9  those documents implicate the associational privileges of

10 other groups you want me to consider.

11         I can't tell looking at that where the documents

12 originate.  That is to say, well, whose file it came out of,

13 who is, therefore, entitled to assert their associational

14 privilege.  Because I'm not sure that if -- if Core Group A

15 from one person, one group, sent as a document in somebody

16 else's file, I don't know that you have the privilege any

17 more.

18         But my point is, is you can't -- I can't tell who

19 withheld the document, right?  They just -- as a group, these

20 are all the documents you are withholding, right?

21         **MR. PANUCCIO:**  Yes.  Although I think that some of

22 that information is --

23         **THE COURT:**  It might be the recipient who got it.

24 It might be in someone else's file.

25         **MR. PANUCCIO:**  But with that level of specificity,

1  again, I would go back to what Mr. Kirk said, which is that

2  the type of log that was produced prior to the amended

3  opinion, when you look at the description of the document,

4  those document descriptions track what the types of things in

5  the preamended opinion that the Ninth Circuit said were

6  privileged.  And the document descriptions themselves say --

7          **THE COURT:**  So if I was to say to you, for

8  example -- I mean, the problem I have now is this, and it's a

9  practical problem, but I think it's somewhat of your making.

10  We come here now to test the privilege, and you say, Well,

11  the privilege may be limited to the core group of

12  ProtectMarriage.com with respect to its documents.  But as to

13  the other people's documents, there may be other

14  associational privileges.  And there is not a shred of

15  evidence before the Court in a privilege log as to what you

16  are talking about, what is for which.

17          So if I said produce ProtectMarriage.com's

18  documents other than those within this core group, you might

19  be able to say, because we have no evidence in the record,

20  that all those are somebody else's associational group --

21  associational rights and they are a core group of someone

22  else.

23          **MR. PANUCCIO:**  The preamended opinion did not say

24  you need to identify core groups.  It talked about the

25  associational rights of people to form messages and

1   strategies.  All of these documents -- this privilege log was

2   made with that opinion and this Court's prior orders.  All of

3   these are identified as documents that are the formulation of

4   messages.

5         If you look at the descriptions, they are not a

6   message.  They are actually about formulation of strategy and

7   messages.  It's not, here is a final message and we are

8   claiming it's privileged.  It's, a message was being

9   formulated in this communication.  There was back-and-forth

10  about formulation of a message that might go out or did go

11  out.

12        So it's not like what's on this log are these

13  communications to discrete groups of voters that were

14  messages.  They were communications among associates,

15  political associates --

16        **THE COURT:**  I guess the plaintiffs dispute that

17  description.

18        **MR. PANUCCIO:**  Well, and they have never challenged

19  a single entry in the log.  They just say, We think the log

20  is insufficient.  They say it broadly and they never give any

21  specificity.

22        **THE COURT:**  If we get down to the details of your

23  argument, I say to Mr. Boutrous, are there any documents on

24  the log that are not about formulation of messages?  Are

25  there, Mr. Boutrous?

1          **MR. BOUTROUS:**  I believe there are, your Honor.

2          **THE COURT:**  Is Dr. Tam's "Dear Friend" memo on the

3    log?

4          **MR. BOUTROUS:**  It is not on the log.

5          **THE COURT:**  Oh, good.

6          **MR. BOUTROUS:**  But, you know, I think -- well,

7    we'll look, but the -- two points I want to make.

8          **THE COURT:**  I mean, he has a good point, that the

9    core group that came out on Monday, I would have thought,

10   frankly, given the pace at which this is developing, you

11   would have spent between when it came out on Monday and today

12   trying to figure out exactly what you are going to say to the

13   Court about who is in the core group, but you are not and you

14   didn't.  And I don't know whether or not I'm willing to say

15   that that was sufficient time.  Maybe it was.  But we are

16   here.

17          I mean, he doesn't have to respond to your

18   arguments about a core group that you made two months ago

19   that he disagrees with.  He doesn't have to collect

20   documents.  He doesn't have to identify a core group just

21   because you argue it.  He has to do it when a Court says or

22   when he has notice or when he thinks the law supports it.

23          So my question to you is:  We are here now.  He has

24   had a week since your motion to compel, and he has had a

25   couple of days since the Court amended its opinion.  What do

```
 1   I do about that?  Assuming for the moment, as I do -- not

 2   just assuming, but there may be associational rights

 3   implicated for other groups.

 4         MR. BOUTROUS:  Your Honor, I think this Court,

 5   yourself and Chief Judge Walker have been enormously patient.

 6   They have had every opportunity to respond.

 7         As soon as the opinion came out Monday, we sent a

 8   letter saying, look, produce these documents.

 9         The issue of who is in the core group in some ways

10   is a red herring because we if took the broadest possible

11   definition of the core group, the Prentice declaration, and

12   add a bunch people in there, we know they haven't produced

13   documents that are now required by the Court's opinion, by

14   the footnote, the documents that went to individual voters,

15   discrete groups of voters.

16         There is no excuse that they didn't come today with

17   a proposal to the Court.  It's their burden.  They know we

18   have been fighting for these documents.  I never suggested in

19   the pretrial conference that we didn't think these were

20   meaningful, important documents.  I said we have alternative

21   arguments, and there is a way to protect the record.

22         We think this is crucial information and we have

23   got this stalling tactic now of how do we define the core

24   group?  They've got an executive committee.  They've got

25   their consultants.
```

1          Dr. Tam is their client.  If Dr. Tam had some group

2   with an associational bond in a core group, they should have

3   filed a separate motion for him that related to his

4   particular associational relation with whatever groups he was

5   in.  It's far too late.

6          The Court has been extraordinarily patient and even

7   cut them many breaks that -- that I don't think they warrant

8   given the way they have really withheld, they say, tens of

9   thousands of documents.

10          And the notion that they don't know who the people

11   were, it's a pretty narrow definition.  The core group of

12   persons engaged in formulation of campaign strategy and

13   messages, they should know that.  They should be able to

14   resolve that in five minutes.  And for them to suggest they

15   can't do it, I think, is disingenuous.

16          As for -- again, for Dr. Tam -- I'm sorry, your

17   Honor.

18          **THE COURT:**  I don't know if it's disingenuous.

19   That's a little strong.

20          **MR. BOUTROUS:**  I didn't mean to be -- to go over

21   the top.

22          But it is frustrating because we have made clear

23   our position.  Just going back to the pretrial, I did propose

24   this core group theory to Chief Judge Walker and the idea was

25   that we get the privilege log and then revisit these

```
 1  questions.  So they were on notice that that was our theory.
 2          Chief Judge Walker's order of October 1 at the end
 3  talked about a more broadly defined core group, and the
 4  Prentice declaration tracks that.  So this isn't some
 5  shocking surprise.
 6          And in response to that October 1 order, they did
 7  not submit a separate list of the other associational groups
 8  that the proponents were members of and say, by the way,
 9  Dr. Tam also was part of this group and the -- and here is
10  the managerial group that relates to that, and that's also
11  protected.  They didn't raise that privilege claim.  They
12  focused on the ProtectMarriage.com campaign and the
13  managerial group, at least as I'm interpreting this
14  declaration, that related to that group.
15          So I -- I really strongly urge the Court to define
16  this core group and order that they produce these documents.
17          The privilege log really is indecipherable.  As you
18  point out, one can't tell who has the document, whether --
19  and who stopped producing it.  In some of the documents they
20  are making -- who they are claiming a privilege claim, they
21  name certain members of the executive committee and then they
22  go to eight more Does.  So these people we don't know are
23  being protected by the privilege.  It's really, really
24  difficult to really decipher what's there and to test the
25  privilege.  I just don't think they have met their burden.
```

1           And I know Dr. Tam and the other proponents, to the

2    extent they are part of other groups, have not met their

3    burden because they have never maintained any kind of

4    submission, any kind of declaration, any kind of showing that

5    some other group's rights are at stake and somehow being

6    intruded upon.

7           And so with that, I would ask the Court to define

8    the core group and order production.

9           And with respect to the individual proponents, they

10   need -- they must produce the documents that are responsive

11   that went to individuals, groups of voters, discrete groups

12   of voters, that track the language of the Ninth Circuit's

13   opinion.

14          And if I could add one more point, your Honor.  The

15   Ninth Circuit's opinion lays it out quite specifically, but

16   this was the argument we were making all along after the

17   first opinion; that this material was on the table.  So there

18   was no -- again, we haven't given that issue up.  Chief Judge

19   Walker hadn't decided it.  He said, Let's get the privilege

20   log and look at it.

21          So, again, it's now in footnote 12, but this was

22   our position going back to the pretrial conference and

23   before.

24              (Discussion held off the record

25                 amongst plaintiffs' counsel.)

 1          **MR. BOUTROUS:**  Your Honor, since the print is so

 2  small, I can't really read it, would be okay if

 3  Mr. McGill just gave you a couple examples --

 4          **THE COURT:**  Somebody younger is going to do it for

 5  us.  Neither you nor I can --

 6          **MR. BOUTROUS:**  I bring in a youthful reader on this

 7  point, and he doesn't even have glasses on.

 8          **THE COURT:**  That's right.  I hate that.

 9          **MR. McGILL:**  Thank you, your Honor.

10          You had asked if there were any documents on the

11  log that did not relate to messaging or campaign strategy.  I

12  was just flipping through it and I came up with two.  This is

13  just two on one page.

14          This is page 59 of the log.  Document number 1059

15  is a document, author is Doe No. 1.  The recipient is Ron

16  Prentice, who is the chairman of the executive committee, and

17  it's a non-public confidential correspondence transmitting

18  resources for developing campaign messaging.  So I take that

19  to mean a letter that came with a check.

20          Another one is from 1045.  This is -- the author is

21  Charles Lemandry, who I think is a lawyer in San Diego, to

22  Frank Schubert and a copy to Ron Prentice.  This is a

23  non-public confidential communication concerning resources

24  for potential campaign strategy and messaging.

25          And as an overarching matter, we just cannot accept

1  and don't agree that they can simply assert that something is

2  a confidential messaging discussion, as they do over a

3  thousand times, and that we just have to accept that as

4  gospel truth.

5          **THE COURT:**  Well, you know, that's a harder

6  problem.  And if we are going to get into a

7  document-by-document analysis, we will finish that sometime

8  after this Circuit rules on the result of the trial.

9          So what I'm looking for is a practical way to deal

10 with this problem so that I might cut you off, the plaintiffs

11 off, from documents that you might otherwise get if we did

12 some kind of detailed analysis of whether it really fell into

13 messaging.

14         But we would get what you need for the trial

15 somewhat more quickly than we would line-by-line every page

16 of these documents.

17         **MR. BOUTROUS:**  I think, your Honor, on that in some

18 ways now I think the most important thing are the things that

19 were not even put or the privilege log.

20         The privilege log does not include the external

21 communications that we claim should have been produced long

22 ago, and so the --

23         **THE COURT:**  I understand that, but that's the core

24 group issue.

25         **MR. BOUTROUS:**  Right.  And I agree with you, doing

1  the line-by-line, it would be very difficult to do.  And with

2  since we don't know precisely what the documents are, we

3  aren't asking to go through each one.

4          We do have, for example, the Tam documents that

5  went to 85 Does.  We thought we would pick the easy -- the

6  low-hanging fruit, so to speak, and seek to deal with those,

7  but not go through and try to figure out at this stage.  I

8  think they failed to meet their burden, but we recognize the

9  practicalities at least at this point.

10         **THE COURT:**  Well, let me tell you what I think

11  about this piece of it.

12         I think that the Ninth Circuit limited the

13  applicability of the privilege in its original amended

14  opinion.  It is limited to internal communications among the

15  core group of a campaign.  And with respect to those

16  communications, limited to subject matter the formulation of

17  strategy and messaging are not resources for them or things

18  like that.

19         Nonetheless, for purposes of this argument, I'm

20  going to -- and purposes of this order, I'm going to only

21  impose a broader restriction, which is that the

22  defendant-intervenors need not produce and shall log

23  documents that are responsive to document requests number

24  one, six and eight, which are communications among the core

25  group regardless of subject matter.  You don't have to

1   produce them.  You have to log them.

2           And by that I don't mean to impose a broader --

3   with respect to the members of the core group where you have

4   already understood them to be members of the core group, I

5   don't need you to impose a broader subject matter for the

6   log.  But what I meant to say that you need to log those

7   documents that are communications among the core group

8   regarding messaging and strategy.  You need to produce

9   responsive documents to those that are not communications

10  among the core group.

11          You don't need to produce responsive documents that

12  are communications among the core group regardless of their

13  subject matter.

14          Okay?  Is that clear?  You are giving me a puzzled

15  look.  We are going to debate to what the core group means,

16  which is the key thing you are waiting for.

17          **MR. KIRK:**  Your Honor, would it be okay if I

18  repeated back --

19          **THE COURT:**  Fabulous.

20          **MR. KIRK:**  Because I did want to make sure I'm

21  understanding what you just said.

22          **THE COURT:**  All I'm saying is that the privilege is

23  limited to communications among the core group.  And as to

24  the communications among the core group, you don't have to

25  produce them.

1          What you do need to, and I think that you have --

2     you will have -- at some point we'll have to decide -- to log

3     those withheld communications among the core group relating

4     to strategy and messaging.  That needs to be logged.

5          **MR. KIRK:**  Let me repeat it back because I do think

6     I have it, but I want to make sure I'm right.

7          We have to produce all documents that are not --

8     that are responsive to one, six and eight that are not

9     communications among the core group.

10         **THE COURT:**  Yes.

11         **MR. KIRK:**  We have to log any documents that are

12    responsive to one, six only eight that are communications

13    among the core group that are related to messaging.

14         **THE COURT:**  Strategy and messaging.

15         **MR. KIRK:**  And messaging.

16         **THE COURT:**  Okay.  Clear so far.  Are we okay so

17    far?  Any comments on that?

18         **MR. BOUTROUS:**  Your Honor, if I could just add the

19    other requests 9, 10 and 13, which --

20         **THE COURT:**  You can move to compel on them.  I'm

21    not going to address them.

22         **MR. BOUTROUS:**  I believe we mentioned them in our

23    examples, your Honor, the requests --

24         **THE COURT:**  No, no, no.  I'm looking at what you

25    want, and what you want is relief.  We want documents

1  responsive to request one and request six and a privilege

2  log.  That's D on page seven.

3         You'll probably get similar things out of those,

4  but that's what you say on D and that's what I'm going to do.

5         **MR. BOUTROUS:**  Okay.  Thank you, your Honor.

6         **MR. KIRK:**  Your Honor, could I ask one further

7  clarification?

8         **THE COURT:**  Yes.

9         **MR. KIRK:**  Some of the 39 -- you recall the 60

10  documents that Judge Walker looked at in camera.  Some of the

11  39 that he said we don't have to produce would fall within

12  what your Honor just said we had to log, because there are

13  some documents within the 39 that are communications among

14  core group, the core group so to speak.

15         **THE COURT:**  That relate to strategy and messaging.

16         **MR. KIRK:**  Not messaging so much, but strategy.

17  And it would seem unreasonable to have to log documents that

18  Judge Walker specifically ruled --

19         **THE COURT:**  I would agree with that.

20         **MR. KIRK:**  And I take it we can extend that to like

21  documents?

22         **THE COURT:**  No, you can't.  It's too amorphous.

23  "Like documents" could mean anything.  You pick out what you

24  think the subject matters are of those documents and we'll

25  all disagree with that and then it won't get us anywhere.

1        **MR. KIRK:**  I can't say anything your Honor said was

2   wrong, but I can say this.  The one thing that seemed to be a

3   source of agreement in a sea of disagreement was that the 60

4   documents, that Chief Judge Walker specifically wanted that

5   to be the template that would be applied to the universe.

6        **THE COURT:**  It don't work.  It didn't work.  You

7   came up with a version of it.  They came up with another

8   version of it.  The Circuit came up with an third version of

9   the it.

10       I appreciate the effort, but I was hoping was you

11  would all look at it and say, this is a reasonable way to

12  proceed and we're going to all do this.  You didn't like it.

13  You appealed.  We're going back.

14       So I don't think I'm changing very much by way of

15  burden by that little nuance, but you could prove me wrong I

16  suppose.

17       **MR. KIRK:**  You are right.  39 is off the table, but

18  that doesn't help on burden, but I understand.

19       **THE COURT:**  Right, right.

20       **MR. BOUTROUS:**  Your Honor, I don't want to push

21  this too far, but we did ask for an order that required them

22  to comply with their discovery obligations, including

23  producing documents responsive to request number one and

24  earlier --

25       **THE COURT:**  Where did you request this?

1        **MR. BOUTROUS:**  That was on page 7, Section D, in

2   the paragraph that -- just the beginning that paragraph.

3        **THE COURT:**  I understand that.  But if you don't

4   actually call out and ask me to do something about it, and we

5   don't argue about it, and I don't read the request, and they

6   are not attached, and I don't know what they say, as far as

7   I'm concerned, you waived the right to move for them now.  So

8   I'm not going to get into that.

9        **MR. BOUTROUS:**  Thank you, your Honor.

10        **THE COURT:**  So with respect to the core group, core

11   group has been defined by the Circuit and that definition is

12   contained in various ways and most recently in footnote 12 of

13   page 36 of the amended opinion as "persons engaged in the

14   formulation of campaign strategy and messages and not

15   messages communicated to the electorate-at-large, discrete

16   groups of voters or individual voters for purposes such as

17   persuasion, recruiting or motivation activities beyond the

18   formulation of strategy and messages."  That is the core

19   group.

20        And the Circuit left it up to this Court to decide,

21   based on the evidence before it, what the core group might

22   be.  That can logically include, in light of the First

23   Amendment association, interests privileges intended to

24   protect.  And the -- despite briefing on the subject, despite

25   filing a privilege log, the only evidence before the Court

1  that bears on this is contained in the Prentice declaration.

2          There is no evidence that's been submitted to the

3  Court beyond the Prentice declaration regarding who might be

4  in the core group.  There has never previously been any

5  assertion that there were groups other than the campaign as

6  defined in the Prentice declaration who might have

7  associational rights that are implicated by this.

8          And in any event, the burden is on the persons

9  asserting privilege to sustain their burden and to the extent

10  that they have decided that there should be a privilege

11  extending beyond the campaign's core group, they have

12  submitted no evidence or even any particularized arguments to

13  the Court in that regard.

14          It is -- I'm sensitive to the notion that we are on

15  a rather fast time frame here, but, frankly, everybody has

16  known we have been on a fast time frame for the past month

17  and could readily have, at least, come to the Court with

18  appropriate argument and evidence of who might be the

19  organizations whose other associational rights were

20  implicated, or at least argument about what those arguments

21  were.

22          But nonetheless, because this -- this matter has

23  been scheduled for -- since Judge Walker's communication to

24  everyone, which I think was on the 30th of December, and the

25  Court of Appeals' amended decision, although its original

1  decision came out on Monday, at least some effort could have

2  been made to at least identify for the Court, even in oral

3  argument the -- who these might be, these associational

4  rights, which, by the way, have never been raised before as

5  separate from the campaign.  So I think the defendant failed

6  to meet the burden of proof in that regard.

7          I think they have sustained the burden of proof in

8  the core group as follows:  The executive committee of

9  ProtectMarriage.com; the official proponents of Proposition

10 8; campaign consultants of Schubert Flint Public Affairs

11 Committee; Lawrence Research firm; the Sterling Corporation.

12 Mr. Andrew Pugno -- I think is how his name is pronounced --

13 as counsel and sometimes listed as a member of the executive

14 committee.

15         I'm also going to include the person listed on

16 Paragraph 11, sub little i, as a member of the core group.

17 That person is listed in the declaration by Mr. Prentice that

18 is filed under seal, so I won't -- and I don't know that

19 people know his name outside the campaign, so I'm not going

20 to mention it, but that person is also a member of the core

21 group.

22         I'm going to also include in the core group -- I'm

23 going to find that those individuals are the individuals for

24 whom there is any evidence or even any argument before the

25 Court as to persons who are engaged in the formulation of

1   campaign strategy and messages and find that the proof fails

2   with respect to any else.

3          I am going to add to the core group with respect to

4   these individuals and entities that I have listed in the core

5   group.  They will include any of their assistants, individual

6   assistants acting on their behalf with respect to the

7   formulation of campaign strategy and messages.

8          Now, that is -- would require production of certain

9   information responsive to those document requests except as

10  limited by the privilege, produced by the

11  defendant-intervenors.

12         One thing I do want to talk about, though, is

13  whether or not I should impose in addition to that privilege

14  limitation a relevance limitation.  And what my thinking

15  was -- and I think I telegraphed this, so I might as well

16  just say it -- is that not every one of those documents that

17  are sent to anyone who might be a voter, because we all vote,

18  or every person regarding Proposition 8 would necessarily be

19  useful in terms of being -- useful at the trial or relevant

20  to the case.  I'm thinking, my example is "Let's meet for

21  lunch on Tuesday."  That email or email to that effect,

22  obviously, would not be particularly helpful.

23         So one of the things I was thinking is limiting, in

24  addition to privilege, you only have to produce documents

25  which contain, refer or relate to a message to be conveyed to

1   voters or an argument for or against Prop 8.  And I'm not

2   wedded to the formulation so much as I -- as the concept

3   frankly, but that's the idea.

4          What matters here and what the -- I understand

5   these documents to be sought for is to prove up or to

6   disprove the propositions -- by "propositions" I mean not on

7   Prop 8, but other statements that might be made by the

8   defendant-intervenors.

9          And it seems to me the most -- the documents that

10  are particularly relevant to that subject are documents that

11  have to do with actual messages that might be conveyed to the

12  voters or arguments.  And I say arguments for or against Prop

13  8 because I don't want to limit it to something that someone

14  intended to go to another.

15         If it's communicated out and it's an argument for

16  Prop 8 and it's outside of the core group within the meaning

17  of the Circuit's ruling, that seems to me to be what the

18  core -- that seems to me to be information that is most

19  relevant to what you are talking about.  Other things seem to

20  me are pretty peripheral.

21         But I don't know how people feel about that

22  limitation or whether I can craft it in a better way, but let

23  me hear from you.

24         **MR. BOUTROUS:**  Your Honor, that generally sounds

25  sensible and a good approach.

1          Two things I would add.  As long as it's clearly

2    understood by the proponents that when the Court refers to

3    "voters," it's including people outside of the core group

4    essentially.  Because what we have is this issue about voters

5    as voters and that's been a big debate.

6          I think the Ninth Circuit's footnote really

7    resolves that.  The language they used was "the large

8    discrete groups of voters or individual voters for purposes

9    of persuasion, recruitment."  It's a broad definition.  So I

10   just don't want to be back here fighting about this issue of

11   what a voter is.

12         I think it's just any person that is not part of

13   the core group, communications sent to them in order to

14   prompt them to support or -- and using the Court's

15   definition, communications for or against Prop 8, I think

16   that would -- that makes a lot of sense, the Court's

17   definition.

18         **THE COURT:**  Maybe another way to say it is just any

19   documents that contain any messages or arguments for or

20   against Prop 8.  I mean, does that work for you?

21         **MR. BOUTROUS:**  I think that works.  I think

22   documents -- documents relating to that, but I think --

23         **THE COURT:**  Relating to arguments for or against

24   Prop 8.

25         **MR. BOUTROUS:**  I think that does it and that way we

1   don't have this debate about voters.

2              **THE COURT:**  Okay.

3              **MR. BOUTROUS:**  And then just one other clarifying

4   point, your Honor, as to the -- I will wait till the

5   Court's --

6              **THE COURT:**  Go ahead.

7              **MR. BOUTROUS:**  As to the first group of documents,

8   documents that proponents claim are private and internal to

9   the core group, we request that the Court make clear that

10  private and internal does not mean documents that are sent to

11  people outside the core group.

12             So on the privilege log, for example, there are

13  people who seem to be in the core group and then people who

14  aren't.  They are Does.  But if that --

15             **THE COURT:**  It's limited to communications among

16  the core group.  If it goes outside the core group, it's not

17  a private internal communication.  That goes without saying.

18  Maybe it doesn't.

19             But the privilege is limited to those -- those

20  communications that are private to the core group.  Once it

21  gets outside the core group, it's not -- it doesn't have the

22  same level of protection.  Okay.

23             **MR. BOUTROUS:**  Thank you.

24             **THE COURT:**  What do you think about the relevance

25  limitation?

1          **MR. KIRK:**  Your Honor, as far as I can tell, it's

2    not really a limitation at all.

3          **THE COURT:**  It's not.

4          **MR. KIRK:**  No.  I don't believe it is.  The request

5    that -- the underlying document request asks for all

6    documents that went to voters that related to Proposition 8.

7    As I understood -- that refer or relate to Proposition --

8    communications to voters relating to Proposition 8.

9          If I wrote what you said down correctly, you

10   suggested all documents that contain, refer or relate to

11   messages to be conveyed to voters or arguments for or against

12   Proposition 8.

13         **THE COURT:**  In fact, I was thinking about saying

14   just the latter.  Documents that were -- contain or refer or

15   led to arguments for or against Prop 8.

16         **MR. KIRK:**  As a practical matter, when you are

17   going through 90,000 documents, the reality is if it says

18   Prop 8 on it or it says something relating to Prop 8, it's

19   in; otherwise, it's out.

20         **THE COURT:**  I understand that it may be your choice

21   not to take advantage of this relevance limitation.  As a

22   practical matter, I have always thought relevance limitations

23   were kind of silly, except where there was something that you

24   could say with respect to those.  The documents that are

25   irrelevant, you really don't want to produce.  If it's not

1  that sort of thing, then just ignore the relevance limitation

2  and produce them all.

3          MR. KIRK:  I completely agree.

4          THE COURT:  If you don't want me to put it, I won't

5  put it.  I did want to give you that opportunity if you

6  wanted to use it, because there are some things that I think

7  are relevant and some that aren't.

8          MR. KIRK:  Our position, your Honor, is all of it's

9  irrelevant.

10          THE COURT:  I understand.

11          MR. KIRK:  So I was viewing the suggestion entirely

12  from a practical standpoint.  Does it make the job easier?

13  And it does not.

14          THE COURT:  So what do you want me to do about it?

15  Put it in or not?

16          MR. KIRK:  Do you want it?

17          MR. PANUCCIO:  I mean, yes.

18          MR. KIRK:  Yes.

19          THE COURT:  Fine.  Then it's in.

20          MR. KIRK:  I did want to ask the Court.  The Court

21  ruled on what it was considering the core group, but didn't

22  indicate whether we would be given an opportunity to

23  supplement that.

24          THE COURT:  Well, I'm going to get into that in a

25  second.

1        **MR. KIRK:**  Because even in the course of working

2    through the binders, I have discovered at least one pleading

3    that lists additional consultants, for whatever that's worth.

4    And it's document -- ironically enough, it's a letter from

5    plaintiffs' counsel.  It's document 220-1 and it's appended

6    to a declaration, but it's a letter from plaintiffs' counsel

7    that lists a whole series of consultants beyond those listed

8    in the Court's order.  And we would at least -- and it's

9    actually their reformulation of request eight --

10       **THE COURT:**  I understand that.  I know that.  But

11   what I'm concerned about is not their requests.  What I want

12   is evidence --

13       **MR. KIRK:**  This is evidence that the parties agree

14   that these people are consultants.

15       **THE COURT:**  Consultants isn't enough.  Because

16   consultants involved in the formulation of campaign strategy

17   and messaging is the test.

18       **MR. KIRK:**  For example, Sonia Eddings Brown was the

19   spokesperson for the campaign.  I would suggest that she is

20   someone who is --

21       **THE COURT:**  Might be.  In any event, my thought is

22   that we are going to start this train rolling so that we can

23   get things done, but I will give you an opportunity to put in

24   something additional.

25           Okay.  We have been going for how long, and I

1  haven't given my court reporter a break.  So before I get in

2  too much trouble, let's take a five-minute recess.

3          (Whereupon there was a recess in the proceedings

4            from 3:49 p.m. until 3:58 p.m.)

5          **THE CLERK:**  Recalling C 09-2292, Kristin Perry

6  versus Arnold Schwarzenegger.

7          **THE COURT:**  So the next thing I want to take brief

8  argument on is the protective order, so you can produce these

9  documents under whatever level of protection that you think

10  is appropriate.

11          So we have got the proposed protective orders from

12  both sides and the arguments.  What I was thinking of doing

13  is entering a form of protective order that is essentially

14  the form proposed by the plaintiffs, except with respect to

15  Paragraph 7.3(a) and (b) adding the following qualification:

16          "Provided, however, that notice of all

17      such attorneys and employees to whom highly

18      confidential attorney's eyes only information

19      will be disclosed shall be given not less

20      than 24 hours in advance of the disclosure to

21      give the other parties the opportunity to

22      object to the disclosure on grounds specific

23      to the designated employee or attorney."

24          The idea being, I mean, you get this list and if

25  there is someone on there that you have a particular issue

1   with, you have an opportunity to come to at least -- you

2   raise your objection.  If you don't get satisfaction, do an

3   emergency application for the Court saying don't apply --

4   don't let that person see those documents.

5        I picked 24 hours -- I would normally have picked a

6   further, a longer period of time -- because we don't have

7   very much time.

8        So that was my thought on that, but I would hear

9   from anyone on the protective order.

10       **MR. BOUTROUS:**  Your Honor, I think that sounds

11   fine.  The one issue I would flag on the Court's addition is

12   I think the proponents had objected to anyone from the City

13   of San Francisco having any access to the documents, and we

14   would object to that.

15       **THE COURT:**  No.  I'm not going to -- I'm going to

16   reject that as a general proposition.  The city attorney's

17   office will be allowed to identify those individuals and the

18   office that they are going to have access to these documents.

19   If there are particular problems with those specific

20   individuals that you -- the defendant-intervenors have

21   evidence of and want to make an application to the Court as

22   to those particular individuals, but just because one works

23   for the city attorney, that's not sufficient.

24       The city attorney's office, I must say, has worked

25   in this Court and with this Court on many cases, many cases

1  involving highly confidential matters, and I have always

2  found their lawyers supremely ethical and I have no doubt

3  they will treat this ethically.

4          On the other hand, if there is some specific

5  evidence as to an individual, I want to hear about that.

6          **MR. BOUTROUS:**  Your Honor, once the protective

7  order is issued, will it be possible for us to get a copy of

8  the Prentice declaration just so we can see -- pursuant to

9  the protective order, so we can see who is on there?

10         **THE COURT:**  I haven't thought through all the

11 implications on that.  That was submitted with the

12 understanding that it be in camera.  I'm not sure that it

13 would be provided to you.  You would have to separately

14 address that.  I can't address it on the fly.

15         **MR. BOUTROUS:**  Okay, your Honor.  Thank you.

16         **THE COURT:**  Did you want to say anything about the

17 protective order?

18         **MR. KIRK:**  We will rest.  We thought ours was

19 better, but --

20         **THE COURT:**  Yours was quite good.  It was quite

21 good.  It's a hard -- there is no absolutely right and wrong

22 there.  So I'm going to hand to my courtroom deputy...

23         (Whereupon, document was tendered

24          to the courtroom deputy.)

25         **THE COURT:**  So, hopefully, that will get out

1    tomorrow.

2         Is there any disagreement about what names are

3    going to get to be redacted on documents?  We are already

4    producing a number of documents before.  I assume that that

5    hasn't been an issue.

6         The rank and file names, I think, you have been

7    redacting them if they come up, but there hasn't been an

8    issue about that, is there?

9         **MR. BOUTROUS:**  Not that I'm aware of, your Honor.

10        **THE COURT:**  Then I won't make any rulings about

11   that.

12        So I want to give you an opportunity to put in some

13   supplemental declaration about the core group of

14   ProtectAmerica.com -- I keep doing that.  I'm sorry,

15   ProtectMarriage.com.  By next week I will have it,

16   ProtectMarriage.com.  Because, I mean, the one you suggest

17   may very well be the spokesperson probably was involved in

18   the campaign messaging.  Certainly hope so.  But it seems to

19   me that that could be done rather quickly.  This time

20   tomorrow?

21        **MR. KIRK:**  Could I have until the end of tomorrow?

22        **THE COURT:**  Yeah.  By the end of tomorrow --

23        **MR. KIRK:**  ECF end of tomorrow?

24        **THE COURT:**  Well, see, the problem is, they are

25   going to want to respond to it and then I have to deal with

1   it.  So I don't think I want to have it at midnight.

2          **MR. KIRK:**  We will do the best we can.

3          **THE COURT:**  Okay.  Do the best you can.  All right.

4   4:00 o'clock tomorrow.

5          And just to be clear, we are not getting into the

6   issue of -- that we talked about, which is core groups of

7   other organizations that might be implicated by the

8   documents.

9          We are talking about -- the Prentice declaration

10  may not be sufficiently inclusive as to ProtectMarriage.com's

11  core group.  You want to put in some declaration about that,

12  add some people, that's fine.

13         **MR. KIRK:**  I understand, your Honor.

14         There is one further point.  I believe some of the

15  people who may be listed may be themselves not people who

16  have been previously disclosed as related to Protect Marriage

17  and in those instances I think we will want to file under

18  seal with a redacted copy to the other side.

19         **MR. BOUTROUS:**  Well, we are going to have a

20  protective order, your Honor, and I think we should be able

21  to find out who the core group is, and we will -- if it's

22  someone like that, I don't see why we shouldn't have access

23  to that.

24         **THE COURT:**  I mean, if it's part of the core group,

25  I mean, you have heard the judge's view on people who are

1  involved in the management of the campaign and their privacy

2  rights.

3          I'm happy to have them protected by a protective

4  order, but to not have them have some ability to say this

5  person has got nothing to do with this --

6          **MR. KIRK:**  If it's someone who has never been

7  disclosed as having any involvement in the campaign -- I know

8  my friend Mr. Boutrous doesn't like this, but they are just

9  like Mrs. McIntyre.

10          **THE COURT:**  Well, they are not just like Mrs.

11  McIntyre.  There are many -- they are part of the management

12  of the campaign, otherwise they are not part of the core

13  group.  A public campaign, a $40 million campaign.

14          **MR. KIRK:**  The cost of the campaign is irrelevant

15  on this point, I would respectfully submit.  And if it's

16  someone who is a consultant who has never been disclosed, but

17  has been privately consulting with the campaign, and

18  California law doesn't otherwise require reporting or

19  disclosing, the First Amendment does protect that person's

20  right to participate in that campaign anonymously.

21          **MR. BOUTROUS:**  Your Honor, if consultants are being

22  paid money to participate in a campaign, I can't conceive of

23  a First Amendment privilege that would protect their

24  identity, number one.

25          And, number two, if produced to us under a

 1  protective order, I don't think there is any basis for

 2  suggesting First Amendment rights would be violated, and we

 3  should have the ability to find out who this control group

 4  consists of.

 5       **THE COURT:**  And I think it's particularly difficult

 6  to accept your interpretation of this given the Ninth

 7  Circuit's ruling that I have to decide who the core group is.

 8  And I don't think they meant I have to decide on an ex-parte

 9  basis.

10       **MR. KIRK:**  Your Honor, I certainly accept that we

11  need to disclose it to the Court, and I'm not trying to keep

12  it from the Court.

13            But if the right to anonymous speech means

14  anything, if the right to participate anonymously in a

15  campaign means anything, surely, it means that you don't have

16  to, if you don't want to, and if you haven't previously

17  disclosed it to the lawyers for the people who are -- were

18  politically on the other side.

19       **THE COURT:**  Not necessarily.  Judge Walker said

20  that this person who was previously an anonymous member of

21  the executive committee's objection was frivolous.

22       **MR. KIRK:**  The reason Judge Walker ruled that way,

23  I believe, and there wasn't much dialogue on that --

24       **THE COURT:**  It had nothing to do with it had been

25  disclosed before.  Judge Walker explained himself clearly.

1   There can be no First Amendment protection to someone who is

2   involved in as an officer, manager, director, managing agent

3   for a campaign.   There can't be --

4        **MR. KIRK:**   Even if the person -- is it the Court's

5   ruling that even if it's a person who is a consultant who has

6   never previously been disclosed, you are saying the First

7   Amendment doesn't protect that person?

8        **THE COURT:**   I am saying that there is not a

9   sufficient privilege that would need to be protected by

10  nondisclosure to even the lawyers from the other side.   That

11  with respect to that identity, it might be sufficient to have

12  attorney's eyes only.   That's my point.

13       Obviously, there are different levels of interest

14  in different things with regards to the First Amendment.   And

15  it seems to me that as to someone who is involved in the

16  formulation of strategy and messaging and is the core group

17  involved in the formulation of strategy and messaging, and

18  since we have to decide under this test, I don't see how I

19  cannot have at least on an attorney's eyes only basis and I

20  don't see why you would object on an attorney's eyes only

21  basis to these persons knowing the identity.

22       **MR. KIRK:**   I do object, your Honor, and I do

23  believe the First Amendment does protect the right of someone

24  to remain anonymous even as to the attorneys representing the

25  political opponents.   I believe it is possible for the Court

1  and, indeed, counsel --

2       **THE COURT:**  Fine.  We will do it that way.  4:00

3  o'clock tomorrow you can submit under seal those you want

4  under seal.

5       But I will tell you, like Judge Walker, I'm

6  extremely uncomfortable with under seal filings.

7       **MR. KIRK:**  I understand, your Honor.

8       **THE COURT:**  I cannot take them at face value.  I

9  just simply can't, because there is no testing involved.  It

10 is your statements about it and untested by the other side.

11 So I will need to be completely convinced by your filings

12 that they are correct.

13      But if you want to do it that way.  I might be much

14 more forgiving in terms of how broad I interpret this core

15 group if I felt it had been tested by having the other side

16 look at it.

17      **MR. KIRK:**  Just to be clear, your Honor, I would

18 expect most of the people we submit don't fall into this

19 category.

20      **THE COURT:**  That's fine.  I will give you that

21 opportunity.  You can have two filings, one under seal.

22      **MR. KIRK:**  Thank you, your Honor.

23      **MR. BOUTROUS:**  And, your Honor, could I just add a

24 request?  If we could at least know how many people when they

25 make that filing?

1          **THE COURT:**  Sure.

2          **MR. BOUTROUS:**  And if the Court could require them

3   to include the unidentified person from the Prentice

4   declaration in that filing, so then if the Court determines,

5   we can at least find out that way without having to go

6   through the whole Prentice declaration.

7          **THE COURT:**  Oh, oh.  What he is saying is figure

8   out whether or not you --

9          **MR. KIRK:**  There may be an easy step on that.  For

10  all I know that person has already been identified and we

11  will just tell them.

12         **THE COURT:**  Fine.

13         **MR. BOUTROUS:**  And if you still maintain he needs

14  to be kept confidential, put it in your sealed submission and

15  we can argue that we should get his name, too, under the

16  protective order.

17         **THE COURT:**  Fine.

18         **MR. BOUTROUS:**  Thank you.

19         **THE COURT:**  So now we have addressed all the easy

20  digs.  We have to deal with the hard digs.

21         Date of production and date for any amended

22  privilege log.  The first seems more important than the

23  second to me.

24         **MR. KIRK:**  May I be heard, your Honor?

25         **THE COURT:**  Please.

1          **MR. KIRK:**  Nobody is going to like what I have to

2    say.

3          **THE COURT:**  Fine.

4          **MR. KIRK:**  As best we can tell, and I believe this

5    was in the brief that we put into the Court, we believe that

6    we will have to go back and rereview roughly 30,000

7    documents.  We don't have the resources to do that while we

8    are simultaneously trying the case.

9          This is -- before the break, your Honor made the

10   point, and it was entirely accurate, that the definition of

11   what's in and what's out has been a moving target as we have

12   proceeded through the fall.  First there was the October 1st

13   order, then there was the November 11th order, then there was

14   the first Ninth Circuit opinion, and then there was the

15   second Ninth Circuit opinion.

16         The practical result of that is that in sorting

17   what's in and what's out, the sort has been done based on

18   moving criteria.  The only way we are going to be able to

19   comply with the order that the Court just described in terms

20   of what must be produced is to go back and rereview 30,000

21   documents and figure out, This is one that must be produced.

22   This is one that must be logged.  This is one we don't have

23   to worry about.

24         That is something that will take us, even if we

25   could devote, you know, one or two lawyers and a paralegal to

```
 1  it, months.

 2          THE COURT:  That's ridiculous.  I have got to tell

 3  you.  I have been in so many large litigations, that is

 4  completely preposterous.  People -- it's not the case that a

 5  person can only log essentially five or ten documents an hour

 6  or can only review five or ten documents an hour.  That is

 7  preposterous.

 8          MR. KIRK:  Your Honor, a person can review and log

 9  somewhere between 50 and 60 documents an hour, not five; 50

10  or 60.

11          THE COURT:  You said 25 in your declaration.  That

12  is silly.  I mean, what am I to believe?  Well, in any

13  event --

14          MR. KIRK:  Fifty to 60 if you are flying, 25 if you

15  are doing it right.

16          I mean, your Honor --

17          THE COURT:  All you are doing is going through a

18  list of names and saying, they're in or they're out.  Because

19  you decided you are not going to do this thing with regard to

20  relevance.  So if you just are reviewing it for who is in the

21  core group, those documents that only contain to and from of

22  the core group, they are on the log.  Those that don't

23  contain any other name, they are not on the log.

24          MR. KIRK:  You also have to review to see if it's

25  related to Proposition 8.
```

1           THE COURT:  Okay.  That will take all of a half a

2    second per document, maybe a second per document.

3           MR. KIRK:  And then -- I mean, your Honor, what do

4    you want me to say?  Honestly --

5           THE COURT:  Okay.  I understand, but I think this

6    is a problem of your own making.  I actually think this is a

7    problem of your own making.  I think you decided a long time

8    ago that you weren't going to review this except as your

9    interpretation of what might be within the privilege.

10          MR. KIRK:  That's true.

11          THE COURT:  Right.

12          MR. KIRK:  We reviewed it --

13          THE COURT:  You didn't leave open for the

14   possibility that there might be other documents,

15   notwithstanding the fact that trial is coming up, where

16   someone might disagree with you.  So it's really of your own

17   making.

18          Why didn't you anticipate that there might be

19   additional -- another way of looking at this?

20          MR. KIRK:  Your Honor, I don't believe,

21   respectfully, that we are responsible for anticipating what

22   the Court is going to rule before the Court rules.

23          THE COURT:  No, no.  And I don't mean that.  What I

24   do mean is that when you decide we are going to make a cut on

25   privilege, okay, and it's coming up on trial and you know

1  that privilege is at issue and you might be wrong, well, you

2  better anticipate that there might be other things that the

3  Court might require you to do before trial.  Don't you?

4          **MR. KIRK:**  Your Honor, I honestly do not believe

5  that there is any obligation to anticipate --

6          **THE COURT:**  I see.  So as long as you have the

7  ability to keep the privilege ball in the air up to the time

8  of trial, you are forgiven.  You don't have to produce any of

9  those documents that the Court now decides are not

10 privileged.

11          I mean, what you're essentially saying is this

12 ruling by the Ninth Circuit as regards to the limitation of

13 the privilege is a nullity for this case.

14          **MR. KIRK:**  No.  I'm not saying that, your Honor,

15 but I am saying that a party is entitled to a reasonable

16 opportunity when a new ruling comes out to adjust to it given

17 the realities of the situation.

18          The reality here is there's 30,000 documents.  I do

19 not believe that it was our obligation to guess in advance

20 that the Ninth Circuit was going to adopt the new footnote

21 12.

22          Now that it has adopted that and now that your

23 Honor has ruled on what that means practically, we have to be

24 given a reasonable amount of time to implement this.  And

25 this --

1           THE COURT:   Notwithstanding the fact that there is

2    a trial imminent.

3           MR. KIRK:   The answer to that is honestly yes, your

4    Honor, notwithstanding the fact that there is a trial.

5           THE COURT:   Irrelevant of the fact that there is a

6    trial.

7           MR. KIRK:   It's not irrelevant, but we can only do

8    what we can do.

9           THE COURT:   You say you don't have the resources.

10   How many lawyers have worked on this case from your firm and

11   all the other firms listed?

12          MR. KIRK:   I don't know the answer to that.  I will

13   tell you there's only 12 lawyers in my firm and not all of

14   them have worked on this case, but some number.

15          THE COURT:   I mean, his number was nine, I think,

16   lawyers have worked on this case.

17          MR. KIRK:   I can't dispute that.  There might be

18   nine.  Honestly, all the lawyers on this case are fully

19   consumed, as any lawyer would be, as any team would be

20   preparing for trial.

21          THE COURT:   Okay.  I understand that.  But I don't

22   think you can play this trump a card.  I think it is

23   outrageous that you are playing this trump card and I

24   actually can't believe you are doing it.

25              That notwithstanding, just because -- just because

1    you were able to keep the ball in the air on privilege until

2    December, therefore, you don't have to produce these

3    documents in this litigation, that is not an appropriate

4    answer.

5             It may be that you are going to have to produce the

6    documents to the other side and not do other things.  That

7    may be.  That may be the price you pay.

8             **MR. KIRK:**  Your Honor, may I respond to that?

9    Respectfully, I don't think the characterization "keep the

10   ball in the air until December" is fair.

11            The positions we've taken on privilege not only

12   have been fully fair, but were largely vindicated by the

13   Court of Appeals.  No one can say that they were purposely

14   putting out objections and taking positions.

15            **THE COURT:**  I didn't, I didn't.

16            **MR. KIRK:**  Maybe I mistook the phrase "keep the

17   ball in the air" --

18            **THE COURT:**  It's an inappropriate phrase.  I

19   withdraw it.

20            **MR. KIRK:**  Your Honor, I don't want to get cross

21   with this.  Thank you, your Honor.

22            **THE COURT:**  Not a problem.

23            **MR. KIRK:**  All I want to suggest is with respect to

24   the Court, I believe we carried out our responsibilities

25   entirely appropriately and the cold reality here is that the

1  rules of the game changed a week before the trial is going to

2  start and as a result of that change in the rules, we have to

3  go back and look at 30,000 documents.  That's something we

4  don't have the resources to do over any short reasonable

5  period of time.

6           There is nothing else I can say other than that's

7  the reality.

8           **THE COURT:**  Okay.  Let me hear from the other side.

9  How do I solve this problem?

10          **MR. BOUTROUS:**  Your Honor, we would request that

11 the Court order production to begin Saturday on a rolling

12 basis.

13          We understand that there is some practical

14 limitations, but this really is of the proponents' own

15 making.  They withheld these documents by their own

16 statements in their notice of privilege log filing on page 12

17 based on the relevance responsiveness objection, which was

18 clearly baseless.

19          **THE COURT:**  I have to tell you, I agree with that.

20 I think the relevance objection is entirely frivolous.  I

21 think that interpretation of Judge Walker's ruling is

22 completely frivolous, and I agree with that.

23          But nonetheless, some of this has to do with the

24 interpretation of the privilege.  So, for example, if they

25 ignored the relevance issue, they still have to go through

1  and identify the names on these things, which are core group

2  only and which have other people, which actually went to

3  other people, have names under there that they really didn't

4  go to.  Who is this person who is listed there, and should I

5  have said that person was a core group?  I mean, that will

6  take some time.

7          So he still has a problem.  It's not as big a

8  problem as he says, because I don't think he has to review

9  for relevance in any particular way.  He certainly said he

10 doesn't think he is going to have to review for relevance.

11 A relevance limitation doesn't help.

12         I think that their objections on relevance and

13 having withheld documents on relevance is entirely frivolous,

14 but there is still a problem there.  There is still 30,000

15 documents to go through for -- even just for First Amendment

16 privilege.  I'm not sure how fast one can do that.

17     **MR. BOUTROUS:**  I guess, your Honor, that the

18 privilege claim -- my colleague is making the point the

19 documents they claimed were privileged were these documents

20 (indicating), and they submitted a privilege log.

21         The other documents, the ones we said needed --

22 that went externally, I think --

23     **THE COURT:**  Why isn't that an answer?  I guess I

24 don't understand why that's not an answer.  I guess let me

25 make sure I understand what the point is.

1          MR. KIRK:  I didn't understand the point.

2          THE COURT:  The point is this, as I understand it,

3    because I want to make sure I understand.  The maximum

4    universe of documents that you assert in the First Amendment

5    privilege are contained in the privilege log.

6          You were required to put a privilege log together.

7    You put a privilege log together and that's it.  They're

8    not -- you're not asserting privilege as to other documents.

9          MR. KIRK:  Yes, we are, your Honor.

10         THE COURT:  Why aren't they in the privilege log?

11         MR. KIRK:  They are not on the privilege log

12   because, and I understand --

13         THE COURT:  Because of the relevance objection.

14         MR. KIRK:  I understand that --

15         THE COURT:  I see, I see.  That's the point.

16         MR. KIRK:  Your Honor, can I finish, please?

17         THE COURT:  Yes, sure.

18         MR. KIRK:  It's not just relevance.  That shorthand

19   is a little bit misleading in the following sense.

20         Judge Walker's November 11th order, as we

21   understood it -- and I appreciate you think that our

22   understanding was frivolous and I don't agree with that, but

23   be that as it may, he specifically said the following

24   categories of documents are not relevant to this case and

25   they are not responsive.

1        THE COURT:  To number eight.

2        MR. KIRK:  He did use it to number eight.  And

3   because we believed that numbers one and number six were

4   subsets of number eight, we believed his rulings extended to

5   numbers one and six.

6        THE COURT:  Except that by that time one and six

7   were not subsets of eight.

8        MR. KIRK:  No, actually --

9        THE COURT:  Because eight had been limited by that

10  time to internal communications, so they clearly weren't

11  subsets.

12       MR. KIRK:  We limited our interpretation to

13  those -- to --

14       THE COURT:  I understand what you are --

15       MR. KIRK:  I don't want to reargue that.

16       All I'm trying to tell you is that we did not

17  believe -- and we clearly stated this.  It's in our paper

18  that we submitted with the privilege log.  We did what the

19  parties ordinarily do in discovery.  We listed on the

20  privilege logs those documents that we believed were

21  responsive to the requests, as we believed they had been

22  limited by Judge Walker, that didn't include those documents

23  that we thought were not responsive, yet, are privileged.

24       THE COURT:  That's the answer to this point.

25  That's the answer.  That is a fair answer to the point, that

1    they -- they haven't reviewed for privilege in that sense.

2    Documents that they understood to fall outside the

3    responsiveness limitations.  I think they thought they were

4    in error.  And they were grasping at straws, frankly, to

5    getting the responsiveness limitation because it's clear the

6    ruling only on number eight, wasn't ruling on any other

7    document request, and he was clearly ruling only in the

8    context of the assertion of the privilege.

9            So I don't think that that's reasonable.  But it

10   really proves not too much because of the notion that his

11   description of relevance had only to do with internal

12   documents was the universe of relevant documents where the

13   cases he sought was clearly contradicted by other parts of

14   it.  But having said that, they do have a problem.

15          **MR. BOUTROUS:**  They -- they do.  It's of their own

16   making and again --

17          **THE COURT:**  How long will it take them to go

18   through all those documents?

19          **MR. BOUTROUS:**  Well, if they have an electronic

20   data base, it shouldn't be very hard because it really is, as

21   you pointed out, the to, the from, names of the people.  You

22   run the search and --

23          **THE COURT:**  I'm sure he's going to say it's all

24   paper copies.

25          **MR. KIRK:**  Not all paper.  I believe they are --

1              THE COURT:  PDFs or something.

2              MR. PANUCCIO:  Or some equivalent.  Outlook files.

3    But we don't have a --

4              MR. BOUTROUS:  A searchable.

5              MR. KIRK:  -- a normal litigation database.  The

6    resources weren't there for that in this case.

7              MR. BOUTROUS:  But I have another point.  Going

8    back to the point about the privilege log, the revised

9    request number eight defined the universe of people to whom

10   the request would apply to basically include everyone who, I

11   think, could conceivably be viewed as in the control group.

12             It was:

13             "Any person who had a role in managing or

14        directing at ProtectMarriage.com or provided

15        advice, counseling, information or services

16        with respect to efforts to encourage persons

17        to vote for Proposition 8 or otherwise

18        educate persons about Proposition 8."

19             So if they were viewing that group and

20   communications among those people as subject to this

21   privilege, I would think they would have searched the

22   document for the very same people in the core group and

23   booked them in the privilege log.

24             THE COURT:  They thought they didn't have to go

25   that broad a subject matter.

1          The same argument, that he thought the subject

2     matter was limited by the responsiveness ruling of Judge

3     Walker and, therefore, he didn't have to review that stuff.

4          But whatever it is, I'm sure -- I take it as his

5     word, which has always been good with this Court, that they

6     haven't reviewed them for privilege.  So they have got to

7     review them for privilege, and it takes some time.  And

8     30,000 documents -- it may not take months to work through,

9     but certainly takes days and days and days.

10          How long do you think it takes to do a privilege

11     review, this type of privilege review for 30,000 documents on

12     a paper file?

13          **MR. BOUTROUS:**  Your Honor, given the pretty clear

14     parameters here, basically the names of the people, and if

15     you put aside the relevant -- the relevance limitation you

16     put, I would think they could do it quickly.

17          I can't off the top of my head think it through

18     here, but they have an army of people working on this case.

19     They have had 12 lawyers file appearances.  They have a huge

20     group of people who participated in their campaign.  They

21     have been very adept at marshaling an army of people in

22     connection with their efforts on Proposition 8.

23          Mr. Schubert's article talks about this

24     unbelievable effort they had, getting people in, the

25     grassroots campaign, this huge group of people who helped

1  them.

2          This is so -- it's not going to take all lawyers to

3  do this.  You have a list of the names and Proposition 8, and

4  I would think if they could get a big group of people, all

5  the volunteers that they talked about, and crank through

6  these documents.  We would like to have them, obviously, by

7  Saturday so we could start our own review and then if they

8  need to retake some depositions or reopen depositions and use

9  them at trial, be ready to do that.

10         We are ready to work ourselves.  We'll have to

11 review the documents once we get them and pull together our

12 team.

13         And so I just think it rings very hollow that this

14 notion that they don't have the resources and --

15         **THE COURT:**  So how long is the trial going to be?

16         **MR. BOUTROUS:**  We think at least three weeks and

17 probably longer.  It could be a month.

18         And we recognize, your Honor, you're trying to

19 balance things out and we very much appreciate all the effort

20 you have put into this and we just want to get the

21 information and see it and go to trial.

22         **THE COURT:**  Well, this may be one of those things

23 where you get some of it, maybe a great deal of it, during

24 trial.  It seems unavoidable.

25         Did you want to say something?

1        **MR. KIRK:**  I just want to make the obvious response

2   to Mr. Boutrous.  It's one thing to recruit people to work on

3   a campaign on an issue they believe in.  I don't believe we

4   can go out and recruit volunteers to do document discovery.

5   That's just not realistic.

6        **THE COURT:**  I know, but the point -- I wasn't

7   listening to the campaign argument, frankly, because I don't

8   think that's relevant.

9        The relevant point is if 12 lawyers made an

10  appearance in this case, that means there's probably at least

11  that many paralegals or secretaries, too, that could also be

12  used.  Why among those people can't you marshal a number

13  folks and get this done on an expedited basis?

14       **MR. KIRK:**  We certainly do not have 12 paralegals.

15  I know of two.  There might be a couple more that work with

16  co-counsel.  Those two will be consumed full time assisting

17  in marshaling exhibits and so forth during the trial.

18       In terms of the lawyers who have made appearances,

19  at least some of them -- and certainly me -- have only done

20  so because the rest of the team was consumed with trial and

21  my appearance was limited to, really, dealing with the issues

22  that were before the Court today.

23       **THE COURT:**  I knew I was going to get you back.  I

24  knew I was going to get you back.  I was hoping it wasn't for

25  document review.

 1          **MR. KIRK:**  So was I, your Honor.  So was I.

 2          Just in thinking about --

 3          **THE COURT:**  Let me tell you the parameters that I'm

 4  thinking about.

 5          It's not acceptable to me that the documents are

 6  not produced.  It's not acceptable to me that the documents

 7  are not produced in time for most of the trial.  So I'm

 8  trying to figure out what schedule is practical within those

 9  parameters.

10          There are -- you have a number of members of

11  lawyers who have shown up.  You have -- whatever clerical

12  help you have.  You have the ability to use people on

13  contract.  It may be a burden.  I have no doubt that it's a

14  significant burden, but I have to balance that against the

15  entire side having this information for trial and not

16  necessarily at the beginning of trial.

17          On a rolling basis sounds fine with me.  We have to

18  figure out a starting point and ending point.

19          **MR. KIRK:**  Your Honor, unfortunately, I don't think

20  I can give you a helpful answer to that, because -- because

21  honestly from our perspective with those parameters it's not

22  something that we feel we have the ability to do.

23          **THE COURT:**  Okay.  Then I will just make a ruling.

24          Okay.  You will start a rolling production of the

25  documents at noon on Sunday -- that is January 10th -- and

1  finish up by noon on January 17.  I'm not going to require a

2  log to be produced until after that point, because I don't

3  think it's going to be particularly useful again.  But we'll

4  have a revised log on January 24th.  So that will be two

5  weeks into the trial.

6          Okay.  Is there anything I have forgotten to rule

7  on?

8          **MR. BOUTROUS:**  I think you have covered it, your

9  Honor.  We would just request if there are documents that the

10  proponents can produce before Sunday, that they start

11  producing them.  It would be -- it would be great to have

12  them, to the extent that they are there.

13          There has got to be a universe of documents they

14  know are not privileged and not subject to the core group and

15  went to voters and we would --

16          **THE COURT:**  I will leave it to you, but, obviously,

17  you're going to start reviewing for privilege right away on

18  this basis.  As you get through, you ought to produce them,

19  but starting on Sunday.

20          **MR. BOUTROUS:**  Thank you, your Honor.  I believe we

21  have covered the issues that we have on our list.

22          **THE COURT:**  Okay.  Anything further?  Okay.  Thank

23  you.  Court stands in recess.

24          (Whereupon, further proceedings in the

25              above matter were adjourned.)

### CERTIFICATE OF REPORTER

I, DEBRA L. PAS, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 09-2292 VRW, KRISTIN PERRY, et al, vs ARNOLD SCHWARZENEGGER, et al were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.

The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.

/s/ Debra L. Pas

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, January 7, 2010