Pages 1 - 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

KRISTIN M. PERRY,                    )
SANDRA B. STIER, PAUL T. KATAMI,     )
and JEFFREY J. ZARRILLO,             )
                                     )
             Plaintiffs,             )
                                     )
VS.                                  ) NO. C 09-2292 VRW
                                     )
ARNOLD SCHWARZENEGGER, in his        )
official capacity as Governor of     )
California; EDMUND G. BROWN, JR.,    )
in his official capacity as          )
Attorney General of California;      )
MARK B. HORTON, in his official      )
capacity as Director of the          )
California Department of Public      )
Health and State Registrar of       )
Vital Statistics; LINETTE SCOTT,     )
in her official capacity as Deputy   )
Director of Health Information &     )
Strategic Planning for the           )
California Department of Public      )
Health; PATRICK O'CONNELL, in his    )
official capacity as                 )
Clerk-Recorder for the County of     )
Alameda; and DEAN C. LOGAN, in his   )
official capacity as                 )
Registrar-Recorder/County Clerk      )
for the County of Los Angeles,       )
                                     ) San Francisco, California
             Defendants.             ) Wednesday
_____) January 6, 2010


**TRANSCRIPT OF PROCEEDINGS**


**Reported By:** *Katherine Powell Sullivan, CRR, CSR 5812*
*Official Reporter - U.S. District Court*

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiffs:** | GIBSON, DUNN & CRUTCHER LLP |
| | 1050 Connecticut Avenue, N.W. |
| | Washington, D.C. 20036-5306 |
| BY: | **THEODORE B. OLSON, ESQUIRE** |
| | **MATTHEW D. MCGILL, ESQUIRE** |
| | |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 333 South Grand Avenue |
| | Los Angeles, California  90071-3197 |
| BY: | **THEODORE J. BOUTROUS, JR., ESQUIRE** |
| | **CHRISTOPHER D. DUSSEAULT, ESQUIRE** |
| | |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 555 Mission Street, Suite 3000 |
| | San Francisco, California  94105-2933 |
| BY: | **ETHAN D. DETTMER, JR., ESQUIRE** |
| | |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 1999 Harrison Street, Suite 900 |
| | Oakland, California  94612 |
| BY: | **JEREMY MICHAEL GOLDMAN, ESQUIRE** |
| | |
| **For Plaintiff-** | CITY AND COUNTY OF SAN FRANCISCO |
| **Intervenor:** | OFFICE OF THE CITY ATTORNEY |
| | One Drive Carlton B. Goodlett Place |
| | San Francisco, California 94102-4682 |
| BY: | **THERESE STEWART, DEPUTY CITY ATTORNEY** |
| | **ERIN BERNSTEIN, DEPUTY CITY ATTORNEY** |
| | |
| **For Defendant** | MENNEMEIER, GLASSMAN & STROUD |
| **Gov. Schwarzenegger:** | 980 9th Street, Suite 1700 |
| | Sacramento, California  95814-2736 |
| BY: | **ANDREW WALTER STROUD, ESQUIRE** |
| | |
| **For Defendant** | STATE ATTORNEY GENERAL'S OFFICE |
| **Edmund G. Brown Jr.:** | 455 Golden Gate Avenue, Suite 11000 |
| | San Francisco, California  94102-7004 |
| BY: | **TAMAR PACHTER, DEPUTY ATTORNEY GENERAL** |

(Appearances continued on next page)

**APPEARANCES (CONTINUED):**

**For Defendant-**             COOPER & KIRK
**Intervenors:**               1523 New Hampshire Avenue, N.W.
                               Washington, D.C.  20036
                   BY:  **MICHAEL W. KIRK, ESQUIRE**
                        **JESSE PANUCCIO, ESQUIRE**


**For Proposed**               ADVOCATES FOR FAITH AND FREEDOM
**Intervenor Imperial**        24910 Las Brisas Road, Suite 110
**County, et al.:**            Murrieta, California  92562
                   BY:  **ROBERT H. TYLER, ESQUIRE**
                        **JENNIFER L. MONK, ESQUIRE**


**For Media Coalition:**       DAVIS WRIGHT TREMAINE LLP
                               505 Montgomery Street, Suite 800
                               San Francisco, California  94111-6533
                   BY:  **THOMAS R. BURKE, ESQUIRE**


**For Doug Swardstrom:**       HICKS THOMAS LLP
                               8001 Folsom Boulevard, Suite 10
                               Sacramento, California  95826
                   BY:  **ERIC GRANT, ESQUIRE**

1                    **P R O C E E D I N G S**

2   **JANUARY 6, 2010**                              **10:05 A.M.**

3

4        **THE CLERK:**  Calling civil action C 09-2292, Kristin

5   M. Perry, et al. versus Arnold Schwarzenegger, et al.

6        **MR. RICO:**  Good morning, everyone.  My name is Buz

7   Rico.  I'm the IT manager for the District Court here.

8        Judge Walker asked me to give a brief presentation to

9   you all, and allow for some questions and answers afterwards,

10  discussing the cameras that you see here in the courtroom.

11       I'm going to give you a demonstration of a test video

12  that we made the other day, to show you the concept that we

13  came up with, and give you an impression on how we're going to

14  allow for public access, how we would like to allow for public

15  access.

16       You will be able to see the presentation on the video

17  monitors there as well as hear it through the sound system.  I

18  will be happy to repeat the little one-minute video that we

19  have, if you like.

20       To give you a brief overview to begin with, we have

21  three cameras, stationary cameras, that are dedicated viewing:

22  The counsel, the judge, and the witness.

23       There are no other room cameras.  And the cameras do

24  not move, zoom, pan, or anything like that.  They are merged

25  into a single video image that I'll bring up on the screen

 1  right now.  Looks like that.

 2            (Image displayed)

 3            There's a clock running in the upper right-hand

 4  corner, notation at the actual case name and number, the court

 5  logo.  And then you see an actual video from that.

 6            I'm going to run the video right now so you can see

 7  what happens.  We're able to moot the sound that's recorded and

 8  is also streamed over to the ceremonial courtroom on the 19th

 9  floor which we will be using for overflow purposes and down to

10  the media center that's on the first floor.

11            In addition to being able to moot the sound, we can

12  black out any of the cameras upon request of the judge.  So if

13  we have a witness who does not wish to appear on camera, the

14  judge can specifically request that to the IT department, where

15  I will be sitting at my desk ready to moot any camera he

16  wishes.

17            So here runs the demo.

18            (Demonstration video played in open court.)

19       **MR. RICO:**  You can see he's talking now.

20            (Demonstration video played in open court.)

21       **MR. RICO:**  So, as you can see, we can moot any aspect

22  of this.  We can continue to hear the audio if the camera is

23  turned off, if you wish.  The only thing we can't do is, we

24  can't turn off individual microphones.  There also would be no

25  point to doing that because the other microphones in the room

1 would pick up anybody else talking.

2          Also, there's really no point in turning off the

3 audio for the other rooms or the video for the other rooms,

4 necessarily, unless the courtroom is also cleared out, because

5 there will be public here from the courtroom.

6          Nevertheless, the intent right now is to record the

7 video of the hearing and then make that available to the public

8 at a slightly later time.

9          So to enact that, we've started up a YouTube channel,

10 where we are able to upload -- we already have uploaded the

11 same video you just saw.

12          We are really proud of that video, as you can tell.

13          (Laughter)

14          **MR. RICO:**  So the idea is basically that.

15          We'll be recording the session.  There's some

16 technical issues we have to get through to be able to get the

17 video ready for YouTube, uploaded to YouTube.  And then YouTube

18 has a processing time, so odds are videos won't be available

19 until many hours, or possibly the next morning, after the

20 hearing or the session is over.

21          We're going to try to make that as quickly as

22 possible.  The judge specifically did not want it broadcast

23 live.  He did want the delay involved in it.

24          And, again, anything that is mooted, audio or video,

25 is then the same way recorded that way and sent to the overflow

1  chambers and to the -- the overflow courtroom, excuse me, and

2  to the media center.

3          So with that, does anybody have any questions?  In

4  the back.

5          **UNIDENTIFIED SPEAKER:**  There is a TV truck that we

6  were told is plugging into this.  Is there a live feed out for

7  us to record, as well?

8          **MR. RICO:**  The question was:  There's a TV truck with

9  a live feed coming out.

10          The television stations actually do have a fiberoptic

11  link that goes to the media center.  The purpose of that link

12  is so that they can connect to their own cameras down in the

13  media center for the purposes of recording interviews.  It's

14  not for the purpose of patching into the system.  They do not

15  have any type of patch, nor are they allowed to record what

16  they actually see on the screen, which I think is probably

17  below the quality they wish anyway.  But, yeah, the purposes of

18  that patch is not for feeding out this link directly.

19          Any other questions?

20          Here in the front.

21          **MR. BURKE:**  I have a number of questions for the

22  Media Coalition, but I assume the judge is also going to answer

23  questions.

24          **MR. RICO:**  Yes.  I'm just here for the technical

25  aspect of this.

 1              There's another question over here.

 2         **UNIDENTIFIED SPEAKER:**  Did I take it from what you

 3    said, the judge is determined -- is not inclined to telecast

 4    any of the trial live?

 5         **MR. RICO:**  I'll leave that answer to the judge.  But,

 6    at this point, my direction is to record and then make

 7    available later; not to make it available outside of this

 8    building live.

 9              We are looking into the possibility of streaming live

10    to other courthouses in the Ninth Circuit, possibly outside the

11    Ninth Circuit, which may allow the public to come to those

12    courts to see the video live, but not to allow the streaming

13    live to the media or to the public or Internet directly.

14              Yes, here in front.

15         **UNIDENTIFIED SPEAKER:**  Will YouTube carry the entire

16    proceeding?

17         **MR. RICO:**  The question is:  Will YouTube carry the

18    entire proceeding?

19              Their only limitation, per our contract with them, is

20    a file-size limit.  We don't have a limitation on the number of

21    files we can do.  Our intent is to upload the entire thing.

22    There is some technical issues on that because your average

23    movie may be two hours long and we've got eight hours a day of

24    this stuff.  So we are going to try to get as much of it up

25    there as we can, if not all.

1        Yes.

2            **UNIDENTIFIED SPEAKER:**  What's the YouTube address?

3        **MR. RICO:**  The YouTube address right now is

4   youtube.com/usdccand.  So it's like U.S. District Court

5   California Northern District.

6            **UNIDENTIFIED SPEAKER:**  Are you going to be recording

7   it and streaming it out in HD quality, at the very least?  Or

8   do you know what quality you are sending it out?

9        **MR. RICO:**  We are going to try to record this at the

10  highest possible quality.  The higher the quality, the longer

11  it takes to process everything.  So if speed is of the issues,

12  we might drop down the quality so we can upload it to YouTube

13  faster.  Right now, we are still working out the kinks.  We are

14  going to try to do the best we can.

15           Another question in front?

16       **MR. BURKE:**  Are those the cameras that you plan to

17  use?

18       **MR. RICO:**  Yeah.  The equipment that you see in the

19  courtroom right now are the cameras we are using.  They are

20  standard cameras.  They are running all in HD.

21           And the video feed you see on the screen here in this

22  movie is also HD.  The images that are seen in the ceremonial

23  courtroom and media center are also all HD.

24           **UNIDENTIFIED SPEAKER:**  Do you happen to know if

25  YouTube has had this arrangement in other courts in the past?

```
 1              MR. RICO:  The question was:  Does YouTube have this
 2   arrangement?  There are other arrangements with other courts.
 3   There's a federal contract between YouTube and the federal
 4   government and individual entities within the government.  The
 5   most noted one is, if you go to youtube.com/whitehouse, all of
 6   the White House videos are there.  They look really good.  We
 7   are trying to match them.
 8              Yes.
 9              UNIDENTIFIED SPEAKER:  What do we have to worry about
10   as far as licensing is concerned?  Do we have to ask anyone for
11   permission to rebroadcast, or is this public domain for the
12   government?
13              MR. RICO:  The question was asked:  Do we have any
14   issues about licensing?
15              I'm not an expert in that, but, as far as I know,
16   this is a matter of public record.
17              UNIDENTIFIED SPEAKER:  Can we quote you as saying
18   that?
19              (Laughter)
20              MR. RICO:  I guess whatever I say is a matter of
21   public record.  I'm just the IT guy here.
22              (Laughter)
23              MR. RICO:  I believe the judge can overrule that or
24   accept that.
25              This is also an experiment, as was noted by the
```

1  announcement in the Ninth Circuit.  We are trying our best at

2  this.

3          This is the first time this has been done, and we

4  didn't have a lot of time to prepare.  So the whole thing might

5  be cancelled or put in some kind of degraded state in some kind

6  of way, if we can't manage to keep up this full workload.

7          So, with that, the judge asked me to take about 15

8  minutes, and that's what I've taken.  So thank you very much.

9          (Pause in proceedings.)

10         **THE CLERK:**  Recalling civil action C 09-2292

11  Kristin M. Perry, et al. versus Arnold Schwarzenegger, et al.

12         Counsel, please step forward and state your

13  appearances along with whom you represent, for the record.

14         **MR. OLSON:**  Good morning, Your Honor.

15         Theodore B. Olson, Gibson, Dunn & Crutcher, on behalf

16  of the plaintiffs.

17         **THE COURT:**  Good morning, Mr. Olson.

18         **MR. BOUTROUS:**  Good morning, Your Honor.

19         Theodore J. Boutrous, Jr., also for the plaintiffs,

20  also from Gibson, Dunn & Crutcher.

21         **THE COURT:**  Mr. Boutrous, good morning.

22         **MR. DETTMER:**  Good morning, Your Honor.

23         Ethan Dettmer, from Gibson, Dunn, on behalf of the

24  plaintiffs.

25         **THE COURT:**  Mr. Dettmer.

1          **MR. MCGILL:**  Good morning, Your Honor.

2          Matthew McGill, Gibson, Dunn & Crutcher, for the

3   plaintiffs.

4          **THE COURT:**  Good morning.

5          **MS. STEWERT:**  Good morning, Your Honor.

6          Therese M. Stewart, Chief Deputy City Attorney for

7   the City and County of San Francisco.

8          **THE COURT:**  Good morning.

9          **MR. GOLDMAN:**  Good morning, Your Honor.

10         Jeremy Goldman, from Boies, Schiller & Flexner, for

11   the plaintiffs.

12         **THE COURT:**  Good morning.

13         **MR. DUSSEAULT:**  Good morning, Your Honor.

14         Christopher Dusseault, of Gibson, Dunn & Crutcher,

15   for the plaintiffs.

16         **THE COURT:**  Good morning.

17         **MR. KIRK:**  Good morning, Judge Walker.

18         My name is Michael Kirk.  I'm here on behalf of the

19   defendant-intervenors, from Cooper & Kirk.

20         **THE COURT:**  Good morning.  I believe this is your

21   first appearance here, isn't it?

22         **MR. KIRK:**  Yes, it is, Your Honor.  And, with any

23   luck, it's my last.

24         (Laughter)

25         **THE COURT:**  Well, this ought to be interesting.

1          (Laughter)

2          **MR. KIRK:**  Thank you, Your Honor.

3          Mr. Cooper had a personal matter, and asked me to

4     pitch hit for him and to express his apologies to the Court.

5     But he should be at the podium Monday morning.

6          **THE COURT:**  Well, that's fine.  Welcome, in any

7     event, Mr. Kirk.

8          **MR. KIRK:**  Thank you, Judge Walker.

9          **MR. PANUCCIO:**  Good morning, Chief Judge Walker.

10         Jesse Panuccio for the defendant-intervenors.

11         **THE COURT:**  Good morning, Mr. Panuccio.

12         **MR. TYLER:**  Good morning, Your Honor.

13         Robert Tyler, Advocates for Faith and Freedom, on

14    behalf of the County of Imperial and County Clerk, Ms. Vargas.

15         **THE COURT:**  Good morning.

16         **MS. MONK:**  Good morning, Your Honor.

17         Jennifer Monk, on behalf of the County of Imperial.

18         **THE COURT:**  Ms. Monk, good morning.

19         **MR. STROUD:**  Good morning, Your Honor.

20         Andrew Stroud on behalf of Governor Arnold

21    Schwarzenegger and the State official defendants.

22         **THE COURT:**  I understand the governor is giving the

23    State of the State Address.

24         **MR. STROUD:**  He is presently occupied, Your Honor,

25    yes, that is true.

 1          **MS. PACHTER:**  Good morning, Your Honor.

 2          Tamar Pachter on behalf of the Attorney General.

 3          **THE COURT:**  Good morning.

 4          **MR. GRANT:**  Good morning, Your Honor.

 5          Eric Grant, Hicks Thomas LLP, for Doug Swardstrom, in

 6  connection with plaintiffs' motion to compel.

 7          **THE COURT:**  Good morning.

 8          **MR. BURKE:**  Good morning, Your Honor.

 9          Thomas Burke of Davis Wright Tremaine, on behalf of

10  the Media Coalition.

11          **THE COURT:**  Very well.  Well, welcome back, Counsel,

12  those of you who are coming back.  And those who are new,

13  welcome for the first time.

14          We have a number of matters to discuss this morning.

15  The first is the issue of recording the proceedings, the trial.

16  And we'll discuss that more fully in a moment.

17          We have a motion to intervene by Imperial County,

18  which we need to hear.

19          And we have the motion to compel the deposition of

20  Mr. Swardstrom.

21          I believe those are the items that we need to

22  discuss.  Are there any others that need to go on the list this

23  morning?

24          Mr. Boutrous.

25          **MR. BOUTROUS:**  Yes, Your Honor.  Thank you.  We had a

1  couple of other issues.

2        One was the depositions and the scope -- some of the

3  deposition objections.  I think the Court had mentioned them in

4  the order.  We would like permission to reopen several of the

5  depositions, in light of the Ninth Circuit's amended opinion

6  which puts many documents back on the table, and the objections

7  which we think were baseless during the depositions that have

8  occurred so far.

9        **THE COURT:**  Why don't we take that up at the time we

10 address the Swardstrom deposition.

11       **MR. BOUTROUS:**  That makes sense, Your Honor.

12       We have a couple of housekeeping matters in

13 connection with the trial that I thought we could maybe raise

14 at the very end of the hearing.

15       **THE COURT:**  That will be fine.

16       **MR. BOUTROUS:**  Thank you, Your Honor.

17       **THE COURT:**  There always are those housekeeping

18 details.

19       Any others?  Any other items that we need to discuss

20 this morning, besides those that I mentioned?

21       Well, the first issue is, of course, the issue of

22 recording these proceedings.  And you've had a demonstration by

23 the Court's IT manager, Mr. Rico, of what he is prepared to do

24 by way of recording these proceedings.

25       As you know, the Ninth Circuit Court of Appeals,

1    Ninth Circuit Council, has approved an experimental pilot

2    program to record District Court civil nonjury proceedings that

3    appear to be of public interest.

4           And this particular case has certainly been

5    identified as a case that is appropriate for that pilot

6    project.

7           Chief Judge Kozinski has authorized that these

8    proceedings today be recorded and be made available to the

9    Internet through the connection, the government contract that

10   the government has with Google YouTube.

11          Now, my understanding is that there is no objection,

12   and I think there can be essentially no objection, to the

13   streaming video and audio image of these proceedings into the

14   overflow courtroom, which is the ceremonial courtroom in this

15   building.

16          My understanding is that the Ninth Circuit would also

17   like that video to go to the Ninth Circuit courthouse here in

18   San Francisco, at 7th and Mission, and would propose to make

19   that available at Ninth Circuit courthouses in Pasadena,

20   Portland, and Seattle.

21          And my understanding, also, is that the Ninth Circuit

22   has received a request to make that streaming video available

23   to the Northern District of Illinois, at the federal courthouse

24   in Chicago.

25          I'm not aware, at this time, that there are requests

1   by any other courts, but it's conceivable there may be.

2           Those transmissions would, of course, be simultaneous

3   with the proceedings.

4           The matter which I think probably we have some reason

5   to discuss this morning is the second step of the process, and

6   that is, namely, the transmission of these proceedings on a

7   delayed basis to YouTube, for purposes of posting on the

8   Internet so the proceedings can be made generally available.

9           My understanding is that the plaintiffs do not object

10  to this.  And we have Mr. Burke, from the Media Coalition, who

11  has submitted materials on this.  We have some concerns that

12  Mr. Kirk and his clients have raised.  And so I'm going to give

13  all parties an opportunity to add to what they have previously

14  submitted on this subject.

15          So, let me begin you with, Mr. Boutrous.  What would

16  you like to add to the materials that have been submitted?

17          **MR. BOUTROUS:**  Your Honor, first, I would like to say

18  that we strongly support the Court's plan, and the

19  demonstration was very helpful.

20          And we think that if ever there were a case that

21  would be perfect for this pilot program, it would be this case,

22  because of the extraordinary public interest, the effect on

23  millions of citizens in California and nationwide.  It's a

24  constitutional issue.

25          I think, based on the demonstration, it confirms our

1  thinking that the Court would be able to protect privacy

2  interests to the extent they are raised, some of the concerns

3  that the proponents have raised about witnesses and reluctance

4  to be in a televised trial, with the ability to turn off the

5  camera or otherwise limit coverage as the Court deems

6  appropriate.

7          So we think this is an ideal situation to use this

8  pilot program.  And, more broadly, I think the openness in

9  allowing people to see and hear what happens in the case as

10 close to simultaneously as possible really will relieve some of

11 the pressure of people wanting to come and be in the courtroom.

12         And, in the First Amendment context, not talking

13 about cameras specifically, the Supreme Court and the Ninth

14 Circuit have said that the value of openness gives people more

15 confidence in the system, whatever their views of the issues,

16 when citizens can see how things are proceeding in an orderly

17 way, with witnesses testifying, with the Court presiding.  It

18 brings a confidence from the public in the results and in the

19 process.  And we think that using cameras would foster those

20 values.

21         **THE COURT:**  Well, televised court proceedings, of

22 course, have a checkered history.

23         What makes this case different?  Why is this case not

24 going to suffer from some of the problems that have attended

25 these other cases that have been televised?

1          **MR. BOUTROUS:**  Several things, Your Honor.

2          First, the fact that it is a bench trial, I think it

3   really eliminates a number of the concerns that have been

4   raised in -- regarding prior trials that have been televised,

5   and concerns about future televised trials, because it's the

6   Court.  The Court can control the presentation and there aren't

7   the jury concerns.

8          Secondly, we are talking about constitutional issues,

9   not so much relating to individual circumstances.  There are

10  some individuals, our clients' stories.  But beyond that, we

11  are talking about issues of widespread importance and

12  constitutional questions, unlike other cases that are in trial,

13  if we are talking about a murder trial or some other type of

14  case that's very fact specific.

15         That's why I think it makes this case, really, an

16  ideal situation for having cameras in the courtroom.  And I

17  think even though they object to the cameras, Counsel on the

18  other side and our team are, I think, ready to work with the

19  court to make it work smoothly and in a way that will be

20  informative to the public and, I think, for real public good.

21         **THE COURT:**  Well, couldn't someone who is, say, a

22  witness in a case have some objection to having his or her

23  testimony recorded for purposes of posting on the Internet?

24         It's qualitatively different, isn't it, from getting

25  in the witness stand and testifying before a courtroom of

1  people?

2      **MR. BOUTROUS:**  Theoretically, they might have an

3  objection.  I don't think it's a valid one, in the sense that,

4  as the Supreme Court has said, what happens in the courtroom is

5  public property.  This is the people's courtroom.  And it

6  really is a mechanism for allowing people to see what is

7  happening in their courtroom.

8      That said, I do recognize that some individuals may

9  feel a shyness and a reluctance to be broadly disseminated on

10  the Internet.  To the extent there is a real concern, I think

11  the Court has the ability to control that.

12      And we would certainly be -- work with the Court to

13  the extent there are real concerns and real issues regarding

14  particular witnesses.

15      Things like opening statements, closing arguments,

16  vast pieces of the case in terms of expert witnesses, I don't

17  think would raise any of those issues.  That's why I think this

18  is really a good case for the pilot program.  And we strongly

19  support the Court's proposal.

20      The other thing I wanted to raise was on the

21  rule-making issues that the proponents' counsel have raised.

22      It seems to me, one, this really isn't a change in

23  any of the court's rules.  The General Order 58 says, "Unless

24  otherwise ordered by a judge of the court," when it's referring

25  to electronic devices.

1          And the Rule 77-3 is not being changed.  The rule

2    still stands.  The Ninth Circuit, which has authority in these

3    matters, has authorized a pilot program.  And that's what is

4    being undertaken.

5          And, this court has invoked the immediate need

6    provision of the notice and comment statute regarding local

7    rules, and asked for comment.

8          So I think all of those procedural issues that have

9    been raised by the proponents are meritless, and, in any event,

10   have been addressed by the Court.

11         Thank you.

12         **THE COURT:**  Very well.  Thank you, Mr. Boutrous.

13         Mr. Burke, you have weighed in on behalf of a group

14   of media folks on this issues.

15         **MR. BURKE:**  Yes, Your Honor.

16         And the Media Coalition appreciates the Court's

17   willingness to hear the concerns and perhaps enhancements that

18   the media coalition can give to the Court's consideration of

19   this particular case being the first of the Ninth Circuit's

20   trials to be televised.

21         We have submitted briefing for the Court which may

22   address some of the larger issues, and I'm happy to address

23   those.  But I have three basic comments that I want to point to

24   the Court, and then talk specifically about the framework

25   that's been proposed for the camera coverage.

1              The first is, it goes to that question that these are

2    historic proceedings; and the issue that this Court will decide

3    will have profound importance to millions of people.

4              And to answer the Court's question about the

5    significance of this case versus some other case -- and the

6    nature of cases perhaps not to be named in the past, where

7    things have not gone as well as others would expect, in some

8    people's impressions -- millions have voted on this very issue

9    that the Court is going to decide.  They voted recently on it.

10             And what happens in this federal court in

11   San Francisco is going to be closely followed not only in

12   California but throughout the nation and, indeed, the world.

13             So the question really is:  What can more realtime TV

14   camera coverage provide to this case if it is, indeed, the

15   first case to be televised?

16             And, I think, most importantly, allowing TV camera

17   coverage will educate the public about how an independent

18   federal judiciary can effectively try, with rules of evidence

19   and procedure, complex and in this case politically sensitive

20   issues which will come up in this case, like this case.

21             It makes it, indeed, as Mr. Boutrous says, the ideal

22   case to be televised, given the issues, given the interest, and

23   given the role of the federal court in this particular issue.

24             And, of course, I guess I would be playing to the

25   audience here, both the Court and to counsel, but there is

 1   tremendously experienced counsel ready to try this case and

 2   zealously represent both sides.  That's an ideal setting for

 3   the Court to have a case where camera coverage is allowed.

 4          There are, however, some concerns based on what we

 5   had heard previously and certainly with what we have seen in

 6   the presentation.  And this is in no way to diminish the

 7   extraordinary efforts that the Court's staff has clearly gone

 8   to, to set up this program.  But if you would grant me the

 9   license to comment on certain aspects of that, the Media

10   Coalition would really like to offer potentially some

11   substantial enhancements to that.

12          But the key issue, and I would like to touch on it

13   initially, is the notion of whether or not there is going to be

14   a realtime broadcast.  And the Court has outlined that there

15   may be, with respect to the overflow courtroom, the Ninth

16   Circuit courtroom and other courthouses around the country.

17          But, truly, I think if there is a concern about

18   something more expansive than that -- and there can be, and it

19   can be far more realtime -- the Court's question has to be

20   about control.

21          And I can assure the Court that the Court will have

22   full control over whatever is televised, whatever is streamed,

23   however contemporaneous that can be.

24          I want to introduce from afar Grace Wong, along with

25   the crew from In Session, formerly known as Court TV.  They

1   have flown in today.  They are available to talk to the Court

2   and to demonstrate to the Court and to counsel, today or some

3   other time before the trial, various additional options that

4   might be available.  And let me just touch on a few of them.

5         But before I do, please, understand that this very

6   crew that's prepared to do this work was hired by the Justice

7   Department to televise live to the world Saddam Hussein's trial

8   in Baghdad, which it did without incident.  Worldwide audience.

9         And what's important there, from that experience, is,

10  not only did it happen, and the crew that is here to do this is

11  the crew that you would have at your disposal, there was a

12  half-an-hour delay.  That was the only delay involved in that.

13  And that did not have to happen.  That was something that was

14  requested as a part of their arrangement.

15        That is something the Court should bear in mind, in

16  terms of the bona fides of this group who have literally

17  thousands of hours of experience of California camera coverage,

18  more than 30 federal trials, principally through the trial

19  period in the early '90s.  They have tremendous experience, and

20  they would make that available to the Court.

21        Let me just touch on four things, with respect to

22  what was outlined.  One is TV camera quality.

23        And, Your Honor, no offense to the cameras who

24  obviously can't be offended, but those are consumer-quality

25  cameras.  They are not broadcast production quality cameras.

1          And that significance, if this Court wants to

2     achieve, especially on a downloaded streaming basis, wants high

3     production values with respect to the camera coverage that it

4     would allow.  It looks pretty good with respect to the

5     demonstration here in the court.  But from the end of those

6     receiving at the end, perhaps on an Internet connection on the

7     download, that quality difference will be significant.  So

8     replacing the cameras with broadcast-quality cameras would be

9     an important upgrade.

10         Secondly, these microphones work well, but these are

11    not broadcast-quality audio.  There is no -- there doesn't

12    appear to be any separate broadcast-quality audio available for

13    the proceeding.  That would be an important, yet very simple,

14    change that could be made to enhance what the Court has

15    proposed.

16         Third, the issue of split screens, we saw the

17    demonstration.  And in practice that will work.  But with a bit

18    of technology, referred to generally as a switch feed function,

19    if one person is speaking, the camera can -- the image that

20    people can see is of that person speaking as opposed to a

21    permanent breaking down of three different.  So if no one is

22    speaking in two of the boxes, that person's image will not be a

23    tiny image.

24         And especially, again, for screening and streaming

25    online, that can be a critical distinction as to what can be

 1   seen and what can't, in terms of the video.

 2          There's also some technical support that could be

 3   produced.  And I did note Mr. Rico's comment that the coverage

 4   that the staff might be able to provide -- and I'm not trying

 5   to quote him; we tried to make him into a lawyer earlier, and

 6   that wasn't fair -- the whole thing might be cancelled or

 7   degraded if it can't be accomplished by the Court's staff.

 8          And this is exactly what we're concerned about.  And,

 9   you know, with due respect, the in camera crew are the best in

10   the business.  And this is what they do for a living.  And that

11   will not happen on their watch, and it doesn't have to be a

12   concern for the Court.

13          **THE COURT:**  You mean the In Session crew?

14          **MR. BURKE:**  Correct.  I apologize, especially to my

15   client.

16          Broadcast-quality footage is available in different

17   formats.  And given the range of media that will be covering

18   this, there is definition, high-def, and digital, and various

19   formats will be requested.  That's an issue that can be

20   addressed by the Media Coalition with technology.  I do not

21   know that the court is prepared or the staff is prepared to

22   address that.

23          And, also, finally, the issue of distributed network

24   for Internet access.  We've heard this morning about the

25   YouTube site.  But, clearly, the downfall there, the

1   disadvantage there is that is not going to be instantaneous.

2          When In Session does its live coverage, In Session is

3   able to stream live that coverage on cnn.com/live.  And it's

4   available.

5          And, in this instance, especially with the experience

6   of the California Judicial Council and its website, which saw

7   it crash for a few hours on March 5th, certainly the Court does

8   not want to be streaming on its own site.

9          So, certainly, the suggestion of YouTube is a change,

10  and an improved one, in terms of bandwidth capacity.  But it

11  doesn't address the issue of instantaneous access.  That is

12  something I really hope the Court would consider differently.

13         There is a substantial demand here, and there will be

14  heavy network use, which would call for a more distributed

15  network for Internet access.

16         I'm happy to address any of these particular points.

17  I'm happy to have Ms. Wong talk with the Court, answer the

18  Court's questions or provide a demonstration, including robotic

19  cameras, smaller cameras, cameras that you won't know are

20  there.  And that's the technology that's available to the

21  Court.  Please, just ask.

22         **THE COURT:**  Very well.  Thank you, Mr. Burke.

23         Mr. Kirk, do you want to weigh in on behalf of your

24  clients?

25         **MR. KIRK:**  Thank you very much, Judge Walker.

1          And, may it please the Court, and let me emphasize,

2     first, how happy I am to be before Your Honor.

3          (Laughter)

4          **THE COURT:**  Even though it's only once.

5          **MR. KIRK:**  Even though it's only once.

6          I'd like to begin with Your Honor's introductory

7     comments concerning, sort of, the state of play, and, first,

8     confirm that Your Honor was correct that the

9     defendant-intervenors do not have an objection to providing

10    streaming coverage to the overflow courtroom here at the

11    courthouse.

12          This morning was, I think, the first we've heard of

13    the suggestion that other courthouses around the country, in

14    Chicago, Pasadena, Seattle, and Portland, and perhaps the Ninth

15    Circuit courthouse, as well, might be interested in having

16    streaming coverage there.

17          And while it's certainly not quite the same as a live

18    broadcast to the public, it does strike me, at least on first

19    hearing, at least a step in that direction as we, you know, add

20    five or six different sites where the material can be

21    broadcast.  It at least is stepping in the direction of a

22    public broadcast.

23          So I would register an objection to that, that I

24    would just fold into our objection to the broader question of

25    whether the proceedings ought to be broadcast or recorded for

1  later broadcast, as I understand the suggestion that's on the

2  table.

3          We've laid out in our papers in, I think, two or

4  three letters that we've submitted to the Court, the basis for

5  our objections.  And, largely, I just rest on those papers.

6          We believe the trial should not be televised largely

7  for the reasons that were stated in multiple proceedings over

8  the last 15 years by the Judicial Conference of the

9  United States.

10          We do think broadcast imperils proponents' right to a

11  fair trial before this Court, and we do think it will violate

12  their due process rights.

13          **THE COURT:**  How so?

14          **MR. KIRK:**  Probably the most compelling concern we

15  have, Your Honor -- and it's one that the Judicial Conference

16  has repeatedly emphasized -- is the unacceptable risk that

17  broadcasting will have an impact on witnesses' testimony.  And

18  the Judicial Conference has kind of identified two different

19  ways.  The one that, quite frankly, concerns us the most is the

20  potential for intimidating witnesses.

21          As the Court is aware, and as I think we've

22  documented in our papers, the Judicial Conference has voiced

23  particular concern about the possibility of intimidating

24  witnesses as a result of broadcasts.

25          And, Your Honor, we do believe that those concerns

 1  are at their apex in this particular case.  This is --

 2       **THE COURT:**  Aren't those concerns generally voiced in

 3  connection with criminal trials?  Whereas, here we have a group

 4  of individuals, your clients, who organized and gathered to put

 5  together a political campaign to change the constitution of

 6  California; who undertook to raise a great deal of money to run

 7  that campaign and run extensive advertisements and a very

 8  extensive campaign.  They assumed a public face, if you will, a

 9  public responsibility in doing so.

10       And the witnesses on your witness list are academics,

11  for the most part, people who stand up before classrooms all

12  the time and express their views and opinions and so forth.

13       Aren't these folks different from the kind of

14  individuals that the Judicial Council has expressed concern

15  about, in connection with witness intimidation?

16       **MR. KIRK:**  I don't believe so, Your Honor.

17       It's true that some of the Judicial Conference's

18  concerns are particular to criminal cases, but they have been

19  quite clear that those concerns carry over to testimony in

20  civil cases as well.

21       That's why their policy is not limited to opposing or

22  prohibiting the use of broadcast cameras in criminal cases.  It

23  extends to civil cases as well.

24       In terms of the witnesses on our list, yes, our

25  experts, many of them are academics.  Nevertheless, it's one

1  thing to stand up in the classroom.  It's another thing to be

2  testifying across the country and across the world on camera in

3  a case like this, one that has raised passions on both sides.

4  It's a case that is contentious and highly politicized.

5         And, most importantly, Your Honor, the record is full

6  of instances in which individuals who have supported

7  Proposition 8 have been subjected to harassment and

8  intimidation.

9         **THE COURT:**  How is the testimony of the witnesses

10  going to be different if the testimony is available on the

11  Internet?

12         **MR. KIRK:**  The Judicial Conference's analysis to that

13  question -- which also drew on the Supreme Court's decision in

14  the Estes case, *Estes vs. Texas* --

15         **THE COURT:**  That goes back a good many years.

16         **MR. KIRK:**  It does, Your Honor.  It's, I believe,

17  1965.

18         And I would also commend the Court, by the way, to

19  Justice Harlan's concurring opinion, which also addressed the

20  effect on witnesses.  And all of those sources basically say

21  the same thing.

22         **THE COURT:**  This was a criminal trial, wasn't it?

23         **MR. KIRK:**  It was a criminal trial, Your Honor;

24  although, the discussion of the effect on witnesses didn't

25  appear to be -- certainly, the discussion in the Court's

1   opinions didn't appear to be focused on the fact that it was

2   criminal.  But, yes, Your Honor is correct, it was criminal.

3          The points that were made in the Estes opinions in

4   the various materials that the Judicial Conference have been

5   published is that the effect on witnesses is twofold.  On the

6   one hand, the knowledge that instead of just testifying to

7   those that are sitting in the courtroom you're testifying to

8   untold thousands and millions of people can have the impact of

9   causing some witnesses to be more timid, to be more retiring,

10  to testify differently than they would in a circumstance where

11  they are just in the courtroom.

12         Conversely, Your Honor, the Supreme Court's opinions

13  and the Judicial Conference's various reports and testimony

14  make the point that some witnesses adopt a bit more bravado or

15  overdramatization, knowing that what they are saying is on a

16  broader platform; it's going out across the world.

17         Now, in, I think the Estes case, if I'm recalling

18  correctly, the Court made the point that -- and, certainly, the

19  Judicial Conference has made this in its materials, that there

20  is no way to know in advance that Mr. Smith, who is going to

21  testify on Tuesday, will be in one category or the other.  But

22  the conclusion that was reached was that the risk is just

23  unacceptable.  The Judicial Conference's conclusion was that

24  and is that the risk to a fair trial is unacceptably high if

25  broadcast is permitted.

1            Now, Your Honor, I did want to respond to a point

2    that Mr. Boutrous made in this regard, and it was featured in

3    the technical presentation that we received this morning from

4    the Court's staff.

5            And that is, Mr. Boutrous suggested that, well, to

6    the extent a witness might feel concerned about it or

7    intimidated by it, the Court could order that that witness's

8    testimony or his picture would be blacked out.  And the

9    presentation we saw showed that, indeed, the Court's staff has

10   that capability.

11           We don't think that solves the problem.  And the

12   Judicial Conference, again, in -- I believe, in testimony

13   responding to proposed legislation, specifically addressed that

14   issue and concluded that that solution does not solve the

15   problem because, number one, in this particular case, a witness

16   who is identified as not wanting to appear and testify on

17   camera, that fact, in and of itself, will shine a spotlight on

18   that person and draw additional attention to that person that

19   otherwise would not be evoked if the witness was just one of

20   the dozens testifying in open court like all the other

21   witnesses.

22           And, second, that possibility of blacking out doesn't

23   address the other side of the coin that the Judicial Conference

24   was worried about; that is, the witness whose testimony is

25   altered in the overdramatization fashion that the -- that a

1  live broadcast or a recorded broadcast that goes up a day later

2  provides as a platform.

3      **THE COURT:**  Since I left the practice of law 20 years

4  ago, it has become common for deposition testimony to be

5  videotaped.

6      **MR. KIRK:**  That's true, Your Honor.  That does

7  happen.

8      **THE COURT:**  It does happen quite frequently.

9      And those videotapes are played in trials.  That

10  process seems not to have affected deposition testimony in any

11  material way.  The testimony is what it is.  And, of course,

12  it's very helpful to a fact finder, whether it's a judge or a

13  jury, to be able to see the witness in deposition testifying.

14  It's proven to be a very powerful enhancement of this method of

15  discovery.

16      So why can you not say the same thing about trial

17  testimony?  Seeing it, essentially, as it unfolds is much more

18  informative than reading a cold record or reading a newspaper

19  story about the testimony.

20      **MR. KIRK:**  Judge Walker, I don't believe the impact

21  on a witness whose deposition is being videotaped is the same

22  as the impact on a witness who is testifying at trial knowing

23  that the video recording of that testimony will be broadcast

24  throughout the world.

25      In the deposition setting, the videotape is taken or

1    the digital -- I guess they are digital now -- is recorded and

2    kept, but it's not broadcast to the world.  Instead, it's kept

3    in the lawyer's files.  Maybe a clip of it will three years

4    later be shown at the trial.  Maybe it won't.  But it's not

5    broadcast worldwide.

6            As I said, we're not objecting to the physical

7    presence of the camera in the courtroom for the purpose of

8    showing the testimony in the overflow courtroom.  And I would

9    submit that that's perhaps analogous to the deposition

10   scenario.

11           But the primary impact on the witness is the

12   knowledge that the testimony is going to be beamed or broadcast

13   to thousands if not millions around the country, and, indeed,

14   with the Internet around the world.

15           I did want to also, very briefly, Your Honor, respond

16   to a couple of the procedural points that Mr. Boutrous made.

17           First, Mr. Boutrous suggested that the Court's rules

18   that were in effect up until mid December perhaps haven't been

19   changed, and perhaps those might have authorized the broadcast

20   of these proceedings.  We certainly don't agree with that

21   suggestion.

22           With regard to General Order 58, that order, I don't

23   believe, has been changed since 1995.  And if the Court takes a

24   look at that, paragraph Roman numeral III is quite clear in

25   adopting the policy of the Judicial Conference of the

1   United States, which is again a policy against the broadcast of

2   civil proceedings.

3         Mr. Boutrous made reference to paragraph IV, Roman

4   IV, which begins with a "except as authorized by the presiding

5   judge."  And, then, one of the exceptions it authorizes is, if

6   the judge authorizes it, photography can take place, for

7   various reasons, in the courtroom.

8         That provision in Roman IV does not eliminate the

9   policy position taken in paragraph 3 of General Order 58.  And

10  any confusion on that, I think, was probably cleared up, if the

11  Court takes a look at the media guide that the clerk's office

12  here in the District Court published for this very case.  That

13  media guide, at least as it stood in December, and I think it

14  was subsequently revised a bit, in light of the changes in the

15  local rules, but as it stood in December, and I think as it

16  stood today, it pointed out to the media and other interested

17  people the General Order 58 adopts the Judicial Council's

18  policy, and it prohibits the broadcast or televising of civil

19  proceedings.

20        Now, with regard to Local Rule 77-3, as I understand

21  the situation, the Court has amended that.  And the amendment

22  does state that it authorizes the court -- it maintains the

23  prohibition against the broadcast of civil proceedings, but it

24  includes an exception in which the court can have a particular

25  case participate in the pilot program that the Ninth Circuit

1  had announced.

2         We have outlined, I think, most of our objections to

3  the procedures that led to the adoption of that rule, in our

4  papers, and I won't repeat those.  The only new points I would

5  make is, I understand that either yesterday, or perhaps the day

6  before, the court posted a revised copy of the rule with a

7  notice that indicated the court was invoking the immediate need

8  exception that was set forth in 28 U.S.C. Section 2071E.

9         I would just note for the Court that we don't believe

10 that there is any immediate need for this particular case to be

11 broadcast.

12        It would be our view that to the extent the rules are

13 going to be changed on a going forward basis, and a pilot

14 program is proper and authorized, that that ought to be done

15 for another what we would submit would be more appropriate case

16 that could --

17        **THE COURT:**  What would be an appropriate case?

18        **MR. KIRK:**  Your Honor, our view would be there is

19 none, because we agree with the view taken by the Judicial

20 Conference that there is none.

21        But if that view is rejected, I would respectfully

22 submit, an appropriate case would be a more run-of-the-mill

23 sort of case that better captures the daily operations,

24 perhaps, of the Federal District Court.  And certainly not a

25 case where any party has objected or any witness has objected.

1  And certainly not a case where there is already specific record

2  evidence demonstrating that because of the highly contentious

3  and politicized nature of the underlying issue, that

4  individuals have been subjected to harassment and intimidation.

5  If ever there was a case where it was appropriate, Your Honor,

6  we would respectfully submit, this isn't it.

7        So we would say, Your Honor, that we don't believe

8  that there is an immediate need that justifies changing the

9  rule without appropriate notice and comment.

10        And the one other point I'd like to make, in putting

11  the rule out for notice and comment, even as the immediate need

12  exception was invoked, the period that was authorized for

13  comment was exceptionally short.  I think it was on the order

14  of five business days.

15        And it would be our view that, especially given the

16  magnitude of the change being proposed to the court's rules,

17  and the fact that it is contrary to a long-standing policy

18  adopted by the Judicial Conference of the United States that

19  the Conference believed was necessary to ensure fair trials, we

20  would submit that a longer comment period really is

21  appropriate.

22        And with that, Your Honor, we would be happy to rest

23  on the papers that we've submitted.  And I thank you so much,

24  Your Honor, for taking the time to hear our argument.

25        **THE COURT:**  Very well.  Thank you, Mr. Kirk.

1              **MR. BOUTROUS:**  Your Honor.

2              **THE COURT:**  One last word, Mr. Boutrous, very

3  quickly.

4              **MR. BOUTROUS:**  May I, Your Honor, very quickly?  I

5  want to focus on this witness issue, very briefly.

6              These witnesses and the proponents are involved in a

7  case that will affect the rights of millions.  The proponents

8  thrust themselves into this issue.  As the Court noted, ran a

9  $40 million campaign, highly public.  They have their own

10  videos on YouTube.  Dr. Marks, one of the proponents' experts,

11  links in his bio to a YouTube bio of himself.  Schubert and

12  Flint have highly-publicized YouTube videos about this case.

13             And I think it's ironic that the proponents are

14  claiming that their witnesses have been subjected to harassment

15  and intimidation in a case where we're talking about stripping

16  away the rights of individuals who themselves have been subject

17  to a history of that kind of behavior.

18             So I think that the arguments about the witnesses and

19  the change in witness testimony are meritless, speculative, and

20  in some ways water under the bridge.

21             The Judicial Conference of the Ninth Circuit, when it

22  issued the release in the pilot program, addressed those issues

23  and wanted to experiment.  This is the perfect case to do it

24  in, and we would ask the Court to move forward with this plan.

25             Thank you, Your Honor.

1          **THE COURT:** Very well.  Well, thank you, Counsel.

2          With respect to how we proceed from here, let me make

3    the following comments:

4          First of all, this certainly is a case that has

5    sparked widespread public interest.  The issues are issues that

6    have been widely debated in a variety of different forums.

7          Now, of course, the issues that we're going to try

8    here are not so much the policy issues, as the constitutional

9    issues that the plaintiffs have raised and that the

10   defendant-intervenors have joined.

11         And those issues, as I said, I think, at our very

12   first gathering, are highly fact laden.  One need only pick up

13   the papers and start reading them to observe that there are a

14   lot of factual hypotheses that have been asserted on both

15   sides.

16         And the other cases that have involved this issue,

17   the issue that is the ultimate issue here, that I'm aware of,

18   have not been aired in the course of a trial, in which

19   witnesses get on the stand, testify, make their factual

20   assertions, and are subject to cross-examination.

21         Facts that are asserted in a declaration or affidavit

22   are quite different from facts that appear and that are voiced

23   in the witness stand and subjected to cross-examination.

24         So I think a trial can be highly informative.  And

25   because of the high information content associated with these

1  proceedings, I think this is a case which merits very serious

2  consideration for widespread distribution.

3          And, of course, today we have the capability of

4  providing that kind of widespread distribution through,

5  essentially, the Internet.

6          There's, of course, another aspect of this.  As the

7  lawyers here know far better than anyone else, trials sometimes

8  involve a lot of tedium.  And I don't want to pop anybody's

9  balloon, but it may very well be that as the trial unfolds

10 there will be a lot less interest in the case than there may be

11 now.  And, perhaps, if that's the situation, maybe that would

12 be an important lesson to be drawn from these proceedings.

13          (Laughter)

14 **THE COURT:**  But, nonetheless, it does seem to me that

15 if we are able to show the public how these issues are dealt

16 with in a judicial proceeding, with some of the most capable

17 and skilled lawyers in the United States, and some of the most

18 responsible lawyers in the United States, who will not, I am

19 quite sure, engage in some of the unfortunate tactics that have

20 perhaps marred other cases in the past, that have been subject

21 to broadcast, so I think this case clearly merits a serious

22 consideration for distribution through the processes that have

23 been outlined.

24          I don't know, with all due respect, Mr. Kirk, that a

25 run-of-the-mill is the kind of case that will provide the civic

1  lesson that might be helpful.  I think the only time that

2  you're going to draw sufficient interest in the legal process

3  is when you have an issue such as the issues here, that people

4  think about, talk about, debate about and consider.

5       The run-of-the-mill traffic accident or injury case

6  is simply not a case that is likely to draw the attention that

7  is necessary to provide that lesson to the public.

8       And I've always thought that if the public could see

9  how the judicial process works, they would take a somewhat

10  different view of it.

11       I've noticed that in the last 20 years with juries,

12  how they find their experience listening to the process so very

13  revealing.  And they come away from it with a much deeper and

14  keener appreciation of the judicial process.

15       So I think it's worth trying in this case.

16       With respect to the various rule changes, the subject

17  of broadcast or televising federal court proceedings is one

18  that has been debated in the judiciary and in the councils of

19  the judiciary, the federal judiciary, for many, many years.

20       There was a proposal for a pilot project as early as

21  1990, that was advanced.  It was advanced in this court by the

22  late chief judge of this court, Robert Peckham, at one of the

23  very first judges meetings that I attended.

24       I recall thinking, if there was any motion that it

25  would be safe for a brand-new judge to make at a judges'

1  meeting, it would be a motion for supporting a recommendation

2  by Judge Peckham, for participation in a pilot project very

3  much like the pilot project we are now dealing with.  So I made

4  the motion at the judges' meeting.  The motion died for want of

5  a second.

6       Well, the subject continued to be debated.  It was

7  debated at the Ninth Circuit Judicial Conference in 2007, and.

8  The Conference, at that time, adopted a resolution seeking a

9  change in Judicial Conference policy, to permit photographing

10 and recording and broadcasting in nonjury civil cases.

11      Now, not much was done on that for some period of

12 time.  I think, primarily, because the Ninth Circuit Judicial

13 Conference was hopeful that Conference policy would change.

14      The Judicial Council of the Ninth Circuit forwarded

15 to the Judicial Conference Committee on Court Administration

16 the recommendation of the Ninth Circuit Conference, requested

17 action in May of this year.  Nothing occurred.  I understand

18 the court administration committee considered the Ninth

19 Circuit's request, but took no action.

20      And, so, in light of that, Chief Judge Kozinski, in

21 October, October 22nd, appointed a committee to evaluate the

22 possibility of adopting a Ninth Circuit rule.  And, clearly,

23 you're correct, this case was very much in mind at that time

24 because it had come to prominence then and was thought to be an

25 ideal candidate for consideration.

1          And the committee, which consisted of Judge Sidney

2    Thomas, Chief Judge Audrey Collins, in the Central District of

3    California, and myself, made a recommendation to the Ninth

4    Circuit Judicial Council, which unanimously adopted the rule

5    which you've seen, permitting a pilot project, an

6    experimental -- it was really a pilot project that was

7    announced in the Ninth Circuit press release.

8          Our court, in response to that, met and amended Local

9    Rule 77-3, to permit participation in that Ninth Circuit pilot

10   project.

11         At the time, we considered that to be a conforming

12   amendment.  Our rules, of course, conform and must conform to

13   the Federal rules and to the Ninth Circuit rules.  And I think

14   our view, at the time, was that was simply conforming our local

15   rules to the Circuit rules.

16         And, then, the issue was raised as to whether or not

17   there was an adequate basis.  And so I take responsibility for,

18   perhaps, a mixed signal with the court clerk, who did not have

19   the opportunity to consider that basis for the amendment.  And

20   that may be the reason why the comment period started later

21   than it might otherwise have started.

22         But, in any event, I'm satisfied, after consideration

23   of the matter and discussions with those in the Circuit who

24   have views and authority on these matters, that the path is

25   clear for participation in a pilot project of this case, should

1  we determine that that is appropriate.  And I think for the

2  reasons I mentioned a moment ago, that it is appropriate.

3      Now, with respect to the comments made by Mr. Burke,

4  I very much appreciate that In Session and other media may have

5  a great deal more experience than the court staff, may have

6  equipment advantages and superiorities over that that the Court

7  has.  Might very well provide higher quality audio and video

8  images of the proceedings.  And perhaps that would be -- would

9  perhaps be helpful.

10      But, I think, in view of the -- I don't want to say

11  the experimental nature, but the nature of these proceedings,

12  it's important for this process to be completely under the

13  Court's control, to permit the Court to stop it if that proves

14  to be a problem, if it proves to be a distraction, if it proves

15  to create problems with witnesses.

16      And, so, I think this is a process that must remain

17  under the Court's control.  And, so, with whatever limitations

18  we may be working with, I'm not prepared, frankly, to permit a

19  third-party vendor to come in and to provide these services.  I

20  think those steps must remain under the control of the Court.

21      And, as I say, if at any time the matter becomes a

22  distraction, it creates collateral problems, if we have

23  technical difficulties -- and we may very well have technical

24  difficulties, given the limitations that we confront -- I will

25  discontinue the program.

1            But I think it's worth attempting in a case of this

2    particular nature and this particular interest.

3            So I understand your concerns, Mr. Kirk, and respect

4    them, but I think we should proceed step by step.

5            Now, what I will do is to tell Chief Judge Kozinski

6    of my determination.  And if he approves, then we will begin a

7    recording of the proceedings beginning on Monday; and the

8    distribution of those recordings in the manner that has been

9    described to you by Mr. Rico.

10           So I want to make it clear, this case is about

11   Proposition 8.  It is not about television in the courtroom.

12           So let's turn to those issues.  And I think the first

13   issue we ought to address is the motion to intervene by

14   Imperial County.

15           Ms. Monk, are you going to be dressing that?

16           **MR. TYLER:**  Your Honor, I will.  Thank you.

17           **THE COURT:**  Let's see, you are Mr. --

18           **MR. TYLER:**  Robert Tyler, Your Honor.

19           **THE COURT:**  Tyler.

20           **MR. TYLER:**  Your Honor, first, I'd like to thank you

21   and the Court staff for allowing this motion to proceed on the

22   expedited basis that it has.

23           First --

24           **THE COURT:**  Well, I appreciate your prompt response.

25           **MR. TYLER:**  Well, we did everything we can to avoid

1  any delay in this case.

2          The liberal policy in favor of intervention would be

3  served in this case by allowing the County of Imperial to

4  intervene because intervention will ensure appellate review is

5  achieved.   Two, appellate review will help to ensure harmony in

6  state laws concerning marriage, thereby protecting local

7  governing bodies from conflicting legal authority.

8          **THE COURT:**   What's the interest of Imperial County on

9  this?   What's the interest of Imperial County that is

10  particularized?

11          **MR. TYLER:**   Your Honor, the County has a significant

12  governmental interest in ensuring that as they implement the --

13  implement Proposition 8 and issue marriage licenses, and

14  perform the day-to-day functions that the county clerk is

15  required to perform, that they have certainty that what they

16  are doing is appropriate.

17          **THE COURT:**   Well, is the County's interest separate

18  and apart from that of the State?

19          **MR. TYLER:**   Your Honor, I believe it is.

20          **THE COURT:**   How so?

21          **MR. TYLER:**   The -- first of all, the County Board of

22  Supervisors has an obligation to supervise the process.

23          **THE COURT:**   Well, are the County's duties simply

24  ministerial, to issue marriage licenses or not to issue

25  marriage licenses in accordance with State law?

1          **MR. TYLER:**  Your Honor, there is a ministerial --

2   Lockyer makes clear that this is a ministerial duty.  There's

3   no contest there.

4          However, what's important to understand is that the

5   county clerks and the county board of supervisors are going to

6   be put in a very difficult position.  And that is the conflict

7   between whether to follow the State official who may, upon an

8   injunction, tell the State registrar to issue same-sex marriage

9   licenses versus following Proposition 8, which is part of the

10  California Constitution.

11         And, with all due respect, the case law seems to be

12  clear that this court decision, if it is not appealed, if it

13  doesn't have appellate review in the Ninth Circuit, would only

14  have limited influence and would not necessarily overturn

15  Proposition 8.

16         **THE COURT:**  Well, that's the other issue here, isn't

17  it?  And that is, what you are saying, in essence, is that the

18  proponents would lack standing to appeal an adverse decision.

19  Isn't that what you're saying?

20         **MR. TYLER:**  Well, Your Honor, of course, that's a

21  issue to be litigated at a later date.  However, it has

22  certainly been brought into question.  It has been brought into

23  question by the County of San Francisco.

24         And the plaintiffs, in their briefing, recognize that

25  this is a significant -- well, they would -- I think they would

1  adhere to the position that the proponents would not have

2  standing to appeal.

3      **THE COURT:**  Assume the following scenario:

4  Proposition 8 is held to be unconstitutional.  The governor of

5  the State of California does not appeal.

6      What standing would Imperial County have to prosecute

7  an appeal?  The governor has decided, as a matter of State

8  policy, he is not going to appeal.  So --

9      **MR. TYLER:**  Which, Your Honor, I think, just to

10  enhance that a little bit, it's been clear to me and the

11  attorney for Governor Schwarzenegger, as indicated, has

12  expressly stated that the governor has taken a neutral position

13  on the issue.  And we know from last hearing that the Attorney

14  General's interest in defending the law has been seriously

15  called into question.  And, therefore, there's a significant

16  concern there, which is what is in part prompting this request

17  for intervention.

18      But let me point out that in --

19      **THE COURT:**  Well, but maybe in the process of that

20  you can answer my question.

21      **MR. TYLER:**  Yes.  I'm sorry, Your Honor.

22      In Lockyer, in footnote 29, it -- the California

23  Supreme Court, in looking at the duties and responsibilities of

24  the clerk, as it relates to performing marriage functions,

25  recognizes in footnote 29, the fact that local officials and a

1    local school district under the Allen case had a personal stake

2    in the outcome of the litigation, wherein they were challenging

3    a State statute which required the issuance of textbooks to

4    anybody within the school district.  And the school district

5    was arguing, well, we believe that's a violation of the

6    establishment clause.  There's a conflict.  The school district

7    says, well, here there's a constitutional question.  We have a

8    personal stake in understandings and having a resolution.

9         The clerks -- the clerks in this case are in the same

10   situation.

11        **THE COURT:**  Well, but if -- just assume the

12   hypothetical:  Proposition 8 is declared to be

13   unconstitutional.  It's not challenged on appeal by the

14   governor.

15        What's the uncertainty that Imperial County would be

16   laboring under?

17        **MR. TYLER:**  Certainly, Your Honor, is, on one hand,

18   having the obligation to uphold the constitution, to abide by

19   the California Constitution, which includes Proposition 8.

20        **THE COURT:**  Under this hypothetical, that

21   constitutional provision has been held to be invalid.

22        **MR. TYLER:**  Yes, Your Honor.  And, again, that takes

23   me back to the issue of the impact that this Court's decision

24   would have upon that constitutional provision.

25        Yes, we recognize that this Court's decision would

1   bind the parties to this litigation.  Which is an important

2   reason why Imperial County wants to be a party to this, to

3   avoid the uncertainty.

4          But if Imperial County were not a party to this case,

5   and no appellate review occurred, and this Court were to

6   declare Proposition 8 unconstitutional, there is serious

7   question as to what impact that would have on third-party

8   county, third-party county clerks, and whether or not they

9   would be obligated to follow this Court's decision versus

10  follow the California Constitution which has not been

11  overturned statewide.

12         And so that calls into the serious question where

13  there is a personal stake in the outcome that the county clerks

14  and the County of Imperial have to know for sure what their

15  rights and responsibilities are, just as footnote 29 in Lockyer

16  said.

17         **THE COURT:**  Well, if the uncertainty here is about

18  standing of the proponents to appeal, why should we address the

19  issue of Imperial County's intervention now?  Why shouldn't we

20  wait?

21         If the plaintiffs -- if the plaintiffs lose, there

22  really isn't any issue; is there?  And, in any event, can't we

23  defer this question until after the trial and we see what the

24  outcome is?

25         **MR. TYLER:**  Yes, Your Honor.

1            The fact is, is that if the County of Imperial waited

2     until after a judgment was decided, it would be too late, at

3     that point in time, for intervention.

4            And the case law --

5            **THE COURT:**  Well, all right.  Fair enough.  Fair

6     enough.

7            You've made your motion.  Why do I need to decide it

8     now?  Let me put the question that way.  Why shouldn't I wait

9     until we -- until the question ripens into a real issue?

10           **MR. TYLER:**  Well, Your Honor --

11           **THE COURT:**  Federal judges are very good at

12    postponing things.

13           (Laughter)

14           **MR. TYLER:**  Your Honor, well, I think one of the most

15    important factors about this, about this motion, is that there

16    is absolutely no prejudice, whatsoever, to any of the parties.

17    There is no -- there is not going to be any delay.  There is no

18    additional legal arguments that are being thrown in front of

19    the Court.  No new issues.

20           **THE COURT:**  You are not going to participate in the

21    trial.  You are not going to present witnesses.  You are not

22    going to file briefs.  You're simply coming into the case to

23    file a notice of appeal if the plaintiffs prevail.  Isn't that

24    correct?

25           **MR. TYLER:**  Yes, Your Honor, that is -- that is

1 accurate in that we are wanting to ensure that the right to

2 appeal is preserved.

3          And what is important in this is that if we -- one of

4 the cases that we've cited, *United States vs. Washington*, it

5 was also cited by the plaintiffs in opposition, but that case

6 makes it very clear that the proposed intervenors, the County

7 of Imperial, have an obligation, promptly upon knowledge of

8 facts necessitating intervention, to come forward and file that

9 motion, which we have done.

10          And there was a question.  And, Your Honor,

11 factually, it's important to know that the County acted very

12 promptly in this situation, from the point in time that they

13 understood that there was a technical problem with the appeal.

14          It's kind of a red herring, some of the other

15 arguments that the opposition raised with regard to newspaper

16 articles and that sort of thing.

17          But what's important about Washington is that what

18 the Washington case says is that if the proponents wait until

19 post judgment to file their motion to intervene, then that

20 would be too late.

21          And they actually -- the Ninth Circuit held that it

22 was -- they denied intervention to a proponent that waited

23 until post judgment when they knew ahead of time --

24          **THE COURT:**  When was the motion to intervene filed in

25 that case?

1              **MR. TYLER:**  In that case?

2              **THE COURT:**  Yes.

3              **MR. TYLER:**  There was a motion to intervene filed

4    prior to trial, that was denied.  There was -- and that was

5    with -- that was with one third-party, one proposed intervenor.

6              That motion was denied -- I'll give you a name.  It

7    was Intersound, which is the party, just for reference here.

8              So Intersound filed a motion to intervene.  After it

9    was denied, they chose not to appeal.  They came back after the

10   appeal and filed a subsequent motion to intervene for the sole

11   purpose of taking the case up to the higher court.

12             And the Court said, no, you should have appealed your

13   original decision when another third-party had also sought

14   intervention post judgment, post trial.

15             The Ninth Circuit said, You're too late.  You knew in

16   advance of the final decision of this court, and should have

17   filed your motion to intervene at that point in time.

18             And so we are in that same position, where we

19   can't -- we couldn't wait.  And with no prejudice whatsoever --

20             **THE COURT:**  Let's go back to the issue of standing.

21             If you have a standing problem here, you're going to

22   have a standing problem on appeal.

23             Now, you recall early in this case there were motions

24   to intervene by a lot of different parties on both sides.  And

25   with the exception of the City and County of San Francisco,

1    those motions to intervene were denied.

2           Now, the City and County of San Francisco came in and

3    alleged that it had a particularized interest, economic

4    interest, here because Proposition 8 deprived it of revenue

5    that it would generate.

6           I don't know whether the City and County will be able

7    to prove that or not.  But, in any event, that was the basis

8    upon which it was permitted to intervene here.  And its

9    intervention is limited, essentially, to those issues.

10          Now, turning to Imperial County, what's the

11   particularized injury that Imperial County would suffer if

12   Proposition 8 is invalidated?

13          **MR. TYLER:**  Yes, Your Honor.

14          As footnote 29 in the Lockyer case recognizes, that

15   similarly to the school district in the Allen case, the county

16   clerks in the Lockyer case had a personal stake in the outcome

17   of the litigation, as they were obligated to issue marriage

18   licenses.

19          I also would like to reference the fact that the City

20   and County of San Francisco, as you know in the Lockyer case,

21   were in violation of state law, of existing state law, at the

22   time.

23          And the Court in the Lockyer case, although it

24   said --

25          **THE COURT:**  San Francisco's intervention here was not

1   based on being out of compliance with state law.  It was a

2   claim that it suffered some economic injury as a result of

3   Proposition 8.

4           **MR. TYLER:**  Yes.  And what I'm trying to express is

5   the fact that we don't have to have the same interest or assert

6   or claim the same interest that the City and County of San

7   Francisco are claiming.

8           **THE COURT:**  You're not suggesting there are a lot of

9   people in Imperial County who are going to flee and pay for

10  their marriage licenses outside of Imperial County if

11  Proposition 8 is invalidated?

12          **MR. TYLER:**  Your Honor, certainly there are economic

13  considerations that could apply to the County of Imperial.  But

14  that's not what we are arguing.

15          We are coming forward arguing that what the -- what

16  the consideration here is that the fact that the clerks have a

17  personal stake in having a complete resolution to know whether

18  they follow Proposition 8 or whether they would have to follow

19  a decision of this court that is applicable to the attorney

20  general or the governor.

21          **THE COURT:**  You are saying that Imperial County does

22  not have an economic interest here?

23          **MR. TYLER:**  No, Your Honor, I'm not necessarily

24  suggesting that.  We have not argued -- we did not argue

25  economic interest in the sense that the County is coming

1   forward saying, as San Francisco did, saying, Well, we're going

2   to lose money.  We -- we have a personal stake in the outcome

3   of this litigation just as --

4          **THE COURT:**  How is that stake different from, say,

5   some citizen who supported Proposition 8?

6          **MR. TYLER:**  A citizen who supported Proposition 8

7   does not issue marriage licenses.  They are not subjected,

8   potentially, to an injunction or conflicting laws.

9          This is -- the case law is clear in that the county

10  officials responsible to issue marriage licenses have a stake

11  in the outcome of the litigation.  Otherwise, City and County

12  of San Francisco would not have had standing to be involved as

13  a plaintiff in the *In Re Marriage Cases* that ultimately

14  overturned Proposition 22.  In the same fashion there they

15  challenged the constitutional litigation.

16         **THE COURT:**  Standing rules in the State are different

17  from Article III standing.

18         **MR. TYLER:**  Your Honor, I understand that.

19         But I think it's instructive as to how the California

20  Supreme Court interprets its own laws as to the question of

21  whether or not there is a personal stake, an individualized

22  interest to participate in the litigation.

23         And that's what we're asserting here today, Your

24  Honor, is that the clerks here are going to be in a very

25  difficult position that:  What do we follow?  We're obligated

1    to abide by the California Constitution --

2           **THE COURT:**   Why can't you file your own declaratory

3    relief action?

4           **MR. TYLER:**   Well, Your Honor --

5           **THE COURT:**   Is Imperial County prepared to file a

6    declaratory relief action?   I'm not sure against whom, but I'm

7    not their lawyer.   But if you have standing to intervene, would

8    you not have standing to file your own dec relief action?

9           **MR. TYLER:**   Your Honor, I would argue we would have

10   the same standing, but that would not be judicial economy when

11   we would have another trial like this to -- we're going to come

12   in front of another federal judge and have all the same legal

13   issues.

14          Judicial economy makes sense to allow us to intervene

15   when there is absolutely no prejudice whatsoever.   There is no

16   delay.   There is no impact on the proceedings at the trial

17   level.

18          **THE COURT:**   Well, if there is no impact on the

19   proceedings, what does Imperial County add to these

20   proceedings?

21          **MR. TYLER:**   Your Honor, we certainly have a

22   significant interest in having the -- as we wrote in our reply

23   brief, knowing that when a judgment is entered it would be

24   applicable to Imperial County as well as a defendant, that this

25   Court's order would subject the County to this Court's

1  jurisdiction as to any orders, whether you rule in favor or in

2  opposition to Proposition 8.

3          And that's a clear, direct, personal interest, an

4  individualized interest in the outcome of this litigation.

5          **THE COURT:**  Very well.  Thank you, Mr. Tyler.

6          Mr. Kirk, do you want to weigh in on this?

7          **MR. KIRK:**  Just very briefly, Your Honor.

8          We do support Imperial County's motion to intervene.

9          I would just make the very brief point, in response

10 to some of the Court's questions about their standing, that the

11 clerk of the -- in Imperial County stands, I believe, in a

12 similar position to the clerks in Alameda County and

13 Los Angeles County, that my friend, Mr. Olson, the great lawyer

14 that he is, knew that he had to sue in order to get the relief

15 he wants.

16         The clerk in Imperial County --

17         **THE COURT:**  How so?  How so?

18         What Mr. Olson is contending is that the reason the

19 clerks in those two counties are failing to issue marriage

20 licenses is because of the intervention of the Proposition 8,

21 which is unconstitutional.

22         **MR. KIRK:**  Correct.  And, so, Mr. Olson is asking

23 Your Honor to issue an injunction requiring those clerks to

24 start issuing the license, notwithstanding Proposition 8,

25 because he asserts that Proposition 8 is unconstitutional.

1          Now, the Imperial County clerk --

2          **THE COURT:**  Well, does it necessarily follow?

3          Let's assume Proposition 8 is unconstitutional.  Does

4    that necessarily mean that Alameda and Los Angeles counties

5    must issue same-sex marriage licenses?

6          **MR. KIRK:**  If this Court enjoins them, yes, they

7    would.

8          **THE COURT:**  Well, enjoins them to do so.  But let's

9    assume Proposition 8 is simply held unconstitutional.  Does it

10   necessarily follow that marriage licenses must issue out of

11   those two counties, same-sex marriage licenses?

12         **MR. KIRK:**  That becomes a question of what is the

13   appropriate remedy for a -- what's found to be a constitutional

14   violation.

15         In that circumstance, perhaps declaratory relief

16   might be deemed appropriate.  But it would only be, I'm sure,

17   acceptable to the plaintiffs -- and I don't mean to speak for

18   them, obviously -- if it were clear that in fact those licenses

19   would start to issue.

20         In fact, you know, to protect themselves, the relief

21   they sought in this case was an injunction.  And that's the

22   standard relief that one seeks when a ministerial official is

23   refusing to take action that one believes the constitution

24   requires.

25         The case that sprung to mind on this, Your Honor, as

1  I was sitting at counsel table, the clerks in Alameda County,

2  Los Angeles County, and Imperial County, I would submit, stand

3  in the same shoes for standing purposes, for interest purposes,

4  as Secretary of State James Madison, in *Marbury vs. Madison*.

5  The relief there was an order requiring him to issue a piece of

6  paper.

7         The clerks here are in the same boat.  The one

8  difference between the Imperial County clerk and the clerks in

9  Los Angeles and Alameda is, Imperial County has apparently

10 taken the view that Proposition 8 is constitutional; and they

11 fear finding themselves in a position where this Court decides

12 otherwise; the officials above them in the state hierarchy, the

13 governor and attorney general, agree with the Court, and choose

14 not to take an appeal; and they fear that no one is left

15 standing to take the appeal.

16         Now, of course, we disagree with that --

17         **THE COURT:**  You think you have standing to appeal?

18         **MR. KIRK:**  We do, Your Honor.  But I think this is

19 not something that ought to be left to chance in a case, which

20 the Court just pointed out --

21         **THE COURT:**  I'm sure you considered this before you

22 intervened.

23         **MR. KIRK:**  We did.  But we intervened with what we

24 had, and we've got our arguments.  Of course, we also

25 intervened with the hope and expectation that we won't be the

1   ones filing the notice of appeal.

2          But in the event we are wrong about that, it is our

3   view that we would have standing.  But an argument has been

4   made to the contrary.  And we would submit, Your Honor, that

5   given the importance of the case, given the importance that the

6   Court, the parties, and all concerned, have placed upon

7   creating a record that is fit and proper for appellate review,

8   given the resources that are being poured into this case,

9   resources from the judiciary and resources from the parties,

10  that there is no good reason not to cross the T's, dot the I's.

11         **THE COURT:**  Well, but if Imperial County's standing

12  is in jeopardy to intervene, it's certainly in jeopardy for an

13  appeal.

14         **MR. KIRK:**  I don't believe it's in jeopardy to

15  intervene, Your Honor, because I believe the Court has an

16  interest in --

17         **THE COURT:**  An interest in certainty.

18         **MR. KIRK:**  Number one, an interest in certainty that,

19  I believe, is fully protectable under Article III.  But,

20  second, even if that's wrong, he certainly has an interest in

21  vindicating his duty to comply with Proposition 8.

22         And if this Court enjoins it, and the attorney

23  general and the governor do not appeal it, and it's found that

24  we don't have standing, his ability to continue complying with

25  Proposition 8 could very well be in jeopardy.

1        So that's more than enough to confer an interest that

2   Article III would deem satisfied.

3        **THE COURT:** Let me ask the other question that's on

4   my mind.  And that's:  Why do I have to decide this now?  Why

5   don't we wait to see how the trial comes out?  And if there is

6   an issue about an appeal, we can deal with it at the time.

7        Imperial County doesn't plan to participate in the

8   trial.  They are not going to present witnesses.  They are not

9   going to file briefs.  So what's the reason for deciding this

10  motion now?

11       **MR. KIRK:** I don't have a strong brief for deciding

12  it right now, Your Honor.  I would only point out that there

13  sort of becomes a chicken-and-egg problem at the end of the

14  case.

15       Once the Court decides the case and issues its

16  ruling, you know, as the Court indicated, if the ruling is in

17  our favor none of this comes up.  But if the ruling goes the

18  other way, the clock starts ticking for appeal.

19       Plaintiffs have made the argument:  Why don't you

20  wait and see because maybe the governor will change his mind.

21       You get yourself into a chicken-and-egg problem.  If

22  there were any great cost to deciding it now, I think deferring

23  it would make a lot of sense.

24       But the truth of the matter is, plaintiffs haven't

25  identified an ounce of prejudice here.  So I would turn the

 1   question around and ask back:  Why not decide it now?  There is

 2   no harm to it.

 3           **THE COURT:**  No harm, no foul.

 4           **MR. KIRK:**  Thank you, Your Honor.

 5           **THE COURT:**  Mr. Boutrous, are you going to be arguing

 6   the other side?

 7           **MR. BOUTROUS:**  I am, Your Honor.

 8           **THE COURT:**  All right.

 9           **MR. BOUTROUS:**  And I'll --

10           **THE COURT:**  Why not?  Why not let Imperial County in?

11   Why not the more the merrier?

12           **MR. BOUTROUS:**  Several reasons, Your Honor.

13           First, the timeliness point.  The Court set a

14   deadline for motions to intervene.  We had significant

15   proceedings.  And they waited until the eve of trial.  I think

16   that's grounds enough.

17           And, in terms of prejudice, we have all spent --

18           **THE COURT:**  Well, but nobody discovered this Arizona

19   case until November.

20           **MR. BOUTROUS:**  Well, I don't think that's

21   justification, Your Honor, for this late intervention.

22           And in terms of prejudice, we have all spent a

23   significant time dealing with the issue --

24           **THE COURT:**  Imperial County is not going to present

25   evidence.  They are not going to file briefs.  They are not

1    going to participate in the trial.

2           Your task is not going to be at all increased,

3    enhanced.  Your life is not going to be made more difficult by

4    Imperial County coming in.  So why not let them in?

5           **MR. BOUTROUS:**  That point takes me to the point the

6    Court was making about:  Why decide it now?

7           I do think it's premature.  I do think there are

8    significant standing questions, as the colloquy demonstrated,

9    in terms of the protectable interest.

10          It's not a -- the counsel for the County has not

11   identified a protectable interest.  Under their theory, if the

12   City of San Francisco had believed that the federal

13   constitution required same-sex marriages to be recognized, they

14   should have been permitted to continue issuing licenses.  That

15   clearly wasn't the rule.

16          So I think that to the extent there's an issue about

17   an appeal, that's something the Court could address after the

18   trial.  But there really is no sense requiring the Court to go

19   through the standing question and deal with these other issues.

20          We didn't have to sue the counties.  We did it in

21   part because that's where our clients applied for their

22   marriage licenses and were denied.  And, therefore, we seek to

23   compel them to do that.

24          But I think it seems --

25          **THE COURT:**  How about the question that I asked

1   Counsel?  Let's assume you prevail, at least insofar as

2   obtaining a declaration that Proposition 8 is unconstitutional.

3   Does that automatically mean that same-sex marriage licenses

4   must emanate out of Alameda and Los Angeles County?

5           **MR. BOUTROUS:**  I think it does, Your Honor.

6           **THE COURT:**  Why?

7           **MR. BOUTROUS:**  This Court's ruling would bind the

8   State of California because the attorney general and --

9           **THE COURT:**  Might there not be some relief, short of

10  a mandate, that those counties issue same-sex marriage

11  licenses?

12          **MR. BOUTROUS:**  Your Honor, I think if they refuse to

13  do it, they would be violating the federal constitution.  And

14  they would also be violating the state constitution, because if

15  Proposition 8 is declared unconstitutional then, as a federal

16  matter, I think then that would mean that the state

17  constitutional provisions that were overturned by Proposition 8

18  would spring back into effect.  So I think they would be

19  bound --

20          **THE COURT:**  That would put State law back into the

21  state it was when *In Re Marriage Cases* was decided; is that

22  your position?

23          **MR. BOUTROUS:**  I think so.  Admittedly, I haven't

24  thought it all the way through and studied it deeply.  But, I

25  think it's an issue that -- that would be an issue that would

1  have to be decided just to determine whether they have

2  standing.

3         **THE COURT:**  Relief might be a good thing for a

4  plaintiff to think about.

5         **MR. BOUTROUS:**  I've thought the relief through, Your

6  Honor.  We think that this Court should issue an injunction,

7  mandating that our clients' licenses be issued so that they can

8  get married.  There is no question about that.

9         But in terms of other counties, I think other

10 counties would be bound to follow this Court's ruling if it

11 binds the State of California and the attorney general and the

12 governor.

13        So I think it's --

14        **THE COURT:**  You're saying if there is a judgment in

15 favor of the plaintiffs, and the governor accepts that

16 judgment, doesn't appeal, then that binds all 58 counties in

17 the state?

18        **MR. BOUTROUS:**  Yes, Your Honor.

19        So, I think, Your Honor, I would just go back to the

20 point that the standard for intervention is not met here.  To

21 the extent there becomes an issue of adequacy of representation

22 at the time of a potential appeal, the Court could address this

23 issue at that point.

24        But given all these other difficult issues swirling

25 around the intervention question for Imperial County, I think

1  the Court should either deny the motion now or defer it.

2        **THE COURT:**  Well, if I deny the motion now, then

3  Imperial County is in a position to decide whether it wants to

4  file a dec relief action.  And it either has standing to do so

5  or it doesn't have standing.  And I don't know that that case

6  would come here.  I suppose it's theoretical there could be a

7  1407 transfer here.

8        But, in any event, why shouldn't Imperial County be

9  told, at this juncture, that if it is not permitted to

10  intervene here it needs to consider what its other remedies

11  are?  Wouldn't the fair thing to do be to decide this case so

12  that Imperial County can see what its options are?

13        **MR. BOUTROUS:**  Your Honor, I think that that issue is

14  something that, one, can be decided once the Court issues a

15  judgment in this case.  But, two, I think that the answer is

16  clear that if the Proposition 8 is ruled unconstitutional, the

17  counties have to follow this Court's ruling and the federal

18  constitution.  That would bind them.

19        **THE COURT:**  I'm talking, really, just about fairness

20  to Imperial County.  If I conclude that it should not be

21  permitted to intervene here, then the County can decide what

22  other remedies it would like to seek or not.

23        Why shouldn't -- why doesn't fairness demand that the

24  matter be decided now, so the County is on notice what its

25  situation is?

1          **MR. BOUTROUS:**  Your Honor, I think that it's

2     perfectly fair to allow this proceeding to unfold as it is

3     already configured; and if there is an issue, at some point in

4     the future to address it; that I don't think it's unfair to the

5     County; that they have not participated and are not going to

6     participate in the case.

7          But, that said, those fairness issues, I think, can

8     be dealt with if and when the issue is presented.  And that

9     would be once there's a judgment.

10         **THE COURT:**  Well, I guess you're saying the County

11    could pursue that declaratory relief action now.  It doesn't

12    have to wait for my decision.

13         **MR. BOUTROUS:**  I think they would have to wait,

14    because the issue they are presenting is really not -- the

15    issue whether Proposition 8 is unconstitutional is being

16    presented here.

17         The issue the County is presenting is a different

18    one.  It's whether they would have to follow a ruling of this

19    Court.  And that's something I think would be premature.  And

20    they wouldn't have standing because it would be too

21    speculative, at this point, to bring a separate action.

22         **THE COURT:**  Couldn't they file a declaratory relief

23    action that Proposition 8 is consistent with the federal

24    constitution?

25         **MR. BOUTROUS:**  They could do that, Your Honor.  They

1    could do it.

2          I'm not sure they have standing, for the reasons we

3    laid out in our brief; that their interests under the Lockyer

4    case is not concrete enough and specific enough to give them

5    Article III standing.  So I think they could try to file a

6    suit.  But I think the standing issues that might preclude the

7    declaratory relief action also preclude intervention in this

8    case, and probably preclude them from appealing even if they

9    intervened.

10         **THE COURT:**  Anything further?

11         **MR. BOUTROUS:**  Nothing further, Your Honor.

12         **THE COURT:**  The matter is submitted.

13         All right.  Let's turn to the --

14         (Court reporter interrupts.)

15         **THE COURT:**  Let's turn to a break, for about five

16   minutes, and we'll resume at that time.

17         (Recess taken from 11:47 to 11:57 a.m.)

18         **THE COURT:**  Very well, thank you, Counsel.

19         We were about ready to turn to the issue of further

20   discovery.  And I think the key question that we need to

21   address is the motion to compel the deposition of Douglas

22   Swardstrom.  Let's see.  That's going to be addressed by the

23   plaintiffs, of course, and Mr. Swardstrom's attorney --

24         **MR. GRANT:**  Grant.  Eric Grant, for Mr. Swardstrom,

25   Your Honor.

1              THE COURT:  Grant.  Very well.  Welcome.

2              And, Mr. Boutrous, are you taking the lead here?

3         MR. BOUTROUS:  Yes, Your Honor.

4         THE COURT:  Well, you had an opportunity to depose

5    Mr. Swardstrom; did you not?

6         MR. BOUTROUS:  Well, Your Honor, we issued a subpoena

7    before we knew his identity.  And we sought to learn his

8    identity.

9              In response to the subpoena, a lawyer surfaced who

10   said he was representing the unnamed executive committee

11   member, and said that they would only produce him for

12   deposition under extremely limited circumstances, which

13   included no videotaping of the deposition; no identifying

14   information could be gleaned from the deposition; and if later

15   we discovered identifying information, we would have had to

16   agree not to speak of it in any public forum.

17             And so we thought that was highly unreasonable.

18        THE COURT:  Well, you could have moved to compel at

19   that time.

20             Let's see.  That was in October, I believe, wasn't

21   it, that you received those conditions?

22        MR. BOUTROUS:  I think it was in November, Your

23   Honor, but it was -- we did have --

24        THE COURT:  I'm looking at an e-mail to your

25   colleague, Mr. Dettmer, dated October 27 --

 1          **MR. BOUTROUS:**  You're correct, Your Honor.

 2          **THE COURT:**  -- regarding the deposition itself.  This

 3   is from a -- I assume, a Ms. Phillips, who I believe, yes,

 4   represented the unnamed executive committee member.  "Regarding

 5   the deposition itself, we do not agree to the deposition being

 6   videotaped.  Our client will not disclose his or her identity

 7   at any point.  All identifying information will be redacted.

 8   Specific provisions to preserve our client's anonymity will be

 9   preserved."  So on and so forth.

10          You had that notice back in October.

11          **MR. BOUTROUS:**  We did, Your Honor.  And we, at the

12   time, were trying to discover the identity of this person.

13   And --

14          **THE COURT:**  Why did you need to know that in order to

15   take the deposition?

16          **MR. BOUTROUS:**  Well, it's a good question, Your

17   Honor.

18          **THE COURT:**  Well, I gather that the Bopp firm was

19   willing to accept service of the subpoena?

20          **MR. BOUTROUS:**  Correct, Your Honor.

21          **THE COURT:**  I suppose you could go to an undisclosed

22   location.

23          (Laughter)

24          **MR. BOUTROUS:**  It seemed a little extreme.  And we

25   felt we were entitled to full discovery.  And we were in the

1  midst of these other battles about anonymity and this

2  First Amendment privilege issue.  And every time we turned

3  around, Mrs. McIntyre was being cited to us.

4         So we were respecting -- we were thinking if this

5  were truly an anonymous person and he is going to be asserting

6  a privilege, maybe it wouldn't make sense to go through the

7  process.  So we were being extraordinarily diligent, Your

8  Honor.

9         And, yes, we could have filed a motion to compel.  We

10  felt we were also deluging the Court with motions about

11  discovery.  So I like to think of it as exercising restraint.

12         But I think -- and we think now, this deposition --

13  we would have been here asking the Court to reconvene it,

14  anyway.  Because now that the -- this Court's rulings and the

15  Ninth Circuit's rulings in its amended opinion on Monday, made

16  clear that proponents -- and we presume Mr. Swardstrom, who

17  made the same objections, broad objections to communications

18  with voters --

19         **THE COURT:**  What is Swardstrom's testimony going to

20  add to the mix of facts here?

21         **MR. BOUTROUS:**  Your Honor, I don't know until we see

22  the documents that he would produce.  But it would go to the

23  same issues in terms of communication to the voters, the

24  motivations behind Proposition 8, one piece of the case that we

25  have talked about before, which goes to the purposes behind

1 Proposition 8.

2          And Mr. Swardstrom, in the objections to the

3 subpoena, made the First Amendment objections, objected to

4 producing any documents that were not sent to the electorate at

5 large; the positions that have now been emphatically rejected

6 by the Ninth Circuit on Monday.

7          So what we would like is to get those documents and

8 review them, and take a -- it won't be a long deposition, but

9 take a deposition of Mr. Swardstrom in --

10          **THE COURT:**  Have all the other members of the

11 executive committee of marriage.com been deposed?

12          **MR. BOUTROUS:**  Yes.  I believe we've now deposed the

13 others.  But this goes to the other issue I alluded to.

14          The objections made during the depositions were so

15 extreme.  I mentioned this at the pretrial, that they were --

16 with Mr. Tam, the document --

17          **THE COURT:**  Let's get into that issue later, if you

18 don't mind.

19          **MR. BOUTROUS:**  Yes.  We have taken those depositions,

20 but their usefulness was severely limited due to the repeated,

21 we think, baseless objections based on First Amendment and

22 relevance grounds.  We think they were inappropriate

23 objections.

24          And so -- but Mr. Swardstrom is the last remaining

25 known executive committee member to be deposed.

1          **THE COURT:**  Now known.

2          **MR. BOUTROUS:**  Now known.

3          And, in fairness, and the Court's point is well-taken

4   that we could have moved to compel.  But, at the same time,

5   proponents had this information that showed he was a known --

6   his identity had been publicly disclosed to the Wall Street

7   Journal and others in their files for a long time.

8          And so we were hampered by that, and would request

9   the Court give us the opportunity to take a -- won't be -- I

10  don't think it will be a long deposition, but to get the

11  documents and take that deposition as soon as practicable.

12         **THE COURT:**  Very well.  Anything further?

13         **MR. BOUTROUS:**  No, Your Honor.  Thank you.

14         **THE COURT:**  Mr. Grant.

15         **MR. GRANT:**  Thank you, again, Your Honor.

16         Just a couple of very quick preliminary things.  You

17  may have seen my request to have Mr. Bopp, my colleague,

18  out-of-state colleague, to appear by telephone at this matter.

19         **THE COURT:**  It came in at, I'm told, sometime between

20  8:00 p.m. and midnight last night.

21         **MR. GRANT:**  It did.  And so I'm here.

22         **THE COURT:**  I'm sure it might be a surprise to you, I

23  was not here at that time.

24         **MR. GRANT:**  I'm glad to hear that, Your Honor.

25         The second thing is, I filed yet another item this

1  morning, objecting to the recording of these proceedings.  And

2  Mr. Bopp asked me to reiterate that for the record.

3       But with those preliminaries, the Court's questions

4  to Mr. Boutrous were good ones.  He said that the plaintiffs

5  could have filed their motion to compel.  In fact, he basically

6  said -- alleged that Mr. Swardstrom's objections were so

7  baseless and so unreasonable at the time that it seems like

8  that was the time to file the motion.

9       **THE COURT:**  Well, it's pretty extraordinary, isn't

10  it, to have an individual who is an officer, director, or

11  managing agent of a party to litigation, purport to attempt to

12  prevent his identity being known?

13       First of all, to not disclose who this individual is,

14  and then to have these other conditions against the disclosure

15  of identity, that's extraordinary; isn't it, Mr. Grant?

16       **MR. GRANT:**  Perhaps it is, Your Honor.  And that's

17  precisely what would have been litigated in a timely motion to

18  compel.

19       As Your Honor pointed out, this was back in October.

20  And --

21       **THE COURT:**  What was the justification for not

22  disclosing Swardstrom's identity?

23       **MR. GRANT:**  I am sorry, Your Honor, what is the

24  justification?

25       **THE COURT:**  Yes.  Of course, it's now disclosed.  But

1    what was the justification?

2            **MR. GRANT:**  It was based upon his First Amendment

3    right of associational privacy.

4            **THE COURT:**  How do you figure that?

5            **MR. GRANT:**  Well, Your Honor --

6            **THE COURT:**  He was not Mrs. McIntyre.  He was a

7    officer, director, managing agent of the organization that put

8    together the campaign.

9            **MR. GRANT:**  Understandably, Your Honor.  And the

10   substance of those objections are precisely what could have

11   been timely litigated by the plaintiffs.

12           Mr. Boutrous stood up here a few minutes ago, in

13   reference to Imperial County and figuratively pounded his fist

14   about the necessity of timeliness on the other side, and urged

15   that Imperial County's motion be denied because it filed it on

16   an untimely basis.  And that's precisely our objection here.

17           As to the substance, if it truly was so easy, if the

18   issues were so against Mr. Swardstrom, plaintiffs could easily

19   have prevailed on a timely motion to compel last October.  They

20   waited, now, until January, on the eve of trial, well past the

21   deadlines.  And so we think, in fairness, they have waived

22   their right to enforce this subpoena.

23           **THE COURT:**  Anything else?

24           **MR. GRANT:**  Not from me, Your Honor.  Thank you.

25           **THE COURT:**  Anybody else want to weigh in on this

1  subject?

2          Well, the motion to compel the deposition of

3  Mr. Swardstrom will be granted.  I think it's quite

4  extraordinary that an individual in his position, who was

5  essentially an officer, director, managing agent of the -- a

6  key party to the litigation, a party that has indeed intervened

7  in the lawsuit, would attempt to prevent his identity from

8  being known.  There was no effort to obtain a protective order,

9  if there was any basis for doing so.

10          It seems to me the failure to disclose Mr. Swardstrom

11  is completely without any justification, whatsoever.  And there

12  can, under this circumstances, be no prejudice to him, at this

13  juncture, in having his deposition taken; and, therefore, the

14  motion will be granted.

15          All right.  Now, Mr. Boutrous, you had other issues

16  pertaining to discovery.

17          As you know, those have been referred to Magistrate

18  Judge Spero, or at least the discovery reference was made to

19  deal with those issues.

20          Why shouldn't he deal with all of these questions of

21  the extent to which the First Amendment privilege has now been

22  clarified by the Ninth Circuit?

23          **MR. BOUTROUS:**  Your Honor, that -- that, for the most

24  part, I think, may make perfect sense.

25          I think the key issue that would be helpful to all of

1   us would be to get this Court's guidance and, I hope, rejection

2   as to the proponents' position that this Court's prior rulings

3   have determined that our requests for communications to voters,

4   outside the core group of the people who managed the campaign,

5   are somehow not relevant and not discoverable.

6        I think it's a completely baseless position.

7   Proponents are taking the position that when this Court denied

8   their motion for protective order as to everything except

9   request No. 8, the Court was somehow saying that all our other

10  requests, including No. 1, which was for communications to

11  voters, donors, basically everything that is discussed in the

12  Ninth Circuit's footnote 12, as being viable and discoverable

13  material, somehow that this Court intended for us not to be

14  able to get that; and withholding, by their own account, tens

15  of thousands of documents that are responsive to those

16  requests.

17       I think if this Court could clarify that this Court

18  has not ruled that our requests -- that that information is not

19  responsive, that would be very helpful, and really would

20  resolve many of the issues that we will be discussing with

21  Judge Spero later today.

22       I was going to say, I can walk through the exact

23  analysis of the Court's orders as to why this position is

24  completely without merit, if the Court would like me to.  But

25  it's your order, so I defer --

1         **THE COURT:**  I can always stand a little

2   clarification.

3         (Laughter).

4         **THE COURT:**  But I really wonder if any is necessary

5   here.

6         Magistrate Judge Spero is very capable.  And there

7   are attorney-client privileges that have been asserted.  And I

8   think it's better, with respect to those privilege issues, that

9   they be dealt with by someone other than the finder-of-fact.

10  And so I'm inclined to trust my very capable colleague in

11  working through these issues with you.

12        I think -- I like to think the orders previously

13  issued are clear enough.

14        **MR. BOUTROUS:**  That's fine, Your Honor.  I think they

15  are.

16        **THE COURT:**  All right.  Anything else?

17        **MR. KIRK:**  May I, Your Honor?

18        **THE COURT:**  Yes, Mr. Kirk.

19        **MR. KIRK:**  Thank you, Your Honor.

20        We certainly agree with and support having Magistrate

21  Judge Spero take up the document issues that were previously

22  referred to him.  We, too, think the orders are quite clear;

23  although, we disagree with Mr. Boutrous on what they mean.  But

24  we can fight that out before Magistrate Spero.

25        There was one other issue I did want to bring to this

 1 │ Court's attention.

 2 │       Mr. Boutrous mentioned that, in addition to seeking

 3 │ documents, he wishes to reopen some untold number of

 4 │ depositions.  We most certainly do oppose that.  And we oppose

 5 │ it on the merits of his arguments.  But there's a second

 6 │ feature to our argument that I want to make sure the Court

 7 │ understands.

 8 │       The simple, practical reality that the

 9 │ defendant-intervenors face is that we do not have the resources

10 │ to simultaneously be redoing the depositions while we're in

11 │ this court trying this case.

12 │       And so if at this very late date, you know, long

13 │ after these depositions were taken, an order were to issue

14 │ suggesting that the depositions have to start up again, we

15 │ would have to come back and ask the Court to postpone the

16 │ trial, because we just don't have the resources that the

17 │ plaintiffs do to allow us to simultaneously present our case in

18 │ this court, and everything that's entailed with that, while

19 │ also conducting a rerun of the discovery.

20 │       And, again, we'll certainly take that up with

21 │ Magistrate Spero.  But given that it impacts this Court's

22 │ schedule, I felt it incumbent to raise it.

23 │       **THE COURT:**  Of course, it's not unusual to have

24 │ deposition discovery going on at the same time the trial is

25 │ going on.  I am sure you have been involved in those cases.  I

1  certainly have been involved in those cases.  And it's not the

2  happiest circumstance, but it does happen.

3       **MR. KIRK:**  I certainly cannot say that it has never

4  happened.  And I cannot say it has never happened to me.  That

5  being said, though, I do think it's unusual.  Not unheard of.

6  Not never happening, but unusual.

7       And in this particular case where we're already on a

8  highly-accelerated schedule, at the plaintiffs' requests, where

9  the resource imbalance is great, as I think is probably obvious

10 to the Court, I simply suggest that it would be unfair to

11 reopen depositions three business days before trial and force

12 the defendant-intervenors -- who, you know, are volunteers.

13 They are here, you know, effectively volunteering to step up

14 and defend the law that the governor and the attorney general

15 have chosen not to defend.  To put them to the additional

16 burden of simultaneously coping with these depositions while

17 conducting the trial, we would submit, is simply too much.

18      Maybe that is premature because, as we say, we think

19 my friend, Mr. Boutrous, is wrong on the merits of his request.

20 And that's an argument we will make to the magistrate, but I

21 did want to alert the Court to that feature.

22      **THE COURT:**  Very well.  Let me hear from your friend,

23 Mr. Boutrous, on that matter.

24      (Laughter)

25      **MR. BOUTROUS:**  Thank you, Your Honor.

1          This is a situation of the proponents own making.

2    The objections that were made in these depositions were so

3    clearly out of bounds.

4          Mr. Tam's letter -- keep using that as an example.

5    It's now an appendix to the Ninth Circuit's opinion.  But the

6    questions that were objected to on First Amendment grounds

7    were:

8                "What was your goal in writing this letter?

9                Was it to encourage people to vote in favor

10               of Proposition 8?

11               "Was your goal in writing this letter to

12               encourage people to raise funds?"

13         Just basic questions.  And they objected on relevance

14   grounds, First Amendment grounds, instructed the witness not to

15   answer.

16         And we told them, our lawyers -- Mr. Dettmer was

17   taking the Tam deposition -- said, "We are going to want to

18   reopen these depositions and get this information."

19         And this was back on December 1.  So they had plenty

20   of notice.  They took extraordinarily unreasonable positions in

21   these depositions, that we think we are entitled to

22   information.

23         That said, Your Honor, we -- yes.

24         **THE COURT:**  Well, you have, I believe, all of these

25   individuals on your witness list, with the exception, of

1  course, of Mr. Swardstrom.  But I assume he may go on the

2  witness list now.

3       Why shouldn't we simply work this out at trial?

4  These individuals are going to be on the stand.  If they refuse

5  to answer a question that's appropriate, they can be directed

6  to answer the question.  And if they fail to do so, then we can

7  proceed to whatever remedies there may be for that refusal.

8       Why shouldn't that be the procedure?

9       **MR. BOUTROUS:**  That might be preferable, Your Honor.

10  We are capable of doing that kind of inquiry.  Obviously, we

11  would rather have the opportunity to take their depositions.

12       We don't want to delay the trial.  But we may be able

13  to do it that way, as well.

14       **THE COURT:**  I don't want to sit through a lot of

15  depositions.

16       **MR. BOUTROUS:**  Yes, we won't do that either.

17       We would just examine them.  We would do a trial

18  examination, without the deposition on those issues, and take

19  our -- you know, we can do that.

20       **THE COURT:**  Take the answers as you get them.

21       **MR. BOUTROUS:**  Exactly.  It's more exciting that way.

22       But we could do that, Your Honor.  And we don't want

23  to delay things.  We don't want to burden this Court and the

24  magistrate judge with any more discovery disputes than we have

25  to.  So --

1          **THE COURT:**  Well, he's going to be burdened with

2     quite a bit of discovery, given the volume of documents that

3     you're contending with.

4          But the issues certainly have clarified considerably,

5     as a result of the Ninth Circuit's amended opinion.  It's a

6     very instructive and useful opinion, and clarifies the issues

7     considerably.

8          **MR. BOUTROUS:**  Thank you.

9          **THE COURT:**  I'm appreciative of that; and I am sure

10    counsel are, as well.

11         **MR. KIRK:**  As a matter of fact, I rise to agree with

12    my friend, Mr. Boutrous.  The Court's suggestion is an

13    excellent one.  That gives us the opportunity to make our

14    objections, and the Court can rule on them and go forward.

15         **THE COURT:**  Good.  That's fine.

16         **MR. KIRK:**  Thank you, Your Honor.

17         **THE COURT:**  Anything further this morning?

18         **MR. DUSSEAULT:**  Your Honor, we did have the

19    housekeeping matter that was --

20         **THE COURT:**  Oh, dear, housekeeping matter.

21         **MR. BOUTROUS:**  Bringing him in for the housekeeping

22    matter.

23         **THE COURT:**  I see.  Everything goes downhill, doesn't

24    it?

25         (Laughter)

1          **MR. DUSSEAULT:**  Your Honor, Chris Dusseault of

2   Gibson, Dunn & Crutcher, also for the plaintiffs.

3          The housekeeping matter we have relates to the

4   48-hour rolling disclosure procedure that Your Honor ordered.

5   And just a couple of points of clarification, since those

6   deadlines are about to start for the parties.

7          One question we had, the procedure you laid out was

8   48 hours before -- before a trial day we would disclose the

9   individuals who would testify on that day, and the documents to

10  be used with them.

11         One point we wanted to get clarification on is

12  whether the Court also expects disclosure of documents to be

13  used on cross-examination, and whether the Court expects

14  disclosure of documents where a witness is going to be called

15  adverse.

16         **THE COURT:**  Are you talking about -- well, what

17  you're concerned about are the documents you're going to use on

18  direct you're prepared to disclose.

19         What are you talking about?  You say documents used

20  on cross-examination.  Are you talking about adverse witnesses?

21         **MR. DUSSEAULT:**  Two situations, Your Honor.  If we

22  are calling one of our own witnesses, the Court's procedure is

23  that 48 hours before we would disclose the documents to be

24  used.

25         What if we are to call one of the proponents

1  adversely, does the Court also envision that we share with

2  counsel for proponents the documents we intend to use when

3  perhaps we wouldn't be required to do exactly the same if we

4  did that as a --

5      **THE COURT:**  Talking about the difference between your

6  party witness or a witness under your control, as opposed to an

7  adverse witness?

8      **MR. DUSSEAULT:**  Yes, that's correct, Your Honor.

9      And the second related issue is whether the

10  proponents would be required to disclose documents that they

11  intend to use with our witness when they cross-examine that

12  witness.

13      **THE COURT:**  Well, Mr. Kirk, what's your view on this?

14      **MR. KIRK:**  Your Honor, I don't have quite as high a

15  hill as my friends, Mr. Olson and Mr. Boutrous, but it goes

16  downhill on this side, too.

17      (Laughter)

18      **MR. KIRK:**  And I'd ask the Court's permission to let

19  Mr. Panuccio address this.

20      **THE COURT:**  All right.

21      **MR. PANUCCIO:**  Thank you, Your Honor.

22      With respect to the disclosure of exhibits that would

23  be used on cross-examination, it's a strange request because it

24  typically does not happen in litigation that there is advance

25  disclosure of such exhibits.  And the reason is fairly obvious.

1   Oftentimes, you don't know exactly what you are going to cross

2   on until you hear the testimony, perhaps that day.

3           So it would be very difficult, for instance, if there

4   was an exhibit introduced while the direct examination is

5   happening, and cross is to happen, you know, four hours later,

6   say in the afternoon session, and you alter the exhibit or are

7   going to use it and say, oh, 24 hours before, "This is the

8   exhibit we intend to use," when you don't know what it is.

9           So it would be a strange trial practice to have to do

10  that, Your Honor, would be our position on that.

11          **THE COURT:**  I'm inclined to think that, given the

12  capability of counsel here, it's sufficient if you disclose the

13  exhibits that you intend to introduce on direct examination of

14  witnesses.  And that, of course, would apply to both sides.

15          I think you're correct, Mr. Panuccio, given the

16  nature of the issues here, it's hard to predict what documents

17  you might use in cross-examination.  And so I think,

18  Mr. Dusseault, that should be sufficient.

19          I remember my favorite local rule was the now

20  abandoned, I think, local rule of the Los Angeles Superior

21  Court, which required disclosure of witnesses and exhibits to

22  be used, except for purposes of impeachment or tactical

23  surprise.

24          (Laughter)

25          **MR. PANUCCIO:**  Best kind.

1          **MR. KIRK:**  Best kind.

2          **THE COURT:**  Those usually are the best kind.

3          **MR. DUSSEAULT:**  Your Honor, that's fine.  The only

4     clarification I would ask is, should we call, say, one of the

5     proponents adversely in our case, is it also your vision that

6     we would disclose the documents 48 hours --

7          **THE COURT:**  That you plan to use on direct

8     examination, sure.

9          Now, you might follow up with additional documents as

10    the testimony unfolds, of course.

11         **MR. DUSSEAULT:**  Thank you.

12         The second issue is a related one.  It has to do with

13    demonstratives that we might put on a screen during an

14    examination or a cross-examination of a witness.

15         When we did the exhibit list, the parties discussed

16    the fact that, obviously, these demonstratives had not been

17    prepared yet, and likely wouldn't be prepared until days or

18    even moments before putting a witness on, and sometimes even

19    while a witness is put on.

20         What we talked about is having a procedure where we

21    would not be precluded from using demonstratives, but we would

22    have some kind of advance notice.  And we had talked about a

23    neutral exchange of demonstratives 72 hours in advance.  That

24    was before the 48-hour rule.

25         **THE COURT:**  This is a court trial.  How valuable are

1   demonstratives, anyway?  I suspect you both will use them.  Why

2   make your life more difficult?

3            MR. DUSSEAULT:  In terms of disclosures?

4            THE COURT:  What's that?

5            MR. DUSSEAULT:  In terms of disclosures, Your Honor,

6   if we are intending to use them?

7            THE COURT:  If you come up with some bright idea for

8   a demonstrative in a court trial, I don't see much harm in

9   using it.

10            MR. DUSSEAULT:  Thank you.

11            THE COURT:  Maybe that will fall into the tactical

12   surprise category.

13            MR. DUSSEAULT:  Thank you.

14            THE COURT:  Any other housekeeping?

15            MR. PANUCCIO:  May I just be heard on the

16   demonstrative issue, Your Honor?

17            THE COURT:  Of course.

18            MR. PANUCCIO:  Thank you, Your Honor.

19            I think it's important just to state the reason, the

20   background of this a little bit further, and also our reasons

21   for wanting disclosure.

22            THE COURT:  Fair enough.

23            MR. PANUCCIO:  The background is, the parties

24   stipulated to an agreement and submitted it to the Court for

25   entry.  That stipulation was a 72-hour disclosure of

1   demonstratives.

2         The background for that was, we agreed with

3   plaintiffs that they would not have to have demonstratives,

4   pursuant to the Court's pretrial order, way back when all other

5   exhibits had to be disclosed, so long as we would have

6   sufficient time before they were introduced to examine them and

7   register any -- and prepare any objections we might have when

8   they come in.

9         So we agreed to waive the requirement of disclosure

10  back in December, so we would have this 72-hour period.  At

11  that time, witness disclosure was only required 24 hours

12  before.

13        The Court since amended that and made a 48-hour

14  disclosure.  And plaintiffs tried to use that change, which

15  actually went further in our direction, to say, well, let's go

16  back on our stipulated agreement, now, for 72 hours.

17        We think that that agreement should stand.  A deal is

18  a deal.  And it would be prejudicial to us to not be able to

19  examine demonstratives with some advance notice.

20        **THE COURT:**  How big an issue is this?  After all,

21  this is a court trial.  Demonstratives are not going to be very

22  important.  It may be helpful, in one sense or another.  But

23  demonstratives are not coming into evidence.  They are simply

24  used for arguments.

25        **MR. PANUCCIO:**  Well, Your Honor, with a trial with so

1   many experts, demonstratives can become very important.

2   Experts use them quite frequently.  It's not all fact

3   witnesses.  And, very often, it is important for counsel who

4   will be --

5            THE COURT:  Usually, the best demonstratives with

6   expert testimony are those that the experts create on the

7   stand.  They get off the stand, go on a board, draw a graph or

8   chart or something.

9            MR. PANUCCIO:  Well, I guess some of the most skilled

10   experts might do that.

11            THE COURT:  What's that?

12            MR. PANUCCIO:  Some of the most skilled experts might

13   be able to do that on a whiteboard.  But we have reason to

14   believe there will be quite a bit, a number of pre-prepared

15   demonstratives.  And it would be, certainly, helpful and fair

16   to be able to see them with some advance notice, before they

17   have given to the witness.

18            THE COURT:  Well, Mr. Dusseault what's your response?

19            MR. DUSSEAULT:  Your Honor, I hate to belabor the

20   issue.  I think your solution is the better one, and I would

21   prefer that.

22            The only point I would make, when Mr. Panuccio says

23   an agreement is an agreement is, the stipulation that we

24   discussed, that hasn't been entered by the Court, was a mutual

25   exchange of demonstratives, "exchange" meaning both sides, 72

1   hours in advance.

2          They told us, I believe last week, that their view is

3   that we have to give them ours on direct, but they don't intend

4   to give us their's for cross.  Which, of course, for the

5   reasons you talked about with cross, may make sense.

6          So I think that while we made an effort here to work

7   something out, I do think if Your Honor believes that the

8   demonstratives are of somewhat limited usefulness in the bench

9   trial, and we should be exercising restraint on how much we use

10  them, I think your procedure is the better one.

11         **THE COURT:**  I'm inclined to punt on this,

12  Mr. Panuccio.

13         As Counsel said, demonstratives are generally not

14  very important in a bench trial.  And I can't imagine that

15  there's going to be any unfair surprise.

16         If there is, you can tell me what the reason for your

17  inability to deal with a demonstrative is.  And if there's a

18  good reason, we can always carry that witness over, always be

19  carried over to a later point in the trial, if there is any

20  unfair surprise to either party.

21         I think we can deal with that in the course of the

22  case.  And I'm highly confident, given the capability of

23  counsel in this case, that we won't have those kinds of

24  instances.

25         All right.  Anything further?

1          Very well.  I will see you Monday morning.  We will

2     begin at 9 o'clock.  And look forward to that day.  Have a nice

3     weekend.

4               (Counsel thank the Court.)

5               (At 12:27 p.m. the proceedings were adjourned.)

6                         -   -   -   -

7

8

9                    **CERTIFICATE OF REPORTER**

10          I certify that the foregoing is a correct transcript

11     from the record of proceedings in the above-entitled matter.

12

13     DATE:   Thursday, January 7, 2010

14

                         s/b Katherine Powell Sullivan
15          _____

16          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                         U.S. Court Reporter
17

18

19

20

21

22

23

24

25