1  LAW OFFICES OF CHARLES S. LIMANDRI, APC
   CHARLES S. LIMANDRI
2  P.O. Box 9120
   Rancho Santa Fe, CA  92067
3  Phone: (858) 759-9930
   Fax: (858) 759-9938
4  Email: climandri@limandri.com

5  ATTORNEYS FOR PROPOSED AMICUS CURIAE NATIONAL ORGANIZATION FOR MARRIAGE, INC.

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10  KRISTIN M. PERRY, SANDRA B. STIER,
    PAUL T. KATAMI, and JEFFREY J.
11  ZARRILLO,                                    CASE NO. 09-CV-2292 VRW

12              Plaintiffs,                       **PRE-TRIAL MEMORANDUM OF**
                                                  **POINTS & AUTHORITIES OF**
        v.                                        ***AMICUS CURIAE* NATIONAL**
13                                                **ORGANIZATION FOR MARRIAGE,**
    ARNOLD SCHWARZENEGGER, in his official        **INC., IN SUPPORT OF**
14  capacity as Governor of California; EDMUND    **DEFENDANTS-INTERVENORS**
    G. BROWN, JR., in his official capacity as
15  Attorney General of California; MARK B.
    HORTON, in his official capacity as Director of
16  the California Department of Public Health and
    State Registrar of Vital Statistics; LINETTE   Date:  To Be Determined By The Court
17  SCOTT, in her official capacity as Deputy      Time:
    Director of Health Information & Strategic     Judge:  Chief Judge Walker
18  Planning for the California Department of Public  Location:  Courtroom 6, 17th Floor
    Health; PATRICK O'CONNELL, in his official
19  capacity as Clerk-Recorder for the County of    Trial Date:  January 11, 2010
    Alameda; and DEAN C. LOGAN, in his official
20  capacity as Registrar-Recorder/County Clerk for
    the County of Los Angeles,
21
                Defendants,
22  and

23  PROPOSITION 8 OFFICIAL PROPONENTS
    DENNIS HOLLINGSWORTH, GAIL J.
24  KNIGHT, MARTIN F. GUTIERREZ, HAK-
    SHING WILLIAM TAM, and MARK A.
25  JANSSON; and PROTECTMARRIAGE.COM –
    YES ON 8, A PROJECT OF CALIFORNIA
26  RENEWAL,

27              Defendant-Intervenors.

28                                   i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................ iii

INTEREST OF AMICUS ..................................................................................... 1

INTRODUCTION ................................................................................................. 2

ARGUMENT ......................................................................................................... 3

   I.     THE GOVERNMENTAL INTEREST IN MARRIAGE IS
        INEXTRICABLY TIED TO RESPONSIBLE PROCREATION AND
        THE WELFARE OF CHILDREN ............................................................... 3

        *A.  Children need mothers and fathers.* ............................................... 4

        *B.  Sex between men and women still makes babies.* ........................ 5

        *C.  Society needs babies.* ..................................................................... 6

  II.    THE STATE'S INTEREST IN MARRIAGE REMAINS LEGITIMATE
        AND IS NOT AN EXPRESSION OF ANIMUS AGAINST GAYS AND
        LESBIANS ...................................................................................................... 6

        *A.  American courts have recognized the legitimacy of marriage as an
            opposite sex union.* ....................................................................... 6

        *B.  State and Federal legislative bodies have recognized marriage's unique
            contributions.* ................................................................................ 8

        *C.  Legislative bodies in other nations have recognized marriage is not
            rooted in animus.* .......................................................................... 9

        *D.  Proposition 8 is consistent with international rulings on the human right
            to marry.* ...................................................................................... 10

 III.   CALIFORNIA VOTERS' OPPOSITION TO SAME-SEX MARRIAGE
        IS NOT ROOTED IN ANIMUS. ............................................................... 12

CONCLUSION ................................................................................................... 14

MEMORANDUM OF AMICUS CURIAE NATIONAL ORGANIZATION FOR MARRIAGE IN SUPPORT OF
DEFENDANTS-INTERVENORS — CASE NO. 09-CV-2292 VRW

# TABLE OF AUTHORITIES

## CASES

*Baker v. Baker,*
 13 Cal. 87 (1859) ........................................................................................7

*Baker v. Nelson,*
 191 N.W.2d 185, 186 (Minn. 1971), *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972) ..............................................................7

*Citizens for Equal Prot. v. Bruning,*
 455 F.3d 859 (8th Cir. 2006) .........................................................................8

*Conaway v. Deane,*
 932 A.2d 571 (Md. 2007) ...............................................................................7

*Cossey v. United Kingdom,*
 13 E.H.R.R. 622 (1991) ...............................................................................11

*Hernandez v. Robles,*
 855 N.E.2d 1 (N.Y. 2006) ..........................................................................7, 8

*Heup v. Heup,*
 172 N.W.2d 334 (Wis. 1969) .........................................................................7

*In re Kandu,*
 315 B.R. 123 (Bankr. W.D. Wash. 2004) .....................................................8

*Joslin v. New Zealand,*
 (Communication No. 902/1999), U.N. Doc. CCPR/C/75/D/902/1999 (17 July 2002). .......................................................................................................11

*K.B. v. National Health Service Pensions Agency, et al.,*
 Case No. C-117/01, 2003 ECJ CELEX LEXIS 650 (10 June 2003) ...............11

*Loving v. Virginia,*
 388 U. S. 1 (1967) ..........................................................................................7

*Maynard v. Hill,*
 125 U.S. 190 (1888) .......................................................................................7

*Morrison v. Sadler,*
 821 N.E.2d 15 (Ind. App. 2005) ....................................................................8

*Poe v. Gerstein,*
 517 F.2d 787 (5th Cir. 1975) .........................................................................7

*Rees v. United Kingdom,*
 9 E.H.R.R. 56 (1987) ...................................................................................11

*Sheffield and Horsham v. United Kingdom,*
 27 E.H.R.R. 163 (1999) ...............................................................................11

iii

*Singer v. Hara,*
  522 P.2d 1187 (Wash. App. 1974) ................................................................7

*Skinner v. Oklahoma,*
  316 U.S. 535 (1942).................................................................................6, 7

*Standhardt v. Superior Court,*
  77 P.3d 451 (Ariz. App. Div. 1, 2003) .......................................................8

*Stegienko v. Stegienko,*
  295 N.W. 252 (Mich. 1940).........................................................................7

Third Amended Complaint, *ProtectMarriage.com v. Bowen,*
  Case No. 2:09-CV-00058-MCE-DAD (E.D. Ca.), filed May 28, 2009, available
  at http://www.alliancedefensefund.org/userdocs/PMCvB_3rd_Amended_
  Complaint.pdf. ..............................................................................................1

*Wilson v. Ake,*
  354 F. Supp. 2d 1298 (M.D. Fla. 2005)......................................................8

*Zoglio v. Zoglio,*
  157 A.2d 627 (D.C. App. 1960) ..................................................................7

## STATUTES

Adopta medidas de protecção das uniões de facto, 109 (I-A) Diário da República
  2797 (2001)................................................................................................10

British Civil Partnership Act, 2004 c. 33 .........................................................10

Croatia Law on Same Sex Civil Union (2003) ................................................10

Denmark Registered Partnership Act, Act No. 372 (June 1, 1989).................10

Finland Registered Partnership Act 950/2001 .................................................10

Germany Life Partnerships Act (2000)............................................................10

Iceland Registered Partnership Law (1996) ....................................................10

Loi no. 99-944 du 15 Novembre 1999, Relative au Pacte Civil de Solidarité. .....................9

Luxembourg Registered Partnership 4946-12 (May 2004) .............................10

Mich. Comp. Laws Ann. §551...........................................................................9

Norway Law on Registered Partnerships, Act No. 40 (April 20, 1993)..........10

Portugal Lei No. 7/2001 de 11 de Maio ..........................................................10

Sweden Registered Partnership Act, SFS 1994:1117.......................................10

iv

Switzerland Bundesgesetz über die eingetragene Partnerschaft
    gleichgeschlechtlicher Paare (2004) ............................................................10

Tenn. Code Ann. §36-3-113 ..............................................................................9


**OTHER AUTHORITIES**

Barack Obama,
    *The Audacity of Hope* (2006) ......................................................................12

Benjamin Scafidi,
    *The Taxpayer Cost of Family Fragmentation: National and State Estimates*
    (Institute for American Values, 2008), available at
    http://center.americanvalues.org/?p=74 .......................................................4

Brad Wilcox, et al.,
    *Why Marriage Matters, Second Edition: Twenty-Six Conclusions from the
    Social Sciences* (Institute for American Values, 2005) ..................................5

Council of Europe,
    *Convention for the Protection of Human Rights and Fundamental Freedoms*
    (CPHRFF), art. 12 ......................................................................................11

David Blankenhorn,
    *The Future of Marriage* (Encounter Books 2007) ........................................4

David F. Greenberg,
    *The Construction of Homosexuality* (University of Chicago Press, 1988) .........4

David L. Chambers,
    *What if? The Legal Consequences of Marriage and the Legal Needs of Lesbian
    and Gay Male Couples*, 95 Mich. L. Rev. 447 (November 1996) ....................14

Donna Freydkin,
    *Elton John: Where Prop. 8 Went Wrong*, USA Today, November 13, 2008 ...........13

E.J. Graff,
    "Retying the Knot," in *Same-Sex Marriage: Pro and Con: A Reader* 134
    (Andrew Sullivan ed., 1st ed., Vintage Books 1997) ......................................14

Elaine Herscher,
    *Most Gays Embrace Right to Marry, But Others Ask, Why?*, S.F. Chron., Feb.
    22, 2000 at A13 ............................................................................................13

Elaine Sorensen & Chava Zibman,
    *To What Extent Do Children Benefit from Child Support?* (The Urban Institute,
    January 2000) ...............................................................................................5

French National Assembly,
    *Report Submitted on Behalf of the Mission of Inquiry on the Family and Rights
    of Children*, No. 2832 (English translation at

v

http://www.preservemarriage.ca/docs/France_Report_on_the_Family_Edited.pdf and original at http://www.assemblee-nationale.fr/12/pdf/rap-info/i2832.pdf) .............9

*Gay Rights Groups Praise New California Laws,* The Globe and Mail, Oct. 4, 1999, at A16....................................................................................................12

George P. Murdock,
    *Social Structure* (1949)............................................................................4

Helen Fisher,
    *Anatomy of Love: A Natural History of Mating, Marriage and Why We Stray* (1992)........................................................................................................4

J. Abma, et al.,
    *Fertility, Family Planning, and Women's Health: New Data from the 1995 National Survey of Family Growth* 23(19) Vital Health Stat. 28 (National Center for Health Statistics, 1997).............................................................5

Jennifer Warren,
    *Gay, Lesbian Group Supports Ban on Same-Sex Marriage,* L.A. Times, Feb. 11, 2000 at A3..........................................................................................13

Joseph Chamie,
    "Low Fertility: Can Governments Make a Difference?" paper presented at the Annual Meeting of the Population Association of America, Boston Massachusetts (April 2, 2004). ........................................................................6

Judith Stacey,
    "Gay and Lesbian Families: Queer Like Us," in *All Our Families: New Policies for a New Century* 117 (Mary Ann Mason, Arlene Skolnick & Stephen D. Sugarman eds., Oxford U. Press 1998)..............................................................14

Kingsley Davis (ed.),
    *Contemporary Marriage: Comparative Perspectives on a Changing Institution* (New York: Russell Sage Foundation, 1985) ..................................................4

Kristin Anderson Moore, et al.,
    "Marriage from a Child's Perspective: How Does Family Structure Affect Children and What Can We Do About It?" *Child Trends Research Brief* (June 2002)............................................................................................................5

Marriage Equality Amendment Bill 2009 (Australia), Senate Legal and Constitutional Affairs Legislation Committee Report, at p.37 (available at http://www.aph.gov.au/senate/committee/legcon_ctte/marriage_equality/report/report.pdf)..........................................10

McLanahan, et al.,
    *Unwed Fathers and Fragile Families,* Center for Research on Child Wellbeing, Working Paper #98-12 (March 1998)............................................................5

Michelangelo Signorile,
    *Bridal wave,* Out Magazine (December/January 1994) ...................................14

vi

Monica Hesse,
    *Opposing Gay Unions With Sanity and a Smile*, Washington Post, August 28,
    2009, at C01 ................................................................................................2

Nancy D. Polikoff,
    *Beyond (Straight and Gay) Marriage* (Beacon Press 2007) ...........................13

Nancy D. Polikoff,
    *We Will Get What We Ask For: Why Legalizing Gay and Lesbian Marriage*
    *Will Not "Dismantle the Legal Structure of Gender in Every Marriage,"* 79 Va.
    L. Rev. 1535 (October 1993) ....................................................................13

Paula Ettelbrick,
    "Since When is Marriage a Path to Liberation?" in William B. Rubenstein,
    *Lesbians, Gay Men, and the Law* (New York: The New Press 1993) ...............13

Press Release, *Human Rights Campaign Endorse Sen. Barack Obama for*
    *President of the United States*, Human Rights Campaign, June 6, 2008,
    available at http://www.hrc.org/10571.htm. .................................................12

Report 104-664, House Committee on the Judiciary, July 9, 1996 (104th Congress,
    2d Session) ...............................................................................................9

*Strong Opposition to Same-Sex Marriage, But Those Who Approve Have*
    *Increased Substantially*, The Harris Poll #25, April 14, 2004, available at
    http://www.harrisinteractive.com/harris_poll/index.asp?PID=454 ...................12

*Supreme Court Nominee Sonia Sotomayor*, CBS News/New York Times Poll,
    June 17, 2009, available at
    http://www.cbsnews.com/htdocs/pdf/poll_sotomayor_061709.pdf .................12

*The Marriage Movement: A Statement of Principles* (New York: Institute for
    American Values, 2000) ..............................................................................4

Thomas M. Messner,
    *Same-Sex Marriage and the Threat to Religious Liberty*, Heritage Foundation
    Executive Summary Backgrounder No. 2201 (published by The Heritage
    Foundation, October 30, 2008), available at
    http://www.heritage.org/research/Family/upload/bg_2201.pdf..........................1

United Nations High Commissioner for Human Rights,
    *International Covenant on Civil and Political Human Rights*, Art. 23, § 2 .....................11

United Nations,
    Universal Declaration of Human Rights, Art. 16 ...........................................11

*Voters Back Mayor on Same-Sex Marriage, Quinnipiac University Poll Finds*,
    Quinnipiac University Polling Institute, March 3, 2005, available at
    http://www.quinnipiac.edu/x1302.xml?ReleaseID=658 ..................................12

vii

Wendy D. Manning & Pamela J. Smock,
*New Families and Non-Resident Father-Child Visitation,* 78(1) Social Forces
87 (Sept. 1999)..................................................................................................5


**CONSTITUTIONAL PROVISIONS**

Ala. Const., amdt. 774 .................................................................................... 2, 9

Alaska Const., Art. I, sec. 25 ................................................................................ 2

Ariz. Const., art. XXX ......................................................................................... 2

Col. Const., Art. II, sec. 31 .................................................................................. 2

Fla. Const., Art. I, sec 27 .................................................................................... 2

Ga. Const., Art I, sec. 4 par. 1 ............................................................................ 2

Haw. Const., Art. I, sec. 23 ................................................................................. 2

Idaho Const., Art. III, sec. 28 ............................................................................. 2

Kansas Const. Art. 15, sec. 16 ............................................................................ 2

Ky. Const., Sec. 233A ......................................................................................... 2

La. Const., Art. XII, sec. 15 ................................................................................ 2

Mich. Const., Art. I, sec. 25 ................................................................................ 2

Miss. Const., Sec. 263-A ..................................................................................... 2

Mo. Const., Art. I, sec. 33 ................................................................................... 2

Mont. Const., Art. Art. 13, sec. 7 ....................................................................... 2

N.D. Const., Art. XI, sec. 28 ............................................................................... 2

Neb. Const., Art. I, sec. 29 .................................................................................. 2

Nev. Const., Art. I, sec. 21 .................................................................................. 2

Ohio Const., Art. XV, sec. 11 ............................................................................. 2

Okla. Const., Art. 2, sec. 35 ................................................................................ 2

Or. Const., Art. XV, sec. 5a ................................................................................ 2

S.C. Const., Art. XVII, sec. 15 ........................................................................... 2

S.D. Const., XXI, sec. 9 ........................................................................................ 2

Tenn. Const., Art. XI, sec. 18 ............................................................................... 2

Texas Const., Art. I, sec. 32 .................................................................................. 2

Utah Const., Art. I, sec. 29 ................................................................................... 2

Va. Const., Art. I, sec. 15-A ................................................................................. 2

Wis. Const., Art. XIII, sec. 13 ............................................................................. 2

ix

MEMORANDUM OF AMICUS CURIAE NATIONAL ORGANIZATION FOR MARRIAGE IN SUPPORT OF
DEFENDANTS-INTERVENORS — CASE NO. 09-CV-2292 VRW

**INTEREST OF AMICUS**

The National Organization for Marriage is a 501(c)(4) nonprofit corporation founded on the principle that good and decent people may disagree on the gay marriage issue, without hatred, hostility or prejudice, and that therefore Americans have a constitutional right to exercise core civil rights to speak, to donate, to vote, and to organize and assemble to protect marriage in law as the union of husband and wife.

Who does gay marriage hurt?  Who will be injured if this Court rules that gay marriage is constitutionally protected?

If we are right, it hurts our organization and our members, among others. It strips us of our core civil right to participate peacefully in the democratic process in pursuit of a vision of marriage that has been cross-culturally acknowledged as reasonable for hundreds of years, by a variety of religious groups, and by people with no religious commitment at all. Even at least a few gay people oppose gay marriage (*see, e.g.*, "Gays Defend Marriage," at http://www.gaysdefendmarriage.com), and we welcome their participation as fellow citizens in our shared mission.

This is not a theoretical right, in our case.  Our members have expended sweat, tears and treasure in honest expectation of our rights to participate in the democratic process, and which Plaintiffs propose to overturn using the courts. Our members and thousands of others have given their time and treasure, have endured insults, petty vandalism, threats to their livelihood, and even to their persons, in order to stand up for their core beliefs, working to get Proposition 8 (hereinafter, "Prop 8") on the ballot and to persuade a majority of their fellow citizens to vote for it. [*See, e.g.*, Thomas M. Messner, *Same-Sex Marriage and the Threat to Religious Liberty*, Heritage Foundation Executive Summary Backgrounder No. 2201 (published by The Heritage Foundation, October 30, 2008), available at http://www.heritage.org/research/Family/upload/bg_2201.pdf; Third Amended Complaint, *ProtectMarriage.com v. Bowen*, Case No. 2:09-CV-00058-MCE-DAD (E.D. Ca.), filed May 28, 2009, available at http://www.alliancedefensefund.org/userdocs/PMCvB_3rd_Amended_Complaint.pdf.

1

Plaintiffs are asking for the right to take away our rights, to nullify the victory we have won working peacefully and arduously in the democratic process for values we believe are constitutionally protected.  We are asking this Court for justice—justice to and for all of these individuals who have worked hard to protect values they hold dear—by rejecting this effort to misuse the courts to overturn Prop 8.

In making this plea for justice from this Court, the National Organization for Marriage is not just one of many voices.  Not only are we the only single-issue national organization working to protect our marriage traditions (whom the Washington Post described as "the preeminent organization dedicated to preventing the legalization of same-sex marriage." Monica Hesse, *Opposing Gay Unions With Sanity and a Smile*, Washington Post, August 28, 2009, at C01).  But even more importantly we played a key role in getting Prop 8 to the voters, forming a ballot initiative committee in California ("NOM California") to work with Protect Marriage for this purpose.  We emerged as the single largest donor to Prop 8 in California, as we have elsewhere.  Prop 8 will affect not only NOM's work in California, it will affect every state in which we have found voters and donors willing and eager to work to protect marriage: a ruling for gay marriage will not be confined to California; it will affect at a minimum the 29 other states that have passed marriage amendments,[1] and NOM has members in every state who will thus be affected by the court's ruling.

## INTRODUCTION

Does animus explain why people wish to retain marriage as the union of husband and wife?

---

[1] Ala. Const., amdt. 774; Alaska Const., Art. I, sec. 25; Ariz. Const., art. XXX; Ark. Const., Amdt. 83; Col. Const., Art. II, sec. 31; Fla. Const., Art. I, sec 27; Ga. Const., Art I, sec. 4 par. 1; Haw. Const., Art. I, sec. 23; Idaho Const., Art. III, sec. 28; Kansas Const. Art. 15, sec. 16; Ky. Const., Sec. 233A; La. Const., Art. XII, sec. 15; Mich. Const., Art. I, sec. 25; Miss. Const., Sec. 263-A; Mo. Const., Art. I, sec. 33; Mont. Const., Art. Art. 13, sec. 7; Neb. Const., Art. I, sec. 29; Nev. Const., Art. I, sec. 21; N.D. Const., Art. XI, sec. 28; Ohio Const., Art. XV, sec. 11; Okla. Const., Art. 2, sec. 35; Or. Const., Art. XV, sec. 5a; S.C. Const., Art. XVII, sec. 15; S.D. Const., XXI, sec. 9; Tenn. Const., Art. XI, sec. 18; Texas Const., Art. I, sec. 32; Utah Const., Art. I, sec. 29; Va. Const., Art. I, sec. 15-A; Wis. Const., Art. XIII, sec. 13.

2

The idea—and ideal—that marriage is a union of male and female is deeply, rationally rooted in the distinct nature of male-female sexual unions: only these unions can both create new life and connect those children in love to their mother and father.  Conversely, sexual unions of male and female pose unique dangers to the common good, because absent marriage, they produce fatherless children. Our marriage traditions are not rooted in animus, but in real common sense distinctions between same-sex couples and opposite-sex unions.

We maintain with great and passionate conviction that these reasons cannot be dismissed as irrational prejudice.  That there is, in other words, at stake in this marriage debate, a reasonable argument on the table about what the public purposes of marriage are, and should be, and therefore what the law of marriage should consist of.

The way such great public arguments about foundational ideas are meant to be settled in our democratic republic is by the democratic process. It is long, expensive, sometimes raucous; and often frustrating to moral purists.  But in the end it requires people to lay their reasons on the table, to demonstrate their convictions through reasonable, peaceful democratic actions, and to accept, if they fail, the legitimacy of the outcome in a way that no other process in our society can command.

The reasonableness of recognizing the distinct nature of male-female marital unions has been recognized by many U.S. courts, by legislative bodies in the U.S. and in sister democracies such as France and Australia, and in international law as well. These views are held by persons from all walks of life and cannot be dismissed as mere animus toward gays and lesbians.

## ARGUMENT

### I. THE GOVERNMENTAL INTEREST IN MARRIAGE IS INEXTRICABLY TIED TO RESPONSIBLE PROCREATION AND THE WELFARE OF CHILDREN.

Marriage is a virtually universal human institution. Although marriage traditions vary greatly, marriage is everywhere recognizably related to furthering the goals of procreation and

3

paternity.[2] Even societies that institutionalized same-sex relations in some contexts did not typically define these relations as marriages.[3] Even these societies recognized the need for a distinct social institution dedicated to managing sexual relationships between men and women in the interests of securing procreation and paternity.[4]

Marriage simultaneously encourages procreation in the ideal context and reduces the number of men and women at risk of producing children outside of wedlock, where children in fatherless households would suffer disadvantages and hardships themselves, and at the same time impose financial hardships and social costs on third parties and society.[5]

In this sense, and as a matter of historical record, marriage is clearly not rooted in animus towards gay and lesbian people or their relationships. It has its own historic dignity and purpose, rooted in real and enduring human realities.

### A. Children need mothers and fathers.

Child Trends (a leading and respected child research organization) sums up the social science consensus on common family structures that have been well-studied using large, nationally representative databases:

> Research clearly demonstrates that family structure matters for children, and the family structure that helps the most is a family headed by two biological parents in

---

[2] *See, e.g.,* David Blankenhorn, *The Future of Marriage* 91 (Encounter Books 2007); Kingsley Davis (ed.), *Contemporary Marriage: Comparative Perspectives on a Changing Institution* 5 (New York: Russell Sage Foundation, 1985); *see also* Helen Fisher, *Anatomy of Love: A Natural History of Mating, Marriage and Why We Stray* 65-66 (1992); George P. Murdock, *Social Structure* (1949).

[3] David F. Greenberg, *The Construction of Homosexuality* 27-28 (University of Chicago Press, 1988).

[4] When courts and legislatures assert that one key purpose of marriage is procreation they do not suggest that, in any literal sense, *only* a husband and wife can make a baby. To the contrary, rather than evidence that marriage is not really about procreation, the fact that men and women can and do procreate outside of marriage is the very problem that, in this and every known human society, marriage as a social institution, and a special legal status, attempts to ameliorate.

[5] Benjamin Scafidi, *The Taxpayer Cost of Family Fragmentation: National and State Estimates* (Institute for American Values, 2008), available at http://center.americanvalues.org/?p=74 (estimating the governmental costs of divorce and unwed childbearing at more than $110 billion per year). *See also The Marriage Movement: A Statement of Principles* (New York: Institute for American Values, 2000).

4

a low-conflict marriage. Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes. . . . There is thus value for children in promoting strong, stable marriages between biological parents.[6]

The risks to children when mothers and fathers do not get and stay married include: poverty, suicide, mental illness, physical illness, infant mortality, lower educational attainment, juvenile delinquency and conduct disorder, adult criminality, early unwed parenthood, and lower life expectancy.[7]

### B. Sex between men and women still makes babies.

Unintended pregnancy remains a common, not rare, consequence of male-female sexual relationships. Nationally, three-fourths of births to unmarried couples were unintended by at least one of the parents.[8] By their late thirties, 60 percent of American women have had at least one unintended pregnancy.[9]

The existence of contraceptives thus does not eliminate the state's interest in encouraging voluntary marital unions between men and women over other kinds of sexual unions between men and women. The vast majority of children born to a married couple will have a mother and a father already committed to caring for them. Most children conceived in sexual unions outside of marriage (and all children of same-sex unions) will not.[10]

---

[6] Kristin Anderson Moore, et al., "Marriage from a Child's Perspective: How Does Family Structure Affect Children and What Can We Do About It?" *Child Trends Research Brief* (June 2002) p. 1. This research brief on family structure does not compare outcomes for children raised by same-sex couples to children in other types of families.

[7] *See generally*, Brad Wilcox, et al., *Why Marriage Matters, Second Edition: Twenty-Six Conclusions from the Social Sciences* (Institute for American Values, 2005).

[8] J. Abma, et al., *Fertility, Family Planning, and Women's Health: New Data from the 1995 National Survey of Family Growth* 23(19) Vital Health Stat. 28 (Table 17) (National Center for Health Statistics, 1997) [70.4 percent of births to married women were intended by both parents, compared to just 28 percent of births to unmarried mothers.].

[9] *Id.* at 28 (Table 3).

[10] Studies show that 2 out of 3 children born out of wedlock have nonresident fathers at birth. This percentage climbs as children grow older (though some couples eventually marry). *See, e.g.,* McLanahan, et al., *Unwed Fathers and Fragile Families,* Center for Research on Child Wellbeing, Working Paper #98-12 at 7 (March 1998); Elaine Sorensen & Chava Zibman, *To What Extent Do Children Benefit from Child Support?* 8 (The Urban Institute, January 2000); Wendy D. Manning & Pamela J. Smock, *New Families and Non-Resident Father-Child Visitation,* 78(1) Social Forces 87, 89 (Sept. 1999).

### C.  Society needs babies.

Finally, there are no signs that artificial reproduction can replace the natural sexual unions of male and female for the purpose of sustaining society. A large majority of modern democracies are now experiencing very low birthrates, causing increasingly urgent concern among scientific experts about the social, economic, and political consequences. In 2004, a U.N. demographer warned:

> A growing number of countries view their low birth rates with the resulting population decline and ageing to be a serious crisis, jeopardizing the basic foundations of the nation and threatening its survival. Economic growth and vitality, defense, and pensions and health care for the elderly, for example, are all areas of major concern.

Joseph Chamie, "Low Fertility: Can Governments Make a Difference?" paper presented at the Annual Meeting of the Population Association of America, Boston, Massachusetts (April 2, 2004).

The State simply does not have the same interests at stake in regulating same-sex unions, because same-sex couples become parents only after much deliberation and joint consultation, at much greater expense, and/or by bringing a potential third party or parties into the relationship. Their sexual unions do not produce children.

Meanwhile there remains a pressing, urgent need to ensure that children created by acts of passion are protected and cared for by their parents. For better and/or worse, same-sex and opposite-sex couples are simply not similarly situated with respect to the great public purposes of marriage.

## II.   THE STATE'S INTEREST IN MARRIAGE REMAINS LEGITIMATE AND IS NOT AN EXPRESSION OF ANIMUS AGAINST GAYS AND LESBIANS.

### A.  American courts have recognized the legitimacy of marriage as an opposite sex union.

In articulating the human right to marry, the U.S. Supreme Court has repeatedly pointed to the link between marriage and procreation. In *Skinner v. Oklahoma,* 316 U.S. 535,

541 (1942), the Court noted, "Marriage and procreation are fundamental to the very existence and survival of the race." Even earlier, the Court spoke of marriage more generally, linking it to the very existence of civilization: "[Marriage] is the foundation of the family and of society, without which there would be neither civilization nor progress." *Maynard v. Hill*, 125 U.S. 190, 211 (1888). The Court echoed this view in *Loving v. Virginia*, writing, "Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival." *Loving v. Virginia*, 388 U. S. 1, 12 (1967) [quoting *Skinner v. Oklahoma, supra,* 316 U.S. at 541, and citing *Maynard v. Hill, supra,* 125 U.S. 190].) It is hard to see how marriage could be considered fundamental to our very existence and survival if it were not understood to be related to making and caring for the next generation.[11]

Historically, American courts have declared procreation to be the primary public purpose (as opposed to varying and diverse individual private purposes) of marriage.  In the words of the California Supreme Court, "[T]he first purpose of matrimony, by the laws of nature and society, is procreation." *Baker v. Baker*, 13 Cal. 87, 103 (1859).[12]

Within the past ten years, at least eight state and federal courts have denied constitutional challenges to state marriage laws, ruling there is a rational relation between the state's definition of marriage and procreation, including decisions from the high courts of Maryland, New York, and Washington, as well as the U.S. Court of Appeals for the 8th Circuit. *Conaway v. Deane,* 932 A.2d 571 (Md. 2007); *Hernandez v. Robles,* 855 N.E.2d 1

---

[11] *See also* Conaway v. Deane*, 932 A.2d 571, 619 (Md. 2007) ("[V]irtually every Supreme Court case recognizing as fundamental the right to marry indicates as the basis for the conclusion the institution's inextricable link to procreation.")

[12] *See also, e.g.*, Poe v. Gerstein, 517 F.2d 787, 796 (5th Cir. 1975) ["[P]rocreation of offspring could be considered one of the major purposes of marriage. . . ."]; Singer v. Hara, 522 P.2d 1187, 1195 (Wash. App. 1974) ["[M]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race."]; Baker v. Nelson, 191 N.W.2d 185, 186 (Minn. 1971), *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972) ["The institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis."]; Heup v. Heup, 172 N.W.2d 334, 336 (Wis. 1969) ["Having children is a primary purpose of marriage."]; Zoglio v. Zoglio, 157 A.2d 627, 628 (D.C. App. 1960) ["One of the primary purposes of matrimony is procreation."]; Stegienko v. Stegienko, 295 N.W. 252, 254 (Mich. 1940) [stating that "procreation of children is one of the important ends of matrimony"].

7

(N.Y. 2006) ; *Andersen v. King County* (Wash. 2006) 138 P.3d 963; *Citizens for Equal Prot. v. Bruning* (8th Cir. 2006) 455 F.3d 859.) As the New York court clearly articulated:

> [T]he Legislature could rationally decide that, for the welfare of children, it is more important to promote stability, and to avoid instability, in opposite-sex than in same-sex relationships. Heterosexual intercourse has a natural tendency to lead to the birth of children; homosexual intercourse does not. . . . . The Legislature could find that unstable relationships between people of the opposite sex present a greater danger that children will be born into or grow up in unstable homes than is the case with same-sex couples, and thus that promoting stability in opposite-sex relationships will help children more.

*Hernandez v. Robles* (N.Y. 2006) 855 N.E.2d 1, 7.[13]

Plaintiffs' claim that this link between marriage as a male-female sexual bond and procreation is today so irrational that no sane or well-intentioned voter could ever entertain it and that procreation is *merely a pretext* for other, more invidious and undeclared motives is difficult to credit. As the New York Court of Appeals held in *Hernandez v. Robles*, "A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted." *Hernandez v. Robles*, 855 N.E.2d 1, 8 (N.Y. 2006).

### B. *State and Federal legislative bodies have recognized marriage's unique contributions.*

American legislative bodies have also recognized the unique societal contributions made by marriage.[14] Perhaps most prominent among these is the House committee report recommending passage of the Federal Defense of Marriage Act in 1996. The committee explained its rationale for protecting state marriage recognition laws this way:

> At bottom, civil society has an interest in maintaining and protecting the institution of heterosexual marriage because it has a deep and abiding interest in encouraging responsible procreation and child-rearing. Simply put, government has an interest in marriage because it has an interest in children.

---

[13] *See also* Morrison v. Sadler, 821 N.E.2d 15, 24 (Ind. App. 2005); Wilson v. Ake, 354 F. Supp. 2d 1298, 1309 (M.D. Fla. 2005); In re Kandu, 315 B.R. 123, 146 (Bankr. W.D. Wash. 2004); Standhardt v. Superior Court, 77 P.3d 451, 463-64 (Ariz. App. Div. 1, 2003) (review denied 2004 Ariz. LEXIS 62, May 25, 2004).

[14] Since 1993, more than 30 state legislatures have approved statutes and/or constitutional amendments recognizing marriage only as the union of a husband and wife, implicitly endorsing the reasonableness of the definition. We focus here on the legislatures which set forth specific findings in support of their legislative actions.

Recently, the Council on Families in America, a distinguished group of scholars and analysts from a diversity of disciplines and perspectives, issued a report on the status of marriage in America. In the report, the Council notes the connection between marriage and children:

The enormous importance of marriage for civilized society is perhaps best understood by looking comparatively at human civilizations throughout history. Why is marriage our most universal social institution, found prominently in virtually every known society? Much of the answer lies in the irreplaceable role that marriage plays in childrearing and in generational continuity.

Report 104-664, House Committee on the Judiciary, July 9, 1996 (104th Congress, 2d Session).

State legislatures have made similar observations. The Michigan legislature stated in 1996: "Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children." Mich. Comp. Laws Ann. §551.1. *See also* Ala. Const. Amdt. 774; Tenn. Code Ann. §36-3-113.

### C. Legislative bodies in other nations have recognized marriage is not rooted in animus.

Legislatures in other nations, most recently France and Australia, have also concluded that the definition of marriage as the union of male and female is reasonable because it is grounded in real differences between same-sex and opposite sex unions that are importantly related to the public purposes of marriage.

In France, a Parliamentary committee found that "the sex-difference condition constitutes an essential component of marriage with regard to marriage's filiation aspects" so that "it is the interests of the child that lead a majority of the Mission to refuse to change the parameters of marriage."[15]

Similarly, the Australian Senate committee considering the "Marriage Equality

---

[15]  French National Assembly, *Report Submitted on Behalf of the Mission of Inquiry on the Family and Rights of Children*, No. 2832 (English translation at http://www.preservemarriage.ca/docs/France_Report_on_the_Family_Edited.pdf and original at http://www.assemblee-nationale.fr/12/pdf/rap-info/i2832.pdf). France also has a separate legal status for unmarried couples, the Civil Solidarity Pacts. Loi no. 99-944 du 15 Novembre 1999, Relative au Pacte Civil de Solidarité.

Amendment Bill 2009" was persuaded by the relationship between marriage and procreation:

> The committee heard a range of compelling evidence from those in opposition to the Bill. Submitters focussed on the origins of the word 'marriage' and the development of what has come to be a technical and common law definition. They argued in favour of preserving the narrower and common definition on the basis of 'natural procreation' and on the potential effect of same-sex parenting on children.

Marriage Equality Amendment Bill 2009, Senate Legal and Constitutional Affairs Legislation Committee Report, at p.37 (available at http://www.aph.gov.au/senate/ committee/legcon_ctte/marriage_equality/report/report.pdf).

The Committee indicated sympathy for same-sex couples, yet ultimately concluded that the definition of marriage should not be changed. *Id.* at 41 ("[T]he committee's recommendation not to alter the definition of marriage should not be taken as a lack of support for same-sex couples. However, the committee considers that the current definition is a clear and well-recognised legal term which should be preserved.")

Other nations as well, including much of Europe, have adopted various forms of legal recognition for same-sex couples, while at the same time recognizing that these statuses are distinct from marriage.[16] Far from evidence of animus, these developments show increasing tolerance and respect for same-sex couples in Europe. In California, too, it is possible for voters to show respect for same-sex unions while at the same time respecting the unique function and status of marriage.

### D. Proposition 8 is consistent with international rulings on the human right to marry.

Men and women of full age, without any limitation due to race, nationality, or religion, have the right to marry and to found a family. . . . The family is the natural

---

[16] *See, e.g.,* British Civil Partnership Act, 2004 c. 33; Denmark Registered Partnership Act, Act No. 372 (June 1, 1989); Finland Registered Partnership Act 950/2001; Iceland Registered Partnership Law (1996); Norway Law on Registered Partnerships, Act No. 40 (April 20, 1993); Sweden Registered Partnership Act, SFS 1994:1117; Switzerland Bundesgesetz über die eingetragene Partnerschaft gleichgeschlechtlicher Paare (2004); Germany Life Partnerships Act (2000); Luxembourg Registered Partnership 4946-12 (May 2004); Slovenia Law on Registered Same Sex Partnership (2005); Croatia Law on same sex civil union (2003); Portugal Lei No. 7/2001 de 11 de Maio, Adopta medidas de protecção das uniões de facto, 109 (I-A) Diário da República 2797 (2001).

and fundamental group unit of society and is entitled to protection by society and the State.

United Nations, *Universal Declaration of Human Rights*, Art. 16 §§ 1, 3.

Although the opposite-sex nature of the union, and its natural, inherent relationship to founding a family, were taken for granted at the time the Universal Declaration of Human Rights was drafted, more recent treaties and judicial interpretations have affirmed this basic view.

In a recent (2002) ruling, the United Nations Human Rights Committee affirmed that the internationally recognized civil right of marriage created by the International Covenant on Civil and Political Rights[17] confers the obligation on states "to recognize as marriage only the union between a man and a woman wishing to marry each other." *Joslin v. New Zealand*, (Communication No. 902/1999), U.N. Doc. CCPR/C/75/D/902/1999 (17 July 2002).

The European Court of Human Rights has repeatedly held that "the right to marry guaranteed by Article 12 [of the European Convention on Human Rights] refers to the traditional marriage between persons of opposite biological sex."[18] In 2003, the European Court of Justice acknowledged this reading of Article 12, describing as "fact" that "Article 12 of the European Convention on Human Rights protects only marriage between two persons of opposite biological sex."[19]

---

[17] United Nations High Commissioner for Human Rights, *International Covenant on Civil and Political Human Rights*, Art. 23, § 2 (entry into force 23 March 1976) ("The right of men and women of marriageable age to marry and to found a family shall be recognized.").

[18] Rees v. United Kingdom (1987) 9 E.H.R.R. 56 at ¶49; *see also* Cossey v. United Kingdom (1991) 13 E.H.R.R. 622 at ¶43; Sheffield and Horsham v. United Kingdom (1999) 27 E.H.R.R. 163 at ¶66. The European Convention on Human Rights states: "Men and women of marriageable age have the right to marry and to found a family, according to the national laws governing the exercise of this right." Council of Europe, *Convention for the Protection of Human Rights and Fundamental Freedoms* (CPHRFF), art. 12 (also referred to as the "European Convention on Human Rights").

[19] K.B. v. National Health Service Pensions Agency, et al. (10 June 2003) Case No. C-117/01, 2003 ECJ CELEX LEXIS 650 at ¶ 55.

11

### III.   CALIFORNIA VOTERS' OPPOSITION TO SAME-SEX MARRIAGE IS NOT ROOTED IN ANIMUS.

While it is not possible or necessary to investigate the motives of each individual who voted for Proposition 8, polling data shows that the 7 million Californians who approved Prop 8 are far from alone, and the majority of Americans who agree marriage is the union of a husband and wife cannot be dismissed simply as bigots. According to a recent CBS News poll, just one in three (33%) Americans support same-sex marriage, including a minority of Democrats (45%) and just 13% of Republicans.[20] Among the Democrats who oppose same-sex marriage is President Barack Obama, who favors civil unions, yet like the people of California, draws a line around marriage, writing in 2006: "I believe that American society can choose to carve out a special place for the union of a man and a woman as the unit of child rearing most common to every culture."[21] Despite this position, which Plaintiffs in this case would characterize as rooted only in animus, President Obama was nevertheless endorsed by the Human Rights Campaign for his "support for LGBT equality" and "unwavering commitment to civil rights."[22]

Just 10 years ago, gay activists in California celebrated the state's domestic partnership law, not as an expression of bigotry, but of equality and tolerance.[23] Even today, a notable minority (approx. 20%) of gays and lesbians continue to oppose same-sex marriage[24] – not

---

[20] *Supreme Court Nominee Sonia Sotomayor*, CBS News/New York Times Poll, June 17, 2009, available at http://www.cbsnews.com/htdocs/pdf/pollor_061709.pdf.

[21] Barack Obama, *The Audacity of Hope* 222 (2006).

[22] Press Release, *Human Rights Campaign Endorse Sen. Barack Obama for President of the United States*, Human Rights Campaign, June 6, 2008, available at http://www.hrc.org/10571.htm.

[23] *See, e.g., Gay Rights Groups Praise New California Laws*, The Globe and Mail, Oct. 4, 1999, at A16.

[24] Polling data suggests that between 15% and 25% of gays and lesbians oppose same-sex marriage. *Strong Opposition to Same-Sex Marriage, But Those Who Approve Have Increased Substantially*, The Harris Poll #25, April 14, 2004, available at http://www.harrisinteractive.com/harris_poll/index.asp?PID=454 (finding 71% of gays and lesbians support same-sex marriage and 25% oppose); *Voters Back Mayor on Same-Sex Marriage, Quinnipiac University Poll Finds*, Quinnipiac University Polling Institute, March 3, 2005, available at http://www.quinnipiac.edu/x1302.xml?ReleaseID=658 (gays and lesbians in New York City support same-sex marriage 77% to 19%).

because of bigotry, but simply because they prefer not to join the history and tradition of marriage.[25] Still others argue for same-sex marriage, not because they want to assimilate into the existing culture of marriage, but because they see same-sex marriage as a vehicle for changing what they view as an outdated and oppressive institution. *See, e.g., Beyond Same-Sex Marriage: A New Strategic Vision For All Our Families & Relationships*, July 26, 2006, available at www.beyondmarriage.org.

As Paula Ettelbrick, former legal director of the Lambda Legal Defense and Education Fund, has stated:

> As a lesbian, I am fundamentally different from non-lesbian women. . . . In arguing for the right to legal marriage, lesbians and gay men would be forced to claim that we are just like heterosexual couples, have the same goals and purposes, and vow to structure our lives similarly. . . . We must keep our eyes on the goals of providing true alternatives to marriage and of radically reordering society's view of reality.

Paula Ettelbrick, "Since When is Marriage a Path to Liberation?," *in* William B. Rubenstein, *Lesbians, Gay Men, and the Law* at 401-05 (New York: The New Press 1993).

Law Professor Nancy Polikoff of American University, a noted lesbian activist, wrote in 1993: "The only argument that has ever tempted me to support efforts to obtain lesbian and gay marriage is the contention that marriages between two men or two women would inherently transform the institution of marriage for all people." Nancy D. Polikoff, *We Will Get What We Ask For: Why Legalizing Gay and Lesbian Marriage Will Not "Dismantle the Legal Structure of Gender in Every Marriage*," 79 VA. L. REV. 1535, 1536 (October 1993).[26]

_____

[25] As Elton John told USA Today in November 2008, "I don't want to be married. I'm very happy with a civil partnership. If gay people want to get married, or get together, they should have a civil partnership . . . You get the same equal rights that we do when we have a civil partnership. Heterosexual people get married. We can have civil partnerships." Donna Freydkin, *Elton John: Where Prop. 8 Went Wrong*, USA Today, November 13, 2008. *See also* Jennifer Warren, *Gay, Lesbian Group Supports Ban on Same-Sex Marriage*, L.A. Times, Feb. 11, 2000 at A3; Elaine Herscher, *Most Gays Embrace Right to Marry, But Others Ask, Why?*, S.F. Chron., Feb. 22, 2000 at A13.

[26] While Professor Polikoff has since come to support same-sex marriage efforts, her ultimate goal remains the same – marginalize marriage as a legal and social structure: "I support the right to marry for same-sex couples as a matter of civil rights law." Nancy D. Polikoff, *Beyond (Straight and Gay) Marriage* at 3 (Beacon Press 2007). But "[m]arriage as a family form is not more important or valuable than other forms of family, so the law should not give it more value." *Id.*

13

Other gay authors have made similar arguments,[27] while some argue specifically that same-sex marriage will restructure marriage in such a way as to sever marriage from the purpose of procreation. For example, same-sex marriage activist E.J. Graff argues that "[i]f same-sex marriage becomes legal, that venerable institution will ever after stand for sexual choice, for cutting the link between sex and diapers." E.J. Graff, "Retying the Knot," *in Same-Sex Marriage: Pro and Con: A Reader* 134, 135-36 (Andrew Sullivan ed., 1st ed., Vintage Books 1997). Andrew Sullivan argues that "[f]rom being a means to bringing up children, [marriage] has become primarily a way in which two adults affirm their emotional commitment to one another." Andrew Sullivan, "Introduction," *in Same-Sex Marriage: Pro and Con: A Reader*, n. 82, at xix (Andrew Sullivan ed., 1st ed., Vintage Books 1997).

## CONCLUSION

Marriage is different. Marriage is unique, because only unions of husband and wife can make new life and connect those children in love to their own mother and father.  It is eminently rational, reasonable, tolerant and compassionate for the citizens of California to seek both to sustain this definition of marriage as a social ideal, while providing important substantive protections for same-sex couples through domestic partnerships and other laws and government practices.

This was the express goal and legal effect of Prop 8.

---

[27] *See, e.g.,* Michelangelo Signorile, *Bridal Wave*, Out Magazine (December/January 1994) ("[F]ight for same-sex marriage and its benefits, and then, once granted, redefine the institution of marriage completely . . ."); David L. Chambers, *What if? The Legal Consequences of Marriage and the Legal Needs of Lesbian and Gay Male Couples*, 95 Mich. L. Rev. 447, 491 (November 1996) ("[T]he effect of permitting same-sex marriage will be to make society more receptive to the further evolution of the law.  By ceasing to conceive of marriage as a partnership composed of one person of each sex, the state may become more receptive to units of three or more . . . "); Judith Stacey, "Gay and Lesbian Families: Queer Like Us," *in All Our Families: New Policies for a New Century* 117, 128-29 (Mary Ann Mason, Arlene Skolnick & Stephen D. Sugarman eds., Oxford U. Press 1998) (favorably suggesting that recognizing same-sex marriages would open the door to other creative family arrangements, including "small group marriages").

14

1      Where so many sister courts in the U.S., and legislative bodies, and international courts

2 of law have been able to perceive that the definition of marriage is rationally related to an

3 important public purpose, it would be wrong for this Court to conclude that only animus could

4 motivate the 7 million Californians who (even as they accept and support a multitude of laws

5 protecting gay citizens' rights) have drawn a line around marriage.

6      For these reasons, the National Organization for Marriage respectfully urges this Court

7 to affirm the constitutionality of Proposition 8.

8

9                       Respectfully submitted,

10

11                       ___/s/ Charles S. LiMandri_____.
                        *Attorney for Amici Curiae*

12

13 DATED: January 8, 2010.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF AMICUS CURIAE NATIONAL ORGANIZATION FOR MARRIAGE, INC.
IN SUPPORT OF DEFENDANTS-INTERVENORS — CASE NO. 09-CV-2292 VRW

1

2

## **ATTESTATION PURSUANT TO GENERAL ORDER NO. 45**

3   Pursuant to General Order No. 45 of the Northern District of California, I attest that

4

5   concurrence in the filing of the document has been obtained from each of the other signatories to

this document.

6

7                                  By:   ___/s/ Charles S. LiMandri___.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF AMICUS CURIAE NATIONAL ORGANIZATION FOR MARRIAGE, INC.
IN SUPPORT OF DEFENDANTS-INTERVENORS — CASE NO. 09-CV-2292 VRW