Angela C. Thompson (CA Bar No. 238708)
Attorney at Law
PO Box 163461
Sacramento, CA 95816-9461
Telephone: (916) 642-6534
Fax: (916) 930-0033
angelathompsonesq@gmail.com

The Becket Fund for Religious Liberty
Kevin Hasson (IL Bar No. 6190825; *pro hac vice* application pending)
1350 Connecticut Avenue, NW, Suite 605
Washington, D.C. 20036-1735
Telephone:  (202) 955-0095
Fax: (202) 955-0090
khasson@becketfund.org

Attorneys for *Amicus Curiae*
The Becket Fund for Religious Liberty

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

KRISTIN M. PERRY, *et al.*,

                    Plaintiffs,

and

CITY AND COUNTY OF SAN FRANCISCO,

                    Plaintiff-Intervenor,

v.

ARNOLD SCHWARZENEGGER, *et al.*,

                    Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, *et al.*,

                    Defendant-Intervenors.

Case No.  09-CV-2292 VRW

**BRIEF *AMICUS CURIAE***
**OF THE BECKET FUND**
**FOR RELIGIOUS LIBERTY**
**IN SUPPORT OF DEFENDANT-**
**INTERVENORS**

**Trial Date:  January 11, 2010**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................ii

INTEREST OF THE *AMICUS* .........................................................................................1

ARGUMENT ..........................................................................................................................2

I.  Adopting same-sex marriage without robust protections for
    religious liberty will result in wide-ranging church-state conflict.........................2

    A. Religious people and institutions that object to same-sex
    marriage will face an increased risk of civil liability
    under anti-discrimination laws..........................................................................3

    B. Religious people and institutions that object to same-sex
    marriage will be labeled "bigots" and penalized by state
    and local governments ......................................................................................6

        1.  Denial of government grants and contracts ..............................................6

        2.  Exclusion from government facilities and fora.........................................7

        3.  Loss of licenses or accreditation .............................................................8

        4.  Loss of state or local tax exemptions ......................................................9

    A. Proposition 8 was a rational response to the threat to religious
    liberty posed by the California Supreme Court's decision to
    promulgate same-sex marriage without conscience protections....................10

II. Legal scholars and state legislatures have reached a consensus that
    adopting same-sex marriage without robust protections for
    conscience will harm religious liberty ...................................................................11

    A. There is a consensus among legal scholars that conflicts
    between same-sex marriage and religious liberty are
    real and should be legislatively addressed ....................................................11

    B. Every state legislature that has enacted same-sex marriage
    legislation has attempted to address conflicts between
    same-sex marriage and religious liberty ........................................................14

APPENDIX

i

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR
RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS**          Case No. 09-CV-2292 VRW

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                   **Page**

3

*Barnes-Wallace* v. *Boy Scouts of America*,
   275 F. Supp. 2d 1259 (S.D. Cal. 2003) ...................................................................8

*Barnes-Wallace* v. *City of San Diego*,
   530 F.3d 776 (9th Cir. 2008) ...................................................................................8

*Bob Jones* v. *United States*,
   461 U.S. 574 (1983) ...............................................................................................10

*Boy Scouts of America* v. *Wyman*,
   335 F.3d 80 (2nd Cir. 2003) .....................................................................................8

*Boy Scouts of America, South Florida Council* v. *Till*,
   136 F. Supp. 2d 1295 (S.D. Fla. 2001).....................................................................7

*Butler* v. *Adoption Media*,
   486 F.Supp.2d 1022 (N.D. Cal. 2007).......................................................................5

*Christian Legal Soc'y Chapter of Univ. of Cal.* v. *Kane*,
   319 Fed. Appx. 645 (9th Cir. 2009) ..........................................................................9

*Cradle of Liberty Council* v. *City of Philadelphia*,
   2008 WL 4399025 (E.D. Pa. Sept. 25, 2008)............................................................8

*Evans* v. *City of Berkeley*,
   38 Cal.4th 1 (Cal. 2006) ............................................................................................8

*Gay Rights Coalition of Georgetown University Law Center* v.
*Georgetown University*,
   536 A.2d 1 (D.C. Ct. App. 1987) ..............................................................................5

*Goodridge* v. *Dep't of Public Health*,
   798 N.E.2d 941 (Mass. 2003)..................................................................................14

*Grove City College* v. *Bell*,
   465 U.S. 555 (1984) ..................................................................................................6

*Harriet Bernstein* et al. v. *Ocean Grove Camp Meeting Ass'n*,
   No. PN34XB-03008 ...................................................................................................5

*Varnum* v. *Brien*,
   763 N.W.2d 862 (Iowa 2009)..................................................................................14

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS**      Case No. 09-CV-2292 VRW

**Statutes**                                                                    **Page**

102 CODE MASS. REGS. §§ 5.04(1)(c) ........................................ 8

102 CODE MASS. REGS. §§ 1.03(1) ........................................... 8

110 CODE MASS. REGS. § 1.09(2) ............................................. 8

19-A ME. REV. STAT. ANN. § 650-A ..................................... 14

9 VT. STAT. ANN. § 4502(l) (2009) ..................................... 14

Bill S1967 § 5, 213th Leg. (N.J. 2009) ................................ 11

CAL EDUC. CODE § 221 ...................................................... 15

CAL. CIVIL CODE § 51.5 ....................................................... 4

CAL. CIVIL CODE §§ 53 ......................................................... 4

CAL. CIVIL CODE §§ 782.5 .................................................... 4

CAL. GOVERNMENT CODE §§ 12955 ...................................... 4

CAL. GOVERNMENT CODE §§ 12955.4 ................................... 4

CIVIL RIGHTS RESTORATION ACT OF 1987, 20 U.S.C. § 1687 ....... 6

CONN. PUBLIC ACT NO. 09-13 (2009) §§ 17-19, *available at*
   http://www.cga.ct.gov/2009/ACT/PA/
   2009PA-00013-R00SB-00899-PA.htm ............................... 14

KY. REV. STAT. ANN. § 344.020 ......................................... 15

N.H. REV. STAT. § 457:37 ................................................... 14

N.H. REV. STAT. ANN. § 354-A:16-17 ................................ 15

**Other Authorities**                                                      **Page**

Andrew Koppelman, *You Can't Hurry Love: Why Antidiscrimination
Protections for Gay People Should Have Religious Exemptions*,
   72 BROOKLYN L. REV. 125 (2006) ...................................... 14

D. Smith, *Accreditation committee decides to keep religious exemption*,
   33 MONITOR ON PSYCHOLOGY 1 (Jan. 2002) ............................ 9

iii

David Blankenhorn and Jonathan Rauch, *A Reconciliation on Gay Marriage,*
　　N.Y. TIMES, Feb. 21, 2009 ............................................................................................ 14

Don Lattin, *Charities balk at domestic partner, open meeting laws,*
　　S.F. CHRON., July 10, 1998 .............................................................................................. 7

Douglas W. Kmiec, *Same-Sex Marriage and the Coming Anti-Discrimination
　　Campaigns,* SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY:
　　EMERGING CONFLICTS ..................................................................................................... 10

*Home Invasion: Vote No on Prop 8* (posted by CourageCampaign Oct. 31, 2008),
　　*available at* http://www.youtube.com/watch?v=q28UwAyzUkE............................................. 11

Ira C. Lupu and Robert W. Tuttle, *Same-Sex Family Equality and Religious
　　Freedom,* NORTHWESTERN JOURNAL OF LAW AND SOCIAL POLICY,
　　Forthcoming, *available on SSRN at* http://ssrn.com/abstract=1492168................................. 13

Jill P. Capuzzo, *Group Loses Tax Break Over Gay Union Issue***,**
　　N.Y. TIMES, Sept. 18, 2007 ............................................................................................. 10

Melissa Walker, "YMCA rewrites rules for lesbian couples,"
　　DES MOINES REGISTER, Aug. 6, 2007.................................................................................. 5

Jonathan Turley, *An Unholy Union: Same-Sex Marriage and the Use
　　of Governmental Programs to Penalize Religious Groups with
　　Unpopular Practices,* SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY:
　　EMERGING CONFLICTS ..................................................................................................... 10

Patricia Wen, "*'They Cared for the Children': Amid Shifting Social Winds,
　　Catholic Charities Prepares to End Its 103 Years of Finding Homes for
　　Foster Children and Evolving Families.*"
　　BOSTON GLOBE, June 25, 2006........................................................................................... 8

*Reference re Same-Sex Marriage,* [2004] 3 S.C.R. 698 ¶ 53 (Can.) ......................................... 10

Richard A. Epstein, *Same-Sex Union Dispute: Right Now Mirrors Left,*
　　WALL ST. J., July 28, 2004 ................................................................................................ 9

*Same-Sex Marriage and Religious Liberty: Emerging Conflicts*
　　(Douglas Laycock, Anthony R. Picarello Jr. & Robin Fretwell
　　Wilson, eds., Rowman & Littlefield 2008) ............................................................ 1, 11, 12, 13

Susan M. Cover, *Mainers Vote Down Gay Marriage Law,*
　　PORTLAND PRESS HERALD, Nov. 4, 2009 ........................................................................... 14

## INTEREST OF THE *AMICUS*

The Becket Fund for Religious Liberty is a non-profit, nonpartisan law firm dedicated to protecting the free expression of all religious traditions. It has represented agnostics, Buddhists, Christians, Hindus, Jews, Muslims, Native Americans, Santeros, Sikhs, and Zoroastrians, among others, in lawsuits across the country and around the world. It is frequently involved, both as counsel of record and as *amicus curiae*, in cases seeking to preserve the freedom of *all* religious people to pursue their beliefs without excessive government interference. The Becket Fund has also represented religious people and institutions with a wide variety of views about same-sex marriage and homosexuality, including religious people and institutions on all sides of the same-sex marriage debate.

The Becket Fund has long sought to facilitate the neutral, academic discussion of the impact that legalizing same-sex marriage could have on religious liberty. In December 2005, it hosted a conference of noted First Amendment scholars—representing the full spectrum of views on same-sex marriage—to assess the religious freedom implications of legalized same-sex marriage. The conference resulted in the book *Same-Sex Marriage and Religious Liberty: Emerging Conflicts* (Douglas Laycock, Anthony R. Picarello Jr. & Robin Fretwell Wilson, eds., Rowman & Littlefield 2008). To date, *Emerging Conflicts* remains the touchstone of scholarly discourse about the intersection of same-sex marriage and religious liberty.

Based on its expertise in the field of religious liberty generally, and the intersection of same-sex marriage and religious liberty specifically, the Becket Fund submits this brief to demonstrate that concerns about the potential conflict between same-sex marriage and religious liberty are both rational and well-founded in fact.

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR
RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**        Case No. 09-CV-2292 VRW

**ARGUMENT**

According to Plaintiffs, Proposition 8 is unsupported by any rational basis. *See*, *e.g.*, Dkt. 281 at 13 (trial brief citing "irrational views"). But as we explain below, there was at least one powerful, rational reason to vote for Proposition 8: Legalizing same-sex marriage without also providing robust protections for conscientious objectors seriously undermines religious liberty.

The California Supreme Court's decision in *In re Marriage Cases*, which recognized no protections for conscience, guaranteed wide-ranging church-state conflict. In the wake of that decision, religious institutions and individuals were exposed both to increased liability in private anti-discrimination lawsuits and a range of government penalties—such as exclusion from government facilities, ineligibility for government contracts, and withdrawal of tax exempt status. Anyone who cares about religious freedom would have had good reason to be deeply concerned at the California Supreme Court's failure to protect religious liberty.

In fact, the consensus among legal scholars—whatever their views on the underlying wisdom of same-sex marriage—has been that same-sex marriage and religious liberty are on a collision course unless robust religious accommodations are provided. And state legislatures in New Hampshire, Connecticut, and Vermont have reached a similar legislative consensus, enacting specific exemptions for conscientious objectors to same-sex marriage.

Rational voters and their governments thus have legitimate reasons to be concerned about the conflict between same-sex marriage and religious liberty, regardless of their underlying views on what relationships the law should recognize as marriages.

**I.  Adopting same-sex marriage without robust protections for religious liberty will result in wide-ranging church-state conflict.**

Legalizing same-sex marriage—without providing protections for conscience—threatens the religious liberty of people and groups who cannot, as a matter of conscience, treat same-sex

---

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**          Case No. 09-CV-2292 VRW

unions as the moral equivalent of husband-wife marriage. Without conscience protections, immediate, widespread, and long-lasting church-state conflict will result.

In general, these conflicts will take two forms. *First*, objecting religious institutions will face an increased risk of lawsuits under various anti-discrimination laws, forcing religious institutions to change their religiously motivated behavior or face substantial liabilities. *Second*, religious institutions will face a range of penalties from state and local governments, such as the targeted withdrawal of government benefits and denial of access to government facilities.

Both types of conflict implicate the fundamental First Amendment rights of religious institutions, including the rights to freedom of religion and freedom of association. It is unclear how these First Amendment issues would play out in every single case. But for present purposes the important points are that the threat to religious liberty is real, and that attempting to protect religious liberty from that threat is a rational government objective.

**A. Religious people and institutions that object to same-sex marriage will face an increased risk of civil liability under anti-discrimination laws.**

Without conscience protections, legalizing same-sex marriage will allow members of same-sex marriages to bring suit against religious institutions under gender, marital status, and sexual orientation anti-discrimination laws, many of which were never designed to reach claims by members of same-sex marriages. Some of these laws have narrow religious accommodations, but those accommodations are not tailored to the new applications made possible by the judicial redefinition of legal marriage.

<u>Housing discrimination laws.</u> Religious colleges and universities frequently provide student housing and often give special priority, benefits, or subsidies to married couples. Legally married same-sex couples could reasonably be expected to seek these benefits, but many religious educational institutions would be constrained by their consciences from providing similar sup-

---

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**        Case No. 09-CV-2292 VRW

1   port for a same-sex sexual relationship. Housing discrimination lawsuits would result.

2       Under California law, gender, marital status, and sexual orientation discrimination in hous-

3   ing are all prohibited. *See* CAL. GOV'T CODE §§ 12955-12956.2; CAL. CIVIL CODE §§ 53, 782.5.

4   There are some limited exemptions for religious institutions, *see* CAL. GOV'T CODE §§ 12955.4,

5   12995, but they would not cover the vast majority of conflicts created by legal recognition of

6   same-sex marriage. For example, under current law, a religious college can provide married

7   students housing on a preferential basis. CAL. GOV'T CODE § 12995. But once same-sex mar-

8   riage is legally recognized, the term "married students" would mean both opposite-sex and

9   same-sex couples. That means that a religious college whose religious principles prevent it

10  from subsidizing or otherwise facilitating same-sex sexual conduct would have to either violate

11  its religious principles, or stop offering married student housing.

12      <u>Public accommodation laws.</u> Religious institutions also provide a broad array of programs

13  and facilities to their members and to the general public, such as hospitals, schools, adoption

14  services, and marital counseling. Religious institutions have historically enjoyed wide latitude

15  in choosing what religiously-motivated services and facilities they will provide, and to whom

16  they will provide them. But legalizing same-sex marriage will likely restrict that freedom, in

17  light of two additional facts. First, California includes gender, marital status and sexual orienta-

18  tion as protected categories under public accommodations laws. *See* CAL. CIVIL CODE § 51(b)

19  (forbidding discrimination in "all business establishments of every kind whatsoever"); CAL.

20  CIVIL CODE § 51.5 (forbidding discriminatory boycotts). Second, religious institutions and their

21  related ministries are facing increased risk of being declared places of public accommodation,

22  and thus being subject to legal regimes designed to regulate secular businesses. When coupled

23  with legalized same-sex marriage, these two facts create a significant liability risk for people

24  and organizations that refuse, for religious reasons, to provide identical services to legally mar-

—  4

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS**          Case No. 09-CV-2292 VRW

ried same-sex couples.

This risk is greatest for those religious institutions that have very open membership and service provision policies. Unfortunately, the more a religious institution seeks to minister to the general public (as opposed to just coreligionists), the greater the risk that the service will be regarded as a public accommodation and that the religious institution will be subject to suit.

Just a few of the many religiously-motivated services that can potentially be deemed "public accommodations" include: health-care services, marriage counseling, family counseling, job training programs, child care, gyms and day camps,[1] life coaching, schooling,[2] adoption services,[3] and even the use of wedding reception facilities.[4] Of the thousands of California religious organizations that minister to the public in one or more of the ways mentioned above, many simply want to avoid the appearance—and reality—of condoning or subsidizing same-sex marriage through their "family-based" services. Yet after *In re Marriage Cases*, the law threatened to forbid these institutions from expressing and acting on their religious objections to same-sex marriage precisely because they seek to serve the broader public.[5]

---

[1]   *See* Melissa Walker, *YMCA rewrites rules for lesbian couples*, DES MOINES REGISTER, Aug. 6, 2007 (city forced YMCA to change its definition of "family" or lose federal grant).

[2]   See *Gay Rights Coalition of Georgetown Univ. Law Center* v. *Georgetown Univ.*, 536 A.2d 1 (D.C. Ct. App. 1987) (en banc) (holding that while the D.C. public accommodations statute did not require a Catholic university to give homosexual groups university "recognition," it nevertheless required the university to allow them equivalent access to all university facilities.).

[3]   *See Butler* v. *Adoption Media*, 486 F.Supp.2d 1022 (N.D. Cal. 2007) (administrators of Arizona adoption facilitation website found subject to California's public accommodations statute because they refused to post profiles of same-sex couples as potential adoptive parents).

[4]   *See Bernstein* v. *Ocean Grove Camp Meeting Ass'n*, No. PN34XB-03008 (N.J. Dep't. of Law and Public Safety, Notice of Probable Cause issued Dec. 29, 2008) (finding that religious organization likely violated public accommodations laws by denying same-sex couple use of wedding pavilion).

[5]   Unlike many other states, California has *no* religious exemptions to its statutory bans on gender, marital status, and sexual orientation discrimination in public accommodations. *See* CAL. CIVIL CODE § 51(b). For a comprehensive comparison to other state public accommodations laws and exemptions, *see* Same-Sex Marriage and State Anti-Discrimination Laws (Octo-

---

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**          Case No. 09-CV-2292 VRW

**B. Religious people and institutions that object to same-sex marriage will be labeled "bigots" and penalized by state and local governments.**

Legalizing same sex marriage not only subjects religious organizations to civil liability at the hands of private litigants, it also subject religious organizations to the denial of benefits at the hands of the government. Specifically, once same-sex marriage is legalized, those who conscientiously object to such marriages can be labeled unlawful "discriminators" and thus denied access to state and local government benefits. Such benefits fall into four categories: (1) government grants and contracts; (2) access to government facilities and fora; (3) government licenses and accreditation; and (4) tax-exempt status.

**1. Denial of government grants and contracts.**

Religious universities, charities, hospitals, and social service organizations receive a significant amount of government funding to serve secular purposes through contracts and grants. Many contracts and grants require recipients to be organized "for the public good" and forbid recipients to act "contrary to public policy." If same-sex marriage is recognized without specific accommodations for religious organizations, those organizations that refuse to approve, subsidize, or perform same-sex marriages could be found to violate such standards, thus disqualifying them from participation in government contracts and grants.

For example, in *Grove City College* v. *Bell*, 465 U.S. 555 (1984), a religious college was denied *all* federal student financial aid for failing to comply, for religious reasons, with Title IX's anti-discrimination affirmation requirements; this even though there was no evidence of actual gender discrimination.[6] Many state and local laws carry similar penalties for institutions that are deemed to discriminate on any number of different grounds. Thus, for example, reli-

ber 2008), *available at* http://www.becketfund.org/files/34a97.pdf.

[6]   The U.S. Congress has since provided a legislative correction to the Department of Education's and the Supreme Court's application of Title IX. *See* Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687.

gious universities that oppose same-sex marriage could be denied access to government funds (such as scholarships, grants, or tax-exempt bonds) by governmental agencies that choose to adopt an aggressive view of applicable anti-discrimination standards.

Religious organizations opposed to same-sex marriage also face the loss of government-funded social service contracts. In 1998, the Salvation Army lost $3.5 million in social service contracts with the City of San Francisco because it refused, on religious grounds, to provide benefits to the same-sex partners of its employees.[7] If same-sex marriage is legalized without accommodation for religious organizations, many religious organizations will be forced either to extend benefits to same-sex spouses, or to stop providing social services in cooperation with government.[8]

### 2. Exclusion from government facilities and fora.

Religious institutions that object to same-sex marriage will also face challenges to their ability to access a diverse array of government facilities and fora. An example foreshadowing this threat is the reaction to the Boy Scouts' requirement that members believe in God and not advocate for, or engage in, homosexual conduct.

Because of their position on homosexual conduct, the Boy Scouts have had to fight to gain equal access to public after-school facilities.[9] They have lost leases to city campgrounds,[10] a

---

[7]   Don Lattin, *Charities balk at domestic partner, open meeting laws*, S.F. CHRON., July 10, 1998 at A-1.

[8]   *See*, *e.g.*, *Catholic Charities of Maine* v. *City of Portland,* 304 F. Supp. 2d 77 (D. Me. 2004) (upholding ordinance forcing religious charity to either extend employee spousal benefit programs to registered same-sex couples, or lose access to all city housing and community development funds).

[9]   *Boy Scouts of America, South Florida Council* v. *Till*, 136 F. Supp. 2d 1295 (S.D. Fla. 2001) (preliminarily enjoining a school board from continuing to exclude the Boy Scouts from school facilities based on their negative views of homosexual conduct).

[10]   *Barnes-Wallace* v. *Boy Scouts of America*, 275 F. Supp. 2d 1259 (S.D. Cal. 2003) (revoking Boy Scouts' use of publicly leased park land), *question certified*, *Barnes-Wallace* v. *City of San*

---
7

lease to a government building that served as their headquarters for 79 years,[11] marina berths reserved for "public interest" groups,[12] and the right to participate in a state-facilitated charitable payroll deduction program.[13] If same-sex marriage is legalized without robust protections for conscientious objectors, religious organizations that object to same-sex marriage would expect to face similar penalties.

### 3. Loss of licenses or accreditation.

A related concern exists for religious institutions in the context of licensing and accreditation decisions. In Massachusetts, for example, the state threatened to revoke the adoption license of Boston Catholic Charities, a large and longstanding religious social-service organization, because it refused on religious grounds to place foster children with same-sex couples.[14] Rather than violate its religious beliefs, Catholic Charities shut down its adoption services.[15] This sort of licensing conflict could only increase after judicial recognition of same-sex marriage, as religious organizations in California would not be able to rely on a distinction between domestic partnerships and legal marriages.

---

*Diego*, 530 F.3d 776 (9th Cir. 2008), *petition for cert. filed*, 77 U.S.L.W. 3563 (U.S. Mar. 31, 2009) (No. 08-1222).

[11]   *Cradle of Liberty Council* v. *City of Philadelphia*, 2008 WL 4399025 (E.D. Pa. Sept. 25, 2008) (denying motion to dismiss Boy Scouts' lawsuit against city for lease termination based on policies regarding homosexuals).

[12]   *Evans* v. *City of Berkeley*, 38 Cal.4th 1 (Cal. 2006) (affirming revocation of a boat berth subsidy at public marina due to Scouts' exclusion of atheist and openly gay members).

[13]   *Boy Scouts of America* v. *Wyman*, 335 F.3d 80 (2nd Cir. 2003) (holding that the Boy Scouts may be excluded from the state's workplace charitable contributions campaign for denying membership to the openly gay).

[14]   *Cf.* 102 CODE MASS. REGS. §§ 1.03(1); 5.04(1)(c); 110 CODE MASS. REGS. § 1.09(2) (requiring adoption agencies to maintain a written statement of purpose declaring that agency does not discriminate upon basis of sexual orientation).

[15]   Patricia Wen, *"They Cared for the Children": Amid Shifting Social Winds, Catholic Charities Prepares to End Its 103 Years of Finding Homes for Foster Children and Evolving Families*,  BOSTON GLOBE, June 25, 2006 at A1 (explaining that Catholic Charities had to choose between following Church beliefs and continuing to offer social services).

Religious colleges and universities have also been threatened with the loss of accreditation because of their opposition to homosexual conduct. In 2001, for example, the American Psychological Association, which is the only government-approved body that can accredit professional psychology programs, threatened to revoke the accreditation of religious colleges and universities that gave preference in hiring to coreligionists—a threat that would particularly harm organizations with religious beliefs forbidding homosexual behavior.[16] If same-sex marriage is judicially mandated, religious colleges and universities that oppose same-sex marriage will likely face similar threats.[17]

### 4. Loss of state or local tax exemptions.

Most religious institutions have charitable tax-exempt status under federal, state and local laws. But without conscience protections, that status could be stripped by state and local governments based solely on that religious institution's conscientious objection to same-sex marriage.[18] In New Jersey, for example, the state has withdrawn the property tax exemption of a beach-side pavilion owned and operated by a Methodist Church, because the Church refused on religious grounds to host a same-sex civil union ceremony.[19] Whether the First Amendment

---

[16]   D. Smith, *Accreditation committee decides to keep religious exemption*, 33 MONITOR ON PSYCHOLOGY 1 (Jan. 2002) (describing why the APA ultimately abandoned its proposal), *available at* http://www.apa.org/monitor/jan02/exemption.html.

[17]   Student organizations on campus face the same threat. *See Christian Legal Soc'y Chapter of Univ. of Cal.* v. *Kane*, 319 Fed. Appx. 645 (9th Cir. 2009), *cert. granted sub. nom. Christian Legal Soc'y Chapter of the Univ. of Cal.* v. *Martinez*, 2009 WL 1269076 (U.S. Dec. 7, 2009) (No. 08-1371) (student organization denied university recognition because it would not allow practicing homosexuals to be voting members or leaders).

[18]   "[P]rivate churches losing their tax exemptions for their opposition to homosexual marriages . . . are among the very dangers from the left against which I warned." Prof. Richard A. Epstein, *Same-Sex Union Dispute: Right Now Mirrors Left*, WALL ST. J., July 28, 2004 at A13.

[19]   Jill P. Capuzzo, *Group Loses Tax Break Over Gay Union Issue*, N.Y. TIMES, Sept. 18, 2007, at B2.

---

**BRIEF** *AMICUS CURIAE* **OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**          Case No. 09-CV-2292 VRW

1    could provide an effective defense to this kind of penalty is an open question.[20]

2        **C. Proposition 8 was a rational response to the threat to religious liberty posed by the**
3        **California Supreme Court's decision to promulgate same-sex marriage without**
         **conscience protections.**

4
5        The examples set out above are hardly an exhaustive list of the danger to religious freedom

6    that adopting same-sex marriage without conscience protections poses. It suffices to show,

7    however, that the California Supreme Court's failure to provide any conscience protections in

8    *In re Marriage Cases* created a significant threat to the ability of religious people and institu-

9    tions to live in accordance with their beliefs.[21] Voter (and official) action designed to eliminate

10   that threat is not at all irrational.

11       Nor is it all surprising, or irrational, that the threat to religious liberty was part of the public
12
13   debate over Proposition 8. Public discussions, opinion pieces in the press, and television and

14   radio advertisements naturally focused on the threat to religious liberty posed by the California

15   Supreme Court's decision in *In re Marriage Cases*. Religious people and institutions, as well as

16   anyone else who cared about human rights protections, were reasonably concerned about the

17   effect of *In re Marriage Cases* on religious freedom in California. In fact, ***failing*** to discuss and

18   debate the religious liberty issue would have been irrational. Silence about religious liberty
19
20   would have been especially remarkable in light of Proposition 8 opponents' public arguments

21   _____
     [20]  *See Bob Jones* v. *United States*, 461 U.S. 574 (1983) (rejecting Free Exercise Clause de-
22   fense to IRS withdrawal of 501(c)(3) status based on religious belief against interracial dating
     and marriage). *See also* Jonathan Turley, *An Unholy Union: Same-Sex Marriage and the Use of*
23   *Governmental Programs to Penalize Religious Groups with Unpopular Practices*, *in* SAME-SEX
     MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS ("EMERGING CONFLICTS") 64-65
24   (supporting legal recognition of same-sex marriage but arguing that opposition to such recogni-
     tion should not result in stripping of objectors' tax exemption); Douglas W. Kmiec, *Same-Sex*
25   *Marriage and the Coming Anti-Discrimination Campaigns*, *in* EMERGING CONFLICTS 108-111
26   (arguing that *Bob Jones* should not apply to conscientious objectors to same-sex marriage).
     [21]  *Cf. Reference re Same-Sex Marriage*, [2004] 3 S.C.R. 698 ¶ 53 (Can.) (Canadian Supreme
27   Court ruled that where future conflicts arose due to legal recognition of same-sex marriage, re-
28   ligious liberty would prevail under Canadian Charter of Rights and Freedoms).

_____10

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVERNORS**          Case No. 09-CV-2292 VRW

1   that the concerns of religious people and institutions were raised in bad faith.[22]

2       It was also rational for the debate over Proposition 8 to consider what public schools would

3   teach children about same-sex marriage. The same issue figured prominently in the debate over

4   same-sex marriage in New Jersey, where sponsors of same-sex marriage legislation expressly

5   protected the right of parents with religious or conscientious objections to remove their children

6   from public school classes that teach the normalcy of same-sex marriage.[23] Those legislators

7   are hardly acting irrationally; they are responding to a concrete threat to religious liberty.

8

9   **II. Legal scholars and state legislatures have reached a consensus that adopting same-sex marriage without robust protections for conscience will harm religious liberty.**

10

11      Both legal scholars versed in the issues and legislatures that have enacted same-sex mar-

12  riage legislation have reached a consensus: Same-sex marriage without conscience protections

13  constitutes a real threat to religious liberty, and something should be done about it. Their delib-

14  erations and debates, both academic and legislative, demonstrate that government action to pro-

15  tect religious liberty is a rational response to legal recognition of same-sex marriage.

16

17      **A. There is a consensus among legal scholars that conflicts between same-sex marriage and religious liberty are real and should be legislatively addressed.**

18

19      In *Same-Sex Marriage and Religious Liberty: Emerging Conflicts* (Douglas Laycock, An-

20  thony R. Picarello Jr. & Robin Fretwell Wilson, eds.) (Rowman & Littlefield 2008) ("*Emerging*

21  *Conflicts*"), seven prominent scholars of First Amendment law agreed that legal recognition of

22  same-sex marriage, without more, would create widespread conflicts with religious liberty. *See*,

23  *e.g.*, Marc D. Stern, *Same-Sex Marriage and the Churches, in Emerging Conflicts* 1 (describing

24

25  _____

26  [22]   *See*, *e.g.*, *Home Invasion: Vote No on Prop 8* (posted by CourageCampaign Oct. 31, 2008), *available at* http://www.youtube.com/watch?v=q28UwAyzUkE (depicting Mormon men attacking lesbian couple).

27  [23]   *See*, *e.g.*, Bill S1967 § 5, 213th Leg. (N.J. 2009) (proposed New Jersey same-sex marriage

28  bill preserving opt-out for parental objections to teaching about same-sex marriage).

_____11

scope of anticipated conflicts).[24] These scholars disagreed about the proper response to this conflict, but all treated concerns about the effects on religious liberty as rational and legitimate positions to take in the scholarly debate. For example, one participant in both the Becket Fund conference and a contributing author to the *Emerging Conflicts* book was Professor Chai Feldblum of Georgetown University Law Center. Professor Feldblum is one of the nation's leading advocates for LGBT rights and was recently nominated to the Equal Employment Opportunity Commission by President Obama. Professor Feldblum, writing from her own experience both as someone raised in an Orthodox Jewish family and as a lesbian, argued that conscientious or religious objections to same-sex marriage are entirely legitimate and meaningful:

> I first want to make transparent the conflict that I believe exists between laws intended to protect the liberty of lesbian, gay, bisexual and transgender (LGBT) people so that they may live lives of dignity and integrity and the religious beliefs of some individuals whose conduct is regulated by such laws. I believe those who advocate for LGBT equality have downplayed the impact of such laws on some people's religious beliefs and, equally, I believe those who have sought religious exemptions from civil rights laws have downplayed the impact that such exemptions would have on LGBT people.

Chai R. Feldblum, *Moral Conflict and Conflicting Liberties*, in *Emerging Conflicts* 123, 124-25. Although her position is that, in areas of unavoidable conflict, gay rights should prevail over religious freedom, she confirmed the real threat to religious liberty that legal recognition of same-sex marriage presents, and treated the positions of others in the debate as rational. *See id.* at 155-56.

   Other *Emerging Conflicts* authors, including editor and leading religious liberty scholar Doug Laycock—who supports same-sex marriage—focused on the notion that some conflicts

---

[24]   The scholars were Prof. Douglas Laycock of the University of Michigan Law School, Prof. Robin Fretwell Wilson of the Washington & Lee University School of Law, Marc Stern, General Counsel of the American Jewish Congress, Prof. Jonathan Turley of the George Washington University Law School, Prof. Douglas W. Kmiec of Pepperdine University School of Law (currently U.S. Ambassador to Malta), Prof. Chai R. Feldblum of Georgetown University Law Center, and Prof. Charles J. Reid, Jr. of the University of St. Thomas School of Law.

BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR
RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS        Case No. 09-CV-2292 VRW

12

between same-sex marriage and religious liberty were inevitable, but some could be mitigated by providing conscience protections. *See, e.g.,* Douglas Laycock, *Afterword*, *in Emerging Conflicts* 189, 197-201; Robin Fretwell Wilson, *Matters of Conscience: Lessons for Same-Sex Marriage from the Healthcare Context, in Emerging Conflicts* 77, 93-102. All of the professors agreed, however, that serious conflicts between same-sex marriage and religious liberty exist and should be legislatively addressed.

Since *Emerging Conflicts* was published, several of the scholars who authored chapters have separately written detailed open letters to legislators in states considering same-sex marriage legislation. These letters describe the concrete threats to religious liberty and argue that the threats should be legislatively addressed: "the conflicts between same-sex marriage and religious conscience will be considerable if adequate protections are not provided." Appendix at 1 (Dec. 4, 2009 letter to New Jersey legislators from six legal scholars).[25]

In response to the open letters, two other prominent First Amendment scholars—Professors Ira Lupu and Robert Tuttle of George Washington University School of Law—have published a law review article disagreeing with some of the specific religious liberty accommodations recommended in the open letters, but agreeing that many conscience protections are indeed necessary and advisable if the threat to religious liberty is to be mitigated.[26] Their argument *presumes* that legislatively addressing the potential conflicts is a rational response to legal recognition of same-sex marriage.

Leading scholars within the gay rights movement have also recognized the threat to religious liberty and advocated for conscience protections. In addition to Professor Feldblum, dis-

---

[25] *Available at* http://mirrorofjustice.blogs.com/files/12-4-2009-nj-sarlo-ssm-letter.pdf.

[26] *See* Ira C. Lupu and Robert W. Tuttle, *Same-Sex Family Equality and Religious Freedom*, NORTHWESTERN JOURNAL OF LAW AND SOCIAL POLICY, Forthcoming, *available on SSRN at* http://ssrn.com/abstract=1492168.

**BRIEF** *AMICUS CURIAE* **OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS**      Case No. 09-CV-2292 VRW

cussed above, Professor Andrew Koppelman of Northwestern University Law School and gay rights expert Jonathan Rauch have both recognized the potential conflict between same-sex marriage and religious liberty and have advocated legislative responses.[27]

There is thus a consensus that the conflicts are real and should be legislatively addressed. The only question is how widespread the conflicts will be, and how they should be addressed.

**B. Every state legislature that has enacted same-sex marriage legislation has attempted to address conflicts between same-sex marriage and religious liberty.**

That consensus is also reflected in the legislative action of the states that have legalized same-sex marriage. Three states—Connecticut, New Hampshire, and Vermont—have successfully adopted same-sex marriage by legislative action.[28] Although their laws vary, and no state has provided complete protection to conscientious objectors, each of the three states has attempted to address the conflicts between same-sex marriage and religious liberty by providing accommodations for conscientious objectors.[29] The fact that every state legislature to address same-sex marriage has recognized the conflict with religious liberty demonstrates that concerns

---

[27] *See, e.g.,* Andrew Koppelman, *You Can't Hurry Love: Why Antidiscrimination Protections for Gay People Should Have Religious Exemptions*, 72 BROOKLYN L. REV. 125 (2006); David Blankenhorn and Jonathan Rauch, *A Reconciliation on Gay Marriage,* N.Y. TIMES, Feb. 21, 2009, at WK11.

[28] Massachusetts and Iowa have same-sex marriage by judicial rulings. *See Goodridge* v. *Dep't of Public Health*, 798 N.E.2d 941 (Mass. 2003); *Varnum* v. *Brien*, 763 N.W.2d 862 (Iowa 2009). Maine's legislature passed a same-sex marriage bill, but it was rejected by citizen initiative before it went into effect. *See* 19-A ME. REV. STAT. ANN. § 650-A; Susan M. Cover, *Mainers Vote Down Gay Marriage Law,* PORTLAND PRESS HERALD, Nov. 4, 2009.

[29] *See* CONN. PUBLIC ACT NO. 09-13 (2009) §§ 17-19, *available at* http://www.cga.ct.gov/2009/ACT/PA/2009PA-00013-R00SB-00899-PA.htm (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges … related to" the "solemnization" or "celebration" of a marriage, and providing separate exemptions for religious adoption agencies and fraternal benefit societies); N.H. REV. STAT. § 457:37 (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges … related to" the "solemnization," "celebration," or "promotion" of a marriage); 9 VT. STAT. ANN. § 4502(l) (2009) (exempting religious organizations from "provid[ing] services, accommodations,  advantages, facilities, goods, or privileges … related to" the "solemnization" or "celebration" of a marriage).

---

**BRIEF *AMICUS CURIAE* OF THE BECKET FUND FOR**
**RELIGIOUS LIBERTY IN SUPPORT OF DEFENDANT-INTERVENORS**          Case No. 09-CV-2292 VRW

1   about religious liberty are rational. Those concerns provide ample support for Proposition 8.

2       And this is just one facet of the national legislative consensus in this area. Many sexual ori-

3   entation anti-discrimination statutes around the country protect conscientious objectors from

4   the operation of the statutes.  *See, e.g.,* CAL. EDUC. CODE § 221; N.H. REV. STAT. ANN. § 354-

5   A:16-17; KY. REV. STAT. ANN. § 344.020.  If protecting religious liberty is irrational, then all

6   of these legislatures have been acting irrationally. The truth of course is that they are doing

7   what legislatures do best (and courts are ill-suited to do): balancing legitimate interests in an

8   attempt to create greater freedom for all.

9

10                                  *   *   *

11

12      At this juncture in our Nation's political life, same-sex marriage and religious liberty stand

13  in conflict. Given that acknowledged conflict, it is not irrational for voters (or government offi-

14  cials) to act to protect the rights of conscience. Proposition 8 was an entirely rational response

15  to the threat to religious liberty.

16  Dated: January 8, 2010                  /s/ Angela C. Thompson
                                            Angela C. Thompson (CA Bar No. 238708)
17                                          Attorney at Law
                                            PO Box 163461
18                                          Sacramento, CA 95816-9461
                                            Telephone: (916) 642-6534
19                                          Fax: (916) 930-0033
                                            angelathompsonesq@gmail.com
20

21                                          The Becket Fund for Religious Liberty
22                                          Kevin Hasson (IL Bar No. 6190825; *pro hac vice*
                                            application pending)
23                                          1350 Connecticut Avenue, NW, Suite 605
                                            Washington, D.C. 20036-1735
24                                          Telephone:  (202) 955-0095
                                            Fax: (202) 955-0090
25                                          khasson@becketfund.org
26
                                            Attorneys for *Amicus Curiae*
27

28

---
                                                                                    15

# APPENDIX

December 4, 2009

**BY EMAIL AND FEDERAL EXPRESS**

Senator Paul A. Sarlo
Senate Judiciary Committee Chairman
207 Hackensack St.
Second Floor
Wood-Ridge, NJ 07075

<strong>Re:  Religious Liberty Implications of Legalizing Same-Sex Marriage</strong>

Dear Senator Sarlo:

We write to urge the New Jersey legislature to ensure that any bill legalizing same-sex marriage—such as the "Freedom of Religion and Equality in Civil Marriage Act" (or "New Jersey Marriage Bill")[1]—does not infringe the religious liberty of organizations and individuals who have a traditional view of marriage. It is not only possible to legalize same-sex marriage without infringing on religious liberty, it is the wise course. The contentious debate in Maine, California and elsewhere surrounding same-sex marriage proves the wisdom of constructive, good-faith attempts both to grant legal recognition to same-sex marriage *and* to protect religious liberty for conscientious objectors.  Unfortunately, the current version of the New Jersey Marriage Bill provides less protection for religious liberty than the same-sex marriage legislation of every other state to address the issue.

This letter analyzes the potential effects of same-sex marriage on religious conscience in New Jersey and proposes a solution to address the conflicts:  a specific religious liberty protection that can be added to the New Jersey Marriage Bill, clarifying that people and organizations may refuse to provide services for a wedding if doing so would violate deeply held beliefs, while ensuring that the refusal creates no undue hardship for the couple seeking the service.  We write not to support or oppose same-sex marriage in New Jersey.  Rather, our aim is to define a "middle way" where both equality in marriage and religious liberty can be honored and respected.[2]

As this letter details, the conflicts between same-sex marriage and religious conscience will be considerable if adequate protections are not provided.  Without adequate safeguards, many religious individuals will be forced to engage in conduct that violates their deepest religious beliefs, and religious organizations will be constrained in crucial aspects of their

---

[1]  Bill A2978, introduced June 16, 2008, *available at* http://www.njleg.state.nj.us/2008/Bills/A3000/ 2978_I1.HTM; *see also* Civil Marriage and Religious Protection Act, Bill A818, pre-filed for introduction in the 2008 session, *available at* http://www.njleg.state.nj.us/2008/Bills/A1000/818_I1.HTM.

[2]  While we have a range of views on the underlying issue of same-sex marriage, we wholeheartedly share the belief that when it is recognized it should be accompanied by corresponding protections for religious liberty.

Senator Sarlo
December 4, 2009
Page 2 of 16

religious exercise.  We urge the New Jersey legislature to take the time and care to ensure that the legalization of same-sex marriage does not restrict the inalienable right of religious liberty. Doing so is entirely consistent with the text of the New Jersey State Constitution that each member of the Legislature has sworn to uphold and protect. From its first constitution in 1776 to the present text, the New Jersey Constitution has always protected religious freedom. *See*, *e.g.*, N.J. CONST., art. I, para. 3.

Part A of this letter proposes a specific religious conscience protection that will defuse the vast majority of potential conflicts between same-sex marriage and religious liberty.  Part B provides examples of precedent for the protection we propose.  Part C details the sorts of legal conflicts that will arise if same-sex marriage is legalized without strong protections for religious liberty.  And Parts D through G detail the serious deficiencies in the religious conscience language currently under consideration in the New Jersey Marriage Bill.

A.    **Proposed Religious Conscience Protection**

The many potential conflicts between same-sex marriage and religious liberty are avoidable.[3]  But they are avoidable only if the New Jersey legislature takes the time and effort to craft the "robust religious-conscience exceptions" to same-sex marriage that leading voices on both sides of the public debate over same-sex marriage are calling for.[4]   The juncture for balancing religious liberty and legal recognition of same-sex unions is now.[5]

The New Jersey Marriage Bill can provide strong, specific protections for religious conscience by including a simple "marriage conscience protection" modeled on existing conscience protections in New Jersey's anti-discrimination laws.  The "marriage conscience protection" would provide as follows:

**Section ___**

**(a) Religious organizations protected.**

---

[3] *See*, *e.g.*, Douglas Laycock, University of Michigan Law School, *Afterword* in SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS, Douglas Laycock, Anthony R. Picarello, Jr. & Robin Fretwell Wilson, eds. 191-97 (Rowman & Littlefield 2008) (detailing the scope of "avoidable" and "unavoidable" conflicts).

[4] *See* David Blankenhorn & Jonathan Rauch, *A Reconciliation on Gay Marriage*, N.Y. TIMES, Feb. 22, 2009, at WK11, *available at* http://www.nytimes.com/2009/02/22/opinion/ 22rauch.html?_r=1 (arguing for recognition of same-sex unions together with religious conscience protections).

[5] Though conscience protections should also extend to existing civil unions, we do not address them here. We anticipate far fewer conflicts regarding civil unions, since for many conscientious objectors they bear less religious significance than marriage.

Notwithstanding any other provision of law, no religious or denominational organization, no organization operated for charitable or educational purposes which is supervised or controlled by or in connection with a religious organization, and no individual employed by any of the foregoing organizations, while acting in the scope of that employment, shall be required to

    (1) provide services, accommodations, advantages, facilities, goods, or privileges for a purpose related to the solemnization or celebration of any marriage; or

    (2) solemnize any marriage; or

    (3) treat as valid any marriage

if such providing, solemnizing, or treating as valid would cause such organizations or individuals to violate their sincerely held religious beliefs.

**(b) Individuals and small businesses protected.**

(1) Except as provided in paragraph (b)(2), no individual, sole proprietor, or small business shall be required

    (A)  to provide goods or services that assist or promote the solemnization or celebration of any marriage, or provide counseling or other services that directly facilitate the perpetuation of any marriage; or

    (B)  to provide benefits to any spouse of an employee; or

    (C)  to provide housing to any married couple

    if providing such goods, services, benefits, or housing would cause such individuals or sole proprietors, or owners of such small businesses, to violate their sincerely held religious beliefs.

(2) Paragraph (b)(1) shall not apply if

    (A)  a party to the marriage is unable to obtain any similar good or services, employment benefits, or housing elsewhere without substantial hardship; or

    (B)  in the case of an individual who is a government employee or official, if another government employee or official is not promptly available and willing to provide the requested government service without inconvenience

or delay; *provided that* no judicial officer authorized to solemnize marriages shall be required to solemnize any marriage if to do so would violate the judicial officer's sincerely held religious beliefs.

(3) A "small business" within the meaning of paragraph (b)(1) is a legal entity other than a natural person

   (A) that provides services which are primarily performed by an owner of the business; or

   (B) that has five or fewer employees; or

   (C) in the case of a legal entity that offers housing for rent, that owns five or fewer units of housing.

**(c) No civil cause of action or other penalties.**

No refusal to provide services, accommodations, advantages, facilities, goods, or privileges protected by this section shall

   (1) create any civil claim or cause of action; or

   (2) result in any action by the State or any of its subdivisions to penalize or withhold benefits from any protected entity or individual, under any laws of this State or its subdivisions, including but not limited to laws regarding employment discrimination, housing, public accommodations, educational institutions, licensing, government contracts or grants, or tax-exempt status.

   This language has several important benefits. First, this language is modeled on existing protections in New Jersey's anti-discrimination law for "any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization."[6] This language also follows specific protections provided in the Vermont, Connecticut, and New Hampshire same-sex marriage laws—each of which provides significantly more protection than New Jersey's proposed marriage bill. The laws of those three states protect, among other things, the conscientious refusal "to provide services, accommodations, advantages, facilities, goods, or privileges . . . related to the solemnization of a marriage."[7]

---

[6] N.J. REV. STAT. § 10:5-5(n) (2008).

[7] *See* N.H. REV. STAT. § 457:37 (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges . . . related to" the "solemnization,"

Second, this language lists the primary areas of New Jersey law where the refusal to treat a marriage as valid is likely to result in liability, penalty, or denial of government benefits ("laws regarding employment discrimination, housing, public accommodations, educational institutions, licensing, government contracts or grants, or tax-exempt status").

Third, this language provides protection only when providing services related to a marriage, solemnizing a marriage, or being forced to treat a marriage as valid would "violate . . . sincerely held religious beliefs."  This phrase is drawn from numerous court cases discussing the First Amendment to the U.S. Constitution and ensures that the religious conscience protections will apply only to a "violation" of "sincere" beliefs that are "religious"—not to situations that merely make religious people uncomfortable, not to insincere beliefs asserted as a pretext for discrimination, and not to non-religious moral beliefs.

Fourth, this language provides vital protections in subsection (b) for individuals of religiously informed conscience who own sole proprietorships and small businesses.  We explain the need for such protection in Sections C and F below.

Finally, this language recognizes that religious accommodations might not be without cost for same-sex couples, such as the need to find a different wedding photographer or caterer if their original choice must decline for reasons of conscience.  In order to address this issue, subsection (b)(2) ensures that a same-sex couple can obtain the service, even from conscientious objectors, when the inability to find a similar service elsewhere would impose an undue hardship on the couple.  But because this hardship exception could force organizations or individuals to violate their religious beliefs, it should be available only in cases of substantial hardship, not mere inconvenience or symbolic harm.  The language in subsection (b)(2)(B) also ensures that no government employee or official (such as a county clerk) may act as a choke point on the path to marriage.  So, for example, no government employee can refuse on grounds of conscience to issue a marriage license unless another government employee is promptly available and willing to do so.  These sorts of override protections are common in other laws protecting the right of conscientious objection, especially in the health care context.[8]

---

"celebration," or "promotion" of a marriage); CONN. PUBLIC ACT NO. 09-13 (2009) §§ 17-19, *available at*  http://www.cga.ct.gov/2009/ACT/PA/2009PA-00013-R00SB-00899-PA.htm  (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges . . . related to" the "solemnization" or "celebration" of a marriage, and providing separate exemptions for religious adoption agencies and fraternal benefit societies); 9 VT. STAT. ANN. § 4502(l) (2009) (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges . . . related to" the "solemnization" or "celebration" of a marriage).

[8] *See, e.g.*, IOWA CODE § 146.1 (2005) ("An individual who may lawfully perform, assist, or participate in medical procedures which will result in an abortion shall not be required against that individual's religious beliefs or moral convictions to perform, assist, or participate in such procedures.  . . .  Abortion does not include medical care which has as its primary purpose the treatment of a serious physical condition requiring emergency medical treatment necessary to save the life of a mother."); S.C. CODE ANN. §§ 44-41-40, -50 (2002) ("No private or non-governmental hospital or clinic shall be required . . . to

Senator Sarlo
December 4, 2009
Page 6 of 16

### B.    Precedent for Religious Conscience Protections

There is ample precedent for the type of conscience protection we have proposed.  As noted above, Connecticut, Vermont, and New Hampshire have already enacted religious exemptions as part of their same-sex marriage implementation legislation.[9]   Similarly, New Jersey's existing anti-discrimination laws on employment, housing, and public accommodations provide exemptions for religious organizations in certain circumstances.[10]   And federal anti-discrimination statutes provide protection for religious and conscientious objectors in many different contexts.[11]   In short, protecting religious conscience is very much a part of America's, and New Jersey's, tradition.  We urge the New Jersey legislature to continue that "middle way" accommodation of interests.

The religious conscience protection that we have proposed would alleviate the vast majority of the conflicts between same-sex marriage and religious liberty, while still allowing for full equality of treatment and respect for same-sex marriages.  It has ample precedent in both New Jersey and U.S. law.  And it represents the best in the American and New Jersey tradition of protecting the inalienable right of conscience.

### C.    Conflicts Between Same-Sex Marriage and Religious Liberty

---

permit their facilities to be utilized for the performance of abortions; *provided*, that no hospital or clinic shall refuse an emergency admittance."); TEX. OCC. CODE ANN. § 103.004 (Vernon 2004) ("A private hospital or private health care facility is not required to make its facilities available for the performance of abortion *unless* a physician determines that the life of the mother is immediately endangered.").

[9] *See* note 7 above and pages 14-15 below.

[10] *See, e.g.,* N.J. REV. STAT. § 10:5-5(n) (exempting religious organizations from anti-discrimination laws applicable to the sale, lease or rental of real property); N.J. REV. STAT. § 10:5-5(l) (exempting from public accommodations laws any "distinctively private" institution and "any educational facility operated or maintained by a bona fide religious or sectarian institution"); N.J. REV. STAT. § 10:5-12(a) (stating that it will not be a discriminatory employment practice "for a religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee").

[11] *See, e.g.*, 32 C.F.R. § 1630.11 (accommodating conscientious objectors to military service); 42 U.S.C. § 300a-7 (accommodating health care professionals who conscientiously object to participating in medical procedures such as abortion or sterilization); 42 U.S.C. § 2000bb *et seq.* (Religious Freedom Restoration Act lifts federal-created burdens on religious exercise).

Senator Sarlo
December 4, 2009
Page 7 of 16

In the only comprehensive scholarly work on same-sex marriage and religious liberty,[12] legal scholars on both sides of the same-sex marriage debate agreed that codifying same-sex marriage **without** providing robust religious accommodations will create widespread and unnecessary legal conflicts—conflicts that will work a "sea change in American law" and will "reverberate across the legal and religious landscape."[13]   The conflicts between religious conscience and same-sex marriage generally take one of two forms.  First, if same-sex marriage is legalized without appropriate statutory accommodations, religious organizations and individuals that object to same-sex marriage will face new lawsuits under the state anti-discrimination act and other similar laws.  So will many small businesses, which are owned by individual conscientious objectors.  Likely lawsuits include claims where:

o  Individuals of conscience, who run a small business, such as wedding photographers, florists, banquet halls, or making wedding cakes in one's home, can be sued under public accommodations laws for refusing to offer their services in connection with a same-sex marriage ceremony.[14]

o  Religious summer camps, day care centers, retreat centers, counseling centers, meeting halls, or adoption agencies can be sued under public accommodations laws for refusing to offer their facilities or services to members of a same-sex marriage.[15]

---

[12] SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS, Douglas Laycock, Anthony R. Picarello, Jr. & Robin Fretwell Wilson, eds. (Rowman & Littlefield 2008) (including contributions from both supporters and opponents of same-sex marriage).

[13] *Id.* Marc Stern, Assistant Executive Director, American Jewish Congress, *Same-Sex Marriage and the Churches* at 1 [hereinafter "Stern"].  *See also id.*, Douglas Laycock, University of Michigan Law School, *Afterword* at 191-97 [hereinafter "Laycock"] (detailing the scope of "avoidable" and "unavoidable" conflicts).

[14] *See* N.J. REV. STAT. § 10:5-12(l) (making it unlawful for any person to refuse to do business with any other person on the basis of, among other things, "gender identity or expression, affectional or sexual orientation, marital status, [or] civil union status"); *Elane Photography v. Willock*, No. D-202-CV-200806632 (N.M. 2d Jud. Dist. Ct.) (filed July 1, 2008) (New Mexico photographer fined for refusing on religious grounds to photograph a same-sex commitment ceremony); Stern at 37-39; *see also Issues Brief: Same-Sex Marriage and State Anti-Discrimination Laws* at 3-5, *available at* http://www.becketfund.org/files/34a97.pdf_ [hereinafter "Issues Brief"].

[15] *Bernstein v. Ocean Grove Camp Meeting Ass'n*, No. PN34XB-03008 (N.J. Dep't of Law and Public Safety, Notice of Probable Cause issued Dec. 29, 2008) (finding that a Methodist organization likely violated public accommodations law by denying same-sex couples use of its wedding pavilion); *Butler v. Adoption Media*, 486 F. Supp.2d 1022 (N.D. Cal. 2007) (administrators of Arizona adoption facilitation website found subject to California's public accommodations statute because they refused to post profiles of same-sex couples as potential adoptive parents); *see also* Stern at 37-39; Robin Fretwell Wilson, *A Matter of Conviction: Moral Clashes Over Same-Sex Adoption*, 22 BYU J. PUB. L. 475 (2008) (describing clashes over adoptions by same-sex couples).

    o  A church or other religious nonprofit that dismisses an employee, such as an organist or secretary, for entering into a same-sex marriage can be sued under employment discrimination laws that prohibit discrimination on the basis of marital status.[16]

        The second form of conflict involving religious organizations and individuals (or the small businesses that they own) that conscientiously object to same-sex marriage is that they will be labeled unlawful "discriminators" under state or municipal laws and thus face a range of penalties at the hand of state agencies and local governments, such as the withdrawal of government contracts or exclusion from government facilities.  For example:

    o  A religious college, hospital, or social service organization that refuses to provide its employees with same-sex spousal benefits can be denied access to government contracts or grants on the ground that it is engaging in discrimination that contravenes public policy.[17]

    o  A religious charity or fraternal organization that opposes same-sex marriage can be denied access to government facilities, such as a lease on government property or participation in a government-sponsored employee charitable campaign.[18]

---

[16] Stern at 48-52; Issues Brief at 3-5.  New Jersey's religious exemption from employment discrimination laws does not cover every possible situation.  *See* N.J. REV. STAT. § 10:5-12(a) (permitting a "religious association or organization to utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization, or in following the tenets of its religion in establishing and utilizing criteria for employment of an employee").

[17] *See, e.g.*, N.J. ADMIN. CODE § 9A:11-1.4 (excluding from state Educational Opportunity Fund grants any institutions that "discriminate in their recruitment and admissions practices based on race, age, creed, religion, marital status, national origin, color, gender, sexual orientation or disability"); N.J. REV. STAT. § 10:2-1 (providing that New Jersey will have the right to cancel public works contracts or penalize public works contractors if they discriminate on the basis of, among other things, "marital status, gender identity or expression, [or] affectional or sexual orientation"); N.J. REV. STAT. § 10:5-32 (nullifying public works contracts that lack anti-discrimination provisions); *see also Catholic Charities of Maine v. City of Portland*, 304 F. Supp.2d 77 (D. Me. 2004) (upholding ordinance forcing religious charity either to extend employee spousal benefit programs to registered same-sex couples, or to lose access to all city housing and community development funds); Don Lattin, *Charities Balk at Domestic Partner, Open Meeting Laws*, S.F. CHRON., July 10, 1998, at A-1 (describing how the Salvation Army lost $3.5 million in social service contracts with the City of San Francisco because it refused, on religious grounds, to provide benefits to the same-sex partners of its employees).

[18] *See Evans v. City of Berkeley*, 38 Cal.4th 1 (Cal. 2006) (affirming revocation of a boat berth subsidy at public marina due to Boy Scouts' exclusion of atheist and openly gay members); *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003) (holding that the Boy Scouts may be excluded from the state's employee charitable contributions campaign for denying membership to openly gay individuals); *Cradle of Liberty Council v. City of Philadelphia*, 2008 WL 4399025 (E.D. Pa. Sept. 25, 2008) (dismissal of complaint denied in case where city terminated a lease with the Boy Scouts based on the Scouts' policies regarding homosexual conduct).

Senator Sarlo
December 4, 2009
Page 9 of 16

o Doctors, psychologists, social workers, counselors, and other professionals who conscientiously object to same-sex marriage can have their licenses revoked.[19]

o Religious fraternal organizations or other nonprofits that object to same-sex marriage can be denied food service licenses, adoption agency licenses, child care licenses, or liquor licenses on the ground that they are engaged in unlawful discrimination.[20]

o Religious colleges or professional schools can have their accreditation revoked for refusing to recognize the validity of same-sex marriages.[21]

o Church-affiliated organizations can have their tax exempt status stripped because of their conscientious objection to same-sex marriage.[22]

---

[19] *See*, *e.g.*, N.J. ADMIN. CODE § 13:34-6.4 (defining professional misconduct for marriage and family therapists to include conduct that offends an individual based upon "marital status [or] sexual orientation"); Stern at 22-24 (noting that a refusal to provide counseling services to same-sex couples could be "considered a breach of professional standards and therefore grounds for the loss of a professional license"); *see also* Patricia Wen, *"They Cared for the Children": Amid Shifting Social Winds, Catholic Charities Prepares to End Its 103 Years of Finding Homes for Foster Children and Evolving Families*, BOSTON GLOBE, June 25, 2006, at A1 (explaining how Massachusetts threatened to revoke the adoption license of Catholic Charities for refusing on religious grounds to place foster children with same-sex couples); Robin Fretwell Wilson, *A Matter of Conviction: Moral Clashes Over Same-Sex Adoption*, 22 BYU J. PUB. L. 475 (2008) (describing dismissals and resignations of social services workers where conscience protections were not available).

[20] *See, e.g.*, N.J. REV. STAT. § 9:3-40 (forbidding adoption agencies from discriminating in the selection of adoptive parents on the basis of sex or marital status); N.J. ADMIN. CODE § 10:122B-1.5 (forbidding foster care, or "resource care," agencies from discriminating against a resource parent applicant on the basis of gender or sexual orientation); *see also* Stern at 19-22 (noting that many state regulators condition licenses on compliance with anti-discrimination requirements).

[21] Stern at 23 (describing how religiously affiliated law schools have unsuccessfully challenged diversity standards imposed by the American Bar Association as a condition of accreditation); D. Smith, *Accreditation Committee Decides to Keep Religious Exemption*, 33 MONITOR ON PSYCHOLOGY 1 (Jan. 2002) (describing a proposal of the American Psychology Association to revoke the accreditation of religious colleges and universities that have codes of conduct forbidding homosexual behavior), *available at* http://www.apa.org/monitor/jan02/exemption.html.

[22] Jill P. Capuzzo, *Group Loses Tax Break Over Gay Union Issue*, N.Y. TIMES, Sept. 18, 2007 (describing the case of *Bernstein v. Ocean Grove Camp Meeting Ass'n*, in which New Jersey revoked the property tax exemption of a beach-side pavilion controlled by an historic Methodist organization, because it refused on religious grounds to host a same-sex civil union ceremony); Douglas W. Kmiec, Pepperdine Law School, *Same-Sex Marriage and the Coming Antidiscrimination Campaigns Against Religion* in SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS 107-21 (describing attacks on tax exemptions for religious organizations with objections to same-sex marriage); Jonathan Turley, George Washington University Law School, *An Unholy Union* in SAME-SEX MARRIAGE AND RELIGIOUS

Senator Sarlo
December 4, 2009
Page 10 of 16

All of these conflicts either did not exist before, or will significantly intensify after, the legalization of same-sex marriage. Thus, legalizing same-sex marriage without adequate protections for religious liberty will have at least two unintended consequences: It will harm religious organizations and individuals of conscience, and it will spawn costly, unnecessary conflicts, many of which will lead to litigation.[23]

### D.       The Need for Robust Religious Liberty Protection

At present, the New Jersey Marriage Bill offers *no protection* to those with conscientious religious objections to same-sex marriage. Section 5 of the Bill would add the following provision:

> 5. No minister of the clergy of any religion authorized to solemnize marriage and no religious society, institution or organization in this State shall be required to solemnize any marriage in violation of the free exercise of religion guaranteed by the First Amendment to the United States Constitution or by Article I, paragraph 4 of the New Jersey Constitution.[24]

As explained below, *this provision provides less protection for religious liberty than every other state that has considered the issue*. By its own terms, section 5 confers on religious organizations only those protections already guaranteed by the U.S. Constitution and New Jersey Constitution. Individual clergy or religious organizations who refuse to perform same-sex marriage receive ersatz protection, for they are already protected by the U.S. Constitution.

---

LIBERTY: EMERGING CONFLICTS 59-76 (arguing for same-sex marriage but against withdrawal of tax exemptions for religious organizations with conscientious objections).

[23] Filed lawsuits are often just the tip of the iceberg with respect to conflicts over a given law and a claimed right. Most conflicts get resolved before a suit is filed and comes to the attention of the public. Some employers will back down when suit is threatened. Others will pay a settlement and walk away. Some employers will be quietly "chilled" even though they would prefer another course of action. What matters is the number of conflicts rather than the number of lawsuits. This data is not available, however, and so cannot be empirically studied. Nonetheless, there need only be a few conflicts for there to be a crisis of conscience. Each conflict is a profound violation of religious liberty. Moreover, even assuming that there are a small number of actual conflicts (as some critics claim), then there will be a correspondingly few number of same-sex couples affected by the religious exemptions we recommend. Finally, discrimination lawsuits often increase dramatically over time, so an important question is how many lawsuits against conscientious objectors will be filed 20 years from now. *See, e.g.*, Vivian Berger *et al.*, *Summary Judgment Benchmarks for Settling Employment Discrimination Lawsuits*, 23 HOFSTRA LAB. & EMP. L.J. 45, 45 (2005) ("The number of employment discrimination lawsuits rose continuously throughout the last three decades of the twentieth century. In the federal courts, such filings grew 2000% . . . .").

[24] Bill A2978 § 5, *available at* http://www.njleg.state.nj.us/2008/Bills/A3000/2978_I1.HTM; *see also* Bill A818 § 8 (same), *available at* http://www.njleg.state.nj.us/2008/Bills/A1000/818_I1.HTM.

Senator Sarlo
December 4, 2009
Page 11 of 16

Indeed, with or without this language, "[n]o one seriously believes that clergy will be forced, or even asked, to perform marriages that are anathema to them."[25]  Focusing on the issue of "forced officiating" is entirely unnecessary and a distraction from real situations where religious conscience is at risk.

What section 5 leaves out is considerable:

o  It provides no protection from the loss of government benefits for refusing to recognize a same-sex marriage.

o  It provides no protection for individual objectors.

o  It provides no protection to religious organizations from private lawsuits brought under New Jersey's anti-discrimination laws.

The following sections detail these gaps in New Jersey's same-sex marriage bill.

### E.        No Protection from Government Penalty

A good deal of misunderstanding surrounds religious liberty exemptions.  Exemptions serve the important function of protecting conscientious objectors from private lawsuits.  But exemptions also serve the purpose of insulating conscientious objectors from penalties at the hands of the government.[26]  How might this occur?

An objector may be penalized by losing access to government grant programs or other state or local benefits.  Thus, in *Catholic Charities of Maine v. City of Portland*, the district court upheld a Portland ordinance that forced a religious charity either to extend employee spousal benefits to registered same-sex couples, or to lose eligibility to all city housing and community development funds.[27]  Similarly, the Salvation Army lost $3.5 million in social service contracts with the City of San Francisco because it refused, on religious grounds, to provide benefits to the same-sex partners of its employees.[28]  The Boy Scouts of America have litigated, *and lost*, numerous suits over a state's authority to deny them access to benefits that others receive, when the law was otherwise silent.[29]

---

[25] Stern at 1.

[26] Robin Fretwell Wilson, *Matters of Conscience:  Lessons for Same-Sex Marriage from the Healthcare Context in* SAME SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS at 81.

[27] 304 F. Supp. 2d 77 (D. Me. 2004); *see also* footnote 17 above.

[28] *See* Don Lattin, *Charities Balk at Domestic Partner, Open Meeting Laws*, S.F. CHRON., July 10, 1998, at A-1.

[29] *See Evans v. City of Berkeley*, 38 Cal.4th 1 (Cal. 2006) (affirming revocation of a boat berth subsidy at public marina due to Boy Scouts' exclusion of atheist and openly gay members); *Cradle of Liberty*

Senator Sarlo
December 4, 2009
Page 12 of 16

Church-affiliated organizations have lost their exemption from taxes as well. In New Jersey, the Ocean Grove Camp Meeting Association, a group owned and operated by an historic Methodist organization, refused on religious grounds to host the same-sex civil union ceremonies of two lesbian couples in its beach-side pavilion.[30] Local authorities stripped the group of their exemption from local property taxes, and billed them for $20,000.[31]

The Camp Meeting Association did not just lose its tax exemption. It was also investigated by the New Jersey Department of Civil Rights for an alleged violation of the New Jersey Law Against Discrimination. In fact, the Department of Civil Rights has determined that probable cause exists to find a violation. Thus, the case is not only about losing tax exempt status, but also about being penalized for allegedly violating state anti-discrimination laws.[32]

---

*Council v. City of Philadelphia*, 2008 WL 4399025 (E.D. Pa. Sept. 25, 2008) (city terminated a lease with the Boy Scouts based on the Boy Scouts' policies regarding homosexual conduct); *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2nd Cir. 2003) (holding that the Boy Scouts may be excluded from the state's workplace charitable contributions campaign for denying membership to openly gay individuals).

These results are possible because of the United States Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990) (concluding that neutral and generally applicable laws do not violate the First Amendment no matter how much they burden an individual's or organization's exercise of religion). These outcomes demonstrate our point: legislative relief is needed to protect religious conscience.

[30] Jill P. Capuzzo, Group Loses Tax Break Over Gay Union Issue, N.Y. TIMES, Sept. 18, 2007 (describing the case of *Bernstein v. Ocean Grove Camp Meeting Ass'n*).

[31] *See* Bill Bowman, *$20G Due in Tax on Boardwalk Pavilion: Exemption Lifted in Rights Dispute*, ASBURY PARK PRESS, Feb. 23, 2008.

Some exemption opponents argue that *Ocean Grove* is irrelevant to the same-sex marriage debate because the tax exemption at issue was conditioned upon the Camp Meeting Association's willingness to open the property for the entire public. This argument, however, overlooks two points. First, while the tax exemption in *Ocean Grove* was based on an open-space requirement, nothing stops governments from conditioning tax exemptions on other things, such as compliance with state and local anti-discrimination laws or, more generally, being organized for the "public interest." *Bob Jones Univ. v. United States*, 461 U.S. 574, 592 (1983). Thus, just as governments can strip a tax exemption because an organization cannot in good conscience open its property to the entire public, so also governments can strip a tax exemption because it concludes that an organization's conscientious objection to same-sex marriage violates anti-discrimination laws or "public policy" more generally. Second, when the Camp Meeting Association agreed to open its property to the entire public, it likely never contemplated the legalization of civil unions or same-sex marriage, much less that it would be asked to facilitate such a marriage in violation of its religious beliefs. *Ocean Grove* thus illustrates the fact that legalizing same-sex marriage will create significant conflicts of conscience that were never contemplated before.

[32] As the Third Circuit explained, "The federal complaint arose out of the DCR's investigation into whether the Association's refusal to permit couples to use the Boardwalk Pavilion for civil unions violates the LAD. Clearly, therefore, New Jersey's interest in eliminating unlawful discrimination is at the

Senator Sarlo
December 4, 2009
Page 13 of 16

These impacts on church-affiliated organizations, predicted by scholars,[33] did not result from statutory revocations of tax-exempt status in civil union legislation.  Instead, these actions occurred because state law offered no explicit exemption providing otherwise.  These experiences drive home the need for explicit protection from penalties by the government.[34]

### F.    No Protection for Individual Objectors

Although New Jersey law in some narrow contexts protects *religious organizations*, legal recognition of same-sex marriage can also place a real burden on *individuals* whose objection arises not from anti-gay animus, but from a sincere religious belief in traditional marriage.

The New Jersey Marriage Bill does not protect individuals who, for religious reasons, prefer to step aside from same-sex marriage ceremonies.  Thus, a religious individual who runs a small business making wedding cakes in her home, a wedding photographer, a caterer, a florist, a reception hall owner, a seamstress, or a tailor, receives no protection at all.[35]  The failure to

---

center of this dispute."  *Ocean Grove Camp Meeting Ass'n of United Methodist Church v. Vespa-Papaleo*, 2009 WL 2048914 at *4 (3d Cir. 2009).

[33] Douglas W. Kmiec, Pepperdine Law School, *Same-Sex Marriage and the Coming Antidiscrimination Campaigns Against Religion* in SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS 107-21 (describing attacks on tax exemptions for religious organizations with objections to same-sex marriage); Jonathan Turley, George Washington University Law School, *An Unholy Union* in SAME-SEX MARRIAGE AND RELIGIOUS LIBERTY: EMERGING CONFLICTS 59-76 (arguing for same-sex marriage but against withdrawal of tax exemptions for religious organizations with conscientious objections).

[34] To make matters worse, New Jersey is one of only a handful of states that have both interpreted their state constitutional religious freedom protections narrowly and have declined to pass a state Religious Freedom Restoration Act.  *See South Jersey Catholic School Teachers Organization v. St. Teresa of the Infant Jesus Church Elementary School*, 696 A.2d 709, 715 (N.J. 1997) ("As the federal jurisprudence concerning the Religion Clauses now stands, there is no need to consider whether our State Constitution affords greater religious protection than that afforded by the First Amendment."); State Religious Freedom Map, *available at* http://law.ucla.edu/volokh/religionmap.jpg (listing Maryland, Oregon, and Tennessee as the other similar states).  Thus, religious objectors receive no generally available protection from state law and must instead rely on the narrow protections of the federal constitution under *Employment Division v. Smith*, 494 U.S. 872 (1990).  *See* footnote 29 above.

[35] New Jersey's anti-discrimination laws provide some narrow exemptions for religious organizations, but no exemptions at all for religious individuals.  *See* footnote 10 above.  Elsewhere, individual religious objectors have been fined for refusing on religious grounds to assist with same-sex commitment ceremonies.  *See Elane Photography v. Willock*, No. D-202-CV-200806632 (N.M. 2d Jud. Dist. Ct) (filed Jul. 1, 2008) (New Mexico photographer fined for refusing on religious grounds to photograph a same-sex commitment ceremony).

protect such individuals puts the individual to a cruel choice: your conscience or your livelihood.[36]

Some assume that any religious objection to same-sex marriage must be an objection to providing goods or services to gays as such: in other words, that a refusal represents animus towards gay couples. Yet many people of good will view marriage as a religious institution and the wedding ceremony as a religious sacrament. For them, assisting with a marriage ceremony has religious significance that commercial services, like serving burgers and driving taxis, simply do not. They have no objection generally to providing services, but they object to directly facilitating a marriage.

In short, non-discrimination statutes enacted years before the New Jersey Marriage Bill now take on a whole new level of significance, with a much greater need for religious exemptions. Because the Marriage Bill provides no protection to individual objectors (other than authorized celebrants, who are already protected by the Constitution), a refusal to assist with same-sex wedding ceremonies opens these individuals to suit, whether framed as sexual-orientation discrimination, sex discrimination, or, where applicable, marital-status discrimination.[37]

---

[36] Robin Fretwell Wilson, *A Matter of Conviction: Moral Clashes Over Same-Sex Adoption*, 22 BYU J. PUB. L. 475 (2008) (describing dismissals and resignations of social service workers where conscience protections were not provided).

[37] Refusals to provide benefits to same-sex partners have been invalidated in other jurisdictions as a form of gender or sex discrimination. For instance, in *In re Levenson*, 560 F.3d 1145 (9th Cir. 2009) (Order of Reinhardt, J.), the court found an employer's denial of coverage for an employee's same-sex partner under the company's employment benefits plan to be sex discrimination. As Judge Reinhardt explained:

> There is no doubt that the denial of Levenson's request that Sears be made a beneficiary of his federal benefits violated the EDR Plan's prohibition on discrimination based on sex or sexual orientation. Levenson was unable to make his spouse a beneficiary of his federal benefits due solely to his spouse's sex. If Sears were female, or if Levenson himself were female, Levenson would be able to add Sears as a beneficiary. Thus, the denial of benefits at issue here was sex-based and can be understood as a violation of the EDR Plan's prohibition of sex discrimination.

*See also In re Golinski*, 2009 WL 2222842 at *3 (9th Cir. Jan. 13, 2009) (Order of Kozinski, C.J.) (construing Ninth Circuit benefits policy to include same-sex spouses because denial of benefits to same-sex spouses raised difficult constitutional questions regarding sex discrimination and sexual-orientation discrimination); *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993) (plurality op.) (discrimination by state against same-sex marriage was form of sex-based discrimination); *In re Marriage Cases*, 183 P.3d 384, 436-40 (Cal. 2008) (same-sex marriage proponents pursued gender discrimination claims ultimately rejected by court); *cf.* WIS. STAT. § 111.36(1)(d) (defining sexual-orientation discrimination as a form of gender discrimination).

Of course, accommodating individual objectors might not be without cost for same-sex couples.  Thus, we argue only for "hardship exemptions"—exemptions that are available only when there is no undue hardship on same-sex couples.[38]

### G.      No Robust and Uniform Protection for Religious Organizations

New Jersey law prohibits discrimination based on, among other things, marital status, civil union status, domestic partnership status, affectional or sexual orientation, sex, and gender identity or expression.[39]   Such discrimination is prohibited in a variety of areas—including employment, housing, and public accommodations[40]—with only very narrow, if any, exemptions for religious organizations.[41]

As explained in Part C above, these nondiscrimination laws can prompt lawsuits against religious organizations that, for religious reasons, cannot recognize or facilitate a same-sex marriage.  For example, a nonprofit social service organization, like a Catholic hospital, could be sued for refusing to provide its employees with same-sex spousal benefits in violation of its religious beliefs; religious day care centers, retreat centers, counseling centers, or adoption agencies could be punished under public accommodations laws for refusing to offer their facilities or services to members of a same-sex marriage; or a religious organization that dismisses an employee, such as a youth counselor, for entering into a same-sex marriage can be sued under employment discrimination laws that prohibit discrimination on the basis of marital status.[42]

The New Jersey Marriage Bill offers no protection in such situations.  Indeed, the New Jersey Marriage Bill provides *much less* protection than *every other state* where the legislature has considered the issue.  Connecticut, New Hampshire, and Vermont have all enacted same-sex marriage laws, and all provide much more protection for religious liberty than does New Jersey.[43]   Each of those states protects religious organizations from being forced to offer

---

[38] *See* Part A, above.

[39] *See* N.J. REV. STAT. § 10:5-12.

[40] *See* N.J. REV. STAT. §§ 10:5-4 (employment, housing, and public accommodations).

[41] *See* footnote 10 above.

[42] *See, e.g.*, footnotes 14-16, above.

[43]      CONN.    PUBLIC    ACT    NO.    09-13    (2009)    §§ 17-19,    *available   at* http://www.cga.ct.gov/2009/ACT/PA/2009PA-00013-R00SB-00899-PA.htm    (exempting    religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges … related to" the "solemnization" or "celebration" of a marriage, and providing separate exemptions for religious adoption agencies and fraternal benefit societies); N.H. REV. STAT. § 457:37 (exempting religious organizations from "provid[ing] services, accommodations, advantages, facilities, goods, or privileges … related to" the "solemnization," "celebration," or "promotion" of a marriage); 9 VT. STAT. ANN. § 4502(l) (2009) (exempting religious organizations from "provid[ing] services, accommodations,

Senator Sarlo
December 4, 2009
Page 16 of 16

"services, accommodations, advantages, facilities, goods, or privileges" related to a marriage when doing so would violate their religious beliefs.[44]   Thus, while the protections in Connecticut, New Hampshire, and Vermont also fall short in key areas,[45] they still provide far more protection than the New Jersey Marriage Bill.

### Conclusion

Without adequate safeguards for religious liberty of the sort proposed in this letter, the recognition of same-sex marriage will lead to socially divisive and entirely unnecessary conflicts between same-sex marriage and religious liberty.  That is a needless and destructive path where both sides lose.  There is a balanced "middle way."  The New Jersey legislature should avoid either extreme and be the peacemaker.  On that note, we would welcome any opportunity to provide further information, analysis, or testimony to the legislature.

Respectfully yours,[46]

Robin Fretwell Wilson                          Thomas C. Berg
Professor of Law                               St. Ives Professor
Washington and Lee University                  University of St. Thomas
  School of Law                                  School of Law (Minnesota)

Carl H. Esbeck                                 Richard W. Garnett
Professor of Law                               Professor of Law
University of Missouri                         University of Notre Dame
  School of Law                                  Law School

Marc D. Stern                                  Edward McGlynn Gaffney, Jr.
Acting Co-Executive Director/                  Professor of Law
  General Counsel                              Valparaiso University
American Jewish Congress                         School of Law

---

advantages, facilities, goods, or privileges … related to" the "solemnization" or "celebration" of a marriage).

[44] *Id.*

[45] *See* Letter to Iowa Legislators, *available at* http://mirrorofjustice.blogs.com/files/2009-07-12-iowa-letter-final.doc, at 6-7 (letter from the undersigned describing shortcomings of Connecticut, Vermont, and New Hampshire conscience protections).

[46] Academic and organizational affiliation is indicated for identification purposes only.  The universities and organizations that employ the signers take no position on this or any other bill.