

**Davis Wright Tremaine LLP**

Suite 2400
865 South Figueroa Street
Los Angeles, CA 90017-2566

**Kelli L. Sager**
213.633.6821 tel
213.633.6899 fax

kellisager@dwt.com

January 8, 2010

**VIA HAND DELIVERY**

Hon. Phyllis Hamilton
Chair of the Rules Committee
United States Courthouse
1301 Clay Street
Oakland, CA 94612

Hon. Vaughn Walker
Chief Judge
United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    Comments on Proposed Revision of Northern District of California Civil Local Rule 77-3

Dear Chief Judge Walker and Judge Hamilton:

      These comments concerning the proposed revision of Civil Local Rule 77-3 are respectfully submitted on behalf of Los Angeles Times Communications LLP (publisher of The Los Angeles Times and Times Community News Newspapers), Dow Jones & Company, Inc. (publisher of The Wall Street Journal, Barron's, Dow Jones Newswires, and community newspapers throughout the country), CBS Broadcasting Inc. (CBS News and KPIX-TV), Bloomberg, L.P., The Associated Press, The McClatchy Company, Inc. (publisher of the Sacramento Bee, Fresno Bee, and Modesto Bee), NBC Universal, KTVU, Inc. (owner/operator of KTVU-TV, Bay Area News Group (publisher of the San Jose Mercury News, Contra Costa Times and Oakland Tribune), the New York Times Company (publisher of the New York Times and the Santa Rosa Press-Democrat), Belo Corporation (publisher of the Press-Enterprise), Tribune Broadcasting Company, California Newspaper Publishers Association, First Amendment Coalition, First Amendment Project, The Reporters Committee for Freedom of the Press, Californians Aware and the Radio Television Digital News Association ("Media Representatives").

      As set forth in more detail below, the Media Representatives all are involved in the gathering and dissemination of information to the public about matters of public interest,

DWT 13777179v1 0050033-000508

Anchorage | New York | Seattle
Bellevue | Portland | Shanghai
Los Angeles | San Francisco | Washington, D.C.

www.dwt.com

including information about civil court proceedings in federal district courts in the Ninth Circuit. They strongly support a change in Civil Local Rule 77-3 of the Northern District of California to permit the dissemination of video recordings of non-jury civil proceedings.[1]

## I.

## INTRODUCTION

In July 2007, the Ninth Circuit Judicial Conference attendees voted decisively in favor of a resolution that recommended a change in policy to permit the photographing, recording, and broadcasting of non-jury civil proceedings in federal district courts. The resolution was proposed and affirmatively supported by the Lawyer Representatives Coordinating Committee ("LRCC"), which, as its name suggests, consists of lawyers representing diverse practice areas throughout the Ninth Circuit. But the support for a rule change to permit electronic coverage of district court proceedings in civil cases came not only from lawyers; a substantial majority of the judges at the Conference also voted in favor of the resolution.

The rationale set forth in the resolution, which explains this strong showing of support for video and audio coverage of non-jury civil court proceedings, included several key points:

- Studies conducted in the past, including a multi-year study conducted by the Federal Judicial Center, overwhelmingly concluded that trial court judges should be permitted to allow photographing, recording, and broadcasting of civil court proceedings.

- The empirical experience in the Ninth Circuit itself over a period of more than 14 years, involving more than 130 appellate proceedings where electronic coverage was allowed, showed that the vast majority of Ninth Circuit judges reported a positive experience with such coverage.

- Significant technological advances in the last decade allow electronic coverage of courtroom proceedings without disruption, using non-invasive equipment, and the ability to share information over the Internet makes access to court proceedings and records easily available to a widespread audience.

---

[1] The Media Representatives would go further, and support giving district judges discretion to allow photography, recording, and live broadcasting or webcasting of non-jury civil proceedings. They recognize, however, that an amendment to the Northern District's rules must be consistent with the authority permitted under the Ninth Circuit Judicial Council's recent directive authorizing a pilot project, which appears to contemplate the dissemination of video recordings. If, however, the Council's authorization permits real-time access to court proceedings, through live telecasting or webcasting, these Media Representatives urge the Northern District to permit such access in its revised rules.

- It is well recognized that providing the public with greater access to the working of the courts through electronic coverage of civil court proceedings promotes greater public understanding of the role and function of the federal judiciary, to the benefit of the public and the courts.

After careful consideration, and after receiving the recommendations of a committee appointed to consider the issues raised by the resolution, the Judicial Council of the Ninth Circuit last month voted unanimously to allow the 15 district courts within the Circuit to experiment with the dissemination of video recordings in non-jury civil proceedings. The Media Representatives strongly support this Court's revision of its Civil Local Rule to permit the Northern District of California to participate in this important experiment.

## II.

### PUBLIC POLICY STRONGLY SUPPORTS THE AMENDMENT TO CIVIL LOCAL RULE 77-3 TO GIVE THE COURT DISCRETION TO PERMIT CAMERAS IN NON-JURY CIVIL PROCEEDINGS.

There are important public benefits that result from providing audio and video coverage of civil court proceedings. As discussed in more detail below, electronic coverage is consistent with long-established constitutional principles that recognize – and indeed, even require – that the public and press be permitted to observe federal court proceedings. As society has evolved and expanded, the ability of individuals to personally attend trials and other court proceedings has diminished, and the function of the press as a surrogate for the public has been magnified. But in more recent times, the economic challenges facing news organizations has again brought change to this critical aspect of our democratic society, requiring new avenues for public access to be explored. Audio and video coverage of non-jury civil proceedings serves the public's important rights of access, by allowing interested interested parties to "observe" court proceedings electronically, and by providing an important mechanism for the media to more accurately and completely provide the public with information about this important branch of government.

### A. Permitting Audio and Video Coverage Is Both Consistent With And Furthers Well-Recognized Constitutional Rights of Access to Court Proceedings.

It is beyond dispute that open judicial proceedings are an essential element of our legal system, and an integral facet of American society. As a matter of constitutional, statutory, and common law, courts consistently have held that judicial proceedings must be held in public. In recognizing this long-standing practice, the Supreme Court noted:

> [T]he historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here

Hon. Phyllis Hamilton
Hon. Vaughn Walker
January 8, 2010
Page 4

> and in England had long been presumptively open. This is no quirk of history; rather, it has long been recognized as an indispensable attribute of an Anglo-American trial. Both Hale in the 17th century and Blackstone in the 18th saw the importance of openness to the proper functioning of a trial; it gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality.

Richmond Newspapers v. Virginia, 448 U.S. 555, 569 (1980) (citations omitted). "People in an open society do not demand infallibility from their institutions," the Court concluded, " but it is difficult for them to accept what they are prohibited from observing." Id. at 572. For these reasons, the Court noted that "historically both civil and criminal trials have been presumptively open" to the public. Id. at 580 n.17 (emphasis added). See also id. at 598 (Stewart, J. concurring) ("stating that "the First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal").

These rights of access historically have been considered vital not only to protect the rights of the parties, but also to ensure public confidence in the judiciary by demonstrating that the proceedings are conducted fairly. As the Supreme Court consistently has recognized,

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed. ... Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

Press Enterprise Co. v. Superior Court, 478 U.S. 1, 15 (1986) ("Press Enterprise II"): 464 U.S. at 509 (quoting Press-Enterprise v. Superior Court, 464 U.S. 501 (1984) ("Press Enterprise I").

In contemporary society, however, demographics preclude the overwhelming majority of Americans from physically attending court proceedings, and therefore, from personally observing them. Id. at 572-573. Yet those societal changes do not mean that the constitutional right of access can be exercised only by the small number of citizens who have the ability to personally attend proceedings. Through technological advances over a period of decades, electronic coverage provides members of the public with a meaningful opportunity to exercise their constitutional right to observe trials.

The benefits of ensuring public access are well established. Not only does public observation of court proceedings educate the public about the rule of law and the functioning of the justice system, it also serves to reinforce public acceptance – crucial in a democratic society – of "both the process and its results." Id. at 571. As Justice Brennan declared:

> Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding to the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability.

Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 587 (1976) (Brennan, J. concurring). Similarly, in Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606 (1982), the Court emphasized that public access to court proceedings allows "the public to participate in and serve as a check upon the judicial process – an essential component in our structure of self-government."

Courts have recognized the importance of public access to civil proceedings specifically, noting that "[t]he community catharsis, which can only occur if the public can watch and participate, is also necessary in civil cases" and because "secrecy insulates the participants, masking impropriety, obscuring incompetence and concealing corruption." Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1156, 1179 (6th Cir. 1983). As one judge in the Central District of California has explained:

> The public interest at issue here has a venerable heritage rooted in the need for openness in a democratic society. The courts' legitimacy in our system of government derives in large measure from our historical commitment to offering reasoned decisions publicly setting forth our rationale not only to litigants, but to the people in whose name we administer justice. As Oliver Wendell Holmes observed: 'It is desirable that the trial of [civil] causes should take place under the public eye, not because the controversies of one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility, and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.' Cowley v. Pulsifer, 137 Mass. 392, 394 (1884).

California ex rel. Lockyer, 355 F. Supp. 2d 1111, 1125 (C.D. Cal. 2005). The district court also cited with approval a decision by the California Supreme Court that recognized a First Amendment right of access to civil trials because "the public has an interest in all civil cases in observing and assessing the performance of its public judicial system ...." NBC Subsidiary (KNBC-TV), Inc. v. Superior Court, 20 Cal.4th 1178, 1210 (1999) (emphasis added) (cited in California ex rel. Lockyer, 355 F. Supp. 2d at 1125).

The Third Circuit emphasized these same considerations in Publicker Industries, Inc. v.

Cohen, 733 F.2d 1059, 1069 (3d Cir. 1984), underscoring that "the civil trial, like the criminal trial, plays a particularly significant role in the functioning of the judicial process and the government as a whole," and that "[p]ublic access to civil trials, no less than criminal trials, 'plays an important role in the participation and free discussion of governmental affairs.'" Id. at 1070 (citations omitted). Accordingly, the court "h[e]ld that the 'First Amendment embraces a right of access to [civil] trials… to ensure that this constitutionally protected discussion of governmental affairs is an informed one.'" Id. (citations omitted). See also Matter of Continental Illinois Securities Litigation, 732 F.2d 1302, 1308 (7th Cir. 1984) (stating that the "policy reasons for granting public access to criminal proceedings apply to civil cases as well").

The importance of the issues decided in civil proceedings in federal district courts cannot be overstated. Every day, decisions are made that impact the exercise of individual civil rights, public and private property interests, environmental concerns, and a wide variety of other critical issues that affect the everyday lives of citizens well beyond the parties to a particular case. The ability of the public to observe – and understand – these proceedings, and the process by which decisions are made, is critical.

Yet in modern society, where television and electronic media serve as a primary news source for most Americans, the most effective way to vindicate the public's right of access is to permit audio and video coverage of court proceedings. Electronic media coverage fulfills the educational function of enhancing public understanding of the judicial system, in which the ability to see and hear the proceeding can be critical. As Justice Marshall observed in Richmond Newspapers, "[i]n advancing the [] purposes [of open judicial proceedings], the availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." 448 U.S. at 597 n.22 (Marshall, J., concurring). A district court in Georgia concurred in Cable News Network v. American Broadcasting Cos., 518 F. Supp. 1238, 1245 (N.D. Ga. 1981), noting that "visual impressions can and sometimes do add a material dimension to one's impression of particular news events. Television film coverage of the news provides a comprehensive visual element and an immediacy, or simultaneous aspect, not found in print media." The fact that electronic coverage of the courts can provide the largest number of citizens with the best opportunity to see court proceedings firsthand is a compelling reason for permitting camera access.

### B. The Availability Of Audio and Video Coverage Improves The Media's Coverage And The Public's Understanding Of Federal Court Proceedings.

Although video and audio coverage of court proceedings provides the public with the ability to directly observe the functions of the court, it also greatly enhances the public's ability to obtain accurate and timely information through the media. It has long been recognized that the media play an indispensable role in informing the public about the conduct of judicial proceedings. In Richmond Newspapers, 448 U.S. at 573, the United States Supreme Court noted that "[i]nstead of acquiring information about trials by first hand observation or by word of

Hon. Phyllis Hamilton
Hon. Vaughn Walker
January 8, 2010
Page 7

mouth from those who attend, people now acquire it chiefly through the print and electronic media." 448 U.S. at 573. The Court explained that this development "validates the media claim of functioning as surrogates for the public." Id. at 573.

Even apart from the geographic and time limitations that prevent individual members of the public from personally observing court proceedings, the sheer number of such interested observants in some cases guarantees that only a small fraction could be admitted at any given time. This reality has not been lost on courts and legislatures that have considered the issue. As a committee of the California Legislature recognized in 1967, long before technological advances permitted the unobtrusive recording of court proceedings, because "sprawling urbanism has replaced concentrated ruralism," and because "no courtroom in the land could hold even a minute fraction of the people interested in specific cases, … a trial is not truly public unless news media are free to bring it to the home of the citizens by newspaper, magazine, radio, television or whatever device they have."[2] Similarly, the Third Circuit acknowledged the practical obstacles that prevent full public attendance at trials, asking rhetorically, "What exists of the right of access if it extends only to those who can squeeze through the [courtroom] door?" United States v. Antar, 38 F.3d 1348, 1360 (3d Cir. 1994).

Thus, the media's role as a surrogate in providing information about court proceedings is uncontroverted. What may be less obvious is the fact that reporters – including newspaper and other print reporters – also benefit substantially from audio and video coverage of court proceedings to aid them in providing comprehensive and accurate reporting. When proceedings are recorded and broadcast (particularly if it is done contemporaneously, or, at minimum, expeditiously), articles and analyses can be prepared as the proceedings unfold, and reporters need not be faced with the inherent time pressure of waiting to receive second-hand information from one of the participants, or from someone lucky enough to have obtained one of the few courtroom seats. Furthermore, when proceedings are televised, in-court events – including quotations and gestures by trial participants – can be verified by simply playing back a videotape of the day's proceedings. Indeed, visually-oriented information that is critical to a complete and accurate portrayal of any court proceeding –including the courtroom's atmosphere, and the participants' demeanor, tone and emotions – are readily available to all reporters, and to the public, with audio and video coverage.

Consequently, an enormous advantage of electronic coverage of court proceedings that may sometimes be overlooked is that it improves the print media's ability to accurately report on these important events. Permitting video and audio coverage of a proceeding enables virtually any reporter to observe court proceedings -- no matter what his or her geographic location, and regardless of his or her good fortune in gaining use of one of few courtroom seats in a case that has garnered significant interest. For this reason, simultaneous coverage of court proceedings is

---

[2] Final Report Of The Subcommittee On Free Press – Fair Trial, Assembly Interim Committee On Judiciary, January 5, 1967, at 9. (See concurrently-submitted Appendix, Exh. A.)

especially critical to the many print reporters who work for entities in California and elsewhere that are not well financed or staffed. Few smaller newspapers or magazines, for example, can commit to having a reporter occupy a courtroom seat for large periods of time, even if they were lucky enough to obtain access to such a seat.

Moreover, some of the smaller print media enterprises whose reporters rely on television coverage of court proceedings reach segments of minority populations that may be very interested in a particular trial, but that do not receive the bulk of their news – because of language barriers or for reasons of preference – from more mainstream news sources. Moreover, some of these smaller print enterprises contribute by providing diverse viewpoints about judicial proceedings; for example, several of these media enterprises employ large numbers of minority reporters who often serve the highly desirable role of disseminating views of a particular proceeding that may not be held by other reporters.

But even more broadly, the economic constraints facing many news organizations have severely impacted their ability to perform their function as "surrogates" by sending reporters to cover specific court proceedings. In the last five years, newspaper companies have declared bankruptcy; some newspapers have ceased publication altogether; and hundreds of jobs have been eliminated as struggling news organizations of all varieties have tried to deal with the pressures of a downward economy. The result has been fewer and fewer reporters available to attend court proceedings, and a need for additional ways to obtain direct information about what transpires in federal courts. Audio and video coverage provides an extraordinarily helpful mechanism to allow news organizations to report on proceedings with fewer resources, in addition to providing a direct mechanism for members of the public to obtain information.

### III.

### THERE ARE NO COUNTERVAILING INTERESTS THAT WARRANT REJECTION OF THE RULE CHANGE.

In evaluating comments that may be received in opposition to the change to Civil Local Rule 77-3, the Court should consider several important points.

First, the rule change will not require district judges to allow video and audio coverage in every non-jury civil proceeding, nor did the resolution adopted at the Ninth Circuit Conference suggest such a rule. Although the language in the rule does not set out a specific procedure to be followed,[3] it clearly contemplates that the district judge assigned to a particular case would retain

---

[3] The Media Representatives encourage the Court, after this initial rule change has been implemented, to set out a procedure by which interested parties may request audio and video coverage of a particular non-jury civil proceeding, and to clarify the mechanisms by which pooling arrangements may be made and through which the audio and video recordings can be made available. The undersigned and representatives of these media organizations would be

Hon. Phyllis Hamilton
Hon. Vaughn Walker
January 8, 2010
Page 9

discretion to determine whether, and under what circumstances, to permit audio and video coverage of a particular civil proceeding. Thus, to the extent that concerns exist in a designated case about sensitive information, the televising of a particular witness,[4] or other case-specific issues, those can and will be handled in an appropriate fashion by the judge who is most familiar with the issues in that case.[5]

<u>Second</u>, in evaluating whether to permit this limited experiment with electronic coverage, this Court has the benefit of extensive studies and broad-based state experiences with cameras in their courts that repeatedly have refuted unsupported claims about potential harm to the integrity of the court or negative impacts upon trial participants.

At least a dozen states have carefully examined the potential impact of electronic media coverage on courtroom proceedings, including the effect (if any) cameras have upon courtroom decorum and upon witnesses, jurors, attorneys and judges.[6] The studies' results were unanimous: concerns about the impact of television coverage on such proceedings – whether civil or criminal, pretrial or trial – were unfounded.[7]

---

pleased to assist the Court in working through any technological and/or logistical issues that may arise in connection with this rule change.

[4] For example, one factor that is considered in many state courts, including California, is whether a particular proceeding involves minor witnesses. The district court in a particular case would have the discretion to refuse video coverage of a particular witness, even if he or she decided to permit audio and video coverage of other witnesses in a civil bench trial, or allowed electronic coverage of other proceedings in the case.

[5] Moreover, during this experimental phase, the Ninth Circuit Judicial Council's directive indicates that electronic coverage in any particular case also would require the approval of this District's Chief Judge, in consultation with the Circuit's Chief Judge.

[6] Arizona, California, Florida, Hawaii, Kansas, Louisiana, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, Ohio, Virginia, and Washington are among the states that have conducted such studies. <u>See</u> Report and Supplemental Report by the Federal Judicial Center, "Electronic Media Coverage of Federal Civil Proceedings: An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeal," 1994, at 38-42 ("Federal Judicial Center Reports"). (For the convenience of this Court, materials cited in this letter have been concurrently submitted in Media Representatives' Appendix. The Federal Judicial Center Reports are included in the Appendix as Exhibit B.)

[7] For example, after systematically observing proceedings where cameras were and were not present, consultants who conducted California's extensive study concluded that witnesses were equally effective at communicating in both sets of circumstances. <u>See</u> concurrently-submitted Appendix, Exh. C (California Study), at 103-04. Similar results were obtained by states that inquired into witness nervousness. The 1991 New York Study, for example, revealed that when jurors were asked whether credibility of the witness was affected by their relative insecurity or tension due to camera coverage, most responded "not at all." "Electronic Media

For example, California's 1981 report on the effect of electronic coverage of court proceedings is one of the most comprehensive of the state evaluations that have been completed. (Appendix, Exh. C.) The California study included observations and comparisons of proceedings that were covered by the electronic media, and proceedings that were not. Id. Not only did California's survey results mirror those of other states – finding that there was no noticeable impact upon witnesses, judges, counsel, or courtroom decorum when cameras were present during judicial proceedings – the "observational" evaluations completed in California further buttressed these results. Id. [8]

The positive results of the state court evaluations were further bolstered by the Federal Judicial Center's own 1994 study of a three-year pilot program that permitted electronic media coverage in civil proceedings in six federal district courts and two circuit courts. (Appendix, Exh. B.) The federal study concluded that no negative impact resulted from having cameras in the courtroom. Id. Thus, the extensive empirical evidence that has been collected on the impact of electronic coverage consistently has concluded that such coverage is not detrimental to the parties, to witnesses, to counsel, or to courtroom decorum. Id.

Since those studies were conducted, modern television equipment has evolved even further, to the point where concerns expressed many decades ago about intrusive cables, microphones, and camerapersons are inapplicable. Notably, more than forty years have passed since the United States Supreme Court overturned a criminal conviction based on the "considerable disruption" of early-model television equipment. See Estes v. Texas, 381 U.S. 532, 536 (1965). Even then, Justice Harlan, the dispositive concurring vote, recognized that the day might come when "television will have become so commonplace an affair in the daily life of the average person as to dissipate all reasonable likelihood that its use in courtrooms may disparage the judicial process. If and when that day arrives the constitutional judgment called for

---

Coverage Of Federal Civil Proceedings, An Evaluation Of The Pilot Program In Six District Courts And Two Courts Of Appeals," Federal Judicial Center Reports (Appendix, Exh. B) at 39. Similarly, more than 90 percent of the respondents in the Florida Study on electronic media coverage of the courtroom said the presence of electronic media had "no effect" whatsoever on their ability to judge the truthfulness of witnesses. Id.

[8] These findings were reinforced by the final report of a special task force appointed after the O.J. Simpson criminal trial to evaluate whether television coverage of trials should be continued in California. Based on all the evidence it gathered, the task force concluded in May 1996 that cameras should be allowed to remain in the California courtrooms. Strikingly, the task force found that judges who actually had presided over televised trials favored allowing cameras in the courtroom. Ninety-six percent of those judges reported that the presence of a video camera did not affect the outcome of a trial or hearing in any way. In addition, the overwhelming majority of them reported that a camera did not affect their ability to maintain control of the proceedings, nor did it diminish jurors' willingness to serve. See 1996 Report of Task Force on Photographing, Recording, and Broadcasting in the Courtroom (Appendix, Exh. D.)

now would of course be subject to re-examination in accordance with the traditional workings of the Due Process Clause." Id. at 595–96 (Harlan, J., concurring).

Justice Harlan's prescient view was adopted by a unanimous Supreme Court in 1981, when it recognized that televising a trial over the objections of two criminal defendants did not violate their due process rights. Chandler v. Florida, 449 U.S. 560, 576 (1981). Even during that fifteen-year period, substantial technological advances had eliminated the concerns about intrusive equipment or distracting lights and sounds. Id. at 560. Almost thirty years later, dramatic advances in audio and video technology – and the ubiquitous presence of discrete video monitoring as part of our every day life – have eliminated any doubt that cameras can be present in a courtroom without distraction or disruption. The availability of sophisticated distribution methods, including webcasting, also make it possible for the Court to seamlessly provide broad public access to court proceedings if an audio and video record exists.

Finally, any concern that might be raised about electronic coverage of non-jury civil proceedings somehow preventing a district court from empaneling an impartial jury for later trial is misplaced. Courts have long recognized that the availability of information about court proceedings cannot be equated with "prejudice," and that many mechanisms exist to ensure that fair and impartial jurors are selected in a given case notwithstanding even widespread publicity that may have occurred.

As the Ninth Circuit noted in CBS v. District Court, 729 F.2d 1174 (9th Cir. 1983):

> [I]t is not enough that publicity might prejudice one directly exposed to it. If it is to be restrained, the publicity must threaten to prejudice the entire community so that twelve unbiased jurors cannot be found. ...
>
> Thus, in assessing the prejudicial nature of pretrial publicity, a court must look not simply to its effect on individual viewers but to its capacity to inflame and prejudice the entire community.

729 F.2d at 1180 (emphasis added). See also Irvin v. Dowd, 366 U.S. 717, 722-23 (1961) ("[i]t is not required, however, that the jurors be totally ignorant of the facts and issues involved. ... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court") (emphasis added).

Moreover, there are innumerable measures available to district judges that could eliminate or mitigate any negative effects of electronic coverage of pretrial hearings or proceedings that might take place outside the jury's presence.[9] In any event, if there was a

---

[9] See, e.g., People v. Manson, 61 Cal. App. 3d 102, 191, cert. denied, 430 U.S. 986 (1977) (controlled and searching voir dire, admonishment of the jury, procedures to provide a dignified and restrained trial atmosphere, and sequestration of the jury meant that fair trial rights

Hon. Phyllis Hamilton
Hon. Vaughn Walker
January 8, 2010
Page 12

justification for denying a request for electronic coverage of a particular non-jury civil proceeding, the proposed rule change does not in any way restrict the district judges' discretion to do so. Thus, any suggestion that a general presumption of "prejudice" exists that would justify rejection of the proposed rule change, is unwarranted.

Almost every state now permits electronic coverage of at least some portion of judicial proceedings. In addition, federal circuit courts, including the Ninth Circuit, have permitted audio and video coverage of appellate arguments, with positive results. As Supreme Court Justice Anthony Kennedy told Congress more than a decade ago, in discussing whether electronic access of court proceedings should be permitted:

> You can make the argument that the most rational, the most dispassionate, the most orderly presentation of the issue is in the courtroom, and it is the outside coverage that is really the problem. In a way, it seems perverse to exclude television from the area in which the most orderly presentation of the evidence takes place.

Hearings Before a Subcm. Of the House Comm. on Appropriations, 104th Congress, 2d Sess. 30 (1996).

District court judges can best decide, on a case-by-case basis, whether they are presented with the rare circumstance where electronic coverage of a non-jury civil proceeding would prejudice the parties' rights, or harm the dignity of the court. The rule change appropriately provides district courts with this discretion, consistent with the guidelines adopted by the Ninth Circuit Judicial Council.

---

were not prejudiced); In re National Broadcasting Company, Inc., 635 F.2d 945, 953 (2d Cir. 1980) ("voir dire can identify impartial jurors and provide a basis for excusing them"); Associated Press v. District Court, 705 F.2d 1143, 1146 (9th Cir. 1983) (unlikely that questioning of the venire and the use of clear jury instructions "will fail to produce an unbiased jury," regardless of the pretrial information that is disclosed); CBS v. United States District Court, 729 F.2d 1174, 1182 ((9th Cir. 1983) ("the Supreme Court ... [and] the circuit courts have repeatedly found voir dire to be a viable alternative to restraints on the press, in cases attracting massive publicity"); In re CBS, Inc., 570 F. Supp. 578, 583 (E.D. La. 1983) (measures such as voir dire, continuances, and instructions to the jury "have never yet proved inadequate in safeguarding Sixth Amendment rights"), app. dism. sub nom. United States v. McKenzie, 735 F.2d 907 (5th Cir. 1984).

## IV

## CONCLUSION

The benefits to allowing audio and video coverage of non-jury civil proceedings are clear. The concerns expressed by critics of electronic coverage have been proven, in empirical studies and extensive experience, to be unfounded. To promote public confidence in and understanding of the judicial system, and in keeping with this Nation's well-established principles supporting public access to court proceedings, the Media Representatives urge this Court to adopt the change to Local Civil Rule 77-3.

If we may provide you with additional information, please do not hesitate to call me at (213) 633-6821, or my partner Thomas R. Burke at (415) 276-6552.

Respectfully submitted,

*Kelli L. Sager  TRB*

Kelli L. Sager
DAVIS WRIGHT TREMAINE LLP

cc:   Thomas R. Burke, Esq.
      Jeff Glasser, Esq.