# EXHIBIT C
# Part 1 of 4

C 2

EVALUATION OF CALIFORNIA'S EXPERIMENT
WITH EXTENDED MEDIA COVERAGE OF COURTS

Submitted to:
The Administrative Office for the Courts
The Chief Justice's Special Committee
on the Courts and the Media
and
The California Judicial Council

Submitted by:
Ernest H. Short and Associates, Inc.
September 1981

Library
National Center for State Courts
300 Newport Ave.
Williamsburg, VA 23185

280

## EVALUATION OF CALIFORNIA'S EXPERIMENT
## WITH EXTENDED MEDIA COVERAGE OF COURTS

This evaluation was conducted by Ernest H. Short and Associates, Inc. under contract with the California Judicial Council and the Administrative Office of the Courts.  The study was supported by funds from the Law Enforcement Assistance Administration of the U.S. Department of Justice.  The points of view and opinions in this report are those of the author and do not necessarily represent the position or policies of the California Judicial Council, the Administrative Office of the Courts or the U.S. Department of Justice.

### Project Staff

Ernest H. Short, Project Director
Charles F. Doolittle, Project Manager
David Island, Ph.D. Senior Analyst
Christina P. Clark, Research Assistant
Gerald R. Miller, Project Consultant

### Principal Report Authors

Charles F. Doolittle
David Island, Ph.D.

Ernest H. Short and Associates, Inc. gratefully acknowledge the assistance of the Administrative Office for the Courts, the Chief Justice's Special Committee on the Courts and the Media, and the Judicial Council in this evaluation.  Appreciation also is extended to the numerous individuals in the media who assisted the evaluation by providing information on extended media coverage events.

281

# TABLE OF CONTENTS

I.    BACKGROUND INFORMATION. . . . . . . . . . . . . . . . 1
      A.  Introduction. . . . . . . . . . . . . . . . . . . 1
      B.  Purpose of the Evaluation . . . . . . . . . . . 5
      C.  Prior Research and Existing Literature. . . . . 9
      D.  California's Experiment:  Rules and Procedures. 13
      E.  Report Organization . . . . . . . . . . . . . . 17

II.   RESEARCH DESIGN
      A.  Overview. . . . . . . . . . . . . . . . . . . . 19
      B.  Detailed Discussion of Research Design. . . . . 22
          1.  Observational Data. . . . . . . . . . . . . 22
          2.  Interview Data. . . . . . . . . . . . . . . 27
          3.  General Attitudinal Surveys . . . . . . . . 29
      C.  Summary . . . . . . . . . . . . . . . . . . . . 38

III.  FACTUAL SUMMARY OF THE EXPERIMENTAL YEAR. . . . . . 40
      A.  Introduction  . . . . . . . . . . . . . . . . . 40
      B.  Total Requests and "Actual Events" Activity
          Volume  . . . . . . . . . . . . . . . . . . . . 41
      C.  Characteristics of EMC Events . . . . . . . . . 46
      D.  Process Observation . . . . . . . . . . . . . . 55
          1.  Logistical Considerations . . . . . . . . . 55
          2.  Instances of Restricted Coverage. . . . . . 64
          3.  "Violations" or Relaxations of EMC Rules. . 65
      E.  Summary Description of EMC Cases. . . . . . . . 67

IV.   COURTROOM ENVIRONMENT AND PARTICIPANT BEHAVIOR DATA
      ANALYSIS. . . . . . . . . . . . . . . . . . . . . . 72
      A.  Courtroom Environment (Disturbance, Distrac-
          tion, Dignity, and Decorum) . . . . . . . . . . 72
          1.  Interview Data. . . . . . . . . . . . . . . 73
          2.  Observational Data. . . . . . . . . . . . . 82
      B.  Participant Behavior  . . . . . . . . . . . . . 98
          1.  Interview Data. . . . . . . . . . . . . . .100

-i-

282

2. Observational Data . . . . . . . . . . . . . . 105

3. Summary Discussion of Participant Behavioral Effects. . . . . . . . . . . . . . . . . . . . . 111

C. Additional and Summary Interview Data. . . . . . 114

V. ATTITUDINAL SURVEYS DATA ANALYSIS. . . . . . . . . . 127

A. General Attitudinal Survey: Judges and Attorneys . . . . . . . . . . . . . . . . . . . 127

1. Results Overview . . . . . . . . . . . . . . 127

2. Survey Administration. . . . . . . . . . . . 132

3. Analysis Procedures. . . . . . . . . . . . . 135

4. Analysis Results . . . . . . . . . . . . . . 138

5. Discussion and Summary . . . . . . . . . . . 171

B. Juror Attitudinal Questionnaires . . . . . . . 174

1. Results Overview . . . . . . . . . . . . . . 174

2. Survey Administration, Sample Size and Sample Characteristics . . . . . . . . . . . 175

3. Analysis Procedures. . . . . . . . . . . . . 180

4. Analysis Results . . . . . . . . . . . . . . 182

5. Discussion and Summary . . . . . . . . . . . 216

VI. CONCLUSIONS AND RECOMMENDATIONS. . . . . . . . . . . 218

A. Summary of Analysis and Findings . . . . . . . . 218

1. Factual Summary of the Experimental Year . . 219

2. Summary of Case Specific Data Analysis . . . 222

3. Summary of Attitudinal Data . . . . . . . . 224

B. Implications of Research Findings for Rules Content. . . . . . . . . . . . . . . . . . . . . 229

1. Still Camera Shutter Noise . . . . . . . . . 230

2. Juror Anonymity . . . . . . . . . . . . . . 231

3. Notice Procedures. . . . . . . . . . . . . . 232

4. Party Consent. . . . . . . . . . . . . . . . 234

5. Equipment and Operator Criteria. . . . . . . 235

C.   Related Issues . . . . . . . . . . . .   . . . .236

     1.   Cameras in the Courthouse  . . . . . . . . . .236

     2.   "Type C" Effects . . . . . . . . . . . . . .239

     3.   Inexperienced Jurors . . . . . . . . . . . . .242

D.   Conclusion . . . . . . . . . . . . . . . . . .243

APPENDICES

-iii-

## LIST OF FIGURES AND TABLES

FIGURE      I-1A:    Extended Media Coverage (EMC)
                     Negative Effects Hypotheses . . . .    7

FIGURE      I-1B:    Trial Participant Behavioral
                     Impacts . . . . . . . . . . . . . .    8

FIGURE      I-2:     Conceptual Model: Potential Effects
                     of Cameras in the Courtrooms  . . .   10

FIGURE      II-1:    Overview of Evaluation Data
                     Collection . . . . . . . . . . . .    20

FIGURE      II-2:    Global Observational Rating
                     Sheet . . . . . . . . . . . . . . .   25

FIGURE      II-3:    General Attitudinal Survey . . . .    30

FIGURE      II-4:    Juror Attitudinal Questionnaire . .   33

FIGURE      II-5:    Juror Attitudinal Questionnaire
                     Conventional . . . . . . . . . . .    35

FIGURE      III-1:   Experimental Year EMC Request Volume
                     and Dispositions . . . . . . . . .    42

TABLE       III-2A:  EMC Requests Proceeding Type
                     Analysis From Request Record Data .   47

FIGURE      III-2B:  Distribution of Cases by Proceeding
                     Stage: Cases on Which Evaluation
                     Data Were Collected
                     (Civil vs. Criminal)  . . . . . . .   48

TABLE       III-3:   EMC Type Analysis (From Evaluation
                     Data) . . . . . . . . . . . . . . .   49

TABLE       III-4:   EMC Court Level Analysis (From
                     Evaluation Data) . . . . . . . . .    50

TABLE       III-5:   EMC Geographic Distribution
                     (From Request Records) . . . . . .    51

TABLE       III-6:   "Importance" Rating of EMC Events .   53

TABLE       III-7:   News Clipping Analysis . . . . . .    55

TABLE       III-8A:  EMC Layout in Burnett vs National
                     Enquirer . . . . . . . . . . . . .    57

TABLE    III-8B:    EMC Layout in People V.
                    Bittaker Sentencing  . . . . . . . .   58

TABLE    III-8C:    EMC Layout in People V. Parnell  . .   59

TABLE    III-8D:    EMC Layout in People V. Robbins
                    (Opening and Closing Arguments Only)   60

TABLE    III-8E:    EMC Layout in People V. McDermand  .   61

TABLE    III-8F:    EMC Layout in People V. Snyder . . .   62

TABLE    III-8G:    EMC Layout in Michel V. Dillard  . .   63

TABLE    IV-1A:     Distribution of Participant "Level
                    of Awareness" Responses  . . . . . .   74

TABLE    IV-1B:     Percentage Distribution of Participant
                    "Level of Distraction" Responses . .   76

TABLE    IV-2:      Judge Distraction Level V. Type
                    EMC Present  . . . . . . . . . . . .   78

TABLE    IV-3:      Attorney Percentage Distribution of
                    Judge and "Dignity and Decorum
                    Impairment" Responses  . . . . . . .   80

TABLE    IV-4:      Distribution of Juror Responses
                    Regarding Courtroom Environmental
                    Effects and Flow of Proceedings  . .   81

TABLE    IV-5:      Distribution of Judge Responses
                    Regarding Supervisory Responsibility   82

TABLE    IV-6:      Means of Observational Ratings on
                    Courtroom Environment Issues
                    (Disturbance, Distraction, Dignity
                    and Decorum) . . . . . . . . . . . .   84

TABLE    IV-7:      "Directly Comparable" Observational
                    Data for Distraction/Disturbance
                    Issues (Means) . . . . . . . . . . .   86

TABLE    IV-8A:     Visual Distraction of EMC Equipment
                    and Personnel vs Other Media . . . .   90

TABLE    IV-8B:     Evaluator Rating of Audience
                    Distraction  . . . . . . . . . . . .   93

TABLE    IV-8C:     Evaluator Rating of Audience Change
                    Frequency  . . . . . . . . . . . . .   94

TABLE    IV-8D:     Evaluator Ratings of Distraction
                    From Court Personnel . . . . . . . .   95

TABLE     IV-8E:     Evaluator Ratings of Distraction
                     From Trial Participants . . . . . . 96

TABLE     IV-8F:     Evaluator Ratings of Auditory
                     Distraction From External Sources. . 97

TABLE     IV-9:      Judge Distraction Level vs Total
                     Press Corps. . . . . . . . . . . . 99

TABLE     IV-10:     Judge Behavior Change Due to EMC . . 101

TABLE     IV-11:     Attorney Behavior Change Due to EMC. 102

TABLE     IV-12:     Attorney Self Assessment Regarding
                     Behavior Change Due to EMC . . . . . 102

TABLE     IV-13:     Witness Behavior Change Due to EMC . 104

TABLE     IV-14:     Witness Self Assessment Regarding
                     Testimony Change Due to EMC  . . . . 104

TABLE     IV-15:     Juror Behavior Change Due to EMC . . 106

TABLE     IV-16:     Jury Deliberation Influence  . . . . 106

TABLE     IV-17:     Means of Observational Ratings on
                     Participant Behavior Issues
                     (Effective Communication). . . . . . 107

TABLE     IV-18:     Directly Comparable Observational
                     Data for Participant Behavior
                     Issues . . . . . . . . . . . . . . . 109

TABLE     IV-19:     Characterization of EMC Experience . 115

TABLE     IV-20:     Judge Experience Characterization
                     vs Importance Rating . . . . . . . . 117

TABLE     IV-21:     Surprises/Problems . . . . . . . . . 118

TABLE     IV-22:     Regrets About Consenting (Judges). . 118

TABLE     IV-23:     Reluctance to Participate Again in
                     an EMC Court Proceeding  . . . . . . 119

TABLE     IV-24:     Preference Regarding EMC Presence  . 121

TABLE     IV-25:     Preference . . . . . . . . . . . . . 122

TABLE     IV-26:     "Fearful of Harm" Due to EMC . . . . 123

TABLE     IV-27:     Main Impression Regarding EMC
                     Impact . . . . . . . . . . . . . . . 124

-vi-

287

TABLE   IV-28:   Importance Rating vs Added
                 Effects . . . . . . . . . . . . . 125

TABLE   V-1A:    Frequency Distributions Pre-Post
                 For All Three Occupational Groups
                 on General Attitudinal Survey
                 Item 26a . . . . . . . . . . . . . 129

TABLE   V-1B:    Frequency Distribution Pre-Post
                 for All Three Occupational Groups
                 on General Attitudinal Survey
                 Item 26b . . . . . . . . . . . . . 130

TABLE   V-1C:    Frequency Distribution Pre-Post
                 for All Three Occupational Groups
                 on General Attitudinal Survey
                 Item 26c . . . . . . . . . . . . . 131

TABLE   V-2:     Number of General Attitudinal
                 Surveys Returned by Occupation . . . 133

TABLE   V-3:     Summary of General Attitudinal
                 Survey Administration Schedule
                 by Groups . . . . . . . . . . . . 134

TABLE   V-4:     General Attitudinal Factor Analysis
                 Items Grouped by Factors . . . . . . 139

TABLE   V-5:     Reliability of Items in Each Factor
                 in the General Attitudinal Survey
                 Analysis . . . . . . . . . . . . . 141

TABLE   V-6:     Results of Pre to Post Slopes
                 Analysis on Factors Between
                 Occupations . . . . . . . . . . . 142

TABLE   V-7:     General Attitudinal Survey Factor 2
                 Mean Scores . . . . . . . . . . . 143

TABLE   V-8:     General Attitudinal Survey Factor
                 Means Used to Calculate Pre-Post
                 Slopes Between Occupations and
                 Within Occupations . . . . . . . . 144

TABLE   V-9:     Results of Pre-Post Analysis on
                 Factors Within Occupational Groups . 147

TABLE   V-10:    General Attitude Survey Factor 4
                 Mean Scores . . . . . . . . . . . 148

-vii-

TABLE     V-11:     Correlated T-Test on Factors
                    Pre to Post Within Occupational
                    Groups . . . . . . . . . . . . 150

TABLE     V-12:     Pretest to During Posttest Means
                    for Judges on Factors on General
                    Attitudinal Survey . . . . . . . . . 152

FIGURE    V-13A     Factor One Bar Graphs General
                    Attitudinal Survey Pre-Post Means
                    for Occupational Groups . . . . . 154

FIGURE    V-13B:    Factor Two Bar Graphs General
                    Attitudinal Survey Pre-Post Means
                    for Occupational Groups . . . . . 155

FIGURE    V-13C:    Factor Three Bar Graphs General
                    Attitudinal Survey Pre-Post Means
                    for Occupational Groups . . . . . 156

FIGURE    V-13D:    Factor Four Bar Graphs General
                    Attitudinal Survey Pre-Post Means
                    for Occupational Groups . . . . . 157

TABLE     V-14:     Correlated T-Test Results on Pre-
                    Post Survey Item Means Grouped by
                    Factor Within Occupations . . . . . 159

TABLE     V-15:     Classification Results
                    Discriminant Function on Pre-Post test
                    Factors by Occupation . . . . . . . 163

TABLE     V-16:     Opposition to No Consent Rule
                    Frequency Distribution of Survey
                    Item 25 . . . . . . . . . . . . . 167

TABLE     V-17:     Opposition to No Consent Rule
                    Frequency Distribution of Survey
                    Item 17 . . . . . . . . . . . . . 169

FIGURE    V-18:     Level of Opposition Pre and Post
                    To Removal of the Party Consent Rule
                    Judges, Prosecutors and Defenders . 170

TABLE     V-19:     General Opinion About EMC Expressed
                    by Jurors in Interviews . . . . . . 174

TABLE     V-20:     Statewide Jury Pool Sample Sizes . . 176

TABLE     V-21:     Characteristics of Jury Pool
                    Sample Inexperienced Jurors. . . .   179

TABLE     V-22:     Item Composition of Factors
                    In Juror Attitudinal Questionnaire   182

TABLE     V-23:     T-Test on Factor means for EMC
                    Inexperienced and Experienced
                    Jurors . . . . . . . . . . . . . .   186

FIGURE    V-24:     EMC-Inexperienced and EMC-experi-
                    enced Juror Attitudes Toward EMC By
                    Factor Means . . . . . . . . . . .   188

TABLE     V-25:     Frequency Distribution Comparisons
                    Between Conventional Media Coverage
                    Experienced and Inexperienced
                    Jurors on Factor Items From Attitude
                    Questionnaire. . . . . . . . . . .   191

TABLE     V-26A:    EMC-Inexperienced Juror Frequency
                    Distribution by Sex on Item 1  . .   196

TABLE     V-26B:    EMC-Inexperienced Juror Frequency
                    Distributions by Sex on Item 5 . .   197

TABLE     V-27A:    EMC-Inexperienced Juror Frequency
                    Distribution by Age on Item 4. . .   198

TABLE     V-27B:    EMC-Inexperienced Juror Frequency
                    Distributions by Age on Item 5 . .   199

TABLE     V-27C:    EMC-Inexperienced Juror Frequency
                    Distributions by Age on Item 13. .   200

TABLE     V-28A:    EMC-Inexperienced Juror Frequency
                    Distributions by Education on
                    Item 3 . . . . . . . . . . . . . .   201

TABLE     V-28B:    EMC-Inexperienced Juror Frequency
                    Distributions by Education on
                    Item 5 . . . . . . . . . . . . . .   202

TABLE     V-28C:    EMC-Inexperienced Juror Frequency
                    Distributions by Education on
                    Item 10. . . . . . . . . . . . . .   203

TABLE     V-28D:    EMC-Inexperienced Juror Frequency
                    Distributions by Education on
                    Item 11. . . . . . . . . . . . . .   204

-ix-

290

TABLE     V-28E:   EMC-Inexperienced Juror Frequency
                   Distributions by Education on
                   Item 12 . . . . . . . . . . . . . . .   205

TABLE     V-29:    Frequency Distribution Comparisons
                   Between FMC Experienced and
                   Inexperienced Jurors on Factor One
                   Items . . . . . . . . . . . . . . .   207

TABLE     V-30:    Frequency Distribution Comparisons
                   Between EMC Experienced and
                   Inexperienced Jurors on Factor Two
                   Items . . . . . . . . . . . . . . .   209

TABLE     V-31:    Frequency Distribution Comparisons
                   Between EMC-Experienced and EMC-
                   Inexperienced Jurors on Factor
                   Three Items . . . . . . . . . . . .   211

TABLE     V-32     Frequency Distribution Comparisons
                   Between EMC-Experienced and EMC-
                   Inexperienced Jurors on Factor Four
                   Items . . . . . . . . . . . . . . .   212

TABLE     V-33     Frequency Distribution Comparisons
                   Between EMC-Experienced and EMC-
                   Inexperienced Jurors on Factor Five
                   Items . . . . . . . . . . . . . . .   213

-x-

291

## I.  BACKGROUND INFORMATION
(Historical and Contextual Perspective on California's
Experiment with "Cameras in the Courts")

### A.  Introduction

On July 1, 1980, the California court system began an experi-
mental year of permitting electronic and photographic media
coverage of court proceedings.[1]  Formally labeled "extended
media coverage" and popularly referred to as "cameras in the
courts", the experiment was authorized by the passage of Cali-
fornia Rules of Court 980.2 and 980.3 by the California Judicial
Council.  These rules set forth the criteria and limitations
under which extended coverage would be allowed for both media
and educational use.  For the first time on a statewide basis
in California's history, videotape cameras, film cameras,
still cameras, and radio audio systems were given access to
cover judicial business conducted inside the courtroom.[2]

California's experiment was initiated in the context of a na-
tionwide trend to permit greater access by electronic and photo-
graphic media to judicial proceedings.  Presently, 15 states
have a permanent provision allowing "cameras in the courts"[3]
and 14 others are engaged in some form of experimentation.

---

[1] The experimental status of the authorizing rules was later
extended for six months by the California Judicial Council.

[2] Film camera use and extended coverage for educational appli-
cations in fact have constituted an extremely small portion
of the experiment.  The predominant mode of extended coverage
has been videotape camera, still camera, and audio systems
covering the proceeding for the news media.

[3] The nature of the provisions in the various states is diverse.
Some include restrictions on court level (e.g. appellate
court access only) or case type  (e.g. civil case access only).
Only a few states allow cameras into criminal trial level pro-
ceedings without the consent of the parties.

292

The momentum of experimentation in recent years (which began
in 1975 when Washington and Alabama began allowing extended
coverage) marks a departure from longstanding prohibitions
against cameras in the courtroom as established by the ABA
Canon 3A(7),[4] by state court rules prohibiting such coverage,
and by the landmark U.S. Supreme Court rulings in Estes v.
Texas.[5]

In Estes, the majority's negative conclusion on the electronic/
photographic coverage issue was qualified by a recognition
that advances in technology could create a new condition for
consideration of the prohibition.  Both Justice Harlan (for
the majority) and Justice Stewart (for the minority) were care-
ful to note that the decision was limited to the technology of
the time.  As breakthroughs in technology have occurred since
Estes, states have been willing to experiment.  Particularly
important is the availability of small videotape cameras which
can be operated by one person and require no additional light.
Still photography also can now be done with quality using
available light.

As technological improvements have made cameras less obtrusive,
argument against "cameras in the courts" has become less per-
suasive.  Yet, initial relaxations of prohibitions against
cameras in the courts have taken the form of experimentation
because of the need to prove that obtrusiveness is no longer a
factor and because disruption and distraction are but two of
many potentially harmful effects of electronic or photographic
coverage of court proceedings.

---

[4] Initially inspired by reaction to sensational press and radio
coverage of the 1937 trial of Bruno Hauptman.  State v. Hauptman
115 N.J. 412, 180A.

[5] Estes v. Texas (1965) 381 U.S. 532.

-2-

293

In Estes, Justice Clark cited a high probability of prejudice
resulting from such coverage due to psychological impacts on
participants.  The Justice hypothesized that jurors could feel
self-conscious, view the case as a *cause celebre* (or feel pres-
sure to conform to a perceived community viewpoint), be ex-
posed to selected, biasing broadcast coverage, or be subject
to influence from others who had seen broadcasts.  Witnesses
might be reluctant to testify, frightened, subjected to har-
rassment, or somehow alter their testimony because of camera
presence.  Judges would have an additional supervisorial bur-
den, be distracted, or "play to the camera".  Attorneys might
also "play to the camera" for personal gain, be distracted, or
otherwise change or diminish their communicative abilities.
Defendants, whose right to a fair trial is what must be bal-
anced with an equally important free press constitutional
guarantee, could be subjected to mental or physical harrass-
ment, prejudice, or intrusions into the attorney-client rela-
tionship and privileges.  The lack of certainty that these
psychological effects would not occur led Justice Clark to
write for the majority, ruling against extended coverage.

Opponents of cameras in the courtroom could add to the concerns
expressed in the Estes opinion, listing numerous other poten-
tial problems which they say far outweigh any benefits derived
from allowing extended media coverage.  The unobtrusiveness
permitted by improved technology pertains to a narrow range of
issues within the broad question of potential effects.  The
psychological negative effects cited by Justice Clark have
little to do with obtrusiveness of cameras and operators and
more to do with the real or perceived effects of television
broadcasting and still photo publication.

A trial, as well as other proceeding stages, involves a complex
set of dynamics and inter-relationships.  Since the "power of

-3-

294

the media" is well recognized and the "power of television"
often cited as particularly potent, even the single unobtru-
sive videotape camera is viewed with caution in its introduc-
tion into the courtroom arena.  The still camera, although a
different medium than television, also carries a visual image
to the public which raises identification and publicity issues
as does television coverage, and is similarly viewed with
caution.

Thus, in authorizing its experiment, the California court sys-
tem entered the domain of an issue which although not foreign
to the experience of states across the nation, is nonetheless
highly controversial.  "Cameras in the courts" continues to
highlight the strain which can exist between the courts and
the media on a number of fronts:  other "access issues" such
as closure of hearings and "gag orders"; disclosure of sources;
issues of libel, slander, and invasion of privacy; and general
criticisms of the media's accuracy and balance in covering
the courts.  This spectrum of issues creates a climate of ten-
sion in which the extended media coverage process must operate,
contributing to apprehensions and suspicions on both sides.
The need to proceed cautiously, on an experimental basis, was
apparent to all.  The need to evaluate the experiment objec-
tively and rigorously was no less apparent.

Despite Justice Clark's strong suspicions that televising
trials would have a marked affect on the trial process, he
observed,  "(O)ur empirical knowledge of its (television's)
full effect on the public, the jury or participants in a trial,
including a judge, witnesses and lawyers, is <u>limited</u>"[6]
Despite the genesis of a body of knowledge based upon limited
experience in states having relaxed the ban on cameras in

---

[6]<u>Estes v. Texas</u>, 381 U.S. 533 (1965).

-4-

295

the courts, there still exists little scientific research
responding to Justice Clark's observation.  When in 1981 the
U.S. Supreme Court rendered its opinion in <u>Chandler v. Florida</u>,[7]
a case contesting television coverage on the grounds that
doing so over the objection of the defendant is inherently a
denial of due process, Justice Burger again pointed to the
inability to draw conclusions on the subject based upon pres-
ent empirical evidence:

> At the moment, however, there is no unimpeachable empir-
> ical support for the thesis that the presence of the
> electronic media, *pro facto* interferes with trial pro-
> ceedings....[8]

Nor is there empirical evidence to establish that it does not.
Indeed, a central theme in the <u>Chandler</u> decision is the util-
ity of experimentation.  How else are we to discover what is
and is not fact about the effects of electronic and photographic
court coverage?  The California experiment and its evaluation
thereof were launched in this spirit.

B.  Purpose of the Evaluation

Realizing that little systematic and rigorous evaluation of
electronic and photographic coverage of court proceedings had
been carried out, California, from the inception of the move-
ment towards actualizing its experiment, sought an evaluation
which would be conducted concurrently to the experiment.[9]  A
subcommittee of the Chief Justice's Special Committee on the
Courts and the Media prescribed the basic direction of the
evaluation by constructing two major evaluation questions:

---

[7]<u>Noel Chandler and Robert Granger v. State of Florida</u>, opinion
announced January 26, 1981, No. 79-1260.  See The United States
Law Week, Vol. 49, No. 29.

[8]<u>Ibid</u>, p. 4146.

[9]As discussed later in this section, only two other states had
conducted statewide evaluations of their experiments, both
relying on after-the-fact surveys.

1. Will the presence and operation of broadcast, record-
   ing, or photographic equipment in a courtroom be a
   significant distraction for trial participants, disrupt
   proceedings, or impair judicial dignity and decorum?

2. Will trial participants or prospective trial partici-
   pants, knowing that their words or pictures will be or
   are being recorded, broadcast or taken for possible
   use on television, radio or in newspapers or magazines,
   change their behavior in a way that interferes with
   the fair and efficient administration of justice?

Clearly, the thrust of these two questions displays a sensi-
tivity to potential <u>negative</u> effects of extended media cover-
age (EMC) on the <u>proceeding being covered</u>.  The evaluation
has been designed to search for the negative, and although
that entails researching positive effects of EMC which may
be balanced against the negative in a particular effect cate-
gory, the primary purpose of the analysis is to measure the
extent to which the above major evaluation questions must be
answered affirmatively.

As a starting point for the research design, the evaluators
composed a list of potential negative effects of EMC relative
to the two major evaluation questions and further organized
research issues on the "behavioral effects on participants"
question by associating potential negative effects with each
participant type.  These listings appear as Figures I-1A and
I-1B.  The issues encompassed by the hypotheses embodied in
these figures determined the content of data collection instru-
ments and the focus of the analysis.  Although in the course
of the project a few other issues surfaced relevant to the
two major evaluation questions, by-in-large the issues delin-
eated in Figures 1A and 1B provided an adequate blueprint for
the research.

It is not assumed that the two major research questions encom-
pass all issues associated with cameras in the courts.  The

-6-

297



FIGURE I-1A

EXTENDED MEDIA COVERAGE (EMC) NEGATIVE EFFECTS HYPOTHESES

1. The presence and operation of EMC equipment in a courtroom is a significant distraction for trial participants.

2. The presence and operation of EMC equipment in a courtroom disrupts proceedings so as to interfere with the administration of justice.

3. The presence and operation of EMC equipment in a courtroom impairs judicial dignity and decorum.

4. EMC causes witnesses to testify untruthfully.

5. EMC causes witnesses to be more reluctant to testify.

6. EMC causes jurors to be more reluctant to serve.

7. EMC leads to harrassment or physical harm of trial participants (e.g., witnesses, jurors, defendants, etc).

8. EMC distracts jurors so as to make them less attentive to trial proceedings.

9. EMC adversely influences the decision-making of jurors because they perceive a difference between the "right" decision and the "popular" decision.

10. EMC depletes the availability of jurors because of widespread public familiarity with a particular case (especially pertinent to retrials).

11. EMC results in a large increase in sequestered juries.

12. EMC is detrimental to the presentational abilities of attorneys and therefore reduces the quality of their advocacy.

13. EMC causes attorneys to behave contrary to the interests of their client by causing them to avoid unpopular positions (including refusing to represent a client) or by causing them to "grandstand" to seek recognition for personal or political gain.

14. EMC causes judges to behave contrary to the interests of justice by causing them to avoid unpopular positions or by causing them to "grandstand" to seek recognition for personal or political gain.

15. EMC reduces efficiency in the administration of justice causing increased costs, increased case processing time, or administrative difficulties (e.g. scheduling and other matters involved in accommodating EMC requirements).

298



FIGURE 1-18



TRIAL PARTICIPANT BEHAVIORAL IMPACTS

| BASE CATEGORY | DEFINITION/CONTENT | NEGATIVE IMPACT |
|---|---|---|
| Juror Effects | Distraction | Reduction in decorum |
| | Decision-making influence (undesired) | Injustice to litigants |
| | Difficulty in obtaining due to reluctance or contaminating media exposure | Jury management problem |
| Witness Effects | Reluctance to testify | Less evidence |
| | Nervousness/guardedness in testimony | Less evidence, distort evidence |
| | Untruthfulness in testimony | Incorrect evidence, damage to litigants |
| Jury Effects | As decision-maker: | |
| | Undesired influence | Injustice to litigants due to decision bias |
| | Distraction, making decision process more difficult | Injustice to litigants due to capability deficiency |
| | As courtroom manager: | |
| | Difficulty maintaining control | Reduction in decorum |
| | Difficulty in conducting an expeditious proceeding | Court delay |
| Attorney Effects | Presentational ability diminished | Advocacy impairment |
| | Grandstanding to media for personal gain | Advocacy impairment |
| | Exploitation of media | |
| *Party Effects | Party as proceeding participant: | |
| | Exploitation of media: in act of violence or disruption | Potential danger to participants, reduction decorum, and efficiency loss |
| Public Effect | As prospective participant: | |
| | Reluctance to participate | Reduction of effectiveness and usefulness judicial system |

\*"Party effects" may also be construed to include impact of EMC on party's constitutional rights, reputation, and well being; however, these impacts are ultimate concerns, not behavioral effects. The role of the party as "receiver" of justice with media exposure is in the mode of a dependent variable while other effects in this figure are in the mode of independent variables.

-8-

299

realm of issues goes beyond the scope of the two questions.
For example, focusing on EMC impacts on the proceeding being
covered, the questions do not address the long range effects
of electronic/photographic court coverage on the judicial pro-
cess and society at large.[10]   The focus of the two questions
precluded a survey of the public at large on their reaction
to extended media coverage and precluded an in-depth analysis
of the product of EMC, i.e. broadcast content (television and
radio) and still photo publication.

To further place the issues inherent in the two major evalu-
ation questions, the evaluation team constructed a model of
the "universe" of potential effects of EMC.  This model is
graphically depicted in Figure I-2.  Potential effects are
categorized in three types.  Type A refers to immediate ef-
fects of the presence of EMC equipment and operators.  Type
B refers to broadcast/publication effects on the proceeding
at hand, either real or perceived.  Type C effects are those
which are manifest after the proceeding is completed, both
short-term and long-term.

To sum up the focus of this evaluation, research was directed
towards all Type A and B effects, with some interview content
seeking data on attitudes and mind states relevant to selected
Type C effects.

C.  Prior Research and Existing Literature

Since state courts have begun opening their doors to television
cameras, still cameras, and radio, research efforts of varying

---

[10]Obviously, an 18 month study could not effectively address
long-term concerns such as possible change in the public's
perception of the judicial process due to television, still
camera, and radio coverage.

-9-

FIGURE I-2

CONCEPTUAL MODEL:

POTENTIAL EFFECTS OF CAMERAS IN THE COURTROOMS



| TYPE "A" EFFECTS | TYPE "B" EFFECTS | TYPE "C" EFFECTS |
|---|---|---|
| $A_1$ Obtrusiveness | $B_1$ Courtroom Atmosphere | $C_1$ Short term: on trial participants and community |
| $A_2$ Behavior Change | $B_2$ Trial Process and Outcome | $C_2$ Long term: on relationship of judicial Process and community |

| EXAMPLES OF EFFECTS | $A_1$ • Distrubance • Distruption • Distraction | $A_2$ • Nervousness • Reluctance • Flamboyance | $B_1$ • Public Pressure • Politicization | $B_2$ • Juror contamination • Witness Effect | $C_1$ • Reputational damage • Physical harm • Extreme reaction to outcome | $C_2$ • Public perception of courts altered • Willingness to participate • Public education/deterrent |

THE COURTROOM

THE COMMUNITY

$A_1$ Effects

$A_2$ Effects

$B_1$ Effects

$B_2$ Effects

$C_1$ Effects

$C_2$ Effects

TIME LINE

-10-

301

degrees of methodological soundness and generalizability
have emerged.  A number of case studies have been conducted
during the experimental phase of several state's experience
with cameras in the courtroom, two statewide surveys conducted
after the experiments have been conducted (Florida and Wiscon-
sin), and a few studies have been done on specific issues
associated with the EMC phenomenon (e.g. witness testimony
and effects of publicity).

When Washington permitted television coverage of a second
degree manslaughter trial as an experiment,[11] the trial
judge interviewed the witnesses, jurors, and lawyers and
found no significant problems in the participants' reactions.
A similar polling of an experimental "cameras in the court-
room" case in Ohio, done by a social scientist, yielded no
evidence of negative camera effects.  However, at least one
case example from Florida produced reports of serious inci-
dents probably related to camera coverage--a witness refusing
to testify for fear of her life and the receiving by the Court
of numerous bomb threats.[12]  Other Florida cases, the cele-
brated Ronny Zamora and Theodore Bundy trials for example, are
often cited as demonstrating that camera coverage can be con-
ducted with no seriously adverse effects.

The case study approach has obvious limitations in generaliza-
bility.  A representative sample of cases within an experimental
period must be studied before general conclusions may be drawn.
The Florida and Wisconsin surveys, both administered on a
statewide basis, have contributed to the improvement of empir-

---

[11]The news stories from the television coverage were not tele-
cast; rather, they were submitted to the Washington Supreme
Court for evaluation of the camera's effects.

[12]From a murder trial in West Palm Beach Florida presided over
by Judge Thomas Sholts.

-11-

302

ical evidence on the subject. Florida surveyed witnesses, jurors, lawyers, and court officers who had participated in televised trials and documented its conclusions.[13] One researcher, in reviewing results from studies to date commented:

> The results suggest that few effects have been felt by trial participants as a result of television cameras, although attorneys showed greater reservations about televising than others did. Although the study suffered from methodological flaws, including extreme simplicity in instrumentation and the rush which the Florida's court deadline imposed on the researchers, the study found few reasons to bar cameras from courtrooms.[14]

Wisconsin sampled <u>trials</u> rather than <u>participants</u> and concluded that given appropriate rules for media conduct, little harm would result from allowing camera coverage. Both Florida and Wisconsin subsequently adopted permanent rules and, until joined recently by California, are the only states to permit camera coverage with a judge-only consent requirement for criminal cases.

There are two published studies which focus on specific issues of the cameras in the courtroom debate and employ a more rigorous methodology than the case study or statewide survey approached discussed above. James Hoyt tested the effect on a witness's testimony of his knowledge that he was being filmed,[15] and Kermit Netteburg surveyed the viewing public to

---

[13]"A Sample Survey of the Attitudes of Individuals Associated with Trials Involving Electronic Media and Still Photography Coverage in Selected Florida Courts between July 5, 1977 and June 30, 1978", prepared by the Judicial Planning Coordination Unit, Office of the State Courts Administrator, Florida Supreme Court.

[14]Kermit Netteburg: "Does Research Support the Estes Ban on Cameras in the Courtroom?" 63 <u>Judicature</u> 466 (May 1980), p.472.

[15]James L. Hoyt, "Courtroom Coverage: The Effects of Being Televised," 21 <u>Journal of Broadcasting</u> 487 (1977).

test the notions of "community incitement" due to televised
coverage, "misperception" as to guilt or innocence due to
publicity and "depletion of the prospective juror pool" for
re-trials of cases in which the first trial was televised.[16]
Hoyt found support for the theory that testimony improves
under the televised condition, and Netteburg's findings can-
not be classified as alarming.[17]

By mid-1980, not enough research had been published to formu-
late comprehensive conclusions on this subject to obviate
the need for California to experiment before considering per-
manently permitting courtroom access by electronic and photo-
graphic media.  There does exist ample literature debating
the issue and reviewing recent developments--the California
evaluation was aided by these materials as well as by prior
research in constructing the evaluation design.  The arguments
for and against are well articulated and highly enthusiastic
on both sides.  The literature and research available cer-
tainly have clarified the issues and provided valuable exper-
ience in developing methods to research them.

D.  California's Experiment:  Rules and Procedures

Before documenting the research design and presenting the findings
of the evaluation in Sections II-VI, the balance of this sec-
tion briefly reviews the rules governing California's experi-
ment.

The California Judicial Council, which is empowered with rule-
making authority, sought the guidance of a special committee

---

[16]*Supra*, n. 11.

[17]Netteburg found that large numbers of respondents were not
aware of the defendant's name or case outcome despite the
television coverage, and other indicators of "community in-
citement" were not found.  The issue of perception of an
acquitted defendant's status was found to warrant further
study because of some misperception held by respondents as
to the disposition of the defendant's charges.

-13-

304

in constructing the rules governing the experiment.  The
Chief Justice's Special Committee on the Courts and the Media
is comprised of 28 members representing the courts, attorneys,
the media and selected special interest groups.[18]  The Commit-
tee was assisted by staff of the Administrative Office of the
Courts and developed as a primary objective of its work a
recommended set of rules to govern the experiment with extended
media coverage (EMC) of court proceedings.  A subcommittee of
the special committee directed its attention to the structur-
ing of and provision for the evaluation of the experiment.

The rules' contents address a broad range of concerns associ-
ated with EMC of court proceedings (see Appendix A for a com-
plete text of the rules as presently constituted).  Logistical
concerns are addressed in some detail:

- request procedures;
- consent requirements;
- restrictions on extended coverage;
- equipment and personnel restrictions;
- sound and light criteria;
- position and movement considerations; and
- pooling requirements.

Request procedures.  A request for EMC must be made in writing
and submitted "a reasonable time in advance" of the proceeding.
A request form was developed by the Administrative Office of
the Courts and distributed throughout the state.  The form
(see Appendix B) contained a section wherein the media requestor
certifies that compliance with the rules will be maintained
and that the evaluation team was notified of the request by
both telephone and mail.

---

[18] The California League of Women Voters, the California
Teachers' Association, and the California Freedom of Infor-
mation Committee were represented on the committee along
with television, newspaper and radio representatives,
defense attorneys, prosecutors, and judges.

-14-

305

Consent requirements raise perhaps the singly most controver-
sial question of cameras in the courts logistics:  should the
consent of the parties be required before EMC is allowed?
Requiring consent of parties in criminal trial level proceed-
ings (i.e. defendant and prosecutor) results in very limited
EMC in criminal cases--precisely the case type that draws
the most media attention.[19]  California was about to proceed
with a no party consent rule when the U.S. Supreme Court
granted *certiorari* to Chandler et al vs. Florida,[20]  a case
appealed on the very issue of camera coverage over the objec-
tion of the defendant.  Uncertainty as to the impact of the
forthcoming ruling in Chandler (e.g. the possibility of the
need to retry numerous cases receiving EMC over the objection
of the defendant) led the Judicial Council to exercise caution
in the consent question.  Party consent for criminal trial
level proceedings was the rule in the California experiment
until after the U.S. Supreme Court rendered its opinion in
Chandler.  Camera coverage over the objection of the defendant
was held not to be an automatic denial of due process and the
right to a fair trial; the states became free to experiment
without a constitutional cloud lurking to obfuscate the pro-
cess.  Immediately thereafter, the party consent provision
was removed from California's rules, revitalizing the ability
of the media to cover criminal case proceedings by electronic
and photographic means.

Restrictions on extended coverage were delineated in six areas:
1) no EMC of closed proceedings, 2) no EMC of *voir dire*,
3) no closeup or "zoom" shots of jurors, 4) no audio coverage

---

[19]As documented in Section III of this report, the volume level
of EMC of criminal cases is decidedly less under a party con-
sent rule than under a no party consent rule.

[20]Noel Chandler and Robert Granger vs. State of Florida, opinion
announced January 26, 1981, No. 79-1260, see The United States
Law Week, Vol. 49, No. 29 p. 4141 January 27, 1981.

-15-

of attorney/client conferences, between co-counsel, or
between counsel and judge at the bench, 5) no EMC of in-
chambers conferences, and 6) to preclude EMC of matters
presented to the court in the absence of the jury which are
for purposes of admissability of evidence, the judge may
conduct a hearing in chambers.

Equipment and personnel guidelines are central to the experi-
ment.  Restrictions on the number of cameras (one videotape
camera and one still photographer with two cameras[21]) and
restrictions on audio systems (existing audio systems must
be used if possible and if not, one system may be used) are
set forth in the rules.  No insignias or identifications of
individual media or networks are permitted.

Sound and light criteria. Minimizing distraction in noise and
lighting is the primary purpose of this portion of the rules.
A schedule of equipment (covering film cameras, videotape
electronic cameras, videotape recorders, and still cameras)
is incorporated into the rules to set a standard for sound
and light: equipment must produce no greater sound or light
than the models in the schedule.  No additional lighting to
the courtroom may be used except to increase the wattage of
existing courtroom lights.  Operating lights or sounds on
equipment (which signal that the equipment is on) may not be
visible or audible to proceeding participants.

Position and movement.  Salient provisions of the rules in
this area are that operators of EMC equipment must assume a
fixed position during the proceedings and that equipment may
only be set up or dismantled before or after the proceeding
or during recess.

─────────────────────────

[21]A second television camera and second still photographer
may be permitted at the discretion of the judge, the former
for live coverage.

-16-

307

Pooling, or arrangements for sharing the output of the limited number of cameras and audio systems permitted access, is the responsibility of the media.  When multiple media representatives request EMC, the media is charged with designating one representative as a liaison to the court.  A court may likewise designate a judge or court representative to coordinate with the media.

Rule 980.3 addresses extended coverage for <u>educational purposes</u> and sets forth slightly different guidelines.  Specific criteria for logistical considerations are not the rule; rather, there is a general provision that "the means of recording will not distract participants or impair the dignity of the proceedings"--980.3(b)(1)).  Furthermore, the consent of all trial participants being depicted is required.

Judge discretion is built into the rules in several respects. His or her consent is required in all cases; the judge may refuse, limit or terminate extended coverage if a party objects to it or may do the same for coverage of any witness if the witness objects to it.  A general clause is contained in the rules which states that nothing in the rules shall be interpreted to limit or restrict the power of the judge to control the conduct of the proceedings.  Particularly since the party consent requirement for criminal trial level proceedings was removed seven months into the experiment (February 1, 1981 ) the judge is a pivotal figure in the decision process regarding extended coverage matters.

E.  Report Organization

The remainder of this report is organized into five sections. Section II documents the evaluation research design.  Section III presents a summary of pertinent factual information about the experiment -- the volume of activity, the types of cases

.17-

covered, and other characteristics of EMC activity.   The
analysis of evaluation data is contained in two sections.
Section IV presents interview and observational data from
specific EMC and baseline cases while Section V analyzes
general attitudinal surveys of judges, attorneys, and jurors.
Finally, Section VI summarizes the findings and conclusions
documented in Sections IV and V followed by recommendations
for rules changes and comments on issues related to the
evaluation.

-18-

309

II.  RESEARCH DESIGN

A.  Overview

This evaluation reports upon a full year of extended media
coverage in California courts.  Unlike prior evaluations of
state experiments, the research was conducted concurrently
with the experimental year--the project actually began three
months prior to the start of the experiment.  This approach
permitted the evaluation team to obtain data from actual
observation of EMC events.  Observational data, along with
in-depth interviews of proceeding participants and general
attitudinal surveys of judges, attorneys and jurors comprise
the data on which this evaluation is based.  A summary of
data types, sources, and instruments appears in Figure II-1.

The collection of various kinds of data sets has a distinct
advantage over a more singular approach.  The effects of ex-
tended media coverage are argued to be subtle and elusive in
many of their manifestations.  The perceptions of individuals
who participated in an EMC proceeding, as captured by an inter-
view, provide useful data, but are often in conflict with one
another.  To some extent, observational data can provide a
conciliatory check on the perceptions of individuals.

Attitudinal data were obtained from statewide populations of
judges, attorneys, and jurors and from members of these groups
who had direct experience with extended coverage.  These data
capture attitudes about EMC generally (supplementing perceptions
regarding a single event from "direct experience" and "no
experience" groups) allowing comparison of the groups.  The

-19-

310

FIGURE II-1

OVERVIEW OF EVALUATION DATA COLLECTION

| DATA TYPE | DATA SOURCE | DATA COLLECTION INSTRUMENT TYPE |
|---|---|---|
| Factual information about specific case proceedings | Judges, attorneys, jurors, witnesses*, parties* | Event log, request form, case records |
| General attitude and opinions about extended media coverage | Evaluator observation, judge, attorneys, media | Attitudinal Survey Interview questions |
| Perceptual and explanatory data from trial participants regarding specific case proceedings | Judge, attorneys, jurors, witnesses, parties, court personnel | Interview questions, attitudinal questionnaire** |
| Behavioral indices of participants from specific case proceedings | Evaluator observation | Observation coding instruments |

*Witnesses and parties were asked about their general attitudes towards EMC during interviews; these participant types were not asked to complete an attitudinal survey.

**For some cases for which no case-specific data were sought, judges provided some information when responding to the July 1981 statewide general attitudinal survey.

-20-

surveys also allowed "direct experience" individuals to
register their opinion above and beyond reporting on the one
experience in which they participated. Furthermore, a state-
wide population of judges, attorneys, and jurors was surveyed
at the beginning and end of the experimental year, permitting
measurement of attitudinal shifts over time.

Proponents of EMC often argue that the introduction of a
camera or microphone in the courtroom of a highly publicized
trial is a minor, even negligible phenomenon in the context
of everything else surrounding such events. The courtroom is
commonly packed with reporters and public spectators in these
cases and a sketch artist, who may or may not be present if a
camera is present, is equally noticeable to the participants--
so goes the argument. If one is to determine the impacts of
electronic/photographic coverage, one must isolate the marginal
difference between it and coverage of a conventional nature.
What added impact does EMC have or, if cameras are replacing
sketch artists, what is the difference in impact?

To isolate the effects of EMC vs. conventional coverage, the
evaluation collected data on highly publicized court proceed-
ings under conventional conditions. Observational data collec-
tion on behavior and environment precisely matched EMC obser-
vational data. These data provided a needed baseline for con-
trol and comparison.

The evaluation applied the full range of data collection tech-
niques to a selected number of EMC and conventional coverage
proceedings (about 35) encompassing all the EMC "major events"
in California throughout the experimental year. For numerous
other EMC events (about 80) many of which were relatively minor
EMC experiences, an interview with the judge was conducted.
The judge interviews identified any unusual or interesting

-21-

aspects of extended coverage in the case. Judges are purposefully represented in the interviews in greater numbers than other participant types, since the judge is a central figure and decision-maker in the courtroom and in the judicial process generally.

B.   Detailed Discussion of Research Design

   1. Observational Data

   In conducting this evaluation it was deemed essential to gather observational data in the courtroom.  For both major areas under scrutiny--obtrusiveness (disruption, distraction) and participant behavioral change--direct observation plays a key role.  Additionally, "being there" gave the evaluators familiarity with the case at hand, the nature of the proceeding, and characteristics of the individuals involved.

   The physical layout of the courtroom and the placement of EMC equipment and operators is an important factor in assessing EMC effects.  While on site, these and other facts were noted by the evaluators and considered in the context of the "tone" and content of the proceeding. Types and numbers of equipment, numbers of media and non-media spectators, and other environmental aspects such as external noise sources and movement also were noted.  An attempt was made to learn from EMC experiences what logistical approaches were least and most successful in conducting non-disruptive, non-obtrusive extended media coverage.

   Structured observational data collection focused on the behaviors of trial participants and the environment within

-22-

313

which these behaviors occurred.  During the course of
an EMC proceeding, a member (or members) of the evalua-
tion team would observe the event and for time increments
of 10 to 30 minutes, make ratings on specific behavioral
and environmental attributes.  "Global judgments"[22] were
made for each participant type and for the courtroom
environment as a whole for the following attributes:

| | |
|---|---|
| JUDGE: | Attentiveness |
| | Effective Control |
| | Effective Communication |
| ATTORNEY (Plaintiff's, Prosecutor, or Defense Attorney): | Effective Communication |
| JUROR: | Attentiveness |
| WITNESS: | Effective Communication |
| COURTROOM (Environment as a whole): | Calm |

---

[22]Global judgments are derived from the perceptions of an
expert observer, who, over time, assesses the degree to
which a particular attribute or state is present in a
person or in an environment.  Typically, several features,
behaviors, or indicators group together or constitute
these globally judged attributes.  Members of a research
team observe a particular target and, after a period of
time has elapsed, the observer decides the degree to
which the attribute under examination is present.  For
instance, if one were observing a group of children in
an attempt to determine the degree of cooperative play
which was displayed, the observer would watch the children
at play, take note of the various factors included in
cooperative play, then assess at the end of a time per-
iod the degree to which (high to low) cooperative play
existed.  These kinds of data are based on the profes-
sional judgment of the observer and are "global" due to
their multi-factor definition.

-23-

These attributes were chosen for study because they best
describe what hypothetically would be altered due to the
presence of electronic/photographic coverage.

Each attribute was rated on a scale of 1.0 to 6.0 (See
the observational rating form, Figure II-2). Detailed
criteria for the rating process were developed by delinea-
ting behavioral indicators for all six cells of each
attribute's continuum. These criteria are reproduced
at Appendix C.

As a general rule, the level of 2.0 was established as
a standard for "normally good" behavior in each attribute.
For example, attorneys are expected to be effective com-
municators because this is an important component of their
professional skills. The norm for attorney Effective
Communication on a scale of 1.0 to 6.0 is 2.0. Similarly,
jurors are expected to be attentive because attentiveness
is a necessary condition for effective information receiv-
ing and intelligent decision-making.

The results of pre-testing the observational rating pro-
cess yielded a salient fact. Most of the ratings were
appropriately falling into the 2.0 cell although there
seemed to be subtle differences in the behavior rated
with this "normally good" category. For this reason, the
instrument was refined by adding a 1.5 and 2.5 rating.
Corresponding definitions for these levels were developed
and integrated into the rating criteria.

The reliability of observational measures rests upon con-
sistency in rating among observers. Three individuals
participated in the rating data collection; inter-observer
testing was done among the three to assess consistency.

-24-

315

bal Observational Rating Sh...

| Case Name | Type of Proceeding | Date    Time |
|-----------|--------------------|--------------|
| Judge Name | Context | Rater |

| Judge | Attent. | | | | | | | |
|-------|---------|--|--|--|--|--|--|--|
| Judge | Eff.Cont. | | | | | | | |
| Judge | Eff.Comm. | | | | | | | |

.5   .5

1   2   3   4   5   6

| Juror #, sex | Attent. | | | | | | |
|--------------|---------|--|--|--|--|--|--|
| Juror #,sex | Attent. | | | | | | |

| Atty pl/pr/def | Eff.Comm. | | | | | | |
|----------------|-----------|--|--|--|--|--|--|
| Atty pl/pr/def | Eff.Comm. | | | | | | |

.5   .5

1   2   3   4   5   6

| Witness Name | Eff.Comm. | | | | | | |
|--------------|-----------|--|--|--|--|--|--|
| Witness Name | Eff.Comm. | | | | | | |

| Courtroom | Calm | | | | | | |
|-----------|------|--|--|--|--|--|--|

### Courtroom Environment
Audience Size _____
Audience (+) (-) _____
Distractions _____

Noise Sources/Movement _____

Other _____

### Media Presence
__ TV Camera   __ Still Camera
__ Radio Equip   __ Reporter w/ pads
__ Sketch Art.   __ Other _____
Total Number Media _____
Other notes about Media _____

Miscellaneous Notes and Observations _____

316

An interjudge reliability quotient of over .90 was
attained as a result of internal training on applica-
tion of the rating measures.

The observational data forms are a type of log of EMC
and conventional coverage events attended by the evalua-
tors.  Numerous other data elements were captured on
each form including narrative descriptions of interest-
ing occurrences in and around the proceeding, occurrences
of potential value to the evaluation.

The ultimate purpose of the observational data was to
provide a structured description of EMC events (behav-
ior and environment) and to produce comparative data on
EMC vs. conventional coverage.  This comparison was
carried out in two primary ways.  First, EMC observa-
tional data from all cases for a given attribute were
totalled and divided by the number of ratings taken.
This yields a cumulative EMC mean (average) for that
attribute.  This average then was compared to a similar
average for all conventional coverage ratings.  Secondly,
EMC vs. conventional rating averages was compared from
a single case if:

- extended media were present for only a portion of the
  proceedings (intermittent EMC); or
- a case receiving EMC ended in a mistrial and was re-
  tried without EMC (or *vice versa*).

Comparing EMC to conventional ratings within a single case
eliminated the problem of the data containing numerous
different participants, the individual characteristics of
which even when aggregated could account for differences
in the cumulative average.  Although the assumption is
that these differences will even themselves out by their
balanced presence within the EMC and conventional groups,

-26-

317

that assumption is open to question.  The single case
comparison method offered a check on the results of the
total population comparison.

Given this structure for observational data collection,
comparisons were made by inspecting the array of obser-
vational averages and assigning significance to those
values which, in the judgment of the evaluation team,
logically separated qualitatively different behaviors.
The behavioral measures also were used to describe the
in-court phenomena in quantifiable terms.  Frequency dis-
tributions were constructed and examined as a way to por-
tray what happened, behaviorally, during an EMC or con-
ventional media coverage event.  Cross-tabulations were
computed between behavioral indices and other salient
observed or interview-obtained data.  These cross-
tabulated frequencies were examined for their descriptive
power in lending understanding to observed and self-
reported differences in events and subjects.

## 2.  Interview Data

Of obvious importance to the evaluation were the percep-
tions of individuals participating in extended coverage
court proceedings.  Interviews were obtained in three
modes: in-person, telephone, and mail.  For the "major
cases" (i.e. those trials receiving a great amount of
publicity and having extended media presence throughout
the proceeding) interviews were conducted in-person
whenever possible.  This format yielded rich data on the
structured agenda of the questionnaire and other issues
as well.  Some interviews were obtained by telephone
which, although producing more information than the mail
format (paper/pencil mode), were generally of less length
than in-person interviews.  Mail questionnaires were used
for a large group of cases for which no observational

318

data were taken.  The mail questionnaire format also
was used for many jurors even in the major case events,
since logistical considerations often made it difficult
to interview jurors in person.

The interview design used an open-ended as well as close-
ended question format.  This approach was taken so as not
to confine interviewees to a pre-determined set of re-
sponses for questions which invite considerable explana-
tion.  Subsequently, responses were categorized carefully
and coded for analysis and presentation.

Interview questions sought participant responses on:

- level of awareness of EMC equipment and operators;

- the extent to which awareness became distraction;

- perceptions on EMC impairment to dignity and decorum;

- perceptions of own behavioral change;

- perceptions of behavioral change of other participants;

- feelings of "preference" as to EMC presence;

- feelings of willingness to participate again in an
  EMC event or feelings of regret at having consented
  to EMC; and

- demographic data.

The contents of the specific questionnaires varied among
participant types.  Some questions were asked of all parti-
cipant types while other questions were directed toward
a particular group.  The questionnaires are reproduced
at Appendix D.

-28-

319

For analysis, after coding all interview data into a
systematic and quantifiable form, the response infor-
mation was constructed into frequency distributions and
percentages of response categories were computed. The
distributions and percentages were examined for trends
and salient groupings for purposes of describing in aggre-
gate form the information gained from interviews. Cross-
tabulations were computed between two sets of interview
data and/or between interview and observational data.
These cross-tabulations were examined to identify inter-
relationships between logically linked information.

3.  General Attitudinal Surveys

The third major component of the evaluation data base was
General Attitudinal Surveys. These Surveys contained
firmly stated hypotheses (regarding a negative or posi-
tive EMC effect) with which the respondent agreed or
disagreed. A Likert scale (continuum of five responses
from "strongly agree" to "strongly disagree") was used in
the survey design. The judge and attorney Survey is shown
in Figure II-3.

Attitudinal surveys were used to research a) the profile
of attitudes of occupational or participant groups (judges,
attorneys, jurors); b) shifts in attitudes over time even
if the respondent had no direct experience with EMC;and
c) shifts in attitudes as a result of direct experience
with EMC. A statewide application of the survey was con-
ducted in July 1980 and July 1981 to measure changes occur-
ring during an one-year experimental period. "Direct ex-
perience" survey data were obtained by mailing a survey
form to judges and jurors along with a post-event question-

-29-

320

1. Extended media coverage (EMC, popularly referred to )"cameras in the courts") of courtroom proceedings will not detract from the decorum of the judicial process.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

2. EMC of courtroom proceedings will make it more difficult to find jurors who have no been exposed to prejudicial publicity about a case.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

3. EMC of courtroom proceedings will increase citizens' willingness to become involved in the judicial process.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

4. EMC of courtroom proceedings will improve the quality of courtroom advocacy.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

5. EMC will cause witnesses to be overly guarded in their testimony.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

6. The physical presence and operation of additional media equipment will itself lead to greater disruption of courtroom proceedings.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

7. EMC of courtroom proceedings will cause judges to avoid unpopular positions or decisions.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

8. EMC of courtroom proceedings will affect voting at the next election of elected officials represented at the proceeding.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

9. Jurors' decision making will be influenced by their friends' and acquaintances' attitudes about the case because of EMC of the trial.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

10. EMC of courtroom proceedings will not affect a judge's ability to maintain courtroom...

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

11. EMC of courtroom proceedings will lead to increased distraction of the participants.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

12. EMC of noncriminal proceedings will result in unfair damage to the reputation of li...

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

13. EMC of courtroom proceedings will result in less effective client representation.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

14. The possibility of EMC of courtroom proceedings will be a factor in attorney negoti... in a case.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

15. EMC of bail proceedings will improperly influence a judge in setting bail.

___Strongly Agree ___Agree ___No Opinion ___Disagree ___Strongly Disagree

-30-

321

16.   ENC of courtroom proceedings will increase jurors' attentiveness to testimony.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

17.   ENC of _criminal_ proceedings should be allowed only with the consent of the parties.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

18.   ENC of courtroom proceedings will cause prosecutors to "play up" to the media to enhance the re-election prospects of the District Attorney.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

19.   ENC will make witnesses more reluctant to testify.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

20.   ENC of noncriminal proceedings will _not_ discourage citizens from filing suit.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

21.   ENC of _criminal_ proceedings will _not_ result in unfair damage to the reputation of participants.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

22.   ENC of courtroom proceedings will make people more apprehensive about participating in legal processes.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

23.   ENC of courtroom proceedings will adversely affect the truthfulness of witness testimony.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

24.   ENC of sentencing proceedings will improperly influence a judge in the sentencing decision.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

25.   ENC of noncriminal proceedings should be allowed only with the consent of the parties.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree

26.   ENC should be allowed in the following proceedings:
Appellate Proceedings    ___Strongly Agree    ___Agree    ___No Opinion    ___Disagree    ___Strongly
Civil Proceedings        ___Strongly Agree    ___Agree    ___No Opinion    ___Disagree    ___Strongly
Criminal Proceedings     ___Strongly Agree    ___Agree    ___No Opinion    ___Disagree    ___Strongly

27.   ENC will diminish the diligence of the defense attorney in defending his client.
      ___Strongly Agree     ___Agree     ___No Opinion     ___Disagree     ___Strongly Disagree


Your name:_____     Your court or
                                              organization:_____


Return to:  Ernest H. Short and Associates, 2709 Marconi Avenue, Sacramento, California  95___

322

naire.  A question on amount of EMC experience was in-
cluded in the July 1981 statewide survey to further iden-
tify those having had direct EMC experience.

The Survey was administered to judges, prosecutors, defense
attorneys, and jurors.  For judges, it was decided that
the entire population of Superior Court judges would be
surveyed (approximately 600 judges) since this court level
would receive the majority of requests for EMC.  (Addi-
tionally, Municipal and Justice Court judges having direct
EMC experience were surveyed.)  For attorneys, a sample
of approximately 250 prosecutors and 250 defense attorneys
was mailed surveys.

The EMC juror Survey, reproduced as Figure II-4, con-
tained fewer data items than the judge/attorney survey
because the evaluation advisory committee wished to mini-
mize the response time burden imposed on individuals
"outside" the judicial system.  The juror survey, in one
sense, may be considered as a survey of the public-at-
large, particularly with respect to the public's role as
prospective jurors.

As a means of obtaining baseline, or control data for
the prospective juror's (public-at-large) attitude toward
media coverage of trials, a survey was constructed with
items paralleling the EMC survey but referring to "news
reporters and sketch artists (conventional media cover-
age).  This survey (reproduced as Figure II-5) was admin-
istered to approximately 400 persons in juror pools
prior to July 1, 1980.

The EMC prospective juror survey with "radio, television,
and still cameras" items was administered to approximately
1,100 individuals in juror pools between July 1, 1980
and July 1, 1981.

-32-

323

FIGURE II-4

Juror Attitudinal Questionnaire
EMC

| Name/No. | Court | Date |
|---|---|---|
| | | |

## BACKGROUND INFORMATION

1. Have you ever served on a jury? _____ Yes _____ No
   If yes, what type of case? _____

2. What amount of media coverage did the case receive?
   _____ Don't know _____ None _____ Some _____ Extensive

3. What media (television, radio, newspapers) do you remember as covering that
   proceeding? _____

4. You sex: _____ Male _____ Female

5. Your age: _____ under 25 _____ 25-34 _____ 35-44 _____ 45-54 _____ 55/over

6. Education: No formal schooling
   Elementary School: 1  2  3  4  5  6  7  8
   High School: 9  10  11  12
   College Degree: 13  14  15  16          (Circle highest
   Graduate Degree: _____         grade completed)
                    (please specify)

7. Your Occupation: _____

## QUESTIONNAIRE

1. The presence and operation of television cameras, still cameras, and radio equip-
   ment will lead to disruption of courtroom proceedings.
   _____ Strongly Agree _____ Agree _____ No Opinion _____ Disagree _____ Strongly Disagree

2. Juror's decision-making will be influenced by their friends' and acquaintances
   attitudes about the case because of television, radio, and still camera coverage
   of the trial.
   _____ Strongly Agree _____ Agree _____ No Opinion _____ Disagree _____ Strongly Disagree

3. Allowing television cameras, still cameras, and radio equipment in the courtroom
   will make people more apprehensive about participating in legal processes.
   _____ Strongly Agree _____ Agree _____ No Opinion _____ Disagree _____ Strongly Disagree

4. Allowing televison cameras, still cameras, and radio equipment in the courtroom
   will motivate witnesses to be truthful in their testimony.
   _____ Strongly Agree _____ Agree _____ No Opinion _____ Disagree _____ Strongly Disagree

-33-

324

5. Allowing television cameras, still cameras, and radio equipment in the courtroom will increase jurors' attentiveness to testimony.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

6. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect sentencing decisions.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

7. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause judges to avoid unpopular positions or decisions.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

8. Allowing television cameras, still cameras, and radio equipment in the courtroom will lead to increased distraction of participants.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

9. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect my willingness to serve as a juror.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

10. Allowing television cameras, still cameras, and radio equipment in the courtroom will not affect my ability to judge wisely the merits of the case.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

11. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect the outcome of trials.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

12. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause me to have to defend my actions as a juror.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

13. Allowing television cameras, still cameras, and radio in the courtroom will not affect a judge's ability to maintain courtroom order.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

14. Allowing television cameras, still cameras, and radio in the courtroom will cause witnesses to be overly guarded in their testimony.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

FIGURE II-5

Juror Attitudinal Questionnaire
Conventional

| Name/No. | Court | Date |
|---|---|---|
| | | |

BACKGROUND INFORMATION

1. Have you ever served on a jury? ____ Yes   ____ No
   If yes, what type of case?_____

2. What amount of media coverage did the case receive?
   ____Don't know    ____None    ____Some    ____Extensive

3. What media (television, radio, newspapers) do you remember as covering that
   proceeding?_____

4. You sex: ____Male    ____Female

5. Your age:____under 25    ____25-34    ____35-44    ____45-54    ____55/over

6. Education:  No formal schooling____
              Elementary School:  1  2  3  4  5  6  7  8
              High School:  9  10  11  12
              College Degree:  13  14  15  16                (Circle highest
              Graduate Degree:_____              grade completed)
                          (please specify)

7. Your Occupation:_____


QUESTIONNAIRE

1. The presence of reporters and sketch artists will lead to disruption of
   courtroom proceedings.
   ____Strongly Agree    ____Agree    ____No Opinion    ____Disagree    ____Strongly Disagree

2. Juror's decision-making will be influenced by their friends' and acquaintances
   attitudes about the case because of reporters and sketch artists coverage of
   the trial.
   ____Strongly Agree    ____Agree    ____No Opinion    ____Disagree    ____Strongly Disagree

3. Allowing reporters and sketch artists in the courtroom will make people more
   apprehensive about participating in legal processes.
   ____Strongly Agree    ____Agree    ____No Opinion    ____Disagree    ____Strongly Disagree

4. Allowing reporters and sketch artists in the courtroom will motivate witnesses
   to be truthful in their testimony.
   ____Strongly Agree    ____Agree    ____No Opinion    ____Disagree    ____Strongly Disagree

-35-

326

5. Allowing reporters and sketch artists in the courtroom will increase jurors' attentiveness to testimony.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

6. Allowing reporters and sketch artists in the courtroom will affect sentencing decisions.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

7. Allowing reporters and sketch artists in the courtroom will cause judges to avoid unpopular positions or decisions.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

8. Allowing reporters and sketch artists in the courtroom will lead to increased distraction of participants.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

9. Allowing reporters and sketch artists in the courtroom will affect my willingness to serve as a juror.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

10. Allowing reporters and sketch artists in the courtroom will not affect my ability to judge wisely the merits of the case.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

11. Allowing reporters and sketch artists in the courtroom will affect the outcome of trials.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

12. Allowing reporters and sketch artists in the courtroom will cause me to have defend my actions as a juror.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

13. Allowing reporters and sketch artists in the courtroom will not affect a judge's ability to maintain courtroom order.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

14. Allowing reporters and sketch artists in the courtroom will cause witnesses be overly guarded in their testimony.

___Strongly Agree   ___Agree   ___No Opinion   ___Disagree   ___Strongly Disagree

327

Both the General Attitudinal Survey (judges, prosecutors,
and defenders) and the General Attitudinal Questtionaires
(jurors) were designed to be subjected to a number of
analytic procedures.  It was suspected that the attitudes
toward EMC by the various groups tested would be multi-
factor in nature.  The cornerstone of the analysis proce-
dure was Factor Analysis, a process which reduced the
number of variables (the items on the instruments) by
summarizing the interrelationships among items on the
instrument and grouping those which are highly correlated
with one another.  A small number of factors resulted,
which by virtue of their small number was an aid in
understanding what the attitude measures mean, since the
information could then be presented parsimoniously.

The attitude factors derived from the General Attitudinal
Survey were then ready for further analyses.  Rates of
change in pre to post scores between and within the pro-
fessional occupational groups were examined for descrip-
tive and inferential purposes.  Amounts of change and
significance of the changed amounts of attitude measures
within occupational groups were identified.  Changes as
a result of the passage of time and changes as a result
of experience with or inexperience with EMC events were
assessed using factor scores.  Predictions were attempted
using response patterns on the survey to classify respond-
ents into occupational groups as a test of group homo-
geneity in attitudes.

Although the General Attitudinal Questionnaire (jurors)
was designed primarily as descriptive instruments since
no pre to post testing was possible on the same subjects,
the Factor Analysis procedure was applied to these instru-
ments as well to reduce the number of variables.  The

-37-

attitude factors for the EMC groups were further analyzed:
experienced and inexperienced jurors were compared using
the grouped factor means.

In addition, frequency distributions of patterns of response
among the items for the subgroups in the juror sample were
computed and examined for their descriptive power.  Cross-
tabulations between demographic variables and Question-
naire items were computed and examined to identify inter-
relationships between logically linked information.
Individual item frequency distributions were computed so
that the response patterns between EMC Experienced
and Inexpereienced groups could be compared for descrip-
tive purposes and, possibly, for inferential purposes.

C.   Summary

This evaluation project conceived an integrated research design
to assess the effects of EMC on trial participants and the
California justice system.

Attitudes toward EMC provided the emotional arena or field
within which the technical "cameras in the courtroom" experi-
ment would be held.  Thus, it was critical to tap the funda-
mental elements of attitudes toward EMC held by three groups
of key players in the system:  Judges, Attorneys, and Jurors.
Little would be gained in understanding the meaning of the
study of specific EMC events without knowing the attitudinal
dimensions of the "field" in which the events occurred.

The EMC events and the participants themselves were the focus
of the evaluation.  Events were attended by project staff
and direct observations were taken on specific behavioral
and environmental phenomena while the EMC event was in pro-
cess.  After the event was over, personal interviews were

-38-

329

conducted with key actors of the event to ascertain their
perceptions and to listen to their report on their own exper-
ience.  The evaluator observations and the participant reports
were cross-checked against each other and viewed in the con-
text of the attitudinal field.

The emerging three-dimensional picture provided a relatively
complete view of the extended media coverage experiment in
the California courts.  The analysis encompassed general
attitudinal background and a series of specific events, seen
on the one hand from the expert observer viewpoint and on
the other hand from the participant viewpoint.  A complete
picture developed by combining all the events together, con-
trasting event data with attitude changes, and identifying
the realistic interplay among the salient forces at work in
the EMC phenomenon.

III.  FACTUAL SUMMARY OF THE EXPERIMENTAL YEAR

A.  Introduction

Before presenting an analysis of evaluation data (surveys,
interviews, and observations), this section offers a brief
summary of pertinent factual information about the California
experiment so that a contextual framework is developed for
presentation of the data analyses.  The time period discussed
is one year, from July 1, 1980, through June 30, 1981.

Descriptive data are presented for:

   ● EMC total requests and "actual events" activity volume
     (including consent rates and reasons for denials); and

   ● distribution of EMC requests and "actual events" by pro-
     ceeding stage, type of media present, court level, geog-
     raphy (county), and "amount" of media coverage.

Subsequently, facts and observations about certain aspects of
the experimental year are reported: logistical considerations
in implementing extended coverage; instances of "violations"
or relaxations of the rules for EMC, and instances of restric-
tion imposed on extended media beyond those set forth in the
Rules of Court.  Finally, a brief description of the cases
receiving EMC from which evaluation data were collected is
presented with emphasis on the "major cases" as defined by
the evaluation.

Data indicative of the volume and nature of EMC activity
throughout the year come from two sources: 1) Request Activity
Records (copies of request forms submitted to the court and

-40-

331

telephone notification forms generated by the evaluation
team), and 2) descriptive analysis of the EMC cases on
which evaluation data were collected.

B. Total Requests and "Actual Events" Activity Volume

The rules governing the experiment required that a request
for extended coverage be in writing.  A form subsequently
designed by the Administrative Office of the Courts included
a certification section of requestor notification of the eval-
uators by telephone and by forwarding to them a copy of the
request form.  Although compliance with this notification re-
quirement did not occur with every request, indications are
that the preponderance of requests were made known to the
evaluation team, perhaps in the neighborhood of 80% of all
requests.  The evaluators followed up on these known requests
by determining whether or not an actual EMC event would or
had transpired and by extracting observational and/or inter-
view data from the case.

As shown in Figure III-1, a grand total of 344 requests were
lodged with the courts during the one year period with just
over 200 of these resulting in actual EMC events.  Of this
number, evaluation data (i.e. observations and interviews)
were collected on 102 cases (50%).  Analysis of these two
data sets (request records and descriptive evaluation data)
yields an informative description of EMC activity volume and
characteristics.

Figure III-1 shows request volume, actual events, denials,
and an "other" category for each of the year's four quarters.
The quarterly breakdown is essential to understanding the
flow of activity volume because the removal of the party con-
sent requirement for criminal cases midway through the year rad-
ically changed the EMC request volume level of the experiment

-41-

332

Experimental Year
EMC Request Volume and Dispositions

|  | Total Requests | Consent/ EMC Events | Denials | Other* (Dropped/ Dismissal) |
|---|---|---|---|---|
| **1st QUARTER:** | | | | |
| Civil | 46 | 40 | 4 | 2 |
| Criminal | 52 | 6 | 43 | 3 |
| Total | 98 | 46 | 47 | 5 |
| **2nd QUARTER:** | | | | |
| Civil | 14 | 10 | 2 | 2 |
| Criminal | 15 | 5 | 10 | 0 |
| Total | 19 | 15 | 12 | 2 |
| **3rd QUARTER:** | | | | |
| Civil | 16 | 12 | 2 | 2 |
| Criminal | 89 | 59 | 21 | 9 |
| Total | 105 | 71 | 23 | 11 |
| **4th QUARTER:** | | | | |
| Civil | 9 | 5 | 1 | 3 |
| Criminal | 96 | 62 | 19 | 15 |
| Total | 105 | 67 | 20 | 18 |
| **YEAR:** | | | | |
| Civil | 85 | 67 | 9 | 9 |
| Criminal | 252 | 132 | 93 | 27 |
| Total | 337 | 199 | 102 | 36 |
| Appellate | 4 | 2 | 2 | 0 |
| Juvenile | 3 | 2 | 1 | 0 |
| GRAND TOTAL: | 344 | 203 | 105 | 36 |

*Case was settled or dismissed, or media lost interest in EMC of case.

-42-

In the first quarter, there were 58 EMC requests, evenly
split between civil and criminal case events.  The party
consent requirement presented an effective barrier in crim-
inal cases--almost all the requests were denied.  Civil case
requests fared well--judges gave consent in almost all cases
(40 of 46).  Much of the first quarter activity volume, how-
ever, is attributable to the "novelty effect" whereby the
new found media opportunity for courtroom access generated
many requests in which the story being pursued was "cameras
in the courtroom" itself.

In the second quarter, activity volume slowed to a snail's
pace.  Interest in civil cases diminished substantially (14),
with ten of these resulting in actual events.  Criminal case
requests parallelled civil activity (15), with five of these
resulting in a cameras in the courtroom experience.  Evidently,
the media tired of failing to gain access in criminal case
events and virtually gave up trying.

On February 1, 1981, one month into the third quarter, the
party consent requirement for criminal cases was removed.
January had witnessed a dearth of request activity and virtu-
ally all of the upsurge in the third quarter volume occurred
in February and March, 1981.  The media's interest focused
on criminal cases; 89 requests were made and in 59 of these
an actual EMC event subsequently took place.  This "success
rate" of 66% is vastly greater than the rate under the party
consent rule although not quite as high as the "success rate"
for civil cases as measured by the year's total (67 actual
events out of 85 requests--79%).  Evidently, judges tend to
exercise more caution in criminal cases than in civil cases
in granting EMC.[23]

---

[23] To compute a "consent rate" as opposed to a "success rate"
one would eliminate the "other" category and figure consents
as a percentage of consents plus denials.  The results of
this computation support the notion that the civil case con-
sent rate is higher than the criminal case consent rate even
under a no party consent rule.

-43-

334

In the fourth quarter, activity volume remained strong,
showing the same total requests as in the third quarter.
The shifting of media interest to criminal cases is even
more pronounced--96 criminal and 9 civil case requests.
The criminal case "success rate" remained stable (65%).

Although some of the third quarter activity is attributable
to a "novelty effect" associated with new found access to
criminal cases, one may safely assume that EMC activity in
the third and fourth quarters is indicative of a level of
activity which may be expected at least for the near future,
so long as a no party consent rule prevails. About 100
requests per quarter may be expected with about two-thirds
of these resulting in EMC events. These will be predominantly
criminal case EMC events.

Surprisingly, very little interest was shown by the media in
EMC of appellate court proceedings. Two of four requests
were granted, both in the Court of Appeals in Los Angeles.
Two requests to the Supreme Court were made; both were denied.[24]
Not surprisingly, little interest was demonstrated for EMC
of juvenile case proceedings (wherein caution and sensitivity
by the court prevail) although two of three requests submitted
were granted. Both were for a feature story and not a story
on the particular case covered.

## The Consent Decision Process

Under the rules of the experiment, electronic and photographic
media were required to obtain consent for EMC; *carte blanche*
access to courtroom proceedings, as is afforded news reporters
and sketch artists, was not the rule. In the first seven
months of the experiment, during which a party consent rule
prevailed, a consent form had to be signed by the prosecutor

---

[24] The Supreme Court subsequently permitted extended coverage
of oral arguments in September 1981.

and defendant, and the most common form of "denial" was
inability to get the parties to sign the form.  The need
for a judge ruling on the request was at that point obviated.
After party consent was removed, the consent burden in crim-
inal cases shifted to the judge.

The rules state that judge "consent shall be in writing,
filed in the record of the proceedings, and recorded in the
minutes of the court"--980.2(f)(1).  This recording took the
form of a written order, minute record, or memorandum made
part of the record.  Orders granting EMC were usually brief,
unless certain restrictions restating or going beyond the
rules were incorporated.

Reasons for denying EMC were sometimes articulated in a denial
order.  In a few cases, hearings on the request issue were
held for which a record was made of argument from requesting
media and objecting attorneys.  Occassionally, briefs from
objecting attorneys were filed advocating denial. (Examples
of EMC orders, EMC related minutes, and EMC hearings on the
record are found in Appendix E).

Reasons for judge denial range from the general to the specific:

- a sensitivity apparent in that particular case (probable
  witness intimidation or embarrassment or concern for
  identification of witnesses or defendants from EMC);

- process problems (e.g. request not submitted a reasonable
  time in advance);

- deference to objecting attorneys or parties;[25] or

- general opposition to "cameras in the courts" for all or
  a certain class of cases (e.g. criminal case exclusion
  only).

---

[25]There also were several instances in which a judge granted
EMC over strong objection of counsel.

-45-

336

In summary, the California experiment in its first year
generated a substantial amount of EMC, reflecting both a
party consent and no party consent status (seven months
and five months, respectively). Clearly, a criminal case
party consent requirement results in little overall EMC
activity--the media appears much more interested in criminal
than civil cases. The bifurcation of the experimental year
by party consent requirement permits a conclusion on the
basic and perhaps obvious assertion that criminal defendants
and their attorneys generally do not want EMC of their court
proceedings. Because party consent in criminal cases was
removed, EMC ultimately occurred in over 200 proceedings,
an experience base large enough to produce meaningful eval-
uation results.

C. Characteristics of EMC Events

What are the characteristics of extended media coverage
activity? Prior discussion of activity volume revealed the
civil/criminal breakout of EMC events; other characteristics
of the EMC requests and actual events are discussed below.

   1. What proceeding stages of adjudication received EMC?

Tables III-2A and III-2B contain a frequency distribution
of EMC by proceeding stage from request activity data and
from EMC evaluation data. The two tables show a similar
pattern. In civil cases, motion hearings attract sub-
stantial coverage, often because a "social issue" story
is being sought. "Social issue" suits, slander/libel
cases, and numerous other types of civil cases are among
the civil trials receiving EMC. In criminal cases, an
even distribution among proceeding stages is evident.
Arraignments, preliminary hearings, motions hearings,
trials, and sentencings all received a sizeable portion
of total EMC activity.

-46-

337

TABLE III-2A

EMC Requests Proceeding Type Analysis From Request Record Data*

| Quarter | C I V I L | | | C R I M I N A L | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Motion | Civil Trial | CIVIL TOTAL | Arraign. | Motion | Prelim. Hearing | Trial | Sent. | CRIM. TOTAL |
| 1 | 33 | 10 | 43 | 6 | 2 | 14 | 19 | 4 | 45 |
| 2 | 6 | 2 | 8 | 4 | -0- | 5 | 4 | 1 | 14 |
| 3 | 6 | 3 | 9 | 19 | 5 | 25 | 21 | 18 | 88 |
| 4 | 2 | 1 | 3 | 14 | 5 | 18 | 18 | 24 | 79 |
| YEAR: | 47 | 16 | 63 | 43 | 12 | 52 | 62 | 47 | 216 |
| PCT: | 75% | 25% | 100% | 20% | 5% | 24% | 29% | 22% | 100% |

*Data available for 279 out of 337 requests.

338

FIGURE III-2B

Distribution of Cases by Proceeding Stage:
Cases on Which Evaluation Data Were Collected
(Civil vs. Criminal)

| | CIVIL | | | CRIMINAL | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Motion | Trial | CIVIL TOTAL | Arraign. | Motion | Prelim. Hearing | Trial | Sent. | TOTAL CRIMINAL |
| Abs. Freq. | 17 | 15 | 32 | 12 | 15 | 6 | 27 | 9 | 69 |
| Pct: | 53% | 47% | 100% | 17% | 22% | 9% | 39% | 13% | 100% |

-48-

339



2.  What type of EMC (television, still camera, radio)
    was applied to the proceedings?

Data for this characteristic are not exact. However, the
pattern apparent in the evaluation data is clear (see
Table III-3). Television is the most common presence
at EMC events (TV only or in combination with still cam-
eras, radio), although still camera presence (alone or
in combination), is substantial (about half as frequent
as television cameras). A large number of events have
multiple EMC types present (TV and still cameras or TV,
still cameras and radio)[26]. Only a few "radio only"
requests were submitted (approximately 7).

TABLE III-3

EMC Type Analysis
(From Evaluation Data)

|  | Abs. Freq. | Pct. |
|---|---|---|
| TV Camera Only | 29 | 29% |
| Still Camera Only | 14 | 13% |
| TV & Still Camera | 39 | 38% |
| TV Camera, Radio, & Still Camera | 19 | 19% |

---

[26] One difficulty in determining EMC type distribution involved
the participation of radio, since radio coverage involves no
camera presence to signal its presence.

-49-

340

3. What is the distribution of EMC events by court level?

Table III-4 shows that EMC in Superior Court is about twice as frequent as in a lower court (only two appellate court EMC events took place). First appearances and preliminary hearings for felonies in Municipal Court (cases which later were bound over to Superior Court) are a sizeable number of the lower court EMC events. Thus, it appears that the media are interested primarily in felonies at both the lower court and Superior Court levels and in major civil cases (those which are heard at the Superior Court).

## TABLE III-4

### EMC Court Level Analysis
### (From Evaluation Data)

|  | Civil Cases | Criminal Cases | Total |
|---|---|---|---|
| Lower Court | 5 | 32 | 37 |
| Superior Court | 27 | 37 | 64 |
| TOTAL | 32 | 68 | 101 |

4. What is the geographic distribution of EMC activity?

Figure III-5 lists EMC requests by county. EMC occurred statewide with pockets of high volume apparent. Fresno

-50-

341



TABLE III-5

EMC Geographic Distribution (From Request Records)

| *County | Superior Court | Municipal Court | Justice Court | Total | Percentage |
|---|---|---|---|---|---|
| Alameda | 10 | 11 | 1 | 22 | 6.7% |
| Amador | 1 | --- | --- | 1 | .3% |
| Butte | 6 | 5 | 1 | 12 | 3.7% |
| Contra Costa | 2 | 3 | --- | 5 | 1.5% |
| El Dorado | 2 | --- | --- | 2 | .6% |
| Fresno | 25 | 16 | 1 | 42 | 12.8% |
| Glenn | 1 | --- | --- | 1 | .3% |
| Humboldt | 5 | --- | --- | 5 | 1.5% |
| Imperial | 2 | 1 | --- | 3 | .9% |
| Kern | 6 | 2 | --- | 8 | 2.4% |
| Los Angeles | 55 | 27 | --- | 82 | 25.1% |
| Madera | 2 | --- | 1 | 3 | .9% |
| Marin | 4 | 2 | --- | 6 | 2.1% |
| Monterey | 1 | 1 | --- | 2 | .6% |
| Nevada | 2 | --- | --- | 2 | .6% |
| Orange | 11 | 1 | --- | 12 | 3.7% |
| Riverside | 10 | --- | --- | 10 | 3.1% |
| Sacramento | 10 | 2 | --- | 12 | 3.7% |
| San Bernardino | 1 | 1 | --- | 2 | .6% |
| San Diego | 3 | 2 | --- | 5 | 1.5% |
| San Francisco | 9 | 6 | --- | 15 | 4.6% |
| San Joaquin | 2 | 7 | --- | 9 | 2.8% |
| San Luis Obispo | 1 | 1 | --- | 2 | .6% |
| San Mateo | 4 | --- | --- | 4 | 1.2% |
| Santa Barbara | 4 | 4 | --- | 8 | 2.4% |
| Santa Clara | 9 | 2 | --- | 11 | 3.4% |
| Santa Cruz | --- | 5 | --- | 5 | 1.5% |
| Shasta | 3 | 2 | --- | 5 | 1.5% |
| Solano | 2 | --- | --- | 2 | .6% |
| Sonoma | 1 | 2 | --- | 3 | .9% |
| Stanislaus | 3 | 2 | --- | 5 | 1.5% |
| Tehama | 3 | --- | --- | 3 | .9% |
| Trinity | 1 | --- | 1 | 2 | .6% |
| Tulare | --- | 1 | --- | 1 | .3% |
| Tuolumne | 1 | --- | --- | 1 | .3% |
| Ventura | 5 | 2 | --- | 7 | 2.1% |
| Yolo | 5 | --- | --- | 5 | 1.5% |
| Yuba | 2 | --- | --- | 2 | .6% |
| TOTAL: | 214 | 108 | 5 | 327 | 100% |
| Information Not Available: | 5 | | | | |

*The following counties are not listed because, to the knowledge of the evaluation team, no EMC events occurred there: Alpine, Calaveras, Colusa, Del Norte, Inyo Kings, Lake, Lassen, Mariposa, Mendocino, Merced, Modoc, Mono, Napa, Placer, Plumas, San Benito, Sierra, Siskiyou and Sutter.

-51-

342

was notably active and expectedly, Los Angeles accounts
for a great many requests (25%). San Francisco and San
Diego volume seems disproportionately low, but this is
explained partially by the fact that evaluator notifica-
tion compliance was worse in these areas than in some
other parts of the state.[27]

5.  What is the variance in "amount" of EMC afforded each
    proceeding?

"Amount" of EMC refers to a) continuousness of coverage,
and b) numbers of media organizations participating in
an EMC pooling arrangement.  Substantial variance in
"amount" of EMC took place.  Most "major" events
lasted several days or weeks and received continuous
EMC.  Other events of similar duration received intermit-
tent EMC, and many events were short proceedings (less
than one-half day) in which extended media were present
throughout.

In the group of EMC cases on which observational and inter-
view data were taken (102), there were 33 intermittent
EMC events and 67 events with continuous coverage, of
both short and long duration.  In a few cases, EMC was a
"once only" application.

Another indicator of the "amount" of EMC is the "impor-
tance rating" assigned to each case by the evaluators.
This rating, established for use in analyzing subsets
of cases, was based upon several factors, two of which
were the continuousness of the extended coverage and
the number of media organizations participating in pool

---

[27]This fact surfaced through discussions with judges
and media representatives in these areas.

-52-

343

coverage (i.e. "amount" of EMC).  (Other factors included
the proceeding stage--e.g. trials weighted heavier than
arraignments--and the duration of the proceeding).  "Im-
portance rating" distribution, shown in Table III-6 is
evenly varied.


TABLE III-6


"Importance" Rating of EMC Events

|  |  | Abs. Freq. | Pct. |
|---|---|---|---|
| Low Import | 1 | 12 | 12% |
|  | 2 | 16 | 16% |
|  | 3 | 28 | 27% |
|  | 4 | 16 | 16% |
|  | 5 | 11 | 10% |
|  | 6 | 8 | 8% |
|  | 7 | 4 | 4% |
|  | 8 | 3 | 3% |
| High Import | 9 | 4 | 4% |


In summary, EMC does not occur in a singular manner.
Rather, the "amount" of coverage occurs across a broad
range, from a single still camera present once during
a proceeding to a pool of TV cameras, still cameras,
and radio presence covering the proceeding continuously
for 25-30 media organizations.


-53-

344

6.   What uses were made of EMC output (videotape and photographs)?

Extended coverage encompasses both media and educational applications.  To the evaluators' knowledge, only one extended coverage event of a purely educational nature took place. In Yolo County, a wrongful death civil suit was videotaped in its entirety for the University of California at Davis Law School.  All other EMC requests were from media organizations or independent journalists.

Far and away the predominant use of TV EMC was for the daily news story on a specific case of interest.  In about fifteen cases, the EMC was for a feature story (excluding a group of requests at the outset of the year due to the novelty effect, i.e. a story on "cameras in the courts".) Rarely was a court proceeding videotaped and aired in its entirety.  The Cable News Network did so for a few of the most major (high publicity) events.

The evaluation employed a newspaper clipping service to monitor print media coverage of the experimental year.  A total of 485 articles were identified and grouped into three categories:  1) a story about "cameras in the courts", the experimental year, or an editorial on the subject (not case specific); 2) a story about a particular case but having the "cameras in the courts" storyline as a primary or secondary aspect (usually accompanied by in-court photograph); and 3) a completely case-specific story using an in-court photograph (no "cameras in the courts" storyline).  The frequencies and percentages for each of these categories are:

-54-

345

|                                  | Abs. Freq. | Pct. |
|----------------------------------|------------|------|
| "Cameras in courts" story only   | 147        | 29%  |
| Mixed case specific/ cameras story | 329      | 69%  |
| Case specific only               | 9          | 2%   |
| Total                            | 485        | 100% |

Clearly, the phenomenon of cameras in the courts--TV
and still camera--captured the attention of the print
media for much of the experimental year.  As directed, no
content analyses were conducted of television EMC, but
it was apparent that the "cameras in the courts" story-
line was of major interest there as well.  The "novelty
effect" was indeed strong; much attention was focused by
the media on the EMC phenomenon itself.

D.  Process Observation

Since a primary feature of the research design was for evalu-
ators to be on site observing "cameras in the courts" events,
much information was accumulated on the process of implement-
ing extended coverage.  Therefore, some factual reporting and
observations emerging from cumulative experience may be made.
Three subject areas warrant comment:  logistical considerations,
instances of limited or terminated EMC, and instances of rule
"violations" or relaxations.

1.  Logistical Considerations

To achieve a smoothly executed EMC event, planning and
preparation are critical, particularly in major EMC cases.
Coordination with the media, primarily through the
media representative, served to avoid logistical

-55-

346

problems or surprises. In some cases, this consumed
judge time, but more commonly, the time of court person-
nel (court administrator/courtroom staff) was devoted to
the task. Fielding media inquiries, facilities arrange-
ments, courtroom seating arrangements, and equipment
placement are among the items which must be handled in
an organized fashion. Instructions to the media regard-
ing governing rules and restrictions were not required
of the court, but often turned out to be a wise invest-
ment of time and effort.

In some of the major EMC events a separate room was used
for the media participating in pool coverage. This
practice tended to diminish in-court equipment needs and
alleviated hallway equipment clutter and confusion. In
one major case, tried in a courtroom where in-court
public seating was limited, the use of an extra room for
the public in which they could view a monitor proved to
be a good idea.

In-court equipment placement generally was easily accom-
modated. Several typical configurations were used, the
most common of which was the placement of a TV camera
"over the shoulder" of the jury and placement of a still
camera in the front row of the audience. Figures III-8A-
III-8G show some of the configurations used in the
major EMC events. Microphone use was sometimes an issue
requiring negotiation, especially when the media wished
to use a clip-on microphone for attorneys. Placement of
a microphone on the counsel table sometimes raised con-
cerns about the attorney/client communication privilege.
In some instances, this concern was eliminated by use of
a microphone with an on/off switch.

-56-

347

TABLE ...T...
EMC LAYOUT IN
BURNETT V. NATIONAL ENQUIRER

Witness

Judge

Court Reporter

Clerk

Jury

Counsel Table

Defense          Plaintiff

Court Per.

This side reserved for media

Los Angeles Superior Court
-57-

348



Los Angeles Superior Court
Torrance Branch
-58-

TABLE III-8C

EMT LAYOUT IN
PEOPLE V. PARNELL



Alameda County Superior Court
Hayward Branch

350



EMG LAYOUT
PEOPLE V. POE
(Opening and Closing Arguments Only)

Sacramento Superior Court

-60-

351

TABLE III-8E

EMC LAYOUT IN
PEOPLE V. McDERMOD



Marin County Superior Court

-61-

352



EMC LAYOUT IN
PEOPLE V. SNYDER

Los Angeles Municipal Court

-62-



TABLE III-8C

EMC LAYOUT IN
MICHEL V. DILLARD

Yolo County Superior Court

354

Although equipment placement rarely raised a problem,
it is evident that existing courtrooms are not designed
to accommodate cameras and microphones. Obtrusiveness,
an issue discussed at length later in this report, could
be almost entirely eliminated if courtroom design reflect-
ed planning for EMC equipment and operators--perhaps by
embedding cameras in the walls and providing a glass
enclosed viewing booth for operators. If electronic/
photographic coverage becomes a regular phenomenon in
California's judicial system, courtroom design would do
well to incorporate accommodating features.

2. Instances of Restricted Coverage

The governing rules for the experiment set forth numerous
guidelines and restrictions for extended coverage (dis-
cussed in detail in Section I). In some instances, how-
ever, judges went beyond the rules and imposed additional
restrictions on EMC, as is their prerogative. These
restrictions often reflected the negotiation process
between media and courts which can occur in the decision
of consent. Ten notable instances of restricted coverage
came to the attention of the evaluation team, as described
below.

> **People v. Cassazza et al.** Cameras were excluded for
> a motions hearing held outside the presence of the
> jury. The judge wanted to guard against contamina-
> tion of the jury by inadvertent exposure to coverage
> of the hearing.
>
> **People v. Miranda.** The media agreed not to televise
> or photograph witness faces. Fear of reprisals was
> the reason.
>
> **People v. Miller.** The media agreed to televise or
> photograph only the back of the defendant's head.
> Identification of defendant issues led the defense
> to assert that EMC presence would jeopardize a right
> to a fair trial.

People v. Miller.  The defendant was permitted to wear a mask over his head during an EMC proceeding to avoid identification.

People v. Bittaker.  No televising or photographing of the jury was permitted.

People v. Young.  No televising or photographing of the jury was permitted and the judge stated that objections to EMC from a witness would result in no EMC of that witness.  No witness objections subsequently were raised.  For a portion of the proceeding, the defendant objected to EMC of himself and the judge invoked that restriction.  The defendant later changed his mind and EMC of him was permitted.

People v. Allen.  The judge restricted EMC of certain witnesses.

People v. Edelbacher.  The testimony of a rape victime was restricted from EMC.

People v. Smith.  Still camera photographs were permitted only during the swearing in of a witness at the beginning of a proceeding.

People v. Robbins.  The judge excluded EMC of the jury and of all testimony.  EMC of young women testifying about explicit sexual matters was deemed to be inappropriate because of likely embarrassment of the young women and because the content of testimony was deemed unsuitable for public airing.

There were no instances in which EMC was terminated after access was granted.  No restrictions beyond those set by the rules were imposed on any civil case EMC event.

3.  "Violations" or Relaxations of EMC Rules

Although it was not the function of evaluation team observers to enforce the rules governing the experiment, instances in which the rules were violated by the media or relaxed by the judge were noted in the course of collecting observational data.  It cannot be said that such

-65-

356

instances were excessive.  Of the 102 cases for which
observational and/or interview data were collected,
violation or relaxations occurred in about 10 cases.
In no instance did the violation or relaxation disrupt
the proceeding to an obvious extent.  Some examples of
the violations and relaxations follow.

- In one civil motions hearing, three still photographers
  were allowed in, all of whom moved freely about the
  courtroom.

- Artificial lights were permitted in two major EMC
  events, both in Sacramento where the courtroom
  lighting is particularly dim.

- Hand held tape recorders were used in at least three
  different cases.

- The judge in one case complained of the distraction
  caused by the excessive movement of the still photo-
  grapher.

- In one criminal case, three still photographers and
  a radio tape recorder were permitted.

- In a civil family law hearing, several mini-cams were
  allowed in the courtroom.  (The courtroom is particu-
  larly large.)

As may be gleaned from the above, the instances of viola-
tions or relaxations occurred at times with the permission
of the judge.  At other times, the judge was simply una-
ware of the full content of the rules.

The number and severity of rule violations is not alarm-
ing.  The year's experience demonstrates that the rules
are sufficiently strict in controlling the presence and
behavior of extended media.  In no case did the evaluators
receive complaints that the rules are not strict enough
or are incomplete.  The one exception to this is with

-66-

the models of still cameras allowed.  As will be ad-
dressed later in this report, still camera shutter noise
was distinctly noticeable in numerous proceedings.
Otherwise, the rules were more than adequate in control-
ling obtrusiveness and distraction of EMC.

E.   Summary Description of EMC Cases

The cases receiving extended media requests and subsequent
coverage have been described in the aggregate by case type,
proceeding stage, and a number of other characteristics.
This evaluation necessarily considers its subject in the
aggregate, but when addressing the judicial process, one
must not lose sight of the individuality of each case.  To
the participants in a court proceeding, the case at hand is
unique, and for many litigants, witnesses, and jurors, it
may be their only courtroom experience.

Although this evaluation is not a series of case studies,
the evaluators attempted to look at each EMC experience in
the context of that individual case.  It is neither feasible
nor necessary to report on the facts and issues of all the
cases studied, but it is worthwhile to make summary observa-
tions about the content of the EMC cases during the experi-
mental year.  As indicated in the following narrative, the
experiment succeeded in encompassing the full range of court
proceedings which are of interest to the public and the media.

In criminal cases, the sensational or heinous crime case type
constituted a large portion of the proceedings receiving
EMC.  Foremost among these was People v. Bittaker, in Los
Angeles County, a case involving the murder, torture, and
rape of five teenage girls.  The jury trial began several
weeks before the party consent rule was removed and origin-

-67-

ally consent was denied.  After party consent removal,
the judge permitted EMC, which captured much of the
defendant's testimony, closing arguments, and later
on, the sentencing.  The facts of the case were particu-
larly gruesome and the issue of media restraint in pre-
senting overly sensational coverage of the case was
tested.  When interviewed, the defendant raised concerns
about personal safety while in prison due to identifica-
tion through EMC exposure.  (Bittaker was convicted on
all counts.)

Another major "sensational crime" case was People v.
Parnell, tried in Alameda County but involving the kid-
napping of a child in Mendocino County.  Mr. Parnell also
is accused of kidnapping a young boy from Merced County
who then lived with him for seven years.  Extended media
was present throughout this jury trial and publicity
was generated statewide.  (Parnell was convicted in the
Mendocino case; the Merced case is still pending.)

There were many EMC events involving a murder charge
which were of high local interest only.

The very first criminal trial receiving EMC was in Kern
County in which a woman named Sandra Nickell was accused
of murdering her husband.  Her defense was self-defense
in that the husband regularly abused her.  The interest-
ing legal and social issues associated with the case
brought it high publicity, exacerbated by the fact that
it was the first "cameras in the courts" criminal trial.
That trial ended in a mistrial (hung jury) and Ms. Nickell
was acquitted in her second trial.

... People v. Carpenter case (the "trailside killer"
case) occurred late in the experimental year.  First
appearances were covered by extended media and interest-
ing issues concerning pretrial prejudicial publicity
were raised within the Santa Cruz judicial community.

Charges against public figures (office holders) represent
another sizeable portion of cases attracting EMC.  One of
the first criminal trials to have extended media was
People v. Snyder.  Mr. Snyder, a City Councilman in Los
Angeles, was tried on one count of driving while intoxi-
cated.  EMC was continuous throughout the trial.  The
issue of excluding EMC for a portion of the trial was
raised at one point, an issue which involved judge decision-
making, defendant reputation, and potential juror con-
tamination.  The case ended in a mistrial (hung jury)
and the case was not re-tried.

Toward the end of the year, the People v. Robbins case
was adjudicated.  State Senator Alan Robbins was accused
of "statutory rape" sex crimes with two teenage girls and
ultimately was acquited.  The case attracted statewide
publicity.  EMC was restricted to opening and closing ar-
guments.  Throughout the case, many courts/media relations
issues were raised, some of which involved extended
media.  Media/courts relations were strained for several
reasons and by several incidences.

Another public figure criminal case was that of People v.
Hawes in Shasta County.  Mr. Hawes, a former District
Attorney, was accused of misconduct in office.  The case
attracted much local publicity.  (Mr. Hawes was convicted.)

-69-

360

## Civil Cases

Two civil cases during the year stand out as being very high publicity cases: Burnett v. National Enquirer and Segraves v. State of California. Both received national publicity.

In Burnett (Los Angeles) the popular entertainer, Carol Burnett, sued the National Enquirer for libel. For numerous reasons, publicity was quite high. The case was an interesting legal confrontation which the public could understand because of its familiarity both with the National Enquirer and with Ms. Burnett as an entertainer. (Ms. Burnett secured a substantial award for personal and punitive damages.)

In Segraves (Sacramento), a creationist group sued the State Department of Education over its policies and practices in teaching the origin of man in public schools. The media perceived the case to be a repeat of the famous "monkey trial" (Scopes v. Arkansas) and often referred to it as "Scopes II". At the outset of the trial, the issues in the case were limited by the plaintiffs, and the creationists vs. evolutionist show-down failed to materialize as dramatically as expected. Nevertheless, the trial was an important factor in the development of the issue and continued to receive substantial publicity.

Another notable civil case in the experiment was Smith vs. Gayle in Fresno. A former district attorney sued a local media organization for slander and libel. The first trial ended in a mistrial (hung jury) and a second trial ensued.

As previously mentioned, one extended coverage event
was for an educational purpose--a wrongful death civil
suit in Yolo County videotaped for U.C. Davis Law
School (Michel v. Dillard).  Two appellate proceedings
received EMC:  In Re Pratt and Crawford v.  Board of
Education. Pratt involved a well known figure from the
anti-war protest movement and Crawford dealt with the
bussing issue.

The above discussion mentions the most major EMC events but
is by no means an exhaustive treatment of the cases receiving
EMC throughout the year.  Over 200 EMC events took place and
many of these could be considered "major" at least in the
locality of their occurrence.

-71-

362

## IV.   COURTROOM ENVIRONMENT AND PARTICIPANT
## BEHAVIOR DATA ANALYSIS

Of the three major data sets generated by the evaluation inter-
views, observation, and attitudinal surveys, the former two
emerge from specific EMC or conventional coverage court pro-
ceedings while the latter is not case specific in its nature.
Interviews and observations logically may be discussed together
in answering the two major research questions.

The presentation of these data is organized into subsections
by the two major evaluation questions.  Under each, the dis-
cussion first addresses interview responses and then obser-
vational data.  Subsequently, interview data of a summary or
adjunct nature is discussed.

The interview responses discussed below are from the data base
described in Appendix F.  Data classifications by case type,
court level, proceeding type and other descriptors are con-
tained in this appendix along with demographic data pertain-
ing to the various participant types: sex, age, education, and
experience levels.

A.   Courtroom Environment (Disturbance, Distraction, Dignity,
     and Decorum)

Will the presence and operation of broadcast, recording, or
photographic equipment in a courtroom be a significant distrac-
tion for trial participants, disrupt proceedings, or impair
judicial dignity and decorum?

This major research question was explored by asking participants
questions about a) their level of awareness of EMC equipment
or operators, b) the extent of any distraction caused by EMC

equipment or operators, c) perceptions of impairment to dig-
nity and decorum (judges and attorneys), d) courtroom environ-
mental effects (jurors), and e) supervisory responsibility
(judges).  Observational data speak to this major evaluation
question in the measurements of Judge Attentiveness, Judge
Control, Juror Attentiveness, and Courtroom Calm.  Attendance
at EMC events also allowed the evaluators to make global judg-
ments on other potential causes of distraction and disruption
in the courtroom:  other media present, audience noise and
movement, court personnel, external noises, and the proceeding
participants themselves.

1.   Interview Data

Awareness and Distraction

All participant types were asked about their "level of
awareness" of EMC equipment and operators and the "level
of distraction" caused by EMC.  "Awareness" and "distrac-
tion" questions were asked to distinguish in the respond-
ents' minds the difference between being merely conscious
of EMC and being somehow impaired in task performance by
a strong consciousness of EMC presence.  "Awareness" is
presumed not to be necessarily deleterious whereas "dis-
traction" is by definition a negative effect of EMC.  Low
levels of distraction may be viewed as insignificant in
the fair administration of justice whereas moderate to
high levels of distraction may be viewed as incompatible
to the proper conduct of the judicial process.

Table IV 1-A shows the percentage distribution of responses
on the "awareness" question.  With all participant types,
the majority of respondents (around 70%) had little aware-
ness, with consistently even distribution among partici-

-73-

TABLE IV 1-A

Distribution of Participant "Level of Awareness" Responses

| | Judges | | Attorneys | | | | | | | | Witnesses | | | | | | Jurors | | Total | |
| | F* | P* | Plaint. F | P | Pros. F | P | Def. F | P | Attorney Total F | P | Exper. F | P | Inexp. F | P | Witness Total F | P | F | P | F | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| None at all | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 1 | 2% | 1 | 4% | 6 | 20% | 7 | 13% | 3 | 5% | | 4% |
| Little | 73 | 73% | 9 | 75% | 13 | 100% | 12 | 52% | 34 | 71% | 23 | 88% | 19 | 63% | 42 | 75% | 32 | 57% | | |
| Moderate | 16 | 16% | 3 | 25% | 0 | 0% | 7 | 31% | 10 | 21% | 1 | 4% | 3 | 10% | 4 | 7% | 11 | 20% | 41 | 15% |
| High | 11 | 11% | 0 | 0% | 0 | 0% | 2 | 9% | 2 | 4% | 1 | 4% | 2 | 7% | 3 | 5% | 9 | 16% | 26 | 10% |
| Very High | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 1 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% | 3 | 1% |

*F = Absolute Frequency

*P = Percentage

-74-

pant types of awareness at the Moderate and High levels.
Among participant types, up to 25% of respondents reported
Moderate awareness and only a few individuals (defense
attorneys and jurors) registered Very High awareness.

The "distraction" levels shown in Table IV-1B are even
more pronounced toward the Not At All side of the response
scale. Among judges, 83% responded Not At All or Only At
First (and then not at all). Attorneys have a slightly
greater tendency to be distracted, although only defense
attorneys registered any responses above Slightly. Wit-
nesses overwhelmingly reported no distraction, even those
with little or no experience as a witness.[28]  Jurors show
greater dispersal in their responses with 69% saying Not
At All or Only At First, 16% saying Slightly and 14% say-
ing Somewhat, Definitely, or Extremely. This distribution
is somewhat more favorable to EMC than defense attorney
responses and somewhat less favorable to EMC than judge
responses.

Since the primary job of the evaluators was to search for
negative effects of EMC, it is appropriate to illustrate
whatever negative effects are found, even if they repre-
sent the highly atypical situation. With the issue of
distraction, a few individuals (about 6% of all respondents)
were Definitely or Extremely distracted by EMC. Commonly,
interviewees commented that the TV camera was silent and
easily forgotten yet the momentary noise of the still
camera clicks was unsettling. In some instances, neglect
of the rules is to blame, as gleened from one judge re-
sponse: "The photographer was very distracting as he
awkardly moved about the courtroom for various angles.

---

[28]"Little" witness experience is defined as 0-5 prior
times as a witness.

TABLE IV 1B

Percentage Distribution of Participant "Level of Distraction" Responses

| | Judges | | Attorneys | | | | | | | | Witnesses | | | | | | Jurors | | Combined Total | |
| | | | Plaint | | Pros | | Def | | Attorney Total | | Exper | | Inexp | | Witness Total | | | | | |
| | F* | P* | F | P | F | P | F | P | F | P | F | P | F | P | F | P | F | P | F | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Not at All | 64 | 65% | 7 | 58% | 7 | 54% | 9 | 39% | 23 | 48% | 22 | 85% | 28 | 94% | 50 | 89% | 27 | 48% | 170 | 64% |
| Only at First | 18 | 18% | 3 | 25% | 5 | 39% | 5 | 22% | 13 | 27% | 4 | 15% | 0 | 0% | 4 | 7% | 12 | 21% | 47 | 18% |
| Slightly | 7 | 7% | 2 | 17% | 1 | 8% | 5 | 22% | 8 | 17% | 0 | 0% | 0 | 0% | 0 | 0% | 9 | 16% | 24 | |
| Somewhat | 4 | 4% | 0 | 0% | 0 | 0% | 3 | 13% | 3 | 6% | 0 | 0% | 1 | 3% | 1 | 2% | 1 | 2% | 9 | 3% |
| Definitely | 5 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 3% | 1 | 2% | 4 | 7% | 10 | 4% |
| Extremely | 1 | 1% | 0 | 0% | 0 | 0% | 1 | 4% | 1 | 2% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 5% | 6 | 2% |

367

Camera clicking was also distracting. The movement of
the photographer is a violation of the rules, but the shut-
ter noise likely was from an approved camera.  A number of
those concluding they were distracted by EMC are referring
to still camera shutter noise.  Clearly evident in inter-
view data is the fact that still camera clicks frequently
were a source of distraction and annoyance to participants,
particularly attorneys.  Among these data are several
cases in which one or more of the participants reported
that the still camera clicks were distracting.[29]

Given that EMC is infrequently distracting and that still
cameras account for a substantial number of those inci-
dences in which it is distracting, can the presence of a
still camera be considered generally distracting?  To
answer this question, Table IV-2 presents a cross-tabulation
of a distraction measure with the variable of Type EMC
present.[30]  This table indicates that all forms of EMC
presence generally are not distracting.  The still camera
shutter noise problem accounts for most of the few responses
in the Somewhat, Definitely, and Extremely Distracting
categories but generally speaking, even still cameras
are not distracting.

---

[29] The data indicate that still cameras were present in
about 70 of the proceedings included in the research.
In about 50 of these, interview responses were solicited
from the judge only.  Camera clicks were indicated as dis-
tracting in 9 of the 70 cases.  In most of these instances,
the camera make was Nikon, one which is on the approved
list of still cameras in the Rules of Court.  The Leica
camera also listed in the Rules, is considerably quieter
than the Nikon and never created a problem.

[30] The Judge Distraction response variable is used because
the sample size of judge interviews is larger than other
interview samples.

-77-

368

TABLE IV-2

Judge Distraction Level vs Type EMC Present

| Judge Level of Distraction | TV | Still Camera | TV & Still | TV, Radio & Still | Totals |
|---|---|---|---|---|---|
| Not at All | 17 | 9 | 28 | 9 | 63 64% |
| Only at First | 6 | 2 | 7 | 3 | 18 19% |
| Slightly | 1 | 2 | 2 | 2 | 7 7% |
| Somewhat | 1 | 0 | 0 | 3 | 4 4% |
| Definitely | 2 | 1 | 1 | 1 | 5 5% |
| Extremely | 0 | 0 | 0 | 1 | 1 1% |
| Total | 27 28% | 14 14% | 38 39% | 19 19% | 98 100% |

## Dignity and Decorum

"Dignity and decorum" represents a desired atmospheric
state in a courtroom, one that is appropriate and neces-
sary for conducting judicial business.  Experienced judges
and attorneys,[31] who presumably know what constitutes dig-

---

[31] Experience levels of judges and attorneys are documented
in Appendix F.

-78-

369

nity and decorum, were asked whether or not the presence
of cameras, microphones, or other EMC equipment (or equip-
ment operators) diminished dignity and decorum in the
courtroom.  As demonstrated in Table IV-3, about three-
fourths of both groups detected no impairment of dignity
and decorum with virtually all of the remaining responses
being in the Slightly category.  A few judges (13%) and a
few defense attorneys (13%) responded in the Somewhat,
Definitely, or Extremely categories.

Jurors were asked about EMC effects on the courtroom envir-
onment and on the flow of proceedings.  The responses,
reported in Table IV-4, evoked a clear pattern.  With
both questions, a majority said there were no effects.
The remaining respondents tended to think that EMC had
a negative effect.  Twenty five percent (25%) said EMC
had a negative effect on courtroom environment and 14%
said it had a negative effect on the flow of proceedings.
In the view of jurors, EMC generally had no effect on
courtroom environment or proceedings flow, although in
the few instances in which it did, the effect was nega-
tive.

Supervisory Responsibility

Also among the interview data regarding the issue of dis-
traction or other negative effects due to the physical
presence of EMC is the subject of judge supervisory re-
sponsibility.  When asked whether or not EMC increased
their "supervisory responsibility", 40% of responding
judges said Not At All, 38% Slightly, 12% Somewhat, 8%
Definitely, and 2% Extremely (see Table IV-5, on page    ).
This descending frequency in the responses suggest that
additional supervisory burden usually is not a serious

-79-

370

## TABLE IV-3

ATTORNEY PERCENTAGE DISTRIBUTION OF JUDGE AND "DIGNITY AND DECORUM IMPAIRMENT" RESPONSES

| | JUDGES | | ATTORNEYS | | | | | | TOTALS | |
| | | | Plaint. | | Pros. | | Def. | | | |
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|
| No Effect | 84 | 85% | 9 | 75% | 11 | 85% | 16 | 72% | 120 | 93% |
| Slightly | 1 | 1% | 3 | 25% | 2 | 15% | 4 | 18% | 10 | 7% |
| Somewhat | 7 | 8% | 0 | 0% | 0 | 0% | 1 | 5% | 8 | 6% |
| Definitely | 5 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 5 | 3% |
| Extremely | 1 | 1% | 0 | 0% | 0 | 0% | 1 | 5% | 2 | 1% |

371

TABLE IV-4

Distribution of Juror Responses Regarding
Courtroom Environmental Effects and Flow of Proceedings

|  | Courtroom Environment | | Flow of Proceedings | |
|---|---|---|---|---|
|  | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| No Effects | 38 | 67% | 45 | 80% |
| Yes, Positive | 2 | 4% | 0 | 0% |
| Yes, Negative | 14 | 25% | 8 | 14% |
| No Opinion | 2 | 4% | 3 | 6% |
| Total | 56 | 100% | 56 | 100% |

problem but that in some cases judges consider the added
element of EMC to impose significant additional responsi-
bilities.

According to the responses of the judges, the added super-
visory burden is manifest both before and during the pro-
ceeding. Some judges objected to the time consuming pre-
paration required by EMC but indicated little added burden
once the proceeding was underway. Those judges in locali-
ties with court administrators or additional courtroom per-
sonnel to assist with "management" of media presence had
less supervisory burden imposed upon them than those with-
out such resources (particularly for major events).

-81-

372

TABLE IV-5

Distribution of Judge Responses Regarding
Supervisory Responsibility

|  | Abs. Freq. | Pct. |
|---|---|---|
| Not at All | 40 | 40% |
| Slightly | 37 | 38% |
| Somewhat | 12 | 12% |
| Definitely | 8 | 8% |
| Extremely | 2 | 2% |
| Totals | 99 | 100% |

2.  Observational Data

As explained in depth in Section II, evaluators spent con-
siderable time in courtrooms observing proceedings with
extended media coverage and in those receiving only con-
ventional media coverage.  In both the "experimental" and
"baseline" conditions, ratings were made based upon detailed
criteria for selected behavioral attributes of participants
(e.g. "attentiveness") and for an overall courtroom envir-
onmental attribute (i.e. "calm").  Four of the eight attri-
butes measured speak to the first major evaluation question
that of disturbance or distraction caused by EMC.

-82-

373