# EXHIBIT C
# Part 2 of 4

Aggregate Ratings Analysis

The analysis considered most reliable for these observa-
tional data is the comparison of the means of the experi-
mental observations with the means of the baseline obser-
vations for each attribute.  These means are computed
from the aggregated observations, experimental or baseline,
for each attribute.  The results of this process are
depicted in Table IV-6.  The means emerge from a scale of
1.0 - 6.0 with 2.0 being defined as the "normally good"
standard for nearly all of the attributes under scrutiny.
The 1.0 - 6.0 scale may be interpreted summarily as:

|           |              |
|-----------|--------------|
| 1.0 - 1.4 | Excellent    |
| 1.5 - 1.9 | Very Good    |
| 2.0 - 2.4 | Good         |
| 2.5 - 2.9 | Average      |
| 3.0+      | Below Average |

Table IV-6 clearly shows that, for the attributes measured,
participants perform as well in EMC proceedings as they
do in conventional media coverage proceedings.  Judges
are on the average just as attentive with cameras present
as when they are not; judges appear to exercise marginally
better control of the courtroom with EMC present than
with conventional-only media present.  Jurors are quite
attentive in both EMC and conventional circumstances,
exhibiting slightly greater attentiveness when cameras
are present.  For the evaluators' judgment of courtroom
"calm", the global judgment measuring disturbance and
disruption, EMC conditions proved to be just as calm as
conventional-only media conditions.

-83-

374

TABLE IV-6

Means of Observational Ratings on Courtroom
Environment Issues (Disturbance,
Distraction, Dignity and Decorum)

|  | EMC Ratings Means | Baseline Ratings Means |
|---|---|---|
| Judge Attentiveness | 1.75[1] | 1.71[5] |
| Judge Control | 1.75[2] | 1.94[6] |
| Juror Attentiveness | 1.49[3] | 1.59[7] |
| Courtroom Calm | 1.66[4] | 1.92[8] |

---

[1] Based upon 357 observations in 19 cases.

[2] Based upon 358 observations in 19 cases.

[3] Based upon 523 observations in 11 cases.

[4] Based upon 353 observations in 19 cases.

[5] Based upon 262 observations in 16 cases.

[6] Based upon 260 observations in 16 cases.

[7] Based upon 395 observations in 12 cases.

[8] Based upon 258 observations in 16 cases.

-84-

375

This methododical process of rating behavior and environ-
ment confirms the predominant theme of interview responses
that the introduction of EMC equipment and operators into
a courtroom does little or no harm to the participants'
ability to concentrate on the business at hand.  In fact,
in high publicity cases, participants appear to do quite
well in the areas measured, and courtrooms appear to be
more than adequately "calm", whether or not cameras are
present.

The differences in the ratings averages in all of the four
attributes are so slight that one cannot conclusively
say that participants are "better" or "worse" with cameras
present.  One can legitimately conclude that there gener-
ally is an absence of effect of EMC presence with respect
to distraction, disturbance, or impairment to dignity
and decorum.

More detailed data on the above discussed attributes appear
in Appendix G, which presents a dispersal of means by
case for each attribute using five ranges:  excellent
(1.0-1.4), very good (1.5-1.9), good (2.0-2.4), average
(2.5-3.0) and below average (3.0+).[32]  This dispersal
is shown for EMC and baseline cases in a side by side
comparison.

Directly Comparable Case Means Analysis

As documented in Section II, baseline observations came
from court proceedings receiving conventional-only cover-
age and from proceedings in which cameras were present

_____

[32]The distributions in Appendix G show means by case.  Each
case mean is based upon a variable number of observations.
Therefore, one cannot compute the overall means for each
attribute from the appendix tables.  This would be "aver-
aging averages" and is statistically unsound.  The true
means, using individual ratings as the unit of measure-
ment are presented in Table IV-6 above.

-85-

376

TABLE IV-7

"Directly Comparable" Observational Data for Distraction/Disturbance Issues (Means)

| Criminal Cases | Judge Attentiveness | Judge Control | Juror Attentiveness | Courtroom Calm |
|---|---|---|---|---|
| Peo. vs. Robbins (experimental) | 2.3 | 1.8 | 1.4 | 1.5 |
| Peo. vs. Robbins (baseline) | 2.1 | 1.9 | 1.8 | 1.7 |
| Peo. vs. McDermand (experimental) | 1.7 | 1.8 | 2.0 | 1.9 |
| Peo. vs. McDermand (baseline) | 2.2 | 2.0 | 2.0 | 1.3 |
| Peo. vs. Nickel (experimental) | 1.0 | 2.0 | 1.1 | 1.1 |
| Peo. vs. Nickel (intermittent baseline) | 1.4 | 2.0 | 1.1 | 1.3 |
| Peo. vs. Nickel | 2.3 | 2.0 | 2.1 | 1.9 |

TABLE IV-7 cont.

| | Judge Attentiveness | Judge Control | Juror Attentiveness | Courtroom Calm |
|---|---|---|---|---|
| **Criminal Cases** | | | | |
| Peo. vs. Cassazza et al (experimental) | 1.9 | 1.9 | 1.8 | 2.1 |
| Peo. vs. Cassazza et al (baseline) | 1.9 | 2.0 | 1.6 | 2.3 |
| **Civil Cases** | | | | |
| Smith vs. Gayle et al (experimental) | 1.3 | 2.0 | 1.2 | 1.6 |
| Smith vs. Gayle et al. (baseline re-trial) | 1.2 | 1.7 | 1.1 | 1.2 |

-R7-

378

only part of the time.  One might suggest that even with
the large sample of cases and observations which were
ultimately collapsed into respective experimental and
baseline cells, comparison of the means of each attribute
is inappropriate because the participants and courtroom
environment are not completely matched in the experimental
and baseline cells.  Therefore, as a supplementary anal-
ysis, it is fitting to look at the experimental (EMC
present) and baseline (conventional-only media present)
data in which the participants and courtroom environment
are the same.  This occurs in two modes: 1) experimental
and baseline data taken from a proceeding in which cameras
were present intermittently; and 2) baseline data taken
from a trial which was subsequently re-tried with cameras
present (or *vice-versa*).  Table IV-7 shows the means by
case for proceedings which yielded data of direct compara-
bility in this fashion.  There exists no pattern showing
that EMC presence negatively affects the attributes
measured; nor is there a pattern showing the reverse.
Judges are shown to be marginally more attentive when
cameras are present in three of the five cases.  Judge
control is the same regardless of EMC presence.  Jurors
appear to be highly attentive under both circumstances
and courtrooms can be said to be very calm with both
extended and conventional-only media presence.

Analysis of Potential Distraction Sources

In collecting observational data, the evaluators monitored
a number of additional factors which are potential sources
of disturbance and distraction and could be compared to
the factor of EMC presence.  Judgments were made regard-
ing the disturbance/distraction level of:

-88-

379

- other media presence--visual and auditory;
- the audience--visual and auditory;
- frequency of audience change;
- courtroom personnel--visual and auditory;
- trial participants--visual and auditory; and
- auditory distraction from external sources.

Global judgments for these items were made for both EMC
and conventional-only media proceedings.

Table IV-8A shows the distribution of evaluator judgments
from Very Low to Very High on the visual and auditory dis-
traction of EMC equipment and personnel compared to "other
media".  Because conventional (i.e. "other") media are
present at EMC as well as conventional coverage proceed-
ings, two categories of "other media" comparisons may be
made.

For visual distraction, a large majority of proceedings
were rated Very Low and Low with regard to EMC presence
with similarly large majorities in these ranges for both
"other media" ratings.  The auditory distraction rating
reveals a different result.  EMC presence was rated as a
Medium distraction level in 44% of the proceedings, a
stark contrast to the auditory distraction rating for
other media.  This is attributable directly to the noise
created by shutter clicks of still cameras.  The in-court
observations of the evaluators confirm what is reported
by proceeding participants, that still camera shutter
noise is the singly most distracting element of extended
media coverage.

In high publicity cases, there is often a large audience,
media presence in the hallway, and other factors which

-89-

TABLE IV-8A

VISUAL DISTRACTION OF EMC EQUIPMENT AND PERSONNEL VS. OTHER MEDIA

|  | EMC Cases | | Other Media In EMC Cases | | Media in Baseline Cases | |
|---|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Very Low | 2 | 11% | 5 | 28% | 10 | 63% |
| Low | 13 | 72% | 9 | 50% | 5 | 31% |
| Medium | 2 | 11% | 2 | 11% | 1 | 6% |
| High | 1 | 6% | 2 | 11% | 0 | 0% |
| Very High | 0 | 0% | 0 | 0% | 0 | 0% |

-90-

381

Table IV-8A Cont'd.

AUDITORY DISTRACTION OF EMC EQUIPMENT AND PERSONNEL VS OTHER MEDIA

| | EMC Cases | | Other Media In EMC Cases | | Media in Baseline Cases | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Very Low | 5 | 28% | 4 | 22% | 10 | 63% |
| Low | 5 | 28% | 11 | 61% | 5 | 31% |
| Medium | 8 | 44% | 2 | 11% | 1 | 6% |
| High | 0 | 0% | 1 | 6% | 0 | 0% |
| Very High | 0 | 0% | 0 | 0% | 0 | 0% |

-91-

382

may be a source of visual or auditory distraction.   One
may postulate that the "circus like" atmosphere, which
opponents of EMC commonly predict, is attributable to
phenomena other than or in addition to camera presence,
such as the audience, court personnel, the trial partici-
pants themselves, or external noise sources such as media
presence in the hallway.   Therefore, global judgments on
these factors were made during on-site observation.

The data in Tables IV-8B, through IV-8F indicate that
these factors account for Low to Moderate levels of dis-
traction and that their occurrence is roughly the same
under EMC and conventional-only media presence.

Visual and auditory <u>audience</u> distraction (see Table IV-
8B) does not appear to be a serious problem although in
33% of the EMC proceedings observed, a Medium visual
audience rating was made.   Audience change (people moving
in and out) probably accounts for the Medium audience
visual distraction rating.   In Table IV-7C, which measures
frequency of audience change, about one-third of the pro-
ceedings were rated at Medium or High levels.   Baseline
cases show generally Low levels of disturbance due to
audience-visual, audience-auditory, or audience change
frequency.

Visual and auditory distraction from <u>court personnel</u> is
somewhat less than from the audience with a large majority
of proceedings rated in the Low range for both EMC and
conventional media only conditions (see Table IV-8D).
<u>Trial participants</u> show the same distribution as court
personnel in their disturbance level with almost all
cases being rated in the Very Low and Low ranges (see
Table IV-7E).

-92-

383

TABLE IV-3B

EVALUATOR RATING OF AUDIENCE DISTRACTION

**VISUAL DISTRACTION OF AUDIENCE**

| EMC CASES | | | BASELINE CASES | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Very Low | 4 | 22% | Very Low | 5 | 31% |
| Low | 8 | 45% | Low | 11 | 69% |
| Medium | 6 | 33% | Medium | 0 | 0% |
| High | 0 | 0% | High | 0 | 0% |
| Very High | 0 | 0% | Very High | 0 | 0% |

**AUDITORY DISTRACTION OF AUDIENCE**

| EMC CASES | | | BASELINE CASES | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Very Low | 3 | 17% | Very Low | 7 | 44% |
| Low | 11 | 61% | Low | 6 | 37% |
| Medium | 4 | 22% | Medium | 3 | 19% |
| High | 0 | 0% | High | 0 | 0% |
| Very High | 0 | 0% | Very High | 0 | 0% |

-93-

384

TABLE IV-8C

EVALUATOR RATING OF AUDIENCE CHANGE FREQUENCY

| | EMC CASES[1] | | | BASELINE CASES[2] | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Very Low | 6 | 32% | Very Low | 8 | 50% |
| Low | 6 | 32% | Low | 6 | 38% |
| Medium | 5 | 26% | Medium | 2 | 12% |
| High | 2 | 10% | High | 0 | 0% |
| Very High | 0 | 0% | Very High | 0 | 0% |

External noises are rated at a Medium level of distrac-
tion in three of the 18 EMC cases observed (17%) with
one case at both the High and Very High ranges. This
is somewhat similar to the conventional-only ratings on
external noises. In all the cases of Medium to Very
High distraction on this factor, the cause was docu-
mented as either media presence in the hallway or con-
struction noise inside or outside the building.

The extent of distraction attributable to factors other
than EMC presence is about the same as EMC--generally
Low with occasional incidences of High distraction.
This conclusion, drawn from observational data on other

-94-

385

TABLE IV-8D

EVALUTOR RATINGS OF DISTRACTION FROM COURT PERSONNEL

VISUAL DISTRACTION OF COURT PERSONNEL

| EMC CASES | | | BASELINE CASES | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Very Low | 3 | 17% | Very Low | 6 | 38% |
| Low | 12 | 67% | Low | 10 | 62% |
| Medium | 2 | 11% | Medium | 0 | 0% |
| High | 1 | 5% | High | 0 | 0% |
| Very High | 0 | 0% | Very High | 0 | 0% |

AUDITORY DISTRACTION OF COURT PERSONNEL

| EMC CASES | | | BASELINE CASES | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Very Low | 3 | 17% | Very Low | 4 | 25% |
| Low | 13 | 72% | Low | 12 | 75% |
| Medium | 2 | 11% | Medium | 0 | 0% |
| High | 0 | 0% | High | 0 | 0% |
| Very High | 0 | 0% | Very High | 0 | 0% |

-95-

 TABLE IX-8E 

EVALUATOR RATINGS OF DISTRACTION FROM TRIAL PARTICIPANTS

| VISUAL DISTRACTION OF TRIAL PARTICIPANTS | | | | | | |
|---|---|---|---|---|---|---|
| EMC CASES | | | | BASELINE CASES | | |
| | Abs. Freq. | Pct. | | | Abs. Freq. | Pct. |
| Very Low | 5 | 28% | Very Low | | 2 | 13% |
| Low | 12 | 67% | Low | | 11 | 69% |
| Medium | 1 | 5% | Medium | | 2 | 12% |
| High | 0 | 0% | High | | 0 | 0% |
| Very High | 0 | 0% | Very High | | 1 | 6% |

| AUDITORY DISTRACTION OF TRIAL PARTICIPANTS | | | | | | |
|---|---|---|---|---|---|---|
| EMC CASES | | | | BASELINE CASES | | |
| | Abs. Freq. | Pct. | | | Abs. Freq. | Pct. |
| Very Low | 5 | 28% | Very Low | | 4 | 25% |
| Low | 12 | 67% | Low | | 10 | 63% |
| Medium | 1 | 5% | Medium | | 1 | 6% |
| High | 0 | 0% | High | | 0 | 0% |
| Very High | 0 | 0% | Very High | | 1 | 6% |

387

## TABLE IV-8F

EVALUATOR RATINGS OF AUDITIORY DISTRACTION FROM EXTERNAL SOURCES

| EMC CASES | | | | BASELINE CASES | | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | | Abs. Freq. | Pct. |
| Very Low | 3 | 17% | Very Low | | 5 | 31% |
| Low. | 10 | 54% | Low | | 8 | 50% |
| Medium | 3 | 17% | Medium | | 1 | 6% |
| High | 1 | 6% | High | | 1 | 6% |
| Very High | 1 | 6% | Very High | | 1 | 6% |

factors, is consistent with observational data on parti-
cipant behavior and interview data.  Courtrooms generally
are dignified, formalized environments and while sometimes
the tone in courtrooms is "relaxed" or "warm", the busi-
ness conducted follows highly structured procedures.
Protocol is at a premium and judges have recognized
authority to control the courtroom environment and sanc-
tion the behavior of participants and attendants (media
and public).  This fundamental ordering of roles and rela-
tionships is not altered by the introduction of electronic
or photographic media.

While on-site, the evaluators made note of the size of
the total press corps.  One may theorize that proceeding
participants in registering any distraction to EMC are
being influenced in their response by a large press corps
presence which happens also to include cameras and micro-

-97-

388

phones.  Alternatively, one may theorize that camera
presence not accompanied by a large press corps in the
courtroom would be more distracting because the cameras
cannot "blend in" with a large press corps.  A cross tab-
ulation of Judge Distraction responses with Size of
Total Press Corps provides a clue to which theory is
more credible.

Table IV-9 which produces this cross tabulation suggests
that the latter theory is more viable than the former.
Most of the Definitely and Extremely Distracting responses
appear in the lowest Press Corps Size cells, although
the predominance of EMC events having six or less total
media persons present makes it difficult to be conclusive.
It is in itself interesting that so few events attract a
large press corps.  Camera presence generally occurs
with few other reporters present and is just as likely
to be distracting in this circumstance as in the circum-
stance of a large press corps.  (The likelihood of dis-
traction in both instances is low).

B.  Participant Behavior

Will trial participants or prospective trial participants,
knowing that their words or pictures will be or are being
recorded, broadcast or taken for possible use on television,
radio or in newspapers or magazines, change their behavior
in a way that interferes with the fair and efficient adminis-
tration of justice?

This second major evaluation question requires an assessment
of the behavior of all participant types under experimental
(EMC present) and baseline (conventional-only media present)
conditions.  Participants at EMC proceedings were asked ques-
tions relating to their own behavior and to the behavior of
others at the proceeding.  Observational data were collected

-98-

389

## TABLE IV-9

### JUDGE DISTRACTION LEVEL VS. TOTAL PRESS CORPS

| LEVEL OF DISTRACTION | TOTAL PRESS CORP | | | | | |
|---|---|---|---|---|---|---|
| | 0-3 | 4-6 | 7-10 | 11-20 | 21+ | Totals |
| Not at All | 61 | 7 | 1 | 0 | 1 | 70 67% |
| At First | 16 | 0 | 1 | 0 | 1 | 18 17% |
| Slightly | 5 | 1 | 0 | 1 | 0 | 7 7% |
| Somewhat | 3 | 1 1 | 0 | 0 | 1 | 4 4% |
| Definitely Distracting | 4 | 0 | 0 | 0 | 1 | 5 5% |
| Extremely | 1 | 0 | 0 | 0 | 0 | 1 1% |
| TOTAL: | 89 85% | 9 9% | 2 2% | 1 1% | 4 4% | 105 100% |

on a specific behavioral attribute, Effective Communication, an attribute considered primary in the performance of the roles of judges, attorneys, and witnesses.[33]

### 1. Interview Data

### Judge Behavior

Attorneys and jurors were asked to assess the behavior of the judge in EMC proceedings with respect to any effects of camera presence.  Table IV-10 displays the responses.  A majority of all types of attorneys and a majority of jurors thought there were no effects whatsoever.  The minority of respondents who felt there were some effects were spilt between viewing them as positive or negative.

Although judges were not formally asked to assess their own behavior beyond the dimension of awareness and distraction, the interviews often evoked such a self-assessment.  Most judges reported no effects on their own behavior from EMC presence.  Those that did generally noted a minor effect such as, "it made me a little more careful".

### Attorney Behavior

Attorney behavioral reaction to EMC was assessed by judges, opposing counsel, and jurors.  Table IV-11 displays the responses.  Judges generally perceived no

---

[33]Other attributes measured by observations (Attentiveness, Supervisory Responsibility) are in a broad sense types of "behaviors".  However, these measures are, for purposes of discussion, presented under the previous section on distraction due to EMC.  The above section more narrowly defines "behavior" in the form of an active attribute--Effective Communication.

-100-

391

TABLE IV-10

JUDGE BEHAVIOR CHANGE DUE TO EMC

|  | Plaint. Att. Response | | Pros. Att. Response | | Def. Att. Response | | Juror Response | |
|---|---|---|---|---|---|---|---|---|
|  | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| None | 8 | 67% | 12 | 92% | 14 | 61% | 40 | 72% |
| Yes, Some Positive | 4 | 33% | 0 | 0% | 2 | 9% | 3 | 5% |
| Yes, Some Negative | 0 | 0% | 0 | 0% | 6 | 26% | 8 | 14% |
| No Opinion | 0 | 0% | 1 | 8% | 1 | 4% | 5 | 9% |

-101-

392

TABLE IV-11

ATTORNEY BEHAVIOR CHANGE DUE TO EMC

| | Judge Response | | Attorney Response (Re: Other Counsel) | | Juror Response | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| None | 71 | 72% | 38 | 79% | 39 | 70% |
| Yes, Some Positive | 11 | 11% | 0 | 0% | 3 | 5% |
| Yes, Some Negative | 10 | 10% | 7 | 15% | 9 | 16% |
| No Opinion | 7 | 7% | 3 | 6% | 5 | 9% |

TABLE IV-12

ATTORNEY SELF ASSESSMENT REGARDING BEHAVIOR CHANGE DUE TO EMC

| STRATEGY CHANGE | | | PRESENTATIONAL QUALITY | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Yes, Affected | 5 | 10% | Yes, Affected (Negatively) | 1 | 2% |
| | | | Yes, Affected (Positively) | 1 | 2% |
| No, Not Affected | 43 | 90% | No, Not Affected | 46 | 96% |

-102-

393

effects (72%) with 11% noting positive effects and 10%
noting negative effects.  Attorneys also generally per-
ceived no effects on opposing counsel, but of those who
did, all viewed the effects as negative.  Jurors' re-
sponses are similar to those of judges and attorneys--
most perceived no effects (70%), a few saw positive
effects (5%) and a few more saw negative effects (16%).

Attorneys were asked to assess their own behavior in
reaction to EMC.  The question of "strategy change" was
posed to attorneys along with an inquiry as to effects
on presentational quality.  As Table IV-12 shows, 90% of
respondents reported no strategy change and 96% felt
there was no effect on their presentational quality.
The few instances in which attorneys reported some effect
on strategy (10%) were perceived not to be of major
significance to the course of the case.  For example,
prospective jurors were sometimes asked in *voir dire*
whether or not the presence of cameras in the courtroom
would influence them or bother them.  EMC presence in
this example had an influence on attorney "strategy"
for selecting jurors.

Witness Behavior

Witness behavior change due to EMC presence was evaluated
by judges, attorneys, and jurors during interviews.
Large majorities in all three groups perceived no effects,
as displayed in Figure IV-13.  Those who did see behav-
ioral change in witnesses tended to view that change as
negative--12% of judges, 22% of attorneys, and 16% of
jurors.  Only a few individuals concluded that EMC had
a positive effect on witnesses.

TABLE IV-13

Witness Behavior Change Due to EMC

| | Judge Response | | Attorney Response | | Juror Response | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | % Pct. |
| None | 44 | 86% | 25 | 78% | 34 | 61% |
| Yes, Some Positive | 1 | 2% | 0 | 0% | 2 | 4% |
| Yes, Some Negative | 6 | 12% | 7 | 22% | 9 | 16% |
| No Opinion | 0 | 0% | 0 | 0% | 11 | 19% |

TABLE IV-14

WITNESS SELF ASSESSMENT REGARDING TESTIMONY CHANGE DUE TO EMC

| | Abs. Freq. | Pct. |
|---|---|---|
| No | 55 | 98% |
| Yes | 1 | 2% |

-104-

395

In assessing themselves, witnesses overwhelmingly re-
ported no effects due to EMC presence (see Table IV-14).
Only one of 56 witness respondents thought EMC had an
effect on the content or delivery of testimony.

## Juror Behavior

Perceptions of juror behavior follow the general pattern
of other perceptions of participant behavior. Most
respondents (judges and attorneys) detected no effects
with a few judges and some attorneys perceiving nega-
tive effects on jurors (see Table IV-15).

Besides reporting on their "awareness" and "distraction"
due to EMC, jurors assessed themselves by rating EMC
"influence on deliberations." Table IV-16 clearly shows
that jurors did not feel that EMC influenced deliberations.
Only one juror perceived a direct influence on the case
due to EMC; two jurors responded to the question by say-
ing that the media generally had an influence on the
deliberation process.

## 2.   Observational Data

## Aggregate Ratings Analysis

To supplement the self-report data on participant behavior,
the evaluators measured the attribute of Effective Communi-
cation of judges, attorneys, and witnesses under both
experimental (EMC present) and baseline (conventional-only
media present) conditions. The mean rating for all obser-
vations in both cells is contained in Table IV-17.

-105-

396

TABLE IV-15

JUROR BEHAVIOR CHANGE DUE TO EMC

| | JUDGE RESPONSES | | | ATTORNEY RESPONSES | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| None | 31 | 94% | None | 22 | 79% |
| Yes, Some Positive | 0 | 0% | Yes, Some Positive | 1 | 3% |
| Yes, Some Negative | 2 | 6% | Yes, Some Negative | 5 | 18% |
| No Opinion | 0 | 0% | No Opinion | 0 | 0% |

TABLE IV-16

JURY DELIBERATION INFLUENCE

| | Abs. Freq. | Pct. |
|---|---|---|
| None | 48 | 94% |
| Yes, Influence of EMC | 1 | 2% |
| Yes, Influence of Media Generally | 2 | 4% |

-106-

397

TABLE IV-17

Means of Observational Ratings

on Participant Behavior Issues

(Effecitve Communication)

| | EMC Ratings Means | Baseline Ratings Means |
|---|---|---|
| Judge Effective Communication | 1.83[1] | 1.98[5] |
| Plaint. Att./ Prosecutor Effective Communication | 1.88[2] | 1.79[6] |
| Defense Attorney Effective Communication | 1.85[3] | 1.99[7] |
| Witness Effective Communication | 1.85[4] | 1.95[8] |

[1] Based upon 330 observations in 18 cases.

[2] Based upon 264 observations in 18 cases.

[3] Based upon 233 observations in 18 cases.

[4] Based upon 226 observations in 12 cases.

[5] Based upon 256 observations in 16 cases.

[6] Based upon 189 observations in 16 cases.

[7] Based upon 160 observations in 16 cases.

[8] Based upon 218 observations in 12 cases.

-107-

398

Again, a 1.0 - 6.0 scale is used and may be summarized as:

| | |
|---|---|
| 1.0 - 1.4 | Excellent |
| 1.5 - 1.9 | Very Good |
| 2.0 - 2.4 | Good |
| 2.5 - 2.9 | Average |
| 3.0+ | Below Average |

As with observational rating means for disturbance/distrac-
tion measures (discussed earlier), the fundamental con-
clusion of the data is that participants perform well on
the rated attribute under both EMC and conventional-
media conditions.  With three of the four participant
types, the mean is slightly lower with EMC present than
with conventional-only media present, although given the
degree of difference, one must conclude that the experi-
mental and baseline scores are virtually the same with
all participant types.  The ability of judges, attorneys,
and witnesses to communicate generally is not impaired by
the presence of extended media or conventional media.

In Appendix H, the dispersal of behavioral ratings by
case mean is presented.  This presentation of the data
groups the average Effective Communication rating of
each case into five categories--Excellent to Below Aver-
age.

Directly Comparable Case Means Analysis

As was done with observational data on the distraction/
disturbance issue, a comparative analytical approach may
be taken with the behavioral issue by comparing the means
of rating scores or participants on an individual

-108-

399

TABLE IV-18

Directly Comparable Observational Data for Participant Behavior Issues

| | Judge Effective Communication | Prosecutor/ Plaint. Att. Effective Communication | Defense Att. Effective Communication | Witness Effective Communication |
|---|---|---|---|---|
| People vs Robbins (experimental) | 2.1 | 2.2 | 1.1 | --- |
| People vs Robbins (baseline) | 1.9 | 1.8 | 1.9 | 2.8 |
| People vs. McDermand (experimental) | 1.4 | 1.9 | 2.0 | 1.4 |
| People vs McDermand (baseline) | 1.5 | 2.0 | 1.8 | 1.7 |
| People vs. Nickell (experimental) | 2.0 | 1.0 | 1.8 | 1.8 |
| People vs. Nickell (intermittent baseline) | 2.0 | 1.2 | 1.5 | 1.9 |
| People vs. Nickell (re-trial baseline) | 2.0 | 2.3 | 1.8 | --- |
| People vs. Cassazza et al (experimental) | 2.0 | 2.2 | 2.3 | 2.0 |
| People vs. Cassazza et al (baseline) | 2.0 | 2.1 | 2.2 | 1.7 |

TABLE IV-18 cont.

| Civil Case | Judge Effective Communication | Prosecutor/ Plaint. Att. Effective Communication | Defense Att. Effective Communication | Witness Effective Communication |
|---|---|---|---|---|
| Smith vs. Gayle et al (experimental) | 2.0 | 1.3 | 1.3 | --- |
| Smith vs. Gayle et al (baseline) | 1.8 | 1.5 | 1.2 | 1.3 |

-110-

401

case basis.  In this approach, the experimental and base-
line scores are from the same participants within the
same courtroom environment.  Table IV-18 presents these
data.

Clearly, EMC presence had no discernable negative impact
on the communicative abilities of judges, attorneys, or
witnesses in these "directly comparable" cases.  Nearly
all scores hover around the "normally good" point of the
rating scale--2.0.  This confirms what is suggested by
the aggregated mean scores for EMC vs. baseline ratings,
that generally participants in media coverage proceedings
communicate well whether or not extended media is present.

3.   Summary Discussion of Participant Behavioral Effects

In exploring communicative ability, the evaluators were
looking for effects of divergent types.  Communication
ability might be impaired by excessive nervousness or
communication behavior might subtley change as attorneys
or judges "play to the camera" and "exploit the media".

One might logically theorize that jurors and witness, to
whom courtrooms generally are unfamiliar environments,
are particularly prone to nervousness in front of the
TV cameras, still cameras, and microphones.  In fact,
many witnesses were cognizant of nervousness particularly
before they began testifying.  The source of the nervous-
ness commonly was reported to be a combination of factors,
only one of which was EMC presence.  A major factor was
apprehension about the proceeding itself--being cross
examined or generally being subjected to a trying experi-
ence.  Some witnesses were in fact the defendants in the
proceeding and were generally nervous about case out-
come.  Upon reflection, many witnesses were surprised at

-111-

how focused they were on the proceeding itself, often
becoming oblivious to the media once they took the stand.
Jurors, whose role is more passive than witnesses, were
rarely nervous about EMC except in the sense that many
desired complete anonymity in the media coverage.

According to the interviews, attorneys and judges exper-
ienced the same feeling as witnesses in becoming surpris-
ingly unaware of EMC presence once the proceeding began.
Attorneys are perhaps the most active of all participants
and although occasional signs of nervousness were apparent
to evaluation observers, they were never alarming.  Often,
attorneys later evaluated any apparent nervousness as
"natural" and due to numerous factors besides EMC.  No
attorney or judge admitted to "playing to the camera" for
personal or political gain and in no instance did evalua-
tors observe an obvious display of such behavior.

As with the issues of distraction and disruption, it is
fitting to elaborate upon the small minority of instances
in which behavior reportedly was altered by EMC.

One veteran attorney, representing an industrial plant
being sued for dumping industrial waste, was certain that
the judge ruled on a motion largely to create a favorable
impression in the media.  The attorney, who has experience
in politics, perceived classic signs of "playing to the
camera".  The judge reported that camera presence did not
alter his behavior at all.

In a major civil case, the plaintiff's attorney felt that
the defense attorney damaged his case by "playing to the
camera and not to the jury".  The defense attorney reported
no sense of this nor did the judge or evaluators perceive

-112-

403

this as occurring.  In another major criminal trial, the
defense attorney thought the judge "played to the cameras
for political gain".

In the Segraves vs. State of California trial, the presence
of the media took on a significance of somewhat unusual
dimensions.  The creationist movement, represented by
the Segraves, seeks publicity and public support as does
any other movement, and the evolutionist/creationist legal
"showdown" was not isolated from media coverage--extended
or conventional.  The behavior of many participants
throughout the trial was influenced by perceptions of
how the "debate" would be publicized by the media.  The
judge, and many of the participants, viewed this as a
healthy airing of a public interest issue and an appro-
priate role for the media.

Throughout the experimental year, a few witnesses, and
fewer attorneys expressed a decided uncomfortableness with
cameras in the courtroom.  One person said "I constantly
felt that I was on camera--it hindered my concentration,
I was concerned about the impact my testimony was having."
Others did not like the presence of cameras but did not
feel that the cameras hindered their concentration  or
affected their testimony.

Interview data show concerns about EMC which do not per-
tain to immediate behavioral change.  For example, the
possibility of prejudicial pre-trial publicity was a con-
cern to some lawyers.  In the People vs. Carpenter case
(the "hillside killer" case), the prosecution feared that
cameras in the courtroom for first appearance would
threaten the integrity of the impending "line-up" identi-
fication by certain witnesses, an event which was to take
place shortly after first appearances.  Therefore, arrange-

-113-

404

ments were made to complete the line up immediately after
the first appearance, before the defendant's picture could
be widely broadcast and published.

The defense attorneys in Carpenter share with many other
defense attorneys severe reservations about EMC at any
stage of the proceeding.  Pre-trial publicity, juror con-
tamination and witness intimidation are high on their list
of concerns.  A portion of all participant types expressed
reservations about the capabilities of television news to
accurately or adequately present a story about the court-
room experience.  On the other hand, a portion of all
participant types warmly welcomed EMC as exposing the
public to the realities of the judicial process and edu-
cating them on court systems and procedures.

Few concrete manifestations of EMC opponents' apprehension
about EMC effects occurred during the experimental year.
Although the data do not address many of the concerns
beyond immediate behavioral and environmental effects,
they do identify the extent of perceived problems in an
immediate behavioral and environmental sense.  Given the
exercise of judge discretion in restricting EMC from sit-
uations with an obvious potential for creating problems
(e.g. testimony of a rape victim), EMC rarely changes the
behavior of proceeding participants in a significantly
detrimental fashion.

C.  Additional and Summary Interview Data

Some of the interview questions put to EMC proceeding parti-
cipants were not focused narrowly on the two major evaluation
questions.  Rather, these questions sought perceptions and
feelings which supplement or place in perspective their re-

-114-

405

sponses about disturbance/distraction or behavioral change,
or which sought summary judgments on the experience of par-
ticipating in an EMC event.  The topics of the questions
are:

- general experience characterization (positive, neutral,
  negative);
- surprises or problems encountered;
- reluctance to participate again in an EMC event;
- preference regarding EMC presence;
- fear of harm due to EMC; and
- main impression as to EMC effects.

## Experience Characterization

Judges and attorneys were asked to characterize their experi-
ence with "cameras in the courts" as positive, neutral, or
negative.  The responses presented in Table IV-19 show inter-
esting distributions.  Judges are evenly split between "posi-
tive" and "neutral" (48% and 45% respectively) and only 7%
said "negative".  Attorneys are less positive than judges:
33% said "positive", 40% "neutral", and 27% "negative".  One
of every four  attorneys reported their experience with EMC
to be negative.

### TABLE IV-19

CHARACTERIZATION OF EMC EXPERIENCE

GENERAL

| Judges Response | | | Attorneys Response | | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Positive | 44 | 48% | Positive | 16 | 33% |
| Neutral | 41 | 45% | Neutral | 19 | 40% |
| Negative | 6 | 7% | Negative | 13 | 27% |

406

In an attempt to explain the negative responses, a test
was made to determine whether major EMC events are more
likely to result in a negative experience as characterized
by the judge.  A cross tabulation of the variables Judge
Experience Characterization and Evaluator Importance Rating
(based upon "amount" of EMC as earlier defined) reveals that
all four judges at the "most important" EMC events viewed
the experience as Positive (see Table IV-20).  The Negative
responses were predominantly at the Low to Moderate "impor-
tance" EMC events.  There is no evidence to suggest that more
EMC presence (in terms of continuousness and size of the
pool) is more likely to result in a negative experience (as
characterized by the judge).

Surprises or Problems

Judges and attorneys also were asked if they perceived any
"problems or surprises" during their EMC experience (see
Table IV-21).  Again, attorneys are more negative towards
EMC--half did perceive "problems or surprises" and half did
not.  Judges reported fewer problems and surprises--21% said
there were some and 79% said there were none.

Regrets

Throughout the experimental year, judge consent was required
before extended media were permitted access to courtrooms.
When asked after an EMC experience if he or she had any re-
grets over consenting, nearly all judges (95%) had none (see
Table IV-22).

Reluctance to Participate Again

All participant types were asked if they would be reluctant
to participate again in a court proceeding covered by electronic

-116-

407

TABLE IV-20

JUDGE EXPERIENCE CHARACTERIZATION VS. IMPORTANCE RATING

| Importance Rating | JUDGE EXPERIENCE CHARACTERIZATION | | | | |
|---|---|---|---|---|---|
| | Positive | Neutral | Negative | No Answer | Total |
| Low Import 1 | 3 | 6 | 0 | 2 | 11 11% |
| 2 | 4 | 10 | 0 | 1 | 15 15% |
| 3 | 7 | 12 | 5 | 4 | 28 28% |
| 4 | 11 | 4 | 0 | 1 | 16 16% |
| 5 | 6 | 4 | 0 | 0 | 10 16% |
| 6 | 5 | 3 | 0 | 0 | 8 8% |
| 7 | 2 | 1 | 1 | 0 | 4 4% |
| 8 | 2 | 1 | 0 | 0 | 3 3% |
| 9 High Import | 4 | 0 | 0 | 0 | 0 0% |
| Totals | 44 45% | 41 41% | 6 6% | 8 8% | 99 100.0% |

-117-

408

TABLE IV-21

SURPRISES/PROBLEMS

| | Judges Response | | | Attorneys Response | | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| Yes | 19 | 21% | Yes | 25 | 52% |
| No | 72 | 79% | No | 23 | 48% |

TABLE IV-22

REGRETS ABOUT CONSENTING (Judges)

| | Abs. Freq. | Pct. |
|---|---|---|
| None | 89 | 95% |
| Yes, Has Regrets | 5 | 5% |

and photographic media.  Although this question is primarily
another way of characterizing the EMC event just experienced
by the participant, it also speaks to the hypotheses that jurors
and witnesses will be reluctant to serve because of apprehension
about the effects of extended coverage.  The data in Table IV-
23 indicate that neither the "civilian participants" (jurors
and witnesses) nor other participants (judges and attorneys)
show significant reluctance to participate again in an EMC pro-
ceeding.  Defendants show the most reluctance, but large major-
ities of all participant types reported no reluctance.

-118-

409

TABLE IV-23

RELUCTANCE TO PARTICIPATE AGAIN IN AN EMC COURT PROCEEDING

| | Judge Response | | Attorney Response | | Witness Response | | Juror Response | |
|---|---|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| No Reluctance to Participate Again | 85 | 89% | 39 | 81% | 25 | 86% | 47 | 87% |
| Has Reluctance to Participate Again | 0 | 0% | 7 | 15% | 2 | 7% | 6 | 11% |
| Would Depend on the Case | 10 | 11% | 2 | 4% | 2 | 7% | 1 | 2% |

-119-

410

Preference

All participant types were asked if they would have preferred
cameras not be present.  The notion of preference is distin-
quished from a perception of effects; presumably one could
perceive no effects yet still prefer cameras not be present.
Table IV-24 contains the distribution of responses for the
preference question.

A somewhat greater percentage of individuals said they would
prefer cameras not be present than indicated either reluctance
to participate again or a negative overall feeling about EMC
presence.  Among judges, 28% preferred cameras not be present,
38% of attorneys so indicated, 24% of witnesses, and 20% of
jurors preferred no cameras.  About equal percentages among
each participant type registered no preference one way or the
other.  Judges were the most positive of all types in saying
EMC presence is acceptable (i.e. does not prefer cameras not
be present--60%) and attorneys were the most negative (25%
indicated camera presence acceptable).  Witnesses and jurors
show a similarity in their response patterns: one-half accept-
ing EMC presence, one-fourth preferring they not be present,
and one fourth having no preference.

Judge response patterns to the questions of experience char-
acterization and preference are somewhat different.  It is
therefore interesting to cross tabulate these responses as is
done in Table IV-25.  As expected, judges who characterized
their EMC experience as positive tended to say that EMC pres-
ence was acceptable (did not prefer EMC not be present).
Those who viewed it as a neutral experience tended to say either
they had no preference or that they preferred cameras not be
present.  The negative judges tended to prefer cameras not
be present, but two registered no preference and one said
EMC presence was acceptable despite the negative experience.
Three judges who said their experience was positive also said
that they prefer EMC not be present.

TABLE IV-24

PREFERENCE REGARDING EMC PRESENCE

| | Judges Response | | Attorneys Response | | Witnesses Response | | Juror Response | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Prefer EMC Not Present | 21 | 23% | 18 | 38% | 7 | 24% | 11 | 20% | 57 | 25% |
| EMC Presence Acceptable | 44 | 47% | 12 | 24% | 14 | 48% | 27 | 49% | 97 | 43% |
| No Preference | 28 | 30% | 18 | 38% | 8 | 28% | 17 | 31% | 71 | 32% |

TABLE IV-25

PREFERENCE

| EXPERIENCE CHARACTERIZATION | Prefer EMC Not Present | EMC Presence Acceptable | No Preference | No Opinion | Total |
|---|---|---|---|---|---|
| Positive | 3 | 33 | 8 | 0 | 44 42% |
| Neutral | 13 | 9 | 18 | 6 | 46 44% |
| Negative | 3 | 1 | 2 | 0 | 6 6% |
| No Opinion | 2 | 1 | 0 | 6 | 9 9% |
| TOTALS | 21 20% | 44 42% | 28 27% | 12 11% | 105 100% |

## Fear of Harm

Witnesses, jurors, and defendants were asked if they feared
any harm attributable to electronic/photographic media cover-
age of the proceeding: physical, psychological, financial,
or reputational. Very few in any group responded in the
affirmative. One witness (2%) seven jurors (16%) and two
defendants (29%) reported a fear of harm (see Table IV-26).

## Main Impression Regarding Effects of EMC

Judges and jurors, the "decision-makers" in court proceedings,
were asked specifically to describe their main impression of
the effects of EMC on the proceeding. Table IV-27 records

-122-

413

the answers.  Half of all judges said there were no effects;
equal minorities characterized the effects as positive or
mixed positive/negative (18% and 20% respectively) and a few
judges (8%) had the main impression that EMC effects were
negative.

Jurors show a more dispersed distribution.  Thirty percent
(30%) reported no effects, 32% said positive effects occurred,
16% said mixed positive/negative, and 21% said the effects
were negative.

## TABLE IV-26

"FEARFUL OF HARM" DUE TO EMC

| | Witness Response* | | Juror Response* | | Defendant Response* | |
|---|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | Abs. Freq. | Pct. | Abs. Freq. | Pct. |
| Not Fearful | 55 | 98% | 38 | 84% | 5 | 71% |
| Fearful | 1 | 2% | 7 | 16% | 2 | 29% |

*Four witnesses and one juror indicated general apprehension about cameras
but had no fears in the instant case.

-123-

414

TABLE IV-27

MAIN IMPRESSION REGARDING EMC IMPACT

| | JUDGES | | | JURORS | |
|---|---|---|---|---|---|
| | Abs. Freq. | Pct. | | Abs. Freq. | Pct. |
| None | 53 | 54% | None | 17 | 30% |
| Positive | 18 | 18% | Positive | 18 | 33% |
| Mixed, Positive & Negative | 20 | 20% | Mixed Positive & Negative | 9 | 16% |
| Negative | 8 | 8% | Negative | 12 | 21% |

To test whether the high "importance" EMC events are more or
less likely to exhibit negative effects in the view of the
judge, an analysis was conducted by cross tabulating judge
response on General Added Effects with Evaluator Importance
rating (see Table IV-28).  The four "highest importance" EMC
events are distributed evenly across None, Positive, Mixed,
and Negative.  The Negative responses overall are distributed
across Importance Rating in about the same pattern as other
Added Effects judge responses in the table.  No pattern exists
to support the theory that the more major EMC events are more
likely to have negative effects.

415

TABLE IV-28

Importance Rating vs. Added Effects

| IMPORTANCE RATING | JUDGE ADDED EFFECTS JUDGMENT | | | | | |
|---|---|---|---|---|---|---|
| | No, None | Yes, Some Positive | Yes, Mixed | Yes, Some Negative | No Opinion | Total |
| Low Import 1 | 4 | 2 | 0 | 0 | 5 | 11 11% |
| 2 | 4 | 6 | 2 | 0 | 3 | 15 15% |
| 3 | 12 | 2 | 5 | 3 | 6 | 28 28% |
| 4 | 7 | 3 | 2 | 1 | 3 | 16 16% |
| 5 | 1 | 2 | 5 | 0 | 2 | 10 10% |
| 6 | 1 | 2 | 2 | 1 | 2 | 8 8% |
| 7 | 1 | 0 | 1 | 2 | 0 | 4 4% |
| 8 | 1 | 0 | 2 | 0 | 0 | 3 3% |
| 9 High Import | 1 | 1 | 1 | 1 | 0 | 4 4% |
| TOTALS | 32 32% | 18 18% | 20 20% | 8 8% | 21 21% | 99 100% |

-125-

416

The analysis of interview and observational data presented
in this section documents a record of experience during
California's experiment which is generally favorable towards
EMC. Negative effects of EMC, either reported or observed,
are consistently low across all measures. The attitudinal
survey data discussed in the next section (V) is not so posi-
tively disposed towards EMC. The relationship of case spe-
cific findings and attitudinal analysis results subsequently
is addressed in Section VI.

-126-

417

V.   ATTITUDINAL SURVEYS DATA ANALYSIS

This report section analyzes the general attitudinal data
collected from judges, attorneys and jurors.  The first
part of the section presents analysis from judge and attorney
surveys.  Attorneys are divided into prosecutor and defense
groups and both judges and attorneys ultimately were cate-
gorized as experienced or inexperienced with EMC.  The
second part of the section analyzes juror attitudinal data
and also compares the responses of experienced and inexper-
ienced groups.

For discussion purposes throughout this section, the General
Attitudinal Survey:  Judges and Attorneys will be referred
to as General Attitudinal Survey, or simply Survey as dis-
tinguished from the Juror Attitudinal Questionnaire, or sim-
ply Questionnaire.

A.   General Attitudinal Survey: Judges and Attorneys

   1.   Results Overview

   While there is not one overall measure of the attitude
   of judges, prosecutors and defenders toward EMC, there
   is, nonetheless an obvious aggregate range of attitudes:
   it is from quite negative to neutral.  It cannot be said
   that among these three groups there is a positive over-
   all attitude toward cameras in the courts.

   Of course, the EMC issues and the attitude dynamics are
   complex, as the divisions in this section which follow

-127-

418

will demonstrate.  But even after sorting through the
complicating effects of experience and the passage of
time on these groups, the most significant attitude
changes move some groups only to a midpoint of neutral-
ity, while others remain firmly negative.

To illustrate the general attitudes of these three occu-
pational groups, Tables V-1A, V-1B, and V-1C summarize
the frequency distribution of respondents' answers, pre-
test[34] and posttest,[35] to Items 26a, b, and c on the
Survey:  Should EMC be allowed in Appellate, Civil and
Criminal proceedings?  Tables similar to these for all
remaining items on the survey are found in Appendix

These frequency distributions show that, in general, the
three groups are more favorable (or less negative)
toward EMC in appellate proceedings than in civil or
criminal proceedings.  On the posttest, 69% of the
judges and 70% of the prosecutors approve (combined
Agree and Strongly Agree percentages) of EMC in appel-
late proceedings, while only 30% of the defenders approve.

For civil proceedings, judges on the posttest approve
(combined Agree and Strongly Agree percentages) at a
58% margin, prosecutors at 43% and defenders at 20%.
The disapproval (combined Disagree and Strongly Disa-
gree percentages) rate for judges is 31%, prosecutors
35% and defenders 61%.  A higher frequency of No Opin-
ion is registered by prosecutors and defenders on this
item than the other two items.

---

[34]Survey administered prior to the experiment.

[35]Survey administered after June 30, 1981.

TABLE V-1a

FREQUENCY DISTRIBUTIONS PRE-POST
FOR ALL THREE OCCUPATIONAL GROUPS ON
GENERAL ATTITUDINAL SURVEY ITEM 26a
"EMC should be allowed in appellate proceedings."

| Response Category | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| Strongly Agree 1 | 67 | 18 | 51 | 23 | 49 | 28 | 35 | 32 | 26 | 15 | 12 | 8 |
| Agree 2 | 130 | 35 | 102 | 46 | 59 | 34 | 42 | 38 | 40 | 24 | 20 | 19 |
| No Opinion 3 | 77 | 20 | 29 | 13 | 19 | 11 | 11 | 10 | 21 | 12 | 15 | 14 |
| Disagree 4 | 72 | 19 | 30 | 14 | 28 | 16 | 13 | 11 | 40 | 24 | 26 | 24 |
| Strongly Disagree 5 | 29 | 8 | 10 | 4 | 20 | 11 | 10 | 9 | 42 | 25 | 34 | 32 |
| Number of Cases | 375 | | 222 | | 175 | | 111 | | 169 | | 109 | |
| Mean | 2.64 | | 2.31 | | 2.49 | | 2.29 | | 3.19 | | 3.47 | |

-129-

TABLE V-1B

FREQUENCY DISTRIBUTION PRE-POST
FOR ALL THREE OCCUPATIONAL GROUPS ON
GENERAL ATTITUDINAL SURVEY ITEM 26b
"EMC should be allowed in Civil proceedings."

| Response Category | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| Strongly Agree 1 | 33 | 9 | 27 | 12 | 7 | 4 | 11 | 10 | 7 | 4 | 2 | 2 |
| Agree 2 | 129 | 34 | 103 | 46 | 50 | 29 | 36 | 33 | 26 | 15 | 19 | 18 |
| No Opinion 3 | 59 | 16 | 24 | 11 | 31 | 18 | 25 | 23 | 42 | 25 | 21 | 2 |
| Disagree 4 | 109 | 29 | 52 | 23 | 53 | 30 | 26 | 24 | 44 | 26 | 31 | 29 |
| Strongly Disagree 5 | 44 | 12 | 18 | 8 | 33 | 19 | 12 | 11 | 50 | 30 | 34 | 32 |
| Number of Cases | 174 | | 224 | | 174 | | 110 | | 169 | | 107 | |
| Mean | 3.01 | | 2.69 | | 3.32 | | 2.93 | | 3.62 | | 3.71 | |

-130-

421

TABLE V-1C

FREQUENCEY DISTRIBUTION PRE-POST
FOR ALL THREE OCCUPATIONAL GROUPS ON
GENERAL ATTITUDINAL SURVEY ITEM 26c
"EMC should be allowed in criminal proceedings."

| Response Category | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| STRONGLY AGREE 1 | 29 | 8 | 26 | 12 | 8 | 5 | 14 | 13 | 5 | 3 | 2 | 2 |
| AGREE 2 | 128 | 34 | 93 | 42 | 45 | 26 | 37 | 34 | 19 | 11 | 12 | 11 |
| NO OPINION 3 | 45 | 12 | 17 | 8 | 8 | 5 | 2 | 2 | 8 | 5 | 6 | 6 |
| DISAGREE 4 | 107 | 28 | 59 | 27 | 44 | 25 | 30 | 27 | 36 | 21 | 22 | 21 |
| STRONGLY DISAGREE 5 | 66 | 18 | 27 | 12 | 70 | 40 | 27 | 24 | 101 | 60 | 65 | 61 |
| Number of Cases | 375 | | 222 | | 175 | | 110 | | 169 | | 107 | |
| Mean | 3.14 | | 2.86 | | 3.70 | | 3.17 | | 4.24 | | 4.27 | |

-131-

422

For EMC of criminal proceedings, few respondents had
No Opinion.  Fifty-four percent of the judges approve
on posttest (combined Agree and Strongly Agree), 47% of
the prosecutors and only 13% of the defenders.  Disap-
proval rates for the three groups on posttest are:
judges, 39%; prosecutors, 51% and defenders, 82%.

These tables also show the general trend among judges
and prosecutors of movement toward a more positive atti-
tude as indicated by changes in the mean scores pre to
post and by the increasing percentages in the Agree
categories pre to post.

The overall trend found in the attitudes of the three
key professional groups of disapproving of, or being
neutral toward, EMC in the courtroom provides the back-
ground for this entire analysis section.

2.  Survey Administration

In June, 1980, the General Attitudinal Survey was admin-
istered to judges, prosecutors, and defense attorneys
throughout California.  In this report these surveys
are referred to as the "Pretest".  All 600+ Superior
Court judges, 279 prosecutors (District Attorneys' Of-
fices), and 259 public defenders and private defense
attorneys received the survey.  Of the total 1,140 surveys
mailed out, 855 were returned (75%): 464 judges, 203
prosecutors and 188 defenders.  During the course of
the experimental year, the evaluation team also admin-
istered the survey immediately after an EMC event to
those judges in whose court the event occurred.  A total
of 63 of these surveys were returned.  These surveys
are hereinafter referred to as the "During Posttest".

-132-

423

In July, 1981, the entire group of judges, prosecutors
and defenders were again sent the Survey for what may
be called the "After Posttest". Of the 1,140 total
surveys mailed out, 225 judges, 112 prosecutors and
110 defenders returned the survey (39%). Table V-2
summarizes the numbers of surveys returned during each
test administration.

TABLE V-2

Number of General Attitudinal Surveys
Returned by Occupation

|  | Survey Administration Schedule | | |
|---|---|---|---|
|  | Pretest June 80 | During Post-test (After EMC event) | After Post-test July 81 |
| Judges | 464 | 63 | 225 |
| Prosecutors | 203 | -- | 112 |
| Defenders | 188 | -- | 110 |

Table V-3 identifies the 10 respondent groups used in
the analysis. At the time of the Pretest in June 1980,
prior to the onset of the EMC experiment, none of the
subjects surveyed had had EMC experience; hence, groups
1, 2, and 3 (judges, prosecutors and defenders) are
labelled "EMC Inexperienced" or simply "Inexperienced."

At the time of the After Posttest in July 1981, some
judges, prosecutors, and defenders had had direct EMC
experience. These are groups 5, 7, and 9: "EMC-Experi-

-133-

424

enced: or simply "Experienced".  Others in these same
occupational categories still had not had direct EMC
experience; hence groups 4, 6, and 8 continue to be
labelled "EMC-Inexperienced" or simply "Inexperienced."

Group 10 is an "EMC-Experienced" group--those who com-
pleted the During Posttest.  The attitudes of these indi-
viduals (judges only) were surveyed during the experi-
mental year, right after an EMC event in their courtroom.

### TABLE V-3

#### Summary of General Attitudinal Survey Administration Schedule by Groups

| Groups Surveyed | Survey Administration Schedule | | |
| --- | --- | --- | --- |
| | Pretest June 80 | During Post-test (After EMC event) | After Post-test July 81 |
| **JUDGES** | | | |
| EMC-Inexperienced | 1 | — | 4* |
| EMC-Experienced | — | 10 | — |
| **PROSECUTORS** | | | |
| EMC-Inexperienced | 2 | n/a | 6 |
| EMC-Experienced | — | — | 7 |
| **DEFENDERS** | | | |
| EMC-Inexperienced | 3 | n/a | 8 |
| EMC-Experienced | — | — | 9 |

-134-

3.   Analysis Procedures

Factor Analysis

The 29 items comprising the General Attitudinal Survey
were subjected to factor analysis using a varimax rota-
tion.   Factor analysis is a correlational procedure that
groups items into orthogonal dimensions.   The technique
identifies patterns of intercorrelations among those
many items which, for all intents and purposes, "measure
the same thing".   Specifically, a measure of the degree
of generalizability found between each item and each
factor is calculated and referred to as a factor loading.
Items that "load" on a particular dimension of the fac-
tor structure are extracted by the analysis.   Thus, the
factor loadings identify items which group together in
close relationship to some derived factor or dimension.

The purpose of factor analysis is to summarize the inter-
relationships among the items in a concise and accurate
manner as an aid to conceptualization.   In so doing, a
maximum amount of information from the original items
(or variables) is included in as few derived variables,
or factors, as possible to keep the solution understand-
able.   Factor analysis is an aid in describing data
parsimoniously.

There are several important conceptual and statistical
advantages associated with treating the General Attitu-
dinal Survey responses as factors, rather than analyzing
single item scores.   The summed items making up a factor
provide a more stable, reliable measure than single item
indices, and factor scores produce a much more manageable
and more easily interpreted data array.   Thus, inferences
concerning the nature of the construct represented by
the dimension are allowed.

-135-

426

After determining how many factors existed and how many
items loaded onto each factor, attitude scores for each
factor were arrived at by summing each respondents'
answers to the Survey items contained in the factor and
dividing by the number of items.  Thus, each respondent
had an attitude measure regarding EMC for each of the
factors instead of 29 measures (one for each item from
the Survey).

Reliability coefficients were determined for the items
on the factors.  Reliability is the accuracy (consistency
and stability) of measurement.  Reliability information
indicates how much confidence can be placed in a measure-
ment.  If high, the coefficients indicate that the items
on the factor would group together again if the survey
instrument were used again.  In summary, the factors
derived from the factor analysis became the new sets of
data for the analyses which follow.

Slopes Analysis

The attitude measures (factors yielded in the factor
analysis) were subjected to a number of analyses using
a statistical program that generates the slopes of re-
gression lines from Time 1 (Pretest) to Time 2 (Posttest)
attitude measures.  This technique permitted determina-
tion of the categories of respondents (judges, prosecu-
tors, defenders) that changed significantly from pre-
test to posttest and whether there were significant dif-
ferences in the rates of change from pretest to posttest
for members of the three professional categories (e.g.
whether or not the rate of change for judges was signi-
ficantly different than the rate of change for defense
attorneys or prosecutors).  Finally, these slope analyses
also were used to determine whether or not there were

-136-

427

differences in the rate of attitude change within occu-
pational categories for those respondents who had direct
experience with EMC as opposed to those respondents who
had no direct experience.

## Correlated T-Tests

To determine if the magnitude of changes in factor mean
scores within occupational groups from pretest to post-
test were significant, correlated t-tests of means were
computed and significance determined. The scores are
correlated because pairs of respondents pre to post are
used. That is, the same respondent has both a pretest
score and a posttest score on the factors.

## Discriminant Function Analysis

Discriminant function analysis is a statistical proce-
dure using occupational group scores on the factors to
develop two canonical discriminant functions for each
group. The functions (weighted standards) are then ap-
plied to the raw scores, resulting in new group classi-
fications for each attitude measure. Ideally, the dis-
criminant would classify (predict) each individual into
the correct group. Such is not typically the case,
however, since groups are not usually that homogeneous
in the first place, and the two discriminant functions
are approximations. Discriminant function gives an indi-
cation of group cohesiveness as well as the stability
(or change) in the patterns of responses on an instrument.

## Frequency Distribution Analysis

The frequency distributions for selected items on the
survey were examined for trends and directional changes.

-137-

428

In particular, Items 17 and 25, the party consent ques-
tions, and Items 26a, b, and c, the attitude poll ques-
tions, were tabulated and presented in the body of the
text in this section.  The results of the examination
of Items 26a, b, and c have already been presented in
the Results Overview section above.

4.  Analysis Results

Factor Analysis

Question:  What patterns of intercorrelations are there
between the items on the Survey such that the minimum
number of factors will emerge?  Which items load onto
the factors and what is the reliability of the items on
the factors?

Four factors emerged from the factor analysis of the Gen-
eral Attitudinal Survey.  The factors are identified in
Table V-4 along with the 18 items from the survey which
comprise, or "load onto", the factors.

Factor 1, which consists of eight of the 29 items, is
characterized by statements referring to various effects
that EMC might have on courtroom trials and is thus
labelled General Effects Factor.  Factor 2 consists of
six items alluding to ways in which EMC might exert a
coercive or restrictive influence on behaviors of trial
participants and is therefore labelled Influence Factor.
The remaining two factors, each consisting of two items,
have been labelled Civilian Concern and Mutual Consent.

Reliability coefficients were calculated to determine the
reliability of items in each survey factor.  Table V-5
summarizes the results of the reliability analysis.
The computed reliability (alpha) coefficients indicate

-138-

TABLE V-4

General Attitudinal Factor Analysis Items Grouped By Factors

| Factor Name | Item from Survey |
|---|---|
| 1. General Effects Factor | Q.1. Extended media coverage (EMC, popularly referred to as "Cameras in the court") of courtroom proceedings will not detract from the decorum of the judicial process. |
| | Q.3. EMC of courtroom proceedings will increase citizens' willingness to become involved in the judicial process. |
| | Q.4. EMC of courtroom proceedings will improve the quality of courtroom advocacy. |
| | Q.10. EMC of courtroom proceedings will not affect a judge's ability to maintain courtroom order. |
| | Q.16. EMC of courtroom proceedings will increase jurors' attentiveness to testimony. |
| | Q.26a. EMC should be allowed in Appellate Proceedings |
| | Q.26b. EMC should be allowed in Civil Proceedings |
| | Q.26c. EMC should be allowed in Criminal Proceedings. |
| 2. Influence Factor | Q.7. EMC of courtroom proceedings will cause judges to avoid unpopular positions or decision. |
| | Q.8. EMC of courtroom proceedings will affect voting at the next election of elected officials represented at the proceeding. |
| | Q.9. Jurors' decision making will be influenced by their friends' and acquaintances' attitudes about the case because of EMC of the trial. |
| | Q.15. EMC of bail proceedings will improperly influence a judge in setting bail. |
| | Q.18. EMC of courtroom proceedings will cause prosecutors to "play up" to the media to enhance the re-election prospects of the District Attorney. |
| | Q.24 EMC of sentencing proceedings will improperly influence a judge in the sentencing decision. |

Table V-4 cont.

| | | |
|---|---|---|
| 3. Civilian Concern Factor | Q.19. | EMC will make witnesses more reluctant to testify. |
| | Q.22. | EMC of courtroom proceedings will make people more apprehensive about participating in legal processes. |
| 4. Mutual Consent Factor | Q.17 | EMC of criminal proceedings should be allowed only with the consent of the parties. |
| | Q.25 | EMC of noncriminal proceedings should be allowed only with the consent of the parties. |

431

that high confidence can be placed in the accuracy
and consistency of the attitude measures taken in this
evaluation.  The coefficients indicate that, if used
again, the same items would group together again, form-
ing the same factors, even with different samples of
judges, prosecutors, and defenders.  In short, the Gen-
eral Attitudinal Survey accurately measures the atti-
tudes of the target populations sampled.

TABLE V-5

RELIABILITY OF ITEMS IN EACH FACTOR IN THE GENERAL
ATTITUDINAL SURVEY ANALYSIS

| Factor Name | Reliability Coefficients | | |
|---|---|---|---|
| | Pretest | During Posttest | Posttest |
| 1. General Effects Factor (Items 1,3,4,10,16,26a, 26b,26c) | .87 | .85 | .88 |
| 2. Influence Factor (Items 7,8,9,15,18,24) | .85 | .86 | .88 |
| 3. Civilian Concern Factor (Items 19,22) | .79 | .90 | .84 |
| 4. Mutual Consent Factor (Items 17,25) | .79 | .80 | .81 |

432

Slopes Analysis:  Rates of Change Over Time

Between Occupational Groups

Question: Over time, are attitude changes, if any, occur-
ring uniformly to judges, prosecutors, and defenders?
Is any one of the three groups changing their attitudes
toward EMC faster or slower than others?  Is one group
becoming more negative toward EMC while others become
more positive?

To determine if EMC-Inexperienced judges, prosecutors
and defenders rates (or slopes) of change on attitudinal
factors from pretest to after posttest differed from one
occupational group to the other (between groups), slopes
of regression lines were generated from pairs of pre and
post measures for each group.  The same was done for EMC-
Experienced judges, prosecutors and defenders.

Table V-6 summarizes the result.  On three of the four
factors, significantly different rates of change were
found between the EMC-Inexperienced judges, prosecutors,
and defenders.  The same was true between EMC-Experienced
groups.  In general, it can be concluded that for both
EMC-Inexperienced occupational groups and EMC-Experienced
occupational groups, the changes in their attitude
measures are occurring at different rates.  Put another
way, judges, prosecutors, and defenders changed at sig-
nificantly different rates over time (pre to post) on
their attitudes toward EMC whether or not they had direct
EMC experience.

Why would both Experienced and Inexperienced occupational
groups show different rates of change?  One could presume
that the indirect or vicarious effects of such a high
publicity occurrence such as the "cameras in the courts"
phenomenon might affect equally all three occupational

TABLE V-6

RESULTS OF PRE TO POST SLOPES ANALYSIS ON FACTORS BETWEEN OCCUPATIONS

| Factor | EXPERIENCE LEVEL | |
| --- | --- | --- |
| | EMC-Inexperienced Judges, Prosecutors and Defenders | EMC-Experienced Judges, Prosecutors, and Defenders |
| [1]General Effects | Not significant | Significant beyond .01 level |
| [2]Influence | Significant beyond .01 level | Significant beyond .025 level |
| [3]Civilian Concern | Significant beyond .025 level | Not significant |
| [4]Mutual Consent | Significant beyond .01 level | Significant beyond .01 level |

142-A

434

groups. Any one individual in any of the groups, whether
receiving direct EMC experience or not, was undoubtedly
aware of and affected by news about and knowledge of the
experiment. Receiving an attitude survey from the evalu-
ation team would be an example of such vicarious parti-
cipation. Hence, it is not too surprising that changes
in attitude measures occurred in even the EMC-Inexperienced
groups.

EMC-Inexperienced. The three EMC-Inexperienced occupa-
tional groups rates of change on Factor 1, General Effects,
were not significantly different. Whatever changes may
have occurred on this factor did so uniformly over time
across groups. On Factor 2, Influence, however, the
three groups changed at different rates. Factor 2 is
comprised of Survey items 7, 8, 9, 15, 18, and 24, all
of which highlight concern that EMC possibly may have a
deleterious effect on either the decision makers in court
proceedings or on those public figures who could gain or
lose from media exposure. To understand how the slopes
analysis works, Table V-7 below, extracted from Table
V-8, illustrates the sense of this result.


TABLE V-7

General Attitudinal Survey Factor 2 Mean Scores

| Factor 2 | Judges | EMC-Inexperienced Prosecutors | Defenders |
|---|---|---|---|
| Pretest Mean Score | 2.91 | 2.99 | 1.82 |
| Posttest Mean Score | 3.01 | 3.08 | 1.84 |

-143-

435

TABLE V-8

General Attitudinal Survey Factor Means Used to
Calculate Pre-Post Slopes Between
Occupations and Within Occupations

| Factor | EMC-Inexperienced | | | EMC- Experienced | |
| | Pre | (After)Post | | Pre | (After)Post |
|---|---|---|---|---|---|
| 1* | 3.11 | 3.10 | Judges | 2.86 | 2.79 |
| | 2.61 | 3.38 | Prosecutors | 3.14 | 2.88 |
| | 3.74 | 3.72 | Defenders | 3.92 | 4.00 |
| 2** | 2.91 | 3.01 | Judges | 2.95 | 3.05 |
| | 2.99 | 3.08 | Prosecutors | 3.22 | 3.33 |
| | 1.82 | 1.84 | Defenders | 1.74 | 1.87 |
| 3** | 2.41 | 2.51 | Judges | 2.65 | 2.90 |
| | 2.00 | 2.06 | Prosecutors | 2.24 | 2.44 |
| | 2.02 | 2.05 | Defenders | 1.88 | 1.88 |
| 4** | 2.12 | 2.49 | Judges | 2.38 | 2.8 |
| | 2.02 | 2.16 | Prosecutors | 2.00 | 2.6 |
| | 1.64 | 1.68 | Defenders | 1.44 | 1.4 |

*Lower mean score indicates a more positive attitude toward EMC

**Higher mean score indicates a more positive attitude toward E

-144-

The judges pretest mean score of 2.91 is the summed score
for all six items on this factor for all judges divided
by six and divided by the number of judges. Their post-
test mean score is 3.01, a gain, or change, of .10 units.
The same amount of change in the same direction occurred
for prosecutors, but not for defenders. The overtime
change from pre to post, (the rate of change), is signi-
ficantly different for the defenders than for judges and
prosecutors. Hence, for Factor 2, Influence, we can say
confidently that the three occupational groups are chang-
ing at significantly different rates and that the defenders,
by not changing, are the cause of the significance.

On Factor 3, Civilian Concern, the three EMC-Inexperienced
groups changed at significantly different rates also.
Factor 3 consists of Survey items 19 and 22, indicating
potential EMC effects of reluctance and apprehension in
witnesses and in people in general. Table V-8 shows
that the judges and prosecutors change but the defenders
do not. The pattern continues even more graphically on
Factor 4, Mutual Consent, consisting of Survey items 17
and 25, the "Party Consent" questions. From the means
listed in Table V-8, it can be seen that all three groups
are changing at very different rates: the defenders
not at all; the judges considerably; and the prosecutors
in between.

EMC-Experienced. The rates of change for the three EMC-
Experienced occupational groups on Factors 1, 2, and 4
are significantly different.

Factor 1, General Effects, consists of Survey items 1,
3, 4, 10, 16, 26a, 26b, and 26c, all of which when taken
together describe general, or global, "good-bad" effects
attributable to EMC. Factor 1 items are also those items

-145-

437

which are likely to be affected by direct EMC experi-
ence.  In other words, a judge who had had EMC in his
courtroom may have first-hand knowledge that his ability
to maintain order (item 10) was not diminished.  His
pre to post measure on that item might reflect his exper-
ience, a fact which might not hold time for those indi-
viduals who remained inexperienced.  As seen in Table
V-8, it is the EMC-Experienced prosecutors whose rate
of change (.26 units) is significantly different from
the other two groups.  The defenders' score in this case
changed in the opposite direction, a fact which magnifies
the change rate differences between the groups; hence,
the passage of time resulted in different growth rates
in attitude for this measure.

In Factor 2, Influence, the defenders show the greatest
change in magnitude while in Factor 4, Mutual Consent,
the prosecutors' and judges' rates of change are vastly
different from those of defenders.

Overall, the rates of change over time in attitude meas-
ures for the three occupational groups for both EMC-
Experienced and EMC-Inexperienced show significant dif-
ferences on the four factors.  The attitude scores for
judges and prosecutors, by-and-large, change over time.
The EMC-Experienced judges and prosecutors, in addition,
have the largest change rates.  Defenders, on the aver-
age, seem to have changed only minimally, if at all.
In summary, attitude changes over time are occurring,
but not uniformly between the three occupational groups.

Within Occupational Groups

Question:  Does experience with EMC affect the rate at
which attitude scores change?  Would Experienced judges'

attitudes change faster in regard to EMC than Inexperienced?  Will Experienced prosecutors develop a negative attitude toward EMC while Inexperienced prosecutors stay the same?  What happens within each occupational group to the rates at which its members' attitudes change?

To determine if rates of change (or slopes) on attitude measures from Pretest to After Posttest differed within occupational groups between EMC-Inexperienced members and EMC-Experienced members, slopes of regression lines were generated from pairs of pre and post measures.

Table V-9 summarizes the results and indicates that the rate of change pre to post for EMC-Inexperienced vs. EMC-Experienced members was not significantly different for any of the three occupational groups on any of the four factors.  For illustration purposes, Table V-10

### TABLE V-9

Results of Pre-Post Slopes Analysis on Factors
Within Occupational Groups

| Factor | EMC-Inexperienced and EMC-Experienced | | |
| --- | --- | --- | --- |
| | Judges | Prosecutors | Defenders |
| 1 | Not Significant | Not Significant | Not Significant |
| 2 | Not Significant | Not Significant | Not Significant |
| 3 | Not Significant | Not Significant | Not Significant |
| 4 | Not Significant | Not Significant | Not Significant |

-147-

439

TABLE V-10

General Attitude Survey Factor 4 Mean Scores

| Factor Four | EMC Inexperienced Judges | EMC Experienced Judges |
|---|---|---|
| Pretest Mean Score | 2.12 | 2.38 |
| Posttest Mean Score | 2.49 | 2.86 |

For illustration purposes, Table V-10 above depicts the mean scores (from Table V-8) for judges on Factor 4. As indicated, the amount of change made by the EMC-Inexperienced judges pre to post (2.12 to 2.49) is roughly paralleled by the amount of change made by the EMC-Experienced judges pre to post (2.38 to 2.86). Thus, the EMC-Inexperienced judges changed their attitude at the same rate as did EMC-Experienced judges; the rate of change is similar and not significantly different.

In similar fashion, no significant rates of changes are found for any factor within any of the occupational groups. Direct experienced with EMC was not a factor which affected the rates at which the groups changed their attitudes toward EMC.

As stated at the beginning of this section, it is not surprising that parallel changes were made by members of one occupational group with or without EMC experience. The vicarious experience that was available to these individuals appears to have transcended actual

-148-

and direct EMC experience.  The general effects of the
statewide experiment in EMC evidently were received
in the same manner by members of an occupational group.
As will be seen below, the magnitude of the changes in
attitude varied, even though the rates of change were
similar.

## Correlated t-Tests on Factor Means

### Within Occupational Groups

Question:  How large were the changes in attitude as
measured by the factors made by members of each occu-
pational subgroup?  Were the changes, pre to post with-
in groups, large enough to be considered significant?
Did any groups not change at all?  Which groups showed
the largest amounts of significant changes in their
attitudes toward EMC?

Table V-11 summarizes the results of the correlated t-
tests on factor means for each of the seven groups on
which pre to post pairs of measures were available.

Defenders.  On none of the four factors for either group
of defenders were the mean difference pre to post scores
significant.  In other words, the defenders' attitude
factor scores were very similar in June, 1980 and July,
1981.

Prosecutors.  EMC-Inexperienced prosecutors mean scores
changed pre to post on Factor 1 significantly.  Located
in Table V-8, the mean score is seen to drop from 3.61
to 3.38, a lowering of their concern for possible gen-
eral negative effects of EMC.  Their change is in the
positive direction, though still on the negative side
of the attitude midpoint.  Thus, the EMC-Inexperienced

-149-

441

TABLE V-11

Correlated T-Teat on Factors Pre to Post
Within Occupational Groups

| Factor | EMC Inexp. Judges | EMC Exper. Judges (after) | EMC Exper. Judges (during) | EMC Inexp. Prosec. | EMC Exper. Prosec. | EMC Inexp. Defenders | EMC Exper. Defenders |
|---|---|---|---|---|---|---|---|
| [1] General Effects | --- | --- | --- | signif. beyond .01 | --- | --- | --- |
| [2] Influence | signif. beyond .01 | --- | signif. beyond .01 | --- | --- | --- | --- |
| [3] Civilian Concern | --- | --- | signif. beyond .01 | --- | --- | --- | --- |
| [4] Mutual Consent | signif. beyond .01 | signif. beyond .01 | signif. beyond .01 | --- | signif. beyond .01 | --- | --- |

442

prosecutors are significantly less negative, though
not positive, about the possible adverse general effects
of EMC.  The survey items in Factor 1 relate to decorum,
citizen apprehension, quality of advocacy, judge ability
to maintain order, juror distraction, and type of pro-
ceeding in which EMC should be permitted.

The EMC-Inexperienced prosecutors came to believe that
on this "good-bad" general factor there was less cause
for concern after one year of the experiment.

EMC-Experienced prosecutors also changed significantly
on only one factor--Factor 4, Mutual Consent.  From
Table V-8 their mean score is seen to move significantly
from 2.0 to 2.69, pre to post.  This factor consists of
survey items 17 and 25 which polled the respondents on
their attitude about party consent.  The EMC-Experienced
prosecutors, while still on the negative side of the
attitude midpoint, shifted dramatically on this issue.

Judges.  EMC-Inexperienced judges showed significant
mean score change on Factor 2, Influence, and Factor 4,
Mutual Consent.  Mean scores (Table V-8) on Factor 2
changed from 2.91 to 3.01 and 2.12 to 2.49 on Factor 4.
The EMC-Inexperienced judges moved exactly to the mid-
point on the agree-disagree attitude scale on Factor 2.
On Factor 4 they still are on the negative side of the
attitude midpoint although their movement is significant
and toward the positive.

The After Posttest EMC-Experienced judges (those meas-
ured in July, 1981) showed significant mean score change
on Factor 4, Mutual Consent, from 2.38 pre to 2.86 post.
The movement is large, toward the positive side of the
scale, but remains on the negative side of the attitude
midpoint.

-151-

443

The During Posttest EMC-Experienced judges (those meas-
ured right after an EMC event in the courtroom during
the experimental data collection year) are the one group
showing the most numerous and the largest pre-to-post
changes on the Factors.  Factors 2, 3, and 4 all exhibit
significant change scores.  Table V-12 shows the pre-
post mean scores for this group of judges.

TABLE V-12

Pretest to During Posttest Means for Judges
on Factors on General Attitudinal Survey

| Factor | Pretest Mean Score | During Posttest Mean Score |
|--------|--------------------|----------------------------|
| 1*     | 2.82               | 2.61                       |
| 2**    | 3.08               | 3.33                       |
| 3**    | 2.37               | 2.94                       |
| 4**    | 2.48               | 3.26                       |

*Lower mean score indicates a more positive attitude
 toward EMC.
**Higher mean score indicates a more positive attitude
 toward EMC.

For this group of EMC-Experienced judges, all their
mean scores show change toward a more positive atti-
tude about EMC.  On Factor 4, Mutual Consent, the mean
scores change Pretest to During Posttest from 2.48 to

-152-

444

3.26, from well below to well past the midpoint on the
agree-disagree attitude scale.  Though not a resounding
endorsement of the no party consent rule, these judges
do, on the average, favor it, and their score represents
them as the only group whose overall attitude is positive
toward the no party consent rule.

On Factor 3, Civilian Concern, these interim-measured
judges show a significant mean score change.  Factor 3
refers to reluctance and apprehension in witnesses and
other civilian participants; i.e., the judges feel that
there is now less cause for concern about these elements.
On Factor 2, Influence, these judges, whose scores on
the Pretest already were at the midpoint on the agree-
disagree attitude scale moved further toward positive
(3.08 to 3.28), indicating a further relaxation of con-
cern about the potential negative effects represented by
the elements in this factor.

Even though not significant at the .05 level, the change
score on Factor 1 continued the above positive trend
and changed a sizeable amount, from 2.82 to 2.61 (trans-
posed for direction correction to achieve consistency
with the other factors, the means moved from 3.18 to 3.39).
This score (3.39) for this group of judges (during Post-
test) represents the most positive attitude of any
group on any factor on the Survey.

Overall Attitude Characteristics

The bar graphs, in Figures V-13A-D provide visual illustration
of the attitudes in general and of the attitude differences
between and among the groups measured by the Survey.
The bar graphs show the practical significance of the

-153-

445

FIGURE V-13A
FACTOR ONE BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR ONE: GENERAL EFFECTS

Survey Items: 1, 3, 4, 10, 16, 26a, b, c

-154-



FIGURE V-13B
FACTOR TWO BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR TWO:  DECISION INFLUENCE
Survey Items:  7, 0, 9, 15, 10, 24

-155-

447



FIGURE V-13C
FACTOR THREE BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR THREE: CIVILIAN CONCERN
Survey Items: 19, 22



FIGURE V-13D
FACTOR FOUR BAR GRAPHS
GENERAL ATTITUDINAL SURVEY
PRE-POST MEANS FOR OCCUPATIONAL GROUPS

FACTOR FOUR:  MUTUAL CONSENT
Survey Items:  17, 25

-157-

449

Survey results.  It is best for a reader to examine the
graphs as a group of four in relation to one another,
using Table V-14, which shows the means for each item,
as an aid.  Factor 1 scores were transposed directionally.

The four most outstanding characteristics shown by the
graphs are: 1) the predominantly negative to only mildly
neutral tone in attitudes toward EMC across all groups;
2) the clear trend in post-testing toward a more posi-
tive attitude except for defenders; 3) the overwhelming
and persistent negative attitude on all factors by the
defender groups, and 4) the posttest factor scores of
experienced judges and prosecutors.

Negative Attitude Toward EMC.  Although some of the
analysis results showed significant changes in a posi-
tive direction on the attitude scale in several groups
on several factors, the general or overall attitude of
respondents can only be characterized as negative.  On
Factor 1, only, for judges and prosecutors and Factor 2
for judges can one conclude even a neutral or mildly
positive attitude toward EMC.  There is not a widespread
or strongly positive attitude among the three professional
groups toward EMC.

Posttest Trend. On every factor, all groups except defense
attorneys showed posttest movement toward a less negative
attitude.  The trend seems to indicate an openness in
examining the results of the current experiement, in terms
of personal experience and perceived effects.  For
judges, their posttest trend toward the positive may
be the manifestation of an attempt to bring their own
attitudes in line with the U.S. Supreme Court decision
on Chandler, which allows states to permit EMC over the
objections of defendants.  Each of the three judge groups
made significant changes on Factor 4, which is the party
consent issue.  While judges (and perhaps prosecutors as
well) may feel some inclination to align themselves with

-158-

450

TABLE V-14

CORRELATED T-TEST RESULTS ON PRE-POST SURVEY ITEM MEANS GROUPED BY FACTOR WITHIN OCCUPATIONS

| Factor | Survey Item | | Inexp. Judges Pre | Post | Exp. Judges Pre | Post (after) | Exp. Judges Pre | Post (during) | Inexp. Prosecutors Pre | Post | Exp. Prosecutors Pre | Post | Inexp. Defense Pre | Post | Exp. Defense Pre | Post |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1_B | Q1 | Decorum | 3.22 | 3.31 | *2.94 | 2.60 | *2.93 | 2.36 | *3.98 | 3.54 | *3.64 | 2.93 | 4.02 | 3.88 | 4.41 | 4.53 |
| | Q3 | Willingness | 3.47 | 3.61 | 3.19 | 3.44 | *3.59 | 3.28 | 3.86 | 3.86 | 3.54 | 3.46 | 3.89 | 3.91 | 3.7 | 3.95 |
| | Q4 | Advocacy | *3.32 | 3.52 | 3.37 | 3.50 | 3.25 | 3.39 | 3.96 | 3.82 | 3.57 | 3.36 | 3.95 | 3.84 | 4.30 | 6.48 |
| | Q10 | Order | 2.48 | 2.59 | 2.27 | 2.21 | 2.00 | 2.03 | *3.32 | 3.00 | 2.54 | 2.46 | 3.05 | 3.05 | 3.33 | 3.30 |
| | Q16 | Attentiveness | 3.51 | 3.50 | 3.28 | 3.39 | 3.23 | 3.30 | 3.72 | 3.54 | 3.59 | 3.63 | 3.73 | 3.73 | *3.63 | 4.11 |
| | Q26a | Appellate EXC | *2.79 | 2.42 | 2.35 | 2.07 | 2.37 | 2.17 | 2.53 | 2.60 | *2.30 | 1.89 | 3.37 | 3.50 | 3.62 | 3.38 |
| | Q26b | Civil EXC | 3.02 | 3.88 | *2.72 | 2.46 | *2.63 | 2.17 | *3.53 | 3.21 | 2.93 | 2.52 | 3.66 | 3.63 | 3.96 | 3.73 |
| | Q26c | Criminal EXC | 3.13 | 3.02 | 2.76 | 2.65 | 2.93 | 2.57 | *3.91 | 3.52 | 3.26 | 2.78 | 4.19 | 4.18 | 4.54 | 4.46 |
| 2_B | Q7 | Decisions | 3.10 | 3.18 | 3.27 | 3.15 | *3.33 | 3.67 | 2.58 | 2.68 | 2.71 | 3.07 | 1.75 | 1.64 | 1.74 | 1.48 |
| | Q8 | Elections | *2.34 | 2.68 | *2.38 | 2.73 | 2.52 | 2.78 | 2.54 | 2.60 | 2.57 | 2.71 | 1.91 | 2.06 | 1.96 | 2.31 |
| | Q9 | Influence Juror | 3.01 | 3.20 | 3.31 | 3.21 | 3.32 | 3.46 | 2.95 | 3.09 | 3.11 | 3.21 | 2.23 | 2.27 | 2.07 | 2.07 |
| | Q15 | Bail | 3.24 | 3.20 | 3.21 | 3.26 | 3.33 | 3.52 | 3.02 | 3.09 | 3.36 | 3.50 | 1.67 | 1.60 | 1.56 | 1.56 |
| | Q18 | Grandstanding | *2.67 | 2.89 | 2.51 | 2.62 | *2.45 | 2.83 | 3.65 | 3.74 | 3.85 | 4.19 | 1.77 | 1.77 | *1.59 | 1.93 |
| | Q24 | Sentencing | *3.15 | 3.38 | 3.24 | 3.50 | 3.45 | 3.59 | 3.21 | 3.23 | 3.59 | 3.44 | 1.56 | 1.69 | 1.44 | 1.70 |

451

TABLE V-14 cont.

CORRELATED T-TEST RESULTS ON PRE-POST SURVEY ITEM MEANS GROUPED BY FACTOR WITHIN OCCUPATIONS

| Fac-tor | Survey Item | Inexp. Judges | | Exp. Judges (after) | | Exp. Judges (during) | | Inexp. Prosecutors | | Exp. Prosecutors | | Inexp. Defense | | Exp. Defense | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Pre | Post | Pre | Post | Pre | Post | Pre | Post | Pre | Post | Pre | Post | Pre | Post |
| $3_B$ | Q19 Reluctance | 2.33 | 2.46 | 2.57 | 2.77 | *2.32 | 2.86 | 1.89 | 2.07 | 2.15 | 2.38 | 1.95 | 1.97 | 1.80 | 1.8 |
| | Q22 Apprehension | 2.50 | 2.56 | 2.78 | 3.09 | *2.50 | 3.11 | 2.11 | 2.05 | 2.35 | 2.46 | 2.08 | 2.13 | 1.85 | 1.9 |
| $4_B$ | Q17 Criminal Consent | *2.09 | 2.43 | *2.24 | 2.80 | *2.21 | 3.21 | 1.91 | 2.04 | 1.96 | 2.52 | 1.44 | 1.44 | 1.23 | 1.3 |
| | Q25 Noncriminal Consent | *2.32 | 2.56 | *2.52 | 2.91 | *2.76 | 3.31 | 2.12 | 2.28 | *2.04 | 2.85 | 1.83 | 1.92 | 1.67 | 1.6 |

A = Lower mean score indicates more positive attitude toward EWC.

B = Higher mean score indicates more positive attitude toward EWC.

* = Difference pre to post significant .05 and beyond.

a newly promulgated legal guideline, defenders, in con-
trast, apparently feel no such obligation.

Defender Attitude. In interpreting the strong anti-EMC
attitude possessed by defense attorneys, the evaluators
were reminded of many personal interviews held with
defense attorneys during the course of data collection.
Many attorneys held that EMC on principle was wrong,
and that they would never change their minds. The survey
results seem to correspond with these interview com-
ments. No change in scores of any consequence occurs
for defenders during the 13 months between testing.
Attitudes which are based on perceived principle are
much less susceptible to change by either additional
information or personal experience. What is perceived
as morally or politically wrong becomes a tenacious
perception.

Other actors, judges notably, may have attitudes toward
EMC which are based less on moral premises and more on
rational examination of the issues involved. Such an
attitude dynamic is more maleable and much more vulner-
able to revision.

Experienced judges and prosecutors. For judges and pro-
secutors, experience appears to alter attitude. Of par-
ticular interest is the judge group whose posttest was
taken during the year, soon after an EMC event in their
courtroom. These judges show the most positive, or
least negative, attitude toward EMC.

From on-site observation, the evaluation team found,
generally, that actual EMC events were not negative

-161-

453

experiences for participants and when interviewed, most judges concurred. As a result, when a particular judge completed an attitudinal survey soon after an EMC event in his courtroom, very likely he could have responded from the framework of a relatively positive recent experience. Hence, these "during posttest" judge attitudes may reflect their views of the specific event just concluded. The other two judge groups responded to the survey from a more abstract or distant perspective; i.e., EMC in general, a perspective of overall attitude and overall experience with the media, and not from the perspective of a recently completed event.

Attitudes toward EMC are long held and probably rather firmly held. There may be an immediate impact on a judge from an EMC event which could alter temporarily the attitude only to have it revert back toward the older (more negative) attitude after the passage of time. The "After Posttest" scores therefore may be somewhat lower than the During Posttest scores because of this "regression toward the mean" phenomenon.

## Discriminant Function Analysis

Question: How cohesive are the patterns of attitude response within occupational groups? Can occupation of respondent be predicted from response patterns on the survey? Is there any relationship between group cohesiveness and attitudes toward EMC?

The discriminant analysis procedure when applied to the 685 valid General Attitudinal Survey pretests and the 432 valid Survey posttest resulted in 53% and 55% of the grouped cases correctly classified. Table V-15 illustrates how the discriminant function analysis supports the other findings in this evaluation.

-162-

454

TABLE V-15

CLASSIFICATION RESULTS
DISCRIMINANT FUNCTION ON PRETEST FACTORS BY OCCUPATION

| Actual Group | No. of Cases | Predicted Group membership | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| Judge 1 | 352 | 144<br>41% | 102<br>29% | 106<br>30% |
| Prosecutor 2 | 168 | 46<br>27% | 94<br>56% | 28<br>17% |
| Defender 3 | 165 | 28<br>17% | 9<br>5% | 128<br>78% |

Percent of grouped cases correctly classified: 53%

---

CLASSIFICATION RESULTS
DISCRIMINANT FUNCTION ON POSTTEST FACTORS BY OCCUPATION

| Actual Group | No. of Cases | Predicted Group Membership | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| Judge 1 | 219 | 88<br>40% | 84<br>38% | 47<br>22% |
| Prosecutor 2 | 109 | 31<br>28% | 64<br>59% | 14<br>13% |
| Defender | 104 | 12<br>11% | 8<br>8% | 84<br>81% |

Percent of grouped cases correctly classified:  55%

455

Judges and prosecutors, on the average, in the posttest
classification become more similar to one another. In
the pretest classification results, 70% of the judges
were predicted into either the judge or prosecutor
groups. On the posttest, 78% of the judges were pre-
dicted into either the judge or prosecutor group. In
the pretest, 83% of the prosecutors were predicted into
either the prosecutor or judge groups while in the post-
test 87% of the prosecutors were predicted into either
prosecutor or judge groups. Attitude differences between
judges and prosecutors faded over the course of the
year. Fewer judges and prosecutors on the posttest
were predicted into the defender group than on the
pretest. Put another way, the attitudes toward EMC
of both judges and prosecutors on the posttest measures
became less like the attitudes of defenders.

The defenders were the easiest group to classify cor-
rectly. On the pretest, 78% of the defenders were classi-
fied as defenders and on the posttest the percentage
rose to 81%. Defenders were least likely to be predicted
in the prosecutor category. This means that the response
pattern of the defender group is very homogeneous and
predictable. On the posttest, 81% of the time the
defender's occupation can be predicted correctly on the
basis of their responses on the Survey. In a graphic
way, the defenders became, one year later, an even more
cohesive group. One might say they became more predicta-
bly "defenders", showing a more unified force in the
display of their attitudes toward EMC.

There was on the pretest and remained on the posttest
more diversity in the prosecutor group than the defender
group. Prosecutors are least likely to be classified
as defenders (13% on the posttest) and most likely to
be classified as prosecutors (59% on the posttest).

-164-

456

The judges are the most diverse and least cohesive
group. On the posttest, 22% of the judges' response
patterns result in their being classified as defenders
and 38% of them are classified as prosecutors. On both
the pre and posttest, only about 40% of the judges are
classified correctly as judges. Because of the diversity
of their opinions, it is very difficult to predict cor-
rectly the occupation of judges on the basis of their
responses to the survey. Due to the diversity of atti-
tude in the judge and prosecutor groups, the percentage
of grouped cases correctly classified remains at 55%.
This is relatively low although it indicates predicta-
bility above that of pure chance.

The classification results also indicate that the prose-
cutors and judges are groups which are shifting their
attitudes toward EMC while defenders appear not to be
changing. These findings are entirely consistent with
other earlier findings on rates and amounts of attitude
change.

One might extrapolate from the most recent discriminant
function Posttest-Classification a description of the
political forces operating in California among these
three occupational groups in regard to EMC. Defense
attorneys seem adamant in their opposition to EMC and
present a unified front with few dissenters. Prosecutors
are less cohesive as a group than defenders and more
likely to line up with non-defender-like judges. Judges
are the least unified group, the most diverse of the
three groups, as of July 1981. About four-fifths of
the judges are similar to non-defender-like prosecutors.
The non-defender-like judges and prosecutors may repre-
sent the pro-EMC forces.

If one assumes (as the earlier data analysis show) that
the defenders are, as a group, the most opposed or nega-
tive toward EMC, there still remains a sizeable group
of prosecutors (13%) and a larger group of judges (22%)
who stand with the defenders in their opposition to
EMC.

## Frequency Distributions

Question:  What frequency of distribution patterns in
general occur pre post among the total judge, prosecutor
and defender groups on each item in the survey?  What
do particular patterns among the groups' frequency dis-
tributions illustrate about their overall attitudes
toward EMC and the no party consent rule?

Among all three occupational groups sampled by the survey,
there is considerable and persistent opposition to the
ruling which removed party consent as a condition for
EMC.  Judges and prosecutors over the course of one year's
time during the experiment did modify their views and
object somewhat less to the ruling by July, 1981.  Defenders
made no such change.

Table V-16 shows the frequency distribution of responses
for all judges, prosecutors and defenders pre and post
on item 25, Noncriminal Consent.  Judges mean scores
change from 2.31 pre to 2.71 post; prosecutors from 2.12
to 2.50 and defenders from 1.85 to 1.87.  By July, 1981,
55% of the judges, 57% of the prosecutors and 82% of the
defenders either Agree or Strongly Agree with the item
(requiring consent).  At the same point in time 37% of
the judges, 18% of the prosecutors and 7% of the defenders
either Disagree or Strongly Disagree with the item (no
consent needed).  Consistent with the general findings
in the analysis of the Survey results, the defense attorneys

-166-

TABLE V-16

OPPOSITION TO NO CONSENT RULE
FREQUENCY DISTRIBUTION OF SURVEY ITEM 25
"EMC of noncriminal proceedings
needs consent of parties."

| Category Label | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| STRONGLY AGREE 1 | 85 | 22 | 34 | 15 | 50 | 29 | 19 | 17 | 74 | 43 | 45 | 41 |
| AGREE 2 | 184 | 49 | 91 | 40 | 80 | 46 | 45 | 40 | 65 | 38 | 45 | 41 |
| NO OPINION 3 | 26 | 7 | 18 | 8 | 20 | 11 | 27 | 24 | 18 | 11 | 12 | 11 |
| DISAGREE 4 | 69 | 18 | 71 | 32 | 24 | 14 | 13 | 12 | 12 | 7 | 2 | 2 |
| STRONGLY DISAGREE 5 | 13 | 3 | 11 | 5 | 1 | 1 | 7 | 6 | 2 | 1 | 5 | 5 |
| Number of Cases | 377 | | 225 | | 175 | | 111 | | 171 | | 109 | |
| Mean | 2.31 | | 2.71 | | 2.12 | | 2.50 | | 1.85 | | 1.87 | |

459

are in solid and unchanging opposition to removing the
consent rule on noncriminal EMC proceedings.  As well,
neither the judge nor prosecutor group, on the average,
are in favor of removing the consent rule.

Table V-17 shows the frequency distribution of responses
for all judges, prosecutors and defenders pre and post
on Item 17, Criminal Consent.  Opposition to no party
consent in criminal proceedings for the three groups,
judges, prosecutors, and defenders, on pretest (combin-
ing Agree and Strongly Agree) starts out at 80%, 79%,
and 91% respectively for the three groups.  A small min-
ority of 16%, 18%, and 7% (combining Disagree and Strongly
Disagree) respectively favors no party consent.  Almost
none of the respondents in any group has No Opinion.

One year later judges opposition to the no party consent
rate changed considerably.  Their percentage of Agree
plus Strongly Agree responses favoring party consent
being required dropped to 61%, with a corresponding in-
crease from 16% to 35% in those who favor no party con-
sent.  Prosecutors made smaller changes though in the
same direction.  Defenders made no change at all.

As of July, 1981, judges, prosecutors, and defense attor-
neys in California as groups oppose the no party consent
required rule for EMC of criminal proceedings by the
large percentages of 61%, 79%, and 90%.  The graphs
shown in Figure V-18 illustrate the magnitude of opposi-
tion to the no party consent rule and the spread of
levels of opposition between the respondent groups.

Frequency distributions for survey Items 26a, b, and c
are located in Table V-1 in the Results Overview (page
of this section of the report.  The tables for the re-
maining items in the survey are located in Appendix I.

-168-

TABLE V-17

OPPOSITION TO NO CONSENT RULE
FREQUENCY DISTRIBUTION OF SURVEY ITEM 17
"EMC of criminal proceedings should be
Allowed only with the consent of the parties"

| Category Label | ALL JUDGES | | | | ALL PROSECUTORS | | | | ALL DEFENDERS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRE | | POST | | PRE | | POST | | PRE | | POST | |
| | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % | FQY | % |
| STRONGLY AGREE 1 | 149 | 40 | 45 | 20 | 88 | 50 | 42 | 38 | 126 | 74 | 77 | 71 |
| AGREE 2 | 151 | 40 | 92 | 41 | 51 | 29 | 37 | 33 | 28 | 17 | 21 | 19 |
| NO OPINION 3 | 12 | 3 | 9 | 4 | 4 | 2 | 3 | 3 | 4 | 2 | 1 | 1 |
| DISAGREE 4 | 54 | 14 | 68 | 30 | 23 | 13 | 24 | 22 | 8 | 5 | 6 | 5 |
| STRONGLY DISAGREE 5 | 9 | 2 | 10 | 5 | 9 | 5 | 5 | 4 | 4 | 2 | 3 | 3 |
| Number of Cases | 375 | | 220 | | 175 | | 111 | | 170 | | 108 | |
| Mean | 2.00 | | 2.58 | | 1.94 | | 2.22 | | 1.45 | | 1.49 | |

-169-

FIGURE V-13

LEVEL OF OPPOSITION PRE AND POST
TO REMOVAL OF THE PARTY CONSENT RULE
JUDGES, PROSECUTORS AND DEFENDERS



-170-

462

Finally, the frequency distribution tables of remaining
items in Appendix I and table of means in Appendix J.
show the continued general trend of transference of
responsibility (items 4, 7, 8, 10, 13, 14, 15, 18, 24,
and 27). Transference of responsibility if a phenomenon
which permits respondents to agree with statements that
suggest possible negative effects of EMC on the behaviors
or the required roles of members of one or both of the
other two groups, but not with statements that suggest
their own professional group will be somehow negatively
impacted by EMC. The phenomenon can best be seen on
Item 18 (refer to Table V-14, in this section) which
suggests that prosecutors will "play up to the camera."
On the pretest and the posttest defenders strongly
agree with this statement. Prosecutors strongly disa-
gree. EMC experience and the passage of time does
little for these groups to modify this human tendency
to see the problem as centered in the other party,
not oneself.

5. Discussion and Summary

The attitude measures are important since decisions and
actions are, at times, determined by attitudes. If
attitude changes follow from experience, as theory sug-
gests, then the trends found in the present evaluation
paint a relatively bright picture for eventual acceptance
of EMC by judges and attorneys, despite the current
level of mixed findings. The evaluation evidence strongly
suggests that specific EMC experience altered attitudes
toward EMC in judges and prosecutors. Even many of those
who did not have direct EMC experience evidenced changes.
For those subgroups within these two groups and for defense
attorneys who oppose EMC on principle, experience may not
so easily modify their attitudes.

463

To sum up briefly, the data analysis first yielded
four reliable factors which summarize the respondents'
general attitudes:  General Effects; Decision Influence;
Civilian Concern; and Mutual Consent.

When each factor was tested for change over time, the
three occupational groups (judges, prosecutors, and
attorneys) showed significantly different rates of
change on most factors.  Experience with EMC did not
prove to be an element affecting rates of change; occu-
pation was the element.  Within occupational groups,
each occupational group showed similar change rates
over time on the factors irrespective of EMC experience.

Magnitude of change over time on the factors (within
occupational groups divided into Experience and Inex-
perience subgroups) proved significant on a selective
basis.

- Neither Experienced nor Inexperienced defenders
  changed on any factor attitude scores pre to post.

- Inexperienced prosecutors became less concerned
  about the potential negative EMC general effects.

- Experienced prosecutors became less concerned about
  the potential negative effects of removing the
  party consent rule.

- Inexperienced judges a) became less concerned about
  potential negative EMC influence on decisions; and,
  b) became less concerned about the potential nega-
  tive effects of removing the party consent rule.

- Experienced judges during (posttested during the
  year right after an event) a) became less concerned
  about potential negative EMC influence on decisions;
  b) became less concerned about the potential nega-
  tive EMC effects on civilian participants; and, c)
  became less concerned about the potential negative
  effects of removing the party consent rule.

- Experienced judges after (posttested in July, 1981) became less concerned about the potential negative effects of removing the party consent rule.

Except for defenders, all other experienced groups became significantly less concerned about the negative effects of removing the party consent rule. However, only the Experienced judges, posttested during the year, ended up on the positive side of midpoint on the scale measuring this factor. Thus, while the no party consent issue stirred the greatest amount of attitude change among experienced judges and prosecutors, their current attitude can best be described as neutral.

In the discriminant function analysis, the defender group proved to be the most cohesive and predictable of the three groups, followed by prosecutors, with judges least cohesive. The history of controversy surrounding EMC in California seemed validated by these results.

Unanswered, and unknown at this point is why do judges, prosecutors, and defenders have such negative overall attitudes toward EMC? In direct contrast to the observed events and to most of the interview data, the global negative to neutral attitudes toward EMC of the three professional groups is puzzling. However, we do know, now, that the attitudes, as measured, are complex and multi-faceted. There is not a single, overall attitude; rather there are _attitudes_ toward EMC. The factors uncovered in the analysis are constructs which seemed to identify the major sources of vitality for these differences in attitude.

-173-

465

B.  Juror Attitudinal Questionnaires

1. Results Overview

Just as there is no one overall measure of the attitudes
of judges, prosecutors and defenders toward EMC, there
is no parallel global indicator of juror attitudes.
Contrary to the negative aggregate range of attitudes
for the professional groups in court proceedings,
however, the juror group's aggregate range of attitudes
varies from neutral to positive.

To support this Attitudinal Questionnaire finding,
Table V-19 below summarizes the general opinion jurors
have toward EMC as gathered using interviews.

### Table V-19

General Opinion About EMC
Expressed by Jurors in Interviews

| Opinion Category | Abs. Freq. | Pct. |
|---|---|---|
| Very Unfavorable | 7 | 13% |
| Unfavorable | 1 | 2% |
| Neutral | 13 | 23% |
| Favorable | 18 | 32% |
| Very Favorable | 17 | 30% |

EMC-Experienced jurors show an overall favorable
percentage of 62%.  Strong objection to EMC is not com-
ing from this citizen group.  The second major trend

-174-

466

found in the study of juror attitudes toward EMC is that
the EMC-Experienced Jurors basically see themselves, see
others in and out of the system, and see the judicial sys-
tem itself as able to withstand whatever potential nega-
tive effects the intrusion of EMC may bring.  These two
overall results provide a background against which the
more detailed analyses of the juror attitude questionnaire
is positioned.

2.  Survey Administration, Sample Size and Sample Charac-
    teristics

A total of 1,340 prospective jurors were sampled for their
perception of and attitudes toward conventional and ex-
tended media coverage of proceedings in California state
courts.  Table V-20 shows the geographical and chronolog-
ical breakdown of the jury pool sample.  All 1,340 indivi-
duals had been called for jury service and were gathered
in juror pools when surveyed.  The Questionnaire was admin-
istered to groups of prospective jurors as they received
their orientation from the jury commissioner.  Either a
member of the evaluation team or a member of the jury
commissioner's staff administered the Questionnaire.
Throughout the balance of this section, this sample of
jurors will be referred to as the Inexperienced group,
meaning that they did not have EMC experience.

In addition to the Inexperienced group, a small sample of
Experienced jurors was measured for their attitudes
toward conventional and extended media coverage.  In
total, 34 jurors who served at conventional high publi-
city trials and 79 jurors who served at EMC high publi-
city trials responded to the Questionnaire.  Experience
means that these jurors had actual trial experience with
either conventional or extended media coverage.  The
total number of Experienced and Inexperienced jurors
sampled was 1,453.

-175-

467

TABLE V-20

Statewide Jury Pool Sample Sizes

|  | Fresno | Los Angeles | Sacramento | San Diego | Total |
|---|---|---|---|---|---|
| Baseline | 0 | 171 | 223 | 0 | 394 |
| Experimental | 87 | 443 | 215 | 201 | 946 |
| Total | 87 | 614 | 438 | 201 | 1,340 |

This evaluation focused primarily on possible effects
of extended media coverage on the conduct of trials and
on the behaviors of trial participants. To establish an
existing frame of reference for understanding issues
relating to EMC, it was deemed useful to sample the
public's perception (through prospective jurors) of the
impact of conventional media coverage (i.e., reporters
and sketch artists) on courtroom atmosphere and trial
conduct. This step was accomplished prior to the begin-
ning of the experimental year by designing and adminis-
tering a Juror Attitudinal Questionnaire comprised of
14 items which sought to tap the perceived impact of the
conventional media on the courts. (See Section II Research
Design.) This questionnaire was administered to a sample
of 394 prospective jurors in Sacramento and Los Agneles.
Prospective jurors were defined as those who had been
called for service but who as yet had not been assigned
to a trial. They may or may not have had prior jury duty.

Because the items on the Questionnaire for conventional
coverage attitudes differed from those on the Questionnaire
for EMC attitudes, subsequent comparisons of the latter

-176-

468

(This page intentionally left blank)

-177-

with the former instrument is not possible, other than
from a heuristic perspective. Nevertheless, as empha-
sized above, responses to the Questionnaire measuring
perceived attitudes toward conventional media coverage
provide a useful descriptive frame of reference for
assessing juror perceptions of the additional impact,
if any, of EMC.

During the experimental year between July 1, 1980 and
June 30, 1981, a second, larger group of prospective
jurors was sampled for their perceived attitudes toward
the impact of extended media coverage. The Juror Attitu-
dinal Questionnaire used in this assessment also was
comprised of 14 items. The items were identical to the
ones used in the earlier instrument. EMC phrasing was
substituted for conventional media phrasing. Thus, it
was expected that roughly the same kinds of attitudes would
be measured. Sampling from jury pools in Sacramento,
San Diego and Los Angeles, the evaluators measured 946
prospective jurors. In addition, this EMC Questionnaire
was collected from 79 EMC-Experienced jurors, those who
had served on high publicity EMC trials during the year.

The characteristics of the Inexpereienced jurors are
summarized in Table V-21. Two thirds of the 1,340 had
not served before on a jury. Of those who had prior
experience, only 5% could remember any media attention
paid to the trial(s) on which they served as jurors. As
a result of this fact, it is reasonable to conclude that
at the time of survey administration this sample of
prospective jurors was almost totally unfamiliar with
media coverage of any kind associated with the courts
other than experience gained in normal life activity as
a citizen of the community.

-178-

470

TABLE V-21

CHARACTERISTICS OF JURY POOL SAMPLE

INEXPERIENCED JURORS

( N = 1,340 )

| PRIOR JURY DUTY | | EDUCATION | |
|---|---|---|---|
| YES | 34% | ELEMENTARY SCHOOL | 2% |
| NO | 66% | HIGH SCHOOL | 40% |
| | | ATTENDED COLLEGE | 50% |
| AMOUNT OF MEDIA COVERAGE FOR THOSE WITH PRIOR JURY DUTY | | GRADUATE DEGREE | 9% |
| DON'T KNOW | 49% | | |
| NONE | 45% | | |
| SOME | 4% | OCCUPATION | |
| EXTENSIVE | 1% | PROFESSIONAL/ MANAGERIAL | 32% |
| | | BUSINESS/SALES SERVICE | 14% |
| SEX | | TECHNICAL | 9% |
| MALE | 46% | TRADE/AGRICULTURE | 8% |
| FEMALE | 54% | CLERICAL | 12% |
| | | HOUSEWIFE/STUDENT RETIRED/UNEMPLOYED | 22% |
| AGE | | UNSKILLED | 3% |
| UNDER 25 | 10% | | |
| 25 - 34 | 24% | | |
| 35 - 44 | 21% | | |
| 45 - 54 | 21% | | |
| 55 + | 25% | | |

-179-

471

Fifty-four percent of the sample was female; 46% was
male. About 25% of the sample was between the ages of 25
and 34. Another 25% was 55 or older. Ten percent was
under age 25 and the remaining two-fifths of the sample
evenly divided between the 35-44 age group and the 45-54
age group.

The prospective juror sample seemed well educated. Nine
percent held Masters degrees or some other graduate degree.
One-half of the sample had attended college. Forty-two
percent had terminated their education at or below high
school.

One-third of the prospective juror sample identified their
occupation as managerial or professional. Those in busi-
ness sales or service totalled 14%. Technical occupations,
skilled trade, and agriculture accounted for 17%. Cleri-
cal occupations were represented by 12% of the sample.
Only 3% were unskilled. The remaining 22% were housewives,
students, unemployed or retired.

3. Analysis Procedures

## Factor Analysis

The 14 items comprising the Juror Attitudinal Questionnaire
were subjected to factor analysis using a varimax rota-
tion. The same procedures were applied to these Question-
naires as were applied to the General Attitudinal Surveys
for judges, prosecutors, and defenders. Attitude scores
for each factor were arrived at by summing each respond-
ent's answers to the items contained in the factor and
by dividing by the number of items. Thus, each respondent
had one measure for each of the factors derived instead
of 14 measures (one from each item).

-180-

## t-Tests on Factor Means

It was determined that the EMC-Inexperienced Juror group measures on factors would be compared to those of the EMC-Experienced Juror group measures, since it appeared on examination of the early printouts on frequency distribution that the two groups were responding differently. These calculations yielded information about whether or not the magnitude of change in mean scores on the factors was significant.

## Frequency Distribution Analyses:  Conventional Media Coverage Questionnaire

The frequency distributions of all 14 Questionnaire items were examined for trends and differences showing between the EMC-Inexperienced Jurors and the EMC-Experienced Jurors.  These descriptive analyses would show potential differences in response approaches between these two groups.

## Cross-Tabulations: EMC Questionnaire

Cross-tabulations were computed between certain Questionnaire items and demographic variables.  Sex, education, and age were examined in contrast to EMC-Inexperienced jurors' responses to certain items on the Questionnaire.

## Chi-square

Chi-square tests were applied to determine the significance of frequency distribution deviations on all Questionnaire items grouped by factors for the EMC-Inexperienced Jurors in contrast to the EMC-Experienced Jurors.

-181-

473

4.  Analysis Results

Factor Analysis

Question:  What patterns of intercorrelations are there
between the items on the Questionnaire such that the
minimum number of factors will emerge?  Which items load
onto the factors and what is the reliability of the items
on the factors?

Five factors emerged from the factor analysis of the Juror
Attitudinal Questionnaire.  The factors are identified
in Table V-22 along with the 14 items from the question-
naire which comprise, or "load onto", the factors.

Factor 1, which consists of two items (items 4 and 5),
is characterized by statements suggestive of a positive
motivating effect on jurors and witnesses.  It is labeled
Positive Task Motivation.  Factor 2 consists of two items
(items 10 and 13) referring to EMC effects on judge and
and juror ability to perform within their prescribed roles,
and is thus labeled Role Performance.  Factor 3 consists
of three items (items 6, 7, and 11) which allude to ways
in which EMC might exert a coercive or restrictive influ-
ence, especially on decisions and is thus labeled Decision
Influence.  Factor 4, which consists of two items (items
9 and 12) suggests EMC may have a general effect on
jurors in producing an uneasiness or discomfort in pro-
jected or actual service.  It is labeled General Juror
Attitude.  Factor 5 consists of the remaining five items
(items 1, 8, 2, 3, and 14).  Each of these items refers
to one of a combination of affects, such as distraction,
disturbance, wariness, uneasiness, or tempering behavior.
It is labeled Distraction and Inhibition.

-182-

474

TABLE V-22

ITEM COMPOSITION OF FACTORS IN
JUROR ATTITUDINAL QUESTIONNAIRE

| FACTOR | FACTOR NAME | | ITEM ON QUESTIONNAIRE |
|--------|-------------|---|----------------------|
| 1 | POSITIVE TASK MOTIVATION | Q 4. | Allowing television cameras, still cameras, and radio equipment in the courtroom will motivate witnesses to be truthful in their testimony. |
| | | Q 5. | Allowing television cameras, still cameras, and radio equipment in the courtroom will increase jurors' attentiveness to testimony. |
| 2 | ROLE PERFORMANCE | Q10. | Allowing television cameras, still cameras, and radio equipment in the courtroom will not affect my ability to judge wisely the merits of the case. |
| | | Q13. | Allowing television cameras, still cameras, and radio in the courtroom will not affect a judge's ability to maintain courtroom order. |
| 3 | DECISION INFLUENCE | Q 6. | Allowing television cameras, still cameras, and radio equipment in the courtroom will affect sentencing decisions. |
| | | Q 7. | Allowing television cameras, still cameras, and radio equipment in the courtroom will cause judges to avoid unpopular positions or decisions. |
| | | Q11. | Allowing television cameras, still cameras, and radio equipment in the courtroom sil affect the outcome of trials. |

-183-

475

TABLE V-22 Cont'd.

| FACTOR | FACTOR NAME | ITEM ON QUESTIONNAIRE |
|---|---|---|
| 4 | GENERAL JUROR ATTITUDE | Q 9. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect my willingness to serve. |
| | | Q12. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause me to have to defend my actions as a juror. |
| 5 | DISTRACTION AND INHIBITION | Q 1. The presence and operation of television cameras, still cameras, and radio equipment will lead to disruption of courtroom proceedings. |
| | | Q 8. Allowing television cameras, still cameras, and radio equipment in the courtroom will lead to increased distraction of participants. |
| | | Q 2. Juror's decision-making will be influenced by their friends' and acquaintances attitudes about the case because of television, radio, and still camera coverage of the trial. |
| | | Q 3. Allowing television cameras, still cameras, and radio equipment in the courtroom will make people more apprehensive about participating in legal processes. |
| | | Q14. Allowing television cameras, still cameras, and radio in the courtroom will cause witnesses to be overly guarded in their testimony. |

-184-

476

The results and recommendations in this evaluation are related
to and predicated on the rules of the experiment.  The evaluation
findings and conclusions only apply in the context of the rules;
any weakening of these rules would tend to invalidate the appli-
cability of the research results.  The generally high marks for
the experiment thus far should not be taken as license to grant
*carte blanche* access by extended media or to ignore the guide-
lines in the rules.

California's experiment thus far with cameras in the courts
has not been tainted by an <u>Estes</u> or a <u>Hauptman</u>. The safeguards
against turning the judicial arena into a circus arena are
working.  Indeed, no "circus-like" atmosphere, to send a clear
signal that justice is threatened, may occur under present
controls.  The threat to a fair trial in the present era of
cameras in the courts is a more subtle one.  It would take a mixing
of subtle elements to create real problems, and the wrong com-
bination of elements could result in injustice.  For example, cameras
in the courts in the context of an overly aggresive media, a
susceptible judge, a vulnerable witness, and a volatile com-
munity issue could do irreparable harm to justice in the case.

The structure of Clifornia's rules on extended media coverage
place the judge in a pivotal position.  It is up to the
judge to recognize when the wrong combination of elements is
present and to take steps to diffuse the danger.  Because the
judge's role is so central, it should be protected from com-
promise.  The media should not assume an absolute right to
access with their cameras and microphones.  The burden to
obtain consent should remain with the media; no burden should be
placed on the judge to justify to the satisfaction of the
media that denial of access is appropriate.

function of jurors and demonstrate that past experience and present safeguards minimize the likelihood of EMC-related problems. This EMC-orientation could be accomplished in a neutral fashion without advocating and promoting EMC as inherently good or bad. The EMC phenomenon when it occurs can and should be treated as simply one more aspect of court life about which jurors need and should have briefing prior to service.

## D. Conclusion

One of the most intriguing aspects to this evaluation has been the perspective gained from in-court observation. The evaluators were able to see for themselves if witnesses were nervous, if prosecutors "played up to the camera", if jurors were distracted, and if judges were unable to keep order. In general, none of the postulated disturbance-distraction-decorum effects occurred. There seemed little reason, in event and after event, to have many fears about the presence of EMC equipment and personnel inside the courtroom, under the controlled experimental conditions.

The experiment was highly structured, heavily monitored and tightly controlled. Media representatives were asked to conform to strict rules and procedures, request in writing to cover a news event, wait for approval, and then gather their news under controlled conditions. As the experiment developed, it would have been quite unexpected and shocking if grossly disruptive or wildly distracting episodes had occurred. The rules and resultant structure virtually eliminated all possibility of extreme immediate impact. In response, the evaluators developed increasingly refined discriminations to analyze behavior attributes and verbal comments from interviews. The "ordinariness" of EMC at court proceedings, is, of course, a major finding. The lack of extremes in behavioral and environmental impacts is important.

-243-

478

The critics of "cameras in the courts" point to this very
fact, the brevity of television news reports, as an argument
against allowing cameras coverage in judicial proceedings.
Some even suggest that the media should be forced to show
"all of it or none at all". Public education in light of
this highly selective editing cannot possibly take place,
say these critics.

This evaluation was not required to offer an opinion on the
quality of television news coverage of judicial proceedings.
Suffice it to say that highly selective editing does occur
and that this necessary practice is one of the most con-
troversial issues associated with cameras in the courts.
Little scientific inquiry has been done to contribute
knowledge to the debate. This issue and other long range
effects on society at large represent the main frontier of
"cameras in the courts" research.

### 3. Inexperienced Jurors

Prior to their service in an EMC event, some jurors evidence
concern about their own abilities to remain free of EMC
influence. These prospective jurors believe that their own
functioning and that of the judicial system in general may be
somewhat impaired with the presence of EMC. Experience with
EMC changes this perception. If EMC becomes a permanent fix-
ture in the courts, the California judiciary may want to con-
sider how jurors who are assigned to EMC trials could come to
enter the experience with their confidence high, rather than
low. Jurors should be assured that their ability, role and
functioning, that of other trial participants and of the system
itself will not be diminished by the presence of EMC.

Methods exist today to orient and instruct jury pools in the
phenomena and issues associated with EMC. Video tape programs
could be developed and shown to prospective jurors. These
tapes would present factual information relevant to the role a.

-242-

479

The first group is a vocal minority of persons, particularly
judges and attorneys, who were skeptical about the media's
ability or inclination to cover the courts fairly and
accurately.  These individuals point to the commercial aspect
of the media and assert that sensationalism and a desire
to "sell soap" dominates the coverage.  In the recent camera
coverage of oral arguments at the Supreme Court (an historic
first) one Justice expressed disappointment that the Court
had "bowed to the persistence of an entertainment medium."

The second group is a substantial number of individuals who
applauded the introduction of electronic and photographic
media in the courtroom as contributing to public revelation
on how the system works--its failings and its strengths.
These persons viewed the media more as an essential component
in the workings of democracy than as a commercial industry.

The largest group of interviewees offering an opinion on
this issue had a totally different attitude.  They recognized
that the time constraints for a news story are such that
only small portions of the courtroom proceeding can be used.
Therefore, say these persons, little opportunity exists
either to educate or bias the public.  Generally, these
individuals felt that on balance the TV news reporters
"did a good job" in covering the story accurately and fairly.
What stands out to many of these persons (and to the evaluators)
is how little in-court material actually is used in the story.
Much of the in-court footage that is used is "dubbed over" by
a reporter's summary of events, relegating the camera coverage
to visual background.  Sound and visual images combined
constitute a small portion of the story and the story is at
best only a few minutes long.[37]

---

[37]As documented in Section III, the overwhelming number of EMC
applications are for news stories.  Very few "gavel to gavel"
broadcasts of trials occurred.