# EXHIBIT C
# Part 3 of 4

This evaluation inquired as to "fear of harm" to jurors witnesses, and defendants, but no follow-up has been possible to determine if any harm actually ensued (physical, psychological, reputational, or financial). Only a few jurors, witnesses, and defendants expressed any sense of "fear of harm" due to EMC and some of these responses referred as much to a general opinion that EMC could facilitate harm as much as any specifically defined fear. Defendants raised the only specific "fear of harm" opinion. A few feared retribution from prison inmates for the type of crime they committed (e.g. rape) and two politician defendants sensed possible damage to their reputations. Otherwise, the "fear of harm " issue did not seem significant.

Another unaddressed area warranting further study is that of community reaction to televised trials and published photographs of trials. What is the immediate result of EMC on the public? Do they feel better informed on the case than they would have with conventional-only coverage? Does the broadcast of trials cumulatively serve to educate the public on the judicial process?

The answers to these questions are related to the question, how does the media present stories from EMC trials? Clearly, this issue was of concern to interviewees among all participant types. Although the evaluators did not formally research opinions on the quality of the broadcast product, the interviewees offered opinions and reactions on this subject quite frequently. These comments may be categorized in three broad groups.

tunity to negotiate with the media on certain practices and behaviors in the corridors and courthouse generally. Whether additional governance of media in this regard is embodied in rules or achieved by presiding judges at specific events, the opportunity to make progress towards a mutually agreeable set of ground rules for covering the courts outside the courtroom should not be ignored.

The results of this evaluation offer some assurance that, under the guidance of specific rules, the courts and the media were able to negotiate relatively satis-factory agreements which minimized obtrusiveness and other potential problems posed by the presence of EMC inside courtrooms. If courthouse and courtroom EMC issues can be linked and if, in the negotiation process of granting such coverage, greater restraints on or control of obtrusiveness and other problems outside the courtroom can be achieved, then the courts and the media together will have made rational headway in resolving some of the real sources of occasional media obtrusiveness and subsequent ill-feelings.

2. "Type C" Effects

A model depicting the "universe" of potential effects of electronic/photographic court coverage is presented in Section I.B. (p.10 ). In placing this study in the context of that model, it was stated that few issues within the "Type C" Effects could be addressed. Type C Effects are those effects of broadcast and publication of EMC products which occur after the completion of the proceeding being covered, of both a short-term and long-term nature.

instance the melee of media behavior in the courthouse
created a concern for safety.  The judge emerged from
the experience recommending that the California Rules
of Court govern the behavior of media, particularly
television cameramen, within the courthouse, on the
courthouse grounds, and in juror parking areas as well
as in the courtroom.  Additionally, the judge observed
that the issue of media coverage consumed over two days
of discussion in chambers before the start of jury se-
lection.  This is the only instance in which the issue
of efficiency impairment due to media coverage was raised
by an interviewee.

A serious incident involving cameras in the courts during
the experimental year occurred as a result of a television
camera peering through the courtroom door.  A still
camera was inside the courtroom, having duly obtained
consent, but the television station had not completed
the request and consent process.  A witness, who was
later characterized by the judge as "unstable to begin
with" was testifying without obvious problem until she
saw the television camera operating through the courtroom
door.  At this point she became hysterical.  The television
crew was reprimanded and in deference to the witness,
the still camera was removed from the courtroom for the
remainder of her testimony.  This anecdote reinforces
the need to control actively extended coverage of court
proceedings.  Certainly, obtaining camera shots through
courtroom door windows is contrary to the intent of EMC
guidelines and restrictions.

Granting courtroom access to the media's cameras and
microphones gives the California court system an oppor-

-238-

483

Media coverage of judicial proceedings has always
entailed the presence of reporters, cameras, micro-
phones, and equipment operators in the hallway out-
side courtrooms and in and around the courthouse gen-
erally.  The bigger the story, the larger the size of
this press corps, and in the high publicity cases, this
gathering can include a dozen TV cameras, numerous
still cameras, and dozens of reporters.  When consid-
ering the issue of media obtrusiveness in covering
judicial proceedings, the presence and behavior of
media in the corridors and courthouse generally stands
out as a much greater problem than in-court presence
and behavior.

In several EMC events, judges and attorneys offerred
unsolicited information to the evaluators regarding
the corridor/courthouse issue.  Among the concerns are:

- intimidation or harrassment of witnesses or defend-
  ants as they circulate in the courthouse;

- influence on jurors who are cognizant of the media
  "commotion" in the corridor, inadvertent exposure
  to biasing input from media in the courthouse, and
  harrassment of jurors after the trial by media
  aggressively seeking interviews;

- disturbance of surrounding courtrooms by media
  hallway commotion; and

- improper conduct in obtaining camera shots through
  the courtroom door.

In one major trial (People v. Robbins) the conduct of
the press outside the courtroom was a serious problem
in the opinion of the judge.  Harrassment of the defend-
ant in seeking camera coverage and interview responses
became an issue before the court and in at least one

-237-

484

rules which permits artificial lights or some other
relaxation of the rules at the discretion of the judge
might be advisable.  The occassional relaxation of
the standards for equipment and operator presence would
then not be a technical violation of the rules.

*Recommendation. Rule 980.2 should be amended to permit
at the discretion of the judge a relaxation of the
restrictions on EMC equipment and operator presence.
The reasons for any rule relaxation in this regard should
be articulated on the record.*

C.  Related Issues

This report has documented the process of applying rigorous
evaluation techniques to the study of California's experi-
ment with extended media coverage of courtroom proceedings.
The evaluation has focused on specific inquiries which encom-
pass many but not all of the issues involved.  Among the
issues not addressed, the research process has identified
three key concerns which warrant direct comment.

1. Cameras in the Courthouse

It has not been the purpose of this study to analyze
media coverage of courtroom proceedings generally,
except in the observation of in-court conventional media
presence for comparison with extended media presence.
Left unaddressed is the issue of hallway/courthouse
media coverage practices.  In the course of attending
highly publicized courtroom proceedings and interview-
ing participants, the opinion was offerred several times
that "hallway pandemonium" and media aggressiveness
outside the courtroom (yet inside the courthouse) was
much more of a problem than in-court coverage, parti-
cularly with respect to the issue of media obtrusiveness.

-236-

485

permanent basis, it is the opinion of the evaluators
that it should do so without a criminal case party
consent requirement.  The result of such a requirement
would be to stifle the extended media process to the
extent that it may as well not be allowed at all.
Since the evaluation has not produced evidence to indi-
cate the necessity of reverting to a complete prohibi-
tion of extended coverage, it is recommended that the
rules continue with no party consent required, given
that the trial judge has the ultimate authority to
allow or disallow EMC.

*Recommendation.  Rule of Court 980.2 should remain as
presently formulated in requiring only the consent of
the judge before EMC may take place.*

5. Equipment and Operator Criteria

In Section III of this report, it was noted that several
instances of rule "relaxations" occurred.  (Rule relaxa-
tions are sanctioned occurrences which are contrary to
the letter of the rules.)  Most prominent among these
instances were the use of artificial lights and the
admission of three or more cameras.  These rule relaxa-
tions were permitted at the discretion of the judge and
occurred under controlled conditions.  None of them
resulted in chaos, a "circus-like" atmosphere, or obvi-
ous disruption or distraction.

To the extent that these relaxations of the rules occur,
there exists an inconsistency in rule requirements and
actual EMC practice.  It is <u>not</u> suggested that any of
the equipment and operator criteria be specifically
repealed.  However, the addition of a clause to the

-235-

486

a party <u>shall</u> be made part of the record.  As a matter
of openness and fairness and for the purpose of aiding
judges in the consent decision process, the practice
of hearing arguments for and against EMC from the
parties to the action and the media should be encouraged.
A written request facilitates the process of notifying
attorneys and litigants that EMC of the proceeding is
under consideration.  The presence of cameras and micro-
phones in the courtroom should never come as a complete
surprise to attorneys and litigants.  This occurred in
at least one case during the experimental year[36] and
the reaction of the defense attorney and his client was
understandably negative.  An effective control for this
potential problem would be to require the Court to notify
attorneys and litigants of a pending EMC request suffi-
ciently in advance to permit their input.

4. Party Consent

One of the most fundamental and important issues associ-
ated with "cameras in the courts" is the question of
party consent.  The California experiment operated under
both a party consent required and no party consent
required condition for criminal trial level proceedings.
A basic finding of the research on this point is that
a party consent requirement in criminal cases results
in very little extended media coverage.  Generally,
defendants and their attorneys reject EMC requests if
empowered to do so, and the media predominantly is
interested in criminal cases.

If the Judicial Council decides to allow electronic
and photographic coverage of court proceedings  on a

---

[36]<u>People v. Roemer</u> in Ventura County.

proceeding and the number of media organizations seek-
ing to participate in the extended coverage.   The
several "major case" events required several days or
a few weeks advanced notice to allow enough time for
arrangements and coordination to take place.   The
large number of more minor EMC events often required
no more than a few hours advanced notice.

The question legitimately is raised whether or not use
of a request form ought to be required if EMC is allowed
on a permanent basis.   Naturally, the preference of
the media is to dispense with this paperwork, particu-
larly since the electronic and photographic media gen-
erally feel that they should have the same access as
the print media to court proceedings.   Although the
research indicates that generally EMC has little or no
effect on the proceeding, there remains the reservoir
of negativity in the reports of those having experienced
EMC, reports which include a few bitter experiences and
more than a few strong preferences against EMC presence.
Requests for extended coverage should be reviewed in
every instance by the judge for determination of possi-
ble negative impacts, some of which may be logically
predicted or even likely.   Covering the testimony of,
for example, a rape victim is obviously unwise.   A
written request process provides a checkpoint for making
these screening decisions.

_Recommendation_.   _To facilitate the screening and decision_
_process of the judge,_ written _request for EMC (i.e._
_use of the AOC Request Form) should continue to be required._

Another argument for a written request is persuasive.
The rules require that an objection of an attorney for

jurors are more negative towards EMC than judges and
witnesses (although less negative than attorneys).
Attitude data show them to be suspicious of media
coverage of court proceedings by both conventional
and electronic/photographic means.   Jurors are some-
what more skeptical towards EMC than conventional media
coverage although their apprehension diminishes after
an experience with EMC.   Many jurors support the intro-
duction of cameras in the court room, but just as many
predict negative impacts of EMC on the case or on them-
selves.   A total ban on EMC of jurors would go far to
alleviate the apprehension of some without compromising
the ability of the media to thoroughly cover the story.

*Recommendation.   Rule 980.2 should be amended to prohibit
extended coverage of jurors.   Emphasis should be placed
on prohibiting side or front face shots of any juror.*

3.  Notice Procedures

The rules require submission of written requests for EMC
a reasonable time in advance of the proceeding for which
it is being requested.   Throughout the experimental year,
the requirement that the request be written proved to be
an effective means of instilling structure into a request
process which could easily become informal and "loose".
As it was, some judges disregarded or never were cogni-
zant of this aspect of the rule and permitted cameras
without a written request.   The "reasonable time in
advance" requirement also proved successful; the absence
of a specific time period permitted a measure of flexi-
bility in the negotiations and arrangements between
courts and the media.   What constituted a reasonable
time in advance varied greatly with the nature of the

-232-

489

*Recommendation.*  *Rule of Court 980.2 should be amended*
*to strengthen its control over still camera shutter*
*noise.  Blimping devices should be mandatory on all*
*but the quietest cameras presently on the approved*
*cameras list.*

2. Juror Anonymity

The rules presently prohibit "close-up" coverage of
jurors.  In only a few instances was this rule violated
by the media but in several other instances an unavoid-
able "gray area" was broached.  The most common TV
camera placement is "over the shoulder" of the jury,
a placement which makes any shot of the jury a close
up of at least the most proximate jurors.  This fact,
coupled with the fact that jurors generally desire
complete anonymity in the performance of their duty,
suggests a possible revision of the rules.

In some trials, the judge invoked a complete ban on
juror coverage.  This restriction occurred in "sensa-
tional crime" type EMC events, the type of case in
which the media has great and constant interest.  In
the opinion of the evaluators, these instances of re-
strictions on juror coverage were appropriately invoked
and well received by the jurors in the case.  A rule
amendment creating a total ban on extended coverage
of jurors is worth considering.  Jurors would be
assured that the justice system had taken every pre-
caution to preserve their anonymity and safety.

The evaluation interviews show jurors to be an outspoken
group, and although the range of opinions is wide,
jurors appear to be moderately skeptical about the
effects of EMC of court proceedings.  As a group,

-231-

490

## 1. Still Camera Shutter Noise

Observational and interview data both reveal a distrac-
tion problem with the shutter noise of still cameras.
While this problem does not occur in a majority of
cases, it does occur frequently enough to warrant
action. The cameras causing the problem are among
those in the list of approved makes and models attached
to the Rules. The control of still camera obtrusive-
ness is the only area in which the rules are not
"tough" enough.

Rarely did the evaluators observe or receive reports
of the use of a blimping device which completely mutes
the noise of still cameras. In the People v. Robbins
trial, a sheath was used to mute still camera noise,
but even this did not completely eliminate the problem.
The use of a blimping device represents an additional
cost or convenience factor which evidently the media
generally prefers to avoid, particularly since the rules
do not require their use so long as an approved camera
is used.

The Judicial Council has available alternative approaches
to dealing with the still camera noise problem should
it decide to do so. It may refine the list of approved
cameras to include only those with relatively quiet
shutter clicks (such as the Leica model). Or, it may
require the use of a blimping or sheathing device on
all still cameras having shutter click noise louder
than the quietest models. Or, it may leave the rules
as is and rely upon the discretion of an informed judge
to control the problem.

491

B.    Implications of Research Findings for Rules Content

A primary objective of the Rules of Court 980.2 and 980.3
is to set guidelines for the physical presence of electronic
and photographic media such that obtrusiveness is minimized.
By all indications of this research, this objective was
accomplished quite satisfactorily.  In virtually no instance
did EMC cause a major disruption of the proceeding being
covered.  Except in the minds of the most sensitive and
negatively predisposed individuals,  EMC never created a
"circus-like" atmosphere.

Despite the fact that the rules were functional throughout
the experimental year in controlling obtrusiveness, the
year's experience does suggest certain refinements in this
regard as well as other respects.  The areas needing refine-
ment are addressed below by a brief description of the problem
or issue accompained by alternative approaches to its resolu-
tion.

The areas addressed in recommending possible rule changes are:

   • still camera shutter noise;

   • juror anonymity;

   • notice procedures; and

   • equipment and operator criteria .

Additionally, the recommendation is made to leave the rules
regarding consent requirements as presently configured.

The issues involved in the decision to allow EMC, and the
conditions under which to do so, are complex indeed.  The
jury needs to be protected from exposure and influence.
Judges need to remain as independent as possible and free
from unnecessary burdensome management responsibilities.
Witnesses should not be subject to unnecessary pressure or
embarrassment.  Parties to the proceedings should not find
their case judged by the television-watching public before
judged by the jury.

Does EMC add significantly enough to the existing court en-
viornment problems caused by conventional media coverage to
warrant its exclusion?  The answer is plainly no.  With minor
problems, most of which are solvable through rules revision,
standarized enforcement of rules and increased experience,
EMC does not add significantly to exsisting disturbance-
distraction-dignity-decorum problems.

Does EMC cause trial participants and prospective trial par-
ticipants to change their behavior in a way that interferes with
the fair and efficient adminstration of justice more than those
changes caused by conventional media coverage to warrant its
exclusion?  The answer is a qualified no.  While the observations
showed little behavioral impact due to EMC, interview data showed
that some individuals felt apprehension and other concerns.
Few reported actual changes in their own behavior.  Many did
not like EMC, just as many did not like conventional media
representatives present.  Attitude measures and the relationship
between attitude and behavior are what remain unanswered.  To
the extent that attitude and behavior are linked, there remains
some qualification in the answer to this question.  Taken
globally, there is little evidence in this evaluation to suggest
that EMC causes significantly more changes in behavior than does
conventional media coverage.

-228-

493

(and other media as well), the majority showed positive
attitudes. Experienced jurors, especially, felt little
damage would ensue from EMC presence. Their attitudes
match closely their observed behavior and data obtained
in interviews. The discrepancies mentioned above for
judges, prosecutors and defenders are not present for
jurors.

## Integration of Research Findings

The evaluation research pinpointed several issues which will
continue to be of major concern. The party consent question
will remain a controversial issue, as will concern about
potential impacts on civilian participants in court proceedings,
and the potential influence of EMC on decision-making will
continue to be a primary issue. Balancing EMC access to courts
with the need to protect courts from outside influence will
likely be the central question on which the fate of EMC rests.
The evaluation yielded other conclusions with predictive value.
Among them are:

- The generally negative attitude toward EMC will be slow
  to change.

- Defenders will persist in their negative attitude. If EMC
  continues in its present form, the defenders will continue
  to pressure judges to invoke their discretion in denying or
  restricting EMC.

- As more experience is accumulated, prosecutors, judges, and
  the general public (jurors) will continue to reduce their
  apprehension toward EMC, unless an uncontrolled, high
  disturbance event occurs.

- At a process level, the administrative support system of
  the courts occasionally will be burdened by major cameras
  in the courts events. There will be times when a court
  will not be staffed or equipped sufficiently to deal with
  an EMC event. Physical remodeling or other logistical
  accommodations may eventuate.

- Judges are going to feel burdened occasionally in their
  decision-maker role. They will at times be "put on the
  spot", since the rules, as presently structured, position
  them as the key decision-maker.

494

It is possible that when measured in an attitude survey,
apprehension, concern or negativity  is a global and
general perception, one which is not necessarily borne
out by actual, specific experience.  In courtrooms the
evaluators observed little apprehension, little disruption
and, in general, found little evidence for anyone to
have a very negative set of attitudes about EMC--on an
event-specific basis.  A judge might feel or believe
that witnesses will be apprehensive while the actual
event over which he presided did not verify his prior
held attitude.

It is also possible that defenders, for instance, whose
anti-EMC position remained unchanged throughout the
experimental year, may actually have had relatively posi-
tive experiences at EMC proceedings, but reported them
to be negative because they hold a negative set of atti-
tudes about EMC in general.  As such, their general
attitude overrides the specific event experience.

Finally, it is possible that respondents retain long-
held fears about general EMC effects, despite the lack
of negative experiences in specific events.  The time
span during which EMC has been tried experimentally in
California is short.  Knowledge and information about
its effects are not widely known.  Individual respondents
may even doubt the validity of their own experience
(especially if it was a single, brief event) and yield
to the longer-held, easily tapped general attitude.

Jurors showed a different picture.  Though a reservoir
of 10 to 30 percent af all jurors are skeptical of EMC

- As of July, 1981, 54% of judges, 47% of prosecutors and 13% of defenders approve of EMC for criminal proceedings.

- The attitude measures revealed that judges, attorneys, and jurors possess a complex multi-factor set of attitudes toward EMC. Factor analysis yielded four reliable indices on which measures of judges and attorneys attitudes toward EMC can be conceptualized.

- Overall, the aggregate attitude measures are negative to neutral for judges and attorneys. Defense attorneys are considerably more negative than either judges or prosecutors in their attitudes toward EMC.

- Judges and prosecutors developed a more positive set of attitudes toward EMC in the course of the experimental year. Defenders remained strongly negative in their attitudes.

- Transference of responsibility, a phenomenon in which one group sees other groups but not their own group as being affected negatively by EMC, persisted in posttesting.

- Factor analysis yielded five reliable indices on which measures of jurors' attitudes toward EMC can be conceptualized.

- Overall, the aggregate attitude measures are neutral to positive for jurors.

- Large numbers of jurors, especially the inexperienced, felt that even the presence of conventional reporters and sketch artist (as well as EMC) creates the potential for disruption, distraction, and participant apprehension.

- Experience with EMC left jurors with positive attitudes toward EMC.

Defenders, to a great extent, and judges and prosecutors to a lesser extent, seem to display one set of attitudes when measured by the Survey and another set when interviewed after an EMC event. In puzzling over the possible explanations for this apparent discrepancy, the evaluators postulated several options.

-225-

Clearly, the number of "uneventful" EMC proceedings
far outnumber those having some obvious or perceived
problem.  The frequency and nature of these problems
have been identified in this evaluation as input to
the forthcoming decision on continuation of EMC.  The
evaluation uncovers the rate at which these problems
occur and provides a basis for determining the proba-
bility of more serious problems occurring.

3.   Summary of Attitudinal Data

Attitudinal data, presented in <u>Section V</u> and summarized
below, present a considerably more skeptical though
mixed picture than event specific data.  However, shifts
in attitude due to time and experience are almost always
in a direction more favorable towards EMC.

The following summary statements about the attitudes of
judges, attorneys, and jurors should be viewed in combin-
ation with the comparative perspective offered earlier
by the event-specific data.  When considered together,
these data provide a more definitive answer to the eval-
uation questions posed than provided by either data
group viewed in isolation.

- As of July, 1981 judges (61%), prosecutors (79%),
  and defenders (90%), all strongly disagree with
  the removal of the party consent requirement as
  a condition for EMC of criminal proceedings.

- As of July, 1981 judges (69%)and prosecutors (70%)
  approve of EMC for appellate proceedings.  Only
  30% of defenders approve of appellate EMC.

- As of July 1981, 58% of judges, 43% of prosecutors,
  and 20% of defenders approve of EMC for civil
  proceedings.

- Judges were evenly divided in characterizing their experience with EMC as positive or neutral. Only a few respondents (7%) reported that their experience was negative. Attorneys show a similar split although a greater percentage (27%) reported having a negative experience.

- In terms of personal preference, about one-fifth to one-fourth of all judge, witness, and juror respondents said they would have preferred EMC not be present. Over one-third (38%) of all attorney respondents so indicated.

- Half of all judge respondents concluded that EMC had virtually no effect on the proceeding. One-fifth said it had a positive effect, another fifth said it had mixed positive and negative effects, and a few (8%) said it had a negative overall effect. Jurors were more negative in their assessment of overall impact: 21% perceived a negative effect from electronic or photographic media presence.

The above summary statements are based upon interview and observational data, which together establish clear patterns regarding the effects of EMC. Throughout the interview data (and to a lesser extent the observational data) there exists a reservoir of skepticism or reported negativity about EMC. In gross terms, this reservoir can be said to hover around the 10% level.

The discussion in Section IV attempts to describe the specific substance of the negativity found in interview and observational data. In the opinion of the evaluators, EMC never was responsible for a "travesty of justice". In only a few instances did experienced attorneys present a specific theory that EMC did or very well could have altered case outcome or otherwise impeded the fair administration of justice. In several other interviews, a more general speculation about negative EMC impacts was offered, without arguing that these negative effects occurred in the case in question.

-223-

498

at the forefront of the "cameras in the courts" issue.
In authorizing a rigorous evaluation of the experiment,
the findings of which are summarized below, California
has contributed to the acquisition of greater knowledge
about the ramifications and consequences of permitting
extended media in the courtroom.

## 2. Summary of Case Specific Data Analysis

Participant interview and evaluator observation data
contributed greatly to the formulation of findings and
conclusions about both major research questions.   Sec-
tion IV contains 28 tables summarizing the responses
of interviewees and results of observational data
analysis.   The following series of statements further
distill the findings and conclusions in that portion
of the report.

- Generally speaking, the response patterns of
  attorneys are more negatively disposed towards
  EMC than other participant types.  Among attorneys,
  defense attorneys clearly are the most negative
  toward EMC.  Judges' and witnesses' response
  patterns are generally more positive towards EMC
  than other participant types.  Jurors' response
  patterns are more positive towards EMC than
  attorneys and more negative towards EMC than
  judges or witnesses.

- The presence of EMC equipment and operators gen-
  erally was not distracting to proceeding partici-
  pants.  Only 10% of participants interviewed said
  that EMC was either somewhat, definitely, or
  extremely distracting.

- Over 80% of interviewed judges and attorneys per-
  ceived no impairment to "dignity and decorum"
  because of EMC.  About 10% of respondents detected
  slight impairment and 10% detected more than slight
  impairment due to EMC.

-222-

499

- In three-fourths of all EMC events during the year, judges reported little or no increase in their supervisory responsibility. Ten percent (10%) of judge respondents reported definite or extreme increase to their supervisory responsibility.

- Observational data confirm interview data in the conclusion that EMC generally was not distracting to participants. These data show that courtrooms were "calm" environments with both EMC and conventional-only media presence.

- Observational data indicate that potential sources of distraction other than EMC (conventional media, court personnel, trial participants, audience, and external noises) were approximately equal to EMC in causing distraction and disruption. All these factors generally cause little problem inside the courtroom.

- The ability of judges, attorneys, and witnesses to "effectivtely communicate" generally was not impaired by EMC.

- Large majorities of attorney and juror interviewees perceived no change in judge behavior due to EMC although some defense attorneys and jurors (26% and 14% respectively) perceived a negative change.

- Judges, opposing counsel, and jurors generally saw no change in attorney behavior due to EMC although a few in each group (10-15%) perceived a negative change.

- Judges, attorneys, and jurors generally saw no change in witness behavior due to EMC although some (12%, 22%, and 16% respectively) perceived negative changes due to EMC.

- Judges overwhelmingly saw no effect of EMC on juror behavior but 18% of attorney respondents saw negative effects.

- There is a distinct trend in interview response data which may be labeled: Transference of Responsibility. That is, a particular participant group tended to see greater negative effect on other participant groups than on their own group.

-22]-

500

- The media's predominant interest is in criminal cases. Civil cases attract less than half the interest of criminal cases and very few requests are submitted for appellate level or juvenile cases.

- EMC events took place twice as often in Superior Court as in lower courts.

- Electronic and photographic media covered all proceeding stages of litigation (evenly distributed) from arraignments to motions to trials.

- Television camera presence at court proceedings was somewhat more frequent than still camera presence and both were considerably more common than radio.

- The predominant purpose of EMC was for daily news stories on the particular case being covered. Relatively few "feature stories" or purely educational applications of EMC occurred.

- In over a dozen cases, judges exercised their discretion in EMC decision-making by restricting coverage beyond the criteria in the California Rules of Court governing the experiment.

- In several cases, "violations" or relaxations of the rules occurred but in no instance was EMC so obtrusive as to disrupt or seriously disturb the proceeding.

- The experimental year was highlighted by about a half dozen extremely high media events having "cameras in the courts". These events include sensational crime cases, public figure trials (politicians), a social issue case, and a libel suit between a celebrity and a newspaper.

In all it was an active and interesting experimental year. At this writing, the experiment continues and even more experience with EMC of court proceedings is being accumulated. In early September, 1981, cameras (one television camera and one still camera) were permitted for the first time in California's history to cover oral arguments at the Supreme Court. Its active experiment places California

-220-

501

The research is documented in the previous five sections of
this report with data analysis occurring in Sections III and
IV.  Section I provides an historical and contextual perspec-
tive for California's experiment with EMC of court proceedings.
The basic purpose of the evaluation of the experiment is set
forth along with a review of prior reserach on the "cameras
in the courtroom" issue.  A summary of the Rules of Court
governing California's experiment (980.2 and 980.3) completes
Section I.  Section II documents in some detail the evaluation
research design.  Sections III, IV, and V are summarized below.

1. Factual Summary of the Experimental Year

Section III of this report presents factual information
about the one year experimental period (July 1, 1980-
June 30, 1981).  Request record data and descriptive
analysis from evaluation data (interviews and observa-
tions) produced this body of factual knowledge.

The requirement that the media notify the evaluators
of EMC requests provided a means of measuring the
volume and characteristics of EMC activity for the
one year time period.  The following statements sum-
marize the pertinent findings emerging from the factual
analysis.

- About 350 requests were submitted to the courts
  and just over 200 of these subsequently resulted
  in an EMC event.

- The requirement in the first seven months of the
  experiment that party consent to EMC in criminal
  trial level proceedings be obtained resulted in
  little criminal case EMC activity.  The removal
  of the party consent requirement resulted in a
  sharp increase in EMC criminal case activity.

## VI.  CONCLUSIONS AND RECOMMENDATIONS

### A.  Summary of Analysis and Findings

California's experiment with extended media coverage (EMC)
of court proceedings was evaluated by an 18 month study
during which data were collected for over one year.  A multi-
faceted data collection approach was employed, relying upon
interviews with court proceeding participants, evaluator
observations of EMC events, and general attitudinal surveys
to judges, attorneys, and jurors.  For baseline comparative
purposes, observational data were collected from conventional-
only media coverage court proceedings.  Attitudinal data were
collected before, during, and after the one year period to
measure shifts in attitude over time, and survey respondents
were grouped into direct EMC experienced and no EMC experience
groups to determine the effects of experience on attitude.

The research focused on two major evaluation questions.
The first question  asked whether or not the "physical pres-
ence" of EMC equipment and operators caused distraction,
disruption, or impairment to dignity and decorum in the
courtroom.  The second question centered on participant
behavior--was that behavior altered by EMC presence in a
manner which threatened the fair administration of justice?
The evaluators formulated a comprehensive list of potential
negative EMC effects related to the two major evaluation
questions and determined the content of data collection
instruments accordingly.

-218-

503

public providing a service to their community EMC-
Experienced jurors have little to gain in stating a posi-
tive attitude toward EMC other than as an honest expres-
sion of exactly what happened to them as a consequence
of service.

Judge after judge interviewed by the evaluation team
expressed a concern about the central role (and utter
necessity of protecting it) played by jurors in the
American judicial system.  They indicated that these
crucially independent individuals must believe that
their role and their function is not compromised by the
presence of EMC.  The Questionnaire results show with
little doubt that the EMC-Experienced jurors themselves
are solid in their perceptions of their own abilities
and those of others and the system to withstand the
intrustion of EMC.

504

EMC-Experienced jurors are less concerned about a nega-
tive impact from EMC.  On issues surrounding "other
participant" distraction, apprehension, giving testi-
mony, and task motivation, the two groups are closer
to one another in their pattern of responses, and a
strong negative "minority vote" is cast.  Moderate per-
centages in both groups expected or saw negative impacts.
While neutral to positive overall attitudes toward EMC
exists among both groups, the EMC-Experienced jurors are
far more positive on the average.

5.  Discussion and Summary

The results of the analyses of juror attitudes are very
important.  The trends of all of the findings for jurors
are consistent.  One conclusion stands out:  the EMC-
Experienced jurors clearly have a different point of
view, a different attitude of EMC and its effects than
those jurors who have not served in an EMC trial.  The
attitude is relatively positive.

Experience with EMC left jurors with positive attitudes.
By virtue of their own direct experience as a juror in
an EMC event, the Experienced jurors are confident of
themselves, of judges, and of the system in general to
withstand whatever effect (imagined or real) which EMC
may bring into the courtroom or to the justice system.

Postured  in their silent role of attentive observers
of the entire trial process from beginning to end, they,
and they alone, among those studied, observed all other
actors without themselves playing an interacting role.
Their observations and views can be understood as a
separate set of observations.  As members of the general

-216-

505

The results in Factor 5 are startling.  In Item 1, only 19% of the EMC-Experienced jurors felt that EMC will be disruptive vs. 51% of the Inexperienced.  Almost a full reversal of attitude occurs.  On Item 8, 59% of the EMC-Inexperienced indicated concern about EMC leading to increased distraction among participants vs. 33% in the Expereienced group.  It should be noted, however, that one-third of the EMC-Experienced jurors do believe that increased distraction occurs.

Juror concern that friends would inhibit their clear thinking about a case (item 2) varied from 43% in the EMC-Inexperienced group to 13% in the Experienced group.  A decisive 70% of the Experienced group disagreed that friends would alter their thinking.

Anticipated apprehension (item 3) about participation in legal processes varied from 40% in the EMC-Experienced group to 56% in the Inexperienced group.  Concern that EMC will cause witnesses to be overly guarded (item 14) was registered at 52% for Inexperienced and at 34% for Experienced.

Overall, the distribution of respondent frequencies on the 14 questionnaire items shows definite attitude differences between EMC-Inexperienced and EMC-Experienced jurors.  Compared to the large percentage of EMC-Inexperienced jurors who are of the opinion that the press *per se* is a disturbing, distracting, or negatively influencing element in the courtroom, considerably fewer EMC-Experienced jurors are so inclined.

On issues relating to disturbance, juror motives and ability, judge ability, decision and trial outcome the

TABLE V-33 cont.

*Q2.  Juror's decision-making will be influenced by their freinds' and acquaintances' attitudes about the case because of television, radio, and still camera coverage of the trial.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 43% | 13% |
| NO OPINION | 13% | 18% |
| DISAGREE OR STRONGLY DISAGREE | 44% | 70% |

*Q3.  Allowing television cameras, still cameras, and radio equipment in the courtroom will make people more apprehensive about participating in legal processes.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 56% | 40% |
| NO OPINION | 13% | 20% |
| DISAGREE OR STRONGLY DISAGREE | 31% | 39% |

*Q14.  Allowing television cameras, still cameras, and radio in the courtroom will cause witnesses to be overly guarded in their testimony.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 52% | 34% |
| NO OPINION | 21% | 23% |
| DISAGREE OR STRONGLY DISAGREE | 27% | 43% |

*Frequency distribution differences between groups significant beyond .05 level.

-214-

507

TABLE V-33

FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR FIVE ITEMS

FACTOR FIVE: Distraction and Inhibition. Suggests concern that
media presence may distract or disrupt proceedings
or cause some participants to worry.

*Q1. The presence and operation of television cameras, still
cameras, and radio equipment will lead to disruption
of courtroom proceedings.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 51% | 19% |
| NO OPINION | 13% | 8% |
| DISAGREE OR STRONGLY DISAGREE | 36% | 73% |

*Q8. Allowing television cameras, still cameras, and radio
equipment in the courtroom will lead to increased
distraction of participants.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 59% | 33% |
| NO OPINION | 12% | 10% |
| DISAGREE OR STRONGLY DISAGREE | 29% | 57% |

-213-

508



TABLE V-22

FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR FOUR ITEMS

FACTOR FOUR: General Juror Attitude. Suggests concern that media presence may cause an overall juror attitude of wariness.

*Q9. Allowing television cameras, still cameras, and radio equipment in the courtroom will affect my willingness to serve as a juror.

| | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 26% | 18% |
| NO OPINION | 13% | 5% |
| DISAGREE OR STRONGLY DISAGREE | 60% | 77% |

Q12. Allowing television cameras, still cameras, and radio equipment in the courtroom will cause me to have to defend my actions as a juror.

| | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 27% | 27% |
| NO OPINION | 19% | 11% |
| DISAGREE OR STRONGLY DISAGREE | 54% | 61% |

*Frequency distribution differences between groups significant beyond .05 level.

-212-

509



TABLE V-31

FREQUENCY DISTRIBUTION COMPARISONS
BETWEEN EMC-EXPERIENCED AND EMC-INEXPERIENCED
JURORS ON FACTOR THREE ITEMS

<u>FACTOR THREE</u>: Decision Influence.  Suggests concern that media
presence may interfere in the decision making process.

*Q6. Allowing television cameras, still cameras, and radio
equipment in the courtroom will affect sentencing decisions.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 25% | 14% |
| NO OPINION | 24% | 19% |
| DISAGREE OR STRONGLY DISAGREE | 50% | 67% |

Q7. Allowing television cameras, still cameras, and radio
equipment in the courtroom will cause judges to avoid
unpopular positions or decisions.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 28% | 17% |
| NO OPINION | 24% | 22% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 61% |

*Q11. Allowing television cameras, still cameras, and radio
equipment in the courtroom will affect the outcome of trials.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 31% | 19% |
| NO OPINION | 21% | 11% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 69% |

*Frequency distribution differences between groups significant
beyond .05 level.

510

sentencing decisions (item 6).  A similar, though not
significant, trend on item 7 shows that the EMC-
Experienced group is more sure by 61% to 48% that EMC
will not cause judges to avoid unpopular positions or
decisions.  The distributions on item 11 show that 69%
of EMC-Experienced Jurors are sure that EMC will not
affect the outcome of trials, vs. 48% for Inexperienced
jurors.  Less than one-fifth of the EMC-Experienced
jurors on each item in Factor 3 believe that EMC will
negatively affect decisions.  It is important to note
that in the EMC-Experienced group there exists a dis-
tinct minority who see negative effects to EMC involve-
ment in court-related decisions.

Table V-32 shows that the distribution of the frequencies
of the two groups of respondent answers to item 9 in
Factor 4 (General Juror Attitude) was significantly
different.

The EMC-Experienced jurors believed by a margin of 77%
to 60% over the Inexperienced jurors that EMC would not
affect their willingness to serve; 18% and 26% respec-
tively felt it would.  On the matter of EMC causing
jurors to defend their actions (item 12) 27% of each
group believed so.  Over half of each group thought not
and the differences were not significant.

Table V-33 shows the distribution of the frequencies
of the two groups of respondent answers on items in
Factor 5, (Distraction and Inhibition).  The distribu-
tion of answers on every item significantly differenti-
ated the two groups.

511

TABLE V-30


FREQUENCY DISTRIBUTION COMPARISIONS
BETWEEN EMC EXPERIENCED AND INEXPERIENCED
JURORS ON FACTOR TWO ITEMS


FACTOR TWO: Role Performance.  Suggests concern that media
presence may reduce the quality of participant
performance required by their role.


*Q10. Allowing television cameras, still cameras, and radio
equipment in the courtroom will not affect my ability
to judge wisely the merits of the case.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 71% | 89% |
| NO OPINION | 12% | 2% |
| DISAGREE OR STRONGLY DISAGREE | 17% | 9% |


*Q13. Allowing television cameras, still cameras, and radio
equipment in the courtroom will not affect a judge's
ability to maintain courtroom order.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 58% | 80% |
| NO OPINION | 19% | 10% |
| DISAGREE OR STRONGLY DISAGREE | 23% | 10% |


*Frequency distribution differences between groups significant
beyond .05 level.


512

ficantly different between EMC-Inexperienced and Exper-
ienced jurors, although shifts occur in each item.
Note that about one-third of the EMC-Experienced jurors
believe that the presence of EMC will motivate witnesses
in their task. On Item 5 it is seen that about 60% of
EMC-Experienced jurors, compared to 47% of the Inexperi-
enced, feel that EMC will not motivate jurors to be more
attentive.

The distribution of the frequencies of the two groups of
respondent answers to items 10 and 13 shown in Table V-
30 were significantly different on the items in Factor
2 (Role Performance), Inexperienced and Experienced jurors
display different attitudes. While both groups show
some concern that the presence of EMC will negatively
affect ability to perform, the experienced jurors were
far more confident that EMC would have little impact on
either the judges or their ability to perform within their
role. The differences between the two groups are striking.
Fully 89% of the EMC-Experienced group compared to 71%
of the Inexperienced group feels confident in their abil-
ity to make a wise decision. As for their perception of
a judge's ability to maintain order (item 13), 80% of
the EMC-Experienced group, in contrast to 58% of the
Inexperienced jurors, agree that EMC will not have an
impact.

Table V-31 shows that the distribution of the frequencies
of the two groups of respondent answers to items 6 and
11 in Factor 3 (Decision Influence) were significantly
different.

Over two-thirds of the EMC-Experienced group, vs. 50%
of the Inexperienced group think EMC will not affect

-208-

513

## TABLE V-29

### FREQUENCY DISTRIBTUION COMPARISIONS BETWEEN EMC EXPEREINCED AND INEXPERIENCED JURORS ON FACTOR ONE ITEMS

FACTOR ONE: Positive Task Motivation. Suggest concern that media presence may diminish participant motivation required in their task.

Q4. Allowing television cameras, still cameras, and radio equipment in the courtroom will motivate witnesses to be truthful in their testimony.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 24% | 32% |
| NO OPINION | 27% | 28% |
| DISAGREE OR STRONGLY DISAGREE | 48% | 40% |

Q5. Allowing television cameras, still cameras, and radio equipment in the courtroom will increase jurors' attentiveness to testimony.

|  | EMC INEXPERIENCED JUROR | EMC EXPERIENCED JUROR |
|---|---|---|
| STRONGLY AGREE OR AGREE | 33% | 23% |
| NO OPINION | 20% | 18% |
| DISAGREE OR STRONGLY DISAGREE | 47% | 59% |

514

may suggest an area for future, more detailed, research.
However, the jury pool sample in this evaluation appears
to be a representative slice of California jury pools.
There seems little reason to believe that these potential
differences due to education will affect the present
research findings, since the effects of education are
most likely randomly spread through the juror samples.

Overall, these frequency distribution discrepancies sug-
gest that opinion solidifies with increased education,
and generally, attitude toward EMC becomes somewhat more
liberal. These inexperienced jurors also suggest that
their view of their own abilities (i.e. confidence in
themselves) increases somewhat with education. The more
educated the juror, the more confident he or she feels
able to withstand the intrusion of EMC into the courtroom.

## Chi-square Tests

Question: Are the frequency distributions on all items
on the Questionnaire similar for both EMC-Inexperienced
and EMC-Experienced jurors? Are any of the frequency
distributions between the two groups on any item deviant
enough to be significant?

Tables V-29, 30, 31, 32, and 33 show the results of the
application of the Chi-square tests to the frequency
distributions for each item. The items are grouped by
Factors. An asterisk by the item number in the table
indicates whether or not the distribution of frequencies
is sufficiently deviant for significance.

Table V-29 shows that the distribution of respondent
frequencies on items 4 and 5 (Factor 1) were not signi-

TABLE V-28E

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 12

ITEM 12:  Allowing television cameras, still cameras, and radio
equipment in the courtroom will cause me to have to
defend my actions as a juror.

HIGHEST EDUCATION LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0% | 8% | 4% | 1% |
| AGREE | 23% | 17% | 23% | 33% |
| NO OPINION | 54% | 20% | 19% | 15% |
| DISAGREE | 15% | 45% | 49% | 33% |
| STRONGLY DISAGREE | 8% | 10% | 6% | 19% |

This table again shows that beyond the elementary school category
there is considerably less EMC-related frequency of response
in the No Opinion category on juror defensiveness.  Correspond-
ingly in each of the higher educational categories there is an
increased response in Disagreeing with the item.  Again, those
with graduate degrees, while being the least undecided, increase
their response frequency in the Agree categories.  This suggests
a perceived new dimension in attitude toward EMC and juror
behavior.

-205-

516

TABLE V-28D

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 11

ITEM 11:  Allowing television cameras, still cameras and radio
equipment in the courtroom will affect the outcome
of trials.

HIGHEST EDUCATIONAL LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0% | 6% | 6% | 6% |
| AGREE | 31% | 21% | 25% | 36% |
| NO OPINION | 39% | 20% | 22% | 22% |
| DISAGREE | 23% | 44% | 42% | 24% |
| STRONGLY DISAGREE | 8% | 9% | 5% | 12% |

On the assertion that EMC will affect the trial outcome, this
table shows that beyond the elementary school category, there
is less frequency of response in the No Opinion category and
for the high school and college categories there is an increase
in the Disagree categories.  Those with graduate degrees change
the frequency distribution with an increase in the frequency
in the Agree categories.  Perhaps those with much higher amounts
of education sense, perceive, or worry about a new complexity
for trial outcome with EMC.

-204-

517

TABLE V28C


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 10


ITEM 10:  Allowing television cameras, still cameras, and radio
          equipment in the courtroom will not affect my ability
          to judge wisely the merits of the case.


HIGHEST EDUCATIONAL LEVEL

|                   | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|-------------------|-------------------|-------------|--------------------|-----------------|
| STRONGLY AGREE    | 8%                | 20%         | 22%                | 31%             |
| AGREE             | 31%               | 47%         | 51%                | 52%             |
| NO OPINION        | 53%               | 12%         | 12%                | 9%              |
| DISAGREE          | 8%                | 18%         | 14%                | 7%              |
| STRONGLY DISAGREE | 0                 | 4%          | 1%                 | 2%              |


This table shows once again that with increased education there
is a higher frequency of response in the Agree and Strongly
Agree categories with corresponding movement away from No
Opinion.  The high frequency (53%) response for those in the
lowest educational category suggests their lack of confidence
to be able to judge objectively the merits of a case covered
by EMC.


-203-

TABLE V-28B

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 9

ITEM 9: Allowing television cameras, still cameras, and radio
equipment into the courtroom will affect willingness
to serve as a juror.

HIGHEST EDUCATIONAL LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 0 | 9% | 7% | 2% |
| AGREE | 33% | 19% | 18% | 16% |
| NO OPINION | 42% | 13% | 13% | 12% |
| DISAGREE | 17% | 44% | 49% | 44% |
| STRONGLY DISAGREE | 8% | 14% | 13% | 26% |

This table shows rather decisively that with increased education
there is a higher frequency of response in the Disagree and
Strongly Disagree categories with corresponding movement away
from Agree and No Opinion categories. Of those with graduate
degrees, 70%, compared to 25% of those with elementary school
education, believe that EMC will not affect their willingness
to serve as a juror.

-202-

TABLE V-28A

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY EDUCATION
ON ITEM 3

ITEM 3: Allowing television cameras, still cameras, and radio
equipment in the courtroom will make people more
apprehensive about participating in legal processes.

HIGHEST EDUCATION LEVEL

|  | ELEMENTARY SCHOOL | HIGH SCHOOL | COLLEGE ATTENDANCE | GRADUATE DEGREE |
|---|---|---|---|---|
| STRONGLY AGREE | 7% | 16% | 16% | 8% |
| AGREE | 50% | 37% | 41% | 53% |
| NO OPINION | 21% | 18% | 11% | 8% |
| DISAGREE | 21% | 25% | 29% | 25% |
| STRONGLY DISAGREE | 0 | 4% | 3% | 6% |

This table shows a slight trend among those with less education
to have a higher frequency of response in the No Opinion
category. In other words, with increasing education the atti-
tude about participant apprehension solidifies.

-201-

TABLE V-27C

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY AGE
ON ITEM 13

ITEM 13:   Allowing television cameras, still cameras and
           radio equipment in the courtroom will <u>not</u> affect
           a judge's ability to maintain courtroom order.

|  | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| STRONGLY AGREE | 9% | 13% | 8% | 14% | 4% |
| AGREE | 51% | 48% | 52% | 46% | 50% |
| NO OPINION | 21% | 18% | 17% | 16% | 23% |
| DISAGREE | 16% | 17% | 21% | 21% | 23% |
| STRONGLY DISAGREE | 3% | 4% | 2% | 4% | 1% |

This table shows that the 25-34 and 45-54 age group increase
the frequency of their responses in the extreme categories,
suggesting a slight trend in these age groups of a more
diversified opinion on the matter of EMC affecting a judge's
ability to maintain order.

-200-

521

TABLE V-27B


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY AGE
ON ITEM 5


ITEM 5:   Allowing television cameras, still cameras and radio
          equipment in the courtroom will increase jurors'
          attentiveness to testimony.

|                   | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|-------------------|----------|-------|-------|-------|-----|
| STRONGLY AGREE    | 5%       | 3%    | 4%    | 2%    | 5%  |
| AGREE             | 27%      | 29%   | 27%   | 26%   | 34% |
| NO OPINION        | 29%      | 22%   | 21%   | 19%   | 15% |
| DISAGREE          | 39%      | 44%   | 43%   | 43%   | 41% |
| STRONGLY DISAGREE | 0        | 3%    | 5%    | 10%   | 6%  |

This table shows a slight increase in No Opinion as the age of
the respondent decreases on the question of EMC stimulating
jurors to be more attentive.  A similar general trend toward
increasing frequency of disagreement with this concept occurs
with advancing age.

-199-

522

TABLE V-27A

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTION BY AGE
ON ITEM 4

ITEM 4:   Allowing television cameras, still cameras, and radio
          equipment in the courtroom will motivate witnesses
          to be truthful in their testimony.

|  | UNDER 25 | 25-34 | 35-44 | 45-54 | 55+ |
|---|---|---|---|---|---|
| STRONGLY AGREE | 5% | 3% | 3% | 3% | 7% |
| AGREE | 22% | 18% | 20% | 19% | 24% |
| NO OPINION | 39% | 25% | 29% | 25% | 27% |
| DISAGREE | 35% | 50% | 38% | 40% | 38% |
| STRONGLY DISAGREE | 0 | 5% | 11% | 13% | 5% |

This table shows a slight tendency among the youngest group to
have No Opinion at a higher frequency and the three middle age
groups to have a higher frequency of combined Disagree and
Strongly Disagree frequencies that EMC will motivate witness to
be truthful.  Certainty of opinion on this matter may be some-
what age related.

-198-

523

TABLE V-26B

EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY SEX
ON ITEM 5

ITEM 5:  Allowing television cameras, still cameras and radio
equipment in the courtroom will increase jurors
attentiveness to testimony.

|                   | MALE | FEMALE |
|-------------------|------|--------|
| STRONGLY AGREE    | 3%   | 4%     |
| AGREE             | 33%  | 25%    |
| NO OPINION        | 22%  | 18%    |
| DISAGREE          | 37%  | 48%    |
| STRONGLY DISAGREE | 5%   | 5%     |

This table shows that women in the EMC-Inexperienced jury pool
sample disagree somewhat more than men 53% to 42% that EMC
will increase juror attentiveness.

-197-

524

TABLE V-26A


EMC-INEXPERIENCED JUROR
FREQUENCY DISTRIBUTIONS BY SEX
ON ITEM 1


ITEM 1:   The presence and operation of television cameras,
          still cameras, and radio equipment will lead to
          disruption of courtroom proceedings.

|                    | MALE | FEMALE |
|--------------------|------|--------|
| STRONGLY AGREE     | 14%  | 15%    |
| AGREE              | 33%  | 42%    |
| NO OPINION         | 15%  | 11%    |
| DISAGREE           | 32%  | 28%    |
| STRONGLY DISAGREE  | 7%   | 5%     |

This table indicates that women in the EMC-Inexperienced jury

pool sample agree slightly more than men 47% to 38% that EMC

will be a disruption in the courtroom.

-196-

Cross-tabulations were computed between all Question-
naire items and the demographic variables of sex, age,
and education for the 946 EMC-Inexperienced Jurors.

Sex of Respondent.  Men and women responded to the
Questionnaire in almost identical ways, as shown in
Tables V-26A and V-26B.  Only two questions (items 1
and 5) showed sex differences in the response frequencies,
and the differences appear minor.  It seems safe to
assume that sex of respondent played no role in the
ultimate display of juror attitude toward EMC.

Age of Respondent.  The 946 respondents in the EMC-
Inexperienced subgroup within the jury pool sample showed
a consistent pattern of answers regardless of their age,
except for the distribution of responses on items 4, 5,
and 13 (see Tables V-27A, B, and C).  Even these differ-
ences are slight, showing only vague trends associated
with age.  It is safe to assume that age of respondent
played no significant role in their pattern of answers
to the questionnaire.

Education of Respondent.  On five items in the attitude
questionnaire, the 946 EMC-Inexperienced Jurors showed
some differences in response patterns as a function of
their educational level.  These differences in frequency
distribution on items 3, 9, 10, 11, and 12 suggest that
opinion/attitude in several EMC related matters may vary
according to the education of the respondent (see Tables
V-28A, B, C, D, and E).  Since the juror sample is a
sample with variety in educational backgrounds (contrasted
to judges, prosecutors, and defenders whose educational
backgrounds are homogeneous), these descriptive findings

526

Q2.   Jurors' decision-making will be influenced by their friends/and acquaint-
      ances' attitudes about the case because of reporters and sketch artists'
      coverage of the trial.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 32% | 9% |
| No Opinion | 13% | 12% |
| Percent Disagree or Strongly Disagree | 55% | 79% |

Q3.   Allowing reporters and sketch artists in the courtroom will make people
      more apprehensive about participating in legal processes.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 43% | 30% |
| No Opinion | 12% | 12% |
| Percent Disagree or Strongly Disagree | 45% | 58% |

Q14.  Allowing reporters and sketch artists in the courtroom will cause
      witnesses to be overly guarded in their testimony.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 40% | 21% |
| No Opinion | 21% | 27% |
| Percent Disagree or Strongly Disagree | 39% | 51% |

*Surveyed while in the jury pool prior to assignment to a trial.

**Surveyed after service as a juror on a high publicity trial which received
  conventional media coverage only.

527

TABLE V-25 Cont'd.

FACTOR FOUR: General Juror Attitude. Suggests concern that media presence may cause an overall juror attitude of wariness.

Q9. Allowing reporters and sketch artists in the courtroom will affect my willingness to serve as a juror.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 19% | 18% |
| No Opinion | 11% | 0% |
| Percent Disagree or Strongly Disagree | 70% | 82% |

Q12. Allowing reporters and sketch artists in the courtroom will cause me to have to defend my actions as a juror.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 21% | 18% |
| No Opinion | 16% | 9% |
| Percent Disagree or Strongly Disagree | 63% | 74% |

FACTOR FIVE: Distraction and Inhibition. Suggests concern that media presence may distract or disrupt proceedings or cause some participants to worry.

Q1. The presence of reporters and sketch artists will lead to disruption of courtroom proceedings.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 29% | 21% |
| No Opinion | 12% | 6% |
| Percent Disagree or Strongly Disagree | 59% | 73% |

Q8. Allowing reporters and sketch artists in the courtroom will lead to increased distraction of participants.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 40% | 23% |
| No Opinion | 16% | 9% |
| Percent Disagree or Strongly Disagree | 44% | 68% |

-193-

528

TABLE V-19 Continued 

Q13.    Allowing reporters and sketch artists in the courtroom will not affect
a judge's ability to maintain courtroom order.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 65% | 82% |
| No Opinion | 17% | 6% |
| Percent Disagree or Strongly Disagree | 19% | 12% |

FACTOR THREE: Decision Influence.  Suggests concern that media
presence may interfere in the decision-making process.

Q6.     Allowing reporters and sketch artists in the courtroom will affect sen-
tencing decisions.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 18% | 3% |
| No Opinion | 16% | 12% |
| Percent Disagree or Strongly Disagree | 66% | 95% |

Q7.     Allowing reporters and sketch artists in the courtroom will cause judges
to avoid unpopular positions or decisions.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 21% | 3% |
| No Opinion | 16% | 24% |
| Percent Disagree or Strongly Disagree | 63% | 73% |

Q11.    Allowing reporters and sketch artists in the courtroom will affect the
outcome of trials.

|  | Inexperienced Jurors | Experienced Jurors |
|---|---|---|
| Percent Agree or Strongly Agree | 20% | 6% |
| No Opinion | 17% | 12% |
| Percent Disagree or Strongly Disagree | 53% | 82% |

-192-

529

TABLE V-25

Frequency Distribution Comparisons Between Conventional
Media Coverage Experienced and Inexperienced Jurors
on Factor Items From Attitude Questionnaire

FACTOR ONE:  Positive Task Motivation.  Suggests concern that
media presence may diminish participant motivation
required in their task.

Q4.    Allowing reporters and sketch artists in the courtroom will motivate
witnesses to be truthful in their testimony.

|                                          | Inexperienced Jurors | Experienced Jurors |
|------------------------------------------|----------------------|--------------------|
| Percent Agree or Strongly Agree          | 29%                  | 18%                |
| No Opinion                               | 22%                  | 24%                |
| Percent Disagree or Strongly Disagree    | 49%                  | 58%                |

Q5.    Allowing reporters and sketch artists in the courtroom will increase
jurors' attentiveness to testimony.

|                                          | Inexperienced Jurors | Experienced Jurors |
|------------------------------------------|----------------------|--------------------|
| Percent Agree or Strongly Agree          | 33%                  | 18%                |
| No Opinion                               | 20%                  | 26%                |
| Percent Disagree or Strongly Disagree    | 47%                  | 56%                |

FACTOR TWO:  Role Performance.  Suggests concern that media presence
may reduce the quality of participant performance re-
quired by their role.

Q10.   Allowing reporters and sketch artists in the courtroom will not affect
my ability to judge wisely the merits of the case.

|                                          | Inexperienced Jurors | Experienced Jurors |
|------------------------------------------|----------------------|--------------------|
| Percent Agree or Strongly Agree          | 75%                  | 75%                |
| No Opinion                               | 9%                   | 3%                 |
| Percent Disagree or Strongly Disagree    | 17%                  | 23%                |

-191-

The items in Table V-25 are arranged according to their presence on the five factors. In Factor 3, for instance, each item shows a sharp increase in the percentage of Experienced Jurors whose attitude suggests that they believe that the decision process will be unaffected by the presence of media. In Factor 5, Distraction and Inhibition, much larger percentages of experienced jurors see less disruption and distraction potential, although sizeable percentages still perceive, even after experience as a juror, that some participants will be apprehensive about their participation because of media presence (items 3 and 14).

Large numbers of jurors, especially the inexperienced, feel that even the presence of conventional reporters and sketch artists creates the potential for disruption, distraction and participant apprehension. This observation is important because it underscores the fact that in the eyes of these prospective juror respondents, initial problems associated with a shift from conventional to extended media coverage are problems of degree rather than kind. While hardly earthshaking, the finding points to the likelihood that conventional levels of media coverage of the courts are seen as cause for concern by many citizens and emphasizes the relative nature of any contemplated shift to more extensive media intrusion into the courtroom.

### Cross-Tabulations: EMC Questionnaire

Question: Is there any relationship between sex, age, and education and the ways the EMC-Inexperienced jurors responded to the Questionnaire? Are the relationships between these variables and certain items strong enough to suggest that the variables affect the patterns of responses?

-190-

Inexperienced and EMC-Experienced Jurors by factors.
The means for Factors 1 and 2 have been corrected for
direction, so that a positive attitude toward EMC is
consistently indicated by the larger numbers. As is
obvious, EMC-Experienced Jurors show very positive atti-
tudes toward EMC on all factors, except Factor 1, which
was discussed above. The overall attitude of all jurors,
EMC-Experienced or Inexperienced, is neutral to positive.
The EMC-Experienced group appears confident that the nega-
tive effects of EMC are minimal.

Frequency Distribution Analysis:  Conventional Media
Coverage Questionnaire

Question:  What frequency distribution patterns occur
on the 14 Questionnaire items for jurors, inexperienced
and experienced, with conventional media coverage?  Are
there any general conclusions that can be drawn from
an examination of the response patterns?

Service as a juror in a high publicity trial receiving
conventional media coverage appears to systematically
and uniformly reduce many of the concerns about conven-
tional media coverage which pre-service prospective
jurors held.  Table V-25 illustrates this graphic change.
The comparisons made here are suggestive only due to
limited analyses.  The sample size of jurors who had
experience with conventional media coverage is very
small.  The trend of the reduction of concerns about
negative effects of conventional media presence is worth
noting.  The concerns do not disappear, but the trend
here is parallel to the trend in juror attitude toward
EMC concerns discussed elsewhere in this section (i.e.,
experienced tends to reduce apprehension).

-189-

532



FIGURE V-24

EMC-INEXPERIENCED AND EMC-EXPERIENCED
JUROR ATTITUDES TOWARD EMC BY FACTOR MEANS

*Score transposed to correct for direction on the scale.

their role and also that EMC will not affect a judge's
ability to conduct the affairs of the court well.

On Factor 3, Decision Influence, the EMC-Experienced
group is significantly more sure that EMC and its effects
will not interfere with court decisions.

On Factor 4, General Juror Attitude, once again the EMC-
Experienced group shows significantly more confidence
that their willingness to serve and their acceptance of
service will be unaffected by EMC. The EMC-Inexperienced
group feels the same way, though more mildly.  On Factor
5, Distraction and Inhibition, the significant change in
scores moves the EMC-Experienced group across the scale
midpoint (3.00) so that as a group, their attitude is
now favorable.  EMC will not have an overall distracting
or inhibiting effect in the opinion of EMC--Experienced
Jurors.

Factor 1, Positive Motivation, shows no difference between
the groups.  Both groups seem to be ambivalent on the
issue of whether or not the presence of EMC will have a
salutary effect on witness and juror motivation to task
with a slight trend toward the negative.  Said another
way, the respondents state that they do not know if EMC
will or will not motivate toward truthfulness or attentive-
ness.  They may very well as a whole group be indicating
that EMC will probably not have such an effect, and that
the questions or concepts raised by the items may be
irrelevant.

Figure V-24 illustrates with bar graphs the level of and
the differences in attitude levels between the EMC-

-187-

TABLE V-23

T-TEST ON FACTOR MEANS FOR EMC
INEXPERIENCED AND EXPERIENCED JURORS

| FACTOR AND FACTOR NAME | NUMBER OF CASES | FACTOR RELIABILITY | MEAN | STANDARD DEVIATION | PROB BILI |
|---|---|---|---|---|---|
| 1.POSITIVE TASK MOTIVATION | | .64 | | | |
| INEXPERIENCED | 912 | | $A_{3.21}$ | .86 | |
| EXPERIENCED | 77 | | 3.29 | .88 | 0.4 |
| 2.ROLE PERFOMANCE | | .50 | | | |
| INEXPERIENCED | 909 | | $A_{2.42}$ | .82 | |
| EXPERIENCED | 79 | | 1.94 | .77 | 0.0 |
| 3.DECSION INFLUENCE | | .79 | | | |
| INEXPERIENCED | 911 | | $B_{3.22}$ | .89 | |
| EXPERIENCED | 79 | | 3.64 | .81 | 0.0 |
| 4.GENERAL JUROR ATTITUDE | | .70 | | | |
| INEXPERIENCED | 906 | | $B_{3.37}$ | .97 | |
| EXPERIENCED | 78 | | 3.65 | .92 | 0.0 |
| 5.DISTRATION AND INHIBITION | | .85 | | | |
| INEXPERIENCED | 899 | | $B_{2.72}$ | .88 | |
| EXPERIENCED | 79 | | 3.35 | .86 | 0.0 |

*= Significant at .05 level or better.

A= Lower  score indicates more positive attitude toward EMC

B= Higher score indicates more positive attitude toward EMC

-186-

535

Reliability coefficients were calculated to determine
the reliability of the items in each survey factor.
Table V-23 indicates the reliabilities for each factor.
They range from a low (and minimally acceptable) .50 to
a high of .85.  Medium to very high confidence can be
placed in the accuracy and consistency of the attitude
measures taken by this Questionnaire in this evaluation.
No doubt due to the wide variation in response patterns
in the juror sample, there is a corresponding fluxuation
in the reliability of the items on the factors.  There
is reasonable evidence to believe, however, that if used
again, the same items would group together again, forming
the same factors, even with a different sample of jurors.
The evaluators are quite confident that the Juror Atti-
tudinal Questionnaire accurately measures the attitudes
of the jurors sampled.

### t-Tests on Factor Mean Scores

Question:  How large are the differences between EMC-
Inexperienced and EMC-Experienced jurors' mean scores
of attitudes as measured by the five factors?  Are any
of the differences large enough to be considered signi-
ficant?

Table V-23 summarizes the result of the t-test of factor
means.  The reader should keep in mind that this analysis
was completed on only the EMC-related Questionnaire.
The table identifies the factor, the factor means for
each group (EMC-Experienced and EMC-Inexperienced), the
standard deviation and the probability statement.

Four of the five factors show significant differences
between the mean scores of the two groups.  On Factor 2,
Role Performance, EMC-Experienced Jurors' mean score is
1.94 while EMC-Inexperienced Jurors' mean score is 2.42.
The significant difference means that the EMC-Experienced
group seems confident of their ability to perform in

-185-

536

The judicial system plays a special role in that it is a forum of last resort where justice ultimately is rendered or occasionally forfeited. Our system of government to some extent insulates the judiciary from the strong forces, political and economic, which operate in our society. Courts preserve delicate and precious rights. Indeed, this is at the root of why cameras have been denied access to courtrooms for so long. If access finally is to be granted to extended media, it should be done carefully.

537

APPENDIX F

Description of Data Base Characteriestics

1   individual media or network involved in extended coverage.

2        Only equipment that does not produce distracting sound

3   or light shall be employed to cover judicial proceedings.

4        It shall be the affirmative duty of extended coverage

5   personnel to demonstrate to the Judge adequately in advance

6   any proceeding that the equipment sought to be used meets the

7   sound and light criteria enumerated herein.

8        Except to increase the wattage of existing courtroom

9   lights, there shall be no modificiations or additions to lig

10  equipment existing in a courtroom.  Any increases in wattage

11  shall be with permission of the Judge and, if authorized, sh

12  be installed, maintained, and removed without public expense

13        No light or signal visible or audible to trial partic

14  pants shall be used on any equipment during extended coverag

15  to indicate whether it is operating.

16        Extended coverage personnel and equipment shall be

17  positioned so as to provide reasonable coverage in such

18  location in the Court facility as shall be designated by the

19  Judge.  Equipment that is not a component part of a televis

20  camera, and video and sound recording equipment, shall be

21  located outside the courtroom, unless other arrangements are

22  approved in advance by the Judge.

23        Extended coverage equipment shall not be placed in or

24  removed from the courtroom except prior to or after proceed

25  each day, or during a recess.

26        All extended coverage equipment operators shall assum

27  their assigned, fixed position within the designated area a

28  once established in that position shall act in a mann   so

                                                        539

not to call attention to their activities.  Extended coverage

equipment operators shall not be permitted to move about during

the Court session.

    Pooling arrangements among members of the media shall be

the sole responsibility of the media and shall not require the

Judge or Court personnel to mediate disputes.  In the absence

of agreement or in the event of unresolved disputes relating to

pooling arrangements, the Judge may terminate all or any

portions of extended coverage.

    DATED:

JUDGE OF THE SUPERIOR COURT

540

To protect the attorney-client privilege and the effective right to counsel of all trial parties, there shall be no audio coverage of conferences between attorneys and clients or parties, or between co-counsel and clients or parties, or between counsel and the Judge held at the bench.

There shall be no extended coverage of any conference held in the chambers of a Judge.

In order to preclude extended coverage of any matters presented to the Court in the absence of the jury which are for the purpose of determining the admissibility of evidence, the Judge may conduct a hearing in chambers.

Extended coverage in the courtroom shall be allowed during and only during:

    (a)   The opening statement of the attorney for the People;

    (b)   The opening statement of the attorney for the Defendant;

    (c)   The opening argument of the attorney for the People;

    (d)   The argument of the attorney for the Defendant; and

    (e)   The closing argument of the attorney for the People.

There shall be no extended coverage of courtroom proceedings through any open courtroom door or window in any door or through any access to or aperture in the courtroom.

Equipment from one television station or network--

///

-3-

541

1  designated as the pooling station or network--shall be per-
2  mitted access to a courtroom proceeding at one time.  The
3  pooling station or network may use a portable television
4  camera that is silent, a videotape electronic camera, or, in
5  the absence of such equipment, a silent 16mm sound on film
6  (self-blimped) camera.  One television camera, operated by
7  one camera person, shall be admitted to record the proceeding.
8       One audio system for broadcast purposes shall be permitted
9  in a proceeding.  Where possible, audio for all media shall be
10 from audio systems present in the Court.  If no technically
11 suitable audio system exists, a microphone and related wiring
12 essential for media purposes shall be unobtrusive, located in
13 places designated in advance by the Judge, and operated by
14 one person.
15      One still photographer, using not more than two still
16 cameras with not more than two lenses for each camera, shall
17 be permitted in a proceeding subject to extended coverage.  A
18 second still photographer, using not more than two still
19 cameras with not more than two lenses for each camera, may be
20 admitted in the discretion of the Judge.  Such still cameras
21 shall not produce distracting clicking sounds or light during
22 the permitted coverage of the proceedings, regardless of
23 Schedules A and B set forth in Rule 980.2(k) of California
24 Rules of Court.  No motorized drive equipment shall be permi-
25 and no moving lights, flash attachments, or sudden lighting
26 changes shall be permitted during Court proceedings.
27      No equipment or clothing of any extended coverage per-
28 sonnel shall bear any insignia or identification of the

-4-

1
2
3
4
5
6
7
8       IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
9         IN AND FOR THE COUNTY OF SACRAMENTO
10 PEOPLE OF THE STATE OF CALIFORNIA,) NO. 59201       DEPT. 19
11             vs.         )
                       )    ORDER ESTABLISHING
12 ALAN ROBBINS,            ) EXTENDED COVERAGE OF TRIAL
                       )
13              .Defendant.)
14

15     Photographing, recording for broadcasting and broadcasting
16 shall not be permitted within the courtroom while Court is in
17 session or during any mid-morning or mid-afternoon recess except
18 as authorized by this Order.
19     "Extended coverage" means any media recording or broad-
20 casting of proceedings by the use of television, radio, photo-
21 graphic, or recording equipment.
22     "Trial participants" means all parties, attorneys, jurors
23 witnesses, Court personnel and the Judge or Judges present
24 during the conduct of proceedings.
25     "Media" means any news gathering or reporting agencies
26 and the individual persons involved, and includes newspapers,
27 radio, television, radio and television networks, news services
28 magazines, trade papers, in-house publications, professio

journals, or other news reporting or news gathering agencies whose function it is to inform the public or some segment thereof.

Extended coverage shall be conducted so as not to be distracting and not to interfere with the solemnity, decorum, and dignity which must attend the making of decisions that affect the life, liberty, or property of citizens.

No extended coverage shall be allowed except with the consent of the Judge. Such consent shall be in writing, filed in the record of the proceedings, and recorded in the minutes of the Court.

The Judge may, in the interests of justice, refuse, limit or terminate extended coverage if a party objects to extended coverage.

The consent of the attorney for a party shall not be required, but the attorney may direct a motion to the Judge to refuse, limit, or terminate extended coverage. Such motion shall be directed to the discretion of the Judge. The objection of the attorney for a party shall be noted in the record of the proceedings and in the minutes of the Court.

The Judge may in the intersts of justice, refuse, limit or terminate extended coverage of any witness who objects to extended coverage.

There shall be no closeup or "zoom" extended coverage of individual members of the jury while in the jury box, while within the courtroom, while in the jury deliberation room during recess, or while going to or from the deliberation ro at any time.

544

1   pursuant to California Rules of Court.

2        On October 30, 1980, none of the persons operating the electronic

3   equipment gave their names or affiliation to the Clerk.

4        Therefore, it appearing (1) that there was a failure of the media to

5   comply with the Court's request that they identify each individual operating

6   the equipment and identify their media affiliation and (2) since the appoint-

7   ment of counsel neither the defendant nor his attorney, or either of them,

8   has filed a written consent authorizing extended media coverage, further

9   media coverage in the case of The People of the State of California vs.

10  Mark Venters McDermand is hereby DENIED.

11       "It shall be the responsibility of the media to make a separate

12  request for later extended coverage". California Rules of Court 980.2(e)(2).

13

14

15

16

17

18  Dated: November 5, 1980

19                                   GARY W. THOMAS
                                     Judge of the Municipal Court

20

21

22

23

24

25

26

27

28

545