FILED

**FOR PUBLICATION**

JAN 04 2010

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

KRISTIN M. PERRY; SANDRA B.
STIER; PAUL T. KATAMI; JEFFREY J.
ZARRILLO,

         Plaintiffs - Appellees,

   and

CITY AND COUNTY OF SAN
FRANCISCO,

         Plaintiff-intervenor,

   v.

ARNOLD SCHWARZENEGGER, in his
official capacity as Governor of California;
EDMUND G. BROWN, Jr., in his official
capacity as Attorney General of California;
MARK B. HORTON in his official
capacity as Director of the California
Department of Public Health & State
Registrar of Vital Statistics; LINETTE
SCOTT, in her official capacity as Deputy
Director of Health Information & Strategic
Planning for the California Department of
Public Health; PATRICK O'CONNELL,
in his official capacity as Clerk-Recorder
for the County of Alameda; DEAN C.
LOGAN, in his official capacity as
Registrar-Recorder/County Clerk for the
County of Los Angeles,

No. 09-17241

D.C. No. 3:09-cv-02292-VRW

AMENDED OPINION

Defendants,

and

DENNIS HOLLINGSWORTH; GAIL J. KNIGHT; MARTIN F. GUTIERREZ; HAK-SHING WILLIAM TAM; MARK A. JANSSON; PROTECTMARRIAGE.COM - YES ON 8, A PROJECT OF CALIFORNIA RENEWAL,

Defendant-intervenors - Appellants.

KRISTIN M. PERRY; SANDRA B. STIER; PAUL T. KATAMI; JEFFREY J. ZARRILLO,

Plaintiffs - Appellees,

and

OUR FAMILY COALITION; LAVENDER SENIORS OF THE EAST BAY; PARENTS, FAMILIES, AND FRIENDS OF LESBIANS AND GAYS, CITY AND COUNTY OF SAN FRANCISCO,

Plaintiff-intervenors - Appellees,

v.

ARNOLD SCHWARZENEGGER;

No. 09-17551

D.C. No. 3:09-cv-02292-VRW

2

EDMUND G. BROWN, Jr.; MARK B.
HORTON; LINETTE SCOTT; PATRICK
O'CONNELL; DEAN C. LOGAN,

Defendants,

and

DENNIS HOLLINGSWORTH; GAIL J.
KNIGHT; MARTIN F. GUTIERREZ;
HAK-SHING WILLIAM TAM; MARK
A. JANSSON;
PROTECTMARRIAGE.COM - YES ON
8, A PROJECT OF CALIFORNIA
RENEWAL,

Defendant-intervenors -
Appellants.

Appeal from the United States District Court
for the Northern District of California
Vaughn R. Walker, Chief District Judge, Presiding

Argued and Submitted December 1, 2009
Pasadena, California

Filed December 11, 2009
Amended

Before:   Kim McLane Wardlaw, Raymond C. Fisher and Marsha S. Berzon,
          Circuit Judges.

Opinion by Judge Fisher

RAYMOND C. FISHER, Circuit Judge:

Proposition 8 amended the California Constitution to provide that only marriage between a man and a woman is valid or recognized in California.  Two same-sex couples filed this action in the district court alleging that Proposition 8 violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The official proponents of Proposition 8 ("Proponents") intervened to defend the suit.  Plaintiffs served a request for production of documents on Proponents, seeking, among other things, production of Proponents' internal campaign communications relating to campaign strategy and advertising.  Proponents objected to disclosure of the documents as barred by the First Amendment.  In two orders, the district court rejected Proponents' claim of First Amendment privilege.  Proponents appealed both orders and, in the alternative, petitioned for a writ of mandamus directing the district court to grant a protective order.  We granted Proponents' motion for stay pending appeal.

We hold that the exceptional circumstances presented by this case warrant issuance of a writ of mandamus.  The freedom to associate with others for the common advancement of political beliefs and ideas lies at the heart of the First Amendment.  Where, as here, discovery would have the practical effect of discouraging the exercise of First Amendment associational rights, the party seeking such discovery must demonstrate a need for the information sufficient to

4

outweigh the impact on those rights. Plaintiffs have not on the existing record carried that burden in this case. We therefore grant Proponents' petition and direct the district court to enter an appropriate protective order consistent with this opinion.

## I. BACKGROUND

In November 2008, California voters approved Proposition 8, an initiative measure providing that "[o]nly marriage between a man and a woman is valid or recognized in California." Cal. Const. art. I, § 7.5. The California Supreme Court has upheld Proposition 8 against several state constitutional challenges. *Strauss v. Horton*, 207 P.3d 48, 63-64 (Cal. 2009). Plaintiffs, two same-sex couples prohibited from marrying, filed this 42 U.S.C. § 1983 action alleging "that Prop. 8, which denies gay and lesbian individuals the right to marry civilly and enter into the same officially sanctioned family relationship with their loved ones as heterosexual individuals, is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution." Compl. ¶¶ 5, 7. They alleged among other things that "[t]he disadvantage Prop. 8 imposes on gays and lesbians is the result of disapproval or animus against a politically unpopular group." *Id.* ¶ 43. Defendants are a number of state officials responsible for the enforcement of Proposition 8, including the

5

Governor and the Attorney General.  *Id.* ¶¶ 13-19.  Plaintiffs seek declaratory and injunctive relief.  *Id.* ¶ 8.

After the Attorney General declined to defend the constitutionality of Proposition 8, the district court granted a motion by Proponents – the official proponents of Proposition 8 and the official Proposition 8 campaign committee – to intervene as defendants.

Plaintiffs served requests for production of documents on Proponents under Federal Rule of Civil Procedure 34.  Plaintiffs' eighth request sought:

> All versions of any documents that constitute communications referring to Proposition 8, between you and any third party, including, without limitation, members of the public or the media.

The parties understand this request as encompassing, among other things, Proponents' internal campaign communications concerning strategy and messaging.

Proponents objected to the request as irrelevant, privileged under the First Amendment and unduly burdensome and filed a motion for a protective order.  They argued that their internal campaign communications, including draft versions of communications never actually disseminated to the electorate at large, were privileged under the First Amendment.  They offered evidence that the disclosure

6

of internal strategy documents would burden political association rights by discouraging individuals from participating in initiative campaigns and by muting the exchange of ideas within those campaigns. They asserted that the documents plaintiffs sought were irrelevant to the issues in this case, and even if they were relevant, the First Amendment interests at stake outweighed plaintiffs' need for the information.

Plaintiffs opposed the motion for protective order. They argued that their request was reasonably calculated to lead to the discovery of admissible evidence concerning the purpose of Proposition 8, as well as evidence concerning the rationality and strength of Proponents' purported state interests for Proposition 8. They disputed Proponents' contention that any of the documents requested were privileged other than with respect to the names of rank-and-file members of the campaign, which they agreed to redact.

In an October 1, 2009 order, the district court granted in part and denied in part Proponents' motion for a protective order. The court denied Proponents' claims of privilege.[1] The court also determined that plaintiffs' request was

---

[1] The district court also observed that Proponents had failed to produce a privilege log required by Federal Rule of Civil Procedure 26(b)(5)(A)(ii). We agree that some form of a privilege log is required and reject Proponents' contention that producing any privilege log would impose an unconstitutional

(continued...)

"reasonably calculated to lead to the discovery of admissible evidence" regarding voter intent, the purpose of Proposition 8 and whether Proposition 8 advances a legitimate governmental interest.  The court said that "communications between proponents and political consultants or campaign managers, even about messages contemplated but not actually disseminated, could fairly readily lead to admissible evidence illuminating the messages disseminated to voters."[2]

Following the court's October 1 order, Proponents submitted a sample of documents potentially responsive to plaintiffs' document request for *in camera* review, asserting that the documents were both irrelevant and privileged.  In a

---

[1](...continued)
burden.

[2] The court indicated that plaintiffs' request was

> appropriate to the extent it calls for (1) communications by and among proponents and their agents (at a minimum, Schubert Flint Public Affairs) concerning campaign strategy and (2) communications by and among proponents and their agents concerning messages to be conveyed to voters, . . . without regard to whether the messages were actually disseminated or merely contemplated.  In addition, communications by and among proponents with those who assumed a directorial or managerial role in the Prop 8 campaign, like political consultants or ProtectMarriage.com's treasurer and executive committee, among others, would appear likely to lead to discovery of admissible evidence.

November 11, 2009 order following that review, the district court again rejected

Proponents' argument that their internal campaign communications were

privileged under the First Amendment:

> Proponents have not . . . identified any way in which the . . .
> privilege could protect the disclosure of campaign
> communications or the identities of high ranking members
> of the campaign. . . . If the . . . privilege identified by
> proponents protects anything, it is the identities of rank-
> and-file volunteers and similarly situated individuals.

Applying the usual discovery standards of Federal Rule of Civil Procedure 26, the

court determined that documents falling into the following categories were

reasonably likely to lead to the discovery of admissible evidence: documents

relating to "messages or themes conveyed to voters through advertising or direct

messaging," documents dealing "directly with advertising or messaging strategy

and themes" and documents discussing voters' "potential reactions" to campaign

messages. The court ordered production of 21 of the 60 documents submitted for

review.

Proponents appealed from the October 1 and November 11 orders and, in the

alternative, petitioned for a writ of mandamus. We granted Proponents' motion for

a stay pending appeal. We now grant the petition for a writ of mandamus.

## II. JURISDICTION

9

Proponents contend that we have jurisdiction on two bases. First, they assert that the district court's orders are appealable under the collateral order doctrine. Second, they have petitioned for issuance of a writ of mandamus.

While this appeal was pending, the Supreme Court decided *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. — (Dec. 8, 2009), holding that discovery orders denying claims of attorney-client privilege are not appealable under the collateral order doctrine. After *Mohawk*, it is uncertain whether the collateral order doctrine applies to discovery orders denying claims of First Amendment privilege, as we shall explain. Ultimately, we do not resolve the question here. Given the uncertainty, we have decided instead to rely on mandamus to review the district court's rulings. We have repeatedly exercised mandamus review when confronted with extraordinarily important questions of first impression concerning the scope of a privilege. As this case falls within that small class of extraordinary cases, we exercise our supervisory mandamus authority here.

### A. Collateral Order Doctrine

We have jurisdiction to review "final decisions of the district courts." 28 U.S.C. § 1291. Under the collateral order doctrine, a litigant may appeal "from a narrow class of decisions that do not terminate the litigation, but must, in the interest of 'achieving a healthy legal system,' nonetheless be treated as 'final.'"

10

*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (quoting

*Cobbledick v. United States*, 309 U.S. 323, 326 (1940)).  To be immediately

appealable, a collateral decision "must conclusively determine the disputed

question, resolve an important issue completely separate from the merits of the

action, and be effectively unreviewable on appeal from a final judgment." *Coopers*

*& Lybrand v. Livesay*, 437 U.S. 463, 468 (1978).

     The first prong is easily satisfied in this case.  Taken together, the October 1

and November 11 discovery orders conclusively determined the scope of the First

Amendment privilege.  The district court concluded that the privilege does not

extend to internal campaign communications and that it is limited to the disclosure

of identities of rank-and-file members and other similarly situated individuals.

Furthermore, in the November 11 order, the district court conclusively determined

that Proponents were required to produce 21 documents that, according to the

court, were not privileged.  *See United States v. Griffin*, 440 F.3d 1138, 1141 (9th

Cir. 2006) ("[T]he district court's order 'conclusively determine[s] the disputed

question' whether the government is entitled to read the communications between

Griffin and his wife for which the [marital communications] privilege had been

claimed.").

11

The second prong is also satisfied.  The overall scope of the First Amendment privilege is a question of law that is entirely separate from the merits of the litigation.  In theory, the application of the privilege to plaintiffs' specific discovery requests has some overlap with merits-related issues, such as whether plaintiffs' substantive claims are governed by strict scrutiny or rational basis review and whether plaintiffs may rely on certain types of evidence to prove that Proposition 8 was enacted for an improper purpose.  We need not, and do not, delve into those questions in this appeal, however.  We assume without deciding that the district court's rulings on those questions are correct.  There is, therefore, no "overlap" between the issues we must decide in this appeal and the "factual and legal issues of the underlying dispute."  *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988).

It is the third prong that poses the most difficult question.  Under *Mohawk*, the third prong turns on whether rulings on First Amendment privilege are, as a class, effectively reviewable on appeal from final judgment – i.e., "whether delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'"  *Mohawk*, 558 U.S. at —, slip op. 6 (quoting *Will v. Hallock*, 546 U.S. 345, 352-53 (2006)).  In *Mohawk*, the Court concluded that this prong was not satisfied with respect to the class of

12

rulings addressing invocation of the attorney-client privilege during discovery. This was so because the typical ruling on the attorney-client privilege will involve only "the routine application of settled legal principles." *Id.* at 8. Denying immediate appellate review would have no "discernible chill" because "deferring review until final judgment does not meaningfully reduce the *ex ante* incentives for full and frank consultations between clients and counsel." *Id.* There being no discernible harm to the public interest, the remaining harm from an erroneous ruling (the harm to the individual litigant of having confidential communications disclosed) could be adequately, if imperfectly, remedied by review after final judgment: "Appellate courts can remedy the improper disclosure of privileged material in the same way they remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected material and its fruits are excluded from evidence." *Id.*

Some of *Mohawk*'s reasoning carries over to the First Amendment privilege. There are, however, several reasons the class of rulings involving the First Amendment privilege differs in ways that matter to a collateral order appeal analysis from those involving the attorney-client privilege. First, this case concerns a privilege of constitutional dimensions. The right at issue here – freedom of political association – is of a high order. The constitutional nature of

the right is not dispositive of the collateral order inquiry, *see, e.g.*, *Flanagan v. United States*, 465 U.S. 259, 267-68 (1984), but it factors into our analysis. Second, the public interest associated with this class of cases is of greater magnitude than that in *Mohawk*. Compelled disclosures concerning protected First Amendment political associations have a profound chilling effect on the exercise of political rights. *See, e.g.*, *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 557 (1963) (underscoring the substantial "deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association" resulting from compelled disclosure of political associations). Third, unlike the attorney-client privilege, the First Amendment privilege is rarely invoked. Collateral review of the First Amendment privilege, therefore, does not implicate significant "institutional costs." *Mohawk*, 558 U.S. —, slip op. at 11. C*f. id.* ("Permitting parties to undertake successive, piecemeal appeals of all adverse attorney-client rulings would unduly delay the resolution of district court litigation and needlessly burden the Courts of Appeals."). Finally, we observe that *Mohawk* expressly reserved whether the collateral order doctrine applies in connection with other privileges. *See id.* at 12 n.4.

In light of these considerations, whether *Mohawk* should be extended to the First Amendment privilege presents a close question. The distinctions between the

14

First Amendment privilege and the attorney-client privilege – a constitutional

basis, a heightened public interest, rarity of invocation and a long recognized

chilling effect – are not insubstantial. Given our uncertainty about the availability

of collateral order review after *Mohawk*, we nonetheless assume without deciding

that discovery orders denying claims of First Amendment privilege are not

reviewable under the collateral order doctrine. Rather, we rely on mandamus to

hear this exceptionally important case, for reasons we now explain.

## B. Mandamus

The exceptional circumstances presented by this case warrant exercising our

jurisdiction under the All Writs Act, 28 U.S.C. § 1651(a). *See Cheney v. U.S. Dist.*

*Court*, 542 U.S. 367, 380 (2004); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1296-

97 (9th Cir. 1984).

"The writ of mandamus is an 'extraordinary' remedy limited to

'extraordinary' causes." *Burlington Northern & Santa Fe Ry. Co. v. U.S. Dist.*

*Court*, 408 F.3d 1142, 1146 (9th Cir. 2005) (quoting *Cheney*, 542 U.S. at 380). In

*Bauman v. United States District Court*, 557 F.2d 650 (9th Cir. 1977), we

established five guidelines to determine whether mandamus is appropriate in a

given case: (1) whether the petitioner has no other means, such as a direct appeal,

to obtain the desired relief; (2) whether the petitioner will be damaged or

15

prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression. *Id.* at 654-55. "The factors serve as guidelines, a point of departure for our analysis of the propriety of mandamus relief." *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1491 (9th Cir. 1989). "Not every factor need be present at once." *Burlington*, 408 F.3d at 1146. "However, the absence of the third factor, clear error, is dispositive." *Id.*

Mandamus is appropriate to review discovery orders "when particularly important interests are at stake." 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3935.3 (2d ed. 2009) (hereinafter Wright & Miller). Although "the courts of appeals cannot afford to become involved with the daily details of discovery," we may rely on mandamus to resolve "new questions that otherwise might elude appellate review" or "to protect important or clear claims of privilege." *Id.*; *see Mohawk*, 558 U.S. —, slip op. 9 ("[L]itigants confronted with a particularly injurious or novel privilege ruling have several potential avenues of review apart from collateral order appeal. . . . [A] party may petition the court of appeals for a writ of mandamus."). In *Schlagenhauf v. Holder*, 379 U.S. 104

16

(1964), for example, the Supreme Court relied on mandamus to answer the novel question whether Federal Rule of Civil Procedure 35 authorized the physical and mental examination of a defendant. "The opinion affords strong support for the use of supervisory or advisory mandamus to review a discovery question that raises a novel and important question of power to compel discovery, or that reflects substantial uncertainty and confusion in the district courts." Wright & Miller § 3935.3.

Consistent with *Schlagenhauf*, we have exercised mandamus jurisdiction to review discovery orders raising particularly important questions of first impression, especially when called upon to define the scope of an important privilege. In *Admiral Insurance*, for example, we granted the mandamus petition to resolve "a significant issue of first impression concerning the proper scope of the attorney-client privilege." 881 F.2d at 1488. *Taiwan v. United States District Court*, 128 F.3d 712 (9th Cir. 1997), likewise involved review of another issue of first impression – the scope of testimonial immunity under the Taiwan Relations Act. *Id.* at 714. Finally, in *Foley*, we exercised our mandamus authority to address an "important issue of first impression" in a context similar to that here – whether legislators can be deposed to determine their subjective motives for enacting a law challenged as violative of the First Amendment. 747 F.2d at 1296.

17

Here, too, we are asked to address an important issue of first impression –
the scope of the First Amendment privilege against compelled disclosure of
internal campaign communications.  Considering the *Bauman* factors, we conclude
that this is an extraordinary case in which mandamus review is warranted.

Assuming, as we are, that no collateral order appeal is available, the first
factor is present: "A discovery order . . . is interlocutory and non-appealable" under
28 U.S.C. §§ 1291, 1292(a)(1) and 1292(b).  *Foley*, 747 F.2d at 1297; *see also id.*
("Mandamus review has been held to be appropriate for discovery matters which
otherwise would be reviewable only on direct appeal after resolution on the
merits.").  In *Admiral Insurance*, for example, we held that the first *Bauman* factor
was satisfied because "the petitioner lacks an alternative avenue for relief."  881
F.2d at 1488.

The second factor also supports mandamus.  A post-judgment appeal would
not provide an effective remedy, as "no such review could prevent the damage that
[Proponents] allege they will suffer or afford effective relief therefrom."  *In re
Cement Antitrust Litig.*, 688 F.2d 1297, 1302 (9th Cir. 1982); *see Star Editorial,
Inc. v. U.S. Dist. Court*, 7 F.3d 856, 859 (9th Cir. 1993) ("[I]f the district court
erred in compelling disclosure, any damage the [newspaper] suffered would not be
correctable on appeal."); *Admiral Ins.*, 881 F.2d at 1491 (holding that the second

18

factor was satisfied in view of "the irreparable harm a party likely will suffer if erroneously required to disclose privileged materials or communications"). One injury to Proponents' First Amendment rights is the disclosure itself. Regardless of whether they prevail at trial, this injury will not be remediable on appeal. *See In re Cement Antitrust Litig.*, 688 F.2d at 1302 ("[A] post-judgment reversal on appeal could not provide a remedy for those injuries."). If Proponents prevail at trial, vindication of their rights will be not merely delayed but also entirely precluded. *See id.* ("Moreover, whatever collateral injuries petitioners suffer will have been incurred even if they prevail fully at trial and thus have no right to appeal from the final judgment.").

Under the second factor, we also consider the substantial costs imposed on the public interest. The district court applied an unduly narrow conception of First Amendment privilege. Under that interpretation, associations that support or oppose initiatives face the risk that they will be compelled to disclose their internal campaign communications in civil discovery. This risk applies not only to the official proponents of initiatives and referendums, but also to the myriad social, economic, religious and political organizations that publicly support or oppose ballot measures. The potential chilling effect on political participation and debate is therefore substantial, even if the district court's error were eventually corrected

19

on appeal from final judgment.  In this sense, our concerns in this case mirror those we articulated in *Foley*, where the district court denied the city's motion for a protective order to prevent plaintiffs from deposing city officials about their reasons for passing a zoning ordinance.  Absent swift appellate review, we explained, "legislators could be deposed in every case where the governmental interest in a regulation is challenged."  747 F.2d at 1296.  More concerning still is the possibility that if Proponents ultimately prevail in the district court, there would be no appeal *at all* of the court's construction of the First Amendment privilege. Declining to exercise our mandamus jurisdiction in this case, therefore, "'would imperil a substantial public interest' or 'some particular value of a high order.'" *Mohawk*, 558 U.S. at —, slip op. at 6 (quoting *Will*, 546 U.S. at 352-53).

The third factor, clear error, is also met.  As discussed below, we are firmly convinced that the district court erred by limiting the First Amendment privilege to "the identities of rank-and-file volunteers and similarly situated individuals" and affording no greater protection to Proponents' internal communications than the generous relevance standard of Federal Rule of Civil Procedure 26.  *See In re Cement Antitrust Litig.*, 688 F.2d at 1306-07 ("[W]hen we are firmly convinced that a district court has erred in deciding a question of law, we may hold that the district court's ruling is 'clearly erroneous as a matter of law as that term is used in

20

mandamus analysis.'") (quoting *Bauman*, 557 F.2d at 660). "[Plaintiffs'] need for information is only one facet of the problem." *Cheney*, 542 U.S. at 385. A political campaign's communications and activities "encompass a vastly wider range of sensitive material" protected by the First Amendment than would be true in the normal discovery context. *Id.* at 381; *see Foley*, 747 F.2d at 1298-99. Thus, "[a]n important factor weighing in the opposite direction is the burden imposed by the discovery orders. This is not a routine discovery dispute." *Cheney*, 542 U.S. at 385.

Finally, the fifth factor weighs in favor of exercise of our supervisory mandamus authority: we are faced with the need to resolve a significant question of first impression. *See, e.g.*, *Schlagenhauf*, 379 U.S. at 110-11 (finding mandamus jurisdiction appropriate where there was an issue of first impression concerning the district court's application of Federal Rule of Civil Procedure 35 in a new context); *Foley*, 747 F.2d at 1296. As these cases – and the very existence of the fifth *Bauman* factor, whether the issue presented is one of first impression – illustrate, the necessary "clear error" factor does not require that the issue be one as to which there is established precedent. Moreover, this novel and important question may repeatedly evade review because of the collateral nature of the discovery ruling. *See In re Cement Antitrust Litig.*, 688 F.2d at 1304-05 ("[A]n

21

important question of first impression will evade review unless it is considered under our supervisory mandamus authority.  Moreover, that question may continue to evade review in other cases as well."); *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 524-26 (D.C. Cir. 1975) (exercising mandamus jurisdiction to correct an error in a discovery order).

In sum, this is an important case for exercise of our mandamus jurisdiction: adequate, alternative means of review are unavailable; the harm to Proponents and to the public interest is not correctable on appeal; the district court's discovery order is clearly erroneous; and it presents a significant issue of first impression that may repeatedly evade review.  As in *Foley*, a closely analogous case, these factors "remove this case from the category of ordinary discovery orders where interlocutory appellate review is unavailable, through mandamus or otherwise." *Cheney*, 542 U.S. at 381.  Accordingly, we hold that the exercise of our supervisory mandamus authority is appropriate.

### III.  FIRST AMENDMENT PRIVILEGE[3]

#### A.

---

[3] We review de novo a determination of privilege. *United States v. Ruehle*, 583 F.3d 600, 606 (9th Cir. 2009) (attorney-client privilege).

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."). Thus, "[t]he First Amendment protects political association as well as political expression," *Buckley v. Valeo*, 424 U.S. 1, 15 (1976), and the "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). "The right to associate for expressive purposes is not, however, absolute." *Roberts*, 468 U.S. at 623. "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.*

The government may abridge the freedom to associate directly, or "abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action." *NAACP*, 357 U.S. at 461. Thus, the

23

government must justify its actions not only when it imposes direct limitations on associational rights, but also when governmental action "would have the practical effect 'of discouraging' the exercise of constitutionally protected political rights." *Id.* (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 393 (1950)). Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights. Accordingly, they "must survive exacting scrutiny." *Buckley*, 424 U.S. at 64.

The compelled disclosure of political associations can have just such a chilling effect. *See id.* ("[W]e have repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."); *AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation.").[4] Disclosures of political affiliations and activities that have a "deterrent effect on the exercise of First Amendment

_____

[4] *See, e.g.*, *NAACP*, 357 U.S. at 461-64 (prohibiting the compelled disclosure of the NAACP membership lists); *Bates v. City of Little Rock*, 361 U.S. 516, 525-27 (1960) (same); *DeGregory v. Attorney Gen.*, 383 U.S. 825, 828-30 (1966) (prohibiting the state from compelling defendant to discuss his association with the Communist Party); *Buckley*, 424 U.S. at 63-74 (recognizing the burden but upholding the compelled disclosure of campaign contributor information under the "exacting scrutiny" standard).

24

rights" are therefore subject to this same "exacting scrutiny." *Buckley*, 424 U.S. at 64-65. A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment *privilege*. *See, e.g.*, *Black Panther Party v. Smith*, 661 F.2d 1243, 1264 (D.C. Cir. 1981), *cert. granted and vacated as moot*, 458 U.S. 1118 (1982); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any *nonprivileged* matter that is relevant to any party's claim or defense[.]") (emphasis added).[5]

In this circuit, a claim of First Amendment privilege is subject to a two-part framework. The party asserting the privilege "must demonstrate . . . a 'prima facie showing of arguable first amendment infringement.'" *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir. 1988) (quoting *United States v. Trader's State Bank*, 695 F.2d 1132, 1133 (9th Cir. 1983) (per curiam)). "This *prima facie* showing requires appellants to demonstrate that enforcement of the [discovery requests] will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively

---

[5] This privilege applies to discovery orders "even if all of the litigants are private entities." *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987); *see also Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 208 (N.D. Cal. 1983) ("[A] private litigant is entitled to as much solicitude to its constitutional guarantees of freedom of associational privacy when challenged by another private party, as when challenged by a government body.") (footnote omitted).

suggest an impact on, or 'chilling' of, the members' associational rights." *Id.* at 350.[6] "If appellants can make the necessary *prima facie* showing, the evidentiary burden will then shift to the government . . . [to] demonstrate that the information sought through the [discovery] is rationally related to a compelling governmental interest . . . [and] the 'least restrictive means' of obtaining the desired information." *Id.*; *see also Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459-61 (9th Cir. 1991) (same). More specifically, the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it. The question is therefore whether the party seeking the discovery "has demonstrated an interest in obtaining the disclosures it seeks . . . which is sufficient to justify the deterrent effect . . . on the

---

[6] A protective order limiting the dissemination of disclosed associational information may mitigate the chilling effect and could weigh against a showing of infringement. The mere assurance that private information will be narrowly rather than broadly disseminated, however, is not dispositive. *See Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1461 (9th Cir. 1991) ("[N]either letter suggests that it is the *unlimited* nature of the disclosure of the Union minutes that underlies the member's unwillingness to attend future meetings. Rather, both letters exhibit a concern for the consequences that would flow from *any* disclosure of the contents of the minutes to the government or any government official.").

free exercise . . . of [the] constitutionally protected right of association." *NAACP*,
357 U.S. at 463.

To implement this standard, we "balance the burdens imposed on individuals
and associations against the significance of the . . . interest in disclosure," *AFL-
CIO v. FEC*, 333 F.3d at 176, to determine whether the "interest in disclosure . . .
outweighs the harm," *Buckley*, 424 U.S. at 72.  This balancing may take into
account, for example, the importance of the litigation, *see Dole*, 950 F.2d at 1461
("[T]here is little doubt that the . . . purpose of investigating possible criminal
violations . . . serves a compelling governmental interest[.]"); the centrality of the
information sought to the issues in the case, *see NAACP*, 357 U.S. at 464-65;
*Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987); *Black Panther
Party*, 661 F.2d at 1268; the existence of less intrusive means of obtaining the
information, *see Grandbouche*, 825 F.2d at 1466; *Black Panther Party*, 661 F.2d at
1268; and the substantiality of the First Amendment interests at stake, *see Buckley*,
424 U.S. at 71 (weighing the seriousness of "the threat to the exercise of First
Amendment rights" against the substantiality of the state's interest); *Black Panther
Party*, 661 F.2d at 1267 ("The argument in favor of upholding the claim of
privilege will ordinarily grow stronger as the danger to rights of expression and

27

association increases.").[7]   Importantly, the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation – a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1).  The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable.

Before we apply these rules to the discovery at issue on this appeal, we address the district court's apparent conclusion that the First Amendment privilege, as a categorical matter, does not apply to the disclosure of internal campaign communications.

## B.

The district court concluded that "[i]f the . . . privilege identified by proponents protects anything, it is the identities of rank-and-file volunteers and similarly situated individuals," and said that "Proponents have not . . . identified a way in which the . . . privilege could protect the disclosure of campaign communications."  The First Amendment privilege, however, has never been limited to the disclosure of identities of rank-and-file members.  *See, e.g.*,

---

[7] Courts generally apply some combination of these factors.  *See, e.g.*, *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 407, 412-15 (D. Kan. 2009); *Adolph Coors Co.*, 570 F. Supp. at 208.

*DeGregory*, 383 U.S. at 828 (applying the privilege to "the views expressed and ideas advocated" at political party meetings); *Dole*, 950 F.2d at 1459 (applying privilege to statements "of a highly sensitive and political character" made at union membership meetings). The existence of a prima facie case turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities. *See NAACP*, 357 U.S. at 460-61; *Brock*, 860 F.2d at 349-50. We have little difficulty concluding that disclosure of internal campaign communications *can* have such an effect on the exercise of protected activities.

First, the disclosure of such information can have a deterrent effect on participation in campaigns. There is no question that participation in campaigns is a protected activity. *See San Francisco County Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 827 (9th Cir. 1987) ("'[T]he right of individuals to associate for the advancement of political beliefs' is fundamental.") (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). Compelled disclosure of internal campaign information can deter that participation. *See Buckley*, 424 U.S. at 68 ("It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute."); *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 407, 414 (D. Kan. 2009) (holding

29

that disclosure of "trade associations' internal communications and evaluations about advocacy of their members' positions on contested political issues" might reasonably "interfere with the core of the associations' activities by inducing members to withdraw . . . or dissuading others from joining").[8]

Second, disclosure of internal campaign information can have a deterrent effect on the free flow of information within campaigns. Implicit in the right to associate with others to advance one's shared political beliefs is the right to exchange ideas and formulate strategy and messages, and to do so in private.[9]

---

[8] In addition to discouraging individuals from joining campaigns, the threat that internal campaign communications will be disclosed in civil litigation can discourage organizations from joining the public debate over an initiative. *See* Letter brief of Amicus Curiae American Civil Liberties Union of Northern California, at 2 (explaining that the ACLU's internal campaign information has been subpoenaed in this case).

[9] We derive this conclusion from cases that have recognized the right of associations to be free of infringements in their internal affairs. The freedom of members of a political association to deliberate internally over strategy and messaging is an incident of associational autonomy. We recognized this right in *San Francisco County Democratic Central Committee v. Eu*, where we said that "the right of association would be hollow without a corollary right of self-governance." 826 F.2d at 827. "[T]here must be a right not only to form political associations but to organize and direct them in the way that will make them most effective." *Id.* (quoting *Ripon Soc'y Inc. v. Nat'l Republican Party*, 525 F.2d 567, 585 (D.C. Cir. 1975) (en banc)) (internal quotation marks omitted); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 224 (1986) ("The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution.");

(continued...)

30

Compelling disclosure of internal campaign communications can chill the exercise of these rights.

In identifying two ways in which compelled disclosure of internal campaign communications can deter protected activities – by chilling participation and by muting the internal exchange of ideas – we do not suggest this is an exhaustive list. Disclosures of the sort challenged here could chill protected activities in other

---

<sup>9</sup>(...continued)
*Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 231 n.21 (1989) ("By regulating the identity of the parties' leaders, the challenged statutes may also color the parties' message and interfere with the parties' decisions as to the best means to promote that message."). The government may not "interfere with a [political] party's internal affairs" absent a "compelling state interest." *Eu*, 489 U.S. at 231. Associations, no less than individuals, have the right to shape their own messages. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342, 348 (1995) (striking down a state law prohibiting anonymous pamphleteering in part because the First Amendment includes a speaker's right to choose a manner of expression that she believes will be most persuasive); *AFL-CIO v. FEC*, 333 F.3d at 177 ("[E]xtensive interference with political groups' internal operations and with their effectiveness . . . implicate[s] significant First Amendment interests in associational autonomy.").

ways as well.[10]  We cite these two examples for purposes of illustration only, and because they are relevant to the assertions of privilege made by Proponents here.

C.

In this case, Proponents have made "a '*prima facie* showing of arguable first amendment infringement'" by demonstrating "consequences which objectively suggest an impact on, or 'chilling' of, . . . associational rights."  *Brock*, 860 F.2d at 349-50 (quoting *Trader's State Bank*, 695 F.2d at 1133).  They presented declarations from several individuals attesting to the impact compelled disclosure would have on participation and formulation of strategy.  For example, Mark Jansson, a member of ProtectMarriage.com's ad hoc executive committee, stated:

> I can unequivocally state that if the personal, non-public communications I have had regarding this ballot initiative – communications that expressed my personal political and moral views – are ordered to be disclosed through discovery in this matter, it will drastically alter how I communicate in the future. . . .

---

[10] *See AFL-CIO v. FEC*, 333 F.3d at 176-77 ("[T]he AFL-CIO and DNC affidavits charge that disclosing detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies will directly frustrate the organizations' ability to pursue their political goals effectively by revealing to their opponents 'activities, strategies and tactics [that] we have pursued in subsequent elections and will likely follow in the future.'"); *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. at 415 ("Disclosure of the associations' evaluations of possible lobbying and legislative strategy certainly could be used by plaintiffs to gain an unfair advantage over defendants in the political arena.").

32

> I will be less willing to engage in such communications
> knowing that my private thoughts on how to petition the
> government and my private political and moral views may
> be disclosed simply because of my involvement in a ballot
> initiative campaign. I also would have to seriously
> consider whether to even become an official proponent
> again.

Although the evidence presented by Proponents is lacking in particularity, it is consistent with the self-evident conclusion that important First Amendment interests are implicated by the plaintiffs' discovery request. The declaration creates a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression. *See Dole*, 950 F.2d at 1459-61 (holding that the union satisfied its prima facie burden by submitting the declarations of two members who said they would no longer participate in union membership meetings if the disclosure of the minutes of the meetings were permitted). A protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms. Proponents have therefore made a prima facie showing that disclosure could have a chilling effect on protected activities. The chilling effect is not as serious as that involved in cases such as *NAACP v. Alabama*, 357 U.S. 449 (1958), but neither is

it insubstantial. *See AFL-CIO v. FEC*, 333 F.3d at 176 ("Although we agree that the evidence in this case is far less compelling than the evidence presented in cases involving groups whose members had been subjected to violence, economic reprisals, and police or private harassment, that difference speaks to the strength of the First Amendment interests asserted, not to their existence.") (citations omitted).

The Proponents having made a prima facie showing of infringement, the evidentiary burden shifts to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance that infringement. The district court did not apply this heightened relevance test. Rather, having determined that the First Amendment privilege does not apply to the disclosure of internal campaign communications except to protect the identities of rank-and-file members and volunteers, the court applied the Rule 26 standard of reasonably calculated to lead to the discovery of admissible evidence. We agree with the district court that plaintiffs' request satisfies the Rule 26 standard. Plaintiffs' request is reasonably calculated to lead to the discovery of admissible evidence on the issues of voter intent and the existence of a legitimate state interest.[11] Such discovery might help to identify messages

---

[11] The parties dispute whether plaintiffs' substantive claims are governed by strict scrutiny or rational basis review. They also disagree about what types of evidence may be relied upon to demonstrate voter intent. These issues are beyond the scope of this appeal. We assume without deciding that the district court has

(continued...)

actually conveyed to voters. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 471 (1982) (considering statements made by proponents during an initiative campaign to determine whether voters adopted an initiative for an improper purpose). It also might lead to the discovery of evidence showing that Proponents' campaign messages were designed to "appeal[] to the . . . biases of the voters." *Id.* at 463 (quoting *Seattle Sch. Dist. No. 1 v. Washington*, 473 F. Supp. 996, 1009 (W.D. Wash. 1979)). It might reasonably lead to the discovery of evidence undermining or impeaching Proponents' claims that Proposition 8 serves legitimate state interests. *See Romer v. Evans*, 517 U.S. 620, 635 (1996) ("[A] law must bear a rational relationship to a legitimate governmental purpose.").

The Rule 26 standard, however, fails to give sufficient weight to the First Amendment interests at stake. Given Proponents' prima facie showing of infringement, we must apply the First Amendment's more demanding heightened relevance standard. Doing so, we cannot agree that plaintiffs have "demonstrated an interest in obtaining the disclosures . . . which is sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right of association." *NAACP*, 357 U.S. at 463. Plaintiffs can obtain much of the

---

[11](...continued)
decided these questions correctly.

35

information they seek from other sources, without intruding on protected activities.

Proponents have already agreed to produce all communications actually

disseminated to voters, including "communications targeted to discrete voter

groups."[12]   Whether campaign messages were designed to appeal to voters'

---

[12] We emphasize that our holding is limited to *private, internal* campaign communications concerning the *formulation of campaign strategy and messages*. *See In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. at 415 ("The court wishes to make clear that defendants have met their prima facie burden only with respect to the associations' internal evaluations of lobbying and legislation, strategic planning related to advocacy of their members' positions, and actual lobbying on behalf of members.  Any other communications to, from, or within trade associations are not deemed protected under the First Amendment associational privilege.").

Our holding is therefore limited to communications among the core group of *persons* engaged in the formulation of campaign strategy and messages.  We leave it to the district court, which is best acquainted with the facts of this case and the structure of the "Yes on 8" campaign, to determine the persons who logically should be included in light of the First Amendment associational interests the privilege is intended to protect.

Our holding is also limited to *private, internal communications regarding formulation of strategy and messages*.  It certainly does not apply to documents or messages conveyed to the electorate at large, discrete groups of voters or individual voters for purposes such as persuasion, recruitment or motivation – activities beyond the formulation of strategy and messages.  Similarly, communications soliciting active support from actual or potential Proposition 8 supporters are unrelated to the formulation of strategy and messages.  The district court may require the parties to redact the names of individuals with respect to these sorts of communications, but the contents of such communications are not privileged under our holding.

By way of illustration, plaintiffs produced at oral argument a letter from Bill Tam, one of Proposition 8's official proponents, urging "friends" to "really work to pass Prop 8."  A copy of the letter is appended to this opinion.  Mr. Tam's letter is

(continued...)

animosity toward gays and lesbians is a question that appears to be susceptible to expert testimony, without intruding into private aspects of the campaign.  Whether Proposition 8 bears a rational relationship to a legitimate state interest is primarily an objective inquiry.

In sum, although the First Amendment interests at stake here are not as weighty as in some of the membership list cases, and harms can be mitigated in part by entry of a protective order, Proponents have shown that discovery would likely have a chilling effect on political association and the formulation of political expression.  On the other side of the ledger, plaintiffs have shown that the information they seek is reasonably calculated to lead to the discovery of admissible evidence, but, bearing in mind other sources of information, they have not shown a sufficient need for the information.  The information plaintiffs seek is attenuated from the issue of voter intent, while the intrusion on First Amendment interests is substantial.[13]

------

[12](...continued)
plainly not a private, internal formulation of strategy or message and is thus far afield from the kinds of communications the First Amendment privilege protects.

[13] We do not foreclose the possibility that some of Proponents' internal campaign communications may be discoverable.  We are not presented here with a carefully tailored request for the production of highly relevant information that is unavailable from other sources that do not implicate First Amendment

(continued...)

Accordingly, we grant the petition for a writ of mandamus. Proponents have made a prima facie showing of infringement. Plaintiffs have not shown the requisite need for the information sought. The district court shall enter a protective order consistent with this opinion.

**PETITION GRANTED.** Each party shall bear its costs on appeal.

---

[13](...continued)
associational interests. We express no opinion as to whether any particular request would override the First Amendment interests at stake.

# Counsel

Andrew P. Pugno, Law Offices of Andrew P. Pugno, Folsom, California; Brian W. Raum and James A. Campbell, Alliance Defense Fund, Scottsdale, Arizona; Charles J. Cooper (argued), David H. Thompson, Howard C. Nielson, Jr., Nicole J. Moss, Jesse Panuccio and Peter A. Patterson, Cooper and Kirk, PLLC, Washington, D.C., for Defendant-Intervenors-Appellants.

Theodore J. Boutrous, Jr. (argued), Rebecca Justice Lazarus, Enrique A. Monagas, Gibson, Dunn & Crutcher LLP, Los Angeles, California; Theodore B. Olson, Matthew D. McGill and Amir C. Tayrani, Gibson, Dunn & Crutcher LLP, Washington, D.C., for Plaintiffs-Appellees.

Stephen V. Bomse, Orrick, Herrington & Sutcliffe LLP, San Francisco, California, Allan L. Schlosser and Elizabeth O. Gill, ACLU Foundation of Northern California, for Amicus Curiae American Civil Liberties Union of Northern California.

Robert H. Tyler and Jennifer Lynn Monk, Advocates for Faith and Freedom, Murrieta, California, for Amici Curiae Schubert Flint Public Affairs, Inc., Frank Schubert and Jeff Flint.