Volume 3

Pages 458 - 669

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

KRISTIN M. PERRY,                    )
SANDRA B. STIER, PAUL T. KATAMI,     )
and JEFFREY J. ZARRILLO,             )
                                     )
          Plaintiffs,                )
                                     )
VS.                                  ) NO. C 09-2292-VRW
                                     )
ARNOLD SCHWARZENEGGER, in his        )
official capacity as Governor of     )
California; EDMUND G. BROWN, JR.,     )
in his official capacity as          )
Attorney General of California;      )
MARK B. HORTON, in his official      )
capacity as Director of the          )
California Department of Public      )
Health and State Registrar of       )
Vital Statistics; LINETTE SCOTT,     )
in her official capacity as Deputy   )
Director of Health Information &     )
Strategic Planning for the          )
California Department of Public      )
Health; PATRICK O'CONNELL, in his    )
official capacity as                 )
Clerk-Recorder for the County of     )
Alameda; and DEAN C. LOGAN, in his   )
official capacity as                 )
Registrar-Recorder/County Clerk      )
for the County of Los Angeles,       )
                                     ) San Francisco, California
          Defendants.                ) Wednesday
_____) January 13, 2010

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:** *Katherine Powell Sullivan, CRR, CSR 5812*
*Debra L. Pas, CRR, CSR 11916*
*Official Reporters - U.S. District Court*

**APPEARANCES**:

**For Plaintiffs:**              GIBSON, DUNN & CRUTCHER LLP
                                 1050 Connecticut Avenue, N.W.
                                 Washington, D.C. 20036-5306
                        BY:  **THEODORE B. OLSON, ESQUIRE**
                             **MATTHEW D. MCGILL, ESQUIRE**

                                 GIBSON, DUNN & CRUTCHER LLP
                                 333 South Grand Avenue
                                 Los Angeles, California  90071-3197
                        BY:  **THEODORE J. BOUTROUS, JR., ESQUIRE**
                             **CHRISTOPHER D. DUSSEAULT, ESQUIRE**
                             **SCOTT MALZAHN, ESQUIRE**

                                 GIBSON, DUNN & CRUTCHER LLP
                                 555 Mission Street, Suite 3000
                                 San Francisco, California  94105-2933
                        BY:  **ETHAN D. DETTMER, JR., ESQUIRE**

                                 BOIES, SCHILLER & FLEXNER LLP
                                 333 Main Street
                                 Armonk, New York 10504
                        BY:  **DAVID BOIES, ESQUIRE**

                                 BOIES, SCHILLER & FLEXNER LLP
                                 575 Lexington Avenue, 7th Floor
                                 New York, New York  10022
                        BY:  **RICHARD BETTAN, ESQUIRE**

                                 BOIES, SCHILLER & FLEXNER LLP
                                 1999 Harrison Street, Suite 900
                                 Oakland, California  94612
                        BY:  **JEREMY MICHAEL GOLDMAN, ESQUIRE**
                             **STEVEN C. HOLTZMAN, ESQUIRE**

**For Plaintiff-**              CITY AND COUNTY OF SAN FRANCISCO
**Intervenor:**                 OFFICE OF THE CITY ATTORNEY
                                 One Drive Carlton B. Goodlett Place
                                 San Francisco, California 94102-4682
                        BY:  **DENNIS J. HERRERA, CITY ATTORNEY**
                             **THERESE STEWART, DEPUTY CITY ATTORNEY**
                             **DANNY CHOU, DEPUTY CITY ATTORNEY**
                             **CHRISTINE VAN AKEN**
                             **JULIA M.C. FRIEDLANDER**
                             **ERIN BERNSTEIN**
                             **DEPUTY CITY ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Defendant**<br>**Gov. Schwarzenegger:** | MENNEMEIER, GLASSMAN & STROUD<br>980 9th Street, Suite 1700<br>Sacramento, California  95814-2736 |

               **BY:  ANDREW WALTER STROUD, ESQUIRE**

**For Defendant**
**Edmund G. Brown Jr.:**    STATE ATTORNEY GENERAL'S OFFICE
                             455 Golden Gate Avenue, Suite 11000
                             San Francisco, California  94102-7004

               **BY:  TAMAR PACHTER, DEPUTY ATTORNEY GENERAL**

                             STATE OF CALIFORNIA
                             Department of Justice
                             Office of the Attorney General
                             1300 I Street, 17th Floor
                             Sacramento, California 95814

               **BY:  GORDON BURNS, DEPUTY SOLICITOR GENERAL**

**For Defendant-**
**Intervenors:**            COOPER & KIRK
                             1523 New Hampshire Avenue, N.W.
                             Washington, D.C.  20036

               **BY:  CHARLES J. COOPER, ESQUIRE**
                     **DAVID H. THOMPSON, ESQUIRE**
                     **HOWARD C. NIELSON, JR., ESQUIRE**
                     **NICOLE MOSS, ESQUIRE**
                     **PETER PATTERSON, ESQUIRE**

                             ALLIANCE DEFENSE FUND
                             15100 North 90th Street
                             Scottsdale, Arizona 85260

               **BY:  BRIAN W. RAUM, SENIOR COUNSEL**

**For Defendant**
**Dean C. Logan:**         OFFICE OF LOS ANGELES COUNTY COUNSEL
                             500 West Temple Street, Room 652
                             Los Angeles, California 90012

               **BY:  JUDY WHITEHURST, DEPUTY COUNTY COUNSEL**

**For Defendant**
**Patrick O'Connell:**      OFFICE OF ALAMEDA COUNTY COUNSEL
                             1221 Oak Street, Suite 450
                             Oakland, California  94612

               **BY:  CLAUDE F. KOLM, DEPUTY COUNTY COUNSEL**

- - - - -

PROCEEDINGS

1                    **P R O C E E D I N G S**

2    **JANUARY 13, 2010**                                    **8:39 A.M.**

3

4            **THE COURT:**  Very well.  Good morning, counsel.

5            (Counsel greet the Court.)

6            **THE COURT:**  Ready to proceed?

7            **MR. THOMPSON:**  Yes, Your Honor.

8            **THE COURT:**  Very well.  Mr. Chauncey, I believe, is

9    on the stand.

10           Yes.  Here he is.

11           **MR. THOMPSON:**  Your Honor, as Professor Chauncey is

12   coming to the stand, I wanted to report that we were able to

13   agree that all the exhibits that the plaintiffs wanted to move

14   into evidence last evening we have no objection.  So if they

15   have a list that they want to provide, we're fine with that.

16           In addition, there was -- I believe it was PX1775, we

17   had a authenticity objection to.  We withdraw that authenticity

18   objection.  And I think Ms. Stewart has a better copy of it,

19   and she can explain that situation.

20           **THE COURT:**  All right.  Ms. Stewart.

21           **MS. STEWART:**  Good morning, Your Honor.

22           We -- yesterday, Mr. Thompson was concerned that the

23   exhibit that was in the binders was a black-and-white copy that

24   was a little bit blurry.  And so there's another exhibit that's

25   been marked, that's the same document, that actually is in

1   color and has no blurriness.  I just wanted to ask the Court

2   for your preference.  The plaintiff exhibit number that the

3   cleaner copy is, is 2288.  But I thought it might make sense to

4   remark it the same as the other exhibit so that the record is

5   clear, because the witness referred to the document.  And the

6   blurrier version of it was exhibit --

7           **MR. THOMPSON:**  1775.

8           **MS. STEWART:**  -- 1775.

9           So I can do whichever, but I thought what I would do

10  is just mark these 1775, and, during a break, substitute them

11  in the binders that the Court has, so that we replace the

12  blurry copy with the clean one.

13          **THE COURT:**  Why don't, instead, you file this as

14  1775A.

15          **MS. STEWART:**  Perfect.  Thank you, Your Honor.

16          And, also --

17          **THE COURT:**  The record will be complete as to which

18  documents are being referred to.

19          (Plaintiffs' Exhibit 1775A marked for

20          identification.)

21          **MS. STEWART:**  If the Court would allow me to, I had

22  requested that the Court allow me to have this list become an

23  exhibit, so that I could then ask the Court to admit the

24  documents that are on the list as Dr. Chauncey's sources,

25  rather than have him read those sources into the record, just

PROCEEDINGS                                    463

1   to spare us the extra time.

2           And so I'd like to ask that the list that

3   Mr. Thompson was referring to, that they have now agreed to, of

4   exhibits that would come in through Mr. Chauncey, to be

5   marked -- what are we up to in next in order for plaintiffs?

6   Plaintiffs' next in order.  Guys?

7           **THE COURT:**  What you have, I gather, is simply a list

8   of those exhibits that are coming in.

9           **MS. STEWART:**  Correct, Your Honor.

10          **THE COURT:**  Why don't you hand those to the clerk,

11  and we will go through the exhibit list and we will mark those

12  as entered.  And that should take care of the problem, should

13  it not, Mr. Thompson?

14          **MR. THOMPSON:**  Yes, Your Honor.

15          (Plaintiffs' Exhibits 847, 848, 849, 850, 851, 852,

16             853, 854, 855, 856, 857, 858, 859, 861, 863, 864,

17             868, 872, 873, 874, 876, 877, 878, 879, 880, 881,

18             882, 2281, 2322, and 2337 received in evidence.)

19          **MS. STEWART:**  We will provide the physical exhibits,

20  themselves, to the Court at a break.

21          **THE COURT:**  Good.  Well, I appreciate that, Counsel.

22  We're moving along.

23          All right.  Mr. Thompson.

24          **MR. THOMPSON:**  Yes.

25

PROCEEDINGS

1                        **GEORGE CHAUNCEY**,

2   called as a witness for the Plaintiffs herein, having been

3   previously duly sworn, was examined and testified as follows:

4           **THE COURT:**  Now, Mr. Chauncey, you're still under

5   oath.  You understand that, do you?

6           **THE WITNESS:**  Yes, sir.

7           **THE COURT:**  The oath that you took yesterday applies

8   to this testimony as it did the testimony yesterday.

9           **THE WITNESS:**  Yes.

10          **THE COURT:**  Is that clear?

11          **THE WITNESS:**  Yes, sir.

12          **THE COURT:**  Very well.  Proceed.

13                  **CROSS EXAMINATION RESUMED**

14  **BY MR. THOMPSON:**

15  **Q.**   Good morning, Professor.

16  **A.**   Good morning.

17  **Q.**   Is it fair to say that as a historian you are most struck

18  by how quickly public opinion is changing in regard to the

19  recognition of same-sex relationships?

20  **A.**   I think that, as a historian, I'm struck both by change in

21  opinion and by the polarization of American society and the

22  roadblocks that have been put in place to prevent the

23  achievement of marriage equality for gay couples.

24  **Q.**   Well, I'd like to direct your attention to tab 6 in your

25  binder, which is excerpts from your book *Why Marriage?*, which

1  has been introduced into evidence in the list that was just

2  handed to the Court.  And I would like to direct your attention

3  to page xii in Roman numerals.  So this would be the

4  introduction.  So it's tab 6, and then Roman numeral xii, which

5  is towards the beginning, in the introduction.

6         Tell me when you're there, Professor.  I don't mean

7  to rush you.

8  **A.**   Yes.

9  **Q.**   Okay.  And so you said, in the first full paragraph:

10         "Nonetheless, as a historian I am most struck

11         by how quickly public opinion is changing in

12         regard to the recognition of same-sex

13         relationships."

14         You wrote that, correct?

15  **A.**   I did write that.  I wrote that in 2004.

16  **Q.**   The question is just whether you wrote that.  On redirect

17  you can explain whatever you like.

18         And when you wrote that, you agreed with it, correct?

19  **A.**   Uhm, yes, I thought this in 2004.

20  **Q.**   Yes.  Okay.  Very well.

21         Now, in 2002, Gallup did a poll that showed that even

22  though 44 percent of people said homosexuality was an

23  unacceptable alternative lifestyle, 86 percent thought

24  homosexuals should have equal rights in terms of job

25  opportunities, correct?

1  **A.**   I'm sorry, which year did you mention?

2  **Q.**   2002.  I can repeat the question, if you like.

3         In 2002, Gallup did a poll that showed that even

4  though 44 percent of the people said homosexuality was an

5  unacceptable alternative lifestyle, 86 percent thought

6  homosexuals should have equal rights in terms of job

7  opportunities; is that right?

8  **A.**   I would have to look at the source again, but that seems

9  possible to me.

10  **Q.**   Okay.  And the contrast was even more striking among

11  African-Americans, who were more supportive of gay civil rights

12  than whites, even though they also expressed more moral

13  disapproval of homosexuality, correct?

14  **A.**   I remember that being a general trend.

15  **Q.**   And when Matthew Shepard was murdered, it provoked a

16  national outcry, correct?

17  **A.**   It received considerable attention, yes.

18  **Q.**   And it was clear that a profound change had taken place,

19  correct?

20  **A.**   Uhm, well, I believe that I was referring there to a

21  growing recognition of the problem of violence against gay

22  people, and that it ought to be considered a problem; even

23  though, it continued at considerable length.

24  **Q.**   But there was a -- there had been a remarkable growth in

25  acceptance of gay people in our own time, correct?  There has

1   been?

2   **A.**    Uhm, as I think I've said throughout my work, there's been

3   both a growth and a growing -- of support for gay people, and a

4   growing polarization in American society over gay issues.

5   **Q.**    As recently as 2000, civil unions seemed like a radical

6   idea, correct?

7   **A.**    Yes.

8   **Q.**    And in Vermont, Governor Howard Dean was denounced for

9   supporting civil unions at the beginning of the last decade,

10  correct?

11  **A.**    Yes, that's correct.

12  **Q.**    But every major democratic candidate for president

13  supported civil unions in the 2004 primary, correct?

14  **A.**    They supported civil unions, but not marriage.

15  **Q.**    And that would have been unthinkable just four years

16  earlier, correct?

17  **A.**    It did mark a change, yes.

18  **Q.**    Indeed, even President George W. Bush sought to moderate

19  his image by supporting the rights of states to enact civil

20  unions for gay couples, correct?

21  **A.**    In a roundabout way, yes.

22  **Q.**    And more telling evidence of the growing public support

23  for gay couples was provided by several state legislatures,

24  correct?

25  **A.**    You'll have to tell me what you're referring to there.

1  **Q.**   Well, the legislatures of New Jersey and Maine passed laws

2  providing a degree of recognition and security to gay couples,

3  correct?

4  **A.**   Yes, there were a handful of states that did that; while

5  many others enacted significant barriers to marriage.

6  **Q.**   And California has enacted a sweeping domestic partnership

7  law that granted registered gay couples all of the state

8  benefits available to married couples.  Yes or no?

9  **A.**   Yes.

10  **Q.**   In 2004, exit polls showed that 60 percent of voters

11  nationwide support either civil unions or marriage for gay

12  couples, correct?

13  **A.**   Yes, I believe it was about half of those for marriage,

14  and then the others just for civil union.  So they drew a

15  distinction between the two.

16  **Q.**   Are you aware of any more recent polling data on that

17  issue?

18  **A.**   I can't give you the particulars on the most recent polls.

19  My sense is that, broadly, there's still about a third support

20  for marriage, and about a third support for civil unions or

21  domestic partnership but not marriage.

22  **Q.**   And the generational shift is especially noteworthy.

23  Americans in their late teens and 20s are four times more

24  likely to support same-sex marriage than their grandparents

25  are, correct?

1  **A.**    I believe that figure was true at one point.  I think that

2  trend is generally true.  It's, of course, hard to know what

3  will happen with that trend, but that would be a fair

4  assessment of current polling data.

5  **Q.**   The years stretching from the spring of 2003 to the spring

6  of 2004, were a decisive turning point in the history of

7  lesbians and gay men in the United States, correct?

8  **A.**    Uhm, well, I believe when I said that, I was referring

9  both to the recognition of marriage by the Massachusetts state

10  court and the enormous debate that emerged.

11         And so it was a decisive turning point in the sense

12  that the issue had really been brought to the fore.  And, of

13  course, tremendous opposition was generated, as well as

14  support.

15  **Q.**   And it's hard to think of another group whose

16  circumstances and public reputation have changed so decisively

17  in so little time, correct?

18  **A.**    I think, in looking back over the last generation, it is

19  really striking how much has changed and how many impediments

20  remain before gay people, and how strong resistance has been to

21  that change.

22  **Q.**   Above all, there's been a sea change in the attitudes of

23  the young who have grown up in a world where they know gay

24  people and see them treated with the respect any human

25  deserves, correct?

1  **A.**    I think that there has been a change on the part of young

2  people, yes.

3  **Q.**    Okay.  And I'd like to direct your attention to tab 9 in

4  your binder.  And this is a website entitled,

5  "beyondhomophobia.com."  It's written by Dr. Herek, who is an

6  expert in this case.

7              And do you know of Dr. Herek's reputation?

8  **A.**    Yes.

9  **Q.**    All right.  And he has a solid reputation in his field?

10  **A.**    Yes.

11  **Q.**    All right.  And I'd like to direct your attention to page

12  4 of this document by Professor Herek.

13              And looking at the fourth paragraph from the bottom,

14  the second sentence reads:

15              "The widespread opposition to Proposition 8

16              and the fact that proponents of the measure

17              have been so careful not to publicly bash

18              sexual minorities are signs of a sea change

19              in public attitudes."

20              Do you agree with Professor Herek?

21  **A.**    Well, as I suggested yesterday, I do think that the Prop 8

22  campaign in, certainly, its most public, official

23  manifestations was more polite than many of the earlier

24  campaigns.  Although, I believe they also drew on some of the

25  fears that were resident because of those earlier campaigns.

1  Q.    In the colonial era, sodomy laws regulated conduct in

2  which anyone could engage, correct?

3  A.    I'm sorry.  Repeat.

4  Q.    Just --

5  A.    Repeat yourself.

6  Q.    Yes.  In the colonial era, sodomy laws regulated conduct

7  in which anyone could engage, correct?

8  A.    Uhm, well, again, there were variations amongst the states

9  as a sort of general rubric.  That would be fine.  But that

10  would be qualified by looking at the laws that affected --

11  primarily, that regulated male sexual behavior.

12  Q.    The prohibition against sodomy was not the same thing as

13  anti-gay discrimination, correct?

14  A.    Yes.  As I said yesterday, it was not the same thing.

15  Q.    Although, anti-gay discrimination is popularly thought to

16  have ancient roots; in fact, it was a unique and relatively

17  short-lived product of the 20th century, correct?

18  A.    Well, as I've suggested, the hostility towards such

19  behavior can be seen in the sodomy laws, even though they

20  didn't apply just to homosexual conduct.

21        But in that sentence, I was referring to the

22  construction of an edifice of anti-gay discrimination and

23  hostility in the context of the 20th century, when the

24  categories of gay and straight, heterosexual and homosexual,

25  became culturally powerful.

1  Q.   But you agree with the sentence I read, correct?

2  A.   If you would read the sentence again, please.

3  Q.   Sure.  The prohibition against sodomy was not the same

4  thing as anti-gay discrimination, correct?

5  A.   Yes.

6  Q.   All right.  And, sorry, although anti-gay discrimination

7  is popularly thought to have ancient roots, in fact, it is a

8  unique and relatively short-lived product of the 20th century,

9  correct?

10  A.   Well, there again, I'm drawing a distinction between

11  hostility towards behavior and discrimination against a class

12  of people based on that -- defined by that behavior.  And so in

13  that sense, yes, discrimination is a product of the 20th

14  century.

15  Q.   And the states began to enact discriminatory measures in

16  the 1920s and '30s against homosexuals, correct?

17  A.   Yes.

18  Q.   Now, in your direct you mentioned -- you discussed

19  discrimination in the context of bars.  Do you remember that?

20  A.   Yes.

21  Q.   Okay.  And gay bars were an important battleground in the

22  post-war years, correct?

23  A.   Yes.

24  Q.   Beginning in the 1930s and '40s, many states, including

25  California, prohibited gay people from being served in bars and

1  restaurants, correct?

2  **A.**    Yes.

3  **Q.**    But raids on bars of gays and lesbians are a thing of the

4  past in California today, correct?

5  **A.**    Uhm, I can't give you a definitive answer on that.  I

6  mean, clearly, they are not a part of the landscape now in the

7  way they were then.

8  **Q.**    So that's an -- and, indeed, throughout the United States,

9  gays and lesbians are free to go -- are legally entitled to go

10  to any bar they wish to, correct?

11  **A.**    Uhm, they are now -- uhm.  Well, I guess that in half the

12  states there's still no laws prohibiting discrimination against

13  them.  And so it could still -- they could still be ejected in

14  bars in, let's say, half the states.

15  **Q.**    Are you aware of any police raids on any bars in the

16  United States that have taken place in the last ten years

17  because the bar was serving gays and lesbians?

18  **A.**    Well, last summer, the police did arrest a number of

19  patrons at a bar in Fort Worth, Texas.  And there was a big

20  controversy about why they had done this.

21  **Q.**    Any other -- any other incidents in the last ten years?

22  **A.**    Uhm, not that I can think of now.

23  **Q.**    And in the -- let's turn to the medical community and the

24  discrimination that was present there in the early part of the

25  20th century.  Leading physicians and medical researchers

1  claimed that homosexuality was a pathological condition or

2  disease, correct?

3  **A.**    Yes.

4  **Q.**    Almost all of the medical literature on homosexuality in

5  the early 20th century considered it to be a pathological

6  condition or disease, correct?

7  **A.**    Yes.

8  **Q.**    But the medical literature was incorrect; isn't that

9  right?

10  **A.**    Uhm, well, certainly, researchers today would, yes, say

11  that that literature was incorrect.

12  **Q.**    Such hostile medical pronouncements provided a powerful

13  source of legitimation to anti-homosexuality sentiment,

14  correct?

15  **A.**    Yes.

16  **Q.**    Such medical pronouncements were themselves a

17  manifestation of discrimination against gays and lesbians,

18  correct?

19  **A.**    They reflected that and enhanced that.

20  **Q.**    But the major institutions that once helped legitimize

21  anti-gay hysteria have changed their positions today, correct?

22  **A.**    Well, could you talk about particular institutions.

23  That's a very general question.

24  **Q.**    Well, let's turn to tab 10 in your binder.

25          Do you recall that you put in a declaration in the

1  California same-sex marriage cases?

2  **A.**    Yes.

3  **Q.**    And is tab 10 a -- if you turn to page 16, is that your

4  signature?

5  **A.**    Yes.

6  **Q.**    Okay.  And, then, I'd like you to look at page 12,

7  paragraph 28.  And in the second sentence you say:

8            "Major institutions that once helped

9            legitimize anti-gay hysteria have changed

10           their positions."

11           And you wrote that, right?

12  **A.**   Well, I did write that.  But I'd like to be able to talk

13  about particulars rather than --

14  **Q.**   All right.

15  **A.**   Yes.  I'll say "major institutions," that's a very general

16  statement.

17  **Q.**   Well, for example, the American Psychiatric Association,

18  in 1973, voted to remove homosexuality from its list of mental

19  disorders, correct?

20  **A.**   Yes.

21  **Q.**   And the American Psychological Association and the

22  American Medical Association soon followed, correct?

23  **A.**   Yes.

24  **Q.**   And today leading physicians and medical researchers no

25  longer claim that homosexuality is a pathological condition,

1  correct?

2  **A.**   Yes.

3  **Q.**   For more than 35 years, the leading American mental health

4  associations have made clear that homosexuality is not a

5  pathological condition or disease, correct?

6  **A.**   Yes.

7  **Q.**   Now, now let's talk about discrimination in academia.

8         You received your undergraduate degree from Yale; is

9  that correct?

10  **A.**   Yes.

11  **Q.**   And you graduated in 1977; is that correct?

12  **A.**   Yes.

13  **Q.**   And you got your Ph.D. from Yale, in 1989; is that

14  correct?

15  **A.**   Yes, uh-huh.

16  **Q.**   And after a couple of years, you went to the University of

17  Chicago, and taught there for 15 years; is that correct?

18  **A.**   Yes.

19  **Q.**   And then you returned to Yale as a tenured professor; is

20  that correct?

21  **A.**   That's correct.

22  **Q.**   All right.  And since returning, you've been astonished to

23  see how much Yale has changed; isn't that right?

24  **A.**   Yes.  I have noted many changes at Yale.

25  **Q.**   And almost all of that change has been for the better,

1    correct?

2    **A.**    Uhm, that's my sense, yes.

3    **Q.**    One of the most remarkable transformations has been in the

4    place of the lesbian, gay, bisexual, and transgender students

5    and faculty, correct?

6    **A.**    Yes.

7    **Q.**    As a graduate student, even with the support of a

8    prominent historian like Nancy Cott, you encountered

9    considerable scepticism when you decided to write a

10   dissertation in gay history, correct?

11   **A.**    Yes.

12   **Q.**    But 20 years later, Yale hired you precisely because of

13   that scholarship, correct?

14   **A.**    Yes.

15   **Q.**    And Yale is a hospitable place to be gay, correct?

16   **A.**    Yes.

17   **Q.**    And this change hasn't occurred at Yale alone, correct?

18   **A.**    It hasn't occurred at Yale alone.  Although, I would

19   hardly take Yale as a bellwether for the entire United States.

20          (Laughter)

21   **Q.**    Thank heavens.

22          There has been a sea change in the place of lesbians,

23   gays, bisexual, and transgender people in American society in

24   the last generation, correct?

25   **A.**    As I've already said, yes, I've noted dramatic changes in

```
 1  the place of gay people in American society.  That's also
 2  included dramatic escalation and opposition to gay rights.
 3  Q.   Now, let's talk about discrimination in the news media.
 4  And I would like to direct your attention to tab 12 in your
 5  binder.
 6         And this is an excerpt from a report by Kenneth
 7  Miller.  And it shows, on the second page, the 15 largest
 8  newspapers by circulation in the State of California.  And all
 9  of them were opposed to Proposition 8.
10         Is it a fair to say that the news media in California
11  is supportive of gay rights?
12  A.   Uhm, you show these editorials, and I'm sure these
13  editorials were there.
14         I don't find I am in a position to broadly
15  characterize the news media in California.
16  Q.   Okay.  Do you read the New York Times with some frequency?
17  A.   I do read the New York Times.
18  Q.   All right.  And the New York Times is supportive of the
19  rights of gays and lesbians, correct?
20  A.   Yes.  The editorial pages of the Times are supportive of
21  those rights.
22  Q.   And it's one of the most influential papers in the
23  United States, correct?
24  A.   For many people.  And, of course, it's reviled by many
25  others.
```

1   Q.   I understand that.

2        Let's talk about television.  In your report in this

3   case, you drew on statistics concerning the number of regular

4   gay characters in television melodramas and sitcoms in the

5   1990s.  Do you recall that?

6   A.   Yes.

7   Q.   And you found there was an increase in the number of

8   regular gay characters in television melodramas and sitcoms,

9   correct?

10  A.   Yes.

11  Q.   And during the 1990s, gay and lesbian characters were a

12  regular part of the television landscape, correct?

13  A.   I think by the end of the '90s they had become that, yes.

14  Q.   And gay people became part of the cultural landscape, even

15  for the people without openly-gay friends, correct?

16  A.   I think more than had been the case before, yes.

17  Q.   And this dramatically changed the dominant representation

18  of homosexuals, correct?

19  A.   It certainly put forward a wider range of images.

20       Some people have been critical of many of those

21  images.  They feel that they rehearse certain stereotypes.  Not

22  ominous ones I discussed yesterday, but the more gender-bending

23  ones.

24       But, yes, I do think that they increased the range of

25  images available to people, even though certain other images

1  persisted.

2  **Q.**   And it didn't just increase the range.  It dramatically

3  changed the dominant representation of homosexuals, correct?

4  **A.**   Yes, by increasing the variety of images, it did mean that

5  there were many images out there, as opposed to a handful of

6  just hostile images.

7  **Q.**   And some of the images -- Will & Grace was an immensely

8  popular TV show?

9  **A.**   Will & Grace was an immensely popular TV show.

10  **Q.**   And you didn't think it bore anti-gay hostility, did you?

11  **A.**   No, I did not.

12        I know some people feel it played on the sort of

13  comedic role of gay people.

14  **Q.**   Let's now talk about movies.

15        In your direct testimony, you referenced a censorship

16  code that Hollywood used to have; is that right?

17  **A.**   Yes.

18  **Q.**   And it was replaced in the 1960s, with rating systems we

19  are accustomed to know today; is that right?

20  **A.**   Yes.

21  **Q.**   And when the censorship code was no longer in effect, it

22  meant that there could -- for the first time in a long time, it

23  was possible to discuss homosexuality overtly, correct?

24  **A.**   Yes.

25  **Q.**   And you would agree that it was important that there were

1    films that included gay characters, correct?

2    **A.**    Yes.

3    **Q.**    The movie *Philadelphia* was the first Hollywood studio film

4    to address AIDS, correct?

5    **A.**    Yes.  Certainly, the first large-budget film to do so,

6    yes.

7    **Q.**    And it was a huge success, correct?

8    **A.**    Yes.

9    **Q.**    And that was in 1993?

10   **A.**    Yes.

11   **Q.**    And, more recently, Brokeback Mountain was a box office

12   success, correct?

13   **A.**    Yes.  Although, I'm actually struck by how few such movies

14   there are.  But, yes, it was.

15   **Q.**    And it received numerous awards; did it not?

16   **A.**    I believe so.

17   **Q.**    Okay.  Now, let's talk about some of the governmental

18   discrimination that you referenced during your direct

19   testimony.

20          In the 1980s, gay right activists secured the

21   enactment of gay rights ordinances in 40 cities, counties, and

22   suburbs, bringing the total to 80; is that right?

23   **A.**    Yes.

24   **Q.**    And there are more today, aren't there?

25   **A.**    Yes.

1  Q.   Just recently, Salt Lake City passed an ordinance that

2  extended protection against discrimination in the workplace to

3  gays and lesbians; is that right?

4  A.   I was not aware of that, but I'm sure it's true if you say

5  it is.

6  Q.   In California, over the last decade, there has been a

7  consistent track record of the legislature voting in favor of

8  extending rights to gays and lesbians; is that correct?

9  A.   I would have to review the California record more fully to

10  give you an adequate answer to that; but, certainly, there have

11  been a number of votes in the California state legislature

12  supportive of gay rights.

13  Q.   And in looking at the federal government, it's true that

14  the federal government once prohibited the employment of

15  homosexuals, correct?

16  A.   Yes.

17  Q.   But today the federal government now prohibits its

18  agencies from discriminating against homosexuals in employment,

19  correct?

20  A.   Well, the military continues to discriminate against

21  homosexuals in its employment.

22  Q.   We will talk about that.  But with that footnote, federal

23  agencies are prohibited from discriminating against gays and

24  lesbians, correct?

25  A.   Yes.

1  Q.   Okay.  In the house of representatives, gays and lesbians

2  have a powerful ally in speaker Nancy Pelosi?

3  A.   What do you mean by "an ally," a "powerful ally"?

4  Q.   Someone who is a champion of their cause.

5  A.   Well, I'm not sure I would accept that assessment.  There

6  are a range of issues that gay rights groups have put before

7  the Congress, that they would like to see put forward.  And

8  with the exception of the Hate Crimes law, they have not moved

9  forward.

10        So I think that many people would question how

11  powerful an ally Nancy Pelosi has been of the gay rights

12  movement.

13  Q.   Didn't the House of Representatives pass ENDA, the

14  Employment Non-Discrimination Act?

15  A.   Has the House of Representatives passed that?

16  Q.   Yes.  Well, we'll move on.

17        No lawmaker would grant a homosexual a hearing in the

18  1950s, correct?

19  A.   Uhm, right.  No lawmakers would grant a hearing to

20  homosexuals.

21  Q.   But today congressmen -- you would concede that

22  Congressman Barney Frank is a powerful ally of gays and

23  lesbians, correct?

24  A.   I would agree that he is a strong supporter of gay rights.

25  So he has often been criticized by gay rights groups.

1    Q.    And Senator Boxer is an ally of gays and lesbians?

2    A.    Well, in what sense do you mean "an ally of gays and

3    lesbians"?

4    Q.    Someone who supports their causes.

5    A.    I would need to review the particulars of her record.

6    Although, I think she's been supportive of some issues, but I

7    would need to look at her record in particular.

8    Q.    Over the last decade, labor unions have consistently

9    supported the rights of gays and lesbians, correct?

10    A.    Well, that's a very large generalization.  And I'm not

11    sure, when you say that, do you mean support in the sense of

12    passing a resolution, or support in the sense of mobilizing

13    their activists to go out and support a particular bill?  Or --

14    Q.    Or giving money.

15    A.    -- referendum.

16    Q.    I mean, unions gave a lot of money to defeat Prop 8; isn't

17    that right?

18    A.    I don't know that, but I would have to ask what level of

19    support you're talking about.

20          I don't know that unions, even if they have passed

21    resolution, if they have actually dedicated resources that --

22    both in volunteer power, staffing, mobilization of people, and

23    money.

24    Q.    Now, you believe that the federal government was slow to

25    respond to the AIDS crisis, correct?

1  **A.**    Yes.

2  **Q.**    And, in your opinion, the association of this disease with

3  a despised group is a significant part of why the government

4  responded so slowly, correct?

5  **A.**    I do think that that's one of the reasons, yes.

6  **Q.**    And funding of AIDS research is an important priority to

7  the gay and lesbian community, correct?

8  **A.**    Yes.

9  **Q.**    It's fair to say that even today the majority of Americans

10  would still think that homosexuals would be more likely to have

11  AIDS than heterosexuals, correct?

12  **A.**    I haven't seen that cite, but I imagine that's the case.

13  **Q.**    And if we look at the level of funding today, for AIDS

14  research, it has increased dramatically since the early days of

15  the AIDS crisis, correct?

16  **A.**    Yes.  Though, of course, any increase would be dramatic,

17  given how little there was initially, yes.

18  **Q.**    Do you have a rough idea as to how much money a year the

19  federal government spends on AIDS research?

20  **A.**    No.  But I do think it is a significant amount.

21  **Q.**    Now, you testified that not all states have bans on

22  discrimination on the basis of sexual orientation.

23          But isn't it true that thousands of private employers

24  have adopted nondiscrimination measures?

25  **A.**    Many have.  Certainly, it could be thousands.

1   **Q.**   Let's look at your California report, which was behind tab

2   10, paragraph 28.  And it's page 13.  And you say in the third

3   full sentence:

4               "A substantial number of cities and counties

5               have prohibited discrimination based on

6               sexual orientation.  Thousands of private

7               employers have adopted similar measures."

8               And that was true when you wrote that?

9   **A.**   It must have been.  I would have just reviewed that

10  literature at that time, which I haven't just done now.

11  **Q.**   Okay.  Local gay rights ordinances became in the 1980s an

12  important barometer of public attitudes towards homosexuality,

13  correct?

14  **A.**   Yes.

15  **Q.**   Local gay rights ordinances also became an important

16  barometer of the relative strength of pro- and anti-gay forces,

17  correct?

18  **A.**   Yes, in the context of the referendum battles over gay

19  rights laws, yes.

20  **Q.**   The efforts of gays and lesbians collectively constituted

21  a massive and remarkably successful grassroots campaign to

22  challenge the misconceptions and daily habits sustaining

23  anti-gay bigotry, correct?

24  **A.**   I think over the sweep of the last generation, yes, it is

25  remarkable, the change that's been produced, even as it's

1    produced a reaction.

2    Q.   As a result of both individual and collective efforts, gay

3    political clout has grown in many parts of the country,

4    correct?

5    A.   I'm sorry, I'm --

6    Q.   Sure.  As a result of both individual and collective

7    efforts, gay political clout has grown in many parts of the

8    country, correct?

9    A.   Yes.  Certainly, in parts of the country, yes.

10   Q.   And a growing number of heterosexuals have taken up the

11   causes -- have taken up gay causes as their own, correct?

12   A.   Uhm, yes.  More heterosexuals have come to support gay

13   rights, yes.

14   Q.   Although, the statistics are imprecise, the best figures

15   we have now, in your opinion, are that somewhere between 2 and

16   5 percent of the population is gay and lesbian, correct?

17   A.   Yes.

18   Q.   And the support for the 2 to 5 percent number comes from a

19   study by the University of Chicago researcher, Edward Laumann,

20   correct?

21   A.   Yes.  As I recall, it is in the 2 to 3 percent category.

22   Q.   It was one of the most highly regarded of the studies that

23   were conducted at the time, in the '90s, correct?

24   A.   Yes.

25        MR. THOMPSON:  Your Honor, we would move the

1  admission -- this is a plaintiffs' expert -- exhibit, PX943.

2  It's the Edward Laumann study that was just referenced.  We

3  would ask the Court to take judicial notice of it.

4           **THE COURT:**  PX9 --

5           **MR. THOMPSON:**  -- 43.

6           **THE COURT:**  43.

7           **MR. OLSON:**  No objection, Your Honor.

8           **THE COURT:**  Very well.  943 is admitted.

9           (Plaintiffs' Exhibit 943 received in evidence.)

10 **BY MR. THOMPSON:**

11 **Q.**   And even as early as 1992, there was a distinct shift

12 towards support for gay people evident in the presidential

13 election year, when gay issues moved to the center of the

14 national debate for the first time, correct?

15 **A.**   Well, I think that in 1992, yes, on the one hand, you had

16 a major presidential candidate, Bill Clinton, who voiced

17 support for gay rights more forcefully than it had been done in

18 the past.

19           And you had a very strong conservative position in

20 the Republican party, on gay rights.

21 **Q.**   And President Clinton became the first president to

22 appoint openly-gay officials, correct?

23 **A.**   Yes.

24 **Q.**   And, in fact, he appointed more than 150 openly-gay

25 officials to his administration, correct?

**A.**    Yes.

**Q.**    President Clinton issued executive orders banning discrimination in the federal workplace on the basis of sexual orientation, correct?

**A.**    Yes.

**Q.**    And President Clinton issued executive orders barring the use of sexual orientation as a criterion for determining security clearance, correct?

**A.**    Yes.

**Q.**    And you've stated that -- and you would agree that, at the national level, gay advocates remained relatively powerless to win gay rights protections in the 1990s, correct?

**A.**    Yes.

**Q.**    And when you use the phrase "relatively powerless," what you mean is gay activists and their supporters had reached the point where they could at least have their issues considered; but they had not achieved the power to win the proposals that they put forward at the federal level, or to defend them against determined opposition.  Yes or no?

**A.**    Yes.

**Q.**    The federal government now prohibits agencies from discriminating against homosexuals in employment, correct?

**A.**    Yes.

**Q.**    And surveys of the largest employers in the United States show that more than 90 percent of them have adopted

1  antidiscrimination measures that protect the rights of gays and

2  lesbians, correct?

3  **A.**    Yes.

4         **MS. STEWART:**  Objection.  Your Honor, I think it

5  misstates the testimony.

6         **THE COURT:**  I beg your pardon?

7         **MS. STEWART:**  Never mind.

8         **THE COURT:**  Objection withdrawn.

9  **BY MR. THOMPSON:**

10 **Q.**    And, in the past, in the past, state and local the

11 government's used to try to ferret out and discharge their

12 homosexual employees, correct?

13 **A.**    Yes.

14 **Q.**    But that's no longer the case today, is it?

15 **A.**    No.  Those employees still report large levels of

16 discrimination; but, no, they do not -- they are not ferreted

17 out by state agencies now.

18 **Q.**    And federal and local agencies in the past sought to

19 curtail gay people's freedom of speech, correct?

20 **A.**    Yes.

21 **Q.**    But that's no longer the case today, correct?

22 **A.**    Correct.

23 **Q.**    And homosexuals used to be barred from entry into the

24 United States, correct?

25 **A.**    Correct.

1    **Q.**    But that's no longer the case today, correct?

2    **A.**    Correct.

3    **Q.**    Okay.  Now, let's talk about Don't Ask, Don't Tell.

4         And during the second World War, the Armed Forces put

5    in place screening mechanisms to ferret out homosexuals during

6    the induction process, correct?

7    **A.**    Yes.

8    **Q.**    The military, however, no longer tries to screen out

9    homosexuals during the induction process, correct?

10   **A.**    I assume that's the case.  I don't understand the exact

11   workings of this.

12   **Q.**    Military police used to cooperate in anti-vice raids

13   against gay bars and other meeting places, correct?

14   **A.**    Yes.

15   **Q.**    But the military or police no longer conduct anti-vice

16   raids against gay bars, correct?

17   **A.**    I assume that's correct.

18   **Q.**    The don't -- you testified yesterday that the Don't Ask,

19   Don't Tell policy was a compromise; is that right?

20   **A.**    Yes.

21        **MR. THOMPSON:**  And, Your Honor, if I may, I think we

22   have some additional -- an additional binder.  May I get that

23   and pass that around?

24        **THE COURT:**  Of course.

25        **MR. THOMPSON:**  Thank you, Your Honor.

1          **THE COURT:**  It's too bad we are not all in the

2     notebook business.

3     **BY MR. THOMPSON:**

4     **Q.**   And, Professor, I would like to direct your attention to

5     tab 14A.  It actually says, "Exhibit A," but it's after 14.

6              And specifically to pages 9 and 10 of this document,

7     which is produced by the Congressional Research Service.  It's

8     entitled, "Don't Ask, Don't Tell.  The Law and Military Policy

9     on Same-Sex Behavior."

10             And we can see that when President Reagan was the

11    president, close to 2,000 individuals, in 1982, were discharged

12    from the Armed Services, correct?

13    **A.**   Yes.

14    **Q.**   And in the year immediately before Don't Ask, Don't Tell

15    was put in place, 949 individuals were discharged, in 1991,

16    right?

17    **A.**   I'm sorry, what page?

18    **Q.**   Sorry.  If you turn the page.

19    **A.**   Uh-huh.

20    **Q.**   Okay.  But in 2008, under President George W. Bush, only

21    634 individuals were discharged, correct?

22    **A.**   Uhm, that's correct.  Although, I believe that the size of

23    the military had declined.

24             So as I look at the percentages, they go up and down.

25    And we have roughly the same percentage being discharged in

1  2008 as were discharged in 1989.

2  **Q.**   But as compared to President Reagan, in 1982, it's less

3  than half, correct?

4  **A.**   A little bit more than -- yes.  That was the high point,

5  under President Reagan.

6          **THE COURT:**  You're referring to what page,

7  Mr. Thompson?

8          **MR. THOMPSON:**  Oh, yes.

9          **THE COURT:**  10?

10         **MR. THOMPSON:**  Page 9 has the Reagan numbers.  And

11  page 10 has the more recent numbers, Your Honor.

12         **THE WITNESS:**  Right.  Of course, another one of the

13  Reagan numbers is from 1988, where it's roughly the same

14  percentage discharged as in 2008.

15  **BY MR. THOMPSON:**

16  **Q.**   And in your report, you truncated your analysis at the

17  year 2000; is that right?

18  **A.**   Yes.

19  **Q.**   Now, let's look at the -- the role of courts and the level

20  of discrimination that's been directed against gays and

21  lesbians in the courts, Professor.

22         Courts used to be able to confine individuals deemed

23  in need of a cure for what was termed their homosexual

24  pathology, correct?

25  **A.**   Yes.

1  Q.   That doesn't happen anymore, does it, in this country?

2  A.   No, I don't believe it does.

3  Q.   So that's a form of discrimination that's vanished,

4  correct?

5  A.   Uhm, I don't -- yes.

6  Q.   And was the Supreme Court's decision in *Bowers vs.*

7  *Hardwick*, in your opinion, itself a reflection of moral

8  disapproval of gays and lesbians?

9  A.   Well, certainly, there were indications in the supporting

10  opinions of that, and in the way they construed the sodomy law

11  at issue itself, and made it an anti-homosexual law.  When, in

12  fact, it was a law that penalized heterosexual as well as

13  homosexual intercourse of certain kinds.

14  Q.   Courts in Connecticut, Massachusetts, Iowa, California,

15  have all held that gays and lesbians have a constitutional

16  right to marry under their state constitutions, correct?

17  A.   Yes.

18  Q.   And those court decisions reflect increased level of

19  support for the rights of gays and lesbians, correct?

20  A.   Well, I think those court decisions reflect the rulings of

21  the decisions of those courts that there was a guarantee of

22  equality, equal protection, and that they themselves may not

23  have reflected growth of support.  They certainly went against

24  much public opinion.

25  Q.   Now, let's talk about religion and discrimination against

1    gays and lesbians.

2           The first American laws against homosexual conduct

3    were rooted in the earliest English settlers' understanding of

4    the religious and secular traditions that prohibited sodomy,

5    correct?

6    **A.**    Yes.

7    **Q.**    And what were the secular traditions that prohibited

8    sodomy?

9    **A.**    Well, those grew out of the English Reformation

10   Parliament's secularization of the law.

11   **Q.**    And Puritan New England penalized many forms of carnal

12   knowledge, including adultery, fornication, and men lying with

13   men, correct?

14   **A.**    Yes.

15   **Q.**    And Puritan clergy in the New England colonies were

16   especially vigorous in their denunciation of sodomy as contrary

17   to God's will, correct?

18   **A.**    Yes.

19   **Q.**    The condemnation of the Puritan clergy was motivated by

20   the pressing need to increase the population and to secure the

21   stability of the family, as well as their reading of the

22   scripture, correct?

23   **A.**    Uhm, that is what a number of historians have argued.  And

24   I think it's probably correct.

25   **Q.**    And the Puritans had no concept of homosexuals as a

1  distinct minority of humankind, correct?

2  **A.**    Uhm, they certainly -- the Puritan clergy did not.  This

3  was not a term available to them.

4        You know, it gets a little more complex when we look

5  at the reality of sort of the on-the-ground engagement with

6  people.  But, yes, there was no concept of a homosexual as

7  such.

8  **Q.**    And Puritans believed that all men and women were children

9  of fallen humanity and, thus, sinners, correct?

10 **A.**    Yes.

11 **Q.**    And even today, conservative Christians' traditions teach

12 that all men and women are sinners, correct?

13 **A.**    Yes.

14 **Q.**    We all know how divided our churches are today over the

15 issue of homosexuality, correct?

16 **A.**    Yes.

17 **Q.**    Religious attitudes have begun to change, though, correct?

18 **A.**    Yes.

19 **Q.**    In the 1970s, many mainline Protestant denominations

20 issued official statements condemning discrimination against

21 homosexuals, and affirming that homosexuals ought to enjoy

22 equal protection under criminal and civil law, correct?

23 **A.**    Yes.  Of course, as I go on to say in the passage you were

24 quoting, they continue to debate the place of gay people in the

25 religious life of the church.  And they represent a fairly

1  small percentage of religious affiliations in the

2  United States.

3  Q.   Several of these groups descended from the historically

4  influential denominations whose religious authority had been

5  invoked to justify colonial sodomy statutes and the policing of

6  homosexuality as one more sign of urban vice, correct?

7  A.   Yes.

8  Q.   The Christian Right's fierce opposition to gay rights is

9  already a minority position among Protestant denominations,

10 correct?

11 A.   Uhm, you know, I think I'm -- I wrote that, and I'm -- I'm

12 not sure that that's correct.

13 Q.   But you did write that?

14 A.   Yes.  And I do occasionally make mistakes.

15 Q.   The Lutheran Church in America has issued a statement in

16 support of gay rights, correct?

17 A.   Yes.

18 Q.   The Unitarian Universalist Association has issued a

19 statement in support of gay rights, correct?

20 A.   Yes.

21 Q.   The United Methodist Church has issued a statement in

22 support of gay rights, correct?

23 A.   Yes.

24 Q.   The United Church of Christ has issued a statement in

25 support of gay rights, correct?

1  **A.**    Yes.

2  **Q.**    The Protestant Episcopal Church has issued a statement in

3  support of gay rights, correct?

4  **A.**    Yes.

5  **Q.**    The Disciples of Christ has issued a statement in support

6  of gay rights, correct?

7  **A.**    Yes.

8  **Q.**    The United Presbyterian Church in the United States has

9  issued a statement in support of gay rights, correct?

10  **A.**    Yes.

11  **Q.**    Many clergy have offered their support to gays and

12  lesbians by making their churches available for gay meetings,

13  correct?

14  **A.**    Yes.

15  **Q.**    And the Unitarians, Quakers, and Methodists were

16  especially noted for this, correct?

17  **A.**    Yes.

18  **Q.**    In the last generation, a growing number of faiths have

19  begun to celebrate the marriages of same-sex couples, correct?

20  **A.**    Yes.  Although, it still encompasses a tiny percentage of

21  people, religious affiliations in the United States.

22  **Q.**    On the day same-sex marriage became legal in

23  Massachusetts, the Unitarians Reformed Judaism,

24  Reconstructionist Judaism, and the Metropolitan Community

25  Church encouraged their clergy to officiate at such weddings,

1   correct?

2   **A.**   Yes.  And, altogether, that would account for churches

3   representing a very small percentage of the American

4   population.

5          **MR. THOMPSON:**  I would like to ask permission to play

6   a video on the screen, if possible.  This is DIX 2648.  It's a

7   short video relating to, the D.C. City Council just passed a

8   bill permitting same-sex marriage in the District of Columbia.

9   **BY MR. THOMPSON:**

10  **Q.**   Were you aware of that, Professor?

11  **A.**   Yes.

12  **Q.**   And the signing was in a church.  Were you aware of that?

13  **A.**   No.

14         **MR. THOMPSON:**  Can we --

15         **THE CLERK:**  I'm sorry, what is the number, again?

16         **MR. THOMPSON:**  Oh, yes.  DIX 2648.

17         **THE CLERK:**  Is this in evidence?

18         **MR. THOMPSON:**  Well, I hope that it will be in

19  evidence.  But we'd like to play it, and then --

20         **THE COURT:**  Do you want to play it before it's in

21  evidence?

22         **MR. THOMPSON:**  Either way.  We would move -- we would

23  ask the Court to take judicial notice of this video that comes

24  from the *Washington Post* website, Your Honor.

25         **THE COURT:**  Any objection, Ms. Stewart?

1          **MS. STEWART:**  Your Honor, I would like to reserve

2  objection until we see the video.  I am not familiar with it.

3          **THE COURT:**  Fair enough.  One of the advantages of a

4  bench trial.

5          (Laughter)

6          (Video played in open court.)

7  **BY MR. THOMPSON:**

8  **Q.**   Does the signing of the D.C. bill, allowing same-sex

9  marriage, in a church symbolize the growing support among --

10  for same-sex marriage among certain faiths?

11  **A.**   Uhm, excuse me.  As I've said, yes, there is growing

12  support in the churches.  Although, those churches represent a

13  very small percentage of people with religious affiliation in

14  the United States.

15          So there is a growing debate, but the churches

16  overall are still opposed to this.

17          **THE COURT:**  Ms. Stewart, objection to 2648?

18          **MS. STEWART:**  Yes, Your Honor.

19          I would just object to its admission into evidence

20  because I don't think it's relevant.  It shows very little.  It

21  doesn't give any sense of -- we saw two religious leaders

22  supporting marriage equality.  I don't think that's a terribly

23  relevant fact.

24          **THE COURT:**  Well, the witness has addressed a matter

25  related to it.  And I think I'll admit it for the value that it

1  may have.

2          So 2648 will be admitted.

3          (Plaintiffs' Exhibit 2648 received in evidence.)

4  BY MR. THOMPSON:

5  Q.   Now, mean evangelical Christians continue to oppose

6  same-sex marriage, correct?

7  A.   Yes.

8  Q.   But it is less acceptable to demonize homosexuals today

9  than it used to be, correct?

10  A.   Yes.  I believe in many circles it is.

11  Q.   And Rick Warren is a prominent evangelical minister; is

12  that correct?

13  A.   Yes.

14  Q.   He wrote *The Purpose Driven Life*; is that correct?

15  A.   Yes.

16  Q.   It's a big bestseller; is that correct?

17  A.   That's my understanding.

18  Q.   And let's hear what --

19          **MR. THOMPSON:**  I would like the Court's permission to

20  play a short video from Rick Warren.

21          I'm not intending, Your Honor, to offer it into

22  evidence.  I just want to get the reaction from the witness as

23  to how this compares in the history of discrimination.

24          He spoke yesterday about what Jerry Falwell, one of

25  the leaders of the Christian Right, said about homosexuals in

1    the 1950s.

2           I would like to ask him whether Pastor Warren's

3    comments here reflect a change in attitudes among the religious

4    community that continues to oppose same-sex marriage.

5           **THE COURT:**  Ms. Stewart.

6           **MS. STEWART:**  Your Honor, I would like to reserve my

7    objection because I haven't determined whether we've worked out

8    authentication issues on this document.  We may have.  But I'm

9    afraid I don't know, at this moment.

10          So I don't -- I mean, I don't want to get in the way

11   of the witness showing it.  But I may object to its admission.

12   I don't know if it's an authentic document.

13          **THE COURT:**  Let's deal with the matter after --

14          **MR. THOMPSON:**  Yes.

15          **THE COURT:**  -- we have heard the excerpt and the

16   witness has been asked to address it.

17          **MR. THOMPSON:**  Thank you, Your Honor.

18          (Video played in open court.)

19   **BY MR. THOMPSON:**

20   **Q.**   So, Professor, this represents a stark shift from the

21   rhetoric of Jerry Falwell, when Rick Warren talks about love

22   and respect for all people, correct?

23          **THE COURT:**  Did he say "love"?

24          **MR. THOMPSON:**  He did, Your Honor.

25          **THE WITNESS:**  He -- he talked about freedom of

1    choice.  He talked about a lifestyle.

2          His suggestion was that homosexuality is a choice.

3    He did not demonize gay people, but he also clearly did not

4    think that their relationships deserve to be treated as equal

5    to heterosexual relationships.

6    **BY MR. THOMPSON:**

7    **Q.**   Now, the bottom line of all the discussion we've had this

8    morning is that there has been a significant shift in public

9    opinion toward acceptance of gay people, correct?

10   **A.**   Uhm, there have been -- there has been a shift in public

11   opinion and growing support for gay people.  And gay people

12   continue to encounter menaced hostility.

13   **Q.**   Now, in terms of the level of discrimination against gays

14   and lesbians in California, you would agree that there are,

15   certainly, many indications that large numbers of gay people

16   have left more hostile settings for the relative openness of

17   California, correct?

18   **A.**   There are indications that people have migrated here

19   because it's less hostile than where they came from.

20   **Q.**   And California has more protections for gays and lesbians

21   against discrimination than any other state, correct?

22   **A.**   I don't know that as a precise fact, but there are

23   certainly many protections in California.

24   **Q.**   Now, you talked -- you were asked yesterday about the

25   purposes and effect of Proposition 8.  And, more generally, you

1    had some preparatory remarks about, I believe, 60 ballot

2    initiatives that were directed at gays and lesbians.  Do you

3    recall that?

4    **A.**    Yes.

5    **Q.**    And how many of those 60 ballot initiatives were in

6    California?

7    **A.**    I'm not sure.  And I wasn't bringing -- I think, in that

8    particular figure I was basing it on something that had not

9    come into -- into the last decade.  But -- so I'm not sure

10   precisely.  There were several.

11   **Q.**    And do you know what the win -- winning percentage was for

12   the gay and lesbian community in California, as opposed to the

13   rest of the country was?

14   **A.**    I'm sorry.  Could you reformulate that question.

15   **Q.**    Didn't you testify yesterday that two-thirds of the

16   initiatives had prevailed against the will of the gay and

17   lesbian community?

18   **A.**    I testified that three-quarters had.

19   **Q.**    Three-quarters.  I apologize, yes.

20           But do you know what the percentage is for

21   California?

22   **A.**    No, I don't.

23   **Q.**    But the Briggs Initiative, that came before the people in

24   California in the 1970s, correct?

25   **A.**    Correct.

1  Q.   It would have prohibited public school teachers from

2  saying anything that could be construed as advocating

3  homosexuality, correct?

4  A.   Correct.

5  Q.   And gay rights groups opposed the Briggs Initiative,

6  correct?

7  A.   Gay rights groups, and many teachers groups which were

8  very concerned about this.  And even noted politicians opposed

9  to it.

10 Q.   Like Ronald Reagan?

11 A.   Like Ronald Reagan, yes.  That seemed a quite ominous

12 censorship of teachers.

13 Q.   And the people of California sided with the gay rights

14 groups in rejecting the Briggs Initiative, correct?

15 A.   Yes.

16 Q.   Now, as I mentioned, you were also asked about the

17 purposes behind Prop 8.  And I would like to quote from you

18 something that President Obama said in his book, *The Audacity*

19 *of Hope*, where he said:

20          "I believe that American society can choose

21          to carve out a special place for the union of

22          a man and a woman as the unit of

23          child-rearing most common to every culture."

24          In your opinion, does -- do President Obama's views

25 on same-sex marriage reflect moral disapproval of gays and

1  lesbians?

2  **A.**   I believe that they reflect a sense that gay relationships

3  are not equal to heterosexual relationships; that they don't

4  deserve that same recognition.

5  **Q.**  That's almost definitionally and tautologically true.

6          My question is in terms of his motivation.  And you

7  spoke to the purposes behind Prop 8, which is why I'm asking

8  you this.

9          Do you believe that that statement by President Obama

10  reflects moral disapproval of gays and lesbians?

11  **A.**   I'm reluctant to plumb the mind of a presidential

12  candidate.  But -- it's hard for me to assess.  But Barack

13  Obama mentioned that.

14  **Q.**  Is it possible for someone to have the position that he

15  articulated, and not to morally disapprove of gays and

16  lesbians?

17  **A.**   Uhm -- uhm, it would be possible.  Certainly, though, as

18  I've said, I believe it reflects a belief in the inequality of

19  lesbian and gay relationships.

20  **Q.**  I would like to direct your attention to tab 16 in your

21  binder, which is the California Supreme Court's decision in the

22  In Re Marriage decisions.

23          And, in particular, I would like to direct your

24  attention to footnote 73, which appears at page 61, I believe,

25  in this printout.

1              And, as you'll recall, Professor, this decision dealt

2    with the validity of Proposition 22.  Do you recall that?

3    **A.**    Yes.

4    **Q.**    Okay.  And tell me when you're there.

5    **A.**    Okay.

6    **Q.**    Okay.  And in the first sentence, the Supreme Court of

7    California said:

8                   "We emphasize that in reaching this

9                   conclusion" -- meaning the conclusion of

10                  invalidating Prop 22 -- "we do not suggest

11                  that the current marriage provisions were

12                  enacted with an invidious intent or purpose."

13             Do you agree that Prop 22 was not enacted with an

14   invidious intent or purpose?

15   **A.**    It's not clear to me what they are referring to when they

16   say "the current marriage provisions."

17   **Q.**    Let's say that's Prop 22.

18   **A.**    You are -- this is not referring to long-standing and

19   current marriage provisions?

20             I'm sorry.  I just need a little more context for

21   this, to be able to assess it.

22   **Q.**    You were an expert in this case, right?

23   **A.**    Yes.  I submitted an affidavit in this case.

24   **Q.**    Yes.  It's Prop 22 that's at issue here.

25   **A.**    Okay.  I'm just sorry, I need a little more context to

1    understand what they are saying here.

2    **Q.**    Well, let me just ask, wholly apart from what they're

3    saying, let me ask you what your opinion is.

4            Do you have an opinion as to whether Proposition 22

5    in California was passed because of invidious discriminatory

6    intent?

7    **A.**    Again, I believe it reflected a belief in the inequality

8    of gay relationships.

9    **Q.**    And then the question becomes:  What's the source of that

10   belief?  And do you believe that it was -- reflected an

11   invidious animus and hatred of gays and lesbians?

12   **A.**    I think that to talk about hatred of lesbians and gay men

13   would only account for some; that there are others who would

14   not, certainly, express hatred towards lesbians or gay men, but

15   would still regard them as unequal, and their relationships as

16   not deserving the same status and rights as heterosexual

17   relationships do.  And I think that's premised on a belief in

18   the inferiority of such relationships.

19   **Q.**    Professor, I would like to direct your attention to tab

20   17.  This is DIX81.  It's an excerpt from Jonathan Rauch's

21   book, which is entitled, *Gay Marriage:  Why it is Good for*

22   *Gays, Good for Straights and Good for America.*

23           And are you aware of Mr. Rauch?  Do you know of him?

24   **A.**    I know of him.

25   **Q.**    Yes.

1      **MR. THOMPSON:**  Your Honor, we would ask the Court to

2   take judicial notice of DIX81.

3          **THE COURT:**  Very well.

4   **BY MR. THOMPSON:**

5   **Q.**   And, Professor, I would like to direct your attention to

6   page 7 of this book.  And on the right-hand column, third

7   sentence from the bottom, Mr. Rauch -- and Mr. Rauch is an

8   advocate for same-sex marriage, correct?

9   **A.**   Yes.

10  **Q.**   And he's openly gay; is that correct?

11  **A.**   Yes.

12  **Q.**   Okay.  And he says:

13              "Some gay marriage opponents may be bigoted

14              or homophobic, or otherwise out to get gay

15              people.  But most of them are motivated by a

16              sincere desire to do what's best for their

17              marriages, their children, their society."

18          Isn't it true that there are some people among the

19  7 million Californians who voted for Prop 8 who fall into

20  precisely this category?

21  **A.**   You know, it's difficult for me to know the variety of

22  reasons in which people -- which people opposed marriage.

23          It's easier for me to comment on the sort of

24  arguments that were made against marriage equality by the

25  Prop 8 advocates, than to assess the various reasons that

1  people might have opposed this.

2  **Q.**  So you just don't know why people opposed Prop 8 -- I

3  mean, supported Prop 8?

4  **A.**  Well, I assume that there were a range of reasons that

5  people supported Prop 8.  But that the -- an underlying premise

6  of them was that gay relationships were unequal.

7  **Q.**  But were some of the people within that range -- and I

8  understand it's a range and that there are all sorts of

9  reasons -- but would some of the people in California, some of

10  the 7 million who voted for Proposition 8, fall into the

11  category that Mr. Rauch indicates here?

12  **A.**  Yes.  But we have to ask why people believe that opposing

13  marriage equality is best for their marriages, their children,

14  and society.

15          **MR. THOMPSON:**  Okay.  Your Honor, I would like

16  permission to play a very short video, which is DIX 2553.

17          **THE COURT:**  DIX, again?

18          **MR. THOMPSON:**  2553, Your Honor.

19          **THE COURT:**  Thank you, sir.

20          **MS. STEWART:**  Your Honor, before we play it, might we

21  have a description of it so I know whether to object or not?

22          **MR. THOMPSON:**  Yes.  This is a video of Carrie --

23  it's a very short video, which has the excerpt of

24  Carrie Prejean's statements, and then Mayor Gavin Newsom's

25  reaction as to her motivation for having the religious

 1  convictions she has.

 2          So I think it speaks directly to the issue we are

 3  talking about, which is:  Why is it that some people were

 4  opposed to same-sex marriage in California?

 5          **MS. STEWART:**  Your Honor, I would object that it's

 6  not relevant, one individual's reasons.

 7          **MR. THOMPSON:**  I'm much more interested in what

 8  Mayor Newsom has to say about it, Your Honor.

 9          **THE COURT:**  I'm really more interested in what the

10  witness has to say.

11          **MR. THOMPSON:**  Well, as --

12          **THE COURT:**  If it ties into this witness's testimony,

13  why, I think it's appropriate.

14          **MR. THOMPSON:**  Yes, Your Honor.

15          And the reason it ties in to what is being said is,

16  it goes to -- he was asked about the purposes behind Prop 8.

17  He testified to that.

18          And I have been asking him about why it is that some

19  people -- he's just testified there's a range of reasons why

20  people supported Prop 8.  Mayor Newsom makes a statement about

21  that, and I would like his reaction whether he agrees with

22  Mayor Newsom.

23          **MS. STEWART:**  Your Honor, we didn't put this witness

24  up -- and the witness's testimony has been about the history of

25  discrimination and the backdrop in the campaign messaging.

1          And I think this whole line of testimony is going

2     beyond the scope of direct.  And I think we're getting even

3     further out on a limb with these kind of extraneous little bits

4     of video and asking him to comment on what he believes other

5     people's intent may have been, particular people.  So I think

6     it's way beyond the scope, and it's also not relevant.

7               **THE COURT:**  Well, it does appear to certainly push

8     the outer boundaries of the scope of direct examination.  But

9     let's see where it goes.

10              **MR. THOMPSON:**  Thank you, Your Honor.

11              **THE COURT:**  And see what the witness's reaction is to

12    the statement.

13              **MR. THOMPSON:**  Okay.

14              (Video played in open court.)

15    **BY MR. THOMPSON:**

16    **Q.**  Would you agree, Professor, with Mayor Newsom, that some

17    people who take the position that Carrie Prejean did are simply

18    speaking their conscience?

19              **MS. STEWART:**  Objection, Your Honor.  Vague.

20              **THE COURT:**  Sustained.

21              **MR. THOMPSON:**  We'll move on, Your Honor.

22    **BY MR. THOMPSON:**

23    **Q.**  The quest for equal rights in marriage has always been a

24    contentious issue within the gay movement itself, correct?

25    **A.**  Uhm, initially, it was much more contentious.  I think

1   that there's been a shift amongst gay activists who fairly

2   widespread support for gay marriage.

3   **Q.**   But it's always been a contentious issue, correct?

4   **A.**   Again, I think there's been a shift in the tenor of that

5   debate amongst gay activists.  So that it was very contentious

6   at one point, and there's much more widespread support for this

7   now.

8   **Q.**   There was a time when support for gay marriage was a

9   distinctly-minority position in the lesbian and gay community,

10  correct?

11  **A.**   Amongst lesbian and gay activists, people who were lesbian

12  and gay organizers, there was minority support.  Certainly,

13  have indications of this.  Amongst ordinary lesbians and gay

14  men, indications would be otherwise, actually.  There probably

15  was more support early on.

16  **Q.**   Isn't it true that one critic in a New York newspaper

17  wrote, "This isn't the freedom we want"?  And this was a gay

18  writer?

19  **A.**   What's the date on that?

20  **Q.**   It's in your book, *Why Marriage*?, at page 93.

21  **A.**   I know.  And I would like to get the date on it.

22  **Q.**   Sure.  It's page 93.  That's behind tab 6 now.

23          Your book has footnotes.  And so we may not -- but

24  I'm happy to let you look at it, to see if it refreshes your

25  recollection.  The newspaper was called --

1  **A.**   Ninety --

2  **Q.**   93, sir.  And it's a newspaper entitled *Gay Power*.  So I

3  don't know if that helps with the date, because maybe it was

4  only printed for a while.

5  **A.**   Right.  It was a fairly short-lived publication, late

6  '60s, early '70s.

7  **Q.**   Okay.  And that editorial captured the dominant spirit

8  among gay male liberationists for whom liberation centered on

9  sexual liberation, correct?

10  **A.**   Yes.  I believe it reflected dominant attitude of gay

11  activists at that time.

12  **Q.**   And it is pretty clear that the majority sentiment among

13  gay rights activists was not interested in marriage as an issue

14  at that time, correct?

15  **A.**   At that time, that's probably correct.

16  **Q.**   Okay.  And most lesbian feminists activists were even less

17  interested in pursuing marriage rights, correct?

18  **A.**   That's probably correct, yes.

19          **THE COURT:**  This was the 1960s?

20  **BY MR. THOMPSON:**

21  **Q.**   And '70s?

22  **A.**   1960s and '70s, we are talking about.

23  **Q.**   Yes.

24  **A.**   That's the height of the sexual revolution.

25  **Q.**   And after an initial flurry of activity, marriage

1    virtually disappeared as a goal of the gay rights movement,

2    correct?

3    A.    Uhm, yes, because, as I pointed out in the book, there

4    were actually a number of lesbian and gay activists who did

5    seek the right to marriage; thought it was due them as it was

6    to heterosexuals.  But it receded as an issue for a while.

7    Q.    But the courts dismissed their petitions as preposterous,

8    right?

9    A.    Yes.

10   Q.    And both lesbian and gay activists agreed, correct?

11   A.    I think for many people in that period the idea that the

12   courts would recognize gay couples' right to marry just seemed

13   unimaginable.

14   Q.    And that was true of gay rights activists, too, correct?

15   A.    Yes.

16   Q.    Now, some feminists, such as the founder of the ACLU's

17   lesbian and gay rights project, Nan Hunter, regarded marriage

18   as a more flexible institution, which had been profoundly

19   changed since 1970s, and would be changed again by the

20   inclusion of same-sex couples, correct?

21   A.    I believe that was the argument Nan Hunter made.

22   Q.    And some gay men and lesbians felt making marriage a

23   central movement goal, or even supporting it, would dishonor

24   the innovative forms of intimacy that had taken shape in their

25   culture, correct?

1  **A.**    Would you refresh me on what period we have moved into, in

2  this account.

3  **Q.**    Well, we can look at your book, page 121.

4  **A.**    So, I think, in this section I'm describing the emergence

5  of the debate over -- within the gay movement over marriage in

6  the 1980s and early '90s, when it became more of an issue,

7  again, and received extensive attention.

8          And, certainly, some gay activists opposed the

9  movement for marriage equality.  And I'm beginning here to

10  describe the sort of period in which the shift in sentiment

11  occurred, in which the right to marry became a more widespread

12  and deeply-held goal of many gay activists.

13          **MR. THOMPSON:**  Your Honor, I was wondering if we

14  might take our morning break sooner rather than --

15          **THE COURT:**  I was thinking maybe you were close to

16  finishing with this witness.

17          **MR. THOMPSON:**  Well, I think if I have a break, I

18  might be able to separate some of the wheat from the chaff, and

19  streamline this a little bit.  I am getting closer, Your Honor.

20          **THE COURT:**  Well, a promise to separate wheat from

21  chaff is one that I can't turn down.

22          (Laughter)

23          We will take until 15 minutes after the hour.

24          **MR. THOMPSON:**  Thank you, Your Honor.

25          (Recess taken from 9:59 to 10:23 a.m.)

1          **THE COURT:**  Very well.  Mr. Thompson, to the wheat.

2          **MR. THOMPSON:**  Yes, your Honor.  Yes, your Honor,

3    absolutely.

4    **BY MR. THOMPSON:**

5    **Q.**   Professor Chauncey, let us skip to tab 23, and this is a

6    *Los Angeles Times* story dated July 10th, 1996.  It's entitled

7    "Area Lawmaker Rejects Same-Sex Marriages, But Backs

8    Partnership Role."

9          And then at the bottom of this first page, and this

10   is DIX-1482, it states:

11              "O'Connell, a Democratic, who represents

12              Santa Barbara and San Luis Obispo counties,

13              as well as parts of western Ventura County,

14              said he supported granting same-sex couples

15              certain legal rights that heterosexual

16              couples enjoys, such as, hospital visitation

17              rights and shared healthcare benefits, but

18              that he had difficulty supporting gay and

19              lesbian marriages.  'My impression is that

20              the term marriage is too steeped in

21              socio-religious traditions and mores for

22              people to feel comfortable with its

23              applications to gays and lesbians, O'Connell

24              said in a prepared statement.'  Neil

25              Demers-Grey, director of Unity Pride

1              Coalition of Ventura County, applauded

2              O'Connell's vote.  I think it's a very

3              equitable position for him to take, she

4              said."

5          Professor, isn't it true that during the mid-1990's,

6   gay rights activists thought it was an equitable position for

7   people to take to support domestic partnerships even while

8   preserving the traditional definition of marriage?

9   **A.**   Well, I don't want to generalize about all gay activists

10  on the basis of a single quote.

11  **Q.**   But many took that view, isn't that right?

12  **A.**   Well, this is at time when marriage was beginning to

13  really explode on the national scene with the Hawaii decision

14  in 1993; but still seemed a far distant prospect to many gay

15  activists given the strength of the opposition to it.

16          I'm not quite sure of the date, but this would have

17  been issued about the time that DOMA, the federal Defense of

18  Marriage Act had been passed.  So I don't know the particulars

19  here, but I could imagine that in this context someone would be

20  happy to get at least this part of what people were looking

21  for, given the scope of opposition to marriage.

22          **MR. THOMPSON:**  Your Honor, we would ask the Court to

23  take judicial notice of DIX-1482.

24          **THE COURT:**  Very well, 1482.

25          **MR. THOMPSON:**  And, your Honor, at this point we

1  would like to put the binder aside and skip the rest of the

2  tabs -- so it was time well spent during the break -- and move

3  to some videos.

4          And if we may, we would like to play DIX-2616.

5          **MS. STEWART:**  Your Honor, may I have a brief

6  description of that before I have to decide whether to object?

7          **MR. THOMPSON:**  Well, it's a video of an elderly

8  couple who have been beaten up by opponents of Prop 8.

9          **MS. STEWART:**  I think I know this video from a

10 deposition, and we do object to it.  We think that it lacks

11 foundation and it also is not relevant to the issues that this

12 witness testified to.

13         **MR. THOMPSON:**  And, your Honor --

14         **MS. STEWART:**  No bearing on his testimony, quite

15 frankly.

16         **MR. THOMPSON:**  And, your Honor, the reason it's

17 highly relevant is because we intend to show some videos now in

18 which supporters of Proposition 8 were harassed subject to

19 violence.

20         And I want to ask the witness whether one of the

21 reasons that the -- he has testified that there is still

22 discrimination against gays and lesbians today, and I want to

23 ask him if one of the reasons why there is still that

24 discrimination is because of the types of tactics we saw

25 employed against supporters of Prop 8.

Case3:09-cv-02292-JW  Document454  Filed01/14/10  Page63 of 213

1        **MS. STEWART:**  Your Honor, if I might, number one,

2   this is hearsay evidence of people who -- the video basically,

3   if it's the one I'm aware of, and I think it was introduced in

4   the Sanders deposition, it completely lacks foundation.

5        It also has zero to do with what this witness has

6   testified about.  And they are going to put up claim -- things

7   where people claimed that they were harassed.  There's no

8   foundation to even prove that they were harassed.  And then

9   he's going to ask this witness to speculate about whether some

10  people may have voted for Proposition 8 because somebody was

11  harassed and they put out news reports claiming that.

12       I think we are far afield.  I think chafe doesn't

13  then begin to state where we are at this point.

14       **THE COURT:**  It does seem to me, Mr. Thompson, you can

15  explore this topic without showing the video.

16       **MR. THOMPSON:**  I could.  I just thought that it might

17  make it more concrete, but I'm happy to do it either way, your

18  Honor.

19       **THE COURT:**  Well, if you can explore it without the

20  video, since there isn't a foundation for the video, that's

21  fine.

22       **MR. THOMPSON:**  Okay.

23       **THE COURT:**  I think it's a fair enough line of

24  inquiry.

25       **MR. THOMPSON:**  Okay.

1    THE COURT:   So you may proceed.

2    BY MR. THOMPSON:

3    Q.   Professor Chauncey, are you aware of the fact that there

4    were some churches that were defaced and vandalized during the

5    Proposition 8 campaign?

6    A.   I have no detailed knowledge of these things.   I have

7    heard that there were various incidents.

8    Q.   And have you heard that there were incidents in which

9    people had their businesses boycotted as a result of donating

10   as little as $100 to Proposition 8?

11   A.   I have heard things to that effect said.

12   Q.   And have you heard that some people were subjected to

13   physical violence as a result of their support for Proposition

14   8?

15   A.   I had not heard that.

16   Q.   Were you aware that the mayor of Fresno was subject to a

17   death threat that was so severe that the police went out and

18   tried to arrest the person who sent the email?

19   A.   No.

20   Q.   Isn't it true that these types of tactics by supporters of

21   the LGBT community have the potential to backfire and create

22   resentment against the LGBT community?

23   A.   Well, honestly, I don't know the details here.   I don't

24   know what the basis is for claiming that these were perpetrated

25   by members of the LGBT community.   And I -- I'm really not in a

 1   position to assess what effect they may or may not have had

 2   here.  I'm really --

 3   Q.  Just so the record is clear, in terms of the level of

 4   discrimination against gays and lesbians in the United States

 5   today, you don't know the extent to which it's attributable to

 6   aggressive, violent acts that supporters of the LGBT community

 7   have taken?

 8   A.  I think that you would have to make a very elaborate case

 9   for me to believe that that is the case.

10   Q.  But you haven't studied it?

11   A.  I have not studied that, but it seems unlikely to me on

12   the face of it.  But, again, that's not something I have

13   studied.

14           MR. THOMPSON:  Your Honor, at this point we would

15   like to play PX 116, which has been admitted -- well, actually,

16   before we play that --

17           THE COURT:  PX?

18           MR. THOMPSON:  116, which has been admitted into

19   evidence.

20   BY MR. THOMPSON:

21   Q.  But before we get to that, let me ask you, Professor, it's

22   true that the voters of California received information about

23   Prop 8 from a myriad of sources, correct?

24   A.  Yes.

25   Q.  From friends, correct?

```
 1  A.   I assume that was the case.

 2  Q.   From radio, correct?

 3  A.   I assume so.

 4  Q.   From the internet?

 5  A.   I assume that was the case.

 6  Q.   From the newspapers?

 7  A.   I assume that was the case.

 8  Q.   From their places of worship?

 9  A.   I assume that was the case.

10  Q.   From TV?

11  A.   Yes.

12  Q.   And many people don't form their opinions on important

13  political topics based on TV ads, correct?

14  A.   You know, I'm really best at just describing what I see as

15  the messaging being developed --

16       THE COURT:  This seems to be a little beyond the --

17  A.   -- and I don't consider myself an expert on, you know,

18  election analysis.

19       MR. THOMPSON:  Okay.  Well, I'm asking these

20  questions as a run-up since he had opined on the TV ads that

21  were run on it.

22  BY MR. THOMPSON:

23  Q.   Let me ask you, Professor, isn't it true that -- you

24  testified you were asked about the purposes and effects of

25  Proposition 8.
```

1            Isn't it true that some people voted on Prop 8 based

2     on their sincerely-held moral values without regard to what was

3     on TV?

4     **A.**   I imagine that that is the case.  And, again, one has to

5     understand the history shaping those moral values and the

6     meaning of those moral values.

7            Many people have, as I said yesterday, have opposed

8     desegregation and interracial marriage on the basis of

9     deeply-held moral values.  And because of the context of

10    hostility and prejudice towards the groups that would have --

11    whose lives would have been changed by desegregation and

12    interracial marriage.  I think that's probably the case today.

13    **Q.**   It's true that most people when they vote try reflect

14    their moral values, correct?

15    **A.**   I'm not really in a position to answer that question.

16    **Q.**   Well, you have taught survey classes on twentieth century

17    U.S. history, correct?

18    **A.**   Yes.  And I think we could say that a wide-range of

19    factors effect people's vote.  A wide-range of factors affect

20    people's voting behavior.

21    **Q.**   But it's part of the American political tradition for

22    people to vote on important issues consistent with their

23    religious views, isn't that right?

24    **A.**   We see that on some issues, more than on others.

25    **Q.**   And there is nothing wrong where that, is there?

1   **A.**   They have the right to do what they wish, but we, as

2   historians, would want to understand what shape those values

3   and those attitudes.

4           **MR. THOMPSON:**  Now I would like to play PX 116.

5           **MS. STEWART:**  Your Honor, again, if we might have a

6   description before we play and head down the path.

7           **MR. THOMPSON:**  It's been admitted into evidence and

8   what it is, it's the four-and-a-half minute version of the

9   thirty-second ad that he was shown yesterday.  So it's directly

10  relevant, your Honor to his direct testimony.

11          This is the Wirthlins.  This is the Wirthlins, the

12  couple from Massachusetts, who describe the reason -- what

13  happened in Massachusetts, then that was created and turned

14  into a thirty-second ad, which Professor Chauncey testified to

15  yesterday.

16          **THE COURT:**  Has the witness seen this four-minute

17  version?

18          **MR. THOMPSON:**  I'd like to ask him if he did.

19  **BY MR. THOMPSON:**

20  **Q.**   Did --

21  **A.**   No, I don't believe I have.

22          **THE COURT:**  All right.  You may play 116.

23          (Videotape played in open court.)

24  **BY MR. THOMPSON:**

25  **Q.**   Now, Professor, did you review that as one of the

1  materials you considered in this case?

2  **A.**   No.   Though, actually, now that I have seen it, I realized

3  that I hadn't seen it before.

4  **Q.**   Okay.   Is it reasonable for parents who morally disapprove

5  of homosexuality to want to wait until the fifth or sixth grade

6  for those sorts of issues to be taught in public school?

7  **A.**   Well, would you say that people who morally disapprove of

8  racial equality or racial marriage should be able to insist

9  that no books showing black and white people as equal or black

10  and white people in relationships should be kept out of the

11  schools?

12       I mean, I think there is a general sense in the

13  schools that if you wish, you can send your child to a private

14  school, but there are things that will be discussed in a public

15  school and that this is a part of the reality of life in

16  Massachusetts now and the country.

17  **Q.**   And would you agree that at least the parents have the

18  primary responsibility for raising their own children?

19  **A.**   Umm, parents certainly have primary responsibility in

20  raising their children, but they also raise them in a society

21  which provides many other mechanisms to teach them and educate

22  them.

23  **Q.**   Do you agree that the parents' responsibility for raising

24  their child includes development of the child's moral

25  character?

1          **MS. STEWART:**  Your Honor, I'm going to object to this

2    line of questioning.  Again, it kind of goes beyond the scope

3    of direct.

4          **MR. THOMPSON:**  Your Honor, he testified about what

5    these ads were intended -- what subliminal messages about

6    stereotypes they were played on.  So I want to probe whether

7    that's really true or whether it was going to a different

8    issue, which was parents wanting to inculcate their children on

9    their moral values.

10          **THE COURT:**  How much longer do you have on this?

11          **MR. THOMPSON:**  Three more questions, your Honor.

12          **THE COURT:**  Objection overruled.

13          **MR. THOMPSON:**  Thank you.

14    **BY MR. THOMPSON:**

15    **Q.**   And you would agree that parents have responsibility for

16    developing their child's moral character, including on issues

17    relating to sexual morality?

18    **A.**   There have been debates for a very long time about what

19    exactly can happen in schools and where parents can withdraw

20    their children, and in general I think the understanding is

21    that schools are free to and are encouraged to teach broader

22    social values.

23          And in this case the child is simply being exposed to

24    the existence of gay people.  And I take note that the parents

25    don't express concern just about marriage, but about

1  homosexuality at all.

2  **Q.**   Do you agree that issues relating to homosexuality and

3  same-sex marriage are issues for parents to discuss with their

4  children according to their own values and beliefs?

5  **A.**   I agree that parents can do that, yes.

6  **Q.**   And then you would agree with the proponents of

7  Proposition 8, that parents would have a right to object if

8  their young children were being taught in public school that

9  there is no difference between same-sex marriage and

10 traditional marriage, if that teaching contradicted the

11 parents' own moral values and beliefs, correct?

12 **A.**   Well, I don't think that they would be able to object to

13 schools teaching about interracial marriage, if that conflicted

14 with their moral beliefs.

15 **Q.**   And so they shouldn't be able, in your opinion, to object

16 if the children are being taught about same-sex marriage, even

17 if it conflicts with their moral beliefs; that's your view?

18 **A.**   I think they are welcome to object, but I don't think that

19 that objection would be binding in this case, no.

20        **MR. THOMPSON:**  No further questions, your Honor.

21        **THE COURT:**  Very well.  Thank you, Mr. Thompson.

22        Redirect, Mrs. Stewart.

23                  **REDIRECT EXAMINATION**

24 **BY MS. STEWART:**

25 **Q.**   Good afternoon, Professor Chauncey.

Case3:09-cv-02292-JW   Document454   Filed01/14/10   Page72 of 213

1          THE COURT:  Not yet.

2          THE WITNESS:  It just feels like that long a day.

3          MS. STEWART:  It feels like afternoon.

4          THE COURT:  It just seems like afternoon.

5          (Laughter.)

6    BY MS. STEWART:

7    Q.   Good morning, Professor Chauncey.

8    A.   Good morning.

9    Q.   Does Proposition 8 say anything about when sex education

10   takes place?

11   A.   No, it does not.

12   Q.   Does it say anything about what parents can teach their

13   children?

14   A.   No, it does not.

15   Q.   Does it say anything about what schools or parents discuss

16   with children and when?

17   A.   No.

18   Q.   Does it say anything about what parents can object to in

19   terms of the schools?

20   A.   No.

21   Q.   We were just looking at the long ad with the Wirthlins,

22   and I'm wondering if you have think thoughts about the

23   reference to gay marriage or homosexuality as a, quote,

24   homosexual relationships as an adult issue?

25   A.   Well, again, I think it implies that there is something

1  wrong with homosexuality.  It focuses entirely -- it suggests

2  the focus on homosexuality entirely as a matter of sexuality,

3  not love, not relationships.

4           This is actually a book about two princes falling in

5  love and it's a fairy tale.  It doesn't talk about sex.  It's

6  another fairy tale that seems appropriate to that age.

7  **Q.**   Are there fairy tales about men and women falling in love?

8  **A.**   I believe there are, yes.

9           (Laughter.)

10 **Q.**   Is heterosexual marriage viewed as an adult issue in our

11 culture?

12 **A.**   I don't believe that it's something that we keep our

13 children from, no.

14 **Q.**   Do children sometimes even play a role in heterosexual

15 weddings?

16 **A.**   I believe they have been exposed to heterosexual weddings,

17 yes.

18 **Q.**   Well, have you ever heard of a flower child -- or flower

19 girl, ring bearer?

20           (Laughter.)

21 **A.**   Yes.  I have heard that children have been allowed to be

22 present at and even been allowed to play a role in heterosexual

23 marriages.

24 **Q.**   Are there any other themes in the Wirthlin's ad that you

25 care to comment on, the one that with just saw?

1   **A.**   Well, again, I think there is the implication here that

2   the very exposure to the idea of homosexuality in gay people

3   somehow threatens the children, threatens their sexual

4   identity, as if that's a choice; that this is something, again,

5   that's being imposed on them.

6          Historically gay rights have often been depicted in

7   that way, assuming the very fact that gay people are asking to

8   be recognized and to have their relationships recognized even

9   by marriage is seen as an imposition on other people rather

10  than simply an extension of fundamental civil rights to those

11  people.

12  **Q.**   I want to move on to a subject that you testified about a

13  little bit on cross that Mr. Thompson asked you about, and he

14  asked you a number of questions about your book and, I think,

15  your report in this case regarding when Americans and sort of

16  western society began to understand that homosexual people were

17  a class of people, people with a primary attraction or

18  relationship with someone of the same sex.

19         But I want to ask you to put aside the issue of when

20  people began to understand that concept and ask you whether

21  there is evidence in the historical record, even before those

22  categories were understood, that there were people whose

23  primary erotic and emotional attraction was to people of the

24  same sex:

25  **A.**   Okay.  This is certainly something that historians are

1    studying today.  There is a broad sense.  It's contested as

2    most issues in history are, but a broad sense that the to

3    categories of hetero and homosexual emerged and became primary

4    organizing categories of state regulation and personal identity

5    beginning in the late nineteenth century.

6           But a number of studies have been published -- and I

7    actually use some of these in my teaching studies and primary

8    sources and so forth -- that do suggest that there were people

9    who had a primary erotic and affectual interest in people in

10   the same sex before then.

11          So I will give you just a couple of examples.  One is

12   in Puritan New England, in Connecticut in the seventeenth

13   century, a case of Nicholas Sension, who's one of the most

14   extensive court records we have access to.  And what's clear

15   there is that although people did not first call him a

16   homosexual, this was not a term available to him and that

17   wouldn't fully explain his mode of life, that he had developed

18   a reputation over the course of almost 30 years in his small

19   town in Connecticut as someone who persistently indicated

20   sexual interest in other males and approached them.  He

21   actually developed a reputation for this.

22          Now, in this period people didn't use a term like

23   "identity."  They talked about character.  They had a variety

24   of ways of other frameworks through which to understand someone

25   like Sension.

1          So we wouldn't call him a homosexual in the sense of

2     having a homosexual identity of that period and, yet, there is

3     strong evidence that, in fact, he had consistent erotic

4     interest in people of the same sex.

5          Likewise, a lot of attention has been paid to the --

6     and I have written about as well, the culture of romantic

7     friendship in the nineteenth century.  There were a wider range

8     of bounds of the kinds of relationships that people of the same

9     sex could have, the degree of affection that they could express

10    for one another.

11         What's striking when you got into some of the diaries

12    and correspondence that we depend on to reconstruct those

13    relationships, are the moments when, say -- I'll just give you

14    an example.  It's a diary that I assign in my lecture course in

15    Lesbian and Gay History written by Frances Willard, who later

16    went on to found the Woman's Christian Temperance Union.  She

17    is young, in the 1860's.  She falls in love with a woman.  The

18    other woman falls in love with her.  Everyone things it's

19    great.  It's very conventional.  Yet, a moment comes when

20    Frances realizes that her attraction is much more powerful and

21    sustaining than her friend Mary's.  And there is sort of a

22    crisis for her, so that the boundaries of what is acceptable

23    and the conventions allow them to take the relationship so far

24    and then, for instance, Willard realizes that this is something

25    different for her and she doesn't have a ready language for

1  it -- certainly not the language of homosexuality and

2  heterosexuality -- but she draws on all sorts of framework to

3  try to understand how she is different from other women because

4  of this passion that she feels for her friend Mary and would go

5  on to feel for others.

6      Likewise, in the early twentieth century, in a period

7  that we discussed at the very end of the day yesterday in

8  direct -- or cross examination, rather, talking about my book

9  on the *Social Organization of Sexuality* and *Male Sexuality in*

10  *the Early Twentieth Century New York*.

11      Yes, there was a wider range of sexual possibilities

12  for conventional sexual patterns in the part of some immigrant

13  working class communities in the early twentieth century.  It

14  was easier in that context for some men to shift back and forth

15  between male and female partners, but their male partners were

16  conventionally typically men who did define themselves on the

17  basis of their difference from other males, on the basis of

18  their consistent desire for sex with those -- with other men

19  and relationships with other men.  Again, understood somewhat

20  differently than we would understand it today, the alliance of

21  gender inversion and so forth.

22      But there were people at that time who were --

23  identified themselves and were identified by others on that

24  basis.

25      **THE COURT:**  Perhaps you could throw a question in

1    there somewhere.

2              MS. STEWART:  I was about to do that, your Honor.

3    BY MS. STEWART:

4    Q.   Shifting to another topic, Dr. Chauncey, Mr. Thompson

5    asked you a number of questions about various lesbian and gay

6    people who at some points weren't supportive of pursuing the

7    right to marry.  And a lot of those questions focused on the

8    period of 60's and 70's.

9              And I want to ask you:  During the 60's and 70's,

10   what were some of the priorities of the lesbian and gay civil

11   rights movement?

12   A.   Well, in the '60s and 70's the fundamental priorities of

13   most gay activists were to simply try to stop the policing of

14   everyday life, the widespread arrest, the raids on bars and

15   restaurants, and then to achieve fundamental -- protections

16   against discrimination at the workplace and in housing and so

17   forth, and simply to be able to come out and to be openly known

18   as gay without facing a whole range of forms of harassment and

19   discrimination because of that.

20   Q.   And before the mid-70's, were they also working on trying

21   to get the medical establishment to change its view?

22   A.   Yes.  That's certainly was a priority of some activists,

23   given the long --

24             THE COURT:  Let's the witness testify, Ms. Stewart.

25

**BY MS. STEWART:**

**Q.**   Dr. Chauncey, during the period when African-American civil rights were being sought in this country, were there black people who sometimes were not in favor of segregation?

**A.**   Were there black people who were not in favor of segregation?

**Q.**   Yes.  Pushing for segregation.

**A.**   Desegregation, do you mean?

**Q.**   I'm sorry, desegregation.

**A.**   Yes, yes.  There were debates amongst African-American activists about the best way to go, the priorities that the movement should have, fears about pushing the white power structure too far.

**Q.**   Mr. Thompson asked you this morning about a statement in your book *Why Marriage* about 92 percent of companies providing benefits to -- well, actually, let me just have you turn in your book to page 52.

**A.**   Sorry, which exhibit is my book?  Six, I think?  Yeah.

**Q.**   I think it's six.

**A.**   Yes.  Right.  So there is a reference to is a survey this 2002, a survey of 319 of America's largest companies and that survey of those 319 companies found that 92 percent of them prohibited workplace discrimination against gays and lesbians.

**Q.**   And so your reference earlier to 92 percent was to that subset of companies, 319 large companies?

1  **A.**    Yes, yes.

2  **Q.**    Is there still employment discrimination in this country

3  today?

4  **A.**    Yes, there is.  On the basis of sexual orientation, yes.

5  **Q.**    Mr. Thompson asked you the question, and I think you

6  responded, whether it's true that the federal government no

7  longer prohibits people from entering the United States; do you

8  remember that?

9  **A.**    Yes.

10 **Q.**    Can a heterosexual person marry a non-U.S. citizen and

11 bring their spouse into this country under current law?

12 **A.**    No, in fact --

13 **Q.**    A heterosexual person.

14 **A.**    Excuse me.  No, a heterosexual person can bring their

15 married partner from abroad into the country.

16 **Q.**    And is the same thing true for gay people?

17 **A.**    No, it is not.

18 **Q.**    You mentioned in your testimony in response to a question

19 of Mr. Thompson that some people need to move to California or

20 do move to California to find a more open society; do you

21 remember that statement?

22 **A.**    Yes.

23 **Q.**    Why do people need to move to California to find a more

24 open society?

25 **A.**    They do so because they continue to face hostility and

1  discrimination in the places they live.  And like other groups,

2  which have faced marginalization in the past, people have --

3  often there are enormous migrations of African-Americans from

4  the deep south to the relative freedom of northern cities and

5  western cities over the course of the twentieth century, and

6  there they found more freedom than they would have found at

7  home, but still certainly not complete freedom and rights.

8           Without drawing a sharp analogy between the two

9  groups, I think that's a pattern that we saw on the part of gay

10 men and lesbians who we have records since the late nineteenth

11 century moving away from small towns to larger cities where

12 they would be more likely to find people like themselves,

13 relative freedom, but still, of course, encountered enormous

14 hostility and discrimination.

15 **Q.**   Thank you.  Mr. Thompson also asked you about a reference

16 in that same exhibit, your book *Why Marriage* to -- and it's on

17 page 51, to a statement that:

18           "The 1990's marked a major turning point of

19           lesbians and gay men in American society."

20           Do you remember that --

21 **A.**   Yes.

22 **Q.**   (Continuing) -- testimony?

23 **A.**   Yes.

24 **Q.**   I believe you said that -- tell me again when the book was

25 written?

1  **A.**    It was written in 2004.

2  **Q.**    Since it was written, have there been some further laws

3  enacted that reflect discrimination against gay people?

4  **A.**    Well, the majority of states have enacted legislation or

5  constitutional amendments that would prohibit same-sex couples

6  from marrying.

7  **Q.**    Have there been -- how have those measures been enacted?

8  **A.**    Well, there have been -- both by legislative vote, but

9  there have also been a tremendous number of popular referenda

10 which have enacted that sort of discrimination.

11 **Q.**    You believe that those measures have an impact on the

12 ability of lesbian and gay people to seek equality through the

13 political process?

14 **A.**    Yes, I do.  And maybe this is a moment to say that --

15 since I wasn't able to in cross-examination, that I was

16 actually -- I thought at the time that I published this book in

17 2004 that there was a greater chance of marriage equality

18 moving forward, and that's the way I ended the book.

19         Since then so many states have enacted these

20 constitutional amendments and statutes, have put such enormous

21 roadblock in the way of movement on that issue that I'm much

22 less likely, much less inclined to believe that that's the

23 case.

24 **Q.**    I want to now turn to an area where Mr. Thompson focused a

25 little bit on religion and religious beliefs.

1          And I think he asked you some questions about

2 religious organizations or churches that support -- supported

3 marriage equality; do you remember that?

4 A.    Yes.

5 Q.    And I was wondering if you could tell us what some of the

6 major faith groups were, some of the churches that were

7 strongly in support of Proposition 8 against marriage equality?

8 A.    The Baptists, the Catholic church, a range of groups that

9 would constitute a much larger percentage of the population,

10 much larger percentage of the population than the small old

11 mainline, as they called them, Protestant churches.

12 Q.    And I believe that when he showed you a video of Pastor

13 Warren, he asked you a question along the lines of, you know,

14 has the religious rhetoric or language being used about

15 homosexuals by religious -- people of faith become more polite

16 or nicer, or something along those lines; do you remember that?

17 A.    Yes.

18 Q.    I would like to ask you to look at Plaintiffs' Exhibit

19 301, which --

20          MS. STEWART:  May I approach, your Honor?

21          THE COURT:  Very well.

22          (Whereupon, document was tendered

23            to the witness.)

24 BY MS. STEWART:

25 Q.    This is a document from the website of the Vatican or a --

1  the Catholics For A Common Good, I should say.  It's from a

2  Catholic organization.  And it's excerpts from a Vatican

3  document on legal recognition of same-sex unions.

4          And I would ask you to read the third paragraph --

5  third paragraph on this page, on the first page.

6  **A.**  "There are absolutely no grounds"?

7  **Q.**  Yes.

8  **A.**  (As read)

9          "There were are absolutely no grounds for

10         considering homosexual unions to be in any

11         way similar or even remotely analogous to

12         God's plan for marriage and the family.

13         Marriage is holy, while homosexual acts go

14         against the natural moral law.  Homosexual

15         acts close the sexual acts to the gift of

16         life.  They do not proceed from a general

17         affective and sexual complementarity.  Under

18         no circumstances can they be approved."

19  **Q.**  Would you also read the last sentence of the next

20  paragraph?

21         **THE COURT:**  Is this in evidence?

22         **MS. STEWART:**  I'm sorry, your Honor.  I would like to

23  move this document into evidence.

24         **MR. THOMPSON:**  Your Honor, no objection.

25         **THE COURT:**  Very well.  301 is admitted.

1              (Plaintiffs' Exhibit 301 received in evidence.)

2  **A.**   (As read)

3              "The homosexual inclination is, however,

4              objectively disordered and homosexual

5              practices are sins gravely contrary to

6              chastity."

7  **BY MS. STEWART:**

8  **Q.**   I would like to have you turn to the third page of this

9  document and look at the third full paragraph and read the

10  sentence beginning with "Allowing children."

11  **A.**   I'm sorry.  Which --

12  **Q.**   Third full paragraph, which begins with, "The absence of

13  sexual complementarity."  Do you see that?

14  **A.**   Okay.

15  **Q.**   The second -- the sentence that begins, "Allowing

16  children."

17  **A.**   (As read)

18              "Allowing children to be adopted by persons

19              living in such unions would actually mean

20              doing violence to these children in a sense

21              that their condition of dependency would be

22              used to place them in an environment that is

23              not conducive to their full human

24              development."

25  **Q.**   Finally, I would ask you to look at the last paragraph on

1    the page, about the middle of the paragraph there is a sentence

2    that starts, "The legal recognition of homosexual unions."

3    Would you read that sentence into the record?

4    **A.**    Umm --

5    **Q.**    Third sentence of the last paragraph, "Legal recognition."

6    **A.**    I'm sorry.  We are still on the same page?

7    **Q.**    We are on the third page of the document -- the last page

8    of the document.

9    **A.**    What is the first word in that paragraph?

10   **Q.**    "The church teaches."

11   **A.**    Third sentence...

12   **Q.**    "Legal recognition."

13   **A.**    Right.

14              "Legal recognition of homosexual unions or

15              placing them on the same level as marriage

16              would mean not only the approval of deviant

17              behavior with the consequences of making it a

18              model in president day society, but it would

19              also obscure basic values which belong to the

20              common inheritance of humanity."

21   **Q.**    Are those statements more moderate framing of religious

22   views on homosexuality in your view?

23   **A.**    Well, compared to some statements, they are more moderate,

24   but I think they express the fundamental view, obviously, of

25   the inferiority of homosexuals, the dangers that they pose to

1    children.

2    Q.   I'd ask you to look now at Plaintiffs' Exhibit 168, which

3    I'm going to move into evidence.

4            MS. STEWART:  May I approach, your Honor?

5            THE COURT:  Very well.

6                (Whereupon, document was tendered

7                 to the witness.)

8            MR. THOMPSON:  No objection, your Honor.

9            THE COURT:  Thank you Mr. Thompson.

10               (Plaintiffs' Exhibit 168 received in evidence)

11   BY MS. STEWART:

12   Q.   Dr. Chauncey, this is a document, a resolution from the

13   Southern Baptist Convention website on the topic of same-sex

14   marriage, and I would ask you to look at the second page of the

15   document, about the fourth paragraph up from the bottom.  Would

16   you read that into the record?

17   A.   "Whereas legalizing," that one?

18   Q.   Yes.

19   A.   (As read)

20               "Whereas, legalizing 'same-sex marriage'

21               would convey a societal approval of a

22               homosexual lifestyle, which the Bible calls

23               sinful and dangerous both to the individuals

24               involved and to society at large" -- quotes

25               Romans and Corinthians in Leviticus -- now,

1           therefore, be it."

2   **Q.**   And there's a number of resolutions, and I'd ask you to

3   look at the next page and read the second paragraph?

4   **A.**   (As read)

5           "Resolve that we oppose all efforts by media

6           and entertainment outlets in public schools

7           to mainstream homosexual unions in the eyes

8           of our children."

9   **Q.**   Would you also read the last paragraph?

10  **A.**   (As read)

11          "Resolve that we call on Southern Baptists

12          not only to stand against same-sex unions,

13          but to demonstrate our love for those

14          practicing homosexuality by sharing with them

15          the forgiving and transforming power of the

16          gospel of Jesus Christ," quoting Corinthians.

17  **Q.**   I have one more of these exhibits.  I would like you to

18  look at Plaintiffs' Exhibit 170.

19          **MS. STEWART:**  Your Honor, may I approach?

20          **THE COURT:**  You may.

21          (Whereupon, document was tendered

22           to the witness.)

23          **MR. THOMPSON:**  We have no objection, your Honor.

24          **THE COURT:**  Very well.  170 will be admitted.

25

```
 1              (Plaintiffs' Exhibit170 received in evidence.)
 2   BY MS. STEWART:
 3   Q.   This, also, is a resolution that is on the Southern
 4   Baptist Convention website reflecting its policies.
 5              Would you look at -- let's see, one, two, three,
 6   four -- the sixth paragraph down on the first page that begins,
 7   Whereas, any action giving homosexual unions," do you see that?
 8   A.   Yes.
 9   Q.   And read that into the record.
10   A.   (As read)
11              "Whereas, any action given homosexual unions
12              the legal status of marriage denies the
13              fundamental immorality of homosexual
14              behavior," citing Leviticus 18-22, Romans --
15              1 Romans 26-27, 1 Corinthians 6:9-11.
16   Q.   And if you look four paragraphs down from that, "Resolve
17   that we encourage," would you read that into the record and the
18   one following?
19   A.   (As read)
20              "Resolve that we encourage all Christian
21              pastors in California and in every other
22              state to speak strongly, prophetically and
23              redemptively concerning the sinful nature of
24              homosexuality and the urgent need to protect
25              biblical marriage in accordance with God's
```

1                          word.  And be it further resolved that we

2                          call on all Southern Baptists and believers

3                          from all denominations everywhere to pray for

4                          the people of California as they seek to

5                          right this terrible wrong that has been

6                          forced upon them by the California Supreme

7                          Court's overturning of the vote of the people

8                          and to pray for the people of every state

9                          where biblical marriage is under attack."

10  **Q.**   Dr. Chauncey, are these pronouncements by the Catholic

11  Church and Baptist Convention consistent with your

12  understanding of the religious beliefs or at least some of them

13  that were voiced in support of Proposition 8?

14  **A.**   Yes.

15  **Q.**   Professor Chauncey, I believe Mr. Thompson asked you a

16  number of questions about people who may believe that

17  homosexuality is sinful or have other religious beliefs that

18  led them to support Proposition 8.  Do you recall that?

19  **A.**   Yes.

20  **Q.**   I would like you to assume for a minute that these

21  religious beliefs are sincerely held.  Would you nevertheless

22  say that they could be affected by stereotypes of gay people

23  that emerged from the twentieth century or even earlier and

24  still endure?

25  **A.**   Yes.

CHAUNCEY - REDIRECT EXAMINATION / STEWART

Q.   You also described segregation theology yesterday, and I
think you talked about it again today.  And during the battles
over segregation and interracial marriage, did people hold
sincere religious beliefs that were rooted in prejudice?

A.   Yes.  That that certainly was a point of that testimony
yesterday; that people do often hold deeply sincerely religious
convictions which seem to them timeless, but historians have
shown and have seen how they, in fact, change over time and
naturally are shaped by the larger culture in which they live.

     And so, again, people, many people in the south
deeply believed that interracial marriage was against God's
will.

     I don't question their sincerity.  I believe, though,
that that reflect the larger system of prejudices that had
shaped their understanding of the world.

Q.   Thank you.

     Professor Chauncey, has there been significant
progress toward reducing discrimination against gays and
lesbians over the last several decades?

A.   There has been significant progress, yes.

Q.   Is there still today significant discrimination against
gays and lesbians?

A.   Yes, there is significant discrimination.

Q.   Now, I have -- my last line of questions this morning have
to do with -- or my last before I consult counsel anyway, my

1   colleagues -- with questions Mr. Thompson asked or one he asked

2   about whether the tone of political discourse has improved

3   regarding gay rights issues.

4           And I would like to show you a video relating to this

5   topic and ask you some questions about it.

6           MS. STEWART:  And we -- your Honor, we had submitted

7   to the Court and opposing counsel a list of excerpts from the

8   depositions that we intended to use in this trial.  And these

9   are the deposition excerpts for the defendant-intervenor -- or

10  at least heretofore to the defendant-intervenor and proponent,

11  official proponent Hak-Shing William Tam.

12          And I would like to ask that those excerpts be shown,

13  stopping where there has been a document that we can then ask

14  the witness about.

15          MR. THOMPSON:  Your Honor, we would object to

16  Professor Chauncey being asked about this on multiple grounds.

17          One of them is that it's not something he considered

18  in his expert report.  It's not a material considered.  We

19  weren't given an opportunity to cross examine -- to depose him

20  on this, and it's plainly outside the scope of Rule 26.

21          MS. STEWART:  Your Honor, may I respond to that?

22          THE COURT:  Of course.

23          MS. STEWART:  He opened the door to it.  He asked the

24  question on cross about whether the dialogue about this issue

25  has changed to be less hostile and whether people are much more

1  polite and less hateful in their commentary, and the witness

2  testified about that, and this goes directly to that topic.

3          **THE COURT:**  Well, I think Mr. Thompson did open the

4  door to that subject.  The question is whether this particular

5  document is one appropriate to use with this witness.

6          **MS. STEWART:**  It's --

7          **THE COURT:**  This, I gather, is the document that the

8  Court of Appeals attached to its amended opinion in the --

9          **MS. STEWART:**  I believe one of the documents is, your

10 Honor.  It's a series of documents by one of the official

11 proponents of Proposition 8 that were sent out to people he

12 tried to persuade to support Proposition 8, including that

13 document, to answer your Honor's question.

14         **MR. THOMPSON:**  I would only add, your Honor, that

15 this gentleman had nothing to do with the campaign.  Even

16 though he was an official proponent, the evidence will show

17 quite clearly that he had nothing to do with the campaign.  So

18 this is -- I didn't open the door to what specific individuals

19 may or may not have thought.

20         We have no problem with him testifying to the subject

21 generally just to these documents, which he has never seen

22 before, to my knowledge.

23         **MS. STEWART:**  Your Honor?

24         **THE COURT:**  Ms. Stewart.

25         **MS. STEWART:**  As Mr. Thompson suggested earlier in a

1  question to the witness, there was broad messaging in this

2  campaign from a lot of sources.

3          And I can't remember if it's Dr. Tam, I think it is,

4  did a great deal of messaging via the web on various websites

5  about Prop 8.  He was an official proponent.

6          And so I -- I disagree completely with the idea that

7  he had nothing to do with the campaign.  He had a tremendous

8  amount to do with the campaign.

9          **THE COURT:**  Are you representing that these exhibits

10  that you are referring to were produced by the intervenor

11  defendants?

12          **MS. STEWART:**  I am not, your Honor.  They were not

13  produced and, in fact, we had defined them --

14          **THE COURT:**  No, no, no, no.  Were put out as part of

15  the campaign?

16          **MS. STEWART:**  I think they were put out by Dr. Tam as

17  part of the campaign.

18          **THE COURT:**  I see.  And the connection is that he was

19  one of the official proponent of Proposition 8?

20          **MS. STEWART:**  Absolutely, your Honor.  And he was

21  speaking about the campaign to a broad constituency of Chinese

22  voters.

23          **MR. THOMPSON:**  Your Honor, the official campaign

24  committee was ProtectMarriage.com, and these materials were not

25  in any way associated with or paid for by or did anyone at

 1  ProtectMarriage.com have any cognizance of these documents.

 2          And depending on what they are going to show, many of

 3  them predated by years Prop 8.

 4          **THE COURT:**  Well, but Dr. Tam was an official

 5  proponent of Proposition 8, was he not?

 6          **MR. THOMPSON:**  He was, your Honor.

 7          I think one of the problems with allowing this line

 8  of questioning is we don't even know the date of these

 9  documents.  And depending on what they are showing, some of

10  them are based on translations from Chinese.

11          I think that they have said that they are going to

12  call Dr. Tam on Friday.  I believe the Court will be able to

13  hear from him and will have a complete record and it will be

14  put in context.

15          Again, we have no objection to the line of questions,

16  just the use of the documents.

17          **MS. STEWART:**  Your Honor, at the deposition Dr. Tam

18  testified about the documents, authenticated the documents.

19          I just want to point out, not only is he an official

20  proponent and will the deposition indicate what the documents

21  are and the context in which they were used, but if we can look

22  at messaging or beliefs articulated by Carrie Jean Prejean, I

23  would think, certainly, the witness could be asked to comment

24  on messages put out by one of the official proponents of the

25  campaign.

1      **THE COURT:**  Well, let's see where the questioning

2  goes with these documents.  I may cut you off at some point, if

3  it goes too far afield.  Let's see how -- how the testimony

4  goes.

5      **MS. STEWART:**  Thank you, your Honor.

6      If you would show the first excerpt?

7      (Videotaped deposition played in open court.)

8  **BY MS. STEWART:**

9  **Q.**  If I could now ask the witness to look at Plaintiffs'

10 Exhibit 513, which is the document Dr. Tam had just been asked

11 about.

12     And if you would, would you just read the first

13 paragraph of this --

14     **THE COURT:**  Why don't you just go right to the

15 question?

16     **MS. STEWART:**  Okay.

17     **THE COURT:**  Ask him to read it to himself and then go

18 right to the question.

19     **MS. STEWART:**  Okay.  Let me play the video a little

20 bit longer.

21     (Videotaped deposition played in open court.)

22 **BY MS. STEWART:**

23 **Q.**  Now, looking at the beginning of this document, Dr.

24 Chauncey, can you tell me if you think this messaging by

25 Dr. Tam, this letter that he wrote, reflects sort of a lower

1  hostility level than past communications about gay people or

2  homosexuality?

3  **A.**    No.  This is consistent in its tone with a much longer

4  history of anti-gay rhetoric.  It describes the right to marry

5  as the legalization of prostitution.

6        It says that it's put forth by the San Francisco city

7  government which is under the rule of homosexuals.

8        It talks about them pushing the gay agenda, and says

9  that after legalizing same-sex marriage, they want to legalize

10  prostitution, and that the next item on their agenda is

11  legalizing having sex with children.

12        So this reproduces many of the major themes of the

13  anti-gay rights campaigns of previous decades and a longer

14  history of anti-gay demonization.

15        **MS. STEWART:**  I would like to offer this document

16  into evidence, your Honor.

17        **THE COURT:**  Mr. Thompson?

18        **MR. THOMPSON:**  We have no objection to the Court

19  taking judicial notice of it, your Honor.

20        (Plaintiffs' Exhibit 513 received in evidence)

21        **MR. THOMPSON:**  May I read two sentences from his

22  deposition to give context, since we have seen a long portion

23  of it?

24        **THE COURT:**  You may.  With respect to the document,

25  it does appear that during deposition, the witness -- the

1  deposition witness, who is a party to the lawsuit, indicated

2  that he had written the document and, therefore, it would

3  appear to be appropriate to be admitted.

4           MR. THOMPSON:  Yes, your Honor.  And as I say, we

5  have no objection to that.  I did want to make clear that

6  Mr. Tam said in his deposition at page 19, lines 19 to 22, he

7  was asked how many times during 2008, from January to November,

8  he had had a conversation with Mr. Schubert.  He said, "One or

9  two times, very rare."

10          The impression that's being created that this was

11 part of the campaign is not true.  We have no problem with

12 discussions about an individual, a private citizen, who is now

13 attempting to withdraw to avoid precisely this sort of focus on

14 his individual views.

15          THE COURT:  All right.  Thank you, Mr. Thompson.

16          You may proceed, Ms. Stewart.

17          MS. STEWART:  Can we go on to the next excerpt?

18          (Videotaped deposition played in open court.)

19 BY MS. STEWART:

20 Q.   I would like to direct the witness's attention to Exhibit

21 516.

22          I would like to ask you to look at the second

23 paragraph of this document --

24          THE COURT:  Are you moving 516 in?

25          MS. STEWART:  Yes, your Honor.

1          THE COURT:  Based on the deposition testimony of

2    Mr. Tam.  Very well.

3          MR. THOMPSON:  No objection.

4          (Plaintiffs' Exhibit 516 received in evidence.)

5    BY MS. STEWART:

6    Q.   You see that that paragraph is talking about legislation

7    passed by a local school board in Alameda County on gay,

8    lesbian bisexual education?

9    A.   Yes.

10   Q.   You see that it says that:

11               "Education such as this used to brainwash

12               children so that one day they will vote for

13               same-sex marriage."

14   A.   Yes.

15   Q.   Can you comment at all on that messaging in terms of

16   whether it reflects a kind of less hostile messaging towards

17   gay people?

18   A.   Well, I think that talking about brainwashing children is

19   not a moderate phrasing.

20          It certainly reflects sort of a continuing concern

21   about homosexuals putting themselves forward, often having an

22   agenda.

23          THE COURT:  This appears to have been posted after

24   the election.

25          MR. THOMPSON:  And, your Honor, that's one of the

1    problems we have with this whole line of questions with this

2    witness, is that there is not a tight temporal connection.  You

3    are going to see some of the documents in this binder are from

4    2005.  Others are translations for Chinese that haven't been

5    certified.

6          So we continue to object to this entire line of

7    inquiry.

8          **MS. STEWART:**  Your Honor, I think, to my knowledge --

9    and I apologize.  I wasn't aware that one was in here.  But

10   most of these documents, we can represent to the Court, were on

11   the -- Dr. Tam's website at the time of the Prop 8 battle.

12          And, also, in any event, this -- the document we just

13   saw goes to the history of discrimination and the kind of

14   messaging that is still out there more broadly even since

15   Proposition 8.

16          **THE COURT:**  Well, let's focus on what was the

17   messaging at or before the election, at the time of the

18   election or before.

19          If you represent that the Exhibit 516 was, in fact,

20   posted in this form or substantially the same form prior to the

21   election, why, I think that's a sufficient connection.

22          But let's move along, Ms. Stewart.

23          **MS. STEWART:**  Yes, your Honor.

24          Can you proceed?

25          (Brief pause.)

1          **MR. THOMPSON:**  Your Honor, thinly after the election,

2     because it starts by talking about a six-to-one win on Prop 8.

3          **MS. STEWART:**  I did -- I think indicated, your Honor,

4     that this one is post election.   There is no question about

5     that.

6          **THE COURT:**  All right.  Well, let's move along.  I'm

7     sure that we will get into these documents when Mr. Tam

8     testifies.

9          (Brief pause.)

10         **MS. STEWART:**  Technical glitch, your Honor.

11         **THE COURT:**  What?

12         **MS. STEWART:**  Technical delay.

13         (Brief pause.)

14         (Videotaped deposition played in open court.)

15   **BY MS. STEWART:**

16   **Q.**   Dr. Chauncey, if you would, I'm particularly interested in

17   the commentary by Dr. Tam about children growing up to think

18   they could marry John or Jane and what you thought about that

19   messaging in terms of what it was reflecting?

20   **A.**   Well, again, it's consistent with the ads that -- major

21   ads put out by the Prop 8 campaign in which the little girl or

22   boy comes forward and says that they have read a book in school

23   about a prince marrying a prince, so that makes them think that

24   they could, too.  So there is a deep fear about -- the idea

25   that simple exposure to homosexuality or to same-sex marriage

1    will lead children to become gay.

2            And I think the phrasing here actually makes it clear

3    that the issue is not just marriage equality itself, but it's

4    in sympathy to homosexuality.  It's about the -- they could be

5    subjected to an education on homosexuality in public schools.

6    It's not just being introduced to the idea of gay marriage, but

7    being introduced to the idea that there are gay people in the

8    world, which is taken to be -- they oppose, they clearly see

9    this as a -- an inferior, despicable way of life.

10           **MS. STEWART:**  Thank you.

11           (Videotaped deposition played in open court.)

12           **MS. STEWART:**  Your Honor, I would like to move

13   Exhibit 515 into evidence.

14           **MR. THOMPSON:**  No objection, your Honor.

15           **THE COURT:**  Is that 516 or 515?

16           **MS. STEWART:**  This one is 515, your Honor.

17           **THE COURT:**  Very well.

18           **MS. STEWART:**  And I'd also, just before I turn to the

19   witness, I would like to move in the last Exhibit 514, which I

20   think I forgot to do.

21           **THE COURT:**  514.

22           **MR. THOMPSON:**  No objection, your Honor.

23           **THE COURT:**  All right.  514 is in and 515.

24           (Plaintiffs' Exhibits 514 and 515 received in

25           evidence.)

1  BY MS. STEWART:

2  **Q.**   Dr. Chauncey, I'm interested in you speaking about the

3  messaging and how it relates to prior messaging and sort of the

4  relative level of antipathy towards gay people that this kind

5  of messaging expresses.

6  **A.**   Well, I think it's pretty consistent with the messaging in

7  earlier campaigns.  Certainly, again, the persistent theme that

8  homosexuality is a choice; that children who are exposed to

9  homosexuals, to gay marriage, but really to homosexuals in any

10  form, are likely to become homosexuals.  So a deep fear about

11  the instability of children's sexuality.

12        The association of homosexuality with disease.  The

13  claim that Aids, associating Aids exclusively with

14  homosexuality without thinking about the widespread

15  heterosexual transmission of Aids in Africa and in the United

16  States.

17        And I think you sort of have a pretty clear sense

18  here of one of the themes that ran through all the referenda

19  campaigns beginning in 1977 with Anita Bryant's campaign that

20  to pass an anti-discrimination measure or measure that in some

21  way granted equality to and recognition of gay people would

22  legitimize them and that we should oppose this, this rhetoric

23  as claimed, just because we don't in any sense want to

24  legitimize homosexuality and gay life as a legitimate equal

25  part of our society, and that marriage is one of those powerful

1   symbols of that for them.

2          So it's premised on a notion of equality and strong

3   hostility towards homosexuality.

4          (Videotaped deposition played in open court.)

5          MR. THOMPSON:  Your Honor, we would object to that

6   document.  It says March-April, 2006 on it, plainly, before

7   Proposition 8 was -- had even been qualified for the ballot.

8          In addition --

9          THE COURT:  Which document are we talking about?

10         MS. STEWART:  It's Exhibit 543, your Honor.

11         THE COURT:  543?

12         MR. THOMPSON:  Yes.  It says, your Honor, right under

13   TFC News "March-April 2006."

14         So we object to that relevance ground and on the

15   relevance ground that these are the views of one individual and

16   not ProtectMarriage.com.

17         MS. STEWART:  Your Honor, this document, first of

18   all, it's -- earlier in the testimony Dr. Tam indicated that

19   the Traditional Family Coalition, of which he is the head,

20   supported Proposition 8 and advocated for it, and that's at

21   page 50 to 52 of the deposition in the excerpts that we have

22   already seen.

23         And, secondly, this was on their website, along with

24   a lot of other materials at the time they were on that website

25   advocating in favor of Proposition 8.

1          And so we think it is relevant and it also goes to

2    the overall messaging that led up to the campaign.

3          **THE COURT:**  I'm going to sustain the objection based

4    on what we have heard to date.

5          We may revisit this when Dr. Tam testifies, if the

6    facts are as you represent them with respect to the posting of

7    this document; but for the moment I think that Mr. Thompson has

8    appropriately objected and the objection will be sustained.

9          All right.  Let's see if you can wrap up with this

10   witness.

11         (Videotaped deposition played in open court.)

12         **MR. THOMPSON:**  Your Honor, I'm going to ask that this

13   be paused so I can make an objection.

14         **THE COURT:**  Very well.

15         **MR. THOMPSON:**  Number one, these documents have no

16   dates on them, so we don't know whether they are relevant or

17   not.  And as we have seen from some other portions of this

18   binder, they are temporally all over the place; after the

19   election, years before the election.

20         In addition, many of these are in Chinese and have

21   translations.  And although it is true they were shown to  Dr.

22   Tam, we have seen from these snippets his diction is festooned

23   with errors.  English is not his first language and the fact

24   that they showed a translation to someone who doesn't speak

25   very good English and said, "Is this correct," doesn't prove

1  anything.  It's not a certified copy of the translation.

2          THE COURT:  Well, I wouldn't characterize Dr. Tam's

3  English in that manner.

4          MR. THOMPSON:  I'm persnickety, your Honor.

5          THE COURT:  It does seem to me, Ms. Stewart, that we

6  have exhausted this topic and would ask you to conclude your

7  redirect examination.

8          MS. STEWART:  Okay, your Honor.  I will do that.  We

9  will return to this later with Mr. Tam or the deposition

10  excerpts.

11          THE COURT:  I would think that would be the

12  appropriate place to take it up.

13          All right.  Please conclude.

14  BY MS. STEWART:

15  Q.  Dr. Chauncey, in what we have seen so far since the last

16  question I asked you is, are there any messaging that we -- you

17  haven't already spoken about that came through in some of what

18  Dr. Tam has written that you would like to comment on?

19  A.  Well, I think it reinforces for me the sense that although

20  gay marriage was the topic at hand, the arguments being made

21  were often against gay rights of any sort.  So as a reference

22  to the right of same-sex couples to adopt children, what

23  effects that would have on children.

24          And so it -- it does seem to me to express the kind

25  of hostility and kinds of arguments that have been made for

1   several decades now, in the context of these referenda battles

2   and that, again, it draws on the long history of hostility,

3   stereotyping and fears that I have described.

4   **Q.**   Dr. Chauncey, in some of the documents I noticed the

5   phrase "gay agenda."

6           In your knowledge as a historian of the gay civil

7   rights movement, is there a gay agenda?

8   **A.**   There has -- at various times there have been a range of

9   degrees of agreement or disagreement on various issues.

10          My understanding is that that term, the "gay agenda"

11  was mobilized particularly effectively in the late 80's and

12  early 90's in combating -- or in support of the referendum

13  initiatives designed to overturn gay rights laws and it's tried

14  to construct the idea of a unitary agenda that includes any of

15  the age of consent laws and, again, just sort of fills -- picks

16  up on these long-standing stereotypes.

17  **Q.**   Professor Chauncey, earlier in Mr. Thompson's questions he

18  asked whether -- he asked a question about conservative

19  traditions teaching that everyone is a sinner; do you recall

20  that?

21  **A.**   Yes.

22  **Q.**   Are you aware of any movements in our recent history, or

23  for that matter going back further, trying to deny adulterer

24  the right to marry?

25  **A.**   I'm not aware of those.

1  **Q.**  In your testimony earlier today when Mr. Thompson was

2  talking to you about your book on gay marriage, he asked you

3  had -- or actually I take it back.  I think he was referring to

4  an exhibit that had to do with television characters and the

5  increasing television coverage of people and your prior

6  testimony about censorship.

7       And I noticed that in a part of your book, your

8  marriage book that he also read from, close to where he read

9  you used the term "erased" to describe what's happened to the

10  historical record of discrimination against gay people.

11       Can you describe what you meant by that and tell us

12  whether the increasing number of gay characters on television

13  has fully counter-acted the effect of the erasure that you have

14  spoken of?

15            **THE COURT:**  Which question do you want him to answer?

16            **MS. STEWART:**  Both, your Honor.

17            **THE COURT:**  Then ask them one at a time.

18  **BY MS. STEWART:**

19  **Q.**  What you meant by the term "erased"?

20  **A.**  What I meant by it was that for a very long time very

21  little research was done on the history of homosexuality or the

22  place of gay people in American history.  And it was actively

23  discouraged, was not seen as a suitable topic.

24       Certainly, even in my own career, which Mr. Thompson

25  referred to -- it's been a very fortunate career, but it's not

1  a typical career.  And I found which I decided to write a

2  dissertation in gay history, that many people advised me that

3  it would be professional suicide to do so.

4        When I finally got a job at the University of Chicago

5  in 1991, I became only the second person in the country to get

6  an academic position in the history department with a

7  dissertation in lesbian or gay history.

8        And certainly, again, this -- there has been some

9  change on this front in recent years and there are more

10 students now writing dissertations in this field.  They have

11 continued to experience trouble in getting jobs.  More of them

12 are beginning to get jobs, but I think that there are still

13 many advisors around the country who would caution a student

14 who would consider publishing in the field.

15       And I have to say I'm still struck, as I try to put

16 together the syllabus for a lecture course at Yale in Lesbian

17 and Gay History both by how limited the literature still is to

18 draw on for that course and that -- that one of the most

19 consistent comments I receive on the course evaluations at the

20 end of that course is that they had never heard about any of

21 this before in their high school or public school education or

22 in college; that they were completely unaware of this history.

23       And so it's pretty clear to me that the erasure of

24 this history, the history of discrimination and of gay life

25 itself, continues to be very prevalent in our culture.

 1  **Q.**   Thank you, Professor Chauncey.  Nothing further.

 2          **THE COURT:**  All right, Ms. Stewart.  You have brought

 3  us to afternoon after all.

 4          All right.  Let's resume, counsel, at 1:30 -- make it

 5  1:40.  And the next witness is going to be?

 6          **MR. BOUTROUS:**  Dr. Peplau, your Honor.

 7          **MS. STEWART:**  Dr. Peplau, your Honor.

 8          **THE COURT:**  Very well.

 9          **MR. COOPER:**  What time did you say, your Honor?

10          **THE COURT:**  1:40, Mr. Cooper.  Is that okay?

11          **MR. COOPER:**  It certainly is.

12          **THE COURT:**  All right.  Good.

13          (Whereupon at 12:12 p.m. proceedings

14           were adjourned for noon recess.)

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1                    P R O C E E D I N G S
 2   JANUARY 13, 2010                              1:42 P.M.
 3
 4            THE COURT:  Very well.  Shall we have the next
 5   witness?
 6            MR. DUSSEAULT:  Yes, Your Honor.  Plaintiffs call
 7   Dr. Anne Peplau.
 8            THE COURT:  Very well.
 9            THE CLERK:  Raise your right hand, please.
10                    LETITIA ANNE PEPLAU,
11   called as a witness for the Plaintiffs herein, having been
12   first duly sworn, was examined and testified as follows:
13            THE WITNESS:  I do.
14            THE CLERK:  State your name, please.
15            THE WITNESS:  My name is Letitia Anne Peplau.
16            THE CLERK:  And spell your last name.
17            THE WITNESS:  P-e-p-l-a-u.
18            THE CLERK:  And your first name.
19            THE WITNESS:  Letitia, L-e-t-i-t-i-a.
20            THE CLERK:  Okay.  Thank you.
21            MR. DUSSEAULT:  And, for the record, my name is
22   Christopher Dusseault, Gibson, Dunn & Crutcher, for the
23   plaintiffs.
24            Very good.  Mr. Dusseault.
25            MR. DUSSEAULT:  Thank you.
```

1                     <u>DIRECT EXAMINATION</u>

2    **BY MR. DUSSEAULT:**

3    **Q.**   Good afternoon, Dr. Peplau.

4    **A.**   Good afternoon.

5    **Q.**   Dr. Peplau, what is your educational background?

6    **A.**   I have a bachelor's degree in psychology from Brown

7    University, and a Ph.D. in social psychology from Harvard

8    University.

9    **Q.**   What is social psychology?

10   **A.**   Social psychology is the sub branch within psychology that

11   studies human relationships, human groups, social influence,

12   basically the relationships among people.

13   **Q.**   And where are you currently employed?

14   **A.**   I'm a professor at the University of California

15   Los Angeles.

16   **Q.**   When did you join the faculty at UCLA?

17   **A.**   I joined the faculty in 1973.

18   **Q.**   And are you tenured?

19   **A.**   Yes.

20   **Q.**   When did you become tenured?

21   **A.**   In 1982.

22   **Q.**   What is your position within the psychology department?

23   **A.**   I'm a professor of psychology.  And I'm also the vice

24   chair for graduate studies in psychology.

25   **Q.**   And what is the general reputation of UCLA's psychology

1  graduate department?

2  **A.**    It's a very respected department.  And we are ranked in

3  the top five nationwide.

4  **Q.**    Dr. Peplau, do you lead any programs at UCLA?

5  **A.**    I do.  I am the director of the UCLA interdisciplinary

6  relationship science program.  It's a graduate training program

7  funded by the National Science Foundation.

8  **Q.**    And in what does it train?

9  **A.**    It trains doctoral students from several disciplines who

10  want to specialize in studying social relationships.  That can

11  include family relationships, marriage, friendship, as well as

12  same-sex relationships.

13  **Q.**    Have you received any professional honors for your work?

14  **A.**    I have.  I have received a number of lifetime achievement

15  or scientific contribution awards.  One is from the Society for

16  the Scientific Study of Sexuality.  And several of them are

17  from different divisions of the American Psychological

18  Association.

19  **Q.**    And have you served as president of any societies?

20  **A.**    Yes.  I was elected president of the International

21  Association for Relationship Research.

22  **Q.**    In the course of your professional work in social

23  psychology, has your study focused on any particular topics?

24  **A.**    It's focused on three interrelated topics:  Close personal

25  relationships, sexual orientation, and gender.

1  Q.   Have you conducted research on heterosexual couples?

2  A.   Yes, I have.

3  Q.   And also on same-sex couples?

4  A.   Yes.

5  Q.   And in studying relationships, have you looked at

6  marriage?

7  A.   Uhm, I have primarily looked at relationships other than

8  marriage, but I have done some studies that have involved

9  marriage, yes.

10  Q.   Do you study the relationships of lesbians and gay men?

11  A.   Yes, I do.

12  Q.   When did you begin doing that?

13  A.   I began studying same-sex couples in the early 1970s.  At

14  that time, there was very little research in the area, and I

15  was one of the first psychologists to do that research.

16         Today, of course, there are many more people studying

17  same-sex relationships, and the field has grown substantially.

18  Q.   Have you authored any books?

19  A.   I've written or coauthored about ten books.

20  Q.   On what subjects?

21  A.   Some have been general topics in psychology, introductory

22  psychology, social psychology.  Others have been

23  professional-level books.  One is on close relationships,

24  another on loneliness.

25         I edited a book on gender, culture, and ethnicity.

1  I've edited a volume on same-sex couples, and another volume on

2  women's sexuality.

3  **Q.**   Have you written articles?

4  **A.**   Yes.  I've written, oh, probably, 120 journal articles and

5  chapters for scholarly books.

6  **Q.**   Are your articles generally published in peer-reviewed

7  journals?

8  **A.**   I believe all of them have been published in peer-reviewed

9  scientific journals.

10  **Q.**   And have you done reviews of other scholars' work?

11  **A.**   Yes.  I've written what I would call literature reviews.

12  That is, chapters for edited books in which I have reviewed the

13  current state of research and theory on a particular topic.

14         **MR. DUSSEAULT:**  Your Honor, I would -- actually, if I

15  may direct the witness to Plaintiffs' Exhibit 2329.

16         Just to be clear, the way we have the witness binder

17  organized, Your Honor, is, certain exhibits that will be

18  introduced individually are in the front.  Then there's an A, B

19  and C tab at the bottom, for certain exhibits that will be

20  introduced collectively.

21  **BY MR. DUSSEAULT:**

22  **Q.**   So if we could look at 2329, Dr. Peplau --

23  **A.**   I'm not finding that in this binder.

24         **MR. DUSSEAULT:**  Your Honor, may I approach?

25         **THE COURT:**  Perhaps you can guide us both through.

1  I'm having the same problem the witness is.

2          MR. DUSSEAULT:  Are you?

3          THE WITNESS:  Actually, I think I just found it.  And

4  it's just prior to tab A.

5          MR. DUSSEAULT:  Yes.

6          THE COURT:  I see.  I see.  All right.

7          Numerical order is a wonderful thing, Counsel.

8          (Laughter)

9          MR. DUSSEAULT:  Understood, Your Honor.

10  BY MR. DUSSEAULT:

11  Q.   Dr. Peplau, is that a true and correct copy of your CV?

12  A.   Yes, it is.

13         MR. DUSSEAULT:  Your Honor, I would submit Exhibit

14  2329 into evidence.

15         MS. MOSS:  No objection.

16         THE COURT:  Very well.

17         (Plaintiffs' Exhibit 2329 received in evidence.)

18         MR. DUSSEAULT:  And, Your Honor, we would tender

19  Professor Peplau as an expert on couple relationships within

20  the field of social psychology.

21         THE COURT:  Any voir dire?

22         MS. MOSS:  No, Your Honor.  No objection.

23         THE COURT:  Very well.  You may proceed,

24  Mr. Dusseault.

25         MR. DUSSEAULT:  Thank you.

BY MR. DUSSEAULT:

**Q.**   Dr. Peplau, do you intend to offer opinions today in this case?

**A.**   Yes.  I will be offering four opinions.

**Q.**   What are those?

**A.**   My first opinion is that for those adults who choose to enter into marriage, that marriage is often associated with many important benefits.

I will also offer the opinion that research examining the relationships of gay and lesbian couples has found remarkable similarities between the research of same-sex couples and heterosexual couples.

I will offer the opinion that when same-sex couples are permitted to enter into civil marriage, that they will likely have the same benefits from marriage that heterosexuals do.

And, fourth, I'll offer the opinion that permitting same-sex civil marriage will not be harmful to heterosexual marriage.

**Q.**   Thank you.

Dr. Peplau, let's start with the first opinion that you mentioned.  Have there been research and studies into how Americans feel about marriage?

**A.**   Americans are very enthusiastic about marriage.  Most Americans view marriage as one of the most important

1  relationships in their life.  Many people view getting married

2  as a very important life goal.

3       And when researchers have surveyed Americans and

4  asked their opinions about marriage, they find a similar

5  pattern.

6       For example, a recent Gallup opinion poll asked a

7  representative sample of Americans about marriage.  And

8  91 percent of those people reported that they either have been

9  married or plan to get married at some time in the future.

10 **Q.**   Is there any evidence, of which you are aware, that

11 lesbians and gay men feel the same way about marriage as

12 heterosexuals?

13 **A.**   Yes.  Of course, for, in most states, asking lesbians and

14 gay men about marriage is a hypothetical question, but that

15 question has been asked.

16       In a recent survey conducted by the Kaiser Family

17 Foundation the question asked was:  "If you were able to

18 legally marry someone of the same sex, would you like to do so

19 at some time in your life?"

20       And the majority of lesbians and gay men, 74 percent,

21 said that, yes, indeed, they would like to get married if they

22 had that option.

23 **Q.**   And turn, if you would, in your binder, to Plaintiff's

24 Exhibit 938.  And this is in the first section before the tab

25 A.

1  A.   Yes, I have it.

2  Q.   And, Dr. Peplau, is this the study you were just referring

3  to?

4  A.   Yes, it is.

5  Q.   And this is something you have relied on in reaching your

6  opinions?

7  A.   Yes.  This is the Kaiser Family Foundation study of

8  lesbians and gay men.

9          MR. DUSSEAULT:  Your Honor, we would submit

10 Plaintiffs' Exhibit 938 into evidence.

11         MS. MOSS:  No objection.

12         THE COURT:  Very well.  938 is admitted.

13         (Plaintiffs' Exhibit 938 received in evidence.)

14 BY MR. DUSSEAULT:

15 Q.   Dr. Peplau, are you aware of any research on the subject

16 of whether people in this country value domestic partnerships

17 to the same extent as they value marriage?

18 A.   Researchers have been interested in whether lesbians and

19 gay men would prefer to get married or would prefer other

20 options such as civil unions or registered partnerships.

21         Evidence on this point comes from research done by

22 Gary Gates, Lee Badgett, and others.  And what these

23 researchers did was to ask the question -- we now have several

24 states that have options for civil unions or registered

25 partnerships.  And they asked the question, across all of those

1   states that permit that:  In the first year, what percent of

2   same-sex cohabiting couples in the state actually took

3   advantage of that option?

4         And then they asked, in Massachusetts, where marriage

5   is the option:  In the first year that marriage was available

6   to same-sex couples, what percent got married?

7         And what they found was that, whereas, across the

8   states that permit civil unions and partnerships, about 10 to

9   12 percent of couples in the first year took that option.

10        In contrast, in Massachusetts, when marriage became

11  available, something like 37 percent of the couples got

12  married.  Suggesting that couples were three times more likely

13  to get married than to enter into one of these other

14  quasi-marital options.

15  **Q.**   Dr. Peplau, if you could turn to tab 909, which is in the

16  front section, before tab A of your binder.  And this the Gates

17  Badgett and Ho study that you referred to?

18  **A.**   Yes, it is.

19        **MR. DUSSEAULT:**  Your Honor, plaintiffs would move

20  Exhibit 909 into evidence.

21        **MS. MOSS:**  No objection.

22        **THE COURT:**  Very well, 909 is admitted.

23        (Plaintiffs' Exhibit 909 received in evidence.)

24  **BY MR. DUSSEAULT:**

25  **Q.**   Are you aware of research regarding the impact of

1   marriage, if any, on health?

2   **A.**   There is a very large body of research on the impact for

3   heterosexuals of marriage on health.  These are studies that

4   have compared the health of married individuals to the health

5   of other adults who are not married.

6          And the very consistent findings from those research

7   are that, on average, married individuals fare better.  They

8   are physically healthier.  They tend to live longer.  They

9   engage in fewer risky behaviors.  They look better on measures

10  of psychological well-being.

11  **Q.**   Now, are you aware of any recent studies, of particular

12  note, that document the health benefits associated with

13  marriage?

14  **A.**   Yes.  One of the recent studies on that is a government

15  study conducted by researchers at the Centers for Disease

16  Control.

17         And what they did was to interview a representative

18  sample of Americans, a very large sample, more than a

19  hundred-thousand people, and to do these comparisons between

20  married individuals and other individuals on a range of

21  questions about health.

22         And what they found was that if you control for age

23  and for income and education, for few things like that, for

24  race, that across all of these groups, the married individuals

25  did better on virtually every measure.

1          So the married couples reported fewer health

2     problems.  They were less likely to indicate that their daily

3     activities at home or at work were restricted because of a

4     physical ailment of some sort.

5          They were less likely to smoke.  They were less

6     likely to drink in excess.  They were less likely to report

7     headaches and migraines.

8          We could go on, but the consistent pattern was that,

9     on average, the married couples were better in terms of health.

10    **Q.**   And does the research tell us anything about why marriage

11    is associated with health benefits?

12    **A.**   That's certainly been an important question for

13    researchers.  And there are two main explanations that have

14    been considered.

15         One is what's been called a selection effect.  And

16    the idea here is that, perhaps, people who are healthier to

17    start out with are more likely to be able to attract a partner,

18    to get married.  And maybe because of their health and --

19    mental health, as well, they are better able to maintain a

20    satisfying relationship.  That would be a selection effect.

21         The second hypothesis or second explanation is what's

22    been called a protection effect.  And that's the idea that

23    there are things associated with marriage that actually enhance

24    and contribute to health; things that people didn't bring into

25    the relationship, that they experience as a result of being

1  married.

2        And research pretty clearly demonstrates that the

3  selection effect is only a partial answer; that there does

4  definitely appear to be a protective effect for many couples,

5  for individuals in many couples, of being married.

6  **Q.**   Can you explain to us why marriage might be associated

7  with what you describe as protective effects?

8  **A.**   Yes.  I think there would be at least four reasons for

9  that.  One is that, for many people, getting married reflects a

10  change in identity.

11        That when psychologists sometimes ask people to

12  describe who are you, if you ask me, I might say, I'm a wife.

13  I'm a psychologist.  I'm an American.  And I would be

14  indicating important identities that I valued and that were

15  part of who I am as a person.

16        And for many people, marriage is one of these

17  identities.  So it is -- I said earlier, it's an important life

18  goal.  Achieving that life goal can lead people to feel good

19  about themselves, can enhance their self-esteem.

20        Marriage is a valued status in society.  So being

21  part of that institution can make you feel good about yourself.

22        As well, part of being married may mean:  Now I'm an

23  adult.  Now I really need to be a kind of mature, responsible

24  person.  And maybe that would lead us to take better care of

25  ourselves.

1          Or maybe we'll feel more responsible for our spouse

2    and say, Well, you know, I'm not just in it for me.  I'm in it

3    for my partner, as well.  So perhaps I ought to give up rock

4    climbing and be more careful about how much I drink.

5          So these would be ways in which marriage, the status

6    of being married, might affect the individual.

7          A second thing is that marriage is about a

8    relationship between two people.  And there are often important

9    ways in which spouses support each her, help each other, try to

10   encourage each other to lead healthy lifestyles.  And so this

11   kind of support from another person can enhance your health.

12         So we talked about the individual and then the

13   couple.  There's also a broader social network, that when

14   people get married, they develop relationships not only with

15   their partner, but also within an extended family, with kin,

16   that marriage links two families.

17         So that if prior to marriage each person had

18   relatives who cared about them, and friends, now they may have

19   two networks and two groups of people who are there as

20   resources to them, who can help them through tough times.

21         And so this connection to an extended community and

22   family network can be helpful to people's health.

23         And, finally, marriage can also lead to various kinds

24   of supports from government, to beneficial laws or being

25   eligible for programs or for health insurance through an

1   employer, or a slew of things that can also contribute to

2   health and well-being.

3          Now, of course, this doesn't happen automatically in

4   every marriage.  These are things that happen in good

5   marriages.  Some marriages are conflict-ridden and miserable,

6   and don't confer those benefits.

7          But, on average, marriage does seem to be associated

8   with benefits.  And I think for many good reasons.

9   **Q.**   Now, Dr. Peplau, if you could turn to your exhibit binder,

10  and now turning to tab A.  There is a series of exhibits here

11  that I've grouped together.  And I'll read the numbers into the

12  record.  They are Plaintiff's Exhibit 781, 913, 937, 964, 1043,

13  1171, 1173, 1250, 1254, and 1474.

14         Do you see those?

15  **A.**   I do.  I don't think they are all in the order you read

16  them in.

17  **Q.**   Are we behind tab A?

18  **A.**   I thought so, yeah.  As I look through them, these are all

19  articles that are relevant to the issue of the benefits of

20  marriage.

21  **Q.**   And are these articles that you've relied on in forming

22  your opinions that you've testified to today, about the

23  benefits of marriage?

24  **A.**   Yes, they are.

25         **MR. DUSSEAULT:**  Your Honor, I would move those

1    exhibits into evidence.

2             **MS. MOSS:**  If I could have just one minute to flip

3    through the binder.

4             **MR. DUSSEAULT:**  Certainly.

5             **MS. MOSS:**  No objection, Your Honor.

6             **THE COURT:**  Very well.  I won't read the entire list,

7    but those exhibits are admitted.

8             (Plaintiffs' Exhibits 781, 913, 937, 964, 1043, 1171,

9             1173, 1250, 1254, 1474 received in evidence.)

10            **MR. DUSSEAULT:**  Thank you, Your Honor.

11   **BY MR. DUSSEAULT:**

12   **Q.**  Now, Dr. Peplau, let's talk about the second opinion that

13   you mentioned when you were beginning your testimony regarding

14   similarity between opposite-sex and same-sex relationships.

15            Has social science research been done that compares

16   same-sex relationships and heterosexual relationships?

17   **A.**  Yes, there have been quite a number of studies that

18   include samples of both same-sex and heterosexual couples, and

19   that compare them in a variety of systematic ways.

20   **Q.**  And has that body of work been well-received in your

21   field?

22   **A.**  Yes, it has.  It's been published in peer-reviewed

23   journals.  It's been presented at major scientific meetings,

24   and so on.

25   **Q.**  What are the primary topics of study in this body of work?

1  **A.**    One major topic has been to examine the quality of

2  same-sex relationships, and to ask how similar or different it

3  is to the quality of heterosexual relationships.

4          A second major topic has been to look at the

5  stability of relationships, their durability over time.

6          And then a third major topic has to look at the

7  processes or the dynamics that affect relationships, to ask

8  questions about whether the quality and the stability of

9  same-sex couples' relationships are influenced by the same

10 kinds of factors that apply in heterosexual couples.

11 **Q.**    And I'd like to ask you about each of those individually,

12 but, first, let me ask you, does this research as a whole show

13 whether there is or is not a similarity, generally, between

14 same-sex and opposite-sex relationships?

15 **A.**    One of the striking things about this research is the

16 consistency of findings across different studies conducted by

17 different researchers, using somewhat different methodologies.

18 And the consistent finding is one of great similarity across

19 couples, both same-sex and heterosexual.

20 **Q.**    Now, the first topic that you mentioned was the quality of

21 relationships.  Has research been done examining and comparing

22 the overall quality of same-sex and opposite-sex relationships?

23 **A.**    Yes.  And let me just say, for a moment, what I mean by

24 "quality."  Because researchers have tried to study quality, or

25 to measure it in a variety of different ways.

1          Researchers have developed standardized measures of

2    relationship adjustment.  We have developed standardized

3    measures of love, of commitment, feelings of closeness in

4    relationship.  These are multiple items, standardized measures.

5          In addition, researchers have also conducted

6    observational studies, in which they bring couples into the

7    laboratory and ask them to talk with each other about an

8    assigned topic while they are being videotaped.

9          And then the researchers systematically code those

10   interactions, and they ask questions like:  How much warmth

11   does the couple express for each other?  Do they express

12   sarcasm?  What's the quality of their interaction?

13          So I want to emphasize that a lot of different

14   methods have been used to assess quality.  And regardless of

15   how it's measured, the consistent finding, time and again, has

16   been that, on average, same-sex couples and heterosexual

17   couples are indistinguishable.

18          That does not mean that all couples are enormously

19   happy.  It means there are some happy couples, some okay

20   couples, and some not-so-happy couples in all groups.  But, on

21   average, the level of quality is the same.

22   **Q.**   Dr. Peplau, have you ever heard a view or stereotype

23   expressed that same-sex couples are somehow generally unhappy

24   or dissatisfied?

25   **A.**   Yes.  I think a common stereotype has been -- there's been

1  several pieces to it.  One, that gay men and lesbians have

2  trouble forming relationships.  That if they do form

3  relationships, they are kind of unstable; they don't last very

4  long.  And that maybe the quality of those relationships is

5  inferior to the quality of heterosexual relationships.

6  **Q.**   And is there any support in your field, that you have

7  seen, for that stereotype of the relationships?

8  **A.**   None at all.

9  **Q.**   You also mentioned the stability of relationships.  Has

10  research been done comparing the stability of same-sex and

11  opposite-sex relationships?

12  **A.**   Yes, it has.

13  **Q.**   What has that shown?

14  **A.**   Uhm, the stability of a relationship refers to how long

15  the relationship lasts over time.

16        For married couples, we have government statistics

17  that tell us when couples marry and when they divorce, or when

18  the relationship is dissolved in various ways.  So we have

19  pretty good national data sets about heterosexual marriages and

20  their length.

21        We do not have comparable data for same-sex couples.

22  Nonetheless, researchers have been able to rely on large-scale

23  surveys, some of them now representative surveys, that address

24  this question, and that have really provided evidence that a

25  substantial proportion of lesbians and gay men are in

1  relationships, that many of those relationships are long-term.

2  **Q.**   Are there any examples of studies that have shown that

3  lesbians and gay men are, in fact, able to form committed,

4  long-lasting relationships?

5  **A.**   I think one of the best studies is a study by Carpenter

6  and Gates, that was published in *Demography*, the leading

7  journal for demographers.

8        What these researchers did was to analyze data from a

9  survey conducted in California, of a representative sample of

10  lesbians and gay men in the state.

11       And one of the questions that was asked on that

12  survey was:  Are you currently in a cohabiting relationship

13  with a same-sex partner?

14       And what the researchers found was that 61 percent of

15  the lesbian respondents said, yes, they were living with

16  another woman in a loving relationship.  And about 46 percent

17  of the gay men said that they were currently in a cohabiting

18  relationship.

19       And just for comparison, the researchers mention that

20  if you looked in the same age range of 18 to 59, at

21  heterosexuals, you would find that about 62 percent of

22  heterosexuals were either married or cohabiting.

23       So the percent for heterosexuals and for lesbians was

24  essentially the same.  And for gay men it wasn't terribly

25  different.

1  Q.   And did that study also look at whether gay men and
2  lesbians are typically able to form long-lasting relationships?
3  A.   Yes.  Another question that was asked was:  How long has
4  your current cohabiting relationship been going on?
5       And what the researchers found was that, on average,
6  these relationships had lasted about 8 to 10 years.
7       Now, to put that in context, the average person who
8  was part of this survey was about 41 years old.  So if you
9  think they are 41 now, their relationship's been going on, say,
10 for ten years, they were 31 when the relationship began.
11      I think that indicates that these are people who,
12 early in adulthood, found a partner, established a
13 relationship, and for the bulk of the -- the -- their young
14 adulthood, that they were with the same partner.
15      So I think the survey provides compelling evidence
16 both that many lesbians and gay men are in a relationship, and
17 that at least some of those relationships are of quite long
18 duration.
19 Q.   Now, to your knowledge, are there any professional
20 organizations that have weighed in on the subject of whether
21 lesbians and gay men can and do form committed relationships?
22 A.   Yes.  My own organization, the American Psychological
23 Association, the largest association in the world of
24 professional psychologists, has recently adopted a position
25 paper, a resolution on that topic.

1  Q.  And turn, if you would, Dr. Peplau, to Exhibit 765, in

2  your binder, which is the second exhibit from the front.

3        Is this the document to which you are referring?

4  A.  Yes, it is.  It's the APA policy statement on sexual

5  orientation and marriage.  And it was adopted by the APA

6  Council of Representatives in July 2004.

7        MR. DUSSEAULT:  Your Honor, we would offer

8  Plaintiff's Exhibit 765 into evidence.

9        MS. MOSS:  No objection.

10        THE COURT:  765 is admitted.

11        (Plaintiffs' Exhibit 765 received in evidence.)

12        MR. DUSSEAULT:  If we could put the first

13  demonstrative on the screen here.

14        (Document displayed.)

15  BY MR. DUSSEAULT:

16  Q.  Dr. Peplau, is this one of the findings from the study

17  that you're referencing, that many lesbians and gay men have

18  formed durable relationships?

19  A.  Yes, it is.

20        MR. DUSSEAULT:  And could we turn to the second

21  slide, please.

22        (Document displayed.)

23  BY MR. DUSSEAULT:

24  Q.  And is it also one of the findings, Dr. Peplau, that the

25  factors that predict relationship satisfaction, relationship

1  commitment, and relationship stability are remarkably similar

2  for both same-sex cohabiting couples and heterosexual married

3  couples?

4  **A.**    Yes.

5  **Q.**    Now, is there some evidence that, on average, cohabiting

6  gay and lesbian relationships are of slightly shorter duration?

7  **A.**    As I mentioned before, we don't have directly-comparable

8  information.  But there is some suggestion that that might be

9  the case.

10  **Q.**    Okay.  And do you have any explanation for that?

11  **A.**    Well, I think there are several possible explanations.

12         One is that, because the data aren't directly

13  comparable, married couples may be a more -- may be a group

14  that's more selected for high levels of commitment and

15  intentions to stay together for a long time.

16         Cohabiting couples, in contrast, may be a more

17  diverse group of people; some of whom feel great levels of

18  commitment, and others of whom don't.  So it's a comparison

19  that may, to some extent, be mixing apples and oranges.

20         But I think there are several other reasons, as well.

21  One is that gay men and lesbians don't have the benefits of

22  marriage, and that marriage is for many relationships a

23  stabilizing influence.  And we've talked about and will talk

24  more about why that may be the case.

25         Another reason may be that sexual orientation, being

1  gay or lesbian, is still a stigmatized identity in the

2  United States.  And so there may be ways in which stigma and

3  prejudice and discrimination take a toll on the relationships

4  of lesbians and gay men.

5            THE COURT:  Let me see if I understand the testimony.

6            Are you saying that there is a difference in

7  durability of relationships among cohabiting heterosexuals from

8  married heterosexuals?

9            THE WITNESS:  That's true.

10           But the comparison I meant to be giving was between

11 same-sex cohabiting or not cohabiting couples and married

12 heterosexuals.

13           I was really trying to do a comparison between

14 same-sex couples and heterosexual couples.  And what I was

15 saying was that we have a very clear idea of who those

16 heterosexual couples are because they are typically married

17 couples; but that the same-sex couples can be a more mixed

18 group.

19           THE COURT:  What do the data show with respect to

20 differences, if any, between married couples, presumably

21 heterosexual couples, and cohabitating heterosexual couples; is

22 there a difference in the durability of those two

23 relationships?

24           THE WITNESS:  Yes, there is.  On average -- and,

25 again, we are talking about gross averages.  But, on average,

1  heterosexual cohabiting relationships are of shorter duration

2  than heterosexual marriages.

3  **BY MR. DUSSEAULT:**

4  **Q.**   Dr. Peplau, you referenced earlier the issue of processes

5  in relationships.

6         Has research been done into whether the same

7  processes are at work in the relationships of same-sex couples,

8  on one hand and opposite-sex couples on the other?

9  **A.**   Yes, it has.

10        Let me just give one example of what I mean by a

11  process.  One of the things researchers have studied is, what

12  factors determine the quality or the level of satisfaction in a

13  relationship?

14        And, obviously, an important factor would be

15  arguments or conflict between the partners.  And so researchers

16  have examined the extent to which same-sex and heterosexual

17  couples have the same frequency of arguing.  Which they do.

18  The extent to which they may be arguing about similar sorts of

19  things.  And the answer is yes.  The extent to which they may

20  try to work out their disagreements, to negotiate in similar

21  ways.  And the answer is they do.

22        And, then, the process question is:  Is the

23  relationship between high levels of conflict and low

24  satisfaction the same for both types of couples?  And the

25  answer there is that, yes, it is; that level of conflict

1  influences the quality of both kinds of relationships.

2  **Q.**    And, now, looking at the three factors that you mentioned,

3  together, quality, stability, and the sameness of processes

4  that affect those factors, is there a consensus in the research

5  as to whether these factors are similar between same-sex and

6  opposite-sex couples?

7  **A.**    Yes.  The overwhelming finding and the consensus of

8  professionals in the field is of similarity across these two

9  types of couples.

10         **MR. DUSSEAULT:**  What I'd like to do now is just move

11  into the record a group of documents that are behind tab B,

12  that support Dr. Peplau's opinion about the similarities

13  between opposite-sex and same-sex relationships.  These are the

14  documents found at tab B.

15         And, for the record they are Plaintiffs' Exhibits

16  921, 942, 1050, 1054, 1130, 1137, 1142, 1144, 1150, 1166,

17  1231 --

18         **THE COURT:**  1156?

19         **MR. DUSSEAULT:**  1166, Your Honor.

20         **THE COURT:**  66.

21         **MR. DUSSEAULT:**  1231, 1234, 1236, and 1245.

22         Your Honor, plaintiffs would submit those documents

23  into evidence.

24         **THE COURT:**  Hearing no objection.

25         **MS. MOSS:**  Your Honor, if I could just have, again, a

 1    moment to look at the tab.

 2              THE COURT:  Of course.

 3              MS. MOSS:  No objection, Your Honor.

 4              THE COURT:  Very well.  Thank you, Ms. Moss.

 5              Proceed, Counsel.

 6              (Plaintiffs' Exhibits 921, 942, 1050, 1054, 1130,

 7              1137, 1142, 1144, 1150, 1166, 1231, 1234, 1236, 1245,

 8              received in evidence.)

 9              MR. DUSSEAULT:  Thank you, Your Honor.

10    BY MR. DUSSEAULT:

11    Q.   Dr. Peplau, let's talk about the third opinion that you

12    mentioned at the beginning of your testimony.

13              Do you have an opinion as to whether gay and lesbian

14    individuals would benefit from marriage?

15    A.   Yes, I do.

16    Q.   What is that opinion?

17    A.   My opinion, based on the great similarities that have been

18    documented between same-sex couples and heterosexual couples,

19    is this if same-sex couples were permitted to marry, that they

20    also would enjoy the same benefits.

21    Q.   Now, to your knowledge, have any professional

22    organizations come to the same conclusion?

23    A.   Yes.  The American Psychiatric Association, which is the

24    national organization of physician psychiatrists, medical

25    experts who study mental health and illness, have issued a

1  policy statement on that.

2  **Q.**   If I could, Dr. Peplau, direct your attention to

3  Plaintiffs' Exhibit 787, which is the third exhibit from the

4  front of your binder.

5        Is this the policy statement of the American

6  Psychiatric Association that you referenced just a moment ago?

7  **A.**   Yes, it is.  And I would just note that it was approved by

8  their assembly and also approved by the board of trustees.  So

9  it went through a vetting process in the professional

10  organization.  And that happened in 2005.

11        **MR. DUSSEAULT:**  Your Honor, plaintiffs would submit

12  Exhibit 787 into evidence.

13        **MS. MOSS:**  No objection.

14        **THE COURT:**  787 is admitted.

15        (Plaintiffs' Exhibit 787 received in evidence.)

16        (Document displayed.)

17  **BY MR. DUSSEAULT:**

18  **Q.**   And, Dr. Peplau, we've highlighted a statement from this

19  policy statement of the American Psychiatric Association.

20  Could you please read the highlighted portion?

21  **A.**   Sure.  It says:

22              "In the interest of maintaining and promoting

23              mental health, the American Psychiatric

24              Association supports the legal recognition of

25              same-sex civil marriage with all rights,

1          benefits, and responsibilities conferred by

2          civil marriage, and opposes restrictions to

3          those same rights, benefits, and

4          responsibilities."

5  **Q.**   Now, Dr. Peplau, have there been any empirical studies on

6  the effects of marriage on American gay and lesbian individuals

7  who choose to marry and are able to?

8  **A.**   My -- let me just step back and say that my strong belief

9  that same-sex couples would benefit from civil marriage is

10 based, primarily, on the large body of research about

11 heterosexuals benefiting from marriage, and the body of

12 research about similarities and differences.

13         Based on that, I would predict that in states in the

14 United States that permit same-sex marriage, that we would not

15 see any change either in the rate of people getting married or

16 in the rate of people getting divorced.

17         And in order to look at that prediction, I went to

18 the government website that provides statistics, federal

19 statistics on the annual rates for marriage and for divorce in

20 Massachusetts.  And I looked at the four years prior to

21 same-sex marriage being legal and the four years after.

22         And in what I was looking at there was, has there

23 been a change in the rates of marriage or of divorce associated

24 with the introduction of civil same-sex marriage?

25         And what's very clear from those data is that there

1 has been no change; that the rates of marriage and divorce are

2 no different after civil marriage was permitted than they were

3 before.

4 **Q.** Dr. Peplau, if I could direct your attention to Exhibit

5 959, in the front section of your binder.

6 **A.** Nine.  I'm having trouble finding it.

7 **Q.** I believe -- believe it's the ninth tab from the front.

8 **A.** 959?

9 **Q.** Yes.

10 **A.** I apologize, but I'm not finding it.

11          **THE COURT:** 959?

12          **MR. DUSSEAULT:** Do you have --

13          **THE COURT:** I have it.

14          **MR. DUSSEAULT:** You do?

15          Your Honor, may I approach the witness and show her

16 mine?

17          **THE COURT:** By all means.  By all means.

18          **THE WITNESS:** Oh, okay.

19 **BY MR. DUSSEAULT:**

20 **Q.** Dr. Peplau, is Exhibit 959 the study that you're referring

21 to, that you looked at about results, where couples have been

22 permitted to marry, same-sex couples have been permitted to

23 marry?

24 **A.** What I was referring to before were government statistics

25 about rates of marriage and divorce.

1          One of the other things that I would predict would be

2    that if we surveyed individuals who have gotten married in

3    civil same-sex marriages in Massachusetts, that they would

4    report benefiting from that.

5          And there is one study that addresses that issue.

6    This is a study by Ramos and others.  They used data that was

7    collected by the Massachusetts Department of Health.

8          The Department of Health was very interested in

9    trying to understand what some of the impact might have been of

10   marriage for same-sex couples in their state.

11         And so, I believe, four years after marriage was

12   permitted, they conducted a survey.  It was not a

13   representative sample, but it was a sample that included over

14   500 lesbians and gay men who had been married in Massachusetts.

15         And the survey asked those individuals questions

16   about why they had gotten married; whether they thought that

17   marriage had improved their lives in a variety of ways.  And

18   for those individuals who were raising children, they also

19   asked people's beliefs about how the marriage had affected the

20   children.

21   **Q.**   And what did that study show as to the effects of access

22   to marriage on same-sex couples?

23   **A.**   One of the things the researchers found, I think, is not

24   at all surprising.  And that is that after they got married,

25   many of the couples said they felt more committed to each

1  other.  I think heterosexual newlyweds might well say the same

2  thing.

3      But there were other things that the couples said

4  that I think are particularly noteworthy.  Many of the married

5  lesbians and gay men said that they -- they believed that their

6  families were now more approving of their relationship.

7      Many of the them said that they felt less worried

8  about legal problems.

9      And a third of them said that either they or their

10 spouse now had access to health benefits from an employer, that

11 they had not had before getting married.

12     And so they were reporting a number of benefits.

13     And for those couples who had children -- and, as I

14 think I mentioned, that was about 25 percent of the respondents

15 in this survey -- they overwhelmingly reported that marriage

16 had been beneficial to the children.

17     95 percent of them said that they thought the

18 children had benefited from the fact that they were now

19 married.

20     **MR. DUSSEAULT:**  Your Honor, plaintiffs would move

21 into evidence Exhibit 959.

22     **MS. MOSS:**  No objection.

23     **THE COURT:**  959 is admitted.

24     (Plaintiffs' Exhibit 959 received in evidence.)

25

1  **BY MR. DUSSEAULT:**

2  **Q.**   Dr. Peplau, was it your conclusion that this study of

3  Massachusetts supported the opinions that you drew through your

4  other research as to potential benefits to marriage?

5  **A.**   Yes.

6  **Q.**   For same-sex couples?

7  **A.**   Yes.

8  **Q.**   So, then, let's turn from the benefits of marriage for

9  same-sex couples, to the fourth opinion that you said you wish

10  to offer today, which is the question of whether allowing

11  same-sex marriages would harm heterosexual marriages.

12          Do you, Dr. Peplau, have an opinion as to whether

13  allowing gay and lesbian couples to marry would in any way

14  affect the stability of heterosexual marriages?

15  **A.**   I do have an opinion.  And it is that I think it would

16  have no impact on the stability of heterosexual marriages.

17  **Q.**   Why is that?

18  **A.**   Uhm, well, we might say that by "stability" we really mean

19  two things.  One would be, is it going to affect entry into

20  marriage?  So, are fewer heterosexuals going to decide to marry

21  because same-sex couples can marry?

22          And then the other would be exit from marriage.  Are

23  we going to see an increase in divorce?

24  **Q.**   So let's start with entry.

25  **A.**   Okay.

1  **Q.**   Based on your work in this field, in the study of

2  relationships, do you see any basis for an argument that

3  allowing same-sex couples to marry would lead fewer

4  heterosexual couples to enter into marriage?

5  **A.**   No, I don't.  I think we have a large literature that

6  tells us some of the many reasons why people get married.  Many

7  of them have to do with the fact that they are in love with

8  someone; that they want to establish a life together; that they

9  have been planning to get married since they were young

10  children, and this has been a life goal.

11         These are things about their relationship.  They are

12  things about a special other person.  And there is nothing,

13  that I am aware of, in the way of data or theory, that would

14  suggest that same-sex civil marriage will lead fewer

15  heterosexuals to marriage.

16  **Q.**   So let's turn to the second part of the equation, as you

17  described it.

18         Is there any basis, in your years of study, for the

19  concept that allowing same-sex couples to marry would lead more

20  married heterosexual couples to exit or divorce from their

21  marriages?

22  **A.**   I can think of no reason.  That is, it is very hard for me

23  to imagine that you would have a happily-married couple who

24  would say, "Gertrude, we've been married for 30 years, but I

25  think we have to throw in the towel because Adam and Stuart

1  down the block got married."

2          (Laughter)

3          We know a lot about factors that lead relationships

4  to fall apart.  The immediate cause is, usually, that the

5  couples are having conflict; they are arguing; the relationship

6  has gone sour.  If they are not arguing, it feels empty.  They

7  feel that their needs are not being met in the relationship.

8  They are very personal reasons for getting divorced.

9          We also know that some of the people who are at

10 greater risk of divorce, people with low levels of education,

11 people who are poor, whose relationships are under great stress

12 and may not have the resources to meet those stress, nothing

13 that we know about all of these kinds of factors that lead to

14 divorce has anything to do with civil rights for same-sex

15 couples.

16 **Q.**  Now, there's obviously been some argument and evidence

17 around this issue about exposure to marriage.

18         Do you have an understanding of what percentage or

19 even roughly what proportion of married couples in America

20 would be same-sex couples, if same-sex couples were permitted

21 to marry?

22 **A.**  My estimate would be that if same-sex couples were

23 permitted to marry, that perhaps 2 percent of couples, 1 to 2

24 to 3 percent, some very small percentage, would be same-sex

25 couples.

1  **Q.**   And to be clear on what you mean, 1 to 3 percent of all

2  married couples?

3  **A.**   Of all married couples.  Absolutely.

4  **Q.**   Would be --

5  **A.**   Thank you.

6  **Q.**   Now, also, do you have -- let me make sure I understand.

7           If same-sex couples are permitted to marry then,

8  presumably, there would be more married couples in the country

9  or in California than otherwise, correct?

10 **A.**   That's correct.

11 **Q.**   Now, do you have a view as to whether that would have any

12 impact, one way or another, on marriage?

13 **A.**   Well, you know, usually we see it as a sign of the health

14 of an institution like marriage -- or, really, of any

15 institution -- if more people want to join.

16          One of the things that has worried some people about

17 heterosexual marriage is that fewer people are getting married,

18 and more of them are getting divorced.

19          So the idea that there's a group of American citizens

20 who want to enter this institution, to keep it going, to keep

21 it vibrant and alive, from my perspective, seems like a very

22 good omen for the future of America.

23 **Q.**   Dr. Peplau, have any professional organizations commented

24 on whether keeping marriage as exclusively a man-woman union is

25 essential to avoiding some sort of harm to our society?

1   **A.**   Yes.   I think -- you know, the group that's best -- the

2   professional group that's best able to comment on that are

3   anthropologists, professionals trained to study varying

4   patterns across time and place in culture.

5   And there's a large group of anthropologists who

6   study kinship, family, and so on.  And the professional

7   organization of anthropologists, the American Anthropological

8   Association, has taken a position on this issue.

9   **Q.**   Turn, if you would, Dr. Peplau, to the very first exhibit

10  in your binder, which I'm hoping is 754.

11  **A.**   Yes.

12  **Q.**   Is this the statement of the American Anthropological

13  Association that you just referenced?

14  **A.**   Yes, it is.

15  **MR. DUSSEAULT:**  Your Honor, plaintiffs would submit

16  Exhibit 754 into evidence.

17  **MS. MOSS:**  No objection.

18  **THE COURT:**  Very well.

19  (Plaintiffs Exhibit 754 received in evidence.)

20  **BY MR. DUSSEAULT:**

21  **Q.**   And as we did with some of the earlier statements, we have

22  culled out some of the language.  Can you read that into the

23  record.

24  **A.**   Sure.

25  "The results of more than a century of

1              anthropological research on households,

2              kinship relationships, and families, across

3              cultures and through time, provide no support

4              whatsoever for the view that either

5              civilization or viable social orders depend

6              upon marriage as an exclusively heterosexual

7              institution.  Rather, anthropological

8              research supports the conclusion that a vast

9              array of family types, including families

10             built upon same-sex partnerships, can

11             contribute to stable and humane societies."

12 **Q.**   Now, Dr. Peplau, I may have gotten you into this issue

13 earlier, accidently.

14        Is there empirical evidence in the United States,

15 that you're aware of, on the issue of whether same-sex

16 marriages have any adverse impact on the lasting stability of

17 heterosexual marriages?

18 **A.**   I think it -- I think we talked a bit earlier about data

19 from Massachusetts, about whether permitting -- whether the

20 change permitting same-sex couples to marry in Massachusetts

21 had led either to an increase in the divorce rate or a decrease

22 in the rate of people getting married.

23        And I would see those data, showing no difference

24 before and after same-sex marriage, as very consistent with the

25 argument that we would not expect harm.

1          MR. DUSSEAULT:  And, Your Honor, plaintiffs would

2   move into evidence the exhibits that are found at tab C of the

3   binder, which is Plaintiffs' Exhibits 1145, 1151 and 1195.

4          THE COURT:  What was the second one you mentioned?

5          MR. DUSSEAULT:  1145, 1151.

6          THE COURT:  Thank you.

7          MR. DUSSEAULT:  And 1195.

8          MS. MOSS:  No objection.

9   BY MR. DUSSEAULT:

10  Q.   And, Dr. Peplau, are those --

11         THE COURT:  Very well.  Those exhibits will be

12  admitted.  Proceed.

13         (Plaintiffs' Exhibits 1145, 1151, 1195 received in

14         evidence.)

15  BY MR. DUSSEAULT:

16  Q.   Dr. Peplau, are those documents materials that you have

17  relied on in reaching your view, the fourth opinion you

18  offered, that allowing same-sex marriages would not harm

19  heterosexual marriages?

20  A.   Yes, they are.

21         MR. DUSSEAULT:  Thank you very much.  I have nothing

22  further.

23         THE COURT:  Very well.  Ms. Moss, you may

24  cross-examine.

25         MS. MOSS:  May I approach, Your Honor?

1           THE COURT:  You may.

2           MS. MOSS:  Dr. Peplau, for you.

3           THE WITNESS:  Thank you.

4                    **CROSS EXAMINATION**

5   BY MS. MOSS:

6   Q.   Good afternoon, Dr. Peplau.

7           For the record, my name is Nicole Moss.

8           I'd like to start, first, with one of your first

9   opinion I think you offered, which is that, marriage confers

10  physical and psychological benefits on married individuals.

11          And when you talk about married individuals in that

12  context you, of course, are referring to heterosexual

13  individuals, correct?

14  A.   That's correct.

15  Q.   And the reason that you're referring to heterosexual

16  individuals is because you don't have data on same-sex

17  individuals, for the most part, in this country; isn't that

18  right?

19  A.   On married same-sex couples, that's correct.

20  Q.   Exactly.  And so a part -- and so there have been no

21  empirical studies that have been done, apart from this one

22  survey that you mention in Massachusetts, on whether same-sex

23  marriage would confer the same physical and psychological

24  benefits that you talked about today and in your report?

25  A.   My opinion is based on many things.  It's based on

1   research on heterosexual couples, which I believe is relevant.

2   It's based on research on same-sex couples showing similarity.

3            So it's really based both on that evidence, that

4   empirical research, and theories and explanations about why

5   those patterns exist.

6            So it's based on those.  And then it's also informed

7   by this one piece of information that you referred to.

8   **Q.**   And that is the only empirical study or survey in this

9   case that has been done on whether there are physical or

10  psychological benefits from same-sex marriage, correct?

11  **A.**   As far as I know, that's correct.

12  **Q.**   And, similarly, as far as you're aware, there have not

13  been any studies, empirical studies, done on domestic --

14  comparing whether there are physical and psychological benefits

15  from domestic partnerships, as compared to same-sex marriage;

16  isn't that right?

17  **A.**   Studies comparing individuals in -- in same-sex domestic

18  partnerships and in same-sex marriages.

19  **Q.**   To see if there would be a difference between the two.  We

20  don't know that either, do we?

21  **A.**   I think we have many reasons to estimate what we would

22  find.  But, no, there have not been studies of that.

23  **Q.**   And you would agree, as a researcher with 35 years of

24  experience, that it would be important for us to study same-sex

25  marriage and whether there are, in fact, the physical and

PEPLAU - CROSS EXAMINATION / MOSS

1  psychological benefits that you hypothesize would exist?

2  **A.**    As a researcher, I would always encourage us to do more

3  research on topics that I think are important and interesting.

4  And this is no different.

5  **Q.**    Now, domestic partnerships, to some degree or another, or

6  civil unions, do exist in this country; isn't that right?

7  **A.**    Correct.

8  **Q.**    But, yet, there has been relatively little to no studies

9  done on whether there are physical and psychological health

10  benefits from domestic partnerships; isn't that right?

11  **A.**    That's right.  And I think the reason for that is that

12  most of the studies on health benefits rely on very large

13  national samples, using government statistics.  And we

14  currently do not have government statistics of that sort on

15  registered partners.

16  **Q.**    And some of the benefits from marriage that you've seen

17  with heterosexual couples -- and you listed several of them and

18  I won't go over them now -- you can't rank or assess which

19  particular aspect of marriage has caused the observed increase

20  in better physical or psychological health; isn't that right?

21  **A.**    I've outlined a number of factors.  And I think they often

22  work together and work simultaneously.  So I wouldn't be able

23  to answer the question.

24         Is there one that is of greater importance than the

25  other?  I think that, in truth, would vary from one couple to

1 another, depending on their life circumstances.  And that's not

2 an activity researchers have tried to undertake.

3 **Q.**   And some of the -- some of the attributes or aspects of

4 marriage that researchers have opined may have a benefit, may

5 be the cause of the physical benefit of marriage, one of those

6 is access to health insurance through one's spouse; isn't that

7 right?

8 **A.**   Yes.

9 **Q.**   And so to the extent that access to health insurance would

10 be afforded through domestic partnerships, you would expect to

11 see benefits from domestic partnerships?

12 **A.**   Yes.  I think there's no question that domestic

13 partnerships have been an improvement for same-sex couples;

14 that they do confer certain benefits.

15        It is my opinion that they are not equivalent to

16 marriage, for a variety of reasons, and that they do not confer

17 all of the benefits of marriage.  But I certainly would not

18 dispute the idea that there are certain many good things that

19 go along with registered partnerships.

20 **Q.**   And to the extent that, in your view, they don't confer

21 all of the benefits of marriage, you can't say with certainty

22 that those aspects that they don't confer are what is

23 responsible for the increased levels of physical and

24 psychological health that you've observed in married couples;

25 isn't that right?

1  **A.**   I have great confidence that some of the things that come

2  from marriage, believing that you are part of the first class

3  kind of relationship in this country, that you are -- that you

4  are in the status of relationships that this society most

5  values, most esteems, considers the most legitimate and the

6  most appropriate, undoubtedly has benefits that are not part of

7  domestic partnerships.

8  **Q.**   But, again, you have no empirical studies, that you can

9  point us to, to support that opinion, that measured

10  specifically whether there were benefits conferred by domestic

11  partnerships separately from or different from same-sex

12  marriage; isn't that right?

13  **A.**   I really believe that we know a lot about the impact that

14  stigma and being second class have on people and have on

15  relationships.

16       And, it seems to me, that being prevented by the

17  government from being married is no different than other kinds

18  of stigma and discrimination that have been studied, in terms

19  of their impact on relationships.

20  **Q.**   Now, you talked about the protective effect of marriage,

21  correct?

22       And in your expert report you testified or you wrote

23  that one of the protective benefits of marriage is the fact

24  that it's a legal contract; isn't that right?

25  **A.**   I -- I would certainly agree with that statement.

```
 1   Q.   Okay.  Okay.  And a legal contract that affords sort of a
 2   second layer, in that it's an enforceable legal contract; isn't
 3   that right?  That, in addition to just being a legal contract,
 4   it's one that the spouses can enforce in court, if need be?
 5   A.   I think that isn't exactly what I said.
 6        I think I referred to a phrase used by sociologist
 7   Andrew Cherlin, who suggested that one of the things that
 8   distinguishes marriage is that it is associated with
 9   enforceable trust.
10        That in many kinds of relationships, partners can
11   pledge all sorts of things.  "I swear I'll be with you forever
12   and forever."  And that one of the benefits of marriage is that
13   it enhances the likelihood that that trust or those commitments
14   will, in fact, be acted upon and be enforceable.
15        I don't think the argument is solely about a legal
16   contract.  I think it goes beyond that; that people associate
17   with marriage a degree of seriousness and sort of gravitas that
18   leads them to take those obligations seriously.
19   Q.   And you have no basis to dispute that many, many
20   individuals who are in registered domestic partnerships view
21   their commitments seriously and with the same level of
22   commitment that you would observe in married couples?
23   A.   One of the remarkable things about couples is that they
24   are very resilient, and that people manage to form
25   high-quality, satisfying relationships under a variety of
```

1    adverse circumstances.

2          And, certainly, many lesbians and gay men without the

3    benefit either of domestic partnerships or of marriage have

4    formed strong, lasting relationships.

5          At the same time, it seems very obvious to me that

6    those relationships might be further enhanced and further

7    stabilized and legitimated and validated by being -- by having

8    access to marriage.

9    **Q.**   Now, one of the -- one of the benefits of marriage or one

10   of the attributes of marriage that you, I believe, testified

11   confer the benefits of marriage that you talked about, is

12   the -- I think one of the terms is called barriers to exit.

13   And the fact that it makes it more difficult for the couple to

14   just split up, lends stability to the relationship.  Is that

15   accurate?

16   **A.**   Yes.  There's a lot of literature and theories about the

17   fact that couples stay together not only because they are

18   attracted to each other and want to be together, but also

19   because it might be difficult to get out; that there are

20   various barriers, yes.

21   **Q.**   And you would agree that domestic partnerships or civil

22   unions also create barriers to exit in a relationship?

23   **A.**   Civil unions, without question, provide some kind of

24   barriers.  But they are not equivalent to marriage.

25          Because part of what goes on when you get married is

1    that, all of a sudden, your relatives know about it; your

2    family is involved; people understand you have a new status.

3    Oh, Anne got married.

4            That's different than when you fill out a form and

5    send it in, or however you go about it in your state, to become

6    a registered partner.  It's kind of like a private contract.

7    It's not something that is necessarily understood or recognized

8    by other people in your environment.

9            And they are an important part of the barrier

10   concept, your relatives saying, Gee, don't throw in the towel

11   on your marriage.  Think twice.  Give it another try.  And your

12   pastor saying, Let's talk about it.  Don't split up.

13   **Q.**   Dr. Peplau, have you undertaken any studies to test what

14   the public's perception is of domestic partnerships as compared

15   to marriage?

16   **A.**   I have not conducted a study on that.  I must say, as I've

17   talked to people about domestic partnership, many of them kind

18   of scratch their heads and say, "I don't really know what that

19   is."

20           But, no, I have not conducted a systematic study.

21   **Q.**   And you don't cite to any in your bibliography or

22   materials relied upon, either; isn't that right?

23           (No audible response heard by the court reporter.

24           Reporter interrupts.)

25           **THE COURT:**  I believe she answered, "That's right."

1              **THE WITNESS:**  I believe that that's -- that's right.

2   **BY MS. MOSS:**

3   **Q.**   And one of the studies that you do rely on in your expert

4   report is a study by Kimberly Balsam.  Are you familiar with

5   that study?

6   **A.**   I haven't reviewed it for today but, yes, I have certainly

7   read that study in the past.

8   **Q.**   Dr. Peplau, it's -- if you could turn to tab three of your

9   binder.

10              I'm going to direct your attention to the exhibit

11   that's been marked PX, Plaintiff's Exhibit 1143?

12   **A.**   Yes.

13   **Q.**   Is that the study by Kim Balsam, that you relied upon in

14   your expert report?

15   **A.**   Yes, it's one of the studies I relied upon.

16   **Q.**   And in this particular study, the researchers found that

17   same-sex couples not in civil unions were more likely to have

18   ended their relationships than same-sex civil unions or

19   heterosexual married couples; isn't that right?

20   **A.**   I believe that's correct, yes.

21   **Q.**   And, in fact, the authorities characterize the data as

22   showing a significant difference in the rates of relationship

23   terminations, correct?

24   **A.**   You know, as I say, I have not reviewed that.  If you

25   wanted to direct me to a place.  I think that is probably

1  correct.

2  **Q.**    Why don't you turn to page 112, in the study.

3  **A.**    Okay.

4  **Q.**    Very bottom of the first column.

5          Isn't it correct, then, that they found or stated

6  that the data showed a significant difference in the rates of

7  relationship terminations?

8  **A.**    Yes.

9  **Q.**    Referring to individuals in these civil unions versus

10 those who were not?

11 **A.**    Yes, that's what it says.

12         **MS. MOSS:**  Your Honor, I move PX1143 in evidence.

13         **MR. DUSSEAULT:**  No objection, Your Honor.

14         **THE COURT:**  Very well.  1143 is admitted.

15         (Plaintiffs' Exhibit 1143 received in evidence.)

16 **BY MS. MOSS:**

17 **Q.**    Now, Dr. Peplau, you focused quite a bit in your testimony

18 on the ways in which gay and lesbian couples were similar to

19 heterosexual couples.  And I want to focus for a bit on ways in

20 which they are different.

21 **A.**    Sure.

22 **Q.**    I want to focus specifically on gay men, for a moment.

23         Would you agree that the practice of monogamy in gay

24 male relationships is quite different from the practice of

25 monogamy in married heterosexual or lesbian relationships?

**A.**    What I would say is this:  Researchers who study sexual

exclusivity or monogamy in relationships often ask about two

questions.

One is:  Do you believe that monogamy is an important

thing in your relationship?  Or some version of that.  And the

second is:  Have you been monogamous or have you been sexually

exclusive in your relationship?

And one of the ways in which gay men's relationships

differ, on average -- some of them do; not all of them, by any

means -- is that a higher percentage of gay men say that they

do not value monogamy; it's not important in their

relationship.  They may have an agreement that their

relationship does not need to be sexually exclusive.

And, correspondingly, somewhat more gay men than

other groups report that they or their partner have had sex

with someone else since their relationship began.

So it's important to put it in that context, because

we sometimes think of non-monogamy in terms of infidelity, a

breach of faith.  But if a couple has an agreement, an

understanding, that sex with other people is acceptable, then

acting on that agreement is not a breach of trust.

And I think that's why researchers have found that

whereas monogamy is correlated with relationship satisfaction

for heterosexuals and lesbians -- that is, having monogamy is

associated with being in a happy relationship -- for gay men

1    there's no association between sexual exclusivity and the

2    satisfaction of the relationship, because it's not one of the

3    markers or the yardstick by which gay men are measuring their

4    relationship.

5              **THE COURT:**  That's not true of most married people,

6    is it?

7              **THE WITNESS:**  Uhm, what's not true is, most married

8    people are very unhappy if their partner is unfaithful; and it

9    detracts from quality.  And the same is true for lesbian

10   couples, and for a sizable part of gay male couples, as well.

11   Just the proportions are different.

12   **BY MS. MOSS:**

13   **Q.**   Dr. Peplau, can you turn to tab 4 in your binder.  I want

14   to direct your attention to the exhibit that's been marked for

15   identification as Defendant-Intervenors' Exhibit DIX1233.

16   **A.**   Uh-huh.

17   **Q.**   Okay.  Do you recognize this as a study that you conducted

18   with David Blasband, as written up in the *Archives of Sexual*

19   *Behavior*, entitled "Sexual Exclusivity Versus Openness in Gay

20   Male Couples"?

21   **A.**   Yes.  It's an oldie from 25 years ago.

22   **Q.**   And in that article, on page 396, you write that:

23              "Available research indicates that sexual

24              exclusivity might be the exception rather

25              than the rule in most gay male

```
 1              relationships."
 2              Isn't that right?
 3   A.   That's what it says, yes.
 4   Q.   And, then, on page 397 you write that:
 5              "For some time, the norms of many segments of
 6              the gay community have encouraged sexual
 7              openness rather than exclusivity, and have
 8              defined casual sexual affairs as a complement
 9              to a steady relationship."
10              Do you see that?
11   A.   Yes.
12   Q.   Okay.  And do you -- you wrote it, so do you agree with
13   that explanation for why gay male relationships that practice
14   monogamy are the exception rather than the rule?
15   A.   I began this by saying, "This is an oldie."  Okay.
16              And I think a number of things are different now than
17   when this article was written, and that we might find different
18   things if we were to redo the study.  One is that when this
19   article was written, no one was talking or thinking about
20   same-sex marriage.  Gay relationships were much more secretive,
21   much more closeted.  It was really a different time.
22              And I think that our understanding about the gay
23   community and about same-sex relationships was -- was less
24   well-developed; that we've learned things over the past 25
25   years.
```

1          So I'm not in any way retracting what I said.  It's

2     an accurate statement in this paper, of what I found at the

3     time.  But I wasn't studying gay men in -- who, for example,

4     had chosen to get married.

5          So what we're talking about, really, is what -- is

6     whether statements like this is true of the majority of gay men

7     would still be accurate, for instance, of gay men who chose to

8     get married.

9     Q.  Well, before I move on to a more recent article from

10    you...

11         MS. MOSS:  First, Your Honor, I would like to move

12    this exhibit in evidence.  DIX1233.

13         THE COURT:  Hearing no objection, 1233 is admitted.

14         (Defendants' Exhibit 1233 received in evidence.)

15    BY MS. MOSS:

16    Q.  Now, Dr. Peplau, turning to tab 6 in the binder.  This is

17    an exhibit that has been marked for identification as DIX1236.

18         Do you recognize this article?

19    A.  Yes.  It's a recent review paper I wrote.

20         THE COURT:  1236.

21         THE WITNESS:  Oh, 1236.  Wait.  I'm on the wrong

22    paper.  It's tab five?

23    BY MS. MOSS:

24    Q.  It's tab six in your binder.  It's the "Close

25    Relationships of Lesbians and Gay Men," authored by you and

1  Adam W. Fingerhut.

2  **A.**   And I have it as 1245.

3          **THE COURT:**  1245 is what is marked on the exhibit.

4  Is that incorrect?

5          **MS. MOSS:**  No.  I'm probably -- I think it's the same

6  article, but I probably have a different -- the defendants'

7  sticker, I apologize.

8          **THE WITNESS:**  It is that article, yes.

9          **MS. MOSS:**  And it's Plaintiffs' 1245.

10          **MR. DUSSEAULT:**  No objection to Plaintiffs' 1245.

11          **THE COURT:**  1245 is admitted.

12          (Plaintiffs' Exhibit 1245 received in evidence)

13  **BY MS. MOSS:**

14  **Q.**   Now, in this more recent article that you wrote, you did a

15  study of a certain number of gay men who were in relationships,

16  isn't that right?

17  **A.**   This paper is not a report of empirical study I conducted.

18  This paper is a literature review.  So it's really a summary of

19  the results of other people's research.  And I sometimes cite

20  my own research, but it's a review paper.

21  **Q.**   I see.  My apologies for that.

22          So on page 410 of this literature review you

23  reference a -- I'm looking in the second column about halfway

24  down.  You write about a study, and it indicates that:

25          "36 percent of gay men indicated that it was

1          important to be sexually monogamous, compared
2          with 71 percent of lesbians, 85 percent of
3          heterosexual wives and 75 percent of
4          husbands."
5          Do you see that?
6    **A.**   I do see that.  And that's a correct statement of that
7    study, which was a study conducted in the late 1970's, early
8    80's.
9    **Q.**   And would you agree, however, that while we may not know
10   the exact percentages today, that it is still the fact that
11   more -- or I should say less gay men believe that sexual
12   monogamy is important, as compared to lesbian couples and
13   heterosexual -- and wives and husbands in a heterosexual
14   marriage?
15   **A.**   Yes.  I agree with both parts of your statement, that we
16   may not really know or be able to pin down the specific
17   percentages, but I think as a general statement, that the
18   percentage is higher -- or that the percentage differs is
19   correct.
20   **Q.**   Going back to your study that you wrote on "Sexual
21   Exclusivity and Openness in Gay Male Couples," in that
22   particular study you noted that there was, I believe -- and
23   please correct me if I'm wrong -- that there was a difference
24   between valuing or saying that you agreed with -- that gay men
25   agreed with monogamy and then actually carrying through when it

1  came to their behavior; that there was a difference between the

2  two, is that not right?

3  **A.**   This was a way in which humans are similar once again;

4  that there are heterosexuals who pledge to be monogamous and

5  who are not, and the same is true of some gay men.

6  **Q.**   And, in fact, in that study you found that 74 percent of

7  men whose relationships had always been, quote, unquote, closed

8  had nonetheless had sex with at least one other person; is that

9  not right?

10  **A.**   It's been probably two decades since I have reviewed that

11  paper and so if you would like me to look at a specific

12  sentence or something, I would be happy to do that.

13  **Q.**   Sure.  Page 407.

14  **A.**   Okay, wait.  Let me get that.

15         (Brief pause.)

16  **A.**   Okay.  Thank you.

17  **Q.**   Would agree that is what you wrote?

18  **A.**   Well, I'm not sure where on the page it is.  I'm on page

19  407.

20  **Q.**   If you look at the very top of the first full paragraph,

21  second sentence, it says:

22         "This is, perhaps, most obvious in our

23          finding that 74 percent of men whose

24          relationships had always been closed had

25          nonetheless had sex with at least one other

1          person."

2          **THE COURT:**  I'm sorry.  407?

3          **MS. MOSS:**  Page 407, yes, your Honor, in Tab 4.

4    **A.**   And what we did in this study was to give participants a

5    definition of a sexually open relationship in which sexual

6    monogamy was not expected and a sexually closed relationship in

7    which it was expected, and then the statement that you are

8    citing is an accurate depiction of what we -- you know, is what

9    we found.

10   **Q.**   And by "closed," you meant -- that means that the two

11   partners in the relationship agreed that they would be sexually

12   exclusive to one another, is that right?

13   **A.**   We meant that they had -- what I'm a little vague on at

14   that point is just exactly how we asked that question, but...

15   Questionnaire used these terms.

16          I assume that what we are reporting here are men who

17   indicated, yes, according to our definition their relationship

18   was open or, yes, it was closed.  And then a question about,

19   presumably, since the beginning of your relationship, have you

20   ever had sex with another person, in what might have been a

21   long relationship or a short relationship.

22   **Q.**   And if it helps, on page 399 of that study under

23   "Questionnaire" it says how "closed" was defined.

24          And as I read it, it says:

25          "We define a closed relationship as one in

1                  which sexual fidelity is expected of both

2                  partners, and an open relationship is one in

3                  which both partners are free to engage in

4                  sexual encounters with other people."

5  **A.**   Right.

6  **Q.**   Okay.  Now, back on page 407, about three-quarters of the

7  way down, you also write your findings in the study that:

8                  "All men in relationships identified as

9                  having been closed and lasting three years or

10                 longer had engaged in sex with at least one

11                 person other than their primary partner."

12                 Isn't that right?

13 **A.**   That's right.  And the context of this, of course, is that

14 this is a study of gay men in Los Angeles and in other times

15 periods, not a representative sample of everybody.

16         So I certainly don't want to deny my findings, but I

17 think it's important to kind of have the context in mind for

18 when and where and how these data were collected.

19 **Q.**   Now, Dr. Peplau, turning your attention for a moment to

20 your testimony on the desire of gays and lesbians to marry as

21 compared to -- well, as compared to the heterosexual community,

22 you -- you noted that 74 percent of lesbians and gay men said

23 if they could legally marry someone of the same sex, they would

24 like to do so some day, correct?

25                 Okay.  Now, I'm going to ask you to turn to tab seven

1    in your binder.  Let me explain this exhibit a little bit to

2    you.

3              There's actually included behind this tab two

4    separate exhibits.  One is marked DIX-2427, and the other is

5    marked DIX-2427a.  And what the "a" is, is these are statistics

6    from an official website, government website in Belgium.  The

7    official website is in French, so we had the website translated

8    into English so it would be more readable.  And the certified

9    translation is 2427a.

10             MS. MOSS:  Your Honor, since these are official

11   government records from an official government website, we

12   would move them in evidence as self-authenticating.

13             MR. DUSSEAULT:  Could I ask one clarification, that

14   if 2427a is disclosed on the exhibit list?

15             MS. MOSS:  I believe it was disclosed on the exhibit

16   list that was just recently filed.

17             MR. DUSSEAULT:  Recently within the last couple days?

18             MS. MOSS:  Last couple days.

19             MR. DUSSEAULT:  If I could -- conditionally, if we

20   could, your Honor, so I could verify that fact.

21             THE COURT:  All right.  Fine.  Then subject to that

22   limitation, 2427 and 2427a are admitted.

23             (Defendants' Exhibits 2427 and 2427a received in

24             evidence)

25

1  BY MS. MOSS:

2  Q.   Dr. Peplau, if you could turn, also, to tab eight in your

3  binder.  And I have a similar exhibit, which is DIX-2644, which

4  is another set of statistical charts from Belgium, and then

5  2644a being the certified English translation.

6       MS. MOSS:   And we would also move both of these

7  exhibits in evidence.

8       MR. DUSSEAULT:   Subject to the same reservation, we

9  have no objection.

10       THE COURT:   Very well.  Same ruling.

11       (Defendants' Exhibits 2644 and 2644a received in

12       evidence)

13  BY MS. MOSS:

14  Q.   Now, I'm going to have you flip between these two tabs, so

15  if you could keep them both at hand.  And let's refer to the

16  English translations, if you would.

17       What I would like you to do is walk with me through

18  determining, based on these statistics, what the relative

19  different percentages were of the population in Belgium, the

20  heterosexual population that gets married versus the same-sex

21  population -- or I should same-sex couples or gay and lesbian

22  population that gets married.

23  A.   I'm happy to do that, but I do want to emphasize that my

24  research and the scope of my expertise is about relationships

25  in the United States; that I am in no way, shape or form

1  knowledgeable or expert about marriage in Europe or anywhere

2  else in the world.

3          And as a researcher, in order to be able to comment--

4  I can read these statistics, but to be able to comment on them

5  or interpret them plausibly, I would feel unqualified to do

6  that because I don't know anything about the context in

7  Belgium; but I'm happy to go with you and read the numbers.

8  Q.   Understood.  And so in offering your expert testimony

9  today, you did not do any study of the other countries in the

10  world where same-sex marriage has, in fact, been available to

11  individuals for some number of years?

12 A.   That is correct.

13 Q.   Now, if you look at tab seven, 2427a, you see at the very

14 top of this chart, the first row has years.  Do you see that?

15 1990, 1995, going all the way up to 2008?

16 A.   Yes.

17 Q.   Okay.  And right under, that there is the line that

18 contains the total population for the country of Belgium?

19 A.   Yes.

20 Q.   And so you would agree that what this is representing is

21 that in 2008 the population of the country of Belgium was

22 10,666,866?

23 A.   Yes.

24 Q.   Okay.  And then it's further broken down by how many

25 individuals in that population were single, married, divorced

1   and widowed; do you see that?

2   **A.**   I do see it.

3   **Q.**   So the total number of married individuals in 2008 in

4   Belgium is 4,509,478?

5   **A.**   Yes.

6   **Q.**   Now, Dr. Peplau, there are no statistics that we could

7   find that would -- from the government in Belgium that would

8   indicate how many gay and lesbians there were in the population

9   of that country.

10         Would you agree that a good conservative estimate

11   would be two percent?

12   **A.**   I think that would --

13         **MR. DUSSEAULT:**   Your Honor, beyond the scope.   The

14   witness has testified that she has not studied other countries

15   at all.

16         **THE COURT:**   Well, the witness has stated that she

17   doesn't have expertise in marriage outside the United States.

18   Obviously, the numbers are what the numbers are.

19         **MS. MOSS:**   Certainly.

20         **THE COURT:**   I will let you explore this and we will

21   see where we are going with it.

22   **BY MS. MOSS:**

23   **Q.**   Do you have an estimate of what the percentage would be of

24   the population in the United States that's gay and lesbian?

25   **A.**   The estimate that I would use would be something like two

PEPLAU - CROSS EXAMINATION / MOSS

1   to three percent who identify as gay or lesbian.  So who on a

2   survey if you said, "What's your sexual orientation," would

3   check a box that said "homosexual" or "gay" or "lesbian."

4   **Q.**   And from what you know of your study of sexual

5   orientation, is there any reason to believe that there would be

6   remarkably different percentages outside of the United States?

7   **A.**   There might well be that is the extent -- people's

8   willingness to disclose -- in this case it looks like in a

9   government document -- their sexual orientation, might well

10  vary from country to country.  And so I really don't -- I don't

11  know.

12  **Q.**   And so it could be more than two percent?

13  **A.**   It could be more, it could be less.

14  **Q.**   It could be less.  And so if we just take as a

15  conservative estimate for the point of this hypothesis

16  two percent, would that be -- can we work with that?  Would you

17  agree that that seems reasonable?

18  **A.**   If we assume that the percent is the same in Belgium that

19  it might be in the United States, my guesstimate for the United

20  States would be that, you know, something like two percent.

21  **Q.**   And, Dr. Peplau, I'm not offering this as evidence that

22  it's two percent.  I don't know either.  I'm asking just to

23  assume as an estimate?

24        **THE COURT:**  Ms. Moss is asking you to base your

25  testimony on a hypothetical.  All right.

1   **BY MS. MOSS:**

2   **Q.**   So if two percent of the population in Belgium were gay or

3   lesbian, then as I do the math, two percent would mean that

4   there are 213,337 individuals in that country.

5         And I don't expect you to do the math right here, but

6   I represent to you that I have done it and that that is the

7   number.  Does that sound reasonable to you?

8   **A.**   Fine.

9   **Q.**   Okay.  Now, because we don't know from this whether, when

10  the -- they're accounting for married individuals, whether that

11  includes same-sex marriage or not in the total marriage figure.

12        Assuming it does, if we separate out -- if we -- I'm

13  sorry, strike that.  I have gotten ahead of myself.

14        I actually need you to turn to DIX-2644.

15  **A.**   Yes.

16  **Q.**   And this is the chart from the Belgian government website

17  that actually lists the number of heterosexual marriages by

18  individual for each year.

19  **A.**   That doesn't correspond to the -- wait, which am I turning

20  to?

21  **Q.**   2644a, behind tab eight.

22        **THE COURT:**   The title says "Trend in Homosexual

23  Marriages."

24        **MS. MOSS:**   I'm sorry.  Did I say heterosexual

25  marriages?

1              THE COURT:  Yes.

2    BY MS. MOSS:

3    Q.   I apologize.  I meant homosexual marriages.

4    A.   Then I'm with you.

5    Q.   I apologize for that.

6             As you'll see, it breaks it down by men, women, and

7    then there's a total on the far right-hand side.

8    A.   Yes.

9    Q.   And it's broken down by year.  So in 2004 it reports there

10   are 2,138 individuals who are in a same-sex marriage; do you

11   see that?

12   A.   I do.  And what I'm not clear about, is that the number of

13   people who got married that year or who reported that they were

14   married?

15   Q.   I believe it's the number of married individuals as

16   identified by the state as being married, by the government of

17   Belgium as being married.

18   A.   So there were fewer married homosexual couples in 2008

19   than there were in 2007.  So there were 2300 in 2007, but there

20   are only 2100 in 2008?

21   Q.   It's -- no.  It's the total number that -- I'm sorry.

22   It's the total number that year, who got married that year.

23   A.   But it's individuals as opposed to marriages.

24   Q.   If you look right above, it says:

25             "The marital status notices do not yet

1              distinguish between homosexual and

2              heterosexual marriages.  The national

3              registry, therefore, provides statistics

4              about the number of people married, not the

5              number of marriages."

6  **A.**   I see.

7  **Q.**   So these are individuals who got married that year.

8  **A.**   So that number is twice as large as the number of

9  marriages?

10  **Q.**   Yes.

11  **A.**   All right.

12  **Q.**   And so if you wanted to know how many individuals at the

13  end of 2008 were, in fact, heterosexual -- or homosexuals were

14  married at the tend of 2008, you would have to add up 2004,

15  2005, 2006, 2007 and 2008?

16  **A.**   Okay, got it.

17  **Q.**   And in doing that -- and in doing that, it comes up with a

18  total number of 10,923.  And, again, I don't expect you to do

19  the math in your head, but that would be 10,923 individuals who

20  are married.

21          And this would over estimate potentially the number

22  of marriages because, of course, it's not taking into account

23  deaths or divorce or anything else; wouldn't you agree?

24          If I'm representing to you that it's just the number

25  that reported being married.  I'm not asking you to assume that

1    any got divorced or died.

2    **A.**    Right.

3    **Q.**    And based on those assumptions, it would -- well, it could

4    possibly be an over representation.   Okay.

5              Now, if you take the total number of married

6    individuals that are reported in Belgium, which we looked at

7    earlier on DX 2427, and then you subtract out the total number

8    of same-sex married individuals, you would agree that would

9    give us the number of opposite-sex marriages?

10   **A.**    I believe so, yes.

11   **Q.**    And then would you agree that to determine what percentage

12   of the gay and lesbian population are married, that you would

13   divide the number in the population of gay and lesbian

14   individuals into the number of gays and lesbians who are

15   married to come up with a percentage?

16   **A.**    Can I -- I'm just puzzled about one thing here that maybe

17   you can help me with, because, I -- you know, you can do the

18   math better than I can.

19             But I thought we said that on the first table, that

20   in 2008 there were 10 million marriages total.   But the table

21   for the same -- for the homosexual marriages is the number per

22   year.  Am I right about that?

23   **Q.**    Ten million was the population.   The total number --

24   **A.**    I mean, the number of married people is 45 -- or

25   four-million-five-hundred-whatever and change.

1 **Q.**   Correct.

2 **A.**   And that's the overall, everybody married in Belgium.

3 **Q.**   Correct.

4 **A.**   And then you're suggesting that it's about 10,000 same-sex

5 couples.

6 **Q.**   No.  10,000 individuals.

7         **THE COURT:**  So that would be 5,000 couples?

8         **MS. MOSS:**  Yes.

9 **BY MS. MOSS:**

10 **Q.**   But if we just want to know on an individual basis what is

11 the percentage of gay and straight individuals in Belgium who

12 are in same-sex marriages, if you divide the number of

13 individuals who are gay and lesbian that report being married

14 into -- so if you basically divide that by the total population

15 of gays and lesbians, you come up with approximately

16 five percent?

17        **MR. DUSSEAULT:**  Your Honor, may I object.  Dr. Peplau

18 is not an economist and she is not a demographer and she has

19 not studied Belgium.  So I don't know for what purpose or

20 usefulness this is with her.

21        **THE COURT:**  Maybe it would be helpful, Ms. Moss, if

22 you ask the bottom line question.

23        **MS. MOSS:**  Sure.

24 **BY MS. MOSS:**

25 **Q.**   Assuming my math is correct -- and I understand as you sit

 1    there, you are not going to be able to do it all.  I'm not able
 2    to do it in my head and I assume that you can't do it in your
 3    head.
 4              But if the bottom line -- if the numbers show that
 5    five percent of gay and lesbian individuals have taken
 6    advantage of same-sex marriage in Belgium and 43 percent of
 7    heterosexuals have taken advantage of marriage in Belgium,
 8    there would be a significant difference between those two,
 9    would there not?
10    A.    Absolutely.
11    Q.    And without taking you through the same -- without taking
12    you through the same process, we also have data for the
13    Netherlands.
14    A.    But can I -- can I just make sure I'm with you on these
15    data.
16              I mean, you are not saying that only five percent of
17    all the homosexuals in Belgium got married.  Rather -- because
18    don't know how many homosexuals there are.
19              Rather, what you are saying is of all married
20    individuals in Belgium, only five percent of them are
21    homosexual?
22    Q.    No.  I'm saying that five percent of homosexuals in
23    Belgium got married.
24    A.    And how is it that we know the number of homosexuals in
25    Belgium?

1  **Q.**   I asked you to assume a conservative estimate, that

2  two percent of the population were gay and lesbian.

3  **A.**   Oh, I see.  I see.  Okay.  It is more complicated math

4  than...

5          So what you believe the data -- the facts of the data

6  are, are that five percent of homosexuals in Belgium are

7  married?

8  **Q.**   Yes.

9  **A.**   Compared to 47 percent, I believe it was, of --

10  **Q.**   43 percent.

11  **A.**   43 percent of heterosexuals.  Okay.

12  **Q.**   Now, Dr. Peplau, you would agree that there is a

13  significant difference in the percentage -- assuming --

14  assuming this hypothetical, that these facts are correct and

15  that the math is correct, you would agree that there is a

16  significant difference, then, in the percentage of population

17  that is choosing to take advantage of the institution of

18  marriage in that country?

19  **A.**   Yes.  And I would be struck by the fact that those data

20  seem to be so different from analyses of the percent of

21  same-sex couples in Massachusetts who have chosen to get

22  married.

23          And since I don't know anything about Belgium, one

24  thing I might speculate about is that Americans are one of the

25  most pro-family people around.  I mean, Americans are

1   enthusiasts of marriage.

2          And so the rates may be lower in Europe, and I don't

3   have any explanation for why or ability to speculate.

4   Q.  Now, if you would turn to tab nine in your binder.

5   A.  Sure.

6   Q.  This is an exhibit that's been marked DIX-2430.

7          MS. MOSS:  Your Honor, I would represent these are

8   statistics from the government of Netherlands.  And Netherlands

9   very nicely puts their statistics up in English, so I did not

10  have to have these translated.

11         I would move these in evidence, again, as a

12  self-authenticating government record.

13         MR. DUSSEAULT:  No objection to the document, your

14  Honor.

15         THE COURT:  2430 is admitted.

16         (Defendants' Exhibit 2430 received in evidence.)

17  BY MS. MOSS:

18  Q.  Tab 10 is some additional statistics from the government

19  of the Netherlands.  This has been marked for identification as

20  DIX-1887.

21         These are statistics, again, on the number of

22  marriages, same-sex marriages -- marriages and then same-sex

23  marriages by year broken down in a table through 2008.

24  A.  Okay.

25  Q.  And, Dr. Peplau, without taking you through the math

1  again, if we were to go through that same exercise with the

2  same set of assumptions in this hypothetical, that there

3  were -- two percent of the population in the Netherlands were

4  gay and lesbian and doing the math, if in doing that we were to

5  find that eight percent of the population of same -- of gay and

6  lesbian couples in -- or gay and lesbian individuals, I should

7  say, in the Netherlands are married versus 42 percent of

8  heterosexual individuals, again, that would be a significant

9  difference in who is taking advantage of the institution,

10  correct?

11  **A.**    It would be a fairly substantial difference, but I would

12  have no way to understand or explain or think about what it's

13  telling us.

14  **Q.**    Dr. Peplau, do you agree that one of the purposes of

15  marriage, both historically and today, is to increase the

16  likelihood that children will not be born out of wedlock?

17  **A.**    By definition.

18  **Q.**    I'm sorry?

19  **A.**    Could you repeat -- I mean, I thought you said one of the

20  purposes of marriage was to ensure that children weren't born

21  out of wedlock, meaning outside of marriage.

22  **Q.**    Yes.  Is that one of the purposes?  So that children that

23  are born to -- that are born from sexual relations of men and

24  women are born within the institution of marriage as opposed to

25  outside of it?

 1           **MR. DUSSEAULT:**  Your Honor, I would object as to

 2   beyond the scope as to the purposes of marriage for Dr.

 3   Peplau's testimony.

 4           **THE COURT:**  Where are we going with this, Miss Moss?

 5           **MS. MOSS:**  Well, she has testified that gay and

 6   lesbians are similarly situated to heterosexuals.  And I'm

 7   simply going to ask her if, in fact, they are similarly

 8   situated with respect to accidentally having children or having

 9   children out of wedlock unintentionally.

10           **THE COURT:**  All right.  Why don't you ask that

11   question.

12   **BY MS. MOSS:**

13   **Q.**   Would you agree that gay and lesbian couples do not

14   accidentally have children?

15   **A.**   I would really just comment two things about that.

16           One is that except in places like Massachusetts, all

17   children born to lesbians or gay men or raised by lesbians or

18   gay men are out of wedlock, because the government doesn't

19   permit their parents to marry.

20           But if your question is, can two lesbians

21   spontaneously accidentally impregnate each other, not to my

22   knowledge.

23           (Laughter.)

24   **Q.**   It has to be planned; it has to be an intentional birth,

25   isn't that right?

1  **A.**    I believe that's correct.

2  **Q.**    And so for that specific purpose or that specific reason,

3  gay and lesbian couples are not fungible with heterosexual

4  couples; wouldn't you agree?

5  **A.**    "Fungible" is a funny term to use, but I would agree that

6  same-sex couples do not have accidental pregnancies.

7  **Q.**    Dr. Peplau, I'm going to ask you to turn to tab 11 in your

8  binder, if you would.  And this is the exhibit marked DIX-1230.

9  **A.**    Yes.

10  **Q.**    Do you recognize this?

11  **A.**    Yes.  This is a book review that I wrote of a book by

12  Esther Rothblum, an edited book, yeah.

13  **Q.**    A book entitled "Boston Marriages:  Romantic but Asexual

14  Relationships Among Contemporary Lesbians," is that right?

15  **A.**    That was the title of the book, yes.

16  **Q.**    And in your book review, you wrote that:

17          "A growing body of research suggests asexual

18          lesbian relationships are not uncommon."

19          Isn't that right?

20  **A.**    I would agree with that.  I don't know if I would -- I

21  agree with the statement that we have documented examples of

22  lesbian relationships that are not characterized by what the

23  general public thinks of asexuality; that is, sort of genital

24  sexual activities.

25          And elsewhere I have written about the fact that

1  sometimes we use definitions or criteria for sexuality that are

2  based on male sexuality.  Kind of assuming if there isn't a

3  penis involved or genital contact of some sort, that it's not a

4  sexual activity.

5       And one of the things that some lesbians report is

6  that other kinds of activities that might have a sexual

7  component, such as cuddling or kissing, are things that they

8  value, but that genital sex may not necessarily be a part of

9  their relationships.

10      **MS. MOSS:**  Your Honor, I would move DIX-1230 into

11  evidence.

12      **MR. DUSSEAULT:**  No objection.

13      **THE COURT:**  1230 is in.

14      (Defendants' Exhibit 1230 received in evidence.)

15 BY MS. MOSS:

16 **Q.**  Dr. Peplau, you are not presenting yourself here today as

17 an expert in the social meaning of marriage, are you?

18 **A.**  That's correct.

19 **Q.**  And --

20 **A.**  I think.  I'm not exactly sure what you mean by the

21 "social meaning."

22 **Q.**  Well, I'm referring to how the public views marriage.

23 **A.**  Well, I have cited data, for example, from the Gallup poll

24 saying that a very large number of Americans either are married

25 or tell you that they like -- they are planning to get married

1  at some point.  So in that sense, yes.

2         But I'm not a sociologist and I have not, you know,

3  conducted studies in which I have tried to assess the attitudes

4  of Americans about many different aspects of marriage.

5         Although, you know, the more we talk about it, the

6  more -- it really kind of depends.  I have done studies on

7  people's attitudes about the division of labor in marriage and

8  things like that.

9         But the -- if by "social meaning," you mean the sorts

10 of things sociologists might do, I'm not, by training, a

11 sociologist.

12 **Q.**   And you have offered various opinions on how you think the

13 public views marriage and understands marriage, but you have

14 not conducted any polls or any research into that specific

15 topic, have you?

16 **A.**   No.  I have relied on other sources of empirical data and

17 theory about it, and the Gallup poll is just one source of

18 things that I relied on.

19 **Q.**   We have already established that you have not done and are

20 -- you have not done any research into the relative benefits of

21 domestic partnerships as compared to either same-sex marriage

22 or heterosexual marriage, correct?

23 **A.**   I have not done that empirical research, no.

24 **Q.**   And the only empirical research study that you have

25 pointed to regarding the beneficial effects of marriage on

 1  same-sex couples is the Massachusetts survey that you

 2  referenced?

 3  **A.**    Yes.  I have drawn conclusions, of course, based on a much

 4  broader set of literatures on same-sex couples and on

 5  heterosexual couples and theories and so on.

 6          So I'm really drawing on, you know, a great knowledge

 7  base, but in terms of studies specifically of the effects of

 8  same-sex civil marriage, I have relied on the Ramos, et al

 9  paper.

10  **Q.**    So let's talk for a little bit about that study.

11  **A.**    Sure.

12  **Q.**    I believe you said on direct that you recognized that it's

13  not a representative -- it did not come from a representative

14  sample, isn't that right?

15  **A.**    That's correct.

16  **Q.**    And by that -- what do you mean when you say it's not a

17  representative sample?

18  **A.**    A representative sample would mean that it was reflective

19  of the entire population.  So if -- so if we wanted to do a

20  representative sample of couples, we would typically try to

21  find some way to access a list of all possible couples in a

22  certain category and then to sample every fifth one or

23  whatever.  It would be a representative sample.

24          This was a volunteer sample of people who were

25  contacted and chose to reply.  And the researchers themselves

1  acknowledge it and I acknowledge it.  So it really is telling

2  us about the opinions of 550, or thereabouts, people who got

3  married in Massachusetts.  And there may be different opinions

4  or similar opinions among the rest of the people who did not

5  get informed about the survey or chose not to answer.

6  **Q.**  And, in fact, we know a little bit about how they came up

7  with the sample for the survey, correct?

8       I mean, we know, for instance, that this particular

9  survey was recruited through a large gay rights advocacy group

10 in Massachusetts?

11 **A.**  Yes.  My understanding is that this survey was done

12 online; that it was an internet survey.  And they went to a

13 group that had a large email list and they assumed that among

14 that large email list, there would be some individuals or

15 couples who had gotten married.  And that was the way the

16 Department of Health of the State of Massachusetts chose to

17 collect information.

18 **Q.**  And so it was individuals who responded -- individuals

19 from this email list of this gay rights advocacy group who

20 responded and who self-identified as being in a marriage that

21 were sent the survey, and the data was gathered from those --

22 from their survey responses, correct?

23 **A.**  That's correct.

24 **Q.**  And we know from the survey responses that these volunteer

25 sample members who responded, that 40 percent of them listed as

1  one of the top three reasons why they got married was having

2  society know about gay and lesbian relationships, correct?

3  **A.**  I'm not sure that's the wording.  I thought the wording

4  was about legal recognition, but it's been awhile since I've

5  looked amount that specifically.  You may be more up on this

6  than I am.

7  **Q.**  Well, if you turn to -- if you return to tab 12 in your

8  binder?

9  **A.**  Yes.

10  **Q.**  And this is the Williams Institute survey.  I believe it's

11  already been admitted in evidence on your direct.

12  **A.**  Yes.

13  **Q.**  If you look at page five?

14  **A.**  Yes.

15  **Q.**  The authors of the survey say that -- and I'm looking at

16  the second full paragraph in that left-hand column, second

17  sentence.  It says:

18            "Four in ten reported wanting to have society

19            know about lesbian or gay relationships."

20  **A.**  I see.  It's the societal visibility that you are talking

21  about.

22  **Q.**  Exactly.  And then in the chart next to it, it says it

23  represents 40 percent of societal visibility of gay and lesbian

24  relationships.

25  **A.**  Okay.

1  **Q.**   So that was one of the top three reasons for why they got

2  married of 40 percent of the respondents of the survey; you

3  would agree with that, right?

4  **A.**   I would note they were asked multiple reasons, and the

5  first reason that was given by virtually almost everybody,

6  93 percent, was love and commitment.  And the second was legal

7  recognition of their relationship.  And then they give other

8  answers.

9            And you are quite right, that 40 percent of this

10 unrepresentative sample said that social visibility was one of

11 the reasons for them.

12 **Q.**   And some of the ways in which the sample was not

13 representative is that it was 90 percent white, isn't that

14 right?

15 **A.**   Yes.  I don't actually know what the -- what the

16 demographic characteristics of lesbians and gay men in

17 Massachusetts are; that is, I don't know what percentage of

18 lesbians and gay men are, in fact, white or not white in the

19 state.  So I --

20 **Q.**   Or in the United States?

21 **A.**   In the United States, it's certainly not -- United States

22 is not 90 percent white.

23 **Q.**   And the average age of the individuals who responded was

24 48 years old, isn't that right?

25 **A.**   Right.  And, again, I don't know -- I don't know what to

1    make out of that.  I mean, that was what they found, right.

2    Q.   And that -- that average age is significantly higher than

3    the average age of most same-sex couples in the United States;

4    isn't that right?

5    A.   I'm trying to -- you know, there may be data from the

6    census about what the average age of same-sex couples is in the

7    United States, but I don't know what those data are.

8             I really don't know how to make the comparisons that

9    you are driving at about, was this sample relatively older than

10   the gay and lesbian population of Massachusetts or not?  I

11   don't know the answer to that.

12   Q.   Now, we also know from the survey results that 85 percent

13   of the respondents had at least a college level education and

14   57 percent of the respondents had a graduate level education;

15   isn't that right?

16   A.   Right.  And those levels are high.  Lesbians and gay men

17   on average have higher levels of education than the general

18   public, but I think these are probably higher.

19   Q.   And we also know that 52 percent of the survey respondents

20   earned a combined household income of more than 110,000, isn't

21   that right?

22   A.   And, you know, when we say a sample is not representative,

23   part of what we mean is that it differs or it might differ, it

24   has the potential for differing, from a fully representative

25   sample of the state.

1              And that's really why when I talked about these

2    data -- and I hope I was very clear about this -- I was not

3    trying to generalize that these would be the experiences of

4    every lesbian or gay man who got married in Massachusetts, but,

5    rather, that this tells us about the experience of some

6    citizens of Massachusetts who were married.

7    **Q.**    I --

8    **A.**    I think that's what you can claim based -- I think that's

9    what you can say based on this study.

10   **Q.**    And, Dr. Peplau, in terms of how the survey was conducted,

11   it was based on self-reporting by these individuals, correct?

12   **A.**    Survey studies are self-report studies.

13   **Q.**    By nature?

14   **A.**    It means you ask people a question and they answer, and

15   this is no different.

16   **Q.**    And like all surveys then, they are open to self-reporting

17   bias, correct?

18   **A.**    We trust that people tell us, you know, honest answers

19   and -- but, you know, they are telling us.  We are taking their

20   word for it and that's kind of the nature of doing that kind of

21   research.

22   **Q.**    And we don't know from the face of this document what, if

23   anything, was done to control for possible self-reporting

24   biases with this survey, do we?

25   **A.**    I don't believe they discussed that issue in this report.

1  **Q.**   And so to the extent that it may be more representative of

2  individuals who are happy with their marriage than the average,

3  we have no way to know that, do we?

4  **A.**   No.  You know, in general relationship researchers have

5  worried about this question, about if we ask for volunteer

6  samples for a study, are we more likely to get happy couples

7  who want to brag about their relationship or miserable couples

8  who want to complain about their partner?

9       It really seems very plausible that you can get both.

10  And in this case we really don't -- we don't know.

11  **Q.**   But we do know that the recruitment came through a gay

12  advocacy organization, correct?

13  **A.**   Correct.

14  **Q.**   And we do know that 40 percent of the respondents to the

15  survey identified as one of the top three reasons they got

16  married, having their relationship more visible, gay and

17  lesbian relationships be more visible, correct?

18  **A.**   Right.  So, you know, so -- the debate about same-sex

19  marriage is something that is widely talked about in this

20  country and in gay communities.

21       And so it wouldn't surprise me that in a state

22  that -- one of the first states to permit same-sex marriage,

23  that it would occur to same-sex couples, particularly those who

24  are more socially engaged or active, that part of what they

25  were doing was participating in a private activity that was

1   going to be known to other people.

2          So it doesn't particularly surprise me that they

3   might have given that answer, given the social climate of the

4   times and the novelty of marriage for same-sex couples in

5   Massachusetts.

6   **Q.**   And so that those facts tell us about -- something about

7   the individuals that chose to respond to the survey, or they

8   may tell us something about the individuals that chose to

9   respond to the survey, correct?

10  **A.**   They tell us about the experiences reported by the people

11  who took the survey, yeah.

12  **Q.**   Now, Dr. Peplau, on direct and in your expert report you

13  have order offered the opinion that in your view allowing

14  same-sex marriage will not harm heterosexual marriage.

15         And you specifically focused on whether it will cause

16  increased divorce rates, isn't that right?

17  **A.**   That was one of the things I talked about, yes.

18  **Q.**   You have not offered opinions or undertaken an extensive

19  analysis about whether or not it might harm the institution of

20  marriage, separate and apart from individual heterosexual

21  couple's relationships, isn't that right?

22  **A.**   The issues I have been centrally interested in are entry

23  into marriage and exiting from marriage through divorce or

24  dissolution.

25         I think those issues speak in very important ways to

1  the institution of marriage and its health and how robust it

2  is, but there are certainly other aspects of the institution of

3  marriage that I do not address in my expert statement, and

4  that's true.

5  **Q.**  Now, Dr. Peplau, I want to direct your attention for a

6  moment to the statement you make on page 11 of your expert

7  report.  And you can find that behind tab one in your binder.

8  **A.**  Okay.  It's page 11, did you say?

9  **Q.**  In page 11 of your expert report, and it's tab one.

10  **A.**  Okay.

11  **Q.**  Specifically, I'm looking at the second paragraph under

12  the heading, the "A" heading.  About halfway down you write:

13          "Public acceptance of divorce has increased,

14           as has the social acceptability of unmarried

15           cohabitation.  Some scholars also suggest

16           that a growing emphasis on individualism and

17           personal fulfillment has eroded an earlier

18           emphasis on the importance of obligation and

19           commitment in marriage."

20          Do you see that?

21  **A.**  Yes, I do.

22  **Q.**  And another reason you cite that contributes to the

23  current divorce rates is that:

24          "State no-fault divorce laws make it easier

25           for spouses to end their relationships."

1     Correct?

2  **A.**    What I was talking about here was analyses that family

3  researchers and historians and sociologists and others have

4  done to try to understand factors that led to an increase in --

5  a dramatic increase in the twentieth century in the divorce

6  rate in the U.S., a divorce rate that peaked in the 80's and

7  has kind of leveled off or decreased since then.

8          So this is really an analysis of factors during -- a

9  reasonably long period that contributed to a fairly high

10 divorce rate in the United States.

11 **Q.**    And those factors include a growing emphasis on

12 individualism and personal fulfillment?

13 **A.**    That's one of the factors that's been suggested by

14 scholars who have studied this.  And part of what they have

15 suggested is that in earlier times when a more important part

16 of marriage might have been marriage as an economic unit in

17 which two people came together as a way, sort of, to meet basic

18 needs for survival, that over time we have come to expect

19 personal fulfillment through marriage; that marriage is not

20 only the place where our laundry is done and someone pays the

21 bills, but marriage is also the place where we develop our

22 personal potential and so on.

23         And it's been suggested that this increasing emphasis

24 among some individuals in what's been called individualism has

25 in some ways set very high expectations for marriage; that now

1    it's not enough for a married partner to treat you well and be

2    kind and thoughtful, but you have to also be able to develop a

3    relationship in which you find your soulmate and which -- so

4    the suggestion has been that shifting American values about

5    individualism may have been one of many factors that

6    contribute.

7            And the reason I talked about these factors was

8    because none of these factors is linked or is due to the gay

9    civil rights moment.  That was really the point I was -- one of

10   the points I was trying to make, was that the increase in the

11   divorce rate was independent of the push for marriage equality

12   for same-sex couples.

13   **Q.**   Now, looking at -- turning to page 13 of your expert

14   report where you have a chart that, I think, lists or sets

15   forth the divorce statistics in Massachusetts that you were --

16   that you spoke of on direct, you have four years worth of data

17   listed, is that right?

18   **A.**   The four years before same-sex marriage and then the four

19   years starting with --

20   **Q.**   And the four years after?

21   **A.**   Yeah.

22   **Q.**   And you would agree that this is not a tremendously large

23   amount of data from which to draw conclusions; isn't that

24   right?

25   **A.**   It's a total of eight years of data.  You know, I don't

1    know what large or small would mean in this capacity.

2              It's only four years since marriage began because

3    that's -- those are the most recent government statistics

4    available.

5    **Q.**   And as we look at them in Massachusetts, we see that in

6    2004 -- of all of the years listed, in 2004 there was the

7    highest marriage rate, correct?

8    **A.**   Correct.

9    **Q.**   6.5 percent?

10   **A.**   Correct.

11   **Q.**   And it went down in 2005 to 6.2 percent?

12   **A.**   Yes.

13   **Q.**   And it went down to 5.9 percent in 2006.  Stayed at 5.9

14   percent for 2007, and we don't know 2008 and 2009 based on the

15   evidence that you have put in; isn't that right?

16   **A.**   What I would -- your reading of these numbers is quite

17   correct.  What I would comment about is that if you look at

18   these kinds of data -- not just in Massachusetts, but in other

19   states -- what you see is that there are always year-to-year

20   minor fluctuations.

21             And so that's why when I looked at these data, my

22   interpretation of them is really an interpretation of no

23   change, because the fact that the rate goes up two percent --

24   .2 percent one year or down, you know, a small fraction of a

25   percent the next, I think is kind of haphazard variation in the

1  data, and I don't take those as necessarily serious indicators

2  of anything.

3        To me, these -- what stands out to me is aside from

4  what looks like the impact of gay people getting married the

5  first year, increasing that number, the numbers just kind of

6  look the same to me.

7  **Q.**  Have you undertaken a comprehensive analysis of the

8  marriage and divorce rates in the neighboring states to

9  Massachusetts?

10  **A.**  No, I have not.

11  **Q.**  How about nationally?  You have not done a comprehensive

12  analysis of what the divorce rates during this time frame were

13  nationally either, have you?

14  **A.**  No.  The only point I was trying to make here was that

15  Massachusetts is a state that permits civil same-sex marriage,

16  and that it would be informative to look at in that state what

17  the patterns were leading up to -- prior to same-sex marriage

18  and following.  I don't make any claims beyond that about what

19  these data show.

20  **Q.**  And looking just for a moment at the divorce rate starting

21  in 2004, the year that same-sex marriage was allowed in

22  Massachusetts, the data, as you present it, 2.2 percent in

23  2004, 2.2 percent in 2005, 2.3 in 2006 and 2.3 in 2007.  So

24  going up slightly in 2006 and 2007, correct?

25  **A.**  And still winding up lower than they had been in the four

1  years preceding the introduction of same-sex marriage.

2          So, I mean, I -- we can try to make something out of

3  a difference between .3 -- you know, 2.3 and 2.4.  But I think

4  given the fact that these numbers bounce around a little bit in

5  all states across years, that I was certainly not claiming that

6  the divorce rate went down as a result of same-sex marriage.

7          But if we want to look at minor variations in

8  divorce, the average divorce rate is lower after same-sex

9  marriage than before, but I interpret it as really the same.

10 Q.   And, again, I don't know if it shows a pattern or not

11 either.  We have four years and you would agree you have got

12 four years, including the year when same-sex marriage was

13 allowed in Massachusetts, and we have that year through 2007

14 and that's the data that we have?

15 A.   Correct.

16 Q.   And you would agree that it would be helpful to have

17 several more additional years worth of data to be able to draw

18 conclusions one way or the other, wouldn't you?

19 A.   I'm sure we will have those data soon.

20 Q.   I'm sure we will.

21          And just to finish up, Dr. Peplau, as to whether

22 same-sex marriage will have any effect on public attitudes

23 towards individualism or commitments over time, you can only

24 speculate about that issue because you have not actually done

25 any study of it, isn't that right?

1  **A.**    Well, the issue is, do I think that -- I'm sorry.  It may

2  be late in the day.  Could you repeat the question?

3  **Q.**    Sure.  Whether same-sex marriage will have any effect on

4  public attitudes towards individualism or commitment over time

5  is something you can only speculate about because you have not

6  studied it and know of no studies, isn't that right?

7  **A.**    So the question is, do I think that permitting same-sex

8  marriage might over time lead Americans to become more or less

9  individualistic, or do I think it might lead them to value

10  commitment more or less over time?  Is that the question?

11  **Q.**    Well, really, have you studied that issue so -- where you

12  can offer an expert opinion on it?

13  **A.**    My general opinion, my overarching opinion that same-sex

14  marriage will not cause harm, is based on my consideration of a

15  lot of research on marriage, on same-sex couples, our

16  understanding of theories and so on.

17          And all of the evidence and the theories I know and

18  can think of are on the side of saying no harm.

19          And then on the side of what theory might there be

20  about why there would be harm or what data might there be to

21  suggest harm, there is nothing.  So it's kind of like this

22  (indicating).

23          And so I have great confidence in that conclusion,

24  but it is the case that that -- that that opinion of mine is

25  not based on my having done an empirical study over time of

1    same-sex marriage will or won't influence the public's

2    attitudes about individualism or commitment.

3              **MS. MOSS:**  Thank you.  One moment.

4              **THE COURT:**  Very well.  Any redirect, Mr. Dusseault?

5              **MR. DUSSEAULT:**  Yes, your Honor.  Very briefly.

6                        <u>**REDIRECT EXAMINATION**</u>

7    **BY MR. DUSSEAULT:**

8    **Q.**    Dr. Peplau, Ms. Moss asked you some questions at the

9    beginning of cross-examination about enforceable trust and

10   whether there was enforceable trust in a domestic partnership;

11   do you recall that?

12   **A.**    Yes, I do.

13   **Q.**    Do you have a view as to whether there is a greater degree

14   of enforceable trust in a marriage than a domestic partnership?

15   **A.**    I think it would be greater in marriage.

16   **Q.**    Ms. Moss also asked you about barriers to exit and whether

17   there were barriers to exit in domestic partnership; do you

18   recall that?

19   **A.**    Yes, I do.

20   **Q.**    Do you have an opinion as to whether there are greater

21   barriers to exit from marriage than from domestic partnerships?

22   **A.**    I believe there are greater barriers in marriage.

23   **Q.**    Ms. Moss asked you about a piece of work from 1985 that's

24   at Tab 4 of your binder, Exhibit 1233, talking about

25   exclusivity.  Do you recall that?

1   A.   Yes.

2   Q.   So that's something that was done 25 years ago?

3   A.   Yes.

4   Q.   And 25 years ago there was no marriage available for

5   same-sex couples, correct?

6   A.   Correct.  Nor were their domestic partnerships.

7   Q.   So any information that you gleaned in that study had

8   nothing to do with the behavior of couples in marriages,

9   correct?

10  A.   That's correct.

11  Q.   And do you know in California, is there any restriction on

12  the ability of a heterosexual couple that doesn't want to be

13  exclusive to marry?

14  A.   No.  There is no restriction.

15  Q.   I'm a bit reluctant to take you back to Belgium, but I had

16  one question.

17          (Laughter.)

18  Q.   Actually maybe two.

19          Why don't we start with the U.S.  Why is it that you

20  focused on the U.S. rather than other countries?

21  A.   We were talking about possible changes to the law in

22  California and in the United States.  And it seems to me that

23  the most directly relevant information is what's happened in

24  another state within our own country.

25  Q.   Now, Ms. Moss asked you about -- it was a hypothetical,

1  but there were some figures drawn from data where she was

2  suggesting that 43 percent of heterosexual couples in the

3  country were married and five percent of same-sex couples were

4  married.

5       Do you have any idea in that hypothetical or that

6  data whether the 43 percent of heterosexual couples included

7  all the heterosexual couples that had been married in all the

8  time that heterosexual marriage had been allowed?

9  A.   My understanding, but I don't trust it, is that it's -- it

10 was really the percent of individuals who are currently

11 married.

12 Q.   And do you know how long opposite-sex marriage has been

13 lawful in the Netherlands or Belgium?

14 A.   I assume for a long time.

15 Q.   Ms. Moss asked you some questions about a growing emphasis

16 on individualism and personal fulfillment, and sometimes that's

17 put in contrast to, let's say, concern for child welfare.

18      Has your study of relationships, Dr. Peplau,

19 suggested in any way that same-sex couples have a greater

20 emphasis on individualism and personal fulfillment than

21 opposite-sex couples?

22 A.   No.

23 Q.   Has your work suggested that same-sex couples have any

24 less concern for the well-being of children they may be raising

25 than opposite sex couples?

PEPLAU - REDIRECT EXAMINATION / DUSSEAULT

1  **A.**   No.

2  **Q.**   Lastly, Ms. Moss asked you some questions about

3  Massachusetts and the need for some more data.

4         Do you feel that you need more data from

5  Massachusetts to form an opinion as to whether allowing

6  same-sex couples to marry would either lead heterosexual

7  couples not to marry or to exit their marriage?

8  **A.**   I don't, because my opinion is based on so much more than

9  simply the Massachusetts data.

10  **Q.**   Thank you very much.  I have no further questions, Dr.

11  Peplau.

12         **THE COURT:**  Very well.  Ms. Peplau, you may step

13  down.  Thank you for your testimony.

14  **A.**   Thank you, your Honor.

15         (Witness excused.)

16         **THE COURT:**  And we are, I think, ready to adjourn for

17  today.  We will recommence at 8:30 in the morning.

18         As you may know, the Supreme Court has given us some

19  guidance with respect to part of the issue.  It seems to be a

20  rather limited guidance at the moment.

21         So we may have issues beyond remote access to these

22  proceedings by other courthouses that we'll have to take up at

23  some point.

24         My inclination, without hearing from counsel and

25  getting their advice, is that we put that issue to the side for

1  the time being and proceed with the trial.  We seem to be

2  moving along well and I don't want to do anything to alter the

3  progress that we are making in these proceedings, but we may,

4  indeed, have to address those issues at some later time.

5          So we will not have remote access to these

6  proceedings from other courthouses in the Ninth Circuit and

7  elsewhere in the Federal Judiciary, but we'll have to deal with

8  the other issues in due time.

9          Now, Mr. Cooper, I understand from the clerk that you

10  asked about the responses to the proposed -- or the change in

11  the local rule and the responses with reference to broadcasting

12  or webcasting these proceedings.

13          And the ones that we have received are all in the

14  jury room.  I believe you or your colleagues have had an

15  opportunity to review them, is that correct?

16      **MR. COOPER:**  I do understand that they are in the

17  jury room available for inspection, and I believe that some of

18  my colleagues have -- have taken advantage of that fact.  I

19  don't have a report for you in terms of whether -- whether that

20  review is complete.

21      **THE COURT:**  Well, there are quite a number.  There

22  are quite a number.  So I can well imagine that maybe you

23  haven't or your colleagues have not had a chance to review them

24  all.

25          My understanding from the clerk was that you or

PROCEEDINGS

```
 1   someone on your team had requested to copy some of them.

 2            MR. COOPER:  You are better informed than I am.

 3            THE COURT:  I see.  Well, maybe you should chat with

 4   your colleagues.

 5            My initial reaction is, I will be guided by whatever

 6   you advise.  I am inclined to think that we should either copy

 7   all or none or make -- make them all part of the record, if

 8   that's necessary; but in view of the volume, I just really

 9   wonder what value they may have for these proceedings, but --

10            MR. COOPER:  Well, the Court has put on the record

11   the selection of the comments that the Court has found

12   relevant.

13            THE COURT:  Those are for organizations.  Those are

14   lawyer organizations, and I put all of those on, but none of

15   the individual comments.

16            MR. COOPER:  Well, I frankly don't know what's in

17   this.  I haven't -- I haven't received a report.

18            But if we do conclude that there is something in

19   those comments that we would like to ask the Court to put on

20   the public record, we will try to make that determination

21   promptly.

22            THE COURT:  All right.  That's fine.  Anything

23   further at the moment before we adjourn?

24            Ms. Stewart?

25            MS. STEWART:  Your Honor, if I might.  I wanted to
```

1   make sure that the excerpts from the Tam deposition that we

2   played this morning did get in the record.  I know that -- or

3   I'm told that they weren't actually transcribed.

4          And so I know we didn't complete them, but insofar as

5   we got part way through, I would like to make sure those

6   deposition excerpts are part of the record and the documents

7   that were with them.

8          THE COURT:  Well, it would be helpful if you would

9   supply the page and line reference to those depositions so the

10  reporter could note that in the record.

11         MS. STEWART:  We will happily do that, your Honor.  I

12  will do that first thing in the morning because I need to check

13  how far we got with my colleagues.

14         THE COURT:  All right.  If you could check on that,

15  as Mr. Cooper is checking with his colleagues.

16         Who is our first witness tomorrow?

17         MS. VAN AKEN:  Your Honor, that would be Ed Egan.

18         THE COURT:  I beg your pardon?

19         MS. VAN AKEN:  Edmund A. Egan.

20         THE COURT:  Mr. Egan?

21         MS. VAN AKEN:  Yes.

22         THE COURT:  All right.  And he will be followed by?

23         MR. DUSSEAULT:  Dr. Ilan Meyer.

24         THE COURT:  All right.  And I suppose we can get

25  through three of these folks tomorrow at least.

PROCEEDINGS

1          **MR. BOIES:**  We believe we will, your Honor.

2          **THE COURT:**  Who is the third one then, Mr. Boies?

3          **MR. BOIES:**  The third one will be Ms. Zia.  And we

4  also have deposition designations in case we don't have -- we

5  also have deposition designations in case we get through with

6  all three of those people.  We actually hope that those three

7  will not take the whole day.  We are trying to move as quickly

8  as possible.

9          **THE COURT:**  Ms. Zia you mentioned.

10          **MR. BOIES:**  Yes.

11          **THE COURT:**  Good.  Well, that would be good progress.

12  And we are moving along, which is what we all want to do.

13              All right.  I will look forward to seeing everybody.

14              (Whereupon at 4:12 p.m. further proceedings

15               in the above-entitled cause was adjourned

16               until Thursday, January 14, 2010 at 8:30 a.m

17

18

19                              -   -   -   -

20

21

22

23

24

25

1                              <u>**I N D E X**</u>

2    <u>**PLAINTIFFS' WITNESSES**</u>                          <u>**PAGE**</u>   <u>**VOL.**</u>

3    **CHAUNCEY, GEORGE**
     Cross Examination Resumed by Mr. Thompson      464     3
4    Redirect Examination by Ms. Stewart            528     3

5    **PEPLAU, LETITIA ANNE**
     (SWORN)                                        568     3
6    Direct Examination by Mr. Dusseault            568     3
     Cross Examination by Ms. Moss                  606     3
7    Redirect Examination by Mr. Dusseault          658     3

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2   PLAINTIFFS' EXHIBITS          IDEN   VOL.   EVID   VOL.

3   168                                         544     3
    170                                         546     3
4   301                                         542     3
    513                                         554     3
5   514, 515                                    559     3
    516                                         556     3
6   754                                         604     3
    765                                         589     3
7   781                                         582     3
    787                                         595     3
8   847 - 859                                   463     3
    861                                         463     3
9   863                                         463     3
    864                                         463     3
10  868                                         463     3
    872                                         463     3
11  873                                         463     3
    874                                         463     3
12  876                                         463     3
    877                                         463     3
13  878                                         463     3
    879                                         463     3
14  880                                         463     3
    881                                         463     3
15  882                                         463     3
    909                                         577     3
16  913                                         582     3
    921                                         593     3
17  937                                         582     3
    938                                         576     3
18  942                                         593     3
    943                                         488     3
19  959                                         599     3
    964                                         582     3
20  1043                                        582     3
    1050                                        593     3
21  1054                                        593     3
    1130                                        593     3
22  1137                                        593     3
    1142                                        593     3
23  1143                                        616     3
    1144                                        593     3
24  1145                                        606     3

25  (Exhibits continued on next page)
```

**EXHIBIT INDEX (CONTINUED):**

| PLAINTIFFS' EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1150 | | | 593 | 3 |
| 1151 | | | 606 | 3 |
| 1166 | | | 593 | 3 |
| 1171 | | | 582 | 3 |
| 1173 | | | 582 | 3 |
| 1195 | | | 606 | 3 |
| 1231 | | | 593 | 3 |
| 1234 | | | 593 | 3 |
| 1236 | | | 593 | 3 |
| 1245 | | | 593 | 3 |
| 1245 | | | 621 | 3 |
| 1250 | | | 582 | 3 |
| 1254 | | | 582 | 3 |
| 1474 | | | 582 | 3 |
| 1775A | 462 | 3 | | |
| 2281 | | | 463 | 3 |
| 2322 | | | 463 | 3 |
| 2329 | | | 573 | 3 |
| 2337 | | | 463 | 3 |
| 2648 | | | 501 | 3 |

| DEFENDANTS' EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1230 | | | 642 | 3 |
| 1233 | | | 620 | 3 |
| 2427, 2427a | | | 626 | 3 |
| 2430 | | | 638 | 3 |
| 2644, 2644a | | | 627 | 3 |

1

2

3                    **CERTIFICATE OF REPORTERS**

4          We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

5  Official Reporters for the United States Court, Northern

6  District of California, hereby certify that the foregoing

7  proceedings in C 09-2292 VRW, **Kristin M. Perry, et al. vs.**

8  **Arnold Schwarzenegger, in his official capacity as Governor of**

9  **California, et al**., were reported by us, certified shorthand

10  reporters, and were thereafter transcribed under our direction

11  into typewriting; that the foregoing is a full, complete and

12  true record of said proceedings at the time of filing.

13

14          _____ /s/ Katherine Powell Sullivan _____

15

16        Katherine Powell Sullivan, CSR #5812, RPR, CRR
                      U.S. Court Reporter

17

18          _____ /s/ Debra L. Pas _____

19          Debra L. Pas, CSR #11916, RMR CRR
                      U.S. Court Reporter

20

21            Wednesday, January 13, 2010

22

23

24

25