Volume 4

Pages 670 - 990

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

KRISTIN M. PERRY,                        )
SANDRA B. STIER, PAUL T. KATAMI,         )
and JEFFREY J. ZARRILLO,                 )
                                         )
              Plaintiffs,                )
                                         )
VS.                                      ) NO. C 09-2292-VRW
                                         )
ARNOLD SCHWARZENEGGER, in his            )
official capacity as Governor of         )
California; EDMUND G. BROWN, JR.,        )
in his official capacity as              )
Attorney General of California;          )
MARK B. HORTON, in his official          )
capacity as Director of the              )
California Department of Public          )
Health and State Registrar of            )
Vital Statistics; LINETTE SCOTT,         )
in her official capacity as Deputy       )
Director of Health Information &         )
Strategic Planning for the               )
California Department of Public          )
Health; PATRICK O'CONNELL, in his        )
official capacity as                     )
Clerk-Recorder for the County of         )
Alameda; and DEAN C. LOGAN, in his       )
official capacity as                     )
Registrar-Recorder/County Clerk          )
for the County of Los Angeles,           )
                                         ) San Francisco, California
              Defendants.                ) Thursday
_____ ) January 14, 2010

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:** *Katherine Powell Sullivan, CRR, CSR 5812*
*Debra L. Pas, CRR, CSR 11916*
*Official Reporters - U.S. District Court*

**APPEARANCES**:

**For Plaintiffs:**
                  GIBSON, DUNN & CRUTCHER LLP
                  1050 Connecticut Avenue, N.W.
                  Washington, D.C. 20036-5306
        BY: **THEODORE B. OLSON, ESQUIRE**
             **MATTHEW D. MCGILL, ESQUIRE**

                  GIBSON, DUNN & CRUTCHER LLP
                  333 South Grand Avenue
                  Los Angeles, California  90071-3197
        BY: **THEODORE J. BOUTROUS, JR., ESQUIRE**
             **CHRISTOPHER D. DUSSEAULT, ESQUIRE**

                  GIBSON, DUNN & CRUTCHER LLP
                  555 Mission Street, Suite 3000
                  San Francisco, California  94105-2933
        BY: **ETHAN D. DETTMER, JR., ESQUIRE**
             **ENRIQUE A. MONAGAS, ESQUIRE**
             **SARAH E. PIEPMEIER, ESQUIRE**

                  BOIES, SCHILLER & FLEXNER LLP
                  333 Main Street
                  Armonk, New York 10504
        BY: **DAVID BOIES, ESQUIRE**

                  BOIES, SCHILLER & FLEXNER LLP
                  575 Lexington Avenue, 7th Floor
                  New York, New York  10022
        BY: **JOSHUA I. SCHILLER, ESQUIRE**

                  BOIES, SCHILLER & FLEXNER LLP
                  1999 Harrison Street, Suite 900
                  Oakland, California  94612
        BY: **JEREMY MICHAEL GOLDMAN, ESQUIRE**
             **STEVEN C. HOLTZMAN, ESQUIRE**

**For Plaintiff-**
**Intervenor:**
                  CITY AND COUNTY OF SAN FRANCISCO
                  OFFICE OF THE CITY ATTORNEY
                  One Drive Carlton B. Goodlett Place
                  San Francisco, California 94102-4682
        BY: **THERESE STEWART, DEPUTY CITY ATTORNEY**
             **DANNY CHOU**
             **CHRISTINE VAN AKEN**
             **RONALD P. FLYNN**
             **MOLLIE M. LEE**
             **DEPUTY CITY ATTORNEYS**

              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES (CONTINUED):**

**For Defendant**        MENNEMEIER, GLASSMAN & STROUD
**Gov. Schwarzenegger:**  980 9th Street, Suite 1700
                     Sacramento, California  95814-2736
         **BY:**  **ANDREW WALTER STROUD, ESQUIRE**

**For Defendant**        STATE ATTORNEY GENERAL'S OFFICE
**Edmund G. Brown Jr.:**  455 Golden Gate Avenue, Suite 11000
                     San Francisco, California  94102-7004
         **BY:**  **TAMAR PACHTER, DEPUTY ATTORNEY GENERAL**

                     STATE OF CALIFORNIA
                     Department of Justice
                     Office of the Attorney General
                     1300 I Street, 17th Floor
                     Sacramento, California 95814
         **BY:**  **GORDON BURNS, DEPUTY SOLICITOR GENERAL**

**For Defendant-**       COOPER & KIRK
**Intervenors:**       1523 New Hampshire Avenue, N.W.
                     Washington, D.C.  20036
         **BY:**  **CHARLES J. COOPER, ESQUIRE**
               **DAVID H. THOMPSON, ESQUIRE**
               **HOWARD C. NIELSON, JR., ESQUIRE**
               **NICOLE MOSS, ESQUIRE**
               **PETER A. PATTERSON, ESQUIRE**

                     ALLIANCE DEFENSE FUND
                     15100 North 90th Street
                     Scottsdale, Arizona 85260
         **BY:**  **BRIAN W. RAUM, SENIOR COUNSEL**

                     ALLIANCE DEFENSE FUND
                     801 G Street NW, Suite 509
                     Washington, D.C.  20001
         **BY:**  **JORDAN W. LORENCE, ESQUIRE**

**For Defendant**        OFFICE OF LOS ANGELES COUNTY COUNSEL
**Dean C. Logan:**     500 West Temple Street, Room 652
                     Los Angeles, California 90012
         **BY:**  **JUDY WHITEHURST, DEPUTY COUNTY COUNSEL**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES (CONTINUED):**

**For Defendant**
**Patrick O'Connell:**     OFFICE OF ALAMEDA COUNTY COUNSEL
                      1221 Oak Street, Suite 450
                      Oakland, California  94612
            BY:  **CLAUDE F. KOLM, DEPUTY COUNTY COUNSEL**
                **MANUEL MARTINEZ, DEPUTY COUNTY COUNSEL**

**For Mr. Garlow,**      AMERICAN CENTER FOR LAW & JUSTICE
**Mr. McPherson:**      11 West Chestnut Hill Road
                      Litchfield, Connecticut  06759
            BY:  **VINCENT P. MCCARTHY, ESQUIRE**

—  —  —  —

1                        **P R O C E E D I N G S**

2   **JANUARY 14, 2010**                                      **8:42 A.M.**

3

4          **THE COURT:**  Very well.  Good morning, Counsel.

5          (Counsel greet the Court.)

6          **THE COURT:**  Let's see.  First order of business, I

7   have communicated to judge -- Chief Judge Kozinski, in light of

8   the Supreme Court's decision yesterday, that I'm requesting

9   that this case be withdrawn from the Ninth Circuit pilot

10  project.  And he indicated that he would approve that request.

11  And so that should take care of the broadcasting matter.

12         And we have motions that have been filed on behalf of

13  Mr. Garlow and Mr. McPherson.  And the clerk informs me counsel

14  for those parties are here present.

15         **MR. MCCARTHY:**  Correct, Your Honor.

16         **THE COURT:**  All right.  Fine.

17         **MR. MCCARTHY:**  Vincent McCarthy, Your Honor.  I was

18  admitted pro hac vice into this court very recently.

19         **THE COURT:**  Yes.  I believe I signed that yesterday,

20  or the day before.

21         **MR. MCCARTHY:**  I understand.

22         **THE COURT:**  Well, welcome.

23         **MR. MCCARTHY:**  Thank you.

24         **THE COURT:**  You've got quite a lineup of lawyers

25  here.

1          **MR. MCCARTHY:**  I understand, yes.

2          **THE CLERK:**  Can you use the microphone, please.

3          **MR. MCCARTHY:**  Sorry.

4          I wanted to ask for Your Honor's guidance as to -- I

5  spoke to counsel for the plaintiffs, and they said they

6  wouldn't be calling my clients until at least next week.  And I

7  wanted to know if Your Honor knew when he was going to make the

8  decision on our motion to quash, because I wanted to remain for

9  that if it's going to be made now.

10          If Your Honor is going to wait until the witnesses

11  are called, I'll just go back to my office and then return at

12  that time.

13          **THE COURT:**  Mr. Boutrous, are you handling this for

14  the plaintiffs?

15          **MR. BOUTROUS:**  Yes, Your Honor.

16          Your Honor, in discussions with counsel I suggested

17  that once we have had a chance to review the documents being

18  produced in this rolling production by the proponents, we would

19  have the universe of documents relating to his clients.

20          We would try to work out with the proponents an

21  agreement that would allow us not to have to call Counsel's

22  clients to testify and authenticate the documents.  That's the

23  main reason that we would need them.

24          And we have several documents that we have now found

25  in this new production that relate to those individuals who

PROCEEDINGS

1  filed motions to quash.  And what I propose is, we look at the

2  documents, we'd figure it out, talk to the proponents' counsel,

3  see if we could work out an arrangement that would allow us

4  simply to move them into evidence without the -- these

5  individuals having to come and testify.

6         THE COURT:  As a consequence, you may be able to

7  handle this matter between yourselves.

8         MR. BOUTROUS:  In short, yes.

9         THE COURT:  All right.

10        MR. BOUTROUS:  Thank you, Your Honor.

11        So we will be in touch, and then if we need to come

12  back, we'll do it Tuesday.

13        THE COURT:  If you need to come back, alert Counsel.

14  And let the clerk know when you need to see us, and we will

15  take care of the matter.

16        MR. BOUTROUS:  Thank you, Your Honor.

17        THE COURT:  I appreciate it.

18        MR. MCCARTHY:  Thank you very much, Your Honor.

19        THE COURT:  All right.  Let's see.  We are ready, I

20  believe, with the next witness.  And you indicated who that

21  witness is.

22        MS. VAN AKEN:  Yes.

23        THE COURT:  And who is going to be presenting him?

24        MS. VAN AKEN:  Dr. Edmund Egan, Your Honor.

25        And my name is Christine Van Aken.

PROCEEDINGS

```
1              THE COURT:  Ms. Rediken?

2              MS. VAN AKEN:  Van Aken.  V-a-n A-k-e-n.

3              THE COURT:  All right.  Please, call your witness.

4              MS. VAN AKEN:  Plaintiffs and plaintiff-intervenors

5    call -- plaintiff-intervenor calls Dr. Edmund A. Egan to

6    testify.

7              THE CLERK:  Raise your right hand, please.

8                        EDMUND EGAN,

9    called as a witness for the Plaintiffs herein, having been

10   first duly sworn, was examined and testified as follows:

11             THE WITNESS:  I do.

12             THE CLERK:  Thank you.  State your name, please.

13             THE WITNESS:  My name is Edmund A. Egan.

14             THE CLERK:  And spell your last name.

15             THE WITNESS:  E-g-a-n.

16             THE CLERK:  Thank you.

17                    DIRECT EXAMINATION

18   BY MS. VAN AKEN:

19   Q.   Good morning, Dr. Egan.

20   A.   Good morning.

21   Q.   I'm going to publish a slide that summarizes -- it's a

22   simple demonstrative slide of some of your credentials.  And

23   then we'll talk about those.

24             (Document displayed)

25             Dr. Egan, what is your current position?
```

1  **A.**    I'm the chief economist in the Controller's Office in

2  San Francisco.

3             (Document displayed.)

4  **Q.**    And what is your role, briefly, in that position?

5  **A.**    I direct the Office of Economic Analysis, which is a

6  division within the Controller's Office, and is responsible for

7  preparing economic impact analysis of pending legislation.

8  **Q.**    Dr. Egan, we'll talk more about that experience and that

9  role in a little while, but tell me a little bit more about

10 your prior professional experience in the area of urban and

11 regional economic policy.

12 **A.**    Immediately before joining San Francisco, the City and

13 County, in 2007, I worked for a consulting form known as ICF

14 International, where I did a number of consulting projects

15 related to economic development strategy and analysis in North

16 America and globally.

17 **Q.**    Can you give me a couple of examples, Dr. Egan.

18 **A.**    In the late 1990s, for example, I worked on the economic

19 development strategy for the City of Toronto.

20             And just before joining San Francisco, I worked as a

21 consultant on the City of San Francisco's economic development

22 plan.

23 **Q.**    Have you ever taught at the university level, Dr. Egan?

24 **A.**    Yes, I have.

25 **Q.**    And can you tell me about that experience, please.

1   **A.**   I'm currently an adjunct faculty member at the University

2   of California at Berkeley.  I teach city and regional planning.

3   I teach in the city and regional planning department at that

4   university.

5   **Q.**   Do you teach undergraduates, Dr. Egan?

6   **A.**   I teach graduates students.

7   **Q.**   And speaking generally, what kinds of courses do you

8   teach graduate students at UC Berkeley?

9   **A.**   I teach in the field of regional economic development and

10  in urban and city regional planning departments.  Since fall of

11  2004, each fall I've taught a course called the "Urban and

12  Regional Economy," which is a review of -- a theoretical review

13  of key things in regional and urban economics, to masters and

14  Ph.D. students.

15  **Q.**   And do you have any academic articles that you've

16  published?

17  **A.**   I published three peer-reviewed academic articles when I

18  was in graduate school and also, subsequently, as a consultant.

19  **Q.**   Do those articles deal with the field of urban and

20  regional economic analysis, economic policy?

21  **A.**   Yes.  All of them did.

22  **Q.**   And, can you tell me, what's the highest level of

23  education that you've received?

24  **A.**   I have a Ph.D. degree.

25  **Q.**   Where did you receive your Ph.D. degree?

1   **A.**   From the University of California at Berkeley.

2   **Q.**   Okay.  Dr. Egan, there is no binder in front of you, but

3   there should be.  So let me correct that.

4             **MS. VAN AKEN:**  Your Honor, may I approach the

5   witness?

6             **THE COURT:**  Yes, you may.

7   **BY MS. VAN AKEN:**

8   **Q.**   Mr. Egan, would you take a look at the exhibit marked

9   "PX2324" behind the tab so marked.

10            Do you recognize that document, Dr. Egan?

11  **A.**   Yes, I do.

12  **Q.**   What is that document?

13  **A.**   That's my CV.

14            **MS. VAN AKEN:**  Your Honor, I would move that Exhibit

15  2324, Plaintiffs' Exhibit 2324, be moved into evidence.

16            **MR. PATTERSON:**  No objection.

17            **THE COURT:**  Very well.  2324 is admitted.

18            (Plaintiffs' Exhibit 2324 received in evidence.)

19  **BY MS. VAN AKEN:**

20  **Q.**   And, Dr. Egan, that CV represents accurately your

21  professional and academic experience?

22  **A.**   Yes, it does.

23  **Q.**   Let's talk a little bit more about your role as chief

24  economist in San Francisco.

25            You told me that you direct the Office of Economic

1  Analysis.  What does that office do?

2  **A.**   Our local legislative body, the board of supervisors,

3  receives all legislation that's introduced by the mayor or by

4  members of that board.

5        And my office reviews that legislation after each

6  meeting, to determine if any of it would have a material

7  economic impact on San Francisco.

8        And if we make the determination that it would, we

9  report on that impact, detailing this extent of the economic

10 impact, before the board acts on that legislation in committee.

11 **Q.**   So what is the intent of those reports with respect to the

12 board's action in committee?

13 **A.**   It's to ensure that the board of supervisors has a full

14 understanding of the economic impact of the decisions they

15 make.

16 **Q.**   How is it that you and your office decide whether a piece

17 of pending legislation could have a material economic impact?

18 **A.**   Well, there are a number of things that we look for.

19 Among them are, in the legislation, that it has a real

20 regulatory power, that it actually affects the behavior of

21 individuals in the city and economic agents such as businesses.

22        And we trace through how the legislation would

23 constrain their behavior and how that would change their

24 economic activity, and then try and quantify that.

25        As a general rule of thumb, if we believe that

1  legislation would have greater than a $10 million impact on the

2  city's economy, we would report on that.

3  **Q.**   And when you say you would report on that, is there a

4  product or a written report that you produce?

5  **A.**   Yes.  We prepare written reports, as well as do verbal

6  oral presentations of our findings.

7  **Q.**   And what kinds of sources of information do you rely on in

8  preparing those economic -- what are they called, those

9  reports?

10  **A.**   Economic impact reports.

11  **Q.**   And what sorts of sources do you rely on in preparing

12  economic impact reports for the board of supervisors?

13  **A.**   We're greatly reliant on government statistical data from

14  the state and from the federal governments.

15        We also, I believe in almost every report, rely upon

16  data generated by city departments, to make quantitative

17  estimates of the impact.

18        We also rely on information that's provided from us

19  from people who work in the city, sometimes people who work in

20  the private sector in San Francisco, and others.

21  **Q.**   And do you rely on research, generally, beyond the data

22  sets that you described?

23  **A.**   Yes, we to rely on research other than the data.

24  Particularly when it pertains to similar legislation or similar

25  issues occurring in other places.

1  **Q.**   And, Dr. Egan, these economic impact reports, are they

2  documents concerning urban economic policy, speaking generally?

3  **A.**   Yes, they are.

4  **Q.**   Relied on by the San Francisco Board of Supervisors?

5  **A.**   That's correct.

6        **MS. VAN AKEN:**   Your Honor, I would tender Dr. Egan as

7  an expert in urban and regional economic policy.

8        **THE COURT:**   Very well.  Voir dire?

9        **MR. PATTERSON:**   No, Your Honor.

10       **THE COURT:**   I beg your pardon?

11       **MR. PATTERSON:**   No.

12       **THE COURT:**   No voir dire.  Very well.

13       And you accept Dr. Egan as an opinion witness in the

14 field for which he has been designated, correct?

15       **MR. PATTERSON:**   Yes.

16       **THE COURT:**   Very well.

17       **MS. VAN AKEN:**   Thank you, Your Honor.

18 **BY MS. VAN AKEN:**

19 **Q.**   Dr. Egan, let's turn, now, to your work in the context of

20 this case.  And I want to ask if you have undertaken an

21 analysis of the effects of the prohibition on the marriage of

22 same-sex couples on San Francisco's economy and its

23 governmental costs and revenues?

24 **A.**   Yes, I have.

25 **Q.**   And, Dr. Egan, tell me, is that analysis that you

1  undertook, similar to or different from the kinds of analysis
2  that you do as chief economist for San Francisco?
3  A.   It's quite similar to the kinds of analysis we do in our
4  daily work.  The only difference being was that we don't
5  normally review state legislation.  We only review city
6  legislation.
7  Q.   And when you considered that analysis, did you look for
8  positive as well as negative economic impacts that the
9  prohibition might have?
10 A.   Well, I think you look for impacts.  You look for ways in
11 which the regulation affects people's behavior.  Whether that
12 winds up being positive or negative is kind of an analytical
13 conclusion.
14 Q.   Speaking generally, did you reach any conclusions after
15 undertaking that analysis?
16 A.   Yes, I did.  I've identified several ways in which the
17 prohibition of marriages of same-sex couples would have a
18 negative impact on San Francisco, and also negatively affect
19 the city's revenues and overall budget.
20 Q.   And can some of those conclusions about the negative
21 economic impact on San Francisco and its budget and revenues be
22 generalized to other jurisdictions?
23 A.   I believe that they could; although, I haven't
24 specifically studied other jurisdictions.
25 Q.   Okay.  Let's turn now to some specific areas where you --

1  I believe you have opinions.

2         And I would like to pull up a demonstrative slide.

3         (Document displayed.)

4         Great.

5         Dr. Egan, do you have any opinions concerning the

6  relationship between the prohibition on same-sex marriage,

7  wealth generation and city revenue?

8  **A.**   Yes, I do.

9  **Q.**   Speaking generally, what is that conclusion?

10 **A.**   Uhm, in general, because of the ways in which marriage

11 affects people's patterns of wealth generation over their life,

12 if same-sex marriage were legalized, San Francisco would see an

13 increase in sales tax revenue and an increase in property tax

14 revenue in the future.

15 **Q.**   Using this demonstrative, can you explain to me the

16 relationship between legalizing marriage and the increase in

17 married couples?

18 **A.**   Yes.  If marriage among same-sex couples were legalized, I

19 predict we would see an increase in the number of married

20 couples in San Francisco.

21        There is a significant amount of research in

22 economics that looks at the impact of marital status on wealth

23 accumulation over the life of an individual.

24        And to put it simply, what it finds in -- as I

25 understand it, is that married couples are -- married

1    individuals tend to accumulate more wealth than single

2    individuals.

3            So to the extent that there are more married people

4    and fewer single people in San Francisco, we would see greater

5    wealth accumulated within the city.

6    **Q.**   Dr. Egan, what are the impacts of that greater wealth

7    accumulation within the city, on San Francisco?

8    **A.**   They have two main impacts.  People with higher wealth

9    tend to have higher income.  As that wealth generates

10   dividends, that leads to higher spending on consumer goods in

11   San Francisco.

12           It also would tend to increase the value of real

13   estate within San Francisco, as we would have more wealth,

14   essentially, bidding for the same amount of land.

15   **Q.**   And what are the impacts on San Francisco's budgets or

16   revenues?

17   **A.**   Well, higher consumer spending in San Francisco, from a

18   wealthier population, leads to an increase in sales tax

19   revenue, since the city gets a percentage of all consumer

20   spending in the city.

21           And greater value of real estate in San Francisco

22   leads to an increase in property tax revenues because we also

23   get a percentage of the assessed value of each property.

24   **Q.**   Dr. Egan, is there any way you can tell us about the

25   magnitude of these potential impacts?

1   **A.**   Not in any strong quantitative sense.  We would need to

2   project over time, first, what the increase in married couples

3   would be, which might not be that challenging.  But projecting

4   the increase in wealth accumulation and how much that would

5   translate into spending is a challenging exercise.  I wouldn't

6   say it's impossible, but it's challenging.

7   **Q.**   And you have not attempted to do so here?

8   **A.**   I have not attempted to do so here.

9   **Q.**   To the extent that San Francisco sees an increase in sales

10  tax revenue and property tax revenue, is that also an impact

11  that you would expect other jurisdictions within California to

12  also see?

13  **A.**   Other jurisdictions within California would actually

14  benefit simply from the San Francisco affect.

15          For example, the State of California gets a

16  percentage of the sales tax that is generated within

17  San Francisco.  And other local government entities get a

18  percentage of the property tax revenue.

19  **Q.**   Dr. Egan, let's turn now to the next slide.

20          (Document displayed.)

21          And this is a demonstrative concerning -- it's

22  entitled, "Healthy Behaviors:  Impact on City Revenue."

23          Do you have an opinion about the relationship between

24  marriage, healthy behavior, and San Francisco's revenue?

25  **A.**   Yes, I do.  My opinion is that legalizing same-sex

1   marriage would encourage healthier behavior.  And that would

2   ultimately lead to higher payroll tax revenue and a reduction

3   in public health costs in San Francisco.

4   **Q.**   You've already explained to us the increase in married

5   couples that you project.  What relationship do you see between

6   an increase in married couples and increased healthy behavior

7   from individuals?

8   **A.**   There is also a number of articles in the economics

9   literature that look at the connection between marital status

10  and healthy behavior, and, essentially, finding that married

11  individuals are healthier, on average, and, in particular,

12  behave themselves in healthier ways than single individuals.

13        That has economic consequences of two kinds.

14  **Q.**   State those consequences, please.

15  **A.**   Certainly.  There is also a well-known connection in

16  economics between health of the work force and work force

17  productivity, which takes many forms in practice.  The simple

18  of which is lower rates of absenteeism due to illness.

19        Higher work force productivity affects workers' wages

20  through the marketplace.  And that directly ties to a local

21  revenue we have in San Francisco, our payroll tax.

22        So the more wages that are earned in San Francisco,

23  the more payroll tax that's earned by the City and County.

24  **Q.**   So there's a general link between worker productivity and

25  an increase in payroll taxes?

1   **A.**   Yes, there is via higher wages.  Higher productivity leads

2   to higher wages.  And higher wages leads to higher payroll tax

3   revenue for the City.

4          Healthier behavior is also associated with less

5   reliance on the healthcare system, including the public

6   healthcare system.  And, therefore, to the extent that the

7   population of San Francisco adopts healthier behaviors over

8   time, due to marriage, the City's public healthcare costs would

9   decline.  And that would result in a cost savings for the City

10   and County.

11   **Q.**   What is the magnitude of the City's spending on public

12   health, in your understanding?

13   **A.**   The City's general fund contribution to public health is

14   in the neighborhood of 360 million, 364 million, I think,

15   dollars per year.

16   **Q.**   Dr. Egan, can you tell us how great a savings we would see

17   if we lifted the prohibition on same-sex marriage, with respect

18   to public health?

19   **A.**   I've not attempted to quantify this, either, because some

20   of the same challenges, taking an estimate of the number of

21   married couples and translating that into healthier behavior,

22   and the specific connections between productivity and less

23   demand for healthcare are challenging to quantify.  I think

24   that they could be quantified, but I have not attempted to do

25   so.

1  **Q.**   Dr. Egan, you also explained the relationship between

2  payroll tax and productivity, along with the reduction in

3  public health costs.

4         Would either of those impacts be seen by other

5  jurisdictions in California, in your view, if the prohibition

6  on the marriage of same-sex couples were lifted?

7  **A.**   Relatively few jurisdictions in California have a payroll

8  tax.  However, many jurisdictions do have a business tax.  And

9  to the extent that higher worker productivity results in

10  stronger business performance -- which I think is a very

11  reasonable assumption to make -- that would lead to higher

12  business tax revenue for those jurisdictions.

13  **Q.**   Okay.  I want to ask you whether you are aware of any

14  relationship between increased healthy behaviors and domestic

15  partnership.

16  **A.**   I have not seen any research on that subject.

17  **Q.**   Well, would you assume with me, for a moment, that

18  domestic partnership has the same effect on healthy behavior as

19  marriage does, and then assume, further, that domestic

20  partnership is an option for same-sex couples, but marriage is

21  not.

22         Would we still expect to see this impact on city

23  revenue, simply from having domestic partnership?

24  **A.**   I think that you would see an impact on city revenue, but

25  it would not be as great as it would with if same-sex marriage

1    were legalized.

2              And the basis for that opinion is that I believe,

3    based on what I have reviewed in the way of the research, is

4    that more individuals would select marriage, more same-sex

5    couples would elect to be married than would elect to register

6    as domestic partners.

7              And so those benefits would essentially affect a

8    greater number of people, and you would have a larger number of

9    people in San Francisco who would be benefiting from healthy

10   behaviors, or in an institution that promotes healthy

11   behaviors.

12   **Q.**   So you would expect a greater impact on San Francisco's

13   budget or revenue or spending from marriage, rather than

14   domestic partnership?

15   **A.**   That's correct.

16   **Q.**   Dr. Egan, let's look at another aspect of your opinions

17   about health.

18             Have you looked at the relationship between the

19   uninsured population, the prohibition on marriage, and the

20   City's expenditures?

21   **A.**   Yes, I have.

22   **Q.**   And can you tell me what that relationship is, in your

23   view.

24   **A.**   Yes.  Essentially, legalizing same-sex marriage would

25   ultimately increase the number of people who had health

1   insurance in San Francisco.  And that would reduce the cost of

2   the City and County in serving the uninsured, which would

3   result in cost savings for the City and County.

4   **Q.**   And what is your basis for believing that legalizing

5   marriage would cause more companies -- would reduce the number

6   of uninsured people, and cause a greater health insurance

7   coverage in San Francisco?

8   **A.**   In my opinion, if same-sex marriage were legalized,

9   same-sex couples would elect that option.  And companies --

10  more companies would extend benefits to those couples as

11  married couples than do currently.

12          That would reduce the number of uninsured people in

13  San Francisco, as at the moment there are individuals in

14  San Francisco who are in same-sex partnerships, where their

15  partner is covered and they are not covered.  Their partner is

16  covered by employer healthcare, and they are not.

17          If that number of people was reduced, that would be

18  less uninsured people in San Francisco, and that would reduce

19  the local burden on covering the uninsured.

20  **Q.**   Dr. Egan, can you take a look at the tab marked "PX2260"

21  in your binder, please?

22          **THE COURT:**  I'm sorry, the number again is?

23          **MS. VAN AKEN:**  2660, Your Honor.

24          **THE COURT:**  Thank you.

25

1  **BY MS. VAN AKEN:**

2  **Q.**   Would you review that and let me know if you've ever seen

3  that document before?

4  **A.**   Yes, I have seen it before.

5  **Q.**   And in what context did you see this document, Dr. Egan?

6  **A.**   This document was provided to me a few days ago, by Greg

7  Sass, who is an official in our Department of Public Health in

8  San Francisco.

9  **Q.**   Is Mr. Sass someone with whom you regularly communicate,

10  as chief economist, about analysis that the Office of Economic

11  Analysis is performing?

12  **A.**   I've spoken to Mr. Sass before, and he's the type of

13  official with whom I would regularly talk about issues

14  concerning his field.

15         **MS. VAN AKEN:**   Your Honor, I move PX2260 into

16  evidence.

17         **MR. PATTERSON:**   Your Honor, we object.  This was not

18  a document that was considered by Dr. Egan in his expert

19  report.

20         **MS. VAN AKEN:**   Your Honor, this is a document that

21  did not exist at the time Mr. Egan was preparing his expert

22  report.  It was something that we received a few days ago, and

23  it's merely illustrative of his opinion.

24         **THE COURT:**   When did you produce this to the

25  proponents?

1        **MS. VAN AKEN:**  It was produced shortly after we

2   received it.  I believe a couple of weeks ago.  And it was also

3   disclosed, I believe, on Sunday night, as a document that we

4   were going to use in examining Dr. Egan.

5        **THE COURT:**  Anything further, Mr. Patterson?

6        **MR. PATTERSON:**  Dr. Egan -- they never submitted a

7   supplemental declaration from Dr. Egan, saying that he was

8   going to consider this document as part of his opinions.

9        And we have no way of determining whether or not it's

10  authentic.  They have not laid a foundation for it.  We don't

11  know where they -- where Greg Sass obtained the document.

12       **THE COURT:**  Well, let me reserve on that.  Let's have

13  the witness lay some additional foundation.

14       I gather you were provided a copy of this document

15  Sunday evening?

16       **MR. PATTERSON:**  Yes.

17       **THE COURT:**  Since the document appears to have been

18  created on December 30, 2009, it would have been hard to

19  produce much before then.

20       In any event, let's see where this goes, and we'll --

21  we'll make a ruling after some additional foundation is laid.

22       **MS. VAN AKEN:**  Yes, Your Honor.

23  **BY MS. VAN AKEN:**

24  **Q.**  Dr. Egan, let's talk a little bit about this document, and

25  see if we can satisfy the concerns.

1            In your understanding, what is the effect of this

2   letter that purports to be sent by the National Elevator

3   Industry?

4            **THE COURT:**  Where did it come from?  Foundation.

5   Foundation.  Foundation.

6            **MS. VAN AKEN:**  Okay.

7   **BY MS. VAN AKEN:**

8   **Q.**  Well, you shared with us that you received it from Greg

9   Sass; is that correct?

10  **A.**   Yes.

11  **Q.**   Did Dr. Sass give you -- or Mr. Sass -- I'm not sure of

12  his degree -- give you any information about the document when

13  he provided it to you?

14  **A.**   Uhm, he did not.  He e-mailed it to me, and did not

15  provide any additional information beyond the fact that it

16  might be important for me to consider in my testimony.

17  **Q.**   And did he give you any reasons why it might be important

18  for you to consider?

19  **A.**   No, he did not.

20  **Q.**   Had he previously given you information in the course of

21  helping you prepare for your testimony?

22  **A.**   Yes, he did.

23  **Q.**   What information did he previously provide you?

24  **A.**   He answered a number of questions I had about the extent

25  of San Francisco's investment in public health or expenditures

1  on public health, and, in particular, its expenditures on the

2  uninsured, if I recall.

3  **Q.**   So assuming that this letter illustrates something about

4  testimony that you're giving today, is that the kind of

5  information that you would regularly rely on, information

6  provided to you from department officials, in preparing

7  economic impact reports for the San Francisco board of

8  supervisors?

9  **A.**   Yes, it is.

10      **MS. VAN AKEN:**   Your Honor, I would offer this under

11  Rule of Evidence 703.  It simply is helpful to the expert's

12  testimony.  It's helpful to his opinion.  And it's certainly

13  not prejudicial, in any way, to proponents.

14      **THE COURT:**   Anything further, Mr. Patterson?

15      **MR. PATTERSON:**   Your Honor, we maintain our

16  objections based on we still don't have assurance that this is

17  an authentic document, or where it came from beyond him

18  receiving it from Greg Sass.

19      **THE COURT:**   All right.  Well, I'll admit it for what

20  value it has.  It appears to be a National Elevator Industry

21  benefit plan description.

22      The connection to these proceedings is a little

23  uncertain in my mind, at the moment, but let's see if you can

24  tie it up.

25      (Plaintiffs' Exhibit 2260 received in evidence.)

Case3:09-cv-02292-JW   Document464   Filed01/15/10   Page28 of 322

1           **MS. VAN AKEN:**  I think I can do that in one question,

2  Your Honor.

3           **THE COURT:**  All right.

4  **BY MS. VAN AKEN:**

5  **Q.**  Dr. Egan, what, in your view, is the import of this letter

6  with respect to the issues we've been discussing concerning

7  uninsured same-sex partners in San Francisco?

8  **A.**  It's my understanding that this document details a change

9  in policy by the National Elevator Industry, insofar as it

10  treats same-sex spouses, as far as benefits are concerned.

11           And, specifically, they are -- they are detailing

12  that they have changed their policy which used to be that

13  same-sex spouses were not covered because a spouse referred

14  only to a person of the opposite sex who is husband or wife.

15  And they have used that reference to a person of the opposite

16  sex, and now offer benefits to any spouse.

17  **Q.**  Do they offer benefits to domestic partners, assuming the

18  information in this letter is correct?

19  **A.**  There is nothing in this letter in reference to domestic

20  partnership.

21  **Q.**  Does this illustrate the phenomenon we were just

22  discussing, that companies typically will offer some benefits

23  to married partners but will not necessarily offer those

24  benefits to domestic partners?

25  **A.**  Yes, I believe it does.

1   **Q.**   Okay.   Let's go back to this analysis then.   In your

2   opinion, we have more companies extending benefits to same-sex

3   partners under a marriage regime.   And what is the import of

4   that for San Francisco?

5   **A.**   Well, if more individuals are covered by their spouse's

6   employer healthcare plan, that would reduce the number of

7   people who are uninsured in San Francisco.   And that would,

8   essentially, reduce the burden of the City and County of

9   San Francisco to provide healthcare to the uninsured.

10   **Q.**   Dr. Egan, can you tell us how much that burden will be

11   reduced if marriage were legal for same-sex couples?

12   **A.**   That's a difficult thing to quantify because we don't

13   precisely know how many individuals right now are in that

14   category where they are in a same-sex relationship, they're

15   unmarried, and one partner is covered and the other is not.

16          So we don't kind of know what that universe looks

17   like, so we don't know how many people would be out of that

18   situation if they were able to be married.

19   **Q.**   Do we know anything about the denominator, the size of the

20   potential pool of dollars that are affected?

21   **A.**   We do know that the City and County spends about

22   175 million, 177 million a year, on providing healthcare for

23   the uninsured.

24   **Q.**   And it's your opinion that that would be reduced if more

25   people had health insurance?

1  **A.**    That's correct.

2  **Q.**    Okay.  Dr. Egan, can you tell me anything about whether

3  other local governments in San Francisco could see the same

4  effect?

5  **A.**    You mean other local governments outside of San Francisco.

6  **Q.**    Thank you.  I sometime take the San Francisco centric

7  view.

8         But, please, tell me about that.

9  **A.**    I think this principle would work more broadly than in

10  San Francisco.  For example, I just noticed that National

11  Elevator Industry, from this document, is based in

12  Pennsylvania.  This is not simply a San Francisco-centric

13  thing.  That companies would provide benefits to all married

14  couples.  And, therefore, you would see this reduction of the

15  uninsured throughout the country.

16  **Q.**    And what is the role within California, at least of local

17  governments, in providing health services to the uninsured?

18  **A.**    Uhm, I'm not sure I can speak to their precise statutory

19  role, but I know that every county in California provides

20  extensive services to the uninsured, and the State funds a

21  great deal of that.

22  **Q.**    Let's look at some other health and health spending

23  impacts.  I've put up another demonstrative concerning behavior

24  and mental health services.  And I'd like you to tell me if you

25  have an opinion about a relationship between spending on

1  behavioral health services and the prohibition on same-sex

2  marriage.

3          (Document displayed.)

4  **A.**   Yes, I do.

5  **Q.**   What is that opinion, Dr. Egan?

6  **A.**   I believe that if marriage among same-sex couples were

7  legalized, the City, over the long-term, would see a reduction

8  in its costs for providing behavioral health services, and the

9  physical health services that can be allied to that.

10 **Q.**   Okay.  Let's talk about the basis for that opinion.

11         I see here a connection between legalizing marriage

12 and reduced discrimination against -- I assume the "LGBT" is

13 lesbian, gay, bisexual, and transgender; is that correct?

14 **A.**   That's correct.

15 **Q.**   What's your basis for believing there is such a

16 relationship?

17 **A.**   I believe that prohibition of marriage for same-sex

18 couples is a form of discrimination.  And I believe that it's

19 reasonable to assume that if that prohibition were released --

20 were removed, there would be, over time, a lessening of the

21 discrimination that those individuals experience in society in

22 their daily lives.

23 **Q.**   Assuming that to be true, what is the relationship between

24 reduced discrimination and public health spending on behavioral

25 health services?

1   **A.**   Uhm, when I was preparing my report, I spoke with an

2   individual in the public health department, who talked to me

3   about the uptake of behavioral health services by gay and

4   lesbian people in San Francisco.

5          And I was told that their use of these services is

6   disproportionately high; and one of the reasons for that is

7   discrimination.

8          Consequently, I believe if the discrimination they

9   experienced was lessened, their disproportionate use of these

10  services would be lessened.  And that would, ultimately, result

11  in a cost savings for San Francisco.

12  **Q.**   Can you tell us how big that cost savings would be?

13  **A.**   It's quite challenging, because how much of the additional

14  demand is due to discrimination is hard to quantify.

15         We also don't know exact -- the exact amount that gay

16  and lesbian individuals require of the City's behavioral health

17  services.

18         One thing we do know is that the City spends

19  two-and-a-half-million dollars a year for specialized services

20  for LGBT populations.  But that doesn't consider the use by gay

21  and lesbian people of all of the general, non-specialized

22  services within behavioral health in San Francisco.

23  **Q.**   And what is the size of the potential public health

24  expenditure we are talking about in San Francisco?

25  **A.**   Again, the City spends around $360 million a year on

1   public health.

2   **Q.**    Would other jurisdictions see a similar effect, if you

3   were correct about the effect that San Francisco would see?

4   **A.**    In proportion to their gay and lesbian population and to

5   the extent that they also see disproportionate use of those

6   services because of discrimination, I would expect to see that

7   in other jurisdictions, yes.

8   **Q.**    Okay.  Let's talk about school funding for a moment.

9            Do you have any opinion about the relationship

10  between the prohibition on marriage and the impact of that on

11  local school district funding?

12  **A.**    Yes, I do.

13  **Q.**    What is that opinion, Dr. Egan?

14  **A.**    In my opinion, if the marriage of same-sex couples were

15  legalized, we would see an increase in school district revenue

16  in San Francisco, and potentially in other jurisdictions in

17  California.

18  **Q.**    Let's talk, first, about how that relationship occurs,

19  using this slide.

20            (Document displayed)

21            You've got, again, this relationship between

22  legalizing marriage and a reduction in discrimination against

23  LGBT populations.  Is that the same relationship we spoke about

24  a moment ago?

25  **A.**    That's the same assumption, yes.

1  Q.   And how do you connect that to reduced violence and

2  intimidation of children based on sexual orientation?

3  A.   I believe that one aspect of that discrimination is the

4  violence and intimidation that children experience at school.

5  Q.   Can you take a look at the exhibit in your binder marked

6  "PX810," please.

7        Do you recognize this document?

8  A.   Yes, I do.

9  Q.   Is this a research brief you relied on in preparing your

10  expert report in this case?

11  A.   Yes, it is.

12        MS. VAN AKEN:  Your Honor, I move PX810 into

13  evidence.

14        MR. PATTERSON:  No objection.

15        THE COURT:  Very well.  810 is admitted.

16        (Plaintiffs Exhibit 810 received in evidence.)

17  BY MS. VAN AKEN:

18  Q.   Dr. Egan, what does this brief tell us about the number of

19  students in California schools who are bullied based on their

20  sexual orientation?

21  A.   It states that over 200,000 students in California each

22  year are bullied based on their actual or perceived sexual

23  orientation.

24  Q.   Is there a relationship between that bullying and

25  absenteeism in schools?

1   **A.**   The report says that there is.   It states that nearly

2   109,000 school absences at the middle and high school levels in

3   California are due to harassment based on actual or perceived

4   sexual orientation.

5   **Q.**   Is there a link between that and school district revenue?

6   **A.**   Yes.   One of the basis for school district funding in

7   California is attendance.   And to the extent that attendance is

8   less than it would be, due to excessive absences, school

9   district funding is less than it otherwise would be.

10  **Q.**   What is the total impact in California, if you know, of

11  that absenteeism?

12  **A.**   The report states that it costs California school

13  districts at least 39.9 million per year.

14  **Q.**   Would any of that impact be felt in San Francisco?

15  **A.**   I would expect that some of that would be felt in

16  San Francisco.

17  **Q.**   Do you know how much?

18  **A.**   I don't have an estimate of how much, and this report does

19  not break out San Francisco.

20  **Q.**   And are there any other economic impacts that you could

21  envision from pupil absenteeism due to bullying based on sexual

22  orientation?

23  **A.**   Well, the ultimate economic value of education is the

24  progression of education.   And that's compromised whenever

25  there is undue absenteeism.   So to the extent that excessive

1  absences reduce the quality of education that children receive,

2  that would have long-term economic consequences.

3  **Q.**   Let's talk about the response to bullying.  To the extent

4  that school districts respond to bullying, does that also

5  expend resources?

6  **A.**   If that -- if that requires staff time, and so forth, yes,

7  that's additional resources spent in policing that behavior.

8  Yes, that would result in a cost.

9  **Q.**   And I want to talk about responding to other kinds of

10  sexual orientation discrimination as well.

11          Could you just take a look, for me, at exhibit

12  numbers 672, PX672, 673, 674, 675 and 676, in your binder,

13  please?

14          **MR. PATTERSON:**  Your Honor --

15          **THE COURT:**  Yes.

16          **MR. PATTERSON:**  These documents to which they refer

17  appear to be hate crimes reports from California.  And Dr. Egan

18  did not refer to hate crimes in his expert report.  We did not

19  have an opportunity to depose him on that matter.  These were

20  not documents that were relied upon by him.

21          So we would object to testimony on hate crimes as

22  beyond the scope of his expert report.

23          **MS. VAN AKEN:**  Your Honor, Dr. Egan's report dealt,

24  generally, with the fact of local governments and state

25  governments responding to claims of discrimination.  These are

1  simply examples.  And I think the limited scope of questioning

2  that I'll conduct on this is going to alleviate any concerns

3  that Mr. Patterson has.

4          THE COURT:  Well, if the topic was covered in his

5  report and in his deposition, I think it's appropriate for him

6  to cover that topic, generally, in his testimony.  But I don't

7  know that that opens the door to the introduction of these

8  particular documents into evidence.

9          MS. VAN AKEN:  Your Honor, these documents were

10  actually authenticated -- they were --

11          THE COURT:  Were they authenticated at his

12  deposition?

13          MS. VAN AKEN:  Not at his deposition.  They were

14  authenticated by the state, by the attorney general, in

15  discovery subsequent to his deposition.

16          Moreover, the 2008 hate crimes Report was not

17  released until late in 2008, after Dr. Egan's deposition had

18  occurred.

19          THE COURT:  Well, that, obviously, would not apply to

20  673, 674, 675.  I suppose -- are these the kinds of documents

21  of which the Court can take judicial notice?  These appear to

22  be produced by the California Department of Justice.

23          MS. VAN AKEN:  Yes, Your Honor, they were.  And I

24  believe that they are the kinds of documents of which the Court

25  can take judicial notice.

1        **THE COURT:**  Any reason the Court cannot take judicial

2   notice of these government documents, Mr. Patterson?

3        **MR. PATTERSON:**  No, Your Honor.  But to the extent

4   Dr. Egan is going to testify about them, the term "hate crimes"

5   did not appear in his expert report.  We did not depose him

6   about hate crimes.  So we have not had an opportunity to

7   prepare to discuss that with Dr. Egan.

8        To the extent Your Honor wants to take judicial

9   notice of the documents, we would not have an objection to

10  that.

11       **THE COURT:**  Did I misunderstand you, Ms. Van Aken?

12  You say --

13       **MS. VAN AKEN:**  Responding -- no, responding to

14  discrimination, Your Honor.  Responding to discrimination was

15  the topic covered in the expert report, the costs of that.

16       We did not specifically talk about hate crimes or

17  hate crime reports.

18       **THE COURT:**  All right.  Well, I think perhaps you

19  should move on then.

20       **MS. VAN AKEN:**  Okay.  Your Honor, may I talk about

21  the 2008 report, which was not in -- had not been released by

22  the Department of Justice?

23       **THE COURT:**  Well, it deals with the same subject,

24  doesn't it?

25       **MS. VAN AKEN:**  It does deal with the same subject,

 1  Your Honor.

 2          **THE COURT:**  I think Mr. Patterson is right.  If you

 3  didn't cover this subject in either his report or in the

 4  deposition, I don't think it's appropriate to open up a whole

 5  new subject.

 6          **MS. VAN AKEN:**  I would move on, Your Honor.

 7  **BY MS. VAN AKEN:**

 8  **Q.**  Dr. Egan, let's talk about whether you saw any

 9  relationship in your report on -- sorry.

10          When you were preparing your report and in forming

11  your opinions in this case, did you reach any opinions about

12  the impacts of wedding-related activity on San Francisco's

13  budget?

14  **A.**  Yes, I did.

15  **Q.**  What is that opinion, Dr. Egan?

16  **A.**  In my opinion, if -- if same-sex marriages were legalized,

17  there would be more same-sex weddings in San Francisco.  And,

18  consequently, those weddings would generate economic activity

19  that would lead to more sales tax revenue and hotel tax revenue

20  for San Francisco.

21  **Q.**  Dr. Egan, how many marriage licenses were issued in

22  San Francisco, in 2008?

23  **A.**  You mean for same-sex marriages?

24  **Q.**  Yes.

25  **A.**  That number I do vaguely remember.  I believe it's around

1   5,100.

2   **Q.**   Okay.  And were some of those marriage licenses issued to

3   couples from out of state?

4   **A.**   Yes.

5   **Q.**   Were some of them issued to couples from other countries?

6   **A.**   I believe so, yes.

7   **Q.**   And at the time that those marriage licenses were being

8   issued, were weddings also taking place?

9   **A.**   Yes, they were.

10   **Q.**   What was the effect of that activity on San Francisco's

11   revenues?

12   **A.**   Uhm, that has -- weddings as an -- as a source of

13   expenditure have two kinds of basic effects on a local economy.

14          There is the spending on the event, and associated

15   consumer spending that leads to sales tax revenue.  Weddings

16   can also draw in guests from out of town, who stay in hotels

17   and generate business for the hotel industry.

18   **Q.**   Is that activity that's been lost since same-sex marriage

19   has been prohibited in San Francisco?

20   **A.**   Yes, it is.

21   **Q.**   Let's talk about how that loss has come about, and what

22   you project if the prohibition were lifted.

23          Can you just briefly describe for me the relationship

24   between lifting that prohibition and then seeing additional

25   sales tax or hotel tax revenue?

1   **A.**   Yes.  If we -- if the prohibition were lifted, we would

2   see, first, more resident weddings, weddings by same-sex

3   couples who currently reside in San Francisco.  And we have

4   projected that additional spending to be about $21 million a

5   year annually.

6         Particularly when we include -- there will also be

7   nonresidents who come to San Francisco to marry.  They will

8   also have event-related spending for their weddings.  Although,

9   greatly reduced compared to residents.

10         They will also generate per-diem spending as visitors

11   to the city.  And they will generate hotel business because

12   they will be staying at hotels.

13         The third set of new economic activity associated

14   would be out-of-town guests, which we have assumed would

15   largely come for resident weddings.  They will generate

16   per-diem spending, and they will also help fill hotel rooms.

17         So it's a combination of the event spending on the

18   wedding itself, and the per-diem spending of visitors generates

19   sales tax revenue.  The additional hotel rooms generates hotel

20   tax revenue.

21   **Q.**   What's the magnitude of the effect of all of this, in your

22   estimate?

23   **A.**   The spending effect is on the order of 35 million.  The

24   hotel room revenue is on the order of 2-and-a-half-million

25   dollars.  And the tax revenue we project at $1.7 million a year

1    for sales tax, and about .9 million a year for hotel tax.

2    **Q.**    Speaking generally, what did you base these calculations

3    on?

4    **A.**    We based it on the experience that San Francisco saw with

5    same-sex weddings in 2008.

6    **Q.**    Is this a short-term or a long-term projection for annual

7    increased revenue from sales and hotel taxes?

8    **A.**    I guess I would characterize it as a short-term

9    projection.  It's reasonable for me to think that if same-sex

10   marriage is legalized, again, we will see a similar level of

11   activity that we saw the last time.  I wouldn't expect that

12   rate to continue forever, however.

13   **Q.**    But continuing into the future, into the long-term, do you

14   expect some level of activity?

15   **A.**    Oh, certainly, I would.  Even if every same-sex couple who

16   resides in San Francisco, for example, were able to get

17   married, and was married, there are still new relationships

18   developing, couples forming, people moving to San Francisco who

19   don't live here now.

20           And so there will always be marriages going on into

21   the future, at some level.  And, therefore, you would see some

22   economic benefit.

23   **Q.**    Okay.  Let's turn, now, to federal income tax benefits

24   with respect to city revenue that might result from the lifting

25   of the prohibition on the marriage of same-sex couples.

1                    (Document displayed.)

2               Do you see a relationship there?

3  **A.**   Yes, I do.

4  **Q.**   And what is that relationship?

5  **A.**   If marriage for same-sex couples were permitted, that

6  would affect their federal income tax burden in a way that

7  would put more revenue -- would result in income tax savings

8  for them.

9               They would have, as a result, more money, some of

10 which they would spend in San Francisco.  And that higher

11 spending in San Francisco would generate more sales tax for the

12 City and County.

13 **Q.**   Are you assuming any changes to federal law?

14 **A.**   It's --

15             **THE COURT:**   The question was?

16 **BY MS. VAN AKEN:**

17 **Q.**   Are you assuming any changes to federal law?

18 **A.**   It's my understanding that the Defense of Marriage Act

19 would have to be changed in order to allow this.

20 **Q.**   I see.  For these couples to see this income tax benefit?

21 **A.**   Yes.  That would be an additional requirement before this

22 benefit could be realized.

23 **Q.**   What is the potential magnitude of this benefit to

24 San Francisco?

25 **A.**   Uhm, to -- to the best of my recollection, the average

1   savings -- some same-sex couples would experience an income tax

2   savings, and some would actually have a higher income tax

3   burden, if they were married.  But the average works out to, I

4   believe, a $440 a year or so savings.

5           And if that were multiplied by a reasonable estimate

6   of the number of same-sex married couples we might see in

7   San Francisco, and they spent all of that in San Francisco, on

8   taxable goods, we would see as much as $74,000 a year in

9   additional revenue.

10  Q.   Would the state see any additional revenue?

11  A.   Yes.  Again, the state gets a larger percentage of sales

12  tax than the City does, so they would see an increase in sales

13  tax revenue as well.

14  Q.   And assuming an effect like this, would this be true for

15  other federal benefits that same-sex couples could receive,

16  such as Social Security, survivor disability benefits?

17  A.   To the extent that their benefits would increase if they

18  were married, then, yes, they would have more revenue to spend

19  in San Francisco, and the City would -- would receive

20  additional tax revenue.

21  Q.   Dr. Egan, I want to turn, now, to talk about

22  San Francisco's Equal Benefits Ordinance.  Can you take a look

23  at the exhibit marked PX811, please.  811.

24          Do you recognize this document?

25  A.   Yes, I do.

1  **Q.**   What is this?

2  **A.**   It is municipal code from San Francisco that details the

3  Human Rights Commission in the City, and its policies

4  concerning discrimination.  And Chapter 12(b) details the Equal

5  Benefits Ordinance.

6  **Q.**   Is this something that you reviewed in preparing your --

7  in reaching opinions in this case?

8  **A.**   Yes, it is.

9         **MS. VAN AKEN:**  Your Honor, I move PX0811 into

10  evidence.

11         **MR. PATTERSON:**  No objection.

12         **THE COURT:**  811 is in.

13         (Plaintiffs' Exhibit 811 received in evidence.)

14  **BY MS. VAN AKEN:**

15  **Q.**   Dr. Egan, does the Equal Benefits Ordinance require the

16  Human Rights Commission to investigate discrimination

17  complaints?

18  **A.**   Yes, it does.

19  **Q.**   And does the Human Rights Commission also have

20  responsibilities with respect to San Francisco's contracting?

21  **A.**   Yes, it does.

22  **Q.**   What are those responsibilities?

23  **A.**   In general, it is -- the City's policy is to regulate

24  contracting in ways that do not promote discrimination, and

25  actively discourage discrimination.

1  Q.   So what is your understanding of the goal or the intent of

2  the Equal Benefits Ordinance?

3  A.   The Equal Benefits Ordinance is intended -- intended to

4  redress discrimination and discourage discrimination by

5  requiring contractors for the City to provide the same benefits

6  to domestic partners that they provide to married couples.

7  Q.   Dr. Egan, is it costly to the City to administer the Equal

8  Benefits Ordinance in some way?

9  A.   I believe the -- the annual administrative cost is in the

10 order of a million dollars a year for the City.

11 Q.   To the extent that other governments investigate claims of

12 discrimination, would they also incur costs?

13 A.   From our Equal Benefits Ordinance, or in general?

14 Q.   No, in general.

15 A.   Yes.

16 Q.   And did the City incur costs in defending the Equal

17 Benefits Ordinance from legal challenges?

18 A.   Yes, the City did.

19 Q.   Dr. Egan, I want to turn to the issue of the City's

20 contracting costs.

21         Under the Equal Benefits Ordinance, do you see any

22 relationship between combating discrimination, as you told me,

23 as the purpose of the Equal Benefits Ordinance, and

24 San Francisco's contracting costs?

25 A.   Yes, I do.

1   **Q.**   What is that relationship, Dr. Egan?

2   **A.**   Uhm, I believe that if same-sex marriage were legalized,

3   the City would see reduced contracting costs and lower bids on

4   many of its RFPs and proposals.

5   **Q.**   Can you tell me how that would work?

6   **A.**   Yes.  I believe that if same-sex marriage were legalized,

7   more companies would extend benefits to same-sex couples who

8   were married.

9        This would lead companies to perceive or experience

10  an actual -- a lower compliance cost to San Francisco's EBO.

11  Since they are already providing the benefits to married

12  couples, it would be easier for them to comply with the Equal

13  Benefits Ordinance.

14       If that were the case, I would expect that some

15  companies who are either not eligible to contract with the City

16  or who are deterred from bidding with the City, because they

17  perceive the EBO as a deterrent, would no longer experience

18  that deterrent.  And, consequently, we would see an expanded

19  competition among contractors for doing business with the City.

20  **Q.**   Do you currently believe that there is a reduced pool of

21  contractors competing for the City's business because of the

22  EBO?

23  **A.**   Well, to the extent that it's a deterrent, yes.

24  **Q.**   And what would be the result of this increased response in

25  competition, that you've described?

1  **A.**    Some of the companies that are either not eligible or are

2  deterred may very well be the lowest bidder or the preferred

3  bidder.  And, consequently, that tends to inflate the City's

4  contracting costs.

5  **Q.**    I see.  Can you quantify what the magnitude of this

6  inflation is, presently?

7  **A.**    Well, it's very difficult to know what the bids of the

8  company who are deterred from building would be, so I can't

9  provide a quantitative estimate of that.  But it's sort of

10  basic economics that the more competitors you have, the more

11  price pressure you have.

12  **Q.**    What's the potential impact of lowered contracting costs

13  for the City, if the EBO is perceived to be easier to comply

14  with?

15  **A.**    Uhm, are you asking for a quantitative estimate of

16  savings?

17  **Q.**    Yeah, at least potentially.

18  **A.**    Well, contracting costs are a significant expense for the

19  City, over $2 billion a year.  So even a very small reduction

20  in costs due to a regulatory change regarding how easy it is to

21  contract with the City could result in a significant savings.

22        A 1 percent savings, for example, would result in a

23  21 -- 1 percent reduction in costs would result in a

24  $21 million savings for the City.

25  **Q.**    Is that an annual figure?

1   A.   Yes, it is.

2   Q.   And assume with me that there is no further discrimination

3   based on sexual orientation in marriage, and assume with me

4   that the San Francisco board of supervisors thereafter repeals

5   the Equal Benefits Ordinance.  What would then be the

6   contracting costs to San Francisco, from the Equal Benefits

7   Ordinance?

8   A.   Well, in that case, it would be none.

9   Q.   I thought so.

10         Dr. Egan, I want to show you a last slide that -- a

11  last demonstrative that's entitled, "Summary of Impacts:

12  Quantifiable and Nonquantifiable," and ask you if that reflects

13  an accurate summary of the opinions that you've rendered in

14  this case.

15         (Document displayed.)

16  A.   Yes, it is.

17  Q.   And what is the import of this distinction between

18  quantitative and nonquantitative, or quantifiable and

19  nonquantifiable?

20  A.   I think the importance of the quantifiable impacts, to

21  discuss them first, is that by the usual methods that we would

22  do in the Office of Economic Analysis, it's clear to me that

23  Proposition 8 has a negative material economic impact on

24  San Francisco.  That is to say, the City is losing more than

25  $10 million a year in economic activity.

1           And, as I've quantified it here, it's at least $2.6

2    million simply from hotel and sales tax revenue that we're not

3    getting from same-sex weddings.

4           And so the import is, although there are many, many

5    impacts, we can quantify impacts that would, if it were local

6    legislation, lead me to think it would have a material economic

7    impact.

8    **Q.**   Just so I understand what you just said, there is a total

9    level of economic activity that must occur for it to be

10   material; is that right?

11   **A.**   That's right.

12   **Q.**   Not necessarily a total revenue effect?

13   **A.**   That's right.  Although, the large economic activity leads

14   to a large -- relatively large revenue impact.

15   **Q.**   I see.  I see.

16          So when you were speaking earlier about the

17   35 million for wedding-related activity, for instance, is that

18   material, in your opinion?

19   **A.**   Yes.  That exceeds $10 million.

20   **Q.**   Okay.  And, now, tell me about this -- this distinction,

21   the nonquantifiable piece.

22   **A.**   Most of the impacts that I detailed in my report are not

23   quantifiable.  At least not as readily quantifiable as the ones

24   on the left.  But I wouldn't want to minimize their impact or

25   suggest that they were small, particularly in the long-term.

1          What we're really talking about in the
2   nonquantifiable impacts are the long-term advantages of
3   marriage as an institution, and the long-term costs of
4   discrimination as a way that weakens people's productivity and
5   integration into the labor force.
6          Whether it's weakening their education because
7   they're discriminated against at school, or leading them to
8   excessive reliance on behavioral and other health services,
9   these are impacts that are hard to quantify, but they can wind
10  up being extremely powerful.  How much healthier you are over
11  your lifetime.  How much wealth you generate because you are in
12  a partnership.
13         So it seems reasonable to me to think that, in the
14  long-term, these are the impacts that would matter for
15  San Francisco, even if we can't attach a number to them now.
16         **MS. VAN AKEN:**  Thank you, Dr. Egan.  Nothing further.
17         **THE COURT:**  Very well.  Mr. Patterson, you may
18  cross-examine.
19         **MR. PATTERSON:**  Your Honor may we approach the
20  witness with the exhibit binder, please?
21         **THE COURT:**  That would be fine.
22                      **CROSS EXAMINATION**
23  BY MR. PATTERSON:
24  **Q.**   Good morning, Dr. Egan.
25  **A.**   Good morning.

1  **Q.** My name is Peter A. Patterson. I will be asking you some

2  questions on behalf of the defendant-intervenor.

3  First, I'd like to start with the economic activity

4  that you believe will be generated in San Francisco on account

5  of same-sex marriages being allowed.

6  And you had testified that San Francisco currently

7  incurs costs because these -- in the forms of foregone sales

8  tax and hotel tax revenues on account of same-sex couples not

9  being able to get married; is that correct?

10 **A.** That's correct.

11 **Q.** You have attempted to estimate, at least for the

12 short-term, the new consumer spending that would generate these

13 revenues that same-sex marriage would generate on an annualized

14 basis in the City and County of San Francisco; is that correct?

15 **A.** Yes, it is.

16 **Q.** You have not attempted to quantify the long-term impact,

17 correct?

18 **A.** That's correct.

19 **Q.** And you've not attempted to quantify the impact of

20 domestic partnerships on San Francisco's economy; is that

21 correct?

22 **A.** That's correct.

23 **Q.** Okay. And, Dr. Egan, are you aware if gays and lesbians

24 may currently have religious and other wedding ceremonies and

25 celebrations, even though they are not permitted to obtain a

1  civil marriage license?

2  **A.**   I'm actually not aware of that.  I don't know.

3  **Q.**   Do you think it's reasonable to assume that -- that they

4  do?

5  **A.**   That they are allowed to have religious --

6  **Q.**   That they are permitted to have religious wedding

7  ceremonies, even though they are not permitted to obtain a

8  civil marriage license?

9  **A.**   I guess I would assume that's reasonable, yes.

10 **Q.**   And is it reasonable to assume that some of them actually

11 do have those types of ceremonies and celebrations?

12 **A.**   I would guess so, yes.

13 **Q.**   But you have not accounted for any economic impact that's

14 generated from those currently, have you?

15 **A.**   That's correct.  I suppose one reason might be I don't

16 have a count of them; whereas, I have a count of legal

17 marriages.

18 **Q.**   And do you know if gays and lesbians that have such

19 celebrations, were they permitted to civilly marry, would they

20 have another one?

21 **A.**   It's difficult for me to put myself in their shoes there.

22 **Q.**   Right.  So -- so your report, essentially, assumes that

23 every gay and lesbian couple that gets married will have a

24 wedding ceremony or celebration; is that correct?

25 **A.**   I actually -- the analysis depends if that there is an

1  average expenditure on weddings associated with each wedding,

2  yes.

3  Q.   So that implicitly assumes that each of them has --

4  A.   No, it assumes that, on average, this is the average

5  expenditure.  It doesn't assume everyone hits exactly the

6  average.

7  Q.   Okay.  Now, you have based your short-term estimate on

8  San Francisco's experience from June 17th, 2008, to

9  November 4th, 2008; is that correct?

10 A.   That's correct.

11 Q.   And you implicitly assume that the same number of same-sex

12 couples will get married, at least in the short-term, at a

13 similar rate as they did during that time period; is that

14 correct?

15 A.   That's correct.

16 Q.   Okay.  And you recognize that the rate that occurred

17 during that time period was partially due to a pent-up demand

18 for same-sex marriage; is that correct?

19 A.   In the sense that there were a number of same-sex couples

20 who were unable to be married and wanted to be married quickly,

21 yes, that's correct.

22 Q.   And that means that the rate that occurred during that

23 time frame was inflated, to some extent, due to that pent-up

24 demand; is that correct?

25 A.   By "inflated" do you mean relative to some future rate?

1  **Q.**    Yes.

2  **A.**    Yes, that's right.

3  **Q.**    But you believe that that pent-up demand was not satisfied

4  during that time period in 2008; is that correct?

5  **A.**    That's correct.  Well, the -- I'm simply assuming that

6  there will be the same rate of marriage if it's legalized

7  again, yes.

8  **Q.**    So that would be if pent-up demand was not satisfied?

9  **A.**    To the extent that includes pent-up demand, yes, you are

10 correct.

11 **Q.**    Your assumption that there is a pent-up demand on same-sex

12 marriage is based simply on your opinion living in the city and

13 observing the interest in it among same-sex couples; is that

14 correct?

15 **A.**    I didn't use -- I didn't use a concept of pent-up demand

16 in my analysis.  I simply said when same sex -- if same-sex

17 marriage is legalized again, it's reasonable to me you would

18 see the same level of activity that you did when it was last

19 legal.

20 **Q.**    I believe you testified a little differently at your

21 deposition.  If you could turn to tab 2 in the binder, on page

22 29, starting at line 24.  Excuse me.  I'm sorry.  Yes, starting

23 at line 24.  And the question is:

24            "So what is your basis for thinking there is

25            a pent-up demand for same-sex marriage?"

1              And, then, if you would go down to line 9 on the

2    following page.  You testified:

3              "I simply thought it was reasonable to

4              presume there was a pent-up demand for

5              same-sex marriages in San Francisco, just

6              from living in the City and observing the

7              interest in it among many same-sex couples."

8              Did you give that testimony at your deposition?

9    A.   Well, those are my words.  I'm trying to reconstruct the

10   context.

11   Q.   Yes or no, did you --

12   A.   Yes.

13   Q.   And your basis for assuming that this pent-up demand was

14   not satisfied from June 17th, 2008, to November 4th, 2008, is

15   that, to the best of your recollection, there were pending

16   marriage appointments in the county clerk's office that were

17   scheduled after November 4, 2008; is that correct?

18   A.   Yes, that's one reason.

19   Q.   Okay.  If you could, please, turn your attention to tab 22

20   in the witness binder.  And this is an exhibit that has been

21   marked PX805, Plaintiffs' Exhibit 805.

22              Do you recognize this document?

23   A.   Yes, I do.

24   Q.   And what is this document?

25   A.   This is a summary of marriage license appointments and

1   actual marriage license issued by the San Francisco County

2   clerk.

3           MR. PATTERSON:  Your Honor, we move this PX805 into

4   evidence.

5           MS. VAN AKEN:  No objection, Your Honor.

6           THE COURT:  805 is admitted.

7           (Plaintiffs' Exhibit 805 received in evidence.)

8   BY MR. PATTERSON:

9   Q.   Dr. Egan, from June 17th, 2006, to June 30th -- or 2008,

10  I'm sorry, to June 30 of 2008, how much marriage license

11  appointments for same-sex couples does this document report?

12  A.   1,080.

13  Q.   But from July 1st to July 31st?

14  A.   897.

15  Q.   August 1st to August 31st?

16  A.   836.

17  Q.   September 1st --

18          THE COURT:  I think we can read these numbers.

19          MR. PATTERSON:  Okay.

20          THE COURT:  Let's go to the question.

21  BY MR. PATTERSON:

22  Q.   The question is:  How about from November 5th to

23  November 30th?

24  A.   56.

25  Q.   And that's quite a bit lower than the number of marriage

1  appointments that were pending during the time same-sex

2  marriage was legal; is that correct?

3       THE COURT:  I think you can ask the witness whether

4  he sees a trend.

5       (Laughter)

6       THE WITNESS:  It's a lower number.  But the only

7  reason I hesitate in giving that answer is, this is as of

8  November 24th.  And I don't know how many people cancelled

9  their appointment between November 5th and November 24th, when

10  this document was prepared.

11 BY MR. PATTERSON:

12 Q.  Okay.  Well, this particular document doesn't provide much

13 evidence that the pent-up demand was similar after -- it was

14 not satisfied during the time same-sex marriage was legal; does

15 it?

16 A.  If you're asking me to believe that there was a great deal

17 of pent-up demand from October 20th to November 4th, when there

18 were a thousand appointments, but somehow it ended right at

19 that point, and there was no pent-up demand as of November 5th,

20 I would just say this is not an indicator of pent-up demand.

21 It's --

22 Q.  Well, you gave as your testimony, did you not, that the

23 pending marriage appointments, license appointments, were an

24 indicator that pent-up demand was not satisfied; is that

25 correct?

1  **A.**    The fact that anyone had an appointment to get married

2  after November 4th, indicates that there are at least some

3  couples who wish to get married.  I would not say that that is

4  an exhaustive list.

5  **Q.**    Right.  But you distinguish between pent-up demand and

6  some sort of demand that would obtain in the long-term; is that

7  correct?

8  **A.**    Pent-up demand is not a concept that I used in my

9  analysis.  I'm simply saying that, in the short-term, if

10  same-sex marriage were legal again, we would see a similar

11  experience to what we saw in 2008.

12  **Q.**    Right.  But what you have said is you would expect that

13  for a period of time the marriage rate would be elevated; and

14  in the longer term, it would go to some-- some more steady

15  state level; is that correct?

16  **A.**    That's correct.  That's a good way to put it.

17  **Q.**    Okay.  And as evidence that this -- the rate would

18  continue at the rate it did before November 4th, 2008, you gave

19  that there were marriage license appointments pending; is that

20  correct?

21  **A.**    That is one indicator, yes.

22  **Q.**    Right.  Now, this does not support an assertion that

23  marriage appointments would continue at a similar rate after

24  November 4, 2008, than it did before, does it?

25  **A.**    Well, it doesn't -- if you believe that this was

1   100 percent of the pent-up demand.

2   **Q.**    Could you clarify that, please.

3   **A.**    Yes.  I mean, it seems to me that suppose you were a --

4   you were in a same-sex relationship, and you wanted to get

5   married after November 5th.  You would be classified as the way

6   we have been talking about it, as pent-up demand.  That doesn't

7   lead me to believe you would go to the county clerk and make an

8   appointment.

9           So this list of outstanding county clerk appointments

10  indicates that there are at least some couples who wish to get

11  married.  But you wouldn't think that every couple that wished

12  to get married would make an appointment for something that

13  couldn't happen.

14  **Q.**    But it doesn't indicate that couples would get married at

15  the same rate after November 4th, as it did before, does it?

16  **A.**    I'm sorry.  Could you repeat that question.

17  **Q.**    It indicates that some same-sex couples would get married

18  after November 4th.  I'm not questioning that at all.  I'm

19  assuming same-sex couples would, if they were permitted to get

20  married.  But it doesn't indicate they would get married at the

21  same rate as they did before November 4, does it?

22  **A.**    But it is not an indicator of those who will get married

23  or want to get married.  It's simply evidence of some.

24  **Q.**    Okay.

25  **A.**    In other words, the marriage licenses when it's legal

1   are -- because you are able to get married, are a fairly

2   accurate measure of the demand for marriage.  The number after

3   you can't get married are not.

4           (Laughter)

5           I think that that would be an important distinction.

6   Q.   Right.  And I'm asking you what you're basing your opinion

7   on, that the number after November 4, 2008, would be comparable

8   to that before.  And this is one of the indicators you gave me;

9   is that correct?

10  A.   That's correct.  And it is an indication that there are

11  some people who, even after Proposition 8 passed, had existing

12  marriage license appointments.

13  Q.   Okay.

14  A.   And if I could give you a slightly deeper answer.  It's

15  the only actual quantitative information that I could have

16  given you in response to your question at the deposition.

17          I don't know how many same-sex couples in

18  San Francisco want to get married now, because there is no way

19  to register that.

20  Q.   Okay.  Fair enough.

21          Now, as we've been discussing here, been calling

22  pent-up demand or this elevated rate of marriages that were

23  obtained for the short-term, you believe that this will last

24  for several years; is that correct?

25  A.   I -- I used the term "several years" in my expert report,

1  yes.

2  **Q.**   But you cannot quantify it beyond the term "several

3  years"; is that correct?

4  **A.**   Right.  Because I don't have a clear sense of what's

5  pent-up demand and what is the factors that go into what you

6  term the steady state rate.

7  **Q.**   And you can't even say it would be less than ten years; is

8  that correct?

9  **A.**   That's -- I cannot put a number to it, yes.

10 **Q.**   Okay.  You can't say it would be less than 20 years?

11 **A.**   That's correct.

12 **Q.**   Please, turn to tab 3 in the witness binder.  This is a

13 document that's been marked Plaintiffs' Exhibit 815, PX815.

14          And do you recognize this document?

15 **A.**   Yes, I do.

16 **Q.**   What is this document?

17 **A.**   This is a report that I prepared in 2008, at the request

18 of a member of our board of supervisors, to estimate what the

19 three-year impact of legalizing same-sex marriage might be on

20 San Francisco's economy.

21          **MR. PATTERSON:**  Your Honor, we would like to admit

22 this in evidence.

23          **MS. VAN AKEN:**  No objection, Your Honor.

24          **THE COURT:**  815 is admitted.

25          (Plaintiffs' Exhibit 815 received in evidence.)

1  **BY MR. PATTERSON:**

2  **Q.**   You said this was done at the request of a member of the

3  board of supervisors; is that correct?

4  **A.**   That's correct.

5  **Q.**   Your office typically does not review statewide

6  legislation; is that right?

7  **A.**   That's correct.

8  **Q.**   And you believe that the board of supervisors -- the board

9  of supervisors member who requested this -- wanted to know if

10  the revenues of same-sex marriage would offset the costs of

11  same-sex marriage; is that correct?

12  **A.**   I believe the request wanted to know the revenue impacts,

13  to look at whether it made sense to add additional resources

14  for the county clerk who had to process an elevated number of

15  license and appointment requests.

16  **Q.**   So they thought they might have some additional staffing

17  costs associated --

18  **A.**   Right.

19  **Q.**   -- with same-sex marriage; is this correct?

20       If you could turn to page 6 of this report.  And this

21  is a slide titled, "Assumptions.  San Francisco Resident

22  Weddings."

23       And can you please read the first sentence of the

24  first bullet point on that page.

25  **A.**   Yes.  It says, "Based on the experience of Massachusetts,

1  we project that 28 percent of San Francisco's same-sex couples

2  will marry in fiscal year 2008-09, and 9 percent in fiscal year

3  2009-10, a 67 percent drop."

4  **Q.**   Okay.   What I'm interested in is this 67 percent drop in

5  same-sex marriages that you assumed from the first year to the

6  second year of its availability.

7         For your opinion in this case, you have not factored

8  in any drop from the time period in 2008, when same-sex

9  marriage was legal, until the time when same-sex marriage is

10  permitted again; is that correct?

11  **A.**   That's right.

12  **Q.**   And you've said that rate that obtained in 2008 would last

13  for several years.   And you've not projected any -- any drop

14  between those years; is that correct?

15  **A.**   That's right.   I have not attempted to quantify that drop.

16  **Q.**   In this report which you did for a member of the

17  San Francisco board of supervisors, you did -- you did project

18  a drop; is that correct?

19  **A.**   That's correct.

20  **Q.**   Okay.   So, now, if you could turn to tab 4 of the witness

21  binder.   And this is a document that's been marked Plaintiffs'

22  Exhibit 1734.

23         Can you identify this document.   And if you would

24  like, at the same time, to look at what has been behind tab 5.

25  That is PX1735.   I believe those two documents, taken together,

1  represent all the marriages that took place in San Francisco

2  during the time period same-sex marriage was legal; is that

3  right?

4  **A.**   I believe you're correct.

5          **MR. PATTERSON:**  Your Honor, we would like to admit

6  these two -- move two documents, PX1734, PX1735, into evidence.

7          **MS. VAN AKEN:**  No objection, Your Honor.

8          **THE COURT:**  Perhaps you can have the witness explain

9  how one should read these.

10         **MR. PATTERSON:**  Yes.

11         **THE COURT:**  Are you planning to do that,

12 Mr. Patterson?

13         **MR. PATTERSON:**  Yes.

14         **THE COURT:**  All right.  Fine.

15         (Plaintiffs' Exhibit 1734, 1735 received in

16         evidence.)

17 **BY MR. PATTERSON:**

18 **Q.**   So this is information the county clerk's office provided

19 you with respect to marriages in San Francisco; is that

20 correct?

21 **A.**   Uh-huh.

22 **Q.**   And it's my understanding that there is an entry in these

23 documents for each marriage that took place in San Francisco

24 from June 17th, 2008, to November 4th, 2008; is that correct?

25 **A.**   That's my understanding, too.

1   Q.   And it's broken down -- first of all, there are two

2   documents.   My understanding is that one of them is

3   confidential weddings, and one of them is weddings that are on

4   the public record; is that correct?

5   A.   That's why there are two documents, yes.

6   Q.   Okay.   And the information in each of these documents, the

7   weddings, are broken down between San Francisco resident

8   weddings -- San Francisco resident same-sex couples,

9   non-San Francisco resident same-sex couples, and then

10  opposite-sex couples; is that correct?

11  A.   I would have to refresh my recollection about the

12  ordering.

13  Q.   Okay.

14  A.   But --

15  Q.   Well, if it would help you refresh your recollection, if

16  you look at PX1735, that one has page numbers on it, so it's a

17  little easier for me to ask you to flip through that one.

18  That's behind tab 5.

19           And then on page 42 of that --

20  A.   Yes.

21  Q.   -- it says, "Same-Sex Inside San Francisco"; is that

22  correct?

23  A.   Yes.

24  Q.   It's cut off, but that's what you understand?

25  A.   Yes.

1  Q.    So everything above that would be same-sex marriages that

2  occurred inside San Francisco?

3  A.    That's correct.

4  Q.    And if you turn to page 90, about a third of the way down

5  the page, do you understand that that's -- represents same sex

6  outside of San Francisco?

7  A.    Yes.

8  Q.    Okay.  And, then, if you turn to page 142, which I believe

9  is the last page of the document, it says "opposite sex"; is

10  that correct?

11  A.    Yes.

12  Q.    And is it your understanding that the other document has

13  these listed in the same -- in the same order?  And this one

14  doesn't have page numbers, but on the fifth page is where the

15  first --

16  A.    Uh-huh.

17  Q.    -- cutoff takes place.

18  A.    It's organized in the same way, yes.

19  Q.    Okay.  For each wedding, would you agree that it includes

20  the city and state of residence for each partner to the

21  marriage?

22  A.    Yes.

23  Q.    And so with these documents you could determine the

24  proportion of out-of-state couples that came to California to

25  get married during this time period; is that correct?

1   A.   Yes.

2   Q.   Or came to San Francisco.   Sorry.

3        And you have not attempted to do so in this report;

4   is that correct?

5   A.   Uhm, I believe the distinction we made in our analysis is

6   resident/nonresident, and not in state/out of state, yes.

7   Q.   Okay.   Now if you could turn to tab 6 of this binder.   And

8   this is a document that's been marked PX1736.

9        And this is data -- first of all, can you identify

10  this document?

11  A.   Yes.   This is a summary of the reports we were just

12  examining, that summarizes them by the -- whether it's an

13  opposite-sex or same-sex marriage, and the location of the

14  residence of the partners.

15       MR. PATTERSON:   Your Honor, we would move to admit

16  PX1736.

17       MS. VAN AKEN:   No objection, Your Honor.

18       THE COURT:   Very well.   1736 is admitted.

19       (Plaintiffs' Exhibit 1736 received in evidence.)

20  BY MR. PATTERSON:

21  Q.   Now, let's start with a San Francisco residents, same-sex

22  marriages.   So from June 17th to November 4, 2008, there were

23  2,331 San Francisco resident same-sex marriages; is that

24  correct?

25  A.   Yes.

1   **Q.**   And your annualized calculations are based on, basically,

2   dividing the activity that took place during this time period

3   by .38, to arrive at an annualized figure; is that correct?

4   **A.**   Right.  Because the period during -- in 2008, that

5   same-sex marriage was legal represents 38 percent of 2008.

6   **Q.**   Okay.

7             **MR. PATTERSON:**   Your Honor, I would like to use a

8   demonstrative to ask the next several questions.

9             **THE COURT:**   Very well.

10            (Document displayed)

11   **BY MR. PATTERSON:**

12   **Q.**   So this is the first slide.  And we just established that

13   2,331 same-sex marriages between San Francisco residents took

14   place in 2008; is that correct?

15   **A.**   Yes, we just did.

16   **Q.**   And that using your methodology, you would have to divide

17   by .38 to get the annualized figure; is that correct?

18            So we move to slide 2, please.  I've done the math

19   here.  2,331 divided by .38 equals 6,134.  Does that look right

20   to you?

21   **A.**   That -- I trust your math on that.

22   **Q.**   Okay.  And you've said that marriages would continue at

23   this rate for several years, so I'm going to assume "several"

24   would be at least two.  Is that correct?

25   **A.**   Again, I can't attach a number to it --

1  Q.   Right.

2  A.   -- because I don't have a sense of what the --

3  Q.   But several, generally, is more than one; is that correct?

4  A.   It's more than one.

5  Q.   Okay.  So, then, after two years, using your methodology,

6  you would project that in addition to the 2,331 San Francisco

7  couples that got married in 2008, there would be 6,134 times

8  two?  Is that correct?

9  A.   Yes.

10 Q.   So can we move to the next slide.

11          (Document displayed.)

12          So that would be, after two years, if same-sex

13 marriage were legalized again, we would have 14,599

14 San Francisco resident same-sex marriages; is that correct?

15 A.   Uh-huh.

16 Q.   Okay.  If you could please turn to tab 7 in your witness

17 binder.  This is a document that's been marked Plaintiffs'

18 Exhibit 817.  Do you recognize this document?

19 A.   Yes, I do.

20 Q.   And could you describe what this document is?

21 A.   Yeah.  This is a table from the U.S. Census Bureau's

22 American Community Survey.

23 Q.   And you relied on this table in preparing your expert

24 report?

25 A.   Yes, I did.

1          **MR. PATTERSON:**  Your Honor, we would like to move

2    this PX817 into evidence.

3          **MS. VAN AKEN:**  No objection.

4          **THE COURT:**  817 is admitted.

5          (Plaintiffs' Exhibit 817 received in evidence.)

6    **BY MR. PATTERSON:**

7    **Q.**   Now, could you tell me how many male-couple households

8    this Census Bureau report estimates there are in San Francisco?

9    **A.**   Do you mean unmarried-partner households where there's a

10   male household or a male partner?

11   **Q.**   Yes, I do.

12   **A.**   That's 7,033.

13   **Q.**   And could you tell me how many female households of

14   similar type there it reports?

15   **A.**   That's 2,591.

16   **Q.**   That's a -- I'll represent to you, that's a total of

17   9,624.  Does that sound correct?

18   **A.**   Yes.

19   **Q.**   So you understand this to be estimated that there are

20   9,624 same-sex couples living in San Francisco; is that

21   correct?

22   **A.**   There were on an average during the three years that were

23   covered by the census, yes.

24   **Q.**   And, in light of that, do you think it's reasonable to

25   assume that after two more years of same-sex marriage, there

1  would be 14,599 San Francisco resident same-sex couples that

2  get married in San Francisco?

3  **A.**   Well, I wouldn't be able to comment on the reasonableness

4  of that, unless I knew something about the migration rate in

5  and out of San Francisco of guy and lesbian individuals, and I

6  knew something about the rate of couple formation.

7       If, for example, these 9,000 or so have either gotten

8  married and are no longer unmarried, or have moved out of

9  San Francisco, or their partnerships have dissolved, there

10  could very well be, over the next two years, an additional

11  14,000 new set of couples that might wish to get married.

12       Again, but this is one reason why I didn't attach a

13  number of years to it, because I don't have that necessary

14  information to make a long-term calculation.

15  **Q.**   Okay.  Do you think it would have been, you know,

16  informative to compare the number of marriages your estimate

17  projects with the population of same-sex couples in

18  San Francisco?

19  **A.**   I think if I had wanted to quantify the length of time

20  that I thought that short-term projection would apply -- well,

21  actually, no.  Because I'm not sure -- I think, by itself, this

22  is not a good predictor of the number of weddings in

23  San Francisco, because you need to know how many couples there

24  are in a given year, who are ready to get married.

25       And that has to do with the dynamics of migration and

1    the dynamics of household formation or couple formation.

2    **Q.**   Can I ask you to look at tab 8 in the witness binder now,

3    please.

4              This is an exhibit that has been marked PX818.  "The

5    Impact of Extending Marriage to Same-Sex Couples on the

6    California Budget."  It's a Williams Institute report.

7              Do you recognize this document?

8    **A.**   Yes, I do.

9    **Q.**   And did you rely on this document in preparing your expert

10   opinion in this case?

11   **A.**   Yes, I did.

12   **Q.**   Now, if you would turn to page 4.  And the second sentence

13   of the -- of the second paragraph says that:

14             "Approximately 9,695 same-sex couples married

15             in Massachusetts during the first three years

16             they were allowed to do so, constituting at

17             least 44 percent of Massachusetts same-sex

18             couples as counted in the U.S. Census

19             Bureau's American Community Survey."

20             Is that correct?

21   **A.**   Yes, it is.

22   **Q.**   And is it correct that your projection assumes that over

23   100 percent of San Francisco same-sex couples, as counted by

24   the U.S. Census Bureau's American Community Survey, would get

25   married after two years, were same-sex marriage permitted?

1  **A.**    Well, the Census Bureau doesn't count the number of

2  couples over a two-year period.  It counts the number of

3  couples at one point in time.

4  **Q.**    Right.

5  **A.**    And report it for that year.

6  **Q.**    But I'm -- this Williams Institute report --

7  **A.**    Yes.

8  **Q.**    -- used the U.S. Census Bureau's American Community Survey

9  to determine what percentage of Massachusetts same-sex couples

10  got married during the first three years they were allowed to

11  do so; is that correct?

12  **A.**    Right.

13  **Q.**    And that is the same methodology I just walked you through

14  with respect to your projections, is that correct?

15          **MS. VAN AKEN:**  Objection, vague.

16          **THE COURT:**  Objection overruled.

17  **BY MR. PATTERSON:**

18  **Q.**    Which methodology are referring to?

19  **A.**    The methodology of seeing how many weddings your

20  methodology would assume occurred in San Francisco during the

21  next two years was the period that I selected.

22          And then using the U.S. Census Bureau's American

23  Community Survey estimates as basically a denominator to figure

24  out the percentage of same-sex couples that that represents.

25          Is that what the Williams Institute did and is that

1    the same thing that I've walked you through?

2    A.    The Williams Institute has compared the number of same-sex

3    couples who were married in Massachusetts during the first

4    three years that they were allowed to do so with an estimate of

5    the total number of same-sex couples in Massachusetts as

6    reported by the American Community Survey.

7             And you have extrapolated my estimate to produce a

8    two-year estimate and compared it to the American Community

9    Survey for San Francisco's estimate of same-sex couples.

10   Q.    And what actually happened in Massachusetts after three

11   years was 44 percent of same-sex couples got married, is that

12   correct, as so estimated?

13   A.    Yes, I believe that's correct.

14   Q.    And your projections assume that over 100 percent of

15   San Francisco same-sex couples would get married, is that

16   correct, using those same parameters?

17   A.    Again, I don't believe that that is a correct measure

18   necessarily of the number of potential weddings that could take

19   place because of the issue of how -- couple formation and

20   migration that I have discussed.

21   Q.    I'm not asking you if it's a correct way to analyze it.

22   I'm asking you if that is the result of that analysis; that

23   over 100 percent as counted that way?

24   A.    Yes.

25   Q.    Okay.  Now, you claim that revenue will be generated from

1  the marriages of same-sex resident -- same-sex couples in the

2  form of hotel tax revenues and sales tax revenues, is that

3  correct?

4  A.    Yes.

5  Q.    Hotel tax revenues are generated when non-resident guests

6  of same-sex couples travel to San Francisco to attend weddings,

7  is that correct?

8  A.    As well as when non-resident couples travel to

9  San Francisco to marry.

10 Q.    I'd like you to just now focus on the San Francisco

11 resident same-sex weddings for this series of questions.

12         And sales tax will be generated by the per diem

13 spending of these out-of-town guests, is that correct?

14 A.    Yes.

15 Q.    And sales tax will also be generated by retail

16 expenditures the couples make on their weddings, is that

17 correct?

18 A.    Yes.

19 Q.    Okay.  So you assume that out-of-town guests will attend

20 weddings of San Francisco resident same-sex couples, is that

21 correct?

22 A.    Yes.

23 Q.    And you haven't attempted to determine how many

24 out-of-town guests actually attended such weddings in 2008,

25 have you?

1  A.   No.

2  Q.   You haven't attempted to determine how many those of

3  guests actually stayed at hotels, is that correct?

4  A.   No.  I would have no way to imagine that information was

5  obtainable.

6  Q.   Okay.  So you simply picked a number to estimate that

7  figure, is that correct?

8  A.   Well, as you do when you make economic projections.  We

9  made some very conservative assumptions about the relative size

10 of same-sex weddings and the number of guests who might stay

11 from out of town.

12       We assumed only 10 percent of wedding guests would

13 come from out of town, which seemed to me to be a fairly

14 conservative assumption.

15 Q.   Okay.  Now, with respect to wedding expenditures by

16 San Francisco same-sex couples, you assumed that the average

17 taxable cost of the wedding for a resident same-sex couple is

18 25 percent of that of the wedding of an opposite-sex couple, is

19 that correct?

20 A.   Yes.

21 Q.   And you have not studied the actual expenditures of

22 same-sex couples on their weddings either, is that correct?

23 A.   No.  We actually relied on the Williams Institute report

24 that we have been referring to for that assumption.

25 Q.   Okay.  If you could, please, turn back to tab three in the

1  witness binder?

2          (Witness complied.)

3  **Q.**   And this is the Office of Economic Analysis report that we

4  discussed earlier.

5          If you could turn to page six, please?  It's the same

6  slide we looked at before.

7          And if you could read the first sentence of the third

8  bullet point?

9  **A.**  (As read)

10          "They will spend an average of 25 percent of

11          what different sex weddings cost in

12          San Francisco or $9,180 per wedding."

13  **Q.**   And by "they" you mean same-sex couples?

14  **A.**   Resident same-sex couples, that's correct.

15  **Q.**   And if you could read the second sentence of the, please?

16  **A.**   The second sentence says:

17          "However, only 10 percent of this is assumed

18          to count as new income for figuring an

19          economic impact."

20  **Q.**   Continue with the third sentence, please?

21  **A.**  (As read)

22          "Most resident spending will simply be

23          diverted from other expenditures and will not

24          create a net economic impact."

25  **Q.**   You haven't made a similar assumption in this case, have

1   you?

2   A.    That's correct.

3   Q.    Your calculations assume that 100 percent of the

4   expenditures San Francisco same-sex couples make on their

5   weddings will constitute new spending, is that correct?

6   A.    Well, technically I'm assuming that the 25 percent costs

7   represents the new income that is generated.

8           So reflected in the fact that the same-sex marriage

9   impact number is less than a -- the cost of an average

10  opposite-sex wedding is considering that which is new income,

11  and that's following the assumption made in the Williams

12  Institute report correctly.

13  Q.    But for the report that you did as part of your official

14  duties in the Office of Economic Analysis, you assumed that

15  only 10 percent of the 25 percent would constitute new

16  spending, is that correct?

17  A.    That's correct.  I believe I misunderstood how the

18  Williams Institute had made that assumption in their report.

19  Q.    Okay.  Fair enough.

20          So we have been discussing San Francisco resident

21  weddings.  Let's now turn to out-of-state weddings.  And if you

22  could return to tab six of the witness binder?

23          (Witness complied.)

24  Q.    This reports that there were 2,821 non-San Francisco

25  resident same-sex marriages that took place in 2008, is that

1  correct, between same-sex couples?

2  **A.**   Yes.

3  **Q.**   And some of these were from out of -- within California,

4  but out of San Francisco; and some were from out of the state

5  and even in different countries, is that correct?

6  **A.**   Yes.

7  **Q.**   You have not distinguished between any of those

8  categories, is that correct?

9  **A.**   That's right.

10 **Q.**   Now, do you know since November 4th, 2008, have there been

11 any additional jurisdictions that have permitted same-sex

12 couples to get married?

13 **A.**   I don't recall the details on that, no.

14          **THE COURT:**   Since what date?

15          **MR. PATTERSON:**   Any additional jurisdictions.

16          **THE COURT:**   No, the date.

17          **MR. PATTERSON:**   Oh, November 4, 2008.

18 **BY MR. PATTERSON:**

19 **Q.**   I will represent to you that there are a number of

20 jurisdictions that have permitted same-sex couples to get

21 married after November 4th, 2008.  During that time period,

22 Massachusetts had allowed out of state couples to get married

23 for a short period of time.  That was the only other

24 jurisdiction.  Now, I believe, four other jurisdictions permit

25 same-sex couples to be married.

1          Do you think those types of changes could have an

2    impact on the number of out-of-state same-sex couples that come

3    to California, San Francisco in particular, to get married?

4    **A.**    It might have an impact, although among the locations from

5    which people traveled to San Francisco to marry were places

6    where -- that were quite adjacent to, or in some cases perhaps

7    even in, jurisdictions where they could already marry.

8          San Francisco is a tourism destination, as well as a

9    place to get married.  And I'm certain that many out-of-state

10   couples came to San Francisco for the tourism dimension, and

11   that would probably continue.

12   **Q.**    Your report assumes that such changes would have no

13   effect, is that correct?

14   **A.**    That's correct.

15   **Q.**    The --

16   **A.**    You know, there are many other potential changes that

17   could affect that number that also don't go in there.  There

18   may be more same-sex couples forming in other states.  There

19   may be more couples wishing to get married.  I don't -- I don't

20   consider that either.  It's a fairly simple methodology,

21   actually.

22   **Q.**    Okay.  And, now, I'm going to ask you a hypothetical, or

23   pose a hypothetical scenario to you, and that is:  Assume that

24   same-sex marriage is legal in all 50 states.

25          In that scenario would you expect the percentage of

1  out-of-state couples coming to California to get married to

2  decrease from what we saw in 2008?

3  **A.**   To California or to San Francisco?

4  **Q.**   To San Francisco.

5  **A.**   I am not sure that that would necessarily reduce the

6  number.  I can see your point, but I would say it depends on

7  the number of same-sex couples wishing to get married across

8  the U.S., and I don't know that that's a fixed number.

9  **Q.**   But you -- as you stated, you have not taken any of that

10  into account?

11  **A.**   That's correct.

12  **Q.**   Okay.  If you could, please, go back to tab three in the

13  witness binder, again, the Office of Economic Analysis report

14  that you put together.  And this time I want to ask you to turn

15  to the seventh page.  And this is assumptions that your office

16  made about out-of-state resident weddings.

17          And in the first bullet point you state that -- you

18  project that the second year total will be 67 percent less than

19  the first year total, is that correct?

20  **A.**   Yes, that's correct.

21  **Q.**   And that's the same as you did for the

22  inside-San Francisco weddings in this -- in the report you did

23  for the Board of Supervisors, is that correct?

24  **A.**   Yes.

25  **Q.**   And, similarly, you have not done that in your report for

1  this Court, is that correct?

2  **A.**   Not done what?

3  **Q.**   You have not assumed that there will be a year to year

4  decrease in the rate of same-sex couples getting married?

5  **A.**   That's correct.

6  **Q.**   And 67 percent is actually a fairly large decrease from

7  year to year, is that correct?

8  **A.**   Well, I was following in this 2008 report the methodology

9  of the Williams Institute as closely as I could.

10       The reason I did not follow that methodology for my

11  expert report for this case was that that methodology from the

12  2008 report substantially underestimated the number of same-sex

13  marriages that we actually had.

14       So rather than attempt to replicate that methodology,

15  which had under counted what we had, I felt it would be more

16  straightforward to simply extrapolate San Francisco's

17  experience during a multi-month period of time.

18  **Q.**   Now, same-sex marriage was not legal in San Francisco for

19  a multi-year period of time, is that correct?

20  **A.**   That's right.

21  **Q.**   So there wasn't really evidence to deviate from

22  a one-year-to-the-next estimate of what would happen, is that

23  correct?

24  **A.**   Right.  That's based on the Williams Institute report,

25  which does look at multi-year experience within Massachusetts.

1    Q.    Okay.

2              MR. PATTERSON:   Your Honor, I would like to request a

3    brief break, if I may?

4              THE COURT:   How much longer do you have with this

5    witness?

6              MR. PATTERSON:   I would say I'm about halfway

7    through, your Honor.

8              THE COURT:   Okay.  Maybe a break, like your colleague

9    Mr. Thompson, will reduce the length somewhat.

10             MR. PATTERSON:   Okay.

11             THE COURT:   That I'm sure will be helpful to

12   everybody.

13             All right.  Shall we take until 15 minutes of the

14   hour, or 10:45.

15             MR. COOPER:   Your Honor, just before we break, may I

16   ask one minor housekeeping matter?

17             THE COURT:   Yes.

18             MR. COOPER:   Point of clarification, actually, and

19   it's further to your announcement as we opened the court day,

20   that the Court was asking for withdrawal of this case from the

21   pilot program.

22             I just ask the Court for clarification, if I may then

23   understand that the recording of these proceedings has been

24   halted, the tape recording itself?

25             THE COURT:   No, that has not been altered.

1        **MR. COOPER:**  As the Court knows, I'm sure, we have

2    put in a letter to the Court asking that the recording of the

3    proceedings be halted.

4        I do believe that in the light of the stay, that the

5    court's local rule would prohibit continued tape recording of

6    the proceedings.

7        **THE COURT:**  I don't believe so.  I read your letter.

8    It does not quote the local rule.

9        The local rule permits remote -- perhaps if we get

10   the local rule --

11       **MR. BOUTROUS:**  Your Honor, I have a copy.

12       **THE COURT:**  Oh, there we go.

13       (Whereupon, document was tendered

14        to the Court.)

15       **THE COURT:**  The local rule permits the recording for

16   purposes the -- of taking the recording for purposes of use in

17   chambers and that is customarily done when we have these remote

18   courtrooms or the overflow courtrooms.  And I think it would be

19   quite helpful to me in preparing the findings of fact to have

20   that recording.

21       So that's the purpose for which the recording is

22   going to be made going forward.  But it's not going to be for

23   purposes of public broadcasting or televising.

24       And you will notice the local rules states that:

25       "The taking of photographs, public

```
 1                     broadcasting or televising, or recording for

 2                     those purposes."

 3                     So the recording is not being made for those

 4   purposes, but simply for use in chambers.

 5          MR. COOPER:  Very well, your Honor, and I appreciate

 6   that clarification.

 7          THE COURT:  All right.

 8          (Whereupon there was a recess in the proceedings

 9           from 10:32 a.m. until 10:59 a.m.)

10          THE COURT:  Very well, Mr. Patterson.  Please

11   continue.

12          MR. PATTERSON:  Very well, your Honor.

13   BY MR. PATTERSON:

14   Q.   Dr. Egan, we were speaking about the revenues you

15   project San Francisco weddings, the out-of-state -- or

16   out-of-San Francisco same-sex couples would generate.

17          And, again, one source of those revenues come from

18   hotel taxes, is that correct?

19   A.   Yes, it is.

20   Q.   And you have basically -- you have assumed how long the

21   non-San Francisco resident same-sex couples would stay in

22   San Francisco when they got married, is that correct?

23   A.   That's correct.

24   Q.   And, once again, you have not done any study of how long

25   non-San Francisco resident same-sex couples actually stay in
```

1  San Francisco when they come here to get married, is that

2  correct?

3  **A.**  Well, no.  On the first time for my 2008 report, same-sex

4  marriage had just become legal and there was no data about it.

5        And for this expert report, again, they are not --

6  it's not legal, so there is nothing to study.  So I had to make

7  an assumption.

8  **Q.**  You could study what occurred during 2008, is that

9  correct?

10  **A.**  Had I known that I would have had to study it, perhaps I

11  could have put in some survey, yes, but I didn't do that.

12  **Q.**  And, again, another source of revenue you cite is sales

13  tax generated by per diem spending and wedding-related

14  expenditures, is that correct?

15  **A.**  Yes.

16  **Q.**  And with respect to the wedding-related expenditures for

17  non-San Francisco resident couples, you have once again

18  followed the Williams Institute's methodology, is that correct?

19  **A.**  In terms of the wedding expenditures by --

20  **Q.**  By non-San Francisco resident same-sex couples.

21  **A.**  I believe that's right, yes.

22  **Q.**  So you haven't done any independent research on that?

23  **A.**  No.

24  **Q.**  So adding all these additional revenues that you have

25  identified, I believe you testified San Francisco would gain

1   $2.7 million of annual increased tax revenues, is that correct?

2   A.   I believe that's roughly correct, yes.

3   Q.   Okay.  And you have not considered any costs San Francisco

4   would incur to administer these additional marriages, is that

5   correct?

6   A.   The costs the city and county would incur are reimbursed

7   by the license fees, so that is not a net cost to the city.

8   Q.   You haven't considered whether the City and County would

9   have to engage additional staffing to administer these weddings

10  then?

11  A.   The staffing -- the fees pay for the staff.  So there --

12  again, there was no net cost.  The fees are intended to

13  reimburse the city's costs for providing the licenses.

14  Q.   So you have determined that the fees as they are now

15  would, in fact, reimburse the city's costs if these additional

16  marriages took place?

17  A.   That's correct -- I haven't independently verified that,

18  but that's the purpose of those fees and that's why I didn't

19  consider that as a separate category of economic impact.

20  Q.   And you testified that the motivating factor behind the

21  Board of Supervisors asking you to analyze the effect of Prop 8

22  was to determine whether the costs would cover the additional

23  fees of administering the weddings, is that correct?

24  A.   No, that's not correct.  It was to estimate the number of

25  weddings so that the extra staffing resources could be needed,

1    not to adjust the size of the fee.

2    **Q.**    Okay.  So is your testimony that if the cost -- or if the

3    revenue generated from the fees was not sufficient, then the

4    city would simply raise the fees so that it would be sufficient

5    to cover the cost of administering these weddings?

6    **A.**    The city sets fees to ensure cost recovery.  It's by no

7    means clear that the fees would need to increase because you

8    have more people paying the fees, therefore, you have more

9    resources to hire more staff.

10          It's a per -- the way this is accounted for is each

11   clerk can handle so many during a day and it's a linear thing.

12   So it's not at all clear that the fees would need to change.

13   **Q.**    You simply -- you did not analyze that?

14   **A.**    That's correct.

15   **Q.**    Okay.  And you have not considered any additional costs

16   with, you know, printing additional marriage licenses?

17   **A.**    That's also covered by fees.

18   **Q.**    Okay.  And is -- would San Francisco have to alter the

19   forms for their marriages were same-sex couples allowed to

20   marry?

21   **A.**    That is another thing that the fee is designed to

22   reimburse the city for.

23   **Q.**    Okay.  You simply have not accounted for any of that?

24   **A.**    That's correct.

25   **Q.**    Okay.  Please turn to tab nine in the witness binder.

1              (Witness complied.)

2    **Q.**    And this is a document that's been marked

3    Defendant-Intervenor's Exhibit 852.  Do you recognize this

4    document?

5    **A.**    Yes, I do.

6    **Q.**    And what is this document?

7    **A.**    This is an email thread that concludes with a response I

8    sent to Margaret Singh, who works in the city's 311 customer

9    service center.

10   **Q.**    And based on this email thread, my understanding is that a

11   caller to the customer service center had asked what the

12   financial impact of Prop 8 would be on the City and County

13   San Francisco, is that correct?

14   **A.**    That's correct.

15   **Q.**    And you answered that Prop 8 would result in $415,000 in

16   lost taxes and fees, is that correct?

17   **A.**    That's what that email says, yes.

18   **Q.**    And you wrote that email?

19   **A.**    That's correct.

20   **Q.**    Okay.  And that's quite a bit lower than the estimate you

21   have provided to the Court in your opinion today, is that

22   correct?

23   **A.**    That's correct.

24            **MR. PATTERSON:**  Your Honor, we would move admission

25   DIX-852 into evidence.

1          **MS. VAN AKEN:**  No objection, your Honor.

2          **THE COURT:**  852 -- D852 is admitted.

3          **MR. PATTERSON:**  Yes.

4          (Defendants' Exhibit 852 received in evidence.)

5    BY MR. PATTERSON:

6    Q.    Okay.  I would now like to turn to lost revenue from

7    higher federal taxes and foregone federal benefits, which was

8    another one of your opinions in this case, is that correct?

9    A.    Yes.

10   Q.    Okay.  And you testified earlier that federal law would

11   have to change before San Francisco and California permitting

12   same-sex couples to marry would have this effect, is that

13   correct?

14   A.    That's my understanding, yes.

15   Q.    Okay.  So -- and you recognize that some same-sex couples

16   would pay more in federal taxes if they were permitted to

17   marry, is that correct?

18   A.    That's my understanding.

19   Q.    Okay.  And so your estimates depend on, you know, how many

20   pay less as compared to how many same-sex couples would pay

21   more, is that correct?

22   A.    As well as the magnitude, yes.

23   Q.    As well as the magnitude, correct.

24          And your estimates of the amount, the relative

25   amounts that fall into those categories and the magnitude are

1  based on calculations by plaintiffs' expert Dr. Badgett, is

2  that correct?

3  A.    Yes, that's correct.

4  Q.    You haven't done any independent verification or analysis

5  of those calculations, is that correct?

6  A.    No, I have not.

7  Q.    So we should ask her any questions about those, is that --

8  about the underlying validity of those, is that correct?

9  A.    Yes, you may.

10  Q.    And one thing you have done is estimated how many same-sex

11  couples married would be residing in San Francisco if they were

12  permitted to marry, is that correct?

13  A.    Yes.

14  Q.    And you assume that the percentage of same-sex couples

15  that would marry would eventually equal the percentage of

16  opposite-sex couples that would marry, is that correct?

17  A.    That's my assumption, yes.

18  Q.    And do you attach a time frame for how long it would take

19  for that to take place?

20  A.    I don't know how long that would take.

21  Q.    Have you attempted to determine how long that would take?

22  A.    No.  It's not necessary for the conclusion that I reach.

23  Q.    Okay.  And for the conclusion that you reach, when the

24  city would obtain the benefit that you identify would only be

25  when that estimate of same-sex couples that you estimate would

1  get married were married, is that correct?

2  A.   Yes.

3  Q.   Okay.  And you base your assumption that these percentages

4  would eventually be equal just on an assumption that the only

5  difference between same-sex couples and opposite-sex couples is

6  that same-sex couples currently face legal barriers to

7  marriage, is that correct?

8  A.   That's correct.

9  Q.   Have you studied the experience of other jurisdictions

10  that have permitted same-sex couples to marry to determine if

11  your prediction has been borne out?

12  A.   Not for the purposes of this piece of the analysis, I did

13  not.

14  Q.   So you don't know if your assumption is consistent with

15  that experience?

16  A.   No.

17  Q.   And you are not an expert on same-sex relationships, is

18  that correct?

19  A.   I wouldn't put myself forward as an expert on same-sex

20  relationships.  However, you know, when you do economic

21  analysis, you have to make assumptions and you try to make ones

22  that are as reasonable as possible and are as informed as

23  possible.

24  Q.   So you haven't done any independent study on whether gay

25  and lesbian relationships differ in any way from opposite-sex

1  relationships?

2  **A.**    No.

3  **Q.**    And I would like to ask you to turn to tab one in the

4  witness binder, which is actually your expert report, and I

5  would just like to refer you to table four, which is, I

6  believe, on the last page of that report.

7  **A.**    Yes, I see it.

8  **Q.**    And this is where you calculate the -- first, you

9  calculate the percentage of heterosexual couples that are

10  married in San Francisco, is that correct?

11  **A.**    Yes.

12  **Q.**    And then you -- you know, you base your calculation of

13  same-sex couples that would get married on that, is that

14  correct?

15  **A.**    That's right.

16  **Q.**    Okay.  And one of the figures in this table is the number

17  of married heterosexual couples, and that is reported here as

18  one thousand -- 103,707, is that correct?

19  **A.**    Yes.

20  **Q.**    I will represent to you that the American Community Survey

21  data that you relied upon that we looked at earlier did not

22  have this number on it.  It had the number of unmarried

23  heterosexual couples.

24         So I would like you to turn to tab 11 in the witness

25  binder, and these are -- this is American Community Survey

```
 1   data, additional data from San Francisco for the same years as
 2   the data that you relied on.
 3           Looking at this, do you recognize that that is what
 4   this document is?
 5   A.   I have not seen this before, but it looks familiar.
 6           MR. PATTERSON:  Your Honor, we would move to admit,
 7   and this is marked Defendant-Intervenor's Exhibit 2558, in
 8   evidence.
 9           MS. VAN AKEN:  Your Honor, I believe the witness said
10   he has not seen this before, but perhaps I missed that.
11           THE COURT:  Well, I understand.  But this appears to
12   be U.S. Census Bureau data.  I think I can at least take
13   judicial notice.
14           Do you have any objection to this?
15           MS. VAN AKEN:  I have no objection.
16           THE COURT:  Very well.  2558 is admitted.
17           (Defendants' Exhibit 2558 received in evidence.)
18   BY MR. PATTERSON:
19   Q.   Then on the first page do you see the "Households By Type"
20   table?
21   A.   Yes, I do.
22   Q.   And do you see the "Married Couple Family" entry in that
23   table?
24   A.   Yes, I do.
25   Q.   And is the estimate there 103,707?
```

1  A.   Yes, it is.

2  Q.   So is this the source of the information in your report?

3  A.   Yes.

4  Q.   Now, you had spoken earlier about coupling rates, is that

5  correct?  That the rates at which people form couples and that

6  that could possibly change among the same-sex community if they

7  were permitted to marry?

8  A.   I spoke of the importance of understanding the rate of

9  couple formation or household formation if you are attempting

10 to estimate the number of weddings in a given year, and that

11 you can't simply look at the number of same-sex existing

12 couples in a static sense and expect that the number of

13 weddings should match that, because households form and there

14 are migration effects.

15 Q.   Okay.  And do you have an estimate of the number of gay

16 and lesbian individuals that there are in San Francisco?

17 A.   I don't have that estimate, no.

18 Q.   And to make that estimate, one piece of data you would

19 need would be the total population of San Francisco, is that

20 correct?

21 A.   Depending on how you would make the estimate, that could

22 be a helpful piece of information.

23 Q.   Okay.  And on the third page of this Census Bureau report,

24 do you see the table labeled "Place Of Birth"?

25 A.   Yes, I do.

1   Q.   And it lists the total population at 757,604, is that

2   correct?

3   A.   Yes.

4   Q.   Okay.  Now, if you could turn to tab 12 in the witness

5   binder?

6        (Witness complied.)

7   Q.   This is an exhibit that's been marked

8   Defendant-Intervenor's Exhibit 1287.  And this is a Williams

9   Institute report called "Census Snapshot - California Gay,

10  Lesbian and Bisexual Population."  Do you see that?

11  A.   Yes, I see it.

12  Q.   And you have relied on the Williams Institute's work in

13  preparing your report, correct?

14  A.   I have not seen this document before.

15  Q.   Not this document specifically, but the Williams

16  Institute's work generally?

17  A.   I have referred to another report prepared by the Williams

18  Institute.

19  Q.   Okay.  And turn to the second page of this report.  And

20  the second bullet point on that page, the first sentence says:

21       "Among California counties, San Francisco has

22       the highest percentage of lesbians, gay men

23       and bisexuals at 14 percent."

24       Is that correct?

25  A.   That's what that says, yes.

1  Q.   Do you have any reason to question that estimate?

2  A.   I don't, no.

3       MR. PATTERSON:   Your Honor, we would move to admit

4  DIX-1287 into evidence.

5       MS. VAN AKEN:   Your Honor, I don't object.

6       THE COURT:   1287 is admitted.

7       (Defendants' Exhibit 1287 received in evidence.)

8  BY MR. PATTERSON:

9  Q.   Okay.  Now, you -- in testifying earlier, you provided an

10 estimate for how much sales tax revenue could be generated by

11 the federal income tax savings that same-sex couples could get

12 if they were permitted to marry, is that correct?

13 A.   Yes.

14 Q.   And, again, that assumes that the net impact of that is

15 that same-sex couples actually have a net savings in federal

16 income taxes, is that correct?

17 A.   It assumes that same-sex couples would pay a lower amount

18 on average in federal income tax if they were married.

19 Q.   And your figure assumes -- I believe you stated this, I

20 just want to make sure -- that same-sex couples spend all of

21 the additional savings that they receive from this lower

22 federal income taxes and that they spend all of it in

23 San Francisco, is that correct?

24 A.   Yes.  That's an upper-end estimate.  They spend all of

25 their additional income in San Francisco on taxable goods.

1  Q.   Have you studied the behavior of people when they obtain

2  tax savings, what amount of it they actually spend?

3  A.   I did not for the purposes of this.  I felt it was

4  sufficient to provide an upper-end estimate.  The number is not

5  particularly, you know, dispositive, so.

6  Q.   Now, you also believe that same-sex couples would be

7  entitled to certain other federal benefits if they were

8  permitted to marry, is that correct?

9  A.   That's my understanding.

10  Q.   And to your understanding, are there federal programs that

11  take spousal income into account when determining eligibility?

12  A.   Yes, there are.

13  Q.   And if the federal government recognized same-sex

14  marriages, potentially the individuals in those marriages could

15  lose eligibility for programs that took spousal income into

16  account, is that correct?

17  A.   I'm not -- I can't think of a specific example, and I'm

18  not sure I can give you a clear answer on that.

19  Q.   If there was an example where there was a threshold of

20  federal -- of income that was required -- you had to have below

21  that income to receive a federal benefit -- and the federal

22  government recognized spousal income, is it not correct that

23  there are some individuals that would, by virtue of that,

24  perhaps go above that threshold that currently do not?

25  A.   Okay.  I understand your example.

1  Q.   Do you agree with that?

2  A.   Again, there was no specific program that's coming to

3  mind, but I'm following your example.

4  Q.   Okay.  And that, you know -- hypothetically, let's -- I'm

5  going to ask you to assume that there are programs that take

6  spousal income into account.  And to determine the net impact

7  of federal recognition of same-sex marriages, you would have to

8  consider that people that could potentially lose eligibility

9  under those programs, as well as individuals that would gain

10  eligibility for other benefits, is that correct?

11  A.   To fully discuss and prepare an estimate of the impact of

12  same-sex marriage on income and spending in San Francisco, you

13  would have to do a full accounting of the ones you refer to in

14  which the eligibility may be less, as well as others in which

15  you're only eligible for the benefit if you are married, and

16  you are denied that benefit if you are not married to your

17  partner.

18       So in order to provide a full estimate, a

19  quantitative estimate, yes, you would need to consider both

20  types.

21  Q.   And you have not attempted to do that?

22  A.   I have not attempted to estimate either type beyond the

23  taxation issue, which was readily quantifiable.

24  Q.   Now, another source of potential savings -- we will move

25  on to another one of your opinions -- is the cost associated

1  with San Francisco's Equal Benefits Ordinance, is that correct?

2  **A.**   Yes.

3  **Q.**   Now, permitting same-sex couples to marry in San Francisco

4  will not repeal the Equal Benefits Ordinance, will it?

5  **A.**   No, it would not.

6  **Q.**   And permitting same-sex couples to marry in San Francisco

7  would not cause San Francisco to stop defending the Equal

8  Benefits Ordinance in court, would it?

9  **A.**   It would not directly cause that, no.

10  **Q.**   Okay.  And your opinion is that -- or your understanding

11  is that San Francisco has expended a certain amount of money

12  defending the Equal Benefits Ordinance in court, is that

13  correct?

14  **A.**   That's my understanding.

15  **Q.**   And do you know when these legal expenditures took place?

16  **A.**   To the best of my recollection, they have -- well, they

17  have occurred since 1997 or so when the Equal Benefits

18  Ordinance was adopted.

19  **Q.**   Do you know if these legal expenditures are ongoing?

20  **A.**   I think, in principle, there is -- they are ongoing and

21  there's a potential risk of expenditures there, but I don't

22  know the specific details.

23  **Q.**   Okay.  If you could please turn to tab 14 in the witness

24  binder, and then there should be an Exhibit A there.  And

25  that's an exhibit that's been marked Plaintiffs' Exhibit 845.

1              (Witness complied.)

2    **Q.**   Do you recognize this document?

3    **A.**   Exhibit A?

4    **Q.**   Entitled "Hours and Expenses for Matters Involving the

5    Equal Benefits Ordinance."

6    **A.**   I don't specifically recollect this document, no.

7    **Q.**   I will represent to you that this was a document given to

8    us along with your expert report in this case.

9              So you do not recognize or recall reviewing this

10   document?

11   **A.**   This is a -- yes, this is a document which is the source

12   for the $1.6 million in city costs for defending the Equal

13   Benefits Ordinance.

14              **MR. PATTERSON:**  Okay.  Your Honor, I would like to

15   move Plaintiffs' Exhibit 845 into evidence.

16              **MS. VAN AKEN:**  No objection, your Honor.

17              **THE COURT:**  Very well.  845 is admitted.

18              (Plaintiffs' Exhibit 845 received in evidence)

19   **BY MR. PATTERSON:**

20   **Q.**   To your knowledge, Dr. Egan, are either of these cases

21   ongoing?

22   **A.**   I don't have any knowledge on that.

23   **Q.**   Okay.  If you could turn to tab 15 in the witness binder.

24              (Witness complied.)

25   **Q.**   And this is an exhibit that's been marked DIX-2671.  And

1   this is a five-year report on the San Francisco Equal Benefits

2   Ordinance from the San Francisco Human Rights Commission.

3           Do you understand the Human Rights Commission

4   administers the Equal Benefits Ordinance?

5   A.   That's correct.

6   Q.   Have you seen this document before?

7   A.   I don't recall the specific document.

8   Q.   To your understanding, does this appear to be an official

9   publication of the City of San Francisco?

10  A.   Yes.

11          MR. PATTERSON:  Your Honor, we would move to admit

12  Defendant-Intervenor's Exhibit 2671 into evidence.

13          MS. VAN AKEN:  Your Honor, we have no objection.

14          THE COURT:  Well, 2671 is admitted.

15          (Defendants' Exhibit 2671 received in evidence.)

16  BY MR. PATTERSON:

17  Q.   If you could turn to page 12?

18          (Witness complied.)

19  Q.   And there's a heading that's called "Litigation Update."

20  Do you see that?

21  A.   Yes.

22  Q.   And it says:

23          "This past year brought successful closure to

24          most of the litigation challenges facing the

25          Equal Benefits Ordinance since its enactment.

1              Two of the three lawsuits filed against the

2              city challenging the legality of the

3              ordinance have concluded with a majority of

4              the law intact.  The third remains on

5              appeal."

6          Is that correct?

7  **A.**   Yes.

8  **Q.**   And it then goes on to list under subtitle A, *Air*

9  *Transport Association* case.

10          And I don't know if you recall from the prior

11 exhibit, you can look back at it, if you don't, under tab 14-a;

12 but was this the litigation that consumed most of the expenses,

13 the vast majority of the expenses that you have reported in

14 your report?

15 **A.**   Yes, it appears that it was.

16 **Q.**   And according to this, if you go to page 13, at the very

17 bottom it talks about a third lawsuit filed by S.D. Meyers, and

18 it says that that appeal is pending, is that correct?  The very

19 bottom of page 13?

20 **A.**   Yes.

21 **Q.**   So based on that, that would lead one to conclude that the

22 *Air Transport Association* case has been concluded, is that

23 correct?

24 **A.**   Yes.

25 **Q.**   Okay.  Now, do you know if permitting same-sex couples to

1  marry in California will convert existing domestic partners

2  into spouses?

3  **A.**   It's my understanding that would not automatically happen.

4  **Q.**   Did that happen when same-sex couples were permitted to

5  marry in 2008?

6  **A.**   To the best of my knowledge, that did not happen.

7  **Q.**   Okay.  And permitting same-sex couples to marry in

8  California will not prevent same-sex couples from entering

9  domestic partnerships, is that correct?

10 **A.**   As far as I know, it would not.

11 **Q.**   And will permitting same-sex couples to marry in

12 California require other states to permit same-sex marriage?

13 **A.**   I don't believe it would.

14 **Q.**   And San Francisco's contractors have employees across the

15 country to whom they provide benefits under the Equal Benefits

16 Ordinance, is that correct?

17 **A.**   Some do, certainly.

18 **Q.**   And if you could, please, turn to tab 17 in the witness

19 binder?

20         (Witness complied.)

21 **Q.**   And this is an exhibit that's been marked DIX-698.

22         Do you recognize this document?

23 **A.**   Yes, I do.

24 **Q.**   And what is this document?

25 **A.**   This is a document that summarizes the research of a

1  colleague of mine in the Controller's Office on the city's

2  costs in administering the Equal Benefits Ordinance.

3  **Q.**  And this was one of the documents you relied upon in

4  forming your opinions in this case?

5  **A.**  Yes, it is.

6         **MR. PATTERSON:**  Your Honor, we would move for the

7  admission of DIX-698.

8         **MS. VAN AKEN:**  No objection, your Honor.

9         **THE COURT:**  Very well 698 is admitted.

10        (Defendants' Exhibit 698 received in evidence.)

11 **BY MR. PATTERSON:**

12 **Q.**  And in the second paragraph about halfway through it

13 states that between -- strike that.

14        Give me one moment, please, Doctor.

15        (Brief pause.)

16 **Q.**  Okay.  My question for you is:  Does the Human Rights

17 Commission, the employees that they employee to administer the

18 Equal Benefits Ordinance, do they also respond to more general

19 sexual orientation discrimination complaints?

20 **A.**  I'm not completely sure on that, but it's my belief that

21 they do.

22 **Q.**  So even if domestic partnerships were no longer necessary,

23 presumably the Human Rights Commission would still have to

24 respond to these types of complaints, is that correct?

25 **A.**  You mean, discrimination related complaints?

1  Q.    Yes.

2  A.    Yes.

3  Q.    Do you know how common it is for companies to offer

4  domestic partnership benefits?

5  A.    I don't have any numbers on that in my head, no.

6  Q.    Okay.  And if you could return to tab 15.  This is the

7  five-year report on the Equal Benefits Ordinance that we just

8  looked at.

9        If you could turn to page one of that report after

10 the table of contents, and in the second paragraph it says:

11           "Today over 4500 employers extend these

12           benefits."

13           Is that correct?

14 A.    Yes.

15 Q.    "These benefits" do you understand to mean domestic

16 partner benefits?

17 A.    Yes.

18 Q.    If you look at the last sentence of that same paragraph it

19 says that:

20           "The concept of employer-provided domestic

21           partner benefits moved from the far fringes

22           of the fringe benefit landscape to become

23           common place among employee benefit

24           offerings."

25           Is that correct?

1   **A.**   That's what it says, yes.

2   **Q.**   Do you agree that domestic partnership benefits are

3   commonplace?

4   **A.**   I don't have any independent basis to evaluate that

5   statement.

6             **THE COURT:**  I gather you are moving this exhibit in?

7             **MR. PATTERSON:**  I thought that we had moved this

8   one --

9             **THE COURT:**  Has it already come in before?

10            **MS. VAN AKEN:**  I believe it was moved in, your Honor.

11            **THE COURT:**  All right, fine.

12  **BY MR. PATTERSON:**

13  **Q.**   Do you know if California has any laws requiring insurance

14  companies and other insurance providers to provide equal

15  benefits to domestic partners?

16  **A.**   I'm not aware of that.

17  **Q.**   Okay.  If you could turn to tab 31 in the witness binder?

18            (Witness complied.)

19  **Q.**   I will represent to you that this is a provision of

20  California law covering group health insurance policies.

21            And the last sentence of subsection A of that states

22  that:

23            "A policy may not offer or provide coverage

24            for a registered domestic partner that is not

25            equal to the coverage provided to the spouse

1              of an employee, insured or policyholder."

2         Is that correct?

3  **A.**   That's what it says, yes.

4  **Q.**   Okay.  And now if you turn, I believe, three pages, there

5  is another provision of California law.  This is California

6  Insurance Code Section 381.5.

7         And this covers, according to the last sentence of

8  subsection A, "all forms of insurance regulated by this code,"

9  is that correct?

10 **A.**   Yes, it is.

11 **Q.**   And the sentence prior to that:

12              "This law provides that a policy may not

13              offer or provide coverage for a registered

14              domestic partner if it is not equal to the

15              coverage provided for the spouse of an

16              insured or policyholder."

17         Is that correct?

18         **MS. VAN AKEN:**   Your Honor, I'm going to object to

19 this line of questions.  If he is asking if this document says

20 what it purports to say, it is totally unnecessary.

21         If he is asking whether this is the law to the

22 witness, he is being asked for a legal conclusion.

23         **THE COURT:**   Well, it does seem to me, Mr. Patterson,

24 this is a provision of law.  The witness said he wasn't aware

25 of it, and you can certainly refer to the provision of law in

1  making your points, but I'm not sure this is really a proper

2  subject for examination of the witness.

3       **MR. PATTERSON:**  Okay.  Well, he had opined about the

4  cost that the Equal Benefits Ordinance imposes upon

5  San Francisco companies, and I'm just testing the reliability

6  of that opinion.

7       **THE COURT:**  Well, I think I understand the point that

8  you are making.  And I think you have done a good job of making

9  it, so maybe you can move on.

10      **MR. PATTERSON:**  Thank you, your Honor.

11  **BY MR. PATTERSON:**

12  **Q.**  Now, do you know, Dr. Egan, if other government bodies

13  have enacted Equal Benefits Ordinances similar to

14  San Francisco's?

15  **A.**  I'm not completely aware of -- of the prevalence of that.

16  **Q.**  Okay.  And if you could turn to tab 16 in the binder?

17      (Witness complied.)

18  **Q.**  This has been marked Defendant-Intervenor's Exhibit 2672.

19  And this is a seven-year update on the San Francisco Equal

20  Benefits Ordinance from the Human Rights Commission.

21      **MR. PATTERSON:**  And, your Honor, I would like to move

22  DIX-2672 into evidence.

23      **MS. VAN AKEN:**  We have no objection, your Honor.

24      (Defendants' Exhibit 2672 received in evidence)

25

1   **BY MR. PATTERSON:**

2   **Q.**   Now, if you could turn to page five, the conclusion,

3   second paragraph of the conclusion states that:

4          "Including San Francisco, by the end of

5          fiscal year 2003-2004, there were 13

6          government bodies with equal benefits

7          legislation on the books.  Several more are

8          considering such legislation, all using

9          San Francisco's law as a model."

10          Now, if Equal Benefits Ordinances were significantly

11   detrimental economically, do you think all these government

12   bodies would enact them?

13   **A.**   That would depend on whether they felt that the economic

14   cost was worth the benefit of remediating discrimination.

15   **Q.**   So the fact that they do enact them indicates that they

16   think the cost is worth the benefit, is that correct?

17   **A.**   I wouldn't want to try and put myself in their head, but

18   it would seem that's a reasonable conclusion.

19   **Q.**   And you have stated that the Equal Benefits Ordinance

20   possibly reduces the pool of contractors who are bidding on

21   San Francisco contracts, is that correct?

22   **A.**   Yes, it is.

23   **Q.**   And that is because that's a theoretical point, is that

24   correct?  You have not studied whether contractors actually are

25   not bidding on San Francisco's contracts because of the Equal

1  Benefits Ordinance, is that correct?

2  **A.**   No.   I mean, it's hard to observe companies when they

3  don't do something, and that would be the case here.

4  **Q.**   And another opinion that you have provided in this case is

5  that the City and County could save money on healthcare that

6  they provide to the uninsured, is that correct?

7  **A.**   Yes.

8  **Q.**   And your basis for that assumption is just that you

9  believe there are some uninsured members of same-sex couples

10 that would be covered by their partner's private insurance if

11 they were -- if they got married, is that correct?

12 **A.**   Yes, that's correct.

13 **Q.**   And you have not considered those provisions of the

14 California Code that we referred to earlier in forming that

15 opinion, is that correct?

16 **A.**   In what context?

17 **Q.**   In the context where they mandate insurance companies to

18 provide equal benefits to spouses, domestic partners.  You have

19 not considered that in your assumption that some uninsured

20 members of same-sex couples would be covered if they could get

21 married --

22          **MS. VAN AKEN:**  Your Honor --

23 **BY MR. PATTERSON:**

24 **Q.**   -- if they are not currently?

25          **MS. VAN AKEN:**  I apologize.

1          I object that the question misstates the law.

2          (Brief pause.)

3          **THE COURT:**  Maybe if you move to the point you are

4    trying to make directly.

5          This is an adverse witness.  You can cross examine

6    him in the old-fashioned way, rather than to take his

7    deposition.

8    **BY MR. PATTERSON:**

9    **Q.**   Well, the point I would like to make, Dr. Egan, is you

10   simply have not considered how -- whether California law would

11   impact that question, is that correct?

12   **A.**   The question of whether there exists uninsured people in

13   San Francisco whose -- whose unmarried partners have private

14   health insurance?

15   **Q.**   Yes.

16   **A.**   I have not.  Although based on my quick reading of the law

17   in front of me, it only requires that domestic partner benefits

18   be -- not be less than married partner benefits.   It doesn't

19   really require them to provide domestic partner benefits.

20   **Q.**   Okay.  I'm not here to ask you about your understanding of

21   the law.

22   **A.**   Okay.

23   **Q.**   And you simply don't know how many gay and lesbian couples

24   would get insurance were they permitted to marry?

25   **A.**   I do not have an estimate of that, no.

1  Q.    And the cost of providing that insurance would just be

2  shifted from San Francisco to the private sector, is that

3  correct; the cost of their healthcare essentially?

4  A.    That's true, although it may be better to think of it as

5  they are being shifted from the uninsured population to the

6  insured population, which is probably a net economic gain from

7  the point of view of society as a whole.

8  Q.    But to answer the question, is -- the private sector would

9  be picking up for the tab where the public sector now  is doing

10  it?

11  A.    That's correct.

12  Q.    Okay.  And now you have also offered an opinion on the

13  cost of providing health services to the LGBT community, is

14  that correct?

15  A.    Yes.

16  Q.    And you believe that same-sex marriage, permitting

17  same-sex marriage could reduce this, is that correct?

18  A.    Umm --

19  Q.    These costs?

20  A.    Yes, that's correct.

21  Q.    And that is because you believe extending marriage to

22  same-sex couples would lessen discrimination against members of

23  the LGBT community?

24  A.    That seems like a reasonable assumption to me, yes.

25  Q.    And you are not a sociologist or a -- a psychologist, are

1  you?

2  **A.**   I'm not, no.

3  **Q.**   So that's not an expert opinion, that that would occur, is

4  that correct?

5  **A.**   No, it's not.

6  **Q.**   Okay.  And you believe that San Francisco has a brand as a

7  popular tourism destination for gay individuals, is that

8  correct?

9  **A.**   I just draw that conclusion based on the number of

10  out-of-state same-sex marriages that we hosted.

11  **Q.**   And you believe that San Francisco is a particular

12  attraction for gay and lesbian tourists?

13  **A.**   I wouldn't -- I don't have any direct information to

14  compare San Francisco to other places in that regard, but I

15  wrote think that it is, yes.

16  **Q.**   Okay.  And, yet -- and, generally, do you think

17  San Francisco is a gay-friendly city?

18  **A.**   I -- I would say so in general, yes.

19  **Q.**   In light of these things, do you still believe that same

20  sex -- or gay and lesbian individuals have elevated rates of

21  behavioral health services because of the psychological effects

22  of the discrimination they endure in San Francisco?

23  **A.**   That's what I have been told by our Department of Public

24  Health, and I don't have any reason to doubt that statement.

25  **Q.**   You haven't done any independent research on that

 1  yourself?

 2  **A.**    That's not my field, no.

 3  **Q.**    Okay.  And the next subject that you opined upon is the

 4  cost of -- costs incurred because of bullying in the

 5  San Francisco school district, is that correct?

 6  **A.**    Yes.

 7  **Q.**    And your opinion on that subject is based solely on the

 8  report, the economic cost of bullying at school that you

 9  reference, is that correct?

10  **A.**    That's correct.

11  **Q.**    You haven't done any independent study on that, is that

12  correct?

13  **A.**    That's correct.

14  **Q.**    That report did not directly address the experience in

15  San Francisco, is that correct?

16  **A.**    That's correct.  It was California.

17           **THE COURT:**  It's true, is it not, that...

18           **MR. PATTERSON:**  Okay.

19           (Laughter.)

20           **MR. PATTERSON:**  Thank you, your Honor.

21  **BY MR. PATTERSON:**

22  **Q.**    Now, finally, you've talked about some -- it's true that

23  you've talked about -- is it not, that you've talked about

24  economic advantages of marriage that cannot be quantified, is

25  that correct?

1    **A.**    That's correct.

2    **Q.**    And you believe there's research supporting the statement

3    that there is significant economic advantages to marriage, is

4    that correct?

5    **A.**    I'm aware of that research, yes.

6    **Q.**    That research does not study same-sex married couples,

7    does it?

8    **A.**    To my knowledge, it does not, right.

9    **Q.**    I would like to turn to tab 19 in the witness binder.

10   This is a Rand Institute study, "Marriage, Assets and Savings."

11   It's been marked PX 809.

12            Do you recognize that document?

13   **A.**    Yes, I do.

14   **Q.**    And this is a study that you relied upon for your opinion

15   that married couples generate more wealth than single people,

16   correct?

17   **A.**    That's correct.

18   **Q.**    And this does not address same-sex married couples, does

19   it?

20   **A.**    It does not.

21            **MR. PATTERSON:**  Your Honor, we would move to admit PX

22   809 in evidence.

23            **MS. VAN AKEN:**  No objection, your Honor.

24            **THE COURT:**  Very well.  809 is in.

25

1          (Plaintiffs' Exhibit 809 received in evidence)

2  **BY MR. PATTERSON:**

3  **Q.**   If could turn to tab 20 in the witness binder, please,

4  Dr. Egan.

5          (Witness complied.)

6  **Q.**   And this has been marked as PX 807.  It's a press release

7  from -- it looks like the agency for Healthcare Research and

8  Quality.

9          And this is what you've relied upon for your opinion

10  that married men are more likely to be engaged in healthy

11  behaviors than single men, is that correct?

12  **A.**   This and the article to which it refers, yes.

13  **Q.**   Okay.  And this is the only item that you included in the

14  "Materials Considered" portion of your expert report, is that

15  correct?

16  **A.**   That's correct.

17  **Q.**   And the studies reported here did not, as far as we can

18  tell, consider same-sex marriages, is that correct?

19  **A.**   That's correct.

20  **Q.**   Now, if you turn to tab 21 --

21          **MR. PATTERSON:**  Your Honor, I would like to move  PX

22  807 into evidence.  I believe I neglected to ask you that.

23          **MS. VAN AKEN:**  No objection, your Honor.

24          **THE COURT:**  Very well.  807 is admitted.

25

1              (Plaintiffs' Exhibit 807 received in evidence)

2    **BY MR. PATTERSON:**

3    **Q.**   If you could, please, turn to tab 21, Dr. Egan?

4              (Witness complied.)

5    **Q.**   And this has been marked Plaintiffs' Exhibit 803.  And

6    this is data from the California Health Interview Survey that

7    you relied upon for your opinion that:

8              "Unmarried men have more emotional and mental

9              health problems than married men."

10             Is that correct?

11   **A.**   Yes, it is.

12             **MR. PATTERSON:**  Your Honor, I would like to move

13   exhibit number PX 803 into evidence.

14             **THE COURT:**  Hearing no objection, 803 is in.

15             (Plaintiffs' Exhibit 803 received in evidence)

16   **BY MR. PATTERSON:**

17   **Q.**   And this does not break down same-sex and opposite-sex

18   marriages, does it?

19   **A.**   That's correct.

20   **Q.**   So you simply -- you don't have any research that supports

21   your view that the advantages of opposite-sex marriage would

22   flow to same-sex marriage, is that correct?

23   **A.**   My research doesn't make any distinction.

24   **Q.**   Your research does not include same-sex married couples,

25   is that correct?

1  **A.**   Most of my research predated when same-sex marriage was

2  legal at any point in the United States.

3  **Q.**   Okay.  Now, you have not considered the impact on

4  opposite-sex couples in San Francisco that extending marriage

5  to same-sex couples may have, is that correct?

6  **A.**   I have not.

7  **Q.**   And it's true, is it not, that if opposite-sex couples got

8  married at lower rates than they did before, that it could

9  offset the benefits you see from same-sex marriage, is that

10 correct?

11 **A.**   If it were the case that same-sex marriage reduced the

12 marriage rate for opposite-sex couples, then, yes, that would

13 be a -- that could have an impact.

14 **Q.**   And if you turn to tab 22 of the witness binder -- I

15 believe this is already in evidence -- this is the marriage

16 license appointment data.  And this has data from the year 2007

17 as well as from the year 2008.

18         And I will represent to you that from the date

19 June 17th to November 4th, 2008 there were 3,239 opposite-sex

20 marriages; that from the date June 17th to October 31st, 2007,

21 just a few days shorter, there were 4,009 opposite-sex

22 marriages.

23         And that's -- there's a column that says actual

24 marriage licenses and a -- for opposite-sex couples for both

25 the year 2008 and 2007.  Do you see that data there?

1  **A.**   I'm not seeing the numbers you are referring to.

2  **Q.**   Well, the numbers are broken down by month, and I have

3  just --

4  **A.**   You are looking at the annual totals or are you --

5  **Q.**   I'm looking at the months during which same-sex marriage

6  was legal in 2008 and in those same dates in 2007.

7  **A.**   Right.

8  **Q.**   And I'm representing to you that I have added up those

9  figures, and that in 2008 there were more than 700 fewer

10  opposite-sex marriages in San Francisco than there were in

11  2007.

12  **A.**   Marriage license appointments?

13  **Q.**   Marriage licenses, actual marriage licenses issued.

14  **A.**   Okay.

15  **Q.**   So if that's true, that means that less opposite-sex

16  couples married in San Francisco during the time that same-sex

17  marriage was legal than the comparable time the prior year,

18  correct?

19  **A.**   It would seem to me, looking at this data, that in some of

20  the months there were fewer opposite sex weddings, and in some

21  of the months there were more; and that your general statement

22  about the year seems to be correct for that one -- that one

23  pair of years.

24  **Q.**   And I have actually just added up the months during which

25  same-sex marriage was legal in order to account for, you know,

1    some months more, some months less.

2    A.    I understand.  But, for example, June 17, 2008 to

3    June 30th, 2008, there were 548 opposite-sex marriage licenses

4    and 1,076 same sex.

5          In the previous, and year during that same period,

6    there was only 462 opposite.  So for that two-week period there

7    was an increase.

8    Q.    Right.  But for the period as a whole, there was a

9    decrease?

10   A.    For the four, five month -- yeah, for that multi-month

11   period, there was a decrease.

12   Q.    Okay.  And, Dr. Egan, you have testified that you teach at

13   the University of California at Berkeley, is that correct?

14   A.    That's correct.

15   Q.    And your courses are focused on the economic analysis of

16   subnational and substate areas, such as cities and metropolitan

17   areas, is that correct?

18   A.    That's right.

19   Q.    And one course -- at least one course that you have taught

20   was essentially a study of why the economics of cities differ

21   from one another and what policy steps can be taken to achieve

22   industrial growth, correct?

23   A.    Yes.

24   Q.    And same-sex marriage did not come up in that course, is

25   that correct?

1   A.   That's correct.

2   Q.   It's not come up in any of the courses that you've taught,

3   is that correct?

4   A.   That's correct.

5   Q.   Okay.  Now, if you could turn to tab 23 of the witness

6   binder?

7        (Witness complied.)

8   Q.   This is an exhibit that's been marked

9   Defendant-Intervenor's Exhibit 854.

10       Do you recognize this document?

11  A.   Yes, I do.

12  Q.   And was this the economic strategy document that you

13  helped San Francisco put together when you were at I.C.F.?

14  A.   That's correct, yes.

15       **MR. PATTERSON:**  Your Honor, we would like to admit

16  Defendant-Intervenor's 854 into evidence.

17       **MS. VAN AKEN:**  No objection, your Honor.

18       **THE COURT:**  Very well 854 is in.

19       (Defendants' Exhibit 854 received in evidence.)

20  BY MR. PATTERSON:

21  Q.   And you were the project manager of this project, is that

22  correct?

23  A.   Yes, I was.

24  Q.   I know this is a lengthy document, but anywhere in here

25  does it mention same-sex marriage?

1  **A.**   I don't believe it does.  It likely doesn't mention many

2  of the things that we study in the Office of Economic Analysis,

3  policy issues that have a material economic impact on the city.

4        I mean, this is really a study of the macro economic

5  infrastructure that drives San Francisco's economy.  It's not

6  meant to be an exhaustive catalog of all of the possible policy

7  steps, particularly state policy steps that could impact the

8  city's economy in a significant way.

9  **Q.**   Okay.  But it's safe to say that same-sex marriage is not

10  part of the San Francisco economic strategy as set forth in

11  this document, is that correct.

12  **A.**   It is true that by 2007 same-sex marriage was not a policy

13  option available to the City and County of San Francisco.

14  **Q.**   Okay.  Now, I would -- if you turn to tab 24, I just want

15  to briefly discuss this National Elevator Industry benefit plan

16  that was introduced on your examination.

17        This says that this -- first of all, do you know what

18  the National Elevator Industry is, benefit plan is?

19  **A.**   It's my understanding it's a union.

20  **Q.**   Okay.  And this says that it's based in New Town Square,

21  Pennsylvania, is that correct?

22  **A.**   That's what it says, yes.

23  **Q.**   Do you know if the union has members in California?

24  **A.**   I don't -- I don't recall.  I don't know -- I don't

25  believe that I know that one way or another.

1  Q.   Okay.  And the only information you have about this

2  union's benefit plan is this letter, is that correct?

3  A.   That's right.

4  Q.   And in the first sentence it says that -- it's addressing

5  the letter to someone who attempted to enroll their same-sex

6  partner into the benefit plan, is that correct?

7  A.   Yes, it does.

8  Q.   It doesn't indicate that that person or their same-sex

9  partner is married, does it?

10  A.   Not directly, but it does say based on their change of

11  policy that redefines marriage to remove the -- the person of

12  an opposite sex clause.

13       On that basis it says to the addressee, you may

14  reapply for coverage, which leads me to suspect that they're

15  married to their partner.

16  Q.   Another possibility is that the National Elevator Industry

17  benefit plan would construe a domestic partner relationship as

18  a marriage for the purpose of their benefit plan, is that

19  correct?

20  A.   Well, no.  It says on the first page:

21            "Further, the SPD provides on page 24 that

22            the word 'spouse' refers only to a person of

23            the opposite sex who is husband or wife."

24       And there is no reference to domestic partnership.

25  Q.   I believe husband -- I believe that's a provision that is

1  going to change?

2  **A.**    Right, but it's not -- the provision changes to provide

3  that:

4           "A participant who has legally married a

5            person of the same sex under laws of his

6            state, if such a marriage is recognized in

7            his state with a properly and legally binding

8            marriage certificate, may be eligible to

9            enroll his same-sex spouse in any I Health

10           Benefit plan."

11          It seems to be that that's explicitly excluding

12  domestic partner.

13  **Q.**   That's not language actually from the plan.  That's their

14  -- that's letters language construing the plan, is that

15  correct?

16  **A.**   Hmm, I'm not sure.  I mean, it is simply attempting to

17  convey to a member what their rights are, and it doesn't

18  mention domestic partnership.  And it appears to define the

19  affected relationships in a way that is clearly limited to

20  marriage.

21          **MR. PATTERSON:**  I have no more questions, your Honor.

22          **THE COURT:**  Very well.  Redirect, please.

23          **MS. VAN AKEN:**  Thank you, your Honor.

24

25

1                      **REDIRECT EXAMINATION**

2    **BY MS. VAN AKEN:**

3    **Q.**   Dr. Egan, I will be very brief.

4            **MS. VAN AKEN:**  Before I begin, your Honor, there is

5    one point I would like to clear up for the record.

6            Did I understand correctly that the Court took

7    judicial notice of the five hate crimes reports that I

8    mentioned earlier, but did not ask the witness about?

9            **THE COURT:**  Was it four or five?

10           **MS. VAN AKEN:**  I believe it's five, PX 0672 through

11   676.

12           **THE COURT:**  No, I did not -- I don't believe I was

13   asked to take judicial notice of those.

14           **MS. VAN AKEN:**  Your Honor, I would like to ask the

15   Court to take judicial notice of those as official government

16   documents and, also, documents that were authenticated by the

17   Attorney General in response to requests for admissions.

18           **THE COURT:**  Mr. Patterson?

19           **MR. PATTERSON:**  I have no objection, your Honor.

20           **THE COURT:**  Very well.

21           **MS. VAN AKEN:**  Thank you, your Honor.

22           **THE COURT:**  We better recite precisely what exhibits

23   there are.

24           **MS. VAN AKEN:**  Yes.  They are PX 672, PX 673,    PX

25   674, PX 675 and PX 676.

1          **THE COURT:**  Very well, thank you.

2     **BY MS. VAN AKEN:**

3     **Q.**   Dr. Egan, you were asked some questions about whether

4     domestic partner celebrations occurred or where expended --

5     expended money on celebrating their domestic partnerships; do

6     you recall that by Mr. Patterson?

7     **A.**   Yes.

8     **Q.**   Are you aware of any studies about domestic partnership

9     celebration expenditures?

10    **A.**   No, I'm not aware of any such study.

11    **Q.**   And are you aware of whether or not San Francisco

12    experienced an uptake in wedding-related economic activity in

13    2008 when same-sex marriage was legal?

14    **A.**    Well, certainly, San Francisco experienced an uptake in

15    weddings, and I could conclude from that that the economic

16    activity associated with weddings increased as well.

17    **Q.**   And are you aware of research that people spend money on

18    weddings, have out-of-town guests and spend money when they are

19    tourists in San Francisco?

20    **A.**   There's a significant industry that helps people spend

21    money on their wedding and provides tourism associated with

22    that.  There is a lot of evidence that there is a wedding

23    industry.

24    **Q.**   Okay.  Thank you, Dr. Egan.

25          Let's talk about your 2008 report about which you

1  were asked some questions on cross-examination.  You talked a

2  little bit about differences between that report and the

3  analysis that you did today.

4          Is there any difference between the per wedding

5  expenses, if the per wedding costs, that you saw between the

6  2008 report and the report you prepared and your opinions in

7  this case?

8  **A.**   We made the same assumption -- well, we used the same

9  source of information related to how much wedding expenses are

10  in both cases.

11  **Q.**   I see.  That assumption was consistent?

12  **A.**   Yes.

13  **Q.**   And when you looked at wedding expenses, did you use that

14  wedding industry data that we have just discussed?

15  **A.**   Yes, we did.

16  **Q.**   And you also talked about some differences in the

17  methodology that you used to determine the number of weddings

18  that you projected would occur, is that right?

19  **A.**   That's right.

20  **Q.**   And why did you change your methodology between the 2008

21  report and your estimates in this case of the number of

22  weddings, of same-sex weddings, that we would expect to see?

23  **A.**   When I was asked to do the report in 2008, I was looking,

24  as I always do, for similar research that had tried to address

25  the same question to see if I could learn anything from their

1  methodology.

2           And I found the Williams Institute report on the

3  Economic Impacts of Marriage in California and thought it would

4  be good to rely on a third-party source for a methodology.

5           So what I did to project the number of weddings for

6  the 2008 report was to estimate using the census data,

7  following as closely as I could the Williams Institute

8  methodology, how many unmarried same-sex partners are there in

9  California and then as they did for their study, look become to

10  the Massachusetts experience and say, what percentage of them

11  would get married in each year?

12           And that led me to my estimate of the three-year

13  number of weddings that is contained in my 2008 report for the

14  residents.

15           I did something else for the non-residents that was

16  built on San Francisco's experience during one month in 2004.

17           The main difference -- issue, however, is that that

18  methodology significantly underestimated what we actually saw

19  from June of 2008 to November, 2008.  And I -- I realized that

20  it would not make sense to reapply a methodology in

21  consideration for this case that had undercounted the actual

22  number of marriages in 2008, even though that approach from the

23  Williams Institute does have the advantage of giving an annual

24  estimate and does have the advantage of bringing in the

25  experience of another place.

1          I thought it would be simpler and more

2    straightforward to say, This is what we experienced.  We, the

3    City and County of San Francisco, during this period in 2008.

4    I don't see any reason that would change if Proposition 8 were

5    lifted and same sex couples could marry again in San Francisco.

6    I think the past is a pretty good estimate of the future, at

7    least in the short term.

8    Q.   See, in essence, you changed your methodology to reflect

9    your -- the experience, is that correct?

10   A.   Correct.  I tried to improve the methodology this time

11   around.

12   Q.   And you also fielded a couple of questions about whether

13   you should have changed the methodology to account for what

14   happened in other states.

15          If I asked you to assume that after 2008 Connecticut

16   had legalized same-sex marriage, would that cause you to revise

17   your projections for San Francisco?

18   A.   Not really, no.

19   Q.   Why not?

20   A.   I don't think a significant amount of the weddings in

21   San Francisco would come from Connecticut residents.

22          And as I was saying earlier, the mere fact that a

23   couple could get married in Connecticut wouldn't mean that they

24   wouldn't come to San Francisco to get married.

25   Q.   We also talked about the short-term nature of your

1  projections with respect to the number of same-sex couples who

2  would marry in San Francisco, and you were asked to compare

3  some census data with -- with your projections.

4       Do you know whether everyone who gets married lives

5  together before marriage?

6  **A.**   I don't know that.

7  **Q.**   And the projections that you made in your opinions for

8  this case, are they short-term or long-term projections?

9  **A.**   They are short-term projections.

10 **Q.**   Assume that the short term turns out to be very short.

11 Does that change your ultimate conclusion that denying marriage

12 to same-sex couples has negative economic impacts on

13 San Francisco with respect to wedding expenditures?

14 **A.**   No.  The actual numbers only affect the magnitude of the

15 impact, but there is an impact in any event.

16 **Q.**   Is there wedding-related activity that you would expect

17 going into the future in the long term if couples were

18 permitted to marry?

19 **A.**   Certainly, because of the migration of people to

20 San Francisco and subsequent formation of couples who elect to

21 get married in the future.

22 **Q.**   You were also asked about pent-up demand, and you were

23 also asked to look at the County Clerk's statistics about

24 opposite-sex couples who had -- or, sorry, same-sex couples who

25 had appointments to get married after November 5th of 2008.

1              Is there anything that happened on November 4, 2008

2     that might have affected that, whether people would be signing

3     up to -- for marriage appointments?

4     **A.**   I don't think anyone signed up after November 4th.  And

5     between November 4th and November 24th, when that report was

6     prepared, I would imagine many might have cancelled.

7              I don't know, frankly, what the number looked like as

8     of November 3rd, but I would say -- I can't imagine any reason

9     other than Proposition 8 that would require people -- that

10    would make people not want to get married after November 5th.

11    **Q.**   Okay.  You were also asked some questions about the number

12    of uninsured partners of same-sex couples for whom one member

13    of the partnership is employed.  The other one does not have

14    access to insurance.

15             Do you recall is that testimony?

16    **A.**   Yes, I do.

17    **Q.**   Let me ask you:  Are you an expert on California insurance

18    law?

19    **A.**   No I'm not.

20    **Q.**   Are you an expert on ERISA and any preemptive effects it

21    may have about benefits plans?

22    **A.**   No, I'm not.

23    **Q.**   Are you an expert on the extent of applicability of

24    California law to out-of-state insurance companies?

25    **A.**   No, I'm not.

1  Q.   Are you aware of research that indicates that companies

2  do, in fact, offer domestic partners benefits less frequently

3  than same-sex partners, or any other information that would

4  lead you to believe that that's the case?

5  A.   Not compared to -- no, I'm not aware of specific research

6  on that question.

7  Q.   If we assume that domestic partners are not insured at the

8  same rates that married couples are insured, does your

9  conclusion that San Francisco's expense for covering uninsured

10 populations hold true; that San Francisco incurs a greater

11 expense because marriage is not legal between same-sex couples?

12 A.   Yes.   Because even if someone is a registered domestic

13 partner, based on your assumption they are less likely to have

14 insurance and, therefore, there may be more partners who are

15 domestic partners with one partner who is uninsured.

16 Q.   And let's talk a little bit about contracting and the

17 Equal Benefits Ordinance.

18       To the extent that discrimination against same-sex

19 couples and lesbian and gay and bisexual and transgendered

20 individuals exists, would you expect that San Francisco's costs

21 to investigate complaints of discrimination would be higher?

22 A.   Could you repeat that?

23 Q.   If such discrimination exists and there is an office

24 charged with investigating such discrimination, does that incur

25 costs?

1  **A.**    Certainly.  I would say in proportion to the amount of

2  discrimination.

3  **Q.**    And to the extent that companies do not offer domestic

4  partners equal insurance coverage as they do with married

5  couples, does that increase San Francisco's contracting costs

6  because of the San Francisco Equal Benefits Ordinance?

7  **A.**    To the extent that it limits our pool of contractors, yes,

8  it does.

9  **Q.**    And if other local governments also have Equal Benefits

10  Ordinances, would you expect a similar increase in their

11  contracting costs from their efforts to combat marriage

12  discrimination?

13  **A.**    I would expect the same thing to hold there as well.

14  **Q.**    And, Dr. Egan, you were asked a little bit about the rates

15  of opposite-sex couples marrying between June and November,

16  2008.

17        If you were going to undertake a study of the rates

18  at which opposite-sex couples got married, would you look at

19  more than four-and-a-half months of data to undertake that

20  study?

21  **A.**    I think it would be prudent to do that and -- yes.

22  **Q.**    And if more data about same-sex couples' marriage rates

23  were available, would you have looked at that here in

24  California to undertake your study of those rates?

25  **A.**    Yes.

1  Q.   Dr. Egan, is it generally the case that improvements among

2  lesbian, gay, bisexual and transgendered individuals and among

3  same-sex couples in health, healthy behaviors, wealth

4  accumulation and productivity increase San Francisco's payroll

5  and property taxes?

6  A.   Yes, it is.

7  Q.   And is it generally the case that those factors, increased

8  health and wealth, increase the city's economic health?

9  A.   Yes, they do.

10        MS. VAN AKEN:  I have nothing further.

11        THE COURT:  Very well.  Thank you, sir.  You may step

12  down.

13        (Witness excused.)

14        THE COURT:  And can we resume at, maybe, 1:00

15  o'clock?  Is that going to give everybody enough time?

16        All right.  Very well.  Let's see.  The next witness

17  is going to be?

18        MR. BOUTROUS:  Dr. Meyer.

19        THE COURT:  Doctor?

20        MR. BOUTROUS:  Dr. Meyer.

21        THE COURT:  Dr. Meyer, fine.

22        (Whereupon at 12:08 p.m. proceedings

23         were adjourned for noon recess.)

24

25

1                    **P R O C E E D I N G S**

2   **JANUARY 14, 2010**                              **1:00 P.M.**

3

4           **THE COURT:**  Mr. Boutrous, your next witness, please.

5           **MR. DUSSEAULT:**  Your Honor, the plaintiffs call

6   Dr. Ilan Meyer.

7           **THE CLERK:**  Raise your right hand, please.

8                        **ILAN MEYER**,

9   called as a witness for the Plaintiffs herein, having been

10  first duly sworn, was examined and testified as follows:

11          **THE WITNESS:**  I do.

12          **THE CLERK:**  Thank you.

13          State your name, please.

14          **THE WITNESS:**  Ilan Meyer.

15          **THE CLERK:**  And spell your last name.

16          **THE WITNESS:**  M-e-y-e-r.

17          **THE CLERK:**  Your first name.

18          **THE WITNESS:**  I-l-a-n.

19          **THE CLERK:**  Thank you.

20                   **DIRECT EXAMINATION**

21  **BY MR. DUSSEAULT:**

22  **Q.**   Good afternoon, Dr. Meyer.

23  **A.**   Good afternoon.

24  **Q.**   I would like to start asking you a few questions about

25  your educational background.  Where did you receive your

1   undergraduate degree?

2   **A.**    I received a B.A. from Tel Aviv University in Israel.    I

3   received a B.A. from Tel Aviv University, in psychology and

4   special education.

5   **Q.**    Do you have a master's degree?

6   **A.**    Yes.    I received a master's degree in psychology from the

7   New School for Social Research in New York City.

8   **Q.**    Did you do a predoctoral fellowship of any kind?

9   **A.**    Yes.    After the master's degree, I moved to a doctoral

10  program at Columbia University.    And during this program, I had

11  a National Institute of Mental Health Fellowship in psychiatric

12  epidemiology.

13  **Q.**    What is psychiatric epidemiology?

14  **A.**    Psychiatric epidemiology is the study of mental disorders.

15  We are interested in patterns of mental disorders, causes of

16  mental disorders, risks for mental disorders.    Very much like

17  epidemiology of infectious diseases, where we are looking at

18  the infections, but this is concerning psychiatric disorders

19  such as depression, anxiety, and so forth.

20  **Q.**    Dr. Meyer, do you have a Ph.D.?

21  **A.**    I do.

22  **Q.**    From where did you receive it?

23  **A.**    From Columbia University.

24  **Q.**    When did you receive it?

25  **A.**    In 1993.

1   Q.   And in what field did you receive your Ph.D.?

2   A.   The department where I got the Ph.D. is called

3   Sociomedical Sciences.  It's a department that brings together

4   people from various social sciences and studying of public

5   health problems or public health issues.  In my case, mental

6   disorders.  But other people may study other types of

7   disorders.

8   Q.   And did you do a doctoral dissertation?

9   A.   I did.

10   Q.   What was the title of it?

11   A.   The title of it was, "Prejudice and Pride.  Minority

12   Stress and Mental Health in Gay Men."

13   Q.   Did it receive any awards?

14   A.   It was chosen for distinction by the University, which is

15   given to the top 10 percent of dissertations at the university,

16   Columbia University.

17   Q.   Did you do any postdoctoral fellowship?

18   A.   I did.  After finishing my Ph.D., I did three years of

19   postdoctoral work.  They were funded also by the National

20   Institutes of Health, or NIH.

21        The first one was a two-year postdoctoral fellowship

22   at City University of New York, the graduate center.  And that

23   was in health psychology.

24        The second one was at Memorial Sloan-Kettering.  And

25   that was in HIV, AIDS and psychiatry.

1   **Q.**   Dr. Meyer, let's talk a bit about your employment.  What's

2   your current employment position?

3   **A.**   I'm an associate professor at the Department of

4   Sociomedical Sciences, the same department where I graduated.

5   I'm also the executive chair for the department, in charge of

6   our masters program, which has about a hundred students a year

7   entering to this master's degree.

8   **Q.**   This is at Columbia University?

9   **A.**   Exactly.

10  **Q.**   At the Mailman School of Public Health?

11  **A.**   Yes.

12  **Q.**   Do you chair any programs within your department?

13  **A.**   Yes.  Well, first, I co-chair what we call the steering

14  committee for the school, entire school.  That is the School of

15  Public Health.

16        And the steering committee is a faculty committee

17  that represents the academic and other issues that the faculty

18  has, in terms of the direction of the school and in terms of

19  programs and so forth.  So we -- so I'm a co-chair of that

20  committee.

21        I also chair the departmental committee on M.P.H.,

22  master's of public health degree.  As I said, I'm in charge of

23  that program.

24        I'm also involved or sit in our curriculum committee,

25  which is the committee that determines what the students should

1    learn in terms of receiving their degrees.

2         I probably have some other committees that I am on.

3    That's quite a bit of --

4    **Q.**   That's a good start.   Thank you.

5         What year did you join the faculty of Columbia

6    University?

7    **A.**   My first appointment, in '94.   But that was while I was

8    still doing my postdoctoral degree.   But I think my full-time

9    appointment is in '96.

10   **Q.**   And you've been there consistently?

11   **A.**   Yes.

12   **Q.**   Let's talk a little bit about what you do professionally.

13   Has your professional -- let me step back.

14        It's been close to 20 years since you got your

15   doctorate?

16   **A.**   It is.

17   **Q.**   Has the professional work you've done over that period

18   focused on any particular topics?

19   **A.**   Yes.   My area of study I would define as social

20   epidemiology.   The terms that are maybe not that

21   self-explanatory, but if I had to explain it, I study the

22   relationship between social issues, social factors in our --

23   the structure of our society, and the way things happen in our

24   society, and health patterns, health outcomes.   And,

25   specifically, mental health outcomes.

1   **Q.**   And that's within the field of social epidemiology?

2   **A.**   That's within the field, I guess, of psychiatric

3   epidemiology.  And social epidemiology would be one approach

4   within that field.

5           **THE COURT:**  Let me see if I have that.  Your area of

6   study is the relationship of social structures and mental

7   health outcomes?

8           **THE WITNESS:**  Yes, within psychiatric epidemiology,

9   which more broadly discusses and studies patterns and causes of

10  mental disorders.

11          **THE COURT:**  Fine.

12  **BY MR. DUSSEAULT:**

13  **Q.**   Dr. Meyer, could you please tell the Court, has your work

14  focused on any particular groups of the population?

15  **A.**   Yes.  Most directly, I have been studying lesbian, gay,

16  and bisexual populations within this area.

17          I have also studied other populations.  I have

18  studied African-Americans.  I have studied other issues, such

19  as asthma and HIV.  But most of my work has been on lesbian,

20  gay, bisexuals and mental health issues.

21  **Q.**   Have you made any presentations at professional

22  conferences in the course of your work?

23  **A.**   Yes, I have made many presentations.  I think most of them

24  are listed in my CV, but maybe not all the major ones.  I would

25  say there were over 40 listed there.

1   **Q.**   Okay.  Have you received any research grants, sir?

2   **A.**   Yes, I've received funding for my research.  Currently,

3   I'm a recipient of the Robert Wood Johnson's Foundation's

4   Health Policy Investigator Award.

5          I've received, in the past, grants from the National

6   Institutes of Health, and the National Library of Medicine,

7   from New York State Department of Health, from private

8   foundations, et cetera.

9   **Q.**   Have you received any awards for your professional work?

10  **A.**   I have.

11  **Q.**   What are some of those?

12  **A.**   Well, I guess, most recently, I received an award for

13  distinguished scientific contribution from the American

14  Psychological Association's Division 44, which is a division of

15  the American Psychological Association that concerns gay,

16  lesbian, and bisexual health.

17  **Q.**   Have you been a reviewer or editor of any publications?

18  **A.**   Many times.  That's part of what we do.  I've reviewed

19  many manuscripts that were to be published and would -- would

20  assess them for their value, and recommend to the editor

21  about -- and critique the manuscripts, and so forth.

22          I've also been a guest editor on a couple of

23  journals.  A major one was when I was invited to guest edit the

24  American Journal of Public Health, special issue on lesbian,

25  gay, bisexual and transgender health.

1        This was the first issue that was published on the

2   topic by the *American Journal of Public Health*, which is a very

3   prestigious journal.  It's been around for, I would say, close

4   to a hundred years.

5        It was a very successful issue.  It actually is the

6   first issue that sold out, in the memory of anybody.  Which is

7   a very rare thing for a scientific journal.

8   **Q.**   Not the highest circulation.

9        (Laughter)

10  **A.**   No.  After that, I edited or co-edited another journal.

11  Again, this is a special issue of a journal, so the journal is

12  published regularly.  But I, in this case, edited a special

13  issue of *American Journal of Public Health*.

14       And the second one was a journal that's called *Social

15  Science in Medicine*.  In that case, I co-edited with two

16  colleagues a special issue that focused on prejudice and

17  stigma, and their impact in public health, and different issues

18  within public health of how we should think about prejudice and

19  stigma.

20  **Q.**   Have you edited any books, sir?

21  **A.**   Yes.  The I -- in part, because of the success of *American

22  Journal of Public Health* issue, I was invited by editors in

23  Springer Publication -- at the time it was *Clure* -- and they

24  asked me to edit a book on lesbian, gay, bisexual and

25  transgender public health issues, which I did with a co-editor

1   also.

2   **Q.**   And have you written any articles?

3   **A.**   Yes.  I have written articles, both peer-reviewed articles

4   and articles that were more of a commentary or editorial

5   nature, and chapters, and so forth.

6   **Q.**   Can you approximate how many articles you've written?

7   **A.**   I think there are 44 peer-reviewed articles listed on my

8   CV right now.  And maybe 12 other types, commentaries, and so

9   forth.

10  **Q.**   Dr. Meyer, do you teach students as part of your position

11  at Columbia?

12  **A.**   Yes.

13  **Q.**   What courses do you teach?

14  **A.**   Currently, I teach three courses.  Not at the same time,

15  but there are three courses I currently teach.  The first one

16  is a course in research methodology, such as how to conduct

17  surveys, and things like that.

18          The -- that's a required course for our students.

19  There are also two seminars that I teach.  One is called,

20  "Prejudice, Stigma, and Discrimination as Social Stressors."

21          And that one is a course on gay and lesbian issues in

22  public health.

23  **Q.**   Dr. Meyer, you have a witness binder in front of you.  If

24  you could turn to the very last tab, which is Plaintiff's

25  Exhibit No. 2328.

1  **A.**   Yes.

2  **Q.**   If you could take a look at that document.

3  **A.**   That's my CV.

4  **Q.**   That's your CV.  That was my question.

5        **MR. DUSSEAULT:**  Your Honor, plaintiffs would tender

6  Dr. Ilan Meyer as an expert in public health, with a focus on

7  social psychology and psychiatric epidemiology.

8        **THE COURT:**  Voir dire?

9        **MR. NIELSON:**  No objection to (inaudible).

10        **THE COURT:**  No objection to him being qualified to

11  offer his opinions?

12        **MR. NIELSON:**  No objection to him being qualified as

13  an expert (inaudible).

14        **THE COURT:**  Very well.

15        **MR. DUSSEAULT:**  And, Your Honor, with respect to the

16  exhibits, to try and keep things efficient, what we have done

17  is, counsel and I have agreed on a list of documents that will

18  be admitted together.

19        I understand that list has been provided to you and

20  to the clerk.  And I'm happy to read them, if it would be

21  better for you, but we could just agree -- I suspect it's not.

22  We could agree that those documents will be admitted.

23        **THE COURT:**  This is five pages.

24        **MR. DUSSEAULT:**  It is.  49 exhibits, I believe.

25        **THE COURT:**  49 exhibits.  If there is no objection,

1   each of these will be admitted.

2               **MR. NIELSON:**  No objection, Your Honor.

3               **THE COURT:**  Thank you, Counsel.

4               (Plaintiffs' Exhibits 900, 922, 923, 926, 927, 955,

5               962, 973, 974, 975, 976, 978, 979, 980, 981, 982,

6               983, 984, 987, 988, 989, 990, 991, 992, 993, 994,

7               995, 996, 997, 998, 999, 1002, 1003, 1004, 1005,

8               1008, 1010, 1011, 1012, 1013, 1014, 1015, 1016, 1020,

9               1168, 1374, 1378, 1471 and 2328 received in

10              evidence.)

11  **BY MR. DUSSEAULT:**

12  **Q.**   Two straightforward questions about those exhibits that

13  were just admitted into evidence.

14              With the exception of three of them, which are

15  Exhibits 973, 975, and 976, is it true that each of the

16  documents that has just been admitted into evidence, that's in

17  your binder, is a document that you've relied on in forming the

18  opinions that you intend to offer in this case?

19  **A.**   Yes.  Based on my examination of this previously, yes.

20  **Q.**   And the three exhibits that I mentioned, 973 -- you can

21  take a look at them, if you like -- 973, 975 and 976, those are

22  documents that came up in the course of your deposition

23  testimony in this case and that were referenced by you in that

24  testimony?

25  **A.**   Yes.  What was the third one?  I'm sorry.

1  Q.   976.

2  A.   Okay.  Yes, that is correct.

3  Q.   Now, Dr. Meyer, do you intend to offer any opinions in

4  this litigation here today?

5  A.   Yes, I do.

6  Q.   What opinions do you intend to offer?

7  A.   Well, my opinion really describes the work that I've been

8  doing, as I described it earlier.  And I would say there are

9  three elements there.

10       The first one is on the nature of stigma.  And I will

11  testify to the effect of stigma on gay and lesbian populations

12  with reference to Proposition 8 as an example of a stigma.

13       The second part will describe a model of minority

14  stress that is a model that I am credited with authoring, and

15  has been referred to in much of the literature on gay and

16  lesbian health.  And I will describe how social stressors

17  affect gay and lesbian populations.

18       And the third part describes the effect of those

19  stressors on health, in particular mental health.

20  Q.   And on what do you base the opinions that you're going to

21  testify about today?

22  A.   As I've said, this is a topic of my study for, as you

23  said, for the past 20 years; really, since my work on my

24  dissertation.  And the opinion is based on many research

25  articles, both -- some that I've conducted myself, and many

1  more that were conducted in the field over many years.  And I

2  rely on -- on this body of evidence.

3           A sample of it, I guess, would be what you offered as

4  an exhibit, which is what I relied on in writing a report

5  earlier.

6  **Q.**    So, Dr. Meyer, let's start talking a little more detail

7  about each of these opinions.  Let's start with the first,

8  which you said refers to stigma experienced by gay men and

9  lesbians.

10           Can you define what you mean by "stigma," as you use

11  that word?

12  **A.**    Yes.  And I have to say that I have to be very brief in

13  this description.  The work on stigma has many, many volumes

14  that I'm sure we don't want -- as I said, it's the subject of

15  the whole seminar that I teach.

16           But the most succinct, I guess, description would be

17  that a group in society has some kind of attribute that has

18  been identified to be a negative attribute, that is seen as

19  negative by society.

20           And this attribute is attached to persons who are

21  believed to have this attribute.  And because of having this

22  attribute, they are, therefore, what we call devalued.

23           So, in the example of gay sexual orientation, sexual

24  orientation is identified as such an attribute that people

25  perceive as being a negative attribute.  And, therefore, gay

1  and lesbian people, as a whole -- I don't mean as a whole --

2  the whole person is identified by that identity that is

3  devalued; and, therefore, the whole person is devalued because

4  of that relationship.

5         And stigma, of course, has been applied to many other

6  populations and instances.

7  Q.   Are you familiar with a concept referred to as "structural

8  stigma"?

9  A.   Yes.

10 Q.   What is structural stigma?

11 A.   Structural stigma refers to, in a sense, the origins of

12 the stigma and the mechanisms that maintain and enact stigma.

13        So those refer -- by the word "structural" we mean to

14 more solid structures in society, societal institutions such

15 as, of course, the law being an important one, and any other

16 institution that is essential in our society.

17 Q.   Explain a little more, if you would, for the Court, the

18 way that laws can play a role in structural stigma.

19 A.   Well, laws have a major role in determining access of

20 different -- of the citizens to different -- we call it goods

21 that society can provide to resources, I guess would be the

22 word.  And laws may block or foster access to such resources.

23 In that sense, they enact, perhaps, for a group that is

24 stigmatized -- or, rather, control the access that various

25 groups may have to a particular institution.

1          So, of course, here we're talking about marriage.

2    And that would be an example of, in this case, a very important

3    institution of marriage.

4          And, of course, the law has a role in determining who

5    can access that institution.  And, again, that would be

6    applicable to other types of examples.

7    **Q.**   So once a social -- excuse me, a structural stigma is in

8    place, how does it affect people?

9    **A.**   So, as I said, structural stigmas determine the access

10   that people have to those resources.

11         I rely on the sociologists that talked about the

12   opportunity structures.  The society lays out goals that

13   people -- I don't want to say fault -- internalize.

14         People want to achieve certain goals that we all view

15   as important goals in our lives; such as, career and marriage

16   being two important examples of that.

17         And stigma would, as I said, determine the access

18   that people have to those desired goals, to achieving those

19   desired goals.

20   **Q.**   And has the research found that there are stigmas

21   associated with gay men and lesbians?

22   **A.**   Yes, of course.

23   **Q.**   And what are some examples of such stigma?

24   **A.**   There are really many stigmas and stereotypes that

25   describe kind of how people are perceived.

1          In my work, I have written about the role of intimate

2     relationships and the way intimate relationships have been

3     portrayed.

4          And part of the stereotype that is part of the

5     stigma, the negative attitude or the negative associations with

6     this group, has been for many years that gay people are un --

7     incapable of relationships, of intimate relationships; they may

8     be undesiring, even, of intimate relationships; and that,

9     certainly, they are not successful at having intimate

10    relationships.

11         And when I say this has been a kind of social stigma,

12    I'm talking about how it has been portrayed in various cultural

13    outlets as well as in a more organized way in various social

14    interactions, social institutions.

15    **Q.**   You used the phrase "intimate relationships."  What do you

16    mean by that?

17    **A.**   "Intimate relationships" mean relationships that people

18    have.  Of course, primary among them would be something like a

19    marriage, a husband and a wife.  But, also, other intimate

20    relationships with one's family, one's children, and one's

21    community.

22         And in all of those, again, as people have been

23    described for many years as social isolates, as unconnected,

24    as -- as not as good citizens, in a sense, who partake in

25    society the same way that everybody else.  As a pariah, so to

1   speak.  So that's what stigma does.

2          And, in particular, for gay and lesbian example, I

3   think the issue of intimate relationship because of the nature

4   of what being gay is about who you choose to be with, that has

5   been a strong source of stigma.

6   Q.   Dr. Meyer, if you could turn in your binder to Plaintiff's

7   Exhibit 1011, please.

8   A.   Yes.

9   Q.   And this is one of the documents that you've relied on in

10  forming your opinions?

11  A.   Yes.

12  Q.   What is Exhibit 1011?

13  A.   This is a chapter from a book that I've relied on and that

14  I've used in teaching as an example of -- maybe I should say

15  what the book is.

16         So, this is a chapter from a book that was published

17  in the '60s, late '60s, and was a very popular book.  It was

18  called, "Everything you Ever Wanted to Know About Sex (But Were

19  Afraid to Ask)."

20         It was very, very popular.  It was published in

21  many -- I have a hardcover edition that is the 17th edition of

22  this book, that was published in 1969.  And I personally

23  remember that book.

24         So in this book there are different chapters that aim

25  to educate the public about different issues concerning

 1   sexuality.  And this particular chapter is concerning male

 2   homosexuality.

 3   **Q.**   And this is a book that had wide distribution?

 4   **A.**   Absolutely.

 5           **MR. DUSSEAULT:**  Could we put up demonstrative 2,

 6   please.

 7           (Document displayed)

 8   **BY MR. DUSSEAULT:**

 9   **Q.**   I'm going to ask you about this, but what I would like to

10   do is just read the text into the record so it's clear what

11   you're addressing.

12   **A.**   May I explain something about this?

13   **Q.**   Of course.

14   **A.**   I'm sorry.  So the book is written in a

15   question-and-answer format.  And, basically, the author goes

16   through explaining sexual issues as if there is a question that

17   somebody is asking him about his opinion about various sexual

18   issues, and then he provides the answer.  So this is an excerpt

19   of one of those question and answers?

20   **Q.**   Okay.  So the question posed is:

21           "What about all the homosexuals who live

22           together happily for years?"

23           And the answer is:

24           "What about them?  They are mighty rare birds

25           among the homosexual flock.  Moreover, the

1              'happy' part remains to be seen.  The

2              bitterest argument between husband and wife

3              is a passionate love sonnet by comparison

4              with a dialogue between a butch and his

5              queen.  Live together?  Yes.  Happily?

6              Hardly."

7              Is this text from this book an example of the stigma

8    that you're talking about, sir?

9    A.    Yes, I think this is a very dramatic experience of what I

10   was referring to where, in this case, an educational book

11   portrays the relationship between, in this case, gay men as --

12   with great disrespect.  I would say ridicule and contempt.  So

13   that was the kind of -- and one example of what I was referring

14   to.

15   Q.    At what stage in life does stigma begin to affect gay men

16   and lesbians?

17   A.    Stigma really affects all people in society, because it is

18   a social norm, if you will.  It is something that we all in

19   society learn from a very young age.

20              It affects gay and lesbian -- this particular stigma

21   affects gay and lesbian -- sorry, gay men and lesbians in a

22   particular way because it is about something that is very

23   pertinent to how they think about who they are.

24              In my mind, this kind of stigma on other stereotypes

25   are very impactful, especially at the younger age, and in

1    particular in the time of life where gay men and lesbians,

2    usually during youth, either realize or recognize or know that

3    they're gay, and begin to try to understand what that means to

4    them.

5            And, of course, the most available reference that

6    they would have is the kind of things that they have learned

7    over their lifetime, over their childhood, socialization that

8    we all have been exposed to.

9            So it affects everybody but, certainly, it affects in

10   a very strong way somebody who is maybe coming out and

11   realizing that he or she is gay, and that's what they might

12   believe is what is in line for them.

13   **Q.**   Now, Dr. Meyer, you live in New York, correct?

14   **A.**   That's true.

15   **Q.**   Are you familiar with Proposition 8, the ballot initiative

16   that was passed in California?

17   **A.**   Yes, I am.

18   **Q.**   And what's your basic understanding of what Proposition 8

19   did?

20   **A.**   Well, proposition 8 was a proposition that was voted by

21   voters in California, restricted marriage to a man and a woman;

22   and, in fact, excluding gay men and lesbians from marriage.

23   And it was a constitutional amendment to the California

24   Constitution.

25   **Q.**   In your view, based on your work in this field, is

1  Proposition 8 a form of structural stigma?

2  **A.**   Yes, absolutely.  As I described stigma earlier, I would

3  say that law, and certainly a constitutional part of the law,

4  would be a very strong part of, as I described, the social

5  structures that define stigma, that define access.

6         In a very simple way, you can think of it as a block

7  or gate toward a particular institution, toward attaining a

8  particular goal.  So, in that sense, it is very much fitting in

9  the definition of structural stigma.

10  **Q.**   And in what ways does Prop 8 impose structural stigma on

11  gay men and lesbians in California?

12  **A.**   Well, it imposes by the fact that it denies them access to

13  the institution of marriage.

14         As I said, people in our society have goals that are

15  cherished by all people.  Again, that's part of social

16  convention, that we all grow up raised to think that there are

17  certain things that we want to achieve in life.

18         And, in this case, this Proposition 8, in fact, says

19  that if you are gay or lesbian, you cannot achieve this

20  particular goal.

21  **Q.**   Now, are you aware, sir, that, in California, gay and

22  lesbian couples can register as a domestic partnership?

23  **A.**   Yes, I am.

24  **Q.**   In your view, does that eliminate the structural stigma of

25  Prop 8?

1  **A.**    No.

2  **Q.**    Why not?

3  **A.**    When I talk about Proposition 8 and the institution of

4  marriage, I'm talking about an institution that has a social

5  meaning.

6          As I described it, this has to do with the

7  aspirations of people to achieve certain goals.  And I was not

8  referring, and I don't refer to any tangible benefit that maybe

9  are accompanying marriage or a domestic partnership

10  arrangement.

11          So my -- what I'm talking about throughout my work

12  and today is really about the symbolic meaning, the social

13  meaning of marriage.

14          It is, I think, quite clear that the young children

15  do not aspire to be domestic partners.  But, certainly, the

16  word "marriage" is something that many people aspire to.

17          Doesn't mean that everybody achieves that, but at

18  least I would say it's a very common, social, socially-approved

19  goal for people as they think -- for children as they think

20  about their future and for people as they develop

21  relationships.

22          For young people, and certainly for people later on,

23  this is a desirable and respected type of goal that if you

24  attain it, it's something that gives you pride and respect.

25  **Q.**    And do you have an opinion as to whether domestic

1  partnerships enjoy similar symbolic and social meaning?

2  **A.**   I have an opinion.  And that is that, as I said, I don't

3  think it has the same social meaning.  In fact, I don't know if

4  it has any social meaning.

5           I think it has, perhaps, value in terms of the types

6  of benefits that people receive.  But as I was trying to

7  explain, that is not what I'm talking about.  And that's not

8  really relevant to my discussion of stigma.

9  **Q.**   Let's turn, then, to the second opinion you mentioned,

10  which had to do with minority stress.

11          What does "minority stress" mean, as you use that

12  phrase?

13  **A.**   Minority stress -- I've written a lot of articles about

14  it, so I'm trying to, again, be brief.

15          But it basically describes the types of stressors

16  which is -- I have to try to explain, maybe, what stress means,

17  before I do that.  Is it --

18  **Q.**   Let me break it down.  Why don't you tell us what stress

19  means.

20  **A.**   Okay.  So that's perhaps something that's easier to

21  understand.

22          Stress is -- well, everybody knows what stress means.

23  But when we talk about stress, what we talk about is the kinds

24  of events and conditions that happen from the outside, to the

25  person.  And that one of the main definitions is they bring

1  about some kind of change that require adaptation.  In that

2  sense, they are taxing on the person because it requires the

3  person to adjust, so to speak, to this new situation.

4          One of the strongest types of stressors is a life

5  event.  And, certainly, losing a loved one would be a very -- a

6  high magnitude type of an event.  Losing a job is another

7  example of an event.

8          So those are the general -- I've referred to those as

9  general stressors, just because I'm trying to distinguish from

10  the minority stress model that I have written about in regards

11  to gay and lesbian stress.

12          So there's those different -- there are different

13  ways that we think about stress, not just life events.  But,

14  for example, there are also chronic stressors.  So, for

15  example, unemployment, a prolonged -- and there are other types

16  that maybe I can explain later if, you want.

17  **Q.**   Let's talk a bit about the types.  I believe you

18  referenced acute stress.  What would that mean?

19  **A.**   So a life event is an acute stressor.  That's something

20  that has a beginning and end.  It is pretty easily discernible.

21  It happened.

22          And chronic stress is something that is, as I say,

23  prolonged.  Obviously, there could be a relationship between

24  the two.  So losing a job would be a life event, but

25  unemployment that would result from that would be a chronic

```
 1   stress.  So they are not totally distinguished.

 2              There are other types of stressors that people have

 3   written about.  And, again, this is in general affecting

 4   everybody.

 5              Another one would be what we sometimes call daily

 6   hassles or minor stressors that are just annoyances that happen

 7   to people.  Maybe being stuck in traffic for a long time, or

 8   being in a long line in bank -- if people still go to banks --

 9   or in supermarket, I guess.  So those would be just daily kind

10   of hassles.

11              And there is another type of stress that is a little

12   different and maybe a little harder to understand as to why it

13   is a stress.  And those have been termed "nonevents."  Which

14   means nothing happened.

15              And the reason why a nonevent can be stressful is

16   because it is something that was expected to have happened; so

17   the fact that it didn't happen, in this case, also requires

18   adaptation or adjustment.

19              So, for example, if I've been working in my job for a

20   certain number of years, and I expected after a certain amount

21   of time I would receive a promotion, but I didn't receive that

22   promotion, that could be a nonevent, in a sense, because

23   nothing happened but it was something that I expected and

24   others expected.

25              It's not just any kind of expectation.  So, you know,
```

1  if I bought a lottery ticket and did not get the prize, would

2  not be the same type.

3        It is something that is normal to expect to happen at

4  a particular time.  Usually, we are talking about milestones

5  over a lifetime.  And, certainly, marriage will be one of those

6  types of expected events.  Having children.

7        If you ask little children, that will be the kind of

8  thing that they will tell you about what might happen to them

9  in the future:  I will marry.  I will have children.  I will be

10  a grandparent.  Things like that, that are easily understood in

11  our society.

12  **Q.**  Are the stressors of the type you are talking about

13  essentially inputs on people's lives, as opposed to the result

14  that they may experience?

15  **A.**  I'm sorry, yes.  So in the research lingo, I guess we

16  would call those the independent factors.  Those are the things

17  that happen from the outside.

18        But in common language, usually, when we talk about

19  stress we think about, also, the outcome, what we call, which

20  is, "I felt stress" means, usually, "I felt some kind of

21  distress because of something that happened."

22        We try to separate those two.  So we try to assess

23  the stressor part, the input, and the outcome that resulted

24  from that stressor, which may -- and, of course, in this case,

25  we study health outcomes.

1  Q.   So now that we've discussed stress, let's go back to this

2  concept of minority stress.   What is minority stress?

3  A.   So minority stress is an extension of this notion of

4  stress, in that it identifies a source of stress that stems, as

5  I described earlier, from social arrangement.   In particular,

6  prejudice, stigma, and discrimination.

7        So in my model, any stress that is related to stigma,

8  prejudice, and discrimination I would designate it as a

9  minority stressor.

10        And, by the way, it could be the exact same type of

11  stressor.   So, for example, losing a job, as I said, is a life

12  event.   But losing a job due to discrimination is a minority

13  stressor of the same life event.

14        And the reason that we distinguish those two is

15  because we know that there's different impact for those types

16  of events.   And, also, because this allows us to assess and

17  measure them, I guess, in a way that is more precise for this

18  purpose of understanding these issues of social determinants.

19  Q.   Thank you, Dr. Meyer.

20        Could you turn to Plaintiffs' Exhibit 1003, in your

21  binder.

22  A.   Yes.

23  Q.   And if you would tell the Court, what is Exhibit 1003?

24  A.   This is an article that was published, that I have

25  written.

1    **Q.**    And what's the subject of it?

2    **A.**    So the title of this article is, "Prejudice, Social Stress

3    and Mental Health in Lesbian, Gay, and Bisexual Populations,

4    Conceptual Issues and Research Evidence."

5        I published this in 2003, in the journal

6    *Psychological Bulletin*, which, I might add, is a very

7    prestigious journal in the field of psychology, and quite

8    difficult to get published there.

9        And this article, I would say, best articulates the

10    model of minority stress that I've written about, and has been

11    referred to by many other researchers who've used it as a

12    theoretical background for their own studies.

13        So, in fact, there are several hundred studies that

14    result -- well, I wouldn't say resulted, but, certainly, that

15    have used this article, the ideas in this article, as a

16    resource for their own research.

17    **Q.**    Now, does the scholarship on minority stress address

18    minority groups other than gay men and lesbians?

19    **A.**    Well, certainly, the principles -- I have to explain,

20    maybe, something about how I got to this idea of minority

21    stress, and not to take too much credit, maybe.

22        So the ideas behind this theory that are outlined

23    here in this article are not all brand-new ideas that I just

24    made up or came up for this purpose of this article.  Rather,

25    they rely on many, many years of research.

1          So, for example, all the research on stress and life

2    events, and so forth, I did not invent that.  That has been

3    going on, I would say, since the 1950s, people began to be

4    interested in life events as a source of stress and its --

5    sorry, impact on health.

6          So what I have done is articulated this within this

7    particular context of gay, lesbian, and bisexual population.

8    So the literature on gay, lesbian, and bisexual population have

9    used this term, "minority stress" -- which I, by the way, also

10   did not invent, but used somebody else's.  This was a term that

11   I read about in a dissertation that was written on lesbians and

12   mental -- sorry, and life events.  And I thought it was a good

13   term.

14         By the word "minority" here, I mean sexual

15   minorities, which is a term that is used to describe gay men,

16   lesbians and bisexuals.

17         So this refers to gay, lesbian, and bisexual.  As you

18   will see later, most of the things in it are quite specific to

19   gay men and lesbians.  But the general theories behind it apply

20   in broader ways.

21   **Q.**   So let's talk a bit more specifically about it.

22         Are there particular processes through which minority

23   stress manifests itself or can manifest itself in the lives of

24   gay men and lesbians?

25   **A.**   Yes.  So --

1  Q.    What are those?

2  A.    So this has been -- I would say, my main contribution is

3  to articulate what do we exactly mean by that when we say that

4  prejudice and stigma has an impact on people?  And I described

5  those as processes that describe what actually happens, why is

6  that a stressor?

7          And I've described in this article and in other work

8  four types of minority stress processes.  The first one I've

9  called "prejudice events."

10          The second -- I'm sorry.

11  Q.    Why don't you articulate what the four are, and then I'd

12  like to do a little more detail on each.  So if you could just

13  generally describe what the four are.

14  A.    Okay.  So the first one is called "prejudice events,"

15  which encompasses a bunch of concepts.

16          The second one is called "expectations of rejection

17  and discrimination."

18          The third one is "concealing," which refers to hiding

19  your sexual orientation, in this case, or not being out, as we

20  say sometimes.

21  Q.    Okay.

22  A.    And the fourth one is "internalized homophobia," which

23  refers to the internalization of social attitudes by a gay

24  person or a lesbian.

25  Q.    Now, how did you identify these processes?

**A.**    So, as I said, there has been work on each of those

topics, that I relied on that work to bring it together to this

model that is maybe more concise.

        While there were work on prejudice -- sorry, on life

events -- and there has been, certainly, a lot of work, for

example, on internalized homophobia, ranging to clinical

psychological literature -- I gathered together those different

sources of research and theory to put it together in this

particular form, to explain the experiences of gay men and

lesbians.

**Q.**    So let's start with the first one you identified,

prejudice events.  What do you money by prejudice events?

**A.**    So just as I described earlier, the general stress,

prejudice events I refer to the types of stressors that are

related to prejudice.

        So I already gave an example of being fired due to

discrimination.  That will be a prejudice event.

        And this -- in this case, sorry, the prejudice events

echo those four types of stressors that I mentioned earlier.

So that would be the major events, the chronic -- the major

acute events, the chronic stress, the minor events we could

call them, the daily hassles, and the nonevents.

        So that is, basically, taking, again, the same

framework and using it here in this context.  As I say, all of

this was not as well-packaged.  So it's not that I just took

1   all of this and copied it into this.  I used a lot of research

2   to develop this.

3   **Q.**   Dr. Meyer, are the events that you describe as prejudice

4   events different from stress events that may be faced by the

5   rest of the population?

6   **A.**   Yes, by definition, they are related to prejudice.

7   **Q.**   Can you give more specific examples of prejudice events?

8   **A.**   Yes.  So in addition to the example I gave that has to do

9   with events related to discrimination, that would include other

10  types of events that people experience.

11         For example, anti-gay violence would be, clearly, a

12  prejudice event, even though it's not a discrimination.  But it

13  is like hate crimes, would be prejudice events in the sense

14  that the person was chosen for this -- to be the victim of this

15  crime because of prejudice.

16         So these are the major events.  Then there are

17  chronic stressors, again, that could be resultant from

18  prejudice.

19         In my studies, for example, I've collected data

20  from -- in the recent study, about 400 gay men and lesbians.

21  And we asked them about life events that happened to them over

22  their entire life.  We have several -- many thousands of life

23  events that each of them described.

24         So there would be chronic things like harassment,

25  that children -- sorry, they were adult, who reported that

1  during their childhood they had been harassed at school.  So

2  that's not an event.  Unless there was an event.  So we assess

3  each of those for what happened and how it happened.

4        But if somebody says, "Somebody called me a name over

5  the entire year that I was in third grade," we would talk about

6  it as a chronic stressor.

7        If somebody said, "I walked down the street and

8  somebody jumped and attacked me and beat me up," that would be

9  an event, and, in this case, a hate crime, probably, but an

10  event related to prejudice.

11        So those are the life events.  There --

12 **Q.**   Can I ask a follow-up question?

13 **A.**   Sorry.

14 **Q.**   Do prejudice events differ in magnitude based on the

15  research?

16 **A.**   So when we say "magnitude," we mean how big the event was.

17  And, usually, what this means is like how much -- going back to

18  the definition in a more technical way, how much change did

19  such an event require, how much adaptation?

20        So that's why I say that losing a job is a very big

21  event.  Maybe -- certainly, the minor events I described,

22  waiting in a line is a very tiny magnitude.

23        But there's another aspect to prejudice event which

24  has been identified, for example, with hate crimes, which is

25  that they have a greater impact psychologically on the person,

1    on the victim of hate crime.

2           And that greater impact has to be -- has -- sorry,

3    has to do not so much with the characteristics of the event,

4    but with the social meaning of the event.

5           So -- and I don't want to -- to talk in this room

6    about anything legal, but, in fact, hate crimes was challenged

7    as a -- whether it could be constitutional.  And one of the

8    reasons why, in my understanding, the Supreme Court allowed it

9    to be a separate crime is, in fact, because of that added

10   social meaning, and the added pain.

11          So that even though it's the same exact crime or the

12   same exact event, when it is attached to prejudice and

13   discrimination and stigma, it has a meaning for the victim that

14   makes it worse.

15          And that's how we -- we described it here, as well.

16   Q.   What has the research shown about who commonly perpetrates

17   these prejudice events in the lives of gay men and lesbians?

18   A.   So when I talk about -- well, "perpetrates" really -- as I

19   described before, I talk about the different levels of, you can

20   say, causes of those events.

21          So at the larger level is, really, the way I

22   described earlier structural stigma.  We sometimes talk about

23   structural prejudice in a similar way.  Those are the things

24   that would determine -- that would be the context for, for

25   example, events.

1           So an event usually is within a larger context.  So

2    we look at both of those.  So a person -- so those are the

3    structural.  And then there are things that we call

4    interpersonal types of events.

5           So the perpetrators might be, on one hand, the state,

6    for example, by creating certain structures.  But, of course,

7    it could -- it is also individuals who do something.  So in the

8    example of the hate crime is the perpetrator.

9           In the case of gay men and lesbians, or sexual

10   minorities, this is quite distinct from other groups that when

11   we think about prejudice.  Unfortunately, often the

12   perpetrators could be family members, even parents and

13   siblings.

14          And some of the stories that we've collected -- we

15   collect them as short narratives -- has been quite dramatic in

16   terms of what some of those respondents reported in terms of

17   what had happened to them in the past.

18          This is, by the way, one of the publications here.

19   And what was -- I don't know if I would say surprising, but

20   what was distinctive about it was how many of them reported

21   family members perpetrating such crimes, really.  It would be

22   things like rape or homelessness, that some of them described.

23          So there is a whole range of potential perpetrators

24   that could be implicated here, in what I'm discussing.

25   Q.   Now, from some of those very serious examples, you also

1  mentioned earlier, I think, a concept of everyday hassles?

2  **A.**    Yes.

3  **Q.**    Are those also prejudice events?

4  **A.**    So in the prejudice literature, we call these daily

5  hassles -- well, some people have called them everyday

6  discrimination events.  That's one word.  There are other terms

7  that have been used to describe those.

8          And in the same way that a hate crime is more

9  significant because of its social meaning that is attached to

10  it, a minor event could have a greater meaning than similar

11  events that -- sorry, could have a greater impact than a

12  similar event that had no such meaning.

13          So one could be just an annoyance, and the other one

14  could be or is representing social disapproval.  And,

15  obviously, they would be felt by the person as -- to be very

16  different.

17  **Q.**    Give us, if you would, a couple of examples of daily

18  hassles the research has looked at in the context of prejudice

19  events.

20  **A.**    Well, there are many.  But, interestingly, I've read the

21  plaintiffs' testimony here, I believe on Monday it was.  I

22  mean, I read it on Tuesday, but the testimony was given on

23  Monday.

24          And I was really struck because one of the things

25  that we hear over and over is forms, filling out forms.  And it

1   is kind of bewildering because, on one hand, you might say,

2   "What's the big deal about filling out a form?"  But gay people

3   do respond to that.

4         And the only way that I can explain it is that it is

5   really not anything about the form.  It is that the form evokes

6   something much larger for the person.  It evokes a social

7   disapproval, a rejection.  And, often, it evokes memories of

8   such events, including large events that have happened maybe in

9   the past.

10        So it is this minor annoyance, most of the time, for

11  most people, to fill out a form.  And they probably would never

12  remember that, if they were asked to talk about what has

13  happened to them.  They would mention major things.

14        But for gay people, I've seen this in -- brought up

15  many times.  There are other type of things that gay people

16  report that, again, might be minor under some circumstances,

17  such as maybe treated in a very unfriendly way by one's

18  partners' parents.

19        And, certainly, it would not be a nice thing for

20  anybody, but for a gay person that may have -- or that does

21  have a very great social meaning of, again, echoing the

22  rejection and disrespect and the -- they have felt in the past

23  and they continue to feel in society.

24        So that is the relationship between the social

25  meaning and those minor events.

1   Q.   There was --

2           **THE COURT:**  Dr. Meyer, you mentioned "forms."  What

3   kind of forms are you talking about?

4           **THE WITNESS:**  I'm sorry.  I mentioned the testimony

5   that was given here, that they talked about forms.

6           What I mean by forms are just any kind of

7   administrative forms that one might have to fill, and in

8   particular where you have to fill your marital status, for

9   example.

10           So a gay person, let's say -- you know, really, what

11   they experience is:  There is no place for me to put anything

12   there.

13           So either they would say, "Well, I'm just going to

14   say single, even though I've been in a relationship for the

15   past 40 years, because I just don't want to get into that.  In

16   this case, it really doesn't matter.  Maybe I'm in a motor

17   vehicle office.  And I don't want to get into this whole

18   explanation with a clerk about what does it mean. "

19           Or there might be -- I think one of the plaintiffs

20   mentioned crossing out things and writing in things.  But my

21   point is, obviously, this is not very demanding to cross out a

22   form and say something else.  And I would say if it was within

23   any other context, nobody would remember that maybe the form

24   was not very well-written and you had to correct something

25   there.  That would not be a memorable event.

1              The only reason that it's memorable is because, as I

2    said, of what it means.  And what it means is social rejection.

3    It echoes the kinds of rejections that I've been describing

4    earlier.

5    Q.   And, Dr. Meyer, to follow up on this, to be sure I

6    understand, you might have applications like at a bank, to open

7    an account, or a lease to get an apartment, or a job

8    application.  Is that the kind of form you're talking about,

9    where there are boxes to describe your status, and not a box

10   that corresponds to your status if you are not married?

11   A.   Absolutely.

12   Q.   There was also some testimony on Monday, I believe, about

13   hassles relating to travel, say, trying to check into a hotel

14   room and get the type of room you reserved.  Would that be --

15   A.   This is very similar, again, where to me it's not so much

16   what happened, but what does it mean to you, to you as a gay

17   person?

18              So, again, a clerk in a hotel asking you about a

19   king-size bed for any couple would really mean nothing.  But

20   for a gay person, it's an area of great sensitivity because it

21   really talks to their rejection and to their rejection of their

22   family members, the people that they feel close to.

23   Q.   Does the fact that you might draw in a box or ultimately

24   get the right size bed make the problem go away for that

25   individual?

 1  A.    No, not at all.  Because, again, it is not about anything

 2  tangible here.  It's not -- there's nothing really horrible

 3  about filling out a form.  Well -- some forms.

 4        (Laughter)

 5  Q.    There can be.

 6  A.    But at least small forms.

 7        But, again, it is not about that effort of the

 8  filling out a form or explaining even to a clerk something

 9  about to clarify maybe some mistake.  That is not what it's

10  about.  It's about, I'm gay and I'm not accepted here.

11  Q.    You also talked, and I think, gave some specific examples

12  about nonevents.  These, although they are called nonevents,

13  are also in the research treated as prejudice events?

14  A.    Right.  They are not all treated as a prejudice event, but

15  when they are related to prejudice then I would call them

16  prejudice nonevents.

17        But they are -- so, for example, somebody may not get

18  a job promotion just because of all kinds of circumstances,

19  that maybe everybody expected them to get.  So that may not be

20  due to prejudice.  But it also could be due to prejudice.

21        Certainly, somebody might not marry for all kinds of

22  reasons, not because of anybody blocking their access to the

23  institution of marriage but for whatever other circumstances in

24  their lives.

25        But it still would be a nonevent that could be

1    significant because other people will begin to ask:  Well, are

2    you married?  Why aren't you married?  Especially if they are

3    of certain ethnic backgrounds where people ask questions like

4    that.

5         So there's expectation that you will get married,

6    that you will have children.  And so when I talk about those as

7    prejudice, it is when those things don't happen because of

8    prejudice.

9         And, again, parallel to everything else I was saying,

10    in this case, it would have that double meaning, both the

11    impact of the actual event, the content of the actual event or,

12    in this case, nonevent, such as not getting married.

13         But for gay men and lesbians, not getting married

14    would also have that social meaning that I just described

15    regarding daily hassles type of things, where not getting

16    married is not just a simple -- it's not really simple either

17    way.  But it's not a fact of their life.

18         It's also a representation of their position in

19    society, of the way society views them, of the kind of respect

20    or, in this case, disrespect that they experience, of the

21    stigma that I described earlier.

22    Q.   Now, Dr. Meyer, what, if anything, is the relationship

23    between Proposition 8 and the denial of the right to marry on

24    the one hand and prejudice events, as you described them?

25    A.   Well, I think it is quite obvious that Proposition 8, by

1  definition, blocks the marriage institution for gay men and

2  lesbians.  This is basically what it says.

3          So, in that sense, it certainly will be responsible

4  for gay men and lesbian not marrying, and having to explain why

5  I have not married.

6          And by explaining why I have not married, you also

7  have to explain, I'm really not seen as equal.  I'm -- my

8  status is -- is not respected by my state or by my country, by

9  my fellow citizens.

10         So it's -- in the very basic definition of structural

11 stigma, it is a block on the way to achieving desirable goals

12 in life.

13 **Q.**   Now, you've already talked a little bit about some of the

14 plaintiff testimony on Monday.  I was hoping that I could show

15 you a couple examples.

16         **MR. DUSSEAULT:**  Do we have demonstrative 4 handy?

17         And, again, so that the record is clear so as to what

18 you are commenting on, let me read this testimony from

19 plaintiff Paul Katami.

20         **"QUESTION:**  Have you experienced

21         discrimination as a result of being gay.

22         **"ANSWER:**  One example that I remember very

23         clearly is the first time in college, with

24         some gay friends, going to my first gay

25         establishment, like a bar or a restaurant,

```
 1            socially.
 2                 "And we were in an outdoor patio.  And rocks
 3            and eggs came flying over the fence of the
 4            patio.  We were struck by these rocks and
 5            eggs.  And there were slurs.  And, again, we
 6            couldn't see who the people were, but we were
 7            definitely hit.  And it was a very sobering
 8            moment because I just accepted that as, well,
 9            that's part of our struggle.  That's part of
10            what we have to deal with."
11  BY MR. DUSSEAULT:
12  Q.   In the context of prejudice events, do you have a reaction
13  to this example?
14  A.   Yes.  And, as I said before, regarding form, this just
15  seems like a very familiar type of report that a gay person
16  might report.
17       And I don't -- I don't mean to tell the plaintiff
18  that their experiences are not unique experiences.  Certainly,
19  within their life they are unique.  But they are really not
20  unique.
21       (Laughter)
22       Many people -- sorry.  Many people experience those
23  kind of things.
24       And I think when I read that what struck me most,
25  almost, may be not what you would notice, but it is that point
```

1  about it was a very sobering moment.  Because I think that

2  refers to the registration about this is a meaningful point.

3  This is about who I am.  This is something I have to get used

4  to.

5          When Mr. Katami talks about, well, that's part of our

6  struggle.  It is really a moment where he describes recognizing

7  something that has to do with who he is as a gay person.

8          But other elements of this would be that, clearly, I

9  would say, this was related to hate.  In fact, when we assess

10  the -- by the way, when we collect those narratives in my

11  research, we go through a very, very tedious process of

12  analyzing each of those narratives so that we quantify some

13  qualities around them.

14          And one of the things we look at related to hate

15  crime.  And we actually try to use some of the guidelines that

16  police use in determining hate crimes.

17          So, in this case, he mentioned being next to a gay

18  establishment, which would be one element that would help in

19  determining a hate crime.

20          But there's something that I don't know here, for

21  example, whether someone was actually hurt, which would go to

22  the issue of the magnitude.

23          But regardless of that, I think what is clear here,

24  that the meaning of this -- and I would dare say not having

25  talked to Mr. Katami and not really knowing anything behind

1    that -- that perhaps one of the main reasons that it's so

2    memorable was because of that sobering moment, because of that

3    recognition:  I am not the same as other people in society.

4    Somebody can come and just throw stones, or whatever it was,

5    and eggs on me, because they don't like that I am gay.

6    **Q.**   When you were talking earlier about whether or not this

7    was unique, do you mean that this sort of example is, in your

8    research, often relayed by gay men and lesbians?

9    **A.**   Exactly.

10   **Q.**   Let's put up a demonstrative 5, another example.  And this

11   is testimony from another of our plaintiffs, Sandra Stier.

12           (Document displayed)

13           **"QUESTION:**  Are there occasions where you

14           have to fill out forms that ask whether you

15           are married or name of spouse or things like

16           that?

17           **"ANSWER:**  Doctor's offices.  Are you single

18           or are you married or are, you know, divorced

19           even?  But, you know, so I have to find

20           myself, you know, scratching something out,

21           putting a line through it and saying

22           'domestic partner' and making sure I explain

23           to folks what that is, to make sure that our

24           transaction can go smoothly."

25           We talked a good bit about forms already, but what's

1  your reaction?

2  **A.**    Again, that's an example of this form.

3           But, you know, you have to think -- or I guess you

4  have to ask yourself, why would a person remember that type of

5  minor incident?  And, as I mentioned before, I think the

6  meaning of this incident is more important than, in this case,

7  what has actually happened.

8           So, like I said, if there was some error on this

9  form, where it says "Mr." or "Mrs." and somehow the words were

10  not clear and she had to fix that, I don't think she would have

11  reported that as a major -- something that she remembers.

12          But I think it is, again, the message that the forms,

13  in a sense, echoes about rejection and about I'm not equal to

14  other people, to most people who fill this form.

15  **Q.**   So let's move to the second process you talked about,

16  expectations of rejection and discrimination.  What do you mean

17  by that?

18  **A.**    Expectations of rejection and discrimination actually mean

19  exactly what it says.  Expecting rejection and discrimination.

20          But this is a very -- well, to me, interesting

21  process that occurs in populations that are -- that are used to

22  prejudice.  By "used" I mean that they know about the prejudice

23  that exists in society.

24          And what happens is that a person who knows that they

25  might be rejected or discriminated against needs to maintain a

1    certain vigilance about their interactions in society that

2    would, first of all, guarantee their safety.

3              So an example that I often use when I talk about this

4    is, a gay couple walking down the street.  In my experience,

5    very often, regardless of how friendly their street is, they

6    would have to monitor the kind of affection that they display

7    with each other because perhaps somebody will come and throw

8    stones and eggs, and so forth, because they bring up something

9    the person doesn't like.  And, again, it's not something about

10   them as individuals, but about the fact that they are

11   representing -- sorry, presenting as gay.

12             So this would be one type of, as I call it,

13   vigilance, that you have to be on edge; you have to watch; you

14   have to have a third eye, looking, monitoring your environment.

15             And that is a very stressful thing, if you think

16   about it, that many people don't have to think about any of

17   that when they walk down the street with their partners.

18   **Q.**   Now, does the impact of expectation of rejection,

19   discrimination go away if the rejection or discrimination

20   doesn't happen?

21   **A.**   Well, that's another interesting thing about expectation

22   of rejection and discrimination, is that nothing really has to

23   happen.  And not only that, the persons involved in the -- in

24   that environment may themselves not at all hold any negative

25   attitudes.

1        So in the sense it is the expectation is not that

2   this particular person may harm me.  It is that what I

3   represent may trigger in somebody.  And it could be this

4   person, but maybe it's not.  So it doesn't have to be about

5   anything specific about the persons involved in this

6   interaction.

7        I often give the example of being in a job interview

8   and having to kind of monitor maybe how your -- what you're

9   saying.  And it doesn't mean -- it doesn't matter what the

10  people interviewing you actually think.  It is that you're

11  expecting that, that matters.  That is what is stressful here.

12       In addition to issues of safety, there are, as I just

13  alluded to, issues around social intercourse, where -- since it

14  can just be very embarrassing or awkward.

15       And we know that from stress literature, generally,

16  many times people either choose to avoid those situations,

17  swallow kind of minor incidents of prejudice or slurs, or

18  something, and just kind of move on because they don't want to

19  get into that, so to speak.

20       But the anticipation itself is what I'm talking about

21  as stressful.  You know, whether or not something happens, that

22  has to do with a life event.  But here we are just talking

23  about that anticipation.

24  Q.  So what if somebody, concerned about having to be vigilant

25  on the street, just stays inside and doesn't go out, does that

1  solve the problem for them?

2  **A.**   Well, that would be quite a severe punishment for that

3  person.

4           (Laughter)

5  **Q.**   Is there a relationship, as you see it, Dr. Meyer, between

6  Proposition 8's denial of the opportunity to marry and this

7  expectation of rejection and discrimination?

8  **A.**   Yes.

9  **Q.**   What is that connection?

10 **A.**   Well, as I described earlier, in my mind, the

11 Proposition 8, in its social meaning, sends a message that gay

12 relationships are not to be respected; that they are of

13 secondary value, if of any value at all; that they are

14 certainly not equal to those of heterosexuals.

15          And, to me, that's -- in addition to achieving the

16 literal aims of not allowing gay people to marry, it also sends

17 a strong message about the values of the state; in this case,

18 the Constitution itself.  And it sends a message that would, in

19 my mind, encourage or at least is consistent with holding

20 prejudicial attitudes.

21          So that doesn't add up to a very welcoming

22 environment.

23 **Q.**   Let's talk about the third process you identify, which I

24 think you described as concealing the stigmatizing identity.

25 **A.**   Yes.

**Q.**   Can you elaborate on that.

**A.**   Yes.   If I may just mention one more concept that is related to the stress, as we call it, the stress process, because it's relevant here.

         And that is the concept of coping.  Coping is part of the stress process.  And when we assess how does a stress affect the outcome, as I mentioned earlier, of health outcome, we really look at the balance between the stress impact and what we call coping.

         There's a whole bunch of stuff that goes into coping. People talk about social support.  But it is anything that we can say is positive impact on the health, that counters the negative impact of the stressor.

         The reason I bring it up here, because interesting thing -- so concealing means I'm not going to reveal to other people that I am gay or lesbian.  I'm going to hide that fact.

         But the interesting relationship with coping is that people conceal, usually, as a coping effort.  They conceal so that they avoid some of the things that I described earlier, so that they are not fired from their job.

         If you're in the United States military, by law you have to conceal, in that you are not allowed to talk about your homosexuality.

         So they conceal as an effort to -- in this case, if you are gay and you are in the military, you would conceal so

1    that you don't get fired.

2          But there are many other types of instances where

3    people might find the need to conceal their sexual orientation.

4    They might conceal it because they feel that they will be

5    rejected if other people knew that they were gay.

6          They may conceal it because of their personal safety,

7    in the similar way that I described hate crimes, that they

8    don't want people to recognize them as gay.

9          They might not want to go to a place that is

10   recognized as gay, for fear that somebody might either hurt

11   them, physically hurt them or in other ways hurt them.

12         So there are reasons that people choose to conceal

13   what they, themselves, know about themselves, that they are gay

14   or lesbian.

15         And what the stress process here talks -- so this

16   is -- but what the stress process is, is that there are many

17   ways that this kind of concealment are stressful.  And I've

18   written about, at least, maybe, three ways.

19         And, again, all of this comes from research and

20   literature that is not specific to this topic or to gay

21   population.  This is basing it on general literature in various

22   fields.  In this case, mostly psychology.

23         So, if you want, I can tell you about the particular

24   ways that concealing can be stressful.

25   Q.   If you could briefly just identify what those ways are, it

1  would be helpful.

2  **A.**   So one way is that concealing requires, actually, a very

3  strong cognitive effort.  By "cognitive" I mean the way we

4  think or the way your mind works.

5         So there's a stress that is involved with concealing,

6  because you have to really work hard on this.  It's not

7  something that is -- you know, if you're lying, it's not that

8  easy, always, to keep a lie and to keep it, certainly, for a

9  long period of time.

10        So there is research that has been done about that,

11 that shows that this is, in fact, a very difficult type of

12 thing.

13        I know, for example -- well, I brought up the example

14 of the military.  If you are in the military and you live your

15 life there, and you have to talk to your comrades -- and people

16 talk about, maybe, their girlfriend and boyfriend or whatever.

17 And gay people have been known to maybe change a pronoun, kind

18 of as a way of monitoring that, and say, "Yeah, my girlfriend,"

19 but you really mean your boyfriend.  But, you know, this takes

20 a lot of coordination.  And, you know, you have to remember

21 what you said the week before.  It's all a lie.

22        So people have actually studied this with -- in other

23 context, as I said.  There's a couple of researchers that refer

24 to that.  Their respondents that they were studying said, "This

25 is a private hell," just the effort of concealing.

1    Q.    The work that's involved?

2    A.    The cognitive effort.  And they describe in great detail

3    the cognitive work that goes into concealing.  In this case, it

4    was in the work environment.

5    Q.    Can I ask a follow-up.  In addition to that, does the

6    person who conceals also lose benefits that he or she might

7    receive if he or she were able to express their true self?

8    A.    Right.  So that's another way that concealment is damaging

9    and stressful.  So, actually, there's several benefits that are

10   associated with that.

11          The first one is that concealing prevents you from

12   what we call or what people call in psychology "expressed

13   emotion."

14          Expressed emotion is very simply that you're

15   expressing your emotion.  But it doesn't have to be any deep

16   emotion, just expressing something about yourself.  And that

17   has been shown to be a very positive, psychologically, thing to

18   do.

19          In fact, people have used it as a form of therapy, to

20   improve people's mental health.  They have used it, for

21   example, in cancer patients, and shown that just writing

22   something, about expressing something not even very intimate,

23   is very helpful psychologically.

24          So, certainly, hiding something and hiding something

25   that is perceived as being such a core thing about who you are,

1   this is how people talk about:  This is who I am.

2          That doesn't mean that gay people are just that.  But

3   it is a central identity that is important.  And if you want to

4   express who you are, certainly, you wouldn't want to hide that

5   part.

6          There's related to that, also, concept of

7   authenticity, of living an authentic life.  And, certainly,

8   people feel better, in a kind of existential way, by just

9   presenting themselves as they are to the world and in

10  interactions with the world.

11  **Q.**   Does concealment impact a gay man or lesbian's ability to

12  obtain social support?

13  **A.**   Exactly.  As I mentioned earlier, one of the important

14  mechanisms around stress and illness is the ability of people

15  to cope with stress.

16         And one of the beneficial -- I'm sorry, one of the

17  beneficial ways people cope with stress is through social

18  support.  For example, through having a network of friends that

19  you can talk about or an intimate friend that you can talk

20  about things.

21         There are also things that happen through -- for gay

22  people, specifically, what we call affiliation with the gay

23  community.  There are things that maybe you feel maybe other

24  people don't understand, but if you go to a certain community

25  center, or to a center -- sorry, to an event that maybe is like

1  a gay pride, that you get certain benefits from being in that

2  environment that maybe you don't get in other places.

3          And, certainly, if you are concealing your gay

4  identity, you are not going to walk into a gay community center

5  or gay pride event.

6          And, finally, related to that, and especially of

7  concern to me being in public health, in terms of health

8  services, there are many health services that are provided that

9  would provide, I would say, more targeted services to gay and

10 lesbian populations that are more both informed from a medical

11 perspective, for example, about the needs of gay men and

12 lesbians, and also that maybe provide a more welcoming

13 environment.

14         And that, too, will be something that a person who

15 conceals his or her gay identity would not be able to benefit

16 from.

17         So both are affected by the negatives but also from

18 the prevention of the positive type of things that they could

19 have had.

20 **Q.**   Now, one point I want to clarify here.  Can concealment be

21 absolute in nature?  Meaning the person doesn't tell anyone,

22 ever, what their identity is?

23 **A.**   I guess it could be.  I don't think that -- certainly, it

24 doesn't have to be that.  And I would think that many people,

25 even if they, for example, conceal at work, they might have

1    some friends that they may have confided with.

2          There's also concealment that will carry more kind of

3    momentary nature, that is not as long-lasting as I was

4    describing.  And that, too, can have -- certainly, is not a

5    pleasant experience.  You know, again, because of the notion

6    that you're really prevented from expressing something about

7    yourself that you don't feel that you should.

8          But the reason that you're concealing it is because,

9    again, of the significance of rejection of the region of

10   disrespect that you would feel if you were to reveal this.

11         So it is not just a simple issue.

12   Q.   Let me try and clarify the question.  I believe there was

13   some testimony from one of the plaintiffs on Monday about

14   knowing that he was gay at a very, very young age, but not

15   coming out, if you will, to anyone until about 25.

16         Is that a form of concealment?

17   A.   Sounds like it.  And to the extent that he knew that he

18   was gay, or he identified as gay at some earlier point, and

19   recognized or feared, at least, that if he were to reveal this

20   or express this about himself would -- would lead to, again,

21   rejection, discrimination, to losing maybe a relationship.

22   Again, this is, I presume, what the person expected, and that

23   was the motivation to maybe not to reveal his sexual

24   orientation.

25   Q.   Okay.  But, alternatively, if somebody, let's say, were

1 open with family or friends, but in particular circumstances

2 chooses to conceal or lie about his or her orientation, just to

3 avoid having to deal with it, is that also --

4 **A.**    That's another example.  As I said, you know, because of

5 Don't Ask, Don't Tell, obviously, if you're there you will have

6 to conceal.  But only in that environment.

7         And you might be able to, on home leave, go back and

8 be your partner or with some friends.  Certainly, you're not

9 going to want to march in a gay pride parade.  So there will

10 be, still, some monitoring, but it doesn't have to be absolute.

11 **Q.**    Dr. Meyer, do you see a connection between the concealment

12 process and Proposition 8 in its denial of marriage rights?

13 **A.**    Well, again, to the extent that we see Proposition 8 as

14 part of the stigma, as something that propagates the stigma, it

15 certainly doesn't send a message that:  It's okay.  You can be

16 who you want to be.  You know, we respect that.  We welcome you

17 as part of the community.

18         It sends the opposite message, in my mind, and,

19 therefore, would -- I would think, add to that pressure, to

20 that social environment that encourages people, some people, to

21 conceal.

22         And, also, when I talk about those effects of

23 Proposition 8, by the way, they don't only affect gay people.

24 They also send the same message to other people who are not

25 themselves gay.

1      So, in that sense, it's not just damaging to gay

2 people because they feel bad about their rejection.  It also

3 sends a message that it is okay to reject.  Not only that it is

4 okay, that this is very highly valued by our Constitution to

5 reject gay people, to designate them a different class of

6 people in terms of their intimate relationships.

7 **Q.**   I'd like to show you another example of testimony from our

8 plaintiffs.  This coming from Kristin Perry testimony that was

9 given on Monday.  Again, I'll read it.

10           **"QUESTION:**  Do you, as you go through life

11           every day, feel that -- the other effects of

12           discrimination on the basis of your sexual

13           orientation?

14           **"ANSWER:**  Every day.

15           **"QUESTION:**  Tell us about that.

16           **"ANSWER:**  I have to decide every day if I

17           want to come out everywhere I go and take the

18           chance that somebody will have a hostile

19           reaction to my sexuality, or just go there

20           and buy the microwave we went there to buy,

21           without having to go through that again.  And

22           the decision every day to come out or not

23           come out at work, at home, at PTA, at music,

24           at soccer, is exhausting.  So much of the

25           time I just choose to do as much of that as I

1          can handle doing in any given day."

2          Do you have a reaction to that testimony?

3  **A.**    Yeah.  I think that, again, demonstrates several of the

4  things I have already mentioned, including the expectations of

5  rejection and the need to monitor and maybe sometimes the need

6  to decide:  Is it worth it?  Do I want to get into this whole

7  thing or just avoid it?  But, also, the repetition of it, like

8  how it really is in so many contexts.

9          But I have to say, the word that most jumped at me in

10 this -- it might be not the word that jumped at other people --

11 is the word "exhausting."

12         And the reason that it jumped at me is because

13 "exhausting" has a special meaning in stress research.  In

14 fact, one of the earliest example of stress research was done

15 by a researcher by the name of Hans Selye, S-e-l-y-e.

16         And he described something that he called the general

17 adaptation syndrome.  He studied animals.  But his general

18 adaptation syndrome, basically, echoes what I was just

19 describing.  There is a stressor, there is a coping.  Which he

20 didn't call "coping," but it's some adjustment period.

21         But, in his words, the end of that was exhaustion.

22 So that the result of the stress process was exhaustion.  And

23 he studied animals, and in many case death of those animals

24 that he studied.

25         So when I saw that, that's kind of what it brought to

1    my mind, is Selye's general adaptation syndrome.

2    **Q.**   Let's turn, Dr. Meyer, to the fourth process you

3    described, which you described as internalized homophobia.

4            Tell me what you mean by that.

5    **A.**   So, again, that's a word that has been discussed in

6    different forms, but it really relates to the same thing in the

7    different form, that it has been discussed in the literature.

8            As again, I mentioned, I used existing literature and

9    in terms homophobia has been something that has been discussed

10   a lot in clinical and psychological research, people who talked

11   about how to treat gay patients.

12           And one of the things they noted is that perhaps a

13   very central aspect of treating people who are troubled by

14   whatever symptom that brought them to therapy, is internalized

15   homophobia.  Internalized homophobia refers to the person who

16   is gay or lesbian basically internalizing or taking in negative

17   attitudes, negative notions that are existing in society that

18   he or she has learned through their -- what we call

19   socialization process, through their growing up in our society.

20           And, of course, it is not only gay -- as I said

21   earlier, gay men and lesbians who learn those negative

22   attitudes.  Those are prevalent attitudes.

23           So in learning those attitudes one might learn -- you

24   know, if they read this book by Rubin that I mentioned about

25   what gay relationships might be.

1          And then at some age the person begins to think or

2    realize or recognize or whatever way this happens, Well, I'm

3    gay.  So the natural thing is that everything that everything

4    that I've learned about what it is to be gay, that must be what

5    I am.  And, therefore, if I was impacted by this quote from

6    Rubin, for example, I would say that it will be quite

7    devastating to a young -- or, really, not only young person.

8    If they believe that and thought, Well, this is what is in my

9    future.

10   Q.   Now, when you use the word "internalized homophobia" here,

11   do you mean specifically that the person internalizes a fear of

12   themselves --

13   A.   No, at all.  When I use the word "homophobia," I use it in

14   the sense of negative attitudes.  Maybe something that is akin

15   to racism or sexism.  Just -- and people use other words, but I

16   use that word because -- well, I have my reasons.  I don't know

17   if you want to hear them.

18        It's a word that is recognizable.  It's a word that

19   is in the dictionary, and I find it just as good a word as some

20   other words that have been proposed.

21        But it basically relates to the negative attitudes

22   that are prevalent in society about gay men and lesbian or

23   about homosexuality in general.

24   Q.   Now, within the context of internalized homophobia, are

25   you aware of a concept called the possible self?

A.    Yes, I am.  And it's not exactly within the -- it's,

again, another concept, a theory that I have used, borrowed, to

explain some of those processes as they pertain to internalized

homophobia.

Q.    And what does it mean?

A.    So possible self is a psychological concept that, again, I

did not invent, unfortunately, because it is a very renowned

work.

        And it basically relates to something very

interesting, which is that whoever we are -- and it really

relates to any age -- we don't only look at where we are and

where we were in our past, but we also project into what we

might become.

        So this is what they call the possible self.  What

would possibly could I become or what are the possibilities for

me?  Maybe you can talk about it like that.

        And the work on that showed that this is a very

important construct, not only because it actually helps people

chart a life course of goals and so forth.  It doesn't have to

be, like, super articulated, like a whole life plan.  Just, you

know, like I mentioned earlier.  I will be a mother, you know,

things like that.

        So the possible self is not only important because of

how it projects to the future and how it maybe helps a person

think about the future.  It is also related to what people feel

1    right now.  And having a -- obviously, a more optimistic notion

2    of their future will be associated with feeling better about

3    who you are.

4           And the opposite of that feeling, that you will be

5    blocked from an achieving goals, obviously, will be associated

6    with what we call a lower sense of well-being and maybe just

7    negative feelings about who you are and about your position.

8    **Q.**   And does internalized homophobia lead to a limitation on

9    one's concept of a possible self?

10   **A.**   Right.  I'm sorry.

11          So the relationship is that internalized homophobia

12   speaks very directly to that notion of possible self, because

13   internalized homophobia conveys that there are certain

14   attitudes, certain stereotypes -- negative attitudes, that

15   is -- in the way that gay people have been portrayed, as I

16   described earlier, related to social stigma, related to

17   cultural portrayal, such as the Rubin, but, certainly, it is

18   just one example.  So if you internalize that, you think this

19   is who I'm going to be in the future.

20          I mean, of course, it is not as simplistic as that,

21   but that part of that is about, How do I see my future?  How do

22   I see my prospects for the future?  Who will I become?

23          And we have seen that actually in some research.  Gay

24   and lesbian youth had a harder time projecting to the future

25   because they have learned those kind of negative attitudes.

1          In fact, they have had a harder time -- so at a very

2     young age children -- you know, the most accessible type of

3     possible self, I think, is the kind of family relation that one

4     describes.  You know, a very young age people might -- sorry,

5     little kids might play and say, "I am the wife" and "I am the

6     mother," things like that.

7          So for gay youth or gay people, really, at whatever

8     age they begin to grapple with those issues, this is -- this is

9     a difficulty.  You know, they have to think, well, how would I

10    be, because is it true that, you know, gay -- homosexuals are

11    not happy together?

12         You have to begin to, in a sense, undo some of those

13    effects and in a sense relearn.  And that was part of what the

14    therapists were talking about, to relearn better attitudes

15    about yourself and about what it is like to be gay.

16    **Q.**   Dr. Meyer, I would like to show you -- if we could have

17    demonstrative eight -- another example of testimony from Monday

18    from our plaintiffs.  Again, from Kristin Perry.

19              **"QUESTION:**  What does the institution of

20              marriage mean to you?  Why do you want that?

21              **"ANSWER:**  Well, I have never really let

22              myself want it until now.  Growing up as a

23              lesbian, you don't let yourself want it,

24              because everyone tells you you are never

25              going to have it."

1          Do you have a reaction to that?

2  **A.**   I think that is a pretty perfect example of what I was

3  just describing, where the person recognizing herself, in this

4  case as a lesbian, applies those notions that some of those

5  things that are relevant to other people, such as marriage

6  here, do not apply to me.  I can't hope for that.  That is not

7  part of my possible self.

8          And, I guess, she is implying here, presumably

9  because of her being a plaintiff, at some point she began to

10 recognize that, yes, this is something that I could possibly

11 get access to as well.  So that's exactly the process I was

12 describing earlier.

13 **Q.**   I would like to move to your third and final opinion that

14 you referenced earlier having to do with health outcomes.

15         You have described the stigma attached to being

16 lesbian and gay and the role of minority stress in the lives of

17 gay men and lesbians.

18         Does that stigma and minority stress, according to

19 the research, have an impact or effect on health outcomes for

20 gay men and lesbians?

21 **A.**   Yes.

22 **Q.**   What is that impact?

23 **A.**   Well, as I mentioned earlier, this entire endeavor, this

24 whole stress process that I described, its purpose is to study

25 health determinants, as we call it, of health, the causes of

1   health and disease.  And there's been literally hundreds of

2   studies that studied different aspects of this and how it is

3   associated with health outcomes.

4         And we know that for gay men and lesbians and, also,

5   bisexuals, there has been shown a relationship between

6   experiencing those kinds of stressors and negative health

7   outcome or adverse health outcomes.

8         In my area of study those were mental disorders, such

9   as -- there are three classes that we usually study in

10  community studies.  Those are anxiety disorders, mood

11  disorders, such as depression, substance use disorders.  It is

12  a -- classify disorders.  There are also just what we would

13  call general distress or just feeling something, blue and sad,

14  things like that.  So there are a variety of outcomes that have

15  been studied.

16        On the other side of it, there's also been health

17  behaviors that are associated with stress, and this minority

18  stress; for example, excess smoking, certain eating behavior,

19  drinking.

20        Again, this is true for the general stress

21  literature, as well as for gay and lesbian populations, with, I

22  guess, the point being that gay and lesbian populations are

23  exposed to more of the stress and -- to distress, which is

24  unique and additive to kind of the general stress that, as I

25  mentioned earlier, everybody experiences.  And, therefore, that

1  excess risk, as we call in epidemiological language, that

2  excess risk is associated with excess disease or disorder or

3  whatever the outcome is.

4          So as I said, it could be disorders.  It could also

5  be generalized distress.

6          We have also studied something that's called

7  well-being, which is -- some people refer to as a positive

8  mental health.

9          And there has also been studies that show excess in

10  suicide attempts, in particular, in youth.

11  **Q.**   And, Dr. Meyer, does the research show that stigma and the

12  minority stress that you talked about contributes to a higher

13  incidence of these adverse mental health consequences or the

14  attempted suicide you talk about in the gay and lesbian

15  population than in the population at large?

16  **A.**   Yes.  So we look at the relationship between excess risk

17  and -- to see whether it is related to excess in outcome, as we

18  said, of the disease that we are studying.  And there has been

19  pretty consistent findings that show excess disorder or higher

20  level of disorder in gay and lesbian populations as compared to

21  heterosexuals.

22  **Q.**   I want to be sure we are being clear on a couple of

23  points.

24          Are you saying that being gay or lesbian is in and of

25  itself in any way a mental illness?

**A.**    No, not at all.  What I'm saying is that there's risks

that is associated with those social arrangement, with the

social situation that I described as stigma and prejudice.  And

that excess risk is related to excess, as we call it, disorder

or to an outcome.  It leads to a certain outcome.

        And because it is excess, it leads to more of the

population that is exposed to the risk.

        But when we study disorders and risk and outcome

relationships, it is never expected that everybody who is

exposed to a risk is, therefore, diseased somehow.

        I mean, even in the area of stress, people who are

exposed to the most severe type of stressors, like extreme

stressors we call them, like war, doesn't mean that all of them

are, therefore, going to be affected with a disease such as

PTSD.

        What we look at is excess and relationship between

populations.  As I said before, I studied patterns of diseases,

so we want to see does this population have more of this risk

and more of this disease.  I don't know if it's clear.

**Q.**    And a related point I just want to be clear on.

        Are you saying that all gay men and lesbians suffer

from some form of adverse mental health consequences or even

that most do?

**A.**    No.  Again, what we look to see is whether this exposure

is related to the outcome among some people.

1          I guess another analogy would be when we look at

2     smoking and lung cancer.  So we want to see, do people who

3     smoke have more lung cancer than people who don't smoke?  And

4     that would indicate one indication of the association between

5     those two, but it actually is not the fact that everybody who

6     smokes gets lung cancer.

7          Going back to the gay and lesbian population, most

8     gay men and lesbians are not disordered, but there is an excess

9     in that population as compared to heterosexuals.

10    **Q.**   Do you have a view as to whether the incidents of adverse

11    health consequences of the type that you are describing would

12    be less if we could find a way to reduce the stigma and

13    minority stress experienced by gay men and lesbians?

14    **A.**   Yes, I think that it stems from everything that I was

15    saying.  When we see people have more of this exposure, they

16    have more of the disorder; and people who have less of this

17    exposure, have less of the disorder.

18          So, for example, if we study within a group of -- we

19    all them respondents, study participants.  And we see that some

20    people may have had a lot of those life events and they were of

21    great magnitude.  And then we see that they have more of the

22    outcome that we're studying, maybe depression.

23          And then we see that some other people, for many

24    reasons, didn't have that exposure.  Maybe for particular

25    circumstances in their own environment they were protected from

1    that or whatever other reasons.  And we see that they have

2    fewer -- a lower level of this disorder.

3            So that indicates that more of those stressors are

4    associated with more of the disease, and by definition less of

5    those stressors would be associated with less of that disease,

6    or the diseases that are affected by those.

7    **Q.**   Dr. Meyer, are you familiar with something called Healthy

8    People 2010?

9    **A.**   Yes.

10   **Q.**   What is that?

11   **A.**   We actually refer to that as Healthy People twenty-ten.

12           (Laughter.)

13           **MR. DUSSEAULT:**  I stand corrected.

14   **BY MR. DUSSEAULT:**

15   **Q.**   And what is Healthy People 2010?

16   **A.**   So, just if you tell people Healthy People two thousand

17   and ten, they would probably not know what you are talking

18   about.  We just call it Healthy People twenty-ten.

19           Healthy People is a project of the federal government

20   organized or, I guess, I would say led by the Department of

21   Health and Human Services.  And it is the plan for the nation's

22   health for the decade that is coming up.  So, actually, right

23   now we will be looking for Healthy People 2020.

24           So Healthy People 2010 is the plan for the health of

25   the nation for the decade that started in 2000 and, obviously,

1    is ending now.

2         MR. DUSSEAULT:  Could we put demonstrative three up?

3         (Document displayed)

4    BY MR. DUSSEAULT:

5    Q.   Do you have that in front of you, sir?

6    A.   Yes.

7    Q.   And this is text from Healthy People 2010?

8    A.   Yes.  And can I explain something about it?

9    Q.   Sure.

10   A.   Okay.  So Healthy People 2010, the Department of Health

11   and Human Services and many, many -- this is a very long

12   process that involves -- I don't know for exact, but many,

13   many, many professionals and researchers and so forth, both in

14   government and outside of government.

15        And so the main goals that the United States set up

16   for itself in terms of health of the nation, one of the main

17   goals was to reduce health disparities.  Health disparities

18   refer to differences between one population to another

19   population where one population has more in excess of any kind

20   of disorder, whether it's a mental or physical disorder.

21        And this is a section from Healthy People 2010 that

22   describes one of those populations, which is a population

23   defined by sexual orientation, and it has identified them as

24   a -- one of our nation's goals to reduce disparities associated

25   with -- in the health of gay and lesbian populations as

1  compared to heterosexuals.  So that's what this is.

2  **Q.**  Okay.  And let me just read so, again, the record is clear

3  what you are looking at.  It says:

4        "Sexual orientation.  America's gay and

5        lesbian population comprises a diverse

6        community with disparate health concerns.

7        Major health issues for gay men are HIV/Aids

8        and other sexually transmitted diseases,

9        substance abuse, depression and suicide.  Gay

10        male adolescents are two to three times more

11        likely than their peers to attempt suicide.

12        Some evidence suggests lesbians have higher

13        rates of smoking, overweight, alcohol abuse,

14        and stress than heterosexual women."

15        And then we have highlighted the last sentence.

16        "The issues surrounding personal, family, and

17        social acceptance of sexual orientation can

18        place a significant burden on mental health

19        and personal safety."

20        In your view, is this finding from Healthy People

21  2010 relevant to your own opinion as to health outcomes and the

22  relationship to stigma and minority stress?

23  **A.**  I think it basically describes what I was talking about

24  today, and this is pretty much what I describing.

25        **MR. DUSSEAULT:**  Okay.  Can we also show the chart?

1  Do we have the chart?

2       (Document displayed)

3  **BY MR. DUSSEAULT:**

4  **Q.**   As we are reaching the end here, I want to just put a

5  chart up here, which begins with social structure and then has

6  a box on top, "Coping Resources," the top in the middle.  And

7  then bottom middle, "Stress (General and Prejudice-related)."

8  And then on the right "Health Outcomes (Disease)."

9       Can you explain what this chart depicts?

10 **A.**   This is a very, very schematic, simple way of basically

11 demonstrating the causal chain that I was describing to you

12 today that goes from the left to the right, with the health

13 outcomes being our outcome of interest.

14       The social structure and social status are here to

15 the left as determinants of stressors that people experience,

16 as well as coping resources.

17       What we mean by that is that stress and coping

18 resources are not randomly assigned to people in society, but

19 they depend on their own social structures.

20       And it could mean something simple as if you are

21 employed, you can get fired from your job.  But if you are not

22 employed, obviously, you cannot have that kind of event.  So

23 events do not just happen in a random order.

24       Specifically to the topics that I was discussing

25 today, what it shows is the social status and the stigma lead

1    to exposure to specific stress -- stressors, such as the ones

2    that I described that I call minority stress.

3            And I described here both general and

4    prejudice-related to indicate that everybody experiences

5    general stressors, as I described them, or just plain stress,

6    and then there is added prejudice-related stress.

7            And on the top, "Coping Resources" relates to what I

8    was describing before as the protective role of coping.  And in

9    coping -- all of this is very simplistic, but there are a lot

10   more behind each of those boxes, as we just discussed at

11   length; the stress, for example.

12           There is a lot more that can be said about coping,

13   for example, and social support is part of that.  And it

14   basically shows what we look for is how does this whole process

15   affect health outcomes.

16   **Q.**   Dr. Meyer, I want to ask you one last thing as we close

17   here.

18           Do you have a view as to whether the mental health

19   outcomes of gay men and lesbians in California would improve if

20   Prop 8 were not the law of California and gay men and lesbians

21   were permitted to marry?

22   **A.**   I do.

23   **Q.**   What is that view?

24   **A.**   I think consistent with everything that I have said, and

25   consistent with my work on the relevance of the social

1    environment of social structures, and consistent with findings

2    that show that when people are exposed to more stress, they

3    fare worse than when they are exposed to less stress.

4           I think that if California -- and, also, consistent

5    with the things I said earlier in terms of the proscriptive

6    elements of Proposition 8, of the law having a constitutional

7    amendment that basically says, you know, to gay people, you are

8    not welcome here, that the opposite of that clearly would send

9    a positive message.  You are welcome here.  Your relationships

10   are valued.  You are valued.  We don't approve with

11   rejection -- sorry.  We don't approve rejection of you as a gay

12   person as a state.  And that has a very significant power.

13          As we all know, the law in the state is a very

14   important party to creating the social environment.  So clearly

15   it's not the only thing that determines even experiences of

16   prejudice and discrimination, but it is certainly a very major

17   player, major factor, in creating this social environment that

18   I described as prejudicial or stigmatizing.

19   **Q.**   Thank you, Dr. Meyer.

20          **MR. DUSSEAULT:**  Your Honor, I have nothing further at

21   this time.

22          **THE COURT:**  Very well.  Why don't we take 10 minutes,

23   counsel, to get ready for cross-examination.

24          We seem to be falling a little bit behind our

25   schedule and so I'm going to suggest, if it's agreeable with

1  counsel, that we go a bit past 4:30 so that we can get in today

2  everything that we had anticipated getting in.

3          Does that sound reasonable?

4          **MR. BOUTROUS:**  That sounds great, your Honor.

5          **THE COURT:**  Very well, good.

6          (Whereupon there was a recess in the proceedings

7           from 2:58 p.m. until 3:17 p.m.)

8          **THE COURT:**  Mr. Boies?

9          **MR. BOIES:**  Your Honor, to perhaps allay some

10  concerns to the Court about our pace, as I just explained to

11  counsel for the defendants, we believe that we are on pace to

12  finish Wednesday of this coming week.  That is, we believe that

13  we will be able to complete our case using tomorrow, Tuesday

14  and Wednesday.

15          **THE COURT:**  Okay.

16          **MR. BOIES:**  And that is true even if we do not do

17  Ms. Zia today.  I had told the Court that we had hoped to get

18  Ms. Zia in today; but even if we don't get her in today, we're

19  still on target to finish on Wednesday.

20          **THE COURT:**  Well, that's fine.  Is that a suggestion

21  that we not go beyond 4:00 o'clock?

22          **MR. BOIES:**  No, your Honor, it's not, but I did

23  want -- having consulted with counsel for defendants, I think

24  their cross may very well take us somewhat beyond 4:00 o'clock.

25  And I just wanted the Court to know that we could go longer,

1   and Ms. Zia is here, or we could go with Ms. Zia sometime

2   tomorrow.

3            THE COURT:  Well, let's just see how far we get and

4   if we can certainly finish Mr. Meyer, that would be most

5   helpful, and if we can get in Ms. Zia, that's all to the

6   better.  But let's take one step at a time.

7            MR. BOIES:  Thank you, your Honor.

8            THE COURT:  Cross examine.

9            MR. NIELSON:  Yes, thank you.  Good afternoon, your

10  Honor.

11                     **CROSS EXAMINATION**

12  **BY MR. NIELSON:**

13  **Q.**   Good afternoon, Professor Meyer.

14  **A.**   Good afternoon.

15           THE COURT:  You are?

16           MR. NIELSON:  Howard Nielson for the

17  Defendant-Intervenors.

18  **BY MR. NIELSON:**

19  **Q.**   I have already put a witness binder on your stand.  You

20  should have that, and it should also have been given to the

21  Court.  And I think we have a couple of witness binders for

22  opposing counsel as well.

23           Professor Meyer, could you turn to tab one of the

24  witness binder?

25           (Witness complied.)

1   A.   Yes.

2   Q.   Thank you.  You will find an exhibit there, a document

3   there pre-marked PX 934.

4   A.   Yes.

5   Q.   Can you identify this document?

6   A.   Yes.  It's a research article by Evelyn Hooker published,

7   I believe, in 1954 or so.

8   Q.   Are you familiar with this study?

9   A.   Yes.

10  Q.   Thank you.

11           Now, in his expert report Professor Herek said:

12           "This is now considered a classic study in

13           one of the first methodologically rigorous

14           examinations of the mental health status of

15           homosexuality."

16           Are you familiar with Professor Herek?

17  A.   Yes.

18  Q.   Do you agree with that characterization of the study?

19  A.   Can you repeat just the characterization?

20  Q.   Yes.  He said:

21           "It is now considered a classic study and one

22           of the first methodologically rigorous

23           examinations of the mental health status of

24           homosexuality."

25  A.   Yes.

1   Q.   Now, according to Professor Herek, quote:

2              "Dr. Evelyn Hooker administered a battery of

3              widely-used psychological tests to groups of

4              homosexual and heterosexual males who were

5              matched for age, I.Q. and education.  The men

6              were recruited from non-clinical settings.

7              None of the men was in therapy at the time of

8              the study.  The heterosexual and homosexual

9              groups did not differ significantly in their

10             overall psychological adjustment as rated by

11             independent experts who were unaware of each

12             man's sexual orientation."

13             Do you agree with that description of the study's

14  results?

15  A.   Yes.

16  Q.   Is there not some tension between Dr. Hooker's conclusions

17  and your opinions that LGB individuals suffer from a higher

18  prevalence of adverse mental health outcomes than

19  heterosexuals?

20  A.   Not at all.

21  Q.   Please turn to tab three in the witness binder.

22             (Witness complied.)

23  Q.   And you will see a document that is premarked DIX-1247.

24             THE COURT:  By the way, are you moving in 934, or has

25  it already come in?

1      **MR. NIELSON:**  I'm not sure, but I will ask that I --

2  that that be admitted.

3      **THE COURT:**  All right.  934 is admitted.

4      **MR. DUSSEAULT:**  No objection.

5      (Defendants' Exhibit 934 received in evidence)

6      **MR. NIELSON:**  And I apologize for not doing that at

7  the first.

8  **BY MR. NIELSON:**

9  **Q.**   Okay, your Honor -- excuse me, Professor Meyer.  Now, can

10  you identify this article.

11  **A.**   Which exhibit is it?

12  **Q.**   Tab three.  It's exhibit DIX-1247.

13  **A.**   Okay.  Yes, this is my article.

14  **Q.**   And, in fact, it's the same article that you talked about

15  on your direct examination, correct?

16  **A.**   Correct.

17      **MR. NIELSON:**  And I happened to hear -- both

18  defendants and plaintiffs separately designated this.  I have

19  my copy in front of me.  I will move it into evidence, just as

20  an abundance of caution in case --

21      **MR. DUSSEAULT:**  No objection.

22      **THE COURT:**  Okay.  It came in, however, as

23  Plaintiffs' --

24      **MR. NIELSON:**  It's PX 1003, your Honor.

25      **THE COURT:**  Fine.  Thank you.  We will refer to it as

1   that.

2          **MR. NIELSON:**  All right.

3   **BY MR. NIELSON:**

4   **Q.**   Now, I would like you to look at page 683 of the article,

5   and that's going by the pagination from the journal that it was

6   published in.

7   **A.**   Yes.

8   **Q.**   I'm going to read to you just a few passages from this

9   page just to explore -- explore your opinions that you

10  expressed in this article.

11         The very first, the top of the first column you

12  write:

13              "Despite a long history of interest in the

14              prevalence of mental disorders among gay men

15              and lesbians, methodologically sound

16              epidemiological studies are rare.  The

17              interest in mental health of lesbians and gay

18              men has been clouded by shifts in the social

19              environment within which it was embedded.

20              Before the 1973 declassification of

21              homosexuality as a mental disorder, gay

22              affirmative psychologists and psychiatrists

23              sought to refute arguments that homosexuality

24              should remain a classified disorder by

25              showing that homosexuals were not more likely

1          to be mentally ill than heterosexuals."

2          Now, you wrote that, correct?

3  **A.**   Yes.

4  **Q.**   And you believe that's correct?

5  **A.**   Yes.

6  **Q.**   Okay.  Thank you.

7          Now, skip down to the next paragraph.  About the

8  middle of the paragraph it's -- it says, "In the social

9  atmosphere of the time."  Do you see that line?  I'm going to

10 read that.  It's about the middle of the next --

11 **A.**   Yes.

12 **Q.**   (As read)

13          "In the social atmosphere of the time,

14          research findings were interpreted by gay

15          affirmative researchers conservatively so as

16          to not erroneously suggest that lesbians and

17          gay men had high prevalences of disorder."

18          Now, again, you wrote that, correct?

19 **A.**   Yes.

20 **Q.**   And you agree with that?

21 **A.**   I wrote the entire article.

22 **Q.**   Yes, okay.

23          (Laughter.)

24 **Q.**   Then you are different from some of the professors I had.

25 **A.**   I'm sorry.  I don't mean to...

1   Q.   All right.  And then -- now, at the bottom that paragraph

2   it says:

3              "Thus, most reviewers have concluded that

4              research evidence has conclusively shown that

5              homosexuals did not have abnormally elevated

6              psychiatric symptomatology compared with

7              heterosexuals.  This conclusion has been

8              widely accepted and has been often restated

9              in most current psychological and psychiatric

10             literature."

11             Correct?

12  A.   Yes.

13  Q.   Now, you believe that this quote "widely accepted," and

14  "often restated view" is incorrect?

15  A.   Do I believe that that --

16  Q.   This "widely accepted" and "often restated view" is

17  incorrect?

18  A.   I believe that it was, as I said here -- you mean --

19  Q.   The view that homosexuals did not have abnormally elevated

20  psychiatric symptomatology compared with heterosexuals; that

21  you said that view is widely accepted and often restated.

22             Do you believe that view is incorrect?

23  A.   I said that it was in the past.

24  Q.   Okay, it was in the past.

25             My question, though, is:  Do you believe that is

1    incorrect, that view?

2    **A.**    I have to explain the context of those studies, because --

3    **Q.**    I'm sorry.  I am going to move things along.  You had a

4    chance to explain your views at length on direct.

5    **A.**    Right.

6    **Q.**    And if opposing counsel thinks it is necessary, you can

7    have an opportunity on redirect, but right now I really just

8    want to know "yes" or "no."

9          Do you believe that view -- that past view, if you

10   will, is incorrect?

11   **A.**    I'm sorry.  I cannot answer you like that because we are

12   talking about what we call different generations of studies,

13   and it's just -- if I could explain, I would explain.

14         But, for example, Evelyn Hooker's study was correct.

15   So if you are asking do I feel that it was not correct, it was

16   correct, but I don't think that it addressed the question that

17   you are asking me about the prevalence of disorders.

18   **Q.**    Well, what I'm asking is:  Do you believe that -- in your

19   own words you said:

20         "Homosexuals did not have abnormally elevated

21          psychiatric symptomatology compared with

22          heterosexuals."

23         Do you believe that it is -- that it is correct that

24   homosexuals do not have abnormally elevated psychiatric

25   symptomatology compared with heterosexuals?

1   **A.**   I don't believe that, as I described the evidence today.

2   **Q.**   So you believe that is incorrect?

3   **A.**   As of today, yes.

4   **Q.**   Okay.   Thank you.

5          And that view is inconsistent with your testimony in

6   this case, correct?  Not the view you just expressed, the view

7   that is the quoted here?

8   **A.**   Right.  My view is -- my research evidence that is recent

9   has shown that, in fact, gay and lesbian population do have

10  higher rates of some disorders.

11  **Q.**   So that opinion is inconsistent with what you said was

12  once the widely accepted and often restated view?

13  **A.**   Correct.

14  **Q.**   Thank you.

15         Look at the next paragraph.  The very first line you

16  say:

17             "More recently, there has been a shift in the

18             popular and scientific discourse on the

19             mental health of lesbians and gay men.  Gay

20             affirmative advocates have begun to advance

21             minority stress hypothesis claiming that

22             discriminatory social conditions lead to poor

23             health outcomes."

24             Correct?

25  **A.**   Yes.

1  Q.   And that is your position, correct?

2  A.   Yes.

3  Q.   Thank you.

4         And I notice you used the -- that one of the

5  citations, in fact, after that sentence is to your own work,

6  correct?

7  A.   Correct.

8  Q.   It says "Meyer, 2001"?

9  A.   Correct.

10 Q.   So you consider yourself a, quote, gay affirmative

11 advocate, correct?

12 A.   I'm considering myself a gay affirmative scientist, and I

13 certainly advocate for the improvement of the social

14 environment for gay men and lesbians, yes.

15 Q.   And the exact words you used here were "gay affirmative

16 advocates."  And you used that in connection with the citation

17 to yourself.

18         So do you believe yourself to be a gay affirmative

19 advocate?

20 A.   Among other things that I am, such as a social scientist.

21 Q.   So, yes, correct?

22 A.   Yes.

23 Q.   All right.  Thank you.

24         And, in fact, you contributed money to the No On 8

25 campaign, correct?

1  A.   Yes.

2  Q.   In fact, you did so on two occasions, correct?

3  A.   I don't remember, but I did contribute to them because I

4  thought that the cause was something that I agreed with.

5  Q.   All right.  Thank you.

6          And please look at tab number four.

7          (Witness complied.)

8  Q.   This is something that we got off the San Francisco

9  Chronicle's data base.  It tracked the Proposition 8

10  contributions.

11          Does this reflect your recollection about your

12  contributions to Proposition 8, to the No On 8 campaign?

13  A.   I don't have independent recollection, but I don't have

14  any reason to doubt it either, so.

15  Q.   All right.  Okay.  Thank you.

16          All right.  In your testimony, writings and the

17  expert report that I read, I notice that sometimes you refer to

18  the minority stress model and sometimes you refer to the social

19  stress model.  For purposes of your opinions in this case, are

20  those synonyms?

21  A.   No.

22  Q.   Are they essentially synonyms for purposes of your opinion

23  here?

24  A.   Well, one is a case of the other, so they refer to similar

25  theories, but the minority stress, per se, is the theory that I

1   described earlier, as I described those stressors that are

2   specific to gays and lesbians.

3          But it's -- the social stress is kind of like a

4   broader category that would fit in it.  So I don't know if you

5   want to say that that's a synonym or not, but the minority

6   stress is one of the models that are used as a -- within the, I

7   would say, rubric of social stress.

8   **Q.**   When we are talking about stress received by disadvantaged

9   groups, would the social stress theory or the social stress

10  model and minority stress model be synonyms?

11  **A.**   I think, as I just explained, the minority stress is

12  usually used to the gay and lesbian population because, for

13  example, it as things like internalized homophobia or -- that

14  are specific.

15         But in the social stress, for example, with

16  African-Americans I would say the most prominent article

17  discussed racism and stress, which is --

18  **Q.**   Okay.  But --

19  **A.**   -- is parallel I guess.

20  **Q.**   So minority stress is a subset of social stress?

21  **A.**   Right, right, but I --

22  **Q.**   Okay.  Thank you.

23         And sometimes you use the word "minority stress

24  theory."  Sometimes you say "minority stress model."  Is that

25  essentially synonymous?

1   **A.**   Yes.  The -- yes, I guess.

2   **Q.**   Thank you.

3         All right.  I just wanted to clarify that, because

4   you used these -- these were different words in some of our

5   articles and I just want to make sure that we're on the same

6   page.

7   **A.**   Sure.

8   **Q.**   Now, the social stress model or, if you will, the minority

9   stress model predicts the individual's --

10         (Court reporter interruption.)

11   **Q.**   The social stress model or the minority stress model, I

12   guess I should say the minority stress model, predicts that

13   individuals who are members of disadvantaged groups receive

14   more stress than individuals who are not members of those

15   groups, correct?

16   **A.**   Yes, and that would be true of the social stress as well.

17   **Q.**   Okay.  So in that case they are synonyms?

18   **A.**   Yes.

19   **Q.**   Okay.  Thank you.

20         And the model predicts that as a result of social

21   stress or as a result of minority stress, individuals who are

22   members of disadvantaged groups will have worse mental health

23   outcomes than individuals who are not members of those groups,

24   correct?

25   **A.**   Yes.

1  **Q.**   All right.  And at least as a theoretical matter, those

2  two premises should apply to other disadvantaged groups,

3  correct?

4  **A.**   That I would say is a question that is of great interest,

5  but I cannot say correct or incorrect on the way that you

6  described it.

7  **Q.**   Okay.  Even as a theoretical matter, you can't say that

8  that's correct?

9  **A.**   As a theoretical matter, we look at commonalities and

10 divergences across populations in order to probe our theories

11 and to understand how things work.  So there are commonalities

12 as the way that you described them, yes.

13 **Q.**   And --

14 **A.**   There are also dissimilarities, of course.  So we -- we

15 try to analyze the balance of those in learning about

16 theoretical issues.

17 **Q.**   Okay.  I would like you to turn to tab number eight in the

18 witness binder.

19          (Witness complied.)

20 **A.**   Yes.

21 **Q.**   And you'll find a document pre-marked DIX-2519.

22 **A.**   Yes.

23 **Q.**   Can you identify that document?

24 **A.**   Yes.  That's an interview that I -- I was interviewed by

25 this person, David Van Nuys, and I believe it's a transcription

1    of that interview.  It was an oral, you know, internet radio

2    interview.

3    Q.   Yes, thank you.

4         And in that interview you discussed some of the

5    studies and work that you have conducted, correct?

6    A.   Yes.

7    Q.   All right.  Thank you.

8         MR. NIELSON:  Your Honor, I would like to move

9    DIX-2519 into evidence.

10        MR. DUSSEAULT:  No objection.

11        THE COURT:  Very well.

12        (Defendants' Exhibit 2519 received in evidence.)

13        MR. NIELSON:  Okay.  Thank you.

14   BY MR. NIELSON:

15   Q.   And I would like to look at the third page of the exhibit.

16   A.   Yes.

17   Q.   Sorry.  I want to look at the second to the bottom

18   paragraph on that page, and it says:

19        "So some of the findings that we had, for

20        example, is when we look at stress exposure.

21        So we wanted to study each aspect of this

22        theory because a lot of the elements of the

23        stress theory, especially when it comes to

24        social stress, are often assumed but not

25        tested.  And we wanted to test carefully the

1              entire process.  So the first hypothesis --

2              you know, it's a pretty big hypothesis, there

3              are a lot of different studies about that --

4              is do disadvantaged groups, in fact, have

5              more stress."

6         Correct?  So that -- that doesn't distinguish gays

7    and lesbians from other disadvantaged groups, correct?

8    A.    Right.  That will be a general test of the social stress

9    model.  As you said, the first assumption is the disadvantaged

10   is associated with added stress.

11   Q.    Right, right.  And I would like to go up earlier on that

12   page, your second full response.  You say:

13             "So around this, I designed the study and the

14             study included 524 men and women who were New

15             York City residents.  And there were people

16             who were in those different groups that we

17             can identify based on this so that we can

18             test this theory.  So they were gay and

19             lesbian bisexual versus heterosexual; they

20             were women versus men; and they were black

21             and Latino versus white.  And we looked at

22             those three disadvantaged statuses and to

23             what extent those disadvantaged statuses are

24             related to an increase in stressors as the

25             theory would say, and to what extent, if they

1        do have those increases in stressors, do

2        they, in fact, lead to certain mental

3        disorder."

4   A.    Yes.

5   Q.    So at least as a theoretical matter, the social stress

6   theory would predict that for each of those three groups, the

7   disadvantaged group would experience more stress and have worse

8   mental health outcomes, correct?

9   A.    Correct.

10  Q.    All right.  Thank you.

11        Turning back to LGB, the LGB individuals in

12  particular.  You believe that as a result of -- you believe

13  that due, in part, to minority status, the LGB population has

14  about twice as many mental health disorders as heterosexuals,

15  including mood, anxiety and substance use disorders, correct?

16  A.    Yes.

17  Q.    And you also believe that the LGB population suffers from

18  a higher prevalence of mood anxiety or substance use problems

19  that do not meet criteria for a formal psychiatric order, but

20  are nevertheless indicative of stress, correct?

21  A.    Yes.

22  Q.    Okay.  Thank you.

23        And you also believe that LGB individuals have lower

24  levels of well-being than heterosexuals, correct?

25  A.    Yes.

1   Q.   And you believe there is a higher incidence of suicide

2   attempts among the LGB individuals compared to heterosexual

3   individuals, correct?

4   A.   Repeat, please?

5   Q.   You believe that there's a higher incidence of suicide

6   attempts among LGB individuals than among heterosexual

7   individuals?

8   A.   Yes.

9   Q.   Okay.  And where one LGB individual suffers from minority

10  stress, it would tend to affect the other partner as well,

11  correct?

12          (Brief pause.)

13  Q.   Let me rephrase that.

14          When an LGB individual is in a relationship, intimate

15  relationship with another individual, where one LGB individual

16  suffers from minority stress, it would tend to affect the other

17  partner as well, correct?

18  A.   I think that's true of all partners.  When something bad

19  happens to one of them, surely it will affect the other.

20  Q.   So it's a yes, correct?

21  A.   Yes.

22  Q.   Okay.  Thank you.

23  A.   I just would say it's not unique to LGB in this case.

24  Q.   Okay.  It's not unique, but it would be true?

25  A.   Yes.

1  Q.   Okay.  Thank you.

2  A.   I assume -- you know, it's kind of theoretical.  I would

3  assume that it would affect the other person, too, who is -- if

4  his loved one experienced something.

5  Q.   And specifically if one of the members of the partnership

6  or the marriage, whatever it might be, if they suffered -- one

7  member suffered from minority stress, it would increase general

8  stress on the relationship and would have a negative impact on

9  their satisfaction, correct?

10 A.   Yes.  Some of the stressors -- you know, this is in

11 general, kind of an average.

12       So some of those stressors would definitely have this

13 effect.  And I particularly studied internalized homophobia as

14 an example of that type of effect, but there might be more

15 minor things that may not have this effect.

16 Q.   Okay.  Thank you.

17       Now, you believe that the adverse mental health

18 outcomes among the LGB population that you believe you have

19 identified are due, in part, to minority stress, correct?

20 A.   Yes.

21 Q.   Emphasis on "due in part."

22 A.   It's not that I identified all those differences.  There

23 are many studies and even in the article that we just

24 discussed, I rely on other studies by summarizing them, but --

25 Q.   My question is really getting --

 1          **MR. DUSSEAULT:**  Could I object to the extent counsel

 2   is interrupting the answers?  He is asking the question and the

 3   witness is answering and he needs to be permitted to answer.

 4          **MR. NIELSON:**  I'll try and be careful.  I'm trying to

 5   move things along, but...

 6          **THE COURT:**  All right.  Well, maybe you can point

 7   your questions and the witness can point his answers and,

 8   hopefully, you will meet in the middle.

 9          (Laughter.)

10   **A.**   I was just making the point that you said that I found

11   those -- the evidence about a higher prevalence, and I just

12   made the point that it is not all my studies.

13   **BY MR. NIELSON:**

14   **Q.**   Correct.  Thank you.  And I appreciate your making that

15   clear.

16          My question, though, what I'm really getting at is:

17   These mental health outcomes can also result from other causes,

18   correct?

19   **A.**   Yes.

20   **Q.**   And some of those causes would be unrelated to stress,

21   correct?

22   **A.**   Yes.

23   **Q.**   And some -- even for stress-related causes, some of those

24   stressors would be not related to minority stress, correct?

25   **A.**   Yes.

1    Q.    General stressors, I think you -- is the term you used --

2    A.    Yes.

3    Q.    -- correct?

4          Okay.  Thank you.

5          And those sorts of general stressors are not

6    dependent on membership in a disadvantaged group, correct?

7    A.    Correct.

8    Q.    All right.  At least as a theoretical matter, the social

9    stress model would predict that women experience more stress

10   than men, correct?

11   A.    It's correct with some -- it's correct that we would look

12   for that prediction, yes.

13   Q.    Okay.  Thank you.

14         And in this interview, as you describe your work, you

15   actually found that men and women did not have different levels

16   of overall stress, correct?

17   A.    Yes.

18   Q.    And this is something that's also found in the general

19   literature, correct?

20   A.    Yes.

21   Q.    So regarding gender, the expectations of social stress

22   theory, the disadvantaged group, in this case women, would have

23   more exposure to stress is not verified by your studies,

24   correct?

25   A.    Yes.

1  Q.   And this expectation, the social stress theory regarding

2  women, is not verified by many other studies either, correct?

3  A.   Yes.

4  Q.   Thank you.

5       And the social stress model would predict that

6  African-Americans and Latinos suffer from a higher prevalence

7  of mental disorders than non-Hispanic whites, correct?

8  A.   As a group, yes.

9  Q.   Thank you.

10      Now, in the study that you describe in this

11 interview, you, in fact, found that African-Americans and

12 Latinos do not have more stress -- or, excuse me, they do have

13 more stress than non-Hispanic whites, correct?

14 A.   Correct.

15 Q.   But you found that African-Americans and Latinos do not

16 have more mental disorders than whites, correct?

17 A.   Correct.

18 Q.   And this is a finding that's not unique to this study,

19 correct?

20 A.   Yes.

21 Q.   This finding seems to be valid because it's been shown

22 with other populations in general studies, correct?

23 A.   I think -- other populations, you mean that studied the

24 same thing?  Other studies, yeah.

25 Q.   Yes, okay.  I was actually just quoting directly from your

1  words --

2  A.    Yeah.  Other studies that use other samples and so forth,

3  yes.

4  Q.    Please look at the third paragraph of your first full

5  answer on page four.  And, again, we're still in this interview

6  you gave.

7          And it starts with "However."  Can you see that,

8  Professor Meyer?

9  A.    Page four --

10 Q.    Your first full answer.  It's about the middle of the

11 page.  And I'm going to read that to you.  You say:

12          "However, regarding the blacks and Latinos,

13          we found an interesting finding.

14          And, in fact, that just repeats what I said, so I'm

15 going to skip to the middle --

16 A.    Okay.

17 Q.    -- where it says:

18          "So blacks and Latinos have more stress, but

19          they don't have more mental disorders.  So

20          that's very bewildering, again, from the

21          social stress perspective because you

22          question whether your theory is correct.  If

23          they have more stress and the stress is a

24          cause of disorders, which is what this whole

25          study is about, then how come they don't show

1          more disorders?"

2          Okay.  Now, you wrote that, correct?

3   **A.**   Yes.

4   **Q.**   Or, rather, you said it probably, because it was an

5   interview.

6   **A.**   Right, but probably have written something like that as

7   well.

8   **Q.**   Okay.  And the social stress model would also predict that

9   within the LGB community, African-Americans and Latino LGB

10  individuals, would suffer from a higher prevalence of mental

11  disorders than white non-Hispanic individuals, correct?

12  **A.**   I'm sorry.  The study that you quoted before was about

13  African-American and Latino gay and lesbian people.

14  **Q.**   Yes.  I --

15  **A.**   Are you asking now a different --

16  **Q.**   Well, in the study we just talked about, you said this was

17  true in the general population as well.

18  **A.**   Right.  So it's true -- but the study that I conducted was

19  about black and Latino gay men and lesbians as compared to

20  white gay men and lesbians.

21  **Q.**   All right.  And I want you to look at another study you

22  did that's -- that's clearly -- more clearly pointed just at

23  that within the LGB group.  But I take your point, so thank you

24  for clarifying that.

25  **A.**   Okay.

1  Q.   But let me ask one clarifying question.

2       The general pattern, you said in this article, is

3  true for non-LGB as well, correct, for both men versus women

4  and for the ethnicity and race groups?

5  A.   I would limit it to African-Americans versus white,

6  because it's a little complicated with Latinos; but, yes,

7  African-Americans versus white.

8  Q.   Okay.  But -- but the social stress model would predict

9  that within the LGB community, African-American and Latino LGB

10 individuals would suffer from a higher prevalence of mental

11 disorders than white non-Hispanic LGB individuals, correct?

12 A.   That was a hypothesis that we tested, yes.

13 Q.   Thank you.

14      And you tested that because that's what the social

15 stress theory or the minority stress theory would predict,

16 correct?

17 A.   We tested because we wanted to see whether -- there's

18 actually an alternative prediction, too.  So it's a little bit

19 more complex than the way you are describing it.  But we -- we

20 test the hypothesis because we always pose one side of the

21 hypothesis.

22      In fact, in this matter of gay and lesbian, which we

23 call kind of having dual minority identities, the one theory or

24 one hypothesis that they would have more -- because they now

25 have two kind of minority identities or disadvantaged, but the

1   other theory was that they actually would do better because

2   somehow their experience as black and exposed to racism would

3   somehow give them special coping ability so that when they deal

4   with the gay homophobia, that they can somehow do better.

5            So those are the two sides, and we certainly posed

6   the hypothesis as one side when we tested it.

7   Q.   Well, two questions.  First of all, do you consider that a

8   very parsimonious explanation?

9            And I don't mean your words.  I mean as a theoretical

10  matter.  Is that a parsimonious theory?

11  A.   Parsimonious in what way?

12  Q.   In the way you use it in the social sciences.  And you

13  have used that word.

14  A.   Exactly, but I have used it in different contexts, so --

15  Q.   My understanding is that parsimonious means simple, and

16  that in the social sciences -- in science in general a simpler

17  answer is preferred to a more complex one, as long as they both

18  fit the data, is that correct?

19  A.   You want me to say if that is preferable in social

20  sciences?

21  Q.   Yes.

22  A.   There is disagreements about that.  So a more parsimonious

23  explanation is preferable if you look to kind of -- in some

24  ways, you know, you are looking for the pithiest and

25  most simple, as you said, explanation that can explain the

1    widest phenomenon.

2           But on the other side of parsimony, there are people

3    and, you know, a study that -- a philosophy of sciences that

4    say that parsimony is not good because it doesn't allow you to

5    understand the details and the workings; that it could

6    oversimplify, in other words.

7           So that is a debatable thing.  But, certainly, we are

8    interested in those questions of parsimony in the way that may

9    be referred to.

10   **Q.**   Okay.

11   **A.**   So we are interested in those questions.  We want to see,

12   is it parsimonious?  Is it explaining a cross situation and a

13   cross populations and so forth.  It's certainly what makes my

14   work interesting.

15   **Q.**   Okay.  Thank you.

16          Now, please, look at tab nine in the witness binder.

17          (Witness complied.)

18   **Q.**   And you will find a document that's pre-marked DIX-1253?

19   **A.**   Yes.

20   **Q.**   Can you identify this document?

21   **A.**   Yes.  That's an article I published in the *American*

22   *Journal of Public Health* in 2008.

23   **Q.**   Thank you.

24          **MR. NIELSON:**  And, your Honor, I would like to

25   introduce DIX-1253 into evidence.

1            **MR. DUSSEAULT:**  No objection.

2            **THE COURT:**  1253 is admitted.

3            (Defendants' Exhibit 1253 received in evidence.)

4            **MR. NIELSON:**  Thank you.

5    BY MR. NIELSON:

6    **Q.**  And this document describes a study that you conducted,

7    correct?

8    **A.**  Yes.

9    **Q.**  Thank you.

10           And, please, look at the top -- there's three columns

11   actually, but look in the first page, the top of the first

12   column -- or the second column, the middle column?

13   **A.**  Uh-huh.

14   **Q.**  And now you stated a minute ago that you were -- you were

15   not inclined to agree with my statement that the social stress

16   theory would predict that black and Latino lesbians -- well,

17   LGB individuals would have more mental disorders than white

18   non-Hispanic LGB individuals.

19           But I would like to read that to you.  It says,"

20   Social stress theories" --

21   **A.**  I don't think I said that.

22   **Q.**  Well, do you agree with that?

23   **A.**  Can you repeat it?

24   **Q.**  Okay.  The social stress model would also predict that

25   within the LGB community African-American and Latino LGB

1   individuals would suffer from a higher prevalence of mental

2   disorders than white non-Hispanic individuals, correct?

3   **A.**   Yes.   I said that was the hypothesis we tested.

4   **Q.**   Okay.

5   **A.**   So I didn't disagree with that, but I also said that there

6   is -- there is a debate, you know, that we tried to address in

7   studying this topic.   So there is one side and the other side

8   in terms of the dual identity.   That's what I was saying

9   earlier.

10          So that was the hypothesis we tested --

11  **Q.**   Now, the --

12          (Court reporter interruption.)

13  **Q.**   Have you completed your answer?

14  **A.**   Yes.

15  **Q.**   I apologize.

16          Now, the first sentence here says:

17          "Social stress theories lead us to expect

18          that compared with socially advantaged

19          groups, disadvantaged groups are at a higher

20          risk for mental disorders."

21  **A.**   Yes.

22  **Q.**   You agree with that statement, correct?

23  **A.**   Yes.

24  **Q.**   So we, thus, hypothesized, one, that black and Latino

25  lesbians, gay men and bisexual individuals have more mental

1   disorders than do white lesbian gay men and bisexual

2   individuals because they are more -- exposed to more stress

3   related to prejudice, discrimination -- excuse me, prejudice

4   and discrimination associated with their race, ethnicity?

5   **A.**   Correct.

6   **Q.**   All right.  And you believe that hypothesis followed from

7   the social stress theory, correct?

8   **A.**   Yes.

9   **Q.**   Thank you.

10          All right.  And then in this study you found that

11  African-Americans and Latino lesbians, gay men and --

12          (Court reporter interruption.)

13  **Q.**   And in this study you found that African-American and

14  Latino lesbians, gay men and bisexual individuals did not have

15  a higher disorder prevalence than did white participants,

16  correct?

17  **A.**   Than the white lesbian, gay men and bisexuals.

18  **Q.**   Correct.

19  **A.**   Yes.

20  **Q.**   And I guess the white non-Hispanic lesbian, gay men and

21  bisexuals.

22  **A.**   Right.

23  **Q.**   And this finding was contrary to your hypothesis, correct?

24  **A.**   Right.

25  **Q.**   All right.  Thank you.

1          And you found that African-American lesbians, gay men

2    and bisexuals have significantly fewer disorders than did white

3    participants, correct?

4    A.    I think in some of the findings that was significantly

5    fewer, yes.

6    Q.    Okay.  And let's look at -- let's look at page -- this

7    first page in the third column, and I will read starting with

8    the second paragraph -- the second sentence, it says:

9               "Contrary to our hypothesis, black and Latino

10              lesbians, gay men and bisexual individuals

11              did not have a higher disorder prevalence

12              than did white participants.  Indeed, black

13              lesbians, gay men and bisexual individuals

14              had significantly fewer disorders than did

15              white participants."

16   A.    Right.  The black --

17   Q.    Okay.  So that is correct?

18   A.    Yes.  But the -- yes.

19   Q.    Okay.  Thank you.

20        And you found that the prevalence of disorders among

21   Latino lesbians, gay men and bisexual individuals was similar

22   to that --

23             (Court reporter interruption.)

24   Q.    Okay, sorry.

25        And you found that the prevalence of disorders among

1  Latino lesbians, gay men and bisexual individuals was similar

2  to that of white lesbians, gay men and bisexual individuals,

3  correct?

4  **A.**   With the exception of serious suicide attempts, that is

5  correct.  But we found them to have a higher prevalence of

6  serious suicide attempts in history.

7  **Q.**   But not of disorders generally, correct?

8  **A.**   Of those three disorders, right.

9  **Q.**   Okay.  Thank you.

10      And men and women did not differ substantially in

11  disorder prevalence, correct?

12  **A.**   Correct.

13  **Q.**   In terms of implications to social stress theory, this

14  study reported inconsistent findings, correct?

15  **A.**   Within the context of this particular questions that were

16  raised in this study, but it is not inconsistent with the

17  general -- what I testified to, which was about the difference

18  between gay, lesbian and heterosexual.

19      So within that gay and lesbian group, there was not

20  the finding that supported the idea that if you had an added --

21  sorry, an added minority identity, that that will add more

22  disorders to you.

23      But as a group, they had more disorders than

24  heterosexuals --

25  **Q.**   Correct.  But the --

1  A.    -- which is not reported here because this is just looking

2  at one particular aspect of it.

3  Q.    But the results regarding race, ethnicity were

4  inconsistent with your predictions made on the basis of social

5  stress theory, correct?

6  A.    Again, within the context of that, yes.

7  Q.    Thank you.  And these results regarding race and ethnicity

8  were inconsistent with other's predictions made on the basis of

9  social stress theory, correct?

10  A.    What is it?  With other peoples, yes.

11  Q.    Yes, thank you.

12        And you found it notable that the race ethnicity

13  patterns reported here among lesbians, gay men and bisexual

14  individuals were similar to race differences found among

15  heterosexual individuals in general population studies,

16  correct?

17  A.    Yes.  But, again, as a group, they were all elevated; but

18  the differences within the group of gay men, lesbians were

19  consistent in that sense of that hypothesis that I tested,

20  although there were some differences.  But I don't think it's

21  relevant to what you are asking right now.

22  Q.    No, I understand that.

23        And you stated that you believed that further

24  research needs to explain the seeming contradiction of social

25  stress predictions, correct?

1  A.    Absolutely.  We always think that further research is

2  necessary.

3  Q.    Yes.

4  A.    That's what we do.

5  Q.    That's how you stay in business.

6          (Laughter.)

7  Q.    And some lawyers predict that litigation is always

8  necessary, too.  But, thank you.

9          The social stress model would also predict that

10 within the LGB community, racial and ethnic minorities would

11 suffer from lower levels of well-being than whites, correct?

12 A.    Yes.  The same rationale.

13 Q.    And the social stress model would predict that within the

14 LGB community, racial and ethnic minorities would suffer from a

15 higher prevalence of depression than whites, correct?

16 A.    I think -- is it repeating the same thing we discussed,

17 because --

18 Q.    I just asked you about mental disorders, which I

19 understood it to be the subject of the study we just read.

20         Now I'm asking about well-being first, and then

21 suicide attempts second.

22 A.    Oh, okay.  I'm sorry.

23         So regarding well-being.  Again, it will be the same

24 basic pattern.  You would -- on one hand, the social stress

25 part of it would say they have another minority identity,

1    therefore, they should have more disorder.

2          The coping, I guess, hypothesis you can say would say

3    the opposite.

4          And with regard to suicide, yes, you would expect

5    them to have more.

6    Q.   Okay.  So the answer is that the social model -- the

7    stress model would predict that within the LGB community,

8    racial and ethnic minorities would suffer from a higher

9    prevalence of depression than whites?

10   A.   Yes.

11   Q.   Is that correct?

12         And I apologize, I misspoke.  The study I'm going to

13   look at next is about depression and well-being.

14   A.   Okay.

15   Q.   Okay.  Thank you.

16         Now, please turn to tab 10 in the witness binder.

17         (Witness complied.)

18   Q.   You will find a document that's pre-marked DIX-1252.  And

19   can you identify this document?

20   A.   Yes.  That's another study from the same -- sorry.

21   Another paper that was published from the same study, looking

22   at the different outcomes that you mentioned actually, and it

23   was published in the *American Journal of Orthopsychiatry* in

24   2009.

25         **MR. NIELSON:**  Your Honor, this is also an exhibit

1    that was designated by both parties.  I believe the plaintiffs

2    designated it as Exhibit No. 999.  And it may have been among

3    that list that Mr. Dusseault submitted, though I can't recall.

4            **THE COURT:**  It is.

5            **MR. NIELSON:**  Okay.  Thank you.

6            **THE COURT:**  So that's in.

7            **MR. NIELSON:**  It's in?  All right.  Thank you.

8    **BY MR. NIELSON:**

9    **Q.**   Now, this document describes another study you have

10   conducted, correct?

11   **A.**   It's the same study.  It's a different analysis on the

12   same -- the same sample that was in the other paper we just

13   discussed.  So it's the same people, but a different outcome,

14   as you mentioned.

15   **Q.**   All right.  So it's the same study, but a different aspect

16   of that study?

17   **A.**   Exactly.

18   **Q.**   All right, thank you.

19           And in this study you did not find decreased

20   well-being or increased depression in racial ethnic minority

21   respondents as a whole, correct?

22   **A.**   In the -- again, those are the gay and lesbian black

23   and -- yes.  Consistent with what we were just saying with the

24   other study, yes.

25   **Q.**   Right.  And this finding was contrary to your hypotheses

1  stemming from minority stress theory about the added stress

2  that racial, ethnic, minority status would place on --

3          (Court reporter interruption.)

4  **Q.**   Sorry.

5          And this finding was contrary to your hypotheses

6  stemming from minority stress theory about the added stress

7  that racial, ethnic, minority status would place on LGB

8  individuals, correct?

9  **A.**   Yes.

10  **Q.**   And your finding regarding mental health and well-being of

11  African-American LGB persons is consistent with results of

12  studies of the general population that found that despite

13  greater exposure to discrimination and prejudice,

14  African-Americans do not have a higher prevalence of most

15  common mental disorders than whites, correct?

16  **A.**   Yes.

17  **Q.**   And studies have found this is true with respect to both

18  the general population and LGB populations, correct?

19  **A.**   Again, it's correct in the sense of black versus white

20  LGB, but the LGB versus heterosexuals, which is what I was

21  testifying to, that was higher.

22          But in the general population, meaning non- -- well,

23  not necessarily gay samples, the finding is that as you

24  described it.

25  **Q.**   Okay.  And we will turn to the studies of heterosexuals

1  versus LGB individuals immediately after this exhibit, but I'm

2  testing the minority stress theory generally, which is why I'm

3  exploring some of the work you've done relating to gender and

4  race.

5  **A.**   Okay.

6  **Q.**   Now, other studies have shown that African-Americans, in

7  fact, have higher self-esteem and well-being than whites,

8  correct?

9  **A.**   That's in the general population.

10  **Q.**   Yes.

11  **A.**   Yes.

12  **Q.**   Look at page eight of this exhibit.  And, again, we are at

13  tab 10.

14         Starting about halfway down in the middle of the

15  paragraph at the bottom of the second column, I'm going to read

16  that to you.  It says:

17             "That our results show inconsistent support

18             for minority stress hypotheses should lead to

19             a reexamination and, if necessary,

20             elaboration of the minority stress model.  We

21             are particularly struck by the finding that

22             black LGB respondents, clearly a

23             disadvantaged social group in American

24             society, do not show higher levels of

25             depressive symptoms and lower levels of

1              well-being than their white counterparts.

2              This finding clearly challenges minority

3              stress theory.  That this finding is

4              consistent with findings about black/white

5              differences and well-being in the general

6              population, as well as findings regarding

7              differences and prevalence of mental

8              disorders between black and white LGB,

9              strengthens our confidence that these

10             findings are not a result of some bias in

11             our study."

12             Those are your words, correct?

13    A.    Yes.

14    Q.    And does that fairly summarize --

15    A.    That's one of the conclusions that we came to, yes.

16    Q.    Okay.  And turn over the page to the next paragraph, the

17    top of the page nine in the first column.  It says:

18             "The lack of parsimony in our results

19             represents a challenge in social stress

20             theory.  It suggests that the theory cannot

21             be applied uniformly and that greater

22             definitions and distinctions are necessary in

23             future research."

24             Correct?

25    A.    Correct.

1  Q.   And we discussed parsimony a minute ago, correct?

2  A.   It is saying exactly what I said, that -- I guess, the

3  word "challenge" needs to be explained.

4         What I'm saying here is that we need to examine,

5  because of those differences, the commonalities and

6  divergences, we need to try to better -- we would call it

7  specify the model; that it will be a better model predicting

8  those types of outcomes so that they -- so we can explain them

9  better.

10  Q.   But you said that it means that the theory cannot be

11  applied uniformly and that greater definition and distinctions

12  are necessary, correct?

13  A.   Exactly.

14  Q.   All right.  Thank you.

15         Please turn to tab 11 in the witness binder, and

16  you'll find a document pre-marked DIX-1246.

17         (Witness complied.)

18  Q.   Can you identify this document?

19  A.   1246?

20  Q.   Yes.  It's tab 11.

21  A.   Yes.  That's an article that I wrote that was published in

22  the *Journal of Health and Social Behavior* in 1995.

23  Q.   Thank you.

24         **MR. NIELSON:**  And, again, this is one that was

25  designated by the plaintiffs as 1002, your Honor, and I believe

1  that it is in evidence.

2         THE COURT:  Very well.

3         MR. DUSSEAULT:  No objection.

4         MR. NIELSON:  Correct?

5         MR. DUSSEAULT:  I'm sorry?

6         MR. NIELSON:  1002, PX 1002.  Could I have opposing

7  counsel confirm that that was admitted?

8         THE COURT:  Yes.  1002?

9         MR. NIELSON:  Yes.

10        THE COURT:  Is in.

11        MR. NIELSON:  Okay.  Thank you.

12 BY MR. NIELSON:

13 Q.   Okay.  Now, this document discusses a study you conducted,

14 correct?

15 A.   Yes.  This was my dissertation study.

16 Q.   This was your doctoral dissertation, you said?

17 A.   This was based on the dissertation.  This is a publication

18 that came out of it, yes.

19 Q.   Okay.  Thank you.

20        All right.  Now, please look at page 39 in the middle

21 of the -- well, towards the top of the second column, about

22 three sentences into the first full paragraph, you write:

23        "It has been predicted that, if minority

24        position is stressful, and if the stress is

25        related to psychological distress, the

1              minority groups must have higher rates of

2              distress than non-minority groups.  But

3              studies that compared rates of distress and

4              disorder between blacks and whites, women and

5              men, and homosexuals and heterosexuals did

6              not confirm such predictions, leading some

7              researchers to refute minority stress

8              conceptualizations."

9         And the study goes on to list a number of citations,

10   a number of studies, including -- I believe I count nine on,

11   quote, gay/straight differences, correct?

12   **A.**   Right.

13   **Q.**   So those studies, at least, do not support the social

14   stress model as it applies to LGB individuals, correct?

15   **A.**   Those are the studies that I was referring to before when

16   you asked me the questions about Evelyn Hooker and so forth

17   that in the past demonstrated that.

18        And as I also said in many of the publications, that

19   the studies in the 90's are the ones that began to use more

20   advanced accepted methods that begin to show this difference.

21        And, in fact, the point of this article is to show

22   the support for minority stress.  And this is the article that,

23   actually, I first introduced the concept and demonstrated how

24   it does work.  In other words, it is supported.  So this was

25   just the introduction to this.

1  Q.   All right.  Thank you.

2         But these studies that you cite here you characterize

3  as studies that compared rates of distress and disorder between

4  homosexuals and heterosexuals and did not confirm such

5  predictions.

6         And the predictions to which you are referring

7  earlier in that sentence already:

8             "It has been predicted that, if minority

9             position is stressful, and if this stress is

10            related to psychological distress, then

11            minority groups must have higher rates of

12            distress than non-minority groups."

13            Correct?

14 A.   So those older studies did not show that, as we    showed

15 --

16 Q.   Sorry --

17 A.   -- yesterday.

18 Q.   All right.  So those studies, at least, were inconsistent

19 with your model, correct?

20 A.   Yes.

21 Q.   Okay.  Thank you.

22         And your 1995 study did not look at inter-group

23 comparisons, correct?  By "intergroup comparisons" I mean

24 comparisons between heterosexuals and LGB individuals.

25 A.   No.  I did this most fully in the 2003 article that we

1    discussed earlier.

2    **Q.**    Yes.  But in 1995 you did not, correct?

3    **A.**    This was looking at a group of gay men.

4    **Q.**    And, in fact, in that article you stated that -- just

5    lower down to the page, you say:

6                    "I suggest that we must reexamine our

7                    reliance on evidence from intergroup

8                    comparisons of rates of distress.  Despite

9                    the intuitive appeal of this approach,

10                    numerous methodological problems lead to

11                    bias, making it difficult to interpret the

12                    evidence from studies using this approach."

13                    Correct?

14    **A.**    This refers to -- you know, we refer to different

15    generations of studies in psychiatric epidemiology.  There was

16    a huge shift in understanding how to do studies like that.

17            So I'm saying here, what I said in that -- what you

18    are quoting, that those older articles are not a good

19    indication for the assessment of those differences because they

20    didn't use sampling methodologies that would be correct, that

21    would allow us to make -- to draw those conclusions.  They

22    didn't at the time have diagnostic criteria that were that

23    clear, and they certainly did not have any measures to assess

24    those.

25            So there were a lot of methodological problems in

1  those earlier studies, including the studies that we were

2  discussing earlier when you quoted some of the, again, early

3  studies that do not talk to the effect off prevalence.

4        So they would have been two groups of gay versus

5  straight, but they were not studies of prevalence in the

6  population.  So, therefore, they are not reliable as an

7  estimate of the difference in the prevalence.

8  **Q.**   Okay.  But you said -- you suggest -- quote:

9             "I suggest that we must reexamine reliance on

10            evidence from intergroup comparisons of rates

11            of disorder (sic)."

12            Correct?

13 **A.**   Yes.  Because of that problem, and other issues that I

14 think I list here.

15 **Q.**   Okay.  And thank you.

16       And that's why you did not conduct an intergroup

17 study in 1995, correct?

18 **A.**   I wouldn't say that is why I didn't conduct it, but I was

19 using this study as another anchor on this problem, on this

20 question.

21       As I said, we used -- we tried to use different

22 approaches to study the same problem from different sides so

23 that we can see convergences and inconsistencies so that we

24 can, by looking at those, improve our way that we understand

25 the problem and the theories.  That is not unique, you know, to

1    these studies.

2            For example, there was a time that people thought

3    that all cancers are caused by some kind of a genetic mutation.

4    And then they find studies that don't confirm that and,

5    therefore, they go on and investigate further and they say, Oh,

6    some studies, some -- sorry -- cancers are caused by an

7    infectious agent.  So that's what I mean by improving the

8    model.  So now we understand something a little better about

9    how cancer is caused.

10            So in the same way we always try to challenge our

11    results and our studies using different methodologies,

12    different ways of assessing the basic theory that, you know, we

13    discussed here as social stress and use it -- so when I say the

14    word "challenge," we use it to further study things that are

15    discovered in, let's say, inconsistencies.  So some of the

16    inconsistencies that you described are now the subject of

17    further investigation.

18    **Q.**    Okay.  Thank you.

19            But you found -- your findings in this study

20    contrasted with the previous evidence compiled on minority

21    stress, correct?

22    **A.**    Well, this study was looking within a group of gay men.

23    It contrasts with those older studies that, as I said, did not

24    show the differences.

25            But as I also said, there were studies that were not

1   up to par in terms of how we assess those issues now in terms

2   of their ability to represent the population prevalence or the

3   proportion of people in the population that have the disorder.

4   Q.   All right.  I'm not asking about the methodology of the

5   previous studies.  I'm just asking whether your findings in

6   this study were inconsistent with those studies?

7   A.   I mean, I guess you could -- I think I would say that the

8   older studies were inconsistent with this new finding.

9   Q.   Okay.  And please turn to page 51, if you would, please,

10  sir?

11  A.   Yeah.

12         (Witness complied.)

13  Q.   Okay, Professor Meyer, let's -- right in the middle of the

14  second column on page 51, you write:

15         "These findings contrast with previous

16         evidence compiled on minority stress.  When

17         studies compared rates of disorder or

18         distress between minority and non-minority

19         groups, we found little evidence that

20         minority stress is related to adverse mental

21         health."

22         Correct?

23  A.   Yes.  Those are those old studies that I mentioned.

24  Q.   Thank you.

25         And in the last -- in the last paragraph of that

1  page, a little farther down, you say:

2          "Certainly the issue of rates of disorder and

3          distress cannot be sidestepped and will have

4          to be addressed, too.  But if the present

5          findings are convincing, we must address the

6          question of rates of difference with this

7          evidence in mind.  The issue, thus, becomes

8          one of explaining why there are no

9          differences in rates of disorder between

10         minority and non-minority populations and how

11         such findings could be consistent with the

12         evidence that not just social conditions do,

13         in fact, have adverse mental health effects."

14         And you wrote that, correct?

15  A.    Yes.

16  Q.    Okay.  Thank you.

17  A.    It's kind of what I was just trying to explain as well,

18  that --

19  Q.    Thank you.

20         Let's turn back to tab three.  And we discussed this

21  document a moment ago and it's in evidence, so we can go

22  straight to it.

23         **THE COURT:**  Tab?

24         **MR. NIELSON:**  Three, your Honor.

25

 1  **BY MR. NIELSON:**

 2  **Q.**   And this is your 2003 article where you did look at

 3  intergroup comparisons, correct?

 4  **A.**   Correct.

 5  **Q.**   Yes, thank you.

 6          And in the middle --

 7          **THE COURT:**  Page?  What page?

 8          **MR. NIELSON:**  That was just a general question, your

 9  Honor.

10          **THE COURT:**  I thought you were about ready to read

11  something.

12          **MR. NIELSON:**  I am.

13  **BY MR. NIELSON:**

14  **Q.**   Now I will direct -- ask you, Professor Meyer, to turn to

15  page 684.

16          (Witness complied.)

17  **Q.**   Okay.  Please look at the second sentence of the first

18  full paragraph.  It starts, "In drawing."

19  **A.**   Uh-huh.

20  **Q.**   (As read)

21          "In drawing a conclusion about whether LGB

22          groups have higher prevalences of mental

23          disorders, one should proceed with caution.

24          The studies are few, methodologies and

25          measurements are inconsistent and trends in

1                   the findings are not always easy to

2                   interpret.  Although several studies show

3                   significant elevation in prevalence of

4                   disorders in LGB people, some do not."

5           So at the time you wrote this, you believed that, at

6    least, some of the previous studies were inconsistent with the

7    minority stress model, correct?

8    **A.**   We are talking still about the same studies that were the

9    older studies.  And the reason that I did this paper is to use

10   only the better studies, the ones that can actually answer the

11   question, and that's what the findings in this paper

12   demonstrate.

13   **Q.**   Okay.  Thank you.

14          Now, please look at page 685.  Look at page 685 and

15   look at the second full paragraph on the page.  You describe --

16   well, I will just read it:

17                  "Two studies assess the risk for completed

18                  suicides among gay men.  These studies assess

19                  the prevalences of homosexuality among

20                  completed suicides and found no

21                  overrepresentation of gay and bisexual men,

22                  concluding that LGB populations are not at

23                  increased risk for suicide.  Thus, findings

24                  from studies of completed suicides are

25                  inconsistent with studies finding the LGB

1              groups are at higher risk of suicide ideation

2              and attempts than heterosexuals."

3         And then in the last sentence of that paragraph  you

4    say:

5              "Considering the scarcity of studies, the

6              methodological challenges and the greater

7              potential for bias in studies of completed

8              suicide, it is difficult to draw firm

9              conclusions from their apparent refutation of

10             minority stress theory."

11             Correct?

12   **A.**   This concerns a particular type of study that looks at

13   completed suicide -- as those people who are dead -- and,

14   therefore, it is -- there are only two of those and it is very

15   hard to assess the proportion of people there who were gay.

16        So that's why I said that it is hard to draw

17   conclusions for those two studies.

18   **Q.**   But at least on their face they -- you describe them as

19   presenting an apparent refutation of minority stress theory,

20   correct?

21   **A.**   Apparent, yes.  But I also say in the same paragraph that

22   the methodological problems would preclude you from drawing

23   those conclusions.

24   **Q.**   All right.  And you said it was --

25             "Considering the scarcity of studies, the

1              methodological challenge and greater

2              potential for bias, it's difficult to draw

3              firm conclusions."

4         That is correct.

5    **A.**   About this particular issue of completed suicides.

6    **Q.**   Yes.  Thank you.

7         Now, your 2003 study did conclude that LGB

8    individuals have a higher prevalence of mental disorders than

9    heterosexuals, correct?

10   **A.**   Yes.

11   **Q.**   Okay.

12   **A.**   As I said before, this was not my study.  This was what we

13   call a meta-analysis, which is a method of gathering data and

14   information from other studies.  So I -- I looked at the other

15   studies and came up with the statistics that describe the

16   aggregate of those studies.

17        So the purpose of that is to get a better handle on

18   those estimates because you are using not just one study, but

19   several studies that are available to you.

20   **Q.**   Correct.  And you -- you relied on two types of studies,

21   correct; studies that targeted LGB groups using non-probability

22   samples, and studies that used probability samples of the

23   general populations that allowed identification of LGB versus

24   heterosexual groups, correct, in your meta-analysis?

25   **A.**   I looked at all of those studies, but in conclusions I

1  relied only on the studies that used probability samples.

2          The studies that don't use probability samples are

3  exactly the ones we were discussing earlier and which is why I

4  said that you cannot really draw good conclusions from them in

5  terms of estimating prevalence.

6          So I looked at, I think, all of the studies that were

7  available going back, I think, to the 70's.  And so when I --

8  when you say "rely," I certainly looked at all of those, but in

9  the meta-analysis I -- as most people do, you create a

10  selection criteria for which studies you want to include and.

11  In this case there were -- I looked specifically at the ones

12  that were community studies that are very large and that

13  involve probability samples, because probability samples allow

14  us to then estimate back into the population the proportions,

15  the prevalences as we called them.

16  Q.  So when you say -- you looked at the first type of

17  non-probability study, but you ultimately didn't rely on that,

18  is that your explanation?

19  A.   In the meta-analysis.

20  Q.  So the meta-analysis was based only on the -- well,  let

21  me get your exact words.  It's the -- well, the probability

22  samples of the general population that allowed identification

23  --

24  A.   I think I did both, and I show -- but in terms of drawing

25  conclusion -- I looked at different things, but in terms of

1 drawing conclusion about prevalences, I relied on those studies

2 that are probability studies and --

3 **Q.**   Okay.   Thank you.   I wasn't clear on that from reading the

4 article, and I appreciate that clarification.

5         So let's talk just about those probability studies

6 then.   The second group of studies you reviewed, the

7 population -- well, the population-based studies do suffer from

8 some methodological deficiencies, correct?

9 **A.**   The population-based studies?

10 **Q.**   Yes.

11 **A.**   All studies suffer from methodological deficiencies, but

12 the population based studies are the best ones that we have to

13 addresses this question.

14         Those are very large population-based studies that

15 the entire United States Public Health Service relies on.

16 Those were the only evidence we have for prevalences of mental

17 disorders in the United States.

18 **Q.**   Thank you.

19         And because none of these studies was a priori

20 designed to assess mental health of the LGB groups, they were

21 not sophisticated in the measurement of sexual orientation,

22 correct?

23 **A.**   Yes.   Those were general population studies and the LGB

24 group were basically -- whoever happened to have been gay

25 within the general population was included by virtue of the

1 probability sampling.

2 **Q.**   The studies classified respondents as "homosexual" or

3 "heterosexual" only on the basis of past sexual behavior,

4 rather than using a more complex matrix that assessed identity

5 and attraction in addition to sexual behavior, correct?

6 **A.**   I actually -- if I said that, I assume it's correct, but I

7 actually don't remember that all of them used even the exact

8 same.

9          But they usually would choose one measure and,

10 therefore, they don't have a more complex measure.  I -- I

11 don't remember independent that they all used the exact same

12 measure that you just quoted, but --

13 **Q.**   Please look at page 685 in the second column.  It's the

14 last full paragraph on that page, so it's above the carryover.

15 And about part way down, I'm going to read it to you, it says

16 -- after the sentence -- the first sentence says that:

17          "...they, too, suffer from methodological

18          deficiencies."

19          But then I'll start reading in full.  It says:

20          "This is because none of these studies was a

21          priori designed to assess mental health of

22          LGB groups.  As a result, they were not

23          sophisticated in the measurement of sexual

24          orientation.  The studies classified

25          respondents as homosexual or heterosexual

1                    only on the basis of past sexual behavior.

2                    In one year," and there is a citation to a

3                    study, "in five years," and another citation,

4                    "or over the lifetime," and a third citation,

5                    "rather than using a more complex matrix that

6                    assessed identity and attraction in addition

7                    to sexual behavior," and another citation.

8                    "The problem of measurement could have

9                    increased potential error due to

10                   misclassification which, in turn, could have

11                   led to selection bias."

12                   Does that refresh your recollections?

13  **A.**    Yes.   I don't know if I'm referring here to a particular

14  group or study, but let me just say that if this is true about

15  all the studies that I use, but it may be.  But in general,

16  this is true the way you described it.

17                   There have been studies of this nature that use not

18  just this one thing, but they all use a selected measure that

19  they find the most relevant to their purpose.

20                   So I just can't confirm that all of the ones here --

21  I would actually be surprised if they all used this exact same

22  measure, but --

23  **Q.**    Well, just answer that -- I'm sorry.  Go ahead.

24  **A.**    Basically, the main point that they do not use the more

25  complex ways of measuring that I agree with.

1  **Q.**   Thank you.

2          And these population studies also suffer because they

3  included a very small number of LGB people, correct?

4  **A.**   Correct.  But let me just say, this is why I conducted the

5  meta-analysis, which allows you to, in a sense, increase your

6  sample because you are then aggregating all of them.

7          But, on the other hand, you are limited by some --

8  maybe some comparisons that you might want to do.  But to

9  conduct the meta-analysis I aggregated them to overcome this

10  problem of small sample sizes.

11  **Q.**   And, please, look at page 688, if you would.  And starting

12  at the middle of the carryover paragraph, as you see it on 688,

13  you write:

14          "My use of a meta-analytic technique to

15          estimate combined ORs somewhat corrects this

16          deficiency, but it is important to remember

17          that a meta-analysis cannot overcome problems

18          on the studies in which it is based."

19          Correct?

20  **A.**   It cannot overcome all the problems, but in this

21  particular example that you used, it certainly overcomes the

22  problem of the sample size.  That's because you are adding all

23  of those sample together.

24          But as I said, there is no method that is like a

25  hundred percent perfect, but it specifically overcomes the

1  problem of both sample size and, also, what we call sampling

2  error.  So that if you just rely on one sample, you might have

3  some specific biases connected with that; but if you aggregate,

4  you know, five samples, then that error will get lost within

5  that bigger number of studies.  So that's what it does.

6           But it certainly doesn't, for example, overcome the

7  issue of measurement because they all -- you know, you can't

8  change the measures that they use.  So it depends on what, you

9  know, you are talking about.

10  Q.   So it may overcome sample size, but it wouldn't overcome a

11  lack of precision in the definition of LGB individuals,

12  correct?

13  A.   I didn't say there was a lack of precision.  But if there

14  were a lack of precision -- I said they didn't use as a -- the

15  measure that they did use could have been precise, but they

16  didn't use a more complex measure.

17           But it wouldn't overcome measurement -- we call it

18  measurement error, although it would help, because of that

19  question -- because of that issue that I just said related to

20  sampling error.

21           So, again, the best way to explain it is that when

22  you take -- even if one study has an error and maybe another

23  one has another error, when you aggregate them all together,

24  they all part of it; but the larger pattern that you see will

25  emerge despite different errors that will get -- they are much

1   better than if you just relied on the one study with the error

2   or with the bias.

3   Q.   But still a meta-analysis cannot overcome all the problems

4   in the study on which it's based, correct?

5   A.   No.

6   Q.   And it's important to interpret results of a meta-analyses

7   with caution on the critical perspective, correct?

8   A.   Absolutely, yeah.

9   Q.   All right.  And in this 2003 study, you described your

10  conclusions as:

11           "Inconsistent with research and theoretical

12            writings that can be described as a minority

13            resilience hypothesis which claims that

14            stigma does not negatively affect

15            self-esteem."

16            Correct?

17  A.   Yes.

18  Q.   And you described your conclusions as:

19           "Inconsistent with studies that showed that

20            blacks do not have a higher prevalence of

21            mental disorders than whites as expected by

22            minority stress formulations."

23            Correct?

24  A.   Yes.

25  Q.   You stated:

1                "Further research must address this apparent

2                contradiction."

3                Correct?

4    A.    Yes.

5    Q.    And please look at 688 again.  I guess if you are still

6    there, that would be great.

7    A.    Yes.

8    Q.    You write:

9                "One problem which can provide a plausible

10               alternative explanation for the findings

11               about prevalences of mental disorders in LGB

12               individuals is that bias related to cultural

13               differences between LGB and heterosexual

14               persons inflates reports about history of

15               mental health symptoms.  It is plausible that

16               cultural differences between LGB and

17               heterosexual individuals cause a response

18               bias that led to overestimation of mental

19               disorders among LGB individuals.  This would

20               happen if, for example, LGB individuals were

21               more likely to report mental health problems

22               than heterosexual individuals."

23               And then your article goes on to identify several

24   reasons why LGB individuals might be more likely to report

25   mental health problems than heterosexual individuals, correct?

**A.**    Yes.  That is one of the possible limitations in the sense
that, you know, we look at -- as I said earlier when I
described the methodology of working on studies, we look at all
kinds of potential explanations and try to address them, assess
whether or not they are feasible, whether or not they threaten
the conclusion and so forth.  So this is one of the things I
considered in looking at this evidence.

**Q.**    And you found -- and you said in your study that:

        "To the extent that such a response bias

        exists, it would have led researchers to

        overestimate the prevalence of mental

        disorders in LGB groups."

        Correct?

**A.**    To the extent that it exists, it would.

**Q.**    And, all right.  In his expert report Professor Herek
wrote:

        "In addition, lesbian, gay, bisexual people

        face other stressors.  For example, because

        the Aids epidemic has had a disproportionate

        impact on the gay male community in the

        United States, many gay and bisexual men have

        experienced the loss of a life partner, and

        gay, lesbian and bisexual people alike have

        experienced extensive losses in their

        personal social networks resulting from the

1           death of close friends and acquaintances.

2           Treatment related to multiple losses is

3           linked to higher levels of depressive

4           symptoms."

5           Do you agree with that statement?

6       **MR. DUSSEAULT:**  Your Honor, could I ask for a

7    citation and page?

8       **MR. NIELSON:**  It's Paragraph 31, note 13 of the Herek

9    report.  That's at tab two, if you would like to look at that.

10   And it's on --

11   **A.**   I'm sorry.  What page?

12   **BY MR. NIELSON:**

13   **Q.**   Tab two, it's and it's Paragraph 31.

14   **A.**   Okay.

15   **Q.**   It appears to be on -- starts at the bottom of page 10.

16   It's in the footnote.  If you would like to look at that, I

17   read it.  I won't ask you to read it aloud, but if you just

18   look at what he writes in that footnote.

19   **A.**   Which footnote?

20   **Q.**   13.  It starts at the bottom of page 10.

21   **A.**   You want me to read what it says?

22   **Q.**   Just to yourself.

23   **A.**   Oh, okay.

24   **Q.**   My question is:  Do you agree with that statement?  I

25   already read --

 1  A.   Yes.   He's actually referring to something that I wrote

 2  apparently, yes.

 3  Q.   Okay.   Thank you.

 4       MR. NIELSON:   Your Honor, I still have a fair amount

 5  of material.   Do you want me to continue?

 6       THE COURT:   Keep plowing.

 7       MR. NIELSON:   Yes, sir.   Yes, your Honor.

 8  BY MR. NIELSON:

 9  Q.   Please turn to tab 13 in the witness binder, Professor

10  Meyer.

11  A.   Yes.

12       (Witness complied.)

13  Q.   You will see a document pre-marked DIX-1249.

14  A.   Yes.

15  Q.   Can you identify that document?

16  A.   That's another article that I wrote, which was published

17  last year in 2009 in a journal that's called *Journal of*

18  *Counseling Psychology*.

19  Q.   Thank you.

20       MR. NIELSON:   And, your Honor, we had a slight

21  technical difficulty with this document.   The PDF version that

22  we provided plaintiffs and, perhaps, the Court inadvertently

23  had an exhibit stamp on each page and so that obscured some of

24  the words.

25       We have corrected that problem in this hard copy, and

1  we can provide corrected PDFs to the plaintiffs and the Court,

2  if that's necessary.

3         THE COURT:  The copy in my binder looks fine.

4         MR. NIELSON:  The hard copy is correct.  The PDF, I

5  believe, had the exhibit stamp on every page.

6         THE COURT:  All right.  Well, why don't you correct

7  that?

8         MR. NIELSON:  We will take care of that, but I assume

9  there is no prejudice since the citation was evident and

10  Professor Meyer wrote it.

11         And I would like to move that into evidence,

12  DIX-1249, the version without the exhibit stamps on every page.

13         THE COURT:  Fine.

14         MR. NIELSON:  Thank you.

15         THE COURT:  1249 is admitted.

16         (Defendants' Exhibit 1249 received in evidence.)

17  BY MR. NIELSON:

18  Q.   Please look at page 23, Professor Meyer.

19  A.   Yes.

20  Q.   You write:

21         "But here lies the first problem for

22         researchers of LGB populations.  The

23         population's definition is elusive."

24         So defining the LGB population as a potential

25  methodological problem in comparing mental health outcomes of

1   LGB individuals to mental health outcomes of non-LGB

2   individuals, correct?

3   **A.**   Where is it?  I assume that it is correct.

4   **Q.**   Well, that last question I didn't read from your report.

5   So if you disagree with it, let me know.

6           You wrote that:

7           "Here lies the first problem for researchers

8           of LGB populations."

9   **A.**   Where is that?

10  **Q.**   I'm sorry.  It's page 23, the second column, the bottom

11  paragraph, about the middle.  It's a carryover paragraph.

12  **A.**   Okay.

13  **Q.**   You write:

14          "But here lies the first problem for

15          researchers of LGB populations.  The

16          population's definition is elusive."

17          And then I asked you this question:  Is defining the

18  LGB population a potential methodological problem in comparing

19  rates -- or comparing mental health outcomes of LGB individuals

20  to mental health outcomes of non-LGB individuals?

21  **A.**   Is it...

22  **Q.**   A potential methodological problem?

23  **A.**   I'm not sure what you mean, what kind of problem.  As I

24  said, in this article defining the population, regardless of

25  LGB or any population, is the first step in conducting a study.

1   And any study faces the challenge of definition of the

2   population because if you want to sample, you cannot -- you

3   know, you have to know who it is that you are sampling from,

4   and there is a variety of steps that one takes in doing this.

5           This is nothing specific to LGB populations, and some

6   of the quotes I use here are just methodological issues.

7           So when you say it causes a problem, I don't exactly

8   see that as a problem.  I see it as just, this is part of what

9   we do when we design a study.  We --

10  **Q.**   Okay.

11  **A.**   -- look through all of those issues.

12  **Q.**   My question was whether it causes a -- raises a potential

13  problem.

14  **A.**   You know, I can come up with scenarios, I guess, but I

15  cannot answer that question in that generic form.  I would have

16  to see what exactly we're talking about.

17          It doesn't create a problem in principle, the fact

18  that we have questions of definition.  As I said, all studies

19  start with questions of definition.  So that fact doesn't

20  create a problem.

21  **Q.**   Now, in the article we were just looking at you noted that

22  the population-based studies, one of the methodological

23  problems they suffered from was that they did not use a

24  sophisticated definition of the LGB population, correct?

25  **A.**   That's not exactly how I said it.  What I said is that

1  they used a -- that's, perhaps, a limitation that they used one

2  type of a definition, but I -- I mean, obviously, I didn't

3  think that there was that great of a problem and, obviously,

4  the reviews of this journal didn't think it was that great of a

5  problem, and the people who quote it -- you know, it's not --

6  you are trying to suggest that it's some big problem.  It's

7  not.

8  **Q.**  Well, I would like to explore that based on what you wrote

9  in this article.

10       As you said in the first line, "The population's

11  definition is elusive," correct?

12  **A.**  The population definition is elusive in every study.  This

13  is one of the greatest sampling methodologies.  Sudman devotes

14  a lot of effort to try to address that and I quoted it here.

15       As I said, this is the first step of trying to

16  establish a study.  If I wanted to study men, I would have to

17  define what age group, is there any particular residence that

18  I'm interested in or a region of the country.

19       This is just basic survey methodology.  This is the

20  first step you have to define.  And it is -- it is challenging,

21  you know.  If you are interested in issues related to birth

22  problems, are you going to study women of a particular age who

23  are -- you know, so those are just normal things.

24       What is a Latino?  Do you include Mexicans or do you

25  include Puerto Ricans?  This is what I'm talking about, that

1  this is the issue that sampling methodologies confront as they

2  design a study.  And this is the first step, is to define a

3  population, which we call the general population.  Then you

4  define the sampling population, which is a more specific

5  definition of where you want to sample from.  And there's

6  further problems and issues of definition.

7  **Q.**   Let's talk about the first question you said, the general

8  sample, not specific sample for LGB individuals.

9          Is there a correct definition of the general LGB

10  population?

11  **A.**   Is there one correct definition?  As I explained in this

12  article, the definition depends on your purpose in the

13  research.  So just as there is no correct definition of Latino,

14  there is no correct or one correct -- it is correct if it is

15  responsive to the research questions that you are trying to

16  answer.

17          So it is only correct in that sense that, did you do

18  a good job in defining the population so that you are getting

19  at the population that you intending to study?  You know, we

20  talk about the kind of theoretical population and the actual

21  population.  So it is correct only in the sense that you

22  correctly sample the population of intention.

23          So if I wanted to study last Latinos and I defined it

24  as Mexicans and Puerto Ricans, there is nothing incorrect about

25  it because I didn't include another Latino group, if that's

1    what I was interested in.

2            So in the same sense here, there is a variety of ways

3    that you can measure what we are calling here in a general way

4    LGB.  So, for example, you might want to measure the behavior

5    as the only thing that you are interested in, in which case

6    that will be a correct thing, if it makes sense for your

7    purpose.

8    **Q.**   Okay.  So I want to ask you two "yes" or "no" questions,

9    if it's possible.

10            First, there is no one correct definition of the LGB

11    population, correct?

12   **A.**   For the purpose of particular research.

13   **Q.**   Okay.  Second, definitions of sexual minorities vary,

14   correct?

15   **A.**      All definitions, by definition, vary.  If you are

16   talking about definitions, they vary.

17   **Q.**   Let's be more concrete.  Let's look at page 24, the first

18   full paragraph.  You write -- and this is starting with the

19   second -- yes, the second sentence of the first full paragraph

20   in the first column on page 24.

21            You write:

22            "Researchers have distinguished among sexual

23            identity, sexual behavior and attraction.

24            Although these overlap -- that is, a person

25            who is attracted to same-sex individuals may

1          also have sex with same-sex individuals --

2          this overlap is not great.  Only among

3          15 percent of women and 24 percent of men do

4          the three categories overlap."

5   **A.**   In this particular study that I quoted, yes.

6   **Q.**   So we have three partially, but only partially overlapping

7   concepts that have been used by researchers to define the LGB

8   population; sexual identity, sexual behavior and attraction,

9   correct?

10  **A.**   Again, they might have used just one of them or they might

11  have used more.  So those are three ways of defining that

12  people have used in the field, yes.

13  **Q.**   And some researchers may use a combination of those,

14  correct?

15  **A.**   Exactly.

16  **Q.**   All right.  And let's break this down.  First of all,

17  sexual identity.  Identity labels -- and even whether a person

18  uses an LGB identity label at all -- vary across generations,

19  racial ethnic groups, geographical regions, education levels

20  and other group characteristics, correct?

21  **A.**   Yes.

22  **Q.**   Not all LGB individuals define themselves as LGB until

23  some developmental tasks along the coming-out process have been

24  achieved, correct?

25  **A.**   Yes.

1  Q.   This means that at any point some people who answer

2  truthfully that they are not LGB will, at a later point, define

3  themselves as LGB, correct?

4  A.   Yes, exactly, because they haven't yet -- I referred

5  before to the coming-out process.

6         So at some point you might talk to a person and they

7  would either hide it or have not yet defined themselves like

8  that, and that they would truthfully answer no to the question.

9  Q.   Thank you.

10         And, furthermore, because of cultural diversity, some

11  people who engage in same-sex behavior, who may be considered

12  by others as sexual minorities and who may be of interest to

13  the researcher, would not identify themselves as LGB, nor

14  consider themselves a sexual minority by any name, regardless

15  of the researcher's definition, correct?

16  A.   Yes.

17  Q.   So it's possible that the same individual may honestly

18  give different answers when asked about his or her sexual

19  identity at different times in his life, correct?

20  A.   Yes.

21  Q.   And it's possible that an individual who engages in

22  same-sex behavior may honestly not identify himself or herself

23  as LGB, correct?

24  A.   Yes.

25  Q.   And both of these -- well, that assumes -- both of those

1   questions assume that an individual gives an honest answer when

2   asked his or her sexual identity, but it's also possible that

3   some individuals will not give an honest answer to that

4   question, correct?

5   **A.**   Obviously, that's possible, that people would not give an

6   honest answer.

7   **Q.**   And, in fact, for LGB individuals, there may be particular

8   reasons why they would -- might be reluctant to answer that

9   question, correct?

10  **A.**   Yes.  As I described before, concealing would be that --

11  what I would refer to that.

12  **Q.**   Thank you.

13         Let's turn next to sexual behavior.  Behavior --

14  behavioral definitions also vary, correct?

15  **A.**   Behavioral definitions of what?

16  **Q.**   Of sexual orientation.

17  **A.**   I'm not sure what you -- I guess they could differ in this

18  time frame that people might have looked at, yes.

19  **Q.**   Yes.  So they could look at different time periods,

20  correct?

21  **A.**   Right.

22  **Q.**   All right.  And because more people have same-sex sex in

23  adolescence, defining sexual orientation as "sexual behavior

24  ever" includes more people than defining it in the past year,

25  correct?

1  **A.**    Right.  But that will be true for anything.  If you look

2  at "ever," you get more.

3  **Q.**    For example, you could ask someone whether they were

4  African-American ever or African-American in the last year?

5  **A.**    That would actually -- that is a very interesting

6  phenomenon, but that is also possible.

7            African-American is an identity, so the identity part

8  of it could vary and, in fact, it does vary.

9            People who move into the United States, for example,

10  who are by our definition African-Americans may not describe

11  themselves as African-American or even black.

12            And there are studies that show that people who come,

13  for example, from the Caribbean who are dark colored, their

14  parents don't describe themselves as black, but their

15  offsprings after being educated in the United States and

16  socialized do.

17            So it -- definitions always vary.  Certainly, with

18  African-Americans, the term itself is relatively recent.  Black

19  was used before that.  And Negro was used even before that.

20  Senator Reid got into trouble for using that term.

21            So those identities change and they are responsive to

22  the social context in many different ways, but -- obviously,

23  the population itself doesn't change, but how people refer to

24  themselves might change.

25  **Q.**    Okay.  But for LGB individuals, the variance in the time

1  period you are looking at can lead to significantly different

2  estimates, correct, of the population?

3  **A.**   As I said, again, that is true for anything.  We always

4  look at lifetime, for example, versus one year.  So if you look

5  at the one-year rate of a disorder, it will be a lot less than

6  a lifetime.

7  **Q.**   Thank you.

8        Now, there are also different ways in which a

9  definition of sexual orientation that focuses on attraction

10  might vary, correct?

11  **A.**   Yes.

12  **Q.**   All right.  Now the size of the LGB population might vary

13  a great deal depending on how sexual orientation is defined,

14  correct?

15  **A.**   Right.

16  **Q.**   Thank you.

17        And please look at tab 12 in the witness binder.  You

18  will find an Exhibit pre-marked DIX-1248.

19        (Witness complied.)

20  **A.**   Wait, I'm sorry.  Oh, 1248, yes.

21  **Q.**   And can you identify this document?

22  **A.**   Umm --

23  **Q.**   I apologize.  It doesn't have a cover sheet.  It's an

24  article you wrote with Laura Dean and others entitled "Lesbian,

25  Gay, Bisexual and Transgender Health Findings and Concerns"

1  that was published in the *Journal of Gay and Lesbian Medical*

2  *Association*.   Is that the document?

3  **A.**   Yes.   That is -- that is actually a report that tries to

4  summarize some of the findings, health findings.

5         **MR. NIELSON:**   And I believe this is also PX 1004,

6  which I believe is in evidence.

7         **THE COURT:**   I can check that.

8         **MR. NIELSON:**   Could I ask the Court to confirm that

9  that is Laura Dean, Meyer findings in the "Lesbian, Gay,

10  Bisexual and Transgender Health Findings and Concerns"?

11         **MR. DUSSEAULT:**   Correct.

12         **MR. NIELSON:**   Okay.   So that's in evidence.

13  **BY MR. NIELSON:**

14  **Q.**   All right.   Please look at page 135 in the exhibit.   It's

15  a lengthy exhibit.   And that's towards the -- not quite the

16  end, but towards the end.

17  **A.**   Yes.

18         (Witness complied.)

19  **Q.**   And in the second full paragraph in the second column you

20  write:

21         "Recent national studies estimating the

22         percentage of the population that falls into

23         each of the three broad dimensions of

24         identity, behavior and attraction show that

25         one to four percent of the population

1              identifies as lesbian or gay, two to

2              six percent of the population reports some

3              same-sex behavior in the previous five years,

4              and up to 21 percent of the population

5              reports same-sex attraction at least once in

6              adulthood."

7          And I will skip the citations.

8          And then you go on to say:

9              "Therefore, depending upon how it is defined

10             and measured, 1 to 21 percent of the

11             population could be classified as lesbian or

12             gay to some degree with the remainder

13             classified as bisexual or heterosexual to

14             some degree."

15         Correct?

16 **A.**    If that's what it says here.  And, obviously, again,

17 depending -- you can -- depending on the definition that you

18 use for the finding of population, you will get different

19 rates.  If it's more expansive, inclusive, then you will get a

20 high rate than if it is less expansive and inclusive.

21 **Q.**    Now, 1 to 21 percent seems like a great deal of variance.

22 **A.**    I don't think anybody would say that attraction is a true

23 measure of LGB, what we are talking about.

24         So I think one of the things is when you -- when you

25 measure things, you realize that it is not exactly the way you

1    think it is.

2            So attraction is a very, very fluid thing in the

3    sense that, for example, I -- a woman tends to have less

4    inhibitions about saying, oh, this other person is attractive.

5    That doesn't make her a lesbian because she said that.  So

6    that's why I'm saying, it's a definitional thing.

7            For me, in my studies, I use identity, which is the

8    standard that we use in the U.S. census, for example -- not in

9    LGB, which is not measured, but, let's say, on race.  So, you

10   know, those things are the same issues in measuring any kind of

11   group's identity.

12           If you wanted to, for example, measure race by skin

13   tone, you will find that you will have a huge number of people

14   who maybe have a darker skin tone, but are not identified as

15   black.

16           So to me, the attraction -- personally, as a

17   researcher, I don't use the attraction definition because I

18   find it very broad.  And I use the identity when I am

19   interested in issues, such as the ones we discussed today; but

20   I might use behavior if I'm interested, for example, in

21   HIV-related risk.

22           So every researcher uses definition based on the

23   purpose of their study or survey or whatever it is.

24   **Q.**   Okay, thank you.

25           **MR. NIELSON:**  And, your Honor, I had more

1  methodological questions, but I'm going to skip ahead.  I think

2  we have dwelled on that long enough.

3          **MR. DUSSEAULT:**  Your Honor, may I raise one issue,

4  just simply to note we have not had a chance to look at 1004.

5  And while it is Meyer and Dean, it's not the same article as

6  Defendants' 1248.  We don't have an objection to Defendants'

7  1248, but we didn't want the record to reflect they were the

8  same.

9          **MR. NIELSON:**  Thank you for -- I appreciate that

10 clarification.

11         And, your Honor, I would move DIX-1248 into evidence

12 then.

13         **THE COURT:**  Very well.  So admitted.

14         (Defendants' Exhibit 1248 received in evidence.)

15         **MR. NIELSON:**  Thank you.

16 **BY MR. NIELSON:**

17 **Q.**   Now, Professor Meyer, it's your opinion that limiting

18 marriage to opposite-sex couples causes minority stress for LGB

19 individuals, correct?

20 **A.**   That limiting -- can you repeat?

21 **Q.**   Yes.  Now, it is your opinion that limiting marriage to

22 opposite-sex couples causes minority stress for LGB

23 individuals, correct?

24 **A.**   Yes, as I described earlier.

25 **Q.**   And it's your opinion that minority stress causes a higher

1 prevalence of mental disorders, a higher prevalence of certain

2 symptoms of distress that don't rise to the level of formal

3 disorders; including mood, anxiety and substance use problems,

4 lower levels of well-being and higher incidents of suicide

5 attempts, correct?

6 A.   Correct.

7 Q.   Now, does limiting marriage to opposite-sex couples cause

8 minority stress for all gays and lesbians or only for lesbians

9 or gay couples who wish to marry?

10 A.   I would say all, because of -- as I explained earlier, it

11 is the message you send.

12        So you can think about the event of marriage in a

13 sense and say, well, this would only affect those people who

14 want to marry.  But the message that I described earlier of

15 rejection or disapproval, clearly applies to all gay people.

16 So they would all -- you know, I can't predict what every

17 single person that sees this, but there would be something that

18 affects the rest of the social environment regardless if you

19 are personally interested in getting married.

20        It is the message, in this case in the constitutional

21 amendment, that demonstrates -- that is of interest, or the

22 meaning as I said before, the social meaning.

23 Q.   So it affects all of them and not just those, not -- all

24 LGB and not just those wishing to marry, correct?

25 A.   It has the potential to effect -- you know, I never said

1    that -- minority stress doesn't affect of single person in the

2    same way.  It is a potential.

3    **Q.**   Thank you for that clarification.

4           Are you aware that same-sex marriage has been legal

5    since 2004 in Massachusetts?

6    **A.**   Yes.

7    **Q.**   Do LGB individuals suffer from a lower prevalence of

8    mental health disorders in Massachusetts than in California?

9    **A.**   Well, the first answer is I don't really know, but that's

10   now how I -- I wouldn't expect it exactly in that way that you

11   are suggesting; that that would be the test of that, because

12   Massachusetts is not, you know, an isolate in the United States

13   and, you know, it would be more complicated for me to assess.

14          So that alone would not change everything.  So it's

15   just one aspect of it.  And, certainly, I would think that

16   people in Massachusetts who are gay would feel more supported

17   and welcome, so to speak.  So in that sense, it would reduce

18   the stress that they have somewhat.

19   **Q.**   But your answer is you don't know, correct?

20   **A.**   Well, I don't -- I don't have the data on that.

21   **Q.**   You don't have data?

22   **A.**   Right.

23   **Q.**   Okay.  Thank you.

24          Do LGB individuals suffer from a lower prevalence of

25   mood, anxiety and substance use problems that do not meet the

1  criteria for formal psychiatric disorders in Massachusetts and

2  in California?

3  **A.**   Again, the study wasn't done in the way that you are

4  describing it, although a study was done looking at states

5  where there's greater rights for gay and lesbian people, and it

6  did show those things that you are alluding to.

7           So it wasn't exactly done in the way that you are

8  saying.  It wasn't Massachusetts versus California.  But in

9  general in the United States states that offer more

10 protections, gay and lesbian populations there fare better than

11 in states that do not offer such protections.

12          So to the extent that you can use that as a

13 suggestion that it does have this effect that you are alluding

14 to, but I don't know of a study that compared California to

15 Massachusetts on any of those outcomes.

16 **Q.**   Okay.  And I was planning to ask you about the other

17 outcomes, but the answer would be the same?

18 **A.**   Right.  I don't know of a study that tested it either way.

19 **Q.**   Thank you.

20          Are you aware that same-sex marriage has been legal

21 since 2001 in the Netherlands?

22 **A.**   I am going to believe you on that.  I'm aware that it's

23 legal.

24 **Q.**   I will represent to you that it was.

25 **A.**   Okay.

1  **Q.**   Do LGB individuals suffer from a lower prevalence of

2  mental disorders in the Netherlands than in California?

3  **A.**   I -- I actually don't know the answer to that, although

4  there are studies that -- I don't know the answer to that.

5  **Q.**   Would your answer be the same if I asked about the other

6  outcomes you identified?

7  **A.**   Right.  I don't -- I don't know the comparison.  Honestly,

8  I don't know that I can tell you the rates of all the disorders

9  specifically to California, so I couldn't compare them.

10         Most of the studies that I relied on were national

11  studies that were not separated by state.

12 **Q.**   Okay.  Thank you.

13         Now, you are aware that California allows same-sex

14 couples to register as domestic partners, correct?

15 **A.**   Yes, I've learned that.

16 **Q.**   And you believe that, quote, domestic partnership has

17 almost no meaning, and, to some extent, it's incomprehensible

18 to people as a social institution, correct?

19 **A.**   Yes.

20 **Q.**   And I apologize, I said "quote."  That's -- that was from

21 your deposition?

22 **A.**   Correct.

23 **Q.**   And for opposing counsel's benefit, I'll identify that as

24 the transcript at page 80, 9 to 11.

25 **A.**   I believe I talked about it today, as well.

1    Q.   Yes.  And you believe that domestic partnership reduces

2    the value of same-sex intimate relationships, correct?

3    A.   Reduces -- yes.

4    Q.   Okay.  And if domestic partnership and marriage were both

5    available to same-sex couples, you think they would probably

6    not choose domestic partnership, correct?

7    A.   I would think that.

8            THE COURT:  How are you doing on time, Mr. Nielson?

9            MR. NIELSON:  Fifteen minutes?

10           THE COURT:  All right.

11           MR. NIELSON:  I'll try.  That may be slightly

12   optimistic, but I'm cutting a lot of -- I'm trying to cut a lot

13   of chaff from the wheat.

14           THE COURT:  The longer we talk, the less wheat

15   that's ...

16   BY MR. NIELSON:

17   Q.   Please turn to page -- or tab 14 in the witness binder.

18           I'm going to represent to you that this is a

19   California statute governing domestic partnerships.

20   A.   Okay.

21   Q.   And I'm going to read you part of this.  And we could read

22   it all, but I am not going to read it all.

23           If you look at section A, it says:

24           "Registered domestic partners shall have the

25           same rights, protections, and benefits, and

1              shall be subject to the same

2              responsibilities, obligations and duties

3              under law, whether they derive from statutes,

4              administrative regulations, court rules,

5              government policies, common law, or any other

6              provisions or sources of law as are granted

7              to and imposed upon spouses."

8              Were you aware that California law treated domestic

9    partners in this manner?

10   **A.**   I'm not aware of all of the legal issues around it, but I

11   was aware that it is at least approximate in the same rights

12   and benefits.

13              But, as I said, I wasn't in my testimony or in my

14   reports talking about those benefits and rights.  I was talking

15   about the social meaning and the social message that marriage

16   conveys.  So I wasn't studying that particular aspect of the --

17   **Q.**   So that does not, in any way, change the opinions that

18   you've offered in the case?

19   **A.**   No.  It certainly is a good thing that they offer

20   benefits, but I'm just saying that's not what I was focusing

21   on.  My focus is on the social meaning, the social place of

22   that --

23   **Q.**   You --

24   **A.**   -- of marriage.

25   **Q.**   I'm sorry.  Are you complete?

1  A.  I'm sorry.

2  Q.  Do you believe that domestic partnerships stigmatize gay

3  and lesbian individuals?

4          THE COURT:  I'm sorry, what was the question?

5  BY MR. NIELSON:

6  Q.  Do you believe that domestic partnerships stigmatize gay

7  and lesbian individuals?

8  A.  Yes.

9  Q.  Okay.  Please look at tab 15 in the witness binder.

10         You will see a document premarked DIX1067.  And, as

11  you can see, it's a letter from California Assembly Member

12  Jackie Goldberg.  And, as you can see, it concerns legislation

13  titled "AB205."

14  A.  I'm going to take your word on that.

15  Q.  And if you look at the heading under it, it says:

16         "AB205 will provide registered domestic

17          partners with a number of significant new

18          rights, benefits, responsibilities and

19          obligations."

20         And I'm going to represent to you that this -- that

21  AB205 was enacted into law, and the principal portion of that

22  law as amended was the statute we were just looking at.

23  A.  Okay.

24  Q.  Okay.  Please turn to the last page of the exhibit.  And

25  please look at the italics, the italicized statement about two

1  and a half inches up from the bottom of the page.

2  **A.**    Uh-huh.  Yes.

3  **Q.**    It says:

4              "This bill is sponsored by Equality

5              California.  Other advocacy organizations

6              that collaborated on the drafting of this

7              bill included Lambda Legal Defense and

8              Education Fund, National Center for Lesbian

9              Rights, and ACLU."

10 **A.**    Yes.

11 **Q.**    Are you familiar with Equality California?

12 **A.**    Yes.  I believe they are the organization that opposed

13 Proposition 8.

14 **Q.**    Right.  And, in fact, you contributed money to the

15 Equality California's No On 8 campaign, correct?

16 **A.**    I should become familiar with them.

17         (Laughter)

18 **Q.**    Do you believe Equality California would sponsor

19 legislation that stigmatizes LGB individuals?

20 **A.**    Do I believe that they intend to stigmatize?  No.

21         But I think that that doesn't change my answer to the

22 question about domestic partnership.  So whatever their

23 intention was, I'm sure, to better the lives of gay and lesbian

24 individuals in California, but, nonetheless, having a second

25 type of an institution that is clearly not the one that is

1  desired by most people is stigmatizing.

2  **Q.**   All right.  And if I were to ask you the same question

3  about the involvement of Lambda Legal Defense and Education

4  Fund, National Center for Lesbian Rights, and the ACLU, your

5  answer would be the same, correct?

6  **A.**   Exactly.

7  **Q.**   All right.  Thank you.

8         **MR. NIELSON:**  Your Honor, I would like to move

9  DIX1067 into evidence.

10         **MR. DUSSEAULT:**  No objection.

11         **THE COURT:**  Very well, 1067 is in.

12         (Defendants' Exhibit 1067 received in evidence.)

13  **BY MR. NIELSON:**

14  **Q.**   I'd like to direct your attention to tab 18.  You'll find

15  a document premarked DIX1020.  Can you identify this document?

16  **A.**   I got it.

17         I don't believe I've seen it before.  It says,

18  "Article Proposition 8 and the future of American Same-Sex

19  Marriage Activism."  But I have not read it before, I believe.

20  **Q.**   And who is the author?

21  **A.**   Jeffrey Redding.

22  **Q.**   Are you familiar with Jeffrey Redding?

23  **A.**   No.  I -- I don't think so.  I don't remember the name.

24  **Q.**   All right.  I'm going to -- I won't question you about

25  that document then.

1            Have you done any research to determine whether,

2    since it adopted AB205 -- and that's this bill we were just

3    talking about -- LGB individuals in California suffer from

4    worse mental health outcomes than LGB individuals in any

5    jurisdiction that recognizes same-sex relationships as

6    marriages?

7    **A.**    No.

8    **Q.**    Okay.  Now, at your deposition -- I would like you to turn

9    to -- you made a statement, and I want to confirm that it was,

10   in fact, a statement that you made.  And it's -- turn to tab 7,

11   if you would.  That's a transcript of your deposition.  And

12   look at page 149.  And the pages are a little confusing.

13   There's four on each page.

14   **A.**    That's okay.

15   **Q.**    And it's actually page 38 in the continuous pagination at

16   the bottom, if that's helpful.

17   **A.**    I got it.

18            **MR. DUSSEAULT:**  Your Honor, I'd object if it's not

19   being offered to impeach anything.

20            **THE COURT:**  Why are you offering it?

21            **MR. NIELSON:**  I was going to ask him whether he

22   agreed with it.  Perhaps I should ask him whether he agreed

23   with it, first.  And then if he doesn't --

24            **THE COURT:**  Why don't you ask him the statement --

25            **MR. NIELSON:**  Yes, exactly.

1          **THE COURT:**  -- without referring to the deposition.

2          **MR. NIELSON:**  Right.

3  BY MR. NIELSON:

4  **Q.**   When you speak of a gay and lesbian person whose intimate

5  relationship has not been granted societal approval, would that

6  include gays and lesbians who are in a domestic partnership?

7  **A.**   Yes, in the same sense that I discussed earlier, about the

8  social meaning of marriage versus domestic partnership.

9  **Q.**   Okay.  Now, let's look at the deposition transcript.  It's

10  lines -- page 149, line 16 through 20.  And you can continue

11  past that, if you need to, for context.

12         Could you -- you don't need to read it aloud, but

13  could you read that and tell me whether you gave that testimony

14  at your deposition.

15  **A.**   Did I give this --

16  **Q.**   Did you say this at your deposition?

17  **A.**   I don't have an independent recollection, but I read it

18  here and I presume that's correct.

19  **Q.**   Okay.  And the statement -- the answer you gave to the

20  question today was "yes."

21         And the answer at your deposition was:

22         "No.  I describe here -- when I talk about

23         these unions in the sense of the impact on

24         stigma, I'm really not considering domestic

25         partners, domestic partnership.  And,

Case3:09-cv-02292-JW   Document464   Filed01/15/10   Page302 of 322

1                  admittedly, they have many benefits,

2                  including maybe something that you were

3                  referring to just recently.  But in terms of

4                  the impact that I'm referring to here, I

5                  wasn't talking about domestic partnerships."

6          And, as you said, you have no reason to think that

7    you didn't give that testimony, correct?

8    **A.**    Right.  But I'm really not sure what the context of this

9    is and what -- what we were talking about before, so I don't

10   know that it is replicating the question that I just agreed to.

11         But my answer is that, you know, what I just told you

12   is what I still believe.  I don't know that that necessarily in

13   any way contradicts that.

14         **MR. DUSSEAULT:**  Your Honor, if it's being offered for

15   impeachment, could I add additional language in the interest of

16   the rule of completeness?

17         **THE COURT:**  Very well.

18         **MR. DUSSEAULT:**  I'll just read it in, so it's part of

19   the record, as well.  This is from page 153, starting at line

20   3.

21         **"QUESTION:**  Perhaps domestic partnership is

22                  confusing and not well understood.  Does it

23                  minimize the significance of the

24                  relationship?

25         **"ANSWER:**  Yes, because, as I explained

1              before, domestic partnership is compared with

2              marriage.  It refers to a similar thing.  It

3              refers to a couple being together, let's say

4              to a union.  And, therefore, when you use

5              'domestic partners,' an obvious comparison

6              would be with marriage.  Now, in this case or

7              in any case, really, domestic partnership is

8              offered clearly as a secondary option, not as

9              the most desirable option."

10             **THE COURT:**  Very well.  Shall we move on,

11 Mr. Nielson?

12             **MR. NIELSON:**  Yes, we shall.

13 **BY MR. NIELSON:**

14 **Q.**  Professor Meyer, you believe that laws are perhaps the

15 strongest of social structures that uphold and enforce stigma,

16 correct?

17 **A.**   Yes.  I believe I wrote that.

18 **Q.**  Yes.  As we've discussed, California recognizes same-sex

19 relationships as domestic partnerships with essentially all the

20 rights of marriage, correct?

21 **A.**   Yes, I have to -- again, I have no knowledge of the law,

22 specifically, but I understand that that's the case.

23 **Q.**  Are you aware that California law prohibits discrimination

24 on the basis of sexual orientation in housing?

25 **A.**   I'll take your word for that.  I think I know that, but...

1  Q.   Are you aware that California law prohibits discrimination

2  on the basis of sexual orientation in businesses' provisions of

3  services?

4  A.   Again, I'm not independently aware, necessarily, of all

5  the legal issues of protection, but I -- I'm aware now that you

6  tell me that.

7  Q.   Okay.  Are you aware that California law prohibits

8  discrimination on the basis of sexual orientation in

9  employment?

10  A.   The same answer.

11  Q.   Okay.  And I could go on and on.  And in the interest of

12  time, I won't.  But let me just ask you this:

13        Leaving aside the question of marriage, are you aware

14  of any other state whose laws reflect less structural stigma

15  than California?

16  A.   Leaving aside the question of marriage?  As I said, I'm

17  not as familiar with the details of the protections either here

18  or in other states, so it's going to be a very -- I cannot

19  answer that.

20  Q.   Okay.  So the answer is, "I don't know," correct?

21  A.   I just cannot answer that.  I don't know what the

22  different legal -- I would have to study this and look at this.

23  Q.   Understood.  Thank you.

24        Now, you talked about Proposition 8 sending a message

25  about the value of gay and lesbian relationships, in your

1  direct testimony.  Did you intend by that to offer an opinion

2  about the purposes of the people who drafted or voted for

3  Proposition 8?

4  **A.**    No.

5          **MR. NIELSON:**  All right.  No further questions, Your

6  Honor.

7          **THE COURT:**  Very well.  Any redirect?

8          **MR. DUSSEAULT:**  Yes, Your Honor.

9          **THE COURT:**  Mr. Dusseault.

10                  <u>**DIRECT EXAMINATION**</u>

11  **BY MR. DUSSEAULT:**

12  **Q.**    Good afternoon, Dr. Meyer.

13  **A.**    Good afternoon.

14  **Q.**    Almost evening, but I'll say afternoon.

15          Just a couple things I wanted to follow up on.

16  Mr. Nielson spent a good bit of time this afternoon talking

17  about your work in minority stress and social stress theory,

18  and the implications of that work with respect to groups, not

19  gay and lesbian individuals but, let's say, racial minorities.

20  Do you recall that?

21  **A.**    Yes.

22  **Q.**    Okay.  Now, is the point of this discussion that you have

23  found in some of the research that certain racial or ethnic

24  minorities, while they experience some stressors as a result of

25  minority status, may not experience the same health effects as

1   a result?

2   **A.**   Correct.  That specifically with African-Americans, or

3   blacks, in the United States.

4   **Q.**   Now, Doctor --

5   **A.**   And I should just correct.  This is not that I found this,

6   but this is a finding that definitely is in the literature.

7   It's not all my studies empirically, but there are studies -- I

8   found it in the sense that I read about it and so forth.

9   **Q.**   Okay.  Now, Dr. Meyer, do you have any views as to any

10   differences between, let's say, the African-American minority

11   community and the minority community of gay men and lesbians

12   that might explain some of the differences in terms of the

13   outcomes that flow from stressors?

14   **A.**   Well, of course, as I mentioned, the reason we look at

15   differences in the patterns of results is exactly to, as I

16   said, improve our models.

17         And one of the things that we, therefore, analyze --

18   and it's not just me -- it would begin to look at, well, what

19   is different between those two populations that might help us

20   understand the workings of these social stressors.

21         In terms of African-American findings, there are

22   several areas of further study that we're interested in.

23         The first one that is most often advanced is the --

24   and I'm discussing this in comparison to gay and lesbian

25   here -- is that while African-Americans are definitely exposed

 1    to racism, in their socialization process, especially earlier

 2    on, they are typically exposed to greater benefits of the

 3    resources that I described before as coping and social support,

 4    for the very simple fact that they typically grow up in black

 5    communities.

 6          Of course, there might be some unique experiences,

 7    but there's evidence that being socialized by your family and

 8    educated about racism, being -- taking part in, for example,

 9    institutions, black churches that have for, really, decades if

10    not centuries, been in place to combat the effects of racism,

11    all the messages of racism.  So as a person growing up and

12    being socialized, an African-American person benefits from this

13    social support affiliation.

14          As I described earlier, regarding gay and lesbian

15    people, that is not how they grow up.  Most gay and lesbian

16    people, like most people in society, internalize very negative

17    attitudes, and they do not have along the way access to gay

18    supportive services, and so forth, until a later point where

19    they have already come out and, you know, really made the big

20    step of affiliating themself with some of the support.

21          So this is one thing --

22    Q.  Before you move on, let me be sure I understand this.  So

23    in the African-American community, for example, typically, an

24    African-American youth growing up would commonly be surrounded

25    by African-American siblings, parents, grandparents, perhaps

1  community, church friends, et cetera.  Is that right?

2  **A.**    Correct.

3  **Q.**    But with gay men and lesbians growing up, they may not

4  have the same community support and socialization support?

5  **A.**    I would say they definitely do not have the --

6  **Q.**    Okay.

7  **A.**    -- those type of -- the equivalent type of support

8  addressing gay and lesbian -- an affirmative gay and lesbian

9  approach.  As I said, it's almost -- it's actually the

10  opposite.

11         And many times we found within even families gay and

12  lesbian individuals are shunned or are harmed in many ways,

13  including violence.  So it's almost like the direct opposite of

14  the support.

15         **THE COURT:**  Are you talking about African-American

16  gays and lesbians or nonAfrican-American gays and lesbians?

17         **THE WITNESS:**  Thank you, Your Honor.

18         In this comparison, we're comparing the overall

19  African-American nongay with overall white nongay.

20         In a previous response --

21         **THE COURT:**  I see.

22         **THE WITNESS:**  -- we were discussing a different study

23  that looked at gay African-American versus gay white, in which

24  I was talking about the added element of racism.

25         But, as Mr. Nielson pointed out, this finding is also

1    true in the general population, nongay population, where

2    African-Americans also have lower rates.  And, therefore,

3    that's why this analogy -- it makes sense in the way that I was

4    answering.

5    **BY MR. DUSSEAULT:**

6    **Q.**   But when comparing the gay and lesbian population to the

7    African-American nongay population, your testimony is that

8    there is more socialization and support in the African-American

9    community that may explain a difference in certain outcomes?

10   **A.**   Yes.  That's one of the differences that may explain.

11              **THE COURT:**  More socialization and support among --

12              **THE WITNESS:**  Nongay --

13              **THE COURT:**  Wait a minute.  More socialization and

14   support for African-American gays and lesbians?

15              **THE WITNESS:**  Nongay.

16              **THE COURT:**  Nongays.

17              **THE WITNESS:**  So let me just clarify.

18              We're talking about two different comparisons that

19   are joined only by the general theoretical perspective of how a

20   social stress could affect people.

21              So the analogy here is that African-Americans being

22   themselves, of course, subject to racism should have a parallel

23   finding that we find in the gay versus straight in

24   African-American nongay with white nongay.

25              It's very different, but you expect some kind of a

1  parallel that the stress related to prejudice is affecting

2  them, then it should affect also blacks.

3        And the questions here were, well, why isn't it true

4  for nongay African-Americans versus nongay white where it's

5  true for gay versus straight, regardless of color?

6        So this is really going to a whole different area

7  that is not pertinent, specifically, to what I testified

8  regarding gay and lesbian population.  This is expanding

9  towards an analysis of broader sociological theories, and

10  looking at some parallels in the findings across groups and

11  across ideas.

12  **BY MR. DUSSEAULT:**

13  **Q.**   Right.  And let me clarify.  The line of questioning that

14  I want to follow up on now was a line of questioning from

15  Mr. Nielson, suggesting that the -- if the theory of minority

16  stress is taken from the gay and lesbian minority population to

17  the African-American minority population, would you expect

18  exactly the same health outcomes; and does that fact that you

19  might not see the same health outcomes in some way suggest that

20  the model doesn't work.

21        Do you recall that discussion?

22  **A.**   Right.  And my answer is that it does not indicate that

23  the model doesn't work.  It indicates that there are

24  differences in the characteristics of the -- that this is not a

25  perfect comparison.

1           There are differences in the characteristics of race,

2     in terms of blacks versus white nongays, and that from that

3     comparison and the comparison of gay versus straight, a major

4     difference is that blacks are socialized with a lot of -- with

5     a variety of access to support for their race, that comes to

6     counter some of the effects of racism; whereas, gays are

7     socialized with homophobia and without, in their families and

8     original communities, say, access to this -- to a similar

9     gay-related affirmation.

10    **Q.**   In some of the exhibits we've seen today, we've seen the

11    term "minority stress" and the term "social stress."  Are those

12    the same things?

13    **A.**   As I responded to Mr. Nielson, social stress can be maybe

14    thought of as a broader category.  And within that, in the

15    African-American comparison, people have talked about racism as

16    stress.  In the nongay African-American versus white, people

17    have discussed it as a racism as stress.

18          So I would put it within the general social stress

19    approach, because here we're looking at racism; whereas, in my

20    examples with gay and lesbian versus heterosexuals, we're

21    looking at homophobia and some of the other things.

22          So they're not obviously the same, but there's some

23    theoretical parallel there in the way that you study those

24    different populations, the different comparisons.

25    **Q.**   But when you use the term "minority stress" in your

1  research, are you referring, generally, to all minorities, or

2  specifically to gays and lesbians?

3  **A.**   No.   As I said, minority stress, which is a term that I

4  helped popularize, refers to sexual minorities.   And it is

5  almost exclusively used in the literature with reference to

6  sexual minorities and, I would dare say, many times referring

7  to my own articles on that matter.

8  **Q.**   And the four processes that we spent a fair amount of time

9  on this afternoon, that embody minority stress, are those

10 processes of general application, or specific to the gay and

11 lesbian population?

12 **A.**   Obviously, they are specific to the gay and lesbian

13 population.

14 **Q.**   Let me ask about one in particular: concealment.

15          Would concealment be a similarly significant issue

16 when you're talking about the gay and lesbian population, as

17 compared to a racial minority such as the African-American

18 population?

19 **A.**   Not -- not at all in the same way, for obvious reasons.

20 Although, the -- the answer is no.

21          There are some instances where somebody may be able

22 to conceal his black identity, but it is -- mostly, we don't

23 think of concealment when we think about the model of racism.

24 **Q.**   Let me also ask you, in this comparison of the gay and

25 lesbian minority to the African-American minority, about the

1  issue of structural stigma.  And you talked about the role of

2  law.

3          Today in America, are African-Americans subject to

4  legal structural stigma in any way comparable to Prop 8?

5  **A.**   Well, obviously, as I said, this will be another

6  difference between the two populations.  When I was saying

7  there are several differences, this is a major difference.

8          I believe that, at least since 1964, there are no

9  legal types of racism in the United States.  So in terms of the

10  power of the law and the state, there is no endorsement of

11  racism.

12          That does not mean that racism has abated.  But,

13  certainly, it is not parallel to what we were discussing today

14  in terms of the structures of the law.

15  **Q.**   Is there any racial minority in the United States that's

16  denied the right to marry?

17  **A.**   I don't think so.  But...

18  **Q.**   With this issue of the extent to which a theory of

19  minority stress or social stress applies to, let's say, a

20  racial minority group, does any of the discussion or findings

21  in that area in any way undermine your view that minority

22  stress operates in the lives of gay and lesbian people and

23  adversely affects health?

24  **A.**   No.  And there's no evidence for that.  There's no real

25  challenge in terms of findings that are this -- confirming.

1    Certainly, not all the findings are always perfectly as you

2    would like them, but there's -- majority of the studies done in

3    the field, as I said -- and many of them that I quote -- do not

4    lead me to have doubt in the veracity of what I was testifying

5    to.

6              And the situation with African-Americans, as I said,

7    is of great interest to me, as is the issue around gender; that

8    is, men versus women.  It is something that I am very motivated

9    to study.  But it is really because of my intellectual

10   curiosity and interest in, as I said, specifying the model

11   better, understanding how do these differences that we were

12   just describing, for example -- and there are others -- how do

13   they play into this causal change that I was describing

14   earlier.

15             So it is of interest, but it doesn't lead me to doubt

16   anything regarding the specific case of minority stress in

17   lesbian and gay men and bisexuals, which has been my work.

18   **Q.**   Now, Dr. Meyer, Mr. Nielson asked you a series of

19   questions where he presented you with a hypothesis and then he

20   would ask you whether a particular study or analysis was

21   inconsistent with that hypothesis.  Do you recall that?

22   **A.**   Yes.

23   **Q.**   Is one of the purposes of a study to test whether a

24   hypothesis is true or not true?

25   **A.**   That is the purpose of a study.

1  **Q.**   Mr. Nielson also asked you about stigma in domestic

2  partnerships, and he read you some examples of certain rights

3  groups supporting domestic partnerships.  Do you recall that?

4  **A.**   Yes.

5  **Q.**   Ask just a couple of follow-up questions about that.

6        Assume, hypothetically, that you have no right to

7  marry for gay and lesbian people, and no right to domestic

8  partnership.  Is it your view that gay and lesbian people are

9  stigmatized?

10  **A.**   They're stigmatized as I showed, regardless of this.  This

11  is, as I said, an added block in the stigmatization and, I

12  think, a very important and forceful one in the sense that it

13  has the power of the state and all that.  But it is not the

14  only stigma, if I understand your question.

15  **Q.**   Hypothetically, if you had a state in which there was no

16  right to marry and no right to domestic partnership, is it your

17  view that that would stigmatize gay and lesbian people?

18  **A.**   Well, I think not having the right to marry would

19  stigmatize them in the same way that it stigmatizes them in

20  this case.

21  **Q.**   And then, alternatively, if in the same state gay and

22  lesbian people are denied the right to marry but they are given

23  a domestic partnership that is valued differently by society,

24  would you view that to be a stigmatic effect as well?

25  **A.**   Of course.  In a sense, you're actually making a clearer

1  statement of stigmatization when you have this dual system,

2  because it is not only that you're denying them the marriage,

3  you're also saying this marriage is highly valued and,

4  therefore, you cannot get that part so we're giving you

5  something that we're calling something else.

6         So in some ways you could say, at least in the way

7  that, again, is not in some general way, but you could say that

8  the message is even more severe.  But, of course, it's kind of

9  a silly comparison, because I agree.

10        I would say that if the state does not offer

11  marriage, that alone is a stigma.  But, certainly, if you have

12  two sides to this, and you're saying you can only get to the

13  back of the bus, that is quite more stigmatizing.

14  **Q.**   Thank you.

15        **MR. DUSSEAULT:**  I have nothing further.

16        **THE COURT:**  Very well.

17        Thank you, Dr. Meyer.  You may step down.

18        **THE WITNESS:**  Thank you.

19        **THE COURT:**  And I think we'll perhaps pass on Ms. Zia

20  until tomorrow morning.

21        (Laughter)

22        **THE COURT:**  Is that agreeable to everybody?

23        **MR. BOIES:**  Yes, Your Honor.

24        **THE COURT:**  All right.  See you all at 8:30 tomorrow

25  morning.

```
 1              A housekeeping matter.

 2         MR. BOUTROUS:  Yeah, one quick -- two, actually, that

 3    might change the order of our witnesses tomorrow.  We may end

 4    up with Dr. Lamb as our first witness, followed by Ms. Zia.

 5              And then the other issue is if at some point tomorrow

 6    we could address -- we could address the issue of the documents

 7    that are under seal pursuant to the protective order, that

 8    would be much appreciated.

 9         THE COURT:  I'll be happy to do that.

10              Have you worked out an agreement with these

11    individuals that we set about this morning?

12         MR. DUSSEAULT:  Still working on it, as we review the

13    documents.  We were going to try to nail that down this

14    weekend, so we could report on Tuesday.

15         THE COURT:  I see.  And exactly what documents are

16    you going to raise tomorrow?

17         MR. BOUTROUS:  There are three documents that were

18    filed with our administrative motion to file under seal, that

19    are documents that were produced pursuant to the most recent

20    order to compel.  They've been produced under the protective

21    order.

22         THE COURT:  Oh, are these the documents that I asked

23    for the response to --

24         MR. BOUTROUS:  Yes.

25         THE COURT:  -- at the close of proceedings today?
```

1          **MR. BOUTROUS:**  Yes.  And yesterday I think the

2   response was filed.  So the proponents have filed a response.

3          We're not going to file a reply.  I'm just ready to

4   argue, whenever you're ready to hear it.

5          **THE COURT:**  All right.  I appreciate that.

6          **MR. BOUTROUS:**  Thank you, Your Honor.

7          **THE COURT:**  8:30 tomorrow.

8          **MR. BOUTROUS:**  Thank you, Your Honor.

9          **MR. OLSON:**  Thank you, Your Honor.

10          (At 5:31 p.m. the proceedings were adjourned until

11          Friday, January 15, 2010, at 8:30 a.m.)

12                          -   -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

   **PLAINTIFFS' WITNESSES**                              **PAGE**    **VOL.**
3
   **EGAN, EDMUND**
4  (SWORN)                                                 677       4
   Direct Examination by Ms. Van Aken                      677       4
5  Cross Examination by Mr. Patterson                      720       4
   Redirect Examination by Ms. Van Aken                    796       4
6

7  **MEYER, ILAN**
   (SWORN)                                                 806       4
8  Direct Examination by Mr. Dusseault                     806       4
   Cross Examination by Mr. Nielson                        882       4
9  Direct Examination by Mr. Dusseault                     974       4
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **I N D E X**

2

3 **PLAINTIFFS' EXHIBITS**          **IDEN**   **VOL.**   **EVID**   **VOL.**

4  803                                                    788      4
   805                                                    726      4
5  807                                                    788      4
   809                                                    787      4
6  810                                                    703      4
   811                                                    714      4
7  815                                                    731      4
   817                                                    740      4
8  845                                                    771      4
   900                                                    816      4
9  922                                                    816      4
   923                                                    816      4
10 926                                                    816      4
   927                                                    816      4
11 955                                                    816      4
   962                                                    816      4
12 973 - 976                                              816      4
   978 - 984                                              816      4
13 987 - 999                                              816      4
   1002 - 1005                                            816      4
14 1008                                                   816      4
   1010 - 1016                                            816      4
15 1020                                                   816      4
   1168                                                   816      4
16 1374                                                   816      4
   1378                                                   816      4
17 1471                                                   816      4
   1734                                                   734      4
18 1735                                                   734      4
   1736                                                   737      4
19 2260                                                   696      4
   2324                                                   680      4
20 2328                                                   816      4

21 (Exhibits continued on next page)

22

23

24

25

**EXHIBIT INDEX (CONTINUED):**

| DEFENDANTS' EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 698 | | | 775 | 4 |
| 852 | | | 760 | 4 |
| 854 | | | 792 | 4 |
| 934 | | | 885 | 4 |
| 1067 | | | 968 | 4 |
| 1248 | | | 959 | 4 |
| 1249 | | | 945 | 4 |
| 1253 | | | 909 | 4 |
| 1287 | | | 767 | 4 |
| 2519 | | | 896 | 4 |
| 2558 | | | 764 | 4 |
| 2671 | | | 772 | 4 |
| 2672 | | | 779 | 4 |

1

2

3

4

5                        **<u>CERTIFICATE OF REPORTERS</u>**

6            We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

7    Official Reporters for the United States Court, Northern

8    District of California, hereby certify that the foregoing

9    proceedings in C 09-2292 VRW, **Kristin M. Perry, et al. vs.**

10   **Arnold Schwarzenegger, in his official capacity as Governor of**

11   **California**, **et al**., were reported by us, certified shorthand

12   reporters, and were thereafter transcribed under our direction

13   into typewriting; that the foregoing is a full, complete and

14   true record of said proceedings at the time of filing.

15

16            _____/s/ Katherine Powell Sullivan_____

17

          Katherine Powell Sullivan, CSR #5812, RPR, CRR
18                        U.S. Court Reporter

19

20

21            _____/s/ Debra L. Pas_____

22            Debra L. Pas, CSR #11916, RMR CRR
                        U.S. Court Reporter
23

24            Friday, January 15, 2010

25