1  GIBSON, DUNN & CRUTCHER LLP
   Theodore B. Olson, SBN 38137
2  *tolson@gibsondunn.com*
   Matthew D. McGill, *pro hac vice*
3  Amir C. Tayrani, SBN 229609
   1050 Connecticut Avenue, N.W., Washington, D.C. 20036
4  Telephone: (202) 955-8668, Facsimile: (202) 467-0539

5  Theodore J. Boutrous, Jr., SBN 132009
   *tboutrous@gibsondunn.com*
6  Christopher D. Dusseault, SBN 177557
   Ethan D. Dettmer, SBN 196046
7  Sarah E. Piepmeier, SBN 227094
   Theane Evangelis Kapur, SBN 243570
8  Enrique A. Monagas, SBN 239087
   333 S. Grand Avenue, Los Angeles, California 90071
9  Telephone: (213) 229-7804, Facsimile: (213) 229-7520

10 BOIES, SCHILLER & FLEXNER LLP
   David Boies, *pro hac vice*
11 *dboies@bsfllp.com*
   333 Main Street, Armonk, New York 10504
12 Telephone: (914) 749-8200, Facsimile: (914) 749-8300

13 Jeremy M. Goldman, SBN 218888
   *jgoldman@bsfllp.com*
14 Theodore H. Uno, SBN 248603
   1999 Harrison Street, Suite 900, Oakland, California 94612
15 Telephone: (510) 874-1000, Facsimile: (510) 874-1460

16 Attorneys for Plaintiffs
   KRISTIN M. PERRY, SANDRA B. STIER,
17 PAUL T. KATAMI, and JEFFREY J. ZARRILLO

18               **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20 KRISTIN M. PERRY, *et al.,*                  CASE NO. 09-CV-2292 VRW

21                       Plaintiffs,
   and                                          **DECLARATION OF REBECCA JUSTICE**
22                                              **LAZARUS IN SUPPORT OF PLAINTIFFS'**
   CITY AND COUNTY OF SAN FRANCISCO,            **OPPOSITION TO PROPONENTS' MOTION**
23                                              **TO AMEND JANUARY 8, 2010**
                         Plaintiff-Intervenor,  **DISCOVERY ORDER**
24           v.
                                                Trial Date:  January 11, 2010
25 ARNOLD SCHWARZENEGGER, *et al.,*             Judge:  Chief Judge Walker
                                                Location:  Courtroom 6, 17th Floor
26                       Defendants,
   and
27 PROPOSITION 8 OFFICIAL PROPONENTS
   DENNIS HOLLINGSWORTH, *et al.,*
28
                    Defendant-Intervenors.

Gibson, Dunn &
Crutcher LLP

09-CV-2292 VRW   DECLARATION OF REBECCA JUSTICE LAZARUS IN SUPPORT OF OPPOSITION TO
                          PROPONENTS' MOTION TO AMEND

Dockets.Justia.com

I, Rebecca Justice Lazarus, declare as follows:

1.      I, Rebecca Justice Lazarus, am an attorney at law, duly licensed to practice before all courts of the State of California and before the United States District Court for the Northern District of California.  I am an associate with Gibson, Dunn & Crutcher LLP, counsel of record for Plaintiffs in the above-captioned matters.  I have personal knowledge of the facts stated herein and could and would testify competently thereto if called upon to do so.

2.      Attached hereto as **Exhibit A** is a true and correct copy of a letter sent on October 5, 2009 from Plaintiffs' counsel, Ethan Dettmer, to Proponents' counsel, Nicole Jo Moss, containing a revised request for production number 8.

3.      On January 10, 2010, at approximately 12:00 p.m., Proponents produced 1,489 pages of documents to Plaintiffs.

4.      On January 13, 2010, at approximately 8:49 p.m., Proponents produced 5,007 pages of documents on behalf of counsel for Defendant-Intervenor Hak-Shing William Tam.

5.      On January 14, 2010, Proponents produced 5,741 pages of documents in three separate productions, beginning shortly after 5:00 p.m. and ending shortly after 8:00 p.m.

6.      On January 15, 2010, at approximately 4:55 p.m., Proponents produced 1,255 pages of documents.

7.      On January 17, 2010, at approximately 11:07 a.m., Jesse Panuccio, counsel for Proponents, notified counsel for Plaintiffs that Proponents intended to file a motion to amend the Court's January 8, 2010 discovery order and a third declaration of Ronald Prentice as soon as the ECF system became available.  A true and correct copy of that email message is attached hereto as **Exhibit B**.

8.      On January 17, 2010, at approximately 11:08 a.m., Jesse Panuccio, counsel for Proponents, notified counsel for Plaintiffs that Proponents' production was "complete," but was

"subject to" Proponents' Motion to Amend.  A true and correct copy of that email message is attached hereto as **Exhibit C**.

9.      On January 16, 2010, beginning at approximately 11:22 p.m. and continuing over the next twelve hours, counsel for Proponents notified counsel for Plaintiffs that it had produced over 9,000 pages of documents on behalf of themselves and Dr. Tam.

10.     On January 17, 2010, at approximately 1:52 p.m., in response to my inquiry as to whether Proponents were withholding documents on the basis set forth in their motion, counsel for Proponents responded that Proponents had withheld ninety-seven (97) documents from the production on the grounds set forth in Proponents' Motion to Amend.  A true and correct copy of that email message is attached hereto as **Exhibit D**.

11.     Attached hereto as **Exhibit E** is a true and correct copy of excerpts from the deposition of Ronald Prentice, taken on December 17, 2009.

12.     Attached hereto as **Exhibit F** is a true and correct copy of excerpts from the deposition of Edward Dolejsi, taken on December 16, 2009.

13.     Attached hereto as **Exhibit G** is a true and correct copy of excerpts from the deposition of Jeffrey Flint, taken on December 18, 2009.

14.     Attached hereto as **Exhibit H** is a true and correct copy of excerpts from the deposition of Ronald Prentice, taken on December 18, 2009.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19th day of January, 2010.

By:_____/s/_____
                Rebecca Justice Lazarus

## ATTESTATION PURSUANT TO GENERAL ORDER NO. 45

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

_/s/ Theodore Boutrous, Jr_
Theodore Boutrous, Jr.

1

Gibson, Dunn & Crutcher LLP

# Exhibit A

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

555 Mission Street, Suite 3000  San Francisco, California 94105-2933
(415) 393-8200
www.gibsondunn.com

EDettmer@gibsondunn.com

October 5, 2009

| | |
|---|---|
| Direct Dial<br>(415) 393-8292<br>Fax No.<br>(415) 374-8444 | Client No.<br>T 36330-00001 |

*VIA ELECTRONIC MAIL*

Nicole Jo Moss, Esq.
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036

> Re:   *Perry, et al. v. Schwarzenegger, et al.,*
> *N.D. Cal. No. C-09-2292 VRW*

Dear Nicole:

Pursuant to the Court's Order of October 1, 2009 (see Dkt. #214 at pp. 16-17), I have set forth below Plaintiffs' revised request for production number 8.  I am generally available this week to discuss with you any objections and the scope of your production in response to this revised request.  As I mentioned on our phone call last week, I would like to follow up with you regarding Defendant-Intervenors' supplemental production in light of the Court's October 1 Order.  Please let me know at your earliest convenience when you can discuss these matters.

<ins>Revised Request No. 8</ins>

The following request is limited to those who (1) had any role in managing or directing ProtectMarriage.com or the Yes on 8 campaign, or (2) provided advice, counseling, information, or services with respect to efforts to encourage persons to vote for Prop. 8 or otherwise to educate persons about Prop. 8, including its meaning, intent, effects if enacted, or effects if rejected; including communications among and between any two or more of the following persons or entities:  Defendant-Intervenors, members of the Ad Hoc Committee described at the September 25, 2009 hearing in this matter, Frank Schubert, Jeff Flint, Sonia Eddings Brown, Andrew Pugno, Chip White, Ron Prentice, Cheri Spriggs Hernandez, Rick Ahern, Laura Saucedo Cunningham, Schubert Flint Public Affairs, Lawrence Research, Bader & Associates, Bieber Communications, Candidates Outdoor Graphic Service Inc., Cardinal Communication

GIBSON, DUNN & CRUTCHER LLP

Nicole Jo Moss, Esq.
October 5, 2009
Page 2

Strategies, Church Communication Network Inc., The Monaco Group, Connell Donatelli, Message Impact Consulting, K Street Communications, Marketing Communications Services, Sterling Corp., and JRM Enterprises.

     Please produce all versions of any documents within your possession, custody or control that constitute analyses of, or communications related to, one or both of the following topics: (1) campaign strategy in connection with Prop. 8; and (2) messages to be conveyed to voters regarding Prop. 8, without regard to whether the voters or voter groups were viewed as likely supporters or opponents or undecided about Prop. 8 and without regard to whether the messages were actually disseminated or merely contemplated.

* * * * *

     I look forward to talking with you soon.

                    Very truly yours,

                    Ethan D. Dettmer

cc:    All Counsel

100740108_1.DOC

# Exhibit B

## Justice Lazarus, Rebecca

| | |
|---|---|
| **From:** | Jesse Panuccio [jpanuccio@cooperkirk.com] |
| **Sent:** | Sunday, January 17, 2010 11:07 AM |
| **To:** | Bailey, Landon; Bernstein, Erin; Bettan, Richard; Boutrous Jr., Theodore J.; Burns, Gordon; Campbell, J; Chhabria, Vince; Chou, Danny; Chuck Cooper; Daly, Catheryn; Dettmer, Ethan D.; Dusseault, Christopher D.; Flynn, Ronald; Goldman, Jeremy; Gosling, Kelcie M.; Janky, Mary; Justice Lazarus, Rebecca; Kapur, Theane Evangelis; Knight, A; Kolm, Claude; Lee, Mollie; Malzahn, Scott; Martinez, Judith; Martinez, Manuel; McGill, Matthew D.; Mennemeier, Kenneth C.; Monagas, Enrique A.; Nicole Moss; Howard Nielson; Olson, Theodore B.; Pachter, Tamar; Pete Patterson; Piepmeier, Sarah E.; Raum, Brian; Richardson, Beko; Schiller, Josh; Stewart, Therese; Stroud, Andy; Tayrani, Amir C.; David Thompson; Uno, Theodore; Van Aken, Christine; Washington, Brian; Whitehurst, Judy; Matsumura, Kaiponanea T; Moon, Gina |
| **Subject:** | Perry v. Schwarzenegger, No. 09-2292 |
| **Attachments:** | 1-17-10 Mot. to Amend Jan. 8 Order FINAL.pdf; 1-17-10 REDACTED Prentice Decl. in Support of Mot. to Amend FINAL.pdf; 1-17-10 Mot. to Seal FINAL.pdf; 1-17-10 Mot. to Seal -- Decl. in Support FINAL.pdf; 1-17-10 Mot to Seal -- Proposed Order FINAL.pdf |

Dear Counsel:

Attached to this email, please find copies of papers that Defendant-Intervenors plan to file with the Court as soon as some means of doing so become available. The papers cannot be filed this morning because the Court's ECF and email systems have been shut down and the Court has no accessible drop box for manual filings on weekends or weeknights.

Regards,

Jesse

---------------------------

Jesse Panuccio
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Phone: (202) 220-9600
Fax: (202) 220-9601
www.cooperkirk.com

# Exhibit C

## Justice Lazarus, Rebecca

| | |
|---|---|
| **From:** | Jesse Panuccio [jpanuccio@cooperkirk.com] |
| **Sent:** | Sunday, January 17, 2010 11:08 AM |
| **To:** | Dettmer, Ethan D.; Justice Lazarus, Rebecca; Piepmeier, Sarah E. |
| **Cc:** | Nicole Moss |
| **Subject:** | Final production available |

Dear Ethan, Rebecca, and Sarah:

Subject to the Motion to Amend the January 8 Order that I just forwarded to all counsel, the 10th and final DEFINT production (DEFINT_PM010) is complete and available on the Proposition FTP site.

Also, the final TAM productions (TAM_PM003; TAM_PM004) are complete and available on the FTP Site.

FTP Site information:

**Address:** 

**Username:** 

**Password:** 

Regards,

Jesse

--------------------------
Jesse Panuccio
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Phone: (202) 220-9600
Fax: (202) 220-9601
www.cooperkirk.com

1

# Exhibit D

**Justice Lazarus, Rebecca**

| | |
|---|---|
| **From:** | Jesse Panuccio [jpanuccio@cooperkirk.com] |
| **Sent:** | Sunday, January 17, 2010 1:52 PM |
| **To:** | Justice Lazarus, Rebecca; Nicole Moss |
| **Cc:** | McGill, Matthew D.; Dettmer, Ethan D.; Piepmeier, Sarah E.; Nicole Moss; andrew@pugnolaw.com |
| **Subject:** | RE: Perry v. Schwarzenegger, No. 09-2292 |

Rebecca,

Ninety-seven documents are subject to the grounds laid out in the motion and have been withheld.

Thank you,

Jesse

---

**From:** Justice Lazarus, Rebecca [mailto:RJustice@gibsondunn.com]
**Sent:** Sunday, January 17, 2010 2:43 PM
**To:** Jesse Panuccio; Nicole Moss
**Cc:** McGill, Matthew D.; Dettmer, Ethan D.; Piepmeier, Sarah E.
**Subject:** RE: Perry v. Schwarzenegger, No. 09-2292

In connection with the papers you attach, please confirm if you are withholding documents on the grounds laid out in your motion and if so, how many documents you are withholding on that basis.

Rebecca Justice Lazarus
**GIBSON, DUNN & CRUTCHER LLP**
555 Mission Street, Suite 3000
San Francisco, CA 94105
Tel 415.393.8296 **|** Fax 415.374.8427
www.gibsondunn.com

**From:** Jesse Panuccio [mailto:jpanuccio@cooperkirk.com]
**Sent:** Sunday, January 17, 2010 11:07 AM
**To:** Bailey, Landon; Bernstein, Erin; Bettan, Richard; Boutrous Jr., Theodore J.; Burns, Gordon; Campbell, J; Chhabria, Vince; Chou, Danny; Chuck Cooper; Daly, Catheryn; Dettmer, Ethan D.; Dusseault, Christopher D.; Flynn, Ronald; Goldman, Jeremy; Gosling, Kelcie M.; Janky, Mary; Justice Lazarus, Rebecca; Kapur, Theane Evangelis; Knight, A; Kolm, Claude; Lee, Mollie; Malzahn, Scott; Martinez, Judith; Martinez, Manuel; McGill, Matthew D.; Mennemeier, Kenneth C.; Monagas, Enrique A.; Nicole Moss; Howard Nielson; Olson, Theodore B.; Pachter, Tamar; Pete Patterson; Piepmeier, Sarah E.; Raum, Brian; Richardson, Beko; Schiller, Josh; Stewart, Therese; Stroud, Andy; Tayrani, Amir C.; David Thompson; Uno, Theodore; Van Aken, Christine; Washington, Brian; Whitehurst, Judy; Matsumura, Kaiponanea T; Moon, Gina
**Subject:** Perry v. Schwarzenegger, No. 09-2292

Dear Counsel:

Attached to this email, please find copies of papers that Defendant-Intervenors plan to file with the Court as soon as some means of doing so become available. The papers cannot be filed this morning because the Court's ECF and email systems have been shut down and the Court has no accessible drop box for manual filings on weekends or weeknights.

Regards,

Jesse

--------------------------
Jesse Panuccio
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Phone: (202) 220-9600
Fax: (202) 220-9601
www.cooperkirk.com

========================================================================
This message may contain confidential and privileged information.  If it has
been sent to you in error, please reply to advise the sender of the error and
then immediately delete this message.
========================================================================

# Exhibit E

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

              Plaintiffs,

       vs.                         Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,

              Defendants.

_____/


Deposition of

RONALD PRENTICE

Volume I

Thursday, December 17, 2009


REPORTED BY:  LESLIE CASTRO, CSR #8876


BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

Page 2

I N D E X

Deposition of RONALD PRENTICE
Volume I, Thursday, December 17, 2009

Page
EXAMINATION BY MS. STEWART          9

Certified Questions:

Page      Line

Page 3

E X H I B I T S

Deposition of RONALD PRENTICE
Volume I, Thursday, December 17, 2009
Exhibit No.       Description          Page
1   ProtectMarriage.com "About Us"          56
    Website article
2   ProtectMarriage.com Coalition          64
    Endorsements (partial) Website article
3   Two-page Initiative Measure to be      70
    Submitted Directly to the Voters
4   Two-page "Restoring Marriage and      101
    Protecting California Children"
    Website article Update as of
5   One-page "Pastors Rapid Response Team"  105
6   Return of Organization Exempt From     116
    Income Tax, 2006
7   Return of Organization Exempt From     117
    Income Tax, 2007
8   Return of Organization Exempt From     117
    Income Tax, 2005
9   Return of Organization Exempt From     118
    Income Tax, 2007
10  Return of Organization Exempt From     119
    Income Tax, 2008

Page 4

E X H I B I T S (continued)

11  460 Recipient Committee Campaign       131
    Statement, 2007
12  ProtectMarriage.com: Vote Yes on       135
    Prop 8 Rallies
13  ProtectMarriage.com "Marriage Amendment 168
14  One-page "Protect Marriage Strategy"   182
15  "Yes on 8, Protect Marriage-Restoring  184
    Marriage and Protecting California
    Children," 12/3/09
16  ProtectMarriage.com-Resources          187
17  One-page "Instructions to Pastors"     189
18  "Restoring and Protecting Marriage:    198
    Yes on Proposition 8"
19  One-page "Why Proposition 8"           192
20  "Protect Marriage - Yes on 8           194
    Testimonials"
21  "The California Marriage Protection     195
    Act"
22  One-page "Yes on 8"                    206
23  One-page "Yes on 8 Protect Marriage"   207
24  One-page Letter dated 8/12/08          210
    From:  Most Reverend Dominic M. Luong
25  Press Release, "Prop 8 Campaign        215
    Announces Official Catholic Effort"

Page 5

E X H I B I T S (continued)

26  Double-sided Letter from Ron Prentice  216
27  One-page "ProtectMarriage.com Targets  217
    the Youth Vote with Facts...."
28  One-page "Statement on Proposition 8   222
    Passing by Ron Prentice...."
29  Pastors Rapid Response Team Conference 227
    Call, 7/30/08
30  Two-page "Catholics                    232
    ProtectMarriage.com" Sheets
31  One-page Website Letter from           234
    Jim Garlow
32  Two-sided Letter dated 10/10/08        235
    from Jim Garlow
33  Four-page Case Study "Passing Prop 8   237
34  One-page Article "How 'Yes on Prop 8'  237
    Campaign Took the Web by Storm"
35  Two-page Letter with attachments       240
    dated 10/20/08
    To: Mr. Abbott  From: ProtectMarriage.com
36  Two-sided Letter dated 11/3/08         245
    From: Jim Garlow

## Page 6

1    BE IT REMEMBERED THAT, pursuant to Notice, and on
2    Thursday, December 17, 2009, commencing at the hour of    08:55:06
3    8:55 o'clock a.m. thereof, at the SHERATON GRAND HOTEL,    08:55:25
4    Falor Room, Sacramento, California 95814, before me,    08:55:30
5    LESLIE CASTRO, a Certified Shorthand Reporter in and for    08:55:33
6    the State of California, personally appeared    08:55:37
7           RONALD PRENTICE    08:55:40
8    Called as a witness, who, being by me first duly sworn,    08:55:46
9    was thereupon examined and testified as hereinafter set    08:55:49
10   forth.    08:55:51
11         08:55:56
12   APPEARANCES:    08:55:58
13     OFFICE OF THE CITY ATTORNEY, Fox Plaza, Seventh    08:55:58
14   Floor, 1390 Market Street, San Francisco, California    08:56:02
15   94102, represented by THERESE M. STEWART, Deputy City    08:56:02
16   Attorney, appeared as counsel on behalf of the City and    08:56:05
17   County of San Francisco.    08:56:07
18     GIBSON, DUNN & CRUTCHER, LLP, 555 Mission Street,    08:56:09
19   Suite 3000, San Francisco, California 94105-2933,    08:56:11
20   represented by SARAH E. PIEPMEIER, Attorney at Law,    08:56:13
21   appeared as counsel on behalf of the Plaintiffs.    08:56:13
22     COOPER & KIRK, 1523 New Hampshire Avenue, N.W.,    08:56:16
23   Washington, D.C. 20036, represented by NICOLE J. MOSS,    08:56:19
24   Attorney at Law, appeared as counsel on behalf of    08:56:21
25   Ronald Prentice.    08:56:25

## Page 7

1    LAW OFFICES OF ANDREW P. PUGNO, 101 Parkshore    08:56:26
2    Drive, Suite 100, Folsom, California 95630, represented    08:56:28
3    by ANDREW P. PUGNO, Attorney at Law, appeared as counsel    08:56:31
4    on behalf of the Ronald Prentice.    08:56:33
5         08:56:35
6    Also Present: Mike Tunick, Videographer, Jill Habig    08:56:38
7           ---oOo---    08:56:43
8         08:56:47
9         08:56:49
10        08:56:50
11        08:56:53
12        08:56:56
13        08:57:02
14        08:57:02
15        08:57:02
16        08:57:06
17        08:57:06
18        08:57:10
19        08:57:12
20        08:57:14
21        08:57:14
22        08:57:14
23        08:57:23
24        08:57:25
25        08:57:26

## Page 8

1           P-R-O-C-E-E-D-I-N-G-S
2      THE VIDEOGRAPHER: Going on the record at 8:55 a.m
3    it's December 17th, 2009.  Start of the deposition of
4    Mr. Ronald Prentice in the matter of Kristin and Perry,
5    et al. versus Arnold Schwarzenegger, et al.  For the
6    U.S. District Court, Northern District of California.
7    Case number 09-CV-2292 VRW.
8      We're located at the Sheraton Hotel in downtown
9    Sacramento.
10     Videographer is Mike Tunick in Rohnert Park.  And
11   I've been retained by the San Francisco City Attorney's
12   Office.
13     And if we could now have our attorneys present
14   please introduce themselves.
15     MS. STEWART:  Therese Stewart, Chief Deputy City
16   Attorney for the City and County of San Francisco here
17   to take the deposition on behalf of the plaintiffs in
18   the case.
19     MS. HABIG:  Jill Habig with the City and County of
20   San Francisco.
21     MS. PIEPMEIER:  Sarah Piepmeier, Gibson and Dunn
22   for plaintiffs.
23     MS. MOSS:  Nicole Moss with Cooper & Kirk
24   representing the defendant intervenors and the witness
25   Ronald Prentice.

## Page 9

1      MS. STEWART:  And Ms. Moss, you wanted to make a
2    statement on the record before we got started, so why
3    don't we go ahead and do that.
4      MS. MOSS:  Rather than interrupt the deposition as
5    it goes on, we just want to state at the beginning a
6    continuing objection to any question that in our view,
7    defendant intervener's view exceed the scope of what the
8    City and County of San Francisco is permitted to
9    intervene on.
10     And it's our view that none of the deposition
11   topics that were noticed for the 30(b)(6) deposition
12   ProtectMarriage. com go to the limited scope of their
13   intervention.  So we would just have that standing
14   objection.  And i won't make it then with every
15   question.
16     MS. STEWART:  Understood.
17     And just to be clear, we are here to take the
18   deposition on behalf of all the plaintiffs.
19     So can you swear the witness.
20           RONALD PRENTICE
21   being first duly sworn, testified as follows:
22   EXAMINATION BY MS. STEWART:
23     MS. STEWART: Q  Mr. Prentice, would you state your
24   full name for the record.
25     A.  Ronald Allen Prentice.

Page 50

10:01:57 1  compensation; is that correct?
10:01:58 2      A.  Correct.  I believe that I operate as its
10:02:02 3  executive director without compensation.
10:02:06 4      Q.  And what are your responsibilities as
10:02:14 5  executive director for California Renewal?
10:02:19 6      A.  Prior to -- there has been no activity by
10:02:27 7  California Renewal leading up to the
10:02:36 8  ProtectMarriage.com-Yes on 8 campaign.
10:02:41 9      Q.  I'm not sure I understand what you just said
10:02:43 10 so let me try to ask.  You say there's been no activity
10:02:49 11 by California Renewal leading up to the Yes on 8
10:02:55 12 campaign.  I'm trying to understand the connection
10:03:00 13 between California Renewal and ProtectMarriage.
10:03:04 14      Is there one?
10:03:06 15      A.  When you say "ProtectMarriage," are you
10:03:08 16 referring to the ProtectMarriage.com-Yes on 8 campaign?
10:03:13 17      Q.  Yes.
10:03:14 18      A.  The sponsoring entity was the (c)(4)
10:03:17 19 California Renewal.
10:03:19 20      Q.  The sponsoring entity of the initiative
10:03:24 21 measure?
10:03:24 22      A.  Yes, of ProtectMarriage.com-Yes on 8 campaign
10:03:30 23 committee.
10:03:40 24      Q.  So just to be clear:  California Renewal was
10:03:43 25 the sponsor of --

Page 51

10:03:44 1      (Mr. Pugno enters the room.)
10:03:47 2      MS. STEWART:  Q  -- the entity, the Yes on 8
10:03:51 3  ProtectMarriage entity or are you saying it was the
10:03:54 4  sponsor of the initiative itself, the ballot measure.
10:03:59 5      A.  To the best of my knowledge, the way that I
10:04:01 6  would frame it would be that the initiative was put
10:04:20 7  forth by the campaign committee called
10:04:24 8  ProtectMarriage.com-Yes on 8.
10:04:32 9      Q.  Okay.
10:04:32 10      So ProtectMarriage.com-Yes on 8 actually was
10:04:36 11 the official proponent or an official proponent of
10:04:41 12 Proposition 8; is that correct?
10:04:44 13      MS. MOSS:  Object to the extent it calls for a
10:04:46 14 legal conclusion.
10:04:48 15      MS. STEWART:  I'm asking for his understanding
10:04:49 16 counsel.
10:04:52 17      THE WITNESS:  I believe that there was a campaign
10:04:56 18 committee formed and there were individual proponents.
10:05:01 19      MS. STEWART:  Q  But just from a lay person's
10:05:03 20 understanding, how was ProtectMarriage.com, the entity,
10:05:07 21 involved in that process?
10:05:13 22      A.  ProtectMarriage.com-Yes on 8, to the best of
10:05:15 23 my understanding, is primarily formed ballot measure
10:05:18 24 committee.
10:05:19 25      Q.  And who formed that ballot measure committee?

Page 52

10:05:23 1      A.  It was created by an ad hoc executive
10:05:26 2  committee.
10:05:27 3      Q.  And earlier you said something about
10:05:32 4  California Renewal being the sponsoring -- I can't
10:05:37 5  remember the language you used -- but member or
10:05:39 6  sponsoring -- in some way sponsoring.  And I was unclear
10:05:48 7  whether you were saying they sponsored the formation of
10:05:52 8  ProtectMarriage.com or something else.
10:05:55 9      Can you explain?
10:05:57 10      A.  Well, I'm not sure that I can explain it much
10:05:59 11 better than I have because it has to do with a lot of legal
10:06:02 12 intellect.  And it would have to do with that there is a
10:06:13 13 board of directors, too.
10:06:18 14      California Renewal who gave authority to an ad
10:06:24 15 hoc executive committee to move forward with a
10:06:28 16 primarily-formed ballot measure called
10:06:34 17 ProtectMarriage.com-Yes on 8.
10:06:40 18      Q.  I would say that's not an intellect issue, I
10:06:45 19 think it was very clear.
10:06:46 20      A.  Thank-you.  Let's just hope it's accurate.
10:06:50 21      MS. MOSS:  Can we take a bathroom break?
10:06:54 22      THE VIDEOGRAPHER:  Off record at 10:08.
10:09:30 23      (Brief break.)
10:09:30 24      (Ms. Piepmeier is not present.)
10:14:51 25      THE VIDEOGRAPHER:  Back on the record at 10:14.

Page 53

10:15:01 1      MS. STEWART:  Q  Mr. Prentice, when you were
10:15:03 2  employed by Focus on the Family, what was the
10:15:06 3  approximate annual budget of that organization?
10:15:11 4      A.  Approximately -- well, it varied within those
10:15:13 5  ten years.  Anywhere from 125 million to 145 million.
10:15:35 6      Q.  Earlier you mentioned that the board of
10:15:36 7  directors of California Renewal gave authority to an ad
10:15:39 8  hoc committee to move forward to create
10:15:42 9  ProtectMarriage.com or what became ProtectMarriage.com.
10:15:49 10      A.  Became the ballot measure committee.
10:15:56 11      Q.  What did -- well, first of all, who was on
10:16:01 12 the ad hoc committee?
10:16:04 13      A.  Of?
10:16:05 14      Q.  You said the board of directors of California
10:16:08 15 Renewal gave authority to an ad hoc committee.  And I
10:16:11 16 was wondering who was on that committee.
10:16:15 17      MS. MOSS:  And in responding to that, I'm going to
10:16:17 18 instruct you to the extent that there's a member of that
10:16:20 19 committee who has asked us to keep his identity
10:16:23 20 confidential while he pursues his claim of privilege, I
10:16:27 21 would instruct you not to reveal that identity.
10:16:29 22 Otherwise, you can respond.
10:16:30 23      MS. STEWART:  Q  And are you going to follow your
10:16:32 24 counsel's instruction?
10:16:35 25      A.  Yes.

Page 58

10:23:19 1    A. I would say that ProtectMarriage.com
10:23:24 2  used -- I would say "yes," and definitely say a
10:23:40 3  broad-based coalition -- loose -- loosely.
10:23:46 4    Q. And when you say "loosely," what do you mean?
10:23:49 5    A. It's a loosely-formed coalition.
10:23:52 6    Q. And who -- what were the organizations that
10:24:00 7  were part of that loosely-based coalition?
10:24:04 8    MS. MOSS: I'm going to object to the extent
10:24:06 9  that -- two grounds: One, I still don't think it's
10:24:13 10  clear exactly which --
10:24:13 11    THE WITNESS: I agree.
10:24:14 12    MS. MOSS: -- entity, ProtectMarriage.com entity
10:24:15 13  that you're referring to. But secondly, to the extent
10:24:18 14  you understand or believe -- understand what entity
10:24:23 15  she's referring to, if it's the Yes on 8 committee, if
10:24:28 16  they were affiliated with organizations and that's
10:24:31 17  publicly known, you can disclose that. If there was any
10:24:35 18  private affiliations that are not publicly known, I
10:24:39 19  instruct you not to answer.
10:24:40 20    THE WITNESS: And I interpret your question to
10:24:42 21  refer to the Yes on 8 campaign. And there were people
10:24:46 22  that would go on to the website and sign on endorsing
10:24:50 23  it. And that's how loose and how broad-based we
10:24:55 24  interpreted the coalition to be.
10:24:58 25    MS. STEWART: Q And so when the website here

Page 59

10:25:07 1  refers to a broad-based coalition of organizations,
10:25:09 2  churches and individuals, was that coalition formed
10:25:18 3  solely by people signing on to the website?
10:25:21 4    A. Well, actually, as I see at the bottom of
10:25:24 5  this, it says "2005." So this may be -- if it's 2005,
10:25:31 6  it obviously came before the formation of the ballot
10:25:36 7  measure committee.
10:25:41 8    And I don't know even then whether -- well,
10:25:43 9  there's a page on the left it says "Endorsement" so I
10:25:47 10  guess there was opportunity for people to align with
10:25:51 11  this general cause.
10:25:53 12    Q. So let me go back to 2005 then.
10:25:56 13    And ask you: Was -- was there an entity to
10:26:03 14  your knowledge called ProtectMarriage.com in 2005?
10:26:10 15    A. No, not an entity. There have been times
10:26:20 16  over -- there have been -- ProtectMarriage.com has been
10:26:26 17  more a general -- general purpose of -- for the benefit
10:26:38 18  of traditional marriage. And there have been -- and
10:26:45 19  prior to the Yes on 8 campaign, there was not an
10:26:51 20  official entity.
10:26:54 21    Q. Was there something other than an official
10:26:58 22  entity that you understood ProtectMarriage.com to refer
10:27:04 23  to before -- let's say before 2008?
10:27:12 24    A. I think that I understood ProtectMarriage.com
10:27:17 25  prior to the ballot measure committee to be, again, a --

Page 60

10:27:24 1  a generally directed purpose, not an entity.
10:27:33 2    Q. Was it a coalition?
10:27:39 3    A. Only to the extent that people aligned with a
10:27:42 4  generally directed purpose.
10:27:45 5    Q. Do you recall who was part of that coalition
10:27:55 6  prior to the 2008?
10:27:57 7    A. Prior to the forming of the ballot measure
10:27:58 8  committee, as it reads here, it's a broad-based
10:28:06 9  coalition of organizations, churches and individuals,
10:28:08 10  and so there was no list. There was no -- there was no
10:28:16 11  entity.
10:28:17 12    Q. Was there a website?
10:28:20 13    A. Apparently, this came off of a website and
10:28:24 14  it's copyright '05.
10:28:26 15    Q. And did you have anything to do with that
10:28:28 16  website prior to 2008?
10:28:37 17    A. I did not have anything to do with the
10:28:39 18  creation of the website, no.
10:28:42 19    Q. Do you know who did?
10:28:48 20    A. There has been a -- a changing relatively
10:28:57 21  fluid group of individuals who attempted to keep the
10:29:07 22  public informed of what was going on legally with
10:29:12 23  marriage.
10:29:15 24    Q. But do you know who created the
10:29:22 25  ProtectMarriage.com website that existed before 2008?

Page 61

10:29:31 1    A. I go not know who is responsible for its
10:29:33 2  creation.
10:29:36 3    Q. Was it someone who worked for the California
10:29:36 4  Family Council?
10:29:37 5    A. No.
10:29:37 6    Q. And I believe you said that California Renewal
10:29:42 7  had no employees; correct?
10:29:43 8    A. Correct.
10:29:46 9    Q. So you have no idea, as you sit here, who was
10:29:49 10  responsible for creating the ProtectMarriage.com website
10:29:53 11  before 2008?
10:29:54 12    A. Well, I have some idea in that I've referred
10:29:58 13  to a fluid committee of people. But I do not -- I do
10:30:03 14  not know precisely who pulled this trigger.
10:30:08 15    Q. If you look at the bottom of Exhibit 1,
10:30:10 16  there's a copyright designation it says "Copyright 2005
10:30:16 17  ProtectMarriage.com."
10:30:17 18    Do you see that?
10:30:18 19    A. Yes.
10:30:18 20    Q. And then it also says "After all rights
10:30:23 21  reserved," it says "ProtectMarriage.com, a project of
10:30:29 22  California Renewal."
10:30:29 23    Do you see that?
10:30:30 24    A. Yes.
10:30:31 25    Q. Was there a project of California Renewal in

| | Page 82 |
|---|---|

11:13:13  1    go ahead to -- let me back up.

11:13:22  2         Did the California Renewal board ask the

11:13:28  3    individuals you mentioned to serve on a committee at

11:13:33  4    some point in time?

11:13:35  5         A. I apologize that I don't have knowledge of the

11:13:39  6    timing of the minutes of the California Renewal board I

11:13:46  7    would say that I lack a definite date as to when that

11:13:54  8    took place.

11:13:55  9         Q. But it did take place?

11:13:57  10        A. In terms of asking those specific individuals?

11:13:59  11        Q. Yes.

11:13:59  12        A. I think it was more -- I was given the

11:14:01  13   authority to move forward with the ballot measure being

11:14:12  14   a project of California Renewal.

11:14:17  15        Q. And did you request the other members -- the

11:14:20  16   people who became the members of the executive committee

11:14:23  17   to serve in that capacity?

11:14:28  18        A. It's an odd -- it's an odd thing to try to

11:14:33  19   describe because we can talk about an ad hoc executive

11:14:36  20   committee and even that we wouldn't have referred to

11:14:44  21   ourselves as "members."  We were -- we were n an

11:14:50  22   association of individuals who by our discussions

11:14:57  23   recognized the need or the desire to move forward.

11:15:03  24        Q. All right.

11:15:04  25        A. Sorry.

| | Page 83 |
|---|---|

11:15:04  1         Q. You said California Renewal --

11:15:10  2         MS. STEWART: Can you read back, like, two answers

11:15:13  3    ago.

11:15:31  4              (Record read.)

11:15:35  5         MS. STEWART: Q  When you were given the authority

11:15:37  6    to move forward with the ballot measure being a project,

11:15:39  7    California Renewal, did you go to Mr. Dolejsi and

11:15:44  8    Mr. Jansson and Mr. or Ms. Doe and ask them to assist

11:15:50  9    you in that endeavor in some way?

11:15:53  10        A. There was no -- there was no official moment

11:15:56  11   in time when I went to any one of them and said, "Will

11:15:58  12   you assist me?"  There was dialogue.  And as a group of

11:16:08  13   individuals, we said, "Let's move forward."

11:16:11  14        Q. And when did you decide to move forward as a

11:16:13  15   group of individuals?

11:16:17  16        A. I -- I have attempted to answer that and --

11:16:23  17        Q. You can say you don't remember.

11:16:26  18        A. I don't recall beyond middle of '07.

11:16:28  19        Q. And what was the function of the executive

11:16:32  20   committee?

11:16:40  21        A. To identify the strategic plan for the ballot

11:16:48  22   measure.  To give consideration to the selection of

11:16:56  23   vendors that would be necessary.  And to identify a

11:17:03  24   fundraising plan.

11:17:11  25        Q. And did the executive committee carry out

| | Page 84 |
|---|---|

11:17:15  1    those functions?

11:17:16  2         A. Yes.

11:17:19  3         Q. Did the executive committee oversee any aspect

11:17:22  4    of the campaign after the measure was qualified for the

11:17:27  5    ballot?

11:17:31  6         A. The executive committee met and received

11:17:34  7    reports and gave and supervised the primary vendors that

11:17:42  8    were selected, yes.

11:17:45  9         Q. So is it fair to say that the first job that

11:17:52  10   the executive committee had was to get a measure

11:17:56  11   qualified for the ballot?

11:17:58  12        A. Yes.

11:18:00  13        Q. First big job anyway?

11:18:01  14        A. Uh-huh.

11:18:02  15        Q. And how did the executive committee do that?

11:18:11  16        A. Through communication, through informing the

11:18:14  17   general population of the -- of title and summary and

11:18:24  18   petitions.  By working with different networks within

11:18:32  19   the State, whether if be individuals who would contact

11:18:38  20   us and say "We want to help with petitions," and we

11:18:43  21   would just attempt to make it something better than

11:18:48  22   chaos in getting those petitions out.

11:18:51  23        Q. And when you say "networks within the State,"

11:18:54  24   what networks?

11:18:56  25        A. They were -- there again, there were -- there

| | Page 85 |
|---|---|

11:19:03  1    were local networks of people who would say we're part

11:19:10  2    of this church or we're part of -- we're a group of

11:19:16  3    pastors in this area.  Or -- that's how it all came to

11:19:23  4    be.  They weren't established organizations or entities,

11:19:26  5    they were just, once again, loosely associated people

11:19:30  6    who were like-minded in this general direction.

11:19:38  7         Q. You said that you were -- strike that.

11:20:01  8              How did you -- did you raise money to do paid

11:20:08  9    signature gathering for the ballot measure?

11:20:13  10        MS. MOSS: Did you ask did or how?

11:20:15  11        MS. STEWART: Did.

11:20:16  12        THE WITNESS: Yes, we participated in that.

11:20:18  13        MS. STEWART: Q  And where did the primary

11:20:23  14   donations come from for the signature gathering?

11:20:41  15        A. Well, I think it's a matter of public record

11:20:44  16   that there were a number of different organizations that

11:20:47  17   contributed during the petition gathering.  National

11:20:51  18   Organization for Marriage was one, Focus on the Family

11:20:54  19   was another I believe were primary during --

11:21:02  20        Q. Did the church of Jesus Christ of the

11:21:03  21   Latter-Day Saints help fund the petition-gathering

11:21:10  22   effort?

11:21:14  23        A. No.

11:21:14  24        Q. Any other organizations that you can think of

11:21:15  25   that were significant donors, more than $25,000 for the

Page 90

11:29:03  1   time and I believe one direct mail piece.
11:29:07  2        Q.  And did they support other entities'
11:29:10  3   communications besides their own?
11:29:13  4        MS. MOSS:  Objection.  Lack of foundation.  If you
11:29:15  5   know, you can answer.
11:29:16  6        THE WITNESS:  I don't know.
11:29:17  7        MS. STEWART:  Q  Okay.
11:29:26  8        Q.  How many people did ProtectMarriage.com have
11:29:30  9   on its staff during the Proposition 8 campaign?
11:29:34  10       A.  How many people did the ballot measure
11:29:37  11  committee ProtectMarriage.com-Yes on 8 have on its
11:29:40  12  staff?
11:29:41  13       Q.  Correct.
11:29:43  14       A.  During the -- well --
11:29:45  15       MS. MOSS:  I --
11:29:46  16       THE WITNESS:  -- I guess I would need you to define
11:29:48  17  staff.
11:29:49  18       MS. STEWART:  Q  Employees.
11:29:51  19       A.  And does that include independent contractors?
11:29:54  20  vendors?
11:29:56  21       Q.  No.
11:29:57  22       A.  Then at the time there were -- there were, to
11:30:06  23  my knowledge, none.
11:30:08  24       Q.  Who did the day-to-day work of
11:30:12  25  ProtectMarriage.com if it had no staff?

Page 91

11:30:17  1        A.  Volunteers.
11:30:19  2        Q.  Did volunteers maintain the website?
11:30:24  3        A.  No, those were vendors.
11:30:27  4        Q.  Did you do work on the campaign?
11:30:34  5        A.  I did work for the passage of the measure.
11:30:38  6        Q.  Are you saying you did that work in a purely
11:30:40  7   volunteer capacity?
11:30:41  8        A.  I was ultimately -- California Family Council
11:30:47  9   was ultimately reimbursed for some portion of their
11:30:50  10  efforts.
11:30:53  11       Q.  How many consultants and independent
11:30:55  12  contractors did ProtectMarriage.com retain to do the
11:31:00  13  work of the campaign?
11:31:03  14       A.  The actual number of vendors was well into the
11:31:10  15  hundreds.
11:31:11  16       Q.  And who are the major ones that you can
11:31:13  17  recall?
11:31:15  18       A.  Shubert and Flint was hired to be the campaign
11:31:18  19  management firm.  Lawrence Research did our focus groups
11:31:25  20  and surveys and polling.  Steve Linder was hired for
11:31:31  21  some fundraising work.  Those are the primaries.
11:31:40  22       Q.  How about Bader and Associates?
11:31:43  23       A.  Bader was used during the petition gathering
11:31:45  24  as the -- as the primary firm.
11:31:52  25       Q.  How about Mr. Pugno?

Page 92

11:31:57  1        A.  Mr. Pugno served as the general counsel to
11:32:00  2   the -- to the ad hoc executive committee.
11:32:19  3        Q.  And what was -- did candidates Outdoor Graphic
11:32:25  4   Service serve as a consultant?
11:32:27  5        A.  Outdoor Graphics Service?  I'm not sure who
11:32:33  6   that was.  A fair amount of these vendors that were
11:32:37  7   selected were done so by Shubert and Flint.
11:32:39  8        Q.  And how about Valley Press?
11:32:47  9        A.  That may have been used for direct mail.
11:32:50  10       Q.  And Cardinal Communications Strategies?
11:32:56  11       A.  I'm sorry, I don't know who that is.
11:32:58  12       Q.  K Street Communication?
11:33:01  13       A.  K Street Communications was hired and served
11:33:07  14  for a number of weeks as -- in public relations during
11:33:10  15  the campaign.
11:33:13  16       Q.  And Complete Campaigns?
11:33:17  17       A.  Complete Campaigns was the donation source
11:33:22  18  online.
11:33:23  19       Q.  So they were an online fundraiser?
11:33:26  20       A.  No.  No.  I believe they were -- I believe
11:33:28  21  that they were the online entity through which donations
11:33:36  22  were gathered.
11:33:37  23       Q.  The technology?
11:33:38  24       A.  Yes.
11:33:47  25       Q.  And how about Meta Information Service?

Page 93

11:33:50  1        A.  That was -- they were used for the gathering
11:33:56  2   of our mail.
11:34:00  3        Q.  And Sterling --
11:34:02  4        A.  Was the -- the Steve Linder is the president of
11:34:08  5   Sterling.
11:34:13  6        Q.  And that they were hired to do fundraising?
11:34:17  7        A.  Fundraising.
11:34:18  8        Q.  And how about the Monaco Group, what were they
11:34:22  9   paid to do.
11:34:23  10       A.  I'm sorry.  I would probably be able to
11:34:26  11  Identify a person's name, but I don't know the name of
11:34:28  12  the group.
11:34:30  13       Q.  And you said Lawrence Research did your
11:34:31  14  polling?
11:34:32  15       A.  Yes, and our focus groups.
11:34:39  16       Q.  Were there any other polling consultants?
11:34:46  17       A.  Not to my knowledge.
11:34:49  18       Q.  And The Broadcast Team, what did they do?
11:34:52  19       A.  Is that an official entity The Broadcast Team?
11:34:52  20       Q.  Insofar as it apparently received $120,000, I
11:34:58  21  assume it's an official entity.
11:35:03  22           But I take it you're not familiar --
11:35:05  23       A.  Correct.
11:35:08  24       Q.  -- with their work?
11:35:10  25           And Engage LLC, do you know what they did?

Page 94

11:35:13  1    A.  Yes.  They created and managed the website.
11:35:24  2    Q.  Was the website creation and management under
11:35:30  3  the umbrella of your responsibilities for
11:35:33  4  ProtectMarriage?
11:35:37  5    A.  Ultimately, it was under the umbrella of the
11:35:41  6  responsibility of the ad hoc executive committee.  It
11:35:44  7  was -- the primary supervision to it came from Shubert
11:35:49  8  and Flint.
11:35:51  9    Q.  Did you oversee Shubert and Flint?
11:35:56 10    A.  The ad hoc executive committee did, yes.
11:36:04 11    Q.  Did you have a title other than being on the
11:36:07 12  ad hoc executive committee with ProtectMarriage.com?
11:36:13 13    A.  I was ultimately given the title within the
11:36:16 14  committee as chairman.
11:36:21 15    Q.  What were your responsibilities as chairman of
11:36:25 16  ProtectMarriage.com?
11:36:30 17    A.  The committee worked very cooperatively with
11:36:39 18  much discussion.  My role was primarily that of
11:36:44 19  facilitator of discussion.
11:36:47 20    Q.  Facilitator of discussion by the executive
11:36:51 21  committee?
11:36:51 22    A.  Yes.
11:36:56 23    Q.  And are you saying that you had no other
11:36:59 24  responsibilities distinct from your responsibilities as
11:37:02 25  an executive committee member?

Page 95

11:37:05  1    A.  I was a volunteer for the -- for the passage
11:37:09  2  of the measure but within the committee, my primary role
11:37:14  3  as chairman, as odd as it may sound, was that I
11:37:19  4  facilitated the discussion to come to decisions.
11:37:24  5    Q.  And earlier you listed as the responsibilities
11:37:31  6  of the executive committee, I think you listed three
11:37:35  7  things.  And I'm just going to bullet point them again
11:37:38  8  and ask you if we've missed any.
11:37:41  9       And now I want to encompass not only the
11:37:44 10  period of signature gathering, but the campaign as a
11:37:47 11  whole.
11:37:48 12    A.  Yes.
11:37:48 13    Q.  Do you understand?
11:37:48 14    A.  Yes.
11:37:49 15    Q.  So the responsibilities that you identified
11:37:53 16  were identifying strategic -- a strategic plan for the
11:37:59 17  ballot measure.  Giving consideration to selection of
11:38:04 18  vendors.  And identifying fundraising -- a fundraising
11:38:09 19  plan.
11:38:09 20    A.  Uh-huh.
11:38:11 21    Q.  Were there other responsibilities that the
11:38:15 22  executive committee had in connection with the
11:38:19 23  Proposition 8 campaign?
11:38:21 24    A.  Our primary responsibility was to hire
11:38:26 25  competent vendors and to oversee their activities, and

Page 96

11:38:29  1  to receive reports from those vendors.  And also to be
11:38:36  2  informed of their strategic plan and plans for
11:38:40  3  implementation.  And we would then provide them with
11:38:43  4  feedback.
11:38:51  5    Q.  And did you -- did the executive committee
11:38:54  6  carry out those responsibilities?
11:38:56  7    A.  Yes.
11:38:57  8    Q.  And did you carry them out to the best of your
11:39:00  9  ability?
11:39:01 10    A.  Yes.
11:39:16 11    Q.  You mentioned -- the last item you said be
11:39:20 12  informed of their strategic plan.
11:39:23 13       Can you explain for me, did the executive
11:39:26 14  committee ask the consultants to create a strategic plan
11:39:30 15  which you then approved or adopted; is that how it
11:39:32 16  worked?
11:39:36 17    MS. MOSS:  I'm going to object.  I think this is
11:39:40 18  getting down into a layer that's -- I think this is
11:39:43 19  getting down into a layer that's beyond, sort of,
11:39:47 20  generalities and how the campaign organized itself and
11:39:51 21  carried out its functions.  Which I think is both
11:39:54 22  outside the scope of relevant discovery per Judge
11:39:56 23  Walker's November 11th order and protected by the First
11:40:00 24  Amendment.  So I'm going to instruct you not to answer.
11:40:45 25    MS. STEWART:  Q  Did you, as part of your

Page 97

11:40:53  1  responsibilities as an executive committee member,
11:40:56  2  communicate with voters or people who were potential
11:41:06  3  voters about Proposition 8?
11:41:10  4    A.  Yes.
11:41:11  5    Q.  And what -- let me step back.
11:41:23  6       Did -- did ProtectMarriage.com also -- strike
11:41:32  7  that.
11:41:32  8       Did ProtectMarriage.com engage in
11:41:36  9  communications with voters or potential voters about
11:41:41 10  Proposition 8?
11:41:42 11    A.  The ballot measure committee did engage in
11:41:45 12  communications.
11:41:48 13    Q.  And what kinds of communications did
11:41:55 14  ProtectMarriage.com engage in with voters or potential
11:42:00 15  voters?
11:42:04 16    A.  Earlier on this morning, I referred to having
11:42:09 17  looked through all of the public documents that were
11:42:13 18  compiled by Shubert and Flint post-campaign.  And they
11:42:18 19  included television and radio advertising.  They
11:42:23 20  included E-mail blasts.  There was direct mail:  Those
11:42:33 21  were the primary forms of communication.
11:42:37 22    Q.  Were there rallies held?
11:42:41 23    A.  Yes.
11:42:44 24    Q.  How about debates?
11:42:47 25    A.  There were -- I'm not aware of any debates

Page 150

02:41:30   1    Q.   And what was the event in Orange?
02:41:32   2    A.   A pastor's gathering.
02:41:34   3    Q.   Did you speak at an event in San Jose?
02:41:38   4    A.   Yes.
02:41:40   5    Q.   What was that event?
02:41:49   6    A.   That was -- that was a rally.
02:41:51   7    Q.   Do you recall where that was held?
02:41:54   8    A.   Not the name of the church.
02:41:56   9    Q.   But it was at a church?
02:41:57   10   A.   Yes.
02:41:58   11   Q.   Would it refresh your recollection if I said
02:42:01        it was something called The Church on the Hill?
02:42:02   13   A.   Yes.
02:42:11   14   Q.   Do you recall who invited you to speak at that
02:42:13        rally?
02:42:18   16   A.   No.
02:42:26   17   Q.   When you spoke at the rallies at the bus tour,
02:42:31        did you -- did you have a kind of, planned presentation
02:42:39        that you gave at each stop that was the same for all
02:42:42        seven stops?
02:42:46   21   A.   No.
02:42:48   22   Q.   Okay.
02:42:50   23        Tell me a little bit more about the bus tour
02:42:53        because we haven't talked about that.
02:42:55   25        What was that about and what was it like?

Page 151

02:42:58   1    A.   Well, it was a rally to bring people together.
02:43:06   2    Q.   And where were the stops for that rally?
02:43:13   3    A.   Other than the seven that I've mentioned?
02:43:15   4    Q.   Well, you mentioned cities.
02:43:16   5        But were they at churches at each city? were
02:43:19        they at schools? were they at particular kinds of
02:43:23        locations?
02:43:25   8    A.   Those that I attended were churches and open
02:43:33        space.
02:43:36   10   Q.   Who else -- so did you actually travel by bus
02:43:40        with this bus tour?
02:43:41   12   A.   No.
02:43:42   13   Q.   You would, sort of, drive in or fly in to the
02:43:46        location and join the group?
02:43:50   15   A.   I -- I -- I would show up.
02:43:55   16   Q.   Was there an actual bus for the bus tour?
02:44:01   17   A.   Yes.
02:44:02   18   Q.   Who were the other people who were part of
02:44:02        that bus tour in the sense of being speakers or
02:44:02        presenters?
02:44:11   21   A.   It depended on the site.  There were several.
02:44:16   22   Q.   Who are the ones that you remember?
02:44:18   23   A.   Mostly local people whose names I don't know.
02:44:24        And we would attempt to have either an executive
02:44:33        committee member or somebody from Shubert and Flint

Page 152

02:44:38   1    there.
02:44:39   2    Q.   Were they Worthlands [phonetic] a part of the
02:44:45        bus tour?
02:44:46   4    A.   One.
02:44:46   5    Q.   Which one?
02:44:47   6    A.   Sacramento.
02:44:56   7    Q.   And how about the Parker Family, were they a
02:44:59        part of the bus tour?
02:45:01   9    A.   No.
02:45:03   10   Q.   Were any of the pastors who were part of the
02:45:09        PRRT speakers on the bus tour?
02:45:16   12   MS. MOSS:   Object to lack of foundation as to --
02:45:19        he's already testified he didn't have any knowledge
02:45:22        about who was on the PPR --
02:45:28   15   MS. STEWART:  Q  Let me ask it this way:  Did
02:45:30        Pastor Garlow speak anywhere on the bus tour?
02:45:34   17   A.   He spoke in San Diego.
02:45:35   18   Q.   And did Miles McPherson participate in the bus
02:45:38        tour?
02:45:41   20   A.   Not to my knowledge.
02:45:52   21   Q.   At the San Jose rally, who were the speakers
02:45:56        besides yourself?
02:46:08   23   A.   I --
02:46:14   24   Q.   Let me see if I can refresh your recollection.
02:46:17   25        Do you recall a pastor by the name of

Page 153

02:46:18   1    Simirock?
02:46:20   2    A.   No.
02:46:21   3    Q.   Do you recall a radio -- I think a radio --
02:46:24        radio or television personality a fellow by the name of
02:46:29        Brian Sussman?
02:46:31   6    A.   No.
02:46:32   7    Q.   Do you recall Bill May?
02:46:32   8    A.   Yes.
02:46:33   9    Q.   And do you recall Bill May speaking at that
02:46:35        rally?
02:46:36   11   A.   Yes.
02:46:36   12   Q.   And how about Don Ange, do you recall --
02:46:41   13   A.   Don Ange, yes.
02:46:44   14   Q.   Sorry.
02:47:05   15        Do you know who organized the San Jose rally?
02:47:16   16   A.   I believe it was Larry Pegnam.
02:47:19   17   Q.   And who is Larry Pegnam?
02:47:22   18   A.   He's the chairman of what's called Values
02:47:27        Advocacy Council.
02:47:32   20   Q.   And what's Values Advocacy Council?
02:47:35   21   MS. MOSS:  Objection.  Lack of foundation.  If you
02:47:36        know, you can answer.
02:47:37   23   THE WITNESS:  I can't -- well, no, not accurately.
02:47:50   24   MS. STEWART:  Q  When you -- well, let me keep
02:47:53        going.  So we talked about your public speaking.

Page 270

1      DEPOSITION OFFICER'S CERTIFICATE
2
3    STATE OF CALIFORNIA              )
4                                     ) Ss.
5    COUNTY OF CONTRA COSTA           )
6
7        I LESLIE CASTRO, CSR, hereby certify:
8        I am a duly qualified Shorthand Reporter in
9    the State of California, holder of Certificate Number
10   8876 issued by the Court Reporter's Board of California
11   and which is in full force and effect.  (Fed R. Civ. P.
12   28(a)).
13       I am authorized to administer oaths of
14   affirmations pursuant to California Code of Civil
15   Procedure, Section 2093(b), and prior to being examined,
16   the deponent was first duly sworn by me.  (Fed. R. Civ.
17   P. 28(a), 30(f) (1)).
18       I am not a relative or employee or attorney or
19   counsel of any of the parties, nor am I a relative or
20   employee of such attorney or counsel, nor am I
21   financially interested in this action.  (Fed. R. Civ. P.
22   28).
23       I am the deposition officer that
24   stenographically recorded the testimony in the foregoing
25   deposition and the foregoing transcript is a true record

Page 271

1    of the testimony given by the deponent.  (Fed. R. Civ.
2    P. 30(f) (1)).
3        Before completion of the deposition, review of
4    the transcript [ ] was  [X] was not requested.  If
5    requested, any changes made by the deponent (and
6    provided to the reporter) during the period allowed, are
7    appended hereto.  (Fed. R. Civ. P. 30(a)).
8
9
10
11
12   Dated:  28th of December, 2009.
13
14
15
16       _____
17       LESLIE CASTRO, CSR
         State of California
18       CSR License No. 8876
19
20
21
22
23
24
25

Page 272

1              ERRATA SHEET
2
3    PAGE  LINE   CHANGE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   _
21       I, RONALD PRENTICE, have made the following changes
22   to my deposition taken in the matter of PERRY, ET AL.
23   vs. SCHWARZENEGGER, ET AL. taken on DECEMBER 17, 2009.
24   DATE:_____  ____  _____
               RONALD PRENTICE
25

Page 273

1          CERTIFICATION OF WITNESS
2
3
4        I, RONALD PRENTICE, hereby declare that I have read
5    the foregoing testimony, and the same is true and a
6    correct transcription of my said testimony except as I
7    have corrected.
8
9
10
11       _____
             Signature
12
13
14
15       _____
             Date
16
17
18
19
20
21
22
23
24
25

# Exhibit F

Edward Dolejsi                                          December 16, 2009
Elk Grove, CA

Page 1

 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3   KRISTIN M. PERRY, et al.,          )

 4        Plaintiffs,                   )

 5        and                          )No. 09-CV-2292 VRW

 6                                      )

 7   CITY AND COUNTY OF SAN FRANCISCO,)

 8        Plaintiff-Intervenor         )

 9   vs.                               )

10   ARNOLD SCHWARZENEGGER, et al.     )

11        Defendants,                  )

12   and                               )

13   PROPOSITION 8 OFFICIAL PROPONENTS)

14

15   DENNIS HOLLINGSWORTH, et al.      )

16        Defendant-Intervenors.      )

17           Videotaped Deposition of

18             EDWARD DOLEJSI

19         Wednesday, December 16, 2009

20                 --o0o--

21      Reported by:  CATHERINE D. LAPLANTE

22          CSR License No. 10140

23

24

25

Edward Dolejsi                                                                December 16, 2009

Elk Grove, CA

|  | Page 2 |
| --- | --- |

1
2                     A P P E A R A N C E S
3     For the Plaintiffs:
4
5         GIBSON, DUNN & CRUTCHER, LLP
6         By:  ETHAN D. DETTMER, Attorney at Law
7         555 Mission Street, Suite 3000
8         San Francisco, CA  94105-2933
9         (415) 393-8292
10
11    For the Defendants:
12        COOPER & KIRK
13        By:  NICOLE JO MOSS, Attorney at Law
14        1523 New Hampshire Avenue, N.W.
15        Washington, DC  20036
16        (202) 220-9600
17
18    For the Witness:
19        SWEENEY & GREENE, LLP
20        By:  JAMES F. SWEENEY, Attorney at Law
21        9381 East Stockton Boulevard, Suite 218
22        Elk Grove, CA  95624
23        (916) 388-5170
24
25    Also present:  Aaron Wattley, Videographer

|  | Page 3 |
| --- | --- |

1              INDEX OF EXAMINATIONS
2     EXAMINATION BY:                            PAGE
3       Mr. Dettmer                    7
4                    --oOo--
5                 E X H I B I T S
6     Exhibit No.     Description          Page
7       1    Subpoena to testify at a Deposition or     20
8            To Produce Documents, 6 pages
9       2    Ministering Together Newsletter,     27
10           October 24, 2007, 5 pages
11      3    Dominican School of Philosophy & Theology,  32
12           College of Fellows, Edward Dolejsi,
13           2 pages
14      4    Article:  Ruling in Support of Gay     41
15           Marriage Draws Criticism from Church,
16           2 pages
17      5    Article:  Catholic Conference Aims to     44
18           Defeat Marriage Bill, 2 pages
19      6    Article, CCC, Gay-Lesbian Advocates at     59
20           Odds Over Discrimination Bill, 3 pages
21      7    Subpoena to Testify at a Deposition or     72
22           To Produce Documents in a Civil Action,
23           6 pages
24      8    Proposition 8 Argument and Rebuttal,     78
25           2 pages

|  | Page 4 |
| --- | --- |

1       9    California Bishops Statements in Support    80
2            Of Proposition 8, 4 pages
3       10   News, Ballot Initiative to Protect     91
4            Marriage Receives Endorsement of
5            California Catholic Conference, 3 pages
6       11   Marriage Pledge Rally, Flow of Events     101
7       12   Marriage Pledge Rally, Flow of Events     104
8            And Talking Points, 3 pages
9       13   Yes On Prop 8 Bus Tour Local Speaker     106
10           Talking Points, Faith Based, 1 page
11      14   Yes On Prop 8 Bus Tour Local Speaker     106
12           Talking Points, Community Leader, 1 page
13      15   The ABCs of the Proposition 8 Marriage    112
14           Amendment, 1 page
15      16   Honest Answers to Questions Many     113
16           Californians are Asking About
17           Proposition 8, 1 page
18      17   ProtectMarriage.com Fact Sheet,     113
19           2 pages
20      18   ProtectMarriage.com Myths and Facts     114
21           About Proposition 8, 2 pages
22      19   E-mails between Kristin Amador and     115
23           Bill Criswell, 12 pages
24      20   E-mails between Jim Carlton and     118
25           Andrew Pugno, 6 pages

|  | Page 5 |
| --- | --- |

1       21   Memo, 10-20-08 to Jim Abbott, from     121
2            Edward Dolejsi, 4 pages
3       22   Memo, 8-12-08, to Reverend Pastors and    128
4            Priests, from Reverend Dominic Luong,
5            1 page
6       23   Volunteer for Yes on Prop 8 memo,     128
7            2 pages
8       24   Proposition 8 to Protect Marriage Receives 134
9            $1 Million Donation from the Knights
10           Of Columbus Catholic Organization, 1 page
11      25   Memo, 8-17-08, to My Brothers, 4 pages    136
12      26   Memo About Catholics for     149
13           ProtectMarriage.com, 3 pages
14      27   Knightline 5300, Division 5, August 2008,  151
15           20 pages
16      28   Memo New Marriage Pastoral Letter     156
17           From US Bishops, 63 pages
18      29   Memo Excerpts from Vatican Document     159
19           On Legal Recognition of Homosexual
20           Unions, 10 pages
21
22
23
24
25

2 (Pages 2 to 5)

Edward Dolejsi                                                    December 16, 2009

Elk Grove, CA

Page 90

1    situations, I kind of have to listen to the question and
2    decide whether I think that crosses the line.
3        MR. DETTMER:  And that's fair.  What I'm doing in
4    spending this time, this valuable time is just trying to
5    make the rest of the deposition more efficient, and
6    obviously I disagree with you on the merits, but that's not
7    the purpose of the discussion.
8        MR. SWEENEY:  I understand.  I suspect we do disagree
9    on that.
10       MR. DETTMER:  Okay.  I'm really just trying to make
11   this more efficient.
12   Q.  In light of that conversation, are you, Mr. Dolejsi,
13   aware of efforts that your organization, California Catholic
14   Conference took to publicize a statement of the California
15   Bishops regarding Proposition 8?  Well, period.
16   A.  In the public?
17   Q.  Correct.
18   A.  Yes.
19   Q.  Okay.  And what were they?
20   A.  We released a press release containing the statement to
21   the public press, and we released a press release to the
22   Catholic Press that I referenced earlier.
23   Q.  And obviously you put it on the website; we've looked
24   at that?
25   A.  Yes.

Page 91

1    Q.  Aside from those efforts that you just mentioned, were
2    there any others that you can think of to publicize this
3    document?
4    A.  We probably sent it to the National Catholic Press, but
5    I don't recall.  It would be customary to do so.
6        MR. DETTMER:  Please mark this next exhibit as number
7    10.
8        (Exhibit 10 marked.)
9        MR. DETTMER:  Exhibit 10 just for the record is, again,
10   a printout of a website page, and at the top it says:
11   Protect Marriage, dash, Yes on 8, and it says, news.
12   Underneath that it says, News.  Ballot Initiative to Protect
13   Marriage Receives Endorsement of California Catholic
14   Conference, and the date is August 4, 2008.
15   Q.  Do you recognize this, Mr. Dolejsi?
16   A.  I don't, but I know what it is.
17   Q.  What is it?
18   A.  It appears to be a copy of a website page from the
19   ProtectMarriage.com website.
20   Q.  Okay.  And I take it from your answer that you don't
21   know where ProtectMarriage.com got the statement of the
22   California Bishops, or do you?
23   A.  I would assume that they got it from the press release
24   that we released publicly.
25   Q.  And if you look at the statement I guess sort of in the

Page 92

1    middle of the page here, it says:  Today ProtectMarriage.com
2    announce the endorsement of the California Catholic
3    Conference.  The support comes from the Archdiocese of Los
4    Angeles and San Francisco, Diocese of Fresno, Monterey,
5    Oakland, Orange, Sacramento, San Bernardino, San Diego, San
6    Jose, Santa Rosa and Stockton.  Byzantine Catholic Eparchy
7    of Van Nuys, and the Maronite Catholic Eparchy of Our Lady
8    of Lebanon of Los Angeles.
9        Do you see what I've read there?
10   A.  Yes.
11   Q.  With the assistance from Mr. Sweeney.
12       Is that statement -- recognizing you didn't write it,
13   is that statement accurate?
14   A.  Yes.
15   Q.  All right.  You can put Exhibit 10 to the side.
16   A.  I was clarifying those are the organizations listed on
17   the letterhead of the California Catholic Conference, which
18   is where the proponents receive them.
19   Q.  Sure.  Okay.  That's fine.
20   A.  They've chosen to list them all.
21   Q.  I see.  And my purpose in asking, is that, in fact,
22   accurate?
23   A.  Yes, it is accurate.
24   Q.  Great.  Did you take part in public rallies in support
25   of Proposition 8?

Page 93

1    A.  You mean personally?
2    Q.  Correct.
3    A.  Yes.
4    Q.  And do you recall how many such rallies you attended?
5    A.  Let me think.
6        Four or five.
7    Q.  Do you remember where they were?
8    A.  Some of them.
9    Q.  Okay.  Which ones do you remember?
10   A.  Wesleyan Church in South Sacramento, rally in Fresno,
11   rally in Modesto, and I'm trying to remember.  There may
12   have been one more in Stockton or Merced.  I can't remember
13   exactly.
14   Q.  The one that you mentioned at the Wesleyan Church in
15   South Sacramento, do you remember how many people were
16   there?
17   A.  The general crowd?
18   Q.  Correct.
19   A.  Couple hundred.  I'm estimating.
20   Q.  Sure.  And who were the speakers?
21   A.  I only recall a few.  As I recall, Ron Prentice spoke,
22   pretty sure he spoke there.  I think -- I don't remember
23   whether -- I don't remember whether Frank Schubert spoke.
24   There was an African-American pastor who spoke, and there
25   was the Worthlands from Massachusetts who spoke, as I

Alderson Reporting Company
1-800-FOR-DEPO

Edward Dolejsi                                                December 16, 2009

Elk Grove, CA

---

Page 94

1    recall.
2    Q.  And who are the Worthlands from Massachusetts?
3    A.  They were a couple who were involved in a dispute in
4    Massachusetts about the use of certain textbooks in their
5    schools.
6    Q.  And do you know how they came to be at that rally?
7    A.  The campaign invited them to come to the rally.
8    Q.  And you spoke at that rally?
9    A.  I am trying to recall.  I spoke at others, and I'm
10   trying to recall whether I spoke at that one or not, so I
11   would have to defer to whatever the record would show there.
12   Q.  You don't remember one way or the other?
13   A.  There were rallies when I was on stage, and there were
14   rallies when I was on stage and spoke.  I remember not
15   speaking at the press conference at that one, but I can't
16   recall whether I spoke at that rally.
17   Q.  Okay.  So was it at the rallies that you attended, and
18   you've identified three that you remember and one that you
19   may remember.
20   A.  And I remember the other one was at Skyline Church in
21   San Diego.
22   Q.  Okay.  Is that in addition to the one that may have
23   been in Stockton or Merced?
24   A.  It may be.
25   Q.  I understand.  Okay.  Was there both a public rally and

---

Page 95

1    then a press conference afterwards at this rally at the
2    Wesleyan Church in South Sacramento that you mentioned?
3    A.  Yes.
4    Q.  And you remember for sure that you did not speak at the
5    press conference?
6    A.  To the best of my recollection I did not.
7    Q.  But you may or may not have spoken at the actual rally?
8    A.  To the best of my recollection.
9    Q.  Okay.  Do you remember who did speak at the press
10   conference?
11   A.  I remember Ron Prentice and the Worthlands spoke.  I
12   don't recall exactly who else would have spoken.  May have
13   spoken at that.  I know there was someone else.
14   Q.  Let me ask you about the Fresno rally.  Do you remember
15   how many people attended that rally, approximately?
16   A.  Fresno.  Where was I in Fresno?  Let me think.
17       I'm getting the venues confused between Modesto and
18   Fresno.  We were downtown.
19       But probably again 2 or 300 would be my guess.  I don't
20   know.
21   Q.  Understood.
22   A.  I recall a large number of people being there.
23   Q.  And do you remember who spoke at that rally?
24   A.  I think I spoke at that rally.  I think there was
25   another local minister who spoke.  There was a local

---

Page 96

1    minister who spoke there.  I don't recall his name.  I would
2    have to defer to the record.  I'm sure there's a public
3    record of who spoke somewhere.
4    Q.  Okay.  And was there also a press conference in
5    connection with that rally?
6    A.  Not that I recall or that I participated in.  There may
7    have been a press availability, and I'm not trying to be
8    evasive.  I just really literally don't remember because
9    there were so many events and things that were going on, and
10   I may have commented to the -- to the press and the
11   availability, but there wasn't a formal press conference
12   that I remember being set up.
13   Q.  Can you tell me your understanding of the difference
14   between a press conference and a press availability?
15   A.  As I understood it, at the press conference, we had --
16   the campaign had formally organized a press conference where
17   we were going to present, you know, definite speakers to the
18   press.
19       As I recall in the rallies, in the other rallies around
20   the State, there was more of a press availability.  We would
21   have a rally, and then there would be an availability for
22   interested press to talk to the speakers and interview
23   attendees, et cetera.
24   Q.  Okay.  Okay.  The Modesto rally that you mentioned, do
25   you remember about how many people were there?

---

Page 97

1    A.  Same amount, I guess.
2    Q.  Similar amount?
3    A.  Similar amount, yeah.
4    Q.  Okay.  Do you remember who spoke at that one?
5    A.  I did.  I do not formally remember the other
6    participants.
7    Q.  Okay.  Was there a press conference after that, after
8    that rally?
9    A.  To the best of my knowledge, there was a press
10   availability, again, to the best of my knowledge.
11   Q.  And then you had said there was another one that may
12   have been in Stockton, may have been in Merced.  Do you
13   remember better where that was?
14   A.  I don't.  I'm sorry.
15   Q.  That's fine.  And again --
16   A.  I don't.  In fact, I think it was not Stockton because
17   I think Modesto was sort of the Stockton area for us.  It
18   may have been Merced.
19   Q.  Okay.
20   A.  No.  It was -- it was Bakersfield.  There we go.  It
21   was Bakersfield.
22   Q.  Okay.  And same questions.  Do you remember about how
23   many people were there?
24   A.  I guess approximately the same amount.
25   Q.  Okay.

25 (Pages 94 to 97)

Edward Dolejsi                                                    December 16, 2009
                              Elk Grove, CA

---

Page 162

1    A.  No.
2    Q.  If you wanted to find, you know, the authoritative
3    version of any church document, where would you go to look
4    for it?
5        MR. SWEENEY:  Object.  No foundation.
6        If you know, you can answer.
7        THE WITNESS:  I'm unclear of the question, so can I --
8        MR. DETTMER:  Sure.
9    Q.  Let's say as a hypothetical situation if you wanted to
10   find the official version of some church document, some
11   church teaching, where would you go to look for it?
12   A.  If I wanted to --
13       MR. SWEENEY:  Hold on.  Object to that question because
14   that -- that is vague and ambiguous in the form of the
15   question.  Church doctrine is -- is documented in a variety
16   of sources, so you need to be more specific in your
17   questions.
18       MR. DETTMER:  Sure.
19       MR. SWEENEY:  And, again, you are getting into matters
20   of the systematic theology, which I'm not certain you have
21   any foundation to ask.
22       If you can respond to it, go ahead.
23   Q.  BY MR. DETTMER:  Let me ask you:  Have you ever -- have
24   you ever studied any -- yes or no question.
25       Have you ever studied any doctrinal writings of the

---

Page 163

1    congregation for the Doctrine of the Faith?
2    A.  Yes.
3    Q.  Okay.  And how do you get the documents that you
4    studied?  Where do you find them?
5    A.  I can either go on-line, as this document points out,
6    or a reference library that I can consult, and I can also go
7    to the United States Catholic Conference and Bishop's
8    Publishing and request that document.
9    Q.  Okay.  Have you ever gone to the Vatican website to get
10   such documents?
11   A.  Personally, no.
12   Q.  Okay.  Do you know whether that's an appropriate place
13   to go to look for them, if you know?
14   A.  I do.
15   Q.  Okay.  And do you think it is?
16   A.  It can be.
17   Q.  Okay.  Have you read this document before today, this
18   Considerations Regarding Proposals to Give Legal Recognition
19   to Unions Between Homosexual Persons?
20   A.  I have.
21   Q.  Okay.  And as we've said before, I have many questions
22   for Mr. Dolejsi about what he thinks about this document,
23   and what he thinks it means, but based on our agreements and
24   what you've guys have told me about your objections, I'm not
25   going to waste our time asking all those questions.

---

Page 164

1        MR. SWEENEY:  I've instructed him not to answer.
2        MR. DETTMER:  Okay.
3        THE WITNESS:  For the record -- also.
4        MR. SWEENEY:  Hold on.  I also would just note that he
5    has no foundation.  You're asking questions of systematic
6    theology.  There's no foundation.
7        THE WITNESS:  And just for the record, I have not seen
8    the cover to this documentation 29.  I have not seen that.
9        MR. DETTMER:  Okay.
10       THE WITNESS:  I do affirm that I have seen and read
11   this particular document.
12       MR. DETTMER:  Okay.  Why don't we go off the record for
13   a second, and then maybe we can wrap this up.
14       VIDEO OPERATOR:  We are off the record at 3:12 p.m.
15       (Off the record.)
16       VIDEO OPERATOR:  The time is 3:16 p.m., and we are back
17   on the record.
18   Q.  BY MR. DETTMER:  Mr. Dolejsi, thank you again.  Just a
19   few more questions.
20       We had talked earlier about a Steering Committee that
21   may or may not have existed at some point in time for
22   ProtectMarriage.com; is that right?
23   A.  That's correct.
24   Q.  Okay.  And so the question I guess I have just to
25   understand that a little bit better is, the questions I

---

Page 165

1    have:  Is there a steering committee of ProtectMarriage.com
2    today?
3    A.  No.
4    Q.  Was there ever a steering committee for
5    ProtectMarriage.com?
6    A.  No.
7    Q.  Okay.
8    A.  Not actually.
9    Q.  So I take from your answer that a steering committee
10   for ProtectMarriage.com was contemplated?
11   A.  Was contemplated and not realized.
12   Q.  Can you say about when that occurred, when it was
13   contemplated but not realized?
14   A.  I would -- I would speculate sometime in July or early
15   August.
16   Q.  Of 2008?
17   A.  Of 2008.
18   Q.  Okay.
19   A.  But I cannot say exactly.
20   Q.  Just to follow up on our discussion off the record.
21       My next questions all go to why was the plan not
22   realized, and I assume you're going to instruct him not to
23   answer that question?
24       MS. MOSS:  That is right.
25       MR. DETTMER:  Okay.  Well, I guess what I'll do then is

---

                                    42  (Pages 162 to 165)

Alderson Reporting Company
1-800-FOR-DEPO

Edward Dolejsi                                                      December 16, 2009

Elk Grove, CA

Page 166

1    let's close the deposition for now.  We'll see what happens
2    with the 9th Circuit or any other rulings that occur, and we
3    may or may not see you again at least before trial, so thank
4    you.
5        THE WITNESS:  Thank you.
6        MR. SWEENEY:  Thank you again.
7        MR. DETTMER:  Any questions?
8        MS. MOSS:  I have no questions.
9        MR. DETTMER:  We're off the record.
10       VIDEO OPERATOR:  This ends tape three, Volume I, of the
11   deposition of Edward Dolejsi.  This also ends his deposition
12   we are off the record at 3:19 p.m.
13       THE REPORTER:  Will you be ordering?
14       MR. DETTMER:  Yes.
15       THE REPORTER:  Mr. Sweeney, are you ordering a copy?
16       MR. SWEENEY:  I don't think so.
17       THE REPORTER:  Will you be ordering?
18       MS. MOSS:  Yes.  Absolutely.  I'd like a rough as soon
19   as possible.
20       Also, we just need the witness to have two weeks to
21   read and sign so we can get the transcript and exhibits for
22   trial.  If we can get a rough draft as soon as possible and
23   final on the 28th of December with exhibits scanned.
24       The witness -- after we get the transcript on the 28th,
25   he'll have two weeks to read and sign, and you can release

Page 167

1    the original for us to use in court.
2        THE REPORTER:  What will you be ordering?
3        MS. MOSS:  Rough and E-tran is fine.  Well, go ahead
4    and give me the hard copy.  I'll have exhibits scanned and
5    attached to the hard copy.
6        THE REPORTER:  Do you want exhibits scanned and sent to
7    you?
8        MR. DETTMER:  I want a hard copy, hard copy exhibits.
9    And E-tran of the transcript.
10       (Today's proceedings concluded at 3:26 p.m.)
11
12
13       _____
14               Edward Dolejsi
15
16
17   Subscribed and Sworn to before me this _____
18   of _____, 200_____.
19
20
21
22       _____
23               Notary Public
24
25   My Commission Expires:

Page 168

1            REPORTER'S CERTIFICATE
2
3        I, CATHERINE D. LAPLANTE, a Certified Shorthand
4    Reporter for the State of California, do hereby certify:
5        That I am a disinterested person herein; that the
6    witness, EDWARD DOLEJSI, in the foregoing deposition, was by
7    me duly sworn to testify the truth, the whole truth and
8    nothing but the truth; that the deposition was reported in
9    shorthand by me, CATHERINE D. LAPLANTE, a Certified
10   Shorthand Reporter of the State of California, and
11   thereafter transcribed into typewriting; that the foregoing
12   is a true and correct record of the testimony given by the
13   witness.
14       IN WITNESS WHEREOF, I hereby certify this transcript at
15   my office in the County of Placer, State of California, this
16   23rd day of December, 2009.
17
18
19       _____
20       CATHERINE D. LAPLANTE, CSR #10140
21
22
23
24
25

Alderson Reporting Company
1-800-FOR-DEPO

# Exhibit G

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   _____
                                   )
 4   KRISTIN M. PERRY, et al.,     )
                                   )
 5              Plaintiffs,        )
                                   )
 6   vs.                          ) No. 09-CV-2292
                                   )        VRW
 7                                )
     ARNOLD SCHWARZENEGGER, et al., )
 8                                )
                Defendants.        )
 9   _____)
10
11
12
13
14
15                  VIDEOTAPED
16           DEPOSITION OF JEFFREY FLINT
17             Sacramento, California
18           Friday, December 18, 2009
19
20
21
22
23   Reported by:  LANA L. LOPER RMR, CRR, CCP,
                    CME, CLR, CCR, CSR No. 9667
24   File No.: 9488
25   Pages 1 - 248
```

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3   _____
                                   )
 4   KRISTIN M. PERRY, et al.,     )
                                   )
 5              Plaintiffs,        )
                                   )
 6   vs.                          ) No. 09-CV-2292
                                   )        VRW
 7                                )
     ARNOLD SCHWARZENEGGER, et al., )
 8                                )
                Defendants.        )
 9   _____)
10
11
12
13
14
15
16
17
18
19       Videotaped deposition of JEFFREY FLINT, taken
20   on behalf of Plaintiffs, at 400 Capitol Mall, Suite
21   1400, Sacramento, California beginning at 8:09 a.m.
22   and ending at 4:17 p.m., on Friday, December 18,
23   2009, before Lana L. Loper, RMR, CRR, CCP, CME, CLR,
24   CCR, CSR No. 9667.
25
```

Page 3

```
 1   APPEARANCE OF COUNSEL:
 2
 3   FOR THE PLAINTIFFS:
 4       BOIES, SCHILLER & FLEXNER LLP
 5       BY:  JEREMY M. GOLDMAN, ESQ.
 6            THEODORE H. UNO, ESQ.
 7       1999 Harrison Street
 8       Suite 900
 9       Oakland, California 94612
10       510-874-1000
11       jgoldman@bsfllp.com
12       tuno@bsfllp.com
13
14   FOR THE DEFENDANT INTERVENORS:
15       COOPER & KIRK
16       BY:  CHARLES J. COOPER, ESQ.
17       1523 New Hampshire Avenue, N.W.
18       Washington, D.C. 20036
19       202-220-9600
20       ccooper@cooperkirk.com
21
22
23
24
25
```

Page 4

```
 1   APPEARANCE OF COUNSEL:
 2
 3   FOR THE DEPONENT:
 4       ADVOCATES FOR FAITH & FREEDOM
 5       BY:  ROBERT H. TYLER, ESQ.
 6       24910 Las Brisas Road
 7       #110
 8       Murrieta, California 92562
 9       951-304-7583
10       rtyler@faith-freedom.com
11
12   FOR THE DEFENDANTS GOVERNOR ARNOLD SCHWARZENEGGER
13   AND ADMINISTRATIVE DEFENDANTS:
14       MENNEMEIER, GLASSMAN & STROUD, LLP
15       BY:  ANDREW W. STROUD, ESQ.
16       980 9th Street
17       Suite 1700
18       Sacramento, California 95814
19       916-551-2590
20       stroud@mgslaw.com
21
22   ALSO PRESENT:
23       CHE PRESANT, CLVS
24       JET BYCRAFT, AUDIO SPECIALIST
25       JASON LIPTON, CASE MANAGER
```

Page 109

1   what I said earlier.  I think you asked me earlier
2   if, in a general sense, whether I engaged in a
3   lengthy process to review documents prior to this
4   deposition, and I testified that I did not.
5       The campaign was over a year ago.  I've
6   run other campaigns since then.  So I acknowledge
7   this statement as factual, that the campaign worked
8   with churches to recruit volunteers.  I'm advised by
9   my attorney that the how is privileged information.
10      If there's anything else in the public
11  domain that I'm not aware of right now that you want
12  to show me and ask me if it's also a document that's
13  accurate, I would be glad to do that, but other than
14  that, I can't answer the question.
15  BY MR. GOLDMAN:
16      Q   Let me ask you to turn to the sentence at
17  the bottom of the page, on page 45.  It says, "We
18  produced campaign materials in more than 40
19  languages," and continues on to the next page.
20      If you could read that sentence.
21      A   Okay.
22      MR. COOPER:  Can we have the sentence, in
23  its entirety, read into the record, if you're going
24  to question him about it?  Do you mind?
25      MR. GOLDMAN:  Sure.

Page 110

1   BY MR. GOLDMAN:
2       Q   The sentence says, "We produced campaign
3   materials in more than 40 languages and worked with
4   church and community leaders to distribute these
5   through the many ethnic networks that make up the
6   fabric of California."
7       A   Okay.
8       Q   I've read that sentence correctly?
9       A   Yes, you have.
10      Q   Okay.  Is it true that ProtectMarriage.com
11  gave material to churches to distribute to their
12  congregants?
13      A   Yes.
14      Q   Let me ask you to move to the next column.
15      A   (Witness complies.)
16      Q   And at the bottom of the first paragraph
17  of that column, there's a sentence that says, "We
18  then segued into potential consequences by featuring
19  a prominent law school professor, warning about
20  implications for religious freedom and freedom of
21  expression and letting voters know that as a result
22  of the court's decision, gay marriage would be
23  taught in the public schools."
24      Do you see that?
25      A   Yes, I do.

Page 111

1       Q   Do you remember the name of the law school
2   professor referred to in this paragraph?
3       A   It was Richard Patterson, I believe.
4       Q   Peterson, does that ring a bell?
5       A   Well, it's right there.
6       Richard Peterson, I see it now.  Yes,
7   correct, Richard Peterson.  I apologize.
8       Q   And what do you mean by the word
9   "prominent"?
10      MR. TYLER:  Objection.  The document
11  speaks for itself.  Except to the extent you believe
12  there is information in the public domain, wherein
13  you described what you meant by the word
14  "prominent," I instruct you not to respond.
15      THE WITNESS:  Again, you know, without
16  having a dictionary in front of me, I think I know
17  what the word "prominent" means.
18  BY MR. GOLDMAN:
19      Q   Is it true that Richard Peterson is a
20  prominent law school professor?
21      MR. TYLER:  Objection.  Argumentative.
22      Go ahead.
23      THE WITNESS:  Is it true that he's a...
24      It's -- I mean, it strikes me as a
25  subjective standard.

Page 112

1   BY MR. GOLDMAN:
2       Q   Where does Richard Peterson teach?
3       A   At the university -- Pepperdine
4   University.  I was going to say University of
5   Pepperdine, but I think it's Pepperdine University,
6   is what it is called.
7       Q   Did there come a time during the campaign
8   when Pepperdine University asked to have its name
9   removed from the ads featuring Richard Peterson?
10      A   Yes.
11      Q   And did ProtectMarriage.com remove the
12  name Pepperdine University from the ads, in response
13  to that request?
14      A   My recollection is that we removed the
15  name for a period of time, and then placed it back
16  in, with an additional disclaimer that -- something
17  to the effect that Professor Peterson's listing as a
18  Pepperdine University law school professor was a
19  title for identification purposes, and did not imply
20  the endorsement of the university itself.
21      Q   Let me ask you to turn to the last page of
22  the document, page 47.
23      A   (Witness complies.)
24      Q   And I want you to read --
25      A   Excuse me.  Sorry.  I do have a cough.

Page 237

1  yes, that's page 3 on the document.
2        THE WITNESS:  Same answer.  I'm not aware
3  of whether a letter was sent to each and/or all of
4  these companies listed on this page.
5  BY MR. GOLDMAN:
6    Q   Do you know whether a similar letter was
7  sent to any of them?
8        MR. TYLER:  I'm going to let him answer
9  after I make an objection.
10       Actually, you can respond to that.
11       THE WITNESS:  I can't name anyone
12  specifically that I know received the letter.  I
13  think there were news accounts that some did, but I
14  can't recall specifically that it said, for example,
15  AT&T or Comcast got a letter.  I don't know.
16  BY MR. GOLDMAN:
17   Q   Do you know whether ProtectMarriage.com
18  received any donations as a result of sending a
19  letter like this?
20       MR. TYLER:  Objection.
21       THE WITNESS:  No.
22       MR. TYLER:  He already responded.
23       THE WITNESS:  Sorry.
24       Well, you know, I don't know.  I mean, I
25  don't believe so, but I don't know for sure.

Page 238

1        MR. TYLER:  It's okay.
2        MR. GOLDMAN:  Why don't we take a short
3  break because I think I can wrap up soon.  And I
4  will just go through my notes and try to expedite
5  matters.
6        THE VIDEOGRAPHER:  We are going off the
7  record.  The time is approximately 4:06 p.m.
8        (Discussion off the record.)
9        THE VIDEOGRAPHER:  We are going on the
10  record.  The time is approximately 4:16 p.m.
11       MR. GOLDMAN:  Mr. Flint, I have no further
12  questions at this time, and I thank you for your
13  time today.
14       THE WITNESS:  Thank you.
15       MR. TYLER:  Thank you.
16       MR. COOPER:  Thank you.
17       MR. GOLDMAN:  We are off the record.
18       THE VIDEOGRAPHER:  We are completing
19  Volume I in the deposition of Jeff Flint.  The total
20  number of tapes will be retained by Now and Forever
21  Video, at 5633 Country Club Drive, Oakland,
22  California 94618.
23       The time is now approximately 4:17 p.m.
24  We are off the record.
25       (END TIME:  4:17 p.m.)

Page 239

1       I declare under penalty of perjury
2  under the laws of the State of California
3  that the foregoing is true and correct.
4       Executed on _____, 2009,
5  at _____, _____.
6
7
8
9       _____
10      SIGNATURE OF THE WITNESS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 240

1  STATE OF CALIFORNIA    )
                          ss:
2  COUNTY OF SAN FRANCISCO )
3
4     I, LANA L. LOPER, RMR, CRR, CCP, CME, CLR, CCR,
5  CSR No. 9667, do hereby certify:
6
7     That the foregoing deposition of JEFFREY FLINT
8  was taken before me at the time and place therein
9  set forth, at which time the witness was placed
10  under oath and was sworn by me to tell the truth,
11  the whole truth, and nothing but the truth;
12    That the testimony of the witness and all
13  objections made by counsel at the time of the
14  examination were recorded stenographically by me,
15  and were thereafter transcribed under my direction
16  and supervision, and that the foregoing pages
17  contain a full, true and accurate record of all
18  proceedings and testimony to the best of my skill
19  and ability.
20    I further certify that I am neither related to
21  counsel for any party to said action, nor am I
22  related to any party to said action, nor am I in any
23  way interested in the outcome thereof.
24
25

Page 241

1    IN WITNESS WHEREOF, I have subscribed my name
2  this 22nd day of December, 2009.
3
4  _____
5  LANA L. LOPER, RMR, CRR, CCP, CME, CLR CCR CSR 9667
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 242

1            E X H I B I T S
2            JEFFREY FLINT
3  EXHIBIT                    PAGE
4  1        Politics Magazine article      61
5  Passing Prop 8, Smart Timing
6  and Messaging Convinced
7  California Voters to Support
8  Traditional Marriage By
9  Frank Schubert and Jeff
10  Flint, February 2009
11  2        ProtectMarriage.com Media     115
12  Advisory memorandum for
13  Immediate Release dated
14  October 31, 2008
15  3       Video CD - To Protect         118
16  Children
17  4       Video CD - Power, Love and a  124
18  Sound Mind
19  5       Video CD - The ABCs of        125
20  Protecting Marriage
21  6       Video CD - The Fine Line      126
22  (defective media)
23  7       Video CD - The Fine Line      126
24  8        Video CD - AAPC Proposition   127
25  Case Study Video 1

Page 243

1            E X H I B I T S
2            JEFFREY FLINT
3  EXHIBIT                    PAGE
4  9       Video CD - AAPC Proposition    130
5  8 Case Study Video 3
6  10       Tape transcription of video   142
7  re Schubert #1, Flint #3,
8  Flint #4, Schubert #7 and
9  Schubert #8
10  11      Video CD - AAPC Proposition    148
11  8 Case Study Video 4
12  12      Video CD - AAPC Proposition    158
13  8 Case Study Video 7
14  13      Video CD - AAPC Proposition    164
15  8 Case Study Video 8
16  14      ccnews.org article Protect    165
17  Marriage Prayer Requests at
18  67 Days from November 4
19  15      Document re If someone        169
20  Answers
21  16       Document re Six Consequences  170
22  if Proposition 8 Fails...
23  17       Phase II Advocacy and        174
24  Persuasion Script
25  ///

Page 244

1            E X H I B I T S
2            JEFFREY FLINT
3  EXHIBIT                    PAGE
4  18       Saturday-Tuesday Script GOTV  181
5  November 1-4
6  19       Memo dated September 17,      183
7  2008 to Area Directors,
8  Regional Coordinators, and
9  Zip Code Supervisors from
10  Gary Lawrence
11  20       ProtectMarriage.com Media    184
12  Advisory dated June 16, 2008
13  21       ProtectMarriage.com Media    185
14  Advisory for Planning
15  Purposes
16  22      Rally signs                   186
17  23       Photocopy of bumper sticker   186
18  re Vote "YES" on Prop 8
19  24       ProtectMarriage.com Media    187
20  Advisory for Immediate Use
21  25       Joint Statement to           188
22  California Religious Leaders
23  Regarding Proposition 8
24  26       ProtectMarriage.com article  189
25  for Immediate Release

# Exhibit H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

                    Plaintiffs,

        vs.                              Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
                    Defendants.
_____/



                    Deposition of

                  RONALD PRENTICE

                    Volume II

              Friday, December 18, 2009



REPORTED BY:  LESLIE CASTRO, CSR #8876



            BONNIE L. WAGNER & ASSOCIATES
              Court Reporting Services
              41 Sutter Street, Suite 1605
            San Francisco, California 94104
                  (415) 982-4849

Page 2

1       I N D E X
2
3    Deposition of RONALD PRENTICE
4    Volume II, Friday, December 18, 2009
5
6                    Page
7    FURTHER EXAMINATION BY MS. STEWART       11
8
9
10
11
12
     Certified Questions:
13
                Page      Line
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       E X H I B I T S (continued)
2    June, 2008
3    47  Multi-page Document with Letter       73
4        attachment - To: To Whom it May Concern
5        From: Debra Bowen
6    48  Three-page Article - "Golden State,    78
7        same-sex marriages"
8    49  Three-page Article - "Changing views   81
9        on marriages"
10   50  Two-page Letter dated 3, 2008          83
11   51  Three-page Article - "Society and      84
12       same-sex marriage"
13   52  Three-page Article - "God, gays and,   87
14       government"
15   53  Three-page Article - "The future of    87
16       marriage"
17   54  Multi-page Document "Knightline 5300"  92
18   55  Two-page Article "Grossmont Union High 97
19       School District board members join
20       suit challenging anti-discrimination law
21   56  Three-page Article "First-Person:      101
22       Silencing the opposition
23   57  Three-page Values Advocacy Council     104
24       Article
25   58  One-page "VAC Position on              107

Page 3

1       E X H I B I T S
2
3    Deposition of RONALD PRENTICE
4    Volume II Friday, December 18, 2009
5
6    Exhibit No.     Description        Page
7    37  460 Recipient Committee Campaign     14
8        Statement, 4/1/08-6/30/08
9    38  460 Recipient Committee Campaign     19
10       Statement, 1/1/08-3/31/08
11   39  460 Recipient Committee Campaign     26
12       Statement, 1/1/09-6/30/09
13   40  460 Recipient Committee Campaign     29
14       Statement, 7/1/08-9/30/08
15   41  460 Recipient Committee Campaign     43
16       Statement, 10/19/08-12/31/08
17   42  460 Recipient Committee Campaign     47
18       Statement, 10/1/08-10/18/08
19   43  460 Recipient Committee Campaign     56
20       Statement, 10/1/08-10/18/08
21   44  460 Recipient Committee Campaign     61
22       Statement, 10/19/08-12/31/08
23   45  "Dr. Dobson Joins in Prayer for      62
24       Protection of Marriage" - 10/29/08
25   46  "Judicial Tyranny and California Lunacy"67

Page 5

1       E X H I B I T S (continued)
2    Homosexuality"
3    59  Two-sided Website Article, May 6, 2009 109
4    60  Two-sided Letter dated Friday,        112
5        July 3, 2009
6    61  One-page Black and White Photocopy of 113
7        Pictures
8    62  One-page Article dated 6/5/06         114
9    63  One-page Article "Vote Tuesday,       117
10       November 4th, 2008"
11   64  "Yes on 8, Protect Marriage-Restoring 118
12       Marriage and Protecting California Children"
13   11/30/09
14   65  Multi-page Article "Proposition 8:    121
15       Who's Really Lying"
16   66  Two-page Letter dated 11/19/08        132
17       To: Dear Friends  From: Ron Prentice
18   67  Two-page Article "Dr. Dobson Denounces 135
19       Connecticut Same-Sex Marriage Ruling"
20   68  One-page Letter From: Bill May        136
21   69  Four-page "Resource List:             139
22       Homosexuality Resources"
23   70  One-page "The Call Timeline"          140
24   71  One-page "The Biblical Foundations    140
25       of The Marriage Debate" by Jim Garlow

Page 6

E X H I B I T S (continued)

72  Two-page "The Ten Declarations For      141
    Protecting Biblical Marriage"
73  One-page "The ABCs of the Proposition 8 142
    Marriage Amendment
74  "God's Design For Marriage"             143
75  Two-page E-mail Letter dated 8/5/08     146
    To: mjansson  From: Ron Prentice
76  Multi-page Article "The Divine          146
    Institution of Marriage, 8/13/08
77  Three-page Article "Friday Five:        152
    Family Champion Ron Prentice
78  Two-sided Website Article "Marriage     154
    Protection Press Conference Speakers
    Announced"
79  Multi-page Article "Frequently Asked    155
    Questions About Same-Sex Marriage"
80  Two-page Article dated 5/20/09          157
81  Two-page Article "Counseling for        158
    Unwanted Same-sex Attractions"
82  Two-side Article "Love Won Out          160
    Transitions to Exodus International"
83  Two-sided "Organizations               161
    Co-Sponsoring Marriage Protection Week"
84  One-page Article "Focus on the Family   162

Page 7

E X H I B I T S (continued)
Conferences on Homosexuality"
85  Two-sided Article "NARTH Position       165
    Statements"
86  Multi-page Article "Is Marriage in      169
    Jeopardy" by Glenn T. Stanton
87  Two-page "Protect Marriage California   170
    Timeline", 6/25-11/6/08
88  Two-page Article "Myths and Facts       172
    about Proposition 8"
89  DVD File No. 100                        174
90  DVD File No. 145                        176
91  DVD File No. 108                        177
92  DVD File No. 139                        179
93A DVD File No. 147                        182
93B DVD File No. 148                        182
94  DVD File No. 240                        184
95  Three-page Article "Multi-State         185
    Polling Study Shows California's Field Poll...."
96  DVD File No. 206                        186
97  Three-page Article "for Pastors &       187
    Churches
98  Multi-page Article "Love Won Out"       188
99  Two-sided Article "Complete Marriage    190
    and Family Home Reference Guide

Page 8

E X H I B I T S (continued)

100 Two-sided Article "Complete Marriage    191
    and Family Home Reference Guide

Page 9

BE IT REMEMBERED THAT, pursuant to Notice, and on
Friday, December 18, 2009, commencing at the hour of
8:51 o'clock a.m. thereof, at the SHERATON GRAND HOTEL,
Falor Room, Sacramento, California 95814, before me,
LESLIE CASTRO, a Certified Shorthand Reporter in and for
the State of California, personally appeared
          RONALD PRENTICE
Called as a witness, who, being by me first (previously)
duly sworn, was thereupon examined and testified as
hereinafter set forth.

APPEARANCES:
     OFFICE OF THE CITY ATTORNEY, Fox Plaza, Seventh
Floor, 1390 Market Street, San Francisco, California
94102, represented by THERESE M. STEWART, Deputy City
Attorney, appeared as counsel on behalf of the City and
County of San Francisco.
     GIBSON, DUNN & CRUTCHER, LLP, 555 Mission Street,
Suite 3000, San Francisco, California 94105-2933,
represented by SARAH E. PIEPMEIER, Attorney at Law,
appeared as counsel on behalf of the Plaintiffs.
     COOPER & KIRK, 1523 New Hampshire Avenue, N.W.,
Washington, D.C. 20036, represented by NICOLE J. MOSS,
Attorney at Law, appeared as counsel on behalf of
Ronald Prentice.

Page 94

11:26:03  1    A.  Yes.
11:26:03  2    Q.  Is it true that ProtectMarriage.com asked --
11:26:12  3  well, let me -- asked Catholics for the Common Good to
11:26:23  4  begin organizing Catholics for ProtectMarriage.com?
11:26:28  5    MS. MOSS:  I would instruct you not to answer to
11:26:30  6  the extent that it would call for you to reveal private
11:26:34  7  information internal to the campaign.  But to the extent
11:26:37  8  it's public, you can respond.
11:26:41  9    MS. STEWART:  Well, Ms. Moss, I'm going to tell you
11:26:43  10 that this document is on the worldwide web.
11:26:48  11   MS. MOSS:  But you're asking him to confirm
11:26:49  12 something that he's never seen before that somebody else
11:26:52  13 drafted.  And people can put anything they want on the
11:26:56  14 web.  It's very different asking him to confirm that
11:26:59  15 fact.  If it's publicly known --
11:27:04  16   MS. STEWART:  If it's on the web, it would seem to
11:27:06  17 be publicly known.
11:27:08  18   MS. MOSS:  People can report incorrect information
11:27:10  19 all the time --
11:27:11  20   MS. STEWART:  And that's why I'm asking.
11:27:12  21   MS. MOSS:  -- known and confirmed by the campaign
11:27:15  22 publicly, then you can --
11:27:19  23   MS. STEWART:  I'm asking him -- let me just ask the
11:27:20  24 question again.  And then if you want to instruct him,
11:27:22  25 instruct him.  I think your instruction makes no sense.

Page 95

11:27:26  1    Q.  I'm asking you whether the statement in this
11:27:28  2  Knights of Columbus Newsletter from Catholics for the
11:27:34  3  Common Good website on have it's headed,
11:27:38  4  That we have been asked by ProtectMarriage.com and the
11:27:41  5  California Catholic Conference to begin organizing
11:27:45  6  Catholics for ProtectMarriage.com is true.
11:27:48  7            And I'm not expecting that you'll know, but
11:27:51  8  you can answer if you do about the California Catholic
11:27:55  9  Conference.
11:27:55  10           But what I do want to know is it true that
11:27:59  11 Catholics for the Common Good have been asked by
11:28:02  12 ProtectMarriage.com to begin organizing Catholics for
11:28:04  13 ProtectMarriage.com?
11:28:07  14   MS. MOSS:  Again, if it has been publicly confirmed
11:28:11  15 by the campaign that that occurred, then you can answer.
11:28:15  16 Obviously, if you know, you can answer.  If it has not
11:28:18  17 been publicly confirmed, I would instruct you not to
11:28:21  18 answer.
11:28:21  19   THE WITNESS:  I'm not aware that it's been publicly
11:28:23  20 confirmed.
11:28:26  21   MS. STEWART:  Q  Do you see on the next page at the
11:28:28  22 end of this piece it's signed For the Common Good,
11:28:32  23 Bill May?
11:28:35  24   A.  Yes.
11:28:36  25   Q.  And who is Bill May?

Page 96

11:28:40  1    A.  Bill May is the leader of Catholics for the
11:28:45  2  Common Good.
11:28:47  3    Q.  And was Bill May a part of the leadership of
11:28:56  4  ProtectMarriage.com?
11:29:01  5    MS. MOSS:  To the extent that's public you's can
11:29:04  6  respond.  If it's -- well, I'm going to object that it's
11:29:12  7  vague what the "leadership" means.
11:29:15  8    MS. STEWART:  Let me ask more specifically.
11:29:17  9    Q.  Was Bill May on the executive committee of
11:29:22  10 ProtectMarriage.com?
11:29:24  11   MS. MOSS:  You can answer that.
11:29:25  12   THE WITNESS:  No.
11:29:27  13   MS. STEWART:  Q  Under the heading here about
11:29:34  14 ProtectMarriage.com on the page 13, it says "I serve on
11:29:37  15 the steering committee of ProtectMarriage.com, the
11:29:41  16 official campaign in support of Prop 8."
11:29:41  17           Do you see that?
11:29:41  18   A.  Yes.
11:29:45  19   Q.  Do you know what Mr. May -- how he was using
11:29:48  20 the word "steering committee"?
11:29:53  21   MS. MOSS:  Objection.  Calls for speculation.
11:29:57  22   THE WITNESS:  I can't say what Mr. May was
11:29:58  23 thinking.
11:30:00  24   MS. STEWART:  Q  Did you ever use the phrase
11:30:00  25 "steering committee" in reference to

Page 97

11:30:04  1  ProtectMarriage.com?
11:30:05  2    MS. MOSS:  If you've used the phrase publicly, you
11:30:07  3  can respond.
11:30:14  4    THE WITNESS:  I don't know.
11:30:16  5    MS. STEWART:  Q  Was there a steering committee as
11:30:19  6  distinct from the executive committee?
11:30:25  7    MS. MOSS:  I need to confer with him before he
11:30:27  8  responds so he doesn't reveal privileged information.
11:30:35  9            (Pause in the proceedings.)
11:31:02  10   THE WITNESS:  Could you repeat the question?
11:31:04  11   MS. STEWART:  Q  Was there a steering committee for
11:31:07  12 ProtectMarriage.com?
11:31:08  13   A.  No.
11:31:14  14   Q.  I'm going to ask you to put my files in order
11:31:26  15 for me -- to take a look at a document that will be
11:31:42  16 marked Exhibit 55.
11:31:42  17            (Whereupon, Exhibit No. 55 was
11:32:08  18   Marked for identification.)
11:32:12  19   MS. STEWART:  Q  Have you seen this document
11:32:14  20 before?
11:32:34  21   A.  No.
11:32:36  22   Q.  Do you recall whether you spoke to a reporter
11:32:39  23 by the name of Margie Palmer about Senate Bill 777 in
11:32:49  24 January of 2008?
11:32:50  25   A.  I don't recall.

Page 190

| | | |
|---|---|---|
| 04:35:49 | 1 | A.  I don't know. |
| 04:35:50 | 2 | Q.  You don't remember that? |
| 04:35:51 | 3 | A.  No. |
| 04:35:51 | 4 | Q.  Now, do you see that it says "That's why we've |
| 04:35:54 | 5 | developed a one-day conference for those looking for |
| 04:35:56 | 6 | answers on this often divisive issue"? |
| 04:36:00 | 7 | A.  Yes. |
| 04:36:00 | 8 | Q.  And underneath that it says "Whether an |
| 04:36:03 | 9 | educator, parent, concerned citizen or even a gay |
| 04:36:06 | 10 | activist, Love Won Out will inform, inspire and offer |
| 04:36:10 | 11 | hope"? |
| 04:36:12 | 12 | A.  Yes. |
| 04:36:12 | 13 | Q.  Does that refresh your recollection in any way |
| 04:36:12 | 14 | that the Love Won Out conference was about teaching |
| 04:36:16 | 15 | people how to prevent and treat homosexuality? |
| 04:36:21 | 16 | A.  No. |
| 04:36:22 | 17 | Q.  Do you see in the next section it says "A |
| 04:36:25 | 18 | dynamic one-day conference addressing, understanding and |
| 04:36:28 | 19 | preventing homosexuality"? |
| 04:36:30 | 20 | A.  Yes. |
| 04:36:40 | 21 | MS. STEWART:  Next document will be marked |
| 04:36:44 | 22 | Exhibit 99. |
| 04:36:44 | 23 | (Whereupon, Exhibit No. 99 was |
| 04:36:56 | 24 | Marked for identification.) |
| 04:37:01 | 25 | MS. STEWART:  Q  Do you see that this is also a |

Page 191

| | | |
|---|---|---|
| 04:37:05 | 1 | document that is from the web archive for the Focus on |
| 04:37:09 | 2 | the Family website? |
| 04:37:12 | 3 | A.  Yes. |
| 04:37:20 | 4 | MS. STEWART:  I'm going to mark as Exhibit 100 a |
| 04:37:30 | 5 | document entitled "Complete Marriage and Home Reference |
| 04:37:34 | 6 | Guide." |
| 04:37:34 | 7 | (Whereupon, Exhibit No. 100 was |
| 04:37:45 | 8 | Marked for identification.) |
| 04:37:49 | 9 | MS. STEWART:  Q  Can you see from the information |
| 04:37:53 | 10 | on this document that it is a printout from the web |
| 04:37:57 | 11 | archive of the Focus on the Family website? |
| 04:38:01 | 12 | A.  Yes. |
| 04:38:08 | 13 | MS. STEWART:  Well, I have lots of further |
| 04:38:09 | 14 | questions, but I think I'm out of time. |
| 04:38:11 | 15 | So I want to thank-you for your patience with a |
| 04:38:15 | 16 | long deposition, given that you were here for two |
| 04:38:19 | 17 | separate notices and send you on your way. |
| 04:38:25 | 18 | MS. MOSS:  Let me confer real quickly with my |
| 04:38:27 | 19 | co-counsel and see if we have any follow-up questions. |
| 04:38:31 | 20 | MS. STEWART:  Sure. |
| 04:38:36 | 21 | THE VIDEOGRAPHER:  Off record at 4:38. |
| 04:38:38 | 22 | (Brief break.) |
| 04:46:24 | 23 | THE VIDEOGRAPHER:  Back on the record at 4:46. |
| 04:46:26 | 24 | So this marks the end of tape No. 3 in volume 2, |
| 04:46:33 | 25 | deposition of Mr. Ronald Prentice.  We're off the record |

Page 192

| | |
|---|---|
| 1 | at 4:46. |
| 2 | (Whereupon, the deposition adjourned. |
| 3 | At 4:46 p.m.) |
| 4 | |
| 5 | |
| 6 | |
| 7 | _____ |
| 8 | RONALD PRENTICE |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

The "at 4:46." lines correspond to timestamps 04:46:36 and 04:46:37.

Page 193

| | |
|---|---|
| 1 | DEPOSITION OFFICER'S CERTIFICATE |
| 2 | |
| 3 | STATE OF CALIFORNIA                )  |
| 4 |                                    ) Ss. |
| 5 | COUNTY OF CONTRA COSTA             ) |
| 6 | |
| 7 | I LESLIE CASTRO, CSR, hereby certify: |
| 8 | I am a duly qualified Shorthand Reporter in |
| 9 | the State of California, holder of Certificate Number |
| 10 | 8876 issued by the Court Reporter's Board of California |
| 11 | and which is in full force and effect. (Fed R. Civ. P. |
| 12 | 28(a)). |
| 13 | I am authorized to administer oaths of |
| 14 | affirmations pursuant to California Code of Civil |
| 15 | Procedure, Section 2093(b), and prior to being examined, |
| 16 | the deponent was first duly sworn by me. (Fed. R. Civ. |
| 17 | P. 28(a), 30(f) (1)). |
| 18 | I am not a relative or employee or attorney or |
| 19 | counsel of any of the parties, nor am I a relative or |
| 20 | employee of such attorney or counsel, nor am I |
| 21 | financially interested in this action. (Fed. R. Civ. P. |
| 22 | 28). |
| 23 | I am the deposition officer that |
| 24 | stenographically recorded the testimony in the foregoing |
| 25 | deposition and the foregoing transcript is a true record |

Page 194

1   of the testimony given by the deponent.  (Fed. R. Civ.
2   P. 30(f) (1)).
3        Before completion of the deposition, review of
4   the transcript [ ] was  [X] was not requested.  If
5   requested, any changes made by the deponent (and
6   provided to the reporter) during the period allowed, are
7   appended hereto.  (Fed. R. Civ. P. 30(a)).
8
9
10
11
12   Dated:  28th of December, 2009.
13
14
15
16        _____
17        LESLIE CASTRO, CSR
         State of California
18        CSR License No. 8876
19
20
21
22
23
24
25

Page 195

1        ERRATA SHEET
2
3   PAGE  LINE   CHANGE
4   ____  ____   _____
5   ____  ____   _____
6   ____  ____   _____
7   ____  ____   _____
8   ____  ____   _____
9   ____  ____   _____
10  ____  ____   _____
11  ____  ____   _____
12  ____  ____   _____
13  ____  ____   _____
14  ____  ____   _____
15  ____  ____   _____
16  ____  ____   _____
17  ____  ____   _____
18  ____  ____   _____
19  ____  ____   _____
20   _
21        I, RONALD PRENTICE, have made the following changes
22   to my deposition taken in the matter of PERRY, ET AL.
23   vs. SCHWARZENEGGER, ET AL. taken on DECEMBER 18, 2009.
24   DATE:_____   _____
              RONALD PRENTICE
25

Page 196

1        CERTIFICATION OF WITNESS
2
3
4        I, RONALD PRENTICE, hereby declare that I have read
5   the foregoing testimony, and the same is true and a
6   correct transcription of my said testimony except as I
7   have corrected.
8
9
10
11        _____
         Signature
12
13
14
15        _____
         Date
16
17
18
19
20
21
22
23
24
25

Page 197

BONNIE L. WAGNER & ASSOCIATES
COURT REPORTING SERVICE
41 SUTTER STREET, SUITE 1605
SAN FRANCISCO, CALIFORNIA 94104
(415) 982-4849

January 4, 2010
Ronald Prentice
c/o Nicole J. Moss, Esq.
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Re:  Perry, et al.  Vs.
        Schwarzenegger, et al.

Dear Mr. Prentice:
You are hereby notified that pursuant to the California
Code of Civil Procedure Section 2019(E), your deposition
is available for your review within 35 days from the
date of this letter.

If you are represented by an attorney in this matter
contact your attorney before contacting this office.
Do not ask that we send you the original deposition.
State law does not allow us to do so.

Yours very truly,

Leslie Castro, CSR
Bonnie L. Wagner & Associates

CC: Original Transcript
    All Counsel