1   GIBSON, DUNN & CRUTCHER LLP
    Theodore B. Olson, SBN 38137
2   *tolson@gibsondunn.com*
    Matthew D. McGill, *pro hac vice*
3   Amir C. Tayrani, SBN 229609
    1050 Connecticut Avenue, N.W., Washington, D.C. 20036
4   Telephone: (202) 955-8668, Facsimile: (202) 467-0539

5   Theodore J. Boutrous, Jr., SBN 132009
    *tboutrous@gibsondunn.com*
6   Christopher D. Dusseault, SBN 177557
    Ethan D. Dettmer, SBN 196046
7   Sarah E. Piepmeier, SBN 227094
    Theane Evangelis Kapur, SBN 243570
8   Enrique A. Monagas, SBN 239087
    333 S. Grand Avenue, Los Angeles, California 90071
9   Telephone: (213) 229-7804, Facsimile: (213) 229-7520

10  BOIES, SCHILLER & FLEXNER LLP
    David Boies, *pro hac vice*
11  *dboies@bsfllp.com*
    333 Main Street, Armonk, New York 10504
12  Telephone: (914) 749-8200, Facsimile: (914) 749-8300

13  Jeremy M. Goldman, SBN 218888
    *jgoldman@bsfllp.com*
14  Theodore H. Uno, SBN 248603
    1999 Harrison Street, Suite 900, Oakland, California 94612
15  Telephone: (510) 874-1000, Facsimile: (510) 874-1460

16  Attorneys for Plaintiffs
    KRISTIN M. PERRY, SANDRA B. STIER,
17  PAUL T. KATAMI, and JEFFREY J. ZARRILLO

18                  **UNITED STATES DISTRICT COURT**

19                  **NORTHERN DISTRICT OF CALIFORNIA**

20  KRISTIN M. PERRY, *et al.,*                      | CASE NO. 09-CV-2292 VRW

21                         Plaintiffs,

    and
22                                                    | **DECLARATION OF REBECCA JUSTICE**
    CITY AND COUNTY OF SAN FRANCISCO,                 | **LAZARUS IN SUPPORT OF PLAINTIFFS'**
23                                                    | **MOTION FOR LEAVE TO REOPEN THE**
                         Plaintiff-Intervenor,        | **DEPOSITION OF RONALD PRENTICE IN**
24          v.                                        | **HIS PERSONAL CAPACITY AND AS THE**
                                                      | **RULE 30(b)(6) REPRESENTATIVE FOR**
    ARNOLD SCHWARZENEGGER, *et al.,*                  | **PROTECTMARRIAGE.COM**
25
                         Defendants,
26  and                                               | Trial Date:  January 11, 2010

27  PROPOSITION 8 OFFICIAL PROPONENTS                 | Judge:  Chief Judge Walker
    DENNIS HOLLINGSWORTH, *et al.,*                   |          Magistrate Judge Joseph C. Spero
28                Defendant-Intervenors.              | Location:  Courtroom 6, 17th Floor

Gibson, Dunn &
Crutcher LLP

Dockets.Justia.com

1    I, Rebecca Justice Lazarus, declare as follows:

2        1.      I am an attorney licensed to practice law in the State of California and in the Northern

3    District of California.  I am an associate in the law firm of Gibson, Dunn & Crutcher LLP, counsel of

4    record for Plaintiffs Kristin M. Perry, Sandra B. Stier, Paul T. Katami, and Jeffrey J. Zarrillo in the

5    above-captioned matter.  I make this declaration in support of Plaintiffs' Motion for Leave to Reopen

6    the Deposition of Ronald Prentice in His Personal Capacity and as the Rule 30(b)(6) Representative

7    for ProtectMarriage.com.  The information below is stated on personal knowledge and if called as a

8    witness, I could and would testify competently thereto.

9        2.      Attached hereto as Exhibit A is a true and correct copy of relevant excerpts of Volume

10   I of the Deposition of Ronald Prentice, taken December 17, 2009.

11       3.      Attached hereto as Exhibit B is a true and correct copy of relevant excerpts of Volume

12   II of the Deposition of Ronald Prentice, taken December 18, 2009.

13       4.      On January 10, 2010, Proponents produced approximately 1,400 pages of documents

14   to Plaintiffs.  On January 13, Proponents produced 5,007 pages of documents on behalf of Dr. Tam's

15   counsel.  On January 14, Proponents produced 5,741 pages of documents in three separate

16   productions.  On January 15, Proponents produced 1,255 pages of documents.  On January 16

17   beginning at approximately 11:22 p.m. and continuing over the next twelve hours, counsel for

18   Proponents notified counsel for Plaintiffs that it had produced over 9,000 pages of documents on

19   behalf of themselves and Dr. Tam.  On January 13, Proponents produced approximately 2,600 pages

20   of documents on behalf of themselves and approximately 5,000 pages on behalf of Dr. Tam's

21   counsel.

22       5.      Plaintiffs' counsel diligently reviewed these documents produced by Proponents on a

23   rolling basis.

24       6.      Since Friday, January 15, Plaintiffs' team of approximately eight lawyers spent a

25   substantial portion of the weekend reviewing over 15,000 pages of documents produced since

26   January 14.

27       7.      To date, Plaintiffs' counsel has identified approximately 398 documents of interest

28   from these productions that mention Mr. Prentice.

Gibson, Dunn &
Crutcher LLP

2

8.      Plaintiffs are in the process of selecting approximately 25 documents from this universe that merit additional deposition questioning of Mr. Prentice.

9.      Attached hereto as Exhibit C is a true and correct copy of a document bates numbered DEFINT_PM_025241-025242, produced by Defendant-Intervenors between January 10 and January 17, 2010.

10.     Attached hereto as Exhibit D is a true and correct copy of a document bates numbered DEFINT_PM_005385-005399, produced by Defendant-Intervenors between January 10 and January 17, 2010.

11.     Attached hereto as Exhibit E is a true and correct copy of a document bates numbered 00172, produced by third party Doug Swardstrom on January 9, 2010.

12.     Attached hereto as Exhibit F is a true and correct copy of a document bates numbered DEFINT_PM_013429, produced by Defendant-Intervenors between January 10 and January 17, 2010.

13.     Attached hereto as Exhibit G is a true and correct copy of a document bates numbered 0076, produced by third party Doug Swardstrom on January 9, 2010.

14.     Attached hereto as Exhibit H is a true and correct copy of a document bates numbered DEFINT_PM_005745-005746, produced by Defendant-Intervenors between January 10 and January 17, 2010.

I declare, under penalty of perjury under the laws of the United States, that these facts are true and correct and that this Declaration is executed this 19th day of January, 2010, at San Francisco, California.


                                    _____/s/ Rebecca Justice Lazarus_____
                                              Rebecca Justice Lazarus

1

## ATTESTATION PURSUANT TO GENERAL ORDER NO. 45

2      Pursuant to General Order No. 45 of the Northern District of California, I attest that

3  concurrence in the filing of the document has been obtained from each of the other signatories to this

4  document.

5

_____/s/ Ethan Dettmer_____

6                             Ethan Dettmer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  DECLARATION OF REBECCA JUSTICE LAZARUS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION TO SEAL DOCUMENTS PURSUANT TO CIVIL LOCAL RULES 7-11 AND 79-5(D)

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - oOo - - -


KRISTIN M. PERRY, et al.,

                Plaintiffs,

    vs.                                Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
                Defendants.
_____/



Deposition of

RONALD PRENTICE

Volume I

Thursday, December 17, 2009



REPORTED BY:  LESLIE CASTRO, CSR #8876



BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

2

1                          I N D E X

2

3        Deposition of RONALD PRENTICE

4        Volume I, Thursday, December 17, 2009

5

6                                              Page

7        EXAMINATION BY MS. STEWART             9

8

9

10

11

12        Certified Questions:

13                       Page        Line

14

15

16

17

18

19

20

21

22

23

24

25

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

1  08:58:24   try to answer audibly and not nod or shake your head

2  08:58:28   because it's very difficult for them to accurately get

3  08:58:31   that down.

4  08:58:31       A.   Okay.

5  08:58:32       Q.   If you goof that up, it's understandable and

6  08:58:34   we'll I'll just try to remind you.

7  08:58:39            And in the same vein, I will try really hard

8  08:58:42   to not step on your answers and to let you finish them

9  08:58:47   before I ask my next question.  And I would always ask,

10 08:58:50   if you can, to try to let me finish the question before

11 08:58:53   you start to answer.

12 08:58:55       A.   Absolutely.

13 08:58:55       Q.   The court reporter can't take two of us down

14 08:58:57   at once.

15 08:58:59            So you said you have never been deposed

16 08:59:01   before?

17 08:59:02       A.   Correct.

18 08:59:02       Q.   Have you ever testified in any proceeding

19 08:59:04   before?

20 08:59:05       A.   No.

21 08:59:09       Q.   Besides medication issues, is there any reason

22 08:59:13   that you don't believe you can testify fully and

23 08:59:16   accurately today?

24 08:59:17       A.   No.

25 08:59:20       Q.   Did you do anything to prepare for today's

| | | |
|---|---|---|
| 1 | 08:59:23 | deposition? |
| 2 | 08:59:25 | A.   Met with counsel to go over the questions that |
| 3 | 08:59:29 | were asked. |
| 4 | 08:59:30 | Q.   And by the questions that were asked, let me |
| 5 | 08:59:34 | ask you:  You have come here today pursuant to a notice |
| 6 | 08:59:39 | of deposition; is that correct? |
| 7 | 08:59:41 | A.   Correct. |
| 8 | 08:59:42 | Q.   And in fact, you've come pursuant to two |
| 9 | 08:59:45 | notices of deposition; do you understand that? |
| 10 | 08:59:47 | A.   Yes. |
| 11 | 08:59:47 | Q.   And one of those is what we call a 30(b)(6) |
| 12 | 08:59:51 | deposition which lists some subject areas that I presume |
| 13 | 08:59:55 | you've seen that notice? |
| 14 | 08:59:56 | A.   Yes. |
| 15 | 08:59:57 | Q.   And the other one is a deposition notice that |
| 16 | 09:00:00 | just seeks you to come in your capacity as somebody with |
| 17 | 09:00:05 | knowledge generally about the topics that are relevant |
| 18 | 09:00:07 | to this case. |
| 19 | 09:00:08 | Do you understand that? |
| 20 | 09:00:08 | A.   Yes.  Yes. |
| 21 | 09:00:09 | MS. STEWART:  And for the record, and for Nikki's |
| 22 | 09:00:11 | benefit, I just want to say -- I'm sorry, Ms. Moss -- |
| 23 | 09:00:15 | that because you asked us to combine these depositions, |
| 24 | 09:00:19 | take them, sort of, together, I didn't try too hard to |
| 25 | 09:00:23 | separate the 30(b)(6) issues from the other issues |

13

| | |
|---|---|
| 1 | 09:00:27 | because there's, kind of, a -- there's no easy way to do |
| 2 | 09:00:30 | that. |
| 3 | 09:00:31 | So I am just going to try to proceed in a way that |
| 4 | 09:00:34 | gets us through efficiently.  And, you know, if you have |
| 5 | 09:00:37 | an issue with a question, obviously you can object.  But |
| 6 | 09:00:40 | I'm not saying this part is 30(b)(6), this part is |
| 7 | 09:00:45 | personal.  It's kind of a combined effort. |
| 8 | 09:00:49 | MS. MOSS:  That's fine.  And if at any point I |
| 9 | 09:00:51 | think it needs to be clarified who he's speaking on |
| 10 | 09:00:53 | behalf of, I'll ask so I understand, and that's fine to |
| 11 | 09:00:55 | proceed in that manner. |
| 12 | 09:00:57 | MS. STEWART:  Q  Besides your counsel, have you |
| 13 | 09:00:58 | spoken with anyone else to prepare for your deposition |
| 14 | 09:01:00 | today? |
| 15 | 09:01:01 | A.   No. |
| 16 | 09:01:02 | Q.   And did you review any materials in |
| 17 | 09:01:05 | preparation for your deposition today? |
| 18 | 09:01:07 | A.   Yes. |
| 19 | 09:01:08 | Q.   What did you review? |
| 20 | 09:01:10 | A.   The materials that Shubert and Flint compiled |
| 21 | 09:01:16 | post -- post-campaign of all of the public |
| 22 | 09:01:20 | communications. |
| 23 | 09:01:23 | Q.   And what were those materials? |
| 24 | 09:01:26 | A.   Oh, everything from television ads, E-mail |
| 25 | 09:01:37 | blasts, letters to the editor, op-eds, radio ads in |

| | | |
|---|---|---|
| 1 | 09:01:48 | terms of coverage. |
| 2 | 09:01:52 | Q.   Great. |
| 3 | 09:01:53 | And did the material that you reviewed include |
| 4 | 09:01:57 | the article that Mr. Shubert and Flint -- Mr. Shubert |
| 5 | 09:02:04 | and Flint wrote about the campaign? |
| 6 | 09:02:06 | A.   No. |
| 7 | 09:02:07 | Q.   Are you familiar with that article? |
| 8 | 09:02:10 | A.   Yes. |
| 9 | 09:02:12 | Q.   I want to turn a little bit to some background |
| 10 | 09:02:15 | information about you. |
| 11 | 09:02:18 | First of all, where did you grow up? |
| 12 | 09:02:20 | A.   Escondido, California. |
| 13 | 09:02:22 | Q.   And did you go to high school there? |
| 14 | 09:02:25 | A.   Yes. |
| 15 | 09:02:26 | Q.   And what -- did you go directly from high |
| 16 | 09:02:31 | school to college? |
| 17 | 09:02:32 | A.   Yes. |
| 18 | 09:02:32 | Q.   What college did you attend first? |
| 19 | 09:02:36 | A.   Well, that's an interesting question.   I |
| 20 | 09:02:39 | attended during my high school years Palimar College for |
| 21 | 09:02:43 | one class, but I moved after graduation to Westmont |
| 22 | 09:02:47 | College in Santa Barbara. |
| 23 | 09:02:50 | Q.   And for how long did you attend Westmont |
| 24 | 09:02:52 | College? |
| 25 | 09:02:53 | A.   Four years. |

57

| 1 | 10:21:52 | Q. Was there a logo that it used on its website? |
| 2 | 10:22:04 | MS. MOSS: Just by point of clarification, |
| 3 | 10:22:05 | objection. When you're referring to |
| 4 | 10:22:09 | ProtectMarriage.com, are you referring to -- I guess |
| 5 | 10:22:12 | what specifically are you referring to? Is it a |
| 6 | 10:22:16 | shorthand for Yes on 8 or -- |
| 7 | 10:22:19 | MS. STEWART: You're getting to my other line of |
| 8 | 10:22:21 | questioning, which I diverted from. So let me go back |
| 9 | 10:22:24 | to that and then we'll go back to the logo. |
| 10 | 10:22:27 | As I mentioned earlier, sometimes it's not a linear |
| 11 | 10:22:31 | process, this deposition business. |
| 12 | 10:22:33 | Q. Do you see the first paragraph of this |
| 13 | 10:22:35 | document where it says "ProtectMarriage.com is a growing |
| 14 | 10:22:38 | broad-based coalition of organizations, churches and |
| 15 | 10:22:42 | individuals who believe that marriage's foremost purpose |
| 16 | 10:22:47 | is raising of healthy children in a family with a mom |
| 17 | 10:22:50 | and a dad"? |
| 18 | 10:22:51 | A. Yes. |
| 19 | 10:22:52 | Q. Is that language that was on |
| 20 | 10:22:54 | ProtectMarriage.com's website at some point in time? |
| 21 | 10:23:00 | A. Apparently, this was printed off of its |
| 22 | 10:23:02 | website, and so I would imagine so. |
| 23 | 10:23:05 | Q. And is it accurate that the title |
| 24 | 10:23:08 | "ProtectMarriage.com" was used to refer to a broad-based |
| 25 | 10:23:13 | coalition of organizations and people? |

| | | |
|---|---|---|
| 1 | 10:23:19 | A.   I would say that ProtectMarriage.com was |
| 2 | 10:23:24 | used -- I would say "yes," and definitely say a |
| 3 | 10:23:40 | broad-based coalition -- loose -- loosely. |
| 4 | 10:23:46 | Q.   And when you say "loosely," what do you mean? |
| 5 | 10:23:49 | A.   It's a loosely-formed coalition. |
| 6 | 10:23:52 | Q.   And who -- what were the organizations that |
| 7 | 10:24:00 | were part of that loosely-based coalition? |
| 8 | 10:24:04 | MS. MOSS:  I'm going to object to the extent |
| 9 | 10:24:06 | that -- two grounds:  One, I still don't think it's |
| 10 | 10:24:13 | clear exactly which -- |
| 11 | 10:24:13 | THE WITNESS:  I agree. |
| 12 | 10:24:14 | MS. MOSS:  -- entity, ProtectMarriage.com entity |
| 13 | 10:24:15 | that you're referring to.  But secondly, to the extent |
| 14 | 10:24:18 | you understand or believe -- understand what entity |
| 15 | 10:24:23 | she's referring to, if it's the Yes on 8 committee, if |
| 16 | 10:24:28 | they were affiliated with organizations and that's |
| 17 | 10:24:31 | publicly known, you can disclose that.  If there was any |
| 18 | 10:24:35 | private affiliations that are not publicly known, I |
| 19 | 10:24:39 | instruct you not to answer. |
| 20 | 10:24:40 | THE WITNESS:  And I interpret your question to |
| 21 | 10:24:42 | refer to the Yes on 8 campaign.  And there were people |
| 22 | 10:24:46 | that would go on to the website and sign on endorsing |
| 23 | 10:24:50 | it.  And that's how loose and how broad-based we |
| 24 | 10:24:55 | interpreted the coalition to be. |
| 25 | 10:24:58 | MS. STEWART:  Q  And so when the website here |

| | | |
|---|---|---|
| 1 | 10:25:07 | refers to a broad-based coalition of organizations, |
| 2 | 10:25:09 | churches and individuals, was that coalition formed |
| 3 | 10:25:18 | solely by people signing on to the website? |
| 4 | 10:25:21 | A.   Well, actually, as I see at the bottom of |
| 5 | 10:25:24 | this, it says "2005." So this may be -- if it's 2005, |
| 6 | 10:25:31 | it obviously came before the formation of the ballot |
| 7 | 10:25:36 | measure committee. |
| 8 | 10:25:41 | And I don't know even then whether -- well, |
| 9 | 10:25:43 | there's a page on the left it says "Endorsement" so I |
| 10 | 10:25:47 | guess there was opportunity for people to align with |
| 11 | 10:25:51 | this general cause. |
| 12 | 10:25:53 | Q.   So let me go back to 2005 then. |
| 13 | 10:25:56 | And ask you: Was -- was there an entity to |
| 14 | 10:26:03 | your knowledge called ProtectMarriage.com in 2005? |
| 15 | 10:26:10 | A.   No, not an entity.  There have been times |
| 16 | 10:26:20 | over -- there have been -- ProtectMarriage.com has been |
| 17 | 10:26:26 | more a general -- general purpose of -- for the benefit |
| 18 | 10:26:38 | of traditional marriage.  And there have been -- and |
| 19 | 10:26:45 | prior to the Yes on 8 campaign, there was not an |
| 20 | 10:26:51 | official entity. |
| 21 | 10:26:54 | Q.   Was there something other than an official |
| 22 | 10:26:58 | entity that you understood ProtectMarriage.com to refer |
| 23 | 10:27:04 | to before -- let's say before 2008? |
| 24 | 10:27:12 | A.   I think that I understood ProtectMarriage.com |
| 25 | 10:27:17 | prior to the ballot measure committee to be, again, a -- |

1   10:27:24   a generally directed purpose, not an entity.

2   10:27:33        Q.   Was it a coalition?

3   10:27:39        A.   Only to the extent that people aligned with a

4   10:27:42   generally directed purpose.

5   10:27:46        Q.   Do you recall who was part of that coalition

6   10:27:55   prior to the 2008?

7   10:27:57        A.   Prior to the forming of the ballot measure

8   10:27:58   committee, as it reads here, it's a broad-based

9   10:28:06   coalition of organizations, churches and individuals,

10  10:28:08   and so there was no list.  There was no -- there was no

11  10:28:16   entity.

12  10:28:17        Q.   Was there a website?

13  10:28:20        A.   Apparently, this came off of a website and

14  10:28:24   it's copyright '05.

15  10:28:26        Q.   And did you have anything to do with that

16  10:28:28   website prior to 2008?

17  10:28:37        A.   I did not have anything to do with the

18  10:28:39   creation of the website, no.

19  10:28:42        Q.   Do you know who did?

20  10:28:48        A.   There has been a -- a changing relatively

21  10:28:57   fluid group of individuals who attempted to keep the

22  10:29:07   public informed of what was going on legally with

23  10:29:12   marriage.

24  10:29:15        Q.   But do you know who created the

25  10:29:22   ProtectMarriage.com website that existed before 2008?

| | | |
|---|---|---|
| 1 | 11:33:50 | A.   That was -- they were used for the gathering |
| 2 | 11:33:56 | of our mail. |
| 3 | 11:34:00 | Q.   And Sterling -- |
| 4 | 11:34:02 | A.   Was the -- Steve Linder is the president of |
| 5 | 11:34:08 | Sterling. |
| 6 | 11:34:13 | Q.   And that they were hired to do fundraising? |
| 7 | 11:34:17 | A.   Fundraising. |
| 8 | 11:34:18 | Q.   And how about the Monaco Group, what were they |
| 9 | 11:34:22 | paid to do. |
| 10 | 11:34:23 | A.   I'm sorry.  I would probably be able to |
| 11 | 11:34:26 | identify a person's name, but I don't know the name of |
| 12 | 11:34:28 | the group. |
| 13 | 11:34:30 | Q.   And you said Lawrence Research did your |
| 14 | 11:34:31 | polling? |
| 15 | 11:34:32 | A.   Yes, and our focus groups. |
| 16 | 11:34:39 | Q.   Were there any other polling consultants? |
| 17 | 11:34:46 | A.   Not to my knowledge. |
| 18 | 11:34:49 | Q.   And The Broadcast Team, what did they do? |
| 19 | 11:34:52 | A.   Is that an official entity The Broadcast Team? |
| 20 | 11:34:58 | Q.   Insofar as it apparently received $120,000, I |
| 21 | 11:35:03 | assume it's an official entity. |
| 22 | 11:35:05 |      But I take it you're not familiar -- |
| 23 | 11:35:08 | A.   Correct. |
| 24 | 11:35:08 | Q.   -- with their work? |
| 25 | 11:35:10 |      And Engage LLC, do you know what they did? |

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

94

1   11:35:13      A.   Yes.  They created and managed the website.

2   11:35:24      Q.   Was the website creation and management under

3   11:35:30   the umbrella of your responsibilities for

4   11:35:33   ProtectMarriage.com?

5   11:35:37      A.   Ultimately, it was under the umbrella of the

6   11:35:41   responsibility of the ad hoc executive committee.  It

7   11:35:44   was -- the primary supervision to it came from Shubert

8   11:35:49   and Flint.

9   11:35:51      Q.   Did you oversee Shubert and Flint?

10  11:35:56      A.   The ad hoc executive committee did, yes.

11  11:36:04      Q.   Did you have a title other than being on the

12  11:36:07   ad hoc executive committee with ProtectMarriage.com?

13  11:36:13      A.   I was ultimately given the title within the

14  11:36:16   committee as chairman.

15  11:36:21      Q.   What were your responsibilities as chairman of

16  11:36:25   ProtectMarriage.com?

17  11:36:30      A.   The committee worked very cooperatively with

18  11:36:39   much discussion.  My role was primarily that of

19  11:36:44   facilitator of discussion.

20  11:36:47      Q.   Facilitator of discussion by the executive

21  11:36:51   committee?

22  11:36:51      A.   Yes.

23  11:36:56      Q.   And are you saying that you had no other

24  11:36:59   responsibilities distinct from your responsibilities as

25  11:37:02   an executive committee member?

1    11:37:05        A.    I was a volunteer for the -- for the passage

2    11:37:09   of the measure but within the committee, my primary role

3    11:37:14   as chairman, as odd as it may sound, was that I

4    11:37:19   facilitated the discussion to come to decisions.

5    11:37:24        Q.    And earlier you listed as the responsibilities

6    11:37:31   of the executive committee, I think you listed three

7    11:37:35   things.  And I'm just going to bullet point them again

8    11:37:38   and ask you if we've missed any.

9    11:37:41        And now I want to encompass not only the

10   11:37:44   period of signature gathering, but the campaign as a

11   11:37:47   whole.

12   11:37:48        A.    Yes.

13   11:37:48        Q.    Do you understand?

14   11:37:48        A.    Yes.

15   11:37:49        Q.    So the responsibilities that you identified

16   11:37:53   were identifying strategic -- a strategic plan for the

17   11:37:59   ballot measure.  Giving consideration to selection of

18   11:38:04   vendors.  And identifying fundraising -- a fundraising

19   11:38:09   plan.

20   11:38:09        A.    Uh-huh.

21   11:38:11        Q.    Were there other responsibilities that the

22   11:38:15   executive committee had in connection with the

23   11:38:19   Proposition 8 campaign?

24   11:38:21        A.    Our primary responsibility was to hire

25   11:38:26   competent vendors and to oversee their activities, and

| | | |
|---|---|---|
| 1 | 11:38:29 | to receive reports from those vendors.  And also to be |
| 2 | 11:38:36 | informed of their strategic plan and plans for |
| 3 | 11:38:40 | implementation.  And we would then provide them with |
| 4 | 11:38:43 | feedback. |
| 5 | 11:38:51 | Q.   And did you -- did the executive committee |
| 6 | 11:38:54 | carry out those responsibilities? |
| 7 | 11:38:56 | A.   Yes. |
| 8 | 11:38:57 | Q.   And did you carry them out to the best of your |
| 9 | 11:39:00 | ability? |
| 10 | 11:39:01 | A.   Yes. |
| 11 | 11:39:16 | Q.   You mentioned -- the last item you said be |
| 12 | 11:39:20 | informed of their strategic plan. |
| 13 | 11:39:23 | Can you explain for me, did the executive |
| 14 | 11:39:25 | committee ask the consultants to create a strategic plan |
| 15 | 11:39:30 | which you then approved or adopted; is that how it |
| 16 | 11:39:32 | worked? |
| 17 | 11:39:36 | MS. MOSS:  I'm going to object.  I think this is |
| 18 | 11:39:40 | getting down into a layer that's -- I think this is |
| 19 | 11:39:43 | getting down into a layer that's beyond, sort of, |
| 20 | 11:39:47 | generalities and how the campaign organized itself and |
| 21 | 11:39:51 | carried out its functions.  Which I think is both |
| 22 | 11:39:54 | outside the scope of relevant discovery per Judge |
| 23 | 11:39:56 | Walker's November 11th order and protected by the First |
| 24 | 11:40:00 | Amendment.  So I'm going to instruct you not to answer. |
| 25 | 11:40:45 | MS. STEWART:  Q  Did you, as part of your |

| | | |
|---|---|---|
| 1 | 11:40:53 | responsibilities as an executive committee member, |
| 2 | 11:40:56 | communicate with voters or people who were potential |
| 3 | 11:41:06 | voters about Proposition 8? |
| 4 | 11:41:10 | A.   Yes. |
| 5 | 11:41:11 | Q.   And what -- let me step back. |
| 6 | 11:41:23 | Did -- did ProtectMarriage.com also -- strike |
| 7 | 11:41:32 | that. |
| 8 | 11:41:32 | Did ProtectMarriage.com engage in |
| 9 | 11:41:36 | communications with voters or potential voters about |
| 10 | 11:41:41 | Proposition 8? |
| 11 | 11:41:42 | A.   The ballot measure committee did engage in |
| 12 | 11:41:45 | communications. |
| 13 | 11:41:48 | Q.   And what kinds of communications did |
| 14 | 11:41:55 | ProtectMarriage.com engage in with voters or potential |
| 15 | 11:42:00 | voters? |
| 16 | 11:42:04 | A.   Earlier on this morning, I referred to having |
| 17 | 11:42:09 | looked through all of the public documents that were |
| 18 | 11:42:13 | compiled by Shubert and Flint post-campaign.  And they |
| 19 | 11:42:18 | included television and radio advertising.  They |
| 20 | 11:42:23 | included E-mail blasts.  There was direct mail:  Those |
| 21 | 11:42:33 | were the primary forms of communication. |
| 22 | 11:42:37 | Q.   Were there rallies held? |
| 23 | 11:42:41 | A.   Yes. |
| 24 | 11:42:44 | Q.   How about debates? |
| 25 | 11:42:47 | A.   There were -- I'm not aware of any debates |

| | | |
|---|---|---|
| 1 | 11:42:50 | that were put -- that were sponsored by the ballot |
| 2 | 11:42:56 | measure committee. |
| 3 | 11:42:57 | Q.   Are you aware of debates that were sponsored |
| 4 | 11:42:59 | by other people? |
| 5 | 11:43:00 | A.   I'm aware of debates where -- yes. |
| 6 | 11:43:10 | Q.   What debates are you aware of? |
| 7 | 11:43:12 | A.   I'm aware of the Federalists Society holding a |
| 8 | 11:43:18 | debate at Cal Lutheran.  I'm aware of -- that actually |
| 9 | 11:43:27 | is the one that comes to mind.  I'm not sure of any |
| 10 | 11:43:30 | others. |
| 11 | 11:43:31 | Q.   Were you present for that debate? |
| 12 | 11:43:32 | A.   No. |
| 13 | 11:43:33 | Q.   Were there town hall meetings held -- |
| 14 | 11:43:35 | A.   Yes. |
| 15 | 11:43:35 | Q.   -- in support of Proposition 8? |
| 16 | 11:43:39 | A.   Yes. |
| 17 | 11:43:44 | Q.   Were there events that were simulcast? |
| 18 | 11:43:51 | A.   Yes. |
| 19 | 11:43:57 | Q.   Were there communications on websites? |
| 20 | 11:44:01 | A.   On various websites not associated with the |
| 21 | 11:44:04 | campaign itself? |
| 22 | 11:44:06 | Q.   On any websites. |
| 23 | 11:44:09 | A.   Absolutely. |
| 24 | 11:44:10 | Q.   And you said not associated with the campaign |
| 25 | 11:44:15 | itself. |

1    11:44:16          Were there websites that were associated with

2    11:44:19    the campaign itself?

3    11:44:21          A.   There is one primary website.

4    11:44:23          Q.   What is that?

5    11:44:23          A.   That's ProtectMarriage.com.

6    11:44:25          Q.   When you say "one primary website," were there

7    11:44:27    secondary websites?

8    11:44:29          A.   We are aware of two additional websites that

9    11:44:34    were created without our supervision.  One was a

10   11:44:43    IProtectMarriage.com.  And another was created by a

11   11:44:49    group in San Diego ProtectMarriageCA.com.

12   11:44:58          Q.   And you said those were created without your

13   11:45:03    supervision; is that what you said?

14   11:45:05          A.   Yes.

15   11:45:06          Q.   Did you -- well, first of all, who created

16   11:45:12    IProtectMarriage.com?

17   11:45:15          A.   It was primarily formed out of a church in

18   11:45:19    San Diego called The Rock.

19   11:45:20          Q.   And who was the head of The Rock?

20   11:45:23          A.   The senior pastor is Miles McPherson.

21   11:45:28          Q.   And when Mr. -- what is his title?

22   11:45:37          A.   Pastor Miles --

23   11:45:38          Q.   McPherson created that web -- well, did Mr. --

24   11:45:43    Pastor McPherson create that website?

25   11:45:48          MS. MOSS:   Object.  Lack of foundation.  But if you

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

| | | |
|---|---|---|
| 1 | 11:45:49 | know. |
| 2 | 11:45:52 | THE WITNESS:  He was not the literal designer and |
| 3 | 11:45:56 | creator of the website. |
| 4 | 11:45:58 | MS. STEWART:  Q  To your knowledge, was it created |
| 5 | 11:46:00 | under his supervision? |
| 6 | 11:46:04 | A.  Yeah, he participated in its development. |
| 7 | 11:46:09 | Q.  And were you aware of its development when |
| 8 | 11:46:12 | that was happening? |
| 9 | 11:46:15 | A.  I was aware that it was in the works, yes. |
| 10 | 11:46:19 | Q.  And did Pastor McPherson request approval or |
| 11 | 11:46:35 | permission from you or the executive committee to create |
| 12 | 11:46:40 | that website? |
| 13 | 11:46:46 | A.  I'm trying to -- I'm struggling with the |
| 14 | 11:46:53 | terms.  No. |
| 15 | 11:46:56 | Q.  Did he ask you or the executive committee |
| 16 | 11:47:05 | whether you would object to him creating that website? |
| 17 | 11:47:09 | A.  No. |
| 18 | 11:47:12 | Q.  What communication did you have with him about |
| 19 | 11:47:15 | that website, if any, before it was created? |
| 20 | 11:47:19 | MS. MOSS:  I'm going to object to that to the |
| 21 | 11:47:21 | extent it's getting into internal communications or |
| 22 | 11:47:25 | private communications that you had with individuals. |
| 23 | 11:47:28 | And I'm sorry, and to be clear that's a First Amendment |
| 24 | 11:47:41 | objection -- |
| 25 | 11:47:43 | THE WITNESS:  Thank-you. |

1   11:47:43      MS. MOSS:  -- and I'm instructing you not to

2   11:47:46   answer.

3   11:47:48      THE WITNESS:  Thank-you.

4   11:47:56      MS. STEWART:  Q  I'm going to ask you to look at a

5   11:47:57   document that we will mark as Exhibit 4.

6   11:48:02      (Whereupon, Exhibit No. 4 was

7   11:48:15      Marked for identification.)

8   11:48:33      MS. STEWART:  Q  Do you recognize this document?

9   11:48:51      A.   Yes.

10  11:48:52      Q.   What is it?

11  11:48:54      A.   Well, it was a communications from the

12  11:49:01   ProtectMarriage.com-Yes on 8 that informed those who

13  11:49:09   received our E-mails about these aspects.

14  11:49:12      Q.   And are you saying this was an E-mail

15  11:49:16   communication?

16  11:49:19      A.   Yeah, it appears to be so, yes.

17  11:49:22      Q.   It's not a web page, it's an E-mail, as far as

18  11:49:24   you can tell?

19  11:49:25      A.   As far as I can tell.

20  11:49:26      Q.   And how do you know that, by the way?

21  11:49:28      A.   How do I know it's an E-mail?

22  11:49:30      Q.   Yes, is there something about --

23  11:49:33      A.   Primarily the "unsubscribe" at the bottom.

24  11:49:36      Q.   Okay.  Fair enough.  Thank-you.

25  11:49:39         I'm going to direct your attention to the

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

| | | |
|---|---|---|
| 1 | 11:49:48 | second page under the heading "IProtectMarriage.com |
| 2 | 11:49:55 | targets the youth vote, the facts about the Prop 8 |
| 3 | 11:49:59 | campaign." |
| 4 | 11:50:00 | Do you see that. |
| 5 | 11:50:01 | A.   Yes. |
| 6 | 11:50:01 | Q.   And it says in the first paragraph under that |
| 7 | 11:50:04 | heading "In conjunction with the Pastors Rapid Response |
| 8 | 11:50:08 | Network, we recently launched a website targeting the |
| 9 | 11:50:11 | youth vote in California.  At the IProtectMarriage.com |
| 10 | 11:50:16 | website young people in California can learn about the |
| 11 | 11:50:19 | important issues involved in Proposition 8 and can sign |
| 12 | 11:50:20 | up to help." |
| 13 | 11:50:21 | Do you see that language? |
| 14 | 11:50:22 | A.   Yes. |
| 15 | 11:50:23 | Q.   Is it true that in conjunction with the |
| 16 | 11:50:26 | Pastors Rapid Response Network, the ProtectMarriage.com |
| 17 | 11:50:34 | launched the website known as IProtectMarriage.com? |
| 18 | 11:50:42 | A.   To the degree that it states it here, I would |
| 19 | 11:50:44 | say it appears to be true.  It was -- it wasn't under my |
| 20 | 11:50:51 | primary supervision. |
| 21 | 11:50:53 | Q.   But do you dispute the accuracy of that |
| 22 | 11:50:58 | statement? |
| 23 | 11:51:03 | A.   Well, I guess the accuracy would hinge on the |
| 24 | 11:51:06 | term "conjunction."  There -- the Pastors Rapid Response |
| 25 | 11:51:13 | Network acted for the passage of Prop 8.  And whether |

1    03:22:32        THE WITNESS:  Members of the LDS Church played an

2    03:22:35    important role.

3    03:22:36        MS. STEWART:  Q  And they did so both in terms of

4    03:22:38    money; correct?  They did so in terms of money?

5    03:22:42        MS. MOSS:  Objection.  Lack of foundation.

6    03:22:48        THE WITNESS:  I don't -- I don't know the degree to

7    03:22:49    which donations are public, specific to any particular

8    03:22:57    religious denomination.

9    03:23:00        MS. STEWART:  Q  Do you recall saying at The Church

10   03:23:02    on the Hill event that the LDS got involved in Prop 22,

11   03:23:07    and they were significant in the battle both in finances

12   03:23:10    and foot soldiers?

13   03:23:11        A.   No.

14   03:23:12        Q.   Do you believe that to be true that they were

15   03:23:14    significant in the battle both in finances and foot

16   03:23:18    solders?

17   03:23:19        A.   Of Prop 22?

18   03:23:20        Q.   Yes.

19   03:23:21        MS. MOSS:  Object to the form of the question to

20   03:23:22    the term "foot soldiers" being undefined.  But if you

21   03:23:27    understand, you can answer.

22   03:23:28        THE WITNESS:  To -- as I would define "foot

23   03:23:36    soldiers" being people who would be willing to be active

24   03:23:40    in the cause, yes.

25   03:23:41        MS. STEWART:  Q  And wasn't it equally true in

1   03:23:46   connection with Proposition 8 that the LDS were

2   03:23:50   significant in the battle both in terms of finances and

3   03:23:53   foot soldiers?

4   03:23:56        MS. MOSS:  Object to the extent there's a lack of

5   03:23:58   foundation.  And he's already testified he doesn't know

6   03:24:03   the particular religious faith of the donors.  If you

7   03:24:12   think of more, you can add to it.

8   03:24:15        THE WITNESS:  I really don't.

9   03:24:17        MS. STEWART:  Q  You don't know?

10  03:24:18        A.   I don't have anything more to add other than

11  03:24:20   what I've already stated.

12  03:24:21        Q.   But you didn't answer my question.  Either you

13  03:24:23   know or don't know.  It's a "yes" or "no" question.

14  03:24:26             Isn't it true that in Proposition 8, the LDS

15  03:24:30   were significant in the battle both in finances and foot

16  03:24:35   solders?

17  03:24:35        A.   I continue to take issue with the vague

18  03:24:38   generalization of the LDS.  I have attempted to

19  03:24:41   stipulate that the LDS leadership has endorsed it.  And

20  03:24:45   Mormans in California were active in participation in

21  03:24:49   giving.

22  03:24:49        Q.   And so they both the church and its member

23  03:24:53   collectively both gave money and time; is that true?

24  03:25:02        MS. MOSS:  Objection.  I think the fact on what

25  03:25:06   they gave I think was an in-kind contribution --

1    03:25:10        MS. STEWART:  The church gave.

2    03:25:11        MS. MOSS:  That the church gave.

3    03:25:13        MS. STEWART:  Q  Did the church members, to your

4    03:25:14    knowledge, donate significant amounts of money to the

5    03:25:18    Proposition 8 campaign?

6    03:25:20        A.   To my knowledge, yes.

7    03:25:22        Q.   And significant amounts of money?

8    03:25:24        MS. MOSS:  I'm going to --

9    03:25:26        THE WITNESS:  I don't know the percentage.

10   03:25:54        MS. STEWART:  Q  I'm going to ask you to take a

11   03:25:55    look at the paragraph under the heading "LDS Church

12   03:25:59    Takes Active Role in Supporting Prop 8."

13   03:26:04            First of all, I want to go back.  You said

14   03:26:06    that you would have worded it differently when I asked

15   03:26:08    you about the heading itself.

16   03:26:10        A.   Uh-huh.

17   03:26:11        Q.   But my question is do you disagree with the

18   03:26:13    statement that the LDS Church took an active role in

19   03:26:18    supporting Proposition 8?

20   03:26:25        A.   The reason that I take issue with this title

21   03:26:29    is because it lumps two groups together:  One of

22   03:26:35    leadership and one of grassroots Californians.

23   03:26:39        Q.   But this is a ProtectMarriage.com

24   03:26:42    communication; correct?

25   03:26:43        A.   Correct.

| | | |
|---|---|---|
| 1 | 03:26:43 | Q.   Is it misleading in your view? |
| 2 | 03:26:49 | A.   It doesn't state it as clearly as I would have |
| 3 | 03:26:52 | liked. |
| 4 | 03:26:59 | Q.   Is it true that as the second paragraph says |
| 5 | 03:27:00 | that the LDS Church rarely takes an official stand on |
| 6 | 03:27:05 | political issues? |
| 7 | 03:27:11 | A.   Yes. |
| 8 | 03:27:13 | Q.   And is it true that in this case the first |
| 9 | 03:27:17 | presidency sent a letter to church leaders in |
| 10 | 03:27:22 | California, at least, regarding -- supporting |
| 11 | 03:27:28 | Proposition 8? |
| 12 | 03:27:30 | A.   I believe that it's true that it was sent to |
| 13 | 03:27:33 | California's leaders. |
| 14 | 03:27:35 | Q.   Were you ever shown or told any part of the |
| 15 | 03:27:38 | content of that letter? |
| 16 | 03:27:39 | A.   No.  No. |
| 17 | 03:27:51 | Q.   I want you to look at the third page of this |
| 18 | 03:27:53 | document where it has a heading "Pastor's committee |
| 19 | 03:28:02 | continues push to organize churches." |
| 20 | 03:28:04 | Do you see that? |
| 21 | 03:28:05 | A.   Yes. |
| 22 | 03:28:05 | Q.   Were you -- well, first of all, do you have an |
| 23 | 03:28:08 | understanding of what this newsletter means by the |
| 24 | 03:28:14 | reference to pastor's committee? |
| 25 | 03:28:20 | A.   No. |

175

```
1   03:28:23      Q.   So when it says "Pastor's committee continues
2   03:28:29  push to organize churches," do you have any
3   03:28:33  understanding of what that's referring to?
4   03:28:35      A.   No.
5   03:28:35      Q.   And underneath that it says "On June 17th,
6   03:28:39  2008, Jim Garlow, a senior pastor of Skyline Church in
7   03:28:45  San Diego, released an invitation letter to the State's
8   03:28:48  pastor community asking them to participate in a
9   03:28:51  state-wide conference call for pastors."
10  03:28:53      Do you see that?
11  03:28:54      A.   Yes.
12  03:28:54      Q.   Were you aware of that when it was happening?
13  03:29:04      A.   After the fact.
14  03:29:06      Q.   Okay.
15  03:29:06      And were you aware -- when you say "after the
16  03:29:09  fact," how far after the fact?
17  03:29:11      A.   I -- I don't know.
18  03:29:17      Q.   When did you first become aware that
19  03:29:19  Pastor Garlow was inviting pastors to participate in
20  03:29:29  conference calls?
21  03:29:29      A.   Well, again, I'm not sure of the date that I
22  03:29:31  became aware of this letter.  It was shortly after the
23  03:29:38  letter went out would be.
24  03:29:41      Q.   And so sometime in later in June in 2008, you
25  03:29:45  knew that Pastor Garlow was making those efforts?
```

1    03:29:51        A.    I -- I knew of Pastor Garlow's desire to
2    03:29:57   connect with the pastor community.
3    03:29:59        Q.    And is it true that "The Call" in June was the
4    03:30:07   first of a series of pastor meetings, as the letter
5    03:30:11   indicates, in the -- as the newsletter indicates in the
6    03:30:14   next paragraph.
7    03:30:17        A.    And is it true?
8    03:30:20        Q.    Yes.
9    03:30:21        A.    If the meetings are the webinars that we've
10   03:30:23   already discussed, yes.
11   03:30:26        Q.    And did the pastor meetings serve to kick off
12   03:30:32   an aggressive grassroots campaign amongst churches of
13   03:30:38   varying denominations?
14   03:30:47        A.    The pastor meeting that Jim Garlow put
15   03:30:50   together was the first of several.  That's -- that's as
16   03:31:03   much as I know.
17   03:31:04        Q.    Did the pastor meetings result in a
18   03:31:08   development of a grassroots campaign?
19   03:31:20        A.    I'm -- I'm struggling for -- allow me a
20   03:31:32   minute, if you would.
21   03:31:43             To answer your question, all that I can say is
22   03:31:46   that this served to kick off Jim Garlow's aggressive
23   03:31:56   campaign amongst churches.
24   03:31:58        Q.    And what do you know about Jim Garlow's
25   03:32:01   aggressive campaign amongst churches?

177

1   03:32:05        A.    Only what we've already addressed, webinars.

2   03:32:08        Q.    You don't know what results those webinars had

3   03:32:11   in terms of pastors going out --

4   03:32:13        A.    No.

5   03:32:13        Q.    -- into their church communities?

6   03:32:15        A.    No, I don't.

7   03:32:16        Q.    Is it true that the Yes on 8 campaign was the

8   03:32:21   largest grassroots campaign in California history?

9   03:32:25        A.    I believe so.

10  03:32:27        Q.    Okay.

11  03:32:28              And who was responsible for the grassroots

12  03:32:34   parts of the Yes on 8 effort?

13  03:32:38        MS. MOSS:  To the extent that's public, which I

14  03:32:41   don't believe it is, but to the extent it is, you can

15  03:32:43   answer.  If not, I direct you not to answer under First

16  03:32:48   Amendment grounds.

17  03:32:49        THE WITNESS:  I choose not to answer.

18  03:32:50        MS. STEWART:  Q  Were the pastors and the churches

19  03:32:52   in part responsible for the grassroots effort?

20  03:32:56        A.    Are you asking if they participated?

21  03:32:58        Q.    Yes.

22  03:32:58        A.    They participated in the grassroots efforts.

23  03:33:00        Q.    Were there others that participated in the

24  03:33:02   grassroots effort?

25  03:33:05        A.    I don't believe that they were public.

1   03:33:07      Q.   So is your answer --

2   03:33:09      A.   I would choose not to answer.

3   03:33:11      Q.   You don't know of any other people or groups

4   03:33:18   who participated in a grassroots effort in a public way

5   03:33:22   except for the pastors of the churches; is that fair?

6   03:33:26      A.   I don't know of any publicly communicated

7   03:33:35   effort that participated in the grassroots campaign.

8   03:33:40      Q.   Were the simulcasts a part of a grassroots

9   03:33:44   campaign?

10  03:33:49      A.   I guess it would depend upon your definition

11  03:33:52   of "grassroots."

12  03:33:53      Q.   Well, have you used the phrase "grassroots" to

13  03:33:56   describe the success of the Yes on 8 campaign?

14  03:34:00      A.   I'm sure I have.

15  03:34:01      Q.   And have you stated that that campaign was the

16  03:34:07   largest grassroots effort in California ever?

17  03:34:11      A.   Yes.

18  03:34:12      Q.   And so as you use that term, were the

19  03:34:18   simulcasts a part of an effort to create a grassroots

20  03:34:26   campaign?

21  03:34:27      A.   Were -- was it my understanding that the

22  03:34:30   simulcasts were part of the grassroots campaign?

23  03:34:33      Q.   Yes.

24  03:34:33      A.   Yes.

25  03:34:34      Q.   And Pastor Garlow as least was involved in the

```
1   05:22:37        Q.    How are voters to know which use you were
2   05:22:40   making of the term "ProtectMarriage.com" when you use
3   05:22:43   that term in public communications?
4   05:22:53        A.    How -- how are voters to know -- sorry.
5   05:22:59        Q.    I'm a voter.  I receive a communication from
6   05:23:04   ProtectMarriage.com talking about the efforts of
7   05:23:09   ProtectMarriage.com.
8   05:23:11        How am I as a voter to know whether that
9   05:23:16   communication is referring to the broad-based coalition
10  05:23:19   described on this document or just the executive
11  05:23:27   committee of the primarily formed ballot committee?
12  05:23:32        A.    Within these two documents, I see the Yes on
13  05:23:36   Proposition 8 campaign which refers to the committee
14  05:23:39   itself.  I see -- I believe there was another one that
15  05:23:46   referred to it in a different way on the same page, I'm
16  05:23:49   not finding it right now, however.
17  05:23:53        And so on document 25, Yes on Proposition 8
18  05:24:01   ProtectMarriage.com campaign, that's -- that's the
19  05:24:06   difficulty I'm having as we discuss this in that we may
20  05:24:11   refer to the campaign in general.  And many
21  05:24:16   organizations who make reference to the passage of
22  05:24:25   Prop 8.  But then there's -- there's a very clear
23  05:24:29   campaign committee that's headed up by a executive
24  05:24:35   committee.
25  05:24:35        Q.    Did you expect the voters in reviewing
```

| | | |
|---|---|---|
| 1 | 05:24:38 | communications that were from -- that referred to |
| 2 | 05:24:44 | ProtectMarriage.com to make a distinction between the |
| 3 | 05:24:46 | coalition that's mentioned on Exhibit 25 and the |
| 4 | 05:25:05 | ProtectMarriage campaign executive committee? |
| 5 | 05:25:10 | A.    Did I expect the voters to be able to make a |
| 6 | 05:25:12 | distinction between what -- |
| 7 | 05:25:14 | Q.    Between -- in reviewing communications that |
| 8 | 05:25:16 | they received from ProtectMarriage.com that referred to |
| 9 | 05:25:20 | ProtectMarriage.com, did you expect voters to |
| 10 | 05:25:24 | distinguish between the executive committee or the |
| 11 | 05:25:28 | primarily formed ballot committee on the one hand, and |
| 12 | 05:25:31 | the broad coalition that you've described on -- or that |
| 13 | 05:25:35 | is described on Exhibit 25 in the last paragraph? |
| 14 | 05:25:42 | A.    Well, I can't speak for everyone who wrote on |
| 15 | 05:25:45 | behalf of the campaign committee.  But I think that |
| 16 | 05:25:49 | there were very clearly incidents where we were very |
| 17 | 05:25:54 | specific about the ProtectMarriage.com-Yes on 8 campaign |
| 18 | 05:26:00 | committee. |
| 19 | 05:26:00 | Q.    What were you the chairman of? |
| 20 | 05:26:04 | A.    I was the chairman of the ad hoc executive |
| 21 | 05:26:07 | committee. |
| 22 | 05:26:07 | Q.    Were you also the chairman of ProtectMarriage |
| 23 | 05:26:12 | in the broader sense of that term? |
| 24 | 05:26:15 | A.    Define the broader sense of the term. |
| 25 | 05:26:17 | Q.    The coalition described at the bottom of |

1  05:26:20  Exhibit 25.

2  05:26:23      A.   No, because there was no -- there was no

3  05:26:26  organization as such.

4  05:26:28      Q.   Look back at Exhibit 26, if you would.

5  05:26:41           Do you see at the top it has a photograph of

6  05:26:43  you?

7  05:26:45      A.   Yes.

8  05:26:45      Q.   And underneath it says "Ron Prentice,

9  05:26:48  coalition chairman"?

10 05:26:49      A.   Yes.

11 05:26:50      Q.   Does that suggest that you were the chairman

12 05:26:53  of the broad-based coalition that is referred to in so

13 05:26:57  many of the communications from ProtectMarriage.com?

14 05:27:10      A.   I would say wrongly so, yes.

15 05:27:32      MS. STEWART:   I'm going to give you what we'll mark

16 05:27:54  as 29.

17 05:27:55      (Whereupon, Exhibit No. 29 was

18 05:28:10      Marked for identification.)

19 05:28:10      MS. STEWART:   Q  Take a minute to look at it and

20 05:28:13  tell me if you have ever seen this document before.

21 05:28:51           (Pause in the proceedings.)

22 05:29:18      THE WITNESS:   I've never seen this document before.

23 05:29:21      MS. STEWART:   Q  In any event, do you recall

24 05:29:23  participating in a conference call organized by the

25 05:29:26  Pastors Rapid Response Team on or about July 30th, 2008?

228

```
1    05:29:47        A.    I don't have any memory of this.

2    05:29:50        Q.    You testified earlier that you did participate

3    05:29:54   in some conference calls organized by the Pastors Rapid

4    05:29:59   Response Team; correct?

5    05:30:00        A.    Yes.

6    05:30:01        Q.    Do you have any reason to doubt -- well, let

7    05:30:04   me focus your attention on the third page of this

8    05:30:09   document, which appears to be some, sort of, perhaps

9    05:30:13   agenda, it's not entirely clear, for a conference call

10   05:30:20   it has a July 30, 2008 date.  And on the third page,

11   05:30:25   Item 5 it says "How to Educate your State."

12   05:30:30              Do you see that?

13   05:30:30        A.    Yes.

14   05:30:31        Q.    And it lists Tony Perkins with a website

15   05:30:35   www.FRC.org.

16   05:30:37              Do you see that?

17   05:30:39        A.    Yes.

18   05:30:40        Q.    And underneath that your name and

19   05:30:42   www.CaliforniaFamily.org.

20   05:30:46              Do you see?

21   05:30:47        A.    Yes.

22   05:30:47        Q.    And underneath that Frank Shubert,

23   05:30:48   Shubert-Flint Public Affairs, Sacramento.

24   05:30:52              Do you see that?

25   05:30:53        A.    Yes.
```

| | | |
|---|---|---|
| 1 | 06:59:11 | MS. STEWART:  Can you read that back. |
| 2 | 06:59:13 | (Record read.) |
| 3 | 06:59:49 | MS. STEWART:  Q  Have you ever referred to the |
| 4 | 06:59:51 | coalition of groups that worked to pass Proposition 8 in |
| 5 | 06:59:57 | the way you just stated a minute, that is as a vague, |
| 6 | 07:00:03 | non-descript, assimilation of groups attempting to pass |
| 7 | 07:00:07 | Proposition 8? |
| 8 | 07:00:08 | A.   No. |
| 9 | 07:00:09 | Q.   I would prefer to stick to the description |
| 10 | 07:00:13 | that ProtectMarriage.com has used on its own materials |
| 11 | 07:00:16 | rather than come up with something completely different, |
| 12 | 07:00:19 | if you don't mind. |
| 13 | 07:00:21 | And it's my understanding that that |
| 14 | 07:00:22 | description is still on ProtectMarriage.com's website |
| 15 | 07:00:25 | today.  And it's the same language that's in this |
| 16 | 07:00:29 | Exhibit 25, a broad-based coalition of California |
| 17 | 07:00:34 | families, community leaders, religious leaders, |
| 18 | 07:00:38 | pro-family organizations and individuals from all walks |
| 19 | 07:00:40 | of life who have joined together to support |
| 20 | 07:00:43 | Proposition 8. |
| 21 | 07:00:45 | So that's how I'm using the term coalition in |
| 22 | 07:00:48 | my question.  And you can say "yes" or "no" and if it |
| 23 | 07:00:51 | doesn't fit, it doesn't fit. |
| 24 | 07:00:53 | So with that understanding of the term |
| 25 | 07:00:55 | "coalition," was the Family Research Council apart of |

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

| | | |
|---|---|---|
| 1 | 07:01:01 | that coalition? |
| 2 | 07:01:11 | THE WITNESS:  Can I? |
| 3 | 07:01:13 | MS. MOSS:  Yes. |
| 4 | 07:01:54 | (Pause in the proceedings.) |
| 5 | 07:01:58 | THE WITNESS:  Would you repeat the question? |
| 6 | 07:02:00 | (Record read.) |
| 7 | 07:02:24 | THE WITNESS:  As I understand the definition that |
| 8 | 07:02:26 | you're using for "coalition," no. |
| 9 | 07:02:29 | MS. STEWART:  Q  And was Advocates for Faith and |
| 10 | 07:02:31 | Freedom a part of that coalition? |
| 11 | 07:02:34 | A.    No. |
| 12 | 07:02:35 | Q.    And how about the Western Center for Law and |
| 13 | 07:02:37 | Policy? |
| 14 | 07:02:38 | A.    No. |
| 15 | 07:02:40 | Q.    And how about Fieldstead and Company? |
| 16 | 07:02:44 | A.    No. |
| 17 | 07:02:54 | Q.    How about the Concerned Women for America? |
| 18 | 07:02:57 | A.    No. |
| 19 | 07:02:57 | MS. STEWART:  Duly noted, thank-you, Mr. Pugno. |
| 20 | 07:03:22 | We will stop and give everybody a rest until |
| 21 | 07:03:25 | morning. |
| 22 | 07:03:27 | THE VIDEOGRAPHER:  This marks the end of tape No. 5 |
| 23 | 07:03:29 | in volume 1.  And we're off the record at 7:03. |
| 24 | 07:03:34 | COURT REPORTER:  For the record, who would like a |
| 25 | 07:03:35 | copy? |

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

                    Plaintiffs,

        vs.                              Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
                    Defendants.
_____/



Deposition of

RONALD PRENTICE

Volume II

Friday, December 18, 2009




REPORTED BY:  LESLIE CASTRO, CSR #8876



BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

1    11:30:04   ProtectMarriage.com?

2    11:30:05      MS. MOSS:  If you've used the phrase publicly, you

3    11:30:07   can respond.

4    11:30:14      THE WITNESS:  I don't know.

5    11:30:16      MS. STEWART:  Q  Was there a steering committee as

6    11:30:19   distinct from the executive committee?

7    11:30:25      MS. MOSS:  I need to confer with him before he

8    11:30:27   responds so he doesn't reveal privileged information.

9    11:30:35            (Pause in the proceedings.)

10   11:31:02      THE WITNESS:  Could you repeat the question?

11   11:31:04      MS. STEWART:  Q  Was there a steering committee for

12   11:31:07   ProtectMarriage.com?

13   11:31:08      A.   No.

14   11:31:14      Q.   I'm going to ask you to put my files in order

15   11:31:26   for me -- to take a look at a document that will be

16   11:31:42   marked Exhibit 55.

17   11:31:42   (Whereupon, Exhibit No. 55 was

18   11:32:08   Marked for identification.)

19   11:32:12      MS. STEWART:  Q  Have you seen this document

20   11:32:14   before?

21   11:32:34      A.   No.

22   11:32:36      Q.   Do you recall whether you spoke to a reporter

23   11:32:39   by the name of Margie Palmer about Senate Bill 777 in

24   11:32:49   January of 2008?

25   11:32:50      A.   I don't recall.

98

| 1 | 11:32:52 | Q. Did you issue a press release for California |
| 2 | 11:32:56 | Family Council on the topic of Senate Bill 777 in or |
| 3 | 11:33:02 | around January of 2008? |
| 4 | 11:33:09 | A. I don't recall. |
| 5 | 11:33:10 | Q. If you look at the first page of this |
| 6 | 11:33:14 | document, it says that "Attorneys for the Alliance |
| 7 | 11:33:20 | Defense Fund and Advocates for Faith and Freedom filed |
| 8 | 11:33:25 | suit in Federal Court in San Diego on November 27 |
| 9 | 11:33:28 | attempting to over turn Senate Bill 777." |
| 10 | 11:33:32 | Do you fleet that? |
| 11 | 11:33:32 | A. Yes. |
| 12 | 11:33:34 | Q. And in the next paragraph it says "The lawsuit |
| 13 | 11:33:37 | filed on behalf of the California Education Committee, a |
| 14 | 11:33:40 | project of California Family Council claims Senate Bill |
| 15 | 11:33:44 | 777 is unconstitutionally vague and violates the privacy |
| 16 | 11:33:48 | of all students, teachers and other persons present on |
| 17 | 11:33:51 | school campuses." |
| 18 | 11:33:52 | Do you see that? |
| 19 | 11:33:53 | A. Yes. |
| 20 | 11:33:54 | Q. Is that accurate that the California Education |
| 21 | 11:33:58 | Committee, a project of the California Family Council, |
| 22 | 11:34:00 | filed a lawsuit in January of 2008 challenging Senate |
| 23 | 11:34:05 | Bill 777. |
| 24 | 11:34:07 | A. Yes. |
| 25 | 11:34:11 | Q. And do you know Priscilla Schrieber? |

BONNIE L. WAGNER & ASSOCIATES
(415) 982-4849

# EXHIBIT C

# Exhibit Lodged with Court –
# To Be Filed Under Seal

# EXHIBIT D

# Exhibit Lodged with Court –
# To Be Filed Under Seal

# EXHIBIT E

From: "Ron Prentice" <ronp@californiafamily.org>
Subject: FW: 'As California goes, so goes . . .'
Date: March 10, 2008 9:11:44 AM PDT
To: "Dan Kirby" <DanK@californiafamily.org>, "Karen Holgate" <karenlholgate@aol.com>, "Lynne Fishel" <LynneF@californiafamily.org>, "Rebecca Burgoyne" <BeckyB@CaliforniaFamily.org>, <ronp@californiafamily.org>, "Trudy Thomas" <TrudyT@californiafamily.org>
Cc: "Chris Clark" <pastorcsquared@sbcglobal.net>, "Charles LiMandri" <cslimandri@aol.com>, "Jim Garlow" <JimGarlow@cox.net>, "Joe Infranco" <jinfranco@telladf.org>, "Miller, Brad" <brad.miller@fotf.org>, "Miles McPherson" <mac330@therocksandiego.org>, "Passignano, Mona" <mona.passignano@fotf.org>, "Penny Harrington, CWA of CA" <legislation@california.cwfa.org>, "Brandt, Peter" <peter.brandt@fotf.org>, "SB" <sjbdr@hotmail.com>
‣ 1 Attachment, 0.1 KB

As promised, FRC put this out for PM.com today. I wrote the draft for them last Friday. Ron

---

From: Family Research Council [mailto:frcpub@frc.org]
Sent: Monday, March 10, 2008 9:56 AM
To: ronp@californiafamily.org
Subject: 'As California goes, so goes . . .'

Family Research Council





Marriage on the Verge in the Golden State

'As California goes, so goes . . .'
March 10, 2008 | Refer a Friend

Eight years ago in California, nearly 62% of the Golden State's voters protected the definition of marriage as the union of only a man and a woman by passing Proposition 22. Since then, attempts to destroy marriage have been relentless:

- Two attempts have been made by the California legislature to legalize homosexual marriage; both were vetoed by Governor Schwarzenegger.
- All rights, responsibilities and privileges of marriage in California are now given to registered domestic partners.
- Superior Court Judge Richard Kramer ruled Prop 22 unconstitutional in 2005; that decision was overturned by the State Appellate Court.

Now, the case against Prop 22 is before the State Supreme Court. After oral arguments in the case, it appears very likely that the majority of judges on California's highest court will rule against the current meaning of marriage, opening up God's ordained institution to same-sex couples. A decision will come from the court no later than the end of May. Seeing this danger approaching, a strong network of organizations, ministries, pastors, and individuals created the *ProtectMarriage.com* coalition in 2005. From this, an initiative of the people, known as the California Marriage Protection Act, is now gathering signatures in order to qualify a **constitutional amendment** for the November 2008 ballot.

**In this critical stage, both for California and the nation, additional money is needed to get the necessary number of petition signatures!** Thus far, more than $1.2 million has been raised. Still, **funding** is needed to ensure the effort's success.

I recently participated in special gatherings of California pastors to inform them of the state's attack on traditional marriage and to ask for their help in acquiring signatures. I told the pastors that "today's conservative legislators are convinced their greatest battles concern the dismantling of religious liberties. The redefinition of marriage will eventually legally silence the truth of God's Word from the pulpits of our churches. As evidenced in other countries, pastors will be accused of 'hate speech' and discrimination."

As of today, endorsements of the marriage petition number well over 500 groups, and more than 1,500

pastors have participated in events where petitions have been distributed. This statewide, organized effort among churches is broader and more cooperative than any effort that has ever come before it, crossing denominational and theological lines for the purpose of defending our families and our children.

"Responses from citizens throughout California have been overwhelming and very encouraging," says Ron Prentice, chairman of the PM.com steering committee and director of the California Family Council. "The phones ring non-stop, requests for petitions are coming all day, every day, and hundreds of churches are being assisted in their petition drives."

With one month left before the signature collection deadline, the progress toward accomplishing the goal of 1.1 million signatures is very good! Thus far, more than half the requisite number of signatures has been collected, and the returns are growing by the day! We can't afford to stop here and risk defeat before Californians are even allowed to vote.

To financially support the efforts of *ProtectionMarriage.com* to place the natural and biblical definition of marriage into California's constitution, **click here**. Every gift is needed, no matter how small. On marriage as on so much else, as California goes, so goes the nation. Thank you and God bless you for donating to this crucial petition drive for marriage as we've always known it.

### 'As California goes, so goes . . .'

Sincerely,

Tony Perkins
President

**P.S.** Please donate to this effort and encourage your friends to do likewise by forwarding this email. The loss of marriage in the Golden State would be a grave defeat for our efforts to secure marriage for generations of Americans to come. Again, God bless you.

**Family Research Council:** 801 G Street N.W. Washington, D.C. 20001
P: 202/393-2100 or 800/225-4008 ▯W: frc.org ▯unsubscribe
You are subscribed to Grassroots Alerts as ronp@californiafamily.org

# EXHIBIT F

# Exhibit Lodged with Court –
# To Be Filed Under Seal

# EXHIBIT G

From: Ron Prentice <ronp@californiafamily.org>
Subject: Re: connecting the producer of Dr. Phil (Wendi Wan) with the producer of the satellite simulcast (Derek Packard)
Date: November 15, 2008 11:24:35 PM PST
To: Jim Garlow <jimgarlow@cox.net>

Jim – I don't agree that using footage from the simulcasts is a good decision for the Dr. Phil Show.  I believe, as is common, that the producer desires to portray Prop 8 negatively, as a religious issue.  We would do well to downplay that issue.  You did a very good job on Larry King Live, by the way, and chose to downplay the biblical side.  Of course, that was a strategic decision by you, based on the audience and the opposition. The producer desires to create an "entertaining" program, and using simulcast content would contribute to it.  Unfortunately, the entertainment may be the selection by the producer of simulcast content, taken out of context. You have shown discernment in knowing your audience and choosing to use or not use "religious" arguments.  I strongly encourage you not to use simulcast content.  Ron

On 11/15/08 10:35 PM, "Jim Garlow" <jimgarlow@cox.net> wrote:

Wendi

I talked to Derek Packard tonite

Derek Packard, as producer, says he can give permission

He is filling out the form & emailing it to me and to you

And – his phone number is  (719) 291-0466

Derek

Wendi Wan is the producer for Dr. Phil

Her number is (323) 956-3368

Reminder
I am gone to Texas – Sun nite / all day Monday

I'll have my phone / blackberry
619.890.5466

Jim

0076

# EXHIBIT H

# Exhibit Lodged with Court –
# To Be Filed Under Seal