1
2
3
4
5
6
7

COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Nicole J. Moss (DC Bar No. 472424)*
*nmoss@cooperkirk.com*
Peter A. Patterson (OH Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

8
9
10

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

11
12
13
14

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

15
16

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, MARK A. JANSSON, and
PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL

17

* Admitted *pro hac vice*

18
19

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20  KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, | CASE NO. 09-CV-2292 VRW |
| 21                             Plaintiffs, | **DECLARATION OF NICOLE JO MOSS IN SUPPORT OF DEFENDANT-INTERVENORS** |
| 22  CITY AND COUNTY OF SAN FRANCISCO, | **PROPOSITION 8 PROPONENTS AND PROTECTMARRIAGE.COM'S** |
| 23                     Plaintiff-Intervenor, | **OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO REOPEN THE DEPOSITION OF RONALD PRENTICE** |
| 24                        v. | |
| 25 | |
| 26  ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. | Trial Date: January 11, 2010 Location: Courtroom 6, 17th Floor |
| 27  BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his | Judge: Chief Judge Vaughn R. Walker |
| 28  official capacity as Director of the California | |

Dockets.Justia.com

1  Department of Public Health and State Registrar of
   Vital Statistics; LINETTE SCOTT, in her official
2  capacity as Deputy Director of Health Information
   & Strategic Planning for the California Department
3  of Public Health; PATRICK O'CONNELL, in his
   official capacity as Clerk-Recorder for the County
4  of Alameda; and DEAN C. LOGAN, in his official
   capacity as Registrar-Recorder/County Clerk for
5  the County of Los Angeles,
6
7                    Defendants,
8  and
9  PROPOSITION 8 OFFICIAL PROPONENTS
   DENNIS HOLLINGSWORTH, GAIL J.
10 KNIGHT, MARTIN F. GUTIERREZ, HAK-
   SHING WILLIAM TAM, and MARK A.
11 JANSSON; and PROTECTMARRIAGE.COM –
   YES ON 8, A PROJECT OF CALIFORNIA
12 RENEWAL,
13                Defendant-Intervenors.

14
15   Additional Counsel for Defendant-Intervenors
16
   ALLIANCE DEFENSE FUND
17 Timothy Chandler (CA Bar No. 234325)
   *tchandler@telladf.org*
18 101 Parkshore Drive, Suite 100, Folsom, California 95630
   Telephone: (916) 932-2850, Facsimile: (916) 932-2851
19
   Jordan W. Lorence (DC Bar No. 385022)*
20 *jlorence@telladf.org*
   Austin R. Nimocks (TX Bar No. 24002695)*
21 *animocks@telladf.org*
   801 G Street NW, Suite 509, Washington, D.C. 20001
22 Telephone: (202) 637-4610, Facsimile: (202) 347-3622
23 * Admitted *pro hac vice*
24
25
26
27
28

DECLARATION OF NICOLE JO MOSS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO MOTION TO REOPEN
PRENTICE DEPOSITION – CASE NO. 09-CV-2292 VRW

I, Nicole Jo Moss, declare as follows in support of Defendant-Intervenors' ("the Proponents") Opposition to Plaintiffs' Motion to Reopen the Deposition of Ronald Prentice:

1.      I am counsel for the Proponents in the above-captioned matter. The information stated in this declaration is based on my personal knowledge and if called as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit A to this declaration are copies of the portions of Mr. Prentice's deposition transcripts where he discussed the nature of the ProtectMarriage.com coalition.

3.      Attached as Exhibit B to this declaration are copies of the portions of Mr. Prentice's deposition transcripts where he was questioned about the Church of Jesus Christ of Latter-Day Saints.

4.      Attached as Exhibit C to this declaration are copies of the portions of Mr. Prentice's deposition transcripts where he discussed Pastor James Garlow's grassroots campaign.

5.      Attached as Exhibit D to this declaration are copies of the portions of Mr. Prentice's deposition transcripts where he discussed ProtectMarriage.com's involvement, or lack thereof, in developing and supervising content for the iProtectMarriage.com website.


I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on January 20, 2010.


By:      /s/ Nicole Jo Moss
         Nicole Jo Moss

1

DECLARATION OF NICOLE JO MOSS IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO MOTION TO REOPEN
PRENTICE DEPOSITION – CASE NO. 09-CV-2292 VRW

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

                    Plaintiffs,

        vs.                          Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
                    Defendants.
_____/



                    Deposition of

                    RONALD PRENTICE

                    Volume I

                Thursday, December 17, 2009



REPORTED BY:  LESLIE CASTRO, CSR #8876



                BONNIE L. WAGNER & ASSOCIATES
                    Court Reporting Services
                41 Sutter Street, Suite 1605
                San Francisco, California 94104
                    (415) 982-4849

**Page 54**

| | | |
|---|---|---|
| 10:16:35 | 1 | MS. STEWART: Just before you respond, I want to |
| 10:16:37 | 2 | see if we can make a stipulation for the record going |
| 10:16:40 | 3 | forward that I don't have to repeatedly ask the witness |
| 10:16:45 | 4 | if he is going to follow your instruction. |
| 10:16:48 | 5 | MS. MOSS: That is fine. |
| 10:16:49 | 6 | MS. STEWART: I'm going to pretty much assume it |
| 10:16:51 | 7 | unless there's something in the way he answers it |
| 10:16:52 | 8 | that -- |
| 10:16:54 | 9 | MS. MOSS: Sure. |
| 10:16:55 | 10 | MS. STEWART: -- that assumes otherwise. |
| 10:16:58 | 11 | Q. So going back to the question with your |
| 10:17:03 | 12 | counsel's instruction, who was on the ad hoc committee |
| 10:17:04 | 13 | that the board of directors of California Renewal gave |
| 10:17:07 | 14 | authority to form a ballot committee? |
| 10:17:11 | 15 | A. There was myself. There was Ned Dolejsi. |
| 10:17:13 | 16 | There was Mark Jansson. And there's the anonymous |
| 10:17:18 | 17 | person. |
| 10:17:19 | 18 | Q. What was the last name? |
| 10:17:20 | 19 | A. I said anonymous. |
| 10:17:23 | 20 | Q. Yourself, Ned Dolejsi, Mr. Jansson? |
| 10:17:27 | 21 | A. Yes. |
| 10:17:29 | 22 | Q. And then an anonymous person? |
| 10:17:33 | 23 | A. A person who chooses to remain confidential. |
| 10:17:40 | 24 | Q. Did you form an entity that is -- did that ad |
| 10:17:46 | 25 | hoc committee then form an entity? |

**Page 55**

| | | |
|---|---|---|
| 10:17:48 | 1 | A. Yes. |
| 10:17:48 | 2 | Q. And what is that entity? |
| 10:17:51 | 3 | A. The primarily formed ballot measure committee |
| 10:17:55 | 4 | of ProtectMarriage.com-Yes on 8. |
| 10:17:58 | 5 | Q. And what is the form of that entity, if you |
| 10:18:01 | 6 | know? |
| 10:18:02 | 7 | A. When you say "form" -- |
| 10:18:04 | 8 | Q. I mean the legal organization. |
| 10:18:06 | 9 | A. Again, I would -- the best I can do is a |
| 10:18:09 | 10 | ballot measure committee. |
| 10:18:19 | 11 | Q. Is -- what is the title of that ballot measure |
| 10:18:28 | 12 | committee? |
| 10:18:31 | 13 | A. ProtectMarriage.com-Yes on 8. |
| 10:18:33 | 14 | Q. Is ProtectMarriage.com used in any sense |
| 10:18:39 | 15 | that's broader than that ballot measure committee? |
| 10:18:47 | 16 | A. As you know, there are now -- there is now a |
| 10:18:56 | 17 | (c)(3) and (c)(4), ProtectMarriage.com Education |
| 10:19:01 | 18 | Foundation and ProtectMarriage.com Action Fund. |
| 10:19:04 | 19 | Q. Do you sometimes use ProtectMarriage.com to |
| 10:19:06 | 20 | describe a coalition of entities? |
| 10:19:16 | 21 | A. I think that there are a number of entities |
| 10:19:19 | 22 | that would say that they align with the general purposes |
| 10:19:32 | 23 | of ProtectMarriage.com. |
| 10:19:36 | 24 | MS. STEWART: I'm going to have marked as |
| 10:19:38 | 25 | Exhibit 1. |

**Page 56**

| | | |
|---|---|---|
| 10:19:38 | 1 | (Whereupon, Exhibit No. 1 was |
| 10:19:54 | 2 | Marked for identification.) |
| 10:20:06 | 3 | MS. STEWART: Q A document that at the top says |
| 10:20:08 | 4 | "Protect Marriage." And I'm going to ask you to take a |
| 10:20:15 | 5 | look at it and tell me if you recognize it. |
| 10:20:37 | 6 | (Pause in the proceedings.) |
| 10:20:38 | 7 | THE WITNESS: I would say I can only go so far as |
| 10:20:42 | 8 | to say I'm familiar with its general content. I don't |
| 10:20:45 | 9 | know if it's in any way been altered, but yes. |
| 10:20:48 | 10 | MS. STEWART: Q And on the left, it has, sort of, |
| 10:20:52 | 11 | a gray box that says "ProtectMarriage.com" and has some |
| 10:20:57 | 12 | little people. |
| 10:20:59 | 13 | Do you see that? |
| 10:20:59 | 14 | A. Yes. |
| 10:21:00 | 15 | Q. Is that the logo of ProtectMarriage.com or a |
| 10:21:07 | 16 | logo? |
| 10:21:08 | 17 | (Ms. Piepmeier enters the room.) |
| 10:21:16 | 18 | THE WITNESS: I wouldn't say that it's a formal |
| 10:21:19 | 19 | logo, no. |
| 10:21:21 | 20 | MS. STEWART: Q Has ProtectMarriage.com -- |
| 10:21:26 | 21 | A. Thank-you. |
| 10:21:26 | 22 | Q. -- does it have a logo that it has adopted? |
| 10:21:39 | 23 | A. There was a logo that was used during the |
| 10:21:42 | 24 | campaign. So when you refer to ProtectMarriage.com, it |
| 10:21:48 | 25 | does not have a formal logo. |

**Page 57**

| | | |
|---|---|---|
| 10:21:52 | 1 | Q. Was there a logo that it used on its website? |
| 10:22:04 | 2 | MS. MOSS: Just by point of clarification, |
| 10:22:05 | 3 | objection. When you're referring to |
| 10:22:09 | 4 | ProtectMarriage.com, are you referring to -- I guess |
| 10:22:12 | 5 | what specifically are you referring to? Is it a |
| 10:22:16 | 6 | shorthand for Yes on 8 or -- |
| 10:22:19 | 7 | MS. STEWART: You're getting to my other line of |
| 10:22:21 | 8 | questioning, which I diverted from. So let me go back |
| 10:22:24 | 9 | to that and then we'll go back to the logo. |
| 10:22:27 | 10 | As I mentioned earlier, sometimes it's not a linear |
| 10:22:31 | 11 | process, this deposition business. |
| 10:22:33 | 12 | Q. Do you see the first paragraph of this |
| 10:22:35 | 13 | document where it says "ProtectMarriage.com is a growing |
| 10:22:38 | 14 | broad-based coalition of organizations, churches and |
| 10:22:42 | 15 | individuals who believe that marriage's foremost purpose |
| 10:22:47 | 16 | is raising of healthy children in a family with a mom |
| 10:22:50 | 17 | and a dad"? |
| 10:22:51 | 18 | A. Yes. |
| 10:22:52 | 19 | Q. Is that language that was on |
| 10:22:54 | 20 | ProtectMarriage.com's website at some point in time? |
| 10:23:00 | 21 | A. Apparently, this was printed off of its |
| 10:23:02 | 22 | website, and so I would imagine so. |
| 10:23:05 | 23 | Q. And is it accurate that the title |
| 10:23:08 | 24 | "ProtectMarriage.com" was used to refer to a broad-based |
| 10:23:13 | 25 | coalition of organizations and people? |

**Page 58**

| | | |
|---|---|---|
| 10:23:19 | 1 | A.  I would say that ProtectMarriage.com was |
| 10:23:24 | 2 | used -- I would say "yes," and definitely say a |
| 10:23:40 | 3 | broad-based coalition -- loose -- loosely. |
| 10:23:46 | 4 | Q.  And when you say "loosely," what do you mean? |
| 10:23:49 | 5 | A.  It's a loosely-formed coalition. |
| 10:23:52 | 6 | Q.  And who -- what were the organizations that |
| 10:24:00 | 7 | were part of that loosely-based coalition? |
| 10:24:04 | 8 | MS. MOSS:  I'm going to object to the extent |
| 10:24:06 | 9 | that -- two grounds:  One, I still don't think it's |
| 10:24:13 | 10 | clear exactly which -- |
| 10:24:13 | 11 | THE WITNESS:  I agree. |
| 10:24:14 | 12 | MS. MOSS:  -- entity, ProtectMarriage.com entity |
| 10:24:15 | 13 | that you're referring to.  But secondly, to the extent |
| 10:24:18 | 14 | you understand or believe -- understand what entity |
| 10:24:23 | 15 | she's referring to, if it's the Yes on 8 committee, if |
| 10:24:28 | 16 | they were affiliated with organizations and that's |
| 10:24:31 | 17 | publicly known, you can disclose that.  If there was any |
| 10:24:35 | 18 | private affiliations that are not publicly known, I |
| 10:24:39 | 19 | instruct you not to answer. |
| 10:24:40 | 20 | THE WITNESS:  And I interpret your question to |
| 10:24:42 | 21 | refer to the Yes on 8 campaign.  And there were people |
| 10:24:46 | 22 | that would go on to the website and sign on endorsing |
| 10:24:50 | 23 | it.  And that's how loose and how broad-based we |
| 10:24:55 | 24 | interpreted the coalition to be. |
| 10:24:58 | 25 | MS. STEWART:  Q  And so when the website here |

**Page 59**

| | | |
|---|---|---|
| 10:25:07 | 1 | refers to a broad-based coalition of organizations, |
| 10:25:09 | 2 | churches and individuals, was that coalition formed |
| 10:25:18 | 3 | solely by people signing on to the website? |
| 10:25:21 | 4 | A.  Well, actually, as I see at the bottom of |
| 10:25:24 | 5 | this, it says "2005."  So this may be -- if it's 2005, |
| 10:25:31 | 6 | it obviously came before the formation of the ballot |
| 10:25:36 | 7 | measure committee. |
| 10:25:41 | 8 | And I don't know even then whether -- well, |
| 10:25:43 | 9 | there's a page on the left it says "Endorsement" so I |
| 10:25:47 | 10 | guess there was opportunity for people to align with |
| 10:25:51 | 11 | this general cause. |
| 10:25:53 | 12 | Q.  So let me go back to 2005 then. |
| 10:25:56 | 13 | And ask you:  Was -- was there an entity to |
| 10:26:03 | 14 | your knowledge called ProtectMarriage.com in 2005? |
| 10:26:10 | 15 | A.  No, not an entity.  There have been times |
| 10:26:20 | 16 | over -- there have been -- ProtectMarriage.com has been |
| 10:26:26 | 17 | more a general -- general purpose of -- for the benefit |
| 10:26:38 | 18 | of traditional marriage.  And there have been -- and |
| 10:26:45 | 19 | prior to the Yes on 8 campaign, there was not an |
| 10:26:51 | 20 | official entity. |
| 10:26:54 | 21 | Q.  Was there something other than an official |
| 10:26:58 | 22 | entity that you understood ProtectMarriage.com to refer |
| 10:27:04 | 23 | to before -- let's say before 2008? |
| 10:27:12 | 24 | A.  I think that I understood ProtectMarriage.com |
| 10:27:17 | 25 | prior to the ballot measure committee to be, again, a -- |

**Page 60**

| | | |
|---|---|---|
| 10:27:24 | 1 | a generally directed purpose, not an entity. |
| 10:27:33 | 2 | Q.  Was it a coalition? |
| 10:27:39 | 3 | A.  Only to the extent that people aligned with a |
| 10:27:42 | 4 | generally directed purpose. |
| 10:27:46 | 5 | Q.  Do you recall who was part of that coalition |
| 10:27:55 | 6 | prior to the 2008? |
| 10:27:57 | 7 | A.  Prior to the forming of the ballot measure |
| 10:27:58 | 8 | committee, as it reads here, it's a broad-based |
| 10:28:06 | 9 | coalition of organizations, churches and individuals, |
| 10:28:08 | 10 | and so there was no list.  There was no -- there was no |
| 10:28:16 | 11 | entity. |
| 10:28:17 | 12 | Q.  Was there a website? |
| 10:28:20 | 13 | A.  Apparently, this came off of a website and |
| 10:28:24 | 14 | it's copyright '05. |
| 10:28:26 | 15 | Q.  And did you have anything to do with that |
| 10:28:28 | 16 | website prior to 2008? |
| 10:28:37 | 17 | A.  I did not have anything to do with the |
| 10:28:39 | 18 | creation of the website, no. |
| 10:28:42 | 19 | Q.  Do you know who did? |
| 10:28:48 | 20 | A.  There has been a -- a changing relatively |
| 10:28:57 | 21 | fluid group of individuals who attempted to keep the |
| 10:29:07 | 22 | public informed of what was going on legally with |
| 10:29:12 | 23 | marriage. |
| 10:29:15 | 24 | Q.  But do you know who created the |
| 10:29:22 | 25 | ProtectMarriage.com website that existed before 2008? |

**Page 61**

| | | |
|---|---|---|
| 10:29:31 | 1 | A.  I go not know who is responsible for its |
| 10:29:33 | 2 | creation. |
| 10:29:34 | 3 | Q.  Was it someone who worked for the California |
| 10:29:36 | 4 | Family Council? |
| 10:29:37 | 5 | A.  No. |
| 10:29:37 | 6 | Q.  And I believe you said that California Renewal |
| 10:29:42 | 7 | had no employees; correct? |
| 10:29:43 | 8 | A.  Correct. |
| 10:29:46 | 9 | Q.  So you have no idea, as you sit here, who was |
| 10:29:49 | 10 | responsible for creating the ProtectMarriage.com website |
| 10:29:53 | 11 | before 2008? |
| 10:29:54 | 12 | A.  Well, I have some idea in that I've referred |
| 10:29:58 | 13 | to a fluid committee of people.  But I do not -- I do |
| 10:30:03 | 14 | not know precisely who pulled this trigger. |
| 10:30:08 | 15 | Q.  If you look at the bottom of Exhibit 1, |
| 10:30:10 | 16 | there's a copyright designation it says "Copyright 2005 |
| 10:30:16 | 17 | ProtectMarriage.com." |
| 10:30:17 | 18 | Do you see that? |
| 10:30:18 | 19 | A.  Yes. |
| 10:30:18 | 20 | Q.  And then it also says "After all rights |
| 10:30:23 | 21 | reserved," it says "ProtectMarriage.com, a project of |
| 10:30:29 | 22 | California Renewal." |
| 10:30:29 | 23 | Do you see that? |
| 10:30:30 | 24 | A.  Yes. |
| 10:30:31 | 25 | Q.  Was there a project of California Renewal in |

**Page 62**

| | | |
|---|---|---|
| 10:30:36 | 1 | 2005 that was called ProtectMarriage.com? |
| 10:30:44 | 2 | A. There was a -- I believe that would have been |
| 10:30:49 | 3 | an earlier iteration of a ballot measure committee. |
| 10:30:56 | 4 | Q. So there was an earlier ballot measure |
| 10:30:59 | 5 | committee formed by or with the authority of the board |
| 10:31:04 | 6 | of California Renewal? |
| 10:31:05 | 7 | A. With the approval, yes. |
| 10:31:08 | 8 | Q. And were you on that ballot measure committee |
| 10:31:11 | 9 | as well? |
| 10:31:12 | 10 | A. No. |
| 10:31:13 | 11 | Q. Do you know who was? |
| 10:31:19 | 12 | MS. MOSS: Again, I'm going to instruct you not to |
| 10:31:20 | 13 | answer -- well, you can answer to the extent whoever the |
| 10:31:23 | 14 | membership was public, whoever the volunteers were that |
| 10:31:27 | 15 | were public. |
| 10:31:28 | 16 | THE WITNESS: I don't know whether they were public |
| 10:31:29 | 17 | or not. |
| 10:31:33 | 18 | MS. MOSS: If you'd like, we can confer and see if |
| 10:31:36 | 19 | we know if they were public or not to give you an |
| 10:31:38 | 20 | answer. |
| 10:31:41 | 21 | MS. STEWART: Sure. |
| 10:31:43 | 22 | THE VIDEOGRAPHER: Off record. 10:31. |
| 10:31:44 | 23 | (Brief break.) |
| 10:36:10 | 24 | THE VIDEOGRAPHER: Back on the record. 10:35. |
| 10:36:15 | 25 | MS. STEWART: Q So Mr. Prentice, were you able to |

**Page 63**

| | | |
|---|---|---|
| 10:36:18 | 1 | determine whether any of the members of the committee |
| 10:36:22 | 2 | that formed the ProtectMarriage.com ballot measure |
| 10:36:29 | 3 | committee in 2005 are public? |
| 10:36:33 | 4 | A. There was one member who was public as the |
| 10:36:36 | 5 | chairman. |
| 10:36:37 | 6 | Q. And who was that? |
| 10:36:38 | 7 | A. And that was Peter Henderson. |
| 10:36:41 | 8 | Q. And again, you were not a member of that |
| 10:36:43 | 9 | committee; is that correct? |
| 10:36:45 | 10 | A. Correct. |
| 10:36:46 | 11 | Q. Were you at the time that committee was formed |
| 10:36:51 | 12 | the executive director of California Renewal? |
| 10:36:56 | 13 | A. Yes. |
| 10:36:58 | 14 | Q. And that ProtectMarriage.com ballot measure |
| 10:37:03 | 15 | committee was a project of California Renewal; correct? |
| 10:37:08 | 16 | A. Yes. |
| 10:37:09 | 17 | Q. And you said I think earlier that it was a -- |
| 10:37:17 | 18 | that the name "ProtectMarriage.com" was used also |
| 10:37:24 | 19 | besides the official ballot committee to describe a |
| 10:37:27 | 20 | coalition of groups and people; correct? |
| 10:37:31 | 21 | A. Yes. |
| 10:37:32 | 22 | Q. And -- |
| 10:37:35 | 23 | A. I'm sorry, did you say official group? |
| 10:37:38 | 24 | Q. No, I just said a group. A coalition is what |
| 10:37:43 | 25 | I said. |

**Page 64**

| | | |
|---|---|---|
| 10:37:44 | 1 | A. Okay. |
| 10:37:44 | 2 | Q. And that's what this document suggests at the |
| 10:37:46 | 3 | top of it; do you see that -- |
| 10:37:48 | 4 | A. Yes. |
| 10:37:48 | 5 | Q. -- ProtectMarriage.com is a growing -- |
| 10:37:51 | 6 | A. Yes. |
| 10:37:51 | 7 | Q. -- broad-based coalition of organizations, |
| 10:37:54 | 8 | churches, et cetera. |
| 10:37:58 | 9 | MS. STEWART: I'm going to ask you to take a look a |
| 10:38:00 | 10 | at an exhibit that would be marked 2. |
| 10:38:02 | 11 | (Whereupon, Exhibit No. 2 was |
| 10:38:15 | 12 | Marked for identification.) |
| 10:38:18 | 13 | MS. STEWART: Q And ask you if you recognize this |
| 10:38:24 | 14 | document. |
| 10:38:33 | 15 | A. Yes. |
| 10:38:34 | 16 | Q. And can you tell me what it is. |
| 10:38:36 | 17 | A. This came from the earlier ballot measure |
| 10:38:44 | 18 | committee of '05. And on that -- on that website then, |
| 10:38:57 | 19 | it did -- it did list endorsements. |
| 10:39:03 | 20 | Q. And is this list -- I think you said earlier |
| 10:39:09 | 21 | that the broad coalition that ProtectMarriage.com was |
| 10:39:15 | 22 | used sometimes to refer to, consisted of people who |
| 10:39:24 | 23 | signed up on the web to endorse or support -- |
| 10:39:34 | 24 | A. I think the confusion is that |
| 10:39:37 | 25 | ProtectMarriage.com a ballot measure committee in '05 is |

**Page 65**

| | | |
|---|---|---|
| 10:39:42 | 1 | something very different from the ballot measure |
| 10:39:44 | 2 | committee of ProtectMarriage.com-Yes on 8. |
| 10:39:48 | 3 | Q. Well, staying with the one that is reflected |
| 10:39:50 | 4 | by the documents that we have here, which is the 2005 |
| 10:39:54 | 5 | ProtectMarriage.com, is Exhibit 2 a list of members or |
| 10:40:02 | 6 | some of the members of the coalition that is described |
| 10:40:06 | 7 | on Exhibit 1? |
| 10:40:11 | 8 | A. I think what I would take issue with would be |
| 10:40:14 | 9 | the term "members." These were folks who agreed with |
| 10:40:20 | 10 | the general direction, purpose of that ballot measure |
| 10:40:25 | 11 | committee and went on themselves and placed themselves |
| 10:40:28 | 12 | on as an endorser. |
| 10:40:32 | 13 | Q. But when the ProtectMarriage website referred |
| 10:40:36 | 14 | to a coalition of organizations, churches and |
| 10:40:39 | 15 | individuals, was it referring, at least in part, to the |
| 10:40:46 | 16 | entities and people listed on Exhibit 2? |
| 10:40:49 | 17 | MS. MOSS: Objection. Lack of foundation. |
| 10:41:00 | 18 | MS. STEWART: Q You can still answer the question. |
| 10:41:03 | 19 | A. I choose not to. |
| 10:41:05 | 20 | MS. STEWART: You can't. |
| 10:41:06 | 21 | MS. MOSS: You can't choose not to. |
| 10:41:06 | 22 | THE WITNESS: I'm sorry. |
| 10:41:07 | 23 | MS. STEWART: She instructs -- |
| 10:41:08 | 24 | MS. MOSS: I would object that there's a lack of |
| 10:41:12 | 25 | foundation for you to necessarily know. But if you |

Page 66

| | | |
|---|---|---|
| 10:41:14 | 1 | do -- so if you know, you can answer the question. I'm |
| 10:41:17 | 2 | not instructing you not to answer. |
| 10:41:24 | 3 | THE WITNESS: You'll need to repeat the question, |
| 10:41:25 | 4 | please. |
| 10:41:30 | 5 | MS. STEWART: Can you read it back. |
| 10:41:32 | 6 | (Record read.) |
| 10:41:51 | 7 | THE WITNESS: And again, that would be essentially |
| 10:41:54 | 8 | before my time and my knowledge. And so forgive me for |
| 10:42:01 | 9 | misunderstanding. Again, what this reads in Exhibit 1 |
| 10:42:12 | 10 | of '05 is, indeed, that it's a growing broad-based |
| 10:42:17 | 11 | coalition. I think it speaks for itself that those who |
| 10:42:24 | 12 | signed on as endorsers claim to align with the general |
| 10:42:31 | 13 | purpose of the measure. |
| 10:42:34 | 14 | MS. STEWART: Q So when you say before your time, |
| 10:42:36 | 15 | I'm trying to understand that. |
| 10:42:38 | 16 | You were the executive director of California |
| 10:42:40 | 17 | Renewal in 2005; correct? |
| 10:42:42 | 18 | A. Yes. |
| 10:42:42 | 19 | **Q. And ProtectMarriage.com was a project of** |
| 10:42:45 | 20 | **California Renewal; correct?** |
| 10:42:48 | 21 | A. Correct. |
| 10:42:52 | 22 | **Q. Are you saying that you didn't have knowledge** |
| 10:42:54 | 23 | **of the operations of that project of California Renewal?** |
| 10:42:58 | 24 | A. I was not involved on a day-to-day basis, |
| 10:43:03 | 25 | correct. |

Page 67

| | | |
|---|---|---|
| 10:43:04 | 1 | **Q. Were you involved on any basis?** |
| 10:43:07 | 2 | A. I was informed because we were -- it was a |
| 10:43:15 | 3 | project of California Renewal. I had a responsibility |
| 10:43:18 | 4 | to inform the board of directors who had given authority |
| 10:43:22 | 5 | to use California Renewal for this purpose. |
| 10:43:26 | 6 | **Q. And as part of that responsibility, did you** |
| 10:43:29 | 7 | **familiarize yourself with the activities of** |
| 10:43:32 | 8 | **ProtectMarriage.com?** |
| 10:43:34 | 9 | A. I was -- I was kept informed of the general |
| 10:43:38 | 10 | activities. |
| 10:43:39 | 11 | **Q. Okay.** |
| 10:43:40 | 12 | And who kept you informed. |
| 10:43:42 | 13 | A. Peter Henderson. |
| 10:43:43 | 14 | **Q. And was Peter Henderson an employee of** |
| 10:43:50 | 15 | **California Family Council?** |
| 10:43:52 | 16 | A. Yes, he was. |
| 10:43:52 | 17 | **Q. And was he the one primarily responsible for** |
| 10:43:55 | 18 | **the ProtectMarriage.com project of California Renewal?** |
| 10:44:00 | 19 | A. As I stated earlier, Peter was the chairman of |
| 10:44:06 | 20 | a separate and distinct committee of the '05 ballot |
| 10:44:13 | 21 | measure. |
| 10:44:16 | 22 | **Q. He was the chairman of the ProtectMarriage.com** |
| 10:44:21 | 23 | **project of California Renewal?** |
| 10:44:25 | 24 | MS. MOSS: Can you -- there's -- I think since |
| 10:44:28 | 25 | there's different ProtectMarriage.com projects of |

Page 68

| | | |
|---|---|---|
| 10:44:32 | 1 | California Renewal, I think there are specific IDs that |
| 10:44:36 | 2 | go with them. |
| 10:44:37 | 3 | Could you specify which -- |
| 10:44:39 | 4 | MS. STEWART: Let me use the date since I think |
| 10:44:39 | 5 | it's a little less cumbersome. |
| 10:44:43 | 6 | MS. MOSS: That would be fine. |
| 10:44:43 | 7 | MS. STEWART: Q So are you saying that |
| 10:44:45 | 8 | Peter Henderson was the chairman of the 2005 |
| 10:44:49 | 9 | California -- I'm sorry -- the 2005 ProtectMarriage.com |
| 10:44:53 | 10 | project of California Renewal? |
| 10:44:55 | 11 | A. The 2005 ProtectMarriage.com ballot measure -- |
| 10:45:00 | 12 | **Q. Is there --** |
| 10:45:01 | 13 | A. -- committee. |
| 10:45:02 | 14 | **Q. -- between the project and the ballot measure?** |
| 10:45:06 | 15 | A. Well, this would go to my lack of legal |
| 10:45:08 | 16 | intellect. And that would be that I believe though the |
| 10:45:16 | 17 | ballot measure committee is a project of California |
| 10:45:19 | 18 | Renewal, it simply went to the board of California |
| 10:45:25 | 19 | Renewal to ask for its use for the ballot measure |
| 10:45:29 | 20 | committee. |
| 10:45:32 | 21 | **Q. Did Mr. Henderson have any responsibility for** |
| 10:45:34 | 22 | **the website of ProtectMarriage.com at the time?** |
| 10:45:38 | 23 | A. I don't -- I'll -- I don't know. |
| 10:45:44 | 24 | **Q. What was the ballot measure that was the** |
| 10:45:47 | 25 | **subject of ProtectMarriage.com in 2005?** |

Page 69

| | | |
|---|---|---|
| 10:45:52 | 1 | A. The -- it was again recognizing the need to |
| 10:46:00 | 2 | protect traditional marriage in California law. |
| 10:46:05 | 3 | **Q. Was it different in any way from the 2008** |
| 10:46:06 | 4 | **ballot measure that became known as Proposition 8?** |
| 10:46:12 | 5 | A. I believe so. |
| 10:46:12 | 6 | **Q. How was it different?** |
| 10:46:14 | 7 | A. I believe that the -- the -- |
| 10:46:25 | 8 | MS. MOSS: You can answer the question, but I'm |
| 10:46:27 | 9 | just going to insert an objection to the extent that |
| 10:46:30 | 10 | calls for a legal conclusion. But you can offer your -- |
| 10:46:35 | 11 | THE WITNESS: I do not have -- I do not have the |
| 10:46:37 | 12 | difference before me. |
| 10:46:40 | 13 | MS. STEWART: Q So are you saying you don't |
| 10:46:41 | 14 | remember. |
| 10:46:41 | 15 | A. I don't I don't recall the specific language. |
| 10:46:44 | 16 | **Q. Do you recall generally in lay persons terms** |
| 10:46:48 | 17 | **how the measure was different in the 2005 measure from** |
| 10:46:53 | 18 | **Proposition 8?** |
| 10:46:55 | 19 | A. The -- there was some discussion of -- yes, |
| 10:47:03 | 20 | within the language there was discussion of where -- |
| 10:47:07 | 21 | let's see -- of domestic partnerships. |
| 10:47:07 | 22 | **Q. And what was your understanding as to what the** |
| 10:47:18 | 23 | **measure would do with respect to domestic partnerships?** |
| 10:47:21 | 24 | MS. MOSS: I'll object to the extent you're asking |
| 10:47:23 | 25 | for a legal understanding. |

## Page 70

| | | |
|---|---|---|
| 10:47:25 | 1 | MS. STEWART: I'm not. I'm asking for his |
| 10:47:27 | 2 | understanding. |
| 10:47:29 | 3 | THE WITNESS: I think that the measure clarified |
| 10:47:32 | 4 | that there was a legal differentiation between domestic |
| 10:47:37 | 5 | partnerships and marriage. |
| 10:47:39 | 6 | MS. STEWART: I'm going to ask you to look at |
| 10:47:41 | 7 | Exhibit 3. |
| 10:47:41 | 8 | (Whereupon, Exhibit No. 3 was marked |
| 10:47:52 | 9 | For identification.) |
| 10:47:53 | 10 | MS. STEWART: Q Do you recognize this document? |
| 10:48:33 | 11 | A. I'm familiar with it. |
| 10:48:35 | 12 | **Q. Is this the ballot measure that was the** |
| 10:48:45 | 13 | **responsibility of ProtectMarriage.com the 2005 ballot** |
| 10:48:48 | 14 | **measure committee?** |
| 10:48:53 | 15 | A. It appears so. |
| 10:48:55 | 16 | **Q. And does this refresh your recollection as to** |
| 10:48:59 | 17 | **what that ballot measure would have done had it taken** |
| 10:49:02 | 18 | **effect?** |
| 10:49:03 | 19 | A. Yes, it does. |
| 10:49:04 | 20 | **Q. And can you tell me what that is?** |
| 10:49:06 | 21 | A. Well, the language states that the marriage |
| 10:49:11 | 22 | between a man and a woman would be the only legal union |
| 10:49:14 | 23 | valid or recognized in California. |
| 10:49:16 | 24 | **Q. And it would bar domestic partnerships from** |
| 10:49:18 | 25 | **being recognized as valid legal unions in California; is** |

## Page 71

| | | |
|---|---|---|
| 10:49:22 | 1 | that correct? |
| 10:49:23 | 2 | MS. MOSS: Objection. Calls for a legal |
| 10:49:24 | 3 | conclusion. |
| 10:49:28 | 4 | THE WITNESS: That's what it states. |
| 10:49:30 | 5 | MS. STEWART: Q Were you aware at the time that |
| 10:49:32 | 6 | the ballot measure that ProtectMarriage.com was |
| 10:49:37 | 7 | responsible for would have eliminated legal recognition |
| 10:49:43 | 8 | for domestic relationships? |
| 10:49:48 | 9 | MS. MOSS: Objection. Assumes legal facts not in |
| 10:49:51 | 10 | evidence. |
| 10:49:53 | 11 | THE WITNESS: I was aware that this language |
| 10:49:57 | 12 | existed from that earlier organization. |
| 10:50:04 | 13 | MS. STEWART: Q And at the time that organization |
| 10:50:07 | 14 | was a project of California Renewal, i.e. in 2005, at |
| 10:50:11 | 15 | that time were you aware that the ballot measure -- that |
| 10:50:16 | 16 | it was promoting would eliminate domestic partnerships? |
| 10:50:22 | 17 | MS. MOSS: Objection. Assumes legal facts not in |
| 10:50:25 | 18 | evidence. |
| 10:50:27 | 19 | THE WITNESS: I can only say that I was aware of |
| 10:50:29 | 20 | what the language stated. |
| 10:50:30 | 21 | MS. STEWART: Q So you were aware that the |
| 10:50:33 | 22 | amendment that was being proposed would bar domestic |
| 10:50:36 | 23 | partnerships from being valid or recognized as legal |
| 10:50:39 | 24 | unions in California? |
| 10:50:40 | 25 | MS. MOSS: Same objection. |

## Page 72

| | | |
|---|---|---|
| 10:50:41 | 1 | THE WITNESS: And I'll restate that I was aware of |
| 10:50:45 | 2 | what the language stated. |
| 10:50:46 | 3 | MS. STEWART: Q Did you have an understanding as |
| 10:50:48 | 4 | to the effect of that language, a lay person's |
| 10:50:53 | 5 | understanding in 2005? |
| 10:50:54 | 6 | A. I had an understanding that this language |
| 10:51:02 | 7 | would be highly contested. |
| 10:51:07 | 8 | **Q. Did you have an understanding of what it would** |
| 10:51:09 | 9 | **mean if it was passed?** |
| 10:51:12 | 10 | A. Well, I -- when you ask that question, I -- we |
| 10:51:15 | 11 | had an understanding of what it may mean. |
| 10:51:19 | 12 | **Q. And what was that understanding?** |
| 10:51:20 | 13 | A. It may mean one of two things: It may mean |
| 10:51:24 | 14 | that it would, as it states here, on its face, bar |
| 10:51:28 | 15 | domestic partnerships from being valid or recognized as |
| 10:51:31 | 16 | legal unions. On the other hand, it may very well mean |
| 10:51:36 | 17 | it would not -- it would not hold up in court. |
| 10:51:44 | 18 | **Q. So in other words, it could be challenged is** |
| 10:51:46 | 19 | **what you're saying?** |
| 10:51:48 | 20 | A. Correct. |
| 10:51:49 | 21 | **Q. But if it held up, it would mean that there** |
| 10:51:51 | 22 | **would be no more domestic partnerships --** |
| 10:51:55 | 23 | A. As it said on its face, yes. |
| 10:52:10 | 24 | Q. Thank-you. |
| 10:52:11 | 25 | So earlier you were -- we got bogged down a |

## Page 73

| | | |
|---|---|---|
| 10:52:18 | 1 | little bit in some confusion about the name |
| 10:52:21 | 2 | ProtectMarriage.com. |
| 10:52:22 | 3 | So we've now I think, if I understand your |
| 10:52:25 | 4 | answers correctly, established that there was an entity |
| 10:52:33 | 5 | and a coalition that used the title |
| 10:52:35 | 6 | "ProtectMarriage.com" in 2005; is that fair? |
| 10:52:40 | 7 | A. There was a ballot measure committee in 2005 |
| 10:52:46 | 8 | that used ProtectMarriage.com. |
| 10:52:48 | 9 | **Q. And there was also a coalition that used that** |
| 10:52:51 | 10 | **terminology; correct?** |
| 10:52:53 | 11 | A. I believe -- I believe I've answered that. I |
| 10:52:56 | 12 | believe that there was no formal coalition. |
| 10:53:00 | 13 | **Q. But there was a coalition -- informal?** |
| 10:53:04 | 14 | A. There were a variety of organizations, |
| 10:53:08 | 15 | churches and individuals who agreed with the general |
| 10:53:14 | 16 | direction of the ballot measure committee. |
| 10:53:16 | 17 | **Q. And was there an effort to circulate the** |
| 10:53:26 | 18 | **measure that we just looked at as Exhibit 3 for** |
| 10:53:31 | 19 | **signatures in 2005?** |
| 10:53:33 | 20 | A. To my knowledge, yes. |
| 10:53:35 | 21 | **Q. And was -- did that effort fail?** |
| 10:53:39 | 22 | A. Yes. |
| 10:53:42 | 23 | **Q. Do you know why it failed?** |
| 10:53:49 | 24 | A. I don't know the specific reason why it |
| 10:53:52 | 25 | failed. I know it didn't receive enough signatures. |

**Page 74**

10:53:55 1    Q. Was there a difficulty raising the funds to
10:53:59 2    get those signatures?
10:54:00 3    A. I'm aware as far as the funding was very
10:54:05 4    limited.
10:54:16 5    Q. Who did the fundraising for that effort?
10:54:21 6    MS. MOSS: To the extent that's publically known,
10:54:25 7    you can respond. To the extent it would require you to
10:54:28 8    reveal somebody whose association with that ballot
10:54:33 9    measure committee is not known, I would direct you not
10:54:36 10   to answer.
10:54:36 11   THE WITNESS: I'm not aware.
10:54:39 12   MS. STEWART: Q You're not aware at all or you're
10:54:41 13   not aware of anyone non-public?
10:54:44 14   A. I'm not aware of anyone at all.
10:54:55 15   Q. I want to fast forward a little bit to 2008 --
10:54:58 16   but before I do, I want to cover the period between the
10:55:05 17   measure we were just talking about, 2005 and 2008, and
10:55:09 18   ask you: Was the name "ProtectMarriage.com" used for
10:55:15 19   any purpose, to your knowledge, between when the 2005
10:55:22 20   measure failed to get enough signatures and 2008?
10:55:30 21   A. I believe that there had been -- actually, I'm
10:55:38 22   not sure. I don't know.
10:55:43 23   Q. Do you -- is it a failure of memory or you
10:55:46 24   really you don't know at all?
10:55:50 25   A. It could be both.

**Page 75**

10:55:53 1    Q. Okay.
10:55:56 2    A. I'm -- I don't have a recollection.
10:55:58 3    Q. Okay. Fair enough.
10:56:02 4    In any event, in 2008, the name
10:56:05 5    "ProtectMarriage.com" was used again; is that correct?
10:56:10 6    A. Correct.
10:56:10 7    Q. Can you tell me the purposes for which the
10:56:14 8    name "ProtectMarriage.com" was used in 2008?
10:56:19 9    A. Well, ProtectMarriage.com was used for the
10:56:24 10   ballot measure committee. And then once we received an
10:56:32 11   initiative number, Yes on 8 was added to that.
10:56:39 12   Q. Okay.
10:56:40 13   So it was used for the ballot measure
10:56:42 14   committee.
10:56:43 15   Was it also used to describe a coalition?
10:56:54 16   A. ProtectMarriage.com was -- has been -- during
10:57:01 17   the ballot measure of '08, yes. When we would
10:57:09 18   communicate about the measure, we would talk about the
10:57:15 19   loose broad-based coalition.
10:57:21 20   Q. For ease of reference, can we refer to that
10:57:32 21   coalition as the "ProtectMarriage.com coalition"?
10:57:36 22   A. I -- I think that we haven't defined the
10:57:39 23   term so that's my hesitancy. So I don't know that I'm
10:57:43 24   comfortable saying there is ease to using that term.
10:57:48 25   Q. Well, you just mentioned that --

**Page 76**

10:57:51 1    MS. STEWART: Can you read back his last answer.
10:58:12 2    (Record read.)
10:58:12 3    MS. STEWART: Q So I want to refer to that
10:58:14 4    coalition that you just mentioned as the
10:58:16 5    "ProtectMarriage.com coalition." To distinguish it from
10:58:19 6    the "ProtectMarriage.com official ballot measure
10:58:23 7    committee."
10:58:25 8    Do you understand that distinction?
10:58:26 9    A. Yes.
10:58:28 10   Q. And I'm doing that so that we don't keep
10:58:31 11   getting bogged down in our questioning "Well, which --
10:58:35 12   are you referring to the entity, the official entity or
10:58:38 13   are you referring more broadly to the coalition?"
10:58:41 14   So do you understand that use of the term?
10:58:43 15   A. I do. I -- however -- I believe I'm still at
10:58:49 16   a place with a lack of understanding or a lack of
10:58:55 17   agreement as to when we refer to a "coalition," you
10:59:01 18   earlier used the term "member" and there were no such --
10:59:04 19   there was no such entity.
10:59:08 20   Q. Okay.
10:59:10 21   Well, let me ask you this: If you go to
10:59:15 22   ProtectMarriage.com's website today, and I think this
10:59:18 23   was true in 2008 as well, under the heading about
10:59:26 24   ProtectMarriage.com it says "ProtectMarriage.com is a
10:59:30 25   broad-based coalition of California families, community

**Page 77**

10:59:35 1    leaders, religious leaders, pro family organizations and
10:59:40 2    individuals from all walks of life who have joined
10:59:44 3    together to support Proposition 8."
10:59:48 4    First of all, is that an accurate statement?
10:59:52 5    A. It's an accurate statement to the degree that
10:59:54 6    we have a an understanding of what "joined together"
10:59:59 7    means.
10:59:59 8    Q. And what does "join together" mean in that
11:00:02 9    website?
11:00:03 10   A. It means that we are like-minded towards the
11:00:06 11   definition of marriage.
11:00:08 12   Q. Does that mean that you work together towards
11:00:10 13   the passage of Proposition 8?
11:00:13 14   A. I think it meant that a number of different
11:00:18 15   organizations, entities, churches worked towards the
11:00:24 16   purpose of the passage.
11:00:26 17   Did we work together? Not always.
11:00:29 18   Q. So sometimes you worked together and sometimes
11:00:30 19   you worked separately; is that fair?
11:00:33 20   A. Well, actually, most -- those people who would
11:00:38 21   say that they were part of that broad-based coalition
11:00:42 22   were by no means under the authority or the direction of
11:00:46 23   the ad hoc executive committee.
11:00:49 24   Q. Fair enough.
11:00:49 25   But they -- when this language -- and I

## Page 78

11:00:53 1 apologize, we will have this printed out later -- but

11:00:57 2 when the language on the website again says "That

11:01:00 3 ProtectMarriage.com is a broad-based coalition of

11:01:04 4 California families, community leaders, religious

11:01:07 5 leaders, pro family organizations, and individuals from

11:01:09 6 all walks of life who have joined together to support

11:01:15 7 Proposition 8."

11:01:16 8     So in some sense, did those entities, those

11:01:21 9 groups, families, religious leaders, et cetera join

11:01:26 10 together to support Proposition 8?

11:01:28 11     A. I would say -- I would not agree with the

11:01:31 12 accuracy of that statement on the website. I would

11:01:34 13 have -- I would have taken issue with it and --

11:01:37 14     (Ms. Piepmeier leaves the room.)

11:01:39 15     THE WITNESS: -- and said working towards the

11:01:40 16 passage. And I would have left out "joined together."

11:01:46 17     MS. STEWART: Q So speaking now about

11:01:55 18 ProtectMarriage.com the ballot measure committee, the

11:02:04 19 one that supported Proposition 8, when was that

11:02:08 20 committee formed?

11:02:11 21     A. To the best of my knowledge, the middle of

11:02:16 22 November, '07.

11:02:38 23     Q. Was a website then created by that committee

11:02:43 24 or for that committee?

11:02:47 25     A. There had been a website during that time,

## Page 79

11:02:52 1 yes.

11:02:52 2     Q. Did the website that was -- that we saw on

11:02:57 3 Exhibits 1 and 2 earlier remain online into 2008?

11:03:04 4     A. I'm not aware. I don't know.

11:03:06 5     Q. Okay.

11:03:07 6     But at some point, there was a

11:03:10 7 ProtectMarriage.com website that was the --

11:03:14 8     A. Oriented towards the ballot measure committee

11:03:16 9 of '08.

11:03:17 10     Q. And you don't know when or how that website

11:03:20 11 was created?

11:03:21 12     A. I -- No, I don't know the specifics.

11:03:27 13     MS. STEWART: I've been informed that the

11:03:28 14 videographer needs to change the tape. So I think we

11:03:33 15 should take a short break.

11:03:36 16     THE VIDEOGRAPHER: This ends the end of tape No. 1,

11:03:39 17 volume 1 of Ronald Prentice. We are off the record at

11:03:46 18 11:03.

11:08:48 19     (Brief break.)

11:09:28 20     THE VIDEOGRAPHER: This marks the beginning of tape

11:09:31 21 No. 2 in the deposition of Ronald Prentice. Back on the

11:09:34 22 record at 11:09.

11:09:37 23     MS. STEWART: Q All right. I think we just were

11:09:40 24 talking about when ProtectMarriage.com the ballot

11:09:46 25 measure committee that was responsible for Proposition 8

## Page 80

11:09:52 1 was formed. And you said I think 2007.

11:09:56 2     A. Mid-November, yes.

11:09:57 3     Q. And did you play a role in the formation of

11:10:00 4 that entity?

11:10:02 5     A. I was a member of the ad hoc executive

11:10:05 6 committee.

11:10:05 7     Q. And who else was an ad -- a member of that ad

11:10:14 8 hoc executive committee for the 2008 entity?

11:10:21 9     MS. MOSS: I think that's been asked and answered.

11:10:21 10 You can answer it again, but the same instruction.

11:10:24 11 Don't reveal the one individual who's asked us to keep

11:10:28 12 his --

11:10:29 13     THE WITNESS: One individual has asked for

11:10:32 14 confidentiality. And then Mark Jansson, Ned Dolejsi and

11:10:37 15 myself.

11:10:39 16     MS. STEWART: Q Was Mr. Pugno a member of the

11:10:40 17 executive committee?

11:10:42 18     A. No.

11:10:42 19     Q. Did the membership of the executive committee

11:10:46 20 change at any time?

11:10:47 21     A. During the campaign? Is that what you're

11:10:51 22 asking?

11:10:53 23     Q. Yes.

11:10:55 24     A. No, not to my knowledge, no.

11:10:57 25     Q. So yourself, Ned Dolejsi, Mr. Jansson and

## Page 81

11:11:04 1 we'll call him Mr. Doe; correct?

11:11:08 2     A. Correct. Mr. or Ms.

11:11:26 3     Q. Fair enough.

11:11:28 4     When was that ad hoc committee first convened?

11:11:31 5     (Ms. Piepmeier enters the room.)

11:11:38 6     THE WITNESS: I'm not -- I wouldn't have referred

11:11:42 7 to that group of people as an ad hoc executive committee

11:11:47 8 until it was decided to move forward with the ballot

11:11:53 9 measure. And therefore, I would say sometime in the

11:12:03 10 middle of '08 -- excuse me -- '07.

11:12:06 11     MS. STEWART: Q And are you saying -- if I

11:12:10 12 understand your answer correctly, you're saying that it

11:12:13 13 didn't meet as a committee per se, until the middle of

11:12:20 14 2007?

11:12:23 15     A. Well, even then we wouldn't have termed

11:12:26 16 ourselves "the committee."

11:12:27 17     Q. So putting aside what you called yourselves,

11:12:30 18 when did that group first begin to meet?

11:12:35 19     A. And I'm sorry, I don't know the any precise

11:12:38 20 date. I would say that it -- that that group of

11:12:46 21 individuals was in discussion anytime March to July,

11:12:57 22 '07.

11:13:01 23     Q. And then at some point -- and let me rephrase

11:13:07 24 that.

11:13:08 25     When did the California Renewal board give the

| | | Page 110 |
|---|---|---|
| 12:03:42 | 1 | A.  A simulcast is where an event takes place in |
| 12:03:46 | 2 | one facility and the event is broadcast into other |
| 12:03:53 | 3 | facilities. |
| 12:03:55 | 4 | Q.  At the same time? |
| 12:03:55 | 5 | A.  Yes. |
| 12:03:56 | 6 | Q.  Hence the simul part of simulcast? |
| 12:04:00 | 7 | A.  Yeah. |
| 12:04:01 | 8 | Q.  So you mentioned earlier that there were |
| 12:04:04 | 9 | simulcasts done in the effort to pass Prop 8. |
| 12:04:14 | 10 | Can you describe those events, those simulcast |
| 12:04:18 | 11 | events. |
| 12:04:19 | 12 | A.  Those were put on by Pastors Rapid Response |
| 12:04:24 | 13 | Team, and were oriented towards pastors and churches. |
| 12:04:34 | 14 | Q.  And how many were there? |
| 12:04:40 | 15 | A.  I believe there were three. |
| 12:04:47 | 16 | Q.  And did you participate in any way in those |
| 12:04:55 | 17 | simulcasts? |
| 12:04:56 | 18 | A.  No. |
| 12:04:57 | 19 | Q.  Were you present at the -- were they held in |
| 12:05:02 | 20 | churches? |
| 12:05:05 | 21 | MS. MOSS:  Let me just interject.  Obviously, you |
| 12:05:07 | 22 | can only answer what you know, and you can answer that. |
| 12:05:09 | 23 | I just want to for the record note a lack of foundation |
| 12:05:12 | 24 | to the extent that he said he didn't. |
| 12:05:15 | 25 | MS. STEWART:  He can say if he doesn't know -- |

| | | Page 111 |
|---|---|---|
| 12:05:17 | 1 | MS. MOSS:  If he knows.  I just want to preserve |
| 12:05:19 | 2 | the foundation objection. |
| 12:05:23 | 3 | MS. STEWART:  Preserve. |
| 12:05:24 | 4 | MS. MOSS:  But you can answer. |
| 12:05:25 | 5 | THE WITNESS:  I believe Pastor Garlow's church was |
| 12:05:28 | 6 | the facility where -- actually, no, I'm wrong. |
| 12:05:32 | 7 | At least one was held at The Rock Church, |
| 12:05:36 | 8 | Miles McPherson's church.  I believe two were held at |
| 12:05:39 | 9 | Pastor Garlow's church.  And then they were broadcast |
| 12:05:43 | 10 | into other churches. |
| 12:05:45 | 11 | MS. STEWART:  Q  And did you observe them while |
| 12:05:48 | 12 | they -- well, first of all, were you at the churches |
| 12:05:51 | 13 | when they were being held? |
| 12:05:52 | 14 | A.  No. |
| 12:05:52 | 15 | Q.  Did you watch the simulcasts? |
| 12:05:56 | 16 | A.  No. |
| 12:05:56 | 17 | Q.  Did you watch them ever after they were held? |
| 12:05:59 | 18 | A.  One portion of one. |
| 12:06:02 | 19 | Q.  And Pastor Garlow's church, which church is |
| 12:06:06 | 20 | that? |
| 12:06:07 | 21 | A.  Skyline Westling Church. |
| 12:06:13 | 22 | Q.  And where is it located? |
| 12:06:16 | 23 | A.  El Cajon, California. |
| 12:06:18 | 24 | Q.  Is that near San Diego? |
| 12:06:19 | 25 | A.  San Diego, eastern San Diego. |

| | | Page 112 |
|---|---|---|
| 12:06:21 | 1 | Q.  And McPherson's church you said was The Rock |
| 12:06:25 | 2 | Church? |
| 12:06:26 | 3 | A.  Correct. |
| 12:06:26 | 4 | Q.  And where is that? |
| 12:06:28 | 5 | A.  Point Loma-San Diego. |
| 12:06:31 | 6 | Q.  Thank-you.  I'm bad with Southern California. |
| 12:06:37 | 7 | So the Pastors Rapid Response Team put them |
| 12:06:46 | 8 | on. |
| 12:06:47 | 9 | Were they sponsored by ProtectMarriage.com? |
| 12:06:50 | 10 | A.  You need to tell me what you mean by |
| 12:06:51 | 11 | "sponsored." |
| 12:06:54 | 12 | Q.  Did ProtectMarriage.com promote them in any |
| 12:07:00 | 13 | way? |
| 12:07:10 | 14 | A.  I'm not -- I'm not remembering a time.  I |
| 12:07:14 | 15 | would imagine we may have -- we may have communicated |
| 12:07:18 | 16 | that they took place or that they were going to take |
| 12:07:21 | 17 | place.  But it wasn't a major part of our communication. |
| 12:07:27 | 18 | Q.  Did ProtectMarriage.com provide funding for |
| 12:07:31 | 19 | them? |
| 12:07:31 | 20 | A.  Yes. |
| 12:07:34 | 21 | Q.  What level of funding, if you recall, did |
| 12:07:38 | 22 | ProtectMarriage.com provide for the simulcasts? |
| 12:07:43 | 23 | A.  We provided for the total funding of the |
| 12:07:46 | 24 | simulcast. |
| 12:07:54 | 25 | MS. STEWART:  I'm going to suggest we take a lunch |

| | | Page 113 |
|---|---|---|
| 12:07:56 | 1 | break.  Is this a good time for you guys? |
| 12:07:59 | 2 | MS. MOSS:  Sure. |
| 12:08:05 | 3 | THE VIDEOGRAPHER:  Off record at 12:07. |
| 12:08:07 | 4 | (Lunch recess.) |
| 12:08:07 | 5 | (Ms. Piepmeier is absent.) |
| 01:19:03 | 6 | THE VIDEOGRAPHER:  The time is 1:18, and we're back |
| 01:19:05 | 7 | on the record. |
| 01:19:08 | 8 | MS. STEWART:  Q  Mr. Prentice, do you understand |
| 01:19:10 | 9 | that you're still under oath? |
| 01:19:12 | 10 | A.  Yes. |
| 01:19:12 | 11 | Q.  And that when we take breaks in the |
| 01:19:15 | 12 | deposition, it doesn't mean the oath goes away. |
| 01:19:19 | 13 | You understand that; right? |
| 01:19:20 | 14 | A.  Yes. |
| 01:19:24 | 15 | Q.  Did the executive committee for |
| 01:19:36 | 16 | ProtectMarriage.com have responsibility to coordinate |
| 01:19:43 | 17 | with the organizations, churches and individuals that |
| 01:19:47 | 18 | made up the ProtectMarriage coalition? |
| 01:19:54 | 19 | A.  By referring to executive committee of |
| 01:19:57 | 20 | ProtectMarriage.com, you're referring to the committee |
| 01:20:00 | 21 | that was formed for the campaign of '08? |
| 01:20:04 | 22 | Q.  Yes. |
| 01:20:04 | 23 | A.  Did we have responsibility to communicate |
| 01:20:06 | 24 | with -- |
| 01:20:07 | 25 | Q.  Right. |

**Page 114**

01:20:07    1          Was that one of the responsibilities of the

01:20:09    2    executive committee?

01:20:10    3          A.  It was one of our strategies.

01:20:12    4          Q.  And were you personally involved in that

01:20:18    5    effort of coordinating with the organizations churches

01:20:22    6    and individuals that made up the coalition?

01:20:28    7          A.  I participated in communicating to churches

01:20:36    8    and pastors.

01:20:49    9          Q.  Did anyone -- did any of the consultants that

01:21:31   10    ProtectMarriage.com retained for the Prop 8 campaign

01:21:39   11    also participate in coordinating with the organizations,

01:21:42   12    churches and individuals that made up the

01:21:46   13    ProtectMarriage coalition?

01:21:59   14          A.  To my knowledge, no.

01:22:01   15          Q.  Not even Shubert-Flint?

01:22:04   16          A.  Well, I continue to go back to the idea of

01:22:07   17    coordinating.  I think they were invited as I mentioned,

01:22:09   18    but they didn't put those together.

01:22:19   19          Q.  Well, I'm not specifically -- I'm not

01:22:21   20    referring to some specific -- from the nature of your

01:22:24   21    answer from what you said, I want to be clear.  I'm not

01:22:29   22    referring to a conference call in particular.

01:22:31   23          I'm just asking in general, did any of the

01:22:35   24    consultants -- you know, did you charge them with some

01:22:40   25    responsibility to coordinate with organizations and

**Page 115**

01:22:45    1    churches and individuals that made up the coalition, the

01:22:49    2    broad ProtectMarriage coalition?

01:22:51    3          MS. MOSS:  I'll object to the term vague -- the

01:22:55    4    term "coordination" is vague.

01:22:57    5          THE WITNESS:  I am struggling with it.

01:22:59    6          MS. STEWART:  Q  Well, you did communicate with the

01:23:03    7    churches and organizations and individuals that made up

01:23:05    8    the coalition; correct?

01:23:12    9          A.  As an individual or as a committee?

01:23:14   10          Q.  As a committee.

01:23:15   11          A.  We certainly communicated with numerous

01:23:19   12    groups.  But I think that the manner in which you're

01:23:26   13    posing the question seems to be all or nothing.

01:23:30   14    That's, kind of, how I'm interpreting it.

01:23:34   15          Q.  All or nothing how?

01:23:37   16          A.  You asked about Shubert-Flint --

01:23:39   17          Q.  Right.

01:23:40   18          A.  -- did they communicate through this and that

01:23:43   19    and that and that.  And the answer would be no, not to

01:23:47   20    all of those groups.

01:23:48   21          Q.  But I guess what I'm asking is did they share

01:23:50   22    in the responsibility of coordinating with the

01:23:55   23    organizations and churches and individuals that made up

01:23:58   24    the ProtectMarriage coalition?

01:24:01   25          MS. MOSS:  Same objection to the term

**Page 116**

01:24:02    1    "coordinating."  But if you understand it, you can

01:24:05    2    answer.

01:24:05    3          THE WITNESS:  I don't well enough.

01:24:55    4          MS. STEWART:  I'm going to ask you to look at an

01:25:02    5    exhibit that will be marked 6.

01:25:04    6          (Whereupon, Exhibit No. 6 was

01:25:28    7          Marked for identification.)

01:25:43    8          MS. STEWART:  Q  Take a moment, if you need to, to

01:25:45    9    look at the document.  Because I'm going to ask you if

01:25:48   10    you recognize it and can tell me what it is.

01:26:13   11          (Pause in the proceedings.)

01:27:08   12          THE WITNESS:  Okay.

01:27:10   13          MS. STEWART:  Q  Do you recognize this as the

01:27:12   14    income tax return for 2006 for the California Family

01:27:16   15    Council Foundation?

01:27:18   16          A.  Yes.

01:27:19   17          Q.  Is the California Family Council Foundation

01:27:23   18    the entity that we were talking about earlier today that

01:27:27   19    we referred to as the California Family Council?  Are

01:27:30   20    there two entities or is it one?

01:27:32   21          A.  It is the same entity.

01:27:34   22          Q.  Thank-you.

01:27:35   23          And is it part of your responsibility -- or

01:27:39   24    let me ask more specifically.

01:27:41   25          In 2006, was it part of your responsibility to

**Page 117**

01:27:44    1    see that the tax returns for the entity were prepared

01:27:51    2    and filed?

01:27:52    3          A.  Yes, ultimately.

01:27:54    4          Q.  And if you look at page 9 of this document, is

01:27:58    5    that your signature on the document?

01:28:05    6          A.  Yes.

01:28:32    7          MS. STEWART:  Now, I'm going to ask you to take a

01:28:35    8    look --

01:28:48    9          (Ms. Piepmeier enters the room.)

01:28:49   10          (Whereupon, Exhibit No. 7 was

01:28:49   11          Marked for identification.)

01:28:57   12          MS. STEWART:  So I'm going to hand you Exhibit 7.

01:30:21   13          Let me know when you've had a chance to review

01:30:24   14    it.

01:30:25   15          A.  Okay.

01:30:25   16          Q.  And I'm going to ask you if this is the 2007

01:30:29   17    tax return for the California Family Council?

01:30:33   18          A.  Yes.

01:30:52   19          Q.  Now, I'm going to ask you to look at

01:30:54   20    Exhibit 8.

01:30:54   21          (Whereupon, Exhibit No. 8 was

01:31:04   22          Marked for identification.)

01:31:16   23          MS. STEWART:  Q  And my question for this one is

01:31:18   24    going to be whether this is the tax return for 2005 for

01:31:31   25    California Renewal.

## Page 198

| | | |
|---|---|---|
| 04:28:34 | 1 | Q. Well, it states that ProtectMarriage.com is |
| 04:28:37 | 2 | now moving forward with another attempt to qualify a |
| 04:28:40 | 3 | ballot measure. |
| 04:28:41 | 4 | That would seem to indicate that the document |
| 04:28:43 | 5 | was prepared and circulated before Proposition 8 had |
| 04:28:49 | 6 | actually qualified for the ballot would it not? |
| 04:28:52 | 7 | A. Yes. |
| 04:28:53 | 8 | However, the ProtectMarriage.com that's |
| 04:28:56 | 9 | referenced here is not the same ProtectMarriage.com that |
| 04:29:05 | 10 | registered as a ballot measure committee. |
| 04:29:08 | 11 | Q. And how do you know that? |
| 04:29:10 | 12 | A. Well, because even members on this coalition |
| 04:29:14 | 13 | were not members -- were not participating in -- were |
| 04:29:23 | 14 | not actively participating in -- in the passage of |
| 04:29:27 | 15 | Prop 8. |
| 04:29:28 | 16 | Q. Okay. |
| 04:29:29 | 17 | So were not actively participating in the |
| 04:29:32 | 18 | passage of Prop 8 at what time period? |
| 04:29:35 | 19 | A. During the campaign. |
| 04:29:36 | 20 | Q. So when you said, "during the campaign," do |
| 04:29:38 | 21 | you mean after the measure had qualified for the ballot? |
| 04:29:51 | 22 | A. I -- I don't know. I don't know precisely the |
| 04:29:55 | 23 | timeline of this. |
| 04:29:56 | 24 | Q. In -- in 2008 when this brochure appears to |
| 04:30:07 | 25 | have been produced, you were the -- I'm forgetting -- |

## Page 199

| | | |
|---|---|---|
| 04:30:13 | 1 | executive director of the California Family Council? |
| 04:30:18 | 2 | MS. MOSS: Object to the extent I don't think it's |
| 04:30:19 | 3 | been established when this brochure was, in fact, |
| 04:30:23 | 4 | created. Whether it was -- |
| 04:30:26 | 5 | MS. STEWART: Q Let me just ask this: Let me go |
| 04:30:38 | 6 | back to the second page and look at that right-hand |
| 04:30:44 | 7 | panel again. And the paragraph above the one that's got |
| 04:30:48 | 8 | a lot of bold-faced type, it says "The ProtectMarriage |
| 04:30:53 | 9 | Coalition's volunteer effort gathered nearly 300,000 |
| 04:30:56 | 10 | signatures through church communications." |
| 04:30:58 | 11 | Do you see that? |
| 04:30:58 | 12 | A. Uh-huh. |
| 04:31:00 | 13 | Q. Is that true that a coalition that called |
| 04:31:06 | 14 | itself "ProtectMarriage" used volunteers to gather |
| 04:31:10 | 15 | 300,000 signatures? |
| 04:31:12 | 16 | A. I would probably take issue with the fact that |
| 04:31:15 | 17 | it would be the ProtectMarriage coalition. I would say |
| 04:31:19 | 18 | that there were a number of groups who participated -- |
| 04:31:25 | 19 | churches and otherwise -- who participated in attempting |
| 04:31:32 | 20 | to gather signatures. |
| 04:31:33 | 21 | Q. And when did the coalition succeed in |
| 04:31:43 | 22 | gathering 300,000 signatures? |
| 04:31:46 | 23 | A. I believe this refers to the -- the attempt in |
| 04:31:51 | 24 | 2005. |
| 04:31:57 | 25 | Q. If that's -- so the 300,000 signatures were |

## Page 200

| | | |
|---|---|---|
| 04:32:03 | 1 | gathered -- I see -- were gathered in 2005. And that |
| 04:32:08 | 2 | was the measure that didn't make it onto the ballot; is |
| 04:32:12 | 3 | that what you're saying? |
| 04:32:13 | 4 | A. Correct. |
| 04:32:13 | 5 | Q. And now it says in the next paragraph that |
| 04:32:15 | 6 | "ProtectMarriage.com is moving forward with another |
| 04:32:19 | 7 | attempt to qualify a ballot measure." |
| 04:32:22 | 8 | Is it your understanding that that refers to |
| 04:32:24 | 9 | what eventually became Proposition 8? |
| 04:32:27 | 10 | A. Yes. |
| 04:32:56 | 11 | Q. Look at the middle panel on the second page of |
| 04:33:00 | 12 | the document in the last piece of text in the bullet |
| 04:33:05 | 13 | point. It says "In mid-2008, the California Supreme |
| 04:33:09 | 14 | Court will decide whether the definition of marriage as |
| 04:33:13 | 15 | only between a man and a woman, Proposition 22, is |
| 04:33:16 | 16 | constitutionally protected." |
| 04:33:18 | 17 | Do you see that? |
| 04:33:18 | 18 | A. Yes. |
| 04:33:19 | 19 | Q. So obviously this document was prepared before |
| 04:33:21 | 20 | the California Supreme Court issued its decision in May |
| 04:33:24 | 21 | of 2008; correct? |
| 04:33:26 | 22 | A. Correct. |
| 04:33:27 | 23 | Q. And was there a coalition of organizations |
| 04:33:34 | 24 | that were in someway moving forward as of sometime in |
| 04:33:49 | 25 | the middle of 2008 or early 2008 to qualify another |

## Page 201

| | | |
|---|---|---|
| 04:33:54 | 1 | measure for the ballot? |
| 04:33:57 | 2 | MS. MOSS: Object to the form of the question. I |
| 04:33:58 | 3 | think again to the extent that there's been some |
| 04:34:01 | 4 | disagreement about exactly what coalition means, to the |
| 04:34:05 | 5 | extent you understand that term, you may answer the |
| 04:34:07 | 6 | question. |
| 04:34:12 | 7 | THE WITNESS: Well, clearly, the -- by referring to |
| 04:34:19 | 8 | this last bullet point in mid-2008, the timing of this |
| 04:34:28 | 9 | appears to have been either just before or during the |
| 04:34:39 | 10 | petition-gathering phase. |
| 04:34:40 | 11 | MS. STEWART: Q Fair enough. |
| 04:34:43 | 12 | And was there -- the third panel says |
| 04:34:51 | 13 | "ProtectMarriage.com is now moving" -- the third panel |
| 04:34:54 | 14 | on the second page -- "ProtectMarriage.com is now moving |
| 04:34:57 | 15 | forward with another attempt to qualify a ballot |
| 04:35:00 | 16 | measure." |
| 04:35:00 | 17 | Do you see that? |
| 04:35:00 | 18 | A. Yes. |
| 04:35:01 | 19 | Q. And is it your understanding that there was |
| 04:35:04 | 20 | some kind of coalition or group -- of group in the first |
| 04:35:11 | 21 | half of 2008 that were working to qualify -- to get the |
| 04:35:15 | 22 | signatures to qualify what became Prop 8? |
| 04:35:20 | 23 | A. I don't believe that there's any change in the |
| 04:35:25 | 24 | definition that we have attempted to establish. And |
| 04:35:28 | 25 | that is that this was a loose broad-based coalition, not |

## Page 202

```
04:35:36   1    taking orders from any authoritative group.  And these
04:35:49   2    entities were like-minded about the passage of such a
04:35:55   3    measure, but -- but that's -- that's the extent of the
04:36:01   4    relationship.
04:36:02   5        Q.  Okay.
04:36:02   6        So without changing that non-authoritative
04:36:07   7    informal coalition -- definition of coalition, were the
04:36:10   8    groups listed on the first page of this brochure moving
04:36:17   9    forward with an attempt to qualify Proposition 8 for the
04:36:19  10    ballot?
04:36:21  11        A.  Individually, independently.
04:36:24  12        Q.  And one of those entities was the California
04:36:27  13    Family Council?
04:36:28  14        A.  Correct.
04:36:28  15        Q.  And another was Focus on the Family?
04:36:32  16        A.  Yes.
04:36:33  17        Q.  And another was Concerned Women for America?
04:36:38  18        A.  I'm not aware of any activity that they were
04:36:40  19    accomplishing in this timeline.
04:36:42  20        Q.  Do you know why they would have been listed on
04:36:45  21    a California Family Council brochure as being part of
04:36:49  22    the effort if they were not doing anything?
04:36:52  23        A.  I think there was -- I believe that this piece
04:36:57  24    was created at the request of a -- a church that wanted
04:37:04  25    information.  And that that church asked that we might
```

## Page 203

```
04:37:09   1    list numerous groups that had expressed interest in its
04:37:14   2    passage.
04:37:14   3        Q.  Okay.
04:37:15   4        Would you have listed a group to be described
04:37:25   5    as being involved or as working on attempting to qualify
04:37:33   6    a ballot measure if it wasn't doing anything?
04:37:37   7        A.  I would have listed a group that was
04:37:38   8    like-minded and whose -- yeah, I -- I would have listed
04:37:46   9    a group that was like-minded.
04:37:48  10        Q.  Even if it had not in any way committed to
04:37:50  11    work on the ballot measure?
04:37:54  12        A.  I would have asked each of these groups
04:37:56  13    whether they would allow us to put their name on this.
04:38:00  14        Q.  Was that done in connection with preparing
04:38:00  15    this brochure?
04:38:01  16        A.  I believe it was.
04:38:03  17        Q.  And were you the one who did it?
04:38:05  18        A.  No.
04:38:05  19        Q.  Do you know who did?
04:38:08  20        A.  No.
04:38:09  21        Q.  What was the -- to whom did this brochure
04:38:13  22    ultimately go?
04:38:16  23        A.  Again, I'm not -- I'm not able to answer that.
04:38:21  24    I expressed how -- how I think it came to be developed
04:38:24  25    and for what purpose.  But I don't know the population
```

## Page 204

```
04:38:28   1    that received it.
04:38:32   2        Q.  And I apologize, again, if I -- there's a lot
04:38:37   3    of entities here, and so I'm not sure what I've asked
04:38:41   4    about and what I haven't.  I'm trying to keep track.
04:38:45   5        But when did the official ballot measure
04:38:48   6    committee for Proposition 8 actually form?
04:38:52   7        A.  The ballot committee formed the -- I'm doing
04:39:01   8    the math here.  I believe it was --
04:39:06   9        MS. MOSS:  That actually has been asked and
04:39:08  10    answered earlier.
04:39:10  11        THE WITNESS:  I thought so.
04:39:11  12        MS. MOSS:  His testimony earlier was in
04:39:14  13    mid-November, 2007.
04:39:15  14        THE WITNESS:  Thank-you.
04:39:16  15        MS. STEWART:  Q  So why would you describe
04:39:19  16    ProtectMarriage.com as a coalition in a brochure if a
04:39:36  17    coalition of groups working to put a measure on the
04:39:39  18    ballot if -- strike that.
04:39:52  19        At the time this brochure was prepared by the
04:39:55  20    California Family Council, there had actually been a
04:40:01  21    ballot measure committee formed; is that right?
04:40:04  22        A.  I don't think that's been established in terms
04:40:05  23    of the timeline of the creation of this (indicating).
04:40:10  24        Q.  Let me tell you that the title of the document
04:40:13  25    in the document production has a date on -- in the Bates
```

## Page 205

```
04:40:29   1    number, and it's February 20, 2008.
04:40:32   2        Now, I don't know what that means because I
04:40:35   3    don't know how those numbers were put on there because
04:40:41   4    your counsel produced the documents in a digital form.
04:40:45   5        But does that help you in any way --
04:40:48   6        A.  No.
04:40:50   7        Q.  But we know that at some point before the
04:40:54   8    Supreme Court decided and knowing that the court would
04:40:57   9    decide in the middle of 2008, this document was
04:41:00  10    prepared?
04:41:05  11        A.  Yes.
04:41:05  12        Q.  And we know from the "what you can do" section
04:41:11  13    that it was talking about a million signatures being
04:41:19  14    needed between now and Easter, 2008.
04:41:21  15        Do you see that?
04:41:22  16        A.  Yes.
04:41:22  17        Q.  And what is the period within which you have
04:41:26  18    to collect signatures for a ballot measure in
04:41:30  19    California?
04:41:30  20        A.  150 days.
04:41:33  21        Q.  So would it be fair to say that this document
04:41:36  22    would have had to have been prepared approximately 150
04:41:46  23    days before Easter of 2008?
04:41:49  24        A.  Yes.
04:41:49  25        Q.  Thank-you.
```

| | | Page 222 |
|---|---|---|
| 05:17:17 | 1 | sometimes and with little Cs other times, was that a |
| 05:17:20 | 2 | practice in your communications? |
| 05:17:25 | 3 | A. I'm sorry, I don't recall. |
| 05:17:37 | 4 | MS. STEWART: I'm going to ask you to look at a |
| 05:17:40 | 5 | document labeled Exhibit 28. |
| 05:18:02 | 6 | (Whereupon, Exhibit No. 28 was |
| 05:18:02 | 7 | Marked for identification.) |
| 05:18:38 | 8 | MS. STEWART: Q Is this a press release that was |
| 05:18:40 | 9 | issued by ProtectMarriage.com? |
| 05:18:43 | 10 | A. Well, yes. |
| 05:18:46 | 11 | Q. Who's Chip White? |
| 05:18:48 | 12 | A. Chip White was a contractor in our |
| 05:18:51 | 13 | communications room. |
| 05:18:52 | 14 | Q. And in the third paragraph, last sentence says |
| 05:19:00 | 15 | "Our coalition has no plans to seek any changes in that |
| 05:19:04 | 16 | law, that law I think referring to Proposition 8." |
| 05:19:08 | 17 | Do you see that? |
| 05:19:09 | 18 | A. Yes. |
| 05:19:11 | 19 | Q. What is the reference to "our coalition," what |
| 05:19:13 | 20 | does that mean? |
| 05:19:16 | 21 | A. It's -- in my opinion, it's a misstatement and |
| 05:19:21 | 22 | should have said "the executive committee." |
| 05:19:25 | 23 | Q. Why do you say that? |
| 05:19:27 | 24 | A. Because we -- we did not speak on behalf of |
| 05:19:31 | 25 | people who participated cooperatively in the campaign. |

| | | Page 223 |
|---|---|---|
| 05:19:35 | 1 | Q. So you did not speak on behalf of the |
| 05:19:37 | 2 | coalition of organizations that supported Proposition 8? |
| 05:19:43 | 3 | A. Well, again, no, I mean we if we spoke on |
| 05:19:45 | 4 | behalf of a loose broadly-based group of organizations |
| 05:19:54 | 5 | that did many things on -- by their own will. |
| 05:19:58 | 6 | Q. And yes, I am. |
| 05:20:00 | 7 | A. And the answer is no. |
| 05:20:01 | 8 | Q. Okay. |
| 05:20:02 | 9 | I'd like you to go back and take a look at |
| 05:20:05 | 10 | Exhibit I think it's 22. |
| 05:20:24 | 11 | A. The sign. |
| 05:20:25 | 12 | Q. 25, I'm sorry. 25. |
| 05:20:37 | 13 | Would you look at the second page of that |
| 05:20:39 | 14 | document. I think you testified earlier that this was a |
| 05:20:45 | 15 | press release issued by ProtectMarriage.com. And you |
| 05:20:51 | 16 | see on the second page there are references to a number |
| 05:20:53 | 17 | of entities -- |
| 05:20:56 | 18 | A. Yes. |
| 05:20:56 | 19 | Q. -- in bold. And the last one is |
| 05:20:59 | 20 | ProtectMarriage.com. |
| 05:20:59 | 21 | Do you see that? |
| 05:21:00 | 22 | A. Yes. |
| 05:21:00 | 23 | Q. And it says "ProtectMarriage.com is a |
| 05:21:04 | 24 | broad-based coalition of California families, community |
| 05:21:07 | 25 | leaders, religious leaders, pro-family organizations, |

| | | Page 224 |
|---|---|---|
| 05:21:10 | 1 | and individuals from all walks of life who have joined |
| 05:21:13 | 2 | together to support Proposition 8." |
| 05:21:16 | 3 | Do you see that? |
| 05:21:16 | 4 | A. Yes. |
| 05:21:17 | 5 | Q. So Isn't it fair to say that the campaign |
| 05:21:20 | 6 | frequently referred to ProtectMarriage.com in its |
| 05:21:24 | 7 | communications as the broad-based coalition that you |
| 05:21:27 | 8 | were talking about? |
| 05:21:35 | 9 | MS. MOSS: I'm sorry, could you clarify? When he |
| 05:21:37 | 10 | was talking about here or -- |
| 05:21:40 | 11 | MS. STEWART: Q Isn't it true that |
| 05:21:44 | 12 | ProtectMarriage.com in its communications with the |
| 05:21:48 | 13 | public frequently referred to ProtectMarriage.com as a |
| 05:21:52 | 14 | broad-based coalition of California families, community |
| 05:21:55 | 15 | leaders, religious leaders, pro-family organizations, |
| 05:21:58 | 16 | and individuals? |
| 05:22:03 | 17 | A. I don't -- I couldn't stipulate to frequently. |
| 05:22:07 | 18 | Q. Did this footer, if you will, appear on many |
| 05:22:13 | 19 | releases issued by ProtectMarriage.com? |
| 05:22:17 | 20 | A. I'm not aware. |
| 05:22:18 | 21 | Q. Okay. |
| 05:22:18 | 22 | Did it appear on the organization's website? |
| 05:22:29 | 23 | A. I -- I would need to look through here. But |
| 05:22:32 | 24 | it strikes me that we've already seen it from a website |
| 05:22:36 | 25 | piece. |

| | | Page 225 |
|---|---|---|
| 05:22:37 | 1 | Q. How are voters to know which use you were |
| 05:22:40 | 2 | making of the term "ProtectMarriage.com" when you use |
| 05:22:43 | 3 | that term in public communications? |
| 05:22:53 | 4 | A. How -- how are voters to know -- sorry. |
| 05:22:59 | 5 | Q. I'm a voter. I receive a communication from |
| 05:23:04 | 6 | ProtectMarriage.com talking about the efforts of |
| 05:23:09 | 7 | ProtectMarriage.com. |
| 05:23:11 | 8 | How am I as a voter to know whether that |
| 05:23:16 | 9 | communication is referring to the broad-based coalition |
| 05:23:19 | 10 | described on this document or just the executive |
| 05:23:27 | 11 | committee of the primarily formed ballot committee? |
| 05:23:32 | 12 | A. Within these two documents, I see the Yes on |
| 05:23:36 | 13 | Proposition 8 campaign which refers to the committee |
| 05:23:39 | 14 | itself. I see -- I believe there was another one that |
| 05:23:46 | 15 | referred to it in a different way on the same page, I'm |
| 05:23:49 | 16 | not finding it right now, however. |
| 05:23:53 | 17 | And so on document 25, Yes on Proposition 8 |
| 05:24:01 | 18 | ProtectMarriage.com campaign, that's -- that's the |
| 05:24:06 | 19 | difficulty I'm having as we discuss this in that we may |
| 05:24:11 | 20 | refer to the campaign in general. And many |
| 05:24:16 | 21 | organizations who make reference to the passage of |
| 05:24:25 | 22 | Prop 8. But then there's -- there's a very clear |
| 05:24:29 | 23 | campaign committee that's headed up by a executive |
| 05:24:35 | 24 | committee. |
| 05:24:35 | 25 | Q. Did you expect the voters in reviewing |

## Page 226

```
05:24:38   1   communications that were from -- that referred to
05:24:44   2   ProtectMarriage.com to make a distinction between the
05:24:46   3   coalition that's mentioned on Exhibit 25 and the
05:25:05   4   ProtectMarriage campaign executive committee?
05:25:10   5       A.  Did I expect the voters to be able to make a
05:25:12   6   distinction between what --
05:25:14   7       Q.  Between -- in reviewing communications that
05:25:16   8   they received from ProtectMarriage.com that referred to
05:25:20   9   ProtectMarriage.com, did you expect voters to
05:25:24  10   distinguish between the executive committee or the
05:25:28  11   primarily formed ballot committee on the one hand, and
05:25:31  12   the broad coalition that you've described on -- or that
05:25:35  13   is described on Exhibit 25 in the last paragraph?
05:25:42  14       A.  Well, I can't speak for everyone who wrote on
05:25:45  15   behalf of the campaign committee.  But I think that
05:25:49  16   there were very clearly incidents where we were very
05:25:54  17   specific about the ProtectMarriage.com-Yes on 8 campaign
05:26:00  18   committee.
05:26:00  19       Q.  What were you the chairman of?
05:26:04  20       A.  I was the chairman of the ad hoc executive
05:26:07  21   committee.
05:26:07  22       Q.  Were you also the chairman of ProtectMarriage
05:26:12  23   in the broader sense of that term?
05:26:15  24       A.  Define the broader sense of the term.
05:26:17  25       Q.  The coalition described at the bottom of
```

## Page 227

```
05:26:20   1   Exhibit 25.
05:26:23   2       A.  No, because there was no -- there was no
05:26:26   3   organization as such.
05:26:28   4       Q.  Look back at Exhibit 26, if you would.
05:26:41   5       Do you see at the top it has a photograph of
05:26:43   6   you?
05:26:45   7       A.  Yes.
05:26:45   8       Q.  And underneath it says "Ron Prentice,
05:26:48   9   coalition chairman"?
05:26:49  10       A.  Yes.
05:26:50  11       Q.  Does that suggest that you were the chairman
05:26:53  12   of the broad-based coalition that is referred to in so
05:26:57  13   many of the communications from ProtectMarriage.com?
05:27:10  14       A.  I would say wrongly so, yes.
05:27:32  15       MS. STEWART:  I'm going to give you what we'll mark
05:27:54  16   as 29.
05:27:55  17       (Whereupon, Exhibit No. 29 was
05:28:10  18       Marked for identification.)
05:28:10  19       MS. STEWART:  Q  Take a minute to look at it and
05:28:13  20   tell me if you have ever seen this document before.
05:28:51  21       (Pause in the proceedings.)
05:29:18  22       THE WITNESS:  I've never seen this document before.
05:29:21  23       MS. STEWART:  Q  In any event, do you recall
05:29:23  24   participating in a conference call organized by the
05:29:26  25   Pastors Rapid Response Team on or about July 30th, 2008?
```

## Page 228

```
05:29:47   1       A.  I don't have any memory of this.
05:29:50   2       Q.  You testified earlier that you did participate
05:29:54   3   in some conference calls organized by the Pastors Rapid
05:29:59   4   Response Team; correct?
05:30:00   5       A.  Yes.
05:30:01   6       Q.  Do you have any reason to doubt -- well, let
05:30:04   7   me focus your attention on the third page of this
05:30:09   8   document, which appears to be some, sort of, perhaps
05:30:13   9   agenda, it's not entirely clear, for a conference call
05:30:20  10   it has a July 30, 2008 date.  And on the third page,
05:30:25  11   Item 5 it says "How to Educate your State."
05:30:30  12       Do you see that?
05:30:30  13       A.  Yes.
05:30:31  14       Q.  And it lists Tony Perkins with a website
05:30:35  15   www.FRC.org.
05:30:37  16       Do you see that?
05:30:39  17       A.  Yes.
05:30:40  18       Q.  And underneath that your name and
05:30:42  19   www.CaliforniaFamily.org.
05:30:46  20       Do you see?
05:30:47  21       A.  Yes.
05:30:47  22       Q.  And underneath that Frank Shubert,
05:30:48  23   Shubert-Flint Public Affairs, Sacramento.
05:30:52  24       Do you see that?
05:30:53  25       A.  Yes.
```

## Page 229

```
05:30:53   1       Q.  Now, July 30th of 2008 was after the
05:30:59   2   Proposition 8 had qualified for the ballot; correct?
05:31:02   3       A.  Yes.
05:31:02   4       Q.  So it was during the campaign itself?
05:31:05   5       A.  Yes.
05:31:05   6       Q.  And do you recall participating in a
05:31:15   7   conference call with -- organized by the Pastors Rapid
05:31:20   8   Response Team in which you spoke about the topic of how
05:31:23   9   to educate your State?
05:31:25  10       A.  No.
05:31:27  11       Q.  Do you recall participating in a conference
05:31:29  12   call organized by the Pastors Rapid Response Team in
05:31:33  13   which you spoke at the -- in a part of the conference
05:31:42  14   call at which Tony Perkins and Frank Shubert also spoke?
05:31:50  15       A.  Yes.  However, there's no evidence that I
05:31:54  16   actually fulfilled this duty having never seen this, and
05:31:59  17   there were other times.
05:32:00  18       Q.  Okay.
05:32:00  19       But you recall speaking with those two
05:32:03  20   individuals at conference calls?
05:32:05  21       A.  I recall a -- you know, one or more webinar
05:32:11  22   conference calls where those gentlemen also spoke.
05:32:16  23       Q.  And when you participated in webinars --
05:32:18  24   webinar conference calls organized by the Pastors Rapid
05:32:26  25   Response Team, did you participate for the entire call?
```

## Page 258

| | | |
|---|---|---|
| 06:43:13 | 1 | umbrella? |
| 06:43:15 | 2 | A. I don't believe it was ever described under |
| 06:43:17 | 3 | the umbrella. |
| 06:43:20 | 4 | Q. Was the Mormon Church one of the churches, |
| 06:43:28 | 5 | organizations, individuals described as part of the |
| 06:43:35 | 6 | ProtectMarriage.com coalition? |
| 06:43:43 | 7 | A. I don't believe it was by the committee. |
| 06:43:46 | 8 | Q. You don't believe it was described that way by |
| 06:43:49 | 9 | the committee? |
| 06:43:49 | 10 | A. Yes. |
| 06:43:50 | 11 | Q. Was -- who's Glenn Stanton? |
| 06:43:55 | 12 | A. An employee at Focus on the Family. |
| 06:43:58 | 13 | Q. What's his position with Focus on the Family? |
| 06:43:59 | 14 | A. I don't know his title. |
| 06:44:02 | 15 | Q. Okay. |
| 06:44:03 | 16 | Do you know what his function is? |
| 06:44:07 | 17 | A. Research. |
| 06:44:10 | 18 | Q. Was he -- did he play any role in the passage |
| 06:44:18 | 19 | of Proposition 8, to your knowledge? |
| 06:44:24 | 20 | MS. MOSS: Lack of foundation. But if you know, |
| 06:44:25 | 21 | answer. |
| 06:44:28 | 22 | THE WITNESS: No active role that I'm aware of. |
| 06:44:31 | 23 | MS. STEWART: Q Are you aware of him having done |
| 06:44:36 | 24 | public speaking on the issue in California during the |
| 06:44:39 | 25 | campaign period? |

## Page 259

| | | |
|---|---|---|
| 06:44:39 | 1 | A. No. |
| 06:44:42 | 2 | Q. Are you aware that he participated in some of |
| 06:44:45 | 3 | the simulcasts that you testified about earlier? |
| 06:44:52 | 4 | A. You remind me that his name may have been in |
| 06:44:57 | 5 | the one that you pointed out to me. But I don't recall |
| 06:45:00 | 6 | his involvement. |
| 06:45:05 | 7 | Q. Was Focus on the Family one of the churches, |
| 06:45:08 | 8 | organizations and individuals that was described as the |
| 06:45:16 | 9 | coalition -- the ProtectMarriage.com coalition? |
| 06:45:24 | 10 | MS. MOSS: I'll object to the extent the term |
| 06:45:27 | 11 | "coalition" or the description -- your understanding of |
| 06:45:30 | 12 | coalition, you can answer. |
| 06:45:32 | 13 | THE WITNESS: I would again reframe it. I would |
| 06:45:42 | 14 | say that Focus on the Family was described in our -- in |
| 06:45:47 | 15 | the committees -- in the campaign committee's |
| 06:45:51 | 16 | communications as participating for the passage of |
| 06:45:57 | 17 | Prop 8. |
| 06:45:58 | 18 | MS. STEWART: Q And earlier we saw an exhibit |
| 06:46:05 | 19 | which was a ProtectMarriage.com communication from your |
| 06:46:10 | 20 | press consultants, as I recall, that described |
| 06:46:15 | 21 | ProtectMarriage.com as a -- I want to get the exact |
| 06:46:21 | 22 | terminology so nobody objects -- |
| 06:46:48 | 23 | I'm looking back again at Exhibit 25, which is |
| 06:46:52 | 24 | what I was referring to. We looked at this exhibit and |
| 06:46:56 | 25 | the language that was used by the people who prepared |

## Page 260

| | | |
|---|---|---|
| 06:46:59 | 1 | the press release for ProtectMarriage.com is broad-based |
| 06:47:07 | 2 | coalition of California families, community leaders, |
| 06:47:11 | 3 | religious leaders, pro-family organizations and |
| 06:47:14 | 4 | individuals from all walks of life." |
| 06:47:17 | 5 | I recognize that as not your phrasing that you |
| 06:47:21 | 6 | drafted. But within the description that they have |
| 06:47:25 | 7 | given, would you consider Focus on the Family to be part |
| 06:47:28 | 8 | of that group? |
| 06:47:44 | 9 | A. If we are defining coalition as a loose |
| 06:47:47 | 10 | association of people walking in the same direction. |
| 06:48:19 | 11 | Q. Using your definition of "coalition" that you |
| 06:48:23 | 12 | just gave, a loose association of people walking in the |
| 06:48:27 | 13 | same direction, and adding to it the direction being to |
| 06:48:30 | 14 | pass Proposition 8, would you consider the National |
| 06:48:33 | 15 | Organization for Marriage to be part of that coalition? |
| 06:48:47 | 16 | A. Yes. |
| 06:48:51 | 17 | Q. How about the Knights of Columbus, would you |
| 06:48:53 | 18 | consider them to be part of the coalition? |
| 06:48:55 | 19 | A. Again, the coalition being people who, and |
| 06:49:00 | 20 | organizations that supported the passage of Prop 8? |
| 06:49:07 | 21 | Yes. |
| 06:49:08 | 22 | Q. And how about Catholics for the Common Good, |
| 06:49:10 | 23 | were they part of that coalition? |
| 06:49:13 | 24 | A. Yes. |
| 06:49:15 | 25 | Q. How about Catholics for ProtectMarriage.com, |

## Page 261

| | | |
|---|---|---|
| 06:49:17 | 1 | were they part of the coalition? |
| 06:49:22 | 2 | MS. MOSS: Same definition? |
| 06:49:24 | 3 | MS. STEWART: Yes. |
| 06:49:31 | 4 | THE WITNESS: Yes. |
| 06:49:32 | 5 | MS. STEWART: Q And how about the California |
| 06:49:34 | 6 | Catholic Conference, were they part of that coalition? |
| 06:49:40 | 7 | A. I think up to now you've talked about |
| 06:49:42 | 8 | activity. And when you name the structure of the |
| 06:49:50 | 9 | Catholic Conference, that's an endorsement. |
| 06:50:03 | 10 | Q. I'm a little confused by your answer. |
| 06:50:05 | 11 | Are you saying that the California Catholic |
| 06:50:08 | 12 | Conference didn't play any kind of active role but |
| 06:50:17 | 13 | rather simply endorsed Proposition 8? |
| 06:50:20 | 14 | A. The California Catholic Conference of Bishops? |
| 06:50:24 | 15 | Q. Yes. |
| 06:50:24 | 16 | A. Yes, endorsed Prop 8. |
| 06:50:26 | 17 | Q. And how about the U.S. Conference of Catholic |
| 06:50:29 | 18 | Bishops, were they a member of coalition as we've been |
| 06:50:39 | 19 | using that term in the last few questions? |
| 06:50:39 | 20 | A. Their objective was to participate in the |
| 06:50:43 | 21 | passage of Prop 8. |
| 06:50:45 | 22 | Q. So again, my question -- I want to make sure I |
| 06:50:48 | 23 | get the question I asked answered. And sometimes it's |
| 06:50:52 | 24 | kind of, a "yes" or "no" question. |
| 06:50:54 | 25 | Would you consider the U.S. Conference of |

| | | Page 262 |
|---|---|---|
| 06:50:58 | 1 | Catholic Bishops to be part of the coalition as we |
| 06:51:03 | 2 | defined it a few minutes ago? |
| 06:51:13 | 3 | A.  By saying that -- the definition that we used |
| 06:51:18 | 4 | a few minutes ago talked about activity and action.  And |
| 06:51:22 | 5 | in my clarification regarding the California Catholic |
| 06:51:25 | 6 | Conference of Bishops, I referred to an endorsement |
| 06:51:28 | 7 | versus an activity.  And the U.S. Council of Catholic |
| 06:51:37 | 8 | Bishops is more of an endorsement than it is an |
| 06:51:43 | 9 | activity. |
| 06:51:43 | 10 | Q.  Okay. |
| 06:51:49 | 11 | Are you familiar with a website called |
| 06:51:51 | 12 | MarriageMattersToKids.org? |
| 06:51:54 | 13 | A.  No. |
| 06:52:02 | 14 | Q.  Did ProtectMarriage.com, the primary ballot |
| 06:52:15 | 15 | committee, the narrow ProtectMarriage.com, have a U-Tube |
| 06:52:21 | 16 | channel that it used to communicate with voters? |
| 06:52:34 | 17 | A.  Not to my knowledge. |
| 06:52:47 | 18 | Q.  The Rock Church, Pastor McPherson's church in |
| 06:52:52 | 19 | San Diego, is that part of the ProtectMarriage.com |
| 06:52:55 | 20 | coalition as we defined it a few minutes ago? |
| 06:53:00 | 21 | Actively working to pass Proposition 8? |
| 06:53:03 | 22 | Q.  Yes. |
| 06:53:04 | 23 | A.  The Rock Church did so, yes. |
| 06:53:06 | 24 | Q.  And did the Skyline Church also do so? |
| 06:53:11 | 25 | A.  Yes. |

| | | Page 263 |
|---|---|---|
| 06:53:17 | 1 | Q.  And did Pastor Garlow and Pastor McPherson |
| 06:53:23 | 2 | also do so? |
| 06:53:25 | 3 | A.  As the heads of those churches? |
| 06:53:28 | 4 | Q.  Yes. |
| 06:53:28 | 5 | A.  Yes. |
| 06:53:30 | 6 | Q.  Did -- never mind. |
| 06:53:39 | 7 | How about The Pacific Justice Institute, did |
| 06:53:43 | 8 | that entity, to your knowledge, play any role in the |
| 06:53:48 | 9 | passage of Proposition 8? |
| 06:53:52 | 10 | A.  Yes. |
| 06:53:52 | 11 | Q.  What role did The Pacific Justice Institute |
| 06:53:56 | 12 | play? |
| 06:53:57 | 13 | MS. MOSS:  Lack of foundation.  But to the extent |
| 06:53:59 | 14 | you know, you can answer. |
| 06:54:00 | 15 | MS. STEWART:  You know what, I'd stipulate that you |
| 06:54:02 | 16 | can preserve that objection for every question if you |
| 06:54:06 | 17 | want -- |
| 06:54:06 | 18 | MS. MOSS:  It's not for every question.  I want it |
| 06:54:09 | 19 | to be clear on the record that you're asking him areas |
| 06:54:11 | 20 | that he may have limited knowledge.  But I want it to be |
| 06:54:13 | 21 | clear for the record he -- |
| 06:54:13 | 22 | MS. STEWART:  I'm saying "to your knowledge." |
| 06:54:15 | 23 | MS. MOSS:  -- established -- |
| 06:54:15 | 24 | MS. STEWART:  Obviously, if he doesn't know -- |
| 06:54:16 | 25 | MS. MOSS:  Well -- |

| | | Page 264 |
|---|---|---|
| 06:54:17 | 1 | MS. STEWART:  -- know. |
| 06:54:17 | 2 | MS. MOSS:  But even if he knows something, it |
| 06:54:21 | 3 | doesn't mean that you've established that he has a basis |
| 06:54:23 | 4 | for accurate or complete or detailed information. |
| 06:54:27 | 5 | MS. STEWART:  I'm not suggesting that by my |
| 06:54:29 | 6 | question. |
| 06:54:29 | 7 | MS. MOSS:  Well -- |
| 06:54:30 | 8 | MS. STEWART:  Make your objection.  That's all |
| 06:54:31 | 9 | right. |
| 06:54:32 | 10 | Q.  So what role did Pacific Justice Institute |
| 06:54:35 | 11 | play, to your knowledge? |
| 06:54:36 | 12 | A.  Pacific Justice Institute promoted the passage |
| 06:54:41 | 13 | of Prop 8 on their own website. |
| 06:54:44 | 14 | Q.  Did the American Family Association, to your |
| 06:54:53 | 15 | knowledge, promote the passage of Proposition 8 on its |
| 06:54:58 | 16 | own website? |
| 06:55:00 | 17 | A.  I'm not sure. |
| 06:55:02 | 18 | Q.  Did Focus on the Family promote passage of |
| 06:55:06 | 19 | Proposition 8 on its website? |
| 06:55:20 | 20 | A.  Yes. |
| 06:55:22 | 21 | Q.  Did the Family -- let me reframe that. |
| 06:55:35 | 22 | Did the -- I think you testified earlier that |
| 06:55:42 | 23 | you did not know whether the Mormon Church had a website |
| 06:55:45 | 24 | specifically to promote Proposition 8; correct? |
| 06:55:50 | 25 | A.  Correct. |

| | | Page 265 |
|---|---|---|
| 06:55:50 | 1 | Q.  Do you know whether the Mormon Church used any |
| 06:55:55 | 2 | website to promote passage of Proposition 8? |
| 06:55:59 | 3 | A.  No, I don't know. |
| 06:56:02 | 4 | Q.  Is the Family Research Council a part of the |
| 06:56:08 | 5 | coalition that we defined earlier, shortly ago that |
| 06:56:16 | 6 | works to pass Proposition 8? |
| 06:56:21 | 7 | A.  You mean the vague non-descript loose |
| 06:56:25 | 8 | association that you're referring to as the coalition? |
| 06:56:28 | 9 | Q.  Yes. |
| 06:56:32 | 10 | A.  Family Research Council participated in the |
| 06:56:35 | 11 | promotion of the passage of Proposition 8. |
| 06:56:38 | 12 | Q.  And not only am I using it that way, but |
| 06:56:42 | 13 | ProtectMarriage.com in its communications has sometimes |
| 06:56:46 | 14 | used it that way; correct? |
| 06:56:48 | 15 | A.  I don't know that that wording has ever been |
| 06:56:51 | 16 | used. |
| 06:56:52 | 17 | Q.  Well, the Exhibit 25 that we've gone back to a |
| 06:56:55 | 18 | few times uses the phrase "coalition" referring to a |
| 06:57:02 | 19 | broad-based coalition of California families, community |
| 06:57:06 | 20 | leaders, religious leaders, pro-family organization and |
| 06:57:09 | 21 | individuals from all walks of life who have joined |
| 06:57:13 | 22 | together to support Proposition 8."  That's the |
| 06:57:17 | 23 | coalition I'm referring to, that description. |
| 06:57:24 | 24 | Do you understand that? |
| 06:57:26 | 25 | A.  I understand that you're saying that, yes. |

**Page 266**

```
06:57:29   1        Q.  Was the Family Research Council a part of that
06:57:32   2   coalition?
06:57:37   3        A.  I would probably go back to take issue with
06:57:43   4   what I'm understanding to be your interpretation of this
06:57:47   5   coalition.  My sense is that you -- my sense is that
06:57:58   6   you're inferring that it's something monolithic and that
06:58:02   7   the committee is authoritarian.
06:58:04   8        Q.  I'm not at all.  I'm not inferring anything of
06:58:07   9   the sort.  I'm taking the language used by
06:58:10  10   ProtectMarriage.com in its press release and in which --
06:58:14  11        A.  This is -- I see what you're saying.
06:58:17  12        Q.  -- without any other adjectives or descriptors
06:58:21  13   of how it functions.  But rather a -- I'm using the term
06:58:27  14   "coalition" or "The ProtectMarriage.com coalition" to
06:58:30  15   refer to a broad-based coalition of California families,
06:58:34  16   community leaders, religious leaders, pro-family
06:58:38  17   organizations and individuals from all walks of life who
06:58:40  18   have joined together to support Proposition 8."  That's
06:58:44  19   it.  That's the definition.  Okay?
06:58:46  20        A.  Okay.
06:58:46  21        Q.  Can we have that understanding that that's how
06:58:49  22   I'm using the word in my question?
06:58:52  23        A.  Well, actually, I would prefer that we could
06:58:55  24   understand that it's a vague non-descript loose
06:59:00  25   assimilation of groups attempting to pass Proposition 8.
```

**Page 267**

```
06:59:11   1        MS. STEWART:  Can you read that back.
06:59:13   2             (Record read.)
06:59:49   3        MS. STEWART:  Q  Have you ever referred to the
06:59:51   4   coalition of groups that worked to pass Proposition 8 in
06:59:57   5   the way you just stated a minute, that is as a vague,
07:00:03   6   non-descript, assimilation of groups attempting to pass
07:00:07   7   Proposition 8?
07:00:08   8        A.  No.
07:00:09   9        Q.  I would prefer to stick to the description
07:00:13  10   that ProtectMarriage.com has used on its own materials
07:00:16  11   rather than come up with something completely different,
07:00:19  12   if you don't mind.
07:00:21  13        And it's my understanding that that
07:00:22  14   description is still on ProtectMarriage.com's website
07:00:25  15   today.  And it's the same language that's in this
07:00:29  16   Exhibit 25, a broad-based coalition of California
07:00:34  17   families, community leaders, religious leaders,
07:00:38  18   pro-family organizations and individuals from all walks
07:00:40  19   of life who have joined together to support
07:00:43  20   Proposition 8.
07:00:45  21        So that's how I'm using the term coalition in
07:00:48  22   my question.  And you can say "yes" or "no" and if it
07:00:51  23   doesn't fit, it doesn't fit.
07:00:53  24        So with that understanding of the term
07:00:55  25   "coalition," was the Family Research Council apart of
```

**Page 268**

```
07:01:01   1   that coalition?
07:01:11   2        THE WITNESS:  Can I?
07:01:13   3        MS. MOSS:  Yes.
07:01:54   4             (Pause in the proceedings.)
07:01:58   5        THE WITNESS:  Would you repeat the question?
07:02:00   6             (Record read.)
07:02:24   7        THE WITNESS:  As I understand the definition that
07:02:26   8   you're using for "coalition," no.
07:02:29   9        MS. STEWART:  Q  And was Advocates for Faith and
07:02:31  10   Freedom a part of that coalition?
07:02:34  11        A.  No.
07:02:35  12        Q.  And how about the Western Center for Law and
07:02:37  13   Policy?
07:02:38  14        A.  No.
07:02:40  15        Q.  And how about Fieldstead and Company?
07:02:44  16        A.  No.
07:02:54  17        Q.  How about the Concerned Women for America?
07:02:57  18        A.  No.
07:02:57  19        MS. STEWART:  Duly noted, thank-you, Mr. Pugno.
07:03:22  20        We will stop and give everybody a rest until
07:03:25  21   morning.
07:03:27  22        THE VIDEOGRAPHER:  This marks the end of tape No. 5
07:03:29  23   in volume 1.  And we're off the record at 7:03.
07:03:34  24        COURT REPORTER:  For the record, who would like a
07:03:35  25   copy?
```

**Page 269**

```
07:03:45   1        MS. MOSS:  Yes.
07:03:47   2   (Whereupon, the deposition adjourned.
07:03:47   3   At 7:03 p.m.)
07:03:47   4
07:03:47   5
07:03:47   6        _____
           7        RONALD PRENTICE
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

Page 270

1     DEPOSITION OFFICER'S CERTIFICATE
2
3   STATE OF CALIFORNIA                    )
4                                          ) Ss.
5   COUNTY OF CONTRA COSTA                 )
6
7        I LESLIE CASTRO, CSR, hereby certify:
8        I am a duly qualified Shorthand Reporter in
9   the State of California, holder of Certificate Number
10  8876 issued by the Court Reporter's Board of California
11  and which is in full force and effect.  (Fed R. Civ. P.
12  28(a)).
13       I am authorized to administer oaths of
14  affirmations pursuant to California Code of Civil
15  Procedure, Section 2093(b), and prior to being examined,
16  the deponent was first duly sworn by me.  (Fed. R. Civ.
17  P. 28(a), 30(f) (1)).
18       I am not a relative or employee or attorney or
19  counsel of any of the parties, nor am I a relative or
20  employee of such attorney or counsel, nor am I
21  financially interested in this action.  (Fed. R. Civ. P.
22  28).
23       I am the deposition officer that
24  stenographically recorded the testimony in the foregoing
25  deposition and the foregoing transcript is a true record

Page 271

1   of the testimony given by the deponent.  (Fed. R. Civ.
2   P. 30(f) (1)).
3        Before completion of the deposition, review of
4   the transcript [ ] was  [X] was not requested.  If
5   requested, any changes made by the deponent (and
6   provided to the reporter) during the period allowed, are
7   appended hereto.  (Fed. R. Civ. P. 30(a)).
8
9
10
11
12  Dated:  28th of December, 2009.
13
14
15
16        _____
17        LESLIE CASTRO, CSR
          State of California
18        CSR License No. 8876
19
20
21
22
23
24
25

Page 272

1              ERRATA SHEET
2
3   PAGE   LINE   CHANGE
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  _
21       I, RONALD PRENTICE, have made the following changes
22  to my deposition taken in the matter of PERRY, ET AL.
23  vs. SCHWARZENEGGER, ET AL. taken on DECEMBER 17, 2009.
24  DATE:_____  _____
            RONALD PRENTICE
25

Page 273

1        CERTIFICATION OF WITNESS
2
3
4        I, RONALD PRENTICE, hereby declare that I have read
5   the foregoing testimony, and the same is true and a
6   correct transcription of my said testimony except as I
7   have corrected.
8
9
10
11        _____
            Signature
12
13
14
15        _____
            Date
16
17
18
19
20
21
22
23
24
25

Page 274

BONNIE L. WAGNER & ASSOCIATES
COURT REPORTING SERVICE
41 SUTTER STREET, SUITE 1605
SAN FRANCISCO, CALIFORNIA 94104
(415) 982-4849

January 4, 2010
Ronald Prentice
c/o Nicole J. Moss, Esq.
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Re:  Perry, et al.  vs.
      Schwarzenegger, et al.

Dear Mr. Prentice:
You are hereby notified that pursuant to the California
Code of Civil Procedure Section 2019(E), your deposition
is available for your review within 35 days from the
date of this letter.


If you are represented by an attorney in this matter
contact your attorney before contacting this office.
Do not ask that we send you the original deposition.
State law does not allow us to do so.

Yours very truly,


Leslie Castro, CSR
Bonnie L. Wagner & Associates

CC: Original Transcript
    All Counsel

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

            Plaintiffs,

     vs.                          Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
            Defendants.
_____/



Deposition of

RONALD PRENTICE

Volume I

Thursday, December 17, 2009



REPORTED BY:  LESLIE CASTRO, CSR #8876



BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

**Page 82**

| | | |
|---|---|---|
| 11:13:13 | 1 | go ahead to -- let me back up. |
| 11:13:22 | 2 | Did the California Renewal board ask the |
| 11:13:28 | 3 | individuals you mentioned to serve on a committee at |
| 11:13:33 | 4 | some point in time? |
| 11:13:35 | 5 | A.  I apologize that I don't have knowledge of the |
| 11:13:39 | 6 | timing of the minutes of the California Renewal board I |
| 11:13:46 | 7 | would say that I lack a definite date as to when that |
| 11:13:54 | 8 | took place. |
| 11:13:55 | 9 | Q.  But it did take place? |
| 11:13:57 | 10 | A.  In terms of asking those specific individuals? |
| 11:13:59 | 11 | Q.  Yes. |
| 11:13:59 | 12 | A.  I think it was more -- I was given the |
| 11:14:01 | 13 | authority to move forward with the ballot measure being |
| 11:14:12 | 14 | a project of California Renewal. |
| 11:14:17 | 15 | Q.  And did you request the other members -- the |
| 11:14:20 | 16 | people who became the members of the executive committee |
| 11:14:23 | 17 | to serve in that capacity? |
| 11:14:28 | 18 | A.  It's an odd -- it's an odd thing to try to |
| 11:14:33 | 19 | describe because we can talk about an ad hoc executive |
| 11:14:36 | 20 | committee and even that we wouldn't have referred to |
| 11:14:44 | 21 | ourselves as "members."  We were -- we were n an |
| 11:14:50 | 22 | association of individuals who by our discussions |
| 11:14:57 | 23 | recognized the need or the desire to move forward. |
| 11:15:03 | 24 | Q.  All right. |
| 11:15:04 | 25 | A.  Sorry. |

**Page 83**

| | | |
|---|---|---|
| 11:15:04 | 1 | Q.  You said California Renewal -- |
| 11:15:10 | 2 | MS. STEWART:  Can you read back, like, two answers |
| 11:15:13 | 3 | ago. |
| 11:15:31 | 4 | (Record read.) |
| 11:15:35 | 5 | MS. STEWART:  Q  When you were given the authority |
| 11:15:37 | 6 | to move forward with the ballot measure being a project, |
| 11:15:39 | 7 | California Renewal, did you go to Mr. Dolejsi and |
| 11:15:44 | 8 | Mr. Jansson and Mr. or Ms. Doe and ask them to assist |
| 11:15:50 | 9 | you in that endeavor in some way? |
| 11:15:53 | 10 | A.  There was no -- there was no official moment |
| 11:15:56 | 11 | in time when I went to any one of them and said, "Will |
| 11:15:58 | 12 | you assist me?"  There was dialogue.  And as a group of |
| 11:16:08 | 13 | individuals, we said, "Let's move forward." |
| 11:16:11 | 14 | Q.  And when did you decide to move forward as a |
| 11:16:13 | 15 | group of individuals. |
| 11:16:17 | 16 | A.  I -- I have attempted to answer that and -- |
| 11:16:23 | 17 | Q.  You can say you don't remember. |
| 11:16:26 | 18 | A.  I don't recall beyond middle of '07. |
| 11:16:28 | 19 | Q.  And what was the function of the executive |
| 11:16:32 | 20 | committee? |
| 11:16:40 | 21 | A.  To identify the strategic plan for the ballot |
| 11:16:48 | 22 | measure.  To give consideration to the selection of |
| 11:16:56 | 23 | vendors that would be necessary.  And to identify a |
| 11:17:03 | 24 | fundraising plan. |
| 11:17:11 | 25 | Q.  And did the executive committee carry out |

**Page 84**

| | | |
|---|---|---|
| 11:17:15 | 1 | those functions? |
| 11:17:16 | 2 | A.  Yes. |
| 11:17:19 | 3 | Q.  Did the executive committee oversee any aspect |
| 11:17:22 | 4 | of the campaign after the measure was qualified for the |
| 11:17:27 | 5 | ballot? |
| 11:17:31 | 6 | A.  The executive committee met and received |
| 11:17:34 | 7 | reports and gave and supervised the primary vendors that |
| 11:17:42 | 8 | were selected, yes. |
| 11:17:45 | 9 | Q.  So is it fair to say that the first job that |
| 11:17:52 | 10 | the executive committee had was to get a measure |
| 11:17:56 | 11 | qualified for the ballot? |
| 11:17:58 | 12 | A.  Yes. |
| 11:18:00 | 13 | Q.  First big job anyway? |
| 11:18:01 | 14 | A.  Uh-huh. |
| 11:18:02 | 15 | Q.  And how did the executive committee do that? |
| 11:18:11 | 16 | A.  Through communication, through informing the |
| 11:18:14 | 17 | general population of the -- of title and summary and |
| 11:18:24 | 18 | petitions.  By working with different networks within |
| 11:18:32 | 19 | the State, whether if be individuals who would contact |
| 11:18:38 | 20 | us and say "We want to help with petitions," and we |
| 11:18:43 | 21 | would just attempt to make it something better than |
| 11:18:48 | 22 | chaos in getting those petitions out. |
| 11:18:51 | 23 | Q.  And when you say "networks within the State," |
| 11:18:54 | 24 | what networks? |
| 11:18:56 | 25 | A.  They were -- there again, there were -- there |

**Page 85**

| | | |
|---|---|---|
| 11:19:03 | 1 | were local networks of people who would say we're part |
| 11:19:10 | 2 | of this church or we're part of -- we're a group of |
| 11:19:16 | 3 | pastors in this area.  Or -- that's how it all came to |
| 11:19:23 | 4 | be.  They weren't established organizations or entities, |
| 11:19:26 | 5 | they were just, once again, loosely associated people |
| 11:19:30 | 6 | who were like-minded in this general direction. |
| 11:19:38 | 7 | Q.  You said that you were -- strike that. |
| 11:20:01 | 8 | How did you -- did you raise money to do paid |
| 11:20:08 | 9 | signature gathering for the ballot measure? |
| 11:20:13 | 10 | MS. MOSS:  Did you ask did or how? |
| 11:20:15 | 11 | MS. STEWART:  Did. |
| 11:20:16 | 12 | THE WITNESS:  Yes, we participated in that. |
| 11:20:18 | 13 | MS. STEWART:  Q  And where did the primary |
| 11:20:23 | 14 | donations come from for the signature gathering? |
| 11:20:41 | 15 | A.  Well, I think it's a matter of public record |
| 11:20:44 | 16 | that there were a number of different organizations that |
| 11:20:47 | 17 | contributed during the petition gathering.  National |
| 11:20:51 | 18 | Organization for Marriage was one, Focus on the Family |
| 11:20:54 | 19 | was another I believe were primary during -- |
| 11:21:02 | 20 | Q.  Did the church of Jesus Christ of the |
| 11:21:03 | 21 | Latter-Day Saints help fund the petition-gathering |
| 11:21:10 | 22 | effort? |
| 11:21:14 | 23 | A.  No. |
| 11:21:14 | 24 | Q.  Any other organizations that you can think of |
| 11:21:15 | 25 | that were significant donors, more than $25,000 for the |

## Page 162

03:05:41  1   the executive committee for the Prop 8 campaign.
03:05:46  2        Do you recall that?
03:05:47  3        A. (Witness nods head.)
03:05:48  4        Q. And you indicated that the group that became
03:05:59  5   that committee had been meeting and talking for sometime
03:06:02  6   before it became a real committee.
03:06:05  7        Do you recall that testimony?
03:06:06  8        A. Yes.
03:06:11  9        Q. How did the group of people who became the
03:06:14  10  executive committee come together?
03:06:32  11       A. I can't answer specifically how they came
03:06:34  12  together. I can -- I can only speak to like-minded
03:06:41  13  perspective.
03:06:42  14       Q. Let me ask it this way: The executive
03:06:52  15  committee had a representative of the Church of the
03:06:53  16  Latter-Day Saints; is that correct?
03:07:00  17       MS. MOSS: Objection. Facts not in evidence.
03:07:02  18       THE WITNESS: That's not, as she said, in evidence.
03:07:06  19       MS. STEWART: Q Was Mr. Jansson a representative
03:07:09  20  of the Church of Jesus Christ of the Latter-Day Saints
03:07:15  21  on the executive committee?
03:07:34  22       MS. MOSS: You can answer.
03:07:35  23       THE WITNESS: No.
03:07:37  24       MS. STEWART: Q He is a member of that church is
03:07:40  25  he not?

## Page 163

03:07:41  1        A. Yes.
03:07:42  2        Q. And was there a member of the executive
03:07:48  3   committee who represented the Catholic Church?
03:08:00  4        A. Specific to your literal question, no.
03:08:03  5        Q. Were there members of -- a member or members
03:08:06  6   of the executive committee who were Catholic?
03:08:11  7        A. Yes.
03:08:11  8        Q. And were there any members of the committee
03:08:17  9   who were Evangelical?
03:08:25  10       A. Yes.
03:08:26  11       Q. Who were the members of the committee or
03:08:30  12  members who were Catholic?
03:08:32  13       A. Ned Dolejsi.
03:08:34  14       Q. And was Mr. Doe or Ms. Doe a Catholic also?
03:08:41  15       A. I don't think that's public and that I need to
03:08:44  16  answer it.
03:08:47  17       MS. MOSS: I was going to direct you not to answer
03:08:49  18  it to the extent -- I don't know if it's public or not.
03:08:54  19       MS. STEWART: I inferred your objection.
03:08:56  20       MS. MOSS: I figured, but for the record.
03:09:01  21       MS. STEWART: Q Who was the Evangelical member of
03:09:05  22  the executive committee?
03:09:07  23       MS. STEWART: To the extent that's public.
03:09:09  24       THE WITNESS: Me.
03:09:10  25       MS. STEWART: Q Was it a coincidence that the

## Page 164

03:09:17  1   executive committee had people of each of those three
03:09:21  2   faith groups?
03:09:24  3        MS. MOSS: Objection to the form of the question.
03:09:26  4   You can answer.
03:09:30  5        THE WITNESS: Yes.
03:09:34  6        MS. STEWART: Q Did you ask any of the other
03:09:42  7   members of the committee to participate in the
03:09:50  8   discussions that led up to forming of the committee?
03:09:54  9        A. No.
03:09:56  10       Q. Did you ask any of the members of the
03:09:58  11  committee to serve on the committee?
03:10:02  12       A. No.
03:10:26  13       Q. Did Mr. Dolejsi make an effort to involve
03:10:41  14  other Catholics in the campaign to support
03:10:47  15  Proposition 8?
03:10:48  16       MS. MOSS: I'm going to object to both the form of
03:10:51  17  the question and to the extent you understand what
03:10:53  18  "efforts" -- if you understand what "effort" means, you
03:10:56  19  can answer.
03:10:56  20       And to the extent you understand that, I would ask
03:10:59  21  you to limit your response to actions and activities
03:11:02  22  that you know Mr. Dolejsi took that are public.
03:11:10  23       THE WITNESS: I'm not aware of any his actions and
03:11:14  24  activities that were public.
03:11:32  25       MS. STEWART: Q Did Mr. -- what was the

## Page 165

03:12:24  1   involvement of The Church of Jesus Christ of the
03:12:31  2   Latter-Day Saints in the Proposition 8 campaign.
03:12:36  3        MS. MOSS: Object to the form of the question to
03:12:38  4   the term "involvement." It's overly broad. But to the
03:12:42  5   extent you understand that, you can answer.
03:12:45  6        THE WITNESS: I would appreciate it being
03:12:47  7   clarified -- defined.
03:12:48  8        MS. STEWART: Q What did The Church of Jesus
03:12:49  9   Christ of the Latter-Day Saints do to support the effort
03:12:57  10  to get Proposition 8 passed?
03:13:01  11       A. The Church of Jesus Christ of the Latter-Day
03:13:01  12  Saints endorsed the initiative.
03:13:08  13       Q. Did The Church of Jesus Christ of the
03:13:09  14  Latter-Day Saints -- can we call it the Mormon Church
03:13:16  15  just for brevity?
03:13:18  16       A. Sure.
03:13:18  17       Q. Did the Mormon Church do more than endorse
03:13:23  18  Proposition 8?
03:13:25  19       MS. MOSS: Lack of foundation. But if you know,
03:13:27  20  you can answer.
03:13:28  21       THE WITNESS: We've already referred to the LDS
03:13:33  22  Church contributing $190,000 primarily of in-kind, I
03:13:38  23  believe. And that's what I'm -- that's what I'm aware
03:13:41  24  of.
03:13:44  25       MS. STEWART: Q Do you recall that you went and

**Page 166**

| | | |
|---|---|---|
| 03:13:46 | 1 | met with the leaders of the Mormon Church about |
| 03:13:50 | 2 | Proposition 8? |
| 03:13:53 | 3 | MS. MOSS:  If this is -- if this is something that |
| 03:13:57 | 4 | you did that's public, you can answer.  If -- if it's |
| 03:14:02 | 5 | not, then I would direct you not to answer the question. |
| 03:14:07 | 6 | THE WITNESS:  I think it's public so I'll say. |
| 03:14:12 | 7 | Yes, we did meet with some of the leadership. |
| 03:14:16 | 8 | MS. STEWART:  Q  And did the leader invite you to |
| 03:14:18 | 9 | come and speak to them about Proposition 8, the leader |
| 03:14:21 | 10 | of the Mormon Church? |
| 03:14:25 | 11 | A.  Yes. |
| 03:14:26 | 12 | Q.  And what was the purpose of your meeting with |
| 03:14:33 | 13 | them? |
| 03:14:35 | 14 | A.  This was -- this was prior to their |
| 03:14:41 | 15 | endorsement and to answer questions. |
| 03:14:50 | 16 | Q.  And was this prior to the Proposition 8 |
| 03:15:05 | 17 | qualifying for the ballot? |
| 03:15:08 | 18 | A.  No. |
| 03:15:13 | 19 | Q.  Did the -- well, when was it? |
| 03:15:22 | 20 | A.  I don't know the date. |
| 03:15:22 | 21 | Q.  But it was, in any event -- |
| 03:15:25 | 22 | A.  Yes. |
| 03:15:25 | 23 | Q.  -- after the ballot measure had qualified? |
| 03:15:29 | 24 | And have you described the Mormon Church |
| 03:15:36 | 25 | involvement in the campaign as them being the foot |

**Page 167**

| | | |
|---|---|---|
| 03:15:43 | 1 | soldiers? |
| 03:15:47 | 2 | A.  I don't know that I've publicly described them |
| 03:15:49 | 3 | that way. |
| 03:15:52 | 4 | Q.  Were they the foot soldiers for the campaign? |
| 03:15:56 | 5 | MS. MOSS:  I'm going to object both to the form of |
| 03:15:57 | 6 | the question and to the extent it's calling for him to |
| 03:16:02 | 7 | comment on something he said that is potentially not |
| 03:16:06 | 8 | public. |
| 03:16:11 | 9 | MS. STEWART:  Q  Did the Mormon Church take an |
| 03:16:15 | 10 | official stand on Proposition 8? |
| 03:16:19 | 11 | A.  Yes. |
| 03:16:20 | 12 | Q.  And was their official stand communicated to |
| 03:16:26 | 13 | their church leaders worldwide and particularly in |
| 03:16:30 | 14 | California? |
| 03:16:32 | 15 | MS. MOSS:  Objection.  Lack of foundation.  If you |
| 03:16:34 | 16 | know, you can answer. |
| 03:16:41 | 17 | THE WITNESS:  In California. |
| 03:16:44 | 18 | MS. STEWART:  Q  You know that it was disseminated |
| 03:16:48 | 19 | in California? |
| 03:16:48 | 20 | A.  Yes. |
| 03:16:55 | 21 | Q.  Do you recall that the church leadership wrote |
| 03:17:06 | 22 | that the church's teachings and position on this moral |
| 03:17:10 | 23 | issue are unequivocal.  Marriage is between a man and a |
| 03:17:15 | 24 | woman -- I'm sorry -- marriage between a man and a woman |
| 03:17:18 | 25 | is ordained of God.  And the formation of families is |

**Page 168**

| | | |
|---|---|---|
| 03:17:19 | 1 | central to the Creator's plan for his children? |
| 03:17:24 | 2 | A.  I don't recall that. |
| 03:17:26 | 3 | Q.  Do you recall that the letter that -- do you |
| 03:17:30 | 4 | recall that the Mormon Church wrote a letter to its |
| 03:17:34 | 5 | constituency asking members of the church to do all they |
| 03:17:39 | 6 | can to support the amendment? |
| 03:17:43 | 7 | MS. MOSS:  Objection.  Lack of foundation.  If you |
| 03:17:44 | 8 | know, you can answer. |
| 03:17:47 | 9 | THE WITNESS:  I -- I was never privy to the letter. |
| 03:17:52 | 10 | MS. STEWART:  I'm going to ask you to look at a |
| 03:17:53 | 11 | document that we will mark Exhibit 13. |
| 03:17:58 | 12 | (Whereupon, Exhibit No. 13 was |
| 03:18:10 | 13 | Marked for identification.) |
| 03:18:54 | 14 | MS. STEWART:  Q  First of all, can you tell me what |
| 03:18:56 | 15 | this document is? |
| 03:19:06 | 16 | A.  I can't -- I can't verify that it's accurate, |
| 03:19:12 | 17 | but I can verify that it appears to be a printout of an |
| 03:19:16 | 18 | E-mail. |
| 03:19:17 | 19 | Q.  An E-mail sent out by ProtectMarriage.com? |
| 03:19:23 | 20 | A.  Yes. |
| 03:19:24 | 21 | Q.  And you see that the subject line says |
| 03:19:27 | 22 | "Protect marriage newsletter"? |
| 03:19:30 | 23 | A.  Yes. |
| 03:19:31 | 24 | Q.  Did ProtectMarriage.com send out newsletters |
| 03:19:36 | 25 | in this form on a periodic basis as part of the |

**Page 169**

| | | |
|---|---|---|
| 03:19:40 | 1 | Proposition 8 campaign? |
| 03:19:46 | 2 | A.  Yes. |
| 03:19:47 | 3 | Q.  And is that the form that the newsletters |
| 03:19:52 | 4 | typically took?  Did they look like this in, sort of, |
| 03:19:55 | 5 | look and feel? |
| 03:20:03 | 6 | A.  I -- I don't recall. |
| 03:20:05 | 7 | Q.  Do you see the language on the second page |
| 03:20:08 | 8 | under the heading "LDS Church Takes Active Role in |
| 03:20:14 | 9 | Supporting Prop 8"? |
| 03:20:16 | 10 | A.  Yes. |
| 03:20:16 | 11 | Q.  Is that heading accurate?  Do you know that |
| 03:20:18 | 12 | the LDS Church took an active role in supporting Prop 8? |
| 03:20:24 | 13 | A.  I would have phrased it differently. |
| 03:20:31 | 14 | Q.  How would you have phrased it? |
| 03:20:36 | 15 | A.  I probably would have -- based on my |
| 03:20:40 | 16 | understanding of the decision by the leadership of the |
| 03:20:46 | 17 | LDS Church, I would have stated that they endorsed |
| 03:20:52 | 18 | Proposition 8. |
| 03:20:54 | 19 | Q.  And isn't it true, Mr. Prentice, that the LDS, |
| 03:20:59 | 20 | the Church of Jesus Christ of the Latter-Day Saints, got |
| 03:21:06 | 21 | involved in Proposition 22? |
| 03:21:06 | 22 | MS. MOSS:  Objection.  Lack of foundation.  If you |
| 03:21:15 | 23 | know, you can respond. |
| 03:21:15 | 24 | THE WITNESS:  I believe that's public knowledge. |
| 03:21:18 | 25 | MS. STEWART:  Q  And isn't it true that they were |

Page 170

| | | |
|---|---|---|
| 03:21:18 | 1 | also -- |
| 03:21:17 | 2 | A. I should back up. |
| 03:21:19 | 3 | When you say "the LDS Church," you're |
| 03:21:21 | 4 | referring to -- tell me, if you would, how you're |
| 03:21:27 | 5 | referring to it? |
| 03:21:29 | 6 | Q. The church and its members got involved in |
| 03:21:32 | 7 | Proposition 22; isn't that correct? |
| 03:21:36 | 8 | A. I believe that the church endorsed it and its |
| 03:21:43 | 9 | members got involved. |
| 03:21:44 | 10 | Q. And they were significant in the |
| 03:21:47 | 11 | Proposition 22 battle; is that correct? |
| 03:21:50 | 12 | MS. MOSS: Objection to the term "significant." If |
| 03:21:54 | 13 | you understand it, you can answer. |
| 03:22:02 | 14 | THE WITNESS: Define "significant," if you would. |
| 03:22:04 | 15 | MS. STEWART: Q Do you know what the word |
| 03:22:05 | 16 | "significant" means? |
| 03:22:07 | 17 | A. Depending upon the context, certainly. What |
| 03:22:10 | 18 | is your context? |
| 03:22:12 | 19 | Q. I am saying they played a significant role, an |
| 03:22:16 | 20 | important role. |
| 03:22:17 | 21 | A. Important role? Yes. |
| 03:22:19 | 22 | Q. And did they play a significant role in |
| 03:22:24 | 23 | Proposition 8? |
| 03:22:27 | 24 | MS. MOSS: Same objection to the form of the |
| 03:22:29 | 25 | question. |

Page 171

| | | |
|---|---|---|
| 03:22:32 | 1 | THE WITNESS: Members of the LDS Church played an |
| 03:22:35 | 2 | important role. |
| 03:22:36 | 3 | MS. STEWART: Q And they did so both in terms of |
| 03:22:38 | 4 | money; correct? They did so in terms of money? |
| 03:22:42 | 5 | MS. MOSS: Objection. Lack of foundation. |
| 03:22:48 | 6 | THE WITNESS: I don't -- I don't know the degree to |
| 03:22:49 | 7 | which donations are public, specific to any particular |
| 03:22:57 | 8 | religious denomination. |
| 03:23:00 | 9 | MS. STEWART: Q Do you recall saying at The Church |
| 03:23:02 | 10 | on the Hill event that the LDS got involved in Prop 22, |
| 03:23:07 | 11 | and they were significant in the battle both in finances |
| 03:23:10 | 12 | and foot soldiers? |
| 03:23:11 | 13 | A. No. |
| 03:23:12 | 14 | Q. Do you believe that to be true that they were |
| 03:23:14 | 15 | significant in the battle both in finances and foot |
| 03:23:18 | 16 | soldiers? |
| 03:23:19 | 17 | A. Of Prop 22? |
| 03:23:20 | 18 | Q. Yes. |
| 03:23:21 | 19 | MS. MOSS: Object to the form of the question to |
| 03:23:22 | 20 | the term "foot soldiers" being undefined. But if you |
| 03:23:27 | 21 | understand, you can answer. |
| 03:23:28 | 22 | THE WITNESS: To -- as I would define "foot |
| 03:23:36 | 23 | soldiers" being people who would be willing to be active |
| 03:23:40 | 24 | in the cause, yes. |
| 03:23:41 | 25 | MS. STEWART: Q And wasn't it equally true in |

Page 172

| | | |
|---|---|---|
| 03:23:46 | 1 | connection with Proposition 8 that the LDS were |
| 03:23:50 | 2 | significant in the battle both in terms of finances and |
| 03:23:53 | 3 | foot soldiers? |
| 03:23:56 | 4 | MS. MOSS: Object to the extent there's a lack of |
| 03:23:58 | 5 | foundation. And he's already testified he doesn't know |
| 03:24:03 | 6 | the particular religious faith of the donors. If you |
| 03:24:12 | 7 | think of more, you can add to it. |
| 03:24:15 | 8 | THE WITNESS: I really don't. |
| 03:24:17 | 9 | MS. STEWART: Q You don't know? |
| 03:24:18 | 10 | A. I don't have anything more to add other than |
| 03:24:20 | 11 | what I've already stated. |
| 03:24:21 | 12 | Q. But you didn't answer my question. Either you |
| 03:24:23 | 13 | know or don't know. It's a "yes" or "no" question. |
| 03:24:26 | 14 | Isn't it true that in Proposition 8, the LDS |
| 03:24:30 | 15 | were significant in the battle both in finances and foot |
| 03:24:35 | 16 | soldiers? |
| 03:24:35 | 17 | A. I continue to take issue with the vague |
| 03:24:38 | 18 | generalization of the LDS. I have attempted to |
| 03:24:41 | 19 | stipulate that the LDS leadership has endorsed it. And |
| 03:24:45 | 20 | Mormans in California were active in participation in |
| 03:24:49 | 21 | giving. |
| 03:24:49 | 22 | Q. And so they both the church and its member |
| 03:24:53 | 23 | collectively both gave money and time; is that true? |
| 03:25:02 | 24 | MS. MOSS: Objection. I think the fact on what |
| 03:25:06 | 25 | they gave I think was an in-kind contribution -- |

Page 173

| | | |
|---|---|---|
| 03:25:10 | 1 | MS. STEWART: The church gave. |
| 03:25:11 | 2 | MS. MOSS: That the church gave. |
| 03:25:13 | 3 | MS. STEWART: Q Did the church members, to your |
| 03:25:14 | 4 | knowledge, donate significant amounts of money to the |
| 03:25:18 | 5 | Proposition 8 campaign? |
| 03:25:20 | 6 | A. To my knowledge, yes. |
| 03:25:22 | 7 | Q. And significant amounts of money? |
| 03:25:24 | 8 | MS. MOSS: I'm going to -- |
| 03:25:26 | 9 | THE WITNESS: I don't know the percentage. |
| 03:25:54 | 10 | MS. STEWART: Q I'm going to ask you to take a |
| 03:25:55 | 11 | look at the paragraph under the heading "LDS Church |
| 03:25:59 | 12 | Takes Active Role in Supporting Prop 8." |
| 03:26:04 | 13 | First of all, I want to go back. You said |
| 03:26:06 | 14 | that you would have worded it differently when I asked |
| 03:26:08 | 15 | you about the heading itself. |
| 03:26:10 | 16 | A. Uh-huh. |
| 03:26:11 | 17 | Q. But my question is do you disagree with the |
| 03:26:13 | 18 | statement that the LDS Church took an active role in |
| 03:26:18 | 19 | supporting Proposition 8? |
| 03:26:25 | 20 | A. The reason that I take issue with this title |
| 03:26:29 | 21 | is because it lumps two groups together: One of |
| 03:26:35 | 22 | leadership and one of grassroots Californians. |
| 03:26:39 | 23 | Q. But this is a ProtectMarriage.com |
| 03:26:42 | 24 | communication; correct? |
| 03:26:43 | 25 | A. Correct. |

Page 174

03:26:43  1      Q.  Is it misleading in your view?
03:26:49  2      A.  It doesn't state it as clearly as I would have
03:26:52  3  liked.
03:26:59  4      Q.  Is it true that as the second paragraph says
03:27:00  5  that the LDS Church rarely takes an official stand on
03:27:05  6  political issues?
03:27:11  7      A.  Yes.
03:27:13  8      Q.  And is it true that in this case the first
03:27:17  9  presidency sent a letter to church leaders in
03:27:22 10  California, at least, regarding -- supporting
03:27:28 11  Proposition 8?
03:27:30 12      A.  I believe that it's true that it was sent to
03:27:33 13  California's leaders.
03:27:35 14      Q.  Were you ever shown or told any part of the
03:27:38 15  content of that letter?
03:27:39 16      A.  No.  No.
03:27:51 17      Q.  I want you to look at the third page of this
03:27:53 18  document that it has a heading "Pastor's committee
03:28:02 19  continues push to organize churches."
03:28:04 20      Do you see that?
03:28:05 21      A.  Yes.
03:28:05 22      Q.  Were you -- well, first of all, do you have an
03:28:08 23  understanding of what this newsletter means by the
03:28:14 24  reference to pastor's committee?
03:28:20 25      A.  No.

Page 175

03:28:23  1      Q.  So when it says "Pastor's committee continues
03:28:29  2  push to organize churches," do you have any
03:28:33  3  understanding of what that's referring to?
03:28:35  4      A.  No.
03:28:35  5      Q.  And underneath that it says "On June 17th,
03:28:39  6  2008, Jim Garlow, a senior pastor of Skyline Church in
03:28:45  7  San Diego, released an invitation letter to the State's
03:28:48  8  pastor community asking them to participate in a
03:28:51  9  state-wide conference call for pastors."
03:28:53 10      Do you see that?
03:28:54 11      A.  Yes.
03:28:54 12      Q.  Were you aware of that when it was happening?
03:29:04 13      A.  After the fact.
03:29:06 14      Q.  Okay.
03:29:06 15      And were you aware -- when you say "after the
03:29:09 16  fact," how far after the fact?
03:29:11 17      A.  I -- I don't know.
03:29:17 18      Q.  When did you first become aware that
03:29:19 19  Pastor Garlow was inviting pastors to participate in
03:29:29 20  conference calls?
03:29:29 21      A.  Well, again, I'm not sure of the date that I
03:29:31 22  became aware of this letter.  It was shortly after the
03:29:38 23  letter went out would be.
03:29:41 24      Q.  And so sometime in later in June in 2008, you
03:29:45 25  knew that Pastor Garlow was making those efforts?

Page 176

03:29:51  1      A.  I -- I knew of Pastor Garlow's desire to
03:29:57  2  connect with the pastor community.
03:29:59  3      Q.  And is it true that "The Call" in June was the
03:30:07  4  first of a series of pastor meetings, as the letter
03:30:11  5  indicates, in the -- as the newsletter indicates in the
03:30:14  6  next paragraph.
03:30:17  7      A.  And is it true?
03:30:20  8      Q.  Yes.
03:30:21  9      A.  If the meetings are the webinars that we've
03:30:23 10  already discussed, yes.
03:30:26 11      Q.  And did the pastor meetings serve to kick off
03:30:32 12  an aggressive grassroots campaign amongst churches of
03:30:38 13  varying denominations?
03:30:47 14      A.  The pastor meeting that Jim Garlow put
03:30:50 15  together was the first of several.  That's -- that's as
03:31:03 16  much as I know.
03:31:04 17      Q.  Did the pastor meetings result in a
03:31:08 18  development of a grassroots campaign?
03:31:20 19      A.  I'm -- I'm struggling for -- allow me a
03:31:32 20  minute, if you would.
03:31:43 21      To answer your question, all that I can say is
03:31:46 22  that this served to kick off Jim Garlow's aggressive
03:31:56 23  campaign amongst churches.
03:31:58 24      Q.  And what do you know about Jim Garlow's
03:32:01 25  aggressive campaign amongst churches?

Page 177

03:32:05  1      A.  Only what we've already addressed, webinars.
03:32:08  2      Q.  You don't know what results those webinars had
03:32:11  3  in terms of pastors going out --
03:32:13  4      A.  No.
03:32:13  5      Q.  -- into their church communities?
03:32:15  6      A.  No, I don't.
03:32:16  7      Q.  Is it true that the Yes on 8 campaign was the
03:32:21  8  largest grassroots campaign in California history?
03:32:25  9      A.  I believe so.
03:32:27 10      Q.  Okay.
03:32:28 11      And who was responsible for the grassroots
03:32:34 12  parts of the Yes on 8 effort?
03:32:38 13      MS. MOSS:  To the extent that's public, which I
03:32:41 14  don't believe it is, but to the extent it is, you can
03:32:43 15  answer.  If not, I direct you not to answer under First
03:32:48 16  Amendment grounds.
03:32:49 17      THE WITNESS:  I choose not to answer.
03:32:50 18      MS. STEWART:  Q  Were the pastors and the churches
03:32:52 19  in part responsible for the grassroots effort?
03:32:56 20      A.  Are you asking if they participated?
03:32:58 21      Q.  Yes.
03:32:58 22      A.  They participated in the grassroots efforts.
03:33:00 23      Q.  Were there others that participated in the
03:33:02 24  grassroots effort?
03:33:05 25      A.  I don't believe that they were public.

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

            Plaintiffs,

    vs.                          Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
            Defendants.
_____/




Deposition of

RONALD PRENTICE

Volume I

Thursday, December 17, 2009




REPORTED BY:  LESLIE CASTRO, CSR #8876




BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

## Page 102

11:49:48  1  second page under the heading "IProtectMarriage.com

11:49:55  2  targets the youth vote, the facts about the Prop 8

11:49:59  3  campaign."

11:50:00  4      Do you see that.

11:50:01  5      A. Yes.

11:50:01  6      Q. And it says in the first paragraph under that

11:50:04  7  heading "In conjunction with the Pastors Rapid Response

11:50:08  8  Network, we recently launched a website targeting the

11:50:11  9  youth vote in California. At the IProtectMarriage.com

11:50:16 10  website young people in California can learn about the

11:50:19 11  important issues involved in Proposition 8 and can sign

11:50:20 12  up to help."

11:50:21 13      Do you see that language?

11:50:22 14      A. Yes.

11:50:23 15      Q. Is it true that in conjunction with the

11:50:26 16  Pastors Rapid Response Network, the ProtectMarriage.com

11:50:34 17  launched the website known as IProtectMarriage.com?

11:50:42 18      A. To the degree that it states it here, I would

11:50:44 19  say it appears to be true. It was -- it wasn't under my

11:50:51 20  primary supervision.

11:50:53 21      Q. But do you dispute the accuracy of that

11:50:58 22  statement?

11:51:03 23      A. Well, I guess the accuracy would hinge on the

11:51:06 24  term "conjunction." There -- the Pastors Rapid Response

11:51:13 25  Network acted for the passage of Prop 8. And whether

## Page 103

11:51:21  1  they or IProtectMarriage.com really sought approval from

11:51:27  2  the executive committee, it would not necessarily always

11:51:36  3  be accurate.

11:51:38  4      Q. So what's the Pastors Rapid Response Network?

11:51:42  5      A. The Pastors Rapid Response Network was an

11:51:47  6  informal entity started by Pastor Jim Garlow in

11:51:53  7  San Diego.

11:51:58  8      Q. And when was that entity created?

11:52:01  9      A. Well, again, it's informal, so I'm not aware

11:52:05 10  that it is -- it has any standing. But I don't know

11:52:11 11  when it was created in Jim Garlow's head.

11:52:15 12      Q. Who else is on it, as far as you know?

11:52:21 13      A. Jim Garlow leads it. That's all I know.

11:52:24 14      Q. Is Miles McPherson involved in it?

11:52:27 15      A. I don't -- I don't know and I don't believe

11:52:30 16  so.

11:52:31 17      Q. And did ProtectMarriage.com work with the

11:52:37 18  pastors rapid response network on any efforts that

11:52:43 19  related to the passage of Proposition 8?

11:52:46 20      MS. MOSS: To the extent that -- I don't know if

11:52:50 21  you did or not. But the instruction is going to be to

11:52:52 22  the extent you did, if it's public, you can respond. If

11:52:55 23  it's private, I'm going to instruct you not to answer.

11:52:58 24      MS. STEWART: Well, Nikki, it's a "yes" or "no"

11:53:00 25  question.

## Page 104

11:53:02  1      MS. MOSS: Did you work with them, and I think

11:53:05  2  whether, you know, he's already explained that he's got

11:53:09  3  some confusion over what in conjunction with means and

11:53:13  4  now you're asking did they work together. So I think

11:53:15  5  you're getting at how did they original themselves.

11:53:18  6      I don't know what they did or didn't do, but I

11:53:20  7  think if they had a private non-public relationship,

11:53:26  8  then he does not have to acknowledge that. But there

11:53:31  9  may be something public.

11:53:33 10      THE WITNESS: Well, I would -- I would -- it's not

11:53:38 11  a simple "yes" or "no". The actual answer is when you

11:53:42 12  phrase it did we work with, we were invited by

11:53:46 13  Jim Garlow, one or another a member of the executive

11:53:53 14  committee or Shubert and Flint to give updates to this

11:54:00 15  network that Jim Garlow created and oftentimes did so

11:54:03 16  (indicating).

11:54:05 17      MS. STEWART: Q When you say this network, you

11:54:05 18  mean the Pastors Rapid Response Team?

11:54:10 19      A. Rapid Response Network is what he called it.

11:54:13 20      Q. Got it.

11:54:15 21      And you were invited by them to give updates

11:54:19 22  about the campaign itself?

11:54:22 23      A. Yes.

11:54:23 24      Q. And did they keep the executive committee or

11:54:29 25  yourself appraised of their efforts in connection with

## Page 105

11:54:35  1  passing Proposition 8?

11:54:46  2      A. Yes, to some degree.

11:55:51  3      MS. STEWART: I'm going to ask you to look at a

11:55:52  4  document that we'll mark as Exhibit 5.

11:56:08  5      (Whereupon, Exhibit No. 5 was marked for

11:56:08  6  identification.)

11:56:16  7      MS. STEWART: Q Have you ever seen this document

11:56:18  8  before?

11:56:19  9      A. No.

11:56:21 10      Q. Have you heard of something called "The

11:56:25 11  Pastors Rapid Response Team?

11:56:28 12      A. Yes.

11:56:29 13      Q. And I think earlier we saw a document that

11:56:33 14  referred to the Pastors Rapid Response Network.

11:56:37 15      Is your understanding that that's the same

11:56:39 16  group or entity?

11:56:40 17      A. That's my understanding, yes.

11:56:42 18      Q. And does this document -- I recognize that you

11:56:45 19  haven't seen it before, but does looking at it refresh

11:56:50 20  your recollection in any way as to who was part of the

11:56:57 21  pastors rapid response Team?

11:57:02 22      A. It doesn't refresh my recollection because I

11:57:05 23  was never aware that there was a true team.

11:57:11 24      Q. Well, you knew there was some sort of informal

11:57:17 25  entity, I think Is What you called it; correct?

## Page 106

| | | |
|---|---|---|
| 11:57:20 | 1 | A.  Uh-huh. |
| 11:57:20 | 2 | Q.  Does it refresh your recollection as to who |
| 11:57:22 | 3 | was a part of that informal entity? |
| 11:57:26 | 4 | A.  The only person that I knew was a part of it |
| 11:57:30 | 5 | was Jim Garlow. |
| 11:57:32 | 6 | Q.  You did know, did you not that Miles McPherson |
| 11:57:36 | 7 | created or had created for him or for his under his |
| 11:57:46 | 8 | supervision the IProtectMarriage.com website? |
| 11:57:50 | 9 | A.  Yes. |
| 11:58:10 | 10 | Q.  I'm going to go back. |
| 11:58:12 | 11 | We were talking earlier about how the campaign |
| 11:58:17 | 12 | communicated with actual and potential voters. |
| 11:58:21 | 13 | Do you recall that discussion? |
| 11:58:22 | 14 | A.  Yes. |
| 11:58:23 | 15 | Q.  And we went through a number of ways, and I |
| 11:58:25 | 16 | want to circle back because I'm not sure if we covered |
| 11:58:29 | 17 | them all. |
| 11:58:30 | 18 | So you mentioned as ways that the campaign |
| 11:58:33 | 19 | communicated with voters or potential voters -- and can |
| 11:58:38 | 20 | I just for shorthand say "voters" to mean potential |
| 11:58:43 | 21 | voters as well. |
| 11:58:44 | 22 | A.  Yes. |
| 11:58:45 | 23 | Q.  Would that be acceptable do you understand |
| 11:58:46 | 24 | that? |
| 11:58:47 | 25 | A.  Uh-huh. |

## Page 107

| | | |
|---|---|---|
| 11:58:47 | 1 | Q.  You have to answer audibly. |
| 11:58:49 | 2 | A.  Yes.  Sorry. |
| 11:58:51 | 3 | Q.  So in communicating with voters the campaign |
| 11:58:56 | 4 | used T.V. ads.  You said radio ads, E-mail blasts, |
| 11:59:00 | 5 | direct mail rallies, town hall meetings, a primary |
| 11:59:08 | 6 | website and you mentioned two other websites |
| 11:59:12 | 7 | IProtectMarriage.com and ProtectMarriage.com and that's |
| 11:59:18 | 8 | where I got diverted. |
| 11:59:21 | 9 | So I want to ask:  Are there other ways |
| 11:59:23 | 10 | besides those that the campaign communicated with |
| 11:59:27 | 11 | voters? |
| 11:59:28 | 12 | A.  Yes.  As you state that, I'm reminded of door |
| 11:59:32 | 13 | hangers.  And I'm reminded of brochures that were |
| 11:59:36 | 14 | distributed, and I'm reminded of yard signs and bumper |
| 11:59:42 | 15 | stickers. |
| 11:59:50 | 16 | Q.  How about press releases? |
| 11:59:51 | 17 | A.  Yes. |
| 11:59:54 | 18 | Q.  And how about press events -- |
| 11:59:58 | 19 | A.  Yes. |
| 11:59:58 | 20 | Q.  -- press conferences that sort of thing? |
| 12:00:00 | 21 | A.  Yes. |
| 12:00:03 | 22 | Q.  And did the campaign provide articles or other |
| 12:00:10 | 23 | content for websites besides its own? |
| 12:00:22 | 24 | A.  Not to my knowledge, no.  Did |
| 12:00:28 | 25 | Q.  Were there conference calls?  Did you |

## Page 108

| | | |
|---|---|---|
| 12:00:32 | 1 | communicate with voters by conference calls? |
| 12:00:45 | 2 | A.  There may have been -- there -- there were |
| 12:00:50 | 3 | fundraising calls, if that's what you mean.  That's the |
| 12:00:54 | 4 | only thing that comes to mind where major donors or |
| 12:01:00 | 5 | potential major donors were brought together for |
| 12:01:02 | 6 | conference calls. |
| 12:01:03 | 7 | Q.  Were there conference calls with pastors? |
| 12:01:08 | 8 | A.  That were sponsored directly by the campaign? |
| 12:01:13 | 9 | Q.  Well, let's start here, yeah. |
| 12:01:18 | 10 | A.  The only conference calls I'm familiar with |
| 12:01:20 | 11 | pastors came through Jim Garlow and his Pastors Rapid |
| 12:01:29 | 12 | Response Team. |
| 12:01:31 | 13 | Q.  And when you say "came through," explain what |
| 12:01:35 | 14 | you mean by that. |
| 12:01:36 | 15 | A.  Created, developed and implemented through |
| 12:01:38 | 16 | him. |
| 12:01:38 | 17 | Q.  So there were conference calls that |
| 12:01:41 | 18 | Pastor Garlow -- he's a pastor; correct? |
| 12:01:43 | 19 | A.  Correct. |
| 12:01:44 | 20 | Q.  -- organized -- |
| 12:01:47 | 21 | A.  Correct. |
| 12:01:47 | 22 | Q.  -- through the Pastors Rapid Response Team? |
| 12:01:54 | 23 | And were you part of those conference calls? |
| 12:01:56 | 24 | A.  Some.  I was invited to participate in some. |
| 12:02:05 | 25 | Q.  Were other members of the executive committee |

## Page 109

| | | |
|---|---|---|
| 12:02:08 | 1 | participants in those conference calls? |
| 12:02:15 | 2 | A.  Let's see.  I'm -- I don't know for sure. |
| 12:02:22 | 3 | Q.  Were Shubert and Flint participants in those |
| 12:02:28 | 4 | conference calls? |
| 12:02:28 | 5 | A.  They were invited to participate in some as |
| 12:02:31 | 6 | well. |
| 12:02:31 | 7 | Q.  Were any of your other -- when I say you, I |
| 12:02:35 | 8 | mean ProtectMarriage.com -- consultants involved in |
| 12:02:38 | 9 | those conference calls? |
| 12:02:42 | 10 | A.  I believe one conference call.  Gary Lawrence |
| 12:02:45 | 11 | from Lawrence Research was invited to participate. |
| 12:02:52 | 12 | Q.  And any other ProtectMarriage.com consultants |
| 12:02:56 | 13 | that you recall were -- who were involved in those |
| 12:02:59 | 14 | conference calls? |
| 12:03:00 | 15 | A.  I vaguely recall and could be inaccurate in |
| 12:03:05 | 16 | whether Steve Linder was -- participated in one. |
| 12:03:09 | 17 | Q.  Okay.  And is that it? |
| 12:03:12 | 18 | A.  To my knowledge. |
| 12:03:15 | 19 | Q.  Were there -- we talked about the simulcasts. |
| 12:03:25 | 20 | Can you tell me about the simulcasts.  And |
| 12:03:28 | 21 | I've seen reference to something called simulcasts, and |
| 12:03:32 | 22 | I'm not sure I fully understand what the term means.  So |
| 12:03:35 | 23 | can we start there. |
| 12:03:38 | 24 | Do you know what simulcast means, can you |
| 12:03:40 | 25 | explain it to me? |

**Page 110**

| | | |
|---|---|---|
| 12:03:42 | 1 | A. A simulcast is where an event takes place in |
| 12:03:46 | 2 | one facility and the event is broadcast into other |
| 12:03:53 | 3 | facilities. |
| 12:03:55 | 4 | Q. At the same time? |
| 12:03:55 | 5 | A. Yes. |
| 12:03:56 | 6 | Q. Hence the simul part of simulcast? |
| 12:04:00 | 7 | A. Yeah. |
| 12:04:01 | 8 | Q. So you mentioned earlier that there were |
| 12:04:04 | 9 | simulcasts done in the effort to pass Prop 8. |
| 12:04:14 | 10 | Can you describe those events, those simulcast |
| 12:04:18 | 11 | events. |
| 12:04:19 | 12 | A. Those were put on by Pastors Rapid Response |
| 12:04:24 | 13 | Team, and were oriented towards pastors and churches. |
| 12:04:34 | 14 | Q. And how many were there? |
| 12:04:40 | 15 | A. I believe there were three. |
| 12:04:47 | 16 | Q. And did you participate in any way in those |
| 12:04:55 | 17 | simulcasts? |
| 12:04:56 | 18 | A. No. |
| 12:04:57 | 19 | Q. Were you present at the -- were they held in |
| 12:05:02 | 20 | churches? |
| 12:05:05 | 21 | MS. MOSS: Let me just interject. Obviously, you |
| 12:05:07 | 22 | can only answer what you know, and you can answer that. |
| 12:05:09 | 23 | I just want to for the record note a lack of foundation |
| 12:05:12 | 24 | to the extent that he said he didn't. |
| 12:05:15 | 25 | MS. STEWART: He can say if he doesn't know -- |

**Page 111**

| | | |
|---|---|---|
| 12:05:17 | 1 | MS. MOSS: If he knows. I just want to preserve |
| 12:05:19 | 2 | the foundation objection. |
| 12:05:23 | 3 | MS. STEWART: Preserve. |
| 12:05:24 | 4 | MS. MOSS: But you can answer. |
| 12:05:25 | 5 | THE WITNESS: I believe Pastor Garlow's church was |
| 12:05:28 | 6 | the facility where -- actually, no, I'm wrong. |
| 12:05:32 | 7 | At least one was held at The Rock Church, |
| 12:05:36 | 8 | Miles McPherson's church. I believe two were held at |
| 12:05:39 | 9 | Pastor Garlow's church. And then they were broadcast |
| 12:05:43 | 10 | into other churches. |
| 12:05:45 | 11 | MS. STEWART: Q And did you observe them while |
| 12:05:48 | 12 | they -- well, first of all, were you at the churches |
| 12:05:51 | 13 | when they were being held? |
| 12:05:52 | 14 | A. No. |
| 12:05:52 | 15 | Q. Did you watch the simulcasts? |
| 12:05:56 | 16 | A. No. |
| 12:05:56 | 17 | Q. Did you watch them ever after they were held? |
| 12:05:59 | 18 | A. One portion of one. |
| 12:06:02 | 19 | Q. And Pastor Garlow's church, which church is |
| 12:06:06 | 20 | that? |
| 12:06:07 | 21 | A. Skyline Westling Church. |
| 12:06:13 | 22 | Q. And where is it located? |
| 12:06:16 | 23 | A. El Cajon, California. |
| 12:06:18 | 24 | Q. Is that near San Diego? |
| 12:06:19 | 25 | A. San Diego, eastern San Diego. |

**Page 112**

| | | |
|---|---|---|
| 12:06:21 | 1 | Q. And McPherson's church you said was The Rock |
| 12:06:25 | 2 | Church? |
| 12:06:26 | 3 | A. Correct. |
| 12:06:26 | 4 | Q. And where is that? |
| 12:06:28 | 5 | A. Point Loma-San Diego. |
| 12:06:31 | 6 | Q. Thank-you. I'm bad with Southern California. |
| 12:06:37 | 7 | So the Pastors Rapid Response Team put them |
| 12:06:46 | 8 | on. |
| 12:06:47 | 9 | Were they sponsored by ProtectMarriage.com? |
| 12:06:50 | 10 | A. You need to tell me what you mean by |
| 12:06:51 | 11 | "sponsored." |
| 12:06:54 | 12 | Q. Did ProtectMarriage.com promote them in any |
| 12:07:00 | 13 | way? |
| 12:07:10 | 14 | A. I'm not -- I'm not remembering a time. I |
| 12:07:14 | 15 | would imagine we may have -- we may have communicated |
| 12:07:18 | 16 | that they took place or that they were going to take |
| 12:07:21 | 17 | place. But it wasn't a major part of our communication. |
| 12:07:27 | 18 | Q. Did ProtectMarriage.com provide funding for |
| 12:07:31 | 19 | them? |
| 12:07:31 | 20 | A. Yes. |
| 12:07:34 | 21 | Q. What level of funding, if you recall, did |
| 12:07:38 | 22 | ProtectMarriage.com provide for the simulcasts? |
| 12:07:43 | 23 | A. We provided for the total funding of the |
| 12:07:46 | 24 | simulcast. |
| 12:07:54 | 25 | MS. STEWART: I'm going to suggest we take a lunch |

**Page 113**

| | | |
|---|---|---|
| 12:07:56 | 1 | break. Is this a good time for you guys? |
| 12:07:59 | 2 | MS. MOSS: Sure. |
| 12:08:05 | 3 | THE VIDEOGRAPHER: Off record at 12:07. |
| 12:08:07 | 4 | (Lunch recess.) |
| 12:08:07 | 5 | (Ms. Piepmeier is absent.) |
| 01:19:03 | 6 | THE VIDEOGRAPHER: The time is 1:18, and we're back |
| 01:19:05 | 7 | on the record. |
| 01:19:08 | 8 | MS. STEWART: Q Mr. Prentice, do you understand |
| 01:19:10 | 9 | that you're still under oath? |
| 01:19:12 | 10 | A. Yes. |
| 01:19:12 | 11 | Q. And that when we take breaks in the |
| 01:19:15 | 12 | deposition, it doesn't mean the oath goes away. |
| 01:19:19 | 13 | You understand that; right? |
| 01:19:20 | 14 | A. Yes. |
| 01:19:24 | 15 | Q. Did the executive committee for |
| 01:19:36 | 16 | ProtectMarriage.com have responsibility to coordinate |
| 01:19:43 | 17 | with the organizations, churches and individuals that |
| 01:19:47 | 18 | made up the ProtectMarriage coalition? |
| 01:19:54 | 19 | A. By referring to executive committee of |
| 01:19:57 | 20 | ProtectMarriage.com, you're referring to the committee |
| 01:20:00 | 21 | that was formed for the campaign of '08? |
| 01:20:04 | 22 | Q. Yes. |
| 01:20:04 | 23 | A. Did we have responsibility to communicate |
| 01:20:06 | 24 | with -- |
| 01:20:07 | 25 | Q. Right. |

Page 138

02:23:21 1    Q.  Does that at all refresh your recollection
02:23:23 2  about what CCN is?
02:23:29 3    A.  I think we've already addressed that.  You
02:23:33 4  asked me what Church Communication Network was, and I
02:23:38 5  said they provide simulcasts.
02:23:40 6    Q.  I didn't know the CCN was their initials.  I
02:23:43 7  hadn't put two and two together, to be honest.
02:23:46 8    So CCN is campaign -- wait.  I'm sorry.
02:23:53 9    Is it -- what did you just say?  Is it Church
02:23:56 10 Communication Network, Inc.?  Because that's the thing
02:23:59 11 that you said --
02:24:00 12   A.  Yes.
02:24:00 13   Q.  -- simulcasts?
02:24:04 14   So CCN is Church Communication Network, Inc.,
02:24:09 15 correct, this has refreshed your recollection about CCN?
02:24:13 16   A.  I am attributing -- I can only go by you
02:24:19 17 having previously mentioned Church Communication Network
02:24:24 18 and me now seeing CCN.
02:24:28 19   Q.  Okay.  Fair enough.
02:24:34 20   Did you know that these simulcasts were being
02:25:00 21 planned at the time they were, in fact, being planned?
02:25:05 22   A.  Yes.
02:25:06 23   Q.  Did you know who the speakers were going to be
02:25:12 24 at the time they were being planned?
02:25:14 25   A.  No.

Page 139

02:25:16 1    Q.  Did you know what the content would be at the
02:25:19 2  time they were being planned?
02:25:20 3    A.  No.
02:25:41 4    Q.  We were earlier going through the ways in
02:25:44 5  which the ProtectMarriage.com campaign communicated with
02:25:50 6  voters.  And we covered a lot of things, but I wanted to
02:25:59 7  ask about a couple that we didn't touch on.
02:26:01 8    You mentioned -- or we may have touched on.
02:26:04 9    You mentioned T.V. ads and radio ads; do you
02:26:09 10 recall that.
02:26:10 11   A.  Uh-huh.  Yes.
02:26:12 12   Q.  And by T.V. ads, did you mean advertisements
02:26:15 13 that were actually broadcast on television?
02:26:19 14   A.  Those that were publicly broadcast, yes.
02:26:22 15   Q.  Were there also video ads that were prepared
02:26:26 16 for the Internet only?
02:26:29 17   A.  No.
02:26:30 18   Q.  Okay.
02:26:31 19   So you didn't have ads on your website that
02:26:36 20 had not been -- or that were never broadcast; is that
02:26:41 21 correct?
02:26:43 22   A.  To my knowledge, yes.
02:26:44 23   Q.  And did you -- were there something called
02:26:49 24 webinars as part of the campaign efforts?
02:27:00 25   MS. MOSS:  Are you asking -- are you asking

Page 140

02:27:02 1  specifically did anybody have webinars or did
02:27:05 2  ProtectMarriage.com-Yes on 8 have webinars?
02:27:13 3    MS. STEWART:  Q  Did anybody have webinars?
02:27:14 4    A.  Yes.
02:27:17 5    Q.  What is a webinar?
02:27:18 6    A.  Webinar is a communication that goes online
02:27:22 7  and people see it on computers.
02:27:24 8    Q.  And is it something that you have to, sort of,
02:27:26 9  be there simultaneously for to participate in it?
02:27:32 10   A.  I believe so.
02:27:32 11   Q.  Is it interactive in some way?
02:27:38 12   A.  No.
02:27:41 13   Q.  And you said there were webinars, tell me what
02:27:45 14 you know about those webinars.
02:27:48 15   Let me start with who did webinars in
02:27:53 16 connection with the Prop 8 campaign?
02:28:01 17   A.  The Pastors Rapid Response Team, not
02:28:08 18 necessarily in connection with the campaign, put on
02:28:13 19 webinars.
02:28:13 20   Q.  When you say "not necessarily in connection
02:28:15 21 with the campaign," you mean -- I'm not sure I follow.
02:28:20 22   Did they have to do with Prop 8?
02:28:22 23   A.  Yes, but I guess we need to clarify whether or
02:28:25 24 not it had to do with the campaign committee.
02:28:28 25   Q.  So you mean -- when you say not necessarily

Page 141

02:28:32 1  in --
02:28:32 2    A.  Campaign --
02:28:33 3    Q.  -- committee?
02:28:34 4    A.  Yes.
02:28:35 5    Q.  But they were Prop 8 related?
02:28:37 6    A.  Yes.
02:28:38 7    Q.  Did you participate in any of those webinars?
02:28:41 8    A.  Yes.
02:28:42 9    Q.  And do you know how many webinars there were?
02:28:45 10   A.  No.
02:28:46 11   Q.  And what -- can you describe what -- well, let
02:28:55 12 me ask it this way.
02:28:58 13   So a webinar is something where a lot of
02:29:02 14 people get online on their computer and watch the
02:29:05 15 presentation that's happening on the computer; is
02:29:07 16 that --
02:29:09 17   A.  A PowerPoint.
02:29:13 18   Q.  A PowerPoint.
02:29:16 19   And what was your participation in the
02:29:19 20 webinars that you had anything to do with?
02:29:21 21   A.  I was asked to speak and give an update.
02:29:27 22   Q.  And how many webinars did you give an update
02:29:29 23 for?
02:29:33 24   A.  I don't recall.
02:29:33 25   Q.  Was it more than five?

## Page 142

| | | |
|---|---|---|
| 02:29:34 | 1 | A. I don't believe so. |
| 02:29:36 | 2 | Q. And do you remember who organized the |
| 02:29:38 | 3 | webinars -- you said it was the PRRT? |
| 02:29:46 | 4 | A. Yes. |
| 02:29:49 | 5 | Q. And in each instance in which you |
| 02:29:53 | 6 | participated, you provided an update about -- about |
| 02:29:57 | 7 | what? |
| 02:29:59 | 8 | A. Oh, whatever I was requested to give an update |
| 02:30:04 | 9 | on. It was typically it varied depending upon the |
| 02:30:12 | 10 | webinar. |
| 02:30:12 | 11 | Q. And did -- do you know who the audience, if |
| 02:30:16 | 12 | you will, was for those webinars? |
| 02:30:24 | 13 | A. The audience was -- yeah, I would say |
| 02:30:31 | 14 | religious workers. |
| 02:30:36 | 15 | Q. And when you say "workers," what do you mean? |
| 02:30:38 | 16 | A. It could be lay people. It could be pastors, |
| 02:30:42 | 17 | priests, rabbis. |
| 02:30:44 | 18 | Q. Do you have any idea how many people were -- |
| 02:30:49 | 19 | do you have any idea of the audience size for those |
| 02:30:53 | 20 | webinars? |
| 02:30:54 | 21 | A. No. |
| 02:30:56 | 22 | Q. Were the webinars separate from the conference |
| 02:30:58 | 23 | calls that we talked about earlier? |
| 02:31:02 | 24 | A. Remind me of the conference calls. |
| 02:31:04 | 25 | Q. I believe you indicated that there were some |

## Page 143

| | | |
|---|---|---|
| 02:31:11 | 1 | conference calls that Pastor Garlow and the PRRT invited |
| 02:31:17 | 2 | you to participate in. |
| 02:31:19 | 3 | A. They were the same. |
| 02:31:20 | 4 | Q. They were the same. Okay. |
| 02:31:22 | 5 | So the webinars involve both being online and |
| 02:31:28 | 6 | watching something and then hearing something on the |
| 02:31:32 | 7 | telephone at the same time. |
| 02:31:37 | 8 | A. Yes. |
| 02:31:40 | 9 | Q. Or is it you're hearing it via your computer? |
| 02:31:45 | 10 | A. Both. |
| 02:31:45 | 11 | Q. As you can see, I'm technologically |
| 02:31:48 | 12 | challenged. |
| 02:31:50 | 13 | Were there -- you mentioned the simulcasts. And I |
| 02:31:58 | 14 | think you told me earlier that they were oriented |
| 02:32:05 | 15 | towards pastors and churches. |
| 02:32:06 | 16 | Do I have that right? |
| 02:32:09 | 17 | A. To the best of my knowledge, yes. |
| 02:32:11 | 18 | Q. Were there other events during the campaign |
| 02:32:15 | 19 | that were designed to attract or appeal to the religious |
| 02:32:23 | 20 | faithful, the faith community? |
| 02:32:30 | 21 | A. No. |
| 02:32:32 | 22 | Q. Do you remember an event called "The Call"? |
| 02:32:35 | 23 | A. Yes. |
| 02:32:36 | 24 | Q. Can you tell me what that was? |
| 02:32:42 | 25 | A. That was a prayer event. |

## Page 144

| | | |
|---|---|---|
| 02:32:52 | 1 | Q. And who ho organized that event? |
| 02:32:55 | 2 | A. A gentleman out of Kansas City. |
| 02:32:58 | 3 | Q. What was his name? |
| 02:32:59 | 4 | A. Lou Engle. |
| 02:33:04 | 5 | Q. Did he -- did you know that event was being |
| 02:33:11 | 6 | planned at the time it was being planned? |
| 02:33:14 | 7 | A. Yes. |
| 02:33:15 | 8 | Q. Did ProtectMarriage.com have any involvement |
| 02:33:19 | 9 | whatsoever in "The Call"? |
| 02:33:22 | 10 | MS. MOSS: To the extent their involvement was |
| 02:33:24 | 11 | public -- I don't know if they had any involvement -- |
| 02:33:26 | 12 | but if they did and it was public, you can respond. If |
| 02:33:30 | 13 | not, I would direct you not to answer. |
| 02:33:33 | 14 | THE WITNESS: I'm not aware of any public. |
| 02:33:36 | 15 | MS. STEWART: Q Did you go to "The Call"? |
| 02:33:38 | 16 | A. Yes. |
| 02:33:39 | 17 | Q. Did you speak at "The Call"? |
| 02:33:40 | 18 | A. No. |
| 02:33:44 | 19 | Q. Was "The Call." kind of a modeled after |
| 02:33:50 | 20 | old-fashioned revival events? Do you know what I'm |
| 02:33:54 | 21 | talking about? |
| 02:33:55 | 22 | MS. MOSS: Objection. Lack of foundation. If you |
| 02:33:57 | 23 | know. |
| 02:33:59 | 24 | THE WITNESS: I didn't attend any old-fashioned |
| 02:34:01 | 25 | revival events so.... |

## Page 145

| | | |
|---|---|---|
| 02:34:04 | 1 | MS. STEWART: Q Me neither. I think I read that |
| 02:34:06 | 2 | somewhere about it. |
| 02:34:11 | 3 | Can you describe what it was like? |
| 02:34:15 | 4 | A. A lot of people in the stands and a lot of |
| 02:34:17 | 5 | people on the stage and a lot of people praying. |
| 02:34:22 | 6 | Q. And where were the speakers if you remember? |
| 02:34:26 | 7 | A. I remember two: Lou Engle and Jim Garlow. |
| 02:34:30 | 8 | Q. Do you remember an ex-gay, I think that's how |
| 02:34:35 | 9 | she was billed, speaking at that event? |
| 02:34:38 | 10 | A. No. |
| 02:34:40 | 11 | Q. Do you remember a number of people who claimed |
| 02:34:42 | 12 | to have once been but ceased to be gay speaking at that |
| 02:34:53 | 13 | event? |
| 02:34:53 | 14 | A. No. |
| 02:34:56 | 15 | Q. Did a part of the way the campaign |
| 02:35:02 | 16 | communicated involve door-to-door precinct walking? |
| 02:35:07 | 17 | A. Yes. |
| 02:35:08 | 18 | Q. Did another part of it involve phone banking? |
| 02:35:14 | 19 | A. But I need to back up and say that when you |
| 02:35:20 | 20 | refer to the campaign, I'm understanding this as the |
| 02:35:22 | 21 | broad-based loose number of people who are doing a great |
| 02:35:28 | 22 | degree of this on their own. |
| 02:35:30 | 23 | Q. Fair enough? |
| 02:35:30 | 24 | A. We understand that. |
| 02:35:31 | 25 | Q. We do. |

| | | Page 174 |
|---|---|---|
| 03:26:43 | 1 | Q. Is it misleading in your view? |
| 03:26:49 | 2 | A. It doesn't state it as clearly as I would have |
| 03:26:52 | 3 | liked. |
| 03:26:59 | 4 | Q. Is it true that as the second paragraph says |
| 03:27:00 | 5 | that the LDS Church rarely takes an official stand on |
| 03:27:05 | 6 | political issues? |
| 03:27:11 | 7 | A. Yes. |
| 03:27:13 | 8 | Q. And is it true that in this case the first |
| 03:27:17 | 9 | presidency sent a letter to church leaders in |
| 03:27:22 | 10 | California, at least, regarding -- supporting |
| 03:27:28 | 11 | Proposition 8? |
| 03:27:30 | 12 | A. I believe that it's true that it was sent to |
| 03:27:33 | 13 | California's leaders. |
| 03:27:35 | 14 | Q. Were you ever shown or told any part of the |
| 03:27:38 | 15 | content of that letter? |
| 03:27:39 | 16 | A. No. No. |
| 03:27:51 | 17 | Q. I want you to look at the third page of this |
| 03:27:53 | 18 | document that it has a heading "Pastor's committee |
| 03:28:02 | 19 | continues push to organize churches." |
| 03:28:04 | 20 | Do you see that? |
| 03:28:05 | 21 | A. Yes. |
| 03:28:05 | 22 | Q. Were you -- well, first of all, do you have an |
| 03:28:08 | 23 | understanding of what this newsletter means by the |
| 03:28:14 | 24 | reference to pastor's committee? |
| 03:28:20 | 25 | A. No. |

| | | Page 175 |
|---|---|---|
| 03:28:23 | 1 | Q. So when it says "Pastor's committee continues |
| 03:28:29 | 2 | push to organize churches," do you have any |
| 03:28:33 | 3 | understanding of what that's referring to? |
| 03:28:35 | 4 | A. No. |
| 03:28:35 | 5 | Q. And underneath that it says "On June 17th, |
| 03:28:39 | 6 | 2008, Jim Garlow, a senior pastor of Skyline Church in |
| 03:28:45 | 7 | San Diego, released an invitation letter to the State's |
| 03:28:48 | 8 | pastor community asking them to participate in a |
| 03:28:51 | 9 | state-wide conference call for pastors." |
| 03:28:53 | 10 | Do you see that? |
| 03:28:54 | 11 | A. Yes. |
| 03:28:54 | 12 | Q. Were you aware of that when it was happening? |
| 03:29:04 | 13 | A. After the fact. |
| 03:29:06 | 14 | Q. Okay. |
| 03:29:06 | 15 | And were you aware -- when you say "after the |
| 03:29:09 | 16 | fact," how far after the fact? |
| 03:29:11 | 17 | A. I -- I don't know. |
| 03:29:17 | 18 | Q. When did you first become aware that |
| 03:29:19 | 19 | Pastor Garlow was inviting pastors to participate in |
| 03:29:29 | 20 | conference calls? |
| 03:29:29 | 21 | A. Well, again, I'm not sure of the date that I |
| 03:29:31 | 22 | became aware of this letter. It was shortly after the |
| 03:29:38 | 23 | letter went out would be. |
| 03:29:41 | 24 | Q. And so sometime in later in June in 2008, you |
| 03:29:45 | 25 | knew that Pastor Garlow was making those efforts? |

| | | Page 176 |
|---|---|---|
| 03:29:51 | 1 | A. I -- I knew of Pastor Garlow's desire to |
| 03:29:57 | 2 | connect with the pastor community. |
| 03:29:59 | 3 | Q. And is it true that "The Call" in June was the |
| 03:30:07 | 4 | first of a series of pastor meetings, as the letter |
| 03:30:11 | 5 | indicates, in the -- as the newsletter indicates in the |
| 03:30:14 | 6 | next paragraph. |
| 03:30:17 | 7 | A. And is it true? |
| 03:30:20 | 8 | Q. Yes. |
| 03:30:21 | 9 | A. If the meetings are the webinars that we've |
| 03:30:23 | 10 | already discussed, yes. |
| 03:30:26 | 11 | Q. And did the pastor meetings serve to kick off |
| 03:30:32 | 12 | an aggressive grassroots campaign amongst churches of |
| 03:30:38 | 13 | varying denominations? |
| 03:30:47 | 14 | A. The pastor meeting that Jim Garlow put |
| 03:30:50 | 15 | together was the first of several. That's -- that's as |
| 03:31:03 | 16 | much as I know. |
| 03:31:04 | 17 | Q. Did the pastor meetings result in a |
| 03:31:08 | 18 | development of a grassroots campaign? |
| 03:31:20 | 19 | A. I'm -- I'm struggling for -- allow me a |
| 03:31:32 | 20 | minute, if you would. |
| 03:31:43 | 21 | To answer your question, all that I can say is |
| 03:31:46 | 22 | that this served to kick off Jim Garlow's aggressive |
| 03:31:56 | 23 | campaign amongst churches. |
| 03:31:58 | 24 | Q. And what do you know about Jim Garlow's |
| 03:32:01 | 25 | aggressive campaign amongst churches? |

| | | Page 177 |
|---|---|---|
| 03:32:05 | 1 | A. Only what we've already addressed, webinars. |
| 03:32:08 | 2 | Q. You don't know what results those webinars had |
| 03:32:11 | 3 | in terms of pastors going out -- |
| 03:32:13 | 4 | A. No. |
| 03:32:13 | 5 | Q. -- into their church communities? |
| 03:32:15 | 6 | A. No, I don't. |
| 03:32:16 | 7 | Q. Is it true that the Yes on 8 campaign was the |
| 03:32:21 | 8 | largest grassroots campaign in California history? |
| 03:32:25 | 9 | A. I believe so. |
| 03:32:27 | 10 | Q. Okay. |
| 03:32:28 | 11 | And who was responsible for the grassroots |
| 03:32:34 | 12 | parts of the Yes on 8 effort? |
| 03:32:38 | 13 | MS. MOSS: To the extent that's public, which I |
| 03:32:41 | 14 | don't believe it is, but to the extent it is, you can |
| 03:32:43 | 15 | answer. If not, I direct you not to answer under First |
| 03:32:48 | 16 | Amendment grounds. |
| 03:32:49 | 17 | THE WITNESS: I choose not to answer. |
| 03:32:50 | 18 | MS. STEWART: Q Were the pastors and the churches |
| 03:32:52 | 19 | in part responsible for the grassroots effort? |
| 03:32:56 | 20 | A. Are you asking if they participated? |
| 03:32:58 | 21 | Q. Yes. |
| 03:32:58 | 22 | A. They participated in the grassroots efforts. |
| 03:33:00 | 23 | Q. Were there others that participated in the |
| 03:33:02 | 24 | grassroots effort? |
| 03:33:05 | 25 | A. I don't believe that they were public. |

Page 178

| | | |
|---|---|---|
| 03:33:07 | 1 | Q. So is your answer -- |
| 03:33:09 | 2 | A. I would choose not to answer. |
| 03:33:11 | 3 | Q. You don't know of any other people or groups |
| 03:33:18 | 4 | who participated in a grassroots effort in a public way |
| 03:33:22 | 5 | except for the pastors of the churches; is that fair? |
| 03:33:26 | 6 | A. I don't know of any publicly communicated |
| 03:33:35 | 7 | effort that participated in the grassroots campaign. |
| 03:33:40 | 8 | Q. Were the simulcasts a part of a grassroots |
| 03:33:44 | 9 | campaign? |
| 03:33:49 | 10 | A. I guess it would depend upon your definition |
| 03:33:52 | 11 | of "grassroots." |
| 03:33:53 | 12 | Q. Well, have you used the phrase "grassroots" to |
| 03:33:56 | 13 | describe the success of the Yes on 8 campaign? |
| 03:34:00 | 14 | A. I'm sure I have. |
| 03:34:01 | 15 | Q. And have you stated that that campaign was the |
| 03:34:07 | 16 | largest grassroots effort in California ever? |
| 03:34:11 | 17 | A. Yes. |
| 03:34:12 | 18 | Q. And so as you use that term, were the |
| 03:34:18 | 19 | simulcasts a part of an effort to create a grassroots |
| 03:34:26 | 20 | campaign? |
| 03:34:27 | 21 | A. Were -- was it my understanding that the |
| 03:34:30 | 22 | simulcasts were part of the grassroots campaign. |
| 03:34:33 | 23 | Q. Yes. |
| 03:34:33 | 24 | A. Yes. |
| 03:34:34 | 25 | Q. And Pastor Garlow as least was involved in the |

Page 179

| | | |
|---|---|---|
| 03:34:40 | 1 | simulcasts; correct? |
| 03:34:42 | 2 | A. Yes. |
| 03:34:43 | 3 | Q. Two of them; right? |
| 03:34:45 | 4 | A. Yes. |
| 03:34:46 | 5 | Q. And Pastor Miles? |
| 03:34:51 | 6 | A. McPherson. |
| 03:34:52 | 7 | Q. McPherson was involved in the third simulcast; |
| 03:34:56 | 8 | correct? |
| 03:34:58 | 9 | A. I believe so. |
| 03:34:59 | 10 | Q. Were there other faith leaders involved in the |
| 03:35:03 | 11 | simulcasts? |
| 03:35:06 | 12 | A. Though I believe so, I can't name them. |
| 03:35:09 | 13 | Q. Isn't it fair to say that a major part of the |
| 03:35:14 | 14 | Yes on 8 campaign was directed towards churches and |
| 03:35:21 | 15 | people who attended churches? |
| 03:35:29 | 16 | MS. MOSS: If that is something that's been |
| 03:35:31 | 17 | publicly stated or acknowledged, you can respond. If |
| 03:35:36 | 18 | not, I'm going to direct you not to respond to that |
| 03:35:39 | 19 | characterization of the strategy of the campaign. |
| 03:35:44 | 20 | THE WITNESS: I'll take that counsel. |
| 03:35:49 | 21 | MS. STEWART: Q I think you testified earlier that |
| 03:35:51 | 22 | you were aware of an article that Mr. Shubert and |
| 03:36:00 | 23 | Mr. Flint wrote about the Yes on 8 campaign? |
| 03:36:03 | 24 | A. Yes. |
| 03:36:04 | 25 | Q. And you have seen and read that article; |

Page 180

| | | |
|---|---|---|
| 03:36:06 | 1 | correct? |
| 03:36:07 | 2 | A. Yes. |
| 03:36:12 | 3 | Q. Did Mr. Shubert and Flint inform you that they |
| 03:36:25 | 4 | were going to publish that article before they did so? |
| 03:36:28 | 5 | A. No. |
| 03:36:30 | 6 | Q. Did you have an objection to them publishing |
| 03:36:34 | 7 | it? |
| 03:36:36 | 8 | A. After the fact would I have -- |
| 03:36:40 | 9 | Q. Did you? Did you ever object? |
| 03:36:43 | 10 | MS. MOSS: To the extent that it's asking for |
| 03:36:46 | 11 | internal communications that you had with Mr. Shubert or |
| 03:36:49 | 12 | Mr. Flint or you know anybody else, I would instruct you |
| 03:36:54 | 13 | not to answer. If you publicly objected, then you can |
| 03:36:57 | 14 | answer. |
| 03:37:00 | 15 | THE WITNESS: I would take your counsel. |
| 03:37:03 | 16 | MS. STEWART: Q And is it true -- are you saying |
| 03:37:07 | 17 | that you didn't -- were not aware that they were going |
| 03:37:09 | 18 | to publish the article before they did? |
| 03:37:13 | 19 | A. I believe I answered that. |
| 03:37:14 | 20 | Q. And the answer is "yes"? |
| 03:37:16 | 21 | A. Yes. |
| 03:37:20 | 22 | Q. Were you unhappy about them having published |
| 03:37:23 | 23 | it when you did find out about it? |
| 03:37:35 | 24 | A. Yes. |
| 03:37:35 | 25 | Q. And did you express that in any way? |

Page 181

| | | |
|---|---|---|
| 03:37:40 | 1 | MS. MOSS: The same instruction as earlier. If it |
| 03:37:42 | 2 | was a public expression of your views, you can respond |
| 03:37:46 | 3 | if it was done -- |
| 03:37:47 | 4 | THE WITNESS: It wasn't a public expression of my |
| 03:37:50 | 5 | views. |
| 03:37:51 | 6 | MS. STEWART: Q And did Mr. Shubert and Flint |
| 03:37:55 | 7 | speak at a conference of the American Political |
| 03:38:01 | 8 | Consultants Association or something along those lines |
| 03:38:04 | 9 | about Proposition 8 campaign, to your knowledge? |
| 03:38:08 | 10 | A. I'm not aware of the specific events where |
| 03:38:13 | 11 | they may have spoken about it. |
| 03:38:16 | 12 | Q. Did you hear that they received an award from |
| 03:38:22 | 13 | an organization of Professional Political Consultants |
| 03:38:28 | 14 | for their work on the Prop 8 campaign? |
| 03:38:30 | 15 | A. Yes. |
| 03:38:30 | 16 | Q. And did you become aware at some point of them |
| 03:38:33 | 17 | speaking at a professional organization about a case |
| 03:38:44 | 18 | study of the Yes on 8 campaign? |
| 03:38:48 | 19 | A. No. |
| 03:38:50 | 20 | Q. So to this day, you're not aware of them |
| 03:38:51 | 21 | having had that -- having made that presentation? |
| 03:38:56 | 22 | A. Correct. |
| 03:38:57 | 23 | Q. Okay. |
| 03:38:58 | 24 | After they published the article and you |
| 03:39:01 | 25 | learned about it, did you make any effort to prevent |

## Page 226

05:24:38  1   communications that were from -- that referred to
05:24:44  2   ProtectMarriage.com to make a distinction between the
05:24:46  3   coalition that's mentioned on Exhibit 25 and the
05:25:05  4   ProtectMarriage campaign executive committee?
05:25:10  5       A.  Did I expect the voters to be able to make a
05:25:12  6   distinction between what --
05:25:14  7       Q.  Between -- in reviewing communications that
05:25:16  8   they received from ProtectMarriage.com that referred to
05:25:20  9   ProtectMarriage.com, did you expect voters to
05:25:24  10  distinguish between the executive committee or the
05:25:28  11  primarily formed ballot committee on the one hand, and
05:25:31  12  the broad coalition that you've described on -- or that
05:25:35  13  is described on Exhibit 25 in the last paragraph?
05:25:42  14      A.  Well, I can't speak for everyone who wrote on
05:25:45  15  behalf of the campaign committee.  But I think that
05:25:49  16  there were very clearly incidents where we were very
05:25:54  17  specific about the ProtectMarriage.com-Yes on 8 campaign
05:26:00  18  committee.
05:26:00  19      Q.  What were you the chairman of?
05:26:04  20      A.  I was the chairman of the ad hoc executive
05:26:07  21  committee.
05:26:07  22      Q.  Were you also the chairman of ProtectMarriage
05:26:12  23  in the broader sense of that term?
05:26:15  24      A.  Define the broader sense of the term.
05:26:17  25      Q.  The coalition described at the bottom of

## Page 227

05:26:20  1   Exhibit 25.
05:26:23  2       A.  No, because there was no -- there was no
05:26:26  3   organization as such.
05:26:28  4       Q.  Look back at Exhibit 26, if you would.
05:26:41  5           Do you see at the top it has a photograph of
05:26:43  6   you?
05:26:45  7       A.  Yes.
05:26:45  8       Q.  And underneath it says "Ron Prentice,
05:26:48  9   coalition chairman"?
05:26:49  10      A.  Yes.
05:26:50  11      Q.  Does that suggest that you were the chairman
05:26:53  12  of the broad-based coalition that is referred to in so
05:26:57  13  many of the communications from ProtectMarriage.com?
05:27:10  14      A.  I would say wrongly so, yes.
05:27:32  15      MS. STEWART:  I'm going to give you what we'll mark
05:27:54  16  as 29.
05:27:55  17      (Whereupon, Exhibit No. 29 was
05:28:10  18      Marked for identification.)
05:28:10  19      MS. STEWART:  Q  Take a minute to look at it and
05:28:13  20  tell me if you have ever seen this document before.
05:28:51  21          (Pause in the proceedings.)
05:29:18  22      THE WITNESS:  I've never seen this document before.
05:29:21  23      MS. STEWART:  Q  In any event, do you recall
05:29:23  24  participating in a conference call organized by the
05:29:26  25  Pastors Rapid Response Team on or about July 30th, 2008?

## Page 228

05:29:47  1       A.  I don't have any memory of this.
05:29:50  2       Q.  You testified earlier that you did participate
05:29:54  3   in some conference calls organized by the Pastors Rapid
05:29:59  4   Response Team; correct?
05:30:00  5       A.  Yes.
05:30:01  6       Q.  Do you have any reason to doubt -- well, let
05:30:04  7   me focus your attention on the third page of this
05:30:09  8   document, which appears to be some, sort of, perhaps
05:30:13  9   agenda, it's not entirely clear, for a conference call
05:30:20  10  it has a July 30, 2008 date.  And on the third page,
05:30:25  11  Item 5 it says "How to Educate your State."
05:30:30  12          Do you see that?
05:30:30  13      A.  Yes.
05:30:31  14      Q.  And it lists Tony Perkins with a website
05:30:35  15  www.FRC.org.
05:30:37  16          Do you see that?
05:30:39  17      A.  Yes.
05:30:40  18      Q.  And underneath that your name and
05:30:42  19  www.CaliforniaFamily.org.
05:30:46  20          Do you see?
05:30:47  21      A.  Yes.
05:30:47  22      Q.  And underneath that Frank Shubert,
05:30:48  23  Shubert-Flint Public Affairs, Sacramento.
05:30:52  24          Do you see that?
05:30:53  25      A.  Yes.

## Page 229

05:30:53  1       Q.  Now, July 30th of 2008 was after the
05:30:59  2   Proposition 8 had qualified for the ballot; correct?
05:31:02  3       A.  Yes.
05:31:02  4       Q.  So it was during the campaign itself?
05:31:05  5       A.  Yes.
05:31:05  6       Q.  And do you recall participating in a
05:31:15  7   conference call with -- organized by the Pastors Rapid
05:31:20  8   Response Team in which you spoke about the topic of how
05:31:23  9   to educate your State?
05:31:25  10      A.  No.
05:31:27  11      Q.  Do you recall participating in a conference
05:31:29  12  call organized by the Pastors Rapid Response Team in
05:31:33  13  which you spoke at the -- in a part of the conference
05:31:42  14  call at which Tony Perkins and Frank Shubert also spoke?
05:31:50  15      A.  Yes.  However, there's no evidence that I
05:31:54  16  actually fulfilled this duty having never seen this, and
05:31:59  17  there were other times.
05:32:00  18      Q.  Okay.
05:32:00  19          But you recall speaking with those two
05:32:03  20  individuals at conference calls?
05:32:05  21      A.  I recall a -- you know, one or more webinar
05:32:11  22  conference calls where those gentlemen also spoke.
05:32:16  23      Q.  And when you participated in webinars --
05:32:18  24  webinar conference calls organized by the Pastors Rapid
05:32:26  25  Response Team, did you participate for the entire call?

## Page 230

05:32:34   1   A.  Not every time, no.
05:32:35   2   Q.  Sometimes you did and sometimes you did not?
05:32:37   3   A.  When you say "participate," there would --
05:32:39   4   again, I would speak for two to five minutes at any
05:32:42   5   time.
05:32:43   6   Q.  And did you listen to the other presentations
05:32:46   7   on any of those calls?
05:32:49   8   A.  Yes, I would say inconsistently.
05:32:52   9   Q.  And who's Jack Hibbs, by the way?
05:32:57   10   A.  A pastor of a church.
05:33:00   11   Q.  In Chino Hills?
05:33:02   12   A.  Correct.
05:33:02   13   Q.  And who's Chuck LiMondri?
05:33:06   14   A.  An attorney.
05:33:10   15   Q.  And who is Maggie Gallagher?
05:33:12   16   A.  She's the president of NOM, National
05:33:16   17   Organization for Marriage.
05:33:17   18   Q.  And I think we talked about Jim Garlow
05:33:20   19   earlier.  And he heads up the Pastors Rapid Response
05:33:26   20   Team; is that right?
05:33:27   21   A.  Yes.
05:33:28   22   Q.  Who's Bishop Cordeleone?
05:33:30   23   A.  Cordeleone.  As it states there, at the time
05:33:34   24   he was an auxiliary bishop of the Catholic -- the
05:33:39   25   Catholic Diocese of San Diego.

## Page 231

05:33:41   1   Q.  And I think we talked about Miles McPherson
05:33:44   2   earlier as the pastor of the Rock Church in San Diego;
05:33:51   3   correct?
05:33:52   4   A.  Yes.
05:33:59   5   Q.  And Tony Perkins at the time was with the
05:34:02   6   Family Research Council; is that correct?
05:34:04   7   A.  Yes.
05:34:05   8   Q.  And at the time Frank Shubert was working on
05:34:07   9   the campaign for ProtectMarriage.com; correct?
05:34:13   10   A.  I believe so, yes.  By July 30th, yes.
05:34:16   11   Q.  And Lou Engle who is listed on the last page
05:34:20   12   of this document, what role did he play in the effort to
05:34:26   13   pass Proposition 8, if you know?
05:34:29   14   A.  Lou Engle?
05:34:33   15   MS. MOSS:  I'm going to object.  Foundation.
05:34:34   16   Answer to the extent you know.
05:34:38   17   THE WITNESS:  It's -- it's been answered.  It's --
05:34:40   18   Lou Engle put together "The Call" event and participated
05:34:52   19   in one or more of these webinars.
05:34:54   20   MS. STEWART:  Q  And that's the extent of his
05:34:56   21   participation.
05:34:56   22   A.  To my knowledge.
05:35:00   23   Q.  And who's Chuck Colson?
05:35:04   24   A.  Chuck Colson is an attorney.
05:35:13   25   Q.  And was he active in the effort to pass

## Page 232

05:35:15   1   Proposition 8, to your knowledge?
05:35:18   2   MS. MOSS:  Objection.  Lack of foundation.  You can
05:35:19   3   answer.
05:35:21   4   THE WITNESS:  He participated in this webinar,
05:35:22   5   apparently.
05:35:24   6   MS. STEWART:  Q  You're not aware of other activity
05:35:26   7   on his part --
05:35:28   8   A.  No.
05:35:28   9   Q.  -- to support Prop 8?
05:35:31   10   A.  No.
05:36:00   11   MS. STEWART:  I'm going to ask you to take look at
05:36:04   12   Exhibit 30.
05:36:04   13   (Whereupon, Exhibit No. 30 was
05:36:22   14   Marked for identification.)
05:36:47   15   THE WITNESS:  Okay.
05:36:48   16   MS. STEWART:  Q  Have you ever seen this document
05:36:50   17   before?
05:36:50   18   A.  No.
05:36:51   19   Q.  It appears to be some type of postcard or
05:36:56   20   other mailing item by which people could express support
05:37:03   21   for Proposition 8 and volunteer?
05:37:06   22   A.  Yes.
05:37:06   23   Q.  And it has the logo "Catholics for
05:37:09   24   ProtectMarriage.com" in a couple of places on each card.
05:37:13   25   Do you see that?

## Page 233

05:37:14   1   A.  The logo or the term?
05:37:16   2   Q.  I'm sorry.  The term.
05:37:17   3   A.  Yes.
05:37:18   4   Q.  And underneath the bottom term, you know,
05:37:24   5   "Catholics for ProtectMarriage.com," it says in very
05:37:28   6   small print it says "Paid for by ProtectMarriage.com-Yes
05:37:33   7   on 8, a project of California Renewal."
05:37:36   8   Do you see that?
05:37:37   9   A.  Yes.
05:37:37   10   Q.  Are you aware that ProtectMarriage.com funded
05:37:42   11   in part efforts by Catholics for ProtectMarriage.com to
05:37:50   12   support Proposition 8?
05:37:52   13   A.  As you present this to me, assuming it is
05:37:56   14   accurate, I am now aware that the campaign committee may
05:38:01   15   have paid for these postcards.
05:38:02   16   Q.  Do you know of any other expenditures by the
05:38:06   17   campaign committee to support Catholic involvement in
05:38:12   18   the Yes on 8 campaign?
05:38:14   19   MS. MOSS:  To the extent such expenditures are
05:38:17   20   public, you can answer.  To the extent you had internal
05:38:20   21   expenditures that are not public, I would direct you not
05:38:24   22   to answer.
05:38:32   23   THE WITNESS:  You referred this morning to an
05:38:37   24   expenditure to Bill May, and that's all that I'm
05:38:45   25   familiar with.

| | | Page 234 |
|---|---|---|
| 05:40:13 | 1 | MS. STEWART:  I'm going to ask you to look at a |
| 05:40:15 | 2 | document that we will mark as Exhibit 31. |
| 05:40:18 | 3 | (Whereupon, Exhibit No. 31 was |
| 05:40:32 | 4 | Marked for identification.) |
| 05:40:54 | 5 | MS. STEWART: Q  Have you ever seen this document |
| 05:40:55 | 6 | before? |
| 05:41:07 | 7 | A.  Yes. |
| 05:41:07 | 8 | Q.  Can you tell me what it is? |
| 05:41:11 | 9 | A.  It began as an E-mail blast from Frank Shubert |
| 05:41:22 | 10 | to our E-mail list.  And was picked up by Jim Garlow and |
| 05:41:27 | 11 | forwarded along. |
| 05:41:59 | 12 | Q.  Was it forwarded along by Jim Garlow -- can |
| 05:42:06 | 13 | you tell -- or do you remember how he forwarded it along |
| 05:42:09 | 14 | whether it was by E-mail or some other way? |
| 05:42:13 | 15 | A.  I -- I'm not sure, no. |
| 05:42:25 | 16 | Q.  You mentioned earlier that you attended part |
| 05:42:27 | 17 | of one of the simulcast events? |
| 05:42:30 | 18 | A.  I listened to one. |
| 05:42:31 | 19 | Q.  You listened to one.  I'm sorry. |
| 05:42:33 | 20 | Which of the simulcast events did you listen |
| 05:42:37 | 21 | to? |
| 05:42:39 | 22 | A.  One that was held at Skyline Church. |
| 05:42:43 | 23 | Q.  And two of the three were held there; is that |
| 05:42:46 | 24 | correct? |
| 05:42:46 | 25 | A.  That's my recollection. |

| | | Page 235 |
|---|---|---|
| 05:42:51 | 1 | Q.  Do you recall whether it was called "The ABCs |
| 05:42:53 | 2 | of Marriage"? |
| 05:42:54 | 3 | A.  No. |
| 05:42:57 | 4 | Q.  Do you recall the time, the approximate month |
| 05:43:02 | 5 | or -- |
| 05:43:03 | 6 | A.  No. |
| 05:43:10 | 7 | Q.  Do you recall anything about the content of it |
| 05:43:13 | 8 | at all? |
| 05:43:16 | 9 | A.  I recall seeing Jim Garlow and Lou Engle. |
| 05:43:22 | 10 | That's all. |
| 05:43:40 | 11 | MS. STEWART:  I'm going to ask you to look at a |
| 05:43:43 | 12 | document we'll mark Exhibit 32. |
| 05:43:44 | 13 | (Whereupon, Exhibit No. 32 was |
| 05:44:00 | 14 | Marked for identification.) |
| 05:44:30 | 15 | MS. STEWART: Q  And I want to just call to your |
| 05:44:32 | 16 | attention that it is a two-page document and was |
| 05:44:36 | 17 | double-side copied so there is something on the back as |
| 05:44:40 | 18 | well. |
| 05:44:51 | 19 | Do you know what this document is? |
| 05:44:57 | 20 | A.  Hang on.  I only know what this document says |
| 05:45:11 | 21 | is what it is. |
| 05:45:14 | 22 | Q.  And what can you tell about it from the text |
| 05:45:17 | 23 | of it? |
| 05:45:19 | 24 | A.  It's Jim Garlow promoting "The Call" event. |
| 05:45:22 | 25 | Q.  And did you receive letters of this kind from |

| | | Page 236 |
|---|---|---|
| 05:45:30 | 1 | Jim Garlow during the campaign? |
| 05:45:32 | 2 | A.  In E-mail form? |
| 05:45:34 | 3 | Q.  In any form.  I'm not quite sure what form |
| 05:45:37 | 4 | this is so.... |
| 05:45:49 | 5 | A.  Sorry.  The answer is "yes" and "no." |
| 05:45:52 | 6 | Sometimes yes; sometimes no. |
| 05:45:55 | 7 | Q.  I'm noticing something that you alerted me to |
| 05:45:58 | 8 | earlier which it says at the bottom "If you wish to be |
| 05:46:00 | 9 | removed from this mailing list, please click |
| 05:46:03 | 10 | unsubscribe." |
| 05:46:05 | 11 | A.  E-mail. |
| 05:46:05 | 12 | Q.  Which would suggest it's an E-mail; is that |
| 05:46:06 | 13 | right? |
| 05:46:07 | 14 | A.  That's what it suggests, yeah. |
| 05:46:09 | 15 | Q.  So you got some E-mails from Jim Garlow but |
| 05:46:12 | 16 | not necessarily all? |
| 05:46:14 | 17 | A.  Yes. |
| 05:46:16 | 18 | Q.  So you were on some list that he blasted; is |
| 05:46:23 | 19 | that fair? |
| 05:46:24 | 20 | A.  Apparently so, yes. |
| 05:46:28 | 21 | MS. STEWART:  Can we take a short break, like five |
| 05:46:31 | 22 | minutes? |
| 05:46:33 | 23 | THE VIDEOGRAPHER:  Off the record at 5:46. |
| 05:59:52 | 24 | (Brief break.) |
| 06:00:02 | 25 | THE VIDEOGRAPHER:  Back on the record at 5:59. |

| | | Page 237 |
|---|---|---|
| 06:00:08 | 1 | MS. STEWART:  I want to ask you to look at an |
| 06:00:11 | 2 | exhibit that we will mark 33. |
| 06:00:15 | 3 | (Whereupon, Exhibit No. 33 was |
| 06:00:30 | 4 | Marked for identification.) |
| 06:00:30 | 5 | (Mr. Pugno is absent.) |
| 06:00:37 | 6 | MS. STEWART: Q  Earlier we talked about an article |
| 06:00:40 | 7 | that Mr. Shubert and Mr. Flint published about passing |
| 06:00:45 | 8 | Proposition 8.  And I think you testified that you had |
| 06:00:48 | 9 | seen that article.  And I want to ask you if this is |
| 06:00:51 | 10 | that article. |
| 06:01:08 | 11 | A.  Yes. |
| 06:01:11 | 12 | MS. STEWART:  I'm going to ask you to look at a |
| 06:01:15 | 13 | document that we will mark as 34. |
| 06:01:19 | 14 | (Whereupon, Exhibit No. 34 was |
| 06:01:39 | 15 | Marked for identification.) |
| 06:01:40 | 16 | (Mr. Pugno enters the room.) |
| 06:01:54 | 17 | MS. STEWART: Q  I'll let you have a minute to look |
| 06:01:55 | 18 | at it.  I'm going to ask you if you've ever seen this |
| 06:01:58 | 19 | before. |
| 06:02:22 | 20 | (Pause in the proceedings.) |
| 06:02:27 | 21 | THE WITNESS:  No, I haven't. |
| 06:02:28 | 22 | MS. STEWART: Q  Did you believe that Mr. Shubert |
| 06:02:29 | 23 | and Mr. Flint spoke to a reporter named Kate Kay or a |
| 06:02:46 | 24 | journalist from something called Politics and Advocacy |
| 06:02:51 | 25 | about the Yes on 8 campaign? |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

        Plaintiffs,

   vs.               Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,

        Defendants.
_____/



Deposition of

RONALD PRENTICE

Volume II

Friday, December 18, 2009



REPORTED BY:  LESLIE CASTRO, CSR #8876



BONNIE L. WAGNER & ASSOCIATES
Court Reporting Services
41 Sutter Street, Suite 1605
San Francisco, California 94104
(415) 982-4849

## Page 138

| | | |
|---|---|---|
| 01:40:51 | 1 | MS. MOSS: Object to the form of the question. If |
| 01:40:52 | 2 | you can define what you mean by "campaign." |
| 01:40:55 | 3 | MS. STEWART: Well, I mean campaign in the very |
| 01:40:57 | 4 | broad sense. |
| 01:41:01 | 5 | THE WITNESS: Yes. |
| 01:41:02 | 6 | MS. STEWART: Q And at the top it also says |
| 01:41:05 | 7 | "Download the new fliers here." And it refers to a |
| 01:41:09 | 8 | website www.CACatholic.org. |
| 01:41:13 | 9 | Do you see that? |
| 01:41:14 | 10 | A. Yes. |
| 01:41:15 | 11 | Q. And it appears to be sending people to that |
| 01:41:19 | 12 | website to get fliers having to do with Proposition 8. |
| 01:41:23 | 13 | Do you see that? |
| 01:41:24 | 14 | A. Yes. |
| 01:41:28 | 15 | Q. Were you familiar with www.CACatholic.org? |
| 01:41:36 | 16 | A. Yes. |
| 01:41:37 | 17 | Q. Did you know that it was being used to support |
| 01:41:44 | 18 | the Proposition 8 campaign -- |
| 01:41:47 | 19 | A. No. |
| 01:41:47 | 20 | Q. -- broad campaign? |
| 01:41:50 | 21 | No? |
| 01:41:50 | 22 | A. The broad campaign, no. |
| 01:41:55 | 23 | MS. STEWART: I'll ask you to look at a document |
| 01:41:57 | 24 | that we will mark 69. |
| 01:42:11 | 25 | MS. STEWART: Q And I apologize but I copied this |

## Page 139

| | | |
|---|---|---|
| 01:42:14 | 1 | myself so I only have two copies. So let me actually |
| 01:42:22 | 2 | give you the one that I'll have the court reporter mark |
| 01:42:27 | 3 | so I can refer to one. |
| 01:42:29 | 4 | MS. MOSS: You only have two, period? |
| 01:42:31 | 5 | MS. STEWART: Period. |
| 01:42:32 | 6 | MS. MOSS: No problem. |
| 01:42:33 | 7 | MS. STEWART: There's only one or two items like |
| 01:42:35 | 8 | this. |
| 01:42:44 | 9 | (Whereupon, Exhibit No. 69 was |
| 01:42:08 | 10 | Marked for identification.) |
| 01:42:47 | 11 | MS. STEWART: Q Do you recognize this document, |
| 01:42:49 | 12 | have you ever seen it before? |
| 01:43:01 | 13 | A. Yes. |
| 01:43:01 | 14 | Q. What is it? |
| 01:43:05 | 15 | A. It appears to be a resource list of |
| 01:43:09 | 16 | homosexuality resources. |
| 01:43:11 | 17 | Q. And a resource list of whose? |
| 01:43:15 | 18 | A. Focus on the Family. |
| 01:43:15 | 19 | Q. Did Focus on the Family use this resource list |
| 01:43:18 | 20 | or something like it when you were working for that |
| 01:43:22 | 21 | organization? |
| 01:43:24 | 22 | A. I don't know. |
| 01:44:05 | 23 | MS. STEWART: I'm going to ask you to look at -- |
| 01:44:07 | 24 | this is the other one, and this one is even worse, I |
| 01:44:13 | 25 | only have one copy. But it's the only one like this so |

## Page 140

| | | |
|---|---|---|
| 01:44:17 | 1 | I apologize. |
| 01:44:18 | 2 | (Whereupon, Exhibit No. 70 was |
| 01:44:35 | 3 | Marked for identification.) |
| 01:44:41 | 4 | MS. STEWART: Q Have you ever seen that document |
| 01:44:43 | 5 | before? |
| 01:44:44 | 6 | A. Yes. |
| 01:44:44 | 7 | Q. Can you tell me what it is. |
| 01:44:48 | 8 | A. It's a timeline that leads up to the event |
| 01:44:52 | 9 | called "The Call." |
| 01:44:54 | 10 | Q. Do you know who prepared that timeline? |
| 01:45:05 | 11 | A. No. |
| 01:45:19 | 12 | MS. STEWART: I'm going to mark -- all right, I |
| 01:45:24 | 13 | lied. This is another one where I only have two. |
| 01:45:28 | 14 | Exhibit 71. |
| 01:45:41 | 15 | (Whereupon, Exhibit No. 71 was |
| 01:45:41 | 16 | Marked for identification.) |
| 01:46:01 | 17 | MS. STEWART: Q Have you ever seen this document |
| 01:46:02 | 18 | before? |
| 01:46:02 | 19 | A. No. |
| 01:46:06 | 20 | Q. Do you see at the bottom that it has three |
| 01:46:09 | 21 | websites listed. One of which is |
| 01:46:10 | 22 | www.ProtectMarriageCA.com? |
| 01:46:15 | 23 | A. Yes. |
| 01:46:15 | 24 | Q. And I think you told me about that website |
| 01:46:17 | 25 | yesterday. |

## Page 141

| | | |
|---|---|---|
| 01:46:18 | 1 | Do you see it has a one for |
| 01:46:20 | 2 | www.SkylineChurch.com? |
| 01:46:23 | 3 | A. Yes. |
| 01:46:24 | 4 | Q. And the other one is www.JimGarlow.com? |
| 01:46:29 | 5 | A. Yes. |
| 01:46:29 | 6 | Q. Were you at all familiar with the Skyline |
| 01:46:31 | 7 | Church website that's on this page? |
| 01:46:33 | 8 | A. No. |
| 01:46:34 | 9 | Q. How about the Jim Garlow website? |
| 01:46:36 | 10 | A. No. |
| 01:46:55 | 11 | MS. STEWART: I'm going to mark Exhibit 72. |
| 01:47:09 | 12 | (Whereupon, Exhibit No. 72 was |
| 01:47:10 | 13 | Marked for identification.) |
| 01:47:21 | 14 | MS. STEWART: Q Have you ever seen that document |
| 01:47:22 | 15 | before? |
| 01:47:35 | 16 | A. I don't recall ever having seen it before. |
| 01:47:39 | 17 | Q. Do you ever remember hearing about the 10 |
| 01:47:42 | 18 | declarations for protecting biblical marriage as the |
| 01:47:47 | 19 | title refers to in the course of the Prop 8 effort? |
| 01:47:56 | 20 | A. Yes. |
| 01:47:57 | 21 | Q. Who did you hear about the 10 declarations for |
| 01:48:00 | 22 | protecting biblical marriage from? |
| 01:48:05 | 23 | MS. MOSS: To the extent that whomever you heard it |
| 01:48:08 | 24 | from is public, then you can reveal the identity. |
| 01:48:21 | 25 | THE WITNESS: Jim Garlow. |

**Page 142**

| | | |
|---|---|---|
| 01:48:23 | 1 | MS. STEWART:  Q  And this document has a copyright |
| 01:48:27 | 2 | symbol with James Garlow's name on it at the bottom, |
| 01:48:31 | 3 | does it not, of the second page? |
| 01:48:33 | 4 | A.  Yes. |
| 01:48:33 | 5 | Q.  And it's dated June 25th, 2008? |
| 01:48:37 | 6 | A.  Yes. |
| 01:48:42 | 7 | Q.  Did you ever hear of something called the 8 |
| 01:48:44 | 8 | for 8 plan in connection with Proposition 8? |
| 01:48:48 | 9 | A.  Yes. |
| 01:48:55 | 10 | Q.  Was that also something that was -- that |
| 01:49:02 | 11 | Pastor Garlow talked about when he talked about |
| 01:49:05 | 12 | Proposition 8? |
| 01:49:12 | 13 | A.  Yes. |
| 01:49:13 | 14 | Q.  Did you ever hear about the ABCs of the |
| 01:49:15 | 15 | Proposition 8 amendment? |
| 01:49:18 | 16 | A.  Yes. |
| 01:49:20 | 17 | Q.  Was that a phrase -- a phrase that |
| 01:49:26 | 18 | Pastor Garlow used in connection with Proposition 8? |
| 01:49:29 | 19 | A.  Yes. |
| 01:49:33 | 20 | MS. STEWART:  I'm going to ask you look at |
| 01:49:35 | 21 | Exhibit 73. |
| 01:49:36 | 22 | (Whereupon, Exhibit No. 73 was |
| 01:49:51 | 23 | Marked for identification.) |
| 01:50:09 | 24 | MS. STEWART:  Q  Have you ever seen Exhibit 73 |
| 01:50:11 | 25 | before? |

**Page 143**

| | | |
|---|---|---|
| 01:50:17 | 1 | A.  Yes. |
| 01:50:20 | 2 | Q.  Do you recall where you saw it? |
| 01:50:27 | 3 | A.  Yes. |
| 01:50:27 | 4 | Q.  Where did you -- where did you come across |
| 01:50:31 | 5 | this document? |
| 01:50:35 | 6 | A.  It was distributed at an event that had to do |
| 01:50:45 | 7 | with a webinar. |
| 01:50:47 | 8 | Q.  At an event that had to do with a webinar? |
| 01:50:50 | 9 | A.  It was at the site where the webinar was cast. |
| 01:50:53 | 10 | Q.  And were you present at that site at the time? |
| 01:50:56 | 11 | A.  Yes. |
| 01:50:57 | 12 | Q.  Where was the site of the webinar? |
| 01:51:02 | 13 | A.  Skyline Church. |
| 01:51:03 | 14 | Q.  And in the, sort of, faint background |
| 01:51:09 | 15 | underneath the lettering, that's Yes on 8 logo in |
| 01:51:15 | 16 | the background; right? |
| 01:51:17 | 17 | A.  Yes. |
| 01:51:51 | 18 | MS. STEWART:  I'm going to mark this as Exhibit 74. |
| 01:51:52 | 19 | (Whereupon, Exhibit No. 74 was |
| 01:52:13 | 20 | Marked for identification.) |
| 01:52:14 | 21 | MS. STEWART:  Q  This is a document entitled "God's |
| 01:52:16 | 22 | Design for Marriage." |
| 01:52:17 | 23 | Do you see that? |
| 01:52:19 | 24 | A.  Yes. |
| 01:52:19 | 25 | Q.  And it has, like, a little male symbol and a |

**Page 144**

| | | |
|---|---|---|
| 01:52:22 | 1 | little female symbol in the word marriage. |
| 01:52:26 | 2 | Do you see that? |
| 01:52:26 | 3 | A.  Yes. |
| 01:52:27 | 4 | Q.  Have you ever seen this document before? |
| 01:52:47 | 5 | MS. MOSS:  I don't know if it's just my copy, it |
| 01:52:50 | 6 | doesn't appear to be -- |
| 01:52:55 | 7 | MS. STEWART:  I know it's, sort of -- I think it |
| 01:52:56 | 8 | may have been in booklet form, but this is how it comes |
| 01:53:02 | 9 | off the web.  I think it's because they may have laid it |
| 01:53:06 | 10 | out in a way that it would fold in half.  But they're |
| 01:53:11 | 11 | all that way, it's not just yours. |
| 01:53:14 | 12 | MS. MOSS:  Okay. |
| 01:53:19 | 13 | THE WITNESS:  Well, earlier I referred to having |
| 01:53:22 | 14 | seen the document, but I don't believe I have, I've only |
| 01:53:26 | 15 | seen that logo (indicating). |
| 01:53:28 | 16 | MS. STEWART:  So you've seen the logo "God's |
| 01:53:31 | 17 | Design for Marriage" but not on this document? |
| 01:53:33 | 18 | A.  This document doesn't -- I don't recall it. |
| 01:53:35 | 19 | Q.  Okay. |
| 01:53:36 | 20 | Do you see that it says on the cover page "For |
| 01:53:39 | 21 | more information, go to www.ProtectMarriage.com? |
| 01:53:43 | 22 | A.  Yes. |
| 01:53:45 | 23 | Q.  And also, it says on what I'm going to guess |
| 01:53:48 | 24 | it's on the left-hand side what might have been the back |
| 01:53:52 | 25 | page of the document if it was a foldover? |

**Page 145**

| | | |
|---|---|---|
| 01:53:54 | 1 | A.  Yes. |
| 01:53:55 | 2 | Q.  And underneath it says "Assembled by Pastor |
| 01:53:58 | 3 | Jim Garlow and the staff at Skyline Church." |
| 01:54:04 | 4 | Do you see that? |
| 01:54:05 | 5 | A.  Yes. |
| 01:54:05 | 6 | Q.  Do you know whether the logo of "God's Design |
| 01:54:09 | 7 | for Marriage" was used by Pastor Garlow in connection |
| 01:54:16 | 8 | with the campaign to pass Proposition 8? |
| 01:54:20 | 9 | MS. MOSS:  By "campaign," are you referring to the |
| 01:54:22 | 10 | broader campaign? |
| 01:54:24 | 11 | MS. STEWART:  Yes. |
| 01:54:27 | 12 | THE WITNESS:  I recognize it from the time of the |
| 01:54:30 | 13 | Yes on 8 campaign, yes. |
| 01:54:33 | 14 | MS. STEWART:  Q  Do you recognize any of the |
| 01:54:35 | 15 | content of the document even though you haven't seen the |
| 01:54:41 | 16 | entire document? |
| 01:55:21 | 17 | A.  Yes. |
| 01:55:22 | 18 | Q.  What parts of it do you remember seeing |
| 01:55:26 | 19 | before? |
| 01:55:32 | 20 | A.  Fourth page, page -- |
| 01:55:34 | 21 | Q.  The one that actually says page 4? |
| 01:55:37 | 22 | A.  And.  And page 8. |
| 01:55:56 | 23 | Q.  Okay. |
| 01:55:56 | 24 | So you saw the part that says "Biblical |
| 01:55:59 | 25 | talking points regarding marriage" and -- is that right? |

# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---


KRISTIN M. PERRY, et al.,

                   Plaintiffs,

      vs.                           Case No. 09-CV-2292 VRW

ARNOLD SCHWARZENEGGER,
et al.,
                   Defendants.
_____/




                    Deposition of

                  RONALD PRENTICE

                     Volume I

              Thursday, December 17, 2009




REPORTED BY:  LESLIE CASTRO, CSR #8876




                BONNIE L. WAGNER & ASSOCIATES
                   Court Reporting Services
                  41 Sutter Street, Suite 1605
                 San Francisco, California 94104
                      (415) 982-4849

Page 98

11:42:50 that were put -- that were sponsored by the ballot
11:42:56 measure committee.
11:42:57 **Q. Are you aware of debates that were sponsored**
11:42:59 **by other people?**
11:43:00 A. I'm aware of debates where -- yes.
11:43:10 **Q. What debates are you aware of?**
11:43:12 A. I'm aware of the Federalists Society holding a
11:43:18 debate at Cal Lutheran. I'm aware of -- that actually
11:43:27 is the one that comes to mind. I'm not sure of any
11:43:30 others.
11:43:31 **Q. Were you present for that debate?**
11:43:32 A. No.
11:43:33 **Q. Were there town hall meetings held --**
11:43:35 A. Yes.
11:43:35 **Q. -- in support of Proposition 8?**
11:43:39 A. Yes.
11:43:44 **Q. Were there events that were simulcast?**
11:43:51 A. Yes.
11:43:57 **Q. Were there communications on websites?**
11:44:01 A. On various websites not associated with the
11:44:04 campaign itself?
11:44:06 **Q. On any websites.**
11:44:09 A. Absolutely.
11:44:10 **Q. And you said not associated with the campaign**
11:44:15 **itself.**

Page 99

11:44:16 **Were there websites that were associated with**
11:44:19 **the campaign itself?**
11:44:21 A. There is one primary website.
11:44:23 **Q. What is that?**
11:44:23 A. That's ProtectMarriage.com.
11:44:25 **Q. When you say "one primary website," were there**
11:44:27 **secondary websites?**
11:44:29 A. We are aware of two additional websites that
11:44:34 were created without our supervision. One was a
11:44:43 IProtectMarriage.com. And another was created by a
11:44:49 group in San Diego ProtectMarriageCA.com.
11:44:58 **Q. And you said those were created without your**
11:45:03 **supervision; is that what you said?**
11:45:05 A. Yes.
11:45:06 **Q. Did you -- well, first of all, who created**
11:45:12 **IProtectMarriage.com?**
11:45:15 A. It was primarily formed out of a church in
11:45:19 San Diego called The Rock.
11:45:20 **Q. And who was the head of The Rock?**
11:45:23 A. The senior pastor is Miles McPherson.
11:45:28 **Q. And when Mr. -- what is his title?**
11:45:37 A. Pastor Miles --
11:45:38 **Q. McPherson created that web -- well, did Mr. --**
11:45:43 **Pastor McPherson create that website?**
11:45:48 MS. MOSS: Object. Lack of foundation. But if you

Page 100

11:45:49 know.
11:45:52 THE WITNESS: He was not the literal designer and
11:45:56 creator of the website.
11:45:58 MS. STEWART: Q To your knowledge, was it created
11:46:00 under his supervision?
11:46:04 A. Yeah, he participated in its development.
11:46:09 **Q. And were you aware of its development when**
11:46:12 **that was happening?**
11:46:15 A. I was aware that it was in the works, yes.
11:46:19 **Q. And did Pastor McPherson request approval or**
11:46:35 **permission from you or the executive committee to create**
11:46:40 **that website?**
11:46:46 A. I'm trying to -- I'm struggling with the
11:46:53 terms. No.
11:46:56 **Q. Did he ask you or the executive committee**
11:47:05 **whether you would object to him creating that website?**
11:47:09 A. No.
11:47:12 **Q. What communication did you have with him about**
11:47:15 **that website, if any, before it was created?**
11:47:19 MS. MOSS: I'm going to object to that to the
11:47:21 extent it's getting into internal communications or
11:47:25 private communications that you had with individuals.
11:47:28 And I'm sorry, and to be clear that's a First Amendment
11:47:41 objection --
11:47:43 THE WITNESS: Thank-you.

Page 101

11:47:43 MS. MOSS: -- and I'm instructing you not to
11:47:46 answer.
11:47:48 THE WITNESS: Thank-you.
11:47:56 MS. STEWART: Q I'm going to ask you to look at a
11:47:57 document that we will mark as Exhibit 4.
11:48:02 (Whereupon, Exhibit No. 4 was
11:48:15 Marked for identification.)
11:48:33 MS. STEWART: Q Do you recognize this document?
11:48:51 A. Yes.
11:48:52 **Q. What is it?**
11:48:54 A. Well, it was a communications from the
11:49:01 ProtectMarriage.com-Yes on 8 that informed those who
11:49:09 received our E-mails about these aspects.
11:49:12 **Q. And are you saying this was an E-mail**
11:49:16 **communication?**
11:49:19 A. Yeah, it appears to be so, yes.
11:49:22 **Q. It's not a web page, it's an E-mail, as far as**
11:49:24 **you can tell?**
11:49:25 A. As far as I can tell.
11:49:26 **Q. And how do you know that, by the way?**
11:49:28 A. How do I know it's an E-mail?
11:49:30 **Q. Yes, is there something about --**
11:49:33 A. Primarily the "unsubscribe" at the bottom.
11:49:36 **Q. Okay. Fair enough. Thank-you.**
11:49:39 **I'm going to direct your attention to the**

Page 102

| | | |
|---|---|---|
| 11:49:48 | 1 | second page under the heading "IProtectMarriage.com |
| 11:49:55 | 2 | targets the youth vote, the facts about the Prop 8 |
| 11:49:59 | 3 | campaign." |
| 11:50:00 | 4 | Do you see that. |
| 11:50:01 | 5 | A.  Yes. |
| 11:50:01 | 6 | Q.  And it says in the first paragraph under that |
| 11:50:04 | 7 | heading "In conjunction with the Pastors Rapid Response |
| 11:50:08 | 8 | Network, we recently launched a website targeting the |
| 11:50:11 | 9 | youth vote in California.  At the IProtectMarriage.com |
| 11:50:16 | 10 | website young people in California can learn about the |
| 11:50:19 | 11 | important issues involved in Proposition 8 and can sign |
| 11:50:20 | 12 | up to help." |
| 11:50:21 | 13 | Do you see that language? |
| 11:50:22 | 14 | A.  Yes. |
| 11:50:23 | 15 | Q.  Is it true that in conjunction with the |
| 11:50:26 | 16 | Pastors Rapid Response Network, the ProtectMarriage.com |
| 11:50:34 | 17 | launched the website known as IProtectMarriage.com? |
| 11:50:42 | 18 | A.  To the degree that it states it here, I would |
| 11:50:44 | 19 | say it appears to be true.  It was -- it wasn't under my |
| 11:50:51 | 20 | primary supervision. |
| 11:50:53 | 21 | Q.  But do you dispute the accuracy of that |
| 11:50:58 | 22 | statement? |
| 11:51:03 | 23 | A.  Well, I guess the accuracy would hinge on the |
| 11:51:06 | 24 | term "conjunction."  There -- the Pastors Rapid Response |
| 11:51:13 | 25 | Network acted for the passage of Prop 8.  And whether |

Page 103

| | | |
|---|---|---|
| 11:51:21 | 1 | they or IProtectMarriage.com really sought approval from |
| 11:51:27 | 2 | the executive committee, it would not necessarily always |
| 11:51:36 | 3 | be accurate. |
| 11:51:38 | 4 | Q.  So what's the Pastors Rapid Response Network? |
| 11:51:42 | 5 | A.  The Pastors Rapid Response Network was an |
| 11:51:47 | 6 | informal entity started by Pastor Jim Garlow in |
| 11:51:53 | 7 | San Diego. |
| 11:51:58 | 8 | Q.  And when was that entity created? |
| 11:52:01 | 9 | A.  Well, again, it's informal, so I'm not aware |
| 11:52:05 | 10 | that it is -- it has any standing.  But I don't know |
| 11:52:11 | 11 | when it was created in Jim Garlow's head. |
| 11:52:15 | 12 | Q.  Who else is on it, as far as you know? |
| 11:52:21 | 13 | A.  Jim Garlow leads it.  That's all I know. |
| 11:52:24 | 14 | Q.  Is Miles McPherson involved in it? |
| 11:52:27 | 15 | A.  I don't -- I don't know and I don't believe |
| 11:52:30 | 16 | so. |
| 11:52:31 | 17 | Q.  And did ProtectMarriage.com work with the |
| 11:52:37 | 18 | pastors rapid response network on any efforts that |
| 11:52:43 | 19 | related to the passage of Proposition 8? |
| 11:52:46 | 20 | MS. MOSS:  To the extent that -- I don't know if |
| 11:52:50 | 21 | you did or not.  But the instruction is going to be to |
| 11:52:52 | 22 | the extent you did, if it's public, you can respond.  If |
| 11:52:55 | 23 | it's private, I'm going to instruct you not to answer. |
| 11:52:58 | 24 | MS. STEWART:  Well, Nikki, it's a "yes" or "no" |
| 11:53:00 | 25 | question. |

Page 104

| | | |
|---|---|---|
| 11:53:02 | 1 | MS. MOSS:  Did you work with them, and I think |
| 11:53:05 | 2 | whether, you know, he's already explained that he's got |
| 11:53:09 | 3 | some confusion over what in conjunction with means and |
| 11:53:13 | 4 | now you're asking did they work together.  So I think |
| 11:53:15 | 5 | you're getting at how did they original themselves. |
| 11:53:18 | 6 | I don't know what they did or didn't do, but I |
| 11:53:20 | 7 | think if they had a private non-public relationship, |
| 11:53:26 | 8 | then he does not have to acknowledge that.  But there |
| 11:53:31 | 9 | may be something public. |
| 11:53:33 | 10 | THE WITNESS:  Well, I would -- I would -- it's not |
| 11:53:38 | 11 | a simple "yes" or "no".  The actual answer is when you |
| 11:53:42 | 12 | phrase it did we work with, we were invited by |
| 11:53:46 | 13 | Jim Garlow, one or another a member of the executive |
| 11:53:53 | 14 | committee or Shubert and Flint to give updates to this |
| 11:54:00 | 15 | network that Jim Garlow created and oftentimes did so |
| 11:54:03 | 16 | (indicating). |
| 11:54:05 | 17 | MS. STEWART:  Q  When you say this network, you |
| 11:54:05 | 18 | mean the Pastors Rapid Response Team? |
| 11:54:10 | 19 | A.  Rapid Response Network is what he called it. |
| 11:54:13 | 20 | Q.  Got it. |
| 11:54:15 | 21 | And you were invited by them to give updates |
| 11:54:19 | 22 | about the campaign itself? |
| 11:54:22 | 23 | A.  Yes. |
| 11:54:23 | 24 | Q.  And did they keep the executive committee or |
| 11:54:29 | 25 | yourself appraised of their efforts in connection with |

Page 105

| | | |
|---|---|---|
| 11:54:35 | 1 | passing Proposition 8? |
| 11:54:46 | 2 | A.  Yes, to some degree. |
| 11:55:51 | 3 | MS. STEWART:  I'm going to ask you to look at a |
| 11:55:52 | 4 | document that we'll mark as Exhibit 5. |
| 11:56:08 | 5 | (Whereupon, Exhibit No. 5 was marked for |
| 11:56:08 | 6 | identification.) |
| 11:56:16 | 7 | MS. STEWART:  Q  Have you ever seen this document |
| 11:56:18 | 8 | before? |
| 11:56:19 | 9 | A.  No. |
| 11:56:21 | 10 | Q.  Have you heard of something called "The |
| 11:56:25 | 11 | Pastors Rapid Response Team? |
| 11:56:28 | 12 | A.  Yes. |
| 11:56:29 | 13 | Q.  And I think earlier we saw a document that |
| 11:56:33 | 14 | referred to the Pastors Rapid Response Network. |
| 11:56:37 | 15 | Is it your understanding that that's the same |
| 11:56:39 | 16 | group or entity? |
| 11:56:40 | 17 | A.  That's my understanding, yes. |
| 11:56:42 | 18 | Q.  And does this document -- I recognize that you |
| 11:56:45 | 19 | haven't seen it before, but does looking at it refresh |
| 11:56:50 | 20 | your recollection in any way as to who was part of the |
| 11:56:57 | 21 | pastors rapid response Team? |
| 11:57:02 | 22 | A.  It doesn't refresh my recollection because I |
| 11:57:05 | 23 | was never aware that there was a true team. |
| 11:57:11 | 24 | Q.  Well, you knew there was some sort of informal |
| 11:57:17 | 25 | entity, I think Is What you called it; correct? |

## Page 106

11:57:20  1      A.  Uh-huh.

11:57:20  2      Q.  Does it refresh your recollection as to who

11:57:22  3  was a part of that informal entity?

11:57:26  4      A.  The only person that I knew was a part of it

11:57:30  5  was Jim Garlow.

11:57:32  6      Q.  You did know, did you not that Miles McPherson

11:57:36  7  created or had created for him or for his under his

11:57:46  8  supervision the IProtectMarriage.com website?

11:57:50  9      A.  Yes.

11:58:10 10      Q.  I'm going to go back.

11:58:12 11          We were talking earlier about how the campaign

11:58:17 12  communicated with actual and potential voters.

11:58:21 13          Do you recall that discussion?

11:58:22 14      A.  Yes.

11:58:23 15      Q.  And we went through a number of ways, and I

11:58:25 16  want to circle back because I'm not sure if we covered

11:58:29 17  them all.

11:58:30 18          So you mentioned as ways that the campaign

11:58:33 19  communicated with voters or potential voters -- and can

11:58:38 20  I just for shorthand say "voters" to mean potential

11:58:43 21  voters as well.

11:58:44 22      A.  Yes.

11:58:45 23      Q.  Would that be acceptable do you understand

11:58:46 24  that?

11:58:47 25      A.  Uh-huh.

## Page 107

11:58:47  1      Q.  You have to answer audibly.

11:58:49  2      A.  Yes.  Sorry.

11:58:51  3      Q.  So in communicating with voters the campaign

11:58:56  4  used T.V. ads.  You said radio ads, E-mail blasts,

11:59:00  5  direct mail rallies, town hall meetings, a primary

11:59:08  6  website and you mentioned two other websites

11:59:12  7  IProtectMarriage.com and ProtectMarriage.com and that's

11:59:18  8  where I got diverted.

11:59:21  9          So I want to ask:  Are there other ways

11:59:23 10  besides those that the campaign communicated with

11:59:27 11  voters?

11:59:28 12      A.  Yes.  As you state that, I'm reminded of door

11:59:32 13  hangers.  And I'm reminded of brochures that were

11:59:36 14  distributed, and I'm reminded of yard signs and bumper

11:59:42 15  stickers.

11:59:50 16      Q.  How about press releases?

11:59:51 17      A.  Yes.

11:59:54 18      Q.  And how about press events --

11:59:58 19      A.  Yes.

11:59:58 20      Q.  -- press conferences that sort of thing?

12:00:00 21      A.  Yes.

12:00:03 22      Q.  And did the campaign provide articles or other

12:00:10 23  content for websites besides its own?

12:00:22 24      A.  Not to my knowledge, no.

12:00:28 25      Q.  Were there conference calls?  Did you

## Page 108

12:00:32  1  communicate with voters by conference calls?

12:00:45  2      A.  There may have been -- there -- there were

12:00:50  3  fundraising calls, if that's what you mean.  That's the

12:00:54  4  only thing that comes to mind where major donors or

12:01:00  5  potential major donors were brought together for

12:01:02  6  conference calls.

12:01:03  7      Q.  Were there conference calls with pastors?

12:01:08  8      A.  That were sponsored directly by the campaign?

12:01:13  9      Q.  Well, let's start there, yeah.

12:01:18 10      A.  The only conference calls I'm familiar with

12:01:20 11  pastors came through Jim Garlow and his Pastors Rapid

12:01:29 12  Response Team.

12:01:31 13      Q.  And when you say "came through," explain what

12:01:35 14  you mean by that.

12:01:36 15      A.  Created, developed and implemented through

12:01:38 16  him.

12:01:38 17      Q.  So there were conference calls that

12:01:41 18  Pastor Garlow -- he's a pastor; correct?

12:01:43 19      A.  Correct.

12:01:44 20      Q.  -- organized --

12:01:47 21      A.  Correct.

12:01:47 22      Q.  -- through the Pastors Rapid Response Team?

12:01:54 23          And were you part of those conference calls?

12:01:56 24      A.  Some.  I was invited to participate in some.

12:02:05 25      Q.  Were other members of the executive committee

## Page 109

12:02:08  1  participants in those conference calls?

12:02:15  2      A.  Let's see.  I'm -- I don't know for sure.

12:02:22  3      Q.  Were Shubert and Flint participants in those

12:02:28  4  conference calls?

12:02:28  5      A.  They were invited to participate in some as

12:02:31  6  well.

12:02:31  7      Q.  Were any of your other -- when I say you, I

12:02:35  8  mean ProtectMarriage.com -- consultants involved in

12:02:38  9  those conference calls?

12:02:42 10      A.  I believe one conference call.  Gary Lawrence

12:02:45 11  from Lawrence Research was invited to participate.

12:02:52 12      Q.  And any other ProtectMarriage.com consultants

12:02:56 13  that you recall were -- who were involved in those

12:02:59 14  conference calls?

12:03:00 15      A.  I vaguely recall and could be inaccurate in

12:03:05 16  whether Steve Linder was -- participated in one.

12:03:09 17      Q.  Okay.  And is that it?

12:03:12 18      A.  To my knowledge.

12:03:15 19      Q.  Were there -- we talked about the simulcasts.

12:03:25 20          Can you tell me about the simulcasts.  And

12:03:28 21  I've seen reference to something called simulcasts, and

12:03:32 22  I'm not sure I fully understand what the term means.  So

12:03:35 23  can we start there.

12:03:38 24          Do you know what simulcast means, can you

12:03:40 25  explain it to me?

## Page 218

| | | |
|---|---|---|
| 05:10:46 | 1 | Q.  And by mail or in some other fashion? |
| 05:10:53 | 2 | A.  Releases would go out usually E-mail -- |
| 05:11:01 | 3 | E-mail. |
| 05:11:06 | 4 | Q.  Do you believe that this release then was |
| 05:11:09 | 5 | E-mailed to potential voters by ProtectMarriage.com? |
| 05:11:13 | 6 | A.  You actually prompt the question:  I'm not |
| 05:11:15 | 7 | sure whether this was placed on our website or was |
| 05:11:19 | 8 | released as an E-mail. |
| 05:11:20 | 9 | Q.  But one of those two ways of communication is |
| 05:11:23 | 10 | how you believe it was released? |
| 05:11:25 | 11 | A.  Yes. |
| 05:11:30 | 12 | Q.  You see the first paragraph where it says |
| 05:11:32 | 13 | "Tapping into a surge of interest in the fall election |
| 05:11:38 | 14 | among young voters, Prop 8 supporters including campaign |
| 05:11:42 | 15 | organizers, a coalition of pastors, youth experts and |
| 05:11:46 | 16 | leaders have launched IProtectMarriage.com a new website |
| 05:11:49 | 17 | designed to educate and motivate young people about in |
| 05:11:51 | 18 | Proposition 8"? |
| 05:11:53 | 19 | A.  Yes. |
| 05:11:53 | 20 | Q.  Is that accurate? |
| 05:11:55 | 21 | A.  I think that it was -- it's accurate in terms |
| 05:12:02 | 22 | of Shubert and Flint was aware of this effort.  And it |
| 05:12:18 | 23 | was cooperative in terms of getting it going. |
| 05:12:23 | 24 | Q.  So campaign organizers would refer to |
| 05:12:28 | 25 | ProtectMarriage.com consultants, is that what you're |

## Page 219

| | | |
|---|---|---|
| 05:12:31 | 1 | saying? |
| 05:12:31 | 2 | A.  I can only -- I can't state for -- for sure -- |
| 05:12:36 | 3 | Q.  Okay. |
| 05:12:37 | 4 | A.  -- what that means. |
| 05:12:40 | 5 | Q.  Is it a fact that ProtectMarriage.com worked |
| 05:12:44 | 6 | with a coalition of pastors and youth experts and |
| 05:12:49 | 7 | leaders to launch the IProtectMarriage.com website? |
| 05:12:56 | 8 | A.  Well, I -- I'm not aware of the -- of who |
| 05:13:13 | 9 | participated in that effort. |
| 05:13:15 | 10 | Q.  Would you -- did the campaign generally put |
| 05:13:19 | 11 | out press releases that suggested people or entities |
| 05:13:25 | 12 | were involved in an effort when it wasn't true? |
| 05:13:30 | 13 | MS. MOSS:  Well -- |
| 05:13:32 | 14 | THE WITNESS:  I guess the question would be what |
| 05:13:38 | 15 | was -- go ahead. |
| 05:13:39 | 16 | MS. MOSS:  I'm going to object to the extent that |
| 05:13:42 | 17 | the question assumes facts in evidence about this |
| 05:13:44 | 18 | release that -- that he hasn't foundationally |
| 05:13:50 | 19 | established what some of these terms mean or who they're |
| 05:13:54 | 20 | necessarily referring to.  To the extent you can answer |
| 05:13:57 | 21 | the question -- |
| 05:14:00 | 22 | THE WITNESS:  And I really can't.  I don't know |
| 05:14:04 | 23 | the -- I don't know what some of these terms mean or who |
| 05:14:11 | 24 | they are implying. |
| 05:14:13 | 25 | MS. STEWART:  Q  So you don't understand the |

## Page 220

| | | |
|---|---|---|
| 05:14:16 | 1 | language of the first paragraph of this press release; |
| 05:14:18 | 2 | is that -- |
| 05:14:20 | 3 | A.  I think it's open to interpretation. |
| 05:14:24 | 4 | Q.  And did you encourage your consultants to put |
| 05:14:32 | 5 | out press releases that were vague? |
| 05:14:38 | 6 | A.  No. |
| 05:14:39 | 7 | Q.  Or open to interpretation? |
| 05:14:40 | 8 | A.  No, we actually -- |
| 05:14:43 | 9 | MS. MOSS:  Well, just -- I think you've answered |
| 05:14:47 | 10 | the question -- |
| 05:14:48 | 11 | THE WITNESS:  No. |
| 05:14:49 | 12 | MS. MOSS:  -- you didn't encourage it.  And beyond |
| 05:14:51 | 13 | that, I don't want you to get into your specific |
| 05:14:53 | 14 | discussions with your consultants about the press |
| 05:14:57 | 15 | releases and the strategy for putting them out. |
| 05:15:02 | 16 | MS. STEWART:  Q  Do you have an understanding of |
| 05:15:04 | 17 | the phrase "campaign organizers" in the context of |
| 05:15:06 | 18 | Proposition 8? |
| 05:15:07 | 19 | A.  No.  I think it's open for interpretation. |
| 05:15:09 | 20 | I'm not precisely sure what Ms. Kerns meant when she |
| 05:15:10 | 21 | said that. |
| 05:15:13 | 22 | Q.  Did you ever use the phrase "campaign |
| 05:15:15 | 23 | organizers"? |
| 05:15:16 | 24 | A.  Not to my knowledge. |
| 05:15:17 | 25 | Q.  How did you refer to ProtectMarriage.com and |

## Page 221

| | | |
|---|---|---|
| 05:15:22 | 1 | its consultants when you spoke publicly? |
| 05:15:30 | 2 | A.  I referred to -- it would depend on what I was |
| 05:15:35 | 3 | intending to communicate.  I would refer to Shubert and |
| 05:15:41 | 4 | Flint.  I would refer to the executive committee.  It |
| 05:15:44 | 5 | would depend. |
| 05:15:45 | 6 | Q.  Did you use ProtectMarriage to refer to |
| 05:15:49 | 7 | anything other than the executive committee in your |
| 05:15:51 | 8 | communications? |
| 05:15:54 | 9 | A.  I -- I may have. |
| 05:16:14 | 10 | Q.  Is there any other interpretation you can |
| 05:16:16 | 11 | think of for the phrase "campaign organizers" besides |
| 05:16:20 | 12 | ProtectMarriage.com? |
| 05:16:27 | 13 | A.  I could interpret that to mean several things: |
| 05:16:31 | 14 | It could mean the executive committee; it could mean any |
| 05:16:37 | 15 | number of -- of vendors that were contracted; it could |
| 05:16:43 | 16 | mean grassroots organizers who are volunteers. |
| 05:16:48 | 17 | Q.  So you would refer to volunteers as campaign |
| 05:16:51 | 18 | organizers?  Is that really a reasonable interpretation |
| 05:16:59 | 19 | of this document, Mr. Prentice? |
| 05:17:02 | 20 | MS. MOSS:  Objection.  I think that's |
| 05:17:03 | 21 | argumentative.  The term "campaign" could mean any |
| 05:17:06 | 22 | things and it's not been defined whether it's small C |
| 05:17:08 | 23 | small O, it's not the campaign in big Cs; it's -- so to |
| 05:17:14 | 24 | the extent -- |
| 05:17:15 | 25 | MS. STEWART:  Q  Did you use campaign with big C |