# Exhibit B

Page 1

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3    _____
                                     )
4    KRISTIN M. PERRY, et al.,       )
                                     )
5              Plaintiffs,           )
                                     )
6    vs.                             ) No. 09-CV-2292
                                     )          VRW
7                                    )
     ARNOLD SCHWARZENEGGER, et al.,  )
8                                    )
               Defendants.           )
9    _____)
10
11
12
13
14
15                     VIDEOTAPED
16          DEPOSITION OF FRANK SCHUBERT
17            Sacramento, California
18          Thursday, December 17, 2009
19
20
21
22
23   Reported by:  LANA L. LOPER RMR, CRR, CCP,
              CME, CLR, CCR, CSR No. 9667
24   File No.: 9487
25   Pages 1 - 266
```

Page 2

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3    _____
                                     )
4    KRISTIN M. PERRY, et al.,       )
                                     )
5              Plaintiffs,           )
                                     )
6    vs.                             ) No. 09-CV-2292
                                     )          VRW
7                                    )
     ARNOLD SCHWARZENEGGER, et al.,  )
8                                    )
               Defendants.           )
9    _____)
10
11
12
13
14
15
16
17
18
19       Videotaped deposition of FRANK SCHUBERT, taken
20   on behalf of Plaintiffs, at 400 Capitol Mall, Suite
21   1400, Sacramento, California beginning at 8:20 a.m.
22   and ending at 5:13 p.m., on Thursday, December 17,
23   2009, before Lana L. Loper, RMR, CRR, CCP, CME, CLR,
24   CCR, CSR No. 9667.
25
```

Page 3

```
1    APPEARANCE OF COUNSEL:
2
3    FOR THE PLAINTIFFS:
4         BOIES, SCHILLER & FLEXNER LLP
5         BY:  JEREMY M. GOLDMAN, ESQ.
6              THEODORE H. UNO, ESQ.
7         1999 Harrison Street
8         Suite 900
9         Oakland, California 94612
10        510-874-1000
11        jgoldman@bsfllp.com
12        tuno@bsfllp.com
13
14   FOR THE DEFENDANT INTERVENORS:
15        COOPER & KIRK
16        BY:  CHARLES J. COOPER, ESQ.
17        1523 New Hampshire Avenue, N.W.
18        Washington, D.C. 20036
19        202-220-9600
20        ccooper@cooperkirk.com
21
22
23
24
25
```

Page 4

```
1    APPEARANCE OF COUNSEL:
2
3    FOR THE DEPONENT:
4         ADVOCATES FOR FAITH & FREEDOM
5         BY:  ROBERT H. TYLER, ESQ.
6         24910 Las Brisas Road
7         #110
8         Murrieta, California 92562
9         951-304-7583
10        rtyler@faith-freedom.com
11
12   FOR THE DEFENDANTS GOVERNOR ARNOLD SCHWARZENEGGER
13   AND ADMINISTRATIVE DEFENDANTS:
14        MENNEMEIER, GLASSMAN & STROUD, LLP
15        BY:  ANDREW W. STROUD, ESQ.
16        980 9th Street
17        Suite 1700
18        Sacramento, California 95814
19        916-551-2590
20        stroud@mgslaw.com
21
22   ALSO PRESENT:
23        CHE PRESANT, CLVS
24        JET BYCRAFT, AUDIO SPECIALIST
25        JASON LIPTON, CASE MANAGER
```

| | Page 5 |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | WITNESS                    EXAMINATION |
| 4 | FRANK SCHUBERT |
| 5 |     BY MR. GOLDMAN          10 |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | EXHIBIT DESCRIPTION AND INDEX ON PAGE:   257 |
| 11 | |
| 12 | |
| 13 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 14 |  PAGE LINE |
| 15 |   23  14 |
| 16 |   24  20 |
| 17 |   27  10 |
| 18 |   28  18 |
| 19 |   36  17 |
| 20 |   37   8 |
| 21 |   39   8 |
| 22 |   40   2 |
| 23 |   40  22 |
| 24 |   52   2 |
| 25 |   55   7 |

| | Page 6 |
|---|---|
| 1 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 2 | PAGE LINE |
| 3 |  58   8 |
| 4 |  66  18 |
| 5 |  71   2 |
| 6 |  75   8 |
| 7 |  76  23 |
| 8 |  77   4 |
| 9 |  77  11 |
| 10 |  77  18 |
| 11 |  77  23 |
| 12 |  78   5 |
| 13 |  78  24 |
| 14 |  79   5 |
| 15 |  80   2 |
| 16 |  80  24 |
| 17 |  86   2 |
| 18 |  88  24 |
| 19 |  89  13 |
| 20 |  90  13 |
| 21 |  91   8 |
| 22 |  91  24 |
| 23 |  95  10 |
| 24 |  115   4 |
| 25 |  116  17 |

| | Page 7 |
|---|---|
| 1 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 2 | PAGE LINE |
| 3 |  117  22 |
| 4 |  133   6 |
| 5 |  138   7 |
| 6 |  138  13 |
| 7 |  142  10 |
| 8 |  147   8 |
| 9 |  154   2 |
| 10 |  155  20 |
| 11 |  157  14 |
| 12 |  162  13 |
| 13 |  164  14 |
| 14 |  164  23 |
| 15 |  169  15 |
| 16 |  170   5 |
| 17 |  172  11 |
| 18 |  174  14 |
| 19 |  182  20 |
| 20 |  183   3 |
| 21 |  188   9 |
| 22 |  189  24 |
| 23 |  191  22 |
| 24 |  192  19 |
| 25 |  193   2 |

| | Page 8 |
|---|---|
| 1 | QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: |
| 2 | PAGE LINE |
| 3 |  195  25 |
| 4 |  210  12 |
| 5 |  211  17 |
| 6 |  213  23 |
| 7 |  214   8 |
| 8 |  214  21 |
| 9 |  217  23 |
| 10 |  219  17 |
| 11 |  221  11 |
| 12 |  221  18 |
| 13 |  225  15 |
| 14 |  226   9 |
| 15 |  227   1 |
| 16 |  234  20 |
| 17 |  236  11 |
| 18 |  239  16 |
| 19 |  240  21 |
| 20 |  241  24 |
| 21 |  243  22 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1   Sacramento, California; Thursday, December 17, 2009
2        8:20 a.m. - 5:13 p.m.
3                - - -
4        THE VIDEOGRAPHER:  We are going on the
5   record.  This is the beginning of Tape 1 of
6   Volume I.  The time is approximately 8:20 a.m.
7        My name is Che E. Presant, CLVS, your
8   videographer, and I represent Affinity Court
9   Reporters, Incorporated, here on behalf of
10  SiteLogic, Incorporated, here on behalf of Boies,
11  Schiller & Flexner, LLP.
12       I'm a certified legal video specialist and
13  notary public.  I am not financially interested in
14  this action, nor am I a relative or employee of any
15  attorney or any of the parties.
16       The date is December 17, 2009.  This
17  deposition is taking place at 400 Capitol Mall,
18  Suite 1400, Sacramento, California 95814.
19       This is Case No. 09-CV-2292 VRW, entitled
20  Kristin M. Perry vs Arnold Schwarzenegger, et al.
21       This deposition is being taken on behalf
22  of the plaintiffs.  The deponent is Frank Schubert.
23       The court reporter is Lana Loper, with
24  Affinity Court Reporters, Incorporated, here on
25  behalf of SiteLogic, Incorporated.

1        Counsel and all parties present will now
2   introduce themselves.
3        MR. GOLDMAN:  Jeremy Goldman, from Boies,
4   Schiller & Flexner, on behalf of the plaintiffs.
5        MR. UNO:  Theodore Uno, Boies, Schiller &
6   Flexner, for the plaintiffs.
7        MR. TYLER:  Robert Tyler, advocate for
8   Faith and Freedom, for the deponent.
9        MR. COOPER:  Charles Cooper, with Cooper &
10  Kirk, representing the defendant intervenors.
11       THE VIDEOGRAPHER:  Thank you.
12       Would the court reporter please swear in
13  the witness.
14            FRANK SCHUBERT,
15       having been first administered an
16       oath in accordance with CCP Section
17       2094, was examined and testified as
18       follows:
19            EXAMINATION
20  BY MR. GOLDMAN:
21   Q   Good morning, Mr. Schubert.
22   A   **Good morning.**
23   Q   Could you tell me your business address,
24  please.
25   A   **1415 L Street, Suite 1250, Sacramento,**

1   **California 95814.**
2    Q   And your home address?
3    A   **I don't believe my home address is public**
4   **information.**
5    Q   We may be able to deal with that.
6    A   **Thank you.**
7    Q   Have you testified previously at a
8   deposition?
9    A   **I have not.**
10   Q   And how about at a trial?
11   A   **I have not.**
12   Q   So let me -- you probably discussed this
13  with your counsel, but let me just go over the basic
14  deposition procedures.
15       It's important that you answer a question
16  out loud so that the court reporter can get it down.
17       Please, even if you know what I'm asking,
18  let me finish the question before you start talking,
19  and I'll try to do the same thing when you are
20  answering, let you finish your answer, so that we're
21  not talking over each other.
22       If you don't understand a question I ask
23  you, please let me know, and I'll try to rephrase it
24  so we're on the same page.
25       If you need a break at any time, that's

1   fine.  Just let me know.  The only thing I would ask
2   is that if there's a question pending, you answer
3   the question first and then we can take a break.
4        Now, is there any reason that you cannot
5   testify truthfully and accurately today, that you're
6   aware of?
7    A   **No.**
8    Q   What did you do to prepare for today's
9   deposition?
10   A   **I reviewed public documents; the**
11  **advertisements that were produced in the campaign;**
12  **press releases that were issued and e-mail blasts**
13  **that were distributed; also had conversations with**
14  **my counsel.**
15   Q   Do you know who Kenneth Miller is?
16   A   **I don't believe I do.**
17   Q   Let me see if I can refresh your
18  recollection.  Kenneth Miller is an expert who has
19  been retained by the defendant intervenors, and he
20  testified that he had a conversation with you in
21  about September in preparation for his expert
22  testimony in this case.  He's a professor at
23  Claremont College.
24       Does that ring a bell?
25   A   **It does not.**

Page 13

1    Q   You don't recall ever having spoken with
2  Mr. Miller?
3    A   I don't recall that, no.
4    Q   I take it you don't know if you have any
5  notes from that conversation.
6    A   I don't know.
7        Sorry.
8        MR. TYLER:  That's okay.  Just give me
9  time.
10  BY MR. GOLDMAN:
11    Q   Have you spoken to any of the other
12  experts retained by the defendant intervenors, so
13  far as you're aware?
14    A   I'm not aware that I have, no.
15    Q   Other than the lawyers, have you spoken
16  with anyone about testimony that they would give in
17  this case?
18        MR. TYLER:  Objection.  Vague.
19  BY MR. GOLDMAN:
20    Q   You can answer the question.
21    A   I'll follow my counsel's direction.
22        MR. TYLER:  You can answer the question.
23  Unless I instruct you not to answer a question, you
24  can go ahead and answer it afterwards.
25        THE WITNESS:  I discussed in the meeting

Page 14

1  with our counsel Mr. --
2        MR. COOPER:  I --
3        MR. TYLER:  Do not answer -- don't discuss
4  anything that we talked about in our communications.
5        THE WITNESS:  I see.
6        MR. TYLER:  Any communication between you
7  and I, or any other attorneys representing you, is
8  attorney-client privileged.  Therefore, you can
9  respond to his question outside of that privilege.
10        Can you repeat the question?
11        MR. GOLDMAN:  Can you read back the
12  question?
13        (The question was read as follows:)
14        "Q  Other than the lawyers, have you
15        spoken with anyone about testimony
16        that they would give in this case?"
17        THE WITNESS:  I spoke with Jeff Flint
18  about the case generally.  I don't know what
19  testimony he might give.
20  BY MR. GOLDMAN:
21    Q   What did you discuss generally with Jeff
22  Flint about the case?
23    A   I discussed public information, the
24  advertisements that were aired, press releases that
25  were issued, and e-mail blasts that were

Page 15

1  distributed.
2        MR. TYLER:  I want to make sure, again,
3  that you're responding as to communications you had
4  with Jeff Flint, outside the presence of counsel.
5        THE WITNESS:  Okay.
6  BY MR. GOLDMAN:
7    Q   And what did you discuss about these
8  publicly distributed materials?
9        MR. TYLER:  Objection.  I want to make
10  sure that the response is not pertaining to
11  necessarily communications about strategy concerning
12  the campaign.
13        You can respond to communications you had
14  following the filing of this lawsuit and discussions
15  you had only in relation to the preparation for
16  depositions and outside the presence of counsel.
17        THE WITNESS:  I had no conversations,
18  then, that would fit that category.
19  BY MR. GOLDMAN:
20    Q   Well, when is the last time that you
21  discussed this case with Mr. Flint, apart from the
22  conversations in the presence of counsel?
23    A   I can't recall a specific conversation
24  prior to discussing it in counsel's presence.
25    Q   It's your testimony that you have not

Page 16

1  discussed this case with Mr. Flint, outside the
2  presence of counsel.  Do I understand that
3  correctly?
4    A   I don't believe I testified to that.  I
5  believe I said I don't recall specific conversation,
6  outside of the discussion with counsel present.
7    Q   But you do believe that you did have such
8  conversations.  Is that correct?
9    A   I know there have been conversations about
10  the case generally, and that there would be an
11  interest in Mr. Flint and I testifying and being
12  deposed in that case.
13        We obviously were served with subpoenas,
14  so we're certainly aware of your interest in talking
15  with us.  So as to a general matter, yes, there were
16  conversations about this case.  I can't tell you
17  when they occurred or any specific elements of that
18  conversation, other than we were aware that you were
19  interested in speaking with us.
20    Q   Well, as a general matter, did you discuss
21  the campaign ads and other documents or videos that
22  were publicly disseminated during the campaign?
23        MR. TYLER:  Are you speaking in
24  preparation for depositions?
25        MR. GOLDMAN:  I am speaking about the

Page 17

1  general conversations that Mr. Schubert just
2  testified to.
3       MR. TYLER: And I'll assert an objection
4  based upon attorney-client privilege.
5       You can respond, so long as it doesn't
6  pertain to conversations that you had in the
7  presence of counsel with Mr. Flint.
8       THE WITNESS: As I testified, there were
9  general conversations. I can't recall a specific
10 element of the discussion.
11 BY MR. GOLDMAN:
12    Q    And when you say "a specific element," do
13 you mean that you can't recall whether you discussed
14 publicly disseminated campaign materials?
15    A    I mean that I can't recall any specific
16 discussion about a particular element of the case,
17 whether it is publicly disseminated or not.
18    Q    Other than counsel, and other than
19 Mr. Flint, did you discuss the case with anyone?
20    A    Not to my recollection, no.
21    Q    Can you just describe briefly for me your
22 education, starting with after high school?
23    A    Certainly. I have an Associate of Arts
24 degree from American River College, and a Bachelor
25 of Science in business administration from

Page 18

1  California State University at Sacramento.
2    Q    And have you had any sort of informal
3  education or certificate programs, or things like
4  that, that you've done since you graduated from
5  college?
6    A    No.
7    Q    Are you currently employed?
8    A    I am.
9    Q    Who is your employer?
10    A    Schubert Flint Public Affairs.
11    Q    What is your title at Schubert Flint
12 Public Affairs?
13    A    I'm president of the firm.
14    Q    How long have you held that position?
15    A    Since 2003, October of 2003.
16    Q    What did you do prior to that?
17    A    Immediately prior to that, I was a partner
18 with a firm named Goddard Claussen Porter Novelli.
19    Q    Is the work that you did at Goddard
20 Claussen similar to the work you do now?
21    A    Yes.
22    Q    And before Goddard Claussen?
23    A    Before that, I was a partner in a
24 different iteration of that firm, when it was just
25 called Goddard Claussen.

Page 19

1    Q    So was Schubert Flint Public Affairs
2  founded in 2003?
3    A    The firm, as Schubert, was founded as
4  Schubert Public Affairs in 2003.
5    Q    When did it become Schubert Flint Public
6  Affairs?
7    A    I believe it was January 2006.
8    Q    And I take it that Schubert Flint Public
9  Affairs is a for-profit entity. Is that right?
10    A    Yes, it is.
11    Q    And does part of the business of Schubert
12 Flint Public Affairs consist in assisting in
13 initiative campaigns?
14    A    Yes, it does.
15    Q    Is that work that Schubert Flint Public
16 Affairs hopes to continue to do in the future?
17    A    Yes, it is.
18    Q    Do you advertise?
19       MR. TYLER: Objection. Vague.
20 BY MR. GOLDMAN:
21    Q    Do you understand the question?
22    A    You're asking if we advertise. I assume
23 you mean our services as a consulting firm.
24    Q    That's correct.
25    A    Yes, we do.

Page 20

1    Q    Tell me about how and where you advertise
2  your services.
3       MR. TYLER: Objection. Vague. Calls for
4  a narration.
5       THE WITNESS: We -- we advertise on
6  various websites that are -- on various websites.
7  We, from time to time, publish advertisements in
8  various publications. From time to time, we'll do
9  mailings to prospective clients.
10 BY MR. GOLDMAN:
11    Q    Anything else that you recall?
12    A    Not specifically.
13    Q    What are some of the publications in which
14 you publish ads?
15       MR. TYLER: Objection. Vague.
16       THE WITNESS: Well, I know one was a
17 publication recently with the Sacramento Choral
18 Society, published.
19 BY MR. GOLDMAN:
20    Q    Do you recall the name of that
21 publication?
22    A    I don't.
23    Q    Is there any other publication that you
24 can think of in which Schubert Flint Public Affairs
25 has purchased advertising space to advertise its

Page 21

```
 1   services?
 2        MR. TYLER: Objection. Vague.
 3        THE WITNESS: I believe we had an ad at
 4   one time in the Comstock's Magazine.
 5   BY MR. GOLDMAN:
 6     Q   What is Comstock's Magazine?
 7     A   Comstock's is a business publication,
 8   Sacramento region.
 9     Q   Any others that you can think of?
10     A   Not immediately.
11     Q   And you mentioned websites. What kind --
12   what are some websites on which you've advertised?
13     A   We have advertised on the website Rough &
14   Tumble. We have advertised on the website
15   FlashReport. And we have advertised on the website
16   Red County.
17     Q   In how many initiative campaigns has
18   Schubert Flint Public Affairs been involved?
19     A   As a company, I can't give you a precise
20   answer. I would estimate two dozen, approximately.
21     Q   And of that two dozen, what percentage
22   were in California?
23     A   Again, I can't give you a precise answer,
24   but certainly the majority were in California.
25     Q   Three-quarters, for example, does that
```

Page 22

```
 1   sound about right?
 2     A   It is difficult to say, without looking at
 3   a list of those campaigns, but certainly a majority
 4   would have been in California.
 5     Q   Has that work included efforts to qualify
 6   measures for the ballot?
 7     A   Well, could you be more specific in what
 8   you mean by qualifying a measure to the ballot?
 9     Q   Sure. I'm trying to distinguish it from
10   efforts to pass the measure, once it has been
11   qualified for the ballot. So efforts to qualify
12   measures for the ballot would mean submitting
13   something to the secretary of state, gathering
14   signatures, that kind of thing.
15     A   Okay. No, Schubert Flint does not qualify
16   measures to the ballot.
17     Q   So if I understand correctly, the
18   involvement of Schubert Flint Public Affairs only
19   comes after a measure has been qualified for the
20   ballot. Is that correct?
21     A   No, I don't think I said that. I said
22   that our -- the services that we provide to clients
23   do not include ballot qualification. We might
24   consult with a client who is seeking to qualify
25   measures to the ballot, but ourselves, we ourselves
```

Page 23

```
 1   do not do those services.
 2     Q   What do you have in mind when you say, We
 3   do not do those services, concretely?
 4        MR. TYLER: Objection. Vague.
 5        THE WITNESS: An example would be mounting
 6   a professional signature-gathering campaign.
 7   BY MR. GOLDMAN:
 8     Q   Now, you indicated that you might consult
 9   with clients, even if you don't provide those kinds
10   of services.
11        Does the consulting include input on
12   drafting the language of an initiative?
13     A   It might.
14     Q   Are there cases in which you have
15   consulted about the language of a ballot initiative?
16        MR. TYLER: Objection. Privileged First
17   Amendment information.
18        I'll instruct you not to answer.
19        MR. GOLDMAN: It's just a yes-or-no
20   question.
21        MR. TYLER: That's fine.
22        MR. GOLDMAN: I'll try not to debate with
23   you the objection on the record, but we obviously
24   disagree with the assertion of privilege as to that
25   question.
```

Page 24

```
 1   BY MR. GOLDMAN:
 2     Q   Do the -- well, why don't you describe, in
 3   general, the services that Schubert Flint Public
 4   Affairs does provide with respect to ballot
 5   initiatives.
 6     A   In general, we provide a range of services
 7   to clients, depending on their particular needs,
 8   that could range from campaign management,
 9   day-to-day management of the various functions of
10   the campaign, to supervising contractors, or it
11   could involve specific discrete services that are --
12   that we perform for a campaign, that might be
13   considered less than overall campaign management.
14     Q   Has Schubert Flint Public Affairs ever
15   played a role in drafting arguments that appear on
16   the official voter guide?
17        MR. TYLER: Objection. Vague.
18        THE WITNESS: Yes.
19   BY MR. GOLDMAN:
20     Q   And has Schubert Flint Public Affairs ever
21   come up with an idea for a ballot measure and
22   approached someone about sponsoring it?
23        MR. TYLER: Objection. I believe that
24   violates my client's First Amendment privilege.
25        I'll instruct you not to answer that
```

Page 25

1  question.
2      MR. GOLDMAN:  Just to try to move things
3  along, I know in other depositions there has been a
4  stipulation that we've preserved our disagreements
5  about this, and I don't need to ask every question
6  that I might ask on that subject to preserve our
7  right to resume the deposition, and I wonder whether
8  you're agreeable to that.
9      MR. TYLER:  Can you explain yourself a
10  little further with regard to what you mean by that?
11      MR. GOLDMAN:  Sure.  I could -- I could
12  ask a number of follow-up questions, but I assume
13  that the instruction would be the same:  You would
14  instruct your client not to answer, and that would
15  waste a lot of time.
16      And so, instead, we'll just stipulate that
17  you are going to instruct the witness not to answer
18  these kinds of questions, and the -- in the event we
19  decide to go to the court and ask the court to issue
20  an order compelling the deposition to resume, I have
21  preserved my right to ask questions in this subject
22  area.
23      MR. COOPER:  That arrangement would
24  certainly meet with my approval.  As the record
25  reflects, I represent the defendant intervenors.  I

Page 26

1  do not represent Mr. Schubert, nor his organization.
2      But just to further this understanding, I
3  would point out that at such time as your questions
4  progressed to the point of asking about the
5  Proposition 8 petition drive and language with
6  respect to Proposition 8, the matters that
7  particularly concern my client and would implicate
8  my clients' First Amendment interests, then I would
9  be heard from in that, in those questions.
10      I would turn to Mr. Tyler, and I would
11  impose upon Mr. Tyler my request that he instruct
12  his client not to answer those questions, and I
13  would assert a First Amendment privilege, as well
14  as, depending upon the nature of the question, the
15  limitations as we see them that the court has
16  established in its discovery orders on the scope of
17  discovery.
18      So with that -- with that more fuller
19  explanation, what you're proposing would certainly
20  be fine with me.
21      MR. TYLER:  I would -- I'll accept that
22  stipulation.
23      MR. GOLDMAN:  Thank you.
24  BY MR. GOLDMAN:
25      Q    Although maybe I should ask whether you

Page 27

1  have ever, as part of your advertising for Schubert
2  Flint Public Affairs, have you ever discussed
3  specific things that your firm has done, to the
4  extent that they include coming up with an idea for
5  a ballot measure and approaching someone about
6  sponsoring it; drafting arguments on official voter
7  guide?  Have you already publicly disclosed that
8  Schubert Flint Public Affairs has done those things?
9      **A    I don't recall.**
10      Q    It's possible that you may have already
11  discussed that publicly.  Is that correct?
12      MR. TYLER:  Objection.  I will assert a
13  privilege, First Amendment.  He said he doesn't
14  recall whether or not there's been any advertising.
15  If you have some advertising to reflect public
16  statements made to refresh his recollection, you can
17  produce it at this time.
18      Otherwise, I'm going to instruct him not
19  to answer that to which he doesn't recall.
20      MR. GOLDMAN:  You're instructing him not
21  to answer whether he recalls having discussed it
22  publicly.
23      MR. TYLER:  I think he already responded.
24  You questioned him whether or not he ever advertised
25  performing certain functions in relation to a

Page 28

1  campaign, and he responded by saying, "I don't
2  recall."
3      Therefore, at this point in time, I'm not
4  going to allow him to respond and approach that
5  First Amendment privilege that I think has already
6  been asserted.
7      If you want to maybe rephrase your
8  question, or if you have some public documents to
9  present to him to help him refresh his recollection,
10  I have no problem.  If it's public, he can testify
11  to it.
12      MR. GOLDMAN:  I think the question was
13  whether it was possible that Schubert Flint has done
14  that.  And I think you are right, he said he didn't
15  recall, but that maybe doesn't answer the question,
16  so I'll just restate the question.
17  BY MR. GOLDMAN:
18      Q    Is it possible that Schubert Flint Public
19  Affairs has advertised that it has done these
20  specific things that we have been talking about?
21      MR. TYLER:  I'll, again, assert the
22  objection because whether it's possible or not goes
23  directly to whether or not he provides certain
24  services that are protected under the First
25  Amendment privilege.

1      Again, if you have some documents to
2  produce to him that are public documents, he can
3  testify to those documents.  He's already testified
4  he doesn't recall.
5      Therefore, I'll instruct him not to answer
6  that question.
7  BY MR. GOLDMAN:
8      Q   What was Proposition 22?
9      **A   Are you speaking of a California**
10 **amendment?**
11     Q   Yes, I am.
12     **A   Proposition 22 was a statutory proposal in**
13 **the year 2002; statutorily defined marriage as**
14 **between a man and a woman in the state of**
15 **California.**
16     Q   And did you have any involvement in the
17 campaign related to Proposition 22?
18     **A   I did not.**
19     Q   Just for purposes of the record, what is
20 Proposition 8?
21     **A   Proposition 8 was a constitutional**
22 **amendment, adopted by the people of California in**
23 **November of 2008 to define marriage as between a man**
24 **and a woman, 14 words that, I believe, are, "Only**
25 **marriage between a man and a woman will be valid or**

1  **recognized in California."**
2      Q   And was Proposition 8 also called the
3  California Marriage Protection Act?
4      **A   It may have been.**
5      Q   Is it fair to say that you have made
6  public statements about Schubert Flint Public
7  Affairs' role in getting Proposition 8 enacted?
8      **A   Yes.**
9      Q   And you've publicly discussed some
10 strategic decisions that you made?
11     **A   I have publicly discussed the campaign.  I**
12 **would have to see a specific reference to determine**
13 **whether it was a strategic decision or not.**
14     Q   As you sit here now, you don't recall
15 whether you have discussed strategic decisions that
16 you made in the Proposition 8 campaign?
17     MR. TYLER:  Objection.  Vague as to
18 "strategic decisions."  Practically every decision
19 in life is somewhat strategic.  Whether you leave
20 and go to the restroom right now or do it later is a
21 strategic decision.
22     I'd suggest that you narrow your
23 questioning a little further.  I prefer it not to be
24 so vague and overbroad.
25 ////

1  BY MR. GOLDMAN:
2      Q   Do you understand the question?
3      **A   I believe you're asking me, do I recall**
4  **publicly discussing strategic decisions that we made**
5  **during the campaign.**
6      Q   That's right.
7      **A   I certainly recall discussing the campaign**
8  **and our role in it, and some of the decisions and**
9  **discussing some of the decisions that we made in**
10 **that campaign.  And you may characterize some of**
11 **those decisions as strategic, yes.**
12     Q   How would you define a strategic decision,
13 in the context of a political campaign?
14     **A   Well, a strategic decision largely relates**
15 **around -- around messages that you are conveying and**
16 **the manner in which you are seeking to define an**
17 **initiative proposal.**
18     **(Mr. Stroud entered the proceedings.)**
19 BY MR. GOLDMAN:
20     Q   Why did you decide to speak publicly about
21 Schubert Flint Public Affairs' role in getting
22 Proposition 8 enacted?
23     MR. TYLER:  I'm sorry.  Could you repeat
24 that question for me?
25     (The question was read as follows:)

1      "Q   Why did you decide to speak
2      publicly about Schubert Flint Public
3      Affairs' role in getting
4      Proposition 8 enacted?"
5      THE WITNESS:  Well, you would have to give
6  me a specific example, so I could respond to answer
7  that particular example.
8  BY MR. GOLDMAN:
9      Q   Okay.  Fair enough.
10     Why don't we -- I'll just note for the
11 record that we have had someone enter the room.
12     Would you like to state your appearance?
13     MR. STROUD:  My name is Andrew Stroud,
14 Mennemeier, Glassman & Stroud, appearing on behalf
15 of Governor Arnold Schwarzenegger and the
16 administration defendants.
17     I apologize.  I wasn't aware that the
18 start-time kickoff had moved up to 8:00.  I thought
19 I was on time at 9:00.
20     THE WITNESS:  May I ask to get a bottle of
21 water or a glass of water?
22     MR. GOLDMAN:  Sure.  Why don't we go off
23 the record, then, for a few minutes.
24     MR. COOPER:  All okay?  Good.
25     THE VIDEOGRAPHER:  We are going off the

Page 33

1   record.  The time is approximately 8:56 a.m.
2           (Discussion off the record.)
3           THE VIDEOGRAPHER:  We are going back on
4   the record.  The time is approximately 9:06 a.m.
5   BY MR. GOLDMAN:
6       Q   Mr. Schubert, before we began with the
7   first exhibit, I'm aware, certainly, of some
8   instances in which you have spoken publicly about
9   your role in the Prop 8 campaign.  But tell me, if
10  you would, which instances you can recall, sitting
11  here today.
12      A   Well, certainly during the course of the
13  campaign, I conducted numerous media interviews,
14  where I revealed that I was the campaign manager or
15  co-campaign manager, as the case may be, of the
16  ProtectMarriage.com Yes on 8 campaign.
17          In the post-election period I'm aware of
18  an article that Jeff Flint and I authored for
19  Politics Magazine and a presentation that we gave to
20  a meeting of the American Association of Political
21  Consultants.  In both of those cases, we discussed
22  our role in Proposition 8.
23      Q   And are those the only two instances after
24  the election, that you can recall?
25      A   I gave a speech in Canada, where I talked

Page 34

1   about the process of running campaigns; and in the
2   course of that, talked about Proposition 8 as one
3   example.
4       Q   When was that speech, and where, in
5   Canada?
6       A   It was in Ottawa.  I believe it was in
7   late January or early February, 2009.
8       Q   Was that part of a conference or something
9   like that?
10      A   I was an invited speaker at a conference.
11      Q   What was the conference?
12      A   The conference was sponsored by the
13  Manning Centre.  I believe it was a conference of
14  conservative political activists in Canada.
15      Q   Do you know if your remarks at that
16  conference were recorded?
17      A   I don't.
18      Q   Are there any other instances that
19  you're -- that you can recall, in which you have
20  spoken publicly about Schubert Flint's Public
21  Affairs' role in the campaign?
22      A   I'm aware of news interviews in the
23  post-election period where we've discussed our role
24  in Proposition 8.
25      Q   About how many news interviews have you

Page 35

1   given?
2       A   Well, are you asking news interviews
3   post-election --
4       Q   Post-election?
5       A   -- dealing with our role --
6       Q   Yes.
7       A   -- or just interviews, generally?
8       Q   No.  Dealing with your role in the
9   Proposition 8 campaign.
10      A   I don't know, precisely.  I would -- I'm
11  certainly familiar with an interview that we gave to
12  the New York Times that discussed the Proposition 8
13  campaign in some detail, including our role in the
14  campaign.  And there may be other -- others of that
15  nature.
16      Q   When was The New York Times interview?
17      A   I don't recall the specific time frame.
18  It was relatively shortly after the campaign, either
19  in late November or possibly in early December.  I
20  don't recall a specific date.
21      Q   Were any of the interviews that you gave
22  with television stations?
23      A   I certainly gave interviews with
24  television stations after the campaign.  I don't
25  recall a specific interview that was focused on our

Page 36

1   role in the campaign, but there may have been.
2           MR. GOLDMAN:  Let's mark this, if we
3   could, as Schubert Exhibit 1.
4           (Schubert Exhibit 1 was marked for
5           identification.)
6           MR. TYLER:  Marking them 1, No. 1.
7   BY MR. GOLDMAN:
8       Q   Can you identify this document for me,
9   Mr. Schubert?
10      A   This appears to be the article that Jeff
11  Flint and I wrote for Politics Magazine.
12      Q   And what is Politics Magazine?
13      A   Politics Magazine is a publication,
14  monthly publication, for -- largely aimed at
15  political professionals, people who are involved in
16  politics professionally.
17      Q   And why did you write this article for
18  Politics Magazine?
19          MR. COOPER:  I would like to object to
20  that question.  I believe that it exceeds the scope
21  of permissible discovery and invades First Amendment
22  information, privileged information, and I would ask
23  counsel to...
24          MR. TYLER:  I'll join in that objection as
25  to his -- that it would invade his first amendment

Page 37

1  privilege.
2       I'm sorry.  Let me restate that to make
3  sure for the record because my microphone was off.
4       I will join in that objection as to my
5  client's First Amendment privilege and instruct him
6  not to answer that question.
7  BY MR. GOLDMAN:
8    Q   Well, Mr. Schubert, did you publish this
9  article, in part, to advertise the work that
10 Schubert Flint Public Affairs does?
11      MR. COOPER:  Same objection.  Same
12 objection.
13      MR. TYLER:  I'll assert the same objection
14 and instruct my client not to respond.
15      MR. GOLDMAN:  I really don't -- I have to
16 say, I do not understand.  I'm asking foundational
17 questions to test the assertion of the First
18 Amendment privilege.  And if he was publishing this,
19 in part, for a commercial purpose, that seems highly
20 relevant to the inquiry.  And to be told that I
21 can't even ask the foundational questions that would
22 test the assertion of the First Amendment privilege,
23 I will really have to say I don't understand that.
24      MR. TYLER:  Mr. Goldman, my response to
25 that is that you can question him with regard to

Page 38

1  whether or not he wrote this document, whether or
2  not it accurately reflects what he wrote, but to
3  dive into the question as to why he wrote it, I
4  think, obviously, violates his First Amendment
5  privilege, when this article is all about
6  Proposition 8.
7       And I believe that it's readily apparent
8  and need not have foundational questions to see that
9  it is readily apparent that it concerns a First
10 Amendment privilege.  So I think you can -- you can
11 ask him whether he wrote it and whether these are
12 his words.  But going beyond that, into why and his
13 personal mental impression for writing it, certainly
14 violates his First Amendment right.
15      MR. GOLDMAN:  Well, we obviously disagree
16 with that, but we will have to take that up with the
17 court at another time.
18 BY MR. GOLDMAN:
19    Q   What is the name of the entity that
20 retained you to manage the campaign for
21 Proposition 8?
22    A   The original entity was
23 ProtectMarriage.com.  That entity's name, I believe,
24 changed following the qualification of the
25 initiative; and at that time I believe was changed

Page 39

1  to ProtectMarriage.com Yes on 8.
2    Q   All right.  And if I just say
3  ProtectMarriage or ProtectMarriage.com, will you
4  understand that the entity that I'm referring to is
5  the entity that retained you to manage the
6  Proposition 8 campaign?
7    A   Thank you for that clarification.
8    Q   Did you discuss with ProtectMarriage.com
9  that you were going to publish this article in
10 Politics Magazine?
11      MR. TYLER:  Objection.  Again, violation
12 of his First Amendment privilege.
13      I'll instruct him not to respond to that
14 question, as to his internal communications with his
15 client.
16      MR. GOLDMAN:  And I take it you're going
17 to instruct the witness not to answer any questions
18 he -- answer any questions about communications he
19 had with ProtectMarriage about this article?
20      MR. TYLER:  I think I'll let you question
21 him.  I'm not going to enter into a stipulation on
22 that, at least at this point in time, until I have a
23 better understanding of the scope of what you're
24 saying.
25 ////

Page 40

1  BY MR. GOLDMAN:
2    Q   Did anyone at ProtectMarriage review this
3  article before it was published?
4       MR. TYLER:  Objection.  Again, concerns
5  internal communications; mental impressions as it
6  relates to the campaign.
7       I would also want to, for foundational
8  purposes here, with regard to this objection, make
9  it clear that there has been widely broadcast
10 information that there are other initiatives to
11 counter Proposition 8 that have been either
12 proposed, approved, that are going to be submitted
13 on upcoming ballots.  And as a result, there's an
14 ongoing First Amendment privilege, I believe, as to
15 the associational rights of the Proposition 8
16 campaign and those involved in the campaign,
17 including Mr. Schubert, here today.
18      With that understanding, I'm going to
19 instruct him not to answer as to your last question,
20 based upon the First Amendment privilege.
21 BY MR. GOLDMAN:
22    Q   Were you authorized by ProtectMarriage.com
23 to publish this article?
24      MR. TYLER:  Objection.  I will again
25 assert the First Amendment privilege as to whether

1  or not he was authorized.  Again, that would go to
2  the strategy and internal communications.
3          And I'm instructing him not to respond,
4  based upon the First Amendment privilege.
5  BY MR. GOLDMAN:
6      Q    Before today, when is the last time that
7  you reviewed this article?
8      **A    Last evening.**
9      Q    And when you reviewed it last evening, was
10  there anything that you thought you had stated
11  incorrectly in this article?
12      **A    There is a statement in the article that**
13  **virtually the entire faith community was on our**
14  **side.**
15          **And upon further reading of the article, I**
16  **believe that statement to be an overstatement.**
17      Q    Why do you believe that to be an
18  overstatement?
19      **A    Because there were very significant**
20  **elements of the faith community who opposed**
21  **Proposition 8 and who actively campaigned against**
22  **it.**
23      Q    What elements of the faith community do
24  you have in mind, by groups who actively opposed
25  Proposition 8?

1      MR. TYLER:  I want to, I guess, just
2  caution you -- I'm not quite sure how far you're
3  going with this -- but I believe you're treading on
4  First Amendment privilege as well.
5          I'll let him respond to this one question,
6  but I'm not sure I'm going to -- I'm not sure if the
7  next question is going to be one that we would
8  believe is appropriate.
9          THE WITNESS:  I would answer the question
10  this way:  It's publicly available information,
11  published by the No on 8 Campaign, that a number of
12  faith leaders and faith organizations opposed
13  Proposition 8 and were working in league with the
14  No on 8 Campaign to persuade California voters to
15  reject it.
16  BY MR. GOLDMAN:
17      Q    And apart from the one statement that
18  you've just talked about, was there anything else,
19  as you reviewed this article yesterday, that struck
20  you as incorrect?
21      **A    In two places in the article, there's a**
22  **reference to the margin of victory being 700,000**
23  **votes.  That is an error, I believe.  I believe the**
24  **margin was approximately 600,000 votes.**
25      Q    Anything else?

1      **A    There's a reference to the number of media**
2  **calls that we fielded on the day that same-sex**
3  **marriages began to be performed in California.  I**
4  **believe that that figure is -- should have been made**
5  **more clear -- was an estimate.**
6          MR. TYLER:  I would also like to instruct
7  my client to make sure you take plenty of time at
8  this point in time.  If you feel you want to reread
9  this document while we sit here, feel free to do so.
10  You have the time you need to read that to make sure
11  you can accurately respond to the question.
12          THE WITNESS:  Okay.
13          MR. GOLDMAN:  My question was just
14  whether, when he reviewed it last night, there was
15  anything that struck him as incorrect.
16          MR. TYLER:  Well --
17          MR. GOLDMAN:  I don't think he needs to
18  read the article now to answer that question.
19          MR. TYLER:  I would disagree.  If -- what
20  struck him last night, he might not remember this
21  morning, so I think he has the right to be able to
22  look through this document, read it, and see if
23  there's anything that came to his recollection that
24  he even had last night.
25          I'm not trying to play any games here; I

1  just think, to be fair, give him an opportunity to
2  review it.
3          THE WITNESS:  Following on my earlier
4  answer, there's a statement in the article that
5  would appear to concede that there were 18,000 gay
6  marriages that were performed in California.  I
7  believe that that figure is -- has never been
8  substantiated and is an estimate conducted by a
9  third-party group, that has been taken as fact, when
10  there's no foundation for that number that exists.
11  So I do not believe that the 18,000 reference being
12  in -- I don't believe that that reference is
13  particularly accurate.
14  BY MR. GOLDMAN:
15      Q    What is your reason for doubting the
16  accuracy of that number?
17      **A    The number came, if I recall correctly,**
18  **from a study conducted by the Williams Institute,**
19  **which is a gay think tank, for lack of a better**
20  **term, I believe associated with UCLA.**
21          **My recollection of that study is that they**
22  **took a look at the number of weddings that were**
23  **performed in California in one period of time, prior**
24  **to the Supreme Court's ruling in the marriage cases.**
25  **I believe that number itself was an estimate.**

1    They then compared the number of marriages
2  performed in a different period of time, a period
3  that included the period following the Supreme
4  Court's ruling in the marriage cases, which I
5  believe was also an estimate.  And the difference
6  between those two numbers, they ascribed as being
7  same-sex marriages.
8    I do not believe that that methodology at
9  all can be relied upon to provide an accurate number
10  as to the marriages that were performed.  And I
11  believe that -- that in point of fact, it's
12  impossible to know how many same-sex marriages were
13  performed because California does not collect the
14  data that would allow us to accurately measure that.
15    Q   Were you aware of the Williams Institute's
16  methodology at the time you wrote the article?
17    A   I was aware of the methodology, which is
18  why I'm pointing out to you the -- that I believe it
19  was an error to have referenced 18,000 gay
20  marriages.
21    Q   Well, if you were aware of the methodology
22  at the time, what is it that has caused you to
23  change your mind about reliability of that number?
24    A   Relative to this article, that number was
25  not a significant factor in the article, so I didn't

1  focus on the number, per se.
2    Q   And is there anything else that you recall
3  reviewing in this article last night that struck you
4  as incorrect?
5    A   There's a statement, "We organized
6  countless meetings and conference calls of pastors
7  and other campaign leaders."
8    Q   What page are you on?
9    A   I'm on page 45, first full -- excuse me --
10  second full paragraph on that page.
11    Q   Yes.  And what's your concern with that
12  statement?
13    A   I believe the statement, "we organized,"
14  is overly broad.  It would have been more accurate
15  to have said, "We participated in countless meetings
16  and conference calls."
17    Q   Anything else?
18    MR. TYLER:  Let me quickly -- I want to
19  instruct Mr. Schubert not to write on the
20  document --
21    THE WITNESS:  I'm sorry.
22    MR. TYLER:  -- that you have, unless
23  you're instructed to do so --
24    THE WITNESS:  I apologize.
25    MR. TYLER:  -- by me.

1    THE WITNESS:  Sorry.
2    MR. TYLER:  And I would also like to get a
3  clarification from you -- and this is a lengthy
4  document.
5    And, for example, there's a statement in
6  here, this is particularly true, "a state with
7  40 million residents."  I think we can all recognize
8  that there's not exactly 40 million residents here
9  in this state.
10    I'm not quite sure, when your question is
11  as to accuracy, whether you're looking at
12  generalizations like that, or whether you're looking
13  for something more specific.
14  BY MR. GOLDMAN:
15    Q   Right.  And to the extent that there was
16  any confusion about what I'm interested in knowing,
17  it's whether something strikes you as inaccurate, so
18  that if you were writing it today, for the same
19  purposes that you had in writing the original
20  article in the context in which it was written, is
21  there anything that, today, you would want to say
22  differently?
23    A   Well, relative to when I was reading the
24  article last night, as you indicated earlier -- and
25  I do recall the statement on page 46, in the full

1  paragraph at the bottom of the left-hand column that
2  begins with, "Fundraising was also a critical
3  activity," the statement that, "Leaders of The
4  Church of Jesus Christ of Latter-Day Saints had
5  endorsed Proposition 8 and joined the campaign
6  executive committee," that statement is inaccurate
7  as to the official participation of leaders of The
8  Church of Jesus Christ of Latter-day Saints.  They
9  did not join the executive committee, as I stated in
10  the article.  And I should have stated that, that
11  they became active in supporting Proposition 8.
12    Q   So your point is that any members of the
13  LDS church who were on the campaign executive
14  committee were not leaders of the LDS church.  Is
15  that what you're saying?
16    A   I believe I said that the Church of --
17  leaders of The Church of Jesus Christ of Latter-Day
18  Saints did not join the executive committee at that
19  time.
20    Q   Oh, they joined it subsequently; is that
21  the distinction you're trying --
22    MR. TYLER:  Objection.  You're being
23  somewhat argumentative with the witness.  That's not
24  what he said.
25    MR. GOLDMAN:  I'm just trying to

1 understand his basis for wanting to say this
2 sentence differently today, what he believes is
3 inaccurate about it. That's all I'm trying to
4 understand.
5 BY MR. GOLDMAN:
6    Q   So if that would help you, can you explain
7 to me what it is that is inaccurate about this
8 sentence that would cause you to rewrite it, if you
9 were going to publish this article today?
10   A   **Leaders of The Church of Jesus Christ of**
11 **Latter-Day Saints did not join the executive**
12 **committee.**
13   Q   There were members of that church on the
14 executive committee; at least one member of that
15 church was on the executive committee, correct?
16   A   **That's correct.**
17   Q   But none of the members of that church who
18 were on the executive committee were leaders of that
19 church. Is that correct?
20       MR. TYLER: Objection. Vague.
21       Would you repeat his question for me,
22 please?
23       (The question was read as follows:)
24       "Q But none of the members of that
25       church who were on the executive

1 committee were leaders of that
2 church. Is that correct?"
3       THE WITNESS: The use of the term "leader"
4 is a subjective one.
5       I would answer your question this way:
6 That there was no member of the LDS hierarchy, as I
7 understand it to exist, the quorum, first
8 presidency, or the second quorum, that I would
9 consider to be within the hierarchy of the LDS
10 church. None of those individuals were members of
11 the executive committee.
12 BY MR. GOLDMAN:
13   Q   All right. Are there any other sentences
14 that you noticed last night that, today, if you were
15 publishing the article, you would write differently?
16   A   **Well, as a general matter, that this**
17 **article was written following Proposition 8 and was**
18 **written in a manner that was intended to**
19 **summarize --**
20       MR. COOPER: I want to object now to any
21 inquiry or response to an inquiry that would go to
22 the author's intention or purpose, with respect to
23 the article. I believe that exceeds the scope of
24 permissible discovery, and I believe it elicits
25 information privileged under the First Amendment.

1       And I think, in addition, it exceeds the
2 scope of the question that counsel has put, which,
3 as I heard it is, are there any statements in that
4 document that you do not believe to be true and
5 accurate today.
6       So I would like to put that objection on
7 the record. And I guess it's up to counsel for the
8 witness, in terms of whether he allows the witness
9 to answer that question.
10      MR. TYLER: I would instruct Mr. Schubert
11 to just respond to the question and make sure you
12 don't give a narration.
13      It might be helpful at this point in time
14 if you would reread the question, Madam Court
15 Reporter.
16      (The question was read as follows:)
17      "Q All right. Are there any other
18      sentences that you noticed last
19      night that, today, if you were
20      publishing the article, you would
21      write differently?"
22      THE WITNESS: Nothing is standing out for
23 me that stood out last night when I read the
24 article.
25 ////

1 BY MR. GOLDMAN:
2    Q   Okay. Is it fair to say that the general
3 point of the article is to show how the decisions
4 you made about how to frame the issue in public
5 messaging about Prop 8 enabled you to convince a
6 majority of California voters to support the
7 measure?
8       MR. TYLER: Objection. The document
9 speaks for itself. And you're getting into First
10 Amendment privileges to his purpose or strategy for
11 writing this article.
12      Instruct him not to respond to this
13 question.
14      MR. GOLDMAN: I did not ask about his
15 purpose. I am trying to summarize what I see as the
16 point of the article, based on my review of it.
17
18 BY MR. GOLDMAN:
19   Q   And I simply want to know whether you
20 would agree with that characterization of the
21 article.
22      MR. TYLER: Continued objection.
23 I'll instruct him not to respond.
24      Counsel, maybe -- I am not trying to be
25 difficult, but I do want to make sure his First

Page 53

1   Amendment privilege is protected.  And maybe if
2   you're getting context, that might be different;
3   but his purpose or his point, because you had asked
4   him for what his point was, effectively, in writing
5   the article, and that goes towards his strategy, his
6   personal mental impression.  What's not already
7   public to this document, I think, is protected and
8   privileged.
9           Maybe context, if you were to reframe the
10   question, that might be a possible way to get a
11   response that you're looking for, but I --
12           MR. GOLDMAN:  Well, you've already
13   instructed him not to answer any questions about the
14   context of the article.  And you're instructing him
15   not to answer any questions about his purpose in
16   writing the article.  And you're instructing him not
17   to answer any questions about what I understand to
18   be the point of the article.  So it's hard for me to
19   see what is left.
20           Maybe you could tell me what you mean by
21   "context" that you would allow him to answer.
22           MR. TYLER:  Time frame of this document,
23   you know, pre- or post-Proposition 8; what type of
24   magazine this is.  I think you did get into that.
25           But, you know, I won't go further with

Page 54

1   regard to instructing you on how to conduct your
2   deposition.  So if you don't think there's anything
3   further to ask, then you can move on, I guess.
4           MR. GOLDMAN:  I think there's a lot
5   further to ask.  I'm just not sure what there is
6   further to ask that you're going to allow him to
7   answer.
8   BY MR. GOLDMAN:
9       Q   When was this article published,
10   Mr. Schubert?
11       **A   By "published," I'm assuming you're asking**
12   **when it was printed.  And it appears to have been**
13   **printed in February 2009.**
14       Q   And at the time it was published, you
15   believed the statements in the article were true,
16   correct?
17       **A   I believed that the statements were true,**
18   **correct.**
19           MR. TYLER:  I would want to assert an
20   objection, except he has previously testified as to,
21   already with regard to some of the statements that
22   were generalizations, and, effectively, you know,
23   words of art, as we might say.  So I would object to
24   your question to the extent that it mischaracterizes
25   what he previously stated.

Page 55

1   BY MR. GOLDMAN:
2       Q   If you could look at page 45.  In the
3   first column, there's a header that says, "Define
4   the terms; win the debate."
5           Do you see that?
6       **A   Yes.**
7       Q   What do you mean by, "Define the terms;
8   win the debate?"
9           MR. TYLER:  Objection.  Violates his First
10   Amendment privilege with regard to what he means.
11   The document speaks for itself.
12           Instruct him not to respond.
13   BY MR. GOLDMAN:
14       Q   What is the Yes on Proposition 8 Campaign?
15           MR. TYLER:  Objection.
16   BY MR. GOLDMAN:
17       Q   What is your understanding of that phrase?
18   What does that refer to?
19           MR. TYLER:  I want to assert an objection.
20   Vague and ambiguous.
21           You can go ahead and respond, to the
22   extent you can.
23           THE WITNESS:  It's an interesting
24   question.
25           The ProtectMarriage.com Yes on 8 Campaign

Page 56

1   is an official campaign committee, organized under
2   the law to support Proposition 8.  That committee
3   retained our firm to assist them in their work.
4           When you say "Yes on 8," that suggests a
5   much broader campaign.  And, in fact, that broad
6   description, Yes on 8, would be reflective of the
7   multitude of voices that voters might hear from
8   during the course of an election campaign.
9           So when you ask me about Yes on 8, there
10   are two components of that.  One is the specific
11   voice to protect marriage; and the other is the
12   broad context in which the election occurred, where
13   there were a multitude of voices for and against the
14   initiative.
15   BY MR. GOLDMAN:
16       Q   Now, were you retained by anyone, other
17   than ProtectMarriage.com, to work on the Prop 8
18   campaign?
19           MR. TYLER:  Let me assert an objection
20   that the question is vague, in light of the last
21   question.  And, really, what I would like to do is
22   just get back to your earlier statements as to
23   referencing ProtectMarriage.com.
24           I believe you had entered an agreement
25   with Mr. Schubert that when referencing

1  ProtectMarriage.com, you were talking about the
2  official campaign committee ProtectMarriage.com
3  Yes on 8. Is that right?
4  　　　MR. GOLDMAN: That's -- yes, that's right.
5  　　　MR. TYLER: Then there was -- your last
6  con -- your last question concerned, I think, what
7  does Mr. Schubert believe the campaign references.
8  And then he talked about a much broader subject
9  matter, all the voices he was talking about, all the
10  voices that would talk about Proposition 8 with
11  regard to the campaign.
12  　　　MR. GOLDMAN: Yes.
13  　　　MR. TYLER: I just want to make sure that
14  I understand that so that your -- you know, your
15  words are understood by Mr. Schubert as well, and we
16  have an agreement as to what you're referencing
17  here.
18  　　　So in referencing ProtectMarriage.com,
19  you're talking about the official campaign committee
20  right now?
21  　　　MR. GOLDMAN: Right.
22  　　　MR. TYLER: Okay.
23  　　　MR. GOLDMAN: I think that's clear from
24  the record, and I don't want to waste a lot of time
25  summarizing what has already transpired in the

1  deposition. We have a written record for that
2  purpose.
3  BY MR. GOLDMAN:
4  　　Q　So my question is, were you retained by
5  anyone other than ProtectMarriage.com Yes on 8 to do
6  work for the Proposition 8 campaign?
7  　　A　No.
8  　　Q　Did you do any work for the Yes on 8
9  campaign that was not compensated?
10  　　　MR. TYLER: Objection. This, again,
11  violates his First Amendment privilege as to whether
12  or not he was paid, volunteered. It exceeds the
13  scope of permissible discovery here. It's not
14  relevant.
15  　　　I'll instruct him not to respond.
16  　　　MR. GOLDMAN: Well, if Mr. Cooper is
17  willing to stipulate that anything that Mr. Schubert
18  did was done on behalf of ProtectMarriage.com, then
19  maybe we don't need to explore these foundational
20  questions. But I think if we're going to have a
21  dispute about whether what Mr. Schubert did is
22  attributable to the ProtectMarriage.com, then I
23  would think I'm entitled to explore these questions.
24  　　　MR. TYLER: Well, regardless of
25  Mr. Cooper, I would not stipulate to that. You

1  would need to address each particular issue that you
2  would like to know, whether or not it was done on
3  behalf of ProtectMarriage.com; whether he went to
4  lunch with a friend, whether that was part of his
5  work for ProtectMarriage.com. You need to ask him
6  whether having lunch with that friend was part of
7  ProtectMarriage.com.
8  　　　I think you need to be more specific about
9  your examples as to what you want to get at. And an
10  overriding stipulation to that extent, I think,
11  would be overly broad and not representative of the
12  facts, necessarily.
13  　　　MR. GOLDMAN: Is there anything you would
14  like to say about this, Mr. Cooper, at this time?
15  　　　MR. COOPER: I have nothing to contribute
16  to the dialogue here.
17  　　　MR. GOLDMAN: Okay.
18  BY MR. GOLDMAN:
19  　　Q　Mr. Schubert, did you do any work on the
20  Yes on 8 campaign that was not part of your
21  responsibilities as the campaign manager for
22  Yes on 8 retained by ProtectMarriage.com?
23  　　　MR. TYLER: Again, I'll assert an
24  objection as to his First Amendment privilege. If
25  you have some public fact that you want to question

1  him on about his work, you can question him about
2  specific facts.
3  　　　But I'm going to instruct him not to
4  respond to overgeneralizations of that nature.
5  　　　MR. GOLDMAN: It's a yes-or-no question.
6  　　　MR. TYLER: I assert the same objection.
7  Whether he volunteered or didn't volunteer is
8  privileged information. The fact is, we all know,
9  and it's a matter of public record, he worked on the
10  campaign.
11  　　　MR. GOLDMAN: Yes. And the question is
12  whether Mr. Schubert contends that he did things
13  that were not part of his work on behalf of
14  ProtectMarriage.com as the campaign manager for
15  Yes on 8.
16  　　　MR. TYLER: Same objection. I don't think
17  that it -- you have to provide something more
18  specific. You can't overgeneralize. And, you know,
19  I don't want to have -- I don't want to have an
20  objection here where I'm arguing and you think I'm
21  trying to coach him. But I can leave it at that, or
22  I can explain myself a little bit further, as to
23  what my problem is with your question.
24  　　　I'll leave that up to you, if you want to
25  talk about that further.

Page 61

1    MR. GOLDMAN: The problem is we cannot
2  speak meaningfully about Mr. Schubert's work if
3  there's a dispute about whether what he did was done
4  on behalf of ProtectMarriage.com.  And that's why
5  I'm asking a very simple question, whether there is
6  any work that he did --
7    MR. TYLER: I can understand --
8    MR. GOLDMAN: -- that was not on behalf
9  ProtectMarriage.com.
10    I think that is very clearly relevant to
11  this case, important to the plaintiffs' burden of
12  proof, and would certainly, to the extent that
13  information is protected by the First Amendment,
14  that would certainly satisfy -- a basic foundational
15  question like that would certainly satisfy
16  overriding the First Amendment to the limited
17  purpose of identifying whether what he did was done
18  on behalf of ProtectMarriage.com.
19    MR. TYLER: I understand your objection,
20  or I should say I understand your argument.
21    And my response is this: You're asking
22  him to be overly broad with the question as to
23  whether or not he ever performed any work that was
24  not in -- I think in his role as official campaign
25  manager.

Page 62

1    So, for example, you could take the
2  article that we were just talking about that was in
3  Politics Magazine and say, Was this written in your
4  capacity as the campaign manager for
5  ProtectMarriage.com.
6    But you can't ask him an overarching
7  generalized question, whether or not he ever did
8  anything in relation to work on the campaign that
9  was of a volunteer nature.
10    There is -- you know, that just could
11  include a myriad of things.
12    MR. GOLDMAN: Let's just --
13    MR. TYLER: No.  No.  Let me just give you
14  an example.
15    MR. GOLDMAN: No.  This is not helpful.
16    MR. TYLER: I'm going to continue.  I am
17  going to make my statement because I want to make
18  sure it's clear for the record.
19    MR. GOLDMAN: No, we're not making
20  statements.  This is not a time for speeches.
21    MR. TYLER: The purpose of that is the
22  fact there are many things, such as whether or
23  not --
24    MR. GOLDMAN: Counsel, counsel, please
25  stop wasting -- this is my deposition.

Page 63

1    MR. TYLER: -- whether or not he paid for
2  his own gas to drive to an event; whether or not he
3  spoke to someone on his own time face-to-face;
4  whether or not that was an official campaign issue
5  or not.
6    These are issues that, I think, go to
7  establish the fact that this is an
8  overgeneralization.
9    MR. GOLDMAN: Counsel, I have a limited
10  amount of time to take this deposition.  I am not
11  going to count against my time for the deposition
12  your speeches, just so that is clear.
13    And I'll do my best to get Mr. Schubert
14  out of here because I know he does have commitments,
15  but we will continue this deposition and be back
16  here if you're going to eat up record time by making
17  speeches.
18    MR. TYLER: I'm not making speeches.  You
19  asked the question.  I responded.
20    Go ahead.
21    And he will need to leave here at an
22  appropriate time.
23  BY MR. GOLDMAN:
24    Q   Mr. Schubert, are any of the activities
25  that are described in this article activities that

Page 64

1  you did not do as the campaign manager for Yes on 8?
2    MR. TYLER: Objection.  Vague and
3  overbroad.
4    You can go ahead and respond.  Take your
5  time to look at it to make sure you look at every
6  specific item mentioned, to ensure that you know
7  whether or not it was or was not part of your work
8  as the official campaign manager for
9  ProtectMarriage.com.
10    Take as much time as you need.
11    MR. GOLDMAN: No.
12  BY MR. GOLDMAN:
13    Q   Mr. Schubert you reviewed this article
14  last night.  This is ridiculous.
15    MR. TYLER: Counsel, if you want to pull
16  out specific --
17    MR. GOLDMAN: If you had let me ask him
18  the question whether he did anything that was not on
19  behalf of ProtectMarriage.com, the answer may have
20  been no, and then we would not be wasting time by
21  having you ask him to read this article again.  You
22  have already asked him to read it once today.
23    MR. TYLER: This is your question.
24    MR. GOLDMAN: After he already said that
25  he read it last night.

1        MR. TYLER:  You're not going to -- you're
2    not going to be oppressive upon my client and do
3    this.  If he needs to read through it and take the
4    time, he will.
5        MR. GOLDMAN:  You will stop coaching the
6    witness to waste time on this record.
7        MR. TYLER:  You can consider it coaching
8    to waste time.  I don't really care.
9        Read the article to the extent you need
10   to, to make sure you refreshed your recollection as
11   to what is in the article, so that you can respond
12   to his question.
13       THE WITNESS:  Based on my reading of it
14   last night, and my cursory review this morning, I
15   don't see anything in the article that discusses our
16   work on the campaign that was not done for
17   ProtectMarriage.
18   BY MR. GOLDMAN:
19       Q   All right.  Did the Yes on 8 campaign
20   build a coalition?
21       **A   Again, I just want to make sure I'm clear.**
22   **When you say the Yes on 8 campaign, you are**
23   **referring to ProtectMarriage.com?**
24       Q   Yes, I am.
25       **A   Okay.  Thank you.**

1        MR. TYLER:  I'll object based upon
2    vagueness.
3        Go ahead.
4        THE WITNESS:  The Yes on 8 campaign sought
5    to recruit allies and to coalesce individuals and
6    groups that shared a support for Proposition 8, yes.
7    BY MR. GOLDMAN:
8        Q   And was there a way in which you
9    identified an entity or individual as an official
10   member of the Yes on 8 coalition, as opposed to
11   someone who just happens to support the Yes on 8
12   campaign?
13       MR. TYLER:  Objection.  Vague.
14       THE WITNESS:  Your use of the term,
15   "official member," would need to be defined, if you
16   would.
17   BY MR. GOLDMAN:
18       Q   Well, did you distinguish in any way
19   members of the Yes on 8 coalition from people who
20   just happened to support Proposition 8?
21       MR. TYLER:  Objection.  Vague.
22       MR. COOPER:  I would like to object.  I
23   believe this goes to internal campaign strategy,
24   deliberations and information, and that it is,
25   therefore, exceeding the limits of discovery that

1    are permissible and encroaching on First Amendment
2    internal information.
3        MR. TYLER:  I would adopt that objection
4    as well and instruct my client not to respond.
5    BY MR. GOLDMAN:
6        Q   Did you publicly disclose that these
7    individuals or these organizations are members of
8    the Yes on 8 coalition?
9        MR. TYLER:  Objection.  Vague.
10       THE WITNESS:  Not to my knowledge.
11   BY MR. GOLDMAN:
12       Q   Did the Yes on 8 campaign communicate
13   messages to voters?
14       MR. COOPER:  I would like to ask for a
15   clarification for counsel, if I may.
16       You're using the term Yes on 8 campaign,
17   and, earlier, we were using ProtectMarriage.com.
18   And I just want to be clear that counsel's question
19   goes to the client that Mr. Schubert represented, or
20   this broader Yes on 8 campaign that Mr. Schubert
21   previously described.
22       MR. GOLDMAN:  Okay.  Well, yes.  And I
23   think that's a fair clarification.
24   BY MR. GOLDMAN:
25       Q   When I say the "Yes on 8 campaign" in this

1    context, I mean the Yes on 8 campaign that you
2    managed.
3        MR. TYLER:  I'm sorry.  That doesn't
4    clarify it for me.
5        The Yes on 8 campaign, he previously
6    talked about being a very broad campaign with many
7    voices, voices that he had no control over, voices
8    that he may have had control over, and then there's
9    the ProtectMarriage.com.
10       So which one are we speaking of --
11       MR. GOLDMAN:  Well, you were --
12       MR. TYLER:  -- the campaign or
13   ProtectMarriage.com.
14   BY MR. GOLDMAN:
15       Q   Well, you were hired to run a campaign for
16   ProtectMarriage.com, correct?
17       **A   That's correct.**
18       Q   And you did that, correct?
19       **A   Correct.**
20       Q   And you had control over the messages that
21   were disseminated by the campaign that you were
22   retained to run and did run?
23       MR. COOPER:  I object to that question --
24       MR. GOLDMAN:  Are you instructing the
25   witness not to answer?

Page 69

1    MR. COOPER: -- on the grounds -- I can't
2  do that, but on the grounds previously stated.
3    MR. TYLER: I'll object on the basis of
4  vagueness to that question.
5    I think it might be helpful if you could
6  define -- when you speak of a campaign, I'm
7  struggling with whether you're talking about --
8  there are many voices out there that he's never
9  spoken to, that he has no control of, and they've
10  never spoken to him, so I'm not sure.
11    You used the word "campaign." I'm not
12  sure if you're speaking of a larger movement or work
13  on behalf of an official campaign committee.
14    MR. COOPER: Counsel, may I offer a
15  friendly suggestion?
16    MR. GOLDMAN: Sure.
17    MR. COOPER: Thank you.
18    At least, to my mind, the definitional
19  issue would be cleared up if you addressed the
20  question I understand you to be asking to
21  Mr. Schubert by referring to the ProtectMarriage.com
22  campaign.
23    MR. GOLDMAN: Let's see if --
24    MR. COOPER: And I think that would
25  coincide with what at least I understand the record

Page 70

1  to have been on this.
2  BY MR. GOLDMAN:
3    Q   Did the ProtectMarriage.com Yes on 8
4  campaign communicate messages to voters?
5    A   Yes.
6    Q   Did those communications include
7  television advertising?
8    A   Yes.
9    Q   Radio advertising?
10    A   Yes.
11    Q   Mass e-mails?
12    A   That depends on your definition. We
13  certainly did distribute large numbers of e-mails to
14  people who requested them.
15    Q   You did not distribute any e-mails, send
16  e-mails, to anyone who did not first request it. Is
17  that correct?
18    A   I believe to answer that might implicate a
19  privilege, so I would have to ask for counsel's
20  guidance because it may get to the process that we
21  employed to develop the list.
22    But I can tell you, as a general matter,
23  people who received our e-mails had gone to our
24  website, to the campaign website, and taken some
25  action that would result in them receiving an

Page 71

1  e-mail.
2    Q   But you did send e-mails to people who did
3  not register at the ProtectMarriage.com website. Is
4  that correct?
5    MR. TYLER: Objection. He just responded
6  as to the fact that it could invade his First
7  Amendment privilege with regard to how people came
8  about getting on the list for e-mails.
9    I'll instruct him not to respond.
10    I think what was publicly sent or what was
11  not is relevant, but not to how he came about
12  deciding who to send to.
13    Therefore, on the First Amendment
14  privilege ground, I'll instruct him not to respond
15  to that question.
16  BY MR. GOLDMAN:
17    Q   Did the communications also include
18  telephone calls?
19    A   Yes.
20    Q   And did the communications include
21  posters?
22    A   I don't recall that. It's possible, but I
23  don't recall.
24    Q   Did the communications include lawn signs?
25    A   Yes.

Page 72

1    Q   Bumper stickers?
2    A   Yes.
3    Q   Flyers?
4    A   Yes.
5    Q   And what kinds of public events did the
6  ProtectMarriage.com campaign stage to disseminate
7  its message?
8    A   The ProtectMarriage campaign organized a
9  bus tour in the latter days of the campaign in a
10  number of cities -- excuse me. And the campaign
11  worked to find locations and encourage supporters of
12  Proposition 8 to come to those events.
13    Q   So the bus would come to town, and then
14  there would be a rally? Is that what you would call
15  it?
16    A   That would be a fair characterization of
17  it.
18    Q   Is a rally something that is opened to the
19  public?
20    MR. TYLER: Objection. Vague.
21    THE WITNESS: I -- we would have to go
22  through the specifics of each event, which I may or
23  may not be familiar with.
24    The rallies may have occurred, in some
25  cases, on private property. And in other cases,

Page 73

1  they may have occurred on public property.  And that
2  might potentially affect the answer to your
3  question.
4  BY MR. GOLDMAN:
5      Q    By "private property," do you have in mind
6  churches?
7      A    That would be one example, yes.
8      Q    Are there any other examples?
9          MR. TYLER:  Let me object to vagueness on
10  that question.
11          THE WITNESS:  I don't have any specific
12  recollection of other examples, but there
13  certainly -- in the context of how you've asked the
14  question, there would be many potential examples of
15  private property.
16  BY MR. GOLDMAN:
17      Q    Were members of the media invited to all
18  of the rallies that were part of the bus tour?
19      A    I believe that they were.
20      Q    Do you have any reason to believe that, at
21  any of the rallies, members of the public who showed
22  up were not admitted if they wanted to attend the
23  rally?
24      A    I don't have any information on whether
25  they were or were not admitted.

Page 74

1      Q    Apart from the bus tour, were there any
2  other public events that you can think of that were
3  staged by the ProtectMarriage.com campaign?
4      A    Are you referring to the period prior to
5  the adoption of Proposition 8?
6      Q    Yes, prior to the election.
7      A    I don't recall any other events, but if
8  you are aware of one, I would be happy to address
9  that specifically.
10      Q    Well, how about town halls, does that
11  phrase mean anything to you?
12      A    Only as a general matter.  In the context
13  of a candidate campaign, frequently a candidate will
14  sponsor an event and invite people to come and ask
15  questions of the candidate about his or her position
16  on an issue.  This, of course, was not a candidate
17  campaign.
18      Q    So as you understand the term, the
19  ProtectMarriage.com campaign did not hold any town
20  halls?
21      A    I don't recall any.
22      Q    Okay.  The ProtectMarriage.com campaign
23  did hold numerous press conferences, correct?
24      A    That's correct.
25      Q    You may have already answered this, but as

Page 75

1  part of your responsibilities as the campaign
2  manager for the ProtectMarriage.com campaign, did
3  you retain other vendors to provide services?
4      A    If by "you," you mean Schubert Flint --
5      Q    Yes, I do?
6      A    -- I don't recall any vendor that we
7  retained as a company.
8      Q    Did you develop campaign strategy?
9          MR. COOPER:  I would like to object to
10  that question.
11          MR. TYLER:  I'll assert the same objection
12  based upon First Amendment privilege and instruct
13  him not to respond.
14  BY MR. GOLDMAN:
15      Q    Did you raise money?
16          MR. COOPER:  That question also is
17  objectionable.
18          MR. GOLDMAN:  Are you going to object and
19  instruct him not to answer any questions about what
20  the responsibilities of Schubert Flint Public
21  Affairs were for the Prop 8 campaign and what they
22  did to satisfy those responsibilities?
23          MR. COOPER:  We are concerned that the
24  area that you're probing goes to internal campaign
25  structures and responsibilities that, as we

Page 76

1  understand the court's previous rulings, are beyond
2  the proper scope of discovery because they're not
3  relevant to the ultimate issues in this case.
4          We also believe they trench on First
5  Amendment values concerning the internal operation
6  and relationships within the political process and
7  campaign that was ProtectMarriage.com.
8          MR. GOLDMAN:  Well, as long as we can
9  stipulate that I have preserved my right to pursue
10  this line of questions, should a court rule that I'm
11  entitled to pursue it, then we can move on.
12          MR. COOPER:  You certainly have preserved
13  your right with respect to that question.  I
14  don't -- I don't -- I certainly can't be certain
15  that there might be questions that you have in mind
16  asking that would not raise these concerns.  But to
17  the extent that they probe, Mr. Goldman, the
18  internal campaign structures, organization and
19  responsibilities within this campaign, then -- then
20  the questions would likely invade the concerns that
21  I've articulated.
22  BY MR. GOLDMAN:
23      Q    Did Schubert Flint Public Affairs organize
24  and supervise grassroots efforts?
25          MR. COOPER:  I make the same objection.

1    MR. TYLER:  I'll object on the First
2  Amendment privilege and instruct him not to respond.
3  BY MR. GOLDMAN:
4    Q   Did Schubert Flint Public Affairs assist
5  with the preparation of required financial filings
6  for ProtectMarriage.com?
7    MR. TYLER:  Objection.  First Amendment
8  privilege.
9    Instruct him not to respond.
10  BY MR. GOLDMAN:
11    Q   Did Schubert Flint Public Affairs play any
12  role in drafting the arguments in the official voter
13  guide for Proposition 8?
14    MR. TYLER:  Same objection.
15    Instruct you not to respond on First
16  Amendment privilege.
17  BY MR. GOLDMAN:
18    Q   Did Schubert Flint Public Affairs decide
19  on the content of campaign messages?
20    MR. TYLER:  Same objection.
21    Instruct you not to respond.
22  BY MR. GOLDMAN:
23    Q   In general, how did you divide
24  responsibility between yourself and Mr. Flint for
25  the ProtectMarriage.com campaign?

1    MR. TYLER:  Objection.  Concerns internal
2  campaign structure.  First Amendment privilege.
3    Instruct him not to respond.
4  BY MR. GOLDMAN:
5    Q   Did ProtectMarriage.com object to any
6  public statements that you made about your
7  involvement in the Proposition 8 campaign?
8    MR. TYLER:  Objection.  Vague and
9  ambiguous.  Concerns internal campaign
10  communications, mental impressions of the campaign,
11  official campaign itself.
12    Based upon First Amendment privilege,
13  instruct him not to respond.
14  BY MR. GOLDMAN:
15    Q   Let me ask you to look at page 44 of this
16  article, the right-hand column, six or seven lines
17  down.  Do you see, it says that you decided to --
18  you urged all your supporters to refrain from
19  demonstrations, protests or rallies opposing the
20  marriages.  And that's the same-sex couples who were
21  getting married.
22    Do you see that?
23    **A   I do, yes.**
24    Q   What did you mean by "supporters," in that
25  sentence?

1    MR. TYLER:  Objection.  First Amendment
2  privilege.  Document speaks for itself.
3    I'll instruct you not to respond.
4  BY MR. GOLDMAN:
5    Q   How did you become aware that supporters
6  wanted to engage in demonstrations against same-sex
7  marriages?
8    MR. TYLER:  Objection.  Argumentative.
9  Vague.  Violates First Amendment privilege.  You're
10  assuming facts that are -- have not been testified
11  to.  There's no foundation to that statement, that
12  there were any such supporters.
13    Therefore, I'll instruct him not to
14  respond.
15    MR. GOLDMAN:  Are you instructing him not
16  to respond on First Amendment grounds?
17    MR. TYLER:  I am.
18  BY MR. GOLDMAN:
19    Q   Did you become aware that there were
20  supporters who wanted to engage in demonstrations
21  against same-sex marriages?
22    MR. TYLER:  Objection.  Vague.
23  BY MR. GOLDMAN:
24    Q   You can answer the question.
25    **A   I was not aware of any specific supporter**

1  **of Proposition 8 who was going to protest marriages.**
2    Q   Were you aware, in general, that there
3  were supporters who wanted to engage in
4  demonstrations against same-sex marriages?
5    MR. TYLER:  Objection.  Vague.  He's
6  already responded to your question, that he was not
7  aware of anyone.
8    MR. COOPER:  I would like to add to that
9  First Amendment objection.  Goes to the witness'
10  mental impressions, his internal thought process,
11  and beyond the face of the document, which speaks
12  for itself.
13    MR. TYLER:  And I would instruct him not
14  to respond on First Amendment privilege.
15    If you have some specific group that
16  demonstrated, you could ask him whether he was aware
17  of that group, I guess.
18  BY MR. GOLDMAN:
19    Q   Let me ask you to look at the next
20  sentence in the article.  It begins, "This initial
21  strategic positioning."
22    Do you see that sentence?
23    **A   I do.**
24    Q   And when you refer in this article to
25  qualitative and quantitative research, did you --

Page 81

1   who did you have conduct qualitative or quantitative
2   research that you referred to in this article?
3           MR. TYLER:  Objection.  First Amendment
4   privilege as to internal campaign structure and the
5   identity of persons involved in that.  And your
6   question lacks foundation.
7           Instruct him not to respond to that
8   question.
9           MR. GOLDMAN:  Would you agree that he can
10  respond to that question to the extent he's already
11  disclosed the names of these people?
12          MR. TYLER:  If you have some public
13  document, some public information as to the
14  disclosure, you can ask him and identify that.
15          MR. COOPER:  If -- and I would only add
16  that at least from the standpoint of my
17  representation of my clients, if the witness is
18  aware of a public disclosure that has taken place,
19  of information that is responsive and answers your
20  question, then at least I would not have an
21  objection to interpose.
22          MR. TYLER:  That would be fine with me as
23  well.
24  BY MR. GOLDMAN:
25      Q   So please answer the question to the

Page 82

1   extent you are aware of public statements you've
2   already made about the people you retained to
3   conduct this research.
4       A   I am aware of public statements that were
5   made regarding people who conducted this type of
6   research.
7       Q   So please answer the question to that
8   extent, that you -- who did you retain to conduct
9   this research referred to in this statement?
10          MR. TYLER:  Limited to those to whom you
11  made public statements regarding that, that
12  established the identity of those third parties.
13          THE WITNESS:  It's been publicly reported
14  that Gary Lawrence, Lawrence Research, conducted
15  research for the campaign.
16          I wouldn't agree that we retained him, but
17  he did conduct research for the campaign.
18  BY MR. GOLDMAN:
19      Q   And just generally, who is Gary Lawrence?
20      A   Dr. Gary Lawrence is a -- is a public
21  opinion researcher who has worked on issues of
22  importance for many years.
23      Q   And when you say that you didn't retain
24  him, you're referring to Schubert Flint Public
25  Affairs?

Page 83

1       A   That's correct.
2       Q   Do you know whether ProtectMarriage.com
3   retained Dr. Gary Lawrence?
4       A   I believe they did.
5       Q   Is there anyone else that you discussed
6   publicly who performed research for the
7   ProtectMarriage.com campaign?
8       A   Not to my recollection.
9           MR. COOPER:  Counsel, if I could interrupt
10  you.  Maybe -- you're pausing.  I wonder if it's
11  appropriate to pause for a break.
12          MR. GOLDMAN:  If you would like to take a
13  break, that would be fine.
14          THE VIDEOGRAPHER:  Can we change our
15  media, then?
16          MR. GOLDMAN:  Sure.
17          THE VIDEOGRAPHER:  Okay.  This is the end
18  of Tape 1, Volume I, in the deposition of Frank
19  Schubert.  The time is approximately 10:20 a.m.  We
20  are off the record.
21          (Discussion off the record.)
22          THE VIDEOGRAPHER:  This is Tape 2 of
23  Volume I in the deposition of Frank Schubert, in
24  Kristin M. Perry vs Arnold Schwarzenegger, et al.
25          The date is December 17, 2009, and the

Page 84

1   time is approximately 10:35 a.m.  We are on the
2   record.
3           MR. COOPER:  Mr. Goldman, before you
4   resume your questioning, I would like to put on the
5   record the following:  In your -- one of your very
6   recent exchanges, I thought it was helpful that you
7   asked the question or proposed the proposition that
8   certain information was of public record.
9           And it's not our intention or purpose to
10  preclude the questions with respect to information
11  that is in the public domain, at least not in terms
12  of privilege.  And you may certainly ask questions
13  that at least I don't know that the information is
14  in the public record.
15          And what I would suggest is that if you
16  know that or you believe that and can suggest it, or
17  the witness knows it and suggests it, then that
18  would be helpful and could eliminate the privilege
19  objection.
20          So I just want to make clear that it is
21  not our purpose to try to preclude questions as to
22  information that is in the public domain on a
23  privileged basis.
24          MR. GOLDMAN:  Thank you for that.
25  Mr. Tyler, do you agree that if I ask a

Page 85

1  question, and you instruct Mr. Schubert not to
2  answer on First Amendment grounds, that your
3  instruction does not cover public statements that he
4  has already made that contain information that would
5  be responsive to that question?
6      MR. TYLER: I would simply say that I
7  concur with Mr. Cooper's comments, and we are not
8  trying to prohibit information that is in the public
9  domain from being addressed.
10  BY MR. GOLDMAN:
11     Q  Mr. Schubert, do you understand the
12  colloquy that I have just had with counsel about
13  what you are permitted to answer on questions that
14  might otherwise intrude on the First Amendment
15  privilege?
16     **A  I believe I do.**
17     Q  Okay. And as you sit here right now, are
18  there any questions that I asked you already today
19  that you did not answer, where, in fact, you believe
20  you have publicly disclosed information that is
21  responsive to the question?
22     MR. TYLER: Objection. Overbroad and --
23     THE WITNESS: I would answer only that
24  nothing springs to mind, but I certainly don't have
25  a comprehensive recollection of all your questions.

Page 86

1  BY MR. GOLDMAN:
2      Q  Okay. Did ProtectMarriage.com coordinate
3  with church leaders on the messages that they were
4  disseminating to their congregants?
5      MR. TYLER: Objection. Violates First
6  Amendment privilege.
7      I'm instructing him not to respond as to
8  what he directed, in relation to the internal
9  communications.
10     THE WITNESS: To the extent that there's
11  public information out there on this, I would be
12  happy to respond to anything that you have.
13  BY MR. GOLDMAN:
14     Q  Do you know whether you have publicly
15  disclosed that ProtectMarriage.com coordinated with
16  church leaders on the messages that they delivered
17  to their congregants?
18     **A  I am -- I understand your question to be**
19  **limited to coordinating regarding the message that**
20  **churches delivered to their congregants, and I'm not**
21  **aware of any such coordination.**
22     MR. COOPER: I would like to ask for a
23  clarification of the question, and perhaps even
24  answer, in terms of whether the answer relates to
25  whether there is public information to that effect.

Page 87

1      I'm not sure I understood that exchange.
2  Forgive me.
3  BY MR. GOLDMAN:
4      Q  I think you just testified that, in fact,
5  ProtectMarriage.com did not coordinate with
6  churches, church leadership, on the messages they
7  disseminated to congregants.
8      That was your testimony, correct?
9      MR. TYLER: I want to object as to
10  vagueness as to the -- this whole line of
11  questioning with regard to -- well, I don't want to
12  coach him, but object to the vagueness.
13     So go ahead and respond.
14     THE WITNESS: I believe that I was
15  responding to the extent that I was aware of public
16  information that the -- that ProtectMarriage would
17  have coordinated on the message that churches
18  delivered to congregants. And my testimony was, I'm
19  not aware of public information to that effect.
20  BY MR. GOLDMAN:
21     Q  Do you agree that the messages that were
22  crafted by Schubert Flint Public Affairs on behalf
23  of ProtectMarriage.com were important in convincing
24  California voters to vote for Proposition 8?
25     MR. TYLER: Let me assert an objection,

Page 88

1  First Amendment objection as to his personal
2  beliefs. And I'm concerned that you're going into
3  mental impressions, strategic decisions of the
4  campaign.
5      Your question is -- I'll allow him to
6  respond to that one, but I really don't see how you
7  can go much further there. I'm sorry.
8      THE WITNESS: Well, I would respond that
9  there's information in the public domain, including
10  in this article that you're referencing, that speak
11  to the importance of -- of certain messages.
12  BY MR. GOLDMAN:
13     Q  And one of the things that you say in this
14  article is that a campaign in favor of traditional
15  marriage would not be enough to prevail.
16     Do you recall that?
17     **A  Could you point me to the specific quote?**
18     Q  Page 45. That's in the first column,
19  about halfway down: "We strongly believed that a
20  campaign in favor of traditional marriage would not
21  be enough to prevail."
22     Do you see that?
23     **A  I do. Thank you.**
24     Q  And by this, you mean that if the Yes on 8
25  campaign had just affirmed traditional marriage, it

Page 89

1  would not have gotten more than 50 percent of the
2  vote, correct?
3        MR. TYLER:  Objection.  I'm going to
4  instruct you not to respond, based on First
5  Amendment privilege.
6        The document speaks for itself.
7  BY MR. GOLDMAN:
8     Q   Have you publicly stated that had the
9  Yes on 8 campaigns just affirmed traditional
10 marriage, it would not have gotten more than
11 50 percent of the vote?
12    **A   I don't know.**
13    Q   Do you agree that that is true?
14       MR. TYLER:  Objection.
15       THE WITNESS:  I --
16       MR. TYLER:  Objection.  First Amendment
17 privilege.  Instruct him not to respond.
18       It states here, "We strongly believe that
19 a campaign in favor of traditional marriage would
20 not be enough to prevail."  The document speaks for
21 itself.
22       MR. GOLDMAN:  Counsel, I am quoting from
23 video of Mr. Schubert making that exact statement,
24 and to be told in a deposition that you're going to
25 instruct him not to answer, and you have no idea

Page 90

1  what he said publicly and what he has not, so that
2  it's on me to go out and search the universe and
3  identify everything that he said publicly, and then
4  show it to you here in this deposition before you
5  will allow Mr. Schubert to answer, is simply not
6  appropriate.  It is obstructionist to the highest
7  degree.
8        MR. TYLER:  If you want to ask a question
9  as to whether or not he ever recalls making that
10 statement publicly, that's an appropriate question,
11 and you can ask it.
12 BY MR. GOLDMAN:
13    Q   Did you confirm through research that a
14 campaign in favor of traditional marriage would not
15 be enough to succeed?
16       MR. TYLER:  Objection.  This calls for
17 information pertaining to strategy, his own research
18 and deliberation, mental impressions.  I believe it
19 violates the First Amendment privilege.
20       I'm instructing him not to respond.
21       If you have a public statement you want to
22 direct him to, that would be fine.
23 BY MR. GOLDMAN:
24    Q   Do you recall whether you have discussed
25 this fact publicly?

Page 91

1        MR. TYLER:  Objection to "this fact."  I'm
2  not sure what you're speaking of.  Vagueness.
3        THE WITNESS:  I believe that there are
4  statements in the public domain that the research
5  that was conducted for the campaign supported the
6  statement in this article.
7  BY MR. GOLDMAN:
8     Q   What research did you conduct for the
9  campaign that supported the statement in this
10 article?
11       MR. TYLER:  Objection.  First Amendment
12 privilege.  I'll instruct him not to respond, except
13 to the extent that you can ask him if he's ever
14 publicly made a statement as to the research that
15 was performed.
16 BY MR. GOLDMAN:
17    Q   Answer to the extent you believe it's been
18 publicly disclosed, if you would, Mr. Schubert.
19    **A   It's been publicly disclosed that we**
20 **conducted focus groups and surveys of California**
21 **voters.  I'm not clear whether it's been publicly**
22 **disclosed that that research was specific to the**
23 **point you're making here.**
24    Q   It might have been, is that your
25 understanding?

Page 92

1        MR. TYLER:  Objection.  Counsel, it's not
2  his burden to prove your case.
3        I'm going to instruct him not to respond
4  based upon First Amendment privilege.
5        This case has tens of thousands of
6  documents, as I understand it, and he cannot be held
7  to know the content of every document and every
8  document that was publicly disseminated.
9        He's not responding to your question at
10 this point, based upon First Amendment privilege.
11       MR. GOLDMAN:  Just so we're clear, it's
12 his burden if he wishes to assert a privilege.  It
13 is his burden to show that that privilege applies.
14 And if he has publicly disclosed information, the
15 privilege is not going to apply.
16       So I think I'm entitled to ask if he
17 thinks he might actually have disclosed publicly
18 this information.
19       And you're now instructing him not to
20 answer.
21       MR. TYLER:  Counsel, counsel, your
22 question --
23       MR. GOLDMAN:  And then he can't carry his
24 burden if you're instructing him not to answer that
25 question.

Page 93

1    MR. TYLER:  Counsel, your question is
2  whether he thinks he may have.  That is different
3  from, do you recall ever publicly disseminating such
4  information.
5    He can answer whether he recalls or not,
6  not whether he thinks he did.  So if you want to
7  restate your question, that will be fine.
8    MR. GOLDMAN:  I want to make sure the
9  privilege is being asserted in good faith and that,
10 unless sitting here right now, he can recall a
11 specific instance when he discussed that specific
12 thing publicly -- if the way you're approaching the
13 privilege is that everything is privileged, unless
14 sitting here, he can recall the specific instance
15 when he publicly disclosed that specific thing, when
16 he has grounds to believe that he may very well have
17 disclosed these things publicly in other contexts, I
18 think I'm entitled to explore that with him.
19    MR. TYLER:  I disagree, and I'm going to
20 instruct him not to respond.
21    If he recalls whether something was
22 publicly disseminated, he can state that he did
23 publicly disseminate it or that he doesn't recall.
24 And if he doesn't recall, you can produce a document
25 that reflects some public dissemination to refresh

Page 94

1  his recollection.  If you don't produce such a
2  document, I'm going to instruct him not to respond
3  to that particular question, as we are sitting right
4  now.
5    I'm not trying to be obstructionist, and
6  I'm not doing it in bad faith.  I'm protecting my
7  client's First Amendment rights.
8    THE WITNESS:  Counsel, relative to what I
9  might be aware is in the public domain, are we still
10 discussing the sentence, "We strongly believe that a
11 campaign in favor of traditional marriage would not
12 be enough to prevail?"  Is that the sentence we're
13 discussing?
14 BY MR. GOLDMAN:
15 Q   Yes, and the research you did to support
16 the conclusion expressed in that sentence.
17 **A   Relative to the sentence, I do believe**
18 **that that sentence, or at least that sentiment, is**
19 **in the public domain and other contexts as well.  I**
20 **am not clear on whether or not any research**
21 **supporting that is in the public domain.**
22 Q   Now, in response to your conclusion that a
23 campaign in favor of a traditional marriage would
24 not be enough to prevail, you decided you needed to
25 convince voters that there would be consequences if

Page 95

1  same-sex marriage were legalized in California,
2  correct?
3  **A   That is in the public domain, as stated in**
4  **this article.**
5  Q   And one of the consequences that you
6  identified was that individual freedom of expression
7  would be eroded, correct?
8  **A   Yes, that's in the public domain, that's**
9  **correct.**
10 Q   What did you mean by, "individual freedom
11 of expression would be eroded"?
12    MR. TYLER:  Objection.  You are going
13 towards his mental impressions.  If there is
14 something specific you can point to that was public
15 information, or ask him if he ever stated publicly
16 what he meant, that would be acceptable.  But,
17 otherwise, I'm going to object on First Amendment
18 grounds.
19    I'm instructing him not to respond, except
20 to that which was publicly disseminated.
21 BY MR. GOLDMAN:
22 Q   With that instruction, can you answer the
23 question, what did you mean when you said that
24 individual freedom of expression would be eroded as
25 a consequence of legalizing same-sex marriage?

Page 96

1  **A   I can't speak to what I meant, but I can**
2  **speak to what is in the public domain relative to**
3  **this point, which was a citation in a television**
4  **commercial to a case, I believe it's a North Coast**
5  **women's case, that was cited in that particular ad**
6  **in support of a similar statement, if not an**
7  **identical statement, to what you're referring to in**
8  **this particular article.**
9  Q   And a second consequence that you
10 suggested would follow from the legalization of
11 same-sex marriage was that religious freedom would
12 be reduced, correct?
13    MR. TYLER:  Objection.  Same assertion,
14 based upon First Amendment privilege.  I would
15 instruct him not to respond, except to the extent it
16 is identified in the public domain.
17    Limit your response to that which is in
18 the public domain.
19    THE WITNESS:  I believe that point is in
20 the public domain in a number of contexts.  I
21 believe it is in the ballot argument.  I believe it
22 is in the commercial -- first television commercial
23 to ProtectMarriage aired.  And I believe it is
24 mentioned in this article and in the AAPC
25 presentation.

Page 97

BY MR. GOLDMAN:

1  BY MR. GOLDMAN:
2  Q   So that is the answer to my question then,
3  whether that is one of the consequences of same-sex
4  marriage that you identified for California voters
5  is the reduction of religious freedom, correct?
6  **A   I don't know if I used the term,**
7  **"reduction of religious freedom." I believe in this**
8  **article, the language is consequences in the area of**
9  **religious freedom, so I can't say that I have used**
10 **that term, "reduction of religious freedom," but I**
11 **can say, generally, that the area of religious**
12 **freedom was a consequence that was discussed**
13 **publicly in the campaign.**
14 Q   And what is the consequence for religious
15 freedom from legalized same-sex marriage that you
16 conveyed to California voters?
17 MR. TYLER: I'll assert the objection
18 again on First Amendment privilege and instruct my
19 client to only respond to that which was publicly
20 stated and specifically publicly stated.
21 THE WITNESS: The first television ad
22 referenced this subject generally. This gets to a
23 variety of examples of potential consequences, some
24 of which were outlined in a letter from the
25 campaign's counsel, Andy Pugno, to television

Page 98

1  stations. And so I would -- I would point to those
2  as examples.
3  BY MR. GOLDMAN:
4  Q   And another consequence is that children
5  would be taught in public schools that same-sex
6  marriage was okay. Is that correct?
7  MR. TYLER: Objection. Same objection as
8  previously. I'm sorry, Mr. Schubert.
9  Based upon First Amendment privilege, I'm
10 instructing you to only respond to that which was
11 publicly disseminated and specifically only comments
12 that were publicly disseminated.
13 THE WITNESS: Yes. The consequence of
14 children being taught about this in public schools
15 was publicly available on a number of contexts,
16 including ballot arguments, various television ads,
17 radio ads, and other public forums.
18 BY MR. GOLDMAN:
19 Q   Was the concern specifically that children
20 in public school would be taught that same-sex
21 marriage was okay?
22 MR. TYLER: Objection. Instruct you not
23 to respond, based upon the First Amendment
24 privilege.
25 If you have a document that you want to

Page 99

1  present, what the message meant, is a whole
2  different question from what was said.
3  BY MR. GOLDMAN:
4  Q   Do you recall that phrase?
5  **A   I do recall the phrase. I don't recall**
6  **the context in which it was used.**
7  Q   Does the -- if I told you that it was in
8  the arguments in the official voter guide, does that
9  refresh your recollection?
10 **A   It does.**
11 Q   Is that where you think you've heard the
12 phrase that children in public school would be
13 taught that same-sex marriage is okay?
14 **A   It may be. There were a variety of**
15 **variations of that, of expression of that**
16 **consequence in a variety of public forums. And it**
17 **may well be that the ballot arguments had that**
18 **particular variation.**
19 Q   And as you sit here right now, can you
20 recall other consequences to children that you
21 portrayed in messages on behalf of the
22 ProtectMarriage.com Yes on 8 campaign?
23 MR. TYLER: Again, I'll assert the
24 objection based on First Amendment privilege, that
25 you only respond to that which was publicly

Page 100

1  disseminated.
2  MR. COOPER: I would also like just to ask
3  for a clarification that, with respect to the term
4  "you," whether or not it means ProtectMarriage.com
5  campaign or Mr. Schubert personally, if you don't
6  mind, Counsel.
7  MR. GOLDMAN: Can you read back the
8  question?
9  (The question was read as follows:)
10 "Q   And as you sit here right now,
11 can you recall other consequences to
12 children that you portrayed in
13 messages on behalf of the
14 ProtectMarriage.com Yes on 8
15 campaign?"
16 BY MR. GOLDMAN:
17 Q   And by "you" in that sentence, I'm
18 referring to you, as the campaign manager for
19 ProtectMarriage.com. And so these would be things
20 that ProtectMarriage.com put in its messages?
21 MR. TYLER: And I'll assert that same
22 objection previously objected to.
23 THE WITNESS: Relative to information
24 that's been publicly disseminated, in a variety of
25 contexts, there was an effort to point people to the

1   argument that children deserve a mother and a
2   father, and that while death and divorce may prevent
3   it, the ideal situation for children is to be raised
4   by a married mother and father.  And variations on
5   that message were used in a variety of public
6   contexts.
7   BY MR. GOLDMAN:
8       Q   And are there any others that you can
9   recall, as you sit here now?
10      A   Certainly, there were a number of public
11  forums in which this issue of how same-sex marriage
12  would be treated in the schools was discussed.  This
13  became a very prominent part of the campaign.  And
14  so to the extent that your question relates to this
15  general category, there was a widespread discussion
16  of it.
17          In terms of specific elements of it, I
18  would have to respond to a specific question.
19          (Schubert Exhibit 2 was marked for
20          identification.)
21      THE WITNESS:  Thank you.  I'll try not to
22  write on this.
23  BY MR. GOLDMAN:
24      Q   Can you identify this document for the
25  record?

1       MR. COOPER:  Has this been marked as an
2   exhibit?
3       THE WITNESS:  It appears to be.
4       MR. COOPER:  Exhibit No. 2?
5       MR. GOLDMAN:  Exhibit No. 2.
6       THE WITNESS:  This appears to be a direct-
7   mail piece distributed by ProtectMarriage.com.
8   BY MR. GOLDMAN:
9       Q   And have you seen this document before?
10      A   I can't say that I've seen it in its
11  produced format, but I have certainly seen elements
12  of it before.
13      Q   Is it your belief that this is a document
14  that was produced by ProtectMarriage.com for the
15  ProtectMarriage.com Yes on 8 campaign?
16      A   Yes, I would agree to that.
17      Q   Okay.  And if you look at the second page
18  of that document, in the middle of the page, are
19  those three of the consequences of legalizing
20  same-sex marriage that we were just talking about
21  before?
22      MR. TYLER:  Objection.  I want to assert
23  the First Amendment privilege to the extent the
24  document speaks for itself.
25      You can go ahead and respond only to the

1   extent that these items in the middle of the page
2   might have similarity to what you were previously
3   discussing.
4       THE WITNESS:  If I understand the question
5   correctly, are these the same consequences that we
6   discussed previously, I would say that they are
7   generally in the same area.
8       We certainly discussed the impact on
9   churches, which is the middle box there.
10      We did discuss, as I indicated previously,
11  the impact on personal freedom of expression, as
12  cited in the North Coast case.
13      And we have discussed, at great length in
14  public documents, including television or radio ads,
15  the Massachusetts experience, as set forth in the
16  Parker vs Hurley case, which is cited here.
17  BY MR. GOLDMAN:
18      Q   Was this document publicly distributed in
19  California?
20      A   I assume so.  I don't know for a fact, but
21  I assume it was.
22      Q   As the campaign manager for
23  ProtectMarriage.com, do you believe that it was?
24      A   I believe that it was, yes.
25      Q   Now, you said in the article we were just

1   looking at, the Exhibit 1, that the Yes on 8
2   campaign distributed 1.25 million-yard signs.  Is
3   that correct?
4       A   Yes, that's in the article.
5       Q   And the same number of bumper stickers?
6       A   There's information in the public domain
7   on both yard signs and bumper strips that are
8   different in number.  I've seen 1.25 million.  I've
9   seen 1 million; but certainly in the public domain,
10  that a vast number of yard signs and bumper strips
11  were distributed in California.
12      Q   How did the number -- that number of yard
13  signs and bumper strips compare to previous ballot
14  campaigns in which your firm has been involved?
15      A   That number is vastly in excess of
16  anything that I've been involved in before.
17      MR. GOLDMAN:  We're going to mark the next
18  exhibit as Schubert Exhibit 3.
19      (Schubert Exhibit 3 was marked for
20      identification.)
21  BY MR. GOLDMAN:
22      Q   And can you identify this document for the
23  record?
24      A   Is that a question you're asking me?
25      Q   Yes.

Page 105

1    **A   I cannot.**
2    Q   Have you seen this document before?
3    **A   It's difficult to tell from this document**
4    **what it is.  I have seen this image before.**
5    Q   Where have you seen this image before?
6    **A   I can't say specifically.  I can say that**
7    **this is not anything that Schubert Flint put into**
8    **the public domain.**
9    Q   Do you know whether this was prepared by
10   ProtectMarriage.com?
11   **A   I know it wasn't prepared by Schubert**
12   **Flint on behalf of ProtectMarriage.com.**
13   Q   You don't know any more than that?
14   **A   I'm not aware of -- I do not believe it**
15   **was prepared by ProtectMarriage.**
16   Q   Do you have any belief about who prepared
17   it?
18   **A   I don't have any specific knowledge of who**
19   **prepared it.**
20   Q   I know you may not have specific
21   knowledge.  I'm just asking if you have any belief
22   about who prepared it?
23   **A   I don't.**
24   Q   Do you know who Damien Dunkley is?
25   **A   Not to my knowledge, no.**

Page 106

1    MR. TYLER:  Do you have a spelling on that
2    last name, Counsel.
3    MR. GOLDMAN:  Yes, D-o-n-k-l-e-y.
4    Did I get that right?
5    MR. UNO:  No.
6    MR. GOLDMAN:  D-u-n-k-l-e-y.
7    Yes, we're going to mark this as Schubert
8    Exhibit 4.
9    (Schubert Exhibit 4 was marked for
10   identification.)
11   BY MR. GOLDMAN:
12   Q   And can you identify this document for the
13   record?
14   **A   By the term, "this document," are you**
15   **referring to the entirety of the stapled pages?**
16   Q   If you believe that this is a compilation
17   of separate documents, it would be helpful to me if
18   you could let me know that.  I believe I'm showing
19   it to you in the form we got it, but please let me
20   know if you think that this combined separate
21   documents.
22   **A   I believe that this combines a number of**
23   **separate documents.**
24   Q   Okay.  So what is the first document in
25   this exhibit?

Page 107

1    **A   This document would appear to be a**
2    **statement of arguments in favor of Proposition 8.**
3    Q   This is a one-page document?
4    **A   Well, I don't know that this is a document**
5    **that we prepared.  We may have.  I don't know that**
6    **we did.**
7    **It certainly contains arguments that were**
8    **utilized in, for example, the ballot arguments that**
9    **ProtectMarriage submitted.  But I don't have a**
10   **specific recollection of this document in this form.**
11   Q   And by "this document," you mean the first
12   page of this exhibit?
13   **A   The first page.**
14   **And I would note that it does not contain**
15   **a disclaimer, so that furthers my inability to**
16   **recall whether it is a campaign document.**
17   Q   And what is the next document in this
18   exhibit; and please identify which pages you think
19   constitute that document?
20   **A   This appears to be a fact sheet that I do**
21   **recognize.**
22   Q   And that's a two-page document?
23   **A   It is -- it is in this current format.  I**
24   **believe this document exists in different formats,**
25   **but, yes.**

Page 108

1    Q   Was this a document prepared by
2    ProtectMarriage.com for the ProtectMarriage Yes on 8
3    campaign?
4    MR. TYLER:  Let me instruct my client that
5    as it pertains to whether or not this -- if this was
6    a document that was publicly distributed, then you
7    can testify to this document from that perspective,
8    but not to the extent that it was prepared for any
9    internal purposes, or even whether it was prepared.
10   Only to the extent that this was a document that was
11   publicly distributed, can you respond.
12   THE WITNESS:  This was a document that was
13   widely distributed by ProtectMarriage.com.
14   BY MR. GOLDMAN:
15   Q   And it was produced by ProtectMarriage.com
16   for the Yes on 8 campaign, correct?
17   **A   That would be correct.**
18   Q   What is the next document in this?
19   **A   Questions and answers about Proposition 8.**
20   Q   Is that a three-page document?
21   **A   Yes, in this format it was a three-page**
22   **document.**
23   Q   Is this also a document that was created
24   by ProtectMarriage.com for the ProtectMarriage.com
25   Yes on 8 campaign?

Page 109

1    **A   I believe it is, yes.**
2    Q   And it was publicly distributed?
3    **A   Yes.**
4    Q   What is the next document in the exhibit?
5    **A   Myths and facts about Proposition 8. And**
6    **this format appears to be a two-page document.**
7    Q   Was this document produced by
8    ProtectMarriage.com for the Yes on 8 campaign?
9    **A   Yes.**
10   Q   And it was publicly distributed in
11   California?
12   **A   Yes.**
13   Q   What is the next document in the exhibit?
14   **A   The next document would be a form.**
15   Q   Is it a one-page document, or do the
16   subsequent pages also form part of the document?
17   **A   This is a one-page document.**
18   Q   Okay. And what is this one-page document?
19   **A   This is a document that was publicly**
20   **distributed to allow people to inform**
21   **ProtectMarriage that they were a public supporter of**
22   **Proposition 8.**
23   Q   And the document was created by
24   ProtectMarriage.com for the ProtectMarriage Yes on 8
25   campaign?

Page 110

1    **A   That's correct.**
2    Q   What is the next document in this exhibit?
3    **A   The next document is entitled**
4    **"Contribution Form."**
5    Q   Do you mean donation form?
6    **A   Donation form, correct.**
7    Q   And is that a two-page document?
8    **A   No, this is a one-page document.**
9    Q   One page. Okay.
10   Again, the same questions: Was this
11   created by ProtectMarriage.com for the Yes on 8
12   campaign and publicly distributed in California?
13   **A   It was -- it was created by -- for the**
14   **ProtectMarriage.com campaign. It was distributed**
15   **publicly, so the answer would be yes.**
16   Q   And the final document in this exhibit,
17   could you identify that document.
18   **A   This appears to be a document setting**
19   **forth information that would subsequently be printed**
20   **on a contribution envelope that someone might use to**
21   **make a contribution to ProtectMarriage.com.**
22   Q   And this was created by
23   ProtectMarriage.com for the purpose of the Yes on 8
24   campaign, correct?
25   **A   That's correct.**

Page 111

1    Q   And it was publicly distributed in
2    California?
3    **A   I believe it was.**
4    Q   What is the first television commercial
5    that the ProtectMarriage.com Yes on 8 campaign ran?
6    **A   It was a television commercial called**
7    **"Whether You Like It or Not."**
8    Q   And did you begin airing that commercial
9    on September 9 -- September 29, 2008?
10   **A   Yes.**
11   Q   And for how long did that commercial air?
12   **A   I believe it aired for approximately eight**
13   **or nine days.**
14   Q   And was it aired throughout California?
15   **A   I believe it aired in every media market**
16   **in California. I don't know that every media market**
17   **would cover and state in its entirety, but it did**
18   **air, what I would say, statewide.**
19   Q   Do you know how many times it aired?
20   **A   I do not.**
21   MR. GOLDMAN: We're going to mark this
22   next exhibit Schubert Exhibit 5.
23   (Schubert Exhibit 5 was marked for
24   identification.)
25   ////

Page 112

1    BY MR. GOLDMAN:
2    Q   Can you identify this document for the
3    record?
4    **A   This appears to be a press release issued**
5    **by ProtectMarriage on the occasion of the**
6    **introduction of our first television commercial.**
7    Q   Okay. And you believe this is a true and
8    correct copy of the press release that
9    ProtectMarriage.com issued on the release of its
10   first television commercial, correct?
11   **A   Yes.**
12   MR. GOLDMAN: We are marking as Schubert
13   Exhibit 6.
14   (Schubert Exhibit 6 was marked for
15   identification.)
16   BY MR. GOLDMAN:
17   Q   Can you identify this document for the
18   record?
19   MR. TYLER: Let me just insert a caveat
20   briefly, and that is, for my client, if any of these
21   documents are produced to you, and they are not a
22   document that was publicly produced, then please so
23   state before you respond to any questions, before
24   you respond to -- well, I'll leave it at that.
25   THE WITNESS: I believe this is an e-mail

Page 113

1   blast that was distributed.  If I recall correctly,
2   it was distributed the evening before our first
3   television commercial aired.
4   BY MR. GOLDMAN:
5       Q   And that was distributed by
6   ProtectMarriage.com, in connection with the
7   ProtectMarriage.com Yes on 8 campaign, correct?
8       A   That's correct.
9       Q   To how many people was this e-mail blast
10  sent, approximately?
11      A   I don't have a precise answer.  I can
12  estimate that it was sent by ProtectMarriage to
13  approximately 90,000 people, 90,000 e-mail
14  addresses.
15      MR. GOLDMAN:  Now we're marking as
16  Schubert Exhibit 7.
17      (Schubert Exhibit 7 was marked for
18      identification.)
19  BY MR. GOLDMAN:
20      Q   Can you identify this document for the
21  record, please?
22      A   This appears to be a media advisory that
23  ProtectMarriage issued to the media, informing them
24  of a press conference on September 29th to reveal
25  the first Yes on 8 television commercial, the one

Page 114

1   we've been discussing.
2       Q   And that was in connection with the
3   Yes on 8 campaign?
4       A   Yes.
5       MR. GOLDMAN:  We are marking now Schubert
6   Exhibit 8.
7       (Schubert Exhibit 8 was marked for
8       identification.)
9   BY MR. GOLDMAN:
10      Q   If you would please identify this document
11  for the record.
12      Again, if it's more than one document in
13  this exhibit, let me know that.
14      A   I believe that these are separate
15  documents.  I believe both are -- I don't -- well,
16  relative to the first document.
17      Q   And that's a two-page document?
18      A   It would appear to be a two-page document.
19      I cannot confirm that this was prepared by
20  ProtectMarriage.com, though it may have been.
21      Q   What is the address at the bottom of the
22  page?
23      A   That is an address used by
24  ProtectMarriage.
25      I just -- in terms of looking at this

Page 115

1   document, the format of the document is not familiar
2   to me, but I'm -- which is the basis of my
3   hesitation.
4       Q   But at least based on the information
5   here, you do believe that it was a document prepared
6   by ProtectMarriage.com?
7       A   Based on the information that I see here,
8   I believe that it is a document, in draft form, that
9   may have been an attempt to compile information to
10  substantiate the television commercial.
11      It is not clear to me that this is a
12  document that was publicly distributed.  And, again,
13  I have no specific familiarity with this document,
14  but there are elements of it that suggest to me that
15  it was --
16      MR. COOPER:  In light of the testimony
17  thus far, it sounds like the witness is of the
18  opinion that this document is not a publicly
19  distributed document; that is a draft of a document
20  that may or may not have been publicly distributed.
21      We do believe that draft documents are
22  within the First Amendment privilege of
23  ProtectMarriage.  And I am concerned, in light
24  of what I have just heard, that this may have been
25  inadvertently produced.

Page 116

1       But in the circumstances, I would raise
2   the objection that I previously stated and would
3   look to counsel for the witness to preclude further
4   testimony with respect to this particular document.
5       MR. TYLER:  I concur and would instruct
6   Mr. Schubert not to answer any further questions
7   with regard to this document, based upon his
8   testimony that it is a draft.
9       And the first -- as we're reviewing these
10  documents, Mr. Schubert, regardless of the question
11  that is asked of you, the first question that needs
12  to be addressed or first issue that needs to be
13  addressed is whether or not it's a document that has
14  been publicly distributed and consider that first.
15  And I will assert such objections as well.
16  BY MR. GOLDMAN:
17      Q   Let me ask you about the next document.
18  That appears to be a three-page document.
19      And could you identify that document for
20  the record?
21      MR. TYLER:  Let me assert an objection,
22  and my objection is there's no foundation that this
23  is, first, a document that was publicly distributed;
24  and, second, that it's a document of the campaign.
25      And to the extent that it is not a

Page 117

1   document publicly distributed, I assert a First
2   Amendment objection to that and instruct him not to
3   respond to that extent.
4         THE WITNESS:  I am unclear as to what I'm
5   responding to.  If you're asking me, is this a
6   public document --
7   BY MR. GOLDMAN:
8       Q   No, that's not my question.
9       A   Okay.
10      Q   My question was whether you could identify
11  this document.
12        MR. TYLER:  Objection.  Lacks foundation.
13        I think you can respond to that question,
14  though, whether you can identify it or not.
15        THE WITNESS:  This appears to be an
16  internal --
17        MR. TYLER:  Mr. Schubert, please just
18  respond to the question.  He asked whether you can
19  identify it or not.
20        THE WITNESS:  Yes.
21  BY MR. GOLDMAN:
22      Q   What is the document?
23      A   This appears to be an internal campaign
24  document.
25        MR. TYLER:  Based upon that, I instruct

Page 118

1   you not to respond any further, based upon the First
2   Amendment privilege.
3   BY MR. GOLDMAN:
4       Q   Were the remarks reflected in this
5   document remarks that were publicly delivered in the
6   ProtectMarriage.com Yes on 8 campaign?
7         MR. TYLER:  I would assert an objection
8   based on First Amendment privilege and instruct you
9   only to respond to whether or not the specific words
10  were publicly distributed in the campaign, as
11  identified in this document, if you can recall.
12        THE WITNESS:  Relative to the bulk of the
13  first page of this document that contains
14  information under the heading, Frank Schubert, I
15  can't -- I do not believe that I read this document
16  verbatim; in fact, I'm quite sure I did not.
17        But I do believe that the public domain
18  will show coverage of that press conference that
19  reflects the sentiments, at least, in the bullet
20  points in the middle of this document.
21  BY MR. GOLDMAN:
22      Q   Was the press conference recorded, to your
23  knowledge?
24      A   It was -- it may have been recorded by
25  media.  I don't know.

Page 119

1       Q   Do you have copies of the press conference
2   recorded?
3       A   I do not.
4       Q   Do you know whether anyone does?
5         MR. TYLER:  Objection.  Vague.  Ambiguous.
6         THE WITNESS:  I am not aware of any
7   recorded copy of the press conference.
8         MR. GOLDMAN:  We're going to mark a DVD --
9   CD as Schubert Exhibit 8 --
10        THE REPORTER:  9.
11        MR. GOLDMAN:  9, sorry.
12        (Schubert Exhibit 9 was marked for
13        identification.)
14        MR. GOLDMAN:  We will play the video that
15  is contained on the CD.
16        (Video CD played.)
17        MR. TYLER:  As far as I'm concerned, you
18  can identify merely that the CD is being played, as
19  long as the CD is part of the record.  It's up to
20  him as to how he wants to handle it.
21        MR. STROUD:  Did you hear the question?
22        The court reporter wants to know whether
23  you want her to take down the entirety of the CD or
24  whether to say, "CD plays."
25        MR. GOLDMAN:  You don't have to take down

Page 120

1   the context.
2         MR. STROUD:  As long as we're off the
3   record, if you look carefully, you'll see a very
4   handsome man.
5         Oh, off the record.
6         THE VIDEOGRAPHER:  We're not off the
7   record.  We're still on video record, just to let
8   you know.
9         MR. TYLER:  We'll look closely for you.
10        MR. STROUD:  Exactly.  I'm in the
11  commercial.
12        That's not me.
13        (Video CD played.)
14  BY MR. GOLDMAN:
15      Q   Could you identify the video that we just
16  watched?
17      A   I believe I've seen it before.  That is
18  the first television commercial ProtectMarriage.com
19  aired.
20      Q   Was there also a version of this ad
21  prepared for radio?
22      A   There was a radio ad that was prepared and
23  distributed publicly, that included Mayor Newsom's
24  comments, yes.
25      Q   Do you know when that radio ad began to

Page 121

1  air?
2      **A   I believe, though I'm not certain, I**
3  **believe it began airing on September 29th.**
4          MR. GOLDMAN:  We're going to mark that as
5  Schubert Exhibit 10.
6          (Schubert Exhibit 10 was marked for
7          identification.)
8          MR. TYLER:  I would like to assert an
9  objection real quick to the extent that he's
10 testifying to an exhibit -- is it the audio of the
11 radio?
12         MR. GOLDMAN:  Well, hopefully, that's what
13 he'll be able to tell us.
14         MR. TYLER:  Okay.  I'm sorry.
15         So you're going to identify Exhibit 10
16 here?
17         MR. GOLDMAN:  Yes.
18         MR. TYLER:  Okay.  Thank you.
19         (Video CD played.)
20 BY MR. GOLDMAN:
21     Q   And can you identify the audio file that
22 we just listened to?
23     **A   Yes, that's a 60-second radio commercial,**
24 **produced by ProtectMarriage.com.**
25     Q   And was that publicly disseminated within

Page 122

1  California?
2      **A   Yes, it was.**
3      Q   Was it played in -- statewide in
4  California?
5      **A   I don't know.  I don't know.  It certainly**
6  **was played in the major media markets.  I don't**
7  **recall if it ran statewide or not.**
8      Q   Do you recall for how long you ran that
9  ad, the duration?
10     **A   I don't specifically.  I believe it ran**
11 **for a period of time longer than the television**
12 **commercial that I previously testified to, but I**
13 **don't know the specific time frame.**
14     Q   After blanketing California with the
15 "Whether You Like It Or Not" ad, did the Yes on 8
16 campaign focus its message on education?
17         MR. TYLER:  Objection.  Based on First
18 Amendment privilege, to the extent of whatever you
19 focused on, you can testify only to whether or not
20 something was made public.
21         THE WITNESS:  The second television ad
22 that ProtectMarriage.com ran was an ad titled "It's
23 Already Happened."  And it discussed the experience
24 of a Massachusetts couple.  And so that -- it
25 certainly touched on the public schools.

Page 123

1  BY MR. GOLDMAN:
2      Q   I was asking a slightly different
3  question.  And feel free to look back at Exhibit 1,
4  if you want to, on page 46.
5          And my question was whether, after
6  blanketing California with "Whether You Like It Or
7  Not," ProtectMarriage.com focused its message on
8  education?
9          MR. TYLER:  Can you identify, Counsel,
10 where on Exhibit 1 it addresses --
11         THE WITNESS:  In the right-hand column,
12 under the heading, "The Response Period," about just
13 over half of the way down.
14         MR. TYLER:  On page 46?
15         MR. GOLDMAN:  Page 46, yeah.
16         MR. TYLER:  Of Exhibit 1?
17         MR. GOLDMAN:  Yes.
18         THE WITNESS:  I would answer that question
19 in the following way:  The statement in the article
20 speaks for itself.  The ads that aired following the
21 "Whether You Like It Or Not" ad speak for
22 themselves.  Many of them, though not all of them,
23 deal with education.
24 BY MR. GOLDMAN:
25     Q   Well, what is the title of the next ad

Page 124

1  that you aired, after "Whether You Like It Or Not"?
2      **A   I believe the title was "It's Already**
3  **Happened."**
4          MR. GOLDMAN:  We will mark a CD as
5  Schubert Exhibit 11.
6          (Schubert Exhibit 11 was marked for
7          identification.)
8          (Video CD played.)
9  BY MR. GOLDMAN:
10     Q   And can you identify the video that we
11 just reviewed for the record?
12     **A   Yes, that's a 30-second television**
13 **commercial that was produced by ProtectMarriage.com.**
14     Q   And was that publicly aired throughout
15 California in connection with the Yes on 8 campaign?
16     **A   I believe the ad did air in all media**
17 **markets, yes.**
18         MR. TYLER:  I'm sorry, Mr. Goldman.  What
19 exhibit was that?
20         MR. GOLDMAN:  11.
21         MR. UNO:  11.
22 BY MR. GOLDMAN:
23     Q   Oh, and do you remember the date on which
24 that ad started to air, approximately?
25     **A   I don't, but it would have aired**

Page 125

1    following -- well, I don't remember specifically.
2        Q   Do you know for approximately how long
3    that commercial was aired in California?
4        A   Approximately a week, seven to eight days,
5    somewhere in that time frame.
6        Q   Was there also a radio ad that was based
7    on that commercial?
8        A   I don't think so. I don't recall one.
9            MR. GOLDMAN: We're going to mark another
10   video, Schubert Exhibit 12.
11           (Schubert Exhibit 12 was marked for
12           identification.)
13           (Video CD played.)
14   BY MR. GOLDMAN:
15       Q   And can you identify this video for the
16   record?
17       A   Yes, this is a 30-second television
18   commercial, entitled "Everything To Do With
19   Schools," produced by ProtectMarriage.com.
20       Q   And when did that commercial start to air
21   in California?
22       A   My recollection is that it began airing
23   the 20th of October, 2008.
24       Q   And for how long was that commercial aired
25   in California?

Page 126

1        A   I believe it aired for one week,
2    approximately.
3        Q   And were these commercials also available
4    online for people who wanted to view them?
5        A   Yes, they were available through the
6    ProtectMarriage website, and also through YouTube.
7        Q   And they were available from the time they
8    were first aired on television, through the duration
9    of the campaign. Is that correct?
10       A   I don't know. I don't know specifically
11   how long they were available for. They may very
12   well have been. They certainly would have been
13   available on YouTube for -- and may still be. I
14   don't know.
15       Q   They were uploaded to YouTube by
16   ProtectMarriage.com?
17       A   I believe so, yes.
18       Q   As you sit here today, do you recall ever
19   removing one of the commercials that were available
20   through the ProtectMarriage.com website, from that
21   website?
22       A   I don't have any recollection of that, no.
23       Q   Why don't we take a short break since we
24   have been going for a while?
25           MR. COOPER: Counsel, what are your plans

Page 127

1    with respect to a lunch break?
2            MR. GOLDMAN: I see it's eight minutes to
3    12:00.
4            THE VIDEOGRAPHER: We are going off the
5    record. The time is approximately 11:51 a.m.
6            (At the hour of 11:51 p.m., the
7            luncheon recess was taken; the
8            proceedings scheduled to resume at
9            12:30 p.m.)
10   ///
11   ///
12   ///
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 128

1            (At the hour of 12:37 p.m., the
2            following proceedings were had at
3            the same place with the same persons
4            present.)
5            THE VIDEOGRAPHER: We are going back on
6    the record. The time is approximately 12:37 a.m.
7            MR. GOLDMAN: Let's mark the next document
8    as Schubert Exhibit 13.
9            (Schubert Exhibit 13 was marked for
10           identification.)
11
12           FRANK SCHUBERT,
13           having previously been duly sworn,
14           testified further as follows:
15           EXAMINATION (RESUMED)
16   BY MR. GOLDMAN:
17       Q   And, Mr. Schubert, can you identify this
18   document for the record?
19       A   I cannot.
20       Q   You have not seen this document before?
21       A   I don't recall seeing this, no.
22       Q   And does seeing this document refresh your
23   recollection about whether ProtectMarriage.com
24   hosted any town halls?
25       A   No, it does not.

Page 129

1    MR. GOLDMAN: And the next document is
2  being marked as Schubert Exhibit 14.
3    (Schubert Exhibit 14 was marked for
4    identification.)
5  BY MR. GOLDMAN:
6    Q   Can you identify this document for the
7  record?
8    **A   No, I cannot.**
9    Q   You have never seen this before?
10   **A   I don't recall seeing this, no.**
11   Q   Do you recall whether ProtectMarriage.com
12  ever made official spokespersons from the ballot
13  initiative available for media comment at a town
14  hall meeting hosted by the San Diego County
15  Republican party?
16   **A   I previously testified that I don't recall**
17  **any town halls hosted by ProtectMarriage. I do**
18  **recall a meeting of the Republican party in**
19  **San Diego, but I don't recall that meeting being**
20  **described as a town hall.**
21   Q   Okay. And at that meeting that you recall
22  of the San Diego Republican party, did
23  ProtectMarriage.com make official spokespersons
24  available at that meeting for media comment?
25   **A   I don't know. I don't recall who attended**

Page 130

1    **that meeting; whether or not they were there on**
2    **behalf of ProtectMarriage or not.**
3    Q   Do you recall the names of the people who
4  were there?
5    **A   I do not.**
6    Q   Can you look back at the previous exhibit
7  I showed you, which is Exhibit 13, and just look at
8  the names that appear next to the word "who"?
9    And my question is, are any of the people
10  you see listed there official spokespersons for
11  ProtectMarriage.com?
12   **A   The only one I see is Ron Prentice, who is**
13  **chairman of ProtectMarriage.com.**
14   Q   Are you familiar with the other people
15  listed in that paragraph?
16   **A   I'm only familiar with Ron Prentice and**
17  **Jim Franklin.**
18   Q   And how do you know Jim Franklin?
19   **A   Jim Franklin is a pastor in Fresno,**
20  **California.**
21   Q   And how is it that you know Jim Franklin?
22   **A   I have been on conference calls with**
23  **Pastor Franklin, and that's primarily how I know**
24  **him.**
25   Q   Is it fair to say you know him through

Page 131

1  your work on the ProtectMarriage campaign?
2    MR. TYLER: Objection. First Amendment
3  privilege. He's already testified he knows
4  Mr. Franklin. Whether or not it's through the
5  campaign or not is privileged information; to whom
6  he associates with concerning the campaign.
7  BY MR. GOLDMAN:
8    Q   When did you first come to know Jim
9  Franklin?
10   **A   I can't say specifically. I can't say**
11  **specifically, but in rough terms, it would have been**
12  **sometime after June 2008.**
13   MR. GOLDMAN: Okay. We're going to mark a
14  CD this time as Schubert Exhibit 15.
15   (Schubert Exhibit 15 was marked for
16    identification.)
17   (Video CD played.)
18  BY MR. GOLDMAN:
19   Q   Can you identify that video for the
20  record?
21   **A   Yes, it's a 30-second television**
22  **commercial, produced for ProtectMarriage.com. It's**
23  **a Spanish-language version of "It's Already**
24  **Happened."**
25   Q   Now, did you air television commercials in

Page 132

1  languages other than English and Spanish?
2    **A   There was an Asian television commercial**
3  **that was aired.**
4    Q   What language was that aired in?
5    **A   I believe it was Chinese.**
6    Q   And was that a translation of an ad that
7  was aired in English?
8    **A   I don't recall the source material for**
9  **that ad.**
10   Q   Do you recall the title of that ad?
11   **A   I do not.**
12   Q   Is it fair to say, in some cases, you
13  simply translated some materials that were in
14  English into other languages, but, in other cases,
15  you created ads or materials in a different language
16  that did not have an English counterpart in the
17  campaign?
18   MR. TYLER: Objection. Vague. Overbroad.
19   THE WITNESS: We produced ads -- we
20  produced radio ads and television ads in Spanish
21  that did not have an English counterpart.
22  BY MR. GOLDMAN:
23   Q   Do you still have copies of all of the ads
24  that ProtectMarriage.com aired?
25   **A   Yes.**

Page 133

1    **If I may just clarify, I believe we do. I**
2    **don't know if we have the Chinese ad. I don't know**
3    **that.**
4        Q    Do you know who would have that ad?
5        **A    I don't.**
6        Q    Who produced that ad?
7        **A    I don't know. It was -- my recollection**
8    **is it was --**
9        MR. TYLER: I'm sorry. Let me assert an
10   objection, based upon First Amendment privilege, and
11   instruct you not to respond.
12       MR. GOLDMAN: My question is just for the
13   purpose of tracking down the material, to the extent
14   we don't already have it.
15       MR. TYLER: To the extent that the
16   information was ever made public previously, you can
17   testify as to who you might know would have that, if
18   something was made public.
19       THE WITNESS: I'm not aware of any public
20   disclosure of that information.
21   BY MR. GOLDMAN:
22       Q    Do you have nonpublic information -- just
23   yes or no, do you have nonpublic information about
24   who produced that video?
25       **A    I don't.**

Page 134

1        MR. GOLDMAN: Let's mark the next document
2    as Schubert Exhibit 16.
3        (Schubert Exhibit 16 was marked for
4        identification.)
5    BY MR. GOLDMAN:
6        Q    If you can, I would like you to identify
7    this document for the record.
8        **A    This was an e-mail blast that was sent to**
9    **our e-mail distribution list.**
10       Q    And it was created by ProtectMarriage.com
11   for use in the Yes on 8 campaign, correct?
12       **A    Yes.**
13       MR. GOLDMAN: The next document is
14   Schubert Exhibit 17.
15       (Schubert Exhibit 17 was marked for
16       identification.)
17   BY MR. GOLDMAN:
18       Q    Again, I would like you to identify this
19   document for the record.
20       **A    I don't have any specific recollection of**
21   **this document.**
22       Q    Do you have a belief about what this
23   document is?
24       **A    It appears to be a press release, but I**
25   **don't recall seeing it previously. I just don't**

Page 135

1    **recall seeing it.**
2        MR. COOPER: Counsel, my version has a
3    blank page as page 3. Is that inadvertent, or is
4    that actually part of the exhibit?
5        MR. GOLDMAN: I think that's how it was
6    produced to us.
7        MR. COOPER: Okay.
8        MR. GOLDMAN: The next document is being
9    marked as Schubert Exhibit 18.
10       (Schubert Exhibit 18 was marked for
11       identification.)
12   BY MR. GOLDMAN:
13       Q    If you can identify this document for the
14   record.
15       **A    An e-mail blast distributed by**
16   **ProtectMarriage.com, I believe either the night**
17   **before or the morning of the airing of the**
18   **television ad featuring the Wirthlin couple.**
19   **"Everything To Do With Schools," I believe is the**
20   **name of it.**
21       Q    And did this ad -- sorry.
22       Yes, did this ad, did that coincide with
23   the start of the Yes on 8 bus tour that you
24   previously testified about?
25       **A    Yes, it did.**

Page 136

1        Q    And I think you testified that was a
2    week-long bus tour. Is that correct?
3        **A    I don't think I testified to the duration**
4    **at all, but it was in that range, seven, eight,**
5    **days, something like that.**
6        MR. GOLDMAN: Next document we are marking
7    as Schubert Exhibit 19.
8        (Schubert Exhibit 19 was marked for
9        identification.)
10   BY MR. GOLDMAN:
11       Q    Can you identify this document for the
12   record?
13       **A    Yes, it's a press release produced by**
14   **ProtectMarriage.com on the occasion of the statewide**
15   **bus tour and the airing of the television**
16   **commercial, "Everything To Do With Schools."**
17       Q    And do you see, in the second paragraph of
18   this document, it refers to a press conference?
19       Do you see that?
20       **A    Yes. First three words?**
21       Q    Yes.
22       Do you know if that press conference was
23   recorded?
24       **A    I do not.**
25       Q    You can see it also refers in the first

Page 137

1  paragraph to a rally.
2      Do you have an understanding about whether
3  the rally is something different from the press
4  conference?  Are those two separate events or the
5  same event?
6      **A   They were separate events.**
7      Q   And do you know if the rally was recorded?
8      **A   I do not.**
9      Q   You -- well, there's a Frank Schubert
10  quoted in the second paragraph of this document.  Do
11  you know whether that refers to you?
12      **A   Yes.**
13      Q   Do you have any reason to doubt that you
14  made the statement attributed to you in that
15  paragraph?
16      **A   No, I have no reason to doubt that.**
17      MR. GOLDMAN:  Let's mark the next exhibit
18  as Schubert Exhibit 20.
19      (Schubert Exhibit 20 was marked for
20      identification.)
21      MR. TYLER:  I want to first assert an
22  objection before any questions are asked concerning
23  this document.  To the extent that this document is
24  a -- was not publicly distributed and is an internal
25  communication or draft or otherwise internally

Page 138

1  confidential to the campaign, I would instruct you
2  not to respond to any questions concerning the
3  content.
4      THE WITNESS:  This was an internal
5  document.
6  BY MR. GOLDMAN:
7      Q   Well, was it a script for robocalls?
8      MR. TYLER:  I would instruct you not to
9  respond to that question, based upon the First
10  Amendment privilege.  So I assert my objection on
11  that basis.
12  BY MR. GOLDMAN:
13      Q   Do you know if the words in this document
14  were read to members of the public at large?
15      MR. TYLER:  I continue my objection and
16  instruct you not to respond to this question with
17  regard to this internal document.
18      The robocalls have been produced, and the
19  robocalls speak for themselves.
20      MR. GOLDMAN:  On what basis --
21      MR. COOPER:  Might these be the robocalls
22  themselves, is that counsel's inquiry?
23      MR. GOLDMAN:  Yes.
24      MR. COOPER:  The actual text of the
25  robocalls?

Page 139

1      MR. GOLDMAN:  Yes, that's what I'm trying
2  to establish.
3      MR. COOPER:  You might ask the witness if
4  he knows the answer to that question, just to
5  clarify.
6      THE WITNESS:  The answer to the question
7  is, it depends on one's understanding of
8  "distributed to the public at large," to use your
9  quote.
10  BY MR. GOLDMAN:
11      Q   Is this the text for robocalls?
12      **A   To --**
13      MR. TYLER:  Well, let me assert an
14  objection, based upon the First Amendment privilege,
15  that I would instruct you that you can only
16  respond -- at least by my instruction, that you
17  would only respond as to whether or not this is the
18  exact text that was used, or if any was used for
19  purposes of robocalls, that were made publicly
20  available.
21      THE WITNESS:  This appears to be the text
22  of calls that were recorded and delivered
23  automatically to certain individuals.  I would not
24  characterize them as counsel did, as the public at
25  large.

Page 140

1  BY MR. GOLDMAN:
2      Q   Well, what are robocalls?
3      **A   Well, the term "robocall" is an automated**
4  **telephone call.**
5      Q   And these are recordings -- the words on
6  this page are what was read in the robocalls.  Is
7  that correct?
8      **A   Yes.**
9      Q   And those robocalls --
10      **A   Certain robocalls.**
11      Q   Right.
12      And those robot calls -- robocalls were
13  produced by ProtectMarriage.com on the Yes on 8
14  campaign, correct?
15      **A   The robocalls were produced by the Yes on**
16  **8 campaign for use with selected people.  You began**
17  **this discussion in the context of the public at**
18  **large, and I'm attempting to differentiate between**
19  **the public at large and those who received these**
20  **robocalls.**
21      Q   They were targeted groups of voters who
22  received these robocalls, correct?
23      **A   That's not the description that I have**
24  **used.  These particular calls were targeted to**
25  **specific individuals for reasons of strategic value**

```
                                          Page 141
1   in the campaign.
2       Q    And they are ProtectMarriage.com
3   robocalls, correct?
4       A    They are, correct.
5       Q    Does this document, which has 15 events
6   listed, to your knowledge, is a complete list
7   of the rallies that were held as part of the
8   Yes on 8 bus tour?
9       A    Yes, as far as I know.
10      Q    Do you know whether any of these rallies
11  were recorded?
12      A    I do not.
13      Q    Were these rallies referred to as marriage
14  pledge rallies?
15          MR. TYLER: Objection. Vague. Ambiguous.
16          THE WITNESS:  I can't testify as to how
17  they were referred to.  I can testify that it's
18  publicly known that people attending the rallies had
19  an opportunity to take a marriage pledge.
20  BY MR. GOLDMAN:
21      Q    And what is a marriage pledge?
22      A    In the context of the Proposition 8
23  campaign, it was an opportunity for people to affirm
24  their support for traditional marriage and affirm
25  their support, their recognition of it, as a
```

```
                                          Page 142
1   foundation of society; affirm their commitment to
2   restore marriage to California law; and to -- and
3   affirm their commitment to support Proposition 8,
4   among other matters.
5          MR. GOLDMAN:  Let's mark the next document
6   as Schubert Exhibit 21.
7          (Schubert Exhibit 21 was marked for
8          identification.)
9   BY MR. GOLDMAN:
10      Q    And if you would please identify this
11  document for the record?
12          MR. TYLER:  Again, before you respond to
13  this question, I would like to assert an objection,
14  on the basis of First Amendment privilege, to the
15  extent that this is not a document that has been
16  publicly disseminated, and that to the extent it is
17  nonpublic and reflects internal communication, I'll
18  instruct you not to respond to any questions
19  concerning content of this document.
20          THE WITNESS:  This is a nonpublic internal
21  campaign document.
22          MR. GOLDMAN:  And if I could ask,
23  Mr. Tyler, a question of clarification.  Whose First
24  Amendment privilege are you asserting?
25          MR. TYLER:  I'm asserting he has a First
```

```
                                          Page 143
1   Amendment privilege, to the extent that he's
2   participated in this campaign.
3          MR. GOLDMAN:  So you are asserting his
4   First Amendment privilege as the paid campaign
5   manager to protect ProtectMarriage.com.  Is that
6   correct, just so I understand?
7          MR. TYLER:  Yes, as well as being an
8   individual.
9          MR. COOPER:  And I would add, as well,
10  that ProtectMarriage.com would assert its privilege,
11  with respect to the document that the witness has
12  now described as an internal campaign document.
13          I don't know the circumstances under which
14  this was produced.  I suspect this may have been
15  produced inadvertently.  But given the character of
16  the document the witness has just described,
17  ProtectMarriage.com also would assert an objection
18  and...
19          MR. GOLDMAN:  I don't believe it is
20  inadvertently produced.  I believe that the request
21  called for materials that were prepared to guide
22  people who were making public statements; that they
23  would use in order to make public statements.
24          This is the best we have, short of a
25  recording, of the public statements that were
```

```
                                          Page 144
1   actually made.  These were remarks prepared for
2   public distribution and dissemination.
3          MR. COOPER:  And we --
4          MR. GOLDMAN:  Are you now asserting that
5   remarks that were prepared to be delivered to the
6   public are protected by the First Amendment and not
7   discoverable in this lawsuit?
8          MR. COOPER:  We have asserted from the
9   beginning that internal documents that are in the
10  nature of talking points for public events and,
11  therefore, are distinguishable from, for example,
12  the scripts of robocalls that we previously
13  discussed, would be different in nature and would be
14  internal, would be confidential.
15          They might or might not have been uttered
16  at the public event, and like any other internal
17  notes that relate to a possible public discussion.
18  So, yes, we have always maintained that documents of
19  this kind would be internal and confidential and
20  privileged.
21          MR. GOLDMAN:  Well, if you're going to
22  instruct the witness not to answer any questions
23  about it and without -- if you want to decide you
24  want to recall this document as inadvertently
25  produced, that's a decision you can make.
```

Page 145

1      And without prejudice to your ability to
2  do that, are you prepared to stipulate, nonetheless,
3  to the authenticity of this document, in the event
4  that you decide not to assert a First Amendment
5  privilege over it?
6      MR. COOPER: If we decide not to do so,
7  assert a First Amendment privilege?
8      MR. GOLDMAN: Yes, if you decide not to
9  recall the document as inadvertently produced.
10     MR. COOPER: And I appreciate that,
11 counsel, because I don't know how we're going to
12 decide that issue until we've inquired into the
13 nature of the production. But at that time, we
14 would be happy to pursue potentially stipulating to
15 its authenticity with you.
16     MR. GOLDMAN: Right. The difficulty I
17 have, as you understand, is witnesses who are
18 knowledgeable about the document are being
19 instructed not to answer any questions about the
20 document.
21     MR. COOPER: Yes. And if this document is
22 ultimately discoverable, either because we withdraw
23 our claim of privilege or it ultimately is not
24 sustained, then we will not put you to the trouble
25 of recalling this witness in order to authenticate

Page 146

1  it.
2      Is that a fair enough approach?
3      MR. GOLDMAN: Yes. Thank you for that,
4  Mr. Cooper.
5      The next document is being marked as
6  Schubert Exhibit 22.
7      (Schubert Exhibit 22 was marked for
8      identification.)
9      MR. TYLER: I'll assert an objection to
10 this Exhibit 22.
11     Instruct my client not to respond to the
12 extent that this document is a nonpublic document
13 that reflects internal communications or impressions
14 or strategy.
15     To the extent that the First Amendment
16 applies, I would instruct my client not to respond
17 to any questions concerning its content.
18     THE WITNESS: This is a nonpublic internal
19 document.
20     MR. COOPER: I would add, as well, my
21 objection to counsel for the witness.
22     MR. GOLDMAN: Then may we have the same
23 agreement with respect to this document?
24     MR. COOPER: Certainly.
25     MR. GOLDMAN: Thank you.

Page 147

1      MR. COOPER: Which number was this one?
2  I'm sorry.
3      MR. UNO: 22.
4      MR. TYLER: Thank you.
5      (Schubert Exhibit 23 was marked for
6      identification.)
7  BY MR. GOLDMAN:
8  Q  Can you identify this document for the
9  record, Mr. Schubert?
10     MR. TYLER: Let me, for the record, state
11 for the record he has been handed a document marked
12 as Exhibit 23. And as well, to the extent this
13 document is a nonpublic document pertaining to the
14 campaign, I would instruct my client, based upon the
15 First Amendment privilege, not to respond to any
16 questions concerning the content of this particular
17 document.
18     (Schubert Exhibit 24 was marked for
19     identification.)
20     THE WITNESS: This is a nonpublic internal
21 document.
22     MR. GOLDMAN: And, Mr. Cooper, do we have
23 the same agreement at this time?
24     MR. COOPER: We do.
25     MR. GOLDMAN: The next document being

Page 148

1  marked is Schubert Exhibit 24.
2      MR. TYLER: With regard to Exhibit 24, I
3  assert the same objections previously identified
4  concerning nonpublic documents.
5      Is that acceptable to you, Mr. Goldman,
6  and we'll proceed in this fashion, or do you want me
7  to restate the objection.
8      MR. GOLDMAN: No, that's fine.
9      And I assume Mr. Cooper has the same
10 agreement with respect to this document.
11     MR. COOPER: We do. We do.
12 BY MR. GOLDMAN:
13 Q  Did you attend --
14     MR. TYLER: I'm sorry, Mr. Goldman. You
15 might want to ask him whether that is a public or
16 nonpublic document.
17     MR. GOLDMAN: Sure.
18 BY MR. GOLDMAN:
19 Q  Is the document marked as Schubert
20 Exhibit 24 a public document?
21 **A  It's a nonpublic internal document.**
22 Q  Did you attend any of the rallies as part
23 of the bus tour?
24 **A  Yes.**
25 Q  Did you attend all of them?

Page 149

1  **A** No.
2  **Q** Did you attend any at which Jim Garlow
3  served as the rally leader?
4  **A** No.
5  **Q** Did you attend any rally at which Bishop
6  Cordileone spoke?
7  **A** No.
8  **Q** Did you attend any rally at which Pastor
9  Chris Clark spoke?
10  **A Your question is in reference to a rally,**
11  **along the lines we've been discussing, and the**
12  **answer would be no.**
13  **Q** Did you attend any rally at which Ned --
14  is it Dolejsi?
15  **A Dolejsi?**
16  **Q** -- Dolejsi spoke?
17  **A I don't believe so, no.**
18  MR. GOLDMAN: I think we need to just
19  change the tape, so why don't we take a short break.
20  THE WITNESS: Okay.
21  THE VIDEOGRAPHER: This the end of Tape 2,
22  Volume I, in the deposition of Frank Schubert.
23  The time is approximately 1:15 p.m. We
24  are off the record.
25  (Discussion off the record.)

Page 150

1  THE VIDEOGRAPHER: This is Tape 3 of
2  Volume I in the deposition of Frank Schubert, in
3  Kristin M. Perry vs Arnold Schwarzenegger, et al.
4  The date is December 17, 2009, and the
5  time is approximately 1:25 p.m. We are on the
6  record.
7  MR. GOLDMAN: We're going to mark the next
8  document as Schubert Exhibit 25.
9  (Schubert Exhibit 25 was marked for
10  identification.)
11  MR. TYLER: I'm going to assert an
12  objection with regard to this Exhibit 25, to the
13  extent it is a nonpublic document. And if I may,
14  can it be agreed that my prior objection, based upon
15  our earlier conversation just before the break, is
16  the same, continuing objection?
17  MR. GOLDMAN: I'm sorry. I think I'm not
18  understanding what you're saying.
19  MR. TYLER: I'm sorry. Maybe I'm not
20  clear. That's okay.
21  Let me just assert an objection to this
22  document. To the extent it is nonpublic, to the
23  extent that it is protected by the First Amendment
24  privilege, I will instruct my client not to respond
25  to any questions concerning the content of this

Page 151

1  document, at least at this point in time, based upon
2  my belief it is not a public document.
3  There's no question pending.
4  BY MR. GOLDMAN:
5  **Q** There is a question pending.
6  The question pending is, can you identify
7  this document for the record, please?
8  MR. TYLER: Same objection.
9  THE WITNESS: These are separate
10  documents. Both of them are public -- were publicly
11  distributed by ProtectMarriage.com.
12  BY MR. GOLDMAN:
13  **Q** They were produced by ProtectMarriage.com
14  and used in the Yes on 8 campaign. Is that correct?
15  **A Yes.**
16  MR. GOLDMAN: We're marking the next
17  document as Schubert Exhibit 26?
18  MR. UNO: I'm sorry. I gave you --
19  MR. TYLER: Oh.
20  MR. STROUD: We're one short.
21  MR. COOPER: You only got one?
22  MR. TYLER: I only got one here.
23  THE WITNESS: Here's an extra one.
24  MR. TYLER: One attached to the bottom.
25  ////

Page 152

1  (Schubert Exhibit 26 was marked for
2  identification.)
3  BY MR. GOLDMAN:
4  **Q** And could you identify this document for
5  the record, please.
6  **A I cannot.**
7  **Q** You have never seen this document before.
8  Is that correct?
9  **A I don't recall seeing this document, no.**
10  MR. GOLDMAN: The next document we're
11  going to mark as Schubert Exhibit 27 is a CD with a
12  video.
13  (Schubert Exhibit 27 was marked for
14  identification.)
15  (Video CD played.)
16  BY MR. GOLDMAN:
17  **Q** Can you identify that video for the
18  record?
19  **A I cannot.**
20  **Q** Have you ever seen that video before?
21  **A Yes, I have.**
22  **Q** When have you seen that video?
23  **A I don't know specifically when I saw it,**
24  **other than late in the campaign, prior to the**
25  **adoption of Proposition 8.**

Page 153

1    Q   Do you know who produced that video?
2    **A   I do not.**
3    Q   Do you know whether ProtectMarriage.com
4  provided a link to that video?
5    **A   I do not.**
6    Q   Why don't you turn back to Schubert
7  Exhibit 1.
8        Look at page 47, the paragraph at the
9  bottom of the left-hand column and continuing to the
10  top of the right-hand column.
11    **A   Yes.**
12    Q   Do you understand that paragraph to refer
13  to this video?
14    **A   I do not.**
15    Q   Is there a video that you believe this
16  paragraph refers to?
17    **A   I'm unaware of any reference to a video in**
18  **the paragraph, Counsel.**
19    Q   It says, "We highlighted other examples
20  where gays had forced their agenda into the public
21  schools, including an episode in Hayward where a
22  school celebrated coming out, while urging
23  kindergarteners to sign pledge cards, promising to
24  be an ally of gay students."
25        Do you see that?

Page 154

1    **A   I do.**
2    Q   What did you do to highlight those
3  examples; and by "you," I mean, ProtectMarriage.com?
4        MR. TYLER:  Objection, based upon the
5  First Amendment privilege, with regard to anything
6  that was performed on behalf of the campaign in a
7  nonpublic fashion.
8        I would advise my client to respond to
9  this question only to the extent that the
10  information is publicly available.
11        THE WITNESS:  My recollection is that
12  there are newspaper articles of this incident that
13  include comments from representatives of
14  ProtectMarriage.com.
15  BY MR. GOLDMAN:
16    Q   Are you saying that members of
17  ProtectMarriage.com spoke to the press about these
18  incidents?
19    **A   That's my recollection.**
20    Q   If you could just look back at Exhibit 26?
21    **A   Yes.**
22    Q   Who is Chip White?
23    **A   Chip White was the communications director**
24  **for a period of time for ProtectMarriage.com.**
25    Q   Was he the communications director for

Page 155

1  ProtectMarriage.com on October 31, 2008?
2    **A   Yes.**
3    Q   Do you have any reason to doubt that this
4  was a media advisory released by
5  ProtectMarriage.com, linking to the YouTube video
6  that we just watched?
7        MR. COOPER:  Counsel, I would object to
8  the question.  The witness has already testified he
9  doesn't have any knowledge of this document, and he
10  can't -- he obviously won't be in a position to
11  authenticate it as a ProtectMarriage.com document.
12        There may be other witnesses who can
13  provide authentication of this document, and I, and
14  we, my clients, are willing to work with you in
15  terms of attempting to assist in authentication if,
16  in fact, that ultimately becomes necessary.  But the
17  witness is not -- is not able to do it, according to
18  the testimony that I've heard.
19  BY MR. GOLDMAN:
20    Q   Well, let me ask if you supervised Chip
21  White.
22        MR. TYLER:  Objection.  Based upon First
23  Amendment privilege as it pertains to campaign
24  structure and internal communications and internal
25  relationships concerning the management of the

Page 156

1  campaign and strategy, I instruct you not to respond
2  to that question.
3    Q   Did you review messages before they were
4  distributed to the media or members to the public?
5        MR. TYLER:  Objection.  Vague.
6        THE WITNESS:  If your question is related
7  to Exhibit 26, I believe I've testified I don't
8  recall this document.
9  BY MR. GOLDMAN:
10    Q   And I'm just asking, in general, whether,
11  in your role as campaign manager for
12  ProtectMarriage.com, did you review materials before
13  they were distributed to the public or members of
14  the media?
15    **A   As a general matter, our -- our firm would**
16  **have liked to have reviewed documents before they**
17  **were publicly disseminated.**
18        MR. GOLDMAN:  Let's mark the next document
19  as Schubert Exhibit 28.
20        (Schubert Exhibit 28 was marked for
21        identification.)
22        MR. TYLER:  I'm going to assert an
23  objection to any testimony concerning this document,
24  Exhibit 28, to the extent it is a nonpublic
25  document, and instruct my client not to testify as

Page 157

1   to the content of this document, should it not be a
2   public document.
3   BY MR. GOLDMAN:
4     Q   Can you identify this document for the
5   record, Mr. Schubert?
6     **A   I cannot.**
7     Q   What was ProtectMarriageCA?
8     **A   ProtectMarriageCA is a separate**
9   **organization from ProtectMarriage.com.**
10    Q   What is it, to the extent you know?
11    **A   I don't know. I don't know its legal**
12  **construction. I only know it is not**
13  **ProtectMarriage.com.**
14    Q   Did ProtectMarriage.com pay any money to
15  ProtectMarriageCA?
16        MR. TYLER: Objection. Assert a First
17  Amendment privilege to the extent that this would
18  address internal communications of the campaign
19  strategies, and will instruct my client not to
20  testify to the extent that this information is not
21  publicly available.
22        THE WITNESS: Your question is whether
23  ProtectMarriage.com paid any money to
24  ProtectMarriageCA.
25        And my answer is, I don't know.

Page 158

1   BY MR. GOLDMAN:
2     Q   Did ProtectMarriage.com coordinate with
3   ProtectMarriageCA on messaging related to
4   Proposition 8?
5         MR. TYLER: Objection. I'm going to
6   insert -- assert another objection, based upon the
7   First Amendment, that, in fact, I believe that the
8   judge, Judge Walker, in one of his rulings,
9   determined that it would be irrelevant to even
10  understand or to obtain documents concerning
11  volunteer coordination and organization. And I
12  believe that's applicable here to your question,
13  and, therefore, not only is it irrelevant, but
14  violates the First Amendment privilege.
15        MR. GOLDMAN: The information is plainly
16  relevant to the extent that the defendant
17  intervenors are claiming that any messages delivered
18  by ProtectMarriageCA are not attributable to
19  ProtectMarriage.com.
20        And very clearly, if that is the assertion
21  of defendant intervenors, and if Mr. Cooper wants to
22  stipulate that all ProtectMarriageCA messages are
23  ProtectMarriage.com messages, we can avoid this.
24        But if the assertion is that these message
25  are not attributable to ProtectMarriage.com, then I

Page 159

1   think I'm entitled to explore the connections and
2   coordination between ProtectMarriage.com and
3   ProtectMarriageCA.
4         MR. TYLER: I think you can find your
5   information pretty easily by simply asking whether
6   or not the communications of ProtectMarriage.CA, I
7   think it was, is -- are messages adopted by
8   ProtectMarriage.com, or however you want to put it.
9   But if that is what you're getting at, I think you
10  can ask that question.
11        MR. GOLDMAN: Well, that will get me an
12  assertion. I then need to test that assertion.
13        MR. TYLER: Not necessarily. You can go
14  ahead and ask that question, and we'll determine
15  whether or not you can test that or not.
16  BY MR. GOLDMAN:
17    Q   All right. Mr. Schubert, are messages
18  that were disseminated to the public regarding
19  Proposition 8 by ProtectMarriageCA messages of
20  ProtectMarriage.com?
21    **A   No.**
22        MR. GOLDMAN: Now, will you instruct the
23  witness not to answer any questions that are
24  designed to test the answer I just received.
25        MR. TYLER: It depends what your question

Page 160

1   is.
2         MR. GOLDMAN: Well, I've already asked
3   some.
4         MR. TYLER: Well, I encourage you to go
5   ahead and begin your inquiry, and we'll see where it
6   goes.
7         MR. COOPER: We do assert that questions
8   relating to associational relationships of
9   ProtectMarriage.com and its -- and its individuals
10  managing that campaign are privileged and that this
11  inquiry goes beyond the scope of permissible
12  discovery, as outlined in the discovery orders of
13  the court.
14        MR. GOLDMAN: And with that, then, are you
15  willing to stipulate that I have preserved my right,
16  should the court allow it, to ask questions about
17  the relationship between ProtectMarriage.com and
18  ProtectMarriageCA?
19        MR. COOPER: Certainly.
20  BY MR. GOLDMAN:
21    Q   I think you said you didn't know, as a
22  legal matter, what ProtectMarriageCA was. Do you
23  have any understanding of what ProtectMarriageCA is?
24    **A   Yeah. Yes.**
25    Q   What is your understanding of what

Page 161

1  ProtectMarriageCA is?
2  **A   Well, as a general matter, my**
3  **understanding is that ProtectMarriageCA was an**
4  **organization led by Dr. Jim Garlow.**
5  Q   When did that organization come into
6  being, if you know?
7  **A   I don't know.**
8  MR. GOLDMAN:  Let's mark as Schubert
9  Exhibit 29 another CD with a video file on it.
10  (Schubert Exhibit 29 was marked for
11  identification.)
12  (Video CD played.)
13  BY MR. GOLDMAN:
14  Q   Have you seen that video before,
15  Mr. Schubert?
16  **A   I have.**
17  Q   When did you see that video before today?
18  **A   I can't recall specifically, but at some**
19  **point during the Proposition 8 campaign.**
20  Q   Was that video produced by
21  ProtectMarriage?
22  **A   No, it was not.**
23  Q   Do you know who produced that video?
24  **A   I don't -- I don't know specifically, but**
25  **it's been my impression that it was produced by the**

Page 162

1  **Family Research Council.**
2  Q   And what is the Family Research Council?
3  **A   My understanding is that the Family**
4  **Research Council is a nonprofit organization, based**
5  **in Washington, focused on pro-family issues.**
6  Q   And, to your knowledge, was that video
7  publicly distributed?
8  **A   I don't know the method of distribution of**
9  **the video.**
10  Q   What was the context in which you reviewed
11  the video?
12  **A   I reviewed the video online, I believe.**
13  Q   So that something, you heard about it
14  and you wanted to check it out, is that the context?
15  MR. TYLER:  Objection.  First Amendment
16  privilege, I think, applies.  And Mr. Schubert
17  testified that he viewed it online.  Why he viewed
18  it or how he heard about it is irrelevant and
19  subject to the First Amendment privilege.
20  I instruct you not to respond to that.
21  BY MR. GOLDMAN:
22  Q   Let's see if we can ask this:  Did you
23  review that video in your capacity as campaign
24  manager for ProtectMarriage.com?
25  **A   Yes.**

Page 163

1  MR. GOLDMAN:  All right.  I think Schubert
2  Exhibit 30 is another video.
3  (Schubert Exhibit 30 was marked for
4  identification.)
5  MR. TYLER:  Just for the record,
6  gentlemen, the log of documents that I e-mailed to
7  someone here to print out, I spoke to Donna.
8  Hopefully, she was able to print it out for us and
9  get it to us on the next break.
10  MR. GOLDMAN:  Okay.  Thank you.
11  (Video CD played.)
12  BY MR. GOLDMAN:
13  Q   Can you identify this video, for the
14  record?
15  **A   Yes, I can.  It's a video produced by**
16  **ProtectMarriage.com for use in the Proposition 8**
17  **campaign.**
18  Q   And how was this video distributed or made
19  available to the public?
20  **A   The video was posted on**
21  **ProtectMarriage.com website, and I believe it was**
22  **uploaded to YouTube.**
23  Q   Do you know whether the
24  ProtectMarriage.com website, during the campaign,
25  had a link to the ProtectMarriageCA.com website?

Page 164

1  **A   I don't know specifically.  The website**
2  **was a dynamic communication tool, so it changed**
3  **frequently throughout the campaign.**
4  Q   Do you believe that, at some point, it
5  linked to the ProtectMarriageCA.com website?
6  **A   It may have, but I don't have a specific**
7  **reference point.**
8  Q   I think in one of your public statements,
9  you've talked about working with about 7,500
10  pastors.
11  Do you recall, generally, those
12  statements?
13  **A   Yes.**
14  Q   Were those pastors part of
15  ProtectMarriageCA?
16  **A   That --**
17  MR. TYLER:  Objection.  Let me assert an
18  objection based upon First Amendment privilege to
19  whom you would associate.
20  I instruct you not to respond to that
21  question.
22  BY MR. GOLDMAN:
23  Q   Did ProtectMarriage.com spend almost a
24  million dollars on pastor involvement?
25  MR. TYLER:  Objection.  I would assert an

Page 165

1  objection, based on First Amendment privilege.
2       Instruct you not to respond to that
3  question, as it pertains to internal campaign
4  strategies.
5  BY MR. GOLDMAN:
6       Q   Unless, of course, you've already spoken
7  about it publicly.
8       MR. TYLER:  And my same objection applies.
9  And if you recall speaking about something publicly,
10 you can testify as to whether you said something
11 publicly or not.
12      THE WITNESS:  I don't recall any public
13 statements regarding how much money was spent on
14 pastor involvement.
15      MR. GOLDMAN:  The next document is being
16 marked as Schubert Exhibit 32.
17      THE VIDEOGRAPHER:  Isn't that 31?
18      MR. GOLDMAN:  31.
19      (Schubert Exhibit 31 was marked for
20      identification.)
21 BY MR. GOLDMAN:
22      Q   Do you have Exhibit 31 in front of you
23 now?
24      A   Yes.
25      Q   And can you identify this document for the

Page 166

1  record?
2       A   It appears to be a screen shot of the
3  ProtectMarriage home page at some point after the
4  passage of Proposition 8.
5       Q   And do you see, in the upper right-hand
6  corner, where it says, "Not receiving
7  ProtectMarriage.com e-mails, sign up"?
8       Do you see that?
9       A   I do.
10      Q   Was that something that was there during
11 the campaign that visitors to the website could use
12 to register and then receive e-mails from
13 ProtectMarriage.com?
14      A   I don't know that.
15      Q   Do you see, further down near the bottom
16 on the right, it says, "Proposition 8 resources for
17 churches and supporters"?
18      Do you see that?
19      A   Yes.
20      Q   Do you know what clicking on that button
21 does?  Do you know where it takes the person who
22 clicks on that button?
23      A   No, I don't know specifically, other than
24 a general description on the home page.
25      Q   Have you ever clicked on this button?

Page 167

1       A   Not to my knowledge, no.
2       MR. GOLDMAN:  The next document, we're
3  going to mark as Schubert Exhibit 32.
4       (Schubert Exhibit 32 was marked for
5       identification.)
6  BY MR. GOLDMAN:
7       Q   Have you seen this before?
8       A   I have not.
9       Q   Do you have any understanding of what this
10 is, as you sit here today, looking at it?
11      A   It would appear to be a ProtectMarriageCA
12 document.  To the best of my knowledge, it is not a
13 ProtectMarriage.com document.
14      Q   Do you know what ProtectMarriageSD is?
15      A   No, I do not.
16      Q   You never heard of ProtectMarriageSD?
17      A   I've heard of it.  I don't know what it
18 is.
19      Q   If I could ask you just to look back at
20 Exhibit 28.
21      A   (Witness complies.)
22      Q   Do you see some links down at the bottom
23 of the page?
24      A   Yes.
25      Q   The last one listed there is

Page 168

1  iProtectMarriage.com.
2       Do you see that?
3       A   Yes.
4       MR. TYLER:  Objection.  I'm going to
5  assert the First Amendment privilege, again, as to
6  this document.  I believe Mr. Schubert testified
7  previously that this document is a nonpublic
8  document.  And to the extent this a nonpublic
9  document, I'm going to instruct him not to respond
10 to its content.
11      If I'm mistaken as to his previous
12 testimony, I'm happy to be corrected.
13      MR. GOLDMAN:  Yes, I think he testified it
14 wasn't a ProtectMarriage.com document; not that it
15 was an internal ProtectMarriage.com document.
16 BY MR. GOLDMAN:
17      Q   But correct me if I'm wrong, Mr. Schubert.
18      A   That's correct.  I could not authenticate
19 the document.
20      Q   So do you see where it says
21 iProtectMarriage.com, down at the bottom?
22      A   Yes.
23      Q   Do you know what iProtectMarriage.com is?
24      A   Yes, iProtectMarriage.com --
25      MR. TYLER:  I'm sorry, Mr. Schubert.

1   There's no question pending.
2   BY MR. GOLDMAN:
3       Q   What is iProtectMarriage.com?
4       A   **IProtectMarriage.com is a website that was**
5   **created by supporters of Proposition 8 that was**
6   **developed with a particular point of view, aimed at**
7   **young people.**
8       Q   And was iProtectMarriage.com part of
9   ProtectMarriage.com?
10      MR. TYLER:  Objection.  Vague.
11  BY MR. GOLDMAN:
12      Q   You can answer the question.
13      A   **IProtectMarriage.com is a separate**
14  **organization from ProtectMarriage.com.**
15      Q   Did ProtectMarriage.com coordinate with
16  iProtectMarriage.com on messaging?
17      MR. TYLER:  Object to First Amendment
18  privilege.  We previously brought this up.  And as I
19  recall, again, Judge Walker's previous instructions,
20  to my understanding, protects, or at least
21  recognized the protection of, volunteer coordination
22  and organization as being not relevant and protected
23  by the First Amendment, or at least, at a bare
24  minimum, not relevant to this case.
25      So I would instruct him not to respond to

1   coordination with this organization, based upon his
2   association -- based upon the association rights of
3   my client.
4   BY MR. GOLDMAN:
5       Q   Did ProtectMarriage.com pay money to
6   iProtectMarriage.com?
7       MR. TYLER:  I will make the same
8   objection, based on the First Amendment privilege.
9   To the extent that any information is publicly
10  available, or I should say that such information was
11  made publicly available, I would instruct you not to
12  respond, except to that extent.
13      THE WITNESS:  I don't know what public
14  information is available on that, in response to
15  that question.
16      MR. GOLDMAN:  Just so I'm clear, you will
17  not allow him to answer yes or no whether
18  ProtectMarriage.com paid money to
19  iProtectMarriage.com.  Is that correct?
20      MR. TYLER:  That's correct, yeah.
21  BY MR. GOLDMAN:
22      Q   Did ProtectMarriage.com direct members of
23  the public to the iProtectMarriage.com website or
24  other materials prepared by iProtectMarriage.com?
25      MR. TYLER:  Objection.  Vague.

1       THE WITNESS:  I believe there may be
2   public documents, whereby ProtectMarriage.com made
3   the public aware of the existence of
4   iProtectMarriage.com.
5       MR. GOLDMAN:  Let's mark the next document
6   as Schubert Exhibit 33.
7       (Schubert Exhibit 33 was marked for
8   identification.)
9   BY MR. GOLDMAN:
10      Q   And can you identify this document, for
11  the record?
12      A   **I believe this is a press release from**
13  **ProtectMarriage.com.**
14      Q   And this press release from
15  ProtectMarriage.com directs people towards
16  iProtectMarriage.com at the site that targets the
17  youth vote.  Is that correct?
18      MR. TYLER:  Objection.  The document
19  speaks for itself.
20  BY MR. GOLDMAN:
21      Q   You can answer the question.
22      A   **Well, this is consistent with my prior**
23  **testimony that ProtectMarriage.com issued a --**
24  **public steps to inform the public about the**
25  **existence of iProtectMarriage.com.**

1       Q   Who is Miles McPherson?
2       A   **Miles McPherson is a pastor with the Rock**
3   **Church of San Diego.**
4       Q   And is it your understanding that Miles
5   McPherson is responsible for the content of
6   iProtectMarriage.com?
7       A   **It's my understanding that Miles McPherson**
8   **had overall responsibility for iProtectMarriage.com.**
9   **I don't -- I can't testify as to his role and the**
10  **content of the website.**
11      Q   Was he a leader in the Yes on 8 campaign?
12      MR. TYLER:  Objection.  Assert the First
13  Amendment privilege, based on associational rights,
14  and instruct my client not to respond to that
15  question.
16      MR. GOLDMAN:  We're going to mark the next
17  exhibit as Schubert Exhibit 34.
18      (Schubert Exhibit 34 was marked for
19  identification.)
20      MR. TYLER:  You gave us an extra one.  Is
21  this yours?
22      We got them.  We just have an extra.
23      MR. UNO:  Thank you.
24      MR. TYLER:  I thought it might be yours.
25  ////

Page 173

1  BY MR. GOLDMAN:
2    Q   Have you seen this document before?
3    A   **No, I have not.**
4    Q   Do you have an understanding of what this
5  document is, as you sit here today?
6    A   **I believe this is a screen shot of the**
7  **iProtectMarriage.com website, at some point after**
8  **the passage of Proposition 8.**
9    Q   And at the bottom, there are some links.
10  Do you see that?
11   A   **Yes.**
12   Q   And the first link is to
13  ProtectMarriage.com. Is that the website for
14  ProtectMarriage.com Yes on 8?
15       MR. TYLER:  Objection.  That lacks
16  foundation that actually links to
17  ProtectMarriage.com. I just want to make -- I
18  object on the basis that it could say
19  ProtectMarriage.com, but be linked to something
20  else. And he's testified he has never seen this
21  document before. Therefore, there is no foundation.
22       You can go ahead and respond, if you want.
23  BY MR. GOLDMAN:
24   Q   I'm just asking if that is the website
25  address.

Page 174

1    A   **ProtectMarriage.com is the website address**
2  **for ProtectMarriage.com.**
3    Q   And do you know what -- what is
4  Prop 8.com? Do you know what that website is?
5    A   **I do not.**
6    Q   And I believe you already testified you
7  don't know what ProtectMarriageSD.com is. Is that
8  correct?
9    A   **That's correct.**
10   Q   Have you ever been to the
11  iProtectMarriage.com website?
12   A   **I believe I visited the website at some**
13  **point in the campaign.**
14   Q   And you visited that website in your
15  official capacity as the campaign manager for
16  ProtectMarriage.com. Is that correct?
17       MR. TYLER:  Objection. Vague.
18       I'm going to instruct him not to answer,
19  based on First Amendment privilege. No basis for
20  him to respond to what he viewed, regardless of
21  whether it was in his capacity or not, as the
22  official campaign manager.
23  BY MR. GOLDMAN:
24   Q   Do you see, there's what looks to be a
25  link to a video in the middle, on the right-hand

Page 175

1  side there?
2    A   **Yes, I do.**
3    Q   Do you recall whether you ever clicked on
4  that link to see what video that was?
5    A   **I have no recollection of doing that.**
6    Q   And do you have an understanding right now
7  of what video that is?
8    A   **My understanding right now, based on**
9  **looking at this, is it's the --**
10       MR. TYLER:  Let me first assert an
11  objection.
12       Vague and ambiguous and instruct you not
13  to guess as to what that might be. If you have
14  personal knowledge as to what video link that is,
15  you can testify to that. If you do not have
16  personal knowledge, so state.
17       THE WITNESS:  The document says the Parker
18  family, and I recognize the scene as being contained
19  in the video that you previously showed.
20       MR. GOLDMAN:  With the Parker family.
21  Okay.
22       Thank you.
23       Next we're going to mark another video as
24  Schubert Exhibit 35.
25  ////

Page 176

1       (Schubert Exhibit 35 was marked for
2       identification.)
3       (Video CD played.)
4  BY MR. GOLDMAN:
5    Q   Can you identify this, for the record?
6    A   **This is a 30-second television commercial,**
7  **produced by ProtectMarriage.com.**
8    Q   And when was this television commercial
9  released, if you recall?
10   A   **I don't recall a specific date, but it**
11  **would have been late in the campaign, in the last**
12  **week of the campaign.**
13   Q   And do you recall whether there were radio
14  ads also based on this commercial that were released
15  around that time?
16   A   **I do not believe there was.**
17   Q   And this commercial was aired statewide in
18  California. Is that correct?
19   A   **That's correct.**
20       MR. GOLDMAN:  I think the next exhibit we
21  have, Schubert Exhibit 36, is another video.
22       (Schubert Exhibit 36 was marked for
23       identification.)
24       (Video CD played.)
25  ////

Page 177

1   BY MR. GOLDMAN:
2       Q   Can you identify this video for the
3   record?
4       **A   Yes, this was a 30-second television**
5   **commercial, produced by ProtectMarriage.com.**
6       Q   And when did that commercial begin to air?
7       **A   I don't recall specifically.  It would**
8   **have been in the October period, though.**
9       Q   Did that air in the major media markets in
10  California?
11      **A   It aired selectively.  It did not air**
12  **statewide.**
13      Q   Do you recall where that ad aired, in
14  which markets?
15      **A   I don't recall specifically, but my**
16  **recollection is that it aired in Los Angeles,**
17  **Fresno, for sure.  And, beyond that, I would be**
18  **speculating.**
19      Q   What was the English title of that
20  commercial, if you know?
21      **A   I don't know.**
22      Q   Do you know whether there was an English
23  version of the video we just saw?
24      **A   There was not.**
25          MR. GOLDMAN:  Okay.  The next video will

Page 178

1   be Schubert Exhibit 37.
2          (Schubert Exhibit 37 was marked for
3          identification.)
4          (Video CD played.)
5   BY MR. GOLDMAN:
6       Q   Can you identify that video for the
7   record, please?
8       **A   Yes, it's a 30-second television**
9   **commercial, produced for ProtectMarriage.com.**
10      Q   And when did this video air?
11      **A   I don't know the specific dates, but late**
12  **in the campaign, late in October.**
13      Q   Which media markets did the video air, if
14  you recall?
15      **A   I don't recall the specific details, other**
16  **than I know it aired in Los Angeles and Fresno.**
17  **Beyond that, I would be speculating.**
18  Q (By Mr. Goldman)
19          MR. GOLDMAN:  Okay.  I think the next
20  video, we'll be marking as Schubert Exhibit 38.
21          (Schubert Exhibit 38 was marked for
22          identification.)
23          (Video CD played.)
24  BY MR. GOLDMAN:
25      Q   Can you identify that video for the

Page 179

1   record?
2       **A   Yes, it's a 30-second television**
3   **commercial, produced by ProtectMarriage.com.**
4       Q   Was the title of that video "Finally The
5   Truth"?
6       **A   Yes, it was.**
7       Q   And when did that video air?
8       **A   That video aired late in the campaign, I**
9   **believe starting on the 27th of October, on or about**
10  **then.**
11      Q   And did that video air statewide in
12  California?
13      **A   Yes.**
14          MR. GOLDMAN:  The next video is Schubert
15  Exhibit 39.
16          (Schubert Exhibit 39 was marked for
17          identification.)
18          (Video CD played.)
19  BY MR. GOLDMAN:
20      Q   Can you identify this video for the
21  record, Mr. Schubert?
22      **A   I cannot.**
23      Q   Have you ever seen this video before?
24      **A   No.**
25      Q   It doesn't have the production values you

Page 180

1   would expect?
2       **A   I have not seen the video prior to now.**
3          MR. STROUD:  P-a-l-l-i-n.
4          MR. GOLDMAN:  The next video, we're going
5   to mark as Schubert Exhibit 40.
6          (Schubert Exhibit 40 was marked for
7          identification.)
8          (Video CD played.)
9   BY MR. GOLDMAN:
10      Q   Have you ever seen this video before,
11  Mr. Schubert?
12      **A   I have.**
13      Q   When did you see that video?
14      **A   At some point during the Proposition 8**
15  **campaign.**
16      Q   Was this video produced by
17  ProtectMarriage.com?
18      **A   No.**
19      Q   Do you know who produced that video?
20      **A   No.**
21          **Can I ask if we're approaching a natural**
22  **breaking point --**
23          MR. GOLDMAN:  Absolutely.  That would be
24  fine.
25          THE WITNESS:  -- for using the restroom.

Page 181

1    MR. GOLDMAN: Fine. Let's take a break.
2    MR. STROUD: Like a film festival.
3    THE VIDEOGRAPHER: We're going off the
4    record. The time is approximately 2:36 p.m.
5        (Discussion off the record.)
6    THE VIDEOGRAPHER: We are going back on
7    the record. The time is approximately 2:46 p.m.
8    MR. GOLDMAN: And we're going to mark
9    another video, now, as Schubert Exhibit 42.
10   THE REPORTER: 41.
11   MR. GOLDMAN: 41. No problem.
12       (Schubert Exhibit 41 was marked for
13       identification.)
14       (Video CD played.)
15   BY MR. GOLDMAN:
16   Q    Have you seen this video before,
17   Mr. Schubert?
18   A    **Yes, I have.**
19   Q    Was this video produced by
20   ProtectMarriage.com?
21   A    **No, it's not.**
22   Q    Do you know who produced this video?
23   A    **No, I do not.**
24   Q    When have you seen this video before?
25   A    **My recollection is seeing it online during**

Page 182

1    **the course of the Proposition 8 campaign.**
2    MR. GOLDMAN: The next video will be
3    marked as Schubert Exhibit 42.
4        (Schubert Exhibit 42 was marked for
5        identification.)
6        (Video CD played.)
7    BY MR. GOLDMAN:
8    Q    Have you seen this video before,
9    Mr. Schubert?
10   A    **Yes, I have.**
11   Q    Was this video produced by
12   ProtectMarriage.com?
13   A    **No, it was not.**
14   Q    Do you know who produced this video?
15   A    **I do not.**
16   Q    When did you first see this video?
17   A    **I saw it during the course of the**
18   **Proposition 8 campaign. I can't say specifically**
19   **when.**
20   Q    Was this video donated to
21   ProtectMarriage.com for its use?
22       MR. TYLER: Objection. First Amendment
23   privilege. The relationships with volunteers or
24   other persons or receipt of donations is
25   confidential and protected information. I'll

Page 183

1    instruct him not to answer that question.
2    BY MR. GOLDMAN:
3    Q    I'm sure your lawyer will instruct you not
4    to answer, but did any other groups donate videos to
5    ProtectMarriage.com for its use?
6        MR. TYLER: Same objection. Same
7    instruction.
8        Do not answer that question, based upon
9    the First Amendment privilege.
10   BY MR. GOLDMAN:
11   Q    Did ProtectMarriage.com distribute or link
12   to or notify the media or members of the public
13   about videos that it received from other groups?
14       MR. TYLER: I'll make an objection, based
15   on the First Amendment privilege. Also, object on
16   the basis of relevancy.
17       However, to the extent that you can recall
18   making a public statement, you can testify as to
19   that public statement only.
20       THE WITNESS: I'm aware of no public
21   statement on this subject.
22   BY MR. GOLDMAN:
23   Q    Well, a public statement would be anything
24   from ProtectMarriage.com directing members of the
25   public or the media to a particular video, correct?

Page 184

1        MR. TYLER: Objection. Calls for, you
2    know, speculation as to what others might think,
3    No. 1.
4        No. 2, it's vague and ambiguous. And if
5    there's a matter of public record, it will speak for
6    itself. Whether you want to characterize link as a
7    public statement, that's your prerogative. He's
8    already testified he's not aware of any public
9    statements.
10       MR. GOLDMAN: Right. And I was just
11   trying to clarify whether that meant he is not aware
12   of any instances in which ProtectMarriage.com
13   publicized, in some way, a video produced by a group
14   other than ProtectMarriage.com.
15       MR. TYLER: I do want to make a further
16   objection. Your question is vague. It's overbroad,
17   to the extent that there's thousands and thousands
18   of pages, and you know that fact, of documents that
19   relate to this case, whether it be on television,
20   Internet, printed materials. And I believe he's
21   already testified.
22       But to the extent you can answer, go
23   ahead.
24       THE WITNESS: Well, just point of
25   clarification, I understood your initial question to

Page 185

1  be, was I aware of ProtectMarriage receiving a
2  donation of a video.
3         Your current question appears to be
4  different.
5  BY MR. GOLDMAN:
6     Q   That's correct.
7         Would you like the question read back, or
8  do you have the question in mind?
9     **A   If I understand it correctly, you're**
10 **asking am I aware of ProtectMarriage doing anything**
11 **publicly to publicize the existence of another**
12 **video.  Is that correct?**
13    Q   A video created by a group other than
14 ProtectMarriage.com?
15    **A   Other than ProtectMarriage.**
16       **I am aware of public -- information in the**
17 **public domain about publicizing the existence of**
18 **other videos, yes.**
19    Q   What videos do you recall
20 ProtectMarriage.com publicized that were created by
21 other groups, other than ProtectMarriage.com?
22    **A   I don't recall the specific content of the**
23 **other videos.  I recall e-mail blasts that made**
24 **reference to other videos.  I recall one of them**
25 **being a humorous video.  I don't recall the content**

Page 186

1  **of the other.**
2     Q   Do you recall what groups created any of
3  the videos that ProtectMarriage.com publicized?
4     **A   I do not.**
5         MR. GOLDMAN:  Exhibit 43, Schubert
6  Exhibit 43.
7         (Schubert Exhibit 43 was marked for
8         identification.)
9         (Audio CD played.)
10 BY MR. GOLDMAN:
11    Q   Can you identify that audio file that we
12 just listened to?
13    **A   I cannot.**
14    Q   Have you ever heard that before?
15    **A   I have not.**
16    Q   Do you know whether ProtectMarriage.com
17 retained Dee Garrett to do a robocall?
18    **A   I do not know that, no.**
19       MR. GOLDMAN:  The next exhibit, I believe,
20 is another audio file, and it will be Schubert
21 Exhibit 44.
22       (Schubert Exhibit 44 was marked for
23       identification.)
24       (Audio CD played.)
25 ////

Page 187

1  BY MR. GOLDMAN:
2     Q   Can you identify that audio file for the
3  record?
4     **A   I cannot.**
5     Q   Do you know whether Ron Prentice recorded
6  any robocalls for ProtectMarriage.com?
7     **A   I believe he did.**
8     Q   Do you understand the audio file we just
9  listened to to be a robocall?
10    **A   Yes, I do.**
11    Q   And did you hear, at the end of the audio
12 file, there were a series of disclosures about who
13 paid for the recording?
14       Do you recall that?
15    **A   I do.**
16    Q   Is that something that ProtectMarriage
17 included at the end of any audio files that it
18 produced?
19       MR. TYLER:  Objection.  Vague.
20       THE WITNESS:  California law requires
21 robocalls in a political campaign to include a
22 disclaimer as to who paid for the call and the top
23 two major funders of the campaign.  And so
24 ProtectMarriage, when it engaged in activities
25 requiring a disclaimer, included the appropriate

Page 188

1  legal disclaimer.
2  BY MR. GOLDMAN:
3     Q   And is that -- is the disclaimer that was
4  at the end of the audio file we just listened to,
5  was that the disclaimer that ProtectMarriage.com
6  used during the campaign?
7     **A   It was a disclaimer that was used at one**
8  **point in the campaign.**
9     Q   Did ProtectMarriage.com ever produce any
10 videos that it did not distribute but gave to other
11 organizations to distribute?
12       MR. TYLER:  I'm sorry.  Can you repeat
13 that question?
14       (The question was read as follows:)
15       "Q  Did ProtectMarriage.com ever
16       produce any videos that it did not
17       distribute, but gave to other
18       organizations to distribute?"
19       MR. TYLER:  Objection.  First amendment
20 privilege.  Those are drafts we've asserted
21 protection to -- I'm sorry -- to communications that
22 have been preserved internally.  Unless a
23 document -- or excuse me -- unless a recording has
24 been publicly distributed, I would instruct you not
25 to respond.

Page 189

1    THE WITNESS:  If I understand the question
2  correctly, it is -- to my knowledge,
3  ProtectMarriage.com produced videos that were
4  publicly distributed by others.
5  BY MR. GOLDMAN:
6    Q   That's correct.
7    **A   To my knowledge, the answer is no.**
8    Q   And how about audio?
9    **A   Same category?**
10    MR. TYLER:  Same objection.
11    THE WITNESS:  To my knowledge, the answer
12  is no.
13  BY MR. GOLDMAN:
14    Q   How about documents?
15    MR. TYLER:  Same objection.
16    THE WITNESS:  ProtectMarriage produced a
17  variety of documents, some of which you've flagged
18  as an exhibit, whatever it was, early on, that were
19  publicly displayed for members of the public to
20  review and to consider, and in that context, it is
21  entirely possible that groups may have used those
22  documents in other context.
23  BY MR. GOLDMAN:
24    Q   Did you give the documents to specific
25  groups, with the intent that they would distribute

Page 190

1  them more broadly?
2    MR. COOPER:  I'm going to object to that
3  question as going beyond the scope of permissible
4  discovery and calling for information that is
5  protected under the First Amendment.
6    MR. TYLER:  I concur with the objection,
7  and, likewise, assert that for the record and
8  instruct Mr. Schubert not to respond to that
9  question.
10    MR. GOLDMAN:  We're now going to mark a
11  document as Schubert Exhibit 45.
12    (Schubert Exhibit 45 was marked for
13    identification.)
14  BY MR. GOLDMAN:
15    Q   Can you identify this document for the
16  record?
17    **A   Yes, this is an e-mail blast from**
18  **ProtectMarriage.com.**
19    Q   By "e-mail blast," again, that was
20  something that was sent to thousands of recipients.
21  Is that correct?
22    **A   This is a same circumstance that we**
23  **discussed some hours ago, in terms of people who**
24  **signed up on the website requesting information or**
25  **to be kept informed.  Those people would have**

Page 191

1  **received an e-mail such as this, and they numbered**
2  **in the thousands, yes.**
3    Q   And let me ask you to look at page 3 of
4  this document.
5    **A   (Witness complies.)**
6    Q   What is the pastors committee?
7    **A   My belief is this is a reference to the**
8  **group of pastors that Jim Garlow organized and**
9  **communicated with.**
10    Q   And is that group of pastors
11  ProtectMarriageCA?
12    MR. TYLER:  Objection to the extent that
13  it calls for speculation.
14    If you have personal knowledge, you can
15  testify.
16    THE WITNESS:  I believe it's been publicly
17  disclosed that Jim Garlow regularly organized
18  meetings, calls of pastors, for the purpose of
19  discussing Proposition 8, and that may have been
20  done under the auspices of ProtectMarriageCA.
21  BY MR. GOLDMAN:
22    Q   Did you participate in any of the pastor
23  conference calls referred to in this document?
24    MR. TYLER:  Objection.  Based on personal
25  privilege and First Amendment associational

Page 192

1  privilege, I will instruct him not to respond to
2  that question.
3  BY MR. GOLDMAN:
4    Q   Do you know if any of the pastor
5  conference calls were recorded?
6    **A   I do not.**
7    Q   Do you know if any of the pastor
8  conference calls were transcribed?
9    **A   I don't know.**
10    MR. TYLER:  Objection.  Again, calls for
11  First Amendment privilege.  To the extent you're
12  aware of public information concerning whether or
13  not it was transcribed, you can respond.
14    Otherwise, I'll instruct you not to
15  answer.
16    THE WITNESS:  I'm aware of no public
17  information on that subject.
18  BY MR. GOLDMAN:
19    Q   Did any representative of
20  ProtectMarriage.com participate in any pastor
21  conference calls?
22    MR. TYLER:  Objection.  First Amendment
23  privilege.  Rights of association implicated.
24    Instruct you not to answer that question.
25  ////

Page 193

1    BY MR. GOLDMAN:
2       Q    Did ProtectMarriage.com prepare any
3    materials for the pastor conference calls?
4          MR. TYLER:  Objection.  First Amendment
5    privilege applies.
6          I'll instruct you not to answer that
7    question, except to the extent that there may be
8    some public documents that you're aware of that
9    would have been distributed.
10         THE WITNESS:  I don't recall any public
11   documents discussing that.
12   BY MR. GOLDMAN:
13      Q    It says here that a total of 1,700
14   pastors, based in 101 locations across the state,
15   participated in this first call.  Is that
16   information correct?
17         MR. TYLER:  Objection.  Vague.
18         Are you questioning whether or not the --
19   whether that, in fact, happened or whether -- I'm
20   sorry.
21         I'll just assert my objection based upon
22   vagueness.
23         You can respond.
24         THE WITNESS:  I believe that there were
25   one or more newspaper articles published concerning

Page 194

1    the initial pastor call that Pastor Garlow
2    organized.  I don't recall the details of those
3    articles, but they may have reported on a number of
4    pastors who participated.
5    BY MR. GOLDMAN:
6       Q    Did any members of the media listen to a
7    pastor conference call?
8          MR. TYLER:  Objection.  Calls for
9    speculation.  To the extent you're aware of some
10   public information identifying that fact, you can
11   respond.
12         Otherwise, First Amendment privilege
13   applies, and you do not need to respond to that
14   question.
15         THE WITNESS:  I would only respond that
16   newspaper articles were written by reporters.  I
17   can't comment on whether or not they listened or
18   recorded the call.
19         MR. GOLDMAN:  Maybe I could just -- if I
20   could understand the position of the defendant
21   intervenors.  We have here a conference call that
22   was -- that had 1,700 people in it around the state.
23   We have a public announcement about it in an e-mail
24   blast to tens of thousands of people.  And we have
25   reporters writing about the conference calls.

Page 195

1          And is ProtectMarriage.com asserting a
2    First Amendment privilege over these conference
3    calls?
4          MR. COOPER:  No, it's not.  It is
5    asserting a First Amendment privilege over whether
6    or not Mr. Schubert, as the campaign manager,
7    listened in on that conference call, if that was the
8    question that was asked --
9          MR. GOLDMAN:  I asked whether --
10         MR. COOPER:  -- except to the extent it is
11   already in the public domain, whether the answer to
12   that question is already in the public domain.
13         MR. GOLDMAN:  Well, if the First Amendment
14   privilege is not asserted over the call itself, then
15   to the extent that Mr. Schubert spoke on the call,
16   or anyone from ProtectMarriage.com spoke on the
17   call, then that information is in the public domain
18   by virtue of the fact that it happened.
19         MR. COOPER:  If the call itself and
20   content of the call is in the public domain or was
21   available publicly in the same way that a rally is,
22   then -- then I would see no objection to the
23   question.
24   BY MR. GOLDMAN:
25      Q    Mr. Schubert, did you speak on any pastor

Page 196

1    conference calls?
2          MR. TYLER:  I'm going to assert an
3    objection on the basis of First Amendment privilege.
4          And I will instruct you only to respond to
5    that question to the extent that you made public
6    statements, or you -- if there were conference calls
7    with pastors opened to the public, wherein you made
8    statements, you could respond to that.
9          Otherwise, if they were not
10   public-oriented conference calls, based upon the
11   First Amendment privilege, you're not obligated to
12   respond.
13         MR. GOLDMAN:  Now, Mr. Tyler, you're
14   asserting Mr. Schubert's personal First Amendment
15   privilege here?
16         MR. TYLER:  As well as on behalf of
17   Schubert Flint, as the official campaign manager.
18         MR. GOLDMAN:  Do the defendant intervenors
19   assert a First Amendment privilege over any comments
20   that Mr. Schubert may have made to a call of 1,700
21   people, reported in an e-mail sent to tens of
22   thousands of people, and reported by members of the
23   media?
24         MR. COOPER:  To the extent that that call
25   was, notwithstanding the number of people who are on

1  it, not a public call, but was a call with invited
2  members, then, yes, we do assert that would be
3  privileged.
4         If the witness knows that that call was
5  one that was not private in the fashion I've
6  described, but, rather, was more in the nature of a
7  rally, that was available to any -- let's say any
8  member of the public or any pastor, for that matter,
9  then I would not consider that to be privileged, but
10 more in the nature of a rally.
11        MR. GOLDMAN:  Let's see if we can find
12 out, then.
13 BY MR. GOLDMAN:
14    Q   Were the pastor conference calls open to
15 any pastor who wanted to participate?
16    **A   Dr. Garlow organized the pastor calls.  My**
17 **understanding is that he invited people to**
18 **participate.  I am not aware that they were open to**
19 **anybody, other than those who were invited, but I**
20 **have no direct knowledge of the process that he**
21 **utilized to invite pastors to participate.**
22        MR. GOLDMAN:  Let's mark the next document
23 as Schubert Exhibit 46.
24 ////
25 ////

1         (Schubert Exhibit 46 was marked for
2  identification.)
3         MR. TYLER:  I'll insert an objection to
4  this document, on the basis that it does appear to
5  be an internal communication now.  If I'm mistaken,
6  and it is a document that was publicly distributed,
7  then that objection is -- doesn't necessarily stand,
8  but to the extent that this is a nonpublic document,
9  I would instruct you not to respond, on the basis of
10 First Amendment privilege.
11        Additionally, it would appear to me that
12 the attorney-client privilege may also be
13 applicable, due to the fact that Andrew Pugno, who
14 you were speaking with, was and is general counsel
15 for the Proposition 8 campaign.
16        So with that caveat, you can begin your
17 questioning on that document.
18 BY MR. GOLDMAN:
19    Q   Can you identify this document for the
20 record, please?
21        MR. TYLER:  I'll assert that objection
22 again.
23        And I would instruct you to consider,
24 first, whether it's a public or nonpublic document.
25        THE WITNESS:  I believe this is a public

1  document, distributed by e-mail, in the same process
2  we've discussed with prior documents.
3  BY MR. GOLDMAN:
4     Q   And is it describing one of the other --
5  another pastor conference call of the kind that
6  we've been discussing?
7     **A   Yes.**
8     Q   And you -- this e-mail indicates it was
9  sent by you and Jeff Flint.  Is that correct?
10    **A   That's what's indicated, yes.**
11    Q   Did you send this e-mail?
12    **A   Certainly the contents of the e-mail look**
13 **familiar.  The format you're presenting it is**
14 **unfamiliar, but the contents are familiar.**
15    Q   And did you send it?
16    **A   I believe we did, yes.**
17    Q   Did you participate on the call described
18 in this e-mail?
19        MR. TYLER:  Just a minute, Frank.
20        MR. COOPER:  In the light of -- I have
21 tried to quickly read this.  And in the light of the
22 context that it provides for the call, at least that
23 it is describing a general invitation that appears
24 to go in a general way to all recipients of a blast
25 e-mail, invite them to participate in this on the

1  Web or by telephone, to the extent I'm understanding
2  it correctly, I withdraw my objection to the
3  question.
4         MR. GOLDMAN:  Okay.  Thank you.
5         MR. TYLER:  Just a second, Frank.
6         I maintain my objection on the basis of
7  the First Amendment.  But I will instruct you that
8  it is permissible for you to respond to any public
9  statements you made within phone calls, where
10 invitations were sent out via massive e-mail in this
11 fashion.
12        THE WITNESS:  I'm not quite sure I
13 understand the character of the question, so perhaps
14 you could repeat it.
15 BY MR. GOLDMAN:
16    Q   Did you speak on the pastor conference
17 call referred to in this e-mail blast, or on other
18 similar pastor conference calls?
19        MR. TYLER:  I want to object.
20        MR. COOPER:  Similar pastor conference
21 calls that were organized in the fashion suggested
22 by this e-mail, if you please.
23        MR. GOLDMAN:  That's fine, with that
24 qualification.
25        THE WITNESS:  I don't know if I spoke on

Page 201

1  this particular call or not.
2  BY MR. GOLDMAN:
3      Q   But you did speak on some pastor
4  conference calls that were organized in this
5  fashion?
6      A   Yes, I did.
7      Q   Did any other representatives of
8  ProtectMarriage.com speak on any of the pastor
9  conference calls that were organized in this
10  fashion?
11      A   Yes.
12      Q   Who spoke?
13      A   My recollection is that Jeff Flint spoke
14  and that Ron Prentice spoke.
15      Q   Anyone else that you recall?
16      A   No.
17      Q   Do you see in the third paragraph here, it
18  states, "If you are interested in joining the
19  call/webinar, or having your church serve as a host
20  site, please visit www.ProtectMarriageCA.com"?
21          Do you see that?
22      A   I do.
23      Q   That was the organization we were
24  discussing earlier, ProtectMarriageCA?
25      A   Correct.

Page 202

1          MR. GOLDMAN:  The next document, we're
2  going to mark as Schubert Exhibit 47.
3          (Schubert Exhibit 47 was marked for
4          identification.)
5          MR. TYLER:  With regard to Exhibit 47,
6  again, I will assert an objection on the basis of
7  the First Amendment privilege that if this document
8  is a nonpublic document that was prepared for
9  internal purposes regarding your campaign, I would
10  instruct you not to respond to the con -- any
11  questions concerning the content of this letter, of
12  this document.
13  BY MR. GOLDMAN:
14      Q   Can you identify this document for the
15  record, Mr. Schubert?
16      A   Is your question, Can I identify it or can
17  I authenticate it as a ProtectMarriage.com document?
18      Q   Well, have you seen this document before?
19      A   Yes, I have.
20      Q   In what context have you seen this
21  document?
22          MR. TYLER:  Objection.  I'll assert the
23  First Amendment privilege on this document, so long
24  as this document has not been publicly produced.
25          And to the extent you can testify about

Page 203

1  this document, as far as it being something publicly
2  produced, then that's acceptable, but I think you
3  have to make that determination first.
4          THE WITNESS:  I don't know if the document
5  was produced publicly or not.
6  BY MR. GOLDMAN:
7      Q   Do you understand this to be an internal
8  ProtectMarriage.com campaign document?
9      A   No.
10      Q   Then when have you seen this document
11  before?
12      A   I don't have a specific recollection of
13  when I have seen it, but I have seen it.
14      Q   In just reviewing briefly the information
15  on the first page, the California Timeline, is there
16  anything you see on here that is inaccurate?
17          MR. TYLER:  Objection.  There's no
18  foundation for him to be able to testify whether
19  this information is accurate or inaccurate there.
20  He's not testifying as to whether or not he produced
21  it, whether or not the information in here is
22  information he even has knowledge of concerning
23  dates and conferences, et cetera.  Therefore, I
24  object on the basis of vagueness, speculation.
25          MR. GOLDMAN:  He sent an e-mail about

Page 204

1  pastor conference calls.  This timeline refers to
2  pastor conference calls.  The fact that he sent an
3  e-mail announcing pastor conference calls
4  establishes a foundation for my question.
5          MR. TYLER:  You could ask him whether or
6  not this timeline is referenced in his prior e-mail.
7          MR. GOLDMAN:  No.  I will ask the question
8  that I asked.
9          Do you need to have it read back,
10  Mr. Schubert?
11          THE WITNESS:  Please.
12          (The question was read as follows:)
13          "Q  In just reviewing briefly the
14          information on the first page, the
15          California Timeline, is there
16          anything you see on here that is
17          inaccurate?"
18          MR. TYLER:  I'll object, again, on the
19  basis of First Amendment privilege.  It lacks
20  foundation.
21          And only to the extent that you're aware,
22  Mr. Schubert, of the contents of this, and you're
23  aware of the public nature of this document, would I
24  instruct you to respond.
25          THE WITNESS:  I would only reiterate my

Page 205

1  testimony that this is not a ProtectMarriage.com
2  document, and I have no information as to whether it
3  was publicly distributed or not.
4  BY MR. GOLDMAN:
5      Q    That wasn't my question.
6          My question was whether there is
7  information on this page that you believe to be
8  inaccurate?
9          MR. TYLER:  Objection.  Vague as to the
10 accuracy of something he didn't prepare.  I don't
11 understand how you can be asking that question, when
12 you don't even know if he was involved in -- this
13 talks about events, and I have no idea whether he
14 was participating in these events.  He hasn't
15 testified to whether or not he even has information
16 to know whether it's accurate or not.
17         MR. GOLDMAN:  Your objection is on the
18 record.
19 BY MR. GOLDMAN:
20     Q    Would you please answer my question,
21 Mr. Schubert?
22     A    I can't testify to the accuracy or
23 inaccuracy of this document.
24     Q    So as you sit here today, you are not
25 aware of any information on this timeline that is

Page 206

1  inaccurate?
2          MR. TYLER:  Objection.  It's
3  argumentative.  It misstates the witness.
4          THE WITNESS:  I believe my testimony was
5  that I can't testify as to the accuracy or
6  inaccuracy of this document.
7  BY MR. GOLDMAN:
8      Q    Focusing just on the pastors' conference
9  call, are the dates and locations and numbers of
10 participants consistent with your understanding of
11 the pastors' conference calls that you have already
12 testified about and that you sent e-mails about?
13         MR. TYLER:  I will instruct my client only
14 to respond to the extent that those pastors calls,
15 those pastors' conference calls, were calls that
16 were of a public nature, by virtue of invitation,
17 such as the invitation identified in Exhibit 46.
18         THE WITNESS:  I can't personally testify
19 as to the accuracy of the detail in the document.
20 BY MR. GOLDMAN:
21     Q    Okay.  Do you know what the iProtect Youth
22 rally is that is indicated here as taking place on
23 October 1st?
24     A    I do not.
25     Q    How about the call, which is indicated as

Page 207

1  taking place at Qualcomm Stadium on Saturday,
2  November 1st?
3      A    I am aware of the event that occurred on
4  Saturday, the 1st of November, called the call, yes.
5      Q    And what was that event?
6      A    That was a public event that Dr. Garlow
7  and others organized for the purpose of bringing
8  people together to pray for marriage, and it
9  occurred in San Diego.
10     Q    And did representatives of
11 ProtectMarriage.com participate in that event?
12     A    Not to my knowledge.
13         MR. GOLDMAN:  I think we need to take a
14 break to change the media.
15         THE WITNESS:  Okay.
16         THE VIDEOGRAPHER:  This is the end of
17 Tape 3, Volume I, in the deposition of Frank
18 Schubert.
19         The time is approximately 3:32 p.m.  We
20 are off the record.
21         (Discussion off the record.)
22         THE VIDEOGRAPHER:  This is Tape 4 of
23 Volume I in the deposition of Frank Schubert, in
24 Kristin M Perry vs Arnold Schwarzenegger, et al.
25         The date is December 17, 2004.  The time

Page 208

1  is approximately 3:46 p.m.  We are on the record.
2          MR. TYLER:  Okay.  As a matter of a little
3  administration, would you mind marking that
4  document?
5          MR. LIPTON:  As what?  An exhibit?
6          MR. GOLDMAN:  As an exhibit?
7          MR. TYLER:  As an exhibit.  What would we
8  mark it, as Exhibit 48?
9          What I have done here is produced a log of
10 documents.  And, Mr. Goldman, I don't know if you
11 were on that phone call, or Mr. Uno, that I had with
12 someone early on in your office.  I think Ethan
13 Dettmer may have been involved in that conversation.
14         It was in relation to the production of
15 documents requested of Schubert Flint Public
16 Affairs, Inc.  So what we've done here is -- we
17 asserted -- we asserted objections.  And the
18 objections came back with a response from your
19 office.
20         There were questions concerning whether or
21 not -- one of the objections was, effectively, that
22 all of these public documents had already been
23 produced to the campaign.  It was our understanding
24 that they had already been produced to yourselves.
25         Now, I was asked to identify the documents

Page 209

1  that were produced and whether or not -- that were
2  produced to the campaign, and then, in turn, whether
3  I had could confirm that those documents were
4  produced to your offices.
5         Therefore, what this is, this is a
6  document that has numerous pages.  The first section
7  is --
8         MR. GOLDMAN:  Can I interrupt you?
9         I don't want to take up time, my record
10 time, to discuss this document.
11        If you -- and I don't think we need to do
12 this on the record.  I don't think we need to
13 discuss the document on the record.
14        But if you would like to, we can do that
15 after I finish my questioning, but I would rather
16 not take up time discussing this log.
17        MR. TYLER:  Well, that's fine.  No
18 problem.  We can talk about it after the fact.
19        I think it's self-explanatory, with the
20 exception of some question marks, but you can ask
21 about that later.  I would like it to be part of the
22 record.
23        MR. GOLDMAN:  And, again, I don't think we
24 need to mark it as an exhibit now.  But if you want
25 to mark it as an exhibit after I'm finished, that's

Page 210

1  fine as well.
2         MR. TYLER:  So be it.
3  BY MR. GOLDMAN:
4     Q   Mr. Schubert, was Jim Garlow a part of
5  ProtectMarriage.com?
6         MR. TYLER:  Objection.  Again, First
7  Amendment privilege.  Vague.  Ambiguous as to your
8  question.
9         But you can go ahead and respond.
10        THE WITNESS:  No.
11 BY MR. GOLDMAN:
12    Q   Was Jim Garlow paid professional service
13 fees by ProtectMarriage.com?
14        MR. TYLER:  Objection.  That's definitely
15 a First Amendment privileged issue.
16        And I'll instruct him not to respond to
17 that, to the extent that the information is not
18 publicly available.  If there is information
19 publicly available that he was paid, then you can
20 respond to that.
21        THE WITNESS:  My understanding is that
22 there is public information indicating that
23 Dr. Garlow received payments.  I can't testify as to
24 whether or not those were personal service contract
25 payments or however you phrased it in your question.

Page 211

1  BY MR. GOLDMAN:
2     Q   He received payments from
3  ProtectMarriage.com.  Is that correct?
4     A   I believe that's correct.
5     Q   And he was paid for services that he
6  rendered to ProtectMarriage.com, correct?
7     A   I don't believe that's a correct
8  characterization.  I believe he was paid.  Those
9  could be for a variety of things.  It could be for
10 reimbursement of expenses.
11        It could be for compensation of time that
12 he spent, though not on behalf of
13 ProtectMarriage.com, but, nonetheless, time that was
14 valuable to the broader cause of Proposition 8, but
15 I cannot characterize those as payment for services
16 rendered to ProtectMarriage.com.
17    Q   Did ProtectMarriage.com pay people for
18 services that they did not render for or on behalf
19 of ProtectMarriage.com?
20        MR. TYLER:  Objection.  We'll assert the
21 First Amendment privilege.  Overbroad.
22        Object on relevancy and instruct you not
23 to respond to that question.
24        MR. GOLDMAN:  Well, the payments are
25 publicly disclosed.  And Mr. Schubert just testified

Page 212

1  that those payments may not have been for services
2  that Mr. Garlow rendered to ProtectMarriage.com.
3         I think I'm entitled to explore that
4  assertion with my question, whether
5  ProtectMarriage.com paid people for services that
6  they did not render to ProtectMarriage.com.
7         MR. TYLER:  Okay.  Let me instruct you,
8  Mr. Schubert, I think you can respond only to the
9  extent that the information is available that
10 individuals were paid, that is public information.
11        If it's not public information, I instruct
12 you not to respond to that.  And only respond to his
13 question as to whether that event occurred of people
14 being paid for services rendered that were not
15 actually rendered to ProtectMarriage.com as the
16 official committee.
17        THE WITNESS:  I believe the campaign
18 finance reports that are public information do show
19 payments to people, but those payments do not
20 necessarily mean that they provided services to
21 ProtectMarriage.com as an organization.
22 BY MR. GOLDMAN:
23    Q   Why not?
24    A   Well, as I indicated in my answer to your
25 last question, there could be a variety of

Page 213

1  circumstances that would exist, including
2  reimbursing someone for expenses; compensating them
3  or an organization for time and energy spent in the
4  broader pursuit of Proposition 8 that would not
5  necessarily be directly related to services that
6  they performed for ProtectMarriage.com.
7     Q   Did ProtectMarriage.com reimburse expenses
8  that were not incurred in work for or on behalf of
9  ProtectMarriage.com?
10    A   Well, as I indicated, ProtectMarriage.com
11 made payments to a variety of people.  And in some
12 cases, those payments were for reimbursement of
13 expenses and to compensate individuals and
14 organizations for time that they spent in the
15 broader pursuit of Proposition 8.
16       Those services were not necessarily
17 performed directly for ProtectMarriage.com.
18    Q   Were they performed indirectly for
19 ProtectMarriage.com?
20    A   I believe my testimony has been that they
21 were performed for the broader pursuit of
22 Proposition 8.
23    Q   How did ProtectMarriage.com decide whether
24 to pay someone for work that was not performed for
25 ProtectMarriage.com?

Page 214

1        MR. TYLER:  Objection.  It's a First
2  Amendment privilege.  I'll instruct you not to
3  respond.
4        It concerns your mental impressions, your
5  strategy, and how decisions were made internally, so
6  do not respond to that question.
7  BY MR. GOLDMAN:
8     Q   How many people did ProtectMarriage.com
9  pay for work that was not on behalf of
10 ProtectMarriage.com?
11       MR. TYLER:  Objection.  If it is a matter
12 of public record, you can testify to that, to the
13 extent that I believe you could respond because it
14 already is in the public domain.
15       If it is not in the public domain already,
16 I would instruct you not to answer, based upon the
17 First Amendment privilege.
18       THE WITNESS:  I'm not aware of any
19 information in the public domain on this subject.
20 BY MR. GOLDMAN:
21    Q   How much money did ProtectMarriage.com
22 spend that was done on behalf of
23 ProtectMarriage.com?
24       MR. TYLER:  Objection.  I'm going to
25 assert the First Amendment privilege.

Page 215

1        Counsel, I think you're going too far in
2  this.  If you have public records and want to
3  question him on matters of public record, that's one
4  thing, but to -- this was a multi-million-dollar
5  campaign, with millions of dollars of expenditures.
6        I'm not going to subject my client to that
7  kind of -- I think it's bordering on harassment on
8  expecting him to be able to respond to that
9  question.
10       And based upon the First Amendment
11 privilege, I'm going to instruct him not to respond.
12       MR. GOLDMAN:  Well, Mr. Tyler, it is
13 obviously important and relevant to this case what
14 activities and messages are attributable to
15 ProtectMarriage.com.  And if, as Mr. Schubert has
16 testified, ProtectMarriage.com was paying people to
17 do things that it is for some reason not calling on
18 behalf of ProtectMarriage.com, then we are entitled
19 to explore the factual basis to determine whether,
20 in fact, those activities and messages should be
21 attributed to ProtectMarriage.com, notwithstanding
22 Mr. Schubert's disclaimer that, for whatever
23 unexplained reason, the work was not on behalf of
24 ProtectMarriage.com.
25       MR. TYLER:  And to the extent you want to

Page 216

1  produce documents that are publicly available that
2  address this, that's fine, you can question him on
3  that, but I'm not going to instruct him to respond
4  to overbroad, vague questions on a campaign that
5  spent millions of dollars with countless people, as
6  far as I know, and I don't know, but countless
7  vendors and persons who have been paid for various
8  things, such as services and reimbursement of costs
9  and whatever it might be.
10       So to ask him today, without having a
11 computer in front of him that identifies every
12 potential person that has written a check, I think
13 it's completely unreasonable, and I'm going to
14 object because I think the First Amendment applies,
15 the privilege applies here.  And I think that you --
16 by asking him that overbroad question, he may not --
17 he may tread upon the First Amendment issues because
18 how is he going to know whether or not something was
19 publicly -- something was made public.
20       MR. GOLDMAN:  Thank you.  I understand
21 your objection.  Your objection is on the record.
22       I think that it is interfering with our
23 right to discover what messages were disseminated by
24 ProtectMarriage.com.  But, you know, we don't need
25 to debate that here.  We will take this up at the

1 appropriate time, but I think it's clearly relevant
2 information.
3      Why don't we mark this as Exhibit 46 --
4      THE VIDEOGRAPHER: 48.
5      MR. GOLDMAN: 48.
6      THE VIDEOGRAPHER: Good.
7      (Schubert Exhibit 48 was marked for
8      identification.)
9 BY MR. GOLDMAN:
10     Q   I'm going to represent to you that this is
11 a portion of ProtectMarriage.com's financial
12 disclosure, sorted by payee.  And I'll ask you to
13 look at page 8 of this document.
14     MR. TYLER: I will assert a First
15 Amendment privilege, first, with regard to this
16 document, unless Mr. Schubert can testify that he
17 recognizes this as being a document that was
18 submitted with the public disclosure.
19 BY MR. GOLDMAN:
20     Q   Do you see four payments to Mr. Garlow at
21 the bottom of this page, Mr. Schubert?
22     **A   Yes, I do.**
23     Q   And tell me, if you would, what Mr. Garlow
24 was paid for?
25     MR. TYLER: Objection. I'm going to

1 assert a First Amendment privilege as well.  He's
2 already testified to what Mr. Garlow has done; what
3 is publicly available here, there is an explanation.
4 And beyond that, he does not need to testify to
5 specifics.  It invades his First Amendment
6 privilege.
7      I'm going to instruct him not to respond.
8      MR. GOLDMAN: You objected to the general
9 questions.  Then you told me to show him specifics
10 and ask him about specifics, so I did that.  And
11 you're also instructing him not to respond as to
12 specifics.
13     MR. TYLER: Well, the information that is
14 made public here, such as on October 7, 2008, James
15 Garlow, appears he provided professional services.
16 It says legal and accounting.
17      And with that, I think that's all of the
18 public information that's required to be disclosed.
19 And I don't believe you're entitled to any further
20 information.
21 BY MR. GOLDMAN:
22     Q   Who is Christopher Clark?
23     **A   Christopher Clark is a pastor.**
24     Q   And let me direct your attention to page 4
25 of the exhibit.

1     **A   (Witness complies.)**
2     Q   Did ProtectMarriage.com pay Christopher
3 Clark?
4     **A   Yes.**
5     Q   Were those payments for work that
6 Mr. Clark did for or on behalf of
7 ProtectMarriage.com?
8     MR. TYLER: Objection. I'll assert the
9 First Amendment privilege.  The document speaks for
10 itself.
11      This is a campaign disclosure.  It
12 identifies services that were performed.  And I do
13 not believe that he, Mr. Schubert, has an obligation
14 to disclose anything beyond what is already
15 disclosed in this campaign disclosure.
16 BY MR. GOLDMAN:
17     Q   And were the payments to Mr. Garlow that
18 we looked at earlier for work that he performed for
19 or on behalf of ProtectMarriage.com?
20     MR. TYLER: Assert the same objection.
21 The payments are public record, and they're
22 identified.
23      Based upon the First Amendment, I'll
24 instruct you not to respond.
25 ////

1 BY MR. GOLDMAN:
2     Q   Let me ask you to look back at Exhibit 47,
3 which is this California timeline.
4      And I want to ask you, the three items at
5 the bottom are simulcast rallies.  Do you see those
6 three items?
7     **A   Yes, I do.**
8     Q   Can you tell me what a simulcast rally is?
9     MR. COOPER: What page are we on? I'm
10 sorry.
11     MR. TYLER: Document 47.
12     MR. COOPER: Oh.
13     MR. TYLER: First, I'm going to assert an
14 objection on the basis that he is not -- he's
15 previously testified this is not his document; that
16 he can not testify to the accuracy.
17      And I object to vagueness, to the extent
18 you're asking for him to identify what a simulcast
19 is.  I think he can testify to what he understands a
20 simulcast to be, but not necessarily what is or has
21 occurred in this document.
22     MR. GOLDMAN: I didn't ask him about the
23 document.
24     MR. TYLER: You're referring to the
25 document, Counselor, please.

Page 221

1    BY MR. GOLDMAN:
2       Q   What is a simulcast rally, Mr. Schubert?
3       A   **My understanding is a simulcast is a**
4    **production technique whereby activities at one**
5    **location are made available by satellite to other**
6    **locations.**
7       Q   And did ProtectMarriage.com promote or
8    publicize the three simulcast rallies referred to on
9    this document?
10      A   **I don't know.**
11      Q   Did ProtectMarriage.com help to develop
12   the content of the three simulcast rallies referred
13   to on this page?
14          MR. TYLER:  Objection.  Violates First
15   Amendment privilege.
16          I'll instruct you not to respond.
17   BY MR. GOLDMAN:
18      Q   Were members of the press encouraged to
19   attend the simulcast rallies?
20          MR. TYLER:  I'll object on the basis of
21   First Amendment privilege and instruct you not to
22   respond, except to the extent that you can -- except
23   to the extent that you have knowledge that press was
24   publicly invited through a press release or
25   something of that nature.

Page 222

1           THE WITNESS:  I don't know if there's
2    information in the public domain related to that or
3    not.
4           MR. GOLDMAN:  Well, just so I understand,
5    is it your contention that an e-mail to a reporter
6    or a news organization, a private individual e-mail
7    to a reporter, saying, "Please join the simulcast
8    rally; please listen to it; you may want to write
9    about it for your newspaper," is that e-mail from
10   ProtectMarriage.com to the reporter covered by the
11   First Amendment privilege?
12          MR. COOPER:  No.
13          And is that the question that you're going
14   to put to the witness, and are you asking if the
15   witness extended an invitation of that kind to the
16   media --
17          MR. GOLDMAN:  My question --
18          MR. COOPER:  -- with respect to an event
19   that wasn't a ProtectMarriage event, unless I
20   misunderstood the testimony?
21          MR. GOLDMAN:  My question was whether
22   Mr. Schubert knows whether members of the media were
23   invited or encouraged to attend these simulcast
24   rallies.
25          The instruction was not to answer if it

Page 223

1    was an individual e-mail to a reporter.  And I just
2    had to clarify, I don't believe that's an
3    appropriate instruction.
4           I think an individual e-mail to a reporter
5    still counts as inviting a member of the press to
6    join, view, hear the simulcast rally.  And if the
7    answer to my question is, yes, because those e-mails
8    were sent, I think I'm entitled to that answer.
9           MR. TYLER:  That's okay.  I think
10   Mr. Cooper is correct, and you're correct as well,
11   so I'll allow him to respond to that.
12          THE WITNESS:  Could you repeat the
13   question, please?
14   BY MR. GOLDMAN:
15      Q   Were members of the press encouraged or
16   invited to attend the simulcast rallies?
17      A   **I don't know.**
18          MR. GOLDMAN:  We are marking the next
19   document as Schubert Exhibit 49.
20          (Schubert Exhibit 49 was marked for
21          identification.)
22          THE WITNESS:  Thank you.
23   BY MR. GOLDMAN:
24      Q   Have you ever seen this document before,
25   Mr. Schubert?

Page 224

1       A   **No, I have not.**
2       Q   Do you see at the top, where it says,
3    "ProtectMarriage.com presents protecting marriage
4    Vote Yes on Prop 8 rallies"?
5           Do you see that?
6       A   **Yes, I do see that.**
7       Q   Is it your testimony that those rallies
8    were not, in fact, presented by ProtectMarriage.com?
9       A   **I believe my testimony was I had not seen**
10   **the document.**
11      Q   Were these rallies presented by
12   ProtectMarriage.com?
13      A   **No.**
14      Q   Do you see the Web address at the bottom
15   of this document?
16      A   **I do.**
17          **Are you speaking of the footer at the**
18   **bottom?**
19      Q   Yes.
20      A   **Where it says CCN?**
21      Q   Yes, ccnet.tv.
22      A   **Yes.**
23      Q   Do you know what that is?
24      A   **I believe this is a Web address,**
25   **associated with the company CCN, which, I believe,**

Page 225

1   **is a company that specializes in the production of**
2   **simulcasts.**
3   Q   Have you seen any of these simulcast
4   rallies?
5   MR. TYLER: Objection. Vague.
6   You're speaking of these particular
7   simulcasts identified in Exhibit 49?
8   MR. GOLDMAN: Yes.
9   THE WITNESS: Are you -- is there a
10  question pending for me?
11  BY MR. GOLDMAN:
12  Q   Yes. Have you seen any of these simulcast
13  rallies?
14  **A   Not to my knowledge.**
15  Q   Did ProtectMarriage.com pay for any
16  expenses related to these simulcast rallies?
17  MR. TYLER: Objection. If that
18  information is not publicly disclosed, I'll instruct
19  you not to respond, based upon the First Amendment
20  privilege.
21  THE WITNESS: I believe that the public
22  information that has been disclosed would reflect
23  payments for the costs of these simulcast rallies.
24  BY MR. GOLDMAN:
25  Q   If I can ask you to look back at

Page 226

1   Exhibit 48, on page 4.
2   Just around the middle of the page, there
3   are three payments to the Church Communication
4   Network?
5   **A   Yes.**
6   Q   Do you understand these to be the payments
7   that relate to the simulcast rallies?
8   **A   Yes.**
9   Q   Do you know if any of the expenses
10  associated with the simulcast rallies were treated
11  as a donation to ProtectMarriage.com?
12  MR. TYLER: Objection. I'm going to
13  assert the First Amendment privilege as to services
14  provided via donation are not discoverable and
15  instruct my client not to respond to that question.
16  BY MR. GOLDMAN:
17  Q   Well, ProtectMarriage.com is required to
18  report donations, isn't it?
19  **A   Certainly.**
20  Q   So that information would be publicly
21  available, correct?
22  **A   The existence of a donation, the amount of**
23  **the donation, and certain legal information required**
24  **of the entity that made the donation would be**
25  **publicly disclosed.**

Page 227

1   Q   And given that fact, were any of the
2   expenses associated with the three simulcasts
3   treated as a donation to ProtectMarriage.com?
4   MR. TYLER: I'll instruct my client to
5   respond only to the extent that the information is
6   publicly available.
7   Otherwise, I assert a First Amendment
8   privilege on his behalf and instruct him not to
9   respond.
10  THE WITNESS: I am not aware of
11  information in the public domain relative to
12  donations associated with the simulcast.
13  BY MR. GOLDMAN:
14  Q   Was one of the simulcasts called "The Fine
15  Line"?
16  **A   I don't know.**
17  Q   Well, if you look at Exhibit 49, the
18  second simulcast there --
19  **A   Yes.**
20  Q   -- do you see the words, "The Fine Line"?
21  Does that refresh your recollection as to
22  whether one of the simulcasts was called "The Fine
23  Line"?
24  **A   Well, as I just testified, I don't know**
25  **whether the simulcast was called a "Fine Line" or**

Page 228

1   **not because I am not familiar with the simulcast at**
2   **all.**
3   **If you're asking me, as a matter of the**
4   **record, that the simulcast identified in the middle**
5   **is, according to this document, called "The Fine**
6   **Line," then I would say the document calls it "The**
7   **Fine Line."**
8   MR. GOLDMAN: Can we take a short break,
9   please?
10  MR. TYLER: Okay.
11  THE VIDEOGRAPHER: We are going off the
12  record. The time is approximately 4:19 p.m.
13  (Discussion off the record.)
14  THE VIDEOGRAPHER: We are going back on
15  the record. The time is approximately 4:24 p.m.
16  MR. GOLDMAN: Let's mark as the next
17  document, Schubert Exhibit 50.
18  (Schubert Exhibit 50 was marked for
19  identification.)
20  BY MR. GOLDMAN:
21  Q   Just tell me whether or not you have ever
22  seen this document before?
23  **A   I don't believe so, no.**
24  Q   And if you would look at page 5 of 6?
25  **A   (Witness complies.)**

Page 229

1    Q   Down at the bottom, do you see the
2  disclaimer there, ProtectMarriage.com?
3    **A   Yes, I do.**
4    Q   Is that the disclaimer that
5  ProtectMarriage.com used in its materials?
6    **A   This is a disclaimer that was used at some**
7  **point during the campaign.**
8    Q   And I take it you do not know why that
9  disclaimer appears at the end of this document.
10   **A   I don't recall seeing this document before**
11 **now.**
12   Q   Does the appearance of the disclaimer at
13 the end of the document suggest to you anything
14 about the document?
15   **A   In the normal course of events, if the**
16 **campaign produced a document by which the terms of**
17 **the disclosure laws would require it to post a**
18 **disclaimer, then the campaign would have done that.**
19   Q   But you don't know whether this document
20 was produced or paid for by ProtectMarriage.com.  Is
21 that correct?
22   **A   That's correct.**
23      MR. GOLDMAN:  The next document will be
24 Schubert Exhibit 51.
25 ////

Page 230

1      (Schubert Exhibit 51 was marked for
2      identification.)
3  BY MR. GOLDMAN:
4    Q   And let me ask whether you have ever seen
5  this document before.
6    **A   No, I have not.**
7    Q   Do you see, towards the bottom of the
8  document, where it says, "Paid for by
9  ProtectMarriage.com"?
10   **A   I do.**
11   Q   I take it you do not know whether, in
12 fact, this document was paid for by
13 ProtectMarriage.com.
14   **A   That's correct.**
15      MR. GOLDMAN:  We're marking as Exhibit
16 Schubert 52 the next document.
17      (Schubert Exhibit 52 was marked for
18      identification.)
19 BY MR. GOLDMAN:
20   Q   Let me ask whether you have seen this
21 document before.
22   **A   No, not to my knowledge.**
23   Q   Do you see at the end, towards the end of
24 document, where it says, "Paid for by
25 ProtectMarriage.com"?

Page 231

1    **A   Yes, I do.**
2    Q   I take it you have no knowledge whether,
3  in fact, this document was paid for by
4  ProtectMarriage.com?
5    **A   That's correct.**
6      MR. GOLDMAN:  We'll mark the next document
7  as Schubert Exhibit 53.
8      (Schubert Exhibit 53 was marked for
9      identification.)
10      THE WITNESS:  Thank you.
11 BY MR. GOLDMAN:
12   Q   Can you identify this document for me?
13   **A   This appears to be a press release issued**
14 **by ProtectMarriage.com, upon occasion of the**
15 **endorsement of the California Catholic Conference in**
16 **support of Proposition 8.**
17   Q   And I take it that the name on here,
18 Jennifer Kerns, that was someone who was a member of
19 ProtectMarriage.com?
20   **A   Jennifer Kerns was a vendor retained by**
21 **ProtectMarriage.com for the purpose of serving as**
22 **communications director.**
23      MR. GOLDMAN:  The next document is being
24 marked as Schubert Exhibit 54.
25 ////

Page 232

1      (Schubert Exhibit 54 was marked for
2      identification.)
3  BY MR. GOLDMAN:
4    Q   And can you identify this document, for
5  the record?
6    **A   This appears to be a press release from**
7  **ProtectMarriage.com on occasion of a donation from**
8  **the Knights of Columbus.**
9    Q   In fact, ProtectMarriage.com did receive a
10 $1 million donation from the Knights of Columbus.
11 Is that correct?
12   **A   Yes, it is.**
13      MR. GOLDMAN:  We are marking the next
14 exhibit as Schubert Exhibit 55.
15      (Schubert Exhibit 55 was marked for
16      identification.)
17      THE WITNESS:  Thank you.
18 BY MR. GOLDMAN:
19   Q   If you could identify this document for
20 the record, Mr. Schubert.
21   **A   Is the question, can I identify the**
22 **document?**
23   Q   Yes.
24   **A   I believe this is a document prepared by a**
25 **supporter, supporting group, a group supporting**

Page 233

1  **Proposition 8.**
2      Q   And at the bottom of the document, it
3  indicates that it was paid for by
4  ProtectMarriage.com.
5      Do you see that?
6      **A   Yes, I do.**
7      Q   And was this document paid for by
8  ProtectMarriage.com?
9      **A   I don't know.**
10     Q   Do you have any reason to doubt it was
11 paid for by ProtectMarriage.com?
12     **A   I have no information on the document.**
13         MR. GOLDMAN:  The next document will be
14 marked as Schubert Exhibit 56.
15         (Schubert Exhibit 56 was marked for
16         identification.)
17         THE VIDEOGRAPHER:  Six and a half hours
18 right now, about six and a half, approximately.
19         MR. TYLER:  For the record, so we're not
20 arguing over it, ma'am, could you give us the
21 specific time when seven hours is up?
22         THE VIDEOGRAPHER:  I'll figure it out for
23 you right now.
24         MR. TYLER:  Thank you.
25         That assumes we continue from this point

Page 234

1  forward without a break.
2  BY MR. GOLDMAN:
3      Q   Can you identify this document for the
4  record, please?
5      **A   This appears to be a press release from**
6  **ProtectMarriage.com, announcing the support of**
7  **Proposition 8 by another organization.**
8      Q   And that other organization is
9  CatholicsForProtectMarriage.com?
10     **A   That's what is indicated on the document.**
11     Q   And was the website,
12 CatholicsForProtectMarriage.com paid for or
13 supported by ProtectMarriage.com?
14     **A   I don't know.**
15     Q   Now, Bill May was the chairman for
16 CatholicsForProtectMarriage.com.  Is that right?
17     **A   Bill May was an active participant in the**
18 **campaign.  And he's listed in this document as**
19 **chairman for CatholicsForProtectMarriage.com.**
20     Q   And was he paid by ProtectMarriage.com?
21         MR. TYLER:  Objection.  Except to the
22 extent that it is identified as a matter of public
23 record on the campaign disclosures, or otherwise
24 made public, I would instruct you not to answer that
25 question on the basis of the First Amendment.

Page 235

1      THE WITNESS:  I believe the public
2  documents, campaign reports, will show payments to
3  Bill May.
4  BY MR. GOLDMAN:
5      Q   And was he paid for work that he did for
6  or on behalf of ProtectMarriage.com?
7          MR. TYLER:  Objection.  The campaign
8  disclosures will identify what he was paid for.  And
9  as a result, I would instruct my client not to
10 respond on the basis of the First Amendment, looking
11 at Exhibit 48 that identifies specific items for
12 which Bill May was paid by the campaign.
13         MR. GOLDMAN:  But I understood from
14 Mr. Schubert's testimony, that would not identify
15 whether what he did was for or on behalf of
16 ProtectMarriage.com, and that's why I asked that
17 question.
18         Are you instructing him not to answer that
19 question.
20         MR. TYLER:  I think I understand your
21 question whether or not it was for the greater
22 Proposition 8 cause or whether it was -- whether he
23 was speaking on behalf of Prop 8
24 ProtectMarriage.com, right?
25         MR. GOLDMAN:  My question was whether he

Page 236

1  was paid for work that he did for or on behalf of
2  ProtectMarriage.com.
3          THE WITNESS:  I believe the public
4  campaign reports reflect payments to Mr. May from
5  ProtectMarriage.com.  Those payments could reflect
6  work done in pursuit of the broader support of
7  Proposition 8.  It could reflect expense
8  reimbursements.  It could reflect a number of
9  things.
10 BY MR. GOLDMAN:
11     Q   And my question is whether you know
12 whether the work he was paid for was work done for
13 or on behalf the ProtectMarriage.com?
14         MR. TYLER:  Objection.  First Amendment.
15 Instruct him not to respond.
16         THE VIDEOGRAPHER:  Approximately 26
17 minutes.
18         MR. TYLER:  Can you identify, is it --
19         THE VIDEOGRAPHER:  I can identify it
20 through my tape right here, so 26 minutes will be
21 right when it gets to one hour, 16 minutes, on my
22 tape, that will be seven hours.
23         THE WITNESS:  Ten after 5:00?
24         THE VIDEOGRAPHER:  Approximately.
25         MR. GOLDMAN:  We are going to mark the

Page 237

1 next document as Schubert Exhibit 57.
2      (Schubert Exhibit 57 was marked for
3      identification.)
4 BY MR. GOLDMAN:
5   Q   Can you identify this document for the
6 record, please?
7   **A   I cannot identify the document, other than**
8 **to acknowledge that it appears, on the face of the**
9 **document, to come from a third-party organization in**
10 **support of Proposition 8.**
11   Q   And do you have any reason to doubt that
12 it was paid for by ProtectMarriage.com, as indicated
13 at the bottom of the document?
14   **A   I have no information on that either way.**
15      MR. GOLDMAN:  The next document is being
16 marked as Schubert Exhibit 58.
17      (Schubert Exhibit 58 was marked for
18      identification.)
19 BY MR. GOLDMAN:
20   Q   Can you identify this document for the
21 record?
22   **A   This appears to be an ad in a print**
23 **publication.**
24   Q   Is it an ad that was paid for by
25 ProtectMarriage.com?

Page 238

1   **A   I believe it was.**
2   Q   Do you know where this ad was published?
3   **A   Not specifically, no.**
4      MR. GOLDMAN:  We're marking the next
5 document as Schubert Exhibit 59.
6      (Schubert Exhibit 59 was marked for
7      identification.)
8      THE WITNESS:  Thank you.
9 BY MR. GOLDMAN:
10   Q   And if you could identify this document
11 for the record, please?
12   **A   This is a print ad for**
13 **ProtectMarriage.com.**
14   Q   And this was paid for by
15 ProtectMarriage.com?
16   **A   Yes, as far as I know.**
17      MR. GOLDMAN:  We will mark the next
18 document as Schubert Exhibit 60.
19      (Schubert Exhibit 60 was marked for
20      identification.)
21 BY MR. GOLDMAN:
22   Q   And could you identify this document for
23 the record, please?
24   **A   I believe this is a newspaper ad produced**
25 **by ProtectMarriage.com.**

Page 239

1      MR. GOLDMAN:  We will mark the next
2 document as Schubert Exhibit 61.
3      (Schubert Exhibit 61 was marked for
4      identification.)
5 BY MR. GOLDMAN:
6   Q   Have you seen this document before?
7   **A   No, I have not.**
8   Q   Do you see that the Web address at the
9 bottom is indicated as www.preservingmarriage.org?
10   **A   Yes, I see that.**
11   Q   Do you have any familiarity with that
12 website?
13   **A   No.**
14   Q   You've never been to that website before?
15   **A   Not to my knowledge.**
16   Q   Did ProtectMarriage.com coordinate at all
17 with the content -- regarding the content of this
18 website?
19      MR. TYLER:  Objection.  First Amendment
20 privilege as testified earlier -- or as I objected
21 earlier.  Judge Walker has identified that as
22 protected information and irrelevant.
23      I'm going to instruct my client not to
24 respond to that question.
25      MR. GOLDMAN:  That's fine, but it's

Page 240

1 obviously not irrelevant, if the answer to the
2 question is yes, but...
3      I understand you have instructed your
4 client not to answer.
5 BY MR. GOLDMAN:
6   Q   And my question is whether you have ever
7 seen this document before.
8      THE VIDEOGRAPHER:  Exhibit 62.
9      MR. GOLDMAN:  Did I fail to say that?
10      THE VIDEOGRAPHER:  Yes.
11      MR. GOLDMAN:  We have marked this as
12 Schubert Exhibit 62.
13      (Schubert Exhibit 62 was marked for
14      identification.)
15      THE WITNESS:  I believe I have seen this
16 document.
17 BY MR. GOLDMAN:
18   Q   When have you seen this document before?
19   **A   It would have been during the course of**
20 **the Proposition 8 campaign.**
21   Q   Did ProtectMarriage.com play any role in
22 developing or approving the content of this website?
23      MR. TYLER:  Objection.  First Amendment
24 privilege as it pertains to work that was done on
25 this.  I think you can ask him if this is a

Page 241

1  publication of ProtectMarriage.com.
2       But I would instruct my client not to
3  respond to the question pending.
4  BY MR. GOLDMAN:
5     Q   Well, it's not a publication -- it's not
6  identified as a publication of ProtectMarriage.com,
7  correct?
8     **A   That's correct.  It appears to be a**
9  **publication of The Church of Jesus Christ of**
10 **Latter-Day Saints.**
11    Q   That's why I asked whether
12 ProtectMarriage.com had any input in the content of
13 this website.
14       MR. TYLER:  Object, again, based upon the
15 First Amendment privilege.  This goes to strategy
16 and coordination of efforts, if any.
17 BY MR. GOLDMAN:
18    Q   Did Focus on the Family -- well, let me
19 ask the preliminary question.  What is Focus On the
20 Family?
21    **A   Focus On the Family, to my understanding,**
22 **is a national pro-family organization, based in**
23 **Colorado.**
24    Q   And did Focus On the Family send out mass
25 e-mails on behalf of ProtectMarriage.com?

Page 242

1        MR. TYLER:  Objection.  Vague.  Also
2  assert the First Amendment privilege as to any
3  internal communications and/or coordination between
4  Focus On the Family and ProtectMarriage.com, if any
5  actually did occur.
6        Based on the associational rights of my
7  client, I'll instruct him not to respond to the
8  question.
9        MR. GOLDMAN:  If Focus On the Family sent
10 out a mass e-mail on behalf of ProtectMarriage.com,
11 that's not -- that's not private.  That would be a
12 mass communication on behalf of ProtectMarriage.com,
13 done by Focus On the Family?
14       MR. TYLER:  I'm not concerned about the --
15 about whether or not the communication was issued.
16 I'm concerned about your attempt to get to the
17 relationship, if any, between Focus On the Family
18 and ProtectMarriage.com.
19       And that relationship is protected by the
20 First Amendment as confidential, and it has a
21 privilege based upon the association of the two
22 organizations, if any actually did exist.
23       Therefore, I'm instructing my client not
24 to respond to your question.
25       If you have documents produced by Focus On

Page 243

1  the Family, you could present them and ask him if
2  that represents a statement of the campaign, but I'm
3  not going to allow you to inquire into the
4  relationship.
5  BY MR. GOLDMAN:
6     Q   If Focus On the Family were to distribute
7  an e-mail on behalf of ProtectMarriage.com, that
8  would be recorded as a nonmonetary donation to
9  ProtectMarriage.com, correct, and publicly
10 disclosed?
11       MR. TYLER:  Objection.  Vague.  Incomplete
12 hypothetical.
13       MR. COOPER:  Calls for a legal conclusion
14 as well.
15       MR. TYLER:  If you know.
16 BY MR. GOLDMAN:
17    Q   You can answer the question.
18    **A   There would be circumstances under**
19 **California's campaign finance laws that would**
20 **require ProtectMarriage.com to report a known**
21 **contribution of an in-kind nature, that's correct.**
22    Q   All right.  Given that, let me ask, did
23 Focus On the Family send out mass e-mails on behalf
24 of ProtectMarriage.com?
25       MR. TYLER:  Objection.  Same objection

Page 244

1  previously asserted.  This goes to the associational
2  rights between the two organizations, if any
3  relationship did occur.
4        And, again, you can question him and
5  present a document to him.  If some public document
6  reflects a communication, you can question him as to
7  that communication.
8        But I'll instruct him not to respond,
9  based upon the First Amendment privilege.
10       MR. GOLDMAN:  All right.  Let's mark this
11 document as Schubert Exhibit 63.
12       MR. UNO:  Unfortunately, we only have two
13 copies of this particular one.  You're giving your
14 copy away.
15       MR. GOLDMAN:  We have a...
16       THE WITNESS:  Thank you.
17       (Schubert Exhibit 63 was marked for
18       identification.)
19 BY MR. GOLDMAN:
20    Q   Can you identify this document for the
21 record?
22       MR. TYLER:  I'm sorry.  One moment.  We
23 have to finish looking at this document, briefly.
24       MR. GOLDMAN:  I think we're up to 63.
25       MR. COOPER:  63.

Page 245

1    THE WITNESS:  This appears to be pages
2  from the nonmonetary contribution report, filed for
3  the period ending September 30, 2008, by
4  ProtectMarriage.com.
5  BY MR. GOLDMAN:
6    Q   Does that document reflect a nonmonetary
7  contribution to ProtectMarriage.com by Focus On the
8  Family for mass mail?
9    **A   The document reflects, I believe, two --**
10  **if I'm reading this correctly -- two nonmonetary**
11  **contributions for mass mail.**
12    **That description "mass mail" is a**
13  **description that may or may not relate to e-mails**
14  **along the lines that you have previously asked**
15  **about.**
16    Q   What else might it refer to?
17    MR. TYLER:  Objection.  Calls for
18  speculation.  The document speaks for itself.
19    MR. GOLDMAN:  I'm just following up on the
20  testimony he just gave me.
21    (The answer was read as follows:)
22    "A  The document reflects, I
23    believe, two -- if I'm reading this
24    correctly -- two nonmonetary
25    contributions for mass mail.

Page 246

1    That description 'mass mail' is a
2    description that may or may not
3    relate to e-mails along the lines
4    that you have previously asked
5    about."
6    MR. TYLER:  What was the -- what was the
7  follow-up question?
8    (The question was read as follows:)
9    "Q  What else might it refer to?"
10    MR. TYLER:  I stand with the objection.
11  He never referenced in his response that it might
12  refer to something else, just simply that it may or
13  may not.
14  BY MR. GOLDMAN:
15    Q   Do you see the page numbers at the top,
16  out of the 5102 is the total?
17    **A   I do, yes.**
18    Q   Do you have page 4923?
19    **A   Yes, I do.**
20    Q   And do you see the last two entries on
21  that page?
22    **A   Yes, I do.**
23    Q   Those say "broadcast e-mail"?
24    **A   They do.**
25    Q   And that's a nonmonetary contribution from

Page 247

1  Focus On the Family?
2    **A   That's correct.**
3    Q   And do you understand that to refer to
4  mass e-mails that were sent by Focus On the Family
5  on behalf of ProtectMarriage.com?
6    **A   I understand that to refer to an in-kind**
7  **contribution from Focus On the Family on these two**
8  **dates and these two amounts that are recorded as**
9  **broadcast e-mail.**
10    Q   Have you ever heard of a company called
11  Coyote Films?
12    **A   Yes.**
13    Q   What do you know about that company?
14    **A   Coyote Films is in the broadcast business.**
15    Q   Did Coyote Films create anything for or on
16  behalf of ProtectMarriage.com?
17    **A   Coyote Films was, on occasion, part of a**
18  **broadcast production effort and provided services**
19  **related to the production of broadcast materials**
20  **used by ProtectMarriage.com.**
21    Q   And I'm just not sure what you mean by
22  "broadcast materials."
23    **A   Coyote Films specializes in producing**
24  **material for -- to be shown in a visual form,**
25  **television, video, that sort of a thing.**

Page 248

1    Q   Okay.  And right now, as you sit here, do
2  you recall specifically what Coyote Films did?
3    **A   As I sit here, I can testify, as I just**
4  **did, that from time to time Coyote Films was part of**
5  **a production effort that resulted in broadcast**
6  **material produced for ProtectMarriage.com.**
7    Q   We have one more exhibit here, and that
8  takes us up to -- what Schubert exhibit?
9    MR. LIPTON:  64.
10    MR. GOLDMAN:  64.
11    (Schubert Exhibit 64 was marked for
12    identification.)
13  BY MR. GOLDMAN:
14    Q   And can you identify this document for me,
15  Mr. Schubert?
16    **A   Yes.  This appears to be a statement of**
17  **nonmonetary contributions, filed by**
18  **ProtectMarriage.com, for the period of October 1**
19  **through October 18.**
20    Q   Let me ask you to turn to the second page
21  of the exhibit, page 1191 of 1295 at the top.
22    **A   (Witness complies.)**
23    Q   Do you see the last entry on that page, a
24  donation from The Church of Jesus Christ of
25  Latter-Day Saints, and the description is a video

| | Page 249 |
|---|---|

1   production?
2       **A   I do see the entry.**
3       Q    What does "video production" refer to?
4       **A   By the terms of the report, I would say it**
5   **refers to a video production, production of video.**
6       Q    Does that mean creation of a video?
7       **A   I am not familiar with the specifics of**
8   **this, other than to say that they appear to have**
9   **donated in-kind services in the amount of $8,325 for**
10  **video production.**
11      Q    The same is true, there's another entry on
12  the next page for travel and video production.
13      Do you see that?
14      **A   I do.  The second entry?**
15      Q    Yes.
16      **A   Yes.**
17      Q    Do you know whether The Church of Jesus
18  Christ of Latter-Day Saints produced any videos for
19  ProtectMarriage.com?
20      MR. TYLER:  Objection.  Vague.  And I
21  believe you're approaching a First Amendment
22  privilege.
23      However, to the extent it is publicly --
24  the information is publicly available, you can
25  respond.

| | Page 250 |
|---|---|

1       THE WITNESS:  Well, the schedule C
2   nonmonetary contribution report is a public
3   document, and that document reflects that the
4   committee reported an in-kind contribution from The
5   Church of Jesus Christ of Latter-Day Saints for
6   travel and video production in the amount of
7   $6,875/$6,849.
8   BY MR. GOLDMAN:
9       Q    My question was whether you know whether
10  The Church of Jesus Christ of Latter-Day Saints
11  produced a video for ProtectMarriage.com.
12      **A   I know what is described here.**
13      **Are you asking me whether or not this is**
14  **an accurate report?**
15      Q    No.  I'm simply asking you whether The
16  Church of Jesus Christ of Latter-Day Saints produced
17  a video for ProtectMarriage.com.
18      **A   And my response is that by the plain**
19  **reading of this report, The Church of Jesus Christ**
20  **of Latter-Day Saints appears to have caused some --**
21  **appears to have undertaken some activity that**
22  **require ProtectMarriage.com to report an in-kind**
23  **contribution of travel and video production in the**
24  **amount of $6,875.**
25      Q    Do you have any knowledge, independent of

| | Page 251 |
|---|---|

1   what is in this report, whether The Church of Jesus
2   Christ of Latter-Day Saints produced a video for
3   ProtectMarriage.com?
4       **A   No.**
5       Q    You don't know what video, if any, the
6   church produced for ProtectMarriage.com, correct?
7       MR. TYLER:  Objection.  Argumentative.  He
8   already testified that he has no knowledge, outside
9   this report.
10      THE WITNESS:  No.
11      MR. GOLDMAN:  I think I have no further
12  questions for today.  Thank you.
13      MR. TYLER:  Thank you very much.
14      MR. COOPER:  You ran right up to 6:59.
15      THE WITNESS:  Thank you.
16      THE VIDEOGRAPHER:  Are we ready to go off
17  the record?  Are we all in agreement?
18      MR. TYLER:  No.  We need to -- I just want
19  to address this briefly, and I would like to
20  identify the fact that we are producing a log, based
21  upon my previous conversations with counsel for the
22  plaintiffs and the plaintiff intervenors, concerning
23  documents that have been produced.
24      There are question marks here for some
25  documents that we are -- I'm still trying to

| | Page 252 |
|---|---|

1   determine from the defendant intervenors whether
2   they produced those documents.
3       Under the notes, it will say either
4   produced, there will be a question mark.  And then
5   there's also another category of documents that we
6   know have not been produced, and they're pending
7   review; and then documents that are privileged
8   communications that we have not produced and will
9   assert, continue to assert, a privilege.
10      And I would like to just attach it and
11  make it a part of this deposition, as Exhibit 63.
12      THE VIDEOGRAPHER:  You mean 65?
13      THE REPORTER:  65.
14      MR. TYLER:  I'm sorry.  I missed those
15  two.
16      THE VIDEOGRAPHER:  We're all in sync, 65.
17      THE REPORTER:  I need it.
18      MR. GOLDMAN:  It may make more sense to
19  mark it as Defendants' Exhibit 1, rather than
20  plaintiff's exhibit, so that we're clear that it's
21  being introduced by you.
22      MR. TYLER:  That's fine.  However you want
23  to mark it, that's fine, as long as it's attached.
24      THE REPORTER:  I need it to mark it.
25  ////

Page 253

1    (Defendants' Exhibit 1 was marked
2    for identification.)
3    THE REPORTER:  Anything else?
4    MR. TYLER:  That's it.  Go off the record.
5    Thank you very much.
6    THE VIDEOGRAPHER:  Let me announce you
7    off.  Just one second.  I'll do this with you.
8    We are completing Volume I in the
9    deposition of Frank Schubert.
10    The total number of tapes will be retained
11    by Now and Forever Video, at 5633 Country Club
12    Drive, Oakland, California 94618.  The time is now
13    approximately 5:13 p.m.  We are going off the
14    record.
15    (END TIME:  5:13 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 254

1    I declare under penalty of perjury
2    under the laws of the State of California
3    that the foregoing is true and correct.
4    Executed on _____, 2010,
5    at _____, _____.
6
7
8
9    _____
10    SIGNATURE OF THE WITNESS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 255

1    STATE OF CALIFORNIA   )
     ss:
2    COUNTY OF SAN FRANCISCO )
3
4    I, LANA L. LOPER, RMR, CRR, CCP, CME, CLR, CCR,
5    CSR No. 9667, do hereby certify:
6
7    That the foregoing deposition of FRANK SCHUBERT
8    was taken before me at the time and place therein
9    set forth, at which time the witness was placed
10    under oath and was sworn by me to tell the truth,
11    the whole truth, and nothing but the truth;
12    That the testimony of the witness and all
13    objections made by counsel at the time of the
14    examination were recorded stenographically by me,
15    and were thereafter transcribed under my direction
16    and supervision, and that the foregoing pages
17    contain a full, true and accurate record of all
18    proceedings and testimony to the best of my skill
19    and ability.
20    I further certify that I am neither related to
21    counsel for any party to said action, nor am I
22    related to any party to said action, nor am I in any
23    way interested in the outcome thereof.
24
25

Page 256

1    IN WITNESS WHEREOF, I have subscribed my name
2    this 22nd day of December, 2009.
3
4    _____
5    LANA L. LOPER, RMR, CRR, CCP, CME, CLR CCR CSR 9667
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 257

```
1              E X H I B I T S
2              FRANK SCHUBERT
3  EXHIBIT                        PAGE
4  1        Politics Magazine article    36
5           Passing Prop 8, Smart
6           Timing and Messaging
7           Convinced California
8           Voters to Support
9           Traditional Marriage By
10          Frank Schubert and Jeff
11          Flint, February 2009
12 2        ProtectMarriage.com direct   101
13          mail piece re Yes on 8
14 3        Advertisement re Vote        104
15          "YES" on Prop 8
16 4        Top Proposition 8           106
17          Arguments, Fact Sheet,
18          Questions & Answers About
19          Proposition 8, Myths and
20          Facts about Proposition 8,
21          Public Supporter form and
22          Donation Form
23 ///
24
25
```

Page 258

```
1              E X H I B I T S
2              FRANK SCHUBERT
3  EXHIBIT                        PAGE
4  5        Protect Marriage/Yes on     111
5           Prop 8 Campaign Releases
6           First Television
7           Commercial:  "Whether You
8           Like It Or Not"
9  6        ProtectMarriage.com e-mail  112
10          blast Our First TV ad
11 7        ProtectMarriage.com Media   113
12          Advisory
13 8        ProtectMarriage.com         114
14          September 26, 2008
15          document and Press
16          Conference Outline
17 9        Video CD - Whether You      119
18          Like it or Not
19 10       Audio CD - Whether You      121
20          Like it or Not Radio
21 11       Video CD - It's Already     124
22          Happened - English
23 12       Video CD - Everything To    125
24          Do With Schools
25 ///
```

Page 259

```
1              E X H I B I T S
2              FRANK SCHUBERT
3  EXHIBIT                        PAGE
4  13       ProtectMarriage.com Media   128
5           Advisory Proposition 8 to
6           Host a "Protect Marriage"
7           Town Hall
8  14       ProtectMarriage.com         129
9           Marriage Amendment Media
10          Advisory for Planning
11          Purposes
12 15       Video CD - It's Already     131
13          Happened - Spanish
14 16       ProtectMarriage.com e-mail  134
15          blast re Watch Our New Ad
16 17       ProtectMarriage.com         134
17          document dated October 9,
18          2008 Text of Yes on 8's TV
19          Ad Which Began Airing
20          Wednesday: "It's Already
21          Happened"
22 18       ProtectMarriage.com         135
23          document Watch Our New Ad
24 ///
25
```

Page 260

```
1              E X H I B I T S
2              FRANK SCHUBERT
3  EXHIBIT                        PAGE
4  19       ProtectMarriage.com Media   136
5           Advisory for Immediate Use
6           dated October 20, 2008 Yes
7           on 8 Launches Statewide
8           Bus Tour
9  20       Document Instructions for   137
10          Events 1-15
11 21       Marriage Pledge Rally Flow  142
12          of Events and Talking
13          Points
14 22       Document Yes on Prop 8 Bus   146
15          Tour Local Speaker Talking
16          Points - Community Leader
17 23       Document Yes on Prop 8 Bus   147
18          Tour Local Speaker Talking
19          Points - Faith Based
20 24       Document Marriage Pledge     147
21          Rally Flow of Events and
22          Talking Points
23 ///
24
25
```

E X H I B I T S

FRANK SCHUBERT

| EXHIBIT | | PAGE |
|---|---|---|
| 25 | Memo to Dear Friend from Steve Linder and ProtectMarriage.com Dear Friend letter | 150 |
| 26 | ProtectMarriage.com Media Advisory memorandum for Immediate Release dated October 31, 2008 | 152 |
| 27 | Video CD - To Protect Children | 152 |
| 28 | Document re For the sake of our children, please forward this to everyone on your contact list | 156 |
| 29 | Video CD - Gay marriage Already Being Taught in Schools in Massachusetts - The Parker Family | 161 |
| 30 | Video CD - PM Wirthlin YouTube | 163 |
| 31 | Protect Marriage - Yes on 8 - Home Page screen shot | 165 |

E X H I B I T S

FRANK SCHUBERT

| EXHIBIT | | PAGE |
|---|---|---|
| 32 | Protect Marriage SD Protect Marriage CA for Pastors & Churches | 167 |
| 33 | ProtectMarriage.com For Immediate Release dated September 2, 2008 | 171 |
| 34 | iProtectMarriage.com - Vote "Yes" on 8! website screen shot | 172 |
| 35 | Video CD - Have You Thought About It - English | 176 |
| 36 | Video CD - Eduardo Verastegui - Spanish | 176 |
| 37 | Video CD - Finally the Truth - Gavin - Spanish | 178 |
| 38 | Video CD - Finally the Truth with Gavin Cut - English | 178 |
| 39 | Video CD - California_S_Children | 179 |

///

E X H I B I T S

FRANK SCHUBERT

| EXHIBIT | | PAGE |
|---|---|---|
| 40 | Video CD - 1025 Proposition 8 Commercial Teachers | 180 |
| 41 | Video CD - Daddy, Where Do Babies Come From | 181 |
| 42 | Video CD - Civil Rights and Prop 8 | 182 |
| 43 | Audio CD - Garrett AA | 186 |
| 44 | Audio CD - Ron GOP | 186 |
| 45 | E-mail dated July 18, 2008 to messageimpact@comcast.net from ProtectMarriage.com | 190 |
| 46 | E-mail dated August 27, 2008 to Andrew P. Pugno from info@protectmarriage.com | 198 |
| 47 | Protect Marriage California Timeline June 25 - Nov 6, 2008 | 202 |
| 48 | Detailed accounting of expenditures | 217 |

E X H I B I T S

FRANK SCHUBERT

| EXHIBIT | | PAGE |
|---|---|---|
| 49 | ccn.tv/protectmarriage website screen shot | 223 |
| 50 | Focusonthefamily.com article Judicial Tyranny and California Lunacy by Dr. James C. Dobson dated June 2008 | 228 |
| 51 | Focusonthefamily.com article Dr. Dobson Denounces Connecticut Same-Sex Marriage Ruling dated October 10, 2008 | 230 |
| 52 | Citizenlink.org article Dr. Dobson Joins in Prayer for Protection of Marriage 10-29-2008 | 230 |
| 53 | ProtectMarriage.com News Release for Immediate Use dated August 4, 2008 | 231 |
| 54 | ProtectMarriage.com News Release for Immediate Use | 232 |

///

Page 265

1            E X H I B I T S
2            FRANK SCHUBERT
3   EXHIBIT                    PAGE
4   55       ProtectMarriage.com Join    232
5   Catholics Working to Pass
6   Prop 8
7   56       ProtectMarriage.com Press   233
8   Release for Immediate
9   Release
10  57       Advertisement Catholic      237
11  Organizations "Yes on Prop
12  8"
13  58       Advertisement Restoring     237
14  and Protecting Marriage:
15  Yes on Proposition 8
16  59       Advertisement Restoring     238
17  and Protecting Marriage:
18  Yes on Proposition 8
19  60       Article Honest Answers to   238
20  Questions Many
21  Californians are Asking
22  About Proposition 8
23  61       Preservingmarriage.org      239
24  website screen shots
25  ///

1            E X H I B I T S
2            FRANK SCHUBERT
3   EXHIBIT                    PAGE
4   62       Newsroom.lds.org article    240
5   The Divine Institution of
6   Marriage 13 August 2008
7   63       Schedule C Nonmonetary      244
8   Contributions Received re
9   ProtectMarriage.com - Yes
10  on 8, a Project of
11  California Renewal from
12  7/1/2008 through 9/30/2008
13  64       Schedule C Nonmonetary      248
14  Contributions Received re
15  ProtectMarriage.com - Yes
16  on 8, a Project of
17  California Renewal from
18  10/1/2008 through
19  10/18/2008
20  DEFENDANTS'
21  1        Detailed listing re Perry   253
22  v Schwarzenegger listing
23  of documents produced,
24  privileged or pending
25  review