1  DIANA E. RICHMOND (State Bar No. 58122)
   E-Mail:     *drichmond@sideman.com*
2  LOUIS P. FEUCHTBAUM (State Bar No. 219826)
   E-Mail:     *lfeuchtbaum@sideman.com*
3  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Eighth Floor
4  San Francisco, California 94111-3629
   Telephone:  (415) 392-1960
5  Facsimile:  (415) 392-0827

6  Attorneys for Amicus Curiae Justice Donald B. King,
   California Court of Appeal, Retired

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, et al., | CASE NO. 09-CV-2292 VRW |
| Plaintiffs, | **BRIEF OF AMICUS CURIAE JUSTICE DONALD B. KING, RETIRED, IN SUPPORT OF PLAINTIFFS** |
| and | |
| CITY AND COUNTY OF SAN FRANCISCO, | Crtrm.: 6 |
| Plaintiff-Intervenor, | Judge: The Hon. Vaughn R. Walker |
| v. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants, | |
| and | |
| PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, et al., | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

**Page**

I.   STATEMENT OF INTEREST BY AMICUS CURIAE ...................................................... 1

II.  INTRODUCTION ........................................................................................................... 1

III. PROPOSITION 8 IS AN ILLEGITIMATE EXERCISE OF STATE POWER ................... 2

    A.  Proposition 8 was part of a continuing practice that discriminates against gays and lesbians by making constitutional protections contingent upon a majority vote ................................................................................................. 2

    B.  Proposition 8 was an irrational expression of voter prejudice ................................ 4

IV.  THE FUNDAMENTAL RIGHT OF MARRIAGE APPLIES TO EQUALLY TO SAME-SEX AND OPPOSITE-SEX COUPLES ................................................................ 6

    A.  Constitutionally protected fundamental rights, like the right to marry, are not statically defined .................................................................................. 6

    B.  The traditional definitions of marriage do not preclude same-sex marriage ............. 6

V.   CHILDREN IN PARTICULAR ARE HARMED BY THEIR PARENTS' NOT BEING ALLOWED TO MARRY .................................................................................. 8

    A.  Legal parentage for children of same-sex couples is more precarious than for children of marriage ............................................................................... 8

VI.  THE RIGHT TO MARRY PER SE CREATES BENEFITS THAT SHOULD BE AVAILABLE TO SAME-SEX PARTNERS AND THEIR CHILDREN ........................... 11

VI.  CONCLUSION ............................................................................................................ 13

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 8TH FLOOR
SAN FRANCISCO, CALIFORNIA 94111

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Dawn D. v. Superior Court*,
  17 Cal.4th 932 (1998) ............................................................................................................. 12

*Griswold v. Connecticut*,
  381 U.S. 479 (1965) ................................................................................................................ 10

*In re Jesusa V.*,
  32 Cal.4th 588 (2004) .............................................................................................................. 11

*In re Marriage Cases*,
  43 Cal.4th 757 (2008) ................................................................................................................ 7

*In re Nicholas H.*,
  28 Cal.4th 56 (2002) ................................................................................................................ 11

*K.M. v. E.G.,* 37 Cal.4th 130 (2005) ............................................................................................ 13

*Knight v. Superior Court*,
  128 Cal.App.4th 14 (2005) ...................................................................................................... 13

*Kristine H. v. Lisa R.*,
  37 Cal.4th 156 (2005) .............................................................................................................. 12

*Lawrence v. Texas*,
  539 U.S. 558 (2003) ..................................................................................................... 7, 8, 9, 10

*Loving v. Virginia*,
  388 U.S. 1 (1965) ............................................................................................................ 5, 9, 10

*Miller-Jenkins v. Miller-Jenkins*,
  2006 VT 78 (912 A. 2d 951) (2006) ....................................................................................... 13

*Miller-Jenkins v. Miller-Jenkins*,
  637 S.E.2d 330, 49 Va.App. 88 (Va.Ct.App. 2006) ................................................................ 13

*Moore v. City of East Cleveland*,
  431 U.S. 494 (1977) ................................................................................................................... 9

*Perez v. Sharp*,
  32 Cal.2d 711 (1948) ......................................................................................................... 14, 16

*Petition of Hill*,
  775 F.2d 1037 (9th Cir. 1985) ................................................................................................. 10

*Romer v. Evans*,
   517 U.S. 620 (1996) .................................................................................................... 6, 8

*Turner v. Safley*,
   482 U.S. 78 (1987) ...................................................................................................... passim

*U.S. Dep't. of Agriculture v. Moreno*,
   413 U.S. 528 (1973) ............................................................................................................ 8

*United States v. Patillo*,
   817 F.Supp. 839 (C.D. Cal. 1993) ...................................................................................... 7

*Zablocki v. Redhail*,
   434 U.S. 374 (1978) ................................................................................................. 5, 9, 10

**STATUTES**

Cal. Fam. Code § 297.5 ........................................................................................................... 12

Cal. Fam. Code § 297.5(d) ............................................................................................... 11, 12

Cal. Fam. Code §§ 297.5(d) and 7540 .................................................................................... 12

Cal. Fam. Code §§ 297-299.6 ................................................................................................. 11

Cal. Fam. Code § 2330.1 ......................................................................................................... 12

Cal. Fam. Code § 4053(a) ....................................................................................................... 14

Cal. Fam. Code § 7540 ............................................................................................................ 12

Cal. Fam. Code § 7541 ............................................................................................................ 12

Cal. Fam. Code § 7611(d) ....................................................................................................... 11

Cal. Fam. Code § 7800 ............................................................................................................ 14

Cal. Fam. Code § 9000 ............................................................................................................ 11

Cal. Stats. 2003 Ch. 421 (AB 205) §15 ................................................................................... 11

Prob. Code § 1610(a) .............................................................................................................. 14

1 **OTHER AUTHORITIES**

2 Andrew Koppelman, "*Interstate Recognition of Same-Sex Marriages and Civil Unions: A
3     Handbook for Judges*," 153 U. Pa. L. Rev. 2143 (2004-2005) .............................................. 13

4 Cal. Const. art. XVIII, § 1 ............................................................................................................ 7

5 Daily Record, Nov. 9, 1988 .......................................................................................................... 6

6 Fourteenth Amendment ................................................................................................... 4, 5, 9, 10

7 Gilbert Herdt and Robert Kertzner, "*I Do, But I Can't: The Impact of Marriage Denial on
      the Mental Health & Sexual Citizenship of Lesbians and Gay Men in the United
8     States*" ................................................................................................................................. 15

9 Jean O'Leary, *Anita Bryant's Crusade*, N.Y. Times, June 7, 1977 ............................................... 6

10 John Cloud, *Why Gay Marriage was Defeated in California* ...................................................... 6

11 Jonathan Rauch, *Gay Marriage* (2004) ...................................................................................... 16

12 Linda J. Waite and Maggie Gallagher, *The Case for Marriage: Why Married People Are
13     Happier, Healthier, and Better Off Financially* (2000) ........................................................ 15

14 Michael S. Wald, *Same-Sex Couple Marriage: A Family Policy Perspective* ............................ 16

15 Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* (2000) .............................. 15

16 Roberta Bennett and David Gamblin, "*Domestic Partnership: Not Enough,*" ............................ 12

17 Defendant-Intervenors' Trial Memorandum, Doc. No. 295 ("Trial Memo") ........................... 4, 5

## I. STATEMENT OF INTEREST BY AMICUS CURIAE

The Honorable Donald B. King, a retired Justice of the California Court of Appeal, has worked indefatigably for more than three decades to improve the practice of family law in California. Appointed to the Superior Court in 1976, he initiated the practice of mediation to aid families in resolving child custody disputes and helped promulgate uniform family law rules for the San Francisco Bay Area county courts. He has co-authored the pre-eminent family law treatise in California, the California Practice Guide - Family Law (The Rutter Group) and has taught at several Bay Area law schools. He has received numerous awards, including the California State Bar Judicial Officer of the Year, later renamed after him, and the National Public Service Award of the American Academy of Matrimonial Lawyers.

Justice King seeks to appear as amicus curiae on behalf of plaintiffs in this action as part of his lifelong work in support of the institution of marriage, which he believes should not be denied to one class of people on the basis of sexual orientation. A motion for leave to file this brief is being filed concurrently.

## II. INTRODUCTION

Proposition 8 is but one example of how a majority can trample upon the fundamental rights of a disfavored minority by stoking the public's fears and prejudices. Constitutional protections become meaningless when they can be overturned by a mere majority vote because an individual's inalienable and fundamental rights then only exist by a license that is revocable.

Marriage is among those fundamental rights that are protected for all people by the Due Process Clause of the Fourteenth Amendment. There is no rational reason for an exception to be carved out for how this fundamental right applies to gays and lesbians ("gays"), just as there was no rational reason for an exception to be carved for how this fundamental right applies to interracial couples. When a class of citizens seeks to preserve its constitutionally guaranteed liberties, the only proper inquiry is whether the Constitution guarantees that liberty interest for all. We do not redefine the liberty interest by asking whether it should apply to a particular class.

Plaintiffs in this case, like same-sex couples throughout the country, seek the same right to marry that already exists. They do not seek the right to "gay marry" any more than a religious couple

seeks the right to "church marry," or an interracial couple seeks the right to "interracially marry," or a prisoner seeks the right to "inmate marry." This fundamental right applies to all of those classes of citizens. The law may not discriminate against same-sex couples, or against any of them, unless there is some compelling justification for it to do so.

There is no rational reason that gays should be precluded from establishing enduring relationships that are ennobled by marriage's obligations, protected by the law, and recognized by the State in the same manner as are the relationships between heterosexual couples. Under California law, the inherent differences between domestic partnerships and marriage are harmful to the stability of same-sex relationships, retard the growth of family relationships, and are detrimental to the children of same-sex couples. There is no rationale that can justify this disparate treatment. The reasons offered by Defendants in this case are grounded in animus and are counter to the California Family Code.

## III. PROPOSITION 8 IS AN ILLEGITIMATE EXERCISE OF STATE POWER

A same-sex couple who wants to preserve their loving relationship by marrying is indistinguishable from an opposite-sex couple who wants to do the same thing. In both instances, marriage is the couples' "expression[] of emotional support and public commitment." *Turner v. Safley*, 482 U.S. 78, 95 (1987). In both instances, marriage provides the couples with a means to preserve "the most important relation in life." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978). In both instances, marriage "is an association for as noble a purpose as any involved [in law]." *Id.* at 384.

The right to marry a person of one's own choice is a fundamental liberty interest, protected by the Due Process Clause of the Fourteenth Amendment. *Loving v. Virginia*, 388 U.S. 1, 12 (1965). This right "is of fundamental importance for *all* individuals." *Zablocki*, 434 U.S. at 384 (emphasis added). It is protected from "unjustified governmental interference[.]" *Id.* at 385 (internal quotations and internal citations omitted). Unfortunately, these fundamental guarantees may be only temporal when they are put before a plebiscite.

### A. Proposition 8 was part of a continuing practice that discriminates against gays and lesbians by making constitutional protections contingent upon a majority vote

Proposition 8 is only one of the most recent efforts in a long line of ballot initiatives that have used prejudice against gays to enact discriminatory measures. The ballot box has been frequently

used to overturn legislative and judicial acts that were intended to prevent anti-gay discrimination. This reflects that a pervasive prejudice remains in our society, which often relegates gays to a second-class citizenship.  In 1977, Anita Bryant convinced voters to overturn a Miami-Dade County ordinance, which prohibited discrimination on the basis of sexual orientation.  By its very name, her "Save Our Children" campaign suggested that southern Florida's children could be safe only if discrimination against gays could continue.[1]  While there have been numerous such local ballot initiatives, voter animus has also been used in many campaigns that have amended state constitutions to allow unequal treatment for gays:

- In 1988, Oregon voters passed "Measure 8," which revoked employment protections for gays who worked in the Executive Branch of state government.  (*Oregon Goes Democratic!*, Ellensburg (WA) Daily Record, Nov. 9, 1988, p. 11.)

- In 1992, the Colorado Constitution was amended through a voter initiative to repeal all policies and legislation that protected homosexuals from discrimination, and to bar homosexuals from using the political process to secure new protections.  *See Romer v. Evans*, 517 U.S. 620, 623-31 (1996).

- In Florida, a ballot initiative amended the state constitution to ban not only same-sex marriages, but also to ban civil unions between same-sex couples.  John Cloud, *Why Gay Marriage was Defeated in California*, Time Magazine, Nov. 5, 2008.

- In Arkansas, a ballot initiative amended the state constitution to invalidate an earlier ruling by the Arkansas Supreme Court, which found that prohibitions against gays adopting children, or having foster children, were in violation of the state's constitution.[2]  The Court had determined those regulations were motivated solely by anti-gay bias.  *Id.*

- In California, Proposition 8 amended the state constitution to effectively overturn a California

---

[1] Jean O'Leary, *Anita Bryant's Crusade*, N.Y. Times, June 7, 1977, p. 35.

[2] Arkansas Secretary of State Website. http://www.votenaturally.org/electionresults/index.php?ac:show:contest_statewide=1&elecid=181&contestid=5.  *See also Homosexual Adoption Ban to Appear on Ballot*, WorldNetDaily, Aug. 25, 2008. http://www.wnd.com/index.php?fa=PAGE.view&pageId=73411

Supreme Court decision, which found that laws relating to marriage applied equally to same-sex couples as to opposite-sex couples. *See In re Marriage Cases*, 43 Cal.4th 757, 856-7 (2008) (describing that laws allowing marriage apply to same-sex couples under the due process and equal protection clauses of the California Constitution).

A temporal expression of the majoritarian will cannot be sufficient to disadvantage a class of citizens under the law. *See Lawrence v. Texas*, 539 U.S. 558, 571 (2003) (rejecting the notion that a majority can use the power of the State to enforce its views in violation of the Constitution). However, Proposition 8, like other voter initiatives, presents a very real danger that constitutional protections for unpopular groups can be removed anytime the public's passions and prejudices are swayed at an election. This danger is particularly acute in California, where the State Constitution can be amended with a bare majority of the voters' assent in any given election. Cal. Const. art. XVIII, § 1.

Throughout the history of our country, an independent judiciary has been the ultimate protector of the Constitution. Proposition 8 violates a centuries-old American maxim, that the courts of our nation have a duty to protect "the rights of minorities against abuse at the hands of the majority[.]" *United States v. Patillo*, 817 F.Supp. 839, 843 (C.D. Cal. 1993).

### B.     Proposition 8 was an irrational expression of voter prejudice

Proposition 8 seized upon society's prejudice and fear, convincing voters that they and their families needed to prevent same-sex marriage in order to remain protected from homosexuals. *See Lawrence*, 539 U.S. at 571 (for the proposition that "for centuries there have been powerful voices to condemn homosexual conduct as immoral."). In addition to the television commercials and advertisements supporting Proposition 8 that are presently in evidence before this Court, the Defendant-Intervenors' ("Defendants'") own filings in this case seem to acknowledge that Proposition 8 is predicated upon irrational prejudice. Among these, Defendants claim that:

- Gays possess so potent a taint, the vital institution of marriage would be weakened merely by recognizing their equal rights to marry. Defendant-Intervenors' Trial Memorandum ("Trial Memo"), Doc. No. 295 at 6.

///

BRIEF OF AMICUS CURIAE JUSTICE DONALD B. KING, RETIRED, IN SUPPORT OF PLAINTIFFS

- Same-sex marriage could detract from heterosexual men's parenting abilities, "likely resulting in fewer men believing it is important for them to be active, hands-on parents of their children[;]"
- Same-sex marriage could inspire widespread belief in "polyamory and polygamy", leading to them becoming "judicially enforceable legal entitlement[s;]"
- Same-sex marriage would weaken the connection of heterosexual fathers to their children by sending "a message to men that they have no significant place in family life[;]"
- Same-sex marriage would harm religion and citizenship by forcing "Americans to choose between being a believer and being a good citizen[;]"
- Same-sex marriage could even "pos[e] a risk to children and the demographic continuity of society."

Trial Memo. Doc. No. 295 at 12-14.[3]

Of course, Defendants fail to describe any causative nexus between the occurrence of same-sex marriage and their forecasted harms. Such broadly unsubstantiated claims of extreme harm seem to rely upon a belief that this class of citizens is so despicable, society could falter by merely allowing their equal existence. *See Romer*, 517 U.S. at 632 (The "sheer breadth [of a discriminatory amendment] is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class that it affects[.]").

Whether society's prejudices against homosexuals result from personal notions of tradition and morality, instead of malice, does not affect their lack of legal merit. *See U.S. Dep't. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) (a desire to harm a politically unpopular group cannot be a legitimate government interest). Prejudice and bigotry against a class do not become constitutionally ennobled by simply adding "immoral" to the list of contumelies that are used against them. *See Lawrence*, 539 U.S. at 578 ("[T]he fact that the governing majority in a State has traditionally viewed

---

[3] We do not challenge Defendants' contention that same-sex marriage would cause increasing "complaint[s] that the legal and practical benefits of marriage properly belong to everyone." Trial Memo. Doc. No. 295 at 15. That is precisely our point.

a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice[.]").

## IV. THE FUNDAMENTAL RIGHT OF MARRIAGE APPLIES TO EQUALLY TO SAME-SEX AND OPPOSITE-SEX COUPLES

### A. Constitutionally protected fundamental rights, like the right to marry, are not statically defined

The liberty interests that are protected by the Due Process Clause of the Fourteenth Amendment "[are] not a series of isolated points pricked out" in the precise terms of specifically enumerated guarantees. *Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977) (internal quotations omitted). Rather, they include "a rational continuum" which. . . includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . ." *Id.*

Given that the Due Process Clause does not make any distinctions between how it treats the liberty interests of homosexuals and the liberty interests of heterosexuals with regard to sodomy, there is no discernable reason for the Due Process Clause to make distinctions between how it treats the liberty interests of same-sex couples and the liberty interests of opposite-sex couples with regard to the fundamental right to marry. *See Lawrence*, 539 U.S. at 601 (J. Scalia, dissenting) (noting that the majority opinion "leaves on pretty shaky grounds state laws limiting marriage to opposite-sex couples."). Plaintiffs in this case are same-sex couples seeking the right to marry; not same-sex couples seeking the right to "gay marry."

### B. The traditional definitions of marriage do not preclude same-sex marriage

Our history demonstrates that the definition of marriage is not a static thing, constrained by its historical antecedents. While marriage has always been a relationship between two committed people that is specially recognized by the law, its other characteristics have changed with time. "Traditional marriage" did not explicitly apply to people of different races, prison inmates, nor to men who had child support obligations for issue not in their custody. *See Loving v. Virginia*, 388 U.S. 1 (1967) (regarding inter-racial couples); *Turner v. Safley*, 482 U.S. 78 (1987) (regarding prison inmates); *Zablocki v. Redhail*, 434 U.S. 374 (1977) (regarding child support). However, modern law has recognized all of these groups as having a constitutionally protected right to marry. *See id.*

An ability to procreate is not a factor that can rationally exclude same-sex couples from the fundamental right to marry because it is not a condition precedent for marriage between opposite-sex couples. Infertile couples, octogenarians, incarcerated prisoners, and people with an unwavering devotion to the use of contraceptives can all marry without distinction under the law. *See Turner*, 482 U.S. 78 (1987) (regarding prison inmates); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (regarding contraceptives).

It is sophistic to suggest that same-sex marriage is a different institution than opposite sex marriage due to the fact that same-sex couples were not explicitly mentioned in laws relating to marriage. It appears that "the concept of the homosexual as a distinct category of person did not emerge until the late 19th century." *Lawrence*, 539 U.S. at 568. Prior to 1973, the American Psychiatric Association had homosexuality misclassified as a mental disorder. *Petition of Hill*, 775 F.2d 1037, 1039 (9th Cir. 1985).

It is outside the realm of reason to expect that a group would have been explicitly mentioned in marriage laws at a time when that group was not known to exist, or during a period when that group was classified as being mentally ill. Earlier misunderstandings about homosexuality cannot remove same-sex marriage from the scope of constitutional protection any more than earlier misunderstandings about race could remove interracial marriage from constitutional protection. *See Loving v. Virginia*, 388 U.S. 1 (1967). In both situations, the freedom to marry is a vital personal right that is protected by the Due Process Clause of the Fourteenth Amendment. *Id.* at 12.

Regardless of sexual orientation, "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring." *Lawrence*, 539 U.S. at 567. "[P]ersonal decisions relating to marriage" are "among the decisions that an individual may make without unjustified governmental interference[.]" *Zablocki*, 434 U.S. at 385 (internal quotations and internal citations omitted). Same-sex couples do not possess any characteristic that could rationally justify depriving them of this most important relation in life. *See Id.* at 384 (declaring that marriage is the most important relation in life). Once the state provides the legal rights and protections of marriage to some, it cannot withhold those rights and protections from others based upon arbitrary distinctions. *See Lawrence*, 539 U.S. at 583 (stating that moral

disapproval of a group cannot justify discriminatory laws).

The ability of opposite-sex couples to procreate and establish parentage does not establish a justification for denying same-sex couples the fundamental right to marry because California does not rely upon biology to establish parentage. *See In re Jesusa V.*, 32 Cal.4th 588 (2004) ; *In re Nicholas H.*, 28 Cal.4th 56 (2002). Instead, a presumption of parentage arises when a person "receives the child into his [or her] home and openly holds out the child as his [or her] natural child." Cal. Fam. Code § 7611(d). Further, California law has sought to remove any distinctions in how the children of domestic partnerships and the children of married couples are treated. "The rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses." Cal. Fam. Code § 297.5(d); *see also* Cal. Fam. Code § 9000. Unfortunately, it does not follow that children of same-sex couples are unharmed by their parents' inability to marry.

## V. CHILDREN IN PARTICULAR ARE HARMED BY THEIR PARENTS' NOT BEING ALLOWED TO MARRY

### A. Legal parentage for children of same-sex couples is more precarious than for children of marriage

Enactment of the California Domestic Partnership Rights and Responsibilities Act was intended to secure to eligible couples and their children all of the same rights and responsibilities as exist for married couples. Cal. Stats. 2003 Ch. 421 (AB 205) §15 and Cal. Fam. Code §§ 297-299.6. However, children of registered domestic partners[4] are not yet vested with all of the legal rights of children of marriage. They are also subject to considerable uncertainty as to the legal stability of their parentage. The parentage of children of same-sex couples who were either born prior to their parents' registration as domestic partners, or born to couples who do not register is far more uncertain.

---

[4] There are tens of thousands of children being raised in households with same-sex parents who are adversely affected by discriminatory marriage laws. The number of same-sex households across the United States totaled 594,391 in the U.S. Census 2000. U.S. Census Bureau, Census 2000 Summary File 1.  www.census.gov/prod/2003pubs/censr-5.naf.  In the 2000 Census, California had 92,138 same-sex unmarried households – more than any other state in the nation; and, of these households, 20.2 percent (18,612) of the male partners and 34.3 percent of the female partners (31,603) – collectively 54.5 percent (50,215) of all same-sex households - included their own and/or unrelated children. U.S. Census, *supra.* Seventy-four percent (74%) of same-sex couples want to be legally married. "*Same-Sex Marriage: Mental Health Perspectives,*" Psychiatric Times, August 1, 2006.

Despite California's good intentions to treat children of registered domestic partners in the same manner as it treats children of spouses, as set forth in Cal. Fam. Code § 297.5(d), one cannot simply read that code section and understand it, without knowing the entirety of the Family Code. No one who is not an expert in California family law can possibly understand what rights are conveyed by Cal. Fam. Code § 297.5. Even for those who are expert in California family law, substantial uncertainty and potential disparity remain in determining parentage for the children of such partnerships. This uncertainty and disparity would be substantially eliminated if same-sex partners were allowed to marry.

By application of Cal. Fam. Code §§ 297.5(d) and 7540, a child born during a registered domestic partnership should be recognized as a child of both partners. However, these sections could be undercut by Cal. Fam. Code § 7541, which allows blood tests to disprove the 'conclusive' presumption of parentage, provided in Cal. Fam. Code § 7540. These statutes have been construed for married couples, where the biological father is not the husband, in a way to promote the stability of the family unit. *Dawn D. v. Superior Court*, 17 Cal.4th 932 (1998). However, it is unclear whether registered domestic partners (for whom one partner is virtually always not a biological parent) will be treated the same as married partners in this analysis.

While the registered domestic partnership has created many opportunities that did not previously exist for same-sex couples, the different category of family created by the Act creates an added layer of statutory interpretation, and an added layer of confusion. As a result of this, many family lawyers shy away from representing domestic partners because the law is too new, too complex and too confusing. See, e.g., Roberta Bennett and David Gamblin, "*Domestic Partnership: Not Enough,*" Los Angeles Daily Journal, July 27, 2007, www.dailyjournal.com.

There are other inequities for determining parentage of registered domestic partners, which do not exist for married couples. In a marital dissolution proceeding, a trial court may determine the parentage of children born before the marriage. Cal. Fam. Code § 2330.1. However, the criteria for determining parentage in a domestic partnership dissolution have not been fully articulated. In previous cases, the California Supreme Court has stopped short of endorsing a pre-birth or post-birth adjudication of parentage for same-sex partners who wish to obtain a judgment establishing joint

1  parentage. *Kristine H. v. Lisa R.,* 37 Cal.4th 156 (2005). The Court created a different criterion for
2  children born of an ova donation from one same-sex partner to the other than the criterion provided by
3  the Family Code for children born to married couples of artificial insemination. *K.M. v. E.G.,* 37
4  Cal.4th 130 (2005).

5  Maintaining parentage becomes a complex issue for a family when its members move from
6  one state to another.[5] While no one thinks to question the parentage of children born to opposite-sex
7  married couples, regardless of where they married, the issue is quite otherwise for children of same-
8  sex partners, even registered domestic partners. "[U]like a marriage, domestic partnership will not
9  automatically be recognized in other states. Therefore, if the domestic partners move out of
10 California, the rights bestowed by our state's domestic partnership may well become illusory." *Knight*
11 *v. Superior Court*, 128 Cal.App.4th 14, 33-34 (2005). As also noted by the court in *Knight, supra,*
12 domestic partners do not have the same freedom to travel without losing the benefits of their union as
13 married persons. This disparity burdens same-sex couples and their children when traveling or
14 relocating to another state and those burdens can be significant.[6]

15 The burdens of interstate recognition of parentage for children of same-sex couples can be
16 vexing, as one out-of-state case makes clear. A lesbian couple separated with one partner residing in
17 Vermont and the other in Virginia. Dissolution of the couple's civil union and determining custody of
18 their child consumed four years of litigation and required decisions by both the Vermont Supreme
19 Court and the Virginia Intermediate Appellate Court. *Miller-Jenkins v. Miller-Jenkins*, 637 S.E.2d
20 330, 49 Va.App. 88 (Va.Ct.App. 2006); *Miller-Jenkins v. Miller-Jenkins*, 2006 VT 78 (912 A. 2d 951)
21 (2006). The economic and emotional costs of such prolonged litigation cannot but harm the children

---

[5] When California registered domestic partners move to another state, the recognition by that state of their dual parentage is uncertain. This uncertainty destabilizes the long-term family relationship. As a result of this, California registered domestic partners who want to move to another state are being advised to take redundant measures and obtain a decree of adoption for the non-birth parent or obtain (if they can) an adjudication that the non-birth parent is a co-parent before they relocate.

[6] For a thoughtful discussion generally of the problems of interstate recognition, *see* Andrew Koppelman, "*Interstate Recognition of Same-Sex Marriages and Civil Unions: A Handbook for Judges*," 153 U. Pa. L. Rev. 2143 (2004-2005)

1  involved.

2  Such fragile rights of parentage is unthinkable for married couples, but it is a harsh reality for
3  same-sex parents, including those who have registered as domestic partners. A child whose second
4  parent is not recognized may be involuntarily separated from that parent and forced into foster care, in
5  the event of the recognized parent's death or disability. This violates California's public policy of
6  fostering stability for children and it would seem to be against the rational interests of all conceivable
7  parties. See, *e.g.,* Cal. Fam. Code § 7800 and Prob. Code § 1610(a).

8  Children of same-sex parents are also financially harmed. Although California recognizes a
9  parent's "first and principal obligation is to support his or her minor children according to the parent's
10 circumstances and station in life" (Cal. Fam. Code § 4053(a)), a child whose second parent is not
11 recognized is deprived of support from that person. This is in addition to the deprivation of the
12 financial support and attendant benefits such as health and life insurance and Social Security benefits
13 that harms the child.

14 This vulnerability would be substantially lessened if the partners were simply accorded the
15 right of every other adult in society to marry the person of his or her choice. *Perez v. Sharp*, 32 Cal.2d
16 711 (1948). Marriage is universally recognized, and children of a married couple – even if the couple
17 is same-sex rather than opposite-sex – are more likely to have both their parents recognized as such
18 than children of registered domestic partners.

19 **VI. THE RIGHT TO MARRY *PER SE* CREATES BENEFITS THAT SHOULD BE AVAILABLE TO SAME-SEX PARTNERS AND THEIR CHILDREN**
20

21 Because California has attempted to provide as many as possible of the rights and
22 responsibilities of spouses to registered domestic partners, the question is purely posed before this
23 Court of whether denial of the right to marry *per se* discriminates against same-sex partners and their
24 children. Civil marriage by itself– the status and the title – conveys benefits to couples that are not
25 replicated by registered domestic partnership. Marriage is an expression of emotional support and
26 public commitment, with spiritual significance; these features are by themselves sufficient to form a
27 constitutionally protected status. *Turner v. Safley*, 482 U.S. 78, 95-96 (1987) (granting prisoners the
28 constitutional right to marry).

Marriage is universally recognized, understood, and respected. "Marriage commands greater respect from popular opinion and implies a greater commitment than 'living together.' The position of legal marriage above comparable relationships resists toppling. Contestation over same-sex marriage has, ironically, clothed the formal institution with renewed honor." Nancy F. Cott, *Public Vows: A History of Marriage and the Nation* (2000) Harvard University Press. By contrast to marriage, registered domestic partnership is little-known, not well understood and not accorded the sanctity, *gravitas* or social respect of marriage. As discussed above, the petitioners in this action and their children, as well as their families, recognize registered domestic partnership as an institution inferior to marriage, as indeed it is.

> [S]tigmatization of homosexuality is perpetuated by discrimination in marriage denial and that, in turn, perpetuates a vicious circle. Because they are not being allowed to marry, same-sex couples often experience commitment ambiguity marked by uncertainty about the extent of mutual obligations in the relationship; uncertainty about the recognition of the partnership by family, friends, and others; and uncertainty about when the relationship is over.[7]

"What gay couples cannot get is legal and social recognition of their relationships."[8] Marriage, like no other institution, creates kinship. Granted, anyone can declare that any other person is a member of his or her family; but nothing unites two unrelated families as does a marriage. Weddings are public events that pull together not only the individuals to be married, but also their extended relatives. Weddings thus introduce the newly-created families and announce to the community the couple's deep commitment to each other.

> Marriage confers status: to be married, in the eyes of society, is to be grown up. Marriage creates stakes: someone depends on you. Marriage creates a safe harbor for sex. Marriage puts two heads together, pooling experience and braking impulsiveness. Of all the things a young person can do to move beyond the vulnerability of early adulthood, marriage is far and away the most fruitful. We all need

---

[7] *Same-Sex Marriage: Mental Health Perspectives,* Psychiatric Times, August 1, 2006. See also Gilbert Herdt and Robert Kertzner, "*I Do, But I Can't: The Impact of Marriage Denial on the Mental Health & Sexual Citizenship of Lesbians and Gay Men in the United States,*" 3 J. Sexuality Res. & Soc. Pol'y. 33 (2006).

[8] Linda J. Waite and Maggie Gallagher, *The Case for Marriage: Why Married People Are Happier, Healthier, and Better Off Financially* (2000), Doubleday.

> domesticating, not in the veterinary sense but in a more literal, human sense: we need a home.  We are different people when we have a home: more stable, more productive, more mature, less self-absorbed, less impatient, less anxious.  And marriage is the great domesticator.[9]

Marriage provides "a critical form of social insurance,"[10] in that it creates a duty of each married partner to care for the other when ill, which in turn lessens the duty of the State to do so.

The argument that gays or lesbians can marry a person of the opposite sex affords them only the opportunity to form a sham marriage.  This argument dishonors the institution of marriage itself and discredits the fundamental issue of choice.  Anyone advancing that argument need only ask himself what it would feel like to be able to marry only someone he would never choose to marry.  As demonstrated above, marriage *per se* (as distinguished from the attendant legal rights and responsibilities or a relationship of some other name, such as domestic partnership) confers unique benefits.

The ability to make the commitment of marriage, even when one or both of the spouses cannot consummate the marriage or otherwise live together as a married couple, is constitutionally protected. *Turner v. Safely, supra.*  The fundamental component of choosing one's marital partner is part of this constitutional protection.  *Perez v. Sharp*, 32 Cal.2d 711, 725 (1948) (recognizing the importance of an individual being able to marry the person "of his choice and that person to him may be irreplaceable").

## VI.    CONCLUSION

Marriage is a fundamental right that applies to same-sex couples equally as it applies to opposite-sex couples.  The right to marry cannot be denied because, not only does the State lack any compelling interest that can be served by denying gays and lesbians this fundamental right, but there is not any rational reason to support this disparate treatment by the law.

/ / /

---

[9]    Jonathan Rauch, *Gay Marriage* (2004) Times Books, Henry Holt and Company, LLC.

[10]   Michael S. Wald, *Same-Sex Couple Marriage: A Family Policy Perspective,* 9 Va. J. Soc. Policy & L. 291 (Fall 2001).

1  Everyday throughout this country, people meet, they fall in love, and they design a life
2  together based upon the legal protections, stability, and public recognition that marriage offers for
3  them. Everyday, gays and lesbians are harmed because these things are denied to them. Everyday in
4  California, the children of same-sex couples are harmed because they are stigmatized by the lack of
5  recognition for their families, and their relationships with their same-gender parents do not have the
6  same protections of law that are provided for other children in this state. The inequalities and harms
7  that result from denying same-sex couples the legal right to marry are unjustified and cannot be
8  sustained.

9  For all of the foregoing reasons, this Court should assert the judiciary's traditional role in
10 guarding the constitutional rights for all citizens by restoring the rights of same-sex couples to marry.

12 DATED: February 3, 2010                SIDEMAN & BANCROFT LLP

14                                        By:  /s/ *Diana E. Richmond*
                                               DIANA E. RICHMOND
15                                             LOUIS P. FEUCHTBAUM
                                          Attorneys for Amicus Curiae Justice Donald B. King,
16                                        California Court of Appeal, Retired

8172\918734v2

14  Case No. 09-CV-2292 VRW
BRIEF OF AMICUS CURIAE JUSTICE DONALD B. KING, RETIRED, IN SUPPORT OF PLAINTIFFS