1   ERIC ALAN ISAACSON (120584)
    erici@csgrr.com
2   STACEY M. KAPLAN (241989)
    staceyk@csgrr.com
3   655 West Broadway, Suite 1900
    San Diego, CA  92101
4   Telephone:  619/231-1058
    619/231-7423 (fax)
5

6   Attorneys for *Amici Curiae* Unitarian Universalist Legislative Ministry California; Unitarian
    Universalist Legislative Ministry Action Network, CA; Unitarian Universalist Association:
7   California Faith for Equality; California Council of Churches; California Council of Churches
    Church IMPACT; Northern California Nevada Conference of the United Church of Christ;
8   Southern California Nevada Conference of the United Church of Christ; General Synod of the
    United Church of Christ; Universal Fellowship of Metropolitan Community Churches; Pacific
9   Association of Reform Rabbis; and Progressive Jewish Alliance

10                           UNITED STATES DISTRICT COURT

11                        NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12  KRISTIN M. PERRY, et al., ) | No. 09-cv-02292-VRW |
| ) | |
| 13                    Plaintiffs, ) | [PROPOSED] BRIEF OF *AMICI CURIAE* |
| ) | UNITARIAN UNIVERSALIST |
| 14         – and – ) | LEGISLATIVE MINISTRY CALIFORNIA; |
| ) | UNITARIAN UNIVERSALIST |
| 15  CITY AND COUNTY OF SAN FRANCISCO,) | LEGISLATIVE MINISTRY ACTION |
| ) | NETWORK, CA; UNITARIAN |
| 16            Plaintiff-Intervenor, ) | UNIVERSALIST ASSOCIATION; |
| ) | CALIFORNIA FAITH FOR EQUALITY; |
| 17         vs. ) | CALIFORNIA COUNCIL OF CHURCHES; |
| ) | CALIFORNIA COUNCIL OF CHURCHES |
| 18  ARNOLD SCHWARZENEGGER, et al., ) | CHURCH IMPACT; NORTHERN |
| ) | CALIFORNIA NEVADA CONFERENCE OF |
| 19                    Defendants, ) | THE UNITED CHURCH OF CHRIST; |
| ) | SOUTHERN CALIFORNIA NEVADA |
| 20         – and – ) | CONFERENCE OF THE UNITED CHURCH |
| ) | OF CHRIST; GENERAL SYNOD OF THE |
| 21  PROPOSITION 8 OFFICIAL PROPONENTS ) | UNITED CHURCH OF CHRIST; |
| DENNIS HOLLINGSWORTH, et al. ) | UNIVERSAL FELLOWSHIP OF |
| 22 ) | METROPOLITAN COMMUNITY |
| Defendant-Intervenors. ) | CHURCHES; PACIFIC ASSOCIATION OF |
| 23 _____ ) | REFORM RABBIS; AND PROGRESSIVE |
| | JEWISH ALLIANCE, IN SUPPORT OF |
| 24 | PLAINTIFFS |
| 25 | Date:       To be determined |
| | Time:       To be determined |
| 26 | Judge:      Chief Judge Walker |
| | Location:   Courtroom 6, 17th Floor |
| 27 | Trial Date: January 11, 2010 |

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     IDENTITY AND INTEREST OF *AMICI* ........................................................2

III.    ARGUMENT .....................................................................................................3

        A.      Proposition 8 Was Enacted to Codify Religious Attitudes Hostile to
                Homosexuals and Homosexuality..........................................................3

        B.      Proposition 8 Denies, Rather than Protects Religious Liberty ...............9

IV.     CONCLUSION..................................................................................................15

1

# TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

*Bandari v. INS*,
  227 F.3d 1160 (9th Cir. 2000) ...................................................................12

5

*Barghout v. Bureau of Kosher Meat & Food Control*,
  66 F.3d 1337 (4th Cir. 1995) ....................................................................15

6

7

*Commack Self-Service Kosher Meats, Inc. v. Weiss*,
  294 F.3d 415 (2d Cir. 2002)......................................................................15

8

*County of Allegheny v. ACLU*,
  492 U.S. 573 (1989)....................................................................................14

9

*Edwards v. Aguillard*,
  482 U.S. 578 (1987)....................................................................................14

10

11

*Epperson v. Arkansas*,
  393 U.S. 97 (1968)......................................................................................14

12

*In re Marriage Cases*,
  43 Cal. 4th 757, 76 Cal. Rptr. 3d 683, 183 P. 3d 384 (2008) ...................10

13

14

*Kedroff v. Saint Nicholas Cathedral*,
  344 U.S. 94 (1952)......................................................................................14

15

*Lee v. Weisman*,
  505 U.S. 577 (1992)....................................................................................14

16

17

*Loving v. Virginia*,
  388 U.S. 1 (1967)........................................................................................13

18

*Norani v. Gonzales*,
  451 F.3d 292 (2d Cir. 2006).......................................................................12

19

20

*Perez v. Sharp*,
  32 Cal. 2d 711, 198 P.2d 17 (1948).....................................................13, 15

21

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
  426 U.S. 696 (1976)....................................................................................14

22

23

*Torcaso v. Watkins*,
  367 U.S. 488 (1961)....................................................................................11

24

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1872) ...................................................................14

25

26

**STATUTES, RULES AND REGULATIONS**

27

California Family Code
  §420(b)........................................................................................................10

28

1

2                                                                            **PAGE**

3   **SECONDARY AUTHORITIES, BOOKS AND ARTICLES**

4   David S. Ariel, *What Do Jews Believe?* (1996).......................................................12

5   Newell G. Bringhurst, *Saints, Slaves, and Blacks: The Changing Place of Black
        People Within Mormonism* (1981).......................................................13, 14

6
    Lester E. Bush, Jr., *Mormonism's Negro Doctrine: An Historical Overview*, in
7       *Neither White nor Black: Mormon Scholars Confront the Race Issue in a
        Universal Church* (Lester E. Bush, Jr. & Armand L. Mauss, eds., 1984).......................13

8
    *Catechism of the Catholic Church* (Washington, D.C.: Libreria Editrice Vaticana,
9       2d ed. 1997)
        ¶1603 ...........................................................................................10
10      ¶1635 ...........................................................................................11
        ¶2384...........................................................................................12, 13
11
    Rebecca Cathcart, *Donation to Same-Sex Marriage Foes Brings Boycott Calls*, New
12      York Times, July 17, 2008..................................................................9

13  Churches IMPACT, *How Would Jesus Vote?  The California Council of Churches
        IMPACT Recommendations for the 2008 State Ballot Propositions*..................................4
14
    *Code of Canon Law* (1917), Canon 1060 ...........................................................11
15
    Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to
16      Give Legal Recognition to Unions between Homosexual Persons* (2003)...................7, 11

17  Patrick Egan & Kenneth Sherill *California's Proposition 8: What Happened and
        What Does the Future Hold?* (National Gay & Lesbian Task Force, 2009)...................9
18
    Louis M. Epstein, *Marriage Laws in the Bible and the Talmud* (1942).......................12
19
    Jerry Falwell, *Listen America!* (1980) ...........................................................7
20
    First Presidency, *Preserving Traditional Marriage and Strengthening Families*,
21      June 29, 2008 ...........................................................................................6

22  First Presidency, *Statement on Position of Blacks within the Church and Civil Rights*,
        December 16, 1969. ...........................................................................................14
23
    Alfred J. Kolatch, *The Second Jewish Book of Why* (2000) .......................................12
24
    Michael G. Lawler, *Interchurch Marriages: Theological and Pastoral Reflections*
25      (2004)...........................................................................................11

26  Jan G. Lin, *What's Wrong With The Christian Right* (2004).......................................4

27

28

**PAGE**

*Marriage, family advocate in state to support Coburn*, The Oklahoman, Oct. 23, 2004...............7

Jesse McKinley & Kirk Johnson, *Mormons Tipped the Scales in Ban on Gay Marriage*, New York Times, Nov. 15, 2008...................................................6, 7

Linda J. Patterson, *Hate Thy Neighbor: How the Bible is Misused to Condemn Homosexuality* (2009).........................................................3, 7

*Marriage in the Catholic Tradition: Scripture, Tradition, and Experience* (Todd A. Salzman, et al., eds., 2004) Ch. 22, 222..................................11

*Neither White nor Black: Mormon Scholars Confront the Race Issue in a Universal Church* (Lester E. Bush, Jr. & Armand L. Mauss, eds., 1984).........................13

Religion & Public Life, *U.S. Religious Landscape Survey* (2008)..........................5

Mark Schoofs, *Mormons Boost Antigay Effort – Group has Given Millions in Support of California Fund*, Wall Street Journal, Sept. 20, 2008 ......................6

Southern Baptist Convention *Resolution on Homosexuality*, June 1977........................7

Southern Baptist Convention *Resolution on Homosexuality*, June 1980........................7

Southern Baptist Convention *Resolution on Homosexuality*, June 1988........................7

Southern Baptist Convention *Resolution on Homosexual Marriage*, 1996..................4, 8

John Shelby Spong, *The Sins of Scripture:  Exposing the Bible's Texts of Hate to Reveal the God of Love* (2005)..........................................3

Chris Thompson, *The Father of Proposition 8:  Meet Oakland Bishop Salvatore Cordileone, the Apostle of the Movement to Deprive Gay Men and Lesbians of the Right to Marry*, East Bay Express, Aug. 12, 2009 ......................9

U.S. Conference of Catholic Bishops, *Compendium – Catechism of the Catholic Church*, (Washington, D.C.: Libreria Editrice Vaticana, 2006) ¶349 ...........................................................13

David Van Biena & Jeff Israelly, *Getting to Know Him: How the Pope is Showing Hints of Being His Own Man*, TIME, Aug. 1, 2005 ......................13

*Yearbook of American & Canadian Churches* 2008 (Eileen W. Lindner, ed., 2008) ..................3

Yohanan Friedman, *Tolerance and Coercion in Islam: Interfaith Relations in Muslim Tradition* (2003) 160-93 ........................................12

## I.    INTRODUCTION

*Amici* respectfully submit that Proposition 8 both reflects and improperly codifies strongly negative religious attitudes toward homosexuality and homosexuals not universally shared by all faiths and denominations.  Anti-gay religionists placed Proposition 8 on the ballot and financed the campaign to deprive gay and lesbian Californians of a fundamental civil right – the right to marry. Polling shows, moreover, a strong correlation between certain religious attitudes and the inclination to vote for the reactionary measure.  California should not be permitted to strip a disfavored minority of a fundamental civil right by enacting its most powerful sects' religious doctrine as general law.

Proposition 8's Proponents suggest that homosexuals cannot possibly be a persecuted and powerless minority because religious voices spoke both for, and against, Proposition 8.  Their expert, Professor Kenneth P. Miller, testified that the California Council of Churches opposed Proposition 8. In fact, its lobbying arm, California Church IMPACT expended less than $3,000 on a ballot mailer covering all the November 2008 propositions, and recommending a "No" vote on Proposition 8.

That some religious voices sought to "speak truth to power" on behalf of the disempowered and oppressed only underscores the fact that America's largest and most powerful denominations both condemn homosexuality, and provided the financial and logistical backing needed to enact their doctrines in Proposition 8's ban on the same-sex marriages.  Looking to the national denominational bodies of America's 25 largest Christian denominations, only the General Synod of the United Church of Christ spoke against Proposition 8.  Of the 21 denominations represented in the California Council of Churches' membership only two – the United Church of Christ's Northern and Southern California Conference, and the Universal Fellowship of Metropolitan Community Churches – generally accepted marriage of same-sex couples in religious ceremonies in their churches.  That the Council's position has been pro-religious freedom, pro-church autonomy, pro-equal protection, and anti-enactment of sectarian dogma concerning marriage cannot change the fact that homosexuals remain a disfavored and persecuted minority.

Though Proposition 8's Proponents suggest that their initiative's demolition of same-sex couples' civil right was designed to protect Californians' religious liberty, quite the opposite is true. Allowing same-sex couples the right to marry threatens religious liberty of Catholics no more than

1   does allowing civilly divorced citizens to marry in contravention of Catholic doctrine.  Allowing

2   same-sex couples to marry no more threatens religious liberty of those who oppose such unions in

3   their churches and synagogues than permitting interfaith marriage threatens the religious liberty of

4   synagogues and rabbis who interpret their scripture and tradition to prohibit such unions.  No one

5   can force clergy of any denomination to solemnize any wedding that conflicts with his or her faith

6   tradition, and no church synagogue, or other place of worship loses its tax exempt status for refusing

7   religious rites of marriage to citizens possessing a civil right to marry.

8        The real threat to religious liberty comes from enforcing as law religious doctrines of a

9   society's most powerful sects, to outlaw marriages that others both recognize and sanctify.  Clergy

10   and congregations of the Unitarian Universalist Association, the Northern and Southern California

11   Conferences of the United Church of Christ, the Universal Fellowship of Metropolitan Community

12   Churches, the Union for Reform Judaism, the Jewish Reconstructionist Federation, and others,

13   proudly solemnized the legal marriages of same-sex couples – until Proposition 8 adopted other

14   sects' doctrine to outlaw those marriages.

15   **II.     IDENTITY AND INTEREST OF *AMICI***

16        The identity and interest of *amici* are stated in greater detail in their motion for leave to file

17   this brief.  As explained there, the Unitarian Universalist Association, Northern California Nevada

18   Conference and Southern California Nevada Conferences of the United Church of Christ, General

19   Synod of the United Church of Christ, and Universal Fellowship of Metropolitan Community

20   Churches, represent faith traditions whose clergy were solemnizing legal marriages for same-sex

21   couples in their California congregations – until Proposition 8 passed.  The Pacific Association of

22   Reform Rabbis includes rabbis who solemnized legal marriages for same-sex couples.  The

23   Unitarian Universalist Legislative Ministry California (UULM CA), California Faith for Equality,

24   and Progressive Jewish Alliance are faith-based organizations that have engaged in educational work

25   supporting religious freedom and access to civil marriage for same-sex couples.  The California

26   Council of Churches' membership comprises more than 4,000 of California's Christian

27   congregations from 21 denominations, including both mainstream and progressive Protestant and

28   Orthodox Christian communities, two of which recognize same-sex marriage in their religious rites.

1    The Unitarian Universalist Legislative Ministry Action Network, CA PAC and California Council of

2    Churches Church IMPACT together spent less than $63,000 opposing Proposition 8.

3    **III.    ARGUMENT**

4        **A.    Proposition 8 Was Enacted to Codify Religious Attitudes Hostile to
             Homosexuals and Homosexuality**

5

6        The Right Reverend John Shelby Spong, emeritus Episcopal Bishop of Newark, has observed

7    that "[t]he first line of defense used by those who want to condemn homosexuality appears now to

8    be the Bible.  It is evident in Western society today that major negativity against gay and lesbian

9    people emanates from conservative Christian churches, both Catholic and Protestant."[1]

10   Proposition 8, in fact, both expresses certain religious groups' hostility toward homosexuality and

11   homosexuals, seeking to enforce sectarian doctrine concerning religious rites of marriage.

12       America's largest and most powerful denominations backed the drive, with Proposition 8, to

13   strip same-sex couples of a fundamental civil right.[2]  The Roman Catholic Church, with more than

14   67 million U.S. members, is by far America's largest denomination.  Joining it in vehement

15   opposition to equal rights for homosexual citizens were many conservative Evangelical churches,

16   including America's largest Protestant denomination, the Southern Baptist Convention, with its more

17   than 16 million members.  In common cause with them was the nation's fourth largest denomination,

18   the Church of Jesus Christ of Latter-day Saints, at 5.8 million American members.

19       Professor Miller testified that California's gays and lesbians cannot be deemed the target of

20   religious bigotry because the California Council of Churches opposed Proposition 8.  In fact, the

21   California Council of Churches devoted no resources to opposing Proposition 8, though its affiliated

22

23   _____

24   [1]      John Shelby Spong, *The Sins of Scripture:  Exposing the Bible's Texts of Hate to Reveal the
25   God of Love* 123 (2005); *see also* Linda J. Patterson, *Hate Thy Neighbor: How the Bible is Misused
     to Condemn Homosexuality* (2009).

26   [2]      National membership statistics in this paragraph are drawn from the *Yearbook of American &
27   Canadian Churches* 2008 (Eileen W. Lindner, ed., 2008), prepared for the National Council of the
     Churches of Christ in the U.S.A.  *See id.* at 10-15.

28

1  501(c)4, Church IMPACT, expended roughly $2,500 on a ballot-recommendation mailer covering

2  all twelve November 2008 ballot propositions – including a "No on 8" recommendation.[3]

3    Professor Miller suggested that the 21 denominations represented in the Council's

4  membership, which he began listing by name, must have both "supported same-sex marriage and

5  opposed Proposition 8."  10 TR 2463(16)-2464(1).  But looking to the seven that Miller named, only

6  the General Synod of the United Church of Christ had spoken against Proposition 8.  Though clergy

7  from several of the 21 denominations represented in the Council's membership offer blessings of

8  same-sex unions, only two – the United Church of Christ (Northern and Southern California

9  Conferences) and the Universal Fellowship of Metropolitan Community Churches – generally

10 recognized same-sex marriages in their religious rites.  Far from promoting same-sex marriage, the

11 Council's position is one of neutrality – urging that each tradition be free to choose its own path.[4]

12   The Metropolitan Community Churches happen to be a small denomination of 43,000

13 members, mostly homosexuals.  The Southern Baptists' Rev. Jerry Falwell notoriously denounced

14 them as "brute beasts," saying that their Church's "vile and satanic system will one day be utterly

15 annihilated and there'll be a celebration in heaven."  Jan G. Lin, *What's Wrong With The Christian*

16 *Right* 48 (2004).  Falwell's Southern Baptist Convention has joined him in decrying homosexual

17 relationships and same-sex marriages as "in every case sinful, impure, degrading, shameful,

18 unnatural, indecent and perverted,"[5] submitting an *amicus* brief in this case emphasizing that it

19

_____

20 [3]  Church IMPACT explained that notwithstanding the "liturgical issues around same-sex
21 marriage, we can be united in supporting civil marriage as a secular right.  No church would be
   forced to conduct a wedding that is contrary to its beliefs, but no church or individual should be
22 barred from the right to marry if they choose to do so."  California Council of Churches IMPACT,
   *How Would Jesus Vote?  The California Council of Churches IMPACT Recommendations for the*
23 *2008 State Ballot Propositions*.

24 [4]  Joining an *amicus* brief in the *Marriage Cases*, the Council declared: "Our commitment to
   religious liberty for all and equal protection under the law leads us to assert that the State may not
25 rely on the views of particular religious sects as a basis for denying civil marriage licenses to same-
   gender couples."   *In re Marriage Cases*, No. S147999, Brief of the Unitarian Universalist
26 Association of Congregations, *et al*., at xv-xvi (filed Sept. 26, 2007).

27 [5]  Southern Baptist Convention, *Resolution on Homosexual Marriage* (June 1996), available
   online: http://www.sbc.net/resolutions/amResolution.asp?ID=614 (last visited Feb. 3, 2010).

28

1    speaks as "the largest non-Catholic denomination in the nation."[6]  Its membership comes to many

2    times that of the United Church of Christ and Metropolitan Community Churches combined.

3         The United Church of Christ, whose General Synod opposed Proposition 8, ranks 21st

4    among the nation's 25 largest Christian denominations, with roughly 1.2 million members

5    nationally.  That its General Synod and the Metropolitan Community Churches were joined by the

6    Unitarian Universalist Association, claiming fewer than 250,000 members nationally, by the Union

7    for Reform Judaism and Jewish Reconstructionist Federation, as well as by some regional and local

8    organizations, and some individual clergy from larger denominations – even California's Episcopal

9    bishops – shows only that prophetic voices sought to "speak truth to power" on behalf of the

10   oppressed.  Raw political power, alas, was not theirs to wield.

11        Professor Miller's testimony ignores the reality of California's religious and political

12   landscape, where roughly 31% of Californians self-identify as Catholic, while another 18% place

13   themselves within an Evangelical tradition (including the Southern Baptists).  The Pew Forum

14   Survey on Religion & Public Life, *U.S. Religious Landscape Survey* 99-100 (2008).  The

15   Metropolitan Community Churches don't register such polls.  Just seven-tenths of one percent of

16   Americans identify with the Reform Jewish tradition, and another seven-tenths of one percent with

17   "Unitarians and other liberal faiths."  *Id*. at 5.

18        Financial contributions from religiously affiliated organizations for and against Proposition 8

19   demonstrate a real disparity of resources and power.[7]  A Catholic fraternal organization, the Knights

20   of Columbus, contributed $1.4 million from its national headquarters in Connecticut.  To this the

21   U.S. Conference of Catholic Bishops added $200,000, for a total of at least $1.6 million coming

22   from out-of-state Catholic interests.  Joining these Catholic institutions were evangelical Protestants

23   and others.  James Dobson's groups, Focus on the Family and the Family Research Council, together

24   _____

25   [6]      Brief of *Amicus Curiae* of the Ethics and Religious Liberty Commission of the Southern
     Baptist Convention at 1 (docket entry 384, filed Jan. 8, 2010).

26   [7]      Data for these paragraphs was obtained from information reported to the California Secretary
27   of State, and complied by the San Francisco Chronicle for public access at
     http://www.sfgate.com/webdb/prop8/ (last visited Feb. 2, 2010).

28

1  gave $715,994, with a board member adding another $450,000.  The amounts originally reported

2  from the Mormon Church's Utah headquarters, and the $189,903.58 it eventually admitted to giving,

3  grossly understate its influence:  A June 29, 2008, letter from the Church's First Presidency was read

4  to all congregations, urging Mormons to "do all you can to support the proposed constitutional

5  amendment by donating your means and time,"[8] and members told the *Wall Street Journal* that

6  "local church leaders had made highly charged appeals, such as saying that their souls would be in

7  jeopardy if they didn't give."[9]  ProtectMarriage estimates that half of the nearly $40 million raised

8  for Proposition 8 came from Mormons, who also constituted 80 to 90 percent of early precinct

9  walkers.  Jesse McKinley & Kirk Johnson, *Mormons Tipped the Scales in Ban on Gay Marriage*,

10  New York Times, Nov. 15, 2008, Sec. A, p.1.  "We've spoken out on other issues," said a Church

11  public-affairs director, "[b]ut we don't get involved to the degree we did on this."  *Id.*

12         Public records reflect no contributions from liberal and progressive religious institutions of

13  sufficient magnitude to counterbalance the $1.6 million coming from national Catholic

14  organizations, let alone those from fundamentalist Evangelicals and Mormons.  The Unitarian

15  Universalist Legislative Ministry and its Action Network, CA PAC, which worked to provide the

16  backbone of religious organizing for marriage equality, spent less than $60,000 opposing

17  Proposition 8.  Church IMPACT spent less than $3,000 on opposing Proposition 8.  Some individual

18  congregations gave to "No on 8."  But the public records show that many more socially conservative

19  churches gave, in aggregate, far more.

20         That Proposition 8's fervent backers sought to enact their sects' religious doctrines as civil

21  law is clear.  The Roman Catholic Church had placed itself on record against civil recognition of

22  same-sex unions in a formal pronouncement approved by the Pope on March 28, 2003, and issued by

23  the Vatican on June 3, 2003, saying that giving civil rights to same-sex couples amounts to the

---

24

25  [8]    First Presidency, *Preserving Traditional Marriage and Strengthening Families*, June 29,
2008 (online at http://newsroom.lds.org/ldsnewsroom/eng/commentary/california-and-same-sex-

26  marriage (last visited Feb. 2, 2010).

27  [9]    Mark Schoofs, *Mormons Boost Antigay Effort – Group has Given Millions in Support of
California Fund*, *Wall Street Journal*, Sept. 20, 2008, p.A8.

28

1   "legalization of evil."   Congregation for the Doctrine of the Faith, *Considerations Regarding*

2   *Proposals to Give Legal Recognition to Unions between Homosexual Persons* §5 at 16 (2003). "In

3   those situations where homosexual unions have been legally recognized or have been given the legal

4   status and rights belonging to marriage," the Vatican said, "clear and emphatic opposition is a duty."

5   *Id.*   Characterizing "[l]egal recognition of homosexual unions" as "the approval of deviant

6   behaviour," the Vatican emphasized that that "all Catholics are obliged to oppose the legal

7   recognition of homosexual unions," and warned that "[t]o vote in favour" of according full civil

8   rights to homosexuals is "gravely immoral." *Id.* §11 at 25, & §10 at 23.

9   America's fundamentalist Evangelical churches, including the Southern Baptist Convention

10  have exhibited even greater hostility toward homosexuals and their relationships. In his book *Listen*

11  *America!* the Southern Baptist Rev. Jerry Falwell declared: "Homosexuality is Satan's diabolical

12  attack upon the family, God's order in creation." Jerry Falwell, *Listen America!* 183 (1980).

13  Falwell elsewhere asserted that "AIDS is not just God's punishment for homosexuals, it is God's

14  punishment for the society that tolerates homosexuals." Patterson, *Hate Thy Neighbor*, *supra* note 1,

15  at 10. And Evangelical leader James Dobson, who founded Focus on the Family and the Family

16  Research Counsel, infamously declared:

17      Homosexuals are not monogamous. They want to destroy the institution of marriage.
        It will destroy marriage. It will destroy the Earth.
18
    *Marriage, family advocate in state to support Coburn*, The Oklahoman, Oct. 23, 2004, p. 10A.
19
20      The Southern Baptist Convention ("SBC") has issued a long series of anti-gay resolutions.

21  Speaking against "legal, social, and religious acceptance for homosexuality and deviant moral

22  behavior," its June 1977 *Resolution on Homosexuality* denounced "[t]he radical scheme to subvert

23  the sacred pattern of marriage in America."[10] A June 1980 *Resolution on Homosexuality* opposed

24  anti-discrimination ordinances and denounced homosexuals' "practices, relations, and perversion."

25  A June 1988 *Resolution on Homosexuality* decried "erosion of moral sanity," declaring

26  _____

27  [10]   The SBC has posted the Resolutions quoted in these paragraphs online at
        http://www.sbc.net/resolutions/ (last visited Feb. 2, 2010).
28

1  homosexuality "a manifestation of a depraved nature," and asserting that homosexuals have

2  "wrought havoc" with "the introduction and spread of AIDS in the United States which has not only

3  affected those of the homosexual community, but also many innocent victims." The *Resolution* said

4  Southern Baptists "deplore homosexuality as a perversion" and "an abomination in the eyes of God."

5  In 1993, the SBC declared that open "homosexuality represents a sign of God's surrendering a

6  society to its perversions."

7       The SBC's 1996 *Resolution on Homosexual Marriage* declared that "homosexual conduct is

8  always a gross abomination for all human beings, both men and women, in all circumstances,

9  without exception." The SBC insisted that permitting same-sex couples to marry is "sinful, impure,

10  degrading, shameful, unnatural, indecent and perverted." It resolved to "clearly and steadfastly

11  oppose the legalization of homosexual marriage," warning that any "action by the government to

12  sanction and legitimize homosexual relationships by the legalization of homosexual marriages, is an

13  abominable sin calling for God's swift judgment upon any such society." Southern Baptists, the

14  SBC declared, are committed "to do all they can to resist and oppose the legalization of homosexual

15  marriages," since anything "that legalizes homosexual marriage is and must be completely and

16  thoroughly wicked according to God's standards."

17       The SBC's June 2008 resolution *On the California Supreme Court Decision to Allow Same-*

18  *Sex Marriage* declared that "[a]ny action giving homosexual unions the legal status of marriage

19  denies the fundamental immorality of homosexual behavior (Leviticus 18:22; Romans 1:26-27; 1

20  Corinthians 6:9-11)." It endorsed Proposition 8, resolving to "wholeheartedly support" the initiative,

21  and urging "all Southern Baptists in the state of California . . . to exercise their civic and moral duty

22  by working diligently to support and voting to pass this referendum."

23       Efforts of religious groups to place their own sects' anti-homosexual doctrine in civil law

24  drove the "Yes on 8" Campaign from its very inception. The Catholic Church's auxiliary bishop in

25  San Diego, Salvatore Cordileone, reportedly "played an indispensable role in conceiving, funding,

26

27

28

1    organizing, and ultimately winning the campaign to pass Proposition 8."[11]   Bishop Cordileone

2    explained on Catholic Radio International that Catholics and fundamentalist Evangelicals had united

3    against a Satanic power:

4        "The ultimate attack of the Evil One is the attack on marriage, . . . .  And again, the
         evangelicals, they understand that.  They understand this is an attack of the Evil One
5        at the core institution."[12]

6        San Diego hotel magnate Douglas Manchester told the New York *Times* that he financed

7    putting the measure on the ballot because "my Catholic faith and longtime affiliation with the

8    Catholic Church leads me to believe that marriage should be between a man and a woman."[13]

9        California's most powerful denominations got their way when Proposition 8 passed with

10   52% voting for the measure, and 48% against.  "By a commonly used measure of religiosity –

11   frequency of attendance at religious services – the most religious (those attending services weekly)

12   favored Proposition 8 by 40 percentage points more than the least religious (those who hardly ever

13   attend services)."[14]   "Among Californians who attend worship at least weekly, support for

14   Proposition 8 was nearly uniform across all racial and ethnic groups.  Among those who attend

15   worship less than weekly, majorities of every racial and ethnic group voted 'no' on Proposition 8."

16   *Id*. at 11.  Sectarian doctrine condemning homosexual relationships became state law.

17       **B.     Proposition 8 Denies, Rather than Protects Religious Liberty**

18       Proposition 8's Proponents say revoking same-sex couples' right to marry finds a rational

19   basis in "[a]ccommodating the First Amendment rights of individuals and institutions that oppose

20

21   [11]    Chris Thompson, *The Father of Proposition 8:  Meet Oakland Bishop Salvatore Cordileone,
     the apostle of the movement to deprive gay men and lesbians of the right to marry*, East Bay Express,
22   Aug. 12, 2009, available online at http://www.eastbayexpress.com/eastbay/the-father-of-proposition-
     8/Content?oid=1370716 (last visited Feb. 3, 2010), and republished by *The Catholic Business
23   Journal*, August 21, 2009 http://www.catholicbusinessjournal.biz/Blogs/?p=198 (last visited Feb. 3,
     2010).

24   [12]    *Id.*

25   [13]    Rebecca Cathcart, *Donation to Same-Sex Marriage Foes Brings Boycott Calls,* New York
26   Times July 17, 2008, Sec. A, p. 15.

27   [14]    Patrick Egan & Kenneth Sherill *California's Proposition 8: What Happened and What Does
     the Future Hold?* at 4 (National Gay & Lesbian Task Force, 2009).

28

1   same-sex marriage on religious or moral grounds." Defendants-Intervenors' Trial Mem. at 8(16-17).

2   Permitting same-sex couples to marry would, they insist, "[r]ender the traditional definition of

3   marriage embraced by millions of Christians, Jewish, and Muslim Americans no longer legally or

4   socially acceptable, thereby probably forcing many of these Americans to choose between being a

5   believer and being a good citizen," and would "[l]ead to new state-imposed restrictions on First

6   Amendment freedoms." *Id*. at 10(13-16).  Proponents' television ads and other materials warned

7   that if same-sex couples may legally marry, ministers who decline to officiate will face legal

8   liability, and their churches will lose their tax-exempt status.  None of this was true.

9       Proposition 8 finds no rational basis in concern for anyone's religious liberty.  The *Marriage*

10  *Cases* opinion itself had carefully specified that

11      affording same-sex couples the opportunity to obtain the designation of marriage will
        not impinge upon the religious freedom of any religious organization, official, or any
12      other person; no religion will be required to change its religious policies or practices
        with regard to same-sex couples, and no religious officiant will be required to
13      solemnize a marriage in contravention of his or her religious beliefs.

14  *In re Marriage Cases*, 43 Cal. 4th 757, 854-55, 76 Cal. Rptr. 3d 683, 183 P. 3d 384 (2008).

15      The First Amendment would in any event preserve every religion's ability to make its own

16  rules concerning its own religious marriages.  No state may force any clergy to officiate at any

17  wedding to which he or she objects.  In fact, by adopting sectarian religious doctrine, Proposition 8

18  impinges directly upon the religious liberty of members and clergy of the faith traditions whose

19  congregations and clergy have welcomed same-sex couples to enter legal marriages in religious

20  ceremonies.  Establishment-clause and free-exercise principles should operate together to ***prohibit***

21  the enactment, as law, of other sects' doctrines to deny legal status to those marriages.

22      Proposition 8's Proponents generally have insisted that marriage is of divine origin –

23  instituted by God.[15]  But California law should be blind to sectarian doctrines on divine law.[16]  Even

24  

---

25  [15]      Endorsing Proposition 8 in September 2008, for example, the California SBC's Executive
26  Board declared "marriage was the first institution ordained by God." *California Southern Baptist*
    *Board Endorses Proposed Constitutional Marriage Amend.*, Sept. 23, 2008,
27  http://www.sbcbaptistpress.org/bpnews.asp?id=28975 (last visited Feb. 3, 2010).  The Roman
    Catholic Church's official *Catechism* agrees that "'God himself is the author of marriage.'"
28  *Catechism of the Catholic Church* ¶1603 (Washington, D.C.: Libreria Editrice Vaticana, 2d ed.

1    nonbelievers have a right to marry.  That atheists and agnostics enjoy ***the same legal right*** to marry

2    as those who revere marriage as a divine institution poses no threat to anyone's religious liberty.  No

3    atheist or agnostic couple may force any church or synagogue to open its doors to them.  But neither

4    may those who deem marriage a divine institution "protect" their own sectarian religious beliefs and

5    practices by legislating any test of faith, or of religious propriety, to deprive nonbelievers or the

6    unorthodox of the legal right to marry.  *See Torcaso v. Watkins*, 367 U.S. 488 (1961).

7         That people of different faiths may marry one another similarly poses no threat to the

8    religious liberty of the faith traditions and clergy that reject, discourage, or restrict interfaith

9    marriages.  For most of the twentieth century, Roman Catholics' *Code of Canon Law* proscribed

10    interfaith marriages.[17]  Dramatically liberalized in 1983, Catholic doctrine still restricts interfaith

11    marriage by requiring the Church's "express permission" for a Catholic to marry a non-Catholic

12    Christian, and "an express dispensation" for a Catholic to marry a non-Christian.  *Catechism of the*

13    *Catholic Church*, *supra* note 15, ¶1635.  Yet the Church and its priests have never faced legal

14    liability for refusing marriage rites to mixed-faith couples, and the religious liberty of California's

15    Catholics by no means requires, nor could it justify, the state's ***legal enforcement*** of their Church's

16    rules regulating mixed-faith marriages.

17

18

19

---

20    1997).  That Church's top doctrinal body insists that marriage "was established by the Creator." Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to give Legal Recognition to Unions between Homosexual Persons*, §2 at 11 (2003).  The Mormon Church First Presidency's June 28 letter to all California congregations, *supra* note 8, was similarly grounded in an assertion that "[m]arriage between a man and a woman is ordained of God."

23    [16]   "From its inception, California law has treated the legal institution of civil marriage as distinct from religious marriage."  *Marriage Cases*, 43 Cal. 4th at 792 n.11.  The Family Code provides: "No contract of marriage, if otherwise duly made, shall be invalidated for want of conformity to the requirements of any sect."  Calif. Family Code. §420(b).

25    [17]   Michael G. Lawler, *Interchurch Marriages: Theological and Pastoral Reflections*, in *Marriage in the Catholic Tradition: Scripture, Tradition, and Experience* Ch. 22, 222 (Todd A. Salzman, et al., eds., 2004) (quoting Canon 1060 of the 1917 *Code of Canon Law*: "The church everywhere most severely prohibits the marriage between two baptized persons, one of whom is Catholic, the other of whom belongs to a heretical or schismatic sect.").

28

1    In Judaism, the Orthodox and Conservative Movements prohibit interfaith marriages.[18] The

2    Rabbinic tradition proscribing mixed-faith marriage is grounded in Scripture.[19] Yet California's

3    Jews do not think their religious liberty needs the protection of state laws barring civil marriage of

4    interfaith couples.  That California permits mixed-faith marriages by no means forces California's

5    Jews "to choose between being a believer and being a good citizen," as Proponents put it.

6    Defendants-Intervenors' Trial Mem. at 10(14-15).

7    Islamic law is widely understood to bar interfaith marriages between a Muslim woman and

8    non-Muslim man, and also to prohibit marriage of any Muslim to a polytheist or pagan.[20] Some

9    nations strive to defend the Muslim faith by incorporating these rules in their civil law.[21] But the

10   religious liberty of California's Muslims could not justify California's adoption of similar rules,

11   which the Ninth Circuit holds amount to religious persecution if backed by governmental power.[22]

12   Under California law, a legally divorced man or woman may marry again.  This poses no

13   threat to the liberty of Roman Catholics, whose Church both pronounces divorce "a grave offense

14   against the natural law," and condemns remarriage by, or to, a divorced person as "public and

15   permanent adultery."  *Catechism of the Catholic Church*, *supra*, ¶2384.  The Roman Catholic

16   Church insists that divorced people who remarry necessarily "find themselves in a situation that

17

18   [18]    *See* Louis M. Epstein, *Marriage Laws in the Bible and the Talmud* 145-219 (1942); *see also,*
     *e.g.*, David S. Ariel, *What Do Jews Believe?* 129 (1996) ("Judaism is clearly and unequivocally

19   opposed to intermarriage between a Jew and a non-Jew"); Alfred J. Kolatch, *The Second Jewish
     Book of Why* 121 (2000).

20   [19]    Kolatch, *The Second Jewish Book of Why*, at 120 ("The prohibition of marriages between

21   Jews and non-Jews is biblical in origin.  Deuteronomy 7:3 sets forth the law clearly:  'You shall not
     intermarry with them; do not give your daughters to their sons or take their daughters for your

22   sons.'"); *see also* Genesis 24:3-4; Exodus 34:11-16; Joshua 23:11-13; Ezra 9-10; Nehemiah, 13:23-
     30; Malachi 2:11-12.

23   [20]    Yohanan Friedman, *Tolerance and Coercion in Islam: Interfaith Relations in Muslim*

24   *Tradition* 160-93 (2003).

25   [21]    *See Bandari v. INS*, 227 F.3d 1160, 1163 (9th Cir. 2000) (noting Iranian Ayatollah's edict
     that "specifically forbids non-Muslims from marrying Muslim women"); *Norani v. Gonzales*, 451

26   F.3d 292, 293 (2d Cir. 2006) (noting that an interfaith Jewish-Muslim marriage "violates Iranian law
     and Muslim law (Shariah)").

27   [22]    *See Bandari*, 227 F.3d at 1168.

28

1   objectively contravenes God's law." *Id*. at ¶1650.  The Church accordingly "cannot recognize the

2   union of people who are civilly divorced and remarried."[23]  Those who divorce and remarry "cannot

3   receive sacramental absolution, take Holy Communion, or exercise certain ecclesial responsibilities

4   as long as their situation, which objectively contravenes God's law, persists."[24]

5          Neither may they sue the Church for enforcing these rules.  No one may compel a Catholic

6   priest either to solemnize a wedding at odds with his Church's doctrine, or to give communion to

7   those whom the civil law recognizes as legally divorced and remarried.  No Catholic Church has lost

8   its tax-exempt status for denying anyone its religious rites of marriage and communion.  The ***civil***

9   ***right*** of the civilly divorced to remarry poses no threat to the religious liberty of Catholics.

10         Recognizing same-sex couples' legal right to marry threatens religious liberty of those who

11  reject such marriages no more than recognizing the legal right of mixed-race couples in *Perez v.*

12  *Sharp*, 32 Cal. 2d 711, 198 P.2d 17 (1948), and in *Loving v. Virginia*, 388 U.S. 1 (1967), could

13  impair the religious liberty of those who reject interracial unions as contrary to God's law.

14         The Mormon Church for most of its history – indeed, until June of 1978 – both barred blacks

15  from its priesthood, and condemned interracial marriage.[25]  Its doctrine was controversial, but no one

16  could force the Church to let black men enter its priesthood, and no interracial couple could insist

17  upon being married in a Mormon temple.  The Church faced no legal liability, and suffered no loss

18  of its tax-exempt status, for refusing Mormon rites of marriage to mixed-race couples.

19

20

21

22  [23]    U.S. Conference of Catholic Bishops*, Compendium – Catechism of the Catholic Church*, ¶349 (Washington, D.C.: Libreria Editrice Vaticana, 2006).

23  [24]    *Id*.  Pope Benedict XVI reportedly has "dashed the hopes of those who begged him to let
24  Catholics who have divorced and remarried without getting an annulment take Communion."  David
    Van Biena & Jeff Israelly, *Getting to Know Him: How the Pope is Showing Hints of Being His Own*
25  *Man*, TIME, Aug. 1, 2005, at 36, 38.

26  [25]    *See generally* Newell G. Bringhurst, *Saints, Slaves, and Blacks: The Changing Place of
    Black People Within Mormonism* (1981); Lester E. Bush, Jr., *Mormonism's Negro Doctrine: An*
27  *Historical Overview*, in *Neither White nor Black: Mormon Scholars Confront the Race Issue in a*
    *Universal Church* 53-129 (Lester E. Bush, Jr. & Armand L. Mauss, eds., 1984).

28

1    The Mormon Church itself observed, at the time, that "matters of faith, conscience, and

2    theology are not within the purview of the civil law."[26]   Church doctrine "affecting those of the

3    Negro race who choose to join the church falls wholly within the category of religion," the First

4    Presidency declared in 1969, and "has no bearing upon matters of civil rights."  The Church quite

5    clearly was protected by the First Amendment when it limited marriage on the basis of race – even if

6    it could no longer impose its religious doctrine on others *as civil law*.

7    Allowing mixed-race couples to marry *outside* the Mormon Church thus presented no threat

8    to Mormons' religious liberty to prohibit interracial marriages *within* their Church.  Allowing same-

9    sex couples to marry *outside* the Mormon Church similarly poses no threat to Mormons' religious

10   liberty.  Any law purporting to protect Mormons' "religious liberty" by banning either mixed-race

11   marriages or same-sex marriages must be deemed utterly irrational.

12   The religious liberty of Proposition 8's Proponents is not enhanced or protected by placing

13   their own faith traditions' doctrinal restrictions in California's constitution – unless "religious

14   liberty" means freedom to force others to follow your own religious rules.  It clearly does not.  Our

15   "'law knows no heresy, and is committed to the support of no dogma, the establishment of no

16   sect.'"[27]  Under our Constitution, "government may not promote or affiliate itself with any religious

17   doctrine."[28]   Thus, the Supreme Court readily invalidates state laws barring the teaching of

18   Darwinian evolution or requiring instruction of "creation science," because they seek to codify

19   conservatives' religious doctrine.[29]  It properly keeps religious doctrine out of our public schools.

20   *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 618-19 (1992); *Epperson*, 393 U.S. at 108-09.  The State

21

22   [26]    All quotations in this paragraph are drawn from: First Presidency, *Statement on Position of
     Blacks within the Church and Civil Rights*, December 16, 1969, *reprinted in* Bringhurst, *Saints,*

23   *Slaves, and Blacks*, *supra* note 25, at 231-32.

24   [27]    *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 710-11 (1976) (quoting
     *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 728 (1872)); *accord Kedroff v. Saint Nicholas Cathedral*,

25   344 U.S. 94, 114 (1952).

26   [28]    *County of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989).

27   [29]    *See Epperson v. Arkansas*, 393 U.S. 97, 104-09 (1968) (Darwinian evolution); *Edwards v.
     Aguillard*, 482 U.S. 578, 593 (1987) (creation science).

28

1   cannot constitutionally choose to impose the traditions of one religion on members of another; it

2   cannot say what is kosher, or holy, or ordained by God.[30]

3          *Perez v. Sharp* starkly frames the religious-liberty issue.  When California law prohibited a

4   mixed-race marriage of two Catholics, whose Church blessed matrimony between believers of

5   different races, the mixed-race couple argued "that the statutes in question are unconstitutional on

6   the grounds that they prohibit the free exercise of their religion and deny to them the right to

7   participate fully in the sacraments of that religion."  32 Cal. 2d at 713.  Justice Traynor wrote for a

8   plurality of three justices that if "the law is discriminatory and irrational, it unconstitutionally

9   restricts not only religious liberty but the liberty to marry as well."  *Id*. at 713-14.  Justice Edmonds

10  provided the fourth vote, making a precedential majority, by agreeing that a couple's right to marry

11  "is protected by the constitutional guarantee of religious freedom."  *Id*. at 740 (Edmonds, J.,

12  concurring).  Outlawing a marriage between two Catholics of different races, because others thought

13  God intended the races to remain apart, violated Catholics' religious freedom.  *See id*.

14         Surely, Unitarian Universalists, members of the United Church of Christ and Metropolitan

15  Community Churches, Reform Jews, Reconstructionist Jews, and others whose faith traditions bless

16  marital unions without regard to the contracting parties' race or sex, are entitled to the same religious

17  liberty as Catholics.  Proposition 8 deprives them of that liberty.

18  **IV.    CONCLUSION**

19         Proposition 8 amounts to an unconstitutional codification of hostility toward, and sectarian

20  doctrine concerning, homosexuality and homosexuals.  It should be stricken.

21  DATED:  February 3, 2010                       Respectfully submitted,

22

23                                    _____
                                               s/ Eric Alan Isaacson
                                      ERIC ALAN ISAACSON

24
                                      ERIC ALAN ISAACSON
25                                    erici@csgrr.com

---

26  [30]   *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 430 (2d Cir. 2002);
    *Barghout v. Bureau of Kosher Meat & Food Control*, 66 F.3d 1337, 1346-49 (4th Cir. 1995) (Luttig,
27  J., concurring).

28

STACEY M. KAPLAN
staceyk@csgrr.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for *Amici Curiae* Unitarian
Universalist Legislative Ministry California;
Unitarian Universalist Legislative Ministry
Action Network, CA; Unitarian Universalist
Association; California Faith for Equality;
California Council of Churches; California
Council of Churches Church IMPACT; Northern
California Nevada Conference of the United
Church of Christ; Southern California Nevada
Conference of the United Church of Christ;
General Synod of the United Church of Christ;
Universal Fellowship of Metropolitan
Community Churches; Pacific Association of
Reform Rabbis; and Progressive Jewish Alliance

1

<u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on February 3, 2010, I electronically filed the foregoing with the Clerk

3 of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4 addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5 mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6 participants indicated on the attached Manual Notice List.

7    I certify under penalty of perjury under the laws of the United States of America that the

8 foregoing is true and correct.  Executed on February 3, 2010.

9                                          s/ ERIC ALAN ISAACSON
                                          ERIC ALAN ISAACSON
10                                         655 West Broadway, Suite 1900
                                          San Diego, CA  92101-3301
11                                         Telephone:  619/231-1058
                                          619/231-7423 (fax)
12                                         E-mail:  erici@csgrr.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:09-cv-02292-VRW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **American College of Pediatricians**
  kevinsnider@pacificjustice.org

- **Rosanne C. Baxter**
  rbaxter@bsfllp.com

- **Erin Brianna Bernstein**
  Erin.Bernstein@sfgov.org,Martina.Hassett@sfgov.org

- **Richard J. Bettan**
  rbettan@bsfllp.com

- **Board of Supervisors of Imperial County**
  rtyler@faith-freedom.com

- **Stephen V. Bomse**
  sbomse@orrick.com,mmacdonald@orrick.com,dcroyle@orrick.com,clubiszewski@orrick.com

- **James Bopp , Jr**
  jboppjr@bopplaw.com

- **Tara Lynn Borelli**
  tborelli@lambdalegal.org

- **Theodore J. Boutrous , Jr**
  tboutrous@gibsondunn.com,bcruz@gibsondunn.com

- **James J. Brosnahan**
  jbrosnahan@mofo.com,bkeaton@mofo.com

- **David E. Bunim**
  DBunim@haasnaja.com

- **Thomas R. Burke**
  thomasburke@dwt.com,natashamajorko@dwt.com

- **Gordon Bruce Burns**
  Gordon.Burns@doj.ca.gov,Stephanie.Grimes@doj.ca.gov

- **James A Campbell**
  jcampbell@telladf.org,dschowengerdt@telladf.org

- **Holly L Carmichael**
  holly.l.carmichael@gmail.com

- **Timothy D Chandler**
  tchandler@telladf.org,mmagnaghi@telladf.org

- **Brian Ricardo Chavez-Ochoa**
  chavezochoa@yahoo.com

- **Danny Yeh Chou**
  danny.chou@sfgov.org,martina.hassett@sfgov.org

- **Matthew Albert Coles**
  mcoles@aclu.org

- **Mark Russell Conrad**
  Mark.Conrad@mto.com,Lori.Nichols@mto.com

- **Charles J. Cooper**
  ccooper@cooperkirk.com,nmoss@cooperkirk.com,mweitzner@cooperkirk.com

- **County of Imperial of the State of California**
  rtyler@faith-freedom.com

- **Jon Warren Davidson**
  jdavidson@lambdalegal.org

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,psaunders@gibsondunn.com,mjanky@gibsondunn.com

- **Christopher Dean Dusseault**
  cdusseault@gibsondunn.com

- **James Dixon Esseks**
  jesseks@aclu.org

- **Ethics and Religious Liberty Commission of the Southern Baptist Convention**
  DLlewellyn@LS4law.com

- **Ronald P. Flynn**
  ronald.flynn@sfgov.org,catheryn.daly@sfgov.org

- **James L Garlow**
  chavezochoa@yahoo.com

- **Elizabeth O. Gill**
  egill@aclunc.org,cwilliams@aclunc.org

- **Jeremy Michael Goldman**
  jgoldman@bsfllp.com,jchavez@bsfllp.com,kmcauliffe@bsfllp.com

- **Patrick John Gorman**
  pgorman@wctlaw.com,cortiz@wctlaw.com

- **Eric Grant**
  grant@hicks-thomas.com,rcoleson@bopplaw.com,kphillips@bopplaw.com,jboppjr@aol.com

- **Institute for Marriage and Public Policy**
  amy@jhmlaw.com

- **Claude Franklin Kolm**
  claude.kolm@acgov.org,Brian.Washington@acgov.org,jamartinez@acgov.org,manuel.martinez@acgov.org

- **Leslie A Kramer**
  lkramer@fenwick.com,tpalmerino@fenwick.com

- **Charles S LiMandri**
  climandri@limandri.com

- **Charles Salvatore LiMandri**
  cslimandri@limandri.com,kdenworth@limandri.com

- **David L. Llewellyn , Jr**
  DLlewellyn@LS4law.com

- **Jordan W. Lorence**
  jlorence@telladf.org,arossiter@telladf.org

- **Manuel Francisco Martinez**
  manuel.martinez@acgov.org

- **Mary Elizabeth McAlister**
  court@lc.org

- **Michael James McDermott**

mjm1usa@aol.com

- **Matthew Dempsey McGill**
  mmcgill@gibsondunn.com

- **Miles McPherson**
  chavezochoa@yahoo.com

- **Kenneth C. Mennemeier**
  kcm@mgslaw.com,slau@mgslaw.com,mhaagensen@mgslaw.com,gosling@mgslaw.com,aknight@mgslaw.com

- **Shannon Minter**
  sminter@nclrights.org

- **Enrique Antonio Monagas**
  emonagas@gibsondunn.com,tmotichka@gibsondunn.com,tkapur@gibsondunn.com

- **Jennifer Lynn Monk**
  jmonk@faith-freedom.com

- **Jose Hector Moreno , Jr**
  jhmoreno@jhmlaw.com

- **National Center for Lesbian Rights**
  sminter@nclrights.org

- **Howard C. Nielson , Jr**
  hnielson@cooperkirk.com

- **Austin R. Nimocks**
  animocks@telladf.org

- **Theodore B Olson**
  tolson@gibsondunn.com

- **Tamar Pachter**
  Tamar.Pachter@doj.ca.gov

- **Jesse Michael Panuccio**
  jpanuccio@cooperkirk.com

- **Peter A. Patterson**
  ppatterson@cooperkirk.com

- **Sarah Elizabeth Piepmeier**
  spiepmeier@gibsondunn.com,bhonniball@gibsondunn.com,bsperry@gibsondunn.com

- **Jennifer Carol Pizer**
  jpizer@lambdalegal.org

- **Andrew Perry Pugno**
  andrew@pugnolaw.com

- **Brian W Raum**
  braum@telladf.org,joshua@telladf.org,jhallock@telladf.org

- **Jerome Cary Roth**
  Jerome.Roth@mto.com,susan.ahmadi@mto.com

- **Josh Schiller**
  jischiller@bsfllp.com

- **Alan Lawrence Schlosser**
  aschlosser@aclunc.org

- **Christopher James Schweickert**
  cjs@wcjuris.com

- **Kevin Trent Snider**
  kevinsnider@pacificjustice.org

- **Christopher Francis Stoll**
  cstoll@nclrights.org

- **Andrew Walter Stroud**
  stroud@mgslaw.com,jestabrook@mgslaw.com

- **Amir Cameron Tayrani**
  ATayrani@gibsondunn.com

- **The Becket Fund for Religious Liberty**
  bkemmy@becketfund.org

- **Angela Christine Thompson**
  angelathompsonesq@gmail.com

- **David H. Thompson**
  dthompson@cooperkirk.com,mbarr@cooperkirk.com

- **Terry Lee Thompson**
  tl_thompson@earthlink.net

- **Ilona Margaret Turner**
  iturner@nclrights.org,jdelgado@nclrights.org

- **Robert Henry Tyler**
  rtyler@faith-freedom.com,jmonk@faith-freedom.com,jlloyd@faith-freedom.com

- **Theodore Hideyuki Uno**
  tuno@bsfllp.com,tplummer@bsfllp.com,jchavez@bsfllp.com,jgoldman@bsfllp.com,kmcauliffe@bsfllp.com

- **Christine Van Aken**
  christine.van.aken@sfgov.org,martina.hassett@sfgov.org,mollie.lee@sfgov.org,therese.stewart@sfgov.org,catheryn.daly@sfgov.org

- **Isabel Vargas**
  rtyler@faith-freedom.com

- **Judy Whitehurst**
  JWhitehurst@counsel.lacounty.gov,lgarcia2@counsel.lacounty.gov

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**David Boies**
Boies Schiller & Flexner LLP
333 Main Street
Armonk, NY 10504

**Thomas Brejcha**
Thomas More Society
29 S. La Salle
Suite 440
Chicago, IL 60603

**Richard E. Coleson**
1 South 6th Street
Terre Haute, IN 47807-3510

**Christopher M. Gacek**
Family Research Council
801 G Street NW
Washington, DC 20001

**Kevin James Hasson**
1350 Connecticut Avenue, NW

Suite 605
Washington, DC 20036-1735

**Theane Evangelis Kapur**
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

**Michael W. Kirk**
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 2003

**Rena M Lindevaldsen**
Liberty Counsel
100 Mountainview Rd, Ste 2775
Lynchberg, VA 24502

**Paul Benjamin Linton**
921 Keystone Avenue
Northbrook, IL 60062

**Vincent P. McCarthy**
W. Chestnut Hill Road
Lichfield, CT 06759

**Michael James McDermott**
7172 Regional #329
Dublin
, CA 94568

**National Legal Foundation**
P.O. Box 64427
Virginia Beach, VA 23467-4427

**Kaylan L. Phillips**
1 South 6th Street
Terre Haute, IN 47807-3510

**Tobias Barrington Wolff**
University of Pennsylvania Law School
3400 Chestnut Street
Philadelphia, PA 19104-6204