1   SUSAN M. POPIK (SBN 67173)
    spopik@chapop.com
2   MERRI A. BALDWIN (SBN 141957)
    mbaldwin@chapop.com
3   CHAPMAN, POPIK & WHITE LLP
    650 California Street, 19th Floor
4   San Francisco, California  94108
    Telephone:  (415) 352-3000
5   Facsimile:   (415) 352-3030

6   SUZANNE B. GOLDBERG (*admission pro hac vice*
        *pending*)
7   sgoldb1@law.columbia.edu
    Clinical Professor of Law and Director
8   Sexuality & Gender Law Clinic
    COLUMBIA LAW SCHOOL
9   435 West 116th Street
    New York, NY  10027
10  Telephone: (212) 854-0411

11  Attorneys for Amicus Curiae
    NATIONAL GAY AND LESBIAN
12  TASK FORCE FOUNDATION

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15

16
    KRISTIN M. PERRY, et al.,              No. C 09-CV-2292 VRW
17
                      Plaintiffs,
18
    and                                    **BRIEF OF AMICUS CURIAE**
19                                         **NATIONAL GAY AND LESBIAN**
    CITY AND COUNTY OF SAN FRANCISCO,      **TASK FORCE FOUNDATION IN**
20                                         **SUPPORT OF PLAINTIFFS**
                      Plaintiff-Intervenor,
21
            v.                             Judge:  Hon. Vaughn R. Walker
22                                         Dep't:   Courtroom 8
    ARNOLD SCHWARZENEGGER, et al.,
23
                      Defendants,
24
    and
25
    PROPOSITION 8 OFFICIAL PROPONENTS
26  DENNIS HOLLINGSWORTH, et al.,

27                    Defendant-Intervenors.

28

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     ARGUMENT ............................................................................................................ 2

      A.    Because the State Wholly Controls Legal Entry to Marriage, It Is Constitutionally Liable for Excluding Same-Sex Couples from Access to Marriage's Unique Value. ........................................................................... 3

           1.    Marriage Has Immense Social Value. .......................................................... 4

           2.    The State, by Exercising Monopoly Authority Over Legal Marriage, Wholly Controls Access to Marriage's Social Value. ............... 4

           3.    Because the State Controls Access to Marriage and, Therefore, to Marriage's Social Value, Attributing That Value to Society or "Tradition" Does Not Provide a Rational Basis on Which to Deny Same-Sex Couples the Right to the Status of "Marriage." ........................ 5

      B.    The Only Plausible Explanation for the Parallel Relationship-Recognition Bureaucracy Created by Proposition 8 Is to Signal the Inferiority of Same-Sex Couples' Relationships. ........................................................................ 7

           1.    Same- and Different-Sex Couples Are Similarly Situated Under California Law, Yet Proposition 8 Accords Each a Distinct Relationship Status. ....................................................................................... 7

           2.    History Teaches That Separation Is Usually Undertaken Impermissibly to Denote Inferiority. ............................................................ 7

           3.    Because the State Recognizes that Same- and Different-Sex Couples Are Functionally Indistinguishable, Their Different Relationship-Recognition Status Necessarily Connotes That They Are Not of Equal Worth. ................................................................................ 9

      C.    Well-Settled Law Forbids the State From Signaling a Status Difference Between Same- and Different-Sex Couples. ..................................................... 11

III.    CONCLUSION ...................................................................................................... 13

1

# TABLE OF AUTHORITIES

2

3   **Cases**

4   *Anderson v. Martin,*
5        375 U.S. 399 (1964) ............................................................................... 6

    *Brown v. Board of Education,*
6        347 U.S. 483 (1954) ...................................................................... 8, 9, 11

7   *City of Cleburne v. Cleburne Living Center,*
         473 U.S. 432 (1985) ............................................................................ 8, 11
8
    *Dodds v. Commission on Judicial Performance,*
9        12 Cal. 4th 163 (1995) ............................................................................. 2

10  *Flagg Bros., Inc. v. Brooks,*
         436 U.S. 149 (1978) ................................................................................. 5
11
    *Heckler v. Mathews,*
12       465 U.S. 728 (1984) ................................................................................. 8

13  *In re Marriage Cases,*
         43 Cal. 4th 757 (2008) ............................................................. 2, 4, 7, 10
14
    *Kerrigan v. Commissioner of Public Health,*
15       957 A.2d 407 (Conn. 2008) ................................................................ 4, 6

16  *Lewis v. Harris,*
         188 N.J. 415 (2006) ............................................................................... 12
17
    *Louisville Gas & Electric Co. v. Coleman,*
18       277 U.S. 32 (1928) ................................................................................... 9

19  *Loving v. Virginia,*
         388 U.S. 1 (1961) ..................................................................................... 8
20
    *McCreary County v. ACLU,*
21       545 U.S. 844 (1984) ............................................................................... 12

22  *Mississippi University for Women v. Hogan,*
         458 U.S. 718 (1982) ............................................................................ 8, 11
23
    *Pacific Mutual Life Insurance Co. v. Haslip,*
24       499 U.S. 1 (1991) ..................................................................................... 5

25  *Palmore v. Sidoti,*
         466 U.S. 429 (1984) ................................................................................. 6
26
    *Perez v. Lippold,*
27       32 Cal. 2d 711, (1948) ............................................................................. 6

28

ii

*Plessy v. Ferguson,*
    163 U.S. 537 (1896) ........................................................................................ 7

*Regents of the University of California v. Bakke,*
    438 U.S. 265 (1978) ...................................................................................... 12

*Romer v. Evans,*
    517 U.S. 620 (1996) .................................................................................... 8, 9

*Shaw v. Reno,*
    509 U.S. 630 (1993) ...................................................................................... 12

*Strauder v. West Virginia,*
    100 U.S. (10 Otto) 303 (1880) ....................................................................... 9

*Strauss v. Horton,*
    46 Cal. 4th 364 (2009) .................................................................................... 7

*United States Department of Agriculture v. Moreno,*
    413 U.S. 528 (1973) ........................................................................................ 6

*United States v. City of Hayward,*
    36 F.3d 832 (9th Cir. 1994) ............................................................................ 6

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................ 1, 8, 9

*Walz v. Tax Commission of New York,*
    397 U.S. 664 (1970) ........................................................................................ 5

*Williams v. Illinois,*
    399 U.S. 235 (1970) ........................................................................................ 5

**Constitutions and Statutes**

U.S. Constitution Amendment XIV, § 1 ............................................................ 3

California Family Code

    § 297(b)(5)(A) ............................................................................................... 7

    § 297(b)(5)(B) ............................................................................................... 7

    § 300 ........................................................................................................... 4, 7

    § 309 ............................................................................................................... 5

    § 350 ............................................................................................................... 5

California Domestic Partner Rights and Responsibilities Act of 2003,
    Stats. 2003, ch. 421, § 1(a) ............................................................................ 2

**Books**

Oliver Wendell Holmes, *John Marshall*, *in Collected Legal Papers* (1920)............................... 13

Kenneth L. Karst, *Law's Promise, Law's Expression* (1993)............................................... 7, 9, 12

**Law Review Articles**

Akhil R. Amar, *Attainder and Amendment 2: Romer's Rightness*,
    95 Mich. L. Rev. 203 (1996)................................................................................ 8

Elizabeth S. Anderson & Richard H. Pildes, *Expressive Theories of Law: A General
    Restatement*, 148 U. Pa. L. Rev. 1503 (2000)................................................... 11, 12

David B. Cruz, *The New "Marital Property": Civil Marriage and the Right to Exclude?*,
    30 Cap. U. L. Rev. 279 (2002).................................................................................... 9

William N. Eskridge, Jr., *Equality Practice*: *Liberal Reflections on the Jurisprudence of
    Civil Unions*, 64 Alb. L. Rev. 853 (2001).................................................................. 6

Suzanne B. Goldberg, *Marriage as Monopoly: History, Tradition, Incrementalism, and
    the Marriage/Civil Union Distinction*, 41 Conn. L. Rev. 1397 (2009)...................... 4

Joseph S. Jackson, *Persons of Equal Worth: Romer v. Evans and the Politics of Equal
    Protection*, 45 UCLA L. Rev. 453 (1997) ............................................................... 8

Richard H. Pildes & Richard G. Niemi, *Expressive Harms, Bizarre Districts, and Voting
    Rights: Evaluating Election-District Appearances After Shaw*, 92 Mich. L. Rev. 483
    (1993)........................................................................................................................ 12

Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*,
    117 Harv. L. Rev. 493 (2003) .................................................................................. 12

**Miscellaneous Authorities**

Argument in Favor of Proposition 8, Official Voter Information Guide, November 4,
    2008 General Election, http://voterguide.sos.ca.gov/past/2008/general/argu-rebut/
    argu-rebutt8.htm........................................................................................................ 10

Family Research Council, *The Slippery Slope of Same-Sex 'Marriage'* (2004),
    http://www.frc.org/get.cfm?i=BC04C02 .................................................................. 10

Pete Winn, *Legal Experts Say Calif. Proposition 8 Decision is Mostly 'Sunny' With One
    'Little Dark Cloud,'* cnsnews.com (May 27, 2009), http://www.cnsnews.com/public/
    content/article.aspx?RsrcID=48650 ......................................................................... 10

# I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

By reserving marriage to heterosexuals while providing a separate relationship status to lesbian and gay couples, Proposition 8 violates the Equal Protection Clause of the Fourteenth Amendment in two distinct ways.  First, it denies same-sex couples access to the unique social value of marriage.[1]   Second, it expresses an impermissibly disfavoring message about the worth of same-sex couples relative to their different-sex counterparts.

As to the first point, the constitutional violation inheres in the state's role as gatekeeper of legally recognized marriage.  Because the state has a monopoly on access to the legal status of marriage, and thus to marriage's unique social value, it may not constitutionally allocate that access differentially among similarly situated couples. Yet that is precisely what Proposition 8 commands:  that some couples may access marriage's unique social value while others, identically situated except for sexual orientation, may not.

Contrary to arguments advanced by proponents of Proposition 8, barring same-sex couples from the social value of marriage while providing it to different-sex couples violates the Constitution regardless of the extent to which the state created that social value.  Thus, the possibility that the state may not have given marriage all of its current social value – that history, tradition, or other societal forces may have contributed to marriage's special status – does not render discriminatory marriage rules any less unconstitutional.

Amicus does not contend that gay and lesbian couples – or any couples, for that matter – have a constitutional right to a particular social value or its benefits.  *Cf. United States v. Virginia*, 518 U.S. 515 (1996) (recognizing the greater social value of attending a prestigious, male-only military school as compared to a less prestigious counterpart for women).  But when

---

[1]   Although this brief endorses the argument, advocated in other briefs, that domestic partnership and marriage do not provide equivalent *tangible* rights and benefits, it does not restate those points here.  Instead, amicus assumes (for the sake for argument only) that the two statuses have equivalent tangible value and demonstrates that the distinction sought by Proposition 8 is constitutionally infirm because of the state's unequal allocation of access to the *social* connotations of marriage.

1

1   the state wholly controls a status that confers such benefits, it cannot deny access to that status to

2   a class of its citizens merely because society may have played a role in giving that status its

3   unique value.  *Cf. Dodds v. Commission on Judicial Performance*, 12 Cal. 4th 163, 176-77

4   (1995) (recognizing that constitutional due process protection reaches factors, such as concerns

5   with dignity and alienation, that derive their value from society rather than government).

6          Second, Proposition 8 inescapably and impermissibly denigrates same-sex couples by

7   denying them the right to marry and restricting them instead to a separate legal status, domestic

8   partnership, which replicates the functions – but not the social meaning – of marriage.  It does so

9   by adopting a state-sanctioned distinction in the relationship-recognition rules accorded

10  different-sex and same-sex couples.  At the same time, however, the state recognizes that the

11  couples are similarly situated, treating them as essentially indistinguishable for purposes of

12  rights and benefits.  *See In re Marriage Cases*, 43 Cal. 4th 757, 779 & n.2 (2008) (noting that

13  domestic partners in California are accorded virtually all of the legal rights and responsibilities

14  accorded married couples in the state).  There can be no plausible, non-arbitrary explanation for

15  creating a new legal relationship-recognition status that is the functional equivalent of the

16  existing status of marriage other than to express that same-sex couples are not worthy of the

17  status of marriage even if they are otherwise worthy of equal treatment.  Well-settled equal

18  protection jurisprudence forbids precisely this sort of status denigration.

19         Only by providing the opportunity for the same legal recognition to both same-sex and

20  different-sex couples can the state remedy these constitutional defects.

## II.

## ARGUMENT

23         Undoubtedly, the state has provided its same-sex couples with valuable benefits through

24  domestic partnership.  If all the Constitution required of the state were that California provide

25  "virtually all of the same legal benefits and privileges" (*In re Marriage Cases*, 43 Cal. 4th at

26  779), and "move closer to fulfilling the promises of . . . equality" (California Domestic Partner

27  Rights and Responsibilities Act of 2003, Stats. 2003, ch. 421, § 1(a)), then perhaps Proposition 8

28  might survive Plaintiffs' challenge.  But the United States Constitution does not have a "virtually

2

Equal" Protection Clause; instead, it unqualifiedly forbids the states from "den[ying] to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

By providing different-sex couples access to marriage and withholding marriage from same-sex couples, Proposition 8 directly contravenes this equal protection guarantee.  Even if domestic partnership successfully granted all couples access to the same material benefits and obligations (which it does not, as Plaintiffs and other amici demonstrate), the distinction between domestic partnership and marriage is nonetheless unconstitutional.  Proposition 8's placement of different-sex couples on one side of the marriage line and same-sex couples on the other denies same-sex domestic partners the unique, particular value of marriage and denigrates their worth relative to different-sex married couples.  As Professor Nancy Cott put it, "there is nothing that is like marriage except marriage."  (RT 208:16-17)

### A. Because the State Wholly Controls Legal Entry to Marriage, It Is Constitutionally Liable for Excluding Same-Sex Couples from Access to Marriage's Unique Value.

Because the state has exclusive control over a couple's legal ability to marry, the question whether the state contributes to the valuable social benefit of marriage is, as a constitutional matter, beside the point.  Even if one makes the unreasonable assumption that the state's imprimatur has not added value to marriage,[2] the constitutional problem remains because, under Proposition 8, the state is actively exercising complete, and impermissibly selective, control over access to that socially valuable status.

Considering the state's monopoly over the licensing function in a different context may help to clarify.  There should be no doubt that being a lawyer carries social value beyond the lawyers' rights and obligations as defined by the state.  Yet the state cannot disclaim constitutional accountability for its rules regarding allocation of licenses to practice law.  So, too,

---

[2]   In fact, Plaintiffs adduced testimony to the contrary.  For example, as Professor Nancy Cott explained, "the fact that the state is involved in granting [certain] benefits and legitimacy to the marital family tends to lend a prestige, a status to that institution that no informal marriage has ever approximated."  (RT 225:4-7; *see also* RT 202:2-5 ("[M]arriage, the ability to marry, to say, 'I do,' is a basic civil right.  It expresses the right of a person to have the liberty to be able to consent validly."))

3

1    here.  Even if marriage's social value derives from sources other than state sanctification, the

2    state cannot avoid constitutional scrutiny when it puts itself in the position of allowing some

3    couples to marry, but not others.  Suzanne B. Goldberg, *Marriage as Monopoly: History,*

4    *Tradition, Incrementalism, and the Marriage/Civil Union Distinction*, 41 Conn. L. Rev. 1397,

5    1413-15 (2009).

6                    **1.      Marriage Has Immense Social Value.**

7            Little ink need be spilled establishing marriage's immense social value, as attested to by

8    many of the witnesses at trial.  *See*, *e.g.*, RT 252:18-23 (Prof. Nancy Cott); 574:21-577:145

9    (Prof. Letitia Peplau); 827:3-4 (Prof. Ilan Meyer); 1251:6-1252:11 (Helen Zia); 2744:19-

10   2746:12, 2790:1-9 (David Blankenhorn).  It has been described as "an institution of transcendent

11   historical, cultural and social significance." *Kerrigan v. Commissioner of Pub. Health*, 957 A.2d

12   407, 418 (Conn. 2008).  The California Supreme Court likewise acknowledged "the long and

13   celebrated history of the term 'marriage'"; "the widespread understanding that this term

14   describes a union unreservedly approved and favored by the community"; and the "considerable

15   and undeniable symbolic importance to this designation." *In re Marriage Cases*, 43 Cal. 4th at

16   845-46.  Indeed, it is the effort to preserve the social value of marriage for heterosexual couples

17   – and the concomitant fear that allowing same-sex couples to marry will diminish that value –

18   that lies at the heart of Proposition 8's proponents' arguments.  As Defendants' expert Kenneth

19   Miller described it:  "[T]here's a view that homosexuals may certainly undermine traditional

20   families" and that "if certain events occur with respect to the recognition of same-sex marriage,

21   that that would undermine traditional families."  (RT 2606:9-19)

22                    **2.      The State, by Exercising Monopoly Authority Over Legal**
                              **Marriage, Wholly Controls Access to Marriage's Social Value.**
23

24           In California, the decision to marry is left largely to private ordering.  But marriage itself

25   is not.  Marriage is a legal status, administered by the state.  As the Family Code establishes,

26   "[c]onsent alone does not constitute marriage.  Consent must be followed by the issuance of a

27   license and solemnization as authorized by this division."  Cal. Fam. Code § 300.  Among other

28

                                                    4

1   legal requirements, couples must obtain a license in advance of their marriage ceremony (*id.*

2   § 350), and go to court to challenge a marriage's validity (*id.* § 309).

3        As a result of these and related rules, "marriage" is available only to those authorized by

4   the state.[3]  The state's monopolistic role as the gatekeeper of marriage thus puts California in

5   control of access not only to marriage's state-sponsored benefits but also to the uniquely

6   valuable social connotations associated with marriage.

7        **3.      Because the State Controls Access to Marriage and, Therefore,**
         **to Marriage's Social Value, Attributing That Value to Society**

8        **or "Tradition" Does Not Provide a Rational Basis on Which to**
         **Deny Same-Sex Couples the Right to the Status of "Marriage."**

9

10       One argument sometimes advanced by proponents of Proposition 8 to avoid

11  constitutional challenge is that the social significance of marriage is not created by the state.

12  *See*, *e.g.*, RT 2790:5-9 (testimony of David Blankenhorn).  But under well-settled law, the state

13  cannot avoid constitutional liability solely because societal traditions and private actors have

14  helped shape the background conditions against which a party's injury has occurred.

15       As the United States Supreme Court has repeatedly made clear, history and tradition

16  cannot justify retention of a discriminatory or exclusionary rule.  *See Pacific Mut. Life Ins. Co. v.*

17  *Haslip*, 499 U.S. 1, 18 (1991) ("Neither the antiquity of a practice nor the fact of steadfast

18  legislative and judicial adherence to it through the centuries insulates it from constitutional

19  attack.") (quoting *Williams v. Illinois*, 399 U.S. 235, 239 (1970)); *Walz v. Tax Comm'n of N.Y.*,

20  397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right

21  in violation of the Constitution by long use, even when that span of time covers our entire

22  national existence and indeed predates it.").  Accordingly, Proposition 8 cannot escape constitu-

23  tional scrutiny on the ground that it is directed at a status with traditional social value beyond

24  that conferred by the state.  Indeed, as the Connecticut Supreme Court explained in reviewing

25

26  ────────────────

27       [3]   This exclusive monopoly over the entry into, incidents of, and dissolution of marriage
     demonstrates the existence of state action.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158-60
     (1978) (describing the link between state action and exclusive governmental control over

28  particular public functions).

                                          5

1  the state's marriage law in *Kerrigan v. Commissioner of Public Health*, 957 A.2d at 418, "[t]o

2  say that the discrimination is 'traditional' is to say only that the discrimination has existed for a

3  long time."

4       Nor can the state aid in the commission of purportedly private discrimination.  As the

5  Supreme Court explained in *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984), "[t]he Constitution

6  cannot control . . . prejudices but neither can it tolerate them.  Private biases may be outside the

7  reach of the law, but the law cannot, directly or indirectly, give them effect."  So, too, in

8  *Anderson v. Martin*, 375 U.S. 399, 402 (1964), the Court rejected a state's use of its power to

9  "induce[] . . . prejudice" among private individuals at the polls.  Likewise, in *United States*

10 *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973), the Court reinforced that

11 individuals' desires to harm a politically unpopular group do not immunize the government from

12 constitutional liability for actions whose purpose is to deprive that group of a public benefit.[4]

13 *See also United States v. City of Hayward*, 36 F.3d 832, 835-36 (9th Cir. 1994) (citing *Palmore*

14 and holding that "we cannot attach value to unlawful discrimination. The Supreme Court has

15 suggested that the law should not sanction private biases").

16      In this case, the fact that views about marriage's social value may be privately held or

17 rooted in "tradition" cannot save Proposition 8 from its constitutional infirmity.  Nor can the

18 state adopt discriminatory policies based on such views and then claim that it is constitutionally

19 unaccountable for its role in effecting illegal discrimination.

20

21

22

23

24

25

26     _____

27      [4]   Imagine, for example, that the state had authorized interracial domestic partnerships but
      not interracial marriages after *Perez v. Lippold*, 32 Cal. 2d 711 (1948).  *See* William N. Eskridge,
      Jr., *Equality Practice*: *Liberal Reflections on the Jurisprudence of Civil Unions*, 64 Alb. L. Rev.
28    853, 870-71 (2001).

1

2

**B.     The Only Plausible Explanation for the Parallel Relationship-Recognition Bureaucracy Created by Proposition 8 Is to Signal the Inferiority of Same-Sex Couples' Relationships.**

3

4

**1.     Same- and Different-Sex Couples Are Similarly Situated Under California Law, Yet Proposition 8 Accords Each a Distinct Relationship Status.**

5       As noted, under California law, same-sex and different-sex couples have "virtually all of

6    the same substantive legal benefits and privileges" and "virtually all of the same legal

7    obligations and duties." *In re Marriage Cases*, 43 Cal. 4th at 779.  Nonetheless, the state treats

8    these similarly situated couples differently by granting a different relationship status to each:

9    with limited exceptions,[5] the state's statutes establish domestic partnerships solely for same-sex

10   couples (*see* Cal. Fam. Code § 297(b)(5)(A)), while restricting marriage solely to different-sex

11   couples (*see id.* § 300).  Obviously, this marriage/domestic partnership distinction cannot be

12   explained on the basis of any functional difference between the couples.  To the contrary, as the

13   California Supreme Court has expressly acknowledged, Proposition 8 creates an "*exception* to

14   the state equal protection clause." *Strauss v. Horton*, 46 Cal. 4th 364, 411 (2009) (emphasis

15   added).

16

17

**2.     History Teaches That Separation Is Usually Undertaken Impermissibly to Denote Inferiority.**

18       History teaches that the separation of a group from a larger community of citizens is

19   almost invariably undertaken to "denote the inferiority of the group set apart" (Kenneth L. Karst,

20   *Law's Promise, Law's Expression* 185 (1993) [hereinafter Karst, *Law's Promise*]) and, when

21   done for that reason, is impermissible.

22       The most salient illustration in American history is, of course, racial segregation, which

23   was not a neutral, administrative scheme but, rather, a means to signal the inferiority of the

24   minority group at issue.  *See Plessy v. Ferguson*, 163 U.S. 537, 560 (1896) (Harlan, J.,

25   dissenting) (describing segregation as premised on the belief that "colored citizens are so inferior

26   and degraded that they cannot be allowed to sit in public coaches occupied by white citizens"),

27

28

---

[5]     Some different-sex couples may also enter into a domestic partnership if one of the partners is over the age of 62.  *See* Cal. Fam. Code § 297(b)(5)(B).

7

1   *overruled by Brown v. Board of Education*, 347 U.S. 483 (1954); *cf. Loving v. Virginia*, 388 U.S.

2   1, 7 (1961) (characterizing the state's miscegenation law as an "obvious[] . . . endorsement of the

3   doctrine of White Supremacy").  Sex segregation was likewise used to reinforce perceptions of

4   women's lesser status relative to men.  *See*, *e.g.*, *Mississippi Univ. for Women v. Hogan*, 458

5   U.S. 718, 725 & n.10 (1982) (describing the history of gender-based discrimination as rooted in

6   the idea that women were "innately inferior").

7          But inferences of inferiority from group-based classifications are not limited to race and

8   gender distinctions.  Legally authorized distinctions based on mental retardation and sexual

9   orientation have also triggered judicial suspicion about the operation of "irrational prejudices"

10  against a target group.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985)

11  (finding the separation of people with mental retardation from others rested on fears of and

12  discomfort with that population); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (identifying animus

13  in an amendment that imposed separate political rules on gay men and lesbians); *cf.* Akhil R.

14  Amar, *Attainder and Amendment 2: Romer's Rightness*, 95 Mich. L. Rev. 203, 224 (1996)

15  (arguing that "the laws at issue in both *Plessy* and *Romer* are about [the] untouchability and

16  uncleanness" of the target group); Joseph S. Jackson, *Persons of Equal Worth: Romer v. Evans*

17  *and the Politics of Equal Protection*, 45 UCLA L. Rev. 453, 487-88 (1997) (arguing that the

18  Constitution "bar[s] the state from making a general pronouncement that gays and lesbians are

19  'unequal to everyone else'").

20         Since Reconstruction, courts have repeatedly held that legal separations, for purposes of

21  diminishing a group's stature or otherwise implying group members' inferiority, violate

22  constitutional guarantees of equality, even without regard to distribution of tangible benefits.

23  *See United States v. Virginia*, 518 U.S. at 532 ("[N]either federal nor state government acts

24  compatibly with the equal protection principle when a law or official policy denies to women,

25  simply because they are women, full citizenship stature.").  As the United States Supreme Court

26  explained in *Heckler v. Mathews*, 465 U.S. 728, 739 (1984), "[t]he right to equal treatment

27  guaranteed by the Constitution is not coextensive with any substantive rights to the benefits

28  denied the party discriminated" against; it also includes a right to be free from stigma and

8

1    "archaic and stereotypic notions."  *See also Strauder v. West Virginia*, 100 U.S. (10 Otto) 303,

2    307-08 (1880); *Brown v. Board of Education*, 347 U.S. at 494.

3            **3.     Because the State Recognizes that Same- and Different-Sex
                      Couples Are Functionally Indistinguishable, Their Different
4                     Relationship-Recognition Status Necessarily Connotes That
                      They Are Not of Equal Worth.**
5

6            "To understand the claim that a law harms a constitutionally protected interest, a court

7    must pay attention to the environment in which a law operates."  Karst, *Law's Promise*, *supra*, at

8    182.  Moreover, "[d]iscriminations of an unusual character especially suggest careful consider-

9    ation to determine whether they are obnoxious to the [Equal Protection Clause]."  *See Romer v.*

10   *Evans*, 517 U.S. at 633 (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38

11   (1928)).

12           The discrimination here can easily be classified as of an "unusual character":  The state

13   duplicated an existing relationship-recognition bureaucracy, then recognized the unconstitutional

14   harm inherent in that duplication.    Still, the defenders of Proposition 8 maintain that the

15   distinction is one without a difference.

16           The only possible explanation for retaining separate relationship-recognition rules for

17   same- and different-sex couples – other than complete and impermissible arbitrariness – can be

18   concerns about equalizing the status of the two classes of couples.  As the United States Supreme

19   Court recognized in *United States v. Virginia*, 518 U.S. at 542-43, a common, albeit invalid,

20   rationale for maintaining separate status is the fear that the "traditional" institution's status will

21   suffer if newcomers are admitted.  *See also* David B. Cruz, *The New "Marital Property": Civil*

22   *Marriage and the Right to Exclude?*, 30 Cap. U. L. Rev. 279, 286-87 (2002) (arguing that

23   maintaining a distinction between civil unions and marriage "deems [gays and lesbians'] lives so

24   fundamentally inferior to or different from [heterosexuals'] that it would be deceptive or

25   degrading to [heterosexuals] to have to participate in the same relationship institution").

26           A measure that separates one class from another but then purports to attach no meaning

27   to that separation can be explained only as a message about the relative worth of groups on either

28   side of the state-drawn line.  Not surprisingly, the public commentary of Proposition 8's

                                                    9

1 supporters reinforces that the measure's advocates intended to exclude same-sex couples from

2 marriage precisely to avoid the message of full and equal inclusion in society – *the* great promise

3 of equal protection – that would flow from granting lesbian and gay couples non-discriminatory

4 access to marriage.  The Argument in Favor of Proposition 8 included in the Official Voter

5 Information Guide for the November 4, 2008 General Election makes this clear:[6]

> 6 [W]e need to pass this measure as a constitutional amendment to RESTORE THE DEFINITION OF MARRIAGE as a man and a woman.
>
> 7
>
> 8 Proposition 8 is about preserving marriage . . . .
>
> 9 *It restores the definition of marriage* to what . . . human history has understood marriage to be. . . . .
>
> 10 It protects our children from being taught in public schools that "same-sex marriage" is the same as traditional marriage. . . .
>
> 11
>
> 12 [W]hile gays have the right to their private lives, *they do not have the right to redefine marriage* for everyone else.

13 (Emphasis in original.)  *See also* Pete Winn, *Legal Experts Say Calif. Proposition 8 Decision is*

14 *Mostly 'Sunny' With One 'Little Dark Cloud,'* cnsnews.com (May 27, 2009)[7] (quoting a leading

15 Proposition 8 supporter in reference to the California Supreme Court's decision to uphold

16 existing same-sex marriages as saying that "[a]n arm and a leg have been cut off the natural

17 institution of marriage in California"); Family Research Council, *The Slippery Slope of Same-*

18 *Sex 'Marriage'* 2 (2004)[8] (claiming to show that "[g]ay marriage threatens the institutions of

19 marriage and the family")).

20     The message of Proposition 8 is especially pernicious and inescapable.  Because same-

21 sex couples had the state-sanctioned right to marry prior to the initiative's passage, the only

22 possible conclusion from the withdrawal of that right effected by Proposition 8 is that same-sex

23 couples are "second-class citizens" unworthy of that status.  *See In re Marriage Cases*, 43 Cal.

24 4th at 784-85 (noting that "retaining the designation of marriage exclusively for opposite-sex

25

26     [6]   http://voterguide.sos.ca.gov/past/2008/general/argu-rebut/argu-rebutt8.htm.

27     [7]   http://www.cnsnews.com/public/content/article.aspx?RsrcID=48650 (accessed Jan. 30, 2010).

28     [8]   http://www.frc.org/get.cfm?i=BC04C02 (accessed Jan. 30, 2010).

1  couples and providing only a separate and distinct designation for same-sex couples" may

2  impermissibly "perpetuate a more general premise . . . that gay individuals and same-sex couples

3  are in some respects 'second-class citizens' who may, under the law, be treated differently from,

4  and less favorably than, heterosexual individuals or opposite-sex couples"); *cf.* Elizabeth S.

5  Anderson & Richard H. Pildes, *Expressive Theories of Law: A General Restatement*, 148 U. Pa.

6  L. Rev. 1503, 1525 (2000) [hereinafter Anderson & Pildes, *Expressive Theories*] (arguing that an

7  interpretation of law must "must make sense in light of the community's other practices, its

8  history, and shared meanings").

9        As Professor Ilan Meyer aptly described it:

10       [I]n my mind, the Proposition 8, in its social meaning, sends a message that gay
         relationships are not to be respected; that they are of secondary value, if of any
11       value at all; that they are certainly not equal to those of heterosexuals. . . . [I]t also
         sends a strong message about the values of the state; in this case, the Constitution
12       itself. And it sends a message that would, in my mind, encourage or at least is
         consistent with holding prejudicial attitudes.
13

14  (RT 854:10-20)

15       C.      **Well-Settled Law Forbids the State From Signaling a Status
                 Difference Between Same- and Different-Sex Couples.**
16

17       In the equal protection context, courts have long rejected governmental efforts to

18  signal a group's inequality.  This body of law includes instances when the classification

19  itself – rather than inequality in tangible benefits – was the driving concern.  As the

20  Supreme Court stressed in *Brown v. Board of Education*, intangible harms themselves

21  can trigger an equal protection violation.  *Brown*, 347 U.S at 493 (finding that, even

22  when all tangible factors are made equal, segregated schools nonetheless violate the

23  Constitution); *see also Mississippi Univ. for Women v. Hogan*, 458 U.S. at 729 (holding

24  that continuation of women-only nursing program harmed women because it perpetuated

25  stereotypes about women's work); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. at

26  473 (Marshall, J., concurring) (noting that denying equal housing opportunities to people

27  with mental retardation reflected "a bare desire to treat the retarded as outsiders, pariahs

28  who do not belong in the community").

1    This concern with impermissible messaging as a consequence of government action can

2    be seen in a variety of contexts.  For example, in *Shaw v. Reno*, 509 U.S. 630 (1993), the Court

3    rejected a state redistricting plan in part because the plan reinforced racial stereotypes and

4    signaled to elected officials that they represented only a particular racial group.  Likewise, in

5    *McCreary County v. ACLU*, 545 U.S. 844, 860 (1984), the Court barred a Ten Commandments

6    display because of its "message to . . . nonadherents that they are outsiders, not full members of

7    the political community."  *Cf. Regents of the University of California v. Bakke*, 438 U.S. 265,

8    357-58 (1978) (Brennan, J., concurring and dissenting) (invoking the "cardinal principle that

9    racial classifications that stigmatize – because they are drawn on the presumption that one race is

10   inferior to another or because they put the weight of government behind racial hatred and

11   separatism – are invalid without more").

12   The underlying concern in these cases is with *expressive* harm – that is, harm "that results

13   from the ideas or attitudes expressed through a governmental action, rather than from the more

14   tangible or material consequences the action brings about."  Richard H. Pildes & Richard G.

15   Niemi, *Expressive Harms, Bizarre Districts, and Voting Rights: Evaluating Election-District*

16   *Appearances After Shaw*, 92 Mich. L. Rev. 483, 506-07 (1993).  Even when these laws "inflict

17   no material injuries on the target group," they are constitutionally infirm because they are "legal

18   communications of status inferiority [that] constitute their targets as second-class citizens."  *See*

19   Anderson & Pildes, *Expressive Theories*, *supra*, 148 U. Pa. L. Rev. at 1533, 1544; Richard A.

20   Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 567

21   (2003) (arguing that *Brown* "turned at least in part on the anti-egalitarian social meanings of the

22   practices at issue").

23   Excluding lesbians and gay men from marriage is emblematic of precisely this type of

24   symbolic denigration.  As Kenneth Karst has observed, proposals to legalize marriage for same-

25   sex couples "are both supported and opposed primarily because of their expressive aspects as

26   symbols of governmental acceptance of gay and lesbian relationships."  Karst, *Law's Promise*,

27   *supra*, at 14; *see also Lewis v. Harris*, 188 N.J. 415, 467 (2006) (Poritz, J., concurring and

28   dissenting) ("Labels set people apart as surely as physical separation on a bus or in school

12

1  facilities. Labels are used to perpetuate prejudice about differences that, in this case, are
2  embedded in the law."). By granting "domestic partnerships" to gays and lesbians rather than
3  "marriage," the state has effectively labeled gays and lesbians as outsiders who are not worthy
4  of, deserving of, or fit for full inclusion in the community of citizens united in marriage.

5                                          **IV.**

6                                    **CONCLUSION**

7          Justice Holmes long ago observed that "[w]e live by symbols." Oliver Wendell Holmes,
8  *John Marshall*, *in Collected Legal Papers* 270 (1920). By "preserving" marriage for
9  heterosexuals, while limiting gay and lesbian couples to a status that accords the same benefits
10  via a different name, Proposition 8 reinforces an impermissible message of difference and
11  unequal worth between gay and non-gay people in California. For this reason, as well as the
12  other reasons addressed above and in the briefs of Plaintiffs' and their other supporting amici,
13  amicus respectfully requests that this Court invalidate Proposition 8 as unconstitutional and
14  declare that the state, through Proposition 8, may not maintain different relationship-recognition
15  rules for same- and different-sex couples.

16  Dated:  February 3, 2010

17                              Respectfully submitted,

18                              Suzanne B. Goldberg (*admission pro hac vice pending*)
                                Clinical Professor of Law and Director
19                              **Sexuality & Gender Law Clinic**
                                **Columbia Law School**
20

21                              CHAPMAN, POPIK & WHITE LLP

22

23                              By: ___/s/ Susan Popik_____
                                    Susan M. Popik
24

25                              Attorneys for Amicus Curiae
                                NATIONAL GAY AND LESBIAN
26                              TASK FORCE FOUNDATION

27

28

                                          13