1  BINGHAM MCCUTCHEN LLP
Peter Obstler (SBN 171623) - peter.obstler@bingham.com
2  Jee Young You (SBN 241658) - jeeyoung.you@bingham.com
John Polito (SBN 253195) - john.polito@bingham.com
3  Lucy Wang (SBN 257771) - lucy.wang@bingham.com
Suneeta Fernandes (SBN 257772) - sunneta.fernandes@bingham.com
4  Perry Grossman (SBN 260570) - perry.grossman@bingham.com
Three Embarcadero Center
5  San Francisco, CA 94111-4067
Telephone: 415.393.2000
6  Facsimile: 415.393.2286

7  Attorneys for *Amici Curiae*

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10

11  KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J.
12  ZARRILLO,

13          Plaintiffs,

14  CITY AND COUNTY OF SAN FRAN-
CISCO,
15
          Plaintiff-Intervenor,
16
          v.
17
ARNOLD SCHWARZENEGGER, in his
18  official capacity as Governor of
California; EDMUND G. BROWN, JR., in his
19  official capacity as Attorney General of
California; MARK B. HORTON, in his official
20  capacity as Director of the California Depart-
ment of Public Health and State Registrar of
21  Vital Statistics; LINETTE SCOTT, in her
official capacity as Deputy Director of Health
22  Information & Strategic Planning for the
California Department of Public Health;
23  PATRICK O'CONNELL, in his official
capacity as Clerk-Recorder for the County of
24  Alameda; and DEAN C. LOGAN, in his
official capacity as Registrar-Recorder/County
25  Clerk for the County of Los Angeles,

26          Defendants,

27  and

28  PROPOSITION 8 OFFICIAL PROPONENTS

No. 09-CV-2292 VRW

**AMENDED BRIEF IN SUPPORT OF
PLAINTIFFS BY *AMICI CURIAE* ASIAN
LAW CAUCUS, ASIAN AMERICAN
JUSTICE CENTER, ASIAN PACIFIC
AMERICAN BAR ASSOCIATION OF
LOS ANGELES COUNTY, ASIAN
PACIFIC AMERICAN LEGAL CENTER,
ASIAN PACIFIC BAR ASSOCIATION OF
SILICON VALLEY, ASIAN PACIFIC
ISLANDER LEGAL OUTREACH,
BIENESTAR HUMAN SERVICES,
CALIFORNIA STATE CONFERENCE OF
THE NAACP, COALITION FOR
HUMANE IMMIGRANT RIGHTS,
JAPANESE AMERICAN BAR
ASSOCIATION, LA RAZA CENTRO
LEGAL, MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND,
NATIONAL BLACK JUSTICE
COALITION, SOUTH ASIAN BAR
ASSOCIATION OF NORTHERN
CALIFORNIA AND ZUNA INSTITUTE**

Judge:      Chief Judge Vaughn R. Walker
Dept.:      Courtroom 6, 17th Floor

DENNIS HOLLINGSWORTH, GAIL J.
KNIGHT, MARTIN F. GUTIERREZ, HAK-
SHING WILLIAM TAM, and MARK A.
JANSSON; and
PROTECTMARRIAGE.COM - YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL,

Defendant-Intervenors.

**AMENDED BRIEF OF AMICI CURIAE ASIAN LAW CAUCUS, ET AL. IN SUPPORT OF PLAINTIFFS**
**CASE NO. 09-CV-2292 VRW**

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST OF AMICI .................................................................................... 1

I.     INTRODUCTION AND SUMMARY OF ARGUMENTS ............................................. 1

II.    THE DETERMINATION OF POLITICAL POWERLESSNESS REQUIRES AN EXAMINATION OF A COMPENDIUM OF MANY FACTORS, NO ONE OF WHICH IS DISPOSITIVE .................................................................................... 3

     A.    The Political Powerlessness Inquiry Should Draw on a Compendium of Factors .................................................................................................. 4

     B.    Inability to Muster Political Support is Not a Prerequisite for Political Powerlessness ....................................................................................... 6

     C.    Isolated Legislative Gains By Gay Men and Lesbians Are Not Dispositive of the Extent to Which This Minority Is Politically Powerless So As To Warrant Heightened Scrutiny of Proposition 8 ...................................... 8

III.   THE NATURE, HISTORY AND CIRCUMSTANCES OF THE PREJUDICE AGAINST GAY MEN AND LESBIANS ESTABLISHES THAT THE COURT SHOULD EVALUATE PROPOSITION 8 UNDER HEIGHTENED SCRUTINY ........ 9

     A.    Gay Men and Lesbians Are Underrepresented in Government ............................ 9

     B.    Gay Men and Lesbians Are the Victims of Political Backlash .......................... 11

     C.    Discrimination Deters Many Gay Men and Lesbians From Political Activ-ism ................................................................................................. 12

     D.    Recent Legislation Protecting Rights of Gay Men and Lesbians Are Dwarfed by the Inequalities They Face Daily ................................... 13

IV.   CONCLUSION ........................................................................................... 15

i

1

# TABLE OF AUTHORITIES

2

Page

3 **FEDERAL CASES**

4
*Casteneda v. Partida,*
5     430 U.S. 482 (1977) ............................................................... 5

6 *City of Cleburne, Tex. v. Cleburne Living Center,*
    473 U.S. 432 (1985) ................................................... 2, 5, 6, 7
7

8 *Foley v. Connelie,*
    435 U.S. 291 (1978) ............................................................. 2, 5

9 *Frontiero v. Richardson,*
10     411 U.S. 677 (1973) ...................................................... passim

11 *Golinski v.U.S. Office of Personnel Mgmt.,*
    Case No. 10-cv-00257, Dkt No. 1 (N.D. Cal. Jan 20, 2010) ................... 9
12

13 *In re Golinski,*
    587 F.3d 956 (9th Cir. 2009) ............................................... 8, 9

14 *J.E.B. v. Alabama,*
15     511 U.S. 127 (1994) ............................................................... 7

16 *Loving v. Virginia.*
    388 U.S. 1 (1967) ................................................................... 6
17

18 *San Antonio Indep. School Dist. v. Rodriguez,*
    411 U.S. 1 (1973) ................................................................... 1

19 *United States v. Broussard,*
20     987 F.2d 215 (5th Cir. 1993) ................................................... 7

21 *United States v. Carolene Prod. Co.,*
    304 U.S. 144 (1938) ............................................................. 2, 4

22
*United States v. Virginia,*
23     518 U.S. 515 (1996) ............................................................... 5

24 *Watkins v. U.S. Army,*
    875 F.2d 699 (9th Cir. 1989) ................................................... 9
25

26 **STATE CASES**

27 *Baehr v. Lewin,*
    852 P.2d 44 (Haw. 1993) ..................................................... 12

28

1

TABLE OF AUTHORITIES
(continued)

2

Page

3

*Goodrich v. Dep't of Public Health*,
  798 N.E. 2d 941 (Mass. 2003) ....................................................................... 11, 12

4

5

*Lewis v. Harris*,
  908 A.2d 196 (N.J. 2006) ....................................................................................... 8

6

**FEDERAL STATUTES**

7

10 U.S.C. § 654(b) .............................................................................................. 14

8

**STATE STATUTES**

9

Ark. Code Ann. § 9-8-304 ...................................................................................... 14

10

Fla. Stat. § 63.042(3) ............................................................................................. 14

11

Miss. Code Ann. § 93-17-3(5) ................................................................................ 14

12

N.J. Stat. § 37:1-28(e) ............................................................................................... 8

13

N.J. Stat. § 37:1-36(a) ............................................................................................... 8

14

Utah Code Ann. § 78B-6-117 ................................................................................ 14

15

16

**OTHER AUTHORITIES**

17

2004 Republican Party Platform: A Safer World and a More Hopeful America, *available
  at* http://www.presidency.ucsb.edu/papers_pdf/25850.pdf .................................... 12

18

19

Bruce A. Ackerman, *Beyond* "Carolene Products," 98 Harv. L. Rev. 713 (1985) ................. 4, 12

20

M. V. Lee Badgett et al., The Williams Institute, *Bias in the Workplace: Consistent
  Evidence of Sexual Orientation and Gender Identity Discrimination* .................................... 13

21

22

Charles E. Beggs, *Gay Issue Will Arise in Court Race*, AP Newswires, Mar. 21, 2004 ............. 10

23

Karen Breslau, *A Rising Tide, Rocking Boats: The Politics of Gay Marriage Roil
  Oregon's Electoral Terrain*, Newsweek, May 17, 2004 ....................................................... 10

24

25

Guido Calabresi, *Antidiscrimination and Constitutional Accountability (What the Bork-
  Brennan Debate Ignores)*, 105 Harv. L.Rev. 77 (1991) ...................................................... 8

26

S.W. Cole et al., *Elevated Physical Health Risk Among Gay Men Who Conceal Their
  Homosexual Identity*, Health Psychol. 243 (1996) ........................................................... 13

27

28

*First Interim Report of the New Jersey Civil Union Review Commission* (2008), *available
  at* http://www.state.nj.us/lps/dcr/downloads/1st-InterimReport-CURC.pdf ........................... 8

iii

1

<u>TABLE OF AUTHORITIES</u>
(continued)

2

Page

3   Gary J. Gates et al., The Williams Institute & The Urban Institute, *Adoption and Foster*
4       *Care by Gay and Lesbian Parents in the United States* (2007) ............................................. 14

5   Gary J. Gates, The Williams Institute, *Same-Sex Couples and the Gay, Lesbian, Bisexual*
        *Population: New Estimates from the American Community Survey* (2006)........................ 12

6   Gay & Lesbian Victory Fund and Leadership Institute, *2008 Annual Report*, *available at*
7       http://www.victoryfund.org/files/ victory_annual_08.pdf ...................................................... 10

8   Ruth Bader Ginsburg, *Ratification of the Equal Rights Amendment*, 57 Tex. L. Rev. 919
9       (1979) ................................................................................................................................... 7

10  Naomi G. Goldberg & M.V. Lee Badgett, The Williams Institute, *Tax Implications for*
        *Same-Sex Couples* (2009) ................................................................................................. 15

11  Human Rights Campaign, *Michigan Adoption Law* (last updated Dec. 9, 2009)........................ 14

12  Human Rights Campaign, *Parenting Laws: Joint Adoption and Second-Parent Adoption*
13      (2009) ................................................................................................................................... 14

14  Kaiser Family Foundation Study, *Inside OUT: A Report on the Experiences of Lesbians,*
        *Gays and Bisexuals in America and the Public's View on Issues and Policies*
15      *Related to Sexual Orientation* (2001) ................................................................................... 13

16  Esther Kaplan, *Onward Christian Soldiers: The Religious Right's Sense of Siege is*
17      *Fueling a Resurgence*, The Nation, July 5, 2004 .................................................................. 11

18  Eric Lichtblau, *Justice Dept. Bans Event By Gay Staff*, New York Times, June 6, 2003 ........... 13

19  Lambda Legal and Deloitte Financial Advisory Services LLP, *2005 Workplace Fairness*
        *Survey* (2006) ................................................................................................................... 13, 14
20

21  Lambda Legal, *Lambda Legal Goes Back To Court in NJ*, Jan. 7, 2010, *available at*
        http://www.lambdalegal.org/publications/articles/ fa_20090107_nj-legislature-fails-
22      marriage-equality-lambda-legal-back-to-court.html ................................................................ 8

23  Michael J. Klarman, Brown *and* Lawrence *(And* Goodridge*)*, 104 Mich. L. Rev. 431
        (2005) ................................................................................................................................ 11, 12
24

25  National Conference of State Legislatures (NCSL), *Legislators, Number, Terms of Office,*
        *Next Election* (2007), http://www.ncsl.org/default.aspx?tabid=17273 .................................. 10

26  Press Release, American Civil Liberties Union, ACLU Urges Kansas Public Library Not
        to Censor Employee for Discussing Historic Sodomy Ruling. July 16, 2003, *available*
27      *at* http://www.aclu.org/free-speech/aclu-urges-kansas-public-library-not-censor-
28      employee-discussing-historic-sodomy-ruling. ...................................................................... 13

iv

1

<u>TABLE OF AUTHORITIES</u>
(continued)

2

Page

3

Steve Schmadeke, *Gay, Lesbian Judges in Cook County Note Their Progress*, Chicago

4

Tribune, Dec. 6, 2009 .......................................................................................... 10

5

The California Legislative Lesbian, Gay, Bisexual, & Transgender (LGBT) Caucus, http://www.assembly.ca.gov/LGBT_Caucus/ (last updated Jan. 28, 2008) ......................... 10

6

U.S. Gen. Acct'g Office, GAO-04-353R, *Defense of Marriage Act: Update to Prior*

7

*Report* (2004) .................................................................................................... 14

8

Kenji Yoshino, *Assimilationist Bias in Equal Protection: The Visibility Presumption and the Case of "Don't Ask, Don't Tell,"* 108 Yale L.J. 485 (1998) ............................................ 13

9

Kenji Yoshino, *Covering*, 111 Yale L.J. 769 (2002) ................................................................ 12

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**STATEMENT OF INTEREST OF AMICI[1]**

2 The Asian Law Caucus, Asian American Justice Center, Asian Pacific American Bar As-

3 sociation of Los Angeles County, Asian Pacific American Legal Center, Asian Pacific Bar

4 Association of Silicon Valley, Asian Pacific Islander Legal Outreach, Bienestar Human Services,

5 California State Conference of the NAACP, Coalition for Humane Immigrant Rights, Japanese

6 American Bar Association, La Raza Centro Legal, Mexican American Legal Defense and

7 Education Fund, National Black Justice Coalition, South Asian Bar Association of Northern

8 California and Zuna Institute (collectively "*Amici*") respectfully submit this "Friend of the Court

9 Brief" in the above captioned case (the "Action") to assist the Court in determining the extent to

10 which the wide-spread prejudice against gay men and lesbians obstructs political processes

11 traditionally available to protect minorities from discrimination so as to warrant increased

12 judicial scrutiny of whether Proposition 8 violates the federal Equal Protection Clause.

13 *Amici* are a broad and diverse array of civil rights organizations dedicated to eliminating

14 discrimination against minorities, including practices and laws that seek to discriminate based on

15 race, ethnicity, national origin, gender and sexual orientation.  In so doing, *Amici* strive to ensure

16 equal rights for all Americans by advocating on behalf of the interests of the diverse groups who

17 contribute to the pluralistic character of our great nation.

18 **I.   INTRODUCTION AND SUMMARY OF ARGUMENTS**

19 In this brief, *Amici* examine the narrow but important issue of whether the long-held ani-

20 mus and discrimination directed against gay men and lesbians prevent this group from seeking

21 recourse in traditional political processes so as to warrant heightened judicial scrutiny of

22 Proposition 8 or other discriminatory governmental action because gay men and lesbians, like

23 other protected minority groups, are "politically powerless."  That examination suggests that the

24 answer is "yes."

25 Political powerlessness is one of many "traditional indicia of suspectness" used to deter-

26 mine the level of scrutiny applied by courts in evaluating the constitutionality of disparate

27

28 [1] More detailed statements of interest for each amicus curiae are attached hereto at Addendum A.

government treatment of minorities.  *See San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).  Political powerlessness rests on the fundamental notion that deep-seated and longstanding prejudices towards certain groups impede their ability to rely on political processes.  *See United States v. Carolene Prod. Co*., 304 U.S. 144, 152 n.4 (1938).  As such, the relevant inquiry is to examine the nature, history and circumstances of the disparate treatment and prejudice against minorities through a broad and empirical data-driven analysis of the extent to which political processes fail to protect minorities from disparate treatment.

Narrowing the definition of and inquiry into political powerlessness, including Defendants' argument that this Court should only examine whether a minority group can attract the attention of lawmakers (the "Attention Test"), is unworkable and runs afoul of more than 70 years of Equal Protection jurisprudence.  Indeed, the Attention Test urged by Defendants would threaten the well-established protected status afforded many minorities under the Equal Protection Clause, all of whom have demonstrated a historical and present ability to get the "attention of lawmakers."  A finding that the mere ability to attract the attention of lawmakers is, by itself, sufficient to prevent protected minorities from receiving heightened judicial scrutiny would eliminate suspect classifications for all persons under the Equal Protection Clause.  In this respect, gay men and lesbians are no different than any other group who, in the face of societal discrimination, should be entitled to demonstrate through empirical evidence that homophobic prejudice, like racism or sexism, has curtailed their ability to rely on political processes to protect them from state actions motivated by bias, hate and prejudice.  *See Carolene Prod.*, 304 U.S. at 152 n.4; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 n.17 (1973) (Brennan, J., plurality opinion) (examining representation of women in "decisionmaking councils" as a measure of political power); *Foley v. Connelie,* 435 U.S. 291, 294 (1978) (examining aliens' inability to vote as a measure of political power); *cf. City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 445 (1985) (examining the mentally handicapped group's "ability to attract the attention of the lawmakers" as a measure of political power).

In this Action, an examination of the nature, history and circumstances of the discrimination faced by gay men and lesbians reveals that their participation in the political process has

been systemically impeded in at least four ways: *First*, gay men and lesbians are underrepresented "in the decisionmaking councils" throughout all levels of government.  Despite the recent increase in the number of openly gay men and lesbians who have run for office, the actual number of these individuals who hold elected office still remains disproportionately small.  *Second*, the passage of some protective legislation in response to widespread sexual-orientation discrimination does not transform gay men and lesbians into a politically powerful group.  Indeed, the limited legislative gains made by gay men and lesbians have consistently triggered a backlash from anti-gay groups that often leads to the mobilization of powerful well-funded groups dedicated to preventing gay men and lesbians from securing greater civil rights protections.  As Proposition 8 exemplifies, anti-gay groups have manipulated longstanding prejudice not only to forestall the passage of legislation favorable to gay men and lesbians, but to pass legislation that *takes away* constitutional and other rights from gay men and lesbians.  The result of this political backlash is the further institutionalization of discriminatory practices and laws at the local, state and national levels.  *Third*, the well-documented social opprobrium against gay men and lesbians presents an "organizational problem" because members of this group, like members of racial, ethnic, and gender-based minorities, can disguise their distinguishing characteristic by hiding their personal relationships and activities.  Unfortunately, political mobilization presents a Catch-22 for gay men and lesbians.  To mobilize politically, gay men and lesbians must "out" themselves to the public.  The public disclosure of their sexual orientation will then subject them to discriminatory treatment.  *Fourth*, gay men and lesbians experience discrimination with appalling frequency across a variety of sectors.  Same-sex couples experience discrimination and harassment at rates that exceed those of other groups with respect to employment, child rearing, family rights and marriage.

## II.   THE DETERMINATION OF POLITICAL POWERLESSNESS REQUIRES AN EXAMINATION OF A COMPENDIUM OF MANY FACTORS, NO ONE OF WHICH IS DISPOSITIVE

The Supreme Court's Equal Protection jurisprudence demonstrates that there is no "one-size-fits-all" approach to determining the extent to which discrimination faced by a minority

1   group impedes their reliance on political processes.  Instead, Equal Protection precedent suggests

2   that all impediments to a group's ability to rely on political processes to remedy discrimination

3   are relevant and important considerations.  As such, Equal Protection jurisprudence requires a

4   court to undertake a thorough and empirically-based analysis of the many different, and often

5   unique, characteristics of discrimination against a particular group.  Restricting consideration of

6   the diverse factors relevant to the political powerlessness inquiry results in an incomplete and

7   flawed analysis.  And the narrowing of inquiry urged by Defendants would necessarily require a

8   reexamination of established Equal Protection jurisprudence by eliminating all suspect classifica-

9   tions, including race and gender.  As Equal Protection jurisprudence establishes, this Court is

10   free to consider any factors it deems material to an objective determination of whether discrimi-

11   nation perpetrated against gay men and lesbians has impeded their ability to count on political

12   processes to protect them from widespread and severe discrimination.

## A.    The Political Powerlessness Inquiry Should Draw On A Compendium Of Factors

The Supreme Court first articulated the concept of political powerlessness in *Carolene Products* as unchecked prejudice against "discrete and insular minorities" that would "curtail the operation of those political processes ordinarily to be relied upon to protect minorities."  304 U.S. at 152 n.4 (1938).  In so doing, the Court focused on how the political weakness of minorities prevents them from relying on traditional political processes, and as a result, gives the majority an unfettered right to legislate or take other disparate state action against them.  *See* Bruce A. Ackerman, *Beyond* "Carolene Products," 98 Harv. L. Rev. 713, 715, 717 (1985).

Applying the fundamental notion from *Carolene Products* that defects in traditional po-litical processes can render minorities unable to rely on the political system, the Supreme Court has analyzed political powerlessness in several different ways.  In *Frontiero*, a gender discrimi-nation action, the Court recognized that although women "when viewed in the abstract . . . do not constitute a small and powerless minority," women are nonetheless "vastly underrepresented" in "decisionmaking councils . . . throughout all levels of our State and Federal Government."  411 U.S. at 686 n.17 (Brennan, J. plurality opinion).  Thus, even in cases where a group does not

4

1   constitute a numerical minority, a group can still face pervasive discrimination "in the political

2   arena" to a degree that requires heightened judicial review of government action treating that

3   group differently from others.  *Id.* at 686; *see also United States v. Virginia*, 518 U.S. 515, 532-

4   33, 575 (1996) (upholding gender as a suspect classification despite Justice Scalia's dissent that

5   women cannot be considered a discrete and insular minority "unable to employ" the ordinary

6   political processes); *cf. Casteneda v. Partida*, 430 U.S. 482, 499 (1977) (holding that the fact that

7   Mexican Americans held a "governing majority" did not dispel the presumption of intentional

8   discrimination established by a prima facie case of underrepresentation).

9        In *Foley*, the Court examined disenfranchisement as a measure of political powerlessness

10   in the context of whether strict scrutiny should be applied to discrimination against non-citizens.

11   435 U.S. at 294.  In that case, the Court found that "aliens — pending their eligibility for citizen-

12   ship — have no direct voice in the political processes."  *Id.*  Similarly, in *United States v. Virginia*,

13   the Court found that the history of opportunities denied women, including disenfranchisement,

14   required the Court to apply a heightened scrutiny standard to the basis for gender discrimination.

15   518 U.S. at 531; *accord Frontiero*, 411 U.S. at 688.

16        The Court articulated yet another measure of political powerlessness in *City of Cleburne*.

17   473 U.S. at 445.  In *Cleburne*, the Court struck down a municipal zoning ordinance as applied to

18   a group home for the mentally retarded.  In examining the political powerlessness of the mentally

19   retarded, the Court noted other legislation conferring rights to the mentally retarded.  Justice

20   White, writing for the majority, concluded that the mentally retarded were not "politically

21   powerless in the sense that they have no ability to attract the attention of the lawmakers" because

22   political powerlessness cannot be based solely on the inability of a minority to "assert direct

23   control over the legislature."  *Id.* at 445.  In so doing, the Court expressed the concern that if the

24   mere inability to control the legislature were sufficient to warrant suspect classification, "much

25   economic and social legislation would now be suspect."  *Id*.

26        The notion that political powerlessness must mean something more than being on the los-

27   ing side of a legislative battle, while self-evident, is of no help to the Court in this Action.  The

28   Supreme Court has never used that premise (prior to or after *Cleburne*) to negate the established

5

1    principal that political powerlessness exists where the nature, history and circumstances of

2    prejudice against a particular group impede their ability to rely on political processes.  Indeed, if

3    political power were a function only of a group's ability to attract the attention of lawmakers,

4    protected groups, including women and racial and ethnic minorities, would lose their protected

5    status under the Equal Protection Clause.

6           In any event, the Supreme Court has never suggested, let alone held, that a group's ability

7    to attract the attention of lawmakers constitutes a *per se* bar to heightened judicial scrutiny of

8    state action.  And Defendants' contention otherwise is inconsistent with the Court's application

9    of heightened scrutiny in Equal Protection cases.  In this Action, heightened scrutiny should

10   apply because the majority has used an unchecked popular referendum process to enshrine

11   discrimination into a state constitution by reversing an Equal Protection ruling of the state's

12   highest court and usurping the traditional power of the judiciary to protect minorities from

13   disparate treatment.

14         **B.     <u>Inability to Muster Political Support Is Not a Prerequisite for Political
                    Powerlessness</u>**

15

16          In this Action, Defendants argue that *Cleburne* precludes the Court from considering any

17   factor regarding political powerlessness other than the ability of same-sex couples to get the

18   attention of lawmakers.  In so doing, Defendants ask this Court to adopt a rigid and narrow

19   definition of political powerlessness based solely on the ability of Plaintiffs to attract the

20   attention of lawmakers.  *Amici* respectfully request that the Court decline to do so because

21   Defendants' Attention Test runs counter to, and would eviscerate, more than 70 years of

22   established Equal Protection jurisprudence.  Indeed, the application of such a restrictive defini-

23   tion would mean the end to suspect classification of any kind, including those relating to race

24   and gender under the Equal Protection Clause.

25          For example, with respect to race, it cannot be contended that blacks had "no ability to at-

26   tract the attention of lawmakers" at the time the Court applied heightened scrutiny to the anti-

27   miscegenation statute at issue in *Loving v. Virginia*.  388 U.S. 1 (1967).  By the time that *Loving*

28   was decided in 1967, Congress had passed an unprecedented series of civil rights laws, starting

6

1    with the Civil Rights Act of 1957 and culminating with the Civil Rights Act of 1964 and the

2    Voting Rights Act of 1965.  The ability to gather political support for protective legislation,

3    however, in no way precluded the Court from deeming race a suspect classification.

4            Similarly, with respect to women, the Court applied heightened scrutiny to sex-based

5    classifications at the very moment Congress was turning its closest attention to discrimination

6    against women.  Indeed, Congress had just passed the Equal Rights Amendment, then pending

7    before states for ratification.  *See* Ruth Bader Ginsburg, *Ratification of the Equal Rights*

8    *Amendment*, 57 Tex. L. Rev. 919, 921 (1979).  As Justice Brennan stated in *Frontiero*: "over the

9    past decade, Congress has itself manifested an increasing sensitivity to sex-based classifica-

10   tions . . . thus, Congress itself has concluded that classifications based on sex are inherently

11   invidious."  411 U.S. at 687.  And years after *Cleburne*, the Supreme Court continued to afford

12   heightened scrutiny to sex-based classifications even as women continued to make gains in the

13   legislature, including gaining additional protections from discrimination.  *See, e.g.*, *J.E.B. v.*

14   *Alabama*, 511 U.S. 127 (1994) (prohibiting discrimination against women in jury selection,

15   abrogating reasoning in *United States v. Broussard*, 987 F.2d 215 (5th Cir. 1993), that women

16   were no longer politically powerless).

17          As these, and other cases suggest, confining the political powerlessness inquiry to

18   whether a group can get the attention of lawmakers, is also unworkable in our system of

19   government because it grants the majority the unchecked ability to usurp the traditional power of

20   the judiciary to protect minorities under a state's constitution.  The reality is that the enactment

21   of a discriminatory constitutional amendment by a bare majority vote infects the entire tripartite

22   checks and balances system inherent in traditional political processes.  Although Proposition 8

23   was limited on its face to a vote on whether gay men and lesbians have the right to marry, its

24   effect was not limited to this single issue.  Rather, because the proponents of Proposition 8 used

25   the referendum to deprive a ***protected class*** of a right to marry, the majority encroached on the

26   power of California's Supreme Court to decide who is a protected class under that state's Equal

27   Protection Clause.  Accordingly, the Attention Test advanced by Defendants impedes, if not

28   destroys, the tripartite separation of powers inherent in our system of government that has

heretofore protected minorities from discrimination for almost a century.

**C.**   **Isolated Legislative Gains By Gay Men and Lesbians Are Not Dispositive Of The Extent To Which This Minority Is Politically Powerless So As To Warrant Heightened Scrutiny Of Proposition 8**

Like racial minorities and women, the existence of state laws that prohibit discrimination on the basis of sexual orientation is not an indicium of political power but a reflection and recognition of the enduring prejudice this group faces in almost all facets of American life. Accordingly, the argument that recent enactments of legislation protecting gay men and lesbians from certain isolated or limited forms of discrimination end the political powerlessness inquiry is without merit. *See* Guido Calabresi, *Antidiscrimination and Constitutional Accountability (What the Bork-Brennan Debate Ignores)*, 105 Harv. L.Rev. 77, 97 n.51 (1991).

For example, in response to the New Jersey Supreme Court's ruling in *Lewis v. Harris*, 908 A.2d 196 (N.J. 2006), the New Jersey Legislature enacted civil unions. *See* N.J. Stat. § 37:1-28(e). The Civil Unions Act also created the New Jersey Civil Union Review Commission, charged to "evaluate the effect on same-sex couples, their children and other family members of being provided civil unions rather than marriage." N.J. Stat. § 37:1-36(a); *id.* at (c)(5). In its first (and only) interim report, the Commission found that (1) employers continued to discriminate against civil union couples "despite [the employers'] familiarity with the [civil union] law," (2) civil union couples face "unequal treatment and uncertainties . . . during a health care crisis, particularly in hospital settings," and (3) "the Civil Union Act has a particularly disparate impact on people of color." *See First Interim Report of the New Jersey Civil Union Review Commission*, at 17-18 (2008), *available at* http://www.state.nj.us/lps/dcr/downloads/1st-InterimReport-CURC.pdf. The Commission further found that "[c]ivil union status is not clear to the general public, which creates a second-class status." *Id.* at 17. The Legislature subsequently considered, but did not pass, same-sex marriage legislation. *See* Lambda Legal, *Lambda Legal Goes Back To Court in NJ*, Jan. 7, 2010, *available at* http://www.lambdalegal.org/publications/articles/fa_20090107_nj-legislature-fails-marriage-equality-lambda-legal-back-to-court.html.

8

1    Same-sex couples have also encountered resistance when attempting to enforce protec-

2    tions against sexual orientation discrimination.  In *In re Golinski*, the Office of Personnel

3    Management ("OPM") directed an insurance carrier not to process a federal judicial employee's

4    benefits election form for her wife, "thwarting the relief . . . ordered" under a ruling by the Ninth

5    Circuit's Employment Dispute Resolution Plan.  587 F.3d 956, 958 (9th Cir. 2009).  Stating that

6    there was "no reason to believe that this discrimination will cease without further action," the

7    court again ordered that federal health benefits be extended to the employee's wife, awarded back

8    pay, and "authorize[d] Ms. Golinski to take appropriate action to secure compliance with this

9    order, such as by petition for enforcement or mandamus."  *Id.* at 960, 964.  Rather than comply

10   or appeal, OPM instead issued a press release stating its intent not to comply, leading the

11   employee to file suit.  *See Golinski v.U.S. Office of Personnel Mgmt.*, Case No. 10-cv-00257,

12   Dkt No. 1 ¶ 4 (N.D. Cal. Jan 20, 2010).

13   **III.    THE NATURE, HISTORY AND CIRCUMSTANCES OF THE PREJUDICE
14           AGAINST GAY MEN AND LESBIANS ESTABLISHES THAT THE COURT
             SHOULD EVALUATE PROPOSITION 8 UNDER HEIGHTENED SCRUTINY**
15

16   At least four important categories of data should be considered in examining how preju-

17   dice against gay men and lesbians impedes their ability to rely on political processes to protect

18   themselves from discrimination: (1) the systemic underrepresentation of gay men and lesbians in

19   political bodies; (2) the backlash by anti-gay groups in countering gains and protections obtained by

20   gay men and lesbians; (3) the perceived "social opprobrium" against gay men and lesbians that

21   impedes their political mobilization; and (4) the frequency, pervasiveness, and severity of the

22   prejudice directed against gay men and lesbians.

23   **A.      Gay Men And Lesbians Are Underrepresented In Government**

24   Underrepresentation in political bodies is an acknowledged measure of relative political

25   power in our representative government.  *See Frontiero,* 411 U.S. at 686 (holding classification

26   based on gender "inherently suspect" because women were "vastly underrepresented"); *see also*

27   *Watkins v. U.S. Army*, 875 F.2d 699, 727 (9th Cir. 1989) (Norris, J., concurring) ("The very fact

28   that homosexuals have historically been underrepresented in and victimized by political bodies is

9

1    itself strong evidence that they lack the political power necessary to ensure fair treatment at the

2    hands of government.").

3            Gay men and lesbians are barely represented in political bodies today.  Only recently have

4    openly gay people dared to run for public office, and the number of openly gay elected officials

5    in this country remains miniscule.  Although California's gay, lesbian, and bisexual constituency is

6    the largest in the country, only three percent of the California state legislators are openly gay or

7    lesbian.  *See* The California Legislative Lesbian, Gay, Bisexual, & Transgender (LGBT) Caucus,

8    http://www.assembly.ca.gov/LGBT_Caucus/ (last updated Jan. 28, 2008) (reporting 4 LGBT

9    members); National Conference of State Legislatures (NCSL), *Legislators, Number, Terms of*

10   *Office, Next Election (2007)*, http://www.ncsl.org/default.aspx?tabid=17273 (reporting 120

11   California legislators).  As of 2008, there were three openly gay or lesbian members of the

12   United States House of Representatives.  *See* Gay & Lesbian Victory Fund and Leadership

13   Institute, *2008 Annual Report*, at 3, *available at* http://www.victoryfund.org/files/

14   victory_annual_08.pdf.  Although more than 40 openly gay or lesbian state legislators were

15   elected to office in 2008, that number represents a minute percentage of the over 7000 state

16   legislators in the United States.  *See id.* at 8; NCSL, http://www.ncsl.org/default.aspx?

17   tabid=17273.  As of January 23, 2010, there is only one openly gay or lesbian federal district

18   court judge.  *See* Steve Schmadeke, *Gay, Lesbian Judges in Cook County Note Their Progress*,

19   Chicago Tribune, Dec. 6, 2009.

20           Openly gay or lesbian individuals in public office are often subject to challenges based

21   solely on their sexual orientation.  In the spring of 2004, the Christian Coalition sent out 75,000

22   voter guides opposing the re-election of Justice Rives Kistler of the Oregon state Supreme Court,

23   denouncing him as "the only open homosexual Supreme Court judge in the nation."  Karen

24   Breslau, *A Rising Tide, Rocking Boats: The Politics of Gay Marriage Roil Oregon's Electoral*

25   *Terrain*, Newsweek, May 17, 2004.  The group promised to challenge Kistler's fitness to serve

26   on moral grounds: "We'll give the people of Oregon information on who they want as a judge, a

27   man who believes family is as important as it has been for thousands of years or a man doing

28

1   what in the past has been against law and is against moral law."  Charles E. Beggs, *Gay Issue*

2   *Will Arise in Court Race*, AP Newswires, Mar. 21, 2004.

3   **B.      Gay Men and Lesbians Are the Victims of Political Backlash**

4          The argument that gay men and lesbians are not politically powerless because of recent

5   gains also ignores the political backlash that has arisen as a result of these victories.  The LGBT

6   rights movement has faced countless setbacks attributable to the group's unpopularity and lack

7   of political clout in local, state and federal politics.  *See* Michael J. Klarman, Brown *and*

8   Lawrence *(And* Goodridge*)*, 104 Mich. L. Rev. 431, 459-73 (2005).  Defendants' assertion that

9   the LGBT rights movement and its "powerful … allies" possess the "ability to force lawmakers

10  to take positions and actions against their preferences" does not ring true in the political market-

11  place.  Voters who support same-sex marriage are less likely to make their vote contingent on a

12  candidate's position on the issue than voters who oppose same-sex marriage.  *See* Esther Kaplan,

13  *Onward Christian Soldiers: The Religious Right's Sense of Siege is Fueling a Resurgence,* The

14  Nation, July 5, 2004, at 33.  Opinion polls conducted soon after the Massachusetts Supreme

15  Court granted same-sex couples the right to marry showed that respondents were much more

16  likely to vote for President Bush than the as-yet undetermined nominee of the Democratic party

17  after being told of their respective positions on same-sex marriage and civil unions.  *See*

18  Klarman, 104 Mich. L. Rev. at 462 n. 228.  After the 2004 presidential election, prominent

19  Democrats blamed Mayor Gavin Newsom's decision to allow same-sex marriages in San

20  Francisco for providing conservatives with a political rallying point.  *See id*. at 482 nn. 365-69;

21  *see also id.* at 481 n. 364 (conservative activists and some Democrats attributed Kerry's loss to

22  Bush in 2004 to San Francisco's same-sex weddings and the Massachusetts Supreme Court's

23  decision in *Goodrich v. Dep't of Public Health*, 798 N.E. 2d 941 (Mass. 2003)).  Politicians

24  showing support for LGBT rights have often suffered political harm.  *See id*. at 465 n. 256, 479

25  n. 350.

26          More than perhaps any other group in the recent history of America, the advance of

27  LGBT rights has led to the immediate mobilization of powerful groups fighting to reverse the

28  legislative and judicial acts granting those rights through drastic measures, such as constitutional

11

1  amendment.  When the Hawaii Supreme Court in *Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993),

2  struck down a state law limiting marriage to a man and a woman, within a few years, more than

3  30 states and Congress responded by passing 'defense of marriage' acts.  *See* Klarman, 104

4  Mich. L. Rev. at 460 n. 212.  After *Goodrich*, in 2004, President George W. Bush stated his

5  support for a marriage amendment to the Constitution.  *See id.* at 460-65.  The Republican

6  party's platform in 2004 proclaimed that a Constitutional amendment was necessary to protect

7  marriage.  *See* 2004 Republican Party Platform: A Safer World and a More Hopeful America, at

8  83, *available at* http://www.presidency.ucsb.edu/papers_pdf/25850.pdf ("We strongly support

9  President Bush's call for a Constitutional amendment that fully protects marriage.").

10      The persistent "backlash" to advances in LGBT equality and the extreme political meas-

11  ures used to take away the group's fundamental right to marry illustrate the overwhelming

12  difficulty that gay men and lesbians face in seeking recourse through "ordinary political

13  processes."

14  **C.**      **Discrimination Deters Many Gay Men And Lesbians From Political Activism**

15      Gay men and lesbians constitute only a very small percentage of the population,[2] and their

16  political power is diminished by the fact that many keep their sexual orientation a secret in light of

17  social opprobrium and animus.  This secrecy is both a shelter from discrimination and an obstacle

18  to overcoming it.  Many gay men and lesbians are deterred from political activism out of fear of

19  exposing themselves to the very discrimination they seek to eliminate.  *See* Bruce A. Ackerman,

20  *Beyond* Carolene Products*, 98 Harv. L. Rev. 713, 731 (1985).  Just as "passing" has been a

21  method of coping with discrimination based on race and gender, efforts of gay and lesbian individu-

22  als to hide their sexual orientation are both an "*effect* of discrimination as well as an *evasion* of it."

23  *See* Kenji Yoshino, *Covering*, 111 Yale L.J. 769, 772, 811-36, 925-33 (2002).

24

25

26  [2] It is estimated that 5.2% of California's population, and 4.1% of the United States population,
    is gay, lesbian or bisexual.  *See* Gary J. Gates, The Williams Institute, *Same-Sex Couples and the*
27  *Gay, Lesbian, Bisexual Population: New Estimates from the American Community Survey*, at
    4, 5 (2006).
28

**AMENDED BRIEF OF AMICI CURIAE ASIAN LAW CAUCUS, ET AL. IN SUPPORT OF PLAINTIFFS**
**CASE NO. 09-CV-2292 VRW**

1    In a survey conducted in 2000, 37% of gay men and lesbians reported they were not open

2    about sexual orientation to their employers; 24% were not open to co-workers; and 15% were not

3    open to family members.  Kaiser Family Foundation Study, *Inside OUT: A Report on the*

4    *Experiences of Lesbians, Gays and Bisexuals in America and the Public's View on Issues and*

5    *Policies Related to Sexual Orientation* (2001).  The cost of keeping one's sexual orientation

6    "hidden" takes a toll on society, as well as the individual who expends great energy and suffers

7    psychological alienation while trying to "pass."  *See* Kenji Yoshino, *Assimilationist Bias in*

8    *Equal Protection: The Visibility Presumption and the Case of "Don't Ask, Don't Tell,"* 108 Yale

9    L.J. 485, 527-29 (1998); *see also* S.W. Cole et al., *Elevated Physical Health Risk Among Gay*

10   *Men Who Conceal Their Homosexual Identity*, 15 Health Psychol. 243 (1996).

11   The chilling effects of censorship and discrimination make it difficult for gay men, lesbi-

12   ans and their allies to politically organize.  Barriers to LGBT visibility are not only imposed by

13   an individual's fear of discrimination and harm, but also strong pressures from society, including

14   government.  In 2003, the Department of Justice "barred a group of employees from holding

15   their annual gay pride event at the department's headquarters" on grounds that "the White House

16   had not formally recognized Gay Pride Month with a presidential proclamation."  *See* Eric

17   Lichtblau, *Justice Dept. Bans Event By Gay Staff*, New York Times, June 6, 2003, at A18.  In

18   2003, the day after *Lawrence v. Texas* was decided, a Kansas librarian who was the mother of a

19   gay son was reprimanded and informed that she could never speak about *Lawrence* again,

20   because she was creating a "hostile work environment."  *See* Press Release, American Civil

21   Liberties Union, ACLU Urges Kansas Public Library Not to Censor Employee for Discussing

22   Historic Sodomy Ruling (July 16, 2003), *available at* http://www.aclu.org/free-speech/aclu-

23   urges-kansas-public-library-not-censor-employee-discussing-historic-sodomy-ruling.

24   **D.      Recent Legislation Protecting Rights of Gay Men and Lesbians are Dwarfed by**
     **the Inequalities They Face Daily**

25

26   According to a 2005 survey, 39% of LGBT employees experienced sexual orientation-

27   based discrimination, with 11% reporting frequent harassment.  Lambda Legal and Deloitte

28   Financial Advisory Services LLP, *2005 Workplace Fairness Survey*, at 4-5 (2006); *see also* M.

1   V. Lee Badgett et al., The Williams Institute, *Bias in the Workplace: Consistent Evidence of*

2   *Sexual Orientation and Gender Identity Discrimination*, Executive Summary, at 1 (2007).  In ten

3   states prohibiting sexual orientation discrimination, employees report gender-based discrimina-

4   tion and sexual orientation-based discrimination at approximately the same rate.  *See* Badgett et

5   al., at 1-2.  Between 12% and 30%  of heterosexual employees surveyed report witnessing sexual

6   orientation discrimination against coworkers.  *See id.* at 1.  Openly gay, lesbian or bisexual

7   individuals are still subject to discharge from serving in the United States Armed Forces.  *See* 10

8   U.S.C. § 654(b).

9       Same-sex couples continue to face barriers to family-building experienced by no other

10  minority group in the United States.  More than half of gay men and 41% of lesbians surveyed

11  wish to have a child.  *See* Gary J. Gates et al., The Williams Institute & The Urban Institute,

12  *Adoption and Foster Care by Gay and Lesbian Parents in the United States*, at 5 (2007).

13  Nevertheless, Florida and Mississippi law forbid "same gender" couples from adopting.  *See* Fla.

14  Stat. § 63.042(3); Miss. Code Ann. § 93-17-3(5); Gates et al., at 3.  Utah both bans same-sex

15  marriage and forbids unmarried couples from adopting.  Utah Code Ann. § 78B-6-117; *see also*

16  Human Rights Campaign, *Parenting Laws: Joint Adoption and Second-Parent Adoption*, at 1

17  (2009) ("HRC Parenting Laws").  Arkansas takes this one step further, by also forbidding foster

18  parenting by individuals "cohabiting with a sexual partner outside of a marriage that is valid

19  under . . . the laws of this state."  *See* Ark. Code Ann. § 9-8-304; *see also* HRC Parenting Laws

20  at 1.  Although gay men and lesbians also engage in biological parenting, at least six states deny

21  second-parent adoptions to same-sex partners, either directly or on the basis that the couples are

22  unmarried.  *See* HRC Parenting Laws at 2; Human Rights Campaign, *Michigan Adoption Law*,

23  http://www.hrc.org/your_community/1076.htm (last updated Dec. 9, 2009).

24      Even where same-sex marriage is available under state law, same-sex couples are denied

25  more than 1000 federal rights due to the lack of federal recognition of their marriages.  *See* U.S.

26  Gen. Acct'g Office, GAO-04-353R, *Defense of Marriage Act: Update to Prior Report*, at 1

27  (2004).  Healthcare and other employment benefits extended to the same-sex partner of an

28  employee are treated as taxable income for that employee, resulting in, on average, $1,070 per

1   year more in taxes than married employees with the same coverage.  *See* Naomi G. Goldberg &

2   M.V. Lee Badgett, The Williams Institute, *Tax Implications for Same-Sex Couples*, at 1 (2009).

3   When the estate tax returns with an exclusion limit of $1 million in 2011, same-sex couples

4   subject to the tax will pay on average $1.1 million more than their married counterparts.  *See id.*

5   Because the federal government does not recognize same-sex partners, social security survivor

6   benefits and similar federal benefits are denied to surviving same-sex partners.  *See id.*, at 2.

7   Gay men and lesbians, in general, and same-sex couples, in particular, continue to experience

8   widespread discrimination related to both their private and public lives.

9   **IV.**    <u>**CONCLUSION**</u>

10       *Amici* respectfully thank the Court for the opportunity to brief the discrete, but important

11   issue of the political powerlessness of gay men and lesbians.  In submitting this brief, *Amici* hope

12   that the legal arguments and empirical data provided will be of assistance to the Court in

13   determining the level of scrutiny to apply in evaluating whether Proposition 8 violates the Equal

14   Protection Clause of the United States Constitution and that the Court will conclude that some

15   level of heightened scrutiny is appropriate in this case.

16

17   DATED:  February 3, 2010           Respectfully submitted,

18

19                            <u>By:       /S/ Peter Obstler         </u>

20                               Bingham McCutchen LLP

21                               Peter Obstler
                               Attorneys for *Amici Curiae*

22

23

24

25

26

27

28