Herma Hill Kay (SBN 30734)
*hkay@law.berkeley.edu*
BERKELEY SCHOOL OF LAW
University of California
Berkeley, CA 94720
Telephone: (510) 643-2671
Facsimile: (510) 643-2673

Michael S. Wald (SBN 47219)
*mwald@stanford.edu*
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305
Telephone: (650) 723-0322
Facsimile: (650) 725-0253

*Attorneys for Amici Curiae*
*California Professors of Family Law*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles, <br><br> Defendants. | Case No. CV-09-2292 VRW <br><br> **BRIEF AMICUS CURIAE** <br><br> **CALIFORNIA PROFESSORS OF FAMILY LAW** <br><br> Judge: Chief Judge Vaughn R. Walker |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

STATEMENT OF INTEREST ..................................................................................... 1

ARGUMENT

    I.   THE LEGAL ISSUES ................................................................................. 2

    II.  THE NATURE AND PURPOSES OF CIVIL MARRIAGE ...................................... 2

         A.   Civil Marriage is a State-Created Legal Status ................................ 2

         B.   Why the State Provides for Marriage ............................................. 3

         C.   Choice of Partners is a Critical Aspect of Marriage ........................ 4

    III.  THERE IS NO RATIONAL BASIS FOR DENYING SAME-
         SEX COUPLES ACCESS TO THE INSTITUTION OF MARRIAGE .................. 5

         A.   The Desire to Preserve a "Traditional" Definition of Marriage
             Does Not Justify Unequal Treatment .............................................. 5

              (1)  Marital Roles .................................................................... 6
              (2)  Access to Marriage ........................................................... 6
              (3)  Marital Dissolution Reforms .............................................. 7

         B.   Same-Sex Unions and Opposite-Sex Unions Are Functionally
             Equivalent with Respect to Purposes of Marriage ........................... 8

    IV. MARRIAGE IS A UNIQUE LEGAL, SOCIAL, AND CULTURAL STATUS
        THAT PROVIDES ADVANTAGES THAT CANNOT BE MATCHED
        BY A DOMESTIC PARTNERSHIP ................................................................ 9

    V.  CONCLUSION ........................................................................................ 14

i

BRIEF AMICUS CURIAE
CALIFORNIA PROFESSORS OF FAMILY LAW
Case No. CV-09-2292 VRW

1

# TABLE OF AUTHORITIES

2
**Page**

3

**Cases:**

4

*DeBurgh v. DeBurgh* 39 Cal.2d 858 (1952) ................................................................. 7
5
*Dunn v. Mullan* 211 Cal. 583 (1931) ......................................................................... 6
*Elden v. Sheldon* 46 Cal.3d 267 (1988) .................................................................... 3
6
*In re Marriage of Carney,* 24 Cal.3d 725 (1979) ....................................................... 6
7
*In re Estate of De Laveaga* 142 Cal. 158 (1904) ........................................................ 3
*In re Marriage of Bonds* 24 Cal.4th 1 (2000) ............................................................ 3
8
*In re Marriage Cases* 183 P.3d 384 (Cal 2008)..................................................... passim
*In re Marriage of Haines* 33 Cal.App. 4th 277 (1995)............................................. 4
9
*Johnson v. Rockefeller* 365 F.Supp. 377 (S.D.N.Y. 1973) ...................................... 10
*Kerrigan v. Comm'r. of Public Health*, 957 A.2d 407 (Conn. 2008) ....................... 12
10
*K.M. v. E.G.* 37 Cal.4th 130 (2005) ........................................................................... 9
*Knight v. Superior Court* 128 Cal.App.4th 14 (2005) .............................................. 11
11
*Lockyer v. City & County of San Francisco*
12
    33 Cal.4th 1055 (2004)...................................................................................... 11
*Loving v. Virginia* 388 U.S. 1 (1967).................................................................... 2,4
13
*Perez v. Sharp* 32 Cal.2d 711 (1948)...................................................................... 4,7
14
*Shaw v. Bernal* 163 Cal.62 (1912) ............................................................................ 6
*Turner v. Safley* 482 U.S. 78 (1987) ................................................................... 2,5,10
15
*Zablocki v. Redhail* 434 U.S. 374 (1978)................................................................ 2,4

16

17
**Statutes:**

18
California Civil Code
    Former Civ. Code § 4506 ................................................................................... 7
19
    Former Civ. Code § 5125 ................................................................................... 6

20
California Family Code
    Fam. Code § 300...................................................................................................2
21
    Fam. Code §§ 301-03 .......................................................................................... 4
22
    Fam. Code § 1100................................................................................................ 3
    Fam. Code § 1612................................................................................................ 3
23
    Fam. Code § 1620................................................................................................ 3
    Fam. Code § 2201................................................................................................ 4
24
    Fam. Code § 2310................................................................................................ 7
    Fam. Code § 3040................................................................................................ 6
25
    Fam. Code § 4300................................................................................................ 6

26
ii

27
28

1

2

**State Legislation**

3

A.B. No. 205 (Reg. Sess. 2003-2004)................................................................ 8

4

5

**Other Authorities**

6

Roberta Bennett and David Gamblin, *Domestic Partnership: Not Enough*, DAILY
        JOURNAL July 27, 2007, p.6 .............................................................. 12

7

Grace G. Blumberg, *Legal Recognition of Same-Sex Conjugal Relationships: The
        2003 California Domestic Partner Rights and Responsibilities Act in
        Comparative Civil Rights and Family Law Perspective*, 51 UCLA L. REV.

8

        1555 (2004)........................................................................................ 9

9

Matthew Bramlett and William Mosher, Centers for Disease Control, Division of
        Vital Statistics, *Advance Data from Vital and Health Statistics*, No. 323 (May

10

        31, 2001) FIRST MARRIAGE, DISSOLUTION, DIVORCE, AND REMARRIAGE:

11

        UNITED STATES ................................................................................. 10
Laura Brill, *Domestic partnerships aren't marriage*, SACRAMENTO BEE July 1,

12

        2007, p. E5 ......................................................................................... 12
Mary Anne Case, *Marriage Licenses*, 89 Minn. L.Rev. 1758 (2005) ................... 9

13

Ronald Dworkin, *Three Questions for America*, NEW YORK REVIEW OF BOOKS 3

14

        (Sept. 21, 2006)................................................................................... 12
Gilbert Herdt and Robert M. Kertzner, *I Do, But I Can't: The Impact of Marriage*

15

        *Denial on the Mental Health and Sexual Citizenship of Lesbian and Gay*
        *Men in the United States*, 3 J. SEXUALITY RES. SOC. POL'Y 33 (2006) ........ 13

16

Jackie Goldberg, *Going past domestic partnership*, LOS ANGELES TIMES,

17

        August 9, 2007, p. A21 ...................................................................... 12
Steven Nock, *Marriage as a Public Issue*, 15 THE FUTURE OF CHILDREN

18

        13 (2005)............................................................................................ 10
Elizabeth M. Scott, *Marriage, Cohabitation and Collective*

19

        *Responsibility for Dependency*, 2004 U. CHI. LEGAL F. 225 (2004) ........... 11
Linda Waite and Maggie Gallagher, The Case for Marriage

20

        (2000)............................................................................................ 10, 11
Michael S. Wald, *Same-Sex Couple Marriage: A Family Policy Perspective*,

21

        9 VA. J. SOC. POL'Y & L. 291(2001) .................................................... 3

22

23

24

25

26

iii

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF INTEREST

Amici are all professors of family law in California. Amici include the authors of major casebooks and treatises on family law, as well as numerous scholarly works related to the issue before this Court. Amici are extremely familiar with California and national family law history, legislation, case law, and policy as they apply to this case. As family law scholars, amici have a substantial interest in the issue before this Court, which concerns a central aspect of family law, the nature of marriage.

Amici agree with both the plaintiffs and defendants in this case that marriage is a critical institution in society. Through both law and culture, marriage imparts distinctive personal, psychological, and social benefits to adults and children. Thus, any laws that deprive individuals of access to marriage raise substantial concerns regarding the promotion of family life and the well-being of adults and children. Amici support plaintiffs' claims that there are no reasonable justifications, relevant to the purposes of family law, for depriving individuals of the opportunity to marry someone of the same sex and that Proposition 8 therefore violates plaintiffs' rights under the Due Process and Equal Protection Clauses of the United States Constitution.

In this brief, amici focus on two of the arguments proffered by those seeking to justify the constitutionality of denying same-sex couples the opportunity to marry: a) that the desire to preserve a "traditional" definition of marriage is an adequate justification for denying individuals the opportunity to marry someone of the same sex; and b) that, by providing same-sex couples the opportunity to enter into domestic partnerships, California has offered them a marriage-like status that is sufficient to meet the State's obligations under the Equal Protection Clause. Amici submit that both contentions lack merit from a constitutional or family law perspective. We believe that our expertise with respect to these issues will contribute to the deliberations of this Court.

///

///

///

///

ARGUMENT

## I.     THE LEGAL ISSUES

What are the limits on the decision of a State to regulate access to the legal status of marriage?  The opportunity to marry is unquestionably a fundamental right. *Loving v. Virginia,* 388 U.S. 1 (1967) (hereafter *Loving*); *Zablocki v. Redhail,* 434 U.S. 374 (1978) (hereafter *Zablocki*); *Turner v. Safley,* 482 U.S. 78 (1987) (hereafter *Turner*);  *In re Marriage Cases,* 183 P.3d 384 (Cal. 2008) (hereafter *Marriage Cases*). No state may deny an individual the opportunity to marry the person of her or his choice absent a significant state interest. *Id.* Under Proposition 8, individuals who wish to marry a person of the same sex are denied this opportunity, while virtually any two individuals of the opposite sex may marry. Thus, this Court must decide whether there is a significant State interest for making the sex of the partners a determinative factor in providing access to marriage.

The Court also must decide whether the registered domestic partnerships that same-sex couples may now enter as the result of legislation enacted in 2003 are the equivalent of marriage, or a satisfactory alternative to marriage. Amici argue that the answer to these two questions is no.

## II.     THE NATURE AND PURPOSES OF CIVIL MARRIAGE

### A.     Civil Marriage is a State-Created Legal Status

In resolving the constitutional issues in this case, this Court must first determine the legal nature and purposes of marriage.  In California, as in other states, civil marriage is, and always has been, a legal status created by the Legislature, which individuals may choose to assume. Cal. Fam. Code § 300.  Individuals can express their commitment to each other through religious vows, or in other ways, but without the State's sanction they cannot claim the legal status of being married, with the multitude of state-created obligations and rights that accompany that status.

2

### B.     Why the State Provides for Marriage

While, as a legal matter, marriage is a status arising out of a contract between individuals, it is considerably more than a simple agreement to enter into a personal relationship. California public policy, like that of all states, has always regarded marriage as a distinctive and special social institution, warranting public acknowledgment, regulation, support, and encouragement. *In re Estate of De Laveaga,* 142 Cal. 158, 170-71 (1904); *Marriage Cases,* 183 P.3d at 57-61.

The purposes of civil marriage are to enable two individuals who choose to integrate their lives, legally and emotionally, and to express their commitment publicly, to do so. Marriage encourages stable family relationships, promotes economic interdependence and security, and enhances the physical and emotional well-being of both the partners and their children. Courts and commentators have long recognized that public policy toward marriage is based on the premise that civil marriage benefits all of society. *Elden v. Sheldon,* 46 Cal.3d 267, 274-275 (1988) (noting that the State accords marriage a special place because marriage is "the most socially productive and individually fulfilling relationship that one can enjoy in the course of a lifetime") (internal quotation omitted); *see also* Michael S. Wald, *Same-Sex Couple Marriage: A Family Policy Perspective,* 9 VA. J. Soc. POL'Y & L. 291, 300-03 (2001).

Because of the special nature and importance of marriage, California, like all states, regulates most aspects of the marital status. *In re Marriage of Bonds,* 24 Cal.4th 1, 25 (2000) (the State's involvement in marriage is "pervasive"). Under California law, marital partners have obligations of mutual support, a joint interest in assets acquired during the marriage, and a right to a share of their decedent spouse's estate.[1] These elements, reflect the State's interest in protecting

_____

[1] *See* Cal. Fam. Code section 1620 (Except as otherwise provided by law, a husband and wife cannot, by a contract with each other, alter their legal relations, except as to property); Section 1612, subdivision (c) (under some circumstances, couples cannot waive spousal support obligations in a premarital agreement); and Section 1100, subdivision (e) (married couples cannot waive the statutory imposition of a fiduciary obligation in their management and control of community

3

the commitment married couples have made to integrate their lives and promote their joint well-being. See *In re Marriage of Haines*, 33 Cal.App.4th 277, 287-288 (1995).

### C.    Choice of Partners is a Critical Aspect of Marriage

Given the purposes of marriage, California has long regarded the choice of a partner as a central element of marriage, essential both to the personal decision to marry and to the societal benefits that follow from marriage. *Perez v. Sharp*, 32 Cal.2d 711, 715 (1948). The State assumes that the social benefits flowing from civil marriage depend on a cooperative integration of individual lives. Today, California places almost no restrictions on marital choice;[2] virtually all adults are able to marry the person of their choice, without regard to their race, national origin, religion, age, income, education, health, fertility, or other characteristics.

The U.S. Supreme Court also has recognized the critical importance of choice of marital partners, elevating it to a constitutionally protected right. The Court first held that a state may not restrict an individual's choice to marry someone of a different race. *Loving,* 388 U.S. at 2,12. Subsequently, the Court has held that a state may not prevent other classes of people from marrying, including parents delinquent in their child-support payments, *Zablocki,* 434 U.S. at 386-87, and prisoners, *Turner,* 482 U.S. at 96, because those restrictions too substantially burdened an individual's right of choice in marriage. In these cases, the Court found that the right to marry a

---

property and they cannot waive spousal support obligations under some circumstances.)

[2]   California does impose several limits on the right to marry. Bigamous and polygamous marriages are prohibited. Cal. Fam. Code § 2201. These relationships are thought to be less susceptible to the emotional integration and stability that the State seeks to further. There also are a limited number of restrictions based on consanguinity. Finally, marriage must be entered into voluntarily and both participants must be capable of making that choice. To ensure that capability, each person must be at least 18 years old, or, if 16 or 17, must obtain parental consent or a court order allowing the marriage. Cal. Fam. Code §§ 301-03.

4

1   person of one's of choice overrides other important state interests, including child-support

2   enforcement and prison regulations.

3

4   **III.   THERE IS NO RATIONAL BASIS FOR DENYING SAME-SEX COUPLES
        ACCESS TO THE INSTITUTION OF MARRIAGE**

5

6   Defendants posit a number of rationales that they claim justify limiting marriage to

7   opposite-sex couples. These rationales are as deficient as were the rationales offered in the past for

8   denial based on race, national origin, income, or other individual characteristics. Amici submit that

9   with respect to the State's goals for marriage, there is no rational, let alone compelling basis, for

10  denying individuals the right to marry someone of the same sex.

11

12  **A.   The Desire to Preserve a "Traditional" Definition of Marriage Does
        Not Justify Unequal Treatment**

13

14  In this brief, amici focus primarily on the claim that the State has an interest in preserving

15  what Defendant-Intervenors (hereafter "Defendants") call the "traditional" definition or meaning

16  of marriage. Defendants argue that that it is acceptable to establish two different marital regimes --

17  marriage and domestic partnerships -- because there is legimate societal value in preserving a

18  "traditional" definition of marriage. This claim cannot stand.

19  To begin with, Defendants are incorrect in asserting that there is single form or definition

20  of "traditional" marriage. While only opposite-sex couples have been permitted to marry until the

21  past decade, the legal meaning of marriage has evolved considerably since the beginning of

22  California's Statehood, especially with respect to such basic elements as who may marry, the roles

23  of the spouses, the management and control of marital assets, and the duration of the marital entity.

24  These changes have been brought about both by shifts in the Legislature's conception of the

25  elements needed to achieve the goals of marriage and by court decisions requiring equal treatment

26  of married spouses in their family status. Since Statehood, the only constant element has been the

27

28

BRIEF AMICUS CURIAE
CALIFORNIA PROFESSORS OF FAMILY LAW
Case No. CV-09-2292 VRW

1    goal of facilitating the decision of two people to integrate their lives into a single entity called

2    marriage.

3         (1)    *Marital Roles*

4         Under California's initial marital regime in 1850, the husband was given a dominant role in

5    the family. Although California adopted a community property regime, the husband was the sole

6    owner and manager of the community property estate during the marriage. Over the years, the

7    legislature, and courts, totally altered this construction of marriage.  By 1890, the Legislature had

8    given the wife substantial control over the management of her separate property and its disposition

9    at her death.  Subsequently, the Legislature further equalized the legal status of husbands and

10   wives by enacting various statutes restricting the husband's power over the community property.

11   California courts interpreted these statutes in ways that benefited the wife's property interests,

12   thereby paving the way for even further equalization of the status of husbands and wives. *Shaw v.*

13   *Bernal,* 163 Cal. 262, 266 (1912); *Dunn v. Mullan,* 211 Cal. 583, 587-88 (1931). These changes

14   culminated in 1973 when California conferred on either spouse equal powers of management and

15   control over the community real and personal property. Former Civ. Code § 5125, as amended

16   (Stats.1973, ch. 987, eff. Jan. 1, 1975, repealed by Stats.1992, ch.162, eff. Jan.1, 1994).  California

17   has also abolished gender-based laws regarding child custody. Cal. Fam. Code § 3040, subd.

18   (a)(1)) and created equal obligations of spousal support during marriage Cal. Fam. Code, § 4300.

19   As a result of both legislative enactments and court decisions, marital roles under California law

20   are no longer sex-based – a far cry from the initial meaning of marriage. *See also In re Marriage of*

21   *Carney,* 24 Cal.3d 725 (1979) (gender not relevant to custody determinations).

22        (2)    *Access to Marriage*

23        California law once prohibited individuals from marrying someone of another race. When

24   the anti-miscegenation statute was declared unconstitutional by the California Supreme Court in

25   *Perez,* 32 Cal.2d 711, the majority of the Legislature and public believed that the need for racial

26   separation outweighed the importance of marital choice. Yet the Court realized that outdated and

27                                          6

28
                                    BRIEF AMICUS CURIAE
                           CALIFORNIA PROFESSORS OF FAMILY LAW
                                    Case No. CV-09-2292 VRW

1    stereotypical beliefs about racial mixing could not withstand scrutiny under the equal protection

2    clause when they were embodied in laws that restricted an individual's opportunity to marry a

3    person of her or his choice.

4                      (3)      *Marital Dissolution Reforms*

5           Initially, California greatly limited the right of spouses to dissolve their relationship.

6    California's 1872 divorce statute recognized only fault-based grounds for divorce, permitting

7    courts to dissolve marriages only upon a showing of the commission of specific acts by an

8    offending spouse, not an unwillingness of each spouse to continue the relationship. In 1952, the

9    California Supreme Court instituted the first major change with respect to dissolution. In *DeBurgh*

10   *v. DeBurgh,* 39 Cal.2d 858, 868-73 (1952), the Court, led by Chief Justice Traynor, abolished the

11   rule disallowing divorce if both parties were "at fault." In 1969, California became the first state to

12   enact a no-fault divorce law in which all the fault-based grounds for divorce were abolished and

13   only two no-fault grounds, "irreconcilable differences which have caused the irremediable

14   breakdown of the marriage" and "incurable insanity," remained available. Former Cal. Civ. Code,

15   § 4506, added by The Family Law Act, Stats. 1969, ch. 1608, § 8, eff. Jan. 1, 1970, repealed and

16   reenacted as Cal. Fam. Code, § 2310 without substantive change, Stats. 1992, ch. 162, § 10, eff.

17   Jan. 1, 1994.

18          The adoption of a no-fault system reflected the Legislative judgment that marriage should

19   be viewed as a means of supporting relationships where the parties are committed to integrating

20   their lives. The Legislative changes rejected traditional elements of marriage (divorce based only

21   on fault grounds) when the tradition was no longer perceived as furthering the societal purposes of

22   marriage.

23          Each of these changes reflected differing legislative and judicial views over time about

24   which elements of marital status are necessary to achieve the State's purposes in authorizing and

25   encouraging marriage. Many of these changes were implemented over strong opposition, with

26   opponents often claiming that the changes would fatally impair the institution of marriage.

27                                                    7

28

1  However, both the Legislature and the courts adopted these changes in order to promote and

2  protect equality and fairness, as well as to further the goals of the State in providing for marriage.

3  As the trial testimony of Nancy Cott demonstrated, similar changes occurred in the meaning and

   consequences of marriage throughout the United States. Trial Tr., vol. 2, 227 – 48, Jan. 12, 2010.

4  Far from harming the institution of marriage, the elimination of discriminatory restrictions on

5  marriage has strengthened its vitality and importance in American society. For similar reasons, it

6  now clearly is discriminatory to deny marital status to same-sex couples.

7          The "traditional" definition of marriage, and its attendant gender roles, offered by

8  defendant-intervenors to justify denying same-sex couples access to marriage no longer exists for

9  opposite-sex couples. Yet, marriage DOES have a constant and traditional meaning as an

10 institution in which two consenting adults commit to integrating their personal lives. As discussed

11 below, this legal and social meaning carries with it intangible benefits. It is the opportunity to

12 participate in this tradition and to enjoy its intangible benefits that same-sex couples seek.

13

   **B.  Same-Sex Unions and Opposite-Sex Unions Are Functionally Equivalent
14      with Respect to Purposes of Marriage**

15         Defendants make a number of other claims regarding the need to give special status to

16 opposite-sex unions.  These arguments rest on the premises that opposite-sex unions are superior

17 to same-sex unions with respect to the purposes of marriage law or that the stability of opposite-

18 sex marriages will be undermined if same-sex couples are permitted to marry.  Amici believe that

19 all of these claims are baseless and that this was fully demonstrated at trial.  In fact, the California

20 Legislature has specifically recognized that same-sex and opposite-sex couples are functionally

21 equivalent with respect to the purposes that underlie marriage law. In 2003, the Legislature enacted

22 a comprehensive domestic partnership statute, Assembly Bill No. 205 (Reg. Sess. 2003-2004), the

23 Domestic Partner Rights and Responsibilities Act of 2003 (Stats. 2003, ch. 421), which became

24 effective on January 1, 2005. This statute makes it clear that the State considers committed same-

25 sex couple relationships functionally equivalent to marriage. See Grace G. Blumberg, *Legal*

26

27                                          8

1    *Recognition of Same-Sex Conjugal Relationships: The 2003 California Domestic Partner Rights*

2    *and Responsibilities Act in Comparative Civil Rights and Family Law Perspective*, 51 UCLA L.

3    REV. 1555 (2004).

4          The passage of Proposition 8 did not alter any of the legislative determinations. California

5    law continues to recognize that same-sex partners are equal to opposite-sex partners with respect to

6    the goals of family law, especially child-rearing. Yet, as a result of Proposition 8, same-sex

7    couples who did not marry between June and November 4, 2008 and who now wish to marry are

8    relegated to a non-marital status solely because of their sex and their sexual orientation.

9

10   **IV.    MARRIAGE IS A UNIQUE LEGAL, SOCIAL, AND CULTURAL STATUS**

11   **THAT PROVIDES ADVANTAGES THAT CANNOT BE MATCHED     BY     A**
     **DOMESTIC PARTNERSHIP**

12         The fact that California permits same-sex couples to enter into registered domestic

13   partnerships with many of the tangible rights and responsibilities that inhere in marriage does not

14   eliminate the existing constitutional violation. While domestic partnerships provide many

15   advantages to same-sex couples and their children, the two statuses are far from equal and cannot

16   be equalized. By denying same-sex couples the opportunity to marry, the State devalues their

17   unions both symbolically and practically. See Mary Anne Case, *Marriage Licenses*, 89 MINN. L.

18   REV. 1758, 1775 (2005). Even if all the economic and other legal benefits associated with marriage

19   were provided to domestic partners, being married is a unique status, with attendant social and

20   cultural meanings that provide considerable and irreplaceable advantages to married couples. By

21   prohibiting individuals from marrying someone of the same sex, the California has effectively

22   denied same-sex partners the opportunity to experience and benefit from the large array of

23   intangible benefits enjoyed by married couples. No alternative to, or substitute for, marriage can be

24   constitutionally adequate.

25

26

27
                           9

28

1    For the vast majority of individuals in our society, marriage is probably the single most

2    important social, as well as legal, institution. More than 90% of Americans rate having a happy

3    marriage as a very important life goal, generally the most important goal in life. *See* Linda Waite

4    & Maggie Gallagher, THE CASE FOR MARRIAGE 3 (2000) (hereafter "Waite & Gallagher").

5    Furthermore, a substantial majority of all adults will marry at some point in their lives. See

6    Mathew Bramlett & William Mosher, Centers for Disease Control, Division of Vital Statistics,

7    *Advance Data from Vital and Health Statistics*, No. 323 First Marriage Dissolution, Divorce, and

8    Remarriage: United States (May 31, 2001).

9    Even if the legal and economic benefits that come with marriage were repealed, people still

10    would marry because marriage has profound personal meaning and social significance. No other

11    institution provides a comparable opportunity for the personal expression of mutual commitment.

12    The U.S. Supreme Court has recognized the importance of the expressive aspects of marriage. In

13    ruling that a state could not deny prisoners the right to marry even when the other benefits of

14    marriage are stripped away, the Court noted that marriage enables individuals to express

15    "emotional support and public commitment," which the Court found to be an "important and

16    significant aspect of the marital relationship." *Turner*, 482 U.S. at 95-96. By preventing same-sex

17    couples from marrying, "the State deprives [them] of the critical emotional support to be found in

18    the formalized and symbolic relation itself." *Johnson v. Rockefeller*, 365 F.Supp. 377, 382

19    (S.D.N.Y. 1973) (conc. & dis. opn. of Lasker, J.), summarily affd sub nom. *Butler v. Wilson*, 415

20    U.S. 953 (1974). For many couples, no other state-recognized relationship can have the same

21    spiritual significance.

22    The difference is more than just spiritual, as important as that is. Marriage combines legal

23    privileges and duties with an extralegal, socially understood set of conventions that affect the

24    impact of marriage on the individuals themselves, on their children, and on the ways in which

25    married couples are treated by others. Leading researchers from many disciplines and differing

26    value perspectives agree that formal marriage, both in its meaning to the couple and its treatment

27    10

28

1   by the broader society, contributes to the quality and stability of the relationship. See *Waite &*

2   *Gallagher* at 18-23; Steven Nock, *Marriage as a Public Issue,* 15 THE FUTURE OF CHILDREN 13,

3   17-21 (2005). Substantial research indicates that the status of being married is a universal concept

4   that conveys multiple messages to the community prompting the community to support the

5   marriage. Married couples are treated differently from single individuals or those cohabiting.

6   Their relationships generally receive affirmation and support from extended family, employers,

7   and the community-at-large. As Professor Elizabeth Scott has written "(m)arriage is an institution

8   that has a clear social meaning and is regulated by a complex set of social norms that promote

9   cooperation between spouses-norms such as fidelity, loyalty, trust, reciprocity, and sharing. They

10  are embodied in well-understood community expectations about appropriate marital behavior that

11  are internalized by individuals entering marriage." Elizabeth M. Scott, *Marriage, Cohabitation and*

12  *Collective Responsibility for Dependency,* 2004 U. CHI. LEGAL F. 225, 241 (2004).

13          These expectations cannot just be transferred to a new institution. Domestic partnerships

14  lack the historic prestige of marriage. Excluding same-sex couples from marriage deprives them of

15  the unique public validation and understanding that only marriage provides. See, e.g., *Lockyer v.*

16  *City & County of San Francisco,* 33 Cal.4th 1055, 1132 (2004) (conc. & dis. opn. of Kennard, J.)

17  (discussing "the public validation that only marriage can give"); *Knight v. Superior Court,* 128

18  Cal.App.4th 14, 31 (2005) ("[M]arriage is considered a more substantial relationship and is

19  accorded a greater stature than a domestic partnership").

20          The consequences of being married are pervasive and often subtle. For example, the

21  language associated with marriage conveys clear meanings to the general public. There are no

22  domestic partnership analogues to the verb "to marry" or the adjective "married." The status of

23  "spouse" or "husband" or "wife" is distinctly different from the status of "partner" or even

24  "domestic partner," terms that apply to many types of relationships and do not connote the same

25  degree of commitment. Children of same-sex couples cannot simply describe their parents as

26  married. All of these factors impact these couples' well-being and the stability of their

27                                                              11

28

relationships. "The institution of marriage is unique: it is a distinct mode of association and commitment with long traditions of historical, social, and personal meaning. . . [Its] . . .meanings depend on associations that have been attached to the institution by centuries of experience. We can no more now create an alternate mode of commitment carrying a parallel intensity of meaning than we can now create a substitute for poetry or for love." (Ronald M. Dworkin, *Three Questions for America*, NEW YORK REVIEW OF BOOKS 30 (Sept. 21, 2006); *Kerrigan v. Comm'r. of Public Health*, 957 A.2d 407, 418 n.15 (Conn. 2008). Granting individuals of the same sex the opportunity to marry will not guarantee that they will get the support of all members of the public, but it is a necessary precondition for garnering that support.

The challenges domestic partners face in being recognized as the equivalent of married couples are exacerbated by the differences in the statutory entry and exit requirements for married spouses and domestic partners. *See Marriage Cases*, 183 P.3d at 416 n.24. The legislative structure implies that a domestic partnership is a less permanent, less committed relationship than is a marriage. These differences send a message—to the couple as well as to their relatives, friends, colleagues, and the general public—that domestic partnership is a less weighty, less substantial, and less esteemed institution than marriage. In addition, because the legal rights and obligations of domestic partners are not clear, individuals entering these relationships endure considerable uncertainty and complexity in managing both the internal and external aspects of their partnership, especially with respect to recognition by employers and other third-parties.[3] From a legal, as well as a social, perspective, the surest way to provide same-sex couples with the status and benefits of

---

[3]   Some of the uncertainties in the present situation are described in Roberta Bennett and David Gamblin, *Domestic Partnership: Not Enough*, DAILY JOURNAL July 27, 2007 p.6; Laura Brill, *Domestic partnerships aren't marriage*, SACRAMENTO BEE July 1, 2007 p.E5; Jackie Goldberg, *Going past domestic partnership*, LOS ANGELES TIMES August 9, 2007 p.A21.)

12

marriage is to allow them to marry. Any other approach will necessarily make their legal status subject to a range of uncertainties.

Finally, by consigning lesbian and gay couples to a marriage substitute, the State signals that their relationships are inferior and less worthy, regardless of any intentions to the contrary. As Chief Justice George of the California Supreme Court explained:

> one of the core elements of this fundamental right (to marry) is the right of same-sex couples to have their official family relationship accorded the same dignity, respect, and stature as that accorded to all other officially recognized family relationships. The current statutes — by drawing a distinction between the name assigned to the family relationship available to opposite-sex couples and the name assigned to the family relationship available to same-sex couples, and by reserving the historic and highly respected designation of marriage exclusively to opposite-sex couples while offering same sex couples only the new and unfamiliar designation of domestic partnership —pose a serious risk of denying the official family relationship of same-sex couples the equal dignity and respect that is a core element of the constitutional right to marry.

*Marriage Cases*, 183 P.3d at 830-31.

The separate status for same-sex couples can cause substantial harms. See Gilbert Herdt and Robert M. Kertzner, *I Do, But I Can't: The Impact of Marriage Denial on the Mental Health and Sexual Citizenship of Lesbian and Gay Men in the United States*, 3 J. SEXUALITY RES. SOC. POL'Y 33 (2006). The fact that domestic partnerships are entitled to so many of the legal entitlements as marriage but denied the right to access the symbolic benefits of the status marriage highlights the devaluation of the relationships of same-sex couples, which in turn may undermine the benefits to relationships that the legal institution of marriage is meant to further. Their children may suffer from the perception that their parents are being singled out for a separate and lesser status. The exclusion of same-sex couples from marriage is all the more significant because, as a matter of family law policy, virtually everyone else is welcomed into the marital circle.

With respect to the well-being of children, amici strongly support the conclusion of the California Supreme Court that "a stable two-parent family relationship, supported by the state's

13

official recognition and protection, is equally as important for the numerous children in California who are being raised by same-sex couples as for those children being raised by opposite-sex couples...." *In re Marriage Cases* 183 P.3d at 828.   The scientific evidence underlying this conclusion was strongly presented to this Court through the testimony of Dr. Michael Lamb. Trial Tr. vol. 5, 1010-43, Jan. 15, 2010.

Finally, offering only domestic partnership to individuals who wish to marry interferes with their constitutionally protected rights to personal intimacy and privacy.  For example, by declaring their status as domestic partners, lesbians and gay men thereby disclose their sexual orientation even when such disclosure may expose them to harmful prejudices.

## V.   CONCLUSION

The historic tradition of limiting marriage to opposite-sex couples cannot be a constitutionally sound justification for maintaining the exclusion of same-sex couples.  The exclusion of these couples is irrational in light of the changes in the legally established elements of marriage overtime. In contrast, the historic social meaning associated with marriage, namely the societal recognition of the mutual commitment and interdependence of two consenting adults, is a tradition that remains critical to our contemporary and ongoing veneration of marriage.  This social meaning is of great importance to the partners and their children. Being excluded from this tradition limits the ability of same-sex couples and their children to participate fully in the cultural fabric of our society. We ask this Court to rectify this denial of petitioners' fundamental right to participate in the tradition and values of marriage and to the equal protection of the law.

///

///

///

///

///

14

1    Dated: February 1, 2010

2

3                                Respectfully submitted,

4                                Herma Hill Kay (SBN 30734)
                                 *hkay@law.berkeley.edu*
5                                BERKELEY SCHOOL OF LAW
                                 University of California
6                                Berkeley, CA 94720
                                 Telephone: (510) 643-2671
7                                Facsimile: (510) 643-2673

8
                                 Michael S. Wald (SBN 47219)
9                                *mwald@stanford.edu*
                                 STANFORD LAW SCHOOL
10                               559 Nathan Abbott Way
                                 Stanford, CA 94305
11                               Telephone: (650) 723-0322
                                 Facsimile: (650) 725-0253
12

13

14         By:

15                               Herma Hill Kay
                                 *Attorneys for:*
16                               AMICI CALIFORNIA PROFESSORS OF FAMILY LAW

17

18

19

20

21

22

23

24

25

26

27                                          15

28                               BRIEF AMICUS CURIAE
                                 CALIFORNIA PROFESSORS OF FAMILY LAW
                                 Case No. CV-09-2292 VRW