COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Nicole J. Moss (DC Bar No. 472424)*
*nmoss@cooperkirk.com*
Jesse Panuccio (DC Bar No. 981634)*
*jpanuccio@cooperkirk.com*
Peter A. Patterson (Ohio Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, MARK A. JANSSON, and
PROTECTMARRIAGE.COM – YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO,<br><br>          Plaintiffs,<br><br>     v.<br><br>ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his official capacity as Director of the | CASE NO. 09-CV-2292 VRW<br><br>**DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH, GAIL KNIGHT, MARTIN GUTIERREZ, MARK JANSSON, AND PROTECTMARRIAGE.COM'S REPLY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH NONPARTY DOCUMENT SUBPOENAS**<br><br>Judge:  Chief Judge Vaughn R. Walker<br>          Magistrate Judge Joseph C. Spero |

1  California Department of Public Health and State
2  Registrar of Vital Statistics; LINETTE SCOTT,
   in her official capacity as Deputy Director of
3  Health Information & Strategic Planning for the
   California Department of Public Health; PA-
4  TRICK O'CONNELL, in his official capacity as
   Clerk-Recorder for the County of Alameda; and
5  DEAN C. LOGAN, in his official capacity as
   Registrar-Recorder/County Clerk for
6  the County of Los Angeles,

7              Defendants,

8  and

9  PROPOSITION 8 OFFICIAL PROPONENTS
   DENNIS HOLLINGSWORTH, GAIL J.
10 KNIGHT, MARTIN F. GUTIERREZ, HAK-
   SHING WILLIAM TAM, and MARK A. JANS-
11 SON; and PROTECTMARRIAGE.COM – YES
   ON 8, A PROJECT OF CALIFORNIA RE-
12 NEWAL,

13             Defendant-Intervenors.

14

15   Additional Counsel for Defendant-Intervenors

16

17 ALLIANCE DEFENSE FUND
   Timothy Chandler (CA Bar No. 234325)
18 *tchandler@telladf.org*
   101 Parkshore Drive, Suite 100, Folsom, California 95630
19 Telephone: (916) 932-2850, Facsimile: (916) 932-2851

20 Jordan W. Lorence (DC Bar No. 385022)*
   *jlorence@telladf.org*
21 Austin R. Nimocks (TX Bar No. 24002695)*
   *animocks@telladf.org*
22 801 G Street NW, Suite 509, Washington, D.C. 20001
   Telephone: (202) 393-8690, Facsimile: (202) 347-3622

23 * Admitted *pro hac vice*

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

A.   CAEBR Concedes That It Has Not Complied with the Subpoena and Presents
     No Argument Against Proponents' Motion ..................................................... 1

B.   The Relevance Arguments Asserted by Equality California and the ACLU
     Lack Merit ........................................................................................................ 3

C.   This Court Has Already Defined the Scope of the First Amendment Privilege to
     Exclude the Claims of Equality California and the ACLU ........................... 10

D.   Burden .............................................................................................................. 12

E.   Timeliness ........................................................................................................ 13

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

*Bates v. Jones* 131 F.3d 843 (9th Cir. 1997) ...................................................................... 9

*City of Cuyahoga Falls v. Buckeye Comm. Found.*, 538 U.S. 188 (2003) .................................. 8

*Clarke v. Securities Indus. Assn.*, 479 U.S. 388 (1987)......................................................... 10

*First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666 (1981) ............................................................ 9

*Perry v. Hollingsworth*, No. 09-17241 (9th Cir. Nov. 13, 2009) ................................................ 4

*Perry v. Hollingsworth*, No. 09-17241 (Nov. 27, 2009)............................................................ 14

*Rutti v. Lojack Corp.*, 578 F.3d 1084 (9th Cir. 2009)................................................................. 9

*Seattle School Dist. No. 1 v. Washington*, 473 F. Supp. 996 (W.D. Wash. 1979) ...................... 9

*United Steelworkers v. Weber*, 443 U.S. 193 (1979)............................................................... 10

*Valeria v. Davis*, 307 F.3d 1036 (9th Cir. 2002) ...................................................................... 9

*Washington v. Seattle School Dist. No. 1*, 459 U.S. 457 (1982)................................................. 9

**Other**

H. R. Rep. No. 245, 80th Cong., 1st Sess., 71 (1947) .............................................................. 9

N.D. Cal. Civ. L.R. 26-2............................................................................................................ 15

http://www.armourmedia.com/Home.html ................................................................................. 3

http://www.griffinschake.com/about.html.................................................................................. 3

On January 15, 2010, Defendant-Intervenors Dennis Hollingsworth, Gail Knight, Martin Gutierrez, Mark Jansson, and ProtectMarriage.com ("Proponents") moved this Court to compel production of documents pursuant to nonparty subpoenas served upon Californians Against Eliminating Basic Rights ("CAEBR"), Equality California, and No on Proposition 8, Campaign for Marriage Equality, a Project of the American Civil Liberties Union of Northern California ("AC-LU") (collectively, the "No-on-8 Groups").  *See* Doc # 472.  Each organization has filed a response to that Motion, as have the Plaintiffs.  As those responses make clear, the No-on-8 Groups are withholding tens of thousands of responsive, nonprivileged documents.  *See* Doc # 543 at 18 (identifying at least "61,046 potentially relevant communications" being withheld by the ACLU); Doc # 546 at 4 (identifying "50,000 messages" in Equality California's possession that are potential-ly responsive); Doc # 542-1 at 2-3 (identifying at least twenty persons who potentially have responsive documents).  This Court has rejected the grounds the No-on-8 Groups have advanced for noncompliance with the subpoenas.  Accordingly, Proponents respectfully submit the following further points in support of their Motion and in reply to the Responses.

**A.    CAEBR Concedes That It Has Not Complied with the Subpoena and Presents No Argument Against Proponents' Motion**

CAEBR does not present any argument to the Court that it is not required to produce any and all documents in its custody or control that are responsive to the subpoena.  Accordingly, this Court should enter an order compelling CAEBR to produce all responsive, non-privileged documents in its possession.

First, CAEBR contends that it has "produced all non-privileged documents in its possession responsive to defendant-intervenors' November 16, 2009 subpoena, as limited by the Court's January 8, 2010 Order."  Doc # 541 at 2.  But as CAEBR paradoxically concedes it "has *not* produced documents it received from other third parties that are the subject of this motion to compel."  *Id.* (emphasis added).  CAEBR admits that it has already identified these documents, that

1

they are responsive, and that they are in CAEBR's custody and control. And CAEBR has not asserted that it has a privilege that protects these documents from disclosure. Indeed, this Court has repeatedly rejected the notions (i) that an association's First Amendment privileges may be maintained if the association communicates with another, politically sympathetic association, or (ii) that an individual may assert a First Amendment privilege over a document if he belongs to more than one association. *See* Doc # 372 at 2-3; Trial Tr. 1614:11-1621:22. Accordingly, pursuant to its prior rulings, the Court should enter an order compelling immediate production of these documents.

Second, although CAEBR represents that is has "produced all documents that contain, refer or relate to any argument for or against Proposition 8, except for communications among CAEBR's core group," its meager production to date belies this representation. CAEBR has produced documents on two occasions. Its first production occurred on September 23, 2009, and consisted of 31 pages, most of which were news articles. *See* Decl. of Jesse Panuccio at ¶ 2. Its second production occurred on the evening of February 1, 2010, and consisted of 63 documents totaling 316 pages. *Id.* at ¶ 3. Most of those pages consisted of duplicates of a two form emails apparently sent by a member or vendor of CAEBR to potential donors. *Id.* Moreover, even in this meager production, CAEBR has redacted large portions of documents (including both names and substance) that appear to include relevant context. *Id.*

Third, CAEBR has refused to produce communications between or among a group of individuals that it defines as its "core group." Doc # 541 at 2; *see also* Doc # 542-1 at 1-2. But CAEBR has not provided Proponents with sufficient information about these persons to assess whether they fall within this Court's definition of persons who qualify for "core group" treatment. For example, this Court has held that media vendors who received confidential drafts of messages and/or internal emails regarding strategy are not part of an organization's "core group" and thus communications including those persons receive no First Amendment protection. *Compare* Doc #

364-1 at ¶ 7.vii, *with* Doc # 372 at 4-5. *Compare also* Doc #474, *with* Hr'g of Jan. 20, 2010, *and* Doc # 499. CAEBR appears to be withholding documents authored or received by several persons who might well fall within this category. *See* Doc # 542-1 at 3 (listing persons from "Armour Media Group" and "Griffin Schake" as part of CAEBR's "core group"); http://www.armourmedia.com/Home.html (explaining that Armour Media produced television advertisements for the No on 8 campaign); http://www.griffinschake.com/about.html (explaining that Griffin Schake is a "firm that specializes in creating cause communications").

Fourth, although CAEBR identifies *twenty* persons in its core group, it only produced a total of 63 documents in its second production, a significant portion of which are duplicates of form mailings. *See* Panuccio Decl. at ¶ 3. Indeed, CAEBR has produced very few email communications, and the majority of those produced come from a single account. *Id.* at 3. It stretches credulity to accept that these twenty "core group" members engaged in *no* email traffic during the course of a multi-month, state-wide campaign in which the No-on-8 Groups collectively spent $45 million. *See* Doc # 472 at 4. For example, CAEBR identifies Dennis Herrera as the Chair of the organization. Yet CAEBR has produced *one* communication—a form fundraising letter—authored by Mr. Herrera. *See* Panuccio Decl. at ¶ 4. This fact raises grave concerns that CAEBR has not searched, and produced from, the personal and professional email accounts of its Chair, as ProtectMarriage.com was required to do.

**B.**  **The Relevance Arguments Asserted by Equality California and the ACLU Lack Merit**

Equality California and the ACLU argue that the documents requested under the subpoenas are not relevant to this case. *See* Doc # 543 at 11-15; Doc # 546 at 7-9. Based on the orders this Court has already issued, these arguments fail.

First, Equality California and the ACLU argue that they have already produced documents that were "disseminated publicly" or that "contain messages that were actually communicated to the

public." Doc # 543 at 14; Doc # 546 at 8.  These groups contend that the only remaining documents

are "internal, confidential, and non-public campaign communications [that] have no bearing on and

cannot possibly reflect the rationale the … voters adopted in support of Prop. 8."  Doc # 546 at 8.

*See also* Doc # 543 at 14.  If the Court has a sense of déjà vu upon reading these arguments, it is

because the Court has already rejected them when Proponents repeatedly advanced them throughout

litigation over Plaintiffs' sweeping requests for all documents disseminated to any third party.  *See,*

*e.g.*, Doc # 187 at 10-14; Doc # 197 at 6-11; Petitioners' Mot. for a Stay, *Perry v. Hollingsworth*,

No. 09-17241 (9th Cir. Nov. 13, 2009) at 19 ("disclosure of Proponents' internal *nonpublic*

communications with their political associates would reveal *nothing* about the voters' intent").  In its

January 8 order, the Court held that discovery requests seeking all communications "to voters" or the

"public," Doc # 187-3 at 5, properly sought "relevant discovery" and, "other than communications

solely among the core group," required production of *any* documents distributed to *any* person that

"contain, refer or relate to arguments for or against Proposition 8."  Doc # 372 at 5.  Accordingly,

this Court has already rejected the argument that documents distributed solely to single individuals

or small groups of individuals closely associated with a political campaign are irrelevant to what the

electorate at large might have intended in passing a law.[1]

Second, Equality California and the ACLU argue that this Court's holding that Proponents'

nonpublic, confidential documents regarding messaging and strategy *are* relevant to the intent of the

electorate at large does not apply, as a matter of law or logic, to the No-on-8 campaign's similar

documents.  As Proponents have made clear in filing after filing, Proponents agree that under prior

---

[1] Tellingly, the ACLU explains that in deciding what was "public" versus "private" within
its store of documents, it "used as a cut-off the California Government Code's definition of 'mass
mailing,' which refers to anything sent to at least 200 people."  Doc # 543 at 6-7.  Again, if this
argument sounds familiar it is because the Court has already heard it—from Proponents—and has
rejected it as a parameter for relevant discovery in this case.  *Compare* Hr'g of Jan. 6, 2010, Tr. at
73:19-24 ("And in terms of trying to find an objective dividing line between sending something
out to voters or sending something out to your own associates, California law specifically
(Continued)

caselaw, and by force of logic, a political campaign's nonpublic documents are utterly irrelevant to the intent of voters who have never seen those documents.[2] But the Court has found otherwise and thus the current controlling law in this case is that such documents are both discoverable and relevant to Plaintiffs' equal protection challenge. Furthermore, there is no basis in this Court's opinions for distinguishing in any way between the nonpublic documents of those who campaigned in support of Proposition 8 and those who campaigned against it. On the contrary, this Court has ruled that the permissible scope of discovery includes "the *mix of information* before and available to the voters," Doc # 214 at 14 (emphasis added), and that this mix of information encompasses *any* document distributed outside a campaign's "core group" that "contain[s], refer[s], or relate[s] to arguments for *or against* Proposition 8," Doc # 372 at 5 (emphasis added). Thus Equality California and the ACLU's contention that this Court's orders applied only to Proponents, and thus say nothing about whether the No-on-8 Groups' documents are relevant, is belied by the plain text of the orders. The Court has held that: (i) it must examine "the history and development of California's ban on

---

identifies the number 200 … as the dividing line."), *with* Doc # 372 at 5 (ordering production of "*all* documents" regardless of number of recipients) (emphasis added).

[2] The ACLU makes great hay out of the fact that Proponents' motion does not contain a lengthy argument section. *See* Doc # 543 at 8. The ACLU contends that Proponents were required to wax poetic regarding the "factual detail as well as any legal authority relied upon" as to why the No-on-8 campaign's nonpublic documents are relevant in this case. *Id.* at 12. But this is not complex algebra requiring pages of explanation and elucidation. This Court has ruled that the "mix of information before and available to the voters" is relevant and includes the types of documents at issue in this Motion. Doc # 214 at 14; Doc # 372 at 5. It is undisputed, as a factual matter, that the No-on-8 Groups possess such documents and are withholding them from production. As for legal authority, the orders in this case are the only authority Proponents have located for the proposition that the nonpublic documents of a political campaign are discoverable in, and relevant to, a constitutional challenge to an enacted ballot measure. And Proponents' Motion cites and quotes those orders. The subpoena against the ACLU issued from this Court, and it is thus the law of this Court that applies to the subpoenas.

Especially peculiar is the ACLU's argument that "Proponents will argue that, by its terms, Magistrate Judge Spero's January 8 Order applies to documents that 'contain, refer or relate to argument for *or against* Proposition 8.'" Doc # 543 at 9 n3 (quoting Doc # 372 at 5) (emphasis added by ACLU). It is true that Proponents did not add the emphasis to this quotation from the January 8 order, but Proponents nonetheless argued *precisely* that this Court's orders "by its terms" applies to the documents at issue here. *See* Doc # 472 at 7 (quoting the January 8 order for the proposition that relevant information consists of "any document 'that contain[s], refer[s] or relate[s] to arguments for or against Proposition 8.'") (quoting Doc #372 at 5) (no emphasis added).

same-sex marriage "and the 'historical context and the conditions existing prior to [Prop 8's] enactment,'" including "advertisements and ballot literature considered by California voters," Doc # 76 at 8-9; (ii) that "the *mix* of information before and available to the voters forms a legislative history that may permit the [C]ourt to discern whether the legislative intent of an initiative measure … was a discriminatory motive," Doc # 214 at 14 (emphasis added); and (iii) that "documents that contain, refer or relate to arguments for *or against* Proposition 8 … [constitute] relevant discovery," Doc # 372 at 5 (emphasis added).  While the orders do deal with Proponents' objections to Plaintiffs' discovery requests, the relevance principles they lay down, by their express terms and by their logic, are in no way limited to Proponents' documents.  If they were, the Court would have had no occasion to state that "the mix" of information is relevant or that documents containing arguments "against" Proposition 8 are relevant.[3]

Nonetheless, Equality California and the ACLU maintain that materials relating to opposition to a ballot measure cannot possibly be relevant to the intent of those voters who approved the measure.  But to the extent the Court deems it appropriate to venture beyond the text of a ballot measure itself (to the ballot arguments, to public advertisements, or to nonpublic information), it follows as a matter of logic that a voter who ultimately voted in support of that measure may have been influenced not only by materials supporting the measure, but also by materials expressing opposition.  Most informed voters weigh both sides of a debate—they credit some arguments, dismiss others, and reconsider others in light of new information.  It is this "mix of information" that informs a voter's choice, regardless of how he or she ultimately comes out.  Thus, materials expressing opposition to Proposition 8 form part of the "mix of information" voters may have

---

[3] The ACLU attempts to sidestep this Court's holdings by dismissing language fatal to its arguments as a "mere passing reference."  Doc # 543 at 13 n.3.  Given that the issue of relevance was repeatedly briefed in this Court and was the focus of the parties' and the Court's attention for many months, Proponents do not believe the Court's repeated holdings regarding the scope of relevant information can be dismissed as lightly considered or imprecisely written.

considered and are equally relevant to materials expressing support (to whatever extent such materials are relevant at all).[4]  Further, voters may well vote for (or against) a law in reaction against the statements, arguments, and messages presented by its opponents (or its supporters).  This seems especially likely in a highly contentious campaign such as that surrounding Proposition 8, where passionate—and sometimes intemperate—statements and arguments were presented by some extremists on both sides of the debate.

Third, Equality California and the ACLU focus solely on the relevance of the documents at issue with respect to voter intent.  But one of the important issues in this case is whether or not gays and lesbians are politically powerless.  And at trial Plaintiffs introduced internal documents created by supporters of Proposition 8 for the alleged proposition that there are "powerful political forces arrayed against gay men and lesbians in connection with the Proposition 8 campaign."  Trial Tr. 1614:12-1615:2 (direct examination of Professor Segura, Plaintiffs' expert on the political power of gays and lesbians).  Documents possessed by the No-on-8 Groups will likely be highly relevant to whether, in fact, gays and lesbians lack political power.  For example, even in the very limited production provided by CAEBR on February 1, there is evidence that the No-on-8 campaign had high level contacts within, or the backing of: the presidential campaigns of Hilary Clinton and Barack Obama; major Hollywood and media figures; and major corporations.  *See* Panuccio Decl., Ex. A ("former LGBT Director for Hillary for President" stating that "it is clear that on LGBT issues, Senator Obama is with our community" and stating that the author is "part of Obama LGBT Steering Committee and LGBT Finance Committee"); *id.*, Ex. B  (arguing that the No-on-8 campaign has to be "as organized, well funded and aggressive as [the Yes-on-8 campaign]" and questioning whether "Brad" would appear "at a carefully orchestrated media event" or "help set an

---

[4] Notably, the ACLU's lawyers have already stated "that evidence of the motivation behind Proposition 8 is relevant to the[] legal claims" in this case.  Doc # 158 at 18.  The Court has defined what the evidence consists of.

example for other entertainment and business leaders to follow"); *id.*, Ex. C (indicating support from Levi Strauss & Co.).  The documents being withheld by the No-on-8 Groups are thus relevant to this issue, as they may show the coalition of powerful political forces aligned against Proposition 8 and in support of the political goals of gays and lesbians.  Yet without access to these documents, Proponents' experts were unable to address issues put into contention by Plaintiffs.  Trial Tr. 2667:10-18 (cross examination of Professor Miller) ("**Q.**  As part of your work, did you investigate the extent to which the groups favoring Proposition 8, the religious groups favoring Proposition 8, contributed far more in money and manpower than the groups opposing Proposition 8?  Did you investigate that?  **A.** I wasn't able to determine in a quantitative way the monetary and organizational contributions of the progressive churches to the No On 8 campaign.  I didn't have any access to the No On 8 campaign's internal documents to know about that.").[5]

Fourth, the ACLU contends that "[w]hile several courts have found campaign-related documents in other cases to be relevant to discriminatory intent, none of these cases has suggested that the existence of such intent could be discerned from the statements—private or public—of *opponents*."  Doc # 543 at 12-13 & n.2.  While Proponents disagree that the cited cases stand for the proposition that campaign-related documents are relevant to discriminatory intent in this case, *see* Doc #197 at 8-9, it is nonetheless worth noting the ACLU's characterization of these cases suffers from other flaws as well.  *City of Cuyahoga Falls v. Buckeye Comm. Found.*, 538 U.S. 188 (2003), did not involve a challenge to an enacted ballot measure.  *See id.* at 197 ("But respondents do not challenge an enacted referendum.").  Thus, the *Cuyahoga Falls* Court simply cannot be said to have

_____

[5] Plaintiffs in their statement (purportedly taking no position on this Motion), argue that the No-on-8 Groups should not be required to comply with the subpoenas served upon them because Proponents "did not seek to introduce into evidence publicly disseminated campaign messages urging voters to vote 'no' on Proposition 8."  Doc # 545 at 2.  Yet Plaintiffs concede that Proponents did, in fact, introduce three such pieces of evidence.  *Id.*  It is impossible to know what else Proponents might have introduced had they had, or will introduce if they obtain, access to the tens of thousands of additional documents being withheld by the No-on-8 Groups.
    (Continued)

found that "campaign-related documents … [were] relevant to discriminatory intent" in that case, Doc # 543 at 12, because that question was not at issue.  Likewise, to the extent the ACLU believes that the discussion of "campaign materials" in *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 471 (1982), means that such materials are relevant in this case, then the ACLU presumably also believes (but neglects to note) that the district court's citation in that case to "the campaigns conducted by supporters *and opponents*" of the ballot measure in question means that the ACLU's documents are relevant here.  *Seattle School Dist. No. 1 v. Washington*, 473 F. Supp. 996, 1008 (W.D. Wash. 1979).  And *Valeria v. Davis*, 307 F.3d 1036 (9th Cir. 2002)—which did not concern a conventional equal protection analysis (as here), but rather a political restructuring argument— simply did not cite campaign-related materials for the issue of voter intent.  *See id.* at 1039, 1041 & n.8, 1042.  And it certainly did not hold that a court looking to such materials with regard to voter intent may look only at documents coming from one side of the campaign.[6]

This Court has characterized "the mix of information before and available to the voters" as "a legislative history" relevant to this case.  Doc # 214 at 14.  Courts that examine legislative history for other purposes regularly examine materials supporting *and opposing* the law in question.  *See, e.g.*, *Rutti v. Lojack Corp.*, 578 F.3d 1084, 1090 (9th Cir. 2009) ("The failure of the minority report to stimulate any change in the bill indicates that Congress did not object to employers setting condi- tions on their employees use of company cars for commuting."); *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 675 n.14 (1981) ("The adoption, instead, of the general phrase now part of § 8(d) was clearly meant to preserve future interpretation by the Board. *See* H. R. Rep. No. 245, 80th Cong., 1st

---

Moreover, Plaintiffs ignore that the documents may be relevant to issues like political power.
[6] The ACLU also tries to limit the reach of *Bates v. Jones* 131 F.3d 843, 846 (9th Cir. 1997).  Proponents agree that *Bates* does not stand for the proposition that courts may look at ballot materials, advertisements, and nonpublic materials for evidence of voter intent, *see* Doc # 197 at 10 n.5, but to the extent this Court has deemed such materials relevant to this inquiry, the analogy to *Bates'* consideration of opposition materials is inescapable.  The ACLU offers a distinction but no explanation as to why it matters.

Sess., 71 (1947) (minority report).”); *Clarke v. Securities Indus. Assn.*, 479 U.S. 388, 414-15 (1987) (Stevens, J., concurring in part) (citing minority report as evidence of legislative compromise that was ultimately reached); *United Steelworkers v. Weber*, 443 U.S. 193, 232-44 (1979) (Burger, C.J., dissenting) (discussing how varying views of proponents and opponents of a bill affected its final version and meaning).  Accordingly, to the extent the Court has ruled it must examine the “legislative history” of Prop 8, and that the documents possessed by political campaigns are part of that “legislative history,” the documents possessed by the losing campaign are also a critical component of that record.

**C.** **This Court Has Already Defined the Scope of the First Amendment Privilege to Exclude the Claims of Equality California and the ACLU**

Equality California and the ACLU maintain that the documents at issue here—documents that contain arguments for or against Prop 8 and that were distributed beyond the “core groups” of these associations—are privileged from disclosure under the First Amendment.  Doc # 543 at 15-18; Doc # 546 at 8.  The ACLU contends that the Ninth Circuit’s amended opinion in *Perry* “consists not of a single footnote on page 36 … but all of the principles established by the decision as a whole.”  Doc # 543 at 15.  Proponents agree completely and have so argued to this Court.  *See* Hr’g of Jan. 6, 2010, Tr. at 28:18-20 (“Let’s not lose sight of the forest for the trees.  It’s not fair to take one footnote of a Ninth Circuit opinion and say that is the opinion.”).

Likewise, the ACLU explains that “there were many organizations involved in communications about how to defeat Proposition 8” organized as an “umbrella campaign,” and also that “numerous groups and individuals working independently to defeat Proposition 8 communicated with the ACLU about their efforts, including strategy and messaging.”  Doc # 543 at 16-17.  The ACLU thus argues that:

> It demonstrably would violate the First Amendment—as specifically interpreted in *Perry*—to hold that no First Amendment privilege attaches to such communications, and that privilege only applies only to a ‘core’ group of individuals who sat on the

executive committee of the umbrella campaign organization. The very essence of the associational rights that are the basis of the Ninth Circuit decision is that individuals and groups have the right to come together to advance shared political interests without communications being routinely, or casually, subject to discovery in civil litigation.

*Id.* at 17. Again, Proponents agree completely, and have made these precise arguments to this Court, vigorously and repeatedly.[7]

But it is not for the Proponents, or for the ACLU, to interpret and implement the Ninth Circuit's decision. That is the province of this Court, and the Court has spoken in a series of orders and rulings explicitly *rejecting* these arguments. *See, e.g.*, Doc # 387; Doc # 496 (denying objections in Doc # 446); Trial Tr. 1614:11-1621:22 (rejecting privilege objection asserted by member of ProtectMarriage.com executive committee made over document shared solely among the leadership of a separate religious association of which he was also a leader). And it is by those rulings and orders that parties subject to the jurisdiction of this Court must abide.

---

[7] *See, e.g.*, Doc # 187 at 9 n.4; Sealed Declaration of Ronald Prentice (Nov. 5, 2009) at ¶ 9; Hr'g of Dec. 16, 2009, Tr. 57:7-11 ("So there is no First Amendment right for individuals, is what they claim. You have to be a member of a 501c3, and then you get First Amendment protection if you have an official title. Which, by the way, in a volunteer campaign you often don't have."); Hr'g of Jan. 6, 2010, Tr. 29:5-11 ("So to argue that you have to carry a business card that says 'Core Group' on it and then you get First Amendment protections, but if you don't carry that business card, you lose your First Amendment protections if you are corresponding with somebody about an associational—a political matter and the formulation of messages, I think is not a proper reading of the opinion."); Doc. 446 at 17 ("The definition of the 'core group' requires production of thousands of documents shared confidentially among those who 'associate[d] with others to advance [their] shared political beliefs, and [did] so in private.' Proponents respectfully object on First Amendment grounds.") (quoting *Perry*, slip op. at 30); *id.* ("Magistrate Judge Spero held that Proponents could not claim privilege over communications made in their capacity as members of any formal political association other than ProtectMarriage.com or as part of an informal political association. This holding runs afoul of the First Amendment."); *id.* at 18 ("Proponents object to Magistrate Judge Spero's orders to the extent they hold that two different associations cannot receive First Amendment protection for communications made between persons in the groups during a political campaign in which they are allied. As with any large campaign, the ProtectMarriage.com effort necessarily involved the support and cooperative effort of other allied persons and groups who may not have had a formal title or position within ProtectMarriage.com (and vice versa). But those other allied persons or groups were part of the political coalition, and sometimes shared with ProtectMarriage.com internal, confidential information to devise general campaign strategy and messages. Proponents object to the disclosure of such nonpublic communications on First Amendment grounds.").

1   **D.**   **Burden**

2          Equality California and the ACLU argue that they ought not have to comply with the

3   subpoenas based on burden.  Doc # 543 at 18-20; Doc # 546 at 9-10.  They raise all of the same

4   arguments that Proponents have raised from the beginning of the discovery period, *see* Doc # 187 at

5   10-14, straight through to the January 6 hearing, *see* Hr'g of Jan. 6, Tr. at 111-125; Doc # 446 at 15-

6   16.  The Court has rejected these arguments as grounds for prohibiting the type of discovery at issue

7   here.  *See* Doc # 372; Doc # 496.  Thus, the only possible difference between Proponents and the

8   No-on-8 Groups is that the latter are not intervenors in the lawsuit.  But under the circumstances of

9   this case, this difference is not a compelling reason to ban this discovery at truncate the record.

10         First, the No-on-8 Groups are not thinly-resourced strangers to Proposition 8 or this litigation.

11  Instead, they raised $45 million during the campaign[8] and sought to intervene and/or file amicus

12  curiae briefs in this suit.  The ACLU, for example, represented to this Court that it has long and deep

13  experience litigating "the civil rights of lesbian and gay people," detailing for the Court the many

14  cases in which it has found the time and money necessary to litigate and to comply with discovery

15  obligations.  Doc # 79 at 11-12.  The ACLU thus represented that it was prepared, in this case, to

16  gather and present to the Court evidence on a vast range of issues.  *Id.* at 12-13.  Indeed, contrary to

17  its current position, when it was seeking to intervene as counsel the ACLU represented that "the

18  development of a complete record through the presentation of evidence … could be of value to the

19  ultimate resolution of this action."  *Id.* at 13.  Further, the ACLU represented that "[t]hrough … the

20  experience of their counsel, Proposed Intervenors would also bring unique resources to the

21  development of the very factual issues that the Court has identified as central to the resolution of the

22  important constitutional claims at stake."  *Id.* at 19.  The ACLU then set out, in great detail, the vast

23  discovery burdens it was prepared to undertake in this case.  *See* Doc # 158.  Having been denied

_____

[8] This Court has previously cited the cost of the campaign as relevant to its consideration of
(Continued)

intervention, the ACLU has found the resources to file papers relating to almost every significant issue in this case, and will likely continuing filing papers straight through to the Supreme Court. *See, e.g.*, Doc # 62, Doc # 158, Doc # 403, Doc # 552.  Given the ACLU's prior representations regarding its resources, and its actual expenditure of resources to date in this very case, its burden arguments are simply not credible.

For its part, Equality California is "California's largest lesbian, gay, bisexual, and transgender civil rights organization," and "spearheaded the 'No' on Proposition 8 campaign, and was one of the leading fund-raising organizations for the campaign." Doc # 64 at 2-3.  Equality California has devoted the resources to "develop[] extensive expertise regarding the legal and factual issues raised" in this case.  *Id.* at 2.  It has claimed "a substantial interest in participating in these proceedings."  *Id.* And it has found the resources to "participate[] in other judicial proceedings concerning marriage equality."  *Id.* at 2-3.  Thus, like the ACLU, Equality California's claims regarding burden and resources ring hollow in light of its prior representations and involvement in the campaign surrounding Proposition 8 and this case.

Second, the Court has deemed the "mix of information before and available to the voters," Doc # 214 at 14, including any documents "that contain, refer or relate to any arguments for or against Proposition 8," Doc # 372 at 5, as critical to its efforts to review the "legislative history" of Prop 8 and to determine whether the "legislative intent … was a discriminatory motive," Doc # 214 at 14.  Given that the Court is deciding a question of public law, and that the No-on-8 Groups have spent millions (including on resources in this case) to affect that public law, the additional burdens of complying with a subpoena are outweighed by the evidentiary needs in this case.

## E.    Timeliness

Equality California and the ACLU argue that Proponents motion to compel is untimely.  *See*

_____

discovery issues.  *See* Hr'g of Jan. 6, 2010, Tr. at 105:10-13.

1  Doc # 546 at 4; Doc # 543 at 9-11. This argument fails in light of the procedural posture of this case

2  at the time Proponents filed their Motion.  This case is being litigated on an extremely truncated and

3  expedited schedule, pursuant to the request of the Plaintiffs and the orders of the Court.  Despite

4  early representations to the contrary, Plaintiffs sought sweeping discovery, beyond the bounds of

5  anything any court has ever previously permitted in a case like to this one.  Defendant-Intervenors

6  opposed this discovery regime and litigated it through the Ninth Circuit, but continually noted to

7  both this Court and the No-on-8 Groups that to the extent the Court ultimately deemed the materials

8  at issue here relevant and non-privileged, Proponents would have no choice but to seek such

9  materials from the No-on-8 Groups. *See, e.g.*, Doc 187 at 10; Doc # 472-3.  When this Court's

10  initial discovery orders issued in October and November, Proponents expeditiously apprised the No-

11  on-8 Groups and reissued subpoenas mirroring Plaintiffs' requests and the permissible scope of

12  discovery as then defined by this Court.  *See* Doc # 472-2.  Meanwhile, both the privilege and

13  relevance issues were before the Ninth Circuit, and the ACLU took part in the briefing on those

14  issues.  *See* Ltr. from ACLU of Northern California to Molly C. Dwyer, *Perry v. Hollingsworth*, No.

15  09-17241 (Nov. 27, 2009).  On December 11, 2009 (after the discovery deadline had already

16  passed), the Ninth Circuit issued its opinion regarding First Amendment privilege and relevance.  On

17  January 4, 2010, the Ninth Circuit issued an amended opinion (the mandate for which did not issue

18  until January 22, 2010, Doc # 513).  On the basis of this amended opinion, this Court issued new

19  orders regarding the scope of permissible discovery, on both relevance and privilege grounds.  *See*

20  Hr'g of Jan. 6, 2010; Doc 372 (order of Jan. 8, 2010); Doc # 425 (amended protective order of Jan.

21  12, 2010); Doc # 496 (order of Jan. 20, 2010, denying objections to order of Jan. 8).  Proponents

22  concurrently apprised the No-on-8 Groups of these developments and requested immediate

23  production pursuant to the terms of the subpoenas and this Court's orders.  *See* Doc # 472-5 (letters

24  of Jan. 12, 2010).  Under these unusual circumstances, in this important case regarding an issue of

14

public law—where the discovery period and trial date were expedited, and where the questions regarding relevance and privilege surrounding discovery were litigated well past the discovery cut-off date—Proponents certainly had good cause to pursue a motion to compel beyond November 30, 2009.  *See* N.D. Cal. Civ. L.R. 26-2.  Indeed, this Court has already permitted Plaintiffs to file a motion to compel well beyond the discovery cut-off, and it was just such a motion that led to the January 2010 orders of this Court.  *See* Doc # 325 at 8 (seeking order compelling discovery, dated Dec. 28, 2009); Hr'g of Jan. 6, 2010, Tr. at 7 (noting that Doc # 325 seeks a "compelling" order); *id.* at 69 (noting that Plaintiffs "filed … what amounts to the motion to compel … on the 28th"); Doc # 372 (granting Plaintiffs' motion to compel on Jan. 8, 2010).[9]

## CONCLUSION

For the foregoing reasons, Proponents respectfully request that the Court grant their Motion to Compel.

Dated: February 5, 2010

COOPER & KIRK, PLLC
ATTORNEYS FOR DEFENDANTS-INTERVENORS

By:   /s/ Charles J. Cooper
Charles J. Cooper

---

[9] Equality California also argues that the multiple letters exchanged between it and Proponents, in which each set out its firm position on the issues surrounding the subpoenas, did not constitute a sufficient effort to meet-and-confer. *See, e.g.*, Doc # 472-6 at 9 (letter from Equality California expressing refusal to produce).  Yet in the unique circumstances of this case, the Court has not required more than an exchange of letters, and has overruled this very objection when posed by Proponents in response to Plaintiffs' efforts to seek a compelling order. *See, e.g.*, Doc # 297 (objecting to Plaintiffs' failure to engage in meaningful meet-and-confer before requesting leave to file an omnibus motion to compel); Hr'g of Dec. 16, 2009, Tr. at 8, 35-85 (entertaining issues raised in Plaintiffs letters seeking leave to file omnibus motion to compel); *id.* at 58:25-59:10 (objecting that Plaintiffs have not provided specificity in document requests following Ninth Circuit's opinion); Hr'g of Jan. 6, 2010, Tr. at 77:18-21 (noting that Plaintiffs failed to provide any specificity in objections to privilege log before filing motion to compel); *id.* at 83-84 (allowing Plaintiffs' counsel to raise objections to specific entries on the privilege log for the first time at hearing on motion to compel).
   Equality California also asserts that Proponents failed to "'set forth each request in full, followed immediately by the objections and/or responses thereto.'"  Doc # 546 at 7.  Yet this simply ignores the content of Proponents' motion. *See* Doc # 472 at 3; Doc # 472-2 (subpoenas); Doc # 472-4 (objections to subpoenas).  Moreover, once again Equality California's argument runs head first into the practice already established in this case.  Plaintiffs never even filed a proper motion to compel and did not approach technical compliance with Rule 37-2.  Nonetheless, the Court heard and granted the motion.