COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Nicole J. Moss (DC Bar No. 472424)*
*nmoss@cooperkirk.com*
Peter A. Patterson (OH Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, MARK A. JANSSON,
and PROTECTMARRIAGE.COM – YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, | CASE NO. 09-CV-2292 VRW |
| Plaintiffs, | **DEFENDANT-INTERVENORS' RESPONSE TO AMICUS SUBMISSIONS** |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Plaintiff-Intervenor, | |
| v. | |
| ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his | |

official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,

Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, and MARK A. JANSSON; and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL,

Defendant-Intervenors.

Additional Counsel for Defendant-Intervenors

ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
*tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 932-2850, Facsimile: (916) 932-2851

Jordan W. Lorence (DC Bar No. 385022)*
*jlorence@telladf.org*
Austin R. Nimocks (TX Bar No. 24002695)*
*animocks@telladf.org*
801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 393-8690, Facsimile: (202) 347-3622

* Admitted *pro hac vice*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT ................................................................................................................................... 1

I.      Same-Sex Couples and Opposite-Sex Couples Differ With Respect to Marriage .............. 1

II.     Gays and Lesbians Are Not Politically Powerless ............................................................ 4

III.    Harms Allegedly Caused by Proposition 8 Are Unproven and Legally Irrelevant ............. 7

IV.     Plaintiffs' Claims Are Subject to Traditional Rational Basis Review............................... 12

CONCLUSION.............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                **Page**

*Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989) ...................................................................... 4

*Board of Trustees v. Garrett*, 531 U.S. 356 (2001) ........................................................................ 7

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ................................................... 1, 6

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ..................................................................................... 13

*FCC v. Beach Communications*, 508 U.S. 307 (1993) ..................................................................... 7

*Foley v. Connelie*, 435 U.S. 291 (1978) ......................................................................................... 6

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .......................................................................... 5, 6

*Halpern v. Attorney Gen.*, No. 684/00 (Ontario Sup. Ct. 2001) (Ca.) .......................................... 11

*Heller v. Doe*, 509 U.S. 312 (1993) ......................................................................................... 12, 13

*High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563 (9th Cir. 1990) .............. 4

*Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985) ....................................................... 13

*In re Marriage Cases*, 183 P.3d 384 (Cal. 2008) ........................................................................... 3

*In re Marriage Cases*, No. 429-539 (Cal. Sup. Ct. Aug. 31, 2004) ................................................ 9

*Kelo v. City of New London*, 545 U.S. 469 (2005) ....................................................................... 14

*Lawrence v. Texas*, 539 U.S. 558 (2003) ..................................................................................... 14

*Loving v. Virginia*, 388 U.S. 1 (1967) ........................................................................................... 6

*Lyng v. United Auto. Workers of America*, 485 U.S. 360 (1988) ................................................. 14

*Romer v. Evans*, 517 U.S. 620 (1996) .......................................................................................... 13

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...................................................... 7

*U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973) .......................................................... 13

*U.S. R.R. Retirement Board v. Fritz*, 449 U.S. 166 (1980) ........................................................... 13

*United States v. Virginia*, 518 U.S. 515 (1996) ........................................................................ 5, 6

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) .......................................................................... 13

**Other**

Annual Report: Web of Truth (2008) (DIX1311) ..................................................................5

1 U.S.C. § 7 ...........................................................................................................................9

28 U.S.C. § 1738C ...............................................................................................................3

BeyondMarriage.org, Beyond Same-Sex Marriage:  A New Strategic Vision for All Our
Families & Relationships (July 26, 2006) (DIX1449)..............................................10

Bill Ainsworth, *Bill Affords New Rights to Same-Sex Couples*, San Diego Union-Tribune,
June 5, 2003 (DIX1480) ..............................................................................................8

Cal. Const. art. I, sec. 7.5 ....................................................................................................3

Cal. Fam. Code § 297.5 ......................................................................................................3

Cal. Fam. Code § 297.5(d) .................................................................................................3

Christopher Carpenter and Gary J. Gates, *Gay and Lesbian Partnership:  Evidence from
California*, 45 Demography 573 (2008) (PX894) ......................................................9

Christopher Ramos et al., The Williams Inst., *The Effects of Marriage Equality in
Massachusetts* (2009) (PX959)....................................................................................9

Cong. Budget Office, The Potential Budgetary Impact of Recognizing Same-Sex Marriages
(2004) (DIX855)..........................................................................................................9

Dan Black et al., Cal. Ctr. For Pop. Res., UCLA, The Measurement of Same-Sex Unmarried
Partner Couples in the 2000 U.S. Census (2007) (DIX1299)...................................11

Danielle MacCartney et al., The Williams Inst., Census Snapshot: Methodological Details
(2007) (PX1265) ........................................................................................................11

David H. Demo & Martha J. Cox, *Families With Young Children:  A Review of Research in the
1990s*, 62 J. Marriage & Fam. 876 (2000) (DIX749) ...........................................12

Douglas W. Allen, *An Economic Assessment of Same-Sex Marriage Laws*, 29 Harv. J. L. &
Pub. Pol'y 949 (2006) (DIX942) ..............................................................................10

E.J. Graff, *Retying the Knot*, The Nation, June 24, 1996 (DIX1445) .........................10

Elaine Herscher, *Most Gays Embrace Right to Marry, But Others Ask, Why?*, S.F. Chron.,
Feb. 22, 2000 (DIX1064)..............................................................................................8

Ellen Willis, contribution to *"Can Marriage be Saved? A Forum,"* The Nation, July 5, 2004
(DIX1030).................................................................................................................10

Equality Cal., *AB 205 Fact Sheet* (Aug. 18, 2003) (DIX1067) ......................................8

Fiona Tasker & Susan Golombok, Growing Up in a Lesbian Family 127 (1997) (PX1396)........................................................................................................12

French National Assembly, *Report Submitted on Behalf of the Mission of Inquiry on the Family and Rights of Children*, No. 2832 (English translation at: http://www.preservemarriage.ca/docs/France_Report_on_the_Family_Edited.pdf .................1

French National Assembly, *Report Submitted on Behalf of the Mission of Inquiry on the Family and Rights of Children*, No. 2832 (Original translation at: http://www.aph.gov.au/senate/committee/legcon_ctte/marriage_equality/report/report.pdf)....1

Gary J. Gates & Christopher Ramos, Williams Inst., *Census Snapshot:  California Lesbian, Gay, & Bisexual Population* (2008) (DIX1287)...................................................6, 9

Gay & Lesbian Alliance Against Defamation, Performance Report (2008), *available at* http://www.glaad.org/Document.Doc?id=88................................................5

Gay, Lesbian, & Straight Educ. Network, Financial Statements (2008) (DIX1314) .......................5

*Gay Rights Groups Praise New California Laws*, The Globe and Mail, Oct. 4, 1999 (DIX1481)...............................................................................................8

Gregg Jones and Nancy Vogel, *Domestic Partners Law Expands Gay Rights*, L.A. Times, Sept. 20, 2003 (DIX1476) ...........................................................................8

Henny Bos, Parenting in Planned Lesbian Families 58 (2004).............................................12

Human Rights Campaign, Annual Report: Politics of the Possible (2008) (DIX1329).................5

Jeffrey A. Redding, *Proposition 8 & the Future of American Same-Sex Marriage Activism*, 14 Nexus J. Op. 113 (2009) (DIX1020) ...................................................................6

Jon Ortiz, *Davis: I'll Sign Gay Rights Bill*, Sacramento Bee, Aug. 17, 2003 (DIX1477)............8

Jocelyn Brown et al., *A Longitudinal Analysis of Risk Factors For Child Maltreatment: Findings Of a 17-Year Old Prospective Study of Officially Recorded and Self-Reported Child Abuse and Neglect*, 22 Child Abuse & Neglect 1065 (1998) (PX1046) ....................11

Judith Stacey, *Gay & Lesbian Families: Queer Like Us, in* All Our Families: New Policies for a New Century (1998) (DIX1033)................................................................10

Katrien Vanfraussen et al.,  *What Does It Mean for Youngsters to Grow Up in a Lesbian Family Created by Means of Donor Insemination*, 20 Journal of Reproductive and Infant Psychology 237 (2002) (PX1131) ........................................................................12

Kristin Anderson Moore et al., *Marriage From a Child's Perspective*, Child Trends (2002) (DIX26)...........................................................................................11

L.A. Gay & Lesbian Ctr., Annual Report (2008) (DIX1336) ........................................5

Lambda Legal, Annual Report: Equality: In Focus (2008) (DIX1321) ..........................................5

Lambda Legal and Deloitte Financial Advisory Services LLP,
    2005 Workplace Fairness Survey (2006) ................................................................................4

Lawrence M. Berger et al., *Mothers, Men, and Child Protective Services Involvement*, 14
    CHILD MALTREATMENT 263 (2009) (PX1105)........................................................................11

Lynn Vincent, *The Gay Point of View*, *In Weighing in on California's Proposition 8, Voices
    from San Diego's Gay Mecca are Hardly of One Mind on the Measure*, WORLDMAG.COM,
    Nov. 4, 2008 (DIX1066)...........................................................................................................8

Letter from Andy Pugno to Station Managers of California Broadcast and Cable Television
    Station re Substantiation of "Everything to do with Schools" ad, October 17, 2008
    (PX129)....................................................................................................................................10

Letter from Andy Pugno to Station Managers of California Broadcast and Cable Television
    Station re Substantiation of "Finally the Truth" ad, October 24, 2008 (PX130).....................10

Letter from Andy Pugno to Station Managers of California Broadcast and Cable Television
    Station re Substantiation of "Have you Thought About It" ad, October 27, 2008 (PX131) ....10

Letter from Andy Pugno to Station Managers of California Broadcast and Cable Television
    Station re Substantiation of "It's Already Happened" ad, October 8, 2008 (PX132) ..............10

Letter from Andy Pugno to Station Managers of California Broadcast and Cable Television
    Station re Substantiation of "Whether You Like it or Not" ad, September 28, 2008
    (PX133)....................................................................................................................................10

Margaret Somerville, *What About the Children*, *in* DIVORCING MARRIAGE: UNVEILING THE
    DANGERS IN CANADA'S NEW SOCIAL EXPERIMENT (Daniel Cere & Douglas Farrow eds.,
    2004) (DIX714) ......................................................................................................................10

Mark Vernon, *We Don't Need Gay Marriage*, GUARDIAN UNLIMITED, July 4, 2009 (DIX1026) ...7

Martin Wisckol, *Foes See a Veil on Prop. 22*, O.C. REG., Jan. 3, 2000 (DIX1474) ......................8

Michelangelo Signorile, *Bridal Wave*, OUT MAG., Dec./Jan. 1994 (DIX1433).............................10

Michael E. Lamb *et al.*, *Effect of Gender and Caretaking Role on Parent-Infant
    Interaction* at 117, *in* THE DEVELOPMENT OF ATTACHMENT AND AFFILIATIVE SYSTEMS
    (Robert N. Emde & Robert J. Harmon, eds. 1982)................................................................11

Michael E. Lamb, *Fathers:  Forgotten Contributors to Child Development*,
    18 HUM. DEV. 245 (1975)........................................................................................................11

MICHAEL E. LAMB, ED., THE ROLE OF THE FATHER IN CHILD DEVELOPMENT 21 (1976)...............11

Michael J. Rosenfeld, Nontraditional Families and Childhood Progress through School, forthcoming in Demography (Draft, April 2009) (PX2299) ....................................11

M.V. Lee Badgett, Money, Myths & Change: The Economic Lives of Lesbians & Gay Men (2001) (DX950)....................................................................................................5

Nat'l Ctr. For Lesbian Rights, Annual Report (2008), available at http://www.nclrights.org/site/DocServer/NCLR_2008_Annual_Report_Web_v No_Donors.pdf?docID=6321 .........................................................................................5

Parents, Families, & Friends of Lesbians & Gays, Inc., Financial Statements (2008), available at http://community.pflag.org/Document.Doc?id=191 .............................5

Paula Ettelbrick, Since When is Marriage a Path to Liberation?, in William B. Rubenstein, Lesbians, Gay Men, and the Law (1993) (DIX1025) .........................................7

Pierre van den Berghe, Human Family Systems 46 (1979) (DIX89); id. at 45; Bertrand Russell, Marriage & Morals 77 (1929) (DIX83)................................................1

Press Release, Equality Cal., Governor Davis Makes History With Signature on Domestic Partner Rights & Responsibilities Act of 2003 (Sept. 19, 2003) (DIX1068) .............................8

Ray Henry, R.I. Officials Elect 1st Openly Gay Speaker, Boston Globe, Feb. 12, 2010 .............6

Richard Green et al., Lesbian Mothers and Their Children: A Comparison with Solo Parent Heterosexual Mothers and Their Children, 15 Archives Sexual Behav. 167 (1986) (DIX756)...........................................................................................................12

Robert Lerner & Althea K. Nagai, No Basis: What the Studies Don't Tell Us About Same-Sex Parenting, Washington, D.C.: Marriage Law Project (2001) (DIX734).........................11

Sara McLanahan & Gary Sandefur, Growing Up With a Single Parent: What Hurts, What Helps 1 (1994) (DIX124)...................................................................................11

Scott James, Many Successful Gay Marriages Share an Open Secret, N.Y. Times, Jan. 29, 2010 ........................................................................................................2

Shelly Lundberg & Robert A. Pollak, The American Family and Family Economics 5 (2007) (PX1305).............................................................................................11

Sotirios Sarantakos, Children in Three Contexts: Family, Education, & Social Development, 21 Child. Austr. 23 (1996) (DIX775) .........................................................12

Statistics Belgium, Contrats de Cohabitation et Cessation de Contrats de Cohabitation, Par Region, 2000-2007 (2009) ................................................................................8

Statistics Belgium, Population Trend by Marital Status: By Year 1990-2008 (DIX2427, 2427a) ..2

Statistics Netherlands, Marriages and Partnership Registrations 1950-2008 (DIX1887) ...............2

Statistics Netherlands, Statistical Yearbook 2009 (DIX2430) ......................................................2

vi

Susan Golombok et al., *Children With Lesbian Parents:  A Community Study*, 39
    DEVELOPMENTAL PSYCHOLOGY 20 (2003) (PX1066) ....................................................12

SYLVIANE AGACINSKI, PARITY OF THE SEXES (2001) (DIX41) ........................................1

Tammy Bruce, *Respecting Marriage & Equal Rights*, MENSNEWSDAILY.COM, Feb. 25, 2004
    (DIX1063)..................................................................................................................8

The Field Poll, Release #2189, *Greater Acceptance of Homosexual Relations and
    Support for Anti-Discriminatory Policies Toward Gays and Lesbians, But Californians
    Remain Narrowly Opposed to Allowing Same-Sex Couples to Marry*, March 22, 2006...........3

Timothy J. Biblarz & Judith Stacey, *How Does the Gender of Parents Matter?*,
    72 J. MARRIAGE & FAM. (2010) ...............................................................................12

*Toward Perfect Unions: California's New Domestic Partnership Law Is Second Only to
    Vermont's*, THE ADVOCATE, Oct. 14, 2003 ................................................................8

Walter R. Schumm, *What Was Really Learned From Tasker and Golombok's (1995) Study of
    Lesbian and Single Parent Mothers?*, 94 PSYCHOL. REPORTS 422 (2004) (DIX779)..............12

WASH. REV. CODE § 26.60.090......................................................................................3

**INTRODUCTION**

Several individuals and groups have filed applications to participate in this case as amici curiae in support of Plaintiffs.  *See* Doc ## 128, 539, 550, 551, 554, 555, 558, 561, 562, 566, 568, 570.  Our Proposed Findings of Fact, Trial Memorandum, summary judgment briefing, and the evidence presented at trial refute the positions taken by amici, but we briefly address the arguments advanced by amici and the new evidence to which they cite.  *See* Order of Feb. 4, 2010, Doc # 573.

**ARGUMENT**

**I.   Same-Sex Couples and Opposite-Sex Couples Differ With Respect to Marriage**

The Equal Protection arguments of several amici proceed from the premise that same-sex and opposite-sex couples are similarly situated with respect to the institution of marriage.  *See, e.g.*, Doc # 537-1 at 8; Doc # 552 at 10; Doc # 563 at 12; Doc # 574 at 12.  They cannot, however, escape one undeniable fact—only opposite-sex couples have the biological capacity to create offspring.  By virtue of this fact, opposite-sex couples as a class "are thus different, immutably so," in a respect central to the institution of marriage.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985).  As the evidence at trial showed, this procreative capacity forms the basis of the institution of marriage, some form of which has been present in virtually all societies throughout history.  *See* Jan. 26, 2010 Tr. of Hr'g at 2744:4-12; PIERRE VAN DEN BERGHE, HUMAN FAMILY SYSTEMS 46 (1979) (DIX89); *id.* at 45; BERTRAND RUSSELL, MARRIAGE & MORALS 77 (1929) (DIX83).

Marriage is thus not an institution whereby society arbitrarily *promotes* heterosexuality at the expense of homosexuality and other sexual orientations; it is rather an institution that *responds* to the natural consequences of opposite-sex relationships by providing for the filiation of children.  *See* Jan. 26, 2010 Tr. of Hr'g at 2745:4-9; SYLVIANE AGACINSKI, PARITY OF THE SEXES xiii (2001) (DIX41); Pre-Trial Memorandum of Points & Authorities of *Amicus Curiae* National Organization for Marriage, Doc # 373-2, at 18-19 (quoting French National Assembly, *Report Submitted on Behalf of the Mission of Inquiry on the Family and Rights of Children*, No. 2832 (English translation at

1

1    http://www.preservemarriage.ca/docs/France_Report_on_the_Family_Edited.pdf and original at

2    http://www.assemblee-nationale.fr/12/pdf/rap-info/i2832.pdf); and Marriage Equality Amendment

3    Bill 2009, Australian Senate Legal and Constitutional Affairs Legislation Committee Report

4    (available at

5    http://www.aph.gov.au/senate/committee/legcon_cttee/marriage_equality/report/report.pdf)).

6    While gay and lesbian individuals can have children through adoption, surrogacy, or artificial

7    insemination, these processes all require planning, forethought, and the involvement of a third

8    party, distinguishing them from the natural way in which opposite-sex couples alone can become

9    parents.  *See* Jan. 13, 2010 Tr. of Hr'g at 640:13-641:1.

10          There are also practical differences between same-sex and opposite-sex couples related to

11   this biological difference.  For one, research shows that individuals in gay couples are less likely

12   to be monogamous than their counterparts in heterosexual couples.  *See* Jan. 13, 2010 Tr. of Hr'g

13   at 617:8-16; *see also* Scott James, *Many Successful Gay Marriages Share an Open Secret*, N.Y.

14   TIMES, Jan. 29, 2010, at 17A.  For another, only a small portion of gay and lesbian individuals

15   have elected to enter into marriage in jurisdictions that provide them with that option.  *See*

16   Statistics Belgium, Population Trend by Marital Status: By Year 1990-2008 (DIX2427, 2427a);

17   Statistics Belgium, Homosexual Marriages 2004-2008 (DIX2644, 2644a); Jan. 13, 2010 Tr. of

18   Hr'g at 636:4-10; Statistics Netherlands, Statistical Yearbook 2009 at 192 (DIX2430); Statistics

19   Netherlands, Marriages and Partnership Registrations 1950-2008 (DIX1887); Jan. 13, 2010 Tr. of

20   Hr'g at 638:25-639:13.  Because same-sex couples, unlike opposite-sex couples, cannot naturally

21   conceive children, these behaviors have different consequences for the individuals and couples

22   involved—and for society.

23          Amici, of course, cannot dispute the facts of biology.  The American Civil Liberties

24   Union, Lambda Legal Defense and Education Fund, Inc., and National Center for Lesbian Rights

25   (collectively, "ACLU"), however, argue that "California recognizes that same-sex couples are

26   similarly situated to different-sex couples."  Doc # 552 at 7.

27          This argument cannot be squared with Proposition 8.  By virtue of that amendment,

28   California's Constitution—"the ultimate expression of the people's will," *In re Marriage Cases*,

2

183 P.3d 384, 450 (Cal. 2008)—now provides that "Only marriage between a man and a woman is valid or recognized in California." CAL. CONST. art. I, sec. 7.5.  While a 4-3 decision of the California Supreme Court, overruling the California Court of Appeals, held that same-sex and opposite-sex couples were similarly situated with respect to marriage because both "consist of pairs of individuals who wish to enter into a formal, legally binding and officially recognized, long-term family relationship that affords the same rights and privileges and imposes the same obligations and responsibilities," *Marriage Cases*, 183 P.3d at 435 n.54, that determination has itself been overruled by the ultimate constitutional authority in California—the people themselves. What is more, it ignores the critical biological difference between same-sex and opposite-sex couples.  Surely it cannot be the case that a faulty, superseded state constitutional determination establishes an issue of federal constitutional law.

It also is of no moment that California provides same-sex couples with the rights, protections, and benefits of married couples through domestic partnerships.  *See* CAL. FAM. CODE § 297.5.[1]  If anything, the creation of a separate domestic partnership regime indicates that California maintains that same-sex and opposite-sex couples are *not* similarly situated with respect to marriage.[2]

## II.    Gays and Lesbians Are Not Politically Powerless

[1] Justice King argues that, due to unresolved legal issues raised by same-sex parenting, the children of same-sex domestic partners are currently not vested with all the rights of the children of married couples.  *See* Doc # 556 at 13.  To the extent he is right, it is difficult to see how permitting same-sex couples to marry would remedy the situation, as California law already provides that "[t]he rights and obligations of registered domestic partners with respect to a child of either shall be the same as those of spouses."  CAL. FAM. CODE § 297.5(d).  Justice King also observes that California domestic partnerships will not necessarily be recognized by other states, Doc # 556 at 15; the same, of course, is true with same-sex marriages should California permit them.  *See* 28 U.S.C. § 1738C.  Indeed, it appears that some states treat out-of-state domestic partners preferably to same-sex spouses.  *See, e.g.*, WASH. REV. CODE § 26.60.090 ("A legal union of two persons of the same sex, other than a marriage, that was validly formed in another jurisdiction, and that is substantially equivalent to a domestic partnership under this chapter, shall be recognized as a valid domestic partnership in this state and shall be treated the same as a domestic partnership registered in this state regardless of whether it bears the name domestic partnership.").

[2] Furthermore, polling data shows that although Californians are broadly supportive of gay and lesbian rights, a majority of them favor limiting marriage to opposite-sex couples.  *See* The Field Poll, Release #2189, *Greater Acceptance of Homosexual Relations and Support for Anti-Discriminatory Policies Toward Gays and Lesbians, But Californians Remain Narrowly Opposed to Allowing Same-Sex Couples to Marry*, March 22, 2006 (attached as Exhibit A).  This bespeaks a recognition that same-sex and opposite-sex couples differ with respect to the purposes of marriage.

Should the Court determine that same-sex couples and opposite-sex couples are similarly situated for purposes of marriage, it must then decide the level of Equal Protection scrutiny to apply to Proposition 8.  One factor in this determination is whether gays and lesbians are politically powerless.  *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573 (9th Cir. 1990).  The Asian Law Caucus *et al*. attack Proponents' articulation of political powerlessness as the inability to "attract the attention of the lawmakers," *Cleburne*, 473 U.S. at 445, as "rigid and narrow."  Doc # 567 at 13.  As an initial matter, this is how the Supreme Court described political powerlessness in *Cleburne*.  The Court favorably contrasted this conception with one that looked to whether a minority could "assert direct control over the legislature"; if that were the test, the Court explained, "much economic and social legislation would now be suspect." *Cleburne*, 473 U.S. at 445.

Furthermore, the *Cleburne* test has been applied by the federal courts in this context.  In *Ben-Shalom v. Marsh*, 881 F.2d 454 (7th Cir. 1989), the court held that "homosexuals are proving that they are not without growing political power.  It cannot be said 'they have no ability to attract the attention of the lawmakers.' " *Id*. at 466 (quoting *Cleburne*).  And, in a decision that is binding on this Court, the Ninth Circuit held that "homosexuals are not without political power; they have the ability to and do 'attract the attention of the lawmakers.' " *High Tech Gays*, 895 F.2d at 574 (quoting *Cleburne*).

Nor is the *Cleburne* test "rigid and narrow."  Proponents do not dispute the relevance of an "empirically-based analysis" of a particular group's political power in determining whether that group has the ability to attract the attention of the lawmakers.  Doc # 567 at 11; *see* Jan. 25, 2010 Tr. of Hr'g at 2437:9-14.[3]  To that end, we adduced evidence at trial showing, among other things,

---

[3] The Asian Law Caucus cites to the history of discrimination experienced by gays and lesbians, but that history is not directly relevant to the current level of political power enjoyed by gays and lesbians.  As one indicator of such discrimination, the Asian Law Caucus cites a 2005 survey which found that 39% of LGBT employees experienced sexual-orientation discrimination.  *See* Doc # 567 at 20.  That survey's participants, however, were hardly a representative sample; they were drawn "through an invitation to members of the Lambda Legal online community."  Lambda Legal and Deloitte Financial Advisory Services LLP, 2005 Workplace Fairness Survey at 4 (2006).  Professor Badgett, at any rate, has written that "the relative invisibility of sexual orientation as a defining characteristic would make it difficult, if not impossible, for an employer to consciously exploit differences in sexual orientation among workers," and has recognized that "[l]esbians and gay

(Continued)

1   that gays and lesbians have been increasingly successful at having their priorities considered—and

2   often adopted—through the legislative process, *see* Jan. 25, 2010 Tr. of Hr'g 2472:17-19; *id.* at

3   2482:19-2483:14, that gays and lesbians have been successful in raising money in support of their

4   political goals, *see id.* at 2438:7-2439:3,[4] that gays and lesbians have strong political allies, *see id.*

5   at 2442:2-2443:12, and that gays and lesbians have had success electing candidates of their

6   choice, *see id.* at 2470:11-2471:9.

7        This latter consideration—the ability of a group to elect candidates of their choice—is

8   *broader* than the related consideration advanced by the Asian Law Caucus, *i.e.*, the ability of

9   members of a minority to attain public office themselves. *See* Doc # 567 at 17-18; *see also* Jan.

10   20, 2010 Tr. of Hr'g at 1720:24-1721:10. At any rate, the Asian Law Caucus has not

11   demonstrated that gays and lesbians are "*vastly* under-represented in this Nation's decisionmaking

12   councils." *Frontiero v. Richardson*, 411 U.S. 677, 686 n.17 (1973) (plurality) (emphasis added).[5]

13   In California, for example, the statistics cited by the Asian Law Caucus indicate that 3.33 percent

14   of California's legislators are openly gay or lesbian, *see* Doc # 567 at 17, while the Williams

---

(Cont'd)

people are actively integrated into the economic life of the United States." M.V. Lee Badgett, Money, Myths & Change: The Economic Lives of Lesbians & Gay Men 43-44, 171 (2001) (DIX950).

[4] The ability to raise significant sums of money in support of their political goals belies the assertion that gays and lesbians are hampered by an "organizational problem." Doc # 567 at 10. Indeed, in 2008 alone, eight lesbian and gay rights organizations raised over $186 million. *See* Gay & Lesbian Alliance Against Defamation, Performance Report, at 17 (2008) (reporting $14,178,095 in total revenue), *available at* http://www.glaad.org/Document.Doc?id=88; Gay Men's Health Crisis, Annual Report: Web of Truth, at 14 (2008) (DIX1311) (reporting $31,031,025 in total support and revenue for 2008; Gay, Lesbian, & Straight Educ. Network, Financial Statements, at 3 (2008) (DIX1314) (reporting $12,751,127 in total public support and revenue); Human Rights Campaign, Annual Report: Politics of the Possible, at 14 (2008) (DIX1329) (reporting combined total revenue and support for the Human Rights Campaign and the Human Rights Campaign Foundation of $43,947,191); L.A. Gay & Lesbian Ctr., Annual Report (2008) (DIX1336) (reporting $48,465,012 in total public support and other revenue); Lambda Legal, Annual Report: Equality: In Focus, at 46 (2008) (DIX1321) (reporting $25,871,414 in total support and revenue); Nat'l Ctr. For Lesbian Rights, Annual Report, at 4 (2008) (reporting $6,618,232 in total public support and revenue), *available at* http://www.nclrights.org/site/DocServer/NCLR_2008_Annual_Report_Web_vNo_Donors.pdf?docID=6321; Parents, Families, & Friends of Lesbians & Gays, Inc., Financial Statements, at 3 (2008) (reporting $3,334,842 in total revenue and support), *available at* http://community.pflag.org/Document.Doc?id=191.

[5] This *Frontiero* opinion, of course, commanded only a plurality of the Court. It would have extended strict scrutiny to sex discrimination, *see id.* at 688, an approach that has never commanded a majority of the Court, *see, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996).

---

5

1   Institute in 2008 estimated that 3.2 percent of California's adult population is lesbian, gay, or

2   bisexual, *see* Gary J. Gates & Christopher Ramos, Williams Inst., *Census Snapshot:  California*

3   *Lesbian, Gay, & Bisexual Population* at 1 (2008) (DIX1287).  As another example, with the

4   recent election of an openly gay man as the speaker of the Rhode Island House of Representatives,

5   two out of the 50 states have chosen openly gay men to serve as the speaker of their lower

6   legislative body.  *See* Ray Henry, *R.I. Officials Elect 1st Openly Gay Speaker*, BOSTON GLOBE,

7   Feb. 12, 2010, Metro Pg. 3; Jan. 20, 2010 Tr. of Hr'g at 1662:8-22.

8         The Asian Law Caucus also asserts that Proponents' approach to political powerlessness

9   would "mean the end to suspect classification of any kind, including those relating to race and

10  gender."  Doc # 567 at 13.  At the time the Supreme Court decided *Cleburne* in 1985, however, it

11  was already well-established that racial and gender classifications were subject to heightened

12  scrutiny under the Equal Protection Clause.  *See Cleburne*, 473 U.S. at 440-41.  The Supreme

13  Court was not calling into question its settled precedent on race and gender.

14        With respect to race, moreover, "[t]he clear and central purpose of the Fourteenth

15  Amendment was to eliminate all official sources of invidious racial discrimination in the States."

16  *Loving v. Virginia*, 388 U.S. 1, 10 (1967).  With respect to women, they, like African-Americans

17  (and unlike gays and lesbians), were at one time disenfranchised.  *See Virginia*, 518 U.S. at 531;

18  *cf. Foley v. Connelie*, 435 U.S. 291, 294 (1978)  ("[T]he Court has treated certain restrictions on

19  aliens with heightened judicial solicitude, a treatment deemed necessary since aliens … have no

20  direct voice in the political process.") (quotation marks and citation omitted).  And women, of

21  course, are not a minority group at all.  This certainly impacts the probative value of measures

22  such as legislative successes and representation in Congress—with only 14 female members, for

23  example, women certainly were vastly under-represented in that body in 1973.  *See Frontiero*, 411

24  U.S. at 686 n.17; *see also Cleburne*, 473 U.S. at 475 ("Any *minority* can be said to be powerless

25  to assert direct control over the legislature.") (emphasis added).  The Asian Law Caucus, at any

26  rate, has not undertaken an exhaustive review of women's ability to attract the attention of

27  lawmakers when the Court began applying heightened scrutiny to gender discrimination in the

28  1970s.

In sum, gays and lesbians have demonstrated that they wield substantial power in the political process.  In light of the evidence, it certainly cannot be said that they "command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973).

**III.   Harms Allegedly Caused by Proposition 8 Are Unproven and Legally Irrelevant**

Several amici assert that Proposition 8 imposes costs on same-sex couples and their children that outweigh its benefits.  As Proponents have explained, such cost-benefit analysis is the province of the democratic process, not the courts:  "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns*, 508 U.S. 307, 313 (1993); *see also Board of Trustees v. Garrett*, 531 U.S. 356, 367-68 (2001). Instead, "[i]n areas of social and economic policy," a classification such as the one in Proposition 8 "that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313.  The claims of harm asserted by amici, moreover, do not withstand scrutiny.

*First*, several amici argue that California's system of reserving marriage to opposite-sex couples while offering legal recognition to same-sex couples through domestic partnerships stigmatizes gays and lesbians, and thus harms them and their children. *See* Doc # 537-1 at 15-18; Doc # 550-1 at 9-18; Doc # 552 at 16 n.12; Doc # 561 at 20; Doc # 563 at 12-18; Doc # 574 at 17-18.  This argument rests on the assumptions that same-sex couples and opposite-sex couples are similarly situated with respect to marriage and that the purpose of marriage is to provide official approval of heterosexuals.  Proponents have already explained why these assumptions are faulty. Treating different things differently is neither discriminatory nor stigmatic.  Indeed, as some advocates for gay and lesbian rights have recognized, treating same-sex couples as if they are the same as opposite-sex couples may pose the greater risk to the dignity of gays and lesbians. *See* Jeffrey A. Redding, *Proposition 8 & the Future of American Same-Sex Marriage Activism*, 14 Nexus J. Op. 113, 122-23 (2009) (DIX1020); Paula Ettelbrick, *Since When is Marriage a Path to Liberation?*, in William B. Rubenstein, Lesbians, Gay Men, and the Law at 403, 405 (1993)

7

(DIX1025); Mark Vernon, *We Don't Need Gay Marriage*, GUARDIAN UNLIMITED, July 4, 2009 (DIX1026).  It is thus unsurprising that not all gays and lesbians support same-sex marriage recognition.  *See, e.g.*, Lynn Vincent, *The Gay Point of View*, *In Weighing in on California's Proposition 8, Voices from San Diego's Gay Mecca are Hardly of One Mind on the Measure*, WORLDMAG.COM, Nov. 4, 2008 (DIX1066); Elaine Herscher, *Most Gays Embrace Right to Marry, But Others Ask, Why?*, S.F. CHRON., Feb. 22, 2000 at A13 (DIX1064); Martin Wisckol, *Foes See a Veil on Prop. 22*, O.C. REG., Jan. 3, 2000 at A01 (DIX1474); Tammy Bruce, *Respecting Marriage & Equal Rights*, MENSNEWSDAILY.COM, Feb. 25, 2004 (DIX1063).

As a practical matter, the notion that domestic partnerships are stigmatic is belied by the fact that they have been conceived, sponsored, and championed by gays and lesbians and their allies.  *See* Equality Cal., *AB 205 Fact Sheet* (Aug. 18, 2003) (DIX1067); Press Release, Equality Cal., *Governor Davis Makes History With Signature on Domestic Partner Rights & Responsibilities Act of 2003* (Sept. 19, 2003) (DIX1068); Answer Brief of State of California & the Attorney General to Opening Briefs on the Merits at 46, *In re Marriage Cases*, 43 Cal. 4th 757 (2008) (DIX1034).[6]  This endorsement also refutes the notion that gays and lesbians are worse off with the option to enter a domestic partnership than if the state provided their relationships with no recognition whatsoever.  *See, e.g.*, Doc # 552 at 16 n.13; *see also* Jan. 13, 2010 Tr. of Hr'g at 610:12-13.  And if a particular couple feels that entering a domestic partnership would harm their relationship in some way, they are not required to form one.  Furthermore, when given the choice between marriage and an alternative institution such as domestic partnerships, many same-sex couples have chosen the latter.  *See* California Domestic Partnership Statistics (DIX2647); Statistics Netherlands, Statistical Yearbook 2009 at 200 (DIX2430); Statistics Belgium, Contrats de Cohabitation et Cessation de Contrats de Cohabitation, Par Region, 2000-2007 (2009)

---

[6] *See also, e.g.*, *Toward Perfect Unions: California's New Domestic Partnership Law Is Second Only to Vermont's*, THE ADVOCATE, Oct. 14, 2003; Gregg Jones and Nancy Vogel, *Domestic Partners Law Expands Gay Rights*, L.A. TIMES, Sept. 20, 2003 at A1 (DIX1476); Jon Ortiz, *Davis: I'll Sign Gay Rights Bill*, SACRAMENTO BEE, Aug. 17, 2003 at A3 (DIX1477); Bill Ainsworth, *Bill Affords New Rights to Same-Sex Couples*, SAN DIEGO UNION-TRIBUNE, June 5, 2003 at A3 (DIX1480); *Gay Rights Groups Praise New California Laws*, THE GLOBE AND MAIL, Oct. 4, 1999 at A16 (DIX1481).

1    (DIX1258; English translation attached as Exhibit B).

2         Indeed, consistent with these practical realities, although Plaintiffs' experts claimed that

3    gays and lesbians suffer adverse health outcomes as a result of stigma, they were unable to

4    identify any empirical support whatsoever for the proposition that gays and lesbians suffer from a

5    higher prevalence of allegedly stigma-related adverse health outcomes in California than in any

6    jurisdiction that recognizes same-sex marriages.  *See* Jan. 14, 2010 Tr. of Hr'g at 961:4-963:12,

7    969:1-7.

8         *Second*, amici argue that gays and lesbians and their children would benefit from marriage

9    in ways similar to opposite-sex couples and their children.  As expert after expert for Plaintiffs

10   confirmed at trial, however, this claim is not supported by empirical evidence.[7]  *See* Jan. 13, 2010

11   Tr. of Hr'g 607:8-19; Jan. 15, 2010 Tr. of Hr'g at 1184:5-11; Jan 14, 2010 Tr. of Hr'g at 788:20-

12   789:2; Jan. 22, 2010 Tr. of Hr'g at 2050:1-5.[8]  Given this dearth of research, it is unsurprising that

13   there is also a lack of evidence regarding any *incremental* benefit to gays and lesbians and their

14   children  from marriage versus an alternative institution such as domestic partnerships.  *See* Jan.

15   13, 2010 Tr. of Hr'g 608:12-22; *cf.* Jan. 27, 2010 Tr. of Hr'g at 2937:15-21.[9]

16        *Third*, amici argue that permitting same-sex marriage would not harm the institution or the

17   purposes it serves.  *See, e.g.*, Doc # 556 at 10.  As Mr. Blankenhorn testified at trial, however,

---

18        [7] The claim that "children in LGBT households are disproportionately exposed to the risk

19   factors of living in poverty," Doc # 553 at 11,  is difficult to square with the evidence that gays and
     lesbians are relatively affluent.  *See* Gary J. Gates & Christopher Ramos, Williams Inst., Census

20   Snapshot:  California Lesbian, Gay, & Bisexual Population at 3 (2008) (DIX1287); Christopher
     Carpenter and Gary J. Gates, *Gay and Lesbian Partnership:  Evidence from California*, 45

21   Demography 573 (2008) (PX894); Declaration of M.V. Lee Badgett in Support of City & County
     of San Francisco ¶ 13, *In re Marriage Cases*, No. 429-539 (Cal. Sup. Ct. Aug. 31, 2004) (DIX96;

22   quoted at Jan. 15, 2010 Tr. of Hr'g at 1062:2-12).
          [8] The Williams Institute has analyzed a survey of certain same-sex couples who married in

23   Massachusetts.  *See* Christopher Ramos et al., The Williams Inst., *The Effects of Marriage
     Equality in Massachusetts* (2009) (PX959); *see also* Doc # 553 at 20.  Due to the methodology

24   of that survey, however, its results cannot be generalized beyond the particular respondents.
     *See, e.g.*, Jan. 13, 2010 Tr. at Hr'g at 649:1-19.

25        [9] As amici note, there are federal rights and benefits associated with marriage.  *See, e.g.*, Doc #
     553 at 19; Doc # 567 at 21-22.  Same-sex couples in California, of course, would not gain access to

26   these benefits if the state recognized them as married.  *See* 1 U.S.C. § 7.  Moreover, the
     Congressional Budget Office has estimated that providing federal marriage recognition to same-sex

27   couples would increase revenues and decrease outlays—in other words, on balance it would work
     to the economic disadvantage of same-sex couples.  *See* Cong. Budget Office, The Potential

28   Budgetary Impact of Recognizing Same-Sex Marriages (2004) (DIX855).

redefining the fundamental elements of an institution will inescapably *change* the institution, and
same-sex marriage would likely contribute to and accelerate the deinstitutionalization of marriage,
leading to negative consequences for society.  *See* Jan. 26, 2010 Tr. of Hr'g at 2777:9-15,
2780:16-2781:18.  Indeed, many advocates of same-sex marriage celebrate the potential negative
impact of same-sex marriage on the institution and its traditional purposes.  *See* E.J. Graff,
*Retying the Knot*, THE NATION, June 24, 1996 at 12 (DIX1445); Judith Stacey, *Gay & Lesbian
Families: Queer Like Us, in* ALL OUR FAMILIES: NEW POLICIES FOR A NEW CENTURY at 155
(1998) (DIX1033); Michelangelo Signorile, *Bridal Wave*, OUT MAG., Dec./Jan. 1994 (DIX1433);
Ellen Willis, contribution to *"Can Marriage be Saved? A Forum,"* THE NATION, July 5, 2004 16-
17 (DIX1030); BeyondMarriage.org, Beyond Same-Sex Marriage:  A New Strategic Vision for
All Our Families & Relationships (July 26, 2006) (DIX1449).  And as explained above, there are
differences between same-sex and opposite-sex relationships such that including same-sex
relationships in the institution may work a profound change in it.  *See also* Jan. 26, 2010 Tr. of
Hr'g at 2780:16-2781:18; Douglas W. Allen, *An Economic Assessment of Same-Sex Marriage
Laws*, 29 HARV. J. L. & PUB. POL'Y 949, 954 (2006) (DIX942); Margaret Somerville, *What About
the Children*, *in* DIVORCING MARRIAGE:  UNVEILING THE DANGERS IN CANADA'S NEW SOCIAL
EXPERIMENT at 63-64 (Daniel Cere & Douglas Farrow eds., 2004) (DIX714).[10]

   A related set of arguments is that sexual orientation is not related to parenting ability and
that the children of same-sex couples and opposite-sex couples are comparable in development
and outcomes.  *See* Doc # 553 at 13; Doc # 561 at 18.  As an initial matter, it is not "the essential

---

[10] Amici also level the charge that the Yes on 8 campaign advertisements made false
allegations.  *See* Doc # 553 at 21; Doc # 559 at 15.  The Yes on 8 campaign, however, thoroughly
substantiated the claims made in its campaign advertisements.  *See* Letter from Andy Pugno to
Station Managers of California Broadcast and Cable Television Station re Substantiation of
"Everything to do with Schools" ad, October 17, 2008 (PX129); Letter from Andy Pugno to Station
Managers of California Broadcast and Cable Television Station re Substantiation of "Finally the
Truth" ad, October 24, 2008 (PX130); Letter from Andy Pugno to Station Managers of California
Broadcast and Cable Television Station re Substantiation of "Have you Thought About It" ad,
October 27, 2008 (PX131); Letter from Andy Pugno to Station Managers of California Broadcast
and Cable Television Station re Substantiation of "It's Already Happened" ad, October 8, 2008
(PX132); Letter from Andy Pugno to Station Managers of California Broadcast and Cable
Television Station re Substantiation of "Whether You Like it or Not" ad, September 28, 2008
(PX133).

premise" of the state's interest in the welfare of children "that heterosexual couples are simply

better parents than same-sex couples." Doc # 561 at 18.  *See* Doc # 213 at 29.  Nevertheless,

neither Plaintiffs nor their amici have proven that "research clearly demonstrates that the

psychosocial development and well-being of children raised by gay and lesbian couples is

comparable to that of their peers raised by heterosexual parents." Doc # 553 at 13.  For one,

Professor Lamb could not identify at trial a single study that compares the outcomes of children of

same-sex couples with the children of married, biological parents, the family structure that

Proponents contend is the ideal.[11]  *See, e.g.*, Jan. 15, 2010 Tr. of Hr'g at 1165:3-6.  For another,

methodological problems such as unrepresentative samples, a focus on lesbian (as opposed to gay-

male) families, and small sample sizes[12] prevent reliable generalizations to be made from the

extant research on same-sex parenting.  *See, e.g.*, Affidavit of Steven Lowell Nock, *Halpern v.*

*Atty. Gen.*, No. 684/00 (Ontario Sup. Ct. 2001) (Ca.) (DIX131); Robert Lerner & Althea K. Nagai,

*No Basis:  What the Studies Don't Tell Us About Same-Sex Parenting*, WASHINGTON, D.C.:

---

[11] Indeed, Professor Lamb has in the past recognized the unique importance of fathers and mothers.  *See* MICHAEL E. LAMB, ED., THE ROLE OF THE FATHER IN CHILD DEVELOPMENT 10 (1997) (see Jan. 15, 2010 Tr. of Hr'g at 1073:16-19); Michael E. Lamb et al., *Effect of Gender and Caretaking Role on Parent-Infant Interaction*, *in* THE DEVELOPMENT OF ATTACHMENT AND AFFILIATIVE SYSTEMS at 117 (Robert N. Emde & Robert J. Harmon, eds. 1982)  (see Jan. 15, 2010 Tr. of Hr'g at 1069:7-14); Michael E. Lamb, *Fathers:  Forgotten Contributors to Child Development*, 18 HUM. DEV. 245, 246 (1975) (see Jan. 15, 2010 Tr. of Hr'g at 1070:17-18); MICHAEL E. LAMB, ED., THE ROLE OF THE FATHER IN CHILD DEVELOPMENT 21 (1976) (*see* Jan. 15, 2010 Tr. of Hr'g at 1075:12-21).  This view is consistent with other research highlighting the importance of children being raised by their biological mothers and fathers.  *See, e.g.*, Tr. 2767:11-2768:23; Kristin Anderson Moore et al., *Marriage From a Child's Perspective*, CHILD TRENDS at 1-2 (2002) (DIX26); SARA MCLANAHAN & GARY SANDEFUR, GROWING UP WITH A SINGLE PARENT: WHAT HURTS, WHAT HELPS 1, 2 (1994) (DIX124); Shelly Lundberg & Robert A. Pollak, *The American Family and Family Economics* 5, 19 (2007) (PX1305); Lawrence M. Berger et al., *Mothers, Men, and Child Protective Services Involvement*, 14 CHILD MALTREATMENT 263, 274 (2009) (PX1105); Jocelyn Brown et al., *A Longitudinal Analysis of Risk Factors For Child Maltreatment: Findings Of a 17-Year Old Prospective Study of Officially Recorded and Self-Reported Child Abuse and Neglect*, 22 CHILD ABUSE & NEGLECT 1065, 1074 (1998) (PX1046).  It is also consistent with evidence that children desire to know and have a relationship with their biological parents.  *See* Doc #172-1 at 88-89.

[12] Professor Lamb could identify only one study that includes a large number of same-sex couples.  *See* Michael J. Rosenfeld, Nontraditional Families and Childhood Progress through School, forthcoming in Demography (Draft, April 2009) (PX2299).  That study, however, used 2000 census data—data whose reliability with respect to same-sex couples is flawed.  *See* Jan. 19, 2010 Tr. of Hr'g at 1398:16-23; *id.* at 1404:11-1406:10; Danielle MacCartney et al., The Williams Inst., Census Snapshot: Methodological Details at 2 (2007) (PX1265); Dan Black et al., Cal. Ctr. For Pop. Res., UCLA, The Measurement of Same-Sex Unmarried Partner Couples in the 2000 U.S. Census (2007) (DIX1299).

1   MARRIAGE LAW PROJECT (2001) (DIX734); Walter R. Schumm, *What Was Really Learned From*

2   *Tasker and Golombok's (1995) Study of Lesbian and Single Parent Mothers?*, 94 PSYCHOL.

3   REPORTS 422, 423 (2004) (DIX779); David H. Demo & Martha J. Cox, *Families With Young*

4   *Children:  A Review of Research in the 1990s*, 62 J. MARRIAGE & FAM. 876, 889 (2000)

5   (DIX749); Timothy J. Biblarz & Judith Stacey, *How Does the Gender of Parents Matter?,* 72 J.

6   MARRIAGE & FAM. 3, 5 (2010).   Finally, several studies have found that children raised by gays

7   and lesbians are not comparable on certain metrics to children raised by heterosexuals.  *See*

8   Sotirios Sarantakos, *Children in Three Contexts:  Family, Education, & Social Development*, 21

9   CHILD. AUSTR. 23, 30 (1996) (DIX775); Susan Golombok et al., *Children With Lesbian Parents:*

10  *A Community Study*, 39 DEVELOPMENTAL PSYCHOLOGY 20, 30 (2003) (PX1066); HENNY BOS,

11  PARENTING IN PLANNED LESBIAN FAMILIES 58, 68 (2004)  (DIX801, *quoted at* Jan. 15, 2010 Tr. of

12  Hr'g at 1159:22-25); FIONA TASKER & SUSAN GOLOMBOK, GROWING UP IN A LESBIAN FAMILY

13  127 (1997) (PX1396); Katrien Vanfraussen et al.,  *What Does It Mean for Youngsters to Grow Up*

14  *in a Lesbian Family Created by Means of Donor Insemination*, 20 JOURNAL OF REPRODUCTIVE

15  AND INFANT PSYCHOLOGY 237, 250 (2002) (PX1131); Richard Green et al., *Lesbian Mothers and*

16  *Their Children: A Comparison with Solo Parent Heterosexual Mothers and Their Children,* 15

17  ARCHIVES SEXUAL BEHAV. 167, 174 (1986) (DIX756).

18  **IV.   <u>Plaintiffs' Claims are Subject to Traditional Rational Basis Review</u>**

19          The nature of rational basis review is well-established.  *See* Doc # 172-1 at 67-70; Doc #

20  213 at 23-26.  The ACLU and the American Association for Marriage & Family Therapy *et al.*,

21  however, argue that a more "careful" or "exacting[]" form of rational basis review applies in this

22  context, *see* Doc # 552 at 17; Doc # 561 at 15; namely, one that "look[s] at the actual purpose of a

23  classification" rather than requiring a challenger to "negative every conceivable basis that might

24  support" a law.  Doc # 552 at 17-18 (quotation marks and emphasis omitted).  The Supreme

25  Court, however, has never purported to create separate tiers of rational basis review.

26          Indeed, *Heller v. Doe*, 509 U.S. 312 (1993)—which the ACLU cites for the proposition

27  that the Supreme Court reviews legislation more carefully in "cases involving individual liberty

28  and human dignity" than in "economic and regulatory contexts," Doc # 552 at 17—is quite to the

contrary.  There, the Court explained that "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.  Such a classification *cannot* run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and *some* legitimate government purpose.  … [A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. … *[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it*."  509 U.S. at 320 (emphases added; citations and quotation marks omitted).  Moreover, the Court explained that *Cleburne*—another of the ACLU's cases—did not "purport to apply a different standard of rational-basis review from that just described."  *Id*. at 321.

Amici also cite *Romer v. Evans*, 517 U.S. 620 (1996) as a case in which the Court took a "more careful" look than that afforded by traditional rational basis review.  *See* Doc # 552 at 17; Doc # 561 at 15.  There, however, the Court (citing *Heller v. Doe*) held that it "will uphold [a] legislative classification so long as it bears a rational relation to *some* legitimate end.  Amendment 2 fails, indeed defies, even this *conventional inquiry*."  517 U.S. at 631-32 (emphases added; citation omitted).  *Romer*, in other words, did nothing more than apply normal rational basis review. [13]   *See* Doc # 172-1 at 101-03.

Amici's remaining cases—*Eisenstadt v. Baird*, 405 U.S. 438 (1972), *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), and *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975)—serve them no better.  Each predates *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166 (1980), in which the Court faced the issue of the "appropriate standard of judicial review" to be applied to distinctions that "do not burden fundamental constitutional rights or create 'suspect' classifications," *id*. at 174.  The Court acknowledged that its "earlier cases [had] not been altogether consistent in [their] pronouncements in this area," and proceeded to articulate the deferential standard of review Proponents have advanced throughout this case—including that

---

[13]   The same is true for *Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985), another case cited by the ACLU.  *See* Doc # 552 at 17.  There, the Court struck down a law after concluding that it was "not supported by any identifiable state interest."  *Hooper*, 472 U.S. at 623.

"[w]here … there are plausible reasons" for a classification, judicial inquiry "is at an end" and that it is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Id*. at 174-79 (quotation marks omitted).[14]

That leaves amici with two concurring opinions. Justice O'Connor, to be sure, stated in her *Lawrence* concurrence that "[w]hen a law exhibits … a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause." *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring in the judgment). But as Justice Scalia pointed out, the cases Justice O'Connor cited—*Romer*, *Cleburne*, and *Moreno*—"do not recognize such a standard, and reach their conclusions only after finding, as required by conventional rational-basis analysis, that no conceivable legitimate state interest supports the classification at issue." *Id*. at 601 (Scalia, J., dissenting). At any rate, Justice O'Connor indicated that "preserving the traditional institution of marriage" would have passed muster under her more searching analysis. *Id*. at 585 (O'Connor, J., concurring in the judgment).

Finally, Justice Kennedy, concurring in *Kelo v. City of New London*, 545 U.S. 469 (2005), stated that "a court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications," *id*. at 491 (Kennedy, J., concurring). The salient point is that the manner in which a court determines that a law must be struck down for the reasons Justice Kennedy describes is by concluding that it is supported by no plausible rational basis. *See* Doc # 172-1 at 101-03.

---

[14] Furthermore, the Court has explained that in *Moreno* it "concluded that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest. This statement is merely an application of the usual rational-basis test: if a statute is not rationally related to any legitimate governmental objective, it cannot be saved from constitutional challenge by a defense that relates it to an illegitimate governmental interest. Accordingly, in *Moreno* … we examined the challenged provision under the rational-basis standard of review." *Lyng v. United Auto. Workers of Am.*, 485 U.S. 360, 370 n.8 (1988) (quotation marks omitted); *see also Moreno*, 413 U.S. at 538 (concluding that the classification failed "[t]raditional equal protection analysis" because it was "wholly without any rational basis").

14

1

**CONCLUSION**

2      The proposed amici submissions in support of Plaintiffs do not change that this Court

3  should enter judgment in favor of the Defendants and Defendant-Intervenors.

4

5  Dated: February 26, 2010

6                                             COOPER AND KIRK, PLLC
                                             ATTORNEYS    FOR    DEFENDANT-INTERVENORS
7                                             DENNIS   HOLLINGSWORTH,   GAIL   J.   KNIGHT,
                                             MARTIN F. GUTIERREZ, MARK A. JANSSON, AND
8                                             PROTECTMARRIAGE.COM – YES ON 8, A PROJECT
                                             OF CALIFORNIA RENEWAL

9

10                                           By: /s/Charles J. Cooper
                                                 Charles J. Cooper

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28