GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
*tolson@gibsondunn.com*
Matthew D. McGill, *pro hac vice*
Amir C. Tayrani, SBN 229609
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
*tboutrous@gibsondunn.com*
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
Sarah E. Piepmeier, SBN 227094
Theane Evangelis Kapur, SBN 243570
Enrique A. Monagas, SBN 239087
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
*dboies@bsfllp.com*
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Steven C. Holtzman, SBN 144177
Jeremy M. Goldman, SBN 218888
Theodore H. Uno, SBN 248603
1999 Harrison Street, Suite 900, Oakland, California 94612
Telephone: (510) 874-1000, Facsimile: (510) 874-1460

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KRISTIN M. PERRY, *et al.*,<br><br>Plaintiffs,<br>and<br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff-Intervenor,<br>v.<br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>Defendants,<br>and<br>PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, *et al.*,<br><br>Defendant-Intervenors. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' RESPONSE TO** *AMICUS CURIAE* **FILINGS**<br><br>Trial Dates:  January 11 – January 27, 2010<br>Judge:  Chief Judge Walker<br>Location:  Courtroom 6, 17th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................................ 1

ARGUMENT .............................................................................................................................. 1

    I.    PROPONENTS' *AMICI* HAVE NOT IDENTIFIED A LEGITIMATE STATE INTEREST FURTHERED BY PROP. 8 ................................................................ 1

    II.    PROPONENTS' *AMICI* HAVE NOT ESTABLISHED THAT HEIGHTENED SCRUTINY IS INAPPLICABLE TO PROP. 8 .......................................................... 5

CONCLUSION ......................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) .................................................................................................................. 4

*Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco*,
784 F.2d 1010 (9th Cir. 1986) .................................................................................................. 6

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
473 U.S. 432 (1985) .................................................................................................................. 6

*Frontiero v. Richardson*,
411 U.S. 677 (1973) .................................................................................................................. 8

*Gay Rights Coalition of Georgetown Law Ctr. v. Georgetown Univ.*,
536 A.2d 1 (D.C. 1987) ............................................................................................................ 7

*Goldberg v. Kelly*,
397 U.S. 254 (1970) .................................................................................................................. 1

*Griswold v. Connecticut*,
381 U.S. 479 (1965) ............................................................................................................. 5, 6

*Hernandez-Montiel v. INS*,
225 F.3d 1084 (9th Cir. 2000) .................................................................................................. 7

*Kerrigan v. Comm'r of Pub. Health*,
957 A.2d 407 (Conn. 2008) ...................................................................................................... 8

*Loving v. Virginia*,
388 U.S. 1 (1967) ...................................................................................................................... 1

*In re Marriage Cases*,
183 P.3d 384 (Cal. 2008) .......................................................................................................... 4

*Mass. Bd. of Ret. v. Murgia*,
427 U.S. 307 (1976) .............................................................................................................. 6, 8

*Maynard v. Hill*,
125 U.S. 190 (1888) .............................................................................................................. 1, 6

*P.O.P.S. v. Gardner*,
998 F.2d 764 (9th Cir. 1993) .................................................................................................... 5

*Palmore v. Sidoti*,
466 U.S. 429 (1984) .................................................................................................................. 5

*Reitman v. Mulkey*,
387 U.S. 369 (1967) .................................................................................................................. 9

*Romer v. Evans*,
517 U.S. 620 (1996) .............................................................................................................. 1, 9

*Sharon S. v. Sup. Ct.*,
73 P.3d 554 (Cal. 2003) ............................................................................................................ 3

*Turner v. Safley*,
   482 U.S. 78 (1987) .................................................................................................................. 5, 6

*Varnum v. Brien*,
   763 N.W.2d 862 (Iowa 2009) ..................................................................................................... 7

**STATUTES**

Cal. Civ. Code § 51(b) ....................................................................................................................... 4

Cal. Fam. Code § 297.5(d) ................................................................................................................. 3

Cal. Fam. Code § 9000(b) .................................................................................................................. 3

**OTHER AUTHORITIES**

Congressional Research Service, *Membership of the 111th Congress: A Profile* (2008) .................... 9

## INTRODUCTION

Plaintiffs proved at trial that Proposition 8 ("Prop. 8") violates the Due Process and Equal Protection Clauses of the U.S. Constitution because it stripped gay men and lesbians of their right to marry, relegated same-sex couples to the inherently unequal institution of domestic partnership, and is not rationally related to any legitimate state interest. Such arbitrary and discriminatory restrictions on the "freedom to marry"—a "vital personal right[ ]" and "'basic civil right[ ]'" (*Loving v. Virginia*, 388 U.S. 1, 12 (1967))—are incompatible with the "Nation's basic commitment . . . to foster the dignity and well-being of *all* persons within its borders." *Goldberg v. Kelly*, 397 U.S. 254, 264-65 (1970) (emphasis added).

Nothing in the *amicus curiae* briefs supporting Proponents can remedy Prop. 8's fundamental constitutional shortcomings.

## ARGUMENT

**I.   PROPONENTS' *AMICI* HAVE NOT IDENTIFIED A LEGITIMATE STATE INTEREST FURTHERED BY PROP. 8.**

Prop. 8 violates the Due Process and Equal Protection Clauses because it eliminated the right of gay men and lesbians to enter into what the Supreme Court has described as "the most important relation in life." *Maynard v. Hill*, 125 U.S. 190, 205 (1888). And the State stripped gay men and lesbians of this right for no legitimate reason at all. Accordingly, Prop. 8 cannot survive rational basis review—let alone, the heightened scrutiny that applies when a fundamental right is at stake and when a law discriminates on the basis of a suspect classification. *See Romer v. Evans*, 517 U.S. 620, 627, 631 (1996) (a State may not "impose[ ] a special disability upon [gay and lesbian individuals] alone" and "withdraw[ ] from" them, "but, no others, specific legal protection" that they had previously enjoyed under the state constitution).

Several of Proponents' *amici* attempt to salvage Prop. 8 by interposing state interests purportedly advanced by this discriminatory and irrational modification of California's marriage laws. None of these proffered interests is sufficient to satisfy the requirements of even rational basis review.

The American College of Pediatricians ("ACP")—a group formed in 2002 in direct response to the American Association of Pediatrics' public support for the parenting abilities of gay men and lesbians (*see* ACP, History of the College, *at* http://www.americancollegeofpediatricians.org/History-of-the-College.html)—argues that Prop. 8 serves the interests of children. According to ACP, studies indicating that same-sex couples raise children as successfully as opposite-sex couples "'suffer critical flaws.'" Doc # 374-1 at 8. The National Organization for Marriage offers a similar defense of Prop. 8. *See* Doc # 373-2 at 13 ("Children need mothers and fathers.").

The evidence at trial, however, conclusively established that the children of same-sex couples are as well-adjusted as the children of opposite-sex couples. *See, e.g.*, PX0766 (JN) (American Psychological Association, Policy Statement on Sexual Orientation, Parents and Children: "There is no scientific basis for concluding that lesbian mothers and gay fathers are unfit parents on the basis of their sexual orientation."); Tr. 1027:3-1028:2 (Lamb: Research indicates that there is not a marked difference between the effects of gay and lesbian and heterosexual parenting on child adjustment.); Tr. 2797:24-2798:3 (Blankenhorn: He is not aware of any studies showing that children raised from birth by a gay or lesbian couple have worse outcomes than children raised from birth by two biological parents.).

Plaintiffs' *amici*—including organizations representing family and marriage therapists and the children of gay and lesbian parents—confirm that "no empirical scientific evidence supports the conclusion that heterosexual couples are better parents than same-sex couples." Doc # 561 at 18 (Brief of American Association for Marriage & Family Therapy, California Division, and others) (capitalization altered); *see also* Doc # 554 at 11-12 (Brief of the Progressive Project and COLAGE). In fact, not only is Prop. 8 unnecessary to protect children, but its discriminatory exclusion of gay men and lesbians from the revered institution of marriage is positively *harmful* to children because it stigmatizes the children of same-sex couples by signaling that their parents' relationships are inferior to the relationships of opposite-sex couples. *See* Doc # 550-1 at 20 (the children of same-sex couples suffer "stigma . . . if the State itself labels their parents' relationship as 'different' and implicitly of lesser standing") (Brief of the American Anthropological Association; American Psychoanalytic

Association; American Academy of Pediatrics, California; and others); Doc # 561 at 20 (Brief of the American Association for Marriage & Family Therapy, California Division, and others).

In any event, even if there were some question as to the relative parenting abilities of same-sex and opposite-sex couples—and there is not—Prop. 8 would not be rationally related to the State's interest in child welfare because California law expressly authorizes adoption by unmarried same-sex couples. *See* Cal. Fam. Code §§ 297.5(d), 9000(b); *Sharon S. v. Sup. Ct.*, 73 P.3d 554, 569 (Cal. 2003). Nor does California law impose any other restrictions on the right of same-sex couples to raise children. *See, e.g.*, PX0710 at RFA No. 60 (Attorney General admits "that in determining who shall raise a child and what is in the best interest of a child, the law of the State of California prohibits discrimination on the basis of sexual orientation"). Thus, whether or not Prop. 8 remains on the books, same-sex couples in California will be free to adopt and raise children.

The ACP and National Organization for Marriage also argue that Prop. 8 advances a legitimate state interest because permitting same-sex couples to marry "may weaken" the institution of marriage, make it less likely that opposite-sex couples will marry, and, in turn, decrease the rate of natural reproduction. Doc # 374-1 at 9; *see also* Doc # 373-2 at 15 ("Society needs babies."). But, as demonstrated at trial, there is absolutely no empirical evidence to support the unfounded assertion of Proponents' *amici* that permitting same-sex couples to marry will discourage opposite-sex couples from marrying and reproducing. *See* PFF § IX.C.2 (excluding same-sex couples from marriage has no effect on opposite-sex relationships). Data from the Netherlands, for example, indicate that permitting same-sex couples to marry did not increase the rate of non-marital cohabitation, the number or percent of unmarried couples with children, or the number or percent of single-parent families. PX2866, DIX2639, DIX2426. And, in Belgium, marriage rates actually *increased* after same-sex marriage was authorized in 2003. DIX2627. Thus, far from weakening the institution of marriage, permitting Plaintiffs and other same-sex couples in loving, committed relationships to marry will strengthen the institution and the relationships of both same-sex and opposite-sex couples. *See* PX0767 at 3 (Am. Psychol. Ass'n, Professional Association Policies: "[A]nthropological research supports the conclusion that a vast array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.").

The efforts of the Becket Fund for Religious Liberty to identify a legitimate state interest furthered by Prop. 8 are equally unavailing. According to the Becket Fund, "[l]egalizing same-sex marriage without also providing robust protections for conscientious objectors seriously undermines religious liberty." Doc # 376 at 7. But, as emphasized in the *amicus* brief filed in support of Plaintiffs by the Unitarian Universalist Legislative Ministry California and other religious groups, the California Supreme Court has already squarely and authoritatively rejected this rationale in the *Marriage Cases*, where it explained that

> affording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs.

*In re Marriage Cases*, 183 P.3d 384, 451-52 (Cal. 2008); *see also* Doc # 559 at 15 ("The First Amendment would . . . preserve every religion's ability to make its own rules concerning its own religious marriages.") (Brief of Unitarian Universalist Legislative Ministry California). The California Supreme Court has thus provided the protection for religious liberty that the Becket Fund seeks.

Moreover, to the extent that the Becket Fund expresses concern that religious groups may be required under California law to provide gay and lesbian couples access to their physical facilities, those requirements are imposed by generally applicable state laws that prohibit discrimination in public accommodations on the basis of sexual orientation. *Compare* Doc # 376 at 9 ("Religious institutions . . . provide a broad array of programs and facilities to their members and to the general public, such as hospitals, schools, adoption services, and marital counsel.") (Brief of the Becket Fund for Religious Liberty), *with* Cal. Civ. Code § 51(b) (prohibiting discrimination in "all business establishments of every kind whatsoever"). Prop. 8 does not exempt religious groups from these generally applicable anti-discrimination laws, and its invalidation will not change the fact that religion cannot be used to justify discrimination in access to public accommodations. Whether the opposition of some religious groups to same-sex marriage is "motivated by love," as one of Proponents' *amici* argues (Doc # 384 at 8 (Brief of the Ethics and Religious Liberty Commission of

the Southern Baptist Convention) (capitalization altered)), or by more nefarious considerations, the "governmental interest" in vindicating the guarantees of due process and equal protection "substantially outweighs" the "burden" that anti-discrimination laws impose on the "exercise of . . . religious beliefs." *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983); *see also id.* (holding that schools that enforce racially discriminatory admissions standards on the basis of religious doctrine do not qualify as tax-exempt organizations under the Internal Revenue Code).

## II. PROPONENTS' *AMICI* HAVE NOT ESTABLISHED THAT HEIGHTENED SCRUTINY IS INAPPLICABLE TO PROP. 8.

Prop. 8 fails even rational basis review because it does not further any legitimate state interest. Nevertheless, the appropriate standard of review in this case is strict scrutiny because Prop. 8 denies gay men and lesbians their fundamental right to marry and discriminates on the basis of a suspect classification. *See P.O.P.S. v. Gardner*, 998 F.2d 764, 767-68 (9th Cir. 1993) ("Statutes that directly and substantially impair [the right to marry] require strict scrutiny."); *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984). The arguments of Proponents' *amici* that Prop. 8 should be subjected to a lesser standard of scrutiny are legally and factually flawed.

The Family Research Council argues that the fundamental right to marry does not extend to same-sex couples because the Supreme Court's decisions uniformly "relat[e] marriage to procreation and childrearing," and that Plaintiffs' due process claim therefore does not warrant strict scrutiny. Doc # 370-1 at 12; *see also* Doc # 373-2 at 15 ("the U.S. Supreme Court has repeatedly pointed to the link between marriage and procreation") (Brief of National Organization for Marriage). But, in fact, the Supreme Court has repeatedly recognized that the importance of marriage transcends its procreative element. The Court has emphasized that marriage is an "expression[ ] of emotional support and public commitment" (*Turner v. Safley*, 482 U.S. 78, 95 (1987)), "a coming together for better or for worse" (*Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)), and a relationship that is "intimate to the degree of being sacred." *Id.*; *see also* Doc # 574 at 7 ("The purposes of civil marriage are to enable two individuals who choose to integrate their lives, legally and emotionally, and to express their commitment publicly, to do so.") (Brief of Family Law Professors). For that reason, the Court has invalidated prohibitions on inmate marriages—even though some inmates will

never have the opportunity to consummate their marriage and others will have to wait years to do so (*Turner*, 482 U.S. at 99)—and upheld the right of married individuals to use contraception to prevent procreation.  *Griswold*, 381 U.S. at 485.  Indeed, if the fundamental right to marry were premised exclusively on an interest in procreation, the State could deny that right to any individual who was unable or unwilling to procreate.  Thus, just as the Due Process Clause protects the right to marry of opposite-sex couples who will not procreate due to biology, incarceration, or mere personal choice, the Due Process Clause similarly protects the right of gay men and lesbians to enter into that "most important relation in life." *Maynard*, 125 U.S. at 205.

Other *amici* supporting Proponents argue that gay men and lesbians do not constitute a suspect or quasi-suspect class and that rational basis review should therefore be applied to Plaintiffs' equal-protection claim.  Paul McHugh, a "scholar of psychiatry with a professional interest in orientation issues," argues that "emerging evidence suggests that homosexuality is not an innate characteristic" and that heightened equal-protection scrutiny is therefore inappropriate.  Doc # 379 at 5, 9.  As an initial matter, Mr. McHugh's argument is irrelevant because the Supreme Court has held that heightened scrutiny is appropriate whenever a group has suffered a history of discrimination based on a "characteristic" that "frequently bears no relation to ability to perform or contribute to society."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-41 (1985) (internal quotation marks omitted); *see also Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (persons "who have been discriminated against on the basis of race or national origin" are a suspect class because they have "experienced a 'history of purposeful unequal treatment'" and "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities").  Even where that characteristic may not be strictly or absolutely "immutable," the history of unwarranted discrimination is sufficient to trigger heightened scrutiny.  *See Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986)

(holding that "an individual religion meets the requirements for treatment as a suspect class," even though religion is not immutable).[1]

In any event, Ninth Circuit precedent establishes that sexual orientation is indeed an immutable characteristic. *See Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual orientation and sexual identity are immutable"); *id.* ("[h]omosexuality is as deeply ingrained as heterosexuality") (quoting *Gay Rights Coalition of Georgetown Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 34 (D.C. 1987)); *see also Varnum v. Brien*, 763 N.W.2d 862, 893 (Iowa 2009) ("sexual orientation forms a significant part of a person's identity," and "influences the formation of personal relationships between all people—heterosexual, gay, or lesbian—to fulfill each person's fundamental needs for love and attachment") (internal quotation marks omitted).

The evidence presented at trial substantiates the fact that sexual orientation is not a personal choice and is highly resistant to change. According to empirical research, 88% of gay men report that they had "no choice at all" about their sexual orientation, and 83% of lesbians report they had "no choice at all" or only a small amount of choice about their sexual orientation. Tr. 2056:4-25 (Herek discussing PX0930). Similarly, a 2009 Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation found that "enduring change to an individual's sexual orientation is uncommon" and that the "results of scientifically valid research indicate that it is unlikely that individuals will be able to reduce same-sex attractions or increase other-sex sexual attractions through" sexual-orientation change efforts. PX0888 at 2, 3; *see also* Tr.

---

[1] Neither Proponents nor their *amici* dispute that gay men and lesbians have been subjected to a history of discrimination in this country. *See* PX0707 at RFA No. 14 (Proponents admit "that in the past gays and lesbians experienced discrimination in the United States"). That long and often violent history dwarfs the regrettable (but isolated) acts of retaliation reported by some supporters of Prop. 8 and discussed by *amicus* Institute for Marriage and Public Policy. *Compare* Doc # 388 at 16 ("reports of Yes on Prop 8 signs being defaced, damaged, dislocated, or stolen are almost too numerous to track reliably"), *with* PX2566 at 2-4 (Letter from John W. Macy of the U.S. Civil Services Comm'n to The Mattachine Society of Washington, Feb. 25, 1966 (refusing to lift the federal government's policy barring the employment of gay men and lesbians due to the "revulsion of other employees by homosexual conduct," "the unavoidable subjection of the sexual deviate to erotic stimulation through on-the-job use of common toilet[s]," and "the offense to members of the public who are required to deal with a known or admitted sexual deviate"), *and* PX0868 at 5, 9 (reporting 29 bias-motivated murders in 2008 of gay and lesbian individuals).

2039:1-3 (Herek:  No major mental health organization endorses the use of therapies designed to modify sexual orientation).

Finally, the National Legal Foundation contends that gay men and lesbians possess such a significant amount of political power that they do not qualify as a suspect or quasi-suspect class for equal-protection purposes.  Doc # 382; *see also* Doc # 370-1 at 20 (Brief of Family Research Council).  According to the National Legal Foundation, gay men and lesbians enjoy substantial political power because they have "powerful political allies," receive contributions from corporations and unions, and are favorably portrayed by some media outlets.  Doc # 382 at 2, 3, 8 (capitalization altered).  But, even if relative political power were sufficient to deny heightened equal-protection scrutiny to a group that continues to suffer pervasive and unjustified societal discrimination—which it is not (*see Murgia*, 427 U.S. at 313)—gay men and lesbians could not be denied heightened scrutiny on this ground because they possess less political power than other suspect and quasi-suspect classes, including racial minorities and women.  *See* Doc # 567 at 11 (the political powerlessness inquiry "urged by [Proponents] would necessarily require a reexamination of established Equal Protection jurisprudence by eliminating all suspect classifications, including race and gender") (Brief of Asian Law Caucus, California State Conference of the NAACP, Mexican American Legal Defense and Education Fund, and others); *see also Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 452 (Conn. 2008) ("With respect to the comparative political power of gay persons, they presently have no greater political power—in fact, they undoubtedly have a good deal less such influence—than women did in 1973, when the United States Supreme Court, in *Frontiero* [*v. Richardson*, 411 U.S. 677 (1973) (plurality opinion)], held that women are entitled to heightened judicial protection.").

Gay men and lesbians are vastly underrepresented in political offices across the country.  Of the more than half million people who hold political office at the local, state, and national levels, less than 300 are openly gay.  *Kerrigan*, 957 A.2d at 446.  No openly gay person has ever served in the United States Cabinet, on any federal court of appeals, or in the United States Senate.  *Id.* at 447.  In contrast, African-Americans have served as President of the United States, Attorney General, and Secretary of State, as well as in the United States Senate and on the U.S. Supreme Court.  Similarly, women currently head the Departments of State, Homeland Security, and Labor, and the 111th

Congress includes seventeen female Senators and seventy-eight female representatives. *See* Congressional Research Service, *Membership of the 111th Congress: A Profile* 5 (2008); *see also* DIX0271 at 1-2 (USA Today/Gallup poll: 43% of Americans would not vote for a generally qualified homosexual presidential candidate nominated by their party versus 5% who would not vote for a similarly qualified black candidate and 11% who would not vote for a woman.).

Moreover, despite their "purportedly powerful political allies," gay men and lesbians have been unable to secure federal legislation to protect themselves from discrimination in housing, employment, and public accommodations (PX0707 at RFA Nos. 35, 36 ); fewer than half the States prohibit sexual-orientation discrimination in employment, housing, and public accommodations (Tr. 1545:6-1546:6 (Segura)); and, in the past fifteen years, voters have used initiatives or referenda to repeal or prohibit marriage rights for gay and lesbian individuals 33 times. Tr. 1553:14-19 (Segura). Indeed, as Professor Segura testified, "[t]here is no group in American society who has been targeted by ballot initiatives more than gays and lesbians." Tr. 1551:25-1552:12.

In light of the underrepresentation of gay men and lesbians in elected office, their inability to obtain meaningful legal protections through the political process, and the frequency with which they are denied or stripped of basic civil rights by popular vote, heightened equal-protection scrutiny is necessary to safeguard the fundamental rights of gay men and lesbians against arbitrary and discriminatory action by democratic majorities. Where the political process fails, it is squarely the province of the courts to intervene on behalf of unpopular and politically vulnerable minorities. *See Romer*, 517 U.S. at 635; *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967).

///

///

///

**CONCLUSION**

Because neither Proponents nor their *amici* have identified a legitimate state interest furthered by Prop. 8, this Court should declare Prop. 8 unconstitutional and permanently enjoin its enforcement.

Respectfully submitted,

DATED: February 26, 2010

GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson
Theodore J. Boutrous, Jr.
Christopher D. Dusseault
Ethan D. Dettmer
Matthew D. McGill
Amir C. Tayrani
Sarah E. Piepmeier
Theane Evangelis Kapur
Rebecca Justice Lazarus
Enrique A. Monagas


By: _____/s/_____
            Theodore B. Olson

and

BOIES, SCHILLER & FLEXNER LLP
David Boies
Steven C. Holtzman
Jeremy M. Goldman
Roseanne C. Baxter
Richard J. Bettan
Beko O. Richardson
Theodore H. Uno
Joshua I. Schiller

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO