1 GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
2 tolson@gibsondunn.com
Matthew D. McGill, *pro hac vice*
3 1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

4 Theodore J. Boutrous, Jr., SBN 132009
tboutrous@gibsondunn.com
5 Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
6 333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

7 BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
8 dboies@bsfllp.com
333 Main Street, Armonk, New York 10504
9 Telephone: (914) 749-8200, Facsimile: (914) 749-8300

10 Steven C. Holtzman, SBN 144177
sholtzman@bsfllp.com
Jeremy M. Goldman, SBN 218888
11 1999 Harrison Street, Suite 900, Oakland, California 94612
Telephone: (510) 874-1000, Facsimile: (510) 874-1460

12 Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
13 PAUL T. KATAMI, and JEFFREY J. ZARRILLO

14 Dennis J. Herrera, SBN 139669
Therese M. Stewart, SBN 104930
Danny Chou, SBN 180240
15
One Dr. Carlton B. Goodlett Place
16 San Francisco, California 94102-4682
Telephone: (415) 554-4708, Facsimile (415) 554-4699

17 Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

18

**UNITED STATES DISTRICT COURT**

19 **NORTHERN DISTRICT OF CALIFORNIA**

20 | KRISTIN M. PERRY, *et al.*, | CASE NO. 09-CV-2292 VRW
21 | Plaintiffs, | **PLAINTIFFS' AND PLAINTIFF-**
**INTERVENOR'S AMENDED PROPOSED**
and | **FINDINGS OF FACT AND CONCLUSIONS**
22 CITY AND COUNTY OF SAN FRANCISCO, | **OF LAW**
23 | Plaintiff-Intervenor, | Trial Dates:  January 11 – January 27, 2010
24 v. | Judge:  Chief Judge Walker
Location:  Courtroom 6, 17th Floor
ARNOLD SCHWARZENEGGER, *et al.*,
25 | Defendants,
26 and
27 PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, *et al.*,
28 | Defendant-Intervenors.

---

## Table of Contents

I.    The Parties ........................................................................................................ 1

    A.    Plaintiffs ................................................................................................ 1

    B.    City and County of San Francisco ...................................................... 2

    C.    Defendants and Their Role in Enforcing Prop. 8 and Denying
        Marriage Licenses ................................................................................ 3

    D.    Proponents and Their Role in the Prop. 8 Campaign ....................... 3

II.   The Meaning of Marriage, "The Most Important Relation in Life" ............ 5

    A.    Supreme Court Holdings Regarding the Fundamental Right to Marry ........ 5

    B.    The Changing Institution of Marriage ................................................ 6

    C.    Marriage Restrictions Historically Have Been Discriminatory ...................... 8

    D.    Marriage Has Never Been Limited to Procreative Unions in
        California .............................................................................................. 10

    E.    There Are No Marriage Exclusions Based on Past Conduct ........................ 10

III.  The Exclusion of Gay and Lesbian People from Marriage in California ................. 11

    A.    California Marriage Law Before *In re Marriage Cases* ..................... 11

    B.    Rights Afforded to Gay and Lesbian Individuals in California .................... 11

        1.    Domestic Partnership Confers Many of the Same Substantive
            Benefits as Marriage ................................................................. 11

        2.    Gay and Lesbian People Can Have, Adopt, and Parent
            Children ...................................................................................... 12

        3.    Gay and Lesbian Californians Are Entitled to Equal
            Treatment in the Workplace, Housing, and Public
            Accommodations ....................................................................... 12

    C.    *In re Marriage Cases* ........................................................................ 13

    D.    The Prop. 8 Campaign and Passage .................................................. 15

    E.    After Prop. 8, Whether Two People Can Marry Turns Entirely on
        Their Sex .............................................................................................. 16

    F.    *Strauss v. Horton* ............................................................................. 16

i

Gibson, Dunn
& Crutcher
LLP

G.   *Perry v. Schwarzenegger* ................................................................ 17

IV.   **The Denial of Marriage Rights Causes Plaintiffs and Other Gay and Lesbian Individuals Grievous Injuries and Drains the Public Fisc** ........................... 18

    A.   **Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples** ...................................................... 18

    B.   **Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples** ...................................................... 23

    C.   **Harm to Children from Denial of Marriage to Same-Sex Couples** ............... 24

    D.   **Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples** .................................................................... 24

V.   **Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws** ........................................................................................ 27

    A.   **Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples** ............................. 27

    B.   **Same-Sex Couples Contribute to Society in All the Ways That Opposite-Sex Couples Do** ........................................................ 28

VI.   **Sexual Orientation Is a Fundamental Aspect of a Person's Identity** ...................... 28

    A.   **Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder** ............. 28

    B.   **Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm** ...................................... 30

VII.   **There Is a Long History of Discrimination Against Gay and Lesbian Individuals, and That Discrimination Persists Today** ................................................. 31

VIII.   **Gay and Lesbian Individuals Lack Political Power to Defend Their Basic Rights When They Are Put Up for a Vote in a State-Sanctioned Plebiscite** ............. 34

IX.   **Prop. 8 Does Not Promote Any Legitimate Governmental Interest** ......................... 38

    A.   **Proponents' Proffered Interests** ................................................................ 38

    B.   **Proponents' Purported Evidence** .............................................................. 39

    C.   **The Evidence Demonstrates That Prop. 8 Does Not Promote Any Legitimate Governmental Interest** .................................................... 42

ii

1.   Excluding Same-Sex Couples From Marriage Does Not Promote the Formation or Stability of "Naturally Procreative Unions" ..................................................... 42

2.   Excluding Same-Sex Couples from Marriage Does Not Further Any Interest in Preventing the "Deinstitutionalization" of Marriage ........................................................ 43

3.   Excluding Same-Sex Couples from Marriage Does Not Promote Achievement of Good Child Adjustment Outcomes ........... 48

D.   There Is No Evidence That Excluding Gay and Lesbian Individuals From Marriage Promotes Administrative Convenience ..................... 52

E.   Excluding Same-Sex Couples from Marriage Does Not Further Any Alleged Interest in Protecting the First Amendment Rights of Those Who Oppose Allowing Them to Marry............................................. 53

F.   Not Only Do No Rational or Legitimate Justifications Support Prop. 8, But the Evidence Demonstrates That Prop. 8 Was Driven by Animus Towards, and Moral Disapproval of, Gay and Lesbian Individuals ........................................................................ 54

X.   Proposed Conclusions of Law ............................................................... 56

A.   Claim One: Due Process ...................................................... 56

1.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Strict Scrutiny. ................................................................ 56

2.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Intermediate Scrutiny................................................... 65

3.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Rational Basis Review.................................................. 66

4.   Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Strict Scrutiny..................................... 66

5.   Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Intermediate Scrutiny. ....................... 66

6.   Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Rational Basis Review. ....................... 67

B.   Claim Two: Equal Protection ................................................. 67

1.   Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Strict Scrutiny.................................................. 67

iii

     **2.**    **Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Intermediate Scrutiny.** ......................................................... 73

     **3.**    **Prop. 8 Discriminates On The Basis of Sexual Orientation And Fails Rational Basis Review.** .................................................. 73

     **4.**    **Prop. 8 Discriminates On The Basis Of Sex And Fails Intermediate Scrutiny.** ...................................................................... 74

     **5.**    **Prop. 8 Infringes On Plaintiffs' Fundamental Right To Marry And Fails Strict Scrutiny.** ................................................................ 74

**C.**    **Claim III: Violation of 42 U.S.C. § 1983** ..................................................... 75

     **1.**    **Enforcement Of Prop. 8 Violates 42 U.S.C. § 1983.** .............................. 75

iv

1         Plaintiffs and Plaintiff-Intervenor City and County of San Francisco hereby submit their

2  Amended Proposed Findings of Fact and Conclusions of Law.  On the last day of trial, January 27,

3  2010, the Court requested that the parties submit post-trial Proposed Findings of Fact and

4  Conclusions of Law with citations to the evidence presented at trial.  Accordingly, attached as Exhibit

5  A to Plaintiffs' and Plaintiff-Intervenor's Amended Proposed Findings of Fact and Conclusions of

6  Law is an annotated version that includes supporting citations below each finding of fact.  The post-

7  trial Proposed Findings of Fact below hew closely to the pre-trial Proposed Findings of Fact

8  submitted by Plaintiffs and Plaintiff-Intervenor on December 11, 2009, except that they have been

9  revised to more accurately reflect the evidence at trial and reordered to match more closely the

10  principal points that Plaintiffs identified to the Court in their Opening Statement on January 11, 2010.

11  For ease of reference, attached as Exhibit B is an appendix that lists each pre-trial Proposed Finding

12  of Fact by number and the post-trial Proposed Finding of Fact that corresponds to it.[1]

## I.    The Parties

### A.    Plaintiffs

PFF 1.       Plaintiffs Kristin M. Perry ("Perry") and Sandra B. Stier ("Stier") reside in Alameda
County and are raising children together.  They are lesbian individuals in a committed
relationship who wish to be married.

PFF 2.       In May 2009, Perry and Stier applied for a marriage license from Defendant
O'Connell, the Alameda County Clerk-Registrar, but were denied because they are a
same-sex couple.

PFF 3.       As a result of Proposition 8 ("Prop. 8"), Perry and Stier are barred from marrying the
individual they wish to marry.

PFF 4.       Plaintiff Paul T. Katami ("Katami") and Plaintiff Jeffrey J. Zarrillo ("Zarrillo") are
gay Californians in a committed relationship who wish to be married.

---

[1]   Plaintiffs will submit an electronic version of Exhibit A containing hyperlinks to the evidence
cited therein as soon as reasonably practicable.

PFF 5.   In May 2009, Katami and Zarrillo applied for a marriage license from the State of California but were denied because they are a same-sex couple.

PFF 6.   As a result of Prop. 8, Katami and Zarrillo are barred from marrying the individual they wish to marry.

### B.   City and County of San Francisco

PFF 7.   Plaintiff-Intervenor the City and County of San Francisco ("CCSF") is a charter city and county organized and existing under the Constitution and laws of the State of California.

PFF 8.   Plaintiff-Intervenor is responsible for issuing marriage licenses, performing civil marriage ceremonies, and maintaining vital records of marriages.

PFF 9.   In February 2004, San Francisco Mayor Gavin Newsom instructed county officials to issue marriage licenses to same-sex couples.  The California Supreme Court ordered the city to stop doing so the following month, and it later nullified the marriages that had been performed.  *Lockyer v. City & County of San Francisco*, 95 P.3d 459 (Cal. 2004).

PFF 10.   In March 2004, CCSF filed a separate state court action challenging the California marriage statutes' exclusion of same-sex couples under the State Constitution, and in May 2008 the California Supreme Court ruled in favor of CCSF and held that counties including CCSF were entitled and indeed required to issue marriage licenses to same-sex couples.  From June 17, 2008 until the passage of Prop. 8, Plaintiff-Intervenor issued thousands of marriage licenses to same-sex couples who applied for them during that period.

PFF 11.   Prop. 8 requires Plaintiff-Intervenor to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

Gibson, Dunn & Crutcher LLP

**C.**     **Defendants and Their Role in Enforcing Prop. 8 and Denying Marriage Licenses**

PFF 12.     Arnold Schwarzenegger ("Schwarzenegger") is the Governor of the State of California.

PFF 13.     Edmund G. Brown, Jr. ("Brown") is the Attorney General of the State of California.

PFF 14.     Mark B. Horton ("Horton") is the Director of the California Department of Public Health and the State Registrar of Vital Statistics of the State of California.  In his official capacity, Horton is responsible for prescribing and furnishing the forms for the application for license to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

PFF 15.     Linette Scott ("Scott") is the Deputy Director of Health Information & Strategic Planning for the California Department of Public Health.  Scott reports to Defendant Horton and is the California Department of Public Health official responsible for prescribing and furnishing the forms for the application for license to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

PFF 16.     Patrick O'Connell ("O'Connell") is the Clerk-Registrar for the County of Alameda and is responsible for maintaining vital records of marriages, issuing marriage licenses, and performing civil marriage ceremonies.

PFF 17.     Dean C. Logan ("Logan") is the Registrar-Recorder/County Clerk for the County of Los Angeles and is responsible for maintaining vital records of marriages, issuing marriage licenses, and performing civil marriage ceremonies.

**D.**     **Proponents and Their Role in the Prop. 8 Campaign**

PFF 18.     Dennis Hollingsworth, Gail J. Knight, Martin F. Gutierrez, Hak-Shing William Tam, and Mark A. Jansson are the "Official Proponents" of Prop. 8.

Gibson, Dunn & Crutcher LLP

PFF 19.    By approving the language and submitting the forms, Proponents became the "Official Proponents" of Prop. 8 within the meaning of California law.

PFF 20.    Proponents dedicated substantial time, effort, reputation, and personal resources in campaigning for Prop. 8.

PFF 21.    Near the beginning of this initiative process, the Official Proponents helped to establish ProtectMarriage.com—Yes on 8, a Project of California Renewal ("ProtectMarriage") as a "primarily formed ballot measure committee" under the California Political Reform Act.

PFF 22.    ProtectMarriage exists with one purpose: to support Prop. 8.  It was directly responsible for all aspects of the campaign to qualify Prop. 8 for the ballot and enact it into law.

PFF 23.    The ProtectMarriage executive committee has included at least the following individuals: Ron Prentice, Yes on Prop. 8 Campaign Chairman; Edward Dolejsi, Executive Director, California Catholic Conference; Mark A. Jansson; and Andrew Pugno, General Counsel.  In addition, David Bauer is the Treasurer and officer of record for ProtectMarriage.

PFF 24.    ProtectMarriage is a "broad coalition" of individuals and organizations, including the Church of Jesus Christ of Latter-Day Saints, the California Catholic Conference, a large number of evangelical churches, and many powerful national political organizations.  These coalition members often made their own statements and efforts in support of Prop. 8, but most of their campaign activity and messaging were coordinated through the sophisticated campaign structure of ProtectMarriage.

PFF 25.    The Yes on 8 campaign comprised national and state coalition members working in concert to pass Prop. 8.

PFF 26.    The LDS Church was part of the Yes on 8 campaign and provided extensive grassroots and monetary support.

4

PFF 27.    Catholic organizations were part of the Yes on 8 campaign and provided extensive grassroots and monetary support.

PFF 28.    Evangelical Pastors, under the name of ProtectMarriageCA and led by The Pastor's Rapid Response Team, were a part of the Yes on 8 campaign and produced three simulcasts, funded and supported by ProtectMarriage.com, that used discriminatory statements to motivate voters to support Prop. 8.

PFF 29.    Other powerful national organizations were a part of the Yes on 8 campaign.

PFF 30.    The Traditional Family Coalition, Bill Tam's group, was a member of the Yes on 8 campaign and frequently used discriminatory statements to motivate voters to support Prop. 8.

## II.    The Meaning of Marriage, "The Most Important Relation in Life"

### A.    Supreme Court Holdings Regarding the Fundamental Right to Marry

PFF 31.    The right to marry is a fundamental right protected by the due process clause. *Loving v. Virginia*, 388 U.S. 1, 12 (1967). The fundamental right at stake is properly characterized as the "right to marry."

PFF 32.    The U.S. Supreme Court has repeatedly described the right to marriage as "one of the vital personal rights essential to the orderly pursuit of happiness by free men"; a "basic civil right"; a component of the constitutional rights to liberty, privacy, association, and intimate choice; an expression of emotional support and public commitment; the exercise of spiritual unity; and a fulfillment of one's self.

PFF 33.    "The Supreme Court cases discussing the right to marry do not define the right at stake in those cases as a subset of the right to marry depending on the factual context in which the issue presented itself. For example, *Loving* addressed marriage; not interracial or opposite-race marriage. . . . *Turner v. Safley* discusses marriage; not marriage involving inmates in penal institutions." (Doc # 228 at 79-80.)

5

PFF 34.   The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men and is deeply meaningful to individuals, families, communities, and the State of California.

PFF 35.   The right of two consenting adults to marry is deeply rooted in the history and tradition of this Nation, and the right to marry is a significant liberty interest.

PFF 36.   The right to privacy and personal autonomy is also a fundamental right. *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).  Similarly, the freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause.

**B.     The Changing Institution of Marriage**

PFF 37.   Civil marriage has never been a static institution.  Historically, it has changed, sometimes dramatically, to reflect the changing needs, values, and understanding of our evolving society.

PFF 38.   Proponents' experts, Mr. Blankenhorn and Dr. Young, agreed that "the institution of marriage is constantly evolving" and "always changing."

PFF 39.   The institution of marriage has served numerous purposes.  Among the purposes that marriage and its regulation by civil authorities have served over this county's history are facilitating governance, creating public order and economic benefit, creating stable households, legitimating children, assigning care-providers and thus limiting the public's liability to care for the vulnerable, and facilitating property ownership and inheritance.

PFF 40.   Marriage serves at least one purpose today that it did not serve at the founding of the country in 1789:  It serves to create a private arena—a zone of liberty, privacy, and intimacy for the partners within it.

PFF 41.   In the United States, the institution of marriage has evolved to reflect changing attitudes towards sex discrimination, including sex-role stereotyping.  For example,

6

*Gibson, Dunn & Crutcher LLP*

the marital doctrine of *coverture*, by which a married woman lost her independent legal status and vanished into the authority of her husband, has been eliminated. The inequality between men and women under *coverture* was once seen as essential to marriage, but it was eliminated in response to the demands of economic modernization and changing values.

PFF 42.   For couples who consent to marry today, marriage has been transformed from an institution rooted in gender inequality and gender-based prescribed roles to one in which the contracting parties decide on appropriate behavior toward one another, and the sex of the spouses is immaterial to their legal obligations and benefits. Put another way, marriage has changed significantly to meet ethical needs of sex equity, in that it is no longer marked by gender asymmetry.

PFF 43.   In the United States, the institution of marriage has also evolved to reflect changing attitudes toward race discrimination. During the slave-holding era, slaves had no right to marry, and laws restricting marriage between whites and persons of color were passed by several of the original colonies and by as many as 41 states and territories. Now, citizens enjoy full civil rights regardless of race, and legal restrictions on racial intermarriage have been struck down as unconstitutional.

PFF 44.   California enacted the nation's first complete no-fault divorce law, removing consideration of marital fault from the grounds for divorce, awards of spousal support, and division of property. The enactment of no-fault divorce was quickly embraced nationally as a means of dealing honestly with marital breakdowns, achieving greater equality between men and women within marriage, and advancing further the notion of consent and choice as to one's spouse. This sweeping change reflected contemporary views that continuing consent to marriage was essential.

PFF 45.   As two economists have definitively shown, extrapolating from the rate at which divorce incidence rose during the century 1860-1960, the annual divorce rate in 2005

7

Gibson, Dunn & Crutcher LLP

was approximately the same as it would have been in the absence of the no-fault system.

PFF 46. Eliminating racial restrictions on marriage and the doctrine of *coverture* have not deprived marriage of its vitality and importance as a social institution.

PFF 47. "The argument that recognition of same-sex marriage simply opens the door to incestuous or polygamous marriage ignores that there may well be compelling state interests against recognizing these other forms of relationships, including preventing exploitation and abuse. Nor is it clear why . . . same-sex marriage (and not, for example, infertile marriage) opens the door to require state recognition of polygamy and incest. Whatever prevents California now from recognizing the marriage of a brother and a sister would likewise stop it from recognizing the marriage of two sisters in the absence of Proposition 8." (Doc # 228 at 81.)

PFF 48. Marriage has also had different or evolving meanings in other societies. For example, in Indian society, a group known as the Hijras had a tradition of marriages by same-sex couples for at least two centuries. Similarly, Native American tribes had a tradition of such marriages among those known as the berdache. And lesbian marriages have been documented in West Africa and in China among silk workers in the nineteenth century. In addition, marriages by same-sex couples were documented among the Roman emperors.

## C. Marriage Restrictions Historically Have Been Discriminatory

PFF 49. Under the marital doctrine of *coverture*, a married woman lost her independent legal status and vanished into the authority of her husband. The inequality between men and women under *coverture* was once seen as essential to marriage.

PFF 50. Slaves had no right to marry, and laws restricting marriage between whites and persons of color were passed by several of the original colonies and by as many as 41 states and territories. Supporters of such racial restrictions, including courts in the late

8

nineteenth century, usually responded when such laws were challenged by saying that there was no discrimination involved: both blacks and whites were equally forbidden from marrying each other.  Such restrictions on racial intermarriage have been struck down as unconstitutional.  These developments in the institution of marriage paralleled larger social changes that eliminated slavery and recognized racial equality.

PFF 51.   California was the first state to strike down racial restrictions on marriage as unconstitutional in *Perez v. Sharp*, 198 P.2d 17 (1948).  The United States Supreme Court in *Loving v. Virginia,* 388 U.S. 1 (1967), ended the nearly 300-year history of race-based legislation on marriage by declaring racial restrictions on marriage unconstitutional.

PFF 52.   Limiting marriage to opposite-sex couples could promote gender stereotypes that in other contexts have long been rejected as an illegitimate basis for legal classifications.

PFF 53.   Heterosexual marriage was traditionally organized around a gender-based division of labor, with the husband as the primary earner and the wife as the primary homemaker and caregiver for children.

PFF 54.   Early American marriage was founded on presumptions of a so-called "natural" division of labor along gender lines—notions that men alone were suited for certain types of work, women alone for other types of work, and that the household needed both to ensure both kinds of work could be done—that are not relevant to today's society.

PFF 55.   Notions of "traditional marriage" are based upon the idea that women can and should play distinct roles in the marital relationship and/or in raising children that cannot be performed by men and vice versa.

PFF 56.   These notions are grounded, in part, on the discriminatory belief that marriage is dependent on gender role stereotypes, suggesting that men and women should play different and gender-based roles in marriage and child rearing.

9

*Gibson, Dunn
& Crutcher
LLP*

PFF 57.    Proponents' arguments for Prop. 8 include that allowing gay and lesbian couples to marry will lead to confusion about gender identity, suggesting that Proponents associate homosexuality with a disruption of traditional gender roles, and that denying gay and lesbian couples the right to marry is based in certain beliefs about sex.

PFF 58.    Similarly Proponents' arguments for Prop. 8 include that children need both a father and a mother, indicating that Proponents believe women and men should or necessarily do perform different parental roles based on their gender.

**D.    Marriage Has Never Been Limited to Procreative Unions in California**

PFF 59.    The ability or willingness of married couples to produce progeny has never been necessary for marriage validity in American law.

PFF 60.    Proponents' expert, Mr. Blankenhorn, admitted that a couple who does not wish to have sex may marry, and that an incarcerated man may marry even if he is not allowed to consummate the relationship.

PFF 61.    Marriage is not now, and has never in this State been, limited to those who are capable of procreating.  The State has never established as a legal requirement for marriage that the members of the couple be fertile, of child-bearing age, physically or mentally healthy, or intent on having or raising children.  In addition, Proponents' expert, Mr. Blankenhorn, testified that approximately 38 percent of children in the United States are born to unmarried parents.  In short, procreation does not require marriage, and marriage does not require procreation.

**E.    There Are No Marriage Exclusions Based on Past Conduct**

PFF 62.    Under California law, murderers, child molesters, rapists, serial divorcers, spousal abusers, and philanderers are permitted to marry.

PFF 63.    The United States Supreme Court has recognized that the right to marry extends to convicted criminals in prison and rejected as unconstitutional a law that prevented prison inmates from getting married.  *See Turner v. Safley*, 482 U.S. 78, 99 (1987).

10

**III.    The Exclusion of Gay and Lesbian People from Marriage in California**

      **A.    California Marriage Law Before *In re Marriage Cases***

PFF 64.    Proposition 22 was enacted by California voters in 2000.  It added section 308.5, which stated "Only marriage between a man and a woman is valid or recognized in California," to the Family Code.

      **B.    Rights Afforded to Gay and Lesbian Individuals in California**

          **1.    Domestic Partnership Confers Many of the Same Substantive Benefits as Marriage**

PFF 65.    Since 1999, California has permitted same-sex couples to register as Domestic Partners.

PFF 66.    The State of California has, at times, expanded the rights and responsibilities of Registered Domestic Partners.

PFF 67.    The California Legislature has found that lesbians and gay men have faced, many lesbian and gay couples "have formed lasting, committed, and caring relationships" and, like heterosexual couples, same-sex couples "share lives together, participate in their communities together, and many raise children and care for other dependent family members together."  The Legislature also has found that "expanding the rights and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises."  2003 Cal. Stats. ch. 421, § 1(b).

PFF 68.    A couple who registers as domestic partners is not married under California law, and registered domestic partners in the State of California are not recognized as married by the United States government.  Registered domestic partners are denied numerous federal marriage benefits

PFF 69.    The qualifications and requirements for entering into or dissolving domestic partnership differ from the qualifications and requirements for entering into or dissolving a marriage.

### 2.    Gay and Lesbian People Can Have, Adopt, and Parent Children

PFF 70.    Same-sex couples are legally permitted to have and raise children through assisted reproduction, adoption, and foster parenting in the State of California.

PFF 71.    California law expressly authorizes adoption by unmarried same-sex couples.

PFF 72.    Many same-sex couples in California are raising children.  Many of California's adopted children live with a lesbian or gay parent, and as of the 2000 census, approximately 18 percent of same-sex couples in California were raising approximately 37,300 children under the age of 18.  This was so despite the absence of any legal recognition of same-sex relationships by the State of California until 1999.

PFF 73.    California freely permits and encourages gay and lesbian individuals to have children through laws that allow such methods of reproduction and permit lesbians and gay men to be foster parents and to adopt children.  In these respects, same-sex couples are indistinguishable from the many opposite-sex couples in California who use these same methods to bring children into their lives to love and raise as their own.  The only difference between these couples is that same-sex couples cannot marry, and they and their children therefore do not enjoy all the social and other benefits that the title and stature of marriage bring; whereas, opposite-sex couples can marry, and they and their children can enjoy these benefits.

### 3.    Gay and Lesbian Californians Are Entitled to Equal Treatment in the Workplace, Housing, and Public Accommodations

PFF 74.    The California Supreme Court has found that California's "current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and

Gibson, Dunn
& Crutcher
LLP

are protected from discrimination on the basis of their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

PFF 75.   The Unruh Civil Rights Act prohibits discrimination on the basis of sexual orientation in the provision of services by any business establishment.

PFF 76.   The California Government Code prohibits sexual orientation discrimination in employment and housing.  The California Government Code also prohibits discrimination on the basis of sexual orientation in any program or activity that is conducted, operated, or administered by the State or receives financial assistance from the State.

## C.   *In re Marriage Cases*

PFF 77.   On May 15, 2008, the California Supreme Court decided *In re Marriage Cases*, which held that Family Code sections 300 and 308.5 were unconstitutional under the privacy, due process, and equal protection guarantees of the California Constitution.

PFF 78.   The California Supreme Court found that "[t]he ability of an individual to join in a committed, long-term, officially recognized family relationship with the person of his or her choice is often of crucial significance to the individual's happiness and well-being."  *In re Marriage Cases*, 183 P.3d 384, 424 (Cal. 2008).

PFF 79.   The California Supreme Court also found that "[t]he state's current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation, and, more specifically, recognize that gay individuals are fully capable of entering into the kind of loving and enduring committed relationships that may serve as the foundation of a family and of responsibly caring for and raising children."  *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

13

Gibson, Dunn & Crutcher LLP

PFF 80.   The California Supreme Court further found that "[i]n light of the fundamental nature of the substantive rights embodied in the right to marry—and their central importance to an individual's opportunity to live a happy, meaningful, and satisfying life as a full member of society—the California Constitution properly must be interpreted to guarantee this basic civil right to *all* individuals and couples, without regard to their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 427 (Cal. 2008) (emphasis in original).

PFF 81.   The California Supreme Court similarly found that "[b]ecause a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment." *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

PFF 82.   The California Supreme Court also found that "because of the long and celebrated history of the term 'marriage' and the widespread understanding that this term describes a union unreservedly approved and favored by the community, there clearly is a considerable and undeniable symbolic importance to this designation." *In re Marriage Cases*, 183 P.3d 384, 445 (Cal. 2008).

PFF 83.   In addition, the California Supreme Court found that creating a separate domestic partnership regime for same-sex couples "perpetuat[ed] a more general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *In re Marriage Cases*, 183 P.3d 384, 402 (Cal. 2008).

PFF 84.   The California Supreme Court also found that classifications based on sexual orientation are entitled to heightened scrutiny under California law. *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

14

PFF 85.   As a result of the *In re Marriage Cases* ruling, California's statutory exclusion of gay and lesbian individuals from civil marriage was invalidated, same-sex couples were permitted to marry in the State, and marriages of same-sex couples began on or about June 16, 2008.  Approximately 18,000 marriages of same-sex couples were performed prior to November 5, 2008.

**D.   The Prop. 8 Campaign and Passage**

PFF 86.   On June 2, 2008, the Secretary of State declared that Prop. 8 could be placed on the ballot.

PFF 87.   The Prop. 8 measure was titled: "Eliminates Rights of Same-Sex Couples to Marry. Initiative Constitutional Amendment."

PFF 88.   The General Election Voter Information Guide stated that Prop. 8 would "[c]hange[] the California Constitution to eliminate the right of same-sex couples to marry in California."

PFF 89.   On November 4, 2008, California voters passed Prop. 8 by a margin of approximately 52.3% to 47.7%.

PFF 90.   Prop. 8 does not purport to, and does not, change or alter any holding in *In re Marriage Cases* that heightened scrutiny applies to classifications based on sexual orientation.

PFF 91.   Prop. 8 added the following text to the Constitution of California: "Only marriage between a man and a woman is valid or recognized in California."

PFF 92.   In their Politics Magazine article, Frank Schubert and Jeff Flint attributed the success of their campaign to their message that marriage between individuals of the same sex would threaten "religious freedom" and "individual freedom of expression," and would result in the forced teaching of gay marriage in public schools.  They also

15

*Gibson, Dunn & Crutcher LLP*

claimed that their "ability to organize a massive volunteer effort through religious denominations gave [them] a huge advantage."

PFF 93.   Prop. 8 went into effect on November 5, 2008, and since that date, same-sex couples have been denied marriage licenses.

PFF 94.   To the extent that opponents of Prop. 8 used boycotts, protests, and picketing to express their opposition, such tactics are an acceptable exercise of their First Amendment rights and are often used by groups who lack power in the political process.

PFF 95.   Supporters of Prop. 8 used threats and intimidation against opponents of Prop. 8, and credible witnesses testified to such incidents.

**E.      After Prop. 8, Whether Two People Can Marry Turns Entirely on Their Sex**

PFF 96.   Marrying a person of the opposite sex is not a realistic option for gay and lesbian individuals.

PFF 97.   Prop. 8 discriminates against gay and lesbian individuals on the basis of their sex.

PFF 98.   Under Prop. 8, whether two individuals can marry is directly based on the sex of those individuals involved.  Under Prop. 8, a man is permitted to marry a woman where a woman would be prohibited from doing so, and vice-versa.  The distinguishing characteristic is the sex of the people involved.

**F.      *Strauss v. Horton***

PFF 99.   On November 5, 2008, three separate suits were filed to invalidate Prop. 8, and they were consolidated into *Strauss v. Horton*, Nos. S168047, S168066, S168078.  The main issue raised in *Strauss* was whether Prop. 8 constituted a revision to the California Constitution, as opposed to an amendment.

PFF 100.  The California Supreme Court heard oral argument in *Strauss v. Horton* on March 5, 2009 and issued its ruling on May 26, 2009.  That ruling upheld Prop. 8, but also

16

1    upheld the 18,000 marriages of same-sex couples performed in California prior to the

2    enactment of Prop. 8.

3  **PFF 101.**    Proponents admit that if any marriages of same-sex couples currently recognized by

4    the State of California as married end by reason of death or divorce, the gay and

5    lesbian individuals in those marriages would not be allowed to remarry.  The ruling in

6    *Strauss v. Horton* therefore created a patchwork regulatory regime with respect to

7    marriage in California that involves at least *five* categories of individuals:  Those in

8    opposite-sex couples, who are permitted to marry, and to remarry upon divorce; those

9    who comprise the 18,000 same-sex couples who were married after the California

10    Supreme Court's decision in the *Marriage Cases* but before the enactment of Prop. 8,

11    whose marriages remain valid but who are not permitted to remarry upon divorce; and

12    those who are in unmarried same-sex couples, who are prohibited by Prop. 8 from

13    marrying and restricted to the status of domestic partnership.  In addition, California

14    Family Code §§ 308(b) and (c), signed into law in 2009, creates two additional

15    categories of individuals:  those same-sex couples who entered into a valid marriage

16    outside of California *before* November 5, 2008 are treated as married under California

17    law, but are not permitted to remarry within the state upon divorce; and those same-

18    sex couples who entered into a valid marriage outside of California *on or after*

19    November 5, 2008 are granted the rights and responsibilities of marriage, but not the

20    designation of "marriage" itself.  In effect, there are now five types of relationships—

21    and five classes of individuals—recognized under California law.

22    **G.**    ***Perry v. Schwarzenegger***

23  **PFF 102.**    Plaintiffs filed their Complaint on May 22, 2009 and a Motion for Preliminary

24    Injunction on May 27, 2009.  The Court denied Plaintiffs' Motion for Preliminary

25    Injunction on July 2, 2009.

26

27

28

*Gibson, Dunn
& Crutcher
LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S AMENDED PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW

PFF 103.    Defendant-Intervenors Proposition 8 Proponents and ProtectMarriage filed a Motion to Intervene on May 28, 2009, which was granted on July 2, 2009.

PFF 104.    Plaintiff-Intervenor City and County of San Francisco filed a Motion to Intervene on July 23, 2009, which was granted on August 19, 2009.

PFF 105.    Proponents filed a Motion for Protective Order on September 15, 2009.  The Court denied, in part, Proponents' Motion for Protective Order on October 1, 2009 and ordered Proponents to produce certain non-public documents relating to the Yes on 8 campaign.

PFF 106.    Proponents filed a Motion for Summary Judgment on September 9, 2009.  The Court denied the Motion on October 14, 2009.

PFF 107.    Proponents filed a Motion to Realign Defendant Edmund G. Brown, Jr., Attorney General of California, as a Plaintiff in this matter on October 2, 2009.  The Court denied Proponents' Motion on December 23, 2009.

## IV.    The Denial of Marriage Rights Causes Plaintiffs and Other Gay and Lesbian Individuals Grievous Injuries and Drains the Public Fisc

### A.    Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples

PFF 108.    Civil marriage is a deeply meaningful institution to individuals, families, communities, and the State of California.  Enhanced by government recognition for so long, legal marriage is a symbol of privilege.  The idea that marriage was a happy ending, the ultimate reward, the sign of adult belonging, and the definitive expression of love and commitment is deeply engrained in our society.  Nothing has the same meaning, obligations, rights, and benefits except marriage itself.  Moreover, marriage is a primary source of well-being for adults in the United States.

18

Gibson, Dunn & Crutcher LLP

PFF 109.    Marriage brings with it many tangible legal rights, privileges, benefits, and obligations to the married individuals, and that it also confers significant intangible benefits to the married individuals.

PFF 110.    The word "marriage" has a unique meaning, and there is a significant symbolic disparity between domestic partnership and marriage.

PFF 111.    Indeed, children aspire to be married, not to be domestic partners.

PFF 112.    There are meaningful differences in the actual practice of registered domestic partnerships, civil unions, and marriage.  Marriage is a valued social institution, and married couples are treated differently than unmarried couples.  Creating a separate institution of domestic partnership stigmatizes same-sex couples and sends a message of inferiority to these couples, their children, and lesbian and gay men generally.  This stigma increases the likelihood that lesbians and gay men will experience discrimination and harassment in schools, employment, and other settings.

PFF 113.    The California Supreme Court has noted at least nine ways in which statutes concerning marriage differ from corresponding statutes concerning domestic partnerships.

PFF 114.    The public recognition that attends marriage, the legal obligations created by marriage, and the emotional and tangible investments that spouses make in their joint relationship serve as deterrents to relationship dissolution.

PFF 115.    Mr. Blankenhorn, one of Proponents' experts, agreed that many positive outcomes would probably flow from allowing same-sex couples to marry, including that "a higher proportion of gays and lesbians would choose to enter into committed relationships," "more stability and . . . longer-lasting relationships for committed same-sex couples."

PFF 116.    Civil unions and domestic partnerships are not equivalent to the well-established and highly valued institution of marriage, and same-sex couples show a clear preference

19

Gibson, Dunn & Crutcher LLP

for marriage over civil unions and domestic partnerships.  In California, same-sex couples are significantly less likely to enter into domestic partnerships than to enter into marriages because domestic partnerships do not offer the same dignity, respect, and stature as marriage.

PFF 117.    Thousands of same-sex couples—including many who were already registered as domestic partners—married in California during the months in 2008 when marriage was a legal option for them, and many same-sex couples have traveled long distances across state and national borders to legally marry.  Survey data show that large numbers of lesbian, gay, and bisexual Americans want to marry.

PFF 118.    Marriage has considerable social meaning.  Getting married has been seen as reaching adulthood, as having grown up, and it is a very esteemed status.  Indeed, the individual's ability to consent to marriage is the mark of the free person and possession of basic civil rights.

PFF 119.    Marriage correlates with a variety of measurable health and protective benefits that extend to children, women, and men.  And many same-sex couples would benefit both physically and psychologically from marriage just as their heterosexual counterparts do.

PFF 120.    Laws are perhaps the strongest of social structures that uphold and enforce stigma.  Laws can be understood as a form of structural stigma.

PFF 121.    Prop. 8 is a part of the structural stigma—it reflects and propagates the stigma that gay and lesbian individuals do not have intimate relations similar to those that heterosexual couples have.  Prop. 8 conveys the State's judgment that a same-sex couple possesses an "undesired differentness" and is inherently less deserving of society's full recognition through the status of civil marriage than are heterosexual couples.  This according of disadvantaged status to the members of one group relative to another is the crux of stigma, and the distinction between same-sex and different-

20

sex couples is stigmatizing even when same-sex couples are granted most of the legal benefits and obligations conferred by marriage through domestic partnerships. Irrespective of such benefits, the "differentness" of domestic partnerships, compared to the historic and highly respected designation of "marriage," is evident.  And the exclusion of gay and lesbian individuals from the institution of civil marriage necessarily relegates them to second-class status—Prop. 8, in effect, communicates the official view that same-sex couples' committed relationships are of a lesser stature than the comparable relationships of opposite-sex couples.

PFF 122.   Prop. 8 thus sends a message to gay and lesbian individuals that they are not welcome in California, and it endorses society's rejection of gay and lesbian relationships.

PFF 123.   The widespread prejudice, discrimination, and violence to which lesbians and gay men are often subjected are significant health concerns.  Sexual prejudice, sexual orientation discrimination, and antigay violence are major sources of stress for lesbian, gay, and bisexual people.

PFF 124.   Stress can be defined as something that happens that requires a person to adapt to a new situation, such as loss of a job.  Minority stress, in turn, is the added or unique stress to which gay, lesbian, and bisexual people are exposed.  They are exposed to this unique stress by virtue of their stigmatized status in society, and such exposure increases the risk for mental disorders in gay and lesbian individuals as compared with heterosexual individuals.

PFF 125.   There are four pathways or processes through which minority stress manifests itself in the lives of sexual minorities (*i.e.*, gays, lesbians, and bisexuals): (1) prejudice events, (2) expectations of prejudice or rejection, (3) concealment, and (4) internalized homophobia.

PFF 126.   The testimony of plaintiffs and other witnesses detailed many such prejudice events. Prejudice events include major incidents such as physical violence and abuse, but also

21

*Gibson, Dunn & Crutcher LLP*

include every day occurrences that might, in isolation, seem more minor, but can have significant negative effects when taken together and over time. For example, gay and lesbian individuals regularly are confronted with situations where it is embarrassing and difficult to explain their status or relationships, such as forms that they must complete where there is no "box" that reflects their status. Even jurors in litigation are regularly asked about their marital status, a question that might be difficult and awkward for gay men and lesbians to address.

PFF 127.    Similarly, there were many examples of expectations of prejudice and resulting vigilance in the testimony of plaintiffs and other witnesses.

PFF 128.    Many lesbians, gays, and bisexuals experience minority stress through concealing their sexual orientation, and there were multiple examples of this in the testimony of plaintiffs and other witnesses.

PFF 129.    Plaintiffs' own testimony also evidences the final minority stress process, internalized homophobia.

PFF 130.    The exclusion of gay and lesbian individuals from the institution of civil marriage inflicts on them and their children humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

PFF 131.    The testimony of plaintiffs and other witnesses demonstrates the harm they suffered as a result of Prop. 8, the campaign, and not being able to be married.

PFF 132.    Stigma has a serious impact on the health of gay and lesbian individuals in the United States by causing stress and disease. This has been recognized by public health authorities including Healthy People 2010, which sets health priorities for the United States.

Gibson, Dunn & Crutcher LLP

**B.    Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples**

PFF 133.    In addition to social and psychological harms, Prop. 8 imposes substantial economic harms on same-sex couples residing in California and their children.

PFF 134.    Denying same-sex couples the right to marry and permitting them to only register as domestic partners imposes a substantial economic cost on gay and lesbian individuals. Similarly, permitting same-sex couples to marry would lead to a substantial economic gain for individuals in same-sex couples.

PFF 135.    Because domestic partnership is inferior to marriage and upholds and enforces the stigma attached to same-sex couples, it reduces the degree of commitment of partners and potential partners, and reduces the incentive to invest in surplus-enhancing behaviors.

PFF 136.    Proponents' expert, Mr. Blankenhorn, admitted that allowing gay and lesbian individual to marry would decrease promiscuity, increase stability of same sex couples' relationships, and decrease "marriage-lite" regimes.

PFF 137.    Compared to allowing same-sex couples to marry in California, domestic partnership results in the creation of a smaller surplus in the relationship.

PFF 138.    The reduced incentive associated with domestic partnership as compared to marriage is reflected in lower utilization of domestic partnership and in a lesser development of specialized skills in the relationship than would occur within marriage.

PFF 139.    That gay and lesbian individuals have continued to press for the right to marry in jurisdictions in which some form of civil union of domestic partnership is already available suggests that they do not see civil unions and domestic partnerships as comparable to marriage.

23

PFF 140.   The long-term nature of marriage encourages spouses to increase household efficiency by dividing their labor in ways that increase the family's productivity in producing goods and services by family members.

PFF 141.   Same-sex couples are economically interdependent in ways and to an extent similar to, not different from, different-sex couples.

### C.   Harm to Children from Denial of Marriage to Same-Sex Couples

PFF 142.   Marriage uniquely legitimizes children and provides them with a sense of security, stability, and increased well-being.

PFF 143.   Marriage provides many tangible and intangible benefits to the married individuals. Certain tangible and intangible benefits of marriage flow to the married couple's children.

PFF 144.   Because same-sex couples cannot marry, they and their children do not enjoy all the social and other benefits that the title and stature of marriage bring.

PFF 145.   Prohibiting same-sex couples from marrying actually harms children, including the children of gay and lesbian couples.

PFF 146.   Creating a separate institution of domestic partnership stigmatizes same-sex couples and sends a message of inferiority to these couples, their children, and lesbian and gay men generally.

PFF 147.   Prop. 8 imposes substantial economic harms on same-sex couples residing in California and their children.

### D.   Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples

PFF 148.   Local governments like San Francisco suffer a series of intangible injuries from Prop. 8's prohibition on marriage between persons of the same sex.  This marriage ban limits the ability of local governments to ensure that their citizens are treated equally

24

Gibson, Dunn & Crutcher LLP

regardless of sexual orientation, which in turn harms the community in general and gay and lesbian citizens in particular.

PFF 149.   Prop. 8 requires local governments to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

PFF 150.   Notwithstanding California's domestic partnership law, its denial of marriage to same-sex couples increases the likelihood that Plaintiff-Intervenor's citizens will depend on local health and welfare programs, and imposes fiscal and economic costs on Plaintiff-Intervenor, such as through loss of tax revenues related to the denial of marriage.

PFF 151.   Plaintiffs' experts, Dr. Egan and Dr. Badgett, testified that Prop. 8 has had a negative economic impact on the City of San Francisco and the State of California.

PFF 152.   Prop. 8 deprives the State of California and its local governments of tax revenue generated by consumer spending on the weddings and wedding-related events that same-sex couples would hold if permitted to marry.  For example, at least in the short term, San Francisco loses an estimated $35 million in total annual economic activity and an estimated $2.6 million in tax revenue from diminished wedding-related spending.  In the next three years, the State of California will lose an estimated $491.2 million in direct spending and $38.9 million in tax revenue from diminished wedding-related spending.

PFF 153.   Taken together, Prop. 8 and federal laws restricting marriage to different-sex couples impose federal income tax burdens on same-sex couples that are not borne by different-sex couples.  Such laws also deprive same-sex couples of federal entitlements and benefits, such as Social Security survivor benefits.  These burdens in turn negatively impact the State of California and its local governments because of the loss of state and local tax revenue that result from higher federal taxes and lower

Gibson, Dunn & Crutcher LLP

1    federal benefits as well as increased numbers of Californians qualifying for means-

2    tested programs for low-income people.

3    PFF 154.    As a general matter, institutional discrimination against gay and lesbian individuals

4    increases social service costs to governments that provide such services.  Two

5    examples illustrate this point.  First, the number of uninsured Californians is higher

6    than it would be if same-sex couples could marry, and this imposes a financial burden

7    on State and local governments that reimburse providers for uncompensated care.

8    Second, local governments like San Francisco are providers of health services and

9    incur higher health costs because of Prop. 8 in two regards.  In providing health

10   benefits to uninsured residents, local governments are the insurer of last resort for

11   members of same-sex couples who do not receive insurance through their partners'

12   employers because they are not married.  And because of the links between

13   institutional discrimination and greater consumption of health services by targets of

14   that discrimination, local governments like San Francisco expend disproportionate

15   amounts on specialized health services for gay and lesbian individuals.

16   PFF 155.    To the extent that institutional discrimination against gay and lesbian individuals also

17   decreases their physical and economic well-being and productivity, it reduces

18   employees' commitment to working in California.  It also decreases state and local

19   government revenue because this revenue is tied to the productivity of their

20   workforces.

21

22   PFF 156.    Prop. 8 will likely make it more difficult for California to attract and retain highly

23   skilled workers.

24   PFF 157.    In order to combat the discriminatory effects of California's ban on marriages of

25   same-sex couples, the City and County of San Francisco mandates that its contractors

26   and vendors must offer benefits to domestic partners of their employees that are equal

27   to those benefits offered to employees' spouses.  This ordinance was costly to defend

28

Gibson, Dunn
& Crutcher
LLP

1     from legal challenges and results in ongoing higher contracting and procurement costs

2     for San Francisco.

PFF 158.    Also in order to combat discrimination based on sexual orientation, the California

Department of Fair Housing and Employment has incurred costs of approximately

$1.5 million since 2004 in investigating claims of discrimination in housing and

employment.

## V.    Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws

### A.    Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples

PFF 159.    Gay and lesbian individuals, including Plaintiffs, have formed lasting, committed, and

caring relationships with persons of the same sex, and same-sex couples share their

lives and participate in their communities together.  Gay and lesbian individuals,

including Plaintiffs Perry and Stier, also raise children together.

PFF 160.    Gay and lesbian individuals possess the same potential and desire for sustained loving

and lasting relationships as heterosexuals.

PFF 161.    Social science research clearly establishes that same-sex couples closely resemble

heterosexual couples both in terms of the quality of their relationships and the

processes that affect their relationships.  Similarly, studies have found same-sex and

heterosexual couples to be equivalent to each other on measures of relationship

satisfaction and commitment.

PFF 162.    Loving relationships between persons of the same sex are equal in worth and dignity

to loving relationships between persons of the opposite sex.

PFF 163.    Same-sex couples wish to marry for many of the same reasons that opposite-sex

couples marry, including the desire to raise, nurture, and protect children.

27

*Gibson, Dunn
& Crutcher
LLP*

**B.      Same-Sex Couples Contribute to Society in All the Ways That Opposite-Sex Couples Do**

PFF 164.      Same-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities and bears no relation to a person's ability to perform or contribute to society.

PFF 165.      Same-sex couples contribute to society in the workplace and the economy, in the public sector, in the non-profit sector, and as citizens.

PFF 166.      Like heterosexuals, gay men and lesbians are racially and ethnically diverse; live throughout the State; have families similar to heterosexual families; are gainfully employed and thus contribute to the State's economy; accounting for education (and gender discrimination), have incomes similar to heterosexuals; pay proportionately more taxes than their heterosexual counterparts; and contribute in myriad ways to the communities in which they live.

**VI.      Sexual Orientation Is a Fundamental Aspect of a Person's Identity**

**A.      Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder**

PFF 167.      Sexual orientation refers to an enduring pattern or disposition to experience sexual, affectional, or romantic desires for and attractions to men, women, or both sexes.  The term is also used to refer to an individual's sense of personal and social identity based on those desires and attractions, behaviors expressing them, and membership in a community of others who share them.

PFF 168.      Proponents' assertions that sexual orientation cannot be defined is both contrary to the weight of the evidence, and also contrary to a common-sense and intuitive understanding of sexual orientation.

PFF 169.      The vast majority of people are consistent in their attraction, behavior, and identity.

Gibson, Dunn & Crutcher LLP

PFF 170.   Although sexual orientation ranges along a continuum from exclusively heterosexual to exclusively homosexual, it is usually discussed in terms of three categories: heterosexual, homosexual, and bisexual.

PFF 171.   Sexual orientation is commonly discussed as a characteristic of the individual, like biological sex, gender identity, race, or age.  Although this perspective is accurate insofar as it goes, it is incomplete because sexual orientation is always defined in relational terms and necessarily involves relationships with other individuals.  Sexual acts and romantic attractions are characterized as homosexual or heterosexual according to the biological sex of the individuals involved in them, relative to each other.  Indeed, it is by acting with another person—or expressing a desire to act—that individuals express their heterosexuality, homosexuality, or bisexuality.

PFF 172.   Proponents' assertion that sexual orientation is distinct from race in that it is fluid and can be changed is contrary to the weight of the evidence, as explained by Dr. Herek, Dr. Meyer, and various professional organizations.

PFF 173.   Mainstream mental health professionals and researchers have long recognized that homosexuality is a normal expression of human sexuality.  Indeed, the American Psychiatric Association removed homosexuality from the *DSM* in 1973, stating that "homosexuality *per se* implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  The American Psychological Association adopted the same position in 1975, and urged all mental health professionals to help dispel the stigma of mental illness that had long been associated with homosexual orientation.

PFF 174.   Sexual orientation is fundamental to a person's identity and is the kind of distinguishing characteristic that defines gay and lesbian individuals as a discrete group.

29

*Gibson, Dunn & Crutcher LLP*

**B.    Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm**

PFF 175.    People generally exercise little or no choice about their sexual orientation, and there is no credible evidence that sexual orientation can or should be changed.

PFF 176.    Proponents' assertions that sexual orientation is fluid and can be changed are based on a selective reading of statements taken out of context, and are contrary to the weight of the current and historical evidence.

PFF 177.    No major mental health professional organization has sanctioned efforts to change sexual orientation, and virtually all of them have adopted policy statements cautioning the profession and the public about treatments that purport to change sexual orientation.  To date, there has been no scientifically adequate research to show that therapy aimed at changing sexual orientation (sometimes called reparative or conversion therapy) is safe or effective.  Indeed, the scientifically adequate research indicates otherwise.

PFF 178.    The 2009 Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation, the result of a thorough review and analysis of the relevant literature, demonstrates, among other things, that "enduring change to an individual's sexual orientation is uncommon."

PFF 179.    Many professional organizations have recognized that efforts to change sexual orientation of adolescents are cause for special concern.

PFF 180.    Dr. Herek agrees with Proponents' own (withdrawn) expert on "immutability," who admitted, among other things, that homosexuality is "refractory" and that enduring change to one's sexual orientation change is uncommon.

PFF 181.    Sexual orientation and sexual identity are so fundamental to one's identity that a person should not be required to abandon them.  Forcing an individual to change his or her sexual orientation would infringe on "the protected right of homosexual adults to

30

Gibson, Dunn & Crutcher LLP

engage in intimate, consensual conduct," which is "an integral part of human freedom." *Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003).

PFF 182.    The promotion of change therapies reinforces stereotypes and contributes to a negative climate for lesbian, gay, and bisexual persons.

PFF 183.    Further, it can be harmful to an individual to attempt to change his or her sexual orientation.

## VII.    There Is a Long History of Discrimination Against Gay and Lesbian Individuals, and That Discrimination Persists Today

PFF 184.    Gay and lesbian individuals have experienced and continue to experience discrimination in the United States.  They have been executed for being homosexual, classified as mental degenerates, targeted by police, discriminated against in the workplace, censored, demonized as child molesters, excluded from the United States military, arrested for engaging in private sexual relations, and have repeatedly had their fundamental state constitutional rights stripped away by popular vote.

PFF 185.    Discrimination against gay and lesbian individuals in the United States has deep historical roots, stretching back at least to colonial American times.

PFF 186.    Through much of the twentieth century, in particular, gay and lesbian individuals suffered under the weight of medical theories that treated their desires as a disorder, penal laws that condemned their consensual adult sexual behavior as a crime, and federal policies and state regulations that discriminated against them on the basis of their homosexual status.  These state policies and ideological messages worked together to create and reinforce the belief that gay and lesbian individuals were an inferior class to be shunned by other Americans.

PFF 187.    Gay and lesbian individuals also continue to face violence motivated by anti-gay bias. The FBI reported 1,260 hate crime incidents based on perceived sexual orientation in 1998, and 1,265 in 2007.  In 2008, a national coalition of anti-violence social service

31

agencies identified 29 murders motivated by the assailants' hatred of lesbian, gay, bisexual, or transgender people.

PFF 188.  Gay and lesbian individuals have been subject to more hate crimes motivated by bias against their sexual orientation in California since 2004 than women, who are members of a protected class, have been subjected to hate crimes motivated by their gender.

PFF 189.  As one of Proponents' experts, Dr. Miller, admitted, the persecution suffered by gay and lesbian individuals in the United States has been severe. Indeed, hostility towards gay and lesbian individuals has resulted not only in discrimination, but also physical danger.

PFF 190.  The medical establishment identified homosexuality as a "disease," "mental defect," "disorder," or "degeneration." Until the American Psychiatric Association removed homosexuality from its list of disorders in 1973, such hostile medical pronouncements provided a powerful source of legitimization to anti-homosexual sentiment.

PFF 191.  The sexual orientation of gay and lesbian individuals has been associated with a stigma of inferiority and second-class citizenship, manifested by the group's history of legal and social disabilities.

PFF 192.  The social marginalization of gay and lesbian individuals gave the police and the public broader informal authority to harass them. The threat of violence and verbal harassment deterred many gay and lesbian individuals from doing anything that might reveal their homosexuality in public.

PFF 193.  In 1950, following Senator Joseph McCarthy's denunciation of the employment of gay persons in the State Department, the Senate conducted a special investigation into "the employment of homosexuals and other sex perverts in government." The Senate Committee recommended excluding gay men and lesbians from all government service, civilian as well as military. The Senate investigation and report were only

32

1    part of a massive anti-homosexual campaign launched by the federal government after

2    the war.

PFF 194.    Many state and local governments followed the federal government's lead in seeking

to ferret out and discharge their homosexual employees.

PFF 195.    Moreover, a series of press and police campaigns in the 1940s and 1950s fomented

demonic stereotypes of homosexuals as child molesters out to recruit the young into

their way of life.  At the time, these demonic new stereotypes were used to justify

draconian new legislation as well as stricter enforcement of existing laws.

PFF 196.    Throughout the early and mid-twentieth Century, gay and lesbian characters and

issues were censored from theatrical productions and movies.  State and federal

officials banned gay and lesbian publications from the mail.  Newspaper stand and

book store owners that carried gay and lesbian content risked being shut down or

arrested.  Censorship, government suppression, and the fear of both curtailed gay

people's freedom of speech and the freedom of all Americans to discuss gay issues.

These conditions made it difficult for gay and lesbian individuals to organize and

speak out on their own behalf.  As a result, censorship stymied and delayed

democratic debate about homosexuality for more than a generation.

PFF 197.    In 1977, Anita Bryant's "Save Our Children" campaign convinced a majority of

Miami voters to repeal a newly enacted gay rights ordinance in Dade County, Florida.

This campaign depended heavily on the use of the images of homosexuals as child

molesters so prevalent in the postwar years.  Her organization published a full-page

advertisement the day before the vote warning that the "other side of the homosexual

coin is a hair-raising pattern of recruitment and outright seductions and molestation."

This campaign's victory inspired other such campaigns, and in the next three years,

gay rights laws were struck down in more than half a dozen referenda.

Gibson, Dunn & Crutcher LLP

1 PFF 198.  The themes and messages from the "Save Our Children" campaign were echoed by

2       Proponents' Yes on 8 campaign.

3 PFF 199.  Recent studies indicate that on a yearly basis, over 200,000 California students suffer

4       harassment based on actual or perceived sexual orientation.  Many of those were

5       harassed several times.

6 PFF 200.  The approval of California's Prop. 8, along with similar laws and constitutional

7       amendments in at least 33 other states indicates the enduring influence of anti-gay

8       hostility and the persistence of ideas about the inequality of gay people and their

9       relationships.

10

11 PFF 201.  Groups that oppose gay rights continue to address homosexuality as a dangerous and

12       inferior condition that threatens children and imperils the stability of the American

13       family—a viewpoint at odds with the notion that gay and lesbian individuals and their

14       relationships are fully equal to those of heterosexuals.

**VIII. Gay and Lesbian Individuals Lack Political Power to Defend Their Basic Rights When They Are Put Up for a Vote in a State-Sanctioned Plebiscite**

17 PFF 202.  Gay and lesbian individuals have historically lacked the political power to ensure

18       protection through the political process, and they still lack the political power to fully

19       ensure that protection.

20 PFF 203.  There are only three openly gay members of the U.S. House of Representatives and no

21       openly gay Senators; there are no openly gay governors; and no openly gay person has

22       ever been appointed to a Cabinet Secretary position.  Gay and lesbian individuals are

23       thus underrepresented among elected political officials relative to their national

24       population share.

25 PFF 204.  Gay and lesbian individuals have been unable to secure national legislation to protect

26       themselves from discrimination in housing, employment, or public accommodations.

27

28

34

*Gibson, Dunn & Crutcher LLP*

PFF 205.    Fewer than half of the states ban sexual orientation discrimination in employment, housing, and/or accommodations.

PFF 206.    The President and Vice President of the United States do not support allowing same-sex couples to marry.

PFF 207.    Nationwide, the initiative process has targeted gay and lesbian individuals more times than any other social group or political minority.  Indeed, nationwide, voters have used initiatives or referenda to repeal or prohibit marriage rights for gay and lesbian individuals 33 times.  Gays and lesbians have essentially lost 100 percent of the contests over marriage.

PFF 208.    Gay and lesbian individuals constitute one of the least popular minorities in American society, with the American public reporting significantly more negative feelings toward them than to most other minority groups.

PFF 209.    Forty-three percent of Americans said that they would not vote for a generally qualified homosexual presidential candidate nominated by their party, versus 4% who would not vote for a woman and 11% who would not vote for a black person.

PFF 210.    In 2008, a majority of Americans believed that sex between two persons of the same sex is always wrong.

PFF 211.    Political mobilization by gay and lesbian individuals is hampered because members of the community are generally invisible unless they have "come out," an act with social costs.

PFF 212.    Elected officials and candidates for elected office have made public statements expressing prejudice and hostility toward gay and lesbian individuals in a manner that would be almost inconceivable against any other minority of Americans.

Gibson, Dunn & Crutcher LLP

PFF 213.  Gay and lesbian individuals are politically disadvantaged by the willingness of legislators and voters to support policies imposing disabilities on them based on religious teachings that homosexuality is sinful.

PFF 214.  Proponents' expert Dr. Young admitted that religious hostility to gays and lesbians plays an important role in creating a social climate that is conducive to hateful acts, to opposition to their interest in the public sphere, and to prejudice and discrimination. In addition, their expert Dr. Miller has written that "[r]eligion was critical in determining voter attitudes towards Proposition 8."

PFF 215.  The gay community suffers from greater political disabilities today than women did in the 1970s when they were afforded quasi-suspect status by the Supreme Court.  Before they were afforded quasi-suspect status by the Supreme Court, women had achieved important victories in the political process, including coverage in the 1964 Civil Rights Act and its subsequent amendments.

PFF 216.  When women were afforded quasi-suspect status by the Supreme Court, although sexism existed and political activism could be costly, identity as a woman was not socially controversial, did not attract familial scorn, and did not bar one from a large range of social institutions, though some institutions were exclusively male.  Women could freely identify one another, gather, coordinate, and act largely free of fear of repressive tactics.

PFF 217.  In the last two decades, anti-gay referenda and initiatives have been widely used to challenge gay rights laws.  Since 1992, initiatives to repeal or block anti-discrimination laws have gone on the ballots in approximately 60 city and county jurisdictions.  In Oregon alone, there were sixteen local anti-gay initiatives in 1993 and another eleven in 1994.  Oregon's gay activists lost all but one.

PFF 218.  Nationwide, there were 143 initiatives or referenda from the 1970s through 2005 relating to gay civil rights, and gay rights supporters lost over 70% of them.

Gibson, Dunn & Crutcher LLP

PFF 219.   In 1996, the United States Senate passed the Defense of Marriage Act (DOMA), which provided a federal definition of marriage as the union of one man and one woman and declared that no state needed to give "full faith and credit" to marriages of same-sex couples performed in another state. It also denied federal benefits to such married couples. And more than 20 states passed state-level DOMA statutes over the next two years.

PFF 220.   In 2004, when Massachusetts became the first state to permit gay couples to marry, thirteen states passed constitutional amendments banning such marriages.

PFF 221.   Today, in at least 28 states, there is no statutory barrier to firing, refusing to hire, or demoting a person in private sector employment solely on the basis of their identity as a gay man or lesbian.

PFF 222.   Proponents called Dr. Miller, and the Court permitted Dr. Miller to testify, as an expert on American and California politics generally and the political power of gays and lesbians. Dr. Miller disagreed with Dr. Segura and testified that, in his opinion, gays and lesbians have political power.

PFF 223.   Dr. Miller's opinion is undermined by the fact that he (i) has not focused on LGBT issues in his research or study, (ii) has not read many of the sources that would be relevant to forming an opinion regarding the political power of gays and lesbians, and (iii) could not confirm that he personally identified even 25 percent of the sources that he cited in his expert report.

PFF 224.   Dr. Miller's opinion is also undermined by his admissions that (i) he has no basis to compare the political power of gays and lesbians to the power of minority groups that are already entitled to heightened levels of scrutiny, including African-Americans and women; (ii) African-Americans are also not politically powerless in his opinion; and (iii) lesbians suffer from greater stereotyping and prejudice than women as a whole.

Gibson, Dunn & Crutcher LLP

PFF 225.   Dr. Miller's opinion is also undermined by the following:  (1) his  concession that gays and lesbians have suffered severe discrimination that continues today; (2) his concession that the extent of prejudice and discrimination faced by a minority group is relevant to evaluating whether that minority group has political power; and (3) Mr. Blankenhorn's admission that "homophobia is a real presence in our society."

PFF 226.   Dr. Miller's credibility was further undermined by the fact that opinions he offered at trial were inconsistent with opinions he expressed before he was retained as an expert, including as recently as mid-2009.

PFF 227.   Dr. Miller's testimony was also contradicted by his previous writings that homosexuals, like other minorities, are vulnerable and powerless in the initiative process, which contradict his trial testimony that he disagrees with Dr. Segura's testimony that gays and lesbians are politically vulnerable with respect to the initiative process.  In fact, Dr. Miller has repeatedly written that minority groups, including gays and lesbians, are vulnerable in the initiative process and that initiatives can easily tap into a strain of anti-minority sentiment in the electorate.

PFF 228.   The persuasiveness of Dr. Miller's opinion is also undermined by his admission that gays and lesbians continue to be subject to discrimination and prejudice at both the federal and state level, and that this is reflected both in federal statutes and Prop. 8 itself.  Indeed, Dr. Miller admitted that "at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice."

## IX.   Prop. 8 Does Not Promote Any Legitimate Governmental Interest

### A.   Proponents' Proffered Interests

PFF 229.   Before trial, Proponents listed 23 governmental interests allegedly served by Prop. 8 and 23 "very likely" harms it would prevent.  Doc #295 at 6-8, 9-11 (Proponents' Trial Mem.).  All of those interests can be grouped into five general categories of interests that have been articulated by Proponents throughout the proceedings:  (1) promotion

38

of the formation or stability of "naturally procreative unions"; (2) preventing the "deinstitutionalization" of marriage; (3) promoting achievement of good child adjustment outcomes; (4) administrative convenience; and (5) protecting the First Amendment rights of religious liberty and freedom of speech of groups that oppose marriage by gay and lesbian individuals.

### B.   Proponents' Purported Evidence

PFF 230.   Proponents elected not to have the majority of their designated witnesses testify at trial.  Proponents withdrew one of their designated experts before trial began and four other designated experts on the first day of trial.  Indeed, Proponents waited until the morning of Monday, January 11, 2010—after the Supreme Court had already granted a stay of this Court's order permitting broadcast of the proceedings—to announce in a two sentence letter that they "no longer intend to call as witnesses Dr. Paul Nathanson, Dr. Loren Marks, Dr. Daniel Robinson, and Dr. Katherine Young."  Although Proponents' counsel stated in open court on Friday, January 15, 2010, that their witnesses "were extremely concerned about their personal safety, and did not want to appear with any recording of any sort, whatsoever," this assertion was entirely unsupported by any evidence at all and was not, on its face, credible.  Proponents had notice of the possibility that the proceedings would be publicly broadcast as early as September 2009.  In addition, the Court announced its decision to broadcast the proceedings on January 6, 2010, but the Supreme Court issued a temporary stay of the Court's order on January 11, 2010—*before* Proponents' counsel sent a letter to all counsel withdrawing four of their experts.  The Supreme Court issued its indefinite stay on January 13, 2010, and then this Court on January 14 withdrew this case from the Ninth Circuit's pilot program, well before Proponents had even called their first witness.  Thus, from at least January 14 on, Proponents and their witnesses knew for a fact that these proceedings would not be broadcast to the public in any form. Proponents made no effort to call any witnesses other than Mr. Blankenhorn and Dr.

39

Gibson, Dunn & Crutcher LLP

1     Miller after the Court withdrew its request to broadcast the proceedings to other

2     federal courthouses and made clear that no such broadcast would take place.

3     Proponents' decision to withdraw any of their experts was therefore a tactical decision

4     unrelated to the Court's decision to broadcast the proceedings to several other federal

5     courthouses.  Indeed, all of the experts withdrawn by Proponents made damaging

6     admissions in their depositions, and Plaintiffs' counsel predicted at the pre-trial

7     hearing in December 2009 that Proponents would seek to withdraw their experts

8     because of the vigorous cross-examination they had faced in deposition and would

9     face at trial.

10 PFF 231.     Proponents called two witnesses to testify at trial:  Dr. Kenneth Miller and Mr. David

11     Blankenhorn.  The Court permitted Dr. Miller to testify as an expert on American and

12     California politics generally and the political power of gays and lesbians, and Dr.

13     Miller's testimony did not concern purported governmental interests allegedly served

14     by Prop. 8.

15 PFF 232.     The Court permitted Mr. Blankenhorn to testify as an expert concerning the subjects

16     of marriage, fatherhood, and family structures.  Mr. Blankenhorn offered four

17     opinions:  (1) marriage has traditionally been defined as between a man and a woman

18     and tied to sexual reproduction; (2) marriage as an institution "is not the creation of

19     religion" or otherwise attributable to anti-homosexual prejudice; (3) the optimal

20     environment for raising children is by two biological parents; and (4) permitting same-

21     sex couples to marry would further deinstitutionalize marriage.

22

23 PFF 233.     Mr. Blankenhorn's expertise with regard to the four opinions he advanced at trial is so

24     limited that these opinions are unreliable and entitled to relatively little weight.

25     Specifically, Mr. Blankenhorn conceded that (i) his purported expertise was based on

26     his study of the writings and analysis of others, (ii) he read relatively few of the

27     studies on which numerous professional organizations' support for marriage equality

28

40

are based, and (iii) he had no or limited expertise based on his education, training or experience.

PFF 234.   Mr. Blankenhorn's testimony is not credible.  He was unable or unwilling to answer many questions directly, and he was defensive in many of his answers.  This included questions concerning the materials that he had identified in his report and purported to rely upon to formulate his opinions.  Mr. Blankenhorn's demeanor and combativeness undermined his credibility as an expert and the reliability of his opinions concerning the purported governmental interests identified by Proponents and the purported harms of permitting same-sex couples to marry.

PFF 235.   With respect to the "rules" of marriage identified by Mr. Blankenhorn—the rule of opposites, the rule of two, and the rule of sex—the reasoning and historical support was strained to the point of breaking, revealing substantial variations in the forms and functions of marriage behind the seeming consistency offered by the term "rules." This is consistent with the fact that marriage has never been a static institution.

PFF 236.   The sources cited and relied upon by Mr. Blankenhorn in forming his opinions— largely writings by anthropologists and sociologists—generally do not consider the issue of marriage by same-sex couples, and confirm that marriage is a flexible institution that has been used in ways inconsistent with Mr. Blankenhorn's purported "rules" and that has changed over time.

PFF 237.   Beyond Mr. Blankenhorn, who was Proponents' only witness who advanced any argument that Prop. 8 serves any purported government interests, Proponents' assertions that such interests exist are conclusory and not supported by any evidence. To the extent that documents offered by Proponents may themselves advance arguments as to certain purported government interests, the Court does not credit these arguments because (i) they were not tested by cross-examination, and (ii) they are not supported by any data or other evidence that shows there is any relationship between

41

1     such interests and removing same-sex couples' right to marry.  In fact, the evidence

2     demonstrates that Prop. 8's actual motivation was moral disapproval of gay and

3     lesbian individuals.

**C.     The Evidence Demonstrates That Prop. 8 Does Not Promote Any Legitimate
Governmental Interest**

**1.     Excluding Same-Sex Couples From Marriage Does Not Promote the
Formation or Stability of "Naturally Procreative Unions"**

PFF 238.     In their Trial Memorandum, Proponents claimed that the evidence will show that Prop.

8 furthers the following interests:  (1) "Promoting the formation of naturally

procreative unions"; and (2) "Promoting stability and responsibility in naturally

procreative relationships."  Doc #295 at 7-8.  Proponents further claimed that the

evidence would show that Prop. 8 prevents related harm because allowing same-sex

couples to marry would "[m]ove marriage further away from its grounding in

reproduction and the intergenerational cycle."  *Id.* at 10.  Proponents presented no

credible, reliable evidence that excluding same-sex couples from marriage would

promote these interests or prevent this alleged "harm." Moreover, the evidence

presented at trial demonstrates that marriage is not tied to sexual reproduction.

PFF 239.     Marriage is not now, and has never in this State been, limited to those who are capable

of procreating.  The State has never established as a legal requirement for marriage

that the members of the couple be fertile, of child-bearing age, physically or mentally

healthy, or intent on having or raising children.  California has permitted different-sex

couples to marry regardless of whether they in fact intend to have children, that

California for a time permitted same-sex couples to marry, and that other states and

countries have also permitted same-sex couples to marry.  In short, procreation does

not require marriage, and marriage does not require procreation.

PFF 240.     Mr. Blankenhorn's opinion that marriage has traditionally been tied to sexual

reproduction is not credible, reliable, or entitled to substantial weight, particularly in

42

light of Mr. Blankenhorn's other testimony.  As Mr. Blankenhorn recognized, there are and have been different views concerning the institution of marriage; marriage has not always or uniformly been understood to be a procreation-centric institution.

PFF 241.   Mr. Blankenhorn testified that he recognized that numerous authors and sources that have evaluated marriage by gay and lesbian couples have expressly recognized the historical flexibility of marriage and the fact that it transcends the purported "rule" that marriage is limited to promoting procreation and the relationship between children and both of their biological parents.

PFF 242.   Moreover, Mr. Blankenhorn admitted that a couple who does not wish to have sex may marry, and that an incarcerated man may marry even if he is not allowed to consummate the relationship.

### 2. Excluding Same-Sex Couples from Marriage Does Not Further Any Interest in Preventing the "Deinstitutionalization" of Marriage

PFF 243.   In their Trial Memorandum, Proponents claimed that the evidence would show that Prop. 8 furthers the following interests:  (1) "Preserving the traditional institution of marriage as the union of a man and a woman";  (2) "Preserving the traditional public, social, and legal meaning and symbolism of marriage"; (3) "Preserving the traditional social and legal purposes, functions, and structure of marriage"; (4) "Preserving the traditional meaning of marriage as it has always been defined in the English language"; (5) "Expressing support for the traditional institution of marriage"; (6) "Acting incrementally and with caution when considering a radical transformation to the fundamental nature of a bedrock social institution"; (7) "Decreasing the probability of weakening the institution of marriage"; and (8) "Decreasing the probability of adverse consequences that could result from weakening the institution of marriage." Doc #295 at 7.  Proponents further claimed that the evidence would show that Prop. 8 prevents a number of related harms because allowing same-sex couples to marry allegedly would:  (1) "Entail the further, and in some respects full,

43

deinstitutionalization of marriage"; (2) "Change the legal and public meaning of marriage from an institution with defined legal and social structure and purposes to a right of personal expression"; (3) "Contribute over time to the further erosion of the institution of marriage, as reflected primarily in lower marriage rates, higher rates of divorce and non-marital cohabitation, and more children raised outside of marriage and separated from at least one of their natural parents"; (4) "Increase the social acceptability of other alternative forms of intimate relationships, such as polyamory and polygamy"; (5) Increase the likelihood that the recognition as marriages of other alternative forms of intimate relationships, such as polyamory and polygamy, will become a judicially enforceable legal entitlement"; (6) "Legally enshrine the principle that sexual orientation, as opposed to sexual embodiment, is a valid determinant of marriage's structure and meaning"; (7) "Increase the likelihood that bisexual orientation could become a legitimate grounding for a legal entitlement to group marriage"; (8) "Require all relevant branches and agencies of government formally to replace the idea that marriage centers on opposite-sex bonding and male-female procreation with the idea that marriage is a private relationship between consenting adults"; (9) "Either end altogether, or significantly dilute, the public socialization of heterosexual young people into a marriage culture"; (10) "Cause many Americans opposed to same-sex marriage to abandon some or all of those public institutions that promote the new definition of marriage, probably resulting in the weakening of those institutions and a further rending of our common culture"; (11) "Contribute to the public belief that marriage in our society is now politicized"; (12) "Result in unmarried people increasingly, and logically, complaining that the legal and practical benefits currently attached to marriage properly belong to everyone"; (13) "Seriously threaten the functions and symbolism of marriage, thereby posing a risk to children and the demographic continuity of society"; and (14) "Lead to changes in the laws governing marriage and parallel institutions in a manner that undercuts the

44

Gibson, Dunn & Crutcher LLP

effectiveness of marriage in achieving its traditional purposes." *Id*. at 9-11. Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these purported interests or prevent these alleged "harms," and the evidence presented at trial demonstrates that allowing gay and lesbian individuals to marry will not harm the institution of marriage.

PFF 244.   Permitting same-sex couples the right to marry does not meaningfully restrict options available to heterosexuals.

PFF 245.   There is no reputable evidence suggesting that the exclusion of same-sex couples from marriage increases the stability of opposite-sex marriage or that including same-sex couples destabilizes opposite-sex marriages.

PFF 246.   Excluding same-sex couples from marriage does not optimize the child-rearing environment of married opposite-sex couples.

PFF 247.   There is no support for the notion that allowing same-sex couples to marry would harm heterosexual relationships.  There is similarly no scientific basis for asserting that legalizing marriage for same-sex couples would affect the underlying processes that foster stability in heterosexual marriages.  Allowing same-sex couples to marry will not lead heterosexuals to abandon the institution of marriage.

PFF 248.   Proponents have set forth no evidence that permitting same-sex couples to marry would transform marriage as an institution.  Proponents' expert, Mr. Blankenhorn, conceded that he could not prove that permitting same-sex couples to marry would have any actual impact on the institution of marriage.  And Proponents' counsel admitted that Proponents "don't know" whether allowing same-sex couples to marry would harm heterosexual relationships.

PFF 249.   Mr. Blankenhorn admitted and agreed that "today the principle of equal human dignity must apply to gay and lesbian persons," and "[i]n that sense, insofar as we are a nation founded on this principle, we would be more American on the day we permitted same-

45

sex marriage than we were on the day before." (Emphasis added.) He also admitted that permitting marriage by same-sex couples would be a "victory for the worthy ideas of tolerance and inclusion" and a "victory for . . . the American idea."

PFF 250.    There is no evidence that there has been any harm to the institution of marriage as a result of allowing same-sex couples to marry. Evidence from the Netherlands suggests that the marriage rate, divorce rate, and nonmarital birth rate were not affected by permitting same-sex couples to marry beginning in 2001.

PFF 251.    In the five years that marriage has been open to couples of the same sex in Massachusetts, the divorce rate has not increased; in fact, the Massachusetts divorce rate is the lowest in the nation.

PFF 252.    During the same time period in which voters in numerous states have acted to exclude gay and lesbian individuals from marriage, those same voters have failed to undertake similar initiatives targeted at other issues that far more directly affect the institution, such as divorce or infidelity, where those initiatives would affect not only gay and lesbian individuals, but the heterosexual majority as well.

PFF 253.    Mr. Blankenhorn's opinion that permitting same-sex couples to marry would further deinstitutionalize marriage is not credible, reliable, or entitled to substantial weight. Mr. Blankenhorn's opinion lacks any actual basis, is inconsistent with Mr. Blankenhorn's writings, and is contrary to the opinions of other experts who testified, whose opinions are credible and reliable. Mr. Blankenhorn cited no evidence either of the potential for or the implications of "deinstitutionalization" as a result of allowing same-sex couples to marry, and he admitted that he had not conducted any scientific studies to support any of his opinions.

PFF 254.    As Mr. Blankenhorn admitted during cross examination, most of the articles cited by him at trial say nothing about deinstitutionalization, and the two that do refer to deinstitutionalization as a concept do not suggest either that deinstitutionalization has

46

occurred elsewhere as a result of allowing same-sex couples to marry, that it will
occur in the future, or that if it does occur it will have adverse effects.

PFF 255.   Moreover, neither Mr. Blankenhorn, nor any other witness or document advanced by
Proponents addressed or rebutted the substantial evidence put forth by Dr. Cott and
Dr. Badgett specific to Massachusetts, the Netherlands, and elsewhere, that allowing
same-sex couples to marry has not caused any adverse effects, whether associated with
"deinstitutionalization" or otherwise.  Mr. Blankenhorn testified that the increased
deinstitutionalization caused by allowing same-sex couples to marry would be
reflected in "higher rates of non-participation in marriage, higher rates of fragility of
one-parent homes, divorce [and] divorced non-marital cohabitation or children outside
of charge and so forth."  Dr. Cott and Dr. Badgett offered opinions on those same
topics, based on data.  The opinion expressed by both Dr. Cott and Dr. Badgett—that
there will be no adverse consequences—is credible and reliable, and the
unsubstantiated and uninformed opinion of Mr. Blankenhorn is neither credible, nor
reliable.  Accordingly, even if Mr. Blankenhorn's purported concerns about the
importance of marriage and the institution of marriage were well-founded, there is no
evidence that Prop. 8's withdrawal of the right of same-sex couples to marry bears any
relationship to these concerns.

PFF 256.   Further, consistent with Dr. Cott's credible testimony and reliable opinion, Mr.
Blankenhorn acknowledged in his testimony that the institution of marriage has
changed over time.

PFF 257.   Mr. Blankenhorn's opinion that allowing same-sex couples to marry would otherwise
harm the institution of marriage is also undermined by his own prior writings.

PFF 258.   Mr. Blankenhorn admitted that allowing gays and lesbian individuals to marry "would
be likely to improve the well-being of gay and lesbian households and their children"

47

Gibson, Dunn
& Crutcher
LLP

and would benefit opposite-sex couples, children, and society in general in many ways.

### 3. Excluding Same-Sex Couples from Marriage Does Not Promote Achievement of Good Child Adjustment Outcomes

PFF 259.    In their Trial Memorandum, Proponents claimed that the evidence would show that Prop. 8 furthers the following interests:  (1) "Promoting enduring and stable family structures for the responsible raising and care of children by their biological parents"; (2) "Increasing the probability that natural procreation will occur within stable, enduring, and supporting family structures"; (3) "Promoting the natural and mutually beneficial bond between parents and their biological children"; (4) "Increasing the probability that each child will be raised by both of his or her biological parents"; and (5) "Increasing the probability that each child will be raised by both a father and a mother."  Doc # 295 at 7-8.  Proponents further claimed that the evidence would show that Prop. 8 prevents a number of related harms because allowing same-sex couples to marry allegedly would:  (1) "Require explicit public endorsement of the idea that a child does not really need both a mother and a father, likely resulting in fewer children growing up with fathers"; (2) "Eradicate in law, and weaken further in culture the idea that what society favors—that what is typically best for the child, the parents, and the community—is the natural mother married to the natural father, together raising their children, likely resulting over time in smaller proportions of children being raised by their own, married mothers and fathers"; (3) "Publicly replace the idea that parenting is largely gendered, ideally involving both a mother and a father, with the idea that parenting is largely unisex, likely resulting in fewer men believing it is important for them to be active, hands-on parents of their children"; (4) "Contribute to replacing the norm of the natural parent with the norm of the legal parent, likely resulting in a growing disjuncture between the biological and legal-social dimensions of parenthood and a significant expansion of the power of the state to determine who is entitled to

48

parental rights"; and (5) "Send a message to men that they have no significant place in family life, weakening the connection of fathers to their children." *Id.* at 9-10. Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these alleged interests or prevent these purported "harms," and the evidence presented at trial demonstrates that prohibiting gay and lesbian individuals to marry will not promote the achievement of good child adjustment outcomes.

PFF 260.    Same-sex couples are raising children and have the same potential and desire as heterosexual couples to love and parent children.

PFF 261.    Social science has shown that the concerns often raised about children of lesbian and gay parents are generally grounded in unfounded prejudice and stereotypes.  Indeed, there is no scientific basis for concluding that the outcomes for children raised by gay and lesbian parents are any different from their counterparts.

PFF 262.    Proponents' experts do not dispute that professional organizations with expertise in this area have concluded that neither gender nor sexual orientation is relevant to one's ability to be a good parent.

PFF 263.    Children and adolescents raised by same-sex parents are as likely to be well-adjusted as children and adolescents raised by heterosexual parents.

PFF 264.    Dr. Lamb's uncontroverted testimony establishes that it is the quality of the parenting, not the gender of the parents, that matters for child adjustment and well-being.

PFF 265.    Indeed, it is well established that both men and women have the capacity to be good parents, and that having parents of both genders does not enhance child or adolescent adjustment.  Similarly, there is no empirical support for the notion that the presence of both male and female role models in the home promotes children's adjustment or well-being.

49

PFF 266.   There is no difference between the ability of a same-sex couple to provide a healthy, positive child-rearing environment and the ability of an opposite-sex couple to provide such an environment. The well-being of children is not contingent on the parents' sexual orientation.

PFF 267.   Studies of personality, self-concept, and behavior problems show few differences between children of lesbian mothers and children of heterosexual parents. Evidence indicates that children of lesbian and gay parents have normal social relationships with their peers and adults. The picture that emerges from this research shows that children of gay and lesbian parents enjoy a social life that is typical of their age group in terms of involvement with peers, parents, family members, and friends.

PFF 268.   There is no scientific support for fears about children of lesbian or gay parents being sexually abused by their parents or their parents' gay, lesbian, or bisexual friends or acquaintances.

PFF 269.   Excluding same-sex couples from marriage actually harms the objective of providing an optimal child-rearing environment for all children, including the children of gay and lesbian couples who have been denied the rights and status attendant to civil marriage.

PFF 270.   Marriage uniquely legitimizes children and provides them with a sense of security, stability and increased well-being.

PFF 271.   Social science research has found that having a gay or lesbian parent does not affect the development of a child's sexual and gender identities (including gender identity, gender-role behavior, and sexual orientation).

PFF 272.   Beliefs that lesbian and gay adults are not fit parents have no empirical foundation.

PFF 273.   Mr. Blankenhorn's opinion that the optimal environment for raising children is by two biological parents is not credible, reliable, or entitled to substantial weight because (i) his purported expertise is based on his study of the writings and analysis of others; (ii)

50

he had no or limited expertise based on his education, training, and experience; and (iii) he could offer no evidence contrary to Dr. Lamb's conclusion that children of same-sex parents are as well-adjusted as children of heterosexual parents.  Indeed, Mr. Blankenhorn's opinion is contradicted by other, more credible, evidence and his own testimony.  Dr. Lamb's opinion was that children and adolescents raised by same-sex parents are as likely to be well-adjusted as children and adolescents raised by heterosexual parents, and that opinion is credible and reliable.

PFF 274.   The evidence introduced by Proponents does not support Mr. Blankenhorn's conclusion that there is a large body of scholarship stating that the optimal child outcome occurs when children are raised by their natural mothers and fathers.

PFF 275.   The research that opponents of allowing gay and lesbian couples to marry use to support their contention that gay and lesbian individuals are not fit parents is not based on studies involving same-sex parents.

PFF 276.   Indeed, the research on "intact families" treats the biological link as irrelevant by considering adoptive and biological parents as part of the same cohort.

PFF 277.   Children are advantaged by increasing the durability of the relationship of the people raising them, and the durability of the relationship of a gay couple is enhanced by permitting the gay couple to marry.

PFF 278.   Marriage increases the commitment in and stability of a relationship regardless of whether it is a gay, lesbian, or heterosexual relationship.

PFF 279.   Prop. 8 does not change California's laws and policies that permit gay and lesbian individuals to have, adopt, or raise children.

PFF 280.   Mr. Blankenhorn admitted that allowing gay and lesbian couples to marry would be likely to "improve the well-being of gay and lesbian households and their children." He testified allowing same-sex couples to marry would result in fewer children growing up in state institutions and more children being raised by loving parents, and

51

1   would in fact reduce the divorce rate, reduce promiscuity, improve the stability of

2   couples' relationships, increase wealth for families and lead to a decline in "anti-gay

3   prejudice" and "anti-gay hate crimes."

### D.   There Is No Evidence That Excluding Gay and Lesbian Individuals From Marriage Promotes Administrative Convenience

PFF 281.   In their Trial Memorandum, Proponents claimed that the evidence will show that Prop.
8 furthers the following interests:  (1) "Using different names for different things"; (2)
"Maintaining the flexibility to separately address the needs of different types of
relationships"; (3) "Ensuring that California marriages are recognized in other
jurisdictions"; and (4) "Conforming California's definition of marriage to federal
law."  Doc # 295 at 7-8.  Proponents presented no credible, reliable evidence that
excluding same-sex couples from marriage would further these purported interests,
and the evidence presented at trial demonstrates that Prop. 8 does not further them.

PFF 282.   Relationships of same-sex couples are not "different" from relationships between
opposite-sex couples in any meaningful or relevant way.  In fact, same-sex couples
form lasting, committed relationships and are fundamentally similar to opposite-sex
couples.

PFF 283.   Prop. 8 does not further any purported state interest in administrative convenience
because it has resulted in a crazy quilt of marriage regulations in the State that
involves five categories of citizens:  (1) Those in opposite-sex couples, who are
permitted to marry, and to remarry upon divorce; (2) those who comprise the 18,000
same-sex couples who were married after the California Supreme Court's decision in
the *Marriage Cases* but before the enactment of Prop. 8, whose marriages remain
valid but who are not permitted to remarry upon divorce; (3) those who are in
unmarried same-sex couples, who are prohibited by Prop. 8 from marrying and
restricted to the status of domestic partnership; (4) those same-sex couples who
entered into a valid marriage outside of California *before* November 5, 2008 are

52

treated as married under California law, but are not permitted to remarry within the state upon divorce; and (5) those same-sex couples who entered into a valid marriage outside of California *on or after* November 5, 2008 are granted the rights and responsibilities of marriage, but not the designation of "marriage" itself.

**E.**     **Excluding Same-Sex Couples from Marriage Does Not Further Any Alleged Interest in Protecting the First Amendment Rights of Those Who Oppose Allowing Them to Marry**

PFF 284.     In their Trial Memorandum, Proponents claimed that the evidence would show that Prop. 8 furthers the following interests:  (1) "Preserving the prerogative and responsibility of parents to provide for the ethical and moral development and education of their own children"; and (2) "Accommodating the First Amendment rights of individuals and institutions that oppose same-sex marriage on religious or moral grounds."  Doc # 295 at 7-8.  Proponents further claimed that the evidence would show that Prop. 8 prevents a number of related harms because allowing same-sex couples to marry would:  (1) "Render the traditional definition of marriage embraced by millions of Christian, Jewish, and Muslim Americans no longer legally or socially acceptable, thereby probably forcing many of these Americans to choose between being a believer and being a good citizen"; (2) "Lead to new state-imposed restrictions of First Amendment freedoms"; and (3) "Force some religious organizations now receiving public support to cease providing charitable services to the poor and to others."  *Id*. at 10.  Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these purported interests or prevent these alleged "harms."  Indeed, Proponents presented no evidence whatsoever that permitting gay and lesbian individuals to marry would alter existing First Amendment freedoms.

Gibson, Dunn & Crutcher LLP

**F.    Not Only Do No Rational or Legitimate Justifications Support Prop. 8, But the Evidence Demonstrates That Prop. 8 Was Driven by Animus Towards, and Moral Disapproval of, Gay and Lesbian Individuals**

PFF 285.    The express and stated purpose of Prop. 8 was to strip gay and lesbian individuals of constitutional rights afforded to them by the California Constitution and to impose a special disability on gay and lesbian individuals alone by denying them state constitutional protections that apply to all other citizens.

PFF 286.    The adoption of Prop. 8 was motivated by an intent to discriminate against, and animus towards, gay and lesbian individuals.

PFF 287.    Campaign messages supporting Prop. 8 and Yes On 8 proponents stated and implied that same-sex relationships are immoral.

PFF 288.    Campaign messages supporting Prop. 8 and Yes On 8 proponents portrayed same-sex relationships and families as inferior.  Campaign messages discussing the protection of children were predicated on a belief that same-sex relationships are morally and socially inferior and undesirable, while opposite-sex relationships are superior and life-giving.  For example, they indicated that allowing gay people to do what they want in "private" is one thing, while accepting their relationships as equal is another.

PFF 289.    Campaign messages supporting Prop. 8 and Yes On 8 proponents played on the public's fear that children would be taught that gay and lesbian individuals and their relationships are equal to those of heterosexual individuals and were premised on the idea that same-sex relationships and homosexuality are immoral and wrong.

PFF 290.    Campaign messages supporting Prop. 8 and Yes On 8 proponents echoed fears that children must be "protected" from gay and lesbian people and exposure to them and their relationships, and that permitting same-sex couples to marry might encourage children to become homosexual themselves.

PFF 291.   Campaign messages supporting Prop. 8 and Yes On 8 proponents employed some of the most enduring anti-gay stereotypes—many of which reflect messages from prior anti-gay campaigns—to heighten public apprehension, including messages that homosexuals recruit and molest children, that gay and lesbian relationships are immoral or bad and should be kept "private" and not flaunted or made public, and that there is a powerful homosexual "lobby" or "agenda" intent on destroying heterosexual families and denying religious freedom.

PFF 292.   Campaign messages supporting Prop. 8 and Yes On 8 proponents portrayed marriage by same-sex couples and those who support that right as destroying marriage and society.

PFF 293.   Campaign messages supporting Prop. 8 and Yes On 8 proponents also sought to invoke a sense of general crisis by linking marriage rights for same-sex couples to social peril caused by the supposed eradication of gender roles and the family structure, as well as moral downfall through suggesting that the failure to pass Prop. 8 would inevitably lead to the legalization of incest, bestiality, and polyamory.

PFF 294.   Campaign messages supporting Prop. 8 and Yes On 8 proponents also played on gender role stereotypes, suggesting that men and women should play different and gender-based roles in marriage and child rearing.

PFF 295.   In an article written for Politics Magazine, Frank Schubert and Jeff Flint, the campaign managers for "Yes on 8," stated that the success of the campaign "would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship."  The campaign sought to convince voters that while "[t]olerance is one thing; forced acceptance of something you personally oppose is a very different matter."  Schubert and Flint decided to play on the fears and distastes of voters, framing the issue of marriage between same-sex individuals as one involving a

*Gibson, Dunn & Crutcher LLP*

conflict between the rights of a gay couple and "other rights[.]"  Schubert and Flint "settled on three broad areas where this conflict of rights was most likely to occur: in the area of religious freedom, in the area of individual freedom of expression, and in how this new 'fundamental right' would be inculcated in young children through the public schools."

PFF 296.   The discriminatory and animus-filled messages in the Yes on 8 campaign materials harmed plaintiffs and other Californians who saw them.

PFF 297.   Mr. Blankenhorn's opinion that marriage has not been defined by religion or anti-homosexual prejudice is unsupported, unreliable, not credible, and irrelevant.  Mr. Blankenhorn testified only that he could not find any evidence of prejudice, and he failed to provide any explanation regarding how the debate about extending the right of marriage to same-sex couples could not be affected by the pervasive prejudice faced by gays and lesbians in the United States.  Even if marriage as a general matter has been shaped by forces other than prejudice, Mr. Blankenhorn offered no opinion to counter the evidence that Prop. 8 was enacted based on such prejudice.  The prevalence of this evidence undermines the credibility of Mr. Blankenhorn's opinion.

## X.   Proposed Conclusions of Law

### A.   Claim One: Due Process

#### 1.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Strict Scrutiny.

PCL 1.   The right to marry is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment.  *See Lawrence v. Texas*, 539 U.S. 558, 573-74 (2003) ("our laws and tradition afford constitutional protection to personal decisions relating to marriage," "family relationships," and "child rearing"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect"); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) ("the right to marry is of fundamental importance

56

Gibson, Dunn & Crutcher LLP

for all individuals"); *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("the decision to marry is a fundamental right"); *id.* (marriage is an "expression[ ] of emotional support and public commitment" whose importance transcends simple reproduction); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) ("marriage involves interests of basic importance in our society"); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"); *see also id.* ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)); *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred.  It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it is an association for as noble a purpose as any involved in our prior decisions."); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause); *Maynard v. Hill*, 125 U.S. 190, 205, 211 (1888) (marriage is "the most important relation in life" and "the foundation of the family and of society, without which there would be neither civilization nor progress").

PCL 2.      Prop. 8 infringes on Plaintiffs' fundamental right to marry.

PCL 2(a).   A State cannot confer separate and unequal rights on socially disfavored groups because excluding a disfavored group from the rights enjoyed by all other members of society brands the disfavored group with an indelible mark of inferiority and that stigmatic harm is itself a judicially cognizable and remediable injury.  *See United*

57

1    *States v. Virginia*, 518 U.S. 515, 554 (1996); *Brown v. Bd. of Educ.*, 347 U.S. 483, 494

2    (1954); *McLaurin v. Okla. State Regents for Higher Educ.*, 339 U.S. 637, 641 (1950);

3    *Sweatt v. Painter*, 339 U.S. 629, 634-35 (1950); *see also Heckler v. Mathews*, 465

4    U.S. 728, 739-40 (1984) ("discrimination itself, by perpetuating 'archaic and

5    stereotypic notions' or by stigmatizing members of the disfavored group as 'innately

6    inferior' and therefore as less worthy participants in the political community, can

7    cause serious noneconomic injuries to those persons who are personally denied equal

8    treatment"); *Plessy v. Ferguson*, 163 U.S. 537, 562 (1896) (Harlan, J., dissenting)

9    (laws creating "separate but equal" accommodations "put[ ] the brand of . . .

10   degradation upon a large class of our fellow-citizens").

11   PCL 2(b).    Prop. 8 infringes on Plaintiffs' fundamental right to marry by relegating gay men and

12   lesbians to the separate-and-inherently-unequal status of domestic partnership.  *See*

13   *Lawrence*, 539 U.S. at 574 ("our laws and tradition afford constitutional protection to

14   personal decisions relating to marriage" and "[p]ersons in a homosexual relationship

15   may seek autonomy for th[is] purpose[ ], just as heterosexual persons do"); *In re*

16   *Marriage Cases*, 183 P.3d 384, 434 (Cal. 2008) (one of the "core elements of th[e]

17   fundamental right [to marry] is the right of same-sex couples to have their official

18   family relationship accorded the same dignity, respect, and stature as that accorded to

19   all other officially recognized family relationships"); *id.* at 402, 434, 445 (by

20   "reserving the historic and highly respected designation of 'marriage' exclusively to

21   opposite-sex couples while offering same-sex couples only the new and unfamiliar

22   designation of domestic partnership," the State communicates the "official view that

23   [same-sex couples'] committed relationships are of lesser stature than the comparable

24   relationships of opposite-sex couples" and impermissibly stamps gay and lesbian

25   individuals—and their children—with a "mark of second-class citizenship"); *Kerrigan*

26   *v. Comm'r of Pub. Health*, 957 A.2d 407, 417 (Conn. 2008) ("the legislature, in

27   establishing a statutory scheme consigning same sex couples to civil unions, has

28

Gibson, Dunn & Crutcher LLP

relegated them to an inferior status, in essence, declaring them to be unworthy of the institution of marriage"); *Opinions of the Justices to the Senate*, 802 N.E.2d 565, 570 (Mass. 2004) ("The dissimilitude between the terms 'civil marriage' and 'civil union' is not innocuous; it is a considered choice of language that reflects a demonstrable assigning of same-sex, largely homosexual, couples to second-class status."); *see also* PFF § IV.A (harms from denial of marriage to same-sex couples); *cf. Marriage Cases*, 183 P.3d at 421 (plaintiffs "are not seeking to create a new constitutional right—the right to 'same-sex marriage' . . . . Instead, plaintiffs contend that, properly interpreted, the state constitutional right to marry affords same-sex couples the same rights and benefits . . . as this constitutional right affords to opposite-sex couples").

PCL 3.    Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *See P.O.P.S. v. Gardner*, 998 F.2d 764, 767-68 (9th Cir. 1993) ("Statutes that directly and substantially impair [the right to marry] require strict scrutiny."); *see also Carey v. Population Control Servs. Int'l*, 431 U.S. 678, 686 (1977); PFF § IX.C-E (absence of governmental interests supporting Prop. 8).  Indeed, Proponents cannot even show that Prop. 8 is substantially related to an important state interest or rationally related to a legitimate state interest.

PCL 3(a).    Prop. 8 cannot be upheld on the basis of a purported interest in promoting procreation.

PCL (3)(a)(i).    The promotion of procreation is not a constitutionally sufficient ground for preventing a couple from marrying.  *See Marriage Cases*, 183 P.3d at 431 (if a State could limit marriage based on procreative ability, "it would follow that in instances in which the state is able to make a determination of an individual's fertility . . . , it would be constitutionally permissible for the state to preclude an individual who is incapable of bearing children from entering into marriage" with even a partner of the opposite sex); *see also Turner*, 482 U.S. at 99 (an almost-complete prohibition on inmate marriages was unconstitutional because it was not "reasonably related to legitimate penological

59

*Gibson, Dunn & Crutcher LLP*

1   objectives"); *Griswold*, 381 U.S. at 485 (upholding the right of married individuals to

2   use contraception to prevent procreation).

3   PCL 3(a)(ii).   Prop. 8's prohibition of marriage by individuals of the same sex does nothing to

4   promote procreation.  *See* PFF § IX.C.2 (no effect on opposite-sex relationships from

5   excluding same-sex couples from marriage).

6   PCL 3(a)(iii).   In any event, Prop. 8 is a fatally underinclusive means of promoting procreation

7   because it permits individuals of the opposite sex who are unable to bear children, or

8   who simply have no desire for children, to marry.  *See Fla. Star v. B.J.F.*, 491 U.S.

9   524, 540-41 (1989) (holding that a statute prohibiting the publication of particular

10  information in certain media but not in others was unconstitutionally underinclusive).

11

12  PCL 3(b).   Prop. 8 cannot be upheld on the basis of a purported interest in ensuring that children

13  are raised by their biological parents or by an adoptive mother and father.

14  PCL3(b)(i).   Ensuring that children are raised by a mother and a father, as opposed to a same-sex

15  couple, is not a legitimate state interest because children of same-sex couples are as

16  well-adjusted as children of opposite-sex couples.  *See Varnum v. Brien*, 763 N.W. 2d

17  862, 899 n.26 (Iowa 2009) ("The research appears to strongly support the conclusion

18  that same-sex couples foster the same wholesome environment as opposite-sex

19  couples and suggests that the traditional notion that children need a mother and a

20  father to be raised into healthy, well-adjusted adults is based more on stereotype than

21  anything else."); *see also* PFF § IX.C.3.

22  PCL3(b)(ii).   Prop. 8 does not advance this purported state interest because California law expressly

23  authorizes adoption by unmarried same-sex couples and does not otherwise restrict the

24  ability of same-sex couples to raise children.  *See Marriage Cases*, 183 P.3d at 452

25  n.72. ("the governing California statutes permit same-sex couples to adopt and raise

26  children and additionally draw no distinction between married couples and domestic

27  partners with regard to the legal rights and responsibilities relating to children raised

28

60

within each of these family relationships"); Cal. Fam. Code §§ 297.5(d), 7601, 7602, 7650, 9000(b); *Elisa B. v. Superior Ct.*, 117 P.3d 660, 670 (Cal. 2005); *Sharon S. v. Sup. Ct.*, 73 P.3d 554, 569 (Cal. 2003); PFF § III.B.2 (gay men and lesbians can adopt and parent children).

PCL 3(c).      Prop. 8 does not advance a purported interest in "'responsible procreation,'" which Proponents define as "directing the inherent procreative capacity of sexual intercourse between men and women into stable, legally bound relationships" (Doc # 36 at 22), because the State's refusal to permit *gay and lesbian* individuals to marry will not encourage *heterosexual* individuals to marry when their relationships result in "unintended children." *Id.* at 13; *see also* PFF § IX.C.2 (no effect on opposite-sex relationships from excluding same-sex couples from marriage).

PCL 3(d).      Prop. 8 does not further a purported interest in ensuring that California marriages are recognized by other States because it preserves 18,000 marriages between same-sex couples that may not be recognized in those States that prohibit marriage by individuals of the same sex. *See Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009) (upholding the 18,000 marriages between same-sex couples performed in California prior to the enactment of Prop. 8); *see also* Oct. 14, 2009 Tr. 89:14 (Court:  This claimed interest is "insubstantial.").

PCL 3(e).      Prop. 8 does not further purported interests in "administrative ease" or conforming California's definition of "marriage" to federal law.

PCL 3(e)(i).   "[A]dministrative ease and convenience" are constitutionally illegitimate grounds for discrimination. *Craig v. Boren*, 429 U.S. 190, 198 (1976).

PCL 3(e)(ii).  Even if California had a valid interest in easing its administrative burden in differentiating between same-sex and opposite-sex unions, Prop. 8 leaves 18,000 marriages of gay and lesbian couples on the books and thus does not ease the State's purported "burden." *See Strauss*, 207 P.3d at 122.

61

Gibson, Dunn & Crutcher LLP

PCL 3(f).    Neither tradition nor moral disapproval is a sufficient basis for a State to impair a

person's constitutionally protected right to marry.  *See Lawrence*, 539 U.S. at 557 (the

"fact that the governing majority in a State has traditionally viewed a particular

practice as immoral is not a sufficient reason for upholding a law prohibiting the

practice"); *id.* at 579 ("times can blind us to certain truths and later generations can see

that laws once thought necessary and proper in fact serve only to oppress"); *id.* at 582

("[m]oral disapproval" of gay men and lesbians, "like a bare desire to harm the group,

is an interest that is insufficient to satisfy" even rational basis review); *Romer v.*

*Evans*, 517 U.S. 620, 634 (1996) (a "bare . . . desire to harm a politically unpopular

group, cannot constitute a *legitimate* governmental interest") (internal quotation marks

omitted; emphasis in original); *id.* at 635 (a state practice of restricting citizens'

constitutional rights cannot be perpetuated merely "for its own sake"); *Palmore v.*

*Sidoti*, 466 U.S. 429, 433 (1984) (while "[p]rivate biases may be outside the reach of

the law," the "law cannot, directly or indirectly, give them effect" at the expense of a

disfavored group's fundamental constitutional rights); *Williams v. Illinois*, 399 U.S.

235, 239 (1970) ("neither the antiquity of a practice nor the fact of steadfast legislative

and judicial adherence to it through the centuries insulates it from constitutional

attack"); *see also* Oct. 14, 2009 Tr. 86:25-87:3 (Court:  "Tradition alone is not enough

because the constitutional imperatives of the Equal Protection clause must have

priority over the comfortable convenience of the status quo.").

PCL 3(g).    Prop. 8 cannot be upheld on the basis of a purported interest in "acting incrementally

and with caution" because caution and incrementalism are constitutionally illegitimate

grounds for perpetuating discrimination.  *See Cooper v. Aaron*, 358 U.S. 1, 16 (1958)

("the preservation of the public peace . . . cannot be accomplished by laws or

ordinances which deny rights created or protected by the federal Constitution").

PCL 3(h).    Prop. 8 does not advance a purported interest in preventing the weakening or

deinstitutionalization of marriage because permitting marriage by individuals of the

62

*Gibson, Dunn
& Crutcher
LLP*

same sex strengthens the institution of marriage for both same-sex couples and opposite-sex couples (and certainly does not weaken marriage for opposite-sex couples).  *See* PFF IX.C.2.

PCL 3(i).      Prop. 8 does not advance a purported interest in preserving "the responsibility of parents to provide for the ethical and moral development and education of their children" because permitting same-sex couples to marry in no way diminishes that parental responsibility and because Prop. 8 did not alter any law or regulation that places limits on parental prerogatives.

PCL 3(j).      Prop. 8 does not further a purported interest in accommodating the First Amendment rights of individuals who oppose allowing gay and lesbian couples to marry on religious grounds.

PCL 3(j)(i).   The First Amendment preserves the right of religious groups to prescribe their own rules regarding religious marriage.  *See Marriage Cases*, 183 P.3d at 451-52 ("affording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs").

PCL 3(j)(ii).  Prop. 8 does not advance the religious freedom of groups that discriminate against gay men and lesbians for religious reasons because it does not alter generally applicable state laws that prohibit discrimination based on sexual orientation.  *See* Cal. Civ. Code § 51(b); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that schools that enforce racially discriminatory admissions standards on the basis of religious doctrine do not qualify as tax-exempt organizations under the Internal Revenue Code).

*Gibson, Dunn & Crutcher LLP*

PCL 3(k).     Prop. 8 does not further purported interests in using different names for different things or maintaining the flexibility to separately address the needs of different types of relationships.

PCL 3(k)(i).     "[A]dministrative ease and convenience" are constitutionally illegitimate grounds for discrimination.  *Craig*, 429 U.S. at 198.

PCL 3(k)(ii).     Even if California had valid interests in using different names and different administrative classifications for same-sex and opposite-sex unions, Prop. 8 leaves 18,000 marriages of gay and lesbian couples on the books and thus does not promote the distinction underlying these purported interests.  *See Strauss*, 207 P.3d at 122.

PCL 3(*l*).     Prop. 8 does not further a purported interest in retaliating against persons who engaged in boycotts, protests, and picketing in opposition to Prop. 8 because the State does not have a constitutionally legitimate interest in retaliating against the exercise of core First Amendment freedoms. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909, 911 (1982) (a "boycott" designed to "bring about political, social, and economic change" "clearly involve[s] constitutionally protected activity" and "does not lose its protected character . . . simply because it may embarrass others or coerce them into action").

PCL 4.     *Baker v. Nelson*, 409 U.S. 810 (1972), does not foreclose Plaintiffs' due process challenge.  *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (the Supreme Court's summary dismissals are binding on lower courts only "on the precise issues presented and necessarily decided"); *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (summary dismissals are binding only to the extent that they have not been undermined by subsequent "doctrinal developments" in the Supreme Court's case law).

PCL 4(a).     The issue in *Baker*—the constitutionality of an outright refusal by a State to afford any recognition to same-sex relationships—is different from the issue presented by

64

Plaintiffs' constitutional challenge, which asks this Court to determine whether it is constitutional for California voters to use the initiative process to strip gay and lesbian individuals of their fundamental right to marry and to relegate same-sex couples to the separate-and-inherently-unequal institution of domestic partnership.

PCL 4(b).   The Supreme Court's subsequent decisions in *Lawrence*—which invalidated a state prohibition on same-sex intimate conduct on due process grounds—and *Romer*— which struck down on equal protection grounds a state constitutional amendment prohibiting governmental action to protect gay and lesbian individuals against discrimination—have fatally weakened *Baker*. *See Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *rev'd in part on other grounds*, 447 F.3d 673 (9th Cir. 2006); *see also Turner*, 482 U.S. at 99 (invalidating an almost-complete prohibition on inmate marriages); *Zablocki*, 434 U.S. at 384 ("the right to marry is of fundamental importance for *all* individuals") (emphasis added).

## 2.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Intermediate Scrutiny.

PCL 5.   The right to marry is a significant liberty interest. *See Witt v. Dep't of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008); PCL 1.

PCL 6.   Prop. 8 infringes on Plaintiffs' right to marry. *See* PCL 2.

PCL 7.   Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest. *See Witt*, 527 F.3d at 819; PCL 3.[2]

---

[2]   Rather than repeat the reasons why Proponents' proffered state interests fail under each level of scrutiny, Plaintiffs include a cross-reference to PCL 3, which demonstrates that Prop. 8 fails to satisfy any level of scrutiny.

65

### 3. Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Rational Basis Review.

PCL 8.     Prop. 8 infringes on Plaintiffs' right to marry.  *See* PCL 1.

PCL 9.     Prop. 8 is not rationally related to a legitimate state interest.  *See Romer*, 517 U.S. at 632-33; PCL 3.

### 4. Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Strict Scrutiny.

PCL 10.    The right to privacy and personal autonomy is a fundamental right.  *See Lawrence*, 539 U.S. at 578.

PCL 11.    Prop. 8 infringes on Plaintiffs' fundamental right to privacy and personal autonomy. *See Zablocki*, 434 U.S. at 384 ("the right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause"); *Carey*, 431 U.S. at 684-85 ("[w]hile the outer limits of [the right of personal privacy] have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage") (internal quotation marks omitted).

PCL 12.    Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *See P.O.P.S.*, 998 F.2d at 767-68; PCL 3.

### 5. Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Intermediate Scrutiny.

PCL 13.    The right to privacy and personal autonomy is a significant liberty interest.  *See Witt*, 527 F.3d at 819.

PCL 14.    Prop. 8 infringes on Plaintiffs' right to privacy and personal autonomy.  *See* PCL 11.

PCL 15.    Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest.  *See Witt*, 527 F.3d at 819 ("when the government attempts to intrude upon the personal and private lives of homosexuals, in

66

Gibson, Dunn & Crutcher LLP

a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest"); PCL 3.

### 6.    Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Rational Basis Review.

PCL 16.    Prop. 8 infringes on Plaintiffs' right to privacy and personal autonomy.  *See* PCL 11.

PCL 17.    Prop. 8 is not rationally related to a legitimate state interest.  *See Romer*, 517 U.S. at 632-33; PCL 3.

### B.    Claim Two: Equal Protection

### 1.    Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Strict Scrutiny.

PCL 18.    Gay men and lesbians are a suspect class.

PCL 18(a).    A classification is suspect where it targets a group that has been subject to a history of discrimination and that is defined by a "characteristic" that "frequently bears no relation to ability to perform or contribute to society."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-41 (1985) (internal quotation marks omitted); *see also Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (persons "who have been discriminated against on the basis of race or national origin" are a suspect class because they have "experienced a history of purposeful unequal treatment" and "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"); *cf. Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986) (holding that "an individual religion meets the requirements for treatment as a suspect class," even though religion is not immutable).

PCL 18(a)(i).    Gay men and lesbians have been subject to a history of discrimination.  *See Lawrence*, 539 U.S. at 571 ("for centuries there have been powerful voices to condemn homosexual conduct as immoral"); *Kerrigan*, 957 A.2d at 432 ("gay persons

67

1   historically have been, and continue to be, the target of purposeful and pernicious

2   discrimination due solely to their sexual orientation"); *id.* at 446 ("the bigotry and

3   hatred that gay persons have faced are akin to, and, in certain respects, perhaps even

4   more severe than, those confronted by some groups that have been accorded

5   heightened judicial protection"); *Varnum*, 763 N.W.2d at 889 (there has been a "long

6   and painful history of discrimination against gay and lesbian persons"); PFF § VII

7   (history of discrimination against gay men and lesbians).

PCL 18(a)(ii).   Sexual orientation is irrelevant to whether someone can make a meaningful

9   contribution to society. *See, e.g.*, *Marriage Cases*, 183 P.3d at 442 ("sexual

10   orientation is a characteristic . . . that bears no relation to a person's ability to perform

11   or contribute to society"); *Kerrigan*, 957 A.2d at 435 ("gay persons stand in stark

12   contrast to other groups that have been denied suspect or quasi-suspect class

13   recognition, despite a history of discrimination, because the distinguishing

14   characteristics of those groups adversely affect their ability or capacity to perform

15   certain functions or to discharge certain responsibilities in society"); PFF § V.B (gay

16   men and lesbians contribute to society in the same ways as heterosexual individuals).

PCL 18(b).   In determining whether a class is "suspect" for equal-protection purposes, it may also

18   be relevant whether the group exhibits "obvious, immutable, or distinguishing

19   characteristics that define them as a discrete group" and whether they are "politically

20   powerless." *Bowen*, 483 U.S. at 602.

PCL 18(b)(i).   Sexual orientation is a fundamental aspect of a person's identity and is immutable in

23   the sense that it is not typically the subject of personal choice and is highly resistant to

24   change; the sexual orientation of gay men and lesbians defines them as a discrete

25   group. *See Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual

26   orientation and sexual identity are immutable"); *id.* ("[h]omosexuality is as deeply

27   ingrained as heterosexuality") (quoting *Gay Rights Coalition of Georgetown Law Ctr.*

28   *v. Georgetown Univ.*, 536 A.2d 1, 34 (D.C. 1987)); *Varnum*, 763 N.W.2d at 893

68

("sexual orientation forms a significant part of a person's identity," and "influences the formation of personal relationships between all people—heterosexual, gay, or lesbian—to fulfill each person's fundamental needs for love and attachment") (internal quotation marks omitted); *id.* ("sexual orientation is central to personal identity and 'may be altered [if at all] only at the expense of significant damage to the individual's sense of self'") (alteration in original); PFF § VI.B (sexual orientation is highly resistant to change).

PCL 18(b)(ii).   Gay and lesbian individuals possess less political power than other groups that are afforded the protection of suspect or quasi-suspect status under the Equal Protection Clause. *See Kerrigan*, 957 A.2d at 446 ("Insofar as gay persons play a role in the political process, it is apparent that their numbers reflect their status as a small and insular minority."); *see also id.* at 452 ("With respect to the comparative political power of gay persons, they presently have no greater political power—in fact, they undoubtedly have a good deal less such influence—than women did in 1973, when the United States Supreme Court, in *Frontiero* [*v. Richardson*, 411 U.S. 677 (1973) (plurality opinion)], held that women are entitled to heightened judicial protection."); PFF § VIII (the relative political power of gay men and lesbians); *cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that all racial classifications are inherently suspect, even though many racial groups exercise substantial political power).

PCL 19.   Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.

PCL 19(a)(i).   Voter-enacted measures that strip disfavored individuals of rights that they had previously possessed under state law and that are possessed by other members of society discriminate against the targeted group. *See Romer*, 517 U.S. at 635 (invalidating a voter-enacted state constitutional provision that stripped gay men and lesbians of antidiscrimination protections that they had previously possessed under

69

1   state law because the measure "classifie[d] homosexuals not to further a proper

2   legislative end but to make them unequal to everyone else"); *id.* at 627, 631 (holding

3   that the voter-enacted amendment was unconstitutional because it "impose[d] a special

4   disability upon [gay and lesbian individuals] alone" and "withdr[e]w[ ] from" them,

5   "but, no others, specific legal protection" that they had previously enjoyed under the

6   state constitution); *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967) (invalidating a voter-

7   enacted California constitutional provision that extinguished state-law protections that

8   minorities had previously possessed against housing discrimination).

PCL 19(a)(ii).   Plaintiffs are similarly situated to heterosexual individuals for purposes of marriage

10   because, like individuals in a relationship with a person of the opposite sex, they are in

11   loving, committed relationships and wish to enter into a formal, legally binding and

12   officially recognized, long-term family relationship.  *See Marriage Cases*, 183 P.3d at

13   435 n.54; *see also Kerrigan*, 957 A.2d at 424 (same-sex couples are similarly situated

14   to opposite-sex couples for purposes of marriage because they "share the same interest

15   in a committed and loving relationship as heterosexual persons who wish to marry,

16   and they share the same interest in having a family and raising their children in a

17   loving and supportive environment"); *Varnum*, 763 N.W.2d at 883 ("plaintiffs are

18   similarly situated compared to heterosexual persons" because "[p]laintiffs are in

19   committed and loving relationships, many raising families, just like heterosexual

20   couples"); PFF § V.A (fundamental similarities between same-sex couples and

21   opposite-sex couples).

PCL 19(a)(iii).   Prop. 8 strips gay men and lesbians of the right to marry that they had previously

23   possessed under the California Constitution as written since its ratification in 1849.

24   *See Marriage Cases*, 183 P.3d at 452; *Strauss*, 207 P.3d at 77 (Prop. 8 "[c]hange[d]

25   the California Constitution to eliminate the right of same-sex couples to marry in

26   California") (internal quotation marks omitted); *see also James B. Beam Distilling Co.*

27   *v. Georgia*, 501 U.S. 529, 549 (1991) (Scalia, J., concurring in judgment) ("the

70

judicial power as understood by our common-law tradition . . . is the power 'to say what the law is,' not the power to change it"); *Newman v. Emerson Radio Corp.*, 772 P.2d 1059, 1062 (Cal. 1989) ("The general rule that judicial decisions are given retroactive effect is basic in our legal tradition.").

PCL 19(b).    Prop. 8 relegates gay men and lesbians to the separate-and-inherently-unequal status of domestic partnership.  *See Marriage Cases*, 183 P.3d at 402 (prohibitions on marriage between individuals of the same sex "perpetuat[e]" the "general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples"); *Kerrigan*, 957 A.2d at 417 ("the legislature, in establishing a statutory scheme consigning same sex couples to civil unions, has relegated them to an inferior status, in essence, declaring them to be unworthy of the institution of marriage"); *Opinions of the Justices*, 802 N.E.2d at 570; PCL 2; PFF § IV.A (harms from denial of marriage to same-sex couples); *see also* PX0728 at 2 and ¶¶ 1, 7, 36-43 (Attorney General's Answer:  Admits that Prop. 8 violates the Fourteenth Amendment to the U.S. Constitution:  "Taking from same-sex couples the right to civil marriage that they had previously possessed under California's Constitution cannot be squared with guarantees of the Fourteenth Amendment.").

PCL 20.    Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it indisputably was designed to strip gay men and lesbians of their right to marry and has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See, e.g.*, *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (1982) ("when facially neutral legislation is subjected to equal protection attack, an inquiry into intent is necessary to determine whether the legislation in some sense was designed to accord disparate treatment on the basis of racial considerations"); PFF § IX.F (evidence of Prop. 8's purpose and effect).

71

PCL 21.   Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *Palmore*, 466 U.S. at 432-33.

PCL 21(a).   Prop. 8 is not even rationally related to a legitimate state interest.  *See* PCL 3.

PCL 21(b).   Prop. 8 irrationally creates at least four categories of couples in California:  Opposite-sex couples, who are permitted to marry, and to remarry upon divorce; the 18,000 same-sex couples who were married after the California Supreme Court's decision in the *Marriage Cases* but before the enactment of Prop. 8, whose marriages remain valid but who are not permitted to remarry upon divorce; same-sex couples who were married in other States before the enactment of Prop. 8, whose marriages are valid and recognized in California; and unmarried same-sex couples, who are prohibited by Prop. 8 from marrying and restricted to the separate-and-inherently-unequal status of domestic partnership.  *See Romer*, 517 U.S. at 632-33; Cal. Fam. Code § 308(b).

PCL 22.   *Baker* does not foreclose Plaintiffs' equal protection challenge because, among other reasons, *Baker* presented an equal protection challenge based only on sex discrimination.  *See* Jurisdictional Statement at 16, *Baker* (No. 71-1027) ("The discrimination in this case is one of gender."); *see also* PCL 4.

PCL 23.   *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563 (9th Cir. 1990), does not foreclose the availability of heightened scrutiny.

PCL 23(a).   *High Tech Gays* is no longer controlling because it was premised on the Supreme Court's since-overruled decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986).  *See High Tech Gays*, 895 F.2d at 571 ("by the *Hardwick* majority holding that the Constitution confers no fundamental right upon homosexuals to engage in sodomy, and because homosexual conduct can thus be criminalized, homosexuals cannot constitute a suspect or quasi-suspect class entitled to greater than rational basis review for equal protection purposes"); *see also Lawrence*, 539 U.S. at 578 (overruling *Bowers*).

72

PCL 23(b).    *High-Tech Gays* found that gay men and lesbians "are not without political power" (895 F.2d at 574), but, since *High-Tech Gays* was decided, the factual bases for that finding have been undermined by the widespread use of state ballot initiatives to target gay men and lesbians for disfavored treatment and strip them of their rights under federal and state law.  *See* PFF § VIII.

PCL 23(c).    *High-Tech Gays* found that "homosexuality . . . is behavioral" (895 F.2d at 573), but the factual bases for that finding have been undermined by recent empirical research demonstrating that sexual orientation is not a personal choice and is highly resistant to change.  PFF § VI.B.

### 2.    Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Intermediate Scrutiny.

PCL 24.    Gay and lesbian individuals are a quasi-suspect class.  *See* PCL 18.

PCL 25.    Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.  *See* PCL 19.

PCL 26.    Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See* PCL 20.

PCL 27.    Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest.  *Virginia*, 518 U.S. at 524; PCL 3; PCL 21.

### 3.    Prop. 8 Discriminates On The Basis of Sexual Orientation And Fails Rational Basis Review.

PCL 28.    Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.  *See* PCL 19.

PCL 29.    Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See* PCL 20.

73

PCL 30.    Prop. 8's discrimination based on sexual orientation is not rationally related to a legitimate state interest. *See Romer*, 517 U.S. at 632-33; PCL 3; PCL 21.

### 4.    Prop. 8 Discriminates On The Basis Of Sex And Fails Intermediate Scrutiny.

PCL 31.    Prop. 8 discriminates against Plaintiffs on the basis of their sex because the male Plaintiffs would be able to marry their partner if one of those Plaintiffs were female, and the female Plaintiffs would be able to marry their partner if one of them were male. *See Virginia*, 518 U.S. at 532-33 (the Equal Protection Clause prohibits "differential treatment or denial of opportunity" based on a person's sex); *cf. Loving*, 388 U.S. at 9 (holding that Virginia's anti-miscegenation law constituted unlawful racial discrimination even though it applied with equal force to blacks and whites).

PCL 32.    Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest. *See Virginia*, 518 U.S. at 524; *see also id.* at 532-33 (the Equal Protection Clause prohibits discrimination based on sex in the absence of an "exceedingly persuasive" justification); PCL 3; PCL 21.

PCL 33.    *Baker* does not foreclose Plaintiffs' sex-discrimination challenge because it was decided before the U.S. Supreme Court recognized that sex is a quasi-suspect classification. *See Frontiero*, 411 U.S. 677; *Craig*, 429 U.S. 190, 197.

### 5.    Prop. 8 Infringes On Plaintiffs' Fundamental Right To Marry And Fails Strict Scrutiny.

PCL 34.    The right to marry is a fundamental right guaranteed by the Equal Protection Clause of the Fourteenth Amendment. *See* PCL 1.

PCL 35.    Prop. 8 infringes on Plaintiffs' constitutional right to marry. *See* PCL 2.

PCL 36.    Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest. *See United States v. Hancock*, 231 F.3d 557, 565 (9th Cir. 2000) (under the Equal Protection Clause, a "law is subject to strict scrutiny

74

if it targets a suspect class or burdens the exercise of a fundamental right"); *see also*

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (applying strict

equal protection scrutiny to a state law that burdened the fundamental right to

procreate); PCL 3; PCL 21.

C.    **Claim III: Violation of 42 U.S.C. § 1983**

1.    **Enforcement Of Prop. 8 Violates 42 U.S.C. § 1983.**

PCL 37.    Defendants are acting under color of state law.  *See* § I.C.

PCL 38.    Prop. 8 violates Plaintiffs' rights under the Due Process and Equal Protection Clauses

of the Fourteenth Amendment.  *See generally* PCL 1-36.

PCL 39.    Defendants are depriving Plaintiffs of their rights, privileges, or immunities secured by

the Constitution and laws of the United States.  *See generally* PCL 1-36

DATED:  February 26, 2010                    GIBSON, DUNN & CRUTCHER LLP
                                            Theodore B. Olson
                                            Theodore J. Boutrous, Jr.
                                            Christopher D. Dusseault
                                            Ethan D. Dettmer
                                            Matthew D. McGill
                                            Amir C. Tayrani
                                            Sarah E. Piepmeier
                                            Theane Evangelis Kapur
                                            Enrique A. Monagas


                                            By:_____/s/_____
                                                        Theodore B. Olson

                                            and

                                            BOIES, SCHILLER & FLEXNER LLP
                                            David Boies
                                            Steven C. Holtzman
                                            Jeremy M. Goldman
                                            Rosanne C. Baxter
                                            Richard J. Bettan
                                            Beko O. Reblitz-Richardson
                                            Theodore H. Uno
                                            Joshua I. Schiller

75

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO


DENNIS J. HERRERA
City Attorney
THERESE M. STEWART
Chief Deputy City Attorney
DANNY CHOU
Chief of Complex and Special Litigation
RONALD P. FLYNN
VINCE CHHABRIA
ERIN BERNSTEIN
CHRISTINE VAN AKEN
MOLLIE M. LEE
Deputy City Attorneys


By:_____/s/_____
                    Therese M. Stewart

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S AMENDED PROPOSED FINDINGS OF
FACT AND CONCLUSIONS OF LAW

1

## **ATTESTATION PURSUANT TO GENERAL ORDER NO. 45**

2

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence

3

in the filing of the document has been obtained from each of the other signatories to this document.

4

5

6

By:_____/s/_____

7

Theodore B. Olson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28