# Exhibit A

GIBSON, DUNN & CRUTCHER LLP
Theodore B. Olson, SBN 38137
tolson@gibsondunn.com
Matthew D. McGill, *pro hac vice*
1050 Connecticut Avenue, N.W., Washington, D.C. 20036
Telephone: (202) 955-8668, Facsimile: (202) 467-0539

Theodore J. Boutrous, Jr., SBN 132009
tboutrous@gibsondunn.com
Christopher D. Dusseault, SBN 177557
Ethan D. Dettmer, SBN 196046
333 S. Grand Avenue, Los Angeles, California 90071
Telephone: (213) 229-7804, Facsimile: (213) 229-7520

BOIES, SCHILLER & FLEXNER LLP
David Boies, *pro hac vice*
dboies@bsfllp.com
333 Main Street, Armonk, New York 10504
Telephone: (914) 749-8200, Facsimile: (914) 749-8300

Steven C. Holtzman, SBN 144177
sholtzman@bsfllp.com
Jeremy M. Goldman, SBN 218888
1999 Harrison Street, Suite 900, Oakland, California 94612
Telephone: (510) 874-1000, Facsimile: (510) 874-1460

Attorneys for Plaintiffs
KRISTIN M. PERRY, SANDRA B. STIER,
PAUL T. KATAMI, and JEFFREY J. ZARRILLO

Dennis J. Herrera, SBN 139669
Therese M. Stewart, SBN 104930
Danny Chou, SBN 180240

One Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4708, Facsimile (415) 554-4699

Attorneys for Plaintiff-Intervenor
CITY AND COUNTY OF SAN FRANCISCO

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, *et al.*,<br><br>　　　　　　Plaintiffs,<br>and<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　　　　Plaintiff-Intervenor,<br>　　v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>　　　　　　Defendants,<br>and<br><br>PROPOSITION 8 OFFICIAL PROPONENTS<br>DENNIS HOLLINGSWORTH, *et al.*,<br><br>　　　　　　Defendant-Intervenors. | CASE NO. 09-CV-2292 VRW<br><br>**PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Dates:　January 11 – January 27, 2010<br>Judge:　　　Chief Judge Walker<br>Location:　　Courtroom 6, 17th Floor |

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

## <u>Table of Contents</u>

2    **I.    The Parties** ........................................................................................................ 1

3        **A.    Plaintiffs** ............................................................................................... 1

4        **B.    City and County of San Francisco** ................................................... 3

5        **C.    Defendants and Their Role in Enforcing Prop. 8 and Denying**
6            **Marriage Licenses** ............................................................................... 4

7        **D.    Proponents and Their Role in the Prop. 8 Campaign** ..................... 6

8    **II.    The Meaning of Marriage, "The Most Important Relation in Life"** ......... 19

9        **A.    Supreme Court Holdings Regarding the Fundamental Right to Marry** ....... 20

10        **B.    The Changing Institution of Marriage** ............................................. 23

11        **C.    Marriage Restrictions Historically Have Been Discriminatory** ...................... 31

12        **D.    Marriage Has Never Been Limited to Procreative Unions in**
13            **California** ............................................................................................ 39

14        **E.    There Are No Marriage Exclusions Based on Past Conduct** .......................... 40

15    **III.   The Exclusion of Gay and Lesbian People from Marriage in California** ................. 41

16        **A.    California Marriage Law Before *In re Marriage Cases*** ................................ 41

17        **B.    Rights Afforded to Gay and Lesbian Individuals in California** ..................... 41

18            **1.    Domestic Partnership Confers Many of the Same Substantive**
19                **Benefits as Marriage** ............................................................... 41

20            **2.    Gay and Lesbian People Can Have, Adopt, and Parent**
                **Children** ................................................................................... 43
21
22            **3.    Gay and Lesbian Californians Are Entitled to Equal**
                **Treatment in the Workplace, Housing, and Public**
23                **Accommodations** ..................................................................... 46

24        **C.    *In re Marriage Cases*** ........................................................................ 47

25        **D.    The Prop. 8 Campaign and Passage** ................................................... 50

26        **E.    After Prop. 8, Whether Two People Can Marry Turns Entirely on**
                **Their Sex** ............................................................................................. 54
27
28        **F.    *Strauss v. Horton*** .............................................................................. 55

i

*Gibson, Dunn*
*& Crutcher*
*LLP*

G.   *Perry v. Schwarzenegger* ....................................................................... 57

IV.  **The Denial of Marriage Rights Causes Plaintiffs and Other Gay and Lesbian Individuals Grievous Injuries and Drains the Public Fisc** ................................ 58

A.   **Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples** ........................................................................ 58

B.   **Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples** ............................................................ 100

C.   **Harm to Children from Denial of Marriage to Same-Sex Couples** ............. 105

D.   **Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples** ............................................................................ 110

V.   **Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws** .......................................................................................... 120

A.   **Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples** ...................................... 120

B.   **Same-Sex Couples Contribute to Society in All the Ways That Opposite-Sex Couples Do** ............................................................... 125

VI.  **Sexual Orientation Is a Fundamental Aspect of a Person's Identity** ....................... 128

A.   **Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder** ............. 128

B.   **Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm** ................................... 136

VII. **There Is a Long History of Discrimination Against Gay and Lesbian Individuals, and That Discrimination Persists Today** ................................................ 144

VIII. **Gay and Lesbian Individuals Lack Political Power to Defend Their Basic Rights When They Are Put Up for a Vote in a State-Sanctioned Plebiscite** ........... 170

IX.  **Prop. 8 Does Not Promote Any Legitimate Governmental Interest** ........................ 189

A.   **Proponents' Proffered Interests** ................................................................. 189

B.   **Proponents' Purported Evidence** ................................................................. 190

C.   **The Evidence Demonstrates That Prop. 8 Does Not Promote Any Legitimate Governmental Interest** ................................................................ 197

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1               1. **Excluding Same-Sex Couples From Marriage Does Not Promote the Formation or Stability of "Naturally Procreative Unions"** ................................................................................ 197

2. **Excluding Same-Sex Couples from Marriage Does Not Further Any Interest in Preventing the "Deinstitutionalization" of Marriage** ........................................................................ 199

3. **Excluding Same-Sex Couples from Marriage Does Not Promote Achievement of Good Child Adjustment Outcomes** .......... 220

D. **There Is No Evidence That Excluding Gay and Lesbian Individuals From Marriage Promotes Administrative Convenience** ................................ 240

E. **Excluding Same-Sex Couples from Marriage Does Not Further Any Alleged Interest in Protecting the First Amendment Rights of Those Who Oppose Allowing Them to Marry** .......................................... 241

F. **Not Only Do No Rational or Legitimate Justifications Support Prop. 8, But the Evidence Demonstrates That Prop. 8 Was Driven by Animus Towards, and Moral Disapproval of, Gay and Lesbian Individuals** ........................................................................ 242

X. **Proposed Conclusions of Law** ........................................................................ 267

A. **Claim One: Due Process** ........................................................................ 267

1. **Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Strict Scrutiny.** ................................................................ 267

2. **Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Intermediate Scrutiny.** ........................................................ 276

3. **Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Rational Basis Review.** ........................................................ 276

4. **Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Strict Scrutiny.** ............................ 276

5. **Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Intermediate Scrutiny.** .................... 277

6. **Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Rational Basis Review.** .................... 277

B. **Claim Two: Equal Protection** ........................................................ 278

1. **Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Strict Scrutiny.** ........................................ 278

iii

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

    **2.**    **Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Intermediate Scrutiny.** .................................................... 284

    **3.**    **Prop. 8 Discriminates On The Basis of Sexual Orientation And Fails Rational Basis Review.** .................................................. 284

    **4.**    **Prop. 8 Discriminates On The Basis Of Sex And Fails Intermediate Scrutiny.** ......................................................... 285

    **5.**    **Prop. 8 Infringes On Plaintiffs' Fundamental Right To Marry And Fails Strict Scrutiny.** .................................................. 285

**C.**    **Claim III: Violation of 42 U.S.C. § 1983** ................................................ 286

    **1.**    **Enforcement Of Prop. 8 Violates 42 U.S.C. § 1983.** ......................... 286

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gibson, Dunn & Crutcher LLP**

iv

# I.   The Parties

## A.   Plaintiffs

PFF 1.   Plaintiffs Kristin M. Perry ("Perry") and Sandra B. Stier ("Stier") reside in Alameda County and are raising children together.  They are lesbian individuals in a committed relationship who wish to be married.

- Tr. 140:6 (Perry:  "I am a lesbian.").[1]

- Tr. 161:18 (Stier:  "I'm gay.").

- Tr. 161:9-12 (Stier:  Perry and Stier live with their four boys; two are Perry's biological sons, and two are Stier's biological sons.).

- Tr. 141:22 (Perry:  "I want to marry Sandy.").

- Tr. 167:11-15 (Stier:  "I would like to marry the person that I choose and that is Kris Perry.").

- PX0707 at RFA No. 66 (Proponents admit "that gay and lesbian individuals, including Plaintiffs Perry and Stier, raise children together.").

- PX0707 at RFA No. 8 (Proponents admit "that Plaintiffs desire to marry their partners.").

PFF 2.   In May 2009, Perry and Stier applied for a marriage license from Defendant O'Connell, the Alameda County Clerk-Registrar, but were denied because they are a same-sex couple.

- Tr. 157:9-158:5 (Perry:  Describing Perry and Stier's attempts to obtain a marriage license from the Alameda County Recorder's Office in May, 2009).

PFF 3.   As a result of Proposition 8 ("Prop. 8"), Perry and Stier are barred from marrying the individual they wish to marry.

---

[1]   Cites to the trial transcript are abbreviated "Tr." and include the page and line cited.  The parentheticals following cites to the transcript include the witness and a description of and/or quote from the witness's testimony.  Cites to trial exhibits include the exhibit number, along with a parenthetical that identifies the exhibit and includes a quote from and/or a description of the exhibit.

1

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Cal. Const. art. I, § 7.5 (Proposition 8:  Amending California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California.").

- Tr. 157:9-158:5 (Perry:  When Perry and Stier attempted to marry, the Alameda County clerk stated that he could not provide a license.).

- Tr. 167:11-15 (Stier:  "I would like to marry the person that I choose and that is Kris Perry.  She is a woman.  And according to California law right now, we can't get married, and I want to get married.").

PFF 4.    Plaintiff Paul T. Katami ("Katami") and Plaintiff Jeffrey J. Zarrillo ("Zarrillo") are gay Californians in a committed relationship who wish to be married.

- Tr. 77:2-5 (Zarrillo:  He is gay.).

- Tr. 91:15-17 (Katami:  He has been gay "[a]s long as [he] can remember[.]").

- Tr. 80:2-3 (Zarrillo:  He and Katami have been in a committed relationship for approximately nine years.).

- Tr. 79:16-80:1 (Zarrillo:  Katami is "the love of my life.  I love him probably more than I love myself.  I would do anything for him. . . . And I want nothing more than to marry him.").

- Tr. 88:15-18 (Katami: "There are many reasons [why I want to get married]. . . . [T]he primary reason for me is because I have found someone that I love and that I know I can dedicate the rest of my life to."); 107:24 (Katami:  Stating that he wants to marry Zarrillo).

- PX0707 at RFA No. 8 (Proponents admit "that Plaintiffs desire to marry their partners.").

PFF 5.    In May 2009, Katami and Zarrillo applied for a marriage license from the State of California but were denied because they are a same-sex couple.

- Tr. 88:9-14 (Katami:  Explaining that he and Zarrillo applied for a marriage license and were denied in May 2009).

PFF 6.    As a result of Prop. 8, Katami and Zarrillo are barred from marrying the individual they wish to marry.

- Cal. Const. art. I, § 7.5 (Proposition 8:  Amending California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California.").

2

Gibson, Dunn & Crutcher LLP

1          • Tr. 88:11-14 (Katami:  Describing denial of marriage license in May 2009).

2     **B.    City and County of San Francisco**

3     PFF 7.   Plaintiff-Intervenor the City and County of San Francisco ("CCSF") is a charter city
4          and county organized and existing under the Constitution and laws of the State of
5          California.

6          • Cal. Const. art. XI, § 5(a) (granting cities the authority to govern municipal
7               affairs under a city charter).

8          • S.F. Charter § 1.101 (setting forth the City and County of San Francisco's
9               rights and powers under the city charter).

10    PFF 8.   Plaintiff-Intervenor is responsible for issuing marriage licenses, performing civil
11         marriage ceremonies, and maintaining vital records of marriages.

12         • Cal. Fam. Code § 350(a) (providing that parties seeking to marry "shall first
13              obtain a marriage license from a county clerk").

14         • Cal. Fam. Code § 401(a) ("For each county, the county clerk is designated as a
              commissioner of civil marriage.").

15         • Cal. Fam. Code § 400(b) (providing that a commissioner of civil marriage may
16              perform marriages).

17    PFF 9.   In February 2004, San Francisco Mayor Gavin Newsom instructed county officials to
18         issue marriage licenses to same-sex couples.  The California Supreme Court ordered
19         the city to stop doing so the following month, and it later nullified the marriages that
20         had been performed.  *Lockyer v. City & County of San Francisco*, 95 P.3d 459 (Cal.
21         2004).

22         • *Lockyer v. City & County of San Francisco*, 95 P.3d 459, 464-67 (Cal. 2004)
23              (describing the procedural background of the litigation).

24         • Tr. 145:1-9 (Perry:  Describing marriage to Stier in 2004).

25         • Tr. 1227:8-1229:21 (Zia:  Describing marriage to same-sex spouse in 2004).

26    PFF 10.  In March 2004, CCSF filed a separate state court action challenging the California
27         marriage statutes' exclusion of same-sex couples under the State Constitution, and in

28
                                         3

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

May 2008 the California Supreme Court ruled in favor of CCSF and held that counties including CCSF were entitled and indeed required to issue marriage licenses to same-sex couples.  From June 17, 2008 until the passage of Prop. 8, Plaintiff-Intervenor issued thousands of marriage licenses to same-sex couples who applied for them during that period.

- *In re Marriage Cases*, 183 P.3d 384, 402-05 (Cal. 2008) (discussing the procedural background of CCSF's court action).

- Tr. 708:25-709:1 (Egan:  Approximately 5,100 marriages licenses were issued to same-sex couples in San Francisco in 2008.).

- Tr. 725:13-18 (Egan:  Marriage licenses were issued to same-sex couples from June 17, 2008 through November 4, 2008).

- PX0805 (Summary of marriage license appointments and actual marriage licenses issued by the San Francisco County Clerk:  5,153 marriage licenses to same-sex couples in 2008).

- Tr. 1232:6-10 (Zia:  Describing marriage to same-sex spouse in June 2008 after the California Supreme Court decision.).

PFF 11.    Prop. 8 requires Plaintiff-Intervenor to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

- Cal. Const. art. I, § 7.5 (Proposition 8:  Amending California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California.").

- PX0728 at 2 and ¶¶ 1, 7, 36-43 (Attorney General's Answer:  Admits that Prop. 8 violates the Fourteenth Amendment to the U.S. Constitution).

- *See also* evidence cited in support of PFF 8.

**C.    Defendants and Their Role in Enforcing Prop. 8 and Denying Marriage Licenses**

PFF 12.    Arnold Schwarzenegger ("Schwarzenegger") is the Governor of the State of California.

- PX0729 at ¶ 13; PX0726 at ¶ 13 (Administration's Answer:  Admits "Defendant Arnold Schwarzenegger is the Governor of the State of California.

4

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

In his official capacity, the Governor is the chief executive officer of the State of California.  It is his responsibility to ensure that the laws of the State are properly enforced.").

PFF 13.   Edmund G. Brown, Jr. ("Brown") is the Attorney General of the State of California.

- PX0728 at ¶ 14 (Attorney General's Answer:  "[A]dmits that he [Brown] is the Attorney General of the State of California; that in his official capacity he is the chief law officer of the state; [and] that it is his duty to see that the laws of the state are uniformly and adequately enforced[.]").

PFF 14.   Mark B. Horton ("Horton") is the Director of the California Department of Public Health and the State Registrar of Vital Statistics of the State of California.  In his official capacity, Horton is responsible for prescribing and furnishing the forms for the application for license to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

- PX0729 at ¶ 15; PX0726 at ¶ 15 (Administration's Answer:  Admits PFF 14 in its entirety).

PFF 15.   Linette Scott ("Scott") is the Deputy Director of Health Information & Strategic Planning for the California Department of Public Health.  Scott reports to Defendant Horton and is the California Department of Public Health official responsible for prescribing and furnishing the forms for the application for license to marry, the certificate of registry of marriage, including the license to marry, and the marriage certificate.

- PX0729 at ¶ 16; PX0726 at ¶ 16 (Administration's Answer:  Admits PFF 15 in its entirety).

PFF 16.   Patrick O'Connell ("O'Connell") is the Clerk-Registrar for the County of Alameda and is responsible for maintaining vital records of marriages, issuing marriage licenses, and performing civil marriage ceremonies.

- PX0731 at ¶ 17; PX0726 at ¶ 17 (O'Connell's Answer:  Admits PFF 16 in its entirety).

5

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 17.        Dean C. Logan ("Logan") is the Registrar-Recorder/County Clerk for the County of
Los Angeles and is responsible for maintaining vital records of marriages, issuing
marriage licenses, and performing civil marriage ceremonies.

- PX0730 at ¶ 13 (Logan's Answer:  Admits PFF 17 in its entirety).

**D.     Proponents and Their Role in the Prop. 8 Campaign**

PFF 18.        Dennis Hollingsworth, Gail J. Knight, Martin F. Gutierrez, Hak-Shing William Tam,
and Mark A. Jansson are the "Official Proponents" of Prop. 8.

- PX0693 at ¶ 19 (Decl. of D. Bauer in Supp. of Proponents' Mot. to Intervene:
Identifies the five "Official Proponents" of Prop. 8).

- Tr. 1886:25-1887:2 (Tam:  Tam was an official proponent of Prop. 8.); *see
also* Tr. 1910:1-8.

PFF 19.        By approving the language and submitting the forms, Proponents became the "Official
Proponents" of Prop. 8 within the meaning of California law.

- PX0507 at ¶¶ 6, 7-9 (Decl. of Hak-Shing William Tam in Supp. of Proposed
Intervenors' Mot. to Intervene:  "I supervised the preparation of the
appropriate language for Proposition 8.  At that time, I also executed the forms
and documents prescribed by the California Elections Code, and presented
them to the California Attorney General so that he would prepare a Title and
Summary of the chief purpose and points of Proposition 8." (at ¶ 6);
description of meeting the requirements of California Elections Code Sections
342, 9608, and 9004 (at ¶¶ 7-9)).

PFF 20.        Proponents dedicated substantial time, effort, reputation, and personal resources in
campaigning for Prop. 8.

- PX0693 at ¶¶ 9, 11 (Decl. of D. Bauer in Supp. of Proponents' Mot. to
Intervene:  ProtectMarriage received over $39 million and spent over $37
million in its successful effort to enact Proposition 8.).

- Tr. 1889:23-1893:15 (Tam:  Tam invested substantial time, effort, and personal
resources in campaigning for Proposition 8.  He spent the majority of his
working hours between January and November of 2008 towards qualifying
Prop. 8 for the ballot and campaigning for its enactment; he organized several
rallies in support of Prop. 8; he invited Ron Prentice, Chairman of
ProtectMarriage.com—Yes on 8, to speak at the rallies; he participated in
televised debates in support of Prop. 8 at the direction of ProtectMarriage.com;

6

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

he communicated with church leaders at the direction of ProtectMarriage.com; and he organized the collection of signatures to get Prop. 8 on the ballot.); PX0507 at ¶ 27 (Decl. of Hak-Shing William Tam in Supp. of Proposed Intervenors' Mot. to Intervene:  outlining Tam's organizing and fundraising efforts in support of Proposition 8); *see also* Tr. 1910:9-12.

- PX2609 (Email from Tam to "pastors and church leaders" on Apr. 15, 2008: "I served as one of the proponents of this initiative and worked closely with ProtectMarriage.com to collect 1,050,000 signatures.").

- PX2185 (Traditional Family Coalition Newsletter:  Explaining that "[a]s a leader in the Prop. 8 campaign, Dr. Bill Tam worked with ProtectMarriage.com to motivate grassroots effort in the Asian community.").

- PX2538 (Email from Tam to "pastors and ministry leaders" sent in May 2008 after the *In re Marriage Cases* decision:  "I stood with the lawyers from Protectmarriage.com, Alliance Defense Fund and some Catholics when we received the rulings.").

- PX2343B (Essay by Tam that was sent to Chinese-speaking voters and sponsored by "ProtectMarriage.com—Yes on 8, a Project of California Renewal" with major funding provided by "Knights of Columbus, National Organization for Marriage California, and Focus on the Family.").

- PX2599 at 2-3 (Protect Marriage Grassroots Meeting Minutes from Aug. 21, 2008 list "Bill Tam" as the person responsible for the "Asian/Pacific Islander Outreach" team report.  Tam's report mentions that "Chinese radio ads starting," the distribution of a "Chinese language Prop. 8 flyer," the creation of the website "1manand1woman.com," working on "dispelling the notion that same-sex marriage is a like a civil rights issue," and efforts to find an Asian spokesperson and Asian speaking people for the Pastor Rapid Response Team.").

- PX2620 (Peter Henderson, who describes himself as Chairman of Protectmarriage.com in July of 2007 states in an email to members of the Executive Committee, among others:  "The Chinese coalition with Bill Tam remains strong.").

PFF 21.   Near the beginning of this initiative process, the Official Proponents helped to establish ProtectMarriage.com—Yes on 8, a Project of California Renewal ("ProtectMarriage") as a "primarily formed ballot measure committee" under the California Political Reform Act.

- PX0693 at ¶¶ 3-4 (Decl. of D. Bauer in Supp. of Proponents' Mot. to Intervene:  ProtectMarriage is a "primarily formed ballot measure committee"

7

Gibson, Dunn & Crutcher LLP

1   under the California Political Reform Act and that the Committee exists
2   primarily to support Prop. 8.).

3   •   PX0507 at ¶ 13 (Decl. of Hak-Shing William Tam in Supp. of Proposed
4       Intervenors' Motion to Intervene:  "As an Official proponent, I endorsed
        ProtectMarriage.com—Yes on 8, A Project of California Renewal (a 'primarily
5       formed ballot measure committee' under California law registered with the
        California Secretary of State) to conduct a petition-gathering campaign for the
6       purpose of qualifying Proposition 8 for the ballot.").

PFF 22.   ProtectMarriage exists with one purpose: to support Prop. 8.  It was directly

7   responsible for all aspects of the campaign to qualify Prop. 8 for the ballot and enact it
8
9   into law.

10  •   PX0693 at ¶¶ 4, 6, 10 (Decl. of D. Bauer in Supp. of Proponents' Mot. to
        Intervene:  ProtectMarriage "exists primarily to support just one ballot
11      measure—Proposition 8" and was "responsible for receiving all contributions
        and making all expenditures in the campaign to qualify Proposition 8 for the
12      ballot and to pass it into law at the November 2008 General Election.").

13
14  •   PX2403 at 1 (Email from Kenyn Cureton, Vice President for Church
        Ministries with the Family Research Council, to Ron Prentice, Chairman of
15      ProtectMarriage.com—Yes on 8, in August of 2008:  Attaching a kit to be
        distributed to Christian voters through churches to better help them promote
16      Prop. 8.  Cureton explains to Prentice that FRC found out from
        ProtectMarriage.com—Yes on 8's lawyer, Andy Pugno, that FRC "need[s] to
17      take FRC logos off of the CA version of the videos (legal issues) and just put
        ProtectMarriage.com on everything" and FRC is "making those changes.").

18
19  •   PX2640 at 2 (Email from Pugno to Tam:  "I do not think it is likely, but in the
        event you are contacted by the media or anyone else regarding the Marriage
20      Amendment, I would encourage you to please refer all calls to the campaign
        phone number . . . . It is crucial that our public message be very specific.").

21  •   PX2640 at 2 (Emails between Tam and Mr. Pugno in which Tam asks if there
22      is anything he should not say or disclose in response to questions from the
        Chinese press; Mr. Pugno responds that Tam was an "exception" and should
23      speak on behalf of the campaign to the Chinese press.); *see also* Tr. 1906:9-12.

24  •   Tr. 1892:9-12 (Tam:  In October of 2007, Tam was waiting for instructions
25      from ProtectMarriage.com of when he would start collecting those signatures.).

26  •   Tr. 1904:3-5 (Tam:  Tam participated in a debate because he was told to
        participate by ProtectMarriage.com.).

27
28

Gibson, Dunn
& Crutcher
LLP

- Tr. 1998:23-1999:11 (Tam: ProtectMarriage.com reimbursed individuals that ran print and television ads in support of Prop. 8.).

- Tr. 1965:15-1966:4 (Tam: Tam signed "a Statement of Unity with respect to the Proposition 8 campaign" both "[o]n behalf of [him]self and on behalf of the Traditional Family Coalition.").

- PX2476 (Email from Tam to his listserv: "I'm still waiting for HYPERLINK "http://protectmarriage.com\" /nProtectMarriage.com for instructions of when we would start the signature collection for California's Marriage Amendment Initiative.").

- PX2599 at 2-3 (ProtectMarriage.com Grassroots Meeting Minutes from Aug. 21, 2008 list "Bill Tam" as the person responsible for the "Asian/Pacific Islander Outreach" team report. Tam's report mentions "Chinese radio ads starting," the distribution of a "Chinese language Prop. 8 flyer," the creation of the website "1manand1woman.com," working on "dispelling the notion that same-sex marriage is a like a civil rights issue," and efforts to find an Asian spokesperson and Asian speaking people for the Pastor Rapid Response Team.").

PFF 23.    The ProtectMarriage executive committee has included at least the following individuals: Ron Prentice, Yes on Prop. 8 Campaign Chairman; Edward Dolejsi, Executive Director, California Catholic Conference; Mark A. Jansson; and Andrew Pugno, General Counsel. In addition, David Bauer is the Treasurer and officer of record for ProtectMarriage.

- Tr. 1890:24-1891:1 (Tam: Mr. Prentice was the chief executive office of ProtectMarriage.com.).

- PX2187 (Rally flier lists Ron Prentice as "President, ProtectMarriage.com").

- PX0209 (Oct. 20, 2008 letter to a business who donated money to Equality California demanding "a donation of a like amount" to Yes on 8: Signed by Ron Prentice, ProtectMarriage.com Chairman; Andrew Pugno, ProtectMarriage.com General Counsel; Edward Dolejsi, Executive Director, California Catholic Conference; and Mark Jansson, a ProtectMarriage.com Executive Committee Member).

- PX0693 at ¶ 1 (Decl. of D. Bauer in Supp. of Proponents' Mot. to Intervene: David Bauer identified as Treasurer).

PFF 24.    ProtectMarriage is a "broad coalition" of individuals and organizations, including the

9

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Church of Jesus Christ of Latter-Day Saints, the California Catholic Conference, a large number of evangelical churches, and many powerful national political organizations.  These coalition members often made their own statements and efforts in support of Prop. 8, but most of their campaign activity and messaging were coordinated through the sophisticated campaign structure of ProtectMarriage.

- *See* evidence cited in support of PFFs 25 to 30.

PFF 25.    The Yes on 8 campaign comprised national and state coalition members working in concert to pass Prop. 8.

- PX2310 (Screenshot of the www.ProtectMarriage.com "About" page: ProtectMarriage.com, is a "broad-based coalition of families, community leaders, religious leaders, pro-family organizations and individuals from all walks of life who have joined together to support Proposition 8.").

- PX0577 at 47 (Article by Frank Schubert and Jeff Flint in *Politics* magazine: "We had the support of virtually the entire faith community in California.").

- PX0035 (ProtectMarriage.com e-mail blast sent 61 days before election: Stating that "[t]he Yes On Proposition 8 Campaign has already built the largest grassroots effort in California history").

- Tr. 1585:20-1646:21 (Segura:  Describing the degree of well-organized opposition that gay men and lesbians faced during the Prop. 8 campaign).

- Tr. 1589:25-1590:2 (Segura:  "[W]hat takes me back here is . . . the sheer breadth of the organization and its level of coordination with Protect Marriage.").

- Tr. 1590:23-1591:12 (Segura:  Describing the "organized effort" and "formal association" of groups forming the "broad-based coalition" of ProtectMarriage.com).

- Tr. 1609:12-1610:6 (Segura:  The coalition between the Catholic Church and the LDS Church against a minority group was "unprecedented.").

- Tr. 1614:5-9 (Segura:  "Apart from [the Pro-Choice abortion rights position], I can't think of a minority group against whom such a coalition has been raised.").

- PX0796 at 55-56 (Article by Proponents' expert Miller:  "Churches and religious organizations supplied most of Proposition 8's institutional support"; "While Mormons are only about 2% of California's population, members of

10

the church (both from California and from other states) provided critical financial contributions and volunteer support"; "[R]eligion was critical in determining voter attitudes towards Proposition 8.").

- PX2660 (Report sent on Aug. 27, 2008 to Evangelical Christian Credit Union from Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8:  Explaining that they had created "[t]he strongest grassroots response in the history of a California initiative" and listing the contributions of various religious groups: "Evangelicals—400,000 signatures; 3,000 pastors, special church offerings"; Catholics—Endorsed by Bishops grassroots activity"; Latter-day Saints—Salt Lake City endorsement; money, canvassing, phoning Orthodox Jewish communities—grassroots and fundraising"; The Arlington Group—60+ organizational networks; special offerings nationally").

- PX2597 (Email from Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, on June 19, 2008:  Summarizing the ProtectMarriage.com "efforts since '05:" "From the initial efforts in 1998 for the eventual success of Prop 22 in 2000, a coalition of many organizations has existed, including evangelical, Catholic and Mormon groups"; a "trio of evangelical pastors took ownership of the development of a statewide effort to inform and motivate pastors to get involved.  From their efforts came over 300 churches serving as distribution and drop-off centers for petitions"; the signature gathering effort received $900,000 from Catholic organizations and donors and an "additional $1.1 million came to the qualification effort from the evangelical community, with major donations from Focus on the Family and other private sources.").

- PX0480 at 6:27-44 (American Family Association video with Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8:  Explaining that "[s]ince 1998, the Protect Marriage Coalition has been together, and it was in '05 when, uh, the coalition came back together.  And a few of us decided that now's the time. Now's the time to, um, move towards a constitutional amendment to take it out of the hands of the courts.").

- PX0390 at 1:50-4:00 (ProtectMarriage.com—Yes on 8 Chairman, Ron Prentice, tells people at a religious rally that in early 2005 after Judge Kramer of the San Francisco Superior Court struck down Proposition 22, the coalition that passed Proposition 22 in 1998-2000 came back together and since then there has been nothing but activity; 2500 pastors in California have come out on a monthly basis.).

- PX0021 (California Family Council brochure:  Stating that San Diego's submission of an amicus brief "in support of homosexual 'marriage'" to the California Supreme Court moved the "evangelical Christian and Catholic communities" to action; that a "coordinated, strategic response must take place;" discussing steps to qualify constitutional amendment to define marriage as the union of one man and one woman.")

- PX0577 at 45-47 (Article by Frank Schubert and Jeff Flint in *Politics* magazine explaining the success of Prop. 8: "We organized countless meetings and conference calls of pastors and other campaign leaders." (at 45); "Our ability to organize a massive volunteer effort through religious denominations gave us a huge advantage, and we set ambitious goals. . . . All of these goals, and more, were achieved." (at 45); "We built a campaign volunteer structure around both time-honored grassroots tactics of organizing in churches . . . and the latest Internet and web-based grassroots tools." (at 45); "Even though LDS members were the last major denomination to join the campaign, their members were immensely helpful in early fundraising, providing much-needed early contributions while we were busy organizing Catholic and Evangelical fundraising efforts. Ultimately, we raised $22 million from July through September with upwards of 40 percent coming from members of the LDS Church." (at 46); "Members of the Mormon faith played an important part of the Yes On 8 coalition, but were only a part of our winning coalition. We had the support of virtually the entire faith community in California." (at 47).).

- PX2630 at 2-4 (ProtectMarriage.com's Grassroots Meeting Minutes from Aug. 7, 2008: Explaining that they are working with LDS, Catholics and Evangelicals regarding financing (at 2); LDS canvassing efforts used 64,000 volunteers for the first phase of canvassing (at 3-4); each month they are holding conference calls attended by about 3,300 pastors, (at 4); and they are working on getting endorsements from Catholic organizations (at 4).).

- PX2599 at 1-4 (Email attaching ProtectMarriage.com Grassroots Meeting Minutes from Aug. 21, 2008: Explaining that on one Saturday, 15,000 people canvassed in support of Prop. 8 (at 1); the following Saturday, the number should be higher (at 1); there are separate teams to handle African American Outreach, Asian/Pacific Islander Outreach, Catholic Outreach, Latino Outreach, Pastor Outreach and Youth Activities (at 2-4)).

- PX2187 (Rally flier listing "Dr. Tony Perkins: President, Family Research Council/ Rev. Won-Bae Son: Sr. Pastor, Emanuel Korean Presbyterian Church/ Dr. David Cannistraci: Sr. Pastor, San Jose Gateway City Church" and "Dr. Ron Prentice: CEO, California Family Council, President, ProtectMarriage.com" as speakers at a rally to "Restore Marriage Protect Children."); *see also* PX2203 (Press release regarding the same rally: Listing "Thomas Wang, President of America Return to God Prayer Movement" as a speaker); PX2204 (Press release regarding the same event: Listing "American Return to God Prayer Movement and 5 Christian Organizations" as sponsors).

PFF 26.   The LDS Church was part of the Yes on 8 campaign and provided extensive grassroots and monetary support.

Gibson, Dunn & Crutcher LLP

- PX2561 at 1 (Email from Prentice: "The giving from the state's Mormons is topping $6 million right now with no signs of slowing down."; "You may know that the Mormons have been out walking neighborhoods the past 2 Saturdays with about 20,000 total volunteers.").

- PX2555 at 2-3 (LDS Meeting Minutes from July 2008: "Salt Lake City" conducted a teleconference with 159 of 161 Stake Presidents, telling them to join in the coalition with ProtectMarriage.com. "We were asked to wait patiently for talking points from the Coalition.").

- Tr. 1636:1-1637:9 (Segura: PX2555, LDS Meeting Minutes from July 2008, "makes it clear that there was a sort of two-way flow of information, where strategic talking points were being provided to religious leaders by the campaign. And, in turn, the religious leaders were providing volunteers to the campaign. But there was this cautious strategic not-to-take-the-lead notion so as to provide . . . plausible deniability or respectable distance between the church organization per se and the actual campaign.").

- PX2554 at 1 (Email from Joseph Bentley to the LDS leadership: "[T]his campaign is entirely under priesthood direction.").

- PX0390 at 4:06-4:38 (Video, ProtectMarriage.com—Yes on 8 Chairman, Ron Prentice: Describing a meeting with the leadership of the LDS church: "One day members of the leadership from Salt Lake City of LDS said that they wanted to meet with us . . . . and we said, well, now, if we have the Catholic participation we might be able to bring in this money and if we have the evangelical participation we might be able to bring in this money, and if we have the LDS participation, and he interrupted me. Oh, Ron we're here to tell you today we're on board.").

- PX1550 at 2-3 (ProtectMarriage.com email: The First Presidency of the LDS Church has taken an official position in favor of Proposition 8 and "[a] total of 1700 pastors based in 101 locations across the state participated" in a June 2008 teleconference).

- Tr. 1628:12-15 (Segura: "[I]t appears that there was an LDS volunteer in every zip code, to coordinate those activities. Which is, once again, a very enviable political organization. I think any political candidate would be pleased to have such a thing.").

- PX2688 (E-mail from Holland to Jansson: Noting that the National Organization for Marriage's founder, Robert George, has been speaking about the campaign with Matthew Holland of Brigham Young University. Holland reports back to Mark Jansson, a member of ProtectMarriage's Executive Committee, about the conversation and George's intent to smooth over any "friction between NOM and PM [ProtectMarriage]").

13

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0391 at 2:22-3:42 (ProtectMarriage.com—Yes on 8 Chairman, Ron Prentice, tells people at a religious rally that in 1999 the LDS Church got involved in Proposition 22 and that "with a capital 'S' they were significant in the battle, both in finances and foot soldiers, and it has been no less true this time around." He describes a group of evangelical pastors and Catholic Bishop who decided to take Prop. 8 forward, and his call to Focus On The Family to obtain funds to print the petitions).

PFF 27.   Catholic organizations were part of the Yes on 8 campaign and provided extensive grassroots and monetary support.

- Tr. 1609:12-15 (Segura:  "[T]he fairly substantial monetary resources of the Roman Catholic Church and its faithful were mobilized in substantial portion on behalf of the Yes on 8 campaign.").

- PX0101 (ProtectMarriage.com—Yes on 8 News Release:  Announcing receipt of $1 million contribution from "the Knights of Columbus, the world's largest Catholic family fraternal service organization" with "more than 1.7 million members"; stating "[w]e are proud to join the Catholic bishops and priests of California"; and encouraging "other groups and individuals of all faiths to lend their support."  The release also quotes ProtectMarriage.com Executive Committee member Ned Dolejsi stating this contribution "shows the broad base of support that Protect Marriage is receiving from a variety of faith-based organizations.").

- PX2341 at 40-47 (Email from Bill May of Catholics for the Common Good to Ned Dolejsi, a member of the ProtectMarriage.com—Yes on 8 executive committee, in June 2008 attaching an agenda for a "Protect Marriage Meeting For Pastors and Christian Leaders" at which the following people spoke: Ron Prentice, then CEO of the California Family Council, also Chairman of ProtectMarriage.com—Yes on 8; Frank Schubert, Campaign Manager of ProtectMarriage.com—Yes on 8; Tony Perkins, President of the Family Research Council; James Dobson, Founder and Chairman of Focus on the Family; Jim Garlow, Lead Pastor of Skyline Church; Bishop Salvatore Cordileone; Miles McPherson, Lead Pastor of the Rock Church; Charles LiMandri, General Counsel for National Organization for Marriage; Brad Dacus, President of the Pacific Justice Institute; Chris Clark, Lead Pastor of East Clairemont Southern Baptist Church; Dean Broyles and James Griffiths of the Western Center for Law and Policy; and others.).

- PX0052 (Aug. 4, 2008 e-mail blast from ProtectMarriage.com:  Announcing California Catholic Conference's endorsement of Proposition 8 and the support of Catholic Archdioceses across the state, and enclosing "A Statement of Catholic Bishops of California in support of Proposition 8" strongly urging California Catholics to support the measure both financially and as volunteers. Message states:  "Paid for by ProtectMarriage.com Yes on 8, a Project of

14

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

California Renewal. . . . Major funding by National Organization for Marriage California Committee, Fieldstead & Co., and Focus on the Family").

- PX0291 (ProtectMarriage.com—Yes on 8 Press Release:  Announcing "Catholics for ProtectMarriage.com, led by the Knights of Columbus, California Catholic Conference and Catholics for the Common Good, has been established as the official Catholic grassroots effort dedicated to passing Proposition 8"; inviting all "lay Catholic organizations and individuals" to join;  stating "Catholics for ProtectMarriage.com supports a wide variety of volunteer activities in parishes and surrounding communities including distribution of literature and phoning"; listing website for Catholics for ProtectMarriage.com and other Catholic organizations supporting Proposition 8 and for Protect Marriage.com, which is described as "a broad-based coalition of California families, community leaders, religious leaders, pro-family organizations and individuals from all walks of life who have joined together to support Proposition 8").

- PX0301 (Catholics for the Common Good webpage:  "There are absolutely no grounds for considering homosexual unions to be in any way similar or even remotely analogous to God's plan for marriage and family.  Marriage is holy, while homosexual acts go against the natural moral law.  Homosexual acts close the sexual act to the gift of life.  They do not proceed from a genuine affective and sexual complementarity.  Under no circumstances can they be approved. . . . The homosexual inclination is however objectively disordered and homosexual practices are sins gravely contrary to chastity. . . . Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children, in the sense that their condition of dependency would be used to place them in an environment that is not conducive to their full human development. . . . Legal recognition of homosexual unions or placing them on the same level as marriage would mean not only the approval of deviant behaviour, with the consequence of making it a model in present-day society, but would also obscure basic values which belong to the common inheritance of humanity.").

PFF 28.    Evangelical Pastors, under the name of ProtectMarriageCA and led by The Pastor's Rapid Response Team, were a part of the Yes on 8 campaign and produced three simulcasts, funded and supported by ProtectMarriage.com, that used discriminatory statements to motivate voters to support Prop. 8.

- PX2314 (Website describing the "Pastors Rapid Response Team," headed by Jim Garlow:  "With a network of churches across California, the PRRT was actively involved in the successful battle to protect marriage in California.").

- PX2552 at 2 (Email from Prentice:  "More than 2,000 pastors have been addressed at events, and 300 churches have offered their staff and facilities as

15

Gibson, Dunn & Crutcher LLP

distribution centers for petitions."  The email notes that $1.25 million had been raised primarily from the Catholic community of San Diego, Fieldstead and Company, Focus on the Family, and small gifts.).

- PX2562 at 2 (Email from Prentice describing a teleconferences with 1,700 participants in June and 3,000 in July, as well as a $500,000 gift from the American Family Association).

- Tr. 1644:1-1644:10 (Segura:  Describing the increase in campaign activity when there were 1,700 pastor participants in a teleconference in June, and 3,000 in July, with a goal of having 5,000 pastors involved in the teleconferences).

- PX0421 (Website announcement:  "ProtectMarriage.com presents Protecting Marriage:  Vote Yes on Prop. 8 Rallies Three Simulcast Events for Church Leaders, Young People and Congregations":  Providing dates and description and information on hosting and attending the simulcast events, and links to order DVDs of same.  Contains links to www.protectmarriage.com, www.protectmarriageca.com, and www.iprotectmarriage.com for "more information about Proposition 8.").

- PX0503, PX0504, PX0504A, PX0505, PX0506, PX1867, and PX1868 (Videos and transcripts of simulcast events and excerpts from same:  Showing evangelical pastors rallies simulcast to hundreds of churches in support of Prop. 8).

- PX2655 (Email from Jim Garlow's Executive Assistant to Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, sent on Sept. 23, 2008:  Attaching an agenda for the simulcasts and a webinar to be held on Sept. 24, 2008).

- PX2773 (Email from Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, to Jim Garlow, copying Frank Schubert and Jeff Flint, ProtectMarriage.com's Campaign Managers, and Andrew Pugno, ProtectMarriage.com's General Counsel:  Reminding Garlow that "[w]e MUST control the message from the simulcasts").

- PX2656 (Email from Andy Pugno:  Insisting that advertising for the simulcasts "should read 'ProtectMarriage.com presents' . . . and 'Paid for by ProtectMarriage.com—Yes on 8, a Project of California Renewal.  Major funding by Knights of Columbus, National Organization for Marriage California, and Focus on the Family'").

- PX1868 at 87:18-20 (At a Sept. 25, 2008 simulcast, Pastor Chris Clark explains that "[w]e have had, for the last month, about 25,000 people a week going out knocking on doors, Saturday after Saturday, just asking people, how are you voting for Prop. 8."); *see also* PX0504 (video of same).

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1      &bull;   PX2075 (Blast e-mail from Frank Schubert & Jeff Flint, Campaign Managers, ProtectMarriage.Com, Yes on 8, Stating: "Subject: Campaign Update 8/27/08," stating "Protect Marriage Pastor Calls Continue to be a Resounding Success [¶] This morning approximately 2,500 pastors and church leaders gathered at 170 sites statewide to participate in a Protect Marriage conference call/Webinar. The call marked the third in a series of energizing calls dedicated to passing Proposition 8. . . . On www.ProtectMarriageCA.com, you will also find information on three upcoming live video conference rallies").

     &bull;   Tr. 1589:2-8 (Segura: "[S]o in going through these documents, Reverend Garlow's name appears frequently and he ends up organizing this team, and it goes on to become . . . Protect Marriage CA.   And they were very instrumental in trying to involve the Evangelical community in supporting the proposition. And I was particularly taken aback by the notion of 1700 pastors.  That is a profound network of influence.").

     &bull;   *See also* evidence cited in support of PFFs 285 to 296.

PFF 29.    Other powerful national organizations were a part of the Yes on 8 campaign.

     &bull;   PX2598 at 2 (Fundraising email from Steve Linder of Sterling Corporation: "We have the political and financial support of groups such as Focus on the Family, Family Research Council, American Family Association, the Arlington Group, and many others.").

     &bull;   PX0021 (California Family Council brochure:  Stating that San Diego's submission of an amicus brief "in support of homosexual 'marriage'" to the California Supreme Court moved the "evangelical Christian and Catholic communities" to action; that a "coordinated, strategic response must take place;" discussing steps to qualify a constitutional amendment to define "marriage as 'the union of one man and one woman'"; and listing organizations that are part of the "ProtectMarriage.com Coalition" including the California Family Council, Focus on the Family, Family Research Council, Concerned Women for America, Eagle Forum of California, Alliance Defense Fund, Pacific Justice Institute and others).

     &bull;   PX2156 (ProtectMarriage.com—Yes on 8 handout entitled "Myths and Facts about Proposition 8":  Stating that "Proposition 8 is supported by a broad range of organizations and individuals, including faith leaders representing virtually every faith in California" and is "Paid for by ProtectMarriage.com—Yes on 8, a Project of California Renewal. . . .  Major funding by American Family Association, National Organization for Marriage California, and Focus on the Family").

     &bull;   PX2385 (Email from Steve Linder, coordinator of the Michigan campaign against allowing gay and lesbian couples to marry, to members of the ProtectMarriage.com executive committee:  Confirming that the Arlington

17

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Group, an umbrella organization for over sixty organizations of the religious right such as Focus on the Family, Family Research Council, and American Family Association, will be working to support ProtectMarriage.com and Prop. 8).

- PX2403 at 1 (Email from Kenyn Cureton, Vice President for Church Ministries with the Family Research Council, to Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, in August of 2008 attaching a kit to be distributed to Christian voters through churches to better help them promote Proposition 8. Cureton explains to Prentice that FRC found out from ProtectMarriage.com—Yes on 8's lawyer, Andy Pugno, that FRC "need[s] to take FRC logos off of the CA version of the videos (legal issues) and just put ProtectMarriage.com on everything" and FRC is "making those changes.").

- PX1765 (Letter from Ron Prentice, Chairman, ProtectMarriage.com—Yes on 8: Thanking "Concerned Voter[s]" for their help with circulating petitions and seeking additional support "[o]n behalf of Focus on the Family, Senator Hollingsworth and the rest of the ProtectMarriage.com Coalition" and referring to himself as "Coalition Chairman").

- PX2455 (Email from Maggie Gallagher of National Organization for Marriage: Asking Frank Schubert, campaign manager of ProtectMarriage.com–Yes on 8, to approve a NOM press release as required by an agreement NOM had with ProtectMarriage.com—Yes on 8).

- PX0480 (Video from American Family Association website: "Prop. 8 and The Case for Traditional Marriage," featuring Chairman of ProtectMarriage.com—Yes on 8, Ron Prentice).

PFF 30.    The Traditional Family Coalition, Bill Tam's group, was a member of the Yes on 8 campaign and frequently used discriminatory statements to motivate voters to support Prop. 8.

- Tr. 1965:15-1966:4 (Tam: Tam signed "a Statement of Unity with respect to the Proposition 8 campaign" both "[o]n behalf of [him]self and on behalf of the Traditional Family Coalition.").

- PX2185 (Traditional Family Coalition Newsletter: Explaining that "[a]s a leader in the Proposition 8 campaign, Dr. Bill Tam worked with ProtectMarriage.com to motivate grassroots effort in the Asian community.").

- Tr. 1946:24-1947:11 (Tam: Prentice appeared at a rally organized by 1man1woman.net sponsored by ProtectMarriage.com and Traditional Family Coalition.).

18

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX2599 at 2-3 (Protect Marriage Grassroots Meeting Minutes from Aug. 21, 2008 list "Bill Tam" as the person responsible for the "Asian/Pacific Islander Outreach" team report. Tam's report mentions that "Chinese radio ads starting," the distribution of a "Chinese language Prop. 8 flyer," the creation of the website "1manand1woman.com," working on "dispelling the notion that same-sex marriage is a like a civil rights issue," and efforts to find an Asian spokesperson and Asian speaking people for the Pastor Rapid Response Team.").

- Tr. 1898:4-10 (Tam: Tam identified Focus on the Family, Family Research Council, California Family Council, Values Advocacy Council, and Traditional Family Coalition as "part of the coalition working with ProtectMarriage.com in support of Proposition 8.").

- Tr. 1904:9-22 (Tam: Concerned Women of America was one of the "many Christian groups . . . joining forces to launch Proposition 8"); *see also* Tr. 1912:11-15.

- PX2612 (Email from Tam to his listserv on Jan.10, 2008: "Right now, many Christian groups are joining forces to launch this project, they include: Focus on the Family, ProtectMarriage.com, California Family Council, TFC, Concerned Women of America, Values Advocacy Council, etc.").

- PX2343B (Essay by Tam that was sent to Chinese-speaking voters: The essay was sponsored by "ProtectMarriage.com—Yes on 8, a Project of California Renewal" with major funding provided by "Knights of Columbus, National Organization for Marriage California, and Focus on the Family.").

- Tr. 1976:10-15 (Tam: Tam attended weekly grassroots meetings with members of different grassroots teams and led the Asian American team.).

- Tr. 1910:9-12 (Tam: "I spent a lot of time sending out petitions and collecting them, and worked closely with all the mechanics, with Protect Marriage, to, you know, get the petitions off to the Chinese churches.").

- PX2620 (Email from Peter Henderson, who describes himself as Chairman of Protectmarriage.com in July of 2007, to members of the Executive Committee, among others: "The Chinese coalition with Bill Tam remains strong.").

- *See also* evidence cited in support of PFFs 285 to 296.

Gibson, Dunn & Crutcher LLP

## II.     The Meaning of Marriage, "The Most Important Relation in Life"

### A.     Supreme Court Holdings Regarding the Fundamental Right to Marry

PFF 31.    The right to marry is a fundamental right protected by the due process clause.  *Loving v. Virginia*, 388 U.S. 1, 12 (1967).  The fundamental right at stake is properly characterized as the "right to marry."

- *Loving v. Virginia*, 388 U.S. 1, 12 (1967).

- *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).

- *Turner v. Safley*, 482 U.S. 78, 99 (1987).

PFF 32.    The U.S. Supreme Court has repeatedly described the right to marriage as "one of the vital personal rights essential to the orderly pursuit of happiness by free men"; a "basic civil right"; a component of the constitutional rights to liberty, privacy, association, and intimate choice; an expression of emotional support and public commitment; the exercise of spiritual unity; and a fulfillment of one's self.

- *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *see also id.* ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)).

- *Meyer v. Nebraska*, 262 U.S. 390, 399 (The right "to marry, establish a home and bring up children" is a central part of the liberty protected by the Due Process Clause).

- *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978) ("[Th]e right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause").

PFF 33.    "The Supreme Court cases discussing the right to marry do not define the right at stake in those cases as a subset of the right to marry depending on the factual context in which the issue presented itself.  For example, *Loving* addressed marriage; not interracial or opposite-race marriage. . . . *Turner v. Safley* discusses marriage; not marriage involving inmates in penal institutions."  (Doc # 228 at 79-80.)

20

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

- *Loving v. Virginia*, 388 U.S. 1, 12 (1967).

- *Turner v. Safley*, 482 U.S. 78, 99 (1987).

PFF 34.    The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men and is deeply meaningful to individuals, families, communities, and the State of California.

- *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

- PX0710 at RFA No. 1 (Attorney General admits that the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia,* 388 U.S. 1, 12 (1967)).

- PX0739 at No. 1 (Proponents stipulate that "the 'freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.' *Loving v. Virginia*, 388 U.S. 1, 12 (1967)").

- PX0707 at RFA No. 2 (Proponents admit "that civil marriage is deeply meaningful to individuals, families, communities, and the State of California.").

- PX0710 at RFA No. 2 (Attorney General admits "that civil marriage is deeply meaningful to individuals, families, communities, and the State of California.").

- Tr. 79:20-80:1 (Zarrillo:  "[Paul Katami] is the love of my life.  I love him probably more than I love myself. . . .  And I want nothing more than to marry him.").

- Tr. 80:20-81:16 (Zarrillo:  Being married would allow Zarrillo "to stand alongside my parents and my brother and his wife, to be able to stand there as one family who have all had the opportunity to take advantage of [] being married; and the pride that one feels when that [] happens."  Marriage says to society "these individuals are serious; these individuals are committed to one another; they have taken that step to be involved in a relationship that one hopes lasts the rest of their life.").

- Tr. 89:17-90:7 (Katami:  "[M]arriage is so important because it solidifies the relationship."  "[H]aving a marriage would grow our relationship.  It represents us to our community and to society.").

21

*Gibson, Dunn
& Crutcher
LLP*

- Tr. 574:24-575:2 (Peplau: "Americans are very enthusiastic about marriage. Most Americans view marriage as one of the most important relationships in their life. Many people view getting married as a very important life goal.").

- Tr. 196:22-197:2 (Cott: The colonists viewed marriage as important, and every single colony moved to adopt marriage laws.).

- Tr. 1962:17-1963:2 (Tam: "Because the name of 'marriage' is so important, especially for us parents to teach our kid[s] . . . . Everyone fantasize whom they will marry when they grow up.").

- Tr. 2003:17-2004:3 (Tam: There were periods of American history when the law limited who Asian-Americans could marry, and he would feel very aggrieved if he couldn't marry the person he loved.).

- PX1316 at 101 (Laura F. Edwards, *The Politics of Slave Marriages in North Carolina After Emancipation*: "Explaining to his troops the implications of Virginia's 1866 act legitimating slave marriages, [a black corporal in the U.S. Colored Troops] maintained: 'The Marriage Covenant is at the foundation of all our rights. In slavery we could not have legalised marriage: now we have it . . . and we shall be established as a people.'").

PFF 35.   The right of two consenting adults to marry is deeply rooted in the history and tradition of this Nation, and the right to marry is a significant liberty interest.

- *Loving v. Virginia*, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

- Tr. 201:3-18 (Cott: A core feature of marriage in the U.S. is that it is based on "a couple's choice to live with each other, to remain committed to one another, and to form a household based on their own feelings about one another, and their agreement to join in an economic partnership and support one another."); *see also* Tr. 209:4-210:9, 251:13-252.

- Tr. 205:13-206:7 (Cott: "It is only those who cannot marry the partner of their choice, or who cannot marry at all, who are aware of the extent to which . . . the ability to marry is an expression of one's freedom.").

- Tr. 202:10-15 (Cott: Slaves could not marry because they "lacked that very basic liberty of person, control over their own actions that enabled them to say, 'I do,' with the force that 'I do' has to have.").

- *See also* evidence cited in support of PFF 34.

- Tr. 1962:17-1963:2 (Tam: "[T]he name of 'marriage' is so important . . . .").

22

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 36.   The right to privacy and personal autonomy is also a fundamental right.  *Lawrence v. Texas*, 539 U.S. 558, 578 (2003).  Similarly, the freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause.

- *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.").

- *See also* evidence cited in support of PFF 35.

### B.   The Changing Institution of Marriage

PFF 37.   Civil marriage has never been a static institution.  Historically, it has changed, sometimes dramatically, to reflect the changing needs, values, and understanding of our evolving society.

- PX0710 at RFA No. 10 (Attorney General admits PFF 37 in its entirety.).

- PX0707 at RFA No. 10 (Proponents "admit that historically, civil marriage has changed in certain respects.").

- Tr. 190:24-191:1 (Cott:  "Human cultures in different places and over time have formulated many different forms of . . . the marriage institution.").

- Tr. 331:3-17 (Cott:  Marriage is not a "static" institution; it has "shed its attributes of inequality and it has shed most [of its] restrictions . . . . [I]t has been altered to adjust to changing circumstances so that it remains a very alive and vigorous institution today.").

- Tr. 653:13-22 (Peplau:  Scholars have suggested that "in earlier times" marriage was an "economic unit in which two people came together as a way . . . to meet basic needs for survival" but "over time we have come to expect personal fulfillment through marriage.").

- PX2877 at 1 (Pew Research Center, *Women, Men and the New Economics of Marriage*:  "The institution of marriage has undergone significant changes in recent decades[.]").

- PX1308 at 1 (Study by Betsey Stevenson & Justin Wolfers:  Discussing trends in marriage in recent decades, including the effects of birth control and changes in wage structure.  "The family is not a static institution.").

- PX0754 at 1 (Am. Anthropological Ass'n, *Policy Statement on Marriage and the Family*:  "[A]nthropological research supports the conclusion that a vast

23

Gibson, Dunn & Crutcher LLP

array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.").

PFF 38.   Proponents' experts, Mr. Blankenhorn and Dr. Young, agreed that "the institution of marriage is constantly evolving" and "always changing."

- DIX0956 at 11 (Blankenhorn, *The Future of Marriage*: "But there is no single universally accepted definition of marriage—partly because the institution is constantly evolving, and partly because many of its features vary across groups and cultures."); *see also* Tr. 2933:7-11 (Blankenhorn: Agreeing that "the institution of marriage is constantly evolving" and "always changing"); Tr. 2933:12-14 (Blankenhorn: Agreeing that there is "no single universally accepted definition of marriage"); PX0749 (*Protecting Marriage to Protect Children*, L.A. Times: "Marriage as a human institution is constantly evolving.").

- PX2545 (Young Nov. 13, 2009 Dep. Tr. 102:1-14, 233:3-6: Noting that arranged marriages have declined over time and stating that U.S. law is no longer based on religion "because you have the doctrine of the separation of church and state").

PFF 39.   The institution of marriage has served numerous purposes. Among the purposes that marriage and its regulation by civil authorities have served over this county's history are facilitating governance, creating public order and economic benefit, creating stable households, legitimating children, assigning care-providers and thus limiting the public's liability to care for the vulnerable, and facilitating property ownership and inheritance.

- Tr. 188:4-189:15, 219:21-222:21, 223:23-224:22, 225:16-227:4, 260:13-261:17, 353:2-21 (Cott: Historically, marriage has served many purposes, including facilitating governance, creating public order and economic benefit, creating stable households, legitimating children, assigning care-providers and thus limiting the public's liability to care for the vulnerable, and facilitating property ownership and inheritance.).

- Tr. 252:4-23 (Cott: Allowing couples of the same-sex to marry is consistent with the state's interests in marriage.).

- Tr. 2839:4-10 (Blankenhorn: Marriage is a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society."); *see also* DIX0956 at 203 (Blankenhorn, *The Future of Marriage* ).

24

Gibson, Dunn
& Crutcher
LLP

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *The Future of Marriage*).

- PX2879 at 8 (*The Marriage Movement:  A Statement of Principles*:  "Though marriage is intimate and personal, marriage also has an inherently public side. Marriage is what lovers do when they want to bring their relationship out of the private realm of personal emotions and make it a social fact, visible to and recognized not only by the couple, but also by friends, family, church, government, and the rest of society.  Good marriages are made, not born, and they are most likely to be made in a society that understands and values marriage as a shared aspiration and key social institution, not just a private affair of the heart.").

- PX2879 at 9 (*The Marriage Movement:  A Statement of Principles*:  "The public, legal side of marriage increases couples' confidence that their partnerships will last.").

- PX2879 at 12 (*The Marriage Movement:  A Statement of Principles*:  "Married adults live longer, healthier, happier and more affluent lives than adults who don't marry or don't stay married.  This phenomenon is not simply an artifact of selection; marriage itself makes adults better off, by offering them greater emotional and financial support, wide and more integrated social networks, important economies of scale, and productive boosts in earnings, parenting capacity, and life management.").

- PX2879 at 12 (*The Marriage Movement:  A Statement of Principles*:  "Marriage also helps to conserve wealth and expand social capital.  At any given level of income, married adults are less likely to experience financial hardship.  The longer people stay married, the more wealth they accumulate, whereas length of cohabitation has no relationship to wealth accumulation. Informal partners—who are not held by the wider society to be financially responsible to one another—do not reap the same benefits as the legally married.").

PFF 40.   Marriage serves at least one purpose today that it did not serve at the founding of the country in 1789:  It serves to create a private arena—a zone of liberty, privacy, and intimacy for the partners within it.

- Tr. 227:25-228:8 (Cott:  Historical restrictions on marriage have been in tension with marriage as a "zone of liberty for the partners within it," which is the emphasis of modern marriage.).

- Tr. 247:4-248:3 (Cott:  Over time, there has been a shift in marriage laws towards liberty and the "zone of privacy and intimacy.").

25

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- DIX0093 at xviii (Report from the Law Commission of Canada: "The state's objectives underlying contemporary regulation of marriage relate essentially to the facilitation of private ordering: providing an orderly framework in which people can express their commitment to each other, receive public recognition and support, and voluntarily assume a range of legal rights and obligations.").

PFF 41.   In the United States, the institution of marriage has evolved to reflect changing attitudes towards sex discrimination, including sex-role stereotyping.  For example, the marital doctrine of *coverture*, by which a married woman lost her independent legal status and vanished into the authority of her husband, has been eliminated.  The inequality between men and women under *coverture* was once seen as essential to marriage, but it was eliminated in response to the demands of economic modernization and changing values.

- PX0710 at RFA No. 12 (Attorney General admits "that the doctrine of coverture, under which women, once married, lost their independent legal identity and became the property of their husbands, was once viewed as a central component of the civil institution of marriage.").

- Tr. 239:25-245:8, 307:14-308:9, 340:14-342:12 (Cott:  Discussing how marriage laws historically have been used to dictate the roles of spouses; how, under *coverture*, a wife's legal and economic identity was merged into that of her husband's; and how the *coverture* system was based on assumptions of what was then considered a natural division of labor between men and women).

- PX1746 at 11-12 (Nancy Cott, *Public Vows*:  Discussing *coverture*).

- PX2547 (Nathanson Nov. 12, 2009 Dep. Tr. 108:24-109:9:  Agreeing that defenders of prejudice or stereotypes against women argued that such discrimination was somehow protective of the family); *see also* PX2545 (Young Nov. 13, 2009 Dep. Tr. 214:19-215:13:  Same).

- PX1319 at 101, 128-29 (Hendrik Hartog, *Marital Exits and Marital Expectations in Nineteenth Century America*:  In nineteenth century America, "[e]ven in equity, a wife could not usually sue under her own name."  And "the most important feature of marriage was the public assumption of a relationship of rights and duties, of men acting as husbands and women acting as wives.").

- PX1326 at 996-98 (Rebecca M. Ryan, *The Sex Right: A Legal History of the Marital Rape Exemption*:  Arguing that "the meanings of 'rape' and 'marriage' changed" with the elimination of the marital rape exemption).

26

Gibson, Dunn
& Crutcher
LLP

- PX1328 at 858 (Paul Sayre, *Duties of Husband and Wife*: "Marriage deprived [the wife] of her legal capacity in most matters affecting property.").

- PX1334 (Joseph Warren, *Husband's Right to Wife's Services*: Discussing that at common law the husband had a right to his wife's services, including wages she earned when employed by a third-party, and the then-modern statutes that allowed married women greater control over their own earnings).

- Tr. 241:19-23 (Cott: "[A]ssumptions were, at the time, that men were suited to be providers . . . whereas, women, the weaker sex, were suited to be dependent.").

- PX1245 at 408 (Review by Anne Peplau and Adam Fingerhut: "Traditional heterosexual marriage is organized around two basic principles: a division of labor based on gender and a norm of greater male power and decision-making authority.").

- Tr. 241:19-242:4 (Cott: Until the 20th century "the sexes were seen as so unsuited to the same type of work.").

PFF 42.    For couples who consent to marry today, marriage has been transformed from an institution rooted in gender inequality and gender-based prescribed roles to one in which the contracting parties decide on appropriate behavior toward one another, and the sex of the spouses is immaterial to their legal obligations and benefits. Put another way, marriage has changed significantly to meet ethical needs of sex equity, in that it is no longer marked by gender asymmetry.

- Tr. 243:5-244:10, 244:21-25 (Cott: Discussing changes in our society that over time have led spousal roles to become more gender-neutral, and changes in the law that have ended gender-determined roles for spouses).

- PX1328 at 875 (Paul Sayre, *Duties of Husband and Wife*: "The common-law presupposition not of family but of the husband, and the existence of the family expressed in law through service of the wife and children to the husband—that pattern, or presupposition or postulate is now contrary to both law and fact.").

PFF 43.    In the United States, the institution of marriage has also evolved to reflect changing attitudes toward race discrimination. During the slave-holding era, slaves had no right to marry, and laws restricting marriage between whites and persons of color were passed by several of the original colonies and by as many as 41 states and territories.

27

Gibson, Dunn
& Crutcher
LLP

Now, citizens enjoy full civil rights regardless of race, and legal restrictions on racial intermarriage have been struck down as unconstitutional.

- Tr. 262:14-21 (Cott:  In colonial Chesapeake in 1667, a law was passed that punished "shameful matches" between "free white women and negroes.").

- Tr. 201:25-203:12, 204:13-25 (Cott:  During the slave-holding era, slaves could not consent to get married and they lacked the basic liberty to enter into a marriage.  Slaves formed their own informal couple relationships, yet state authorities did not give "any protection or credence to these relationships whatsoever" and families were "[b]roken up all the time.").

- Tr. 228:9-231:3 (Cott:  Discussing laws in "[a]s many as 41 states and territories" that placed restrictions on "marriage between a white person and a person of color."  These laws were justified on the ground that the races should not mix and that certain marriages were not within nature's and "God's plan.").

- Tr. 231:12-235:18 (Cott:  Discussing a federal policy that treated Chinese immigrants as "aliens ineligible for citizenship."  Additionally, any American woman who married a Chinese man would lose her American citizenship and never be able to regain it unless she divorced him or he died.).

- Tr. 236:17-238:23 (Cott:  Discussing the abolition of racial restrictions).

- Tr. 440:9-13 (Chauncey:  Jerry Falwell criticized *Brown v. Board of Education*, because it could "lead to interracial marriage, which was then sort of the ultimate sign of black and white equality.").

- PX2547 (Nathanson Nov. 12, 2009 Dep. Tr. 108:12-23:  Agreeing that defenders of prejudice or stereotypes against African-Americans argued that such discrimination was somehow protective of the family).

- Tr. 2003:19-22 (Tam:  There were periods of American history when the law limited who Asian Americans could marry.).

- PX1746 (Nancy Cott, *Public Vows*:  Extensive discussion of racial restrictions throughout American history).

- PX1314 at 189 (Margaret A. Burnham, *An Impossible Marriage: Slave Law and Family Law*:  Since "tenets of family law held that marriage and family were natural, sacred, and morally compelled," courts rationalized the denial of marriage rights to slaves by categorizing slaves as a "different kind of human being.").

- PX1322, PX1324, PX1325, PX1327, PX1335 (Articles concerning miscegenation laws and the Acts of 1855 and 1907, which expatriated women who married aliens.).

28

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 44.   California enacted the nation's first complete no-fault divorce law, removing consideration of marital fault from the grounds for divorce, awards of spousal support, and division of property. The enactment of no-fault divorce was quickly embraced nationally as a means of dealing honestly with marital breakdowns, achieving greater equality between men and women within marriage, and advancing further the notion of consent and choice as to one's spouse. This sweeping change reflected contemporary views that continuing consent to marriage was essential.

- Tr. 338:5-340:3 (Cott: Discussing the history of no-fault divorce).

- PX1319 at 121 (Hendrik Hartog, *Marital Exits and Marital Expectations in Nineteenth Century America*: In nineteenth century America, divorce "punished the guilty for criminal conduct" and "provided a form of public punishment for a spouse who had knowingly and criminally violated his or her public vows of marriage.").

PFF 45.   As two economists have definitively shown, extrapolating from the rate at which divorce incidence rose during the century 1860-1960, the annual divorce rate in 2005 was approximately the same as it would have been in the absence of the no-fault system.

- PX1308 at 2-3 and Fig. 1 (Article by Betsey Stevenson and Justin Wolfers: Discussing trends in marriage and divorce over the last 150 years).

PFF 46.   Eliminating racial restrictions on marriage and the doctrine of *coverture* have not deprived marriage of its vitality and importance as a social institution.

- PX0707 at RFA No. 13 (Proponents admit PFF 46 in its entirety.).

- PX0710 at RFA No. 13 (Attorney General admits "that neither the race- nor gender-based reforms in civil marriage law deprived marriage of its vitality and importance as a social institution.").

- Tr. 206:14-207:8, 331:18-333:1 (Cott: Elimination of restrictions on marriage has strengthened the institution.).

- Tr. 237:12-239:24 (Cott: When racial restrictions on marriage across color lines were abolished, there was alarm and many people worried that the institution of marriage would be degraded and devalued. But "there has been

29

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

no evidence that the institution of marriage has become less popular because . . . white people can marry whoever they want.").

- Tr. 245:9-247:3 (Cott: The notion that the husband is the "legal and economic representative of the couple, and the protector and provider for his wife, was [once] seen as absolutely essential to what marriage was." Notwithstanding concerns raised by many to changes in the coverture laws, gender inequality in marriage "has been removed to no apparent damage to the institution. And, in fact, I think to the benefit of the institution.").

PFF 47.   "The argument that recognition of same-sex marriage simply opens the door to incestuous or polygamous marriage ignores that there may well be compelling state interests against recognizing these other forms of relationships, including preventing exploitation and abuse. Nor is it clear why . . . same-sex marriage (and not, for example, infertile marriage) opens the door to require state recognition of polygamy and incest. Whatever prevents California now from recognizing the marriage of a brother and a sister would likewise stop it from recognizing the marriage of two sisters in the absence of Proposition 8." (Doc # 228 at 81.)

- Tr. 194:7-14 (Cott: The Founders of the American Republic "were very aware that most of the peoples in the globe, at that time, practiced polygamy or group marriage, or as they saw among Native Americans, other forms of marriage quite different from their own.").

- Tr. 345:11-347:18 (Cott: A historical theme in the U.S. equates polygamy with "despotism" and monogamy with "consent and free choice." Further, there is a hygienic basis for incest laws.); *see also* PX1746 at 22-23 (Nancy Cott, *Public Vows*: Same).

PFF 48.   Marriage has also had different or evolving meanings in other societies. For example, in Indian society, a group known as the Hijras had a tradition of marriages by same-sex couples for at least two centuries. Similarly, Native American tribes had a tradition of such marriages among those known as the berdache. And lesbian marriages have been documented in West Africa and in China among silk workers in the nineteenth century. In addition, marriages by same-sex couples were documented among the Roman emperors.

30

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX2545 (Young Nov. 13, 2009 Dep. Tr. 43:21-44:10, 46:10-21, 47:13-18, 51:11-53:6, 53:12-53:19, 54:1-17:  Homosexuality was tolerated historically among the Hijras, berdache, West African societies, Chinese silk workers, and Roman emperors.).

- PX2876 at 377-78 (Nancy E. Levine, *Alternative Kinship, Marriage, and Reproduction*:  Article relied upon by Blankenhorn that identifies alternative kin and marital relationships in Africa, China, Tibet, India, and among the American Indians.).

## C.   Marriage Restrictions Historically Have Been Discriminatory

PFF 49.   Under the marital doctrine of *coverture*, a married woman lost her independent legal status and vanished into the authority of her husband.  The inequality between men and women under *coverture* was once seen as essential to marriage.

- PX0710 at RFA No. 12 (Attorney General admits "that the doctrine of coverture, under which women, once married, lost their independent legal identity and became the property of their husbands, was once viewed as a central component of the civil institution of marriage.").

- Tr. 239:25-245:8, 307:14-308:9, 340:14-342:12 (Cott:  Discussing how marriage laws historically have been used to dictate the roles of spouses; how, under *coverture*, a wife's legal and economic identity was merged into that of her husband's; and how the *coverture* system was based on assumptions of what was then considered a natural division of labor between men and women).

- PX1746 at 11-12 (Nancy Cott, *Public Vows*:  Discussing *coverture*).

- PX2547 (Nathanson Nov. 12, 2009 Dep. Tr. 108:24-109:9:  Agreeing that defenders of prejudice or stereotypes against women argued that such discrimination was somehow protective of the family); *see also* PX2545 (Young Nov. 13, 2009 Dep. Tr. 214:19-215:13:  Same).

- PX1319 at 101, 128-29 (Hendrik Hartog, *Marital Exits and Marital Expectations in Nineteenth Century America*:  In nineteenth century America, "[e]ven in equity, a wife could not usually sue under her own name."  And "the most important feature of marriage was the public assumption of a relationship of rights and duties, of men acting as husbands and women acting as wives.").

- PX1328 at 858 (Paul Sayre, *Duties of Husband and Wife*:  "Marriage deprived [the wife] of her legal capacity in most matters affecting property.").

- PX1334 (Joseph Warren, *Husband's Right to Wife's Services*:  Discussing that at common law the husband had a right to his wife's services, including wages

31

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

she earned when employed by a third-party, and the then-modern statutes that allowed married women greater control over their own earnings).

PFF 50.   Slaves had no right to marry, and laws restricting marriage between whites and persons of color were passed by several of the original colonies and by as many as 41 states and territories.  Supporters of such racial restrictions, including courts in the late nineteenth century, usually responded when such laws were challenged by saying that there was no discrimination involved: both blacks and whites were equally forbidden from marrying each other.  Such restrictions on racial intermarriage have been struck down as unconstitutional.  These developments in the institution of marriage paralleled larger social changes that eliminated slavery and recognized racial equality.

- *Pace v. State*, 106 U.S. 583, 585 (1883) (justifying anti-miscegenation laws on the grounds that they are facially neutral with respect to race (or, rather, discriminate equally against both African-Americans and whites)).

- Tr. 262:14-21 (Cott:  In colonial Chesapeake in 1667, a law was passed that punished "shameful matches" between "free white women and negroes.").

- Tr. 201:25-203:12, 204:13-25 (Cott:  During the slave-holding era, slaves could not consent to get married and they lacked the basic liberty to enter into a marriage.  Slaves formed their own informal couple relationships, yet state authorities did not give "any protection or credence to these relationships whatsoever" and families were "[b]roken up all the time.").

- Tr. 228:9-231:3 (Cott:  Discussing laws in "[a]s many as 41 states and territories" that placed restrictions on "marriage between a white person and a person of color."  These laws were justified on the ground that the races should not mix and that certain marriages were not within nature's and "God's plan.").

- Tr. 231:12-235:18 (Cott:  Discussing a federal policy that treated Chinese immigrants as "aliens ineligible for citizenship."  Additionally, any American woman who married a Chinese man would lose her American citizenship and never be able to regain it unless she divorced him or he died.).

- Tr. 236:17-238:23 (Cott:  Discussing the abolition of racial restrictions).

- Tr. 440:9-13 (Chauncey:  Jerry Falwell criticized *Brown v. Board of Education*, because it could "lead to interracial marriage, which was then sort of the ultimate sign of black and white equality.").

32

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX2547 (Nathanson Nov. 12, 2009 Dep. Tr. 108:12-23:  Agreeing that defenders of prejudice or stereotypes against African-Americans argued that such discrimination was somehow protective of the family).

- Tr. 2003:19-22 (Tam:  There were periods of American history when the law limited who Asian Americans could marry.).

- PX1746 (Nancy Cott, *Public Vows*:  Extensive discussion of racial restrictions throughout American history).

- PX1314 at 189 (Margaret A. Burnham, *An Impossible Marriage: Slave Law and Family Law*:  Since "tenets of family law held that marriage and family were natural, sacred, and morally compelled," courts rationalized the denial of marriage rights to slaves by categorizing slaves as a "different kind of human being.").

- PX1322, PX1324, PX1325, PX1327, PX1335 (Articles concerning miscegenation laws and the Acts of 1855 and 1907, which expatriated women who married aliens.).

- *Loving v. Virginia,* 388 U.S. 1 (1967).

PFF 51.   California was the first state to strike down racial restrictions on marriage as unconstitutional in *Perez v. Sharp*, 198 P.2d 17 (1948).  The United States Supreme Court in *Loving v. Virginia,* 388 U.S. 1 (1967), ended the nearly 300-year history of race-based legislation on marriage by declaring racial restrictions on marriage unconstitutional.

- *Perez v. Sharp*, 198 P.2d 17 (Cal. 1948).

- *Loving v. Virginia,* 388 U.S. 1 (1967).

- PX0710 at RFA No. 11 (Attorney General admits that California law barred interracial couples from civil marriage until the California Supreme Court invalidated the prohibition in *Perez v. Sharp*, 198 P.2d 17 (Cal. 1948).).

PFF 52.   Limiting marriage to opposite-sex couples could promote gender stereotypes that in other contexts have long been rejected as an illegitimate basis for legal classifications.

- PX0710 at RFA No. 45 (Attorney General admits "that in California, restricting the access of same-sex couples to civil marriage may reinforce gender stereotypes and traditional gender roles of men and women in child rearing and family responsibilities.").

33

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX 2545 (Young 11/13/09 Dep. Tr. 197:12-24: "Just because something is a norm, it doesn't necessarily mean it is an appropriate norm, and it has to then be reassessed in the contemporary context to see if there are good reasons why that norm should remain.").

- Tr. 248:11-14 (Cott: "[I]f gender symmetry and equality and the couple's own definition of spousal roles are characteristic of marriage, then same-sex couples seem perfectly able to fulfill those roles.").

- PX1245 at 415 (Review by Anne Peplau and Adam Fingerhut: Research shows that same-sex couples tend to be more egalitarian in the division of household labor than heterosexual couples.).

- *See also* evidence cited in support of PFFs 53-58.

PFF 53.   Heterosexual marriage was traditionally organized around a gender-based division of labor, with the husband as the primary earner and the wife as the primary homemaker and caregiver for children.

- Tr. 241:19-23 (Cott: "[A]ssumptions were, at the time, that men were suited to be providers . . . whereas, women, the weaker sex, were suited to be dependent.").

- PX1245 at 408 (Review by Anne Peplau and Adam Fingerhut: "Traditional heterosexual marriage is organized around two basic principles: a division of labor based on gender and a norm of greater male power and decision-making authority.").

PFF 54.   Early American marriage was founded on presumptions of a so-called "natural" division of labor along gender lines—notions that men alone were suited for certain types of work, women alone for other types of work, and that the household needed both to ensure both kinds of work could be done—that are not relevant to today's society.

- Tr. 242:19-243:4 (Cott: "[F]rom the state's point of view," it was "extremely important" to "credit and create incentives for the formation of marital households" based on the assumed natural division of labor because the work of both sexes was "seen as crucial to human survival.").

- Tr. 241:19-242:4 (Cott: Until the 20th century "the sexes were seen as so unsuited to the same type of work.").

34

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 55.  Notions of "traditional marriage" are based upon the idea that women can and should play distinct roles in the marital relationship and/or in raising children that cannot be performed by men and vice versa.

• Tr. 1087:5-18 (Lamb: The "traditional family" refers to a family with a married mother and father who are both biologically related to their children where the mother stays at home and the father is the bread winner.).

• PX0506 at 13 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters: "Children need a loving family and yes they need a mother and father. Now going on what Sean was saying here about the consequences of this, if Prop. 8 doesn't pass then it will be illegal to distinguish between heterosexual and same sex couples when it comes to adoption. Um Yvette just mentioned some statistics about growing up in families without a mother and father at home. How important it is to have that kind of thing. I'm not a sociologist. I'm not a psychologist. I'm just a human being but you don't need to be wearing a white coat to know that kids need a mom and dad. (clapping) I'm a dad and I know that I provide something different than my wife does in our family and my wife provides something entirely different than I do in our family and both are vital."); *see also* PX0505 (video of same).

• PX0506 at 6 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters: "When moms are in the park taking care of their kids they always know where those kids are. They have like a, like a radar around them. They know where those kids are and there's just a, there's a bond between a mom and a kid different from a dad. I'm not saying dads don't have that bond but they don't. It's just different. You know middle of the night mom will wake up. Dad will just sleep you know if there's a little noise in the room. And, and when kids get scared they run to mommy. Why? They spent 9 months in mommy. They go back to where they came."); *see also* PX0505 (video of same).

• PX0390 at 5:25-6:04 (Protect Marriage – Yes On 8 Chairman, Ron Prentice – Yes on 8, tells people at a religious rally that marriage is not about love, its about women civilizing men: "Again, because its not about two people in love, its about men becoming civilized frankly, and I can tell you this from personal experience and every man in this audience can do the same if they've chosen to marry, because when you do find the woman that you love you are compelled to listen to her, and when the woman that I love prior to my marrying her told me that my table manners were less than adequate I became more civilized; when she told me that my rust colored corduroy were never again to be worn, I became more civilized.").

• PX0506 at 15 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters: "Skin color is morally trivial

35

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

as you pointed out but sex is fundamental to everything.  There is no difference between a white or a black human being but there's a big difference between a man and a woman."); *see also* PX0505 (video of same).

• PX1867 at 27:6-9 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, Dr. Jennifer Roback Morse states that "[t]he function of marriage is to attach mothers and fathers to one another and mothers and fathers to their children, especially fathers to children."); *see also* PX0503 (video of same).

• PX0480 at 16:58-17:20 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," Ron Prentice, Chairman of ProtectMarriage.com – Yes on 8, states that "[c]hildren need the chance to have both mother love and father love.  And that moms and dads, male and female, complement each other.  They don't bring to a marriage and to a family the same natural set of skills and talents and abilities.  They bring to children the blessing of both masculinity and femininity.").

• PX2403 at 3 (Email from Kenyn Cureton, Vice President for Church Ministries with the Family Research Council, to Ron Prentice, Chairman of ProtectMarriage.com – Yes on 8, in August of 2008:  Attaching a kit to be distributed to Christian voters through churches to better help them promote Proposition 8 which states:  "Thank God for the difference between men and women.  In fact, the two genders were meant to complete each other physically, emotionally, and in every other way.  Also, both genders are needed for a healthy home.  As Dr. James Dobson notes, 'More than ten thousand studies have concluded that kids do best when they are raised by mothers and fathers.'").

PFF 56.    These notions are grounded, in part, on the discriminatory belief that marriage is dependent on gender role stereotypes, suggesting that men and women should play different and gender-based roles in marriage and child rearing.

• PX0480 at 8:47-48 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," Chuck Colson, founder of the Prison Fellowship Ministries and leader of the Christian conservative movement explains that he thought the physical differences between men and women make heterosexual marriage the only appropriate union and constitute "the natural moral order of things.").

• PX1868 at 43:19-24 (At a Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind," Glen Stanton states that "[s]ame sex marriage, it will unravel that in a significant way and say that really male and female, mother and father, husband and wife are just really optional for the family, not necessary.

36

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

And that is a radically anti-human thing to say."); *see also* PX0504 (video of same).

- PX1867 at 28:18-23 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, Glen Stanton states "And we know that fatherlessness has caused significant problems for a whole generation of children and same-sex marriage would send us more in that direction of intentionally fatherless homes."); *see also* PX0503 (video of same).

- PX0506 at 5 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters:  McPherson states that it is a truth "that God created the woman bride as the groom's compatible marriage companion."); *see also* PX0505 (video of same).

- *See also* evidence cited in support of PFF 294.

PFF 57.    Proponents' arguments for Prop. 8 include that allowing gay and lesbian couples to marry will lead to confusion about gender identity, suggesting that Proponents associate homosexuality with a disruption of traditional gender roles, and that denying gay and lesbian couples the right to marry is based in certain beliefs about sex.

- PX0480 at 20:21-21:3 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," Ron Prentice, Chairman of ProtectMarriage.com – Yes on 8, states that "Children need the chance to have both mother love and father love.  And that moms and dads, male and female, complement each other.  They don't bring to a marriage and to a family the same natural set of skills and talents and abilities.  They bring to children the blessing of both masculinity and femininity.").

- PX2341 at 40 (Email from Bill May of Catholics for the Common Good to Ned Dolejsi, a member of the ProtectMarriage.com – Yes on 8 executive committee, in June 2008:  Attaching a document written by Jim Garlow entitled "The Ten Declarations Protecting Biblical Marriage" and presented at a "Protect Marriage Meeting For Pastors and Christian Leaders" that states: "maximal sexual fulfillment occurs within one man-one woman monogamous, covenantal relationships"; "the sustaining of the human race, occurs exclusively within male-female union"; "boys and girls need and deserve to have a daddy and a mommy who love each other and are committed to each other in marriage").

- PX2403 at 6 (Email from Kenyn Cureton, Vice President for Church Ministries with the Family Research Council, to Ron Prentice, Chairman of ProtectMarriage.com – Yes on 8, in August of 2008:  Attaching a kit to be distributed to Christian voters through churches to better help them promote

37

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Proposition 8 which states: "School children as young as kindergarten-age can now be forced to learn about and support homosexuality, bisexuality, and trans-sexuality. School-sponsored activities, textbooks, and instructional material could require a positive portrayal of homosexual 'marriages,' cross-dressing, sex-change operations, and all aspects of homosexuality and bisexuality.").

- *See also* evidence cited in support of PFF 55.

PFF 58.   Similarly Proponents' arguments for Prop. 8 include that children need both a father and a mother, indicating that Proponents believe women and men should or necessarily do perform different parental roles based on their gender.

- PX2589 (Email from Ron Prentice, Chairman of ProtectMarriage.com – Yes on 8: Explaining that he attached "the messages that have come from the research" and attaching a document entitled "Top Proposition 8 Arguments." They include: "3. . . . the ideal situation is for a child to be raised by a married mother and father in the bond of marriage. . . . 5. . . . . every child desires to have a mother and a father who are married to each other. . . . 8. California should do more to encourage families to stay together so that more children have both a mother and a father in the home. Reaffirming marriage as between a man and a woman is a positive step in that direction.").

- PX0052 (Aug. 4, 2008 blast e-mail from ProtectMarriage.com: Enclosing "A Statement of Catholic Bishops of California in support of Proposition 8": Explaining that if Proposition 8 did not pass "Children—if there are any—are no longer a primary societal rationale for the institution [of marriage]. . . . The marriage of a man and a woman embraces not only their sexual complementarity [sic] as designed by nature but includes their ability to procreate. The ideal for the well being of children is to be born into a traditional marriage and to be raised by both a mother and a father.").

- PX0506 at 13 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters: "Buy [sic] why would we want to engineer that on purpose and make it the law of the land that we can deprive a child of a mother or a father. This doesn't make any sense. They deserve better. (clapping)"); *see also* PX0505 (video of same).

- PX0480 at 16:25-32 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," the video's host, Natalie Thomas, states that "the specter of children being raised in same-sex homes also turns nature on its head.").

- PX1867 at 26:19-21 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, Pastor Jim Garlow tells audience members

38

Gibson, Dunn
& Crutcher
LLP

that "Every little boy and little girl deserves a daddy and a mommy."); *see also* PX0503 (video of same).

- PX2595 (Flier urging voters to "Vote Yes on Prop. 8" included the following reasons for supporting Proposition 8: "Proposition 8 protects the right of children to have both father and mother as role models," and "children need parents of both genders.").

- *See also* evidence cited in support of PFF 55, 57.

### D.   Marriage Has Never Been Limited to Procreative Unions in California

PFF 59.   The ability or willingness of married couples to produce progeny has never been

necessary for marriage validity in American law.

- Cal. Fam. Code § 300 *et seq.*

- *In re Marriage Cases,* 183 P.3d 384, 431 (Cal. 2008) ("This contention [that because only a man and a woman can produce children biologically with one another, the constitutional right to marry necessarily is limited to opposite-sex couples] is fundamentally flawed for a number of reasons.").

- *Lawrence v. Texas,* 539 U.S. 558, 604-05 (2003) (Scalia, J., dissenting) ("If moral disapprobation of homosexual conduct is 'no legitimate state interest' for purposes of proscribing that conduct . . . what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the Constitution'?  Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.").

- Tr. 222:22-223:22 (Cott:  "There has never been a requirement that a couple produce children in order to have a valid marriage. . . .  Nor has [the inability to have children] been a ground . . . for divorce.").

PFF 60.   Proponents' expert, Mr. Blankenhorn, admitted that a couple who does not wish to

have sex may marry, and that an incarcerated man may marry even if he is not allowed

to consummate the relationship.

- Tr. 2902:7-16 (Blankenhorn:  Acknowledging that a couple who does not wish to have sex may marry).

- Tr. 2901:13-2902:6 (Blankenhorn:  Acknowledging that an incarcerated man may get married even if he is not allowed to consummate the relationship); *see also* Tr. 2905:4-14; Tr. 2907:20-2908:5.

39

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 61.  Marriage is not now, and has never in this State been, limited to those who are capable of procreating.  The State has never established as a legal requirement for marriage that the members of the couple be fertile, of child-bearing age, physically or mentally healthy, or intent on having or raising children.  In addition, Proponents' expert, Mr. Blankenhorn, testified that approximately 38 percent of children in the United States are born to unmarried parents.  In short, procreation does not require marriage, and marriage does not require procreation.

- PX0709 at RFA No. 52 (Administration admits "that California law does not restrict heterosexual individuals with no children and/or no intent to have children from marrying on the basis of their status as a heterosexual individual with no children and/or no intent to have children.").

- Tr. 335:22-24 (Cott:  Noting that since the 1960's, "there has been an increase in births out of wedlock.").

- Tr. 2274:24-2775:4 (Blankenhorn:  Noting that statistics reveal "that today about 38 percent of children in the U.S. are born to unmarried parents.").

- *See also* evidence cited in support of PFF 59.

### E.  There Are No Marriage Exclusions Based on Past Conduct

PFF 62.  Under California law, murderers, child molesters, rapists, serial divorcers, spousal abusers, and philanderers are permitted to marry.

- Cal. Fam. Code § 300 *et seq.* (No prohibition against murderers, child molesters, rapists, serial divorcers, spousal abusers, and philanderers from marrying).

- Cal. Penal Code § 2601(e) (Guaranteeing the right of incarcerated inmates to marry).

- PX0710 at RFA No. 52 (Attorney General admits "that heterosexual individuals with no children and/or no intent to have children, who are incarcerated for serious crimes, who have failed to pay child support obligations or who are adulterers are all permitted to marry.").

PFF 63.  The United States Supreme Court has recognized that the right to marry extends to convicted criminals in prison and rejected as unconstitutional a law that prevented prison inmates from getting married.  *See Turner v. Safley*, 482 U.S. 78, 99 (1987).

40

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 2901:13-2902:6 (Blankenhorn:  Acknowledging that an incarcerated man may get married even if he is not allowed to consummate the relationship); *see also* Tr. 2905:4-14; Tr. 2907:20-2908:5.

**III.    The Exclusion of Gay and Lesbian People from Marriage in California**

  **A.    California Marriage Law Before *In re Marriage Cases***

PFF 64. Proposition 22 was enacted by California voters in 2000.  It added section 308.5, which stated "Only marriage between a man and a woman is valid or recognized in California," to the Family Code.

- *In re Marriage Cases*, 183 P.3d 384, 409 (Cal. 2008) (Discussing the passage of Proposition 22 and its addition of statutory language to the Family Code).

  **B.    Rights Afforded to Gay and Lesbian Individuals in California**

    **1.    Domestic Partnership Confers Many of the Same Substantive Benefits as Marriage**

PFF 65. Since 1999, California has permitted same-sex couples to register as Domestic Partners.

- Cal. Fam. Code §§ 297, 297.5 (Setting forth the definition and entrance requirements for domestic partnerships and the rights of domestic partners).

PFF 66. The State of California has, at times, expanded the rights and responsibilities of Registered Domestic Partners.

- Cal. Fam. Code §§ 297, 297.5 (Setting forth the definition and entrance requirements for domestic partnerships and the rights of domestic partners).

- *In re Marriage Cases*, 183 P.3d 384, 414-15 (Cal. 2008) (Discussing the incremental expansion of rights in 2001 and 2003).

PFF 67. The California Legislature has found that lesbians and gay men have faced, many lesbian and gay couples "have formed lasting, committed, and caring relationships" and, like heterosexual couples, same-sex couples "share lives together, participate in their communities together, and many raise children and care for other dependent family members together."  The Legislature also has found that "expanding the rights

41

*Gibson, Dunn & Crutcher LLP*

and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises." 2003 Cal. Stats. ch. 421, § 1(b).

- 2003 Cal. Stats. Ch. 421, § 1(b) ("The Legislature hereby finds and declares that despite longstanding social and economic discrimination, many lesbian, gay, and bisexual Californians have formed lasting, committed, and caring relationships with persons of the same sex. These couples share lives together, participate in their communities together, and many raise children and care for other dependent family members together. Many of these couples have sought to protect each other and their family members by registering as domestic partners with the State of California and, as a result, have received certain basic legal rights. Expanding the rights and creating responsibilities of registered domestic partners would further California's interests in promoting family relationships and protecting family members during life crises, and would reduce discrimination on the bases of sex and sexual orientation in a manner consistent with the requirements of the California Constitution.").

PFF 68.    A couple who registers as domestic partners is not married under California law, and registered domestic partners in the State of California are not recognized as married by the United States government.  Registered domestic partners are denied numerous federal marriage benefits

- *In re Marriage Cases*, 183 P.3d 384, 416-17 & n.24 (Cal. 2008) (Discussing the various differences between domestic partnerships and marriages, and observing the lack of federal recognition of domestic partnerships).

- Cal. Fam. Code § 297.5 (Setting out a separate statutory provision for domestic partnerships).

- 1 U.S.C. § 7 ("[T]he word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.").

- 28 U.S.C. § 1738C ("No State, territory, or possession of the United States, or Indian tribe, shall be required to give effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship.").

- Tr. 1963:3-8 (Tam:  "If 'domestic partner' is defined as it is now, then we can explain to our children that, yeah, there are some same-sex person wants to

42

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

have a lifetime together as committed partners, and that is called 'domestic partner,' but it is not 'marriage.'").

- Tr. 712:5-12, 712:23-713:9 (Egan:  Estimating that same-sex couples would realize an income tax savings, on average, of $440 a year, if allowed to marry).

PFF 69.  The qualifications and requirements for entering into or dissolving domestic partnership differ from the qualifications and requirements for entering into or dissolving a marriage.

- Cal. Fam. Code § 297 (setting forth multiple, specific entrance requirements for domestic partnerships).

- Cal. Fam. Code § 299(a) (allowing domestic partners to terminate their partnership without having to file a proceeding for dissolution of domestic partnership if certain circumstances are met).

- Cal. Fam. Code § 299(d) (providing that, in other respects, the dissolution of a domestic partnership will mirror the dissolution of marriages under Family Code §§ 2300 *et seq.* (statutory provisions governing dissolution procedures)).

- Cal. Fam. Code § 300 (setting forth the requirements for entering into a marriage, which constitute only consent and the issuance of a marriage license).

## 2.   Gay and Lesbian People Can Have, Adopt, and Parent Children

PFF 70.  Same-sex couples are legally permitted to have and raise children through assisted reproduction, adoption, and foster parenting in the State of California.

- PX0709 at RFA No. 22 (Administration admits "that California law does not prohibit individuals from raising children on the basis of sexual orientation").

- PX0710 at RFA No. 57 (Attorney General admits "that the law of the State of California protects the right of gay men and lesbians in same sex relationships to be foster parents and to adopt children by forbidding discrimination on the basis of sexual orientation.").

- Cal. Welf. & Inst. Code § 16013(a) ("It is the policy of this state that all persons engaged in providing care and services to foster children . . . shall have fair and equal access to all available programs, services, benefits, and licensing processes, and shall not be subjected to discrimination or harassment on the basis of their clients' or their own actual or perceived . . . sexual orientation.").

43

Gibson, Dunn & Crutcher LLP

- Cal. Fam. Code § 297.5(d) ("The rights and obligations of registered domestic partners with respect to a child of either of them shall be the same as those of spouses.").

- *Elisa B. v. Superior Court*, 117 P.3d 660, 670 (Cal. 2005) (holding that under the Uniform Parentage Act, a parent may have two parents of the same sex).

PFF 71.   California law expressly authorizes adoption by unmarried same-sex couples.

- PX0710 at RFA No. 57 (Attorney General admits "that the law of the State of California protects the right of gay men and lesbians in same sex relationships to be foster parents and to adopt children by forbidding discrimination on the basis of sexual orientation.").

- Cal. Fam. Code § 297.5(d) (making the rights of registered domestic partners with respect to the child of either partner the same as spouses); Cal. Fam. Code § 9000(b) (allowing a domestic partner to adopt the other partner's child).

- *Sharon S. v. Superior Court*, 73 P.3d 554, 569 (Cal. 2003) ("Unmarried persons always have been permitted to adopt children.").

PFF 72.   Many same-sex couples in California are raising children.  Many of California's adopted children live with a lesbian or gay parent, and as of the 2000 census, approximately 18 percent of same-sex couples in California were raising approximately 37,300 children under the age of 18.  This was so despite the absence of any legal recognition of same-sex relationships by the State of California until 1999.

- PX0707 at RFA No. 66 (Proponents admit that gay and lesbian individuals raise children together.).

- PX2096 at 2 (Williams Institute, Census Snapshot: California (Aug. 2008): "18% of same-sex couples in California are raising children under the age of 18" and "[a]s of 2005, an estimated 37,311 of California's children are living in households headed by same-sex couples.").

- Tr. 1348:23-1350:2 (Badgett:  Same-sex couples in California are raising 37,300 children under the age of 18.).

- PX1264 at 8 (Report by Gary J. Gates, et al.:  "More than 16,000 adopted children are living with lesbian and gay parents in California, the highest number among the states.").

44

*Gibson, Dunn
& Crutcher
LLP*

- Assem. B. No. 26, Act of Oct. 2, 1999, ch. 588, 1999 Cal. Legis. Serv. 3372 (West) (adding, *inter alia*, Cal. Health & Safety Code § 1261, which provided visitation rights for domestic partners).

PFF 73.   California freely permits and encourages gay and lesbian individuals to have children through laws that allow such methods of reproduction and permit lesbians and gay men to be foster parents and to adopt children.  In these respects, same-sex couples are indistinguishable from the many opposite-sex couples in California who use these same methods to bring children into their lives to love and raise as their own.  The only difference between these couples is that same-sex couples cannot marry, and they and their children therefore do not enjoy all the social and other benefits that the title and stature of marriage bring; whereas, opposite-sex couples can marry, and they and their children can enjoy these benefits.

- PX0709 at RFA No. 22 (Administration admits "that California law does not prohibit individuals from raising children on the basis of sexual orientation[.]").

- PX0710 at RFA No. 57 (Attorney General admits "that the law of the State of California protects the right of gay men and lesbians in same sex relationships to be foster parents and to adopt children by forbidding discrimination on the basis of sexual orientation.").

- Tr. 640:16-19 (Peplau:  "[E]xcept in places like Massachusetts, all children born to lesbians or gay men or raised by lesbians or gay men are out of wedlock, because the government doesn't permit their parents to marry.").

- PX1245 at 414 (Review by Letitia Anne Peplau & Adam W. Fingerhut: Discussing the various ways in which gay and lesbian parents have children).

- Tr. 583:12-585:21 (Peplau:  Discussing a large and well-respected body of research that shows same-sex relationships are similar to opposite-sex relationships.  The research shows "great similarity across couples, both same-sex and heterosexual.").

- Tr. 592:4-593:9 (Peplau:  Explaining that the same processes or dynamics at work in heterosexual relationships are also at work in same-sex relationships).

- Tr. 579:21-582:2 (Peplau:  Describing the various ways in which the marriage relationship has a protection effect that benefits a family's physical and psychological health).

45

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0781, PX0913, PX0937, PX0964, PX1171, PX1173, PX1250, PX1254, PX1474 (Examples of studies and reports showing that there are physical and psychological benefits associated with marriage for couples and their children).

- Tr. 594:13-20 (Peplau: "My opinion, based on the great similarities that have been documented between same-sex and heterosexual couples, is th[at] if same-sex couples were permitted to marry, that they also would enjoy the same benefits.").

- Tr. 599:12-19 (Peplau: Discussing the result of a survey of same-sex couples who married in Massachusetts showing that 95 percent of same-sex couples raising children thought that children had benefitted from the fact that their parents were able to marry).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.: "Of those [respondents] with children, nearly all respondents (93%) agreed or somewhat agreed that their children are happier and better off as a result of their marriage.").

- Tr. 1331:3-5 (Badgett: "[M]y opinion is that same-sex couples are very similar to different-sex couples in most economic and demographic characteristics.").

- Tr. 1332:19-1337:25 (Badgett: Same-sex couples and their children are denied all of the economic benefits of marriage that are available to different-sex couples.).

- Tr. 1964:17-1965:2 (Tam: It is important to children of same-sex couples that their parents be able to marry.).

- *See also* evidence cited in support of PFFs 145, 260, 269, 278.

**3.    Gay and Lesbian Californians Are Entitled to Equal Treatment in the Workplace, Housing, and Public Accommodations**

PFF 74.    The California Supreme Court has found that California's "current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

46

Gibson, Dunn
& Crutcher
LLP

PFF 75. The Unruh Civil Rights Act prohibits discrimination on the basis of sexual orientation in the provision of services by any business establishment.

- Cal. Civ. Code § 51 (prohibiting discrimination based on sexual orientation).

- *In re Marriage Cases*, 183 P.3d 384, 428 n.46 (Cal. 2008) (discussing state antidiscrimination provisions applicable to sexual orientation).

PFF 76. The California Government Code prohibits sexual orientation discrimination in employment and housing. The California Government Code also prohibits discrimination on the basis of sexual orientation in any program or activity that is conducted, operated, or administered by the State or receives financial assistance from the State.

- PX0710 at RFA No. 56 (Attorney General admits "that the law of the State of California . . . forbids discrimination in, among other things, employment, housing, education, and public accommodations on the basis of sex and sexual orientation.").

- Cal. Gov't Code § 11135 (prohibiting discrimination by any program or activity conducted, operated by, administered, or funded by the state or a state agency on the grounds of, inter alia, sexual orientation); § 12920 (prohibiting employment discrimination on the grounds of, inter alia, sexual orientation); § 12955 (prohibiting discrimination in housing accommodations).

- *In re Marriage Cases*, 183 P.3d 384, 428 n.46 (Cal. 2008) (discussing state antidiscrimination provisions applicable to sexual orientation).

**C.** ***In re Marriage Cases***

PFF 77. On May 15, 2008, the California Supreme Court decided *In re Marriage Cases*, which held that Family Code sections 300 and 308.5 were unconstitutional under the privacy, due process, and equal protection guarantees of the California Constitution.

- *In re Marriage Cases*, 183 P.3d 384, 433-34, 452 (Cal. 2008) (holding that same-sex couples have the right to marry under article I, sections 1 and 7 of the California Constitution and under the state's equal protection clause).

PFF 78. The California Supreme Court found that "[t]he ability of an individual to join in a committed, long-term, officially recognized family relationship with the person of his

47

09-CV-2292 VRW PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Gibson, Dunn & Crutcher LLP

or her choice is often of crucial significance to the individual's happiness and well-being." *In re Marriage Cases*, 183 P.3d 384, 424 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 424 (Cal. 2008).

PFF 79. The California Supreme Court also found that "[t]he state's current policies and conduct regarding homosexuality recognize that gay individuals are entitled to the same legal rights and the same respect and dignity afforded all other individuals and are protected from discrimination on the basis of their sexual orientation, and, more specifically, recognize that gay individuals are fully capable of entering into the kind of loving and enduring committed relationships that may serve as the foundation of a family and of responsibly caring for and raising children." *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 428 (Cal. 2008).

- PX0707 at RFA No. 58 (Proponents admit "that many gay men and lesbians have established loving and committed relationships.").

PFF 80. The California Supreme Court further found that "[i]n light of the fundamental nature of the substantive rights embodied in the right to marry—and their central importance to an individual's opportunity to live a happy, meaningful, and satisfying life as a full member of society—the California Constitution properly must be interpreted to guarantee this basic civil right to *all* individuals and couples, without regard to their sexual orientation." *In re Marriage Cases*, 183 P.3d 384, 427 (Cal. 2008) (emphasis in original).

- *In re Marriage Cases*, 183 P.3d 384, 427 (Cal. 2008).

PFF 81. The California Supreme Court similarly found that "[b]ecause a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment." *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

48

Gibson, Dunn
& Crutcher
LLP

- *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

PFF 82.    The California Supreme Court also found that "because of the long and celebrated history of the term 'marriage' and the widespread understanding that this term describes a union unreservedly approved and favored by the community, there clearly is a considerable and undeniable symbolic importance to this designation." *In re Marriage Cases*, 183 P.3d 384, 445 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 445 (Cal. 2008).

PFF 83.    In addition, the California Supreme Court found that creating a separate domestic partnership regime for same-sex couples "perpetuat[ed] a more general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples." *In re Marriage Cases*, 183 P.3d 384, 402 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 402 (Cal. 2008).

PFF 84.    The California Supreme Court also found that classifications based on sexual orientation are entitled to heightened scrutiny under California law. *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

- *In re Marriage Cases*, 183 P.3d 384, 442 (Cal. 2008).

PFF 85.    As a result of the *In re Marriage Cases* ruling, California's statutory exclusion of gay and lesbian individuals from civil marriage was invalidated, same-sex couples were permitted to marry in the State, and marriages of same-sex couples began on or about June 16, 2008.  Approximately 18,000 marriages of same-sex couples were performed prior to November 5, 2008.

- PX0710 at RFA No. 46 (Attorney General admits "that under California law, before the adoption of Proposition 8, gay men and lesbians had a constitutional right to civil marriage.").

49

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- • PX0710 at RFA No. 63 (Attorney General admits "that approximately 18,000 same-sex civil marriages were solemnized in California between May 15 and November 5, 2008.").

- • *Strauss v. Horton*, 207 P.3d 48, 59 (Cal. 2009) (Noting that the California Supreme Court would have to consider, in part, what effect Proposition 8 had on the approximately 18,000 marriages performed during the period in which marriage between people of the same sex was legal).

- • *Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009) (Upholding the existing 18,000 marriages by gay and lesbian couples and thereby creating three classes of citizens in California).

- • Tr. 1338:20-22; 1469:10-17; PX 1271 at app. tbl. 2 (Report by Gary J. Gates: Stating that approximately 18,000 same-sex couples have gotten married in California).

- • PX0710 at RFA No. 62 (Attorney General admits "that neither Proposition 8 nor any other law changed the legal legitimacy or status of same-sex civil marriages that were solemnized in California between May 15, 2008 and November 5, 2008.").

- • Cal. Fam. Code § 308 (providing for the recognition of marriages by gay and lesbian couples contracted outside California under certain circumstances).

### D. The Prop. 8 Campaign and Passage

PFF 86. On June 2, 2008, the Secretary of State declared that Prop. 8 could be placed on the

ballot.

- • *Strauss v. Horton*, 207 P.3d 48, 68 (Cal. 2009) ("On June 2, 2008, the Secretary of State certified that Proposition 8 had obtained a sufficient number of valid signatures to appear on the November 4, 2008 general election ballot.").

- • PX0507 at ¶ 21 (Decl. of Hak-Shing William Tam in Supp. of Proposed Intervenors' Mot. to Intervene: "On June 2, 2008, because of my capacity as an Official Proponent, the Secretary of State notified me that the county-elections officials had verified the requisite number of voter signatures and that Proposition 8 qualified for inclusion on the November 2008 ballot.").

PFF 87. The Prop. 8 measure was titled: "Eliminates Rights of Same-Sex Couples to Marry.

Initiative Constitutional Amendment."

- • PX0001 at 9 (California Voter Guide).

50

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 88.   The General Election Voter Information Guide stated that Prop. 8 would "[c]hange[]
the California Constitution to eliminate the right of same-sex couples to marry in
California."

- PX0001 at 9 (California Voter Information Guide:  "Changes California
  Constitution to eliminate the right of same-sex couples to marry.").

- PX0710 at RFA No. 49 (Attorney General admits that according to the official
  General Election Voter Information Guide, Prop. 8 "[c]hange[d] the California
  Constitution to eliminate the right of same-sex couples to marry in
  California.").

PFF 89.   On November 4, 2008, California voters passed Prop. 8 by a margin of approximately
52.3% to 47.7%.

- Cal. Sec'y of State, Votes For and Against November 4, 2008 State Ballot
  Measures, *available at*
  http://www.sos.ca.gov/elections/sov/2008_general/7_votes_for_against.pdf
  (7,001,084 people voted for Prop. 8, and 6,401,482 voted against).

- *Strauss v. Horton*, 207 P.3d 48, 68 (Cal. 2009) ("At that election, Proposition 8
  was approved by a majority (52.3 percent) of the voters casting votes on the
  proposition.").

- PX0707 at RFA No. 33, PX0710 at RFA No. 33, PX0709 at RFA No. 33
  (Proponents, Attorney General, and Administrations admissions that Prop. 8
  was approved by 52.3% of the voters casting votes on the proposition).

PFF 90.   Prop. 8 does not purport to, and does not, change or alter any holding in *In re
Marriage Cases* that heightened scrutiny applies to classifications based on sexual
orientation.

- *Strauss v. Horton*, 207 P.3d 48, 61 (Cal. 2009) (holding that Proposition 8 did
  not "fundamentally alter the meaning and substance of state constitutional
  equal protection principles" but rather "carve[d] out a narrow and limited
  exception . . . .") (italics omitted).

PFF 91.   Prop. 8 added the following text to the Constitution of California: "Only marriage
between a man and a woman is valid or recognized in California."

- Cal. Const. art. I, § 7.5 ("Only marriage between a man and a woman is valid
  or recognized in California.").

51

PFF 92.    In their Politics Magazine article, Frank Schubert and Jeff Flint attributed the success of their campaign to their message that marriage between individuals of the same sex would threaten "religious freedom" and "individual freedom of expression," and would result in the forced teaching of gay marriage in public schools.  They also claimed that their "ability to organize a massive volunteer effort through religious denominations gave [them] a huge advantage."

- PX0577 at 45-56 (Article by Frank Schubert and Jeff Flint in *Politics Magazine*:  "We settled on three broad areas where this conflict of rights was most likely to occur: in the area of religious freedom, in the area of individual freedom of expression, and in how this new 'fundamental right' would be inculcated in young children through public schools." "After blanketing the state with 'Whether You Like It or Not,' we focused our message on education."); *see also id.* at 47 (Discussing the support of the religious community).

PFF 93.    Prop. 8 went into effect on November 5, 2008, and since that date, same-sex couples have been denied marriage licenses.

- PX0710 at RFA No. 47 (Attorney General admits "that Proposition 8 eliminated the right of same sex couples to marry.").

- PX0728 at ¶ 36 (Attorney General's Answer: "[A]dmits that absent an adverse judgment or entry of an injunction in this case, the Defendants (excepting the Attorney General) will have a legal obligation to enforce Proposition 8 to the extent that Proposition 8 is subject to enforcement by them, see Cal. Const., art. III, § 3.5 [and] that the passage of Proposition 8 was in violation of the Fourteenth Amendment to the United States Constitution[.]").

- PX0710 at RFA No. 64 (Attorney General admits "that if any of the same-sex civil marriages solemnized in California between May 15 and November 5, 2008 end by reason of death or divorce, the individuals formerly in those marriages would not have the legal right to enter into another same sex civil marriage in California.").

- Tr. 88:6-14 (Katami: Explaining that he and Zarrillo applied for a marriage license and were denied in May 2009).

- Tr. 157:9-158:5 (Perry:  Describing their unsuccessful attempt to obtain a marriage license from the Alameda County Recorder's Office in May, 2009).

52

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 94.    To the extent that opponents of Prop. 8 used boycotts, protests, and picketing to express their opposition, such tactics are an acceptable exercise of their First Amendment rights and are often used by groups who lack power in the political process.

- *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982) ("The boycott of white merchants at issue in this case took many forms.  The boycott was launched at a meeting of a local branch of the NAACP attended by several hundred persons.  Its acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice.  The boycott was supported by speeches and nonviolent picketing. Participants repeatedly encouraged others to join in its cause.").

- *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909 (1982) ("Speech itself also was used to further the aims of the boycott.  Nonparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation.  These elements of the boycott involve speech in its most direct form.  In addition, names of boycott violators were read aloud at meetings at the First Baptist Church and published in a local black newspaper. Petitioners admittedly sought to persuade others to join the boycott through social pressure and the 'threat' of social ostracism.  Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action.").

- Tr. 1839:24-1840:2 (Segura:  "[B]oycotts, protests, picketing are strategies used by people who are less powerful in the political systems, for whom traditional means of political action are less productive.").

PFF 95.    Supporters of Prop. 8 used threats and intimidation against opponents of Prop. 8, and credible witnesses testified to such incidents.

- Tr. 1219:24-1220:3, 1220:14-20 *(*Zia:  "And when we would be out on the streets of San Francisco or in Oakland, handing out fliers, people would just come up to us and say, you know, 'You dike.'  And excuse my language, Your Honor, but, 'You fucking dike.'  Or, 'You're going to die and burn in hell. You're an abomination.' . . . And while we were handing out fliers, dozens of people, separate people in separate locations, separate times in different cities, would look at the flier, laugh, or just look at us, or say something with a—the most derisive kind of expression, and say, 'No more people.  With this, no more people.  No more human race.'  That we, such abominations, would be the cause of the end of the human race.").

53

*Gibson, Dunn
& Crutcher
LLP*

1    •   Tr. 1317:21-1318:6 (Sanders:  "[S]omebody wrote [in] chalk, in front of my
2        house, because we had a No On 8 sign out.  That said, 'God's law.  Vote Yes
         On 8.'").

3    **E.    After Prop. 8, Whether Two People Can Marry Turns Entirely on Their Sex**

4    PFF 96.    Marrying a person of the opposite sex is not a realistic option for gay and lesbian
5
         individuals.
6
7        •   PX0707 at RFA No. 9 (Proponents "admit that for many gay and lesbian
             individuals, marriage to an individual of the opposite sex is not a meaningful
8            alternative.").

9        •   PX0710 at RFA No. 9 (Attorney General "admits that for gay men and
             lesbians, opposite sex marriage may not be a meaningful alternative to same-
10           sex marriage to the extent that it would compel them to negate their sexual
11           orientation and identity.").

12       •   Tr. 85:9-21 (Zarrillo:  Explaining that he would not marry a person of the
             opposite sex:  "I have no attraction, desire, to be with a member of the opposite
13           sex.").

14       •   Tr. 2042:14-25 (Herek:  While gay men and lesbians in California are
             permitted to marry, they are only permitted to marry a member of the opposite
15           sex.  For the vast majority of gay men and lesbians, that is not a realistic
16           option.  This is true because sexual orientation is about the relationships people
             form—it defines the universe of people with whom one is able to form the sort
17           of intimate, committed relationship that would be the basis for marriage.).

18       •   Tr. 2043:1-2044:10 (Herek:  Some gay men and lesbians have married
             members of the opposite sex, but many of those marriages dissolve, and some
19           of them experience considerable problems simply because one of the partners
20           is gay or lesbian.  A gay or lesbian person marrying a person of the opposite
             sex is likely to create a great deal of conflict and tension in the relationship.).

21
22   PFF 97.    Prop. 8 discriminates against gay and lesbian individuals on the basis of their sex.

23       •   Tr. 244:21-25 (Cott:  "[T]he more symmetrical and gender-neutral spousal
             roles have become in fact, I would say, in the social world and certainly in the
24           law, the more that the marriage between couples of the same sex seems
             perfectly capable of fulfilling the purposes of marriage.").
25
26       •   Tr. 248:15-19 (Cott:  "There is no longer an expectation that the man-woman
             difference need found household, given that the sexual division of labor is no
27           longer so pronounced in our society and isn't, I hope, a founding feature of our
             economy and how economic benefit is created.").
28

54

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Cal. Const. Art. I, § 7.5 (Proposition 8:  Amending California Constitution to provide that "[o]nly marriage between a man and a woman is valid or recognized in California," thereby prohibiting a man from marrying a person that a woman would be free to marry, and vice-versa).

- *See also* evidence cited in support of PFFs 52-58.

PFF 98.  Under Prop. 8, whether two individuals can marry is directly based on the sex of those individuals involved.  Under Prop. 8, a man is permitted to marry a woman where a woman would be prohibited from doing so, and vice-versa.  The distinguishing characteristic is the sex of the people involved.

- Tr. 167:12-15 (Stier:  "I would like to marry the person that I choose and that is Kris Perry.  She is a woman.  And according to California law right now, we can't get married, and I want to get married.").

- Cal. Const. Art. I, § 7.5 (Proposition 8).

- *See also* evidence cited in support of PFF 97.

### F.  *Strauss v. Horton*

PFF 99.  On November 5, 2008, three separate suits were filed to invalidate Prop. 8, and they were consolidated into *Strauss v. Horton*, Nos. S168047, S168066, S168078.  The main issue raised in *Strauss* was whether Prop. 8 constituted a revision to the California Constitution, as opposed to an amendment.

- *Strauss v. Horton*, 207 P.3d 48, 68-69 (Cal. 2009) (discussing procedural background and consolidation of the lawsuits); *id.* at 59 (discussing issues presented).

PFF 100.  The California Supreme Court heard oral argument in *Strauss v. Horton* on March 5, 2009 and issued its ruling on May 26, 2009.  That ruling upheld Prop. 8, but also upheld the 18,000 marriages of same-sex couples performed in California prior to the enactment of Prop. 8.

- *Strauss v. Horton*, 207 P.3d 48, 69 (Cal. 2009) (providing date of oral argument); *id.* at 122 (upholding the 18,000 marriages performed in California prior to the enactment of Prop. 8).

55

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 101.   Proponents admit that if any marriages of same-sex couples currently recognized by the State of California as married end by reason of death or divorce, the gay and lesbian individuals in those marriages would not be allowed to remarry.  The ruling in *Strauss v. Horton* therefore created a patchwork regulatory regime with respect to marriage in California that involves at least *five* categories of individuals:  Those in opposite-sex couples, who are permitted to marry, and to remarry upon divorce; those who comprise the 18,000 same-sex couples who were married after the California Supreme Court's decision in the *Marriage Cases* but before the enactment of Prop. 8, whose marriages remain valid but who are not permitted to remarry upon divorce; and those who are in unmarried same-sex couples, who are prohibited by Prop. 8 from marrying and restricted to the status of domestic partnership.  In addition, California Family Code §§ 308(b) and (c), signed into law in 2009, creates two additional categories of individuals:  those same-sex couples who entered into a valid marriage outside of California *before* November 5, 2008 are treated as married under California law, but are not permitted to remarry within the state upon divorce; and those same-sex couples who entered into a valid marriage outside of California *on or after* November 5, 2008 are granted the rights and responsibilities of marriage, but not the designation of "marriage" itself.  In effect, there are now five types of relationships—and five classes of individuals—recognized under California law.

- PX0710 at RFA No. 47 (Attorney General admits "that Proposition 8 eliminated the right of same sex couples to marry.").

- *Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009) (Upholding the 18,000 marriages performed in California prior to the enactment of Proposition 8).

- PX0707 at RFA No. 64 (Proponents admit "that if the marriages of any of approximately 18,000 same-sex couples currently recognized by the State of California as married end by reason of death or divorce, the gay and lesbian individuals in those marriages would not be allowed to remarry.").

- Cal. Fam. Code § 308 (Providing the legal designation of "marriage" for marriages by gay and lesbian couples contracted outside California prior to November 5, 2008, and all the rights and responsibilities—but not the

56

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

designation of marriage—for such marriages contracted outside California *after* November 5, 2008).

### G.   *Perry v. Schwarzenegger*

PFF 102.   Plaintiffs filed their Complaint on May 22, 2009 and a Motion for Preliminary Injunction on May 27, 2009.  The Court denied Plaintiffs' Motion for Preliminary Injunction on July 2, 2009.

- Doc # 1 (Complaint); Doc # 7 (Motion for Preliminary Injunction); Doc # 77 (Minute Entry describing motion hearing held on July 2, 2009).

PFF 103.   Defendant-Intervenors Proposition 8 Proponents and ProtectMarriage filed a Motion to Intervene on May 28, 2009, which was granted on July 2, 2009.

- Doc # 8 (Proponents' Motion to Intervene); Doc # 76 (Order granting same).

PFF 104.   Plaintiff-Intervenor City and County of San Francisco filed a Motion to Intervene on July 23, 2009, which was granted on August 19, 2009.

- Doc # 109 (City and County of San Francisco's Motion to Intervene); Doc # 160 (Minute Entry describing motion hearing held on August 19, 2009).

PFF 105.   Proponents filed a Motion for Protective Order on September 15, 2009.  The Court denied, in part, Proponents' Motion for Protective Order on October 1, 2009 and ordered Proponents to produce certain non-public documents relating to the Yes on 8 campaign.

- Doc # 187 (Proponents' Motion for Protective Order); Doc # 214 (Order granting in part and denying in part same).

PFF 106.   Proponents filed a Motion for Summary Judgment on September 9, 2009.  The Court denied the Motion on October 14, 2009.

- Doc # 172 (Proponents' Motion for Summary Judgment); Doc # 226 (Minute Entry describing motion hearing held on October 14, 2009, reflecting the denial of Proponents' Motion for Summary Judgment).

Gibson, Dunn
& Crutcher
LLP

PFF 107.    Proponents filed a Motion to Realign Defendant Edmund G. Brown, Jr., Attorney General of California, as a Plaintiff in this matter on October 2, 2009.  The Court denied Proponents' Motion on December 23, 2009.

- Doc # 216 (Proponents' Motion to Realign Defendant Attorney General Edmund G. Brown); Doc # 319 (Order denying same).

## IV.   The Denial of Marriage Rights Causes Plaintiffs and Other Gay and Lesbian Individuals Grievous Injuries and Drains the Public Fisc

### A.    Stigmatic Harm and Related Health Effects from Denial of Marriage to Same-Sex Couples

PFF 108.    Civil marriage is a deeply meaningful institution to individuals, families, communities, and the State of California.  Enhanced by government recognition for so long, legal marriage is a symbol of privilege.  The idea that marriage was a happy ending, the ultimate reward, the sign of adult belonging, and the definitive expression of love and commitment is deeply engrained in our society.  Nothing has the same meaning, obligations, rights, and benefits except marriage itself.  Moreover, marriage is a primary source of well-being for adults in the United States.

- DIX0956 at 6 (Blankenhorn, *Future of Marriage*): "*Marriage matters*.  It significantly influences individual and societal well-being.").

- Tr. 2790:5-9 (Blankenhorn:  "When we say the word 'marriage,' it's a big institution that performs a very large contribution to society and it's much bigger, much more powerful and potent as a role in society than merely or only the enumeration of its legal incidents.").

- Tr. 2839:4-10 (Blankenhorn:  Characterizing marriage as a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 202:2-203:0 (Cott:  The ability to marry is a "basic civil right."  "[A]n ex-slave who had also been a Union soldier . . . declared, 'The marriage covenant is the foundation of all our rights.'").

58

- Tr. 207:9-208:6 (Cott:  Describing the social meaning of marriage in our culture; marriage has been the "happy ending to the romance."  Marriage "is the principal happy ending in all of our romantic tales"; the "cultural polish on marriage" is "as a destination to be gained by any couple who love one another.").

- Tr. 208:9-17 (Cott:  "Q.  Let me ask you this.  How does the cultural value and the meaning, social meaning of marriage, in your view, compare with the social meaning of domestic partnerships and civil unions?  A.  I appreciate the fact that several states have extended—maybe it's many states now, have extended most of the material rights and benefits of marriage to people who have civil unions or domestic partnerships.  But there really is no comparison, in my historical view, because there is nothing that is like marriage except marriage.").

- Tr. 579:23-580:1 (Peplau:  Marriage has a protective effect.  "[T]here are things associated with marriage that actually enhance and contribute to health; things that people didn't bring into the relationship, that they experience as a result of being married.").

- Tr. 580:20 (Peplau:  "Marriage is a valued status in society.").

- Tr. 580:6-581:6 (Peplau:  Getting married signals a change in a person's identity that often leads to changes in a person's behavior that can benefit one's physical and psychological health.).

- Tr. 581:7-11 (Peplau:  "[T]here are often important ways in which spouses . . . help each other, try to encourage each other to lead healthy lifestyles.").

- Tr. 581:12-22 (Peplau:  Getting married expands a person's social networks to his or her spouses' family and friends who can assist the couple "through tough times.").

- Tr. 611:1-7 (Peplau:  "I have great confidence that some of the things that come from marriage, believing that you are part of the first class kind of relationship in this country, that you are . . . in the status of relationships that this society most values, most esteems, considers the most legitimate and the most appropriate, undoubtedly has benefits that are not part of domestic partnerships.").

- Tr. 1342:14-1343:12 (Badgett:  Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as second class status, value marriage because it is socially validated by the community and dislike domestic partnership because it sounds too clinical.).

- Tr. 1471:1-1472:8 (Badgett:  Same-sex couples value the social recognition of marriage, and believe that the alternative status conveys a message of inferiority.).

59

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1344:3-1348:13; PX1267 at 1 (Badgett: A study of married same-sex couples in Massachusetts, PX1267, indicated that almost 70% felt more accepted by their communities as a result of marriage.).

- Tr. 79:20-80:13 (Zarrillo: "[Paul Katami] is the love of my life. I love him probably more than I love myself. . . . And I want nothing more than to marry him. . . . The word 'marriage' has a special meaning. . . . I want to be able to share the joy and the happiness that my parents felt, my brother felt, my friends, my co-workers, my neighbors, of having the opportunity to be married. It's the logical next step for us.").

- Tr. 89:17-90:3 (Katami: "[M]arriage is so important because it solidifies the relationship"; "[H]aving a marriage would grow our relationship. It represents us to our community and to society.").

- Tr. 1962:17-24 (Tam: "Because the name of 'marriage' is so important, especially for us parents to teach our kid kids, all right? . . . Everyone fantasize whom they will marry when they grow up.").

- Tr. 2003:19-2004:3 (Tam: There were periods of American history when the law limited who Asian Americans could marry and that he would feel very aggrieved if he couldn't marry the person he loved.).

- Tr. 1960:1-9 (Tam: Tam knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

- PX0767, at 5 (Am. Psychol. Ass'n, Professional Association Policies: "[M]arriage is a basic human right and an individual personal choice.").

PFF 109.    Marriage brings with it many tangible legal rights, privileges, benefits, and obligations to the married individuals, and that it also confers significant intangible benefits to the married individuals.

- PX0707 at RFA Nos. 5, 6 (Proponents admit PFF 109 in its entirety).

- PX0710 at RFA Nos. 5, 6 (Attorney General admits PFF 109 in its entirety).

- PX0709 at RFA No. 5 (Administration admits "that California law confers certain legal rights, privileges, benefits, and obligations to married individuals").

- PX0760 at 1 (Am. Psychoanalytic Ass'n. Position Paper on Gay Marriage: "Civil marriage provides a legal framework for the creation and dissolution of committed relationships; it socially sanctions a relationship, defining its legal

60

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   rights, benefits and responsibilities.  Marriage thus functions as a stabilizing
2   force.”).

3   •   Tr. 2839:4-10 (Blankenhorn:  Marriage is a “public good” that “serves
4   important public purposes, and marriage makes a distinctive contribution to
    society.”); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

5   •   Tr. 2839:11-15 (Blankenhorn:  Agreeing that “marriage is something that
6   benefits both the participants in the marriage, the couple that are married, as
    well as any children that the couple may raise”); *see also* DIX0956 at 203
7   (Blankenhorn, *Future of Marriage*).

8   •   Tr. 2790:5-9 (Blankenhorn:  “When we say the word ‘marriage,’ it’s a big
9   institution that performs a very large contribution to society and it’s much
    bigger, much more powerful and potent as a role in society than merely or only
10  the enumeration of its legal incidents.”).

11  •   DIX0956 at 6 (Blankenhorn, *Future of Marriage*):  “*Marriage matters*.  It
    significantly influences individual and societal well-being.”).

12  •   PX2879 at 9 (*The Marriage Movement:  A Statement of Principles* (2000):
13  “The public, legal side of marriage increases couples’ confidence that their
    partnerships will last.”).

14
15  •   PX2879 at 12 (*The Marriage Movement:  A Statement of Principles* (2000):
    “Married adults live longer, healthier, happier and more affluent lives than
16  adults who don’t marry or don’t stay married.  This phenomenon is not simply
    an artifact of selection; marriage itself makes adults better off, by offering
17  them greater emotional and financial support, wider and more integrated social
    networks, important economies of scale, and productive boosts in earnings,
18  parenting capacity, and life management.”).

19  •   PX2879 at 12 (*The Marriage Movement:  A Statement of Principles* (2000):
20  “Marriage also helps to conserve wealth and expand social capital.  At any
    given level of income, married adults are less likely to experience financial
21  hardship.  The longer people stay married, the more wealth they accumulate,
    whereas length of cohabitation has no relationship to wealth accumulation.
22  Informal partners—who are not held by the wider society to be financially
    responsible to one another—do not reap the same benefits as the legally
23  married.”).

24  •   PX0886 (Am. Psychiatric Ass’n, Position Statement:  Noting the benefits of
25  marriage for married adults and their children).

26  •   PX1397 at 1 (U.S. General Accounting Office Report, Jan. 23, 2004:
    Identifies “a total of 1,138 federal statutory provisions classified in the United
27  States Code in which marital status is a factor in determining or receiving
    benefits, rights, and privileges”).
28

61

*Gibson, Dunn
& Crutcher
LLP*

- Tr. 235:19-236:16 (Cott:  "[I]n the 20th century, the federal government has tended to use the institution of marriage and the marriage-based family as the conduit for benefits of many sorts.").

- PX1746 throughout, including at 2 (Nancy Cott, *Public Vows*:  "Marriage prescribes duties and dispenses privileges.").

- Tr. 581:23-582:2 (Peplau:  "[M]arriage can also lead to various kinds of supports from government, to beneficial laws or being eligible for programs or for health insurance through an employer.").

- Tr. 1331:12-1337:2 (Badgett:  Marriage confers numerous economic benefits including greater specialization of labor, reduced transaction costs, health and insurance benefits, stronger statement of commitment, greater validation and social acceptance of the relationship and more positive workplace outcomes.  Some costs are not quantifiable, but are nevertheless substantial.).

- Tr. 1341:2-1342:13 (Badgett:  Couples that would marry but would not enter into a domestic partnership suffer tangible economic harm such as higher taxes and limited access to health insurance.  Not all of these costs are quantifiable, but across the state there are millions of dollars of quantifiable costs to same-sex couples that cannot marry.).

- PX2876 at 381 (Levine, *Alternative Kinship, Marriage, and Reproduction*, Annual Review of Anthropology (2008):  "[I]t is already clear that many gay men and lesbian women are seeking formal recognition of their relationships as marriages, and not only for pragmatic reasons, such as access to employer-paid health care, rights to inheritance, or designations as next of kin in case of an emergency.  Hull (2006) argued that same-sex couples do so because marriage is a powerful relationship model in American culture and because of the power of law in American society to validate relationships—and thus to offer recognition and social legitimacy to homosexual relationships.").

- Tr. 1232:11-1237:22 (Zia:  Zia explained that getting married has "made changes in so many multitude of ways, tangible and intangible."  One of the main benefits of her marriage is the way her family is relating to her and Lia.  Zia recounted that after her wedding ceremony, her niece said "Auntie Lia, now you're really my auntie."  And suddenly Lia's family was able to say, "Helen is my daughter-in-law."  To Zia, "in those most important moments in our lives, marriage made it very clear that I was family, that we were family, and where we stand.").

- Tr. 179:5-18 (Stier:  Explaining that being able to marry Perry would: "change my life dramatically . . . I would feel more secure.  I would feel more accepted.  I would feel more pride.").

*Gibson, Dunn & Crutcher LLP*

PFF 110.   The word "marriage" has a unique meaning, and there is a significant symbolic

disparity between domestic partnership and marriage.

- PX0707 at RFA Nos. 4, 38 (Proponents admit PFF 110 in its entirety).

- PX0710 at RFA No. 38 (Attorney General admits "that there is a significant symbolic disparity between domestic partnership and marriage.").

- PX0767, at 6 (Am. Psychol. Ass'n, Professional Association Policies: "[S]ame-sex couples who enter into a civil union are denied equal access to all the benefits, rights, and privileges provided by federal law to married couples . . . the benefits, rights, and privileges associated with domestic partnerships are not universally available, are not equal to those associated with marriage, and are rarely portable[.]").

- DIX0956 at 6 (Blankenhorn, *Future of Marriage*): "*Marriage matters*.  It significantly influences individual and societal well-being.").

- Tr. 2790:5-9 (Blankenhorn:  "When we say the word 'marriage,' it's a big institution that performs a very large contribution to society and it's much bigger, much more powerful and potent as a role in society than merely or only the enumeration of its legal incidents.").

- Tr. 2839:4-10 (Blankenhorn:  Characterizing marriage as a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2839:11-15 (Blankenhorn: Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2850:4-9 (Blankenhorn:  Agreeing that "Same-sex marriage would signify greater social acceptance of homosexual love and the worth and validity of same-sex intimate relationships."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- PX2876 at 381 (Levine, *Alternative Kinship, Marriage, and Reproduction*, Annual Review of Anthropology (2008): "[I]it is already clear that many gay men and lesbian women are seeking formal recognition of their relationships as marriages, and not only for pragmatic reasons, such as access to employer-paid health care, rights to inheritance, or designations as next of kin in case of an emergency.  Hull (2006) argued that same-sex couples do so because marriage is a powerful relationship model in American culture and because of the power of law in American society to validate relationships—and thus to offer recognition and social legitimacy to homosexual relationships.").

63

Gibson, Dunn & Crutcher LLP

- Tr. 208:9-209:3 (Cott:  Explaining that, from a historical perspective, "[t]here is nothing that is like marriage except marriage").

- Tr. 225:4-7 (Cott: " [T]he fact that the state is involved in granting these kinds of benefits and legitimacy to the marital family tends to lend a prestige, a status to that institution that no informal marriage has ever approximated.").

- Tr. 612:6-612:18 (Peplau:  Scholars have suggested that marriage is an enforceable trust; that is, "it enhances the likelihood that . . . commitments will, in fact, be acted upon and be enforceable. . . . [P]eople associate with marriage a degree of seriousness and sort of gravitas that leads them to take those obligations seriously.").

- Tr. 613:23-614:12 (Peplau:  Discussing the symbolic disparity between marriage and domestic partnerships; a domestic partnership is "not something that is necessarily understood or recognized by other people in your environment").

- Tr. 659:8-15 (Peplau:  As a result of the different social meanings of a marriage and a domestic partnership, there is a greater degree of an enforceable trust in a marriage than a domestic partnership.).

- Tr. 1225-1227:7 (Zia:  Zia and her wife were registered as domestic partners in San Francisco in 1993.  Zia described the process as "anticlimactic. . . . It didn't feel like much at all.  It wasn't the kind of thing we sent notice out to friends about, or sent invitations to a party or anything.").

- Tr. 1233:11-25 (Zia:  When Zia and her wife were just domestic partners, nobody understood what it meant.  They would tell people they were partners, and people would ask them, "Partner in what business?" Even after they explained that they were "partners in life," people would still be bewildered and ask "Do you mean life insurance?").

- Tr. 1234:2-22 (Zia:  When Zia and her wife were just domestic partners, her family would struggle to describe their relationship. For example, Zia's mom would just call Shigemura, "Helen's friend.").

- Tr. 1234:23-1237:22 (Zia:  After they got married, people, including her family, now understood their relationship. Her mom now refers to Shigemura as her "daughter-in-law" and "people understand that."  Nobody has to ask for clarification.).

- PX0186 (YouTube Video of Sanders Support for Gay Marriage Announcement:  Sanders said he signed a San Diego resolution supporting gay marriage because "I just could not bring myself to tell an entire group of people, in our community, they were less important, less worthy, or less deserving of the rights and responsibilities of marriage than anyone else, simply because of their sexual orientation.").

64

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0186 (YouTube Video of Sanders Support for Gay Marriage Announcement: "In the end, I couldn't look any of them in the face and tell them that their relationship, their very lives were any less meaningful than the marriage I share with my wife Rana.").

- Tr. 1281:1-1282:3 (Sanders: Sanders' daughter Lisa entered into a domestic partnership with her partner Meagan in July of 2009. Sanders said that there was no celebration and that there was no notice that they were going to do so. He just received a text from Lisa telling him that "they had got the DP taken care of.").

- Tr. 142:2-13 (Perry: When you are married, "you are honored and respected by your family. Your children know what your relationship is. And when you leave home and you go to work or you go out in the world, people know what your relationship means.").

- Tr. 153:4-155:5 (Perry: Stier and Perry completed documents to register as domestic partners and mailed them in to the State. Perry views domestic partnership as an agreement; it is not the same as marriage, which symbolizes "maybe the most important decision you make an adult, who you choose [as your spouse].").

- Tr. 170:12-171:14 (Stier: To Stier, domestic partnership feels like a legal agreement between two parties that spells out responsibilities and duties. Nothing about domestic partnership indicates the love and commitment that are inherent in marriage, and for Stier and Perry, "it doesn't have anything to do . . . with the nature of our relationship and the type of enduring relationship we want it to be. It's just a legal document.").

- Tr. 172:6-21 (Stier: Marriage is about making a public commitment to the world and to your spouse, to your family, parents, society, and community. It is the way we tell them and each other that this is a lifetime commitment. "And I have to say, having been married for 12 years and been in a domestic partnership for 10 years, it's different. It's not the same. I want—I don't want to have to explain myself.").

- Tr. 82:9-83:1 (Zarrillo: "Domestic partnership would relegate me to a level of second class citizenship . . . . It's giving me part of the pie, but not the whole thing . . . [I]t doesn't give due respect to the relationship that we have had for almost nine years.").

- Tr. 115:3-116:1 (Katami: Domestic partnerships "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages from other states. . . . None of our friends have ever said, 'Hey, this is my domestic partner.'").

Gibson, Dunn & Crutcher LLP

- Tr. 1960:1-9 (Tam:  Knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

PFF 111.   Indeed, children aspire to be married, not to be domestic partners.

- Tr. 826:21-828:4 (Meyer:  Domestic partnership does not eliminate the structural stigma of Prop. 8 because it does not provide the symbolic meaning or social meaning of marriage.  Young children, for example, do not aspire to be domestic partners, but the word "marriage" is something that people aspire to.  Marriage is a desirable and respected goal that, if you attain it, gives you pride and respect.  Not only does domestic partnership not have a similar symbolic and social meaning, but Dr. Meyer does not know that it has any social meaning.).

- Tr. 1962:17-1963:8 (Tam:  Tam gets "very very upset" about the idea of children fantasizing about marrying people of the same sex, but he is reassured by knowing that gay couples are not allowed to get married.  This allows parents to explain to their children that gay couples can enter domestic partnerships, "but it is not 'marriage.'"  He is comforted because this difference is "something that is very easy for our children to understand.").

PFF 112.   There are meaningful differences in the actual practice of registered domestic partnerships, civil unions, and marriage.  Marriage is a valued social institution, and married couples are treated differently than unmarried couples.  Creating a separate institution of domestic partnership stigmatizes same-sex couples and sends a message of inferiority to these couples, their children, and lesbian and gay men generally.  This stigma increases the likelihood that lesbians and gay men will experience discrimination and harassment in schools, employment, and other settings.

- Tr. 611:13-19 (Peplau:  "[B]eing prevented by the government from being married is no different than other kinds of stigma and discrimination that have been studied, in terms of their impact on relationships.").

- Tr. 1251:8-1252:6 (Zia:  Although her 2004 marriage to Lia had been invalidated, Zia still believed that the marriage, as opposed to a domestic partnership, was significant:  "it was really the difference, night and day, between being domestic partners and being married."  She explained that "we—for a brief moment in time we experienced a feeling of . . . what equality is, what—instead of having to go to the fountain that is just for gay and lesbian people, here we could go to the fountain that formerly said heterosexuals only.  And we tasted the water that was sweeter there.  And our families experienced that.").

66

Gibson, Dunn & Crutcher LLP

- Tr. 2058:2-24 (Herek:  Ms. Zia's testimony highlights that there is this sense of feeling different.  And one of the leading writers in the area of stigma has characterized it as an "undesired differentness."  Ms. Zia's testimony is an illustration of how someone who is in a stigmatized group has that feeling of being different in an undesired way.  What she seems to be experiencing here is that there was a brief time, in 2004, when she felt that difference had been removed.).

- Tr. 1252:7-11 (Zia:  Marriage brought their families together in a away "that did not happen in the prior 11 years that we had been domestic partners.").

- PX0186 (YouTube Video of Sanders Support for Gay Marriage Announcement:  "Two years ago I believed that civil unions were a fair alternative, those beliefs, in my case, have changed.  The concept of . . . a separate but equal institution is not something I can support.").

- Tr. 1280:24-1283:19 (Sanders:  Describing how he learned of his daughter's domestic partnership when she texted him that "they had got the DP taken care of" and how he had to ask her "What in the world is a DP?"  He did not attend because "I don't think that's really an exciting thing to do . . . to go to a state or county building and watch someone fill out forms."  His daughter and her partner did not send out announcements of their domestic partnership, and no one congratulated him about it.  When they later married in Vermont while on a trip to the East Coast, he felt bad that it could not be in front of family and friends, but even the attorney who took his deposition in this case congratulated him when he told him his daughter had married.  Sanders testified that he did not feel domestic partnership was sufficient for his daughter because she "deserves the same opportunity to have a wedding in front of family and friends and co-workers.  I believe she has—she should have the same opportunity to have that recognized lawfully.")

- Tr. 1276:10-13 (Sanders:  One of reasons he signed resolution in support of right to marry for same-sex couples in 2007 is that it was in the interest of government.  At the police department, he attempted to treat all communities equally, and this was difficult for people who could not marry and could not talk about their relationships and their families at work.  On his view, "[a]ll of those things . . . are important on the government's side, because if government tolerates discrimination against anyone for any reason, it becomes an excuse for the public to do exactly the same thing.").

- Tr. 1277:5-1279:7 (Sanders:  Governmental discrimination can foster private discrimination.  With respect to the history of and recent anti-gay hate crimes in San Diego:  "I think that when a city, when leadership talks in disparaging terms about people, or denies the rights that everybody else have, the fundamental rights, then I think some people in the community feel empowered to take action in hate crimes and in other ways.").

67

Gibson, Dunn
& Crutcher
LLP

- Tr. 82:16-83:1 (Zarrillo: "Domestic partnership would relegate me to a level of second class citizenship . . . . It's *giving* me part of the pie, but not the whole thing. . . . [I]t doesn't give due respect to the relationship that we have had for almost nine years.").

- Tr. 115:3-116:1 (Katami: Domestic partnerships "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages from other states. . . . None of our friends have ever said, 'Hey, this is my domestic partner.'").

- Tr. 1962:17-1963:8 (Tam: Tam gets "very very upset" about the idea of children fantasizing about marrying people of the same sex, but he is reassured by knowing that gay couples are not allowed to get married. This allows parents to explain to their children that gay couples can enter domestic partnerships, "but it is not 'marriage.'" He is comforted because this difference is "something that is very easy for our children to understand.").

- Tr. 1960:1-9 (Tam: Knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

- Tr. 1964:17-1965:2 (Tam: It is important to children of same-sex couples that their parents be able to marry.).

- Tr. 966:6-8 (Meyer: Domestic partnerships stigmatize gay and lesbian individuals.).

- Tr. 964:1-3 (Meyer: Domestic partnerships reduce the value of same-sex relationships.).

- Tr. 2044:11-19 (Herek: Gay men and lesbians can enter into same-sex domestic partnerships, and domestic partnerships have virtually all of the same rights and privileges as married couples.).

- Tr. 2044:20-2045:22 (Herek: But the difference between domestic partnerships and marriage is more than simply a word. "[J]ust the fact that we're here today suggests that this is more than a word . . . clearly, [there is] a great deal of strong feeling and emotion about the difference between marriage and domestic partnerships.").

- Tr. 2047:13-2048:13 (Herek: In 2004, California legislature enacted legislation that increased the benefits and responsibilities associated with domestic partnership, which would be effective in 2005. In the second-half of 2004, the California Secretary of State mailed a letter to all registered domestic partners advising them of the changes and telling recipients to consider whether to dissolve the partnership. Dr. Herek "find[s] it difficult to imagine that if there were changes in tax laws that were going to affect married couples, that you would have the state government sending letters to people suggesting

68

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

that they consider whether or not they want to get divorced before this new law goes into effect.  I think that—that letter just illustrates the way in which domestic partnerships are viewed differently than marriage.").

- PX2265 (Letter from Secretary of State, State of California to Registered Domestic Partners:  Explaining changes in law and suggesting that domestic partners dissolve their partnership if they do not wish to be bound by the new rights and responsibilities.).

- Tr. 2048:19-2049:8 (Herek:  In fact, it appears that domestic partnerships in California were dissolved after this letter was received.  There was an increase in dissolution of domestic partnerships in the end of 2004, and in December, 2004, just before the new law was set to take effect, "there was a huge spike in the number of domestic partnerships that were dissolved in California, presumably in anticipation of this new law, and perhaps in response to this letter that was sent from the Secretary of State.").

- PX0909/PX1263 at 15 (Study by Gary Gates, Lee Badgett and Deborah Ho:  Showing a dramatic spike in the number of dissolutions of domestic partnerships in California in late 2004, going from 68 in May, to 99 in June, to 1188 in December 2004.).

PFF 113.   The California Supreme Court has noted at least nine ways in which statutes concerning marriage differ from corresponding statutes concerning domestic partnerships.

- *In re Marriage Cases*, 183 P.3d 384, 416, n.24 (Cal. 2008).

- PX0710 at RFA No. 4 (Attorney General admits "that under California law, no legal institution, legal status, or legal relationship offers the same meaning, obligations, rights, and benefits as civil marriage").

PFF 114.   The public recognition that attends marriage, the legal obligations created by marriage, and the emotional and tangible investments that spouses make in their joint relationship serve as deterrents to relationship dissolution.

- Tr. 613:9-614:12 (Peplau:  Marriage is an important barrier to the dissolution of a relationship.).

- PX1245 at 413 (Review by Anne Peplau and Adam Fingerhut:  "Marriage would help couples feel closer and strengthen their relationships, in part by creating structural barriers to relationship dissolution.").

69

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 2045:23-2047:12 (Herek:  Marriage encourages the stability of a relationship, both in terms of the rewards offered, and also in terms of the barriers to dissolution.  When people are married, there are a number of barriers that make it not an easy thing to dissolve the marriage.  These are both legal and social barriers.  Domestic partnerships are not perceived the way that marriage is in terms of those barriers.).

- PX0708 at RFA No. 87 (Proponents admit "that marriage between a man and a woman can be a source of relationship stability and commitment, including by creating barriers and constraints on dissolving the relationship").

- PX0708 at RFA No. 85 (Proponents admit "that societal support is central to the institution of marriage, and that marital relationships are typically entered in the presence of family members, friends, and civil or religious authorities").

- PX0710 at RFA No. 3 (Attorney General admits "that marriage is a public expression of love and long-term commitment").

- Tr. 2839:4-10 (Blankenhorn:  Characterizing marriage as a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2914:10-23 (Blankenhorn:  Agreeing that one of the six dimensions of marriage as described in *The Marriage Movement:  A Statement of Principles* (2000) [PX2879] is that "Marriage is a legal contract" and that this dimension of marriage applies equally to marriage between a heterosexual couple or a gay or lesbian couple).

- Tr. 2914:24-2915:5 (Blankenhorn:  Agreeing that one of the six dimensions of marriage as described in *The Marriage Movement:  A Statement of Principles* (2000) [PX2879] is that "Marriage is a financial partnership" and that this dimension of marriage applies equally to marriage between a heterosexual couple or a gay or lesbian couple).

PFF 115.   Mr. Blankenhorn, one of Proponents' experts, agreed that many positive outcomes would probably flow from allowing same-sex couples to marry, including that "a higher proportion of gays and lesbians would choose to enter into committed

70

Gibson, Dunn & Crutcher LLP

relationships," "more stability and . . . longer-lasting relationships for committed same-sex couples."

- Tr. 2846:17-2853:10 (Blankenhorn:  Listing possible positive consequences of permitting marriage by same-sex couples); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:12-17 (Blankenhorn:  Agreeing that "[e]xtending the right to marry to same-sex couples would probably mean that a higher proportion of gays and lesbians would choose to enter into committed relationships."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:18-23 (Blankenhorn:  Agreeing that "[s]ame-sex marriage would likely contribute to more stability and to longer-lasting relationships for committed same-sex couples."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:24-2850:3 (Blankenhorn:  Agreeing that "[s]ame-sex marriage might lead to less sexual promiscuity among lesbians and (perhaps especially) gay men."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2850:4-9 (Blankenhorn:  Agreeing that "[s]ame-sex marriage would signify greater social acceptance of homosexual love and the worth and validity of same-sex intimate relationships."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- *See also* evidence cited in support of PFFs 109, 119.

PFF 116.    Civil unions and domestic partnerships are not equivalent to the well-established and highly valued institution of marriage, and same-sex couples show a clear preference for marriage over civil unions and domestic partnerships.  In California, same-sex couples are significantly less likely to enter into domestic partnerships than to enter into marriages because domestic partnerships do not offer the same dignity, respect, and stature as marriage.

- PX0909/PX1263 at 2 (Study by Gary Gates, Lee Badgett and Deborah Ho: "Same-sex couples prefer marriage over civil unions or domestic partnerships: While 37% of same-sex couples in Massachusetts married during the first year that marriage was offered, only 12% of same-sex couples have entered civil unions and 10% have entered domestic partnerships during the first year in which states have offered these forms of recognition.").

71

*Gibson, Dunn & Crutcher LLP*

- Tr. 1338:15-1338:25; 1469:10-1470:6 (Badgett:  During the six months when same-sex couples were permitted to marry in California, approximately 18,000 same-sex couples chose marriage, whereas only 2,000 same-sex couples chose domestic partnerships.).

- Tr. 1339:9-1340:15; PX1263 (Badgett:  Data of the take-up rate in states that allow same-sex couples to marry and have a civil union or have a domestic partnership indicate a clear preference for marriage.).

- Tr. 1342:14-1343:12 (Badgett:  Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as second class status, value marriage because it is socially validated by the community and dislike domestic partnership because it sounds too clinical.).

- PX0909/PX1263 at 1 (Study by Gary Gates, Lee Badgett and Deborah Ho: "The data show that same-sex couples prefer marriage over civil unions or domestic partnerships.").

- Tr. 576:15-577:14 (Peplau:  Discussing study by Gary Gates, Lee Badgett, and Deborah Ho that found same-sex couples are "three times more likely to get married than to enter into" domestic partnerships or civil unions).

- PX1273 at 58, 59, 60 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "Many Dutch couples saw marriage as better because it had an additional social meaning that registered partnership, as a recent political invention, lacked."; "In some places, the cultural and political trappings of statuses that are not marriage send a very clear message of difference and inferiority to gay and lesbian couples." As the California Supreme Court noted about the deficiencies in domestic partnership in 2008: "when compared to marriage, domestic partnerships may become a mark of second-class citizenship and are less understood socially.  In practice, these legal alternatives to marriage are limited because they do not map onto a well-developed social institution that gives the act of marrying its social and cultural meaning.").

- PX1273 at 63 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "Same-sex couples want their relationships to be legally recognized and prefer the option closest to marriage.  Both same-sex couples and different-sex couples prefer marriage over other legal forms.").

- Tr. 82:9-85:8 (Zarrillo:  "Domestic partnership would relegate me to a level of second class citizenship . . . . It's giving me part of the pie, but not the whole thing. . . . [I]t doesn't give due respect to the relationship that we have had for almost nine years.").

- Tr. 115:3-116:1 (Katami:  Domestic partnerships "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages

72

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

from other states. . . . None of our friends have ever said, 'Hey, this is my domestic partner.'").

- Tr. 2044:20-2045:22 (Herek:  The difference between domestic partnerships and marriage is more than simply a word.  If we look at public opinion data, for example, there is a sizable proportion of the public, both in California and in the United States, who say that they are willing to let same-sex couples have domestic partnerships or civil unions, but not marriage.  This suggests a distinction in the minds of a large number of Americans—it is not simply a word.  In addition, looking at the recent history of California, when it became possible for same-sex couples to marry, thousands of them did.  And many of those were domestic partners.  So, clearly, they thought there was something different about being married.  And "just the fact that we're here today suggests that this is more than a word . . . clearly, [there is] a great deal of strong feeling and emotion about the difference between marriage and domestic partnerships.").

- Tr. 224:23-225:7 (Cott:  "[T]he fact that the state is involved in granting these kinds of benefits and legitimacy to the marital family tends to lend prestige, a status to that institution that no informal marriage has ever approximated.").

- PX1397 at 1 (U.S. General Accounting Office Report, Jan. 23, 2004:  Identifies "a total of 1,138 federal statutory provisions classified in the United States Code in which marital status is a factor in determining or receiving benefits, rights, and privileges").

- PX0707 at RFA No. 4 (Proponents admit "that the word 'marriage' has a unique meaning").

- PX0707 at RFA No. 38 (Proponents admit "that there is a significant symbolic disparity between domestic partnership and marriage").

- PX0708 at RFA No. 86 (Proponents admit "that marriage and domestic partnerships do not have identical social meaning").

- PX0708 at RFA No. 100 (Proponents admit "that, for each year that marriage and domestic partnership were available in the Netherlands, more same-sex couples married than entered registered domestic partnerships").

- PX0710 at RFA No. 4 (Attorney General admits "that under California law, no legal institution, legal status, or legal relationship offers the same meaning, obligations, rights, and benefits as civil marriage").

PFF 117.    Thousands of same-sex couples—including many who were already registered as domestic partners—married in California during the months in 2008 when marriage was a legal option for them, and many same-sex couples have traveled long distances

73

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

across state and national borders to legally marry.  Survey data show that large numbers of lesbian, gay, and bisexual Americans want to marry.

- Tr. 708:21-709:9 (Egan:  "[A]round 5,100" marriage licenses issued to same-sex couples in San Francisco during 2008 with some of those issued to couples from other states and countries).

- PX0805 (Summary of marriage license appointments and actual marriage licenses issued by the San Francisco County Clerk:  5,153 marriage licenses issued to same-sex couples in 2008).

- PX1734 and PX1735 (List of marriage licenses issued to same-sex couples by San Francisco County Clerk showing residence of each couple).

- PX0938 at 4 (Kaiser Fam. Found. Report:  "More than one quarter (28%) of lesbians, gays, and bisexuals report living with a partner as if they were married, and almost three quarters (74%) say they would like to marry legally someday.").

- Tr. 575:10-22 (Peplau:  Many lesbians and gay men feel the same way about marriage as heterosexuals.).

- Tr. 602:22-603:3 (Peplau:  If gays and lesbians were permitted to marry, approximately 1-3% of all married couples in the U.S. would likely be same-sex couples.).

- Tr. 1338:15-1338:25; 1469:10-1470:6 (Badgett:  During the six months when same-sex couples were permitted to marry in California, approximately 18,000 same-sex couples chose marriage whereas only 2,000 same-sex couples chose domestic partnerships.).

- Tr. 1423:19-1424:4 (Badgett:  Badgett used the data from the San Francisco Clerk's Office to estimate how many out of state couples travelled to California to get married and estimated that there 3,746 out-of-state couples married in California.).

- PX0909/PX1263 at 1 (Study by Gary Gates, Lee Badgett and Deborah Ho:  "The data show that same-sex couples prefer marriage over civil unions or domestic partnerships.").

- PX0909/PX1263 at 2  (Study by Gary Gates, Lee Badgett and Deborah Ho:  "While 37% of same-sex couples in Massachusetts married during the first year that marriage was offered, only 12% of same-sex couples have entered civil unions and 10% have entered domestic partnerships during the first year in which states have offered these forms of recognition.").

74

Gibson, Dunn
& Crutcher
LLP

- PX1273 at 59, 60 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*: "In some places, the cultural and political trappings of statuses that are not marriage send a very clear message of difference and inferiority to gay and lesbian couples."; As the California Supreme Court noted about the deficiencies in domestic partnership in 2008: "when compared to marriage, domestic partnerships may become a mark of second-class citizenship and are less understood socially.  In practice, these legal alternatives to marriage are limited because they do not map onto a well-developed social institution that gives the act of marrying its social and cultural meaning.").

- PX1273 at 63 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*: "Same-sex couples want their relationships to be legally recognized and prefer the option closest to marriage. Both same-sex couples and different-sex couples prefer marriage over other legal forms.").

- Tr. 1232:6-10 (Zia:  Zia and Shigemura got married in June 2008 after the California Supreme Court decision.).

- Tr. 1282:14-1283:14 (Sanders:  Describing how his daughter and daughter in law married in Vermont in December 2009 while on a trip to the East Coast, and how he felt bad that it could not be in front of family and friends).

- Tr. 141:21-142:1 (Perry:  Describing the reasons that she wants to marry Sandy).

- Tr. 143:8-144:2 (Perry:  Describing proposing to Sandy).

- Tr. 2044:20-2045:22 (Herek:  The difference between domestic partnerships and marriage is more than simply a word.  Looking at the recent history of California, when it became possible for same-sex couples to marry, thousands of them did.  And many of those were domestic partners.  So, clearly, they thought there was something different about being married.).

- DIX2647 (Proponents introduced DIX2647, which purports to contain data reflecting monthly domestic partnership registrations in California for January 2000 through November 2009.  During cross-examination of Badgett, Proponents sought to elicit testimony that the fact that same-sex couples registered partnerships during 20008, when they could marry, reflects that same-sex couples do not necessarily prefer marriage (*see* Tr. 1393:2-1397:1), but Badgett rejected that assumption, stating "I don't know that some of those of 18,000 couples who marriage didn't also register a domestic partnership in order to hedge their bets against the outcome of the election." (Tr. 1396:15-24.)  Given Badgett's testimony, and the reasonable possibility that many same-sex couples were both marrying and registering as domestic partners simultaneously, DIX2647 can in no way be read to establish that gays and lesbians do not prefer marriage over domestic partnership.).

PFF 118.    Marriage has considerable social meaning.  Getting married has been seen as reaching adulthood, as having grown up, and it is a very esteemed status.  Indeed, the individual's ability to consent to marriage is the mark of the free person and possession of basic civil rights.

- PX0708 at RFA No. 86 (Proponents admit "that marriage and domestic partnerships do not have identical social meaning").

- PX0752 at 1 (Am. Psychoanalytic Ass'n, Position Statement:  "[T]he milestone of marriage moves a couple and its children into full citizenship in American society.").

- Tr. 2839:4-10 (Blankenhorn:  Characterizing marriage as a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2790:5-9 (Blankenhorn:  "When we say the word 'marriage,' it's a big institution that performs a very large contribution to society and it's much bigger, much more powerful and potent as a role in society than merely or only the enumeration of its legal incidents.").

- PX2876 at 381 (Levine, *Alternative Kinship, Marriage, and Reproduction*, Annual Review of Anthropology (2008):  "[I]t is already clear that many gay men and lesbian women are seeking formal recognition of their relationships as marriages, and not only for pragmatic reasons, such as access to employer-paid health care, rights to inheritance, or designations as next of kin in case of an emergency.  Hull (2006) argued that same-sex couples do so because marriage is a powerful relationship model in American culture and because of the power of law in American society to validate relationships—and thus to offer recognition and social legitimacy to homosexual relationships.").

- Tr. 200:10-210:9 (Cott:  Discusses the social meaning of marriage in our nation).

- Tr. 205:1-12 (Cott:  Emancipated slaves viewed marriage as a basic civil right and assumed "that once they were legally married, that they could make valid claims about their family rights.").

- Tr. 311:3-6 (Cott:  Marriage is "seen as a mark of adulthood, settling down.").

76

Gibson, Dunn
& Crutcher
LLP

- Tr. 202:2-203:9 (Cott:  The ability to marry is a "basic civil right."  "[A]n ex-slave who had also been a Union soldier . . . declared, 'The marriage covenant is the foundation of all our rights.'").

- PX1316 at 100 (Article by Laura F. Edwards:  "Explaining to his troops the implications of Virginia's 1866 act legitimating slave marriages, [a black corporal in the U.S. Colored Troops] maintained:  'The Marriage Covenant is at the foundation of all our rights.  In slavery we could not have legalised marriage: now we have it . . . and we shall be established as a people.'").

- Tr. 227:21-24 (Cott:  Being able to marry is a sign that one has "basic civil rights and ability to consent.").

- Tr. 574:24-575:2 (Peplau:  "Americans are very enthusiastic about marriage.  Most Americans view marriage as one of the most important relationships in their life.  Many people view getting married as a very important life goal.").

- Tr. 580:9-25 (Peplau:  "getting married reflects a change in identity" and, for many people, it means:  "Now I'm an adult.  Now I really need to be a kind of mature, responsible person.").

- Tr. 2791:12-14 (Blankenhorn:  Acknowledging that "[i]t is discriminatory and . . . morally wrong in my view, morally wrong to refuse to call two things that are the same by the same name.").

- Tr. 1342:14-1343:12 (Badgett:  Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as second class status, value marriage because it is socially validated by the community and dislike domestic partnership because it sounds too clinical.).

- Tr. 1471:1-1472:8 (Badgett:  Badgett's interviews with same-sex couples indicate that couples value the social recognition of marriage that and couples see marriage as more valuable than an alternative status.).

- Tr. 82:9-83:1 (Zarrillo:  "Domestic partnership would relegate me to a level of second class citizenship . . . . It's giving me part of the pie, but not the whole thing. . . . [I]t doesn't give due respect to the relationship that we have had for almost nine years.").

- Tr. 115:3-116:1 (Katami:  Domestic partnerships "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages from other states. . . . None of our friends have ever said, 'Hey, this is my domestic partner.'").

- Tr. 2003:17-2004:3 (Tam:  Tam acknowledging he would be "very aggrieved" if he "couldn't marry the person he loved" because of racial restrictions on marriage).

Gibson, Dunn
& Crutcher
LLP

PFF 119.   Marriage correlates with a variety of measurable health and protective benefits that extend to children, women, and men.  And many same-sex couples would benefit both physically and psychologically from marriage just as their heterosexual counterparts do.

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement:  "[T]he denial of [marriage] benefits has been demonstrated to have significant psychological and social impact on gay and lesbian couples and their families" and "research is now substantiating the benefit that accrues to married same-sex couples and their children.").

- PX0760 at 3, 4 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: Noting the benefits of marriage to psychological and physical well-being, and the various levels of stress that same-sex couples are subjected to due to the lack of legal recognition of their relationships).

- PX0708 at RFA No. 84 (Proponents admit "that opposite-sex couples who are married experience, on average, less anxiety and depression and greater happiness and satisfaction with life than do non-married opposite-sex couples or persons not involved in an intimate relationship").

- Tr. 578:2-10 (Peplau:  "[T]he very consistent findings from [a very large body of research on the impact of marriage on health] are that, on average, married individuals fare better.  They are physically healthier.  They tend to live longer.  They engage in fewer risky behaviors.  They look better on measures of psychological well-being.").

- Tr. 578:11-579:9 (Peplau:  A recent, large-scale study by the CDC found that married individuals, on average, fare better on "virtually every measure" of health compared to non-married individuals.).

- PX1043 at 1 (CDC Report by Charlotte A. Shoenborn:  "Regardless of population subgroup (age, sex, race, Hispanic origin, education, income, or nativity) or health indicator (fair or poor health, limitations in activities, low back pain, headaches, serious psychological distress, smoking, or leisure-time physical inactivity), married adults were generally found to be healthier than adults in other marital status categories.").

- PX0781, PX0913, PX0937, PX0964, PX1171, PX1173, PX1250, PX1254, PX1474 (Examples of studies and reports that are consistent with a well-established body of research showing that there are physical and psychological benefits associated with marriage for couples and their children).

- Tr. 594:13-20 (Peplau:  "My opinion, based on the great similarities that have been documented between same-sex couples and heterosexual couples, is th[at]

78

if same-sex couples were permitted to marry, that they also would enjoy the same benefits.").

- PX0959 (Study by Christopher Ramos, Naomi G. Goldberg, and Lee Badgett: Examines survey data collected by the Massachusetts Department of Health on the effects of marriage equality in that state on couples and their children).

- Tr. 598:1-599:19 (Peplau:  Married same-sex couples in Massachusetts have reported various benefits from marriage including greater commitment to the relationship, more acceptance from extended family, less worry over legal problems, greater access to health benefits, and benefits for their children.).

- Tr. 688:10-12 (Egan: "[M]arried individuals are healthier, on average, and in particular, behave themselves in healthier ways than single individuals.").

- Tr. 691:24-692:1 (Egan:  "[L]egalizing same-sex marriage would ultimately increase the number of people who had health insurance in San Francisco.").

- Tr. 697:21-25 (Egan: Explaining that companies typically will offer some benefits to married partners but will not necessarily offer those benefits to domestic partners).

- PX0803 (California Health Interview Survey data illustrating that married individuals are less likely to have psychological distress than individuals who are single and never married, divorced, separated, widowed or living with their partner).

- PX0807 (U.S. Department of Health and Human Services Agency for Healthcare Research and Quality report stating that marriage encourages healthy behaviors).

- PX0809 (RAND report on relationship between marriage, assets and savings outlining correlation between marriage and wealth accumulation).

- Tr. 2839:4-10 (Blankenhorn:  Characterizing marriage as a "public good" that "serves important public purposes, and marriage makes a distinctive contribution to society."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- PX2879 at 12 (Institute for American Values, "The Marriage Movement: A Statement of Principles":  "Married adults live longer, healthier, happier, and more affluent lives than adults who don't marry or don't stay married.  This phenomenon is not simply an artifact of selection; marriage itself makes adults

*Gibson, Dunn & Crutcher LLP*

better off, by offering them greater emotional and financial support, wider and more integrated social networks, important economies of scale, and productive boosts in earnings, parenting capacity, and life management.").

- Tr. 2849:6-11 (Blankenhorn:  Agreeing that "Gay marriage would extend a wide range of the natural and practical benefits of marriage to many lesbian and gay couples and their children."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:12-17 (Blankenhorn:  Agreeing that "Extending the right to marry to same-sex couples would probably mean that a higher proportion of gays and lesbians would choose to enter into committed relationships."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:18-23 (Blankenhorn:  Agreeing that "Same-sex marriage would likely contribute to more stability and to longer-lasting relationships for committed same-sex couples."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2849:24-2850:3 (Blankenhorn:  Agreeing that "Same-sex marriage might lead to less sexual promiscuity among lesbians and (perhaps especially) gay men."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2850:4-9 (Blankenhorn:  Agreeing that "Same-sex marriage would signify greater social acceptance of homosexual love and the worth and validity of same-sex intimate relationships."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2850:10-19 (Blankenhorn:  Agreeing that "Gay marriage would be a victory for the worthy ideas of tolerance and inclusion.  It would likely decrease the number of those in society who tend to viewed warily as 'other' and increase the number who are accepted as part of 'us.'  In that respect, gay marriage would be a victory for, and another key expansion of, the American idea."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2851:5-18 (Blankenhorn:  Agreeing that "Because marriage is a wealth-creating institution, extending marriage rights to same-sex couples would probably increase wealth accumulation and lead to higher living standards for these couples, as well as help reduce welfare costs (by promoting family economic self-sufficiency) and decrease economic inequality."); *see also* DIX0956 at 203-04 (Blankenhorn, *Future of Marriage*).

- Tr. 2852:18-22 (Blankenhorn:  Agreeing that "Adopting same-sex marriage would likely be accompanied by a wide-ranging and potentially valuable national discussion of marriage's benefits, status and future."); *see also* DIX0956 at 205 (Blankenhorn, *Future of Marriage*).

Gibson, Dunn & Crutcher LLP

- Tr. 2921:6-8 (Blankenhorn:  "[M]any scholarly associations, the leadership groups, as a policy matter have endorsed same-sex marriage.").

- PX0787 at 1 (Am. Psychiatric Ass'n, Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage:  "In the interest of maintaining and promoting mental health, the American Psychiatric Association supports the legal recognition of same-sex civil marriage with all rights, benefits, and responsibilities conferred by civil marriage, and opposes restrictions to those same rights, benefits, and responsibilities.").

- Tr. 1344:3-1348:13; PX1267 (Badgett:  A study of same-sex couples that got married in Massachusetts, PX1267, indicated that 72% of respondents felt more committed to their partners as a result of marrying, almost 70% felt more accepted by their communities and 93% of respondents with children thought that their children were happier and better off as a result of their marriage.).

- Tr. 1332:19-1337:2 (Badgett:  Marriage confers numerous economic benefits including greater specialization of labor, reduced transaction costs, health and insurance benefits, stronger statement of commitment, greater validation and social acceptance of the relationship and more positive workplace outcomes. Some costs are not quantifiable, but are nevertheless substantial.).

- Tr. 1350:3-9; PX0189 at 1 (Badgett:  The American Medical Association concluded that denying the same-sex couples the right to marry reduces access to health insurance and creates healthcare disparities among children.).

- Tr. 2050:1-19 (Herek:  A study conducted by the Massachusetts Department of Public Health asked questions of same-sex married couples regarding their experience and impressions of their marriage, and it found that in excess of 70% of couples said that as a result of getting married, they felt that their commitment to their relationship had strengthened.).

PFF 120.    Laws are perhaps the strongest of social structures that uphold and enforce stigma.

Laws can be understood as a form of structural stigma.

- Tr. 819:10-12 (Meyer:  Structural stigma refers to "the origins of the stigma and the mechanisms that maintain and enact stigma.").

- Tr. 820:7-19 (Meyer:  Structural stigmas determine the access that people have to resources and desired goals.).

- Tr. 972:14-17 (Meyer:  "Laws are perhaps the strongest of social structures that uphold and enforce stigma.").

- Tr. 2053:8-18 (Herek:  Structural stigma provides the context and identifies which members of society are devalued.  It also gives a level of permission to

81

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

denigrate or attack particular groups, or those who are perceived to be members of certain groups in society.).

- Tr. 819:17-820:6 (Meyer:  Laws play a major role in determining access of citizens to resources—they may block or foster such access.  For example, the law has a role in determining who can access the institution of marriage.).

- Tr. 2051:9-2052:1 (Herek:  Stigma is also manifested in the institutions of society.  And "a good example of structural stigma is the law, the legal institutions that designate certain groups as lacking resources relative to others.").

PFF 121.  Prop. 8 is a part of the structural stigma—it reflects and propagates the stigma that gay and lesbian individuals do not have intimate relations similar to those that heterosexual couples have.  Prop. 8 conveys the State's judgment that a same-sex couple possesses an "undesired differentness" and is inherently less deserving of society's full recognition through the status of civil marriage than are heterosexual couples.  This according of disadvantaged status to the members of one group relative to another is the crux of stigma, and the distinction between same-sex and different-sex couples is stigmatizing even when same-sex couples are granted most of the legal benefits and obligations conferred by marriage through domestic partnerships.  Irrespective of such benefits, the "differentness" of domestic partnerships, compared to the historic and highly respected designation of "marriage," is evident.  And the exclusion of gay and lesbian individuals from the institution of civil marriage necessarily relegates them to second-class status—Prop. 8, in effect, communicates the official view that same-sex couples' committed relationships are of a lesser stature than the comparable relationships of opposite-sex couples.

- Tr. 2054:7-11 (Herek:  Prop. 8 is an instance of structural stigma by definition. It is part of the legal system, and it differentiates people in same-sex relationships from people in heterosexual relationships.).

- Tr. 825:25-826:20 (Meyer:  Prop. 8 denies gay men and lesbians access to the institution of marriage in California.  It is a form of structural stigma.  Indeed, a Constitutional provision such as Prop. 8 is a very strong instance of the social structures that define stigma in our society.  It can be thought of as a gate that blocks access to a particular institution or towards attaining a particular goal.

82

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Prop. 8 tells gay men and lesbians that they cannot achieve this particular goal—marriage.).

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement: "[S]ame-sex couples and their children are adversely affected by [existing] discriminatory marriage laws.").

- PX0760 at 1, 4 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: Discriminatory marriage laws adversely affect the children of same-sex couples by stigmatizing those children and making them less financially secure).

- PX2876 at 381 (Levine, *Alternative Kinship, Marriage, and Reproduction*, Annual Review of Anthropology (2008): "[I]t is already clear that many gay men and lesbian women are seeking formal recognition of their relationships as marriages, and not only for pragmatic reasons, such as access to employer-paid health care, rights to inheritance, or designations as next of kin in case of an emergency. Hull (2006) argued that same-sex couples do so because marriage is a powerful relationship model in American culture and because of the power of law in American society to validate relationships—and thus to offer recognition and social legitimacy to homosexual relationships.").

- Tr. 230:8-14 (Cott: In the history of our country, restrictive marriage laws have been used to create "second class" relationships that stigmatize particular groups.).

- Tr. 1342:14-1343:12 (Badgett: Some same-sex couples who might marry would not register as domestic partners because individuals see domestic partnership as second class status, view marriage as more socially validated by the community and dislike domestic partnership because it sounds too clinical.).

- Tr. 1471:1-1472:8 (Badgett: Badgett's interviews with same-sex couples indicate that couples value the social recognition of marriage, and believe that the alternative status conveys a message of inferiority.).

- Tr. 854:5-22 (Meyer: This is demonstrated by Prop. 8, which "sends a message that gay relationships are not to be respected; that they are of secondary value, if of any value at all; that they are certainly not equal to those of heterosexuals. . . . [So] in addition to achieving the literal aims of not allowing gay people to marry, it also sends a strong message about the values of the state; in this case, the Constitution itself. And it sends a message that would, in [Dr. Meyer's] mind, encourage or at least is consistent with holding prejudicial attitudes. So that doesn't add up to a very welcoming environment.").

- Tr. 846:22-847:12 (Meyer: Prop. 8 is certainly responsible for gay men and lesbians not marrying. And when gay men and lesbians have to explain why

83

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

they are not married, they "have to explain, I'm really not seen as equal. I'm—my status is—is not respected by my state or by my country, by my fellow citizens."  Prop. 8 is a block in the way to achieving desirable goals in life.).

- PX0710 at RFA No. 40 (Attorney General admits "that the inability to marry relegates gay and lesbian relationships to second-class status").

- PX0710 at RFA No. 37 (Attorney General admits "that establishing a separate legal institution for State recognition and support of lesbian and gay families, even if well-intentioned, marginalizes and stigmatizes gay families").

- PX0710 at RFA No. 42 (Attorney General admits "that there has been a history of discrimination against gay and lesbian individuals. California's creation of the alternative regime of domestic partnership was intended to, and may have, diminished anti-gay prejudice, but its continuation may reinforce anti-gay prejudice").

- PX0728 at ¶ 27 (Attorney General's Answer:  "[A]dmits that the effect of passage of Proposition 8 was to overturn the decision of the California Supreme Court in *In re Marriage Cases,* by taking away the rights previously protected by the California Constitution to same-sex civil marriage in California . . . and admits that in doing so Proposition 8 imposed a special disability on gays and lesbians and their families on the basis of sexual orientation.").

- PX0728 at ¶ 30 (Attorney General's Answer:  Admits "the inability to marry the person of their choice denies gays and lesbians, as well as their families, the personal and public affirmation that accompanies state-sanctioned civil marriage.").

- Tr. 203:18-204:12 (Cott:  In the infamous *Dred Scott* decision, Justice Taney relied on the fact that Dred Scott as a black man could not marry a white woman to support the Court's view that Dred Scott was not a full citizen.).

- Tr. 236:17-237:8 (Cott:  There are striking parallels between past marriage laws that prohibited certain inter-racial marriages and current laws that prohibit individuals from marrying a person of the same gender.).

- Tr. 1226:1-15 (Zia:  To obtain a domestic partnership license, "[w]e came to City Hall.  We went to a window that I would describe as a—it's kind of all purpose postal window kind of thing, where I think they issued dog licenses as well as domestic partner licenses. . . .  We walked away with a little certificate, the kind that a kid gets for perfect attendance that week. . . .  [I]t didn't feel like much at all.").

- Tr. 1226:18-1227:7 (Zia:  To obtain a California domestic partnership license, "we downloaded the form from the Internet, filled it out, got it notarized and

84

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

mailed it in. . . We got another form back in the mail.  And it said 'You are now domestic partners in the State of California.' " According to Zia, it was "not an occasion to write home about.").

- Tr. 1280:24-1283:19 (Sanders:  Describing how he learned of his daughter's domestic partnership when she texted him that "they had got the DP taken care of" and how he had to ask her "What in the world is a DP?"  He did not attend because "I don't think that's really an exciting thing to do . . . to go to a state or county building and watch someone fill out forms."  His daughter and her partner did not send out announcements of their domestic partnership, and no one congratulated him about it.  When they later married in Vermont while on a trip to the East Coast he felt bad that it could not be in front of family and friends, but even the attorney who took his deposition in this case congratulated him when he told him his daughter had married.  Sanders testified that he did not feel domestic partnership was sufficient for his daughter because she "deserves the same opportunity to have a wedding in front of family and friends and co-workers.  I believe she has—she should have the same opportunity to have that recognized lawfully.").

- Tr. 1274:7-1275:7 (Sanders:  Recounted the depth of feeling and hurt of members of the lesbian and gay community when he told them that he was planning to veto the ordinance supporting marriage rights of gay and lesbian individuals because he thought that civil unions were a fair alternative.).

- PX0186 (YouTube Video of Sanders 2007 Press Conference stating he would sign the resolution in support of  Gay Marriage:  "I just could not bring myself to tell an entire group of people in our community they were less important, less worthy or less deserving of the rights and responsibilities of marriage than anyone else simply because of their sexual orientation." "In the end I couldn't look any of them in the face and tell them that their relationships, their very lives, were any less meaningful than the marriage I share with my wife, Rana.").

- Tr. 151:20-24 (Perry:  Describing an experience in which a passenger on a plane assumes that she can take the seat that Perry had been saving for Stier because Perry refers to Stier as her "partner.").

- Tr. 174:3-175:4 (Stier:  Describing the difficulty of explaining her relationship to Perry because they are not married.).

- Tr. 142:7-16 (Perry:  Describing why she wants to be married to Stier and that viewing marriage, as an outsider, "what it looks like is that you are honored and respected by your family.  Your children know what your relationship is.  And when you leave your home and you go to work or you go out in the world, people know what your relationship means.  And so then everyone can, in a sense, join in supporting your relationship.").

85

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

3

- Tr. 82:16-83:1 (Zarrillo: "Domestic partnership would relegate me to a level of second class citizenship, maybe even third class citizenship. . . . And that's not enough. . . . [W]e hold marriage in such high regard . . . [and domestic partnership] doesn't give due respect to the relationship that we have had for almost nine years. Only a marriage could do that.").

4

5

6

7

8

- Tr. 115:3-116:1 (Katami: Domestic partnerships "creat[e] a separate category for us." They "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages from other states. . . . And when your state sanctions something that segregates you, it fortifies people's biases. . . . [A]s long as that we are sanctioned by our state to be told that we're different, regardless of how proud we want to be, regardless of how happy we are in our pursuits, we're still lacking.").

9

10

11

12

13

14

- Tr. 1251:8-1252:6 (Zia: Although her 2004 marriage to Lia had been invalidated, Zia still believed that the marriage, as opposed to a domestic partnership, was significant: "it was really the difference, night and day, between being domestic partners and being married." She explained that "we—for a brief moment in time we experienced a feeling of . . . what equality is, what—instead of having to go to the fountain that is just for gay and lesbian people, here we could go to the fountain that formerly said heterosexuals only. And we tasted the water that was sweeter there. And our families experienced that.").

15

16

17

18

- Tr. 2058:2-24 (Herek: Ms. Zia's testimony highlights that there is this sense of feeling different. And one of the leading writers in the area of stigma has characterized it as an "undesired differentness." Ms. Zia's testimony is an illustration of how someone who is in a stigmatized group has that feeling of being different in an undesired way. What she seems to be experiencing here is that there was a brief time, in 2004, when she felt that difference had been removed.).

19

20

21

- Tr. 1960:1-9 (Tam: Knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

22

23

24

25

- Tr. 1962:17-1963:8 (Tam: Tam gets "very very upset" about the idea of children fantasizing about marrying people of the same sex, but he is reassured by knowing that gay couples are not allowed to get married. This allows parents to explain to their children that gay couples can enter domestic partnerships, "but it is not 'marriage.'" He is comforted because this difference is "something that is very easy for our children to understand.").

26

- Tr. 1964:17-1965:2 (Tam: It is important to children of same-sex couples that their parents be able to marry).

27

28

- *See also* evidence cited in support of PFFs 191, 285-296.

Gibson, Dunn & Crutcher LLP

PFF 122.    Prop. 8 thus sends a message to gay and lesbian individuals that they are not welcome in California, and it endorses society's rejection of gay and lesbian relationships.

- Tr. 854:5-14 (Meyer:  "Proposition 8, in its social meaning, sends a message that gay relationships are not to be respected; that they are of secondary value, if of any value at all; that they are certainly not equal to those of heterosexuals.").

- Tr. 863:1-6 (Meyer:  Prop. 8 is "not just damaging to gay people because they feel bad about their rejection.  It also sends a message that it is okay to reject.  Not only that it is okay, that this is very highly valued by our Constitution to reject gay people, to designate them a different class of people in terms of their intimate relationships.").

- Tr. 846:22-847:12 (Meyer:  Prop. 8 is certainly responsible for gay men and lesbians not marrying.  And when gay men and lesbians have to explain why they are not married, they "have to explain, I'm really not seen as equal.  I'm—my status is—is not respected by my state or by my country, by my fellow citizens."  Prop. 8 is a block in the way to achieving desirable goals in life.).

- Tr. 854:5-22 (Meyer:  This is demonstrated by Prop. 8, which "sends a message that gay relationships are not to be respected; that they are of secondary value, if of any value at all; that they are certainly not equal to those of heterosexuals. . . .  [So] in addition to achieving the literal aims of not allowing gay people to marry, it also sends a strong message about the values of the state; in this case, the Constitution itself.  And it sends a message that would, in [Dr. Meyer's] mind, encourage or at least is consistent with holding prejudicial attitudes.  So that doesn't add up to a very welcoming environment.").

- Tr. 879:18-880:19 (Meyer:  Research has shown that when people are exposed to more stress, they fare worse than when they are exposed to less stress.  A Constitutional amendment that says to gay people "you are not welcome here" has an effect, and the opposite message—"You are welcome here.  Your relationships are valued.  You are valued. . . .  We don't approve rejection of you as a gay person as a state"—has a very significant power that would improve lives.).

PFF 123.    The widespread prejudice, discrimination, and violence to which lesbians and gay men are often subjected are significant health concerns.  Sexual prejudice, sexual orientation discrimination, and antigay violence are major sources of stress for lesbian, gay, and bisexual people.

87

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

- Tr. 872:11-21 (Meyer: There have been pretty consistent findings in the literature showing excess disorder in gay and lesbian populations as compared to heterosexuals.).

2

3

- Tr. 873:21-874:9 (Meyer: Not all—or even most—gay men and lesbians suffer from adverse mental health consequences. Most gay men and lesbians are not disordered, but there is an excess in that population as compared to heterosexuals.).

4

5

6

- Tr. 870:13-872:10 (Meyer: Stigma and minority stress have an impact or an effect on mental health outcomes for gay men and lesbians. Research has shown a strong relationship between those kinds of stressors and negative or adverse health outcomes, such as anxiety disorders, mood disorders, substance abuse disorders, and excess suicide attempts. Put another way, the excess exposure or risk is associated with excess disease or disorder.).

7

8

9

10

- PX0767, at 6 (Am. Psychol. Ass'n, Professional Association Policies: "[D]iscrimination and prejudice based on sexual orientation detrimentally affect psychological, physical, social, and economic well-being.").

11

12

- PX0752 at 3 (Am. Psychoanalytic Ass'n, Position Statement: "Years of psychological research and experience have shown the extensive mental toll of keeping one's sexual orientation hidden.").

13

14

15

- PX2547 (Nathanson 11/12/09 Dep. Tr. 82:09-82:23: Stating that studies of the psychological effects of hostility on homosexuals have concluded uniformly concluded that it has negative effects on gay and lesbian individuals).

16

17   PFF 124.   Stress can be defined as something that happens that requires a person to adapt to a

18   new situation, such as loss of a job. Minority stress, in turn, is the added or unique

19   stress to which gay, lesbian, and bisexual people are exposed. They are exposed to

20   this unique stress by virtue of their stigmatized status in society, and such exposure

21   increases the risk for mental disorders in gay and lesbian individuals as compared with

22   heterosexual individuals.

23

- Tr. 828:18-830:14 (Meyer: Stress refers to the kind of events and conditions that happen to a person from the outside and that require the person to adapt or adjust to the new situation. There are different types of stressors—they may be acute or chronic, for example. There are also daily hassles and "nonevents.").

24

25

26

- Tr. 832:3-9 (Meyer: Minority stress identifies sources of stress that stem from social arrangements such as prejudice, stigma, and discrimination.).

27

28

88

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

- Tr. 834:6-20 (Meyer: The term "minority" in "minority stress" refers to sexual minorities—gay men, lesbians, and bisexuals. Most of the processes are quite specific to lesbians, gay men, and bisexuals.); *see also* Tr. 892:24-893:2.

3

4

- Tr. 870:13-872:10 (Meyer: Stigma and minority stress have an impact or an effect on mental health outcomes for gay men and lesbians. Research has shown a strong relationship between those kinds of stressors and negative or adverse health outcomes, such as anxiety disorders, mood disorders, substance abuse disorders, and excess suicide attempts. Put another way, the excess exposure or risk is associated with excess disease or disorder.).

5

6

7

8

- Tr. 898:11-899:8 (Meyer: The lesbian, gay, and bisexual population has about twice as many mental health disorders as heterosexuals, including mood, anxiety, and substance use disorders. That population also suffers from a higher prevalence of mood, anxiety, or substance abuse problems that do not meet the criteria for a formal psychiatric disorder, but are nevertheless indicative of stress. That population also has lower levels of well-being and than heterosexuals, and there is a higher incidence of suicide attempts among lesbian, gay, and bisexual individuals than among heterosexual individuals.)

9

10

11

12

13

- PX1003 (Article entitled "Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations: Conceptual Issues and Research Evidence," published in the Psychological Bulletin in 2003 by Dr. Meyer: This article, published in a prestigious journal, best articulates Dr. Meyer's model of minority stress. It has been used by many other researchers as a theoretical background for their own studies, and it has been used as a resource for hundreds of other articles. The article reports a meta-analysis that Dr. Meyer performed regarding the prevalence of mental disorders in lesbians, gay men, and bisexuals, and it demonstrates that the prevalence of such disorders is twice as high for lesbians, gay men, and bisexuals as it is for heterosexuals. This article also sets forth the processes through which minority stress works, including the experience of prejudice events, expectations of rejection, hiding and concealing, and internalized homophobia.); *see also* Tr. 832:20-833:16.

14

15

16

17

18

19

20

- Tr. 975:9-981:13 (Meyer: That different rates of adverse mental health outcomes may be seen for racial minorities, as opposed to sexual minorities, has no bearing on the applicability of the minority stress theory to lesbians, gay men, and bisexuals. This is true for many reasons, including that the socialization process for racial minorities provides coping mechanisms that sexual minorities do not obtain; that the minority stress theory is directed towards sexual minorities, not racial minorities; and that many of the processes through which the minority stress theory works are specific to sexual minorities, such as concealment and internalized homophobia.).

21

22

23

24

25

26

- Tr. 982:18-983:17 (Meyer: Whether the minority stress theory applies to racial minorities is interesting to study, but it does not lead Dr. Meyer to doubt its applicability to sexual minorities.).

27

28

89

- Tr. 982:3-14 (Meyer:  Though racism obviously still exists, racial minorities are not subjected to structural stigmas such as Prop. 8.).

- Tr. 700:23-701:7 (Egan:  Explaining that the use of behavioral health services by gay and lesbian people in San Francisco is "disproportionately high" due in part to discrimination).

PFF 125.    There are four pathways or processes through which minority stress manifests itself in the lives of sexual minorities (*i.e.*, gays, lesbians, and bisexuals): (1) prejudice events, (2) expectations of prejudice or rejection, (3) concealment, and (4) internalized homophobia.

- Tr. 834:21-835:24 (Meyer:  The four types of minority stress processes are: (1) "prejudice events," (2) "expectations of rejection and discrimination," (3) "concealing," and (4) "internalized homophobia.").

- Tr. 834:6-20 (Meyer:  The term "minority" in "minority stress" refers to sexual minorities—gay men, lesbians, and bisexuals.  Most of the processes are quite specific to lesbians, gay men, and bisexuals.); *see also* Tr. 892:24-893:2.

PFF 126.    The testimony of plaintiffs and other witnesses detailed many such prejudice events. Prejudice events include major incidents such as physical violence and abuse, but also include every day occurrences that might, in isolation, seem more minor, but can have significant negative effects when taken together and over time.  For example, gay and lesbian individuals regularly are confronted with situations where it is embarrassing and difficult to explain their status or relationships, such as forms that they must complete where there is no "box" that reflects their status.  Even jurors in litigation are regularly asked about their marital status, a question that might be difficult and awkward for gay men and lesbians to address.

- Tr. 836:11-837:15 (Meyer:  Prejudice events are types of stressors that are related to prejudice.  The include major acute events, chronic stress, daily hassles, and non-events.  Examples include being fired due to discrimination and anti-gay violence.  By definition, they are different from stressors that affect the general population because they are related to prejudice.).

- Tr. 840:9-22 (Meyer:  For gay men and lesbians, prejudice events are also committed against them in many instances by members of their own family. This is distinct from other groups that experience prejudice.).

90

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 150:21-151:19 (Perry:  Explaining that she feels the effects of discrimination on the basis of her sexual orientation "every day" and detailing many instances of discrimination she has faced.).

- Tr. 175:5-17 (Stier:  Recounting the experience of filling out forms in doctor's offices that ask whether she is single, married, or divorced and explaining that "I have to find myself, you know, scratching something out, putting a line through it and saying "domestic partner" and making sure I explain to folks what that is to make sure that our transaction can go smoothly.").

- Tr. 841:17-844:11, 845:7-10 (Meyer:  For lesbians and gay men, filling out a form that requires one to designate their marital status can be a prejudice event because the form-filler has no box to check.  While correcting a form is certainly a minor event, it is significant for the gay or lesbian person because the form evokes something much larger for the person—a social disapproval and rejection.  "It's about, I'm gay and I'm not accepted here.").

- Tr. 850:10-851:14 (Meyer:  Ms. Stier's testimony about filling out forms demonstrates that "the meaning of this incident is more important than . . . what has actually happened."  The message is that the form echoes rejection and says "I'm not equal to other people, to most people who fill [out] this form.").

- Tr. 91:20-93:13 (Katami:  "[W]hen you are considered different from the norm, you're subject to all kinds of issues and situations that you want to avoid . . . I had a girlfriend in high school because you needed to have one to go to the prom or to go to the game." "[I]n high school and college, being gay is associated with something that's undesirable. 'Oh that's gay.'  You know.  That's me.  So I'm in that category now.  So it's very difficult.").

- Tr. 1513:6-14 (Kendall:  On the stress of going through reversal therapy: "During this whole thing, my life had kind of fallen apart.  I didn't have the world that I grew up in; my faith, which was very important to me; my family, which was even more important.  Everything had just kind of stopped.  And I just couldn't take any more.  And I realized, at one point, that if I didn't stop going I wasn't going to survive. . . . Uhm, I would have probably killed myself.").

- Tr. 1514:6-16 (Kendall:  Following reversal therapy, for a period of four or five years, Mr. Kendall was suicidal, depressed, and turned to drugs to escape reality.).

- Tr. 1219:7-1221:9 (Zia:  Describing various prejudice events she encountered during the Prop. 8 campaign, including slurs.).

- Tr. 1212:15-1215:5 (Zia:  While working as a community organizer in Asian and African American communities, Zia was asked to attend a meeting where she was confronted with her involvement with other groups that had many

91

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

lesbian members.  Leaders from both the Asian and African American community were concerned that she was associating with lesbians because, so they claimed, there were no homosexuals in the Asian or African American community.  They said that homosexuality is a symptom of "white petty bourgeois".).

- Tr. 1216:24-1217:18 (Zia:  Notre Dame rescinded a speaking engagement because she might say something "about sexual orientation or being a lesbian.")

- Tr. 1217:19-1218:8 (Zia:  Her cousin cut off all contact with her after finding out she was a lesbian.).

- Tr. 839:5-15 (Meyer:  Regardless of who perpetrates them, such crimes have different meanings when they are rooted in prejudice:  A crime committed against someone who is gay because he or she is gay has a meaning for the victim that adds pain and makes it worse.).

- Tr. 841:8-16 (Meyer:  Just as a hate crime is worse for the victim than a regular crime, a minor event could have a greater impact on the person than a similar event that had no such meaning.  This is the difference between an event that constitutes a minor annoyance and an event that represents social disapproval.).

- Tr. 844:12-845:20 (Meyer:  Similarly, the hassle of checking into a hotel and having the clerk question whether the gay or lesbian couple wants one king sized bed may seem minor, but for gay people, it is an area of great sensitivity because it reflects their rejection and the rejection of their family members.).

- Tr. 845:11-846:21 (Meyer:  Not getting married can be seen as a "nonevent," and it could be significant for a gay or lesbian person because there is an expectation that he or she will get married, but that is not permitted.  This nonevent is "a representation of their position in society . . . of the kind of respect or, in this case, disrespect that they experience, of the stigma.").

- Tr. 846:22-847:12 (Meyer:  Prop. 8 is certainly responsible for gay men and lesbians not marrying.  And when gay men and lesbians have to explain why they are not married, they "have to explain, I'm really not seen as equal. I'm—my status is—is not respected by my state or by my country, by my fellow citizens."  Prop. 8 is a block in the way to achieving desirable goals in life.).

- Tr. 93:14-96:25 (Katami:  "We were struck by these rocks and eggs.  And there were slurs . . . And it was a very sobering moment . . . [I]n that moment, being gay means I'm unequal.  I'm less than.  I am undesirable.  I have been relegated to a corner.").

92

Gibson, Dunn
& Crutcher
LLP

- Tr. 846:16-850:5 (Meyer:  Mr. Katami's testimony about being struck by rocks and eggs while at a gay bar or restaurant is a prejudice event.  Mr. Katami's testimony demonstrates the realization that this was a meaningful moment:  "This is about who I am.  This is something I have to get used to."  Indeed, one of the main reasons this event is so memorable is because of the "sobering moment" that Mr. Katami describes—"because of that recognition: I am not the same as other people in society.  Somebody can come and just thrown stones, or whatever it was, and eggs on me, because they don't like that I am gay.").

- Tr. 2765:3-6 (Blankenhorn:  "I believe that homophobia is a real presence in our society and, I'm pretty confident, in many, many other societies around the world.  And I regret and deplore it, and wish it to go away.").

PFF 127.    Similarly, there were many examples of expectations of prejudice and resulting vigilance in the testimony of plaintiffs and other witnesses.

- Tr. 152:3-11 (Perry:  "I have to decide every day if I want to come out everywhere I go and take the chance that somebody will have a hostile reaction to my sexuality or just go there and buy the microwave we went there to buy without having to go through that again.  And the decision every day to come out or not come out at work, at home, at PTA, at music, at soccer, is exhausting.  So much of the time I just choose to do as much of that as I can handle doing in any given day.").

- Tr. 169:23-170:2 (Stier:  Stier feared getting married in 2008 because she knew about Prop. 8 and felt that the invalidation of their 2004 marriage "made a circus out of [their] lives and [she doesn't] want to be a party to that.").

- Tr. 1218:9-1219:6 (Zia:  "I feel constantly aware that my sexual orientation could, for whatever reason, provoke violence toward me or toward my loved ones." As a result, she is very careful about how she and her wife act toward each other in public.).

- Tr. 851:15-853:14 (Meyer:  Expectations of rejection and discrimination means exactly what it says.  A person who knows that they might be rejected or discriminated against needs to maintain a certain vigilance about their interactions in society that ensures their safety.  A gay or lesbian couple walking down the street would have to monitor the kind of affection that they display because of the reactions they might receive—for example, someone might throw something at them.  Notably, this reaction is not about the individuals—it is about their presentation as gay.  Regardless of whether the expected prejudice or discrimination actually occurs, this constant vigilance is stressful.).

93

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 853:15-23 (Meyer:  Many times, people choose to avoid these situations or just swallow minor incidents of prejudice, such as slurs, and move on because they do not want to deal with it.  But the anticipation itself is stressful.).

- Tr. 854:5-22 (Meyer:  This is demonstrated by Prop. 8, which "sends a message that gay relationships are not to be respected; that they are of secondary value, if of any value at all; that they are certainly not equal to those of heterosexuals. . . .  [So] in addition to achieving the literal aims of not allowing gay people to marry, it also sends a strong message about the values of the state; in this case, the Constitution itself.  And it sends a message that would, in [Dr. Meyer's] mind, encourage or at least is consistent with holding prejudicial attitudes.  So that doesn't add up to a very welcoming environment.").

PFF 128.   Many lesbians, gays, and bisexuals experience minority stress through concealing their sexual orientation, and there were multiple examples of this in the testimony of plaintiffs and other witnesses.

- Tr. 1506:1-19 (Kendall:  When he first realized that he was gay, he knew that his family and community did not approve of homosexuality so he "kept this a secret," and hid it as far away from everyone as he could.).

- Tr. 1215:7-1216:23 (Zia:  After her lesbian trial, she "stepped into the closet and slammed the door shut." She even burned her diaries to hide any evidence that she might be a lesbian.).

- Tr. 152:3-11 (Perry:  "I have to decide every day if I want to come out everywhere I go and take the chance that somebody will have a hostile reaction to my sexuality or just go there and buy the microwave we went there to buy without having to go through that again.  And the decision every day to come out or not come out at work, at home, at PTA, at music, at soccer, is exhausting.  So much of the time I just choose to do as much of that as I can handle doing in any given day.").

- Tr. 863:7-865:1 (Meyer:  Ms. Perry's testimony demonstrates many of the minority stress processes.  The word "exhausting" also resonates because it demonstrates how much work is required to adapt.).

- Tr. 854:23-856:11 (Meyer:  People conceal their stigmatizing identity as a coping effort, so that they can avoid discrimination or prejudice.  For example, if you are gay or lesbian and in the United States military, you have to conceal in that you are not allowed to talk about your homosexuality or you will be fired.  People may also conceal for personal safety.).

94

Gibson, Dunn
& Crutcher
LLP

- Tr. 861:8-10 (Meyer:  "[T]he reason that you're concealing [your identity] is because, again, of the significance of rejection [and] . . . disrespect that you would feel if you were to reveal this.").

- Tr. 856:15-860:16 (Meyer:  Concealment is stressful in at least three ways. First, concealing requires a very strong cognitive effort—there is stress involved because it is hard work.  The effort of concealing has been described as "a private hell."  Concealing also prevents one from being able to express emotion, which is valuable.  Similarly, concealing something "that is perceived as being such a core thing about who you are," a "central identity" prevents one from being able to live an authentic life.  Finally, concealing can prevent gays and lesbians from being able to access appropriate social or medical support or services.).

- Tr. 862:11-863:6 (Meyer:  Prop. 8 is related to this—it "certainly doesn't send a message that:  It's okay.  You can be who you want to be.  You know, we respect that.  We welcome you as part of this community.  It sends the opposite message . . . [it] add[s] to that pressure, to that social environment that encourages people, some people, to conceal. . . .  [I]t's not just damaging to gay people . . .  It also sends a message that it is okay to reject.  Not only that it is okay, that this is very highly valued by our Constitution to reject gay people, to designate them a different class of people.").

PFF 129.    Plaintiffs' own testimony also evidences the final minority stress process, internalized homophobia.

- Tr. 142:4-6 (Perry:  "I have never really let myself want [marriage] until now. Growing up as a lesbian, you don't let yourself want it, because everyone tells you you are never going to have it.").

- Tr. 869:16-870:7 (Meyer:  Ms. Perry's testimony is a perfect example of someone who says that marriage, for example, does "not apply to me.  I can't hope for that.  That is not part of my possible self.").

- Tr. 146:15-147:14 (Perry:  When the California Supreme Court invalidated her 2004 marriage to Stier, Perry's response was: "when you're gay, you think you don't really deserve things.  So it did have this sense of, well, you know, I really didn't deserve to be married. . . .  I'm not good enough to be married.").

- Tr. 865:2- 866:23 (Meyer:  Homophobia refers to the negative attitudes that are prevalent in society about gay men, lesbians, or homosexuality in general. And internalized homophobia refers to the process by which a gay or lesbian person internalizes or takes in these prevalent negative attitudes that she or he has learned through the socialization process.  When one has internalized them, the natural thing to think is: this is what it means to be gay, so "that must be what I am.").

95

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1
2
3
4
5

- Tr. 866:24-868-7 (Meyer:  The "possible self" is a concept whereby a person not only looks at where he or she is currently, but projects out into the future—into what he or she might become.  This is an important construct because it helps one chart a life course and goals, and having a more optimistic notion of the future improves one's current feeling about who he or she is.  And on the other hand, the feeling that you will be blocked from achieving your goals is associated with a lower sense of well-being or negative feelings.).

6
7
8

- Tr. 868:8-25 (Meyer:  Internalized homophobia relates to the possible self—if you internalize these negative attitudes, you think: "[T]his is who I'm going to be in the future. . . .  Gay and lesbian youth had a harder time projecting into the future because they have learned those kind of negative attitudes.").

9
10

- Tr. 78:4-79:14 (Zarrillo:  Describing the effects of stereotypes and peer pressure when he was in school; explaining that "[I] really wanted to . . . go out for the football team, but I was afraid to—to be with men in the locker room").

11

PFF 130.

12

The exclusion of gay and lesbian individuals from the institution of civil marriage

13

inflicts on them and their children humiliation, emotional distress, pain, suffering,

psychological harm, and stigma.

14
15

- Tr. 960:7-22 (Meyer:  Limiting marriage to opposite-sex couples causes minority stress for all gay men and lesbians.).

16
17

- Tr. 960:22-962:15 (Meyer:  Minority stress results in a higher level of mental disorder and negative mental health outcomes in the gay and lesbian population.).

18
19
20

- Tr. 870:13-872:21 (Meyer:  Studies consistently show that stigma and minority stress is linked to "excess disorder or higher level of disorder in gay and lesbians populations as compared to heterosexuals."); *see also* PX0982 and PX1003.

21
22
23

- PX0962, PX0915, PX0974, PX0975, and PX0976 (Articles demonstrating that the enactment of laws that stigmatize gay men and lesbians—and, in particular, the enactment of laws prohibiting marriage by gay and lesbian couples—results in greater minority stress and leads to the greater prevalence of mental disorders in the gay and lesbian population).

24
25
26

- PX1471 (Herdt article entitled "I Do, but I Can't: The Impact of Marriage Denial on the Mental Health and Sexual Citizenship of Lesbians and Gay Men in the United States:  Demonstrating the impact of marriage denial on the mental health and well-being of gay men and lesbians.).

27
28

- PX0921 (Herek article entitled "Legal Recognition of Same-Sex Relationships in the United States: A Social Science Perspective," published in the American

96

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Psychologist in 2006:  Explaining how same-sex couples and their children are disadvantaged by their lack of legal recognition, how they would benefit from such recognition, how quasi-marital institutions do not afford the same protections and benefits as marriage, and how restricting same-sex couples to a separate and inherently unequal status perpetuates antigay stigma).

- Tr. 879:18-880:18 (Meyer:  If Proposition 8 was no longer the law of California, the mental health outcomes of gay men and lesbians would improve.).

- PX0710 at RFA No. 39 (Attorney General admits "that denying same-sex couples and their families access to the familiar and favorable official designation 'marriage' harms them by denying their family relationships . . . the same dignity and respect afforded to opposite-sex couples and their families").

- PX0710 at RFA No. 43 (Attorney General admits "that the stigma associated with discrimination and second-class treatment takes a toll on the well-being of gay men and lesbians and their families").

- Tr. 1346:17-1347:18 (Badgett:  In a study on married same-sex couples in Massachusetts, respondents with children indicated that their children valued being part of a family that looked like other families and that it was easier for them to deal with important people in their children's lives such as teachers and healthcare providers.).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.:  "Of those [respondents] with children, nearly all respondents (93%) agreed or somewhat agreed that their children are happier and better off as a result of their marriage.").

PFF 131.    The testimony of plaintiffs and other witnesses demonstrates the harm they suffered as a result of Prop. 8, the campaign, and not being able to be married.

- Tr. 159:2-11 (Perry:  "[I]f I had grown up in a world where the most important decision I was going to make as an adult was treated the same way as everybody else's decision . . . I would not have been treated the way I was growing up or as an adult.  There's something so humiliating about everybody knowing that you want to make that decision [to be married] and you don't get to . . . it's hard to face the people at work and the people even here right now.  And many of you have this, but I don't.").

- Tr. 159:16-20 (Perry:  On the other hand, "if Prop. 8 were undone and kids like me growing up in Bakersfield right now could never know what this felt like, then I assume that their entire lives would be on a higher arch.  They would

97

live with a higher sense of themselves that would improve the quality of their entire lives.").

- Tr. 142:23-143:3 (Perry:  Due to Prop. 8 and her inability to marry Stier, Perry feels that the state "isn't letting me feel happy.  It's not letting me experience my full potential because I am not permitted to experience everything I might feel if this barrier were removed.").

- Tr. 147:20-148:13 (Perry:  By 2008, when the *In re Marriages* decision issued, Perry still had not recovered from her 2004 marriage to Stier being invalidated.).

- Tr. 168:14-169:1 (Stier:  When their 2004 marriage was invalidated, Stier felt outraged and hurt and humiliated.  She felt as though everyone who had come to their 2004 wedding must feel a level of humiliation themselves, too.  She felt as though there are people who felt pity them.).

- Tr. 169:23-170:2 (Stier:  Stier felt that the invalidation of their 2004 marriage "made a circus out of [their] lives and [she doesn't] want to be a party to that.").

- Tr. 179:5-16 (Stier:  On the effects of being able to be married: "I would feel more secure.  I would feel more accepted.  I would feel more pride. . . . [I] think about that generation and the possibility of having grandchildren some day and having them live in a world where they grow up and whoever they fall in love with, it's okay, because they can be honored and they can be true to themselves and they can be accepted by society and protected by their government . . . .  And as somebody who is from one of those conservative little pockets of the country . . ., having those legal protections is everything.").

- Tr. 82:9-85:8 (Zarrillo:  "Domestic partnership would relegate me to a level of second class citizenship . . . . It's giving me part of the pie, but not the whole thing. . . . [I]t doesn't give due respect to the relationship that we have had for almost nine years.").

- Tr. 115:3-116:1 (Katami:  Domestic partnerships "make[] you into a second, third, and . . . fourth class citizen now that we actually recognize marriages from other states. . . . None of our friends have ever said, 'Hey, this is my domestic partner.'").

- Tr. 99:23-100:9 (Katami:  Describing the ProtectMarriage.com "It's Already Happened" video (PX0099) as "demonizing a group of people").

- Tr. 113:12-115:2 (Katami:  Discussing Proponents' argument in favor of Proposition 8 in the California Voter Information Guide for 2008.  "It absolutely puts me into a category that I do not belong in.  It separates me from the norm.  It makes me into someone—a part of a community that is perpetrating some sort of threat.").

98

Gibson, Dunn
& Crutcher
LLP

1     • Tr. 1274:7-1275:16 (Sanders: Recounted the depth of feeling and hurt of
2       members of the lesbian and gay community when he told them that he was
        planning to veto the ordinance supporting marriage rights for gay and lesbian
3       individuals because he thought that civil unions were a fair alternative).

4  PFF 132.    Stigma has a serious impact on the health of gay and lesbian individuals in the United

5  States by causing stress and disease. This has been recognized by public health

6  authorities including Healthy People 2010, which sets health priorities for the United

7  States.

8     • Tr. 875:15-876:20 (Meyer: Healthy People 2010 is a project of the federal
9       government and led by the Department of Health and Human Services. It is
        the plan for the health of the nation for the decade that started in 2000.).

10    • Tr. 876:10-877:19 (Meyer: Healthy People 2010 reports that a main goal of
11      the United States is to reduce health disparities. One goal of Healthy People
        2010 is to reduce the health disparities between gay and lesbians, on the one
12      hand, and heterosexuals, on the other hand: "Sexual Orientation. America's
        gay and lesbian population comprises a diverse community with disparate
13      health concerns. Major health issues for gay men are HIV/AIDS and other
        sexually transmitted diseases, substance abuse, depression, and suicide. Gay
14      male adolescents are two to three times more likely than their peers to attempt
15      suicide. Some evidence suggests lesbians have higher rates of smoking,
        overweight, alcohol abuse, and stress than heterosexual women. . . . The issues
16      surrounding personal, family, and social acceptance of sexual orientation can
        place a significant burden on mental health and personal safety.").
17

18    • Tr. 700:23-701:7 (Egan: Explaining that the use of behavioral health services
19      by gay and lesbian people in San Francisco is "disproportionately high" due in
        part to discrimination).

20    • Tr. 703:21-23 (Egan: "[O]ver 200,000 students in California each year are
21      bullied based on their actual or perceived sexual orientation.").

22    • PX0810 at 1: (Safe Schools Research Brief concerning economic costs of
        bullying in school: "More than 200,000 students in California each year report
23      being bullied based on actual or perceived sexual orientation based on the
        2001-2002 California Healthy Kids Survey (CHKS) - that is 7.5% of students
24      in the 7th, 9th, and 11th grades. This harassment is linked to risk behavior,
        poor grades, and emotional distress for students").
25

26    • PX0810 at 4: (Safe Schools Research Brief concerning economic costs of
        bullying in school: "26.6% of students who were bullied because of actual or
27      perceived sexual orientation during the past 12 months also reported that they
        missed school the past 30 days because they felt unsafe.").
28

99

Gibson, Dunn
& Crutcher
LLP
09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0760 at 1 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: "socially sanctioned discrimination adds to the burdens of both the children of same-sex couples as well as gay and lesbian youth (who have higher rates of suicide attempts than heterosexual youth.").

- *See also* evidence cited in support of PFFs 123-124.

**B.**   **Economic Harm to Gay and Lesbian Individuals from Denial of Marriage to Same-Sex Couples**

PFF 133.   In addition to social and psychological harms, Prop. 8 imposes substantial economic harms on same-sex couples residing in California and their children.

- Tr. 692:4-25 (Egan:  Explaining that individuals in same-sex partnerships may not be covered by their partners' healthcare plan).

- PX2260 (Letter from National Elevator Industry Benefit Plans:  Explaining that benefits coverage under the plan is available to a spouse only when legally married); *see also* Tr. 794:16-795:12 (Egan:  Discussing same).

- Tr. 1330:14-16 (Badgett:  Prop. 8 has "inflicted substantial economic harm on same-sex couples and their children who live here in California.").

- Tr. 1331:12-1337:25 (Badgett:  Marriage confers numerous economic benefits including greater specialization of labor, reduced transaction costs, health and insurance benefits, stronger statement of commitment, greater validation and social acceptance of the relationship and more positive workplace outcomes. Some costs are not quantifiable, but are nevertheless substantial.).

- Tr. 1341:2-1342:13 (Badgett:  Couples that would marry but would not enter into a domestic partnership suffer tangible economic harm such as higher taxes and limited access to health insurance.  Not all of these costs are quantifiable, but across the state there are millions of dollars of quantifiable costs to same-sex couples that cannot marry.).

- Tr. 1343:20-25 (Badgett:  "If it's costing couples thousands of dollars a year in additional costs because they can't marry, then that's thousands of dollars that will not be available to spend on children or to save for their college education or whatever parents might want to actually do with that, with that money.").

- Tr. 1344:11-1348:13 (Badgett:  A study of married same-sex couples in Massachusetts found that almost all of the parents who were raising children agreed that their children were better off after marriage.).

- Tr. 1350:6-9 (Badgett:  The American Medical Association concluded that denying same-sex couples the right to marry reduces access to health insurance and creates healthcare disparities among children.).

100

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX1259 at 1 (Badgett, *Unequal Taxes on Equal Benefits: The Taxation of Domestic Partner Benefits*: "[W]orkers who have an unmarried domestic partner are doubly burdened: Their employers typically do not provide coverage for domestic partners; and even when partners are covered, the partner's coverage is taxed as income to the employee.").

- PX2898 at 307 (Langbein and Yost, *Same Sex Marriage and Negative Externalities*: "For example, the ban on gay marriage induces failures in insurance and financial markets. Because spousal benefits do not transfer (in most cases) to domestic partners, there are large portions of the population that should be insured, but instead receive inequitable treatment and are not insured properly. . . . This is equally true in the treatment of estates on the death of individuals. In married relationships, it is clear to whom an estate reverts, but in the cases of homosexual couples, there is no clear right of ownership, resulting in higher transactions costs, widely regarded as socially inefficient.").

- PX0188 at 9 (Report by the Council on Science and Public Health: "Survey data confirm that same-sex households have less access to health insurance. If they have health insurance, they pay more than married heterosexual workers, and also lack other financial protections. . . . [C]hildren in same-sex households lack the same protections afforded children in heterosexual households.").

- PX0189 at 1 (Am. Med. Ass'n Resolution: "[E]xclusion from civil marriage contributes to health care disparities affecting same-sex households.").

- PX1261 at 7 (Cal. Employer Health Benefits Survey: Only 56% of California firms offered health insurance to unmarried same-sex couples in 2008.).

- PX1266 at 13 (Report on Cal. Domestic Partnership Law: Illustrating the additional transactions costs associated with domestic partnership: "Despite this automatic legal protection for children born to registered domestic partners, [the National Center for Lesbian Rights] is strongly recommending that *all* couples obtain a court judgment declaring both partners to be their child's legal parents, either an adoption or a parentage judgment.").

- PX1269 at 1 (Report by Michael D. Steinberger: "Using data from several government data sources, this report estimates the dollar value of the estate tax disadvantage faced by same-sex couples. In 2009, the differential treatment of same-sex and married couples in the estate tax code will affect an estimated 73 same-sex couples, costing each of them, on average, more than $3.3 million.").

PFF 134.    Denying same-sex couples the right to marry and permitting them to only register as

domestic partners imposes a substantial economic cost on gay and lesbian individuals.

101

Gibson, Dunn
& Crutcher
LLP

Similarly, permitting same-sex couples to marry would lead to a substantial economic gain for individuals in same-sex couples.

- Tr. 685:25-686:2 (Egan: "[M]arried individuals tend to accumulate more wealth than single individuals.").

- Tr. 712:5-8 (Egan: "If marriage for same-sex couples were permitted, that would put more revenue—would result in income tax savings for them.").

- PX0809 (RAND report on relationship between marriage, assets and savings: Outlining correlation between marriage and wealth accumulation).

- *See also* evidence cited in support of PFF 133.

PFF 135.   Because domestic partnership is inferior to marriage and upholds and enforces the stigma attached to same-sex couples, it reduces the degree of commitment of partners and potential partners, and reduces the incentive to invest in surplus-enhancing behaviors.

- Tr. 80:14-81:6 (Zarrillo: "I think one's capacity to be committed to another individual can absolutely expand.  And I'm confident that that would happen with us [were we married].").

- Tr. 88:22-89:12 (Katami: "Being able to call him my husband is so definitive, it changes our relationship . . . It's something that you've dedicated yourself to and you're committed to.").

- Tr. 1342:14-1343:12 (Badgett:  Some people would marry but would not register as domestic partners because they view domestic partnership as a second class status, value the social validation of marriage and dislike domestic partnerships because it sounds too clinical.).

- Tr. 1471:1-1472:8 (Badgett: "[I]ndividuals clearly not only see marriage as something that's more valuable that comes with added characteristics over some alternative status, but the alternative status in and of itself is devalued because it's seen as sending a message of inferiority.").

- Tr. 1334:19-1335:9 (Badgett:  Marriage is a strong signal of commitment "that is recognized and reinforced by people outside of the marriage.").

- Tr. 1345:19-1346:5; PX1267 at 1 (Badgett:  In a study on married same-sex couples in Massachusetts, PX1267, over 72% of respondents felt more committed to their partners as a result of marrying.).

102

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1331:15-1332:9, 1332:25-1334:17 (Badgett: Marriage incentivizes couples to divide up labor more efficiently, which enhances economic well-being by increasing family income and making more time available for the family. Marriage also reduces transaction costs.).

PFF 136. Proponents' expert, Mr. Blankenhorn, admitted that allowing gay and lesbian individual to marry would decrease promiscuity, increase stability of same sex couples' relationships, and decrease "marriage-lite" regimes.

- DIX0956 at 202-05 (David Blankenhorn, *The Future of Marriage*: Listing 23 positive consequences of legalizing marriage by same-sex couples).

- *See also* evidence cited in support of PFFs 249, 258, 280.

PFF 137. Compared to allowing same-sex couples to marry in California, domestic partnership results in the creation of a smaller surplus in the relationship.

- Tr. 1332:19-1337:25 (Badgett: Marriage confers numerous economic benefits, many of which are not provided by domestic partnership.).

- Tr. 1337:16-21 (Badgett: "[B]ut even those couples who do have a domestic partnership, in my opinion, are not getting the same kind of statement of commitment and social validation that would give rise to the full—the full effect of the other possible benefits, that would—that they would experience if they were allowed to marry.").

- Tr. 1341:25-1342 (Badgett: "[I]t's very hard to actually quantify some of these costs, but the ones that we can quantify, like the access to health insurance and the tax burdens, are very likely to be in the thousands of dollars per year for each couple who has to bear them. . . . [I]f you were to multiply those thousands of dollars by the thousands of couples, you'd have tens of millions of dollars in quantifiable costs for those couples.").

- Tr. 1343:20-24 (Badgett: "If it's costing couples thousands of dollars a year in additional costs because they can't marry, then that's thousands of dollars that will not be available to spend on children or to save for their college education or whatever parents might want to actually do with that, with that money.").

PFF 138. The reduced incentive associated with domestic partnership as compared to marriage is reflected in lower utilization of domestic partnership and in a lesser development of specialized skills in the relationship than would occur within marriage.

103

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1331:15-1332:9, 1332:25-1334:17 (Badgett:  Marriage incentivizes couples to divide up labor more efficiently, which enhances economic well-being by increasing family income and by making more time available for the family. Marriage also reduces transaction costs.).

- Tr. 1342:14-1343:12 (Badgett:  Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as second class status, value marriage because it is socially validated and dislike domestic partnership because it sounds clinical.).

PFF 139.   That gay and lesbian individuals have continued to press for the right to marry in jurisdictions in which some form of civil union of domestic partnership is already available suggests that they do not see civil unions and domestic partnerships as comparable to marriage.

- Tr. 82:16-83:1 (Zarrillo:  Domestic partnership is not comparable to marriage.).

- Tr. 1338:15-25; 1469:10-1470:6 (Badgett:  During the six months when same-sex couples were permitted to marry in California, approximately 18,000 same-sex couples chose marriage whereas only 2,000 same-sex couples chose domestic partnerships.).

- Tr. 1339:9-1340:15; PX1263 (Badgett:  A study of take-up rates in states that allow marriages by gay and lesbian couples, civil unions and domestic partnerships indicated that same-sex couples have a clear preference for marriage.).

- Tr. 1342:14-1343:12 (Badgett:  Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as second class status, value marriage because it is socially validated and dislike domestic partnership because it sounds clinical.).

- Tr. 1472:4-8 (Badgett:  "[I]ndividuals clearly not only see marriage as something that's more valuable that comes with added characteristics over some alternative status, but the alternative status in and of itself is devalued because it's seen as sending a message of inferiority.").

PFF 140.   The long-term nature of marriage encourages spouses to increase household efficiency by dividing their labor in ways that increase the family's productivity in producing goods and services by family members.

104

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0708 at RFA No. 88 (Proponents admit "that marriage between a man and a woman encourages spouses to increase household efficiency, including by dividing their labor in ways that increase the family's productivity in producing goods and services for family members.").

- Tr. 1331:15-1332:9, 1332:25-1334:17 (Badgett:  Marriage incentivizes couples to divide up labor more efficiently, which enhances economic well-being by increasing family income and by making more time available for the family. Marriage also reduces transaction costs.).

PFF 141.   Same-sex couples are economically interdependent in ways and to an extent similar to, not different from, different-sex couples.

- PX2096 at 1 (Census Snapshot by Adam P. Romero, et al.:  "In many ways, the more than 107,000 same-sex couples living in California are similar to married couples.  According to Census 2000, they . . . have partners who depend upon one another financially.").

- *See also* evidence cited in support of PFFs 161, 163.

## C.   Harm to Children from Denial of Marriage to Same-Sex Couples

PFF 142.   Marriage uniquely legitimizes children and provides them with a sense of security, stability, and increased well-being.

- PX0710 at RFA No. 7 (Attorney General admits "that under California law, marriage legitimizes children and provides them greater financial security, which may well give children a greater sense of security.").

- Tr. 1964:17-1965:2 (Tam:  It is important to children of same-sex couples that their parents be able to marry.).

- PX2852 (Human Rights Campaign, posting a Position Statement of the American Medical Association on Adoption by Same-Sex Couples:  "Having two fully sanctioned and legally defined parents promotes a safe and nurturing environment for children, including psychological and legal security[.] . . . therefore, be it RESOLVED, That our American Medical Association support legislative and other efforts to allow the adoption of a child by the same-sex partner, or opposite sex non-married partner, who functions as a second parent or co-parent to that child.").

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that benefits both the participants in the marriage, the couple that are married, as well as any children that the couple may raise"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

105

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 2849:6-11 (Blankenhorn:  Agreeing that "Gay marriage would extend a wide range of the natural and practical benefits of marriage to many lesbian and gay couples and their children"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2803:13-15 (Blankenhorn:  "I believe that adopting same-sex marriage would be likely to improve the well-being of gay and lesbian households and their children."); *see also* Tr. 2839:22-24 (Blankenhorn:  "I do believe it is almost certainly true that gay and lesbian couples and their children would benefit by having gay marriage."); Tr. 2848:24-2849:5 (Blankenhorn: Agreeing that marriage "would improve the happiness and well-being of many gay and lesbian individuals, couples, and family members.").

- Tr. 2852:11-17 (Blankenhorn:  Agreeing that "[b]y increasing the number of married couples who might be interested in adoption and foster care, same-sex marriage might well lead to fewer children growing up in state institutions and more growing up in loving adoptive and foster families"); *see also* DIX0956 at 204 (Blankenhorn, *Future of Marriage*).

- Tr. 1042:12-1043:16 (Lamb:  Prohibiting same-sex couples from marrying cannot be expected to improve the adjustment outcomes of any children.  The ability of same-sex couples to get married can improve the likelihood that their child will achieve a good adjustment outcome.).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.:  "Of those [respondents] with children, nearly all respondents (93%) agreed or somewhat agreed that their children are happier and better off as a result of their marriage.").

PFF 143.   Marriage provides many tangible and intangible benefits to the married individuals. Certain tangible and intangible benefits of marriage flow to the married couple's children.

- PX0739 at No. 6 (Proponents stipulated that "[t]he tangible and intangible benefits of marriage flow to the married couple's children.  Marriage legitimizes children born to the couple and provides a sense of security and support for the family").

- PX0767 at 2-4, 6 (Am. Psychol. Ass'n, Professional Association Policies: Discussing the deprivation of the benefits of marriage for children being raised by gay couples that cannot marry, and noting that "the institution of marriage confers a social status and important legal benefits, rights, and privileges[.]").

- Tr. 2803:13-15 (Blankenhorn:  "I believe that adopting same-sex marriage would be likely to improve the well-being of gay and lesbian households and

106

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

their children."); *see also* Tr. 2839:22-24 (Blankenhorn: "I do believe it is almost certainly true that gay and lesbian couples and their children would benefit from gay marriage."); Tr. 2848:15-2849:5 (Blankenhorn: Agreeing that allowing them to marry "would improve the happiness and well-being of many gay and lesbian individuals, couples and family members.")

- Tr. 2849:6-11 (Blankenhorn: Agreeing that "Gay marriage would extend a wide range of the natural and practical benefits of marriage to many lesbian and gay couples and their children."); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 2790:5-9 (Blankenhorn: "When we say the word 'marriage,' it's a big institution that performs a very large contribution to society and it's much bigger, much more powerful and potent as a role in society than merely or only the enumeration of its legal incidents.").

- DIX0956 at 6 (Blankenhorn, *Future of Marriage*): "*Marriage matters*. It significantly influences individual and societal well-being.").

- PX2879 at 9 (*The Marriage Movement: A Statement of Principles* (2000): "The public, legal side of marriage increases couples' confidence that their partnerships will last.").

- PX2879 at 12 (*The Marriage Movement: A Statement of Principles* (2000): "Married adults live longer, healthier, happier and more affluent lives than adults who don't marry or don't stay married. This phenomenon is not simply an artifact of selection; marriage itself makes adults better off, by offering them greater emotional and financial support, wider and more integrated social networks, important economies of scale, and productive boosts in earnings, parenting capacity, and life management.").

- PX2879 at 12 (*The Marriage Movement: A Statement of Principles* (2000): "Marriage also helps to conserve wealth and expand social capital. At any given level of income, married adults are less likely to experience financial hardship. The longer people stay married, the more wealth they accumulate, whereas length of cohabitation has no relationship to wealth accumulation. Informal partners—who are not held by the wider society to be financially responsible to one another—do not reap the same benefits as the legally married.").

- PX0886 (Am. Psychiatric Ass'n, Position Statement: noting the benefits of marriage for married adults and their children).

- PX1397 at 1 (U.S. General Accounting Office Report, Jan. 23, 2004: Identifies "a total of 1,138 federal statutory provisions classified in the United States Code in which marital status is a factor in determining or receiving benefits, rights, and privileges").

107

*Gibson, Dunn & Crutcher LLP*

- Tr. 235:19-236:16 (Cott:  "[I]n the 20th century, the federal government has tended to use the institution of marriage and the marriage-based family as the conduit for benefits of many sorts.").

- PX1746 throughout, including at 2 (Nancy Cott, *Public Vows*:  "Marriage prescribes duties and dispenses privileges.").

- Tr. 581:23-582:2 (Peplau:  "[M]arriage can also lead to various kinds of supports from government, to beneficial laws or being eligible for programs or for health insurance through an employer.").

- PX1384 at 20 (Article by Charlotte J. Patterson, Megan Fulcher, & Jennifer Wainright:  Recommending that gay and lesbian individuals be allowed to marry because of the tangible and intangible benefits to the children of lesbian and gay parents, such as lessened stigmatization and access to health insurance).

- Tr. 1343:13-1348:13 (Badgett:  In a study of married same-sex couples in Massachusetts almost all of the respondents who were raising children agreed that their children were better off after marriage because of the value of having a family that looks like other families and because it was easier to deal with important people in their children's lives such as healthcare providers and teachers.  If same-sex couples were permitted to marry in California, there would likely be the same results because same-sex couples in Massachusetts and California are demographically similar in terms of income and education levels.).

- Tr. 1350:6-9; PX0189 at 1 (Badgett:  The American Medical Association concluded that denying the same-sex couples the right to marry reduces access to health insurance and creates healthcare disparities among children.).

- Tr. 81:17-82:8 (Zarrillo:  Explaining that it would be "easier for our children" if he were able to marry and that "it would afford us additional protections for our child").

- Tr. 90:15-17 (Katami:  Marriage creates a more stable home for children.  "We need to be married before we have kids.").

- Tr. 1964:17-1965:2 (Tam:  It is important to children of same-sex couples that their parents be able to marry.).

- *See also* evidence cited in support of PFF 109.

PFF 144.    Because same-sex couples cannot marry, they and their children do not enjoy all the

social and other benefits that the title and stature of marriage bring.

- Tr. 640:16-19 (Peplau: "[E]xcept in places like Massachusetts, all children born to lesbians or gay men or raised by lesbians or gay men are out of wedlock, because the government doesn't permit their parents to marry.").

- Tr. 599:12-19 (Peplau: Discussing the result of a survey of same-sex couples who married in Massachusetts showing that 95 percent of same-sex couples raising children thought that children had benefitted from the fact that their parents were able to marry).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.: "Of those [respondents] with children, nearly all respondents (93%) agreed or somewhat agreed that their children are happier and better off as a result of their marriage.").

- Tr. 1332:19-1337:25 (Badgett: Same-sex couples and their children are denied all of the economic benefits of marriage that are available to different-sex couples.).

- *See also* evidence cited in support of PFFs 145, 260, 269, and 277.

PFF 145.    Prohibiting same-sex couples from marrying actually harms children, including the children of gay and lesbian couples.

- PX0787 at 1 (Am. Psychiatric Ass'n, Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage: Finding that "[t]he children of unmarried gay and lesbian parents do not have the same protection that civil marriage affords the children of heterosexual couples").

- PX2879 at 3 (Institute for American Values, "The Marriage Movement: A Statement of Principles": "Children suffer when marriages between parents do not take place." "We firmly believe that every family raising children deserves respect and support.").

- PX2880 at 11 (Institute for American Values, "The Marriage Index: A Proposal to Establish Leading Marriage Indicators": "Because cohabitation and single-parent families tend to be much less stable arrangements than marriage, children born outside of wedlock tend to be in a disadvantaged position.").

- Tr. 1964:17-1965:2 (Tam: It is important to children of same-sex couples that their parents be able to marry.).

109

Gibson, Dunn
& Crutcher
LLP

PFF 146.   Creating a separate institution of domestic partnership stigmatizes same-sex couples and sends a message of inferiority to these couples, their children, and lesbian and gay men generally.

- Tr. 1277:5-1279:7 (Sanders:  Governmental discrimination can foster private discrimination.  With respect to the history of and recent anti-gay hate crimes in San Diego:  "I think that when a city, when leadership talks in disparaging terms about people, or denies the rights that everybody else have, the fundamental rights, then I think some people in the community feel empowered to take action in hate crimes and in other ways.").

- Tr. 1964:17-1965:2 (Tam:  It is important to children of same-sex couples that their parents be able to marry.).

- *See also* evidence cited in support of PFFs 108, 110, 112, 142, 144.

PFF 147.   Prop. 8 imposes substantial economic harms on same-sex couples residing in California and their children.

- Tr. 1330:14-16 (Badgett:  Proposition 8 has "inflicted substantial economic harm on same-sex couples and their children who live here in California.").

- *See also* evidence cited in support of PFF 133.

### D.   Harm to State and Local Governments from Denial of Marriage to Same-Sex Couples

PFF 148.   Local governments like San Francisco suffer a series of intangible injuries from Prop. 8's prohibition on marriage between persons of the same sex.  This marriage ban limits the ability of local governments to ensure that their citizens are treated equally regardless of sexual orientation, which in turn harms the community in general and gay and lesbian citizens in particular.

- Tr. 720:1-12 (Egan:  "What we're really talking about in the nonquantifiable impacts are the long-term advantages of marriage as an institution, and the long-term costs of discrimination in a way that weakens people's productivity and integration into the labor force.  Whether it's weakening their education because they're discriminated against at school, or leading them to excessive reliance on behavioral or other health services, these are impacts that are hard to quantify, but they can wind up being extremely powerful.  How much healthier you are over your lifetime.  How much wealth you generate because you are in a partnership.").

110

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1270:2-22, 1275:19-1278:7, 1278:22-1279:8 (Sanders: Recounted loss of talented police sergeant who was driven from police force because he was gay and experience with hate crimes against gay people in San Diego, including gay bashings and robberies. Explained that he signed resolution supporting marriage for same-sex couples because it was in the interest of government, that discrimination means lesbian and gay employees cannot talk about their families at work, and that when government and its leaders tolerate discrimination this invites the public to engage in discrimination of all kinds, including hate crimes. Described hate crimes against gay men and lesbians in San Diego, including violence resulting in death and serious bodily injury. Described how hard it was to be openly gay on the police force because of fears about career loss and being treated differently).

- Tr. 1330:23-25 (Badgett: "Proposition 8 has imposed some economic losses on the State of California and on counties and municipalities.").

- Tr. 1364:16-1369:4 (Badgett: Denying same-sex couples the right to marry imposes costs on local governments such as loss of tax revenue, higher usage of means-tested programs, higher costs for healthcare of uninsured same-sex partners and loss of skilled workers.).

PFF 149. Prop. 8 requires local governments to violate the federal constitutional rights of lesbians and gay men by denying them the marriage licenses that it daily issues to heterosexual couples.

- PX0728 at 2 and ¶¶ 1, 7, 36-43 (Attorney General's Answer: Admits that Prop. 8 violates the Fourteenth Amendment to the U.S. Constitution).

- *Lockyer v. City & County of San Francisco*, 95 P.3d 459, 472-73 (Cal. 2004) (describing the ministerial duties of county clerks and county recorders)

- *See also* evidence cited in support of PFFs 8, 12-17.

PFF 150. Notwithstanding California's domestic partnership law, its denial of marriage to same-sex couples increases the likelihood that Plaintiff-Intervenor's citizens will depend on local health and welfare programs, and imposes fiscal and economic costs on Plaintiff-Intervenor, such as through loss of tax revenues related to the denial of marriage.

- Tr. 685:10-14 (Egan: "[B]ecause of the ways in which marriage affects people's patterns of wealth generation over their life, if same-sex marriage were legalized, San Francisco would see an increase in sales tax revenue and an increase in property tax revenue in the future.").

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 689:4-10 (Egan: "Healthier behavior is also associated with less reliance on the healthcare system, including the public healthcare system. And, therefore, to the extent that the population of San Francisco adopts healthier behaviors over time, due to marriage, the City's public healthcare costs would decline. And that would result in a cost savings for the City and County.").

- Tr. 692:13-19 (Egan: "[A]t the moment, there are individuals in San Francisco who are in same-sex partnerships, where their partner is covered and they are not covered. Their partner is covered by employer healthcare, and they are not. If that number of people was reduced, that would be less uninsured people in San Francisco, and that would reduce the local burden on covering the uninsured.").

- Tr. 700:23-701:22 (Egan: Explaining that the use of behavioral health services by gay and lesbian people in San Francisco is "disproportionately high" due in part to discrimination).

- Tr. 712:5-12 (Egan: "If marriage for same-sex couples were permitted, that would affect their federal income tax burden in a way that would put more revenue—would result in income tax savings for them. They would have, as a result, more money, some of which they would spend in San Francisco. And that higher spending in San Francisco would generate more sales tax for the City and County.").

- Tr. 1367:5-1368:1 (Badgett: Denying same-sex couples the right to marry tends to reduce same-sex couples' income, which "will make them more likely to need and be eligible for those means-tested programs that are paid for by the state." Similarly, to the extent that same-sex couples cannot obtain health insurance for their partners and children, there will be more people who might need to sign up for the state's sponsored health programs.).

- Tr. 2851:5-18 (Blankenhorn: Agreeing that "Because marriage is a wealth-creating institution, extending marriage rights to same-sex couples would probably increase wealth accumulation and lead to higher living standards for these couples, as well as help reduce welfare costs (by promoting family economic self-sufficiency) and decrease economic inequality."); *see also* DIX0956 at 203-04 (Blankenhorn, *The Future of Marriage*).

- PX2898 at 307 (Langbein and Yost, *Same Sex Marriage and Negative Externalities*: "For example, the ban on gay marriage induces failures in insurance and financial markets. Because spousal benefits do not transfer (in most cases) to domestic partners, there are large portions of the population that should be insured, but instead receive inequitable treatment and are not insured properly. Large insurance pools reduce costs for all.").

PFF 151.   Plaintiffs' experts, Dr. Egan and Dr. Badgett, testified that Prop. 8 has had a negative

economic impact on the City of San Francisco and the State of California.

112

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 718:22-25 (Egan: "[I]t's clear to me that Proposition 8 has a negative material economic impact on San Francisco. That is to say, the City is losing more than $10 million a year in economic activity.").

- Tr. 1364:16-1366:14 (Badgett: Badgett estimated that by denying same-sex couples the right to marry, the state of California loses about $490 million in increased spending over three years, and about $40 million in sales tax and hotel occupancy tax revenues.).

- Tr. 1426:11-24 (Badgett: Denying same-sex couples the right to marry is likely to cost state businesses "hundreds of millions of dollars." The economic damages are "difficult to quantify very precisely, but I think we have a very, very good idea of what the order of magnitude would be.").

PFF 152.   Prop. 8 deprives the State of California and its local governments of tax revenue generated by consumer spending on the weddings and wedding-related events that same-sex couples would hold if permitted to marry. For example, at least in the short term, San Francisco loses an estimated $35 million in total annual economic activity and an estimated $2.6 million in tax revenue from diminished wedding-related spending. In the next three years, the State of California will lose an estimated $491.2 million in direct spending and $38.9 million in tax revenue from diminished wedding-related spending.

- Tr. 1364:6-1366:14 (Badgett: Badgett estimated the number of same-sex couples that would get married in California and how much they might spend on weddings and tourism, and concluded that over three years California would lose approximately $490 million in increased spending and approximately $40 million in sale tax and hotel occupancy tax revenues.); *see also* Tr. 1426:11-24.

- PX1260 at 8-9 (Badgett & R. Bradley Sears, *Putting A Price on Equality?*: "We find that allowing same-sex couples to marry will have three positive impacts on California's budget: (1) expenditure savings in means-tested public benefits programs; (2) increased sales tax revenues from tourism; and (3) increased sales tax revenues from expenditures on weddings by California resident same-sex couples.").

- PX1268 at 1 (June 2008 Report by Brad Sears & Badgett: Finding that "[e]xtending marriage to same-sex couples will boost California state and local government revenues by over $63.8 million").

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1226:6-17, 1226:18-1227:7 (Zia: When Zia obtained a domestic partnership license she did not have a celebration because it was "not an occasion to write home about."); *cf.* Tr. 1229:22-1231:15, PX0600 (Zia: When Zia got married, she had a "wedding reception like every other couple would have, with a wedding banquet." About 150 people attended from "all over the United States.").

- Tr. 146:4-20 (Perry: Perry and Stier had a wedding ceremony in August 2004, after they were married in San Francisco. They invited 100 people and had a large celebration.).

- Tr. 1280:24-1283:19 (Sanders: Describing how his daughter did not have a ceremony to celebrate her domestic partnership and how he learned of the occasion via text message. He also describes his daughter's impromptu wedding in Vermont (so that she could have a "marriage certificate from some government"), which he was unable to attend.).

- Tr. 709:12-20, 710:23-711:1 (Egan: Estimating the lost economic activity for San Francisco from the prohibition on marriage by same-sex couples "on the order of 35 million. The hotel room revenue is on the order of 2-and-a-half-million dollars. And the tax revenue we project at $1.7 million a year for sales tax, and about .9 million a year for hotel tax.").

PFF 153.    Taken together, Prop. 8 and federal laws restricting marriage to different-sex couples impose federal income tax burdens on same-sex couples that are not borne by different-sex couples. Such laws also deprive same-sex couples of federal entitlements and benefits, such as Social Security survivor benefits. These burdens in turn negatively impact the State of California and its local governments because of the loss of state and local tax revenue that result from higher federal taxes and lower federal benefits as well as increased numbers of Californians qualifying for means-tested programs for low-income people.

- Tr. 712:5-12, 712:23-713:9 (Egan: Estimating that same-sex couples would realize an income tax savings, on average, of $440 a year, if allowed to marry. A portion of that savings would be spent in San Francisco and would generate more sales tax for the City and County.).

- Tr. 713:10-13 (Egan: Noting that because the State gets a larger percentage of sales tax than the City does, California would see an increase in sales tax revenue if same-sex couples were allowed to marry).

114

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 713:14-20 (Egan:  Explaining that if same-sex couples could receive benefits such as Social Security and survivor disability benefits, San Francisco would receive additional tax revenue).

- Tr. 1332:4-9 (Badgett:  "There are other specific benefits that sometimes come from third parties, such as the state or employers who might offer specific benefits . . . to people who are married, but are not provided to couples who are not married.").

- Tr. 1341:8-16 (Badgett:  Same-sex couples are likely to be paying higher taxes.).

- Tr. 1367:5-1368:1 (Badgett:  Prohibiting marriage by same-sex couples tends to reduce same-sex couples' income, which "will make them more likely to need and be eligible for those means-tested programs that are paid for by the state."  Similarly, to the extent that same-sex couples cannot obtain health insurance for their partners and children, there will be more people who might need to sign up for the state's sponsored health programs.).

PFF 154.   As a general matter, institutional discrimination against gay and lesbian individuals increases social service costs to governments that provide such services.  Two examples illustrate this point.  First, the number of uninsured Californians is higher than it would be if same-sex couples could marry, and this imposes a financial burden on State and local governments that reimburse providers for uncompensated care.  Second, local governments like San Francisco are providers of health services and incur higher health costs because of Prop. 8 in two regards.  In providing health benefits to uninsured residents, local governments are the insurer of last resort for members of same-sex couples who do not receive insurance through their partners' employers because they are not married.  And because of the links between institutional discrimination and greater consumption of health services by targets of that discrimination, local governments like San Francisco expend disproportionate amounts on specialized health services for gay and lesbian individuals.

- PX0711 at RFA No. 26 (Attorney General admits that in defending California's domestic partner statutes against legal challenges to their validity, the California Department of Justice incurred at least $148,065.45 in legal fees and costs.).

115

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

- PX0711 at RFA No. 27 (Attorney General admits that the California Secretary of State estimates that the Secretary of State's Office has incurred approximately $242,981 to establish a domestic partner registry.).

3

4

- PX0711 at RFA No. 28 (Attorney General admits the California Secretary of State estimates that the Secretary of State's Office incurs a cost of $70,000 per year to administer California's domestic partner registry.).

5

6

7

- PX0711 at RFA No. 29 (Attorney General admits that the California Secretary of State estimates that the Secretary of State's Office incurred approximately $118,000 to establish a domestic partner registry.).

8

9

10

- PX0711 at RFA No. 30 (Attorney General admits that the California Secretary of State estimates that the Secretary of State's Office has incurred an additional cost of approximately $118,000 to modify its domestic partner registry procedures as required by Assembly Bill 205 (Statutes of 2003, chapter 421) and Assembly Bill 102 (Statutes of 2007, chapter 567).).

11

12

13

- Tr. 698:21-699:1, 699:19-21 (Egan:  Noting that "the City and County spends about 175 million, 177 million a year on providing healthcare for the uninsured" and that that amount would be reduced if more people had health insurance).

14

15

16

- Tr. 700:6-9 (Egan:  "I believe that if marriage among same-sex couples were legalized, the City, over the long term, would see a reduction in its costs for providing behavioral health services, and the physical health services that can be allied to that.").

17

18

- Tr. 700:23-701:22 (Egan:  Explaining that the use of behavioral health services by gay and lesbian people in San Francisco is "disproportionately high" due in part to discrimination).

19

20

- Tr. 702:2-7 (Egan:  Stating that he would expect other jurisdictions to see a decrease in spending on specialized services like that estimated for San Francisco).

21

22

- Tr. 704:20-705:8 (Egan: Noting that school districts expend resources responding to bullying based on sexual orientation).

23

24

25

- Tr. 1513:17-1514:25 (Kendall:  Following reversal therapy, Mr. Kendall was unable to support himself for a period of four to five years; he relied on public benefits including using emergency rooms to obtain medical treatment, and getting counseling through state sponsored school programs.).

26

27

28

- Tr. 1367:5-1368:1 (Badgett:  Prohibiting same-sex couples from marrying tends to reduce same-sex couples' income, which "will make them more likely to need and be eligible for those means-tested programs that are paid for by the state."  Similarly, to the extent that same-sex couples cannot obtain health

116

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

insurance for their partners and children, there will be more people who might need to sign up for the state's sponsored health programs.).

- PX0672, PX0673, PX0674, PX0675, PX0676 (JN) [2] (*Hate Crimes in California,* 2004-2008:  Noting that sexual orientation hate crime offenses have consistently been the second largest bias motivation category of hate crimes since 1995 and detailing prosecution statistics of same).

- Tr. 2302:11-22 (Herek:  The relationship between Proposition 8 and hate crimes is that structural stigma such as Proposition 8 is creating the atmosphere in which individual enactments of stigma occur.).

- PX0915, PX0962, PX0974, PX0975, and PX0976 (Demonstrating that the enactment of laws that stigmatize gay men and lesbians—and, in particular, the enactment of laws prohibiting same-sex couples from marrying—results in greater minority stress and leads to the greater prevalence of mental disorders in the gay and lesbian population).

- *See also* evidence cited in support of PFFs 120-132 (Demonstrating that Proposition 8 causes minority stress, which in turn leads to a higher level of mental disorders and negative mental health outcomes in the gay and lesbian population, and that allowing gay and lesbian couples to marry would likely improve the mental health of gay men and lesbians).

- *See also* evidence cited in support of PFF 133.

PFF 155.    To the extent that institutional discrimination against gay and lesbian individuals also decreases their physical and economic well-being and productivity, it reduces employees' commitment to working in California.  It also decreases state and local government revenue because this revenue is tied to the productivity of their workforces.

- Tr. 688:8-23 (Egan:  Explaining that "married individuals are healthier, on average" and that there is a "well-known connection in economics between health of the work force and work force productivity").

- Tr. 688:24-689:3 (Egan:  "Higher productivity leads to higher wages.  And higher wages leads to higher payroll tax revenue for the City.").

- Tr. 690:1-12 (Egan:  Stating that many jurisdictions would obtain greater revenue from their business tax if gay and lesbian couples were allowed to marry).

---

[2]    "(JN)" refers to exhibits that were judicially noticed.

117

- Tr. 805:1-6 (Egan:  Agreeing that improvements among lesbian, gay, bisexual and transgendered individuals and among same-sex couples in health, healthy behaviors, wealth accumulation and productivity increase San Francisco's payroll and property taxes).

- Tr. 1335:22-1336:15 (Badgett:  Same-sex couples who are not allowed to marry "may feel in the workplace context that they are treated differently from their heterosexual coworkers who are allowed to marry . . . [and] that feeling of discrimination might have an adverse effect . . . on their work performance.").

- Tr. 1366:23-1367:3 (Badgett:  "[I]f gay and lesbian people or people in same-sex couples feel like they are being treated differently, they may not be as productive in the workplace and that has potential broad economic harms to the state that will filter down to harmful impacts on state governments[.]").

- Tr. 1368:2-1369:4 (Badgett:  Gay and lesbian individuals of the creative class, the drivers of economic growth, may move to jurisdictions that permit them to marry instead of California.).

- PX1284 at 1 (Study by Nancy E. Day & Patricia Schoenrade:  "[W]ork attitude levels of gay and lesbian workers are predicted in part by the amount of communication about their sexual orientation in which these workers engage.").

- PX1286 at 1191 (Study by Kristin H. Griffith & Michelle R. Hebl:  "Disclosing at work and working for an organization perceived to be more gay supportive was related to higher job satisfaction and lower job anxiety.").

- PX1291 at 75 (Study by Alan L. Ellis & Ellen D. B. Riggle:  Finding a strong relationship between openness about one's sexual orientation and satisfaction with co-workers).

PFF 156.    Prop. 8 will likely make it more difficult for California to attract and retain highly skilled workers.

- Tr. 1368:8-11 (Badgett:  "People, gay or lesbian people, who either want to marry their current partner or want to have that option in the future might decide that California is not a good place for them to live and they may move elsewhere in order to have that right.").

- PX1262 at 1 (Report by Gary J. Gates:  "The evidence that marriage equality may enhance the ability of Massachusetts to attract highly-skilled creative class workers among those in same-sex couples offers some support that the policy has the potential to have a long-term positive economic impact.").

- PX1289 at 1 (Report by Richard Florida & Gary Gates:  "The five metropolitan areas with the highest concentration of gay residents were all

118

Gibson, Dunn & Crutcher LLP

among the nation's top 15 high-technology areas:  San Francisco, Washington D.C, Austin, Atlanta, and San Diego.  Gays not only predict the concentration of high-tech industry, they are also a predictor of its growth.").

PFF 157.    In order to combat the discriminatory effects of California's ban on marriages of same-sex couples, the City and County of San Francisco mandates that its contractors and vendors must offer benefits to domestic partners of their employees that are equal to those benefits offered to employees' spouses.  This ordinance was costly to defend from legal challenges and results in ongoing higher contracting and procurement costs for San Francisco.

- • PX0811 at 9-17 (San Francisco Administrative Code Chapter 12B setting out text of Equal Benefits Ordinance and providing for Human Rights Commission to investigate discrimination complaints).

- • Cal. Pub. Cont. Code § 10295.3 (California's Equal Benefits Ordinance).

- • Tr. 715:3-6 (Egan:  "The Equal Benefits Ordinance is intended—intended to redress discrimination and discourage discrimination by requiring contractors for the City to provide the same benefits to domestic partners that they provide to married couples.").

- • Tr. 715:9-10 (Egan:  "[T]he annual administrative cost [to administer the Equal Benefits Ordinance] is in the order of a million dollars a year for the City.").

- • Tr. 715:16-18 (Egan:  Noting that the City incurs costs from defending the Equal Benefits Ordinance from legal challenges).

- • Tr. 771:7-13 (Egan:  City's cost to defend Equal Benefits Ordinance was $1.6 million); *see also* PX0845 (*Hours and Expenses for Matters Involving the Equal Benefits Ordinance*: same).

- • Tr. 716:2-4 (Egan:  "I believe that if same-sex marriage were legalized, the City would see reduced contracting costs and lower bids on many of its RFPs and proposals.").

- • Tr. 716:6-19 (Egan:  Stating that "if same-sex marriage were legalized, more companies would extend benefits to same-sex couples who were married" and because those companies would no longer view San Francisco's Equal Benefits Ordinance as a deterrent, San Francisco "would see an expanded competition among contractors for doing business with the City").

- • Tr. 717:1-4 (Egan:  "Some of the companies that are either not eligible or are deterred [due to San Francisco's Equal Benefits Ordinance] may very well be

119

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the lowest bidder or the preferred bidder. And consequently, that tends to inflate the City's contracting costs.").

- Tr. 717:18-24 (Egan: "[C]ontracting costs are a significant expense for the City, over $2 billion a year. So even a very small reduction in costs due to a regulatory change regarding how easy it is to contract with the City could result in a significant savings . . . a 1 percent reduction in costs would result in $21 million savings for the City.").

- Tr. 718:2-8 (Egan: Noting that if there were no further discrimination based on sexual orientation in marriage and the Equal Benefits Ordinance were repealed, there would be no contracting costs associated with compliance with that Ordinance).

- Tr. 803:23-804:2 (Egan: Stating that San Francisco incurs costs associated with its office tasked with investigating discrimination "in proportion to the amount of discrimination").

- Tr. 804:3-8 (Egan: Stating that San Francisco's Equal Benefits Ordinance increases the City's contracting costs to the extent that it limits the pool of available contractors).

PFF 158.    Also in order to combat discrimination based on sexual orientation, the California

Department of Fair Housing and Employment has incurred costs of approximately

$1.5 million since 2004 in investigating claims of discrimination in housing and

employment.

- PX0722 at Rog. No. 10, PX0723 at Rog. No. 11 (From July 1, 2004 to the present the California Department of Fair Employment and Housing expended approximately $114,041.52 to investigate complaints of sexual orientation discrimination in housing and approximately $1,360,050.72 to investigate complaints of sexual orientation discrimination in employment.).

## V.    Plaintiffs Are Similarly Situated to Those Benefitted by California's Marriage Laws

### A.    Same-Sex Couples Form Lasting, Committed Relationships and Are Fundamentally Similar to Opposite-Sex Couples

PFF 159.    Gay and lesbian individuals, including Plaintiffs, have formed lasting, committed, and

caring relationships with persons of the same sex, and same-sex couples share their

lives and participate in their communities together. Gay and lesbian individuals,

including Plaintiffs Perry and Stier, also raise children together.

120

Gibson, Dunn & Crutcher LLP

- PX0707 at RFA No. 65 (Proponents admit "that gay and lesbian individuals, including Plaintiffs, have formed lasting, committed, and caring relationships with persons of the same sex, and same-sex couples share their lives and participate in their communities together.").

- PX0710 at RFA No. 65 (Attorney General admits "that gay men and lesbians have formed lasting, committed, and caring same-sex relationships, and that same-sex couples share their lives and participate in their communities together.").

- PX0710 at RFA No. 58 (Attorney General admits that an individual's capacity to establish a loving and long-term committed relationship with another person does not depend on the individual's sexual orientation and that "this proposition is implicitly recognized in the law in the State of California.").

- Tr. 586:22-587:1 (Peplau:  Reliable research shows that "a substantial proportion of lesbians and gay men are in relationships, that many of those relationships are long-term.").

- Tr. 587:2-588:18 (Peplau:  Discussing a study conducted by Christopher Carpenter and Gary Gates that analyzed a representative sample of lesbians and gay men in California.  The researchers found that about 61% of lesbians and 46% of gay men are in a cohabiting relationship with a same-sex partner and that these relationships averaged 8 to 10 years in length.).

- PX0894 at 573 (Carpenter & Gates, "Gay and Lesbian Partnership: Evidence from California":  Studies concluding that between 37% to 46% of gay men and 51% to 62% of lesbians are in a cohabiting partnership).

- PX0765 at 2 (Am. Psychol. Ass'n, Policy Statement on Sexual Orientation and Marriage:  "[B]etween 18% and 28% of gay couples and between 8% and 21% of lesbian couples have lived together 10 or more years.").

- Tr. 79:16-80:1 (Zarrillo:  Explaining that he is in a "committed relationship with another gay man" who is the "love of [his life]").

- Tr. 139:1-3 (Perry:  "Sandy is the women I love, and we live together in Berkeley.").

- Tr. 167:3-9 (Stier:  Stier has fallen in love one time in her life—with Perry. Their love is a blend of many things.  "It's physical attraction.  It's romantic attraction.  It's a strong commitment.  It's intellectual bonding and emotional bonding.").

- Tr. 2914:10-2915:16 (Blankenhorn:  Agreeing that the "dimensions" of marriage as described in *The Marriage Movement:  A Statement of Principles* (2000) [PX2879], including that marriage is a legal contract, financial

Gibson, Dunn
& Crutcher
LLP

partnership, sacred promise, sexual union and a personal bond, apply equally to marriage between a heterosexual couple or a gay or lesbian couple).

- PX0707 at RFA No. 66 (Proponents admit "that gay and lesbian individuals, including Plaintiffs Perry and Stier, raise children together.").

- Tr. 1085:14-1087:4 (Lamb:  Many children are raised by parents who are not their genetic parents.  For example, a "social mother" is sometimes distinguished from a "natural mother."  Regardless of whether a parent is genetically related to his or her child, that parent-child relationship "is a supremely important element in shaping the[] child's development.").

- Tr. 161:9-12 (Stier:  Perry and Stier live with their four boys; two are Perry's biological sons, and two are Stier's biological sons.).

- Tr. 166:11-23 (Stier:  After their relationship developed, Perry and Stier realized that they wanted to build a life together.  They wanted to join their families and live as a family—to have that kind of commitment and stability that they both appreciated.).

- Tr. 1224:1-4 (Zia:  On her relationship with her wife Lia:  "I feel that Lia is my soulmate in life.  I love her.  I—she's the person I want to spend the rest of my life with.  She's the most important person to me.").

PFF 160.    Gay and lesbian individuals possess the same potential and desire for sustained loving and lasting relationships as heterosexuals.

- PX0707 at RFA No. 58 (Proponents admit "that many gay men and lesbians have established loving and committed relationships.").

- Tr. 583:12-585:21 (Peplau:  Research that has compared the quality of same-sex and opposite-sex relationships and the processes that affect those relationships consistently shows "great similarity across couples, both same-sex and heterosexual.").

- PX0765 at 1 (Am. Psychol. Ass'n, Policy Statement on Sexual Orientation and Marriage:  "Research indicates that many gay men and lesbians want and have committed relationships.  For example, survey data indicate that between 40% and 60% of gay men and between 45% and 80% of lesbians are currently involved in a romantic relationship.").

- PX0760 at 3 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage:  "Numerous studies have shown that a significant number of gay men and lesbians are in committed long-term relationships . . . and that these couples derive increased life satisfaction, enhanced personal meaning and stability from their relationship . . . .  Studies of same-sex relationships have provided persuasive evidence that lesbian and gay couples do not vary from

122

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

heterosexual couples on measures of relationship satisfaction, stability, durability, and commitment.").

- PX0752 at 1 (Am. Psychoanalytic Ass'n, Position Statement: "[G]ay men and lesbians possess the same potential and desire for sustained loving and lasting relationships as heterosexuals.").

- PX 2545 (Young 11/13/09 Dep. Tr. 122:17-123:1: Agreeing with American Psychoanalytic Association's statement that "gay men and lesbians possess the same potential and desire for sustained loving and lasting relationships as heterosexuals").

- PX 2545 (Young 11/13/09 Dep. Tr. 100:17-101:5: Agreeing that love and commitment are the reasons both gay people and heterosexuals have for wanting to marry).

- PX1245 at 407 (Review by Anne Peplau and Adam Fingerhut: "Regardless of sexual orientation, most individuals value affection, dependability, shared interests, and similarity of religious beliefs.").

- Tr. 252:10-12 (Cott: "[C]ouples of the same sex have expressed many of the same motivations as couples of different sex to marry to and to establish stable households.").

- Tr. 79:25-80:1 (Zarrillo: "I want nothing more than to marry [Katami].").

- Tr. 107:24-25 (Katami: "I love Jeff Zarrillo. I want to get married to Jeff. I want to start a family.").

- Tr. 154:22 (Perry: Perry has been in love with Stier for 10 years.).

- *See also* evidence cited in support of PFF 159.

PFF 161.   Social science research clearly establishes that same-sex couples closely resemble heterosexual couples both in terms of the quality of their relationships and the processes that affect their relationships. Similarly, studies have found same-sex and heterosexual couples to be equivalent to each other on measures of relationship satisfaction and commitment.

- Tr. 583:12-585:21 (Peplau: Research that has compared the quality of same-sex and opposite-sex relationships and the processes that affect those relationships consistently shows "great similarity across couples, both same-sex and heterosexual.").

123

Gibson, Dunn
& Crutcher
LLP

1

2

- Tr. 592:4-593:9 (Peplau:  The same processes at work in heterosexual relationships are also at work in same-sex relationships.).

3

4

5

6

7

- PX0765 at 1-2 (Am. Psychol. Ass'n, Policy Statement on Sexual Orientation and Marriage:  "[S]tudies that have compared partners from same-sex couples to partners from heterosexual couples on standardized measures of relationship quality (such as satisfaction and commitment) have found partners from same-sex and heterosexual couples to be equivalent to each other."  Further, "research has found that the factors that predict relationship satisfaction, relationship commitment, and relationship stability are remarkably similar for both same-sex cohabiting couples and heterosexual married couples.").

8

9

10

- PX0921, PX942, PX1050, PX1054, PX1130, PX1137, PX1142, PX1144, PX1150, PX1166, PX1231, PX1234, PX1236, PX1245 (Examples of studies and reviews of the literature that consistently and reliably show that same-sex couples are very similar to opposite-sex couples.).

11

12

PFF 162.   Loving relationships between persons of the same sex are equal in worth and dignity to loving relationships between persons of the opposite sex.

13

- PX0708 at RFA No. 106 (Proponents admit PFF 162 in its entirety).

14

15

16

17

- DIX0956 (Blankenhorn, *Future of Marriage*):  "I believe that today the principle of equal human dignity must apply to gay and lesbian persons.  In that sense, insofar as we are a nation founded on this principle, we would be *more* American on the day we permitted same-sex marriage than we were on the day before.") (emphasis in original); *see also* Tr. 2805:8-20 (Blankenhorn).

18

19

- PX2547 (Nathanson 11/12/09 Dep. Tr. 29:3-19:  Acknowledging that the American Anthropological Association, the American Psychoanalytic Association, the American Psychological Association, and the American Psychiatric Association all support the right of same-sex couples to marry).

20

21

22

- Tr. 585:22-586:8 (Peplau:  There is no empirical support for the negative stereotypes that gay men and lesbians have trouble forming stable relationships or that those relationships are inferior to heterosexual relationships.).

23

- Tr. 79:16-80:3 (Zarrillo:  Describing long-term relationship with Katami).

24

25

26

- Tr. 1280:18-23 (Sanders:  Describing his lesbian daughter-in-law.  "I love being with Meagan.  She is like a third daughter.  She is great to be around.  She's smart.  She's resourceful.  She's energetic.  She's hardworking.  She has been an excellent partner for my daughter.  And I love being around both of them.  But Meagan is like another piece of the family, and has been.").

27

28

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 163.   Same-sex couples wish to marry for many of the same reasons that opposite-sex

couples marry, including the desire to raise, nurture, and protect children.

- Tr. 661:15-662:1 (Peplau:  There is no evidence that same-sex couples place a greater emphasis on individualism and personal fulfillment than opposite-sex couples, or that they are less concerned with the well-being of their children than opposite-sex couples.).

- PX0762 at 1 (JN) (Am. Acad. of Child & Adolescent Psychiatry, Policy Statement:  "There is no evidence to suggest or support that parents who are lesbian, gay, bisexual, or transgender are per se different from or deficient in parenting skills, child-centered concerns, and parent-child attachments when compared with heterosexual parents.").

- Tr. 1362:17-21 (Badgett:  Same-sex couples wish to marry for many of the same reasons that opposite-sex couples marry.).

- PX1273 at 41 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "The 2006 survey of Dutch married and registered partner couples by Boele-Woelki and colleagues also finds that same-sex couples are motivated in similar ways as different-sex couples. Roughly 60% of gay and heterosexual married couples report primarily emotional reasons for choosing marriage, and about 40% of each group also report that practical reasons encouraged them to consider formalizing their relationships.").

### B.   Same-Sex Couples Contribute to Society in All the Ways That Opposite-Sex Couples Do

PFF 164.   Same-sex sexual orientation does not result in any impairment in judgment or general

social and vocational capabilities and bears no relation to a person's ability to perform

or contribute to society.

- PX0739 at No. 21 (Proponents stipulated that "[s]ame-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities.").

- PX0710 at RFA No. 19 (Attorney General admits "that sexual orientation bears no relation to a person's ability to perform or contribute to society.").

- PX0605 at 2 (JN) (Report by R. Bradley Sears et. al.: "Courts and legal scholars have concluded that sexual orientation is not related to an individual's ability to contribute to society or perform in the workplace.").

125

Gibson, Dunn & Crutcher LLP

1      • PX0609 at 4-4 (JN) (Williams Institute Report:  Summarizes cases in which
2        "courts and individual judges have found that sexual orientation bears no
         relation to an individual's ability to contribute to society").

3      • Tr. 2530:25-2532:25 (Miller:  Agrees that "[c]ourts and legal scholars have
4        concluded that sexual orientation is not related to an individual's ability to
         contribute to society or perform in the workplace").
5
6      • Tr. 2028:3-7 (Herek:  There is no inherent relationship between a person's
         sexual orientation and his or her ability to be a productive and contributing
7        member of society—to be happy and lead a fulfilling life.).

8      • PX0752 at 1 (Am. Psychoanalytic Ass'n, Position Statement on
         Homosexuality:  Psychoanalysts should be selected without regard to sexual
9        orientation.).

10     • PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement:  "[S]exual
         orientation is not germane to any aspect of military effectiveness, including
11       unit cohesion, morale, recruitment or retention."); *see also* PX1410 (Am.
12       Psychol. Ass'n, Policy Statement on Sexual Orientation & Military Service).

13   PFF 165.   Same-sex couples contribute to society in the workplace and the economy, in the

14           public sector, in the non-profit sector, and as citizens.

15     • PX0710 at RFA No. 21 (Attorney General admits "that a person's sexual
16       orientation is irrelevant in evaluating his or her judgment and social and
         vocational capabilities.").
17
       • PX0609 at 4-4 (JN) (Williams Institute Report:  "Sexual orientation bears no
18       relation to an individual's ability to contribute to society.").

19     • DIX1109 (Gates, *Same-Sex Spouses and Unmarried Partners in the American
20       Community Survey, 2008*, Williams Institute (Oct. 2009):  Describing
         similarities between income of same-sex and different-sex spousal couples).

21     • Tr. 138:6-22 (Perry:  Perry has been working with children and in the field of
22       child protection, child development, and family support for almost 25 years.
         She is currently the executive director of a state-wide agency that provides
23       services and support to families with children from zero to five.  She has spent
         her entire career working for the government.).
24
25     • Tr. 161:2-6 (Stier:  Stier works for a county government as an information
         systems director in healthcare systems.).
26
27     • Tr. 76:21-77:1 (Zarrillo:  Describing employment with same company for 21
         years).
28
                                        126

Gibson, Dunn
& Crutcher
LLP

- Tr. 87:11-23 (Katami:  Describing educational and work background).

- Tr. 1209:23-1210:21 (Zia:  Zia is a writer who has written two books. She has also been an Executive Editor for Ms. Magazine.).

- Tr. 1504:16-1505:2 (Kendall:  Works for the Denver Police Department as a National Crime Information Center agent).

- Tr. 1279:2-8 (Sanders:  Describing his Chief of Staff when he was Chief of Police coming out to him as a lesbian but stating she would not come out to others because it wasn't in her best interest, because people would only see her as a lesbian and not as his Chief of Staff.).

- Tr. 1270:2-13, 1278:16-21 (Sanders:  Describing a gay Sergeant who worked for San Diego Police Department in 1970s who was respected as a good Sergeant and police officer).

- Tr. 1278:22-1279:1 (Sanders:  Describing gay men and lesbians who served in the police department but would not come out of the closet because they felt their careers would be over and that they would be treated differently).

- *See also* evidence cited in support of PFF 164.

PFF 166.   Like heterosexuals, gay men and lesbians are racially and ethnically diverse; live throughout the State; have families similar to heterosexual families; are gainfully employed and thus contribute to the State's economy; accounting for education (and gender discrimination), have incomes similar to heterosexuals; pay proportionately more taxes than their heterosexual counterparts; and contribute in myriad ways to the communities in which they live.

- PX0710 at RFA No. 22 (Attorney General admits "that the laws of California recognize no relationship between a person's sexual orientation and his or her ability to raise children; to his or her capacity to enter into a relationship that is analogous to marriage; or to his or her ability to participate fully in all economic and social institutions, with the exception of civil marriage.").

- Tr. 1362:5-10 (Badgett:  Same-sex couples have more similarities than differences with different-sex couples, and any differences are marginal.).

- PX2096 at 1 (The Williams Institute, UCLA, Census Snapshot on California:  "In many ways, the more than 107,000 same-sex couples living in California are similar to married couples.  According to Census 2000, they live throughout the state, are racially and ethnically diverse, have partners who depend upon one another financially, and actively participate in California's

127

economy.  Census data also show that 18% of same-sex couples in California are raising children.").

- DIX1109 (Gates, *Same-Sex Spouses and Unmarried Partners in the American Community Survey, 2008*, Williams Institute (Oct. 2009):  Describing similarities between age, education, income and home ownership of same-sex and different-sex spousal couples).

- PX1271 at ii (Report by Gary J. Gates:  "Same-sex and different-sex spouses share many characteristics," including income.).

- PX1269 at Executive Summary (Report by Michael D. Steinberger:  "Using data from several government data sources, this report estimates the dollar value of the estate tax disadvantage faced by same-sex couples.  In 2009, the differential treatment of same-sex and married couples in the estate tax code will affect an estimated 73 same-sex couples, costing them each, on average, more than $3.3 million.").

- Tr. 1341:8-16 (Badgett:  Same-sex couples are likely to be paying higher taxes because they cannot file jointly, and in some cases they must pay income taxes for unregistered domestic partnership benefits.).

- Tr. 1368:15-21 (Badgett:  Many gay and lesbian individuals are part of creative class, which includes drivers of economic growth such scientists, inventors and artists.).

- *See also* evidence cited in support of PFFs 164-165.

## VI.   Sexual Orientation Is a Fundamental Aspect of a Person's Identity

### A.   Sexual Orientation Exists, Can Be Defined, and Is Not a Disorder

PFF 167.   Sexual orientation refers to an enduring pattern or disposition to experience sexual, affectional, or romantic desires for and attractions to men, women, or both sexes.  The term is also used to refer to an individual's sense of personal and social identity based on those desires and attractions, behaviors expressing them, and membership in a community of others who share them.

- Tr. 2025:3-12 (Herek:  "Sexual orientation is a term that we use to describe an enduring sexual, romantic, or intensely affectional attraction to men, to women, or to both men and women.  It's also used to refer to an identity or a sense of self that is based on one's enduring patterns of attraction.  And it's also sometimes used to describe an enduring pattern of behavior.").

128

Gibson, Dunn & Crutcher LLP

- Tr. 2060:7-11 (Herek:  Most social science and behavioral research has assessed sexual orientation in terms of attraction, behavior, or identity, or some combination thereof.).

- Tr. 2060:11-2061:10 (Herek:  An "enduring pattern" means that there is some consistency over a period of time.  It is something that constitutes an important period of one's life—these are feelings and attractions that endure over a significant portion of time.).

PFF 168.   Proponents' assertions that sexual orientation cannot be defined is both contrary to the weight of the evidence, and also contrary to a common-sense and intuitive understanding of sexual orientation.

- Tr. 2026:7-24 (Herek:  In his own research, Dr. Herek has asked ordinary people if they are heterosexual, straight, gay, lesbian, or bisexual, and that is a question that people generally are able to answer fairly easily.).

- Tr. 2309:11-2310:6 (Herek:  Dr. Herek has asked thousands of people what their sexual orientation is in various studies, and based on that and other research he has read, it is Dr. Herek's opinion that most people can answer that question intelligently.).

- Tr. 2324:8-13 (Herek:  If two women wish to marry each other, it is reasonable to assume that they are lesbians.  And if two men want to marry each other, it is reasonable to assume that they are gay.).

- Tr. 2324:2-5 (Herek:  "I think it's reasonable to expect that by the age of 45, when one is in a committed relationship, one probably does have a pretty good sense of the constancy of where their life is likely to go in the future.").

- Tr. 2025:13-2026:4 (Herek:  In the context of research, a researcher will use these different aspects of the definition in different contexts depending upon his or her focus in a particular research study.  For example, in public health research, it is often the case that the focus is on sexually-transmitted diseases or other aspects of sexual behavior.  In that context, sexual orientation is often defined in operational terms, according to patterns of sexual behavior.  But in the context of looking at discrimination on people who are gay, lesbian, or bisexual, it would probably make sense to focus on identity.  So it varies somewhat depending on the research context.); *see also* Tr. 958:22-23 (Meyer).

- Tr. 2304:13-2305:10 (Herek:  One of the documents that Proponents used on cross examination, DIX1249, states:  "So what is the correct definition of the LGB population?  The answer depends on the purpose of the study.  A researcher who is interested in risks for HIV/Aids among men who have sex with men, MSM's, might focus on behavioral definitions because behavior

129

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

affects risk exposure regardless of personal identity. A researcher who is interested in developmental milestones of gay youth might focus on identity definitions, because development of a gay identity is a core task facing the youth. Thus, there is not one answer to the question. It is the researcher's intellectual responsibility to answer this question with reasoned justification. The researcher must define the population on the basis of the study's objectives and its underlying conceptual framework." And this is consistent with Dr. Herek's understanding.).

- Tr. 2107:6-2108-13 (Herek: Operationalizing a variable means to put it in measurable terms and define how it will be used in a particular study. For example, a study may use a definition of socioeconomic status, but to actually use it in a survey, one needs to develop questions to elicit that information, such as "What was your household income during the last year?" because you cannot simply ask "What is your socioeconomic status?").

- Tr. 2306:12-2308:14 (Herek: Sexual orientation is not the only area in which definitional issues arise in the context of studies—it also comes up with respect to racial or ethnic minorities. Over the past 100 years, many different terms have been used or have come into favor and gone out of favor for describing particular racial or ethnic groups. Indeed, some of the research on lesbian and gay identity has borrowed from previous research on racial and ethnic minority identities as a starting point.).

- Tr. 2078:10-12 (Herek: "[H]eterosexual and homosexual behaviors alike have been common throughout human history . . . .").

- Tr. 531:25-533:24 (Chauncey: the categories of hetero and homosexual emerged in the late 19th century, but there were people at all time periods in American history whose primary erotic and emotional attractions were to people of the same sex, such as Nicholas Sension, an 18th century American Puritan known for his consistent erotic interest in men, Frances Willard, who founded the Women's Temperance Union in the 19th century and wrote in her diary of her deep and sustained passion for other women, and people in the early 20th century who identified themselves and were identified by others by their consistent attraction to people of the same sex.).

- PX0480 (Supporters of Prop. 8 were able to identify gay and lesbian individuals or couples); *see also* PX1867 at 42, 63, 64 and 81; PX1868 at 21, 33, 48, 61, 72, 94, and 98; PX2153; PX2156; and PX2597.

PFF 169.     The vast majority of people are consistent in their attraction, behavior, and identity.

- Tr. 2072:19-2073:4 (Herek: "[T]he vast majority of people are consistent in their behavior, their identity, and their attractions."); *see also* Tr. 2308:24-2309:1 (Herek: same).

Gibson, Dunn
& Crutcher
LLP

- Tr. 2086:13-21 (Herek:  The Laumann study indicates that 90% of people in his sample were consistently heterosexual in their behavior, identity, and attraction, and a core group of 1 to 2 % of the sample was consistently lesbian, gay, or bisexual in their attractions, behavior, and identity.); *see also* Tr. 2309:2-10; 2311:8-18.

- Tr. 2211:8-10 (Herek:  "[I]f I were a betting person, I would say that you would do well to bet that their future sexual behavior will correspond to their current identity.").

PFF 170.    Although sexual orientation ranges along a continuum from exclusively heterosexual to exclusively homosexual, it is usually discussed in terms of three categories: heterosexual, homosexual, and bisexual.

- Tr. 2064:22-23 (Herek:  In practice, we generally refer to three groups: homosexuals, heterosexuals, and bisexuals.).

- Tr. 2174:7-17 (Herek:  DIX1266, an article by John Gonsiorek from 1995 that Proponents used on cross-examination with Dr. Herek, states:  "Regardless of these philosophical debates, most present-day North Americans tend to label themselves as homosexual, heterosexual, or bisexual, despite the fact that these labels do not capture the full range of complexity of sexual orientation and sexual identity.").

- Tr. 2310:12-17 (Herek:  Regardless of the causes of sexual orientation, there is no doubt that some people are lesbian, some are gay, and some are bisexual.).

PFF 171.    Sexual orientation is commonly discussed as a characteristic of the individual, like biological sex, gender identity, race, or age.  Although this perspective is accurate insofar as it goes, it is incomplete because sexual orientation is always defined in relational terms and necessarily involves relationships with other individuals.  Sexual acts and romantic attractions are characterized as homosexual or heterosexual according to the biological sex of the individuals involved in them, relative to each other.  Indeed, it is by acting with another person—or expressing a desire to act—that individuals express their heterosexuality, homosexuality, or bisexuality.

- Tr. 2027:2-18 (Herek:  Sexual orientation is a relational construct because it is all about a relationship between two people that is defined by the sex of the two persons involved.  Whether we are talking about behavior, or attraction, or identity, it is really about the fundamental relationships that people form to

131

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

meet their needs for intimacy and attachment.  These sorts of relationships, that need for intimacy and attachment is a very core part of the human experience and a very fundamental need that people have.).

PFF 172.  Proponents' assertion that sexual orientation is distinct from race in that it is fluid and can be changed is contrary to the weight of the evidence, as explained by Dr. Herek, Dr. Meyer, and various professional organizations.

- Tr. 954:3-24 (Meyer:  "African-American is an identity, so the identity part of it could vary and, in fact, it does vary.  People who move into the United States, for example, who are by our definition African-Americans may not describe themselves as African-American or even black.  And there are studies that show that people who come, for example, from the Caribbean who are dark colored, their parents don't describe themselves as black, but their offsprings after being educated in the United States and socialized do.  So it— definitions always vary.  Certainly, with African-Americans, the term itself is relatively recent.  Black was used before that.  And Negro was used even before that.  Senator Reid got into trouble for using that term.  So those identities change and they are responsive to the social context in many different ways, but—obviously, the population itself doesn't change, but how people refer to themselves might change.").

- Tr. 958:12-15 (Meyer:  "If you wanted to . . . measure race by skin tone, you will find that you will have a large number of people who maybe have a darker skin tone, but are not identified as black.").

- PX1675 at 1 (JN) (Am. Anthropological Ass'n Statement on "Race":  "In the United States both scholars and the general public have been conditioned to viewing human races as natural and separate divisions within the human species . . . . however, it has become clear that human populations are not unambiguous, clearly demarcated, biologically distinct groups.  Evidence from the analysis of genetics (e.g., DNA) indicates that most physical variation, about 94%, lies *within* so-called racial groups . . . . These facts render any attempt to establish lines of division among biological populations both arbitrary and subjective.").

- PX1676 at 1, 2 (JN) (Am. Ass'n of Physical Anthropologists, Statement on Biological Aspects of Race:  "Pure races, in the sense of genetically homogenous populations, do not exist in the human species today, nor is there any evidence that they have ever existed in the past. . . . There is no necessary concordance between biological characteristics and culturally defined groups.").

- Tr. 2176:23-2177:14 (Herek:  "[Social constructionists] are talking about the construction of sexual orientation at the cultural level, in the same way that we have cultural constructions of race and ethnicity and social class. . . . [S]o, in a

132

Gibson, Dunn
& Crutcher
LLP

sense, you can say there's nothing real about them in that these are not things that might be argued to exist in nature except for society's creation of them. But to say that there's no such thing as class or race or ethnicity or sexual orientation is to, I think, minimize the importance of that. . . . And, again, social constructionists . . . . are not saying that this is a process of the individual's construction of sexual orientation.").

- Tr. 2178:2-16 (Herek: "[S]ocial constructionists would say race is an entirely constructed category; although, it is based on some physical characteristics. But the definition of which races are which, which ones are separate from each other, what type of skin coloring or what type of ancestry involves a person being of a particular race, all of those things are socially constructed. And I think they [social constructionists] would say a similar thing about sexual orientation. Again, it doesn't mean that that individual personally constructs her or his racial identity or her or his sexual orientation in the sense of just making it up and it has no reality and it could change tomorrow. But I think that's . . . more consistent with what the social constructionists would argue.").

PFF 173.   Mainstream mental health professionals and researchers have long recognized that homosexuality is a normal expression of human sexuality. Indeed, the American Psychiatric Association removed homosexuality from the *DSM* in 1973, stating that "homosexuality *per se* implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." The American Psychological Association adopted the same position in 1975, and urged all mental health professionals to help dispel the stigma of mental illness that had long been associated with homosexual orientation.

- Tr. 2027:19-2028:2 (Herek: Homosexuality is not considered a mental disorder. The American Psychiatric association, the American Psychological Association, and others of the major professional mental health associations have all gone on record affirming that homosexuality is a normal expression of sexuality and that it is not in any way a form of pathology.).

- Tr. 872:24-873:1 (Meyer: Being gay or lesbian is not, in and of itself, a mental illness.).

- Tr. 2028:8-19 (Herek: In the past, homosexuality was seen as a mental disorder. In 1952, the American Psychiatric Association created its first official roster of mental illnesses, called the Diagnostic and Statistical Manual of Mental Disorders, or the DSM for short. Homosexuality was included in the first edition of the DSM.).

133

- PX0885 at 38-39 (Diagnostic and Statistical Manual of Mental Disorders, first edition:  Includes homosexuality as a disorder under the heading "Sexual Deviation.").

- Tr. 2028:19-25 (Herek:  Over time, the inclusion of homosexuality in the DSM was challenged.  In 1973, the American Psychiatric Association removed homosexuality from the DSM, and shortly thereafter the American Psychological Association went on record strongly supporting that decision.).

- Tr. 2030:17-2032:11 (Herek:  The original position that homosexuality was a disorder was not supported by empirical research.  One cause for the change in positions was that this common wisdom was challenged by empirical data showing people who were homosexual and very well-adjusted.).

- PX0764 (American Psychological Association Policy Statement— Discrimination Against Homosexuals, 1975:  "The American Psychological Association supports the action taken on December 15, 1973, by the American Psychiatric Association, removing homosexuality from that Association's official list of mental disorders.  The American Psychological Association therefore adopts the following resolution: Homosexuality per se implies no impairment in judgement, stability, reliability, or general social and vocational capabilities; Further, the American Psychological Association urges all mental health professionals to take the lead in removing the stigma of mental illness that has long been associated with homosexual orientations."); *see also* Tr. 2030:11-15 (Herek:  PX0764 is still the position of the American Psychological Association.  In fact, the APA has reaffirmed that position in several subsequent resolutions.).

- PX0760 at 3 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: "Same-gender sexual orientation cannot be assumed to represent a deficit in personality development or the expression of psychopathology.").

- PX 2545 (Young 11/13/09 Dep. Tr. 121:24-122:16 (agreeing with the American Psychoanalytic Association's statement that "homosexuality is a normal variant of adult sexuality").

- Tr. 1032:6-12 (Lamb:  Gay and lesbian sexual orientations are "normal variations and are considered to be aspects of well-adjusted behavior.").

- Tr. 1937:13-25 (Tam:  Homosexuality is no longer considered a medical condition that needed to be treated and that it is "a part of normal behavior.").

- PX0707 at RFA No. 20 (Proponents admit that "prominent medical and psychiatric professional organizations no longer consider sexual orientation an illness or a disorder.").

134

Gibson, Dunn
& Crutcher
LLP

1

2

- PX0710 at RFA No. 20 (Attorney General admits "that the medical and psychiatric communities do not consider sexual orientation an illness or disorder.").

3

PFF 174.   Sexual orientation is fundamental to a person's identity and is the kind of

4

distinguishing characteristic that defines gay and lesbian individuals as a discrete

5

group.

6

7

- Tr. 858:24-859:5 (Meyer:  Sexual orientation is perceived as "a core thing about you are."  People say: "This is who I am. . . .  [I]t is a central identity that is important.").

8

9

- Tr. 2027:14-18  (Herek: These sorts of relationships, that need for intimacy and attachment is a very core part of the human experience and a very fundamental need that people have.).

10

11

- Tr. 140:6, 141:14-19 (Perry:  Perry is a lesbian and feels that she was born with her sexual orientation.  At 47 years old, she does not think that it might somehow change.).

12

13

- Tr. 1510:4-8 (Kendall:  "I knew I was gay just like I knew I'm short and I'm half Hispanic.  And I just never thought those factors would change.").

14

15

- Tr. 77:4-5 (Zarrillo:  Zarrillo is gay and has been as long as he can remember.).

16

17

- Tr. 91:15-17 (Katami:  Katami is "a natural-born gay" and has been as long as he can remember.).

18

19

20

- Tr. 1372:10-1374:7 (Badgett:  DIX1108, titled Best Practices for Asking Questions about Sexual Orientation on Surveys, reflects a discussion about methods for conducting surveys; it does not conflict with the substantial evidence demonstrating that sexual orientation is a distinguishing characteristic that defines gay and lesbian individuals as a discrete group.).

21

22

23

- PX0021 (Supporters of Prop. 8 referred to homosexuals as a discrete and identifiable group of people.); *see also* PX0480; PX0506 at 12 and 15; PX1868 at 56, 64, 71, 72; PX0577 at 45 and 46; PX2153; PX2156; PX 2589; and PX2655 at 4.

24

25

- PX2343A (Tam identifies homosexuals as a discrete group); *see also* PX2343B; PX0513; PX2185; PX2507; Tr.1914:22-24; Tr. 1923: 21-1924:16; Tr. 1928:6-13; Tr. 1937:13-25; Tr. 1962:17-1963:8; Tr. 1964:17-1965:2.

26

27

- PX0710 at RFA Nos. 23, 24, 28 (Attorney General admits PFF 100 in its entirety.).

28

135

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**B.      Sexual Orientation Is Highly Resistant to Change, and Attempting to Change Sexual Orientation Is Likely to Cause Harm**

PFF 175.    People generally exercise little or no choice about their sexual orientation, and there is no credible evidence that sexual orientation can or should be changed.

- Tr. 2032:15-22 (Herek:  Herek has conducted research in which he has found that the vast majority of lesbians and gay men, and most bisexuals as well, when asked how much choice they have about their sexual orientation say that they have "no choice" or "very little choice" about it.); *see also* Tr. 2312:7-21 (Herek).

- PX0928 (Article by Dr. Herek entitled "Internalized Stigma Among Sexual Minority Adults: Insights From a Social Psychological Perspective," which was published in the Journal of Counseling Psychology in 2009:  Describes a social psychological framework for understanding sexual stigma, and it reports data on sexual minority individuals' stigma-related experiences.  It also contains data regarding the degree of perceived choice of sexual orientation among lesbians, gay men, and bisexuals.).

- Tr. 2054:12-2055:24 (Herek:  Page 39 of PX0928 contains a table that reports data on approximately 2,200 people who responded to questions about how much choice they had about being lesbian, gay, or bisexual.  Among the gay men, 87% said that they experienced no choice or only a little choice about their sexual orientation.  Among lesbians, 70% said that they had no or very little choice about their sexual orientation.).

- PX0930 at 27 (Article by Dr. Herek entitled "Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults in a U.S. Probability Sample," accepted for publication in Sexuality Research and Social Policy:  Based on a U.S. probability sample and reports percentages of gay men, lesbians, and bisexuals regarding the amount of choice they feel they have regarding their sexual orientation.).

- Tr. 2056:4-25  (Herek: PX0930 demonstrates that 88% of gay men reported that they had "no choice at all" about their sexual orientation, and 68% of lesbians said they had "no choice at all," and another 15% reported a small amount of choice.).

- Tr. 2057:5-16 (Herek:  Dr. Herek is not aware of any empirical studies regarding whether heterosexual men and women believe that their sexual orientation is a choice, but he believes it would be a reasonable hypothesis to say that most heterosexual men and women would probably report that they similarly did not make a choice to be heterosexual.).

- PX0710 at RFA No. 25 (Attorney General admits "that there is no credible evidence that sexual orientation can or should be changed.").

136

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    PFF 176.        Proponents' assertions that sexual orientation is fluid and can be changed are based on

2                    a selective reading of statements taken out of context, and are contrary to the weight of

3                    the current and historical evidence.

4             •   Tr. 2252:1-10 (Herek:  "It is certainly the case that there have been many
5                 people who, most likely because of societal stigma, wanted very much to
                  change their sexual orientation and were not able to do so.").

6             •   Tr. 2259:11-2260:5 (Herek:  Freud's Letter to An American Mother says; "By
7                 asking me if I can help, you mean, I suppose, if I can abolish homosexuality
                  and make normal heterosexuality take its place.  The answer is, in a general
8                 way, we cannot promise to achieve it.").

9             •   Tr. 2261:10-13 (Herek:  "I believe that Freud [was] actually very pessimistic
10                about the likelihood of psychoanalysis being able to change a person's sexual
                  orientation.").

11            •   Tr. 2245:6-2246:4 (Herek:  Lisa Diamond's study (*see* DIX856) demonstrates
12                that "on a whole . . . the patterns of sexual attraction reported by the women
                  tended to remain fairly stable.").
13

14            •   Tr. 2313:3-19 (Herek:  Lisa Diamond's studies do not cast any doubt on Dr.
                  Herek's opinions.  "She also made it very clear in her book and in her various
15                articles that this was not a representative sample; that you couldn't use these
                  data to generalize about the entire population.").
16

17            •   Tr. 2314:3-17 (Herek:  Dr. Herek agrees with following quote from Dr. Peplau:
                  "Claims about the potential erotic plasticity of women do not mean that most
18                women will actually exhibit change over time.  At a young age, many women
                  adopt patterns of heterosexuality that re stable across their lifetime.  Some
19                women adopt enduring patterns of same-sex attractions and relationships.").

20            •   Tr. 2202:8-22 (Herek:  "[M]ost people are brought up in society assuming that
                  they will be heterosexual.  Little boys are taught that they will grow up and
21                marry a girl.  Little girls are taught they will grow up and marry a boy.  And
                  growing up with those expectations, it is not uncommon for people to engage
22                in sexual behavior with someone of the other sex, possibly before they have
                  developed their real sense of who they are, of what their sexual orientation is.
23                And I think that's one of the reasons why . . . [gay men and lesbians have]
                  experience[d] heterosexual intercourse.  Although; it is not part of their
24                identity.  It's not part of who they are, and not indicative of their current
                  attractions.").
25

26            •   Tr. 2319:23-2320:10 (Herek:  One of the documents that Proponents used on
27                cross examination, DIX0912, states:  "We suggested the term sexual
                  preference is misleading, as it assumes conscious or deliberate choice and may
28

137

Gibson, Dunn
& Crutcher
LLP

trivialize the depth of the psychological processes involved. We recommend the term sexual orientation because most of research findings indicate that homosexual feelings are a basic part of an individual's psyche and are established much earlier than conscious choice would indicate." Dr. Herek agrees with this.).

- Tr. 140:6, 141:14-19 (Perry:  Perry is a lesbian and feels that she was born with her sexual orientation.  At 47 years old, she does not think that it might somehow change.).

- Tr. 166:24-167:9 (Stier:  Stier is 47 years old and has fallen in love one time in her life—with Perry.).

- Tr. 1509:24-1510:1 (Kendall:  Neither reversal therapy Kendall tried was successful in changing him from gay to heterosexual.); *see also* Tr. 1521:3-18 (Kendall:  While in reversal therapy, Kendall met a man who was purportedly "cured of his homosexuality."  When the doctor running the session left the room, the purportedly "cured" man admitted that he was going to a gay bar that evening, and he was "just pretending to be cured for the sake of his family.").

- Tr. 1210:22-25 (Zia:  Zia is a lesbian and thinks she has been a lesbian all her life.).

- Tr. 77:4-5 (Zarrillo:  Has been gay "as long as [he] can remember.").

- Tr. 91:15-17 (Katami:  Has been a "natural-born gay" "as long as he can remember.").

- Tr. 398:12-399:3 (Chauncey:  Earlier in the 20th century, doctors who were charged with curing people convicted of sex offenses complained that they could not "cure" homosexuals—they could not turn them into heterosexuals.); *see also* Tr. 493:22-25.

PFF 177.   No major mental health professional organization has sanctioned efforts to change sexual orientation, and virtually all of them have adopted policy statements cautioning the profession and the public about treatments that purport to change sexual orientation.  To date, there has been no scientifically adequate research to show that therapy aimed at changing sexual orientation (sometimes called reparative or conversion therapy) is safe or effective.  Indeed, the scientifically adequate research indicates otherwise.

- Tr. 2032:23-2033:5 (Herek:  The terms reparative therapy and sexual orientation change therapy refer to various types of interventions that are

138

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

intended to alter a person's sexual orientation, to change them from being homosexual into being heterosexual.).

- Tr. 2033:6-19 (Herek: These therapies have not been found to be effective in that they have not been shown to consistently produce the desired outcome without causing harm to the individuals involved.).

- Tr. 2033:20-2034:9 (Herek: The American Psychological Association has taken a stand on these types of therapies. It convened a Task Force in 2008 or 2009 to evaluate the current status of these therapies and to produce a report advising the Association on their effectiveness, their safety, and whether they should be used.).

- Tr. 2039:20-2049:3 (Herek: The underlying assumption of these therapies tends to be that there is something wrong with homosexuality; that homosexuality is a mental illness; that it is something to be cured or fixed or repaired. That is completely inconsistent with the stance of the American Psychological Association, the American Psychiatric Association, and other professional organizations in this area.).

- Tr. 2039:1-3 (Herek: Dr. Herek is not aware of any major mental health organizations that have endorsed the use of such therapies.).

PFF 178.    The 2009 Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation, the result of a thorough review and analysis of the relevant literature, demonstrates, among other things, that "enduring change to an individual's sexual orientation is uncommon."

- PX0888 at 2-3 (Report of the Am. Psychol. Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009: "[E]nduring change to an individual's sexual orientation is uncommon. The participants in this body of research continued to experience same-sex attractions following SOCE [sexual orientation change efforts] and did not report significant change to other-sex attractions that could be empirically validated, though some showed lessened physiological arousal to all sexual stimuli. Compelling evidence of decreased same-sex sexual behavior and of engagement in sexual behavior with the other sex was rare. Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life. Thus, the results of scientifically valid research indicate that it is unlikely that individuals will be able to reduce same-sex attractions or increase other-sex sexual attractions through SOCE."); *see also* Tr. 2035:15-2036:16 (Herek: These conclusions are consistent with Dr. Herek's opinion.).

- PX0888 (Report of the Am. Psychol. Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009: The list of references

139

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

considered or relied upon in this Task Force Report spans twenty-five pages.); *see also* Tr. 2034:10-16 (Herek:  The Task Force did a very thorough review of the research literature.).

- PX0888 at 121 (Report of the Am. Psychol. Ass'n Task Force on Appropriate Therapeutic Responses to Sexual Orientation, 2009:  "BE IT FURTHER RESOLVED, That the American Psychological Association reaffirms its position that homosexuality per se is not a mental disorder and opposes portrayals of sexual minority youths and adults as mentally ill due to their sexual orientation;  BE IT FURTHER RESOLVED, That the American Psychological Association concludes that there is insufficient evidence to support the use of psychological interventions to change sexual orientation.");  see also Tr. 2038:9-25 (Herek:  This resolution is consistent with Dr. Herek's opinion.).

- Tr. 2318:16-2319:9 (Herek:  The members of the Spitzer sample were a very, very religious group who were very strongly involved in organizations that promote reparative therapy.  Dr. Spitzer thought that that was an important qualification on his findings, suggesting that these same findings would not be observed for a group of people who didn't match his sample in terms of their religious beliefs and their activities related to reparative therapy.).

- Tr. 2256:13-21 (Herek:  The Spitzer study does not actually show that the interventions brought about the self-perceived change in sexual orientation.).

PFF 179.    Many professional organizations have recognized that efforts to change sexual orientation of adolescents are cause for special concern.

- Tr. 2039:4-19 (Herek:  There is concern when these therapies are used with anyone, but adolescents are a special case.  There are concerns that they cannot provide true informed consent; that they may be coerced into undertaking such therapies; that they could be harmful to an adolescent.).

- PX2338 (*Just the Facts About Sexual Orientation and Youth: A Primer for Principals, Educators, and School Personnel*:  A document that was created by and cosponsored by a number of mental health associations, as well as some teacher and school professional associations.).

- PX2338 at 1 and 6 (*Just the Facts About Sexual Orientation and Youth: A Primer for Principals, Educators, and School Personnel*:  Sponsored by:  "American Academy of Pediatrics, American Association of School Administrators, American Counseling Association, American Federation of Teachers, American Psychological Association, American School Counselor Association, American School Health Association, Interfaith Alliance Foundation, National Association of School Psychologists, National Association of Secondary School Principals, National Association of Social

140

Gibson, Dunn & Crutcher LLP

Workers, National Education Association, School Social Work Association of America," which collectively represent 480,000 mental health professionals.).

- PX2338 at 5 (*Just the Facts About Sexual Orientation and Youth: A Primer for Principals, Educators, and School Personnel*: "Despite the general consensus of major medical, health, and mental health professions that both heterosexuality and homosexuality are normal expressions of human sexuality, efforts to change sexual orientation through therapy have been adopted by some political and religious organizations and aggressively promoted to the public. However, such efforts have serious potential to harm young people because they present the view that the sexual orientation of lesbian, gay, and bisexual youth is a mental illness or disorder, and they often frame the inability to change one's sexual orientation as a personal and moral failure."); *see also* Tr. 2041:18-2042:12 (Herek: These conclusions are consistent with Dr. Herek's opinion.).

- Tr. 1509:24-1510:1 (Kendall: Neither reversal therapy Kendall tried was successful in changing him from gay to heterosexual.).

- Tr. 1509:10-16 (Kendall: His reversal therapist told him that homosexuality was inconsistent with Christian teaching, that his parents did not want him to be gay, that he needed to change, and that homosexuals were bad people.).

- Tr. 1511:1-16 (Kendall: During his time at reversal therapy, Mr. Kendall's family told him he was repulsive and disgusting, and that being gay was worse than having Down Syndrome or being mentally retarded.).

- Tr. 1512:19-23 (Kendall: "At NARTH, I was being told that I had to reject who I was on the most fundamental level because what that was was dirty and bad.").

PFF 180.   Dr. Herek agrees with Proponents' own (withdrawn) expert on "immutability," who admitted, among other things, that homosexuality is "refractory" and that enduring change to one's sexual orientation change is uncommon.

- Tr. 2315:20-2316:3 (Herek: Dr. Robinson testified in deposition as follows: "Question: Now, do you believe that sexual orientation is readily subject to change? Answer: No." Dr. Herek would give the same response to that question.).

- Tr. 2317:5-13 (Herek: Dr. Robinson testified in deposition as follows: "Question: And you have not found enduring change as a result of therapy to be common? Answer: No, it's not common. It's not reported to be common." This is consistent with Dr. Herek's understanding.).

141

Gibson, Dunn & Crutcher LLP

- Tr. 2316:4-2316:21 (Herek: Dr. Robinson testified in deposition as follows: "Question: Were you aware at the time you did your report that the APA reached that conclusion? Answer: Yes. In fact, I have noted often the refractory nature of homosexuality to any kind of therapeutic intervention and, therefore, it wouldn't be at all surprising that enduring changes would not be common.").

- Tr. 2317:22-2318:14 (Herek: Dr. Robinson testified in deposition as follows: "Question: Okay. So when you make a statement, homosexuality is no more immutable than those identities one takes on in various walks and works of life, and you don't limit that to a group where there's 93 percent of people deeply religious and 78 percent of people who are on speaking engagements often at churches, is it appropriate in your view to take a finding in that one limited type of sample and apply it generally as you do in your report? Answer: If my statement about the immutability of homosexuality were tied exclusively to Spitzer's research or anything like it, then, indeed, it would be an implausible inference.").

PFF 181.   Sexual orientation and sexual identity are so fundamental to one's identity that a person should not be required to abandon them. Forcing an individual to change his or her sexual orientation would infringe on "the protected right of homosexual adults to engage in intimate, consensual conduct," which is "an integral part of human freedom." *Lawrence v. Texas*, 539 U.S. 558, 576-77 (2003).

- Tr. 858:24-859:5 (Meyer: Sexual orientation is perceived as "a core thing about you are." People say: "This is who I am. . . . [I]t is a central identity that is important.").

- Tr. 2027:14-18 (Herek: These sorts of relationships, that need for intimacy and attachment is a very core part of the human experience and a very fundamental need that people have.).

- PX0710 at RFA Nos. 23, 27 (Attorney General admits PFF 181 in its entirety.).

- *See also* evidence cited in support of PFF 174.

PFF 182.   The promotion of change therapies reinforces stereotypes and contributes to a negative climate for lesbian, gay, and bisexual persons.

- Tr. 1509:10-16 (Kendall: His reversal therapist told him that homosexuality was inconsistent with Christian teaching, that his parents did not want him to be gay, that he needed to change, and that homosexuals were bad people.).

142

- Tr. 1511:1-16 (Kendall:  During his time at reversal therapy, Mr. Kendall's family told him he was repulsive and disgusting, and that being gay was worse than having Down Syndrome or being mentally retarded.).

- Tr. 1512:19-23 (Kendall: "At NARTH, I was being told that I had to reject who I was on the most fundamental level because what that was was dirty and bad.").

- Tr. 1938:10-1939:6 (Tam:  His belief that homosexuality "is a changeable sexual preference; that it is not genetically wired" comes from information he read on the NARTH website).

- PX0836 at 236 (Article by Donald P. Haider-Markel and Mark R. Joslyn: "[A]ttributing homosexuality to upbringing or the environment significantly increases the probability that a respondent will oppose same-sex marriage.").

PFF 183.   Further, it can be harmful to an individual to attempt to change his or her sexual orientation.

- Tr. 2253:12-16 (Herek:  "We do have some data from experimental studies showing harm to some of the participants, and we do have self-reports of people who believed or perceived that they were harmed as a result of going through one or more of these interventions.").

- Tr. 2036:17-2037:3 (Herek:  The Task Force pointed to anecdotal reports of individuals who felt that they had experienced harm related to these therapies. There were some instances in those rigorous experimental studies that did document individuals experiencing harm in the form of, for example, depression or anxiety problems.).

- Tr. 1513:6-14 (Kendall: "During this whole thing, my life had kind of fallen apart.  I didn't have the world that I grew up in; my faith, which was very important to me; my family, which was even more important.  Everything had just kind of stopped.  And I just couldn't take any more.  And I realized, at one point, that if I didn't stop going I wasn't going to survive."  Without intervention, he "would have probably killed [him]self.").

- Tr. 1513:17-1514:13 (Kendall:  "When I was 16, I separated myself from my family and surrendered myself to the Department of Human Services in Colorado Springs. . . . I went in, and I spoke with the case worker.  And I told her what had been going on in my family, what had been going on with reversal therapy.  And I told her that if I went back to that house, I was going to end up killing myself.  And so they started a dependency and neglect proceeding to revoke my parents' custody. . . . I was a 16-year-old kid who had just lost everything he ever knew.  I didn't really know what to do.  I was very lost.  And so the next few years I just wandered in and out of jobs.  I wandered in and out of attempts at school.  I was incredibly suicidal and

143

Gibson, Dunn
& Crutcher
LLP

1    depressed.  I hated my entire life.  At one point, I turned to drugs as an escape
2    from reality and because I was, you know, trying to kill myself.").

3    •   PX0710 at RFA No. 26 (Attorney General admits PFF 183 in its entirety).

4    •   *See also* evidence cited in support of PFFs 175-178.

5    **VII.  There Is a Long History of Discrimination Against Gay and Lesbian Individuals, and
      That Discrimination Persists Today**

6

7    PFF 184.    Gay and lesbian individuals have experienced and continue to experience

     discrimination in the United States.  They have been executed for being homosexual,

8

9    classified as mental degenerates, targeted by police, discriminated against in the

     workplace, censored, demonized as child molesters, excluded from the United States

10

11   military, arrested for engaging in private sexual relations, and have repeatedly had

12   their fundamental state constitutional rights stripped away by popular vote.

13   •   Tr. 361:11-22 (Chauncey:  "lesbians and gay men have experienced
         widespread and acute discrimination from both public and private authorities
14       over the course of the 20th century.  And that has continuing legacies and
         effects.  This has manifested in the criminalization of sexual intimacy and
15       association; the discrimination in public accommodations, in employment;
         censorship of images about gay people and speech by gay activists;
16       stereotyping and demonization of lesbians and gay men.  And that all this has
         been drawn on and reinforced sustained patterns of prejudice and hostility.").
17

18   •   Tr. 390:8-16 (Chauncey:  Discrimination against lesbians and gay men in
         public employment has not ended, and employment discrimination by public
19       entities remains legally permissible in 20 states, and such discrimination by
         private employers remains legally permissible in 28 states.).
20

21   •   Tr. 537:25-538:14 (Chauncey:  Like African Americans who historically
         migrated away from the deep south, gay men and lesbians continue to migrate
22       to escape from extreme hostility and discrimination in some areas of the
         country to places that are less hostile, and they do so because discrimination
23       and hostility still exist.).

24   •   Tr. 539:4-23 (Chauncey:  Since Chauncey published his book on marriage in
         2004, a majority of the states have enacted legislation or constitutional
25       amendments to prohibit marriage, in many cases through popular referenda,
         creating enormous roadblock to lesbian and gay men's ability to seek equality
26       through the political process.).

27

28
                                        144

Gibson, Dunn
& Crutcher
LLP

- Tr. 548:23 (Chauncey:  There is still significant discrimination against lesbians and gay men in the United States.).

- PX0707 at RFA No. 14 (Proponents admit "that in the past gays and lesbians experienced discrimination in the United States").

- PX0707 at RFA No. 29 (Proponents admit "that gays and lesbians continue to experience instances of discrimination").

- PX0709 at RFA Nos. 14, 15 (Administration admits "that gay and lesbian individuals have been subject to discrimination.  The Administration further admit[s] that in 2003, the California Legislature adopted AB 205, the Domestic Partner Rights and Responsibilities Act of 2003 (Stats. 2003, ch. 421), which stated in part that 'The Legislature hereby finds and declares that despite longstanding social and economic discrimination, many lesbian, gay, and bisexual Californians have formed lasting, committed, and caring relationships with persons of the same sex.'  The Administration further admit[s] that the California Supreme Court has stated that sexual orientation 'is a characteristic that frequently has been the basis for biased and improperly stereotypical treatment.' *See In re Marriage Cases*, 43 Cal. 4th 757, 844 (2008).").

- PX0710 at RFA No. 14 (Attorney General admits "that the persecution suffered by gay and lesbian individuals in the United States has been severe.").

- PX0710 at RFA No. 15 (Attorney General admits "that gay and lesbian individuals have been subjected to and stigmatized by a long history of purposeful and invidious discrimination that continues to this day.").

- PX0715 at Rog No. 3 (The California Department of Fair Employment and Housing received 3,863 complaints from members of the public alleging employment discrimination on the basis of sexual orientation from fiscal year 2004-2005 through fiscal year 2008-2009.).

- PX0716 at Rog No. 4 (The California Department of Fair Employment and Housing received 162 complaints from members of the public alleging housing discrimination on the basis of sexual orientation from fiscal year 2004-2005 through 2008-2009.).

- PX0711 at RFA Nos. 3, 8, 13, 18, 23 (Attorney General admissions regarding the number of Sexual Orientation Hate Crime Events in 2004-2008).

- PX2547 (Nathanson 11/12/09 Dep. Tr. 81:17-81:25:  Agreeing that religion and societies have been very hostile to homosexuality historically and that hostility has resulted in discrimination against and physical danger for, homosexuals); *see also id.* at 94:23-95:11; 95:15-96:11.

- PX2545 (Young 11/13/09 Dep. Tr. 43:7-12:  Agreeing that gay people have historically been the subject of prejudice and discrimination).

145

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1569:11-1571:5 (Segura:  "[O]ver the last five years, there has actually been an increase in violence directed toward gay men and lesbians"; "[G]ays and lesbians are representing a larger and larger portion of the number of acts of bias motivated violence" and "are far more likely to experience violence"; "73 percent of all the hate crimes committed against gays and lesbians also include an act of violence" "we are talking about the most extreme forms of hate based violence"; they accounted for "71 percent of all hate-motivated murders" and "[f]ifty-five percent of all hate-motivated rapes" in 2008; "There is simply no other person in society who endures the likelihood of being harmed as a consequence of their identity than a gay man or lesbian.").

- PX0675 at 4, PX0834 at 8, 14 (Los Angeles Hate Crimes Reports 2007-2008).

- Tr. 1571:10-1573:12 (Segura:  In Los Angeles County from 2007-08, there was "an increase of 21 percent in bias-motivated crimes against gays and lesbians," while racial and ethnic hate crimes declined; there were "a fair number of hate crimes specifically related to [] Proposition 8"; there were four violent hate crimes against gays and lesbians.).

- Tr. 1577:10-1579:21 (Segura:  Describing censorship and discrimination faced by gays and lesbians and explaining anti-gay messages in Prop. 8 campaign).

- Tr. 2510:23-2535:7 (Miller:  Agreeing that "there has been severe prejudice and discrimination against gays and lesbians" and "widespread and persistent" discrimination against gays and lesbians; stating that "there is ongoing discrimination in the United States [against gays and lesbians]").

- Tr. 2572:11-16 (Miller:  Gays and lesbians are still the "object of prejudice and stereotype.").

- Tr. 2599:17-2604:7 (Miller:  Agreeing that "there are some gays and lesbians who are fired from their jobs, refused work, paid less, and otherwise discriminated against in the workplace because of their sexual orientation").

- Tr. 2598:12-2599:14 (Miller:  "[U]ntold millions across this country, who happen to be lesbian or gay, are not covered by federal law for employment discrimination.  That's currently the case.").

- PX0605 at 1 (JN) (Report by R. Bradley Sears et. al.:  "There is a widespread and persistent pattern of unconstitutional discrimination on the basis of sexual orientation and gender identity against state government employees.").

- PX0489 at 9; PX0490 at 9; PX0491 at 1, 19; PX0492 at 32; PX0493 at 2; PX0494 at 1, 71 (table 4) (FBI Hate Crimes Reports 2003-2008).

- PX0604 at 3 (Testimony on H.R. 3017, The Employment Non-Discrimination Act of 2009, by R. Bradley Sears:  "[T]here has been a widespread and persistent pattern of unconstitutional discrimination by state governments.").

146

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    • PX0610 at 5-2 (JN), PX0611 (JN), PX0612 (JN), PX0613 (JN), PX0614 at 9-1
2      (JN), PX0615 at 10-1 to -2 (JN), PX0616 at 11-2 (JN), PX0617 (JN), PX0618
3      at 13-1 (JN), PX0620 (JN) (Williams Institute Reports recounting the history
       of various of types of discrimination against gays and lesbians including by
4      ballot measure.).

5    • PX1869 at *1053, *1056-57 (Article by Proponents' expert Miller, arguing
       that the ballot initiative process harms minorities: "In allowing proponents to
6      eschew compromise and accommodation of competing interests, the initiative
       process fosters polarization rather than consensus building." "[T]he direct
7      initiative system, by bypassing checks and balances, is weighted heavily
       towards majority rule at the expense of certain minorities. Racial minorities,
8      illegal immigrants, homosexuals, and criminal defendants have been exposed
       to the electorate's momentary passions as Californians have adopted a large
9      number of initiatives that represent Populist backlash against representative
       government's efforts to protect or promote the interests of racial or other
10     minorities.").

11   • PX0619 at 14-8 (JN) (Williams Institute Report: Summarizes and recounts
       examples of statements made by legislators, judges, governors and other
12     officials in all 50 states, showing animus towards LGBT people, including a
       1999 statement by California State Senator Richard Mountjoy that "being gay
13     'is a sickness . . . an uncontrolled passion similar to that which would cause
14     someone to rape'").

15   • PX2859 at 5, 7 (Human Rights Campaign report, documenting employment
       discrimination against gays and lesbians across the country: [T]here is "no
16     protection under federal law." "Anti-gay discrimination often means enduring
17     daily harassment – including name-calling, humiliation and physical threats.").

18   • DIX1162 at 1 (Williams Institute study: "A popular stereotype paints lesbians
       and gay men as an affluent elite . . . the misleading myth of affluence steers
19     policymakers, community organizations service providers, and the media away
20     from fully understanding poverty among LGBT people.").

21   • Tr. 1506:21 1507:19 (Kendall: Throughout his childhood, Kendall was
       consistently teased about being gay. He was called names and even had his
22     glasses stolen by other children who were picking on him because of his sexual
       orientation. Due to this harassment, his parents eventually removed him from
23     his grade school.).

24   • Tr. 1508:7-10 (Kendall: When his parents found out he was gay: "I remember
25     my mother looking at me and telling me that I was going to burn in hell.").

26   • Tr. 1511:12-16 (Kendall: "[M]y mother would tell me that she hated me, or
       that I was disgusting, or that I was repulsive. Once she told me that she wished
27     she had had an abortion instead of a gay son. She told me that she wished I

28
                                          147

Gibson, Dunn
& Crutcher
LLP

had been born with Down Syndrome or I had been mentally retarded.  Things like that.").

- Tr. 1512:7-9 (Kendall:  "I recall Nicolosi (a reversal therapy doctor) saying that, you know, 'Homosexuality is incompatible with what God wants for you, and your parents want you to change,' and that this is a bad thing.").

- Tr. 1212:15-1215:5 (Zia:  While working as a community organizer in Asian and African American communities, Zia was asked to attend a meeting where she was confronted with her involvement with other groups that had many lesbian members.  Leaders from both the Asian and African American community were concerned that she was associating with lesbians because, so they claimed, there were no homosexuals in the Asian or African American community.  They said that homosexuality is a symptom of white petty bourgeois.).

- Tr. 1217:1-1218:8 (Zia:  Zia said she had experienced discrimination in the workplace due to her sexual orientation.  She once had an offer to speak at an event rescinded because of her sexual orientation.  She also experienced discrimination from family members: One cousin, upon learning that she was a lesbian, cut off all ties to Zia.).

- Tr. 1231:20-1232:5 (Zia:  After being married in 2004, Zia's marriage license was invalidated about a week before she was to have a big wedding ceremony.  "Lia and I felt devastated.  We felt sad.  We . . . grieved. . . .  We felt that we, as human beings, had suddenly become invalidated.").

- Tr. 1269:19-21 (Sanders:  When his daughter came out as a lesbian, he told her that he had concerns because "it was very tough on gay people in society.").

- Tr. 1270:2-13, 1278:16-21 (Sanders:  During his time serving as a police officer, Sanders saw "what happened to people who came out, who had either a gay or lesbian relationship."  He recounted the story of a sergeant who was well respected, yet still was driven out of the squad after he came out as gay.).

- Tr. 1278:22-1279:8 (Sanders:  Sanders worked with gay men and lesbians who served in the police department but would not come out of the closet because they felt their careers would be over and that they would be treated differently, including his Chief of Staff when he was Chief of Police, who came out to him as a lesbian but stated that she would not come out to others because it was not in her best interest because people would only see her as a lesbian and not as his Chief of Staff.).

- *See also* evidence cited in support of PFFs 285-296, 186-201.

PFF 185.    Discrimination against gay and lesbian individuals in the United States has deep

historical roots, stretching back at least to colonial American times.

148

1
2
3

- PX2547 (Nathanson 11/12/09 Dep. Tr. 81:17-81:25:  Agreeing that religion and societies have been very hostile to homosexuality historically and that hostility has resulted in discrimination against and physical danger for, homosexuals); *see also id.* at 94:23-95:11; 95:15-96:11.

4
5
6

- PX2545 (Young 11/13/09 Dep. Tr. 55:15-55:20, 56:21-57:7:  Agreeing that there is a religious component to the bigotry and prejudice against gay and lesbian individuals); *see also id.* at 61:18-22, 62:13-17 (Catholic Church views homosexuality as "sinful").

7
8

- Tr. 362:2-363:1 (Chauncey:  Criminalization of homosexual conduct dates back to colonial times.).

9
10
11
12
13

- Tr. 531:12-533:4 (Chauncey:  While the categories of heterosexual and homosexual emerged and became primary organizing categories of state regular and personal identity in the late 19th century, there were people who had a primary erotic and affectional interest in people of the same sex before then.  Nicholas Sension, for example, had developed a reputation over the course of 30 years as someone who persistently indicated a sexual interest in males, even though he was not called a homosexual because that term was not available to him.).

14

- Tr. 471:18-20 (Chauncey:  The hostility towards homosexuality can be seen in the sodomy laws even though they didn't apply just to homosexual conduct.).

15
16

- PX0610 at 5-2; PX0611 (JN) (Williams Institute Report:  Discussing long history of discrimination).

17
18
19
20
21
22
23

PFF 186.    Through much of the twentieth century, in particular, gay and lesbian individuals

suffered under the weight of medical theories that treated their desires as a disorder,

penal laws that condemned their consensual adult sexual behavior as a crime, and

federal policies and state regulations that discriminated against them on the basis of

their homosexual status.  These state policies and ideological messages worked

together to create and reinforce the belief that gay and lesbian individuals were an

inferior class to be shunned by other Americans.

24
25
26

- PX0881 at 324-325; PX0879; PX0876 at 298-299; PX0857 at 105 (Chauncey articles:  Describing formal and informal prohibitions on gay visibility/presence in public spaces such as bars, streets, theaters during the 20th century.).

27
28

- Tr. 361:23 -367:9 (Chauncey:  Sodomy laws, disorderly conduct statutes, and vagrancy laws are all examples of the criminalization of gay people.  Their

149

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

enforcement resulted in people being exposed as gay, which led to much more significant social consequences, such as the loss of a job, a home, social respect, or family ties.).

- Tr. 376:20-377:25 (Chauncey:  At the beginning of World War II, the military decided to absolutely exclude all homosexuals and to institute screening procedures that would keep homosexuals out.  This regulation, in one form or another, continues to the present day.).

- Tr. 378:1-379:10 (Chauncey:  People would question men who were of a certain age and not in the military or a critical defense industry, and this was humiliating.  In addition, men who could not serve were denied benefits under the GI Bill.  Also, men who had been discovered to be gay in the military and who were discharged had a difficult time getting hired because people wanted to see their discharge papers.).

- Tr. 379:11-380:3 (Chauncey:  The war was such an important moment in bringing people together in our country, and one of the effects of this discrimination was the profound way in which gay people were being excluded from the cultural image of the nation.  This exclusion impressed upon people that homosexuals were being denied their membership in the community, and in a sense, they were being denied their citizenship.).

- Tr. 380:4-22, Tr. 381:2-13 (Chauncey:  Under Don't Ask, Don't Tell— President Clinton's compromise position that as long as gay people do not tell that they are gay, the military will not ask if they are—approximately 9,500 people were discharged in the first decade.  Under this policy, the country lost the services of patriotic citizens who wanted to serve, and there was a financial cost of recruiting and training people to take their place.).

- PX0872 at 1 (GAO 2005 Report to Congressional Requesters on Military Personnel:  Estimates that over the 10-year period, it could have cost DOD about $190 million in constant fiscal year 2004 dollars to recruit and train replacements for servicemembers separated under the policy.).

- Tr. 395:19-25 (Chauncey:  Doctors in the late 19th century assumed homosexuality to be a pathology.  They reinforced a range of stereotypes associated with gay people—they were pathological, sick, and something was wrong with them and their bodies.).

- Tr. 474:12-19 (Chauncey:  Medical pronouncements that were hostile to gays and lesbians provided a powerful source of legitimation to anti-homosexual sentiment and were themselves a manifestation of discrimination against gays and lesbians.).

- PX2566 at 2-4 (Letter from John W. Macy of the U.S. Civil Services Comm'n to The Mattachine Society of Washington, Feb. 25, 1967 (*available at* The Kameny Papers, www.kamenypapers.org):  Letter denying the Society's

request to change the policy banning active homosexuals from Federal employment).

- PX2581, at 1, 4-5 (Letter from E. D. Coleman, Internal Revenue Service, to The Pride Foundation, Oct. 8, 1974 (*available at* The Kameny Papers, www.kamenypapers.org):  Letter denying exemption under Internal Revenue Code § 501(c)(3) on the grounds that the organization's goal of "advance[ing] the welfare of the homosexual community" was "perverted or deviate behavior" "contrary to public policy and are therefore, not 'charitable[,]'" and the group's "activities are not 'educational' because they are detrimental, rather than beneficial to the public.").

- PX1384 at 5 (Article by Charlotte J. Patterson, Megan Fulcher, and Jennifer Wainwright:  "Important underpinnings of discrimination against lesbian women and gay men in many states are provided by the so-called sodomy laws.").

- Tr. 1954:9-1955:15 (Tam:  To convince voters to support Prop. 8, he told them that if Prop. 8 did not pass there would be "social moral decay" and that "social moral decay" means  "if same-sex marriage is legal, it would encourage children to explore same sex as their future marriage partner.  And from the both Asian cultural and, also, from our Christian angle, we think this is social moral decay.").

- Tr. 1921:19-21 (Tam:  Tam believes homosexuals are 12 times more likely to molest children).

- Tr. 1918:19-24 (Tam:  Tam believes homosexuality is linked to pedophilia).

- Tr. 1928:6-13 (Tam:  Tam thought "permitting gays and lesbians to marry" would mean "one by one other states would fall into Satan's hand.").

- Tr. 1943:16-1944:1 (Tam:  Tam wrote that "We hope to convince Asian Americans that gay marriage will encourage more children to experiment with the gay lifestyle, and that that lifestyle comes with all kinds of disease" to convince voters to adopt Prop. 8).

- Tr. 1960:1-9 (Tam:  Tam knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

- *See also* evidence cited in support of PFFs 184-185, 187-201.

PFF 187.     Gay and lesbian individuals also continue to face violence motivated by anti-gay bias.

The FBI reported 1,260 hate crime incidents based on perceived sexual orientation in

1998, and 1,265 in 2007.  In 2008, a national coalition of anti-violence social service

151

Gibson, Dunn
& Crutcher
LLP

agencies identified 29 murders motivated by the assailants' hatred of lesbian, gay, bisexual, or transgender people.

- Tr. 408:15-23 (Chauncey:  Many gay people face violence as a result of being gay.  While evidence of frequency is sketchy for earlier periods, the FBI has been collecting hate crime statistics more recently.  They show that hate crimes against gays, lesbians, or people perceived to be gay or lesbian average around 1,500 per year.).

- Tr. 409:9-18 (Chauncey:  Two famous examples of violent hate crimes are Matthew Shepard, who was murdered in 1998 in Laramie, Wyoming, and Larry King, a 15 year old junior high school student in California who was murdered in 2008 by another student who later explained that Larry had said he was attracted to him.).

- Tr. 409:19-410:5 (Chauncey:  As a result of this hostility, the fear of vigilante violence really affects the lives of many gay people.  The scope of the violence is one of the most powerful continuing effects of these campaigns of generating prejudice and hostility.).

- Tr. 537:18-538:14 (Chauncey:  Some people move to California to find a more open society because they continue to face hostility and discrimination in the places they live.).

- PX0708 at RFA No. 77 (Proponents admit "that according to the Federal Bureau of Investigation, in the year 2007 law enforcement agencies reported 1,265 incidents motivated by bias based on sexual orientation.").

- PX0709 at RFA No. 17 (Administration admits "that gay and lesbian individuals have been subject to hate crimes").

- PX0710 at RFA No. 29 (Attorney General admits "that discrimination against gay and lesbian individuals, including through hate crimes, exists to this day").

- PX0672-76 (JN) (*Hate Crimes in California 2004-8*:  Noting that sexual orientation hate crime offenses have consistently been the second largest bias motivation category of hate crimes since 1995 and detailing prosecution statistics of same).

- Tr.1569:11-17 (Segura:  "The data that I observed show that over the last decade, there has been no real improvement, no real decline; and over the last five years, there has actually been an increase in violence directed towards gay men and lesbians."  "There was a substantial increase" in hate crimes against gays and lesbians between 2007 and 2008.).

- PX0873 at 5, 16 (FBI Hate Crime Statistics, 1998: "1,260 [motivated] by sexual-orientation bias").

152

*Gibson, Dunn
& Crutcher
LLP*

- PX0489 at 9; PX0490 at 9; PX0491 at 1; PX0492 at 32; PX0493 at 2; PX0494 at 1, 71 (FBI Hate Crimes Reports 2003-08:  Demonstrating increase from 16% to 17.7% in hate crimes reported against gays and lesbians from 2003-08).

- PX0834 (Los Angeles Hate Crimes Report 2008:  Between 2007 and 2008 hate crimes motivated by race declined 16%, but hate crimes against gays and lesbians increased 21%; several hate crimes against gays and lesbians were prompted by Prop. 8, including four violent crimes.).

- PX0868 at 5 (National Coalition of Anti-Violence Programs, *Hate Violence against Lesbian, Gay, Bisexual, and Transgender People in the United States 2008*: "2008, with 29 total murders, has the highest number of deaths since 1999.").

- PX0868 at 5, 9 (National Coalition of Anti-Violence Programs Report on Hate Violence: Provides national statistics on hate motivated violence against LGBT individuals and reports 29 murders in 2008 motivated by hatred of LGBT individuals—an increase of 28% from 2007.).

- Tr. 1218:9-1219:6 (Zia: Zia has felt physically threatened because of her sexual orientation.  She constantly has to be aware of her surroundings and be alert and even has told her wife to be careful showing any physical affection in public for fear of violence.).

- Tr. 1277:17-1278:4 (Sanders: "In the early days there were a lot of hate crimes. There were gay bashings, where young men would go out and get drunk and feel no problem at all with bashing people who they thought were gay people, whether they were or not."  And after the 2006 pride celebration, an individual brought a baseball bat and beat many people, literally beating one man almost to death.).

- Tr. 1277:5-9 (Sanders:  "I think that when a city, when leadership talks in disparaging terms about people, or denies the rights that everybody else have, the fundamental rights, then I think some people in the community feel empowered to take action in hate crimes and in other ways.").

- Tr. 2302:7-22 (Herek:  Hate crimes are illegal in California but still continue to occur.  Structural stigmas such as Prop. 8 create the atmosphere in which individual enactments of stigma occur.).

PFF 188.    Gay and lesbian individuals have been subject to more hate crimes motivated by bias against their sexual orientation in California since 2004 than women, who are members of a protected class, have been subjected to hate crimes motivated by their gender.

153

Gibson, Dunn
& Crutcher
LLP

1
2
3

- PX0672 at 26; PX0673 at 28; PX0674 at 28; PX0675 at 26; PX0676 at 1, 20 (Hate Crime in California Reports, 2004-2008: Demonstrating that gays and lesbians have been subject to more hate crimes motivated by bias against their sexual orientation in California since 2004 than women have been subjected to hate crimes motivated by their gender).

4
5

- PX0711 at RFA Nos. 4, 5, 9, 10, 14, 15, 19, 20, 24, 25 (Attorney General admissions regarding Sexual Orientation Hate Crime Events in 2004-2008).

6
7
8

- PX0672-76 (JN) (*Hate Crimes in California* 2004-2008: Noting that sexual orientation hate crime offenses have consistently been the second largest bias motivation category of hate crimes since 1995 and detailing prosecution statistics of same).

9

PFF 189.

10
11
12

As one of Proponents' experts, Dr. Miller, admitted, the persecution suffered by gay and lesbian individuals in the United States has been severe. Indeed, hostility towards gay and lesbian individuals has resulted not only in discrimination, but also physical danger.

13
14
15

- PX2547 (Nathanson 11/12/09 Dep. Tr. 81:17-81:25: Agreeing that religion and societies have been very hostile to homosexuality historically and that hostility has resulted in discrimination against and physical danger for, homosexuals); *see also id*. at 94:23-95:1195:15-96:11.

16
17

- Tr. 2765:3-5 (Blankenhorn: "I believe that homophobia is a real presence in our society and I'm pretty confident, in many, many other societies around the world.").

18
19
20

- Tr. 1571:3-5 (Segura: "There is simply no other person in society who endures the likelihood of being harmed as a consequence of their identity than a gay man or lesbian.").

21
22

- Tr. 2510:23-2535:7 (Miller: Agreeing that "there has been severe prejudice and discrimination against gays and lesbians" and "widespread and persistent" discrimination against gays and lesbians; stating that "there is ongoing discrimination in the United States [against gays and lesbians]").

23
24
25

- Tr. 361:11-15 (Chauncey: "lesbians and gay men have experienced widespread and acute discrimination from both public and private authorities over the course of the 20th century. And that has continuing legacies and effects.").

26
27

- Tr. 565:20-566:7, 566:15-25 (Chauncey: Chauncey was only the second person to get an academic position in a history department after writing a dissertation on lesbian and gay history; he is struck when he receives course evaluations with how many students have never heard about gay history or

28

154

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

discrimination before college.  Given this, it is pretty clear to him that the erasure of the history of discrimination and of gay life itself continues to be very prevalent in our culture.).

- *See also* evidence cited in support of PFFs 184-188, 190-201.

PFF 190.   The medical establishment identified homosexuality as a "disease," "mental defect," "disorder," or "degeneration."  Until the American Psychiatric Association removed homosexuality from its list of disorders in 1973, such hostile medical pronouncements provided a powerful source of legitimization to anti-homosexual sentiment.

- Tr. 473:23-474:6 (Chauncey:  In the early part of the 20th century, leading physicians, medical researchers, and almost all medical literature claimed that homosexuality was a pathological condition or a disease.).

- Tr. 396:1-7 (Chauncey:  A lot of the medical literature in the 19th and early 20th century focused on gender nonconformity as an essential element of sex perversion, describing mannish women and effeminate men as quintessential emblems of homosexuals.  Homosexuality was seen as one sign of a more general gender inversion or reversal of one's gender role.).

- Tr. 398:12-399:3 (Chauncey:  Someone who was convicted of a range of sex offenses and determined to be a sex psychopath could be committed for an indeterminate sentence, and they would be kept in a prison/mental institution until they had been cured of their pathology.  But very quickly, doctors who were charged with curing them complained that they could not "cure" homosexuals—they could not turn them into heterosexuals.); *see also* Tr. 493:22-25.

- Tr. 474:12-19 (Chauncey:  Medical pronouncements that were hostile to gays and lesbians provided a powerful source of legitimation to anti-homosexual sentiment and were themselves a manifestation of discrimination against gays and lesbians.).

- PX0707 at RFA No. 21 (Proponents admit that "prominent medical and psychiatric professional organizations no longer consider sexual orientation an illness or a disorder").

- PX0710 at RFA No. 20 (Attorney General admits "that the medical and psychiatric communities do not consider sexual orientation an illness or disorder").

- Tr. 1937:13-25 (Tam:  Homosexuality is no longer considered a medical condition that needs to be treated and that it is "a part of normal behavior."

155

Tam goes on to explain how NARTH taught him that homosexuality is not a part of normal behavior).

- PX0856 at 103 (Estelle Freedman article on the "sexual psychopath": Stating that the American Psychiatric Association categorized homosexuality as a mental disease until 1973.).

- *See also* evidence cited in support of PFF 173.

PFF 191.   The sexual orientation of gay and lesbian individuals has been associated with a

stigma of inferiority and second-class citizenship, manifested by the group's history of

legal and social disabilities.

- Tr. 818:10-819:4 (Meyer:  Stigma occurs when a group has an attribute that has been identified as negative by society such that group members who share the attribute are devalued by society.).

- Tr. 2050:20-2051:8 (Herek:  Stigma is a kind of shared cultural knowledge about particular characteristics or attributes of groups that are viewed negatively by society, such that the members of those groups are devalued and looked down upon.  They are treated differently, such that they end up having less control over the course of their own lives, less influence over others, less access to the valued resources of society, all of which we think of as power.).

- Tr. 824:15-825:12 (Meyer:  Stigmas affect all people in society because they are social norms—they are something we all learn from a very young age.  Stigmas are especially impactful at younger ages for gays and lesbians because that is a time when they are beginning to recognize that they are gay and are beginning to try to understand what that means to them.).

- Tr. 820:20-25 (Meyer:  Research has determined that there are stigmas associated with gay men and lesbians that describe how gay and lesbian people are perceived.).

- Tr. 820:23-822:5 (Meyer:  One of the stereotypes that is part of the stigma surrounding gay men and lesbians is that gay men and lesbians are incapable of, uninterested in, and not successful at having intimate relationships.  Gay men and lesbians have been described as social isolates, as unconnected to society, and people who do not participate in society the way everyone else does – as "a pariah, so to speak."  This stigma is important because part of the nature of being gay is who you choose to have an intimate relationship with.).

- PX1011 (Book entitled *Everything You Always Wanted to Know About Sex But Were Afraid to Ask*: "What about all of the homosexuals who live together happily for years?  What about them?  They are mighty rare birds among the homosexual flock.  Moreover, the 'happy' part remains to be seen.  The

156

bitterest argument between husband and wife is a passionate love sonnet by comparison with a dialogue between a butch and his queen. Live together? Yes. Happily? Hardly.").

- Tr. 822:12-824:14 (Meyer:  PX1011 is an excerpt from the first edition (1969) of a very popular book that contains different chapters that aim to educate the public about different issues concerning sexuality.  The chapter that is exhibit PX1011 concerns male homosexuality.  In the cited excerpt, the purportedly educational reference is portraying a relationship between two men with great disrespect, ridicule, and contempt.  This demonstrates the stigma associated with gay relationships.); *cf.* PFFs 159-160 (Demonstrating, *inter alia*, the long-term commitment of Plaintiffs and their partners).

- Tr. 2052:2-2053:7 (Herek:  There is a great deal of research showing that gay men and lesbians are stigmatized today.  For example, national survey data tell us that there are large numbers of people who will say that they have negative feelings towards lesbians and gay men; that they even feel disgusted by lesbians and gay men.  There are also instances of discrimination and violence against people who are lesbian and gay.  The FBI and State of California both track hate crimes perpetrated against people because of their sexual orientation.  And in a national survey that Dr. Herek conducted, he found that roughly 1 in 5 people in the sample had experienced some sort of violence based on their sexual orientation in the course of their lifetime.  A slightly lower percentage of lesbians and gay men had experienced some sort of discrimination, for example, in employment.  There are also instances of violence and discrimination against children and youth who are perceived to be gay or lesbian.  And at an intuitive level, Dr. Herek believes that most people understand that if two men were to walk down the street holding hands, in many places that would elicit a great deal of negative reaction.).

- PX0710 at RFA No. 16 (Attorney General admits "that gay and lesbian individuals are still among the most stigmatized groups in the country" and cites *In re Marriage Cases,* 43 Cal.4th 757, 842 (2008) (quoting with approval *People v. Garcia,* 77 Cal.App.4th 1269, 1276 (2000) ("Outside of racial and religious minorities, we can think of no group which has suffered such 'pernicious and sustained hostility' [citation], and such 'immediate and severe opprobrium' [citation], as homosexuals")).

- Tr. 361:23-363:9 (Chauncey:  Even though not all sodomy laws solely penalized homosexual conduct, over the course of the 20th century, sodomy laws came to symbolize the criminalization of homosexual sex in particular.  This was most striking in *Bowers v. Hardwick*, which reads as though the law at issue simply bears on homosexual sex.).

- Tr. 363:10-14 (Chauncey:  In the 1960s and 70s, as states decriminalized sodomy, several states actually enacted new legislation that specified homosexual conduct, such as the Texas statute.).

157

Gibson, Dunn & Crutcher LLP

- Tr. 409:18-20 (Chauncey: Federal and local agencies in the past sought to curtail homosexuals' freedom of speech.).

- Tr. 483:17-20 (Chauncey: In the 1950's, no lawmaker would grant a hearing to homosexuals.).

- Tr. 484:24-485:5 (Chauncey: The federal government was slow to respond to the AIDS crisis, and this was in part because of the association of AIDS with a "despised group".).

- Tr. 490:23-25 (Chauncey: Homosexuals used to be barred from entry into the United States.).

- Tr. 537:10-17 (Chauncey: A heterosexual person can marry a non-U.S. citizen and bring him or her from abroad into this country, but a homosexual person cannot.).

- Tr. 564:22-25 (Chauncey: Chauncey is not aware of any movements that tried to deny an adulterer the right to marry.).

- Tr. 566:1-7 (Chauncey: Chauncey was personally advised not to write a dissertation in gay history; he was told that it would be professional suicide to do so. When he finally got a job at the University of Chicago in 1991, he was the second person in the country to get an academic position in the history department with a dissertation in lesbian or gay history.).

- Tr. 387:14-388:16 (Chauncey: One effect of discrimination is that most people realized that they had to be very careful to hide their homosexuality at the workplace, for fear of losing their jobs. Ultimately, it funneled gay men and lesbians into low-status jobs where people were less likely to care that they were gay, such as being waiters, hair dressers, or low-level clerical workers.).

- Tr. 585:22-586:8 (Peplau: There is no empirical support for the negative stereotypes that gay men and lesbians have trouble forming stable relationships or that those relationships are inferior to heterosexual relationships.).

PFF 192. The social marginalization of gay and lesbian individuals gave the police and the public broader informal authority to harass them. The threat of violence and verbal harassment deterred many gay and lesbian individuals from doing anything that might reveal their homosexuality in public.

- Tr. 363:17-365:5 (Chauncey: In New York, the disorderly conduct statute began to be applied more and more to homosexuals. Indeed, police began to record "disorderly conduct (degenerate)" in their record books. This law was used to criminalize men picking up men, but also to arrest people found in a

158

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

bar or club, or even a private home. From 1924 to 1966, there were approximately 50,000 arrests in New York under this charge. It was a pervasive form of policing.).

- Tr. 365:6-11 (Chauncey: In California, a vagrancy law was similarly used in these situations, and a variety of states tailored these sorts of laws to deal with homosexuals.).

- Tr. 366:22-367:9 (Chauncey: People feared being arrested because it would expose the person as being gay, which would lead to much more significant social consequences, such as the loss of a job, a home, or ties with family. And this did, in fact, happen sometimes.).

- Tr. 365:17-366:4 (Chauncey: There were three lasting effects of this criminalization. First, it was used to justify forms of discrimination. For example, openly-gay soldiers could not serve because what defines them as being homosexual is a criminal offense. Second, it also stood as a sign of disapproval of homosexuals. Third, it meant that a phenomenal number of people ran across the law and knew that police were looking for them.).

- Tr. 367:10-368:16 (Chauncey: Starting in 1933, with the repeal of prohibition, New York and then many other states issued regulations that prohibited any place with a liquor license from serving drinks to lesbians and gay men, or allowing them to congregate on the premises. This criminalization meant that when people went to a bar or restaurant, they typically had to be very careful to hide the fact that they were gay.); *see also* Tr. 472:24-473:2.

- Tr. 368:17-369:1 (Chauncey: To survive, some establishments had to pay bribes to the police or to organized crime. Gay life thus became enmeshed with criminality.).

- Tr. 369:4-21 (Chauncey: Establishments could tell patrons to leave the bar, or they could post signs telling gays and lesbians to stay away, such as "It is against the law to serve homosexuals." This conveyed a very clear message to both gay and straight customers that homosexuals were a despised category to be excluded.).

- Tr. 371:7-372:3 (Chauncey: These laws were enforced in multiple ways. In some instances, plainclothes policemen would strike up conversations with customers, lead them on, and then arrest them when an invitation was issued. In other instances, the police would point to stereotypical gender behavior or cross-gender behavior that was associated with lesbians and gay men, and use that as evidence that a bar was patronized by them.).

- Tr. 491:12-14 (Chauncey: Military police used to cooperate in anti-vice raids against gay bars and other meeting places.).

159

Gibson, Dunn
& Crutcher
LLP

1        •   Tr. 373:19-374:24 (Chauncey:  In San Francisco, Mayor Christopher launched
2            a two year campaign against gay life in the City.  According to one historian's
             account, this led to 40 to 60 arrests a week, and about a third of the bars being
3            shut down.  This occurred *after* a California Supreme Court ruling outlawed
             such discrimination.).

4
         •   Tr. 375:2-15 (Chauncey:  In 1969, the police raided the Stonewall Bar in New
5            York *after* the courts had ruled that it was legitimate to serve lesbians and gay
             men.  And just last summer, in Fort Worth, Texas, the police went into a bar
6            and arrested seven of the patrons.); *see also* Tr. 473:18-20.

7        •   Tr. 473:11-14 (Chauncey:  "[I]n half the states there's still no laws prohibiting
8            discrimination against them [gay or lesbians].  And so . . . they could still be
             ejected in bars in, let's say, half the states.").

9
         •   Tr. 375:22-376:14 (Chauncey:  There were many effects of shutting down
10           places where gay people gathered.  First, it conveyed to gays and lesbians that
             they were a despised class of people and a group of outlaws in the eyes of the
11           law.  It also associated gay life with criminality, and it contributed to the
             growing sense that gay people were dangerous and a part of the seedy and
12           violent underworld.  It conveyed the message that gays and lesbians had to
13           take great care in keeping the fact that they were gay a secret.).

14       •   PX0881 at 324-325; PX0879; PX0876 at 298-299; PX0857 at 105 (Chauncey
15           articles:  Describing formal and informal prohibitions on gay
             visibility/presence in public spaces such as bars, streets, theaters during the
16           20th century.).

17       •   Tr. 1575:7-9 (Segura:  "[S]elf-identification as a gay man or a lesbian can be
             quite detrimental to one's health, one's income.  There is still a profound
18           incentive to not self-identify.").

19       •   Tr. 1218:9-1219:6 (Zia:  Zia has felt physically threatened because of her
20           sexual orientation.  She constantly has to be aware of her surroundings and be
             alert and even has told her wife to be careful showing any physical affection in
21           public for fear of violence.).

22       •   Tr. 1277:5-9 (Sanders:  "I think that when a city, when leadership talks in
23           disparaging terms about people, or denies the rights that everybody else have,
             the fundamental rights, then I think some people in the community feel
24           empowered to take action in hate crimes and in other ways.").

25       •   Tr. 1278:22-12798 (Sanders:  Sanders worked with gay men and lesbians who
26           served in the police department but would not come out of the closet because
             they felt their careers would be over and that they would be treated differently,
27           including his Chief of Staff when he was Chief of Police, who came out to him
             as a lesbian but stated that she would not come out to others because it was not

28
                                             160
─────────────────────────────────────────────────────────────────────
Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

in her best interest because people would only see her as a lesbian and not as his Chief of Staff.).

PFF 193.   In 1950, following Senator Joseph McCarthy's denunciation of the employment of gay persons in the State Department, the Senate conducted a special investigation into "the employment of homosexuals and other sex perverts in government."  The Senate Committee recommended excluding gay men and lesbians from all government service, civilian as well as military.  The Senate investigation and report were only part of a massive anti-homosexual campaign launched by the federal government after the war.

- PX2337 at 4 (The 1950 Senate Report entitled "Employment of Homosexuals and Other Sex Perverts in Government:"  "Most of the authorities agree and our investigation has shown that the presence of a sex pervert in a Government agency tends to have a corrosive influence on his fellow employees.  These perverts will frequently attempt to entice normal individuals to engage in perverted practices.  This is particularly true in the case of young and impressionable people who might come under the influence of a pervert.  Government officials have the responsibility of keeping this type of corrosive influence out of the agencies under their control.  It is particularly important that the thousands of young men and women who are brought into Federal jobs not be subjected to that type of influence while in the service of the Government.  One homosexual can pollute a Government office.").

- PX2337 at 9-10 (1950 Senate Report called "Employment of Homosexuals and Other Sex Perverts in Government:"  Finding that in the two and a half years since 1947, 1,700 people had been prohibited from getting civil service jobs because they were discovered to be homosexual and describing the reasons why "homosexuals and other sex perverts" are "not proper persons" to be employed by the government, and recommending preventing these individuals from obtaining government employment, and removing individuals already employed by the government.).

- Tr. 383:5-384:6 (Chauncey:  A Congressional Committee in 1950, following charges made by Senator McCarthy, produced a report finding that in the two and a half years since 1947, 1,700 people had been prohibited from getting civil service jobs because they were discovered to be homosexual.  This was determined to be inadequate, so the recommendation was made to tighten procedures.); see also Tr. 482:13-15.

- Tr. 404:1-405:8 (Chauncey:  This 1950 Senate Report gave the imprimatur of senior government officials to these images of stereotypes of homosexuals.).

161

Gibson, Dunn & Crutcher LLP

- PX2281 at 177 (Chauncey article:  Describing firing of hundreds of gay employees from the State Department during the 1950's.).

- PX2566 at 2-4 (Letter from John W. Macy of the U.S. Civil Services Comm'n to The Mattachine Society of Washington, Feb. 25, 1967 (available at The Kameny Papers, www.kamenypapers.org): Letter denying the Society's request to change the policy banning active homosexuals from Federal employment).

- PX0856 at 103 (Estelle Freedman article:  Explaining that the federal government launched a campaign to remove homosexuals form government jobs in the 1950s.).

- Tr. 384:7-24 (Chauncey:  One of President Eisenhower's first executive orders decreed that homosexuals would be prohibited from civilian as well as military employment in the federal government.  It also required private companies who had contracts with the government to ferret out and fire their homosexual employees.  The historian who has studied this most closely estimates that at the height of the McCarthy period in the 1950s, the State Department actually dismissed more suspected homosexuals than Communists.).

- Tr. 385:22-386:4 (Chauncey:  This policy was in place for most federal agencies until 1975, but it continued to be in effect for some of the highly-sensitive intelligence agencies until the 1990s, when President Clinton ended the policy bearing on intelligence agencies and also prohibited discrimination in federal employment.).

- Tr. 537:2-4 (Chauncey:  Employment discrimination on the basis of sexual orientation still exists today in this country.); see also Tr. 390:6-16 (Chauncey: Today, 20 states do not prohibit discrimination in public employment, and 28 states do not prohibit discrimination in private employment.).

PFF 194.   Many state and local governments followed the federal government's lead in seeking to ferret out and discharge their homosexual employees.

- Tr. 386:16-21 (Chauncey:  In addition, across the country, state governments tried in various ways to institutionalize employment discrimination against lesbians and gay men.).

- Tr. 386:22-387:10 (Chauncey:  One example of state discrimination in the late 1950s was a legislative investigation committee that launched an investigation of homosexuals in the state university system.  More than 300 people were interrogated, and more than a dozen members of faculty and staff were fired. At the city level, the Welfare Department in New York City, for example, had to fire several of its welfare workers in the 1950s when they were discovered to be gay.).

162

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0610 at 5-2 (JN) (Williams Institute Report: Recounts the history of public sector discrimination against gays and lesbians. "Between 1946 and 1969, witch hunts for LGBT public employees meant they were fired *en masse*, not on an individual basis.").

PFF 195.   Moreover, a series of press and police campaigns in the 1940s and 1950s fomented demonic stereotypes of homosexuals as child molesters out to recruit the young into their way of life. At the time, these demonic new stereotypes were used to justify draconian new legislation as well as stricter enforcement of existing laws.

- Tr. 390:3-5 (Chauncey: One effect of gays and lesbians being forced into hiding for fear of losing their jobs or being arrested was that it was easier for demonic stereotypes of gay people to develop.).

- Tr. 395:6-13 (Chauncey: Like most outsider groups, there have been stereotypes associated with gay people; indeed, a range of groups have worked in a coordinated way to develop stereotypical images of gay people.).

- Tr. 397:2-6 (Chauncey: "[I]n some ways, the most dangerous stereotypes for homosexuals really developed between the 1930s and '50s, when there were a series of press and police campaigns that identified homosexuals as child molesters.").

- Tr. 397:25-398:5 (Chauncey: These press campaigns against assault on children focused on sex perverts or sex deviants. Through these campaigns, the homosexual emerged as the quintessential sex deviant.).

- PX2281 / PX0851 at 170-173 ("The Post War Sex Crime Panic," an article written by George Chauncey: Describing postwar stereotype propagated by the media of homosexuals as dangerous child molesters and psychopaths and actions taken by psychiatrists and government officials to prevent sexual "nonconformity.").

- PX2281 / PX0851 at 171 ("The Post War Sex Crime Panic," an article written by George Chauncey: Contains excerpts from the popular Coronet Magazine in the fall of 1950: "Once a man assumes the role of homosexual, he often throws off all moral restraints. . . . Some male sex deviants do not stop with infecting their often-innocent partners: they descended through perversions to other forms of depravity, such as drug addiction, burglary, sadism, and even murder.").

- Tr. 400:18-401:8 (Chauncey: This excerpt from Coronet Magazine depicts homosexuals as subjects of moral decay. In addition, there is a sense of homosexuality as a disease in which the carriers infect other people. And the

163

1    term "innocent" pretty clearly indicates that the authors are talking about
2    children.).

3    •    PX2281 / PX0851 at 170-71 (The Post War Sex Crime Panic," an article
4         written by George Chauncey: Contains a statement made by a Special
         Assistant Attorney General of California in 1949:  "The sex pervert, in his
5         more innocuous form, is too frequently regarded as merely a 'queer' individual
         who never hurts anyone but himself. . . .  All too often we lose sight of the fact
6         that the homosexual is an inveterate seducer of the young of both sexes . . . and
         is ever seeking for younger victims.").

7    •    Tr. 402:21-24 (Chauncey:  These articles were mostly addressed to adults who
8         were understandably concerned about the safety of their children, and who
         were being taught to believe that homosexuals posed a threat to their
9         children.).

10   •    Tr. 407:8-408:4 (Chauncey:  One of the most enduring legacies of the
11        emergence of these demonic stereotypes is the creation and then re-
         enforcement of a series of demonic images of homosexuals that stay with us
12        today.  This fear of homosexuals as child molesters or as recruiters continues
         to play a role in debates over gay rights, and with particular attention to gay
13        teachers, parents, and married couples—people who might have close contact
         with children.).

14

15   PFF 196.   Throughout the early and mid-twentieth Century, gay and lesbian characters and

16   issues were censored from theatrical productions and movies.  State and federal

17   officials banned gay and lesbian publications from the mail.  Newspaper stand and

18   book store owners that carried gay and lesbian content risked being shut down or

19   arrested.  Censorship, government suppression, and the fear of both curtailed gay

20   people's freedom of speech and the freedom of all Americans to discuss gay issues.

21   These conditions made it difficult for gay and lesbian individuals to organize and

22   speak out on their own behalf.  As a result, censorship stymied and delayed

23   democratic debate about homosexuality for more than a generation.

24   •    Tr. 390:21-391:24 (Chauncey:  Gays and lesbians have also experienced
25        censorship, including censorship of representation of homosexuality in the
         movies.  In 1934, the Production Code imposed rules regarding treatment of
26        certain delicate issues, such as crime and adultery.  Under the Code, lesbian
         and gay characters, the discussion of homosexuality, or even the inference of
27        "sex perversion" was prohibited.  This meant that for a generation—until the

28
                                        164

Gibson, Dunn
& Crutcher
LLP

late '50s and early '60s—Hollywood films could not include gay characters or explore gay lives.).

- Tr. 392:24:393:23 (Chauncey:  The television networks were even more constrained than Hollywood, so there were very few characters who could even be hinted at as being gay in the first several decades of television.  A boycott in 1989 as a result of a scene in the show Thirtysomething put a chilling effect on the inclusion of gay characters.  Indeed, as recently as 1996, Ellen Degeneres' coming out on national television was so astonishing that it put her on the cover of Time Magazine.).

- Tr. 394:19-385:2 (Chauncey:  This censorship meant that, for most people, gay people were not a part of the media landscape or a part of the world that they knew.  This allowed more frightening stereotypes to develop.).

- Tr. 1574:24-1579:21 (Segura:  Describing censorship and discrimination faced by gays and lesbians, including "some states specifically forbid[ing] the mentioning of homosexuality in health classes or actually instruct teachers to tell students that it's not acceptable lifestyle and it's unhealthy" and "periods of time when gays and lesbians weren't allowed to use the mails" because "the transmission of material through the U.S. mails related to gay and lesbians political activity was considered to be obscene and, therefore, illegal").

- Tr. 2298:20-24 (Herek:  "[P]eople who grew up in the 1920's and 1930's and the early part of twentieth century would have been growing up in a time where there was very strong repression against people who were lesbian or gay and, in fact, when there wasn't much open discussion of sexuality at all.").

- Tr. 1577:10-1579:21 (Segura:  Describing censorship and discrimination faced by gays and lesbians and explaining anti-gay messages in Prop. 8 campaign).

- PX0876 at 299 (Chauncey article:  Explaining "[o]ther men I interviewed had been contacted by the post office and warned about receiving gay publications in the mail.  They lived in a world in which the police sometimes shut down whole newspaper stands on busy city corners because they dared to carry early gay magazines like *ONE* or the *Ladder*.").

PFF 197.    In 1977, Anita Bryant's "Save Our Children" campaign convinced a majority of

Miami voters to repeal a newly enacted gay rights ordinance in Dade County, Florida.

This campaign depended heavily on the use of the images of homosexuals as child

molesters so prevalent in the postwar years.  Her organization published a full-page

advertisement the day before the vote warning that the "other side of the homosexual

coin is a hair-raising pattern of recruitment and outright seductions and molestation."

165

1    This campaign's victory inspired other such campaigns, and in the next three years,

2    gay rights laws were struck down in more than half a dozen referenda.

3    •    Tr. 413:22-414:2 (Chauncey: The "Save Our Children" campaign in Dade
4         County, Florida in 1977 was led by Anita Bryant, a famous Baptist singer. It
         sought to overturn an enactment that added sexual orientation to an anti-
5         discrimination law, and it drew on and revived these earlier stereotypes of
         homosexuals as child molesters.).

6
7    •    PX0864 at 303 (In *Out for Good*, a book by Dudley Clendinen and Adam
         Nagourney, Anita Bryant is quoted as saying: "Some of the stories I can tell
8         you of child recruitment and child abuse by homosexuals would turn your
         stomach.").

9
10   •    PX1621JN and PX0864 at 303 (A newspaper advertisement during the "Save
         Our Children" campaign, signed by Anita Bryant: "This recruitment of our
11        children is absolutely necessary for the survival and growth of homosexuality
         —for since homosexuals cannot reproduce, they must recruit, must freshen
12        their ranks. And who qualifies as likely recruit: a 35-year-old father or mother
         of two. . .or a teenage boy or girl who is surging with sexual awareness?").

13
14   •    PX0864 at 304 (In *Out for Good*, a book by Dudley Clendinen and Adam
         Nagourney, a Miami Herald advertisement states: "There is no human right to
15        corrupt our children. Many parents are confused, and don't know the real
         dangers posed by many homosexuals—and perceive them as all being gentle,
16        non-aggressive types. The other side of the homosexual coin is a hair-raising
         pattern of recruitment and outright seduction and molestation, a growing
17        pattern that predictably will intensify if society approves laws granting
         legitimacy to the sexually perverted.").

18
19   •    PX0864 at 309 (In *Out for Good,* a book by Dudley Clendinen and Adam
         Nagourney, Anita Bryant is quoted as saying: "Homosexuality is a conduct, a
20        choice, a way of life. And if you choose to have a lifestyle as such, then
         you're going to have to live with the consequences. It's not a sickness, but a
21        sin."); ("Tonight the laws of God and the cultural values of man have been
         vindicated. I thank God for the strength he has given me and I thank my
22        fellow citizens who join me in what at first was a walk through the
         wilderness. The people of Dade County—t he normal majority—have said,
23        'Enough! Enough! Enough!' They voted to repeal an obnoxious assault on
         our moral values. . . despite our community's reputation as one of the most
24        liberal areas in the country.").

25
26   •    Tr. 418:19-419:7 (Chauncey: One campaign argument was that simple
         tolerance of gay people and allowing them to be openly gay would allow them
27        to serve as role models who would encourage children to become
         homosexuals—the presumption was that sexual identity is unstable and that
28        children are easily swayed to homosexuality. Another was that homosexuals

166

Gibson, Dunn
& Crutcher
LLP

were child molesters, so allowing the anti-discrimination ordinance to stand would release homosexual predators onto the children of Miami.).

- Tr. 414:7-15 and 423:10-23 (Chauncey:  The "Save Our Children" campaign inspired a series of campaigns in the late '70s and early '80s and another in the late '80s and early '90s.  While figures vary, in the 20 years after the "Save Our Children" campaign, there were at least 60 such campaigns, usually to overturn existing gay rights ordinances, and about three-quarters of those were successful.).

- PX0864 at 308, 312-330 (Describing victory of Anita Bryant's "Save Our Children" campaign and the subsequent successful anti-gay rights ballot measures in 1977).

PFF 198.    The themes and messages from the "Save Our Children" campaign were echoed by Proponents' Yes on 8 campaign.

- Tr. 429:15-430:8, 431:17-432:11, 436:25-437:15, 438:8-439:6, 529:25-531:11; PX0015; PX0016; PX0029; PX0091; PX0099; PX1775; PX1775A (*see* Tr. 461:21-462:18); PX2288 (Chauncey:  The campaign television and print ads focused on protecting children and the concern that people of faith and religious groups would somehow be harmed by the recognition of gay marriage.  They conveyed a message that gay people and relationships are inferior, that homosexuality is undesirable, and that children need to be protected from exposure to gay people and their relationships.  The most striking image, to Chauncey, is of the little girl who comes in to tell her mom that she learned that a prince can marry a prince, which strongly echoes the idea that the simple exposure to gay people and their relationships is going to somehow lead a generation of young people to become gay.  They conveyed a message used in earlier campaigns that when gay people seek any recognition this is an imposition on other people rather than a simply an extension of civil rights to gay people.).

- Compare above with Tr. 412:23-413:13, 418:11-419:22, 420:3-20; PX1621; PX0864 at 303 (Chauncey:  Describing one of earliest anti-gay referenda campaigns with more overt messaging of similar content).

- Tr. 553:23-554:14 (Chauncey: Dr. Tam's "What If We Lose" letter is consistent in its tone with a much longer history of anti-gay rhetoric.  It reproduces many of the major themes of the anti-gay rights campaigns of previous decades and a longer history of anti-gay discrimination.).

PFF 199.    Recent studies indicate that on a yearly basis, over 200,000 California students suffer harassment based on actual or perceived sexual orientation.  Many of those were harassed several times.

167

- PX0810 at 1 (Safe Schools Research Brief concerning economic costs of bullying in school:  "More than 200,000 students in California each year report being bullied based on actual or perceived sexual orientation based on the 2001-2002 California Healthy Kids Survey (CHKS) - that is 7.5% of students in the 7th, 9th, and 11th grades. This harassment is linked to risk behavior, poor grades, and emotional distress for students"); at 4 ("26.6% of students who were bullied because of actual or perceived sexual orientation during the past 12 months also reported that they missed school during the past 30 days because they felt unsafe."); *see also* Tr. 703:21-23 (Egan).

- PX0874 at 1 (Document entitled "Safe Place to Learn Consequences of Harassment Based on Actual or Perceived Sexual Orientation and Gender Non-Conformity and Steps for Making Schools Safer," from the California Safe Schools Coalition:  Finding that "7.5 percent of California students reported being harassed on the basis of actual or perceived sexual orientation: that translates to over 200,000 middle school and high school students harassed every year."); *see also* Tr. 408:24-409:4 (Chauncey:  In discussing PX0874, Chauncey explained that "a good number of those were harassed several times.").

PFF 200.   The approval of California's Prop. 8, along with similar laws and constitutional amendments in at least 33 other states indicates the enduring influence of anti-gay hostility and the persistence of ideas about the inequality of gay people and their relationships.

- PX2547 (Nathanson 11/12/09 Dep. Tr. 102:3-8:  Agreeing that religions teaching that homosexual relations are a sin contributes to gay bashing).

- PX2545 (Young 11/13/09 Dep. Tr. 55:15-55:20, 56:21-57:7:  Agreeing that there is a religious component to the bigotry and prejudice against gay and lesbian individuals); *see also id.* at 61:18-22, 62:13-17 (Catholic Church views homosexuality as "sinful").

- Tr. 1554:14-19 (Segura:  Ballot initiatives banning marriage equality have been passed in 33 States.).

- Tr. 2608:16-18 (Miller:  "My view is that at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.").

- PX0796 at 52 (Article by Proponents' expert Dr. Miller:  "In the decade between 1998 and 2008, thirty states held statewide elections on state constitutional amendments defining marriage as a union between a man and a woman . . . Voters approved marriage amendments in all thirty states where they were able to vote on the question, usually by large margins.").

168

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 538:15-539:10 (Chauncey:  Since 2004, when Chauncey wrote *Why Marriage? The History Shaping Today's Debate over Gay Equality*, the majority of states have enacted legislation or constitutional amendments that would prohibit same-sex couples from marrying.  Some have been enacted by legislative vote, but a tremendous number of popular referenda have enacted these discriminatory measures.).

- Tr. 424:18-23 (Chauncey:  "[T]he wave of campaigns that we have seen against gay marriage rights in the last decade are, in effect, the latest stage and cycle of anti-gay rights campaigns of a sort that I have been describing; that they continue with a similar intent and use some of the same imagery.").

- Tr. 412:20-412:1 (Chauncey:  The series of referendum initiatives we have seen since the mid-to-late '70s over gay rights are another example of continuing prejudice and hostility.).

- Tr. 564:4-16 (Chauncey:  The term "the gay agenda" was mobilized particularly effectively in the late '80s and early '90s in support of referendum initiatives designed to overturn gay rights laws.  It tries to construct the idea of a unitary agenda and that picks up on long-standing stereotypes.).

- Tr. 1505:16-20 (Kendall:  "I remember during the discussion about Amendment 2, during the Amendment 2 campaign, my parents would talk about homosexuals seeking special rights, and how they were essentially evil people; and how they felt threatened and how our family was threatened by homosexuals.").

- Tr. 966:6-8 (Meyer:  Domestic partnerships stigmatize gay and lesbian individuals.).

- *See also* evidence cited in support of PFFs 285-296.

PFF 201.   Groups that oppose gay rights continue to address homosexuality as a dangerous and inferior condition that threatens children and imperils the stability of the American family—a viewpoint at odds with the notion that gay and lesbian individuals and their relationships are fully equal to those of heterosexuals.

- PX2547 (Nathanson 11/12/09 Dep. Tr. 73:16-74:10, 74:23-75:21, 76:08-76:13:  Agreeing that the Catholic Church and the Southern Baptist Convention teach that homosexual behavior is "a sin"); *see also id.* at 85:08-85:13.

- PX2547 (Nathanson 11/12/09 Dep. Tr. 102:3-8:  Agreeing that religions teaching that homosexual relations are a sin contributes to gay bashing); *see also id.* at 102:24-103:5 (agreeing that the primary cause of culturally propagated hostility against homosexual behavior is religious teaching).

169

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1579:5-1579:21 (Segura:  Prop. 8 campaign advertisements reflect the "very strong taboo about the portrayal of homosexuality as anything other than pathological in the views of a lot of Americans.  It's never to be talked about; not only not positively, but even neutrally.").

- Tr. 1560:22-1591:9 (Segura:  "[T]he role of prejudice is profound. . . . [I]f the group is envisioned as being somehow . . . morally inferior, a threat to children, a threat to freedom, if there's these deeply-seated beliefs, then the range of compromise is dramatically limited.  It's very difficult to engage in the give-and-take of the legislative process when I think you are an inherently bad person.  That's just not the basis for compromise and negotiation in the political process.").

- Tr. 1856:20-1857:5 (Segura:  Testifying about "The Gathering Storm" video: "It's hard not to look at the video and not conclude that the message of the video is that gays and lesbians are deeply threatening to individuals in American society; the ominous music, the dark storm, on actor saying, "I'm afraid," suggest that homosexuals are to be feared.  There is references to children. There's references to taking your religious liberty away. There's references to churches being discriminated against or facing some form of government repression. It really does present gays and lesbians as a very serious threat to all sorts of aspects of American life.").

- *See also* evidence cited in support of PFFs 200 and 285-296.

## VIII.   Gay and Lesbian Individuals Lack Political Power to Defend Their Basic Rights When They Are Put Up for a Vote in a State-Sanctioned Plebiscite

PFF 202.   Gay and lesbian individuals have historically lacked the political power to ensure protection through the political process, and they still lack the political power to fully ensure that protection.

- PX0710 at RFA No. 18 (Attorney General admits "that although social antipathy toward gay and lesbian individuals has moderated, these groups suffer from continuing political disabilities and discrimination.").

- Tr. 1646:12-21 (Segura: "[W]hen we take together the moments of legislative victory, the moments of legislative defeat, the presence of ballot initiatives, the absence of statutory or constitutional protection, the presence of statutory or constitutional disadvantage, and a host of circumstances, including small numbers, public hostility, hostility of elected officials, and a clearly well-integrated, nationally prominent, organized opposition, I conclude that gays and lesbians lack the sufficient power necessary to protect themselves in the political system.").

170

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1538:10-18 (Segura: "[B]y any measure, gays and lesbians would have to be understood as a minority faction, in Madison's terms. . . . [T]hey simply don't have the numbers and the resources to be effective advocates in a lot of political arenas."); Tr. 1560:14-19 (Same).

- Tr. 1546:11-1548:8 (Segura: Discussing historical discrimination against gays in federal employment and the early pro-gay movement, as evidence of "a lack of political power on the part of gay men and lesbians").

- Tr. 1577:10-1578:7 (Segura: "If we go back historically, of course, there were periods of time when gays and lesbians weren't allowed to use the mails; that the transmission of material through the U.S. mails related to gay and lesbian political activity was considered obscene and, therefore, illegal.").

- Tr. 1839:24-1840:2 (Segura: "[B]oycotts, protests, picketing are strategies used by people who are less powerful in the political systems, for whom traditional means of political action are less productive.").

- Tr. 1318:22-25 (Sanders: Cannot think of a group of Americans that has faced stronger political opposition in recent years than the gay and lesbian community).

- DIX1105/PX0838 at 378-383 (Study by Jeffrey R. Lax and Justin H. Phillips: "[R]epresentative institutions do a poor job protecting minority rights even when the public supports the pro-minority position"; noncongruence between public opinion and policy is in the conservative direction, in part due to the "overrepresentation" of religious conservatives.).

- PX1869 at *1053, *1056-57 (Article by Miller: The ballot initiative process harms minorities.).

- PX2857 at 55 (Miller, *Dangerous Democracy*: The role of the courts in response to ballot initiatives is to "act as a filter to protect constitutional principles and minority rights," because "it is easier for violations of minority rights or other constitutional norms to emerge from an otherwise unfiltered majoritarian process than one in which there are multiple checks and balances.").

- DIX271 at 1-2 (USA Today/Gallup poll: 43% of Americans said that they would not vote for a generally qualified homosexual presidential candidate nominated by their party, versus 4% who would not vote for a woman and 11% who would not vote for a black person.).

- *See also* evidence cited in support of PFFs 203 to 228.

PFF 203.    There are only three openly gay members of the U.S. House of Representatives and no

openly gay Senators; there are no openly gay governors; and no openly gay person has

171

Gibson, Dunn
& Crutcher
LLP

ever been appointed to a Cabinet Secretary position.  Gay and lesbian individuals are

thus underrepresented among elected political officials relative to their national

population share.

- PX0707 at RFA No. 30 (Proponents admit "that there are only three openly gay members of the U.S. House of Representatives and no openly gay Senators.").

- PX0707 at RFA No. 31 (Proponents admit "that there are no openly gay governors.").

- PX0707 at RFA No. 32 (Proponents admit "that no openly gay person has ever been appointed to a Cabinet Secretary position.").

- Tr. 1556:23-1557:9 (Segura:  "At last count only six people have ever served in the House of Representatives who have been openly gay and only two of those were elected as openly gay. . . . [I]n the other four instances their sexuality became a matter of public record after their initial election.  There has never been an openly gay senator or cabinet member or . . .  president. There is only about one percent of the [states'] legislatures that are gay and an even smaller, much smaller percentage of local elected officials." "I believe it's five-hundredths of one percent.").

- Tr. 1651:12-20 (Segura:  The 69 persons of color serving in the House of Representatives "compares favorably to the six gay and lesbians who have ever served, and the three who currently serve in the House of Representatives.").

- DIX271 at 1-2 (USA Today/Gallup poll:  43 percent of Americans said that they would not vote for a generally qualified homosexual presidential candidate nominated by their party versus 5 percent who would not vote for a similarly qualified black candidate and 11 percent who would not vote for a woman.).

- PX0841 at 575 (Study by Donald P. Haider-Markel, Mark R. Joslyn and Chad J. Kniss:  Authors analyze 270 localities and conclude that "gay activists are more likely to be successful in the policy-making process if they elect openly gay officials.").

- Tr. 1923:21-1924:16 (Tam:  When pressed to identify "the homosexuals that San Francisco is under the rule of," he could only identify one city supervisor.).

PFF 204.    Gay and lesbian individuals have been unable to secure national legislation to protect

themselves from discrimination in housing, employment, or public accommodations.

172

Gibson, Dunn
& Crutcher
LLP

1   •   PX0707 at RFA Nos. 35, 36 (Proponents admit PFF 164 in its entirety.).

2   •   PX0710 at RFA Nos. 35, 36 (Attorney General admits PFF 164 in its
3       entirety.).

4   •   Tr. 1546:15-1547:6 (Segura:  "[T]here are also statutory disadvantages at the
        federal level.  [T]here is no federal-level antidiscrimination protection for
5       housing and employment.  There's no federal-level protection . . . on any level
        beyond the recently passed Hate Crimes Bill.  There is federal legislation
6       prohibiting gays and lesbians from receiving partner benefits in federal
        employment, as an incident of the Defense of Marriage Act.  There is the
7       exclusion of gays and lesbians from service in the military.  And, historically,
        at one point, gays and lesbians were completely forbidden from working for
8       the federal government. . . . [T]hat actually ended in the 1970s, but it started as
        far back as immediately in the post-war era, maybe President Eisenhower.").
9

10  •   Tr. 2598:12- 2599:14 (Miller:  "[U]ntold millions across this country, who
        happen to lesbian or gay, are not covered by federal law for employment
11      discrimination.  That's currently the case.").

12  •   PX2859 at 5 (Human Rights Campaign report:  [T]here is "no protection under
13      federal law.").

14  PFF 205.   Fewer than half of the states ban sexual orientation discrimination in employment,

15  housing, and/or accommodations.

16  •   PX0710 at RFA No. 34 (Attorney General admits PFF 165 in its entirety.).

17  •   Tr. 1545:6-1546:6 (Segura:  29 States do not ban sexual orientation
18      discrimination, including Wyoming, where the Matthew Shepard murder
        occurred and which also does not have a hate crimes law.).
19

20  •   Tr. 1546:7-10 (Segura:  Only three of the ten largest states in the U.S. have
        laws that provide protection against discrimination based on sexual
21      orientation.).

22  •   *Compare* Tr. 2492:19-2494:6 (Miller:  Did not know how many states have no
        state law providing protection from discrimination on the basis of sexual
23      orientation).

24  PFF 206.   The President and Vice President of the United States do not support allowing same-

25  sex couples to marry.

26  •   PX0025 (Campaign ad:  Quoting President Obama and Vice President Biden
27      advising that they do not support allowing gay and lesbian couples to marry).

28

173

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- DIX1061 at 2 (Human Rights Campaign 2008 Presidential Questionnaire: Then-Senator Obama advises "I do not support gay marriage.").

- Tr. 1581:22-1582:3 (Segura:  "The current President describes himself as a fierce advocate for gay and lesbian civil rights, but, yet, has actually taken no steps to overturn either [The Defense of Marriage Act or Don't Ask, Don't Tell], and actually, I understand has refused an order by the chief Judge of the Ninth Circuit to provide domestic partner benefits to his clerk.").

- Tr. 1693:18-1694:5 (Segura:  "President Obama is . . . the best illustration of an ally who cannot be counted upon, an ally whose rhetoric far exceeds his actions."  "[Obama] articulated repeatedly during the 2008 campaign that he was not in favor of same-sex marriage.").

PFF 207.    Nationwide, the initiative process has targeted gay and lesbian individuals more times than any other social group or political minority.  Indeed, nationwide, voters have used initiatives or referenda to repeal or prohibit marriage rights for gay and lesbian individuals 33 times.  Gays and lesbians have essentially lost 100 percent of the contests over marriage.

- Tr. 1551:25-1552:12 (Segura:  "There is no group in American society who has been targeted by ballot initiatives more than gays and lesbians.  The number of ballot initiative contests since the first one in the late 1970's is probably at or above 200. . . . The initiative process nationalizes issues because money and activism crosses state lines. . . . [E]ven if there is a local legislative majority to enact something for the protection of gays and lesbians, participation of people around the country can play a role in shaping a ballot process that would reverse it.").

- Tr. 1554:14-19 (Segura:  33 of 34 ballot initiatives banning marriage equality have been passed in the last decade; in Arizona the initiative failed the first time and was passed the second time.).

- Tr. 1553:22-1554:13 (Segura:  Ballot initiatives disadvantage the gay and lesbian community in particular.).

- Tr. 2540:8-2564:10 (Miller:  Initiatives foster polarization.).

- Tr. 2609:2-2644:12 (Miller:  Has written that "initiatives that differentially affect minorities can easily tap into a strain of antiminority sentiment in the electorate," and "Californians have adopted a large number of initiatives that represent Populist backlash against representative government's efforts to protect or promote the interests of racial or other minorities"); PX2857 at 52 (Miller, *Dangerous Democracy*:  "[I]nitiatives that differentially affect

174

Gibson, Dunn & Crutcher LLP

minorities can easily tap into a strain of antiminority sentiment in the electorate.").

- Tr. 2708:17-21 (Miller: "There have been few initiatives in the . . . United States that affect gays and lesbians, if you set aside the marriage initiatives," but the Williams Institute reports that "[s]ince 1992, initiatives to repeal or block anti-discrimination laws have gone on the ballot in approximately 60 city and county jurisdictions." (PX0618 at 13-8)).

- PX1869 at *1053, *1056-57 (Miller article: Arguing that ballot initiatives harm minorities).

- PX2857 at 55 (Miller, *Dangerous Democracy*: The role of the courts in response to ballot initiatives is to "act as a filter to protect constitutional principles and minority rights," because "it is easier for violations of minority rights or other constitutional norms to emerge from an otherwise unfiltered majoritarian process").

- PX0618 at 13-1 to 13-2 (JN) (Williams Institute Report: From 1974 to 2009, 58 ballot measures passed that sought to repeal or prevent prohibitions of discrimination, or mandated discriminatory conduct or speech, against LGBT people, whereas only four measures passed that provided protections for LGBT people in the workplace; "(g)ay men and lesbians have seen their civil rights put to a popular vote more often than any other group." (quoting political scientist Barbara S. Gamble)).

- DIX1105/PX0838 at 378-383 (Study by Jeffrey R. Lax and Justin H. Phillips: "It may not be surprising that minority rights suffer when the majority is opposed to them, but our results show that representative institutions do a poor job protecting minority rights even when the public supports the pro-minority position"; noncongruence between public opinion and policy is in the conservative direction, in part due to the "overrepresentation" of religious conservatives.).

- Tr. 1552:9-12 (Segura: "Gays and lesbians lose 70 percent of the contests over other matters. They have essentially lost a hundred percent of the contests over same-sex marriage and now on adoption.").

- PX0840 (Study by Arthur Lupia et al.: Outcomes of state constitutional amendments regarding gay marriage depend on procedural variations rather than differences in attitudes across states.).

PFF 208.  Gay and lesbian individuals constitute one of the least popular minorities in American society, with the American public reporting significantly more negative feelings toward them than to most other minority groups.

175

Gibson, Dunn & Crutcher LLP

- Tr. 1563:5-1564:21 (Segura: "[T]he American public is not very fond of gays and lesbians"; warmness scores for gays and lesbians are as much as 16 to 20 points below the average score for religious, racial, and ethnic groups; over 65 percent of respondents placed gays and lesbians below the midpoint, below the score of 50, whereas a third to 45 percent did the same for other groups; "when . . . 2/3 of all respondents are giving gays and lesbians a score below 50, that's telling elected officials that they can say bad things about gays and lesbians, and that could be politically advantageous to them because . . . many parts of the electorate feel the same way"; "the initiative process could be fertile ground to try to mobilize some of these voters to the polls for that cause.").

- DIX0469 2-3 (Public Opinion Pros article: Discussing "feeling thermometer" research: "Many Americans dislike gay people, and they aren't reluctant to say so to survey researchers. As we shall see, any efforts by the gay rights movement to promote policies favorable to gay people are handicapped by this deep-seated antipathy, which is shared (to varying degrees) by Americans of all races, backgrounds, and ages.").

- Tr. 1580:24-1581:21 (Segura: Allies of gays and lesbians are unreliable.).

- Tr. 1860:4-12 (Segura: "[T]here is at least one political party in the United States . . . and an awful lot of politicians. . . who think that there is electoral gain to be made from targeting gays and lesbians for disadvantage. . . it's clear in many parts of the country and in many sub-electorates in all parts of the country, there is gain to be made from saying that you don't like gays and lesbians or you are adverse to their interests.").

- Tr. 1273:19-1274:6 (Sanders: Sanders's lesbian daughter expressed concern that if he supported marriage rights for gay and lesbian couples, he might not be reelected.).

- Tr. 1316:5-13 (Sanders: The Republican Party was very unhappy with his decision to support marriage equality, and they said that they were considering withdrawing their endorsement for him, a sitting Republican Mayor.).

- Tr. 2608:16-18 (Miller: "[A]t least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.").

PFF 209.    Forty-three percent of Americans said that they would not vote for a generally qualified homosexual presidential candidate nominated by their party, versus 4% who would not vote for a woman and 11% who would not vote for a black person.

- DIX271 at 1-2 (USA Today/Gallup poll).

176

Gibson, Dunn & Crutcher LLP

PFF 210.    In 2008, a majority of Americans believed that sex between two persons of the same sex is always wrong.

- Tr. 1561:16-19 (Segura: "It is still the case, even today, that a majority of Americans find sex between two persons of the same gender to be morally unacceptable in most cases.").

PFF 211.    Political mobilization by gay and lesbian individuals is hampered because members of the community are generally invisible unless they have "come out," an act with social costs.

- Tr. 1574:24-1576:21 (Segura: "[T]he psychology of the closet and the social and economic pressures of the closet are still quite relentless and insidious. . . . [I]f you are in the closet, you are unlikely to mobilize. . . . [Therefore,] the public has a lower estimation of the total number of gays and lesbians. They have a misinformed estimation of the socioeconomic status of gays and lesbians. . . . and a misperception of the quality of life or the level of societal treatment of gays and lesbians. . . . [And] people are likely to perceive gays and lesbians as not having any political needs.").

- Tr. 1215:8-1215:024 (Zia:  To hide her sexual orientation from her co-workers, Zia stepped into the closet and slammed the door shut.  As a result, Zia also stopped seeing her friends and cut off ties with women's movement groups.).

- PX0835 (Article by Scott S. Gartner and Gary M. Segura:  Invisible group members mobilize at lower rates, and members of visible groups are more likely to receive support from people outside the group.).

- PX0837 at 361 (Study by Jay Barth, L. Marvin Overby and Scott H. Huffmon: "[K]nowing gays and lesbians has a statistically significant and substantially important impact on support for the SSM proposal.").

PFF 212.    Elected officials and candidates for elected office have made public statements expressing prejudice and hostility toward gay and lesbian individuals in a manner that would be almost inconceivable against any other minority of Americans.

- Tr. 1558:24-1559:22 (Segura: "[U.S. Senators], in public speeches, have compared same-sex marriage to marrying a box turtle.  [A U.S. Senator] has a hold on a judicial nomination because the nominee attended a lesbian commitment ceremony.  Senator Coburn has gone on record saying that the gay and lesbian agenda is the greatest threat to freedom in the United States today.  And a [U.S.] Senator from South Carolina . . . said [in] his campaign that gays and lesbians shouldn't be allowed to teach in the public schools.").

177

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1        • Tr. 1560:6-13 (Segura:  Such statements "legitimize[] some of these hostile
2          beliefs.").

3        • Tr. 1297:17-24 (Sanders:  Mayor Sanders believes that his prior opposition to
          marriage for same-sex couples was grounded in prejudice, even though he does
4          not think that he felt hatred.).

5        • Tr. 1315:17-1316:1 (Sanders:  As Mayor, Sanders has never made a decision
          based on fear of political repercussions from the gay community, has never
6          seen any other policy maker in San Diego make a decision or cast a vote based
          on fear of political repercussions from the gay community, and thinks it is
7          easier to make a decision against the gay and lesbian community than it is to
8          make it for them.).

9        • PX0619 at 14-8 (JN) (Williams Institute Report:  Summarizes examples of
          statements made by legislators, judges, governors and other officials in all 50
10         states showing animus towards LGBT people, including a 1999 statement by
          California State Senator Richard Mountjoy that "being gay 'is a sickness . . . an
11         uncontrolled passion similar to that which would cause someone to rape.'").

12
PFF 213.   Gay and lesbian individuals are politically disadvantaged by the willingness of
13
           legislators and voters to support policies imposing disabilities on them based on
14
           religious teachings that homosexuality is sinful.
15
16       • Tr. 1565:2-1566:6 (Segura:  "[R]eligion is the chief obstacle for gay and
          lesbian political progress, and it's the chief obstacle for a couple of reasons. . .
17         . [I]t's difficult to think of a more powerful social entity in American society
          than the church. . . . [I]t's a very powerful organization, and in large measure
18         they are arrayed against the interests of gays and lesbians. . . . "[B]iblical
19         condemnation of homosexuality and the teaching that gays are morally inferior
          on a regular basis to a huge percentage of the public makes the . . . political
20         opportunity structure very hostile to gay interests.  It's very difficult to
          overcome that.").

21       • Tr. 395:14-18 (Chauncey:  Many clergy in churches considered homosexuality
22         a sin, preached against it, and have led campaigns against gay rights.).

23       • Tr. 440:19-441:2 (Chauncey:  The religious arguments that were mobilized in
          the 1950s to argue against interracial marriage and integration as against God's
24         will are mirrored by arguments that have been mobilized in this campaign and
          many of the campaigns since Anita Bryant's "Save Our Children" campaign,
25         which argue that homosexuality itself or gay people or the recognition of their
26         equality is against God's will.).

27       • Tr. 548:1-15 (Chauncey:  People often hold deeply sincere religious
28         convictions that seem timeless, but historians have shown how they change

                                        178

over time and are shaped by the larger culture in which they live.  For example, many people in the South deeply believed that interracial marriage was against God's will.).

- DIX1105/PX0838 at 383 (Study by Jeffrey R. Lax and Justin H. Phillips: Noncongruence between public opinion and policy is in the conservative direction, in part due to the "overrepresentation" of religious conservatives.).

- PX0843 (Essay by David C. Campbell and Carin Robinson:  Discussing the significant cooperation between religious groups in Ohio and California in the movement against gay marriage).

- PX0844 at 174 (Essay by Sean Cahill:  The anti-gay marriage movement involves an alliance between Christian evangelicals and Roman Catholics and it generally outspends groups promoting equal rights for gays and lesbians.).

- PX2853 at 8 (CNN Prop. 8 Exit Poll:  84% of people who attended church weekly voted in favor of Prop. 8.).

- PX0831 (USA Today poll:  Documenting the number of Americans who claimed particular religious identities.).

- PX0832 at 5 (American Religious Identity Survey 2008:  25.1% of Americans identified as Catholic and 15.8% identified as Baptist.).

- PX0833 at 5 (The Pew Forum on Religion and Public Life U.S. Religious Landscape Survey 2008:  26.3% of Americans self-identify as Christian evangelicals.).

- PX2582 at 11-13 (2008 American National Election Study:  49.9% of Baptists, 28.5% of Catholics, and 89.53% of LDS members believe there should be no gay marriage or civil unions.).

- PX0005 at 1 (Ten Declarations for Protecting Biblical Marriage:  "The Bible defines marriage as a covenantal union of one male and one female. . . . We will avoid unproductive arguments with those who, through the use of casuistry and rationalization, revise biblical passages in order to condone the practice of homosexuality or other sexual sins.").

- PX0770 at 2 (Vatican document:  "Sacred Scripture condemns homosexual acts as 'a serious depravity.'").

- PX0301 (Document from Website of Catholics for the Common Good:  There are absolutely no grounds for considering homosexual unions to be "in any way similar or even remotely analogous to God's plan for marriage and family"; "homosexual acts go against the natural moral law" and "[u]nder no circumstances can . . . be approved"; "[t]he homosexual inclination is . . . objectively disordered and homosexual practices are sins gravely contrary to

179

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

chastity"; "[a]llowing children to be adopted by persons living in such unions would actually mean doing violence to these children"; and "legal recognition of homosexual unions . . . would mean . . . the approval of deviant behavior.").

- PX0168 at 1 (Southern Baptist Convention Resolution on same-sex marriage: "[L]egalizing 'same-sex marriage' would convey a societal approval of a homosexual lifestyle, which the Bible calls sinful and dangerous both to the individuals involved and to society at large."); PX0771 at 1 (Southern Baptist Convention document: "The Bible clearly teaches that homosexual behavior is an abomination and shameful before God.").

- PX2839 at 3 (Evangelical Presbyterian Church Position Paper on Homosexuality: "[H]omosexual practice is a distortion of the image of God as it is still reflected in fallen man, and a perversion of the sexual relationship as God intended it to be.").

- PX2840 at 5 (Free Methodist Church Book of Discipline, Chapter 3: "Homosexual behavior, as all sexual deviation, is a perversion of God's created order.").

- PX2842 at 1 (Publication of The Lutheran Church Missouri Synod: "The Lord Teaches us through His Word that homosexuality is a sinful distortion of His desire that one man and one woman live together in marriage as husband and wife.").

- PX2844 at 1 (Orthodox Church of America: "Homosexuality is to be approached as the result of humanity's rebellion against God.").

PFF 214. Proponents' expert Dr. Young admitted that religious hostility to gays and lesbians plays an important role in creating a social climate that is conducive to hateful acts, to opposition to their interest in the public sphere, and to prejudice and discrimination. In addition, their expert Dr. Miller has written that "[r]eligion was critical in determining voter attitudes towards Proposition 8."

- Tr. 1566:18-22 (Segura: "[Proponents' expert] Dr. Young freely admits that religious hostility to homosexuals is an important role in creating a social climate that's conducive to hateful acts, to opposition to their interest in the public sphere, and to prejudice and discrimination.").

- PX2545 (Young Nov. 13, 2009 Dep. Tr. 56:21-57:07: Admitting that bigotry and prejudice against gays and lesbians in the United States was in substantial part based on religious beliefs).

- PX0796 at 55-56 (Miller article: "Churches and religious organizations supplied most of Proposition 8's institutional support." "While Mormons are

180

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

only about 2% of California's population, members of the church (both from California and from other states) provided critical financial contributions and volunteer support."  "Religion was critical in determining voter attitudes towards Proposition 8.").

- Tr. 2676:8-2678:24 (Miller:  Agreeing with his former statement that "the religious characteristics of California's Democratic voters" explains why so many Democrats voted for Barack Obama and also for Prop. 8; "[t]he apparent contradiction can be explained by examining the religious characteristics of California's Democratic voters").

- PX0796 at 47, 57-58 (Article by Miller:  The "state's Democratic coalition divided along religious lines.").

- *See also* evidence cited in support of PFF 225.

PFF 215.   The gay community suffers from greater political disabilities today than women did in the 1970s when they were afforded quasi-suspect status by the Supreme Court.  Before they were afforded quasi-suspect status by the Supreme Court, women had achieved important victories in the political process, including coverage in the 1964 Civil Rights Act and its subsequent amendments.

- Tr. 1646:22-1648:6 (Segura:  "[R]elative to the position of women in the early 1970s, gay men and lesbians are more disadvantaged today than women were in the 1970s . . . there was already statutory protection [through the] 1963 Equal Pay Act, [and] certain provisions of the 1964 Civil Rights Act.").

PFF 216.   When women were afforded quasi-suspect status by the Supreme Court, although sexism existed and political activism could be costly, identity as a woman was not socially controversial, did not attract familial scorn, and did not bar one from a large range of social institutions, though some institutions were exclusively male.  Women could freely identify one another, gather, coordinate, and act largely free of fear of repressive tactics.

- Tr. 1647:11-24 (Segura:  "[W]omen constituted then [in the 1970s] and constitute today a majority of the population.  And were they so motivated, they could determine most if not all political outcomes. . . .[W]hile there [was] certainly sexism . . . being a woman is not inherently controversial.  Families don't hate their daughters. . . . [And] there were women in public office.").

PFF 217.     In the last two decades, anti-gay referenda and initiatives have been widely used to challenge gay rights laws.  Since 1992, initiatives to repeal or block anti-discrimination laws have gone on the ballots in approximately 60 city and county jurisdictions.  In Oregon alone, there were sixteen local anti-gay initiatives in 1993 and another eleven in 1994.  Oregon's gay activists lost all but one.

- DIX1086/PX0847 at 46 (Chauncey, *Why Marriage?*:  "In Oregon alone, there were sixteen local antigay initiatives in 1993 and another eleven in 1994; gay activists lost all but one.  Nationwide, gay rights supporters lost almost three-quarters of them.").

- Tr. 2708:17-21 (Miller:  "There have been few initiatives in the . . . United States that affect gays and lesbians, if you set aside the marriage initiatives," but the Williams Institute reports that "[s]ince 1992, initiatives to repeal or block anti-discrimination laws have gone on the ballot in approximately 60 city and county jurisdictions." (PX0618 at 13-8)).

- *See* evidence cited in support of PFF 207.

PFF 218.     Nationwide, there were 143 initiatives or referenda from the 1970s through 2005 relating to gay civil rights, and gay rights supporters lost over 70% of them.

- PX0839 at 312 (Study by Donald P. Haider-Markel, Alana Querze and Kara Lindaman:  "[B]etween 1972 and 2005, 71 percent of the 143 local and state gay civil rights initiatives and referenda resulted in losses for minority rights.  The evidence clearly suggests that the homosexual minority tends to lose when the voters decide" in direct elections.).

- Tr. 1552:6-20 (Segura:  "The number of ballot initiative contests since the first one in the late 1970's is probably at or above 200.  Gays and lesbians lose 70 percent of the contests over other matters.").

- Tr. 1543:9-12 (Segura:  "[B]etween 1990 and the middle part of the 2000s, there's been probably like 150—not even counting the same-sex marriage votes, there's been like 150 votes on gay and lesbian—usually, on gay and lesbian antidiscrimination protections.  And they lose about 70 percent of the time.").

- Tr. 1734:21-1735:25 (Segura:  "[W]e have 150 or more instances in a decade and a half where anti-discrimination protections are voted on by the population, and overturned, even though the legislature or its city council or county board had granted them.  We have uniform passage of constitutional amendments to exclude one group of citizens from a civil institution.  And that's extraordinary in my view.").

182

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 219.   In 1996, the United States Senate passed the Defense of Marriage Act (DOMA), which provided a federal definition of marriage as the union of one man and one woman and declared that no state needed to give "full faith and credit" to marriages of same-sex couples performed in another state.  It also denied federal benefits to such married couples.  And more than 20 states passed state-level DOMA statutes over the next two years.

- DIX1086/PX0847 at 125-27 (George Chauncey, *Why Marriage?*:  "Fifteen legislatures enacted 'State DOMAs' in 1996.").

- Alaska Stat. § 25.05.013 (May 7, 1996); Ariz. Rev. Stat. Ann. § 25-101 (May 1, 1996); Del. Code Ann. tit. 13, § 101 (June 21, 1996); Ga. Code Ann. § 19-3-3.1 (Apr. 2, 1996); Idaho Code Ann. § 32-201 (Jan. 1, 1996); 750 Ill. Comp. Stat. Ann. § 5/212 (May 24, 1996); Kan. Stat. Ann. § 23-101 (Apr. 10, 1996); Mich. Comp. Laws Ann. §§ 551.1 (June 25, 1996); Mo. Rev. Stat. § 451.022 (July 3, 1996); N.C. Gen. Stat. § 51-1.2 (June 20, 1996); Okla. Stat. Ann. tit. 43, § 3.1 (Apr. 29, 1996); 23 Pa. Cons. Stat. Ann. § 1704 (Oct. 16, 1996); S.C. Code Ann. § 20-1-15  (May 20, 1996); S.D. Codified Laws §§ 25-1-1 (Feb. 21, 1996); Tenn. Code Ann. § 36-3-113 (May 15, 1996); Ark. Code Ann. § 9-11-109 (Feb. 13, 1997); Fla. Stat. Ann. § 741.212 (May 29, 1997); Ind. Code § 31-11-1-1 (May 13, 1997); Me. Rev. Stat. Ann. tit. 19A, § 701 (Mar. 28, 1997); Minn. Stat. Ann. § 517.01 (June 2, 1997); Miss. Code Ann. § 93-1-1 (Feb. 12, 1997); Mont. Code Ann. § 40-1-401 (Apr. 29, 1997); N. D. Cent. Code § 14-03-01 (Mar. 25, 1997); Va. Code Ann. § 20-45.2 (Mar. 15, 1997).

PFF 220.   In 2004, when Massachusetts became the first state to permit gay couples to marry, thirteen states passed constitutional amendments banning such marriages.

- PX2856 at 22 (Miller:  Table demonstrating thirteen state constitutional amendments in 2004 prohibiting marriage by same-sex couples).

- Ark. Const. amend. 83, § 1 (Nov. 2, 2004); Ga. Const. art. I, § 4, ¶ I (Nov. 2, 2004); Ky. Const. § 233A (Nov. 2, 2004); La. Const. art. XII, § 15 (Sept. 18, 2004); Mich. Const. art. I, § 25 (Nov. 2, 2004); Miss. Const. art. XIV, § 263A (Nov. 2, 2004); Mo. Const. art. I, § 33 (Aug. 3, 2004); Mont. Const. art. XIII, § 7 (Nov. 2, 2004); N.D. Const. art. XI, § 28 (Nov. 2, 2004); Ohio Const. art. XV, § 11 (Nov. 2, 2004); Okla. Const. art. 2, § 35 (Nov. 2, 2004); Or. Const. art. XV, §5a (Nov. 2, 2004); Utah Const. art. I, § 29 (Nov. 2, 2004).

- Tr. 539:4-539:6 (Chauncey: "[T]he majority of states have enacted legislation or constitutional amendments that would prohibit same-sex couples from marrying.").

*Gibson, Dunn & Crutcher LLP*

PFF 221.   Today, in at least 28 states, there is no statutory barrier to firing, refusing to hire, or demoting a person in private sector employment solely on the basis of their identity as a gay man or lesbian.

- Tr. 1545:6-18 (Segura:  29 states currently do not have laws prohibiting employment discrimination on the basis of sexual orientation.).

- Tr. 390:8-16 (Chauncey:  Discrimination against lesbians and gay men in public employment has not ended, and employment discrimination by public entities remains legally permissible in 20 states, and such discrimination by private employers remains legally permissible in 28 states.).

- *Compare* Tr. 2492:19-2494:6 (Miller:  Did not know how many states have no laws providing protection from discrimination on the basis of sexual orientation).

PFF 222.   Proponents called Dr. Miller, and the Court permitted Dr. Miller to testify, as an expert on American and California politics generally and the political power of gays and lesbians.  Dr. Miller disagreed with Dr. Segura and testified that, in his opinion, gays and lesbians have political power.

- Tr. 2427:10-2428:7 (Proponents' counsel:  "[W]e would tender Professor Miller as an expert in the field of American politics and California politics," and "[w]e think the political power of gays and lesbians is a subcomponent of American politics and California politics.").

- 2435:21-2436:25 (Court:  Qualifying Miller on these topics).

- Tr. 2482:2-8 (Miller:  "I believe that gays and lesbians do have power at the national level.").

PFF 223.   Dr. Miller's opinion is undermined by the fact that he (i) has not focused on LGBT issues in his research or study, (ii) has not read many of the sources that would be relevant to forming an opinion regarding the political power of gays and lesbians, and (iii) could not confirm that he personally identified even 25 percent of the sources that he cited in his expert report.

- Tr. 2418:10-18 (Miller:  Miller does not teach any course on gay and lesbian politics or political power.).

184

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0796 (Miller's own scholarship on Prop. 8 does not address the issue of the political power of gays and lesbians as a group.).

- Tr. 2428:19-2429:7 (Miller:  Admitting he has not written any peer-reviewed article analyzing the political power of gays and lesbians).

- Tr. 2432:7-19 (Miller:  Admitting he has not written about the discrimination experienced by gays and lesbians in the last 50 years; what he knows about the subject he learned in preparation for his testimony in this case).

- Tr. 2435:3-19; 2518:15-2519:10; 2520:11-2521:9; 2522:11-25 (Miller: Admitting he was unfamiliar with significant figures in LGBT history, scholarship, or politics, and/or had not read their writings).

- Tr. 2513:9-18 (Miller:  Unable to name any books or articles that dealt with prejudice against minority groups, although he has acknowledged that prejudice factors into political power).

- Tr. 2491:12-2494:14; 2501:18-2502:16; 2506:2-2507:1 (Miller:  Admitting he was unaware of how many or which states had failed to enact laws protecting gays and lesbians from discrimination on the basis of sexual orientation, which of the ten most populous states did not provide protections against discrimination on the basis of sexual orientation for gays and lesbians, or whether existing anti-discrimination protections for gays and lesbians were more narrow than for other minority groups).

- Tr. 2512:5-2513-2 (Miller:  Incorrectly defining "gay-bashing" as excluding physical violence and being limited to "pejorative statements" and "ad hominem attacks").

- Tr. 2496:14-2499:4; 2684:9-2686:21 (Miller:  Unable to confirm that he—rather than Proponents' attorneys—personally identified even 25 percent of the materials listed in his expert report (PX794A) as sources on which he relied for his opinion that gays and lesbians have political power.).

- PX794A (Index of materials to Miller's expert report:  Demonstrating that Miller was unsure whether he or attorneys for Proponents had supplied the majority of sources on which he relied).

- Tr. 1653:11-1656:24 (Segura:  Miller's analysis of the political power of gays and lesbians is unreliable because he "doesn't know anything about gay and lesbian politics," and he was not "familiar with some of the key pieces on—on how political science would address gays and lesbians."  "To put it in starkest terms, in 29 states, there is no anti-discrimination protection for gays and lesbians.  And Professor Miller concluded that gays and lesbians possessed political power, without being aware of that fact.").

185

PFF 224.    Dr. Miller's opinion is also undermined by his admissions that (i) he has no basis to compare the political power of gays and lesbians to the power of minority groups that are already entitled to heightened levels of scrutiny, including African-Americans and women; (ii) African-Americans are also not politically powerless in his opinion; and (iii) lesbians suffer from greater stereotyping and prejudice than women as a whole.

- Tr. 2572:17-2573:17 (Miller:  Admitting that he had not investigated whether gays and lesbians face more stereotyping than African-Americans or women: "I haven't done a comparative analysis.").

- Tr. 2538:25-2539:8 (Miller:  Could not compare African-American minority with gay and lesbian minority).

- Tr. 2538:13-17 (Miller:  African-Americans are not politically powerless).

- Tr. 2573:18-2574:3 (Miller:  Admitting that lesbians would face greater prejudice and stereotyping than heterosexual women).

PFF 225.    Dr. Miller's opinion is also undermined by the following:  (1) his  concession that gays and lesbians have suffered severe discrimination that continues today; (2) his concession that the extent of prejudice and discrimination faced by a minority group is relevant to evaluating whether that minority group has political power; and (3) Mr. Blankenhorn's admission that "homophobia is a real presence in our society."

- Tr. 2523:1-5 (Miller: Admitting discrimination is a factor in political power).

- Tr. 2510:23-2511:2 (Miller: Admitting that historically there has been severe prejudice and discrimination against gays and lesbians).

- Tr. 2572:11-13 (Miller:  Admitting gays and lesbians are still the object of prejudice and stereotype).

- Tr. 2527:11-15 (Miller:  Admitting that "there is ongoing discrimination in the United States," but that he has not tried to investigate the extent of it).

- Tr. 2765:3-6 (Blankenhorn:  "I believe that homophobia is a real presence in our society and, I'm pretty confident, in many, many other societies around the world.  And I regret and deplore it, and wish it to go away.").

- *See also* evidence cited in Section VIII (regarding discrimination).

186

Gibson, Dunn
& Crutcher
LLP

- Tr. 2437:7-14 (Miller:  One of the "key determinants of political power" is "the ability to attract allies and form coalitions.").

- Tr. 2442:2-2443:12 (Miller:  Identifying, among others, the Democratic Party, organized labor, and churches and faith-based organizations as allies of gays and lesbians).

- Tr. 2591:11-2592:17 (Miller:  Despite his opinion that organized labor was an ally of gays and lesbians, acknowledging that households with union members were more likely to vote for Prop. 8).

- Tr. 2590:4-6 (Miller:  Despite his opinion that churches and faith-based organizations are allies of gays and lesbians, admitting that "frequent attenders of religious services were more in favor of Prop. 8 than other people by a considerable amount").

- PX2853 at 8 (Exit polls showing that 32 percent of the population attended church weekly, and that 84 percent of those frequent attendees voted yes on Prop. 8).

- PX2853 at 4 (Exit polls showing that 36 percent of Democrats voted in favor of Prop. 8 and that only 18 percent of Republicans voted against Prop. 8).

PFF 226.   Dr. Miller's credibility was further undermined by the fact that opinions he offered at trial were inconsistent with opinions he expressed before he was retained as an expert, including as recently as mid-2009.

- Tr. 2623:19-2624:2 (Miller:  With respect to an article he had written in 2001 (PX1869), and his assertion that California's Proposition 22 was an example of the initiative system "bypassing checks and balances" at "the expense of certain minorities" (in that case, gays and lesbians), Dr. Miller testified: "That's what I wrote at the time.  I no longer believe that.").

- *Compare* Tr. 2652:18-22 (Miller:  "Q. And the reason it [Prop. 8] passed was because of religion, correct, sir?  A. I don't know if I would agree with that.") *with* PX0796 at 56 (Miller article written in 2009:  "Religion was critical in determining voter attitudes towards Proposition 8.").

PFF 227.   Dr. Miller's testimony was also contradicted by his previous writings that homosexuals, like other minorities, are vulnerable and powerless in the initiative process, which contradict his trial testimony that he disagrees with Dr. Segura's testimony that gays and lesbians are politically vulnerable with respect to the initiative process.  In fact, Dr. Miller has repeatedly written that minority groups, including gays

187

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    and lesbians, are vulnerable in the initiative process and that initiatives can easily tap

2    into a strain of anti-minority sentiment in the electorate.

3    • Tr. 2474:19-2475:20 (Miller: Disagreeing with Segura that gays and lesbians
     are vulnerable to the initiative process); *compare* PX1869 at 8 (Miller article:
4    "Racial minorities, illegal immigrants, *homosexuals*, and criminal defendants
     have been exposed to the electorate's momentary passions as Californians have
5    adopted a large number of initiatives that represent Populist backlash against
     representative governments' efforts to protect or promote the interests of racial
6    or other minorities." (emphasis added)).

7

8    • Tr. 2615:12-18; 2621:10-18; 2624:15-24 (Miller: Admitting that initiatives
     can easily tap into a strain of anti-minority sentiment in the electorate, that this
9    has occurred, and that direct initiatives can be and have been used to
     disadvantage minorities); PX1869 at *1056 (Miller article: Same).

10

11   • PX2857 at 52 (Miller article: "[I]nitiatives that directly and differentially
     affect minorities, can easily tap into a strain of anti-minority sentiment in the
12   electorate. The initiatives from the three states in this category sought to ban
     state efforts to prevent, quote, private, closed quote, racial discrimination in
13   housing, restrict busing to desegregate public schools, *restrict state efforts to
     protect the rights of* homosexuals, establish English as the state's official
14   language, restrict illegal immigration, ban state affirmative action for women
     and minorities, and restrict bilingual education.") (emphasis added).

15

16   • PX1869 at *1056 (Miller article: "With respect to the second substantive
     concern, minority rights, it is clear that the direct initiative can be and has been
17   used to disadvantage minorities. . . . [T]he direct initiative system, by
     bypassing checks and balances, is weighted heavily toward majority rule at the
18   expense of certain minorities.").

19   • PX1869 at *1054 (Miller article: "In sum, it is ironic that initiatives have the
     reputation of being a more pure form of democracy when the process
20   undermines democratic opportunities and violates procedural guarantees
     observed by almost every freely elected legislature in the world.").

21

22   • PX2865 at 138 (Miller article: "[T]he initiative process radically departs from
     the Madisonian system of delegation and checks and balances by substituting
23   unfiltered direct democratic rule.").

24   • PX2857 at 33, 41, 45 (Miller article: "We discuss how ironically direct
     democracy can actually be less democratic than representative democracy in
25   that it fails to maximize democratic opportunities for refinement, informed
     liberation, consensus building and compromise, and violates democratic norms
26   of openness, accountability, competence and fairness." "Initiative
     constitutional amendments (ICAs) most seriously undermine representative
27   government because they can only be altered by another constitutional

28
                                        188

**Gibson, Dunn
& Crutcher
LLP**

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

amendment." "The actual operation of the initiative process violates a number of norms that have evolved in advanced democracies.").

PFF 228.  The persuasiveness of Dr. Miller's opinion is also undermined by his admission that gays and lesbians continue to be subject to discrimination and prejudice at both the federal and state level, and that this is reflected both in federal statutes and Prop. 8 itself.  Indeed, Dr. Miller admitted that "at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice."

- Tr. 2508:2-8 (Miller:  Admitting that no openly gay or lesbian person has ever been elected to statewide office in California).

- Tr. 2509:12-2510:5; 2523:9-2524:22 (Miller:  "Don't Ask, Don't Tell" constitutes official discrimination by the federal government against gays and lesbians; gays and lesbians are still being discharged from the military because of their sexual orientation under "Don't Ask, Don't Tell"; no other minority is discharged from the military despite performing well because their status as a minority is discovered.).

- Tr. 2510:9-22; 2524:23-2525:4 (Miller:  The Defense of Marriage Act ("DOMA") constitutes official discrimination by the federal government against gays and lesbians; DOMA acts against the interests of the LGBT community and has not been repealed.).

- Tr. 2608:11-18 (Miller:  "[A]t least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.").

## IX.  Prop. 8 Does Not Promote Any Legitimate Governmental Interest

### A.  Proponents' Proffered Interests

PFF 229.  Before trial, Proponents listed 23 governmental interests allegedly served by Prop. 8 and 23 "very likely" harms it would prevent. Doc #295 at 6-8, 9-11 (Proponents' Trial Mem.).  All of those interests can be grouped into five general categories of interests that have been articulated by Proponents throughout the proceedings:  (1) promotion of the formation or stability of "naturally procreative unions"; (2) preventing the "deinstitutionalization" of marriage; (3) promoting achievement of good child adjustment outcomes; (4) administrative convenience; and (5) protecting the First

189

Gibson, Dunn
& Crutcher
LLP

1   Amendment rights of religious liberty and freedom of speech of groups that oppose

2   marriage by gay and lesbian individuals.

3   **B.    Proponents' Purported Evidence**

4   PFF 230.    Proponents elected not to have the majority of their designated witnesses testify at

5   trial.  Proponents withdrew one of their designated experts before trial began and four

6   other designated experts on the first day of trial.  Indeed, Proponents waited until the

7   morning of Monday, January 11, 2010—after the Supreme Court had already granted

8   a stay of this Court's order permitting broadcast of the proceedings—to announce in a

9   two sentence letter that they "no longer intend to call as witnesses Dr. Paul Nathanson,

10  Dr. Loren Marks, Dr. Daniel Robinson, and Dr. Katherine Young."  Although

11  Proponents' counsel stated in open court on Friday, January 15, 2010, that their

12  witnesses "were extremely concerned about their personal safety, and did not want to

13  appear with any recording of any sort, whatsoever," this assertion was entirely

14  unsupported by any evidence at all and was not, on its face, credible.  Proponents had

15  notice of the possibility that the proceedings would be publicly broadcast as early as

16  September 2009.  In addition, the Court announced its decision to broadcast the

17  proceedings on January 6, 2010, but the Supreme Court issued a temporary stay of the

18  Court's order on January 11, 2010—*before* Proponents' counsel sent a letter to all

19  counsel withdrawing four of their experts.  The Supreme Court issued its indefinite

20  stay on January 13, 2010, and then this Court on January 14 withdrew this case from

21  the Ninth Circuit's pilot program, well before Proponents had even called their first

22  witness.  Thus, from at least January 14 on, Proponents and their witnesses knew for a

23  fact that these proceedings would not be broadcast to the public in any form.

24  Proponents made no effort to call any witnesses other than Mr. Blankenhorn and Dr.

25  Miller after the Court withdrew its request to broadcast the proceedings to other

26  federal courthouses and made clear that no such broadcast would take place.

27  Proponents' decision to withdraw any of their experts was therefore a tactical decision

28

190

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

unrelated to the Court's decision to broadcast the proceedings to several other federal courthouses. Indeed, all of the experts withdrawn by Proponents made damaging admissions in their depositions, and Plaintiffs' counsel predicted at the pre-trial hearing in December 2009 that Proponents would seek to withdraw their experts because of the vigorous cross-examination they had faced in deposition and would face at trial.

- Tr. 1352:23-1353:3 (Proponents' Counsel (Cooper): Explaining that Proponents withdrew Professor Douglas Allen before the trial commenced).

- Tr. 1094:18-19 (Proponents' Counsel (Thompson): Claiming, without support, that Proponents withdrew Dr. Loren Marks and other experts because of concerns about video recording).

- Tr. 1125:22-24 (Plaintiffs' Counsel (Boutrous): "And we had predicted back at the pretrial that they would be seeking to withdraw their expert witnesses because of the cross-examination that had occurred and that would occur.").

- Doc # 292 at 1-2 (Proponents' Witness Statement, dated December 7, 2009: Identifying six experts who Proponents "expect[ed] to present").

- *See Hollingsworth v. Perry*, No. 09A648 (U.S. Jan. 11, 2010) (order granting temporary stay).

- *See Hollingsworth v. Perry*, No. 09A648 (U.S. Jan. 13, 2010) (indefinite stay).

PFF 231. Proponents called two witnesses to testify at trial: Dr. Kenneth Miller and Mr. David Blankenhorn. The Court permitted Dr. Miller to testify as an expert on American and California politics generally and the political power of gays and lesbians, and Dr. Miller's testimony did not concern purported governmental interests allegedly served by Prop. 8.

- Tr. 2427:10-2428:7 (Proponents' Counsel); Tr. 2435:21-2436:25 (Court).

- Tr. 61:4-19; 63:18-64:11; 66:16-25; 68:20-69:6 (Proponents' Counsel (Cooper): Asserting that Mr. Blankenhorn will testify about the broad consensus of leading scholars that agree that "across history and cultures marriage is fundamentally a pro-child institution anchored in socially-approved sexual intercourse between a man and a woman"; asserting that allowing same-sex couples to marry might deinstitutionalize marriage, and Mr. Blankenhorn will testify that deinstitutionalization is likely to lead to "very real social

191

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

harms, such as . . . lower marriage rates and higher rates of divorce and non-marital cohabitation, with more children raised outside of marriage and separated from at least one of their parents"; Mr. Blankenhorn will testify that "marriage is essentially the sexual embodiment of the man and the woman who form the marital union").

- Tr. 65:3-21 (Proponents' Counsel (Cooper):  Claiming that the evidence will show that in the Netherlands, allowing same-sex couples to marry has caused the marital rate to decline and the rate of non-martial cohabitation of couples with children to increase).

PFF 232.   The Court permitted Mr. Blankenhorn to testify as an expert concerning the subjects of marriage, fatherhood, and family structures.  Mr. Blankenhorn offered four opinions:  (1) marriage has traditionally been defined as between a man and a woman and tied to sexual reproduction; (2) marriage as an institution "is not the creation of religion" or otherwise attributable to anti-homosexual prejudice; (3) the optimal environment for raising children is by two biological parents; and (4) permitting same-sex couples to marry would further deinstitutionalize marriage.

- Tr. 2732:5-7 (Proponents' Counsel); Tr. 2741:21-2742:3 (Court:  "With respect to Mr. Blankenhorn's qualifications, were this a jury trial, I think the question might be a close one.  But this being a court trial, I'm going to permit the witness to testify; and, as Mr. Cooper has suggested, to weigh that testimony in light of the witness's qualifications, his background, training, and experience, and the reasons that he offers for his opinions.").

- Tr. 2744:2-2745:20 (Blankenhorn:  Marriage rests on the need to reproduce sexually and the need to create the biological, social, and legal dimensions of parenthood for children.).

- Tr. 2762:10-2763:13; 2764:25-2766:4 (Blankenhorn:  Marriage is a natural human institution that is consistent across societies with a range of different religious beliefs.  Blankenhorn has not found any evidence that the laws and customs surrounding marriage are attributable to anti-homosexual prejudice.).

- Tr. 2766:5-2768:23 (Blankenhorn:  Children should be raised by their biological parents because "kin altruism" ensures that they will get better care from people who are closely related to them.  Child outcome studies also indicate that it is optimal for children to be raised by their biological mother and father.).

- Tr. 2772:21-2777:15 (Blankenhorn:  In the last five decades there has been a marked process of deinstitutionalization of marriage, and the process of

192

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

deinstitutionalization would be furthered and accelerated significantly by allowing same-sex couples to marry.).

PFF 233.   Mr. Blankenhorn's expertise with regard to the four opinions he advanced at trial is so limited that these opinions are unreliable and entitled to relatively little weight. Specifically, Mr. Blankenhorn conceded that (i) his purported expertise was based on his study of the writings and analysis of others, (ii) he read relatively few of the studies on which numerous professional organizations' support for marriage equality are based, and (iii) he had no or limited expertise based on his education, training or experience.

- DIX2693 (Blankenhorn CV:  Three-page CV that does not identify any relevant education or employment except with respect to his association with the Institute for American Values).

- Tr. 2735:15-2736:3 (Blankenhorn:  Testifying that the fields of psychology, sociology, and anthropology are relevant to the subjects on which he was being asked to testify, but he had no degrees in any of those subjects).

- DIX2693; Tr. 2732:16-25 (Blankenhorn:  Blankenhorn has a master's degree in comparative labor history and completed his thesis on the study of two cabinetmakers' unions in 19th century Britain.).

- Tr. 2897:11-2899:13 (Blankenhorn:  Testified that he was just "repeating" things said by others and serving as a "transmitter" of findings by others).

- Tr. 2735:6-14; 2736:4-9 (Blankenhorn:  Admitted that he had never taught any course in any college or university on the three areas for which Proponents sought to qualify him as an expert).

- Tr. 2734:12-2735:4 (Blankenhorn:  Had not published any peer-reviewed articles concerning the issues of allowing same-sex couples to marry).

- Tr. 2816:16-2817:24 (Blankenhorn:  His expertise was based on twenty years of reading and writing on the subject of marriage.).

- Tr. 2920:12-2922:20; 2922:21-2925:10 (Blankenhorn:  Admitted that he had not read many of the materials that were relevant to the issue of marriage by same-sex couples, such as the materials cited by various associations, including (as to PX765) that he had only read "four or perhaps five of the 40 or 41 references").

193

Gibson, Dunn & Crutcher LLP

- Tr. 2916:20-2918:16 (Blankenhorn:  Had not read an article, PX2898, that states:  "The argument that same-sex marriage poses a negative externality on society cannot be rationally held.").

- Tr. 2736:13-19 (Blankenhorn:  With respect to whether there would be any adverse effects of permitting same-sex couples to marry, he testified that he had not undertaken any scientific study, and he has otherwise written that it would be impossible to prove that there are any such adverse effects (PX2936 at 1) ("Neither Kurtz nor anyone else can scientifically prove that allowing gay marriage causes the institution of marriage to get weaker.  Correlation does not imply causation.")).

PFF 234.   Mr. Blankenhorn's testimony is not credible.  He was unable or unwilling to answer many questions directly, and he was defensive in many of his answers.  This included questions concerning the materials that he had identified in his report and purported to rely upon to formulate his opinions.  Mr. Blankenhorn's demeanor and combativeness undermined his credibility as an expert and the reliability of his opinions concerning the purported governmental interests identified by Proponents and the purported harms of permitting same-sex couples to marry.

- Tr. 2737:11-2738:6; 2798:24-2799:12; 2800:25-2801:11; 2808:3-22; 2808:25-2809:25; 2815:13-25; 2822:15-25; 2825:4-2826:3; 2829:15-23; 2830:8-16; 2873:21-2876:13; 2878:2-20; 893:5-2895:2 (Blankenhorn:  Repeated refusals to answer the question posed).

- Tr. 2827:25-2828:10 (Blankenhorn:  "I don't know whether in this particular writing [which Mr. Blankenhorn cited and relied upon in forming his opinions] [the author] deals with the process of deinstitutionalization of marriage.").

PFF 235.   With respect to the "rules" of marriage identified by Mr. Blankenhorn—the rule of opposites, the rule of two, and the rule of sex—the reasoning and historical support was strained to the point of breaking, revealing substantial variations in the forms and functions of marriage behind the seeming consistency offered by the term "rules."  This is consistent with the fact that marriage has never been a static institution.

- Tr. 2879:17-25 (Blankenhorn:  Identifying three "rules" of marriage).

- Tr. 2881:5-2882:15 (Blankenhorn:  Acknowledging that certain states and countries currently permit same-sex couples to marry and that there were "two

194

Gibson, Dunn
& Crutcher
LLP

or three or four what I would call hard cases" that were also inconsistent with the "rule of opposites").

- Tr. 2890:8-2892:9 (Blankenhorn: "83 percent of societies permit polygamy," which would be inconsistent with Mr. Blankenhorn's second rule but for his clarification that the rule of two only means that there are no group marriages, not that the marriage would only be between two people.).

- Tr. 2897:4-10 (Blankenhorn: "Q. Now it's your testimony that that man with five wives is consistent – that marriage is consistent with what you say is your rule of two is that correct?  That is a yes or no answer.  A.  Based on the finding of the anthropologists who've actually studied this, yes, the answer to your question is yes.").

- Tr. 2907:20-2908:5 (Blankenhorn: "The law on this has changed in recent decades.  And now, in recent years, there has been a growing permission on the part of courts to accept married couples who cannot have sexual intercourse.  For example, when one spouse is in prison.").

- Tr. 2902:17-2903:24 (Blankenhorn:  Blankenhorn was unaware that the Supreme Court has ruled that prisoners have the right to marry.).

PFF 236.   The sources cited and relied upon by Mr. Blankenhorn in forming his opinions—largely writings by anthropologists and sociologists—generally do not consider the issue of marriage by same-sex couples, and confirm that marriage is a flexible institution that has been used in ways inconsistent with Mr. Blankenhorn's purported "rules" and that has changed over time.

- Tr. 2856:10-2857:21 (Blankenhorn:  When asked to identify which articles cited in his report "assert that permitting gay marriage will adversely affect heterosexual marriage[,]" Mr. Blankenhorn testified "the overwhelming majority of these materials were actually written before the gay marriage debate even came up," and he identified only six.).

- Tr. 2866:7-2868:2 (Blankenhorn:  Blankenhorn later removed three articles from this list because they did not actually assert that permitting gay marriage will adversely affect heterosexual marriage, leaving just three.).

- DIX0956 (Frayser, *Varieties of Sexual Experience* at 8 ("I have excluded several topics of interest because of insufficient information, e.g., homosexual relations, specific means of contraception, and types of incestuous relations."), 248 ("I emphasize the nature of the relationship between the couple, instead of focusing on the possible consequences of the relationship, i.e., children."), 271-72 (discussing a group in West Africa that recognizes same-sex marriage

195

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

between women, and concluding that "this type of marriage shows how broadly the definition of marriage can extend"), 334-36 (discussing a group in southern New Guinea that extensively uses adoption, and noting that "conceiving or giving birth to a child is not sufficient reason to claim the right of parenthood; people acquire this right by taking care of the child. Caretaking overrides the physiological foundation for parenthood").

- DIX0050 at 3-5 (Davis, *The Meaning and Significance of Marriage in Contemporary Society*: Raises the question "Can homosexuals 'marry' each other?," but does not further discuss the question or reach a conclusion regarding it).

- DIX0079 at 3 (Quale, *A History of Marriage Systems*: Discussing use of polygyny in other cultures: "Among the Nayar the eldest brother who stayed home took all responsibility for the economic maintenance of the nonfighting women and children. That made it possible for the husband to take none, and for most men to be gone on military service most of the time. It also made it possible to accept the legitimacy of marriages between a woman and several husbands, each of whom might spend his military leave in her company, and each of whom might on his side be wed to several women.").

- DIX0073 (A Committee of the Royal Anthropological Institute of Great Britain and Ireland, *Notes and Queries on Anthropology*, at 71 (making clear that in other cultures a marriage can be either monogamous or polygamous), 73 (pointing out that married parents are not always the biological parents of the children of the marriage, and that in some cultures, adoption is highly developed)).

- DIX0089 at 48 (Van Den Berghe, *Human Family Systems: An Evolutionary View*: "Until the spread of Christianity, prescriptively monogamous societies were exotic exceptions. . . . Statistically, monogamy is the most frequent arrangement in most societies, but the vast majority of societies allow and indeed encourage polygyny or have done so until recently, when they were conquered by monogamous societies.").

- DIX0066 at 8-10 (Malinowski, *Sex, Culture and Myth*: Noting the practice of "wife-lending," and that even where wife-lending persists and it is understood physiologically that the legal husband is not likely the biological father of the children, he remains the legal father of the children).

- DIX0063 at 42-43 (Levi-Strauss, *The View from Afar*: Noting cultures in which a chief who may marry sisters who then raise their *children* together without differentiating whose children are whose, or in which polyandry is practiced, and concluding "[i]t would thus be wrong to approach the study of family in a dogmatic spirit").

196

Gibson, Dunn & Crutcher LLP

PFF 237.   Beyond Mr. Blankenhorn, who was Proponents' only witness who advanced any argument that Prop. 8 serves any purported government interests, Proponents' assertions that such interests exist are conclusory and not supported by any evidence. To the extent that documents offered by Proponents may themselves advance arguments as to certain purported government interests, the Court does not credit these arguments because (i) they were not tested by cross-examination, and (ii) they are not supported by any data or other evidence that shows there is any relationship between such interests and removing same-sex couples' right to marry.  In fact, the evidence demonstrates that Prop. 8's actual motivation was moral disapproval of gay and lesbian individuals.

- *See* evidence cited in Section IX.F and in supporting PFFs 200 to 201 (Demonstrating that Prop. 8's actual motivation was moral disapproval of gay and lesbian individuals).

- *See* evidence cited in support of PFFs 207, 218, 227-228 (Demonstrating that the initiative process is particularly vulnerable to measures that discriminate against minorities).

- Tr. 2608:11-18 (Miller: "[A]t least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.").

C.   **The Evidence Demonstrates That Prop. 8 Does Not Promote Any Legitimate Governmental Interest**

1.   **Excluding Same-Sex Couples From Marriage Does Not Promote the Formation or Stability of "Naturally Procreative Unions"**

PFF 238.   In their Trial Memorandum, Proponents claimed that the evidence will show that Prop. 8 furthers the following interests:  (1) "Promoting the formation of naturally procreative unions"; and (2) "Promoting stability and responsibility in naturally procreative relationships."  Doc #295 at 7-8.  Proponents further claimed that the evidence would show that Prop. 8 prevents related harm because allowing same-sex couples to marry would "[m]ove marriage further away from its grounding in reproduction and the intergenerational cycle."  *Id*. at 10.  Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would

197

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

promote these interests or prevent this alleged "harm." Moreover, the evidence presented at trial demonstrates that marriage is not tied to sexual reproduction.

- *See* evidence cited in support of PFFs 239-241.

PFF 239.   Marriage is not now, and has never in this State been, limited to those who are capable of procreating.  The State has never established as a legal requirement for marriage that the members of the couple be fertile, of child-bearing age, physically or mentally healthy, or intent on having or raising children.  California has permitted different-sex couples to marry regardless of whether they in fact intend to have children, that California for a time permitted same-sex couples to marry, and that other states and countries have also permitted same-sex couples to marry.  In short, procreation does not require marriage, and marriage does not require procreation.

- PX0709 at RFA No. 52 (Administration admits "that California law does not restrict heterosexual individuals with no children and/or no intent to have children from marrying on the basis of their status as a heterosexual individual with no children and/or no intent to have children.").

- Tr. 347:20-23 (Cott:  There is no reason to conclude that allowing individuals of the same sex to marry would affect population growth.).

- *See* evidence cited in support of PFFs 10, 59, 60, 61, 93, and 247.

PFF 240.   Mr. Blankenhorn's opinion that marriage has traditionally been tied to sexual reproduction is not credible, reliable, or entitled to substantial weight, particularly in light of Mr. Blankenhorn's other testimony.  As Mr. Blankenhorn recognized, there are and have been different views concerning the institution of marriage; marriage has not always or uniformly been understood to be a procreation-centric institution.

- Tr. 2755:17-2756:1 (Blankenhorn:  One "well-developed and opposing point of view" asserts that "marriage is fundamentally a private adult commitment."); Tr. 2759:23-2760:14 (Same).

PFF 241.   Mr. Blankenhorn testified that he recognized that numerous authors and sources that have evaluated marriage by gay and lesbian couples have expressly recognized the historical flexibility of marriage and the fact that it transcends the purported "rule" that

198

1   marriage is limited to promoting procreation and the relationship between children and

2   both of their biological parents.

3   • DIX0093 at 129 (Law Commission of Canada, *Beyond Conjugality:*
4   *Recognizing And Supporting Close Personal Adult Relationships*:  "A review
     of the history of state regulation of marriage helps illuminate that the state
5   interest in marriage is not connected to the promotion of any particular
     conception of appropriate gender roles.  Nor is the state reserving marriage to
6   procreation and the raising of children.").

7   • DIX0051 at 6-7 (Eskridge, *The Case for Same-Sex Marriage*:  History is
8   replete with examples of marriages by same-sex couples in other times and
     cultures; throughout human history people have raised children in same-sex
9   households.).

10  • Tr. 2913:8-2916:10 (Blankenhorn:  Blankenhorn admitted that all six
     "dimensions" of marriage—a legal contract, a financial partnership, a sacred
11  promise, a sexual union, a personal bond, and a family-making bond—apply
     not only to different-sex couples but also to same-sex couples).
12

13  PFF 242.   Moreover, Mr. Blankenhorn admitted that a couple who does not wish to have sex

14  may marry, and that an incarcerated man may marry even if he is not allowed to

15  consummate the relationship.

16  • Tr. 2902:7-16 (Blankenhorn:  Acknowledging that a couple who does not wish
17    to have sex may marry).

18  • Tr. 2901:13-2902:6 (Blankenhorn:  Acknowledging that an incarcerated man
      may get married even if he is not allowed to consummate the relationship);
19    *see also* Tr. 2905:4-14; Tr. 2907:20-2908:5.

20      **2.    Excluding Same-Sex Couples from Marriage Does Not Further Any
              Interest in Preventing the "Deinstitutionalization" of Marriage**
21

22  PFF 243.   In their Trial Memorandum, Proponents claimed that the evidence would show that

23  Prop. 8 furthers the following interests:  (1) "Preserving the traditional institution of

24  marriage as the union of a man and a woman";  (2) "Preserving the traditional public,

25  social, and legal meaning and symbolism of marriage"; (3) "Preserving the traditional

26  social and legal purposes, functions, and structure of marriage"; (4) "Preserving the

27  traditional meaning of marriage as it has always been defined in the English

28  language"; (5) "Expressing support for the traditional institution of marriage"; (6)

199

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  "Acting incrementally and with caution when considering a radical transformation to

2  the fundamental nature of a bedrock social institution"; (7) "Decreasing the probability

3  of weakening the institution of marriage"; and (8) "Decreasing the probability of

4  adverse consequences that could result from weakening the institution of marriage."

5  Doc #295 at 7.  Proponents further claimed that the evidence would show that Prop. 8

6  prevents a number of related harms because allowing same-sex couples to marry

7  allegedly would:  (1) "Entail the further, and in some respects full,

8  deinstitutionalization of marriage"; (2) "Change the legal and public meaning of

9  marriage from an institution with defined legal and social structure and purposes to a

10  right of personal expression"; (3) "Contribute over time to the further erosion of the

11  institution of marriage, as reflected primarily in lower marriage rates, higher rates of

12  divorce and non-marital cohabitation, and more children raised outside of marriage

13  and separated from at least one of their natural parents"; (4) "Increase the social

14  acceptability of other alternative forms of intimate relationships, such as polyamory

15  and polygamy"; (5) Increase the likelihood that the recognition as marriages of other

16  alternative forms of intimate relationships, such as polyamory and polygamy, will

17  become a judicially enforceable legal entitlement"; (6) "Legally enshrine the principle

18  that sexual orientation, as opposed to sexual embodiment, is a valid determinant of

19  marriage's structure and meaning"; (7) "Increase the likelihood that bisexual

20  orientation could become a legitimate grounding for a legal entitlement to group

21  marriage"; (8) "Require all relevant branches and agencies of government formally to

22  replace the idea that marriage centers on opposite-sex bonding and male-female

23  procreation with the idea that marriage is a private relationship between consenting

24  adults"; (9) "Either end altogether, or significantly dilute, the public socialization of

25  heterosexual young people into a marriage culture"; (10) "Cause many Americans

26  opposed to same-sex marriage to abandon some or all of those public institutions that

27  promote the new definition of marriage, probably resulting in the weakening of those

28

200

*Gibson, Dunn & Crutcher LLP*

institutions and a further rending of our common culture"; (11) "Contribute to the public belief that marriage in our society is now politicized"; (12) "Result in unmarried people increasingly, and logically, complaining that the legal and practical benefits currently attached to marriage properly belong to everyone"; (13) "Seriously threaten the functions and symbolism of marriage, thereby posing a risk to children and the demographic continuity of society"; and (14) "Lead to changes in the laws governing marriage and parallel institutions in a manner that undercuts the effectiveness of marriage in achieving its traditional purposes." *Id*. at 9-11. Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these purported interests or prevent these alleged "harms," and the evidence presented at trial demonstrates that allowing gay and lesbian individuals to marry will not harm the institution of marriage.

- *See* evidence cited in support of PFFs 244-258.

PFF 244.    Permitting same-sex couples the right to marry does not meaningfully restrict options available to heterosexuals.

- PX0709 at RFA No. 54 (Administration "is not aware of any legal right or benefit existing under California law that heterosexual individuals would lose as a result of a hypothetical change in California law permitting gay and lesbian individuals to marry.").

- Tr. 600:8-601:15 (Peplau:  Discussing research on the reasons why people get married, and concluding that "there is nothing, that I am aware of, in the way of data or theory, that would suggest that same-sex civil marriage will lead fewer heterosexuals to marriage.").

- Tr. 603:19-22 (Peplau:  Explaining that institutions are generally stronger with more, rather than fewer, members:  "[T]he idea that there's a group of American citizens who want to enter the institution [of marriage], to keep it going, to keep it vibrant and alive, from my perspective, seems like a very good omen for the future of America.").

PFF 245.    There is no reputable evidence suggesting that the exclusion of same-sex couples from marriage increases the stability of opposite-sex marriage or that including same-sex couples destabilizes opposite-sex marriages.

201

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0710 at RFA No. 53 (Attorney General admits "that if same-sex couples had access to civil marriage, their access to that legal status would not destabilize the marriages of opposite-sex couples.").

- Tr. 1283:20-1284:3 (Sanders: Sanders thinks that his daughter's marriage to another woman has not harmed his marriage. In fact, it has made him and his wife stronger. It has not harmed anybody in his family's marriage, and he does not believe it has harmed anybody in the world. "I think Lisa and Meagan have been an excellent example for us of persevering, loving each other, and being will to go to great lengths to show that.").

- Tr. 156:4-10 (Perry: Describing how she feels that their heterosexual friends would feel better about their own marriages if Perry and Stier also could get married).

- Tr. 249:3-13 (Cott: From a historical perspective, there is no empirical basis for concluding that allowing gay and lesbian couples to marry would increase the divorce rate.).

- Tr. 601:18-602:1 (Peplau: "[I]t is very hard for me to imagine that you would have a happily-married couple who would say, 'Gertrude, we've been married for 30 years, but I think we have to throw in the towel because Adam and Stuart down the block got married.'").

- PX2810 at 23:10-16; 24:5-8; 29:14-18 (Proponents' lead counsel admitted that Proponents "don't know" whether allowing same-sex couples to marry would harm heterosexual relationships. He further admits that whether any harm exists "can't possibly be known now . . . . It may well be that there are no harms.").

- Tr. 2912:18-2913:5 (Blankenhorn: Acknowledging that PX2879 (*The Marriage Movement: A Statement of Principles* (2000)), published in part by his organization, The Institute for American Values, did not include homosexuality or marriage by same-sex couples as one of the reasons the institution of marriage was "weakening").

- Tr. 2780:16-17 (Blankenhorn: Acknowledging that "[i]t's impossible to be completely sure about a prediction of future events. I don't think anyone can" with respect to whether allowing gay and lesbian couples to marry would further the deinstitutionalization of marriage).

- PX2936 at 1 (Blankenhorn, *Defining Marriage Down* . . ., Weekly Standard.com (Apr. 2, 2007): "Neither Kurtz nor anyone else can scientifically prove that allowing gay marriage causes the institution of marriage to get weaker. Correlation does not imply causation.").

- PX0767 at 3 (Am. Anthropological Ass'n, Professional Association Policies: "The results of more than a century of anthropological research on households,

202

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

kinship relationships, and families, across cultures and through time, provide no support whatsoever for the view that either civilization or viable social orders depend upon marriage as an exclusively heterosexual institution. Rather, anthropological research supports the conclusion that a vast array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.").

- Tr. 652:5-654:12 (Peplau: Discussing the factors that family researchers, historians, and sociologists have identified as contributing to the divorce rate in the U.S. and concluding that "the increase in the divorce rate was independent of the push for marriage equality for same-sex couples.").

- *See also* evidence cited in support of PFFs 246-251.

PFF 246.   Excluding same-sex couples from marriage does not optimize the child-rearing environment of married opposite-sex couples.

- Tr. 1042:12-19 (Lamb: Prohibiting same-sex couples from marrying cannot reasonably be expected to improve the adjustment outcomes of any child.).

- Tr. 590:20-23 (Peplau: "[G]ay men and lesbians don't have the benefits of marriage, and . . . marriage is for many relationships a stabilizing influence.").

- Tr. 640:16-19 (Peplau: "[E]xcept in places like Massachusetts, all children born to lesbians or gay men or raised by lesbians or gay men are out of wedlock, because the government doesn't permit their parents to marry.").

- *See also* evidence cited in support of PFFs 247-251.

PFF 247.   There is no support for the notion that allowing same-sex couples to marry would harm heterosexual relationships. There is similarly no scientific basis for asserting that legalizing marriage for same-sex couples would affect the underlying processes that foster stability in heterosexual marriages. Allowing same-sex couples to marry will not lead heterosexuals to abandon the institution of marriage.

- PX2866 (Netherlands data regarding non-marital cohabitation) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands shows that permitting same-sex couples to marry did not lead to any increase in the rate of non-marital cohabitation in the Netherlands. PX2866 contains data reflecting non-marital cohabitation in the Netherlands, 1995 to 2009, and shows no impact from permitting same-sex couples to marry beginning in 2001. The average percent of cohabitating couples in the Netherlands who are not married, as calculated

203

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

from the data in PX2866, is as follows:  13.49 percent for 1995-1996; 15.32 percent for 1997-2000; 17.41 percent for 2002-2005; and 19.00 percent for 2006-2009.  The data reflects that the pre-existing trend of increasing cohabitation in the Netherlands, and it does not reflect any increasing rate of cohabitation after 2001.  In fact, there was a decrease in the percent change after 2001.)

- DIX2639 (Netherlands data regarding unmarried couples with children) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands shows that permitting same-sex couples to marry did not cause any increase in the number or percent of unmarried couples with children in the Netherlands.  Badgett testified that, with respect to the number of unmarried couples with children in the Netherlands as reflected in the demonstrative at Tab 4 of the binder prepared by Proponents and DIX2639, the data confirmed the absence of any adverse impact of permitting same-sex couples to marry:  "This is just like the earlier slide that you showed. . . .  [T]here was a trend of increasing—the increasing numbers of unmarried couples with children. . . .  But there was a—there was a trend before and a trend after.  I think, if you took that red line out there and showed it to everyone in this courtroom, nobody would be able to tell where same-sex couples got married."  (Tr. 1446:3-1447:2.)  Badgett also testified that, with respect to the number of unmarried couples with children as a percent of all families in the Netherlands as reflected in the demonstratives at Tabs 5, 6, and 7 of the binder prepared by Proponents and DIX2639 and DIX2426, Badgett similarly testified that "the rate of change over the years is exactly the same.  It's quite clear.  It's pretty much a straight line.  There was a trend of the increase before, that is exactly equal to the of the -- of the increase afterwards. . . . [T]here's no break, whatsoever, to suggest that anything happened of importance in 2001."  (Tr. 1447:3-1448:1.)  More generally, Badgett testified that "these kinds of differences are very sensitive to the years that you happen to pick to start and end the calculation" and therefore any small increases do not necessarily reflect any impact, let alone any change corresponding to marriage by same-sex couples.  (Tr. 1448:23-25.)  Further, Badgett testified that one confounding factor that needed to be accounted for was that, in 2001, there was a change that "increased the parental responsibilities of people who were in registered partnerships" (Tr. 1357:25-1358:2), which likely would have impacted this particular trend, separate and apart from any changes with respect to the law governing the rights of same-sex couples.).

- DIX2426 (Netherlands data regarding single parent families) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands does not show that permitting same-sex couples to marry increased the number or percent of single parent families in the Netherlands.  Badgett testified that, with respect to the number of single parent

204

Gibson, Dunn
& Crutcher
LLP

families and the number of single parents as a percent of all families in the Netherlands as reflected in the demonstratives at Tabs 8, 9, 10, and 11 of the binder prepared by Proponents and DIX2426, "you have to look at data in the larger context of other kinds of things that are changing and earlier trends." (Tr. 1449:6-1451:5.)  Further, Badgett testified that one confounding factor that needed to be accounted for was that, in 2001, there was a change that "increased the parental responsibilities of people who were in registered partnerships" (Tr. 1357:25-1358:2), which likely would have also impacted this particular trend, separate and apart from any changes with respect to the law as applied to same-sex couples.  Badgett did not analyze this data in depth to determine whether there were other confounding factors, and Proponents did not call any other expert to offer opinions on this data.  Thus, there was no testimony reflecting that this data in any way reflected an adverse impact of permitting same-sex couples to marry, and there is no way to reach that finding without expert testimony given the existence of various confounding factors.).

- DIX2627 (Belgium marriage rates, 1997-2008:  Showing a decrease in the marriage rate before 2003, when same-sex couples were first permitted to marry in Belgium, and an increase in the marriage rate after 2003, which undermines any claim that permitting same-sex couples to marry caused any harm to different-sex couples).

- DIX1836 (Belgium divorce rates, 1997-2008:  Showing an increase in the divorce rate before 2003, when same-sex couples were first permitted to marry in Belgium, and a  decrease in the divorce rateafter 2003, which undermines any claim that permitting same-sex couples to marry caused any harm to different-sex couples).

- PX0767 at 3 (Am. Anthropological Ass'n, Professional Association Policies:  "The results of more than a century of anthropological research on households, kinship relationships, and families, across cultures and through time, provide no support whatsoever for the view that either civilization or viable social orders depend upon marriage as an exclusively heterosexual institution.  Rather, anthropological research supports the conclusion that a vast array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.").

- PX2810 at 23:10-16; 24:5-8; 29:14-18 (Proponents' lead counsel admitted that Proponents "don't know" whether allowing same-sex couples to marry would harm heterosexual relationships.  He further admitted that whether any harm exists "can't possibly be known now . . . . It may well be that there are no harms.").

- PX0710 at RFA No. 54 (Attorney General admits "that allowing gay and lesbian individuals to marry will not deprive heterosexual individuals of any rights or benefits they currently enjoy.").

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1
2
3

- PX2879 (The Marriage Movement:  A Statement of Principles (2000)); Tr. 2912:18-2913:5 (Blankenhorn:  Acknowledging that this publication, published in part by his organization, The Institute for American Values, did not include homosexuality or marriage by same-sex couples as one of the reasons the institution of marriage was "weakening").

4
5
6

- Tr. 2780:16-17 (Blankenhorn:  Acknowledging that "[i]t's impossible to be completely sure about a prediction of future events.  I don't think anyone can" with respect to whether allowing same-sex couples to marry would further the deinstitutionalization of marriage).

7
8
9
10

- Tr. 2775:24-2776:6 (Blankenhorn:  Acknowledging that "if we go back and look at the trends I described, it's very clear that this . . . deinstitutionalization is not something that just cropped up a few years ago whenever we began discussing the possibility of extending equal marriage rights to gay and lesbian people.  It predates all that.").

11
12

- Tr. 2866:3-2867:5 (Blankenhorn:  Acknowledging that many of the scholars cited in his expert report have not stated that permitting gay and lesbian marriage would harm heterosexual marriage).

13
14
15

- PX2936 at 1 (Blankenhorn, Defining Marriage Down . . ., Weekly Standard.com (Apr. 2, 2007):  "Neither Kurtz nor anyone else can scientifically prove that allowing gay marriage causes the institution of marriage to get weaker.  Correlation does not imply causation.").

16
17
18

- DIX0060 at 28 (Article by Norval Glenn:  "Legitimating of same-sex marriage would have a small effect, at most, on the percentage of fatherless children and there is no precedent for prohibiting a family arrangement because it creates less than ideal conditions for children.").

19
20
21

- PX2899 at 8 (Badgett, Will Providing Marriage Rights to Same-Sex Couples Undermine Heterosexual Marriage?, Sexuality Research & Social Policy (Sept. 2004):  "Overall, there is no evidence that giving partnership rights to same-sex couples had any impact on heterosexual marriage in Scandinavian countries and the Netherlands.").

22
23
24

- Tr. 601:16-602:15 (Peplau:  Discussing the factors that lead relationships to fall apart, and concluding that "nothing that we know about all of these kinds of factors that lead to divorce has anything to do with civil rights for same-sex couples").

25
26
27

- Tr. 601:18-602:1 (Peplau:  "[I]t is very hard for me to imagine that you would have a happily-married couple who would say, 'Gertrude, we've been married for 30 years, but I think we have to throw in the towel because Adam and Stuart down the block got married.").

28

- Tr. 600:8-601:15 (Peplau: Discussing research on the reasons why people get married, and concluding that "there is nothing, that I am aware of, in the way of data or theory, that would suggest that same-sex civil marriage will lead fewer heterosexuals to marriage").

- Tr. 602:22-603:3 (Peplau: Explaining that if gays and lesbians were permitted to marry they would constitute a very small percentage – approximately 1-3% – of all married couples in the nation.).

- Tr. 603:19-22 (Peplau: Explaining that institutions are generally stronger with more, rather than fewer, members. "[T]he idea that there's a group of American citizens who want to enter the institution [of marriage], to keep it going, to keep it vibrant and alive, from my perspective, seems like a very good omen for the future of America.").

- Tr. 574:24-25 (Peplau: "Americans are very enthusiastic about marriage.").

- Tr. 652:5-654:12 (Peplau: Discussing the factors that family researchers, historians, and sociologists have identified as contributing to the divorce rate in the U.S. and concluding that "the increase in the divorce rate was independent of the push for marriage equality for same-sex couples").

- PX1151 (Article by Stephanie Coontz: Discussing the origins of modern divorce including the personal psychological characteristics of one or both spouses, the stresses of economic hardship and community disintegration, and the modern emphasis placed on finding personal fulfillment and mutual love in a marriage).

- Tr. 658:11-22 (Peplau: There is no scientific theory or data that suggest Americans would be harmed if gays and lesbians are allowed to marry.).

- Tr. 596:13-597:3 (Peplau: In Massachusetts there has been no significant change in the rates of marriage and divorce since civil marriage was opened to gay and lesbian couples in 2004.).

- Tr. 1330:17-19 (Badgett: "I have the opinion that letting same-sex couples marry would not have any adverse effect on . . . different-sex couples.").

- Tr. 1476:7-13 (Badgett: There is no evidence that allowing gay and lesbian couples to marry would harm heterosexual relationships.).

- Tr. 1350:10-1351:1 (Badgett: After looking at demographic data from places where gay and lesbian couples are allowed to marry and the behavior of heterosexual individuals before and after gay and lesbian couples were allowed to marry, Badgett did not find any evidence of any adverse effects of allowing gay and lesbian couples to marry on the marriages of heterosexual couples.).

207

Gibson, Dunn & Crutcher LLP

1

2

3

4

5

6

- PX1273 at 202, 204, 206 (Badgett: *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "My answer to the big question guiding this book [will gay people change marriage?] is 'No'—gay people will not change marriage in any significant way on their own.";  "Contrary to fears expressed by opponents of marriage equality, the marriage patterns of heterosexuals have not been knocked off course once gay couples have the same or similar rights.";  "Heterosexual reactions in the Netherlands also reveal how easily gay people have been integrated into marriage as an institution.").

7

8

9

10

11

12

- PX1273 at 68, 70, 72-77 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  There has been no obvious change in marriage behavior, non-marital cohabitation rates or divorce rates in Denmark, Norway, Sweden, Iceland and the Netherlands once gay couples got partnership or marriage rights.  Any "trends [in these statistics] were well established in the 1970s and 1980s, and no adverse changes have occurred since these countries recognized rights for same-sex couples:  marriage rates are up, divorce rates are down, and (mostly) nonmarital birth rates are not rising in comparison to rates for the years before gay couples could register.").

13

14

- Tr. 251:13-252:23 (Cott:  Denying gays and lesbians the right to marry undermines society's interest in creating stable households and social order).

15

16

- Tr. 348:14-20 (Cott:  Given how the movement in favor of marriage for gays and lesbians has advocated for the importance of marriage, allowing gays and lesbians to marry would likely be very beneficial to the institution.).

17

18

19

- PX2547 (Nathanson 11/12/09 Dep. Tr. 29:3-19:  Acknowledging that American Psychoanalytic Association, American Psychological Association and American Psychiatric Association all support allowing gay and lesbian couples to marry).

20

21

22

23

24

- PX0754 at 1 (Am. Anthropological Ass'n, Policy Statement on Marriage and the Family:  "The results of more than a century of anthropological research on households, kinship relationships, and families, across cultures and through time, provide no support whatsoever for the view that either civilization or viable social orders depend upon marriage as an exclusively heterosexual institution.  Rather, anthropological research supports the conclusion that a vast array of family types, including families built upon same-sex partnerships, can contribute to stable and humane societies.").

25

26

- PX0769 (Natl. Ass'n of Social Workers Same-Sex Marriage Position Statement).

27

- *See also* evidence cited in support of PFFs 245, 248-251, 163.

28

208

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 248.    Proponents have set forth no evidence that permitting same-sex couples to marry would transform marriage as an institution. Proponents' expert, Mr. Blankenhorn, conceded that he could not prove that permitting same-sex couples to marry would have any actual impact on the institution of marriage. And Proponents' counsel admitted that Proponents "don't know" whether allowing same-sex couples to marry would harm heterosexual relationships.

- PX2936 at 1 (Blankenhorn, Defining Marriage Down . . ., Weekly Standard.com (Apr. 2, 2007): "Neither Kurtz nor anyone else can scientifically prove that allowing gay marriage causes the institution of marriage to get weaker. Correlation does not imply causation.").

- PX2545 (Young 11/13/09 Dep. Tr. 94:20-24: Acknowledging that the number of children being raised by married biological parents was decreasing before there was gay marriage in the United States).

- PX2545 (Young 11/13/09 Dep. Tr. 102:15-24: Acknowledging that divorce rates went up with a decline in arranged marriages and increased female literacy).

- Tr. 2912:18-2913:5 (Blankenhorn: Acknowledging that PX2879 (The Marriage Movement: A Statement of Principles (2000)), published in part by his organization, The Institute for American Values, did not include homosexuality or marriage by same-sex couples as one of the reasons the institution of marriage was "weakening").

- Tr. 2780:16-17 (Blankenhorn: Acknowledging that "[i]t's impossible to be completely sure about a prediction of future events. I don't think anyone can" with respect to whether allowing same-sex couples to marry would further the deinstitutionalization of marriage).

- Tr. 334:21-337:11 (Cott: Discussing Mr. Blankenhorn's opinion about the "deinstitutionalization" of marriage and concluding that the changes in marriage that Mr. Blankenhorn is concerned about "have occurred in heterosexual mores about love and sex outside of marriage" and are separate from the "question of same-sex couples wanting to enter the marriage institution and gain its stability and its formal imprimatur").

- Tr. 658:11-22 (Peplau: There is no scientific theory or data that suggest Americans would be harmed if gays and lesbians are allowed to marry.).

- PX2899 at 8 (Badgett, Will Providing Marriage Rights to Same-Sex Couples Undermine Heterosexual Marriage?, Sexuality Research & Social Policy (Sept. 2004): "Overall, there is no evidence that giving partnership rights to same-

209

sex couples had any impact on heterosexual marriage in Scandinavian countries and the Netherlands.").

- Tr. 1476:7-13 (Badgett: After Proponents' examination, and a review of the data and charts presented by Proponents, Badgett testified that she still had not seen any evidence that there would be any harm or change to the institution of marriage or to heterosexual relationships as a result of permitting same-sex couples to marry.).

- PX2810 at 23:10-24:8; 29:17-18 (Proponents' lead counsel (Cooper): Admitting that Proponents "don't know" whether allowing same-sex couples to marry would harm heterosexual relationships; further admitting that whether any harm exists "can't possibly be known now. . . . It may well be that there are no harms.").

- PX0506 at 10 (The only direct change that would affect heterosexual couples that any speaker at any of the Simulcasts could identify was that couples could no longer fill out forms asking for the name of the "bride" and the "groom." Rather they would be forced to use forms asking for the name of "Party A" and "Party B."); *see also* PX1867 at 12:20-13:4; PX 1868 at 44:5-45:1; PX0505.

- *See also* evidence cited in support of PFFs 245, 247, 250-251.

PFF 249.  Mr. Blankenhorn admitted and agreed that "today the principle of equal human dignity must apply to gay and lesbian persons," and "[i]n that sense, insofar as we are a nation founded on this principle, we would be more American on the day we permitted same-sex marriage than we were on the day before." (Emphasis added.) He also admitted that permitting marriage by same-sex couples would be a "victory for the worthy ideas of tolerance and inclusion" and a "victory for . . . the American idea."

- DIX0956 at 2 (Blankenhorn, *Future of Marriage*: "I believe that today the principle of equal human dignity must apply to gay and lesbian persons. In that sense, insofar as we are a nation founded on this principle, we would be more American on the day we permitted same-sex marriage than we were on the day before.") (emphasis in original); *see also* Tr. 2805:8-20 (Blankenhorn).

- Tr. 2850:10-2852:24 (Blankenhorn: Agreeing that allowing same-sex couples to marry would be "a victory for the worthy ideas of tolerance and inclusion," and "a victory for, and another key expansion of, the American idea," and that it would lead to a decline in anti-gay prejudice and hate-crimes, and a valuable national discussion of marriage's benefits); *see also* DIX0956 at 203 & 205 (Blankenhorn, *The Future of Marriage*).

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 250.    There is no evidence that there has been any harm to the institution of marriage as a result of allowing same-sex couples to marry.  Evidence from the Netherlands suggests that the marriage rate, divorce rate, and nonmarital birth rate were not affected by permitting same-sex couples to marry beginning in 2001.

- PX2898 (JN) at 292 (Article by Laura Langbein and Mark A. Yost: Evaluating data from 1990 to 2004 from various U.S. states to determine whether allowing same-sex couples to marry will have negative impacts on marriage, divorce, abortion rates, the proportion of children born to single women, and the percent of children in female-headed households and concluding that the "argument that same-sex marriage poses a negative externality on society cannot be rationally held"), at 293 ("The results show that allowing gay marriage has no significant adverse impact on the family values variables."), at 295 ("Badgett (2004) has shown that giving marriage rights to same-sex couples in Europe has had no a[d]verse effect on marriage, divorces, or children."), at 296-98 (describing data analysis for study), at 301 ("permitting gay marriage does not reduce the marriage rate and may even raise it"), at 302 ("Legalization of gay marriage has no effect on divorces."), at 302 ("[L]egalization of gay marriage clearly does not raise abortion rates and may even reduce them."), at 303 ("[L]aws regulating gay marriage, either permitting it or forbidding it, have no impact on the percentage of children born out of wedlock."), at 305-06 ("The results above show that laws permitting same-sex marriage or civil unions have no adverse effect on marriage, divorce, and abortion rates, the percent of children born out of wedlock, or the percent of households with children under 18 headed by women. . . .  Permitting gay marriage does no harm, and making it legal may even be beneficial, since it seems to raise marriage rates, reduce abortions, and reduce the chance that children grow up in single-headed households.").

- Tr. 601:16-602:15 (Peplau:  Discussing the factors that lead relationships to fall apart, and concluding that "nothing that we know about all of these kinds of factors that lead to divorce has anything to do with civil rights for same-sex couples").

- Tr. 601:18-602:1 (Peplau:  "[I]t is very hard for me to imagine that you would have a happily-married couple who would say, 'Gertrude, we've been married for 30 years, but I think we have to throw in the towel because Adam and Stuart down the block got married.").

- Tr. 600:8-601:15 (Peplau:  Discussing research on the reasons why people get married, and concluding that "there is nothing, that I am aware of, in the way of data or theory, that would suggest that same-sex civil marriage will lead fewer heterosexuals to marriage").

211

Gibson, Dunn & Crutcher LLP

- Tr. 602:22-603:3 (Peplau:  Explaining that if gays and lesbians were permitted to marry they would constitute a very small percentage – approximately 1-3% – of all married couples in the nation).

- Tr. 603:19-22 (Peplau:  Explaining that institutions are generally stronger with more, rather than fewer, members.  "[T]he idea that there's a group of American citizens who want to enter the institution [of marriage], to keep it going, to keep it vibrant and alive, from my perspective, seems like a very good omen for the future of America.").

- Tr. 574:24-25 (Peplau:  "Americans are very enthusiastic about marriage.").

- Tr. 652:5-654:12 (Peplau:  Discussing the factors that family researchers, historians, and sociologists have identified as contributing to the divorce rate in the U.S. and concluding that "the increase in the divorce rate was independent of the push for marriage equality for same-sex couples").

- PX1151 (Article by Stephanie Coontz:  Discussing the origins of modern divorce including the personal psychological characteristics of one or both spouses, the stresses of economic hardship and community disintegration, and the modern emphasis placed on finding personal fulfillment and mutual love in a marriage).

- Tr. 658:11-22 (Peplau:  There is no scientific theory or data that suggest Americans would be harmed if gays and lesbians are allowed to marry.).

- Tr. 596:13-597:3 (Peplau:  In Massachusetts there has been no significant change in the rates of marriage and divorce since civil marriage was opened to gay and lesbian couples in 2004.).

- Tr. 1330:17-19 (Badgett:  "I have the opinion that letting same-sex couples marry would not have any adverse effect on the institution of marriage.").

- Tr. 1476:7-13 (Badgett:  There is no evidence that allowing same-sex couples to marry would cause harm to the institution of marriage.).

- Tr. 1350:10-1351:1 (Badgett:  After looking at demographic data from places where marriage by gay and lesbian couples is allowed and the behavior of heterosexual individuals before and after gay and lesbian couples were allowed to marry, Badgett did not find any evidence of any adverse effects of allowing gay and lesbian couples to marry on the institution of marriage.).

- Tr. 1347:19-1348:13; 1358:7-17; 1361:14-1362:4 (Badgett:  Cultural and demographic similarities between California and Massachusetts make Massachusetts an appropriate benchmark for the likely impact of allowing gay and lesbian couples to marry; "In my opinion, it would be more appropriate to look at Massachusetts [than the Netherlands or other countries] because of the similarities, cultural similarities between different states here in the U.S.";

212

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

There was no evidence of adverse effects on the institution of marriage in Massachusetts, and Badgett believes that there would similarly be no adverse effects in California if same-sex couples were allowed to marry.).

• PX2346 (Massachusetts data reflecting the marriage rate) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from Massachusetts shows that permitting same-sex couples to marry did not lead to a decline in the marriage rate in Massachusetts. Badgett testified that, with respect to the marriage rate for just different-sex couples in Massachusetts, the rate declined prior to 2004 but *increased* after 2004, when same-sex couples were first permitted to marry. (Tr. 1465:6-1466:3.) Badgett's testimony was based on an adjustment to exclude marriages between same-sex couples, which would mean that the overall increase in the marriage rate was even greater after 2004 if you include those marriages. In either case, the Massachusetts data is supports Badgett's opinion that there will be no adverse impact on marriage rates in California.).

• PX2823 and 2824 (Netherlands data reflecting the marriage rate) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands shows that permitting same-sex couples to marry did not lead to a decline in the marriage rate in the Netherlands. Badgett testified that, with respect to the marriage rate in the Netherlands, as reflected in PX2824, the trend after 2001 was no different than the trend before 2001, when same-sex couples were first permitted to marry. (Tr. 1460:9-23.) The data reflects a long-term decline in the marriage rate in the Netherlands and no adverse impact related to permitting same-sex couples to marry beginning in 2001. Proponents showed Badgett three charts, Tabs 1, 2, and 3 in the binder prepared by Proponents, reflecting the marriage rate in the Netherlands from 1994 to 2008 and the average yearly rate of change from 1994 to 2000 compared to 2001 to 2008, derived from DIX1887, and Badgett testified that the rate "has not declined significantly from the rates that we would expect" and she otherwise testified that the Netherlands marriage rate data does not reflect any adverse impact of permitting same-sex couples to marry. (Tr. 1443:6-1446:2.) There was no conflicting expert testimony on this point, or with respect to any of the other data in the record. Badgett agreed with Proponents' withdrawn-expert that the declining marriage rate "is no doubt part of a larger secular trend." (Tr. 1351:16-1354:3.) With respect to the combined number of new marriages and new partnership registrations, as reflected in PX2823, the data similarly shows a long-term decline in the combined number of marriages and new partnership registrations and the rate, as calculated using the population totals included in PX2826, with no adverse impact related to permitting same-sex couples to marry beginning in 2001).)

• PX 2826, 2827, and 2828 (Netherlands data reflecting the divorce rate) (Consistent with Badgett's opinion that permitting same-sex couples to marry

213

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands shows that permitting same-sex couples to marry did not lead to a higher divorce rate in the Netherlands. Badgett testified that the divorce rate in the Netherlands, as reflected in PX2827, *decreased* after 2001.  (Tr. 1461:5-12.)  Notably, Proponents did not question Badgett at all about divorce rates in the Netherlands.  This was because this data confirms the absence of any adverse consequences.  One confounding factor with respect to divorce rates was that in 2001 there was a change in the law that "allowed people who were in marriages to convert their marriages into registered partnerships" instead of filing for divorce.  (Tr. 1357:19-24.)  To account for this confounding factor, Badgett considered the combined divorce and conversion rate, as derived from PX2826, PX2827, and PX2828.  The combined divorce and conversion rate also decreased after 2001, confirming that allowing same-sex couples to marry did not lead to any increase in the divorce rate.  *See* Tr. 1461:18-1463:4.).

- PX 2829 (Netherlands data reflecting the non-marital birth rate) (Consistent with Badgett's opinion that permitting same-sex couples to marry will not adversely affect the institution of marriage or different-sex couples (Tr. 1330:17-19), data from the Netherlands shows that permitting same-sex couples to marry did not lead to any increase in the non-marital birth rate in the Netherlands.  The data in PX2829 reflects the number of non-marital birth rate in the Netherlands, 1950 to 2008, and shows a long-term increase in the rate of non-marital live born children, with no impact related to permitting same-sex couples to marry beginning in 2001.).

- PX2899 at 1, 8 (Badgett, *Will Providing Marriage Rights to Same-Sex Couples Undermine Heterosexual Marriage?,* Sexuality Research & Social Policy (Sept. 2004):  "This paper analyzes data regarding the impact on heterosexual marriages of laws in five European countries that provide marriage or marriage-like rights to same-sex couples.  The data provide no evidence that giving partnership rights to same-sex couples had any impact on heterosexual marriage.";  "Overall, there is no evidence that giving partnership rights to same-sex couples had any impact on heterosexual marriage in Scandinavian countries and the Netherlands.").

- PX1273 at 202, 204, 206 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "My answer to the big question guiding this book [*will gay people change marriage?*] is 'No'—gay people will not change marriage in any significant way on their own.";  "Contrary to fears expressed by opponents of marriage equality, the marriage patterns of heterosexuals have not been knocked off course once gay couples have the same or similar rights.";  "Heterosexual reactions in the Netherlands also reveal how easily gay people have been integrated into marriage as an institution.").

214

Gibson, Dunn
& Crutcher
LLP

- PX1273 at 68, 70, 72-77 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  There has been no obvious change in marriage behavior, non-marital cohabitation rates or divorce rates in Denmark, Norway, Sweden, Iceland and the Netherlands once gay couples got partnership or marriage rights.  Any "trends [in these statistics] were well established in the 1970s and 1980s, and no adverse changes have occurred since these countries recognized rights for same-sex couples: marriage rates are up, divorce rates are down, and (mostly) nonmarital birth rates are not rising in comparison to rates for the years before gay couples could register.").

- PX1273 at 84 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  Reviewing the data from the World Values Survey: Between 1990 and 1999, "the belief that marriage is outdated was becoming relatively *less* common in countries that recognized same-sex partners than in other European countries that did not.  This finding contradicts the prediction that recognizing same-sex couples will somehow undermine marriage in the minds of heterosexual people.").

- PX1273 at 85 (Badgett, *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage*:  "Overall, whether we look at marriage behavior or marriage beliefs, none of the data convincingly link the recognition of same-sex partners to either fewer marriages or a declining belief in the current relevance of marriage.  The findings from survey data, demographic trends, and logical analysis in this chapter all fail to support the idea that policy change led to cultural change in the meaning of marriage.").

- *See also* evidence cited in support of PFFs 245, 247-249, 251, 163.

PFF 251.   In the five years that marriage has been open to couples of the same sex in Massachusetts, the divorce rate has not increased; in fact, the Massachusetts divorce rate is the lowest in the nation.

- Tr. 250:25-251:11 (Cott:  "Massachusetts has the lowest divorce rate in the nation."  Its divorce rate has not increased following the legalization of marriage by same-sex couples.).

- Tr. 596:13-597:3 (Peplau:  There has been no significant change in the rates of marriage and divorce in Massachusetts since civil marriage was opened to gay and lesbian couples in 2004.).

- Tr. 656:20-657:9 (Peplau:  The average divorce rate in Massachusetts was slightly lower in the four years after the legalization of marriage by same-sex couples than in the four preceding years.).

215

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX1309 (Division of Vital Statistics, National Center for Health Statistics, CDC:  The divorce rate in Massachusetts was lower in 2007 than before the gay and lesbian couples were allowed to marry, and is nearly the lowest in the nation, second only to the District of Columbia.).

- Tr. 1466:7-23 (Badgett:  After legalizing marriage by same-sex couples, the divorce rate in Massachusetts has declined faster than the divorce rate in the rest of the United States.).

- PX1309 (Division of Vital Statistics, National Center for Health Statistics, CDC:  Divorce rates fell from 2.5 percent in 2000 to 2.3 percent in 2007.).

- PX2345 (National Marriage and Divorce Rate Trends, CDC: Data reflecting divorce rates in the U.S. for 2000-2007, which fell at a rate less than for Massachusetts).

PFF 252.   During the same time period in which voters in numerous states have acted to exclude gay and lesbian individuals from marriage, those same voters have failed to undertake similar initiatives targeted at other issues that far more directly affect the institution, such as divorce or infidelity, where those initiatives would affect not only gay and lesbian individuals, but the heterosexual majority as well.

- Tr. 564:22-25 (Chauncey:  He is unaware of any recent or historical movement that tried to deny adulterers the right to marry.).

PFF 253.   Mr. Blankenhorn's opinion that permitting same-sex couples to marry would further deinstitutionalize marriage is not credible, reliable, or entitled to substantial weight. Mr. Blankenhorn's opinion lacks any actual basis, is inconsistent with Mr. Blankenhorn's writings, and is contrary to the opinions of other experts who testified, whose opinions are credible and reliable.  Mr. Blankenhorn cited no evidence either of the potential for or the implications of "deinstitutionalization" as a result of allowing same-sex couples to marry, and he admitted that he had not conducted any scientific studies to support any of his opinions.

- Tr. 2736:13-19 (Blankenhorn:  He had not undertaken any scientific study regarding whether there would be any adverse effects of permitting same-sex couples to marry.).

- Tr. 2736:13-19, Tr. 2739:14-20 (Blankenhorn:  When asked what jurisdictions he had studied, Blankenhorn identified the "Scandinavian countries" (which do not include the Netherlands) and Massachusetts, for neither of which he provided any evidence of "deinstitutionalization" or any adverse effects from allowing same-sex couples to marry.).

- Tr. 2775:25 (Blankenhorn:  "[H]eterosexuals, you know, did the deinstitutionalizing.").

PFF 254.   As Mr. Blankenhorn admitted during cross examination, most of the articles cited by him at trial say nothing about deinstitutionalization, and the two that do refer to deinstitutionalization as a concept do not suggest either that deinstitutionalization has occurred elsewhere as a result of allowing same-sex couples to marry, that it will occur in the future, or that if it does occur it will have adverse effects.

- Tr. 2818:20-2820:16 (Blankenhorn:  Admitting that most of the articles offered say nothing about deinstitutionalization).

- DIX0049 at 849, 853ff (Andrew Cherlin, "The Deinstitutionalization of American Marriage":  Describing deinstitutionalization as a long-term phenomenon that was underway no later than the 1970s, rather than as a result of allowing same-sex couples to marry anywhere; asserting that notwithstanding the trend towards deinstitutionalization, positive attitudes towards the importance of marriage have remained constant, and not advancing any opinion as to whether deinstitutionalization is a positive or negative trend).

- DIX0060 at 28 (Norval Glenn, "The Struggle for Same-Sex Marriage":  "Legitimating of same-sex marriage would have a small effect, at most, on the percentage of fatherless children, and there is no precedent for prohibiting a family arrangement because it creates less than ideal conditions for children. Having two parents of the same gender may not be ideal for children, but it should be better than having only one parent, and children with one parent are much more numerous than children with same-sex parents are ever likely to be.").

PFF 255.   Moreover, neither Mr. Blankenhorn, nor any other witness or document advanced by Proponents addressed or rebutted the substantial evidence put forth by Dr. Cott and Dr. Badgett specific to Massachusetts, the Netherlands, and elsewhere, that allowing same-sex couples to marry has not caused any adverse effects, whether associated with "deinstitutionalization" or otherwise.  Mr. Blankenhorn testified that the increased

217

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

deinstitutionalization caused by allowing same-sex couples to marry would be reflected in "higher rates of non-participation in marriage, higher rates of fragility of one-parent homes, divorce [and] divorced non-marital cohabitation or children outside of charge and so forth."  Dr. Cott and Dr. Badgett offered opinions on those same topics, based on data.  The opinion expressed by both Dr. Cott and Dr. Badgett—that there will be no adverse consequences—is credible and reliable, and the unsubstantiated and uninformed opinion of Mr. Blankenhorn is neither credible, nor reliable.  Accordingly, even if Mr. Blankenhorn's purported concerns about the importance of marriage and the institution of marriage were well-founded, there is no evidence that Prop. 8's withdrawal of the right of same-sex couples to marry bears any relationship to these concerns.

- Tr. 2782:7-20 (Blankenhorn's testimony regarding the consequences of deinstitutionalization, as quoted above).

- *See* evidence cited in support of PFFs 244-252.

PFF 256.   Further, consistent with Dr. Cott's credible testimony and reliable opinion, Mr. Blankenhorn acknowledged in his testimony that the institution of marriage has changed over time.

- Tr. 190:23-191:1; 331:3-17; 349:10-353:1 (Cott).

- Tr. 2745:10-12 (Blankenhorn:  "So marriage does numerous things.  There are numerous dimensions to it, of course.  And it changes historically, and it evolves over time, and there's great diversity."); Tr. 2746:1-2 (Blankenhorn: "[M]arriage can look very different in different places and different times.").

- *See also* evidence cited in Section II.B (Demonstrating the changing institution of marriage).

PFF 257.   Mr. Blankenhorn's opinion that allowing same-sex couples to marry would otherwise harm the institution of marriage is also undermined by his own prior writings.

- PX2936 at 1 (Blankenhorn:  "Neither Kurtz nor anyone else can scientifically prove that allowing gay marriage causes the institution of marriage to get weaker.  Correlation does not imply causation.").

218

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

- *See* evidence cited in support of PFF 258 (Blankenhorn:  Listing benefits to opposite-sex couples and to society as a result of allowing same-sex couples to marry).

PFF 258.   Mr. Blankenhorn admitted that allowing gays and lesbian individuals to marry "would be likely to improve the well-being of gay and lesbian households and their children" and would benefit opposite-sex couples, children, and society in general in many ways.

- DIX0956 at 2 (Blankenhorn, *The Future of Marriage*:  "I believe that today the principle of equal human dignity must apply to gay and lesbian persons.  In that sense insofar as we are a nation founded on this principle, we would be *more* American on the day we permitted same-sex marriage than we were on the day before.")

- Tr. 2795:1-5 (Blankenhorn:  "The studies show that adoptive parents, because of the rigorous screening process that they undertake before becoming adoptive parents, actually on some outcomes outstrip the biological parents in terms of providing protective care for their children.").

- Tr. 2803:13-15 (Blankenhorn:  "I believe that adopting same-sex marriage would be likely to improve the well-being of gay and lesbian households and their children.").

- Tr. 2839:22-24 (Blankenhorn:  "[I]t is almost certainly true that gay and lesbian couples and their children would benefit by having gay marriage.").

- Tr. 2843:11-2853:12 (Blankenhorn:  Agreeing that allowing same-sex couples to marry is likely to have at least 13 of the 23 possible positive consequences identified in his book, *The Future of Marriage* (DIX 0956): (1) meeting the stated needs and desires of gays and lesbians, (2) extending the benefits of marriage to gays and lesbians, (3) more gay and lesbian people choosing to enter committed relationships, (4) more stability and longer-lasting relationships for same-sex couples, (5) less sexual promiscuity, (6) greater acceptance of homosexual love and intimacy, (7) "a victory for the worthy ideas of tolerance and inclusion," and "a victory for, and another key expansion of, the American idea," (8) decline in anti-gay prejudice and hate-crimes, (9) increased wealth-accumulation and higher living standards for gays and lesbians, (10) reduced number of gays and lesbians unhappily marrying people of the opposite sex, (11) more children growing up in loving adoptive foster-families, (12) valuable national discussion of marriage's benefits, and (13) new scholarly research on a variety of topics related to marriage and parenting).

Gibson, Dunn
& Crutcher
LLP

1

2   • DIX0956 at 202-05 (Blankenhorn, *The Future of Marriage*: A seminar co-
    convened and chaired by Blankenhorn assembled a list of 23 "Positive

3   Consequences" of allowing same-sex couples to marry: (1) meeting the stated
    needs and desires of gays and lesbians, (2) extending the benefits of marriage

4   to gays and lesbians, (3) more gay and lesbian people choosing to enter
    committed relationships, (4) more stability and longer-lasting relationships for

5   same-sex couples, (5) less sexual promiscuity, (6) greater acceptance of
    homosexual love and intimacy, (7) "a victory for the worthy ideas of tolerance

6   and inclusion," and "a victory for, and another key expansion of, the American
    idea," (8) reaffirmation of society's commitment to social justice, (9)

7   expanding the concept of human rights, (10) decline in anti-gay prejudice and
    hate-crimes, (11) increased wealth-accumulation and higher living standards

8   for gays and lesbians, (12) making marriage more universally accessible, (13)
    demonstration that marriage can be an adaptive social form, (14) decline of

9   "marriage lite" schemes such as civil unions, which can harmfully blur the
    distinction between marriage and non-marriage, (15) reduced number of gays

10  and lesbians unhappily marrying people of the opposite sex, (16) reduced
    number of younger Americans who believe that marriage is an outdated and

11  discriminatory institution, (17) increased birth rate, (18) more children growing
    up in loving adoptive foster-families, (19) valuable national discussion of

12  marriage's benefits, (20) end to today's socially divisive and distracting debate
    over gay marriage, (21) reduction in gender stereotypes, (22) new scholarly

13  research on a variety of topics related to marriage and parenting, and (23)
    valuable local experimentation in matters of marriage and marriage law).

14

15

16  **3.      Excluding Same-Sex Couples from Marriage Does Not Promote
         Achievement of Good Child Adjustment Outcomes**

17  PFF 259.    In their Trial Memorandum, Proponents claimed that the evidence would show that

18  Prop. 8 furthers the following interests: (1) "Promoting enduring and stable family

19  structures for the responsible raising and care of children by their biological parents";

20  (2) "Increasing the probability that natural procreation will occur within stable,

21  enduring, and supporting family structures"; (3) "Promoting the natural and mutually

22  beneficial bond between parents and their biological children"; (4) "Increasing the

23  probability that each child will be raised by both of his or her biological parents"; and

24  (5) "Increasing the probability that each child will be raised by both a father and a

25  mother." Doc # 295 at 7-8. Proponents further claimed that the evidence would show

26  that Prop. 8 prevents a number of related harms because allowing same-sex couples to

27  marry allegedly would: (1) "Require explicit public endorsement of the idea that a

28

220

*Gibson, Dunn
& Crutcher
LLP*

child does not really need both a mother and a father, likely resulting in fewer children growing up with fathers"; (2) "Eradicate in law, and weaken further in culture the idea that what society favors—that what is typically best for the child, the parents, and the community—is the natural mother married to the natural father, together raising their children, likely resulting over time in smaller proportions of children being raised by their own, married mothers and fathers"; (3) "Publicly replace the idea that parenting is largely gendered, ideally involving both a mother and a father, with the idea that parenting is largely unisex, likely resulting in fewer men believing it is important for them to be active, hands-on parents of their children"; (4) "Contribute to replacing the norm of the natural parent with the norm of the legal parent, likely resulting in a growing disjuncture between the biological and legal-social dimensions of parenthood and a significant expansion of the power of the state to determine who is entitled to parental rights"; and (5) "Send a message to men that they have no significant place in family life, weakening the connection of fathers to their children." *Id.* at 9-10. Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these alleged interests or prevent these purported "harms," and the evidence presented at trial demonstrates that prohibiting gay and lesbian individuals to marry will not promote the achievement of good child adjustment outcomes.

- *See* evidence cited in support of PFFs 260-280.

PFF 260.    Same-sex couples are raising children and have the same potential and desire as heterosexual couples to love and parent children.

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement: "[S]ame-sex couples are raising children and have the same potential and desire as heterosexual couples to love and parent children."); *see also* PX 2545 (Young 11/13/09 Dep. Tr. 123:2-11: Agreeing with this statement).

- Tr. 1120:10-25 (Lamb: Approximately 30% of lesbian same-sex couples and 20% of male same-sex couples in the U.S. are raising children.).

*Gibson, Dunn & Crutcher LLP*

- PX2096 at 1 (Adam P. Romero, et al., Census Snapshot: "In many ways, the more than 107,000 same-sex couples living in California are similar to married couples. . . . Census data also show that 18% of same-sex couples in California are raising children.").

- PX0710 at RFA No. 59 (Attorney General admits that an individual's capacity to raise children does not depend on the individual's sexual orientation and that "this proposition is implicitly recognized in the law in the State of California.").

- PX0753 at 339 (JN) (Am. Academy of Pediatrics statement: "The American Academy of Pediatrics recognizes that a considerable body of professional literature provides evidence that children with parents who are homosexual can have the same advantages and the same expectations for health, adjustment, and development as can children whose parents are heterosexual.").

- PX1055 at 45 (Study by Henny M. W. Bos, Frank van Balen & Dymphna C. van den Boom:  Finding that lesbian biological and social mothers had a stronger desire to have a child than heterosexual parents and that lesbian social mothers were more effective and more committed than heterosexual fathers).

- Tr. 2795:1-5 (Blankenhorn:  "The studies show that adoptive parents, because of the rigorous screening process that they undertake before becoming adoptive parents, actually on some outcomes outstrip the biological parents in terms of providing protective care for their children.").

- Tr. 1362:15-1363:21 (Badgett:  Same-sex couples wish to marry for the same reasons as opposite-sex couples.  Same-sex couples are raising children and are engaged in positive assertive matching.).

- Tr. 161:9-12 (Stier:  Plaintiffs Perry and Stier live with their four boys; two are Perry's biological sons, and two are Stier's biological sons.).

- *See also* evidence cited in Section III.B.2.

PFF 261.     Social science has shown that the concerns often raised about children of lesbian and gay parents are generally grounded in unfounded prejudice and stereotypes.  Indeed, there is no scientific basis for concluding that the outcomes for children raised by gay and lesbian parents are any different from their counterparts.

- PX2565 at 5 (Am. Psychol. Ass'n brochure:  "[S]ocial science has shown that the concerns often raised about children of lesbian and gay parents—concerns that are generally grounded in prejudice against and stereotypes about gay people—are unfounded.").

222

Gibson, Dunn
& Crutcher
LLP

- PX0766 (JN) (Am. Psychol. Ass'n, Policy Statement on Sexual Orientation, Parents and Children: "There is no scientific basis for concluding that lesbian mothers or gay fathers are unfit parents on the basis of their sexual orientation.").

- PX0767 at 1, 8 (Am. Psychol. Ass'n, Professional Association Policies: "There is no evidence to suggest or support that parents with a gay, lesbian, or bisexual orientation are per se different from or deficient in parenting skills, child-centered concerns and parent-child attachments, when compared to parents with a heterosexual orientation"; "[T]here is no scientific evidence that parenting effectiveness is related to parental sexual orientation.").

- Tr. 1027:3-1028:2 (Lamb: Research indicates that there is not a marked difference between the effects of gay and lesbian and heterosexual parenting on child adjustment.); *see also* Tr. 1201:21-1202:23 (Lamb: Children of same-sex parents adjust just as well as children of heterosexual parents.).

- Tr. 1038:13-17 (Lamb: There is no evidence that children raised by homosexuals are traumatized emotionally or socially.).

- PX1372 at 946 (Article by Falk, *Lesbian Mothers: Psychosocial Assumptions in Family Law*, American Psychologist (June 1989): "[N]o research has identified significant differences between lesbian mothers and their heterosexual counterparts or the children raised by these groups. Researchers have been unable to establish empirically that detriment results to children from being raised by lesbian mothers.").

- PX1055 at 45 (Study by Henny M. W. Bos, Frank van Balen & Dymphna C. van den Boom: "In general, our findings support the 'no difference' consensus in empirical research on planned lesbian-parent families. That is, children in planned lesbian-parent families do not differ in well-being or child adjustment compared with their counterparts in heterosexual-parent families based on parental reports of the [Child Behavior Checklist]. These findings contradict what is maintained by opponents of lesbian-parent families, namely that children of lesbian parents run the risk of developing a variety of behavior problems because they were raised fatherless, lack a biological tie with one of the mothers, and are stigmatized by their peers.").

- PX2878 at 17 (Article by Biblarz and Stacey, *How Does the Gender of Parents Matter?*: "Current claims that children need both a mother and father are spurious because they attribute to the gender of parents benefits that correlate primarily with the number and marital status of a child's parents since infancy. At this point, no research supports the widely held conviction that the gender of parents matters for child well-being.").

PFF 262.    Proponents' experts do not dispute that professional organizations with expertise in

this area have concluded that neither gender nor sexual orientation is relevant to one's

223

Gibson, Dunn & Crutcher LLP

1    ability to be a good parent.

2      •    PX2547 (Nathanson 11/12/09 Dep. Tr. 49:05-49:19:  Stating that sociological

3          and psychological peer-reviewed studies conclude that permitting gay and

         lesbian individuals to marry does not cause any problems for children); *see*

4          *also* PX2547 (*id.* at 32:03-05:  Noting that American Academy of Pediatrics

         supports allowing same-sex couples to marry because "they see no problem for

5          children").

6      •    Tr. 2797:24-2798:3 (Blankenhorn:  He is not aware of any studies showing that

7          children raised from birth by a gay or lesbian couple have worse outcomes than

         children raised from birth by two biological parents.); *see also* Tr. 2794:12-15

8          (Blankenhorn:  Biological parents are not better parents than adoptive

         parents.).

9

10   PFF 263.    Children and adolescents raised by same-sex parents are as likely to be well-adjusted

11       as children and adolescents raised by heterosexual parents.

12      •    Tr. 1025:4-23 (Lamb:  Studies have demonstrated "very conclusively that

13          children who are raised by gay and lesbian parents are just as likely to be well-

         adjusted as children raised by heterosexual parents."  These results are

14          "completely consistent with our broader understanding of the factors that affect

         children's adjustment.").

15      •    PX1093 at 238 (Study by Fiona Tasker:  "Findings from the existing research

16          studies indicate that while there is obviously variation among children with

         lesbian and gay parents, they are as a group just as likely as children with

17          heterosexual parents to show typical adjustment on the various developmental

         outcomes assessed.  Seldom have reports dissented from this general

18          conclusion.").

19      •    PX1116 at 1895 (Study by Jennifer Wainright, Stephen T. Russell and

20          Charlotte J. Patterson:  "The results of the present study, which is the first

         based on a large national sample of adolescents living with same-sex couples,

21          revealed that on nearly all of a large array of variables related to school and

         personal adjustment, adolescents with same-sex parents did not differ

22          significantly from a matched group of adolescents living with opposite-sex

23          parents.").

24      •    PX0753 (JN), PX0757 (JN), PX0762 (JN), PX0763 (JN), PX0766 (JN),

25          PX0768 (JN), PX1025 (JN), PX1032 (JN) (Examples of policy statements

         from professional organizations concerned with child development that

26          uniformly conclude that children and adolescents of same-sex parents adjust

         just as well as children of heterosexual parents).

27      •    PX1066 at 29 (Study by Susan Golombok, Beth Perry, Amanda Burston, Clare

28          Murray, Julie Mooney-Somers, Madeleine Stevens, & Jean Golding:  "The

224

findings of the present investigation are largely in line with those of earlier studies of lesbian-mother families that pointed to positive mother-child relationships and well-adjusted children.  No significant differences were identified between lesbian mothers and heterosexual mothers for most of the parenting variables, although lesbian mothers reported smacking their children less and engaged more frequently in imaginative and domestic play with their children than did heterosexual mothers.").

- PX2299 at Abstract (Study by Michael J. Rosenfeld:  The first ever nationally representative tests of outcomes for children raised by same-sex couples showing "that children of same-sex couples are as likely to make normal progress through school as the children of most other family structures.").

- Tr. 1118:9-1120:6, 1189:7-1190:6 (Lamb:  Discussing a recent, important study conducted by Michael Rosenfeld that analyzes U.S. census data on all the gay and lesbian couples in the U.S. who are raising children.  This study of the entire population of children of gay and lesbian parents is consistent with the findings of other studies showing that there are no significant differences between the children of same-sex and the children of opposite-sex couples.).

- PX0778, PX1066, PX1111, PX1116 (Examples of studies that examine the adjustment of children of same-sex parents through the use of representative sampling techniques.  These studies consistently and reliably show that the children of same-sex couples are, on average, just as well adjusted as the children of opposite-sex couples.).

- PX1055, PX1101, PX1115, PX1396 (Examples of studies that examine the adjustment of children of same-sex parents through the use of convenience sampling techniques.  These studies consistently and reliably show that the children of same-sex couples are, on average, just as well adjusted as the children of opposite-sex couples.).

- PX1088, PX1101, PX1396 (Examples of studies that examine the adjustment of children of same-sex parents through the use of longitudinal designs.  These studies consistently and reliably show that the children of same-sex couples are, on average, just as well adjusted as the children of opposite-sex couples.).

- PX1066, PX1072, PX1116 (Examples of studies that examine the adjustment of children of same-sex parents through the use of cross-sectional designs.  These studies consistently and reliably show that the children of same-sex couples are, on average, just as well adjusted as the children of opposite-sex couples.).

- PX1093, PX1384, DIX2424 (Several literature reviews that summarize the high quality and substantial research that has been conducted on the adjustment of children of same-sex parents.).

- *See also* evidence cited in support of PFFs 261-262, 264-268.

225

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

PFF 264.    Dr. Lamb's uncontroverted testimony establishes that it is the quality of the parenting, not the gender of the parents, that matters for child adjustment and well-being.

- Tr. 1039:9-12 (Lamb: "[W]hat's important for children's development and adjustment is the quality of the parenting that they obtained from the people who are raising them. . . . [G]ender is not one of those important dimensions."); *see also* Tr. 1075:4-11 (Lamb: The absence of a father does not in and of itself cause problems in child development. Research demonstrates that the most important factors in explaining differences in child development are processes within the household.).

- PX1066 at 31 (Study by Susan Golombok, Beth Perry, Amanda Burston, Clare Murray, Julie Mooney-Somers, Madeleine Stevens, and Jean Golding: "[T]he findings of the present investigation suggest that the presence of two parents irrespective of their gender, rather than the presence of a parent of each sex, is associated with more positive outcomes for children's psychological well-being than is rearing by a single mother. That is, it may be the involvement of a second parent rather than the involvement of a male parent that makes a difference.").

- PX2266 at 6-7 (Michael Lamb, *The role of the father in child development*: "In sum, the evidence suggests that father absence may be harmful not necessarily because a sex-role model is absent but because many paternal roles- economic, social, emotional- go unfilled or inappropriately filled in these families.").

PFF 265.    Indeed, it is well established that both men and women have the capacity to be good parents, and that having parents of both genders does not enhance child or adolescent adjustment. Similarly, there is no empirical support for the notion that the presence of both male and female role models in the home promotes children's adjustment or well-being.

- Tr. 1014:25-1015:19 (Lamb: "[W]hat makes for an effective parent is the same whether or not you are talking about a mother or a father. . . . [C]hildren do not need to have a masculine-behaving parent figure, a father, in order to be well adjusted." Children similarly do not need a female parent to be well adjusted. The overwhelming consensus in the field is that family structure is not the factor that most affects child adjustment.).

- Tr. 1039:18-1040:17 (Lamb: There is no social science research that supports the contention that a parent's failure to observe traditional gender roles will harm a child.).

226

*Gibson, Dunn & Crutcher LLP*

- PX2878 at 5 (Article by Timothy J. Biblarz and Judith Stacey, *How Does the Gender of Parents Matter?*:  Discussing how some advocates of gender-differentiated parenting have misrepresented the research in order to support their claims by failing to note that the research does not compare children in married-couple homes with children raised by same-sex couples); *see also id.* at 17 ("Current claims that children need both a mother and father are spurious because they attribute to the gender of parents benefits that correlate primarily with the number and marital status of a child's parents since infancy.  At this point, no research supports the widely held conviction that the gender of parents matters for child well-being.").

- PX2878 at 16 (Article by Biblarz and Stacey, *How Does the Gender of Parents Matter?*:  "Research has not identified any gender-exclusive parenting abilities (with the partial exception of lactation).").

- PX1372 at 946 (Falk, *Lesbian Mothers: Psychosocial Assumptions in Family Law*, American Psychologist (June 1989):  "[N]o research has identified significant differences between lesbian mothers and their heterosexual counterparts or the children raised by these groups.  Researchers have been unable to establish empirically that detriment results to children from being raised by lesbian mothers.").

- PX 2545 (Young 11/13/09 Dep. Tr. 195:6-195:13:  It does not make a difference if a single parent is male or female, gay or straight.).

- Tr. 1083:5-1084:1 (Lamb:  Children learn about sex roles from role models from inside and outside their home.).

- Tr. 1185:19-21 (Lamb:  Fathers are important figures in children's development and when children have father figures, those relationships are very significant ones.  However, the argument that the presence of a father is itself determinative of child outcomes is not empirically supported.); *see also* PX1088 at 19 (Longitudinal study by Susan Golombok and Shirlene Badger: concluding that presence of father is not determinative of child outcomes).

- DIX0792 (Susan Golombok, *Parenting, What Really Counts*:  Family structure is not one of the primary factors that affect child development.).

- PX1055 at 45 (Study by Henny M. W. Bos, Frank van Balen & Dymphna C. van den Boom:  Finding that children in planned lesbian-parent families do not run the risk of developing a variety of behavior problems because they were raised without fathers.).

- *See also* evidence cited in support of PFFs 261-264, 266-267.

PFF 266.    There is no difference between the ability of a same-sex couple to provide a healthy, positive child-rearing environment and the ability of an opposite-sex couple to provide

227

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

such an environment.  The well-being of children is not contingent on the parents' sexual orientation.

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement: "Gay and lesbian individuals and couples are capable of meeting the best interest of the child and should be afforded the same rights and should accept the same responsibilities as heterosexual parents.").

- PX0757 at 1 (JN) (Am. Psychiatric Ass'n, Position Statement on Adoption and Co-parenting of Children by Same-sex Couples: "Numerous studies over the last three decades consistently demonstrate that children raised by gay or lesbian parents exhibit the same level of emotional, cognitive, social, and sexual functioning as children raised by heterosexual parents.  This research indicates that optimal development for children is based not on the sexual orientation of the parents, but on stable attachments to committed and nurturing adults.  The research also shows that children who have two parents, regardless of the parents' sexual orientations, do better than children with only one parent.").

- PX0766 at 1-2 (JN) (Am. Psychol. Ass'n, Policy Statement on Sexual Orientation, Parents and Children:  "There is no scientific basis for concluding that lesbian mothers and gay fathers are unfit parents on the basis of their sexual orientation.  On the contrary, results of research suggest that lesbian and gay parents are as likely as heterosexual parents to provide supportive and healthy environments for their children . . . . Overall, results of research suggest that the development, adjustment, and well-being of children with lesbian and gay parents do not differ markedly from that of children with heterosexual parents.").

- Tr. 1010:13-1011:13 (Lamb:  A "substantial consensus has developed over the last 30 or 40 years of research" that the factors that affect children's development have to do with the quality of the parent-child relationship, the quality of the relationships between the parents or parent figures, and the social and economic resources available to the child.); *see also* PX2266, DIX0792 (Books discussing the factors that affect child development including processes within the household.  Family structure per se is not one of the central factors that affects child adjustment.); PX1245 at 414 (Review by Anne Peplau and Adam Fingerhut:  "[R]esearch has documented that [the children of same-sex couples] are comparable to children of heterosexual parents on measures of psychological well-being, self-esteem, cognitive abilities, and peer relations.").

- PX0921 (Article by Gregory M. Herek:  "The data indicate . . . that a parent's sexual orientation is unrelated to her or his ability to provide a healthy and nurturing family environment.").

- PX1372 at 947 (Falk, *Lesbian Mothers: Psychosocial Assumptions in Family Law*, American Psychologist (June 1989):  "The majority of researchers

228

recommend that legal decision makers should focus less or not at all on the sexual orientation of a potential custodian and more on the quality of the relationship between the parent and the child. [internal citation omitted] Basile (1974) commented, '[t]he best interests of the child lay with a loving parent, not with a heterosexual parent or a homosexual parent.'").

- Tr. 177:19-178:3 (Stier: "[T]he best thing children can have is parents who love them. That's the most important thing. And I know I love my children with all my heart. Kris loves our children with all her heart. And that's what I believe to be the best thing for them, to be loved.").

- *See also* evidence cited in support of PFFs 261-265.

PFF 267. Studies of personality, self-concept, and behavior problems show few differences between children of lesbian mothers and children of heterosexual parents. Evidence indicates that children of lesbian and gay parents have normal social relationships with their peers and adults. The picture that emerges from this research shows that children of gay and lesbian parents enjoy a social life that is typical of their age group in terms of involvement with peers, parents, family members, and friends.

- Tr. 1037:5-8 (Lamb: "[S]tudies conclude that whether or not children are raised by heterosexual or same-sex parents, there were no differences in their ability to establish appropriate social relationships with peers, either as children or as adolescents.").

- Tr. 1037:13-24 (Lamb: "[W]hile children with gay or lesbian parents are more likely to be teased about their family configuration, they aren't more likely to be teased in general.").

- Tr. 1038:13-17 (Lamb: There is no social science evidence that supports the notion that kids raised by homosexuals are traumatized emotionally and socially.).

- *See also* evidence cited in support of PFFs 261-266, 268.

PFF 268. There is no scientific support for fears about children of lesbian or gay parents being sexually abused by their parents or their parents' gay, lesbian, or bisexual friends or acquaintances.

- Tr. 1034:24-1036:19 (Lamb: "It is clearly established that children are at no greater risk of abuse when being raised by gay and lesbian parents. . . . [T]here is no evidence that gays or lesbians are more likely to sexually abuse children."

229

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

There is no social science research that supports the notion that children need to be protected from gay men or lesbians.).

- PX1384 at 14 (Article by Charlotte J. Patterson, Megan Fulcher, & Jennifer Wainright:  "Fears that children in custody of gay or lesbian parents might be at heightened risk for sexual abuse are thus without empirical foundation.").

- PX2259 at 44 (Article by Jenny, et al., *Are Children at Risk for Sexual Abuse by Homosexuals*?:  "[N]o evidence is available from this data that children are at greater risk to be molested by identifiable homosexuals than by other adults. There is no support for the claim to this effect by groups advocating legislation limiting rights of homosexuals.").

- PX2258 at 181 (Article by Groth, et al., *Adult Sexual Orientation and Attraction to Underage Persons*:  "[T]he adult heterosexual male constitutes a greater sexual risk to underage children than does the adult homosexual male.").

PFF 269.   Excluding same-sex couples from marriage actually harms the objective of providing an optimal child-rearing environment for all children, including the children of gay and lesbian couples who have been denied the rights and status attendant to civil marriage.

- PX0787 at 1 (Am. Psychiatric Ass'n, Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage:  Finding that "[t]he children of unmarried gay and lesbian parents do not have the same protection that civil marriage affords the children of heterosexual couples").

- PX2879 at 3 (Institute for American Values, "The Marriage Movement:  A Statement of Principles":  "Children suffer when marriages between parents do not take place."  "We firmly believe that every family raising children deserves respect and support.").

- PX2880 at 11 (Institute for American Values, "The Marriage Index: A Proposal to Establish Leading Marriage Indicators":  "Because cohabitation and single-parent families tend to be much less stable arrangements than marriage, children born outside of wedlock tend to be in a disadvantaged position.").

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement:  "[S]ame-sex couples and their children are adversely affected by [existing] discriminatory marriage laws.").

- PX0760 at 1, 4 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: Discriminatory marriage laws adversely affect the children of same-sex

230

**Gibson, Dunn & Crutcher LLP**

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

couples by stigmatizing those children and making them less financially
secure.).

PFF 270.   Marriage uniquely legitimizes children and provides them with a sense of security,

stability and increased well-being.

- PX0710 at RFA No. 7 (Attorney General admits "that under California law,
  marriage legitimizes children and provides them greater financial security,
  which may well give children a greater sense of security.").

- Tr. 1964:17-1965:2 (Tam:  It is important to children of same-sex couples that
  their parents be able to marry.).

- PX2852 (Human Rights Campaign, posting a Position Statement of the
  American Medical Association on Adoption by Same-Sex Couples:  "Having
  two fully sanctioned and legally defined parents promotes a safe and nurturing
  environment for children, including psychological and legal security[.] . . .
  therefore, be it RESOLVED, That our American Medical Association support
  legislative and other efforts to allow the adoption of a child by the same-sex
  partner, or opposite sex non-married partner, who functions as a second parent
  or co-parent to that child.").

- Tr. 2839:11-15 (Blankenhorn:  Agreeing that "marriage is something that
  benefits both the participants in the marriage, the couple that are married, as
  well as any children that the couple may raise"); *see also* DIX0956 at 203
  (Blankenhorn, *Future of Marriage*).

- Tr. 2849:6-11 (Blankenhorn:  Agreeing that "Gay marriage would extend a
  wide range of the natural and practical benefits of marriage to many lesbian
  and gay couples and their children"); *see also* DIX0956 at 203 (Blankenhorn,
  *Future of Marriage*).

- Tr. 2803:13-15 (Blankenhorn:  "I believe that adopting same-sex marriage
  would be likely to improve the well-being of gay and lesbian households and
  their children."); *see also* Tr. 2839:22-24 (Blankenhorn:  "I do believe it is
  almost certainly true that gay and lesbian couples and their children would
  benefit by having gay marriage."); Tr. 2848:24-2849:5 (Blankenhorn:
  Agreeing that allowing gay and lesbian couples to marry "would improve the
  happiness and well-being of many gay and lesbian individuals, couples, and
  family members.").

- Tr. 2852:11-17 (Blankenhorn:  Agreeing that "[b]y increasing the number of
  married couples who might be interested in adoption and foster care, same-sex
  marriage might well lead to fewer children growing up in state institutions and
  more growing up in loving adoptive and foster families"); *see also* DIX0956 at
  204 (Blankenhorn, *Future of Marriage*).

231

Gibson, Dunn
& Crutcher
LLP

- Tr. 1042:12-1043:16 (Lamb:  Prohibiting same-sex couples from marrying cannot be expected to improve the adjustment outcomes of any children.  The ability of same-sex couples to get married can improve the likelihood that their child will achieve a good adjustment outcome.).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.:  "Of those [respondents] with children, nearly all respondents (93%) agreed or somewhat agreed that their children are happier and better off as a result of their marriage.").

PFF 271.   Social science research has found that having a gay or lesbian parent does not affect the development of a child's sexual and gender identities (including gender identity, gender-role behavior, and sexual orientation).

- Tr. 1030:8-11 (Lamb:  "Gender identity disorders . . . are extremely rare.  And there is no evidence that they are more common when children are being raised by gay and lesbian parents.").

- PX1372 at 945 (Article by Falk, *Lesbian Mothers: Psychosocial Assumptions in Family Law*, American Psychologist (June 1989):  "Thus, taking even the most conservative view of this relatively well-developed area of research, it is apparent that lesbian mothers do not exert a detrimental influence on their children's gender role development.").

- Tr. 1032:18-21 (Lamb:  "[S]tudies have shown that there is no significant increase in the proportion of children who become gay or lesbian themselves when they are raised by gay or lesbian parents.").

- PX1093 at 233 (Article by Fiona Tasker:  "Having a lesbian or gay parent does not seem to influence gender role development, and the large majority of sons and daughters of lesbian or gay parents grow up to identify as heterosexual.").

- PX1088 at 17-18 (Longitudinal study by Susan Golombok & Shirlene Badger:  Finding that children raised in lesbian families are not more likely to identify as homosexual in their young adulthood).

- Tr. 1034:2-16 (Lamb:  "There have been a number of studies that have, for example, shown that in some cases children raised by gay and lesbian parents have less sex stereotyped attitudes than those being raised by heterosexual parents[,]" but this is "viewed as an aspect of normal variation.").

- PX1384 at 11 (Article by Charlotte J. Patterson, Megan Fulcher & Jennifer Wainright:  "In general, research has failed to reveal any differences in the development of children's gender identity or gender role behavior as a function of parents' sexual orientation.").

232

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1            •    PX1066 at 31 (Study by Susan Golombok, Beth Perry, Amanda Burston, Clare
2                 Murray, Julie Moone-Somers, Madeleine Stevens & Jean Golding:
                Concluding that maternal sexual orientation is not a major influence on
3                 children's gender development).

**PFF 272.**    Beliefs that lesbian and gay adults are not fit parents have no empirical foundation.

         •    *See* evidence cited in support of PFFs 261-268.

**PFF 273.**    Mr. Blankenhorn's opinion that the optimal environment for raising children is by two

biological parents is not credible, reliable, or entitled to substantial weight because (i)

his purported expertise is based on his study of the writings and analysis of others; (ii)

he had no or limited expertise based on his education, training, and experience; and

(iii) he could offer no evidence contrary to Dr. Lamb's conclusion that children of

same-sex parents are as well-adjusted as children of heterosexual parents.  Indeed, Mr.

Blankenhorn's opinion is contradicted by other, more credible, evidence and his own

testimony.  Dr. Lamb's opinion was that children and adolescents raised by same-sex

parents are as likely to be well-adjusted as children and adolescents raised by

heterosexual parents, and that opinion is credible and reliable.

         •    Tr. 2766:5-2768:23 (Blankenhorn:  Children should be raised by their
            biological parents because "kin altruism" ensures that they will get better care
            from people who are closely related to them.  Child outcome studies also
            indicate that it is optimal for children to be raised by their biological mother
            and father.).

         •    Tr. 2767:22-2768:1 (Blankenhorn:  The "accumulating weight of evidence
            [shows] that the optimal environment for children is if they are raised from
            birth by their own natural mother who is married to their own natural father.").

         •    DIX2693 (Blankenhorn CV:  Three-page CV that does not identify any
            relevant education or employment except with respect to his association with
            the Institute for American Values.).

         •    Tr. 2735:15-2736:3 (Blankenhorn:  Testifying that the fields of psychology,
            sociology, and anthropology are relevant to the subjects on which he was being
            asked to testify, but he had no degrees in any of those subjects.).

233

*Gibson, Dunn
& Crutcher
LLP*

1

2
- DIX2693, Tr. 2732:5-7, 2732:16-25 (Blankenhorn: Has a master's degree in comparative labor history and completed his thesis on the study of two cabinetmakers' unions in 19th century Britain.).

3

4
- Tr. 2897:11-2899:13 (Blankenhorn: Testified that he was just "repeating" things said by others and serving as a "transmitter" of findings by others).

5

6
- Tr. 2797:24-2798:3 (Blankenhorn: "Q. Are you aware of any studies showing that children raised from birth by a gay or lesbian couple have worse outcomes than children raised from birth by two biological parents? A. No, sir.").

7

8

9
- Tr. 2931:25-2933:5 (Blankenhorn: Blankenhorn was aware of multiple peer-reviewed articles that had reached the conclusion that "children with lesbian or gay parents are comparable with children with heterosexual parents on key psychosocial developmental outcomes.").

10
- *See* evidence cited in support of PFFs 260-271, 274-280.

11

12
- Tr. 2797:24-2798:3 (Blankenhorn: "Q. Are you aware of any studies showing that children raised from birth by a gay or lesbian couple have worse outcomes than children raised from birth by two biological parents? A. No, sir.").

13

14

15
- Tr. 2931:25-2933:5 (Blankenhorn: Blankenhorn was aware of multiple peer-reviewed articles that had reached the conclusion that "children with lesbian or gay parents are comparable with children with heterosexual parents on key psychosocial developmental outcomes.").

16

17
- Tr. 2803:6-15 (Blankenhorn: "[A]dopting same-sex marriage would be likely to improve the well-being of gay and lesbian households and their children.").

18

19
- Tr. 2839:11-24 (Blankenhorn: "[I]t is almost certainly true that gay and lesbian couples and their children would benefit by having gay marriage.").

20
PFF 274.    The evidence introduced by Proponents does not support Mr. Blankenhorn's

21
conclusion that there is a large body of scholarship stating that the optimal child

22
outcome occurs when children are raised by their natural mothers and fathers.

23
- Tr. 2797:24-2798:3 (Blankenhorn: "Q. Are you aware of any studies showing that children raised from birth by a gay or lesbian couple have worse outcomes than children raised from birth by two biological parents? A. No, sir.").

24

25

26
- Tr. 2767:16-2768:1 (Blankenhorn: Asserting that the "accumulating weight of evidence [shows] that the optimal environment for children is if they are raised from birth by their own natural mother who is married to their own natural father.").

27

28

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- DIX0002 at 83, 86 n.63 (Study by Paul Amato, Professor of Family Sociology and Demography, Department of Sociology & Crime, Law and Justice, Pennsylvania State University:  Including the conclusions that "I considered adoptive parents to be the same as biological parents" and that "[r]egardless of family structure, the quality of parenting is one of the best predictors of children's emotional and social well-being").

- DIX0026 at 6 (*Child Trends* report:  Discussing the importance of two biological parents, as compared to "Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships," but not analyzing marriages by same-sex couples).

- DIX0124 at 2 (Study by McLanahan and Sandefur:  Concluding that children who grow up with only one biological parent are worse off than those who grow up with two, but not evaluating or comparing biological to adoptive parents or heterosexual to homosexual parents, acknowledging that the processes within households (rather than the biology or gender of the parent) account for child outcomes, and noting:  "But are single motherhood and father absence therefore the root cause of child poverty, school failure and juvenile delinquency? Our findings lead us to say no.").

- DIX0108 at 229 (Blankenhorn, *Fatherless America*:  Blankenhorn previously proposed "encouraging unmarried girls to give up their babies for adoption by married couples" to increase male responsibility.).

- *See* evidence cited in support of PFFs 275-276.

PFF 275.   The research that opponents of allowing gay and lesbian couples to marry use to support their contention that gay and lesbian individuals are not fit parents is not based on studies involving same-sex parents.

- Tr. 1012:5-1014:7 (Lamb:  Statistics that compare child adjustment outcomes in single-parent versus two-parent families are not drawn from studies on the children of same-sex parents.  These studies are consistent with the broader body of research on the factors that account for child development and do not demonstrate that the absence of a father in and of itself causes children to be more likely to have poor child adjustment outcomes.).

- Tr. 1186:8-14 (Lamb:  Research on father absence is usually used to describe "heterosexual families in which single heterosexual women are raising their children, either by choice or as a result of a family dissolution.").

- Tr. 1187:13-1189:6 (Lamb:  Research on father absent-, divorced-, and step-families does not tell us anything about the adjustment of children with gay or lesbian parents.  Gay and lesbian parents should be studied as a discrete category when studying the adjustment of their children.).

235

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- Tr. 1190:7-17 (Lamb:  The most appropriate control group when studying children raised by same-sex couples is to compare that group of children to children being raised by heterosexual couples because there are unmarried parents in both of those groups.  This methodology is consistent with how research in this area has been conducted.).

- Tr. 1198:7-1201:20 (Lamb:  There is only one study that finds that children raised by gay and lesbian parents have problems, and most people in the field of studying children's adjustment share concerns about the study's reliability.  In contrast, Lamb relied on hundreds of studies that make it "clear that having a gay or lesbian parent does not make children more likely to be maladjusted than if those children were raised by heterosexual parents.").

PFF 276.   Indeed, the research on "intact families" treats the biological link as irrelevant by considering adoptive and biological parents as part of the same cohort.

- Tr. 1190:18-1194:21 (Lamb:  In the field of developmental psychology, the phrase "biological parent" is often used to refer to both adoptive and genetic parents who have raised a child continuously from birth.).

- PX1040 at 6 fn. 3 (Study by Robert A. Johnson, John P. Hoffmann, and Dean R. Gerstein:  "[M]ost studies do not distinguish biological parents from adoptive parents since the latter is a rare family form in virtually all studies.  Presumably, though, families in which both parents have adopted the child are to be considered intact.").

- DIX2 at 83, 96 (Review by Paul R. Amato:  "Regardless of family structure, the quality of parenting is one of the best predictors of children's emotional and social well-being"; "I considered adoptive parents to be the same as biological parents.").

- PX0779, PX1100, PX1108 (Examples of studies on adoption and the use of assisted reproductive technologies.  These studies demonstrate that children who are not biologically related to one or both of their parents are just as likely to be well adjusted as children being raised by their biological parents.).

- Tr. 1194:14-21 (Lamb:  Stating that Proponents' withdrawn expert, Dr. Loren Marks, was correct to withdraw his emphasis on the word "biological" with respect to his conclusions about the characteristics of an ideal child-rearing environment, because the research does not treat the biological link as determinative of child outcomes.).

PFF 277.   Children are advantaged by increasing the durability of the relationship of the people raising them, and the durability of the relationship of a gay couple is enhanced by permitting the gay couple to marry.

236

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0753 at 339 (JN) (Am. Acad. of Pediatrics, Statement: "Children deserve to know that their relationships with both of their parents are stable and legally recognized. This applies to all children, whether their parents are of the same or opposite sex.").

- Tr. 1042:20-1043:16 (Lamb: The ability of same-sex couples to get married can improve the likelihood that their child will achieve a good adjustment outcome. "[B]eing able to consider themselves part of a well-recognized institution, can be beneficial for. . . children.").

- Tr. 1105:14-1106:3 (Lamb: Being raised in an intact two-parent family is generally good for children.).

- DIX2 at 79 (Review by Paul R. Amato: "The risk of relationship dissolution also is substantially higher for cohabiting couples with children than for married couples with children. . . . To the extent that marriage increases union stability and binds fathers more strongly to their children, marriage among cohabiting parents may improve children's long-term well-being.").

- Tr. 343:6-10 (Cott: "[I]t's clear that couples of the same sex are going to form intimate relationships and rear children of their own or adopted. And it seems to me to the public's interest for them to be able to do that in marital units that are recognized as such and honored as such.").

- PX2545 (Young 11/13/09 Dep. Tr. 82:4-82:12, 86:1-8: Agreeing that children of gay and lesbian couples would be advantaged if their parents were allowed to marry because it would increase the "durability" of their relationship).

- PX2547 (Nathanson 11/12/09 Dep. Tr. 38:19-39:09: Agreeing that permitting gay and lesbian individuals to marry increases the stability in commitment of their relationship, as well as their happiness, sense of security and well-being).

- Tr. 2849:12-17 (Blankenhorn: Agreeing that "[e]xtending the right to marry to same-sex couples would probably mean that a higher proportion of gays and lesbians would choose to enter into committed relationships"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- PX0787 at 1 (Am. Psychiatric Ass'n, Position Statement on Support of Legal Recognition of Same-Sex Civil Marriage: Noting the benefits of marriage for married adults and their children and stating that "[t]he children of unmarried gay and lesbian parents do not have the same protection that civil marriage affords the children of heterosexual couples.").

- PX0752 at 2 (Am. Psychoanalytic Ass'n, Position Statement: "[S]ame-sex couples and their children are adversely affected by [existing] discriminatory marriage laws.").

Gibson, Dunn
& Crutcher
LLP

- PX0760 at 1, 4 (Am. Psychoanalytic Ass'n, Position Paper on Gay Marriage: Discriminatory marriage laws adversely affect the children of same-sex couples by stigmatizing those children and making them less financially secure.).

- *See also* evidence cited in support of PFFs 142-145, 278.

PFF 278.    Marriage increases the commitment in and stability of a relationship regardless of whether it is a gay, lesbian, or heterosexual relationship.

- Tr. 2849:18-23 (Blankenhorn:  Agreeing that "[s]ame-sex marriage would likely contribute to more stability and to longer-lasting relationships for committed same-sex couples"); *see also* DIX0956 at 203 (Blankenhorn, *Future of Marriage*).

- Tr. 590:20-23 (Peplau:  "[G]ay men and lesbians don't have the benefits of marriage, and . . . marriage is for many relationships a stabilizing influence.").

- Tr. 612:19-613:8 (Peplau:  Access to civil marriage would further stabilize, legitimate, and validate same-sex relationships.).

- Tr. 659:16-22 (Peplau:  There are greater social barriers preventing a couple from exiting a marriage than a domestic partnership.).

- Tr. 1345:19-1348:13 (Badgett:  A study of married same-sex couples in Massachusetts indicated that 72% of respondents felt more committed to their partners as a result of marrying.  Badgett expects that she would see similar results in California if same-sex couples could marry.).

- PX1267 at 1 (Report on a survey of the experiences and impact of marriage on same-sex couples in Massachusetts by Christopher Ramos, et al.:  "As a result of marrying . . . [o]ver 72% felt more committed to their partners.").

PFF 279.    Prop. 8 does not change California's laws and policies that permit gay and lesbian individuals to have, adopt, or raise children.

- PX0001 (California Voter Information Guide for Proposition 8:  Noting that a "Yes" vote on Prop. 8 means that only marriage between a man and a woman will be valid in California, but containing no mention of any effort to prevent gay and lesbian individuals from having, adopting or raising children); *see also* Cal. Const. Art. I, § 7.5 (same).

- PX0709 at RFA No. 22 (Administration admits "that California law does not prohibit individuals from raising children on the basis of sexual orientation" and cites California Welf. & Inst. Code § 16013(a), Cal. Fam. Code § 297.5(d), and *Elisa B. v. Superior Court*, 37 Cal. 4th 108, 113 (2005).).

238

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0710 at RFA No. 57 (Attorney General admits "that the law of the State of California protects the right of gay men and lesbians in same sex relationships to be foster parents and to adopt children by forbidding discrimination on the basis of sexual orientation.").

- PX0710 at RFA No. 60 (Attorney General admits "that in determining who shall raise a child and what is in the best interest of a child, the law of the State of California prohibits discrimination on the basis of sexual orientation.").

- PX0739 at No. 57 (Proponents stipulate that "the State of California allows gay men and lesbians in same-sex relationships to serve as foster parents and to adopt children.").

PFF 280.  Mr. Blankenhorn admitted that allowing gay and lesbian couples to marry would be likely to "improve the well-being of gay and lesbian households and their children." He testified allowing same-sex couples to marry would result in fewer children growing up in state institutions and more children being raised by loving parents, and would in fact reduce the divorce rate, reduce promiscuity, improve the stability of couples' relationships, increase wealth for families and lead to a decline in "anti-gay prejudice" and "anti-gay hate crimes."

- Tr. 2803:13-15 (Blankenhorn:  "I believe that adopting same-sex marriage would be likely to improve the well-being of gay and lesbian households and their children.").

- Tr. 2839:22-24 (Blankenhorn:  "[I]t is almost certainly true that gay and lesbian couples and their children would benefit by having gay marriage.").

- Tr. 2843:11-2853:12 (Blankenhorn:  Agreeing that allowing same-sex couples to marry is likely to have at least 13 of the 23 possible positive consequences identified in his book, *The Future of Marriage* (DIX 0956)).

- DIX0956 at 202-05 (David Blankenhorn, *The Future of Marriage*:  A seminar co-convened and chaired by Blankenhorn assembled a list of 23 "Positive Consequences" of allowing same-sex couples to marry:  (1) meeting the stated needs and desires of gays and lesbians, (2) extending the benefits of marriage to gays and lesbians, (3) more gay and lesbian people choosing to enter committed relationships, (4) more stability and longer-lasting relationships for same-sex couples, (5) less sexual promiscuity, (6) greater acceptance of homosexual love and intimacy, (7) "a victory for the worthy ideas of tolerance and inclusion," and "a victory for, and another key expansion of, the American idea," (8) reaffirmation of society's commitment to social justice, (9) expanding the concept of human rights, (10) decline in anti-gay prejudice and

239

Gibson, Dunn & Crutcher LLP

1
2
3
4
5
6
7
8

hate-crimes, (11) increased wealth-accumulation and higher living standards for gays and lesbians, (12) making marriage more universally accessible, (13) demonstration that marriage can be an adaptive social form, (14) decline of "marriage lite" schemes such as civil unions, which can harmfully blur the distinction between marriage and non-marriage, (15) reduced number of gays and lesbians unhappily marrying people of the opposite sex, (16) reduced number of younger Americans who believe that marriage is an outdated and discriminatory institution, (17) increased birth rate, (18) more children growing up in loving adoptive foster-families, (19) valuable national discussion of marriage's benefits, (20) end to today's socially divisive and distracting debate over gay marriage, (21) reduction in gender stereotypes, (22) new scholarly research on a variety of topics related to marriage and parenting, and (23) valuable local experimentation in matters of marriage and marriage law.

9
10

**D.     There Is No Evidence That Excluding Gay and Lesbian Individuals From Marriage Promotes Administrative Convenience**

11
12
13
14
15
16
17
18

PFF 281.     In their Trial Memorandum, Proponents claimed that the evidence will show that Prop.

8 furthers the following interests: (1) "Using different names for different things"; (2)

"Maintaining the flexibility to separately address the needs of different types of

relationships"; (3) "Ensuring that California marriages are recognized in other

jurisdictions"; and (4) "Conforming California's definition of marriage to federal

law."  Doc # 295 at 7-8.  Proponents presented no credible, reliable evidence that

excluding same-sex couples from marriage would further these purported interests,

and the evidence presented at trial demonstrates that Prop. 8 does not further them.

19

•     *See* evidence cited in PFFs 282 and 283.

20
21
22
23

PFF 282.     Relationships of same-sex couples are not "different" from relationships between

opposite-sex couples in any meaningful or relevant way.  In fact, same-sex couples

form lasting, committed relationships and are fundamentally similar to opposite-sex

couples.

24
25

•     *See* evidence cited in Section V.

26
27

PFF 283.     Prop. 8 does not further any purported state interest in administrative convenience

because it has resulted in a crazy quilt of marriage regulations in the State that

involves five categories of citizens:  (1) Those in opposite-sex couples, who are

28

240

*Gibson, Dunn & Crutcher LLP*

permitted to marry, and to remarry upon divorce; (2) those who comprise the 18,000 same-sex couples who were married after the California Supreme Court's decision in the *Marriage Cases* but before the enactment of Prop. 8, whose marriages remain valid but who are not permitted to remarry upon divorce; (3) those who are in unmarried same-sex couples, who are prohibited by Prop. 8 from marrying and restricted to the status of domestic partnership; (4) those same-sex couples who entered into a valid marriage outside of California *before* November 5, 2008 are treated as married under California law, but are not permitted to remarry within the state upon divorce; and (5) those same-sex couples who entered into a valid marriage outside of California *on or after* November 5, 2008 are granted the rights and responsibilities of marriage, but not the designation of "marriage" itself.

- *See* evidence cited in support of PFF 101.

**E.    Excluding Same-Sex Couples from Marriage Does Not Further Any Alleged Interest in Protecting the First Amendment Rights of Those Who Oppose Allowing Them to Marry**

PFF 284.    In their Trial Memorandum, Proponents claimed that the evidence would show that Prop. 8 furthers the following interests:  (1) "Preserving the prerogative and responsibility of parents to provide for the ethical and moral development and education of their own children"; and (2) "Accommodating the First Amendment rights of individuals and institutions that oppose same-sex marriage on religious or moral grounds."  Doc # 295 at 7-8.  Proponents further claimed that the evidence would show that Prop. 8 prevents a number of related harms because allowing same-sex couples to marry would:  (1) "Render the traditional definition of marriage embraced by millions of Christian, Jewish, and Muslim Americans no longer legally or socially acceptable, thereby probably forcing many of these Americans to choose between being a believer and being a good citizen"; (2) "Lead to new state-imposed restrictions of First Amendment freedoms"; and (3) "Force some religious organizations now receiving public support to cease providing charitable services to

241

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

the poor and to others."  *Id*. at 10.  Proponents presented no credible, reliable evidence that excluding same-sex couples from marriage would promote these purported interests or prevent these alleged "harms."  Indeed, Proponents presented no evidence whatsoever that permitting gay and lesbian individuals to marry would alter existing First Amendment freedoms.

**F.      Not Only Do No Rational or Legitimate Justifications Support Prop. 8, But the Evidence Demonstrates That Prop. 8 Was Driven by Animus Towards, and Moral Disapproval of, Gay and Lesbian Individuals**

PFF 285.      The express and stated purpose of Prop. 8 was to strip gay and lesbian individuals of constitutional rights afforded to them by the California Constitution and to impose a special disability on gay and lesbian individuals alone by denying them state constitutional protections that apply to all other citizens.

- PX0001 at 9 (California Voter Information Guide:  "Changes California Constitution to eliminate the right of same-sex couples to marry.").

- PX2864 at 7 (JN) (Amicus brief in *Strauss v. Horton*, by Professors Eskridge and Cain:  "In contrast to Proposition 115, which applied to all citizens who might in the future be charged with a crime, Proposition 8 takes away a fundamental constitutional right from just a minority.  In contrast to Proposition 14, where the discrimination was found in the motivations of proponents, discrimination is on the face of Proposition 8.").

- Tr. 1962:17-1963:8 (Tam:  Tam gets "very very upset" about the idea of children thinking about marrying people of the same sex, but he is reassured by knowing that gay couples are not allowed to get married so that parents can explain to their children that gay couples can enter domestic partnerships, "'but it is not 'marriage.'"  He is comforted because this difference is "something that is very easy for our children to understand.").

- PX2343A at 5-6 (Pro-Prop. 8 fliers translated from Chinese:  "[l]egal marriage must meet moral standards and consider posterity. It cannot use equality as its standard" (at 5); "Using 'demanding equal treatment' as a reason to obtain rights is an argument often used by homosexuals. It is also a scary reason. Demanding equal treatment at work is acceptable but not so for marriage."(at 5-6)).

- PX1867 at 29:17-30:2 (Transcript of the simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election:  Ms. Ana Samuel, a lecturer at Princeton University explained that "Laws can have a tremendous

242

*Gibson, Dunn & Crutcher LLP*

effect on the way we view marriage and if we have same-sex marriage legalized, it's really giving implicitly our political blessing to this thing. It's not just kind of an it's okay. It's an affirmation that it's just as good. And then we're going to have this society that eventually is going to come to believe it over generations."); *see also* PX0503 (video of same).

- PX2150 (Mailer "Paid for by ProtectMarriage.com—Yes on 8:" "four activist judges on the Supreme Court in San Francisco ignored four million voters and imposed same-sex marriage on California. Their ruling means it is no longer about 'tolerance.' Acceptance of Gay Marriage is Now Mandatory [sic].").

PFF 286. The adoption of Prop. 8 was motivated by an intent to discriminate against, and animus towards, gay and lesbian individuals.

- PX0001 at 9 (California Voter Information Guide: "Changes California Constitution to eliminate the right of same-sex couples to marry.").

- PX0001 at 128 (California Voter Information Guide stating the text of Proposition 8: "Only marriage between a man and a woman is valid or recognized in California.").

- PX2864 at 7 (JN) (Amicus brief in *Strauss v. Horton*, by Professors Eskridge and Cain: "In contrast to Proposition 115, which applied to all citizens who might in the future be charged with a crime, Proposition 8 takes away a fundamental constitutional right from just a minority. In contrast to Proposition 14, where the discrimination was found in the motivations of proponents, discrimination is on the face of Proposition 8.").

- PX2864 at 17 (JN) (Amicus brief in *Strauss v. Horton*, by Professors Eskridge and Cain: "[M]any prejudiced voters favor any measure that harms or excludes lesbians, gay men, bisexuals, or transgendered persons, and even moderate voters are reluctant because of the anti-gay stereotypes . . . that the state long built into its public education and state policy.").

- Tr. 424:24-429:6 (Chauncey: Prop. 8 Official Voter Guide evoked fears about and contained stereotyped images of gay people.).

- PX0710 at RFA No. 51 (Attorney General admits "that some of the advertising in favor of Proposition 8 was based on fear of and prejudice against homosexual men and women.").

- Tr. 2608:16-18 (Miller: "My view is that at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.").

- PX0577 (Article by Frank Schubert and Jeff Flint in *Politics* magazine: "[P]assing Proposition 8 would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only

243

about the two individuals involved in a committed gay relationship." (at 44); "We strongly believed that a campaign in favor of traditional marriage would not be enough to prevail." (at 44); "We probed long and hard in countless focus groups and surveys to explore reactions to a variety of consequences our issue experts identified." (at 45); they decided to create campaign messaging focusing on "how this new 'fundamental right' would be inculcated in young children through public schools." (at 45); "there were limits to the degree of tolerance Californians would afford the gay community.  They would entertain allowing gay marriage, but not if doing so had significant implications for the rest of society." (at 45); "The Prop. 8 victory proves something that readers of *Politics* magazine know very well: campaigns matter." (at 47).).

- Tr. 548:1-15 (Chauncey: People often hold deeply sincerely religious convictions that seem timeless, but historians have shown and have seen how they, in fact, change over time and are naturally shaped by the larger culture in which they live.  Indeed, many people in the South deeply believed that interracial marriage was against God's will.  These are sincere beliefs, but they "reflect the larger system of prejudices that had shaped [the belief-holder's] understanding of the world.").

- *See also* evidence cited in support of PFFs 287-296.

PFF 287.    Campaign messages supporting Prop. 8 and Yes On 8 proponents stated and implied that same-sex relationships are immoral.

- PX1868 at 51:15-24 (Transcript of the Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind": Reverend Dwight McKissic, Senior Pastor of Cornerstone Baptist Church in Arlington, Texas stated:  "To compare homosexuality to civil rights is to compare my skin with their sin.  That's insulting, demeaning and offensive.  I believe it's even racist to compare my complexion to somebody else's sin.  Homosexuality is a choice and skin color is not a choice."); *see also* PX0504 (video of same).

- PX1868 at 77:12-15 (Transcript of the Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind": Pastor Miles McPherson stated:  "And right now kids in kindergarten are being taught what we would call as perversion, and we sit around and let it happen."); *see also* PX0504 (video of same).

- PX1867 at 2:19-20 (Transcript of the simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election:  Pastor Jim Garlow, creator of the Simulcasts promoting Prop. 8, explained that he is working to pass Prop. 8 "to turn back the tides of evil"); *see also* PX0503 (video of same).

- PX0401 ("Stand up for Righteousness. Vote Yes on Proposition 8" video, featuring Ron Prentice, Tony Perkins and Miles McPherson:  An oncoming train rushes towards the viewer; "The devil wants to blur the lines between right and wrong when it comes to family structure"; "If Prop. 8 fails, it opens

244

1
2
3

up the door for all the other laws that the homosexual agenda wants to enforce on other people"; "We will see a further demise of the family"; "Our children are confused about what marriage is"; God is "giving America a second chance"; and imploring voters to not deny Jesus like Peter did).

4
5
6
7
8

•   PX2403 (Email from Kenyn Cureton, Vice President for Church Ministries with the Family Research Council, to Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, in August, 2008:  Attaching Stand for Marriage materials describing homosexuality as a "sin" and "poor misguided lost people trapped in Satan's snare" and asserting that "[p]ublic schools will teach the fully equal status of homosexual and heterosexual conduct based, in substantial part, on state marriage law.  Those who object may find themselves on the wrong side of the law" in advocating for support of Prop. 8.).

9
10

•   Tr. 1960:1-9 (Tam:  Tam knows that "domestic partnerships are the same as marriage, except for the name," but he still thinks that "just changing the name of domestic partnerships to marriage will have this enormous moral decay.").

11
12

•   Tr. 1928:6-13 (Tam:  Tam thought "permitting gays and lesbians to marry" would mean "one by one other states would fall into Satan's hand.").

13
14
15

•   PX2187 (Flyer promoting an Oct. 19, 2008 rally to "Restore Marriage Protect Children" sponsored by Traditional Family Coalition and co-sponsored by ProtectMarriage.com:  "It is time the church rise up against the forces of evil that are destroying families and young souls.").

16
17

•   Tr. 540:5-11 (Chauncey: The Catholic Church and the Baptists strongly supported Prop. 8.).

18
19
20
21
22
23
24
25

•   PX0170 (Website with the Southern Baptist Convention Resolution On The California Supreme Court Decision To Allow Same-Sex Marriage: "WHEREAS, Any action giving homosexual unions the legal status of marriage denies the fundamental Immorality of homosexual behavior (Leviticus 18:22; Romans 1:26-27; 1 Corinthians 6:9-11). . . . RESOLVED, That we encourage all Christian pastors in California and in every other state to speak strongly, prophetically, and redemptively concerning the sinful nature of homosexuality and the urgent need to protect biblical marriage in accordance with God's Word; and be it further RESOLVED, That we call on all Southern Baptists and believers from all denominations everywhere to pray for the people of California as they seek to right this terrible wrong that has been forced upon them by the California Supreme Court's overturning of the vote of the people and to pray for the people of every state where biblical marriage is under attack.").

26
27
28

•   PX0168 (Website with the Resolution from the Southern Baptist Convention: "WHEREAS, Legalizing same-sex 'marriage' would convey a societal approval of a homosexual lifestyle, which the Bible calls sinful and dangerous both to the individuals involved and to society at large (Romans 1:24-27; 1

245

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Corinthians 6:9-10; Leviticus 18:22); now, therefore, be it . . . RESOLVED, That we oppose all efforts by media and entertainment outlets and public schools to mainstream homosexual unions in the eyes of our children . . . RESOLVED, That we call on Southern Baptists not only to stand against same-sex unions, but to demonstrate our love for those practicing homosexuality by sharing with them the forgiving and transforming power of the gospel of Jesus Christ (1 Corinthians 6:9-11).").

PFF 288.   Campaign messages supporting Prop. 8 and Yes On 8 proponents portrayed same-sex relationships and families as inferior.  Campaign messages discussing the protection of children were predicated on a belief that same-sex relationships are morally and socially inferior and undesirable, while opposite-sex relationships are superior and life-giving.  For example, they indicated that allowing gay people to do what they want in "private" is one thing, while accepting their relationships as equal is another.

- Tr. 427:16-428:22 (Chauncey:  The official Yes on 8 voter arguments are premised on the notion of the inferiority of gay people and their relationships. To argue that the best situation for a child is to be with a married mother and father is to argue that the married heterosexual couple is superior.).

- PX0027; PX0052; PX0082; PX0093; PX0097; PX0101; PX0119; PX0138; PX0562; PX1556; DIX1374; DIX1412 (Campaign materials:  Suggesting that the ideal situation for children is to be raised by a mother and father, implying that homosexual parents would not be able to provide a comparable loving environment).

- PX0027; PX0090; PX0093; PX0097; PX0119; PX0138; PX0562; DIX1374; DIX1412; DIX1502; DIX1503; DIX1504 (Campaign materials:  Suggesting that children need both a mother and a father to ensure a loving environment for children).

- PX0082 (California Republican Assembly Newsletter:  Asserting that different-sex marriage is best for society and for children).

- PX0097 (Campaign ad:  Stating that marriage involves a complex web of social, legal, and spiritual commitments that bind men and women for the purpose of procreation and to create a loving environment for children).

- PX0090; DIX1503; DIX1504; DIX2460 (Spanish campaign ads:  Emphasizing that a mother and a father are essential for children).

- PX0097 (Campaign ad:  Stating that marriage involves a complex web of social, legal and spiritual commitments that bind men and women for the purpose of procreation and to create a loving environment for children).

246

- PX1868 at 43:22-24 (Transcript of the Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind," one speaker stated that presenting marriage of gay and lesbian couples as equal to marriage of heterosexual couples "is a radically anti-human thing to say."); *see also* PX0504 (video of same).

- PX1867 at 29:17-30:2 (Transcript of the simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election:  Ms. Ana Samuel, a lecturer at Princeton University explained that "Laws can have a tremendous effect on the way we view marriage and if we have same-sex marriage legalized, it's really giving implicitly our political blessing to this thing. It's not just kind of an it's okay. It's an affirmation that it's just as good. And then we're going to have this society that eventually is going to come to believe it over generations."); *see also* PX0503 (video of same).

- PX0480 at 8:47-48 (Video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage":  Chuck Colson, founder of the Prison Fellowship Ministries and leader of the Christian conservative movement, refers to heterosexual couples as "the natural moral order of things.").

- PX0480 at 12:16-22 (Video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage":  One commentator states that "[h]omosexuals can only imitate what a man and a woman do by natural design.").

- Tr. 1943:16-1944:1 (Tam:  Tam wrote that "We hope to convince Asian Americans that gay marriage will encourage more children to experiment with the gay lifestyle, and that that lifestyle comes with all kinds of disease" to convince voters to adopt Prop. 8.).

- PX2341 (Script and Powerpoint from June 25, 2008 Project Marriage meeting with Pastors and Christian leaders:  Arguing that Christians must assist those "struggling with same sex attraction" and preserve traditional, Biblical marriage between a man and a woman).

- PX2341 at 40 (Email from Bill May of Catholics for the Common Good to Ned Dolejsi, a member of the ProtectMarriage.com—Yes on 8 executive committee, in June 2008:  Attaching a document written by Jim Garlow entitled "The Ten Declarations Protecting Biblical Marriage" and presented at a "Protect Marriage Meeting For Pastors and Christian Leaders" that states:  "[M]aximal sexual fulfillment occurs within one man-one woman monogamous, covenantal relationships"; "the sustaining of the human race, occurs exclusively within male-female union.").

- PX2589 (Email from Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8:  Explaining that he attached "the messages that have come from the research" and attaching a document entitled "Top Proposition 8 Arguments." They include: "1. I do not want public schools to teach elementary school

247

children that gay marriage is okay . . . . 3 . . . . the ideal situation is for a child to be raised by a married mother and father in the bond of marriage . . . . 5 . . . . every child desires to have a mother and a father who are married to each other. . . . 10. What gays do in their private lives does not bother me, but I do not want children exposed to it.").

- PX0052 (Aug. 4, 2008 e-mail blast from ProtectMarriage.com enclosing "A Statement of Catholic Bishops of California in support of Proposition 8": Explaining that its support of Prop. 8 was based in part on the belief that "[t]he ideal for the well being of children is born into a traditional marriage and to be raised by both a mother and a father.").

- Tr. 1954:9-1955:15 (Tam:  To convince voters to support Prop. 8, he told them that if Prop. 8 did not pass there would be "social moral decay" and that "social moral decay" means "if same-sex marriage is legal, it would encourage children to explore same sex as their future marriage partner.  And from the both Asian cultural and, also, from our Christian angle, we think this is social moral decay.").

- PX0029 (Official Yes on 8 television ad entitled "Whether You Like It Or Not":  Warning that gay marriage has been imposed on others by the Court, and alleges that forced acceptance of gays will be detrimental to children, to churches, and to people who can purportedly be sued for personal beliefs if Prop. 8 does note pass.).

PFF 289.    Campaign messages supporting Prop. 8 and Yes On 8 proponents played on the public's fear that children would be taught that gay and lesbian individuals and their relationships are equal to those of heterosexual individuals and were premised on the idea that same-sex relationships and homosexuality are immoral and wrong.

- PX0001 (Prop. 8 ballot arguments in the Voter Information Guide: "*It protects our children* from being taught in public schools that 'same-sex marriage' is the same as traditional marriage.
Proposition 8 protects marriage as an essential institution of society.  While death, divorce, or other circumstances may prevent the ideal, the best situation for a child is to be raised by a married mother and father . . . .
We should not accept a court decision that may result in public schools teaching our kids that gay marriage is okay.  That is an issue for parents to discuss with their children according to their own values and beliefs.  *It shouldn't be forced on us against our will* . . . .
Proposition 8 DOES NOT take away any of those rights and does not interfere with gays living the lifestyle they choose.
However, while gays have the right to their private lives, *they do not have the right to redefine marriage* for everyone else." (emphases in original)).

248

Gibson, Dunn
& Crutcher
LLP

- Tr. 427:16-429:6 (Chauncey:  The voter arguments in favor of Prop. 8 are premised on the notion of the inferiority of gay people and their relationships. These arguments also focus on children—while they do not refer to gays as child molesters, they do warn that we should not teach our children that gay marriage is okay; that it should not be forced on us against our will.  For Chauncey, the statement "protects our children" evokes the question: Protects them against what?  It evokes the language of "saving our children;" the need to protect children from exposure to homosexuality; not just from exposure to homosexuals as presumed child molesters, but the need to protect them from the idea of openly gay people.).

- Tr. 529:9-20 (Chauncey:  The language of Prop. 8 itself does not say anything about when sex education takes place, what parents can teach their children, what schools or parents should discuss with children and when, or what parents can object to in terms of school's teachings.).

- Tr. 436:12-437:15 (Chauncey:  PX1775A is Photograph of a Yes on 8 campaign ad depicting a presumably married couple with their child.  There is an indication of protecting marriage and of protecting the child, which begs the question: What are we protecting the children from?).

- Tr. 438:6-439:6 (Chauncey:  PX1763 is a Yes on 8 official campaign flyer that reiterates the theme of protecting California's children from exposure to gay people, the idea of gay equality, the full recognition of gay relationships, and the equality of gay relationships.).

- Tr. 431:14-432:11 (Chauncey:  These Yes on 8 television ads convey a number of themes, including the inequality of gay people and their relationships; the fear that something is being forced on people.  To Chauncey, the most striking theme is the idea that people have to protect their children from two things— exposure to the idea of gay marriage, which is a sign of the full equality of gay people, and also exposure to gay people that could lead children who have unstable sexual identities to become gay.  The underlying message is about the undesirability of homosexuality—"that we do not want out children to become this way.").

- PX0012; PX0027; PX0049; PX0075; PX0093; PX0119; PX0126; PX0138; PX1551; PX2151; DIX1374; DIX1412 (Campaign materials:  Asserting that unless Prop. 8 passes public schools will be compelled to teach children that there is no difference between marriages of gay and lesbian couples and marriages of heterosexual couples, implying that marriages of same-sex couples are lesser than marriages of opposite-sex couples).

- PX0098 (Campaign television ad:  Asking viewers to think about why marriage by gay and lesbian couples "was forced on us" and what the consequences are to children).

- PX0099 ("It's Already Happened" video paid for by ProtectMarriage.com: "Teaching children about gay marriage will happen here unless we pass Proposition 8"; "Protect our children; restore marriage.").

- PX0008; PX0095; PX0096; PX0098; PX0100; PX0116; DIX1494; DIX1495; DIX1497 (English and Spanish campaign television and radio ads:  Warning that children are already starting to be taught about gay marriage in schools, that public schools will be compelled to teach about marriages by gay and lesbian couples unless Prop. 8 passes, and that parents will not have the right to remove their children from the classroom or a right to prior notice when teachers discuss the fact that gay and lesbian couples are allowed to marry).

- PX0008; PX0080; PX0138; DIX1495 (Campaign materials:  Asserting that Prop. 8 ensures that parents will have control over when and how their children are taught about marriages by gay and lesbian couples).

- PX0080 (Asian American Community Newsletter & Voter Guide:  "If Prop. 8 is not passed, schools will be able to tell children that same-sex marriage is ok.").

- PX0390 at 7:56-8:23 (ProtectMarriage.com—Yes on 8 Chairman, Ron Prentice, tells people at a religious rally that in early 2005 explains that "If we don't protect it than every public school child will be indoctrinated. . . . If we don't protect traditional marriage, if we don't restore it, then every child in public school will be taught that there is no difference between same sex marriage and traditional marriage.").

- PX0390 at 9:07-9:32 (ProtectMarriage.com—Yes on 8 Chairman, Ron Prentice, "And all it took when we asked someone, do you plan to vote yes, plan to vote no, or are you somewhere in the mushy middle, if they weren't a solid yes, 80% of the time all it took was to tell them did you know that every public school child will be taught this? 'Oh!' And they would flip.  And that's the role that we have to play with our family, with our friends, and our neighbors.").

- PX0514 (Article concerning Prop. 8 debate: "Pro-prop. 8 panelists argued that 'common sense' dictated that the historic nature of marriage as an institution between a man and a woman could not be expanded to include same-sex couples.  They also insisted that children would be harmed because they would be subjected to education on homosexuality in public schools if Prop. 8 failed to pass.  'Asian parents feel the government is taking away their right to teach their children what is right or wrong,' said Bill Tam, executive director of the Traditional Family Council.  '[State Superintendent of Public Instruction, Jack] O'Connell claims that schools aren't going to teach same-sex marriage in schools but that's an insult to our intelligence—it's already happening.' . . . Tam insisted that interracial marriage couldn't be compared to gay marriage because it was still between a man and a woman and included the potential for

250

Gibson, Dunn & Crutcher LLP

having biological children.  Further, Tam said, race and sexual orientation were not comparable.").

- PX0563; DIX1376 (Campaign materials:  Arguing that voters should not accept a court decision that results in "public school teachers teaching our kids that gay marriage is acceptable").

- PX1868 at 22:16-24 (At a Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind," Tony Perkins, President of the Family Research Council, states that "We know that families find themselves in some very awkward situations when even their elementary age children come home from school having been read a book about same sex marriage that affirms it. If same sex marriage is legalized, then it must be taught as normal, acceptable and moral behavior in every public school."); *see also* PX0504 (video of same).

- PX1868 at 25:16-26:2 (At a Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind," a parent of a child attending a Massachusetts public school that was given a book about families that included families of same-sex couples, worried when his child's public school told him that "same sex marriage is legal in Massachusetts.  Therefore, we can broach it anytime with your child.  And when they are putting forward that it's equal, they're putting forward that it's a morally equal alternative and affirming it in the minds of children."); *see also* PX0504 (video of same).

- PX2150 (Mailer "Paid for by ProtectMarriage.com—Yes on 8:"  "It protects our children from being taught in public schools that 'same-sex marriage' is the same as traditional marriage."; "Same-sex marriage threatens the education of our children. . . . since California law already provides children as young as kindergarten be taught about marriage, gay marriage will be taught in our schools too!").

- PX2150 (Mailer "Paid for by ProtectMarriage.com—Yes on 8:"  Stating: "Will gay marriage really be taught in public schools unless Prop. 8 is adopted?  Yes. The subject is required to be taught in 96% of California public schools. . . . We should not accept a court decision that forces gay marriage on young children in California school just as it is in Massachusetts."); *see also* PX2156 (a flier entitled "Myths and Facts about Proposition 8" containing nearly identical language).

PFF 290.   Campaign messages supporting Prop. 8 and Yes On 8 proponents echoed fears that children must be "protected" from gay and lesbian people and exposure to them and their relationships, and that permitting same-sex couples to marry might encourage children to become homosexual themselves.

251

Gibson, Dunn & Crutcher LLP

- PX0015, PX0016, and PX0091 (Official Yes on 8 television ads entitled, respectively, "Finally The Truth," "Have You Thought About It?," and "Everything To Do With Schools": Each ad threatens potential consequences to children if Prop. 8 does not pass.).

- PX0513 ("What If We Lose" letter from Bill Tam concerning Prop. 8: "This November, San Francisco voters will vote on a ballot to 'legalize prostitution'. This is put forth by the SF city government, which is under the rule of homosexuals. They lose no time in pushing the gay agenda—after legalizing same-sex marriage, they want to legalize prostitution. What will be next? On their agenda list is: legalize having sex with children . . . .
We can't lose this critical battle. If we lose, this will very likely happen . . . .
1. Same-Sex marriage will be a permanent law in California. One by one, other states would fall into Satan's hand.
2. Every child, when growing up, would fantasize marrying someone of the same sex. More children would become homosexuals. Even if our children are safe, our grandchildren may not. What about our children's grandchildren?
3. Gay activists would target the big churches and request to be married by their pastors. If the church refuse, they would sue the church."); *see also* PX2507.

- Tr. 553:23-554:14 (Chauncey: Dr. Tam's "What If We Lose" letter is consistent in its tone with a much longer history of anti-gay rhetoric. It reproduces many of the major themes of the anti-gay rights campaigns of previous decades and a longer history of anti-gay discrimination.).

- PX0116 (Campaign ad featuring the Wirthlins: Warning that redefining marriage has an impact on every level of society, especially on children, and claiming that in Massachusetts homosexuality and gay marriage will soon be taught and promoted in every subject, including math, reading, social studies, and spelling).

- Tr. 530:24-531:11 (Chauncey: The Wirthlins' long ad also implies that the very exposure to the idea of homosexuality somehow threatens children and threatens their sexual identity, as if homosexuality is a choice. In addition, it suggests that the fact that gay people are being asked to be recognized and have their relationships be recognized is an imposition on other people, as opposed to an extension of fundamental civil rights to gay and lesbian people.).

- Tr. 1579:5-21 (Segura: "[O]ne of the enduring . . . tropes of anti-gay argumentation has been that gays are a threat to children. . . . [I]n the Prop. 8 campaign [there] was a campaign advertisement saying, . . . 'At school today, I was told that I could marry a princess too.' And the underlying message of that is that . . . if Prop. 8 failed, the public schools are going to turn my daughter into a lesbian.").

Gibson, Dunn
& Crutcher
LLP

- PX0015, PX0099, PX0116, PX0350, PX0401 (ProtectMarriage.com videos focusing on the need to protect children).

- PX0079; PX0097; DIX2460 (Campaign materials: Suggesting that children need "protection" from gays and lesbians).

- PX0052; PX0101 (Campaign press releases: Announcing that religious organizations endorse Prop. 8 because the ideal situation for a child is to be raised by a mother and father).

- PX0090; DIX1503; DIX1504; DIX2460 (Spanish campaign ads: Emphasizing that a mother and a father are essential for children).

- PX0097 (Campaign ad: Stating that marriage involves a complex web of social, legal, and spiritual commitments that bind men and women for the purpose of procreation and to create a loving environment for children).

- PX0037 (Campaign ad: Explaining that allowing gay and lesbians individuals to marry has "profound implications for all of society—particularly children").

- PX1529 (Campaign ad: Showing a series of fallen dominos stating that the "[m]andated acceptance of same-sex 'marriage' triggers a series of consequences that affect all Californians, especially our children.").

- PX0100 ("It's Already Happened" campaign television ad (Spanish version): Showing a little girl telling her mother that she learned how she can marry a prince or a princess and explaining that if Prop. 8 fails gay marriage will continue to be taught in California schools).

- PX0009; PX0012; PX0025; PX0075; PX0080; PX0082; PX0093; PX0102; PX0119; PX0126; PX0136; PX0138; PX0562; PX0563 ; PX215l; DIX1374; DIX1412 (Campaign materials: Warning that children will be taught about marriages by gay and lesbian couples in schools).

- PX0025 (Campaign ad: Quoting a pastor explaining that "the institution of marriage . . . has always been reserved for a man, the father and a woman, the mother").

- Tr. 1913:17-1914:12 (Tam: Tam supported Prop. 8 because he thinks "it's very important for the next generation to understand the historical meaning of marriage. It is very important that our children won't grow up to fantasize or think about, Should I marry Jane or John when I grow up? Because this is very important for Asian families, the cultural issues, the stability of the family.").

- Tr. 1962:17-1963:8 (Tam: Tam gets "very very upset" about the idea of children thinking about marrying people of the same sex, but that he is reassured by knowing that gay couples are not allowed to get married so that parents can explain to their children that gay couples can enter domestic

253

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

partnerships, "'but it is not 'marriage.'"  He is comforted because this difference is "something that is very easy for our children to understand.").

- PX2185 at 3-4 (Traditional Family Coalition Newsletter:  "One of the worries haunting parents is that their children have been 'brainwashed' by the public school and the media into believing that being gay is a fashionable lifestyle"; and that "gay activists are aiming at our young children.").

- PX2343A at 3-6 (Pro-Prop. 8 fliers translated from Chinese:  "science proves that homosexuality is a changeable 'sexual preference'. [sic] If 'sexual preference' can be listed as a civil right, then 'pedophilia,' 'incest,' and 'polygamy' can also be listed as civil rights" (at 3); "Legalization of same sex marriage would cause more young people to try homosexuality" (at 3);  "Facts prove same sex marriage causes society's ethics to decline and is harmful to children" (at 3);  "Studies show that the chance of children growing up in same sex families becoming homosexuals is 4-10 times greater than those growing up in the average family" (at 4);  "If homosexuals are allowed to legalize marriage, one day, incest offenders may also use the equal treatment argument to demand for marriage certificates.  Social relationships would be in chaos" (at 6);  "If homosexuality was a normal behavior, deadly diseases such as AIDS, hepatitis and pneumonia would not exist" (at 6);  "homosexuality is an abnormal behavior against nature" (at 6).).

- PX2343B at 1-4 (Essay by Tam entitled "The Harm to Children from Same Sex Marriage" included in a Chinese language advertisement "supported by . . . ProtectMarriage.com—Yes on 8, a Project of California Renewal":  "The general public does not realize that same sex marriage is only a 'smoke-screen ploy' of the homosexual movement.  Since most of them lead an indulgent life, many gay men die because of AIDS and other serious illnesses.  They need to recruit new blood to become homosexuals. Also, the objects of play for many homosexuals are youth and children, which attracts children to become homosexuals and is the main method to maintain homosexual numbers and a sense of freshness. If same sex marriage were legalized, it would be much easier than it is now to attract children. . . . Furthermore, television, movies, toys and entertainment media, because of the new market, would produce large quantities of homosexual products. Feminine men or masculine women would become fashionable. Can our children resist the temptation of such a trend?" (at 1);  "Another demand following same sex marriage would be the lowering of the legal age for intercourse. In Europe, when a country lowered the legal age for intercourse, most of those celebrating and dancing on the streets were homosexuals." (at 1); "Furthermore, legalizing drugs, prostitution and polygamy are also the ultimate goals of the homosexual movement" (at 2); "In Denmark, same sex marriage was legalized in the early nineties. Now, sex education CDs produced with the permission of the Education Ministry of Denmark include pictures of 'man-and-animal intercourse' and 'man eating feces' (note: eating feces is an example of one type of homosexual intercourse.) . . . Recently in Quebec, Canada, almost all cases of venereal

254

Gibson, Dunn
& Crutcher
LLP

disease are from homosexuals. Yet, the Canadian government still wants to legalize same sex marriage" (at 2); "If Proposition 8 is Not Passed . . . Young people's idea of sexual morality will be twisted. . . . The possibility of our posterity becoming homosexuals will definitely increase."( at 3)).

- Tr. 558:16-560:12 (Chauncey:  Dr. Tam's deposition testimony displays the deep fear about the idea that simple exposure to homosexuality or to marriages of gay and lesbian couples would lead children to become gay.  And the issue is not just marriage equality itself—it is sympathy to homosexuality.  They oppose the idea that children could be introduced in school to the idea that there are gay people in the world.  It is also consistent with the idea that homosexuality is a choice and there is an association between homosexuality with disease.).

- PX0480 at 15:45-58 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, states: "If traditional marriage goes by the wayside, then in every public school, children will be indoctrinated with a message that is absolutely contrary to the values that their family is attempting to teach them at home.").

- PX1867 at 15:18-21 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, Pastor Jim Garlow states: "Children in public schools are being impacted  enormously; even un-church people realize how inappropriate it is for schools to be teaching on this topic."); *see also* PX0503 (video of same).

- PX1867 at 16:23-17:19 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, a parent of a child in Massachusetts explained to the audience that he "went into the schools and found out that they have books like this all throughout the school in every classroom and that there's going to be teacher-initiated discussions with the children to affirm, embrace and even celebrate gay marriage and homosexual relationships. We asked for parental notification before they do it, uh, to let us know so we can talk to our children first or have the option to opt out. They said amazingly, no, you do not have that right."); *see also* PX0503 (video of same).

- PX1867 at 20:3-14 (At a simulcast entitled "ABCs of Protecting Marriage" held 15 days before the election, a parent of a child in Massachusetts explained to the audience that he worries about "people forcing their will and forcing their worldview and beliefs not only on you as citizens but now on the youngest, most impressionable children who they know very well are very easy to manipulate and—and indoctrinate into their belief system, behind your back and against their will. . . . Parental rights are at stake here and the rights of—to defend the childrens' [sic] innocence."); *see also* PX0503 (video of same).

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- PX0506 at 10 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters: "We'll see indoctrination in schools. For example in 2007 the only other state that allowed same sex marriage besides California is Massachusetts. In 2007 a judge passed a ruling that said every young person in Massachusetts will be taught the homosexual lifestyle. Even Christian kids in a public school."); *see also* PX0505 (video of same).

- PX2150 (Mailer "Paid for by ProtectMarriage.com—Yes on 8:" "four activist judges on the Supreme Court in San Francisco ignored four million voters and imposed same-sex marriage on California. Their ruling means it is no longer about 'tolerance.' Acceptance of Gay Marriage is Now Mandatory [sic].").

- PX0560 (Memorandum created by ProtectMarriage.com entitled "Media Advisory: New YouTube Video Clarifies Yes on 8 Proponents' Concerns: Education and Protection of Children is at Risk:" "Since the California Supreme Court narrowly overturned the will of the voters and allowed gay marriage, children as young as kindergarten have been exposed to indoctrination on gay lifestyles . . . Should Proposition 8 fail, gay activists will be able to force gay marriage to be taught as part of our school health curriculum and other matters of sexual orientation.").

- PX2595 (Flier urging voters to "Vote Yes on Prop. 8" included the following reasons for supporting Prop. 8: "Proposition 8 protects children from being taught in schools that same sex marriage = traditional marriage;" "Proposition 8 protects the right of children to have both father and mother as role models;" "Proposition 8 protects against social moral decay;" "If a 'sexual orientation' is categorized as a civil right, then so would pedophilia, polygamy and incest;" "children need parents of both genders;" and "Countries that legalized same sex marriage saw alarming moral decline").

- PX1556 (Campaign update: Describing an op-ed by David Blankenhorn in the *Los Angeles Times* about the alleged detrimental effects on children of allowing gay and lesbian couples to marry).

- Tr. 560:6-561:3; PX0515 (Chauncey: Tam's comments to press during Prop. 8 campaign that "We hope to convince Asian-Americans that gay marriage will encourage more children to experiment with the gay lifestyle and that the lifestyle comes with all kinds of disease" is consistent with the messaging in earlier campaigns, the persistent theme that homosexuality is a choice, that children who are exposed to homosexuality in any form are likely to become homosexuals, and the association of homosexuality with disease, and that any measure that grants equality in any form to gay people would " legitimize homosexuality and gay life as a legitimate equal part of our society."

- Tr. 1954:9-1955:15 (Tam: To convince voters to support Prop. 8, he told them that if Prop. 8 did not pass there would be "social moral decay" and that

256

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1
2
3

"social moral decay" means "if same-sex marriage is legal, it would encourage children to explore same sex as their future marriage partner. And from the both Asian cultural and, also, from our Christian angle, we think this is social moral decay.").

4

PFF 291.   Campaign messages supporting Prop. 8 and Yes On 8 proponents employed some of

5

the most enduring anti-gay stereotypes—many of which reflect messages from prior

6

anti-gay campaigns—to heighten public apprehension, including messages that

7

homosexuals recruit and molest children, that gay and lesbian relationships are

8

immoral or bad and should be kept "private" and not flaunted or made public, and that

9

there is a powerful homosexual "lobby" or "agenda" intent on destroying heterosexual

10

families and denying religious freedom.

11
12
13
14
15
16
17
18
19

- Tr. 429:15-430:8, 431:17-432:11, 436:25-437:15, 438:8-439:6, 529:25-531:11; PX0015; PX0016; PX0029; PX0091; PX0099; PX1775; PX1775A (*see* Tr. 461:21-462:18); PX1763 (Chauncey:  The campaign television and print ads focused on protecting children and the concern that people of faith and religious groups would somehow be harmed by the recognition of gay marriage.  They conveyed a message that gay people and relationships are inferior, that homosexuality is undesirable, and that children need to be protected from exposure to gay people and their relationships.  The most striking image, to Chauncey, is of the little girl who comes in to tell her mom that she learned that a prince can marry a prince, which strongly echoes the idea that the simple exposure to gay people and their relationships is going to somehow lead a generation of young people to become gay.  They conveyed a message used in earlier campaigns that when gay people seek any recognition this is an imposition on other people rather than a simply an extension of civil rights to gay people.).

20
21

- Compare above with Tr. 412:23-413:1, 418:11-419:22, 420:3-20; PX1621, PX0864 at 303 (Chauncey:  Describing one of earliest anti-gay referenda campaigns with more overt messaging of similar content).

22
23
24

- PX0008; PX0025; PX1565 (Campaign materials:  Warning that unless Prop. 8 passes children will be exposed to indoctrination on gay lifestyles, invoking fears about the gay agenda).

25
26

- PX0516 ("A Message from Bill Tam:" "[e]ducation such as this is used to brainwash children so that one day they'll vote for same-sex marriage.").

27

- Tr. 556:15-22 (Chauncey:  PX0516 reflects a continuing concern about homosexuals putting themselves forward and having an "agenda.").

28

257

*Gibson, Dunn
& Crutcher
LLP*

PFF 292.    Campaign messages supporting Prop. 8 and Yes On 8 proponents portrayed marriage by same-sex couples and those who support that right as destroying marriage and society.

- PX2403 at 2-11 (Email from Kenyn Cureton, Vice President for Church Ministries with the Family Research Council, to Ron Prentice, Chairman of ProtectMarriage.com—Yes on 8, in August of 2008:  Attaching a kit to be distributed to Christian voters through churches to better help them promote Prop. 8:  Stating that "[h]omosexual activists and their allies have been very effective in promoting their extreme makeover of the American family and are pushing for recognition of same-sex relationships in our laws, schools, culture, and even in the church" (at 2); "homosexual activists won't stop at recognition, their aim is domination" (at 7); "Let's stand against this destructive program that threatens all that we hold dear, and protect our children from this ungodly agenda" (at 11); "What are the goals of the radical homosexual agenda? They include universal acceptance of the gay and lesbian lifestyle, gaining special privileges and rights in the laws, [and] 'sensitivity training' of our children through public education" (at 5); "Bible-believing Christians have been shocked to witness same-sex weddings all over California and repulsed by men kissing men and women kissing women for the cameras" (at 2); "The welfare of children, the propagation of the faith, the wellbeing of society, and the orderliness of civilization are all dependent upon the stability of marriage according to the divine pattern.  When this God-given pattern is undermined, the whole superstructure of society becomes unstable.  Any deviation from the divine pattern invites disaster" (at 3); "With this recent Supreme Court ruling, homosexual indoctrination in public schools will go into hyper-drive" (at 6); "Aren't you glad God created Adam and Eve, and not just Adam and Steve?" (at 3); "Thank God for the difference between men and women.  In fact, the two genders were meant to complete each other physically, emotionally, and in every other way.  Also, both genders are needed for a healthy home.  As Dr. James Dobson notes, 'More than ten thousand studies have concluded that kids do best when they are raised by mothers and fathers.'" (at 3); "School children as young as kindergarten-age can now be forced to learn about and support homosexuality, bisexuality, and trans-sexuality.  School-sponsored activities, textbooks, and instructional material could require a positive portrayal of homosexual 'marriages,' cross-dressing, sex-change operations, and all aspects of homosexuality and bisexuality" (at 6); "Public schools will teach the fully equal status of homosexual and heterosexual conduct based, in substantial part, on state marriage law" (at 7).).

- PX0506 at 10 (Transcript of Simulcast conducted by Miles McPherson called "The Fine Line" and directed at younger voters comparing the impact if Prop. 8 does not pass to the impact of the terrorist attacks of September 11, 2001; *see also* PX0505 (video of same).

Gibson, Dunn
& Crutcher
LLP

- PX2403 (DEFINT_PM_005385-005446:  Stand for Marriage materials describing homosexuality as a "sin" and "poor misguided lost people trapped in Satan's snare" in advocating for support of Prop. 8).

- PX0008; PX0080; PX0138; DIX1495 (Campaign materials:  Asserting that Prop. 8 ensures that parents will have control over when and how their children are taught about marriages by gay and lesbian couples).

- PX0082; PX1529; DIX1494 (Campaign ads:  Warning that if Prop. 8 fails, acceptance of gay marriage will be mandatory).

- PX0082; DIX1494 (Campaign ads:  Warning that unless Prop. 8 passes, an individual will not be able to refuse to offer services to gay couples without incurring legal liability).

- PX0562 (Campaign ad:  Stating that "98% of Californians who are not gay should not have their religious freedoms and freedom of expression be compromised to afford special legal rights for the 2% of Californians who are gay").

- PX0027; PX0093; DIX1503; DIX1504 (Campaign materials:  Warning that allowing gay and lesbian couples to marry destroys the sanctity of marriage, implying that their marriage is not as sacred as different-sex marriage).

- PX0069 (Press release from Ron Prentice:  Stating that the California Supreme Court "effectively rendered marriage meaningless" when it recognized the right of gay and lesbian couples to marry).

- PX2343B at 3 and 5 (Tam wrote an essay titled "The Harm to Children from Same Sex Marriage" included in a Chinese language advertisement "supported by . . . ProtectMarriage.com—Yes on 8, a Project of California Renewal" in which he explains that if  Prop. 8 does not pass, "[t]he meaning and status of marriage will be completely lost and family relationships will degenerate" (at 3).  He also implores his readers to "[s]ave marriage, save posterity, defend reasonable human rights" (at 5).).

- Tr. 1579:5-1579:21 (Segura:  Prop. 8 campaign advertisements reflect the "very strong taboo about the portrayal of homosexuality as anything other than pathological in the views of a lot of Americans.  It's never to be talked about; not only not positively, but even neutrally.").

- Tr. 529:21-530:23 (Chauncey:  The Wirthlins' long ad implies that there is something wrong with homosexuality.  It suggests that the focus for homosexuality is only on sexuality, not love or relationships.  But the book at issue—*King & King*—is about two princes falling in love.  It does not talk about sex; it's an age-appropriate fairy tale.  There are plenty of fairy tales about men and women falling in love, and children are encouraged to participate in heterosexual marriages by being flower girls or ring bearers.).

259

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

- PX0037; PX0116 (Campaign materials: Warning that allowing gay and lesbian couples to marry has profound consequences on every level of society).

- PX0098 (Campaign television ad: Asking viewers to think about what the consequences will be when marriage rights for gay and lesbian individuals conflict with religious freedoms, and how their marriages will affect parental rights).

- Tr. 556:15-22 (Chauncey: PX0516 reflects a continuing concern about homosexuals putting themselves forward and having an "agenda.").

- PX0139 (Campaign signs: Suggesting that Prop. 8 promotes less government, parental rights, religious freedom and free speech).

- Tr. 1856:20-1857:5 (Segura: Testifying about "The Gathering Storm" video: "It's hard not to look at the video and not conclude that the message of the video is that gays and lesbians are deeply threatening to individuals in American society; the ominous music, the dark storm, on actor saying, "I'm afraid," suggest that homosexuals are to be feared. There is references to children. There's references to taking your religious liberty away. There's references to churches being discriminated against or facing some form of government repression. It really does present gays and lesbians as a very serious threat to all sorts of aspects of American life.").

- PX0577 at 47 (Article written by ProtectMarriage.com—Yes on 8 campaign managers Schubert and Flint: "There were multiple skirmishes in the press over the education issue during the final days of the campaign. The other side claimed the wedding episode wasn't really as we described it, while we defended the ad as accurate and highlighted other examples where gays had forced their agenda into the public schools ....").

- Tr. 1975:15-17 (Tam: Schubert Flint served as campaign managers for ProtectMarriage.com—Yes on 8).

- Tr. 1954:9-1955:15 (Tam: To convince voters to support Prop. 8, he told them that if Prop. 8 did not pass there would be "social moral decay" and that "social moral decay" means "if same-sex marriage is legal, it would encourage children to explore same sex as their future marriage partner. And from the both Asian cultural and, also, from our Christian angle, we think this is social moral decay.").

PFF 293.     Campaign messages supporting Prop. 8 and Yes On 8 proponents also sought to

invoke a sense of general crisis by linking marriage rights for same-sex couples to

social peril caused by the supposed eradication of gender roles and the family

260

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

structure, as well as moral downfall through suggesting that the failure to pass Prop. 8

would inevitably lead to the legalization of incest, bestiality, and polyamory.

- PX0513 ("What If We Lose" letter from Bill Tam concerning Prop. 8:
  "This November, San Francisco voters will vote on a ballot to 'legalize
  prostitution'. This is put forth by the SF city government, which is under the
  rule of homosexuals. They lose no time in pushing the gay agenda—after
  legalizing same-sex marriage, they want to legalize prostitution. What will be
  next? On their agenda list is: legalize having sex with children . . . .
  We can't lose this critical battle. If we lose, this will very likely happen . . . .
  1. Same-Sex marriage will be a permanent law in California. One by one,
  other states would fall into Satan's hand.
  2. Every child, when growing up, would fantasize marrying someone of the
  same sex. More children would become homosexuals. Even if our children are
  safe, our grandchildren may not. What about our children's grandchildren?
  3. Gay activists would target the big churches and request to be married by
  their pastors. If the church refuse, they would sue the church."); *see also*
  PX2507.

- PX0506 at 12 (Transcript of Simulcast conducted by Miles McPherson called
  "The Fine Line" and directed at younger voters: "[L]et's say sexual
  orientation or sexual attractions were the basis upon which we were allowed to
  marry. Then pedophiles would have to be allowed to marry 6-7-8 year olds.
  The man from Massachusetts who petitioned to marry his horse after marriage
  was instituted in Massachusetts. He'd have to be allowed to do so. Mothers
  and sons, sisters and brothers, any, any combination would have to be
  allowed."); *see also* PX0505 (video of same).

- PX2595 (Flier urging voters to "Vote Yes on Prop. 8" included the following
  reasons for supporting Prop. 8: "Proposition 8 protects children from being
  taught in schools that same sex marriage = traditional marriage"; "Proposition
  8 protects the right of children to have both father and mother as role models";
  "Proposition 8 protects against social moral decay"; "If a 'sexual orientation' is
  categorized as a civil right, then so would pedophilia, polygamy and incest";
  "children need parents of both genders"; and "Countries that legalized same
  sex marriage saw alarming moral decline.").

- Tr. 1925:22-1926:9 (Tam: To convince voters to support Prop. 8, Tam had
  told them that homosexual activists have an agenda that includes legalizing
  prostitution and having sex with children).

- Tr. 1955:21-1956:7 (Tam: Tam wrote that "If sexual orientation is
  characterized as a civil right, then so would pedophilia, polygamy and incest"
  to convince voters to adopt Prop. 8).

- Tr. 1960:14-21 (Tam: "I believe that if the term 'marriage' can be used
  beyond one man and one woman, then any two person of any age or of any

261

Gibson, Dunn
& Crutcher
LLP

relationships can use the same argument and come and ask for the term 'marriage.' That would lead to incest. That would lead to polygamy. I mean, if—if this is a—if this is a civil right, what would prevent the other groups not to use the same argument and come and ask for the name 'marriage'?").

- Tr. 1220:4-13 (Zia:  During the Prop. 8 campaign, Zia read materials stating that same sex marriage would lead to bestiality, polygamy, and harm to children—including molestation and the "end of the human race.").

- Tr. 1921:19-21 (Tam:  Tam believes homosexuals are 12 times more likely to molest children.).

- Tr. 1918:19-24 (Tam:  Tam believes homosexuality is linked to pedophilia.).

- PX2199 (Page from Dr. Tam's website, 1man1woman.net:  Suggesting that homosexuals engage in pedophilia and that gay politicians and doctors molest boys.).

- Tr. 1222:2-1223:3; PX2199 (Zia:  Zia saw PX2199—which claimed that homosexuality is linked to pedophilia—during the Prop. 8 campaign).

- PX1868 at 9:19-10:8 (Transcript of the Sept. 25, 2008 simulcast entitled "Love, Power and a Sound Mind":  A reverend explained that "the polygamist are waiting in the wings because if a man can marry a man and a woman can marry a woman based on the fact that you have the right to marry whoever you want to marry, then the polygamists are going to use that exact same argument and they're probably going to win. And then I think about the damage done to our children and our children are going to be taught in the schools that gay marriage is not just a different type of a marriage; they're going to be taught that it's a good thing. And, of course, we're destroying the pillar of our society."); *see also* PX0504 (video of same).

- Tr. 1926:19-1927:2 (Tam:  "Because when I look at liberal countries in Europe, which have—or even look north, at Canada, at that time, they have their legal age of consent down to like 14 years old. Some are even down to 13 years old. To me, those is very unacceptable. And that is having sex with children. Or older child having sex with another child. And—and Canada was a country that legalize same-sex marriage. So the liberal trend, that's what I'm afraid of.").

PFF 294.    Campaign messages supporting Prop. 8 and Yes On 8 proponents also played on gender role stereotypes, suggesting that men and women should play different and gender-based roles in marriage and child rearing.

- PX0480 at 16:58-17:20 (Video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage":  Ron

262

Gibson, Dunn & Crutcher LLP

Prentice, Chairman of ProtectMarriage.com—Yes on 8, states that "Children need the chance to have both mother love and father love. And that moms and dads, male and female, complement each other. They don't bring to a marriage and to a family the same natural set of skills and talents and abilities. They bring to children the blessing of both masculinity and femininity.").

- PX0480 at 16:58-17:20 (In a video posted on the American Family Association's website entitled "Proposition 8 and the Case for Traditional Marriage," a Dr. Melson "can only imagine the confusion with two moms or two dads. I mean, who do you go to when you need to learn how to change the oil if you're a guy? Who is there—I mean, God's giving, given moms a natural instinct to mother and love. . . . If you have a boy with two moms, who's going to teach him all the dad stuff? Dads have instinctual differences. They do. They don't, they, there's just appropriateness on when to cry, when to be emotional, when to not—when to stand up, when to be the leader.").

- PX0504A (Excerpts from simulcast video paid for by ProtectMarriage.com: "In kindergarten they are being taught that if a little boy thinks he's a little girl in the state of California, he's a little girl.").

- *See also* evidence cited in support of PFF 56.

PFF 295.    In an article written for Politics Magazine, Frank Schubert and Jeff Flint, the campaign managers for "Yes on 8," stated that the success of the campaign "would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship." The campaign sought to convince voters that while "[t]olerance is one thing; forced acceptance of something you personally oppose is a very different matter." Schubert and Flint decided to play on the fears and distastes of voters, framing the issue of marriage between same-sex individuals as one involving a conflict between the rights of a gay couple and "other rights[.]" Schubert and Flint "settled on three broad areas where this conflict of rights was most likely to occur: in the area of religious freedom, in the area of individual freedom of expression, and in how this new 'fundamental right' would be inculcated in young children through the public schools."

263

*Gibson, Dunn & Crutcher LLP*

- PX0577 at 45 (Frank Schubert & Jeff Flint, "Passing Prop 8: Smart Timing and Messaging Convinced California Voters to Support Traditional Marriage," *Politics*, Feb. 2009.).

- Tr. 1975:15-17 (Tam:  Schubert Flint served as campaign managers for ProtectMarriage.com—Yes on 8).

- PX0082; PX1529; DIX1494 (Campaign ads:  Warning that if Prop. 8 fails, acceptance of gay marriage will be mandatory).

- PX0082; DIX1494 (Campaign ads:  Warning that unless Prop. 8 passes, an individual will not be able to refuse to offer services to gay couples without incurring legal liability).

- PX1529 (Campaign ad:  Showing a series of fallen dominos, warning that "[m]andated acceptance of same-sex 'marriage' triggers a series of consequences that affect all Californians, especially our children").

- PX0037; PX0116 (Campaign materials:  Warning that allowing gay and lesbian individuals to marry has profound consequences on every level of society).

- PX0098 (Campaign television ad:  Asking viewers to think about what the consequences will be when marriage rights of gay and lesbian individuals conflict with religious freedoms, and how their marriages will affect parental rights).

- PX0562 (Campaign ad:  Stating that "98% of Californians who are not gay should not have their religious freedoms and freedom of expression be compromised to afford special legal rights for the 2% of Californians who are gay").

- PX0139 (Campaign signs:  Suggesting that Prop. 8 promotes less government, parental rights, religious freedom and free speech).

- PX0095; PX0096; PX0116 (English and Spanish campaign television ads:  Warning that parents will not have the right to remove their children from the classroom or a right to prior notice when teachers discuss marriage by gay and lesbian couples).

- PX0008; PX0080; PX0138; DIX1495 (Campaign materials:  Asserting that Prop. 8 ensures that parents will have control over when and how their children are taught about marriages by gay and lesbian couples).

- PX0029 (Official Yes on 8 television ad entitled "Whether You Like It Or Not" warns that gay marriage has been imposed on others by the Court, and alleges that forced acceptance of gays will be detrimental to children, to

264

Gibson, Dunn
& Crutcher
LLP

1    churches, and to people who can purportedly be sued for personal beliefs if
2    Prop. 8 does note pass.).

3    • *See also* evidence cited in support of PFF 49.

4    PFF 296.    The discriminatory and animus-filled messages in the Yes on 8 campaign materials

5    harmed plaintiffs and other Californians who saw them.

6    • Tr. 99:23-100:9 (Katami:  Discussing ads that stated "Protect our children.":
7    "What are you protecting your children from? . . . . [T]he threat that's implied
8    is insulting. . . . [T]here are ways to convey a message without potentially
     demonizing a group of people or creating fear around a group of people.").

9    • Tr. 107:4-108:16 (Katami: Discussing campaign ad and explaining that "[t]o
10   categorize [gays and lesbians] as people of the devil or even put them in the
     same category," in that they are "likened to the devil blurring the lines between
11   right and wrong," is to "talk[] about things that are bad in nature, that harm
     people and society"; "an ad like this . . . demeans you [and] makes you feel
12   like people are putting efforts into discriminating against you" and portrayed
     gays and lesbians as "a class of citizen or category of people that need to be
13   stood up against").

14   • Tr. 113:12-114:25 (Katami:  Discussing official ballot material statement that
15   "Voting YES protects our children" and explaining "[t]hat language is
     indicative of some kind of perpetration against a child. . . . [I]t's
16   discriminatory.  It absolutely puts me into a category that I do not belong in.  It
     separates me from the norm.  It makes me into someone . . . part of a
17   community that is perpetrating some sort of threat.").

18   • Tr. 149:11-150:20 (Perry:  Perry recalls a pro-Prop. 8 ad that mentioned the
19   California Education Code and discussed needing to "protect your children"
     from learning about gay marriage in school.  Perry felt that the ad suggested
20   that she, as a lesbian, was in a group of people who would not be protective of
     children, which did not match how she feels about her children or reflect that
21   she works on behalf of children and has for years.  In addition, Perry felt as
     though the ad mocked something that she cannot change about herself—her
22   sexual orientation.).

23   • Tr. 176:17-177:18 (Stier:  Explained that the campaign's focus on protecting
24   children implied "that you need to be protected from gay marriage because it
     must be, apparently, bad or you wouldn't have to protect anybody from it.  I
25   felt like the constant reference to children . . . felt manipulative and it felt very
     harmful to me, as an individual, to us, as a couple, and our children, our
26   family, our community.  I felt like there was great harm being done and I felt
     like it was used to sort of educate people or convince people that there was a
27   great evil to be feared and that evil must be stopped and that evil is us, I guess.
     . . . [T]he very notion that I [am] part of what other need to protect their
28

265

Gibson, Dunn
& Crutcher
LLP

children from was just—it was more than upsetting.  It was sickening, truly.  I felt sickened by that campaign.").

- Tr. 1284:4-19 (Sanders:  When confronted with Prop. 8 advertisements implying that children would be harmed by same-sex marriage, Sanders could not imagine why anyone would think that children would be harmed by marriage.  He could not imagine how Lisa and Meagan could harm anybody else and could not imagine why children would have to be protected from his daughter, one of the kindest and most compassionate people that he knows.).

- Tr. 1317:23-1318:4 (Sanders:  Describing experience during campaign where "somebody wrote on chalk, in front of my house, because we had a No On 8 sign out.  That said 'God's law.  Vote Yes On'" and observing similar writings on houses of other No On 8 households.).

- Tr. 1219:7-17 (Zia:  During the Prop. 8 campaign, Zia felt discriminated by a campaign to "degrade and devalue the marriage that I have with my wife."  She felt that the misinformation put out by the pro-Prop. 8 campaign was discriminatory.).

- Tr. 1219:18- 1220:3 (Zia:  During the Prop. 8 campaign, people came up to Zia and called her "You fucking dike (sic)" or told her "You're going to die and burn in hell.").

- Tr. 1220:14-20 (Zia:  While she was handing out fliers during the Prop. 8 campaign, dozens of people would come up to her and say, "'No more people.  With this, no more people.  No more human race.'").

- Tr. 1220:3-1221:9 (Zia:  "And, to me, these were all highly discriminatory because, in essence, they're saying that we are so offensive that we are so not worthy of being human beings, of having the full rights and equality that every other human being, heterosexual human being, can enjoy to just be married to each other, that we would cause the end of the human race.").

- *See also* evidence cited in support of PFFs 108-132.

PFF 297.   Mr. Blankenhorn's opinion that marriage has not been defined by religion or anti-homosexual prejudice is unsupported, unreliable, not credible, and irrelevant.  Mr. Blankenhorn testified only that he could not find any evidence of prejudice, and he failed to provide any explanation regarding how the debate about extending the right of marriage to same-sex couples could not be affected by the pervasive prejudice faced by gays and lesbians in the United States.  Even if marriage as a general matter has been shaped by forces other than prejudice, Mr. Blankenhorn offered no opinion to

266

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

counter the evidence that Prop. 8 was enacted based on such prejudice. The prevalence of this evidence undermines the credibility of Mr. Blankenhorn's opinion.

- Tr. 2766:1-4 (Blankenhorn: Stating that he could not find any evidence that the laws and customs of marriage are based on anti-homosexual prejudice. "Now, I am not saying that no such evidence exists. And if evidence—such evidence exists, I would welcome—I would—I want to know it. But I'm telling you that I have looked for it, and I cannot find it.").

- *See* evidence cited in support of PFFs 285 to 296.

## X.   Proposed Conclusions of Law

### A.   Claim One: Due Process

#### 1.   Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Strict Scrutiny.

PCL 1.   The right to marry is a fundamental right guaranteed by the Due Process Clause of the Fourteenth Amendment. *See Lawrence v. Texas*, 539 U.S. 558, 573-74 (2003) ("our laws and tradition afford constitutional protection to personal decisions relating to marriage," "family relationships," and "child rearing"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("[c]hoices about marriage" are "sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect"); *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) ("the right to marry is of fundamental importance for all individuals"); *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("the decision to marry is a fundamental right"); *id.* (marriage is an "expression[ ] of emotional support and public commitment" whose importance transcends simple reproduction); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) ("[t]his Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) ("marriage involves interests of basic importance in our society"); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"); *see also id.*

Gibson, Dunn
& Crutcher
LLP

1   ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence

2   and survival.") (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541

3   (1942)); *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) ("Marriage is a coming

4   together for better or for worse, hopefully enduring, and intimate to the degree of

5   being sacred.  It is an association that promotes a way of life, not causes; a harmony in

6   living, not political faiths; a bilateral loyalty, not commercial or social projects.  Yet it

7   is an association for as noble a purpose as any involved in our prior decisions.");

8   *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the right "to marry, establish a home

9   and bring up children" is a central part of the liberty protected by the Due Process

10  Clause); *Maynard v. Hill*, 125 U.S. 190, 205, 211 (1888) (marriage is "the most

11  important relation in life" and "the foundation of the family and of society, without

12  which there would be neither civilization nor progress").

13  PCL 2.      Prop. 8 infringes on Plaintiffs' fundamental right to marry.

14  PCL 2(a).   A State cannot confer separate and unequal rights on socially disfavored groups

15  because excluding a disfavored group from the rights enjoyed by all other members of

16  society brands the disfavored group with an indelible mark of inferiority and that

17  stigmatic harm is itself a judicially cognizable and remediable injury.  *See United*

18  *States v. Virginia*, 518 U.S. 515, 554 (1996); *Brown v. Bd. of Educ.*, 347 U.S. 483, 494

19  (1954); *McLaurin v. Okla. State Regents for Higher Educ.*, 339 U.S. 637, 641 (1950);

20  *Sweatt v. Painter*, 339 U.S. 629, 634-35 (1950); *see also Heckler v. Mathews*, 465

21  U.S. 728, 739-40 (1984) ("discrimination itself, by perpetuating 'archaic and

22  stereotypic notions' or by stigmatizing members of the disfavored group as 'innately

23  inferior' and therefore as less worthy participants in the political community, can

24  cause serious noneconomic injuries to those persons who are personally denied equal

25  treatment"); *Plessy v. Ferguson*, 163 U.S. 537, 562 (1896) (Harlan, J., dissenting)

26  (laws creating "separate but equal" accommodations "put[ ] the brand of . . .

27  degradation upon a large class of our fellow-citizens").

28

268

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   PCL 2(b).    Prop. 8 infringes on Plaintiffs' fundamental right to marry by relegating gay men and

2            lesbians to the separate-and-inherently-unequal status of domestic partnership. *See*

3            *Lawrence*, 539 U.S. at 574 ("our laws and tradition afford constitutional protection to

4            personal decisions relating to marriage" and "[p]ersons in a homosexual relationship

5            may seek autonomy for th[is] purpose[ ], just as heterosexual persons do"); *In re*

6            *Marriage Cases*, 183 P.3d 384, 434 (Cal. 2008) (one of the "core elements of th[e]

7            fundamental right [to marry] is the right of same-sex couples to have their official

8            family relationship accorded the same dignity, respect, and stature as that accorded to

9            all other officially recognized family relationships"); *id.* at 402, 434, 445 (by

10          "reserving the historic and highly respected designation of 'marriage' exclusively to

11          opposite-sex couples while offering same-sex couples only the new and unfamiliar

12          designation of domestic partnership," the State communicates the "official view that

13          [same-sex couples'] committed relationships are of lesser stature than the comparable

14          relationships of opposite-sex couples" and impermissibly stamps gay and lesbian

15          individuals—and their children—with a "mark of second-class citizenship"); *Kerrigan*

16          *v. Comm'r of Pub. Health*, 957 A.2d 407, 417 (Conn. 2008) ("the legislature, in

17          establishing a statutory scheme consigning same sex couples to civil unions, has

18          relegated them to an inferior status, in essence, declaring them to be unworthy of the

19          institution of marriage"); *Opinions of the Justices to the Senate*, 802 N.E.2d 565, 570

20          (Mass. 2004) ("The dissimilitude between the terms 'civil marriage' and 'civil union'

21          is not innocuous; it is a considered choice of language that reflects a demonstrable

22          assigning of same-sex, largely homosexual, couples to second-class status."); *see also*

23          PFF § IV.A (harms from denial of marriage to same-sex couples); *cf. Marriage Cases*,

24          183 P.3d at 421 (plaintiffs "are not seeking to create a new constitutional right—the

25          right to 'same-sex marriage' . . . .  Instead, plaintiffs contend that, properly interpreted,

26          the state constitutional right to marry affords same-sex couples the same rights and

27          benefits . . . as this constitutional right affords to opposite-sex couples").

28

*Gibson, Dunn & Crutcher LLP*

PCL 3.         Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *See P.O.P.S. v. Gardner*, 998 F.2d 764, 767-68 (9th Cir. 1993) ("Statutes that directly and substantially impair [the right to marry] require strict scrutiny."); *see also Carey v. Population Control Servs. Int'l*, 431 U.S. 678, 686 (1977); PFF § IX.C-E (absence of governmental interests supporting Prop. 8).  Indeed, Proponents cannot even show that Prop. 8 is substantially related to an important state interest or rationally related to a legitimate state interest.

PCL 3(a).      Prop. 8 cannot be upheld on the basis of a purported interest in promoting procreation.

PCL (3)(a)(i).  The promotion of procreation is not a constitutionally sufficient ground for preventing a couple from marrying.  *See Marriage Cases*, 183 P.3d at 431 (if a State could limit marriage based on procreative ability, "it would follow that in instances in which the state is able to make a determination of an individual's fertility . . . , it would be constitutionally permissible for the state to preclude an individual who is incapable of bearing children from entering into marriage" with even a partner of the opposite sex); *see also Turner*, 482 U.S. at 99 (an almost-complete prohibition on inmate marriages was unconstitutional because it was not "reasonably related to legitimate penological objectives"); *Griswold*, 381 U.S. at 485 (upholding the right of married individuals to use contraception to prevent procreation).

PCL 3(a)(ii).   Prop. 8's prohibition of marriage by individuals of the same sex does nothing to promote procreation.  *See* PFF § IX.C.2 (no effect on opposite-sex relationships from excluding same-sex couples from marriage).

PCL 3(a)(iii).  In any event, Prop. 8 is a fatally underinclusive means of promoting procreation because it permits individuals of the opposite sex who are unable to bear children, or who simply have no desire for children, to marry.  *See Fla. Star v. B.J.F.*, 491 U.S. 524, 540-41 (1989) (holding that a statute prohibiting the publication of particular information in certain media but not in others was unconstitutionally underinclusive).

270

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

PCL 3(b).      Prop. 8 cannot be upheld on the basis of a purported interest in ensuring that children are raised by their biological parents or by an adoptive mother and father.

PCL3(b)(i).    Ensuring that children are raised by a mother and a father, as opposed to a same-sex couple, is not a legitimate state interest because children of same-sex couples are as well-adjusted as children of opposite-sex couples.  *See Varnum v. Brien*, 763 N.W. 2d 862, 899 n.26 (Iowa 2009) ("The research appears to strongly support the conclusion that same-sex couples foster the same wholesome environment as opposite-sex couples and suggests that the traditional notion that children need a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotype than anything else."); *see also* PFF § IX.C.3.

PCL3(b)(ii).   Prop. 8 does not advance this purported state interest because California law expressly authorizes adoption by unmarried same-sex couples and does not otherwise restrict the ability of same-sex couples to raise children.  *See Marriage Cases*, 183 P.3d at 452 n.72. ("the governing California statutes permit same-sex couples to adopt and raise children and additionally draw no distinction between married couples and domestic partners with regard to the legal rights and responsibilities relating to children raised within each of these family relationships"); Cal. Fam. Code §§ 297.5(d), 7601, 7602, 7650, 9000(b); *Elisa B. v. Superior Ct.*, 117 P.3d 660, 670 (Cal. 2005); *Sharon S. v. Sup. Ct.*, 73 P.3d 554, 569 (Cal. 2003); PFF § III.B.2 (gay men and lesbians can adopt and parent children).

PCL 3(c).      Prop. 8 does not advance a purported interest in "'responsible procreation,'" which Proponents define as "directing the inherent procreative capacity of sexual intercourse between men and women into stable, legally bound relationships" (Doc # 36 at 22), because the State's refusal to permit *gay and lesbian* individuals to marry will not encourage *heterosexual* individuals to marry when their relationships result in "unintended children." *Id.* at 13; *see also* PFF § IX.C.2 (no effect on opposite-sex relationships from excluding same-sex couples from marriage).

271

*Gibson, Dunn
& Crutcher
LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PCL 3(d).     Prop. 8 does not further a purported interest in ensuring that California marriages are recognized by other States because it preserves 18,000 marriages between same-sex couples that may not be recognized in those States that prohibit marriage by individuals of the same sex.  *See Strauss v. Horton*, 207 P.3d 48, 122 (Cal. 2009) (upholding the 18,000 marriages between same-sex couples performed in California prior to the enactment of Prop. 8); *see also* Oct. 14, 2009 Tr. 89:14 (Court:  This claimed interest is "insubstantial.").

PCL 3(e).     Prop. 8 does not further purported interests in "administrative ease" or conforming California's definition of "marriage" to federal law.

PCL 3(e)(i).     "[A]dministrative ease and convenience" are constitutionally illegitimate grounds for discrimination.  *Craig v. Boren*, 429 U.S. 190, 198 (1976).

PCL 3(e)(ii).     Even if California had a valid interest in easing its administrative burden in differentiating between same-sex and opposite-sex unions, Prop. 8 leaves 18,000 marriages of gay and lesbian couples on the books and thus does not ease the State's purported "burden."  *See Strauss*, 207 P.3d at 122.

PCL 3(f).     Neither tradition nor moral disapproval is a sufficient basis for a State to impair a person's constitutionally protected right to marry.  *See Lawrence*, 539 U.S. at 557 (the "fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice"); *id.* at 579 ("times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress"); *id.* at 582 ("[m]oral disapproval" of gay men and lesbians, "like a bare desire to harm the group, is an interest that is insufficient to satisfy" even rational basis review); *Romer v. Evans*, 517 U.S. 620, 634 (1996) (a "bare . . . desire to harm a politically unpopular group, cannot constitute a *legitimate* governmental interest") (internal quotation marks omitted; emphasis in original); *id.* at 635 (a state practice of restricting citizens'

272

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

constitutional rights cannot be perpetuated merely "for its own sake"); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (while "[p]rivate biases may be outside the reach of the law," the "law cannot, directly or indirectly, give them effect" at the expense of a disfavored group's fundamental constitutional rights); *Williams v. Illinois*, 399 U.S. 235, 239 (1970) ("neither the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack"); *see also* Oct. 14, 2009 Tr. 86:25-87:3 (Court: "Tradition alone is not enough because the constitutional imperatives of the Equal Protection clause must have priority over the comfortable convenience of the status quo.").

PCL 3(g).   Prop. 8 cannot be upheld on the basis of a purported interest in "acting incrementally and with caution" because caution and incrementalism are constitutionally illegitimate grounds for perpetuating discrimination.  *See Cooper v. Aaron*, 358 U.S. 1, 16 (1958) ("the preservation of the public peace . . . cannot be accomplished by laws or ordinances which deny rights created or protected by the federal Constitution").

PCL 3(h).   Prop. 8 does not advance a purported interest in preventing the weakening or deinstitutionalization of marriage because permitting marriage by individuals of the same sex strengthens the institution of marriage for both same-sex couples and opposite-sex couples (and certainly does not weaken marriage for opposite-sex couples).  *See* PFF IX.C.2.

PCL 3(i).   Prop. 8 does not advance a purported interest in preserving "the responsibility of parents to provide for the ethical and moral development and education of their children" because permitting same-sex couples to marry in no way diminishes that parental responsibility and because Prop. 8 did not alter any law or regulation that places limits on parental prerogatives.

273

*Gibson, Dunn & Crutcher LLP*

PCL 3(j).    Prop. 8 does not further a purported interest in accommodating the First Amendment rights of individuals who oppose allowing gay and lesbian couples to marry on religious grounds.

PCL 3(j)(i).    The First Amendment preserves the right of religious groups to prescribe their own rules regarding religious marriage. *See Marriage Cases*, 183 P.3d at 451-52 ("affording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs").

PCL 3(j)(ii).    Prop. 8 does not advance the religious freedom of groups that discriminate against gay men and lesbians for religious reasons because it does not alter generally applicable state laws that prohibit discrimination based on sexual orientation. *See* Cal. Civ. Code § 51(b); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that schools that enforce racially discriminatory admissions standards on the basis of religious doctrine do not qualify as tax-exempt organizations under the Internal Revenue Code).

PCL 3(k).    Prop. 8 does not further purported interests in using different names for different things or maintaining the flexibility to separately address the needs of different types of relationships.

PCL 3(k)(i).    "[A]dministrative ease and convenience" are constitutionally illegitimate grounds for discrimination. *Craig*, 429 U.S. at 198.

PCL 3(k)(ii).    Even if California had valid interests in using different names and different administrative classifications for same-sex and opposite-sex unions, Prop. 8 leaves 18,000 marriages of gay and lesbian couples on the books and thus does not promote the distinction underlying these purported interests. *See Strauss*, 207 P.3d at 122.

274

*Gibson, Dunn & Crutcher LLP*

PCL 3(*l*).    Prop. 8 does not further a purported interest in retaliating against persons who engaged in boycotts, protests, and picketing in opposition to Prop. 8 because the State does not have a constitutionally legitimate interest in retaliating against the exercise of core First Amendment freedoms. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909, 911 (1982) (a "boycott" designed to "bring about political, social, and economic change" "clearly involve[s] constitutionally protected activity" and "does not lose its protected character . . . simply because it may embarrass others or coerce them into action").

PCL 4.    *Baker v. Nelson*, 409 U.S. 810 (1972), does not foreclose Plaintiffs' due process challenge.  *See Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam) (the Supreme Court's summary dismissals are binding on lower courts only "on the precise issues presented and necessarily decided"); *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (summary dismissals are binding only to the extent that they have not been undermined by subsequent "doctrinal developments" in the Supreme Court's case law).

PCL 4(a).    The issue in *Baker*—the constitutionality of an outright refusal by a State to afford any recognition to same-sex relationships—is different from the issue presented by Plaintiffs' constitutional challenge, which asks this Court to determine whether it is constitutional for California voters to use the initiative process to strip gay and lesbian individuals of their fundamental right to marry and to relegate same-sex couples to the separate-and-inherently-unequal institution of domestic partnership.

PCL 4(b).    The Supreme Court's subsequent decisions in *Lawrence*—which invalidated a state prohibition on same-sex intimate conduct on due process grounds—and *Romer*—which struck down on equal protection grounds a state constitutional amendment prohibiting governmental action to protect gay and lesbian individuals against discrimination—have fatally weakened *Baker*. *See Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not

275

Gibson, Dunn
& Crutcher
LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as 'unsubstantial.'"), *rev'd in part on other grounds*, 447 F.3d 673 (9th Cir. 2006); *see also Turner*, 482 U.S. at 99 (invalidating an almost-complete prohibition on inmate marriages); *Zablocki*, 434 U.S. at 384 ("the right to marry is of fundamental importance for *all* individuals") (emphasis added).

### 2. Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Intermediate Scrutiny.

PCL 5.     The right to marry is a significant liberty interest.  *See Witt v. Dep't of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008); PCL 1.

PCL 6.     Prop. 8 infringes on Plaintiffs' right to marry.  *See* PCL 2.

PCL 7.     Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest.  *See Witt*, 527 F.3d at 819; PCL 3.[3]

### 3. Prop. 8 Infringes On Plaintiffs' Right To Marry And Fails Rational Basis Review.

PCL 8.     Prop. 8 infringes on Plaintiffs' right to marry.  *See* PCL 1.

PCL 9.     Prop. 8 is not rationally related to a legitimate state interest.  *See Romer*, 517 U.S. at 632-33; PCL 3.

### 4. Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Strict Scrutiny.

PCL 10.    The right to privacy and personal autonomy is a fundamental right.  *See Lawrence*, 539 U.S. at 578.

PCL 11.    Prop. 8 infringes on Plaintiffs' fundamental right to privacy and personal autonomy.  *See Zablocki*, 434 U.S. at 384 ("the right to marry is part of the fundamental 'right of

---

[3]   Rather than repeat the reasons why Proponents' proffered state interests fail under each level of scrutiny, Plaintiffs include a cross-reference to PCL 3, which demonstrates that Prop. 8 fails to satisfy any level of scrutiny.

276

Gibson, Dunn & Crutcher LLP

privacy' implicit in the Fourteenth Amendment's Due Process Clause"); *Carey*, 431 U.S. at 684-85 ("[w]hile the outer limits of [the right of personal privacy] have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage") (internal quotation marks omitted).

PCL 12.    Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *See P.O.P.S.*, 998 F.2d at 767-68; PCL 3.

### 5.    Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Intermediate Scrutiny.

PCL 13.    The right to privacy and personal autonomy is a significant liberty interest.  *See Witt*, 527 F.3d at 819.

PCL 14.    Prop. 8 infringes on Plaintiffs' right to privacy and personal autonomy.  *See* PCL 11.

PCL 15.    Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest.  *See Witt*, 527 F.3d at 819 ("when the government attempts to intrude upon the personal and private lives of homosexuals, in a manner that implicates the rights identified in *Lawrence*, the government must advance an important governmental interest, the intrusion must significantly further that interest, and the intrusion must be necessary to further that interest"); PCL 3.

### 6.    Prop. 8 Infringes On Plaintiffs' Right To Privacy And Personal Autonomy And Fails Rational Basis Review.

PCL 16.    Prop. 8 infringes on Plaintiffs' right to privacy and personal autonomy.  *See* PCL 11.

PCL 17.    Prop. 8 is not rationally related to a legitimate state interest.  *See Romer*, 517 U.S. at 632-33; PCL 3.

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

B.      **Claim Two: Equal Protection**

1.      **Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Strict Scrutiny.**

PCL 18.         Gay men and lesbians are a suspect class.

PCL 18(a).      A classification is suspect where it targets a group that has been subject to a history of discrimination and that is defined by a "characteristic" that "frequently bears no relation to ability to perform or contribute to society."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440-41 (1985) (internal quotation marks omitted); *see also Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (persons "who have been discriminated against on the basis of race or national origin" are a suspect class because they have "experienced a history of purposeful unequal treatment" and "been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities"); *cf. Christian Sci. Reading Room Jointly Maintained v. City & County of San Francisco*, 784 F.2d 1010, 1012 (9th Cir. 1986) (holding that "an individual religion meets the requirements for treatment as a suspect class," even though religion is not immutable).

PCL 18(a)(i).   Gay men and lesbians have been subject to a history of discrimination.  *See Lawrence*, 539 U.S. at 571 ("for centuries there have been powerful voices to condemn homosexual conduct as immoral"); *Kerrigan*, 957 A.2d at 432 ("gay persons historically have been, and continue to be, the target of purposeful and pernicious discrimination due solely to their sexual orientation"); *id.* at 446 ("the bigotry and hatred that gay persons have faced are akin to, and, in certain respects, perhaps even more severe than, those confronted by some groups that have been accorded heightened judicial protection"); *Varnum*, 763 N.W.2d at 889 (there has been a "long and painful history of discrimination against gay and lesbian persons"); PFF § VII (history of discrimination against gay men and lesbians).

278

*Gibson, Dunn & Crutcher LLP*

PCL 18(a)(ii).    Sexual orientation is irrelevant to whether someone can make a meaningful contribution to society. *See, e.g.*, *Marriage Cases*, 183 P.3d at 442 ("sexual orientation is a characteristic . . . that bears no relation to a person's ability to perform or contribute to society"); *Kerrigan*, 957 A.2d at 435 ("gay persons stand in stark contrast to other groups that have been denied suspect or quasi-suspect class recognition, despite a history of discrimination, because the distinguishing characteristics of those groups adversely affect their ability or capacity to perform certain functions or to discharge certain responsibilities in society"); PFF § V.B (gay men and lesbians contribute to society in the same ways as heterosexual individuals).

PCL 18(b).    In determining whether a class is "suspect" for equal-protection purposes, it may also be relevant whether the group exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group" and whether they are "politically powerless." *Bowen*, 483 U.S. at 602.

PCL 18(b)(i).    Sexual orientation is a fundamental aspect of a person's identity and is immutable in the sense that it is not typically the subject of personal choice and is highly resistant to change; the sexual orientation of gay men and lesbians defines them as a discrete group. *See Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[s]exual orientation and sexual identity are immutable"); *id.* ("[h]omosexuality is as deeply ingrained as heterosexuality") (quoting *Gay Rights Coalition of Georgetown Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 34 (D.C. 1987)); *Varnum*, 763 N.W.2d at 893 ("sexual orientation forms a significant part of a person's identity," and "influences the formation of personal relationships between all people—heterosexual, gay, or lesbian—to fulfill each person's fundamental needs for love and attachment") (internal quotation marks omitted); *id.* ("sexual orientation is central to personal identity and 'may be altered [if at all] only at the expense of significant damage to the individual's sense of self'") (alteration in original); PFF § VI.B (sexual orientation is highly resistant to change).

279

Gibson, Dunn
& Crutcher
LLP

PCL 18(b)(ii).   Gay and lesbian individuals possess less political power than other groups that are afforded the protection of suspect or quasi-suspect status under the Equal Protection Clause.  *See Kerrigan*, 957 A.2d at 446 ("Insofar as gay persons play a role in the political process, it is apparent that their numbers reflect their status as a small and insular minority."); *see also id.* at 452 ("With respect to the comparative political power of gay persons, they presently have no greater political power—in fact, they undoubtedly have a good deal less such influence—than women did in 1973, when the United States Supreme Court, in *Frontiero* [*v. Richardson*, 411 U.S. 677 (1973) (plurality opinion)], held that women are entitled to heightened judicial protection."); PFF § VIII (the relative political power of gay men and lesbians); *cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 235 (1995) (holding that all racial classifications are inherently suspect, even though many racial groups exercise substantial political power).

PCL 19.   Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.

PCL 19(a)(i).   Voter-enacted measures that strip disfavored individuals of rights that they had previously possessed under state law and that are possessed by other members of society discriminate against the targeted group.  *See Romer*, 517 U.S. at 635 (invalidating a voter-enacted state constitutional provision that stripped gay men and lesbians of antidiscrimination protections that they had previously possessed under state law because the measure "classifie[d] homosexuals not to further a proper legislative end but to make them unequal to everyone else"); *id.* at 627, 631 (holding that the voter-enacted amendment was unconstitutional because it "impose[d] a special disability upon [gay and lesbian individuals] alone" and "withdr[e]w[ ] from" them, "but, no others, specific legal protection" that they had previously enjoyed under the state constitution); *Reitman v. Mulkey*, 387 U.S. 369, 381 (1967) (invalidating a voter-

280

Gibson, Dunn
& Crutcher
LLP

1   enacted California constitutional provision that extinguished state-law protections that

2   minorities had previously possessed against housing discrimination).

3   PCL 19(a)(ii).   Plaintiffs are similarly situated to heterosexual individuals for purposes of marriage

4   because, like individuals in a relationship with a person of the opposite sex, they are in

5   loving, committed relationships and wish to enter into a formal, legally binding and

6   officially recognized, long-term family relationship.  *See Marriage Cases*, 183 P.3d at

7   435 n.54; *see also Kerrigan*, 957 A.2d at 424 (same-sex couples are similarly situated

8   to opposite-sex couples for purposes of marriage because they "share the same interest

9   in a committed and loving relationship as heterosexual persons who wish to marry,

10   and they share the same interest in having a family and raising their children in a

11   loving and supportive environment"); *Varnum*, 763 N.W.2d at 883 ("plaintiffs are

12   similarly situated compared to heterosexual persons" because "[p]laintiffs are in

13   committed and loving relationships, many raising families, just like heterosexual

14   couples"); PFF § V.A (fundamental similarities between same-sex couples and

15   opposite-sex couples).

16
17   PCL 19(a)(iii).   Prop. 8 strips gay men and lesbians of the right to marry that they had previously

18   possessed under the California Constitution as written since its ratification in 1849.

19   *See Marriage Cases*, 183 P.3d at 452; *Strauss*, 207 P.3d at 77 (Prop. 8 "[c]hange[d]

20   the California Constitution to eliminate the right of same-sex couples to marry in

21   California") (internal quotation marks omitted); *see also James B. Beam Distilling Co.

22   v. Georgia*, 501 U.S. 529, 549 (1991) (Scalia, J., concurring in judgment) ("the

23   judicial power as understood by our common-law tradition . . . is the power 'to say

24   what the law is,' not the power to change it"); *Newman v. Emerson Radio Corp.*, 772

25   P.2d 1059, 1062 (Cal. 1989) ("The general rule that judicial decisions are given

26   retroactive effect is basic in our legal tradition.").

27   PCL 19(b).   Prop. 8 relegates gay men and lesbians to the separate-and-inherently-unequal status

28   of domestic partnership.  *See Marriage Cases*, 183 P.3d at 402 (prohibitions on

281

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

marriage between individuals of the same sex "perpetuat[e]" the "general premise . . . that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples"); *Kerrigan*, 957 A.2d at 417 ("the legislature, in establishing a statutory scheme consigning same sex couples to civil unions, has relegated them to an inferior status, in essence, declaring them to be unworthy of the institution of marriage"); *Opinions of the Justices*, 802 N.E.2d at 570; PCL 2; PFF § IV.A (harms from denial of marriage to same-sex couples); *see also* PX0728 at 2 and ¶¶ 1, 7, 36-43 (Attorney General's Answer:  Admits that Prop. 8 violates the Fourteenth Amendment to the U.S. Constitution:  "Taking from same-sex couples the right to civil marriage that they had previously possessed under California's Constitution cannot be squared with guarantees of the Fourteenth Amendment.").

PCL 20.     Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it indisputably was designed to strip gay men and lesbians of their right to marry and has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See, e.g.*, *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (1982) ("when facially neutral legislation is subjected to equal protection attack, an inquiry into intent is necessary to determine whether the legislation in some sense was designed to accord disparate treatment on the basis of racial considerations"); PFF § IX.F (evidence of Prop. 8's purpose and effect).

PCL 21.     Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored to further a compelling state interest.  *Palmore*, 466 U.S. at 432-33.

PCL 21(a).     Prop. 8 is not even rationally related to a legitimate state interest.  *See* PCL 3.

PCL 21(b).     Prop. 8 irrationally creates at least four categories of couples in California:  Opposite-sex couples, who are permitted to marry, and to remarry upon divorce; the 18,000

*Gibson, Dunn & Crutcher LLP*

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1     same-sex couples who were married after the California Supreme Court's decision in

2     the *Marriage Cases* but before the enactment of Prop. 8, whose marriages remain

3     valid but who are not permitted to remarry upon divorce; same-sex couples who were

4     married in other States before the enactment of Prop. 8, whose marriages are valid and

5     recognized in California; and unmarried same-sex couples, who are prohibited by

6     Prop. 8 from marrying and restricted to the separate-and-inherently-unequal status of

7     domestic partnership. *See Romer*, 517 U.S. at 632-33; Cal. Fam. Code § 308(b).

8 PCL 22.     *Baker* does not foreclose Plaintiffs' equal protection challenge because, among other

9     reasons, *Baker* presented an equal protection challenge based only on sex

10     discrimination. *See* Jurisdictional Statement at 16, *Baker* (No. 71-1027) ("The

11     discrimination in this case is one of gender."); *see also* PCL 4.

12

13 PCL 23.     *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563 (9th

14     Cir. 1990), does not foreclose the availability of heightened scrutiny.

15 PCL 23(a).     *High Tech Gays* is no longer controlling because it was premised on the Supreme

16     Court's since-overruled decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986). *See*

17     *High Tech Gays*, 895 F.2d at 571 ("by the *Hardwick* majority holding that the

18     Constitution confers no fundamental right upon homosexuals to engage in sodomy,

19     and because homosexual conduct can thus be criminalized, homosexuals cannot

20     constitute a suspect or quasi-suspect class entitled to greater than rational basis review

21     for equal protection purposes"); *see also Lawrence*, 539 U.S. at 578 (overruling

22     *Bowers*).

23 PCL 23(b).     *High-Tech Gays* found that gay men and lesbians "are not without political power"

24     (895 F.2d at 574), but, since *High-Tech Gays* was decided, the factual bases for that

25     finding have been undermined by the widespread use of state ballot initiatives to target

26     gay men and lesbians for disfavored treatment and strip them of their rights under

27     federal and state law. *See* PFF § VIII.

28

283

*Gibson, Dunn
& Crutcher
LLP*

PCL 23(c).    *High-Tech Gays* found that "homosexuality . . . is behavioral" (895 F.2d at 573), but the factual bases for that finding have been undermined by recent empirical research demonstrating that sexual orientation is not a personal choice and is highly resistant to change.  PFF § VI.B.

2.    **Prop. 8 Discriminates On The Basis Of Sexual Orientation And Fails Intermediate Scrutiny.**

PCL 24.    Gay and lesbian individuals are a quasi-suspect class.  *See* PCL 18.

PCL 25.    Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.  *See* PCL 19.

PCL 26.    Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See* PCL 20.

PCL 27.    Proponents cannot meet their burden of establishing that Prop. 8 is substantially related to an important state interest.  *Virginia*, 518 U.S. at 524; PCL 3; PCL 21.

3.    **Prop. 8 Discriminates On The Basis of Sexual Orientation And Fails Rational Basis Review.**

PCL 28.    Prop. 8 discriminates against gay men and lesbians on the basis of their sexual orientation.  *See* PCL 19.

PCL 29.    Even if Prop. 8 did not discriminate against gay men and lesbians on its face—which it does—it has the purpose and effect of according disparate treatment to gay men and lesbians with regard to the right to marry.  *See* PCL 20.

PCL 30.    Prop. 8's discrimination based on sexual orientation is not rationally related to a legitimate state interest.  *See Romer*, 517 U.S. at 632-33; PCL 3; PCL 21.

284

*Gibson, Dunn & Crutcher LLP*

1           **4.**      **Prop. 8 Discriminates On The Basis Of Sex And Fails Intermediate**
2                         **Scrutiny.**

3   PCL 31.     Prop. 8 discriminates against Plaintiffs on the basis of their sex because the male

4               Plaintiffs would be able to marry their partner if one of those Plaintiffs were female,

5               and the female Plaintiffs would be able to marry their partner if one of them were

6               male.  *See Virginia*, 518 U.S. at 532-33 (the Equal Protection Clause prohibits

7               "differential treatment or denial of opportunity" based on a person's sex); *cf. Loving*,

8               388 U.S. at 9 (holding that Virginia's anti-miscegenation law constituted unlawful

9               racial discrimination even though it applied with equal force to blacks and whites).

10   PCL 32.     Proponents cannot meet their burden of establishing that Prop. 8 is substantially

11               related to an important state interest.  *See Virginia*, 518 U.S. at 524; *see also id.* at

12               532-33 (the Equal Protection Clause prohibits discrimination based on sex in the

13               absence of an "exceedingly persuasive" justification); PCL 3; PCL 21.

14   PCL 33.     *Baker* does not foreclose Plaintiffs' sex-discrimination challenge because it was

15               decided before the U.S. Supreme Court recognized that sex is a quasi-suspect

16               classification.  *See Frontiero*, 411 U.S. 677; *Craig*, 429 U.S. 190, 197.

17           **5.**      **Prop. 8 Infringes On Plaintiffs' Fundamental Right To Marry And Fails**
18                         **Strict Scrutiny.**

19   PCL 34.     The right to marry is a fundamental right guaranteed by the Equal Protection Clause of

20               the Fourteenth Amendment.  *See* PCL 1.

21   PCL 35.     Prop. 8 infringes on Plaintiffs' constitutional right to marry.  *See* PCL 2.
22

23   PCL 36.     Proponents cannot meet their burden of establishing that Prop. 8 is narrowly tailored

24               to further a compelling state interest.  *See United States v. Hancock*, 231 F.3d 557, 565

25               (9th Cir. 2000) (under the Equal Protection Clause, a "law is subject to strict scrutiny

26               if it targets a suspect class or burdens the exercise of a fundamental right"); *see also*

27               *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942) (applying strict

28

*Gibson, Dunn
& Crutcher
LLP*

1    equal protection scrutiny to a state law that burdened the fundamental right to

2    procreate); PCL 3; PCL 21.

3    **C.      Claim III: Violation of 42 U.S.C. § 1983**

4        **1.      Enforcement Of Prop. 8 Violates 42 U.S.C. § 1983.**

5    PCL 37.    Defendants are acting under color of state law.  *See* § I.C.

6

7    PCL 38.    Prop. 8 violates Plaintiffs' rights under the Due Process and Equal Protection Clauses

8              of the Fourteenth Amendment.  *See generally* PCL 1-36.

9    PCL 39.    Defendants are depriving Plaintiffs of their rights, privileges, or immunities secured by

10             the Constitution and laws of the United States.  *See generally* PCL 1-36

11   DATED:  February 26, 2010              GIBSON, DUNN & CRUTCHER LLP
                                           Theodore B. Olson
12                                         Theodore J. Boutrous, Jr.
                                           Christopher D. Dusseault
13                                         Ethan D. Dettmer
                                           Matthew D. McGill
14                                         Amir C. Tayrani
                                           Sarah E. Piepmeier
15                                         Theane Evangelis Kapur
                                           Enrique A. Monagas
16

17

18                                         By:_____/s/_____
19                                                    Theodore B. Olson
20   ///

21   ///

22   ///

23

24

25

26

27

28

                                                286

*Gibson, Dunn
& Crutcher
LLP*

1          and

2          BOIES, SCHILLER & FLEXNER LLP
           David Boies
3          Steven C. Holtzman
           Jeremy M. Goldman
4          Rosanne C. Baxter
           Richard J. Bettan
5          Beko O. Reblitz-Richardson
           Theodore H. Uno
6          Joshua I. Schiller
7
           Attorneys for Plaintiffs
8          KRISTIN M. PERRY, SANDRA B. STIER,
           PAUL T. KATAMI, and JEFFREY J. ZARRILLO
9
10
11         DENNIS J. HERRERA
           City Attorney
12         THERESE M. STEWART
           Chief Deputy City Attorney
13         DANNY CHOU
           Chief of Complex and Special Litigation
14         RONALD P. FLYNN
           VINCE CHHABRIA
15         ERIN BERNSTEIN
           CHRISTINE VAN AKEN
16         MOLLIE M. LEE
           Deputy City Attorneys
17
18
19         By:_____/s/_____
20                        Therese M. Stewart
21         Attorneys for Plaintiff-Intervenor
           CITY AND COUNTY OF SAN FRANCISCO
22
23
24
25
26
27
28

Gibson, Dunn & Crutcher LLP

09-CV-2292 VRW  PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S ANNOTATED AMENDED PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

## ATTESTATION PURSUANT TO GENERAL ORDER NO. 45

2

Pursuant to General Order No. 45 of the Northern District of California, I attest that concurrence

3

in the filing of the document has been obtained from each of the other signatories to this document.

4

5

6

By:_____/s/_____

7

Theodore B. Olson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Gibson, Dunn
& Crutcher
LLP*