1  DENNIS J. HERRERA, State Bar #139669
    City Attorney
2  THERESE M. STEWART, State Bar #104930
    Chief Deputy City Attorney
3  DANNY CHOU, State Bar #180240
    Chief of Complex and Special Litigation
4  RONALD P. FLYNN, State Bar #1841867
    VINCE CHHABRIA, State Bar #208557
5  ERIN BERNSTEIN, State Bar #231539
    CHRISTINE VAN AKEN, State Bar #241755
6  MOLLIE M. LEE, State Bar #251404
    Deputy City Attorneys
7  City Hall, Room 234
    One Dr. Carlton B. Goodlett Place
8  San Francisco, California 94102-4682
    Telephone:   (415) 554-4708
9  Facsimile:   (415) 554-4699

10  Attorneys for Plaintiff-Intervenors
    CITY AND COUNTY OF SAN FRANCISCO

11

12                UNITED STATES DISTRICT COURT

13           NORTHERN DISTRICT OF CALIFORNIA

14

15  KRISTIN M. PERRY, SANDRA B. STIER,    Case No. 09-CV-2292 VRW
    PAUL T. KATAMI, and JEFFREY J.
16  ZARRILLO,                          **PLAINTIFF-INTERVENOR CITY AND
                                 COUNTY OF SAN FRANCISCO'S
17        Plaintiffs,                OPPOSITION TO DEFENDANT-
                                 INTERVENORS PROPONENTS AND DR.
18        vs.                    TAM'S MOTIONS TO STRIKE /
                                 RECONSIDER**
19  ARNOLD SCHWARZENEGGER, in his
    official capacity as Governor of California;
20  EDMUND G. BROWN JR., in his official
    capacity as Attorney General of California;    Trial:  Jan. 11-27, 2010
21  MARK B. HORTON, in his official capacity
    as Director of the California Department of    Judge:  Chief Judge Vaughn R. Walker
22  Public Health and State Registrar of Vital
    Statistics; LINETTE SCOTT, in her official    Location:  Courtroom 6, 17th Floor
23  capacity as Deputy Director of Health
    Information & Strategic Planning for the
24  California Department of Public Health;
    PATRICK O'CONNELL, in his official
25  capacity as Clerk-Recorder for the County of
    Alameda; and DEAN C. LOGAN, in his
26  official capacity as Registrar-Recorder/County
    Clerk for the County of Los Angeles,
27
        Defendants.
28

and

PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, GAIL J.
KNIGHT, MARTIN F. GUTIERREZ, HAK-
SHING WILLIAM TAM, and MARK A.
JANSSON; and PROTECTMARRIAGE.COM –
YES ON 8, A PROJECT OF CALIFORNIA
RENEWAL,

            Defendant-Intervenors.


PROPOSITION 8 OFFICIAL PROPONENTS
DENNIS HOLLINGSWORTH, GAIL J.
KNIGHT, MARTIN F. GUTIERREZ, HAK-
SHING WILLIAM TAM, and MARK A.
JANSSON; and PROTECTMARRIAGE.COM –
YES ON 8, A PROJECT OF CALIFORNIA
RENEWAL,

            Defendant-Intervenors.


CITY AND COUNTY OF SAN FRANCISCO,

            Plaintiff-Intervenor

            vs.

ARNOLD SCHWARZENEGGER, in his official
capacity as Governor of California; EDMUND G.
BROWN JR., in his official capacity as Attorney
General of California; MARK B. HORTON, in
his official capacity as Director of the California
Department of Public Health and State Registrar
of Vital Statistics; and LINETTE SCOTT, in her
official capacity as Deputy Director of Health
Information & Strategic Planning for the
California Department of Public Health,

            Defendants.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

I.     AS THE DISTRICT COURT RECOGNIZED, THE FIRST AMENDMENT PRIVILEGE DESCRIBED IN *PERRY I* AND *PERRY II* IS LIMITED IN TWO CRITICAL RESPECTS ...................................................................................... 4

II.    THE PRIVILEGE PROPONENTS NOW ADVOCATE IS INCONSISTENT WITH THEIR REPRESENTATIONS AND TESTIMONY IN DISCOVERY AND AT TRIAL, INCONSISTENT WITH THE LIMITED PRIVILEGE EXCEPTION ESTABLISHED BY THE NINTH CIRCUIT AND VIRTUALLY UNLIMITED IN SCOPE ........................................................... 7

     A.    Contrary to their current assertions, Proponents consistently denied any close political association with the groups and individuals whose communications they now seek to cloak in privilege. ................................... 7

     B.    Evidence presented at trial demonstrates that proponents were linked to various organizations, but that link falls far short of the Ninth Circuit's standard for the First Amendment privilege exception. ........................... 13

III.   THERE IS A STRONG PUBLIC INTEREST IN TRANSPARENCY ABOUT THE ENACTMENT OF LAWS THAT WEIGHS AGAINST REVISITING AND EXPANDING THE SCOPE OF THE LIMITED PRIVILEGE. ................. 17

## TABLE OF AUTHORITIES

**Federal Cases**

*Alaska Right to Life Comm. v. Miles*
   441 F.3d 773 (9th Cir. 2006)................................................................19, 20

*Buckley v. Valeo*
   424 U.S. 1 (1976)..................................................................................19

*California Pro-Life Council, Inc. v. Getman*
   328 F.3d 1088 (9th Cir. 2003)...............................................................20

*California Pro-Life Council, Inc. v. Randolph*
   507 F.3d 1172 (9th Cir. 2007)...........................................................19, 20

*Citizens Against Rent Control v. City of Berkeley*
   454 U.S. 290 (1981).............................................................................20

*Goland v. United States*
   903 F.2d 1247 (9th Cir. 1990)...............................................................19

*Grosjean v. American Press Co.*
   297 U.S. 233........................................................................................22

*McConnell v. Federal Election Comm'n*
   540 U.S. 93 (2003)...........................................................................19, 22

*NAACP v. Claiborne Hardware Co.*
   458 U.S. 886 (1982).............................................................................22

*Perry v. Schwarzennegger*
   591 F.3d 1147 (9th Cir. 2010).............................................4, 5, 6, 8, 15, 18

*Perry v. Schwarzennegger*
   No. 10-15649 (9th Cir. Apr. 12, 2010) ..................................4, 5, 15, 18

**State Statutes & Codes**

Cal. Const. art. II
   § 8(b)..................................................................................................21
   § 10(a)................................................................................................21

Cal. Elections Code
   § 9001(a)............................................................................................21
   § 9604................................................................................................21
   § 9607................................................................................................21

California Government Code

§ 6250...........................................................................................................................21
§ 10248.........................................................................................................................21
§ 81000.........................................................................................................................19
§ 84102(a).....................................................................................................................19
§ 84102(c).....................................................................................................................19
§ 84102(e).....................................................................................................................19
§ 84211(f)......................................................................................................................19
§ 84211(k).....................................................................................................................19
§ 84305.........................................................................................................................19
§ 84503.........................................................................................................................20
§ 84506.........................................................................................................................19
§§ 11120-11132.............................................................................................................21
§§ 6250-70....................................................................................................................21
§§ 9070-9080.................................................................................................................21

**San Francisco Statutes, Codes & Ordinances**

S.F. Admin. Code § 67.1 ...............................................................................................21

S. F. Campaign and Gov. Conduct Code

§ 1.134..........................................................................................................................20
§ 1.135..........................................................................................................................20
§ 1.152..........................................................................................................................20
§ 1.161..........................................................................................................................20
§ 1.161.5.......................................................................................................................20
§ 1.162..........................................................................................................................20
§ 1.163..........................................................................................................................20
§ 2.110..........................................................................................................................20

1    Plaintiff-Intervenor City and County of San Francisco writes separately to emphasize two

2    points relating to the issues before the Court that implicate important government interests.  The first

3    reason is to prevent Defendant-Intervenors' ("Proponents") from chipping away at the evidentiary

4    foundation for the City's showing that Proposition 8 is not in the government's interest.  Proponents

5    seek to retract from the public record evidence that reflects the involvement in the campaign of groups

6    and individuals who held views and conveyed messages to their voting constituencies that reflected

7    deep antipathy toward lesbians and gay men.  The evidence Proponents seek to strike is one piece of

8    the foundation for the City's showing at trial that laws that discriminate against lesbians and gay men,

9    including Proposition 8, stigmatize and injure them and their families, which in turn costs the

10   government money and undermines its interest in promoting a healthy and productive citizenry.  The

11   second reason is that Proponents ask this Court to expand the scope of the First Amendment privilege

12   identified in *Perry I*, but there is competing government interest which weighs against such an

13   expansion.  That interest, which is crucial to a functioning democracy, is the right of the public to

14   know who was behind the passage of a law that governs the entire citizenry and what were the

15   arguments they made to justify its passage.

16                                              **INTRODUCTION**

17          Proponents' motion to reconsider this Court's privilege rulings and to strike evidence from the

18   record is a continuation of its efforts to hide, from the Court and from the public, information about

19   the churches, religious leaders and self-described "pro-family" organizations that participated in the

20   effort to pass Proposition 8, the nature and extent of their efforts, and the messages those entities and

21   persons conveyed to their voting constituents.  Those messages were steeped in prejudice against

22   lesbians and gay men—referring to homosexuality as a "perversion" and an abomination, associating

23   homosexuality with pedophilia and bestiality, and suggesting gay people were on a mission to destroy

24   marriage and Christianity.  Proponents now seek, post hoc, to sanitize the record by excising this

25   evidence of bias and prejudice.

26          Proponents' goal of preventing the anti-gay messages from seeing the light of day, and

27   excluding them from being admitted at trial, led them to make strategic choices earlier in this litigation

28   which foreclose the current motion to strike.  Proponents first asserted the novel theory that *all*

1  campaign-related communications and documents between *any and all persons* who share a political

2  belief are cloaked in a First Amendment privilege of secrecy.  That argument was correctly rejected by

3  this Court and the Ninth Circuit.  The Ninth Circuit did hold that a limited First Amendment privilege

4  protects communications between the core group of persons engaged in formulation of strategy and

5  messaging for the campaign so long as these communications were internal to the core group and were

6  kept confidential.  This limitation posed a dilemma for Proponents.  In order to cloak communications

7  with the anti-gay churches, so-called "pro-family" organizations, and associated persons in the

8  privilege, Proponents would have to acknowledge a close "core group" relationship between

9  ProtectMarriage.com and those same entities or their leaders—and thereby admit that the messaging

10  those groups disseminated was central to the campaign.

11         Proponents strategically chose a different path.  They proffered evidence that this Court found

12  supported a broad core group of persons who were closely affiliated with ProtectMarriage.com for

13  First Amendment purposes, including its executive committee, its staff and its many consultants.  But

14  broad as that group was, Proponents did *not* assert or attempt to prove that the core group of persons

15  engaged in formulating campaign strategy and messaging was so broad as to include the religious

16  leaders, churches and "pro-family" organizations whose messaging they sought to keep at arms length.

17  This Court accepted Proponents' declarations about their core group at face value.  Following the clear

18  guidance of the Ninth Circuit, it held that Proponents were not required to disclose confidential

19  communications about strategy and messaging among those individuals Proponents identified as

20  members of the core group responsible for those tasks.  The remaining communications, including

21  those at issue in the motion to strike, were required to be disclosed.

22         The messages filled with anti-gay rhetoric were admitted at trial, over Proponents' objections

23  that the material was unrelated to the official campaign because the groups that authored and

24  distributed them were acting on their own.  Proponents even jettisoned from their core group one of

25  the official proponents, Dr. Tam, when his hate-filled messages were revealed.  But evidence of these

26  groups' and individuals' connections to Proponents also came to light, making it impossible for

27  Proponents to distance themselves from these groups and their messages.

28

1    So Proponents now seek to go down a different path, one that is diametrically opposed to their

2    prior testimony and representations to Plaintiffs and this Court. They now seek to embrace the same

3    groups and individuals, including Dr. Tam, that at trial and during discovery they worked tirelessly to

4    disclaim. They argue for an expansion of the limited privilege established by the Ninth Circuit,

5    relying on an opinion that did not involve the evidence at issue here. Ignoring the limits on the

6    privilege in that and the Ninth Circuit's prior decision, they argue that virtually all campaign-related

7    communications and documents are cloaked in a First Amendment privilege of secrecy so long as the

8    persons included in them share a political belief of goal, and that the Court erred in not finding these

9    groups part of the core group of persons entitled to First Amendment privilege. They claim not only

10   that previously produced documents are privileged, but ask this Court to take the extraordinary step of

11   altering the record created at trial by excising these documents and the testimony that relates to them.

12        Having made the choice to distance themselves from these groups in the first instance, they

13   cannot now be heard to argue the opposite. And even if the Court were to entertain Proponents'

14   complete about-face on the issue, their current declarations fail to lay the foundation that the Ninth

15   Circuit and this Court required for the privilege to apply: evidence of a core group of persons engaged

16   in formulation of campaign strategy and messaging and proof that the material claimed to be

17   privileged was internal to persons within that group and treated as confidential. Indeed, the Prentice

18   declaration concedes that the authors or recipients of these emails were *not* part of the core group as

19   this Court (consistent with the Ninth Circuit) defined it. The Court did not err, and the motion should

20   be denied.

21        This motion must be denied for a reason independent of Proponents' prior representations and

22   admissions and complete failure of proof – one that is even more important than the significance of the

23   documents at issue to this case. This Court should not revisit or depart from strict adherence to the

24   limits on the privilege set by the Ninth Circuit because while the privilege protects one First

25   Amendment interest, there is an equally, indeed more important, First Amendment interest on the

26   other side of the scale. That interest is the public's right to know – in a country where we have a true

27   democracy – the identity of those who promoted the laws that affect all citizens and the arguments

28   they made to support those laws. Without openness about the interests at stake in a law, the public

cannot meaningfully participate on an ongoing basis in the democracy.  This First Amendment interest

is at least as weighty as that which led the Ninth Circuit and this Court to protect certain

communications of those who seek to influence the political process from disclosure.  The First

Amendment privilege recognized in *Perry I* and *Perry II* is an exception to the rule of disclosure that

is just as central to democracy as the freedom to participate in the process itself.  Those countervailing

First Amendment interests require the Court to adhere to the narrow limitations of the privilege that

the Ninth Circuit articulated and to avoid expanding this new privilege beyond that limited scope.

I.   **AS THE DISTRICT COURT RECOGNIZED, THE FIRST AMENDMENT PRIVILEGE DESCRIBED IN *PERRY I* AND *PERRY II* IS LIMITED IN TWO CRITICAL RESPECTS.**

The Ninth Circuit's opinions in *Perry v. Schwarzennegger*, 591 F.3d 1147 (9th Cir. 2010)

("*Perry I*") and *Perry v. Schwarzennegger*, No. 10-15649 (9th Cir. Apr. 12, 2010) ("*Perry II*")

recognized a limited exception to the general requirement of transparency in government affairs and to

the general rule that litigants are entitled to information reasonably calculated to lead to the discovery

of admissible evidence.[1]  Specifically, the Ninth Circuit held that campaign groups could make a

prima facie showing of arguable First Amendment infringement by demonstrating either 1)

harassment, membership withdrawal, or discouragement of new members, or 2) other consequences

suggesting a chilling on members' associational rights.  It held that Proponents and Dr. Tam

(collectively referred here as "Proponents") made a prima facie showing of "other consequences" by

submitting declarations asserting that disclosure would discourage political association and inhibit

internal campaign communications.  But in *Perry I*, the Ninth Circuit emphasized that its holding was

limited in two critical respects, both of which remain in force after *Perry II* and both of which

Proponents ignore.

First, the privilege exception is "limited to communications among the core group of persons

engaged in the formulation of campaign strategy and messages." *Perry I*, 591 F.3d at 1165 n.12.  In

---

[1] We refer to the doctrine as the "privilege exception" because it is an *exception* to the general rule of transparency with respect to governmental affairs.

*Perry II*, the Ninth Circuit clarified that the First Amendment privilege exception could extend to communications among individuals in different groups, but it retained the core group requirement, holding that the privilege exception only "applies to the *core group* of persons engaged in the formulation of strategy and messages, whether or not they are members of a single organization or entity" (emphasis added). *Perry II*, slip op. at 9. The Ninth Circuit thus retained the requirement that the party asserting the privilege identify the members of a limited core group of persons engaged in formulation of strategy and messages. Proponents ignore this limitation and suggest instead that the privilege applies broadly "among persons who associated during the Proposition 8 campaign." Doc. #640-2 at 4:5-7. They would have this Court literally delete the core group requirement that is central to the Ninth Circuit's holding and expand the privilege exception to communications between any persons who "associated" at all for the purpose of passing Proposition 8.

Second, the Ninth Circuit held that the privilege exception applies only to "private, internal campaign communications concerning the formulation of campaign strategy and messages." *Perry I*, 591 F.3d at 1165 n.12. Again, Proponents ignore this critical part of the Ninth Circuit's holding and attempt to shield from disclosure even broadly disseminated communications. But there is no chilling effect, and consequently no arguable First Amendment infringement, in disclosing a communication that has already been widely broadcast by a speaker. This Court recognized this when Proponents first asserted a privilege over campaign communications, noting that "a rather striking disclosure concerning campaign strategy has already voluntarily been made by at least one, if not the principal, campaign manager-consultant employed by Proponents." Doc. 214 at 10-11 (describing Schubert Flint article about passing Proposition 8). The Ninth Circuit acknowledged this as well when it specifically rejected the proposition that general campaign communications to large groups of voters are protected by the privilege. *See Perry I*, 591 F.3d at 1165 n.12 (holding that communication from Bill Tam urging "friends" to work to pass Prop 8 is "plainly not a private, internal formulation of strategy or

1   message and is thus far afield from the kinds of communications the First Amendment privilege

2   protects").

3       This Court properly applied the Ninth Circuit's holding defining the scope of the privilege

4   exception throughout the trial.  After the Ninth Circuit remanded to the district court "to determine the

5   persons who logically should be included in the core group," Proponents argued that the core group

6   should include organizations other than the official campaign. *See* Doc. #372 at 2.  Magistrate Judge

7   Spero rejected this because Proponents had not previously asserted a First Amendment privilege over

8   communications with other groups and because Proponents did not present evidence about any

9   campaign organization or group other than ProtectMarriage.com. *Id.* at 3.  Critically, the Judge did not

10  reject the notion that the privilege could apply to a core group that extended beyond the official

11  campaign.

12      In fact, when presented with evidence about a political group encompassing multiple separate

13  organizations, the Magistrate identified a core group for that broader group, and the Court affirmed

14  this determination. *See* Doc. #610 (Magistrate's Order defining core group for the umbrella

15  organization Equality for All); Doc. #623 at 19-21 (District Court overruling Proponent's objections to

16  the Magistrate defining a core group for Equality for All).  The District Court explained: "Because the

17  evidence showed a formal relationship between Equality for All and the No on 8 groups, it was not an

18  error for the magistrate to conclude that individuals associated with the Equality for All umbrella

19  organization who were engaged in the formulation of strategy and messages may claim a privilege

20  over communications within the umbrella organization."  Doc. #623 at 20:21-27.  As this application

21  of the privilege exception demonstrates, the Magistrate Judge and the District Court understood and

22  applied the privilege exactly as intended by the Ninth Circuit.

23      Proponents' arguments to the contrary are unavailing.  For instance, Proponents make much of

24  the Court's remarks when it admitted Plaintiffs' Exhibit 2554 over Proponents' objections.  They

1  suggest that the Court rejected their assertion of privilege because the document was created by a

2  group other than ProtectMarriage.  But as the transcript shows, Defendant Intervenors claimed the

3  privilege for PX2554 not on the ground that it was created or disseminated by a member of the core

4  group under the privilege exception established by the Ninth Circuit, but rather on the wholly separate

5  and novel theory that it was a private, internal communication within a church or religious

6  organization and was protected from discovery on *that* separate ground.  This Court rejected that

7  argument because it was not supported by the *facts*, observing that  PX2554 was *not* private and

8  internal to the church, as Proponents claimed, but instead was in the files and possession of

9  ProtectMarriage.com.  Tr. 1621-16.

## II.   THE PRIVILEGE PROPONENTS NOW ADVOCATE IS INCONSISTENT WITH THEIR REPRESENTATIONS AND TESTIMONY IN DISCOVERY AND AT TRIAL, INCONSISTENT WITH THE LIMITED PRIVILEGE EXCEPTION ESTABLISHED BY THE NINTH CIRCUIT AND VIRTUALLY UNLIMITED IN SCOPE.

### A.   Contrary to their current assertions, Proponents consistently denied any close political association with the groups and individuals whose communications they now seek to cloak in privilege.

Through this motion, Proponents seek to cloak in the privilege exception communications

between them and various religious and self-described "pro-family" organizations.  During depositions

and throughout trial, Proponents denied any meaningful political association with the very groups they

now claim are political associates for purposes of determining the First Amendment privilege

exception.  Having previously disclaimed any meaningful political coordination with these groups and

individuals at trial and in discovery, Proponents cannot now be heard to claim that these same groups

and persons are within "the core group of persons engaged in the formulation of campaign strategy

and messages" for the Prop. 8 campaign.  *Perry I*, 591 F.3d at 1165 n.12.

First, and perhaps most starkly, Defendant-Intervenors now argue that documents sent to or

received by Dr. Tam are entitled to the privilege exception from disclosure because they are

"confidential communications" between "political associates ... in a common effort to pass

Proposition 8."  Doc. #260-2 at 12:11-20; *see also* Doc. #640-2 at 10-12 (discussing PX2620 (email

chain between Mr. Henderson, Dr. Tam, and at least eleven other individuals), PX2633 (email chain

between Mr. Pugno, Mr. Flint, Ms. Pollo, Mr. Dolejsi, Mr. Swardstrom, and Mr. Jansson), PX2650

(email chain between Dr. Tam, Ms. Fishel, and other "political associates," Doc. #640-2 at 11:13),

PX2651 (email chain between Dr. Tam and Ms. Fishel, with others copied to certain parts) PX2640

(email chain between Mr. Pugno and Dr. Tam, cc'ing Mr. Prentice in part), and PX2627 (email chain

between Mr. Pugno, Mr. Ng, and Dr. Tam)).  Proponents have made no effort to prove that Dr. Tam

was part of the core group as required by the Ninth Circuit.  Moreover, at trial Proponents represented

to Plaintiffs and the Court that Dr. Tam, one of the official proponents of Proposition 8, was *anything

but* a close political associate of ProtectMarriage.com engaged in strategy and messaging with core

group members.  Mr. Thompson stated emphatically, "[*T]his gentleman had nothing to do with the

campaign.*  Even though he was an official proponent, the evidence will show quite clearly that he had

nothing to do with the campaign." Tr. 550:14-17 (emphasis added).  Proponents reiterated this

assertion when confronting messages that Dr. Tam wrote and disseminated through his organization

(the "Traditional Family Coalition"): "[T]he official campaign committee was ProtectMarriage.com,

and these materials were not in any way associated with or paid for by or did anyone at

ProtectMarriage.com have any cognizance of these documents." Tr. 551:23 - 552:1; *see also* Tr.

1223:10-15 ("There's no indication that this -- there's any foundation for this document. As I've

indicated a moment ago, it's not an official campaign document from ProtectMarriage.com. It's highly

prejudicial if it's associated with the campaign as an official document, and it should be excluded.").[2]

Taking Proponents at their word in trial would thus preclude categorizing Dr. Tam as a close political

associate deserving of core group status.

---

[2] Dr. Tam has also moved separately to exclude certain documents, including two described above, as "private communication[s] among individuals and/or groups that had a shared political objective and were associating and engaging in conversations towards that end." Doc #642-3, Tam Decl. at ¶ 6. Yet on the stand, Dr. Tam joined in the effort to refute any notion of political association with ProtectMarriage.com. *See, e.g.*, Tr.1907:19-22 ("[F]rankly, I don't believe I am ProtectMarriage.com, within their core group. I'm not.").

Similarly, Proponents seek to shield from public view documents concerning the simulcasts. Proponents contend PX2656 (an email chain about the simulcasts between Mr. Prentice, Mr. Garlow, Mr. Flint, Mr. Pugno, and Ms. Layman of the Church Communications Network), falls within the privilege exception because "Pastor Garlow shared the political goal of passing Proposition 8 and associated with other religious leaders and ProtectMarriage.com for that purpose." Doc. #640-2 at 4:12-15. Proponents similarly argue that PX2773 (an email chain about the simulcasts between Mr. Prentice, Mr. Garlow, Mr. Packard, and Mr. Dallas) is within the privilege exception as "an email chain sent and received among associates who were communicating for purposes of formulating messages and strategy." Doc. #640-2 at 4:20-22. Again, Proponents have never claimed nor proffered evidence to prove that these individuals (Garlow, Layman, Packard, and Dallas) were members of the core group engaged in formulating campaign messaging and strategy. Moreover, at trial Proponents emphatically disclaimed any involvement in or control over the simulcast messages.[3] Rather, Proponents represented to the Court, "The campaign does not dispute that these simulcasts were paid for with money that was raised by ProtectMarriage.com. But there is no evidence that they had control over the content of these simulcasts or what was said in these simulcasts." Tr. 2363:4-8. Proponents also specifically disclaimed control over the content of PX2656, one of the exhibits they now claim falls within the privilege exception. *See* Tr. 2367:3-12. According to their own representations, then, ProtectMarriage.com did not engage in privileged associational activity in developing the simulcast messages. Certainly Proponents have not proven otherwise.

In deposition, Mr. Prentice – offered by Proponents as the person most knowledgeable about ProtectMarriage.com's organizational structure and campaign messaging and strategy (Declaration of Therese M. Stewart ¶ 2, Exh. A at 5-7; Exh. B at 12:8-14) – testified under oath that many of the

---

[3] In his declaration accompanying Proponents' reconsideration motion, Mr. Prentice re-confirms that ProtectMarriage.com funded the simulcasts (which Proponents attempted to exclude from evidence, but which are not subject to the motion to strike). Doc. #640-3, Prentice Decl. ¶ 5.x.

groups Proponents *now* claim as political associates were *not* part of any ProtectMarriage.com

coalition, even broadly defined.  For example, Proponents today seek to exclude PX2403, an email

sent to Mr. Prentice from Kenyn Cureton at the Family Research Council ("FRC"), contending, "FRC

and ProtectMarriage.com were political allies associated together regarding a common political goal."

Doc. #640-3, Prentice Decl. at ¶ 5.iii.  This conclusory assertion falls far short of establishing that FRC

was part of the core group engaged in formulating strategy and messaging for Proposition 8.  But even

if it were sufficient, Proponents' current position is directly contradicted by their own testimony earlier

in the case.  In stark contrast to Proponents' current claim of a political association with FRC, when

asked in deposition whether FRC was part of the ProtectMarriage.com coalition Mr. Prentice refused

even to concede the existence of such a coalition, defining it as merely "the vague non-descript loose

association that you're referring to as the coalition."  Stewart Decl., Exh. B, Prentice Depo. Vol. I at

265:7-8.  Using even this amorphous definition, Mr. Prentice *still* did not place FRC within that

"coalition," stating only, "Family Research Council participated in the promotion of the passage of

Proposition 8." *Id.*, Exh. B (Prentice Depo. Vol. I at 265:10-11).  Later, using the somewhat more

cohesive concept of "coalition" that ProtectMarriage.com had used on its own website – "a broad-

based coalition of California families, community leaders, religious leaders, pro-family organizations

and individuals from all walks of life who have joined together to support Proposition 8," Mr. Prentice

again denied that FRC was part of such a coalition with ProtectMarriage.com. *See id.*, Exh. B

(Prentice Depo. Vol. I at 267:9-268:8).  Proponents cannot be heard now to claim that

ProtectMarriage.com and FRC "joined together" to pass Proposition 8 when Mr. Prentice so

thoroughly disclaimed any such association at his deposition in December.

Similarly, Proponents now move to strike PX2385, an email chain including members of the

Arlington Group, as shielded by the privilege exception because "[a]ll of these individuals and their

respective organizations were political allies who had associated together for the common goal of

promoting and defending traditional marriage and passing Proposition 8." Doc. #640-3, Prentice Decl. at ¶ 5.ii.b. At trial, however, Proponents sought to distance themselves from the Arlington Group, challenging the admissibility of PX2385 as insufficiently connected to the campaign: "Ms. Snow's e-mail is – she is not a party. … [T]he portion that they're seeking to go offer in, or what this reflects, is an e-mail from *somebody outside the campaign*, sending it in." Tr. 2393:11-16 (emphasis added). Ms. Moss went on to challenge the notion that the Arlington Group had any association with ProtectMarriage.com whatsoever, stating, "Your Honor, I would again just note, these statements as to what The Arlington Group are supposedly doing or not doing are out-of-court statements being offered for the truth of the matter asserted. It hasn't even been established that these are efforts. My understanding is, they were also involved in the ballot initiatives in other states. And so to what extent this is even pertinent or applicable to California, I don't think has been established." Tr. 2394:16-24. Proponents thus effectively disclaimed any relationship with the Arlington Group in connection with the campaign to pass Proposition 8.

In short, to the extent that Proponents now argue that there was a large core group of persons working together to formulate strategy and messages that extended beyond ProtectMarriage.com and its agents, this position is inconsistent with Proponents' prior assertions. Throughout the litigation, Proponents sought to combat the notion that ProtectMarriage.com coordinated its campaign with *any* other political organizations, let alone formed associations deserving of a limited privilege exception. As briefly noted above, Mr. Prentice disputed the very notion of a coordinated campaign. When asked about ProtectMarriage.com's website description of a "broad-based coalition of California families, community leaders, religious leaders, pro-family organizations and individuals from all walks of life who have joined together to support Proposition 8," Mr. Prentice stated there "was no organization as such" matching that description. Stewart Decl., Exh. B, Prentice Depo. Vol. I at 226:19 – 227:3. Specifically, Mr. Prentice "would not agree with the accuracy of that statement on the website. I

1    would have – I would have taken issue with it and – and said working towards the passage. *And I*

2    *would have left out 'joined together.'*" *Id.*, Exh. B (Prentice Depo. Vol. I at 78:1a-16 [emphasis

3    added]). Instead, he described the other groups supporting Proposition 8 as merely a "loose

4    association of people walking in the same direction." *Id.*, Exh. B (Prentice Depo. Vol. 1 at 260:9-10).

5         Indeed, contrary to their present assertions, Proponents attempted to draw a sharp boundary

6    around the official legal contours of ProtectMarriage.com and to distance that entity from, and

7    disclaim any close association with, other persons and entities. For example, Proponents now ask the

8    Court to cloak in privilege PX2455, an email chain between members of ProtectMarriage.com and

9    members of the National Organization for Marriage ("NOM") about a NOM press release.

10   Proponents contend this document falls within the privilege exception because "NOM and

11   ProtectMarriage.com had associated for the common purpose of passing Proposition 8 and sometimes

12   communicated thoughts and advice about the formulation of messaging and strategy." Doc. #640-3,

13   Prentice Decl. at ¶ 5.iv. However, at trial, when discussing a public message disseminated by NOM,

14   Proponents stated: "Your Honor, number one, this was not produced by ProtectMarriage.com. And

15   ProtectMarriage.com is not the National Organization for Marriage." Tr. 111:4-6. Later, Mr.

16   Thompson sought to clarify the record once more about that particular message, stating, "And just so

17   the record is clear, your Honor, this was paid for and sponsored by the National Organization For

18   Marriage, not ProtectMarriage.com." Tr. 1855:7-9.

19        With respect to each group and person working to pass Proposition 8 other than

20   ProtectMarriage.com and its consultants, Proponents in discovery and at trial repeatedly *denied any*

21   *meaningful coordination* that would render these groups part of a core group of close political

22   associates for the purposes of the First Amendment privilege exception. Indeed, though they seek to

23   invoke the privilege exception, to this day Proponents do not contend that any of these persons were

24   part of a core group that formulated the strategy and messaging for Prop. 8. Instead, Mr. Prentice

admits that none of these individuals or groups were within the "core group" as defined by this Court, and that while they occasionally communicated with ProtectMarriage.com about their own messaging, neither consistently informed the other of their messaging nor controlled each other's messaging. *See* Doc. #640-3, Prentice Decl. ¶¶ 3-4, 5.ii.a, 5.v, 5.ix, 5.xi, 5.xii, 5.xiii. Mr. Prentice does not suggest that any of these groups or persons had any input at all into ProtectMarriage.com's messaging. Rather, Proponents have repeatedly and deliberately sought to distance themselves from other pro-Prop 8 persons and groups, disclaiming any joint effort to coordinate messaging and strategy. The "vague, non-descript loose assimilation of groups attempting to pass Proposition 8" that Mr. Prentice described as the *only* coalition supporting the measure (Stewart Decl. Exh. B, Prentice Depo. Vol. 1 at 266:23-25), certainly does not meet the requirement of a "core group" under the Ninth Circuit's test.

**B.**   **Evidence presented at trial demonstrates that proponents were linked to various organizations, but that link falls far short of the Ninth Circuit's standard for the First Amendment privilege exception.**

As the preceding section demonstrates, Proponents' current assertions about their political association with the groups whose communications they now seek to cloak in the privilege exception are in stark contrast to the statements they and their counsel made in discovery and at trial attempting to disavow their association with such groups' bias-infused messaging. Proponents should be bound by their prior representations under doctrines of waiver and judicial estoppel. Further, even though (as Proponents now finally and belatedly admit but had previously denied) ProtectMarriage.com is linked to the messages disseminated by other groups, including messages designed to promote stereotypes about, and prejudice against, gay and lesbian individuals, and even though the evidence shows ProtectMarriage.com sometimes knew of, encouraged or acquiesced in, and even funded the distribution of such messages, these facts are not enough to establish that its communications with these groups fall within the privilege exception to disclosure. Even now, Proponents have failed to demonstrate the existence of a core group extending beyond ProtectMarriage.com and its consultants that was engaged in formulating campaign messaging and strategy, much less that each of the groups

and individuals whose communications they now seek to shield was a member of that core group.  Nor have Proponents shown that the communications at issue were intended to remain within that core group, and in fact kept confidential.

For instance, despite Proponents' and Dr. Tam's efforts to distance ProtectMarriage.com from Dr. Tam and his prejudiced-infused messages directed to the Asian-American community, the evidence shows Dr. Tam worked with and received support from ProtectMarriage.com.  *See* PX2609 (email from Bill Tam inviting people to a fundraising dinner and noting that he "worked closely with ProtectMarriage.com."); PX2633 (Statement of Unity with ProtectMarriage.com signed by Dr. Tam). Following instructions in the Statement of Unity, Dr. Tam's organization raised money by collecting checks made out to ProtectMarriage.com, and ProtectMarriage.com in turn funneled money back to Dr. Tam for communications to the Asian-American community.  See PX2627.  Thus, Proponents were paying for many of the messages that Dr. Tam disseminated.  Despite these connections, however, neither Proponents nor Dr. Tam, even in the motion for reconsideration, provides the factual basis for a finding that their communications should be shielded by the First Amendment privilege as defined by *Perry I* and *Perry II*.  Mr. Prentice and Dr. Tam continue to deny that Dr. Tam was within the only core group that has been shown to exist with respect to the pro-Proposition 8 campaign.  Doc. #640-3, Prentice Decl. ¶ 5.xii ("Dr. Tam . . . would not fit in ProtectMarriage.com's particular `core group' as that term was defined by this Court in January 2010."); Doc. #642-3, Tam Decl. ¶ 6 ("This email reflects one of the limited conversations that I had with a representative of ProtectMarriage.com during the campaign phase of the Proposition 8 election.").  Instead, they admit only that Dr. Tam was part of "the larger collection of political associates working together to pass Proposition 8."  Doc. #640-3, Prentice Decl. ¶ 5.xii; *see also* Doc. #642-3, Tam Decl. ¶ 7 (share "political objective of qualifying Prop. 8 for the ballot.).  Proponents continue to seek to keep Dr. Tam and his hostile anti-

gay messages a safe distance from ProtectMarriage.com, while at the same time wrapping all his communications in an ever-expanding First Amendment privilege.

Proponents also seek to cloak in the First Amendment privilege email communications sent to "representatives from grassroots organizations that shared the political goal of passing Proposition 8." Doc. #640-3, Prentice Decl. ¶ 5xi. Those communications show that ProtectMarriage.com was aware of and promoted Dr. Tam's website "1manand1woman.com," and that the campaign funded and coordinated the simulcasts. *See* PX2599. While ProtectMarriage.com funded projects by these organizations, and encouraged them to disseminate information, there is no evidence that they and ProtectMarriage.com joined together to form a core group or other close political association to engage in formulation of strategy and messaging. Mr. Prentice himself emphasizes that the recipients did not have a "substantial or regular role in ProtectMarriage.com's operations and decisionmaking;" rather, the recipients belonged to organizations that simply shared the political goal of passing Proposition 8. Doc. #640-3, Prentice Decl. at ¶ 5.xi. He says nothing about the recipients' involvement in formulating strategy or messaging with or for ProtectMarriage.com. In addition, nowhere do Proponents set out evidence that the email communications were actually maintained as confidential by the recipients, or even that they were required to do so. Instead, Proponents argue that the mere shared political desire to pass Proposition 8 is sufficient to shield all such communications in a First Amendment privilege.

Proponents' attempt to drastically expand the First Amendment privilege is aimed not at protecting private, internal communications within a core group engaged in formulating campaign strategy and messaging, but rather at clearing the trial record of some of the most damaging examples of anti-gay bias perpetrated by the campaign. For example, Proponents were well aware that the general public would consider the simulcasts to reveal the true "bias" of the messages that were targeted at evangelical voters. *See* PX2773 at DEFINT_PM_018900. Accordingly,

ProtectMarriage.com worked desperately to prevent any portion of the simulcasts (which were publicly available) from being shown on national television through the Dr. Phil Show. The email Proponents seek to exclude, PX2773, was sent to "associates or vendors" of Pastor Garlow after the election, discussing the simulcast "put on" by Pastor Garlow but paid for by ProtectMarriage.com. Doc. #640-3, Prentice Decl. ¶ 5.x.   While Mr. Prentice discusses some recipients of the email in his declaration, the exhibit itself contains redactions that eliminate the ability to see all of the email's actual recipients. Accordingly, there is no evidence that the email itself was actually maintained as confidential. Proponents' motion to strike this exhibit is revealing. Striking the email would simply remove from the record that ProtectMarriage.com knew the simulcast messages were biased, had a say in how they were used, and that after the campaign it hoped to shield these prejudiced statements from the public-at-large. But the simulcasts themselves (including the biased nature of their contents), and the fact that ProtectMarriage.com paid for them, would remain in the record, as those facts are revealed by the publicly available simulcasts, campaign finance disclosure reports, and by Mr. Prentices' own statements in deposition and in the motion for reconsideration. The motion to strike is simply an effort to distance Proponents from biased messages and avoid the admission that they are biased, not an effort to shield the formulation of campaign messages or strategy.

The documents Proponents seek to hide also show that they were aware of and encouraged or acquiesced in the prejudice-filled messages that were prepared and disseminated by other groups. For instance, Family Research Council sent a document to Ron Prentice. PX2403; Doc. #640-3, Prentice Decl. at ¶5.iii. There is no evidence that the transmission was done in a confidential manner, and no evidence that ProtectMarriage.com revised the material (*i.e.*, shaped the message or strategy). PX2403, Doc. #640-2, Prentice Decl. ¶ 5.iii.[4] It is no wonder, however, why ProtectMarriage.com wants to hide the document. This kit that FRC – one of the powerful national organizations that

---

[4] Moreover, as described more fully above, FRC was one of the organizations Mr. Prentice denied was part of any ProtectMarriage coalition.

provided funding and other support for the campaign (*see* Doc. #608-1 at 17-18, PPF 29) – prepared

for distribution for "Christian voters" blatantly reinforces gender stereotypes, PX2403 at

DEFINT_PM_005387, 5427, declares homosexuals and their agenda to be "evil," *id.* at

DEFINT_005418, 5421, 5423, and engaged in a "Destructive Program" whose "aim" is "domination,"

*id.* at DEFINT_PM_005389-005392, characterizes homosexuality as a "devilish perversion,"

"DECEPTIVE PERVERSION," "detestable," an "abomination" and "condemn[ed]" by scripture, *id.* at

DEFINT_PM 005387-005388, 005392, 005407-005413, and generally exhorts recipients to participate

in their churches' efforts to pass Proposition 8, *id.* at DEFINT_PM_ 005430-005436.  The

significance of the exhibit is not the formulation of a strategy or message.  Instead, the document is

part of the evidence that Proponents were aware of – and did nothing to discourage, *see* Doc. #640-3,

Prentice Decl. ¶ 5.iii ("neither I nor Protect Marriage ever provided any edits or response to this

email") – the hate-filled anti-gay messages that self-described "pro-family" organizations like FRC

used to tap into voters' prejudice.

Proponents' proposed expansion of the First Amendment privilege articulated in *Perry I* and

*Perry II* to include all communications between anyone who shares a political ideology, without any

core group or confidentiality requirement, would shield this highly relevant information both from the

Court and from the public.

## III. THERE IS A STRONG PUBLIC INTEREST IN TRANSPARENCY ABOUT THE ENACTMENT OF LAWS THAT WEIGHS AGAINST REVISITING AND EXPANDING THE SCOPE OF THE LIMITED PRIVILEGE.

As discussed above, Proponents have asked this Court to vastly expand the scope of the limited

First Amendment privilege as defined in *Perry I* and *Perry II*.  Those decisions – including limitations

they impose on the privilege exception they and this Court recognized – are binding on the Court.  But

even if this Court concludes otherwise, San Francisco respectfully requests that it decline to expand

the privilege exception.  It is critically important to enforce the limitations of the privilege. Proponents'

proposed expansion would not only strike information that is relevant to this case, but it would do so at the expense of strong countervailing First Amendment interests, including a strong public interest in favor of disclosing campaign information about ballot measures so that California citizens can know the history and circumstances underlying the passage of laws that affect them all.

As the Ninth Circuit recently observed, "in the context of disclosure requirements, the government's interest in providing the electorate with information related to election and ballot issues is well-established." *California Pro-Life Council, Inc. v. Randolph*, 507 F.3d 1172, 1179 (9th Cir. 2007) (citing *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 196 (2003); *Buckley v. Valeo*, 424 U.S. 1, 66 (1976); *Goland v. United States*, 903 F.2d 1247, 1261 (9th Cir. 1990); *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 791 (9th Cir. 2006)). This interest is rooted in the First Amendment. As the Ninth Circuit recognized in *Alaska Right to Life Committee*, "there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way" and attempts to shield such information about political campaigns "ignore[] the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." 441 F.3d at 793 (quoting *McConnell*, 540 U.S. at 197).

The public interest in an informed electorate finds expression in laws requiring regular reporting by campaign committees and public disclosure of information about donors and expenditures. In California, for instance, the Political Reform Act of 1974, Cal. Gov't Code ("CGC") § 81000 *et seq.*, requires significant disclosures from campaign committees, including detailed reporting and disclosure of contributions and expenditures.[5] Plaintiff-Intervenor has enacted local

---

[5] For instance, the Political Reform Act requires campaign committees to file a Statement of Organization that includes the name, street address, and telephone number of the committee, CGC § 84102(a); the full name, street address, and telephone number of the treasurer and other principal officers, CGC § 84102(c); and a brief description of its general political activities or the ballot measure or candidate that the committee supports or opposes as its primary activity, CGC § 84102(e). The Political Reform Act also requires disclosure of the name, address, occupation, and employer of that for each donor who contributed $100 or more, CGC § 84211(f), and disclosures regarding expenditures of $100 or more and the persons to whom those expenditures were made, CGC § 84211(k). Furthermore, it requires committees to state their name, street address and city on the

laws that impose additional disclosure requirements on local candidates and committees.[6] In

numerous cases, the Supreme Court and the Ninth Circuit have held that the governmental interest

underlying such disclosure requirements outweighs any burdens they may impose on First

Amendment rights. *See, e.g., Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981)

(upholding an ordinance requiring disclosure of ballot measure expenditures and contributions);

*California Pro-Life Council, Inc. v. Randolph*, 507 F.3d at 1183-87 (holding the definition of

"contribution" in California's Political Reform Act is narrowly tailored to a compelling governmental

interest in disclosing information about ballot measure advocacy); *Alaska Right To Life Comm. v.

Miles*, 441 F.3d 773, 793 (9th Cir. 2006) (upholding Alaska's requirement that campaign advertising

disclose the identity of major donors).

This informational interest is particularly strong for campaign materials concerning ballot

measures because these materials constitute the legislative record for a measure. As the Court

recognized when Proponents first asserted the privilege, "[i]n the case of an initiative measure, the

enacting body is the electorate as a whole." Doc. #214 at 14:7-8. Put differently, "[v]oters act as

legislators in the ballot-measure context, and interest groups and individuals advocating a measure's

defeat or passage act as lobbyists; both groups aim at pressuring the public to pass or defeat

legislation." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1106 (9th Cir. 2003). Thus,

when individuals associate for the purpose of proposing or passing a ballot measure, they do more than

---

outside of each piece of mass mailing, CGC § 84305, requires independent expenditures that expressly support or oppose any ballot measure to include the names of the two persons making the largest contributions to the committee making the independent expenditure, CGC § 84506, and requires any advertisement for or against any ballot measure to include a disclosure statement identifying the top two contributors of $50,000 or more, CGC § 84503.

[6] *See, e.g.*, San Francisco Campaign and Governmental Conduct Code § 1.134 (third-party reporting relating to voluntary expenditure ceilings); § 1.135 (pre-election statements) § 1.152 (third-party reporting relating to public financing program for mayoral and board races); § 1.161 (mass mailings); § 1.161.5 (electioneering); § 1.162 (disclaimer requirement for campaign ads); § 1.163 (disclaimer requirement for robo-calls) § 2.110 (disclosure of contributions made by lobbyists).

petition the government in their capacity as private citizens.  They assume the mantle of the state, and their actions have operative effect.[7]

Because voters act in a legislative capacity when they approve or reject ballot measures, disclosure of campaign communications and materials about these measures also serves the broader public interest in open government.   In California, this interest is expressed in numerous public meeting and public records laws.[8]  *See, e.g.*, Legislative Open Records Act, CGC §§ 9070-9080 (providing for public access to legislative documents); CGC § 10248 (requiring the Legislative Counsel to provide numerous legislative documents in electronic form for public access); Bagley-Keene Open Meeting Act, CGC §§ 11120-11132 (providing for public access to government meetings); California Public Records Act, CGC §§ 6250-70 (providing for public access to files maintained by state agencies).   As the California Public Records Act states: "In enacting this chapter, the Legislature, mindful of the right of individuals to privacy, finds and declares that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in the state."  CGC § 6250.  In short, when state laws are enacted through the ordinary legislative process, citizens have an expansive right to review the legislative files for those laws.

---

[7] The initiative power, as well as the powers and duties of initiative proponents, is described in numerous provisions of the California Constitution and the California Elections Code. *See, e.g.*, Cal. Const. art. II § 8(b) ("An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or amendment to the Constitution and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and 8 percent in the case of an amendment to the Constitution of the votes for all candidates for Governor at the last gubernatorial election."); *id.* § 10(a) ("An initiative statute or referendum approved by a majority of votes thereon takes effect the day after the election unless the measure provides otherwise."); Cal. Elec. Code § 9001(a) ("Prior to the circulation of any initiative or referendum petition for signatures, the text of the proposed measure shall be submitted to the Attorney General with a written request that a circulating title and summary of the chief purpose and points of the proposed measure be prepared. The electors presenting the request shall be known as the 'proponents.' "); § 9604 (describing process by which proponents may withdraw a ballot measure); § 9607 (requiring proponents to instruct petition circulators "on the requirements and prohibitions imposed by state law with respect to circulation of the petition and signature gathering thereon").

[8] San Francisco has a particularly strong commitment to open government, and it has enacted local laws that provide even greater public access to records and meetings than State law requires. *See The San Francisco Sunshine Ordinance of 1999*, S.F. Admin. Code § 67.1 *et seq.*

These statutory disclosure rules do not, of course, require automatic reporting and disclosure of the types of documents Proponents seek to shield here, but they demonstrate the general principle that campaign-related information should be available to the public, and weigh against expanding the privilege as Proponents have requested.  The free flow of information is the lifeblood of a robust democracy.  "There is a profound national commitment to the principle that debate on public issues should be uninhibited, robust and *wide-open*."  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909 (1982) (emphasis added).  Proponents vigorously assert the First Amendment rights of organizations campaigning in support of Proposition 8, which they claim will somehow be "chilled" by disclosure of campaign-related documents, but they ignore altogether "the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace." *McConnell*, 540 U.S. at 197 (quoting with approval the district court, 251 F. Supp. 2d 176, 237 (D.D.C. 2003)). As in *McConnell*, Proponents "never satisfactorily answer the question of how uninhibited, robust, and wide open speech can occur when organizations hide themselves from the scrutiny of the voting public." 251 F. Supp. 2d at 237 (internal citations and quotation marks omitted).   And Proponents' continued efforts to shield campaign documents from discovery is particularly troubling because "informed public opinion is the most potent of all restraints upon misgovernment." *Grosjean v. American Press Co.*, 297 U.S. 233, 250.

In striking the balance required by recognition of a privilege exception to transparency in government affairs, the Court should weigh in the balance not only the First Amendment interest of ballot measure proponents but also the equally important First Amendment interests of the public in participating in the legislative process on an ongoing basis with full access to information about the legislative record.  The latter interests weigh strongly against any expansion of the privilege exception.

1

## CONCLUSION

2      For all of the foregoing reasons, the City respectfully request that the Court deny Proponents'

3  motion to reconsider and strike.

4

Dated: May 6, 2010

5                                             DENNIS J. HERRERA
                                              City Attorney
6                                             THERESE M. STEWART
                                              Chief Deputy City Attorney
7                                             DANNY CHOU
                                              Chief of Complex & Special Litigation
8                                             RONALD P. FLYNN
                                              VINCE CHHABRIA
9                                             ERIN BERNSTEIN
                                              CHRISTINE VAN AKEN
10                                            MOLLIE M. LEE
                                              Deputy City Attorneys

11

12                                   By:_____/s/_____
                                             THERESE M. STEWART
13

14                                   Attorneys for Plaintiff-Intervenor
                                     CITY AND COUNTY OF SAN FRANCISCO
15

16

17

18

19

20

21

22

23

24

25

26

27

28