COOPER AND KIRK, PLLC
Charles J. Cooper (DC Bar No. 248070)*
*ccooper@cooperkirk.com*
David H. Thompson (DC Bar No. 450503)*
*dthompson@cooperkirk.com*
Howard C. Nielson, Jr. (DC Bar No. 473018)*
*hnielson@cooperkirk.com*
Nicole J. Moss (DC Bar No. 472424)*
*nmoss@cooperkirk.com*
Peter A. Patterson (OH Bar No. 0080840)*
*ppatterson@cooperkirk.com*
1523 New Hampshire Ave. N.W., Washington, D.C. 20036
Telephone: (202) 220-9600, Facsimile: (202) 220-9601

LAW OFFICES OF ANDREW P. PUGNO
Andrew P. Pugno (CA Bar No. 206587)
*andrew@pugnolaw.com*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 608-3065, Facsimile: (916) 608-3066

ALLIANCE DEFENSE FUND
Brian W. Raum (NY Bar No. 2856102)*
*braum@telladf.org*
James A. Campbell (OH Bar No. 0081501)*
*jcampbell@telladf.org*
15100 North 90th Street, Scottsdale, Arizona 85260
Telephone: (480) 444-0020, Facsimile: (480) 444-0028

ATTORNEYS FOR DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH,
GAIL J. KNIGHT, MARTIN F. GUTIERREZ, MARK A. JANSSON,
and PROTECTMARRIAGE.COM – YES ON 8, A
PROJECT OF CALIFORNIA RENEWAL

* Admitted *pro hac vice*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTIN M. PERRY, SANDRA B. STIER, PAUL T. KATAMI, and JEFFREY J. ZARRILLO, | CASE NO. 09-CV-2292 VRW |
| Plaintiffs, | **DEFENDANT-INTERVENORS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, MARK A. JANSSON, AND PROTECTMARRIAGE.COM'S ANSWERS TO QUESTIONS FOR CLOSING ARGUMENTS** |
| CITY AND COUNTY OF SAN FRANCISCO, | |
| Plaintiff-Intervenor, | |
| v. | |
| ARNOLD SCHWARZENEGGER, in his official capacity as Governor of California; EDMUND G. BROWN, JR., in his official capacity as Attorney General of California; MARK B. HORTON, in his | |

official capacity as Director of the California Department of Public Health and State Registrar of Vital Statistics; LINETTE SCOTT, in her official capacity as Deputy Director of Health Information & Strategic Planning for the California Department of Public Health; PATRICK O'CONNELL, in his official capacity as Clerk-Recorder for the County of Alameda; and DEAN C. LOGAN, in his official capacity as Registrar-Recorder/County Clerk for the County of Los Angeles,

Defendants,

and

PROPOSITION 8 OFFICIAL PROPONENTS DENNIS HOLLINGSWORTH, GAIL J. KNIGHT, MARTIN F. GUTIERREZ, HAK-SHING WILLIAM TAM, and MARK A. JANSSON; and PROTECTMARRIAGE.COM – YES ON 8, A PROJECT OF CALIFORNIA RENEWAL,

Defendant-Intervenors.

Additional Counsel for Defendant-Intervenors

ALLIANCE DEFENSE FUND
Timothy Chandler (CA Bar No. 234325)
*tchandler@telladf.org*
101 Parkshore Drive, Suite 100, Folsom, California 95630
Telephone: (916) 932-2850, Facsimile: (916) 932-2851

Jordan W. Lorence (DC Bar No. 385022)*
*jlorence@telladf.org*
Austin R. Nimocks (TX Bar No. 24002695)*
*animocks@telladf.org*
801 G Street NW, Suite 509, Washington, D.C. 20001
Telephone: (202) 393-8690, Facsimile: (202) 347-3622

* Admitted *pro hac vice*

1

2

3

# **TABLE OF CONTENTS**

4

**Questions to Proponents**

5

Question 1  ...................................................................................................1

6

7

Question 2  ...................................................................................................7

8

Question 3  .................................................................................................11

9

10

Question 4  .................................................................................................13

11

Question 5  .................................................................................................15

12

13

Question 6  .................................................................................................15

14

Question 7  .................................................................................................16

15

16

Question 8  .................................................................................................18

17

Question 9  .................................................................................................19

18

19

Question 10  ...............................................................................................20

20

Question 11  ...............................................................................................22

21

22

Question 12  ...............................................................................................26

23

**Questions to Plaintiffs and Proponents**

24

25

Question 1  .................................................................................................27

26

Question 2  .................................................................................................27

27

Question 3  .................................................................................................28

28

Question 4 .................................................................................................30

Question 5 .................................................................................................32

Question 6 .................................................................................................34

Question 7 .................................................................................................36

Question 8 .................................................................................................36

Question 9 .................................................................................................38

Question 10 ...............................................................................................40

Question 11 ...............................................................................................41

Question 12 ...............................................................................................42

Question 13 ...............................................................................................44

Question 14 ...............................................................................................45

Question 15 ...............................................................................................45

Defendant-Intervenors Hollingsworth, Knight, Gutierrez, Jansson, and ProtectMarriage.com ("Proponents") provide the following written answers to the Court's questions for closing arguments. *See* Doc #677. We address the Court's questions to Proponents and to Plaintiffs and Proponents.[1]

**TO PROPONENTS:**

1. Assuming a higher level of scrutiny applies to either plaintiffs' due process or equal protection claim, what evidence in the record shows that Proposition 8 is substantially related to an important government interest? Narrowly tailored to a compelling government interest?

**ANSWER:**     Because Proposition 8 neither infringes a fundamental right nor discriminates on the basis of sex, and because gays and lesbians are not entitled to heightened protection under the Equal Protection Clause, Proposition 8 is subject only to rational basis review. Even if heightened scrutiny applied, however, Proposition 8 would readily satisfy such scrutiny.

California's interest in increasing the likelihood that children will be born to and raised by their biological mothers and fathers in stable and enduring family units is a government interest of the highest order. Not only is this core procreative purpose of marriage "fundamental to our very existence and survival," *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *see also Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."), it also encompasses the state's "duty of the highest order to protect the interests of minor children." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Indeed, "[i]t is hard to

---

[1] Citations to "Findings of Fact" in our answers refer to Doc # 606, our post-trial findings of fact including record citations.

conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society." *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 819 (11th Cir. 2004); *see also Nguyen v. INS*, 533 U.S. 53, 68 (2001) ("facilitation of a relationship between parent and child is an important government interest"); *cf. Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 470 (1981) (plurality) (recognizing that the State has "a strong interest" in preventing "illegitimate pregnancy").  For all of these reasons, the Supreme Court has recognized that marriage is " 'the foundation of the family and of society, without which there would be neither civilization nor progress.' " *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (quoting *Maynard v. Hill*, 125 U.S. 190, 205, 211 (1988)).  Thus, "it seems beyond dispute that the state has a compelling interest in encouraging and fostering procreation of the race and providing status and stability to the environment in which children are raised.  This has always been one of society's paramount goals." *Adams v. Howerton*, 486 F. Supp. 1119, 1124 (C.D. Cal. 1980), *aff'd on other grounds*, 673 F.2d 1036 (1982).   For the same reasons, California has a compelling interest in proceeding with caution when considering changes to the vital institution of marriage that could well weaken that institution and the critically important interests it has traditionally served.

As explained more fully in our responses to Questions to Proponents ## 3 and 7, as well as in our response to Question to Plaintiffs and Proponents #8, Proposition 8 furthers these interests by preserving the traditional definition and form of marriage and by providing special encouragement and recognition to those relationships that uniquely further California's interests in increasing the likelihood that children will be born to and raised by their natural parents in stable and enduring family units.

Proposition 8 is substantially related to at least the two important interests identified above.

It does not matter that California could have done more to further these interests, for example by refusing to accommodate either the vested interests of a limited number of same-sex couples who acted in reliance on the California Supreme Court's decision prior to the enactment of Proposition 8 or the interests of gay and lesbian families that are served by domestic partnerships that offer essentially the same rights and obligations of marriage.[2]  To the contrary, it is well settled that the Constitution "does not require that a regulatory regime single-mindedly pursue one objective to the exclusion of all others to survive . . . intermediate scrutiny." *Coyote Publishing, Inc. v. Miller*, 598 F.3d 592, 610 (9th Cir. 2009).  Simply put, the fact that California has "struck its own idiosyncratic balance between various important but competing state interests" does not render "its asserted interest" in responsible procreation and parenting "any less substantial than in the states" that have taken a different approach.  *Id*. at  606; *see also id*. at 604 (state may "delineate[] a . . . nuanced boundary" between competing interests).

Nor does the fact that California permits opposite-sex couples who cannot, or do not intend to, have children to marry render Proposition 8 unconstitutionally over-inclusive.  For one thing, allowing such couples to marry does further the State's interest in increasing the likelihood that children will be born to and raised by their natural parents in enduring family units because it reinforces social norms that seek to channel intimate heterosexual relationships into marriage—

---

[2] The fact that California permits gays and lesbians—as well as single individuals and cohabiting heterosexual couples—to adopt, *see Sharon S. v. Superior Court*, 73 P.3d 554, 570 (Cal. 2003), does not in anyway undermine the States' interest in increasing the likelihood that children will be born and raised by their natural parents in stable, enduring family units.  Rather, as explained more fully in our response to Question to Proponents # 8, it simply reflects an attempt to provide for the practical reality that this ideal is not always possible.  It is simply implausible that by recognizing and making provisions for the reality that an ideal will not be achieved in all cases, the State somehow abandons its interests in promoting and increasing the likelihood of that ideal.  Likewise, the fact that California has opted to encourage, rather than require, that opposite-sex couples procreate only within marriage and stay together to raise their children, does not render Proposition 8 unconstitutional.  *See Nguyen*, 533 U.S. at 69 (government may seek to "ensur[e] at least an opportunity for a parent-child relationship to develop" rather than attempt to "ensur[e] an actual, meaningful relationship in every case"; statute "should not be invalidated because Congress elected to advance an interest that is less demanding to satisfy than some other alternative").

relationships that in most, if not all, cases are capable of producing offspring either intentionally or unintentionally.  See our response to Question to Proponents #6.  Allowing such couples to marry furthers the State's interest in other ways as well.  Most obviously, couples who do not plan to have children may experience accidents or change their plans, and some couples who do not believe they can have children may discover otherwise.  *See, e.g.*, *Morrison v. Sadler*, 821 N.E.2d 15, 24-25 (Ind. Ct. App. 2005).  And even in cases of obvious infertility, it is usually the case that only one spouse is infertile.  In such cases marriage furthers the State's interest in responsible procreation by decreasing the likelihood that the fertile spouse will engage in sexual activity with a third party, for the State's interest is served not only by *increasing* the likelihood that procreation occurs *within* stable family units, but also by *decreasing* the likelihood that it occurs *outside* of such units.  See our response to Question to Proponents #6.

Moreover, as explained more fully in our response to Question #6, attempting to determine on a case-by-case basis whether each heterosexual couple seeking to marry will have children would be intolerably burdensome, intrusive, and impractical.  As another district court has recognized, because such an approach is simply not a "real alternative" for achieving the state's "compelling interest in encouraging and fostering procreation … and providing status and stability to the environment in which children are raised," allowing "legal marriage as between all couples of opposite sex" is "the least intrusive alternative available to protect the procreative relationship."  *Adams*, 486 F. Supp. at 1124-25.

Thus, even if intermediate scrutiny applied, no principle of constitutional law bars California from foregoing an implausible and Orwellian attempt to police fertility and childbearing intentions and relying instead on the common-sense presumption that opposite-sex couples are, in

4

general, capable of procreation.[3]  *See, e.g., Nguyen*, 533 U.S. at 69 (Congress could properly enact "an easily administered scheme" to avoid "the subjectivity, intrusiveness, and difficulties of proof" that "an inquiry into any particular bond or tie" might require); *id*. at 70 ("None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance.").  Indeed, applying intermediate scrutiny in a closely analogous context, the Supreme Court rejected as "ludicrous" an argument that a law criminalizing statutory rape for the purpose of preventing teenage pregnancies was "impermissibly overbroad because it makes unlawful sexual intercourse with prepubescent females, who are, by definition, incapable of becoming pregnant." *Michael M*., 450 U.S. at 475 (plurality); *see also id*. at 480 n.10 (Stewart, J., concurring) (rejecting argument that the statute was "overinclusive because it does not allow a defense that contraceptives were used, or that procreation was for some other reason impossible" because, *inter alia*, "a statute recognizing [such defenses] would encounter difficult if not impossible problems of proof").

Finally, because there is a clear biological difference between opposite-sex couples who, at least as a general matter, are capable of natural procreation (both intentionally and unintentionally) and same-sex couples who are categorically incapable of natural procreation, California's separate treatment of these two types of couples "is neither surprising nor troublesome from a constitutional perspective." *Nguyen*, 533 U.S. at 63; *see also* Answer to Question to Plaintiffs and Proponents #3. Given that same-sex couples and opposite-sex couples are not similarly situated with respect to the state's interest in channeling potentially procreative relationships into stable and enduring family

---

[3] California has relied on essentially the same presumption in other areas of the law.  Indeed, prior to 1990, California embraced, for purposes of its law of trusts and estates, "a conclusive presumption that a woman is capable of bearing children as long as she lives." *Fletcher v. Los Angeles Trust & Savings Bank*, 187 P. 425, 426 (Cal. 1920).  Even today, California maintains "the presumption of fertility," though the presumption is now "rebuttable."  Cal. Prob. Code Ann. § 15406.

units, intermediate scrutiny does not require the State to prove that limiting marriage to opposite-sex couples is "necessary" to further this interest or even that extending marriage more broadly would not "serve that goal equally well." *Michael M*., 450 U.S. at 473 (plurality) (rejecting argument that statutory rape statute punishing only males was "impermissibly underinclusive" and concluding that limiting punishment to males was warranted because "virtually all of the significant harmful and inescapably identifiable consequences of teenage pregnancy fall on the young female"); *see also id*. at 471 (plurality) ("We need not be medical doctors to discern that young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse.  Only women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity); *id*. at 481 (Stewart, J., concurring) ("That other States may have decided to attack the same problems more broadly, with gender-neutral statutes, does not mean that every State is constitutionally compelled to do so.").  In all events, as explained in our responses to Questions to Proponents ## 2, 4, and 5, there are very good reasons to believe that redefining marriage to include same-sex couples could weaken that institution and the interests it has always served.  In light of these risks, the traditional opposite-sex definition of marriage as reflected in Proposition 8 is substantially related to the State's important interests in increasing the likelihood that children will be born to and raised by their biological mothers and fathers in stable and enduring family units and proceeding with caution when considering changes to the vital institution of marriage that could well weaken that institution and the critically important interests it has traditionally served.

   For essentially the same reasons, the traditional definition of marriage reflected in Proposition 8 is narrowly tailored to at least the compelling interests identified above.  *See Adams*, 486 F. Supp. at 1124-25 (holding that the traditional definition of marriage "is narrowly tailored to serve a compelling state interest" for purposes of "strict scrutiny").

2.   Aside from the testimony of Mr. Blankenhorn, what evidence in the record supports a finding that same-sex marriage has or could have negative social consequences?  What does the evidence show the magnitude of these consequences to be?

**ANSWER:**       There is substantial common ground among the parties relating to the fact that there will be significant consequences flowing from the adoption of same-sex marriage.  Professor Cott has acknowledged that the adoption of same-sex marriage will change the public meaning of marriage, *see* Tr. at 313:2-4, that a change in the social meaning of marriage will unquestionably have real world consequences, *see* Tr. at 311:24-312:2, and that whatever these consequences are, they will be momentous.  As Professor Cott told National Public Radio when Massachusetts legalized same-sex marriage:  "One could point to earlier watersheds, but perhaps none quite so explicit as this particular turning point," and she added at trial that same-sex marriage is "arguably a highly distinctive turning point."  Tr. at 268:1-7.  There is ample evidence supporting Professor Cott's view that same-sex marriage would represent a watershed turning point in the history of this venerable institution.  For example:

- According to Joseph Raz, professor at both Oxford University and Columbia Law School, "there can be no doubt that the recognition of gay marriages will affect as great a transformation in the nature of marriage as that from polygamous to monogamous or from arranged to unarranged marriage."  DIX1444 at 23.

- Same-sex marriage activist E.J. Graff of Brandeis University has written that, "Same-sex marriage is a breathtakingly subversive idea." DIX1445 at 12.

- Yale Law School professor and prominent gay rights advocate William Eskridge believes that "enlarging the concept [of marriage] to embrace same-sex couples would necessarily transform it into something new." PX2342 at 19.

- The New Jersey Supreme Court recognized that "the shared societal meaning of marriage … has always been the union of a man and a woman.  To alter that

meaning would render a profound change in the public consciousness of a social institution of ancient origin." *Lewis v. Harris*, 908 A.2d 196, 222 (N.J. 2006). *See also* Findings of Fact 21-22, 87.

Professor Cott also admits that it is not possible to predict with precision the consequences that will flow from same-sex marriage. Tr. 254:17-22. But there is a wealth of evidence in the record as to the likely negative consequences that does not rely on Mr. Blankenhorn's testimony. *See* Findings of Fact 37, 86-115. Taken together, the evidence supporting these findings strongly suggests that redefining marriage to include same-sex unions will change the public meaning of marriage in ways that will weaken the social norms that seek to discourage procreative sexual relationships and childrearing outside of marital bonds. Redefining marriage in this way would also change its focus from the needs of children to the desires of the adult partners, suggesting that the latter are paramount, as well as weaken the social understanding that, all else being equal, what is best for a child is to be raised by its married, biological parents and to have a mother and father. All of these changes are likely to reduce the willingness of biological parents, especially fathers, to make the commitments and sacrifices necessary to marry, stay married, and play an active role in raising their children. The evidence suggests that as a result, there will be lower marriage rates, higher rates of divorce and cohabitation, more out of wedlock children, and fewer children raised by both of their biological parents.

First, extending marriage to same-sex couples would eliminate the state's ability to specially promote those relationships that uniquely further the vital societal purpose of channeling potentially and naturally procreative conduct into stable and enduring family units. It would, in E.J. Graff's memorable line, cut the marital "link between sex and diapers." DIX1445 at 12. This would have particularly negative consequences for the involvement of fathers in raising their children. The link marriage provides between sex and procreation helps to increase the likelihood that fathers will care for their children. "[T]he establishment of marriage in all civilized states is built on this natural

8

obligation of the father to provide for his children; for that ascertains and makes known the person who is bound to fulfill this obligation; whereas, in promiscuous and illicit conjunctions, the father is unknown." Blackstone, 1 *Commentaries* *435; *see also* Finding of Fact 8. And Professor Lamb admits that an "increase in father's absence is particularly troubling because it is consistently associated with poor school achievement, diminished involvement in the labor force, early child bearing, and heightened levels of risk-taking behavior." Tr. 1073:6-9; *see also* Findings of Fact 74-83.

Second, and relatedly, extending marriage to same-sex couples would likely accelerate and perhaps even complete the "deinstitutionalization of marriage." We discuss deinstitutionalization in more detail in response to the fourth question posed to us, which specifically addresses the concept. In short, a range of social science scholars agree that there is a connection between same-sex marriage and the deinstitutionalization of marriage, *see, e.g.*, DIX49 at 850 (Professor Andrew Cherlin: "the most recent development in the deinstitutionalization of marriage is the movement to legalize same-sex marriage."); DIX60 at 26 (Professor Norval Glenn: "acceptance of the arguments made by some advocates of same-sex marriage would bring this trend to its logical conclusion, namely, the definition of marriage as being for the benefit of those who enter it rather than as an *institution* for the benefit of society …..") (emphasis added); and that deinstitutionalization is associated with results that are particularly harmful to children, such as "high levels of nonmarital childbearing, cohabitation, and divorce," DIX49 at 850. *See also* Findings of Fact 92, 94.

Third, leaving aside the obvious fact that it is far too soon to draw any firm empirical conclusions based on the scant experience with same-sex marriage in those few jurisdictions that

have adopted it,[4] the evidence shows that concerns about the potential harms from same-sex marriage have not been negated by experience in those few places where it has been adopted.  For example, since becoming the first nation in the world to institute same-sex marriage in 2001, there have been a number of worrisome trends in the Netherlands, including:

- Fewer marriages.  There was an average yearly *decrease* of .07 in the marriage rate from 2001 through 2008, following an average yearly *increase* of .02 from 1994 through 2000.  *See* DIX1887.

- More single-parent families.  Single-parent families (as a percentage of all families) increased by an average of .08% annually from 2001 to 2008, after increasing by an average of only .032% annually from 1994 to 2000.  *See* DIX2426.  That is jump of over 150% in the annual rate of change.

- More unmarried parents raising children.  From 2001 to 2008, non-married cohabiting couples with children (as a percentage of all cohabiting couples) increased at a 30% greater average annual rate than it had from 1994 to 2000.  *See* PX2866.

- More opposite-sex couples choosing an alternative status over marriage.  In 2001, 2.05% of all opposite-sex couples entering marriage or a new registered partnership chose a partnership.  By 2008, that figure climbed to 9.14%.  *See* PX2825.

The evidence also shows that even some same-sex marriage advocates recognize the common-sense wisdom in taking a cautious approach to making such a significant change to the institution of marriage.  Indeed, in 2008 leading same-sex marriage advocate Jonathan Rauch recommended that "the way to do this is let different states do different things.  Let's find out how gay marriage works in a few states.  Let's find out how civil unions work.  In the meantime, let the other states hold back."  DIX1035 at 3; *see also* Finding of Fact 23.

---

[4] Indeed, Professor Cott recognizes that it is too soon to draw any meaningful conclusions about long-term trends from the short experience that Massachusetts has had with same-sex marriage: "[T]he divorce rate question is very hard to answer in a period of simply five years, which is all there has been same-sex marriage in Massachusetts.  And that's why … I simply couldn't make a claim about that relation, but the divorce rate question is a long-term trend."  Tr. 337:20-25; *see also* Tr. 656:14-19, 657:5-6 (Peplau) ("The only point I was trying to make here was that Massachusetts is a state that permits civil same-sex marriage, and that it would be informative to look at in that state what the [divorce rate] patterns were … prior to same-sex marriage and following. … I was certainly not claiming that the divorce rate went down as a result of same-sex marriage.").

Refining marriage to include same-sex unions would have other consequences as well. For one thing, it would indisputably eliminate the State's ability to provide special encouragement and recognition to those relationships most likely to further core interests that marriage has traditionally served, namely increasing the likelihood that children will be born to and raised by their natural parents in stable and enduring family units. *See, e.g.*, DIX956 at 91 ("In all or nearly all human societies, marriage is socially approved sexual intercourse between a woman and a man, ... primarily such that any children resulting from the union are ... emotionally, morally, practically, and legally affiliated with both of the parents."); *see also* evidence cited in response to Question to Proponents #3. In addition, such a redefinition will likely infringe, or at least threaten, the First Amendment and other fundamental liberty interests of institutions, parents, and other individuals who support the traditional opposite-sex definition of marriage on religious or moral grounds. *See* Doc #376 (Becket Fund Amicus Brief); PX15 (campaign ad depicting first grade class taken to celebrate San Francisco lesbian wedding); PX116 (interview of Massachusetts parents whose second grade child learned about gay marriage in school); *see also* Findings of Fact 123-24.

3. The court has reserved ruling on plaintiffs' motion to exclude Mr. Blankenhorn's testimony. If the motion is granted, is there any other evidence to support a finding that Proposition 8 advances a legitimate governmental interest?

**ANSWER:**      Wholly apart from Mr. Blankenhorn's testimony, there is a large volume of evidence demonstrating that Proposition 8 advances legitimate government interests. *See generally* Findings of Fact 196-223; Doc #605 at pp. 12-15.

First, by restoring the traditional definition of marriage, Proposition 8 advances the government interests in marriage, especially increasing the likelihood that children will be born to

and raised by both their natural parents in stable and enduring family units.  Authorities from a wide range of disciplines recognize these as primary interests advanced by marriage.  *See, e.g.*, DIX79 at 2 (Historian Robina Quale: "Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature."); DIX66 at 11 (Anthropologist Bronislaw Malinowski: "[T]he institution of marriage is primarily determined by the needs of the offspring, by the dependence of children upon the parents."); DIX50 at 7-8 (Sociologist Kingsley Davis: "The genius of the family system is that, through it, the society normally holds the biological parents responsible for each other and their offspring.  By identifying children with their parents … the social system powerfully motivates individuals to settle into a sexual union and take care of the ensuing offspring.").  *See generally* Findings of Fact 1-10, 216-220.

Second, restoring the traditional definition of marriage also enables California to proceed with caution when considering changes to the fundamental and critical social institution of marriage.  In particular, it allows California to observe the results of same-sex marriage in other jurisdictions that have adopted it.  As leading same-sex marriage advocate Jonathan Rauch has said: "Let's find out how gay marriage works in a few states.  Let's find out how civil unions work.  In the meantime, let the other states hold back."  DIX1035 at 3.  Professor Badgett also agrees that "social change with respect to same-sex marriage in this country is taking place at a sensible pace at this time with more liberal states taking the lead and providing examples that other states might some day follow."  Tr. 1456:23-1457:4.  *See generally* Findings of Fact 23, 86-92.

Third, the evidence also demonstrates that Proposition 8 advances a series of other legitimate interests including ensuring democratic control over important social policy,[5] treating

---

[5] *See, e.g.*, Tr. 2705 (Miller) (The initiative process is "a way in which the people can … express popular sovereignty in a constitutional system," and particularly a way in which the people can exercise "a check on judicial activism."); Tr. 2706-07 (Miller) (Taking the same-sex marriage "decision out of the hands of the people … is an example of the courts taking too strong a position on … [a] fundamental issue of social policy."); *see also* Finding of Fact 119.

DEFENDANT-INTERVENORS' ANSWERS TO QUESTIONS FOR CLOSING ARGUMENTS
CASE NO. 09-CV-2292 VRW

different things differently, both in language and in law,[6] and accommodating the First Amendment and other fundamental liberty interests of institutions, parents, and other individuals who support the traditional opposite-sex definition of marriage on religious or moral grounds.[7]  *See generally* Findings of Fact 116-125, 26-27, 29-36, 74-85.

In addition, Proposition 8 forestalls the harms that would flow from same-sex marriage.  *See* Answer to Question to Proponents #2.

4.  Why should the court assume that the deinstitutionalization of marriage is a negative consequence?

**ANSWER:**        The court need not assume that the deinstitutionalization of marriage is a negative consequence.  The evidence shows that deinstitutionalization weakens marriage, and hence weakens its ability to fulfill its vital societal purposes.  *See generally* Findings of Fact 92-94.

Andrew Cherlin, a sociologist at Johns Hopkins University, defines deinstitutionalization as "the weakening of the social norms that define people's behavior in a social institution such as marriage."  DIX49 at 848.  This weakening of social norms with respect to marriage entails shifting the focus of marriage from serving vital societal needs to facilitating the personal fulfillment of individuals.  In other words, people become less likely "to focus on the rewards to be found in fulfilling socially valued roles such as the good parent or the loyal and supportive spouse"; instead "personal choice and self-development loom large in people's construction of their marital careers."

---

[6] *See, e.g.*, DIX1020 at 123 (Pro-gay rights law professor Redding:  "Gays and lesbians will arguably have a much greater voice in the legislation and elaboration of these [separate] relationship recognition and regulation regimes than they ever will in a heterosexually-dominated, majoritarian marriage system."); *see also* Findings of Fact 24, 26.

[7] *See* Doc # 376 (Becket Fund Amicus Brief); PX15 (campaign ad depicting first grade class taken to celebrate San Francisco lesbian wedding); *see also* Findings of Fact 123-24.

*Id.* at 853.  *See also* PX1273 at 4 (Badgett defining deinstitutionalization as "the fading away of the social and legal meanings of marriage that structure how married people live their lives.").

Mr. Blankenhorn concurs.  He describes deinstitutionalization as occurring when "the rules that govern [an] institution become less comprehensible and less clear and … therefore less authoritative."  Tr. 2773:14-16.  "[T]he possible participants in the institution become over time less loyal to it, … the institution loses esteem in the society."  Tr. 2774:1-4.  As a result, the institution "becomes less and less able to carry out its contributions to society."  Tr. 2774:6-7.

A principal societal purpose of marriage is channeling naturally procreative relationships into stable, long-lasting unions.  Deinstitutionalization weakens marriage's ability to perform this function, and thus would likely result in "high levels of nonmarital childbearing, cohabitation, and divorce."  DIX49 at 858; *see also* Tr. 2782:11-18 (Blankenhorn identifying similar consequences of deinstitutionalization).  These consequences directly and negatively impact children.  As a leading survey of social science research explains:  "Children in single-parent families, children born to unmarried mothers, and children in stepfamilies or cohabiting relationships face higher risks of poor outcomes than do children in intact families headed by two biological parents.  Parental divorce is also linked to a range of poorer academic and behavioral outcomes among children.  There is thus value for children in promoting stable, strong marriages between biological parents."  DIX26 at 6.  Indeed, even Professor Lamb acknowledged that the research shows that "on average, children being raised by two, married heterosexual parents do better than children being raised by single or divorced heterosexual parents."  Tr. 1105:24-1106:3; *see also* Tr. 1109:2-6.  *See also* Findings of Fact 74-83.

Poorer outcomes for children, of course, lead directly to poorer outcomes for society.  That is why California law recognizes that "unwed pregnancy" is a "problem[] that affect[s] community health and success," Cal. Wel. & Inst. Code § 18993.1(g), not just individual health and success.

14

As Mr. Blankenhorn put it, marriage between men and women benefits "society as a whole because these are the family units that are most likely to produce good outcomes for children and, thus, be the kind of seedbeds from which come good citizens and people who are … positive contributors to society." Tr. 2772:1-6. It is thus clear that when marriage weakens in its ability to channel procreation and childrearing into stable and enduring family units, comprising the child and its biological mother and father, society as a whole suffers.

5. What evidence in the record shows that same-sex marriage is a drastic or far-reaching change to the institution of marriage?

**ANSWER:** As explained more fully in our answers to Questions to Proponents and Plaintiffs ## 4 and 6, the limitation of marriage to opposite-sex unions has been a fundamental, definitional feature of that institution throughout history at common law, in this Country and, almost without exception, in every civilized society that has ever existed. And, with only a handful of exceptions, the same is true today. *See* Findings of Fact 28-36.

As explained in our answer to Question to Proponents #2, redefining marriage to include same-sex unions would constitute a drastic and far-reaching change to that institution.

.

6. What evidence in the record shows that same-sex couples are differently situated from opposite-sex couples where at least one partner is infertile?

**ANSWER:** Same-sex couples are differently situated from opposite-sex couples where at least one partner is infertile in at least three ways. First, determining infertility in opposite-sex

15

couples is extremely burdensome and intrusive, and is not always 100 percent reliable, *see* DIX1028 at 345, Marriage Facts (noting the "scientific (i.e., medical) difficulty or impossibility of securing evidence of [procreative] capacities") (quotation marks omitted), while same-sex couples are categorically infertile.  Second, the fertile partner in an opposite-sex couple is capable of procreative sexual activity with a third party, and allowing all opposite-sex couples to marry discourages the fertile partner of a sterile spouse from engaging in such potentially procreative activity with other individuals.  *See* Finding of Fact 222.  Third, the marriage of opposite-sex couples reinforces social norms that discourage heterosexual intercourse—which generally is potentially procreative—outside the framework of marriage.  *See* DIX1028 at 344, Marriage Facts ("By normalizing and privileging marriage as the situs for man-woman intercourse and thereby seeking to channel all heterosexual intercourse within that institution, society seeks to assure that when man-woman sex does produce children, those children receive from birth onward the maximum amount of private welfare."); *see also* Finding of Fact 223.

7.   Assume the evidence shows that children do best when raised by their married, biological mother and father. Assume further the court concludes it is in the state's interest to encourage children to be raised by their married biological mother and father where possible. What evidence if any shows that Proposition 8 furthers this state interest?

**ANSWER:**       The traditional institutional of marriage has always been understood to further society's interest in increasing the likelihood that children will be raised by their biological mother and father in a stable and enduring family unit.  *See, e.g*., Blackstone, *Commentaries* \*410 (describing the relationship of "husband and wife" as "founded in nature, but modified by civil society: the one directing man to continue and multiply his species, the other prescribing the

16

manner in which that natural impulse must be confined and regulated," and the relationship of "parent and child" as "consequential to that of marriage, being its principal end and design: it is by virtue of this relation that infants are protected, maintained, and educated"); Locke, *Second Treatise of Civil Government* § 79 (1690) ("For the end of conjunction between male and female, being not barely procreation, but the continuation of the species, this conjunction betwixt male and female ought to last, even after procreation, so long as is necessary to the nourishment and support of the young ones, who are to be sustained by those that got them, till they are able to shift and provide for themselves."); *see also* Findings of Fact 6-10.  Because Proposition 8 simply restores the opposite-sex definition and form of marriage that has prevailed all but universally throughout history and that continues to prevail in all but a handful of jurisdictions today, the evidence that Proposition 8 furthers society's interest in increasing the likelihood that children will be raised by their biological mother and father in a stable and enduring family unit is the same evidence that establishes that marriage furthers this interest.  See, in addition to the evidence cited above, all of the evidence cited in response to Question to Proponents #3.

The traditional opposite-sex definition of marriage reflected in Proposition 8 is closely aligned with this central concern of that institution.  Because sexual relationships between members of the opposite sex can in most cases produce children, either intentionally or not, such relationships have the potential to further—or harm—this vital interest in a way, and to an extent, that other types of relationships do not.  By providing special recognition and encouragement to committed opposite-sex relationships, Proposition 8 seeks to channel potentially procreative conduct into relationships where that conduct is likely to further, rather than harm, these interests.  Further, by maintaining the traditional definition of marriage, Proposition 8 avoids those harms to the institution of marriage and the purposes it has traditionally served that would very likely flow from the "watershed" redefinition of that institution urged by Plaintiffs.  See all of the evidence

cited in response to Question to Proponents ## 2, 4, and 5.

8. Do California's laws permitting same-sex couples to raise and adopt children undermine any conclusion that encouraging children to be raised by a married mother and father is a legitimate state interest?

**ANSWER:**      California's laws permitting same-sex couples to raise and adopt children do not undermine any conclusion that encouraging children to be raised by a married mother and father is a legitimate state interest.  California's adoption laws instead recognize and make provision for the reality that not all children will be raised by their own biological parents:  "The main purpose of adoption statutes is the promotion of the welfare of children, bereft of the benefits of home and care of their real parents."  *In re Guardianship of Santos*, 185 Cal. 127, 130 (1921).  As Mr. Blankenhorn explains, "Sometimes natural parents die.  Sometimes they do not or cannot competently parent their child.  Sometimes they become threats to their own children.  In such cases, society can and must intervene directly on behalf of the child, primarily through institutions such as adoption and state-run residences for children."  DIX956 at 188-89.  The official ballot argument in support of Proposition 8 presented voters with a similar understanding:  "Proposition 8 protects marriage as an essential institution of society.  While death, divorce, or other circumstances may prevent the ideal, the best situation for a child is to be raised by a married mother and father."  PX1 at 56.   It is simply implausible that by recognizing and making provisions for the reality that this ideal situation will not be achieved in all cases, the State somehow abandons its interests in promoting and increasing the likelihood of that ideal.

Adoption, in other words, is society's provision for caring for children who, for whatever reason, *will not* be raised by their own two married parents.  And California addresses this interest

by enlarging the pool of potential adoptive parents to include "any otherwise qualified single adult or two adults, married or not." *Sharon S. v. Superior Court*, 73 P.3d 554, 570 (Cal. 2003). Permitting same-sex couples to adopt—no more than permitting single adults to adopt—thus does nothing to undermine the state's legitimate interest in encouraging that children be raised by a married mother and father.  Mr. Blankenhorn again provides a cogent explanation:  "[A]doption is ultimately a derivative and compensatory institution.  It is not a standalone good, primarily because its existence depends upon prior human loss.  Almost everyone believes that in a good society, the great majority of children should be cared for by their own two natural parents.  But it would never occur to anyone to believe that, in a good society, all or most children should be adopted."  DIX956 at 191.

9.  How does the Supreme Court's holding in *Michael H v Gerald D*, 491 US 110 (1989) square with an emphasis on the importance of a biological connection between parents and their children?

**ANSWER:**        At issue in *Michael H.* was California's law providing that a child born to a married woman living with her husband, who is neither impotent nor sterile, is presumed to be a child of the marriage.  The biological father of a child born to such a woman brought a filiation action to establish his paternity, which would have entailed "the right to be considered as the parent who should have custody."  491 U.S. at 118.  Stressing that the marital parents wished to raise the child as their own, the Court rejected the biological father's claim that he had a substantive due process right to be accorded parental rights despite the presumption of paternity in the marital father.  Because the Court could find no basis in "the traditions and conscience of our people" for an alleged "right to legal parentage on the part of an adulterous natural father," 491 U.S. at 122, 129

n.7, the Court held that the State was entitled to balance the competing interests in favor of policies traditionally underlying the presumption of legitimacy—prevention of illegitimate children becoming "wards of the state" and "promoting the peace and tranquility of . . . families." *Id.* at 125 (internal quotation marks omitted). As the Court held: "It is a question of legislative policy and not constitutional law whether California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted." *Id*. at 129-130.

In ruling that the parental interests of the "adulterous natural father" do not trump the competing interests served by the presumption of legitimacy, the Court in no way denigrated the importance of the biological connection between parents and their children. To the contrary, the Court acknowledged its earlier cases according constitutional protection to certain rights of biological parents, but emphasized that these rights were part and parcel of "the historic respect . . . traditionally accorded to the relationships that develop within the unitary family." *Id.* at 123. *See also Smith v. Administrator*, 431 U.S. 816, 845 (1977) (noting "important distinctions between the foster family and the natural family" and that the rights of the latter are grounded "not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition.' ") (citation omitted).

In this case, likewise, the people of California have had to strike a balance between competing interests. And as the California Court of Appeals held in the *Marriage Cases*: "By maintaining the traditional definition of marriage while simultaneously granting legal recognition and expanded rights to same-sex relationships, the [State] has struck a careful balance to satisfy the diverse needs and desires of Californians." *In re Marriage Cases*, 143 Cal. App. 4th 873, 935-36 (2006).

10. Assume the evidence shows that sexual orientation is socially constructed. Assume further the

1

2

evidence shows Proposition 8 assumes the existence of sexual orientation as a stable category.

What bearing if any do these facts have on the constitutionality of Proposition 8?

3

4

5

**ANSWER:**       These facts bear on the constitutionality of Proposition 8 to the extent that they

6

are potentially relevant to determining the level of equal protection scrutiny to afford sexual

7

orientation classifications. The answer to that question, however (rational basis review) is

8

established by controlling circuit precedent. *See High Tech Gays v. Defense Industrial Security*

9

*Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).

10

What is more, the posited facts simply underscore the correctness of the Ninth Circuit's

11

consistent refusal to afford suspect or quasi-suspect class status to gays and lesbians.  Heightened

12

scrutiny under the equal protection clause is reserved for groups defined by "an immutable

13

characteristic determined solely by the accident of birth."  *Frontiero v. Richardson*, 411 U.S. 677,

14

686 (1973) (plurality).  As a "socially constructed" category, sexual orientation clearly fails this

15

16

requirement:  "Social constructionism suggests that there is nothing 'real' about sexual orientation

17

except society's construction of it. … Not surprisingly, social constructionists generally reject the

18

possibility of biological factors in sexual orientation."  DIX1266 at 4.

19

20

Even on the assumption that Proposition 8 assumed the existence of sexual orientation as a

21

"stable" category, and even if this assumption could somehow overcome all of the evidence to the

22

contrary, *see* all of the evidence cited in response to Questions to Plaintiffs and Proponents  ## 5

23

and 11, gays and lesbians still would not meet the Supreme Court's strict immutability requirement:

24

"[T]he 'immutable characteristic' notion, as it appears in Supreme Court decisions, is tightly

25

cabined.  It does not mean, broadly, something that cannot be undone.  Instead, it is a trait

26

determined *solely* by accident of birth." *Quiban v. Veterans Admin.*, 928 F.2d 1154, 1160 n.13

27

(D.C. Cir. 1991) (Ruth Bader Ginsburg, J.) (quotation marks omitted, emphasis in original).  Absent

28

21

the additional finding that a same-sex orientation is determined solely by accident of birth, in other words, its mere stability as a category would not satisfy the immutability requirement for suspect class status.

Finally, even if the facts assumed in this question did meet the immutability requirement for heightened equal protection scrutiny, rational basis would remain the proper standard of review. Whether or not gays and lesbians are defined by an immutable characteristic, they are not "politically powerless in the sense that they have no ability to attract the attention of the lawmakers," *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 445 (1985), and thus do not command the "extraordinary protection from the majoritarian political process" that heightened scrutiny is designed to provide, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 28 (1973).

11. Why is legislating based on moral disapproval of homosexuality not tantamount to discrimination? *See* Doc #605 at 11 ("But sincerely held moral or religious views that require acceptance and love of gay people, while disapproving certain aspects of their conduct, are not tantamount to discrimination."). What evidence in the record shows that a belief based in morality cannot also be discriminatory? If that moral point of view is not held and is disputed by a small but significant minority of the community, should not an effort to enact that moral point of view into a state constitution be deemed a violation of equal protection?

**ANSWER:**      As an initial matter, Proposition 8 does not legislate based on moral disapproval of homosexuality.  Proposition 8 furthers important government interests that have nothing to do with such disapproval.  See all of the evidence cited in response to Questions to Proponents ## 3 and 7.  Indeed, it does not matter that voters may have supported Proposition 8 for "a variety of

reasons," including arguably illegitimate ones.  *See Michael M.*, 450 U.S. at 470, 472 n.7 (plurality).  This court must uphold Proposition 8 so long as furthering a legitimate interest "is at least one of the 'purposes' of the statute," and may not reject the asserted reasons for the enactment of Proposition 8 unless it determines they "could not have been *a* goal of the legislation." *Id.* at 470 (emphasis added, quotation marks omitted).  As the Supreme Court has repeatedly explained, even when heightened scrutiny applies (and it does not here), " '[it] is a familiar practice of constitutional law that this court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" *Id.* at 472 n.7 (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)).

Further, religious support for the traditional definition of marriage has a doctrinal and historical basis in the sacred nature of matrimony, which is wholly distinct from religious teachings regarding homosexuality and cannot reasonably be equated with moral disapproval of homosexuality.  *See, e.g.*, Doc #384 at 5 (Southern Baptist Convention Amicus Brief); PX2688 (Bishop of Sacramento Letter); PX0005 (The Ten Declarations for Protecting Biblical Marriage); PX1867 at 85 (The ABCs of Marriage Transcript).  Religious teachings regarding the sacred nature of marriage developed without regard to issues of sexual orientation, predating by millennia the movement for same-sex marriage.  *See, e.g., Baker v. Nelson*, 191 N.W.2d 185, 186 (1971), *appeal dismissed for want of a substantial federal question*, 409 U.S. 810 (1972) ("marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis").  Indeed, it is only that very recent movement that has introduced discussion of sexual orientation into religious discourse regarding marriage.

Furthermore, even if Proposition 8 were based on moral disapproval of homosexual conduct, it would not be unconstitutional.  While Proponents have not argued that a belief based in morality can never be discriminatory, it is plain that moral disapproval of homosexual conduct is

23

not tantamount to animus, bigotry, or discrimination.  On the contrary, religions that condemn

homosexual conduct also teach love of gays and lesbians.[8]  And, as the Supreme Court has

explained, for many, moral disapproval of homosexual conduct arises out of "profound and deep

convictions accepted as ethical and moral principles to which they aspire and which thus determine

the course of their lives."  *Lawrence v. Texas*, 539 U.S. 558, 571 (2003).  To be sure, moral

disapproval of homosexual conduct cannot be enforced "through operation of the criminal law,"

and thus cannot support a law seeking to criminalize "the most private human conduct, sexual

behavior, and in the most private of places, the home."  *Id*. at 567, 571.  But it does not follow that

moral considerations cannot influence the formation of public policy. On the contrary, it is well

settled that a State need not promote or facilitate what it cannot prohibit.  Thus, for example,

although with few exceptions a State cannot prohibit abortions, *see Planned Parenthood v. Casey*,

505 U.S. 833 (1992); *Roe v. Wade*, 410 U.S. 113 (1973), the Supreme Court has "unequivocally"

held "that a state has no constitutional obligation to fund or promote abortion and 'is not required to

show a compelling interest for its policy choice to favor normal childbirth.' "  *Planned Parenthood*

*of Central and Northern Arizona v. Arizona*, 718 F.2d 938, 943 (9th Cir. 1983) (quoting *Maher v.*

*Roe*, 432 U.S. 464, 477 (1977); *see also Maher*, 432 U.S. at 474 (*Roe* "implies no limitation on the

authority of a State to make a value judgment favoring childbirth over abortion, and to implement

---

[8] *See, e.g.*, PX52 (Statement of the Catholic Bishops of California in Support of Proposition 8: "we need to remember that we are all children of God possessed of human dignity and that each of us is created in God's image.  Protecting the traditional understanding of marriage should not in any way disparage our brothers and sisters—even if they disagree with us"); PX0005 (Pastor Garlow, The Ten Declarations for Protecting Biblical Marriage:  "God loves all people, therefore we love all people. . . .  We choose to love those who, for whatever reason, have chosen to involve themselves in homosexual or other unbiblical sexual activity. . . .  We openly welcome into our lives as friends and into our churches those who are struggling with same sex attraction . . . . Genuine, biblically-founded tolerance means not only that we must love those who are actively involved in the homosexual lifestyle, but would include them loving us, without placing demands upon us to renounce our biblical convictions."); Doc # 384 at 9 (Southern Baptist Convention Amicus Brief:  "Our beliefs about marriage and human sexuality must also be understood in the context of our love for all people. …There is no authority in Biblical teachings for hatred of any people, including those who identify as gay or lesbian.").

that judgment by the allocation of public funds"). As the Supreme Court has explained: "[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." *Maher*, 432 U.S. at 475-76. Under these precedents, the fact that a State may not criminalize intimate same-sex relationships in no way suggests that it cannot draw a distinction between such relationships and traditional opposite-sex marriages by preserving the traditional understanding of marriage.

Finally, marriage is inextricably intertwined with religious and moral concerns (though as noted, it is simplistic and inaccurate to equate these concerns with moral disapproval of homosexual conduct). *See, e.g., Turner v. Safley*, 482 U.S. 78, 96 (1987) (because "many religions recognize marriage as having spiritual significance," for many Americans, "the commitment of marriage may be an exercise of religious faith"); *Maynard v. Hill*, 125 U.S. 190, 205 (1988) (marriage has "more to do with the morals and civilization of a people than any other institution"). As with other issues that are inextricably intertwined with moral values, such as the death penalty, gambling, obscenity, prostitution, and assisted suicide, legislation regarding marriage must inevitably choose between, or attempt to balance, competing moral views. It is not only inevitable, but entirely proper, that voters' decisions be informed by their most deeply held values and beliefs as such debates are resolved, as they should be, through the democratic process. *See Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (noting that "[t]hroughout the Nation, Americans are engaged in an earnest and profound debate about the morality, legality, and practicality of physician-assisted suicide" and permitting "this debate to continue, as it should in a democratic society"); *Gregg v. Georgia*, 428 U.S. 153, 175 (1976) (plurality) ("[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people") (quotation marks omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12. What harm do proponents face if an injunction against the enforcement of Proposition 8 is
     issued?

**ANSWER:**     This Court has already held that Proponents have a "significant protectable
interest in defending Proposition 8" that is not adequately represented by any other party.  That
interest would obviously be harmed by an injunction against enforcement of Proposition 8.
Additionally, Proponents would be harmed by the issuance of an injunction against the enforcement
of Proposition 8 in their capacities as agents for the People and Government of the State of
California, recognized as such under state law to defend, in lieu of the defendant public officials,
the constitutionality of Proposition 8.  *See Strauss v. Horton*, 207 P.3d 48, 69 (Cal. 2009)
(permitting Proponents to intervene to defend Proposition 8 against state constitutional challenge
where Attorney General asserted state constitutional claims against Proposition 8).

**TO PLAINTIFFS AND PROPONENTS:**

1.  What party bears the burden of proof on plaintiffs' claims?  Under what standard of review is the evidence considered?

**ANSWER:**       Because same-sex marriage is neither "objectively, deeply rooted in this Nation's history and tradition" nor "implicit in the concept of ordered liberty," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks omitted), and because Proposition 8 does not classify on the basis of a suspect or quasi-suspect characteristic, *see High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990), Plaintiffs claims are subject to rational basis review.  *See Glucksberg*, 521 U.S. at 728 (due process); *Heller v. Doe*, 509 U.S. 312, 319-20 (1993) (equal protection).  Proposition 8 thus "bear[s] a strong presumption of validity," and Plaintiffs "have the burden to negative every conceivable basis which might support it."  *FCC v. Beach Communications*, 508 U.S. 307, 314-315 (1993) (quotation marks omitted); *see also* Doc #172-1 at 67-69 (describing characteristics of rational basis review); Doc #213 at 23-26 (same).

2.  Does the existence of a debate inform whether the existence of a rational basis supporting Proposition 8 is "debatable" or "arguable" under the Equal Protection Clause? *See Minnesota v Clover Leaf Creamery Co*, 449 US 456, 469 (1981); *FCC v Beach Communications, Inc*, 508 US 305, 320 (1993).

**ANSWER:**       If any conceivable rationale for Proposition 8 is "at least debatable," this Court must not "substitut[e] its judgment for that of" the people of California.  *Minnesota v Clover Leaf*

27

*Creamery Co*, 449 US 456, 469 (1981).  Even if the "assumptions underlying these rationales [are] erroneous, … the very fact that they are arguable" is sufficient to satisfy rational basis review.  *FCC v. Beach Communications*, 508 U.S. 307, 320 (1993) (quotation marks omitted).  Indeed, "the *very admission* that the facts are arguable … immunizes [Proposition 8] from constitutional attack." *Vance v. Bradley*, 440 U.S. 93, 112 (1979) (emphasis added).  It simply cannot be denied that same-sex marriage, and the rationales opposing and supporting it, are the subject of debate among people of good faith across this Nation and the world.  *See, e.g.*, DIX81 at 7, Gay Marriage:  Why it is Good for Gays, Good for Straights, and Good for America ("[M]ost [opponents of same-sex marriage] are motivated by a sincere desire to do what's best for their marriages, their children, their society.").  That debate is taking place in the legislatures, the courts, and the polling places of the country.  This is inescapable evidence that the rationales underlying opposition to same-sex marriage are at least debatable.  Indeed, the debate has been resolved *against* extending marriage to same-sex couples in the vast majority of American states and nations of the world.  In this light, any claim that the rational bases supporting Proposition 8 are inarguably and undeniably wanting is untenable.


3.  What does the evidence show the difference to be between gays and lesbians, on the one hand, and heterosexuals on the other?  Is that difference one which the government "may legitimately take into account" when making legislative classifications?  *See City of Cleburne v Cleburne Living Center*, 473 US 432, 446 (1985).


**ANSWER:**        First, it is undeniable that only the sexual union of a man and a woman is capable of producing offspring.  *See* Findings of Fact 196, 202.  This unique property of opposite-sex relationships is why marriage is "fundamental to our very existence and survival." *Loving v.*

*Virginia*, 388 U.S. 1, 12 (1967); *see also Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942); Findings of Fact 210-212; *see generally* Findings of Fact 2-10 (identifying the purposes of traditional marriage).  The government may legitimately take into account this indisputable biological difference between opposite-sex and same-sex couples.  *Cf., e.g., Nguyen*, 533 U.S. at 63 ("To fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it."); *Michael M.*, 450 U.S. at 472 (plurality) ("We need not be medical doctors to discern that young men and young women are not similarly situated with respect to the problems and risks of sexual intercourse.  Only women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity.").

Second, it is undeniable that only the union of a man and a woman can provide a child with both of its biological parents.  The government may legitimately take this into account when making legislative classifications.  Social science research indicates that, on average, the ideal family structure for a child is a family headed by two biological parents in a low-conflict marriage.  *See* Findings of Fact 74, 76-82, 197.  Furthermore, for most children the alternative to being raised by their married, biological parents is being raised by a single parent or in a step-family.  *See* Findings of Fact 75-76.  As the eminent sociologist Kingsley Davis explained, "the creation, nurture, and socialization of the next generation" are "vital and extremely demanding tasks" for which "society normally holds the biological parents responsible."  DIX50 at 7-8; *see also* Findings of Fact 213-215.

Third, it is undeniable that only the union of a man and a woman can provide a child with both a father and a mother.  *See* Finding of Fact 198.  This is another unique property of opposite-sex unions that may form a legitimate basis for legislative classifications.  Indeed, "the accumulated

wisdom of several millennia of human experience" has not discovered a child-rearing model superior to that centered on the child's married mother and father. *Lofton v. Secretary Dept. Children & Family*, 358 F.3d 804, 820 (11th Cir. 2004); *see also Hernandez v. Robles*, 855 N.E.2d 1, 7-8 (N.Y. 2006); *Bowen v. Gilliard*, 483 U.S. 587, 614 (1987) (Brennan, J., dissenting) (noting that the "optimal situation for the child is to have both an involved mother and an involved father") (internal quotation marks omitted).

Finally, the evidence demonstrates—and Plaintiffs' experts acknowledge—that there are other meaningful differences between gay and lesbian relationships and heterosexual relationships. *See* Finding of Fact 24.

4. What does the evidence show the definition (or definitions) of marriage to be? How does Professor Cott's proposed definition of marriage fit within Mr. Blankenhorn's testimony that competing definitions of marriage are either focused on children or focused on spousal affection? *See* Cott, Tr 201:9-14 and 222:13-17; Blankenhorn, Tr 2742:9-18 and 2755:25-2756:1.

**ANSWER:**       The evidence shows that marriage is, as Justice Stevens has put it, "a license to cohabit and produce legitimate offspring." *Bowers v. Hardwick*, 478 U.S. 186, 215 (1986) (Stevens, J., dissenting).  Marriage confers societal approval to engage in procreative sexual intercourse and the birth of children.  *See, e.g.*, Tr. 2742:9-10 (Blankenhorn) ("Marriage is a socially-approved sexual relationship between a man and a woman."); PX1626 at 248 (Anthropologist Suzanne Frayser:  "Marriage is a relationship within which a group socially approves and encourages sexual intercourse and the birth of children."); DIX50 at 5 (Sociologist Kingsley Davis:  "[M]arriage is social recognition and approval … of a couple's engaging in sexual

intercourse and bearing and rearing offspring."); DIX79 at 2 (Historian Robina Quale: "Marriage, as the socially recognized linking of a specific man to a specific woman and her offspring, can be found in all societies."); DIX63 at 40-41 (Anthropologist Claude Levi-Strauss: "the family—based upon a union, more or less durable, but socially approved, of two individuals of opposite-sexes who establish a household and bear and raise children—appears to be a practically universal phenomenon, present in every type of society."); DIX73 at 71 (Royal Anthropological Institute of Great Britain and Ireland: "[M]arriage … is defined as a union between a man and a woman such that children born of the woman are recognized as the legitimate offspring of both partners."); *see also* Findings of Fact 1-10. As this evidence demonstrates, this definition of marriage is supported by the historical and anthropological record. As Mr. Blankenhorn testified, there is an alternative, incomplete account of marriage that emphasizes not its procreative and child-centered nature, but instead views marriage as "fundamentally a private adult commitment." Tr. 2755:25-2756:1, 2760:15-2761:2; *see also* Finding of Fact 11. Professor Cott, by focusing on the relationship between the marital partners as the core social meaning of marriage, subscribes to the latter view. *See* Tr. 201:15-16 ("So marriage places a unique valuation on … couples' choices. And that is the core of its social meaning.").

To be sure, Professor Cott's view is that the government's purpose in licensing and promoting marriage "is to create stable households in which the adults who reside there and are committed to one another by their own consents will support one another *as well as their dependants*." Tr. 222:14-17 (emphasis added).

By referring generically to "dependants" rather than "children," Professor Cott presents a misleading and ahistorical account of marriage. According to Professor Cott, marriage historically "set up men as heads of households who would be responsible economically for their spouses and for any of their dependants, whether those were biological children, adopted children, stepchildren,

slaves, apprentices, et cetera." Tr. 221:23-222:2. But at common law, responsibilities to slaves, apprentices and other non-child "dependants" were not grounded in the laws governing marriage, but rather in the law of master and servant. The master-servant relationship was "founded in convenience, whereby a man is directed to call in the assistance of others, where his own skill and labour will not be sufficient to answer the cares incumbent upon him." Blackstone, 1 *Commentaries* *410. The parent-child relationship, on the other hand, was "consequential to that of marriage, being its principal end and design." *Id*.

In sum, Professor Cott's view that there is little evidence that government authorities "considered marriage from the point of view of its pro-child … advantages" cannot be squared with the historical record. Tr. 226:5-7. "The main end and design of marriage," that record demonstrates, is "to ascertain and fix upon some certain person, to whom the care, the protection, the maintenance, and the education of children should belong." Blackstone, 1 *Commentaries* *443.

5. What does it mean to have a "choice" in one's sexual orientation? *See, e.g.*, Tr 2032:17-22; PX 928 at 37.

**ANSWER:**        Professor Herek's study, referenced by the court, found that 13 percent of self-identified gay men, 30 percent of self-identified lesbians, 41 percent of self-identified bisexual men, and 55 percent of self-identified bisexual women reported that they experienced some, a fair amount, or a lot of choice with respect to their sexual orientation, with the balance reporting that they experienced little choice, or no choice. PX 928 at 37, 39; Tr. 2209:1-22:10 (Herek) (discussing the process through which individuals were classified for purposes of the study). These statistics, at face value, are wholly inconsistent with any finding that gays and lesbians are a class defined by an immutable characteristic. Indeed, statistics such as these would be unthinkable with

32

respect to other classes, such as race or sex, which the Supreme Court has held to be entitled to heightened protection under the Equal Protection Clause.

Nor does the fact that any given individual reported that he or she experiences little or no choice with respect to his or her sexual orientation mean that his or her sexual orientation has not changed in the past, or that it might not change in the future. *See* Tr. 2210:19-2211:2 (Herek) (acknowledging that study does "not really shed any light" on the question "whether people's sexual orientation had changed"); 2212:6-14 (Herek) (acknowledging that he testified at his deposition that "if you are trying to predict for any specific individual whether their identity will predict their sexual behavior in the future, especially, that can be problematic"). And this is not merely hypothetical: as Professor Herek acknowledged, "[w]e certainly know that people report that they have experienced a change in their sexual orientation at various points in their life." Tr. 2212:21-24. Other evidence is to the same effect. *See, e.g.*, PX918 at 149 (Herek) ("Some [people] experience considerable fluidity in their sexuality throughout their lives."); DIX1010 at 5 (Garnets & Peplau: "Female sexual development is a potentially continuous, lifelong process in which multiple changes in sexual orientation are possible."); *see generally* Findings of Fact 157-162. Again, this sort of fluidity would be unthinkable with respect to other classes, such as race or sex, which the Supreme Court has held to be entitled to heightened protection under the Equal Protection Clause.

Finally, the fact that substantial numbers of gays, lesbians, and bisexuals reported that they experienced at least some choice with respect to their sexual orientation establishes that that orientation is not "determined solely by accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality), as required for heightened protection under the Equal Protection Clause. Not only have plaintiffs presented no evidence that sexual orientation is determined in this manner, but a substantial body of evidence indicates that sexual orientation is not so determined. *See*

DIX1278 at 2 (American Psychiatric Association:  "[T]o date there are no replicated scientific studies supporting any specific biological etiology for homosexuality."); Tr. 2285 (Herek) ("[W]e don't really understand the origins of sexual orientation in men or in women."); DIX1239 at 81 (Peplau:  "Available evidence indicates that biological contributions to the development of sexual orientation in women are minimal."); *see generally* Findings of Fact 156-57.

6.  In order to be rooted in "our Nation's history, legal traditions, and practices," *see Washington v Glucksberg*, 521 US 702, 710 (1997), is it sufficient that a practice has existed historically, or need there be an articulable purpose underlying the practice?

**ANSWER:**       "[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal quotation marks and citations omitted).  While it is difficult to imagine a practice with no articulable purpose meeting this stringent test, this Court ultimately need not decide whether such a purpose is necessary.

As an initial matter, it is well-settled that marriage between a man and a woman is a fundamental right.  *See Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942).  And its fundamental nature derives from its naturally procreative capacity.  As the evidence shows, a central purpose of marriage has always been to channel potentially and naturally procreative relationships into stable, enduring family units.  *See, e.g.*, Tr. 2744:19-2745:9 (Blankenhorn) (Marriage is the "only one institution in the world that performs the task of bringing together the three dimensions of parenthood. … [I]f that need [to affiliate the child with its parents] was not there, we … likely would not have the institution at

34

all."); DIX79 at 2 (Historian Robina Quale:  "Through marriage, children can be assured of being born to both a man and a woman who will care for them as they mature."); DIX66 at 11 (Anthropologist Bronislaw Malinowski:  "[T]he institution of marriage is primarily determined by the needs of the offspring, by the dependence of children upon the parents."); DIX1475 (Bertrand Russell:  "[I]t is through children alone that sexual relations become important to society, and worthy to be taken cognizance of by a legal institution."); *see Loving*, 388 U.S. at 12 ("Marriage is … fundamental to our very existence and survival."); *Skinner*, 316 U.S. at 541 (same); *see Baker v. Baker*, 13 Cal. 87, 103 (1859) ("[T]he first purpose of matrimony, by the laws of nature and society, is procreation."); Noah Webster, An American Dictionary of the English Language (1st ed. 1828) (Marriage "was instituted … for the purpose of preventing the promiscuous intercourse of the sexes, for promoting domestic felicity, and for securing the maintenance and education of children."); Blackstone, 1 *Commentaries* *410 (describing the relationship of "husband and wife" as "founded in nature, but modified by civil society: the one directing man to continue and multiply his species, the other prescribing the manner in which that natural impulse must be confined and regulated"); Locke, *Second Treatise of Civil Government* § 79 (1690) ("For the end of conjunction between male and female being not barely procreation, but the continuation of the species, this conjunction betwixt male and female ought to last, even after procreation, so long as is necessary to the nourishment and support of the young ones, who are to be sustained by those that got them, till they are able to shift and provide for themselves."); *see generally* Findings of Fact 6-8.

Furthermore, same-sex marriage is plainly *not* deeply rooted in our Nation's history, legal traditions, and practices.  Indeed, only in 2004 did Massachusetts become the first state in the Nation to issue same-sex marriage licenses, and only four other states have adopted the practice since then.  *See* Findings of Fact 28-33.

In the face of this evidence, Plaintiffs attempt to abstract from the traditional practice of

opposite-sex marriage purposes that would also apply to same-sex marriage, and to denigrate the overriding procreative and childrearing purposes of marriage.  *See, e.g.*, Answer to Question to Plaintiffs and Proponents #4.  In so doing, they fail to provide a "careful description of the asserted fundamental liberty interest."  *Glucksberg*, 521 U.S. at 721 (quotation marks omitted).  Proposition 8 limits marriage in California to the union of a man and a woman; thus "the question before [this Court] is whether the 'liberty' specially protected by the Due Process Clause includes a right" to marry a person of the same sex.  *Id.* at 723.  And the Supreme Court has already rejected on the merits the claim that the fundamental right to marry protected by the due process clause includes the right to marry a person of the same sex.  *See Baker v. Nelson*, 409 U.S. 810 (1972).  *Baker* thus establishes that same-sex marriage is neither itself deeply rooted in our Nation's history, legal traditions, and practices, nor part of the fundamental right to marry that is so rooted.

7.  If spouses are obligated to one another for mutual support and support of dependents, and if legal spousal obligations have no basis in the gender of the spouse, what purpose does a law requiring that a marital partnership consist of one man and one woman serve?

**ANSWER:**      The equal treatment under law of each spouse without respect to gender is an analytically separate issue from the State's interest in preserving the traditional definition of marriage.  As explained above in response to Question to Proponents #3, the traditional definition of marriage serves a myriad of governmental interests.

8.  The California Family Code requires that registered domestic partners be treated as spouses. Cal Fam Code § 297.5.  Businesses that extend benefits to married spouses in California must extend equal benefits to registered domestic partners. *See Koebke v Bernardo Heights Country*

*Club*, 36 Cal 4th 824, 846 (2005) ("We interpret [Cal Fam Code § 297.5(f)] to mean that there shall be no discrimination in the treatment of registered domestic partners and spouses."). If, under California law, registered domestic partners are to be treated just like married spouses, what purpose is served by differentiating – in name only – between same-sex and opposite-sex unions?

**ANSWER:**          The California Court of Appeals answered this question when it upheld the California Legislature's decision to differentiate, in name only, between registered domestic partners and married spouses:  "By maintaining the traditional definition of marriage while simultaneously granting legal recognition and expanded rights to same-sex relationships, the Legislature has struck a careful balance to satisfy the diverse needs and desires of Californians."  *In re Marriage Cases*, 143 Cal. App. 4th 873, 935-36 (Cal. Ct. App. 2006).  By retaining the traditional opposite-sex definition of marriage, California preserves the abiding link between that institution and the vital social interests that are implicated by the uniquely procreative capacity of male-female unions and provides special recognition and encouragement to those unions that uniquely serve its interest in increasing the likelihood that children will be born to and raised by both of their natural parents in stable and enduring family units.  At the same time, the parallel institution of domestic partnerships recognizes and honors the committed loving relationships of gays and lesbians.  These parallel institutions seek to respect and accommodate differing types of relationships that have differing natural capacities and thus serve differing societal interests.  It is not irrational that they be called by different names.  "Words do matter and there is much in favor of using terms that differentiate to describe biologically different models."  *Id.* at 941 (Parrili, J., concurring).

Relatedly, redefining marriage to include same-sex couples would work a profound

transformation in the meaning and nature of the institution.  See our response to Question to Proponents #2.  The New Jersey Supreme Court recognized this consideration in *Lewis v. Harris*.  There, the court held that the state's constitution required New Jersey to "provide to committed same-sex couples, on equal terms, the full rights and benefits enjoyed by heterosexual married couples."  908 A.2d 196, 224 (N.J. 2006).  New Jersey was not, however, required to extend the title marriage to same-sex couples:  "We cannot escape the reality that the shared societal meaning of marriage—passed down through the common law into our statutory law—has always been the union of a man and a woman.  To alter that meaning would render a profound change in the public consciousness of a social institution of ancient origin."  *Id*. at 222.  It is not unreasonable for the State to proceed incrementally and with caution in balancing the competing interests in this novel and controversial area.

In sum, by retaining the traditional definition of marriage while extending the rights and benefits of marriage to same-sex couples through domestic partnerships, California seeks both to preserve the institution of marriage and its traditional purposes *and* to recognize and honor gay and lesbian relationships.  Nothing in the Constitution requires the state categorically to favor one of these values over the other.

9.  What evidence, if any, shows whether infertility has ever been a legal basis for annulment or divorce?

**ANSWER:**      California courts have allowed annulment on the basis of fraud, Cal. Fam. Code § 2210(d), only "if the fraud relates to a matter which the state deems vital to the marriage relationship."  *Bruce v. Bruce*, 71 Cal. App. 2d 641, 643 (1945).  As recently as 2005, the California Court of Appeals has held that procreation is such a vital matter.  In fact, "annulments on the basis

38

of fraud are generally granted only in cases where the fraud related in some way to the sexual or procreative aspects of marriage." *In re Marriage of Meagher and Maleki*, 131 Cal. App. 4th. 1, 7 (2005). Thus, the California Court of Appeals has held that an annulment should be granted where one spouse fraudulently concealed known sterility from the other. *See Aufort v. Aufort*, 9 Cal. App. 2d 310 (1935). The justification for the rule is the central place of procreation in marriage:

> [T]he procreation of children is the most important end of matrimony, and when a woman, knowing herself to be barren and incapable of conceiving and bearing children by reason of an operation, does not disclose this fact to her intended husband, he, upon discovering such sterility after marriage, is entitled to a decree of annulment on the ground of fraud.

*Aufort*, 9 Cal. App. 2d at 311; *see also Vileta v. Vileta*, 53 Cal. App. 2d 794 (1942) (same); *Baker v. Baker*, 13 Cal. 87, 103 (Cal. 1859) ("A woman, to be marriageable, must, at the time, be able to bear children to her husband, and a representation to this effect is implied in the very nature of the contract."). More recently in 2008, the California Court of Appeals explained:

> Other decisions demonstrate that to void a marriage, the fraud alleged must show an intention not to perform a duty vital to the marriage, which exists in the mind of the offending spouse at the time of marriage. (Millar v. Millar (1917) 175 Cal. 797 [167 P. 394] [wife concealed from husband at time of marriage that she did not intend to have sexual relations with him]; Hardesty v. Hardesty (1924) 193 Cal. 330 [223 P. 951] [wife concealed from husband at time of marriage that she was pregnant by another man]; Vileta v. Vileta (1942) 53 Cal.App.2d 794 [128 P.2d 376] [spouse concealed from other spouse known fact of sterility at time of marriage]; In re Marriage of Liu, supra, 197 Cal.App.3d 143 [wife married husband in Taiwan to acquire a green card, and never consummated the marriage].) Thus, historically, annulments based on fraud have only been granted in cases where the fraud relates in some way to the sexual, procreative or child-rearing aspects of marriage. (Meagher, supra, 131 Cal.App.4th at pp. 7-8.)

*In re Marriage of Ramirez*, 165 Cal. App. 4th 751, 757-58 (Cal. Ct. App. 2008) (finding that the intention to continue an extramarital sexual relationship is fraud sufficient to grant an annulment because it precludes fulfillment of the obligation of sexual fidelity).

In addition, California's very first divorce statute of 1851 specifically acknowledged that divorce was available where one spouse was infertile due to natural impotence. Act Concerning

39

Divorces, 1851 Cal. Stat. 186 ("Divorces may be granted … [f]or natural impotence existing at the time of marriage."). And "physical incapacity" for marriage remains an independent basis for annulment. *See* Cal. Fam. Code § 2210(f) ("A marriage is voidable and may be adjudged a nullity if … [e]ither party was, at the time of marriage, physically incapable of entering into the marriage state, and that incapacity continues, and appears to be incurable."); *see also Millar v. Millar*, 175 Cal. 797, 802 (Cal. 1917) ("The physical incapacity here referred to, as is thoroughly established, is the physical incapacity to consummate the marriage by coition."); *Stepanek v. Stepanek*, 193 Cal. App. 2d 760, 762 (Cal. Ct. App. 1961) ("By physical incapacity is meant the physical incapacity to consummate the marriage by coition, or legal impotence.") (citation omitted).

The historic basis for these legal rules is the centrality of procreation to the institution of marriage. As one commentator explained, " 'since marriage is a sexual relation, having in view the propagation of the species, a man or woman so imperfect in the sexual organism as to be perpetually and incurably incapable of the connection which precedes parentage cannot enter into indissoluble matrimony with another having no notice of the incapacity.' " *Carmichael v. Carmichael*, 106 Ore. 198, 206-07 (1923) (quoting 1 Bishop on Marriage and Divorce, § 758).

10. How should the failure of the Briggs Initiative (Proposition 6 in 1978) or the LaRouche Initiative (Proposition 64 in 1986) be viewed in determining whether gays and lesbians are politically powerless?

**ANSWER:**       As Professor Miller testified, these two initiatives were defeated by wide margins. *See* Tr. at 2476-2477 (Proposition 6 was voted down by 58% of the electorate; Proposition 64 was voted down by 71% of the electorate). These victories by the gay and lesbian community are just two of many pieces of evidence showing that gays and lesbians are not

40

1  politically powerless.  *See* Findings of Fact 163-190.

2

3  11. What are the constitutional consequences if the evidence shows that sexual orientation is

4  immutable for men but not for women? Must gay men and lesbians be treated identically under

5  the Equal Protection Clause?

6

7

8  **ANSWER:**  As an initial matter, the evidence makes clear that sexual orientation is not

9  immutable, either for gay men or for lesbians.  *See, e.g.*, Tr. 2285 (Herek) ("[W]e don't really

10  understand the origins of sexual orientation in men or in women."); PX918 at 149 (Herek:  "some

11  [people] experience considerable fluidity in their sexuality throughout their lives."); *see generally*

12  Findings of Fact 156-162.  Proponents acknowledge, however, that the evidence indicates that there

13  are differences between how gay men and lesbians experience sexual orientation and that for many

14  women, in particular, sexual orientation is a very fluid construct.  *See, e.g.*, DIX1239 at 93 (Peplau

15  et al:  scholars have recognized "the astonishing sexual plasticity of the human female.") (quotation

16  marks omitted); Tr. 2208 (Herek) ("[W]hen we look at women's histories, we do more often see the

17  idea that their … romantic relationships and their experiences of sexuality are more likely to change

18  … than is the case for men, over the course of their lives."); *see generally* Finding of Fact 160.  In

19  both its "amorphous" nature, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (1985),

20  and its fluidity, among other things, the putative class of gays and lesbians differs from any other

21  that the Supreme Court has held to be entitled to heightened protection under the Equal Protection

22  Clause.

23  If this Court were to find, however, that sexual orientation is immutable for gay men but not

24  for lesbians, Proponents are aware of no constitutional precedent for treating gay men and lesbians

25  differently for purposes of a sexual orientation classification under the Equal Protection Clause.

Even if it were appropriate to distinguish between gays and lesbians for purposes of the Equal Protection Clause, a finding that sexual orientation is immutable for gay men would satisfy only one of the requirements for heightened protection; they would still need to satisfy the other requirements for heightened scrutiny, including a lack of political power. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 573-74 (9th Cir. 1990). Gay men cannot make such a showing. *See* Findings of Fact 163-190.

12. How many opposite-sex couples have registered as domestic partners under California law? Are domestic partnerships between opposite-sex partners or same-sex partners recognized in other jurisdictions? If appropriate, the parties may rely on documents subject to judicial notice to answer this question.

**ANSWER:**        California's Domestic Partners Registry is maintained by the Secretary of State. *See* http://www.sos.ca.gov/dpregistry/.  The State does not maintain separate statistics for same-sex and opposite-sex partners, *see* PX909 at 24; indeed the Declaration of Domestic Partnership form does not ask for the sex of the registrants.  *See* http://www.sos.ca.gov/dpregistry/forms/sf-dp1.pdf. Thus, while the record shows that 55,684 domestic partnerships had been registered through November 2009, *see* DIX2647, the number of opposite-sex partnerships cannot be determined with certainty.  One researcher, however, has estimated that approximately 95% of domestic partners are same-sex couples.  *See* PX909 at 24.

        In addition to California, four states and the District of Columbia have active, comprehensive domestic partnership or civil union schemes that provide all or nearly all the rights

and benefits of marriage[9]:

- Nevada.  Domestic partnership scheme provides the same rights granted to spouses, and is open to opposite-sex and same-sex couples without age restriction.  *See* Nev. Rev. Stat. §§ 122A.200(1)(a) & (2).

- Oregon.  Domestic partnership scheme provides the same rights afforded based on marriage, and is open only to same-sex couples.  *See* Or. Rev. Stat. §§ 106.340(1) & 106.310(1).

- New Jersey.  Civil union scheme provides the same rights granted to spouses, and is open only to same-sex couples.  *See* N.J. Stat. §§ 37:1-30 & 37:1-31(a).

- Washington.  Domestic partnership scheme provides approximately 180 rights and benefits, and is open to all same-sex couples and to opposite-sex couples where at least one of the persons is at least 62 years old.  *See* Wash. Rev. Code § 26.60.030.

- District of Columbia.  Domestic partnership scheme provides most of the rights and benefits of marriage, and is open to both opposite-sex and same-sex couples without age restriction.  *See* D.C. Code § 32-702(a).

Several jurisdictions have laws that clearly provide for recognition of California domestic partnerships:

- Connecticut.  Recognizes as marriage both same-sex and opposite-sex domestic partnerships. *See* Conn. Gen. Stat. § 46b-28a.

- New Jersey.  Recognizes a same-sex domestic partnership as a civil union, *see* N.J. Attorney General Formal Opinion No. 3-2007; N.J. Stat. § 26:8A-6(c), and recognizes an opposite-sex domestic  partnership, *see* N.J. Stat. § 26:8A-6(c).  *See* Conn. Gen. Stat. § 46b-28a.

- Nevada.  Recognizes as domestic partnership both same-sex and opposite-sex domestic partnerships.  *See* Nev. Rev. Stat. § 122A.500.

- Washington.  Recognizes as domestic partnership a same-sex domestic partnership.  *See* Wash. Rev. Code § 26.60.090.

- District of Columbia.  Recognizes as domestic partnership both same-sex and opposite-sex domestic partnerships.  *See* D.C. Code § 32-702(i)(2).

---

[9] Three additional states that recently adopted same-sex marriage are phasing out same-sex civil unions to varying degrees.

There are several other states whose statutes and case law make it likely that they also would recognize California same-sex domestic partnerships. Notably, at least one state will recognize a California same-sex domestic partnership but will *not* recognize a California same-sex marriage as a marriage or a domestic partnership. *See* Wash. Rev. Code § 26.60.090.

13. Do domestic partnerships create legal extended family relationships or in-laws?

**ANSWER:**      Domestic partnerships likely create legal extended family relationships and in-laws. There are only a few areas in law where extended family relationships or in-laws are relevant. One of the primary areas is intestate succession, where domestic partners are treated the same as spouses. *See* Cal. Prob. Code § 6402. And the California legislature has clearly declared that registered domestic partners "shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses." Cal. Fam. Code § 297.5. So any time "spouse" is mentioned in the law, it would presumably include domestic partners. *See, e.g., Koebke v. Bernardo Heights Country Club*, 36 Cal.4th 824, 845 (Cal. 2005) (finding that the Unruh Civil Rights Act protected domestic partners in the same manner as spouses because "the Legislature has made it abundantly clear that an important goal of the Domestic Partner Act is to create substantial legal equality between domestic partners and spouses"); *In re Domestic Partnership of Ellis*, 162 Cal.App.4th 1000 (Cal. Ct. App. 2008) (finding that the putative-spouse statute applied equally to domestic partners, even though it did not mention domestic partners).

Another area where in-law status might be relevant is income tax law. In California, the word 'dependant' "has the same meaning as that term is defined by Section 152 of the Internal Revenue Code." Cal. Rev & Tax Code § 17056. Section 152 of the IRC defines dependant to

include in-laws. 26 U.S.C. § 152(d)(2)(G). The Domestic Partnership Act specifies that "[t]o the extent that provisions of California law adopt, refer to, or rely upon, provisions of federal law in a way that otherwise would cause registered domestic partners to be treated differently than spouses, registered domestic partners shall be treated by California law as if federal law recognized a domestic partnership in the same manner as California law." Cal. Fam. Code § 297.5(e). Thus, because California law seeks legal equality between spouses and domestic partners, as noted above, in-laws would likely be treated as dependants for domestic partners in the same way that they are for spouses.

This same principle would likely apply to all other areas of California law that have created legal significance for in-law status. One such area of law includes conflict-of-interest laws. *See, e.g.,* Cal. Fin. Code § 31820(c) (including in-laws as close relatives).

14.     What does the evidence show regarding the difficulty or ease with which the State of California regulates the current system of opposite-sex and same-sex marriage and opposite-sex and same-sex domestic partnerships?

**ANSWER:**     We are unaware of any evidence regarding the difficulty or ease with which the State of California regulates the current system of opposite-sex and same-sex marriage and opposite-sex and same-sex domestic partnership.[10]

15. If the court finds Proposition 8 to be unconstitutional, what remedy would "yield to the

---

[10] In answers to requests for admission that have been made part of the record, the Attorney General either admits or claims to have seen documents supporting several costs related to maintaining and administering California's domestic partnership registry. *See* PX711 at 6-8. These figures, standing alone, do not lead to any conclusion regarding the difficulty or ease with which California regulates domestic partnerships and marriages.

constitutional expression of the people of California's will"? *See* Doc #605 at 18.

**ANSWER:**        If, as Plaintiffs maintain, Proposition 8 cannot be reconciled with its own non-retrospective application, as interpreted by the California Supreme Court, or with any other feature of California law, the remedy that would "yield to the constitutional expression of the people of California's will" is sustaining Proposition 8 by giving it retrospective effect or invalidating the conflicting feature of California law. Several factors support this conclusion. Proposition 8 is a provision of the California Constitution, and thus "constitute[s] the ultimate expression of the people's will." *In re Marriage Cases*, 183 P.3d 384, 450 (Cal. 2008). And through their votes on Proposition 22 and Proposition 8, the people of California have consistently expressed their commitment to maintaining the institution of marriage in its traditional form as the union of a man and a woman. A contrary result would entail the conclusion that the California judiciary and legislature—the very bodies the people's initiative process is designed to control—have the power to secure the invalidation of a state constitutional provision under the federal constitution by issuing judicial decisions or passing laws that rationally cannot be squared with the expressed will of the people. *Cf. Lofton*, 358 F.3d at 824 (executive's enforcement of decisions could not call into question the rationality of the legislature's action).

Dated: June 15, 2010

COOPER AND KIRK, PLLC
ATTORNEYS FOR DEFENDANT-INTERVENORS
DENNIS HOLLINGSWORTH, GAIL J. KNIGHT,
MARTIN F. GUTIERREZ, MARK A. JANSSON, AND
PROTECTMARRIAGE.COM – YES ON 8, A PROJECT
OF CALIFORNIA RENEWAL

By:    /s/Charles J. Cooper
       Charles J. Cooper