IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KRISTIN M PERRY, SANDRA B STIER,
PAUL T KATAMI and JEFFREY J
ZARRILLO,

        Plaintiffs,

CITY AND COUNTY OF SAN FRANCISCO,

        Plaintiff-Intervenor,

        v

ARNOLD SCHWARZENEGGER, in his
official capacity as Governor of
California; EDMUND G BROWN JR, in
his official capacity as Attorney
General of California; MARK B
HORTON, in his official capacity
as Director of the California
Department of Public Health and
State Registrar of Vital
Statistics; LINETTE SCOTT, in her
official capacity as Deputy
Director of Health Information &
Strategic Planning for the
California Department of Public
Health; PATRICK O'CONNELL, in his
official capacity as Clerk-
Recorder of the County of
Alameda; and DEAN C LOGAN, in his
official capacity as Registrar-
Recorder/County Clerk for the
County of Los Angeles,

        Defendants,

DENNIS HOLLINGSWORTH, GAIL J
KNIGHT, MARTIN F GUTIERREZ, HAK-
SHING WILLIAM TAM, MARK A
JANSSON and PROTECTMARRIAGE.COM –
YES ON 8, A PROJECT OF CALIFORNIA
RENEWAL, as official proponents
of Proposition 8,

        Defendant-Intervenors.
_____/

No C 09-2292 VRW

PRETRIAL PROCEEDINGS AND
TRIAL EVIDENCE

✦

CREDIBILITY DETERMINATIONS

✦

FINDINGS OF FACT

✦

CONCLUSIONS OF LAW

✦

ORDER

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                    TABLE OF CONTENTS

     BACKGROUND TO PROPOSITION 8  . . . . . . . . . . . . . . .  1

     PROCEDURAL HISTORY OF THIS ACTION  . . . . . . . . . . . .  3

     PLAINTIFFS' CASE AGAINST PROPOSITION 8 . . . . . . . . . .  5

     PROPONENTS' DEFENSE OF PROPOSITION 8 . . . . . . . . . . .  6

     TRIAL PROCEEDINGS AND SUMMARY OF TESTIMONY . . . . . . . . 10

CREDIBILITY DETERMINATIONS  . . . . . . . . . . . . . . . . . . 25

     PLAINTIFFS' WITNESSES  . . . . . . . . . . . . . . . . . . 25

     PROPONENTS' WITNESSES  . . . . . . . . . . . . . . . . . . 35

FINDINGS OF FACT  . . . . . . . . . . . . . . . . . . . . . . . 54

     THE PARTIES  . . . . . . . . . . . . . . . . . . . . . . . 54

     WHETHER ANY EVIDENCE SUPPORTS CALIFORNIA'S REFUSAL TO
     RECOGNIZE MARRIAGE BETWEEN TWO PEOPLE BECAUSE OF THEIR SEX  60

     WHETHER ANY EVIDENCE SHOWS CALIFORNIA HAS AN INTEREST
     IN DIFFERENTIATING BETWEEN SAME-SEX AND OPPOSITE-SEX UNIONS 71

     WHETHER THE EVIDENCE SHOWS THAT PROPOSITION 8 ENACTED
     A PRIVATE MORAL VIEW WITHOUT ADVANCING A LEGITIMATE
     GOVERNMENT INTEREST  . . . . . . . . . . . . . . . . . . . 85

CONCLUSIONS OF LAW  . . . . . . . . . . . . . . . . . . . . . . 109

     DUE PROCESS  . . . . . . . . . . . . . . . . . . . . . . . 109

     EQUAL PROTECTION . . . . . . . . . . . . . . . . . . . . . 117

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . 135

REMEDIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

**United States District Court**
For the Northern District of California

1    Plaintiffs challenge a November 2008 voter-enacted
2   amendment to the California Constitution ("Proposition 8" or "Prop
3   8").  Cal Const Art I, § 7.5.  In its entirety, Proposition 8
4   provides: "Only marriage between a man and a woman is valid or
5   recognized in California."  Plaintiffs allege that Proposition 8
6   deprives them of due process and of equal protection of the laws
7   contrary to the Fourteenth Amendment and that its enforcement by
8   state officials violates 42 USC § 1983.

9    Plaintiffs are two couples.  Kristin Perry and Sandra
10  Stier reside in Berkeley, California and raise four children
11  together.  Jeffrey Zarrillo and Paul Katami reside in Burbank,
12  California.  Plaintiffs seek to marry their partners and have been
13  denied marriage licenses by their respective county authorities on
14  the basis of Proposition 8.  No party contended, and no evidence at
15  trial suggested, that the county authorities had any ground to deny
16  marriage licenses to plaintiffs other than Proposition 8.

17   Having considered the trial evidence and the arguments of
18  counsel, the court pursuant to FRCP 52(a) finds that Proposition 8
19  is unconstitutional and that its enforcement must be enjoined.

20
21  BACKGROUND TO PROPOSITION 8

22   In November 2000, the voters of California adopted
23  Proposition 22 through the state's initiative process.  Entitled
24  the California Defense of Marriage Act, Proposition 22 amended the
25  state's Family Code by adding the following language: "Only
26  marriage between a man and a woman is valid or recognized in
27  California."  Cal Family Code § 308.5.  This amendment further
28  codified the existing definition of marriage as "a relationship

between a man and a woman."  In re Marriage Cases, 183 P3d 384, 407 (Cal 2008).

In February 2004, the mayor of San Francisco instructed county officials to issue marriage licenses to same-sex couples. The following month, the California Supreme Court ordered San Francisco to stop issuing such licenses and later nullified the marriage licenses that same-sex couples had received.  See Lockyer v City & County of San Francisco, 95 P3d 459 (Cal 2004).  The court expressly avoided addressing whether Proposition 22 violated the California Constitution.

Shortly thereafter, San Francisco and various other parties filed state court actions challenging or defending California's exclusion of same-sex couples from marriage under the state constitution.  These actions were consolidated in San Francisco superior court; the presiding judge determined that, as a matter of law, California's bar against marriage by same-sex couples violated the equal protection guarantee of Article I Section 7 of the California Constitution.  In re Coordination Proceeding, Special Title [Rule 1550(c)], 2005 WL 583129 (March 14, 2005).  The court of appeal reversed, and the California Supreme Court granted review.  In May 2008, the California Supreme Court invalidated Proposition 22 and held that all California counties were required to issue marriage licenses to same-sex couples.  See In re Marriage Cases, 189 P3d 384.  From June 17, 2008 until the passage of Proposition 8 in November of that year, San Francisco and other California counties issued approximately 18,000 marriage licenses to same-sex couples.

\\

**United States District Court**
For the Northern District of California

After the November 2008 election, opponents of Proposition 8 challenged the initiative through an original writ of mandate in the California Supreme Court as violating the rules for amending the California Constitution and on other grounds; the California Supreme Court upheld Proposition 8 against those challenges. <u>Strauss v Horton</u>, 207 P3d 48 (Cal 2009). <u>Strauss</u> leaves undisturbed the 18,000 marriages of same-sex couples performed in the four and a half months between the decision in <u>In re Marriage Cases</u> and the passage of Proposition 8. Since Proposition 8 passed, no same-sex couple has been permitted to marry in California.

PROCEDURAL HISTORY OF THIS ACTION

Plaintiffs challenge the constitutionality of Proposition 8 under the Fourteenth Amendment, an issue not raised during any prior state court proceeding. Plaintiffs filed their complaint on May 22, 2009, naming as defendants in their official capacities California's Governor, Attorney General and Director and Deputy Director of Public Health and the Alameda County Clerk-Recorder and the Los Angeles County Registrar-Recorder/County Clerk (collectively "the government defendants"). Doc #1. With the exception of the Attorney General, who concedes that Proposition 8 is unconstitutional, Doc #39, the government defendants refused to take a position on the merits of plaintiffs' claims and declined to defend Proposition 8. Doc #42 (Alameda County), Doc #41 (Los Angeles County), Doc #46 (Governor and Department of Public Health officials).

\\

United States District Court

For the Northern District of California

1    Defendant-intervenors, the official proponents of

2    Proposition 8 under California election law ("proponents"), were

3    granted leave in July 2009 to intervene to defend the

4    constitutionality of Proposition 8.  Doc #76.  On January 8, 2010,

5    Hak-Shing William Tam, an official proponent and defendant-

6    intervenor, moved to withdraw as a defendant, Doc #369; Tam's

7    motion is denied for the reasons stated in a separate order filed

8    herewith.  Plaintiff-intervenor City and County of San Francisco

9    ("CCSF" or "San Francisco") was granted leave to intervene in

10   August 2009.  Doc #160 (minute entry).

11       The court denied plaintiffs' motion for a preliminary

12   injunction on July 2, 2009, Doc #77 (minute entry), and denied

13   proponents' motion for summary judgment on October 14, 2009, Doc

14   #226 (minute entry).  Proponents moved to realign the Attorney

15   General as a plaintiff; the motion was denied on December 23, 2009,

16   Doc #319.  Imperial County, a political subdivision of California,

17   sought to intervene as a party defendant on December 15, 2009, Doc

18   #311; the motion is denied for the reasons addressed in a separate

19   order filed herewith.

20       The parties disputed the factual premises underlying

21   plaintiffs' claims and the court set the matter for trial.  The

22   action was tried to the court January 11-27, 2010.  The trial

23   proceedings were recorded and used by the court in preparing the

24   findings of fact and conclusions of law; the clerk is now DIRECTED

25   to file the trial recording under seal as part of the record.  The

26   parties may retain their copies of the trial recording pursuant to

27   the terms of the protective order herein, see Doc #672.

28   \\

4

Proponents' motion to order the copies' return, Doc #698, is accordingly DENIED.

PLAINTIFFS' CASE AGAINST PROPOSITION 8

The Due Process Clause provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." US Const Amend XIV, § 1. Plaintiffs contend that the freedom to marry the person of one's choice is a fundamental right protected by the Due Process Clause and that Proposition 8 violates this fundamental right because:

1.  It prevents each plaintiff from marrying the person of his or her choice;

2.  The choice of a marriage partner is sheltered by the Fourteenth Amendment from the state's unwarranted usurpation of that choice; and

3.  California's provision of a domestic partnership —— a status giving same-sex couples the rights and responsibilities of marriage without providing marriage —— does not afford plaintiffs an adequate substitute for marriage and, by disabling plaintiffs from marrying the person of their choice, invidiously discriminates, without justification, against plaintiffs and others who seek to marry a person of the same sex.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." US Const Amend XIV, § 1. According to plaintiffs, Proposition 8 violates the Equal Protection Clause because it:

1.  Discriminates against gay men and lesbians by denying them a right to marry the person of their choice whereas heterosexual men and women may do so freely; and

2.  Disadvantages a suspect class in preventing only gay men and lesbians, not heterosexuals, from marrying.

Plaintiffs argue that Proposition 8 should be subjected to heightened scrutiny under the Equal Protection Clause because gays

1  and lesbians constitute a suspect class.  Plaintiffs further

2  contend that Proposition 8 is irrational because it singles out

3  gays and lesbians for unequal treatment, as they and they alone may

4  not marry the person of their choice.  Plaintiffs argue that

5  Proposition 8 discriminates against gays and lesbians on the basis

6  of both sexual orientation and sex.

7       Plaintiffs conclude that because Proposition 8 is

8  enforced by state officials acting under color of state law and

9  because it has the effects plaintiffs assert, Proposition 8 is

10  actionable under 42 USC § 1983.  Plaintiffs seek a declaration that

11  Proposition 8 is invalid and an injunction against its enforcement.

12

13  PROPONENTS' DEFENSE OF PROPOSITION 8

14       Proponents organized the official campaign to pass

15  Proposition 8, known as ProtectMarriage.com —— Yes on 8, a Project

16  of California Renewal ("Protect Marriage").  Proponents formed and

17  managed the Protect Marriage campaign and ensured its efforts to

18  pass Proposition 8 complied with California election law.  See FF

19  13-17 below.  After orchestrating the successful Proposition 8

20  campaign, proponents intervened in this lawsuit and provided a

21  vigorous defense of the constitutionality of Proposition 8.

22       The ballot argument submitted to the voters summarizes

23  proponents' arguments in favor of Proposition 8 during the 2008

24  campaign.  The argument states:

25          Proposition 8 is simple and straightforward. * * *
    Proposition 8 is about preserving marriage; it's not an attack
26  on the gay lifestyle. * * * It protects our children from
    being taught in public schools that "same-sex marriage" is the
27  same as traditional marriage. * * * While death, divorce, or
    other circumstances may prevent the ideal, the best situation
28  for a child is to be raised by a married mother and father.

**\* \* \* If the gay marriage ruling [of the California Supreme Court] is not overturned, TEACHERS COULD BE REQUIRED to teach young children there is <u>no difference</u> between gay marriage and traditional marriage.**

**We should not accept a court decision that may result in public schools teaching our own kids that gay marriage is ok. \* \* \* [W]hile gays have the right to their private lives, <u>they do not have the right to redefine marriage</u> for everyone else.**

PX0001[1] California Voter Information Guide, California General Election, Tuesday, November 4, 2008 at PM 003365 (emphasis in original).

In addition to the ballot arguments, the Proposition 8 campaign presented to the voters of California a multitude of television, radio and internet-based advertisements and messages. The advertisements conveyed to voters that same-sex relationships are inferior to opposite-sex relationships and dangerous to children.  See FF 79-80 below.  The key premises on which Proposition 8 was presented to the voters thus appear to be the following:

1.  Denial of marriage to same-sex couples preserves marriage;

2.  Denial of marriage to same-sex couples allows gays and lesbians to live privately without requiring others, including (perhaps especially) children, to recognize or acknowledge the existence of same-sex couples;

3.  Denial of marriage to same-sex couples protects children;

4.  The ideal child-rearing environment requires one male parent and one female parent;

5.  Marriage is different in nature depending on the sex of the spouses, and an opposite-sex couple's marriage is superior to a same-sex couple's marriage; and

6.  Same-sex couples' marriages redefine opposite-sex couples' marriages.

---

[1] All cited evidence is available at http://ecf.cand.uscourts.gov/cand/09cv2292

United States District Court
For the Northern District of California

A state's interest in an enactment must of course be secular in nature. The state does not have an interest in enforcing private moral or religious beliefs without an accompanying secular purpose. See Lawrence v Texas, 539 US 558, 571 (2003); see also Everson v Board of Education of Ewing Township, 330 US 1, 15 (1947).

Perhaps recognizing that Proposition 8 must advance a secular purpose to be constitutional, proponents abandoned previous arguments from the campaign that had asserted the moral superiority of opposite-sex couples. Instead, in this litigation, proponents asserted that Proposition 8:

> 1.   Maintains California's definition of marriage as excluding same-sex couples;
>
> 2.   Affirms the will of California citizens to exclude same-sex couples from marriage;
>
> 3.   Promotes stability in relationships between a man and a woman because they naturally (and at times unintentionally) produce children; and
>
> 4.   Promotes "statistically optimal" child-rearing households; that is, households in which children are raised by a man and a woman married to each other.

Doc #8 at 17-18.

While proponents vigorously defended the constitutionality of Proposition 8, they did so based on legal conclusions and cross-examinations of some of plaintiffs' witnesses, eschewing all but a rather limited factual presentation.

Proponents argued that Proposition 8 should be evaluated solely by considering its language and its consistency with the "central purpose of marriage, in California and everywhere else, * * * to promote naturally procreative sexual relationships and to channel them into stable, enduring unions for the sake of producing

and raising the next generation."  Doc #172-1 at 21.  Proponents asserted that marriage for same-sex couples is not implicit in the concept of ordered liberty and thus its denial does not deprive persons seeking such unions of due process.  See generally Doc #172-1.  Nor, proponents continued, does the exclusion of same-sex couples in California from marriage deny them equal protection because, among other reasons, California affords such couples a separate parallel institution under its domestic partnership statutes.  Doc #172-1 at 75 et seq.

At oral argument on proponents' motion for summary judgment, the court posed to proponents' counsel the assumption that "the state's interest in marriage is procreative" and inquired how permitting same-sex marriage impairs or adversely affects that interest.  Doc #228 at 21.  Counsel replied that the inquiry was "not the legally relevant question," id, but when pressed for an answer, counsel replied: "Your honor, my answer is: I don't know. I don't know."  Id at 23.

Despite this response, proponents in their trial brief promised to "demonstrate that redefining marriage to encompass same-sex relationships" would effect some twenty-three specific harmful consequences.  Doc #295 at 13-14.  At trial, however, proponents presented only one witness, David Blankenhorn, to address the government interest in marriage.  Blankenhorn's testimony is addressed at length hereafter; suffice it to say that he provided no credible evidence to support any of the claimed adverse effects proponents promised to demonstrate.  During closing arguments, proponents again focused on the contention that "responsible procreation is really at the heart of society's

United States District Court
For the Northern District of California

1   interest in regulating marriage."  Tr 3038:7-8.  When asked to

2   identify the evidence at trial that supported this contention,

3   proponents' counsel replied, "you don't have to have evidence of

4   this point."  Tr 3037:25-3040:4.

5          Proponents' procreation argument, distilled to its

6   essence, is as follows: the state has an interest in encouraging

7   sexual activity between people of the opposite sex to occur in

8   stable marriages because such sexual activity may lead to pregnancy

9   and children, and the state has an interest in encouraging parents

10  to raise children in stable households.  Tr 3050:17-3051:10.  The

11  state therefore, the argument goes, has an interest in encouraging

12  all opposite-sex sexual activity, whether responsible or

13  irresponsible, procreative or otherwise, to occur within a stable

14  marriage, as this encourages the development of a social norm that

15  opposite-sex sexual activity should occur within marriage.  Tr

16  3053:10-24.  Entrenchment of this norm increases the probability

17  that procreation will occur within a marital union.  Because same-

18  sex couples' sexual activity does not lead to procreation,

19  according to proponents the state has no interest in encouraging

20  their sexual activity to occur within a stable marriage.  Thus,

21  according to proponents, the state's only interest is in opposite-

22  sex sexual activity.

23

24  TRIAL PROCEEDINGS AND SUMMARY OF TESTIMONY

25          The parties' positions on the constitutionality of

26  Proposition 8 raised significant disputed factual questions, and

27  for the reasons the court explained in denying proponents' motion

28  //

for summary judgment, Doc #228 at 72-91, the court set the matter for trial.

The parties were given a full opportunity to present evidence in support of their positions.  They engaged in significant discovery, including third-party discovery, to build an evidentiary record.  Both before and after trial, both in this court and in the court of appeals, the parties and third parties disputed the appropriate boundaries of discovery in an action challenging a voter-enacted initiative.  See, for example, Doc ##187, 214, 237, 259, 372, 513.

Plaintiffs presented eight lay witnesses, including the four plaintiffs, and nine expert witnesses.  Proponents' evidentiary presentation was dwarfed by that of plaintiffs. Proponents presented two expert witnesses and conducted lengthy and thorough cross-examinations of plaintiffs' expert witnesses but failed to build a credible factual record to support their claim that Proposition 8 served a legitimate government interest.

Although the evidence covered a range of issues, the direct and cross-examinations focused on the following broad questions:

WHETHER ANY EVIDENCE SUPPORTS CALIFORNIA'S REFUSAL TO RECOGNIZE MARRIAGE BETWEEN TWO PEOPLE BECAUSE OF THEIR SEX;

WHETHER ANY EVIDENCE SHOWS CALIFORNIA HAS AN INTEREST IN DIFFERENTIATING BETWEEN SAME-SEX AND OPPOSITE-SEX UNIONS; and

WHETHER THE EVIDENCE SHOWS PROPOSITION 8 ENACTED A PRIVATE MORAL VIEW WITHOUT ADVANCING A LEGITIMATE GOVERNMENT INTEREST.

Framed by these three questions and before detailing the court's credibility determinations and findings of fact, the court abridges the testimony at trial:

1

2

**WHETHER ANY EVIDENCE SUPPORTS CALIFORNIA'S REFUSAL TO**
**RECOGNIZE MARRIAGE BETWEEN TWO PEOPLE BECAUSE OF THEIR SEX**

3           All four plaintiffs testified that they wished to marry

4   their partners, and all four gave similar reasons.  Zarrillo wishes

5   to marry Katami because marriage has a "special meaning" that would

6   alter their relationships with family and others.  Zarrillo

7   described daily struggles that arise because he is unable to marry

8   Katami or refer to Katami as his husband.  Tr 84:1-17.  Zarrillo

9   described an instance when he and Katami went to a bank to open a

10  joint account, and "it was certainly an awkward situation walking

11  to the bank and saying, 'My partner and I want to open a joint bank

12  account,' and hearing, you know, 'Is it a business account?  A

13  partnership?'  It would just be a lot easier to describe the

14  situation —— might not make it less awkward for those individuals,

15  but it would make it —— crystalize it more by being able to say

16  * * * 'My husband and I are here to open a bank account.'"  Id.  To

17  Katami, marriage to Zarrillo would solidify their relationship and

18  provide them the foundation they seek to raise a family together,

19  explaining that for them, "the timeline has always been marriage

20  first, before family."  Tr 89:17-18.

21           Perry testified that marriage would provide her what she

22  wants most in life: a stable relationship with Stier, the woman she

23  loves and with whom she has built a life and a family.  To Perry,

24  marriage would provide access to the language to describe her

25  relationship with Stier: "I'm a 45-year-old woman.  I have been in

26  love with a woman for 10 years and I don't have a word to tell

27  anybody about that."  Tr 154:20-23.  Stier explained that marrying

28  Perry would make them feel included "in the social fabric."  Tr

175:22.  Marriage would be a way to tell "our friends, our family, our society, our community, our parents * * * and each other that this is a lifetime commitment * * * we are not girlfriends.  We are not partners.  We are married."  Tr 172:8-12.

        Plaintiffs and proponents presented expert testimony on the meaning of marriage.  Historian Nancy Cott testified about the public institution of marriage and the state's interest in recognizing and regulating marriages.  Tr 185:9-13.  She explained that marriage is "a couple's choice to live with each other, to remain committed to one another, and to form a household based on their own feelings about one another, and their agreement to join in an economic partnership and support one another in terms of the material needs of life."  Tr 201:9-14.  The state's primary purpose in regulating marriage is to create stable households.  Tr 222:13-17.

        Think tank founder David Blankenhorn testified that marriage is "a socially-approved sexual relationship between a man and a woman" with a primary purpose to "regulate filiation."  Tr 2742:9-10, 18.  Blankenhorn testified that others hold to an alternative and, to Blankenhorn, conflicting definition of marriage: "a private adult commitment" that focuses on "the tender feelings that the spouses have for one another."  Tr 2755:25-2756:1; 2756:10-2757:17; 2761:5-6.  To Blankenhorn, marriage is either a socially approved sexual relationship between a man and a woman for the purpose of bearing and raising children who are biologically related to both spouses or a private relationship between two consenting adults.

\\

United States District Court
For the Northern District of California

1    Cott explained that marriage as a social institution
2    encompasses a socially approved sexual union and an affective
3    relationship and, for the state, forms the basis of stable
4    households and private support obligations.

5    Both Cott and Blankenhorn addressed marriage as a
6    historical institution.  Cott pointed to consistent historical
7    features of marriage, including that civil law, as opposed to
8    religious custom, has always been supreme in regulating and
9    defining marriage in the United States, Tr 195:9-15, and that one's
10   ability to consent to marriage is a basic civil right, Tr 202:2-5.
11   Blankenhorn identified three rules of marriage (discussed further
12   in the credibility determinations, section I below), which he
13   testified have been consistent across cultures and times: (1) the
14   rule of opposites (the "man/woman" rule); (2) the rule of two; and
15   (3) the rule of sex.  Tr 2879:17-25.

16   Cott identified historical changes in the institution of
17   marriage, including the removal of race restrictions through court
18   decisions and the elimination of coverture and other gender-based
19   distinctions.  Blankenhorn identified changes that to him signify
20   the deinstitutionalization of marriage, including an increase in
21   births outside of marriage and an increasing divorce rate.

22   Both Cott and Blankenhorn testified that California
23   stands to benefit if it were to resume issuing marriage licenses to
24   same-sex couples.  Blankenhorn noted that marriage would benefit
25   same-sex couples and their children, would reduce discrimination
26   against gays and lesbians and would be "a victory for the worthy
27   ideas of tolerance and inclusion."  Tr 2850:12-13.  Despite the
28   multitude of benefits identified by Blankenhorn that would flow to

United States District Court
For the Northern District of California

the state, to gays and lesbians and to American ideals were California to recognize same-sex marriage, Blankenhorn testified that the state should not recognize same-sex marriage. Blankenhorn reasoned that the benefits of same-sex marriage are not valuable enough because same-sex marriage could conceivably weaken marriage as an institution. Cott testified that the state would benefit from recognizing same-sex marriage because such marriages would provide "another resource for stability and social order." Tr 252:19-23.

Psychologist Letitia Anne Peplau testified that couples benefit both physically and economically when they are married. Peplau testified that those benefits would accrue to same-sex as well as opposite-sex married couples. To Peplau, the desire of same-sex couples to marry illustrates the health of the institution of marriage and not, as Blankenhorn testified, the weakening of marriage. Economist Lee Badgett provided evidence that same-sex couples would benefit economically if they were able to marry and that same-sex marriage would have no adverse effect on the institution of marriage or on opposite-sex couples.

As explained in the credibility determinations, section I below, the court finds the testimony of Cott, Peplau and Badgett to support findings on the definition and purpose of civil marriage; the testimony of Blankenhorn is unreliable. The trial evidence provides no basis for establishing that California has an interest in refusing to recognize marriage between two people because of their sex.

\\

\\

United States District Court
For the Northern District of California

1

**WHETHER ANY EVIDENCE SHOWS CALIFORNIA HAS AN INTEREST IN
DIFFERENTIATING BETWEEN SAME-SEX AND OPPOSITE-SEX UNIONS**

2

3          Plaintiffs' experts testified that no meaningful

4  differences exist between same-sex couples and opposite-sex

5  couples.  Blankenhorn identified one difference: some opposite-sex

6  couples are capable of creating biological offspring of both

7  spouses while same-sex couples are not.

8          Psychologist Gregory Herek defined sexual orientation as

9  "an enduring sexual, romantic, or intensely affectional attraction

10 to men, to women, or to both men and women.  It's also used to

11 refer to an identity or a sense of self that is based on one's

12 enduring patterns of attraction.  And it's also sometimes used to

13 describe an enduring pattern of behavior."  Tr 2025:5-11.  Herek

14 explained that homosexuality is a normal expression of human

15 sexuality; the vast majority of gays and lesbians have little or no

16 choice in their sexual orientation; and therapeutic efforts to

17 change an individual's sexual orientation have not been shown to be

18 effective and instead pose a risk of harm to the individual.

19 Proponents did not present testimony to contradict Herek but

20 instead questioned him on data showing that some individuals report

21 fluidity in their sexual orientation.  Herek responded that the

22 data proponents presented does nothing to contradict his conclusion

23 that the vast majority of people are consistent in their sexual

24 orientation.

25          Peplau pointed to research showing that, despite

26 stereotypes suggesting gays and lesbians are unable to form stable

27 relationships, same-sex couples are in fact indistinguishable from

28 opposite-sex couples in terms of relationship quality and

16

stability.  Badgett testified that same-sex and opposite-sex couples are very similar in most economic and demographic respects. Peplau testified that the ability of same-sex couples to marry will have no bearing on whether opposite-sex couples choose to marry or divorce.

Social epidemiologist Ilan Meyer testified about the harm gays and lesbians have experienced because of Proposition 8.  Meyer explained that Proposition 8 stigmatizes gays and lesbians because it informs gays and lesbians that the State of California rejects their relationships as less valuable than opposite-sex relationships.  Proposition 8 also provides state endorsement of private discrimination.  According to Meyer, Proposition 8 increases the likelihood of negative mental and physical health outcomes for gays and lesbians.

Psychologist Michael Lamb testified that all available evidence shows that children raised by gay or lesbian parents are just as likely to be well-adjusted as children raised by heterosexual parents and that the gender of a parent is immaterial to whether an adult is a good parent.  When proponents challenged Lamb with studies purporting to show that married parents provide the ideal child-rearing environment, Lamb countered that studies on child-rearing typically compare married opposite-sex parents to single parents or step-families and have no bearing on families headed by same-sex couples.  Lamb testified that the relevant comparison is between families headed by same-sex couples and families headed by opposite-sex couples and that studies comparing these two family types show conclusively that having parents of different genders is irrelevant to child outcomes.

United States District Court
For the Northern District of California

Lamb and Blankenhorn disagreed on the importance of a biological link between parents and children.  Blankenhorn emphasized the importance of biological parents, relying on studies comparing children raised by married, biological parents with children raised by single parents, unmarried mothers, step families and cohabiting parents.  Tr 2769:14-24 (referring to DIX0026 Kristin Anderson Moore, Susan M Jekielek, and Carol Emig, <u>Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do about It</u>, Child Trends (June 2002)); Tr 2771:1-13 (referring to DIX0124 Sara McLanahan and Gary Sandefur, <u>Growing Up with a Single Parent: What Hurts, What Helps</u> (Harvard 1994)).  As explained in the credibility determinations, section I below, none of the studies Blankenhorn relied on isolates the genetic relationship between a parent and a child as a variable to be tested.  Lamb testified about studies showing that adopted children or children conceived using sperm or egg donors are just as likely to be well-adjusted as children raised by their biological parents.  Tr 1041:8-17.  Blankenhorn agreed with Lamb that adoptive parents "actually on some outcomes outstrip biological parents in terms of providing protective care for their children."  Tr 2795:3-5.

Several experts testified that the State of California and California's gay and lesbian population suffer because domestic partnerships are not equivalent to marriage.  Badgett explained that gays and lesbians are less likely to enter domestic partnerships than to marry, meaning fewer gays and lesbians have the protection of a state-recognized relationship.  Both Badgett and San Francisco economist Edmund Egan testified that states

receive greater economic benefits from marriage than from domestic partnerships.  Meyer testified that domestic partnerships actually stigmatize gays and lesbians even when enacted for the purpose of providing rights and benefits to same-sex couples.  Cott explained that domestic partnerships cannot substitute for marriage because domestic partnerships do not have the same social and historical meaning as marriage and that much of the value of marriage comes from its social meaning.  Peplau testified that little of the cultural esteem surrounding marriage adheres to domestic partnerships.

To illustrate his opinion that domestic partnerships are viewed by society as different from marriage, Herek pointed to a letter sent by the California Secretary of State to registered domestic partners in 2004 informing them of upcoming changes to the law and suggesting dissolution of their partnership to avoid any unwanted financial effects.  Tr 2047:15-2048:5, PX2265 (Letter from Kevin Shelley, California Secretary of State, to Registered Domestic Partners).  Herek concluded that a similar letter to married couples would not have suggested divorce.  Tr 2048:6-13.

The experts' testimony on domestic partnerships is consistent with the testimony of plaintiffs, who explained that domestic partnerships do not satisfy their desire to marry.  Stier, who has a registered domestic partnership with Perry, explained that "there is certainly nothing about domestic partnership * * * that indicates the love and commitment that are inherent in marriage."  Tr 171:8-11.  Proponents did not challenge plaintiffs' experts on the point that marriage is a socially superior status to domestic partnership; indeed, proponents stipulated that "[t]here

19

is a significant symbolic disparity between domestic partnership and marriage."  Doc #159-2 at 6.

Proponents' cross-examinations of several experts challenged whether people can be categorized based on their sexual orientation.  Herek, Meyer and Badgett responded that sexual orientation encompasses behavior, identity and attraction and that most people are able to answer questions about their sexual orientation without formal training.  According to the experts, researchers may focus on one element of sexual orientation depending on the purpose of the research and sexual orientation is not a difficult concept for researchers to apply.

As explained in the credibility determinations, section I below, and the findings of fact, section II below, the testimony shows that California has no interest in differentiating between same-sex and opposite-sex unions.

### WHETHER THE EVIDENCE SHOWS PROPOSITION 8 ENACTED A PRIVATE MORAL VIEW WITHOUT ADVANCING A LEGITIMATE GOVERNMENT INTEREST

The testimony of several witnesses disclosed that a primary purpose of Proposition 8 was to ensure that California confer a policy preference for opposite-sex couples over same-sex couples based on a belief that same-sex pairings are immoral and should not be encouraged in California.

Historian George Chauncey testified about a direct relationship between the Proposition 8 campaign and initiative campaigns from the 1970s targeting gays and lesbians; like earlier campaigns, the Proposition 8 campaign emphasized the importance of protecting children and relied on stereotypical images of gays and

lesbians, despite the lack of any evidence showing that gays and lesbians pose a danger to children. Chauncey concluded that the Proposition 8 campaign did not need to explain what children were to be protected from; the advertisements relied on a cultural understanding that gays and lesbians are dangerous to children.

This understanding, Chauncey observed, is an artifact of the discrimination gays and lesbians faced in the United States in the twentieth century. Chauncey testified that because homosexual conduct was criminalized, gays and lesbians were seen as criminals; the stereotype of gay people as criminals therefore became pervasive. Chauncey noted that stereotypes of gays and lesbians as predators or child molesters were reinforced in the mid-twentieth century and remain part of current public discourse. Lamb explained that this stereotype is not at all credible, as gays and lesbians are no more likely than heterosexuals to pose a threat to children.

Political scientist Gary Segura provided many examples of ways in which private discrimination against gays and lesbians is manifested in laws and policies. Segura testified that negative stereotypes about gays and lesbians inhibit political compromise with other groups: "It's very difficult to engage in the give-and-take of the legislative process when I think you are an inherently bad person. That's just not the basis for compromise and negotiation in the political process." Tr 1561:6-9. Segura identified religion as the chief obstacle to gay and lesbian political advances. Political scientist Kenneth Miller disagreed with Segura's conclusion that gays and lesbians lack political power, Tr 2482:4-8, pointing to some successes on the state and

United States District Court
For the Northern District of California

national level and increased public support for gays and lesbians, but agreed that popular initiatives can easily tap into a strain of antiminority sentiment and that at least some voters supported Proposition 8 because of anti-gay sentiment.

Proponent Hak-Shing William Tam testified about his role in the Proposition 8 campaign. Tam spent substantial time, effort and resources campaigning for Proposition 8. As of July 2007, Tam was working with Protect Marriage to put Proposition 8 on the November 2008 ballot. Tr 1900:13-18. Tam testified that he is the secretary of the America Return to God Prayer Movement, which operates the website "1man1woman.net." Tr 1916:3-24. 1man1woman.net encouraged voters to support Proposition 8 on grounds that homosexuals are twelve times more likely to molest children, Tr 1919:3-1922:21, and because Proposition 8 will cause states one-by-one to fall into Satan's hands, Tr 1928:6-13. Tam identified NARTH (the National Association for Research and Therapy of Homosexuality) as the source of information about homosexuality, because he "believe[s] in what they say." Tr 1939:1-9. Tam identified "the internet" as the source of information connecting same-sex marriage to polygamy and incest. Tr 1957:2-12. Protect Marriage relied on Tam and, through Tam, used the website 1man1woman.net as part of the Protect Marriage Asian/Pacific Islander outreach. Tr 1976:10-15; PX2599 (Email from Sarah Pollo, Account Executive, Schubert Flint Public Affairs (Aug 22, 2008) attaching meeting minutes). Tam signed a Statement of Unity with Protect Marriage, PX2633, in which he agreed not to put forward "independent strategies for public messaging." Tr 1966:16-1967:16.
\\

United States District Court

For the Northern District of California

Katami and Stier testified about the effect Proposition 8 campaign advertisements had on their well-being. Katami explained that he was angry and upset at the idea that children needed to be protected from him. After watching a Proposition 8 campaign message, PX0401 (Video, Tony Perkins, Miles McPherson, and Ron Prentice Asking for Support of Proposition 8), Katami stated that "it just demeans you. It just makes you feel like people are putting efforts into discriminating against you." Tr 108:14-16. Stier, as the mother of four children, was especially disturbed at the message that Proposition 8 had something to do with protecting children. She felt the campaign messages were "used to sort of try to educate people or convince people that there was a great evil to be feared and that evil must be stopped and that evil is us, I guess. * * * And the very notion that I could be part of what others need to protect their children from was just —— it was more than upsetting. It was sickening, truly. I felt sickened by that campaign." Tr 177:9-18.

Egan and Badgett testified that Proposition 8 harms the State of California and its local governments economically. Egan testified that San Francisco faces direct and indirect economic harms as a consequence of Proposition 8. Egan explained that San Francisco lost and continues to lose money because Proposition 8 slashed the number of weddings performed in San Francisco. Egan explained that Proposition 8 decreases the number of married couples in San Francisco, who tend to be wealthier than single people because of their ability to specialize their labor, pool resources and access state and employer-provided benefits. Proposition 8 also increases the costs associated with

discrimination against gays and lesbians.  Proponents challenged only the magnitude and not the existence of the harms Egan identified.  Badgett explained that municipalities throughout California and the state government face economic disadvantages similar to those Egan identified for San Francisco.

For the reasons stated in the sections that follow, the evidence presented at trial fatally undermines the premises underlying proponents' proffered rationales for Proposition 8.  An initiative measure adopted by the voters deserves great respect. The considered views and opinions of even the most highly qualified scholars and experts seldom outweigh the determinations of the voters.  When challenged, however, the voters' determinations must find at least some support in evidence.  This is especially so when those determinations enact into law classifications of persons. Conjecture, speculation and fears are not enough.  Still less will the moral disapprobation of a group or class of citizens suffice, no matter how large the majority that shares that view.  The evidence demonstrated beyond serious reckoning that Proposition 8 finds support only in such disapproval.  As such, Proposition 8 is beyond the constitutional reach of the voters or their representatives.

\\
\\
\\
\\
\\
\\
\\

I

CREDIBILITY DETERMINATIONS

**PLAINTIFFS' WITNESSES**

Plaintiffs presented the testimony of the four plaintiffs, four lay witnesses and nine expert witnesses. Proponents did not challenge the credibility of the lay witnesses or the qualifications of the expert witnesses to offer opinion testimony.

Having observed and considered the testimony presented, the court concludes that plaintiffs' lay witnesses provided credible testimony:

1.	Jeffrey Zarrillo, a plaintiff, testified about coming out as a gay man.  (Tr 77:12-15: "Coming out is a very personal and internal process. * * * You have to get to the point where you're comfortable with yourself, with your own identity and who you are.")  Zarrillo described his nine-year relationship with Katami.  (Tr 79:20-21: "He's the love of my life.  I love him probably more than I love myself.")

2.	Paul Katami, a plaintiff, testified about his reasons for wanting to marry Zarrillo.  (Tr 89:1-3: "Being able to call him my husband is so definitive, it changes our relationship." Tr 90:24-91:2: "I can safely say that if I were married to Jeff, that I know that the struggle that we have validating ourselves to other people would be diminished and potentially eradicated.")  Katami explained why it was difficult for him to tell others about his sexual orientation even though he has

United States District Court

For the Northern District of California

been gay for "as long as [he] can remember." (Tr 91:17-92:2: "I struggled with it quite a bit. Being surrounded by what seemed everything heterosexual * * * you tend to try and want to fit into that.") Katami described how the Proposition 8 campaign messages affected him. (Tr 97:1-11: "[P]rotect the children is a big part of the [Proposition 8] campaign. And when I think of protecting your children, you protect them from people who will perpetrate crimes against them, people who might get them hooked on a drug, a pedophile, or some person that you need protecting from. You don't protect yourself from an amicable person or a good person. You protect yourself from things that can harm you physically, emotionally. And so insulting, even the insinuation that I would be part of that category.")

3. Kristin Perry, a plaintiff, testified about her relationship with Stier. (Tr 139:16-17; 140:13-14: Stier is "maybe the sparkliest person I ever met. * * * [T]he happiest I feel is in my relationship with [Stier.]") Perry described why she wishes to marry. (Tr 141:22-142:1: "I want to have a stable and secure relationship with her that then we can include our children in. And I want the discrimination we are feeling with Proposition 8 to end and for a more positive, joyful part of our lives to * * * begin.") Perry described the reason she and Stier registered as domestic partners. (Tr 153:16-17: "[W]e are registered domestic partners based on just legal advice that we received for creating an estate plan.")

\\

26

4.   Sandra Stier, a plaintiff, testified about her relationship
     with Perry, with whom she raises their four children.   (Tr
     167:3-5: "I have fallen in love one time and it's with
     [Perry]."). Stier explained why she wants to marry Perry
     despite their domestic partnership.   (Tr 171:8-13: "[T]here is
     certainly nothing about domestic partnership as an institution
     — not even as an institution, but as a legal agreement that
     indicates the love and commitment that are inherent in
     marriage, and [domestic partnership] doesn't have anything to
     do for us with the nature of our relationship and the type of
     enduring relationship we want it to be.")

5.   Helen Zia, a lay witness, testified regarding her experiences
     with discrimination and about how her life changed when she
     married her wife in 2008.   (Tr 1235:10-13: "I'm beginning to
     understand what I've always read — marriage is the joining of
     two families.")

6.   Jerry Sanders, the mayor of San Diego and a lay witness,
     testified regarding how he came to believe that domestic
     partnerships are discriminatory.   (Tr 1273:10-17: On a last-
     minute decision not to veto a San Diego resolution supporting
     same-sex marriage: "I was saying that one group of people did
     not deserve the same dignity and respect, did not deserve the
     same symbolism about marriage.")

7.   Ryan Kendall, a lay witness, testified about his experience as
     a teenager whose parents placed him in therapy to change his

27

**United States District Court**
For the Northern District of California

sexual orientation from homosexual to heterosexual.  (Tr 1521:20: "I knew I was gay.  I knew that could not be changed.")  Kendall described the mental anguish he endured because of his family's disapproval of his sexual orientation.  (Tr 1508:9-10, 1511:2-16: "I remember my mother looking at me and telling me that I was going to burn in hell. * * * [M]y mother would tell me that she hated me, or that I was disgusting, or that I was repulsive.  Once she told me that she wished she had had an abortion instead of a gay son.")

8.  Hak-Shing William Tam, an official proponent of Proposition 8 and an intervening defendant, was called as an adverse witness and testified about messages he disseminated during the Proposition 8 campaign.  (Tr 1889:23-25: "Q: Did you invest substantial time, effort, and personal resources in campaigning for Proposition 8?  A: Yes.")

      Plaintiffs called nine expert witnesses.  As the education and experience of each expert show, plaintiffs' experts were amply qualified to offer opinion testimony on the subjects identified.  Moreover, the experts' demeanor and responsiveness showed their comfort with the subjects of their expertise.  For those reasons, the court finds that each of plaintiffs' proffered experts offered credible opinion testimony on the subjects identified.

1.  Nancy Cott, a historian, testified as an expert in the history of marriage in the Untied States.  Cott testified that

marriage has always been a secular institution in the United States, that regulation of marriage eased the state's burden to govern an amorphous populace and that marriage in the United States has undergone a series of transformations since the country was founded.

a.   PX2323 Cott CV: Cott is a professor of American history at Harvard University and the director of the Schlesinger Library on the History of Women in America;

b.   PX2323: In 1974, Cott received a PhD from Brandeis University in the history of American civilization;

c.   PX2323: Cott has published eight books, including Public Vows: A History of Marriage and the Nation (2000), and has published numerous articles and essays;

d.   Tr 186:5-14: Cott devoted a semester in 1998 to researching and teaching a course at Yale University in the history of marriage in the United States;

e.   Tr 185:9-13; 188:6-189:10: Cott's marriage scholarship focuses on marriage as a public institution and as a structure regulated by government for social benefit.

2.   George Chauncey, a historian, was qualified to offer testimony on social history, especially as it relates to gays and lesbians.  Chauncey testified about the widespread private and public discrimination faced by gays and lesbians in the twentieth century and the ways in which the Proposition 8 campaign echoed that discrimination and relied on stereotypes against gays and lesbians that had developed in the twentieth century.

a.   PX2322 Chauncey CV: Chauncey is a professor of history and American studies at Yale University; from 1991-2006, Chauncey was a professor of history at the University of Chicago;

b.   Tr 357:15-17: Chauncey received a PhD in history from Yale University in 1989;

United States District Court

For the Northern District of California

c.   PX2322: Chauncey has authored or edited books on the subject of gay and lesbian history, including <u>Gay New York: Gender, Urban Culture, and the Making of the Gay Male World, 1890-1940</u> (1994) and <u>Hidden from History: Reclaiming the Gay and Lesbian Past</u> (1989, ed);

d.   Tr 359:17-360:11: Chauncey relies on government records, interviews, diaries, films and advertisements along with studies by other historians and scholars in conducting his research;

e.   Tr 360:12-21: Chauncey teaches courses in twentieth century United States history, including courses on lesbian and gay history.

3.   Lee Badgett, an economist, testified as an expert on demographic information concerning gays and lesbians, same-sex couples and children raised by gays and lesbians, the effects of the exclusion of same-sex couples from the institution of marriage and the effect of permitting same-sex couples to marry on heterosexual society and the institution of marriage. Badgett offered four opinions: (1) Proposition 8 has inflicted substantial economic harm on same-sex couples and their children; (2) allowing same-sex couples to marry would not have any adverse effect on the institution of marriage or on opposite-sex couples; (3) same-sex couples are very similar to opposite-sex couples in most economic and demographic respects; and (4) Proposition 8 has imposed economic losses on the State of California and on California counties and municipalities.   Tr 1330:9-1331:5.

a.   PX2321 Badgett CV: Badgett is a professor of economics at UMass Amherst and the director of the Williams Institute at UCLA School of Law;

b.   PX2321: Badgett received her PhD in economics from UC Berkeley in 1990;

c.   Tr 1325:2-17; PX2321: Badgett has written two books on gay and lesbian relationships and same-sex marriage:

*Money, Myths, and Change: The Economic Lives of Lesbians and Gay Men* (2001) and *When Gay People Get Married: What Happens When Societies Legalize Same-Sex Marriage* (2009); Badgett has also published several articles on the same subjects;

d.   Tr 1326:4-13: Badgett co-authored two reports (PX1268 Brad Sears and M V Lee Badgett, *The Impact of Extending Marriage to Same-Sex Couples on the California Budget*, The Williams Institute (June 2008) and PX1283 M V Lee Badgett and R Bradley Sears, *Putting a Price on Equality? The Impact of Same-Sex Marriage on California's Budget*, 16 Stan L & Pol Rev 197 (2005)) analyzing the fiscal impact of allowing same-sex couples to marry in California;

e.   Tr 1326:18-1328:4: Badgett has been invited to speak at many universities and at the American Psychological Association convention on the economics of same-sex relationships;

f.   Tr 1329:6-22: Badgett has testified before federal and state government bodies about domestic partner benefits and antidiscrimination laws.

4.   Edmund A Egan, the chief economist in the San Francisco Controller's Office, testified for CCSF as an expert in urban and regional economic policy.  Egan conducted an economic study of the prohibition of same-sex marriage on San Francisco's economy and concluded that the prohibition negatively affects San Francisco's economy in many ways.  Tr 683:19-684:19.

a.   Tr 678:1-7: As the chief economist for CCSF, Egan directs the Office of Economic Analysis and prepares economic impact analysis reports for pending legislation;

b.   Tr 681:16-682:25: In preparing economic impact reports, Egan relies on government data and reports, private reports and independent research to determine whether legislation has "real regulatory power" and the effects of the legislation on private behavior;

c.   PX2324 Egan CV: Egan received a PhD in city and regional planning from UC Berkeley in 1997;

d.   Tr 679:1-14: Egan is an adjunct faculty member at UC Berkeley and teaches graduate students on regional and urban economics and regional and city planning.

5.   Letitia Anne Peplau, a psychologist, was qualified as an expert on couple relationships within the field of psychology. Peplau offered four opinions: (1) for adults who choose to enter marriage, that marriage is often associated with many important benefits; (2) research has shown remarkable similarities between same-sex and opposite-sex couples; (3) if same-sex couples are permitted to marry, they will likely experience the same benefits from marriage as opposite-sex couples; and (4) permitting same-sex marriage will not harm opposite-sex marriage.  Tr 574:6-19.

a.   PX2329 Peplau CV: Peplau is a professor of psychology and vice chair of graduate studies in psychology at UCLA;

b.   Tr 569:10-12: Peplau's research focuses on social psychology, which is a branch of psychology that focuses on human relationships and social influence; specifically, Peplau studies close personal relationships, sexual orientation and gender;

c.   Tr 571:13: Peplau began studying same-sex relationships in the 1970s;

d.   Tr 571:19-572:13; PX2329: Peplau has published or edited about ten books, authored about 120 peer-reviewed articles and published literature reviews on psychology, relationships and sexuality.

6.   Ilan Meyer, a social epidemiologist, testified as an expert in public health with a focus on social psychology and psychiatric epidemiology.  Meyer offered three opinions: (1) gays and lesbians experience stigma, and Proposition 8 is an example of stigma; (2) social stressors affect gays and lesbians; and (3) social stressors negatively affect the mental health of gays and lesbians.  Tr 817:10-19.

a. PX2328 Meyer CV: Meyer is an associate professor of sociomedical sciences at Columbia University's Mailman School of Public Health;

b. PX2328; Tr 807:20-808:7: Meyer received a PhD in sociomedical sciences from Columbia University in 1993;

c. Tr 810:19-811:16: Meyer studies the relationship between social issues and structures and patterns of mental health outcomes with a specific focus on lesbian, gay and bisexual populations;

d. Tr 812:9-814:22: Meyer has published about forty peer-reviewed articles, teaches a course on gay and lesbian issues in public health, has received numerous awards for his professional work and has edited and reviewed journals and books.

7. Gregory Herek, a psychologist, testified as an expert in social psychology with a focus on sexual orientation and stigma. Herek offered opinions concerning: (1) the nature of sexual orientation and how sexual orientation is understood in the fields of psychology and psychiatry; (2) the amenability of sexual orientation to change through intervention; and (3) the nature of stigma and prejudice as they relate to sexual orientation and Proposition 8. Tr 2023:8-14.

a. PX2326 Herek CV: Herek is a professor of psychology at UC Davis;

b. PX2326: Herek received a PhD in personality and social psychology from UC Davis in 1983;

c. Tr 2018:5-13: Social psychology is the intersection of psychology and sociology in that it focuses on human behavior within a social context; Herek's dissertation focused on heterosexuals' attitudes towards lesbians and gay men;

d. Tr 2020:1-5: Herek regularly teaches a course on sexual orientation and prejudice;

e. PX2326; Tr 2021:12-25; Tr 2022:11-14: Herek serves on editorial boards of peer-reviewed journals and has published over 100 articles and chapters on sexual orientation, stigma and prejudice.

United States District Court
For the Northern District of California

8.  Michael Lamb, a psychologist, testified as an expert on the developmental psychology of children, including the developmental psychology of children raised by gay and lesbian parents.  Lamb offered two opinions: (1) children raised by gays and lesbians are just as likely to be well-adjusted as children raised by heterosexual parents; and (2) children of gay and lesbian parents would benefit if their parents were able to marry.  Tr 1009:23-1010:4.

    a.  PX2327 Lamb CV: Lamb is a professor and head of the Department of Social and Developmental Psychology at the University of Cambridge in England;

    b.  Tr 1003:24-1004:6; PX2327: Lamb was the head of the section on social and emotional development of the National Institute of Child Health and Human Development in Washington DC for seventeen years;

    c.  Tr 1007:2-1008:8; PX2327: Lamb has published approximately 500 articles, many about child adjustment, has edited 40 books in developmental psychology, reviews about 100 articles a year and serves on editorial boards on several academic journals;

    d.  PX2327: Lamb received a PhD from Yale University in 1976.

9.  Gary Segura, a political scientist, testified as an expert on the political power or powerlessness of minority groups in the United States, and of gays and lesbians in particular.  Segura offered three opinions: (1) gays and lesbians do not possess a meaningful degree of political power; (2) gays and lesbians possess less power than groups granted judicial protection; and (3) the conclusions drawn by proponents' expert Miller are troubling and unpersuasive.  Tr 1535:3-18.

    a.  PX2330 Segura CV: Segura is a professor of political science at Stanford University and received a PhD in political science from the University of Illinois in 1992;

United States District Court
For the Northern District of California

b.  Tr 1525:1-10: Segura and a colleague, through the Stanford Center for Democracy, operate the American National Elections Studies, which provides political scientists with data about the American electorate's views about politics;

c.  Tr 1525:11-19: Segura serves on the editorial boards of major political science journals;

d.  Tr 1525:22-1526:24: Segura's work focuses on political representation and whether elected officials respond to the voting public; within the field of political representation, Segura focuses on minorities;

e.  PX2330; Tr 1527:25-1528:14: Segura has published about twenty-five peer-reviewed articles, authored fifteen chapters in edited volumes and has presented at between twenty and forty conferences in the past ten years;

f.  PX2330; Tr 1528:21-24: Segura has published three pieces specific to gay and lesbian politics and political issues;

g.  Tr 1532:11-1533:17: Segura identified the methods he used and materials he relied on to form his opinions in this case.  Relying on his background as a political scientist, Segura read literature on gay and lesbian politics, examined the statutory status of gays and lesbians and public attitudes about gays and lesbians, determined the presence or absence of gays and lesbians in political office and considered ballot initiatives about gay and lesbian issues.

PROPONENTS' WITNESSES

Proponents elected not to call the majority of their designated witnesses to testify at trial and called not a single official proponent of Proposition 8 to explain the discrepancies between the arguments in favor of Proposition 8 presented to voters and the arguments presented in court.  Proponents informed the court on the first day of trial, January 11, 2010, that they were withdrawing Loren Marks, Paul Nathanson, Daniel N Robinson and Katherine Young as witnesses.  Doc #398 at 3.  Proponents' counsel stated in court on Friday, January 15, 2010, that their witnesses

United States District Court
For the Northern District of California

1   **"were extremely concerned about their personal safety, and did not**

2   **want to appear with any recording of any sort, whatsoever."  Tr**

3   **1094:21-23.**

4   **The timeline shows, however, that proponents failed to**

5   **make any effort to call their witnesses after the potential for**

6   **public broadcast in the case had been eliminated.  The Supreme**

7   **Court issued a temporary stay of transmission on January 11, 2010**

8   **and a permanent stay on January 13, 2010.  See Hollingsworth v**

9   **Perry, 130 SCt 1132 (Jan 11, 2010); Hollingsworth v Perry, 130 SCt**

10  **705 (Jan 13, 2010).  The court withdrew the case from the Ninth**

11  **Circuit's pilot program on broadcasting on January 15, 2010.  Doc**

12  **#463.  Proponents affirmed the withdrawal of their witnesses that**

13  **same day.  Tr 1094:21-23.  Proponents did not call their first**

14  **witness until January 25, 2010.  The record does not reveal the**

15  **reason behind proponents' failure to call their expert witnesses.**

16  **Plaintiffs entered into evidence the deposition testimony**

17  **of two of proponents' withdrawn witnesses, as their testimony**

18  **supported plaintiffs' claims.  Katherine Young was to testify on**

19  **comparative religion and the universal definition of marriage.  Doc**

20  **#292 at 4 (proponents' December 7 witness list) Doc #286-4 at 2**

21  **(expert report).  Paul Nathanson was to testify on religious**

22  **attitudes towards Proposition 8.  Doc #292 at 4 (proponents'**

23  **December 7 witness list); Doc #280-4 at 2 (expert report).**

24  **Young has been a professor of religious studies at McGill**

25  **University since 1978.  PX2335 Young CV.  She received her PhD in**

26  **history of religions and comparative religions from McGill in 1978.**

27  **Id.  Young testified at her deposition that homosexuality is a**

28  **normal variant of human sexuality and that same-sex couples possess**

36

the same desire for love and commitment as opposite-sex couples. PX2545 (dep tr); PX2544 (video of same). Young also explained that several cultures around the world and across centuries have had variations of marital relationships for same-sex couples. Id.

Nathanson has a PhD in religious studies from McGill University and is a researcher at McGill's Faculty for Religious Studies. PX2334 Nathanson CV. Nathanson is also a frequent lecturer on consequences of marriage for same-sex couples and on gender and parenting. Id. Nathanson testified at his deposition that religion lies at the heart of the hostility and violence directed at gays and lesbians and that there is no evidence that children raised by same-sex couples fare worse than children raised by opposite-sex couples. PX2547 (dep tr); PX2546 (video of same).

Proponents made no effort to call Young or Nathanson to explain the deposition testimony that plaintiffs had entered into the record or to call any of the withdrawn witnesses after potential for contemporaneous broadcast of the trial proceedings had been eliminated. Proponents called two witnesses:

1. David Blankenhorn, founder and president of the Institute for American Values, testified on marriage, fatherhood and family structure. Plaintiffs objected to Blankenhorn's qualification as an expert. For the reasons explained hereafter, Blankenhorn lacks the qualifications to offer opinion testimony and, in any event, failed to provide cogent testimony in support of proponents' factual assertions.

2.   Kenneth P Miller, a professor of government at Claremont
     McKenna College, testified as an expert in American and
     California politics.  Plaintiffs objected that Miller lacked
     sufficient expertise specific to gays and lesbians.  Miller's
     testimony sought to rebut only a limited aspect of plaintiffs'
     equal protection claim relating to political power.

### David Blankenhorn

          Proponents called David Blankenhorn as an expert on
marriage, fatherhood and family structure.  Blankenhorn received a
BA in social studies from Harvard College and an MA in comparative
social history from the University of Warwick in England.  Tr
2717:24-2718:3; DIX2693 (Blankenhorn CV).  After Blankenhorn
completed his education, he served as a community organizer in low-
income communities, where he developed an interest in community and
family institutions after "seeing the weakened state" of those
institutions firsthand, "especially how children were living
without their fathers."  Tr 2719:3-18.  This experience led
Blankenhorn in 1987 to found the Institute for American Values,
which he describes as "a nonpartisan think tank" that focuses
primarily on "issues of marriage, family, and child well-being."
Tr 2719:20-25.  The Institute commissions research and releases
reports on issues relating to "fatherhood, marriage, family
structure [and] child well-being."  Tr 2720:6-19.  The Institute
also produces an annual report "on the state of marriage in
America."  Tr 2720:24-25.

          Blankenhorn has published two books on the subjects of
marriage, fatherhood and family structure: <u>Fatherless America:</u>

United States District Court
For the Northern District of California

<u>Confronting Our Most Urgent Social Problem</u> (HarperCollins 1995),
DIX0108, and <u>The Future of Marriage</u> (Encounter Books 2006),
DIX0956.  Tr 2722:2-12.  Blankenhorn has edited four books about
family structure and marriage, Tr 2728:13-22, and has co-edited or
co-authored several publications about marriage.  Doc #302 at 21.

Plaintiffs challenge Blankenhorn's qualifications as an
expert because none of his relevant publications has been subject
to a traditional peer-review process, Tr 2733:2-2735:4, he has no
degree in sociology, psychology or anthropology despite the
importance of those fields to the subjects of marriage, fatherhood
and family structure, Tr 2735:15-2736:9, and his study of the
effects of same-sex marriage involved "read[ing] articles and
ha[ving] conversations with people, and tr[ying] to be an informed
person about it," Tr 2736:13-2740:3.  See also Doc #285
(plaintiffs' motion in limine).  Plaintiffs argue that
Blankenhorn's conclusions are not based on "objective data or
discernible methodology," Doc #285 at 25, and that Blankenhorn's
conclusions are instead based on his interpretation of selected
quotations from articles and reports, id at 26.

The court permitted Blankenhorn to testify but reserved
the question of the appropriate weight to give to Blankenhorn's
opinions.  Tr 2741:24-2742:3.  The court now determines that
Blankenhorn's testimony constitutes inadmissible opinion testimony
that should be given essentially no weight.

Federal Rule of Evidence 702 provides that a witness may
be qualified as an expert "by knowledge, skill, experience,
training, or education."  The testimony may only be admitted if it
"is based upon sufficient facts or data" and "is the product of

United States District Court
For the Northern District of California

reliable principles and methods." Id. Expert testimony must be both relevant and reliable, with a "basis in the knowledge and experience of [the relevant] discipline." Kumho Tire Co v Carmichael, 526 US 137, 147, 149 (1999) (citing Daubert v Merrell Dow Pharm, 509 US 579, 589, 592 (1993)).

While proponents correctly assert that formal training in the relevant disciplines and peer-reviewed publications are not dispositive of expertise, education is nevertheless important to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 US at 152. Formal training shows that a proposed expert adheres to the intellectual rigor that characterizes the field, while peer-reviewed publications demonstrate an acceptance by the field that the work of the proposed expert displays "at least the minimal criteria" of intellectual rigor required in that field. Daubert v Merrell Dow Pharm, 43 F3d 1311, 1318 (9th Cir 1995) (on remand) ("Daubert II").

The methodologies on which expert testimony may be based are "not limited to what is generally accepted," Daubert II at 1319 n11, but "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." General Electric Co v Joiner, 522 US 136, 146 (1997). The party proffering the evidence "must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable * * * method and followed it faithfully." Daubert II, 43 F3d at 1319 n11.

Several factors are relevant to an expert's reliability:
(1) "whether [a method] can be (and has been) tested"; (2) "whether
the [method] has been subjected to peer review and publication";
(3) "the known or potential rate of error"; (4) "the existence and
maintenance of standards controlling the [method's] operation"; (5)
"a * * * degree of acceptance" of the method within "a relevant
* * * community," Daubert, 509 US at 593-94; (6) whether the expert
is "proposing to testify about matters growing naturally and
directly out of research they have conducted independent of the
litigation," Daubert II, 43 F3d at 1317; (7) whether the expert has
unjustifiably extrapolated from an accepted premise to an unfounded
conclusion, see Joiner, 522 US at 145-146; (8) whether the expert
has adequately accounted for obvious alternative explanations, see
generally Claar v Burlington Northern RR Co, 29 F3d 499 (9th Cir
1994); (9) whether the expert "employs in the courtroom the same
level of intellectual rigor that characterizes the practice of an
expert in the relevant field," Kumho Tire, 526 US at 152; and (10)
whether the field of expertise claimed by the expert is known to
reach reliable results for the type of opinion the expert would
give, see id at 151.

Blankenhorn offered opinions on the definition of
marriage, the ideal family structure and potential consequences of
state recognition of marriage for same-sex couples.  None of
Blankenhorn's opinions is reliable.

Blankenhorn's first opinion is that marriage is "a
socially-approved sexual relationship between a man and a woman."
Tr 2742:9-10.  According to Blankenhorn, the primary purpose of
marriage is to "regulate filiation."  Tr 2742:18.  Blankenhorn

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

testified that the alternative and contradictory definition of
marriage is that "marriage is fundamentally a private adult
commitment." Tr 2755:25-2756:1; Tr 2756:4-2757:17 (DIX0093 Law
Commission of Canada, Beyond Conjugality: Recognizing and
Supporting Close Personal Adult Relationships (2001)).  He
described this definition as focused on "the tender feelings that
spouses have for one another," Tr 2761:5-6.  Blankenhorn agrees
this "affective dimension" of marriage exists but asserts that
marriage developed independently of affection.  Tr 2761:9-2762:3.

         Blankenhorn thus sets up a dichotomy for the definition
of marriage: either marriage is defined as a socially approved
sexual relationship between a man and a woman for the purpose of
bearing and raising children biologically related to both spouses,
or marriage is a private relationship between two consenting
adults.  Blankenhorn did not address the definition of marriage
proposed by plaintiffs' expert Cott, which subsumes Blankenhorn's
dichotomy.  Cott testified that marriage is "a couple's choice to
live with each other, to remain committed to one another, and to
form a household based on their own feelings about one another, and
their agreement to join in an economic partnership and support one
another in terms of the material needs of life."  Tr 201:9-14.
There is nothing in Cott's definition that limits marriage to its
"affective dimension" as defined by Blankenhorn, and yet Cott's
definition does not emphasize the biological relationship linking
dependents to both spouses.

         Blankenhorn relied on the quotations of others to define
marriage and provided no explanation of the meaning of the passages
he cited or their sources.  Tr 2744:4-2755:16.  Blankenhorn's mere

recitation of text in evidence does not assist the court in
understanding the evidence because reading, as much as hearing, "is
within the ability and experience of the trier of fact."  Beech
Aircraft Corp v United States, 51 F3d 834, 842 (9th Cir 1995).

        Blankenhorn testified that his research has led him to
conclude there are three universal rules that govern marriage: (1)
the rule of opposites (the "man/woman" rule); (2) the rule of two;
and (3) the rule of sex.  Tr 2879:17-25.  Blankenhorn explained
that there are "no or almost no exceptions" to the rule of
opposites, Tr 2882:14, despite some instances of ritualized same-
sex relationships in some cultures, Tr 2884:25-2888:16.
Blankenhorn explained that despite the widespread practice of
polygamy across many cultures, the rule of two is rarely violated,
because even within a polygamous marriage, "each marriage is
separate."  Tr 2892:1-3; Tr 2899:16-2900:4 ("Q: Is it your view
that that man who has married one wife, and then another wife, and
then another wife, and then another wife, and then another wife,
and now has five wives, and they are all his wives at the same
time, that that marriage is consistent with your rule of two? * * *
A: I concur with Bronislaw Malinowski, and others, who say that
that is consistent with the two rule of marriage.").  Finally,
Blankenhorn could only hypothesize instances in which the rule of
sex would be violated, including where "[h]e's in prison for life,
he's married, and he is not in a system in which any conjugal
visitation is allowed."  Tr 2907:13-19.

        Blankenhorn's interest and study on the subjects of
marriage, fatherhood and family structure are evident from the
record, but nothing in the record other than the "bald assurance"

of Blankenhorn, <u>Daubert II</u>, 43 F3d at 1316, suggests that
Blankenhorn's investigation into marriage has been conducted to the
"same level of intellectual rigor" characterizing the practice of
anthropologists, sociologists or psychologists. See <u>Kumho Tire</u>,
526 US at 152. Blankenhorn gave no explanation of the methodology
that led him to his definition of marriage other than his review of
others' work. The court concludes that Blankenhorn's proposed
definition of marriage is "connected to existing data only by the
<u>ipse dixit</u>" of Blankenhorn and accordingly rejects it. See <u>Joiner</u>,
522 US at 146.

Blankenhorn's second opinion is that a body of evidence
supports the conclusion that children raised by their married,
biological parents do better on average than children raised in
other environments. Tr 2767:11-2771:11. The evidence Blankenhorn
relied on to support his conclusion compares children raised by
married, biological parents with children raised by single parents,
unmarried mothers, step families and cohabiting parents. Tr
2769:14-24 (referring to DIX0026 Kristin Anderson Moore, Susan M
Jekielek, and Carol Emig, <u>Marriage from a Child's Perspective: How
Does Family Structure Affect Children, and What Can We Do about It</u>,
Child Trends (June 2002)); Tr 2771:1-11 (referring to DIX0124 Sara
McLanahan and Gary Sandefur, <u>Growing Up with a Single Parent: What
Hurts, What Helps</u> (Harvard 1994)).

Blankenhorn's conclusion that married biological parents
provide a better family form than married non-biological parents is
not supported by the evidence on which he relied because the
evidence does not, and does not claim to, compare biological to
non-biological parents. Blankenhorn did not in his testimony

44

consider any study comparing children raised by their married
biological parents to children raised by their married adoptive
parents.  Blankenhorn did not testify about a study comparing
children raised by their married biological parents to children
raised by their married parents who conceived using an egg or sperm
donor.  The studies Blankenhorn relied on compare various family
structures and do not emphasize biology.  Tr 2768:9-2772:6.  The
studies may well support a conclusion that parents' marital status
may affect child outcomes.  The studies do not, however, support a
conclusion that the biological connection between a parent and his
or her child is a significant variable for child outcomes.  The
court concludes that "there is simply too great an analytical gap
between the data and the opinion proffered."  <u>Joiner</u>, 522 US at
146.  Blankenhorn's reliance on biology is unsupported by evidence,
and the court therefore rejects his conclusion that a biological
link between parents and children influences children's outcomes.

Blankenhorn's third opinion is that recognizing same-sex
marriage will lead to the deinstitutionalization of marriage.  Tr
2772:21-2775:23.  Blankenhorn described deinstitutionalization as a
process through which previously stable patterns and rules forming
an institution (like marriage) slowly erode or change.  Tr 2773:4-
24.  Blankenhorn identified several manifestations of
deinstitutionalization: out-of-wedlock childbearing, rising divorce
rates, the rise of non-marital cohabitation, increasing use of
assistive reproductive technologies and marriage for same-sex
couples.  Tr 2774:20-2775:23.  To the extent Blankenhorn believes
that same-sex marriage is both a cause and a symptom of
deinstitutionalization, his opinion is tautological.  Moreover, no

United States District Court
For the Northern District of California

credible evidence supports Blankenhorn's conclusion that same-sex marriage could lead to the other manifestations of deinstitutionalization.

Blankenhorn relied on sociologist Andrew Cherlin (DIX0049 The Deinstitutionalization of American Marriage, 66 J Marriage & Family 848 (Nov 2004)) and sociologist Norval Glen (DIX0060 The Struggle for Same-Sex Marriage, 41 Society 25 (Sept/Oct 2004)) to support his opinion that same-sex marriage may speed the deinstitutionalization of marriage. Neither of these sources supports Blankenhorn's conclusion that same-sex marriage will further deinstitutionalize marriage, as neither source claims same-sex marriage as a cause of divorce or single parenthood. Nevertheless, Blankenhorn testified that "the further deinstitutionalization of marriage caused by the legalization of same-sex marriage," Tr 2782:3-5, would likely manifest itself in "all of the consequences [already discussed]." Tr 2782:15-16.

Blankenhorn's book, The Future of Marriage, DIX0956, lists numerous consequences of permitting same-sex couples to marry, some of which are the manifestations of deinstitutionalization listed above. Blankenhorn explained that the list of consequences arose from a group thought experiment in which an idea was written down if someone suggested it. Tr 2844:1-12; DIX0956 at 202. Blankenhorn's group thought experiment began with the untested assumption that "gay marriage, like almost any major social change, would be likely to generate a diverse range of consequences." DIX0956 at 202. The group failed to consider that recognizing the marriage of same-sex couples might lead only to minimal, if any, social consequences.

During trial, Blankenhorn was presented with a study that posed an empirical question whether permitting marriage or civil unions for same-sex couples would lead to the manifestations Blankenhorn described as indicative of deinstitutionalization. After reviewing and analyzing available evidence, the study concludes that "laws permitting same-sex marriage or civil unions have no adverse effect on marriage, divorce, and abortion rates, the percent of children born out of wedlock, or the percent of households with children under 18 headed by women." PX2898 (Laura Langbein & Mark A Yost, Jr, Same-Sex Marriage and Negative Externalities, 90 Soc Sci Q 2 (June 2009) at 305-306). Blankenhorn had not seen the study before trial and was thus unfamiliar with its methods and conclusions. Nevertheless, Blankenhorn dismissed the study and its results, reasoning that its authors "think that [the conclusion is] so self-evident that anybody who has an opposing point of view is not a rational person." Tr 2918:19-21.

Blankenhorn's concern that same-sex marriage poses a threat to the institution of marriage is further undermined by his testimony that same-sex marriage and opposite-sex marriage operate almost identically. During cross-examination, Blankenhorn was shown a report produced by his Institute in 2000 explaining the six dimensions of marriage: (1) legal contract; (2) financial partnership; (3) sacred promise; (4) sexual union; (5) personal bond; and (6) family-making bond. PX2879 (Coalition for Marriage, Family and Couples Education, et al, The Marriage Movement: A Statement of Principles (Institute for American Values 2000)). Blankenhorn agreed that same-sex marriages and opposite-sex marriages would be identical across these six dimensions. Tr

47

2913:8-2916:18.  When referring to the sixth dimension, a family-making bond, Blankenhorn agreed that same-sex couples could "raise" children.  Tr 2916:17.

Blankenhorn gave absolutely no explanation why manifestations of the deinstitutionalization of marriage would be exacerbated (and not, for example, ameliorated) by the presence of marriage for same-sex couples.  His opinion lacks reliability, as there is simply too great an analytical gap between the data and the opinion Blankenhorn proffered.  See Joiner, 522 US at 146.

Blankenhorn was unwilling to answer many questions directly on cross-examination and was defensive in his answers. Moreover, much of his testimony contradicted his opinions. Blankenhorn testified on cross-examination that studies show children of adoptive parents do as well or better than children of biological parents.  Tr 2794:12-2795:5.  Blankenhorn agreed that children raised by same-sex couples would benefit if their parents were permitted to marry.  Tr 2803:6-15.  Blankenhorn also testified he wrote and agrees with the statement "I believe that today the principle of equal human dignity must apply to gay and lesbian persons.  In that sense, insofar as we are a nation founded on this principle, we would be more American on the day we permitted same-sex marriage than we were the day before."  DIX0956 at 2; Tr 2805:6-2806:1.

Blankenhorn stated he opposes marriage for same-sex couples because it will weaken the institution of marriage, despite his recognition that at least thirteen positive consequences would flow from state recognition of marriage for same-sex couples, including: (1) by increasing the number of married couples who

48

United States District Court
For the Northern District of California

might be interested in adoption and foster care, same-sex marriage might well lead to fewer children growing up in state institutions and more children growing up in loving adoptive and foster families; and (2) same-sex marriage would signify greater social acceptance of homosexual love and the worth and validity of same-sex intimate relationships.  Tr 2839:16-2842:25; 2847:1-2848:3; DIX0956 at 203-205.

Blankenhorn's opinions are not supported by reliable evidence or methodology and Blankenhorn failed to consider evidence contrary to his view in presenting his testimony.  The court therefore finds the opinions of Blankenhorn to be unreliable and entitled to essentially no weight.

Kenneth P Miller

Proponents called Kenneth P Miller, a professor of government at Claremont McKenna College, as an expert in American and California politics.  Tr 2427:10-12.  Plaintiffs conducted voir dire to examine whether Miller had sufficient expertise to testify authoritatively on the subject of the political power of gays and lesbians.  Tr 2428:3-10.  Plaintiffs objected to Miller's qualification as an expert in the areas of discrimination against gays and lesbians and gay and lesbian political power but did not object to his qualification as an expert on initiatives.  Tr 2435:21-2436:4.

Miller received a PhD from the University of California (Berkeley) in 2002 in political science and is a professor of government at Claremont McKenna College.  Doc #280-6 at 39-44 (Miller CV).  Plaintiffs contend that Miller lacks sufficient

49

expertise to offer an opinion on the relative political power of gay men and lesbians. Having considered Miller's background, experience and testimony, the court concludes that, while Miller has significant experience with politics generally, he is not sufficiently familiar with gay and lesbian politics specifically to offer opinions on gay and lesbian political power.

Miller testified that factors determining a group's political power include money, access to lawmakers, the size and cohesion of a group, the ability to attract allies and form coalitions and the ability to persuade. Tr 2437:7-14. Miller explained why, in his opinion, these factors favor a conclusion that gays and lesbians have political power. Tr 2442-2461.

Miller described religious, political and corporate support for gay and lesbian rights. Miller pointed to failed initiatives in California relating to whether public school teachers should be fired for publicly supporting homosexuality and whether HIV-positive individuals should be quarantined or reported as examples of political successes for gays and lesbians. Tr 2475:21-2477:16. Miller testified that political powerlessness is the inability to attract the attention of lawmakers. Tr 2487:1-2. Using that test, Miller concluded that gays and lesbians have political power both nationally and in California. Tr 2487:10-21.

Plaintiffs cross-examined Miller about his knowledge of the relevant scholarship and data underlying his opinions. Miller admitted that proponents' counsel provided him with most of the "materials considered" in his expert report. Tr 2497:13-2498:22; PX0794A (annotated index of materials considered). See also Doc #280 at 23-35 (Appendix to plaintiffs' motion in limine listing 158

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  sources that appear on both Miller's list of materials considered
2  and the list of proponents' withdrawn expert, Paul Nathanson,
3  including twenty-eight websites listing the same "last visited"
4  date).  Miller stated that he did not know at the time of his
5  deposition the status of antidiscrimination provisions to protect
6  gays and lesbians at the state and local level, Tr 2506:3-2507:1,
7  could only identify Don't Ask, Don't Tell and the federal Defense
8  of Marriage Act as examples of official discrimination against gays
9  and lesbians, Tr 2524:4-2525:2, and that he has read no or few
10  books or articles by George Chauncey, Miriam Smith, Shane Phelan,
11  Ellen Riggle, Barry Tadlock, William Eskridge, Mark Blasius,
12  Urvashi Vaid, Andrew Sullivan and John D'Emilio, Tr 2518:15-
13  2522:25.

14       Miller admitted he had not investigated the scope of
15  private employment discrimination against gays and lesbians and had
16  no reason to dispute the data on discrimination presented in PX0604
17  (The Employment Non-Discrimination Act of 2009, Hearings on HR 3017
18  before the House Committee on Education and Labor, 111 Cong, 1st
19  Sess (Sept 23, 2009) (testimony of R Bradley Sears, Executive
20  Director of the Williams Institute)).  Tr 2529:15-2530:24.  Miller
21  did not know whether gays and lesbians have more or less political
22  power than African Americans, either in California or nationally,
23  because he had not researched the question.  Tr 2535:9-2539:13.

24       Plaintiffs questioned Miller on his earlier scholarship
25  criticizing the California initiative process because initiatives
26  eschew compromise and foster polarization, undermine the authority
27  and flexibility of representative government and violate norms of
28  openness, accountability, competence and fairness.  Tr 2544:10-

2547:7.   In 2001 Miller wrote that he was especially concerned that initiative constitutional amendments undermine representative democracy.   Tr 2546:14-2548:15.

Plaintiffs questioned Miller on data showing 84 percent of those who attend church weekly voted yes on Proposition 8, 54 percent of those who attend church occasionally voted no on Proposition 8 and 83 percent of those who never attend church voted no on Proposition 8.   Tr 2590:10-2591:7; PX2853 at 9 <u>Proposition 8 Local Exit Polls - Election Center 2008</u>, CNN).   Plaintiffs also asked about polling data showing 56 percent of those with a union member in the household voted yes on Proposition 8.   Tr 2591:25-2592:6; PX2853 at 13.   Miller stated he had no reason to doubt the accuracy of the polling data.   Tr 2592:7-8.   Miller did not explain how the data in PX2853 are consistent with his conclusion that many religious groups and labor unions are allies of gays and lesbians.

Miller testified that he did not investigate the extent of anti-gay harassment in workplaces or schools.   Tr 2600:7-17, 2603:9-24.   Miller stated he had not investigated the ways in which anti-gay stereotypes may have influenced Proposition 8 voters.   Tr 2608:19-2609:1.   Miller agreed that a principle of political science holds that it is undesirable for a religious majority to impose its religious views on a minority.   Tr 2692:16-2693:7.

Miller explained on redirect that he had reviewed "most" of the materials listed in his expert report and that he "tried to review all of them."   Tr 2697:11-16.   Miller testified that he believes initiatives relating to marriage for same-sex couples arise as a check on the courts and do not therefore implicate a fear of the majority imposing its will on the minority.   Tr

United States District Court

For the Northern District of California

2706:17-2707:6.  Miller explained that prohibiting same-sex couples from marriage "wasn't necessarily invidious discrimination against" gays and lesbians.  Tr 2707:20-24.

The credibility of Miller's opinions relating to gay and lesbian political power is undermined by his admissions that he: (1) has not focused on lesbian and gay issues in his research or study; (2) has not read many of the sources that would be relevant to forming an opinion regarding the political power of gays and lesbians; (3) has no basis to compare the political power of gays and lesbians to the power of other groups, including African-Americans and women; and (4) could not confirm that he personally identified the vast majority of the sources that he cited in his expert report, see PX0794A.  Furthermore, Miller undermined the credibility of his opinions by conceding that gays and lesbians currently face discrimination and that current discrimination is relevant to a group's political power.

Miller's credibility was further undermined because the opinions he offered at trial were inconsistent with the opinions he expressed before he was retained as an expert.  Specifically, Miller previously wrote that gays and lesbians, like other minorities, are vulnerable and powerless in the initiative process, see PX1869 (Kenneth Miller, <u>Constraining Populism: The Real Challenge of Initiative Reform</u>, 41 Santa Clara L Rev 1037 (2001)), contradicting his trial testimony that gays and lesbians are not politically vulnerable with respect to the initiative process.  Miller admitted that at least some voters supported Proposition 8 based on anti-gay sentiment.  Tr 2606:11-2608:18.

\\

For the foregoing reasons, the court finds that Miller's opinions on gay and lesbian political power are entitled to little weight and only to the extent they are amply supported by reliable evidence.

## II

### FINDINGS OF FACT[2]

Having considered the evidence presented at trial, the credibility of the witnesses and the legal arguments presented by counsel, the court now makes the following findings of fact pursuant to FRCP 52(a). The court relies primarily on the testimony and exhibits cited herein, although uncited cumulative documentary evidence in the record and considered by the court also supports the findings.

**THE PARTIES**

**Plaintiffs**

1.  Kristin Perry and Sandra Stier reside together in Alameda County, California and are raising four children. They are lesbians in a committed relationship who seek to marry.

2.  On May 21, 2009, Perry and Stier applied for a marriage license from defendant O'Connell, the Alameda County Clerk-Recorder, who denied them a license due to Proposition 8 because they are of the same sex.

---

[2] To the extent any of the findings of fact should more properly be considered conclusions of law, they shall be deemed as such.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

3.   Paul Katami and Jeffrey Zarrillo reside together in Los
     Angeles County, California.  They are gay men in a committed
     relationship who seek to marry.

4.   On May 20, 2009, Katami and Zarrillo applied for a marriage
     license from defendant Logan, the Los Angeles County Clerk,
     who denied them a license due to Proposition 8 because they
     are of the same sex.

     **Plaintiff-Intervenor**

5.   San Francisco is a charter city and county under the
     California Constitution and laws of the State of California.
     Cal Const Art XI, § 5(a); SF Charter Preamble.

6.   San Francisco is responsible for issuing marriage licenses,
     performing civil marriage ceremonies and maintaining vital
     records of marriages.  Cal Fam Code §§ 350(a), 401(a), 400(b).

     **Defendants**

7.   Arnold Schwarzenegger is the Governor of California.

8.   Edmund G Brown, Jr is the Attorney General of California.

9.   Mark B Horton is the Director of the California Department of
     Public Health and the State Registrar of Vital Statistics of
     the State of California.  In his official capacity, Horton is
     responsible for prescribing and furnishing the forms for
     marriage license applications, the certificate of registry of
     marriage, including the license to marry, and the marriage
     certificate.  See Doc #46 ¶ 15 (admitting Doc #1 ¶ 15).

10.  Linette Scott is the Deputy Director of Health Information &
     Strategic Planning for the California Department of Public

Health.  Scott reports to Horton and is the official responsible for prescribing and furnishing the forms for marriage license applications, the certificate of registry of marriage, including the license to marry, and the marriage certificate.  See Doc #46 ¶ 16 (admitting Doc #1 ¶ 16).

11.  Patrick O'Connell is the Alameda County Clerk-Registrar and is responsible for maintaining vital records of marriages, issuing marriage licenses and performing civil marriage ceremonies.  See Doc #42 ¶ 17 (admitting Doc #1 ¶ 17).

12.  Dean C Logan is the Los Angeles County Registrar-Recorder/County Clerk and is responsible for maintaining vital records of marriages, issuing marriage licenses and performing civil marriage ceremonies.  Doc #41 ¶ 13 (admitting Doc #1 ¶ 18).

**Defendant-Intevenors (Proponents)**

13.  Dennis Hollingsworth, Gail J Knight, Martin F Gutierrez, Hak-Shing William Tam and Mark A Jansson are the "official proponents" of Proposition 8 under California law.

a.  Doc #8-6 at ¶ 19 (Decl of David Bauer);

b.  Doc #8 at 14 (Proponents' motion to intervene: "Proponents complied with a myriad of legal requirements to procure Proposition 8's enactment, such as (1) filing forms prompting the State to prepare Proposition 8's Title and Summary, (2) paying the initiative filing fee, (3) drafting legally compliant signature petitions, (4) overseeing the collection of more than 1.2 million signatures, (5) instructing signature-collectors on state-law guidelines, and (6) obtaining certifications from supervising signature-gatherers.").

United States District Court
For the Northern District of California

14. Proponents dedicated substantial time, effort, reputation and personal resources in campaigning for Proposition 8.

    a.   Tr 1889:23-1893:15: Tam spent the majority of his hours in 2008 working to pass Proposition 8;

    b.   Doc #8-1 at ¶ 27 (Decl of Dennis Hollingsworth);

    c.   Doc #8-2 at ¶ 27 (Decl of Gail J Knight);

    d.   Doc #8-3 (Decl of Martin F Gutierrez: describing activities to pass and enforce Proposition 8);

    e.   Doc #8-4 at ¶ 27 (Decl of Hak-Shing William Tam);

    f.   Doc #8-5 at ¶ 27 (Decl of Mark A Jansson).

15. Proponents established ProtectMarriage.com — Yes on 8, a Project of California Renewal ("Protect Marriage") as a "primarily formed ballot measure committee" under California law.

    a.   Doc #8-1 at ¶ 13 (Decl of Dennis Hollingsworth);

    b.   Doc #8-2 at ¶ 13 (Decl of Gail J Knight);

    c.   Doc #8-3 at ¶ 13 (Decl of Martin F Gutierrez);

    d.   Doc #8-4 at ¶ 13 (Decl of Hak-Shing William Tam);

    e.   Doc #8-5 at ¶ 13 (Decl of Mark A Jansson).

16. The Protect Marriage Executive Committee includes Ron Prentice, Edward Dolejsi, Mark A Jansson and Doug Swardstrom. Andrew Pugno acts as General Counsel. David Bauer is the Treasurer and officer of record for Protect Marriage.

    a.   Doc #372 at 4 (identifying the above individuals based on the declaration of Ron Prentice, submitted under seal on November 6, 2009);

    b.   PX0209 Letter from Protect Marriage to Jim Abbott (Oct 20, 2008): Letter to a business that donated money to a group opposing Proposition 8 demanding "a donation of a like amount" to Protect Marriage. The letter is signed by: Ron Prentice, Protect Marriage Chairman; Andrew Pugno, Protect Marriage General Counsel; Edward Dolejsi, Executive Director, California Catholic Conference; and

Mark Jansson, a Protect Marriage Executive Committee Member.

17. Protect Marriage was responsible for all aspects of the campaign to qualify Proposition 8 for the ballot and enact it into law.

    a.   Doc #8-6 at ¶¶ 4, 6, 10, 11 (Decl of David Bauer);

    b.   PX2403 Email from Kenyn Cureton, Vice-President, Family Research Council, to Prentice at 1 (Aug 25, 2008): Cureton attaches a kit to be distributed to Christian voters through churches to help them promote Proposition 8. Cureton explains to Prentice that Family Research Council ("FRC") found out from Pugno that FRC "need[s] to take FRC logos off of the CA version of the videos (legal issues) and just put ProtectMarriage.com on everything" and FRC is "making those changes.";

    c.   PX2640 Email from Pugno to Tam (Feb 5, 2008) at 2: "I do not think it is likely, but in the event you are contacted by the media or anyone else regarding the Marriage Amendment [Proposition 8], I would encourage you to please refer all calls to the campaign phone number. * * * It is crucial that our public message be very specific.";

    d.   PX2640 Email from Pugno to Tam (Feb 5, 2008) at 2: Pugno explains that Tam is "an exception" to Protect Marriage's press strategy and should speak on behalf of the campaign directly to the Chinese press. See Tr 1906:9-12;

    e.   Tr 1892:9-12 (Tam: In October 2007, Tam was waiting for instructions from Protect Marriage regarding when he should start collecting signatures to place Proposition 8 on the ballot.);

    f.   Tr 1904:3-5 (Tam: Tam participated in a debate because Protect Marriage told him to do so.);

    g.   Tr 1998:23-1999:11 (Tam: Protect Marriage reimbursed individuals who ran print and television ads in support of Proposition 8.);

    h.   Tr 1965:15-1966:4 (Tam: Tam signed a "Statement of Unity with respect to the Proposition 8 campaign" both "[o]n behalf of [him]self and on behalf of the Traditional Family Coalition.");

    i.   PX2476 Email from Tam to list of supporters (Oct 22, 2007): "I'm still waiting for ProtectMarriage.com for

1    instructions of when we would start the signature
2    collection for [Proposition 8]."

3  **18.** Protect Marriage is a "broad coalition" of individuals and

4    organizations, including the Church of Jesus Christ of

5    Latter-Day Saints (the "LDS Church"), the California Catholic

6    Conference and a large number of evangelical churches.

7    **a.**  PX2310 About ProtectMarriage.com, Protect Marriage
8         (2008): Protect Marriage "about" page identifies a
          "broad-based coalition" in support of Proposition 8;

9    **b.**  PX0577 Frank Schubert and Jeff Flint, <u>Passing Prop 8</u>,
          Politics (Feb 2009) at 47: "We had the support of
10        virtually the entire faith community in California.";

11   **c.**  Tr 1585:20-1590:2 (Segura: Churches, because of their
          hierarchical structure and ability to speak to
12        congregations once a week, have a "very strong
          communication network" with churchgoers.  A network of
13        "1700 pastors" working with Protect Marriage in support
          of Proposition 8 is striking because of "the sheer
14        breadth of the [religious] organization and its level of
          coordination with Protect Marriage.");
15
     **d.**  Tr 1590:23-1591:12 (Segura: An "organized effort" and
16        "formal association" of religious groups formed the
          "broad-based coalition" of Protect Marriage.);
17
     **e.**  Tr 1609:12-1610:6 (Segura: The coalition between the
18        Catholic Church and the LDS Church against a minority
          group was "unprecedented.");
19
20   **f.**  PX2597 Email from Prentice to Lynn Vincent (June 19,
          2008): Prentice explains that "[f]rom the initial efforts
21        in 1998 for the eventual success of Prop 22 in 2000, a
          coalition of many organizations has existed, including
22        evangelical, Catholic and Mormon groups" and identifies
          Catholic and evangelical leaders working to pass
          Proposition 8;
23
24   **g.**  PX0390A Video, Ron Prentice Addressing Supporters of
          Proposition 8, Excerpt: Prentice explains the importance
25        of contributions from the LDS Church, Catholic bishops
          and evangelical ministers to the Protect Marriage
26        campaign;

27   **h.**  PX0577 Frank Schubert and Jeff Flint, <u>Passing Prop 8</u>,
          Politics at 46 (Feb 2009): "By this time, leaders of the
28        Church of Jesus Christ of Latter Day Saints had endorsed
          Prop 8 and joined the campaign executive committee.  Even

though the LDS were the last major denomination to join the campaign, their members were immensely helpful in early fundraising, providing much-needed contributions while we were busy organizing Catholic and Evangelical fundraising efforts."

**WHETHER ANY EVIDENCE SUPPORTS CALIFORNIA'S REFUSAL TO RECOGNIZE MARRIAGE BETWEEN TWO PEOPLE BECAUSE OF THEIR SEX**

19. Marriage in the United States has always been a civil matter. Civil authorities may permit religious leaders to solemnize marriages but not to determine who may enter or leave a civil marriage. Religious leaders may determine independently whether to recognize a civil marriage or divorce but that recognition or lack thereof has no effect on the relationship under state law.

a. Tr 195:13-196:21 (Cott: "[C]ivil law has always been supreme in defining and regulating marriage. * * * [Religious practices and ceremonies] have no particular bearing on the validity of marriages.  Any clerics, ministers, rabbis, et cetera, that were accustomed to * * * performing marriages, only do so because the state has given them authority to do that.");

b. Cal Fam Code §§ 400, 420.

20. A person may not marry unless he or she has the legal capacity to consent to marriage.

a. Tr 202:2-15 (Cott: Marriage "is a basic civil right.  It expresses the right of a person to have the liberty to be able to consent validly.");

b. Cal Fam Code §§ 300, 301.

21. California, like every other state, has never required that individuals entering a marriage be willing or able to procreate.

a. Cal Fam Code § 300 et seq;

b. In re Marriage Cases, 183 P3d 384, 431 (Cal 2008) ("This contention [that marriage is limited to opposite-sex couples because only a man and a woman can produce

children biologically related to both] is fundamentally flawed[.]");

c.  <u>Lawrence v Texas</u>, 539 US 558, 604-05 (2003) (Scalia, J, dissenting) ("If moral disapprobation of homosexual conduct is 'no legitimate state interest' for purposes of proscribing that conduct * * * what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising 'the liberty protected by the Constitution'?  Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.");

d.  Tr 222:22-223:22 (Cott: "There has never been a requirement that a couple produce children in order to have a valid marriage.  Of course, people beyond procreative age have always been allowed to marry. * * * [P]rocreative ability has never been a qualification for marriage.").

22.  When California became a state in 1850, marriage was understood to require a husband and a wife.  See Cal Const, Art XI § 14 (1849); <u>In re Marriage Cases</u>, 183 P3d at 407.

23.  The states have always required the parties to give their free consent to a marriage.  Because slaves were considered property of others at the time, they lacked the legal capacity to consent and were thus unable to marry.  After emancipation, former slaves viewed their ability to marry as one of the most important new rights they had gained.  Tr 202:2-203:12 (Cott).

24.  Many states, including California, had laws restricting the race of marital partners so that whites and non-whites could not marry each other.

a.  Tr 228:9-231:3 (Cott: In "[a]s many as 41 states and territories," laws placed restrictions on "marriage between a white person and a person of color.");

b.  Tr 236:17-238:23 (Cott: Racially restrictive marriage laws "prevented individuals from having complete choice on whom they married, in a way that designated some groups as less worthy than other groups[.]"  Defenders of race restrictions argued the laws were "naturally-based and God's plan just being put into positive law, the efforts to undo them met extreme alarm among those who

thought these laws were correct. * * * [P]eople who supported [racially restrictive marriage laws] saw these as very important definitional features of who could and should marry, and who could not and should not.");

c.   Tr 440:9-13 (Chauncey: Jerry Falwell criticized <u>Brown v Board of Education</u>, because school integration could "lead to interracial marriage, which was then sort of the ultimate sign of black and white equality.");

d.   PX2547 (Nathanson Nov 12, 2009 Dep Tr 108:12-23: Defenders of race restrictions in marriage argued that such discrimination was protective of the family); PX2546 (video of same);

e.   <u>Pace v Alabama</u>, 106 US 583, 585 (1883) (holding that anti-miscegenation laws did not violate the Constitution because they treated African-Americans and whites the same);

f.   PX0710 at RFA No 11: Attorney General admits that California banned interracial marriage until the California Supreme Court invalidated the prohibition in <u>Perez v Sharp</u>, 198 P2d 17 (Cal 1948);

g.   PX0707 at RFA No 11: Proponents admit that California banned certain interracial marriages from early in its history as a state until the California Supreme Court invalidated those restrictions in <u>Perez</u>, 198 P2d 17.

25.   Racial restrictions on an individual's choice of marriage partner were deemed unconstitutional under the California Constitution in 1948 and under the United States Constitution in 1967.  An individual's exercise of his or her right to marry no longer depends on his or her race nor on the race of his or her chosen partner.

a.   <u>Loving v Virginia</u>, 388 US 1 (1967);

b.   <u>Perez v Sharp</u>, 198 P2d 17 (Cal 1948).

26.   Under coverture, a woman's legal and economic identity was subsumed by her husband's upon marriage.  The husband was the legal head of household.  Coverture is no longer part of the marital bargain.

   a.   PX0710 at RFA No 12: Attorney General admits that the
        doctrine of coverture, under which women, once married,
        lost their independent legal identity and became the
        property of their husbands, was once viewed as a central
        component of the civil institution of marriage;

   b.   Tr 240:11-240:15 (Cott: Under coverture, "the wife was
        covered, in effect, by her husband's legal and economic
        identity.  And she —— she lost her independent legal and
        economic individuality.");

   c.   Tr 240:22-241:6 (Cott: Coverture "was the marital bargain
        to which both spouses consented.  And it was a reciprocal
        bargain in which the husband had certain very important
        * * * obligations that were enforced by the state.  His
        obligation was to support his wife, provide her with the
        basic material goods of life, and to do so for their
        dependents.  And her part of the bargain was to serve and
        obey him, and to lend to him all of her property, and
        also enable him to take all of her earnings, and
        represent her in court or in any sort of legal or
        economic transaction.");

   d.   Tr 241:7-11 (Cott: Coverture "was a highly-asymmetrical
        bargain that, to us today, appears to enforce inequality.
        * * * But I do want to stress it was not simply
        domination and submission.  It was a mutual bargain, a
        reciprocal bargain joined by consent.");

   e.   Tr 243:5-244:10 (Cott: The sexual division of roles of
        spouses began to shift in the late nineteenth century and
        came fully to an end under the law in the 1970s.
        Currently, the state's assignment of marital roles is
        gender-neutral.  "[B]oth spouses are obligated to support
        one another, but they are not obligated to one another
        with a specific emphasis on one spouse being the provider
        and the other being the dependent.");

   f.   Follansbee v Benzenberg, 122 Cal App 2d 466, 476 (2d Dist
        1954) ("The legal status of a wife has changed.  Her
        legal personality is no longer merged in that of her
        husband.").

27.  Marriage between a man and a woman was traditionally organized
     based on presumptions of a division of labor along gender
     lines.  Men were seen as suited for certain types of work and
     women for others.  Women were seen as suited to raise children
     and men were seen as suited to provide for the family.

a.   Tr 239:25-245:8, 307:14-308:9, 340:14-342:12 (Cott: Marriage laws historically have been used to dictate the roles of spouses.  Under coverture, a wife's legal and economic identity was merged into that of her husband's. The coverture system was based on assumptions of what was then considered a natural division of labor between men and women.);

b.   Tr 241:19-23 (Cott: "[A]ssumptions were, at the time, that men were suited to be providers * * * whereas, women, the weaker sex, were suited to be dependent.");

c.   PX1245 Letitia Anne Peplau and Adam W Fingerhut, <u>The Close Relationships of Lesbians and Gay Men</u>, 58 Annual Rev Pschol 405, 408 (2007): "Traditional heterosexual marriage is organized around two basic principles: a division of labor based on gender and a norm of greater male power and decision-making authority.";

d.   PX2547 (Nathanson Nov 12, 2009 Dep Tr 108:24-109:9: Defenders of prejudice or stereotypes against women argued that such discrimination was meant to be protective of the family. (PX2546 video of same); see also PX2545 (Young Nov 13, 2009 Dep Tr 214:19-215:13: same, PX2544 video of same);

e.   PX1319 Hendrik Hartog, Lecture, <u>Marital Exits and Marital Expectations in Nineteenth Century America</u>, 80 Georgetown L J 95, 101, 128-129 (1991): "Even in equity, a wife could not usually sue under her own name."  And "the most important feature of marriage was the public assumption of a relationship of rights and duties, of men acting as husbands and women acting as wives.";

f.   PX1328 Note, <u>A Reconsideration of Husband's Duty to Support and Wife's Duty to Render Services</u>, 29 Va L Rev 857, 858 (1943): "Marriage deprived [the wife] of her legal capacity in most matters affecting property."

28.  The development of no-fault divorce laws made it simpler for spouses to end marriages and allowed spouses to define their own roles within a marriage.

a.   Tr 338:5-14 (Cott: No-fault divorce "was an indication of the shift * * * [that] spousal roles used to be dictated by the state.  Now they are dictated by the couple themselves.  There's no requirement that they do X or Y if they are one spouse or the other.");

b.   Tr 339:10-14 (Cott: The move to no-fault divorce underlines the fact that marriage no longer requires

specific performance of one marital role or another based on gender.);

c.   PX1319 Hendrik Hartog, Lecture, <u>Marital Exits and Marital Expectations in Nineteenth Century America</u>, 80 Georgetown L J 95, 97, 121 (1991): In nineteenth century America, marriage was permanent, spousal roles were non-negotiable and divorce "punished the guilty for criminal conduct" and "provided a form of public punishment for a spouse who had knowingly and criminally violated his or her public vows of marriage.";

d.   PX1308 Betsey Stevenson and Justin Wolfers, <u>Marriage and Divorce: Changes and their Driving Forces</u>, Institute for the Study of Labor at 2-3, Fig 1 (Feb 2007): Current divorce rates are consistent with trends that developed before states adopted no-fault divorce.

29.  In 1971, California amended Cal Civ Code § 4101, which had previously set the age of consent to marriage at twenty-one years for males and eighteen years for females, to read "[a]ny unmarried person of the age of 18 years or upwards, and not otherwise disqualified, is capable of consenting to and consummating marriage."  Cal Civ Code § 4101 (1971); <u>In re Marriage Cases</u>, 183 P3d at 408.

30.  In the 1970s, several same-sex couples sought marriage licenses in California, relying on the amended language in Cal Civ Code § 4101.  <u>In re Marriage Cases</u>, 183 P3d at 409.  In response, the legislature in 1977 amended the marriage statute, former Cal Civ Code § 4100, to read "[m]arriage is a personal relation arising out of a civil contract between a man and a woman * * *."  Id.  That provision became Cal Fam Code § 300.  The legislative history of the enactment supports a conclusion that unique roles of a man and a woman in marriage motivated legislators to enact the amendment.  See <u>In re Marriage Cases</u>, 183 P3d at 409.

31. In 2008, the California Supreme Court held that certain provisions of the Family Code violated the California Constitution to the extent the statutes reserve the designation of marriage to opposite-sex couples.  <u>In re Marriage Cases</u>, 183 P3d at 452.  The language "between a man and a woman" was stricken from section 300, and section 308.5 (Proposition 22) was stricken in its entirety.  Id at 453.

32. California has eliminated marital obligations based on the gender of the spouse.  Regardless of their sex or gender, marital partners share the same obligations to one another and to their dependants.  As a result of Proposition 8, California nevertheless requires that a marriage consist of one man and one woman.

   a.  Cal Const Art, I § 7.5 (Proposition 8);

   b.  Cal Fam Code § 720.

33. Eliminating gender and race restrictions in marriage has not deprived the institution of marriage of its vitality.

   a.  PX0707 at RFA No 13: Proponents admit that eliminating the doctrine of coverture has not deprived marriage of its vitality and importance as a social institution;

   b.  PX0710 at RFA No 13: Attorney General admits that gender-based reforms in civil marriage law have not deprived marriage of its vitality and importance as a social institution;

   c.  Tr 245:9-247:3 (Cott: "[T]he primacy of the husband as the legal and economic representative of the couple, and the protector and provider for his wife, was seen as absolutely essential to what marriage was" in the nineteenth century.  Gender restrictions were slowly removed from marriage, but "because there were such alarms about it and such resistance to change in this what had been seen as quite an essential characteristic of marriage, it took a very very long time before this trajectory of the removal of the state from prescribing these rigid spousal roles was complete."  The removal of gender inequality in marriage is now complete "to no

apparent damage to the institution.  And, in fact, I think to the benefit of the institution.");

d.   PX0707 at RFA No 13: Proponents admit that eliminating racial restrictions on marriage has not deprived marriage of its vitality and importance as a social institution;

e.   PX0710 at RFA No 13: Attorney General admits that race-based reforms in civil marriage law have not deprived marriage of its vitality and importance as a social institution;

f.   Tr 237:9-239:24 (Cott: When racial restrictions on marriage across color lines were abolished, there was alarm and many people worried that the institution of marriage would be degraded and devalued.  But "there has been no evidence that the institution of marriage has become less popular because * * * people can marry whoever they want.").

34.   Marriage is the state recognition and approval of a couple's choice to live with each other, to remain committed to one another and to form a household based on their own feelings about one another and to join in an economic partnership and support one another and any dependents.  Tr 187:11-16; 188:16-189:2; 201:9-14 (Cott).

35.   The state has many purposes in licensing and fostering marriage.  Some of the state's purposes benefit the persons married while some benefit the state:

a.   Facilitating governance and public order by organizing individuals into cohesive family units.  Tr 222:13-17 (Cott: "[T]he purpose of the state in licensing and incentivizing marriage is to create stable households in which the adults who reside there and are committed to one another by their own consents will support one another as well as their dependents.");

b.   Developing a realm of liberty, intimacy and free decision-making by spouses, Tr 189:7-15 (Cott: "[T]he realm created by marriage, that private realm has been repeatedly reiterated as a —— as a realm of liberty for intimacy and free decision making by the parties[.]");

c.   Creating stable households.  Tr 226:8-15 (Cott: The government's aim is "to create stable and enduring unions between couples.);

    d.   **Legitimating children.  Tr 225:16-227:4 (Cott: Historically, legitimating children was a very important function of marriage, especially among propertied families.  Today, legitimation is less important, although unmarried couples' children still have to show "that they deserve these inheritance rights and other benefits of their parents.");**

    e.   **Assigning individuals to care for one another and thus limiting the public's liability to care for the vulnerable.  Tr 226:8-227:4 (Cott: Marriage gives private actors responsibility over dependents.); Tr 222:18-20 ("The institution of marriage has always been at least as much about supporting adults as it has been about supporting minors.");**

    f.   **Facilitating property ownership.  Tr 188:20-22 (Marriage is "the foundation of the private realm of * * * property transmission.").**

36.   **States and the federal government channel benefits, rights and responsibilities through marital status.  Marital status affects immigration and citizenship, tax policy, property and inheritance rules and social benefit programs.**

    a.   **Tr 1341:2-16 (Badgett: Specific tangible economic harms flow from being unable to marry, including lack of access to health insurance and other employment benefits, higher income taxes and taxes on domestic partner benefits.);**

    b.   **Tr 235:24-236:16 (Cott: The government has historically channeled many benefits through marriage; as an example, the Social Security Act had "a very distinct marital advantage for those who were married couples as compared to either single individuals or unmarried couples.");**

    c.   **PX1397 US General Accounting Office Report at 1, Jan 23, 2004: Research identified "a total of 1138 federal statutory provisions classified in the United States Code in which marital status is a factor in determining or receiving benefits, rights, and privileges.".**

37.   **Marriage creates economic support obligations between consenting adults and for their dependents.**

    a.   **Tr 222:13-17 (Cott: "[T]he purpose of the state in licensing and incentivizing marriage is to create stable households in which the adults who reside there and are**

committed to one another by their own consents will support one another as well as their dependents.");

b.   Cal Fam Code § 720.

38.  Marriage benefits both spouses by promoting physical and psychological health.  Married individuals are less likely to engage in behaviors detrimental to health, like smoking or drinking heavily.  Married individuals live longer on average than unmarried individuals.

a.   Tr 578:11-579:9 (Peplau: A recent, large-scale study by the Centers for Disease Control found that married individuals, on average, fare better on "virtually every measure" of health compared to non-married individuals.);

b.   PX0708 at RFA No 84: Proponents admit that opposite-sex couples who are married experience, on average, less anxiety and depression and greater happiness and satisfaction with life than do non-married opposite-sex couples or persons not involved in an intimate relationship;

c.   Tr 578:2-10 (Peplau: "[T]he very consistent findings from [a very large body of research on the impact of marriage on health] are that, on average, married individuals fare better.  They are physically healthier.  They tend to live longer.  They engage in fewer risky behaviors.  They look better on measures of psychological well-being.");

d.   Tr 688:10-12 (Egan: "[M]arried individuals are healthier, on average, and, in particular, behave themselves in healthier ways than single individuals.");

e.   PX1043 Charlotte A Schoenborn, Marital Status and Health: United States, 1999-2002, US Department of Health and Human Services at 1 (Dec 15, 2004): "Regardless of population subgroup (age, sex, race, Hispanic origin, education, income, or nativity) or health indicator (fair or poor health, limitations in activities, low back pain, headaches, serious psychological distress, smoking, or leisure-time physical inactivity), married adults were generally found to be healthier than adults in other marital status categories.";

f.   PX0803 California Health Interview Survey (2009): Married individuals are less likely to have psychological distress than individuals who are single and never married, divorced, separated, widowed or living with their partner;

g.   PX0807 Press Release, Agency for Healthcare Research and Quality, <u>Marriage Encourages Healthy Behaviors among the Elderly, Especially Men</u> (Oct 26, 1998): Marriage encourages healthy behaviors among the elderly.

39.   Material benefits, legal protections and social support resulting from marriage can increase wealth and improve psychological well-being for married spouses.

a.   PX0809 Joseph Lupton and James P Smith, <u>Marriage, Assets, and Savings</u>, RAND (Nov 1999): Marriage is correlated with wealth accumulation;

b.   Tr 1332:19-1337:2 (Badgett: Marriage confers numerous economic benefits, including greater specialization of labor and economies of scale, reduced transactions costs, health and insurance benefits, stronger statement of commitment, greater validation and social acceptance of the relationship and more positive workplace outcomes. Some benefits are not quantifiable but are nevertheless substantial.);

c.   PX0708 at RFA No 85: Proponents admit that societal support is central to the institution of marriage and that marital relationships are typically entered in the presence of family members, friends and civil or religious authorities;

d.   PX0708 at RFA No 87: Proponents admit that marriage between a man and a woman can be a source of relationship stability and commitment, including by creating barriers and constraints on dissolving the relationship.

40.   The long-term nature of marriage allows spouses to specialize their labor and encourages spouses to increase household efficiency by dividing labor to increase productivity.

a.   Tr 1331:15-1332:9; 1332:25-1334:17 (Badgett);

b.   PX0708 at RFA No 88: Proponents admit that marriage between a man and a woman encourages spouses to increase household efficiency, including by dividing their labor in ways that increase the family's productivity in producing goods and services for family members.

41.  The tangible and intangible benefits of marriage flow to a married couple's children.

   a.  Tr 1042:20-1043:8 (Lamb: explaining that when a cohabiting couple marries, that marriage can improve the adjustment outcomes of the couple's child because of "the advantages that accrue to marriage.");

   b.  PX0886 Position Statement, American Psychiatric Association, <u>Support of Legal Recognition of Same-Sex Civil Marriage</u> (July 2005): Marriage benefits children of that couple.

<u>WHETHER ANY EVIDENCE SHOWS CALIFORNIA HAS AN INTEREST IN DIFFERENTIATING BETWEEN SAME-SEX AND OPPOSITE-SEX UNIONS</u>

42.  Same-sex love and intimacy are well-documented in human history.  The concept of an identity based on object desire; that is, whether an individual desires a relationship with someone of the opposite sex (heterosexual), same sex (homosexual) or either sex (bisexual), developed in the late nineteenth century.

   a.  Tr 531:25-533:24 (Chauncey: The categories of heterosexual and homosexual emerged in the late nineteenth century, although there were people at all time periods in American history whose primary erotic and emotional attractions were to people of the same sex.);

   b.  Tr 2078:10-12 (Herek: "[H]eterosexual and homosexual behaviors alike have been common throughout human history[.]");

   c.  Tr 2064:22-23 (Herek: In practice, we generally refer to three groups: homosexuals, heterosexuals and bisexuals.);

   d.  Tr 2027:4-9 (Herek: "[S]exual orientation is at its heart a relational construct, because it is all about a relationship of some sort between one individual and another, and a relationship that is defined by the sex of the two persons involved[.]").

43.  Sexual orientation refers to an enduring pattern of sexual, affectional or romantic desires for and attractions to men, women or both sexes.  An individual's sexual orientation can

be expressed through self-identification, behavior or

attraction.  The vast majority of people are consistent in

self-identification, behavior and attraction throughout their

adult lives.

a.  Tr 2025:3-12 (Herek: "Sexual orientation is a term that
    we use to describe an enduring sexual, romantic, or
    intensely affectional attraction to men, to women, or to
    both men and women.  It's also used to refer to an
    identity or a sense of self that is based on one's
    enduring patterns of attraction.  And it's also sometimes
    used to describe an enduring pattern of behavior.");

b.  Tr 2060:7-11 (Herek: Most social science and behavioral
    research has assessed sexual orientation in terms of
    attraction, behavior or identity, or some combination
    thereof.);

c.  Tr 2072:19-2073:4 (Herek: "[T]he vast majority of people
    are consistent in their behavior, their identity, and
    their attractions.");

d.  Tr 2086:13-21 (Herek: The Laumann study (PX0943 Edward O
    Laumann, et al, <u>The Social Organization of Sexuality:
    Sexual Practices in the United States</u> (Chicago 1994))
    shows that 90 percent of people in Laumann's sample were
    consistently heterosexual in their behavior, identity and
    attraction, and a core group of one to two percent of the
    sample was consistently lesbian, gay or bisexual in their
    behavior, identity and attraction.);

e.  Tr 2211:8-10 (Herek: "[I]f I were a betting person, I
    would say that you would do well to bet that [a person's]
    future sexual behavior will correspond to [his or her]
    current identity.").

44.  Sexual orientation is commonly discussed as a characteristic

of the individual.  Sexual orientation is fundamental to a

person's identity and is a distinguishing characteristic that

defines gays and lesbians as a discrete group.  Proponents'

assertion that sexual orientation cannot be defined is

contrary to the weight of the evidence.

a.  Tr 2026:7-24 (Herek: In his own research, Herek has asked
    ordinary people if they are heterosexual, straight, gay,

United States District Court
For the Northern District of California

> lesbian or bisexual, and that is a question people generally are able to answer.);

b.  Tr 858:24-859:5 (Meyer: Sexual orientation is perceived as "a core thing about who you are."  People say: "This is who I am. * * * [I]t is a central identity that is important.");

c.  Tr 2027:14-18 (Herek: These sorts of relationships, that need for intimacy and attachment is a very core part of the human experience and a very fundamental need that people have.);

d.  Tr 2324:8-13 (Herek: If two women wish to marry each other, it is reasonable to assume that they are lesbians. And if two men want to marry each other, it is reasonable to assume that they are gay.);

e.  Tr 2304:9-2309:1 (Herek: Researchers may define sexual orientation based on behavior, identity or attraction based on the purpose of a study, so that an individual studying sexually transmitted infections may focus on behavior while a researcher studying child development may focus on identity.  Researchers studying racial and ethnic minorities similarly focus their definition of the population to be studied based on the purpose of the study.  Most people are nevertheless consistent in their behavior, identity and attraction.);

f.  Tr 2176:23-2177:14 (Herek, responding to cross-examination that sexual orientation is a socially constructed classification and not a "valid concept": "[Social constructionists] are talking about the construction of [sexual orientation] at the cultural level, in the same way that we have cultural constructions of race and ethnicity and social class. * * * But to say that there's no such thing as class or race or ethnicity or sexual orientation is to, I think, minimize the importance of that construction.);

g.  Tr 1372:10-1374:7 (Badgett: DIX1108 The Williams Institute, <u>Best Practices for Asking Questions about Sexual Orientation on Surveys</u> (Nov 2009), includes a discussion about methods for conducting surveys; it does not conflict with the substantial evidence demonstrating that sexual orientation is a distinguishing characteristic that defines gay and lesbian individuals as a discrete group.).

45.  Proponents' campaign for Proposition 8 assumed voters understood the existence of homosexuals as individuals distinct from heterosexuals.

a.   PX0480A Video supporting Proposition 8: Supporters of Proposition 8 identified "homosexuals and those sympathetic to their demands" as supporters of marriage for same-sex couples;

b.   PX2153 Advertisement, <u>Honest Answers to Questions Many Californians Are Asking About Proposition 8</u>, Protect Marriage (2008): "The 98% of Californians who are not gay should not have their religious freedoms and freedom of expression be compromised to afford special legal rights for the 2% of Californians who are gay.";

c.   PX2156 Protect Marriage, <u>Myths and Facts About Proposition 8</u>: "Proposition 8 does not interfere with gays living the lifestyle they choose.  However, while gays can live as they want, they should not have the right to redefine marriage for the rest of society.";

d.   PX0021 Leaflet, California Family Council, The California Marriage Protection Act ("San Diego County's 'Tipping Point'") at 2: The leaflet asserts that "homosexuals" do not want to marry; instead, the goal of the "homosexual community" is to annihilate marriage;

e.   PX0577 Frank Schubert and Jeff Flint, <u>Passing Prop 8</u>, Politics at 45 (Feb 2009): The Proposition 8 campaign was organized in light of the fact that many Californians are "tolerant" of gays;

f.   PX0001 California Voter Information Guide, California General Election, Tuesday, November 4, 2008 at PM 3365: "[W]hile gays have the right to their private lives, <u>they do not have the right to redefine marriage</u> for everyone else" (emphasis in original).

46.   Individuals do not generally choose their sexual orientation. No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation.

a.   Tr 2032:15-22 (Herek: Herek has conducted research in which he has found that the vast majority of lesbians and gay men, and most bisexuals as well, when asked how much choice they have about their sexual orientation say that they have "no choice" or "very little choice" about it.);

b.   Tr 2054:12-2055:24 (Herek: PX0928 at 39 contains a table that reports data on approximately 2,200 people who responded to questions about how much choice they had about being lesbian, gay or bisexual.  Among gay men, 87 percent said that they experienced no or little choice

about their sexual orientation.  Among lesbians, 70
percent said that they had no or very little choice about
their sexual orientation.); Tr 2056:4-25 (Herek: PX0930
demonstrates that 88 percent of gay men reported that
they had "no choice at all" about their sexual
orientation, and 68 percent of lesbians said they had "no
choice at all," and another 15 percent reported a small
amount of choice.);

c.    Tr 2252:1-10 (Herek: "It is certainly the case that there
have been many people who, most likely because of
societal stigma, wanted very much to change their sexual
orientation and were not able to do so.");

d.    Tr 2314:3-17 (Herek: Herek agrees with Peplau's statement
that "[c]laims about the potential erotic plasticity of
women do not mean that most women will actually exhibit
change over time.  At a young age, many women adopt
patterns of heterosexuality that are stable across their
lifetime.  Some women adopt enduring patterns of same-sex
attractions and relationships.");

e.    Tr 2202:8-22 (Herek: "[M]ost people are brought up in
society assuming that they will be heterosexual.  Little
boys are taught that they will grow up and marry a girl.
Little girls are taught they will grow up and marry a
boy.  And growing up with those expectations, it is not
uncommon for people to engage in sexual behavior with
someone of the other sex, possibly before they have
developed their real sense of who they are, of what their
sexual orientation is.  And I think that's one of the
reasons why * * * [gay men and lesbians have]
experience[d] heterosexual intercourse. * * * [I]t is not
part of their identity.  It's not part of who they are,
and not indicative of their current attractions.");

f.    Tr 2033:6-2034:20 (Herek: Therapies designed to change an
individual's sexual orientation have not been found to be
effective in that they have not been shown to
consistently produce the desired outcome without causing
harm to the individuals involved.); Tr 2039:1-3 (Herek:
Herek is not aware of any major mental health
organizations that have endorsed the use of such
therapies.);

g.    Tr 140:6, 141:14-19 (Perry: Perry is a lesbian and feels
that she was born with her sexual orientation.  At 45
years old, she does not think that it might somehow
change.);

h.    Tr 166:24-167:9 (Stier: Stier is 47 years old and has
fallen in love one time in her life — with Perry.);

i.    Tr 77:4-5 (Zarrillo: Zarrillo has been gay "as long as
[he] can remember.");

75

United States District Court
For the Northern District of California

j.   Tr 91:15-17 (Katami: Katami has been a "natural-born gay" "as long as he can remember.");

k.   Tr 1506:2-11 (Kendall: "When I was a little kid, I knew I liked other boys.  But I didn't realize that meant I was gay until I was, probably, 11 or 12 years old. * * * I ended up looking up the word 'homosexual' in the dictionary.  And I remember reading the definition[.] * * * And it slowly dawned on me that that's what I was.");

l.   Tr 1510:6-8 (Kendall: "I knew I was gay just like I knew I'm short and I'm half Hispanic.  And I just never thought that those facts would change.").

47.   California has no interest in asking gays and lesbians to change their sexual orientation or in reducing the number of gays and lesbians in California.

a.   PX0707 at RFA No 21: Proponents admit that same-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities;

b.   PX0710 at RFA No 19: Attorney General admits that sexual orientation bears no relation to a person's ability to perform in or contribute to society;

c.   PX0710 at RFA No 22: Attorney General admits that the laws of California recognize no relationship between a person's sexual orientation and his or her ability to raise children; to his or her capacity to enter into a relationship that is analogous to marriage; or to his or her ability to participate fully in all economic and social institutions, with the exception of civil marriage;

d.   Tr 1032:6-12 (Lamb: Gay and lesbian sexual orientations are "normal variation[s] and are considered to be aspects of well-adjusted behavior.");

e.   Tr 2027:19-2028:2 (Herek: Homosexuality is not considered a mental disorder.  The American Psychiatric Association, the American Psychological Association and other major professional mental health associations have all gone on record affirming that homosexuality is a normal expression of sexuality and that it is not in any way a form of pathology.);

f.   Tr 2530:25-2532:25 (Miller: Miller agrees that "[c]ourts and legal scholars have concluded that sexual orientation is not related to an individual's ability to contribute to society or perform in the workplace.").

48.   Same-sex couples are identical to opposite-sex couples in the
      characteristics relevant to the ability to form successful
      marital unions.  Like opposite-sex couples, same-sex couples
      have happy, satisfying relationships and form deep emotional
      bonds and strong commitments to their partners.  Standardized
      measures of relationship satisfaction, relationship adjustment
      and love do not differ depending on whether a couple is same-
      sex or opposite-sex.

      a.   PX0707 at RFA No 65: Proponents admit that gay and
           lesbian individuals, including plaintiffs, have formed
           lasting, committed and caring relationships with persons
           of the same sex and same-sex couples share their lives
           and participate in their communities together;

      b.   PX0707 at RFA No 58: Proponents admit that many gay men
           and lesbians have established loving and committed
           relationships;

      c.   PX0710 at RFA No 65: Attorney General admits that gay men
           and lesbians have formed lasting, committed and caring
           same-sex relationships and that same-sex couples share
           their lives and participate in their communities
           together;

      d.   PX0710 at RFA No 58: Attorney General admits that
           California law implicitly recognizes an individual's
           capacity to establish a loving and long-term committed
           relationship with another person that does not depend on
           the individual's sexual orientation;

      e.   Tr 583:12-585:21 (Peplau: Research that has compared the
           quality of same-sex and opposite-sex relationships and
           the processes that affect those relationships
           consistently shows "great similarity across couples, both
           same-sex and heterosexual.");

      f.   Tr 586:22-587:1 (Peplau: Reliable research shows that "a
           substantial proportion of lesbians and gay men are in
           relationships, that many of those relationships are
           long-term.");

      g.   PX2545 (Young Nov 13 2009 Dep Tr 122:17-123:1: Young
           agrees with the American Psychoanalytic Association's
           statement that "gay men and lesbians possess the same
           potential and desire for sustained loving and lasting
           relationships as heterosexuals."); PX2544 at 12:40-14:15
           (video of same);

h.   PX2545 (Young Nov 13, 2009 Dep Tr 100:17-101:5: Young agrees that love and commitment are reasons both gay people and heterosexuals have for wanting to marry.); PX2544 at 10:35-10:55 (video of same);

i.   Tr 1362:17-21 (Badgett: Same-sex couples wish to marry for many of the same reasons that opposite-sex couples marry.);

j.   Tr 1362:5-10 (Badgett: Same-sex couples have more similarities than differences with opposite-sex couples, and any differences are marginal.);

k.   PX2096 Adam Romero, et al, Census Snapshot: California, The Williams Institute at 1 (Aug 2008): "In many ways, the more than 107,000 same-sex couples living in California are similar to married couples.  According to Census 2000, they live throughout the state, are racially and ethnically diverse, have partners who depend upon one another financially, and actively participate in California's economy.  Census data also show that 18% of same-sex couples in California are raising children."

49.   California law permits and encourages gays and lesbians to become parents through adoption, foster parenting or assistive reproductive technology.  Approximately eighteen percent of same-sex couples in California are raising children.

a.   PX0707 at RFA No 66: Proponents admit that gay and lesbian individuals raise children together;

b.   PX0710 at RFA No 22: Attorney General admits that the laws of California recognize no relationship between a person's sexual orientation and his or her ability to raise children;

c.   PX0709 at RFA No 22: Governor admits that California law does not prohibit individuals from raising children on the basis of sexual orientation;

d.   PX0710 at RFA No 57: Attorney General admits that California law protects the right of gay men and lesbians in same-sex relationships to be foster parents and to adopt children by forbidding discrimination on the basis of sexual orientation;

e.   Cal Welf & Inst Code § 16013(a): "It is the policy of this state that all persons engaged in providing care and services to foster children * * * shall not be subjected to discrimination or harassment on the basis of their

clients' or their own actual or perceived * * * sexual
orientation.";

f.   Cal Fam Code § 297.5(d): "The rights and obligations of
registered domestic partners with respect to a child of
either of them shall be the same as those of spouses.";

g.   Elisa B v Superior Court, 117 P3d 660, 670 (Cal 2005)
(holding that under the Uniform Parentage Act, a parent
may have two parents of the same sex);

h.   PX2096 Adam Romero, et al, Census Snapshot: California,
The Williams Institute at 2 (Aug 2008): "18% of same-sex
couples in California are raising children under the age
of 18.";

i.   Tr 1348:23-1350:2 (Badgett: Same-sex couples in
California are raising 37,300 children under the age of
18.).

50. **Same-sex couples receive the same tangible and intangible**
**benefits from marriage that opposite-sex couples receive.**

a.   Tr 594:17-20 (Peplau: "My opinion, based on the great
similarities that have been documented between same-sex
couples and heterosexual couples, is th[at] if same-sex
couples were permitted to marry, that they also would
enjoy the same benefits [from marriage].");

b.   Tr 598:1-599:19 (Peplau: Married same-sex couples in
Massachusetts have reported various benefits from
marriage including greater commitment to the
relationship, more acceptance from extended family, less
worry over legal problems, greater access to health
benefits and benefits for their children.);

c.   PX0787 Position Statement, American Psychiatric
Association, Support of Legal Recognition of Same-Sex
Civil Marriage at 1 (July 2005): "In the interest of
maintaining and promoting mental health, the American
Psychiatric Association supports the legal recognition of
same-sex civil marriage with all rights, benefits, and
responsibilities conferred by civil marriage, and opposes
restrictions to those same rights, benefits, and
responsibilities."

51. **Marrying a person of the opposite sex is an unrealistic option**
**for gay and lesbian individuals.**

a.   PX0707 at RFA No 9: Proponents admit that for many gay
and lesbian individuals, marriage to an individual of the
opposite sex is not a meaningful alternative;

b.   PX0710 at RFA No 9: Attorney General admits that for gay men and lesbians, opposite-sex marriage may not be a meaningful alternative to same-sex marriage to the extent that it would compel them to negate their sexual orientation and identity;

c.   Tr 85:9-21 (Zarrillo: "I have no attraction, desire, to be with a member of the opposite sex.");

d.   Tr 2042:14-25 (Herek: While gay men and lesbians in California are permitted to marry, they are only permitted to marry a member of the opposite sex. For the vast majority of gay men and lesbians, that is not a realistic option. This is true because sexual orientation is about the relationships people form — it defines the universe of people with whom one is able to form the sort of intimate, committed relationship that would be the basis for marriage.);

e.   Tr 2043:1-2044:10 (Herek: Some gay men and lesbians have married members of the opposite sex, but many of those marriages dissolve, and some of them experience considerable problems simply because one of the partners is gay or lesbian. A gay or lesbian person marrying a person of the opposite sex is likely to create a great deal of conflict and tension in the relationship.).

52.   Domestic partnerships lack the social meaning associated with marriage, and marriage is widely regarded as the definitive expression of love and commitment in the United States.

a.   PX0707 at RFA No 38: Proponents admit that there is a significant symbolic disparity between domestic partnership and marriage;

b.   PX0707 at RFA No 4: Proponents admit that the word "marriage" has a unique meaning;

c.   Tr 207:9-208:6 (Cott, describing the social meaning of marriage in our culture: Marriage has been the "happy ending to the romance." Marriage "is the principal happy ending in all of our romantic tales"; the "cultural polish on marriage" is "as a destination to be gained by any couple who love one another.");

d.   Tr 208:9-17 (Cott: "Q. Let me ask you this. How does the cultural value and the meaning, social meaning of marriage, in your view, compare with the social meaning of domestic partnerships and civil unions? A. I appreciate the fact that several states have extended — maybe it's many states now, have extended most of the material rights and benefits of marriage to people who

have civil unions or domestic partnerships.  But there really is no comparison, in my historical view, because there is nothing that is like marriage except marriage.");

e.   Tr 611:1-7 (Peplau: "I have great confidence that some of the things that come from marriage, believing that you are part of the first class kind of relationship in this country, that you are * * * in the status of relationships that this society most values, most esteems, considers the most legitimate and the most appropriate, undoubtedly has benefits that are not part of domestic partnerships.");

f.   Tr 1342:14-1343:12 (Badgett: Some same-sex couples who might marry would not register as domestic partners because they see domestic partnership as a second class status.);

g.   Tr 1471:1-1472:8 (Badgett: Same-sex couples value the social recognition of marriage and believe that the alternative status conveys a message of inferiority.);

h.   Tr 1963:3-8 (Tam: "If 'domestic partner' is defined as it is now, then we can explain to our children that, yeah, there are some same-sex person wants to have a lifetime together as committed partners, and that is called 'domestic partner,' but it is not 'marriage.'" (as stated)).

53.  Domestic partners are not married under California law. California domestic partnerships may not be recognized in other states and are not recognized by the federal government.

a.   Cal Fam Code §§ 297-299.6 (establishing domestic partnership as separate from marriage);

b.   Compare Doc #686 at 39 with Doc #687 at 47: The court asked the parties to identify which states recognize California domestic partnerships.  No party could identify with certainty the states that recognize them. Plaintiffs and proponents agree only that Connecticut, New Jersey and Washington recognize California domestic partnerships.  See also #688 at 2: "To the best of the Administrative Defendants' knowledge," Connecticut, Washington DC, Washington, Nevada, New Hampshire and New Jersey recognize California domestic partnerships;

c.   <u>Gill v Office of Personnel Management et al</u>, No 09-10309-JLT at Doc #70 (July 8, 2010) (holding the federal Defense of Marriage Act ("DOMA") unconstitutional as applied to plaintiffs who are married under state law. (Domestic partnerships are not available in Massachusetts

and thus the court did not address whether a person in a domestic partnership would have standing to challenge DOMA.)); see also <u>In re Karen Golinski</u>, 587 F3d 901, 902 (9th Cir 2009) (finding that Golinski could obtain coverage for her wife under the Federal Employees Health Benefits Act without needing to consider whether the result would be the same for a federal employee's domestic partner).

54. The availability of domestic partnership does not provide gays and lesbians with a status equivalent to marriage because the cultural meaning of marriage and its associated benefits are intentionally withheld from same-sex couples in domestic partnerships.

a.  Tr 613:23-614:12 (Peplau: There is a significant symbolic disparity between marriage and domestic partnerships; a domestic partnership is "not something that is necessarily understood or recognized by other people in your environment.");

b.  Tr 659:8-15 (Peplau: As a result of the different social meanings of a marriage and a domestic partnership, there is a greater degree of an enforceable trust in a marriage than a domestic partnership.);

c.  Tr 2044:20-2045:22 (Herek: The difference between domestic partnerships and marriage is much more than simply a word.  "[J]ust the fact that we're here today suggests that this is more than just a word * * * clearly, [there is] a great deal of strong feeling and emotion about the difference between marriage and domestic partnerships.");

d.  Tr 964:1-3 (Meyer: Domestic partnerships reduce the value of same-sex relationships.);

e.  PX0710 at RFA No 37: Attorney General admits that establishing a separate legal institution for state recognition and support of lesbian and gay families, even if well-intentioned, marginalizes and stigmatizes gay families;

f.  Tr 142:2-13 (Perry: When you are married, "you are honored and respected by your family.  Your children know what your relationship is.  And when you leave your home and you go to work or you go out in the world, people know what your relationship means.");

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

g.  Tr 153:4-155:5 (Perry: Stier and Perry completed documents to register as domestic partners and mailed them in to the state.  Perry views domestic partnership as an agreement; it is not the same as marriage, which symbolizes "maybe the most important decision you make as an adult, who you choose [as your spouse].");

h.  Tr 170:12-171:14 (Stier: To Stier, domestic partnership feels like a legal agreement between two parties that spells out responsibilities and duties.  Nothing about domestic partnership indicates the love and commitment that are inherent in marriage, and for Stier and Perry, "it doesn't have anything to do * * * with the nature of our relationship and the type of enduring relationship we want it to be.  It's just a legal document.");

i.  Tr 172:6-21 (Stier: Marriage is about making a public commitment to the world and to your spouse, to your family, parents, society and community.  It is the way to tell them and each other that this is a lifetime commitment.  "And I have to say, having been married for 12 years and been in a domestic partnership for 10 years, it's different.  It's not the same.  I want — I don't want to have to explain myself.");

j.  Tr 82:9-83:1 (Zarrillo: "Domestic partnership would relegate me to a level of second class citizenship. * * * It's giving me part of the pie, but not the whole thing * * * [I]t doesn't give due respect to the relationship that we have had for almost nine years.");

k.  Tr 115:3-116:1 (Katami: Domestic partnerships "make[]you into a second, third, and * * * fourth class citizen now that we actually recognize marriages from other states. * * * None of our friends have ever said, 'Hey, this is my domestic partner.'").

55.  Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages.

a.  Tr 596:13-597:3 (Peplau: Data from Massachusetts on the "annual rates for marriage and for divorce" for "the four years prior to same-sex marriage being legal and the four years after" show "that the rates of marriage and divorce are no different after [same-sex] marriage was permitted than they were before.");

b.  Tr 605:18-25 (Peplau: Massachusetts data are "very consistent" with the argument that permitting same-sex

United States District Court
For the Northern District of California

couples to marry will not have an adverse effect on the institution of marriage.);

c.   Tr 600:12-602:15 (Peplau: Allowing same-sex couples to marry will have "no impact" on the stability of marriage.);

d.   PX1145 Matthew D Bramlett and William D Mosher, <u>First Marriage Dissolution, Divorce, and Remarriage: United States</u>, US Department of Health and Human Services at 2 (May 31, 2001): Race, employment status, education, age at marriage and other similar factors affect rates of marriage and divorce;

e.   PX1195 Matthew D Bramlett and William D Mosher, <u>Cohabitation, Marriage, Divorce, and Remarriage in the United States</u>, Vital and Health Statistics 23:22, US Department of Health and Human Services at 12 (July 2002): Race and socioeconomic status, among other factors, are correlated with rates of marital stability;

f.   PX0754 American Anthropological Association, <u>Statement on Marriage and the Family</u>: The viability of civilization or social order does not depend upon marriage as an exclusively heterosexual institution.

56.   The children of same-sex couples benefit when their parents can marry.

a.   Tr 1332:19-1337:25 (Badgett: Same-sex couples and their children are denied all of the economic benefits of marriage that are available to married couples.);

b.   PX0787 Position Statement, American Psychiatric Association, <u>Support of Legal Recognition of Same-Sex Civil Marriage</u> at 1 (July 2005): "The children of unmarried gay and lesbian parents do not have the same protection that civil marriage affords the children of heterosexual couples.";

c.   Tr 1964:17-1965:2 (Tam: It is important to children of same-sex couples that their parents be able to marry.);

d.   Tr 599:12-19 (Peplau: A survey of same-sex couples who married in Massachusetts shows that 95 percent of same-sex couples raising children reported that their children had benefitted from the fact that their parents were able to marry.).

**WHETHER THE EVIDENCE SHOWS THAT PROPOSITION 8 ENACTED A PRIVATE
MORAL VIEW WITHOUT ADVANCING A LEGITIMATE GOVERNMENT INTEREST**

57. Under Proposition 8, whether a couple can obtain a marriage
license and enter into marriage depends on the genders of the
two parties relative to one another. A man is permitted to
marry a woman but not another man. A woman is permitted to
marry a man but not another woman. Proposition 8 bars state
and county officials from issuing marriage licenses to same-
sex couples. It has no other legal effect.

    a. Cal Const Art I, § 7.5 (Proposition 8);

    b. PX0001 California Voter Information Guide, California
        General Election, Tuesday, November 4, 2008: Proposition
        8 "eliminates right of same-sex couples to marry."

58. Proposition 8 places the force of law behind stigmas against
gays and lesbians, including: gays and lesbians do not have
intimate relationships similar to heterosexual couples; gays
and lesbians are not as good as heterosexuals; and gay and
lesbian relationships do not deserve the full recognition of
society.

    a. Tr 611:13-19 (Peplau: "[B]eing prevented by the
        government from being married is no different than other
        kinds of stigma and discrimination that have been
        studied, in terms of their impact on relationships.");

    b. Tr 529:21-530:23 (Chauncey: The campaign for Proposition
        8 presented marriage for same-sex couples as an adult
        issue, although children are frequently exposed to
        romantic fairy tales or weddings featuring opposite-sex
        couples.);

    c. Tr 854:5-14 (Meyer: "Proposition 8, in its social
        meaning, sends a message that gay relationships are not
        to be respected; that they are of secondary value, if of
        any value at all; that they are certainly not equal to
        those of heterosexuals.");

    d. Tr 2047:13-2048:13 (Herek: In 2004, California enacted
        legislation that increased the benefits and

United States District Court
For the Northern District of California

85

responsibilities associated with domestic partnership, which became effective in 2005. In the second half of 2004, the California Secretary of State mailed a letter to all registered domestic partners advising them of the changes and telling recipients to consider whether to dissolve their partnership. Herek "find[s] it difficult to imagine that if there were changes in tax laws that were going to affect married couples, that you would have the state government sending letters to people suggesting that they consider whether or not they want to get divorced before this new law goes into effect. I think that — that letter just illustrates the way in which domestic partnerships are viewed differently than marriage.");

e. PX2265 Letter from Kevin Shelley, California Secretary of State, to Registered Domestic Partners: Shelley explains domestic partnership law will change on January 1, 2005 and suggests that domestic partners dissolve their partnership if they do not wish to be bound by the new structure of domestic partnership;

f. Tr 972:14-17 (Meyer: "Laws are perhaps the strongest of social structures that uphold and enforce stigma.");

g. Tr 2053:8-18 (Herek: Structural stigma provides the context and identifies which members of society are devalued. It also gives a level of permission to denigrate or attack particular groups, or those who are perceived to be members of certain groups in society.);

h. Tr 2054:7-11 (Herek: Proposition 8 is an instance of structural stigma.).

59. Proposition 8 requires California to treat same-sex couples differently from opposite-sex couples.

a. See PX0710 at RFA No 41: Attorney General admits that because two types of relationships — one for same-sex couples and one for opposite-sex couples — exist in California, a gay or lesbian individual may be forced to disclose his or her sexual orientation when responding to a question about his or her marital status;

b. Compare Cal Fam Code §§ 300-536 (marriage) with Cal Fam Code §§ 297-299.6 (registered domestic partnerships).

60. Proposition 8 reserves the most socially valued form of relationship (marriage) for opposite-sex couples.

a. Tr 576:15-577:14 (Peplau: Study by Gary Gates, Lee Badgett and Deborah Ho suggests that same-sex couples are

"three times more likely to get married than to enter into" domestic partnerships or civil unions.);

b.  PX1273 M V Lee Badgett, <u>When Gay People Get Married</u> at 58, 59, 60 (NYU 2009): "Many Dutch couples saw marriage as better because it had an additional social meaning that registered partnership, as a recent political invention, lacked."  "In some places, the cultural and political trappings of statuses that are not marriage send a very clear message of difference and inferiority to gay and lesbian couples."  "[W]hen compared to marriage, domestic partnerships may become a mark of second-class citizenship and are less understood socially.  In practice, these legal alternatives to marriage are limited because they do not map onto a well-developed social institution that gives the act of marrying its social and cultural meaning.";

c.  Tr 2044:20-2045:22 (Herek: The difference between domestic partnerships and marriage is more than simply a word.  If we look at public opinion data, for example, there is a sizable proportion of the public, both in California and the United States, who say that they are willing to let same-sex couples have domestic partnerships or civil unions, but not marriage.  This suggests a distinction in the minds of a large number of Americans — it is not simply a word.  In addition, looking at the recent history of California, when it became possible for same-sex couples to marry, thousands of them did.  And many of those were domestic partners.  So, clearly, they thought there was something different about being married.);

d.  PX0504B Video, Satellite Simulcast in Defense of Marriage, Excerpt at 0:38-0:56: Speaker warns that if Proposition 8 does not pass, children will be taught "that gay marriage is not just a different type of a marriage, they're going to be taught that it's a good thing."

61.  Proposition 8 amends the California Constitution to codify distinct and unique roles for men and women in marriage.

a.  Tr 1087:5-18 (Lamb: The "traditional family" refers to a family with a married mother and father who are both biologically related to their children where the mother stays at home and the father is the bread winner.);

b.  PX0506 Protect Marriage, The Fine Line Transcript (Oct 1, 2008) at 13: "Children need a loving family and yes they need a mother and father.  Now going on what Sean was saying here about the consequences of this, if Prop 8 doesn't pass then it will be illegal to distinguish between heterosexual and same sex couples when it comes

United States District Court
For the Northern District of California

to adoption.  Um Yvette just mentioned some statistics about growing up in families without a mother and father at home.  How important it is to have that kind of thing.  I'm not a sociologist.  I'm not a psychologist.  I'm just a human being but you don't need to be wearing a white coat to know that kids need a mom and dad.  I'm a dad and I know that I provide something different than my wife does in our family and my wife provides something entirely different than I do in our family and both are vital.";

c.   PX0506 Protect Marriage, The Fine Line Transcript at 6 (Oct 1, 2008): "When moms are in the park taking care of their kids they always know where those kids are.  They have like a, like a radar around them.  They know where those kids are and there's just a, there's a bond between a mom and a kid different from a dad.  I'm not saying dads don't have that bond but they don't.  It's just different.  You know middle of the night mom will wake up.  Dad will just sleep you know if there's a little noise in the room.  And, and when kids get scared they run to mommy.  Why?  They spent 9 months in mommy.  They go back to where they came.";

d.   PX390 Video, Ron Prentice Addressing Supporters of Proposition 8, Part I at 5:25-6:04: Prentice tells people at a religious rally that marriage is not about love but instead about women civilizing men: "Again, because it's not about two people in love, it's about men becoming civilized frankly, and I can tell you this from personal experience and every man in this audience can do the same if they've chosen to marry, because when you do find the woman that you love you are compelled to listen to her, and when the woman that I love prior to my marrying her told me that my table manners were less than adequate I became more civilized; when she told me that my rust colored corduroy were never again to be worn, I became more civilized.";

e.   PX0506 Protect Marriage, The Fine Line Transcript (Oct 1, 2008) at 15: "Skin color is morally trivial as you pointed out but sex is fundamental to everything.  There is no difference between a white or a black human being but there's a big difference between a man and a woman.";

f.   PX1867 Transcript, ABC Protecting Marriage at 27:6-9: Dr Jennifer Roback Morse states that "[t]he function of marriage is to attach mothers and fathers to one another and mothers and fathers to their children, especially fathers to children.";

g.   PX0480A Video supporting Proposition 8 at 2:00-2:24: Prentice states that "[c]hildren need the chance to have both mother love and father love.  And that moms and dads, male and female, complement each other.  They don't

bring to a marriage and to a family the same natural set of skills and talents and abilities.  They bring to children the blessing of both masculinity and femininity.";

h.   PX2403 Email from Kenyn Cureton, Vice-President, Family Research Council, to Prentice at 3 (Aug 25, 2008): Attached to the email is a kit to be distributed to Christian voters through churches to help them promote Proposition 8 which states: "Thank God for the difference between men and women.  In fact, the two genders were meant to complete each other physically, emotionally, and in every other way.  Also, both genders are needed for a healthy home.  As Dr James Dobson notes, 'More than ten thousand studies have concluded that kids do best when they are raised by mothers and fathers.'";

i.   PX1868 Transcript, _Love, Power, Mind_ (CCN simulcast Sept 25, 2008) at 43:19-24: "Same sex marriage, it will unravel that in a significant way and say that really male and female, mother and father, husband and wife are just really optional for the family, not necessary.  And that is a radically anti-human thing to say.";

j.   PX1867 Transcript, ABC Protecting Marriage at 28:18-23: "And we know that fatherlessness has caused significant problems for a whole generation of children and same-sex marriage would send us more in that direction of intentionally fatherless homes.";

k.   PX0506 Protect Marriage, The Fine Line Transcript at 5 (Oct 1, 2008): Miles McPherson states that it is a truth "that God created the woman bride as the groom's compatible marriage companion."

62.  Proposition 8 does not affect the First Amendment rights of those opposed to marriage for same-sex couples.  Prior to Proposition 8, no religious group was required to recognize marriage for same-sex couples.

a.   <u>In re Marriage Cases</u>, 189 P3d at 451-452 ("[A]ffording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs.") (Citing Cal Const Art I, § 4);

b.   Tr 194:24-196:21 (Cott: Civil law, not religious custom, is supreme in defining and regulating marriage in the United States.);

c.   Cal Fam Code §§ 400, 420.

63.  Proposition 8 eliminates the right to marry for gays and lesbians but does not affect any other substantive right under the California Constitution.  <u>Strauss</u>, 207 P3d at 102 ("Proposition 8 does <u>not</u> eliminate the substantial substantive [constitutional] protections afforded to same-sex couples[.]") (emphasis in original).

64.  Proposition 8 has had a negative fiscal impact on California and local governments.

a.   Tr 1330:23-25 (Badgett: "Proposition 8 has imposed some economic losses on the State of California and on counties and municipalities.");

b.   Tr 1364:16-1369:4 (Badgett: Denying same-sex couples the right to marry imposes costs on local governments such as loss of tax revenue, higher usage of means-tested programs, higher costs for healthcare of uninsured same-sex partners and loss of skilled workers.);

c.   Tr 720:1-12 (Egan: "What we're really talking about in the nonquantifiable impacts are the long-term advantages of marriage as an institution, and the long-term costs of discrimination as a way that weakens people's productivity and integration into the labor force. Whether it's weakening their education because they're discriminated against at school, or leading them to excessive reliance on behavioral and other health services, these are impacts that are hard to quantify, but they can wind up being extremely powerful.  How much healthier you are over your lifetime.  How much wealth you generate because you are in a partnership.");

d.   Tr 1367:5-1368:1 (Badgett: Denying same-sex couples the right to marry tends to reduce same-sex couples' income, which "will make them more likely to need and be eligible for those means-tested programs that are paid for by the state."  Similarly, to the extent that same-sex couples cannot obtain health insurance for their partners and children, there will be more people who might need to sign up for the state's sponsored health programs.).

65. **CCSF would benefit economically if Proposition 8 were not in effect.**

   a. CCSF would benefit immediately from increased wedding revenue and associated expenditures and an increased number of county residents with health insurance. Tr 691:24-692:3; Tr 708:16-20 (Egan);

   b. CCSF would benefit economically from decreased discrimination against gays and lesbians, resulting in decreased absenteeism at work and in schools, lower mental health costs and greater wealth accumulation. Tr 685:10-14; Tr 689:4-10; Tr 692:12-19; Tr 720:1-12 (Egan);

   c. CCSF enacted the Equal Benefits Ordinance to mandate that city contractors and vendors provide same-sex partners of employees with benefits equal to those provided to opposite-sex spouses of employees. CCSF bears the cost of enforcing the ordinance and defending it against legal challenges. Tr 714:15-715:10 (Egan).

66. **Proposition 8 increases costs and decreases wealth for same-sex couples because of increased tax burdens, decreased availability of health insurance and higher transactions costs to secure rights and obligations typically associated with marriage. Domestic partnership reduces but does not eliminate these costs.**

   a. Tr 1330:14-16 (Badgett: Proposition 8 has "inflicted substantial economic harm on same-sex couples and their children who live here in California.");

   b. Tr 1331:12-1337:25 (Badgett: Marriage confers economic benefits including greater specialization of labor, reduced transactions costs, health and insurance benefits and more positive workplace outcomes.);

   c. Tr 1341:2-1342:13 (Badgett: Couples that would marry but would not enter into a domestic partnership suffer tangible economic harm such as higher taxes and limited access to health insurance.);

   d. PX1259 MV Lee Badgett, Unequal Taxes on Equal Benefits: The Taxation of Domestic Partner Benefits, The Williams Institute at 1 (Dec 2007): "[W]orkers who have an unmarried domestic partner are doubly burdened: Their employers typically do not provide coverage for domestic

partners; and even when partners are covered, the
partner's coverage is taxed as income to the employee.";

e.   PX2898 Laura Langbein and Mark A Yost, <u>Same-Sex Marriage
     and Negative Externalities</u>, 490 Soc Sci Q 293, 307
     (2009): "For example, the ban on gay marriage induces
     failures in insurance and financial markets.  Because
     spousal benefits do not transfer (in most cases) to
     domestic partners, there are large portions of the
     population that should be insured, but instead receive
     inequitable treatment and are not insured properly. * * *
     This is equally true in the treatment of estates on the
     death of individuals.  In married relationships, it is
     clear to whom an estate reverts, but in the cases of
     homosexual couples, there is no clear right of ownership,
     resulting in higher transactions costs, widely regarded
     as socially inefficient.";

f.   PX0188 Report of the Council on Science and Public
     Health, Health Care Disparities in Same-Sex Households, C
     Alvin Head (presenter) at 9: "Survey data confirm that
     same-sex households have less access to health insurance.
     If they have health insurance, they pay more than married
     heterosexual workers, and also lack other financial
     protections. * * * [C]hildren in same-sex households lack
     the same protections afforded children in heterosexual
     households.";

g.   PX0189 American Medical Association Policy: Health Care
     Disparities in Same-Sex Partner Households, Policy D-
     160.979 at 1: "[E]xclusion from civil marriage
     contributes to health care disparities affecting same-sex
     households.";

h.   PX1261 California Employer Health Benefits Survey,
     California HealthCare Foundation at 7 (Dec 2008): Only 56
     percent of California firms offered health insurance to
     unmarried same-sex couples in 2008;

i.   PX1266 National Center for Lesbian Rights and Equality
     California, <u>The California Domestic Partnership Law: What
     it Means for You and Your Family</u> at 13 (2009): Domestic
     partnerships create more transactions costs than exist in
     marriage.  "Despite * * * automatic legal protection for
     children born to registered domestic partners, [the
     National Center for Lesbian Rights] is strongly
     recommending that all couples obtain a court judgment
     declaring both partners to be their child's legal
     parents, either an adoption or a parentage judgment.";

j.   PX1269 Michael Steinberger, <u>Federal Estate Tax
     Disadvantages for Same-Sex Couples</u>, The Williams
     Institute at 1 (July 2009): "Using data from several
     government data sources, this report estimates the dollar
     value of the estate tax disadvantage faced by same-sex

United States District Court
For the Northern District of California

couples.  In 2009, the differential treatment of same-sex and married couples in the estate tax code will affect an estimated 73 same-sex couples, costing each of them, on average, more than $3.3 million."

67.   Proposition 8 singles out gays and lesbians and legitimates their unequal treatment.  Proposition 8 perpetuates the stereotype that gays and lesbians are incapable of forming long-term loving relationships and that gays and lesbians are not good parents.

   a.   Tr 2054:7-11 (Herek: In "a definitional sense," Proposition 8 is an instance of structural stigma against gays and lesbians.);

   b.   Tr 826:21-828:4 (Meyer: Domestic partnership does not eliminate the structural stigma of Proposition 8 because it does not provide the symbolic or social meaning of marriage.);

   c.   Tr 820:23-822:5 (Meyer: One of the stereotypes that is part of the stigma surrounding gay men and lesbians is that gay men and lesbians are incapable of, uninterested in and not successful at having intimate relationships.);

   d.   Tr 407:8-408:4 (Chauncey: The fear of homosexuals as child molesters or as recruiters continues to play a role in debates over gay rights, and with particular attention to gay teachers, parents and married couples —— people who might have close contact with children.);

   e.   PX0001 California Voter Information Guide, California General Election, Tuesday, November 4, 2008 at PM 3365: "TEACHERS COULD BE REQUIRED to teach young children that there is no difference between gay marriage and traditional marriage."  (emphasis in original);

   f.   Tr 854:5-22 (Meyer: Proposition 8 "sends a message that gay relationships are not to be respected; that they are of secondary value, if of any value at all; that they are certainly not equal to those of heterosexuals. * * * [So] in addition to achieving the literal aims of not allowing gay people to marry, it also sends a strong message about the values of the state; in this case, the Constitution itself.  And it sends a message that would, in [Meyer's] mind, encourage or at least is consistent with holding prejudicial attitudes.  So that doesn't add up to a very welcoming environment.").

68. Proposition 8 results in frequent reminders for gays and
lesbians in committed long-term relationships that their
relationships are not as highly valued as opposite-sex
relationships.

    a.    Tr 846:22-847:12 (Meyer: When gay men and lesbians have
to explain why they are not married, they "have to
explain, I'm really not seen as equal.  I'm — my status
is — is not respected by my state or by my country, by
my fellow citizens.");

    b.    Tr 1471:1-1472:8 (Badgett: Badgett's interviews with
same-sex couples indicate that couples value the social
recognition of marriage and believe that the alternative
status conveys a message of inferiority.);

    c.    Tr 151:20-24 (Perry: A passenger on a plane once assumed
that she could take the seat that Perry had been saving
for Stier because Perry referred to Stier as her
"partner.");

    d.    Tr 174:3-175:4 (Stier: It has been difficult to explain
to others her relationship with Perry because they are
not married.);

    e.    Tr 175:5-17 (Stier: It is challenging to fill out forms
in doctor's offices that ask whether she is single,
married or divorced because "I have to find myself, you
know, scratching something out, putting a line through it
and saying 'domestic partner' and making sure I explain
to folks what that is to make sure that our transaction
can go smoothly.");

    f.    Tr 841:17-844:11; 845:7-10 (Meyer: For lesbians and gay
men, filling out a form requiring them to designate their
marital status can be significant because the form-filler
has no box to check.  While correcting a form is a minor
event, it is significant for the gay or lesbian person
because the form evokes something much larger for the
person — a social disapproval and rejection.  "It's
about, I'm gay and I'm not accepted here.").

69. The factors that affect whether a child is well-adjusted are:
(1) the quality of a child's relationship with his or her
parents; (2) the quality of the relationship between a child's
parents or significant adults in the child's life; and (3) the

United States District Court
For the Northern District of California

1   availability of economic and social resources.  Tr 1010:13-

2   1011:13 (Lamb).

70.   The gender of a child's parent is not a factor in a child's

adjustment.  The sexual orientation of an individual does not

determine whether that individual can be a good parent.

Children raised by gay or lesbian parents are as likely as

children raised by heterosexual parents to be healthy,

successful and well-adjusted.  The research supporting this

conclusion is accepted beyond serious debate in the field of

developmental psychology.

a.   Tr 1025:4-23 (Lamb: Studies have demonstrated "very
conclusively that children who are raised by gay and
lesbian parents are just as likely to be well-adjusted as
children raised by heterosexual parents."  These results
are "completely consistent with our broader understanding
of the factors that affect children's adjustment.");

b.   PX2565 American Psychological Association, Answers to
Your Questions: For a Better Understanding of Sexual
Orientation and Homosexuality at 5 (2008): "[S]ocial
science has shown that the concerns often raised about
children of lesbian and gay parents — concerns that are
generally grounded in prejudice against and stereotypes
about gay people — are unfounded.";

c.   PX2547 (Nathanson Nov 12, 2009 Dep Tr 49:05-49:19:
Sociological and psychological peer-reviewed studies
conclude that permitting gay and lesbian individuals to
marry does not cause any problems for children); PX2546
at 2:20-3:10 (video of same).

71.   Children do not need to be raised by a male parent and a

female parent to be well-adjusted, and having both a male and

a female parent does not increase the likelihood that a child

will be well-adjusted.  Tr 1014:25-1015:19; 1038:23-1040:17

(Lamb).

72. The genetic relationship between a parent and a child is not related to a child's adjustment outcomes. Tr 1040:22-1042:10 (Lamb).

73. Studies comparing outcomes for children raised by married opposite-sex parents to children raised by single or divorced parents do not inform conclusions about outcomes for children raised by same-sex parents in stable, long-term relationships. Tr 1187:13-1189:6 (Lamb).

74. Gays and lesbians have been victims of a long history of discrimination.

   a. Tr 3080:9-11 (Proponents' counsel: "We have never disputed and we have offered to stipulate that gays and lesbians have been the victims of a long and shameful history of discrimination.");

   b. Tr 361:11-15 (Chauncey: Gays and lesbians "have experienced widespread and acute discrimination from both public and private authorities over the course of the twentieth century. And that has continuing legacies and effects."); see also Tr 361-390 (Chauncey: discussing details of discrimination against gays and lesbians);

   c. PX2566 Letter from John W Macy, Chairman, Civil Service Commission, to the Mattachine Society of Washington (Feb 25, 1966) at 2-4: The Commission rejected the Mattachine Society's request to rescind the policy banning active homosexuals from federal employment. "Pertinent considerations here are the revulsion of other employees by homosexual conduct and the consequent disruption of service efficiency, the apprehension caused other employees of homosexual advances, solicitations or assaults, the unavoidable subjection of the sexual deviate to erotic stimulation through on-the-job use of the common toilet, shower and living facilities, the offense to members of the public who are required to deal with a known or admitted sexual deviate to transact Government business, the hazard that the prestige and authority of a Government position will be used to foster homosexual activity, particularly among the youth, and the use of Government funds and authority in furtherance of conduct offensive both to the mores and the law of our society.";

   d. PX2581 Letter from E D Coleman, Exempt Organizations Branch, IRS, to the Pride Foundation at 1, 4-5 (Oct 8,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1974): The Pride Foundation is not entitled to an exemption under Internal Revenue Code § 501(c)(3) because the organization's goal of "advanc[ing] the welfare of the homosexual community" was "perverted or deviate behavior" "contrary to public policy and [is] therefore, not 'charitable.'"

75. Public and private discrimination against gays and lesbians occurs in California and in the United States.

a.   PX0707 at RFA No 29: Proponents admit that gays and lesbians continue to experience instances of discrimination;

b.   PX0711 at RFA Nos 3, 8, 13, 18, 23: Attorney General admits 263 hate crime events based on sexual orientation bias occurred in California in 2004, 255 occurred in 2005, 246 occurred in 2006, 263 occurred in 2007 and 283 occurred in 2008;

c.   PX0672 at 18; PX0673 at 20; PX0674 at 20; PX0675 at 3; PX0676 at 1 (California Dept of Justice, Hate Crime in California, 2004-2008): From 2004 to 2008, between 17 and 20 percent of all hate crime offenses in California were motivated by sexual orientation bias;

d.   PX0672 at 26; PX0673 at 28; PX0674 at 28; PX0675 at 26; PX0676 at 20 (California Dept of Justice, Hate Crime in California, 2004-2008): From 2004 to 2008, between 246 and 283 hate crime events motivated by sexual orientation bias occurred each year in California;

e.   Tr 548:23 (Chauncey: There is still significant discrimination against lesbians and gay men in the United States.);

f.   Tr 1569:11-1571:5 (Segura: "[O]ver the last five years, there has actually been an increase in violence directed toward gay men and lesbians"; "gays and lesbians are representing a larger and larger portion of the number of acts of bias motivated violence" and "are far more likely to experience violence"; "73 percent of all the hate crimes committed against gays and lesbians also include an act of violence * * * we are talking about the most extreme forms of hate based violence"; the hate crimes accounted for "71 percent of all hate-motivated murders" and "[f]ifty-five percent of all hate-motivated rapes" in 2008; "There is simply no other person in society who endures the likelihood of being harmed as a consequence of their identity than a gay man or lesbian.");

g.   PX0605 The Williams Institute, et al, Documenting Discrimination on the Basis of Sexual Orientation and

Gender Identity in State Employment at 1 (Sept 2009):
"There is a widespread and persistent pattern of
unconstitutional discrimination on the basis of sexual
orientation and gender identity against [California]
government employees" and the pattern of discrimination
is similar for private sector employees in California;

h.   PX0619 The Williams Institute, Chapter 14: Other Indicia
of Animus against LGBT People by State and Local
Officials, 1980-Present at 14-8 (2009): Statements made
by legislators, judges, governors and other officials in
all fifty states show hostility towards gays and
lesbians, including a 1999 statement by California State
Senator Richard Mountjoy that "being gay 'is a sickness
* * * an uncontrolled passion similar to that which would
cause someone to rape.'";

i.   Tr 2510:23-2535:7 (Miller: Miller agrees that "there has
been severe prejudice and discrimination against gays and
lesbians" and "widespread and persistent" discrimination
against gays and lesbians and that "there is ongoing
discrimination in the United States" against gays and
lesbians.);

j.   Tr 2572:11-16 (Miller: Gays and lesbians are still the
"object of prejudice and stereotype.");

k.   Tr 2599:17-2604:7 (Miller: Miller agrees that "there are
some gays and lesbians who are fired from their jobs,
refused work, paid less, and otherwise discriminated
against in the workplace because of their sexual
orientation.").

76.  Well-known stereotypes about gay men and lesbians include a

belief that gays and lesbians are affluent, self-absorbed and

incapable of forming long-term intimate relationships.   Other

stereotypes imagine gay men and lesbians as disease vectors or

as child molesters who recruit young children into

homosexuality.   No evidence supports these stereotypes.

a.   DIX1162 Randy Albelda, et al, Poverty in the Lesbian,
Gay, and Bisexual Community, The Williams Institute at 1
(Mar 2009): "A popular stereotype paints lesbians and gay
men as an affluent elite * * *.   [T]he misleading myth of
affluence steers policymakers, community organizations
service providers, and the media away from fully
understanding poverty among LGBT people.";

b.   Tr 474:12-19 (Chauncey: Medical pronouncements that were hostile to gays and lesbians provided a powerful source of legitimation to anti-homosexual sentiment and were themselves a manifestation of discrimination against gays and lesbians.);

c.   Tr 820:23-822:5 (Meyer: One of the stereotypes that is part of the stigma surrounding gay men and lesbians is that gay men and lesbians are incapable of, uninterested in and not successful at having intimate relationships. Gay men and lesbians have been described as social isolates, as unconnected to society and people who do not participate in society the way everyone else does — as "a pariah, so to speak.");

d.   PX1011 David Reuben, Everything You Always Wanted to Know About Sex (But Were Afraid to Ask) 129-151 at 143 (Van Rees 1969): "What about all of the homosexuals who live together happily for years? What about them? They are mighty rare birds among the homosexual flock. Moreover, the 'happy' part remains to be seen. The bitterest argument between husband and wife is a passionate love sonnet by comparison with a dialogue between a butch and his queen. Live together? Yes. Happily? Hardly.";

e.   Tr 361:23-363:9 (Chauncey: Even though not all sodomy laws solely penalized homosexual conduct, over the course of the twentieth century, sodomy laws came to symbolize the criminalization of homosexual sex in particular. This was most striking in Bowers v Hardwick, which reads as though the law at issue simply bears on homosexual sex when in fact the Georgia law at issue criminalized both homosexual and heterosexual sodomy.);

f.   Tr 484:24-485:5 (Chauncey: The federal government was slow to respond to the AIDS crisis, and this was in part because of the association of AIDS with a "despised group.");

g.   Tr 585:22-586:8 (Peplau: There is no empirical support for the negative stereotypes that gay men and lesbians have trouble forming stable relationships or that those relationships are inferior to heterosexual relationships.);

h.   PX2337 Employment of Homosexuals and Other Sex Perverts in Government, S Rep No 81-241, 81st Congress, 2d Sess (1950) at 4: "Most of the authorities agree and our investigation has shown that the presence of a sex pervert in a Government agency tends to have a corrosive influence on his fellow employees. These perverts will frequently attempt to entice normal individuals to engage in perverted practices. This is particularly true in the case of young and impressionable people who might come under the influence of a pervert. Government officials

have the responsibility of keeping this type of corrosive influence out of the agencies under their control.  It is particularly important that the thousands of young men and women who are brought into Federal jobs not be subjected to that type of influence while in the service of the Government.  One homosexual can pollute a Government office.";

i.   Tr 395:6-25 (Chauncey: Like most outsider groups, there have been stereotypes associated with gay people; indeed, a range of groups, including medical professionals and religious groups, have worked in a coordinated way to develop stereotypical images of gay people.);

j.   Tr 397:2-6; Tr 397:25-398:5 (Chauncey: "[I]n some ways, the most dangerous stereotypes for homosexuals really developed between the 1930s and '50s, when there were a series of press and police campaigns that identified homosexuals as child molesters."  These press campaigns against assaults on children focused on sex perverts or sex deviants.  Through these campaigns, the homosexual emerged as a sex deviant.);

k.   PX2281 George Chauncey, The Postwar Sex Crime Panic, in William Graebner, ed, True Stories from the Past 160, 171 (McGraw-Hill 1993): Contains excerpts from wide-circulation Coronet Magazine, Fall 1950: "Once a man assumes the role of homosexual, he often throws off all moral restraints. * * * Some male sex deviants do not stop with infecting their often-innocent partners: they descended through perversions to other forms of depravity, such as drug addiction, burglary, sadism, and even murder.";

l.   Tr 400:18-401:8 (Chauncey: This excerpt from Coronet Magazine, PX2281 at 171, depicts homosexuals as subjects of moral decay.  In addition, there is a sense of homosexuality as a disease in which the carriers infect other people.  And the term "innocent" pretty clearly indicates that the authors are talking about children.);

m.   PX2281 Chauncey, The Postwar Sex Crime Panic, at 170-171: Contains a statement made by a Special Assistant Attorney General of California in 1949: "The sex pervert, in his more innocuous form, is too frequently regarded as merely a 'queer' individual who never hurts anyone but himself. * * * All too often we lose sight of the fact that the homosexual is an inveterate seducer of the young of both sexes * * * and is ever seeking for younger victims.";

n.   Tr 402:21-24 (Chauncey: These articles (in PX2281) were mostly addressed to adults who were understandably concerned about the safety of their children, and who "were being taught to believe that homosexuals posed a threat to their children.");

o.     Tr 407:8-408:4 (Chauncey: One of the most enduring
       legacies of the emergence of these stereotypes is the
       creation and then reenforcement of a series of demonic
       images of homosexuals that stay with us today.  This fear
       of homosexuals as child molesters or as recruiters
       continues to play a role in debates over gay rights, and
       with particular attention to gay teachers, parents and
       married couples —— people who might have close contact
       with children.);

p.     Tr 1035:13-1036:19 (Lamb: Social science studies have
       disproven the hypothesis that gays and lesbians are more
       likely to abuse children.).

77.  Religious beliefs that gay and lesbian relationships are

     sinful or inferior to heterosexual relationships harm gays and

     lesbians.

a.     PX2547 (Nathanson Nov 12, 2009 Dep Tr 102:3-8: Religions
       teach that homosexual relations are a sin and that
       contributes to gay bashing); PX2546 (video of same);

b.     PX2545 (Young Nov 13, 2009 Dep Tr 55:15-55:20,
       56:21-57:7: There is a religious component to the bigotry
       and prejudice against gay and lesbian individuals); see
       also id at 61:18-22, 62:13-17 (Catholic Church views
       homosexuality as "sinful."); PX2544 (video of same);

c.     Tr 1565:2-1566:6 (Segura: "[R]eligion is the chief
       obstacle for gay and lesbian political progress, and it's
       the chief obstacle for a couple of reasons. * * * [I]t's
       difficult to think of a more powerful social entity in
       American society than the church. * * * [I]t's a very
       powerful organization, and in large measure they are
       arrayed against the interests of gays and lesbians. * * *
       [B]iblical condemnation of homosexuality and the teaching
       that gays are morally inferior on a regular basis to a
       huge percentage of the public makes the * * * political
       opportunity structure very hostile to gay interests.
       It's very difficult to overcome that.");

d.     PX0390 Video, Ron Prentice Addressing Supporters of
       Proposition 8, Part I at 0:20-0:40: Prentice explains
       that "God has led the way" for the Protect Marriage
       campaign and at 4:00-4:30: Prentice explains that "we do
       mind" when same-sex couples want to take the name
       "marriage" and apply it to their relationships, because
       "that's not what God wanted. * * * It's real basic. * * *
       It starts at Genesis 2.";

e.     Tr 395:14-18 (Chauncey: Many clergy in churches
       considered homosexuality a sin, preached against it and
       have led campaigns against gay rights.);

f.   Tr 440:19-441:2 (Chauncey: The religious arguments that were mobilized in the 1950s to argue against interracial marriage and integration as against God's will are mirrored by arguments that have been mobilized in the Proposition 8 campaign and many of the campaigns since Anita Bryant's "Save Our Children" campaign, which argue that homosexuality itself or gay people or the recognition of their equality is against God's will.);

g.   PX2853 <u>Proposition 8 Local Exit Polls - Election Center 2008</u>, CNN at 8: 84 percent of people who attended church weekly voted in favor of Proposition 8;

h.   PX0005 Leaflet, James L Garlow, <u>The Ten Declarations For Protecting Biblical Marriage</u> at 1 (June 25, 2008): "The Bible defines marriage as a covenantal union of one male and one female. * * * We will avoid unproductive arguments with those who, through the use of casuistry and rationalization, revise biblical passages in order to condone the practice of homosexuality or other sexual sins.";

i.   PX0770 Congregation for the Doctrine of Faith, <u>Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons</u> at 2: "Sacred Scripture condemns homosexual acts as 'a serious depravity.'";

j.   PX0301 Catholics for the Common Good, <u>Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons, Excerpts from Vatican Document on Legal Recognition of Homosexual Unions</u> (Nov 22, 2009): There are absolutely no grounds for considering homosexual unions to be "in any way similar or even remotely analogous to God's plan for marriage and family"; "homosexual acts go against the natural moral law" and "[u]nder no circumstances can * * * be approved"; "[t]he homosexual inclination is * * * objectively disordered and homosexual practices are sins gravely contrary to chastity"; "[a]llowing children to be adopted by persons living in such unions would actually mean doing violence to these children"; and "legal recognition of homosexual unions * * * would mean * * * the approval of deviant behavior.";

k.   PX0168 Southern Baptist Convention, SBC Resolution, <u>On Same-Sex Marriage</u> at 1 (June 2003): "Legalizing 'same-sex marriage' would convey a societal approval of a homosexual lifestyle, which the Bible calls sinful and dangerous both to the individuals involved and to society at large.";

l.   PX0771 Southern Baptist Convention, <u>Resolution on President Clinton's Gay and Lesbian Pride Month Proclamation</u> (June 1999): "The Bible clearly teaches that

homosexual behavior is an abomination and shameful before God.";

m.  PX2839 Evangelical Presbyterian Church, <u>Position Paper on Homosexuality</u> at 3: "[H]omosexual practice is a distortion of the image of God as it is still reflected in fallen man, and a perversion of the sexual relationship as God intended it to be.";

n.  PX2840 <u>The Christian Life — Christian Conduct: As Regards the Institutions of God</u>, Free Methodist Church at 5: "Homosexual behavior, as all sexual deviation, is a perversion of God's created order.";

o.  PX2842 A L Barry, <u>What About * * * Homosexuality</u>, The Lutheran Church-Missouri Synod at 1: "The Lord teaches us through His Word that homosexuality is a sinful distortion of His desire that one man and one woman live together in marriage as husband and wife.";

p.  PX2844 <u>On Marriage, Family, Sexuality, and the Sanctity of Life</u>, Orthodox Church of America at 1: "Homosexuality is to be approached as the result of humanity's rebellion against God.";

q.  Tr 1566:18-22 (Segura: "[Proponents' expert] Dr Young freely admits that religious hostility to homosexuals [plays] an important role in creating a social climate that's conducive to hateful acts, to opposition to their interest in the public sphere and to prejudice and discrimination.");

r.  Tr 2676:8-2678:24 (Miller: Miller agrees with his former statement that "the religious characteristics of California's Democratic voters" explain why so many Democrats voted for Barack Obama and also for Proposition 8.).

78.  Stereotypes and misinformation have resulted in social and legal disadvantages for gays and lesbians.

a.  Tr 413:22-414:6 (Chauncey: The "Save Our Children" campaign in Dade County, Florida in 1977 was led by Anita Bryant, a famous Baptist singer.  It sought to overturn an enactment that added sexual orientation to an antidiscrimination law, and it drew on and revived earlier stereotypes of homosexuals as child molesters.);

b.  Tr 1554:14-19 (Segura: Ballot initiatives banning marriage equality have been passed in thirty-three states.);

c.   Tr 2608:16-18 (Miller: "My view is that at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.");

d.   Tr 538:15-539:10 (Chauncey: Chauncey is less optimistic now that same-sex marriage will become common in the United States than he was in 2004.  Since 2004, when Chauncey wrote <u>Why Marriage? The History Shaping Today's Debate over Gay Equality</u>, the majority of states have enacted legislation or constitutional amendments that would prohibit same-sex couples from marrying.  Some have been enacted by legislative vote, but a tremendous number of popular referenda have enacted these discriminatory measures.);

e.   Tr 424:18-23 (Chauncey: "[T]he wave of campaigns that we have seen against gay marriage rights in the last decade are, in effect, the latest stage and cycle of anti-gay rights campaigns of a sort that I have been describing; that they continue with a similar intent and use some of the same imagery.");

f.   Tr 412:20-413:1 (Chauncey: The series of initiatives we have seen since the mid-to-late 1970s over gay rights are another example of continuing prejudice and hostility.);

g.   Tr 564:4-16 (Chauncey: The term "the gay agenda" was mobilized particularly effectively in the late 1980s and early 1990s in support of initiatives designed to overturn gay rights laws.  The term tries to construct the idea of a unitary agenda and that picks up on long-standing stereotypes.);

h.   Tr 1560:22-1561:9 (Segura: "[T]he role of prejudice is profound. * * * [I]f the group is envisioned as being somehow * * * morally inferior, a threat to children, a threat to freedom, if there's these deeply-seated beliefs, then the range of compromise is dramatically limited.  It's very difficult to engage in the give-and-take of the legislative process when I think you are an inherently bad person.  That's just not the basis for compromise and negotiation in the political process.");

i.   Tr 1563:5-1564:21 (Segura: "[T]he American public is not very fond of gays and lesbians."  Warmness scores for gays and lesbians are as much as 16 to 20 points below the average score for religious, racial and ethnic groups; over 65 percent of respondents placed gays and lesbians below the midpoint, below the score of 50, whereas a third to 45 percent did the same for other groups.  When "two-thirds of all respondents are giving gays and lesbians a score below 50, that's telling elected officials that they can say bad things about gays and lesbians, and that could be politically advantageous

to them because * * * many parts of the electorate feel the same way."  Additionally, "the initiative process could be fertile ground to try to mobilize some of these voters to the polls for that cause.");

j.   PX0619 The Williams Institute, <u>Chapter 14: Other Indicia of Animus against LGBT People by State and Local Officials, 1980-Present</u> at 9 (2009): The Williams Institute collected negative comments made by politicians about gays and lesbians in all fifty states.  An Arizona state representative compared homosexuality to "bestiality, human sacrifice, and cannibalism."  A California state senator described homosexuality as "a sickness * * * an uncontrolled passion similar to that which would cause someone to rape.";

k.   PX0796 Kenneth P Miller, <u>The Democratic Coalition's Religious Divide: Why California Voters Supported Obama but Not Same-Sex Marriage,</u> 119 Revue Française d'Études Américaines 46, 52 (2009): "In the decade between 1998 and 2008, thirty states held statewide elections on state constitutional amendments defining marriage as a union between a man and a woman. * * * Voters approved marriage amendments in all thirty states where they were able to vote on the question, usually by large margins."

79.  The Proposition 8 campaign relied on fears that children exposed to the concept of same-sex marriage may become gay or lesbian.  The reason children need to be protected from same-sex marriage was never articulated in official campaign advertisements.  Nevertheless, the advertisements insinuated that learning about same-sex marriage could make a child gay or lesbian and that parents should dread having a gay or lesbian child.

a.   Tr 424:24-429:6 (Chauncey: Proposition 8 Official Voter Guide evoked fears about and contained stereotypical images of gay people.);

b.   PX0710 at RFA No 51: Attorney General admits that some of the advertising in favor of Proposition 8 was based on fear of and prejudice against homosexual men and women;

c.   Tr 2608:16-18 (Miller: "My view is that at least some people voted for Proposition 8 on the basis of anti-gay stereotypes and prejudice.");

d.  PX0577 Frank Schubert and Jeff Flint, <u>Passing Prop 8</u>, Politics at 45-47 (Feb 2009): "[P]assing Proposition 8 would depend on our ability to convince voters that same-sex marriage had broader implications for Californians and was not only about the two individuals involved in a committed gay relationship."  "We strongly believed that a campaign in favor of traditional marriage would not be enough to prevail."  "We probed long and hard in countless focus groups and surveys to explore reactions to a variety of consequences our issue experts identified" and they decided to create campaign messaging focusing on "how this new 'fundamental right' would be inculcated in young children through public schools."  "[T]here were limits to the degree of tolerance Californians would afford the gay community.  They would entertain allowing gay marriage, but not if doing so had significant implications for the rest of society."  "The Prop 8 victory proves something that readers of <u>Politics</u> magazine know very well: campaigns matter.";

e.  PX2150 Mailing leaflet, Protect Marriage: "[F]our activist judges on the Supreme Court in San Francisco ignored four million voters and imposed same-sex marriage on California.  Their ruling means it is no longer about 'tolerance.'  Acceptance of Gay Marriage is Now Mandatory.";

f.  PX0015 Video, <u>Finally the Truth</u>; PX0016 Video, <u>Have You Thought About It?</u>; and PX0091 Video, <u>Everything to Do With Schools</u>: Protect Marriage television ads threatening unarticulated consequences to children if Proposition 8 does not pass;

g.  PX0513 Letter from Tam to "friends": "This November, San Francisco voters will vote on a ballot to 'legalize prostitution.'  This is put forth by the SF city government, which is under the rule of homosexuals.  They lose no time in pushing the gay agenda ⸺ after legalizing same-sex marriage, they want to legalize prostitution.  What will be next?  On their agenda list is: legalize having sex with children * * * We can't lose this critical battle.  If we lose, this will very likely happen * * * 1. Same-Sex marriage will be a permanent law in California.  One by one, other states would fall into Satan's hand.  2. Every child, when growing up, would fantasize marrying someone of the same sex.  More children would become homosexuals.  Even if our children is safe, our grandchildren may not.  What about our children's grandchildren?  3. Gay activists would target the big churches and request to be married by their pastors.  If the church refuse, they would sue the church."  (as written);

h.  Tr 553:23-554:14 (Chauncey: Tam's "What If We Lose" letter is consistent in its tone with a much longer

history of anti-gay rhetoric.  It reproduces many of the major themes of the anti-gay rights campaigns of previous decades and a longer history of anti-gay discrimination.);

i.   PX0116 Video, Massachusetts Parents Oppose Same-Sex Marriage: Robb and Robin Wirthlin, Massachusetts parents, warn that redefining marriage has an impact on every level of society, especially on children, and claim that in Massachusetts homosexuality and gay marriage will soon be taught and promoted in every subject, including math, reading, social studies and spelling;

j.   Tr 530:24-531:11 (Chauncey: The Wirthlins' advertisement implies that the very exposure to the idea of homosexuality threatens children and threatens their sexual identity, as if homosexuality were a choice.  In addition, it suggests that the fact that gay people are being asked to be recognized and have their relationships recognized is an imposition on other people, as opposed to an extension of fundamental civil rights to gay and lesbian people.);

k.   PX0391 Ron Prentice Addressing Supporters of Proposition 8, Part II at 1:25-1:40: "It's all about education, and how it will be completely turned over, not just incrementally now, but whole hog to the other side.";

l.   Tr 1579:5-21 (Segura: "[O]ne of the enduring * * * tropes of anti-gay argumentation has been that gays are a threat to children. * * * [I]n the Prop 8 campaign [there] was a campaign advertisement saying, * * * 'At school today, I was told that I could marry a princess too.'  And the underlying message of that is that * * * if Prop 8 failed, the public schools are going to turn my daughter into a lesbian.");

m.   PX0015 Video, Finally the Truth; PX0099 Video, It's Already Happened; PX0116 Video, Massachusetts Parents Oppose Same-Sex Marriage; PX0401 Video, Tony Perkins, Miles McPherson and Ron Prentice Asking for Support of Proposition 8: Proposition 8 campaign videos focused on the need to protect children;

n.   PX0079 Asian American Empowerment Council, Asian American Community Newsletter & Voter Guide (Oct/Nov 2008): Children need to be protected from gays and lesbians;

o.   Tr 1913:17-1914:12 (Tam: Tam supported Proposition 8 because he thinks "it is very important that our children won't grow up to fantasize or think about, Should I marry Jane or John when I grow up?  Because this is very important for Asian families, the cultural issues, the stability of the family.");

p.   Tr 558:16-560:12 (Chauncey: Tam's deposition testimony displays the deep fear about the idea that simple exposure to homosexuality or to marriages of gay and lesbian couples would lead children to become gay. And the issue is not just marriage equality itself ─── it is sympathy to homosexuality. They oppose the idea that children could be introduced in school to the idea that there are gay people in the world. It is also consistent with the idea that homosexuality is a choice and there is an association between homosexuality and disease.);

q.   PX0480A Video supporting Proposition 8 at 0:58-1:12: Prentice states that "[i]f traditional marriage goes by the wayside, then in every public school, children will be indoctrinated with a message that is absolutely contrary to the values that their family is attempting to teach them at home."

80.   The campaign to pass Proposition 8 relied on stereotypes to show that same-sex relationships are inferior to opposite-sex relationships.

a.   Tr 429:15-430:8, 431:17-432:11, 436:25-437:15, 438:8-439:6, 529:25-531:11; PX0015 Video, Finally the Truth; PX0016 Video, Have You Thought About It?; PX0029 Video, Whether You Like It Or Not; PX0091 Video, Everything to Do With Schools; PX0099 Video, It's Already Happened; PX1775 Photo leaflet, Protect Marriage (black and white); PX1775A Photo leaflet, Protect Marriage (color); PX1763 Poster with Phone Number, Protect Marriage: (Chauncey: The campaign television and print ads focused on protecting children and the concern that people of faith and religious groups would somehow be harmed by the recognition of gay marriage. The campaign conveyed a message that gay people and relationships are inferior, that homosexuality is undesirable and that children need to be protected from exposure to gay people and their relationships. The most striking image is of the little girl who comes in to tell her mom that she learned that a princess can marry a princess, which strongly echoes the idea that mere exposure to gay people and their relationships is going to lead a generation of young people to become gay, which voters are to understand as undesirable. The campaign conveyed a message used in earlier campaigns that when gay people seek any recognition this is an imposition on other people rather than simply an extension of civil rights to gay people.);

b.   Compare above with Tr 412:23-413:1, 418:11-419:22, 420:3-20; PX1621 Pamphlet, Save Our Children; PX0864 Dudley Clendinen and Adam Nagourney, Out for Good: The Struggle to Build a Gay Rights Movement in America at 303

1   (Touchstone 1999): (Chauncey: One of the earliest
    anti-gay initiative campaigns used overt messaging of
2   content similar to the Proposition 8 campaign.);

3   c.   PX0008 Memorandum, Protect Marriage, New YouTube Video
         Clarifies Yes on 8 Proponents' Concerns: Education and
4        Protection of Children is [sic] at Risk (Oct 31, 2008);
         PX0025 Leaflet, Protect Marriage, Vote YES on Prop 8
5        (Barack Obama: "I'm not in favor of gay marriage
         * * *."); PX1565 News Release, Protect Marriage, First
6        Graders Taken to San Francisco City Hall for Gay Wedding
         (Oct 11, 2008): Proposition 8 campaign materials warn
7        that unless Proposition 8 passes, children will be
         exposed to indoctrination on gay lifestyles.  These
8        materials invoke fears about the gay agenda.

9

10                                 III

11                        CONCLUSIONS OF LAW[3]

12        Plaintiffs challenge Proposition 8 under the Due Process

13   and Equal Protection Clauses of the Fourteenth Amendment.  Each

14   challenge is independently meritorious, as Proposition 8 both

15   unconstitutionally burdens the exercise of the fundamental right to

16   marry and creates an irrational classification on the basis of

17   sexual orientation.

18

19   DUE PROCESS

20        The Due Process Clause provides that no "State [shall]

21   deprive any person of life, liberty, or property, without due

22   process of law."  US Const Amend XIV, § 1.  Due process protects

23   individuals against arbitrary governmental intrusion into life,

24   liberty or property.  See Washington v Glucksberg, 521 US 702, 719-

25   720 (1997).  When legislation burdens the exercise of a right

26   deemed to be fundamental, the government must show that the

27   _____

28   [3] To the extent any of the conclusions of law should more properly be considered
     findings of fact, they shall be deemed as such.

                                  109

United States District Court
For the Northern District of California

intrusion withstands strict scrutiny.  <u>Zablocki v Redhail</u>, 434 US
374, 388 (1978).

THE RIGHT TO MARRY PROTECTS AN INDIVIDUAL'S CHOICE OF MARITAL
PARTNER REGARDLESS OF GENDER

        The freedom to marry is recognized as a fundamental right
protected by the Due Process Clause.  See, for example, <u>Turner v
Safely</u>, 482 US 78, 95 (1987) ("[T]he decision to marry is a
fundamental right" and marriage is an "expression[ ] of emotional
support and public commitment."); <u>Zablocki</u>, 434 US at 384 (1978)
("The right to marry is of fundamental importance for all
individuals."); <u>Cleveland Board of Education v LaFleur</u>, 414 US 632,
639-40 (1974) ("This Court has long recognized that freedom of
personal choice in matters of marriage and family life is one of
the liberties protected by the Due Process Clause of the Fourteenth
Amendment."); <u>Loving v Virginia</u>, 388 US 1, 12 (1967) (The "freedom
to marry has long been recognized as one of the vital personal
rights essential to the orderly pursuit of happiness by free
men."); <u>Griswold v Connecticut</u>, 381 US 479, 486 (1965) ("Marriage
is a coming together for better or for worse, hopefully enduring,
and intimate to the degree of being sacred.  It is an association
that promotes a way of life, not causes; a harmony in living, not
political faiths; a bilateral loyalty, not commercial or social
projects.  Yet it is an association for as noble a purpose as any
involved in our prior decisions.").

        The parties do not dispute that the right to marry is
fundamental.  The question presented here is whether plaintiffs
seek to exercise the fundamental right to marry; or, because they

United States District Court
For the Northern District of California

are couples of the same sex, whether they seek recognition of a new
right.

To determine whether a right is fundamental under the Due
Process Clause, the court inquires into whether the right is rooted
"in our Nation's history, legal traditions, and practices."
Glucksberg, 521 US at 710.  Here, because the right to marry is
fundamental, the court looks to the evidence presented at trial to
determine: (1) the history, tradition and practice of marriage in
the United States; and (2) whether plaintiffs seek to exercise
their right to marry or seek to exercise some other right.  Id.

Marriage has retained certain characteristics throughout
the history of the United States.  See FF 19, 34-35.  Marriage
requires two parties to give their free consent to form a
relationship, which then forms the foundation of a household.  FF
20, 34.  The spouses must consent to support each other and any
dependents.  FF 34-35, 37.  The state regulates marriage because
marriage creates stable households, which in turn form the basis of
a stable, governable populace.  FF 35-37.  The state respects an
individual's choice to build a family with another and protects the
relationship because it is so central a part of an individual's
life.  See Bowers v Hardwick, 478 US 186, 204-205 (1986) (Blackmun,
J, dissenting).

Never has the state inquired into procreative capacity or
intent before issuing a marriage license; indeed, a marriage
license is more than a license to have procreative sexual
intercourse.  FF 21.  "[I]t would demean a married couple were it
to be said marriage is simply about the right to have sexual
intercourse."  Lawrence, 539 US at 567.  The Supreme Court

recognizes that, wholly apart from procreation, choice and privacy play a pivotal role in the marital relationship.  See <u>Griswold</u>, 381 US at 485-486.

Race restrictions on marital partners were once common in most states but are now seen as archaic, shameful or even bizarre. FF 23-25.  When the Supreme Court invalidated race restrictions in <u>Loving</u>, the definition of the right to marry did not change.  388 US at 12.  Instead, the Court recognized that race restrictions, despite their historical prevalence, stood in stark contrast to the concepts of liberty and choice inherent in the right to marry.  Id.

The marital bargain in California (along with other states) traditionally required that a woman's legal and economic identity be subsumed by her husband's upon marriage under the doctrine of coverture; this once-unquestioned aspect of marriage now is regarded as antithetical to the notion of marriage as a union of equals.  FF 26-27, 32.  As states moved to recognize the equality of the sexes, they eliminated laws and practices like coverture that had made gender a proxy for a spouse's role within a marriage.  FF 26-27, 32.  Marriage was thus transformed from a male-dominated institution into an institution recognizing men and women as equals.  Id.  Yet, individuals retained the right to marry; that right did not become different simply because the institution of marriage became compatible with gender equality.

The evidence at trial shows that marriage in the United States traditionally has not been open to same-sex couples.  The evidence suggests many reasons for this tradition of exclusion, including gender roles mandated through coverture, FF 26-27, social disapproval of same-sex relationships, FF 74, and the reality that

United States District Court
For the Northern District of California

the vast majority of people are heterosexual and have had no reason to challenge the restriction, FF 43.  The evidence shows that the movement of marriage away from a gendered institution and toward an institution free from state-mandated gender roles reflects an evolution in the understanding of gender rather than a change in marriage.  The evidence did not show any historical purpose for excluding same-sex couples from marriage, as states have never required spouses to have an ability or willingness to procreate in order to marry.  FF 21.  Rather, the exclusion exists as an artifact of a time when the genders were seen as having distinct roles in society and in marriage.  That time has passed.

The right to marry has been historically and remains the right to choose a spouse and, with mutual consent, join together and form a household.  FF 19-20, 34-35.  Race and gender restrictions shaped marriage during eras of race and gender inequality, but such restrictions were never part of the historical core of the institution of marriage.  FF 33.  Today, gender is not relevant to the state in determining spouses' obligations to each other and to their dependents.  Relative gender composition aside, same-sex couples are situated identically to opposite-sex couples in terms of their ability to perform the rights and obligations of marriage under California law.  FF 48.  Gender no longer forms an essential part of marriage; marriage under law is a union of equals.

Plaintiffs seek to have the state recognize their committed relationships, and plaintiffs' relationships are consistent with the core of the history, tradition and practice of marriage in the United States.  Perry and Stier seek to be spouses;

they seek the mutual obligation and honor that attend marriage, FF
52.  Zarrillo and Katami seek recognition from the state that their
union is "a coming together for better or for worse, hopefully
enduring, and intimate to the degree of being sacred."  <u>Griswold</u>,
381 US at 486.  Plaintiffs' unions encompass the historical purpose
and form of marriage.  Only the plaintiffs' genders relative to one
another prevent California from giving their relationships due
recognition.

Plaintiffs do not seek recognition of a new right.  To
characterize plaintiffs' objective as "the right to same-sex
marriage" would suggest that plaintiffs seek something different
from what opposite-sex couples across the state enjoy —— namely,
marriage.  Rather, plaintiffs ask California to recognize their
relationships for what they are: marriages.

**DOMESTIC PARTNERSHIPS DO NOT SATISFY CALIFORNIA'S OBLIGATION TO
ALLOW PLAINTIFFS TO MARRY**

Having determined that plaintiffs seek to exercise their
fundamental right to marry under the Due Process Clause, the court
must consider whether the availability of Registered Domestic
Partnerships fulfills California's due process obligation to same-
sex couples.  The evidence shows that domestic partnerships were
created as an alternative to marriage that distinguish same-sex
from opposite-sex couples.  FF 53-54; <u>In re Marriage Cases</u>, 183 P3d
384, 434 (Cal 2008) (One of the "core elements of th[e] fundamental
right [to marry] is the right of same-sex couples to have their
official family relationship accorded the same dignity, respect,
and stature as that accorded to all other officially recognized
family relationships."); id at 402, 434, 445 (By "reserving the

**United States District Court**
For the Northern District of California

historic and highly respected designation of marriage exclusively to opposite-sex couples while offering same-sex couples only the new and unfamiliar designation of domestic partnership," the state communicates the "official view that [same-sex couples'] committed relationships are of lesser stature than the comparable relationships of opposite-sex couples.").  Proponents do not dispute the "significant symbolic disparity between domestic partnership and marriage."  Doc #159-2 at 6.

California has created two separate and parallel institutions to provide couples with essentially the same rights and obligations.  Cal Fam Code § 297.5(a).  Domestic partnerships are not open to opposite-sex couples unless one partner is at least sixty-two years old.  Cal Fam Code § 297(b)(5)(B).  Apart from this limited exception —— created expressly to benefit those eligible for benefits under the Social Security Act —— the sole basis upon which California determines whether a couple receives the designation "married" or the designation "domestic partnership" is the sex of the spouses relative to one another.  Compare Cal Fam Code §§ 297-299.6 (domestic partnership) with §§ 300-536 (marriage).  No further inquiry into the couple or the couple's relationship is required or permitted.  Thus, California allows almost all opposite-sex couples only one option —— marriage —— and all same-sex couples only one option —— domestic partnership.  See id, FF 53-54.

The evidence shows that domestic partnerships do not fulfill California's due process obligation to plaintiffs for two reasons.  First, domestic partnerships are distinct from marriage and do not provide the same social meaning as marriage.  FF 53-54.

United States District Court
For the Northern District of California

Second, domestic partnerships were created specifically so that California could offer same-sex couples rights and benefits while explicitly withholding marriage from same-sex couples.  Id, Cal Fam Code § 297 (Gov Davis 2001 signing statement: "In California, a legal marriage is between a man and a woman. * * * This [domestic partnership] legislation does nothing to contradict or undermine the definition of a legal marriage.").

The evidence at trial shows that domestic partnerships exist solely to differentiate same-sex unions from marriages.  FF 53-54.  A domestic partnership is not a marriage; while domestic partnerships offer same-sex couples almost all of the rights and responsibilities associated with marriage, the evidence shows that the withholding of the designation "marriage" significantly disadvantages plaintiffs.  FF 52-54.  The record reflects that marriage is a culturally superior status compared to a domestic partnership.  FF 52.  California does not meet its due process obligation to allow plaintiffs to marry by offering them a substitute and inferior institution that denies marriage to same-sex couples.

PROPOSITION 8 IS UNCONSTITUTIONAL BECAUSE IT DENIES PLAINTIFFS A FUNDAMENTAL RIGHT WITHOUT A LEGITIMATE (MUCH LESS COMPELLING) REASON

Because plaintiffs seek to exercise their fundamental right to marry, their claim is subject to strict scrutiny.  Zablocki, 434 US at 388.  That the majority of California voters supported Proposition 8 is irrelevant, as "fundamental rights may not be submitted to [a] vote; they depend on the outcome of no elections."  West Virginia State Board of Education v Barnette, 319

United States District Court
For the Northern District of California

US 624, 638 (1943).  Under strict scrutiny, the state bears the burden of producing evidence to show that Proposition 8 is narrowly tailored to a compelling government interest.  <u>Carey v Population Services International</u>, 431 US 678, 686 (1977).  Because the government defendants declined to advance such arguments, proponents seized the role of asserting the existence of a compelling California interest in Proposition 8.

As explained in detail in the equal protection analysis, Proposition 8 cannot withstand rational basis review.  Still less can Proposition 8 survive the strict scrutiny required by plaintiffs' due process claim.  The minimal evidentiary presentation made by proponents does not meet the heavy burden of production necessary to show that Proposition 8 is narrowly tailored to a compelling government interest.  Proposition 8 cannot, therefore, withstand strict scrutiny.  Moreover, proponents do not assert that the availability of domestic partnerships satisfies plaintiffs' fundamental right to marry; proponents stipulated that "[t]here is a significant symbolic disparity between domestic partnership and marriage."  Doc #159-2 at 6.  Accordingly, Proposition 8 violates the Due Process Clause of the Fourteenth Amendment.

EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  US Const Amend XIV, § 1.  Equal protection is "a pledge of the protection of equal laws."  <u>Yick Wo v Hopkins</u>, 118 US 356, 369 (1886).  The guarantee

United States District Court

For the Northern District of California

of equal protection coexists, of course, with the reality that most legislation must classify for some purpose or another.  See Romer v Evans, 517 US 620, 631 (1996).  When a law creates a classification but neither targets a suspect class nor burdens a fundamental right, the court presumes the law is valid and will uphold it as long as it is rationally related to some legitimate government interest.  See, for example, Heller v Doe, 509 US 312, 319-320 (1993).

     The court defers to legislative (or in this case, popular) judgment if there is at least a debatable question whether the underlying basis for the classification is rational.  Minnesota v Clover Leaf Creamery Co, 449 US 456, 464 (1980).  Even under the most deferential standard of review, however, the court must "insist on knowing the relation between the classification adopted and the object to be attained."  Romer, 517 US at 632; Heller, 509 US at 321 (basis for a classification must "find some footing in the realities of the subject addressed by the legislation").  The court may look to evidence to determine whether the basis for the underlying debate is rational.  Plyler v Doe, 457 US 202, 228 (1982) (finding an asserted interest in preserving state resources by prohibiting undocumented children from attending public school to be irrational because "the available evidence suggests that illegal aliens underutilize public services, while contributing their labor to the local economy and tax money to the state fisc").  The search for a rational relationship, while quite deferential, "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  Romer, 517 US at 633.  The classification itself must be related to the purported

118

interest.  <u>Plyler</u>, 457 US at 220 ("It is difficult to conceive of a rational basis for penalizing [undocumented children] for their presence within the United States," despite the state's interest in preserving resources.).

Most laws subject to rational basis easily survive equal protection review, because a legitimate reason can nearly always be found for treating different groups in an unequal manner.  See <u>Romer</u>, 517 US at 633.  Yet, to survive rational basis review, a law must do more than disadvantage or otherwise harm a particular group.  <u>United States Department of Agriculture v Moreno</u>, 413 US 528, 534 (1973).

SEXUAL ORIENTATION OR SEX DISCRIMINATION

Plaintiffs challenge Proposition 8 as violating the Equal Protection Clause because Proposition 8 discriminates both on the basis of sex and on the basis of sexual orientation.  Sexual orientation discrimination can take the form of sex discrimination.  Here, for example, Perry is prohibited from marrying Stier, a woman, because Perry is a woman.  If Perry were a man, Proposition 8 would not prohibit the marriage.  Thus, Proposition 8 operates to restrict Perry's choice of marital partner because of her sex.  But Proposition 8 also operates to restrict Perry's choice of marital partner because of her sexual orientation; her desire to marry another woman arises only because she is a lesbian.

The evidence at trial shows that gays and lesbians experience discrimination based on unfounded stereotypes and prejudices specific to sexual orientation.  Gays and lesbians have historically been targeted for discrimination because of their

United States District Court

For the Northern District of California

119

United States District Court
For the Northern District of California

sexual orientation; that discrimination continues to the present. FF 74-76. As the case of Perry and the other plaintiffs illustrates, sex and sexual orientation are necessarily interrelated, as an individual's choice of romantic or intimate partner based on sex is a large part of what defines an individual's sexual orientation. See FF 42-43. Sexual orientation discrimination is thus a phenomenon distinct from, but related to, sex discrimination.

Proponents argue that Proposition 8 does not target gays and lesbians because its language does not refer to them. In so arguing, proponents seek to mask their own initiative. FF 57. Those who choose to marry someone of the opposite sex —— heterosexuals —— do not have their choice of marital partner restricted by Proposition 8. Those who would choose to marry someone of the same sex —— homosexuals —— have had their right to marry eliminated by an amendment to the state constitution. Homosexual conduct and identity together define what it means to be gay or lesbian. See FF 42-43. Indeed, homosexual conduct and attraction are constitutionally protected and integral parts of what makes someone gay or lesbian. Lawrence, 539 US at 579; FF 42-43; see also Christian Legal Society v Martinez, 561 US ___, 130 SCt 2971, No 08-1371 Slip Op at 23 ("Our decisions have declined to distinguish between status and conduct in [the context of sexual orientation].") (June 28, 2010) (citing Lawrence, 539 US at 583 (O'Connor, J, concurring)).

Proposition 8 targets gays and lesbians in a manner specific to their sexual orientation and, because of their relationship to one another, Proposition 8 targets them

specifically due to sex.  Having considered the evidence, the relationship between sex and sexual orientation and the fact that Proposition 8 eliminates a right only a gay man or a lesbian would exercise, the court determines that plaintiffs' equal protection claim is based on sexual orientation, but this claim is equivalent to a claim of discrimination based on sex.

STANDARD OF REVIEW

As presently explained in detail, the Equal Protection Clause renders Proposition 8 unconstitutional under any standard of review.  Accordingly, the court need not address the question whether laws classifying on the basis of sexual orientation should be subject to a heightened standard of review.

Although Proposition 8 fails to possess even a rational basis, the evidence presented at trial shows that gays and lesbians are the type of minority strict scrutiny was designed to protect. Massachusetts Board of Retirement v Murgia, 427 US 307, 313 (1976) (noting that strict scrutiny may be appropriate where a group has experienced a "'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities" (quoting San Antonio School District v Rodriguez, 411 US 1, 28 (1973)).  See FF 42-43, 46-48, 74-78.  Proponents admit that "same-sex sexual orientation does not result in any impairment in judgment or general social and vocational capabilities."  PX0707 at RFA No 21.

The court asked the parties to identify a difference between heterosexuals and homosexuals that the government might fairly need to take into account when crafting legislation.  Doc

United States District Court
For the Northern District of California

1   #677 at 8.  Proponents pointed only to a difference between same-

2   sex couples (who are incapable through sexual intercourse of

3   producing offspring biologically related to both parties) and

4   opposite-sex couples (some of whom are capable through sexual

5   intercourse of producing such offspring).  Doc #687 at 32-34.

6   Proponents did not, however, advance any reason why the government

7   may use sexual orientation as a proxy for fertility or why the

8   government may need to take into account fertility when

9   legislating.  Consider, by contrast, City of Cleburne v Cleburne

10  Living Center, 473 US 432, 444 (1985) (Legislation singling out a

11  class for differential treatment hinges upon a demonstration of

12  "real and undeniable differences" between the class and others);

13  see also United States v Virginia, 518 US 515, 533 (1996)

14  ("Physical differences between men and women * * * are enduring.").

15  No evidence at trial illuminated distinctions among lesbians, gay

16  men and heterosexuals amounting to "real and undeniable

17  differences" that the government might need to take into account in

18  legislating.

19          The trial record shows that strict scrutiny is the

20  appropriate standard of review to apply to legislative

21  classifications based on sexual orientation.  All classifications

22  based on sexual orientation appear suspect, as the evidence shows

23  that California would rarely, if ever, have a reason to categorize

24  individuals based on their sexual orientation.  FF 47.  Here,

25  however, strict scrutiny is unnecessary.  Proposition 8 fails to

26  survive even rational basis review.

27  \\

28  \\

United States District Court
For the Northern District of California

1  **PROPOSITION 8 DOES NOT SURVIVE RATIONAL BASIS**

2         Proposition 8 cannot withstand any level of scrutiny

3  under the Equal Protection Clause, as excluding same-sex couples

4  from marriage is simply not rationally related to a legitimate

5  state interest.  One example of a legitimate state interest in not

6  issuing marriage licenses to a particular group might be a scarcity

7  of marriage licenses or county officials to issue them.  But

8  marriage licenses in California are not a limited commodity, and

9  the existence of 18,000 same-sex married couples in California

10  shows that the state has the resources to allow both same-sex and

11  opposite-sex couples to wed.  See Background to Proposition 8

12  above.

13         Proponents put forth several rationales for Proposition

14  8, see Doc #605 at 12-15, which the court now examines in turn: (1)

15  reserving marriage as a union between a man and a woman and

16  excluding any other relationship from marriage; (2) proceeding with

17  caution when implementing social changes; (3) promoting opposite-

18  sex parenting over same-sex parenting; (4) protecting the freedom

19  of those who oppose marriage for same-sex couples; (5) treating

20  same-sex couples differently from opposite-sex couples; and (6) any

21  other conceivable interest.

22
23  **PURPORTED INTEREST #1: RESERVING MARRIAGE AS A UNION BETWEEN A MAN
   AND A WOMAN AND EXCLUDING ANY OTHER RELATIONSHIP**

24         Proponents first argue that Proposition 8 is rational

25  because it preserves: (1) "the traditional institution of marriage

26  as the union of a man and a woman"; (2) "the traditional social and

27  legal purposes, functions, and structure of marriage"; and (3) "the

28  traditional meaning of marriage as it has always been defined in

the English language." Doc #605 at 12-13. These interests relate
to maintaining the definition of marriage as the union of a man and
a woman for its own sake.

Tradition alone, however, cannot form a rational basis
for a law. Williams v Illinois, 399 US 235, 239 (1970). The
"ancient lineage" of a classification does not make it rational.
Heller, 509 US at 327. Rather, the state must have an interest
apart from the fact of the tradition itself.

The evidence shows that the tradition of restricting an
individual's choice of spouse based on gender does not rationally
further a state interest despite its "ancient lineage." Instead,
the evidence shows that the tradition of gender restrictions arose
when spouses were legally required to adhere to specific gender
roles. See FF 26-27. California has eliminated all legally-
mandated gender roles except the requirement that a marriage
consist of one man and one woman. FF 32. Proposition 8 thus
enshrines in the California Constitution a gender restriction that
the evidence shows to be nothing more than an artifact of a
foregone notion that men and women fulfill different roles in civic
life.

The tradition of restricting marriage to opposite-sex
couples does not further any state interest. Rather, the evidence
shows that Proposition 8 harms the state's interest in equality,
because it mandates that men and women be treated differently based
only on antiquated and discredited notions of gender. See FF 32,
57.

Proponents' argument that tradition prefers opposite-sex
couples to same-sex couples equates to the notion that opposite-sex

United States District Court

For the Northern District of California

relationships are simply better than same-sex relationships. Tradition alone cannot legitimate this purported interest. Plaintiffs presented evidence showing conclusively that the state has no interest in preferring opposite-sex couples to same-sex couples or in preferring heterosexuality to homosexuality.  See FF 48-50.  Moreover, the state cannot have an interest in disadvantaging an unpopular minority group simply because the group is unpopular.  <u>Moreno</u>, 413 US at 534.

        The evidence shows that the state advances nothing when it adheres to the tradition of excluding same-sex couples from marriage.  Proponents' asserted state interests in tradition are nothing more than tautologies and do not amount to rational bases for Proposition 8.

PURPORTED INTEREST #2: PROCEEDING WITH CAUTION WHEN IMPLEMENTING SOCIAL CHANGES

        Proponents next argue that Proposition 8 is related to state interests in: (1) "[a]cting incrementally and with caution when considering a radical transformation to the fundamental nature of a bedrock social institution"; (2) "[d]ecreasing the probability of weakening the institution of marriage"; (3) "[d]ecreasing the probability of adverse consequences that could result from weakening the institution of marriage"; and (4) "[d]ecreasing the probability of the potential adverse consequences of same-sex marriage."  Doc #605 at 13-14.

        Plaintiffs presented evidence at trial sufficient to rebut any claim that marriage for same-sex couples amounts to a sweeping social change.  See FF 55.  Instead, the evidence shows beyond debate that allowing same-sex couples to marry has at least

a neutral, if not a positive, effect on the institution of marriage and that same-sex couples' marriages would benefit the state.  Id.  Moreover, the evidence shows that the rights of those opposed to homosexuality or same-sex couples will remain unaffected if the state ceases to enforce Proposition 8.  FF 55, 62.

The contrary evidence proponents presented is not credible.  Indeed, proponents presented no reliable evidence that allowing same-sex couples to marry will have any negative effects on society or on the institution of marriage.  The process of allowing same-sex couples to marry is straightforward, and no evidence suggests that the state needs any significant lead time to integrate same-sex couples into marriage.  See Background to Proposition 8 above.  Consider, by contrast, Cooper v Aaron, 358 US 1, 7 (1958) (recognizing that a school district needed time to implement racial integration but nevertheless finding a delay unconstitutional because the school board's plan did not provide for "the earliest practicable completion of desegregation").  The evidence shows that allowing same-sex couples to marry will be simple for California to implement because it has already done so; no change need be phased in.  California need not restructure any institution to allow same-sex couples to marry.  See FF 55.

Because the evidence shows same-sex marriage has and will have no adverse effects on society or the institution of marriage, California has no interest in waiting and no practical need to wait to grant marriage licenses to same-sex couples.  Proposition 8 is thus not rationally related to proponents' purported interests in proceeding with caution when implementing social change.

\\

United States District Court
For the Northern District of California

**PURPORTED INTEREST #3: PROMOTING OPPOSITE-SEX PARENTING OVER SAME-SEX PARENTING**

Proponents' largest group of purported state interests relates to opposite-sex parents.  Proponents argue Proposition 8: (1) promotes "stability and responsibility in naturally procreative relationships"; (2) promotes "enduring and stable family structures for the responsible raising and care of children by their biological parents"; (3) increases "the probability that natural procreation will occur within stable, enduring, and supporting family structures"; (4) promotes "the natural and mutually beneficial bond between parents and their biological children"; (5) increases "the probability that each child will be raised by both of his or her biological parents"; (6) increases "the probability that each child will be raised by both a father and a mother"; and (7) increases "the probability that each child will have a legally recognized father and mother."  Doc #605 at 13-14.

The evidence supports two points which together show Proposition 8 does not advance any of the identified interests: (1) same-sex parents and opposite-sex parents are of equal quality, FF 69-73, and (2) Proposition 8 does not make it more likely that opposite-sex couples will marry and raise offspring biologically related to both parents, FF 43, 46, 51.

The evidence does not support a finding that California has an interest in preferring opposite-sex parents over same-sex parents.  Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant to children's developmental outcomes.  FF 70.  Moreover, Proposition 8 has nothing to do with children, as Proposition 8 simply prevents same-sex couples from marrying.  FF

United States District Court
For the Northern District of California

57.   Same-sex couples can have (or adopt) and raise children.   When
they do, they are treated identically to opposite-sex parents under
California law.   FF 49.   Even if California had an interest in
preferring opposite-sex parents to same-sex parents —— and the
evidence plainly shows that California does not —— Proposition 8 is
not rationally related to that interest, because Proposition 8 does
not affect who can or should become a parent under California law.
FF 49, 57.

To the extent California has an interest in encouraging
sexual activity to occur within marriage (a debatable proposition
in light of Lawrence, 539 US at 571) the evidence shows Proposition
8 to be detrimental to that interest.   Because of Proposition 8,
same-sex couples are not permitted to engage in sexual activity
within marriage.   FF 53.   Domestic partnerships, in which sexual
activity is apparently expected, are separate from marriage and
thus codify California's encouragement of non-marital sexual
activity.   Cal Fam Code §§ 297-299.6.   To the extent proponents
seek to encourage a norm that sexual activity occur within marriage
to ensure that reproduction occur within stable households,
Proposition 8 discourages that norm because it requires some sexual
activity and child-bearing and child-rearing to occur outside
marriage.

Proponents argue Proposition 8 advances a state interest
in encouraging the formation of stable households.   Instead, the
evidence shows that Proposition 8 undermines that state interest,
because same-sex households have become less stable by the passage
of Proposition 8.   The inability to marry denies same-sex couples
the benefits, including stability, attendant to marriage.   FF 50.

United States District Court
For the Northern District of California

Proponents failed to put forth any credible evidence that married opposite-sex households are made more stable through Proposition 8. FF 55. The only rational conclusion in light of the evidence is that Proposition 8 makes it less likely that California children will be raised in stable households. See FF 50, 56.

None of the interests put forth by proponents relating to parents and children is advanced by Proposition 8; instead, the evidence shows Proposition 8 disadvantages families and their children.

PURPORTED INTEREST #4: PROTECTING THE FREEDOM OF THOSE WHO OPPOSE MARRIAGE FOR SAME-SEX COUPLES

Proponents next argue that Proposition 8 protects the First Amendment freedom of those who disagree with allowing marriage for couples of the same sex. Proponents argue that Proposition 8: (1) preserves "the prerogative and responsibility of parents to provide for the ethical and moral development and education of their own children"; and (2) accommodates "the First Amendment rights of individuals and institutions that oppose same-sex marriage on religious or moral grounds." Doc #605 at 14.

These purported interests fail as a matter of law. Proposition 8 does not affect any First Amendment right or responsibility of parents to educate their children. See In re Marriage Cases, 183 P3d at 451-452. Californians are prevented from distinguishing between same-sex partners and opposite-sex spouses in public accommodations, as California antidiscrimination law requires identical treatment for same-sex unions and opposite-sex marriages. Koebke v Bernardo Heights Country Club, 115 P3d 1212, 1217-1218 (Cal 2005). The evidence shows that Proposition 8

United States District Court
For the Northern District of California

does nothing other than eliminate the right of same-sex couples to marry in California.  See FF 57, 62.  Proposition 8 is not rationally related to an interest in protecting the rights of those opposed to same-sex couples because, as a matter of law, Proposition 8 does not affect the rights of those opposed to homosexuality or to marriage for couples of the same sex.  FF 62.

To the extent proponents argue that one of the rights of those morally opposed to same-sex unions is the right to prevent same-sex couples from marrying, as explained presently those individuals' moral views are an insufficient basis upon which to enact a legislative classification.

**PURPORTED INTEREST #5: TREATING SAME-SEX COUPLES DIFFERENTLY FROM OPPOSITE-SEX COUPLES**

Proponents argue that Proposition 8 advances a state interest in treating same-sex couples differently from opposite-sex couples by: (1) "[u]sing different names for different things"; (2) "[m]aintaining the flexibility to separately address the needs of different types of relationships"; (3) "[e]nsuring that California marriages are recognized in other jurisdictions"; and (4) "[c]onforming California's definition of marriage to federal law." Doc #605 at 14.

Here, proponents assume a premise that the evidence thoroughly rebutted: rather than being different, same-sex and opposite-sex unions are, for all purposes relevant to California law, exactly the same.  FF 47-50.  The evidence shows conclusively that moral and religious views form the only basis for a belief that same-sex couples are different from opposite-sex couples.  See FF 48, 76-80.  The evidence fatally undermines any purported state

United States District Court
For the Northern District of California

interest in treating couples differently; thus, these interests do not provide a rational basis supporting Proposition 8.

In addition, proponents appear to claim that Proposition 8 advances a state interest in easing administrative burdens associated with issuing and recognizing marriage licenses.  Under precedents such as <u>Craig v Boren</u>, "administrative ease and convenience" are not important government objectives.  429 US 190, 198 (1976).  Even assuming the state were to have an interest in administrative convenience, Proposition 8 actually creates an administrative burden on California because California must maintain a parallel institution for same-sex couples to provide the equivalent rights and benefits afforded to married couples.  See FF 53.  Domestic partnerships create an institutional scheme that must be regulated separately from marriage.  Compare Cal Fam Code §§ 297-299.6 with Cal Fam Code §§ 300-536.  California may determine whether to retain domestic partnerships or eliminate them in the absence of Proposition 8; the court presumes, however, that as long as Proposition 8 is in effect, domestic partnerships and the accompanying administrative burden will remain.  Proposition 8 thus hinders rather than advances administrative convenience.

PURPORTED INTEREST #6: THE CATCHALL INTEREST

Finally, proponents assert that Proposition 8 advances "[a]ny other conceivable legitimate interests identified by the parties, amici, or the court at any stage of the proceedings."  Doc #605 at 15.  But proponents, amici and the court, despite ample opportunity and a full trial, have failed to identify any rational basis Proposition 8 could conceivably advance.  Proponents,

United States District Court

For the Northern District of California

represented by able and energetic counsel, developed a full trial record in support of Proposition 8.  The resulting evidence shows that Proposition 8 simply conflicts with the guarantees of the Fourteenth Amendment.

Many of the purported interests identified by proponents are nothing more than a fear or unarticulated dislike of same-sex couples.  Those interests that are legitimate are unrelated to the classification drawn by Proposition 8.  The evidence shows that, by every available metric, opposite-sex couples are not better than their same-sex counterparts; instead, as partners, parents and citizens, opposite-sex couples and same-sex couples are equal.  FF 47-50.  Proposition 8 violates the Equal Protection Clause because it does not treat them equally.

**A PRIVATE MORAL VIEW THAT SAME-SEX COUPLES ARE INFERIOR TO OPPOSITE-SEX COUPLES IS NOT A PROPER BASIS FOR LEGISLATION**

In the absence of a rational basis, what remains of proponents' case is an inference, amply supported by evidence in the record, that Proposition 8 was premised on the belief that same-sex couples simply are not as good as opposite-sex couples. FF 78-80.  Whether that belief is based on moral disapproval of homosexuality, animus towards gays and lesbians or simply a belief that a relationship between a man and a woman is inherently better than a relationship between two men or two women, this belief is not a proper basis on which to legislate.  See Romer, 517 US at 633; Moreno, 413 US at 534; Palmore v Sidoti, 466 US 429, 433 (1984) ("[T]he Constitution cannot control [private biases] but neither can it tolerate them.").

United States District Court

For the Northern District of California

1      The evidence shows that Proposition 8 was a hard-fought

2  campaign and that the majority of California voters supported the

3  initiative.  See Background to Proposition 8 above, FF 17-18, 79-

4  80.  The arguments surrounding Proposition 8 raise a question

5  similar to that addressed in Lawrence, when the Court asked whether

6  a majority of citizens could use the power of the state to enforce

7  "profound and deep convictions accepted as ethical and moral

8  principles" through the criminal code.  539 US at 571.  The

9  question here is whether California voters can enforce those same

10  principles through regulation of marriage licenses.  They cannot.

11  California's obligation is to treat its citizens equally, not to

12  "mandate [its] own moral code."  Id (citing Planned Parenthood of

13  Southeastern Pa v Casey, 505 US 833, 850, (1992)).  "[M]oral

14  disapproval, without any other asserted state interest," has never

15  been a rational basis for legislation.  Lawrence, 539 US at 582

16  (O'Connor, J, concurring).  Tradition alone cannot support

17  legislation.  See Williams, 399 US at 239; Romer, 517 US at 635;

18  Lawrence, 539 US at 579.

19      Proponents' purported rationales are nothing more than

20  post-hoc justifications.  While the Equal Protection Clause does

21  not prohibit post-hoc rationales, they must connect to the

22  classification drawn.  Here, the purported state interests fit so

23  poorly with Proposition 8 that they are irrational, as explained

24  above.  What is left is evidence that Proposition 8 enacts a moral

25  view that there is something "wrong" with same-sex couples.  See FF

26  78-80.

27      The evidence at trial regarding the campaign to pass

28  Proposition 8 uncloaks the most likely explanation for its passage:

a desire to advance the belief that opposite-sex couples are morally superior to same-sex couples.  FF 79-80.  The campaign relied heavily on negative stereotypes about gays and lesbians and focused on protecting children from inchoate threats vaguely associated with gays and lesbians.  FF 79-80; See PX0016 Video, Have You Thought About It? (video of a young girl asking whether the viewer has considered the consequences to her of Proposition 8 but not explaining what those consequences might be).

At trial, proponents' counsel attempted through cross-examination to show that the campaign wanted to protect children from learning about same-sex marriage in school.  See PX0390A Video, Ron Prentice Addressing Supporters of Proposition 8, Excerpt; Tr 132:25-133:3 (proponents' counsel to Katami: "But the fact is that what the Yes on 8 campaign was pointing at, is that kids would be taught about same-sex relationships in first and second grade; isn't that a fact, that that's what they were referring to?").  The evidence shows, however, that Proposition 8 played on a fear that exposure to homosexuality would turn children into homosexuals and that parents should dread having children who are not heterosexual.  FF 79; PX0099 Video, It's Already Happened (mother's expression of horror upon realizing her daughter now knows she can marry a princess).

The testimony of George Chauncey places the Protect Marriage campaign advertisements in historical context as echoing messages from previous campaigns to enact legal measures to disadvantage gays and lesbians.  FF 74, 77-80.  The Protect Marriage campaign advertisements ensured California voters had these previous fear-inducing messages in mind.  FF 80.  The

United States District Court
For the Northern District of California

evidence at trial shows those fears to be completely unfounded.  FF 47-49, 68-73, 76-80.

Moral disapproval alone is an improper basis on which to deny rights to gay men and lesbians.  The evidence shows conclusively that Proposition 8 enacts, without reason, a private moral view that same-sex couples are inferior to opposite-sex couples.  FF 76, 79-80; Romer, 517 US at 634 ("[L]aws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected.").  Because Proposition 8 disadvantages gays and lesbians without any rational justification, Proposition 8 violates the Equal Protection Clause of the Fourteenth Amendment.

CONCLUSION

Proposition 8 fails to advance any rational basis in singling out gay men and lesbians for denial of a marriage license. Indeed, the evidence shows Proposition 8 does nothing more than enshrine in the California Constitution the notion that opposite-sex couples are superior to same-sex couples.  Because California has no interest in discriminating against gay men and lesbians, and because Proposition 8 prevents California from fulfilling its constitutional obligation to provide marriages on an equal basis, the court concludes that Proposition 8 is unconstitutional.

\\

\\

\\

\\

\\

REMEDIES

Plaintiffs have demonstrated by overwhelming evidence that Proposition 8 violates their due process and equal protection rights and that they will continue to suffer these constitutional violations until state officials cease enforcement of Proposition 8. California is able to issue marriage licenses to same-sex couples, as it has already issued 18,000 marriage licenses to same-sex couples and has not suffered any demonstrated harm as a result, see FF 64-66; moreover, California officials have chosen not to defend Proposition 8 in these proceedings.

Because Proposition 8 is unconstitutional under both the Due Process and Equal Protection Clauses, the court orders entry of judgment permanently enjoining its enforcement; prohibiting the official defendants from applying or enforcing Proposition 8 and directing the official defendants that all persons under their control or supervision shall not apply or enforce Proposition 8. The clerk is DIRECTED to enter judgment without bond in favor of plaintiffs and plaintiff-intervenors and against defendants and defendant-intervenors pursuant to FRCP 58.

IT IS SO ORDERED.

VAUGHN R WALKER
United States District Chief Judge

136